IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ------------------------------------------------------------- x | |
| *In re* | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA |
| | : Title III |
| as representative of | : Case No. 17-BK-3283 (LTS) |
| | : (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : |
| | : |
| Debtors.[1] | : |
| ------------------------------------------------------------- x | |
| THE OFFICIAL COMMITTEE OF UNSECURED | : |
| CREDITORS OF THE COMMONWEALTH OF | : |
| PUERTO RICO, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO | : |
| | : |
| as representative of | : Adv. Proc. No. 17-00257-LTS |
| | : |
| THE COMMONWEALTH OF PUERTO RICO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BETTINA WHYTE, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO | : |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

DX-GG

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ------------------------------------------------------------ x | |
| *In re* | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA |
| | : Title III |
| as representative of | : Case No. 17-BK-3283 (LTS) |
| | : (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : |
| | : |
| Debtors.[1] | : |
| ------------------------------------------------------------ x | |
| THE OFFICIAL COMMITTEE OF UNSECURED | : |
| CREDITORS OF THE COMMONWEALTH OF | : |
| PUERTO RICO, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO | : |
| | : |
| as representative of | : Adv. Proc. No. 17-00257-LTS |
| | : |
| THE COMMONWEALTH OF PUERTO RICO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BETTINA WHYTE, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : |
| MANAGEMENT BOARD FOR PUERTO RICO | : |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

|  | : |
| as representative of | : |
|  | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|  | : |
| Defendant. | : |

--------------------------------------------------------------- x

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN FURTHER SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT BY THE COFINA AGENT

Pursuant to Local Civil Rule for the U.S. District Court for the District of Puerto Rico 56(b), Bettina M. Whyte (the "**COFINA Agent**"), in her capacity as the appointed agent of the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") as representative of the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), respectfully submits the following statement of material facts as to which there is no genuine issue to be tried ("**Statement of Undisputed Facts**") in support of her motion for summary judgment on all outstanding claims in this adversary proceeding, filed contemporaneously with and in support of this Statement of Undisputed Facts.  Exhibits cited herein are annexed to the declaration of Antonio Yanez, Jr. dated February 21, 2018.

1.  In 2006, the Commonwealth was experiencing a severe financial crisis.

   a.  Answer and Defenses of Commonwealth Agent to COFINA Agent's Second Amended Counterclaims [Dkt. No. 286] (the "**CW Agent Answer**") ¶ 2 ("[T]he Commonwealth Agent admits that, in 2006, the Commonwealth faced a severe financial crisis that led to a near complete shutdown of its government.").

   b.  Act No. 91 of May 13, 2006 (codified as amended at P.R. Laws Ann. tit. 13, § 12) ("**Act 91**"), Statement of Motives ("During the past decades, the Government of Puerto Rico has been contracting debts to finance its operation without succeeding in identifying effective methods for their repayment.  The current amounts of this extraconstitutional debt have substantially affected government credit. This situation turned more severe during fiscal year 2005-2006, when government expenses once again surpassed revenues, thus creating the government crisis that afflicts the Island at present and which led to layoffs for over 95,000 government employees.").

2.     The 2006 financial crisis resulted in a near complete shutdown of the government

of Puerto Rico.

    a.  CW Agent Answer ¶ 2 ("[T]he Commonwealth Agent admits that, in 2006, the
        Commonwealth faced a severe financial crisis that led to a near complete shutdown
        of its government.").

3.     The 2006 financial crisis left tens of thousands of public employees out of work

and hundreds of thousands of children without school.

    a.  CW Agent Answer ¶ 14 (admitting that, as a result of the financial crisis, "[n]early
        100,000 public employees were left without pay and 500,000 children were left
        without school. The government shutdown affected Puerto Rico's entire economy,
        with restaurants, shops, and other industries reporting significant drops in business
        as government employees struggled to get by without their salaries.") (quoting
        Second Amended Answer, Defenses, and Counterclaims of the Appointed Agent
        of the Puerto Rico Sales Tax Financing Corporation (COFINA) [Dkt. 269], ¶ 14).

    b.  Ex. 34 (Remarks of Alfredo Salazar, Chairman and President of the Government
        Development Bank for Puerto Rico, Goldman Sachs Government Development
        Bank for Puerto Rico Investor Conference Call, May 16, 2006, at 2) ▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮.

4.     On May 13, 2006, Act 91 was passed in response to the 2006 financial crisis

creating the Urgent Interest Fund.

    a.  CW Agent Answer ¶ 15 ("[T]he Commonwealth Agent admits that, in response to
        the financial crisis, the Legislative Assembly passed Act 91 of May 13, 2006.").

    b.  Act 91, Statement of Motives ("In order to address said situation and as part of a
        number of legislative measures approved to dispel said crisis, the Urgent Interest
        Fund is hereby created as a special fund, the moneys of which shall be used to cover
        the deficit thus generated, as well as other government obligations and debts that
        seriously affect the credit of the Government of Puerto Rico.").

5.      On December 26, 2006, Act 291 authorized the creation of the Puerto Rico Urgent
Interest Fund Corporation as a subsidiary of the Development Bank of Puerto Rico ("**G.D.B.**").

    a.  Act 291 § 1 ("[T]he Puerto Rico Urgent Interest Fund Corporation [is] a subsidiary
        of the Government Development Bank for Puerto Rico . . . .").

    b.  CW Agent Answer ¶ 16 ("[T]he Commonwealth Agent admits that the Legislative
        Assembly authorized the creation of the Urgent Interest Fund Corporation as a
        subsidiary of the GDB on December 26, 2006.").

    c.  Second Amended Complaint ("**2d. Am. Compl.**") [Dkt. No. 221], ¶ 27 ("The
        amendments to Act 91 . . . [c]reated COFINA as a purportedly independent public
        corporation 'attached' to the GDB (in lieu of a previously authorized subsidiary of
        the GDB called the 'Urgent Interest Fund Corporation').").

6.      Act 56 established the English name of the Urgent Interest Fund as the "Dedicated
Sales Tax Fund."

    a.  Act No. 56-2007 of July 5, 2007, (codified as amended P.R. Laws Ann. tit. 13, §§
        11a-16 ("**Act 56**") § 2 ("A special fund is hereby created . . . whose name in English
        shall be Dedicated Sales Tax Fund . . . .").

7.      Act No. 117-2006 of July 4, 2006 ("**Act 117**") imposed a new sales and use tax.

    a.  Act 117 § 2401 ("A tax on every sales transaction of a taxable item in Puerto Rico
        shall be imposed, collected and paid.").

    b.  2d Am. Compl. ¶ 16 ("The SUT is a general sales and use tax applicable to a wide
        range of goods and services.  Pursuant to Act No. 117 of July 4, 2006, the
        Commonwealth imposed the SUT for the first time, effective November 1, 2006,
        at a rate of 5.5% . . . .").

8.      Act 91 was amended by Act 56 to mandate that a portion of the proceeds from that
sales tax (the "Pledged Sales Tax") be deposited in the Dedicated Sales Tax Fund.

    a.  Act 91 (as amended), § 3 ("A special fund is hereby created . . . whose name in
        English shall be 'Dedicated Sales Tax Fund,' to be administered by the GDB.  [The
        Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date
        of this Act and all the future funds that must be deposited in [the Dedicated Sales
        Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall
        be the property of COFINA. . . .  [The Dedicated Sales Tax Fund] shall be funded
        each fiscal year from the following sources . . . [including a specified amount of]
        [t]he first revenues of the sales and use tax . . . .").

    b. Act 56 § 2 ("A special fund is hereby created . . . whose name in English shall be Dedicated Sales Tax Fund, to be administered by the GDB . . . . The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this this law are hereby transferred to, and shall be the property of COFINA. . . . The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

9.     On July 5, 2007, Act 91 was amended by Act 56 to create the Urgent Interest Fund Corporation as Corporación del Fondo de Interés Apremiante ("COFINA"), whose name in English is Puerto Rico Sales Tax Financing Corporation.

    a. Act 56 § 1 ("A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the Corporación del Fondo de Interés Apremiante de Puerto Rico ('COFINA'), whose name in English shall be Puerto Rico Sales Tax Financing Corporation.").

    b. CW Agent Answer ¶ 16 ("The Commonwealth Agent further admits that, on July 5, 2007, the Legislative Assembly amended the law so that the Urgent Interest Fund Corporation was renamed 'COFINA' . . . .").

10.    COFINA is a corporate and political entity that is independent and separate from the Commonwealth of Puerto Rico.

    a. Act 56 § 1 ("A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the Corporación del Fondo de Interés Apremiante de Puerto Rico ('COFINA'), whose name in English shall be Puerto Rico Sales Tax Financing Corporation.")

    b. CW Agent Answer ¶ 16 ("The Commonwealth Agent further admits that, on July 5, 2007, the Legislative Assembly amended the law so that the Urgent Interest Fund Corporation was renamed 'COFINA' and would not be a subsidiary of the GDB but purportedly 'a corporate and political entity independent and separate from the Commonwealth.'").

    c. 2d Am. Compl. ¶¶ 6, 12, 27 ("The amendments to Act 91 . . . [c]reated COFINA as a purportedly independent public corporation 'attached' to the GDB . . . .").

    d. *Stipulation and Order*, Adv. Proc. No. 17-133-LTS [Dkt. No. 421], Statement of Facts of AAFAF, the Commonwealth of Puerto Rico, and COFINA, Ex. A at ¶ 2

("COFINA is an 'independent governmental instrumentality of the Commonwealth.'").

11.     On July 5, 2007, the Pledged Sales Tax and the Dedicated Sales Tax Fund were

transferred to COFINA.

a.  Act 56 § 2 (The "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of, COFINA. . . .  The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

b.  Act No. 1-2009 of Jan. 14, 2009 § 2 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. . . .  The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

c.  Act No. 7-2009 of Mar. 9, 2009 § 50 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. . . .  The [Dedicated Sales Tax Fund] shall be [funded] each fiscal year from the following sources . . . [including a specified portion of] [t]he first collections of the sales and use tax . . . .").

d.  Act No. 18-2009 of May 22, 2009 § 2 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. . . .  The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

e.  Act No. 116-2013 of Oct. 10, 2013 § 2 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("[The Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. . . .  The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

- 6 -

f. Act No. 101-2015 of July 1, 2015 § 1 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("[The Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in [the Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. . . . The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the following sources . . . [including a specified amount of] [t]he first revenues of the sales and use tax . . . .").

g. 2d Am. Compl. ¶ 42 ("In 2007, Act 91 was amended to provide that '[t]he [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the **future funds** that must be deposited in the [Dedicated Sales Tax Fund] . . . are hereby transferred to, and shall be the property of COFINA.'") (emphasis in original).

12. The Legislative Assembly intended that COFINA would own the Pledged Sales Tax and the Dedicated Sales Tax Fund.

a. Act 56, Statement of Motives ("It is the intention of this Legislature to increase the amount of funds that are deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Act No. 91 so that they be used to pay the extraconstitutional debt, that they be owned by COFINA until such time as the extraconstitutional debt outstanding as of June 30, 2006 has been paid, and that such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose, including for purposes of Section 8 of Article VI of the Constitution.").

13. Act 56, which established COFINA and transferred the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA, was passed with the support of both political parties of the Commonwealth of Puerto Rico.

a. CW Agent Answer ¶ 22 ("[T]he Commonwealth Agent admits that the legislation creating the COFINA structure passed with bipartisan support.").

b. Ex. 48 (Remarks of José Coleman of the Government Development Bank, Conference Call about COFINA Legal Opinions, at 12-13 (Oct. 31, 2013)) ("Yeah and something, you know, to add, you know, the person who asked the question is correct that both Puerto Rico's main political parties have been in power when COFINA legislation has been successfully passed and that, you know . . . and we see that with all the . . . with the Secretary of Justice's [opinions]. In fact the COFINA [program] was created by the administration of then Governor Aníbal Acevedo Vilá, who was Governor from 2005 to 2008. And this is done in collaboration with a then PNP 'statehood controlled' legislature. In other words, the COFINA program has really been bipartisan since its inception. As many people know, this is a very ra[r]e and precious thing in Puerto Rico. As people well know, the PNP affiliated Fortuño administration implemented the largest expansion

- 7 -

of the COFINA program during the 2009-2012 term. The current PDP administration legislated a new, more limited expansion to the COFINA program.").

  c. Ex. 5 (Eva Lloréns Vélez, *Puerto Rico Legislative Leaders Back Local Bondholders*, Caribbean Business (Mar. 9, 2017)) (House Speaker Carlos Méndez explained, "[COFINA] was created in a legal fashion with the support of all political parties in a unanimous way").

14. The Commonwealth represented to rating agencies that COFINA owns the Pledged Sales Tax and the Dedicated Sales Tax Fund.

  a. Act 56 § 2 (The "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA.").

  b. Ex. 36 (Rating Agency Presentation: Commonwealth of Puerto Rico: Puerto Rico Sales Tax Financing Corporation at 27 (June 15, 2007)) ████████████████ ████████████████████████████████████████████████ .

  c. Ex. 3 (Memorandum from Citigroup Global Markets to F. Batlle re: Roadmap for COFINA I Ratings Upgrade to "AA" Category at 2 (Feb. 18, 2009) ████████ ████████████████████████████████████████████ .

  d. Ex. 48 (Transcript of GBD Conference Call re: COFINA Legal Opinions at 2 (Oct. 31, 2013) (José Pagán, Interim President of the GDB: "COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth.")).

  e. Ex. 44 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, Rating Evaluation Service Presentation at 3 (Sept. 13, 2013)) ████████████████████████████████████████████ .

  f. Ex. 45 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, Updated Rating Evaluation Service Presentation at 3 (Sept. 20, 2013) ██████████████████████████████████████ ████████████████████████████████████████████████ .

  g. Ex. 46 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, Moody's Rating Evaluation Service Presentation at 4

- 8 -

(Sept. 25, 2013) ███████████████████████████████████
███████████████████████████████████████████████████ .

    h.  Ex. 33 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds,
Junior Lien, Moody's Indicative Rating Presentation at 3 (undated) ██████████
███████████████████████████████████████████████████████

15.    COFINA has issued four types of bonds currently outstanding ("**COFINA**

**Bonds**"):  (a) senior "current interest" bonds; (b) senior "capital appreciation" bonds; (c)

subordinate "current interest" bonds; and (d) subordinate "capital appreciation" bonds.

    a.  Ex. 2 (Puerto Rico Sales Tax Financing Corporation Amended and Restated Sales
Tax Revenue Bond Resolution adopted July 13, 2007, as amended on June 10,
2009) (the "**Bond Resolution**") (denoting types of COFINA Bonds).

    b.  Ex. 18 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds,
Senior Series 2011C at 20 (December 1, 2011)) ██████████████████████████
██████████████████████████████████████████████ .

    c.  Ex. 12 (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds,
First Subordinate Series 2009B at 16 (June 19, 2009) ("The Series 2009B Bonds
will be issued as current interest bonds (the 'Current Interest Bonds'), capital
appreciation bonds (the 'Capital Appreciation Bonds'), and convertible capital
appreciation bonds (the 'Convertible Capital Appreciation Bonds').").

16.    The COFINA Bonds were issued pursuant to the Amended and Restated Sales Tax

Revenue Bond Resolution, a contract among COFINA, the Bank of New York Mellon (as trustee),

the COFINA bondholders, and certain other beneficiaries.

    a.  *See generally* Ex. 2 (Bond Resolution).

17.    The COFINA Bonds were not issued by the Commonwealth.

    a.  Ex. 2 (Bond Resolution § 201) █████████████████████████████████
█████████████████████████████████████ .

18.    The COFINA Bonds are not backed by a pledge of the full faith and credit of the

Commonwealth.

      a.    CW Agent Answer ¶ 23 ("The Commonwealth Agent further admits that the
           COFINA Bonds are not backed by a pledge of the full faith and credit of the
           Commonwealth.").

      b.    Ex. 2 (Bond Resolution § 201) ███████████████████████████████████
           █████████████████.

      c.    Act 56 § 3 ("The bonds and other obligations of COFINA shall not constitute a debt
           or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities.
           Neither the Commonwealth of Puerto Rico nor its other public instrumentalities
           shall be responsible for the payment of such bonds or other obligations, for which
           the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall
           not be pledged.").

19.    The Commonwealth and COFINA represented to investors that COFINA owns the

Pledged Sales Tax and the Dedicated Sales Tax Fund.

      a.    Act 56 § 2 (The "[Dedicated Sales Tax Fund] and all the funds deposited therein
           on the effective date of this act and all the future funds that must be deposited in
           the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby
           transferred to, and shall be the property of COFINA.").

      b.    Ex. 38 (Investor Presentation: Commonwealth of Puerto Rico: Puerto Rico Sales
           Tax Financing Corporation (COFINA) at 17 (June 25, 2007)) ███████████████
           ███████████████████████████████████████████████████

      c.    Ex. 41 (Puerto Rico Sales Tax Financing Corporation: Sales Tax Revenue Bonds,
           First Subordinate Series 2009A: Investor Presentation at 12 (June 2009)) ████████
           ███████████████████████████████████████████████████.

      d.    Ex. 43 (Puerto Rico Sales Tax Financing Corporation: Sales Tax Revenue Bonds,
           First Subordinate Series 2011 A & B: Sales Tax Revenue Bonds, Senior Series
           2011 C & D: Investor Presentation at 18 (Nov. 14, 2011)) ████████████████████
           ███████████████████████████████████████████████████.

      e.    Ex. 47 (The Commonwealth of Puerto Rico: Update on Fiscal and Economic
           Progress FY 2014 Q1 Investor Webcast at 63 (Oct. 15, 2013)) ("Law 91-2006,
           which created COFINA, transferred ownership of a portion of the Sales Tax to

COFINA and provided that any transferred portion was not 'available resources' under the Constitutional provisions relating to full faith and credit bonds.").

20.    The Commonwealth represented to investors of general obligation bonds ("**GO Bonds**") that COFINA owns the Pledged Sales Tax and the Dedicated Sales Tax Fund.

    a.  Act 56 § 2 (The "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA.").

    b.  Ex. 19 (Commonwealth of Puerto Rico, Tax and Revenue Anticipation Notes, Series 2008, Official Statement at 3 (Oct. 18, 2007)) ("[The Pledged Sales Tax] is deposited by the Secretary of the Treasury upon receipt into the [Dedicated Sales Tax Fund], which is held and owned by [COFINA] separate and apart from the Commonwealth's General Fund.  Amounts on deposit in the [Dedicated Sales Tax Fund] are applied to the payment of debt issued by [COFINA] to refinance the above extra constitutional debt outstanding.").

    c.  Ex. 24 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 B at 14, I-37 (Nov. 4, 2009)) ("Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute 'available resources' of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary.  As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. . . .  [T]he portion of the Sales Tax . . . allocated to COFINA is also not included as internal revenues consistent with the legislation creating [COFINA], which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not 'available resources' under the Constitutional provisions relating to the Bonds.").

    d.  Ex. 25 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009C (General Obligation Bonds) at 14 (Dec. 3, 2009)) ("[T]he portion of the Sales Tax . . . allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not 'available resources' under the Constitutional provisions relating to the Bonds.").

    e.  Ex. 29 (Commonwealth of Puerto Rico, Public Improvement Bonds of 2011 and Public Improvement Refunding Bonds, Series 2011 D and 2011 E (General Obligation Bonds) at 20-21 (July 11, 2011)) ("[T]he portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. . . .  In addition, the portion of the sales and use tax

allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt.").

21. The Commonwealth represented to investors in GO Bonds that the proceeds from the Pledged Sales Tax were not available to service general obligation debt.

    a. Act 56 § 2 (The "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of, COFINA.").

    b. Ex. 20 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008 A and 2008 B (General Obligation Bonds) at 29, I-42 (May 7, 2008)) ("[T]he portion of the sales tax allocated to [COFINA] is . . . not 'available resources' under the Constitutional provisions relating to the Bonds.").

    c. Ex. 21 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008 C at 16, I-42 (May 7, 2008)) ("[T]he portion of the sales tax allocated to [COFINA] is . . . not 'available resources' under the Constitutional provisions relating to the Bonds.").

    d. Ex. 22 (Commonwealth of Puerto Rico, Public Improvement Bonds of 2008, Series A (General Obligation Bonds) at 12, I-41 (Sept. 5, 2008)) ("[T]he portion of the sales tax allocated to [COFINA] is . . . not 'available resources' under the Constitutional provisions relating to the Bonds.").

    e. Ex. 23 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 A (General Obligation Bonds) at 12 (Sept. 11, 2009)) ("[T]he portion of the Sales Tax allocated to COFINA is . . . not 'available resources' under the Constitutional provisions relating to the Bonds.).

    f. Ex. 26 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds) at 18, 19 (Feb. 10, 2011)) ("Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute 'available Commonwealth resources' of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. . . . [T]he portion of the sales and use tax allocated to COFINA is . . . not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt.").

g. Ex. 30 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012 A (General Obligation Bonds) at 13, 14 (Mar. 7, 2012)) ("[T]he portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. . . . In addition, the portion of the sales and use tax allocated to COFINA is . . . not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt.").

h. Ex. 31 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012 B (General Obligation Bonds) at 12, 13 (Mar. 7, 2012)) ("[T]he portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. . . . In addition, the portion of the sales and use tax allocated to COFINA is . . . not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt.").

i. Ex. 32 (Commonwealth of Puerto Rico, General Obligation Bonds of 2014, Series A, Official Statement at 29, 31 (Mar. 11, 2014)) ███████████████████████

22.    COFINA raised more than $16 billion by issuing bonds to investors.

a. CW Agent Answer ¶ 5 ("[T]he Commonwealth Agent admits that, in the last decade, investors have purchased over $16 billion of COFINA Bonds."), ¶ 25 ("[T]he Commonwealth Agent admits that the issuance of COFINA Bonds generated more than $16 billion in proceeds.").

23.    Puerto Rican and mainland investors purchased approximately $4.5 billion in COFINA Bonds in 2007, $740 million in 2008, $5.5 billion in 2009, $3.6 billion in 2010, and $1.9 billion in 2011.

a. CW Agent Answer ¶ 25 ("The Commonwealth Agent further admits that investors purchased approximately $4.5 billion in COFINA Bonds in 2007 and approximately another $740 million in 2008. The Commonwealth Agent further admits that, between 2009 and 2011, additional COFINA Bonds were sold to investors, both in Puerto Rico and off the island.").

b. Ex. 6 (COFINA, Sales Tax Revenue Bonds, Series 2007 A (July 13, 2007)) (issuing $2,667,603,572.60 of bonds).

c. Ex. 7 (COFINA, Sales Tax Revenue Bonds, Series 2007 B (July 17, 2007)) (issuing $1,333,101,779.90 of bonds).

d. Ex. 8 (COFINA, Sales Tax Revenue Bonds, Series 2007 C (Dec. 18, 2007)) (issuing $499,996,621.90 of bonds).

e. Ex. 9 (COFINA, Sales Tax Revenue Bonds, Series 2008 A (June 25, 2008)) (issuing $737,046,992.35 of bonds)

f. Ex. 10 (COFINA , Sales Tax Revenue Bonds, First Subordinate Series 2009 A (June 10, 2009)) (issuing $4,118,153,700 of bonds).

g. Ex. 11 (COFINA, Sales Tax Revenue Bonds, Senior Series 2009 C (June 10, 2009)) (issuing $237,875,000 of bonds).

h. Ex. 12 (COFINA, Sales Tax Revenue Bonds, First Subordinate Series 2009 B (June 19, 2009)) (issuing $1,217,915,779.20 of bonds).

i. Ex. 13 (COFINA, Sales Tax Revenue Bonds, First Subordinate Series 2010 A (Jan. 28, 2010)) (issuing $1,823,757,271.30 of bonds).

j. Ex. 14 (COFINA, Sales Tax Revenue Bonds, First Subordinate Series 2010 C (June 24, 2010)) (issuing $1,619,404,596.60 of bonds).

k. Ex. 15 (COFINA, Sales Tax Revenue Bonds,  First Subordinate Series 2010 D and 2010 E (June 24, 2010)) (issuing $182,190,000 of bonds).

l. Ex. 16 (COFINA, Sales Tax Revenue Bonds, First Subordinate Series 2011 A (Nov. 16, 2011)) (issuing $734,795,573.95 of bonds).

m. Ex. 17 (COFINA, Sales Tax Revenue Bonds, First Subordinate Series 2011 B (Nov. 16, 2011)) (issuing $45,620,000 of bonds).

n. Ex. 18 (COFINA, Sales Tax Revenue Bonds, Senior Series 2011 C (Dec. 1, 2011)) (issuing $1,006,474,702 of bonds).

o. Ex. 18 (COFINA, Sales Tax Revenue Bonds, Senior Series 2011 D (Dec. 1, 2011)) (issuing $91,155,000 of bonds).

24. The COFINA Bonds represent the most widely-held investment by Puerto Rican retirees and retail investors.

a. Ex. 51 (Commonwealth Fiscal Plan, Oct. 14, 2016 at 71) (chart demonstrating that COFINA has the largest amount of local holdings).

b. CW Agent Answer ¶ 60 ("[T]he Commonwealth Agent admits that some COFINA Bonds are held by Puerto Rico retirees and retail investors.").

25. Financing using the COFINA Bonds has saved the Commonwealth between $1.1 and $2.2 billion in borrowing costs on the $16 billion of COFINA bonds issued to date.

  a. Ex. 4 (Press Release, *Treasury Secretary and Interim GDB President Announce Amendments to COFINA Act that Will Facilitate More Cost-effective Financing for the Commonwealth*, PRNewswire, Sept. 25, 2013) (available at: https://www.prnewswire.com/news-releases/treasury-secretary-and-interim-gdb-president-announce-amendments-to-cofina-act-that-will-facilitate-more-cost-effective-financing-for-the-commonwealth-225219522.html) (estimating "between $66 million and $132 million [of savings] for every $1 billion issued in bonds.").

26. In the decade since COFINA's creation, in addition to the representations contained within Act 91 and its subsequent amendments, the Commonwealth has repeatedly stated on at least 35 different occasions that the Pledged Sales Tax and the Dedicated Sales Tax Fund were transferred to, and are the property of, COFINA.

  a. Ex. 1 (Catalogue of Select Commonwealth Admissions Reaffirming COFINA's Ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund).

27. Secretaries of Justice serving three different administrations have all issued legal opinions concluding that COFINA is the owner of the Pledged Sales Tax and the Dedicated Sales Tax Fund.

  a. Ex. 52 (Letter from Roberto J. Sánchez Ramos, Department of Justice, to Alfredo Salazar, Chairman, COFINA, Consulta Núm. 06-63-B ¶ 3 (July 31, 2007))

  b. Ex. 53 (Letter from Antonio M. Sagardía de Jesús, Secretary of Justice, to Carlos M. García Rodríguez, President and Chairman of the Board of Directors, Consulta Núm. 09-198-A ¶ 4 (May 28, 2009))

- 15 -

c. Ex. 54 (Letter from Antonio M. Sagardía de Jesús, Secretary of Justice, to Carlos M. García Rodríguez, President and Chairman of the Board of Directors, Consulta Núm. 09-233-A ¶ 4 (June 18, 2009)) (same).

d. Ex. 55 (Letter from Antonio M. Sagardía de Jesús, Secretary of Justice, to Carlos M. García Rodríguez, President and Chairman of the Board of Directors, Consulta Núm. 09-10-B ¶ 4 (July 23, 2009)) (same).

e. Ex. 56 (Letter from Guillermo A. Somoza Colombani, Secretary of Justice, to Carlos M. García Rodríguez, President and Chairman of the Board of Directors, Consulta Núm. 10-175-A ¶ 4 (Feb. 9, 2010)) (same).

f. Ex. 57 (Letter from Guillermo A. Somoza Colombani, Secretary of Justice, to Juan Carlos Batlle, President and Vice-Chairman of the Board of Directors, Inquiry No. 11-137-B ¶ 4 (Nov. 23, 2011)) (same).

g. Ex. 58 (Letter from Guillermo A. Somoza Colombani, to Juan Carlos Batlle, President and Vice-Chairman of the Board, Inquiry No. 11-145-B ¶ 4 (Dec. 13, 2011)) (same).

h. Ex. 59 (Letter from Rafael Ortiz Carrión, Acting Attorney General, to Javier Ferrer, President, Inquiry No. 13-151-A ¶ 4 (Apr. 30, 2013)) (same).

i. *Stipulation and Order*, Adv. Proc. No. 17-133-LTS [Dkt. No. 421] containing Statement of Facts of AAFAF, the Commonwealth of Puerto Rico, and COFINA, Ex. A at ¶ 3 ("On July 31, 2007, Jun 18, 2009, February 9, 2010, June 30, 2010, November 23, 2011, and December 13, 2011 the Secretary of Justice of the Commonwealth issued official opinions regarding the validity of the COFINA structure and the COFINA Bonds.").

28. In connection with each issuance of COFINA Bonds, COFINA obtained a legal opinion that it provided to investors concluding that, under Acts 91 and each of its amendments, COFINA owns the Pledged Sales Tax and the Dedicated Sales Tax Fund, which serves as security for the COFINA Bonds.

a. Ex. 60 (Opinion Letter of Fiddler Gonzalez & Rodriguez, P.S.C. at 1, ¶ 6 (July 31, 2007))



- 16 -

    b.   Ex. 60 (Opinion Letter of Hawkins Delafield & Wood LLP at 1-2 (July 31, 2007))



    c.   Ex. 63 (Opinion Letter of Hawkins Delafield & Wood LLP at 1 (June 18, 2009)) ("Pursuant to Act No. 91 of May 13, 2006, as amended ('Act 91'), the Corporation was created as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, and such portion of the sales and use tax (including the additional portions designated in amendments to Act 91), and the right to receive the same (referred to herein and in the Resolution as the 'Pledged Sales Tax'), were by the terms of Act 91 made the property of the Corporation, and not the property of the Commonwealth Treasury, in consideration for provision by the Corporation of bond proceeds and other funds to be applied for the various purposes stated in Act 91.").

    d.   Ex. 62 (Opinion Letter of Jorge A. Rivera, Esq., Puerto Rico Sales Tax Financing Corporation General Counsel at 1 (May 28, 2009))



    e.   Ex. 61 (Opinion Letter of Pietrantoni Mendez & Alvarez LLC at 1-2, 6, 8 (May 28, 2009))



f.  Ex. 64 (Opinion Letter of Pietrantoni Mendez & Alvarez LLC at 1 (June 18, 2009)) (same).

g.  Ex. 65 (Opinion Letter of Pietrantoni, Mendez & Alvarez LLC at 1 (June 25, 2009))



h.  Ex. 71 (Opinion Letter of Pietrantoni, Mendez & Alvarez LLC at 1 (Dec. 13, 2011)) ("Pursuant to the provisions of Act 91 and the Resolution, the Offered Bonds are primarily secured by a security interest granted by the Corporation in receipts of a portion (and the right to receive the same) of the sales and use tax imposed by the Commonwealth.  Such portion of the sales and use tax and the right to receive the same (referred to herein collectively as the 'Pledged Sales Tax'), are by the terms of Act 91 made the property of the Corporation.").

i.  Ex. 72 (Opinion Letter of Pietrantoni, Mendez & Alvarez LLC at 1 (Apr. 30, 2013))



j.    Ex. 66 (Opinion Letter of O'Neill & Borges at 1, 3 (June 25, 2009))



k.    Ex. 67 (Opinion Letter of Nixon Peabody at 1, 10-11 (Feb. 9, 2010))



l.    Ex. 68 (Opinion Letter of Nixon Peabody at 1, 10-11 (June 30, 2010)) (same).

m.   Ex. 69 (Opinion Letter of Nixon Peabody at 1, 10-11 (Nov. 23, 2011) (same).

n.    Ex. 70 (Opinion Letter of Nixon Peabody at 1, 10-11 (Dec. 13, 2011)) (same).

29.     Puerto Rico has been borrowing to finance its deficits since at least 1970.

   a.   Ex. 73 (Commonwealth of Puerto Rico Moody's Historical Ratings) (showing ratings on bonds first began in 1970).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------ x

*In re*                                                            :
                                                                   :
THE FINANCIAL OVERSIGHT AND                                        :
MANAGEMENT BOARD FOR PUERTO RICO,                                  :     PROMESA
                                                                   :     Title III
        as representative of                                       :     Case No. 17-BK-3283 (LTS)
                                                                   :     (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICO *et al.*,                          :
                                                                   :
        Debtors.[1]                                                :
------------------------------------------------------------------ x

THE OFFICIAL COMMITTEE OF UNSECURED                                :
CREDITORS OF THE COMMONWEALTH OF                                   :
PUERTO RICO,                                                       :
                                                                   :
                                                                   :
        as agent of                                                :
                                                                   :
THE FINANCIAL OVERSIGHT AND                                        :
MANAGEMENT BOARD FOR PUERTO RICO                                   :
                                                                   :
        as representative of                                       :     Adv. Proc. No. 17-00257-LTS
                                                                   :
THE COMMONWEALTH OF PUERTO RICO,                                   :
                                                                   :
        Plaintiff,                                                 :
                                                                   :
v.                                                                 :
                                                                   :
BETTINA WHYTE,                                                     :
                                                                   :
        as agent of                                                :
                                                                   :
THE FINANCIAL OVERSIGHT AND                                        :
MANAGEMENT BOARD FOR PUERTO RICO                                   :
                                                                   :

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

|     |     |
| --- | --- |
| as representative of | : |
|     | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|     | : |
| Defendant. | : |

----------------------------------------------------------------- x

## DECLARATION OF ANTONIO YANEZ, JR.

Antonio Yanez, Jr., pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of the bar of the State of New York and am admitted *pro hac vice* to practice before the United States District Court for the District of Puerto Rico.  I am a partner with the law firm of Willkie Farr & Gallagher LLP, counsel to Bettina M. Whyte (the "**COFINA Agent**"), in her capacity as the appointed agent of the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") as representative of the Puerto Rico Sales Tax Financing Corporation ("**COFINA**") in the above-captioned action.

2.      I submit this declaration in support of the COFINA Agent's Motion for Summary Judgment and accompanying papers, filed contemporaneously with this declaration.

3.      Annexed hereto as **Exhibit 1** is a Catalogue of Select Commonwealth Admissions Reaffirming COFINA's Ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund.  All documents cited within Exhibit 1 are annexed to this declaration as exhibits.

4.      Annexed hereto as **Exhibit 2** is a true and correct copy of the Puerto Rico Sales Tax Financing Corporation, Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 10, 2009, among COFINA, the Bank of New York Mellon (as trustee), the COFINA bondholders, and certain other beneficiaries.  Exhibit 2 was produced in this action by Nixon Peabody LLP, and bears Bates numbers NP004429 through NP004517.

5. Annexed hereto as **Exhibit 3** is a true and correct copy of a Memorandum from Citigroup Global Markets Inc. to Fernando L. Batlle, Executive Vice President, Director Financing and Treasury *et al*., with a subject of Roadmap for COFINA I Ratings Upgrade to 'AA' Category, dated February 18, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0355710 through PR-CCD-0355712.

6. Attached hereto as **Exhibit 4** is a true and correct copy of a news article published by PRNewswire, titled *Treasury Secretary and Interim GDB President Announce Amendments to COFINA Act that Will Facilitate More Cost-effective Financing for the Commonwealth*, dated September 25, 2013, and available publicly online at https://www.prnewswire.com/news-releases/treasury-secretary-and-interim-gdb-president-announce-amendments-to-cofina-act-that-will-facilitate-more-cost-effective-financing-for-the-commonwealth-225219522.html.

7. Annexed hereto as **Exhibit 5** is a true and correct copy of a news article published by Caribbean Business, written by Eva Lloréns Vélez, titled *Puerto Rico Legislative Leaders Back Local Bondholders*, dated March 9, 2017, and available publicly online at http://caribbeanbusiness.com/puerto-rico-legislative-leaders-back-local-creditors-of-public-debt/.

8. Attached hereto as **Exhibit 6** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A, dated July 13, 2007, produced in this action by the Puerto Rico Fiscal Agency & Financial Advisory Authority ("**AAFAF**"), and bearing Bates numbers PR-INT-000005245 through PR-INT-000005479.

9. Attached hereto as **Exhibit 7** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007B, dated

July 17, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0010888 through PR-CCD-0010998.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007C, dated December 18, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0006499 through PR-CCD-0006598.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2008A, dated June 25, 2008, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000007388 through PR-INT-000007492.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A, dated June 10, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000010916 through PR-INT-000011071.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of the Supplement to Official Statement, dated June 10, 2009, relating to the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A, and the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Senior Series 2009C, dated June 10, 2009, produced in this action by The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of the Commonwealth of Puerto Rico, in this action, and bearing Bates numbers CWPR_00003642 through CWPR_00003649.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate

Series 2009B, dated June 19, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0009366 through PR-CCD-0009515.

15. Attached hereto as **Exhibit 13** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010A, dated January 28, 2010, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000012709 through PR-INT-000012855.

16. Attached hereto as **Exhibit 14** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010C, dated June 24, 2010, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000014055 through PR-INT-000014340.

17. Attached hereto as **Exhibit 15** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E, dated June 24, 2010, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0011145 through PR-CCD-0011287.

18. Attached hereto as **Exhibit 16** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2011A, dated November 16, 2011, produced in this action by Citigroup Global Markets, Inc., and bearing Bates numbers COFINA-C-001482 through COFINA-C-001637.

19. Attached hereto as **Exhibit 17** is a true and correct copy of the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2011B, dated November 16, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0006344 through PR-CCD-0006498.

20.     Attached hereto as **Exhibit 18** is a true and correct copy of the Supplement to Certain Official Statements of Puerto Rico Sales Tax Financing Corporation Relating to Sales Tax Revenue Bonds, Senior Series 2011C, Senior Series 2011D, First Subordinate Series 2011A, and First Subordinate Series 2011B, dated December 7, 2011, and the Official Statement of the Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Senior Series 2011C, dated December 1, 2011, produced in this action by Citigroup Global Markets, Inc., and bearing Bates numbers COFINA-C-002076 through COFINA-C-002229.

21.     Attached hereto as **Exhibit 19** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Tax and Revenue Anticipation Notes, Series 2008, dated October 18, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0010726 through PR-CCD-0010764.

22.     Attached hereto as **Exhibit 20** is a true and correct copy of the Supplement, dated May 7, 2008, to Official Statement, dated April 25, 2008, relating to the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008A and Public Improvement Refunding Bonds, Series 2008B, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0006788 through PR-CCD-0007161.

23.     Attached hereto as **Exhibit 21** is a true and correct copy of the Supplement, dated May 7, 2008, to Official Statement, dated April 25, 2008, relating to the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008C, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0007162 through PR-CCD-0007300.

24.     Attached hereto as **Exhibit 22** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Bonds of 2008, Series A, dated

September 5, 2008, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0009527 through PR-CCD-0009865.

25.     Attached hereto as **Exhibit 23** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009A, dated September 11, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0007774 through PR-CCD-0007907.

26.     Attached hereto as **Exhibit 24** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009B, dated November 4, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0005157 through PR-CCD-0005303.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009C, dated December 3, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0010542 through PR-CCD-0010584.

28.     Attached hereto as **Exhibit 26** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2011A, dated February 10, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0005451 through PR-CCD-0005629.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2011C, dated March 10, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0005630 through PR-CCD-0005808.

30. Attached hereto as **Exhibit 28** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Bonds of 2011, Public Improvement Refunding Bonds, Series 2011D, and Public Improvement Refunding Bonds Series 2011E, dated June 29, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0026056 through PR-CCD-0026245.

31. Attached hereto as **Exhibit 29** is a true and correct copy of the Supplement to Official Statement dated June 29, 2011 relating to the Commonwealth of Puerto Rico Public Improvement Bonds of 2011, Public Improvement Refunding Bonds, Series 2011D, and Public Improvement Refunding Bonds Series 2011E, supplement dated July 11, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0005884 through PR-CCD-0006073.

32. Attached hereto as **Exhibit 30** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012A, dated March 7, 2012, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0010172 through PR-CCD-0010358.

33. Attached hereto as **Exhibit 31** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012B, dated March 7, 2012, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0010359 through PR-CCD-0010541.

34. Attached hereto as **Exhibit 32** is a true and correct copy of the Official Statement of the Commonwealth of Puerto Rico, General Obligation Bonds of 2014, Series A, dated March 11, 2014, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000009750 through PR-INT-000010001.

35.     Attached hereto as **Exhibit 33** is a true and correct copy of a presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien, Moody's Indicative Rating Presentation, undated, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0405132 through PR-CCD-0405169.

36.     Attached hereto as **Exhibit 34** is a true and correct copy of a transcript from the Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call, dated May 16, 2006, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0060626 through PR-CCD-0060665.

37.     Attached hereto as **Exhibit 35** is a true and correct copy of a presentation to Financial Guarantors by the Commonwealth of Puerto Rico, titled Sales Tax Financing Corporation, dated June 14, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0054681 through PR-CCD-54715.

38.     Attached hereto as **Exhibit 36** is a true and correct copy of a rating agency presentation, titled Commonwealth of Puerto Rico, Puerto Rico Sales Tax Financing Corporation, dated June 15, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0041921 through PR-CCD-0041956.

39.     Attached hereto as **Exhibit 37** is a true and correct copy of the Estado Libre Asociado de Puerto Rico, Programa de Financiamiento del IVU (COFINA), dated June 25, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0058663 through PR-CCD-0058686.

40.     Attached hereto as **Exhibit 38** is a true and correct copy of an Investor Presentation by the Commonwealth of Puerto Rico, titled Puerto Rico Sales Tax Financing Corporation

(COFINA), dated June 25, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0079158 through PR-CCD-0079181.

41. Attached hereto as **Exhibit 39** is a true and correct copy of a presentation by the Commonwealth of Puerto Rico, titled Puerto Rico Sales Tax Financing Corporation (COFINA), Sales Tax Revenue Bonds, Series 2007A, dated July 2007, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0054550 through PR-CCD-0054574.

42. Attached hereto as **Exhibit 40** is a true and correct copy of the Treasury Department of the Commonwealth of Puerto Rico, Due Diligence Questions, dated April 24, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0054043 through PR-CCD-0054094.

43. Attached hereto as **Exhibit 41** is a true and correct copy of a presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A, dated June 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0356299 through PR-CCD-0356325.

44. Attached hereto as **Exhibit 42** is a true and correct copy of a memorandum from the Government Development Bank for Puerto Rico, Commonwealth of Puerto Rico, titled Allowance for Loan Losses, dated June 30, 2010, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0074504 through PR-CCD-0074551.

45. Attached hereto as **Exhibit 43** is a true and correct copy of an investor presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2011A & B, Sales Tax Revenue Bonds, Senior Series 2011C & D, dated November 14, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0048991 through PR-CCD-0049021.

46.     Attached hereto as **Exhibit 44** is a true and correct copy of a presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, Rating Evaluation Service Presentation, dated September 13, 2013, produced in this action by Nixon Peabody LLP, and bearing Bates numbers NP 008281 through NP 008320.

47.     Attached hereto as **Exhibit 45** is a true and correct copy of a presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, *Updated* Rating Evaluation Service Presentation, dated September 20, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0211191 through PR-CCD-0211230.

48.      Attached hereto as **Exhibit 46** is a true and correct copy of a presentation titled Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013A, Moody's Rating Evaluation Service Presentation, dated September 25, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0374059 through PR-CCD-0374104.

49.     Attached hereto as **Exhibit 47** is a true and correct copy of an Investor Webcast, titled The Commonwealth of Puerto Rico, Update on Fiscal and Economic Progress, FY 2014 Q1 Investor Webcast, dated October 15, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0448379 through PR-CCD-0448451.

50.     Attached hereto as **Exhibit 48** is a true and correct copy of a transcript of the Government Development Bank for Puerto Rico Investor's Conference Call, dated October 31, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0374039 through PR-CCD-0374054.

51.     Attached hereto as **Exhibit 49** is a true and correct copy of a press release from the Government Development Bank for Puerto Rico, Commonwealth of Puerto Rico, titled Government Development Bank for Puerto Rico Comments on Conference Call About COFINA

Legal Opinions, dated October 31, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0374055 through PR-CCD-0374056.

52.     Attached hereto as **Exhibit 50** is a true and correct copy of the Commonwealth of Puerto Rico Liquidity Update, dated March 26, 2015, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0364534 through PR-CCD-0364632.

53.     Attached hereto as **Exhibit 51** is a true and correct copy of the Commonwealth of Puerto Rico Fiscal Plan, dated October 14, 2016, produced in this action by the Department of the Treasury of Puerto Rico, and bearing Bates numbers PR-CCD-0556832 through PR-CCD-0556931.

54.     Attached hereto as **Exhibit 52** is a true and correct copy of an official letter of Roberto J. Sánchez Ramos, Secretary of Justice, Consulta Núm. 06-63-B, dated July 31, 2007, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000010262 through PR-INT-000010263.

55.     Attached hereto as **Exhibit 53** is a true and correct copy of an official letter of Antonio M. Sagardía de Jesús, Secretary of Justice, Consulta Núm. 09-198-A, dated May 28, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0426126 through PR-CCD-0426128.

56.     Attached hereto as **Exhibit 54** is a true and correct copy of an official letter of Antonio M. Sagardía de Jesús, Secretary of Justice, Consulta Núm. 09-233-A, dated June 18, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000011699 through PR-INT-000011701.

57.     Attached hereto as **Exhibit 55** is a true and correct copy of an official letter of Antonio M. Sagardía de Jesús, Secretary of Justice, Consulta Núm. 09-10-B, dated July 23, 2009,

produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0168434 through PR-CCD-0168436.

58.     Attached hereto as **Exhibit 56** is a true and correct copy of an official letter of Guillermo A. Somoza Colombani, Secretary of Justice, Consulta Núm. 10-175-A, dated February 9, 2010 produced in this action by Moody's Investor Services, Inc., and bearing Bates numbers MDYS COMMONWEALTH 006963 through MDYS COMMONWEALTH 006965.

59.     Attached hereto as **Exhibit 57** is a true and correct copy of an official letter of Guillermo A. Somoza Colombani, Secretary of Justice, Inquiry No. 11-137-B, dated November 23, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0406795 through  PR-CCD-0406797.

60.     Attached hereto as **Exhibit 58** is a true and correct copy of an official letter of Guillermo A. Somoza Colombani, Secretary of Justice, Inquiry No. 11-145-B, dated December 13, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000018899 through  PR-INT-000018901.

61.     Attached hereto as **Exhibit 59** is a true and correct copy of an official letter of Rafael Ortiz Carrión, Secretary of Justice, Inquiry No. 13-151-A, dated April 30, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0339891 through PR-CCD-0339893.

62.     Attached hereto as **Exhibit 60** is a true and correct copy of a document produced in this action by AAFAF bearing Bates numbers PR-CCD-0099899 through PR-CCD-0099913. The document contains legal opinions from Fiddler González & Rodríguez, PS.C., dated July 31, 2007, located at Bates range PR-CCD-0099908 through PR-CCD-0099913, and from Hawkins

- 13 -

Delafield & Wood LLP, dated July 31, 2007, located at Bates range PR-CCD-0099901 through PR-CCD-0099907.

63.    Attached hereto as **Exhibit 61** is a true and correct copy of a legal opinion from Pietrantoni Méndez & Alvarez LLP, dated May 28, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0433318 through PR-CCD-0433327.

64.    Attached hereto as **Exhibit 62** is a true and correct copy of a legal opinion from Jorge A. Rivera, Esq., General Counsel, Government Development Bank for Puerto Rico, Commonwealth of Puerto Rico, dated May 28, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0433685 through PR-CCD-0433689.

65.    Attached hereto as **Exhibit 63** is a true and correct copy of a legal opinion from Hawkins Delafield & Wood LLP, dated June 18, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000020410 through PR-INT-000020416.

66.    Attached hereto as **Exhibit 64** is a true and correct copy of a legal opinion from Pietrantoni Méndez & Alvarez LLP, dated June 18, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0432475 through PR-CCD-0432491.  This specific legal opinion is located at Bates range PR-CCD-0432482 through PR-CCD-0432491.

67.    Attached hereto as **Exhibit 65** is a true and correct copy of a legal opinion from Pietrantoni Méndez & Alvarez LLP, dated June 25, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0406836 through PR-CCD-0406846.

68.    Attached hereto as **Exhibit 66** is a true and correct copy of a legal opinion from O'Neill & Borges, dated June 25, 2009, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0406811 through PR-CCD-0406823.

69.    Attached hereto as **Exhibit 67** is a true and correct copy of a legal opinion from Nixon Peabody LLP, dated February 9, 2010, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000013457 through PR-INT-000013478.

70.    Attached hereto as **Exhibit 68** is a true and correct copy of a legal opinion from Nixon Peabody LLP, dated June 30, 2010 produced in this action by AAFAF, and bearing Bates numbers PR-INT-000015649 through PR-INT-000015680.

71.    Attached hereto as **Exhibit 69** is a true and correct copy of a legal opinion from Nixon Peabody LLP, dated November 23, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000017322 through PR-INT-000017344.

72.    Attached hereto as **Exhibit 70** is a true and correct copy of a letter from Nixon Peabody LLP, dated October 22, 2013, to Puerto Rico Sales Tax Financing Corporation, attaching a legal opinion from Nixon Peabody LLP, dated December 13, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0405640 through PR-CCD-0405652.

73.    Attached hereto as **Exhibit 71** is a true and correct copy of a letter from Pietrantoni Méndez & Alvarez LLP, dated October 22, 2013, to Puerto Rico Sales Tax Financing Corporation, attaching a legal opinion from Pietrantoni Méndez & Alvarez LLP, dated December 13, 2011, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0405455 through PR-CCD-0405465.  The opinion can be found at Bates number PR-CCD-0405456.

74.    Attached hereto as **Exhibit 72** is a true and correct copy of a legal opinion from Pietrantoni Méndez & Alvarez LLP, dated April 30, 2013, produced in this action by AAFAF, and bearing Bates numbers PR-INT-000019143 through PR-INT-000019152.

75.    Attached hereto as **Exhibit 73** is a true and correct copy of an undated document titled Commonwealth of Puerto Rico Moody's Historical Rating, produced in this action by AAFAF, and bearing Bates numbers PR-CCD-0009349 through PR-CCD-0009350.

76.    Attached hereto as **Exhibit 74** is a true and correct copy of an opinion by Moody's Investor Service, titled Moody's Assigns A1 Rating and Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, dated June 27, 2007, produced in this action by Moody's Investor Services, Inc., bearing Bates numbers MDYS PUERTO RICO 000001 through MDYS PUERTO RICO 000005.

77.    Attached hereto as **Exhibit 75** is a certified English translation from Spanish of *Asoc. de Empleadors Gerenciales de Law Corporación del Fondo Del Seguro Del Estado v. Corporación Del Fondo Del Seguro Del Estado*, No. SJ2014CV00204, 2015 WL 4075649 (P.R. May 29, 2015), certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

78.    Attached hereto as **Exhibit 76** is a certified English translation from Spanish of *Asoc. Importadores de Cerveza v. E.L.A.*, 171 P.R. Dec. 140 (P.R. 2007), certified by Jennifer De La Cruz, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 06-014, on February 17, 2018.

79.    Attached hereto as **Exhibit 77** is a certified English translation from Spanish of excerpts from Constitutional History of Puerto Rico, Volume III, published by the Publishing Company of the University of Puerto Rico, 1982, certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

80.     Attached hereto as **Exhibit 78** is a certified English translation from Spanish of excerpts from *Diario de Sesiones de la Asemblea Legislativa*, dated September 4-5, 1961, certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

81.     Attached hereto as **Exhibit 79** is a certified English translation from Spanish of excerpts from *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, dated December 12, 1951, certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.  The full *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, including this excerpt, is available on the website of Puerto Rico's Office of Legislative Services at http://www.oslpr.org/v2/documentos.aspx.

82.     Attached hereto as **Exhibit 80** is a certified English translation from Spanish of *Maldonado v. Junta Planificación*, 171 D.P.R. 46 (P.R. 2007), certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

83.     Attached hereto as **Exhibit 81** is a certified English translation from Spanish of *Matos v. Junta Examinadora*, 165 D.P.R. 741 (P.R. 2005), certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

84.     Attached hereto as **Exhibit 82** is a certified English translation from Spanish of *P.R. Telephone Co. v. Tribunal de Contribuciones de Puerto Rico*, 81 D.P.R. 982 (P.R. 1960), certified Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

85.     Attached hereto as **Exhibit 83** is a certified English translation from Spanish of Opiniones del Secretario de Justicia de Puerto Rico Número 1974-15, dated May 21, 1974, certified by Andrew Moskowitz, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 00-050, on February 17, 2018.

86.     Attached hereto as **Exhibit 84** is a certified English translation from Spanish of *Telefonica Larga Distancia De Puerto Rico Inc. v. Departmento De Hacienda*, No. KCO97-0021, 2001 WL 176054 (P.R. Nov. 26, 2001), certified by Stephanie Penn, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 300599, on February 19, 2018.

87.     Attached hereto as **Exhibit 85** is a certified English translation from Spanish of Estado Libre Asociado de Puerto Rico, Programa de Financiamiento del IVU (COFINA), dated June 25, 2007.  The translation has been certified by Andre Moskowitz, Federally Certified Court Interpreter by the Administrative Office of the United States Courts certification # 00-050, on February 17, 2018.  A true and correct copy of the original Spanish version of this document, produced in this action by AAFAF and Bates numbered PR-CCD-0058663 through PR-CCD-0058686, is also included with this exhibit.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:          February 21, 2018
                New York, New York

                                          /s/ Antonio Yanez, Jr.
                                         Antonio Yanez, Jr.

Case:17-00257-LTS Doc#:576-1 Filed:02/21/18 Entered:02/21/18 23:14:15 Desc:
Exhibit 1 Page 2 of 24

**EXHIBIT 1**

**to the**

*Declaration of Antonio Yanez, Jr. in Support of the Motion for Summary Judgment by the COFINA Agent*

**CATALOGUE OF SELECT COMMONWEALTH ADMISSIONS REAFFIRMING COFINA'S OWNERSHIP OF THE PLEDGED SALES TAX AND DEDICATED SALES TAX FUND**

**Table of Contents**

Legislative Acts .......................................................................................................................1

Commonwealth of Puerto Rico Bonds/Notes – Official Statements ......................................5

COFINA Bonds – Official Statements ...................................................................................10

Commonwealth/COFINA Presentations .................................................................................18

Secretary of Justice Opinions .................................................................................................20

Other Documents .....................................................................................................................22

| Legislative Acts | | |
|---|---|---|
| **Act** | **Pincite** | **Excerpt** |
| Act No. 56-2007 of July 5, 2007 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | Stmt. of Motives | "It is the intention of this Legislature to increase the amount of funds that are deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Act No. 91 so that they be used to pay the extraconstitutional debt, that they be owned by COFINA until such time as the extraconstitutional debt outstanding as of June 30, 2006 has been paid, and that such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose, including for purposes of Section 8 of Article VI of the Constitution." |
| | § 2 | "The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA." |
| | § 2 | "The [Pledged Sales Tax] . . . shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary." |
| | § 2 | "The [Dedicated Sales Tax Fund] shall be funded each fiscal year from . . . [a specified portion of] [t]he first revenues of the sales and use tax." |
| Act No. 1-2009 of Jan. 14, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | § 2 | "The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA." |

- 1 -

| Legislative Acts | | |
|---|---|---|
| **Act** | **Pincite** | **Excerpt** |
| | § 2 | "The [Pledged Sales Tax] . . . shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary." |
| | § 2 | "The [Dedicated Sales Tax Fund] shall be funded each fiscal year from . . . [a specified portion of] [t]he first revenues of the sales and use tax." |
| Act No. 7-2009 of Mar. 9, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | § 50 | "The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA." |
| | § 50 | "The [Pledged Sales Tax] . . . shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary." |
| | § 50 | "The [Dedicated Sales Tax Fund] shall be [funded] each fiscal year from . . . [a specified portion of] [t]he first collections of the sales and use tax." |
| Act No. 18-2009 of May 22, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | § 2 | "The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA." |

Case:17-03283-LTS Doc#:4781-1 Filed:01/14/19 Entered:01/14/19 23:19:25 Desc:
Exhibit 1 Page 43 of 1005

| Legislative Acts | | |
|---|---|---|
| **Act** | **Pincite** | **Excerpt** |
| | § 2 | "The [Pledged Sales Tax] . . . shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute available resources to the Commonwealth, nor shall these be available for use by the Secretary." |
| | § 2 | "The [Dedicated Sales Tax Fund] shall be funded each fiscal year from . . . [a specified portion of] [t]he first revenues of the sales and use tax." |
| Act No. 116-2013 of Oct. 10, 2013 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | § 2 | "[The Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA." |
| | §2 | "[The Pledged Sales Tax] . . . shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary." |
| | § 2 | "[The Dedicated Sales Tax Fund] shall be funded each fiscal year from . . . [a specified portion of] [t]he first revenues of the sales and use tax." |
| Act No. 101-2015 of July 1, 2015 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) | § 1 | "[The Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in [the Dedicated Sales Tax Fund] pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA." |

Case:17-00257-LTS Doc#:516-1 Filed:02/21/18 Entered:02/21/18 23:14:15 Desc:
Exhibit 1 Page 300 of 1005

| Legislative Acts | | |
|---|---|---|
| **Act** | **Pincite** | **Excerpt** |
| | § 1 | "[The Pledged Sales Tax] . . . shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary." |
| | § 1 | "[The Dedicated Sales Tax Fund] shall be funded each fiscal year from . . . [a specified portion of] [t]he first revenues of the sales and use tax." |

| Commonwealth of Puerto Rico Bonds/Notes – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 19 | **Commonwealth of Puerto Rico, Tax and Revenue Anticipation Notes, Series 2008** (Oct. 18, 2007) | 3 | "[The Pledged Sales Tax] is deposited by the Secretary of the Treasury upon receipt into the [Dedicated Sales Tax Fund], which is held and owned by [COFINA] separate and apart from the Commonwealth's General Fund.  Amounts on deposit in the [Dedicated Sales Tax Fund] are applied to the payment of debt issued by [COFINA] to refinance the above extra constitutional debt outstanding." |
| 20 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008 A and 2008 B** (May 7, 2008) | 29 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| | | I-42 | "Act 91 provides that present and future collections of the pledged sales tax be transferred to COFINA in exchange for, and in consideration of, COFINA's commitment to pay, or establish mechanisms to pay, all or part of virtually all appropriation-backed debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by COFINA and with other funds and resources available to COFINA." |
| 21 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2008 C (General Obligation Bonds)** (May 7, 2008) | 16 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| | | I-42 | "Act 91 provides that present and future collections of the pledged sales tax be transferred to COFINA in exchange for, |

| Commonwealth of Puerto Rico Bonds/Notes – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| | | | and in consideration of, COFINA's commitment to pay, or establish mechanisms to pay, all or part of virtually all appropriation-backed debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by COFINA and with other funds and resources available to COFINA." |
| 22 | **Commonwealth of Puerto Rico, Public Improvement Bonds of 2008, Series A (General Obligation Bonds)** (Sept. 5, 2008) | 12 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| | | I-41 | "Act 91 provides that present and future collections of the pledged sales tax be transferred to COFINA in exchange for, and in consideration of, COFINA's commitment to pay, or establish mechanisms to pay, all or part of virtually all appropriation-backed debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by COFINA and with other funds and resources available to COFINA." |
| 23 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 A (General Obligation Bonds)** (Sept. 11, 2009) | 12 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| 24 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 B (General Obligation Bonds)** (Nov. 4, 2009) | 14 | "Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |
| | | I-37 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available |

| Commonwealth of Puerto Rico Bonds/Notes – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| | | | resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| 25 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 C (General Obligation Bonds)** (Dec. 3, 2009) | 14 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available resources' under the Constitutional provisions relating to the [Commonwealth] Bonds." |
| 26 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds)** (Feb. 10, 2011) | 18 | "Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |
| | | 19 | "[T]he legislation creating [COFINA] . . . provides that such portion [of the SUT allocated to COFINA] is not 'available Commonwealth resources' under the Constitutional provisions relating to public debt." |
| 27 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2011 C (General Obligation Bonds)** (Feb. 10, 2011) | 18-19 | Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |
| | | 20 | "[T]he legislation creating COFINA . . . provides that such portion [of the SUT allocated to COFINA] is not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt." |
| 28 | **Commonwealth of Puerto Rico, Public Improvement Bonds of 2011 and Public Improvement Refunding Bonds, Series** | 20 | "Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |

| Commonwealth of Puerto Rico Bonds/Notes – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| | **2011 D and 2011 E (General Obligation Bonds)** (July 11, 2011) | 21 | "[T]he legislation creating COFINA . . . provides that such portion [of the SUT allocated to COFINA] is not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt." |
| 30 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012 A (General Obligation Bonds)** (Mar. 7, 2012) | 13 | "Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |
| | | 14 | "[T]he legislation creating COFINA . . . provides that such portion [of the SUT allocated to COFINA] is not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt." |
| 31 | **Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2012 B** (Mar. 7, 2012) | 12 | "Act No. 91 provides that . . . the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." |
| | | 13 | "[T]he legislation creating COFINA . . . provides that such portion [of the SUT allocated to COFINA] is not 'available Commonwealth resources' under the above cited Constitutional provisions relating to public debt." |
| 32 | **Commonwealth of Puerto Rico, General Obligation Bonds of 2014, Series A** (Mar. 11, 2014) | 29 | ███████████████████████ |
| | | 31 | ███████████████████████ |

| Commonwealth of Puerto Rico Bonds/Notes – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
|  |  |  |  |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 6 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A** (July 13, 2007) | 1 | COFINA Bonds "will be payable from and secured by a security interest [in the Pledged Sales Tax] . . . , imposed by a newly-enacted statute of the Commonwealth that grants to [COFINA] ownership of the Pledged Sales Tax . . . ." |
| | | 17, 22 | "Under the provisions of Act 91, the [Dedicated Sales Tax Fund] and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, [COFINA] . . . . [the] Commonwealth agrees and commits . . . that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of [COFINA] to comply with its agreements with [COFINA bondholders] until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of [COFINA]." |
| | | 22 | "Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited in the Commonwealth's General Fund." |
| 7 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007B** (July 17, 2007) | 1 | COFINA Bonds "will be payable from and secured by a security interest [in the Pledged Sales Tax] . . . imposed by a newly-enacted statute of the Commonwealth that grants to [COFINA] ownership of the Pledged Sales Tax . . . ." |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
|  |  | 7 | "Under the provisions of Act 91, the [Dedicated Sales Tax Fund] and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, [COFINA]." |
|  |  | 12 | "Pursuant to Act 91, the Commonwealth agrees and commits . . . that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of [COFINA] to comply with its agreements with [COFINA bondholders] until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of [COFINA]." |
|  |  | 12 | "Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited in the Commonwealth's General Fund." |
| 9 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2008A** (June 25, 2008) | 7 | "Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation . . . ." |
|  |  | 11 | "Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to |

| | COFINA Bonds – Official Statements | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| | | | the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund." |
| 10 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2009A** (June 10, 2009) | 10 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank." |
| | | 31 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of Treasury." |
| 12 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009B** (June 19, 2009) | 10 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| **Ex. No.** | **Document** | **Pincite** | **Excerpt** |
| | | | resources for Authorized Uses.  The Dedicated Sales Tax Fund is administered by Government Development Bank." |
| | | 28 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury." |
| 13 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010A** (Jan. 28, 2010) | 11 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund.  Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses.  The Dedicated Sales Tax Fund is administered by Government Development Bank." |
| | | 32 - 33 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of Treasury." |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 14 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010C** (June 24, 2010) | 11 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank." |
| | | 31 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of Treasury." |
| 15 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E** (June 24, 2010) | 12 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank." |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| | | 30 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of Treasury." |
| 16 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2011A-1 and 2011A-2** (Nov. 16, 2011) | 14 | |
| | | 35 | |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 17 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2011B** (Nov. 16, 2011) | 14 | "Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank." |
| | | 35 | "Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, [COFINA] and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of Treasury." |
| 18 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Senior Series 2011A, 2011B, 2011C, 2011D** (Dec. 1, 2011) | 13 | ███████████████████████ |
| | | 34 | ███████████████████████ |

| COFINA Bonds – Official Statements | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
|  |  |  |  |

| Commonwealth/COFINA Presentations | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 35 | **Presentation to Financial Guarantors: Commonwealth of Puerto Rico: Sales Tax Financing Program** (June 14, 2007) | 27 | |
| 36 | **Rating Agency Presentation: Commonwealth of Puerto Rico: Puerto Rico Sales Tax Financing Corporation**, (June 15, 2007) | 27 | |
| 37 and 85[1] | **Estado Libre Asociado de Puerto Rico: Programa de Financiamiento del IVU (COFINA)** (June 25, 2007) | 17 | |
| 38 | **Investor Presentation: Commonwealth of Puerto Rico: Puerto Rico Sales Tax Financing Corporation (COFINA)** (June 25, 2007) | 18 | |
| 39 | **Commonwealth of Puerto Rico: Puerto Rico Sales Tax Financing Corporation (COFINA): Sales Tax Revenue Bonds, Series 2007A** (July 2007) | 17 | |
| 41 | **Puerto Rico Sales Tax Financing Corporation: Sales Tax Revenue Bonds, First Subordinate Series 2009A: Investor Presentation** (June 2009) | 12 | |

---

[1] Exhibit 37 references the Spanish version and Exhibit 85 references the English version.

- 18 -

| Commonwealth/COFINA Presentations | | | |
|---|---|---|---|
| **Ex. No.** | **Document** | **Pincite** | **Excerpt** |
| 43 | **Puerto Rico Sales Tax Financing Corporation: Sales Tax Revenue Bonds, First Subordinate Series 2011 A & B, Sales Tax Revenue Bonds, Senior Series 2011 C & D: Investor Presentation** (Nov. 14, 2011) | 17 | |
| 45 | **Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Junior Lien Series 2013 A,** *Updated* **Rating Evaluation Service Presentation** (Sept. 20, 2013) | 3 | |
| 47 | **The Commonwealth of Puerto Rico: Update on Fiscal and Economic Progress FY 2014 Q1 Investor Webcast** (Oct. 15, 2013) | 63 | "Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales Tax to COFINA and provided that any transferred portion was not 'available resources' under the Constitutional provisions relating to full faith and credit bonds." |
| 50 | **Commonwealth of Puerto Rico Liquidity Update** (Mar. 26, 2015) | 98 | |

| Secretary of Justice Opinions | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 52 | **Letter of Roberto J. Sánchez Ramos, Consulta Núm. 06-63-B** (July 31, 2007) | ¶ 3 | |
| 53 | **Letter of Antonio M. Sagardía de Jesús, Consulta Núm. 09-198-A** (May 28, 2009) | ¶ 4 | |
| 54 | **Letter of Antonio M. Sagardía de Jesús, Consulta Núm. 09-233-A** (June 18, 2009) | ¶ 4 | |
| 55 | **Letter of Antonio M. Sagardía de Jesús, Consulta Núm. 09-10-B** (July 23, 2009) | ¶ 4 | |
| 56 | **Letter of Guillermo A. Somoza Colombani, Consulta Núm. 10-175-A** (Feb. 9, 2010) | ¶ 4 | |
| 57 | **Letter of Guillermo A. Somoza Colombani, Inquiry No. 11-137-B** (Nov. 23, 2011) | ¶ 4 | |

| Secretary of Justice Opinions | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 58 | **Letter of Guillermo A. Somoza Colombani, Inquiry No. 11-145-B** (Dec. 13, 2011) | ¶ 4 | "Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to [COFINA]." |
| 59 | **Letter of Rafael Ortiz Carrión, Inquiry No. 13-151-A** (Apr. 30, 2013) | ¶ 4 | ████████████████████████████████ |

| Other Documents | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
| 40 | **Puerto Rico Sales Tax Financing Corporation: Treasury Department Due Diligence Questions** (Apr. 24, 2009) | 2 | ████████████████████ |
| 42 | **GDB Memo: Allowance for Loan Losses** (June 30, 2010) | 17 | ████████████████████ |
| | | 18 | ████████████████████ |
| 48 | **Transcript of GBD Conference Call re: COFINA Legal Opinions** (Oct. 31, 2013) | 3 | "The opinion that was posted on the GDB website as a note concludes that if the issues addressed by it are properly presented for judicial decision, a court would fin[d] that Act 91 validly transferred the Pledge[d] Sales tax, including the right to receive the tax to COFINA. The Pledge[d] Sales tax does not constitute available resources for purposes of the Puerto Rico Constitutional Debt Priority Provision and that Act 91 validly provides that the Pledge[d] Sales Tax is not available for use by the Secretary of the Treasury. These conclusions were based on our analysis review and consideration of several factors, including various cases decided by other jurisdictions including those that are specifically referenced in our opinion and those cases that analyze legislative provision that divert revenues from |

| Other Documents | | | |
|---|---|---|---|
| Ex. No. | Document | Pincite | Excerpt |
|  |  |  | State treasuries and dedicate them without annual appropriations to a specific purpose." |
| 49 | **Government Development Bank for Puerto Rico Comments on Conference Call About COFINA Legal Opinions,** Press Release (Oct. 31, 2013) | 1 | "Key points addressed in today's conference call include the following:<br><br>Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales and Use Tax ('SUT') to COFINA and provided that any transferred portion are not 'available resources' under the Constitutional provisions relating to full faith and credit general obligation ('GO') bonds.<br><br>The law provides that the Commonwealth agrees not to limit or restrict the rights granted by the COFINA Act or the rights of COFINA to meet its obligations to its bondholders.<br><br>COFINA's bond documents require written confirmation of all outstanding ratings and opinions confirming that new revenue would not constitute 'available resources' in the event the SUT were to be replaced with another source of revenues.<br><br>The Puerto Rico Secretary of Justice has provided, for each COFINA transaction (13 in total), a legal opinion that the SUT allocated to COFINA is not subject to 'claw-back' by GO bondholders under the PR Constitution.  US-based Bond Counsel and PR-based Underwriters' Counsel have delivered legal opinions reaching the same conclusion." |

# Exhibit 2

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 3

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 4

# Treasury Secretary and Interim GDB President Announce Amendments to COFINA Act that Will Facilitate More Cost-effective Financing for the Commonwealth

Sep 25, 2013, 13:20 ET from Puerto Rico Department of the Treasury from ,Government Development Bank for Puerto Rico (GDB)

Legislative Bill Aims to Facilitate Capital Injection to the Economy and Long-term Bond Issuance that will Result in Significant Savings to the General Fund

SAN JUAN, Puerto Rico, Sept. 25, 2013 /PRNewswire-USNewswire/ -- Today, Treasury Secretary Melba Acosta Febo and Government Development Bank for Puerto Rico (GDB) Interim President José V. Pagán Beauchamp announced the introduction of a bill to amend Act 91-2006, as amended, known as the "Dedicated Sales Tax Fund Act." The bill will expand the Sales Tax Fund Financing Corporation's (COFINA, by its Spanish acronym) capacity to issue bonds and will facilitate the execution of a more cost-effective financing for the Commonwealth.  These amendments seek to increase the Sales and Use Tax percentage allocated to COFINA from 2.75 percent to 3.50 percent and to allow the use of these funds for financings related to the FY 2011-12, FY 2012-13 and FY 2013-14 budgets.

"Puerto Rico continues to move swiftly towards economic growth and job creation, and a well-financed and stable GDB is critical to continuing the progress the Commonwealth has made to date," said Acosta Febo.  "The proposed amendments are an important step in this direction and will provide a more cost-effective capital injection to support the services Puerto Ricans deserve and to develop the infrastructure projects that will lay the foundation for economic growth."

The Commonwealth plans to refinance approximately $1,223 million in debts incurred by the previous administration and finance another $820 million related to the FY 2014 budget.  Certain debts incurred before 2014 are on the GDB's books.

"We want to use our most cost-effective financing tool to facilitate the General Fund's ability to continue meeting its budget obligations and to finance this Administration's new infrastructure projects," said Acosta Febo.  "Since they are backed by sales and use tax revenues, COFINA bonds are the best financing source for the Commonwealth."

Pagán Beauchamp noted that total net savings from issuing COFINA bonds, compared to other available options, are estimated between $66 million and $132 million for every $1 billion issued in bonds. "Using COFINA will not have an impact on the General Fund, because sales tax receipts allocated to COFINA will be offset by an equivalent reduction in the debt service payable from the General Fund," he said.

"The new COFINA structure may increase COFINA's capacity to issue debt by up to approximately $2 billion," said Pagán Beauchamp. "However, as we've said, the Commonwealth plans to issue between $500 million $1.2 billion in aggregate, including COFINA, during the rest of the calendar year".

"The bonds issued under the proposed COFINA transaction would be subordinated to current COFINA bondholders.  Additional protections would also be included so as to protect the interests of current holders of COFINA bonds," said Pagán Beauchamp.

SOURCE Puerto Rico Department of the Treasury; Government Development Bank for Puerto Rico (GDB)

# Exhibit 5

WEDNESDAY, FEBRUARY 14, 2018                                      Search site

 CARIBBEAN **BUSINESS** 

LATEST NEWS    REGIONAL    ECONOMY    POLITICS    OPINION    ESPAÑOL    EPAPER

 MATRÍCULA ABIERTA · COORDINA UN RECORRIDO INDIVIDUAL    Excelencia. Fe. Liderazgo. Servicio.
Llama al 787.765.3814 o escribe a admisiones@sanignacio.pr    Los encuentros en todo lo que hacemos.
**COLEGIO SAN IGNACIO DE LOYOLA**    HOMBRES AL SERVICIO DE LOS DEMÁS
1940 Calle Saúco · Urbanización Santa María · San Juan · Puerto Rico 00927 · Tel. 787.765.3814 · Búscanos en:

Home > Economy > Puerto Rico Legislative leaders back local bondholders

# Puerto Rico Legislative leaders back local bondholders

By *Eva Lloréns Vélez* on March 9, 2017

**78**
SHARES

 




House Speaker Carlos Méndez and Senate President Thomas Rivera Schatz (Juan J. Rodríguez/ CB)

SAN JUAN — Senate President Thomas Rivera Schatz warned that the Senate will not allow hedge funds or corporate creditors to get a better deal than local bondholders in debt restructuring negotiations with the government.

Rivera Schatz and House Speaker Carlos Méndez also said during the Bonistas del Patio local creditor event that the government will continue to pay Puerto Rico Sales Tax Financing Corp. (Cofina by its Spanish acronym) bonds, whose legality is being challenged in a lawsuit against the government.

Rivera Schatz made a distinction among the hedge funds or corporate creditors and the local bondholders. Hedge funds purchased bonds in the secondary market at very low prices and seek payment on the full value of the bonds. Local bondholders, he said, are different because they are not savvy investors with the resources to have known that the government was going to default.

Throughout many years, the government told investors and Wall Street that it had the financial capacity to pay its obligations and that, in the case of general obligations, they were guaranteed by the island's Constitution.

"They are trying to provide the perception that local bondholders deceived the government and have been demonized… These are people who invested the money they earned… And they cannot be treated worse than the hedge funds," he said.


 

LATEST NEWS    POPULAR    COMMENTS



**Measure Would Amend Puerto Rico Insurance Code To Require That Fined Companies Be Made Public**

House Bill 1449 would also establish that insurers pay…

February 14, 2018

**Alternatives Being Evaluated After Cancelled Puerto Rico Housing Contract**

Case:17-03283-LTS  Doc#:5781-1  Filed:02/14/19  Entered:02/14/19 18:19:25  Desc:
Case:17-00257-LTS  Doc#:516-1  Filed:02/21/18  Entered:02/21/18 23:14:45  Desc:
Exhibit DX-GG Part 1  Page 72 of 1005
Exhibit 3  Page 3 of 3

He said the Senate is open to helping local bondholders. "At the Senate, we will not pass any law that treats corporate bondholders with better conditions than local bondholders. If that bondholder wants to seek a reasonable deal under Title VI [voluntary negotiations under Promesa]…no bondholder who speculated with the bonds can expect to obtain a 100% investment back… Therefore, I urge hedge funds to join local bondholders in good faith and obtain investments proportionally to what they made," he said.

The leaders of both legislative chambers proposed legislation that would provide tax credits to local bondholders on future government earnings so they can get some of their investment back. He also proposed that any government savings as part of public-private partnerships be used to pay local bondholders. The local government has previously proposed using such savings to capitalize the commonwealth retirement system.

"I am just exploring such alternatives," Rivera Schatz said.

Méndez said the tax credit bill will be presented "as soon as it is viable."

The two legislative leaders stressed the legality of Cofina, which critics say was a structure created in 2006 to circumvent limits on constitutional debt. Méendez said similar structures have been created in other jurisdictions.

"Cofina was created in a legal fashion with the support of all political parties in a unanimous way. It served as a rescue bond for Puerto Rico to pay other debt, and at its time obtained a high credit rating… A lot of local bondholders are Cofina bondholders… It is not in my interest to hinder what was done in the past… If there were any incorrect acts, we will correct them," the House speaker said.

"Facts are sacred. Opinions are free," Rivera Schatz said about the claims against Cofina.

The legislative leaders also criticized the dismantled committee that sought to audit the entire public debt, contending it is not needed and is just another attempt to avoid paying the debt. Rivera Schatz revealed that leaders of the audit committee lied when they said they brought 100,000 signatures to the Legislature to audit the debt. He said the names provided did not have addresses or phone numbers, and that typewritten names were included instead of handwritten signatures. "They are lying to the people of Puerto Rico… They are charlatans," Rivera Schatz said.

In an aside with the press, the legislative leaders also said they will not yield to the fiscal oversight board's demands that the Legislature cut contracts or reduce the workweek because the entity's jurisdiction is over the executive not the legislative branch. The board's contracts, according to Rivera Schatz, are more expensive than those of the Legislature. The board costs the government $3 million a month. "I don't work for the board. I work for the people of Puerto Rico," the Senate president said.

Rivera Schatz spoke about apparent conflict of interest with respect to the chairman of the board, José Carrión, and its executive director, Ramón Ruiz Comas.

"What has caught my attention is that the oversight board chairman and its interim executive director have bonds and, if that is true, we have to see if there is a potential conflict as to whether they will make decisions to ensure the government pays their bonds first over other bonds… That is why board members have made courtesy visits to different entities except us because they cannot visit the Senate with hypocrisy," he said.

Secretary Gil Enseñat reiterates his department carried out the…
February 14, 2018



Filming Of 'StartUp' In Puerto Rico To Generate Thousands Of Jobs

Tech thriller series' entire 3rd season to be filmed…
February 13, 2018

Case:17-03283-LTS  Doc#:4781-1  Filed:01/14/19  Entered:01/14/19 18:19:25  Desc:
Case:17-00257-LTS  Doc#:516-5  Filed:02/21/18  Entered:02/21/18 23:14:15  Desc:
Exhibit D X-CC Part 1  Page 73 of 1005
Exhibit 3  Page 400 3



(Juan J. Rodríguez / CB)

Earlier in the event Thursday, three local bondholders described how their lives were turned upside down after the government defaulted on payments in the money they had invested. There are an estimated 60,000 local bondholders.

The government very recently began to pay interest on the general obligation bonds after defaulting in June. The first big default, the Government Development Bank's, occurred in May.

Mercedes Pont said her parents always told her to work and not depend on any man. She saved her hard-earned money initially in Christmas Clubs and then she put funds in a savings account at a cooperative. Then she decided to invest in government bonds because they were low risk. In 2011, her company eliminated her position, but she decided not to work again to take care of her mother, who was 87 years old, as well as do social work. She was living off the interest of her investments.

"I figured I would have enough money until the age of 65. Everything was fine until 2016. Now, not only have I lost interest, but I am at risk of losing the principal, the money that I had and gave the government to help it out," she said.

Since then, she has suffered the humiliation of having to ask for help because she does not have the funds to pay for utilities. She said she does not expect to recuperate all of her money but expects everyone to make sacrifices.

"We are willing to make a sacrifice as long as they take us into account during the debt negotiations. We are as vulnerable as the government retirees," she said.

José Julian Álvarez and Juan Rodríguez, two other retirees, also dreamed of living their golden years worry-free and are now struggling to survive.

"When they stopped paying, I woke up to a new reality that was not what I sought out," Álvarez said.

Rodríguez said he worked about 40 years as a manager in a needle factory and saved the money he had earned, and added that his son offered him a room in his house in the mainland United States if things get worse.



**78**
SHARES

f    🐦    g    📌    in

STUY TOWN LOTTERY    Is Your Household Income $86-$170k? Less than 10 days left! Hurry! Enter today! Apply now!
**Stuy Town Lottery Is Open**

Featured Stories

Case: 17-03283-LTS   Doc#:4781-1   Filed:01/14/19   Entered:01/14/19 18:10:25   Desc:
Case: 17-00257-LTS   Doc#:576-5   Filed:02/21/19   Entered:02/21/19 23:14:15   Desc:
Exhibit DX-GG Part 1   Page 74 of 1005
Exhibit 5   Page 5 of 5

**RELATED POSTS**






You must be logged in to post a comment Login



-->
FIND MORE

ADVERTISE WITH US   |   ARCHIVES   |   PRIVACY POLICY   |   DMCA   |   CONTACT US

Copyright © 2016 - 2018 Latin Media House, LLC. All rights reserved.

# Exhibit 6

NEW ISSUE – BOOK-ENTRY ONLY
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) assuming continuing compliance with certain tax covenants as described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. See "Tax Matters" herein.*

## PUERTO RICO SALES TAX FINANCING CORPORATION
### $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

Dated: Date of Delivery                                           Due: August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement.  The issuance of the Series 2007A Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds, the Series 2007B Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as fixed rate bonds (the "Fixed Rate Bonds") in the form of current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), and as LIBOR-based adjustable rate bonds (the "LIBOR Bonds") as set forth in the inside cover page.  Interest on the Current Interest Bonds will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on August 1, 2007, and will be payable at maturity or redemption. Interest on the LIBOR Bonds will be payable quarterly, commencing on November 1, 2007. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

The scheduled payment of principal and interest on certain of the Bonds will be guaranteed under bond insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, and Ambac Assurance Corporation, as indicated in the inside cover page of this Official Statement.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman, Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | | **Lehman Brothers** |
| **AG Edwards** | **Banc of America Securities LLC** | **BBVAPR MSD** |
| **Bear, Stearns & Co., Inc.** | **Citi** | **First Albany** |
| **JPMorgan** | **Loop Capital** | **Merrill Lynch & Co.** |
| **Morgan Stanley** | **Oriental Financial Services** | **Popular Securities** |
| **RBC Capital Markets** | **Samuel A. Ramírez & Co.** | **Santander Securities** |
| **UBS Investment Bank** | | **Wachovia Bank, National Association** |

July 13, 2007

CONFIDENTIAL

# Puerto Rico Sales Tax Financing Corporation
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

### $1,667,718,572.60 Capital Appreciation Bonds

$15,445,848.60[*] Capital Appreciation Bonds due August 1, 2040; Approximate Yield: 4.96%
$114,697,901.80[*] Capital Appreciation Bonds due August 1, 2041; Approximate Yield: 4.98%
$113,630,448.00[*] Capital Appreciation Bonds due August 1, 2042; Approximate Yield: 4.99%
$112,132,508.00[†] Capital Appreciation Bonds due August 1, 2043; Approximate Yield: 5.01%
$110,597,947.20[†] Capital Appreciation Bonds due August 1, 2044; Approximate Yield: 5.03%
$109,430,361.25[‡] Capital Appreciation Bonds due August 1, 2045; Approximate Yield: 5.04%
$108,235,860.00[†] Capital Appreciation Bonds due August 1, 2046; Approximate Yield: 5.05%
$107,014,744.15[‡] Capital Appreciation Bonds due August 1, 2047; Approximate Yield: 5.06%
$701,475,105.60[‡] Capital Appreciation Bonds due August 1, 2054; Approximate Yield: 5.14%
$175,057,848.00 Capital Appreciation Bonds due August 1, 2056; Approximate Yield: 5.34%
Price of all Capital Appreciation Bonds 100%

$563,885,000 5.25% Current Interest Fixed Rate Bonds due August 1, 2057; Yield: 4.90%[§]

$436,000,000 LIBOR-Based Adjustable Rate Bonds due August 1, 2057; Price: 100%

The LIBOR Bonds will bear interest from their date of delivery, after an initial rate equal to 4.51775%, at a per annum rate for each period equal to 67% of the Three-Month LIBOR Rate for such period plus a per annum spread equal to 93 basis points (0.93%); provided, however, that the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

---

[*] Insured by Financial Guaranty Insurance Corporation.
[†] Insured by MBIA Insurance Corporation.
[‡] Insured by Ambac Assurance Corporation.
[§] Yield to August 1, 2017 call date.

CONFIDENTIAL

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Corporation ("FGIC"), MBIA Insurance Corporation ("MBIA"), and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

Other than with respect to the information concerning Ambac, FGIC, and MBIA contained under the heading "BOND INSURANCE" of this Official Statement, none of the information in this Official Statement has been supplied or verified by Ambac, FGIC or MBIA.  Ambac, FGIC and MBIA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information, (ii) the validity of the Bonds, or (iii) the tax exempt status of the interest on the Bonds.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| THE CORPORATION | 2 |
| BOND INSURANCE | 3 |
|   Financial Guaranty Insurance Company | 3 |
|   MBIA Insurance Corporation | 5 |
|   Ambac Assurance Corporation | 8 |
|   Provisions of the Resolution | 10 |
| THE BONDS | 10 |
|   General | 10 |
|   Redemption | 12 |
| BOOK-ENTRY ONLY SYSTEM | 14 |
| ESTIMATED SOURCES AND USES OF FUNDS | 15 |
| PLEDGED SALES TAX | 15 |
|   Commonwealth Sales Tax | 15 |
|   Sales Tax Revenue Projections and Actual Collections | 16 |
|   Pledged Sales Tax and FIA Fund | 17 |
|   Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund | 18 |
| SECURITY FOR THE RESOLUTION BONDS | 18 |
|   General | 18 |
|   Property Pledged for the Payment of the Bonds | 19 |
|   Funds and Accounts under the Resolution | 19 |
|   Additional Bonds, Refunding Bonds and Other Obligations | 20 |
|   Commonwealth's Authority to Cover Deficiencies | 21 |
|   Special Investment Considerations | 21 |

| | Page |
|---|---|
|   Commonwealth Non-Impairment Covenant | 22 |
| TAX MATTERS | 22 |
|   United States Tax Considerations | 22 |
| RATINGS | 25 |
| LEGALITY FOR INVESTMENT | 25 |
| UNDERWRITING | 25 |
| LEGAL MATTERS | 26 |
| CONTINUING DISCLOSURE | 26 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 28 |
| MISCELLANEOUS | 28 |
| | |
| APPENDIX A – Commonwealth Economic Information | A-1 |
| APPENDIX B – Summary of Certain Definitions and Provisions of the Resolution | B-1 |
| APPENDIX C – Proposed Form of Approving Opinion of Bond Counsel to the Corporation | C-1 |
| APPENDIX D –Book-Entry System | D-1 |
| APPENDIX E – Table of Compounded Amounts for Capital Appreciation Bonds | E-1 |
| APPENDIX F – Specimen of Financial Guaranty Insurance Corporation's Bond Insurance Policy | F-1 |
| APPENDIX G – Specimen of MBIA Insurance Corporation's Bond Insurance Policy | G-1 |
| APPENDIX H – Specimen of Ambac Assurance Corporation's Bond Insurance Policy | H-1 |

i

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005248

# Puerto Rico Sales Tax Financing Corporation
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"). Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution (the "General Resolution") and a First Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), each adopted by the Board of Directors of the Corporation on July 13, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee").

The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2040 through 2042, as shown in the inside cover of this Official Statement (the "FGIC Insured Bonds"), when due, will be insured by a municipal insurance policy (the "FGIC Insurance Policy") issued by Financial Guaranty Insurance Corporation ("FGIC") simultaneously with the delivery of the FGIC Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2043 through 2046, as shown in the inside cover of this Official Statement (the "MBIA Insured Bonds"), when due, will be insured by a municipal insurance policy (the "MBIA Insurance Policy") issued by MBIA Insurance Corporation ("MBIA") simultaneously with the delivery of the MBIA Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2047 and 2054, as shown in the inside cover of this Official Statement (the "Ambac Insured Bonds," and together with the FGIC Insured Bonds and the MBIA Insured Bonds, the "Insured Bonds"), when due, will be insured by a municipal insurance policy (the "Ambac Insurance Policy," and together with the FGIC Insurance Policy and the MBIA Insurance Policy, the "Insurance Policies") issued by Ambac Assurance Corporation ("Ambac," and together with FGIC and MBIA, the "Bond Insurers") simultaneously with the delivery of the Ambac Insured Bonds.

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See *"Pledged Sales Tax and FIA Fund"* in "PLEDGED SALES TAX" below.

CONFIDENTIAL

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds and the Series 2007B Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006 owing to Government Development Bank and PFC, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds and the Series 2007B Bonds. The Bonds, the Series 2007B Bonds and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in, the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds and the Series 2007B Bonds, the "Resolution Bonds").

The requirements contained in the Resolution as conditions to the issuance of additional Resolution Bonds have been modified from those presented in the Preliminary Official Statement dated June 22, 2007. See "SECURITY FOR THE RESOLUTION BONDS" below.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is a newly-created independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred on Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

2

PR-INT-000005250

| Name | Occupation |
|---|---|
| Alfredo Salazar-Conde | Acting President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## BOND INSURANCE

**Financial Guaranty Insurance Company**

The following information has been furnished by FGIC for use in this Official Statement. Reference is made to *Appendix F* for a specimen of the FGIC Insurance Policy. Concurrently with the issuance of the Bonds, FGIC will issue the FGIC Insurance Policy for the FGIC Insured Bonds. The FGIC Insurance Policy guarantees the scheduled payment of principal of and interest on the FGIC Insured Bonds when due, as set forth in the form of the FGIC Insurance Policy included as *Appendix F* to this Official Statement.

*Payments Under the Policy.* Concurrently with the issuance of the Bonds, FGIC will issue its FGIC Insurance Policy. The FGIC Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Corporation. FGIC will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which FGIC shall have received notice (in accordance with the terms of the FGIC Insurance Policy) from an owner of FGIC Insured Bonds or the trustee or paying agent, if any, of the nonpayment of such amount by the Corporation. The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in a FGIC. The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a FGIC Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Insurance Policy is non-cancellable by FGIC. The FGIC Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the FGIC Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The FGIC Insurance Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the FGIC Insured Bonds is accelerated, FGIC will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, FGIC will become the owner of the FGIC Insured Bonds, appurtenant coupon or right to payment of principal or interest on such FGIC Insured Bonds and will be fully subrogated to all of the Bondowner's rights thereunder.

The FGIC Insurance Policy does not insure any risk other than nonpayment by the Corporation, as defined in the FGIC Insurance Policy. Specifically, the FGIC Insurance Policy does not cover: (i) payment on

CONFIDENTIAL

PR-INT-000005251

acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure FGIC Insured Bonds, FGIC may be granted certain rights under the FGIC Insured Bond documentation. The specific rights, if any, granted to FGIC in connection with its insurance of the FGIC Insured Bonds may be set forth in the description of the principal legal documents appearing elsewhere in this Official Statement, and reference should be made thereto.

The FGIC Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

FGIC is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. FGIC is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth, the U.S. Virgin Islands and the United Kingdom.

FGIC is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At March 31, 2007, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of FGIC or any claims under any insurance policy, including the FGIC Insurance Policy, issued by FGIC.

FGIC is subject to the insurance laws and regulations of the State of New York, where FGIC is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, FGIC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At March 31, 2007, FGIC had net admitted assets of approximately $3.947 billion, total liabilities of approximately $2.828 billion, and total capital and policyholders' surplus of approximately $1.119 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The unaudited financial statements as of March 31, 2007, and the audited consolidated financial statements of FGIC and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of December 31, 2006 and December 31, 2005, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company*," or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by FGIC with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of FGIC (if any) included in documents filed by FGIC with the NRMSIRs subsequent to the date of this Official Statement and prior to the termination of the offering of the FGIC Insured

4

CONFIDENTIAL

PR-INT-000005252

Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although FGIC prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to FGIC's audited SAP financial statements.**

Copies of FGIC's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. FGIC's telephone number is (212) 312-3000.

*Financial Guaranty's Credit Ratings.* The financial strength of FGIC is rated "AAA" by Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, Inc. ("S&P"), "Aaa" by Moody's Investors Service, Inc. ("Moody's"), and "AAA" by Fitch Ratings ("Fitch"). Each rating of FGIC should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of FGIC. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC Insured Bonds. FGIC does not guarantee the market price or investment value of the FGIC Insured Bonds nor does it guarantee that the ratings on the FGIC Insured Bonds will not be revised or withdrawn.

**Neither FGIC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Official Statement or any information or disclosure that is provided to potential purchasers of the FGIC Insured Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to FGIC or the FGIC Insurance Policy under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company.*" In addition, FGIC makes no representation regarding the FGIC Insured Bonds or the advisability of investing in the FGIC Insured Bonds.**

**MBIA Insurance Corporation**

The following information has been furnished by MBIA for the use in this Official Statement. Reference is made to *Appendix G* for a specimen of the MBIA Insurance Policy. Concurrently with the issuance of the Bonds, MBIA will issue the MBIA Insurance Policy for the MBIA Insured Bonds. The MBIA Insurance Policy guarantees the scheduled payment of principal of and interest on the MBIA Insured Bonds when due, as set forth in the form of the MBIA Insurance Policy included as *Appendix G* to this Official Statement.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted hrerefrom, other than with respect to the accuracy of the information regarding the MBIA Insurance Policy and MBIA set forth under this "BOND INSURANCE-*MBIA Insurance Corporation*" section. Additionally, MBIA makes no representation regarding the MBIA Insured Bonds or the advisability of investing in the MBIA Insured Bonds.

The MBIA Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Corporation to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment ) and interest on, the MBIA Insured Bonds as such payment shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or

CONFIDENTIAL

PR-INT-000005253

optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless MBIA elects in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The MBIA Insurance Policy also does not insure against nonpayment or any other act or omission of the Trustee or any other paying agent, if any, for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Trustee or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment or such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners or the Trustee payment of the insured amounts due on such MBIA Insured Bonds, less any amount held by the Trustee for the payment of such insured amounts and legally available therefore.

*General.* MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands and the Territory of Guam. MBIA, either directly or through subsidiaries, is licensed to do business in the Republic of France, the United Kingdom and the Kingdom of Spain and is subject to regulation under the laws of those jurisdictions. In February 2007, MBIA Corp. incorporated a new subsidiary, MBIA México, S.A. de C.V. ("MBIA México"), through which it intends to write financial guarantee insurance in México beginning in 2007. To date, MBIA México has had no operating activity.

The principal executive offices of MBIA are located at 113 King Street, Armonk, New York 10504 and the main telephone number at that address is (914) 273-4545.

*Regulation.* As a financial guaranty insurance company licensed to do business in the State of New York, MBIA is subject to the New York State Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for MBIA, limits the classes and concentrations of investments that are made by MBIA and required the approval of policy rates and forms that are employed by MBIA. State law also regulates the amount of both the aggregate and individual risks that may be insured by MBIA, the payment of dividends by MBIA, changes in control with respect to MBIA, and transactions amount MBIA and its affiliates.

CONFIDENTIAL

PR-INT-000005254

The MBIA Insurance Policy is not covered by the Property/Casualty Insurance Security Funds specified in Article 76 of the New York Insurance Law.

*Financial Strength Ratings of MBIA.*  Moody's rates the financial strength of MBIA "Aaa."  S&P rates the financial strength of MBIA "AAA."  Fitch rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently.  The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance.  Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies.  Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the MBIA Insured Bonds.  MBIA does not guaranty the market price of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

*MBIA Financial Information.*  As of December 31, 2006, MBIA had admitted assets of $10.9 billion (audited), total liabilities of $6.9 billion (audited), and total capital and surplus of $4.0 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.  As of March 31, 2007, MBIA had admitted assets of $11.2 billion (unaudited), total liabilities of $7.0 (unaudited), and total capital and surplus of $4.2 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning MBIA, see the consolidated financial statements of MBIA and its subsidiaries as of December 31, 2006 and December 31, 2005 and for each of the three years in the period ended December 31, 2006, prepared in accordance with GAAP, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 2006 and the consolidated financial statements of MBIA and its subsidiaries as of March 31, 2007 and for the three month period ended March 31, 2007 and March 31, 2006 included in the Quarterly Report on Form 10-Q of MBIA Inc. for the quarter ended March 31, 2007, which are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Copies of the statutory financial statements filed by MBIA with the State of New York Insurance Department are available over the Internet at MBIA Inc.'s web site at http://www.mbia.com and at no cost, upon request to MBIA at its principal offices.

*Incorporation of Certain Documents by Reference.*  The following documents filed by MBIA Inc. with the Securities & Exchange Commission ("SEC") are incorporated by reference into this Official Statement:

(1)     MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006;

(2)     MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

Any documents, including any financial statement of MBIA and its subsidiaries that are included therein or attached as exhibits thereto, filed by MBIA Inc. pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") after the date of MBIA Inc.'s most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the termination of the offering of the MBIA Insured Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof from the respective dates of filing such documents.  Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed documents which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

7

PR-INT-000005255

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006, and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA Inc.'s web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA at its principal executive offices.

**Ambac Assurance Corporation**

The following information has been furnished by Ambac for the use in this Official Statement. Reference is made to *Appendix H* for a specimen of the Ambac Insurance Policy. Concurrently with the issuance of the Bonds, Ambac will issue the Ambac Insurance Policy for the Ambac Insured Bonds. The Ambac Insurance Policy guarantees the scheduled payment of principal of and interest on the Ambac Insured Bonds when due, as set forth in the form of the Ambac Insurance Policy included as *Appendix H* to this Official Statement.

*Payment Pursuant to Financial Guaranty Insurance Policy.* Ambac has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds, effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee"), that portion of the principal of and interest on the Ambac Insured Bonds that shall become due for payment but shall be unpaid by reason of nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy). Ambac will make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes due for payment or within one business day following the date on which Ambac shall have received notice of nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond that has become due for payment and that is made to a owner by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, non-appealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does **not** insure any risk other than nonpayment (as set forth in the Ambac Insurance Policy). Specifically, the Ambac Insurance Policy does **not** cover:

1.   payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

8

PR-INT-000005256

2.      payment of any redemption, prepayment or acceleration premium; and

3.      nonpayment of principal or interest caused by the insolvency or negligence of the Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the owner's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, or right to payment of the principal of or interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering owner's rights to payment.

*General.* Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $10,194,000,000 (unaudited) and statutory capital of approximately $6,557,000,000 (unaudited) as of March 31, 2007. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. S&P, Moody's and Fitch have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc., is subject to the informational requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including Ambac Financial Group, Inc. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac. The address of Ambac's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004, and its telephone number is (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by Ambac Financial Group, Inc. with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

Ambac Financial Group, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and filed on March 1, 2007;

Ambac Financial Group, Inc.'s Current Report on Form 8-K dated and filed on April 25, 2007; and

Ambac Financial Group, Inc.'s Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2007 and filed on May 10, 2007.

9

CONFIDENTIAL

All documents subsequently filed by Ambac Financial Group, Inc. pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in *"Available Information."*

**Provisions of the Resolution**

Each of the Bond Insurers named under this caption "BOND INSURANCE" imposes requirements that are contained in the First Supplemental Resolution that provide that the related Bond Insurer shall be deemed to be the Owner of the Series 2007A Bonds that such Bond Insurer insures for purposes of certain matters and consents under the Resolution, including rights with respect to the naming of successor Trustee, rights upon an Event of Default and rights with respect to amendments to the Resolution, and otherwise imposes restrictions contained in the First Supplemental Resolution on eligible investment securities and defeasance securities.

## THE BONDS

### General

*Fixed Rate Bonds*

The fixed rate bonds (the "Fixed Rate Bonds") will be dated their date of delivery, and will be issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the approximate yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable semiannually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2007 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

*LIBOR Bonds*

The Bonds due August 1, 2057 bearing interest at a LIBOR-based adjustable rate (the "LIBOR Bonds") will be dated their date of delivery.

Interest on the LIBOR Bonds will be payable on each August 1, November 1, February 1 and May 1, commencing on November 1, 2007, and if such day is not a Business Day, then the next succeeding Business Day (the "Interest Payment Date"), and such interest shall be computed on a basis of a 365 or 366-day year, as applicable, for the number of days in such LIBOR-Based Interest Rate Period.

The LIBOR-Based Interest Rate (other than the rate for the first period) will be the rate of interest per annum determined by the Trustee to be equal to 67% of Three-Month LIBOR plus 93 basis points (0.93%); provided, further that in all cases, the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

10

During each period with respect to the LIBOR Bonds during which a LIBOR-Based Interest Rate is in effect (the "LIBOR-Based Interest Rate Period"), commencing on and including each Interest Payment Date (or the date of issuance of the LIBOR Bonds for the period prior to the first Interest Payment Date) to but not including the following Interest Payment Date, the LIBOR Bonds will bear interest at the LIBOR-Based Interest Rate.

"Three-Month LIBOR," with respect to the LIBOR Bonds, shall mean the rate for deposits in U.S. dollars with a three-month maturity that appears on Reuters Screen LIBOR 01 Page (or such other page as may replace that page on that service, or such other service as may be nominated by the British Bankers Association, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, on the LIBOR Rate Determination Date, except that, if such rate does not appear on such page, the Three-Month LIBOR Rate means a rate determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on the LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank market (herein referred to as the "Reference Banks") selected by a market agent appointed by the Trustee upon written direction of the Corporation to identify such Reference Banks (initially, Goldman, Sachs & Co. or such other market agent as may be selected by the Corporation, the "Market Agent"). The Market Agent will request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of the rates quoted by three (if three quotations are not provided, two or one, as applicable) major banks in New York City, selected by the Market Agent, at approximately 11:00 a.m., New York City time, on the LIBOR Rate Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity. If none of the banks in New York City selected by the Market Agent is then quoting rates for such loans, then the Three-Month LIBOR Rate for the ensuing interest period will mean the Three-Month LIBOR Rate then in effect in the immediately preceding LIBOR-Based Interest Accrual Period.

The Market Agent will calculate the LIBOR-Based Interest Rate applicable to each Interest Payment Date and will notify the Trustee and the Corporation of the LIBOR-Based Interest Rate so calculated in writing, or by electronic communication promptly confirmed in writing, by no later than close of business on the second Business Day preceding the Interest Payment Date. All calculations of the LIBOR-Based Interest Rate by the Market Agent will be final and conclusive and binding on the Trustee, the Owners of the LIBOR Bonds and the Corporation, absent manifest error. If the Market Agent fails to provide a notice of the LIBOR-Based Interest Rate as described in this paragraph, then the Trustee will calculate the LIBOR-Based Interest Rate for such Interest Payment Date and notify the Corporation of the LIBOR-Based Interest Rate so calculated as if it were the Market Agent by no later than close of business on the first Business Day preceding the Interest Payment Date.

The determination of the LIBOR-Based Interest Rate will be made on the day that is two London Banking Days preceding each Interest Payment Date (each, a "LIBOR Rate Determination Date"). As soon as possible after 11:00 a.m., New York City time, on each LIBOR Rate Determination Date, but in no event later than 11:00 a.m., New York City time, on the Business Day immediately following each LIBOR Rate Determination Date, the Trustee will notify the owners of the LIBOR Bonds of the LIBOR-Based Interest Rate for the next LIBOR-Based Interest Accrual Period. For purposes of this Official Statement, "London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in the City of London, United Kingdom.

In connection with the issuance of the LIBOR Bonds, the Corporation is expected to enter into interest rate exchange agreements (the "Swap Agreements"), with Goldman Sachs Capital Markets, L.P., an affiliate of Goldman, Sachs & Co., and Lehman Brothers Special Financing Inc. (each, a "Swap Provider"), each in a notional amount equal to $218,000,000, and together aggregating the principal amount of the LIBOR Bonds. In general, the Swap Agreements provide that, subject to the terms thereof, the Corporation will pay to the Swap

11

PR-INT-000005259

Provider a fixed interest rate and the Swap Provider will pay to the Corporation a floating interest rate exactly equal to the LIBOR-Based Interest Rate payable on the LIBOR Bonds. The purpose of the Swap Agreements is generally to convert the Corporation's floating rate obligations with respect to the LIBOR Bonds to fixed rate obligations.

Under certain circumstances, the Swap Agreements are subject to termination prior to their scheduled termination date and prior to the maturity of the LIBOR Bonds. In the event of a required early termination of either of the Swap Agreements, there can be no assurance that (i) the Corporation will receive any termination payment payable to it by the Swap Provider, (ii) the Corporation will have sufficient amounts to pay a termination payment payable by it to the Swap Provider, and (iii) the Corporation will be able to obtain a replacement swap agreement with comparable terms. Payment due upon early termination may be substantial. Neither the owners of the LIBOR Bonds nor any other person acting on behalf of such owners shall have any rights under the swap agreements or against the Swap Provider.

The Corporation will be obligated to pay interest on and the principal of the LIBOR Bonds regardless of whether the Swap Providers perform their obligations under the Swap Agreements.

The obligation of the Corporation to make regularly scheduled swap payments under the Swap Agreements will be secured by a grant of a security interest in the Pledged Property, on a parity with the Bonds. The obligation of the Corporation to make any termination payment under the Swap Agreements will be secured by a grant of a security interest in the Pledge Property subordinate to the Bonds and other Resolution Bonds.

*Rounding*

All percentages resulting from any calculation of the interest rate on the LIBOR Bonds will be rounded to the nearest fifth decimal place (one-hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)). All dollar amounts used in or resulting from such calculation on the LIBOR Bonds will be rounded to the nearest cent (with one-half cent being rounded upward).

*Form of Bonds*

The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (of maturity amount in the case of the Capital Appreciation Bonds). The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under "SECURITY FOR THE RESOLUTION BONDS."

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds and LIBOR Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to 100% of the principal amount of the Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

12

PR-INT-000005260

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2012, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted, on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

In the further event Municipal Market Advisors no longer publishes the Consensus Scale, the Applicable Tax-Exempt Municipal Bond Rate will be determined by Goldman, Sachs & Co., as the quotation agent, based upon the rate per annum equal to the yield to maturity (based upon semiannual compounding) of those tax-exempt general obligation bonds rated in the highest rating category by Moody's and S&P with a maturity date closest to the remaining weighted maturity date of the Bonds having characteristics (other than the ratings) most comparable to those of the Bonds in the judgment of the quotation agent. The quotation agent's determination of the Applicable Tax-Exempt Municipal Bond Rate is final and binding in the absence of manifest error.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Capital Appreciation Bonds maturing on August 1, 2054 and August 1, 2056 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

CONFIDENTIAL

PR-INT-000005261

**Sinking Fund Installments for Capital Appreciation Bonds Maturing**

| Mandatory Redemption Date | August 1, 2054 | | August 1, 2056 | |
|---|---|---|---|---|
| | Original Principal Amount | Compounded Amount | Original Principal Amount | Compounded Amount |
| 08/01/2048 | $102,859,098.30 | $ 823,990,091.40 | | |
| 08/01/2049 | 101,982,687.10 | 859,508,225.80 | | |
| 08/01/2050 | 101,102,593.50 | 896,448,120.75 | | |
| 08/01/2051 | 100,217,436.60 | 934,865,609.70 | | |
| 08/01/2052 | 99,329,057.60 | 974,818,780.80 | | |
| 08/01/2053 | 98,438,837.40 | 1,016,370,837.90 | | |
| 08/01/2054* | 97,545,395.10 | 1,059,585,000.00 | | |
| 08/01/2055 | | | $88,021,458.00 | $1,104,529,581.30 |
| 08/01/2056* | | | 87,036,390.00 | 1,151,275,000.00 |

\* Final maturity.

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix D* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriters believe to be reliable, but neither the Corporation nor the Underwriters take responsibility for the accuracy thereof.

14

CONFIDENTIAL

PR-INT-000005262

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix D-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

| | |
|---|---:|
| **Sources** | |
| Principal Amount of the Bonds | $2,667,603,572.60 |
| Additional Sources of Funds | 4,400,000.00 |
| Original Issue Premium | 15,456,087.85 |
| **Total Sources** | $2,687,459,660.45 |
| | |
| **Uses** | |
| Payment of Extraconstitutional Debt | $2,594,848,882.83 |
| Underwriters' Discount and Other Costs of Issuance[1] | 92,610,777.62 |
| **Total Uses** | $2,687,459,660.45 |

[1] Includes insurance premiums aggregating $70,329,182, legal, printing, and other financing expenses.

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax: (i) taxable

CONFIDENTIAL

PR-INT-000005263

items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

**Sales Tax Revenue Projections and Actual Collections**

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information*. The CTM is an

16

input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

**Pledged Sales Tax and FIA Fund**

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires

17

CONFIDENTIAL

that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

18

CONFIDENTIAL

**Property Pledged for the Payment of the Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the

19

PR-INT-000005267

Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

    A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

    B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be

CONFIDENTIAL

PR-INT-000005268

increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

**Special Investment Considerations**

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative

CONFIDENTIAL

PR-INT-000005269

Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

## Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

## TAX MATTERS

### United States Tax Considerations

*Opinion of Bond Counsel to the Corporation*

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, assuming continuing compliance with certain tax covenants described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel to the Corporation has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Corporation, the Commonwealth, the Government Development Bank, and others, in connection with the Bonds, and Bond Counsel to the Corporation has assumed compliance by the Corporation, the Commonwealth,

22

CONFIDENTIAL

PR-INT-000005270

and the Government Development Bank with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel to the Corporation, under existing statutes, the Bonds and the interest thereon are exempt from state, Commonwealth and local taxation.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Bonds. Bond Counsel to the Corporation renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update its opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel to the Corporation expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes or under state, Commonwealth and local tax law.

*Certain Ongoing Federal Tax Requirements and Covenants*

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the Bonds in order that interest on the Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the Bonds to become included in gross income for Federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Corporation, the Commonwealth, and the Government Development Bank have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

*Certain Collateral Federal Tax Consequences*

The following is a brief discussion of certain collateral Federal income tax matters with respect to the Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular Bondowner. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the Bonds.

Prospective owners of the Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for Federal income tax purposes. Interest on the Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

*Original Issue Discount*

"Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of the Bonds is expected to be the initial public offering price set forth on the

CONFIDENTIAL

PR-INT-000005271

inside cover page of the Official Statement. Bond Counsel further is of the opinion that, for any Bond having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bond under Section 1288 of the Code is excludable from gross income for Federal income tax purposes to the same extent as other interest on the Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such Discount Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for Federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

*Bond Premium*

In general, if an owner acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond.) An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a tax-exempt Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange or other disposition of the Premium Bonds.

*Information Reporting and Backup Withholding*

Information reporting requirements apply to interest on tax-exempt obligations, including the Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the Bonds from gross income for Federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a

24

refund or a credit against the owner's Federal income tax once the required information is furnished to the Internal Revenue Service (the "IRS").

*Possible Government Action*

Legislation affecting municipal bonds is regularly under consideration by the United States Congress. In addition, the IRS has established an expanded audit program for tax-exempt bonds. There can be no assurance that legislation enacted or proposed or an IRS audit after the date of issuance of the Bonds involving either the Bonds or other tax-exempt bonds will not have an adverse effect on the tax-exempt status, the market price or the marketability of the Bonds.

## RATINGS

The Bonds have received ratings of "A1" from Moody's, "A+" from S&P and "A+" from Fitch. Moody's, S&P and Fitch have assigned ratings of "Aaa," "AAA" and "AAA," respectively to the FGIC Insured Bonds, MBIA Insured Bonds and Ambac Insured Bonds based upon the coverage of the applicable Insurance Policies. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $2,665,702,597.47 (representing a purchase price equal to the principal amount of the Bonds at issuance, plus a premium of $15,456,087.85, less underwriters' discount in an amount equal to $17,357,062.98), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

BBVAPR Division de Valores Municipales ("BBVA") and RBC Dain Rauscher, Inc., doing business under the name RBC Capital Markets ("RBC"), have entered into an agreement to jointly pursue underwritings with the Commonwealth and its issuers. In furtherance of the agreement, BBVA and RBC will form a joint account and will allocate the agreed participations in any bond offering to one another.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV

25

PR-INT-000005273

Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

Oriental Financial Services Corporation ("OFS") and Bear, Stearns & Co., Inc. ("Bear Stearns") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, OFS and Bear Stearns will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

Eurobank and A.G. Edwards ("AG") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, Eurobank and AG will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service

CONFIDENTIAL

PR-INT-000005274

reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

CONFIDENTIAL

PR-INT-000005275

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriters to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

CONFIDENTIAL

PR-INT-000005276

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*), the specimen of the FGIC Insurance Policy (*Appendix F*), the specimen of the MBIA Insurance Policy *(Appendix G)*, and the specimen of the Ambac Insurance Policy *(Appendix H)*.

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing in "UNDERWRITING," was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

<div align="center">

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____/s/ Samuel Sierra Rivera_____
Samuel Sierra Rivera
Executive Director

</div>

29

CONFIDENTIAL

Case 17-03283-LTS   Doc#5116-6   Filed 02/21/19   Entered 02/21/19 23:14:15   Desc:
Exhibit DX-GG Part I)   Page 99 of 1005

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL
PR-INT-000005278

<div align="right">**APPENDIX A**</div>

### COMMONWEALTH OF PUERTO RICO
### ECONOMIC INFORMATION

#### INTRODUCTION

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

<div align="center">A-1</div>

CONFIDENTIAL

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from Georgetown University Law Center. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006. Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB. Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions. He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras. He is also a member of the American Institute of Certified Public Accountants.

Alfredo Salazar Conde became Acting President of Government Development Bank for Puerto Rico ("GDB") effective on August 19, 2005. Mr. Salazar is a private investor with over 30 years of experience in commercial banking. Mr. Salazar served as President of GDB from 1975 to 1976 and as Executive Director of Puerto Rico Industrial Development Company during 1990. Mr. Salazar has a Bachelor's degree in economics from Villanova University and pursued post graduate studies in finance at New York University and Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

A-2

CONFIDENTIAL

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to May 2007.

### Commonwealth Sales Tax Collections
(in millions)

|  | November[1] | December | January | February | March | April | May | Total |
|---|---|---|---|---|---|---|---|---|
| General Fund | $41 | $90 | $78 | $71 | $79 | $70 | $77 | $506 |
| FIA | 9 | 20 | 17 | 16 | 18 | 16 | 17 | 113 |
| Total | $50 | $110 | $95 | $87 | $97 | $86 | $94 | $619 |

(1) Commonwealth Sales Tax was effective on November 15, 2006.

As of today, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

## THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

A-3

CONFIDENTIAL

PR-INT-000005281

**General**

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, equivalent to an increase by 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, equivalent to an increase by 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for the first nine months of Fiscal Year 2007 averaged 1,268,300, an increase of 0.1% compared to 1,266,600 for the same period in Fiscal Year 2006. The seasonally adjusted unemployment rate for first nine months of Fiscal Year 2007 was 10.5%, a decrease from 11.2% for the same period in Fiscal Year 2006.

*Fiscal Year 2006*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased marginally from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,000, an increase of 1.2% compared to 1,237,600 for Fiscal Year 2005. An important component of total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Prior to Fiscal Year 2006, Puerto Rico enjoyed more than two decades of almost continuous economic expansion. Virtually every sector of the economy participated in this expansion, and record levels of employment were achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing for private and public capital projects. In some years, these factors were aided by a significant expansion in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. During Fiscal Years 2003 to 2005, the economy expanded at a moderate annual rate of 2.2%. Recently, however, as several key economic figures began to indicate a contraction of economic activity, the Planning Board lowered its forecast of growth in real gross national product from 2.2% to 0.7% for Fiscal Year 2006. Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for

A-4

CONFIDENTIAL

approximately 50% of total imports to Puerto Rico), and the deceleration of public investment (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit. For Fiscal Year 2007, the Planning Board's February 2007 projection forecasts a real gross national product decline of 1.4% (nominal growth of 2.0%), followed by slight real growth of 0.8% for Fiscal Year 2008 (nominal growth of 5.1%).

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce

A-5

CONFIDENTIAL

PR-INT-000005283

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006(\*)** |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
| Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.7 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
| Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
| Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
| Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

(\*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005. At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

A-6

CONFIDENTIAL

PR-INT-000005284

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[1]** |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

A-7

CONFIDENTIAL

PR-INT-000005285

Case 17-03283-LTS Doc#4781-1 Filed 01/14/19 Entered 01/14/19 23:14:15 Desc:
Exhibit DX-GG Part 1i Page 117 of 1005

**Commonwealth of Puerto Rico**
**Gross National Product**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

(1) Preliminary.
(2) In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008. In nominal terms, gross national product is forecasted to increase by 2.0% and 5.1% in Fiscal Years 2007 and 2008. respectively.

# Real GNP Growth Rate



* Puerto Rico Planning Board.
** Global Insight 04/07.

A-8

CONFIDENTIAL

PR-INT-000005286

# Puerto Rico Nominal GNP Growth Rate



## Economic Performance by Sector

### General

From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Sector and Gross National Product
#### (in millions at current prices)

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less: net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

A-9

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

<div align="center">

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

</div>

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[2]** |
| Natural Resources and Construction | 72,142 | 68,525 | 69,297 | 68,221 | 67,442 |
| Manufacturing | | | | | |
|     Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
|     Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,367 |
|     Sub Total | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
|     Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
|     Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
|     Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
|     Sub Total | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| | | | | | |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional & Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Government | 288,675 | 297,722 | 303,431 | 307,835 | 302,025 |
|     Total Non-Farm | 1,000,550 | 1,008,609 | 1,033,265 | 1,049,684 | 1,049,935 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in Fiscal Year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During Fiscal Year 2006, payroll employment for the manufacturing sector was 112,859, a decrease of 3.8% compared with Fiscal Year 2005, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of December 2006, the average hourly manufacturing wage rate in Puerto Rico was 68.9% of the average mainland United States rate.

<div align="center">A-10</div>

CONFIDENTIAL

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five Fiscal Years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: |  |  |  |  |  |
| Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
| Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
| Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
| Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
| Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1)   Preliminary.
(2)   Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3)   Totals may not add due to rounding.

*Source:* Planning Board

A-11

CONFIDENTIAL

PR-INT-000005289

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,525 | 4,444 | 4,706 | 4,471 | 4,108 |
| Cement and Concrete Products Manufacturing | 3,617 | 3,543 | 3,867 | 3,750 | 3,542 |
| Fabricated Metal Products | 6,517 | 6,198 | 6,490 | 6,427 | 5,808 |
| Computer and Electronic | 11,742 | 11,623 | 10,581 | 10,673 | 10,808 |
| Electrical Equipment | 7,233 | 7,415 | 7,744 | 7,645 | 6,858 |
| Electrical Equipment Manufacturing | 4,125 | 4,399 | 4,935 | 4,971 | 4,708 |
| Miscellaneous Manufacturing | 12,033 | 12,308 | 12,070 | 11,157 | 11,225 |
| Medical Equipment and Supplies Manufacturing | 10,858 | 11,336 | 11,059 | 10,473 | 10,492 |
| Other Durable Goods Manufacturing | 8,450 | 7,646 | 8,185 | 7,693 | 7,685 |
| Total – Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 14,842 | 13,628 | 13,244 | 13,050 | 12,667 |
| Beverage and Tobacco Products Manufacturing | 3,508 | 3,159 | 3,038 | 3,175 | 3,425 |
| Apparel Manufacturing | 12,000 | 8,988 | 8,522 | 8,873 | 8,400 |
| Cut and Sew Apparel Manufacturing | 11,233 | 8,969 | 8,518 | 8,846 | 8,183 |
| Chemical Manufacturing | 31,067 | 31,183 | 31,385 | 32,885 | 32,335 |
| Pharmaceutical and Medicine Manufacturing | 26,358 | 26,645 | 27,187 | 28,572 | 28,017 |
| Plastics and Rubber Products | 3,492 | 3,340 | 3,210 | 2,744 | 2,350 |
| Plastics Product Manufacturing | 3,183 | 3,030 | 2,917 | 2,266 | 2,158 |
| Other Non-Durable Goods Manufacturing | 9,391 | 8,823 | 9,261 | 8,529 | 7,200 |
| Total – Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,377 |
| | | | | | |
| Total Manufacturing Employment | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |

\*   Totals may not add due to rounding.
(1)   Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 11,941 from Fiscal Year 2002 to Fiscal Year 2006. Manufacturing employment had been declining during the past decade, but the decline accelerated during Fiscal Years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in Fiscal Year 2006 with the sector experiencing another significant drop of -3.8%. For the first six months of Fiscal Year 2007 the employment decline accelerated further to -6.2%. During the last two years the economy has lost around 5,500 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

A-12

CONFIDENTIAL

PR-INT-000005290

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between Fiscal Years 2002 and 2006, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for Fiscal Year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector\***
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

\*    Totals may not add due to rounding.
(1)    Preliminary.
(2)    Includes tourism.

According to the Establishment Survey, for the first six months of Fiscal Year 2007 the net employment gain for this sector was 2,200 jobs, compared to same period in the previous year. Service, finance, insurance and real estate employment added 6,800 jobs, while trade lost 4,600 jobs; for a net growth rate of 1%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In Fiscal Year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 514,933 in Fiscal Year 2002 to 567,609 in Fiscal Year 2006 (representing 54.1% of total, non-farm, payroll employment). This represents a cumulative increase of 10.2% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in Fiscal Years 2002 to 2006, as measured by gross domestic product. From Fiscal Year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2006 were $106.6 billion. As of December 31, 2006, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $76.3 billion.

A-13

CONFIDENTIAL

The following table sets forth employment figures for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector\***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006[(1)]** |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 |

\*     Totals may not add due to rounding.
(1)   Preliminary.

*Source:*   Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During Fiscal Year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in Fiscal Year 2005. The number of non-resident tourists registered in tourist hotels during Fiscal Year 2006 increased 4.6% compared to Fiscal Year 2005. Hotel rooms available during Fiscal Year 2006 increased 3.9% compared to Fiscal Year 2005. The average number of rooms rented in tourist hotels increased 3.9% during Fiscal Year 2006 compared to Fiscal Year 2005. The average occupancy rate in tourist hotels during Fiscal Years 2005 and 2006 was 70.8%.

During the first six months of Fiscal Year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 859,300, a decrease of 5.7% over the number of persons registered during the same period in Fiscal Year 2006. The average occupancy rate in tourist hotels during the first six months of Fiscal Year 2007 was 67%, compared to 66.6% during the same period in Fiscal Year 2006. The average number of rooms rented in tourist hotels decreased 5.8% during the first six months of Fiscal Year 2007 compared with the same period during Fiscal Year 2006. The average number of rooms available in tourist hotels decreased 7.7% during the first six months of Fiscal Year 2007 compared to the same period in Fiscal Year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five Fiscal Years ended June 30, 2006.

A-14

CONFIDENTIAL

PR-INT-000005292

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30 | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 ......................................... | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 ......................................... | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 ......................................... | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 ......................................... | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 ......................................... | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

(1)  Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2)  Includes visitors in guesthouses.
(3)  Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:*   Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In Fiscal Year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 302,025 workers, or 28.8% of total, non-farm, payroll employment in Fiscal Year 2006.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During Fiscal Year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material budgetary impact on the Commonwealth.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean

A-15

CONFIDENTIAL

PR-INT-000005293

islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The Island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in Fiscal Year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April, 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from Fiscal Year 2002 through Fiscal Year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior Fiscal Years. The total value of construction permits increased 2.5% during the same five Fiscal Year period.

Public investment has been an important component of construction investment. During Fiscal Year 2006, approximately 42% of the total investment in construction was related to public projects. For Fiscal Year 2006 compared to Fiscal Year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during Fiscal Year 2006 was 67,059, a decrease of 1.7% from Fiscal Year 2005. Through the first three quarters of Fiscal Year 2007, construction employment increased to a seasonally adjusted 67,500, but cement sales (including imports) continued their decline falling 7.1% compared to the same period in Fiscal Year 2006.

Total construction investment for Fiscal Year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in Fiscal Year 2005) due principally to the drop in construction related public projects. For Fiscal Years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first seven months of Fiscal Year 2007, the number and the total value of construction permits decreased 5.2% and 22.8%, respectively, compared to the same period in Fiscal Year 2006.

A-16

PR-INT-000005294

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During Fiscal Year 2006, gross income from agriculture was $805.6 million, an increase 1.5% compared with Fiscal Year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During Fiscal Year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous Fiscal Year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Employment and Unemployment**

Total average annual employment (as measured by the Household Survey) has increased. From Fiscal Year 2002 to Fiscal Year 2006, annual employment increased 8.8% to 1,253,000.

The number of persons employed in Puerto Rico during Fiscal Year 2006 averaged 1,253,000, a 1.2% increase from 1,237,600 in Fiscal Year 2005. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate increased from 10.6% in Fiscal Year 2005 to 11.7% in Fiscal Year 2006.

The following table presents annual statistics of employment and unemployment for Fiscal Year 2002 through Fiscal Year 2006 and monthly statistics, seasonally adjusted, for the first nine months of Fiscal Year 2007. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, the Payroll Survey, which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

A-17

CONFIDENTIAL

PR-INT-000005295

Commonwealth of Puerto Rico
Employment and Unemployment[1]
(persons age 16 and over)
(in thousands)

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| **Fiscal Year 2007** | | (Seasonally Adjusted) | | |
| July | 1,392 | 1,234 | 158 | 11.4% |
| August | 1,399 | 1,252 | 146 | 10.5 |
| September | 1,417 | 1,262 | 155 | 10.9 |
| October | 1,407 | 1,274 | 134 | 9.5 |
| November | 1,411 | 1,270 | 141 | 10.0 |
| December | 1,409 | 1,257 | 152 | 10.8 |
| January | 1,431 | 1,287 | 144 | 10.0 |
| February | 1,459 | 1,289 | 170 | 11.6 |
| March | 1,428 | 1,290 | 138 | 9.6 |

(1)  Totals may not add due to rounding.
(2)  Unemployed as percentage of labor force.

*Source:*  Department of Labor and Human Resources – Household Survey

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

A-18

CONFIDENTIAL

PR-INT-000005296

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1)  Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)  Based on census population as of April 1 of the stated year.
(3)  Estimated population (reference July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2005-2006 was approximately 63,973 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two Fiscal Years immediately preceding the current Fiscal Year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years.

A-19

CONFIDENTIAL

In order to enjoy the benefits provided by the 1998 Tax Incentives Act, a business must apply for such benefits prior to December 31, 2007. It has been proposed that new tax incentives legislation be enacted to replace the 1998 Tax Incentives Act and that pending the enactment of such legislation, the aforementioned deadline be extended for two years. There is no assurance that such legislation will be enacted before December 31, 2007 or that the deadline will be extended.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any Fiscal Year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs will encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

A-20

PR-INT-000005298

Tax and other incentives have also been established to promote the development of the tourism industry. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Recently, many United States corporations operating in Puerto Rico are organized as controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. CFCs are subject to a fifteen percent (15%) Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

A-21

CONFIDENTIAL

Case:17-00257-LTS Doc#:516-6 Filed:02/21/18 Entered:02/21/18 23:14:15 Desc:
Exhibit 6 (Part 1 of 1) Page 37 of 1005

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to

B-1

the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

B-2

CONFIDENTIAL

PR-INT-000005302

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

B-3

CONFIDENTIAL

PR-INT-000005303

Compounding Date shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

Contractual Maximum Interest Rate shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

Convertible Capital Appreciation Bonds shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

Corporation shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

Costs of Issuance shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

Costs of Issuance Account shall mean the Costs of Issuance Account established pursuant to the Resolution.

Credit Facility shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

Credit Facility Provider shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

<div align="center">B-4</div>

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any croup of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)      Government Obligations;

        (ii)      Defeased Municipal Obligations;

        (iii)      any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

        (iv)      an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

B-5

CONFIDENTIAL

PR-INT-000005305

(v)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

B-6

CONFIDENTIAL

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

        (iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

        (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

        (vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

B-7

CONFIDENTIAL

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)      investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

B-8

CONFIDENTIAL

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

  (i) any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

  (ii) Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

CONFIDENTIAL

PR-INT-000005309

(iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

B-10

CONFIDENTIAL

PR-INT-000005310

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

    4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

    5.    Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

CONFIDENTIAL

PR-INT-000005311

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

CONFIDENTIAL

PR-INT-000005312

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.     All Pledged Sales Tax received by the Corporation or the Trustee.

      2.     With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

B-13

CONFIDENTIAL

PR-INT-000005313

3.      Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007 Bonds of the Series designated as "Series 2007A" and "Series 2007B," and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under the Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

CONFIDENTIAL

PR-INT-000005314

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-15

CONFIDENTIAL

PR-INT-000005315

<u>**Summary of Certain Provisions of the Resolution**</u>

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

          (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

          (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-16

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-17

CONFIDENTIAL

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-18

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-19

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-20

CONFIDENTIAL

PR-INT-000005320

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

        (i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

        (ii)    stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-21

CONFIDENTIAL

PR-INT-000005321

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

> (i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

> (ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly into the Debt Service Account for such purpose.  In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited.  Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

B-22

CONFIDENTIAL

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

B-23

PR-INT-000005323

(iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

CONFIDENTIAL

PR-INT-000005324

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

B-25

PR-INT-000005325

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

B-26

CONFIDENTIAL

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)     amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)     amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

B-27

CONFIDENTIAL

      (iii)    amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

      (iv)    amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

## Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

B-28

CONFIDENTIAL

PR-INT-000005328

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

B-29

CONFIDENTIAL

PR-INT-000005329

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

B-30

PR-INT-000005330

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and, which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-31

CONFIDENTIAL

PR-INT-000005331

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

CONFIDENTIAL

PR-INT-000005332

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the

CONFIDENTIAL

PR-INT-000005333

Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of

CONFIDENTIAL

PR-INT-000005334

defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

CONFIDENTIAL

PR-INT-000005335

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

        (i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

        (ii)    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

CONFIDENTIAL

PR-INT-000005336

(iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

B-37

PR-INT-000005337

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

B-38

CONFIDENTIAL

PR-INT-000005338

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

B-39

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

B-40

CONFIDENTIAL

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

B-41

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

CONFIDENTIAL

PR-INT-000005342

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

B-43

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

B-44

CONFIDENTIAL

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon.  Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be.  Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account.  To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein.  If any portion of the moneys deposited with

B-45

CONFIDENTIAL

PR-INT-000005345

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-46

CONFIDENTIAL

PR-INT-000005346

APPENDIX C

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

*Hawkins Delafield & Wood LLP*

_____, 2007

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

Puerto Rico Sales Tax Financing Corporation
Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the Board of Directors on such date (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

### $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

| Serial Bond Maturity | Initial Principal Amount | Interest Rate | Initial Principal Amount Per $5,000 |
|---|---|---|---|
| 2040 | $ 15,445,848.60 | n/a | $992.60 |
| 2041 | 114,697,901.80 | n/a | 938.90 |
| 2042 | 113,630,448.00 | n/a | 890.80 |
| 2043 | 112,132,508.00 | n/a | 842.00 |
| 2044 | 110,597,947.20 | n/a | 795.60 |
| 2045 | 109,430,361.25 | n/a | 754.25 |
| 2046 | 108,235,860.00 | n/a | 714.90 |
| 2047 | 107,014,744.15 | n/a | 677.45 |
| 2057 | 563,885,000.00 | 5.25% | n/a |
| 2057 | 436,000,000.00 | Adjustable | n/a |

C-1

CONFIDENTIAL

$701,475,105.60 Capital Appreciation Term Bonds due August 1, 2054
(initial principal amount per $5,000 maturity amount:  $460.30)

$175,057,848.00 Capital Appreciation Term Bonds due August 1, 2056
(initial principal amount per $5,000 maturity amount:  $378.00)

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) providing funds for the payment or retirement of certain "extraconstitutional" loans owing by the Commonwealth, and (ii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear or compound interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

The Internal Revenue Code of 1986, as amended (the "Code"), establishes requirements that must be met subsequent to the initial issuance and delivery of the Bonds in order that interest on the Bonds not be included, on and after the date of such issuance and delivery, in gross income for Federal income tax purposes under the Code. The Corporation has established procedures in the Resolution to meet the requirements of the Code. The Corporation has also covenanted in the Resolution to comply with the requirements of Sections 141 and 148 through 150 of the Code. In our opinion, the procedures that have been established as of the date hereof in the Resolution are sufficient, if followed by the Corporation, to comply with the requirements of the Code. Our opinion in paragraph 5 below is rendered on the assumption that the Corporation will carry out the aforementioned procedures and comply with the aforementioned covenants.

In rendering the opinion in paragraph 5 below, we also have relied on and assumed compliance by the Government Development Bank for Puerto Rico and by the Commonwealth of Puerto Rico with procedures and covenants set forth in certificates delivered on the date hereof.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

C-2

CONFIDENTIAL

PR-INT-000005348

(3)     The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions, or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions, nor instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)     Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) assuming compliance with certain conditions imposed by applicable Federal tax law as described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to applicable Federal tax law, and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations; and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation. Additionally, certain provisions of the Code may affect the tax treatment of interest on the Bonds for certain Bondowners, and certain requirements of the Code must be satisfied after the date of issuance of the Bonds in order to maintain the exclusion from gross income of interest thereon under Federal law.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

C-3

CONFIDENTIAL

PR-INT-000005349

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-INT-000005350

<div align="right">**APPENDIX D**</div>

## BOOK-ENTRY SYSTEM

### The Depository Trust Company

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will

<div align="center">D-1</div>

CONFIDENTIAL

PR-INT-000005351

not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

D-2

CONFIDENTIAL

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

CONFIDENTIAL

PR-INT-000005353

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005354

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/31/2007 | 992.60 | 938.90 | 890.80 | 842.00 | 795.60 | 754.25 | 714.90 | 677.45 | 460.30 | 378.00 |
| 2/1/2008 | 1,017.20 | 962.25 | 913.00 | 863.10 | 815.60 | 773.25 | 732.95 | 694.60 | 472.10 | 388.10 |
| 8/1/2008 | 1,042.45 | 986.25 | 935.80 | 884.70 | 836.10 | 792.70 | 751.45 | 712.15 | 484.25 | 398.45 |
| 2/1/2009 | 1,068.30 | 1,010.80 | 959.15 | 906.90 | 857.15 | 812.70 | 770.40 | 730.20 | 496.70 | 409.10 |
| 8/1/2009 | 1,094.80 | 1,035.95 | 983.05 | 929.60 | 878.70 | 833.20 | 789.85 | 748.65 | 509.45 | 420.00 |
| 2/1/2010 | 1,121.95 | 1,061.75 | 1,007.60 | 952.90 | 900.80 | 854.20 | 809.80 | 767.60 | 522.55 | 431.20 |
| 8/1/2010 | 1,149.80 | 1,088.20 | 1,032.75 | 976.75 | 923.45 | 875.70 | 830.25 | 787.00 | 536.00 | 442.75 |
| 2/1/2011 | 1,178.30 | 1,115.30 | 1,058.50 | 1,001.20 | 946.70 | 897.75 | 851.20 | 806.95 | 549.75 | 454.55 |
| 8/1/2011 | 1,207.50 | 1,143.05 | 1,084.90 | 1,026.30 | 970.50 | 920.40 | 872.70 | 827.35 | 563.90 | 466.70 |
| 2/1/2012 | 1,237.45 | 1,171.55 | 1,112.00 | 1,052.00 | 994.90 | 943.60 | 894.75 | 848.30 | 578.40 | 479.15 |
| 8/1/2012 | 1,268.15 | 1,200.70 | 1,139.70 | 1,078.35 | 1,019.90 | 967.35 | 917.35 | 869.75 | 593.25 | 491.95 |
| 2/1/2013 | 1,299.60 | 1,230.60 | 1,168.15 | 1,105.40 | 1,045.55 | 991.75 | 940.50 | 891.75 | 608.50 | 505.10 |
| 8/1/2013 | 1,331.85 | 1,261.25 | 1,197.30 | 1,133.05 | 1,071.85 | 1,016.75 | 964.25 | 914.30 | 624.15 | 518.55 |
| 2/1/2014 | 1,364.85 | 1,292.65 | 1,227.20 | 1,161.45 | 1,098.80 | 1,042.35 | 988.60 | 937.45 | 640.20 | 532.40 |
| 8/1/2014 | 1,398.70 | 1,324.85 | 1,257.80 | 1,190.55 | 1,126.45 | 1,068.65 | 1,013.55 | 961.15 | 656.65 | 546.65 |
| 2/1/2015 | 1,433.40 | 1,357.80 | 1,289.20 | 1,220.35 | 1,154.80 | 1,095.55 | 1,039.15 | 985.50 | 673.50 | 561.20 |
| 8/1/2015 | 1,468.95 | 1,391.65 | 1,321.35 | 1,250.95 | 1,183.85 | 1,123.15 | 1,065.40 | 1,010.40 | 690.80 | 576.20 |
| 2/1/2016 | 1,505.40 | 1,426.30 | 1,354.30 | 1,282.30 | 1,213.60 | 1,151.45 | 1,092.30 | 1,035.95 | 708.60 | 591.60 |
| 8/1/2016 | 1,542.70 | 1,461.80 | 1,388.10 | 1,314.40 | 1,244.15 | 1,180.50 | 1,119.90 | 1,062.20 | 726.80 | 607.40 |
| 2/1/2017 | 1,580.95 | 1,498.20 | 1,422.75 | 1,347.35 | 1,275.40 | 1,210.25 | 1,148.15 | 1,089.05 | 745.45 | 623.60 |
| 8/1/2017 | 1,620.20 | 1,535.50 | 1,458.25 | 1,381.10 | 1,307.50 | 1,240.75 | 1,177.15 | 1,116.60 | 764.65 | 640.25 |
| 2/1/2018 | 1,660.35 | 1,573.75 | 1,494.60 | 1,415.70 | 1,340.40 | 1,272.00 | 1,206.90 | 1,144.85 | 784.30 | 657.35 |
| 8/1/2018 | 1,701.55 | 1,612.95 | 1,531.90 | 1,451.15 | 1,374.10 | 1,304.05 | 1,237.35 | 1,173.85 | 804.45 | 674.90 |
| 2/1/2019 | 1,743.75 | 1,653.10 | 1,570.15 | 1,487.50 | 1,408.65 | 1,336.90 | 1,268.60 | 1,203.55 | 825.10 | 692.95 |
| 8/1/2019 | 1,787.00 | 1,694.25 | 1,609.30 | 1,524.75 | 1,444.10 | 1,370.60 | 1,300.65 | 1,234.00 | 846.30 | 711.45 |
| 2/1/2020 | 1,831.30 | 1,736.45 | 1,649.45 | 1,562.95 | 1,480.40 | 1,405.15 | 1,333.45 | 1,265.20 | 868.05 | 730.40 |
| 8/1/2020 | 1,876.70 | 1,779.70 | 1,690.60 | 1,602.10 | 1,517.65 | 1,440.55 | 1,367.15 | 1,297.20 | 890.40 | 749.95 |
| 2/1/2021 | 1,923.25 | 1,824.00 | 1,732.80 | 1,642.25 | 1,555.80 | 1,476.85 | 1,401.65 | 1,330.05 | 913.25 | 769.95 |
| 8/1/2021 | 1,970.95 | 1,869.40 | 1,776.05 | 1,683.40 | 1,594.95 | 1,514.10 | 1,437.05 | 1,363.70 | 936.75 | 790.50 |
| 2/1/2022 | 2,019.85 | 1,915.95 | 1,820.35 | 1,725.55 | 1,635.05 | 1,552.25 | 1,473.35 | 1,398.20 | 960.80 | 811.60 |
| 8/1/2022 | 2,069.95 | 1,963.65 | 1,865.75 | 1,768.75 | 1,676.15 | 1,591.35 | 1,510.55 | 1,433.55 | 985.50 | 833.30 |
| 2/1/2023 | 2,121.25 | 2,012.55 | 1,912.30 | 1,813.10 | 1,718.30 | 1,631.45 | 1,548.70 | 1,469.85 | 1,010.85 | 855.55 |
| 8/1/2023 | 2,173.90 | 2,062.70 | 1,960.05 | 1,858.50 | 1,761.55 | 1,672.55 | 1,587.80 | 1,507.00 | 1,036.80 | 878.40 |
| 2/1/2024 | 2,227.80 | 2,114.05 | 2,008.95 | 1,905.05 | 1,805.85 | 1,714.70 | 1,627.90 | 1,545.15 | 1,063.45 | 901.85 |
| 8/1/2024 | 2,283.05 | 2,166.70 | 2,059.05 | 1,952.80 | 1,851.25 | 1,757.95 | 1,669.00 | 1,584.25 | 1,090.80 | 925.90 |
| 2/1/2025 | 2,339.65 | 2,220.65 | 2,110.45 | 2,001.70 | 1,897.80 | 1,802.25 | 1,711.15 | 1,624.30 | 1,118.80 | 950.65 |
| 8/1/2025 | 2,397.70 | 2,275.90 | 2,163.10 | 2,051.85 | 1,945.55 | 1,847.65 | 1,754.35 | 1,665.40 | 1,147.55 | 976.00 |
| 2/1/2026 | 2,457.15 | 2,332.60 | 2,217.05 | 2,103.25 | 1,994.50 | 1,894.20 | 1,798.65 | 1,707.55 | 1,177.05 | 1,002.10 |
| 8/1/2026 | 2,518.10 | 2,390.70 | 2,272.35 | 2,155.90 | 2,044.65 | 1,941.95 | 1,844.05 | 1,750.75 | 1,207.30 | 1,028.85 |
| 2/1/2027 | 2,580.55 | 2,450.20 | 2,329.05 | 2,209.95 | 2,096.05 | 1,990.90 | 1,890.60 | 1,795.05 | 1,238.35 | 1,056.30 |
| 8/1/2027 | 2,644.55 | 2,511.20 | 2,387.20 | 2,265.30 | 2,148.80 | 2,041.05 | 1,938.35 | 1,840.45 | 1,270.15 | 1,084.50 |
| 2/1/2028 | 2,710.10 | 2,573.75 | 2,446.75 | 2,322.05 | 2,202.85 | 2,092.50 | 1,987.30 | 1,887.00 | 1,302.80 | 1,113.45 |
| 8/1/2028 | 2,777.35 | 2,637.85 | 2,507.80 | 2,380.20 | 2,258.25 | 2,145.20 | 2,037.50 | 1,934.75 | 1,336.30 | 1,143.20 |
| 2/1/2029 | 2,846.20 | 2,703.50 | 2,570.35 | 2,439.85 | 2,315.00 | 2,199.30 | 2,088.90 | 1,983.70 | 1,370.65 | 1,173.70 |
| 8/1/2029 | 2,916.80 | 2,770.85 | 2,634.50 | 2,500.95 | 2,373.25 | 2,254.70 | 2,141.65 | 2,033.90 | 1,405.85 | 1,205.05 |
| 2/1/2030 | 2,989.15 | 2,839.85 | 2,700.20 | 2,563.60 | 2,432.95 | 2,311.55 | 2,195.75 | 2,085.35 | 1,442.00 | 1,237.25 |
| 8/1/2030 | 3,063.25 | 2,910.55 | 2,767.60 | 2,627.80 | 2,494.10 | 2,369.80 | 2,251.20 | 2,138.10 | 1,479.05 | 1,270.25 |
| 2/1/2031 | 3,139.25 | 2,983.00 | 2,836.65 | 2,693.65 | 2,556.85 | 2,429.50 | 2,308.05 | 2,192.20 | 1,517.05 | 1,304.20 |
| 8/1/2031 | 3,217.10 | 3,057.30 | 2,907.40 | 2,761.10 | 2,621.15 | 2,490.70 | 2,366.30 | 2,247.70 | 1,556.05 | 1,339.00 |
| 2/1/2032 | 3,296.85 | 3,133.40 | 2,979.95 | 2,830.30 | 2,687.10 | 2,553.50 | 2,426.05 | 2,304.55 | 1,596.05 | 1,374.75 |
| 8/1/2032 | 3,378.65 | 3,211.45 | 3,054.30 | 2,901.20 | 2,754.65 | 2,617.85 | 2,487.30 | 2,362.85 | 1,637.05 | 1,411.45 |
| 2/1/2033 | 3,462.40 | 3,291.40 | 3,130.50 | 2,973.85 | 2,823.95 | 2,683.80 | 2,550.15 | 2,422.65 | 1,679.15 | 1,449.15 |
| 8/1/2033 | 3,548.30 | 3,373.35 | 3,208.60 | 3,048.35 | 2,894.95 | 2,751.45 | 2,614.50 | 2,483.95 | 1,722.30 | 1,487.85 |
| 2/1/2034 | 3,636.30 | 3,457.35 | 3,288.70 | 3,124.70 | 2,967.75 | 2,820.75 | 2,680.55 | 2,546.75 | 1,766.55 | 1,527.60 |
| 8/1/2034 | 3,726.45 | 3,543.45 | 3,370.75 | 3,203.00 | 3,042.40 | 2,891.85 | 2,748.20 | 2,611.20 | 1,811.95 | 1,568.35 |

E-1

CONFIDENTIAL

PR-INT-000005355

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/2035 | 3,818.90 | 3,631.70 | 3,454.85 | 3,283.25 | 3,118.95 | 2,964.75 | 2,817.60 | 2,677.25 | 1,858.55 | 1,610.25 |
| 8/1/2035 | 3,913.60 | 3,722.10 | 3,541.05 | 3,365.45 | 3,197.35 | 3,039.45 | 2,888.75 | 2,745.00 | 1,906.30 | 1,653.25 |
| 2/1/2036 | 4,010.65 | 3,814.80 | 3,629.40 | 3,449.80 | 3,277.80 | 3,116.05 | 2,961.70 | 2,814.45 | 1,955.30 | 1,697.35 |
| 8/1/2036 | 4,110.10 | 3,909.80 | 3,719.95 | 3,536.20 | 3,360.20 | 3,194.55 | 3,036.50 | 2,885.65 | 2,005.55 | 1,742.70 |
| 2/1/2037 | 4,212.05 | 4,007.15 | 3,812.75 | 3,624.80 | 3,444.75 | 3,275.05 | 3,113.15 | 2,958.65 | 2,057.10 | 1,789.25 |
| 8/1/2037 | 4,316.50 | 4,106.90 | 3,907.85 | 3,715.60 | 3,531.35 | 3,357.60 | 3,191.75 | 3,033.50 | 2,109.95 | 1,837.00 |
| 2/1/2038 | 4,423.55 | 4,209.15 | 4,005.35 | 3,808.65 | 3,620.20 | 3,442.20 | 3,272.35 | 3,110.25 | 2,164.20 | 1,886.05 |
| 8/1/2038 | 4,533.25 | 4,314.00 | 4,105.30 | 3,904.05 | 3,711.25 | 3,528.95 | 3,355.00 | 3,188.95 | 2,219.80 | 1,936.40 |
| 2/1/2039 | 4,645.70 | 4,421.40 | 4,207.75 | 4,001.85 | 3,804.55 | 3,617.90 | 3,439.70 | 3,269.65 | 2,276.85 | 1,988.10 |
| 8/1/2039 | 4,760.90 | 4,531.50 | 4,312.70 | 4,102.10 | 3,900.25 | 3,709.05 | 3,526.55 | 3,352.35 | 2,335.35 | 2,041.20 |
| 2/1/2040 | 4,879.00 | 4,644.35 | 4,420.30 | 4,204.85 | 3,998.35 | 3,802.55 | 3,615.60 | 3,437.20 | 2,395.40 | 2,095.70 |
| 8/1/2040 | 5,000.00 | 4,760.00 | 4,530.60 | 4,310.20 | 4,098.90 | 3,898.35 | 3,706.90 | 3,524.15 | 2,456.95 | 2,151.65 |
| 2/1/2041 | | 4,878.50 | 4,643.65 | 4,418.15 | 4,202.00 | 3,996.60 | 3,800.50 | 3,613.30 | 2,520.10 | 2,209.10 |
| 8/1/2041 | | 5,000.00 | 4,759.50 | 4,528.85 | 4,307.70 | 4,097.30 | 3,896.45 | 3,704.70 | 2,584.85 | 2,268.10 |
| 2/1/2042 | | | 4,878.25 | 4,642.30 | 4,416.00 | 4,200.55 | 3,994.85 | 3,798.45 | 2,651.30 | 2,328.65 |
| 8/1/2042 | | | 5,000.00 | 4,758.60 | 4,527.10 | 4,306.40 | 4,095.70 | 3,894.55 | 2,719.45 | 2,390.80 |
| 2/1/2043 | | | | 4,877.80 | 4,640.95 | 4,414.95 | 4,199.15 | 3,993.10 | 2,789.30 | 2,454.65 |
| 8/1/2043 | | | | 5,000.00 | 4,757.65 | 4,526.20 | 4,305.15 | 4,094.10 | 2,861.00 | 2,520.20 |
| 2/1/2044 | | | | | 4,877.30 | 4,640.25 | 4,413.85 | 4,197.70 | 2,934.55 | 2,587.50 |
| 8/1/2044 | | | | | 5,000.00 | 4,757.20 | 4,525.30 | 4,303.90 | 3,009.95 | 2,656.55 |
| 2/1/2045 | | | | | | 4,877.05 | 4,639.60 | 4,412.80 | 3,087.30 | 2,727.50 |
| 8/1/2045 | | | | | | 5,000.00 | 4,756.75 | 4,524.45 | 3,166.65 | 2,800.30 |
| 2/1/2046 | | | | | | | 4,876.85 | 4,638.90 | 3,248.05 | 2,875.10 |
| 8/1/2046 | | | | | | | 5,000.00 | 4,756.25 | 3,331.50 | 2,951.85 |
| 2/1/2047 | | | | | | | | 4,876.60 | 3,417.15 | 3,030.65 |
| 8/1/2047 | | | | | | | | 5,000.00 | 3,504.95 | 3,111.60 |
| 2/1/2048 | | | | | | | | | 3,595.05 | 3,194.65 |
| 8/1/2048 | | | | | | | | | 3,687.40 | 3,279.95 |
| 2/1/2049 | | | | | | | | | 3,782.20 | 3,367.55 |
| 8/1/2049 | | | | | | | | | 3,879.40 | 3,457.45 |
| 2/1/2050 | | | | | | | | | 3,979.10 | 3,549.75 |
| 8/1/2050 | | | | | | | | | 4,081.35 | 3,644.55 |
| 2/1/2051 | | | | | | | | | 4,186.25 | 3,741.85 |
| 8/1/2051 | | | | | | | | | 4,293.85 | 3,841.75 |
| 2/1/2052 | | | | | | | | | 4,404.20 | 3,944.35 |
| 8/1/2052 | | | | | | | | | 4,517.40 | 4,049.65 |
| 2/1/2053 | | | | | | | | | 4,633.45 | 4,157.80 |
| 8/1/2053 | | | | | | | | | 4,752.55 | 4,268.80 |
| 2/1/2054 | | | | | | | | | 4,874.70 | 4,382.80 |
| 8/1/2054 | | | | | | | | | 5,000.00 | 4,499.80 |
| 2/1/2055 | | | | | | | | | | 4,619.95 |
| 8/1/2055 | | | | | | | | | | 4,743.30 |
| 2/1/2056 | | | | | | | | | | 4,869.95 |
| 8/1/2056 | | | | | | | | | | 5,000.00 |

E-2

CONFIDENTIAL

PR-INT-000005356



**Financial Guaranty Insurance Company**
25 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

| Issuer: | Policy Number: |
| --- | --- |
|  | Control Number:  0010001 |
| Bonds: | Premium: |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                                                                    Page 1 of 2

F—1

CONFIDENTIAL



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                         **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                 Page 2 of 2

F-2

CONFIDENTIAL                                                      PR-INT-000005358



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | Control Number: | 0010001 |
|---|---|---|

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                         **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0002 (10/93)                                                                 Page 1 of 1

F-3

CONFIDENTIAL                                                          PR-INT-000005359



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| | | |
|---|---|---|
| Policy Number: | Control Number: | 0010001 |

It is further understood that with respect to the Bonds maturing on _____, the amount insured under this Policy is that portion of the accreted value (as set forth in the bond documents under which the Bonds are issued) of said Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                                  Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
**U.S. Bank Trust National Association, as Fiscal Agent**

F-4

CONFIDENTIAL                                    PR-INT-000005360

APPENDIX G

# FINANCIAL GUARANTY INSURANCE POLICY

## MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

COUNTERSIGNED:

SPECIMEN

Resident Licensed Agent

_____

City, State

STD-RCS-7
01/05

MBIA Insurance Corporation

SPECIMEN

President

Attest: _____

Assistant Secretary

G—1

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

**APPENDIX H**

# *Ambac*

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

SEAL

Authorized Representative

Effective Date:

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.
Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

H–1

CONFIDENTIAL

PR-INT-000005363

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005364

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-INT-000005366



Printed on Recycled Paper
IMAGEMASTER 800.452.5152

CONFIDENTIAL

PR-INT-000005367

Case:17-03283-LTS Doc#:5716-1 Filed:02/21/19 Entered:02/21/19 23:14:25 Desc:
Exhibit DX-GG Part II) Page 199 of 1005

Divider

PR-INT-000005368

**NEW ISSUE – BOOK-ENTRY ONLY**
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Bonds, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. In the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, (a) under the provisions of Commonwealth of Puerto Rico existing statutes and regulations now in force, the Bonds, and the interest thereon, are exempt from Commonwealth of Puerto Rico and local taxation and (b) under the provisions of existing Federal statutes and regulations now in force, under certain circumstances, interest on the Bonds will be exempt from United States taxation to individuals who are bona fide residents of the Commonwealth of Puerto Rico and corporations organized under the laws of the Commonwealth of Puerto Rico. See "Tax Matters" herein.*

# PUERTO RICO SALES TAX FINANCING CORPORATION
## $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

**Dated:** Date of Delivery                    **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007B (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"). The Series 2007A Bonds are being offered for sale solely in the tax-exempt 103 United States market pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007A Bonds.

The Bonds, the Series 2007A Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on September 1, 2007. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on February 1, 2008, and will be payable at maturity or redemption. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, as Special Tax Counsel to the Corporation and as counsel to the Underwriters. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

## UBS Financial Services Incorporated of Puerto Rico

| | | |
|---|---|---|
| Popular Securities | | Santander Securities |
| BBVAPR MSD | Citi | Lehman Brothers |
| Merrill Lynch & Co. | Oriental Financial Services Corporation | Samuel A. Ramirez & Co., Inc. |
| TCM Capital | | Wachovia Capital Markets, LLC |

July 17, 2007

CONFIDENTIAL

PR-INT-000005369

## Puerto Rico Sales Tax Financing Corporation
## $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

### $147,101,779.90 Capital Appreciation Bonds

| Maturity Date August 1, | Initial Principal Amount | Maturity Amount | Yield to Maturity |
|---|---|---|---|
| 2027 | $12,007,513.60 | $ 40,720,000.00 | 6.20% |
| 2028 | 30,000,504.45 | 108,145,000.00 | 6.20 |
| 2029 | 26,798,324.85 | 103,785,000.00 | 6.25 |
| 2030 | 29,298,676.00 | 120,670,000.00 | 6.25 |
| 2031 | 14,497,685.00 | 63,500,000.00 | 6.25 |
| 2032 | 34,499,076.00 | 160,700,000.00 | 6.25 |

### $1,186,000,000 Current Interest Bonds

| Maturity Date | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| August 1, 2036 | $575,000,000.00 | 6.05% | 100.000% |
| August 1, 2037 | 167,780,000.00 | 6.05 | 99.312 |
| August 1, 2038 | 167,710,000.00 | 6.05 | 99.304 |
| July 1, 2039 | 37,755,000.00 | 6.05 | 99.297 |
| August 1, 2039 | 37,755,000.00 | 6.05 | 99.297 |
| May 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| June 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| July 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| August 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |

CONFIDENTIAL

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| THE CORPORATION | 2 |
| THE BONDS | 3 |
| General | 3 |
| Redemption | 3 |
| BOOK-ENTRY ONLY SYSTEM | 5 |
| ESTIMATED SOURCES AND USES OF FUNDS | 5 |
| PLEDGED SALES TAX | 5 |
| Commonwealth Sales Tax | 5 |
| Sales Tax Revenue Projections and Actual Collections | 6 |
| Pledged Sales Tax and FIA Fund | 7 |
| Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund | 8 |
| SECURITY FOR THE RESOLUTION BONDS | 9 |
| General | 9 |
| Property Pledged for the Payment of the Bonds | 9 |
| Funds and Accounts under the Resolution | 9 |
| Additional Bonds, Refunding Bonds and Other Obligations | 10 |
| Commonwealth's Authority to Cover Deficiencies | 11 |
| Special Investment Considerations | 12 |
| Commonwealth Non-Impairment Covenant | 12 |
| TAX MATTERS | 13 |
| Puerto Rico Tax Considerations (for Puerto Rico Residents only) | 13 |
| United States Federal Taxation for individual resident of Puerto Rico | 14 |

| | Page |
|---|---|
| United States Tax Considerations | 15 |
| U.S. Holders of the Bonds | 16 |
| Non-U.S. Holders of the Bonds | 18 |
| Information Reporting and Backup Withholding for the Bonds | 19 |
| IRS Circular 230 Disclosure | 19 |
| RATINGS | 19 |
| LEGALITY FOR INVESTMENT | 20 |
| UNDERWRITING | 20 |
| LEGAL MATTERS | 20 |
| CONTINUING DISCLOSURE | 20 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 22 |
| MISCELLANEOUS | 23 |
| | |
| APPENDIX A – Commonwealth Economic Information | A-1 |
| APPENDIX B – Summary of Certain Definitions and Provisions of the Resolution | B-1 |
| APPENDIX C – Proposed Form of Approving Opinion of Bond Counsel to the Corporation | C-1 |
| APPENDIX D – Proposed Form of Opinion of Special Tax Counsel | D-1 |
| APPENDIX E – Book-Entry Only System | E-1 |
| APPENDIX F – Table of Compounded Amounts for Capital Appreciation Bonds | F-1 |

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005372

# Puerto Rico Sales Tax Financing Corporation
## $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B (the "Bonds"). Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"). The Series 2007A Bonds are being offered for sale solely in the tax-exempt 103 United States market pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007A Bonds.

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, and a Second Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on July 17, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee").

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See "*Pledged Sales Tax and FIA Fund*" in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds and the Series 2007A Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006 owing to Government Development Bank and PFC, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds and the Series 2007A Bonds. The Bonds, the Series 2007A Bonds and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds and the Series 2007A Bonds, the "Resolution Bonds").

The requirements contained in the Resolution as conditions to the issuance of additional Resolution Bonds have been modified from those presented in the Preliminary Official Statement dated June 22, 2007. See "SECURITY FOR THE RESOLUTION BONDS" below.

CONFIDENTIAL

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is a newly-created independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred on Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation |
|---|---|
| Alfredo Salazar-Conde | Acting President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

2

CONFIDENTIAL

## THE BONDS

**General**

The Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $1,333,101,779.90, as current interest bonds (the "Current Interest Bonds"), and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on September 1, 2007, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on February 1, 2008 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds). The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under "SECURITY FOR THE RESOLUTION BONDS".

**Redemption**

*Optional Redemption.* The Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to the principal amount (in the case of Capital Appreciation Bonds, the Compounded Amount) of the Bonds, plus accrued interest to the redemption date, and without premium.

*Mandatory Sinking Fund Redemption.* The Current Interest Bonds due August 1, 2036 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

3

CONFIDENTIAL

**Current Interest Bond maturing August 1, 2036**

| Mandatory Redemption Date August 1, | Sinking Fund Installment |
|---|---|
| 2033 | $105,430,000 |
| 2034 | 129,270,000 |
| 2035 | 156,030,000 |
| 2036 | 184,270,000 |

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

Any notice of optional redemption of Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions thereof if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such rescission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

4

PR-INT-000005376

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix E* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriters believe to be reliable, but neither the Corporation nor the Underwriters take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix E-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---|
| Principal Amount of the Bonds | $1,333,101,779.90 |
| Original Issue Discount | (2,852,423.30) |
| **Total Sources** | $1,330,249,356.60 |

**Uses**

| | |
|---|---|
| Payment of Extraconstitutional Debt | $1,314,816,190.78 |
| Underwriters' Discount | 12,979,302.25 |
| Other Costs of Issuance | 2,453,863.57 |
| **Total Uses** | $1,330,249,356.60 |

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

5

CONFIDENTIAL

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax: (i) taxable items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

## Sales Tax Revenue Projections and Actual Collections

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

CONFIDENTIAL

PR-INT-000005378

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information*. The CTM is an input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

**Pledged Sales Tax and FIA Fund**

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

7

CONFIDENTIAL

PR-INT-000005379

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

8

CONFIDENTIAL

PR-INT-000005380

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

**Property Pledged for the Payment of the Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the

9

CONFIDENTIAL

PR-INT-000005381

Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the Corporation to the Trustee:  provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such

10

CONFIDENTIAL

PR-INT-000005382

additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

        B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

11

PR-INT-000005383

**Special Investment Considerations**

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

CONFIDENTIAL

PR-INT-000005384

# TAX MATTERS

**Puerto Rico Tax Considerations (for Puerto Rico Residents only)**

The following is a summary of the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel, regarding certain Puerto Rico tax consequences of the ownership of the Bonds by Puerto Rico residents. See *Appendix D – Form of Opinion of Special Tax Counsel*. This section does not purport to cover all of the Puerto Rico tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws and regulations now in effect and is subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below.

In the opinion of Fiddler González & Rodríguez, P.S.C., based on the laws of Puerto Rico now in force:

1.     Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.     The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.     The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5.     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

13

CONFIDENTIAL

Prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

**United States Federal Taxation for individual resident of Puerto Rico**

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Bonds. Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Bonds under state, local or foreign tax laws.

This summary is based on current provisions of the Code, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS and interpretations thereof.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a citizen of the United States and a bona fide resident of Puerto Rico, the meaning of Section 937 of the Code, during the entire taxable year within. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

ALL PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF THE BONDS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES, AS WELL AS THE EFFECT OF ANY FOREIGN, STATE, LOCAL OR OTHER LAWS.

*Interest on the Bonds*

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holders during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

14

CONFIDENTIAL

*Sale or Retirement of Series 2007B Bonds*

In general, pursuant to the provisions of Section 1.937-2T of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided, (i) that such Bonds do not constitute inventory in the hands of such individual, and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the preceding 10 years of recognizing the gain, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and other requirements are satisfied.

*Backup Withholding*

Backup withholding of United States federal income tax may apply to payments made in respect of the Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

Prospective owners of the Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

The opinion of the Special Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Bonds is limited to the above. We express no opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or to any other laws of any other jurisdiction or compliance therewith by any party.

**United States Tax Considerations**

The following discussion is a summary of the principal Federal income tax consequences of the acquisition, ownership and disposition of the Bonds by original purchasers of the Bonds. This summary is based on the Code, Treasury regulations, revenue rulings and court decisions, all as now in effect and all subject to change at any time, possibly with retroactive effect. This summary assumes that the Bonds will be held as "capital assets" under the Code, and it does not discuss all of the Federal income tax consequences that may be relevant to a holder in light of its particular circumstances or to holders subject to special rules, such as insurance companies, financial institutions, tax-exempt organizations, dealers in securities or foreign currencies, persons holding the Bonds as a position in a "hedge" or "straddle" for Federal income tax purposes, or holders whose functional currency (as defined in Section 985 of the Code) is not the United States dollar. Each prospective purchaser of the Bonds should consult with its own tax advisor concerning the Federal income tax

15

PR-INT-000005387

and other tax consequences to it of the acquisition, ownership and disposition of the Bonds as well as any tax consequences that may arise under the laws of any state, local or foreign tax jurisdiction.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

As used herein, the term "U.S. Holder" means a beneficial owner of a Bond that is for Federal income tax purposes (i) a citizen or resident of the United States, other than individuals who are bona fide residents of Puerto Rico during the entire taxable year, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof, (iii) an estate the income of which is subject to Federal income taxation regardless of its source, or (iv) a trust whose administration is subject to the primary jurisdiction of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust. As used herein, the term "Non-U.S. Holder" means a beneficial owner of a Bond that is not a U.S. Holder.

## U.S. Holders of the Bonds

### U.S. Holders—Interest Income

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Bonds, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Bonds.

### U.S. Holders—Original Issue Discount

For Federal income tax purposes, a Bond will be treated as issued with original issue discount ("OID") if the excess of a Bond's "stated redemption price at maturity" over its "issue price" equals or exceeds a statutorily determined de minimis amount. The "issue price" of each Bond in a particular issue equals the first price at which a substantial amount of such issue is sold to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). The "stated redemption price at maturity" of a Bond is the sum of all payments provided by such Bond other than "qualified stated interest" payments. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. In general, if the excess of a Bond's stated redemption price at maturity over its issue price is less than .25 percent of the Bond's stated redemption price at maturity multiplied by the number of complete years to its maturity (the "de minimis amount"), then such excess, if any, constitutes de minimis OID, and the Bond is not treated as being issued with OID and all payments of stated interest (including stated interest that would otherwise be characterized as OID) is treated as qualified stated interest, as described below.

Payments of qualified stated interest on a Bond are taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the U.S. Holder's regular method of tax accounting. A U.S. Holder of a Bond having a maturity of more than one year from its date of issue generally must include OID in income as ordinary interest as it accrues on a constant-yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting. The amount of OID included in income by the U.S. Holder of a Bond is the sum of the daily portions of OID with respect to such Bond for each day during the taxable year (or portion of the taxable year) on which such U.S. Holder held such Bond. The daily portion of OID on any Bond is determined by allocating to each day in any "accrual period" a ratable portion of the OID allocable to the accrual period. All accrual

16

PR-INT-000005388

periods with respect to a Bond may be of any length and the accrual periods may vary in length over the term of the Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or final day of an accrual period. The amount of OID allocable to an accrual period is generally equal to the difference between (i) the product of the Bond's "adjusted issue price" at the beginning of such accrual period and such Bond's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a Bond at the beginning of any accrual period is the issue price of the Bond plus the amount of accrued OID includable in income for all prior accrual periods minus the amount of any prior payments on the Bond other than qualified stated interest payments. The amount of OID allocable to an initial short accrual period may be computed using any reasonable method if all other accrual periods other than a final short accrual period are of equal length. The amount of OID allocable to the final accrual period is the difference between (i) the amount payable at the maturity of the Bond (other than a payment of qualified stated interest) and (ii) the Bond's adjusted issue price as of the beginning of the final accrual period. Under the OID rules, U.S. Holders generally will have to include in income increasingly greater amounts of OID in successive accrual periods.

A U.S. Holder may elect to include in gross income all interest that accrues on a Bond using the constant-yield method described above under the heading "U.S. Holders—Original Issue Discount," with the modifications described below. For purposes of this election, interest includes, among other things, stated interest, OID and de minimis OID, as adjusted by any amortizable bond premium described below under the heading "U.S. Holders—Bond Premium." In applying the constant-yield method to a Bond with respect to which this election has been made, the issue price of the Bond will equal its cost to the electing U.S. Holder, the issue date of the Bond will be the date of its acquisition by the electing U.S. Holder, and no payments on the Bond will be treated as payments of qualified stated interest. The election will generally apply only to the Bond with respect to which it is made and may not be revoked without the consent of the Internal Revenue Service. If this election is made with respect to a Bond with amortizable bond premium, then the electing U.S. Holder will be deemed to have elected to apply amortizable bond premium against interest with respect to all debt instruments with amortizable bond premium (other than debt instruments the interest on which is excludable from gross income) held by the electing U.S. Holder as of the beginning of the taxable year in which the Bond with respect to which the election is made is acquired or thereafter acquired. The deemed election with respect to amortizable bond premium may not be revoked without the consent of the IRS.

U.S. Holders of any Bonds issued with OID should consult their own tax advisors with respect to the treatment of OID for Federal income tax purposes, including various special rules relating thereto, and tax consequences under tax laws of the states, including their political subdivisions, and the District of Columbia, in connection with the acquisition, ownership, and disposition of Bonds.

*U.S. Holders—Bond Premium*

In general, if a U.S. Holder acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, a U.S. Holder of a Premium Bond may either deduct the amortizable bond premium for a taxable year under Section 171(a)(1) of the Code or may elect to amortize the total bond premium over the remaining term of the Premium Bond, based on the U.S. Holder's yield over the remaining term of the Premium Bond, following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the highest yield on such bond.) Any such election applies to all debt instruments of the U.S. Holder (other than tax-exempt bonds) held at the beginning of the first taxable year to which the election applies and to all such debt instruments thereafter acquired, and is irrevocable without the Internal Revenue Service's consent. A U.S. Holder of a Premium Bond that so elects to amortize bond premium does so

17

PR-INT-000005389

by offsetting the qualified stated interest allocable to each interest accrual period under the U.S. Holder's regular method of Federal tax accounting against the bond premium allocable to that period. If the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is treated as a bond premium deduction under Section 171(a)(1) of the Code, subject to certain limitations. If a Premium Bond is optionally callable before maturity at a price in excess of its stated redemption price at maturity, special rules may apply with respect to the amortization of bond premium. Under certain circumstances, the U.S. Holder of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the U.S. Holder's original acquisition cost.

U.S. Holders of any Premium Bonds should consult their own tax advisors with respect to the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, and disposition of Premium Bonds.

*U.S. Holders—Disposition of Bonds*

Except as discussed above, upon the sale, exchange, redemption, or other disposition (which would include a legal defeasance) of a Bond, a U.S. Holder generally will recognize taxable gain or loss in an amount equal to the difference between the amount realized (other than amounts attributable to accrued interest not previously includable in income) and such U.S. Holder's adjusted tax basis in the Bond. A U.S. Holder's adjusted tax basis in a Bond generally will equal such U.S. Holder's initial investment in the Bond, increased by any OID included in the U.S. Holder's income with respect to the Bond and decreased by the amount of any payments, other than qualified stated interest payments, received and bond premium amortized with respect to such Bond. Such gain or loss generally will be long-term capital gain or loss if the Bond was held for more than one year.

*U.S. Holders—Defeasance*

U.S. Holders of the Bonds should be aware that, for Federal income tax purposes, the deposit of moneys or securities in escrow in such amount and manner as to cause the Bonds to be deemed to be no longer outstanding under the resolution of the Bonds (a "defeasance"), could result in a deemed exchange under Section 1001 of the Code and a recognition by such owner of taxable income or loss, without any corresponding receipt of moneys. In addition, for Federal income tax purposes, the character and timing of receipt of payments on the Bonds subsequent to any such defeasance could also be affected. U.S. Holders of the Bonds are advised to consult with their own tax advisors regarding the consequences of a defeasance for Federal income tax purposes and under the tax laws of the states, including their political subdivisions, and the District of Columbia.

**Non-U.S. Holders of the Bonds**

Under existing Federal income tax law, interest (including any OID) on the Bonds is considered to be income from sources without the United States, and unless effectively connected with the conduct of a United States trade or business of a Non-U.S. Holder, such interest is not subject to Federal income or withholding tax when paid to or for a Non-U.S. Holder. A Non-U.S. Holder may be requested to furnish its name and address and to certify under penalties of perjury, using IRS Form W-8 or substantially similar substitute form, that it is not a United States person and is the beneficial owner of a Bond.

In general, a Non-U.S. Holder of a Bond is not subject to Federal income or withholding tax, under existing law, with respect to any gain realized on the sale, exchange, retirement or other disposition of a such a bond, unless the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year and certain other requirements are met, or unless the gain is effectively connected with the conduct of a United States trade or business of the Non-U.S. Holder.

18

Any person who seeks to become a Non-U.S. Holder of a Bond is advised to consult with its own tax advisor concerning the foregoing or any other Federal income tax consequences that may arise in connection with the acquisition, ownership and disposition of such a bond.

**Information Reporting and Backup Withholding for the Bonds**

*U.S. Holders*

In general, information reporting requirements will apply to non-corporate U.S. Holders with respect to payments of principal, payments of interest, and the accrual of OID on a Bond and the proceeds of the sale of a Bond before maturity within the United States. Backup withholding may apply to U.S. Holders under Section 3406 of the Code to such payments and to payments of OID unless the U.S. Holder (i) is a corporation or other exempt recipient and, when required, demonstrates that fact, or (ii) provides a correct taxpayer identification number, certifies under penalties of perjury, when required, that such U.S. Holder is not subject to backup withholding and has not been notified by the IRS that it has failed to report all interest and dividends required to be shown on its Federal income tax returns.

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner, and which constitutes over-withholding, would be allowed as a refund or a credit against such beneficial owner's Federal income tax provided the required information is furnished to the IRS.

*Non-U.S. Holders*

Under existing Federal income tax law, information reporting and backup withholding do not apply to payments of principal and interest (including OID) made to a Non-U.S. Holder in respect of a Bond, provided that the payor does not have actual knowledge that such Bondholder is a United States person.

**IRS Circular 230 Disclosure**

The advice under the captions "United States Tax Considerations Relating," "U.S. Holders of the Bonds," and "Non-U.S. Holders of the Bonds," concerning certain income tax consequences of the acquisition, ownership and disposition of the Bonds, was written to support the marketing of the Bonds. To ensure compliance with requirements imposed by the IRS, Bond Counsel to the Corporation informs you that (i) any Federal tax advice contained in the Official Statement (including any attachments) or in writings furnished by the Bond Counsel to the Corporation is not intended to be used, and cannot be used by any Bondholder, for the purpose of avoiding penalties that may be imposed on the Bondholder under the Code, and (ii) the Bondholder should seek advice from an independent tax advisor based on the Bondholder's particular circumstances.

## RATINGS

The Bonds have received ratings of "A1" from Moody's, "A+" from S&P and "A+" from Fitch. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

CONFIDENTIAL

PR-INT-000005391

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $1,317,270,054.35 (representing a purchase price equal to the principal amount of the Bonds at issuance, less an original discount in an amount equal to $2,852,423.30, less underwriters' discount in an amount equal to $12,979,302.25), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

CONFIDENTIAL

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation

21

described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriters to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

CONFIDENTIAL

PR-INT-000005394

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of tax opinion of Special Tax Counsel (*Appendix D*), the summary of the book-entry system for the Bonds (*Appendix E*), and the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix F*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing in "UNDERWRITING," was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

> PUERTO RICO SALES TAX FINANCING
> CORPORATION
>
> By: _____/s/ Samuel Sierra Rivera_____
> Samuel Sierra Rivera
> Executive Director

23

PR-INT-000005395

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005396

<div align="right">**APPENDIX A**</div>

<div align="center">

**COMMONWEALTH OF PUERTO RICO**
**ECONOMIC INFORMATION**

**INTRODUCTION**

</div>

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

<div align="center">A-1</div>

CONFIDENTIAL

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from Georgetown University Law Center. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006. Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB. Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions. He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras. He is also a member of the American Institute of Certified Public Accountants.

Alfredo Salazar Conde became Acting President of Government Development Bank for Puerto Rico ("GDB") effective on August 19, 2005. Mr. Salazar is a private investor with over 30 years of experience in commercial banking. Mr. Salazar served as President of GDB from 1975 to 1976 and as Executive Director of Puerto Rico Industrial Development Company during 1990. Mr. Salazar has a Bachelor's degree in economics from Villanova University and pursued post graduate studies in finance at New York University and Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

A-2

CONFIDENTIAL

PR-INT-000005398

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to May 2007.

### Commonwealth Sales Tax Collections
#### (in millions)

|  | November[1] | December | January | February | March | April | May | Total |
|---|---|---|---|---|---|---|---|---|
| General Fund | $41 | $90 | $78 | $71 | $ 79 | $70 | $77 | $506 |
| FIA | 9 | 20 | 17 | 16 | 18 | 16 | 17 | 113 |
| Total | $50 | $110 | $95 | $87 | $97 | $86 | $94 | $619 |

(1) Commonwealth Sales Tax was effective on November 15, 2006.

As of today, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

### THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

A-3

CONFIDENTIAL

PR-INT-000005399

**General**

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, equivalent to an increase by 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, equivalent to an increase by 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for the first nine months of Fiscal Year 2007 averaged 1,268,300, an increase of 0.1% compared to 1,266,600 for the same period in Fiscal Year 2006. The seasonally adjusted unemployment rate for first nine months of Fiscal Year 2007 was 10.5%, a decrease from 11.2% for the same period in Fiscal Year 2006.

*Fiscal Year 2006*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased marginally from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,000, an increase of 1.2% compared to 1,237,600 for Fiscal Year 2005. An important component of total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Prior to Fiscal Year 2006, Puerto Rico enjoyed more than two decades of almost continuous economic expansion. Virtually every sector of the economy participated in this expansion, and record levels of employment were achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing for private and public capital projects. In some years, these factors were aided by a significant expansion in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. During Fiscal Years 2003 to 2005, the economy expanded at a moderate annual rate of 2.2%. Recently, however, as several key economic figures began to indicate a contraction of economic activity, the Planning Board lowered its forecast of growth in real gross national product from 2.2% to 0.7% for Fiscal Year 2006. Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for

A-4

approximately 50% of total imports to Puerto Rico), and the deceleration of public investment (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit. For Fiscal Year 2007, the Planning Board's February 2007 projection forecasts a real gross national product decline of 1.4% (nominal growth of 2.0%), followed by slight real growth of 0.8% for Fiscal Year 2008 (nominal growth of 5.1%).

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce

A-5

CONFIDENTIAL

PR-INT-000005401

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | **Fiscal Years Ended June 30,** | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[(*)] |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
| Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.1 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
| Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
| Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
| Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

(*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005. At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

A-6

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

A-7

CONFIDENTIAL

PR-INT-000005403

**Commonwealth of Puerto Rico**
**Gross National Product**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

(1)   Preliminary.
(2)   In current dollars.

*Sources:*  Puerto Rico Planning Board and Global Insight Inc.


The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008.  In nominal terms, gross national product is forecasted to increase by 2.0% and 5.1% in Fiscal Years 2007 and 2008. respectively.

# Real GNP Growth Rate



Fiscal Years

■ P.R. *  ▧ U.S. **

*        Puerto Rico Planning Board.
**      Global Insight 04/07.

A-8

CONFIDENTIAL

PR-INT-000005404

## Puerto Rico Nominal GNP Growth Rate



## Economic Performance by Sector

*General*

From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Sector and Gross National Product
### (in millions at current prices)

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less: net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

A-9

CONFIDENTIAL

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006**[2] |
| Natural Resources and Construction | 72,142 | 68,525 | 69,297 | 68,221 | 67,442 |
| Manufacturing | | | | | |
|     Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
|     Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,367 |
|   Sub Total | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
|     Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
|     Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
|     Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
|   Sub Total | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| | | | | | |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional & Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Government | 288,675 | 297,722 | 303,431 | 307,835 | 302,025 |
|   Total Non-Farm | 1,000,550 | 1,008,609 | 1,033,265 | 1,049,684 | 1,049,935 |

(1)   The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2)   Preliminary.

*Source:*   Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in Fiscal Year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During Fiscal Year 2006, payroll employment for the manufacturing sector was 112,859, a decrease of 3.8% compared with Fiscal Year 2005, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of December 2006, the average hourly manufacturing wage rate in Puerto Rico was 68.9% of the average mainland United States rate.

A-10

CONFIDENTIAL

PR-INT-000005406

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five Fiscal Years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
|   Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
|   Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
|   Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
| Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1)  Preliminary.
(2)  Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3)  Totals may not add due to rounding.

*Source:* Planning Board

A-11

CONFIDENTIAL

PR-INT-000005407

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,525 | 4,444 | 4,706 | 4,471 | 4,108 |
| Cement and Concrete Products Manufacturing | 3,617 | 3,543 | 3,867 | 3,750 | 3,542 |
| Fabricated Metal Products | 6,517 | 6,198 | 6,490 | 6,427 | 5,808 |
| Computer and Electronic | 11,742 | 11,623 | 10,581 | 10,673 | 10,808 |
| Electrical Equipment | 7,233 | 7,415 | 7,744 | 7,645 | 6,858 |
| Electrical Equipment Manufacturing | 4,125 | 4,399 | 4,935 | 4,971 | 4,708 |
| Miscellaneous Manufacturing | 12,033 | 12,308 | 12,070 | 11,157 | 11,225 |
| Medical Equipment and Supplies Manufacturing | 10,858 | 11,336 | 11,059 | 10,473 | 10,492 |
| Other Durable Goods Manufacturing | 8,450 | 7,646 | 8,185 | 7,693 | 7,685 |
| Total – Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 14,842 | 13,628 | 13,244 | 13,050 | 12,667 |
| Beverage and Tobacco Products Manufacturing | 3,508 | 3,159 | 3,038 | 3,175 | 3,425 |
| Apparel Manufacturing | 12,000 | 8,988 | 8,522 | 8,873 | 8,400 |
| Cut and Sew Apparel Manufacturing | 11,233 | 8,969 | 8,518 | 8,846 | 8,183 |
| Chemical Manufacturing | 31,067 | 31,183 | 31,385 | 32,885 | 32,335 |
| Pharmaceutical and Medicine Manufacturing | 26,358 | 26,645 | 27,187 | 28,572 | 28,017 |
| Plastics and Rubber Products | 3,492 | 3,340 | 3,210 | 2,744 | 2,350 |
| Plastics Product Manufacturing | 3,183 | 3,030 | 2,917 | 2,266 | 2,158 |
| Other Non-Durable Goods Manufacturing | 9,391 | 8,823 | 9,261 | 8,529 | 7,200 |
| Total – Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,377 |
| | | | | | |
| Total Manufacturing Employment | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |

\*   Totals may not add due to rounding.
(1)   Preliminary.

*Source:*   Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 11,941 from Fiscal Year 2002 to Fiscal Year 2006. Manufacturing employment had been declining during the past decade, but the decline accelerated during Fiscal Years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in Fiscal Year 2006 with the sector experiencing another significant drop of -3.8%. For the first six months of Fiscal Year 2007 the employment decline accelerated further to -6.2%. During the last two years the economy has lost around 5,500 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

A-12

CONFIDENTIAL

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between Fiscal Years 2002 and 2006, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for Fiscal Year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2005 | 2006[1] |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

\*    Totals may not add due to rounding.
(1)   Preliminary.
(2)   Includes tourism.

According to the Establishment Survey, for the first six months of Fiscal Year 2007 the net employment gain for this sector was 2,200 jobs, compared to same period in the previous year. Service, finance, insurance and real estate employment added 6,800 jobs, while trade lost 4,600 jobs; for a net growth rate of 1%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In Fiscal Year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 514,933 in Fiscal Year 2002 to 567,609 in Fiscal Year 2006 (representing 54.1% of total, non-farm, payroll employment). This represents a cumulative increase of 10.2% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in Fiscal Years 2002 to 2006, as measured by gross domestic product. From Fiscal Year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2006 were $106.6 billion. As of December 31, 2006, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $76.3 billion.

A-13

CONFIDENTIAL

PR-INT-000005409

The following table sets forth employment figures for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006[1] |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 |

---
\*  Totals may not add due to rounding.
(1)  Preliminary.

*Source:*  Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During Fiscal Year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in Fiscal Year 2005. The number of non-resident tourists registered in tourist hotels during Fiscal Year 2006 increased 4.6% compared to Fiscal Year 2005. Hotel rooms available during Fiscal Year 2006 increased 3.9% compared to Fiscal Year 2005. The average number of rooms rented in tourist hotels increased 3.9% during Fiscal Year 2006 compared to Fiscal Year 2005. The average occupancy rate in tourist hotels during Fiscal Years 2005 and 2006 was 70.8%.

During the first six months of Fiscal Year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 859,300, a decrease of 5.7% over the number of persons registered during the same period in Fiscal Year 2006. The average occupancy rate in tourist hotels during the first six months of Fiscal Year 2007 was 67%, compared to 66.6% during the same period in Fiscal Year 2006. The average number of rooms rented in tourist hotels decreased 5.8% during the first six months of Fiscal Year 2007 compared with the same period during Fiscal Year 2006. The average number of rooms available in tourist hotels decreased 7.7% during the first six months of Fiscal Year 2007 compared to the same period in Fiscal Year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five Fiscal Years ended June 30, 2006.

A-14

CONFIDENTIAL

PR-INT-000005410

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30 | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

(1)   Only includes information about non-resident tourists registering in tourist hotels. They are counted even if registered in more than one hotel.
(2)   Includes visitors in guesthouses.
(3)   Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:*   Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In Fiscal Year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 302,025 workers, or 28.8% of total, non-farm, payroll employment in Fiscal Year 2006.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During Fiscal Year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material budgetary impact on the Commonwealth.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean

A-15

CONFIDENTIAL

PR-INT-000005411

islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The Island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in Fiscal Year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April, 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from Fiscal Year 2002 through Fiscal Year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior Fiscal Years. The total value of construction permits increased 2.5% during the same five Fiscal Year period.

Public investment has been an important component of construction investment. During Fiscal Year 2006, approximately 42% of the total investment in construction was related to public projects. For Fiscal Year 2006 compared to Fiscal Year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during Fiscal Year 2006 was 67,059, a decrease of 1.7% from Fiscal Year 2005. Through the first three quarters of Fiscal Year 2007, construction employment increased to a seasonally adjusted 67,500, but cement sales (including imports) continued their decline falling 7.1% compared to the same period in Fiscal Year 2006.

Total construction investment for Fiscal Year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in Fiscal Year 2005) due principally to the drop in construction related public projects. For Fiscal Years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first seven months of Fiscal Year 2007, the number and the total value of construction permits decreased 5.2% and 22.8%, respectively, compared to the same period in Fiscal Year 2006.

A-16

CONFIDENTIAL

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During Fiscal Year 2006, gross income from agriculture was $805.6 million, an increase 1.5% compared with Fiscal Year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During Fiscal Year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous Fiscal Year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Employment and Unemployment**

Total average annual employment (as measured by the Household Survey) has increased. From Fiscal Year 2002 to Fiscal Year 2006, annual employment increased 8.8% to 1,253,000.

The number of persons employed in Puerto Rico during Fiscal Year 2006 averaged 1,253,000, a 1.2% increase from 1,237,600 in Fiscal Year 2005. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate increased from 10.6% in Fiscal Year 2005 to 11.7% in Fiscal Year 2006.

The following table presents annual statistics of employment and unemployment for Fiscal Year 2002 through Fiscal Year 2006 and monthly statistics, seasonally adjusted, for the first nine months of Fiscal Year 2007. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, the Payroll Survey, which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

A-17

CONFIDENTIAL

PR-INT-000005413

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| **Fiscal Year 2007** | | (Seasonally Adjusted) | | |
| July | 1,392 | 1,234 | 158 | 11.4% |
| August | 1,399 | 1,252 | 146 | 10.5 |
| September | 1,417 | 1,262 | 155 | 10.9 |
| October | 1,407 | 1,274 | 134 | 9.5 |
| November | 1,411 | 1,270 | 141 | 10.0 |
| December | 1,409 | 1,257 | 152 | 10.8 |
| January | 1,431 | 1,287 | 144 | 10.0 |
| February | 1,459 | 1,289 | 170 | 11.6 |
| March | 1,428 | 1,290 | 138 | 9.6 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

A-18

CONFIDENTIAL

PR-INT-000005414

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1)  Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)  Based on census population as of April 1 of the stated year.
(3)  Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2005-2006 was approximately 63,973 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two Fiscal Years immediately preceding the current Fiscal Year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years.

A-19

CONFIDENTIAL

In order to enjoy the benefits provided by the 1998 Tax Incentives Act, a business must apply for such benefits prior to December 31, 2007. It has been proposed that new tax incentives legislation be enacted to replace the 1998 Tax Incentives Act and that pending the enactment of such legislation, the aforementioned deadline be extended for two years. There is no assurance that such legislation will be enacted before December 31, 2007 or that the deadline will be extended.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any Fiscal Year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs will encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

A-20

CONFIDENTIAL

Tax and other incentives have also been established to promote the development of the tourism industry. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Recently, many United States corporations operating in Puerto Rico are organized as controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. CFCs are subject to a fifteen percent (15%) Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

CONFIDENTIAL

PR-INT-000005417

[This Page Intentionally Left Blank]

CONFIDENTIAL

PR-INT-000005418

<div align="right">

**APPENDIX B**

</div>

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to

<div align="center">

B-1

</div>

PR-INT-000005419

the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

B-2

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

B-3

CONFIDENTIAL

PR-INT-000005421

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

B-4

CONFIDENTIAL

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any croup of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)      Government Obligations;

        (ii)     Defeased Municipal Obligations;

        (iii)    any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

        (iv)    an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

B-5

CONFIDENTIAL

PR-INT-000005423

(v)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

B-6

CONFIDENTIAL

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

      (i)      Defeasance Obligations;

      (ii)      Defeased Municipal Obligations;

      (iii)      public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

      (iv)      direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

      (v)      direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

      (vi)      prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

CONFIDENTIAL

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

B-8

CONFIDENTIAL

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

        (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

        (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

CONFIDENTIAL

PR-INT-000005427

(iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges.  Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution.  Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

B-10

CONFIDENTIAL

PR-INT-000005428

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

        1.     All Revenues.

        2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

        3.     The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

        4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

        5.     Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

CONFIDENTIAL

PR-INT-000005429

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

B-12

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.     All Pledged Sales Tax received by the Corporation or the Trustee.

      2.     With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

B-13

CONFIDENTIAL

3. Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007 Bonds of the Series designated as "Series 2007A" and "Series 2007B," and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under the Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

B-14

CONFIDENTIAL

PR-INT-000005432

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

CONFIDENTIAL

PR-INT-000005433

**Summary of Certain Provisions of the Resolution**

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-16

CONFIDENTIAL

PR-INT-000005434

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)  either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)  a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

## Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

## Qualified Hedges (Section 206)

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-17

CONFIDENTIAL

PR-INT-000005435

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments") and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-18

PR-INT-000005436

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-19

CONFIDENTIAL

PR-INT-000005437

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

### Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-20

CONFIDENTIAL

PR-INT-000005438

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

        (i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

        (ii)    stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-21

CONFIDENTIAL

PR-INT-000005439

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

        (i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

        (ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

## Revenue Account (Section 505)

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

B-22

PR-INT-000005440

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)    Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

CONFIDENTIAL

PR-INT-000005441

(iii)    Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)    Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

CONFIDENTIAL

PR-INT-000005442

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

B-25

PR-INT-000005443

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

### Satisfaction of Sinking Fund Installments (Section 508)

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

B-26

PR-INT-000005444

of the Corporation at the time of such purchase or redemption.  Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment.  All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds.  Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment.  The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)      amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)      amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

B-27

PR-INT-000005445

          (iii)     amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

          (iv)     amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

          Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

          To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds.  Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

          The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

          The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

          The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

          The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

          The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

CONFIDENTIAL

PR-INT-000005446

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation.  The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended.  The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee.  The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount.  The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account.  The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another.  The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

CONFIDENTIAL

PR-INT-000005447

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

B-30

PR-INT-000005448

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-31

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

B-32

PR-INT-000005450

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its

CONFIDENTIAL

PR-INT-000005451

duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

### Evidence on Which Trustee May Act (Section 803)

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

### Compensation and Indemnification (Section 804)

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the

B-34

CONFIDENTIAL

PR-INT-000005452

acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

### Certain Permitted Acts (Section 805)

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

### Resignation of Trustee (Section 806)

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

### Removal of Trustee (Section 807)

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

B-35

CONFIDENTIAL

PR-INT-000005453

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)     to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-36

CONFIDENTIAL                                                              PR-INT-000005454

(iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

B-37

CONFIDENTIAL

PR-INT-000005455

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

B-38

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

B-39

CONFIDENTIAL                                                           PR-INT-000005457

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)      by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)      by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)      by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)      by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

B-40

CONFIDENTIAL

PR-INT-000005458

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

B-41

CONFIDENTIAL

PR-INT-000005459

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

CONFIDENTIAL

PR-INT-000005460

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

B-43

CONFIDENTIAL

PR-INT-000005461

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

B-44

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with

B-45

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

CONFIDENTIAL

PR-INT-000005464

APPENDIX C

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

*Hawkins Delafield & Wood LLP*

_____, 2007

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

Puerto Rico Sales Tax Financing Corporation
Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the
"Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as
amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the
"Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the
Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the
Board of Directors on July 17, 2007 (together with the General Resolution, the "Resolution"), and other
proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

**$1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B**

| Maturity Date | Principal Amount at Issuance | Rate | CABs Value at Maturity |
|---|---|---|---|
| August 1, 2027 | $12,007,513.60 | n/a | $40,720,000.00 |
| August 1, 2028 | 30,000,504.45 | n/a | 108,145,000.00 |
| August 1, 2029 | 26,798,324.85 | n/a | 103,785,000.00 |
| August 1, 2030 | 29,298,676.00 | n/a | 120,670,000.00 |
| August 1, 2031 | 14,497,685.00 | n/a | 63,500,000.00 |
| August 1, 2032 | 34,499,076.00 | n/a | 160,700,000.00 |
| August 1, 2036 | 575,000,000.00 | 6.050% | n/a |
| August 1, 2037 | 167,780,000.00 | 6.050% | n/a |
| August 1, 2038 | 167,710,000.00 | 6.050% | n/a |
| July 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| August 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| May 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| June 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| July 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| August 1, 2057 | 50,000,000.00 | 6.350% | n/a |

C-1

CONFIDENTIAL

PR-INT-000005465

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) providing funds for the payment or retirement of certain "extraconstitutional" loans owing by the Commonwealth, and (ii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear or compound interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)    The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)    The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)    The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)    The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions, or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions, nor instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)    Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes pursuant to applicable Federal tax law; provided, that no opinion is expressed with respect to certain Federal income tax matters covered by the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date hereof, and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of

C-2

PR-INT-000005466

the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the inclusion of interest on the Bonds in gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

C-3

CONFIDENTIAL

PR-INT-000005467

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-INT-000005468

<div align="right">

**APPENDIX D**

</div>

<div align="center">

**PROPOSED FORM OF OPINION OF
SPECIAL TAX COUNSEL**

**FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.**
ATTORNEYS AND COUNSELORS AT LAW
PO BOX 363507
SAN JUAN, PR 00936-3507

</div>

TELEPHONE (787) 753-3113
FAX (787) 759-3123

<div align="center">

July [   ], 2007

</div>

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
HATO REY, PR 00918

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Gentlemen:

In connection with the issuance on the date hereof by the Puerto Rico Sales Tax Financing Corporation (the "Corporation") of its Sales Tax Revenue Bonds, Series 2007B (collectively, the "Bonds"), you have requested our opinion with respect to the treatment for Puerto Rico tax purposes of the ownership and disposition of the Bonds.

We have examined Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended (the "Act"), creating the Corporation. The Corporation is a body corporate and politic constituting a public corporation and governmental instrumentality of Commonwealth of Puerto Rico exercising public and essential governmental functions.

From such an examination, we are of the opinion that:

1.      Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.      The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.      The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.      Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

<div align="center">

D-1

</div>

CONFIDENTIAL

5.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.      Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

7.      Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)      Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof; and

(b)      Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico or any foreign country and such interest is not effectively connected with the conduct of a trade or business in the United States by such corporation, such corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1)      These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service,

(2)      These statements were written in connection with the promotion or marketing of the Bonds; and

<center>D-2</center>

PR-INT-000005470

(3)     Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated July 17, 2007 in connection with the Bonds.  We further consent to the reference made to us under the captions "Tax Matters - Puerto Rico Tax Considerations" and "Legal Matters" in said Official Statement.

Respectfully submitted,

D-3

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000005472

APPENDIX E

# BOOK-ENTRY SYSTEM

### The Depository Trust Company

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

E-1

CONFIDENTIAL

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

E-2

PR-INT-000005474

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

CONFIDENTIAL

PR-INT-000005475

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | 2027 CAB 8/1/2027 6.20% | 2028 CAB 8/1/2028 6.20% | 2029 CAB 8/1/2029 6.25% | 2030 CAB 8/1/2030 6.25% | 2031 CAB 8/1/2031 6.25% | 2032 CAB 8/1/2032 6.25% |
|---|---|---|---|---|---|---|
| 7/31/2007 | 1,474.40 | 1,387.05 | 1,291.05 | 1,214.00 | 1,141.55 | 1,073.40 |
| 2/01/2008 | 1,520.10 | 1,430.05 | 1,331.40 | 1,251.95 | 1,177.20 | 1,106.95 |
| 8/01/2008 | 1,567.25 | 1,474.40 | 1,373.00 | 1,291.05 | 1,214.00 | 1,141.55 |
| 2/01/2009 | 1,615.80 | 1,520.10 | 1,415.90 | 1,331.40 | 1,251.95 | 1,177.20 |
| 8/01/2009 | 1,665.90 | 1,567.25 | 1,460.15 | 1,373.00 | 1,291.05 | 1,214.00 |
| 2/01/2010 | 1,717.55 | 1,615.80 | 1,505.80 | 1,415.90 | 1,331.40 | 1,251.95 |
| 8/01/2010 | 1,770.80 | 1,665.90 | 1,552.85 | 1,460.15 | 1,373.00 | 1,291.05 |
| 2/01/2011 | 1,825.70 | 1,717.55 | 1,601.40 | 1,505.80 | 1,415.90 | 1,331.40 |
| 8/01/2011 | 1,882.30 | 1,770.80 | 1,651.45 | 1,552.85 | 1,460.15 | 1,373.00 |
| 2/01/2012 | 1,940.65 | 1,825.70 | 1,703.05 | 1,601.40 | 1,505.80 | 1,415.90 |
| 8/01/2012 | 2,000.80 | 1,882.30 | 1,756.25 | 1,651.45 | 1,552.85 | 1,460.15 |
| 2/01/2013 | 2,062.85 | 1,940.65 | 1,811.15 | 1,703.05 | 1,601.40 | 1,505.80 |
| 8/01/2013 | 2,126.80 | 2,000.80 | 1,867.75 | 1,756.25 | 1,651.45 | 1,552.85 |
| 2/01/2014 | 2,192.70 | 2,062.85 | 1,926.10 | 1,811.15 | 1,703.05 | 1,601.40 |
| 8/01/2014 | 2,260.70 | 2,126.80 | 1,986.30 | 1,867.75 | 1,756.25 | 1,651.45 |
| 2/01/2015 | 2,330.75 | 2,192.70 | 2,048.40 | 1,926.10 | 1,811.15 | 1,703.05 |
| 8/01/2015 | 2,403.00 | 2,260.70 | 2,112.40 | 1,986.30 | 1,867.75 | 1,756.25 |
| 2/01/2016 | 2,477.50 | 2,330.75 | 2,178.40 | 2,048.40 | 1,926.10 | 1,811.15 |
| 8/01/2016 | 2,554.30 | 2,403.00 | 2,246.50 | 2,112.40 | 1,986.30 | 1,867.75 |
| 2/01/2017 | 2,633.50 | 2,477.50 | 2,316.70 | 2,178.40 | 2,048.40 | 1,926.10 |
| 8/01/2017 | 2,715.15 | 2,554.30 | 2,389.10 | 2,246.50 | 2,112.40 | 1,986.30 |
| 2/01/2018 | 2,799.30 | 2,633.50 | 2,463.75 | 2,316.70 | 2,178.40 | 2,048.40 |
| 8/01/2018 | 2,886.10 | 2,715.15 | 2,540.75 | 2,389.10 | 2,246.50 | 2,112.40 |
| 2/01/2019 | 2,975.55 | 2,799.30 | 2,620.15 | 2,463.75 | 2,316.70 | 2,178.40 |
| 8/01/2019 | 3,067.80 | 2,886.10 | 2,702.00 | 2,540.75 | 2,389.10 | 2,246.50 |
| 2/01/2020 | 3,162.90 | 2,975.55 | 2,786.45 | 2,620.15 | 2,463.75 | 2,316.70 |
| 8/01/2020 | 3,260.95 | 3,067.80 | 2,873.50 | 2,702.00 | 2,540.75 | 2,389.10 |
| 2/01/2021 | 3,362.05 | 3,162.90 | 2,963.30 | 2,786.45 | 2,620.15 | 2,463.75 |
| 8/01/2021 | 3,466.25 | 3,260.95 | 3,055.95 | 2,873.50 | 2,702.00 | 2,540.75 |
| 2/01/2022 | 3,573.75 | 3,362.05 | 3,151.45 | 2,963.30 | 2,786.45 | 2,620.15 |
| 8/01/2022 | 3,684.50 | 3,466.25 | 3,249.90 | 3,055.95 | 2,873.50 | 2,702.00 |
| 2/01/2023 | 3,798.75 | 3,573.75 | 3,351.45 | 3,151.45 | 2,963.30 | 2,786.45 |
| 8/01/2023 | 3,916.50 | 3,684.50 | 3,456.20 | 3,249.90 | 3,055.95 | 2,873.50 |
| 2/01/2024 | 4,037.90 | 3,798.75 | 3,564.20 | 3,351.45 | 3,151.45 | 2,963.30 |
| 8/01/2024 | 4,163.10 | 3,916.50 | 3,675.60 | 3,456.20 | 3,249.90 | 3,055.95 |
| 2/01/2025 | 4,292.15 | 4,037.90 | 3,790.45 | 3,564.20 | 3,351.45 | 3,151.45 |
| 8/01/2025 | 4,425.20 | 4,163.10 | 3,908.90 | 3,675.60 | 3,456.20 | 3,249.90 |
| 2/01/2026 | 4,562.40 | 4,292.15 | 4,031.05 | 3,790.45 | 3,564.20 | 3,351.45 |
| 8/01/2026 | 4,703.80 | 4,425.20 | 4,157.05 | 3,908.90 | 3,675.60 | 3,456.20 |
| 2/01/2027 | 4,849.65 | 4,562.40 | 4,286.95 | 4,031.05 | 3,790.45 | 3,564.20 |
| 8/01/2027 | 5,000.00 | 4,703.80 | 4,420.90 | 4,157.05 | 3,908.90 | 3,675.60 |
| 2/01/2028 | - | 4,849.65 | 4,559.05 | 4,286.95 | 4,031.05 | 3,790.45 |
| 8/01/2028 | - | 5,000.00 | 4,701.55 | 4,420.90 | 4,157.05 | 3,908.90 |

F-1

CONFIDENTIAL

PR-INT-000005477

| Date | 2027 CAB 8/1/2027 6.20% | 2028 CAB 8/1/2028 6.20% | 2029 CAB 8/1/2029 6.25% | 2030 CAB 8/1/2030 6.25% | 2031 CAB 8/1/2031 6.25% | 2032 CAB 8/1/2032 6.25% |
|---|---|---|---|---|---|---|
| 2/01/2029 | - | - | 4,848.45 | 4,559.05 | 4,286.95 | 4,031.05 |
| 8/01/2029 | - | - | 5,000.00 | 4,701.55 | 4,420.90 | 4,157.05 |
| 2/01/2030 | - | - | - | 4,848.45 | 4,559.05 | 4,286.95 |
| 8/01/2030 | - | - | - | 5,000.00 | 4,701.55 | 4,420.90 |
| 2/01/2031 | - | - | - | - | 4,848.45 | 4,559.05 |
| 8/01/2031 | - | - | - | - | 5,000.00 | 4,701.55 |
| 2/01/2032 | - | - | - | - | - | 4,848.45 |
| 8/01/2032 | - | - | - | - | - | 5,000.00 |

F-2

CONFIDENTIAL

PR-INT-000005478

Exhibit DX (Part II of II)   Page 317 of 1115



Printed on Recycled Paper
IMAGEMASTER 800.452.5152

CONFIDENTIAL

PR-INT-000005479

Case: 17-00257-LTS   Doc#: 516-8   Filed: 02/21/18   Entered: 02/21/18 23:14:15   Desc:
Exhibit 7 Part 1   Page 199 of 112

# Exhibit 7

NEW ISSUE – BOOK-ENTRY ONLY
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Bonds, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. In the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, (a) under the provisions of Commonwealth of Puerto Rico then existing statutes and regulations now in force, the Bonds, and the interest thereon, are exempt from Commonwealth of Puerto Rico and local taxation and (b) under the provisions of existing Federal statutes and regulations now in force, under certain circumstances, interest on the Bonds will be exempt from United States taxation to individuals who are bona fide residents of the Commonwealth of Puerto Rico and corporations organized under the laws of the Commonwealth of Puerto Rico. See "Tax Matters" herein.*

## PUERTO RICO SALES TAX FINANCING CORPORATION
### $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

**Dated:** Date of Delivery

**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007B (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"). The Series 2007A Bonds are being offered for sale solely in the tax-exempt 103 United States market pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007A Bonds.

The Bonds, the Series 2007A Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on September 1, 2007. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on February 1, 2008, and will be payable at maturity or redemption. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, as Special Tax Counsel to the Corporation and as counsel to the Underwriters. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

## UBS Financial Services Incorporated of Puerto Rico

| | | |
|---|---|---|
| **Popular Securities** | | **Santander Securities** |
| **BBVAPR MSD** | **Citi** | **Lehman Brothers** |
| **Merrill Lynch & Co.** | **Oriental Financial Services Corporation** | **Samuel A. Ramirez & Co., Inc.** |
| **TCM Capital** | | **Wachovia Capital Markets, LLC** |

July 17, 2007

PR-CCD-0010888

# Puerto Rico Sales Tax Financing Corporation
## $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

### $147,101,779.90 Capital Appreciation Bonds

| Maturity Date August 1, | Initial Principal Amount | Maturity Amount | Yield to Maturity |
|---|---|---|---|
| 2027 | $12,007,513.60 | $ 40,720,000.00 | 6.20% |
| 2028 | 30,000,504.45 | 108,145,000.00 | 6.20 |
| 2029 | 26,798,324.85 | 103,785,000.00 | 6.25 |
| 2030 | 29,298,676.00 | 120,670,000.00 | 6.25 |
| 2031 | 14,497,685.00 | 63,500,000.00 | 6.25 |
| 2032 | 34,499,076.00 | 160,700,000.00 | 6.25 |

### $1,186,000,000 Current Interest Bonds

| Maturity Date | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| August 1, 2036 | $575,000,000.00 | 6.05% | 100.000% |
| August 1, 2037 | 167,780,000.00 | 6.05 | 99.312 |
| August 1, 2038 | 167,710,000.00 | 6.05 | 99.304 |
| July 1, 2039 | 37,755,000.00 | 6.05 | 99.297 |
| August 1, 2039 | 37,755,000.00 | 6.05 | 99.297 |
| May 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| June 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| July 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |
| August 1, 2057 | 50,000,000.00 | 6.35 | 100.000 |

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness, and is not to be construed as a representation by, the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1
THE CORPORATION ......................................................... 2
THE BONDS ......................................................................... 3
    General .............................................................................. 3
    Redemption ....................................................................... 3
BOOK-ENTRY ONLY SYSTEM ........................................ 5
ESTIMATED SOURCES AND USES OF FUNDS ............... 5
PLEDGED SALES TAX ....................................................... 5
    Commonwealth Sales Tax ................................................ 5
    Sales Tax Revenue Projections and Actual Collections ..... 6
    Pledged Sales Tax and FIA Fund ..................................... 7
    Procedures for the Collection and Deposit of the Pledged
        Sales Tax to the FIA Fund ........................................... 8
SECURITY FOR THE RESOLUTION BONDS ................... 9
    General .............................................................................. 9
    Property Pledged for the Payment of the Bonds ................ 9
    Funds and Accounts under the Resolution ......................... 9
    Additional Bonds, Refunding Bonds and Other
        Obligations, .................................................................. 10
    Commonwealth's Authority to Cover Deficiencies .......... 11
    Special Investment Considerations .................................. 12
    Commonwealth Non-Impairment Covenant ..................... 12
TAX MATTERS .................................................................. 13
    Puerto Rico Tax Considerations (for Puerto Rico
        Residents only) ........................................................... 13
    United States Federal Taxation for individual resident of
        Puerto Rico ................................................................. 14

**Page**

United States Tax Considerations ...................................... 15
U.S. Holders of the Bonds ................................................ 16
Non-U.S. Holders of the Bonds ........................................ 18
Information Reporting and Backup Withholding for the
    Bonds ............................................................................ 19
IRS Circular 230 Disclosure ............................................ 19
RATINGS ........................................................................... 19
LEGALITY FOR INVESTMENT ...................................... 20
UNDERWRITING ............................................................. 20
LEGAL MATTERS ............................................................ 20
CONTINUING DISCLOSURE ........................................... 20
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
    RICO ............................................................................ 22
MISCELLANEOUS ........................................................... 23

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
    Provisions of the Resolution ........................................ B-1
APPENDIX C – Proposed Form of Approving Opinion of
    Bond Counsel to the Corporation ................................ C-1
APPENDIX D – Proposed Form of Opinion of Special Tax
    Counsel ........................................................................ D-1
APPENDIX E – Book-Entry Only System ......................... E-1
APPENDIX F – Table of Compounded Amounts for Capital
    Appreciation Bonds ...................................................... F-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010891

# Puerto Rico Sales Tax Financing Corporation
# $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B (the "Bonds"). Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"). The Series 2007A Bonds are being offered for sale solely in the tax-exempt 103 United States market pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007A Bonds.

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, and a Second Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on July 17, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee").

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See "*Pledged Sales Tax and FIA Fund*" in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds and the Series 2007A Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006 owing to Government Development Bank and PFC, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds and the Series 2007A Bonds. The Bonds, the Series 2007A Bonds and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds and the Series 2007A Bonds, the "Resolution Bonds").

The requirements contained in the Resolution as conditions to the issuance of additional Resolution Bonds have been modified from those presented in the Preliminary Official Statement dated June 22, 2007. See "SECURITY FOR THE RESOLUTION BONDS" below.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED
PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES
TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH,
CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR
POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND
NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL
SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE
LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and
the provisions of the Resolution are included in this Official Statement. All references to the Resolution and
other documents and agreements are qualified in their entirety by reference to such documents and agreements,
copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation.
These statements are based upon a number of assumptions and estimates that are subject to significant
uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could,"
"will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to
identify these forward-looking statements. Actual results may differ materially from those expressed or implied
by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B.*

## THE CORPORATION

The Corporation is a newly-created independent governmental instrumentality of the Commonwealth
created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional
Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred on
Government Development Bank under its charter (other than the power to act as fiscal agent), including the
power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out
the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name --
"COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the
Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish
mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net
proceeds of the bonds issued by the Corporation and with other funds and resources available to the
Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall
consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation |
| --- | --- |
| Alfredo Salazar-Conde | Acting President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto
Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

PR-CCD-0010893

**THE BONDS**

**General**

The Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $1,333,101,779.90, as current interest bonds (the "Current Interest Bonds"), and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on September 1, 2007, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on February 1, 2008 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds). The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under "SECURITY FOR THE RESOLUTION BONDS".

**Redemption**

*Optional Redemption.* The Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to the principal amount (in the case of Capital Appreciation Bonds, the Compounded Amount) of the Bonds, plus accrued interest to the redemption date, and without premium.

*Mandatory Sinking Fund Redemption.* The Current Interest Bonds due August 1, 2036 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

3

### Current Interest Bond maturing August 1, 2036

| Mandatory Redemption Date August 1, | Sinking Fund Installment |
|---|---|
| 2033 | $105,430,000 |
| 2034 | 129,270,000 |
| 2035 | 156,030,000 |
| 2036 | 184,270,000 |

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

Any notice of optional redemption of Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events.  Any conditional notice so given may be rescinded at any time before payment of such principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions thereof if any such condition so specified is not satisfied or if any such other event shall not occur.  Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such rescission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

4

PR-CCD-0010895

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix E* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriters believe to be reliable, but neither the Corporation nor the Underwriters take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix E-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---|
| Principal Amount of the Bonds | $1,333,101,779.90 |
| Original Issue Discount | (2,852,423.30) |
| **Total Sources** | $1,330,249,356.60 |

**Uses**

| | |
|---|---|
| Payment of Extraconstitutional Debt | $1,314,816,190.78 |
| Underwriters' Discount | 12,979,302.25 |
| Other Costs of Issuance | 2,453,863.57 |
| **Total Uses** | $1,330,249,356.60 |

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

PR-CCD-0010896

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax: (i) taxable items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

**Sales Tax Revenue Projections and Actual Collections**

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

6

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information*. The CTM is an input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

### Pledged Sales Tax and FIA Fund

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

PR-CCD-0010898

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

PR-CCD-0010899

## SECURITY FOR THE RESOLUTION BONDS

**General**

     Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

**Property Pledged for the Payment of the Bonds**

     Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

     The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

     The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

     Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the

9

Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

### Additional Bonds, Refunding Bonds and Other Obligations

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such

10

additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

PR-CCD-0010902

### Special Investment Considerations

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

### Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

12

## TAX MATTERS

**Puerto Rico Tax Considerations (for Puerto Rico Residents only)**

The following is a summary of the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel, regarding certain Puerto Rico tax consequences of the ownership of the Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Tax Counsel*. This section does not purport to cover all of the Puerto Rico tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws and regulations now in effect and is subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below.

In the opinion of Fiddler González & Rodríguez, P.S.C., based on the laws of Puerto Rico now in force:

1. Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2. The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3. The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4. Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5. The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6. Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

PR-CCD-0010904

Prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

**United States Federal Taxation for individual resident of Puerto Rico**

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Bonds. Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Bonds under state, local or foreign tax laws.

This summary is based on current provisions of the Code, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS and interpretations thereof.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a citizen of the United States and a bona fide resident of Puerto Rico, the meaning of Section 937 of the Code, during the entire taxable year within. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

ALL PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF THE BONDS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES, AS WELL AS THE EFFECT OF ANY FOREIGN, STATE, LOCAL OR OTHER LAWS.

*Interest on the Bonds*

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holders during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

14

PR-CCD-0010905

*Sale or Retirement of Series 2007B Bonds*

In general, pursuant to the provisions of Section 1.937-2T of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided, (i) that such Bonds do not constitute inventory in the hands of such individual, and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the preceding 10 years of recognizing the gain, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and other requirements are satisfied.

*Backup Withholding*

Backup withholding of United States federal income tax may apply to payments made in respect of the Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

Prospective owners of the Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

The opinion of the Special Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Bonds is limited to the above. We express no opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or to any other laws of any other jurisdiction or compliance therewith by any party.

**United States Tax Considerations**

The following discussion is a summary of the principal Federal income tax consequences of the acquisition, ownership and disposition of the Bonds by original purchasers of the Bonds. This summary is based on the Code, Treasury regulations, revenue rulings and court decisions, all as now in effect and all subject to change at any time, possibly with retroactive effect. This summary assumes that the Bonds will be held as "capital assets" under the Code, and it does not discuss all of the Federal income tax consequences that may be relevant to a holder in light of its particular circumstances or to holders subject to special rules, such as insurance companies, financial institutions, tax-exempt organizations, dealers in securities or foreign currencies, persons holding the Bonds as a position in a "hedge" or "straddle" for Federal income tax purposes, or holders whose functional currency (as defined in Section 985 of the Code) is not the United States dollar. Each prospective purchaser of the Bonds should consult with its own tax advisor concerning the Federal income tax

PR-CCD-0010906

and other tax consequences to it of the acquisition, ownership and disposition of the Bonds as well as any tax consequences that may arise under the laws of any state, local or foreign tax jurisdiction.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

As used herein, the term "U.S. Holder" means a beneficial owner of a Bond that is for Federal income tax purposes (i) a citizen or resident of the United States, other than individuals who are bona fide residents of Puerto Rico during the entire taxable year, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof, (iii) an estate the income of which is subject to Federal income taxation regardless of its source, or (iv) a trust whose administration is subject to the primary jurisdiction of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust. As used herein, the term "Non-U.S. Holder" means a beneficial owner of a Bond that is not a U.S. Holder.

## U.S. Holders of the Bonds

### U.S. Holders—Interest Income

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Bonds, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Bonds.

### U.S. Holders—Original Issue Discount

For Federal income tax purposes, a Bond will be treated as issued with original issue discount ("OID") if the excess of a Bond's "stated redemption price at maturity" over its "issue price" equals or exceeds a statutorily determined de minimis amount. The "issue price" of each Bond in a particular issue equals the first price at which a substantial amount of such issue is sold to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). The "stated redemption price at maturity" of a Bond is the sum of all payments provided by such Bond other than "qualified stated interest" payments. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. In general, if the excess of a Bond's stated redemption price at maturity over its issue price is less than .25 percent of the Bond's stated redemption price at maturity multiplied by the number of complete years to its maturity (the "de minimis amount"), then such excess, if any, constitutes de minimis OID, and the Bond is not treated as being issued with OID and all payments of stated interest (including stated interest that would otherwise be characterized as OID) is treated as qualified stated interest, as described below.

Payments of qualified stated interest on a Bond are taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the U.S. Holder's regular method of tax accounting. A U.S. Holder of a Bond having a maturity of more than one year from its date of issue generally must include OID in income as ordinary interest as it accrues on a constant-yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting. The amount of OID included in income by the U.S. Holder of a Bond is the sum of the daily portions of OID with respect to such Bond for each day during the taxable year (or portion of the taxable year) on which such U.S. Holder held such Bond. The daily portion of OID on any Bond is determined by allocating to each day in any "accrual period" a ratable portion of the OID allocable to the accrual period. All accrual

16

periods with respect to a Bond may be of any length and the accrual periods may vary in length over the term of the Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or final day of an accrual period. The amount of OID allocable to an accrual period is generally equal to the difference between (i) the product of the Bond's "adjusted issue price" at the beginning of such accrual period and such Bond's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a Bond at the beginning of any accrual period is the issue price of the Bond plus the amount of accrued OID includable in income for all prior accrual periods minus the amount of any prior payments on the Bond other than qualified stated interest payments. The amount of OID allocable to an initial short accrual period may be computed using any reasonable method if all other accrual periods other than a final short accrual period are of equal length. The amount of OID allocable to the final accrual period is the difference between (i) the amount payable at the maturity of the Bond (other than a payment of qualified stated interest) and (ii) the Bond's adjusted issue price as of the beginning of the final accrual period. Under the OID rules, U.S. Holders generally will have to include in income increasingly greater amounts of OID in successive accrual periods.

A U.S. Holder may elect to include in gross income all interest that accrues on a Bond using the constant-yield method described above under the heading "U.S. Holders—Original Issue Discount," with the modifications described below. For purposes of this election, interest includes, among other things, stated interest, OID and de minimis OID, as adjusted by any amortizable bond premium described below under the heading "U.S. Holders—Bond Premium." In applying the constant-yield method to a Bond with respect to which this election has been made, the issue price of the Bond will equal its cost to the electing U.S. Holder, the issue date of the Bond will be the date of its acquisition by the electing U.S. Holder, and no payments on the Bond will be treated as payments of qualified stated interest. The election will generally apply only to the Bond with respect to which it is made and may not be revoked without the consent of the Internal Revenue Service. If this election is made with respect to a Bond with amortizable bond premium, then the electing U.S. Holder will be deemed to have elected to apply amortizable bond premium against interest with respect to all debt instruments with amortizable bond premium (other than debt instruments the interest on which is excludable from gross income) held by the electing U.S. Holder as of the beginning of the taxable year in which the Bond with respect to which the election is made is acquired or thereafter acquired. The deemed election with respect to amortizable bond premium may not be revoked without the consent of the IRS.

U.S. Holders of any Bonds issued with OID should consult their own tax advisors with respect to the treatment of OID for Federal income tax purposes, including various special rules relating thereto, and tax consequences under tax laws of the states, including their political subdivisions, and the District of Columbia, in connection with the acquisition, ownership, and disposition of Bonds.

*U.S. Holders—Bond Premium*

In general, if a U.S. Holder acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, a U.S. Holder of a Premium Bond may either deduct the amortizable bond premium for a taxable year under Section 171(a)(1) of the Code or may elect to amortize the total bond premium over the remaining term of the Premium Bond, based on the U.S. Holder's yield over the remaining term of the Premium Bond, following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the highest yield on such bond.) Any such election applies to all debt instruments of the U.S. Holder (other than tax-exempt bonds) held at the beginning of the first taxable year to which the election applies and to all such debt instruments thereafter acquired, and is irrevocable without the Internal Revenue Service's consent. A U.S. Holder of a Premium Bond that so elects to amortize bond premium does so

17

PR-CCD-0010908

by offsetting the qualified stated interest allocable to each interest accrual period under the U.S. Holder's regular method of Federal tax accounting against the bond premium allocable to that period. If the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is treated as a bond premium deduction under Section 171(a)(1) of the Code, subject to certain limitations. If a Premium Bond is optionally callable before maturity at a price in excess of its stated redemption price at maturity, special rules may apply with respect to the amortization of bond premium. Under certain circumstances, the U.S. Holder of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the U.S. Holder's original acquisition cost.

U.S. Holders of any Premium Bonds should consult their own tax advisors with respect to the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, and disposition of Premium Bonds.

*U.S. Holders—Disposition of Bonds*

Except as discussed above, upon the sale, exchange, redemption, or other disposition (which would include a legal defeasance) of a Bond, a U.S. Holder generally will recognize taxable gain or loss in an amount equal to the difference between the amount realized (other than amounts attributable to accrued interest not previously includable in income) and such U.S. Holder's adjusted tax basis in the Bond. A U.S. Holder's adjusted tax basis in a Bond generally will equal such U.S. Holder's initial investment in the Bond, increased by any OID included in the U.S. Holder's income with respect to the Bond and decreased by the amount of any payments, other than qualified stated interest payments, received and bond premium amortized with respect to such Bond. Such gain or loss generally will be long-term capital gain or loss if the Bond was held for more than one year.

*U.S. Holders—Defeasance*

U.S. Holders of the Bonds should be aware that, for Federal income tax purposes, the deposit of moneys or securities in escrow in such amount and manner as to cause the Bonds to be deemed to be no longer outstanding under the resolution of the Bonds (a "defeasance"), could result in a deemed exchange under Section 1001 of the Code and a recognition by such owner of taxable income or loss, without any corresponding receipt of moneys. In addition, for Federal income tax purposes, the character and timing of receipt of payments on the Bonds subsequent to any such defeasance could also be affected. U.S. Holders of the Bonds are advised to consult with their own tax advisors regarding the consequences of a defeasance for Federal income tax purposes and under the tax laws of the states, including their political subdivisions, and the District of Columbia.

**Non-U.S. Holders of the Bonds**

Under existing Federal income tax law, interest (including any OID) on the Bonds is considered to be income from sources without the United States, and unless effectively connected with the conduct of a United States trade or business of a Non-U.S. Holder, such interest is not subject to Federal income or withholding tax when paid to or for a Non-U.S. Holder. A Non-U.S. Holder may be requested to furnish its name and address and to certify under penalties of perjury, using IRS Form W-8 or substantially similar substitute form, that it is not a United States person and is the beneficial owner of a Bond.

In general, a Non-U.S. Holder of a Bond is not subject to Federal income or withholding tax, under existing law, with respect to any gain realized on the sale, exchange, retirement or other disposition of a such a bond, unless the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year and certain other requirements are met, or unless the gain is effectively connected with the conduct of a United States trade or business of the Non-U.S. Holder.

18

PR-CCD-0010909

Any person who seeks to become a Non-U.S. Holder of a Bond is advised to consult with its own tax advisor concerning the foregoing or any other Federal income tax consequences that may arise in connection with the acquisition, ownership and disposition of such a bond.

**Information Reporting and Backup Withholding for the Bonds**

*U.S. Holders*

In general, information reporting requirements will apply to non-corporate U.S. Holders with respect to payments of principal, payments of interest, and the accrual of OID on a Bond and the proceeds of the sale of a Bond before maturity within the United States. Backup withholding may apply to U.S. Holders under Section 3406 of the Code to such payments and to payments of OID unless the U.S. Holder (i) is a corporation or other exempt recipient and, when required, demonstrates that fact, or (ii) provides a correct taxpayer identification number, certifies under penalties of perjury, when required, that such U.S. Holder is not subject to backup withholding and has not been notified by the IRS that it has failed to report all interest and dividends required to be shown on its Federal income tax returns.

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner, and which constitutes over-withholding, would be allowed as a refund or a credit against such beneficial owner's Federal income tax provided the required information is furnished to the IRS.

*Non-U.S. Holders*

Under existing Federal income tax law, information reporting and backup withholding do not apply to payments of principal and interest (including OID) made to a Non-U.S. Holder in respect of a Bond, provided that the payor does not have actual knowledge that such Bondholder is a United States person.

**IRS Circular 230 Disclosure**

The advice under the captions "United States Tax Considerations Relating," "U.S. Holders of the Bonds," and "Non-U.S. Holders of the Bonds," concerning certain income tax consequences of the acquisition, ownership and disposition of the Bonds, was written to support the marketing of the Bonds. To ensure compliance with requirements imposed by the IRS, Bond Counsel to the Corporation informs you that (i) any Federal tax advice contained in the Official Statement (including any attachments) or in writings furnished by the Bond Counsel to the Corporation is not intended to be used, and cannot be used by any Bondholder, for the purpose of avoiding penalties that may be imposed on the Bondholder under the Code, and (ii) the Bondholder should seek advice from an independent tax advisor based on the Bondholder's particular circumstances.

<div align="center">

**RATINGS**

</div>

The Bonds have received ratings of "A1" from Moody's, "A+" from S&P and "A+" from Fitch. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

PR-CCD-0010910

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $1,317,270,054.35 (representing a purchase price equal to the principal amount of the Bonds at issuance, less an original discount in an amount equal to $2,852,423.30, less underwriters' discount in an amount equal to $12,979,302.25), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

20

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation

PR-CCD-0010912

described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriters to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

PR-CCD-0010913

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of tax opinion of Special Tax Counsel (*Appendix D*), the summary of the book-entry system for the Bonds (*Appendix E*), and the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix F*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing in "UNDERWRITING," was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO SALES TAX FINANCING CORPORATION**


By: _____/s/ Samuel Sierra Rivera_____
         Samuel Sierra Rivera
         Executive Director

23

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010915

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

### INTRODUCTION

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

PR-CCD-0010916

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from Georgetown University Law Center. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006. Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB. Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions. He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras. He is also a member of the American Institute of Certified Public Accountants.

Alfredo Salazar Conde became Acting President of Government Development Bank for Puerto Rico ("GDB") effective on August 19, 2005. Mr. Salazar is a private investor with over 30 years of experience in commercial banking. Mr. Salazar served as President of GDB from 1975 to 1976 and as Executive Director of Puerto Rico Industrial Development Company during 1990. Mr. Salazar has a Bachelor's degree in economics from Villanova University and pursued post graduate studies in finance at New York University and Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | **1988** | **1992** | **1996** | **2000** | **2004** |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

A-2

PR-CCD-0010917

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | **Senate** | **House** |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to May 2007.

### Commonwealth Sales Tax Collections
(in millions)

|  | **November**[1] | **December** | **January** | **February** | **March** | **April** | **May** | **Total** |
|---|---|---|---|---|---|---|---|---|
| **General Fund** | $41 | $90 | $78 | $71 | $ 79 | $70 | $77 | $506 |
| **FIA** | 9 | 20 | 17 | 16 | 18 | 16 | 17 | 113 |
| **Total** | $50 | $110 | $95 | $87 | $97 | $86 | $94 | $619 |

(1) Commonwealth Sales Tax was effective on November 15, 2006.

As of today, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

## THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

A-3

PR-CCD-0010918

**General**

     The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

     The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, equivalent to an increase by 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, equivalent to an increase by 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

     According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for the first nine months of Fiscal Year 2007 averaged 1,268,300, an increase of 0.1% compared to 1,266,600 for the same period in Fiscal Year 2006. The seasonally adjusted unemployment rate for first nine months of Fiscal Year 2007 was 10.5%, a decrease from 11.2% for the same period in Fiscal Year 2006.

*Fiscal Year 2006*

     The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased marginally from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

     According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,000, an increase of 1.2% compared to 1,237,600 for Fiscal Year 2005. An important component of total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

     Prior to Fiscal Year 2006, Puerto Rico enjoyed more than two decades of almost continuous economic expansion. Virtually every sector of the economy participated in this expansion, and record levels of employment were achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing for private and public capital projects. In some years, these factors were aided by a significant expansion in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. During Fiscal Year 2003 to 2005, the economy expanded at a moderate annual rate of 2.2%. Recently, however, as several key economic figures began to indicate a contraction of economic activity, the Planning Board lowered its forecast of growth in real gross national product from 2.2% to 0.7% for Fiscal Year 2006. Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for

A-4

approximately 50% of total imports to Puerto Rico), and the deceleration of public investment (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit. For Fiscal Year 2007, the Planning Board's February 2007 projection forecasts a real gross national product decline of 1.4% (nominal growth of 2.0%), followed by slight real growth of 0.8% for Fiscal Year 2008 (nominal growth of 5.1%).

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce

PR-CCD-0010920

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[(*)] |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
| Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.7 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
| Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
| Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| | | | | | |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
| Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

(*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005. At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

PR-CCD-0010921

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

A-7

PR-CCD-0010922

| Commonwealth of Puerto Rico Gross National Product | | | | | |
|---|---|---|---|---|---|
| | Fiscal Years Ended June 30, | | | | |
| | **2002** | **2003** | **2004** | **2005** | **2006[1]** |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

(1) Preliminary.
(2) In current dollars.

*Sources:*  Puerto Rico Planning Board and Global Insight Inc.


The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008. In nominal terms, gross national product is forecasted to increase by 2.0% and 5.1% in Fiscal Years 2007 and 2008, respectively.

# Real GNP Growth Rate



Fiscal Years

■ P.R. *   □ U.S. **

\*        Puerto Rico Planning Board.
\*\*      Global Insight 04/07.

A-8

PR-CCD-0010923

# Puerto Rico Nominal GNP Growth Rate



**Economic Performance by Sector**

*General*

From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[1]** |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less: net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

(1)   Preliminary.
(2)   Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3)   Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4)   Includes mining.
(5)   Totals may not add due to rounding.

*Source:* Planning Board

A-9

PR-CCD-0010924

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

### Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[2]** |
| Natural Resources and Construction | 72,142 | 68,525 | 69,297 | 68,221 | 67,442 |
| Manufacturing | | | | | |
|    Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
|    Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,367 |
|    Sub Total | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
|    Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
|    Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
|    Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
|    Sub Total | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| | | | | | |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional & Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Government | 288,675 | 297,722 | 303,431 | 307,835 | 302,025 |
|    Total Non-Farm | 1,000,550 | 1,008,609 | 1,033,265 | 1,049,684 | 1,049,935 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### *Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in Fiscal Year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During Fiscal Year 2006, payroll employment for the manufacturing sector was 112,859, a decrease of 3.8% compared with Fiscal Year 2005, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of December 2006, the average hourly manufacturing wage rate in Puerto Rico was 68.9% of the average mainland United States rate.

A-10

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five Fiscal Years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
|   Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
|   Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
|   Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
| Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1) Preliminary.
(2) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3) Totals may not add due to rounding.

*Source:* Planning Board

A-11

PR-CCD-0010926

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,525 | 4,444 | 4,706 | 4,471 | 4,108 |
| Cement and Concrete Products Manufacturing | 3,617 | 3,543 | 3,867 | 3,750 | 3,542 |
| Fabricated Metal Products | 6,517 | 6,198 | 6,490 | 6,427 | 5,808 |
| Computer and Electronic | 11,742 | 11,623 | 10,581 | 10,673 | 10,808 |
| Electrical Equipment | 7,233 | 7,415 | 7,744 | 7,645 | 6,858 |
| Electrical Equipment Manufacturing | 4,125 | 4,399 | 4,935 | 4,971 | 4,708 |
| Miscellaneous Manufacturing | 12,033 | 12,308 | 12,070 | 11,157 | 11,225 |
| Medical Equipment and Supplies Manufacturing | 10,858 | 11,336 | 11,059 | 10,473 | 10,492 |
| Other Durable Goods Manufacturing | 8,450 | 7,646 | 8,185 | 7,693 | 7,685 |
| Total – Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 14,842 | 13,628 | 13,244 | 13,050 | 12,667 |
| Beverage and Tobacco Products Manufacturing | 3,508 | 3,159 | 3,038 | 3,175 | 3,425 |
| Apparel Manufacturing | 12,000 | 8,988 | 8,522 | 8,873 | 8,400 |
| Cut and Sew Apparel Manufacturing | 11,233 | 8,969 | 8,518 | 8,846 | 8,183 |
| Chemical Manufacturing | 31,067 | 31,183 | 31,385 | 32,885 | 32,335 |
| Pharmaceutical and Medicine Manufacturing | 26,358 | 26,645 | 27,187 | 28,572 | 28,017 |
| Plastics and Rubber Products | 3,492 | 3,340 | 3,210 | 2,744 | 2,350 |
| Plastics Product Manufacturing | 3,183 | 3,030 | 2,917 | 2,266 | 2,158 |
| Other Non-Durable Goods Manufacturing | 9,391 | 8,823 | 9,261 | 8,529 | 7,200 |
| Total – Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,377 |
| | | | | | |
| Total Manufacturing Employment | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |

\*   Totals may not add due to rounding.
(1)   Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 11,941 from Fiscal Year 2002 to Fiscal Year 2006. Manufacturing employment had been declining during the past decade, but the decline accelerated during Fiscal Years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in Fiscal Year 2006 with the sector experiencing another significant drop of -3.8%. For the first six months of Fiscal Year 2007 the employment decline accelerated further to -6.2%. During the last two years the economy has lost around 5,500 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

A-12

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between Fiscal Years 2002 and 2006, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for Fiscal Year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

\* Totals may not add due to rounding.
(1) Preliminary.
(2) Includes tourism.

According to the Establishment Survey, for the first six months of Fiscal Year 2007 the net employment gain for this sector was 2,200 jobs, compared to same period in the previous year. Service, finance, insurance and real estate employment added 6,800 jobs, while trade lost 4,600 jobs; for a net growth rate of 1%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In Fiscal Year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 514,933 in Fiscal Year 2002 to 567,609 in Fiscal Year 2006 (representing 54.1% of total, non-farm, payroll employment). This represents a cumulative increase of 10.2% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in Fiscal Years 2002 to 2006, as measured by gross domestic product. From Fiscal Year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2006 were $106.6 billion. As of December 31, 2006, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $76.3 billion.

A-13

PR-CCD-0010928

The following table sets forth employment figures for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 |

---
\*    Totals may not add due to rounding.
(1)  Preliminary.

*Source:*  Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

### Hotels and Related Services – Tourism

During Fiscal Year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in Fiscal Year 2005. The number of non-resident tourists registered in tourist hotels during Fiscal Year 2006 increased 4.6% compared to Fiscal Year 2005. Hotel rooms available during Fiscal Year 2006 increased 3.9% compared to Fiscal Year 2005. The average number of rooms rented in tourist hotels increased 3.9% during Fiscal Year 2006 compared to Fiscal Year 2005. The average occupancy rate in tourist hotels during Fiscal Years 2005 and 2006 was 70.8%.

During the first six months of Fiscal Year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 859,300, a decrease of 5.7% over the number of persons registered during the same period in Fiscal Year 2006. The average occupancy rate in tourist hotels during the first six months of Fiscal Year 2007 was 67%, compared to 66.6% during the same period in Fiscal Year 2006. The average number of rooms rented in tourist hotels decreased 5.8% during the first six months of Fiscal Year 2007 compared with the same period during Fiscal Year 2006. The average number of rooms available in tourist hotels decreased 7.7% during the first six months of Fiscal Year 2007 compared to the same period in Fiscal Year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five Fiscal Years ended June 30, 2006.

A-14

PR-CCD-0010929

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30 | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

(1)  Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2)  Includes visitors in guesthouses.
(3)  Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:*   Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In Fiscal Year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 302,025 workers, or 28.8% of total, non-farm, payroll employment in Fiscal Year 2006.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During Fiscal Year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material budgetary impact on the Commonwealth.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean

A-15

islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The Island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in Fiscal Year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April, 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from Fiscal Year 2002 through Fiscal Year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior Fiscal Years. The total value of construction permits increased 2.5% during the same five Fiscal Year period.

Public investment has been an important component of construction investment. During Fiscal Year 2006, approximately 42% of the total investment in construction was related to public projects. For Fiscal Year 2006 compared to Fiscal Year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during Fiscal Year 2006 was 67,059, a decrease of 1.7% from Fiscal Year 2005. Through the first three quarters of Fiscal Year 2007, construction employment increased to a seasonally adjusted 67,500, but cement sales (including imports) continued their decline falling 7.1% compared to the same period in Fiscal Year 2006.

Total construction investment for Fiscal Year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in Fiscal Year 2005) due principally to the drop in construction related public projects. For Fiscal Years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first seven months of Fiscal Year 2007, the number and the total value of construction permits decreased 5.2% and 22.8%, respectively, compared to the same period in Fiscal Year 2006.

A-16

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During Fiscal Year 2006, gross income from agriculture was $805.6 million, an increase 1.5% compared with Fiscal Year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During Fiscal Year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous Fiscal Year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Employment and Unemployment**

Total average annual employment (as measured by the Household Survey) has increased. From Fiscal Year 2002 to Fiscal Year 2006, annual employment increased 8.8% to 1,253,000.

The number of persons employed in Puerto Rico during Fiscal Year 2006 averaged 1,253,000, a 1.2% increase from 1,237,600 in Fiscal Year 2005. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate increased from 10.6% in Fiscal Year 2005 to 11.7% in Fiscal Year 2006.

The following table presents annual statistics of employment and unemployment for Fiscal Year 2002 through Fiscal Year 2006 and monthly statistics, seasonally adjusted, for the first nine months of Fiscal Year 2007. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, the Payroll Survey, which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

A-17

PR-CCD-0010932

**Commonwealth of Puerto Rico**
**Employment and Unemployment**[1]
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| **Fiscal Year 2007** | | (Seasonally Adjusted) | | |
| July | 1,392 | 1,234 | 158 | 11.4% |
| August | 1,399 | 1,252 | 146 | 10.5 |
| September | 1,417 | 1,262 | 155 | 10.9 |
| October | 1,407 | 1,274 | 134 | 9.5 |
| November | 1,411 | 1,270 | 141 | 10.0 |
| December | 1,409 | 1,257 | 152 | 10.8 |
| January | 1,431 | 1,287 | 144 | 10.0 |
| February | 1,459 | 1,289 | 170 | 11.6 |
| March | 1,428 | 1,290 | 138 | 9.6 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

A-18

PR-CCD-0010933

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| Academic Year | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2005-2006 was approximately 63,973 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two Fiscal Years immediately preceding the current Fiscal Year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years.

A-19

PR-CCD-0010934

In order to enjoy the benefits provided by the 1998 Tax Incentives Act, a business must apply for such benefits prior to December 31, 2007. It has been proposed that new tax incentives legislation be enacted to replace the 1998 Tax Incentives Act and that pending the enactment of such legislation, the aforementioned deadline be extended for two years. There is no assurance that such legislation will be enacted before December 31, 2007 or that the deadline will be extended.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any Fiscal Year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs will encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

A-20

PR-CCD-0010935

Tax and other incentives have also been established to promote the development of the tourism industry. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Recently, many United States corporations operating in Puerto Rico are organized as controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. CFCs are subject to a fifteen percent (15%) Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

PR-CCD-0010936

Case 17-00257-LTS   Doc#:516-8   Filed:02/21/18   Entered:02/21/18 23:14:15   Desc:
Exhibit 7   Page 361 of 512

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010937

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to

PR-CCD-0010938

the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

B-2

PR-CCD-0010939

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

B-3

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

<div align="center">B-4</div>

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any croup of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

    (i)      Government Obligations;

    (ii)     Defeased Municipal Obligations;

    (iii)    any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

    (iv)    an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

PR-CCD-0010942

(v)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

B-6

PR-CCD-0010943

Fixed Tender Bond shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

Foreign Currency shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

Fund or Funds shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

GDB shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

Government Obligations shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

Interest Subaccount shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

Investment Obligations shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)     Defeasance Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of both annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

B-7

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

PR-CCD-0010945

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

> (i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

> (ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

PR-CCD-0010946

(iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

B-10

PR-CCD-0010947

Person or Persons shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

Pledged Property shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.     All Revenues.

      2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

      3.     The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

      4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

      5.     Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Pledged Sales Tax shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

Pledged Sales Tax Base Amount means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

Principal Installment shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

Principal Subaccount shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

Qualified Hedge shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

PR-CCD-0010948

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

PR-CCD-0010949

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

PR-CCD-0010950

        3.      Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

        4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

        5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007 Bonds of the Series designated as "Series 2007A" and "Series 2007B," and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under the Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

B-14

PR-CCD-0010951

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

PR-CCD-0010952

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

> (i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

> (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

PR-CCD-0010953

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii) either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv) a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-17

PR-CCD-0010954

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-18

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

PR-CCD-0010956

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-20

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-21

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

> (i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

> (ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

PR-CCD-0010959

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

PR-CCD-0010960

(iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

B-24

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

PR-CCD-0010962

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

PR-CCD-0010963

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)    amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)    amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

B-27

PR-CCD-0010964

(iii)   amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)   amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on such due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

PR-CCD-0010965

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

   Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

   Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

   Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

   The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

B-29

PR-CCD-0010966

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

PR-CCD-0010967

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-31

PR-CCD-0010968

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

PR-CCD-0010969

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its

B-33

duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the

B-34

acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

B-35

PR-CCD-0010972

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i) to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii) to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-36

PR-CCD-0010973

(iii)   to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)   to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)   to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)   to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)   to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)   to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)   to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)   as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)   to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)   to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

B-37

PR-CCD-0010974

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

PR-CCD-0010975

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

B-39

PR-CCD-0010976

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)   by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)   by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)   by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)   by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

PR-CCD-0010977

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST:  to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND:  to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD:  to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH:  to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH:  to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

B-41

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

PR-CCD-0010979

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law.  It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

B-43

PR-CCD-0010980

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

B-44

PR-CCD-0010981

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with

B-45

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-46

Case: 17-03283-LTS   Doc#:4781-1   Filed:01/14/19   Entered:01/14/19 23:10:25   Desc:
Exhibit DX-GG Part 1   Page 408 of 1005

APPENDIX C

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

*Hawkins Delafield & Wood LLP*

_____, 2007

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

Puerto Rico Sales Tax Financing Corporation
Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the Board of Directors on July 17, 2007 (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

### $1,333,101,779.90 Sales Tax Revenue Bonds, Series 2007B
#### Principal

| Maturity Date | Amount at Issuance | Rate | CABs Value at Maturity |
|---|---|---|---|
| August 1, 2027 | $12,007,513.60 | n/a | $40,720,000.00 |
| August 1, 2028 | 30,000,504.45 | n/a | 108,145,000.00 |
| August 1, 2029 | 26,798,324.85 | n/a | 103,785,000.00 |
| August 1, 2030 | 29,298,676.00 | n/a | 120,670,000.00 |
| August 1, 2031 | 14,497,685.00 | n/a | 63,500,000.00 |
| August 1, 2032 | 34,499,076.00 | n/a | 160,700,000.00 |
| August 1, 2036 | 575,000,000.00 | 6.050% | n/a |
| August 1, 2037 | 167,780,000.00 | 6.050% | n/a |
| August 1, 2038 | 167,710,000.00 | 6.050% | n/a |
| July 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| August 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| May 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| June 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| July 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| August 1, 2057 | 50,000,000.00 | 6.350% | n/a |

C-1

PR-CCD-0010984

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) providing funds for the payment or retirement of certain "extraconstitutional" loans owing by the Commonwealth, and (ii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear or compound interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)    The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)    The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)    The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)    The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions, or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions, nor instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)    Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes pursuant to applicable Federal tax law; provided, that no opinion is expressed with respect to certain Federal income tax matters covered by the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date hereof, and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of

C-2

PR-CCD-0010985

the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the inclusion of interest on the Bonds in gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

C-3

PR-CCD-0010986

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010987

Case: 17-03283-LTS   Doc#:4781-1   Filed:01/14/19   Entered:01/14/19 23:19:25   Desc:
Exhibit Exhibit 7 Part 1 Page 2 of 112

**APPENDIX D**

## PROPOSED FORM OF OPINION OF
## SPECIAL TAX COUNSEL

FIDDLER GONZÁLEZ & RODRÍGUEZ, P.S.C.
ATTORNEYS AND COUNSELORS AT LAW
PO BOX 363507
SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

July [　], 2007

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
HATO REY, PR 00918

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Gentlemen:

In connection with the issuance on the date hereof by the Puerto Rico Sales Tax Financing Corporation (the "Corporation") of its Sales Tax Revenue Bonds, Series 2007B (collectively, the "Bonds"), you have requested our opinion with respect to the treatment for Puerto Rico tax purposes of the ownership and disposition of the Bonds.

We have examined Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended (the "Act"), creating the Corporation. The Corporation is a body corporate and politic constituting a public corporation and governmental instrumentality of Commonwealth of Puerto Rico exercising public and essential governmental functions.

From such an examination, we are of the opinion that:

1.      Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.      The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.      The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.      Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

D-1

5.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.      Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

7.      Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)      Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof; and

(b)      Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico or any foreign country and such interest is not effectively connected with the conduct of a trade or business in the United States by such corporation, such corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1)      These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service,

(2)      These statements were written in connection with the promotion or marketing of the Bonds; and

D-2

    (3)  Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

    This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

    This letter is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

    We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated July 17, 2007 in connection with the Bonds. We further consent to the reference made to us under the captions "Tax Matters - Puerto Rico Tax Considerations" and "Legal Matters" in said Official Statement.

           Respectfully submitted,

PR-CCD-0010990

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010991

<div align="right">APPENDIX E</div>

<div align="center">

**BOOK-ENTRY SYSTEM**

</div>

**The Depository Trust Company**

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

<div align="center">E-1</div>

PR-CCD-0010992

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

E-2

PR-CCD-0010993

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

PR-CCD-0010994

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010995

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | 2027 CAB 8/1/2027 6.20% | 2028 CAB 8/1/2028 6.20% | 2029 CAB 8/1/2029 6.25% | 2030 CAB 8/1/2030 6.25% | 2031 CAB 8/1/2031 6.25% | 2032 CAB 8/1/2032 6.25% |
|---|---|---|---|---|---|---|
| 7/31/2007 | 1,474.40 | 1,387.05 | 1,291.05 | 1,214.00 | 1,141.55 | 1,073.40 |
| 2/01/2008 | 1,520.10 | 1,430.05 | 1,331.40 | 1,251.95 | 1,177.20 | 1,106.95 |
| 8/01/2008 | 1,567.25 | 1,474.40 | 1,373.00 | 1,291.05 | 1,214.00 | 1,141.55 |
| 2/01/2009 | 1,615.80 | 1,520.10 | 1,415.90 | 1,331.40 | 1,251.95 | 1,177.20 |
| 8/01/2009 | 1,665.90 | 1,567.25 | 1,460.15 | 1,373.00 | 1,291.05 | 1,214.00 |
| 2/01/2010 | 1,717.55 | 1,615.80 | 1,505.80 | 1,415.90 | 1,331.40 | 1,251.95 |
| 8/01/2010 | 1,770.80 | 1,665.90 | 1,552.85 | 1,460.15 | 1,373.00 | 1,291.05 |
| 2/01/2011 | 1,825.70 | 1,717.55 | 1,601.40 | 1,505.80 | 1,415.90 | 1,331.40 |
| 8/01/2011 | 1,882.30 | 1,770.80 | 1,651.45 | 1,552.85 | 1,460.15 | 1,373.00 |
| 2/01/2012 | 1,940.65 | 1,825.70 | 1,703.05 | 1,601.40 | 1,505.80 | 1,415.90 |
| 8/01/2012 | 2,000.80 | 1,882.30 | 1,756.25 | 1,651.45 | 1,552.85 | 1,460.15 |
| 2/01/2013 | 2,062.85 | 1,940.65 | 1,811.15 | 1,703.05 | 1,601.40 | 1,505.80 |
| 8/01/2013 | 2,126.80 | 2,000.80 | 1,867.75 | 1,756.25 | 1,651.45 | 1,552.85 |
| 2/01/2014 | 2,192.70 | 2,062.85 | 1,926.10 | 1,811.15 | 1,703.05 | 1,601.40 |
| 8/01/2014 | 2,260.70 | 2,126.80 | 1,986.30 | 1,867.75 | 1,756.25 | 1,651.45 |
| 2/01/2015 | 2,330.75 | 2,192.70 | 2,048.40 | 1,926.10 | 1,811.15 | 1,703.05 |
| 8/01/2015 | 2,403.00 | 2,260.70 | 2,112.40 | 1,986.30 | 1,867.75 | 1,756.25 |
| 2/01/2016 | 2,477.50 | 2,330.75 | 2,178.40 | 2,048.40 | 1,926.10 | 1,811.15 |
| 8/01/2016 | 2,554.30 | 2,403.00 | 2,246.50 | 2,112.40 | 1,986.30 | 1,867.75 |
| 2/01/2017 | 2,633.50 | 2,477.50 | 2,316.70 | 2,178.40 | 2,048.40 | 1,926.10 |
| 8/01/2017 | 2,715.15 | 2,554.30 | 2,389.10 | 2,246.50 | 2,112.40 | 1,986.30 |
| 2/01/2018 | 2,799.30 | 2,633.50 | 2,463.75 | 2,316.70 | 2,178.40 | 2,048.40 |
| 8/01/2018 | 2,886.10 | 2,715.15 | 2,540.75 | 2,389.10 | 2,246.50 | 2,112.40 |
| 2/01/2019 | 2,975.55 | 2,799.30 | 2,620.15 | 2,463.75 | 2,316.70 | 2,178.40 |
| 8/01/2019 | 3,067.80 | 2,886.10 | 2,702.00 | 2,540.75 | 2,389.10 | 2,246.50 |
| 2/01/2020 | 3,162.90 | 2,975.55 | 2,786.45 | 2,620.15 | 2,463.75 | 2,316.70 |
| 8/01/2020 | 3,260.95 | 3,067.80 | 2,873.50 | 2,702.00 | 2,540.75 | 2,389.10 |
| 2/01/2021 | 3,362.05 | 3,162.90 | 2,963.30 | 2,786.45 | 2,620.15 | 2,463.75 |
| 8/01/2021 | 3,466.25 | 3,260.95 | 3,055.95 | 2,873.50 | 2,702.00 | 2,540.75 |
| 2/01/2022 | 3,573.75 | 3,362.05 | 3,151.45 | 2,963.30 | 2,786.45 | 2,620.15 |
| 8/01/2022 | 3,684.50 | 3,466.25 | 3,249.90 | 3,055.95 | 2,873.50 | 2,702.00 |
| 2/01/2023 | 3,798.75 | 3,573.75 | 3,351.45 | 3,151.45 | 2,963.30 | 2,786.45 |
| 8/01/2023 | 3,916.50 | 3,684.50 | 3,456.20 | 3,249.90 | 3,055.95 | 2,873.50 |
| 2/01/2024 | 4,037.90 | 3,798.75 | 3,564.20 | 3,351.45 | 3,151.45 | 2,963.30 |
| 8/01/2024 | 4,163.10 | 3,916.50 | 3,675.60 | 3,456.20 | 3,249.90 | 3,055.95 |
| 2/01/2025 | 4,292.15 | 4,037.90 | 3,790.45 | 3,564.20 | 3,351.45 | 3,151.45 |
| 8/01/2025 | 4,425.20 | 4,163.10 | 3,908.90 | 3,675.60 | 3,456.20 | 3,249.90 |
| 2/01/2026 | 4,562.40 | 4,292.15 | 4,031.05 | 3,790.45 | 3,564.20 | 3,351.45 |
| 8/01/2026 | 4,703.80 | 4,425.20 | 4,157.05 | 3,908.90 | 3,675.60 | 3,456.20 |
| 2/01/2027 | 4,849.65 | 4,562.40 | 4,286.95 | 4,031.05 | 3,790.45 | 3,564.20 |
| 8/01/2027 | 5,000.00 | 4,703.80 | 4,420.90 | 4,157.05 | 3,908.90 | 3,675.60 |
| 2/01/2028 | - | 4,849.65 | 4,559.05 | 4,286.95 | 4,031.05 | 3,790.45 |
| 8/01/2028 | - | 5,000.00 | 4,701.55 | 4,420.90 | 4,157.05 | 3,908.90 |

F-1

PR-CCD-0010996

| Date | 2027 CAB 8/1/2027 6.20% | 2028 CAB 8/1/2028 6.20% | 2029 CAB 8/1/2029 6.25% | 2030 CAB 8/1/2030 6.25% | 2031 CAB 8/1/2031 6.25% | 2032 CAB 8/1/2032 6.25% |
|---|---|---|---|---|---|---|
| 2/01/2029 | - | - | 4,848.45 | 4,559.05 | 4,286.95 | 4,031.05 |
| 8/01/2029 | - | - | 5,000.00 | 4,701.55 | 4,420.90 | 4,157.05 |
| 2/01/2030 | - | - | - | 4,848.45 | 4,559.05 | 4,286.95 |
| 8/01/2030 | - | - | - | 5,000.00 | 4,701.55 | 4,420.90 |
| 2/01/2031 | - | - | - | - | 4,848.45 | 4,559.05 |
| 8/01/2031 | - | - | - | - | 5,000.00 | 4,701.55 |
| 2/01/2032 | - | - | - | - | - | 4,848.45 |
| 8/01/2032 | - | - | - | - | - | 5,000.00 |

F-2

PR-CCD-0010997


Printed on Recycled Paper
IMAGEMASTER 800.452.5152

PR-CCD-0010998

# Exhibit 8

NEW ISSUE – BOOK-ENTRY ONLY
See "BOOK-ENTRY ONLY SYSTEM"

*In the opinion of Fiddler González & Rodríguez, P.S.C., Bond Counsel to the Corporation, (a) under the provisions of Commonwealth of Puerto Rico existing statutes and regulations now in force, and the interest thereon, are exempt from Commonwealth of Puerto Rico and local taxation, (b) interest on the Bonds is not excludable from gross income for Federal income tax purposes under Section 103(a) of the United States Internal Revenue Code of 1986, as amended, and (c) under the provisions of existing Federal statutes and regulations now in force, under certain circumstances, interest on the Bonds will be exempt from United States taxation to individuals who are bona fide residents of the Commonwealth of Puerto Rico and corporations organized under the laws of the Commonwealth of Puerto Rico. See "TAX MATTERS" herein.*

# Puerto Rico Sales Tax Financing Corporation
## $499,996,627.90 Sales Tax Revenue Bonds, Series 2007C

**Dated:** Date of Delivery                                             **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007C (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its "extraconstitutional" debt.

The Bonds and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the *first receipts* of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on February 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on February 1, 2008, and will be payable at maturity or redemption. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriter when, as and if issued by the Corporation and received by the Underwriter, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, Bond Counsel to the Corporation. It is expected that the Bonds will be delivered through The Depository Trust Company on or about December 20, 2007.

# SANTANDER SECURITIES

December 18, 2007

## Puerto Rico Sales Tax Financing Corporation
## $499,996,627.90 Sales Tax Revenue Bonds, Series 2007C

### $84,691,627.90 Capital Appreciation Bonds

| Maturity Date August 1, | Initial Principal Amount | Maturity Amount | Yield to Maturity |
|---|---|---|---|
| 08/01/2022 | $   513,216.60 | $  1,235,000.00 | 6.10% |
| 08/01/2023 | 725,898.60 | 1,855,000.00 | 6.10 |
| 08/01/2024 | 2,140,985.00 | 5,810,000.00 | 6.10 |
| 08/01/2025 | 8,602,377.90 | 24,790,000.00 | 6.10 |
| 08/01/2026 | 6,994,511.85 | 21,405,000.00 | 6.10 |
| 08/01/2027 | 2,983,345.40 | 9,695,000.00 | 6.10 |
| 08/01/2029 | 358,824.05 | 1,315,000.00 | 6.10 |
| 08/01/2030 | 1,951,611.20 | 7,595,000.00 | 6.10 |
| 08/01/2031 | 6,621,509.05 | 27,365,000.00 | 6.10 |
| 08/01/2033 | 13,272,227.35 | 61,855,000.00 | 6.10 |
| 08/01/2034 | 8,463,283.10 | 41,885,000.00 | 6.10 |
| 08/01/2035 | 5,925,959.15 | 31,145,000.00 | 6.10 |
| 08/01/2036 | 9,772,477.20 | 54,540,000.00 | 6.10 |
| 08/01/2037 | 6,139,241.05 | 36,385,000.00 | 6.10 |
| 08/01/2038 | 10,226,160.40 | 64,360,000.00 | 6.10 |

### $415,305,000 Term Bonds

$105,125,000 6.00% Term Bonds due August 1, 2031; Price: 100%
$73,000,000 6.00% Term Bonds due August 1, 2032; Price: 100%
$61,000,000 6.00% Term Bonds due August 1, 2034; Price: 100%
$176,180,000 6.00% Term Bonds due August 1, 2038; Price: 100%

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriter to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriter have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriter do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITER MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITER.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................1
THE CORPORATION .................................................2
THE BONDS ...............................................................3
   General ...................................................................3
   Redemption ...........................................................3
BOOK-ENTRY ONLY SYSTEM ...............................5
ESTIMATED SOURCES AND USES OF FUNDS ...............5
PLEDGED SALES TAX .............................................6
   Commonwealth Sales Tax .....................................6
   Sales Tax Revenue Projections and Actual Collections ......6
   Pledged Sales Tax and FIA Fund ..........................7
   Procedures for the Collection and Deposit of the Pledged
      Sales Tax to the FIA Fund .................................8
SECURITY FOR THE RESOLUTION BONDS ...............9
   General ...................................................................9
   Property Pledged for the Payment of the Bonds .................9
   Funds and Accounts under the Resolution ...........9
   Additional Bonds, Refunding Bonds and Other
      Obligations ......................................................10
   Commonwealth's Authority to Cover Deficiencies ..........11
   Special Investment Considerations ......................12
   Commonwealth Non-Impairment Covenant ...................12

**Page**

TAX MATTERS ........................................................13
   Puerto Rico Tax Considerations .........................13
   United States Federal Taxation for individual resident of
      Puerto Rico .....................................................14
RATINGS ................................................................16
LEGALITY FOR INVESTMENT .............................16
UNDERWRITING ....................................................16
LEGAL MATTERS ..................................................16
CONTINUING DISCLOSURE ..................................16
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ...................................................................18
MISCELLANEOUS ..................................................19

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution .............................. B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation ...................... C-1
APPENDIX D – Book-Entry Only System ...................D-1
APPENDIX E – Table of Compounded Amounts for Capital
   Appreciation Bonds ......................................... E-1

# Puerto Rico Sales Tax Financing Corporation
## $499,996,627.90 Sales Tax Revenue Bonds, Series 2007C

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its $499,996,627.90 Sales Tax Revenue Bonds, Series 2007C (the "Bonds").

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, and a Third Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on December 18, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee"). Immediately prior to the issuance of the Bonds, the Corporation will have outstanding $4.0 billion of its Sales Tax Revenue Bonds (calculated by excluding all accretion on any existing capital appreciation bonds) issued under the Resolution, the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, and a Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007.

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See *"Pledged Sales Tax and FIA Fund"* in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds. The Bonds, the Series 2007A Bonds, the Series 2007B Bonds, and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds, the "Resolution Bonds").

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation |
|------|------------|
| Jorge Irizarry Herráns | President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

PR-CCD-0006503

## THE BONDS

**General**

    The Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $499,996,627.90, as current interest bonds (the "Current Interest Bonds") and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

    Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on February 1, 2008, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on February 1, 2008 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

    For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

    The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of Capital Appreciation Bonds). The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

    Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under "SECURITY FOR THE RESOLUTION BONDS".

**Redemption**

    *Optional Redemption.* The Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to the principal amount (in the case of Capital Appreciation Bonds, the Compounded Amount) of the Bonds, plus accrued interest to the redemption date, and without premium.

    *Mandatory Sinking Fund Redemption.* The Current Interest Bonds due August 1, 2031, 2032, 2034 and 2038 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

3

| Maturity Date | Term Bonds due 08/01/2031 | Term Bonds due 08/01/2032 | Term Bonds due 08/01/2034 | Term Bonds due 08/01/2038 |
|---|---|---|---|---|
| 08/01/2022 | $ 3,495,000 | | | |
| 08/01/2023 | - | $ 5,255,000 | | |
| 08/01/2024 | 16,445,000 | - | | |
| 08/01/2025 | 4,680,000 | 4,675,000 | | |
| 08/01/2026 | 5,365,000 | 12,010,000 | | |
| 08/01/2027 | 4,570,000 | 18,280,000 | | |
| 08/01/2028 | - | | | |
| 08/01/2029 | 6,215,000 | 1,245,000 | | |
| 08/01/2030 | 14,335,000 | 3,590,000 | | |
| 08/01/2031 | 50,020,000 | 14,510,000 | | |
| 08/01/2032 | | 13,435,000 | | |
| 08/01/2033 | | | $19,450,000 | |
| 08/01/2034 | | | 41,550,000 | |
| 08/01/2035 | | | | $24,870,000 |
| 08/01/2036 | | | | 1,960,000 |
| 08/01/2037 | | | | 60,685,000 |
| 08/01/2038 | | | | 88,665,000 |

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

Any notice of optional redemption of Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions thereof if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such rescission to affected

PR-CCD-0006505

Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix D* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriter believe to be reliable, but neither the Corporation nor the Underwriter take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix D-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

| Sources | |
|---|---|
| Principal Amount of the Bonds | $499,996,627.90 |
| **Total Sources** | $499,996,627.90 |
| | |
| Uses | |
| Payment of Extraconstitutional Debt | $496,772,145.61 |
| Underwriter's Discount | 1,999,986.51 |
| Other Costs of Issuance | 1,224,495.78 |
| **Total Uses** | $499,996,627.90 |

5

PR-CCD-0006506

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items:  (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax:  (i) taxable items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

**Sales Tax Revenue Projections and Actual Collections**

The Commonwealth Sales Tax went into effect on November 15, 2006.  For the seven and one half month period from November 15, 2006 through June 30, 2007 of Fiscal Year 2006-2007, the total Commonwealth Sales Tax collections was $713.3 million (an average of $95.1 million per month).

6

PR-CCD-0006507

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month. Total Commonwealth Sales Tax collections from July 1, 2007 through October 31, 2007 was $366.2 million (an average of $91.6 million per month), representing a projected increase of approximately $8 million from the Commonwealth Sales Tax revenue projections for the same period. As of October 2007, seventy-five percent of the collections from the Commonwealth Sales Tax are received electronically.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 and 2008 as presented by the Planning Board on February 2007. The CTM is an input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

**Pledged Sales Tax and FIA Fund**

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

PR-CCD-0006508

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[*].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

---

[*] Act No. 80 of July 29, 2007, requires the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities).

PR-CCD-0006509

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

**Property Pledged for the Payment of the Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the

9

PR-CCD-0006510

Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

      A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such

PR-CCD-0006511

additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

   B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

   In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

   Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

   Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

   If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

11

**Special Investment Considerations**

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

On July 31, 2007, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) issued an opinion stating that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

12

## TAX MATTERS

**Puerto Rico Tax Considerations**

The following is a summary of the opinion of Fiddler González & Rodríguez, P.S.C., Bond Counsel, regarding certain Puerto Rico tax consequences of the ownership of the Bonds by Puerto Rico residents. See also *Appendix B – Form of Opinion of Bond Counsel*. This section does not purport to cover all of the Puerto Rico tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws and regulations now in effect and is subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below.

The discussion in connection with the Puerto Rico tax considerations is based on the current provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code"), and the regulations promulgated or applicable thereunder (the "PR IRC Regulations") issued by the Treasury Department of Puerto Rico (the "Treasury Department"), the Puerto Rico Municipal Property Tax Act of 1991, as amended (the "MPTA"); and the regulations promulgated thereunder, the Municipal License Tax Act, as amended (the "MLTA"); and the regulations promulgated thereunder, and certain industrial and incentive tax act described below. The U.S. federal tax discussion is based on the current provisions of the United States Internal Revenue Code of 1986, as amended (the "Code") and the regulations promulgated thereunder (the "Code Regulations").

This discussion deals only with Bonds held by original investors as capital assets within the meaning of Section 1121 of the P.R. Code and Section 1221 of the Code.

The existing provisions of the statutes, regulations, judicial decisions, and administrative pronouncements on which this summary is based, are subject to change (even with retroactive effect) and could affect the continued validity of this summary.

In the opinion of Bond Counsel, based on the laws of Puerto Rico now in force:

1.      Interest on the Bonds is excluded from gross income and exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of P.R. Code;

2.      The Bonds are exempt from property taxes imposed by the MPTA, and interest thereon is exempt from the municipal license tax imposed by the MLTA;

3.      The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.      Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

PR-CCD-0006514

6.     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

**United States Federal Taxation for individual resident of Puerto Rico**

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Bonds. Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Bonds as capital assets within the meaning of Section 1221 of the Code and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Bonds under state, local or foreign tax laws.

This summary is based on current provisions of the Code, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS and interpretations thereof.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a citizen of the United States and a bona fide resident of Puerto Rico, the meaning of Section 937 of the Code, during the entire taxable year within. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

ALL PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF THE BONDS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES, AS WELL AS THE EFFECT OF ANY FOREIGN, STATE, LOCAL OR OTHER LAWS.

PR-CCD-0006515

*Interest on the Bonds*

Interest on the Bonds is not excludable from gross income for Federal income tax purposes under Section 103(a) of the Code.

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holders during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

*Sale or Retirement of the Bonds*

In general, pursuant to the provisions of Section 1.937-2T of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided, (i) that such Bonds do not constitute inventory in the hands of such individual, and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the preceding 10 years of recognizing the gain, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and other requirements are satisfied.

*Backup Withholding*

Backup withholding of United States federal income tax may apply to payments made in respect of the Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

Prospective owners of the Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

The opinion of Bond Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Bonds is limited to the above.

PR-CCD-0006516

We express no opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or to any other laws of any other jurisdiction or compliance therewith by any party.

## RATINGS

The Bonds have received ratings of "A1" from Moody's and "A+" from S&P. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriter has agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $497,996,641.39 (representing a purchase price equal to the principal amount of the Bonds at issuance, less underwriter's discount in an amount equal to $1,999,986.51), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriter. The Underwriter's obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Fiddler González & Rodríguez, P.S.C., Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C*.

## CONTINUING DISCLOSURE

In order to assist the Underwriter in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee entered into a certain Master Continuing Disclosure Agreements, dated as of July 31, 2007 (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial

PR-CCD-0006517

statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIR and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

PR-CCD-0006518

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriter to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriter of the Bonds. Certain of the Underwriter have been selected by Government Development Bank to serve from time to time as underwriter of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriter or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

18

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), and the summary of the book-entry system for the Bonds (*Appendix D*), and the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO SALES TAX FINANCING
CORPORATION**


By:    _____/s/ Samuel Sierra Rivera_____
                        Executive Director

PR-CCD-0006520

<div align="right">

**APPENDIX A**

</div>

<div align="center">

**COMMONWEALTH OF PUERTO RICO
ECONOMIC INFORMATION**

**INTRODUCTION**

</div>

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this

<div align="center">

A-1

</div>

court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments.  In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005.  He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree.  He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell.  He also served in the public sector as legislative adviser to the Governor of Puerto Rico.  From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives.  From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005.  He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree.  He obtained an LL.M. in tax law from Georgetown University Law Center.  From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury.  Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006.  Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB.  Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions.  He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras.  He is also a member of the American Institute of Certified Public Accountants.

Jorge Irizarry Herráns became President of Government Development Bank for Puerto Rico ("GDB") effective on December 4, 2007.  Mr. Irizarry has been Acting President of the GDB since August 28, 2007, when Alfredo Salazar, former Acting President and Chairman of the Board of Directors of GDB, vacated that position.  Since April 2005, Mr. Irizarry has served as GDB's Executive Vice President and Financing Director, with responsibility for supervising over $29 billion in bonds, loans and other transactions of the central government.  Mr. Irizarry, who has over 30 years of experience in banking, investments and consulting, which he acquired while working at Chase Manhattan, Booz Allen Hamilton, Inc., Banco Mercantil, Banco de Ponce, PaineWebber, Inc. and Sandoval Associates.  Mr. Irizarry has Bachelor's degree in finance from New York University and a Master's degree in Business Administration from Harvard University.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States:  one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party.  The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections.  While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who

A-2

PR-CCD-0006522

support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to June 30, 2007, and for the four month-period of fiscal year 2007-2008.

### Commonwealth Sales Tax Collections
(in millions)

| 2006-07 | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F.I.A | - | - | - | - | $ 9.1 | $ 20.0 | $17.3 | $15.7 | $16.0 | $15.7 | $16.9 | $16.2 | $126.9 |
| CINE[1] | - | - | - | - | - | - | - | - | - | - | - | 1.1 | 1.1 |
| G.F. | - | - | - | - | 41.1 | 90.0 | 77.7 | 70.5 | 80.4 | 70.0 | 77.5 | 78.1 | 585.3 |
| Total | - | - | - | - | $50.2 | $110.0 | $95.0 | $86.2 | $96.4 | 85.7 | $94.4 | $95.4 | $713.3 |

| 2007-08 | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F.I.A | $96.1 | $88.9 | - | - |  |  |  |  |  |  |  |  | $185.0 |
| CINE[1] | - | - | $ .8 | $ .3 |  |  |  |  |  |  |  |  | 1.1 |
| G.F. | - | - | 85.4 | 93.4 | - | - | - | - | - | - | - | - | 180.1 |
| Total[2] | $96.1 | $90.2 | $86.2 | $93.7 |  |  |  |  |  |  |  |  | $366.2 |

(1) Pursuant to Act No. 23 of March 8, 2007, the Secretary of the Treasury must transfer said moneys to the Fund for the Development of the Arts, Sciences, and Cinematographic Industry of Puerto Rico.
(2) Preliminary.

A-3

PR-CCD-0006523

As of today, seventy-five percent of the collections from the Commonwealth Sales Tax are received electronically.

<div align="center">

**THE ECONOMY**

</div>

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

**General**

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, or 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, or 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, among others, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for Fiscal Year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,253,400 for Fiscal Year 2006. The unemployment rate for Fiscal Year 2007 was 10.4%, a decrease from 11.7% for Fiscal Year 2006.

*Fiscal Year 2006*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over Fiscal Year 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,400, an increase of 1.3% compared to 1,237,600 for Fiscal Year 2005. The driving force behind total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006 that resulted in the two week

<div align="center">

A-4

</div>

furlough of many government employees. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for approximately 50% of total imports to Puerto Rico), and the deceleration of public investment due to the Commonwealth's budget deficit (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit. The implementation of the tax reform legislation discussed below, however, is expected to alleviate the Commonwealth's fiscal difficulties by raising additional revenues from the imposition of a sales tax but this, too, may reduce net disposable income even after giving effect to certain income tax reductions provided in the tax reform legislation.

As can be observed from the above economic activity index charts, the EAI grew by 0.6% during Fiscal Year 2006 but was trending significantly downward during the second half of the Fiscal Year.

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

PR-CCD-0006525

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006**[(*)] |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
| Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.7 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
| Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
| Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| | | | | | |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
| Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

(*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005. At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

PR-CCD-0006526

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.0 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

_____
(1) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis.

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

A-7

PR-CCD-0006527

**Commonwealth of Puerto Rico**
**Gross National Product**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

(1)  Preliminary.
(2)  In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008.

# Real GNP Growth Rate



Fiscal Years

■ P.R.  □ U.S. *.

* Global Insight 11/07.

The Federal Open Market Committee has revised down its projections for GNP growth at the end of 2007 and 2008. The central tendency for growth in 2007 was reduced by about 40 basis points less than the July forecast for fiscal year 2007 and around 25 points for fiscal years 2008. Thus, Global Insight August forecast will reflect the downward scenario.

A-8

PR-CCD-0006528

# Puerto Rico Nominal GNP Growth Rate



**Economic Performance by Sector**

*General*

    From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

    The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less: net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

(1)  Preliminary.
(2)  Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3)  Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4)  Includes mining.
(5)  Totals may not add due to rounding.

*Source:* Planning Board

A-9

PR-CCD-0006529

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2007.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2007[2]** |
| Natural Resources and Construction | 72,142 | 68,525 | 69,300 | 68,233 | 67,442 | 67,392 |
| Manufacturing | | | | | | |
| Durable Goods | 50,500 | 48,567 | 48,808 | 48,067 | 46,492 | 44,850 |
| Non-Durable Goods | 74,300 | 70,192 | 69,633 | 69,250 | 66,367 | 60,958 |
| Sub Total | 124,800 | 118,759 | 118,441 | 117,317 | 112,859 | 105,808 |
| | | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | | |
| Wholesale Trade | 32,200 | 32,183 | 33,300 | 33,717 | 33,992 | 33,158 |
| Retail Trade | 130,675 | 130,183 | 132,008 | 136,192 | 137,800 | 135,058 |
| Transportation, Warehouse & Utilities | 18,017 | 17,358 | 17,042 | 17,617 | 17,433 | 16,700 |
| Sub Total | 180,892 | 179,724 | 182,350 | 187,526 | 189,225 | 184,916 |
| | | | | | | |
| Information | 22,483 | 21,617 | 21,917 | 22,608 | 22,600 | 21,733 |
| Finance | 44,975 | 44,667 | 46,850 | 48,633 | 49,767 | 49,975 |
| Professional & Business | 97,408 | 98,500 | 101,900 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 86,400 | 92,408 | 98,108 | 99,967 | 103,583 | 105,842 |
| Leisure & Hospitality | 65,783 | 67,917 | 70,317 | 72,592 | 74,767 | 73,433 |
| Other Services | 16,992 | 18,858 | 20,671 | 21,257 | 21,267 | 22,283 |
| Government | 288,675 | 297,717 | 303,408 | 307,825 | 302,025 | 297,450 |
| Total Non-Farm | 1,000,550 | 1,008,692 | 1,033,262 | 1,049,725 | 1,049,935 | 1,033,599 |

(1)  The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2)  Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During fiscal year 2007, payroll employment for the manufacturing sector was 105,808, a decrease of 6.2% compared with fiscal year 2006, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of September 2007, the average hourly manufacturing wage rate in Puerto Rico was 68.6% of the average mainland United States rate.

A-10

PR-CCD-0006530

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: | | | | | |
| Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
| Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
| Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
| Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
| Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1) Preliminary.
(2) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3) Totals may not add due to rounding.

*Source:* Planning Board.

A-11

PR-CCD-0006531

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2003 to 2007.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,444 | 4,706 | 4,471 | 4,108 | 3,792 |
| Cement and Concrete Products Manufacturing | 3,543 | 3,867 | 3,750 | 3,542 | 3,208 |
| Fabricated Metal Products | 6,198 | 6,490 | 6,427 | 5,808 | 5,817 |
| Computer and Electronic | 11,623 | 10,581 | 10,673 | 10,808 | 10,133 |
| Electrical Equipment | 7,415 | 7,744 | 7,645 | 6,858 | 6,567 |
| Electrical Equipment Manufacturing | 4,399 | 4,935 | 4,971 | 4,708 | 4,525 |
| Miscellaneous Manufacturing | 12,308 | 12,070 | 11,157 | 11,225 | 11,200 |
| Medical Equipment and Supplies Manufacturing | 11,336 | 11,059 | 10,473 | 10,492 | 10,467 |
| Other Durable Goods Manufacturing | 7,646 | 8,185 | 7,693 | 7,685 | 7,341 |
| Total – Durable Goods | 49,634 | 49,776 | 48,066 | 46,492 | 44,850 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 13,628 | 13,244 | 13,050 | 12,667 | 12,433 |
| Beverage and Tobacco Products Manufacturing | 3,159 | 3,038 | 3,175 | 3,425 | 3,267 |
| Apparel Manufacturing | 8,988 | 8,522 | 8,873 | 8,400 | 7,250 |
| Cut and Sew Apparel Manufacturing | 8,969 | 8,518 | 8,846 | 8,183 | 6,933 |
| Chemical Manufacturing | 31,183 | 31,385 | 32,885 | 32,335 | 30,067 |
| Pharmaceutical and Medicine Manufacturing | 26,645 | 27,187 | 28,572 | 28,017 | 25,742 |
| Plastics and Rubber Products | 3,340 | 3,210 | 2,744 | 2,350 | 2,217 |
| Plastics Product Manufacturing | 3,030 | 2,917 | 2,266 | 2,158 | 2,083 |
| Other Non-Durable Goods Manufacturing | 8,823 | 9,261 | 8,529 | 7,200 | 5,724 |
| Total – Non-Durable Goods | 69,121 | 68,660 | 69,256 | 66,367 | 60,958 |
| | | | | | |
| Total Manufacturing Employment | 118,755 | 118,436 | 117,322 | 112,869 | 105,808 |

\* Totals may not add due to rounding.
(1) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 12,947 from fiscal year 2003 to fiscal year 2007. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in fiscal year 2006 with the sector experiencing another significant drop of -3.8%. For fiscal year 2007 the employment decline accelerated further to -6.2%. During the last year the economy has lost around 7,050 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job

A-12

PR-CCD-0006532

outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2002 and 2006, the gross product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for fiscal year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Year 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector\***
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[1]** |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

\*     Totals may not add due to rounding.
(1)   Preliminary.
(2)   Includes tourism.

Source:   Planning Board.

According to the Establishment Survey, for the first four months of fiscal year 2008 the net employment gain for this sector was 4,000 jobs, compared to same period in the previous year, while trade lost 3,500 jobs; for a net growth rate of 0.9%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 523,691 in fiscal year 2003 to 562,949 in fiscal year 2007 (representing 54.5% of total, non-farm, payroll employment). This represents a cumulative increase of 7.5% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2002 to 2006, as measured by gross domestic product. From fiscal year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these

A-13

PR-CCD-0006533

institutions as of June 30, 2007 were $111.0 billion. As of June 30, 2007, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $79.4 billion.

The following tables set forth gross domestic product for fiscal years 2002 to 2006 and employment for the services sector for fiscal years 2002 to 2007.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 | 33,158 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 | 135,058 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 | 16,700 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 | 184,916 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 | 21,733 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 | 49,975 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 | 105,842 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 | 73,433 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 | 22,283 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 | 562,949 |

---

\*     Totals may not add due to rounding.
(1)   Preliminary.

*Source:*   Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During fiscal year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in fiscal year 2005. The number of non-resident tourists registered in tourist hotels during fiscal year 2006 increased 4.6% compared to fiscal year 2005. Hotel rooms available during fiscal year 2006 increased 3.9% compared to fiscal year 2005. The average number of rooms rented in tourist hotels increased 3.9% during fiscal year 2006 compared to fiscal year 2005. The average occupancy rate in tourist hotels during fiscal years 2005 and 2006 was 70.8%.

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,793,300, a decrease of 6.5% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.3%, compared to 70.3% during fiscal year 2006. The average number of rooms rented in tourist hotels decreased 6.0% during the first nine months of fiscal year 2007 compared with the same period during fiscal year 2006. The average number of rooms available in tourist hotels decreased 6.3% during fiscal year 2007 compared to fiscal year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-14

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2006.

### Commonwealth of Puerto Rico
### Tourism Data[1]
### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In fiscal year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 297,450 workers, or 28.8% of total, non-farm, payroll employment in fiscal year 2006. This total includes municipal employees. As of March 31, 2007, central government employment has been reduced by approximately 13,700 positions since September 2004.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During fiscal year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material impact on the General Fund.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas,

A-15

PR-CCD-0006535

Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

As of May 31, 2007, PAA had an outstanding balance of $86.3 million under various lines of credit from GDB. PAA is authorized to borrow up to $250 million under these lines of credit. This debt is payable from annual legislative appropriations until the PAA starts generating revenues sufficient to cover debt service and is also guaranteed by the Commonwealth. Partial operation of the Port of the Americas, at a capacity of up to 250,000 TEUs per year, could begin in early 2008.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from fiscal year 2002 through fiscal year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior fiscal years. The total value of construction permits increased 2.5% during the same five fiscal year period.

Public investment has been an important component of construction investment. During fiscal year 2006, approximately 42% of the total investment in construction was related to public projects. For fiscal year 2006 compared to fiscal year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during fiscal year 2006 was 67,400, a decrease of 1.2% from fiscal year 2005. Through the fiscal year 2007, construction employment was 67,400. The cement sales (including imports) continued their decline falling 7.1% compared to the same period in fiscal year 2006.

A-16

Total construction investment for fiscal year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in fiscal year 2005) due principally to the drop in construction related public projects. For fiscal years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first three months of fiscal year 2008, the number of construction permits decreased 13.3% and the total value of construction permits increased 24.3% compared to the same period in fiscal year 2007.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2006, gross income from agriculture was $805.6 million, an increase of 1.5% compared with fiscal year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During fiscal year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous fiscal year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2007 averaged 1,262,900, a 0.8% increase from 1,253,400 in fiscal year 2006. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate decreased from 11.7% in fiscal year 2006 to 10.4% in fiscal year 2007.

A-17

PR-CCD-0006537

The following table presents annual statistics of employment and unemployment for fiscal year 2002 through fiscal year 2007 and monthly statistics, seasonally adjusted, for the first three months of fiscal year 2008. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

<div align="center">

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

</div>

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| 2007 | 1,409 | 1,263 | 147 | 10.4 |
| **Fiscal Year 2008** | | (Seasonally Adjusted) | | |
| July | 1,389 | 1,226 | 163 | 11.8% |
| August | 1,412 | 1,279 | 133 | 9.4 |
| September | 1,364 | 1,213 | 151 | 11.1 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

## Higher Education

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

<div align="center">

A-18

</div>

PR-CCD-0006538

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1)   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)   Based on census population as of April 1 of the stated year.
(3)   Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico.

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2006-2007 was approximately 62,340 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

A-19

PR-CCD-0006539

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, which are designed to promote investment in Puerto Rico, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these industrial incentives laws is the 1998 Tax Incentives Act.

The benefits provided by the 1998 Tax Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. Companies qualifying thereunder can benefit from income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, the 1998 Tax Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 60% and 80% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities. The 1998 Tax Incentives Act also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

Under the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments are fully exempt from income and municipal license taxes. Individual shareholders of an exempted business are allowed a credit against their Puerto Rico income taxes up to 30% of their proportionate share of the exempted business's income tax liability. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period is subject to a 4% income tax rate.

Under the 1998 Tax Incentives Act, core pioneer industries that employ innovative technologies in their operations, including high technology industries with activities that produce a significant economic impact, can be eligible for income tax rates below 2%. Eligible manufacturing industries may also qualify for certain payroll and training deductions, building and construction expense deductions, a 25% credit for purchases of products manufactured in Puerto Rico, and a 35% credit for purchases of locally recycled products and products manufactured with locally recycled materials.

The 1998 Tax Incentives Act also provides investors who acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or assets. Also, exempted businesses that produce high technology products may be eligible for a credit equal to the amount in excess of $100 million of the annual taxes retained on the payment of rights, rents, royalties and licenses related to the production of such goods. Finally, call centers servicing markets outside Puerto Rico are exempt from paying excise taxes on the purchase of equipment needed for the operation of such call centers.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received

A-20

PR-CCD-0006540

from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,900 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996 (the "1996 Amendments"), its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

Because of the modification and phase out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a fifteen percent Puerto Rico withholding tax on royalty payments.

A-21

PR-CCD-0006541

Case:17-03283-LTS Doc#:5716-9 Filed:02/21/19 Entered:02/21/19 23:14:45 Desc:
Exhibit 8 Part 1 Page 490 of 1005

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

A-22

PR-CCD-0006542

Case:17-03283-LTS Doc#:5761-1 Filed:01/14/19 Entered:01/14/19 23:19:25 Desc:
Exhibit B Part 1 Page 468 of 1005

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

B-1

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-2

PR-CCD-0006544

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

B-3

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriter's or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

B-4

PR-CCD-0006546

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

(iv)    an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

(v)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided,

B-5

PR-CCD-0006547

however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi) a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i) which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii) (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

B-6

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

        (iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

        (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

        (vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

        (vii)  shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or

PR-CCD-0006549

money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)   bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)   repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)   investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)   any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

PR-CCD-0006550

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

(i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

B-9

(iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

PR-CCD-0006552

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

        1.      All Revenues.

        2.      All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

        3.      The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

        4.      Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

        5.      Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

B-11

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the
principal amount of such Bonds as may be designated or a notional principal amount relating to all or a
portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction
or agreement, other exchange or rate protection transaction agreement, other similar transaction (however
designated), or any combination thereof, or any option with respect to any of the foregoing, executed by
the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a
written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee,
and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument
securing the obligations of the Corporation under any financial arrangement described in clause (i) above;
provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge
constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge
Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds
covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except
to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a
Person whose long term obligations, other unsecured long term obligations, financial program rating,
counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate
exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long
term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the
time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating
Category of each Rating Agency, but in no event lower than any Rating Category designated by any such
Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if
any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the
Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without
reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment
obligations under an interest rate exchange agreement are subject to collateralization requirements that, as
evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result
in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding
Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then
maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency
without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as
described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and
interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution
authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the
Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a
Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

PR-CCD-0006554

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

PR-CCD-0006555

3.       Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4.       Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

5.       Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007C Bonds of the Series designated as "Series 2007C", and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds and Series 2007B Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007C Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007C.

**Series 2007C Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007C Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

B-14

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-15

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

(i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)     if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-16

PR-CCD-0006558

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)      either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)      a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

### Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

### Qualified Hedges (Section 206)

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-17

PR-CCD-0006559

**Privilege of Redemption and Redemption Price (Section 401)**

        Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

        In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

        In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

        In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

        The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

PR-CCD-0006560

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-19

PR-CCD-0006561

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

## Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

PR-CCD-0006562

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

      (i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

      (ii)    stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-21

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

> (i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

> (ii)      stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

B-22

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)     Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

B-23

(iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

B-24

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

B-25

PR-CCD-0006567

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

B-26

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

B-27

(iii)     amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)     amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

PR-CCD-0006570

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

B-29

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

B-30

PR-CCD-0006572

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-31

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007C Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007C Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007C Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

B-32

PR-CCD-0006574

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

## Responsibilities of Trustee (Section 802)

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its

B-33

PR-CCD-0006575

duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the

B-34

PR-CCD-0006576

acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

B-35

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section.  The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books.  Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee.  Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i)   to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)   to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-36

(iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

B-37

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

B-38

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided*, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

PR-CCD-0006581

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

· *Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

> (i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

> (ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

> (iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

> (iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

PR-CCD-0006582

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

B-41

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law.  It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

PR-CCD-0006585

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

B-44

PR-CCD-0006586

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with

B-45

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-46

APPENDIX C

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

December 20, 2007

Puerto Rico Sales Tax Financing Corporation
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

    **Re:**   **$499,996,627.90 Puerto Rico Sales Tax Financing Corporation
Series 2007C Bonds**

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the Board of Directors on December 18, 2007 (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the issuance of the Corporation's Sales Tax Revenues Bonds, Series 2007C in the aggregate principal amount of $499,996,627.90 (the "Bonds").

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of providing funds for the payment or retirement of certain "extraconstitutional" debt as authorized under the Act.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the General Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

C-1

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion, and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)     Interest on the Bonds is excluded from gross income and exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

(6)     The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

(7)     The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

(8)     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

(9)     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

(10)     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

PR-CCD-0006590

Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(1)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(2)     Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico ("Puerto Rico Corporation") or any foreign country and such interest is not effectively connected with the conduct of a trade or business in the United States by such corporation, such corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(3)     Interest on the Bonds is not excludable from the gross income of the recipient thereof for Federal income tax purposes under Section 103(a) of the U.S. Code.

(4)     Pursuant to the provisions of Section 1.937-2T of the Regulations issued under the Code ("Temporary Regulations"), the source of the income from the sale of personal property by a bona fide resident of Puerto Rico within the meaning of Section 937 of the Code shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Bond recognized by an individual who is a *bona fide* resident of Puerto Rico, within the meaning of Section 937 of the Code, during the entire taxable year Rico will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided (i) that such Stock do not constitute inventory in the hands of such individual and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the 10 years preceding the taxable year for which the source of the gain must be determined, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation that invests in the Bonds will be subject to U.S. federal income tax on a gain from a disposition of Bonds only if the gain is effectively connected to a U.S. trade or business carried on by the Puerto Rico Corporation.

(5)     The transfer of the Bonds by death or gift will not be subject to estate or gift tax under the U.S. Code in the case of decedents or donors who, at the time of death or gift, are (a) residents of Puerto Rico and (b) (i) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (ii) not United States citizens.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes; and (c) the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign

PR-CCD-0006591

corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

        (a)     These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

        (b)     These statements were written in connection with the promotion or marketing of the Bonds.

        (c)     Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the inclusion of interest on the Bonds in gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Bond Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

C-4

PR-CCD-0006592

## BOOK-ENTRY SYSTEM

**The Depository Trust Company**

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

PR-CCD-0006593

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

D-2

PR-CCD-0006594

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITER WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

PR-CCD-0006595

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | CABs due 8/1/2022 6.10% | CABs due 8/1/2023 6.10% | CABs due 8/1/2024 6.10% | CABs due 8/1/2025 6.10% | CABs due 8/1/2026 6.10% | CABs due 8/1/2027 6.10% | CABs due 8/1/2029 6.10% | CABs due 8/1/2030 6.10% | CABs due 8/1/2031 6.10% | CABs due 8/1/2033 6.10% | CABs due 8/1/2034 6.10% | CABs due 8/1/2035 6.10% | CABs due 8/1/2036 6.10% | CABs due 8/1/2037 6.10% | CABs due 8/1/2038 6.10% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/20/2007 | $2,077.80 | $1,956.60 | $1,842.50 | $1,735.05 | $1,633.85 | $1,538.60 | $1,364.15 | $1,284.80 | $1,209.85 | $1,072.85 | $1,010.30 | $951.35 | $895.90 | $843.65 | $794.45 |
| 2/1/2008 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,549.15 | 1,373.70 | 1,293.60 | 1,218.15 | 1,080.20 | 1,017.20 | 957.90 | 902.05 | 849.45 | 799.90 |
| 8/1/2008 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 | 1,695.25 | 1,596.40 | 1,415.60 | 1,333.05 | 1,255.30 | 1,113.15 | 1,048.25 | 987.10 | 929.55 | 875.35 | 824.30 |
| 2/1/2009 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,458.80 | 1,373.70 | 1,293.60 | 1,147.10 | 1,080.20 | 1,017.20 | 957.90 | 902.05 | 849.45 |
| 8/1/2009 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 | 1,695.25 | 1,503.30 | 1,415.60 | 1,333.05 | 1,182.10 | 1,113.15 | 1,048.25 | 987.10 | 929.55 | 875.35 |
| 2/1/2010 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 | 1,549.15 | 1,458.80 | 1,373.70 | 1,218.15 | 1,147.10 | 1,080.20 | 1,017.20 | 957.90 | 902.05 |
| 8/1/2010 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 | 1,596.40 | 1,503.30 | 1,415.60 | 1,255.30 | 1,182.10 | 1,113.15 | 1,048.25 | 987.10 | 929.55 |
| 2/1/2011 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 | 1,645.10 | 1,549.15 | 1,458.80 | 1,293.60 | 1,218.15 | 1,147.10 | 1,080.20 | 1,017.20 | 957.90 |
| 8/1/2011 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 | 1,695.25 | 1,596.40 | 1,503.30 | 1,333.05 | 1,255.30 | 1,182.10 | 1,113.15 | 1,048.25 | 987.10 |
| 2/1/2012 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 | 1,746.95 | 1,645.10 | 1,549.15 | 1,373.70 | 1,293.60 | 1,218.15 | 1,147.10 | 1,080.20 | 1,017.20 |
| 8/1/2012 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 | 1,800.25 | 1,695.25 | 1,596.40 | 1,415.60 | 1,333.05 | 1,255.30 | 1,182.10 | 1,113.15 | 1,048.25 |
| 2/1/2013 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,458.80 | 1,373.70 | 1,293.60 | 1,218.15 | 1,147.10 | 1,080.20 |
| 8/1/2013 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 | 1,911.75 | 1,800.25 | 1,695.25 | 1,503.30 | 1,415.60 | 1,333.05 | 1,255.30 | 1,182.10 | 1,113.15 |
| 2/1/2014 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 | 1,970.05 | 1,855.15 | 1,746.95 | 1,549.15 | 1,458.80 | 1,373.70 | 1,293.60 | 1,218.15 | 1,147.10 |
| 8/1/2014 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 | 2,030.15 | 1,911.75 | 1,800.25 | 1,596.40 | 1,503.30 | 1,415.60 | 1,333.05 | 1,255.30 | 1,182.10 |
| 2/1/2015 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 | 2,092.05 | 1,970.05 | 1,855.15 | 1,645.10 | 1,549.15 | 1,458.80 | 1,373.70 | 1,293.60 | 1,218.15 |
| 8/1/2015 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 | 2,155.85 | 2,030.15 | 1,911.75 | 1,695.25 | 1,596.40 | 1,503.30 | 1,415.60 | 1,333.05 | 1,255.30 |
| 2/1/2016 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 | 2,221.60 | 2,092.05 | 1,970.05 | 1,746.95 | 1,645.10 | 1,549.15 | 1,458.80 | 1,373.70 | 93.60 |
| 8/1/2016 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 | 2,289.40 | 2,155.85 | 2,030.15 | 1,800.25 | 1,695.25 | 1,596.40 | 1,503.30 | 1,415.60 | 1,333.05 |
| 2/1/2017 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 | 2,359.20 | 2,221.60 | 2,092.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,549.15 | 1,458.80 | 1,373.70 |
| 8/1/2017 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 | 2,431.15 | 2,289.40 | 2,155.85 | 1,911.75 | 1,800.25 | 1,695.25 | 1,596.40 | 1,503.30 | 1,415.60 |
| 2/1/2018 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 | 2,505.30 | 2,359.20 | 2,221.60 | 1,970.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,549.15 | 1,458.80 |
| 8/1/2018 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 | 2,581.70 | 2,431.15 | 2,289.40 | 2,030.15 | 1,911.75 | 1,800.25 | 1,695.25 | 1,596.40 | 1,503.30 |
| 2/1/2019 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 | 2,660.45 | 2,505.30 | 2,359.20 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 | 1,645.10 | 1,549.15 |
| 8/1/2019 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 | 2,741.60 | 2,581.70 | 2,431.15 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 | 1,695.25 | 1,596.40 |
| 2/1/2020 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 | 2,825.25 | 2,660.45 | 2,505.30 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 | 1,645.10 |

E-1

| Date | CABs due 8/1/2022 6.10% | CABs due 8/1/2023 6.10% | CABs due 8/1/2024 6.10% | CABs due 8/1/2025 6.10% | CABs due 8/1/2026 6.10% | CABs due 8/1/2027 6.10% | CABs due 8/1/2029 6.10% | CABs due 8/1/2030 6.10% | CABs due 8/1/2031 6.10% | CABs due 8/1/2033 6.10% | CABs due 8/1/2034 6.10% | CABs due 8/1/2035 6.10% | CABs due 8/1/2036 6.10% | CABs due 8/1/2037 6.10% | CABs due 8/1/2038 6.10% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/1/2020 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 | 2,911.40 | 2,741.60 | 2,581.70 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 | 1,695.25 |
| 2/1/2021 | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 | 3,000.20 | 2,825.25 | 2,660.45 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 | 1,746.95 |
| 8/1/2021 | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 | 3,091.70 | 2,911.40 | 2,741.60 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 | 1,800.25 |
| 2/1/2022 | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 | 3,186.00 | 3,000.20 | 2,825.25 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 | 1,855.15 |
| 8/1/2022 | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 | 3,283.20 | 3,091.70 | 2,911.40 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 | 1,911.75 |
| 2/1/2023 | - | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 | 3,383.30 | 3,186.00 | 3,000.20 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 | 1,970.05 |
| 8/1/2023 | - | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 | 3,486.50 | 3,283.20 | 3,091.70 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 | 2,030.15 |
| 2/1/2024 | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 | 3,592.85 | 3,383.30 | 3,186.00 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 | 2,092.05 |
| 8/1/2024 | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 | 3,702.45 | 3,486.50 | 3,283.20 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 | 2,155.85 |
| 2/1/2025 | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 3,815.35 | 3,592.85 | 3,383.30 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 | 2,221.60 |
| 8/1/2025 | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 3,931.75 | 3,702.45 | 3,486.50 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 | 2,289.40 |
| 2/1/2026 | - | - | - | - | 4,852.00 | 4,569.05 | 4,051.65 | 3,815.35 | 3,592.85 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 | 2,359.20 |
| 8/1/2026 | - | - | - | - | 5,000.00 | 4,708.40 | 4,175.20 | 3,931.75 | 3,702.45 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 | 2,431.15 |
| 2/1/2027 | - | - | - | - | - | 4,852.00 | 4,302.55 | 4,051.65 | 3,815.35 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 | 2,505.30 |
| 8/1/2027 | - | - | - | - | - | 5,000.00 | 4,433.80 | 4,175.20 | 3,931.75 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 | 2,581.70 |
| 2/1/2028 | - | - | - | - | - | - | 4,569.05 | 4,302.55 | 4,051.65 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 | 2,660.45 |
| 8/1/2028 | - | - | - | - | - | - | 4,708.40 | 4,433.80 | 4,175.20 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 | 2,741.60 |
| 2/1/2029 | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 | 2,825.25 |
| 8/1/2029 | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 | 2,911.40 |
| 2/1/2030 | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 | 3,000.20 |
| 8/1/2030 | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 | 3,091.70 |
| 2/1/2031 | - | - | - | - | - | - | - | - | 4,852.00 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 | 3,186.00 |
| 8/1/2031 | - | - | - | - | - | - | - | - | 5,000.00 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 | 3,283.20 |
| 2/1/2032 | - | - | - | - | - | - | - | - | - | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 | 3,383.30 |
| 8/1/2032 | - | - | - | - | - | - | - | - | - | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 | 3,486.50 |
| 2/1/2033 | - | - | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 | 3,592.85 |
| 8/1/2033 | - | - | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 | 3,702.45 |
| 2/1/2034 | - | - | - | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 | 3,815.35 |
| 8/1/2034 | - | - | - | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 | 3,931.75 |
| 2/1/2035 | - | - | - | - | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 | 4,051.65 |
| 8/1/2035 | - | - | - | - | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 | 4,175.20 |
| 2/1/2036 | - | - | - | - | - | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 | 4,302.55 |

E-2

| Date | CABs due 8/1/2022 6.10% | CABs due 8/1/2023 6.10% | CABs due 8/1/2024 6.10% | CABs due 8/1/2025 6.10% | CABs due 8/1/2026 6.10% | CABs due 8/1/2027 6.10% | CABs due 8/1/2029 6.10% | CABs due 8/1/2030 6.10% | CABs due 8/1/2031 6.10% | CABs due 8/1/2033 6.10% | CABs due 8/1/2034 6.10% | CABs due 8/1/2035 6.10% | CABs due 8/1/2036 6.10% | CABs due 8/1/2037 6.10% | CABs due 8/1/2038 6.10% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/1/2036 | - | - | - | - | - | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 | 4,433.80 |
| 2/1/2037 | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,852.00 | 4,569.05 |
| 8/1/2037 | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000.00 | 4,708.40 |
| 2/1/2038 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,852.00 |
| 8/1/2038 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000.00 |

E-3

# Exhibit 9

**NEW ISSUE – BOOK-ENTRY ONLY**
**See "BOOK-ENTRY ONLY SYSTEM"**

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Series 2008A Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Series 2008A Bonds, and (b) the Series 2008A Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. In the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, (a) under the provisions of Commonwealth of Puerto Rico existing statutes and regulations now in force, the Series 2008A Bonds, and the interest thereon, are exempt from Commonwealth of Puerto Rico and local taxation and (b) under the provisions of existing Federal statutes and regulations now in force, under certain circumstances, interest on the Series 2008A Bonds will be exempt from United States taxation to individuals who are bona fide residents of the Commonwealth of Puerto Rico and corporations organized under the laws of the Commonwealth of Puerto Rico. See "TAX MATTERS" herein.*

# Puerto Rico Sales Tax Financing Corporation
## $737,046,992.35 Sales Tax Revenue Bonds, Series 2008A

**Dated:** Date of Delivery                    **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its "extraconstitutional" debt.

The Series 2008A Bonds to be issued, bonds previously issued, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the *first receipts* of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Series 2008A Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Series 2008A Bonds will not receive certificates representing the Series 2008A Bonds. The Series 2008A Bonds are being issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on August 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on August 1, 2008, and will be payable at maturity or redemption. The Series 2008A Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Series 2008A Bonds.

THE SERIES 2008A BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE SERIES 2008A BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

UBS Financial Services Incorporated of Puerto Rico (the "Principal") will serve as agent for the Corporation. The Series 2008A Bonds will be placed by the Principal when, as and if issued by the Corporation. Certain legal matters will be passed upon by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation, and Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, as Special Tax Counsel to the Corporation and as counsel to the Principal. It is expected that the Series 2008A Bonds will be delivered through The Depository Trust Company on or about June 26, 2008.

## UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO

June 25, 2008

CONFIDENTIAL

**Puerto Rico Sales Tax Financing Corporation**
**$737,046,992.35 Sales Tax Revenue Bonds, Series 2008A**

### $248,161,992.35 Capital Appreciation Bonds

| Maturity Date August 1, | Initial Principal Amount | Maturity Amount | Yield to Maturity |
|---|---|---|---|
| 2024 | $22,406,534.40 | $ 60,155,000.00 | 6.23% |
| 2025 | 33,212,087.60 | 94,805,000.00 | 6.23 |
| 2026 | 34,722,843.30 | 105,390,000.00 | 6.23 |
| 2027 | 16,414,833.50 | 52,975,000.00 | 6.23 |
| 2031 | 23,076,651.40 | 95,185,000.00 | 6.23 |
| 2032 | 22,470,385.50 | 98,550,000.00 | 6.23 |
| 2033 | 22,669,524.60 | 105,715,000.00 | 6.23 |
| 2034 | 21,581,776.80 | 107,010,000.00 | 6.23 |
| 2035 | 26,269,731.60 | 138,495,000.00 | 6.23 |
| 2036 | 25,337,623.65 | 142,035,000.00 | 6.23 |

### $488,885,000.00 Current Interest Bonds

$33,000,000.00 6.13% Term Bonds due August 1, 2027; Price: 100%
$74,030,000.00 6.13% Term Bonds due August 1, 2028; Price: 100%
$91,015,000.00 6.13% Term Bonds due August 1, 2029; Price: 100%
$80,825,000.00 6.13% Term Bonds due August 1, 2030; Price: 100%
$111,880,000.00 6.13% Term Bonds due August 1, 2037; Price: 100%
$98,135,000.00 6.13% Term Bonds due August 1, 2038; Price: 100%

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Principal to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2008A Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Principal. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Principal has reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Principal does not guarantee the accuracy or completeness of such information.

## TABLE OF CONTENTS

### Page

INTRODUCTION ........................................................1
THE CORPORATION ................................................2
THE SERIES 2008A BONDS ...................................3
   General ...................................................................3
   Redemption ...........................................................3
BOOK-ENTRY ONLY SYSTEM ............................4
ESTIMATED SOURCES AND USES OF FUNDS...............5
PLEDGED SALES TAX ............................................5
   Commonwealth Sales Tax ....................................5
   Sales Tax Revenue Projections and Actual Collections......6
   Pledged Sales Tax and FIA Fund .........................6
   Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund ..........................7
SECURITY FOR THE BONDS .................................8
   General ...................................................................8
   Property Pledged for the Payment of the Series 2008A Bonds .......................................................8
   Funds and Accounts under the Resolution ...........8
   Additional Bonds, Refunding Bonds and Other Obligations ............................................................9
   Commonwealth's Authority to Cover Deficiencies ..........10
   Special Investment Considerations.......................11
   Commonwealth Non-Impairment Covenant ........11
RECENT DEVELOPMENTS ...................................12
   Proposed Changes to the Commonwealth Sales Tax ........12
   Planning Board Revised Economic Growth Estimates .....12
   Indictment of Governor of Puerto Rico...............12
TAX MATTERS.........................................................13
   Federal and Commonwealth Taxation of the Series 2008A Bonds—General..................................13

### Page

Puerto Rico Tax Considerations (for Puerto Rico Residents only) ......................................................13
United States Federal Taxation for individual resident of Puerto Rico ........................................14
United States Tax Considerations ..............................16
U.S. Holders of the Series 2008A Bonds..................17
Non-U.S. Holders of the Series 2008A Bonds..................19
Information Reporting and Backup Withholding for the Series 2008A Bonds ........................................20
IRS Circular 230 Disclosure .....................................20
RATINGS ....................................................................21
LEGALITY FOR INVESTMENT ..............................21
DISTRIBUTION .........................................................21
LEGAL MATTERS......................................................21
CONTINUING DISCLOSURE....................................21
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ........................................................23
MISCELLANEOUS ....................................................24

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and Provisions of the Resolution ............................B-1
APPENDIX C – Proposed Form of Approving Opinion of Bond Counsel to the Corporation .....................C-1
APPENDIX D – Proposed Form of Opinion of Special Tax Counsel........................................................D-1
APPENDIX E – Book-Entry Only System...................E-1
APPENDIX F – Table of Compounded Amounts for Capital Appreciation Bonds.....................................F-1

i

# Puerto Rico Sales Tax Financing Corporation
## $737,046,992.35 Sales Tax Revenue Bonds, Series 2008A

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its $737,046,992.35 Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds").

The Series 2008A Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, and a Fourth Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 18, 2008, pursuant to which The Bank of New York will act as trustee (the "Trustee"). Immediately prior to the issuance of the Series 2008A Bonds, the Corporation will have outstanding $4.5 billion of its Sales Tax Revenue Bonds (calculated by excluding all accretion on any existing capital appreciation bonds) issued under the Resolution, the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, and the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007.

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See "*Pledged Sales Tax and FIA Fund*" in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Series 2008A Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Series 2008A Bonds. The Series 2008A Bonds, the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds, and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Series 2008A Bonds (such additional bonds and previously issued bonds, together with the Series 2008A Bonds, the "Bonds").

PR-INT-000007391

THE SERIES 2008A BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE SERIES 2008A BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Bonds, the terms of the Series 2008A Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation |
|------|------------|
| Ana I. Vilá | Certified Public Accountant |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| José Guillermo Dávila | Certified Public Accountant |
| Armando A. Valdez | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

2

CONFIDENTIAL

PR-INT-000007392

## THE SERIES 2008A BONDS

**General**

The Series 2008A Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $737,046,992.35, as current interest bonds (the "Current Interest Bonds") and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Series 2008A Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable monthly to maturity (or earlier redemption), commencing on August 1, 2008, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2008 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

The Series 2008A Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds). The Series 2008A Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Series 2008A Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Series 2008A Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Series 2008A Bonds and other Bonds or on a subordinate basis. See *Additional Bonds, Refunding Bonds and Other Obligations*" under "SECURITY FOR THE BONDS".

**Redemption**

*Optional Redemption.* The Series 2008A Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2018, at a redemption price equal to the principal amount (in the case of Capital Appreciation Bonds, the Compounded Amount) of the Series 2008A Bonds, plus accrued interest to the redemption date, and without premium.

*Notice of Redemption.* In the event any Series 2008A Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Series 2008A Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2008A Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2008A Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2008A Bonds or such portion shall be

3

redeemed.

The Notice shall (a) specify the (i) Series 2008A Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Series 2008A Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2008A Bonds, and the portions of the Series 2008A Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2008A Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

Any notice of optional redemption of Series 2008A Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Series 2008A Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Series 2008A Bonds or such portions thereof if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such rescission to affected Owners of the Series 2008A Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Series 2008A Bonds (or portions thereof) to be redeemed, then the Series 2008A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix E* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Principal believe to be reliable, but neither the Corporation nor the Principal take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2008A Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2008A Bonds; (ii) confirmation of ownership interest in the Series 2008A Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2008A Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2008A Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2008A Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2008A Bonds. See *Appendix E-Book-Entry System.*

CONFIDENTIAL

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2008A Bonds | $737,046,992.35 |
| Cash Payment-Accrued Interest | 3,002,930.03 |
| **Total Sources** | $740,050,438.29 |

**Uses**

| | |
|---|---|
| Payment of Extraconstitutional Debt | $732,292,769.25 |
| Principal's Fee | 2,948,187.97 |
| Other Costs of Issuance | 1,806,035.13 |
| Accrued Interest of Portfolio | 3,002,930.03 |
| **Total Uses** | $740,050,438.29 |

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items:  (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax:  (i) taxable items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must

5

PR-INT-000007395

request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2008, 372,000 merchants were registered at the Treasury Department.

## Sales Tax Revenue Projections and Actual Collections

The Commonwealth Sales Tax went into effect on November 15, 2006. For the seven and one half month period from November 15, 2006 through June 30, 2007 of Fiscal Year 2006-2007, the total Commonwealth Sales Tax collections was $713.3 million (an average of $95.1 million per month).

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month. Total Commonwealth Sales Tax collections from July 1, 2007 through April 30, 2008 was $942.7 million (an average of $94.3 million per month), representing a projected increase of approximately $9.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of April 2008, seventy-five percent of the collections from the Commonwealth Sales Tax are received electronically.

The Commonwealth Sales Tax revenue projections for Fiscal Year 2008 referred to above were made based on the Commonwealth's economic outlook as presented by the Planning Board on February 2007.

## Pledged Sales Tax and FIA Fund

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE BONDS."

CONFIDENTIAL

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities*.

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%)

---

* Act No. 80 of July 29, 2007, requires the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities).

7

PR-INT-000007397

of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

## SECURITY FOR THE BONDS

**General**

Pursuant to the Resolution, the Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Series 2008A Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Series 2008A Bonds or subordinate to the Series 2008A Bonds.

**Property Pledged for the Payment of the Series 2008A Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Series 2008A Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition,

8

PR-INT-000007398

there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Series 2008A Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of

9

CONFIDENTIAL

PR-INT-000007399

such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Series 2008A Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include

10

PR-INT-000007400

in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

**Special Investment Considerations**

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

On July 31, 2007, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) issued an opinion stating that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services. See "PLEDGED SALES TAX—Recent Legislative Developments."

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2008A Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Series 2008A Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

CONFIDENTIAL

PR-INT-000007401

# RECENT DEVELOPMENTS

**Proposed Changes to the Commonwealth Sales Tax**

On February 6, 2008, the Governor of Puerto Rico, in his State of the Commonwealth address, proposed suspending the collection of a portion of the Commonwealth Sales Tax and replace such collections with the imposition of a new excise tax on goods imported into Puerto Rico in order to help stimulate Commonwealth's economy.

On February 7, 2008, the Governor stated that any proposal from his administration would not impair the rights of bondholders and that he will veto any counter-proposal from the Legislature of Puerto Rico that would constitute a possible impairment of the rights of bondholders. On that same day, Standard & Poor's Ratings Service placed the Bonds on CreditWatch Negative and Fitch Ratings Ltd. placed the same Bonds on Rating Watch.

On March 14, 2008, a bill was submitted to the Legislature of Puerto Rico (B. of HR. 4273 and B. of S. 2419; collectively, the "Legislation") establishing the conditions for suspending the collection of portion of the Commonwealth Sales Tax for a reduction from 5.5% to 1% and re-instituting a revamped excise tax. The Legislation requires that such suspension cannot occur unless the Bonds are secured by a fully funded reserve fund (the "Reserve Fund") funded at an amount equal to the annual debt service obligation for the Bonds in the next ensuing bond year (the "Debt Service Reserve Requirement"), calculated in such manner as reasonably determined by COFINA to account for fixed and variable rate Bonds. The Reserve Fund is to be funded, and amounts in the Reserve Fund are to be maintained at the Debt Service Reserve Requirement, from deposits of collections of the Commonwealth Sales Tax, to the extent not required for the funding of COFINA operating expenses and debt service on Bonds, by the new excise tax, and by any other resources available to the Secretary of the Treasury. In the event that the Reserve Fund is not funded at least in the amount of the Debt Service Reserve Requirement for a period of thirty (30) days, COFINA shall notify the Secretary of the Treasury, and if the deficiency in the Reserve Fund is not funded from available resources within an additional thirty (30) days, the suspension of the collection of the 4.5% Commonwealth Sales Tax will be, without further legislative or administrative act, rescinded and collections thereof will resume, and the Secretary will no longer be authorized to collect the new excise tax. The Legislation has been structured to safeguard the rights of COFINA bondholders and is aimed at preserving the current rating of the Bonds. This action is expected to be revenue neutral for the General Fund. No assurance can be given that the above proposal will be enacted, or that if it is enacted, it will be in the form recommended by the Governor of Puerto Rico.

There are various pending legislations which, if approved, could have an impact on the Commonwealth Sales Tax.

**Planning Board Revised Economic Growth Estimates**

On March, 2008, the Planning Board, as part of its final review of fiscal year 2007 economic statistics, indicated that it expected to reduce the 2007 economic growth rate to -1.8% from -1.4% and that the forecast for fiscal years 2008 and 2009 will be lowered on account of the projected length of the current recession. The factors that influenced the Board's fiscal year 2007 indication included higher oil prices, reductions in retail sales, private investment (especially in the construction sector) and government investment. Price increases in certain key areas such as energy and raw materials contributed to the Board's numbers as well.

**Indictment of Governor of Puerto Rico**

On March 27, 2008, the Governor of Puerto Rico and several other individuals were named in federal grand jury indictments relating to the use of political contributions and campaign funds during the period when the Governor was Resident Commissioner in Washington, D.C. The Governor has denied any wrongdoing and has stated his intention to remain in his position and present his defense. It is not expected that such

12

PR-INT-000007402

developments will have any impact on the fiscal affairs of the Commonwealth or on the payment of any obligations issued by the Commonwealth.

## TAX MATTERS

### Federal and Commonwealth Taxation of the Series 2008A Bonds—General

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Series 2008A Bonds is included in gross income for Federal income tax purposes under Section 103(a) of the United States Internal Revenue Code of 1986, as amended, except that no opinion is expressed with respect to certain Federal income tax matters covered by the opinion of Fiddler Gonzalez & Rodriguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Series 2008A Bonds, and (b) the Series 2008A Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation.

### Puerto Rico Tax Considerations (for Puerto Rico Residents only)

The following is a summary of the opinion of Fiddler González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, regarding certain Puerto Rico tax consequences of the ownership of the Series 2008A Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Tax Counsel*. This section does not purport to cover all of the Puerto Rico tax consequences arising from the purchase and ownership of the Series 2008A Bonds. The following is based upon laws and regulations now in effect and is subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below.

The discussion in connection with the Puerto Rico tax considerations is based on the current provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code"), and the regulations promulgated or applicable thereunder (the "PR IRC Regulations") issued by the Treasury Department of Puerto Rico (the "Treasury Department"); the Puerto Rico Municipal Property Tax Act of 1991, as amended (the "MPTA"), and the regulations promulgated thereunder; the Municipal License Tax Act, as amended (the "MLTA"), and the regulations promulgated thereunder; and certain industrial and incentive tax act described below. The U.S. federal tax discussion is based on the current provisions of the United States Internal Revenue Code of 1986, as amended (the "Code") and the regulations promulgated thereunder (the "Code Regulations").

This discussion deals only with Series 2008A Bonds held by original investors as capital assets within the meaning of Section 1121 of the P.R. Code and Section 1221 of the Code.

The existing provisions of the statutes, regulations, judicial decisions, and administrative pronouncements on which this summary is based, are subject to change (even with retroactive effect) and could affect the continued validity of this summary.

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

In the opinion of Fiddler González & Rodríguez, P.S.C., based on the laws of Puerto Rico now in force:

1.      Interest on the Series 2008A Bonds is excluded from gross income and exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of P.R. Code;

13

CONFIDENTIAL

PR-INT-000007403

2.      The Series 2008A Bonds are exempt from property taxes imposed by the MPTA, and interest thereon is exempt from the municipal license tax imposed by the MLTA;

3.      The transfer of the Series 2008A Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.      Gain recognized from the sale or exchange of a Series 2008A Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5.      The Series 2008A Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.      Interest on the Series 2008A Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Series 2008A Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Series 2008A Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the Series 2008A Bonds, including but not limited to financial institutions, should be aware that ownership of the Series 2008A Bonds may result in having a portion of their interest and other expenses attributable to interest on the Series 2008A Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

**United States Federal Taxation for individual resident of Puerto Rico**

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Series 2008A Bonds. Each prospective purchaser of the Series 2008A Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Series 2008A Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Series 2008A Bonds as capital assets within the meaning of Section 1221 of the Code and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Series 2008A Bonds under state, local or foreign tax laws.

14

This summary is based on current provisions of the Code, the Code Regulations, judicial decisions and published administrative rulings and pronouncements of the IRS and interpretations thereof.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a citizen of the United States and a bona fide resident of Puerto Rico, within the meaning of Section 937 of the Code and the regulations thereunder, during the entire taxable year within, including the taxable year in which the Series 2008A Bonds are acquired by such individual. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

ALL PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF THE SERIES 2008A BONDS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES, AS WELL AS THE EFFECT OF ANY FOREIGN, STATE, LOCAL OR OTHER LAWS.

*Interest on the Series 2008A Bonds*

Interest on the Series 2008A Bonds is not excludable from gross income for Federal income tax purposes under Section 103(a) of the Code. Payment of interest on the Series 2008A Bonds will generally be taxable to a U. S Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U. S. Holder's regular accounting method).

Interest on the Series 2008A Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holders during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Series 2008A Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

*Sale or Retirement of the Series 2008A Bonds*

In general, pursuant to the provisions of Section 1.937-of the Code Regulations, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Series 2008A Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code.

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of Series 2008A Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and other requirements are satisfied.

*Backup Withholding*

Backup withholding of United States federal income tax may apply to payments made in respect of the Series 2008A Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Series 2008A Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A

CONFIDENTIAL

PR-INT-000007405

Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

Prospective owners of the Series 2008A Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

The opinion of the Special Tax Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Series 2008A Bonds is limited to the above. We express no opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or to any other laws of any other jurisdiction or compliance therewith by any party.

**United States Tax Considerations**

The following discussion is a summary of the principal Federal income tax consequences of the acquisition, ownership and disposition of the Series 2008A Bonds by original purchasers of the Series 2008A Bonds. This summary is based on the Code, Treasury regulations, revenue rulings and court decisions, all as now in effect and all subject to change at any time, possibly with retroactive effect. This summary assumes that the Series 2008A Bonds will be held as "capital assets" under the Code, and it does not discuss all of the Federal income tax consequences that may be relevant to a holder in light of its particular circumstances or to holders subject to special rules, such as insurance companies, financial institutions, tax-exempt organizations, dealers in securities or foreign currencies, persons holding the Series 2008A Bonds as a position in a "hedge" or "straddle" for Federal income tax purposes, or holders whose functional currency (as defined in Section 985 of the Code) is not the United States dollar. Each prospective purchaser of the Series 2008A Bonds should consult with its own tax advisor concerning the Federal income tax and other tax consequences to it of the acquisition, ownership and disposition of the Series 2008A Bonds as well as any tax consequences that may arise under the laws of any state, local or foreign tax jurisdiction.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

- As used herein, the term "U.S. Holder" means a beneficial owner of a Series 2008A Bond that is for Federal income tax purposes (i) a citizen or resident of the United States, other than individuals who are bona fide residents of Puerto Rico during the entire taxable year, (ii) a corporation, partnership or other entity created or organized in the United State or under the laws of the United States , (iii) an estate the income of which is subject to Federal income taxation regardless of its source, or (iv) a trust whose administration is subject to the primary jurisdiction of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or a trust that was in existence on August 20, 1996 and validly elected to be treated as a domestic trust. As used herein, the term "Non-U.S. Holder" means a beneficial owner of a Series 2008A Bond that is not a U.S. Holder other than a Puerto Rico U.S. Holder.

16

**U.S. Holders of the Series 2008A Bonds**

*U.S. Holders—Interest Income*

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) interest on the Series 2008A Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain federal income tax matters covered by the opinion of Fiddler, González & Rodríguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Series 2008A Bonds, and (b) the Series 2008A Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Series 2008A Bonds.

*U.S. Holders—Original Issue Discount*

*Original Issue Discount.* The following summary is a general discussion of the U.S. federal income tax consequences to U.S. Holders of the purchase, ownership and disposition of the Series 2008A Bonds issued with original issued discount. The following summary is based upon final Treasury Regulations (the "OID Regulations") released by the Internal Revenue Service under the OID provisions of the Code.

For Federal income tax purposes, a Series 2008A Bond will be treated as issued with original issue discount ("OID") if the excess of a Series 2008A Bond's "stated redemption price at maturity" over its "issue price" equals or exceeds a statutorily determined de minimis amount. The "issue price" of each Series 2008A Bond in a particular issue equals the first price at which a substantial amount of such issue is sold to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). The "stated redemption price at maturity" of a Series 2008A Bond is the sum of all payments provided by such Series 2008A Bond other than "qualified stated interest" payments. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. In general, if the excess of a Series 2008A Bond's stated redemption price at maturity over its issue price is less than .25 percent of the Series 2008A Bond's stated redemption price at maturity multiplied by the number of complete years to its maturity (the "de minimis amount"), then such excess, if any, constitutes de minimis OID, and the Series 2008A Bond is not treated as being issued with OID and all payments of stated interest (including stated interest that would otherwise be characterized as OID) is treated as qualified stated interest, as described below. However, under the OID Regulations, if a Series 2008A Bond bears interest for one or more accrual periods at a rate below the rate applicable for the remaining term of such Series 2008A Bond (*e.g.*, Series 2008A Bonds with teaser rates or interest holidays), and if the greater of either the resulting foregone interest on such Series 2008A Bond or any "true" discount on such Series 2008A Bond (*i.e.*, the excess of the Series 2008A Bond's stated principal amount over its issue price) equals or exceeds a specified *de minimis* amount, then the stated interest on the Series 2008A Bond would be treated as OID rather than qualified stated interest.

Payments of qualified stated interest on a Series 2008A Bond are taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the U.S. Holder's regular method of tax accounting. A U.S. Holder of a Series 2008A Bond having a maturity of more than one year from its date of issue generally must include OID in income as ordinary interest as it accrues on a constant-yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting. The amount of OID included in income by the U.S. Holder of a Series 2008A Bond is the sum of the daily portions of OID with respect to such Series 2008A Bond for each day during the taxable year (or portion of the taxable year) on which such U.S. Holder held such Series 2008A Bond.

17

PR-INT-000007407

The daily portion of OID on any Series 2008A Bond is determined by allocating to each day in any "accrual period" a ratable portion of the OID allocable to the accrual period. All accrual periods with respect to a Series 2008A Bond may be of any length and the accrual periods may vary in length over the term of the Series 2008A Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or final day of an accrual period. The amount of OID allocable to an accrual period is generally equal to the difference between (i) the product of the Series 2008A Bond's "adjusted issue price" at the beginning of such accrual period and such Series 2008A Bond's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a Series 2008A Bond at the beginning of any accrual period is the issue price of the Series 2008A Bond plus the amount of accrued OID includable in income for all prior accrual periods minus the amount of any prior payments on the Series 2008A Bond other than qualified stated interest payments. The amount of OID allocable to an initial short accrual period may be computed using any reasonable method if all other accrual periods other than a final short accrual period are of equal length. The amount of OID allocable to the final accrual period is the difference between (i) the amount payable at the maturity of the Series 2008A Bond (other than a payment of qualified stated interest) and (ii) the Series 2008A Bond's adjusted issue price as of the beginning of the final accrual period. Under the OID rules, U.S. Holders generally will have to include in income increasingly greater amounts of OID in successive accrual periods.

A U.S. Holder may elect to include in gross income all interest that accrues on a Series 2008A Bond using the constant-yield method described above under the heading "U.S. Holders—Original Issue Discount," with the modifications described below. For purposes of this election, interest includes, among other things, stated interest, OID and de minimis OID, as adjusted by any amortizable bond premium described below under the heading "U.S. Holders—Bond Premium." In applying the constant-yield method to a Series 2008A Bond with respect to which this election has been made, the issue price of the Series 2008A Bond will equal its cost to the electing U.S. Holder, the issue date of the Series 2008A Bond will be the date of its acquisition by the electing U.S. Holder, and no payments on the Series 2008A Bond will be treated as payments of qualified stated interest. The election will generally apply only to the Series 2008A Bond with respect to which it is made and may not be revoked without the consent of the Internal Revenue Service. If this election is made with respect to a Series 2008A Bond with amortizable bond premium, then the electing U.S. Holder will be deemed to have elected to apply amortizable bond premium against interest with respect to all debt instruments with amortizable bond premium (other than debt instruments the interest on which is excludable from gross income) held by the electing U.S. Holder as of the beginning of the taxable year in which the Series 2008A Bond with respect to which the election is made is acquired or thereafter acquired. The deemed election with respect to amortizable bond premium may not be revoked without the consent of the IRS.

The Series 2008A Bonds may be redeemed at the option of the Corporation prior to their stated maturity. The Series 2008A Bonds containing such features may be subject to rules that differ from the general rules discussed above. Investors intending to purchase Series 2008A Bonds with such features should consult their own tax advisors, since the original issued discount consequences will depend, in part, on the particular terms and features of the purchased Series 2008A Bonds.

U.S. Holders of any Series 2008A Bonds issued with OID should consult their own tax advisors with respect to the treatment of OID for Federal income tax purposes, including various special rules relating thereto, and tax consequences under tax laws of the states, including their political subdivisions, and the District of Columbia, in connection with the acquisition, ownership, and disposition of Series 2008A Bonds.

*U.S. Holders—Bond Premium*

In general, if a U.S. Holder acquires a Series 2008A Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Series 2008A Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Series 2008A

18

PR-INT-000007408

Bond (a "Premium Bond"). In general, under Section 171 of the Code, a U.S. Holder of a Premium Bond may either deduct the amortizable bond premium for a taxable year under Section 171(a)(1) of the Code or may elect to amortize the total bond premium over the remaining term of the Premium Bond, based on the U.S. Holder's yield over the remaining term of the Premium Bond, following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the highest yield on such bond.) Any such election applies to all debt instruments of the U.S. Holder (other than tax-exempt bonds) held at the beginning of the first taxable year to which the election applies and to all such debt instruments thereafter acquired, and is irrevocable without the Internal Revenue Service's consent. A U.S. Holder of a Premium Bond that so elects to amortize bond premium does so by offsetting the qualified stated interest allocable to each interest accrual period under the U.S. Holder's regular method of Federal tax accounting against the bond premium allocable to that period. If the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is treated as a bond premium deduction under Section 171(a)(1) of the Code, subject to certain limitations. If a Premium Bond is optionally callable before maturity at a price in excess of its stated redemption price at maturity, special rules may apply with respect to the amortization of bond premium. Under certain circumstances, the U.S. Holder of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the U.S. Holder's original acquisition cost.

U.S. Holders of any Premium Bonds should consult their own tax advisors with respect to the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, and disposition of Premium Bonds.

*U.S. Holders—Disposition of Series 2008A Bonds*

Except as discussed above, upon the sale, exchange, redemption, or other disposition (which would include a legal defeasance) of a Series 2008A Bond, a U.S. Holder generally will recognize taxable gain or loss in an amount equal to the difference between the amount realized (other than amounts attributable to accrued interest not previously includable in income) and such U.S. Holder's adjusted tax basis in the Series 2008A Bond. A U.S. Holder's adjusted tax basis in a Series 2008A Bond generally will equal such U.S. Holder's initial investment in the Series 2008A Bond, increased by any OID included in the U.S. Holder's income with respect to the Series 2008A Bond and decreased by the amount of any payments, other than qualified stated interest payments, received and bond premium amortized with respect to such Series 2008A Bond. Such gain or loss generally will be long-term capital gain or loss if the Series 2008A Bond was held for more than one year.

*U.S. Holders—Defeasance*

U.S. Holders of the Series 2008A Bonds should be aware that, for Federal income tax purposes, the deposit of moneys or securities in escrow in such amount and manner as to cause the Series 2008A Bonds to be deemed to be no longer outstanding under the resolution of the Series 2008A Bonds (a "defeasance"), could result in a deemed exchange under Section 1001 of the Code and a recognition by such owner of taxable income or loss, without any corresponding receipt of moneys. In addition, for Federal income tax purposes, the character and timing of receipt of payments on the Series 2008A Bonds subsequent to any such defeasance could also be affected. U.S. Holders of the Series 2008A Bonds are advised to consult with their own tax advisors regarding the consequences of a defeasance for Federal income tax purposes and under the tax laws of the states, including their political subdivisions, and the District of Columbia.

**Non-U.S. Holders of the Series 2008A Bonds**

Under existing Federal income tax law, interest (including any OID) on the Series 2008A Bonds is considered to be income from sources without the United States, and unless effectively connected with the conduct of a United States trade or business of a Non-U.S. Holder, such interest is not subject to Federal income or withholding tax when paid to or for a Non-U.S. Holder. A Non-U.S. Holder may be requested to furnish its

19

name and address and to certify under penalties of perjury, using IRS Form W-8 or substantially similar substitute form, that it is not a United States person and is the beneficial owner of a Series 2008A Bond.

In general, a Non-U.S. Holder of a Series 2008A Bond is not subject to Federal income or withholding tax, under existing law, with respect to any gain realized on the sale, exchange, retirement or other disposition of a such a bond, unless the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year and certain other requirements are met, or unless the gain is effectively connected with the conduct of a United States trade or business of the Non-U.S. Holder.

Any person who seeks to become a Non-U.S. Holder of a Series 2008A Bond is advised to consult with its own tax advisor concerning the foregoing or any other Federal income tax consequences that may arise in connection with the acquisition, ownership and disposition of such a bond.

**Information Reporting and Backup Withholding for the Series 2008A Bonds**

*U.S. Holders*

In general, information reporting requirements will apply to non-corporate U.S. Holders with respect to payments of principal, payments of interest, and the accrual of OID on a Series 2008A Bond and the proceeds of the sale of a Series 2008A Bond before maturity within the United States. Backup withholding may apply to U.S. Holders under Section 3406 of the Code to such payments and to payments of OID unless the U.S. Holder (i) is a corporation or other exempt recipient and, when required, demonstrates that fact, or (ii) provides a correct taxpayer identification number, certifies under penalties of perjury, when required, that such U.S. Holder is not subject to backup withholding and has not been notified by the IRS that it has failed to report all interest and dividends required to be shown on its Federal income tax returns.

In addition, upon the sale of a Series 2008A Bond to (or through) a broker, the broker must report the sale and withhold on the entire purchase price, unless either (i) the broker determines that the seller is a corporation or other exempt recipient or (ii) the seller certifies that such seller is a non-U.S. Holder (and certain other conditions are met). Certification of the registered owner's non-U.S. status would be made normally on an IRS Form W-8BEN under penalties of perjury, although in certain cases it may be possible to submit other documentary evidence.

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner, and which constitutes over-withholding, would be allowed as a refund or a credit against such beneficial owner's Federal income tax provided the required information is furnished to the IRS.

*Non-U.S. Holders*

Under existing Federal income tax law, information reporting and backup withholding do not apply to payments of principal and interest (including OID) made to a Non-U.S. Holder in respect of a Series 2008A Bond, provided that the payor does not have actual knowledge that such Bondholder is a United States person.

**IRS Circular 230 Disclosure**

The advice under the captions "United States Tax Considerations Relating," "U.S. Holders of the Series 2008A Bonds," and "Non-U.S. Holders of the Series 2008A Bonds," concerning certain income tax consequences of the acquisition, ownership and disposition of the Series 2008A Bonds, was written to support the marketing of the Series 2008A Bonds. To ensure compliance with requirements imposed by the IRS, Bond Counsel to the Corporation informs you that (i) any Federal tax advice contained in the Official Statement (including any attachments) or in writings furnished by the Bond Counsel to the Corporation is not intended to be used, and cannot be used by any Bondholder, for the purpose of avoiding penalties that may be imposed on

20

the Bondholder under the Code, and (ii) the Bondholder should seek advice from an independent tax advisor based on the Bondholder's particular circumstances.

## RATINGS

It is a condition to the issuance of the Series 2008A Bonds that they have received ratings of "A1" from Moody's and "A+" with a negative credit watch from S&P. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2008A Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

## LEGALITY FOR INVESTMENT

The Series 2008A Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## DISTRIBUTION

UBS Financial Services Incorporated of Puerto Rico will act as Principal in a riskless principal transaction and will purchase the Bonds from the Corporation subject to the terms and conditions of an Agency Agreement by and between the Corporation and the Principal. In turn, the Purchasers (as such term is defined in the Bond Purchase Agreement between the Corporation, the Principal and the purchasers named therein) shall purchase the Bonds from the Principal. Notwithstanding the foregoing, the Principal shall not be obligated to purchase the Bonds on the date of delivery thereof unless it has received from Purchasers the purchase price of the Bonds. The Corporation will pay the Principal a fee in an amount equal to $2,948,187.97.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2008A Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2008A Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed for the Principal by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Principal in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee entered into a certain Master Continuing Disclosure Agreements, dated as of July 31, 2007 (the "Disclosure Agreement") for the benefit of the owners of the Bonds, including the Series 2008A Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

CONFIDENTIAL

PR-INT-000007411

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE SERIES 2008A BONDS" above, (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the

CONFIDENTIAL

PR-INT-000007412

Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Principal to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2008A Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Principal of the Series 2008A Bonds. The Principal has been selected by Government Development Bank to serve from time to time as underwriter of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. The Principal or its affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Series 2008A Bonds.

CONFIDENTIAL

PR-INT-000007413

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2008A Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Series 2008A Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of tax opinion of Special Tax Counsel (*Appendix D*), the summary of the book-entry system for the Series 2008A Bonds (*Appendix E*), and the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix F*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO SALES TAX FINANCING
CORPORATION**

By: _____ /s/ Samuel Sierra Rivera _____
Executive Director

24

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

### INTRODUCTION

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this

A-1

court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Angel Ortíz García was named acting Secretary of the Department of the Treasury (the "Treasury") in May 30, 2008. He is a certified public accountant and a lawyer. He graduated from the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. Between March and May, 2008 Mr. Ortiz was Assistant Secretary of Internal Revenue. Previously, since April 2005, he was Assistant Secretary of the Treasury Division. Prior to working in the Government, between May 2001 and April 2005, Mr. Ortiz was Senior Treasurer of Pfizer Pharmaceuticals LLC. Prior to 2001, he worked at PricewaterhouseCoopers.

Armando A. Valdez was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in January 2008. Before that, he served as advisor to the Governor from January 2005 to December 2007, as Executive Director of the Incoming Transition Committee from November 2004 to December 2004, and as Director of Intergovernmental Affairs to the Puerto Rico Federal Affairs Administration from June 2001 to December 2003. He earned a Bachelor of Arts degree in Architecture from Yale University and a Masters degree in Government (thesis pending) from John Hopkins University.

Jorge Irizarry Herráns was appointed President of Government Development Bank for Puerto Rico ("GDB") on December 4, 2007. Mr. Irizarry served as Executive Vice President and Director of Financing of GDB from 2005 until his appointment as Acting President, and has over 30 years of experience in banking, investments and consulting, which he acquired while working at Chase Manhattan, Booz Allen Hamilton, Inc., Banco Mercantil, Banco de Ponce, PaineWebber, Inc. and Sandoval Associates. Mr. Irizarry has Bachelor's degree in finance from New York University and holds a Masters Degree in Business Administration from Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

A-2

CONFIDENTIAL

PR-INT-000007416

| | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

| | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to June 30, 2007, and the ten month-period of fiscal year 2007-2008.

**Commonwealth Sales Tax Collections**
(in millions)

| 2006-07 | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F.I.A | - | - | - | - | $ 9.1 | $ 20.0 | $17.3 | $15.7 | $17.5 | $15.6 | $17.0 | $17.5 | $129.7 |
| CINE[1] | - | - | - | - | - | - | - | - | - | - | - | 1.1 | 1.1 |
| G.F. | - | - | - | - | 41.1 | 90.0 | 77.7 | 70.5 | 78.9 | 70.1 | 77.4 | 76.8 | 582.5 |
| Total | - | - | - | - | $50.2 | $110.0 | $95.0 | $86.2 | $96.4 | $85.7 | $94.4 | $95.4 | $713.3 |

| 2007-08 | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F.I.A | $96.1 | $88.9 | - | - | - | - | - | - | - | - | - | - | $185.0 |
| CINE[1] | - | - | $ .8 | $ .2 | $ .2 | $ .2 | $ .2 | $ .2 | $ .2 | $ .2 | - | - | $2.7 |
| G.F. | - | 1.2 | 85.3 | 93.4 | 95.9 | 120.9 | 89.5 | 86.2 | 89.0 | 93.2 | - | - | 755.0 |
| Total[2] | $95.1 | $90.1 | $86.1 | $93.7 | $96.1 | $121.2 | $89.7 | $86.4 | $89.3 | $93.4 | - | - | $942.7 |

(1) Pursuant to Act No. 23 of March 8, 2007, the Secretary of the Treasury must transfer said moneys to the Fund for the Development of the Arts, Sciences, and Cinematographic Industry of Puerto Rico.
(2) Preliminary.

A-3

As of today, twenty-nine percent of the collections from the Commonwealth Sales Tax are received electronically.

<div align="center">

**THE ECONOMY**

</div>

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

**General**

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2008 and 2009*

The Planning Board's current real gross national product forecast for Fiscal Year 2008, which was released in March 2008, projected a decline of 2.1%, in constant dollars, or an increase of 3.4% in current dollars. Personal income is expected to increase by 0.8%, in real terms, or 4.3% in nominal terms[1]. The major factors affecting the economy are, among others, the continued increase of oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis. The Planning Board expects real growth to return in Fiscal Year 2009, at 2.1%, or 7.1% in current dollars. This forecast assumed that the WTI oil price would be approximately $86/bbl for fiscal year 2008, and that such prices would decline slightly to $83/bbl for fiscal year 2009. However, fiscal year 2008 WTI oil prices will close at an average of $97/bbl, and such prices could increase to $120/bbl during fiscal year 2009. Therefore, oil prices are currently 12.8% above those forecasted for fiscal year 2008, and could increase 50% over the original forecast for fiscal year 2009. Moreover, the Planning Board forecast assumed that tax rebates to individuals would be implemented in fiscal year 2009, but they were actually implemented during the last quarter of fiscal year 2008, lowering the effects for fiscal year 2009. These outcomes would have a significant impact on the forecast of real GNP growth for fiscal year 2009, lowering its real growth rate below 1%, taking into account the high oil dependency of the Puerto Rican economy.

According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), the employment for the first eleven months of fiscal year 2008 averaged 1,214,800, a decrease of 3.8% compared to 1,262,900 for the same period of fiscal year 2007. At the same time, the unemployment rate for the first eleven months of fiscal year 2008 was 10.9%, an increase from 10.3% for the same period of fiscal year 2007.

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

<div align="center">

A-4

</div>

CONFIDENTIAL

*Fiscal Year 2007*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2007 indicate that real gross national product decreased 1.8% (3.5% in current dollars) over Fiscal Year 2006. Nominal gross national product was $58.7 billion in Fiscal Year 2007 ($44.3 billion in 2000 prices), compared to $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices) to $53.9 billion in fiscal year 2007 ($44.4 billion in 2000 prices) and personal income per capita increased from $13,033 in fiscal year 2006 ($11,229 in 2000 prices), to $13,491 in fiscal year 2007 ($11,279 in 2000 prices).

According to the Household Survey, total employment for Fiscal Year 2007 averaged 1,262,900 an increase of 0.8% compared to 1,253,400 for Fiscal Year 2006. The driving force behind total employment is self-employment. The unemployment rate for Fiscal Year 2007 was 10.4%, a decrease from 11.7% for Fiscal Year 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, and the current slowdown of the United States Economy. Moreover, the continuing weakness of local construction investment has aggravated the current situation. The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of income in fiscal year 2008. The current financial difficulties associated with the subprime mortgage crisis have resulted in lowering of short-term interest rates. This could help alleviate the situation of the construction sector, which historically has been a major contributor to economic growth. The implementation of the tax reform legislation may reduce net disposable income even after giving effect to certain income tax reductions provided in the tax reform legislation.

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 1985 to 2007. In Fiscal Year 2007, aggregate personal income was $53.1 billion ($44.4 billion in 2000 prices) and personal income per capita was $13,491 ($11,279 in 2000 prices).[2] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $12 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Eighty two percent (82%) of the transfer payments to individuals in Fiscal Year 2007 ($8.9 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

---

[2] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

A-5

PR-INT-000007419

The following table shows the personal income for the five Fiscal Years ended June 30, 2007.

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Employees' compensation | | | | | |
| Business | $17,593.8 | $18,710.9 | $19,420.1 | $20,144.1 | $20,680.9 |
| Government | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 | 8,586.3 |
| Household and nonprofit institutions | 656.3 | 711.0 | 704.8 | 737.2 | 756.6 |
| Other | 985.1 | 958.6 | 1,085.3 | 1,036.7 | 1,026.4 |
| Total Employees' compensation | $26,182.8 | $27,768.9 | $29,360.7 | $30,342.2 | $31,050.2 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,907.7 | 2,068.2 | 2,181.0 | 2,241.9 | 2,250.0 |
| Employers | 2,777.3 | 2,884.9 | 3,061.6 | 3,167.1 | 3,152.0 |
| Total Contributions for social insurance | $4,684.9 | $4,953.0 | $5,242.6 | $5,409.0 | 5,402.0 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,397.8 | 2,633.9 | 2,736.9 | 2,791.4 | 2,931.8 |
| Dividends of domestic corporations | 229.6 | 249.4 | 249.8 | 304.3 | 322.1 |
| Miscellaneous income and dividends received from abroad | 13.7 | 13.0 | 12.6 | 13.4 | 13.8 |
| Rental income of persons | 3,352.8 | 3,663.1 | 3,901.8 | 4,468.1 | 4,824.2 |
| Personal interest income | 2,409.7 | 2,127.7 | 2,705.0 | 3,586.6 | 2,962.1 |
| Total Proprietors' income | $8,403.6 | $8,687.2 | $9,606.1 | $11,163.8 | $11,053.9 |
| | | | | | |
| Transfer payments | 14,314.1 | 14,062.8 | 14,543.4 | 14,992.9 | 16,381.6 |
| Commonwealth government and municipalities | 3,119.3 | 3,290.3 | 3,324.2 | 3,390.7 | 3,577.4 |
| Federal government | 9,391.5 | 8,903.0 | 9,243.7 | 9,725.9 | 10,466.3 |
| U.S. state governments | 19.1 | 16.4 | 14.9 | 17.6 | 22.7 |
| Business | 1,091.4 | 1,116.1 | 1,140.4 | 1,216.1 | 1,691.2 |
| Other nonresidents | 692.9 | 737.0 | 820.3 | 642.6 | 624.0 |
| Total Personal Income | $44,215.6 | $45,565.9 | $48,267.6 | $51,089.9 | $53,083.7 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2007, at current prices, personal consumption amounted to $51.9 billion, increasing by $2.4 billion or 4.8% from the amount of $49.5 billion for Fiscal Year 2006. At constant prices, personal consumption increased 1.8% from Fiscal Year 2006. Such an increase was based on a 3.4% increase in nondurable goods (39% of personal consumption), 1.1% increase in durable goods (18% of personal consumption), and 0.6% increase in services (43% of personal consumption). These figures are characteristic of an economy in recession, where durable goods and services are the most affected categories.

A-6

PR-INT-000007420

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2007.

### Commonwealth of Puerto Rico
### Personal Consumption Expenditures by Product
### (in millions of dollars)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Food | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,982.2 | $ 7,259.2 |
| Alcoholic beverages and tobacco products | 1,513.4 | 1,540.8 | 1,435.5 | 1,803.1 | 1,837.9 |
| Clothing and accessories | 2,693.6 | 2,851.9 | 2,957.1 | 3,073.3 | 3,510.2 |
| Personal care | 752.8 | 782.2 | 815.5 | 984.6 | 1,052.4 |
| Housing | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 | 8,010.0 |
| Household operations | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 | 6,485.5 |
| Medical care and funeral expenses | 6,960.4 | 7,162.5 | 7,527.7 | 7,944.1 | 8,305.7 |
| Business services | 2,881.5 | 2,962.7 | 3,055.8 | 3,042.5 | 2,985.6 |
| Transportation | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 | 6,300.3 |
| Recreation | 3,800.1 | 4,401.9 | 4,531.6 | 4,699.9 | 4,942.9 |
| Education | 1,345.3 | 1,589.3 | 1,627.8 | 1,686.3 | 1,709.3 |
| Religious and nonprofit organizations, not elsewhere classified | 418.8 | 473.3 | 482.3 | 508.4 | 511.5 |
| Foreign travel | 1,274.2 | 1,450.1 | 1,539.3 | 1,608.9 | 1,616.9 |
| Miscellaneous purchases | 520.0 | 565.7 | 605.8 | 704.1 | 819.4 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $43,676.8 | $46,448.6 | $49,569.2 | $52,870.9 | $55,346.8 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 | 3,457.4 |
| Total Personal Consumption Expenditures | $40,973.4 | $43,396.0 | $46,299.8 | $49,467.8 | $51,889.4 |

(1) Preliminary figures.

Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

A-7

CONFIDENTIAL

PR-INT-000007421

The following table shows the gross national product for the five Fiscal Years ended June 30, 2007.

### Commonwealth of Puerto Rico
### Gross National Product

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Gross national product – $ millions[2] | $47,479 | $50,709 | $53,752 | $56,733 | $58,712 |
| Real gross national product – $ millions (2000 prices) | 42,795 | 43,967 | 44,819 | 45,061 | 44,252 |
| Annual percentage increase in real gross national product (2000 prices) | 2.1% | 2.7% | 1.9% | 0.5% | (1.8)% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 1.9% | 4.0% | 3.0% | 3.1% | 2% |

(1) Preliminary.
(2) In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2008 and 2009. The graph also shows a slight slowdown in fiscal year 2007, and a significant slowdown which is expected for fiscal year 2009.

### Real GNP Growth Rate



Source: Global Insight 03/08.

A-8

CONFIDENTIAL

**Economic Performance by Sector**

*General*

From Fiscal Year 2003 to Fiscal Year 2007, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2003 through 2007.

<div align="center">

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

</div>

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Manufacturing | $31,532 | $33,267 | $34,534 | $36,547 | $36,717 |
| Services[2] | 28,919 | 30,476 | 32,449 | 33,948 | 35,925 |
| Government[3] | 6,948 | 7,389 | 8,150 | 8,424 | 8,586 |
| Transportation, communication and public utilities | 5,178 | 5,343 | 5,309 | 5,701 | 5,971 |
| Agriculture, forestry and fisheries | 333 | 414 | 375 | 385 | 441 |
| Construction[4] | 1,772 | 1,905 | 1,848 | 1,807 | 1,875 |
| Statistical discrepancy | 146 | 415 | 144 | 131 | 186 |
| Total gross domestic product[5] | $74,827 | $79,209 | $82,809 | $86,943 | $89,701 |
| Less: net payment abroad | (27,348) | (28,501) | (29,056) | (30,210) | (30,989) |
| Total gross national product[5] | $47,479 | $50,709 | $53,753 | $56,733 | $58,712 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Employment Survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

<div align="center">A-9</div>

CONFIDENTIAL

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2003 to 2007.

| | 2003 | 2004 | 2005 | 2006 | 2007[1] |
|---|---|---|---|---|---|
| Natural Resources and Construction | 68,525 | 69,300 | 68,233 | 67,442 | 67,392 |
| Manufacturing | | | | | |
|    Durable Goods | 48,567 | 48,808 | 48,067 | 46,492 | 44,850 |
|    Non-Durable Goods | 70,192 | 69,633 | 69,250 | 66,367 | 60,958 |
|   Sub Total | 118,759 | 118,441 | 117,317 | 112,859 | 105,808 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
|    Wholesale Trade | 32,183 | 33,300 | 33,717 | 33,992 | 33,158 |
|    Retail Trade | 130,183 | 132,008 | 136,192 | 137,800 | 135,058 |
|    Transportation, Warehouse & Utilities | 17,358 | 17,042 | 17,617 | 17,433 | 16,700 |
|   Sub Total | 179,724 | 182,350 | 187,526 | 189,225 | 184,916 |
| | | | | | |
| Information | 21,617 | 21,917 | 22,608 | 22,600 | 21,733 |
| Finance | 44,667 | 46,850 | 48,633 | 49,767 | 49,975 |
| Professional & Business | 98,500 | 101,900 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 92,408 | 98,108 | 99,967 | 103,583 | 105,842 |
| Leisure & Hospitality | 67,917 | 70,317 | 72,592 | 74,767 | 73,433 |
| Other Services | 18,858 | 20,671 | 21,257 | 21,267 | 22,283 |
| Government | 297,717 | 303,408 | 307,825 | 302,025 | 297,450 |
|    Total Non-Farm | 1,008,692 | 1,033,262 | 1,049,725 | 1,049,935 | 1,033,599 |

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2007 manufacturing generated $36.7 billion, or 40.9%, of gross domestic product. During fiscal year 2007, payroll employment for the manufacturing sector was 105,808, a decrease of 6.2% compared with fiscal year 2006. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of February, 2008, the average hourly manufacturing wage rate in Puerto Rico was 68.0% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. This change has had a long term impact on local manufacturing activity.

CONFIDENTIAL

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2003 through June 30, 2007.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| Pharmaceuticals | $18,998 | $19,814 | $20,705 | $21,837 | $21,511 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 3,507 | 3,372 | 3,307 | 3,215 | 3,210 |
|   Electrical machinery | 1,771 | 1,818 | 1,904 | 1,852 | 1,811 |
|   Professional and scientific instruments | 2,981 | 3,540 | 3,698 | 4,157 | 4,364 |
|   Other machinery and metal products | 288 | 274 | 283 | 285 | 293 |
| Food products | 1,903 | 2,202 | 2,312 | 2,958 | 3,146 |
| Other chemical and allied products | 502 | 591 | 613 | 624 | 375 |
| Apparel | 353 | 344 | 325 | 228 | 222 |
| Other[1] | 1,231 | 1,312 | 1,387 | 1,391 | 1,785 |
| Total gross domestic product of manufacturing sector[2] | $31,532 | $33,267 | $34,534 | $36,547 | $36,717 |

(1) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(2) Totals may not add due to rounding.

*Source:* Planning Board

A-11

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2003 to 2007.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,444 | 4,706 | 4,471 | 4,108 | 3,792 |
|   Cement and Concrete Products Manufacturing | 3,543 | 3,867 | 3,750 | 3,542 | 3,208 |
| Fabricated Metal Products | 6,198 | 6,490 | 6,427 | 5,808 | 5,817 |
| Computer and Electronic | 11,623 | 10,581 | 10,673 | 10,808 | 10,133 |
| Electrical Equipment | 7,415 | 7,744 | 7,645 | 6,858 | 6,567 |
|   Electrical Equipment Manufacturing | 4,399 | 4,935 | 4,971 | 4,708 | 4,525 |
| Miscellaneous Manufacturing | 12,308 | 12,070 | 11,157 | 11,225 | 11,200 |
|   Medical Equipment and Supplies Manufacturing | 11,336 | 11,059 | 10,473 | 10,492 | 10,467 |
| Other Durable Goods Manufacturing | 7,646 | 8,185 | 7,693 | 7,685 | 7,341 |
|   Total – Durable Goods | 49,634 | 49,776 | 48,066 | 46,492 | 44,850 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 13,628 | 13,244 | 13,050 | 12,667 | 12,433 |
| Beverage and Tobacco Products Manufacturing | 3,159 | 3,038 | 3,175 | 3,425 | 3,267 |
| Apparel Manufacturing | 8,988 | 8,522 | 8,873 | 8,400 | 7,250 |
|   Cut and Sew Apparel Manufacturing | 8,969 | 8,518 | 8,846 | 8,183 | 6,933 |
| Chemical Manufacturing | 31,183 | 31,385 | 32,885 | 32,335 | 30,067 |
|   Pharmaceutical and Medicine Manufacturing | 26,645 | 27,187 | 28,572 | 28,017 | 25,742 |
| Plastics and Rubber Products | 3,340 | 3,210 | 2,744 | 2,350 | 2,217 |
|   Plastics Product Manufacturing | 3,030 | 2,917 | 2,266 | 2,158 | 2,083 |
| Other Non-Durable Goods Manufacturing | 8,823 | 9,261 | 8,529 | 7,200 | 5,724 |
|   Total – Non-Durable Goods | 69,121 | 68,660 | 69,256 | 66,367 | 60,958 |
| | | | | | |
| Total Manufacturing Employment | 118,755 | 118,436 | 117,322 | 112,869 | 105,808 |

\*   Totals may not add due to rounding.
(1) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 12,947 from fiscal year 2003 to fiscal year 2007. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in fiscal year 2006 with the sector experiencing another significant drop of -3.8%. For fiscal year 2007 the

A-12

Case:17-03283-LTS Doc#:4781-10 Filed:01/24/18 Entered:01/24/18 18:12:25 Desc:
Exhibit DX-GG Part 3 Page 406 of 566 of 1005
Exhibit DX-GG Part 3 Page 406 of 566 of 1005

employment decline accelerated further to -6.2%. During the last year the economy has lost around 7,050 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2003 and 2007, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.4%, while payroll employment in this sector increased at an average annual rate of 1.8%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for fiscal year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2007, services generated $35.9 billion of gross domestic product, or 40% of the total. Services employment grew from 523,691 in fiscal year 2003 to 562,949 in fiscal year 2007 (representing 54.5% of total, non-farm, payroll employment). This represents a cumulative increase of 7.5% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2003 to 2007, as measured by gross domestic product. From fiscal year 2003 to 2007, gross domestic product increased in wholesale and retail trade from $9.2 billion to $11.1 billion, and in finance, insurance, and real estate from $12.5 billion to $16.3 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2007 were $113.9 billion. As of December 31, 2007, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $75.8 billion.

A-13

PR-INT-000007427

The following tables set forth gross domestic product for fiscal years 2003 to 2007 and employment for the services sector for fiscal years 2003 to 2007.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Wholesale and retail trade | $ 9,150 | $ 9,802 | $10,217 | $10,709 | $11,061 |
| Finance, insurance and real estate | 12,508 | 13,029 | 14,267 | 14,998 | 16,336 |
| Other services[2] | 7,261 | 7,646 | 7,965 | 8,241 | 8,529 |
| Total | $28,919 | $30,476 | $32,449 | $33,948 | $35,925 |

* Totals may not add due to rounding.
(1) Preliminary.
(2) Includes tourism.

Source: Planning Board.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Wholesale Trade | 32,181 | 33,299 | 33,710 | 33,992 | 33,158 |
| Retail Trade | 130,180 | 132,008 | 136,189 | 137,800 | 135,058 |
| Transportation, Warehouse & Utilities | 17,352 | 17,054 | 17,615 | 17,433 | 16,700 |
| Trade, Transportation, Warehouse & Utilities | 179,713 | 182,361 | 187,514 | 189,225 | 184,916 |
| Information | 21,619 | 21,907 | 22,598 | 22,600 | 21,733 |
| Finance | 44,648 | 46,852 | 48,621 | 49,767 | 49,975 |
| Professional and Business | 98,498 | 101,899 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 92,409 | 98,101 | 99,963 | 103,583 | 105,842 |
| Leisure & Hospitality | 67,912 | 70,310 | 72,586 | 74,767 | 73,433 |
| Other Services | 18,808 | 20,671 | 21,257 | 21,267 | 22,283 |
| Total | 523,607 | 542,101 | 556,306 | 567,609 | 562,949 |

* Totals may not add due to rounding.
(1) Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During fiscal year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in fiscal year 2005. The number of non-resident tourists registered in tourist hotels during fiscal year 2006 increased 4.6% compared to fiscal year 2005. Hotel rooms available during fiscal year 2006 increased 3.9% compared to fiscal year 2005. The

A-14

CONFIDENTIAL

PR-INT-000007428

average number of rooms rented in tourist hotels increased 3.9% during fiscal year 2006 compared to fiscal year 2005. The average occupancy rate in tourist hotels during fiscal years 2005 and 2006 was 70.8%.

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,798,300, a decrease of 6.5% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.3%, compared to 70.1% during fiscal year 2006. The average number of rooms rented in tourist hotels decreased 5.0% fiscal year 2007 compared with fiscal year 2006. The average number of rooms available in tourist hotels decreased 6.3% from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

The number of persons registered in tourist hotels during the first nine months of fiscal year 2008, was 1,331,700, a decrease of 2.2% over the number of persons registered during the same period of fiscal year 2007. The average occupancy rate in tourist hotels during the first four months of fiscal year 2008 was 68.2%, compared to 68.4% in the period for fiscal year 2007. During the first four months of fiscal year 2008, the average number of rooms rented in tourist hotels decreased 2.3% and the average number of rooms available in tourist hotels decreased 2.7% compared with the same period in fiscal year 2007.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2007.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 | 1,424,170 | 1,300,120 | 2,297,840 | 5,022,130 | 3,369.3 |
| 2007[4] | 1,353,380 | 1,375,430 | 2,333,600 | 5,062,410 | 3,143.9 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes visitors in homes of relatives, friends, and in hotel apartments.
(4) Preliminary

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

A-15

PR-INT-000007429

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In fiscal year 2007, the government accounted for $8.6 billion of Puerto Rico's gross domestic product, or 9.6% of the total. The government is also a significant employer, providing jobs for 297,400 workers, or 28.8% of total, non-farm, payroll employment in fiscal year 2006. This total includes municipal employees. As of January 31, 2008, central government employment has been reduced by approximately 11,500 positions since September 2004.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During fiscal year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material impact on the General Fund.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2008. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required

A-16

CONFIDENTIAL

PR-INT-000007430

environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is completed, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

As of September 30, 2007, PAA had an outstanding balance of $94.6 million under various lines of credit from GDB. PAA is authorized to borrow up to $250 million under these lines of credit. This debt is payable from annual legislative appropriations until the PAA starts generating revenues sufficient to cover debt service and is also guaranteed by the Commonwealth. Partial operation of the Port of the Americas, at a capacity of up to 250,000 TEUs per year, could begin in early 2008.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity, due to its multiplier effect on the whole economy. During the period from fiscal year 2003 through fiscal year 2007, however, real construction investment has decreased at an average annual growth rate of 5.9%. The total value of construction permits decreased by 5.4% during the same five fiscal year period.

Public investment has been an important component of construction investment. During fiscal year 2007, approximately 43.4% of the total investment in construction was related to public projects. For fiscal year 2007 compared to fiscal year 2006, the total value of construction permits decreased 22.2% and total sales of cement, including imports, decreased 8.2%. Average payroll employment in the construction sector during fiscal year 2007 was 67,400, a reduction of 0.1% from fiscal year 2006. Cement sales (including imports) continued their decline, during the first three quarters of fiscal year 2008, falling 11.4% compared to the same period in fiscal year 2007.

Total construction investment for fiscal year 2007 decreased (in real terms) by 6.3% (following a 10.4% real decline in fiscal year 2006) due principally to the drop in construction related public projects. For fiscal year 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 5.3% and stagnation (0% real growth) for fiscal year 2009. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first ten months of fiscal year 2008, the number of construction permits decreased 12.1% and the total value of construction permits increased 24.2% compared to the same period in fiscal year 2007.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2007, gross income from agriculture was $814.2 million, an increase of 1.6% compared with fiscal year 2006. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During fiscal year 2007, starchy vegetables, coffee, livestock products and ornamental plants contributed a higher percentage of the sector's income than in the previous fiscal year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100%

A-17

PR-INT-000007431

exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.  Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector.  The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

### Employment and Unemployment

The number of persons employed in Puerto Rico during fiscal year 2007 averaged 1,262,900, a 0.8% increase from 1,253,400 in fiscal year 2006.  Unemployment, although at relatively low historical levels, is about twice the United States average.  The average unemployment rate decreased from 11.7% in fiscal year 2006 to 10.4% in fiscal year 2007.

The following table presents annual statistics of employment and unemployment for fiscal year 2003 through fiscal year 2007 and monthly statistics, seasonally adjusted, for the first eight months of fiscal year 2008.  These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2003 | 1,352 | 1,188 | 164 | 12.1% |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| 2007 | 1,409 | 1,263 | 147 | 10.4 |
| **Fiscal Year 2008** | | (Seasonally Adjusted) | | |
| July | 1,389 | 1,226 | 163 | 11.8% |
| August | 1,412 | 1,279 | 133 | 9.4 |
| September | 1,364 | 1,213 | 151 | 11.1 |
| October | 1,372 | 1,210 | 163 | 11.9 |
| November | 1,369 | 1,217 | 151 | 11.0 |
| December | 1,361 | 1,209 | 152 | 11.2 |
| January | 1,374 | 1,226 | 148 | 10.8 |
| February | 1,374 | 1,216 | 158 | 11.5 |

_____
(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:*  Department of Labor and Human Resources – Household Survey

A-18

CONFIDENTIAL

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2006-2007 was approximately 62,340 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural

A-19

CONFIDENTIAL

PR-INT-000007433

sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, which are designed to promote investment in Puerto Rico, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The industrial incentives law currently in force is Act No. 135 of December, 1997 known as the Tax Incentives Act of 1998 ("Act 135"), which expires on June 30, 2008. This law will be replaced by Act No. 73 of May 28, 2008 known as the Economic Incentives Act for the Development of Puerto Rico ("Act 73"), and will be effective on July 1, 2008.

The benefits provided by Act 135 are currently available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. Companies qualifying thereunder can benefit from income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, Act 135 grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 60% and 80% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities. Act 135 also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

An exempt business currently under Act 135 will be able to continue to enjoy the benefits provided in said act and its current grant of industrial tax exemption until expiration or may elect to convert said grant to Act. 73. In case of a conversion, if the exempt business is subject to a fixed income tax rate of no more than 4% and no less than 2%, it will be able to retain its fixed income tax rate under Act 135 and its current grant, but will be required to maintain at least 80% of the average employment of the last three taxable years.

Under Act 73, the activities eligible for tax exemption include manufacturing, services, production of energy, recycling and value added activities among others. Companies qualifying thereunder can benefit from income tax rates of 4% (with a withholding tax on royalty payments of 12%) or 8% (with a withholding tax on royalty payments of 2%) for 15 year periods. Pioneer products can benefit from a fixed income tax rate of 1%, or of 0%, if the intangible property used has been created or developed in Puerto Rico, including

A-20

PR-INT-000007434

but not limited to activities geared to the commercial viability of the product. In addition, Act 73 will grant a 90% exemption from personal and real property taxes and a 60% exemption from municipal license taxes. For small and medium size businesses there will be a 75% municipal license tax exemption.

Act 73 will provide a 100% state excise tax and sales and use tax exemption on raw materials; machinery and equipment; fuel used for the generation of energy; chemicals used in the treatment of waste water; and energy efficient equipment. It will also provide an income tax credit for the purchase of products manufactured in Puerto Rico; the creation of employment; clinical and toxicology trials; and for the investment in machinery and equipment for the generation of energy, among others. Certain credits against the fixed income tax rate are provided under Act 73.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,900 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996 (the "1996 Amendments"), its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

Because of the modification and phase out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in

CONFIDENTIAL

the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a fifteen percent Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

A-22

CONFIDENTIAL

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

B-1

CONFIDENTIAL

PR-INT-000007437

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-2

PR-INT-000007438

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

B-3

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

B-4

PR-INT-000007440

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any croup of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i) Government Obligations;

(ii) Defeased Municipal Obligations;

(iii) any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

(iv) an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

(v) certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided,

however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

      (vi)  a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

    **Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

      (i)  which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

      (ii)  (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

    **Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

    **Event of Default** shall have the meaning specified in the Resolution.

    **Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

    **Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

    **Fitch** shall mean Fitch Ratings, and its successors and assigns.

    **Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

<div align="center">B-6</div>

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

        (iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

        (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

        (vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

        (vii)  shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or

B-7

PR-INT-000007443

money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

B-8

CONFIDENTIAL

PR-INT-000007444

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility.  Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

      (i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

      (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

B-9

CONFIDENTIAL

(iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

B-10

CONFIDENTIAL                                                                                 PR-INT-000007446

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.      All Revenues.

      2.      All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

      3.      The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

      4.      Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

      5.      Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

CONFIDENTIAL

PR-INT-000007447

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

B-12

PR-INT-000007448

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1. All Pledged Sales Tax received by the Corporation or the Trustee.

    2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

B-13

CONFIDENTIAL

PR-INT-000007449

3.      Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2008A Bonds of the Series designated as "Series 2008A", and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds, the Series 2007B Bonds, and the Series 2007C Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2008A Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2008A.

**Series 2008A Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2008A Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

B-14

PR-INT-000007450

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-15

CONFIDENTIAL

PR-INT-000007451

### Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-16

CONFIDENTIAL

PR-INT-000007452

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)   either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)   a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

### Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

### Qualified Hedges (Section 206)

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

CONFIDENTIAL

PR-INT-000007453

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-18

PR-INT-000007454

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-19

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-20

PR-INT-000007456

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-21

PR-INT-000007457

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

> (i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

> (ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

B-22

PR-INT-000007458

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds.  Such purchases shall be made at such price or prices as determined by such written instructions.  If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

B-23

CONFIDENTIAL

PR-INT-000007459

(iii)    Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)    Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

B-24

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

B-25

PR-INT-000007461

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

### Satisfaction of Sinking Fund Installments (Section 508)

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

B-26

PR-INT-000007462

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)     amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)     amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

B-27

        (iii)    amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

        (iv)    amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

B-28

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

CONFIDENTIAL

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

CONFIDENTIAL

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-31

CONFIDENTIAL

PR-INT-000007467

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2008A Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2008A Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2008A Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

CONFIDENTIAL

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its

B-33

PR-INT-000007469

duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

### Evidence on Which Trustee May Act (Section 803)

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

### Compensation and Indemnification (Section 804)

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the

CONFIDENTIAL

acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

B-35

CONFIDENTIAL

PR-INT-000007471

**Appointment of Successor Trustee (Section 808)**

   In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

   If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

   Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

   For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

     (i) to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

     (ii) to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

<div align="center">B-36</div>

CONFIDENTIAL

(iii) to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv) to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v) to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi) to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii) to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii) to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x) to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi) as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii) to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii) to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

CONFIDENTIAL

PR-INT-000007473

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

B-38

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

CONFIDENTIAL

PR-INT-000007475

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)      by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)      by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)      by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)      by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

CONFIDENTIAL

PR-INT-000007476

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

B-41

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

PR-INT-000007478

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

B-43

CONFIDENTIAL

PR-INT-000007479

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

      Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

      If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

      Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

CONFIDENTIAL

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon.  Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be.  Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account.  To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein.  If any portion of the moneys deposited with

B-45

PR-INT-000007481

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

### Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

### Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

### No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

### Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-46

CONFIDENTIAL

APPENDIX C

PROPOSED FORM OF APPROVING OPINION OF
BOND COUNSEL TO THE CORPORATION

June 26, 2008

Puerto Rico Sales Tax Financing Corporation
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

        **Re:**    **$737,046,992.35**
                    **Puerto Rico Sales Tax Financing Corporation**
                    **Series 2008A Bonds**

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a Fourth Supplemental resolution adopted by the Board of Directors on June 25, 2008 (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the Corporation's $737,046,992.35 Sales Tax Revenue Bonds, Series 2008A (the "Bonds").

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of providing funds for the payment or retirement of certain "extraconstitutional" debt as authorized under the Act.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the General Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the

C-1

CONFIDENTIAL
PR-INT-000007483

address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion, and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)     Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) interest on the Bonds is included in gross income for Federal income tax purposes, except that no opinion is expressed with respect to certain Federal income tax matters covered by the opinion of Fiddler, Gonzalez & Rodriguez, P.S.C., Special Tax Counsel to the Corporation, delivered to the Corporation on the date of delivery of the Bonds, and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the inclusion of interest on the Bonds in gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Bond Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Very truly yours,

C-2

CONFIDENTIAL

PR-INT-000007484

APPENDIX D

PROPOSED FORM OF OPINION OF
SPECIAL TAX COUNSEL

June 26, 2008

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

> Re:   $737,046,922.35
>        Puerto Rico Sales Tax Financing Corporation
>        Sales Tax Revenue Bonds, Series 2008A

Gentlemen:

In connection with the issuance on the date hereof by the Puerto Rico Sales Tax Financing Corporation (the "Corporation") of its Sales Tax Revenue Bonds, Series 2008A (collectively, the "Bonds"), you have requested our opinion with respect to the treatment for Puerto Rico tax purposes of the ownership and disposition of the Bonds.

We have examined Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended (the "Act"), creating the Corporation. The Corporation is a body corporate and politic constituting a public corporation and governmental instrumentality of Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") exercising public and essential governmental functions.

From such an examination, we are of the opinion that:

1.      Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.      The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.      The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico, and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4.      Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

D-1

CONFIDENTIAL

PR-INT-000007485

5.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.      Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

7.      Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)      Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof; and

(b)      Interest received or accrued, or "original issue discount", on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico and such interest is not effectively connected with the conduct of a trade or business in the United States by such corporation, such corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1)      these tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service,

(2)      these statements were written in connection with the promotion or marketing of the Bonds; and

(3)      each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

D-2

This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated June 25, 2008 in connection with the Bonds. We further consent to the reference made to us under the captions "Tax Matters - Puerto Rico Tax Considerations" and "Legal Matters" in said Official Statement.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the inclusion of interest on the Bonds in gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

Respectfully submitted,

D-3

CONFIDENTIAL

PR-INT-000007487

APPENDIX E

BOOK-ENTRY SYSTEM

**The Depository Trust Company**

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

E-1

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

E-2

PR-INT-000007489

NONE OF THE CORPORATION, THE TRUSTEE OR THE PRINCIPAL WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

E-3

CONFIDENTIAL

PR-INT-000007490

APPENDIX F

### TABLE OF COMPOUNDED AMOUNTS FOR
### CAPITAL APPRECIATION BONDS

| Date | CABS Due 2024 | CABS Due 2025 | CABS Due 2026 | CABS Due 2027 | CABS Due 2031 | CABS Due 2032 | CABS Due 2033 | CABS Due 2034 | CABS Due 2035 | CABS Due 2036 |
|---|---|---|---|---|---|---|---|---|---|---|
| 06/26/2008 | $1,862.40 | $1,751.60 | $1,647.40 | $1,549.30 | $1,212.20 | $1,140.10 | $1,072.20 | $1,008.40 | $ 948.40 | $ 892.00 |
| 08/01/2008 | 1,873.60 | 1,762.10 | 1,657.20 | 1,558.60 | 1,219.50 | 1,146.90 | 1,078.60 | 1,014.50 | 954.10 | 897.30 |
| 02/01/2009 | 1,931.90 | 1,817.00 | 1,708.90 | 1,607.20 | 1,257.40 | 1,182.60 | 1,112.20 | 1,046.10 | 983.80 | 925.30 |
| 08/01/2009 | 1,992.10 | 1,873.60 | 1,762.10 | 1,657.20 | 1,296.60 | 1,219.50 | 1,146.90 | 1,078.60 | 1,014.50 | 954.10 |
| 02/01/2010 | 2,054.20 | 1,931.90 | 1,817.00 | 1,708.90 | 1,337.00 | 1,257.40 | 1,182.60 | 1,112.20 | 1,046.10 | 983.80 |
| 08/01/2010 | 2,118.20 | 1,992.10 | 1,873.60 | 1,762.10 | 1,378.60 | 1,296.60 | 1,219.50 | 1,146.90 | 1,078.60 | 1,014.50 |
| 02/01/2011 | 2,184.10 | 2,054.20 | 1,931.90 | 1,817.00 | 1,421.60 | 1,337.00 | 1,257.40 | 1,182.60 | 1,112.20 | 1,046.10 |
| 08/01/2011 | 2,252.20 | 2,118.20 | 1,992.10 | 1,873.60 | 1,465.90 | 1,378.60 | 1,296.60 | 1,219.50 | 1,146.90 | 1,078.60 |
| 02/01/2012 | 2,322.30 | 2,184.10 | 2,054.20 | 1,931.90 | 1,511.50 | 1,421.60 | 1,337.00 | 1,257.40 | 1,182.60 | 1,112.20 |
| 08/01/2012 | 2,394.70 | 2,252.20 | 2,118.20 | 1,992.10 | 1,558.60 | 1,465.90 | 1,378.60 | 1,296.60 | 1,219.50 | 1,146.90 |
| 02/01/2013 | 2,469.30 | 2,322.30 | 2,184.10 | 2,054.20 | 1,607.20 | 1,511.50 | 1,421.60 | 1,337.00 | 1,257.40 | 1,182.60 |
| 08/01/2013 | 2,546.20 | 2,394.70 | 2,252.20 | 2,118.20 | 1,657.20 | 1,558.60 | 1,465.90 | 1,378.60 | 1,296.60 | 1,219.50 |
| 02/01/2014 | 2,625.50 | 2,469.30 | 2,322.30 | 2,184.10 | 1,708.90 | 1,607.20 | 1,511.50 | 1,421.60 | 1,337.00 | 1,257.40 |
| 08/01/2014 | 2,707.30 | 2,546.20 | 2,394.70 | 2,252.20 | 1,762.10 | 1,657.20 | 1,558.60 | 1,465.90 | 1,378.60 | 1,296.60 |
| 02/01/2015 | 2,791.60 | 2,625.50 | 2,469.30 | 2,322.30 | 1,817.00 | 1,708.90 | 1,607.20 | 1,511.50 | 1,421.60 | 1,337.00 |
| 08/01/2015 | 2,878.60 | 2,707.30 | 2,546.20 | 2,394.70 | 1,873.60 | 1,762.10 | 1,657.20 | 1,558.60 | 1,465.90 | 1,378.60 |
| 02/01/2016 | 2,968.20 | 2,791.60 | 2,625.50 | 2,469.30 | 1,931.90 | 1,817.00 | 1,708.90 | 1,607.20 | 1,511.50 | 1,421.60 |
| 08/01/2016 | 3,060.70 | 2,878.60 | 2,707.30 | 2,546.20 | 1,992.10 | 1,873.60 | 1,762.10 | 1,657.20 | 1,558.60 | 1,465.90 |
| 02/01/2017 | 3,156.00 | 2,968.20 | 2,791.60 | 2,625.50 | 2,054.20 | 1,931.90 | 1,817.00 | 1,708.90 | 1,607.20 | 1,511.50 |
| 08/01/2017 | 3,254.30 | 3,060.70 | 2,878.60 | 2,707.30 | 2,118.20 | 1,992.10 | 1,873.60 | 1,762.10 | 1,657.20 | 1,558.60 |
| 02/01/2018 | 3,355.70 | 3,156.00 | 2,968.20 | 2,791.60 | 2,184.10 | 2,054.20 | 1,931.90 | 1,817.00 | 1,708.90 | 1,607.20 |
| 08/01/2018 | 3,460.30 | 3,254.30 | 3,060.70 | 2,878.60 | 2,252.20 | 2,118.20 | 1,992.10 | 1,873.60 | 1,762.10 | 1,657.20 |
| 02/01/2019 | 3,568.00 | 3,355.70 | 3,156.00 | 2,968.20 | 2,322.30 | 2,184.10 | 2,054.20 | 1,931.90 | 1,817.00 | 1,708.90 |
| 08/01/2019 | 3,679.20 | 3,460.30 | 3,254.30 | 3,060.70 | 2,394.70 | 2,252.20 | 2,118.20 | 1,992.10 | 1,873.60 | 1,762.10 |
| 02/01/2020 | 3,793.80 | 3,568.00 | 3,355.70 | 3,156.00 | 2,469.30 | 2,322.30 | 2,184.10 | 2,054.20 | 1,931.90 | 1,817.00 |
| 08/01/2020 | 3,912.00 | 3,679.20 | 3,460.30 | 3,254.30 | 2,546.20 | 2,394.70 | 2,252.20 | 2,118.20 | 1,992.10 | 1,873.60 |
| 02/01/2021 | 4,033.80 | 3,793.80 | 3,568.00 | 3,355.70 | 2,625.50 | 2,469.30 | 2,322.30 | 2,184.10 | 2,054.20 | 1,931.90 |
| 08/01/2021 | 4,159.50 | 3,912.00 | 3,679.20 | 3,460.30 | 2,707.30 | 2,546.20 | 2,394.70 | 2,252.20 | 2,118.20 | 1,992.10 |
| 02/01/2022 | 4,289.00 | 4,033.80 | 3,793.80 | 3,568.00 | 2,791.60 | 2,625.50 | 2,469.30 | 2,322.30 | 2,184.10 | 2,054.20 |
| 08/01/2022 | 4,422.70 | 4,159.50 | 3,912.00 | 3,679.20 | 2,878.60 | 2,707.30 | 2,546.20 | 2,394.70 | 2,252.20 | 2,118.20 |
| 02/01/2023 | 4,560.40 | 4,289.00 | 4,033.80 | 3,793.80 | 2,968.20 | 2,791.60 | 2,625.50 | 2,469.30 | 2,322.30 | 2,184.10 |
| 08/01/2023 | 4,702.50 | 4,422.70 | 4,159.50 | 3,912.00 | 3,060.70 | 2,878.60 | 2,707.30 | 2,546.20 | 2,394.70 | 2,252.20 |
| 02/01/2024 | 4,849.00 | 4,560.40 | 4,289.00 | 4,033.80 | 3,156.00 | 2,968.20 | 2,791.60 | 2,625.50 | 2,469.30 | 2,322.30 |
| 08/01/2024 | 5,000.00 | 4,702.50 | 4,422.70 | 4,159.50 | 3,254.30 | 3,060.70 | 2,878.60 | 2,707.30 | 2,546.20 | 2,394.70 |
| 02/01/2025 | - | 4,849.00 | 4,560.40 | 4,289.00 | 3,355.70 | 3,156.00 | 2,968.20 | 2,791.60 | 2,625.50 | 2,469.30 |
| 08/01/2025 | - | 5,000.00 | 4,702.50 | 4,422.70 | 3,460.30 | 3,254.30 | 3,060.70 | 2,878.60 | 2,707.30 | 2,546.20 |
| 02/01/2026 | - | - | 4,849.00 | 4,560.40 | 3,568.00 | 3,355.70 | 3,156.00 | 2,968.20 | 2,791.60 | 2,625.50 |
| 08/01/2026 | - | - | 5,000.00 | 4,702.50 | 3,679.20 | 3,460.30 | 3,254.30 | 3,060.70 | 2,878.60 | 2,707.30 |
| 02/01/2027 | - | - | - | 4,849.00 | 3,793.80 | 3,568.00 | 3,355.70 | 3,156.00 | 2,968.20 | 2,791.60 |
| 08/01/2027 | - | - | - | 5,000.00 | 3,912.00 | 3,679.20 | 3,460.30 | 3,254.30 | 3,060.70 | 2,878.60 |
| 02/01/2028 | - | - | - | - | 4,033.80 | 3,793.80 | 3,568.00 | 3,355.70 | 3,156.00 | 2,968.20 |
| 08/01/2028 | - | - | - | - | 4,159.50 | 3,912.00 | 3,679.20 | 3,460.30 | 3,254.30 | 3,060.70 |

F-1

| Date | CABS Due 2024 | CABS Due 2025 | CABS Due 2026 | CABS Due 2027 | CABS Due 2031 | CABS Due 2032 | CABS Due 2033 | CABS Due 2034 | CABS Due 2035 | CABS Due 2036 |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/01/2029 | - | - | - | - | 4,289.00 | 4,033.80 | 3,793.80 | 3,568.00 | 3,355.70 | 3,156.00 |
| 08/01/2029 | - | - | - | - | 4,422.70 | 4,159.50 | 3,912.00 | 3,679.20 | 3,460.30 | 3,254.30 |
| 02/01/2030 | - | - | - | - | 4,560.40 | 4,289.00 | 4,033.80 | 3,793.80 | 3,568.00 | 3,355.70 |
| 08/01/2030 | - | - | - | - | 4,702.50 | 4,422.70 | 4,159.50 | 3,912.00 | 3,679.20 | 3,460.30 |
| 02/01/2031 | - | - | - | - | 4,849.00 | 4,560.40 | 4,289.00 | 4,033.80 | 3,793.80 | 3,568.00 |
| 08/01/2031 | - | - | - | - | 5,000.00 | 4,702.50 | 4,422.70 | 4,159.50 | 3,912.00 | 3,679.20 |
| 02/01/2032 | - | - | - | - | - | 4,849.00 | 4,560.40 | 4,289.00 | 4,033.80 | 3,793.80 |
| 08/01/2032 | - | - | - | - | - | 5,000.00 | 4,702.50 | 4,422.70 | 4,159.50 | 3,912.00 |
| 02/01/2033 | - | - | - | - | - | - | 4,849.00 | 4,560.40 | 4,289.00 | 4,033.80 |
| 08/01/2033 | - | - | - | - | - | - | 5,000.00 | 4,702.50 | 4,422.70 | 4,159.50 |
| 02/01/2034 | - | - | - | - | - | - | - | 4,849.00 | 4,560.40 | 4,289.00 |
| 08/01/2034 | - | - | - | - | - | - | - | 5,000.00 | 4,702.50 | 4,422.70 |
| 02/01/2035 | - | - | - | - | - | - | - | - | 4,849.00 | 4,560.40 |
| 08/01/2035 | - | - | - | - | - | - | - | - | 5,000.00 | 4,702.50 |
| 02/01/2036 | - | - | - | - | - | - | - | - | - | 4,849.00 |
| 08/01/2036 | - | - | - | - | - | - | - | - | - | 5,000.00 |

F-2

PR-INT-000007492

# Exhibit 11

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 10

Exhibit 10 Page 1 of 35

**NEW ISSUE – BOOK-ENTRY ONLY**　　　　　　　　　　　　**RATINGS (see RATINGS herein):**　**S&P: A+**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Moody's: A2**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Fitch: A**

# $4,118,153,700
# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2009A

**Dated:** Date of Delivery　　　　　　　　　　　　　　　　　**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes described herein. Concurrently with the issuance of the Series 2009A Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds" and, together with the Series 2009A Bonds, the "Series 2009 Bonds") and its Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds"). The Series 2009B Bonds and the Series 2009C Bonds are being offered for sale pursuant to separate Official Statements and, in the case of the Series 2009B Bonds, are being offered for sale solely in Puerto Rico. The issuance of the Series 2009A Bonds is not contingent upon the issuance of the Series 2009B Bonds or the Series 2009C Bonds.

**The Series 2009 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2009 Bonds are subordinate in payment priority to the Corporation's previously-issued bonds and parity obligations incurred, the Series 2009C Bonds and certain additional bonds that may be issued by the Corporation, as described herein. The Bank of New York Mellon will act as trustee (the "Trustee") under the Resolution. In connection with the issuance of the Series 2009 Bonds, the Resolution is being amended. See** *Appendix B – Summary of Certain Definitions and Provisions of the Resolution* **and** *Appendix C – Summary of Amendments to the General Resolution.*

The Series 2009A Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2009A Bonds on the records of The Depository Trust Company and its participants. The Series 2009A Bonds are being issued as Current Interest Bonds, Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. The inside cover pages of this Official Statement contain information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2009A Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

**This cover page contains information for quick reference only. It is** *not* **a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a)(i) assuming compliance with certain conditions imposed by applicable Federal tax law as described herein, interest on the Series 2009A Bonds is excluded from gross income for Federal income tax purposes pursuant to applicable Federal tax law, and (ii) interest on the Series 2009A Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations; and (b) the Series 2009A Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation. See TAX MATTERS herein.*

**The Series 2009A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2009A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2009A Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2009A Bonds will be delivered through The Depository Trust Company on or about June 18, 2009.*

## Citi　　　　　　　　　　　　　　　　　　　　　　　　　　　Barclays Capital

Goldman, Sachs & Co.　　　　　J.P. Morgan　　　　　Merrill Lynch & Co.　　　　Morgan Stanley

Popular Securities　　　　　　　Santander Securities　　　　　UBS Financial Services Incorporated of Puerto Rico

June 10, 2009

**$4,118,153,700**

**Puerto Rico Sales Tax Financing Corporation**

**Sales Tax Revenue Bonds, First Subordinate Series 2009A**

**$3,636,150,000 Current Interest Bonds[*]**

**$1,121,150,000 Serial Bonds**

| Maturity August 1 | Amount | Interest Rate | Price or Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2015 | $ 11,300,000 | 3¾% | 100 | 74529JGS8 |
| 2016 | 29,705,000 | 4 | 100 | 74529JGT6 |
| 2017 | 14,470,000 | 5 | 4.250% | 74529JGV1 |
| 2017 | 11,530,000 | 4¼ | 100 | 74529JGU3 |
| 2018 | 15,625,000 | 4½ | 4.600 | 74529JGW9 |
| 2018 | 39,985,000 | 5 | 4.600 | 74529JGX7 |
| 2019 | 22,125,000 | 4⅜ | 4.750 | 74529JGY5 |
| 2019 | 19,420,000 | 5 | 4.750 | 74529JGZ2 |
| 2019 | 46,300,000 | 5¼ | 4.750 | 74529JHA6 |
| 2020 | 12,645,000 | 4¾ | 4.890 | 74529JHB4 |
| 2020 | 54,345,000 | 5⅜ | 4.890[c] | 74529JHC2 |
| 2021 | 53,660,000 | 5½ | 5.020[c] | 74529JHD0 |
| 2022 | 75,705,000 | 5½ | 5.140[c] | 74529JHE8 |
| 2023 | 96,870,000 | 5½ | 5.250[c] | 74529JHF5 |
| 2024 | 116,100,000 | 5 | 5.350 | 74529JHG3 |
| 2027 | 137,230,000 | 5¼ | 5.625 | 74529JHH1 |
| 2028 | 204,135,000 | 5½ | 5.700 | 74529JHJ7 |
| 2029 | 160,000,000 | 6¼ | 5.500[cc] | 74529JHK4 |

**$1,815,000,000 Term Bonds**

$365,000,000  5¾% Term Bonds due August 1, 2037, to yield 6.100%  CUSIP[†] 74529JHL2
$200,000,000  6⅛% Term Bonds due August 1, 2039, to yield 6.000%[c]  CUSIP[†] 74529JHM0
$900,000,000  6% Term Bonds due August 1, 2042, to yield 6.250%  CUSIP[†] 74529JHN8
$350,000,000  6½% Term Bonds due August 1, 2044, to yield 6.100%[c]  CUSIP[†] 74529JHP3

**$700,000,000 Mandatory Tender Bonds[‡]**

| Maturity August 1 | Initial Multiannual Period | Principal Amount | Initial Interest Rate | Price | Mandatory Tender Date | CUSIP Numbers[†] |
|---|---|---|---|---|---|---|
| 2039 | July 31, 2011 | $700,000,000 | 5% | 100 | August 1, 2011 | 74529JHQ1 |

---

[*]  Interest on the Current Interest Bonds will be payable semi-annually on each August 1 and February 1, commencing on February 1, 2010

[†]  Copyright 2008, American Bankers Association.  CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc.  This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services.  CUSIP numbers are provided for convenience of reference only.  Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[c]  Priced at the stated yield to the August 1, 2019 optional redemption date at a redemption price of 100%.  See *"Redemption"* under THE SERIES 2009A BONDS herein.

[cc]  Priced at the stated yield to the February 1, 2014 optional redemption date at a redemption price of 100%.  See *"Redemption"* under THE SERIES 2009A BONDS herein.

[‡]  Through the period that commences on the date of delivery of the Mandatory Tender Bonds and ends on the date specified as the Initial Multiannual Period, interest will accrue on the Mandatory Tender Bonds at the Initial Interest Rate and will be payable on August 1 and February 1 of each year, commencing February 1, 2010.  On August 1, 2011, the Mandatory Tender Bonds will be subject to mandatory tender for purchase, subject to a successful remarketing of the Mandatory Tender Bonds at such time.  In the event the Mandatory Tender Bonds are not remarketed on August 1, 2011, the interest rate will convert, without further notice to bondholders, to 10% from August 1, 2011 until purchased.  The Mandatory Tender Bonds have been priced to the mandatory tender date of August 1, 2011.

CONFIDENTIAL

### $139,155,700 Capital Appreciation Bonds[*]

| Maturity August 1 | Initial Principal Amount | Maturity Amount | Approximate Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2030 | $31,185,700 | $130,000,000 | 6.875% | 74529JHR9 |
| 2031 | 21,830,000 | 100,000,000 | 7.000 | 74529JHS7 |
| 2034 | 86,140,000 | 500,000,000 | 7.125 | 74529JHT5 |

### $342,848,000 Convertible Capital Appreciation Bonds[‡]

| Maturity August 1 | Initial Principal Amount | Compounded Amount as of August 1, 2016 and Amount Due at Maturity | Interest Rate | Price | CUSIP Numbers[†] |
|---|---|---|---|---|---|
| 2032 | $342,848,000 | $550,000,000 | 6¼% | 62.336 | 74529JHU2 |

---

[*] Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on August 1, 2009, and will be payable at maturity (or earlier redemption).

[†] Copyright 2008, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[‡] Interest on the Convertible Capital Appreciation Bonds will not be payable on a current basis prior to February 1, 2017, but will compound from their date of delivery on a semi-annual basis, beginning August 1, 2009, to and including August 1, 2016 (the "Current Interest Commencement Date"). On and after the Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds will be payable semi-annually on February 1, 2017 and on each August 1 and February 1 thereafter. Principal and Compounded Amount will be payable at maturity or earlier redemption.

CONFIDENTIAL

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2009A Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2009A Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2009A Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2009A Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Series 2009A Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

PR-INT-000010919

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................1
   The Corporation ....................................................1
   Sales and Use Tax ................................................2
   Dedicated Sales Tax Fund......................................2
   The Resolution......................................................2
   Outstanding Senior Bonds and Parity Obligations............2
   Subordinate Bonds ...............................................3
   Source of Payment and Security for the Bonds..................3
PLEDGED SALES TAX ...............................................4
   Commonwealth Sales Tax Revenues ........................4
   Commonwealth Sales Tax Collections and Projections......5
   Collections by Source ............................................7
   Economic Indicators .............................................8
   Dedicated Sales Tax Fund....................................10
   Pledged Sales Tax Base Amount ...........................10
   Act 7..................................................................12
   Procedures for the Collection and Deposit of the Pledged
      Sales Tax in the Dedicated Sales Tax Fund ................13
   Commonwealth Sales Tax Enforcement Initiatives ..........15
THE SERIES 2009A BONDS ......................................16
   General...............................................................16
   Redemption .........................................................17
   Optional and Mandatory Tender .............................20
   Book-Entry Only System......................................22
SECURITY FOR THE BONDS.....................................22
   General...............................................................22
   Commonwealth Non-Impairment Covenant ....................23
   Property Pledged for the Payment of the Series 2009A
      Bonds ...............................................................23
   Outstanding Senior Bonds and Parity Obligations............24
   Subordination Provisions of the Series 2009A Bonds ......24
   Funds and Accounts under the Resolution......................25
   Additional Bonds, Refunding Bonds and Other
      Obligations.........................................................27
   Commonwealth's Authority to Cover Deficiencies ..........30
RISK FACTORS ......................................................30

**Page**

   Economic Conditions Could Affect Commonwealth Sales
      Tax Revenues ....................................................30
   Legislative Assembly Authority over the Commonwealth
      Sales Tax ..........................................................30
   Certain Constitutional Considerations Relating to Act 91 31
   Limited Nature of Ratings; Reductions, Suspension or
      Withdrawal of a Rating .......................................32
   Limited Nature of Remedies ..................................33
AGGREGATE DEBT SERVICE REQUIREMENTS ..........34
PLAN OF FINANCING................................................37
   Overview.............................................................37
   Estimated Sources and Uses of Funds............................37
THE CORPORATION..................................................37
   Other Obligations of the Corporation...........................38
TAX MATTERS........................................................39
   United States Tax Considerations ...........................39
RATINGS................................................................41
LEGALITY FOR INVESTMENT.....................................41
UNDERWRITING......................................................41
LEGAL MATTERS....................................................42
CONTINUING DISCLOSURE.......................................42
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ................................................................44
MISCELLANEOUS....................................................44

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution...................................B-1
APPENDIX C – Summary of Amendments to the General
   Resolution ..........................................................C-1
APPENDIX D – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation .............................D-1
APPENDIX E – Book-Entry Only System.........................E-1
APPENDIX F – Table of Compounded Amounts for
   Capital Appreciation Bonds................................... F-1
APPENDIX G – Table of Compounded Amounts for
   Convertible Capital Appreciation Bonds ....................G-1

i

PR-INT-000010920

(This page intentionally left blank)

CONFIDENTIAL

PR-INT-000010921

$4,118,153,700
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2009A

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $4,118,153,700 Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"). Concurrently with the issuance of the Series 2009A Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds" and, together with the Series 2009A Bonds, the "Series 2009 Bonds") and its Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds"). The Series 2009B Bonds and the Series 2009C Bonds are being offered for sale pursuant to separate Official Statements and, in the case of the Series 2009B Bonds, are being offered for sale solely in Puerto Rico. The issuance of the Series 2009A Bonds is not contingent upon the issuance of the Series 2009B Bonds or the Series 2009C Bonds. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth of Puerto Rico (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 6, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation was originally created for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006. Such Commonwealth debt obligations, payable solely from Commonwealth budgetary appropriations, are generally referred to as the "2006 Appropriation Debt."

Recently, the Legislative Assembly expanded the purposes of the Corporation and increased the Corporation's dedicated revenues by increasing from 1% to 2.75% (out of a total sales tax of 5.5%, as described below) the portion of the Commonwealth Sales Tax (as defined below) transferred to the Corporation. The Corporation is now authorized to pay or finance, in whole or in part, or fund, in addition to the 2006 Appropriation Debt: (i) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (ii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (v) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vi) the Puerto Rico Economic Stimulus Fund, (vii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

The recent expansion of the Corporation's purposes and the increase in the Corporation's dedicated revenues are part of the new administration's recently-adopted multi-year plan to achieve fiscal balance and restore economic growth to the Commonwealth. For a summary of the multi-year plan, see *Appendix A – Commonwealth Economic Information.*

1

PR-INT-000010922

### Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

### Dedicated Sales Tax Fund

Act 91 established the Dedicated Sales Tax Fund (also known by the acronym of its Spanish name, as the "FIA"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) (one percent (1%) prior to July 1, 2009) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund* under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or satisfaction of the Authorized Uses. See *Dedicated Sales Tax Fund* and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

### The Resolution

The Series 2009 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Sixth Supplemental Sales Tax Bond Resolution, which amends the General Resolution (the "Sixth Supplemental Resolution"), a Seventh Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2009A Bonds and the Series 2009C Bonds (the "Seventh Supplemental Resolution"), and an Eighth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2009B Bonds (the "Eighth Supplemental Resolution") (the General Resolution, as amended by the Sixth Supplemental Resolution, the Seventh Supplemental Resolution and the Eighth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 10, 2009, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) will act as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution* and for a summary of the amendments to the Resolution included in the Sixth Supplemental Resolution, see *Appendix C – Summary of Amendments to the General Resolution.*

### Outstanding Senior Bonds and Parity Obligations

The Corporation currently has outstanding $5.2 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $160.3 million accreted on existing capital appreciation bonds as of February 1, 2009. The Corporation's outstanding bonds consist of the following: Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B

2

(the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), and (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds and the Series 2007C Bonds, the "Outstanding Senior Bonds").

The Corporation currently also has outstanding three interest rate swap agreements in an aggregate notional amount of $436 million, which were entered into under the Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing semi-annual payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

On the date of issuance of the Series 2009 Bonds, the Corporation will also issue the Series 2009C Bonds. After giving effect to the issuance of the Series 2009C Bonds in order to retire a portion of its Series 2007A LIBOR-Based Adjustable Rate Bonds in the principal amount of $300,000,000 (the "Retired Bonds") and to make the termination payments under three interest rate swap agreements related to the Retired Bonds (two of which were terminated in full and the other was partially terminated), the Corporation will have $5.2 billion aggregate initial principal amount of Outstanding Senior Bonds and an aggregate notional amount of $136 million of Outstanding Parity Obligations.

All Outstanding Senior Bonds, the Series 2009C Bonds, and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds and the Series 2009C Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

**Subordinate Bonds**

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2009 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2009 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations.

All Series 2009 Bonds and all additional bonds issued on a parity with the Series 2009 Bonds ("Additional First Subordinate Bonds" and, together with the Series 2009 Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, the Series 2009 Bonds shall not be entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See "*Subordination Provisions of the Series 2009A Bonds*" and "*Funds and Accounts Under the Resolution*" under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior**

CONFIDENTIAL

PR-INT-000010924

or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.

The Series 2009A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2009A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.

Brief descriptions of the Corporation, the security for the Series 2009A Bonds, the terms of the Series 2009A Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

In 2009 a special credit against the Commonwealth Sales Tax previously available to local exporters who acquired goods from local manufacturers was eliminated. The Treasury Department estimates that the elimination of this credit will generate incremental Commonwealth Sales Tax revenues for Fiscal Year 2008-2009 of approximately $5 million.

4

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support the exemption of any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly of Puerto Rico, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of September and October 2008 was due, in part, to this four and a half day tax holiday.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items would be exempt from the Commonwealth Sales Tax. Recently enacted legislation provides that, for each calendar year, the tax holiday will take place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday will take place from July 15 to July 17 of such calendar year. This tax holiday is scheduled to occur for the first time this year.

The Treasury Department does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

## Commonwealth Sales Tax Collections and Projections

The Commonwealth Sales Tax went into effect on November 15, 2006. For the twenty-nine and a half month period from November 15, 2006 through April 30, 2009, total Commonwealth Sales Tax collections have been approximately $2.8 billion, an average of $94 million per month.

*Fiscal Year 2006-2007.* For the seven and one-half months of Fiscal Year 2006-2007, when the Commonwealth Sales Tax was first imposed, collections equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections for Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2008-2009.* For the ten months ended April 30, 2009, Commonwealth Sales Tax collections totaled $910 million, or an average of $91 million per month. Collections year-to-date are 3.5% below collections for the same period in the prior Fiscal Year 2007-2008. The Treasury Department believes that this decline is due primarily to the previously mentioned four and one-half day sales tax holiday. The Treasury Department's current estimate for total Commonwealth Sales Tax collections for Fiscal Year 2008-2009 is $1.12 billion.

5

CONFIDENTIAL

PR-INT-000010926

The following tables show historical Commonwealth Sales Tax collections per month:

### Sales and Use Tax – Collection History by Month
(Dollars in Thousands)

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2006-2007 | 2007-2008 | 2008-2009 |
| July | - | $ 96,100 | $ 95,592 |
| August | - | 90,181 | 91,353 |
| September | - | 86,163 | 77,788 |
| October | - | 93,751 | 86,191 |
| November | $ 50,200[1] | 96,170 | 91,996 |
| December | 110,000 | 121,251 | 119,836 |
| January | 95,000 | 89,798 | 85,763 |
| February | 86,200 | 86,486 | 84,608 |
| March | 96,400 | 89,355 | 88,065 |
| April | 85,700 | 93,487 | 88,788 |
| May | 94,400 | 103,331 | |
| June | 95,460 | 97,526 | |

(1) Reflects collections beginning November 15, when the sales tax was first imposed.
Source: Treasury Department



Source: Treasury Department

*Fiscal 2009-2010.* For the Fiscal Year 2009-2010, the Treasury Department is projecting Commonwealth Sales Tax revenues of approximately $1.2 billion. This projection considers that personal consumption expenditures for Fiscal Year 2009-2010 is projected to grow by 3.2% (nominal amount), as forecast by the Puerto Rico Planning Board, and the implementation of various compliance initiatives by the Treasury Department. Beginning on July 1, 2009, the Corporation and the Treasury Department will begin reporting Commonwealth Sales Tax collections on a cash basis. The Banking Services Agreement (as defined below) has been modified to account for this change.

6

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See "*Economic Conditions could affect Commonwealth Sales Tax Revenues*" under RISK FACTORS.

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections for Fiscal Year 2007-2008. Of the $1.14 billion in collections, approximately 52% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 13% from prepared foods, bars and full service restaurants, 11% from information and telecommunications, 10% from wholesale trade, and 4% from manufacturing, among other categories.

<div align="center">

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2007-2008**

</div>



Source: Treasury Department

CONFIDENTIAL

PR-INT-000010928

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

**Compounded Annual Growth Rates for
Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
| | | | Services | Non-Durable Goods | Durable Goods |
|---|---|---|---|---|---|
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-08 | 4.35% | 4.64% | 5.31% | 4.58% | 2.11% |
| 1947-2008 | 7.70% | 7.61% | 8.78% | 6.71% | 8.27% |

Source: Planning Board

**Historical Components of Personal Consumption Expenditures and GNP**
(Measured in Current Dollars)



Consumption of Non-Durable Goods
Consumption of Services
Consumption of Durable Goods
Gross National Product

Source: Government Development Bank

8

PR-INT-000010929

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during four periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by 3.1% annually during this period.

### Personal Consumption Expenditures and GNP
(Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
(Constant Dollars)



Source: Government Development Bank

9

CONFIDENTIAL

PR-INT-000010930

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $8.9 billion in Fiscal Year 2003-2004 to $11.9 billion in Fiscal Year 2007-2008, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 22% of personal consumption expenditures in Fiscal Year 2007-2008 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* As a result of the recent amendments to Act 91, commencing on July 1, 2009, the Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 will be $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

10

PR-INT-000010931

The following table shows the growth of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the Outstanding Senior Bonds:

| | Annual Pledged Sales Tax Base Amount | | |
|---|---|---|---|
| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

CONFIDENTIAL

PR-INT-000010932

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Act 7**

Act 7 is the financial centerpiece of the Commonwealth's fiscal stabilization plan. Act 7 creates an integrated plan that includes: (1) operating expense-reduction measures, including various workforce reduction initiatives and a temporary freeze of salary increases and other economic benefits included in certain laws and collective bargaining agreements, (2) tax revenue enforcement measures, (3) a combination of permanent and temporary tax increases, and (4) financial measures, including the provisions that amended Act 91 to increase the amount of the Commonwealth Sales Tax pledged to the Corporation from 2% to 2.75% and the aggregate Pledged Sales Tax Base Amount from $400,192,000 to $550,264,000.

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies.

The Corporation has been advised by the Commonwealth that it will defend vigorously against the allegations contained in the complaint and that the Commonwealth continues to implement Act 7.

The Corporation is not a defendant in the complaint. The complaint does not challenge the valid existence of the Corporation, the validity of Act 91, the validity of the Bonds, or the powers of the Corporation. As discussed elsewhere in this Official statement, Bond Counsel has opined that Act 91 is valid in all respects material to their approving opinion (see *Appendix D*). In addition, in connection with the issuance of the Bonds, the Secretary of Justice of the Commonwealth has opined that Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

CONFIDENTIAL

PR-INT-000010933

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In June 2009, the Banking Services Agreement was amended to (i) add the Corporation as a party to the agreement, and (ii) make the agreement consistent with the recent amendments to Act 91.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day (effective as of December 10, 2009 and, prior to December 10, 2009, on the 20th day), the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount (after July 1, 2009). Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

13

CONFIDENTIAL

PR-INT-000010934

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred (effective as of December 10, 2009), unless otherwise provided in regulations adopted by the Secretary of the Treasury (recently enacted legislation shortened this time period from the 20th day of the following month to the 10th day of the following month).

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month (effective as of December 10, 2009). Certain large merchants and retailers are required to file their return electronically. As of February 2009, the Treasury Department reports that 87.6% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. Annually, every merchant and retailer dedicated to a business or industry that was a merchant or retailer at any time during its taxable year must file an annual return detailing all taxable transactions for the prior calendar year no later than the 15th day of the third month following the end of its taxable year. As of March 2008, 209,006 merchants and retailers are required to file a monthly return, out of which 111,000 merchants and retailers are currently filing their monthly returns.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

14

CONFIDENTIAL

PR-INT-000010935

**Commonwealth Sales Tax Enforcement Initiatives**

Recently, the Treasury Department announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of aggressive enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department, through the implementation of its recently announced enforcement programs, has set a goal of collecting in Fiscal Year 2009-2010 an additional $75 million in annually recurring Commonwealth Sales Tax revenue.

As part of these initiatives, the Treasury Department has undertaken various enforcement initiatives, such as the implementation of a voluntary compliance program and "offer and compromise" settlements where uncertainty exists as to the existence of a liability or the Treasury Department's ability to collect. The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems to the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts.

The Treasury Department intends to strengthen its enforcement workforce. It plans to establish a call center staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The Treasury Department also intends to increase staffing levels in its Enforcement and Compliance Bureaus, which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently estimates it will make approximately 2,000 visits per month.

As a result of recent enforcement efforts, the Treasury Department has collected approximately $7 million in fines and penalties in connection with non-compliance with sales tax regulations.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, the amendments incorporated in Act No. 7 of March 9, 2009 require a merchant or retailer to file his or her Commonwealth Sales Tax return on or prior to the tenth day of the following month, rather than the twentieth day, effective December 10, 2009. It also replaced the Commonwealth Sales Tax exemption applicable to resellers with a credit that must be claimed in each monthly filing. This is intended to prevent a reseller from using the Commonwealth Sales Tax reseller's exemption illegally.

Recently, legislation was enacted that, among other things, postponed until November 2009 the effectiveness of the provisions that replaced the Commonwealth Sales Tax exemption applicable to resellers with a credit that must be claimed in each monthly filing. Legislation is pending that, among other things, would reestablish the exemption for merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 threshold but meet certain other requirements imposed by the Treasury Department.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

15

PR-INT-000010936

## THE SERIES 2009A BONDS

**General**

The Series 2009A Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $4,118,153,700. The Series 2009A Bonds will be issued as current interest bonds (the "Current Interest Bonds"), capital appreciation bonds (the "Capital Appreciation Bonds"), and convertible capital appreciation bonds (the "Convertible Capital Appreciation Bonds"). The Current Interest Bonds, the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds will be issued in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds), paying interest on the dates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover pages of this Official Statement.

The Series 2009A Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds). Interest on the Series 2009A Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2009A Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Series 2009A Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2009A Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the Series 2009A Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Series 2009 Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds, the Compounded Amount thereof.

*Current Interest Bonds.* Interest on the Current Interest Bonds will accrue from their date of delivery and will be payable semi-annually to maturity (or earlier redemption) on February 1 and August 1, commencing on February 1, 2010.

The Current Interest Bonds maturing on August 1, 2039 that are identified as being subject to tender for purchase on the inside cover pages of this Official Statement (collectively, the "Mandatory Tender Bonds") are subject to mandatory tender for purchase on August 1, 2011 (the "Mandatory Tender Date"), subject to a successful remarketing, as described below. Through the period that commences on the date of delivery of the Mandatory Tender Bonds and ends on July 31, 2011 (the "Initial Multiannual Period"), interest on the Mandatory Tender Bonds will accrue from their date of delivery and will be payable on August 1 and February 1 of each year, commencing February 1, 2010, at a rate of interest equal to 5% per annum (the "Initial Interest Rate") until the Mandatory Tender Date. Thereafter, the Mandatory Tender Bonds shall bear interest, payable on each February 1 and August 1, at the rate to maturity determined by the Remarketing Agent that will permit the remarketing of all of the Mandatory Tender Bonds at par; provided, that if the Remarketing Agent shall not be able to remarket all of the Mandatory Tender Bonds on the Mandatory Tender Date, the Mandatory Tender Bonds shall bear interest from and after the Mandatory Tender Date, without further notice to Bondowners, at the Stepped-Up Rate (as defined below) until such time as the Remarketing Agent shall establish an interest rate to maturity that shall permit all of the Mandatory Tender Bonds to be remarketed at par. Principal will come due on August 1, 2039 or upon the earlier redemption of the Mandatory Tender Bonds.

16

The Mandatory Tender Bonds will be subject to mandatory tender for purchase on the Mandatory Tender Date as described below under "— *Redemption*." At that time, the Corporation expects to remarket the Mandatory Tender Bonds at a fixed rate.

**As of the date of this Official Statement, the Corporation has not provided any credit or liquidity facility for the payment of the purchase price payable upon the mandatory tender of the Mandatory Tender Bonds on the Mandatory Tender Date, nor is there any requirement or expectation that such credit or liquidity facility will be obtained. The principal portion of the purchase price for the Mandatory Tender Bonds is expected to be obtained from the remarketing thereof. The obligation of the Corporation to purchase Mandatory Tender Bonds on the Mandatory Tender Date is subject to the successful remarketing of such Mandatory Tender Bonds. The Corporation has no obligation to purchase Mandatory Tender Bonds except from remarketing proceeds.**

*Capital Appreciation Bonds.* Interest on the Capital Appreciation Bonds will compound from their date of delivery. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2009 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix F — Table of Compounded Amounts for Capital Appreciation Bonds.*

*Convertible Capital Appreciation Bonds.* Interest on the Convertible Capital Appreciation Bonds will compound from their date of delivery to August 1, 2016 (the "Current Interest Commencement Date"). Prior to the Current Interest Commencement Date, interest will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each Compounding Date, commencing August 1, 2009, and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix G — Table of Compounded Amounts for Convertible Capital Appreciation Bonds.* After the Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds will be payable on a current basis on each February 1 and August 1, commencing on February 1, 2017, as shown on the inside covers of this Official Statement.

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds (other than the Current Interest Bonds maturing on August 1, 2029 and Mandatory Tender Bonds) are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2019, at a redemption price equal to 100% of the principal amount of the Series 2009A Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

The Current Interest Bonds maturing August 1, 2029 are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after February 1, 2014, at a redemption price equal to 100% of the principal amount of the Series 2009A Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

The Mandatory Tender Bonds are not subject to redemption prior to the Mandatory Tender Date. The Mandatory Tender Bonds are subject to redemption from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, on the Mandatory Tender Date and on any date during the Stepped Up Rate Period (defined below) under "*Optional and Mandatory Tender*" below at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date.

17

PR-INT-000010938

*Optional Redemption of Convertible Capital Appreciation Bonds.* The Convertible Capital Appreciation Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2026, at a redemption price equal to 100% of the principal amount of the Series 2009A Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2014, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate plus 0.3%.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Current Interest Term Bonds maturing on August 1, 2037, 2039, 2042 and 2044, the Mandatory Tender Bonds, and the Convertible Capital Appreciation Bonds shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds:

18

CONFIDENTIAL                                                      PR-INT-000010939

| | Sinking Fund Installments for Current Interest Term Bonds Maturing | | | |
|---|---|---|---|---|
| Mandatory Redemption Date | August 1, 2037 | August 1, 2039 | August 1, 2042 | August 1, 2044 |
| 08/01/2036 | $182,500,000 | | | |
| 08/01/2037 | $182,500,000* | | | |
| 08/01/2038 | | $100,000,000 | | |
| 08/01/2039 | | $100,000,000* | | |
| 08/01/2040 | | | $299,995,000 | |
| 08/01/2041 | | | $300,000,000 | |
| 08/01/2042 | | | $300,005,000* | |
| 08/01/2043 | | | | $175,000,000 |
| 08/01/2044 | | | | $175,000,000* |

\* Final Maturity

| Mandatory Redemption Date | Sinking Fund Installments for Mandatory Tender Bonds Maturing August 1, 2039 |
|---|---|
| 08/01/2036 | $ 83,780,000 |
| 08/01/2037 | 120,220,000 |
| 08/01/2038 | 219,800,000 |
| 08/01/2039* | 276,200,000 |

\* Final maturity.

| | Sinking Fund Installments for Convertible Capital Appreciation Bonds Maturing August 1, 2032 | |
|---|---|---|
| Mandatory Redemption Date | Original Principal Amount | Compounded Amount |
| 08/01/2030 | $ 16,378,784 | $ 26,275,000 |
| 08/01/2031 | 75,177,216 | 120,600,000 |
| 08/01/2032* | 251,292,000 | 403,125,000 |

\* Final Maturity

*Notice of Redemption.* In the event any Series 2009A Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Series 2009A Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2009A Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2009A Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2009A Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2009A Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2009A Bonds are

19

to be redeemed, the CUSIP identification numbers, the numbers of the Series 2009A Bonds, and the portions of the Series 2009A Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2009A Bonds or portions thereof to be redeemed will cease to bear interest (in the case of the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase).

Any notice of optional redemption of Series 2009A Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds) and interest on such Series 2009A Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds) and interest on the Series 2009A Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2009A Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds) and premium, if any, and interest on the Series 2009A Bonds (or portions thereof) to be redeemed, then the Series 2009A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase), and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Optional and Mandatory Tender**

*Optional Tender.* The Mandatory Tender Bonds are not subject to optional tender during the Initial Multiannual Period.

*Mandatory Tender.* The Mandatory Tender Bonds are subject to mandatory tender for purchase on the Mandatory Tender Date and must be tendered for purchase to the Trustee by the owners thereof, with no right of retention by such owners. The purchase price (the "Purchase Price") on the Mandatory Tender Date or a later Purchase Date in the event of a failed remarketing of the Mandatory Tender Bonds on the Mandatory Tender Date (each a "Purchase Date") is equal to the principal amount of the Mandatory Tender Bonds, plus accrued interest, if any, to the Purchase Date. **The obligation of the Corporation to purchase Mandatory Tender Bonds on the Mandatory Tender Date or any subsequent Purchase Date is subject to the successful remarketing of such Mandatory Tender Bonds. The Corporation has no obligation to purchase Mandatory Tender Bonds except from remarketing proceeds.** The Corporation intends to select a remarketing agent (the "Remarketing Agent") to act as remarketing agent in connection with the Mandatory Tender Bonds pursuant to a remarketing agreement to be entered into with the Corporation and has covenanted to appoint the Remarketing Agent prior to the Mandatory Tender Date. The Remarketing Agent may not remarket any Mandatory Tender Bonds if a default in the payment of principal of or interest on the Mandatory Tender Bonds has occurred and is continuing.

The Remarketing Agent will be required to use its best efforts to remarket the Mandatory Tender Bonds on the Mandatory Tender Date and each Purchase Date. If on such Mandatory Tender Date or Purchase Date money sufficient to pay the Purchase Price is on deposit with the Trustee, acting as tender agent, the Mandatory Tender Bonds will be deemed to have been tendered on such date for purchase and interest on such tendered

CONFIDENTIAL

PR-INT-000010941

Mandatory Tender Bonds will cease to accrue. Mandatory Tender Bonds that have been deemed tendered, but have not been delivered to the Trustee, will not be considered outstanding under the Resolution on the Purchase Date. See "— *Undelivered Mandatory Tender Bonds*" below.

The Remarketing Agreement will allow the Remarketing Agent to resign upon giving 10 days' written notice to the Corporation and Trustee and the Remarketing Agent may be removed at any time by the Corporation, in accordance with the Resolution, upon seven (7) days' notice to the Trustee, the Remarketing Agent, and each Rating Agency then maintaining a rating on the Mandatory Tender Bonds.

Prior to the Mandatory Tender Date or a later Purchase Date, the Corporation will determine the interest rate that will be applicable to the Mandatory Tender Bonds from and after the Purchase Date. The interest rate or rates to be borne by the Mandatory Tender Bonds immediately after the Purchase Date will be determined by the Remarketing Agent and will be equal to the rate or rates that, in the opinion of the Remarketing Agent, will permit the remarketing of such Mandatory Tender Bonds at par.

Payment of the Purchase Price of the Mandatory Tender Bonds will be made by the Trustee on the Purchase Date provided that the Mandatory Tender Bonds subject to purchase are delivered to the Trustee prior to 11:00 a.m., New York City time, on the Purchase Date, in immediately available funds (or by wire transfer). The principal portion of the Purchase Price of Mandatory Tender Bonds tendered for purchase will be paid by the Trustee to the owners solely from the proceeds of the remarketing of the Mandatory Tender Bonds by the Remarketing Agent.

**As of the date of this Official Statement, the Corporation has not provided any credit or liquidity facility for the payment of the Purchase Price payable upon the mandatory tender of the Mandatory Tender Bonds on the Mandatory Tender Date, nor is there any requirement or expectation that such credit or liquidity facility will be obtained. The principal portion of the Purchase Price for the Mandatory Tender Bonds is expected to be obtained from the remarketing thereof.**

The Corporation has agreed that it will use its best efforts to have the Mandatory Tender Bonds remarketed on the Mandatory Tender Date, if such Mandatory Tender Bonds are to stay outstanding after such date.

*Effects of a Failed Remarketing.* In the event that any Mandatory Tender Bonds cannot be remarketed to new purchasers on the Mandatory Tender Date, the Corporation has no obligation to purchase the Mandatory Tender Bonds tendered on the Mandatory Tender Date, the failed conversion and remarketing will not constitute an Event of Default under the Resolution, the mandatory tender will be deemed to have been rescinded for that date, and such Mandatory Tender Bonds (i) will continue to be outstanding, (ii) will be purchased upon the availability of funds to be received from the subsequent remarketing of such bonds, (iii) will bear interest at the rate of 10% per annum (the "Stepped-Up Rate") from the applicable Mandatory Tender Date until purchased upon a subsequent remarketing (the "Stepped-Up Rate Period"), and (iv) will be subject to redemption and mandatory tender for purchase on any date during the Stepped-Up Rate Period. In the event of a failed remarketing on the Mandatory Tender Date, the Corporation has agreed that it will cause the Mandatory Tender Bonds to be remarketed on the earliest possible date on which they can be sold at par at a rate not exceeding 10% per annum.

*Undelivered Mandatory Tender Bonds.* If a book-entry system is not in effect at the time any Mandatory Tender Bond is subject to mandatory tender for purchase, and if the Trustee is in receipt of an amount sufficient to pay the Purchase Price, then such Mandatory Tender Bond (or portion) will be deemed purchased on the Purchase Date, and ownership of such Mandatory Tender Bond (or portion) shall be transferred to the purchaser thereof. Any registered owner who fails to deliver such Mandatory Tender Bond for purchase will not be entitled to any payment other than the Purchase Price for such Mandatory Tender Bond upon surrender of such Mandatory Tender Bond to the Trustee, and such Mandatory Tender Bond will no longer be outstanding and entitled to the benefits of the Resolution, except for the payment of the Purchase Price of

21

PR-INT-000010942

such Mandatory Tender Bond from moneys held by the Trustee for such payment upon presentation and surrender of the Mandatory Tender Bond. Moneys which remain unclaimed three years after the due date will, at the request of the Corporation, and if the Corporation is not, at the time, to the knowledge of the Trustee, in default with respect to any covenant in the Resolution or the Mandatory Tender Bonds, be paid to the Corporation, and the owners of the Mandatory Tender Bonds for which the deposit was made will thereafter be limited to a claim against the Corporation.

*Notices.* Notice of tender for purchase on the Mandatory Tender Date or subsequent Purchase Date shall be given not less than 15 days prior to such Mandatory Tender Date or Purchase Date by first-class mail, postage prepaid, to The Depository Trust Company, New York, New York (or if the book-entry only system has been discontinued with respect to the Mandatory Tender Bonds, to the registered owners of the Mandatory Tender Bonds at their addresses appearing upon the registration books). The notice shall provide that the tender is conditioned upon the ability of the Remarketing Agent to remarket all (and not less than all) of the Mandatory Tender Bonds on such Mandatory Tender Date or subsequent Purchase Date and should it not be possible for such Bonds to be remarketed in whole on such date, the tender will be postponed (with such owners retaining their Mandatory Tender Bonds) until such date as such Bonds are able to be so remarketed. Failure to mail the notice of tender to the registered owner of any Mandatory Tender Bond will not affect the tender or remarketing of said Bond or any other Mandatory Tender Bond.

**Book-Entry Only System**

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2009A Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2009A Bonds; (ii) confirmation of ownership interest in the Series 2009A Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2009A Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2009A Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2009A Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2009A Bonds. See *Appendix E - Book-Entry Only System.*

## SECURITY FOR THE BONDS

**General**

Pursuant to the Resolution, the Series 2009A Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2009A Bonds, however, are subordinate in payment priority to the Senior Bonds and Parity Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2009A Bonds. Only Senior Bonds and the Parity Obligations, however, will be senior to the Series 2009A Bonds.

22

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2009A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2009A Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2009A Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

Pursuant to a recent amendment to Act 91, the Commonwealth also agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2009A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2009A Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Sixth Supplemental Resolution amends the General Resolution to provide that the Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

**Property Pledged for the Payment of the Series 2009A Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2009 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which

CONFIDENTIAL

is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Senior Bonds and Parity Obligations**

The Corporation currently has outstanding $5.2 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $160.3 million accreted on existing capital appreciation bonds as of February 1, 2009. The Corporation's outstanding bonds consist of: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, and (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $436 million.

On the date of issuance of the Series 2009 Bonds, the Corporation will also issue the Series 2009C Bonds. After giving effect to the issuance of the Series 2009C Bonds in order to retire the Retired Bonds and to make the termination payments under three interest rate swap agreements related to the Retired Bonds (two of which were terminated in full and the other was partially terminated), the Corporation will have $5.2 billion aggregate initial principal amount of Outstanding Senior Bonds and an aggregate notional amount of $136 million of Outstanding Parity Obligations.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

**Subordination Provisions of the Series 2009A Bonds**

The Series 2009A Bonds are subordinate to the Senior Bonds and the Parity Obligations. As a result, the Series 2009A Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the Series 2009A Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

24

PR-INT-000010945

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (each of which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1)   to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2)   to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3)   to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4)   to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5)   to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

(6)   if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts

25

PR-INT-000010946

transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

        (a)      to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

        (b)      at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation

CONFIDENTIAL

PR-INT-000010947

(Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):



*No Debt Service Reserve deposit requirement currently exists.

### Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is

27

PR-INT-000010948

less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds in addition to the Outstanding Senior Bonds (a) to satisfy the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

*Additional Requirements — Senior Bonds and Parity Obligations*

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)") and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

28

CONFIDENTIAL

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.    No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D.    *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

29

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

### Commonwealth's Authority to Cover Deficiencies

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

### RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2009A Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2009A Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2009A Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2009A Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2009A Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of Fiscal Year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country

30

which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See "*Commonwealth Non-Impairment Covenant*" under SECURITY FOR THE BONDS.

The Sixth Supplemental Resolution amends the General Resolution to provide that the Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2009A Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2009 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force

31

PR-INT-000010952

and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, the prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2009A Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2009A Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2009A Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2009A Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2009A Bonds is not a recommendation to purchase, hold or sell such Series 2009A Bonds and such rating will not address the marketability of such Series 2009A Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating

32

agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market for the market prices for the Series 2009A Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2009A Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See *"Subordination Provisions of the Series 2009A Bonds"* under SECURITY FOR THE BONDS. In the event the owners of the Series 2009A Bonds shall be entitled to declare a default, the payment of the Series 2009A Bonds by the Corporation cannot be accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2009A Bonds on the date such default is declared.

33

CONFIDENTIAL

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2009A Bonds, the Series 2009C Bonds, and the Outstanding Senior Bonds and Parity Obligations* as of August 1 of each year, including the principal of the Series 2009 Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations† | Series 2009A Bonds | | | Series 2009C Bonds | | | Total Annual Debt Service† |
|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Debt Service† | Principal | Interest | Debt Service† | |
| 2009 | $ 170,915,113 | - | - | - | - | $ 1,633,739 | $ 1,633,739 | $ 172,548,852 |
| 2010 | 163,535,113 | - | $ 229,980,892 | $ 229,980,892 | - | 13,677,813 | 13,677,813 | 407,193,817 |
| 2011 | 163,535,113 | - | 205,441,988 | 205,441,988 | - | 13,677,813 | 13,677,813 | 382,654,913 |
| 2012 | 163,535,113 | - | 240,441,988 | 240,441,988 | - | 13,677,813 | 13,677,813 | 417,654,913 |
| 2013 | 163,535,113 | - | 240,441,988 | 240,441,988 | - | 13,677,813 | 13,677,813 | 417,654,913 |
| 2014 | 163,535,113 | - | 240,441,988 | 240,441,988 | - | 13,677,813 | 13,677,813 | 417,654,913 |
| 2015 | 163,535,113 | $ 11,300,000 | 240,441,988 | 251,741,988 | - | 13,677,813 | 13,677,813 | 428,954,913 |
| 2016 | 163,535,113 | 29,705,000 | 240,018,238 | 269,723,238 | - | 13,677,813 | 13,677,813 | 446,936,163 |
| 2017 | 163,535,113 | 26,000,000 | 275,955,038 | 301,955,038 | - | 13,677,813 | 13,677,813 | 479,167,963 |
| 2018 | 163,535,113 | 55,610,000 | 274,741,513 | 330,351,513 | - | 13,677,813 | 13,677,813 | 507,564,438 |
| 2019 | 163,535,113 | 87,845,000 | 272,039,138 | 359,884,138 | - | 13,677,813 | 13,677,813 | 537,097,063 |
| 2020 | 163,535,113 | 66,990,000 | 267,614,106 | 334,604,106 | - | 13,677,813 | 13,677,813 | 511,817,032 |
| 2021 | 163,535,113 | 53,660,000 | 264,092,425 | 317,752,425 | - | 13,677,813 | 13,677,813 | 494,965,351 |
| 2022 | 168,265,113 | 75,705,000 | 261,141,125 | 336,846,125 | - | 13,677,813 | 13,677,813 | 518,789,051 |
| 2023 | 170,415,413 | 96,870,000 | 256,977,350 | 353,847,350 | - | 13,677,813 | 13,677,813 | 537,960,576 |
| 2024 | 245,420,113 | 116,100,000 | 251,649,500 | 367,749,500 | - | 13,677,813 | 13,677,813 | 626,847,426 |
| 2025 | 290,973,413 | - | 245,844,500 | 245,844,500 | - | 13,677,813 | 13,677,813 | 550,495,726 |
| 2026 | 305,632,113 | - | 245,844,500 | 245,844,500 | - | 13,677,813 | 13,677,813 | 565,154,426 |
| 2027 | 319,659,613 | 137,230,000 | 245,844,500 | 383,074,500 | - | 13,677,813 | 13,677,813 | 716,411,926 |
| 2028 | 339,200,713 | 204,135,000 | 238,639,925 | 442,774,925 | - | 13,677,813 | 13,677,813 | 795,653,451 |
| 2029 | 356,062,674 | 160,000,000 | 227,412,500 | 387,412,500 | - | 13,677,813 | 13,677,813 | 757,152,986 |
| 2030 | 373,475,854 | 47,564,484 | 326,323,016 | 373,887,500 | - | 13,677,813 | 13,677,813 | 761,041,167 |
| 2031 | 391,010,782 | 97,007,216 | 339,431,722 | 436,438,938 | - | 13,677,813 | 13,677,813 | 841,127,532 |
| 2032 | 409,243,982 | 251,292,000 | 359,531,438 | 610,823,438 | - | 13,677,813 | 13,677,813 | 1,033,745,232 |
| 2033 | 428,202,882 | - | 180,487,500 | 180,487,500 | - | 13,677,813 | 13,677,813 | 622,368,194 |
| 2034 | 447,922,367 | 86,140,000 | 594,347,500 | 680,487,500 | - | 13,677,813 | 13,677,813 | 1,142,087,680 |
| 2035 | 468,433,532 | - | 180,487,500 | 180,487,500 | - | 13,677,813 | 13,677,813 | 662,598,845 |
| 2036 | 489,766,517 | 266,280,000 | 180,487,500 | 446,767,500 | - | 13,677,813 | 13,677,813 | 950,211,830 |
| 2037 | 472,425,582 | 302,720,000 | 161,615,750 | 464,335,750 | - | 13,677,813 | 13,677,813 | 950,439,145 |
| 2038 | 493,915,548 | 319,800,000 | 139,100,000 | 458,900,000 | - | 13,677,813 | 13,677,813 | 966,493,360 |
| 2039 | 128,883,169 | 376,200,000 | 110,745,000 | 486,945,000 | - | 13,677,813 | 13,677,813 | 629,505,982 |
| 2040 | 126,800,162 | 299,995,000 | 76,750,000 | 376,745,000 | - | 13,677,813 | 13,677,813 | 517,222,975 |
| 2041 | 659,805,162 | 300,000,000 | 58,750,300 | 358,750,300 | - | 13,677,813 | 13,677,813 | 1,032,233,275 |
| 2042 | 686,795,162 | 300,005,000 | 40,750,300 | 340,755,300 | - | 13,677,813 | 13,677,813 | 1,041,228,275 |
| 2043 | 714,865,162 | 175,000,000 | 22,750,000 | 197,750,000 | - | 13,677,813 | 13,677,813 | 926,292,975 |
| 2044 | 744,055,162 | 175,000,000 | 11,375,000 | 186,375,000 | - | 13,677,813 | 13,677,813 | 944,107,975 |
| 2045 | 774,420,162 | - | - | - | - | 13,677,813 | 13,677,813 | 788,097,975 |
| 2046 | 805,995,162 | - | - | - | - | 13,677,813 | 13,677,813 | 819,672,975 |
| 2047 | 838,830,162 | - | - | - | - | 13,677,813 | 13,677,813 | 852,507,975 |
| 2048 | 872,988,580 | - | - | - | - | 13,677,813 | 13,677,813 | 886,666,392 |
| 2049 | 908,506,061 | - | - | - | - | 13,677,813 | 13,677,813 | 922,183,873 |
| 2050 | 945,437,800 | - | - | - | - | 13,677,813 | 13,677,813 | 959,115,612 |
| 2051 | 983,859,310 | - | - | - | - | 13,677,813 | 13,677,813 | 997,537,122 |
| 2052 | 1,023,822,509 | - | - | - | - | 13,677,813 | 13,677,813 | 1,037,500,321 |
| 2053 | 1,065,358,321 | - | - | - | - | 13,677,813 | 13,677,813 | 1,079,036,134 |
| 2054 | 1,108,580,162 | - | - | - | - | 13,677,813 | 13,677,813 | 1,122,257,975 |
| 2055 | 1,153,515,792 | - | - | - | - | 13,677,813 | 13,677,813 | 1,167,193,604 |
| 2056 | 1,200,270,162 | - | - | - | - | 13,677,813 | 13,677,813 | 1,213,947,975 |
| 2057 | 947,292,662 | - | - | - | $237,875,000 | 13,677,813 | 251,552,813 | 1,198,845,475 |
| Total | $23,993,463,509 | $4,118,153,780 | $7,747,937,710 | $11,866,091,410 | $237,875,000 | $658,168,739 | $896,043,739 | $36,755,598,658 |

---

\*  After giving effect to the issuance of the Series 2009C Bonds to retire certain Outstanding Senior Bonds and terminate certain related Outstanding Parity Obligations.

†  Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

CONFIDENTIAL

PR-INT-000010955

### Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,142,791,920 | $ 178,295,113 | $ 361,085,279 | $ 539,380,392 | 2.12 |
| 2011 | 1,188,507,758 | 178,295,113 | 382,660,495 | 560,955,608 | 2.12 |
| 2012 | 1,236,052,314 | 216,423,834 | 366,969,999 | 583,393,832 | 2.12 |
| 2013 | 1,285,498,736 | 225,080,787 | 381,648,798 | 606,729,585 | 2.12 |
| 2014 | 1,336,923,102 | 234,084,018 | 396,914,750 | 630,998,769 | 2.12 |
| 2015 | 1,390,404,530 | 243,447,379 | 412,791,340 | 656,238,720 | 2.12 |
| 2016 | 1,446,025,306 | 253,185,274 | 429,302,994 | 682,488,268 | 2.12 |
| 2017 | 1,503,871,005 | 263,312,685 | 446,475,114 | 709,787,799 | 2.12 |
| 2018 | 1,564,030,626 | 273,845,193 | 464,334,118 | 738,179,311 | 2.12 |
| 2019 | 1,626,596,727 | 284,799,000 | 482,907,483 | 767,706,484 | 2.12 |
| 2020 | 1,691,665,569 | 296,190,960 | 502,223,782 | 798,414,743 | 2.12 |
| 2021 | 1,759,337,265 | 308,038,599 | 522,312,734 | 830,351,333 | 2.12 |
| 2022 | 1,829,715,930 | 320,360,143 | 543,205,243 | 863,565,386 | 2.12 |
| 2023 | 1,902,909,845 | 333,174,549 | 564,933,453 | 898,108,001 | 2.12 |
| 2024 | 1,979,031,622 | 346,501,530 | 587,530,791 | 934,032,321 | 2.12 |
| 2025 | 2,058,198,379 | 360,361,592 | 611,032,023 | 971,393,614 | 2.12 |
| 2026 | 2,140,531,915 | 374,776,055 | 635,473,303 | 1,010,249,359 | 2.12 |
| 2027 | 2,226,158,904 | 389,767,098 | 660,892,236 | 1,050,659,333 | 2.12 |
| 2028 | 2,315,211,088 | 405,357,781 | 687,327,925 | 1,092,685,707 | 2.12 |
| 2029 | 2,407,825,475 | 421,572,093 | 714,821,042 | 1,136,393,135 | 2.12 |
| 2030 | 2,504,144,557 | 438,434,976 | 743,413,884 | 1,181,848,860 | 2.12 |
| 2031 | 2,604,316,523 | 455,972,375 | 773,150,439 | 1,229,122,815 | 2.12 |
| 2032 | 2,708,495,491 | 474,211,271 | 804,076,457 | 1,278,287,727 | 2.12 |
| 2033 | 2,816,841,745 | 493,179,721 | 836,239,515 | 1,329,419,236 | 2.12 |
| 2034 | 2,929,521,977 | 512,906,910 | 869,689,095 | 1,382,596,006 | 2.12 |
| 2035 | 3,046,709,550 | 533,423,187 | 904,476,659 | 1,437,899,846 | 2.12 |
| 2036 | 3,168,584,759 | 554,760,114 | 940,655,726 | 1,495,415,840 | 2.12 |
| 2037 | 3,295,335,114 | 576,950,519 | 978,281,955 | 1,555,232,473 | 2.12 |
| 2038 | 3,427,155,622 | 600,028,539 | 1,017,413,233 | 1,617,441,772 | 2.12 |
| 2039 | 3,564,249,092 | 624,029,681 | 1,058,109,762 | 1,682,139,443 | 2.12 |
| 2040 | 3,706,826,446 | 648,990,868 | 1,100,434,153 | 1,749,425,021 | 2.12 |
| 2041 | 3,855,107,042 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 2.13 |
| 2042 | 4,009,319,012 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 2.21 |
| 2043 | 4,169,699,616 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 2.30 |
| 2044 | 4,336,495,600 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 2.39 |
| 2045 | 4,509,963,583 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 2.49 |
| 2046 | 4,690,370,449 | 821,180,488 | 992,545,002 | 1,813,725,490 | 2.59 |
| 2047 | 4,877,993,757 | 854,027,708 | 959,697,782 | 1,813,725,490 | 2.69 |
| 2048 | 5,073,122,166 | 888,188,816 | 925,536,674 | 1,813,725,490 | 2.80 |
| 2049 | 5,276,035,885 | 923,716,369 | 890,009,121 | 1,813,725,490 | 2.91 |
| 2050 | 5,487,107,129 | 960,665,024 | 853,060,467 | 1,813,725,490 | 3.03 |
| 2051 | 5,706,600,603 | 999,091,625 | 814,633,866 | 1,813,725,490 | 3.15 |
| 2052 | 5,934,874,000 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 3.27 |
| 2053 | 6,172,278,520 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 3.40 |
| 2054 | 6,419,179,412 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 3.54 |
| 2055 | 6,675,956,535 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 3.68 |
| 2056 | 6,943,004,942 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 3.83 |
| 2057 | 7,220,735,488 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 3.98 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.

(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2007-2008 collections of $1,143,000,000 with no escalation.

35

PR-INT-000010956

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.51%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.51% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,142,791,920 | $178,295,113 | $361,085,279 | $539,380,392 | 2.12 |
| 2011 | 1,160,048,078 | 178,295,113 | 382,660,495 | 560,955,608 | 2.07 |
| 2012 | 1,177,564,804 | 216,423,834 | 366,969,999 | 583,393,832 | 2.02 |
| 2013 | 1,195,346,033 | 225,080,787 | 381,648,798 | 606,729,585 | 1.97 |
| 2014 | 1,213,395,758 | 234,084,018 | 396,914,750 | 630,998,769 | 1.92 |
| 2015 | 1,231,718,034 | 243,447,379 | 412,791,340 | 656,238,720 | 1.88 |
| 2016 | 1,250,316,976 | 253,185,274 | 429,302,994 | 682,488,268 | 1.83 |
| 2017 | 1,269,196,762 | 263,312,685 | 446,475,114 | 709,787,799 | 1.79 |
| 2018 | 1,288,361,633 | 273,845,193 | 464,334,118 | 738,179,311 | 1.75 |
| 2019 | 1,307,815,894 | 284,799,000 | 482,907,483 | 767,706,484 | 1.70 |
| 2020 | 1,327,563,914 | 296,190,960 | 502,223,782 | 798,414,743 | 1.66 |
| 2021 | 1,347,610,129 | 308,038,599 | 522,312,734 | 830,351,333 | 1.62 |
| 2022 | 1,367,959,042 | 320,360,143 | 543,205,243 | 863,565,386 | 1.58 |
| 2023 | 1,388,615,224 | 333,174,549 | 564,933,453 | 898,108,001 | 1.55 |
| 2024 | 1,409,583,313 | 346,501,530 | 587,530,791 | 934,032,321 | 1.51 |
| 2025 | 1,430,868,021 | 360,361,592 | 611,032,023 | 971,393,614 | 1.47 |
| 2026 | 1,452,474,129 | 374,776,055 | 635,473,303 | 1,010,249,359 | 1.44 |
| 2027 | 1,474,406,488 | 389,767,098 | 660,892,236 | 1,050,659,333 | 1.40 |
| 2028 | 1,496,670,026 | 405,357,781 | 687,327,925 | 1,092,685,707 | 1.37 |
| 2029 | 1,519,269,743 | 421,572,093 | 714,821,042 | 1,136,393,135 | 1.34 |
| 2030 | 1,542,210,716 | 438,434,976 | 743,413,884 | 1,181,848,860 | 1.30 |
| 2031 | 1,565,498,098 | 455,972,375 | 773,150,439 | 1,229,122,815 | 1.27 |
| 2032 | 1,589,137,119 | 474,211,271 | 804,076,457 | 1,278,287,727 | 1.24 |
| 2033 | 1,613,133,090 | 493,179,721 | 836,239,515 | 1,329,419,236 | 1.21 |
| 2034 | 1,637,491,400 | 512,906,910 | 869,689,095 | 1,382,596,006 | 1.18 |
| 2035 | 1,662,217,520 | 533,423,187 | 904,476,659 | 1,437,899,846 | 1.16 |
| 2036 | 1,687,317,004 | 554,760,114 | 940,655,726 | 1,495,415,840 | 1.13 |
| 2037 | 1,712,795,491 | 576,950,519 | 978,281,955 | 1,555,232,473 | 1.10 |
| 2038 | 1,738,658,703 | 600,028,539 | 1,017,413,233 | 1,617,441,772 | 1.07 |
| 2039 | 1,764,912,449 | 624,029,681 | 1,058,109,762 | 1,682,139,443 | 1.05 |
| 2040 | 1,791,562,627 | 648,990,868 | 1,100,434,153 | 1,749,425,021 | 1.02 |
| 2041 | 1,818,615,223 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 1.00 |
| 2042 | 1,846,076,313 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 1.02 |
| 2043 | 1,873,952,065 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 1.03 |
| 2044 | 1,902,248,741 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 1.05 |
| 2045 | 1,930,972,697 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 1.06 |
| 2046 | 1,960,130,385 | 821,180,488 | 992,545,002 | 1,813,725,490 | 1.08 |
| 2047 | 1,989,728,354 | 854,027,708 | 959,697,782 | 1,813,725,490 | 1.10 |
| 2048 | 2,019,773,252 | 888,188,816 | 925,536,674 | 1,813,725,490 | 1.11 |
| 2049 | 2,050,271,828 | 923,716,369 | 890,009,121 | 1,813,725,490 | 1.13 |
| 2050 | 2,081,230,933 | 960,665,024 | 853,060,467 | 1,813,725,490 | 1.15 |
| 2051 | 2,112,657,520 | 999,091,625 | 814,633,866 | 1,813,725,490 | 1.16 |
| 2052 | 2,144,558,649 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 1.18 |
| 2053 | 2,176,941,484 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 1.20 |
| 2054 | 2,209,813,301 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 1.22 |
| 2055 | 2,243,181,481 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 1.24 |
| 2056 | 2,277,053,522 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 1.26 |
| 2057 | 2,311,437,030 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 1.27 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).
(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.
(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.
(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.
(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2007-2008 collections of $1,143,000,000 with no escalation.

36

CONFIDENTIAL

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and service that represent the sales tax base. While historical trends do not predict future performance, since 1947, annual growth rate in personal consumption expenditures (nominal) averaged 7.61% and the lowest and second-lowest annual growth rates in personal consumption expenditures in any year between 1947 and 2008 were 2.47% (1949) and 3.20% (1991).

## PLAN OF FINANCING

**Overview**

The Corporation anticipates using the proceeds of Bonds, together with other funds available to the Corporation, to repay certain of its outstanding obligations and to provide funds to the Commonwealth for the Authorized Uses.

**Estimated Sources and Uses of Funds**

| Sources | |
|---|---|
| Principal Amount of the Series 2009A Bonds | $4,118,153,700.00 |
| Net Original Issue Discount | (31,421,731.35) |
| **Total Sources** | **$4,086,731,968.65** |

| Uses | |
|---|---|
| Deposit to the Project Fund | $4,055,391,182.25 |
| Underwriters' Discount and Other Costs of Issuance[1] | 31,340,786.40 |
| **Total Uses** | **$4,086,731,968.65** |

[1] Includes legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

37

PR-INT-000010958

The following individuals are at present members of the Governing Board of the Corporation (one position is vacant):

| Name | Occupation | Expiration of Term |
|------|-----------|-------------------|
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Alejandro M. Ballester | Businessman | September 23, 2012 |
| Marcos Rodríguez-Ema | Attorney | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

**Other Obligations of the Corporation**

In addition to the Outstanding Senior Bonds and the Outstanding Parity Obligations, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of May 15, 2009, the Corporation had outstanding $1.1 billion in aggregate principal amount of borrowings from Government Development Bank and a Puerto Rico financial institution. These borrowings are not secured by a lien on the Pledged Sales Tax under the Resolution. They are payable solely from future bond proceeds and moneys available to the Corporation after release from the lien of the Resolution. These borrowings may be repaid, in whole or in part, from the proceeds of the Series 2009 Bonds.

On May 28, 2009, the Corporation issued its Sales Tax Revenue Bonds, First Subordinate Series 2009 Bond Anticipation Notes in the aggregate principal amount of $900 million. These bond anticipation notes are secured under the Resolution pursuant to a lien subordinate to the Outstanding Senior Bonds and the Outstanding Parity Obligations. These bond anticipation notes will be repaid in full from the proceeds of the Series 2009 Bonds.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

38

PR-INT-000010959

## TAX MATTERS

### United States Tax Considerations

*Opinion of Bond Counsel to the Corporation.* In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, assuming continuing compliance with certain tax covenants described herein, (i) interest on the Series 2009A Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Code, and (ii) interest on the Series 2009A Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel to the Corporation has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Corporation, the Commonwealth, the Government Development Bank, and others, in connection with the Series 2009A Bonds, and Bond Counsel to the Corporation has assumed compliance by the Corporation, the Commonwealth, and the Government Development Bank with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code. The provisions of the American Recovery and Reinvestment Act of 2009 reflecting the treatment of interest on certain tax-exempt bonds do not apply to the Series 2009A Bonds.

In addition, in the opinion of Bond Counsel to the Corporation, under existing statutes, the Series 2009A Bonds and the interest thereon are exempt from state, Commonwealth and local taxation.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix D* hereto.

Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Series 2009A Bonds. Bond Counsel to the Corporation renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update its opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel to the Corporation expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Series 2009A Bonds from gross income for Federal income tax purposes or under state, Commonwealth and local tax law.

*Certain Ongoing Federal Tax Requirements and Covenants.* The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the Series 2009A Bonds in order that interest on the Series 2009A Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the Series 2009A Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the Series 2009A Bonds to become included in gross income for Federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Corporation, the Commonwealth, and the Government Development Bank have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the Series 2009A Bonds from gross income under Section 103 of the Code.

*Certain Collateral Federal Tax Consequences.* The following is a brief discussion of certain collateral Federal income tax matters with respect to the Series 2009A Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular Bondholder. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the Series 2009A Bonds.

39

PR-INT-000010960

Prospective owners of the Series 2009A Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for Federal income tax purposes. Interest on the Series 2009A Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

*Original Issue Discount.* "Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the Series 2009A Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of the Series 2009A Bonds is expected to be the initial public offering price set forth on the inside cover page of the Official Statement. Bond Counsel further is of the opinion that, for any Bond having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bond under Section 1288 of the Code is excludable from gross income for Federal income tax purposes to the same extent as other interest on the Series 2009A Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such Discount Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for Federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

*Bond Premium.* In general, if an owner acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond.) An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a tax-exempt Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange or other disposition of the Premium Bonds.

*Information Reporting and Backup Withholding.* Information reporting requirements apply to interest on tax-exempt obligations, including the Series 2009A Bonds. In general, such requirements are satisfied if the

40

CONFIDENTIAL

PR-INT-000010961

interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the Series 2009A Bonds from gross income for Federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's Federal income tax once the required information is furnished to the Internal Revenue Service (the "IRS").

*Miscellaneous.* Tax legislation, administrative actions taken by tax authorities, or court decisions, whether at the Federal or state court level, may adversely affect the tax-exempt status of interest on the Series 2009A Bonds under Federal or state law and could affect the market price or the marketability of the Series 2009A Bonds.

Prospective purchasers of the Series 2009A Bonds should consult their own tax advisors regarding the foregoing matters.

## RATINGS

The Series 2009A Bonds have been assigned ratings of A+ by Standard & Poor's Ratings Services, A2 by Moody's Investors Service, and A by Fitch Ratings. These ratings will only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2009A Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Series 2009A Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2009A Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $4,061,858,190.46 reflecting an original issue discount of $31,421,731.35 and an underwriters' discount of $24,873,778.19, and to reoffer such Series 2009A Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2009A Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2009A Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain

41

conditions precedent, and they will be obligated to purchase all such Series 2009A Bonds if any Series 2009A Bonds are purchased.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. and Morgan Stanley & Co. Incorporated, each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup Global Markets Inc. and Morgan Stanley & Co. Incorporated will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup Global Markets Inc. and Morgan Stanley & Co. Incorporated will compensate Morgan Stanley Smith Barney LLC. for its selling efforts in connection with their respective allocations of Bonds.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2009A Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have agreed to provide services and advice to each other related to the structuring and execution of the underwriting of the Series 2009A Bonds in accordance with the terms and provisions of a joint venture agreement which was entered into between SSC and Banc of America Securities LLC ("BAS") (Merrill and BAS are now affiliated broker-dealers). SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2009A Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2009A Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2009A Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2009A Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a) within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the

CONFIDENTIAL

Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)    in a timely manner, through June 30, 2009, to each nationally recognized municipal securities information repository ("NRMSIR") or to the MSRB, and to any Commonwealth information depository, if any, and thereafter to EMMA, notice of any of the following events with respect to the Series 2009A Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Series 2009A Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2009A Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2009A Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Series 2009A Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2009A Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2009A Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2009A Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as

43

PR-INT-000010964

well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

      (b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

### GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2009A Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2009A Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2009A Bonds.

### MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2009A Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the summary of amendments to the General Resolution (*Appendix C*), the proposed form of approving opinion of Bond Counsel (*Appendix D*), the summary of the book-entry system for the Series 2009A Bonds (*Appendix E*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix F*) and the table of Compounded Amounts for the Convertible Capital Appreciation Bonds (*Appendix G*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

CONFIDENTIAL

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO SALES TAX FINANCING
CORPORATION**

By: _____ /s/ Fernando L. Batlle _____
Executive Director

CONFIDENTIAL

PR-INT-000010966

(This page intentionally left blank)

CONFIDENTIAL

PR-INT-000010967

**APPENDIX A**

# COMMONWEALTH OF PUERTO RICO
# ECONOMIC INFORMATION

## THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

**General**

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,954,037 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375 (422,665 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, the real gross national product contracted by 1.9% and 2.5%, respectively. This contraction has continued into fiscal year 2009, for which the Puerto Rico Planning Board (the "Planning Board") expects a reduction of 3.4% in real gross national product. While the trend was expected to continue in fiscal year 2010, the Planning Board announced on April 29, 2009 that the expected positive impact of the U.S. federal and local economic stimulus measures discussed below under "Fiscal and Economic Reconstruction" should outweigh the expected negative impact of the Fiscal Stabilization Plan also described below under "Fiscal and Economic Reconstruction" and revised its projections for fiscal year 2010 to reflect an increase of 0.1% in real gross national product. The Planning Board is also projecting increases in real gross national product of 0.9% and 1.0% for fiscal years 2011 and 2012, respectively.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP"), personal consumption expenditures and personal income. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

**Personal Income**

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2008. In fiscal year 2008, aggregate personal income was $56.2 billion ($44.8 billion at 2000 prices) and personal income per capita was $14,237 ($11,341 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

to individuals amounted to $12.3 billion in fiscal year 2008 ($10.5 billion in fiscal year 2007).  Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $9.3 billion, or 76% of the transfer payments to individuals in fiscal year 2008 ($8.6 billion, or 82%, in fiscal year 2007).  The remainder of federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.  The increase in federal transfer payments to individuals, and the corresponding decline in the share of entitlements to total transfers to individuals, from fiscal year 2007 to fiscal year 2008 was due almost exclusively to the U.S. federal tax rebates implemented in fiscal year 2008.

The following table shows the personal income for the five Fiscal Years ended June 30, 2008.

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| Employees' compensation | | | | | |
| Business | $18,710.9 | $19,431.0 | $19,828.0 | $20,216.2 | $20,628.2 |
| Government | 7,388.5 | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 |
| Household and nonprofit institutions | 711.0 | 706.5 | 738.2 | 750.5 | 786.6 |
| Other | 958.6 | 1,085.3 | 1,036.7 | 948.6 | 986.8 |
| Total Employees' compensation | $27,768.9 | $29,371.5 | $30,027.1 | $30,500.2 | $31,163.8 |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,068.2 | 2,181.0 | 2,241.9 | 2,158.8 | 2,170.4 |
| Employers | 2,884.9 | 3,064.0 | 3,167.1 | 3,150.9 | 3,097.0 |
| Total Contributions for social insurance | $4,953.0 | $5,245.0 | $5,409.0 | $5,309.7 | $5,267.5 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,633.9 | 2,687.0 | 2,832.3 | 2,979.1 | 3,220.5 |
| Dividends of domestic corporations | 249.4 | 286.7 | 304.3 | 322.1 | 351.9 |
| Miscellaneous income and dividends received from abroad | 13.0 | 13.4 | 13.4 | 13.8 | 14.7 |
| Rental income of persons | 3,663.1 | 4,201.8 | 4,387.4 | 5,030.0 | 5,670.0 |
| Personal interest income | 2,127.7 | 2,911.9 | 3,725.1 | 3,140.4 | 3,505.3 |
| Total Proprietors' income | $8,687.2 | $10,100.7 | $11,262.5 | $11,485.4 | $12,762.4 |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,290.3 | 3,323.5 | 3,390.7 | 3,577.4 | 3,813.9 |
| Federal government | 8,903.0 | 9,243.7 | 9,725.9 | 10,165.3 | 11,879.3 |
| U.S. state governments | 16.4 | 14.9 | 17.6 | 22.7 | 23.0 |
| Business | 1,116.1 | 1,190.7 | 1,184.9 | 1,232.3 | 1,298.7 |
| Other nonresidents | 737.0 | 820.3 | 642.6 | 621.1 | 527.8 |
| Total transfer payments | $14,062.8 | $14,593.0 | $14,961.8 | $15,618.8 | $17,542.6 |
| Total Personal Income | $45,565.9 | $48,820.2 | $50,842.3 | $52,294.7 | $56,201.4 |

(1) Preliminary figures.
Source: Planning Board

A-2

**Personal Consumption**

During Fiscal Year 2008, at current prices, personal consumption amounted to $54.3 billion, representing an increase of $2.3 billion, or 4.5%, from Fiscal Year 2007. At constant prices, personal consumption decreased 0.5% from Fiscal Year 2007. This increase was based on a 0.6% decrease in nondurable goods (39% of personal consumption), 6.1% decrease in durable goods (17% of personal consumption), and 2% increase in services (44% of personal consumption). These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2008.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| Food | $ 6,061.2 | $ 6,535.4 | $ 6,982.2 | $ 7,315.0 | $ 7,953.5 |
| Alcoholic beverages and tobacco products | 1,540.8 | 1,739.3 | 1,765.8 | 1,783.1 | 1,721.3 |
| Clothing and accessories | 2,851.9 | 2,957.1 | 3,084.9 | 3,543.7 | 3,646.0 |
| Personal care | 782.2 | 815.5 | 984.6 | 1,041.6 | 1,139.2 |
| Housing | 6,549.4 | 7,012.3 | 7,499.7 | 7,979.8 | 8,430.0 |
| Household operations | 4,773.4 | 5,267.9 | 5,929.2 | 6,479.0 | 6,861.4 |
| Medical care and funeral expenses | 7,162.5 | 7,525.9 | 8,007.2 | 8,295.3 | 8,617.4 |
| Business services | 2,962.7 | 3,020.1 | 3,035.5 | 2,991.3 | 2,993.2 |
| Transportation | 5,283.7 | 6,136.4 | 6,325.3 | 6,297.1 | 6,706.1 |
| Recreation | 4,401.9 | 4,547.2 | 4,810.3 | 4,955.4 | 5,015.4 |
| Education | 1,589.3 | 1,627.8 | 1,819.5 | 1,844.5 | 1,856.4 |
| Religious and nonprofit organizations, not elsewhere classified | 473.3 | 482.3 | 505.9 | 504.3 | 537.5 |
| Foreign travel | 1,450.1 | 1,531.9 | 1,608.9 | 1,616.9 | 1,754.0 |
| Miscellaneous purchases | 565.7 | 605.8 | 704.1 | 819.4 | 823.2 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $46,448.6 | $49,804.9 | $53,063.1 | $55,466.4 | $58,054.6 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,052.6 | 3,269.4 | 3,403.1 | 3,457.4 | 3,700.3 |
| Total Personal Consumption Expenditures | $43,396.0 | $46,535.4 | $49,660.0 | $52,009.0 | $54,354.3 |

(1) Preliminary figures.
Source: Planning Board.

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

A-3

The following table shows the gross national product for the five fiscal years ended June 30, 2008.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30**

|  | 2004 | 2005 | 2006 | 2007 | 2008[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $50,709 | $53,752 | $56,732 | $58,563 | $60,787 |
| Real gross national product – $ millions (2000 prices) | 43,967 | 44,819 | 45,048 | 44,175 | 43,049 |
| Annual percentage increase (decrease) in real gross national product (2000 prices) | 2.7% | 1.9% | 0.5% | (1.9)% | (2.5)% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 4.0% | 3.1% | 3.0% | 1.8% | 2.8% |

(1) Preliminary.
(2) In current dollars.
*Sources:* Planning Board and Global Insight Inc.

     The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal year 2009.

**Real GNP Growth Rate**



Sources: Puerto Rico Planning Board.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Apr-2009). Estimate for U.S. from Global Insight (Apr-2009).

*Forecast for Fiscal Years 2009 and 2010*

     The Planning Board's gross national product forecast for fiscal year 2009, which was released in February 2009, projected a decline of 3.4% in constant dollars, or an increase of 1.5% in current dollars. Personal income is expected to decline by 1.5% in real terms, or to increase by 2.3% in nominal terms (see footnote 1 on page 8). While a prolongation of the economic contraction through fiscal year 2010 had been expected, the Planning Board announced on April 29, 2009 that the expected positive impact of the U.S. federal and local economic stimulus measures discussed below should outweigh the expected negative

A-4

impact of the Fiscal Stabilization Plan also described below, leading it to adjust its projections for fiscal year 2010. The Planning Board is now projecting a slight increase in gross national product of 0.1% in constant dollars or 3.4% in current dollars. The major factors affecting the economy at this point are, among others, the current contraction of U.S. economic activity; the difficulties of the U.S. and local financial systems, which affect the local economy directly; the increase in federal transfers associated to the economic stimulus enacted by the U.S. government; and the local difficulties associated with the Commonwealth's prolonged fiscal crisis, including the cost-reduction initiatives to be implemented as part of the fiscal stabilization plan discussed below.

The number of persons employed in Puerto Rico during the first nine months of fiscal year 2009, from July 2008 to March 2009, averaged 1,179,900, a decrease of 3.1% from the same period of the previous year. Moreover, for the first nine months of the current fiscal year, the unemployment rate was 13.0%, an increase from 11.0% for the first nine months of fiscal year 2008.

*Fiscal Year 2008*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.5% (3.8% in current dollars) over fiscal year 2007. Nominal gross national product was $60.8 billion in fiscal year 2008 ($43.0 billion in 2000 prices), compared to $58.6 billion in fiscal year 2007 ($44.2 billion in 2000 prices). Aggregate personal income increased from $52.3 billion in fiscal year 2007 ($43.4 billion in 2000 prices) to $56.2 billion in fiscal year 2008 ($44.8 billion in 2000 prices), and personal income per capita increased from $13,269 in fiscal year 2007 ($11,012 in 2000 prices) to $14,237 in fiscal year 2008 ($11,341 in 2000 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The persistent high level of the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into an improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.9%. Nominal gross national product was $58.6 billion ($44.2 billion in 2000 prices), compared to $56.7 billion in fiscal year 2006 ($45.0 billion in 2000 prices). This represents an increase in nominal gross national product of 3.2%. Aggregate personal income was $52.3 billion in fiscal year 2007 ($43.4 billion in 2000 prices), as compared to $50.8 billion in fiscal year 2006 ($43.4 billion in 2000 prices), and personal income per capita was $13,269 in fiscal year 2007 ($11,012 in 2000 prices), as compared to $12,944 in fiscal year 2006 ($11,052 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,253,400 for fiscal year 2006. The driving force behind total employment

A-5

CONFIDENTIAL

PR-INT-000010972

was self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.7% for fiscal year 2006.

**Overview of Economic and Fiscal Condition**

*Economic Condition*

Puerto Rico's economy has been in a recession, which commenced in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked with the United States economy, for fiscal years 2007 and 2008, Puerto Rico's real gross national product decreased by 1.9% and 2.5%, respectively, while the United States economy grew at a rate of 1.8% and 2.8%, respectively, during the same periods. According to the Planning Board's latest projections, the economic contraction has accelerated in fiscal year 2009, with an expected further reduction in real gross national product of 3.4%. While this trend was expected to continue in fiscal year 2010, the expected positive impact of the U.S. federal and local economic stimulus measures discussed below led the Planning Board to announce on April 29, 2009 revised projections for fiscal year 2010 reflecting a projected increase in real gross national product of 0.1%.

*Fiscal Condition*

The Commonwealth is experiencing a fiscal crisis as a result of the structural imbalance between recurring government revenues and expenses. The structural imbalance has been exacerbated during fiscal years 2008 and 2009, with recurring government expenses significantly higher than recurring revenues, which have declined as a result of the multi-year economic contraction mentioned above. In order to bridge the deficit resulting from the structural imbalance, the government has used non-recurring solutions, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, and postponing the payment of various government expenses, such as payments to suppliers and utilities providers.

As discussed below, the structural deficit for fiscal year 2009 is projected to be $3.2 billion.

*Rating Downgrades*

The continued fiscal imbalance led to successive downgrades in the Commonwealth's general obligation debt ratings, from "Baa1" by Moody's Investors Service ("Moody's") and "A−" by Standard & Poor's Rating Services ("S&P") in fiscal year 2004 to "Baa3" by Moody's and "BBB−" by S&P currently. Each of the rating agencies has a stable outlook on the Commonwealth's general obligation debt.

*Fiscal Year 2009 Estimated Structural Deficit*

For fiscal year 2009, estimated revenues of the General Fund (the primary operating fund of the Commonwealth) are $7.6 billion (down from the original budgeted revenues of $8.5 billion). Although budgeted expenditures for the fiscal year were $9.5 billion, the government has identified additional expenses for fiscal year 2009 that were not included in the budget. Unbudgeted expenses for fiscal year 2009 are estimated at $1.4 billion. Thus, the resulting estimated structural deficit for fiscal year 2009 is currently approximately $3.2 billion.

*General Fund Revenues (Ten Months)*

Preliminary General Fund revenues for the first ten months of fiscal year 2009 (from July 2008 through April 2009) were $6.54 billion, a decline of 6.6% from the $7 billion for the same period in the prior fiscal year. The continued decline in General Fund revenues reflects primarily the impact of the ongoing economic recession on tax revenues.

A-6

CONFIDENTIAL

PR-INT-000010973

*Fiscal Stabilization Plan*

The new government administration, which commenced on January 2, 2009 and controls the Executive and Legislative branches of government, has developed and commenced implementing a multi-year plan designed to achieve fiscal balance and restore economic growth. The fiscal stabilization plan seeks to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including the following: (i) a $2 billion operating expense-reduction plan during fiscal year 2010, through government reorganization and reduction of operating expenses, including payroll as the main component of government expenditures; (ii) a combination of temporary and permanent tax increases, coupled with additional tax enforcement measures; and (iii) a bond issuance program through Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym). Before the temporary measures expire in 2013, the administration intends to design and adopt a comprehensive reform of the tax system and a long-term economic development plan to complement the economic reconstruction and supplemental stimulus initiatives described below. The proceeds expected to be obtained from the COFINA bond issuance program will be used to repay existing government debt (including debts with GDB), finance operating expenses of the Commonwealth for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, the funding of an economic stimulus plan, as described below, and for other purposes to address the fiscal imbalance while the fiscal stabilization plan is being implemented. The fiscal stabilization plan seeks to safeguard the investment grade ratings of the Commonwealth's general obligation debt and lay the foundation for sustainable economic growth. Legislation has already been enacted authorizing the implementation of all the measures in the fiscal stabilization plan and the Office of Management and Budget ("OMB") has certified projected savings of $237 million for fiscal year 2010 from implemented measures to date.

*Economic Reconstruction Plan*

The current administration has also developed and commenced implementing a short-term economic reconstruction plan. The cornerstone of this plan is the implementation of U.S. federal and local economic stimuli. Puerto Rico will benefit from the American Recovery and Reinvestment Act of 2009 ("ARRA") enacted by the U.S. government to provide a stimulus to the U.S. economy in the wake of the global economic downturn. Puerto Rico expects to receive approximately $5.0 billion from ARRA during the next two fiscal years, which includes tax relief, expansion of unemployment benefits and other social welfare provisions, and domestic spending in education, health care, and infrastructure, among other measures. The administration will seek to complement the U.S. federal stimulus with additional short- and medium-term supplemental stimulus measures seeking to address specific local challenges and providing investment in strategic areas. These measures include a local $500 million economic stimulus plan to supplement the federal plan. In addition, to further stimulate economic development and cope with the fiscal crisis, the administration is in the process of establishing a legal framework to authorize and promote the use of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets.

The new administration is also developing a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration will emphasize (i) the simplification and shortening of the permitting and licensing process; (ii) the strengthening of the labor market by encouraging greater labor-force participation and bringing out-of-date labor laws and regulations in line with U.S. and international standards and (iii) the adoption of a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies.

A-7

PR-INT-000010974

*Proposed Fiscal Year 2010 Budget*

On April 29, 2009, the Governor submitted to the Legislature a proposed budget for fiscal year 2010. The proposed budget provides for total General Fund resources and appropriations of $7.67 billion, compared to estimated General Fund revenues of $7.60 billion for fiscal year 2009. Budgeted General Fund expenditures total $7.67 billion, a decrease of $1.81 billion, or 19%, from the fiscal year 2009 budgeted expenditures of $9.48 billion. To cover approximately $2 billion of additional transitory expenses for fiscal year 2010 related to the implementation of the expense-reduction plan (including expenses that will be incurred in fiscal year 2010 but will not be incurred in subsequent fiscal years) and a $500 million projected remaining structural deficit, the Commonwealth will establish a Stabilization Fund to be funded with proceeds from COFINA bond issues.

The projections and assumptions used in the proposed fiscal year 2010 budget are subject to a number of risks, including risks related to the economic forecasts, the implementation of the expense-reduction plan, and the execution of certain transactions contemplated in the fiscal stabilization plan (such as the COFINA financings). Many complex political, social, environmental, and economic forces influence the Commonwealth's economy and finances unpredictably from fiscal year to fiscal year. The budget is necessarily based on forecasts of economic activity, which have frequently failed to accurately predict the timing and magnitude of specific cyclical changes in the U.S. and local economy. There can be no assurance that the Commonwealth's economy will not experience results in the current and ensuing fiscal years that are materially worse than predicted, with corresponding material and adverse effects on the Commonwealth's projections of receipts and disbursements.

As a result of the global credit crisis, many municipal issuers either have been unable to issue bonds or, in other instances, are issuing them at higher rates than previously. If the Commonwealth cannot sell the COFINA bonds at the level (or in the timetable) expected, it could experience cash shortfalls, with no clear source of funds to address the same.

An additional risk to the Commonwealth's finances and the implementation of the fiscal stabilization plan arises from the potential impact of certain litigation now pending against the Commonwealth.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For the first nine months of fiscal year 2009, the number of persons employed averaged 1,179,900, a decrease of 3.1% compared to the same period of the previous fiscal year. Currently, the unemployment rate in Puerto Rico is slightly less than twice the U.S. average.

The following table presents annual statistics of employment and unemployment for fiscal year 2004 through fiscal year 2008, and the average figures for the first nine months of fiscal year 2009. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States.

A-8

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2004 | 1,360 | 1,206 | 155 | 11.4% |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009[3] | 1,356 | 1,180 | 176 | 13.0 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.
(3) Accumulated average from July 2008 to March 2009.
*Source:* Department of Labor and Human Resources – Household Survey

### Economic Performance by Sector

From fiscal year 2004 to fiscal year 2008, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| Manufacturing | $33,267 | $34,534 | $35,638 | $36,309 | $38,458 |
| Service[2] | 30,476 | 32,449 | 33,785 | 35,608 | 37,068 |
| Government[3] | 7,389 | 8,151 | 8,424 | 8,585 | 8,762 |
| Transportation, communication, and public utilities | 5,343 | 5,309 | 5,907 | 6,111 | 6,020 |
| Agriculture, forestry, and fisheries | 414 | 375 | 394 | 418 | 386 |
| Construction[4] | 1,905 | 1,848 | 1,788 | 1,929 | 1,991 |
| Statistical discrepancy | 417 | 141 | 221 | (58) | 578 |
| Total gross domestic product[5] | $79,209 | $82,809 | $86,158 | $88,902 | $93,263 |
| Less: net payment abroad | (28,501) | (29,056) | (29,425) | (30,339) | (32,476) |
| Total gross national product[5] | $50,709 | $53,752 | $56,732 | $58,563 | $60,792 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under Service in the table.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

A-9

CONFIDENTIAL

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2007** | **2008[2]** |
| Natural resources and construction | 69,300 | 68,233 | 67,442 | 66,589 | 60,023 |
| Manufacturing | | | | | |
|    Durable goods | 48,808 | 48,067 | 46,350 | 45,427 | 43,185 |
|    Non-durable goods | 69,633 | 69,250 | 66,233 | 62,447 | 61,013 |
| Sub-total | 118,442 | 117,317 | 112,583 | 107,874 | 104,198 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,300 | 33,717 | 33,992 | 33,267 | 33,821 |
|    Retail trade | 132,008 | 136,192 | 137,358 | 133,744 | 131,178 |
|    Transportation, warehouse, and utilities | 17,042 | 17,617 | 17,433 | 16,988 | 16,840 |
|      Sub-total | 182,350 | 187,526 | 188,783 | 183,999 | 181,839 |
| | | | | | |
| Information | 21,917 | 22,608 | 22,675 | 22,639 | 21,342 |
| Finance | 46,850 | 48,633 | 49,767 | 49,094 | 48,125 |
| Professional and business | 101,900 | 103,767 | 106,517 | 108,796 | 108,660 |
| Educational and health | 98,108 | 99,967 | 103,650 | 105,226 | 108,743 |
| Leisure and hospitality | 70,317 | 72,592 | 74,767 | 73,562 | 73,750 |
| Other services | 20,650 | 21,258 | 20,567 | 18,233 | 17,354 |
| Government[3] | 303,408 | 307,825 | 302,492 | 298,108 | 297,666 |
|    Total non-farm | 1,033,242 | 1,049,725 | 1,049,242 | 1,034,118 | 1,021,699 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.
(3) Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2008 manufacturing generated $38.5 billion, or 41.2%, of gross domestic product. During fiscal year 2008, payroll employment for the manufacturing sector was 104,200, a decrease of 3.4% compared with fiscal year 2007. For the first nine months of fiscal year 2009, the average manufacturing employment was 99,300, a decrease of 5.3% compared to the same period of the prior fiscal year. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2008, the average hourly manufacturing wage rate in Puerto Rico was approximately 68.5% of the average mainland U.S. rate.

A-10

CONFIDENTIAL

PR-INT-000010977

Manufacturing in Puerto Rico is concentrated in two major industries. Pharmaceuticals and other chemical products and machinery and metal products constituted 90% of the total manufacturing production in fiscal year 2008. Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under "The Economy."

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2004 to 2008.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2007** | **2008**[3] |
| Pharmaceuticals | $19,814 | $20,705 | $21,024 | $21,273 | $21,735 |
| Machinery and metal products: | | | | | |
|    Machinery, except electrical | 3,372 | 3,307 | 3,252 | 3,428 | 3,920 |
|    Electrical machinery | 1,818 | 1,904 | 1,855 | 1,840 | 2,342 |
|    Professional and scientific instruments | 3,540 | 3,698 | 4,166 | 4,293 | 4,705 |
|    Other machinery and metal products | 274 | 282 | 276 | 280 | 300 |
| Food products | 2,202 | 2,312 | 2,875 | 2,970 | 3,065 |
| Other chemical and allied products | 591 | 613 | 663 | 691 | 792 |
| Apparel | 344 | 325 | 253 | 213 | 234 |
| Other[1] | 1,312 | 1,387 | 1,273 | 1,321 | 1,364 |
| Total gross domestic product of manufacturing sector[2] | $33,267 | $34,534 | $35,638 | $36,309 | $38,458 |

(1) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(2) Totals may not add due to rounding.
(3) Preliminary.

*Source:* Planning Board

CONFIDENTIAL

PR-INT-000010978

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,708 | 4,467 | 4,100 | 3,823 | 3,772 |
| Cement and concrete products manufacturing | 3,850 | 3,750 | 3,533 | 3,300 | 3,389 |
| Fabricated metal products | 6,483 | 6,442 | 5,775 | 5,677 | 5,368 |
| Computer and electronic | 10,575 | 10,667 | 10,808 | 10,101 | 8,612 |
| Electrical equipment | 7,750 | 7,650 | 6,842 | 6,619 | 6,659 |
| Electrical equipment manufacturing | 4,933 | 4,975 | 4,700 | 4,517 | 4,383 |
| Miscellaneous manufacturing | 11,100 | 11,158 | 11,258 | 12,299 | 11,978 |
| Medical equipment and supplies manufacturing | 11,067 | 10,467 | 10,533 | 11,574 | 11,341 |
| Other durable goods manufacturing | 8,192 | 7,683 | 7,567 | 6,908 | 6,796 |
| Total – durable goods | 48,808 | 48,067 | 46,350 | 45,427 | 43,185 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,242 | 13,050 | 12,650 | 12,194 | 11,630 |
| Beverage and tobacco products manufacturing | 3,042 | 3,175 | 3,392 | 3,251 | 3,270 |
| Apparel manufacturing | 8,533 | 8,875 | 8,258 | 7,717 | 9,637 |
| Cut and sew apparel manufacturing | 8,533 | 8,850 | 8,017 | 7,078 | 8,610 |
| Chemical manufacturing | 32,367 | 32,883 | 32,317 | 30,463 | 28,061 |
| Pharmaceutical and medicine manufacturing | 28,158 | 28,567 | 28,017 | 26,123 | 24,204 |
| Plastics and rubber products | 3,217 | 2,750 | 2,325 | 2,192 | 1,986 |
| Plastics product manufacturing | 2,917 | 2,258 | 2,133 | 2,032 | 1,839 |
| Other non-durable goods manufacturing | 9,232 | 8,517 | 7,291 | 6,630 | 6,429 |
| Total – non-durable goods | 69,633 | 69,250 | 66,233 | 62,447 | 61,013 |
| | | | | | |
| Total manufacturing employment | 118,442 | 117,317 | 112,583 | 107,874 | 104,198 |

\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 14,200 from fiscal year 2004 to fiscal year 2008. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment seemed to stabilize around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another significant drop of 4.0%. For fiscal years 2007 and 2008, manufacturing employment decreased by 4.2% and 3.4%, respectively. For the first nine months of fiscal year 2009, the sector lost an average of 5,600 jobs, or 5.3% compared to the same period of the previous year. In summary, the manufacturing sector lost nearly 17,000 jobs from calendar year 2005 to

A-12

CONFIDENTIAL

2008, and, according to the trend observed for the first months of 2009, it is likely that it will lose more than 5,000 additional jobs in calendar year 2009. Given that this sector used to pay the highest wages, on average, in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are needed to improve it.

*Service Sector*

Puerto Rico has experienced significant growth in the service sector, which, for purposes of the data set forth below, includes finance, insurance, real estate, wholesale and retail trade, and other services. This sector has expanded in terms of both income and employment over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2004 and 2008, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.0%, while payroll employment in this sector increased at an average annual rate of 0.8%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2008, the service sector generated $37.1 billion of gross domestic product, or 40% of the total. Service-sector employment grew from 542,092 in fiscal year 2004 to 559,811 in fiscal year 2008 (representing 54.8% of total, non-farm, payroll employment). This represents a cumulative increase of 3.3% during such period. For the first nine months of fiscal year 2009, the average service-sector employment was 546,108, a decrease of 2.6% compared to the same period of the prior fiscal year. Wholesale and retail trade, finance, insurance, and real estate experienced growth in fiscal years 2004 to 2008, as measured by gross domestic product at current prices. From fiscal year 2004 to 2008, gross domestic product increased in the trade sector from $9.8 billion to $11.8 billion, and in finance, insurance, and real estate from $13.0 billion to $16.4 billion.

Puerto Rico has a developed banking and financial system. As of December 31, 2008, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of December 31, 2008 were $87.5 billion, as compared to $87.9 billion as of December 31, 2007.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $26.5 billion as of December 31, 2008, down from $27.9 billion on December 31, 2007. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $13.9 billion as of December 31, 2008, down slightly from $14.1

CONFIDENTIAL

billion as of December 31, 2007 according to the OCFI. Most of the assets under management of local mutual funds are reflected in the amount of assets under management by broker-dealers stated above.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of December 31, 2008, there were 33 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $63.8 billion, a decrease from $75.8 billion in total assets as of December 31, 2007. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $6.7 billion in assets as of December 31, 2008, a slight increase from $6.5 billion as of December 31, 2007.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2004 to 2008.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector*
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| Wholesale and retail trade | $ 9,802 | $10,217 | $10,675 | $11,110 | $11,811 |
| Finance, insurance, and real estate | 13,029 | 14,267 | 14,833 | 15,927 | 16,391 |
| Other services[2] | 7,646 | 7,965 | 8,277 | 8,572 | 8,867 |
| Total | $30,476 | $32,449 | $33,785 | $35,608 | $37,068 |

\* Totals may not add due to rounding.
(1) Preliminary.
(2) Includes tourism.

*Source*: Planning Board.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Service Sector*
### (thousands of persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008[1] |
| Wholesale trade | 33,300 | 33,717 | 33,992 | 33,267 | 33,821 |
| Retail trade | 132,008 | 136,192 | 137,358 | 133,744 | 131,178 |
| Transportation, warehouse and utilities | 17,042 | 17,617 | 17,433 | 16,988 | 16,840 |
| Trade, transportation, warehouse, and utilities | 182,350 | 187,525 | 188,783 | 183,998 | 181,838 |
| Information | 21,917 | 22,608 | 22,675 | 22,639 | 21,342 |
| Finance | 46,850 | 48,633 | 49,767 | 49,094 | 48,125 |
| Professional and business | 101,900 | 103,767 | 106,517 | 108,796 | 108,660 |
| Educational and health | 98,108 | 99,967 | 103,650 | 105,226 | 108,743 |
| Leisure and hospitality | 70,317 | 72,592 | 74,767 | 73,562 | 73,750 |
| Other services | 20,650 | 21,258 | 20,567 | 18,233 | 17,354 |
| Total | 542,092 | 556,351 | 566,726 | 561,549 | 559,813 |

\* Totals may not add due to rounding.
(1) Preliminary.

*Source*: Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

A-14

PR-INT-000010981

*Hotels and Related Services—Tourism*

During fiscal year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,922,500, an increase of 3.8% over the number of persons registered during the same period in fiscal year 2005.  The number of non-resident tourists registered in tourist hotels during fiscal year 2006 increased by 3.5% compared to fiscal year 2005.  Tourist hotel rooms available during fiscal year 2006 increased by 3.9% to 10,739 rooms, compared to fiscal year 2005.  The average occupancy rate in tourist hotels during fiscal years 2005 and 2006 was 70.8%.

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006.  The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006.  The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

For fiscal year 2008, the number of persons registered in tourist hotels was 1,745,000, a further decline of 2.6% over the number of persons registered during fiscal year 2007.  The average occupancy rate in tourist hotels during fiscal year 2008 was 70.3%, compared to 71.7% in fiscal year 2007.  The average number of rooms available in tourist hotels increased by 2.1% to 10,253 rooms from fiscal year 2007 to fiscal year 2008.

The number of persons registered in tourist hotels during the first six months of fiscal year 2009 was 826,300, a decrease of 0.8% over the number of persons registered during the same period of fiscal year 2008.  The average occupancy rate in tourist hotels during the first semester of fiscal year 2009 was 63.7%, compared to 67.5% in the period for fiscal year 2008.  During the first six months of fiscal year 2009, the average number of rooms available in tourist hotels increased by 2.7% to 10,220 rooms compared with the same period in fiscal year 2008.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity.  For the first nine months of fiscal year 2009, employment in hotels and lodging places was reduced by 3.9% to 13,700 jobs.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-15

CONFIDENTIAL

PR-INT-000010982

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2008.

### Commonwealth of Puerto Rico
### Tourism Data[1]

#### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 |
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008[4] | 1,276,989 | 1,496,853 | 2,617,348 | 5,391,190 |

#### Total Visitors' Expenditures
#### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2004 | $ 1,334.1 | $ 154.0 | $ 1,536.0 | $ 3,024.0 |
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008[5] | 1,451.2 | 194.3 | 1,998.9 | 3,644.5 |

---

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500-key hotel is scheduled to commence operations at the end of 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people enjoying over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

A-16

CONFIDENTIAL

PR-INT-000010983

In fiscal year 2008, the government accounted for $8.8 billion, or 9.4%, of Puerto Rico's gross domestic product. The Puerto Rico government is also a significant employer, providing jobs for 282,900 workers (state and local), or 27.7% of total, non-farm, payroll employment in fiscal year 2008. From fiscal year 2005 to fiscal year 2008, Commonwealth and municipal government employment has been reduced by approximately 10,100 positions. Nevertheless, during the first nine months of fiscal year 2009, state and local government employment increased by 1.2% or by 3,300 jobs to 284,400. According to the payroll survey, the distribution of these job increases was 600 jobs in the state government and 2,700 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of certain provisions of Act 7.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

In general, Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Fajardo, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2008, totaled approximately 4,625 miles and 11,774 miles of local streets and adjacent roads. The highway system comprises 425 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-5, PR-66, and PR-20 toll highways, 252 miles of primary urban

A-17

system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,051 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 35,000 per day.

The Port of the Americas is a deep draft port on the south coast of Puerto Rico that is under development by the Port of the Americas Authority. The Port of the Americas is expected to be used for broad operations such as domestic cargo, bulk, and liquid shipments for Puerto Rico, as well as transshipments. The first phase of the development was completed in 2004, and the second phase is substantially complete. A third development phase is currently underway, which is to result in a processing capacity of 500,000 Twenty-Foot Equivalent Units per year.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2001 through fiscal year 2008, however, real construction investment has decreased at an average annual rate of 5.4%. During the same time period, the total value of construction permits, in current dollars, increased at an average annual rate of 0.3% but, adjusting the value of construction permits by the construction investment price deflator, the total value of permits, in constant dollars, declined at an average annual rate of 2.3%.

Public investment has been an important component of construction investment. During fiscal year 2008, approximately 50.2% of the total investment in construction was related to public projects. The total value of construction permits increased 12.9% in fiscal year 2008 as compared to fiscal year 2007, but total sales of cement decreased by 10.7%, the largest decline during the last decade. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2008 decreased in real terms by 8.8%, following a 7.6% real decline in fiscal year 2007, due principally to the drop in construction-related public projects. The Planning Board has estimated a construction investment decrease of 11.5% in real terms during fiscal year 2009. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties and the decline in construction investment is highly related to these difficulties. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, it announced on April 29, 2009 that the expected positive impact of the Federal Stimulus and the Local Stimulus had led it to reduce its projected decrease in construction investment to 5.6% in real terms. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During the first four months of fiscal year 2009, the number of construction permits decreased 4.8%, while the total value of construction permits dropped 12.9% compared to the same period in fiscal year 2008. For the first nine months of fiscal year 2009, cement sales have declined by 23.0%, reaching levels not seen in more than a decade.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2008, gross income from agriculture was $792 million, an increase of 1.2% compared with fiscal year 2007. The largest

CONFIDENTIAL

contributors to gross income in agriculture during fiscal year 2008 were livestock products (48% of the sector's gross income) and starchy vegetables (13%).

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 ("Act 225") provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

A-19

CONFIDENTIAL

PR-INT-000010986

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |
| 2006 | 407,134[3] | 209,547 | 51.5% | 29,312,950[3] | 17,672,000 | 60.3% |
| 2007 | 396,057[3] | 225,402 | 56.9% | 29,492,415[3] | 17,959,000 | 60.9% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).

*Sources:* U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2007-2008 was approximately 63,205 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2007-2008 of approximately 164,341 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 36,781 students at approximately 76 institutions. This figure represents enrollment at federal Title IV-eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax

A-20

CONFIDENTIAL

and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains. Companies qualifying thereunder can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. However, Puerto Rico resident individuals, as well as non-resident individuals who are U.S. citizens, must include as income for purposes of computing their potential alternative minimum tax liability dividends derived from companies covered by the Economic Incentives Act and the 1998 Tax Incentives Act. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities,

A-21

PR-INT-000010988

including hotel and condo-hotel development projects. Other legislation enacted in 2001 and 2002 provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of eighteen hotel projects representing over 4,700 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

Because of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

A-22

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

CONFIDENTIAL

PR-INT-000010990

(This page intentionally left blank)

CONFIDENTIAL

PR-INT-000010991

**APPENDIX B**

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

PR-INT-000010992

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

CONFIDENTIAL

PR-INT-000010993

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

CONFIDENTIAL

PR-INT-000010994

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

<center>B-4</center>

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

CONFIDENTIAL

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

CONFIDENTIAL

PR-INT-000010997

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

B-7

CONFIDENTIAL

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

      (i)     Defeasance Obligations;

      (ii)    Defeased Municipal Obligations;

B-8

CONFIDENTIAL

(iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

CONFIDENTIAL

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

CONFIDENTIAL

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

    (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

    (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

    (iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

    (iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

    (v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

    (vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

CONFIDENTIAL

PR-INT-000011002

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Revenues.

2. All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3. The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

4. Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

CONFIDENTIAL

PR-INT-000011003

5.      Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

CONFIDENTIAL

PR-INT-000011004

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

CONFIDENTIAL

PR-INT-000011005

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Pledged Sales Tax received by the Corporation or the Trustee.

2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

3. Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

B-15

CONFIDENTIAL

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

CONFIDENTIAL

PR-INT-000011007

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

CONFIDENTIAL

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-18

CONFIDENTIAL

PR-INT-000011009

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

     (i)  irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

     (ii)  if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

<center>B-19</center>

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

        (iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

        (iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

        Refunding Bonds may be issued only upon compliance with Section 710.

### Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

        In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

        Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

### Qualified Hedges (Section 206)

        The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

<div align="center">B-20</div>

CONFIDENTIAL

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

CONFIDENTIAL

PR-INT-000011012

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special *Accounts and Subaccounts are created and established within the Project Fund, each of which shall have* as a prefix "COFINA" and shall be held by the Trustee:

B-22

CONFIDENTIAL

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

PR-INT-000011014

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

B-24

CONFIDENTIAL

PR-INT-000011015

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

           (i)        setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

           (ii)       stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest

CONFIDENTIAL

Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds

CONFIDENTIAL

purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)   Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in

B-27

PR-INT-000011018

written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

## Debt Service Reserve Account (Section 507)

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the

CONFIDENTIAL

Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement.  In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent.  Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts.  Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph.  In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any.  In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section.  Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account.  If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.  In the event

B-29

that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if

B-30

CONFIDENTIAL

PR-INT-000011021

applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii) amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv) amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as

B-31

PR-INT-000011022

practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

### Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

### Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

B-32

CONFIDENTIAL

PR-INT-000011023

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal

B-33

CONFIDENTIAL

Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

B-34

CONFIDENTIAL

PR-INT-000011025

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-35

CONFIDENTIAL

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.     No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month

CONFIDENTIAL

period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.    No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D.    *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month

B-37

Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

B-38

CONFIDENTIAL

PR-INT-000011029

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be

B-39

PR-INT-00001103

liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including

B-40

CONFIDENTIAL

the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee,

B-41

CONFIDENTIAL

PR-INT-000011032

notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

## Supplemental Resolutions (Article IX)

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

      (i)    to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

      (ii)    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

      (iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

      (iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

B-42

(v)     to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)     to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)     to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)     as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

B-43

PR-INT-000011034

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of

B-44

PR-INT-000011035

and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

B-45

CONFIDENTIAL

PR-INT-000011036

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the

B-46

CONFIDENTIAL

interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

CONFIDENTIAL

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution,

B-48

except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

B-49

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used

B-50

for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by

B-51

PR-INT-000011042

the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-52

CONFIDENTIAL

**APPENDIX C**

### AMENDMENTS TO THE GENERAL RESOLUTION

On June 10, 2009, the Corporation approved the Sixth Supplemental Sales Tax Revenue Bond Resolution for the purpose of providing for the First Amendment to the Sales Tax Revenue Bond Resolution. The amendments generally consist of edits to conform the General Resolution to amendments made to Act 91, edits required to accommodate the issuance of First Subordinate Bonds (and incurrence of First Subordinate Obligations) and Second Subordinate Bonds (and incurrence of Second Subordinate Obligations), and clarifying and miscellaneous amendments.

#### A. Edits to conform to Act 91 Amendments.

1. The following definitions in the General Resolution were amended to take account of renumbering or redesignation of sections in Act 91:

"Dedicated Sales Tax" shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

"Dedicated Sales Tax Fund" shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

"Pledged Sales Tax" shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

2. The following definitions in the General Resolution were amended and/or added to take account of the expansion in Act 91 of the scope of the Pledged Sales Tax Base Amount:

"Pledged Sales Tax Base Amount" means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

"Pledged Sales Tax Additional Base Amount" means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

"Pledged Sales Tax Original Base Amount" means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

3. The following text, amending and expanding the scope of Section 706 of the General Resolution, was added to the General Resolution:

PR-INT-000011044

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

4. The terms "Repayment Project" and "Repayment Project Fund" in the General Resolution were amended to read "Project" and "Project Fund" in recognition of the expansion of the corporate purposes of the Corporation contained in Act 91.

B. **Edits to accommodate issuance of First Subordinate and Second Subordinate Bonds.**

1. The following definitions were added to the General Resolution to add the concept of First Subordinate Bonds (and First Subordinate Obligations) and Second Subordinate Bonds (and Second Subordinate Obligations):

"First Subordinate Bonds" means the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

"First Subordinate Credit Facility" shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

C-2

CONFIDENTIAL

"First Subordinate Credit Facility Provider" shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

"First Subordinate Hedge Obligations" means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

"First Subordinate Obligations" means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

"First Subordinate Qualified Hedge Provider" shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

"First Subordinate Reimbursement Obligations" means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

"First Subordinate Series 2009A Bonds" means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

"Second Subordinate Bonds" means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

"Second Subordinate Coverage Test" shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

"Second Subordinate Credit Facility" shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

"Second Subordinate Credit Facility Provider" shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

"Second Subordinate Hedge Obligations" means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

"Second Subordinate Obligations" means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

"Second Subordinate Qualified Hedge Provider" shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with

C-3

respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

"Second Subordinate Reimbursement Obligations" means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

"Class Priority" shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to the respective payment priorities set forth in the applicable Series Resolution.

*2. The following definitions and text were added to the General Resolution to provide for the creation of Holding Subaccounts in the Debt Service Account for Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds to set up escrows that are to be accumulated over time in anticipation of payment of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds with balloon maturity payments:*

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution

"Holding Subaccount" means each Account by that name established in a Debt Service Account pursuant to Section 502.

[New Section 506.7] There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

*3. The following definitions were added to the General Resolution and Section 505 of the General Resolution was amended (and the definition of "Accrued Payment Obligation" was amended) to accommodate First Subordinate and Second Subordinate Bonds in the flow of Revenues from the Revenue Account on each Revenue Account Monthly Disbursement Date, to read as follows:*

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-

<div align="center">C-4</div>

month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

[Section 505.1] All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In

C-5

addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15- Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax

C-6

CONFIDENTIAL

Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2. Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

4. *The following definitions were added to the General Resolution, the provisions of Section 710 in the General Resolution regarding requirements for the issuance of Senior Bonds were supplemented, and requirements for the issuance of First Subordinate Bonds (and incurrence of First Subordinate Obligations) and Second Subordinate Bonds (and incurrence of Second Subordinate Obligations) were added, to read as follows:*

"Related August 2 Computation Period" shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

[Section 710.1] 1. No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant

C-7

period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

1   (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.   (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.   (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.   No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such

C-8

PR-INT-000011051

Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. except with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. except with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

C-9

PR-INT-000011052

5. *A new subsection to Section 710.3 in the General Resolution was added to accommodate Subordinate Bonds and Subordinate Obligations of a Class Priority lower than First Subordinate and Second Subordinate, to read as follows:*

[Section 710.3] The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

### C. Miscellaneous and Clarifying Amendments.

1. *A definition added to the General Resolution to accommodate direct receipt by the Corporation of tax credits for issuance of Bonds that qualify as "Build America Bonds", as follows:*

"Build America Bond Tax Credit Receipts" shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

2. *Section 1101 of the General Resolution was amended to* <u>*delete*</u> *the following text regarding Events of Default:*

"2. The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax shall not constitute a default or Event of Default under the Resolution."

3. *Section 202 of the General Resolution was amended to insert the requirement that all new Bonds must be payable as to principal on August 1 of the related year.*

4. *Section 203 of the General Resolution was amended to clarify that Refunding Bonds must always be tested under the requirements of Section 710.*

5. *Section 205 of the General Resolution was amended to add the statement that, among other factors, a Supplemental Resolution may set forth outstanding rating requirements for Credit Facility Providers that must be maintained in order for the Credit Facility Providers to retain rights of approval or consent under the General Resolution.*

6. *The definitions of "Bonds" and "Subordinate Bonds" in the General Resolution were amended to expand the concept to include notes, debentures or any other evidence of indebtedness.*

7. *The concept of "Outstanding" in the General Resolution was amended to expand its application to Parity Obligations or Subordinate Obligations that have not been fully paid and satisfied.*

C-10

CONFIDENTIAL

APPENDIX D

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

June 18, 2009

Puerto Rico Sales Tax Financing Corporation
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Re:

**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds**
**$ _____ First Subordinate Series 2009A**
**$ _____ Senior Series 2009C**

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented ("Act 91"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of the Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (as amended and supplemented prior to the date hereof, the "General Resolution") and a Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors on June 10, 2009 (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

**Sales Tax Revenue Bonds**

**$ First Subordinate Series 2009A**

| Serial Bond Maturity | Principal Amount | Interest Rate |
|---|---|---|

$ Term Bonds due _____

**$ Senior Series 2009C**

| Serial Bond Maturity | Principal Amount | Interest Rate |
|---|---|---|

$ Term Bonds due _____

CONFIDENTIAL

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of providing funds for the purposes provided in Article 2 of Act 91.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), and other Revenues (as such terms are defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York.  The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

The Internal Revenue Code of 1986, as amended (the "Code") establishes requirements that must be met subsequent to the initial issuance and delivery of the Bonds in order that interest on the Bonds not be included, on and after the date of such issuance and delivery, in gross income for Federal income tax purposes under the Code.  The Corporation has established procedures in the Resolution to meet the requirements of the Code.  The Corporation has also covenanted in the Resolution to comply with the requirements of Section 143 and 148 of the Code.  In our opinion, the procedures that have been established as of the date hereof in the Resolution are sufficient, if followed by the Corporation, to comply with the requirements of the Code.  Our opinion in paragraph 6 below is rendered on the assumption that the Corporation will carry out the aforementioned procedures and comply with the aforementioned covenants.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     Act 91 is valid in all respects material to the matters covered by this opinion.  The Corporation is duly constituted and validly existing as a public corporation and governmental instrumentality of the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid and binding limited obligations of the Corporation, enforceable in accordance with their terms.  The Bonds are payable solely from, and secured by a valid and binding pledge under the Resolution of, the Pledged Property held under the Resolution, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

CONFIDENTIAL                                                                                   PR-INT-0000110!

(4)     The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

(5)     Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a)(i) assuming compliance with certain conditions imposed by applicable Federal tax law as described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to applicable Federal tax law, and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations; and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation. Additionally, certain provisions of the Code may affect the tax treatment of interest on the Bonds for certain Bondowners, and certain requirements of the Code must be satisfied after the date of issuance of the Bonds in order to maintain the exclusion from gross income of interest thereon under Federal law.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from [in] gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

We express no opinion in this letter regarding the validity under Commonwealth law of imposition of the Commonwealth Sales Tax or the validity under Commonwealth law, including under the Constitution of Puerto Rico, of assignment to the Corporation of total ownership of the right to future receipts of a portion of the Commonwealth Sales Tax pursuant to the terms of Act 91.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and, in our opinion, the form of said Bond and its execution are regular and proper.

Very truly yours,

D-3

CONFIDENTIAL

PR-INT-000011056

(This page intentionally left blank)

CONFIDENTIAL

APPENDIX E

BOOK-ENTRY SYSTEM

**The Depository Trust Company**

DTC will act as securities depository for the Series 2009A Bonds. The Series 2009A Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2009A Bond certificate will be issued for each stated maturity of the Series 2009A Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Series 2009A Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2009A Bonds on DTC's records. The ownership interest of each actual purchaser of the Series 2009A Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2009A Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 2009A Bonds, except in the event that use of the book-entry system for the Series 2009A Bonds is discontinued.

To facilitate subsequent transfers, the Series 2009A Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series 2009A Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2009A Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2009A Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2009A Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2009A Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2009A Bonds documents. For example, Beneficial Owners of Series 2009A Bonds may wish to ascertain that the nominee holding the Series 2009A Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2009A Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2009A Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2009A Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Series 2009A Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2009A Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such

CONFIDENTIAL

circumstances, in the event that a successor depository is not obtained, Series 2009A Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series 2009A Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES 2009A BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES 2009A BONDS.

E-3

CONFIDENTIAL

(This page intentionally left blank)

CONFIDENTIAL

# APPENDIX F

## TABLE OF COMPOUNDED AMOUNTS FOR CAPITAL APPRECIATION BONDS

| Date | Capital Appreciation Bonds Due 2030 | Capital Appreciation Bonds Due 2031 | Capital Appreciation Bonds Due 2034 |
|------|------|------|------|
| 06/18/2009 | $1,199.45 | $1,091.50 | $ 861.40 |
| 08/01/2009 | 1,209.15 | 1,100.50 | 868.60 |
| 02/01/2010 | 1,250.75 | 1,139.00 | 899.55 |
| 08/01/2010 | 1,293.70 | 1,178.85 | 931.60 |
| 02/01/2011 | 1,338.20 | 1,220.15 | 964.80 |
| 08/01/2011 | 1,384.20 | 1,262.85 | 999.20 |
| 02/01/2012 | 1,431.80 | 1,307.05 | 1,034.75 |
| 08/01/2012 | 1,481.00 | 1,352.80 | 1,071.65 |
| 02/01/2013 | 1,531.90 | 1,400.15 | 1,109.80 |
| 08/01/2013 | 1,584.55 | 1,449.15 | 1,149.35 |
| 02/01/2014 | 1,639.05 | 1,499.85 | 1,190.30 |
| 08/01/2014 | 1,695.40 | 1,552.35 | 1,232.70 |
| 02/01/2015 | 1,753.65 | 1,606.70 | 1,276.60 |
| 08/01/2015 | 1,813.95 | 1,662.90 | 1,322.10 |
| 02/01/2016 | 1,876.30 | 1,721.15 | 1,369.20 |
| 08/01/2016 | 1,940.80 | 1,781.35 | 1,418.00 |
| 02/01/2017 | 2,007.50 | 1,843.70 | 1,468.50 |
| 08/01/2017 | 2,076.50 | 1,908.25 | 1,520.80 |
| 02/01/2018 | 2,147.90 | 1,975.05 | 1,575.00 |
| 08/01/2018 | 2,221.75 | 2,044.15 | 1,631.10 |
| 02/01/2019 | 2,298.10 | 2,115.70 | 1,689.20 |
| 08/01/2019 | 2,377.10 | 2,189.75 | 1,749.40 |
| 02/01/2020 | 2,458.80 | 2,266.40 | 1,811.70 |
| 08/01/2020 | 2,543.35 | 2,345.75 | 1,876.25 |
| 02/01/2021 | 2,630.75 | 2,427.85 | 1,943.10 |
| 08/01/2021 | 2,721.20 | 2,512.80 | 2,012.35 |
| 02/01/2022 | 2,814.75 | 2,600.75 | 2,084.00 |
| 08/01/2022 | 2,911.50 | 2,691.80 | 2,158.25 |
| 02/01/2023 | 3,011.60 | 2,786.00 | 2,235.15 |
| 08/01/2023 | 3,115.10 | 2,883.50 | 2,314.80 |
| 02/01/2024 | 3,222.20 | 2,984.45 | 2,397.25 |
| 08/01/2024 | 3,332.95 | 3,088.90 | 2,482.65 |
| 02/01/2025 | 3,447.55 | 3,197.00 | 2,571.10 |
| 08/01/2025 | 3,566.05 | 3,308.90 | 2,662.70 |
| 02/01/2026 | 3,688.65 | 3,424.70 | 2,757.55 |
| 08/01/2026 | 3,815.45 | 3,544.55 | 2,855.80 |
| 02/01/2027 | 3,946.60 | 3,668.65 | 2,957.55 |
| 08/01/2027 | 4,082.25 | 3,797.05 | 3,062.90 |
| 02/01/2028 | 4,222.55 | 3,929.95 | 3,172.00 |
| 08/01/2028 | 4,367.75 | 4,067.50 | 3,285.00 |
| 02/01/2029 | 4,517.85 | 4,209.85 | 3,402.05 |
| 08/01/2029 | 4,673.15 | 4,357.20 | 3,523.25 |
| 02/01/2030 | 4,833.80 | 4,509.70 | 3,648.75 |
| 08/01/2030 | 5,000.00 | 4,667.55 | 3,778.75 |
| 02/01/2031 | - | 4,830.90 | 3,913.35 |
| 08/01/2031 | - | 5,000.00 | 4,052.75 |
| 02/01/2032 | - | - | 4,197.15 |
| 08/01/2032 | - | - | 4,346.70 |
| 02/01/2033 | - | - | 4,501.55 |
| 08/01/2033 | - | - | 4,661.90 |
| 02/01/2034 | - | - | 4,828.00 |
| 08/01/2034 | - | - | 5,000.00 |

CONFIDENTIAL

(This page intentionally left blank)

PR-INT-00001106

APPENDIX G

**TABLE OF COMPOUNDED AMOUNTS FOR
CONVERTIBLE CAPITAL APPRECIATION BONDS**

| Date | Convertible Capital Appreciation Bonds Due 2032 |
|---|---|
| 06/18/2009 | $3,116.80 |
| 08/01/2009 | 3,141.60 |
| 02/01/2010 | 3,247.60 |
| 08/01/2010 | 3,357.25 |
| 02/01/2011 | 3,470.55 |
| 08/01/2011 | 3,587.65 |
| 02/01/2012 | 3,708.75 |
| 08/01/2012 | 3,833.90 |
| 02/01/2013 | 3,963.30 |
| 08/01/2013 | 4,097.10 |
| 02/01/2014 | 4,235.35 |
| 08/01/2014 | 4,378.30 |
| 02/01/2015 | 4,526.05 |
| 08/01/2015 | 4,678.80 |
| 02/01/2016 | 4,836.75 |
| 08/01/2016 | 5,000.00 |
| 02/01/2017 | - |
| 08/01/2017 | - |
| 02/01/2018 | - |
| 08/01/2018 | - |
| 02/01/2019 | - |
| 08/01/2019 | - |
| 02/01/2020 | - |
| 08/01/2020 | - |
| 02/01/2021 | - |
| 08/01/2021 | - |
| 02/01/2022 | - |
| 08/01/2022 | - |
| 02/01/2023 | - |
| 08/01/2023 | - |
| 02/01/2024 | - |
| 08/01/2024 | - |
| 02/01/2025 | - |
| 08/01/2025 | - |
| 02/01/2026 | - |
| 08/01/2026 | - |
| 02/01/2027 | - |
| 08/01/2027 | - |
| 02/01/2028 | - |
| 08/01/2028 | - |
| 02/01/2029 | - |
| 08/01/2029 | - |
| 02/01/2030 | - |
| 08/01/2030 | - |
| 02/01/2031 | - |
| 08/01/2031 | - |
| 02/01/2032 | - |
| 08/01/2032 | - |

CONFIDENTIAL

(This page intentionally left blank)

CONFIDENTIAL

PR-INT-000011065

NEW ISSUE – BOOK-ENTRY ONLY                                    RATINGS: See RATINGS herein

<div align="center">

SUPPLEMENT TO OFFICIAL STATEMENT, DATED JUNE 10, 2009
RELATING TO

$4,118,153,700
PUERTO RICO SALES TAX FINANCING CORPORATION
Sales Tax Revenue Bonds, First Subordinate Series 2009A

$237,875,000
# PUERTO RICO SALES TAX FINANCING CORPORATION
## Sales Tax Revenue Bonds, Senior Series 2009C

</div>

This Supplement sets forth certain information in connection with the issuance and sale by Puerto Rico Sales Tax Financing Corporation (the "Corporation,") of its $237,875,000 Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds"), which will be sold to certain institutional investors in the United States tax-exempt market. The Series 2009C Bonds will be issued by the Corporation on June 18, 2009.

Concurrently with the issuance of the Series 2009C Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds") and its Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds" and, together with the Series 2009A Bonds, the "Series 2009 Bonds"). The Series 2009B Bonds are being offered for sale solely in Puerto Rico. Both the Series 2009A Bonds and the Series 2009B Bonds are being offered pursuant to separate Official Statements. The issuance of the Series 2009C Bonds is not contingent upon the issuance of the Series 2009A Bonds or the Series 2009B Bonds.

The Series 2009A Bonds are being offered pursuant to an Official Statement dated June 10, 2009 (the "Official Statement"). This is a Supplement to the Official Statement. The information provided herein supplements the information appearing in the Official Statement as it relates solely to the Series 2009C Bonds.

All the information appearing in the Official Statement, other than information pertaining to the subordinate lien of the Series 2009A Bonds, the information appearing under the captions THE SERIES 2009A BONDS, PLAN OF FINANCING and UNDERWRITING, is applicable to the Series 2009C Bonds, except as otherwise indicated in this Supplement. The Series 2009C Bonds will constitute Senior Bonds as such term is used in the Official Statement. The proposed form of opinion of Bond Counsel included as *Exhibit D* to the Official Statement includes the Series 2009C Bonds.

**This Supplement is intended to be read solely in conjunction with the Official Statement, which will be attached to this Supplement. To make an informed decision regarding the Series 2009C Bonds, a prospective investor should read the Official Statement and this Supplement in their entirety. Capitalized terms not otherwise defined herein shall have the meaning given them in the Official Statement.**

<div align="center">

## Citi                                    Barclays Capital

</div>

June 10, 2009

CONFIDENTIAL

# $237,875,000
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, Senior Series 2009C

| Maturity Date August 1 | Initial Principal Amount | Interest Rate | Price | CUSIP* |
|---|---|---|---|---|
| 2057 | $237,875,000 | 5.75% | 100% | 74529JHV0 |

---

\* Copyright 2008, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

CONFIDENTIAL

## THE SERIES 2009C BONDS

### General

The Series 2009C Bonds will be issued pursuant to the General Resolution, as amended, and the Seventh Supplemental Resolution, will be dated their date of delivery, and will be issued in the principal amount of $237,875,000. The Series 2009C Bonds will bear interest at the rate and mature (subject to the rights of redemption described below) on the date shown on the inside cover page of this Supplement. Interest on the Series 2009C Bonds will accrue from their date of delivery and will be payable semi-annually to maturity (or earlier redemption) on February 1 and August 1, commencing on August 1, 2009.

The Series 2009C Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof. Interest on the Series 2009C Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2009C Bonds will be registered under The Depository Trust Company's Book-Entry Only system described in the Official Statement and in *Appendix E* to the Official Statement. Certificated Series 2009C Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2009C Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" in the Official Statement.

The Corporation may issue additional bonds on a parity with the Series 2009C Bonds and the Outstanding Senior Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS in the Official Statement. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and the Series 2009C Bonds, and on a parity with the Series 2009 Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS in the Official Statement.

### Redemption

The Series 2009C Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2019, at a redemption price equal to the principal amount of the Series 2009C Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Notice of Redemption.* In the event any Series 2009C Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Series 2009C Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2009C Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2009C Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2009C Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2009C Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such

1

PR-INT-000011068

redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2009C Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2009C Bonds, and the portions of the Series 2009C Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2009C Bonds or portions thereof to be redeemed will cease to bear interest.

Any notice of optional redemption of Series 2009C Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of and interest on such Series 2009C Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of and interest on the Series 2009C Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2009C Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of and premium, if any, and interest on the Series 2009C Bonds (or portions thereof) to be redeemed, then the Series 2009C Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest, and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## SECURITY FOR THE BONDS

Pursuant to the Resolution, the Series 2009C Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2009C Bonds are issued on a parity with the Outstanding Senior Bonds and Outstanding Parity Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2009 Bonds.

Except for the information set forth under the heading "*General*" and "*Subordination Provisions of the Series 2009A Bonds*," which do not apply to the Series 2009C Bonds, all other information regarding the Series 2009A Bonds set forth under the caption SECURITY FOR THE BONDS in the Official Statement is applicable to the Series 2009C Bonds.

## RISK FACTORS

Except for the information set forth under the heading "*Limited Nature of Remedies,*" the information set forth under the caption RISK FACTORS in the Official Statement is applicable to the Series 2009C Bonds.

2

CONFIDENTIAL

## PLAN OF FINANCING

**Overview**

The Corporation will use the proceeds of Series 2009C Bonds, together with other funds available to the Corporation, to retire its Series 2007A LIBOR-Based Adjustable Rate Bonds in the principal amount of $300,000,000 (the "Retired Bonds") and to make the termination payments under three interest rate swap agreements related to the Retired Bonds.

**Estimated Sources and Uses of Funds**

| Sources | |
|---|---:|
| Principal Amount of the Series 2009C Bonds | $237,875,000.00 |
| Other Corporation Funds | 5,616,832.25 |
| **Total Sources** | **$243,491,832.25** |

| Uses | |
|---|---:|
| Retirement of Outstanding Bonds | $183,638,334.25 |
| Swap Termination Payments | 58,456,346.00 |
| Underwriters' Discount and Other Costs of Issuance[1] | 1,397,152.00 |
| **Total Uses** | **$243,491,832.25** |

[1] Includes legal, printing and other financing expenses.

## TAX MATTERS

All information pertaining to the Series 2009A Bonds appearing under the caption TAX MATTERS in the Official Statement applies equally to the Series 2009C Bonds.

## RATINGS

It is a condition to the obligation of the Underwriters to purchase the Series 2009C Bonds, that, at the date of the delivery thereof, Standard & Poor's Ratings Services and Moody's Investors Service assign the Series 2009C Bonds a rating of "AA-" and a rating of "Aa3," respectively. These ratings will only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2009C Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS in the Official Statement. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

3

PR-INT-000011070

## UNDERWRITING

The Underwriters have agreed, subject to certain conditions, to purchase from the Corporation the Series 2009C Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $236,898,599.80 reflecting an underwriters' discount of $976,400.20, and to reoffer such Series 2009C Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. The Underwriters' obligation is subject to certain conditions precedent, and it will be obligated to purchase all such Series 2009C Bonds if any Series 2009C Bonds are purchased.

## MISCELLANEOUS

The information set forth in this Supplement was supplied by certain officials of the Corporation, in their official capacities.

<div align="right">

PUERTO RICO SALES TAX FINANCING
CORPORATION

By: _____ /s/ Fernando L. Batlle _____
Executive Director

</div>

4

# Exhibit 12

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):

S&P: A+
Moody's: A2
Fitch: A

**$1,217,915,799.20**
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2009B**

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes described herein. Concurrently with the issuance of the Series 2009B Bonds, the Corporation issued its Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds" and, together with the Series 2009B Bonds, the "Series 2009 Bonds") and its Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds"). The Series 2009A Bonds and the Series 2009C Bonds were offered for sale to investors in the United States tax-exempt market pursuant to separate Official Statements.

**The Series 2009 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2009 Bonds are subordinate in payment priority to the Corporation's previously-issued bonds and parity obligations incurred, the Series 2009C Bonds and certain additional bonds that may be issued by the Corporation, as described herein. The Bank of New York Mellon will act as trustee (the "Trustee") under the Resolution. In connection with the issuance of the Series 2009 Bonds, the Resolution is being amended. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution* and *Appendix C – Summary of Amendments to the General Resolution*.**

The Series 2009B Bonds have the following characteristics:

- The Series 2009B Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount (or maturity amount, in the case of Capital Appreciation Bonds and Convertible Capital Appreciation Bonds) and integral multiples thereof.

- The Series 2009B Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2009B Bonds on the records of The Depository Trust Company and its participants.

- The Series 2009B Bonds are being issued as Current Interest Bonds, Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. Interest on the Current Interest Bonds will be payable monthly on the first day of each month, commencing on August 1, 2009. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on August 1, 2009, and will be payable at maturity. Interest on the Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 will not be payable on a current basis but will compound from their date of delivery on a semi-annual basis on each February 1 and August 1, commencing on August 1, 2009, to and including August 1, 2016 (August 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031) (the "Current Interest Commencement Date"), and will be payable at maturity (or earlier redemption). After the applicable Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 will be payable monthly on the first day of each month, commencing on September 1, 2016 (September 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031). The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Series 2009B Bonds.

- The Current Interest Bonds are subject to redemption at the option of the Corporation on August 1, 2014, and on a monthly basis thereafter on each interest payment date, subject to at least 30 days prior notice. The Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 are subject to redemption at the option of the Corporation on August 1, 2021 (August 1, 2025 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031), and on a monthly basis thereafter on each interest payment date, subject to at least 30 days prior notice.

- This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision. Prospective investors should consider the information set forth in RISK FACTORS before investing.

- In the opinion of Bond Counsel to the Corporation, as described herein, under existing statutes the Series 2009B Bonds, and the interest thereon, are exempt from Commonwealth of Puerto Rico income, municipal license and property taxes. Under most circumstances, interest on the Series 2009B Bonds will be exempt from United States income taxes to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. See TAX MATTERS herein. The Corporation has determined, based on the advice of counsel, that interest on the Series 2009B Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Series 2009B Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico.

- The Series 2009B Bonds will be dated their date of delivery.

- It is expected that the Series 2009B Bonds will be delivered through The Depository Trust Company on or about June 25, 2009.

**The Series 2009B Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2009B Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2009B Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by O'Neill & Borges, San Juan, Puerto Rico, Bond Counsel to the Corporation. Certain legal matters will be passed for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Underwriters' Counsel.*

*Joint Lead Managers*

**UBS Financial Services Incorporated of Puerto Rico**    **Popular Securities**    **Santander Securities**

| | | |
|---|---|---|
| **Barclays Capital** | **BBVAPR MSD** | **Citi** |
| **Merrill Lynch & Co.** | **Oriental Financial Services** | **Raymond James** |
| **Samuel A. Ramirez & Co., Inc.** | **Scotia Capital** | **Wachovia Capital Markets, LLC** |

June 19, 2009

PR-CCD-0009366

<div align="center">

**$1,217,915,799.20**
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2009B**

</div>

<div align="center">

**$957,410,000 Current Interest Bonds**

</div>

$434,065,000 6.05% Term Bonds due August 1, 2029; Price: 100%; Yield: 6.05%; CUSIP[*] 74529JGN9
$523,345,000 6.35% Term Bonds due August 1, 2039; Price: 100%; Yield: 6.35%; CUSIP[*] 74529JGP4

<div align="center">

**$53,551,619.40 Capital Appreciation Bonds**

</div>

| Maturity Date August 1 | Initial Principal Amount | Maturity Amount | Yield | Price | CUSIP[*] |
|---|---|---|---|---|---|
| 2033 | $18,551,553.90 | $106,270,000.00 | 7.375% | 17.457 | 74529JGR0 |
| 2035 | 35,000,065.50 | 237,950,000.00 | NRO | NRO | 74529JHY4 |

<div align="center">

**$206,954,179.80 Convertible Capital Appreciation Bonds**

</div>

| Maturity Date August 1 | Initial Principal Amount | Compounded Amount as of August 1, 2016 and Amount Due at Maturity | Yield | Price | CUSIP[*] |
|---|---|---|---|---|---|
| 2025 | $ 50,002,303.80 | $80,940,000.00 | NRO | NRO | 74529JHW8 |
| 2026 | 50,002,303.80 | 80,940,000.00 | NRO | NRO | 74529JHX6 |

| Maturity Date August 1 | Initial Principal Amount | Compounded Amount as of August 1, 2020 and Amount Due at Maturity | Yield[†] | Price | CUSIP[*] |
|---|---|---|---|---|---|
| 2031 | $106,949,572.20 | $229,540,000.00 | 7.00% | 46.593 | 74529JGQ2 |

---

[*] Copyright 2008, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[†] Yield to August 1, 2025, the first redemption date.

PR-CCD-0009367

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2009B Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2009B Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2009B Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2009B Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Series 2009B Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

(This page intentionally left blank)

## TABLE OF CONTENTS

**Page**

SUMMARY ............................................................................... i
INTRODUCTION ................................................................. 1
  The Corporation ................................................................. 1
  Sales and Use Tax ............................................................. 2
  Dedicated Sales Tax Fund ................................................ 2
  The Resolution .................................................................. 2
  Outstanding Senior Bonds and Parity Obligations ............. 2
  Subordinate Bonds ............................................................ 3
  Source of Payment and Security for the Bonds ................. 3
PLEDGED SALES TAX ....................................................... 4
  Commonwealth Sales Tax Revenues ................................ 4
  Commonwealth Sales Tax Collections and Projections ...... 5
  Collections by Source ....................................................... 7
  Economic Indicators ......................................................... 8
  Dedicated Sales Tax Fund ............................................... 10
  Pledged Sales Tax Base Amount ..................................... 10
  Act 7 ................................................................................ 12
  Procedures for the Collection and Deposit of the Pledged
    Sales Tax in the Dedicated Sales Tax Fund ................. 12
  Commonwealth Sales Tax Enforcement Initiatives .......... 15
THE SERIES 2009B BONDS ............................................. 16
  General ............................................................................. 16
  Redemption ...................................................................... 17
  Book-Entry Only System ................................................. 19
SECURITY FOR THE BONDS ........................................... 19
  General ............................................................................. 19
  Commonwealth Non-Impairment Covenant ..................... 19
  Property Pledged for the Payment of the Series 2009B
    Bonds ......................................................................... 20
  Outstanding Senior Bonds and Parity Obligations ........... 21
  Subordination Provisions of the Series 2009B Bonds ...... 21
  Funds and Accounts under the Resolution ........................ 21
  Additional Bonds, Refunding Bonds and Other
    Obligations ................................................................. 24
  Commonwealth's Authority to Cover Deficiencies .......... 26
RISK FACTORS ................................................................. 27
  Economic Conditions Could Affect Commonwealth Sales
    Tax Revenues .............................................................. 27
  Legislative Assembly Authority over the Commonwealth
    Sales Tax ..................................................................... 27
  Certain Constitutional Considerations Relating to Act 91  28

**Page**

  Limited Nature of Ratings; Reductions, Suspension or
    Withdrawal of a Rating .............................................. 29
  Limited Nature of Remedies ............................................ 29
  There is no Assurance that a Secondary Market for the
    Series 2009B Bonds will Develop ............................... 30
AGGREGATE DEBT SERVICE REQUIREMENTS ......... 31
PLAN OF FINANCING ...................................................... 34
  Overview .......................................................................... 34
  Estimated Sources and Uses of Funds ............................. 34
THE CORPORATION ......................................................... 34
  Other Obligations of the Corporation ............................... 35
TAX MATTERS ................................................................. 35
  Puerto Rico Tax Considerations for Puerto Rico
    Residents .................................................................... 36
  United States Federal Tax Considerations for Puerto Rico
    Residents .................................................................... 36
  Backup Withholding ........................................................ 38
  No Opinion as to Exclusion under Section 103(a) of the
    Code ........................................................................... 38
RATINGS ........................................................................... 38
LEGALITY FOR INVESTMENT ....................................... 39
UNDERWRITING .............................................................. 39
LEGAL MATTERS ............................................................ 39
CONTINUING DISCLOSURE ............................................ 39
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
  RICO ................................................................................ 41
MISCELLANEOUS ........................................................... 41

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
  Provisions of the Resolution ............................................ B-1
APPENDIX C – Summary of Amendments to the General
  Resolution ....................................................................... C-1
APPENDIX D – Proposed Form of Approving Opinion of
  Bond Counsel to the Corporation ..................................... D-1
APPENDIX E – Book-Entry Only System ......................... E-1
APPENDIX F – Table of Compounded Amounts for
  Capital Appreciation Bonds ............................................. F-1
APPENDIX G – Table of Compounded Amounts for
  Convertible Capital Appreciation Bonds .......................... G-1

(This page intentionally left blank)

PR-CCD-0009371

# SUMMARY

This summary highlights selected information contained elsewhere in this Official Statement. Because it is a summary, it does not contain all the information that a purchaser should consider before purchasing the Series 2009B Bonds. A purchaser should read the entire Official Statement.

Offering .......................................The Sales Tax Revenues Bonds, First Subordinate Series 2009B Bonds (the "Series 2009B Bonds") are being offered for sale to investors in the Commonwealth of Puerto Rico (the "Commonwealth"). Concurrently with the issuance of the Series 2009B Bonds, the Corporation issued its Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds") and its Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds") for sale to investors in the United States tax-exempt market in an aggregate initial principal amount of $4,118,153,700 and $237,875,000, respectively. The Series 2009A Bonds and the Series 2009C Bonds were offered by means of separate Official Statements and are not being offered hereby.

Issuer ..........................................Puerto Rico Sales Tax Financing Corporation (the "Corporation"), an independent governmental instrumentality of the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth of Puerto Rico (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 6, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009, and Act No. 18, approved May 22, 2009 (collectively, "Act 91").

Principal Amount ......................$1,217,915,799.20

Use of Proceeds.........................The Corporation will use the proceeds from the sale of the Series 2009B Bonds for the purposes authorized by Act 91. See *"The Corporation"* under INTRODUCTION.

Interest on the Series 2009B
Bonds ........................................Interest on the Current Interest Bonds will be payable monthly on the first day of each month, commencing on August 1, 2009. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on August 1, 2009, and will be payable at maturity. Interest on the Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 will not be payable on a current basis but will compound from their date of delivery on a semi-annual basis on each February 1 and August 1, commencing on August 1, 2009, to and including August 1, 2016 (August 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031) (the "Current Interest Commencement Date"), and will be payable at maturity (or earlier redemption). After the applicable Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 will be payable monthly on the first day of each month, commencing on September 1, 2016 (September 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031). The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Series 2009B Bonds.

i

Book-Entry Form ........................The Series 2009B Bonds will be issued in book-entry form through the book-entry system of The Depository Trust Company. Purchasers of the Series 2009B Bonds will not receive physical delivery of the Series 2009B Bonds.

Security .....................................The Series 2009B Bonds will be payable solely from, and secured (on a subordinate basis) by a security interest granted under the Sales Tax Revenue Bond Resolution, as amended, in the Pledged Property, consisting primarily of the Pledged Sales Tax. The Series 2009B Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor any of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2009B Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.

Redemption ...............................The Current Interest Bonds are subject to redemption at the option of the Corporation on August 1, 2014, and on a monthly basis thereafter on each interest payment date, subject to at least 30 days prior notice. The Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 are subject to redemption at the option of the Corporation on August 1, 2021 (August 1, 2025 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031), and on a monthly basis thereafter on each interest payment date, subject to at least 30 days prior notice.

Additional Bonds .......................Under the Sales Tax Revenue Bond Resolution, as amended, the Corporation may issue additional bonds and incur additional obligations subject to the applicable additional bonds test and solely for the purposes described in Act 91.

Risk Factors...............................Prospective investors should consider the information set forth in RISK FACTORS before investing.

Absence of Public Market..........The Series 2009B Bonds are a new issue of securities. There is no assurance that a secondary market for the Series 2009B Bonds will develop, or if it does develop, that it will provide the holders of the Series 2009B Bonds with liquidity for their investment or that it will continue for the life of the Series 2009B Bonds. Although the Underwriters have advised the Corporation that they presently intend to make a market in the Series 2009B Bonds as permitted by applicable laws, the Underwriters are not obligated to do so and any such market-making may be discontinued at any time at the sole discretion of the Underwriters.

Governing Law...........................All rights and obligations under the Series 2009B Bonds will be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

Ratings ......................................The Series 2009B Bonds have been assigned ratings of A+ by S&P, A2 by Moody's, and A by Fitch. See RATINGS herein.

Tax Matters ...............................In the opinion of Bond Counsel, under existing statutes, the Series 2009B Bonds and the interest thereon are exempt from Commonwealth of Puerto Rico income, municipal license and property taxes. Under most circumstances, interest on the Series 2009B Bonds will be exempt from United States income taxes to (i) individuals who are bona fide residents of Puerto Rico during the

ii

PR-CCD-0009373

entire taxable year in which such interest is received and (ii) Puerto Rico corporations. See TAX MATTERS for a description of these and other tax considerations.

PR-CCD-0009374

(This page intentionally left blank)

PR-CCD-0009375

# $1,217,915,799.20
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2009B

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $1,217,915,799.20 Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"). Concurrently with the issuance of the Series 2009B Bonds, the Corporation issued its Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds" and, together with the Series 2009B Bonds, the "Series 2009 Bonds") and its Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds"). The Series 2009A Bonds and the Series 2009C Bonds were offered for sale to investors in the United States tax-exempt market pursuant to separate Official Statements. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth of Puerto Rico (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 6, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation was originally created for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006. Such Commonwealth debt obligations, payable solely from Commonwealth budgetary appropriations, are generally referred to as the "2006 Appropriation Debt."

Recently, the Legislative Assembly expanded the purposes of the Corporation and increased the Corporation's dedicated revenues by increasing from 1% to 2.75% (out of a total sales tax of 5.5%, as described below) the portion of the Commonwealth Sales Tax (as defined below) transferred to the Corporation. The Corporation is now authorized to pay or finance, in whole or in part, or fund, in addition to the 2006 Appropriation Debt: (i) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (ii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (v) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vi) the Puerto Rico Economic Stimulus Fund, (vii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

The recent expansion of the Corporation's purposes and the increase in the Corporation's dedicated revenues are part of the new administration's recently-adopted multi-year plan to achieve fiscal balance and restore economic growth to the Commonwealth. For a summary of the multi-year plan, see *Appendix A – Commonwealth Economic Information.*

1

PR-CCD-0009376

## Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

## Dedicated Sales Tax Fund

Act 91 established the Dedicated Sales Tax Fund (also known by the acronym of its Spanish name, as the "FIA"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) (one percent (1%) prior to July 1, 2009) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See "*Dedicated Sales Tax Fund*" under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or satisfaction of the Authorized Uses. See "*Dedicated Sales Tax Fund*" and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

## The Resolution

The Series 2009 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Sixth Supplemental Sales Tax Bond Resolution, which amends the General Resolution (the "Sixth Supplemental Resolution"), and a Seventh Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2009A Bonds and the Series 2009C Bonds (the "Seventh Supplemental Resolution"), adopted by the Board of Directors of the Corporation on June 10, 2009, and an Eighth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2009B Bonds (the "Eighth Supplemental Resolution") (the General Resolution, as amended by the Sixth Supplemental Resolution, the Seventh Supplemental Resolution and the Eighth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 17, 2009, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) will act as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution* and for a summary of the amendments to the Resolution included in the Sixth Supplemental Resolution, see *Appendix C – Summary of Amendments to the General Resolution*.

## Outstanding Senior Bonds and Parity Obligations

The Corporation currently has outstanding $5.2 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $160.3 million accreted on existing capital appreciation bonds as of February 1, 2009. The Corporation's outstanding bonds consist of the following: Sales

2

Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), and (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds and the Series 2007C Bonds, the "Outstanding Senior Bonds").

The Corporation currently also has outstanding three interest rate swap agreements in an aggregate notional amount of $436 million, which were entered into under the Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

Prior to the issuance of the Series 2009B Bonds, the Corporation issued the Series 2009C Bonds. After giving effect to the issuance of the Series 2009C Bonds in order to retire a portion of its Series 2007A LIBOR-Based Adjustable Rate Bonds in the principal amount of $300,000,000 (the "Retired Bonds") and to make the termination payments under three interest rate swap agreements related to the Retired Bonds (two of which were terminated in full and the other was partially terminated), the Corporation will have $5.2 billion aggregate initial principal amount of Outstanding Senior Bonds and an aggregate notional amount of $136 million of Outstanding Parity Obligations.

All Outstanding Senior Bonds, the Series 2009C Bonds, and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds and the Series 2009C Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

**Subordinate Bonds**

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2009 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2009 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations.

All Series 2009 Bonds and all additional bonds issued on a parity with the Series 2009 Bonds ("Additional First Subordinate Bonds" and, together with the Series 2009 Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, the Series 2009 Bonds shall not be entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See "*Subordination Provisions of the Series 2009B Bonds*" and "*Funds and Accounts Under the Resolution*" under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred**

3

(collectively, the "**Obligations**") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.

The Series 2009B Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2009B Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.

Brief descriptions of the Corporation, the security for the Series 2009B Bonds, the terms of the Series 2009B Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

**Commonwealth Sales Tax Revenues**

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

In 2009 a special credit against the Commonwealth Sales Tax previously available to local exporters who acquired goods from local manufacturers was eliminated. The Treasury Department estimates that the elimination of this credit will generate incremental Commonwealth Sales Tax revenues for Fiscal Year 2008-2009 of approximately $5 million.

4

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support the exemption of any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly of Puerto Rico, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of September and October 2008 was due, in part, to this four and a half day tax holiday.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items would be exempt from the Commonwealth Sales Tax. Recently enacted legislation provides that, for each calendar year, the tax holiday will take place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday will take place from July 15 to July 17 of such calendar year. This tax holiday is scheduled to occur for the first time this year.

The Treasury Department does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

## Commonwealth Sales Tax Collections and Projections

The Commonwealth Sales Tax went into effect on November 15, 2006. For the twenty-nine and a half month period from November 15, 2006 through April 30, 2009, total Commonwealth Sales Tax collections have been approximately $2.8 billion, an average of $94 million per month.

*Fiscal Year 2006-2007.* For the seven and one-half months of Fiscal Year 2006-2007, when the Commonwealth Sales Tax was first imposed, collections equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections for Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2008-2009.* For the ten months ended April 30, 2009, Commonwealth Sales Tax collections totaled $910 million, or an average of $91 million per month. Collections year-to-date are 3.5% below collections for the same period in the prior Fiscal Year 2007-2008. The Treasury Department believes that this decline is due primarily to the previously mentioned four and one-half day sales tax holiday. The Treasury Department's current estimate for total Commonwealth Sales Tax collections for Fiscal Year 2008-2009 is $1.12 billion.

PR-CCD-0009380

The following tables show historical Commonwealth Sales Tax collections per month:

**Sales and Use Tax – Collection History by Month**
(Dollars in Thousands)

| | Fiscal Year | | |
| | 2006-2007 | 2007-2008 | 2008-2009 |
|---|---|---|---|
| July | - | $ 96,100 | $ 95,592 |
| August | - | 90,181 | 91,353 |
| September | - | 86,163 | 77,788 |
| October | - | 93,751 | 86,191 |
| November | $ 50,200[1] | 96,170 | 91,996 |
| December | 110,000 | 121,251 | 119,836 |
| January | 95,000 | 89,798 | 85,763 |
| February | 86,200 | 86,486 | 84,608 |
| March | 96,400 | 89,355 | 88,065 |
| April | 85,700 | 93,487 | 88,788 |
| May | 94,400 | 103,331 | |
| June | 95,460 | 97,526 | |

(1) Reflects collections beginning November 15, when the sales tax was first imposed.
Source: Treasury Department



Source: Treasury Department

*Fiscal 2009-2010.* For the Fiscal Year 2009-2010, the Treasury Department is projecting Commonwealth Sales Tax revenues of approximately $1.2 billion. This projection considers that personal consumption expenditures for Fiscal Year 2009-2010 is projected to grow by 3.2% (nominal amount), as forecast by the Puerto Rico Planning Board, and the implementation of various compliance initiatives by the Treasury Department. Beginning on July 1, 2009, the Corporation and the Treasury Department will begin reporting Commonwealth Sales Tax collections on a cash basis. The Banking Services Agreement (as defined below) has been modified to account for this change.

6

PR-CCD-0009381

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See *"Economic Conditions could affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections for Fiscal Year 2007-2008. Of the $1.14 billion in collections, approximately 52% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 13% from prepared foods, bars and full service restaurants, 11% from information and telecommunications, 10% from wholesale trade, and 4% from manufacturing, among other categories.

<p align="center"><strong>Commonwealth Sales Tax Collections<br>by Source for Fiscal Year 2007-2008</strong></p>



Source: Treasury Department

7

PR-CCD-0009382

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

<div align="center">

**Compounded Annual Growth Rates for**
**Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

</div>

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
|---|---|---|---|---|---|
| | | | Services | Non-Durable Goods | Durable Goods |
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-08 | 4.35% | 4.64% | 5.31% | 4.58% | 2.11% |
| 1947-2008 | 7.70% | 7.61% | 8.78% | 6.71% | 8.27% |

Source: Planning Board

<div align="center">

**Historical Components of Personal Consumption Expenditures and GNP**
(Measured in Current Dollars)

</div>



Source: Government Development Bank

<div align="center">8</div>

PR-CCD-0009383

   The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline.  Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during four periods.  Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by 3.1% annually during this period.

**Personal Consumption Expenditures and GNP**
(Current Dollars)



Source: Government Development Bank

**Personal Consumption Expenditures and GNP**
(Constant Dollars)



Source: Government Development Bank

9

PR-CCD-0009384

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $8.9 billion in Fiscal Year 2003-2004 to $11.9 billion in Fiscal Year 2007-2008, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 22% of personal consumption expenditures in Fiscal Year 2007-2008 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* As a result of the recent amendments to Act 91, commencing on July 1, 2009, the Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 will be $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

10

PR-CCD-0009385

The following table shows the growth of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the Outstanding Senior Bonds:

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| | | **Annual Pledged Sales Tax Base Amount** | |
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

11

PR-CCD-0009386

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Act 7**

Act 7 is the financial centerpiece of the Commonwealth's fiscal stabilization plan. Act 7 creates an integrated plan that includes: (1) operating expense-reduction measures, including various workforce reduction initiatives and a temporary freeze of salary increases and other economic benefits included in certain laws and collective bargaining agreements, (2) tax revenue enforcement measures, (3) a combination of permanent and temporary tax increases, and (4) financial measures, including the provisions that amended Act 91 to increase the amount of the Commonwealth Sales Tax pledged to the Corporation from 2% to 2.75% and the aggregate Pledged Sales Tax Base Amount from $400,192,000 to $550,264,000.

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies.

The Corporation has been advised by the Commonwealth that it will defend vigorously against the allegations contained in the complaint and that the Commonwealth continues to implement Act 7.

The Corporation is not a defendant in the complaint. The complaint does not challenge the valid existence of the Corporation, the validity of Act 91, the validity of the Bonds, or the powers of the Corporation. As discussed elsewhere in this Official Statement, Bond Counsel has opined that Act 91 is valid in all respects material to their approving opinion (see *Appendix D*). In addition, in connection with the issuance of the Bonds, the Secretary of Justice of the Commonwealth has opined that Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the

12

collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In June 2009, the Banking Services Agreement was amended to (i) add the Corporation as a party to the agreement, and (ii) make the agreement consistent with the recent amendments to Act 91.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day (effective as of December 10, 2009 and, prior to December 10, 2009, on the 20th day), the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount (after July 1, 2009). Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

PR-CCD-0009388

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred (effective as of December 10, 2009), unless otherwise provided in regulations adopted by the Secretary of the Treasury (recently enacted legislation shortened this time period from the 20th day of the following month to the 10th day of the following month).

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month (effective as of December 10, 2009). Certain large merchants and retailers are required to file their return electronically. As of February 2009, the Treasury Department reports that 87.6% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. Annually, every merchant and retailer dedicated to a business or industry that was a merchant or retailer at any time during its taxable year must file an annual return detailing all taxable transactions for the prior calendar year no later than the 15th day of the third month following the end of its taxable year. As of March 2008, 209,006 merchants and retailers are required to file a monthly return, out of which 111,000 merchants and retailers are currently filing their monthly returns.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

14

**Commonwealth Sales Tax Enforcement Initiatives**

Recently, the Treasury Department announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of aggressive enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department, through the implementation of its recently announced enforcement programs, has set a goal of collecting in Fiscal Year 2009-2010 an additional $75 million in annually recurring Commonwealth Sales Tax revenue.

As part of these initiatives, the Treasury Department has undertaken various enforcement initiatives, such as the implementation of a voluntary compliance program and "offer and compromise" settlements where uncertainty exists as to the existence of a liability or the Treasury Department's ability to collect. The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems to the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts.

The Treasury Department intends to strengthen its enforcement workforce. It plans to establish a call center staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The Treasury Department also intends to increase staffing levels in its Enforcement and Compliance Bureaus, which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently estimates it will make approximately 2,000 visits per month.

As a result of recent enforcement efforts, the Treasury Department has collected approximately $7 million in fines and penalties in connection with non-compliance with sales tax regulations.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, the amendments incorporated in Act No. 7 of March 9, 2009 require a merchant or retailer to file his or her Commonwealth Sales Tax return on or prior to the tenth day of the following month, rather than the twentieth day, effective December 10, 2009. It also replaced the Commonwealth Sales Tax exemption applicable to resellers with a credit that must be claimed in each monthly filing. This is intended to prevent a reseller from using the Commonwealth Sales Tax reseller's exemption illegally.

Recently, legislation was enacted that, among other things, postponed until November 2009 the effectiveness of the provisions that replaced the Commonwealth Sales Tax exemption applicable to resellers with a credit that must be claimed in each monthly filing. Legislation is pending that, among other things, would reestablish the exemption for merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 threshold but meet certain other requirements imposed by the Treasury Department.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

15

## THE SERIES 2009B BONDS

**General**

The Series 2009B Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $1,217,915,799.20. The Series 2009B Bonds will be issued as current interest bonds (the "Current Interest Bonds"), capital appreciation bonds (the "Capital Appreciation Bonds"), and convertible capital appreciation bonds (the "Convertible Capital Appreciation Bonds"). The Current Interest Bonds, the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds will be issued in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

The Series 2009B Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds). Interest on the Series 2009B Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2009B Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Series 2009B Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2009B Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the Series 2009B Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Series 2009 Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds, the Compounded Amount thereof.

*Current Interest Bonds.* Interest on the Current Interest Bonds will accrue from their date of delivery and will be payable monthly on the first day of each month until maturity (or earlier redemption), commencing on August 1, 2009.

*Capital Appreciation Bonds.* Interest on the Capital Appreciation Bonds will compound from their date of delivery. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2009 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity. See *Appendix F — Table of Compounded Amounts for Capital Appreciation Bonds.*

*Convertible Capital Appreciation Bonds.* Interest on the Convertible Capital Appreciation Bonds maturing on August 1, 2025, 2026 and 2031 will compound from their date of delivery to August 1, 2016 (August 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031) (the "Current Interest Commencement Date"). Prior to the applicable Current Interest Commencement Date, interest will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each Compounding Date, commencing on August 1, 2009, and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix G — Table of Compounded Amounts for Convertible Capital Appreciation Bonds.* After the applicable Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds will be payable monthly on the first day of each month, commencing on September 1, 2016 (September 1, 2020 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031).

16

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2014, at the redemption prices set forth below, which are expressed as percentages of the principal amount of the Series 2009B Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

| Redemption Period | Redemption Price |
|---|---|
| August 1, 2014 through July 31, 2015 | 101.00% |
| August 1, 2015 through July 31, 2016 | 100.50% |
| August 1, 2016 and thereafter | 100.00% |

*Optional Redemption of Convertible Capital Appreciation Bonds.* The Convertible Capital Appreciation Bonds maturing on 2025, 2026 and 2031 are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2021 (August 1, 2025 in the case of the Convertible Capital Appreciation Bonds maturing on August 1, 2031), at a redemption price equal to 100% of the principal amount of the Series 2009B Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*No Optional Redemption of Capital Appreciation Bonds.* The Capital Appreciation Bonds are not subject to optional redemption by the Corporation.

*Mandatory Sinking Fund Redemption.* The Convertible Capital Appreciation Bonds maturing on August 1, 2031, and the Current Interest Term Bonds maturing on August 1, 2029 and 2039, shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds:

| Mandatory Redemption Date | Sinking Fund Installments for Convertible Capital Appreciation Bonds Maturing August 1, 2031 | |
|---|---|---|
| | Original Principal Amount | Compounded Amount |
| 08/01/2030 | $53,474,786.10 | $114,770,000.00 |
| 08/01/2031* | 53,474,786.10 | 114,770,000.00 |

\* Final maturity.

PR-CCD-0009392

|  | Sinking Fund Installments for Current Interest Term Bonds Maturing | |
| Mandatory Redemption Date | August 1, 2029 | August 1, 2039 |
| --- | --- | --- |
| 08/01/2025 | $86,810,000 | |
| 08/01/2026 | 86,810,000 | |
| 08/01/2027 | 86,815,000 | |
| 08/01/2028 | 86,815,000 | |
| 08/01/2029 | 86,815,000* | |
| 08/01/2030 | | |
| 08/01/2031 | | |
| 08/01/2032 | | |
| 08/01/2033 | | |
| 08/01/2034 | | |
| 08/01/2035 | | $104,665,000 |
| 08/01/2036 | | 104,665,000 |
| 08/01/2037 | | 104,670,000 |
| 08/01/2038 | | 104,670,000 |
| 08/01/2039 | | 104,675,000* |

\* Final maturity.

*Notice of Redemption.* In the event any Series 2009B Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Series 2009B Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2009B Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2009B Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2009B Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2009B Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2009B Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2009B Bonds, and the portions of the Series 2009B Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2009B Bonds or portions thereof to be redeemed will cease to bear interest (in the case of the Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase).

Any notice of optional redemption of Series 2009B Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Convertible Capital Appreciation Bonds) and interest on such Series 2009B Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of (or Compounded Amount, in the case of the Convertible Capital Appreciation Bonds) and interest on the Series 2009B Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the

18

Series 2009B Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Convertible Capital Appreciation Bonds) and premium, if any, and interest on the Series 2009B Bonds (or portions thereof) to be redeemed, then the Series 2009B Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase), and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2009B Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2009B Bonds; (ii) confirmation of ownership interest in the Series 2009B Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2009B Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2009B Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2009B Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2009B Bonds. See *Appendix E - Book-Entry Only System*.

## SECURITY FOR THE BONDS

**General**

Pursuant to the Resolution, the Series 2009B Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2009B Bonds, however, are subordinate in payment priority to the Senior Bonds and Parity Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2009B Bonds. Only Senior Bonds and the Parity Obligations, however, will be senior to the Series 2009B Bonds.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2009B Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2009B Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2009B Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

19

Pursuant to a recent amendment to Act 91, the Commonwealth also agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2009B Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2009B Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Sixth Supplemental Resolution amends the General Resolution to provide that the Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

## Property Pledged for the Payment of the Series 2009B Bonds

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2009 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

PR-CCD-0009395

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Senior Bonds and Parity Obligations**

The Corporation currently has outstanding $5.2 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $160.3 million accreted on existing capital appreciation bonds as of February 1, 2009. The Corporation's outstanding bonds consist of: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, and (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $436 million.

Prior to the issuance of the Series 2009B Bonds, the Corporation issued the Series 2009C Bonds. After giving effect to the issuance of the Series 2009C Bonds in order to retire the Retired Bonds and to make the termination payments under three interest rate swap agreements related to the Retired Bonds (two of which were terminated in full and the other was partially terminated), the Corporation will have $5.2 billion aggregate initial principal amount of Outstanding Senior Bonds and an aggregate notional amount of $136 million of Outstanding Parity Obligations.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

**Subordination Provisions of the Series 2009B Bonds**

The Series 2009B Bonds are subordinate to the Senior Bonds and the Parity Obligations. As a result, the Series 2009B Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the Series 2009B Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (each of which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

21

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

      (1)    to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

      (2)    to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

      (3)    to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

      (4)    to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

      (5)    to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

      (6)    if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

            (a)    to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

            (b)    at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for

PR-CCD-0009397

the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal

23

amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):



*No Debt Service Reserve deposit requirement currently exists.

**Additional Bonds, Refunding Bonds and Other Obligations**

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds in addition to the Outstanding Senior Bonds (a) to satisfy the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and on a parity with or subordinate to such Subordinate Bonds).

24

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(a)     the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

*Additional Requirements — Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

PR-CCD-0009400

C.   No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D.   *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from

PR-CCD-0009401

available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2009B Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2009B Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2009B Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2009B Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2009B Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of Fiscal Year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall

PR-CCD-0009402

impair any obligation or commitment of the Corporation. See "*Commonwealth Non-Impairment Covenant*" under SECURITY FOR THE BONDS.

The Sixth Supplemental Resolution amends the General Resolution to provide that the Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

### Certain Constitutional Considerations Relating to Act 91

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2009B Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2009 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, the prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference

PR-CCD-0009403

to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2009B Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2009B Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2009B Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2009B Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2009B Bonds is not a recommendation to purchase, hold or sell such Series 2009B Bonds and such rating will not address the marketability of such Series 2009B Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2009B Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2009B Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See *"Subordination Provisions of the Series 2009B Bonds"* under SECURITY FOR THE BONDS. In the event the owners of the Series 2009B Bonds shall be entitled to declare a default, the payment of the Series 2009B Bonds by the Corporation cannot be

PR-CCD-0009404

accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2009B Bonds on the date such default is declared.

**There is no Assurance that a Secondary Market for the Series 2009B Bonds will Develop**

The Series 2009B Bonds are a new issue of securities. There is no assurance that a secondary market for the Series 2009B Bonds will develop, or if it does develop, that it will provide the holders of the Series 2009B Bonds with liquidity for their investment or that it will continue for the life of the Series 2009B Bonds. Although the Underwriters have advised the Corporation that they presently intend to make a market for the Series 2009B Bonds as permitted by applicable laws, the Underwriters are not obligated to do so and any such market making may be discontinued at any time at the sole discretion of the Underwriters.

PR-CCD-0009405

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2009 Bonds, the Series 2009C Bonds and the Outstanding Senior Bonds and Parity Obligations[*] as of August 1 of each year, including the principal of the Series 2009 Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[†] | Payments on Outstanding First Subordinate Bonds[*] | Series 2009B Bonds Principal | Interest[‡] | Debt Service[†‡] | Total Annual Debt Service[†] |
|---|---|---|---|---|---|---|
| 2009 | $ 172,548,852 | - | - | - | - | $ 172,548,852 |
| 2010 | 177,212,926 | $ 229,980,892 | - | $ 44,620,005 | $ 44,620,005 | 451,813,822 |
| 2011 | 177,212,926 | 205,441,988 | - | 59,493,340 | 59,493,340 | 442,148,253 |
| 2012 | 177,212,926 | 240,441,988 | - | 59,493,340 | 59,493,340 | 477,148,253 |
| 2013 | 177,212,926 | 240,441,988 | - | 59,493,340 | 59,493,340 | 477,148,253 |
| 2014 | 177,212,926 | 240,441,988 | - | 59,493,340 | 59,493,340 | 477,148,253 |
| 2015 | 177,212,926 | 251,741,988 | - | 59,493,340 | 59,493,340 | 488,448,253 |
| 2016 | 177,212,926 | 269,723,238 | - | 59,493,340 | 59,493,340 | 506,429,503 |
| 2017 | 177,212,926 | 301,955,038 | - | 70,663,060 | 70,663,060 | 549,831,023 |
| 2018 | 177,212,926 | 330,351,513 | - | 70,663,060 | 70,663,060 | 578,227,498 |
| 2019 | 177,212,926 | 359,884,138 | - | 70,663,060 | 70,663,060 | 607,760,123 |
| 2020 | 177,212,926 | 334,604,106 | - | 70,663,060 | 70,663,060 | 582,480,092 |
| 2021 | 177,212,926 | 317,752,425 | - | 86,730,860 | 86,730,860 | 581,696,211 |
| 2022 | 181,942,926 | 336,846,125 | - | 86,730,860 | 86,730,860 | 605,519,911 |
| 2023 | 184,113,226 | 353,847,350 | - | 86,730,860 | 86,730,860 | 624,691,436 |
| 2024 | 259,097,926 | 367,749,500 | - | 86,730,860 | 86,730,860 | 713,578,286 |
| 2025 | 304,651,226 | 245,844,500 | $ 136,812,304 | 117,668,556 | 254,480,860 | 804,976,586 |
| 2026 | 319,309,926 | 245,844,500 | 136,812,304 | 106,831,691 | 243,643,995 | 808,798,421 |
| 2027 | 333,337,426 | 383,074,500 | 86,815,000 | 65,057,130 | 151,872,130 | 868,284,056 |
| 2028 | 352,878,526 | 442,774,925 | 86,815,000 | 59,804,823 | 146,619,823 | 942,273,273 |
| 2029 | 369,740,486 | 387,412,500 | 86,815,000 | 54,552,515 | 141,367,515 | 898,520,501 |
| 2030 | 387,153,667 | 373,887,500 | 53,474,786 | 110,595,421 | 164,070,208 | 925,111,374 |
| 2031 | 404,688,594 | 436,438,938 | 53,474,786 | 102,561,521 | 156,036,308 | 997,163,839 |
| 2032 | 422,921,794 | 610,823,438 | - | 33,232,408 | 33,232,408 | 1,066,977,639 |
| 2033 | 441,880,694 | 180,487,500 | 18,551,554 | 120,950,854 | 139,502,408 | 761,870,602 |
| 2034 | 461,600,180 | 680,487,500 | - | 33,232,408 | 33,232,408 | 1,175,320,087 |
| 2035 | 482,111,345 | 180,487,500 | 139,665,066 | 236,182,342 | 375,847,408 | 1,038,446,252 |
| 2036 | 503,444,330 | 446,767,500 | 104,665,000 | 26,586,180 | 131,251,180 | 1,081,463,010 |
| 2037 | 486,103,395 | 464,335,750 | 104,670,000 | 19,939,953 | 124,609,953 | 1,075,049,097 |
| 2038 | 507,593,360 | 458,900,000 | 104,670,000 | 13,293,408 | 117,963,408 | 1,084,456,768 |
| 2039 | 142,560,982 | 486,945,000 | 104,675,000 | 6,646,863 | 111,321,863 | 740,827,844 |
| 2040 | 140,477,975 | 376,745,000 | - | - | - | 517,222,975 |
| 2041 | 673,482,975 | 358,750,300 | - | - | - | 1,032,233,275 |
| 2042 | 700,472,975 | 340,755,300 | - | - | - | 1,041,228,275 |
| 2043 | 728,542,975 | 197,750,000 | - | - | - | 926,292,975 |
| 2044 | 757,732,975 | 186,375,000 | - | - | - | 944,107,975 |
| 2045 | 788,097,975 | - | - | - | - | 788,097,975 |
| 2046 | 819,672,975 | - | - | - | - | 819,672,975 |
| 2047 | 852,507,975 | - | - | - | - | 852,507,975 |
| 2048 | 886,666,392 | - | - | - | - | 886,666,392 |
| 2049 | 922,183,873 | - | - | - | - | 922,183,873 |
| 2050 | 959,115,612 | - | - | - | - | 959,115,612 |
| 2051 | 997,537,122 | - | - | - | - | 997,537,122 |
| 2052 | 1,037,500,321 | - | - | - | - | 1,037,500,321 |
| 2053 | 1,079,036,134 | - | - | - | - | 1,079,036,134 |
| 2054 | 1,122,257,975 | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,193,604 | - | - | - | - | 1,167,193,604 |
| 2056 | 1,213,947,975 | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | 1,198,845,475 |
| Total | $24,889,507,248 | $11,866,091,410 | $1,217,915,799 | $2,138,291,796 | $3,356,207,595 | $40,111,806,253 |

[*] After giving effect to the issuance of the Series 2009C Bonds to retire certain Outstanding Senior Bonds and terminate certain related Outstanding Parity Obligations.

[†] Includes interest accreted on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

[‡] Net of capitalized interest.

31

PR-CCD-0009406

## Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,142,791,920 | $178,295,113 | $361,085,279 | $539,380,392 | 2.12 |
| 2011 | 1,188,507,758 | 178,295,113 | 382,660,495 | 560,955,608 | 2.12 |
| 2012 | 1,236,052,314 | 216,423,834 | 366,969,999 | 583,393,832 | 2.12 |
| 2013 | 1,285,498,736 | 225,080,787 | 381,648,798 | 606,729,585 | 2.12 |
| 2014 | 1,336,923,102 | 234,084,018 | 396,914,750 | 630,998,769 | 2.12 |
| 2015 | 1,390,404,530 | 243,447,379 | 412,791,340 | 656,238,720 | 2.12 |
| 2016 | 1,446,025,306 | 253,185,274 | 429,302,994 | 682,488,268 | 2.12 |
| 2017 | 1,503,871,005 | 263,312,685 | 446,475,114 | 709,787,799 | 2.12 |
| 2018 | 1,564,030,626 | 273,845,193 | 464,334,118 | 738,179,311 | 2.12 |
| 2019 | 1,626,596,727 | 284,799,000 | 482,907,483 | 767,706,484 | 2.12 |
| 2020 | 1,691,665,569 | 296,190,960 | 502,223,782 | 798,414,743 | 2.12 |
| 2021 | 1,759,337,265 | 308,038,599 | 522,312,734 | 830,351,333 | 2.12 |
| 2022 | 1,829,715,930 | 320,360,143 | 543,205,243 | 863,565,386 | 2.12 |
| 2023 | 1,902,909,845 | 333,174,549 | 564,933,453 | 898,108,001 | 2.12 |
| 2024 | 1,979,031,622 | 346,501,530 | 587,530,791 | 934,032,321 | 2.12 |
| 2025 | 2,058,198,379 | 360,361,592 | 611,032,023 | 971,393,614 | 2.12 |
| 2026 | 2,140,531,915 | 374,776,055 | 635,473,303 | 1,010,249,359 | 2.12 |
| 2027 | 2,226,158,904 | 389,767,098 | 660,892,236 | 1,050,659,333 | 2.12 |
| 2028 | 2,315,211,088 | 405,357,781 | 687,327,925 | 1,092,685,707 | 2.12 |
| 2029 | 2,407,825,475 | 421,572,093 | 714,821,042 | 1,136,393,135 | 2.12 |
| 2030 | 2,504,144,557 | 438,434,976 | 743,413,884 | 1,181,848,860 | 2.12 |
| 2031 | 2,604,316,523 | 455,972,375 | 773,150,439 | 1,229,122,815 | 2.12 |
| 2032 | 2,708,495,491 | 474,211,271 | 804,076,457 | 1,278,287,727 | 2.12 |
| 2033 | 2,816,841,745 | 493,179,721 | 836,239,515 | 1,329,419,236 | 2.12 |
| 2034 | 2,929,521,977 | 512,906,910 | 869,689,095 | 1,382,596,006 | 2.12 |
| 2035 | 3,046,709,550 | 533,423,187 | 904,476,659 | 1,437,899,846 | 2.12 |
| 2036 | 3,168,584,759 | 554,760,114 | 940,655,726 | 1,495,415,840 | 2.12 |
| 2037 | 3,295,335,114 | 576,950,519 | 978,281,955 | 1,555,232,473 | 2.12 |
| 2038 | 3,427,155,622 | 600,028,539 | 1,017,413,233 | 1,617,441,772 | 2.12 |
| 2039 | 3,564,249,092 | 624,029,681 | 1,058,109,762 | 1,682,139,443 | 2.12 |
| 2040 | 3,706,826,446 | 648,990,868 | 1,100,434,153 | 1,749,425,021 | 2.12 |
| 2041 | 3,855,107,042 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 2.13 |
| 2042 | 4,009,319,012 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 2.21 |
| 2043 | 4,169,699,616 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 2.30 |
| 2044 | 4,336,495,600 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 2.39 |
| 2045 | 4,509,963,583 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 2.49 |
| 2046 | 4,690,370,449 | 821,180,488 | 992,545,002 | 1,813,725,490 | 2.59 |
| 2047 | 4,877,993,757 | 854,027,708 | 959,697,782 | 1,813,725,490 | 2.69 |
| 2048 | 5,073,122,166 | 888,188,816 | 925,536,674 | 1,813,725,490 | 2.80 |
| 2049 | 5,276,055,885 | 923,716,369 | 890,009,121 | 1,813,725,490 | 2.91 |
| 2050 | 5,487,107,129 | 960,665,024 | 853,060,467 | 1,813,725,490 | 3.03 |
| 2051 | 5,706,600,603 | 999,091,625 | 814,633,866 | 1,813,725,490 | 3.15 |
| 2052 | 5,934,874,000 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 3.27 |
| 2053 | 6,172,278,520 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 3.40 |
| 2054 | 6,419,179,412 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 3.54 |
| 2055 | 6,675,956,535 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 3.68 |
| 2056 | 6,943,004,942 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 3.83 |
| 2057 | 7,220,735,488 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 3.98 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.

(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2007-2008 collections of $1,143,000,000 with no escalation.

PR-CCD-0009407

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.51%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.51% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,142,791,920 | $178,295,113 | $361,085,279 | $539,380,392 | 2.12 |
| 2011 | 1,160,048,078 | 178,295,113 | 382,660,495 | 560,955,608 | 2.07 |
| 2012 | 1,177,564,804 | 216,423,834 | 366,969,999 | 583,393,832 | 2.02 |
| 2013 | 1,195,346,033 | 225,080,787 | 381,648,798 | 606,729,585 | 1.97 |
| 2014 | 1,213,395,758 | 234,084,018 | 396,914,750 | 630,998,769 | 1.92 |
| 2015 | 1,231,718,034 | 243,447,379 | 412,791,340 | 656,238,720 | 1.88 |
| 2016 | 1,250,316,976 | 253,185,274 | 429,302,994 | 682,488,268 | 1.83 |
| 2017 | 1,269,196,762 | 263,312,685 | 446,475,114 | 709,787,799 | 1.79 |
| 2018 | 1,288,361,633 | 273,845,193 | 464,334,118 | 738,179,311 | 1.75 |
| 2019 | 1,307,815,894 | 284,799,000 | 482,907,483 | 767,706,484 | 1.70 |
| 2020 | 1,327,563,914 | 296,190,960 | 502,223,782 | 798,414,743 | 1.66 |
| 2021 | 1,347,610,129 | 308,038,599 | 522,312,734 | 830,351,333 | 1.62 |
| 2022 | 1,367,959,042 | 320,360,143 | 543,205,243 | 863,565,386 | 1.58 |
| 2023 | 1,388,615,224 | 333,174,549 | 564,933,453 | 898,108,001 | 1.55 |
| 2024 | 1,409,583,313 | 346,501,530 | 587,530,791 | 934,032,321 | 1.51 |
| 2025 | 1,430,868,021 | 360,361,592 | 611,032,023 | 971,393,614 | 1.47 |
| 2026 | 1,452,474,129 | 374,776,055 | 635,473,303 | 1,010,249,359 | 1.44 |
| 2027 | 1,474,406,488 | 389,767,098 | 660,892,236 | 1,050,659,333 | 1.40 |
| 2028 | 1,496,670,026 | 405,357,781 | 687,327,925 | 1,092,685,707 | 1.37 |
| 2029 | 1,519,269,743 | 421,572,093 | 714,821,042 | 1,136,393,135 | 1.34 |
| 2030 | 1,542,210,716 | 438,434,976 | 743,413,884 | 1,181,848,860 | 1.30 |
| 2031 | 1,565,498,098 | 455,972,375 | 773,150,439 | 1,229,122,815 | 1.27 |
| 2032 | 1,589,137,119 | 474,211,271 | 804,076,457 | 1,278,287,727 | 1.24 |
| 2033 | 1,613,133,090 | 493,179,721 | 836,239,515 | 1,329,419,236 | 1.21 |
| 2034 | 1,637,491,400 | 512,906,910 | 869,689,095 | 1,382,596,006 | 1.18 |
| 2035 | 1,662,217,520 | 533,423,187 | 904,476,659 | 1,437,899,846 | 1.16 |
| 2036 | 1,687,317,004 | 554,760,114 | 940,655,726 | 1,495,415,840 | 1.13 |
| 2037 | 1,712,795,491 | 576,950,519 | 978,281,955 | 1,555,232,473 | 1.10 |
| 2038 | 1,738,658,703 | 600,028,539 | 1,017,413,233 | 1,617,441,772 | 1.07 |
| 2039 | 1,764,912,449 | 624,029,681 | 1,058,109,762 | 1,682,139,443 | 1.05 |
| 2040 | 1,791,562,627 | 648,990,868 | 1,100,434,153 | 1,749,425,021 | 1.02 |
| 2041 | 1,818,615,223 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 1.00 |
| 2042 | 1,846,076,313 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 1.02 |
| 2043 | 1,873,952,065 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 1.03 |
| 2044 | 1,902,248,741 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 1.05 |
| 2045 | 1,930,972,697 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 1.06 |
| 2046 | 1,960,130,385 | 821,180,488 | 992,545,002 | 1,813,725,490 | 1.08 |
| 2047 | 1,989,728,354 | 854,027,708 | 959,697,782 | 1,813,725,490 | 1.10 |
| 2048 | 2,019,773,252 | 888,188,816 | 925,536,674 | 1,813,725,490 | 1.11 |
| 2049 | 2,050,271,828 | 923,716,369 | 890,009,121 | 1,813,725,490 | 1.13 |
| 2050 | 2,081,230,933 | 960,665,024 | 853,060,467 | 1,813,725,490 | 1.15 |
| 2051 | 2,112,657,520 | 999,091,625 | 814,633,866 | 1,813,725,490 | 1.16 |
| 2052 | 2,144,558,649 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 1.18 |
| 2053 | 2,176,941,484 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 1.20 |
| 2054 | 2,209,813,301 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 1.22 |
| 2055 | 2,243,181,481 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 1.24 |
| 2056 | 2,277,053,522 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 1.26 |
| 2057 | 2,311,437,030 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 1.27 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).
(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.
(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.
(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.
(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2007-2008 collections of $1,143,000,000 with no escalation.

33

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and service that represent the sales tax base. While historical trends do not predict future performance, since 1947, annual growth rate in personal consumption expenditures (nominal) averaged 7.61% and the lowest and second-lowest annual growth rates in personal consumption expenditures in any year between 1947 and 2008 were 2.47% (1949) and 3.20% (1991).

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Bonds, together with other funds available to the Corporation, to provide funds to the Commonwealth for the Authorized Uses.

### Estimated Sources and Uses of Funds

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2009B Bonds | $1,217,915,799.20 |
| **Total Sources** | $1,217,915,799.20 |

**Uses**

| | |
|---|---|
| Deposit to the Project Fund | $1,175,404,206.93 |
| Capitalized Interest through November 1, 2009 | 20,822,668.99 |
| Underwriters' Discount and Other Costs of Issuance[1] | 21,688,923.28 |
| **Total Uses** | $1,217,915,799.20 |

[1] Includes legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation (one position is vacant):

| Name | Occupation | Expiration of Term |
|---|---|---|
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Alejandro M. Ballester | Businessman | September 23, 2012 |
| Marcos Rodríguez-Ema | Attorney | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |

PR-CCD-0009409

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## Other Obligations of the Corporation

In addition to the Outstanding Senior Bonds and the Outstanding Parity Obligations, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of May 15, 2009, the Corporation had outstanding $1.1 billion in aggregate principal amount of borrowings from Government Development Bank and a Puerto Rico financial institution. These borrowings are not secured by a lien on the Pledged Sales Tax under the Resolution. They are payable solely from future bond proceeds and moneys available to the Corporation after release from the lien of the Resolution. These borrowings were repaid in full from the proceeds of the Series 2009A Bonds.

On May 28, 2009, the Corporation issued its Sales Tax Revenue Bonds, First Subordinate Series 2009 Bond Anticipation Notes in the aggregate principal amount of $900 million. These bond anticipation notes are secured under the Resolution pursuant to a lien subordinate to the Outstanding Senior Bonds and the Outstanding Parity Obligations. These bond anticipation notes were repaid in full from the proceeds of Series 2009A Bonds.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

## TAX MATTERS

The following is a summary of the opinion of O'Neill & Borges, Bond Counsel to the Corporation, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Series 2009B Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Bond Counsel.*

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Series 2009B Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

PR-CCD-0009410

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

**Puerto Rico Tax Considerations for Puerto Rico Residents**

In the opinion of O'Neill & Borges, based on the laws of Puerto Rico now in force:

1. Interest on the Series 2009B Bonds is exempt from Puerto Rico income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2. The Series 2009B Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3. The transfer of the Series 2009B Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4. Gain recognized from the sale or exchange of a Series 2009B Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico;

5. The Series 2009B Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6. Interest on the Series 2009B Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Series 2009B Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the Series 2009B Bonds, including but not limited to financial institutions, should be aware that ownership of the Series 2009B Bonds may result in having a portion of their interest and other expenses attributable to interest on the Series 2009B Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

**United States Federal Tax Considerations for Puerto Rico Residents**

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with

36

the promotion or marketing of the Series 2009B Bonds. Each prospective purchaser of the Series 2009B Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Series 2009B Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Series 2009B Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Series 2009B Bonds under state, local or foreign tax laws.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a bona fide resident of Puerto Rico, within the meaning of Section 937 of the Code, during the entire taxable year. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

*Interest on the Series 2009B Bonds.* Interest on the Series 2009B Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holder during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Series 2009B Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation and such corporation is not treated as a domestic corporation for purposes of the Code.

*Sale or Retirement of Series 2009B Bonds.* In general, pursuant to the provisions of Section 1.937-2 of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Series 2009B Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided, (i) that such Series 2009B Bonds do not constitute inventory in the hands of such individual, and (ii) the Puerto Rico U.S. Holder was a bona fide resident of Puerto Rico for the 10 years preceding the year of the gain. The regulations provide a special rule under which a Puerto Rico U.S. Holder who was not a resident of Puerto Rico for the entire 10 year period preceding the year of the gain may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the Code.

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of the Series 2009B Bonds, provided such gain is not effectively connected or treated as effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and such corporation is not treated as a domestic corporation for purposes of the Code.

The opinion of Bond Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Series 2009B Bonds is limited

37

to the above. Bond Counsel does not express any opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or as to any other laws of any other jurisdiction or compliance therewith by any party.

**Backup Withholding**

Backup withholding of United States federal income tax may apply to payments made in respect of the Series 2009B Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Series 2009B Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

The United States Treasury Department has recently published the General Explanation of the Administration's Fiscal Year 2010 Revenue Proposals (the "Green Book"). Said proposals include extending the information reporting requirement to payments of interest to corporations in excess of $600 per calendar year and requiring backup withholding in certain circumstances not currently contemplated in the Code. As of this date, no bills have been filed at the United States Congress to adopt these proposals.

Prospective owners of the Series 2009B Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

**No Opinion as to Exclusion under Section 103(a) of the Code**

The Corporation has determined, based on the advice of counsel, that interest on the Series 2009B Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Series 2009B Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico. Bond Counsel is not opining as to the status of the Series 2009B Bonds for purposes of Section 103(a) of the United States Internal Revenue Code.

## RATINGS

The Series 2009B Bonds have been assigned ratings of A+ by Standard & Poor's Ratings Services, A2 by Moody's Investors Service, and A by Fitch Ratings. These ratings will only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2009B Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

38

## LEGALITY FOR INVESTMENT

The Series 2009B Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2009B Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $1,198,187,173.73 reflecting an underwriters' discount of $19,728,625.47, and to reoffer such Series 2009B Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2009B Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2009B Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2009B Bonds if any Series 2009B Bonds are purchased.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have agreed to provide services and advice to each other related to the structuring and execution of the underwriting of the Series 2009B Bonds in accordance with the terms and provisions of a joint venture agreement which was entered into between SSC and Banc of America Securities LLC ("BAS") (Merrill and BAS are now affiliated broker-dealers). SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2009B Bonds as consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2009B Bonds are subject to the approval of O'Neill & Borges, San Juan, Puerto Rico, Bond Counsel to the Corporation. The issuance of the Series 2009B Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2009B Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a)     within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)     in a timely manner, through June 30, 2009, to each nationally recognized municipal securities information repository ("NRMSIR") or to the MSRB, and to any Commonwealth information depository, if any, and thereafter to EMMA, notice of any of the following events with respect to the Series 2009B Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting

39

financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Series 2009B Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2009B Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2009B Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Series 2009B Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2009B Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2009B Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2009B Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

PR-CCD-0009415

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2009B Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2009B Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2009B Bonds

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2009B Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the summary of amendments to the General Resolution (*Appendix C*), the proposed form of approving opinion of Bond Counsel (*Appendix D*), the summary of the book-entry system for the Series 2009B Bonds (*Appendix E*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix F*) and the table of Compounded Amounts for the Convertible Capital Appreciation Bonds (*Appendix G*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

<div align="right">

**PUERTO RICO SALES TAX FINANCING
CORPORATION**

By: _____/s/ Fernando L. Batlle_____
Executive Director

</div>

PR-CCD-0009416

(This page intentionally left blank)

# COMMONWEALTH OF PUERTO RICO
# ECONOMIC INFORMATION

## THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

### General

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,954,037 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375 (422,665 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, the real gross national product contracted by 1.9% and 2.5%, respectively. This contraction has continued into fiscal year 2009, for which the Puerto Rico Planning Board (the "Planning Board") expects a reduction of 3.4% in real gross national product. While the trend was expected to continue in fiscal year 2010, the Planning Board announced on April 29, 2009 that the expected positive impact of the U.S. federal and local economic stimulus measures discussed below under "Fiscal and Economic Reconstruction" should outweigh the expected negative impact of the Fiscal Stabilization Plan also described below under "Fiscal and Economic Reconstruction" and revised its projections for fiscal year 2010 to reflect an increase of 0.1% in real gross national product. The Planning Board is also projecting increases in real gross national product of 0.9% and 1.0% for fiscal years 2011 and 2012, respectively.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP"), personal consumption expenditures and personal income. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

### Personal Income

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2008. In fiscal year 2008, aggregate personal income was $56.2 billion ($44.8 billion at 2000 prices) and personal income per capita was $14,237 ($11,341 in 2000 prices).[*] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $12.3 billion in fiscal year 2008 ($10.5 billion in fiscal year 2007). Entitlements for previously

---

[*]   Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $9.3 billion, or 76% of the transfer payments to individuals in fiscal year 2008 ($8.6 billion, or 82%, in fiscal year 2007). The remainder of federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships. The increase in federal transfer payments to individuals, and the corresponding decline in the share of entitlements to total transfers to individuals, from fiscal year 2007 to fiscal year 2008 was due almost exclusively to the U.S. federal tax rebates implemented in fiscal year 2008.

The following table shows the personal income for the five Fiscal Years ended June 30, 2008.

### Commonwealth of Puerto Rico
### Personal Income
### (in millions of dollars)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008**[1] |
| Employees' compensation | | | | | |
| Business | $18,710.9 | $19,431.0 | $19,828.0 | $20,216.2 | $20,628.2 |
| Government | 7,388.5 | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 |
| Household and nonprofit institutions | 711.0 | 706.5 | 738.2 | 750.5 | 786.6 |
| Other | 958.6 | 1,085.3 | 1,036.7 | 948.6 | 986.8 |
| Total Employees' compensation | $27,768.9 | $29,371.5 | $30,027.1 | $30,500.2 | $31,163.8 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,068.2 | 2,181.0 | 2,241.9 | 2,158.8 | 2,170.4 |
| Employers | 2,884.9 | 3,064.0 | 3,167.1 | 3,150.9 | 3,097.0 |
| Total Contributions for social insurance | $4,953.0 | $5,245.0 | $5,409.0 | $5,309.7 | $5,267.5 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,633.9 | 2,687.0 | 2,832.3 | 2,979.1 | 3,220.5 |
| Dividends of domestic corporations | 249.4 | 286.7 | 304.3 | 322.1 | 351.9 |
| Miscellaneous income and dividends received from abroad | 13.0 | 13.4 | 13.4 | 13.8 | 14.7 |
| Rental income of persons | 3,663.1 | 4,201.8 | 4,387.4 | 5,030.0 | 5,670.0 |
| Personal interest income | 2,127.7 | 2,911.9 | 3,725.1 | 3,140.4 | 3,505.3 |
| Total Proprietors' income | $8,687.2 | $10,100.7 | $11,262.5 | $11,485.4 | $12,762.4 |
| | | | | | |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,290.3 | 3,323.5 | 3,390.7 | 3,577.4 | 3,813.9 |
| Federal government | 8,903.0 | 9,243.7 | 9,725.9 | 10,165.3 | 11,879.3 |
| U.S. state governments | 16.4 | 14.9 | 17.6 | 22.7 | 23.0 |
| Business | 1,116.1 | 1,190.7 | 1,184.9 | 1,232.3 | 1,298.7 |
| Other nonresidents | 737.0 | 820.3 | 642.6 | 621.1 | 527.8 |
| Total transfer payments | $14,062.8 | $14,593.0 | $14,961.8 | $15,618.8 | $17,542.6 |
| | | | | | |
| Total Personal Income | $45,565.9 | $48,820.2 | $50,842.3 | $52,294.7 | $56,201.4 |

(1) Preliminary figures.
Source: Planning Board

A-2

## Personal Consumption

During Fiscal Year 2008, at current prices, personal consumption amounted to $54.3 billion, representing an increase of $2.3 billion, or 4.5%, from Fiscal Year 2007. At constant prices, personal consumption decreased 0.5% from Fiscal Year 2007. This increase was based on a 0.6% decrease in nondurable goods (39% of personal consumption), 6.1% decrease in durable goods (17% of personal consumption), and 2% increase in services (44% of personal consumption). These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2008.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008**[1] |
| Food | $ 6,061.2 | $ 6,535.4 | $ 6,982.2 | $ 7,315.0 | $ 7,953.5 |
| Alcoholic beverages and tobacco products | 1,540.8 | 1,739.3 | 1,765.8 | 1,783.1 | 1,721.3 |
| Clothing and accessories | 2,851.9 | 2,957.1 | 3,084.9 | 3,543.7 | 3,646.0 |
| Personal care | 782.2 | 815.5 | 984.6 | 1,041.6 | 1,139.2 |
| Housing | 6,549.4 | 7,012.3 | 7,499.7 | 7,979.8 | 8,430.0 |
| Household operations | 4,773.4 | 5,267.9 | 5,929.2 | 6,479.0 | 6,861.4 |
| Medical care and funeral expenses | 7,162.5 | 7,525.9 | 8,007.2 | 8,295.3 | 8,617.4 |
| Business services | 2,962.7 | 3,020.1 | 3,035.5 | 2,991.3 | 2,993.2 |
| Transportation | 5,283.7 | 6,136.4 | 6,325.3 | 6,297.1 | 6,706.1 |
| Recreation | 4,401.9 | 4,547.2 | 4,810.3 | 4,955.4 | 5,015.4 |
| Education | 1,589.3 | 1,627.8 | 1,819.5 | 1,844.5 | 1,856.4 |
| Religious and nonprofit organizations, not elsewhere classified | 473.3 | 482.3 | 505.9 | 504.3 | 537.5 |
| Foreign travel | 1,450.1 | 1,531.9 | 1,608.9 | 1,616.9 | 1,754.0 |
| Miscellaneous purchases | 565.7 | 605.8 | 704.1 | 819.4 | 823.2 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $46,448.6 | $49,804.9 | $53,063.1 | $55,466.4 | $58,054.6 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,052.6 | 3,269.4 | 3,403.1 | 3,457.4 | 3,700.3 |
| Total Personal Consumption Expenditures | $43,396.0 | $46,535.4 | $49,660.0 | $52,009.0 | $54,354.3 |

(1) Preliminary figures.
Source: Planning Board.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

PR-CCD-0009420

The following table shows the gross national product for the five fiscal years ended June 30, 2008.

### Commonwealth of Puerto Rico
### Gross National Product
### Fiscal Years Ended June 30

|  | __2004__ | __2005__ | __2006__ | __2007__ | __2008__[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $50,709 | $53,752 | $56,732 | $58,563 | $60,787 |
| Real gross national product – $ millions (2000 prices) | 43,967 | 44,819 | 45,048 | 44,175 | 43,049 |
| Annual percentage increase (decrease) in real gross national product (2000 prices) | 2.7% | 1.9% | 0.5% | (1.9)% | (2.5)% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 4.0% | 3.1% | 3.0% | 1.8% | 2.8% |

———————————
(1) Preliminary.
(2) In current dollars.
*Sources:* Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal year 2009.

### Real GNP Growth Rate





Sources: Puerto Rico Planning Board.

* Estimate for Puerto Rico from the Puerto Rico Planning Board (Apr-2009). Estimate for U.S. from Global Insight (Apr-2009).

*Forecast for Fiscal Years 2009 and 2010*

The Planning Board's gross national product forecast for fiscal year 2009, which was released in February 2009, projected a decline of 3.4% in constant dollars, or an increase of 1.5% in current dollars. Personal income is expected to decline by 1.5% in real terms, or to increase by 2.3% in nominal terms (see footnote 1 on page 8). While a prolongation of the economic contraction through fiscal year 2010 had been expected, the Planning Board announced on April 29, 2009 that the expected positive impact of the U.S. federal

A-4

and local economic stimulus measures discussed below should outweigh the expected negative impact of the Fiscal Stabilization Plan also described below, leading it to adjust its projections for fiscal year 2010. The Planning Board is now projecting a slight increase in gross national product of 0.1% in constant dollars or 3.4% in current dollars. The major factors affecting the economy at this point are, among others, the current contraction of U.S. economic activity; the difficulties of the U.S. and local financial systems, which affect the local economy directly; the increase in federal transfers associated to the economic stimulus enacted by the U.S. government; and the local difficulties associated with the Commonwealth's prolonged fiscal crisis, including the cost-reduction initiatives to be implemented as part of the fiscal stabilization plan discussed below.

The number of persons employed in Puerto Rico during the first nine months of fiscal year 2009, from July 2008 to March 2009, averaged 1,179,900, a decrease of 3.1% from the same period of the previous year. Moreover, for the first nine months of the current fiscal year, the unemployment rate was 13.0%, an increase from 11.0% for the first nine months of fiscal year 2008.

*Fiscal Year 2008*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.5% (3.8% in current dollars) over fiscal year 2007. Nominal gross national product was $60.8 billion in fiscal year 2008 ($43.0 billion in 2000 prices), compared to $58.6 billion in fiscal year 2007 ($44.2 billion in 2000 prices). Aggregate personal income increased from $52.3 billion in fiscal year 2007 ($43.4 billion in 2000 prices) to $56.2 billion in fiscal year 2008 ($44.8 billion in 2000 prices), and personal income per capita increased from $13,269 in fiscal year 2007 ($11,012 in 2000 prices) to $14,237 in fiscal year 2008 ($11,341 in 2000 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The persistent high level of the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into an improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.9%. Nominal gross national product was $58.6 billion ($44.2 billion in 2000 prices), compared to $56.7 billion in fiscal year 2006 ($45.0 billion in 2000 prices). This represents an increase in nominal gross national product of 3.2%. Aggregate personal income was $52.3 billion in fiscal year 2007 ($43.4 billion in 2000 prices), as compared to $50.8 billion in fiscal year 2006 ($43.4 billion in 2000 prices), and personal income per capita was $13,269 in fiscal year 2007 ($11,012 in 2000 prices), as compared to $12,944 in fiscal year 2006 ($11,052 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,253,400 for fiscal year 2006. The driving force behind total employment was

PR-CCD-0009422

self-employment.  The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.7% for fiscal year 2006.

**Overview of Economic and Fiscal Condition**

*Economic Condition*

Puerto Rico's economy has been in a recession, which commenced in the fourth quarter of fiscal year 2006.  Although Puerto Rico's economy is closely linked with the United States economy, for fiscal years 2007 and 2008, Puerto Rico's real gross national product decreased by 1.9% and 2.5%, respectively, while the United States economy grew at a rate of 1.8% and 2.8%, respectively, during the same periods.  According to the Planning Board's latest projections, the economic contraction has accelerated in fiscal year 2009, with an expected further reduction in real gross national product of 3.4%.  While this trend was expected to continue in fiscal year 2010, the expected positive impact of the U.S. federal and local economic stimulus measures discussed below led the Planning Board to announce on April 29, 2009 revised projections for fiscal year 2010 reflecting a projected increase in real gross national product of 0.1%.

*Fiscal Condition*

The Commonwealth is experiencing a fiscal crisis as a result of the structural imbalance between recurring government revenues and expenses.  The structural imbalance has been exacerbated during fiscal years 2008 and 2009, with recurring government expenses significantly higher than recurring revenues, which have declined as a result of the multi-year economic contraction mentioned above.  In order to bridge the deficit resulting from the structural imbalance, the government has used non-recurring solutions, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, and postponing the payment of various government expenses, such as payments to suppliers and utilities providers.

As discussed below, the structural deficit for fiscal year 2009 is projected to be $3.2 billion.

*Rating Downgrades*

The continued fiscal imbalance led to successive downgrades in the Commonwealth's general obligation debt ratings, from "Baa1" by Moody's Investors Service ("Moody's") and "A−" by Standard & Poor's Rating Services ("S&P") in fiscal year 2004 to "Baa3" by Moody's and "BBB−" by S&P currently.  Each of the rating agencies has a stable outlook on the Commonwealth's general obligation debt.

*Fiscal Year 2009 Estimated Structural Deficit*

For fiscal year 2009, estimated revenues of the General Fund (the primary operating fund of the Commonwealth) are $7.6 billion (down from the original budgeted revenues of $8.5 billion).  Although budgeted expenditures for the fiscal year were $9.5 billion, the government has identified additional expenses for fiscal year 2009 that were not included in the budget.  Unbudgeted expenses for fiscal year 2009 are estimated at $1.4 billion. Thus, the resulting estimated structural deficit for fiscal year 2009 is currently approximately $3.2 billion.

*General Fund Revenues (Ten Months)*

Preliminary General Fund revenues for the first ten months of fiscal year 2009 (from July 2008 through April 2009) were $6.54 billion, a decline of 6.6% from the $7 billion for the same period in the prior fiscal year. The continued decline in General Fund revenues reflects primarily the impact of the ongoing economic recession on tax revenues.

PR-CCD-0009423

*Fiscal Stabilization Plan*

The new government administration, which commenced on January 2, 2009 and controls the Executive and Legislative branches of government, has developed and commenced implementing a multi-year plan designed to achieve fiscal balance and restore economic growth. The fiscal stabilization plan seeks to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including the following: (i) a $2 billion operating expense-reduction plan during fiscal year 2010, through government reorganization and reduction of operating expenses, including payroll as the main component of government expenditures; (ii) a combination of temporary and permanent tax increases, coupled with additional tax enforcement measures; and (iii) a bond issuance program through Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym). Before the temporary measures expire in 2013, the administration intends to design and adopt a comprehensive reform of the tax system and a long-term economic development plan to complement the economic reconstruction and supplemental stimulus initiatives described below. The proceeds expected to be obtained from the COFINA bond issuance program will be used to repay existing government debt (including debts with GDB), finance operating expenses of the Commonwealth for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, the funding of an economic stimulus plan, as described below, and for other purposes to address the fiscal imbalance while the fiscal stabilization plan is being implemented. The fiscal stabilization plan seeks to safeguard the investment grade ratings of the Commonwealth's general obligation debt and lay the foundation for sustainable economic growth. Legislation has already been enacted authorizing the implementation of all the measures in the fiscal stabilization plan and the Office of Management and Budget ("OMB") has certified projected savings of $237 million for fiscal year 2010 from implemented measures to date.

*Economic Reconstruction Plan*

The current administration has also developed and commenced implementing a short-term economic reconstruction plan. The cornerstone of this plan is the implementation of U.S. federal and local economic stimuli. Puerto Rico will benefit from the American Recovery and Reinvestment Act of 2009 ("ARRA") enacted by the U.S. government to provide a stimulus to the U.S. economy in the wake of the global economic downturn. Puerto Rico expects to receive approximately $5.0 billion from ARRA during the next two fiscal years, which includes tax relief, expansion of unemployment benefits and other social welfare provisions, and domestic spending in education, health care, and infrastructure, among other measures. The administration will seek to complement the U.S. federal stimulus with additional short- and medium-term supplemental stimulus measures seeking to address specific local challenges and providing investment in strategic areas. These measures include a local $500 million economic stimulus plan to supplement the federal plan. In addition, to further stimulate economic development and cope with the fiscal crisis, the administration is in the process of establishing a legal framework to authorize and promote the use of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets.

The new administration is also developing a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration will emphasize (i) the simplification and shortening of the permitting and licensing process; (ii) the strengthening of the labor market by encouraging greater labor-force participation and bringing out-of-date labor laws and regulations in line with U.S. and international standards and (iii) the adoption of a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies.

PR-CCD-0009424

*Proposed Fiscal Year 2010 Budget*

On April 29, 2009, the Governor submitted to the Legislature a proposed budget for fiscal year 2010. The proposed budget provides for total General Fund resources and appropriations of $7.67 billion, compared to estimated General Fund revenues of $7.60 billion for fiscal year 2009. Budgeted General Fund expenditures total $7.67 billion, a decrease of $1.81 billion, or 19%, from the fiscal year 2009 budgeted expenditures of $9.48 billion. To cover approximately $2 billion of additional transitory expenses for fiscal year 2010 related to the implementation of the expense-reduction plan (including expenses that will be incurred in fiscal year 2010 but will not be incurred in subsequent fiscal years) and a $500 million projected remaining structural deficit, the Commonwealth will establish a Stabilization Fund to be funded with proceeds from COFINA bond issues.

The projections and assumptions used in the proposed fiscal year 2010 budget are subject to a number of risks, including risks related to the economic forecasts, the implementation of the expense-reduction plan, and the execution of certain transactions contemplated in the fiscal stabilization plan (such as the COFINA financings). Many complex political, social, environmental, and economic forces influence the Commonwealth's economy and finances unpredictably from fiscal year to fiscal year. The budget is necessarily based on forecasts of economic activity, which have frequently failed to accurately predict the timing and magnitude of specific cyclical changes in the U.S. and local economy. There can be no assurance that the Commonwealth's economy will not experience results in the current and ensuing fiscal years that are materially worse than predicted, with corresponding material and adverse effects on the Commonwealth's projections of receipts and disbursements.

As a result of the global credit crisis, many municipal issuers either have been unable to issue bonds or, in other instances, are issuing them at higher rates than previously. If the Commonwealth cannot sell the COFINA bonds at the level (or in the timetable) expected, it could experience cash shortfalls, with no clear source of funds to address the same.

An additional risk to the Commonwealth's finances and the implementation of the fiscal stabilization plan arises from the potential impact of certain litigation now pending against the Commonwealth.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For the first nine months of fiscal year 2009, the number of persons employed averaged 1,179,900, a decrease of 3.1% compared to the same period of the previous fiscal year. Currently, the unemployment rate in Puerto Rico is slightly less than twice the U.S. average.

The following table presents annual statistics of employment and unemployment for fiscal year 2004 through fiscal year 2008, and the average figures for the first nine months of fiscal year 2009. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States.

A-8

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2004 | 1,360 | 1,206 | 155 | 11.4% |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009[3] | 1,356 | 1,180 | 176 | 13.0 |

(1)  Totals may not add due to rounding.
(2)  Unemployed as percentage of labor force.
(3)  Accumulated average from July 2008 to March 2009.
*Source:*  Department of Labor and Human Resources – Household Survey

**Economic Performance by Sector**

From fiscal year 2004 to fiscal year 2008, the manufacturing and service sectors generated the largest portion of gross domestic product.  The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008[1]** |
| Manufacturing | $33,267 | $34,534 | $35,638 | $36,309 | $38,458 |
| Service[2] | 30,476 | 32,449 | 33,785 | 35,608 | 37,068 |
| Government[3] | 7,389 | 8,151 | 8,424 | 8,585 | 8,762 |
| Transportation, communication, and public utilities | 5,343 | 5,309 | 5,907 | 6,111 | 6,020 |
| Agriculture, forestry, and fisheries | 414 | 375 | 394 | 418 | 386 |
| Construction[4] | 1,905 | 1,848 | 1,788 | 1,929 | 1,991 |
| Statistical discrepancy | 417 | 141 | 221 | (58) | 578 |
| Total gross domestic product[5] | $79,209 | $82,809 | $86,158 | $88,902 | $93,263 |
| Less:  net payment abroad | (28,501) | (29,056) | (29,425) | (30,339) | (32,476) |
| Total gross national product[5] | $50,709 | $53,752 | $56,732 | $58,563 | $60,792 |

(1)  Preliminary.
(2)  Includes wholesale and retail trade, finance, insurance and real estate, and other services.
(3)  Includes the Commonwealth, its municipalities and certain public corporations, and the federal government.  Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under Service in the table.
(4)  Includes mining.
(5)  Totals may not add due to rounding.

*Source:*  Planning Board

A-9

PR-CCD-0009426

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2004 to 2008.

## Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
#### (persons age 16 and over)

| | **Fiscal Years Ended June 30,** | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008**[2] |
| Natural resources and construction | 69,300 | 68,233 | 67,442 | 66,589 | 60,023 |
| Manufacturing | | | | | |
|   Durable goods | 48,808 | 48,067 | 46,350 | 45,427 | 43,185 |
|   Non-durable goods | 69,633 | 69,250 | 66,233 | 62,447 | 61,013 |
| Sub-total | 118,442 | 117,317 | 112,583 | 107,874 | 104,198 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|   Wholesale trade | 33,300 | 33,717 | 33,992 | 33,267 | 33,821 |
|   Retail trade | 132,008 | 136,192 | 137,358 | 133,744 | 131,178 |
|   Transportation, warehouse, and utilities | 17,042 | 17,617 | 17,433 | 16,988 | 16,840 |
|     Sub-total | 182,350 | 187,526 | 188,783 | 183,999 | 181,839 |
| | | | | | |
| Information | 21,917 | 22,608 | 22,675 | 22,639 | 21,342 |
| Finance | 46,850 | 48,633 | 49,767 | 49,094 | 48,125 |
| Professional and business | 101,900 | 103,767 | 106,517 | 108,796 | 108,660 |
| Educational and health | 98,108 | 99,967 | 103,650 | 105,226 | 108,743 |
| Leisure and hospitality | 70,317 | 72,592 | 74,767 | 73,562 | 73,750 |
| Other services | 20,650 | 21,258 | 20,567 | 18,233 | 17,354 |
| Government[3] | 303,408 | 307,825 | 302,492 | 298,108 | 297,666 |
|     Total non-farm | 1,033,242 | 1,049,725 | 1,049,242 | 1,034,118 | 1,021,699 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

(2) Preliminary.

(3) Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### Manufacturing

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2008 manufacturing generated $38.5 billion, or 41.2%, of gross domestic product. During fiscal year 2008, payroll employment for the manufacturing sector was 104,200, a decrease of 3.4% compared with fiscal year 2007. For the first nine months of fiscal year 2009, the average manufacturing employment was 99,300, a decrease of 5.3% compared to the same period of the prior fiscal year. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2008, the average hourly manufacturing wage rate in Puerto Rico was approximately 68.5% of the average mainland U.S. rate.

A-10

PR-CCD-0009427

Manufacturing in Puerto Rico is concentrated in two major industries. Pharmaceuticals and other chemical products and machinery and metal products constituted 90% of the total manufacturing production in fiscal year 2008. Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under "The Economy."

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008**[3] |
| Pharmaceuticals | $19,814 | $20,705 | $21,024 | $21,273 | $21,735 |
| Machinery and metal products: | | | | | |
| Machinery, except electrical | 3,372 | 3,307 | 3,252 | 3,428 | 3,920 |
| Electrical machinery | 1,818 | 1,904 | 1,855 | 1,840 | 2,342 |
| Professional and scientific instruments | 3,540 | 3,698 | 4,166 | 4,293 | 4,705 |
| Other machinery and metal products | 274 | 282 | 276 | 280 | 300 |
| Food products | 2,202 | 2,312 | 2,875 | 2,970 | 3,065 |
| Other chemical and allied products | 591 | 613 | 663 | 691 | 792 |
| Apparel | 344 | 325 | 253 | 213 | 234 |
| Other[1] | 1,312 | 1,387 | 1,273 | 1,321 | 1,364 |
| Total gross domestic product of manufacturing sector[2] | $33,267 | $34,534 | $35,638 | $36,309 | $38,458 |

(1) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(2) Totals may not add due to rounding.
(3) Preliminary.

*Source:* Planning Board

PR-CCD-0009428

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry group | 2004 | 2005 | 2006 | 2007 | 2008[1] |
|---|---|---|---|---|---|
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,708 | 4,467 | 4,100 | 3,823 | 3,772 |
| Cement and concrete products manufacturing | 3,850 | 3,750 | 3,533 | 3,300 | 3,389 |
| Fabricated metal products | 6,483 | 6,442 | 5,775 | 5,677 | 5,368 |
| Computer and electronic | 10,575 | 10,667 | 10,808 | 10,101 | 8,612 |
| Electrical equipment | 7,750 | 7,650 | 6,842 | 6,619 | 6,659 |
| Electrical equipment manufacturing | 4,933 | 4,975 | 4,700 | 4,517 | 4,383 |
| Miscellaneous manufacturing | 11,100 | 11,158 | 11,258 | 12,299 | 11,978 |
| Medical equipment and supplies manufacturing | 11,067 | 10,467 | 10,533 | 11,574 | 11,341 |
| Other durable goods manufacturing | 8,192 | 7,683 | 7,567 | 6,908 | 6,796 |
| Total – durable goods | 48,808 | 48,067 | 46,350 | 45,427 | 43,185 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,242 | 13,050 | 12,650 | 12,194 | 11,630 |
| Beverage and tobacco products manufacturing | 3,042 | 3,175 | 3,392 | 3,251 | 3,270 |
| Apparel manufacturing | 8,533 | 8,875 | 8,258 | 7,717 | 9,637 |
| Cut and sew apparel manufacturing | 8,533 | 8,850 | 8,017 | 7,078 | 8,610 |
| Chemical manufacturing | 32,367 | 32,883 | 32,317 | 30,463 | 28,061 |
| Pharmaceutical and medicine manufacturing | 28,158 | 28,567 | 28,017 | 26,123 | 24,204 |
| Plastics and rubber products | 3,217 | 2,750 | 2,325 | 2,192 | 1,986 |
| Plastics product manufacturing | 2,917 | 2,258 | 2,133 | 2,032 | 1,839 |
| Other non-durable goods manufacturing | 9,232 | 8,517 | 7,291 | 6,630 | 6,429 |
| Total – non-durable goods | 69,633 | 69,250 | 66,233 | 62,447 | 61,013 |
| | | | | | |
| Total manufacturing employment | 118,442 | 117,317 | 112,583 | 107,874 | 104,198 |

_____
\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source*:  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 14,200 from fiscal year 2004 to fiscal year 2008.  Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively.  Thereafter, manufacturing employment seemed to stabilize around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another significant drop of 4.0%.  For fiscal years 2007 and 2008, manufacturing employment decreased by 4.2% and 3.4%, respectively.  For the first nine months of fiscal year 2009, the sector lost an average of 5,600 jobs, or 5.3% compared to the same period of the previous year.  In summary, the manufacturing sector lost nearly 17,000 jobs from calendar year 2005 to 2008, and, according to the trend

PR-CCD-0009429

observed for the first months of 2009, it is likely that it will lose more than 5,000 additional jobs in calendar year 2009. Given that this sector used to pay the highest wages, on average, in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are needed to improve it.

*Service Sector*

Puerto Rico has experienced significant growth in the service sector, which, for purposes of the data set forth below, includes finance, insurance, real estate, wholesale and retail trade, and other services. This sector has expanded in terms of both income and employment over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2004 and 2008, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.0%, while payroll employment in this sector increased at an average annual rate of 0.8%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2008, the service sector generated $37.1 billion of gross domestic product, or 40% of the total. Service-sector employment grew from 542,092 in fiscal year 2004 to 559,811 in fiscal year 2008 (representing 54.8% of total, non-farm, payroll employment). This represents a cumulative increase of 3.3% during such period. For the first nine months of fiscal year 2009, the average service-sector employment was 546,108, a decrease of 2.6% compared to the same period of the prior fiscal year. Wholesale and retail trade, finance, insurance, and real estate experienced growth in fiscal years 2004 to 2008, as measured by gross domestic product at current prices. From fiscal year 2004 to 2008, gross domestic product increased in the trade sector from $9.8 billion to $11.8 billion, and in finance, insurance, and real estate from $13.0 billion to $16.4 billion.

Puerto Rico has a developed banking and financial system. As of December 31, 2008, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of December 31, 2008 were $87.5 billion, as compared to $87.9 billion as of December 31, 2007.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $26.5 billion as of December 31, 2008, down from $27.9 billion on December 31, 2007. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $13.9 billion as of December 31, 2008, down slightly from $14.1 billion as of December 31, 2007 according to the OCFI. Most of the assets under management of local mutual funds are reflected in the amount of assets under management by broker-dealers stated above.

PR-CCD-0009430

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of December 31, 2008, there were 33 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $63.8 billion, a decrease from $75.8 billion in total assets as of December 31, 2007. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $6.7 billion in assets as of December 31, 2008, a slight increase from $6.5 billion as of December 31, 2007.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2004 to 2008.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2007** | **2008**[1] |
| Wholesale and retail trade | $ 9,802 | $10,217 | $10,675 | $11,110 | $11,811 |
| Finance, insurance, and real estate | 13,029 | 14,267 | 14,833 | 15,927 | 16,391 |
| Other services[2] | 7,646 | 7,965 | 8,277 | 8,572 | 8,867 |
| Total | $30,476 | $32,449 | $33,785 | $35,608 | $37,068 |

* Totals may not add due to rounding.
(1) Preliminary.
(2) Includes tourism.

*Source*: Planning Board.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2007** | **2008**[1] |
| Wholesale trade | 33,300 | 33,717 | 33,992 | 33,267 | 33,821 |
| Retail trade | 132,008 | 136,192 | 137,358 | 133,744 | 131,178 |
| Transportation, warehouse and utilities | 17,042 | 17,617 | 17,433 | 16,988 | 16,840 |
| Trade, transportation, warehouse, and utilities | 182,350 | 187,525 | 188,783 | 183,998 | 181,838 |
| Information | 21,917 | 22,608 | 22,675 | 22,639 | 21,342 |
| Finance | 46,850 | 48,633 | 49,767 | 49,094 | 48,125 |
| Professional and business | 101,900 | 103,767 | 106,517 | 108,796 | 108,660 |
| Educational and health | 98,108 | 99,967 | 103,650 | 105,226 | 108,743 |
| Leisure and hospitality | 70,317 | 72,592 | 74,767 | 73,562 | 73,750 |
| Other services | 20,650 | 21,258 | 20,567 | 18,233 | 17,354 |
| Total | 542,092 | 556,351 | 566,726 | 561,549 | 559,813 |

* Totals may not add due to rounding.
(1) Preliminary.

*Source*: Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

A-14

During fiscal year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,922,500, an increase of 3.8% over the number of persons registered during the same period in fiscal year 2005. The number of non-resident tourists registered in tourist hotels during fiscal year 2006 increased by 3.5% compared to fiscal year 2005. Tourist hotel rooms available during fiscal year 2006 increased by 3.9% to 10,739 rooms, compared to fiscal year 2005. The average occupancy rate in tourist hotels during fiscal years 2005 and 2006 was 70.8%.

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006. The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

For fiscal year 2008, the number of persons registered in tourist hotels was 1,745,000, a further decline of 2.6% over the number of persons registered during fiscal year 2007. The average occupancy rate in tourist hotels during fiscal year 2008 was 70.3%, compared to 71.7% in fiscal year 2007. The average number of rooms available in tourist hotels increased by 2.1% to 10,253 rooms from fiscal year 2007 to fiscal year 2008.

The number of persons registered in tourist hotels during the first six months of fiscal year 2009 was 826,300, a decrease of 0.8% over the number of persons registered during the same period of fiscal year 2008. The average occupancy rate in tourist hotels during the first semester of fiscal year 2009 was 63.7%, compared to 67.5% in the period for fiscal year 2008. During the first six months of fiscal year 2009, the average number of rooms available in tourist hotels increased by 2.7% to 10,220 rooms compared with the same period in fiscal year 2008.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For the first nine months of fiscal year 2009, employment in hotels and lodging places was reduced by 3.9% to 13,700 jobs.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

PR-CCD-0009432

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2008.

## Commonwealth of Puerto Rico
## Tourism Data[1]

### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 |
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008[4] | 1,276,989 | 1,496,853 | 2,617,348 | 5,391,190 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2004 | $ 1,334.1 | $ 154.0 | $ 1,536.0 | $ 3,024.0 |
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008[5] | 1,451.2 | 194.3 | 1,998.9 | 3,644.5 |

_____
(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500-key hotel is scheduled to commence operations at the end of 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people enjoying over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2008, the government accounted for $8.8 billion, or 9.4%, of Puerto Rico's gross domestic product. The Puerto Rico government is also a significant employer, providing jobs for 282,900 workers (state and local), or 27.7% of total, non-farm, payroll employment in fiscal year 2008. From fiscal year 2005 to fiscal

PR-CCD-0009433

year 2008, Commonwealth and municipal government employment has been reduced by approximately 10,100 positions. Nevertheless, during the first nine months of fiscal year 2009, state and local government employment increased by 1.2% or by 3,300 jobs to 284,400. According to the payroll survey, the distribution of these job increases was 600 jobs in the state government and 2,700 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of certain provisions of Act 7.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

In general, Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Fajardo, Arecibo, Cciba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2008, totaled approximately 4,625 miles and 11,774 miles of local streets and adjacent roads. The highway system comprises 425 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-5, PR-66, and PR-20 toll highways, 252 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,051 miles of tertiary highways and roads serving local, intra-regional traffic.

PR-CCD-0009434

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 35,000 per day.

The Port of the Americas is a deep draft port on the south coast of Puerto Rico that is under development by the Port of the Americas Authority. The Port of the Americas is expected to be used for broad operations such as domestic cargo, bulk, and liquid shipments for Puerto Rico, as well as transshipments. The first phase of the development was completed in 2004, and the second phase is substantially complete. A third development phase is currently underway, which is to result in a processing capacity of 500,000 Twenty-Foot Equivalent Units per year.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2001 through fiscal year 2008, however, real construction investment has decreased at an average annual rate of 5.4%. During the same time period, the total value of construction permits, in current dollars, increased at an average annual rate of 0.3%, but, adjusting the value of construction permits by the construction investment price deflator, the total value of permits, in constant dollars, declined at an average annual rate of 2.3%.

Public investment has been an important component of construction investment. During fiscal year 2008, approximately 50.2% of the total investment in construction was related to public projects. The total value of construction permits increased 12.9% in fiscal year 2008 as compared to fiscal year 2007, but total sales of cement decreased by 10.7%, the largest decline during the last decade. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2008 decreased in real terms by 8.8%, following a 7.6% real decline in fiscal year 2007, due principally to the drop in construction-related public projects. The Planning Board has estimated a construction investment decrease of 11.5% in real terms during fiscal year 2009. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties and the decline in construction investment is highly related to these difficulties. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, it announced on April 29, 2009 that the expected positive impact of the Federal Stimulus and the Local Stimulus had led it to reduce its projected decrease in construction investment to 5.6% in real terms. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During the first four months of fiscal year 2009, the number of construction permits decreased 4.8%, while the total value of construction permits dropped 12.9% compared to the same period in fiscal year 2008. For the first nine months of fiscal year 2009, cement sales have declined by 23.0%, reaching levels not seen in more than a decade.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2008, gross income from agriculture was $792 million, an increase of 1.2% compared with fiscal year 2007. The largest contributors to gross income in agriculture during fiscal year 2008 were livestock products (48% of the sector's gross income) and starchy vegetables (13%).

A-18

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 ("Act 225") provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

A-19

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age[2] | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age[2] | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |
| 2006 | 407,134[3] | 209,547 | 51.5% | 29,312,950[3] | 17,672,000 | 60.3% |
| 2007 | 396,057[3] | 225,402 | 56.9% | 29,492,415[3] | 17,959,000 | 60.9% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2007-2008 was approximately 63,205 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2007-2008 of approximately 164,341 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 36,781 students at approximately 76 institutions. This figure represents enrollment at federal Title IV-eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

## Tax Incentives

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax

A-20

and other incentives have also been established to promote the development of the tourism industry.  These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation.  Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes.  The most recent of these incentives laws is the Economic Incentives Act.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business.  The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development.  The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.  Companies qualifying thereunder can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments.  Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments.  Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%).  In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes.  However, Puerto Rico resident individuals, as well as non-resident individuals who are U.S. citizens, must include as income for purposes of computing their potential alternative minimum tax liability dividends derived from companies covered by the Economic Incentives Act and the 1998 Tax Incentives Act.  In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes.  Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island.  The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years.  The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects.  Other legislation enacted in 2001 and 2002 provides further tourism

A-21

PR-CCD-0009438

incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of eighteen hotel projects representing over 4,700 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

Because of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

PR-CCD-0009439

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

PR-CCD-0009440

(This page intentionally left blank)

PR-CCD-0009441

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

PR-CCD-0009445

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

B-5

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi) a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i) which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii) (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

B-7

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)       Defeasance Obligations;

        (ii)      Defeased Municipal Obligations;

PR-CCD-0009449

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

PR-CCD-0009450

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

B-10

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

        (i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

        (ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

        (iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

        (iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

        (v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

        (vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

B-11

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

    4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

PR-CCD-0009453

5. Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

PR-CCD-0009454

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

    3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

PR-CCD-0009456

4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

PR-CCD-0009457

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-18

PR-CCD-0009459

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

(i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)     if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-19

PR-CCD-0009460

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

        (iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

        (iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

        Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

        In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

        Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

        The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

PR-CCD-0009461

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-21

PR-CCD-0009462

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

## Selection of Bonds to be Redeemed in Partial Redemption (Section 404)

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

## The Pledge (Section 501)

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

## Establishment of Fund and Accounts (Section 502)

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

PR-CCD-0009463

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

PR-CCD-0009465

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1. All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest

PR-CCD-0009466

Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds

PR-CCD-0009467

purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)        Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)        Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)        Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)        Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)        Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in

PR-CCD-0009468

written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions.  The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the

B-28

Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement.  In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent.  Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts.  Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph.  In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any.  In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section.  Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account.  If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.  In the event

B-29

that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if

PR-CCD-0009471

applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

## Redemption Account; Amounts to be Deposited Therein (Section 509)

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)     amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)     amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii)     amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)     amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as

PR-CCD-0009472

practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

B-32

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal

Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

PR-CCD-0009475

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

B-35

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.      No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.      (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month

B-36

period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.   (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.   No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D.   *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month

PR-CCD-0009478

Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E.    *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2.    In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3.    The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

B-38

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be

B-39

liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including

B-40

the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee,

PR-CCD-0009482

notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

     (i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

     (ii)     to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

     (iii)     to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

     (iv)     to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

PR-CCD-0009483

(v)     to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)     to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)     to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)     as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

B-43

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of

B-44

and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided*, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

PR-CCD-0009486

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

    (i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

    (ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

    (iii)    by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

    (iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the

PR-CCD-0009487

interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST:  to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND:  to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD:  to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH:  to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH:  to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

PR-CCD-0009488

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution,

PR-CCD-0009489

except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

PR-CCD-0009490

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used

PR-CCD-0009491

for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by

PR-CCD-0009492

the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

PR-CCD-0009493

**APPENDIX C**

## AMENDMENTS TO THE GENERAL RESOLUTION

On June 10, 2009, the Corporation approved the Sixth Supplemental Sales Tax Revenue Bond Resolution for the purpose of providing for the First Amendment to the Sales Tax Revenue Bond Resolution.   The amendments generally consist of edits to conform the General Resolution to amendments made to Act 91, edits required to accommodate the issuance of First Subordinate Bonds (and incurrence of First Subordinate Obligations) and Second Subordinate Bonds (and incurrence of Second Subordinate Obligations), and clarifying and miscellaneous amendments.

### A.   Edits to conform to Act 91 Amendments.

*1.   The following definitions in the General Resolution were amended to take account of renumbering or redesignation of sections in Act 91:*

"Dedicated Sales Tax" shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

"Dedicated Sales Tax Fund" shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

"Pledged Sales Tax" shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

*2.   The following definitions in the General Resolution were amended and/or added to take account of the expansion in Act 91 of the scope of the Pledged Sales Tax Base Amount:*

"Pledged Sales Tax Base Amount" means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

"Pledged Sales Tax Additional Base Amount" means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

"Pledged Sales Tax Original Base Amount" means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

*3.   The following text, amending and expanding the scope of Section 706 of the General Resolution, was added to the General Resolution:*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*4. The terms "Repayment Project" and "Repayment Project Fund" in the General Resolution were amended to read "Project" and "Project Fund" in recognition of the expansion of the corporate purposes of the Corporation contained in Act 91.*

**B. Edits to accommodate issuance of First Subordinate and Second Subordinate Bonds.**

*1. The following definitions were added to the General Resolution to add the concept of First Subordinate Bonds (and First Subordinate Obligations) and Second Subordinate Bonds (and Second Subordinate Obligations):*

"First Subordinate Bonds" means the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

"First Subordinate Credit Facility" shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

C-2

"First Subordinate Credit Facility Provider" shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

"First Subordinate Hedge Obligations" means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

"First Subordinate Obligations" means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

"First Subordinate Qualified Hedge Provider" shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

"First Subordinate Reimbursement Obligations" means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

"First Subordinate Series 2009A Bonds" means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

"Second Subordinate Bonds" means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

"Second Subordinate Coverage Test" shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

"Second Subordinate Credit Facility" shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

"Second Subordinate Credit Facility Provider" shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

"Second Subordinate Hedge Obligations" means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

"Second Subordinate Obligations" means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

"Second Subordinate Qualified Hedge Provider" shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with

C-3

respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

"Second Subordinate Reimbursement Obligations" means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

"Class Priority" shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to the respective payment priorities set forth in the applicable Series Resolution.

2.  *The following definitions and text were added to the General Resolution to provide for the creation of Holding Subaccounts in the Debt Service Account for Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds to set up escrows that are to be accumulated over time in anticipation of payment of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds with balloon maturity payments:*

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution

"Holding Subaccount" means each Account by that name established in a Debt Service Account pursuant to Section 502.

[New Section 506.7] There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

3.  *The following definitions were added to the General Resolution and Section 505 of the General Resolution was amended (and the definition of "Accrued Payment Obligation" was amended) to accommodate First Subordinate and Second Subordinate Bonds in the flow of Revenues from the Revenue Account on each Revenue Account Monthly Disbursement Date, to read as follows:*

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-

PR-CCD-0009497

month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

[Section 505.1] All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In

PR-CCD-0009498

addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited.  Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST:  to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND:  to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15- Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD:  to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH:  to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH:  to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH:  to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH:  to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH:  the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax

C-6

Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2. Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

4. *The following definitions were added to the General Resolution, the provisions of Section 710 in the General Resolution regarding requirements for the issuance of Senior Bonds were supplemented, and requirements for the issuance of First Subordinate Bonds (and incurrence of First Subordinate Obligations) and Second Subordinate Bonds (and incurrence of Second Subordinate Obligations) were added, to read as follows:*

"Related August 2 Computation Period" shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

[Section 710.1]  1.    No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant

C-7

period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

1   (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.   (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.   (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.   No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such

C-8

Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

C-9

   5.   *A new subsection to Section 710.3 in the General Resolution was added to accommodate Subordinate Bonds and Subordinate Obligations of a Class Priority lower than First Subordinate and Second Subordinate, to read as follows:*

   [Section 710.3]   The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

   ### C.  *Miscellaneous and Clarifying Amendments.*

   *1.   A definition added to the General Resolution to accommodate direct receipt by the Corporation of tax credits for issuance of Bonds that qualify as "Build America Bonds", as follows:*

   "Build America Bond Tax Credit Receipts" shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

   *2. Section 1101 of the General Resolution was amended to <u>delete</u> the following text regarding Events of Default:*

   "2. The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax shall not constitute a default or Event of Default under the Resolution."

   *3. Section 202 of the General Resolution was amended to insert the requirement that all new Bonds must be payable as to principal on August 1 of the related year.*

   *4. Section 203 of the General Resolution was amended to clarify that Refunding Bonds must always be tested under the requirements of Section 710.*

   *5. Section 205 of the General Resolution was amended to add the statement that, among other factors, a Supplemental Resolution may set forth outstanding rating requirements for Credit Facility Providers that must be maintained in order for the Credit Facility Providers to retain rights of approval or consent under the General Resolution.*

   *6.  The definitions of "Bonds" and "Subordinate Bonds" in the General Resolution were amended to expand the concept to include notes, debentures or any other evidence of indebtedness.*

   *7.  The concept of "Outstanding" in the General Resolution was amended to expand its application to Parity Obligations or Subordinate Obligations that have not been fully paid and satisfied.*

PR-CCD-0009503

**APPENDIX D**

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

June    , 2009

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Re:    Puerto Rico Sales Tax Financing Corporation
       Sales Tax Revenue Bonds, Series 2009B

Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007, as amended (the "General Resolution"), and of a supplemental resolution adopted by the Board of Directors on June 17, 2009 providing for the issuance of the Bonds (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, Series 2009B (the "Bonds").

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom, undisbursed Bond proceeds, certain funds held under the Resolution, and income earned thereon (collectively referred to herein as the "Pledged Property").

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)    The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)    The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)    The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)    The Bonds do not constitute a debt, obligation or pledge of the credit of the Commonwealth or any municipality or political subdivision thereof, or of Government Development Bank for Puerto Rico, or of any other public instrumentality of the Commonwealth other than the Corporation as set forth above, and neither the Commonwealth nor any such municipality or political subdivision, nor Government Development Bank for Puerto Rico, or any other public instrumentality of the Commonwealth, other than the Corporation as set forth above, is liable for the payment of the Bonds or the interest thereon.

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

In addition, we are of the opinion that:

1.    Interest on the Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

2.    The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

3.    The transfer of the Bonds by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made. The transfer of the Bonds by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

4.    Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico.

5.    The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

6.    Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

D-2

PR-CCD-0009505

7.     Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(b)     Interest received, or original issue discount accrued, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico and such interest or original issue discount is not effectively connected or treated as effectively connected with the conduct of a trade or business in the United States by such corporation, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(c)     Gain on the sale of the Bonds derived by an individual who is a bona fide resident of Puerto Rico within the meaning of Section 937 of the U. S. Code during the entire year of the sale and during the ten years preceding the year of the sale who does not hold the Bonds as inventory will be excludable from gross income for purposes of the U.S. Code under Section 933(1) thereof.   Provided that if the individual was not a bona fide resident of Puerto Rico during the entire ten year period preceding the year of the sale the individual may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the U.S. Code.

(d)     Gain on the sale of the Bonds derived by a Puerto Rico Corporation will not be subject to United States federal income tax provided such gain is not effectively connected or treated as effectively connected with the conduct of a trade or business by such Puerto Rico Corporation in the United States and such corporation is not treated as a domestic corporation for purposes of the U.S. Code.

Prospective owners of the Bonds should be aware that the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies," or "passive foreign investment companies," as such terms are defined in the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1)     These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

(2)     These statements were written in connection with the promotion or marketing of the Bonds; and

(3)     Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

PR-CCD-0009506

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

This opinion is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated June 19, 2009 in connection with the Bonds. We further consent to the reference made to us under the captions "Tax Matters" and "Legal Matters" in said Official Statement.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

Respectfully submitted,

D-4

PR-CCD-0009507

**APPENDIX E**

# BOOK-ENTRY SYSTEM

## The Depository Trust Company

DTC will act as securities depository for the Series 2009B Bonds. The Series 2009B Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2009B Bond certificate will be issued for each stated maturity of the Series 2009B Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Series 2009B Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2009B Bonds on DTC's records. The ownership interest of each actual purchaser of the Series 2009B Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2009B Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 2009B Bonds, except in the event that use of the book-entry system for the Series 2009B Bonds is discontinued.

To facilitate subsequent transfers, the Series 2009B Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series 2009B Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2009B Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2009B Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2009B Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2009B Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2009B Bonds documents. For example, Beneficial Owners of Series 2009B Bonds may wish to ascertain that the nominee holding the Series 2009B Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2009B Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2009B Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2009B Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Series 2009B Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2009B Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Series 2009B Bond certificates are required to be printed and delivered.

E-2

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series 2009B Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES 2009 BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES 2009B BONDS.

E-3

PR-CCD-0009510

(This page intentionally left blank)

PR-CCD-0009511

**APPENDIX F**

**TABLE OF COMPOUNDED AMOUNTS FOR CAPITAL APPRECIATION BONDS**

| Date | Capital Appreciation Bonds Due 2033 | Capital Appreciation Bonds Due 2035 |
|------|------------------------------------:|------------------------------------:|
| 06/25/2009 | $     872.85 | $     735.45 |
| 08/01/2009 | 879.20 | 740.90 |
| 02/01/2010 | 911.65 | 768.60 |
| 08/01/2010 | 945.25 | 797.35 |
| 02/01/2011 | 980.10 | 827.15 |
| 08/01/2011 | 1,016.25 | 858.10 |
| 02/01/2012 | 1,053.70 | 890.20 |
| 08/01/2012 | 1,092.55 | 923.50 |
| 02/01/2013 | 1,132.85 | 958.05 |
| 08/01/2013 | 1,174.65 | 993.85 |
| 02/01/2014 | 1,217.95 | 1,031.05 |
| 08/01/2014 | 1,262.85 | 1,069.60 |
| 02/01/2015 | 1,309.45 | 1,109.60 |
| 08/01/2015 | 1,357.70 | 1,151.10 |
| 02/01/2016 | 1,407.80 | 1,194.15 |
| 08/01/2016 | 1,459.70 | 1,238.80 |
| 02/01/2017 | 1,513.55 | 1,285.15 |
| 08/01/2017 | 1,569.35 | 1,333.20 |
| 02/01/2018 | 1,627.20 | 1,383.05 |
| 08/01/2018 | 1,687.20 | 1,434.80 |
| 02/01/2019 | 1,749.45 | 1,488.45 |
| 08/01/2019 | 1,813.95 | 1,544.15 |
| 02/01/2020 | 1,880.85 | 1,601.90 |
| 08/01/2020 | 1,950.20 | 1,661.80 |
| 02/01/2021 | 2,022.10 | 1,723.95 |
| 08/01/2021 | 2,096.70 | 1,788.40 |
| 02/01/2022 | 2,174.00 | 1,855.30 |
| 08/01/2022 | 2,254.15 | 1,924.70 |
| 02/01/2023 | 2,337.30 | 1,996.70 |
| 08/01/2023 | 2,423.45 | 2,071.35 |
| 02/01/2024 | 2,512.85 | 2,148.85 |
| 08/01/2024 | 2,605.50 | 2,229.20 |
| 02/01/2025 | 2,701.60 | 2,312.55 |
| 08/01/2025 | 2,801.20 | 2,399.05 |
| 02/01/2026 | 2,904.50 | 2,488.80 |
| 08/01/2026 | 3,011.60 | 2,581.85 |
| 02/01/2027 | 3,122.65 | 2,678.45 |
| 08/01/2027 | 3,237.80 | 2,778.60 |
| 02/01/2028 | 3,357.20 | 2,882.50 |
| 08/01/2028 | 3,481.00 | 2,990.35 |
| 02/01/2029 | 3,609.35 | 3,102.15 |
| 08/01/2029 | 3,742.45 | 3,218.20 |
| 02/01/2030 | 3,880.45 | 3,338.55 |
| 08/01/2030 | 4,023.55 | 3,463.40 |
| 02/01/2031 | 4,171.90 | 3,592.95 |
| 08/01/2031 | 4,325.75 | 3,727.30 |
| 02/01/2032 | 4,485.25 | 3,866.75 |
| 08/01/2032 | 4,650.65 | 4,011.35 |
| 02/01/2033 | 4,822.15 | 4,161.35 |
| 08/01/2033 | 5,000.00 | 4,317.00 |
| 02/01/2034 | - | 4,478.45 |
| 08/01/2034 | - | 4,645.95 |
| 02/01/2035 | - | 4,819.70 |
| 08/01/2035 | - | 5,000.00 |

(This page intentionally left blank)

**APPENDIX G**

## TABLE OF COMPOUNDED AMOUNTS FOR
## CONVERTIBLE CAPITAL APPRECIATION BONDS

| Date | Convertible Capital Appreciation Bonds Due 2025 | Convertible Capital Appreciation Bonds Due 2026 | Convertible Capital Appreciation Bonds Due 2031 |
|---|---|---|---|
| 06/25/2009 | $3,088.85 | $3,088.85 | $2,329.65 |
| 08/01/2009 | 3,109.85 | 3,109.85 | 2,345.75 |
| 02/01/2010 | 3,217.15 | 3,217.15 | 2,427.85 |
| 08/01/2010 | 3,328.15 | 3,328.15 | 2,512.80 |
| 02/01/2011 | 3,442.95 | 3,442.95 | 2,600.75 |
| 08/01/2011 | 3,561.75 | 3,561.75 | 2,691.80 |
| 02/01/2012 | 3,684.60 | 3,684.60 | 2,786.00 |
| 08/01/2012 | 3,811.75 | 3,811.75 | 2,883.50 |
| 02/01/2013 | 3,943.25 | 3,943.25 | 2,984.45 |
| 08/01/2013 | 4,079.30 | 4,079.30 | 3,088.90 |
| 02/01/2014 | 4,220.00 | 4,220.00 | 3,197.00 |
| 08/01/2014 | 4,365.60 | 4,365.60 | 3,308.90 |
| 02/01/2015 | 4,516.25 | 4,516.25 | 3,424.70 |
| 08/01/2015 | 4,672.05 | 4,672.05 | 3,544.55 |
| 02/01/2016 | 4,833.25 | 4,833.25 | 3,668.65 |
| 08/01/2016 | 5,000.00 | 5,000.00 | 3,797.05 |
| 02/01/2017 | - | - | 3,929.95 |
| 08/01/2017 | - | - | 4,067.50 |
| 02/01/2018 | - | - | 4,209.85 |
| 08/01/2018 | - | - | 4,357.20 |
| 02/01/2019 | - | - | 4,509.70 |
| 08/01/2019 | - | - | 4,667.55 |
| 02/01/2020 | - | - | 4,830.90 |
| 08/01/2020 | - | - | 5,000.00 |

(This page intentionally left blank)

# Exhibit 13

NEW ISSUE – BOOK-ENTRY ONLY (See "RATINGS herein):

S&P: A+
Moody's: A2
Fitch: A

$1,823,757,271.30

## Puerto Rico Sales Tax Financing Corporation
### Sales Tax Revenue Bonds, First Subordinate Series 2010A

**Dated:** Date of Delivery

**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes described herein.

**The Series 2010A Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2010A Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The Series 2010A Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See** *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

The Series 2010A Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2010A Bonds on the records of The Depository Trust Company and its participants. The Series 2010A Bonds are being issued as Current Interest Bonds, Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2010A Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

The scheduled payment of principal of and interest on the Series 2010A Bonds maturing on August 1, 2040 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.), as indicated on the inside cover of this Official Statement.

**This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth, interest on the Series 2010A Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that interest on the Series 2010A Bonds is exempt from state, Commonwealth and local income taxation. See TAX MATTERS herein.*

**The Series 2010A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2010A Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed on for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2010A Bonds will be delivered through The Depository Trust Company on or about February 9, 2010*

| | | | |
|---|---|---|---|
| **Citi** | | | **BofA Merrill Lynch** |
| Barclays Capital | Goldman, Sachs & Co. | J.P. Morgan | Morgan Stanley |
| RBC Capital Markets | UBS Financial Services Incorporated of Puerto Rico | | Wells Fargo Securities |
| BBVAPR MSD | FirstBank Puerto Rico Securities | Popular Securities | Santander Securities | Scotia Capital |

January 28, 2010

**$1,823,757,271.30**
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2010A**

### $1,543,950,000 Current Interest Bonds[*]

#### $306,610,000 Serial Bonds

| Maturity August 1 | Amount | Interest Rate | Price or Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2016 | $15,000,000 | 3⅜% | 100.00 | 74529JJW6 |
| 2017 | 3,000,000 | 3⅝ | 100.00 | 74529JJX4 |
| 2018 | 3,000,000 | 3⅞ | 100.00 | 74529JJY2 |
| 2020 | 40,000,000 | 4⅜ | 100.00 | 74529JJZ9 |
| 2021 | 15,000,000 | 4½ | 100.00 | 74529JKA2 |
| 2022 | 4,000,000 | 4⅝ | 100.00 | 74529JKB0 |
| 2023 | 6,000,000 | 4¾ | 100.00 | 74529JKC8 |
| 2024 | 15,000,000 | 4⅞ | 100.00 | 74529JKD6 |
| 2026 | 25,000,000 | 5 | 100.00 | 74529JKE4 |
| 2027 | 4,000,000 | 5 | 5.08% | 74529JKF1 |
| 2030 | 26,610,000 | 5¼ | 5.32 | 74529JKG9 |
| 2030 | 50,000,000 | 5⅜ | 5.00 | 74529JKH7 |
| 2040[‡] | 100,000,000 | 5 | 5.15 | 74529JKL8 |

#### $1,237,340,000 Term Bonds

| | | |
|---|---|---|
| $290,390,000 5½% | Term Bonds due August 1, 2037, price: 100.00 | CUSIP[†] 74529JKJ3 |
| $425,265,000 5⅝% | Term Bonds due August 1, 2039, to yield 5.59% | CUSIP[†] 74529JKK0 |
| $521,685,000 5½% | Term Bonds due August 1, 2042, to yield 5.65% | CUSIP[†] 74529JKM6 |

### $129,809,532.30 Capital Appreciation Bonds[§]

| Maturity August 1 | Initial Principal Amount | Maturity Amount | Approximate Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2031 | $14,013,165.25 | $57,115,000 | 6.65% | 74529JKN4 |
| 2032 | 8,742,372.80 | 38,290,000 | 6.68 | 74529JKP9 |
| 2033 | 34,382,013.90 | 162,655,000 | 6.73 | 74529JKQ7 |
| 2034 | 7,553,732.60 | 38,270,000 | 6.74 | 74529JKR5 |
| 2035 | 28,375,668.75 | 154,375,000 | 6.76 | 74529JKS3 |
| 2036 | 36,742,579.00 | 214,180,000 | 6.77 | 74529JKT1 |

### $149,997,739 Convertible Capital Appreciation Bonds[**]

| Maturity Date August 1 | Initial Principal Amount | Compounded Amount as of August 1, 2019 and Amount Due at Maturity | Rate | Price | CUSIP[†] |
|---|---|---|---|---|---|
| 2029 | $39,515,000 | $70,000,000 | 6⅛% | 56.450 | 74529JKU8 |
| 2033 | 110,482,739 | 197,980,000 | 6¼ | 55.805 | 74529JKV6 |

---

[*]   Interest on the Current Interest Bonds will be payable semi-annually on each August 1 and February 1, commencing on August 1, 2010.

[†]   Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[‡]   Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

[§]   Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on August 1, 2010, and will be payable at maturity (or earlier redemption).

[**]  Interest on the Convertible Capital Appreciation Bonds will not be payable on a current basis prior to February 1, 2020, but will compound from their date of delivery on a semi-annual basis, beginning August 1, 2010, to and including August 1, 2019 (the "Current Interest Commencement Date"). After the Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds will be payable semi-annually on February 1, 2020 and on each August 1 and February 1 thereafter. Principal and Compounded Amount will be payable at maturity or earlier redemption.

CONFIDENTIAL

**In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2010A Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2010A Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.**

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters.  The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2010A Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2010A Bonds and other documents herein do not purport to be complete.  Reference is made to said laws, resolutions, the Series 2010A Bonds and other documents for full and complete statement of their provisions.  Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") makes no representation regarding the Series 2010A Bonds or the advisability of investing in the Series 2010A Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "Bond Insurance" and "Appendix G - Specimen Municipal Bond Insurance Policy."

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................ 1
   The Corporation ..................................................... 1
   Sales and Use Tax .................................................. 1
   Dedicated Sales Tax Fund ........................................ 1
   The Resolution ...................................................... 2
   Outstanding Bonds and Parity Obligations ................... 2
   Source of Payment and Security for the Bonds ............. 4
PLEDGED SALES TAX ............................................. 4
   Commonwealth Sales Tax Revenues ......................... 4
   Commonwealth Sales Tax Collections and Projections ... 5
   Collections by Source ............................................. 8
   Economic Indicators .............................................. 9
   Dedicated Sales Tax Fund ...................................... 11
   Pledged Sales Tax Base Amount ............................. 11
   Act 7 ................................................................. 13
   Procedures for the Collection and Deposit of the Pledged
     Sales Tax in the Dedicated Sales Tax Fund ............. 14
   Commonwealth Sales Tax Enforcement Initiatives ......... 16
THE SERIES 2010A BONDS ..................................... 17
   General ............................................................... 17
   Redemption .......................................................... 18
   Book-Entry Only System ......................................... 20
BOND INSURANCE ................................................ 21
   Bond Insurance Policy ............................................ 21
   Assured Guaranty Municipal Corp. (formerly known as
     Financial Security Assurance Inc.) ........................ 21
SECURITY FOR THE BONDS ................................... 23
   General ............................................................... 23
   Commonwealth Non-Impairment Covenant .................. 23
   Property Pledged for the Payment of the Series 2010A
     Bonds ............................................................. 24
   Outstanding Bonds and Parity Obligations ................... 25
   Subordination Provisions of the First Subordinate Bonds 25
   Funds and Accounts under the Resolution .................... 26
   Additional Bonds, Refunding Bonds and Other
     Obligations ...................................................... 28
   Commonwealth's Authority to Cover Deficiencies ......... 31
RISK FACTORS ..................................................... 31
   Economic Conditions Could Affect Commonwealth Sales
     Tax Revenues ................................................... 31
   Legislative Assembly Authority over the Commonwealth
     Sales Tax ........................................................ 31

**Page**

   Certain Constitutional Considerations Relating to Act 91 32
   Limited Nature of Ratings; Reductions, Suspension or
     Withdrawal of a Rating ....................................... 34
   Limited Nature of Remedies .................................... 34
   Nature of Bond Insurance ....................................... 34
AGGREGATE DEBT SERVICE REQUIREMENTS ......... 35
PLAN OF FINANCING ............................................. 38
   Overview ............................................................. 38
   Estimated Sources and Uses of Funds ....................... 38
THE CORPORATION .............................................. 38
   Other Obligations of the Corporation ......................... 39
TAX MATTERS ...................................................... 39
   Federal Income Taxes ............................................ 39
   State Taxes .......................................................... 40
   Original Issue Discount ........................................... 40
   Original Issue Premium .......................................... 40
   Ancillary Tax Matters ............................................ 41
   Changes in Law and Post Issuance Events ................... 41
RATINGS .............................................................. 41
LEGALITY FOR INVESTMENT ................................. 42
UNDERWRITING ................................................... 42
LEGAL MATTERS .................................................. 43
CONTINUING DISCLOSURE ..................................... 43
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ................................................................. 45
MISCELLANEOUS ................................................. 45

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution .................................. B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation ........................... C-1
APPENDIX D – Book-Entry Only System .................... D-1
APPENDIX E – Table of Compounded Amounts for
   Capital Appreciation Bonds ................................... E-1
APPENDIX F – Table of Compounded Amounts for
   Convertible Capital Appreciation Bonds ................... F-1
APPENDIX G – Specimen Municipal Bond Insurance
   Policy .............................................................. G-1

CONFIDENTIAL

Case:17-03283-LTS Doc#:478-1 Filed:01/24/18 Entered:01/24/18 18:18:25 Desc:
Exhibit 13 Part Page 3 of 148

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

$1,823,757,271.30
# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2010A

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover pages, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $1,823,757,271.30 Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"). Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

## The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

## Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

## Dedicated Sales Tax Fund

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such

CONFIDENTIAL

Commonwealth Sales Tax (at present, 5.5%, the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund* under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See *Dedicated Sales Tax Fund* and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The Series 2010A Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, and a Twelfth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010A Bonds (the "Twelfth Supplemental Resolution") (the General Resolution, as amended by the Twelfth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on January 28, 2010, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the Series 2010A Bonds, the Corporation had outstanding $11 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $302 million accreted on existing capital appreciation bonds as of January 1, 2010. The Corporation's outstanding bonds consist of senior and first subordinate bonds. The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds"). The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), and (iii) Sales Tax Revenue Bonds, First Subordinate Series 2009D Bond Anticipation Notes (the "Series 2009D Bonds" and, together with the Series 2009A Bonds and the Series 2009B Bonds, the "Outstanding First Subordinate Bonds").

Concurrently with the issuance of the Series 2010A Bonds, the Corporation will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010B Bond Anticipation Notes (the "Series 2010B Bonds") to Government Development Bank for Puerto Rico in order to finance certain Authorized Uses on a taxable basis. After giving effect to the issuance of the Series 2010A Bonds and the Series 2010B Bonds and the repayment of the Series 2009D Bonds, the Corporation will have $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.2 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $275 million accreted on existing capital appreciation bonds as of January 1, 2010) and $7.3 billion aggregate initial principal amount will consist of Outstanding First Subordinate Bonds (plus $27 million accreted on existing capital appreciation bonds as of January 1, 2010).

2

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

The Corporation routinely explores opportunities to refinance its debt to reduce debt service from time to time. As previously announced, the Corporation is considering the purchase of all or a portion of the Corporation's Series 2009A Bonds issued as Mandatory Tender Bonds. It is also considering the purchase of all or a portion of the Series 2007A Bonds issued as LIBOR-based Adjustable Rate Bonds accompanied by a termination of an equivalent amount of the interest rate exchange agreement related to such Series 2007A Bonds. If the Corporation decides to purchase the Series 2009A Bonds, such purchase would be funded through the issuance of First Subordinate Bonds. If the Corporation decides to purchase the Series 2007A Bonds, such purchase would be funded through the issuance of a series of Senior Bonds. No assurance can be given that the Corporation will purchase any of its Outstanding Senior Bonds or Outstanding First Subordinate Bonds or terminate any interest rate exchange agreement in connection therewith.

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See *Additional Bonds, Refunding Bonds and Other Obligations* under SECURITY FOR THE BONDS.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2010A Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2010A Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The Series 2010A Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the Series 2010A Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *Subordination Provisions of the Series 2010A Bonds* and *Funds and Accounts Under the Resolution* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

3

CONFIDENTIAL

The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.

The Series 2010A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.

Brief descriptions of the Corporation, the security for the Series 2010A Bonds, the terms of the Series 2010A Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

4

CONFIDENTIAL

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of September and October 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for July 2009 as compared to collections for July 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers).

**Commonwealth Sales Tax Collections and Projections**

The Commonwealth Sales Tax went into effect on November 15, 2006. The Treasury Department records its sales tax collection data on a modified cash basis. This means that the collection figures for any particular month represent the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* below for a description of the reporting and collections procedures utilized by the Treasury Department. Accordingly, the sales tax reported by the Treasury Department for November 2006 relate to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. Total Commonwealth Sales Tax collections attributable to sales made from November 15, 2006 through November 30, 2009 were approximately $3.4 billion, an average of $91.6 million per month.

*Fiscal Year 2006-2007.* Collections related to sales made during the seven and one-half months of Fiscal Year 2006-2007, when the Commonwealth Sales Tax was first imposed, equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Such collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

5

*Fiscal Year 2008-2009.* Commonwealth Sales Tax collections related to sales made during Fiscal Year 2008-2009 totaled $1.098 billion, or an average of $91.5 million per month. Such collections were below the Treasury Department's revised estimate of $1.116 billion by $19 million, or 1.7%, and were $46 million, or 4%, below collections for Fiscal Year 2007-2008. The Treasury Department believes that this decline is due primarily to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown. The Pledged Sales Tax then in effect (1%) totaled $199.6 million, nearly $7.2 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2009-2010.* Commonwealth Sales Tax collections related to sales made during the six month period ended December 31, 2009 (which represent actual receipts by the Treasury Department during the six month period from August 2009 through January 2010), totaled $554.5 million, or an average of $92.4 million per month. Such collections year-to-date are 1.5% below collections for the same period in Fiscal Year 2008-2009. The Treasury Department believes that this decline is due primarily to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions. The Treasury Department's current estimate for total Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2009-2010 is $1.218 billion. Whether sales tax collections meet this estimate is uncertain and depends upon general economic conditions and taxable sales activity for the remainder of Fiscal Year 2009-2010, as well as upon compliance levels and the results of enforcement efforts, among other factors. The next revision of this Treasury Department estimate is expected to be released in February 2010.

*Fiscal Year 2010-2011.* Commonwealth Sales Tax revenue projections for Fiscal Year 2010-2011 are not currently available. The Treasury Department usually prepares Commonwealth Sales Tax revenue projections during the Commonwealth's budget preparation process, which typically begins in the third quarter of each Fiscal Year.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See "*Economic Conditions could affect Commonwealth Sales Tax Revenues*" under RISK FACTORS.

6

PR-INT-000012720

The following tables show historical Commonwealth Sales Tax collections per month:

### Sales and Use Tax – Collection History by Month*
(Dollars in Thousands)

| | Fiscal Year | | | |
|---|---|---|---|---|
| | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 |
| July | – | $ 96,100 | $ 95,592 | $ 88,000 |
| August | – | 90,181 | 91,353 | 84,100 |
| September | – | 86,163 | 77,788 | 83,775 |
| October | – | 93,751 | 86,191 | 85,120 |
| November | $ 50,200[1] | 96,170 | 91,996 | 95,075 |
| December | 110,000 | 121,251 | 119,836 | 118,476 |
| January | 95,000 | 89,798 | 85,763 | |
| February | 86,200 | 86,486 | 84,608 | |
| March | 96,400 | 89,355 | 88,065 | |
| April | 85,700 | 93,487 | 88,788 | |
| May | 94,400 | 103,331 | 93,302 | |
| June | 95,460 | 97,526 | 94,382 | |

\*    Based on the modified cash basis reporting system utilized by the Treasury Department in which collections are shown on the month preceding the month on which they are actually received by the Treasury Department since such collections relate to sales made and taxes collected by the merchant and retailer during the month shown.

[1]    Reflects collections for sales made between November 15 and November 30. The sales tax became effective on November 15, 2006.

Source: Treasury Department



Source: Treasury Department

7

## Collections by Source

The chart below illustrates the composition of Commonwealth Sales Tax collections related to sales made during Fiscal Year 2008-2009 (actual receipts by the Treasury Department from August 2008 thru July 2009). Of the $1.098 billion in collections, approximately 51% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 12% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3.9% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2008-2009**



Source: Treasury Department

8

CONFIDENTIAL

PR-INT-000012722

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

### Compounded Annual Growth Rates for
### Gross National Product and Personal Consumption Expenditures
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
| --- | --- | --- | --- | --- | --- |
| | | | Services | Non-Durable Goods | Durable Goods |
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.73% | 4.90% | 5.93% | 4.76% | 0.85% |
| 1947-2009 | 7.75% | 7.64% | 8.87% | 6.73% | 8.07% |

Source: Planning Board

### Historical Components of Personal Consumption Expenditures and GNP
(Measured in Current Dollars)



Source: Government Development Bank

9

The graphs below show estimates of the current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.8% during this period.

### Personal Consumption Expenditures and GNP
(Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
(Constant Dollars)



Source: Government Development Bank

10

Personal consumption expenditures are also enhanced by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $13.1 billion in Fiscal Year 2008-2009, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 23.6% of personal consumption expenditures in Fiscal Year 2008-2009 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *The Economy -- Personal Income" in Appendix A -- Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

## Dedicated Sales Tax Fund

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

## Pledged Sales Tax Base Amount

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 is $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

11

PR-INT-000012725

The following table shows Estimated Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

**Annual Pledged Sales Tax Base Amount**

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

12

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Act 7**

Act 7 contains the main components of the Commonwealth's fiscal stabilization plan. Act 7 creates an integrated plan that includes: (1) operating expense-reduction measures, including various workforce reduction initiatives and a temporary freeze of salary increases and other economic benefits included in certain laws and collective bargaining agreements, (2) tax revenue enforcement measures, (3) a combination of permanent and temporary tax increases, and (4) financial measures, including the provisions that amended Act 91 to increase the amount of the Commonwealth Sales Tax pledged to the Corporation from 2% to 2.75% and the aggregate Pledged Sales Tax Base Amount from $400,192,000 to $550,264,000.

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies. On August 5, 2009, the United States District Court for the District of Puerto Rico denied the preliminary injunction. The District Court's decision allows the Government to continue with the implementation of Act No. 7. The Government has moved to dismiss the complaint and will continue to vigorously defend the constitutionality of Act No. 7.

The Corporation is not a defendant in the complaint. The complaint does not challenge the valid existence of the Corporation, the validity of Act 91, the validity of the Bonds, or the powers of the Corporation. As discussed elsewhere in this Official statement, Bond Counsel has opined that Act 91 is valid in all respects material to their approving opinion (see *Appendix C*). In addition, in connection with the issuance of the Bonds, the Secretary of Justice of the Commonwealth has opined that Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

13

CONFIDENTIAL

PR-INT-000012727

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day,[*] the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

---

[*] Prior to December 2009 the return was due on the 20th day of the month.

14

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1)   Includes 1.5% Municipal Sales Tax.
(2)   Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. Certain large merchants and retailers are required to file their return electronically. As of October 2009, the Treasury Department reports that 88.2% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of June 2009, 216,269 merchants and retailers were required to file a monthly return, out of which 57,366 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants' Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized

15

CONFIDENTIAL

PR-INT-000012729

and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

**Commonwealth Sales Tax Enforcement Initiatives**

The Treasury Department has announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department, through the implementation of its recently announced enforcement programs, has set a goal of collecting in Fiscal Year 2009-2010 an additional $75 million in annually recurring Commonwealth Sales Tax revenue. The Treasury Department may not reach the Fiscal Year 2009-2010 revenue goal due to certain delays in the implementation of a new point-of-sale system caused by a temporary restraining order issued in connection with a lawsuit that has since been lifted and dismissed, as described below.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has reviewed more than 26 cases and collected approximately $1.4 million. The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts. As a result of these initiatives, the Treasury Department has collected approximately $8.2 million in fines and penalties attributable to non-compliance with legal and regulatory requirements related to the sales tax.

The Treasury Department is focusing its efforts to increase sales tax revenues by improving compliance in retail transactions. To this end, the Treasury Department undertook a request for proposals procurement process and selected a vendor to provide a new point-of-sale electronic system that would strengthen its enforcement efforts. The system was designed to (i) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets and (ii) deposit the sales tax applicable to purchases made with debit or credit cards immediately into the Treasury Department's account. This point-of-sale system, which would be provided to the majority of merchants free of charge, would also have wireless capabilities in order to capture sales by street vendors. The Treasury Department's vendor selection process was delayed by a temporary restraining order issued by the Puerto Rico Court of Appeals in connection with a challenge filed by a losing bidder. On December 11, 2009, the challenge was dismissed and the temporary restraining order was lifted. Since December 11, 2009, the Treasury Department has been working to restructure the selection process, which is expected to resume during the first quarter of calendar year 2010.

The Treasury Department intends to strengthen its enforcement workforce. It has equipped a call center to be staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center, which has been completed and is fully equipped, is expected to commence full operations during the first quarter of calendar year 2010. The Treasury Department is also providing additional training to its auditors in order to conduct more effective audits. Currently, there are 491 cases under audit and the Audit Bureau has issued approximately $10.3 million in preliminary deficiencies in connection with 18 cases related to promoters in the entertainment industry.

The Treasury Department also intends to increase staffing levels in its Enforcement and Compliance Bureaus by approximately 500 employees (including the 150 tax collection agents assigned to the call center

16

PR-INT-000012730

mentioned in the previous paragraph), which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently makes approximately 2,000 visits per month.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act No. 7 of March 9, 2009, as amended, require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department expects to commence certain additional sales tax enforcement measures. The Treasury Department will begin to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. In November 2009, the Treasury Department entered into this type of agreement with the municipality of San Juan. The Treasury Department is currently negotiating this type of agreement with the municipalities of Caguas, Guaynabo and Bayamon.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

## THE SERIES 2010A BONDS

### General

The Series 2010A Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $1,823,757,271.30. The Series 2010A Bonds will be issued as current interest bonds (the "Current Interest Bonds"), capital appreciation bonds (the "Capital Appreciation Bonds") and convertible capital appreciation bonds ("Convertible Capital Appreciation Bonds"). The Current Interest Bonds, the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds will be issued in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds), paying interest on the dates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover pages of this Official Statement.

The Series 2010A Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds). Interest on the Series 2010A Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2010A Bonds will be registered under The Depository

17

CONFIDENTIAL

Trust Company's Book-Entry Only system described below and in *Appendix D*. Certificated Series 2010A Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2010A Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the Series 2010A Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds, the Compounded Amount thereof.

*Current Interest Bonds.* Interest on the Current Interest Bonds will accrue from their date of delivery and will be payable semi-annually to maturity (or earlier redemption) on February 1 and August 1, commencing on August 1, 2010.

*Capital Appreciation Bonds.* Interest on the Capital Appreciation Bonds will compound from their date of delivery. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2010 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix E — Table of Compounded Amounts for Capital Appreciation Bonds*.

*Convertible Capital Appreciation Bonds.* Interest on the Convertible Capital Appreciation Bonds will compound from their date of delivery to August 1, 2019 (the "Current Interest Commencement Date"). Prior to the Current Interest Commencement Date, interest will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each Compounding Date, commencing August 1, 2010, and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix G — Table of Compounded Amounts for Convertible Capital Appreciation Bonds*. After the Current Interest Commencement Date, interest on the Convertible Capital Appreciation Bonds will be payable on a current basis on each February 1 and August 1, commencing on February 1, 2020, as shown on the inside cover of this Official Statement.

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after February 1, 2020 (February 1, 2015 in the case of the Current Interest Bonds bearing interest at the rate of 5.625% and maturing on August 1, 2030), at a redemption price equal to 100% of the principal amount of the Current Interest Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Optional Redemption of Convertible Capital Appreciation Bonds.* The Convertible Capital Appreciation Bonds maturing on August 1, 2033 are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2029, at a redemption price equal to 100% of the principal amount of the Convertible Capital Appreciation Bonds to be redeemed, plus accrued interest to the date fixed for redemption. The Convertible Capital Appreciation Bonds maturing on August 1, 2029 are not subject to redemption.

18

CONFIDENTIAL

PR-INT-000012732

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2015, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate plus 0.30%.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Current Interest Term Bonds maturing on August 1, 2037, 2039, and 2042, shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Current Interest Term Bond:

| Mandatory Redemption Date | Sinking Fund Installments for Current Interest Term Bonds Maturing | | |
|---|---|---|---|
| | **August 1, 2037** | **August 1, 2039** | **August 1, 2042** |
| 08/01/2036 | $ 28,320,000 | | |
| 08/01/2037 | $262,070,000* | | |
| 08/01/2038 | | $187,380,000 | |
| 08/01/2039 | | $237,885,000* | |
| 08/01/2040 | | | $ 8,545,000 |
| 08/01/2041 | | | $172,420,000 |
| 08/01/2042 | | | $340,720,000* |

\* Final Maturity

*Notice of Redemption.* In the event any Series 2010A Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is

19

PR-INT-000012733

discontinued for any Series of Series 2010A Bonds as described above, to the registered owners of the Series 2010A Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2010A Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2010A Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2010A Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2010A Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2010A Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2010A Bonds, and the portions of the Series 2010A Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2010A Bonds or portions thereof to be redeemed will cease to bear interest (in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase).

Any notice of optional redemption of Series 2010A Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) and interest on the Series 2010A Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2010A Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) and premium, if any, and interest on the Series 2010A Bonds (or portions thereof) to be redeemed, then the Series 2010A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase), and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix D* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix D* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2010A Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2010A Bonds; (ii) confirmation of ownership interest in the Series 2010A Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2010A Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

CONFIDENTIAL

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2010A Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2010A Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2010A Bonds. See *Appendix D - Book-Entry Only System.*

<div align="center">

**BOND INSURANCE**

</div>

**Bond Insurance Policy**

Concurrently with the issuance of the Bonds, Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") will issue its Municipal Bond Insurance Policy (the "Policy") for the Series 2010A Bonds maturing on August 1, 2040 (the "Insured Bonds"). The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix G to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

**Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.)**

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, structured finance and mortgage markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

On July 1, 2009, AGL acquired the financial guaranty operations of Holdings from Dexia S.A. ("Dexia"). In connection with such acquisition, Holdings' financial products operations were separated from its financial guaranty operations and retained by Dexia. For more information regarding the acquisition by AGL of the financial guaranty operations of Holdings, see Item 1.01 of the Current Report on Form 8-K filed by AGL with the Securities and Exchange Commission (the "SEC") on July 8, 2009.

Effective November 9, 2009, Financial Security Assurance Inc. changed its name to Assured Guaranty Municipal Corp.

AGM's financial strength is rated "AAA" (negative outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"), "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's") and "AA" (Negative Outlook) by Fitch, Inc. ("Fitch"). Each rating of AGM should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guaranty the market price of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

<div align="center">

21

</div>

*Recent Developments*

*Ratings*

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

In a press release dated October 12, 2009, Fitch announced that it had downgraded the insurer financial strength rating of Financial Security Assurance Inc. ("Financial Security"), now known as AGM, to "AA" (Negative Outlook) from "AA+" (Ratings Watch Negative). Reference is made to the press release, a copy of which is available at www.fitchratings.com, for the complete text of Fitch's comments.

On July 1, 2009, S&P published a Research Update in which it affirmed its "AAA" counterparty credit and financial strength ratings on Financial Security, now known as AGM. At the same time, S&P continued its negative outlook on AGM. Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

There can be no assurance as to any further ratings action that Moody's, Fitch or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see Holdings' Annual Report on Form 10-K for the fiscal year ended December 31, 2008, which was filed by Holdings with the SEC on March 19, 2009, Holdings' Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, which was filed by Holdings with the SEC on May 20, 2009, AGL's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2009, which was filed by AGL with the SEC on August 10, 2009, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, which was filed by AGL with the SEC on November 16, 2009. Effective July 31, 2009, Holdings is no longer subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended (the "Exchange Act").

*Capitalization of AGM*

At September 30, 2009, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,365,609,560 and its total net unearned premium reserve was approximately $2,380,470,385 in accordance with statutory accounting principles.

*Incorporation of Certain Documents by Reference*

Portions of the following documents filed by Holdings or AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i) Annual Report of Holdings on Form 10-K for the fiscal year ended December 31, 2008 (which was filed by Holdings with the SEC on March 19, 2009);

(ii) Quarterly Report of Holdings on Form 10-Q for the quarterly period ended March 31, 2009 (which was filed by Holdings with the SEC on May 20, 2009);

(iii) the Current Reports on Form 8-K filed by Holdings with the SEC on May 21, 2009, June 10, 2009, and July 8, 2009;

(iv) Quarterly Report of AGL on Form 10-Q for the quarterly period ended June 30, 2009 (which was filed by AGL with the SEC on August 10, 2009);

(v) the Current Report on Form 8-K filed by AGL with the SEC on July 8, 2009; and

22

CONFIDENTIAL

PR-INT-000012736

(vi)     Quarterly Report of AGL on Form 10-Q for the quarterly period ended September 30, 2009 (which was filed by AGL with the SEC on November 16, 2009).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents.  Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at Holdings' website at http://www.fsa.com, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.):  31 West 52nd Street, New York, New York 10019, Attention:  Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "BOND INSURANCE – Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.)" or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information.  Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE."

<div align="center">

## SECURITY FOR THE BONDS

</div>

**General**

Pursuant to the Resolution, the Series 2010A Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property.  The Series 2010A Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations.   The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations.  The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2010A Bonds.  Only Senior Bonds and the Parity Obligations will be senior to the Series 2010A Bonds.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010A Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2010A Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010A Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose,

<div align="center">23</div>

PR-INT-000012737

maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

### Property Pledged for the Payment of the Series 2010A Bonds

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2010A Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

24

CONFIDENTIAL

**Outstanding Bonds and Parity Obligations**

Prior to the issuance of the Series 2010A Bonds, the Corporation had outstanding $11 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $302 million accreted on existing capital appreciation bonds as of January 1, 2010. The Corporation's outstanding bonds consist of Senior and First Subordinate Bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.2 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

After the issuance of the Series 2010A Bonds and the Series 2010B Bonds and the repayment of the Series 2009D Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $7.3 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2009D Bonds, issued pursuant to the Tenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 22, 2009, (iv) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, and (v) the Series 2010B Bonds, issued pursuant to the Thirteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010.

**Subordination Provisions of the First Subordinate Bonds**

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to

25

PR-INT-000012739

provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

## Funds and Accounts under the Resolution

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1)     to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2)     to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3)     to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4)     to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5)     to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

(6)     if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or

CONFIDENTIAL

transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

        (a)     to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

        (b)     at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds

27

or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund*" under PLEDGED SALES TAX):



*No Debt Service Reserve deposit requirement currently exists.

## Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be

28

PR-INT-000012742

paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

### All Bonds, Parity Obligations and Subordinate Obligations

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

### Additional Requirements — Senior Bonds and Parity Obligations

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each

29

PR-INT-000012743

subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

       B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

       C.      No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

       D.      *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

       Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

CONFIDENTIAL

PR-INT-000012744

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

### Commonwealth's Authority to Cover Deficiencies

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2010A Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2010A Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2010A Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2010A Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2010A Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. The Planning Board is revising its most recent projection for fiscal year 2010 and expects to complete and announce the revised projection during February 2010. The revised projection may be lower than the previously published projection and may show a continued reduction in gross national product during fiscal year 2010. For more information regarding the economic conditions of the Commonwealth, see *Appendix A — Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

CONFIDENTIAL

PR-INT-000012745

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will

32

CONFIDENTIAL

PR-INT-000012746

(i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2010A Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2010 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, a prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion. On June 18, 2009, in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A, the prior Secretary of Justice also issued an opinion (the "2009 Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2010 Opinion, the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2010A Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2010A Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

CONFIDENTIAL

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2010A Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2010A Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2010A Bonds is not a recommendation to purchase, hold or sell such Series 2010A Bonds and such rating will not address the marketability of such Series 2010A Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market for the market prices for the Series 2010A Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2010A Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "Subordination Provisions of the Bonds" under SECURITY FOR THE BONDS. In the event the owners of the Series 2010A Bonds shall be entitled to declare a default, the payment of the Series 2010A Bonds by the Corporation cannot be accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2010A Bonds on the date such default is declared.

**Nature of Bond Insurance**

The payment of principal of and interest on the Insured Bonds by AGM, as and when due under the terms set forth in the Policy issued in connection with the Insured Bonds, is subject to the risk that AGM is unable or unwilling to make such payment. Further, the market price and marketability of the Insured Bonds may be adversely affected by the financial condition or the ratings of AGM.

34

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2010A Bonds, the Outstanding Senior Bonds and Parity Obligations, and the Outstanding First Subordinate Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding First Subordinate Bonds[1][2] | Series 2010A Bonds | | | Total Annual Debt Service[2] |
|---|---|---|---|---|---|---|
| | | | Principal | Interest[1] | Debt Service[1] | |
| 2010 | $177,212,926 | $274,600,897 | - | $12,135,369 | $12,135,369 | $463,949,192 |
| 2011 | 177,212,926 | 264,935,328 | - | 82,539,144 | 82,539,144 | 524,687,398 |
| 2012 | 177,212,926 | 299,935,328 | - | 60,104,531 | 60,104,531 | 537,252,785 |
| 2013 | 177,212,926 | 299,935,328 | - | 82,539,144 | 82,539,144 | 559,687,398 |
| 2014 | 177,212,926 | 299,935,328 | - | 82,539,144 | 82,539,144 | 559,687,398 |
| 2015 | 177,212,926 | 311,235,328 | - | 82,539,144 | 82,539,144 | 570,987,398 |
| 2016 | 177,212,926 | 329,216,578 | $15,000,000 | 82,539,144 | 97,539,144 | 603,968,648 |
| 2017 | 177,212,926 | 372,618,098 | 3,000,000 | 82,032,894 | 85,032,894 | 634,863,918 |
| 2018 | 177,212,926 | 401,014,573 | 3,000,000 | 81,924,144 | 84,924,144 | 663,151,643 |
| 2019 | 177,212,926 | 430,547,198 | - | 81,807,894 | 81,807,894 | 689,568,018 |
| 2020 | 177,212,926 | 405,267,166 | 40,000,000 | 98,469,144 | 138,469,144 | 720,949,236 |
| 2021 | 177,212,926 | 404,483,285 | 15,000,000 | 96,719,144 | 111,719,144 | 693,415,355 |
| 2022 | 181,942,926 | 423,576,985 | 4,000,000 | 96,044,144 | 100,044,144 | 705,564,055 |
| 2023 | 184,113,226 | 440,578,210 | 6,000,000 | 95,859,144 | 101,859,144 | 726,550,580 |
| 2024 | 259,097,926 | 454,480,360 | 15,000,000 | 95,574,144 | 110,574,144 | 824,152,430 |
| 2025 | 304,651,226 | 500,325,360 | - | 94,842,894 | 94,842,894 | 899,819,480 |
| 2026 | 319,309,926 | 489,488,495 | 25,000,000 | 94,842,894 | 119,842,894 | 928,641,315 |
| 2027 | 333,337,426 | 534,946,630 | 4,000,000 | 93,592,894 | 97,592,894 | 965,876,950 |
| 2028 | 352,878,526 | 589,394,748 | - | 93,392,894 | 93,392,894 | 1,035,666,168 |
| 2029 | 369,740,487 | 528,780,015 | 39,515,000 | 123,877,894 | 163,392,894 | 1,061,913,396 |
| 2030 | 387,153,667 | 537,957,708 | 76,610,000 | 89,105,394 | 165,715,394 | 1,090,826,769 |
| 2031 | 404,688,595 | 592,475,245 | 14,013,165 | 127,997,704 | 142,010,869 | 1,139,174,709 |
| 2032 | 422,921,795 | 644,055,845 | 8,742,373 | 114,443,496 | 123,185,869 | 1,190,163,509 |
| 2033 | 441,880,695 | 319,989,908 | 144,864,753 | 300,666,116 | 445,530,869 | 1,207,401,472 |
| 2034 | 461,600,180 | 713,719,908 | 7,553,733 | 103,238,386 | 110,792,119 | 1,286,112,207 |
| 2035 | 482,111,345 | 556,334,908 | 28,375,669 | 198,521,450 | 226,897,119 | 1,265,343,372 |
| 2036 | 503,444,330 | 578,018,680 | 65,062,579 | 249,959,540 | 315,022,119 | 1,396,485,129 |
| 2037 | 486,103,395 | 588,945,703 | 262,070,000 | 70,964,519 | 333,034,519 | 1,408,083,617 |
| 2038 | 507,593,361 | 576,863,408 | 187,380,000 | 56,550,669 | 243,930,669 | 1,328,387,438 |
| 2039 | 142,560,982 | 598,266,863 | 237,885,000 | 46,478,994 | 284,363,994 | 1,025,191,839 |
| 2040 | 140,477,975 | 376,745,000 | 108,545,000 | 33,692,675 | 142,237,675 | 659,460,650 |
| 2041 | 673,482,975 | 358,750,300 | 172,420,000 | 28,222,700 | 200,642,700 | 1,232,875,975 |
| 2042 | 700,472,975 | 340,755,300 | 340,720,000 | 18,739,600 | 359,459,600 | 1,400,687,875 |
| 2043 | 728,542,975 | 197,750,000 | - | - | - | 926,292,975 |
| 2044 | 757,732,975 | 186,375,000 | - | - | - | 944,107,975 |
| 2045 | 788,097,975 | - | - | - | - | 788,097,975 |
| 2046 | 819,672,975 | - | - | - | - | 819,672,975 |
| 2047 | 852,507,975 | - | - | - | - | 852,507,975 |
| 2048 | 886,663,066 | - | - | - | - | 886,663,066 |
| 2049 | 922,181,201 | - | - | - | - | 922,181,201 |
| 2050 | 959,121,096 | - | - | - | - | 959,121,096 |
| 2051 | 997,538,585 | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | 1,198,845,475 |
| Total | $24,716,967,424 | $15,222,299,014 | $1,823,757,271 | $3,152,496,978 | $4,976,254,249 | $44,915,520,687 |

[1] Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion is capitalized in years 2010 and 2012.

[2] Excludes payments on the (i) Series 2009D Bonds in the aggregate principal amount of $500 million expected to be repaid from proceeds of the Series 2010A Bonds and (ii) Series 2010B Bonds in the aggregate principal amount of $172.1 million bearing interest at 6% per annum and amortizing in equal amounts in 2038 and 2039, which are expected to be repaid from the proceeds of the Corporation's first bond issue after the issuance of the Series 2010A Bonds.

35

Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,791,960 | $177,212,926 | $362,261,584 | $539,474,510 | 2.03 |
| 2011 | 1,141,707,799 | 177,212,926 | 383,840,565 | 561,053,490 | 2.03 |
| 2012 | 1,187,380,355 | 216,423,834 | 367,071,796 | 583,495,630 | 2.03 |
| 2013 | 1,234,879,898 | 225,080,787 | 381,754,668 | 606,835,455 | 2.03 |
| 2014 | 1,284,279,510 | 234,084,018 | 397,024,855 | 631,108,873 | 2.03 |
| 2015 | 1,335,655,194 | 243,447,379 | 412,905,849 | 656,353,228 | 2.03 |
| 2016 | 1,389,085,995 | 253,185,274 | 429,422,083 | 682,607,357 | 2.03 |
| 2017 | 1,444,654,121 | 263,312,685 | 446,598,967 | 709,911,652 | 2.03 |
| 2018 | 1,502,445,065 | 273,845,193 | 464,462,925 | 738,308,118 | 2.03 |
| 2019 | 1,562,547,743 | 284,799,000 | 483,041,442 | 767,840,442 | 2.03 |
| 2020 | 1,625,054,625 | 296,190,960 | 502,363,100 | 798,554,060 | 2.03 |
| 2021 | 1,690,061,882 | 308,038,599 | 522,457,623 | 830,496,222 | 2.04 |
| 2022 | 1,757,669,531 | 320,360,143 | 543,355,928 | 863,716,071 | 2.04 |
| 2023 | 1,827,981,589 | 333,174,549 | 565,090,165 | 898,264,714 | 2.04 |
| 2024 | 1,901,106,235 | 346,501,530 | 587,693,773 | 934,195,303 | 2.04 |
| 2025 | 1,977,155,975 | 360,361,592 | 611,201,523 | 971,563,115 | 2.04 |
| 2026 | 2,056,247,813 | 374,776,055 | 635,649,584 | 1,010,425,639 | 2.04 |
| 2027 | 2,138,503,438 | 389,767,098 | 661,075,567 | 1,050,842,665 | 2.04 |
| 2028 | 2,224,049,402 | 405,357,781 | 687,518,591 | 1,092,876,372 | 2.04 |
| 2029 | 2,313,017,320 | 421,572,093 | 715,019,333 | 1,136,591,426 | 2.04 |
| 2030 | 2,405,544,075 | 438,434,976 | 743,620,108 | 1,182,055,084 | 2.04 |
| 2031 | 2,501,772,020 | 455,972,375 | 773,364,912 | 1,229,337,287 | 2.04 |
| 2032 | 2,601,849,207 | 474,211,271 | 804,299,507 | 1,278,510,778 | 2.04 |
| 2033 | 2,705,929,608 | 493,179,721 | 836,471,488 | 1,329,651,209 | 2.04 |
| 2034 | 2,814,173,354 | 512,906,910 | 869,930,348 | 1,382,837,258 | 2.04 |
| 2035 | 2,926,746,980 | 533,423,187 | 904,727,561 | 1,438,150,748 | 2.04 |
| 2036 | 3,043,823,686 | 554,760,114 | 940,916,664 | 1,495,676,778 | 2.04 |
| 2037 | 3,165,583,596 | 576,950,519 | 978,553,330 | 1,555,503,849 | 2.04 |
| 2038 | 3,292,214,042 | 600,028,539 | 1,017,695,464 | 1,617,724,003 | 2.04 |
| 2039 | 3,423,909,848 | 624,029,681 | 1,058,403,282 | 1,682,432,963 | 2.04 |
| 2040 | 3,560,873,630 | 648,990,868 | 1,100,739,414 | 1,749,730,282 | 2.04 |
| 2041 | 3,703,316,112 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 2.04 |
| 2042 | 3,851,456,444 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 2.12 |
| 2043 | 4,005,522,543 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 2.21 |
| 2044 | 4,165,751,443 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 2.30 |
| 2045 | 4,332,389,659 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 2.39 |
| 2046 | 4,505,693,566 | 821,180,488 | 992,545,002 | 1,813,725,490 | 2.48 |
| 2047 | 4,685,929,796 | 854,027,708 | 959,697,782 | 1,813,725,490 | 2.58 |
| 2048 | 4,873,375,645 | 888,188,816 | 925,536,674 | 1,813,725,490 | 2.69 |
| 2049 | 5,068,319,502 | 923,716,369 | 890,009,121 | 1,813,725,490 | 2.79 |
| 2050 | 5,271,061,289 | 960,665,024 | 853,060,466 | 1,813,725,490 | 2.91 |
| 2051 | 5,481,912,928 | 999,091,625 | 814,633,865 | 1,813,725,490 | 3.02 |
| 2052 | 5,701,198,816 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 3.14 |
| 2053 | 5,929,256,327 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 3.27 |
| 2054 | 6,166,436,329 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 3.40 |
| 2055 | 6,413,103,727 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 3.54 |
| 2056 | 6,669,638,020 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 3.68 |
| 2057 | 6,936,433,887 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 3.82 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.

(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

36

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.6%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.6% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,791,960 | $177,212,926 | $362,261,584 | $539,474,510 | 2.03 |
| 2011 | 1,115,685,199 | 177,212,926 | 383,840,565 | 561,053,490 | 1.99 |
| 2012 | 1,133,870,083 | 216,423,834 | 367,071,796 | 583,495,630 | 1.94 |
| 2013 | 1,152,351,364 | 225,080,787 | 381,754,668 | 606,835,455 | 1.90 |
| 2014 | 1,171,133,875 | 234,084,018 | 397,024,855 | 631,108,873 | 1.86 |
| 2015 | 1,190,222,524 | 243,447,379 | 412,905,849 | 656,353,228 | 1.81 |
| 2016 | 1,209,622,301 | 253,185,274 | 429,422,083 | 682,607,357 | 1.77 |
| 2017 | 1,229,338,278 | 263,312,685 | 446,598,967 | 709,911,652 | 1.73 |
| 2018 | 1,249,375,607 | 273,845,193 | 464,462,925 | 738,308,118 | 1.69 |
| 2019 | 1,269,739,528 | 284,799,000 | 483,041,442 | 767,840,442 | 1.65 |
| 2020 | 1,290,435,362 | 296,190,960 | 502,363,100 | 798,554,060 | 1.62 |
| 2021 | 1,311,468,520 | 308,038,599 | 522,457,623 | 830,496,222 | 1.58 |
| 2022 | 1,332,844,500 | 320,360,143 | 543,355,928 | 863,716,071 | 1.54 |
| 2023 | 1,354,568,889 | 333,174,549 | 565,090,165 | 898,264,714 | 1.51 |
| 2024 | 1,376,647,366 | 346,501,530 | 587,693,773 | 934,195,303 | 1.47 |
| 2025 | 1,399,085,703 | 360,361,592 | 611,201,523 | 971,563,115 | 1.44 |
| 2026 | 1,421,889,764 | 374,776,055 | 635,649,584 | 1,010,425,639 | 1.41 |
| 2027 | 1,445,065,510 | 389,767,098 | 661,075,567 | 1,050,842,665 | 1.38 |
| 2028 | 1,468,619,000 | 405,357,781 | 687,518,591 | 1,092,876,372 | 1.34 |
| 2029 | 1,492,556,390 | 421,572,093 | 715,019,333 | 1,136,591,426 | 1.31 |
| 2030 | 1,516,883,938 | 438,434,976 | 743,620,108 | 1,182,055,084 | 1.28 |
| 2031 | 1,541,608,003 | 455,972,375 | 773,364,912 | 1,229,337,287 | 1.25 |
| 2032 | 1,566,735,046 | 474,211,271 | 804,299,507 | 1,278,510,778 | 1.23 |
| 2033 | 1,592,271,638 | 493,179,721 | 836,471,488 | 1,329,651,209 | 1.20 |
| 2034 | 1,618,224,452 | 512,906,910 | 869,930,348 | 1,382,837,258 | 1.17 |
| 2035 | 1,644,600,272 | 533,423,187 | 904,727,561 | 1,438,150,748 | 1.14 |
| 2036 | 1,671,405,994 | 554,760,114 | 940,916,664 | 1,495,676,778 | 1.12 |
| 2037 | 1,698,648,623 | 576,950,519 | 978,553,330 | 1,555,503,849 | 1.09 |
| 2038 | 1,726,335,282 | 600,028,539 | 1,017,695,464 | 1,617,724,003 | 1.07 |
| 2039 | 1,754,473,207 | 624,029,681 | 1,058,403,282 | 1,682,432,963 | 1.04 |
| 2040 | 1,783,069,753 | 648,990,868 | 1,100,739,414 | 1,749,730,282 | 1.02 |
| 2041 | 1,812,132,396 | 674,950,503 | 1,138,774,987 | 1,813,725,490 | 1.00 |
| 2042 | 1,841,668,732 | 701,948,523 | 1,111,776,967 | 1,813,725,490 | 1.02 |
| 2043 | 1,871,686,481 | 730,026,464 | 1,083,699,026 | 1,813,725,490 | 1.03 |
| 2044 | 1,902,193,491 | 759,227,522 | 1,054,497,968 | 1,813,725,490 | 1.05 |
| 2045 | 1,933,197,736 | 789,596,623 | 1,024,128,867 | 1,813,725,490 | 1.07 |
| 2046 | 1,964,707,320 | 821,180,488 | 992,545,002 | 1,813,725,490 | 1.08 |
| 2047 | 1,996,730,479 | 854,027,708 | 959,697,782 | 1,813,725,490 | 1.10 |
| 2048 | 2,029,275,584 | 888,188,816 | 925,536,674 | 1,813,725,490 | 1.12 |
| 2049 | 2,062,351,142 | 923,716,369 | 890,009,121 | 1,813,725,490 | 1.14 |
| 2050 | 2,095,965,800 | 960,665,024 | 853,060,466 | 1,813,725,490 | 1.16 |
| 2051 | 2,130,128,343 | 999,091,625 | 814,633,865 | 1,813,725,490 | 1.17 |
| 2052 | 2,164,847,701 | 1,039,055,289 | 774,670,201 | 1,813,725,490 | 1.19 |
| 2053 | 2,200,132,950 | 1,080,617,501 | 733,107,989 | 1,813,725,490 | 1.21 |
| 2054 | 2,235,993,314 | 1,123,842,201 | 689,883,289 | 1,813,725,490 | 1.23 |
| 2055 | 2,272,438,165 | 1,168,795,889 | 644,929,601 | 1,813,725,490 | 1.25 |
| 2056 | 2,309,477,030 | 1,215,547,725 | 598,177,765 | 1,813,725,490 | 1.27 |
| 2057 | 2,347,119,592 | 1,264,169,634 | 549,555,856 | 1,813,725,490 | 1.29 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).
(2) Debt service for the year ending and including August 1. Debt service assumes that all Senior Bonds and Parity Obligations permitted under the Resolution have been issued or incurred beginning in 2012.
(3) Debt service for the year ending and including August 1. Debt service assumes that all First Subordinate Bonds and First Subordinate Obligations permitted under the Resolution have been issued.
(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.
(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

37

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2009, the average annual growth rate in personal consumption expenditures (nominal) was 7.64%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 5.03%. During Fiscal Year 2009, which constitutes the third consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 1.8% while Commonwealth Sales Tax revenues decreased by 4% as compared to Fiscal Year 2008.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Series 2010A Bonds, together with other funds available to the Corporation, to repay certain of its outstanding obligations and to provide funds to the Commonwealth for the Authorized Uses.

### Estimated Sources and Uses of Funds

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2010A Bonds | $1,823,757,271.30 |
| Net Original Issue Discount | (25,939,862.75) |
| **Total Sources** | $1,797,817,408.55 |

**Uses**

| | |
|---|---|
| Deposit to the Project Fund | $1,728,226,051.01 |
| Capitalized Interest through February 1, 2012 | 49,734,613.10 |
| Underwriters' Discount and Other Costs of Issuance[1] | 19,856,744.44 |
| **Total Uses** | $1,797,817,408.55 |

[1] Includes bond insurance premium, legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

38

CONFIDENTIAL

PR-INT-000012752

The following individuals are at present members of the Governing Board of the Corporation (one position is vacant):

| Name | Occupation | Expiration of Term |
| --- | --- | --- |
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Marcos Rodríguez-Ema | Governor's Chief of Staff | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |
| Agnes B. Suárez | Businesswoman | September 23, 2010 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## Other Obligations of the Corporation

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of December 31, 2009, the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Series 2010A Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Series 2010A Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Series 2010A Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable

39

PR-INT-000012753

requirements of the Code in order to maintain the exclusion of the interest on the Series 2010A Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in the Bond Resolution and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth described above, interest on the Series 2010A Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Series 2010A Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

## State Taxes

Bond Counsel is also of the opinion that, under existing statutes, interest on the Series 2010A Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Series 2010A Bonds.

## Original Issue Discount

Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Series 2010A Bonds maturing on August 1, 2027, 2029 (Convertible Capital Appreciation Bonds), 2030 (bearing interest at a rate of 5.25%), 2031 through 2036 (Capital Appreciation Bonds), 2033 (Convertible Capital Appreciation Bonds), 2039, 2040 and 2042 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2010A Bonds. In the case of the Series 2010A Bonds that are Convertible Capital Appreciation Bonds maturing on August 1, 2029 and 2033, the principal amount at maturity is treated as including all debt service payments on such bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

## Original Issue Premium

The Series 2010A Bonds maturing on August 1, 2030 (bearing interest at a rate of 5.625%) (the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in

40

PR-INT-000012754

the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Series 2010A Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Series 2010A Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Series 2010A Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions. Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Series 2010A Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Series 2010A Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinions attached as Appendix C. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Series 2010A Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Series 2010A Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Series 2010A Bonds. This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur. Prospective purchasers of the Series 2010A Bonds should consult their own tax advisers regarding such matters.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Series 2010A Bonds may affect the tax status of interest on the Series 2010A Bonds. Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Series 2010A Bonds, or the interest thereon, if any action is taken with respect to the Series 2010A Bonds or the proceeds thereof upon the advice or approval of other counsel.

## RATINGS

The Series 2010A Bonds, other than the Insured Bonds, have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A2" by Moody's Investors Service ("Moody's), and "A" by Fitch Ratings ("Fitch"). The Insured Bonds are expected to be assigned insured ratings of "AAA" (negative outlook) by S&P, "Aa3" (negative outlook) by Moody's and "AA" (negative outlook) by Fitch, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

CONFIDENTIAL

These ratings will only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2010A Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Series 2010A Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2010A Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $1,786,620,222.74 reflecting an original issue discount of $25,939,862.75 and an underwriters' discount of $11,197,185.81, and to reoffer such Series 2010A Bonds at the public offering prices or yields derived from such prices set forth on the inside cover pages hereof. Such Series 2010A Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2010A Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2010A Bonds if any Series 2010A Bonds are purchased.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. Incorporated ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC. for its selling efforts in connection with their respective allocations of Series 2010A Bonds.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2010A Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

CONFIDENTIAL

PR-INT-000012756

J.P. Morgan Securities Inc. has entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2010A Bonds as consideration for their professional services.

BBVAPR MSD ("BBVAPR") and RBC Capital Markets Corporation ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR and RBC share in the risk from the underwriting of the Series 2010A Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia Capital to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement, and in compliance with applicable rules, compensation with respect to the underwriting of the securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2010A Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2010A Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2010A Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a)      within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)      in a timely manner, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and

43

PR-INT-000012757

interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Series 2010A Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2010A Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2010A Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Series 2010A Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2010A Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2010A Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2010A Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)      the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

44

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2010A Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2010A Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2010A Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2010A Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*), the table of Compounded Amounts for the Convertible Capital Appreciation Bonds (*Appendix F*), and the specimen of the AGM Policy (*Appendix G*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing under the heading BOND INSURANCE and UNDERWRITNG, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

PUERTO RICO SALES TAX FINANCING
CORPORATION

By: _____
/s/ Fernando L. Batlle
Executive Director

45

Exhibit 13 Page 33 of 918

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

**General**

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,967,288 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375 (422,665 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, the real gross national product contracted by 1.2% and 2.8%, respectively. For fiscal year 2009, the real gross national product also contracted by 3.7%, which is 1.1% less than the Puerto Rico Planning Board's (the "Planning Board") projected reduction of 4.8% published in August 2009. In August 2009, the Planning Board also announced that the expected positive impact of the U.S. federal and local economic stimulus measures discussed below under "Overview of Economic and Fiscal Condition — Economic Reconstruction Plan" should outweigh the expected negative impact of the Fiscal Stabilization Plan also described below under "Overview of Economic and Fiscal Condition" and revised its projections for fiscal year 2010 to reflect an increase of 0.7% in real gross national product. The Planning Board, however, is currently working on a revised fiscal year 2010 gross national product forecast that would take into account the recently announced preliminary results for fiscal year 2009, the economic impact of a delay in the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors that may require a downward revision of their projection. The revised projection may show a continued reduction in gross national product during fiscal year 2010. The Planning Board expects to complete and announce the revised projection during February 2010.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP"), personal consumption expenditures and personal income. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

**Personal Income**

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2009. In fiscal year 2009, aggregate personal income was $58.9 billion ($45.4 billion at 2000 prices) and personal income per capita was $14,905 ($11,463 in 2000 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments

PR-INT-000012761

to individuals amounted to $13.1 billion in fiscal year 2009 ($12.2 billion in fiscal year 2008). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10 billion, or 74.4% of the transfer payments to individuals in fiscal year 2009 ($9.3 billion, or 73.9%, in fiscal year 2008). The remainder of federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2009.

<div align="center">

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

</div>

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Employees' compensation | | | | | |
| Business | $19,431.0 | $19,828.0 | $20,586.1 | $21,079.6 | $21,012.4 |
| Government | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 | 9,254.2 |
| Household and nonprofit institutions | 706.5 | 738.2 | 116.8 | 125.2 | 132.5 |
| Other | 1,085.3 | 1,036.7 | 946.4 | 999.4 | 1,122.7 |
|    Total Employees' compensation | $29,371.5 | $30,027.1 | $30,234.2 | $30,966.4 | $31,521.8 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,181.0 | 2,241.9 | 2,221.2 | 2,253.3 | 2,285.0 |
| Employers | 3,064.0 | 3,167.1 | 3,074.1 | 3,121.4 | 3,192.8 |
|    Total Contributions for social insurance | $5,245.0 | $5,409.0 | $5,295.3 | $5,374.7 | $5,477.8 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,687.0 | 2,832.3 | $2,219.8 | $2,232.2 | $2,246.5 |
| Dividends of domestic corporations | 286.7 | 304.3 | $322.1 | $351.9 | $355.6 |
| Miscellaneous income and dividends received from abroad | 13.4 | 13.4 | 9.9 | 17.1 | 6.6 |
| Rental income of persons | 4,201.8 | 4,387.4 | 5529.0 | 5825.5 | 6747.1 |
| Personal interest income | 2,911.9 | 3,725.1 | 2820.5 | 2872.6 | 3425.1 |
|    Total Proprietors' income | $10,100.7 | $11,262.5 | $10,901.3 | $11,299.3 | $12,780.9 |
| | | | | | |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,323.5 | 3,390.7 | 3,569.5 | 3,813.9 | 4,371.3 |
| Federal government | 9,243.7 | 9,725.9 | 10,327.1 | 12,209.3 | 13,057.7 |
| U.S. state governments | 14.9 | 17.6 | 22.7 | 24.1 | 35.6 |
| Business | 1,190.7 | 1,184.9 | 1,741.0 | 2,126.8 | 2,251.8 |
| Other nonresidents | 820.3 | 642.6 | 610.0 | 518.7 | 493.6 |
|    Total transfer payments | $14,593.0 | $14,961.8 | $16,270.3 | $18,692.8 | $20,210.0 |
| | | | | | |
|    Total Personal Income | $48,820.2 | $50,842.3 | $52,110.5 | $55,583.6 | $58,856.9 |

(1) Preliminary figures.
Source: Planning Board

<div align="center">

A-2

</div>

PR-INT-000012762

**Personal Consumption**

During Fiscal Year 2009, at current prices, personal consumption amounted to $55.6 billion, representing an increase of $1 billion, or 1.8%, from Fiscal Year 2008. This increase was based on a 1.5% increase in nondurable goods (40% of personal consumption), 4.2% decrease in durable goods (9% of personal consumption), and 3.2% increase in services (51% of personal consumption). At constant prices, personal consumption decreased 2.4% from Fiscal Year 2008. These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2009.

<div align="center">

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

</div>

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Food | $ 6,535.4 | $ 6,982.2 | $ 7,315.0 | $ 7,925.8 | $ 8,559.8 |
| Alcoholic beverages and tobacco products | 1,739.3 | 1,765.8 | 1,783.1 | 1,705.3 | 1,777.5 |
| Clothing and accessories | 2,957.1 | 3,084.9 | 3,528.0 | 3,568.7 | 3,604.8 |
| Personal care | 815.5 | 984.6 | 1,031.0 | 1,213.4 | 1,281.4 |
| Housing | 7,012.3 | 7,499.7 | 8,065.8 | 8,568.6 | 9,166.7 |
| Household operations | 5,267.9 | 5,929.2 | 6,479.0 | 7,053.6 | 6,997.6 |
| Medical care and funeral expenses | 7,525.9 | 8,007.2 | 8,434.8 | 9,046.7 | 9,453.3 |
| Business services | 3,020.1 | 3,035.5 | 3,103.0 | 3,022.5 | 3,055.5 |
| Transportation | 6,136.4 | 6,325.3 | 6,079.8 | 6,252.5 | 5,509.0 |
| Recreation | 4,547.2 | 4,810.3 | 4,935.0 | 4,997.0 | 4,938.2 |
| Education | 1,627.8 | 1,819.5 | 1,776.6 | 1,788.2 | 1,845.3 |
| Religious and nonprofit organizations, not elsewhere classified | 482.3 | 505.9 | 439.2 | 449.8 | 458.7 |
| Foreign travel | 1,531.9 | 1,608.9 | 1,616.9 | 1,737.8 | 1,631.4 |
| Miscellaneous purchases | 605.8 | 704.1 | 819.5 | 822.0 | 830.0 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $49,804.9 | $53,063.1 | $55,406.7 | $58,151.8 | $59,109.2 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,269.4 | 3,403.1 | 3,457.4 | 3,590.8 | 3,544.6 |
| Total Personal Consumption Expenditures | $46,535.4 | $49,660.0 | $51,949.3 | $54,561.0 | $55,564.6 |

(1) Preliminary figures.
Source: Planning Board.

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a

CONFIDENTIAL

major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30**

|  | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $53,752 | $56,732 | $59,521 | $61,527 | $62,759 |
| Real gross national product – $ millions (2000 prices) | 44,819 | 45,048 | 44,525 | 43,265 | 41,648 |
| Annual percentage increase (decrease) in real gross national product (2000 prices) | 1.9% | 0.5% | (1.2)% | (2.8)% | (3.7)% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 3.1% | 3.0% | 1.8% | 2.8% | (2.5)% |

(1) Preliminary.
(2) In current dollars.
*Sources:* Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990.

**REAL GNP GROWTH RATE**



Sources: Puerto Rico Planning Board.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Jul-2009). Estimate for U.S. from Global Insight (Nov-2009).

A-4

PR-INT-000012764

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2009 shown in this Appendix are preliminary until the revised figures are released and the forecast for fiscal year 2010 is revised. Certain information regarding current economic activity is, however, available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, which is shown in the table below and has been published on the website of Government Development Bank for Puerto Rico since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline), which provide an index that highly correlates to Puerto Rico's real gross national product.

As the following graph shows, the month-to-month reduction in the Government Development Bank – Economic Activity Index has begun to stabilize.



A-5

*Revised Economic Forecast for Fiscal Year 2010*

In August 2009, the Planning Board made an upward revision of its gross national product forecast for fiscal year 2010 by projecting an increase of 0.7% in constant dollars. The Planning Board's revised forecast for fiscal year 2010 took into account the estimated effect on the Puerto Rico economy of the Government's fiscal stabilization plan and of the activity expected to be generated by $1.73 billion from ARRA and $280.3 million from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board, however, is currently working on a revised fiscal year 2010 gross national product forecast that would take into account the recently announced preliminary results for fiscal year 2009, the economic impact of a delay in the disbursement of funds from ARRA, and other economic factors that may require a downward revision of their projections. The revised projection may show a continued reduction in gross national product during fiscal year 2010. The Planning Board expects to complete and announce the revised projection during February 2010.

*Fiscal Year 2009*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 3.7% (an increase of 2.0% in current dollars) over fiscal year 2008. Nominal gross national product was $62.8 billion in fiscal year 2009 ($41.6 billion in 2000 prices), compared to $61.5 billion in fiscal year 2008 ($43.3 billion in 2000 prices). Aggregate personal income increased from $55.6 billion in fiscal year 2008 ($44.1 billion in 2000 prices) to $58.9 billion in fiscal year 2009 ($45.4 billion in 2000 prices), and personal income per capita increased from $14,080 in fiscal year 2008 ($11,180 in 2000 prices) to $14,905 in fiscal year 2009 ($11,463 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. Although the situation improved significantly during fiscal year 2009, oil prices remained at relatively high levels, and the impact of the increases of previous years were still felt in fiscal year 2009. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector.

*Fiscal Year 2008*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.8% (an increase of 3.4% in current dollars) over fiscal year 2007. Nominal gross national product was $61.5 billion in fiscal year 2008 ($43.3 billion in 2000 prices), compared to $59.5 billion in fiscal year 2007 ($44.5 billion in 2000 prices). Aggregate personal income increased from $52.1 billion in fiscal year 2007 ($43.6 billion in 2000 prices) to $55.6 billion in fiscal year 2008 ($44.1 billion in 2000 prices), and personal income per capita increased from $13,244 in fiscal year 2007 ($11,094 in 2000 prices) to $14,080 in fiscal year 2008 ($11,180 in 2000 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

A-6

PR-INT-000012766

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.2%. Nominal gross national product was $59.5 billion ($44.5 billion in 2000 prices), compared to $56.7 billion in fiscal year 2006 ($45.0 billion in 2000 prices). This represents an increase in nominal gross national product of 4.9%. Aggregate personal income was $52.1 billion in fiscal year 2007 ($43.6 billion in 2000 prices), as compared to $50.8 billion in fiscal year 2006 ($43.4 billion in 2000 prices), and personal income per capita was $13,244 in fiscal year 2007 ($11,094 in 2000 prices), as compared to $12,970 in fiscal year 2006 ($11,146 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,253,400 for fiscal year 2006. The driving force behind total employment was self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.7% for fiscal year 2006.

**Overview of Fiscal Condition**

*Fiscal Condition*

The Commonwealth is experiencing a fiscal crisis as a result of the structural imbalance between recurring government revenues and expenses. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenses significantly higher than recurring revenues, which declined as a result of the multi-year economic contraction mentioned above. In order to bridge the deficit resulting from the structural imbalance, the government used non-recurring solutions, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, and excluding from the budget various government expenses, such as payments to suppliers and utilities providers.

*Rating Downgrades*

The continued fiscal imbalance led to successive downgrades in the Commonwealth's general obligation debt ratings, from "Baa1" by Moody's Investors Service ("Moody's") and "A–" by Standard & Poor's Rating Services ("S&P") in fiscal year 2004 to "Baa3" by Moody's and "BBB–" by S&P currently. Each of the rating agencies has a stable outlook on the Commonwealth's general obligation debt.

*Results for Fiscal Year 2009*

Total preliminary General Fund revenues for fiscal year 2009 were $7.76 billion, representing a decrease of $598.6 million, or 7.2%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $145.4 million and in corporate income taxes of

A-7

PR-INT-000012767

$201.2 million, (ii) a decrease of $51.9 in motor vehicle excise taxes, (iii) a decrease of $60.1 million in miscellaneous non-tax revenues, and (iv) a decrease of $16.1 million in sales and use tax revenues. The continued decline in General Fund tax revenues reflects primarily the impact of the ongoing economic recession and the effect of tax benefits and incentives granted to certain individual and corporate taxpayers pursuant to previous legislation designed to stimulate economic development.

Total preliminary General Fund revenues for fiscal year 2009 of $7.76 billion exceeded the revised estimate (made in February 2009) of General Fund revenues for fiscal year 2009 of $7.60 billion by approximately $160 million, or 2.1%. The major changes from the revised estimate for fiscal year 2009 were: (i) an increase of $190.4 million in income taxes withheld from non-residents pursuant to certain closing agreements entered into by the Department of the Treasury and (ii) an increase of $59 million in income taxes from individuals.

*Fiscal Stabilization Plan*

The government has developed and commenced implementing a multi-year plan designed to achieve fiscal balance and restore economic growth. The fiscal stabilization plan, which is generally contained in Act No. 7 of March 9, 2009 ("Act No. 7"), seeks to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including the following: (i) a $2 billion operating expense-reduction plan through government reorganization and reduction of operating expenses, including payroll as the main component of government expenditures; (ii) a combination of temporary and permanent tax increases, coupled with additional tax enforcement measures; and (iii) a bond issuance program through Puerto Rico Sales Tax Financing Corporation (known by the acronym of its Spanish name, "COFINA"). The proceeds obtained from the COFINA bond issuance program will be used to repay existing government debt (including debts with GDB), finance operating expenses of the Commonwealth for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, the funding of an economic stimulus plan and for other purposes to address the fiscal imbalance while the fiscal stabilization plan is being implemented. Before the temporary measures expire in 2013, the administration intends to design and adopt a comprehensive reform of the tax system and a long-term economic development plan to complement the economic reconstruction and supplemental stimulus initiatives described below. The fiscal stabilization plan seeks to safeguard the investment grade ratings of the Commonwealth's general obligation debt and lay the foundation for sustainable economic growth.

On June 18, 2009, COFINA issued its Sales Tax Revenue Bonds, First Subordinate Series 2009A and Sales Tax Revenue Bonds, Senior Series 2009C in the aggregate principal amount at issuance of $4,118,153,700 and $237,875,000, respectively. On June 25, 2009, COFINA issued to Puerto Rico investors its Sales Tax Revenue Bonds, First Subordinate Series 2009B in the aggregate principal amount at issuance of $1,217,915,799. On July 23, 2009, COFINA entered into a term loan agreement with a Puerto Rico institutional investor in the aggregate principal amount of $500 million and issued its Sales Tax Revenue Bonds, First Subordinate Series 2009D Bond Anticipation Notes in an aggregate principal amount of $250,000,000 to evidence the first draw thereunder. On September 29, 2009, COFINA issued another of its Sales Tax Revenue Bonds, First Subordinate Series 2009D Bond Anticipation Notes in an aggregate principal amount of $250,000,000 to evidence the second and final draw. The bond proceeds were used for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund.

The fiscal stabilization plan contemplated a three-phase payroll expense reduction program. In Phase I, which commenced in March 2009 and ended on April 27, 2009, the government offered certain incentives to government employees who resigned or accepted a permanent workday reduction. Phase II

CONFIDENTIAL

involved the layoff government employees, subject to certain exceptions, if sufficient savings were not generated through the implementation of Phase I. Finally, Phase III, which commenced in March 2009 and will remain in effect for a two-year period, contemplates a temporary freeze in salary increases and other economic benefits included in laws, collective bargaining agreement, and any other agreements.

On September 25, 2009, the Fiscal Restructuring and Stabilization Board created under Act No. 7 (the "Fiscal Board") announced the second and final round of layoffs by the Commonwealth under Phase II of Act No. 7. As part of the second round of layoffs, 16,970 government employees would have been terminated, effective November 6, 2009. On November 3, 2009, however, the Fiscal Board announced its decision to require a number of Commonwealth government agencies to start anew the process of notifying certain union employees as to their layoff as a result of the implementation of Phase II of Act No. 7, as well as certain other notifications required under Act No. 7, including notifying certain union workers of their time of service in the government. This resulted in the delay of approximately 7,191 layoffs that would have been effective on November 6, 2009. It is estimated that the delay in the effective date of the 7,191 layoffs will have a negative impact of approximately $60 million in the General Fund cash flow projection for fiscal year 2010.

On December 4, 2009, the Fiscal Board announced that it had mailed 2,798 termination letters corresponding to union employees of five Government agencies and that it expected to mail approximately 3,590 additional termination letters to union employees in the coming weeks, for a total of 6,379 layoffs. All of these layoffs became effective in January 2010. The Fiscal Board also announced that approximately 6,037 union employees that have been employed by the Government for a period of less than 13 years, 6 months as of April 17, 2009 will receive termination letters that are expected to become effective in February 2010, following the required notifications of time of service in government. The total government employees to be dismissed as part of the implementation of Phase I and II of Act No. 7 is expected to be approximately 15,037.

Approximately 1,000 of the laid-off employees are expected to be recruited and retrained by the Treasury Department to perform tax auditing and collection functions and by private collection firms to assist the Treasury Department in those functions.

The implementation of Phases I, II, and III of Act No. 7 is expected to result in annual savings of approximately $649 million.

*Progress in the Implementation of the Fiscal Stabilization Plan*

The fiscal stabilization plan established a government-wide operating expense-reduction program aimed at reducing annual payroll and other operating expenses by $2 billion. The Fiscal Board estimates that the annual savings from all cost reduction measures implemented or identified by the Commonwealth as of September 30, 2009 will amount to approximately $1.2 billion, which is approximately 60% of the $2 billion target. The Fiscal Board continues to seek and implement various initiatives to obtain additional savings necessary in order to achieve the $2 billion target. The additional savings are expected to come from both cost reduction and revenue generating initiatives, which include, among others, improvements in government procurement processes, reorganization and increased fiscal oversight of government agencies and improvements in tax collection and enforcement measures.

*Economic Reconstruction Plan*

The current administration has also developed and commenced implementing a short-term economic reconstruction plan. The cornerstone of this short-term plan is the implementation of U.S. federal and local economic stimuli. Puerto Rico will benefit from ARRA enacted by the U.S. government to provide a stimulus to the U.S. economy in the wake of the global economic downturn. Puerto Rico expects to receive approximately $6 billion in stimulus funds from ARRA, of which approximately $3.3 billion will be used to

A-9

CONFIDENTIAL

provide consumer and tax payer relief and the remainder will enable the expansion of unemployment benefits and other social welfare provisions, and domestic spending in education, health care, and infrastructure, among other measures. As of December 31, 2009, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $2.16 billion in ARRA funds for use in health, housing, and education related projects, among others, had been disbursed.

As part of the Government's short-term economic reconstruction plan, it has begun disbursing funds under the $500 million local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The Government has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29, establishing a clear public policy and legal framework for public-private partnerships in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. On September 1, 2009, the Governor constituted the Board of Directors of the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding public-private partnerships. On December 19, 2009, the PPP Authority approved regulations establishing the administrative framework for the procurement, evaluation, selection, negotiation and award process for public-private partnerships in Puerto Rico.

The Government has also developed a comprehensive medium- and long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration will emphasize (i) the simplification and shortening of the permitting and licensing process; (ii) the strengthening of the labor market by encouraging greater labor-force participation and bringing out-of-date labor laws and regulations in line with U.S. and international standards and (iii) the adoption of a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on oil through the use of liquefied natural gas and the promotion of diverse, renewable-energy technologies. One of these goals was accomplished on December 1, 2009, when the Governor signed Act No. 161, which overhauls the existing permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development.

*Approved Budget for Fiscal Year 2010*

On July 1, 2009, the Governor signed a General Fund budget for fiscal year 2010 of $7.670 billion. The approved budget is approximately 19% lower than the $9.48 billion budget approved for fiscal year 2009. The approved budget is lower than the preliminary General Fund net revenues for fiscal year 2009 by $90 million, or 1.2%, and creates a payment schedule for certain Commonwealth debts or other obligations, such as borrowings from Government Development Bank that did not have a dedicated source of repayment, and accounts payable to public corporations. The General Fund budget excludes a $2.5 billion Stabilization Fund that will facilitate the orderly implementation of certain expense reduction measures adopted by the Government of the Commonwealth pursuant to Act No. 7 of March 9, 2009. The Stabilization Fund will provide (i) $1 billion to finance the cost of transitioning public employees to non-governmental sectors and providing vouchers for re-training, self-employment, relocation and salary subsidy alternatives, and (ii) $1.5 billion to cover during fiscal year 2010 payroll and operating expenses that are expected to be eliminated during fiscal year 2010, but whose savings will not be realized in such fiscal year. The Stabilization Fund will be funded with proceeds from bonds issued by COFINA.

A-10

Preliminary General Fund revenues for the first five months of fiscal year 2010 (July through November) were $2.7 billion, approximately $218 million below the revenues for the same period in the prior fiscal year, but approximately $3 million above budgeted revenues for this period.

The projections and assumptions used in the fiscal year 2010 budget are subject to a number of risks, including risks related to the economic forecasts, the implementation of the expense-reduction plan, and the execution of certain transactions contemplated in the fiscal stabilization plan (such as the COFINA financings). Many complex political, social, environmental, and economic forces influence the Commonwealth's economy and finances unpredictably from fiscal year to fiscal year. The budget is necessarily based on forecasts of economic activity, which have frequently failed to accurately predict the timing and magnitude of specific cyclical changes in the U.S. and local economy. There can be no assurance that the Commonwealth's economy will not experience results in the current and ensuing fiscal years that are materially worse than predicted, with corresponding material and adverse effects on the Commonwealth's projections of receipts and disbursements.

An additional risk to the Commonwealth's finances and the implementation of the fiscal stabilization plan arises from the potential impact of certain litigation now pending against the Commonwealth.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For fiscal year 2009, the number of persons employed averaged 1,168,200, a decrease of 4.1% compared to the same period of the previous fiscal year. During the first five months of fiscal year 2010, total employment averaged 1,117,300, a decline of 7.1% with respect to the same period of the prior year. Currently, the unemployment rate in Puerto Rico is approximately 15.6%.

The following table presents annual statistics of employment and unemployment for fiscal year 2005 through fiscal year 2009, and the average figures for the first five months of fiscal year 2010. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States.

<div align="center">

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

</div>

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010[3] | 1,325 | 1,117 | 207 | 15.6 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.
(3) Average figures for the first five months of fiscal year 2010 (July through November 2009).
*Source:* Department of Labor and Human Resources – Household Survey

CONFIDENTIAL

PR-INT-000012771

## Economic Performance by Sector

From fiscal year 2005 to fiscal year 2009, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Sector and Gross National Product[1]
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009[2] |
| Manufacturing | $37,637 | $40,548 | $43,541 |
| Service[3] | 39,297 | 40,334 | 40,135 |
| Government[4] | 8,585 | 8,762 | 9,254 |
| Agriculture | 430 | 613 | 633 |
| Construction[5] | 2,027 | 1,991 | 1,782 |
| Statistical discrepancy | 429 | 678 | 363 |
| Total gross domestic product[6] | $88,405 | $92,926 | $95,708 |
| Less: net payment abroad | (28,884) | (31,399) | (32,949) |
| Total gross national product[6] | $59,521 | $61,527 | $62,759 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.
(4) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
(5) Includes mining.
(6) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

A-12

CONFIDENTIAL

PR-INT-000012772

The following table presents annual statistics of average employment based on NAICS for fiscal years 2005 to 2009.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[2] |
| Natural resources and construction | 68,233 | 65,492 | 64,700 | 59,992 | 52,825 |
| Manufacturing | | | | | |
|     Durable goods | 48,067 | 46,350 | 45,417 | 43,183 | 40,100 |
|     Non-durable goods | 69,250 | 66,233 | 62,442 | 61,017 | 57,725 |
| Sub-total | 117,317 | 112,583 | 107,858 | 104,200 | 97,825 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|     Wholesale trade | 33,717 | 33,992 | 33,267 | 33,817 | 33,658 |
|     Retail trade | 136,192 | 137,358 | 133,750 | 131,175 | 126,758 |
|     Transportation, warehouse, and utilities | 17,617 | 17,433 | 16,992 | 16,833 | 15,675 |
|     Sub-total | 187,525 | 188,783 | 184,008 | 181,825 | 179,092 |
| | | | | | |
| Information | 22,608 | 22,675 | 22,642 | 21,333 | 19,867 |
| Finance | 48,633 | 49,767 | 49,108 | 48,125 | 45,492 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,650 | 103,492 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,733 | 109,117 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,750 | 72,983 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 15,875 |
| Government[3] | 307,825 | 302,492 | 298,125 | 297,675 | 300,125 |
| Total non-farm | 1,049,725 | 1,047,742 | 1,032,442 | 1,019,708 | 993,692 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.
(3) Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2009 manufacturing generated $43.5 billion, or 45.5%, of gross domestic product. During fiscal year 2009, payroll employment for the manufacturing sector was 97,825, a decrease of 6.1% compared with fiscal year 2008. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2009, the average hourly manufacturing wage rate in Puerto Rico was approximately 67.9% of the average mainland U.S. rate.

Manufacturing in Puerto Rico is concentrated in two major industries. Pharmaceuticals and other chemical products and machinery and metal products constituted 90% of the total manufacturing production in fiscal year 2008. Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the

A-13

CONFIDENTIAL

PR-INT-000012773

rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under "The Economy."

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector[1]
### (in thousands at current prices)

| | Fiscal Years Ended June 30, | | |
| | 2007 | 2008 | 2009[2] |
|---|---|---|---|
| Food | $1,103,133 | $ 831,351 | $ 864,364 |
| Beverage and Tobacco Products | 932,301 | 1,405,111 | 1,554,799 |
| Textile Mills | 2,310 | 1,378 | 1,055 |
| Textile Product Mills | 13,944 | 13,876 | 12,221 |
| Apparel | 211,110 | 236,186 | 260,107 |
| Leather and Allied Products | 18,256 | 21,530 | 23,895 |
| Wood Products | 24,193 | 22,668 | 23,830 |
| Paper | 73,908 | 71,304 | 71,704 |
| Printing and Related Support Activities | 129,716 | 131,217 | 117,720 |
| Petroleum and Coal Products | 374,137 | 86,317 | 360,041 |
| Chemical | 26,891,695 | 27,966,500 | 29,806,137 |
| Plastics and Rubber Products | 126,642 | 127,091 | 122,338 |
| Nonmetallic Mineral Products | 295,265 | 273,670 | 236,869 |
| Primary Metals | 103,960 | 109,287 | 104,321 |
| Fabricated Metal Products | 248,929 | 247,804 | 250,066 |
| Machinery | 223,441 | 232,868 | 225,734 |
| Computer and Electronic Products | 4,222,014 | 5,957,553 | 6,266,460 |
| Magnetic and Optica | - | - | - |
| Electrical Equipment, Appliances and Components | 518,471 | 677,088 | 747,903 |
| Transportation Equipment | 81,906 | 85,913 | 78,249 |
| Furniture and Related Products | 66,039 | 62,985 | 54,217 |
| Miscellaneous | 1,975,250 | 1,986,317 | 2,359,370 |
| Total gross domestic product of manufacturing sector[3] | $37,636,619 | $40,548,014 | $43,541,398 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Totals may not add due to rounding.

*Source:* Planning Board

A-14