The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2005 to 2009.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group***
**(persons age 16 years and over)**

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,467 | 4,100 | 3,825 | 3,775 | 3,308 |
| Cement and concrete products manufacturing | 3,750 | 3,533 | 3,300 | 3,375 | 3,033 |
| Fabricated metal products | 6,442 | 5,775 | 5,675 | 5,375 | 4,825 |
| Computer and electronic | 10,667 | 10,808 | 10,092 | 8,600 | 7,558 |
| Electrical equipment | 7,650 | 6,842 | 6,617 | 6,658 | 5,867 |
| Electrical equipment manufacturing | 4,975 | 4,700 | 4,508 | 4,383 | 3,917 |
| Miscellaneous manufacturing | 11,158 | 11,258 | 12,292 | 11,983 | 12,058 |
| Medical equipment and supplies manufacturing | 10,467 | 10,533 | 11,575 | 11,342 | 11,450 |
| Other durable goods manufacturing | 7,683 | 7,567 | 6,917 | 6,792 | 6,483 |
| Total – durable goods | 48,067 | 46,350 | 45,417 | 43,183 | 40,100 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,050 | 12,650 | 12,183 | 11,625 | 11,167 |
| Beverage and tobacco products manufacturing | 3,175 | 3,392 | 3,258 | 3,267 | 3,125 |
| Apparel manufacturing | 8,875 | 8,258 | 7,708 | 9,633 | 9,583 |
| Cut and sew apparel manufacturing | 8,850 | 8,017 | 7,075 | 8,617 | 8,600 |
| Chemical manufacturing | 32,883 | 32,317 | 30,467 | 28,067 | 25,767 |
| Pharmaceutical and medicine manufacturing | 28,567 | 28,017 | 26,375 | 24,200 | 22,175 |
| Plastics and rubber products | 2,750 | 2,325 | 2,200 | 1,975 | 1,842 |
| Plastics product manufacturing | 2,258 | 2,133 | 2,025 | 1,850 | 1,725 |
| Other non-durable goods manufacturing | 8,517 | 7,292 | 6,625 | 6,450 | 6,242 |
| Total – non-durable goods | 69,250 | 66,233 | 62,442 | 61,017 | 57,725 |
| | | | | | |
| Total manufacturing employment | 117,317 | 112,583 | 107,858 | 104,200 | 97,825 |

\* Totals may not add due to rounding.
(1) Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 19,492 from fiscal year 2005 to fiscal year 2009. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment seemed to stabilize around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another significant drop of 4.0%. For fiscal years 2007, 2008 and 2009, manufacturing employment decreased by 4.2%, 3.4% and 6.1%, respectively. For the first five months of fiscal year 2010, the sector lost an average of 9,900 jobs, or 9.8% compared to the same period of the previous year. Given that this sector used to pay the highest wages, on average, in Puerto Rico,

A-15

its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2009, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector increased at an average annual rate of 1.7%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2009, the service sector generated $40.1 billion of gross domestic product, or 41.9% of the total. Wholesale and retail trade, information services, education and health services, professional and business services and real estate and rentals experienced growth in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. Finance and insurance, transportation and warehousing, utilities, and leisure and hospitality experienced contractions in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. From fiscal year 2007 to 2009, gross domestic product increased in the trade sector from $7.2 billion to $7.5 billion and in real estate and rentals from $10.8 billion to $12.4 billion, and decreased in finance and insurance from $6.7 billion to $5 billion.

Service-sector employment decreased from 556,350 in fiscal year 2005 to 542,917 in fiscal year 2009 (representing 54.6% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2009 represents a decrease of 3% compared to the prior fiscal year. For the first five months of fiscal year 2010, average service-sector employment was 518,700, a decrease of 5% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of September 30, 2009, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of September 30, 2009 were $85.4 billion, as compared to $87.3 billion as of September 30, 2008.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $27.2 billion as of September 30, 2009, up from $26.5 billion on December 31, 2008. Another relevant component of the financial sector in Puerto Rico

CONFIDENTIAL

is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $13.6 billion as of September 30, 2009, down slightly from $13.9 billion as of December 31, 2008 according to the OCFI. Most of the assets under management of local mutual funds are reflected in the amount of assets under management by broker-dealers stated above.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of September 30, 2009, there were 33 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $52 billion, a decrease from $63.8 billion in total assets as of December 31, 2008. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7 billion in assets as of September 30, 2009, a slight increase from $6.7 billion as of December 31, 2008.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector*
### (in thousands at current prices)

| | Fiscal Years ended June 30 | | |
|---|---|---|---|
| | **2007** | **2008** | **2009[1]** |
| Wholesale trade | $ 2,751,605 | $ 2,834,602 | $ 2,885,450 |
| Retail trade | 4,471,359 | 4,508,676 | 4,583,719 |
| Transportation and warehousing | 968,345 | 998,521 | 978,042 |
| Utilities | 2,214,391 | 2,114,609 | 2,123,081 |
| Information | 2,466,488 | 2,477,432 | 2,553,139 |
| Finance and insurance | 6,694,300 | 6,693,450 | 4,951,805 |
| Real Estate and rental | 10,785,713 | 11,251,972 | 12,353,532 |
| Professional and business | 3,112,456 | 3,223,695 | 3,304,970 |
| Education and health | 3,599,345 | 3,938,899 | 4,138,161 |
| Leisure and hospitality | 1,861,446 | 1,919,075 | 1,895,600 |
| Other services[2] | 371,590 | 372,821 | 367,900 |
| Total | $39,297,038 | $40,333,752 | $40,135,399 |

---
\* Totals may not add due to rounding. For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(1) Preliminary.
(2) Includes tourism.

*Source:* Planning Board.

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| | 2005 | 2006 | 2007 | 2008[1] | 2009[1] |
|---|---|---|---|---|---|
| Wholesale trade | 33,717 | 33,992 | 33,267 | 33,817 | 33,658 |
| Retail trade | 136,192 | 137,358 | 133,750 | 131,175 | 126,758 |
| Transportation, warehouse and utilities | 17,617 | 17,433 | 16,992 | 16,833 | 15,675 |
| Information | 22,608 | 22,675 | 22,642 | 21,333 | 19,867 |
| Finance | 48,633 | 49,767 | 49,108 | 48,125 | 45,492 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,650 | 103,492 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,733 | 109,117 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,750 | 72,983 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 15,875 |
| Total | 556,350 | 566,725 | 561,592 | 559,783 | 542,917 |

\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006. The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

For fiscal year 2008, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,744,200, a further decline of 2.7% over the number of persons registered during fiscal year 2007. The average occupancy rate in tourist hotels during fiscal year 2008 was 70.3%, compared to 71.7% in fiscal year 2007. The average number of rooms available in tourist hotels increased by 2.1% to 10,250 rooms from fiscal year 2007 to fiscal year 2008.

During fiscal year 2009, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,708,700, a decrease of 2% over the number of persons registered during the same period of fiscal year 2008. The average occupancy rate in tourist hotels during fiscal year 2009 was 66.2%, a decrease of 4.1% from the prior fiscal year. During fiscal year 2009, the average number of rooms available in tourist hotels increased by 2% to 10,452 rooms compared to fiscal year 2008.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2009, employment in hotels and lodging places was reduced by 4.5% to 13,600 jobs. For the first five months of fiscal year 2010, the average decrease was 6.4% with respect to the same period for the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-18

CONFIDENTIAL

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,800 | 1,496,853 | 2,373,400 | 5,213,100 |
| 2009 | 1,277,700 | 1,232,000 | 2,272,800 | 4,782,500 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009[5] | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500-key hotel located next to the Convention Center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people enjoying over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

A-19

CONFIDENTIAL

PR-INT-000012779

In fiscal year 2009, the government accounted for $9.3 billion, or 9.7%, of Puerto Rico's gross domestic product. The Puerto Rico government is also a significant employer, providing jobs for 285,600 workers (state and local), or 28.7% of total, non-farm, payroll employment in fiscal year 2009. From fiscal year 2005 to fiscal year 2009, Commonwealth and municipal government employment has been reduced by approximately 7,500 positions. During the first five months of fiscal year 2010, state and local government employment decreased by 7,100 jobs. According to the payroll survey, the distribution of these job reductions was 2,000 jobs in the state government and 5,100 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

In general, Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Fajardo, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2008, totaled approximately 4,625 miles and 11,774 miles of local streets and adjacent roads. The highway system comprises 425 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-5, PR-66, and PR-20 toll highways, 252 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,051 miles of tertiary highways and roads serving local, intra-regional traffic.

CONFIDENTIAL

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 35,000 per day.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's second largest city by population. Managed by the Port of the Americas Authority, the terminal will handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard capacity of 250,000 Twenty-Foot Equivalent Units per year, was completed in March 2009. A third development phase, which entails an investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop a value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2007 to 2009, however, real construction investment decreased at an average annual rate of 14.7%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 9.8%.

Public investment has been an important component of construction investment. During fiscal year 2008, approximately 50.2% of the total investment in construction was related to public projects. The total value of construction permits increased 12.9% in fiscal year 2008 as compared to fiscal year 2007, but total sales of cement decreased by 10.7%, the largest decline during the last decade. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2008 decreased in real terms by 8.8%, following a 7.6% real decline in fiscal year 2007, due principally to the drop in construction-related public projects. The Planning Board has estimated a construction investment decrease of 11.5% in real terms during fiscal year 2009. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties and the decline in construction investment is highly related to these difficulties. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, it announced on April 29, 2009 that the expected positive impact of the Federal Stimulus and the Local Stimulus had led it to reduce its projected decrease in construction investment to 5.6% in real terms. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2009, the number of construction permits decreased 20.7%, while the total value of construction permits dropped by 28% compared to fiscal year 2008. For the first four months of fiscal year 2010, the total number of construction permits decreased by 26.9%, while the value of construction permits decreased by 24.8%. These figures are consistent with cement sales, which declined by 25.4% in fiscal year 2009 and by 27.2% during the first five months of fiscal year 2010, reaching levels not seen in more than a decade.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2009, gross income from agriculture was $633 million, an increase of 3.4% compared with fiscal year 2008.

A-21

CONFIDENTIAL

PR-INT-000012781

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 ("Act 225") provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 15,312,298 | 56.4% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 27,946,091[3] | 15,927,986 | 57.0% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,378,777[3] | 16,611,710 | 58.5% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,744,193[3] | 16,911,486 | 58.8% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,062,634[3] | 17,272,043 | 59.4% |
| 2005 | 406,547[3] | 208,032 | 51.2% | 29,134,149[3] | 17,487,481 | 60.0% |
| 2006 | 400,530[3] | 209,547 | 52.3% | 29,236,155[3] | 17,758,872 | 60.7% |
| 2007 | 396,059[3] | 225,402 | 56.9% | 29,407,260[3] | 18,248,133 | 62.1% |
| 2008 | 395,482[3] | 227,546 | 57.5% | 29,757,219[3] | 18,698,630[4] | 62.8% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).
(4) Middle alternative projection (NCES).
*Sources:* U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

A-22

CONFIDENTIAL

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2008-2009 was approximately 64,077 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2008-2009 of approximately 171,541 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentive Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

A-23

CONFIDENTIAL                                    PR-INT-000012783

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Other legislation enacted in 2001 and 2002 provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of eighteen hotel projects representing over 4,700 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

A-24

CONFIDENTIAL

PR-INT-000012784

*Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

A-25

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-INT-000012786

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

 PR-INT-000012788

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

CONFIDENTIAL

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

B-4

CONFIDENTIAL                                                                 PR-INT-000012790

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

B-5

CONFIDENTIAL

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)     Government Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

        (vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

        (i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

        (ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

CONFIDENTIAL

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

      (i)     Defeasance Obligations;

      (ii)    Defeased Municipal Obligations;

B-8

CONFIDENTIAL

(iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

CONFIDENTIAL                                                                 PR-INT-000012795

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

B-10

CONFIDENTIAL

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

    (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

    (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

    (iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

    (iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

    (v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

    (vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

CONFIDENTIAL

PR-INT-000012797

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Revenues.

2. All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3. The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

4. Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

CONFIDENTIAL

PR-INT-000012798

5.      Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

 PR-INT-000012800

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

         1.      All Pledged Sales Tax received by the Corporation or the Trustee.

         2.      With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

         3.      Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

B-15

CONFIDENTIAL

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

CONFIDENTIAL                                                      PR-INT-000012802

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

CONFIDENTIAL

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-18

CONFIDENTIAL

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

(i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)     if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

CONFIDENTIAL

PR-INT-000012805

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)     either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)     a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-20

CONFIDENTIAL

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-21

CONFIDENTIAL

PR-INT-000012807

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-22

PR-INT-000012808

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

CONFIDENTIAL

PR-INT-000012809

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

B-24

CONFIDENTIAL

PR-INT-000012810

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

PR-INT-000012811

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

B-26

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)     Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

CONFIDENTIAL

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

B-28

CONFIDENTIAL

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

B-29

CONFIDENTIAL

PR-INT-000012815

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

B-30

PR-INT-000012816

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

## Redemption Account; Amounts to be Deposited Therein (Section 509)

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii) amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv) amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

B-31

CONFIDENTIAL

PR-INT-000012817

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

## Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

## Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

PR-INT-000012818

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

B-33

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

B-34

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

CONFIDENTIAL

PR-INT-000012821

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.    No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

B-36

CONFIDENTIAL                                                                     PR-INT-000012822

*Additional Requirements—Senior Bonds and Parity Obligations*

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

B-37

PR-INT-000012823

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

           *Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

      E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

      2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

      3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

CONFIDENTIAL

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

PR-INT-000012825

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

B-40

PR-INT-000012826

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

CONFIDENTIAL

PR-INT-000012827

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i) to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii) to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii) to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-42

CONFIDENTIAL

PR-INT-000012828

(iv)     to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)     to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)     to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)     to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)     as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

B-43

CONFIDENTIAL

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

B-44

PR-INT-000012830

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

B-45

CONFIDENTIAL

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

B-46

 PR-INT-000012832

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

B-47

CONFIDENTIAL

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

B-48

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

CONFIDENTIAL

PR-INT-000012835

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

B-50

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

CONFIDENTIAL

PR-INT-000012837

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-52

CONFIDENTIAL

PR-INT-000012838

Exhibit 13 Part 2   Page 132 of 146 **APPENDIX C**

**PROPOSED FORM OF APPROVING OPINION OF
BOND COUNSEL TO THE CORPORATION**

February __, 2010

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $1,823,757,271.30 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Twelfth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Bond Resolution," the General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on January 28, 2010. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds and First Subordinate Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

CONFIDENTIAL

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.     Act 91 is valid in all respects material to the matters covered by this opinion.

2.     The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.     The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.     Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.     As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.     The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

7.     The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

8.     The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of

CONFIDENTIAL

PR-INT-000012840

the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in its Bond Resolution and Tax Certificate. We have not undertaken to independently verify the accuracy of those certifications and representations.

Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on corporations.

9.      The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

10.      Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Bonds maturing on August 1, 2027, 2029 (Convertible Capital Appreciation Bonds), 2030 (bearing interest at a rate of 5.25%), 2031 through 2036 (Capital Appreciation Bonds), 2033 (Convertible Capital Appreciation Bonds), 2039, 2040 and 2042 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Bonds. In the case of the Discount Bonds that are Convertible Capital Appreciation Bonds maturing on August 1, 2029 and 2033, the principal amount at maturity is treated as including all debt service payments on such bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 8 through 10 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

C-3

PR-INT-000012841

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000012842

**APPENDIX D**

## BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.  If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

PR-INT-000012843

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

CONFIDENTIAL

PR-INT-000012844

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

D-3

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000012846

**APPENDIX E**

## TABLE OF COMPOUNDED AMOUNTS FOR CAPITAL APPRECIATION BONDS

| Date | CABs Due 2031 | CABs Due 2032 | CABs Due 2033 | CABs Due 2034 | CABs Due 2035 | CABs Due 2036 |
|---|---|---|---|---|---|---|
| 2/9/2010 | $1,226.75 | $1,141.60 | $1,056.90 | $ 986.90 | $ 919.05 | $ 857.75 |
| 8/1/2010 | 1,265.70 | 1,178.00 | 1,090.90 | 1,018.65 | 948.70 | 885.45 |
| 2/1/2011 | 1,307.80 | 1,217.35 | 1,127.60 | 1,052.95 | 980.75 | 915.45 |
| 8/1/2011 | 1,351.30 | 1,258.00 | 1,165.55 | 1,088.45 | 1,013.95 | 946.40 |
| 2/1/2012 | 1,396.20 | 1,300.05 | 1,204.75 | 1,125.15 | 1,048.20 | 978.45 |
| 8/1/2012 | 1,442.65 | 1,343.45 | 1,245.30 | 1,163.05 | 1,083.65 | 1,011.55 |
| 2/1/2013 | 1,490.60 | 1,388.35 | 1,287.20 | 1,202.25 | 1,120.25 | 1,045.80 |
| 8/1/2013 | 1,540.15 | 1,434.70 | 1,330.50 | 1,242.75 | 1,158.10 | 1,081.20 |
| 2/1/2014 | 1,591.40 | 1,482.60 | 1,375.30 | 1,284.65 | 1,197.25 | 1,117.80 |
| 8/1/2014 | 1,644.30 | 1,532.15 | 1,421.55 | 1,327.95 | 1,237.75 | 1,155.65 |
| 2/1/2015 | 1,698.95 | 1,583.30 | 1,469.40 | 1,372.70 | 1,279.55 | 1,194.80 |
| 8/1/2015 | 1,755.45 | 1,636.20 | 1,518.85 | 1,418.95 | 1,322.80 | 1,235.20 |
| 2/1/2016 | 1,813.85 | 1,690.85 | 1,569.95 | 1,466.80 | 1,367.55 | 1,277.05 |
| 8/1/2016 | 1,874.15 | 1,747.30 | 1,622.80 | 1,516.20 | 1,413.75 | 1,320.25 |
| 2/1/2017 | 1,936.45 | 1,805.70 | 1,677.40 | 1,567.30 | 1,461.55 | 1,364.95 |
| 8/1/2017 | 2,000.85 | 1,866.00 | 1,733.85 | 1,620.15 | 1,510.95 | 1,411.15 |
| 2/1/2018 | 2,067.35 | 1,928.30 | 1,792.20 | 1,674.75 | 1,562.00 | 1,458.95 |
| 8/1/2018 | 2,136.10 | 1,992.75 | 1,852.50 | 1,731.15 | 1,614.80 | 1,508.30 |
| 2/1/2019 | 2,207.15 | 2,059.30 | 1,914.85 | 1,789.50 | 1,669.40 | 1,559.35 |
| 8/1/2019 | 2,280.55 | 2,128.05 | 1,979.30 | 1,849.80 | 1,725.80 | 1,612.15 |
| 2/1/2020 | 2,356.35 | 2,199.15 | 2,045.90 | 1,912.15 | 1,784.15 | 1,666.75 |
| 8/1/2020 | 2,434.70 | 2,272.60 | 2,114.70 | 1,976.60 | 1,844.45 | 1,723.15 |
| 2/1/2021 | 2,515.65 | 2,348.50 | 2,185.90 | 2,043.20 | 1,906.80 | 1,781.50 |
| 8/1/2021 | 2,599.30 | 2,426.95 | 2,259.45 | 2,112.05 | 1,971.25 | 1,841.80 |
| 2/1/2022 | 2,685.75 | 2,508.00 | 2,335.45 | 2,183.25 | 2,037.90 | 1,904.15 |
| 8/1/2022 | 2,775.05 | 2,591.75 | 2,414.05 | 2,256.80 | 2,106.75 | 1,968.60 |
| 2/1/2023 | 2,867.30 | 2,678.35 | 2,495.30 | 2,332.90 | 2,177.95 | 2,035.20 |
| 8/1/2023 | 2,962.65 | 2,767.80 | 2,579.25 | 2,411.50 | 2,251.60 | 2,104.10 |
| 2/1/2024 | 3,061.15 | 2,860.25 | 2,666.05 | 2,492.75 | 2,327.70 | 2,175.35 |
| 8/1/2024 | 3,162.95 | 2,955.75 | 2,755.75 | 2,576.75 | 2,406.35 | 2,248.95 |
| 2/1/2025 | 3,268.10 | 3,054.50 | 2,848.50 | 2,663.60 | 2,487.70 | 2,325.10 |
| 8/1/2025 | 3,376.75 | 3,156.50 | 2,944.35 | 2,753.35 | 2,571.80 | 2,403.80 |
| 2/1/2026 | 3,489.05 | 3,261.95 | 3,043.45 | 2,846.15 | 2,658.70 | 2,485.20 |
| 8/1/2026 | 3,605.05 | 3,370.90 | 3,145.85 | 2,942.10 | 2,748.60 | 2,569.30 |
| 2/1/2027 | 3,724.95 | 3,483.50 | 3,251.70 | 3,041.25 | 2,841.50 | 2,656.25 |
| 8/1/2027 | 3,848.80 | 3,599.85 | 3,361.15 | 3,143.70 | 2,937.55 | 2,746.20 |
| 2/1/2028 | 3,976.75 | 3,720.05 | 3,474.25 | 3,249.65 | 3,036.80 | 2,839.15 |
| 8/1/2028 | 4,109.00 | 3,844.30 | 3,591.15 | 3,359.15 | 3,139.45 | 2,935.25 |
| 2/1/2029 | 4,245.60 | 3,972.70 | 3,712.00 | 3,472.40 | 3,245.60 | 3,034.60 |
| 8/1/2029 | 4,386.80 | 4,105.40 | 3,836.90 | 3,589.40 | 3,355.30 | 3,137.35 |
| 2/1/2030 | 4,532.65 | 4,242.55 | 3,966.00 | 3,710.35 | 3,468.70 | 3,243.55 |
| 8/1/2030 | 4,683.35 | 4,384.25 | 4,099.45 | 3,835.40 | 3,585.95 | 3,353.35 |
| 2/1/2031 | 4,839.05 | 4,530.65 | 4,237.40 | 3,964.65 | 3,707.15 | 3,466.85 |
| 8/1/2031 | 5,000.00 | 4,682.00 | 4,380.00 | 4,098.25 | 3,832.45 | 3,584.20 |
| 2/1/2032 | - | 4,838.35 | 4,527.40 | 4,236.40 | 3,961.95 | 3,705.50 |
| 8/1/2032 | - | 5,000.00 | 4,679.75 | 4,379.15 | 4,095.90 | 3,830.95 |
| 2/1/2033 | - | - | 4,837.20 | 4,526.70 | 4,234.35 | 3,960.65 |
| 8/1/2033 | - | - | 5,000.00 | 4,679.30 | 4,377.45 | 4,094.70 |
| 2/1/2034 | - | - | - | 4,836.95 | 4,525.40 | 4,233.30 |
| 8/1/2034 | - | - | - | 5,000.00 | 4,678.35 | 4,376.60 |
| 2/1/2035 | - | - | - | - | 4,836.50 | 4,524.75 |
| 8/1/2035 | - | - | - | - | 5,000.00 | 4,677.90 |
| 2/1/2036 | - | - | - | - | - | 4,836.25 |
| 8/1/2036 | - | - | - | - | - | 5,000.00 |

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

## TABLE OF COMPOUNDED AMOUNTS FOR
## CONVERTIBLE CAPITAL APPRECIATION BONDS

| Date | Convertible CABs Due 2029 | Convertible CABs Due 2033 |
|---|---|---|
| 2/9/2010 | $2,822.50 | $2,790.25 |
| 8/1/2010 | 2,905.05 | 2,873.50 |
| 2/1/2011 | 2,994.00 | 2,963.30 |
| 8/1/2011 | 3,085.70 | 3,055.95 |
| 2/1/2012 | 3,180.20 | 3,151.45 |
| 8/1/2012 | 3,277.60 | 3,249.90 |
| 2/1/2013 | 3,378.00 | 3,351.45 |
| 8/1/2013 | 3,481.45 | 3,456.20 |
| 2/1/2014 | 3,588.05 | 3,564.20 |
| 8/1/2014 | 3,697.95 | 3,675.60 |
| 2/1/2015 | 3,811.20 | 3,790.45 |
| 8/1/2015 | 3,927.90 | 3,908.90 |
| 2/1/2016 | 4,048.20 | 4,031.05 |
| 8/1/2016 | 4,172.20 | 4,157.05 |
| 2/1/2017 | 4,299.95 | 4,286.95 |
| 8/1/2017 | 4,431.65 | 4,420.90 |
| 2/1/2018 | 4,567.35 | 4,559.05 |
| 8/1/2018 | 4,707.25 | 4,701.55 |
| 2/1/2019 | 4,851.40 | 4,848.45 |
| 8/1/2019 | 5,000.00 | 5,000.00 |
| 2/1/2020 | - | - |
| 8/1/2020 | - | - |
| 2/1/2021 | - | - |
| 8/1/2021 | - | - |
| 2/1/2022 | - | - |
| 8/1/2022 | - | - |
| 2/1/2023 | - | - |
| 8/1/2023 | - | - |
| 2/1/2024 | - | - |
| 8/1/2024 | - | - |
| 2/1/2025 | - | - |
| 8/1/2025 | - | - |
| 2/1/2026 | - | - |
| 8/1/2026 | - | - |
| 2/1/2027 | - | - |
| 8/1/2027 | - | - |
| 2/1/2028 | - | - |
| 8/1/2028 | - | - |
| 2/1/2029 | - | - |
| 8/1/2029 | - | - |
| 2/1/2030 | - | - |
| 8/1/2030 | - | - |
| 2/1/2031 | - | - |
| 8/1/2031 | - | - |
| 2/1/2032 | - | - |
| 8/1/2032 | - | - |
| 2/1/2033 | - | - |
| 8/1/2033 | - | - |
| 2/1/2034 | - | - |
| 8/1/2034 | - | - |
| 2/1/2035 | - | - |
| 8/1/2035 | - | - |
| 2/1/2036 | - | - |
| 8/1/2036 | - | - |

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000012850

APPENDIX G



**MUNICIPAL BOND INSURANCE POLICY**

ISSUER:

BONDS: $    in aggregate principal amount of

Policy No.:   -N

Effective Date:

Premium: $

      ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

      On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

      Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which    has    been    recovered    from    such    Owner    pursuant    to    the

CONFIDENTIAL

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM. The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.   THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) has caused this Policy to be executed on its behalf by its Authorized Officer.

ASSURED GUARANTY MUNICIPAL CORP.
(FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.)

By _____
Authorized Officer

(212) 826-0100

Form 500NY (5/90)

G-2

CONFIDENTIAL

PR-INT-000012852

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000012854



Printed by: ImageMaster, Inc.

CONFIDENTIAL

PR-INT-000012855

Case:17-03283-LTS Doc#:4781-2 Filed:01/24/19 Entered:01/24/19 18:19:25 Desc:
Exhibit DX-GG Part 2 Page 82 of 1000

# Exhibit 14

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):

|  | |
|---|---|
| S&P: | A+ |
| Moody's: | A1 |
| Fitch: | A+ |

$1,619,404,596.60

# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2010C

**Dated:** Date of Delivery

**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), to refund certain outstanding bonds of the Corporation and provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes, all as described herein. Concurrently with the issuance of the Series 2010C Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010C Bonds and the Series 2010D Bonds, the "Series 2010 Bonds"). The Series 2010D Bonds and Series 2010E Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2010C Bonds is not contingent upon the issuance of the Series 2010D Bonds or the Series 2010E Bonds.

**The Series 2010 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2010 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The Series 2010 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.***

The Series 2010C Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2010C Bonds on the records of The Depository Trust Company and its participants. The Series 2010C Bonds are being issued as Current Interest Bonds and Capital Appreciation Bonds. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2010C Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

The scheduled payment of principal of and interest on the Series 2010C Bonds maturing on August 1, 2042 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.), as indicated on the inside cover of this Official Statement.

**This cover page contains information for quick reference only. It is not a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth, interest on the Series 2010C Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that interest on the Series 2010C Bonds is exempt from state, Commonwealth and local income taxation. See Tax Matters herein.*

**The Series 2010C Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010C Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2010C Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2010C Bonds will be delivered through The Depository Trust Company on or about June 30, 2010.*

| Citi | BofA Merrill Lynch | J.P. Morgan | Wells Fargo Securities |
|---|---|---|---|

| Barclays Capital | Goldman, Sachs & Co. | Jefferies & Company |
|---|---|---|
| Morgan Stanley | Ramirez & Co. Inc. | Raymond James |

| RBC Capital Markets | UBS Financial Services Incorporated of Puerto Rico |
|---|---|

| BBVAPR MSD | FirstBank Puerto Rico Securities | Oriental Financial Services | Popular Securities | Santander Securities |
|---|---|---|---|---|

June 24, 2010

$1,619,404,596.60
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2010C**

### $1,521,685,000 Current Interest Bonds*

#### $447,660,000 Serial Bonds

| Maturity August 1 | Amount | Interest Rate | Price or Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2035 | $ 60,000,000 | 6½% | 4.98%[‡] | 74529JLF0 |
| 2036 | 87,660,000 | 5¾ | 99.50 | 74529JLH6 |
| 2039 | 150,000,000 | 6 | 5.28[‡] | 74529JLK9 |
| 2042[§] | 150,000,000 | 5¾ | 99.75 | 74529JLN3 |

#### $1,074,025,000 Term Bonds

| | | | |
|---|---|---|---|
| $ 40,595,000 | 5% | Term Bonds due August 1, 2035, to yield 5.35% | CUSIP[†] 74529JLG8 |
| $ 64,995,000 | 5¼% | Term Bonds due August 1, 2038, to yield 5.45% | CUSIP[†] 74529JLJ2 |
| $299,995,000 | 5½% | Term Bonds due August 1, 2040, price: 100.00 | CUSIP[†] 74529JLL7 |
| $668,440,000 | 5¼% | Term Bonds due August 1, 2041, to yield 5.47% | CUSIP[†] 74529JLM5 |

### $97,719,596.60 Capital Appreciation Bonds**

| Maturity August 1 | Initial Principal Amount | Maturity Amount | Approximate Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2037 | $19,999,650.00 | $116,875,000 | 6.625% | 74529JLP8 |
| 2038 | 45,764,145.60 | 285,455,000 | 6.625 | 74529JLQ6 |
| 2039 | 31,955,801.00 | 212,755,000 | 6.625 | 74529JLR4 |

---

* Interest on the Current Interest Bonds will be payable semi-annually on each August 1 and February 1, commencing on February 1, 2011.

† Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

‡ Priced at the stated yield to the August 1, 2020 optional redemption date at a redemption price of 100%. See *Redemption - Optional Redemption of Current Interest Bonds* under THE SERIES 2010C BONDS herein.

§ Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

** Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on August 1, 2010, and will be payable at maturity (or earlier redemption).

CONFIDENTIAL

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2010C Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2010C Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2010C Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2010C Bonds and other documents herein do not purport to be complete.  Reference is made to said laws, resolutions, the Series 2010C Bonds and other documents for full and complete statement of their provisions.  Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") makes no representation regarding the Series 2010C Bonds or the advisability of investing in the Series 2010C Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "Bond Insurance" and "Appendix F - Specimen Municipal Bond Insurance Policy."

CONFIDENTIAL

[This Page Intentionally Left Blank]

CONFIDENTIAL

PR-INT-000014058

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................1
   The Corporation ........................................................1
   Sales and Use Tax ......................................................1
   Dedicated Sales Tax Fund............................................2
   The Resolution ..........................................................2
   Outstanding Bonds and Parity Obligations ...............2
   Source of Payment and Security for the Bonds..........4
PLEDGED SALES TAX ...................................................4
   Commonwealth Sales Tax Revenues .......................4
   Commonwealth Sales Tax Collections and Projections....5
   Collections by Source ................................................8
   Economic Indicators ..................................................9
   Dedicated Sales Tax Fund.........................................11
   Pledged Sales Tax Base Amount .............................11
   Procedures for the Collection and Deposit of the Pledged
     Sales Tax in the Dedicated Sales Tax Fund .................13
   Commonwealth Sales Tax Enforcement Initiatives ..........15
THE SERIES 2010C BONDS ..........................................17
   General ...................................................................17
   Redemption .............................................................17
   Book-Entry Only System ..........................................19
BOND INSURANCE ......................................................20
   Bond Insurance Policy ..............................................20
   Assured Guaranty Municipal Corp. (formerly known as
     Financial Security Assurance Inc.)..............................20
SECURITY FOR THE BONDS .........................................22
   General ...................................................................22
   Commonwealth Non-Impairment Covenant ...................22
   Property Pledged for the Payment of the Series 2010C
     Bonds ...................................................................23
   Outstanding Bonds and Parity Obligations ...................23
   Subordination Provisions of the First Subordinate Bonds 24
   Funds and Accounts under the Resolution.......................24
   Additional Bonds, Refunding Bonds and Other
     Obligations.............................................................27
   Commonwealth's Authority to Cover Deficiencies ..........29
RISK FACTORS ...........................................................30
   Economic Conditions Could Affect Commonwealth Sales
     Tax Revenues.........................................................30
   Legislative Assembly Authority over the Commonwealth
     Sales Tax ...............................................................30

**Page**

Certain Constitutional Considerations Relating to Act 91 31
Limited Nature of Ratings; Reductions, Suspension or
   Withdrawal of a Rating .............................................32
Limited Nature of Remedies .........................................32
Nature of Bond Insurance ...........................................33
AGGREGATE DEBT SERVICE REQUIREMENTS .........34
PLAN OF FINANCING ...................................................37
   Overview.................................................................37
   Estimated Sources and Uses of Funds..........................37
THE CORPORATION ....................................................38
   Other Obligations of the Corporation............................38
TAX MATTERS ............................................................39
   Federal Income Taxes ...............................................39
   State Taxes .............................................................39
   Original Issue Discount .............................................39
   Original Issue Premium .............................................40
   Ancillary Tax Matters ...............................................40
   Changes in Law and Post Issuance Events....................40
RATINGS ....................................................................41
LEGALITY FOR INVESTMENT........................................41
VERIFICATION OF MATHEMATICAL
   COMPUTATIONS .....................................................41
UNDERWRITING ..........................................................42
LEGAL MATTERS .........................................................43
CONTINUING DISCLOSURE ...........................................43
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO .....................................................................45
MISCELLANEOUS ........................................................45

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution .....................................B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation ...............................C-1
APPENDIX D – Book-Entry Only System .......................D-1
APPENDIX E – Table of Compounded Amounts for
   Capital Appreciation Bonds.......................................E-1
APPENDIX F – Specimen Municipal Bond Insurance
   Policy ...................................................................F-1

i

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000014060

# $1,619,404,596.60
# Puerto Rico Sales Tax Financing Corporation
# Sales Tax Revenue Bonds, First Subordinate Series 2010C

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $1,619,404,596.60 Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"). Concurrently with the issuance of the Series 2010C Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010C Bonds and the Series 2010D Bonds, the "Series 2010 Bonds"). The Series 2010D Bonds and Series 2010E Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2010C Bonds is not contingent upon the issuance of the Series 2010D Bonds or the Series 2010E Bonds. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

## The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

## Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

1

PR-INT-000014061

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund*" under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See "*Dedicated Sales Tax Fund*" and "*Pledged Sales Tax Base Amount*" under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The Series 2010 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Fourteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010C Bonds (the "Fourteenth Supplemental Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution"), and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution") (the General Resolution, as amended by the Fourteenth Supplemental Resolution, the Fifteenth Supplemental Resolution, and the Sixteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of senior and first subordinate bonds. The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds"). The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series

2

2010A (the "Series 2010A Bonds"), and (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010B Bond Anticipation Notes (the "Series 2010B Bonds" and, together with the Series 2009A Bonds, the Series 2009B Bonds, the Series 2010A Bonds, the "Outstanding First Subordinate Bonds").

Concurrently with the issuance of the Series 2010C Bonds, the Corporation is issuing the Series 2010D Bonds and the Series 2010E Bonds. The Series 2010D Bonds will be issued in order to repay a portion of the Series 2010B Bonds and to provide funds to the Commonwealth for the Authorized Uses. The Series 2010E Bonds will be issued to provide fund to the Commonwealth for the Authorized Uses.

After giving effect to the issuance of the Series 2010 Bonds, the refunding of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A Mandatory Tender Bonds (the "Refunded Bonds") and the repayment of the Series 2010B Bonds, the Corporation will have $13.4 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.2 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $328.6 million accreted on existing capital appreciation bonds as of June 1, 2010) and $8.3 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $54.9 million accreted on existing capital appreciation bonds as of June 1, 2010).

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

The Corporation routinely explores opportunities to refinance its debt to reduce debt service from time to time. As previously announced, the Corporation is considering the purchase of all or a portion of the Series 2007A Bonds issued as LIBOR-based Adjustable Rate Bonds accompanied by a termination of an equivalent amount of the interest rate exchange agreement related to such Series 2007A Bonds. If the Corporation decides to purchase the Series 2007A Bonds, such purchase would be funded through the issuance of a series of Senior Bonds. No assurance can be given that the Corporation will purchase any of its Outstanding Senior Bonds or terminate any interest rate exchange agreement in connection therewith.

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2010 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2010 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The Series 2010 Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the Series 2010 Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity

3

CONFIDENTIAL

PR-INT-000014063

therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *"Subordination Provisions of the First Subordinate Bonds"* and *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

## Source of Payment and Security for the Bonds

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The Series 2010 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Series 2010C Bonds, the terms of the Series 2010C Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

4

PR-INT-000014064

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 28, 2010, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday will take place during Fiscal Year 2010-2011.

## Commonwealth Sales Tax Collections and Projections

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See "*Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund*" below for a description of the reporting and collections procedures utilized by the Treasury Department. Accordingly, the sales tax reported by the Treasury Department for November 2006 related to

5

sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change is effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through May 2010 were approximately $3.86 billion, an average of $93 million per month.

*Fiscal Year 2006-2007.* Commonwealth Sales Tax collections during the seven months of Fiscal Year 2006-2007 (December 2006 through June 2007), when the Commonwealth Sales Tax was first imposed, equaled $617.9 million, or an average of $95.1 million per month (after adjustment for December receipts which were based on 15 days of sales in November). Under the previous reporting method utilized by the Treasury Department, total collections reported attributable to sales made during the seven and one-half months of Fiscal Year 2006-2007 (November 15, 2006 through June 2007) equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.1 million per month. Under the previous reporting method utilized by the Treasury Department, total Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Such collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2008-2009.* Commonwealth Sales Tax collections during Fiscal Year 2008-2009 totaled $1.10 billion, or an average of $91.7 million per month. Under the previous reporting method utilized by the Treasury Department, Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2008-2009 would have totaled $1.098 billion, or an average of $91.5 million per month. Such collections were below the Treasury Department's revised estimate of $1.117 billion by $19 million, or 1.7%, and were $46 million, or 4%, below collections for Fiscal Year 2007-2008. The Treasury Department believes that the decline in sales tax collections during Fiscal Year 2008-2009 is due primarily to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown. The Pledged Sales Tax then in effect (1%) totaled $199.6 million, nearly $7.2 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2009-2010.* Commonwealth Sales Tax collections during the eleven month period ended May 31, 2010 totaled $999.3 million, or an average of $90.8 million per month. Such collections year-to-date are 0.8% below collections for the same period in Fiscal Year 2008-2009. The Treasury Department believes that this decline is due primarily to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions. The Treasury Department's current estimate for total Commonwealth Sales Tax collections for Fiscal Year 2009-2010 is $1.098 billion.

*Fiscal Year 2010-2011.* Commonwealth Sales Tax revenue projections for Fiscal Year 2010-2011 are $1.194 billion, or an average of $99.5 million per month. This projection represents an increase of 8.7% compared to estimated collections for Fiscal Year 2009-2010. This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives."* The first phase of this system is expected to be

6

operational in November 2010.  Whether sales tax collections meet this estimate is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2010-2011, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth.  A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections.  See "*Economic Conditions could affect Commonwealth Sales Tax Revenues*" under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010.  Under the new reporting method, which is effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer.  Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer.  To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

### Sales and Use Tax – Collection History by Month
#### (Dollars in Thousands)

| | Fiscal Year | | | |
| --- | --- | --- | --- | --- |
| | **2006-2007** | **2007-2008** | **2008-2009** | **2009-2010** |
| July | - | $ 95,460 | $ 97,526 | $94,382 |
| August | - | 96,100 | 95,592 | 88,000 |
| September | - | 90,181 | 91,353 | 84,100 |
| October | - | 86,163 | 77,788 | 83,775 |
| November | - | 93,751 | 86,191 | 85,120 |
| December | $ 50,200[(1)] | 96,170 | 91,996 | 95,075 |
| January | 110,000 | 121,251 | 119,836 | 118,476 |
| February | 95,000 | 89,798 | 85,763 | 88,942 |
| March | 86,200 | 86,486 | 84,608 | 82,538 |
| April | 96,400 | 89,355 | 88,065 | 93,415 |
| May | 85,700 | 93,487 | 88,788 | 85,469 |
| June | 94,400 | 103,331 | 93,302 | |

[(1)] Reflects collections for sales made between November 15 and November 30.  The sales tax became effective on November 15, 2006.

Source: Treasury Department



Source: Treasury Department

CONFIDENTIAL

PR-INT-000014067

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2008-2009 (actual receipts by the Treasury Department from August 2008 thru July 2009). Of the $1.098 billion in collections (under the previous reporting method utilized by the Treasury Department), approximately 51% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 12% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3.9% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2008-2009**

Source: Treasury Department

CONFIDENTIAL

PR-INT-000014068

## Economic Indicators

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

### Compounded Annual Growth Rates for
### Gross National Product and Personal Consumption Expenditures
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
|---|---|---|---|---|---|
| | | | Services | Non-Durable Goods | Durable Goods |
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.73% | 4.90% | 5.93% | 4.76% | 0.85% |
| 1947-2009 | 7.75% | 7.64% | 8.87% | 6.73% | 8.07% |

Source: Planning Board

### Historical Components of Personal Consumption Expenditures and GNP
(Measured in Current Dollars)



Source: Government Development Bank

9

ation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.8% during this period.

### Personal Consumption Expenditures and GNP
(Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
(Constant Dollars)



Source: Government Development Bank

10

CONFIDENTIAL

PR-INT-000014070

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $13.1 billion in Fiscal Year 2008-2009, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 23.6% of personal consumption expenditures in Fiscal Year 2008-2009 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

## Dedicated Sales Tax Fund

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

## Pledged Sales Tax Base Amount

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 is $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

11

CONFIDENTIAL

The following table shows the growth of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

### Annual Pledged Sales Tax Base Amount

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

12

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

## Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day,* the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been

---

* Prior to December 2009 the return was due on the 20th day of the month.

13

deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1)  Includes 1.5% Municipal Sales Tax.
(2)  Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. Certain large merchants and retailers are required to file their return electronically. As of May 2010, the Treasury Department reports that 86.9% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of March 2010, 225,915 merchants and retailers were required to file a monthly return, out of which 61,014 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants'

CONFIDENTIAL

Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

## Commonwealth Sales Tax Enforcement Initiatives

The Treasury Department has announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department estimates that it will collect in Fiscal Year 2010-2011 an additional $96 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has collected approximately $26.5 million in connection with 59 cases. In May 2010, the Treasury Department began a letter campaign to promote the use of the voluntary disclosure program. The Treasury Department has sent approximately 2,000 of these letters and expects to send approximately 1,000 letters a week.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts. As a result of these initiatives, the Treasury Department has collected approximately $10.3 million in fines and penalties attributable to non-compliance with legal and regulatory requirements related to the sales tax.

The Treasury Department is focusing its efforts to increase sales tax revenues by improving compliance in retail transactions. To this end, the Treasury Department undertook a request for proposals procurement process and selected a vendor to provide a new point-of-sale electronic system that would strengthen its enforcement efforts. The system was designed to (i) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets and (ii) transmit on a daily basis information regarding all sales tax transactions to the Treasury Department. This point-of-sale system, which would be provided to the majority of merchants free of charge, would also have wireless capabilities in order to capture sales by street vendors. The Treasury Department's vendor selection process was delayed by a temporary restraining order issued by the Puerto Rico Court of Appeals in connection with a challenge filed by a losing bidder. On December 11, 2009, the challenge was dismissed and the temporary restraining order was lifted. On March 12, 2010, the Treasury Department published a revised request for proposals and on May 5, 2010 received proposals from interested vendors. The Treasury Department is currently reviewing the submitted proposals and expects to select a vendor in June 2010 and have a contract in place by July 2010. The first phase of the point-of-sale system is expected to be implemented by November 2010.

15

CONFIDENTIAL

The Treasury Department is also focused on strengthening its enforcement workforce. It has equipped a call center to be staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. Currently, there are 714 cases under audit and, from July 2009 through April 2010, the Audit Bureau has completed 214 audits and assessed approximately $7.9 million in deficiencies. The Treasury Department expects to conclude approximately 270 additional audits by July 2010.

The Treasury Department is also increasing staffing levels in its Enforcement and Compliance Bureaus by approximately 500 employees (including the 150 tax collection agents assigned to the call center mentioned in the previous paragraph), which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently makes approximately 2,000 visits per month.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan and Caguas and is currently working with five other municipalities that have expressed interest in entering into similar agreements. In April 2010, the Treasury Department began joint interventions with the municipality of San Juan. These efforts have resulted in 336 visits to merchants and the imposition of $36,000 in fines. In May 2010, the Treasury Department began joint interventions with the municipality of Caguas.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

16

# THE SERIES 2010C BONDS

**General**

The Series 2010C Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $1,619,404,596.60. The Series 2010C Bonds will be issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"). The Current Interest Bonds and the Capital Appreciation Bonds will be issued in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of Capital Appreciation Bonds), paying interest on the dates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

The Series 2010C Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds). Interest on the Series 2010C Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2010C Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix D*. Certificated Series 2010C Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2010C Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the Series 2010 Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

*Current Interest Bonds.* Interest on the Current Interest Bonds will accrue from their date of delivery and will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2011.

*Capital Appreciation Bonds.* Interest on the Capital Appreciation Bonds will compound from their date of delivery. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2010 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix E — Table of Compounded Amounts for Capital Appreciation Bonds.*

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2020, at a redemption price equal to 100% of the principal amount of the Current Interest Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2015, at a redemption price equal to the greater of: (i) 100% of the Compounded

17

PR-INT-000014077

Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate plus 30 basis points.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Current Interest Term Bonds maturing on August 1, 2035, 2038, 2040 and 2041, shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Current Interest Term Bond:

| Mandatory Redemption Date | Sinking Fund Installments for Current Interest Term Bonds Maturing | | | |
|---|---|---|---|---|
| | August 1, 2035 | August 1, 2038 | August 1, 2040 | August 1, 2041 |
| 08/01/2033 | $26,570,000 | | | |
| 08/01/2034 | - | | | |
| 08/01/2035 | 14,025,000* | | | |
| 08/01/2036 | | | | |
| 08/01/2037 | | $ 3,555,000 | | |
| 08/01/2038 | | 61,440,000* | | |
| 08/01/2039 | | | $ 13,880,000 | |
| 08/01/2040 | | | 286,115,000* | |
| 08/01/2041 | | | | $189,760,000 |
| | | | | 478,680,000* |

---
\*   Final Maturity

*Notice of Redemption.* In the event any Series 2010C Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Series 2010C Bonds as described above, to the registered owners of the Series 2010C Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to

CONFIDENTIAL

PR-INT-000014078

give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2010C Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2010C Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2010C Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2010C Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2010C Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2010C Bonds, and the portions of the Series 2010C Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2010C Bonds or portions thereof to be redeemed will cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase).

Any notice of optional redemption of Series 2010C Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on the Series 2010C Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2010C Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Series 2010C Bonds (or portions thereof) to be redeemed, then the Series 2010C Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase), and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix D* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix D* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2010C Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2010C Bonds; (ii) confirmation of ownership interest in the Series 2010C Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2010C Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC

19

PR-INT-000014079

Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2010C Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2010C Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2010C Bonds. See *Appendix D - Book-Entry Only System.*

## BOND INSURANCE

**Bond Insurance Policy**

Concurrently with the issuance of the Bonds, Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") will issue its Municipal Bond Insurance Policy (the "Policy") for the Series 2010C Bonds maturing on August 1, 2042 (the "Insured Bonds"). The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix G to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

**Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.)**

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, structured finance and mortgage markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

On July 1, 2009, AGL acquired the financial guaranty operations of Holdings from Dexia S.A. ("Dexia"). In connection with such acquisition, Holdings' financial products operations were separated from its financial guaranty operations and retained by Dexia. For more information regarding the acquisition by AGL of the financial guaranty operations of Holdings, see Item 1.01 of the Current Report on Form 8-K filed by AGL with the Securities and Exchange Commission (the "SEC") on July 8, 2009.

Effective November 9, 2009, Financial Security Assurance Inc. changed its name to Assured Guaranty Municipal Corp.

AGM's financial strength is rated "AAA" (negative outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"), "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's"). On February 24, 2010, Fitch, Inc. ("Fitch"), at the request of AGL, withdrew its "AA" (negative outlook) insurer financial strength rating of AGM at the then current rating level. Each rating of AGM should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guaranty the market price of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

*Recent Developments*

*Ratings*

On May 17, 2010, S&P published a Research Update in which it affirmed its "AAA" counterparty credit and financial strength ratings on AGM. At the same time, S&P continued its negative outlook on AGM.

CONFIDENTIAL

Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

In a press release dated February 24, 2010, Fitch announced that, at the request of AGL, it had withdrawn the "AA" (negative outlook) insurer financial strength rating of AGM at the then current rating level. Reference is made to the press release, a copy of which is available at www.fithratings.com, for the complete text of Fitch's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's, Fitch or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, which was filed by AGL with the SEC on March 1, 2010, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010, which was filed by AGL with the SEC on May 10, 2010. Effective July 31, 2009, Holdings is no longer subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended (the "Exchange Act").

*Capitalization of AGM*

At March 31, 2010, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,220,015,145 and its total net unearned premium reserve was approximately $2,228,912,193 in accordance with statutory accounting principles.

*Incorporation of Certain Documents by Reference*

Portions of the following documents filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i) Annual Report on Form 10-K for the fiscal year ended December 31, 2009 (which was filed by AGL with the SEC on March 1, 2010); and

(ii) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010 (which was filed by AGL with the SEC on May 10, 2010).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.): 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "BOND INSURANCE – Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.)" or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

21

PR-INT-000014081

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE."

SECURITY FOR THE BONDS

**General**

Pursuant to the Resolution, the Series 2010C Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2010C Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2010C Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Series 2010C Bonds.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010C Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010C Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2010C Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010C Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010C Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

22

PR-INT-000014082

## Property Pledged for the Payment of the Series 2010C Bonds

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.  The Series 2010 Bonds do not have any Debt Service Reserve requirement.  None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

## Outstanding Bonds and Parity Obligations

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010.  The Corporation's outstanding bonds consist of Senior and First Subordinate Bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.2 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

23

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

After the issuance of the Series 2010 Bonds, the refunding of the Refunded Bonds and the repayment of the Series 2010B Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $8.3 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued pursuant to the Fifteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, and (vi) the Series 2010E Bonds, issued pursuant to the Sixteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010.

## Subordination Provisions of the First Subordinate Bonds

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

## Funds and Accounts under the Resolution

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time

24

PR-INT-000014084

in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2) to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3) to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4) to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5) to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

(6) if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

25

CONFIDENTIAL

PR-INT-000014085

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

26

PR-INT-000014086

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):



*No Debt Service Reserve deposit requirement currently exists.

## Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds

27

designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

### All Bonds, Parity Obligations and Subordinate Obligations

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

### Additional Requirements — Senior Bonds and Parity Obligations

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.    No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as

CONFIDENTIAL

PR-INT-000014088

Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not**

CONFIDENTIAL

PR-INT-000014089

intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2010C Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2010C Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2010C Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2010C Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2010C Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

30

CONFIDENTIAL

PR-INT-000014090

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

## Certain Constitutional Considerations Relating to Act 91

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2010 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2010 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, a prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion. On June 18, 2009, in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A, the prior Secretary of Justice also issued an opinion (the "2009 Opinion") reaching substantially the same conclusion. On February 9, 2010, in connection with the issuance of the Series 2010A Bonds, the current Secretary of Justice issued an opinion (the "2010A Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2010 Opinion, the 2010A Opinion, the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court

31

of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2010 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2010 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

## Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating

Any rating assigned to the Series 2010C Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2010C Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2010C Bonds is not a recommendation to purchase, hold or sell such Series 2010C Bonds and such rating will not address the marketability of such Series 2010C Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2010C Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## Limited Nature of Remedies

The Series 2010C Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "Subordination Provisions of the Bonds" under SECURITY FOR THE BONDS. In the event the owners of the Series 2010C Bonds shall be entitled to

CONFIDENTIAL

PR-INT-000014092

declare a default, the payment of the Series 2010C Bonds by the Corporation cannot be accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2010C Bonds on the date such default is declared.

**Nature of Bond Insurance**

The payment of principal of and interest on the Insured Bonds by AGM, as and when due under the terms set forth in the Policy issued in connection with the Insured Bonds, is subject to the risk that AGM is unable or unwilling to make such payment. Further, the market price and marketability of the Insured Bonds may be adversely affected by the financial condition or the ratings of AGM.

CONFIDENTIAL

PR-INT-000014093

# AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2010C Bonds, the Series 2010D Bonds, the Series 2010E Bonds, the Outstanding Senior Bonds and Parity Obligations, and the Outstanding First Subordinate Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding First Subordinate Bonds[1] | Series 2010D Bonds Total Debt Service[2] | Series 2010E Bonds Total Debt Service[3] | Series 2010C Bonds Principal | Series 2010C Bonds Interest[4] | Series 2010C Bonds Debt Service[4] | Total Annual Debt Service |
|---|---|---|---|---|---|---|---|---|
| 2010 | $ 177,212,926 | $ 279,924,660 | – | – | – | – | – | $ 457,137,606 |
| 2011 | 177,212,926 | 312,474,471 | $ 3,630,471 | $ 3,185,973 | – | $ 50,020,729 | $ 50,020,729 | 546,524,570 |
| 2012 | 177,212,926 | 290,039,858 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 555,944,075 |
| 2013 | 177,212,926 | 312,474,471 | 3,342,633 | 2,933,377 | – | 62,197,924 | 62,197,924 | 558,161,331 |
| 2014 | 177,212,926 | 312,474,471 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 578,378,688 |
| 2015 | 177,212,926 | 323,774,471 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 589,678,688 |
| 2016 | 177,212,926 | 356,755,721 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 622,659,938 |
| 2017 | 177,212,926 | 387,650,991 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 653,555,208 |
| 2018 | 177,212,926 | 415,938,716 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 681,842,933 |
| 2019 | 177,212,926 | 442,355,091 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 708,259,308 |
| 2020 | 177,212,926 | 473,736,310 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 739,640,527 |
| 2021 | 177,212,926 | 446,202,429 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 712,106,646 |
| 2022 | 181,942,926 | 453,621,129 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 724,255,346 |
| 2023 | 184,113,226 | 472,437,354 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 745,241,871 |
| 2024 | 259,097,926 | 495,054,504 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 842,843,721 |
| 2025 | 304,651,226 | 525,168,254 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 918,510,771 |
| 2026 | 319,309,926 | 539,331,389 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 947,332,606 |
| 2027 | 333,337,426 | 562,539,524 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 984,568,241 |
| 2028 | 352,878,526 | 612,787,641 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 1,054,357,458 |
| 2029 | 369,740,487 | 622,172,909 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 1,080,604,687 |
| 2030 | 387,153,667 | 633,673,101 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 1,109,518,059 |
| 2031 | 404,688,595 | 664,486,114 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 1,157,866,000 |
| 2032 | 422,921,795 | 697,241,714 | 3,342,633 | 2,933,377 | – | 82,415,281 | 82,415,281 | 1,208,854,800 |
| 2033 | 441,880,695 | 695,520,776 | 3,342,633 | 2,933,377 | $26,570,000 | 82,415,281 | 108,985,281 | 1,252,662,762 |
| 2034 | 461,600,180 | 754,512,026 | 3,342,633 | 2,933,377 | – | 81,086,781 | 81,086,781 | 1,303,474,997 |
| 2035 | 482,111,345 | 713,232,026 | 3,342,633 | 2,933,377 | 74,025,000 | 81,086,781 | 155,111,781 | 1,356,731,162 |
| 2036 | 503,444,330 | 739,260,799 | 3,342,633 | 2,933,377 | 87,660,000 | 76,485,531 | 164,145,531 | 1,413,126,670 |
| 2037 | 486,103,395 | 740,138,221 | 3,342,633 | 2,933,377 | 23,554,650 | 168,649,156 | 192,203,806 | 1,424,721,432 |
| 2038 | 507,593,361 | 551,394,076 | 3,342,633 | 2,933,377 | 107,204,146 | 311,273,579 | 418,477,725 | 1,483,741,172 |
| 2039 | 142,560,982 | 578,810,856 | 3,342,633 | 2,933,377 | 195,835,801 | 249,079,524 | 444,915,325 | 1,172,563,173 |
| 2040 | 140,477,975 | 518,982,675 | 3,342,633 | 2,933,377 | 475,875,000 | 58,516,925 | 534,391,925 | 1,200,128,585 |
| 2041 | 673,482,975 | 559,393,000 | 3,342,633 | 2,933,377 | 478,680,000 | 32,818,200 | 511,498,200 | 1,750,650,185 |
| 2042 | 700,472,975 | 700,214,900 | 92,777,633 | 95,688,377 | 150,000,000 | 7,687,500 | 157,687,500 | 1,746,841,385 |
| 2043 | 728,542,975 | 197,750,000 | – | – | – | – | – | 926,292,975 |
| 2044 | 757,732,975 | 186,375,000 | – | – | – | – | – | 944,107,975 |
| 2045 | 788,097,975 | – | – | – | – | – | – | 788,097,975 |
| 2046 | 819,672,975 | – | – | – | – | – | – | 819,672,975 |
| 2047 | 852,507,975 | – | – | – | – | – | – | 852,507,975 |
| 2048 | 886,663,066 | – | – | – | – | – | – | 886,663,066 |
| 2049 | 922,181,201 | – | – | – | – | – | – | 922,181,201 |
| 2050 | 959,121,096 | – | – | – | – | – | – | 959,121,096 |
| 2051 | 997,538,585 | – | – | – | – | – | – | 997,538,585 |
| 2052 | 1,037,491,756 | – | – | – | – | – | – | 1,037,491,756 |
| 2053 | 1,079,043,813 | – | – | – | – | – | – | 1,079,043,813 |
| 2054 | 1,122,257,975 | – | – | – | – | – | – | 1,122,257,975 |
| 2055 | 1,167,202,556 | – | – | – | – | – | – | 1,167,202,556 |
| 2056 | 1,213,947,975 | – | – | – | – | – | – | 1,213,947,975 |
| 2057 | 1,198,845,475 | – | – | – | – | – | – | 1,198,845,475 |
| Total | $24,716,967,424 | $17,535,530,699 | $196,687,098 | $186,875,656 | $1,619,404,597 | $2,909,623,531 | $4,529,028,135 | $47,165,089,004 |

[1] Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion of the interest is capitalized in years 2010 and 2012.

[2] These figures are reduced by the 35% Build America Bonds subsidy.

[3] These figures are reduced by the 45% Recovery Zone Economic Development Bonds subsidy.

[4] These figures are reduced by the interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 but include accreted interest on Capital Appreciation Bonds.

34

PR-INT-000014094

## Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|------|------|------|------|------|------|
| 2010[5] | $1,097,791,960 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,141,707,799 | 177,212,926 | 369,311,645 | 546,524,570 | 2.09 |
| 2012 | 1,187,380,355 | 204,756,582 | 378,731,149 | 583,487,731 | 2.03 |
| 2013 | 1,234,879,898 | 225,879,593 | 380,948,406 | 606,827,998 | 2.03 |
| 2014 | 1,284,279,510 | 229,935,655 | 401,165,763 | 631,101,417 | 2.03 |
| 2015 | 1,335,655,194 | 243,877,713 | 412,465,763 | 656,343,476 | 2.03 |
| 2016 | 1,389,085,995 | 237,150,313 | 445,447,013 | 682,597,326 | 2.03 |
| 2017 | 1,444,654,121 | 233,562,213 | 476,342,283 | 709,904,496 | 2.03 |
| 2018 | 1,502,445,065 | 233,667,213 | 504,630,008 | 738,297,221 | 2.03 |
| 2019 | 1,562,547,743 | 236,782,213 | 531,046,383 | 767,828,596 | 2.03 |
| 2020 | 1,625,054,625 | 236,117,213 | 562,427,601 | 798,544,814 | 2.03 |
| 2021 | 1,690,061,882 | 295,597,213 | 534,893,720 | 830,490,933 | 2.03 |
| 2022 | 1,757,669,531 | 321,395,613 | 542,312,420 | 863,708,033 | 2.03 |
| 2023 | 1,827,981,589 | 337,131,813 | 561,128,645 | 898,260,458 | 2.03 |
| 2024 | 1,901,106,235 | 350,442,913 | 583,745,795 | 934,188,708 | 2.03 |
| 2025 | 1,977,155,975 | 357,700,613 | 613,859,545 | 971,560,158 | 2.03 |
| 2026 | 2,056,247,813 | 382,399,013 | 628,022,680 | 1,010,421,693 | 2.03 |
| 2027 | 2,138,503,438 | 399,604,213 | 651,230,815 | 1,050,835,028 | 2.03 |
| 2028 | 2,224,049,402 | 391,389,213 | 701,478,933 | 1,092,868,146 | 2.03 |
| 2029 | 2,313,017,320 | 425,721,174 | 710,864,200 | 1,136,585,374 | 2.03 |
| 2030 | 2,405,544,075 | 459,686,155 | 722,364,393 | 1,182,050,547 | 2.03 |
| 2031 | 2,501,772,020 | 476,151,882 | 753,177,405 | 1,229,329,287 | 2.03 |
| 2032 | 2,601,849,207 | 492,568,782 | 785,933,005 | 1,278,501,787 | 2.03 |
| 2033 | 2,705,929,608 | 518,855,382 | 810,782,068 | 1,329,637,450 | 2.03 |
| 2034 | 2,814,173,354 | 540,949,867 | 841,874,818 | 1,382,824,685 | 2.03 |
| 2035 | 2,926,746,980 | 563,521,032 | 874,619,818 | 1,438,140,850 | 2.03 |
| 2036 | 3,043,823,686 | 585,979,017 | 909,682,340 | 1,495,661,357 | 2.03 |
| 2037 | 3,165,583,596 | 616,873,082 | 938,618,038 | 1,555,491,120 | 2.03 |
| 2038 | 3,292,214,042 | 641,558,048 | 976,147,811 | 1,617,705,859 | 2.03 |
| 2039 | 3,423,909,848 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 2.03 |
| 2040 | 3,560,873,630 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 2.03 |
| 2041 | 3,703,316,112 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 2.08 |
| 2042 | 3,851,456,444 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 2.17 |
| 2043 | 4,005,522,543 | 728,542,975 | 197,750,000 | 926,292,975 | 4.32 |
| 2044 | 4,165,751,443 | 757,732,975 | 186,375,000 | 944,107,975 | 4.41 |
| 2045 | 4,332,389,659 | 788,097,975 | - | 788,097,975 | 5.50 |
| 2046 | 4,505,693,566 | 819,672,975 | - | 819,672,975 | 5.50 |
| 2047 | 4,685,929,796 | 852,507,975 | - | 852,507,975 | 5.49 |
| 2048 | 4,873,375,645 | 886,666,392 | - | 886,666,392 | 5.49 |
| 2049 | 5,068,319,502 | 922,183,873 | - | 922,183,873 | 5.49 |
| 2050 | 5,271,061,289 | 959,115,612 | - | 959,115,612 | 5.49 |
| 2051 | 5,481,912,928 | 997,537,122 | - | 997,537,122 | 5.49 |
| 2052 | 5,701,198,816 | 1,037,500,321 | - | 1,037,500,321 | 5.49 |
| 2053 | 5,929,256,327 | 1,079,036,134 | - | 1,079,036,134 | 5.49 |
| 2054 | 6,166,436,329 | 1,122,257,975 | - | 1,122,257,975 | 5.49 |
| 2055 | 6,413,103,727 | 1,167,193,604 | - | 1,167,193,604 | 5.49 |
| 2056 | 6,669,638,020 | 1,213,947,975 | - | 1,213,947,975 | 5.49 |
| 2057 | 6,936,433,887 | 1,198,845,475 | - | 1,198,845,475 | 5.78 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

35

PR-INT-000014095

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.57%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.57% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,460,000 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,114,689,971 | 177,212,926 | 369,311,645 | 546,524,570 | 2.04 |
| 2012 | 1,132,190,450 | 204,756,582 | 378,731,149 | 583,487,731 | 1.94 |
| 2013 | 1,149,965,684 | 225,879,593 | 380,948,406 | 606,827,998 | 1.90 |
| 2014 | 1,168,019,987 | 229,935,655 | 401,165,763 | 631,101,417 | 1.85 |
| 2015 | 1,186,357,740 | 243,877,713 | 412,465,763 | 656,343,476 | 1.81 |
| 2016 | 1,204,983,393 | 237,150,313 | 445,447,013 | 682,597,326 | 1.77 |
| 2017 | 1,223,901,467 | 233,562,213 | 476,342,283 | 709,904,496 | 1.72 |
| 2018 | 1,243,116,551 | 233,667,213 | 504,630,008 | 738,297,221 | 1.68 |
| 2019 | 1,262,633,310 | 236,782,213 | 531,046,383 | 767,828,596 | 1.64 |
| 2020 | 1,282,456,479 | 236,117,213 | 562,427,601 | 798,544,814 | 1.61 |
| 2021 | 1,302,590,870 | 295,597,213 | 534,893,720 | 830,490,933 | 1.57 |
| 2022 | 1,323,041,367 | 321,395,613 | 542,312,420 | 863,708,033 | 1.53 |
| 2023 | 1,343,812,934 | 337,131,813 | 561,128,645 | 898,260,458 | 1.50 |
| 2024 | 1,364,910,612 | 350,442,913 | 583,745,795 | 934,188,708 | 1.46 |
| 2025 | 1,386,339,521 | 357,700,613 | 613,859,545 | 971,560,158 | 1.43 |
| 2026 | 1,408,104,861 | 382,399,013 | 628,022,680 | 1,010,421,693 | 1.39 |
| 2027 | 1,430,211,913 | 399,604,213 | 651,230,815 | 1,050,835,028 | 1.36 |
| 2028 | 1,452,666,043 | 391,389,213 | 701,478,933 | 1,092,868,146 | 1.33 |
| 2029 | 1,475,472,700 | 425,721,174 | 710,864,200 | 1,136,585,374 | 1.30 |
| 2030 | 1,498,637,419 | 459,686,155 | 722,364,393 | 1,182,050,547 | 1.27 |
| 2031 | 1,522,165,820 | 476,151,882 | 753,177,405 | 1,229,329,287 | 1.24 |
| 2032 | 1,546,063,614 | 492,568,782 | 785,933,005 | 1,278,501,787 | 1.21 |
| 2033 | 1,570,336,600 | 518,855,382 | 810,782,068 | 1,329,637,450 | 1.18 |
| 2034 | 1,594,990,668 | 540,949,867 | 841,874,818 | 1,382,824,685 | 1.15 |
| 2035 | 1,620,031,802 | 563,521,032 | 874,619,818 | 1,438,140,850 | 1.13 |
| 2036 | 1,645,466,078 | 585,979,017 | 909,682,340 | 1,495,661,357 | 1.10 |
| 2037 | 1,671,299,669 | 616,873,082 | 938,618,038 | 1,555,491,120 | 1.07 |
| 2038 | 1,697,538,844 | 641,558,048 | 976,147,811 | 1,617,705,859 | 1.05 |
| 2039 | 1,724,189,970 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 1.02 |
| 2040 | 1,751,259,515 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 1.00 |
| 2041 | 1,778,754,049 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 1.00 |
| 2042 | 1,806,680,242 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 1.02 |
| 2043 | 1,835,044,873 | 728,542,975 | 197,750,000 | 926,292,975 | 1.98 |
| 2044 | 1,863,854,825 | 757,732,975 | 186,375,000 | 944,107,975 | 1.97 |
| 2045 | 1,893,117,090 | 788,097,975 | - | 788,097,975 | 2.40 |
| 2046 | 1,922,838,767 | 819,672,975 | - | 819,672,975 | 2.35 |
| 2047 | 1,953,027,071 | 852,507,975 | - | 852,507,975 | 2.29 |
| 2048 | 1,983,689,327 | 886,666,392 | - | 886,666,392 | 2.24 |
| 2049 | 2,014,832,977 | 922,183,873 | - | 922,183,873 | 2.18 |
| 2050 | 2,046,465,577 | 959,115,612 | - | 959,115,612 | 2.13 |
| 2051 | 2,078,594,805 | 997,537,122 | - | 997,537,122 | 2.08 |
| 2052 | 2,111,228,457 | 1,037,500,321 | - | 1,037,500,321 | 2.03 |
| 2053 | 2,144,374,454 | 1,079,036,134 | - | 1,079,036,134 | 1.99 |
| 2054 | 2,178,040,837 | 1,122,257,975 | - | 1,122,257,975 | 1.94 |
| 2055 | 2,212,235,779 | 1,167,193,604 | - | 1,167,193,604 | 1.90 |
| 2056 | 2,246,967,576 | 1,213,947,975 | - | 1,213,947,975 | 1.85 |
| 2057 | 2,282,244,658 | 1,198,845,475 | - | 1,198,845,475 | 1.90 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

36

CONFIDENTIAL

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2009, the average annual growth rate in personal consumption expenditures (nominal) was 7.64%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 5.03%. During Fiscal Year 2009, which constitutes the third consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 1.8% while Commonwealth Sales Tax revenues decreased by 3.6% as compared to Fiscal Year 2008.

## PLAN OF FINANCING

**Overview**

The Corporation anticipates using the proceeds of Series 2010C Bonds, together with other funds available to the Corporation, to (i) redeem prior to maturity the Refunded Bonds on the redemption dates and at the redemption prices set forth below plus accrued interest to the redemption dates, (ii) repay certain of its outstanding obligations, (iii) provide funds to the Commonwealth for the Authorized Uses, and (iv) pay the cost of issuance of the Series 2010C Bonds.

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date | Redemption Price (% of Par) | Redemption Date |
|---|---|---|---|---|---|
| Series 2009A Mandatory Tender Bonds | $700,000,000 | 5% | August 1, 2039 | 100% | August 1, 2011 |

**Estimated Sources and Uses of Funds**

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2010C Bonds ............................ | $1,619,404,596.60 |
| Net Original Issue Discount ...................................................... | 9,850,742.15 |
| Other Available Sources ........................................................... | 17,500,00.00 |
| **Total Sources** ................................................................ | $1,627,053,854.45 |

**Uses**

| | |
|---|---|
| Deposit to the Project Fund ...................................................... | $  797,591,828.34 |
| Deposit to the Escrow Fund ...................................................... | 750,297,165.00 |
| Capitalized Interest .................................................................. | 59,708,780.12 |
| Underwriters' Discount and Other Costs of Issuance[1] .............. | 19,456,080.99 |
| **Total Uses** ................................................................... | $1,627,053,854.45 |

[1] Includes bond insurance premium, legal, printing and other financing expenses.

The Corporation will deposit a portion of the net proceeds of the Series 2010C Bonds with the Trustee, as escrow agent, under the terms of an escrow deposit agreement. Such amount of net proceeds of the Series 2010C Bonds will be invested in Government Obligations, the principal of and interest on which when due will provide moneys sufficient to pay the principal of or the redemption price of the Refunded Bonds and the interest coming due on the Refunded Bonds through their date of redemption or maturity date, as applicable.

Upon the deposit with the Trustee, the Refunded Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the Resolution and the Refunded Bonds will thereupon be defeased. In rendering the foregoing opinion, Bond Counsel will rely on the report of Samuel Klein and Company, Certified Public Accountants, as verification agent, dated the date of delivery of the Series 2010C Bonds, relating to the verification of certain mathematical computations with respect to the moneys and Government Obligations deposited with the escrow agent under the terms of the escrow deposit agreement.

37

CONFIDENTIAL

# THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation | Expiration of Term |
|------|-----------|-------------------|
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Marcos Rodríguez-Ema | Governor's Chief of Staff | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |
| Agnes B. Suárez | Businesswoman | September 23, 2010 |
| Angel A. Fullana Olivencia | Engineer | September 23, 2010 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## Other Obligations of the Corporation

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of December 31, 2009, the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such

38

PR-INT-000014098

swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

## TAX MATTERS

**Federal Income Taxes**

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Series 2010C Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Series 2010C Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Series 2010C Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Series 2010C Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in the Bond Resolution and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth described above, interest on the Series 2010C Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Series 2010C Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

**State Taxes**

Bond Counsel is also of the opinion that, under existing statutes, interest on the Series 2010C Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Series 2010C Bonds.

**Original Issue Discount**

Bond Counsel is further of the opinion that the difference between the principal amount of the Series 2010C Bonds maturing on August 1, 2035 bearing an interest rate of 5%, 2036, 2037 (Capital Appreciation Bonds), 2038 bearing an interest rate of 5.375%, 2038 (Capital Appreciation Bonds), 2039 (Capital Appreciation Bonds), 2041, and 2042 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2010C Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

CONFIDENTIAL

PR-INT-000014099

## Original Issue Premium

The Series 2010C Bonds maturing on August 1, 2035 bearing an interest rate of 6.5% and 2039 bearing an interest rate of 6% (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Series 2010C Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

## Ancillary Tax Matters

Ownership of the Series 2010C Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Series 2010C Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions. Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Series 2010C Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Series 2010C Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinions attached as Appendix C. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Series 2010C Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

## Changes in Law and Post Issuance Events

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Series 2010C Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Series 2010C Bonds. This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur. Prospective purchasers of the Series 2010C Bonds should consult their own tax advisers regarding such matters.

CONFIDENTIAL

PR-INT-000014100

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Series 2010C Bonds may affect the tax status of interest on the Series 2010C Bonds. Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Series 2010C Bonds, or the interest thereon, if any action is taken with respect to the Series 2010C Bonds or the proceeds thereof upon the advice or approval of other counsel.

## RATINGS

The Series 2010C Bonds have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A1" by Moody's Investors Service ("Moody's), and "A+" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies. The Insured Bonds are expected to be assigned insured ratings of "AAA" (negative outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

In April 2010, Moody's and Fitch began to recalibrate their ratings of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across their portfolio of rated securities. As a result of this recalibration, the Corporation's First Subordinate Bonds are now rated "A1" instead of "A2" by Moody's with a stable outlook and "A+" instead of "A" by Fitch with a stable outlook. This recalibration, however, does not reflect an improvement in the credit quality or a change in Moody's or Fitch's opinion of the Corporation's credit quality. The recalibration is just an adjustment to denote a comparable level of credit risk as ratings in other sectors.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2010C Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See "Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings" under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Series 2010C Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Samuel Klein and Company, Certified Public Accountants, will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Series 2010C Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the Defeasance Obligations and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (2) the computations of yield on both the Defeasance Obligations and the Series 2010C Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

41

PR-INT-000074101

# UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2010C Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $1,599,913,781.35 reflecting a net original issue discount of $9,850,742.15 and an underwriters' discount of $9,640,073.10, and to reoffer such Series 2010C Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2010C Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2010C Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2010C Bonds if any Series 2010C Bonds are purchased.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. Incorporated ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Series 2010C Bonds.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2010C Bonds as consideration for their professional services.

J.P. Morgan Securities Inc. ("JPMSI"), one of the Underwriters of the Series 2010C Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Series 2010C Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS& Co. will purchase Series 2010C Bonds from JPMSI at the original issue price less a negotiated portion of the selling concession applicable to any Series 2010C Bonds that CS&Co. sells. JPMSI has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities

CONFIDENTIAL

PR-INT-000014102

located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2010C Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Series 2010C Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets Corporation ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Series 2010C Bonds as part of the consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2010C Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2010C Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2010C Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a) within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b) in a timely manner, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Series 2010C Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2010C Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

43

PR-INT-000014103

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2010C Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Series 2010C Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2010C Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2010C Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2010C Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

44

PR-INT-000014104

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2010C Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2010C Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2010C Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2010C Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*), and the specimen of the AGM Policy (*Appendix F*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing under the heading BOND INSURANCE and UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____/s/ Fernando L. Batlle_____
         Executive Director

45

PR-INT-000014105

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000014106

APPENDIX A

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

**General**

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,967,179 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,374 (420,326 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, Puerto Rico's real gross national product contracted by 1.2% and 2.8%, respectively. For fiscal year 2009, preliminary reports indicate that the real gross national product contracted by 3.7%. In March 2010, the Puerto Rico Planning Board (the "Planning Board") announced that it was projecting a contraction of 3.6% in real gross national product for fiscal year 2010 and an increase of 0.4% in real gross national product for fiscal year 2011.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

**Personal Income**

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2009. In fiscal year 2009, aggregate personal income was $59 billion ($49.9 billion in 2005 prices) and personal income per capita was $14,905 ($12,589 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $13.1 billion in fiscal year 2009 ($12.2 billion in fiscal year 2008). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10 billion, or 76% of the transfer payments to individuals in fiscal year 2009 ($9.3 billion, or 73.9%, in fiscal year 2008). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2009.

### Commonwealth of Puerto Rico
### Personal Income
### (in millions of dollars)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,137.5 | $20,566.2 | $20,702.9 | $20,204.8 | $21,144.9 |
| Government | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 | 9,254.2 |
| Other | 1,083.5 | 1,036.7 | 946.4 | 999.4 | 1,122.7 |
| Total Employees' compensation | $29,371.5 | $30,027.1 | $30,234.2 | $30,966.4 | $31,521.8 |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,181.0 | 2,241.9 | 2,221.2 | 2,253.3 | 2,285.0 |
| Employers | 3,064.0 | 3,167.1 | 3,074.1 | 3,121.4 | 3,192.8 |
| Total Contributions for social insurance | $5,245.0 | $5,409.0 | $5,295.3 | $5,374.7 | $5,477.8 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,687.0 | 2,832.3 | $2,219.8 | $2,232.2 | $2,246.5 |
| Dividends of domestic corporations | 286.7 | 304.3 | $322.1 | $351.9 | $355.6 |
| Miscellaneous income and dividends received from abroad | 13.4 | 13.4 | 9.9 | 17.1 | 6.6 |
| Rental income of persons | 4,201.8 | 4,387.4 | 5,529.0 | 5,825.5 | 6,747.1 |
| Personal interest income | 2,911.9 | 3,725.1 | 2,820.5 | 2,872.6 | 3,425.1 |
| Total Proprietors' income | $10,100.7 | $11,262.5 | $10,901.3 | $11,299.3 | $12,780.9 |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,323.5 | 3,390.7 | 3,569.5 | 3,813.9 | 4,371.3 |
| Federal government | 9,243.7 | 9,725.9 | 10,327.1 | 12,209.3 | 13,057.7 |
| U.S. state governments | 14.9 | 17.6 | 22.7 | 24.1 | 35.6 |
| Business | 1,190.7 | 1,184.9 | 1,741.0 | 2,126.8 | 2,251.8 |
| Other nonresidents | 820.3 | 642.6 | 610.0 | 518.7 | 493.6 |
| Total transfer payments | $14,593.0 | $14,961.8 | $16,270.3 | $18,692.8 | $20,210.0 |
| Total Personal Income | $48,820.2 | $50,842.3 | $52,110.4 | $55,583.7 | $58,856.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

## Personal Consumption

During Fiscal Year 2009, at current prices, personal consumption amounted to $55.6 billion, representing an increase of $1 billion, or 1.8%, from Fiscal Year 2008. This increase was based on a 1.5% increase in nondurable goods (40% of personal consumption), 4.2% decrease in durable goods (9% of personal consumption), and 3.2% increase in services (51% of personal consumption). At constant 2005 prices, personal consumption decreased 2.4% from Fiscal Year 2008. These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Food | $ 6,535.4 | $ 6,982.2 | $ 7,315.0 | $ 7,925.8 | $ 8,559.8 |
| Alcoholic beverages and tobacco products | 1,739.3 | 1,765.8 | 1,783.1 | 1,705.3 | 1,777.5 |
| Clothing and accessories | 2,957.1 | 3,084.9 | 3,528.0 | 3,568.7 | 3,604.8 |
| Personal care | 815.5 | 984.6 | 1,031.0 | 1,213.4 | 1,281.4 |
| Housing | 7,012.3 | 7,499.7 | 8,065.8 | 8,568.6 | 9,166.7 |
| Household operations | 5,267.9 | 5,929.2 | 6,479.0 | 7,053.6 | 6,997.6 |
| Medical care and funeral expenses | 7,525.9 | 8,007.2 | 8,434.8 | 9,046.7 | 9,453.3 |
| Business services | 3,020.1 | 3,035.5 | 3,103.0 | 3,022.5 | 3,055.5 |
| Transportation | 6,136.4 | 6,325.3 | 6,079.8 | 6,252.5 | 5,509.0 |
| Recreation | 4,547.2 | 4,810.3 | 4,935.0 | 4,997.0 | 4,938.2 |
| Education | 1,627.8 | 1,819.5 | 1,776.6 | 1,788.2 | 1,845.3 |
| Religious and nonprofit organizations, not elsewhere classified | 482.3 | 505.9 | 439.2 | 449.8 | 458.7 |
| Foreign travel | 1,531.9 | 1,608.9 | 1,616.9 | 1,737.8 | 1,631.4 |
| Miscellaneous purchases | 605.8 | 704.1 | 819.5 | 822.0 | 830.0 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $49,804.9 | $53,063.1 | $55,406.7 | $58,151.8 | $59,109.2 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,269.4 | 3,403.1 | 3,457.4 | 3,590.8 | 3,544.6 |
| Total Personal Consumption Expenditures | $46,535.4 | $49,660.0 | $51,949.3 | $54,561.0 | $55,564.6 |

(1) Preliminary figures.
Source: Planning Board.

A-3

CONFIDENTIAL

PR-INT-000014109

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2009.

### Commonwealth of Puerto Rico
### Gross National Product
### Fiscal Years Ended June 30,

| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $53,752 | $56,732 | $59,521 | $61,527 | $62,759 |
| Real gross national product – $ millions (2005 prices) | 53,752 | 54,027 | 53,400 | 51,889 | 49,951 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 1.9% | 0.5% | (1.2)% | (2.8)% | (3.7)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 3.1% | 2.8% | 1.8% | 2.8% | (2.5)% |

[1] Preliminary.
[2] In current dollars.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1995, and the forecast of the growth rate for fiscal year 2011.

A-4

CONFIDENTIAL
PR-INT-000014110

## REAL GNP GROWTH RATE
### (Percent)



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\*    Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2010).
\*\* Estimate for U.S. from IHS-Global Insight (Jun-2010).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2009 shown in this Appendix are preliminary until the revised figures are released and the forecast for fiscal year 2010 is revised. Certain information regarding current economic activity is, however, available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the table below and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that provide for an index that highly correlates to Puerto Rico's real gross national product.

As the following graph shows, the month-to-month reduction in the Government Development Bank – Economic Activity Index has begun to stabilize.

A-5

CONFIDENTIAL

PR-INT-000014111



*Economic Forecast for Fiscal Years 2010 and 2011*

On March 10, 2010, the Planning Board released its revised gross national product forecast for fiscal year 2010 and its gross national product forecast for fiscal year 2011. The Planning Board revised its gross national product forecast for fiscal year 2010 from a projected growth of 0.7% to a contraction of 3.6%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2010 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2011 projects an increase in gross national product of 0.4% in constant dollars. The forecast, however, did not take into account the activity expected to be generated from funds received or expected to be received by the American Recovery and Reinvestment Act of 2009 ("ARRA"). The Planning Board's forecast for fiscal year 2011 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships.

*Fiscal Year 2009*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 3.7% (an increase of 2.0% in current dollars) over fiscal year 2008. Nominal gross national product was $62.8 billion in fiscal year 2009 ($50 billion in 2005 prices), compared to $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices). Aggregate

CONFIDENTIAL

PR-INT-000014112

personal income increased from $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices) to $59 billion in fiscal year 2009 ($49.9 billion in 2005 prices), and personal income per capita increased from $14,080 in fiscal year 2008 ($12,410 in 2005 prices) to $14,905 in fiscal year 2009 ($12,589 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. Although the situation improved significantly during fiscal year 2009, oil prices remained at relatively high levels and the impact of the increases of previous years were still felt in fiscal year 2009. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2008*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.8% (an increase of 3.4% in current dollars) over fiscal year 2007. Nominal gross national product was $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices), compared to $59.5 billion in fiscal year 2007 ($53.4 billion in 2005 prices). Aggregate personal income increased from $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices) to $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices), and personal income per capita increased from $13,244 in fiscal year 2007 ($12,319 in 2005 prices) to $14,080 in fiscal year 2008 ($12,410 in 2005 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.2%. Nominal gross national product was $59.5 billion ($53.4 billion in 2005 prices), compared to $56.7 billion in fiscal year 2006 ($54.0 billion in 2005 prices). This represents an increase in nominal gross national product of 4.9%. Aggregate personal income was $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices), as compared to $50.8 billion in fiscal year

CONFIDENTIAL

2006 ($48.5 billion in 2000 prices), and personal income per capita was $13,244 in fiscal year 2007 ($12,319 in 2005 prices), as compared to $12,970 in fiscal year 2006 ($12,382 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,266,300 for fiscal year 2006. This increase in employment was driven by self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.0% for fiscal year 2006.

## Overview of Fiscal Condition

### Fiscal Condition

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and expenditures. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenditures significantly exceeding recurring revenues.

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from GDB or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance.

For fiscal year 2009, the estimated deficit was approximately $3.490 billion, consisting of the difference between preliminary revenues (without taking into account a one time accounting adjustment related to the sales and use tax) and estimated expenses for such fiscal year. The estimated deficit is projected to be less than $2.5 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below. The administration projects it will eliminate the deficit by fiscal year 2013.

*Results for Fiscal Year 2009.* Total preliminary General Fund revenues for fiscal year 2009 were $7.673 billion, representing a decrease of $686 million, or 8.2%, from fiscal year 2008 revenues and an increase of $73 million, or 1.0%, over the $7.6 billion revised estimate presented by the administration in February 2009. Total expenses for fiscal year 2009 were approximately $11.250 billion, consisting of budgeted General Fund expenditures of $9.484 billion and approximately $1.766 billion of additional non-budgeted expenses. The difference between preliminary General Fund revenues and total expenses for fiscal year 2009 was principally paid from proceeds of Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym) bond issues pursuant to the fiscal stabilization plan described below.

*Preliminary Results for Fiscal Year 2010 (First Ten Months).* Preliminary General Fund revenues for the first ten months of fiscal year 2010 (from July 2009 through April 2010) were $6.281 billion, a decline of $253.8 million, or 3.9%, from the $6.535 billion of revenues for the same period in the prior fiscal year and a decline of $88 million, or 1.4%, from budgeted revenues of $6.370 billion for the first ten months of fiscal year 2010. As budgeted, the decline in General Fund revenues reflects the reduction in General Fund revenues from the sales and use tax as a result of the allocation of a larger portion of such tax to COFINA (amounting to $353.8 million for the first ten months of fiscal year 2010), and the continuing impact of the ongoing economic recession, partly offset by the effect of the temporary and permanent revenue raising measures implemented as part of the fiscal stabilization plan described below (including $213.4 million in additional property taxes for the first ten months of fiscal year 2010). If the additional allocation to COFINA and additional property taxes are not taken into account, the reduction in General Fund revenues would have been $99 million, or 1.6%. The estimated General Fund revenues for fiscal year 2010 remain, as budgeted, at $7.670 billion.

A-8

CONFIDENTIAL

PR-INT-000014114

Budgeted expenditures for fiscal year 2010 amount to $10.170 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.5 billion of additional expenditures to be covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance (see "Fiscal Stabilization Plan" below).

*Fiscal Stabilization Plan.* In January 2009, the administration, which controls the Executive and Legislative branches of government, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), sought to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual $2 billion operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program were and will be used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal year 2010, the administration began to design a comprehensive reform of the tax system (that it expects to adopt during fiscal year 2011) and to implement a long-term economic development plan, both of which are designed to complement the short-term economic reconstruction and supplemental stimulus initiatives described below.

As of April 30, 2010, the administration had implemented measures that are expected to result in annual savings of approximately $900 million.

*Government Reorganization Plan.* The administration has also taken the first steps to reorganize and modernize the Executive Branch. On December 11, 2009, the Governor signed Act No. 182 that seeks to reduce the number of government agencies and operational expenditures. On April 13, 2010, the administration submitted to the Legislative Assembly a bill proposing a referendum to amend the Constitution in order to restructure the Legislative Assembly by reducing the number of legislators. If the bill is approved, the referendum would be held on or prior to May 1, 2011 and any amendments to the Constitution approved in such referendum would take effect with respect to the Legislative Assembly to be installed on January 2, 2013.

*Unfunded Pension Benefit Obligations and Cash Flow Deficits of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and cash flow deficits of the three government retirement systems that are funded principally with government appropriations. As of June 30, 2009, the total unfunded accrued actuarial liability for the three retirement systems was $23.9 billion and the expected aggregate cash flow deficit for fiscal year 2010 was $640 million.

In February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The Commission is expected to submit a report to the Governor by the end of the first quarter of fiscal year 2011.

Economic Reconstruction Plan

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. Puerto Rico has been awarded approximately $6.5 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic

A-9

downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of April 23, 2010, Puerto Rico has disbursed $2.8 billion in ARRA funds, or 43% of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also proposes to (i) strengthen the labor market and encourage greater labor-force participation by bringing out-of-date labor laws and regulations in line with U.S. and international standards, (ii) adopt a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies, and (iii) adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. In February 2010, the Governor named a committee to review the Commonwealth's tax system and propose a tax reform. The committee's report is due by September 2010 and the administration plans to file tax reform legislation during the immediately following legislative session.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. The administration is currently evaluating and expects to commence procurement for eight public-private partnership priority projects during fiscal year 2011.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include the development of a trans-shipment port and tourism and urban redevelopment projects.

*Recalibration of Ratings of Commonwealth General Obligation Bonds*

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" with a stable outlook by Moody's, which is three categories above the previous "Baa3" rating. The administration expects that this recalibration will increase the number of potential investors for the Commonwealth's general obligation bonds and have a positive impact on the Commonwealth's financing costs.

*Proposed Fiscal Year 2011 Budget*

On April 26, 2010, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2011. The proposed budget provides for total General Fund revenues of $8.195 billion, compared to

CONFIDENTIAL

estimated General Fund revenues of $7.670 billion for fiscal year 2010. The proposed General Fund revenues of $8.195 billion include base revenues of $7.645 billion, $241 million from tax enforcement and compliance measures, and $89 million of property taxes from the self-appraisal of real property. The proposed General Fund revenues originally included $220 million from the license fees of video lottery machines, but this measure has been withdrawn. Preparation of the budget is an ongoing process and various proposals are under review to replace these $220 million. The proposed fiscal year 2011 budget provides for total expenditures of $9.195 billion, consisting of General Fund expenditures of $8.195 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA bond issues, including a $500 million proposed bond issue during fiscal year 2011. The proposed total expenditures for fiscal year 2011 are $975 million, or 9.6%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $2.055 billion, or 18.3%, lower than estimated total expenditures of $11.250 billion for fiscal year 2009.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For fiscal year 2009, the number of persons employed averaged 1,168,200, a decrease of 4.1% compared to previous fiscal year. During the first ten months of fiscal year 2010, total employment averaged 1,106,600, a decline of 5.9% with respect to the same period of the prior year; and the unemployment rate averaged 15.9%.

The following table presents annual statistics of employment and unemployment for fiscal year 2005 through fiscal year 2009, and the average figures for the first ten months of fiscal year 2010. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.2% of total employment in fiscal year 2009.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,422 | 1,266 | 156 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010[3] | 1,316 | 1,107 | 209 | 15.9 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first ten months of fiscal year 2010 (July through April 2010).

*Source:* Department of Labor and Human Resources – Household Survey

CONFIDENTIAL

PR-INT-000014117

## Economic Performance by Sector

From fiscal year 2005 to fiscal year 2009, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009[2] |
| Manufacturing | $37,637 | $40,548 | $43,541 |
| Service[3] | 40,190 | 41,227 | 41,028 |
| Government[4] | 8,585 | 8,762 | 9,254 |
| Agriculture | 430 | 613 | 633 |
| Construction[5] | 2,027 | 1,991 | 1,782 |
| Statistical discrepancy | (464) | (215) | (538) |
| Total gross domestic product[6] | $88,405 | $92,926 | $95,708 |
| Less: net payment abroad | (28,884) | (31,399) | (32,949) |
| Total gross national product[6] | $59,521 | $61,527 | $62,759 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.
(4) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
(5) Includes mining.
(6) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

A-12

CONFIDENTIAL

PR-INT-000014118

The following table presents annual statistics of average employment based on NAICS for fiscal years 2005 to 2009.

## Commonwealth of Puerto Rico
## Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2008 | 2009[2] |
| Natural resources and construction | 68,233 | 65,492 | 64,700 | 59,675 | 49,083 |
| Manufacturing | | | | | |
|    Durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
|    Non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| Sub-total | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
|    Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
|    Transportation, warehouse, and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
|     Sub-total | 187,525 | 188,783 | 184,008 | 181,342 | 176,408 |
| | | | | | |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Government[3] | 307,825 | 302,492 | 298,125 | 297,742 | 300,683 |
|    Total non-farm | 1,049,725 | 1,047,742 | 1,032,275 | 1,020,208 | 992,450 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
[2] Preliminary.
[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### Manufacturing

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2009 manufacturing generated $43.5 billion, or 45.5%, of gross domestic product. During fiscal year 2009, payroll employment for the manufacturing sector was 96,708, a decrease of 7.1% compared with fiscal year 2008. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2009, the average hourly manufacturing wage rate in Puerto Rico was approximately 53.8% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the

A-13

last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" below.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector[1]
### (in thousands at current prices)

| | Fiscal Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009[2] |
| Food | $1,103,133 | $ 831,351 | $ 864,364 |
| Beverage and Tobacco Products | 932,301 | 1,405,111 | 1,554,799 |
| Textile Mills | 2,310 | 1,378 | 1,055 |
| Textile Product Mills | 13,944 | 13,876 | 12,221 |
| Apparel | 211,110 | 236,186 | 260,107 |
| Leather and Allied Products | 18,256 | 21,530 | 23,895 |
| Wood Products | 24,193 | 22,668 | 23,830 |
| Paper | 73,908 | 71,304 | 71,704 |
| Printing and Related Support Activities | 129,716 | 131,217 | 117,720 |
| Petroleum and Coal Products | 374,137 | 86,317 | 360,041 |
| Chemical | 26,891,695 | 27,966,500 | 29,806,137 |
| Plastics and Rubber Products | 126,642 | 127,091 | 122,338 |
| Nonmetallic Mineral Products | 295,265 | 273,670 | 236,869 |
| Primary Metals | 103,960 | 109,287 | 104,321 |
| Fabricated Metal Products | 248,929 | 247,804 | 250,066 |
| Machinery | 223,441 | 232,868 | 225,734 |
| Computer and Electronic Products | 4,222,014 | 5,957,553 | 6,266,460 |
| Magnetic and Optica | - | - | - |
| Electrical Equipment, Appliances and Components | 518,471 | 677,088 | 747,903 |
| Transportation Equipment | 81,906 | 85,913 | 78,249 |
| Furniture and Related Products | 66,039 | 62,985 | 54,217 |
| Miscellaneous | 1,975,250 | 1,986,317 | 2,359,370 |
| Total gross domestic product of manufacturing sector[3] | $37,636,619 | $40,548,014 | $43,541,398 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Totals may not add due to rounding.

*Source:* Planning Board

A-14

CONFIDENTIAL

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2005 to 2009.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,467 | 4,100 | 3,825 | 3,758 | 3,058 |
| Cement and concrete products manufacturing | 3,750 | 3,533 | 3,300 | 3,367 | 2,833 |
| Fabricated metal products | 6,442 | 5,775 | 5,675 | 5,375 | 4,908 |
| Computer and electronic | 10,667 | 10,808 | 10,092 | 8,600 | 7,033 |
| Electrical equipment | 7,650 | 6,842 | 6,617 | 6,658 | 5,867 |
| Electrical equipment manufacturing | 4,975 | 4,700 | 4,508 | 4,383 | 3,917 |
| Miscellaneous manufacturing | 11,158 | 11,258 | 12,292 | 11,967 | 11,975 |
| Medical equipment and supplies          manufacturing | 10,467 | 10,533 | 11,575 | 11,342 | 11,442 |
| Other durable goods manufacturing | 7,683 | 7,567 | 6,917 | 6,742 | 6,375 |
| Total – durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,050 | 12,650 | 12,183 | 11,725 | 11,392 |
| Beverage and tobacco products manufacturing | 3,175 | 3,392 | 3,258 | 3,267 | 3,125 |
| Apparel manufacturing | 8,875 | 8,258 | 7,708 | 9,633 | 9,825 |
| Cut and sew apparel manufacturing | 8,850 | 8,017 | 7,075 | 8,617 | 8,975 |
| Chemical manufacturing | 32,883 | 32,317 | 30,467 | 27,900 | 25,042 |
| Pharmaceutical and medicine manufacturing | 28,567 | 28,017 | 26,375 | 24,033 | 21,500 |
| Plastics and rubber products | 2,750 | 2,325 | 2,200 | 1,983 | 1,967 |
| Plastics product manufacturing | 2,258 | 2,133 | 2,025 | 1,850 | 1,825 |
| Other non-durable goods manufacturing | 8,517 | 7,292 | 6,625 | 6,442 | 6,142 |
| Total – non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| | | | | | |
| Total manufacturing employment | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 20,609 from fiscal year 2005 to fiscal year 2009. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in

CONFIDENTIAL

fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008 and 2009, manufacturing employment decreased by 4.2%, 3.5% and 7.1%, respectively. For the first ten months of fiscal year 2010, the sector lost an average of 7,600 jobs, or 7.8% compared to the same period of the previous year. Given that this sector used to pay the highest wages, on average, in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2009, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.0%, while payroll employment in this sector decreased at an average annual rate of 1.4%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2009, the service sector generated $41.0 billion of gross domestic product, or 42.9% of the total. Wholesale and retail trade, information services, education and health services, professional and business services and real estate and rentals experienced growth in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. Finance and insurance, transportation and warehousing, utilities, and leisure and hospitality experienced contractions in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. From fiscal year 2007 to 2009, gross domestic product increased in the trade sector from $7.2 billion to $7.5 billion and in real estate and rentals from $11.7 billion to $13.3 billion, and decreased in finance and insurance from $6.7 billion to $5 billion.

Service-sector employment decreased from 556,350 in fiscal year 2005 to 545,975 in fiscal year 2009 (representing 55% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2009 represents a decrease of 2.3% compared to the prior fiscal year. For the first ten months of fiscal year 2010, average service-sector employment was 533,080, a decrease of 2.7% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of March 31, 2010, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of March 31, 2010were $81.1 billion, as compared to $86.4 billion as of March 31, 2009. On April 30, 2010, the OCFI closed three of the thirteen commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption

CONFIDENTIAL

agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $3.4 billion as of March 31, 2010, up from $2.8 billion on March 31, 2009. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.4 billion as of March 31, 2010, up from $13.0 billion as of March 31, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of March 31, 2010, there were 38 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $39.8 billion, a decrease from $61.5 billion in total assets as of March 31, 2009. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.3 billion in assets as of March 31, 2010, a slight increase from $6.8 billion as of March 31, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | |
|---|---|---|---|
| | **2007** | **2008** | **2009**[1] |
| Wholesale trade | $ 2,751.6 | $ 2,834.6 | $ 2,885.5 |
| Retail trade | 4,471.4 | 4,508.7 | 4,583.7 |
| Transportation and warehousing | 968.3 | 998.5 | 978.0 |
| Utilities | 2,214.4 | 2,114.6 | 2,123.1 |
| Information | 2,466.5 | 2,477.4 | 2,552.8 |
| Finance and insurance | 6,694.3 | 6,693.4 | 4,951.8 |
| Real Estate and rental | 11,685.7 | 12,152.0 | 13,253.5 |
| Professional and business | 3,112.5 | 3,223.7 | 3,305.0 |
| Education and health | 3,592.5 | 3,932.1 | 4,131.4 |
| Leisure and hospitality | 1,861.5 | 1,919.1 | 1,895.6 |
| Other services[2] | 371.6 | 372.8 | 367.9 |
| Total | $40,190.3 | $41,226.9 | $41,028.3 |

\* Totals may not add due to rounding. For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(1) Preliminary.
(2) Includes tourism.

*Source:* Planning Board.

CONFIDENTIAL

PR-INT-000014123

## Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Service Sector*
### (thousands of persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
| Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
| Transportation, warehouse and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Total | 556,350 | 566,725 | 561,592 | 558,742 | 545,975 |

\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006. The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

For fiscal year 2008, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,744,200, a further decline of 2.7% over the number of persons registered during fiscal year 2007. The average occupancy rate in tourist hotels during fiscal year 2008 was 70.4%, compared to 71.7% in fiscal year 2007. The average number of rooms available in tourist hotels increased by 2.1% to 10,250 rooms from fiscal year 2007 to fiscal year 2008.

During fiscal year 2009, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,708,500, a decrease of 2% over the number of persons registered during the same period of fiscal year 2008. The average occupancy rate in tourist hotels during fiscal year 2009 was 66.2%, a decrease of 5.9% from the prior fiscal year. During fiscal year 2009, the average number of rooms available in tourist hotels increased by 2.1% to 10,467 rooms compared to fiscal year 2008.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2009, employment in hotels and other lodging facilities was reduced by 6.7% to 13,300 jobs. For the first ten months of fiscal year 2010, the average decrease was 4.3% with respect to the same period for the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

CONFIDENTIAL

PR-INT-000014124

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2009.

## Commonwealth of Puerto Rico
## Tourism Data[1]

### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009[5] | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the Convention Center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

A-19

In fiscal year 2009, the government accounted for $9.3 billion, or 9.7%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 285,600 workers (state, including public corporations, and local), or 28.8% of total, non-farm, payroll employment in fiscal year 2009. From fiscal year 2005 to fiscal year 2009, state and municipal government employment has been reduced by approximately 7,500 positions. During the first ten months of fiscal year 2010, state and local government employment decreased by 15,100 jobs. According to the payroll survey, the distribution of these job reductions was 10,800 jobs in the state government and 4,300 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act No. 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act No. 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. The Ports Authority and the Public-Private Partnerships Authority continue to evaluate entering into a public-private partnership with respect to the Luis Muñoz Marín International Airport. The Public-Private Partnerships Authority has engaged a team of advisors to assist it in the preparation of a study required for the establishment of a public-private partnership.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

A-20

CONFIDENTIAL

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,629 miles and 11,947 miles of local streets and adjacent roads. The highway system comprises 387 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 252 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,053 miles of tertiary highways and roads serving local, intra-regional traffic.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed in March 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. Currently, the Port of the Americas Authority is exploring entering into a concession agreement with respect to the terminal facility and is simultaneously undertaking efforts to maximize private sector interest in the related value-added zones.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2007 to 2009, however, real construction investment decreased at an average annual rate of 14.7%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 9.8%.

Public investment has been an important component of construction investment. During fiscal year 2009, approximately 52.9% of the total investment in construction was related to public projects. The total value of construction permits increased 28.0% in fiscal year 2009 as compared to fiscal year 2008 but total sales of cement decreased by 25.4%, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2009 decreased in real terms by 20.1%, following a 9.0% real decline in fiscal year 2008, due principally to the drop in private construction activity. The Planning Board expects a further construction investment decrease of 5.2% in real terms for fiscal year 2010. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, the expected positive impact of the Federal Stimulus and the Local Stimulus led it to reduce its projected decrease in construction investment to 5.2% in real terms. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2009, the number of construction permits decreased 20.7%, while the total value of construction permits dropped by 28% compared to fiscal year 2008. For the first nine months of fiscal year 2010, the total number of construction permits decreased by 19.4%, while the value of construction permits decreased by 28.9%. These figures are consistent with cement sales, which declined by 25.4% in fiscal year 2009 and by 27.2% during the first ten months of fiscal year 2010, reaching levels not seen in more than a decade.

A-21

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2009, gross income from agriculture was $633 million, an increase of 3.4% compared with fiscal year 2008.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

CONFIDENTIAL

PR-INT-000014128

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,195 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,011 | 37.4% | 26,961,000[2] | 13,621,000 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,143,454[2] | 15,312,289 | 56.4% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 27,946,091[3] | 15,927,987 | 57.0% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,378,777[3] | 16,611,711 | 58.5% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,744,193[3] | 16,911,481 | 58.8% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,062,634[3] | 17,272,044 | 59.4% |
| 2005 | 406,547[3] | 208,032 | 51.2% | 29,134,149[3] | 17,487,475 | 60.0% |
| 2006 | 400,530[3] | 209,547 | 52.3% | 29,236,155[3] | 17,758,870 | 60.7% |
| 2007 | 396,059[3] | 225,402 | 56.9% | 29,407,260[3] | 18,248,128 | 62.1% |
| 2008 | 395,482[3] | 227,546 | 57.5% | 29,757,219[3] | 19,102,814[4] | 64.2% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | N/A | N/A |

N/A – Not available.
(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).
(4) Middle alternative projection (NCES).
*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2008-2009 was approximately 65,669 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2008-2009 of approximately 171,541 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

CONFIDENTIAL

PR-INT-000014129

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding tax rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Other legislation enacted in 2001 and 2002 provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or

A-24

PR-INT-000014130

interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate $1.137 billion for loans made or bonds issued to finance the development of twenty tourism projects representing 4,585 new hotel rooms and a total investment of $1.795 billion.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production

CONFIDENTIAL

activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

CONFIDENTIAL

**APPENDIX B**

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Senior Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

CONFIDENTIAL

PR-INT-000014134

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

CONFIDENTIAL

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

CONFIDENTIAL

PR-INT-000014137

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

      (i)      Government Obligations;

      (ii)      Defeased Municipal Obligations;

      (iii)      certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

CONFIDENTIAL

PR-INT-000014138

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

CONFIDENTIAL

PR-INT-000014139

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)  Defeasance Obligations;

(ii)  Defeased Municipal Obligations;

B-8

CONFIDENTIAL

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

CONFIDENTIAL

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

CONFIDENTIAL

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

        (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

        (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

        (iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

        (iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

        (v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

        (vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

CONFIDENTIAL

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.    All Revenues.

      2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

      3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

      4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

CONFIDENTIAL

PR-INT-000014144

     5.     Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

PR-INT-000014145

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

PR-INT-000014146

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

Refunding Bonds shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

Related August 2 Computation Period shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

Reserve Account Cash Equivalent shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

Resolution shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

Revenue Account Monthly Disbursement Date shall mean the last Business Day of each calendar month.

Revenues shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.      All Pledged Sales Tax received by the Corporation or the Trustee.

2.      With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

3.      Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

B-15

CONFIDENTIAL

4.       Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.       Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

CONFIDENTIAL

PR-INT-000014148

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

CONFIDENTIAL

   **Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

   **Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

   **Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

   **Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-18

PR-INT-000014150

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

## Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

## Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

## Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-19

CONFIDENTIAL

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

## Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

## Qualified Hedges (Section 206)

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-20

CONFIDENTIAL

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments") and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-21

PR-INT-000014153

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-22

PR-INT-000014154

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

## Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

PR-INT-000014155

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

B-24

PR-INT-000014156

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1. All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

FOURTH:    to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH:    to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH:    to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH:    to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH:    the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

CONFIDENTIAL

PR-INT-000014158

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii) Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i) Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii) Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

B-27

PR-INT-000014159

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

B-28

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments and of interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

B-29

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

B-30

CONFIDENTIAL

PR-INT-000014162

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

### Redemption Account; Amounts to be Deposited Therein (Section 509)

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)  amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)  amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii)  amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)  amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

B-31

CONFIDENTIAL

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

## Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

## Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

CONFIDENTIAL

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall also advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

## Particular Covenants of the Corporation

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

B-33

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

B-34

PR-INT-000014166

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

B-35

CONFIDENTIAL

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.      No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

### All Bonds, Parity Obligations and Subordinate Obligations

(1)   (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

B-36

CONFIDENTIAL

*Additional Requirements—Senior Bonds and Parity Obligations*

A.        (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.        (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

B-37

PR-INT-000014169

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

       *Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

       E.  *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

       2.  In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

       3.  The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

CONFIDENTIAL

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

PR-INT-000014171

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

B-40

PR-INT-000014172

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

CONFIDENTIAL

PR-INT-000014173

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

      (i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

      (ii)     to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

      (iii)     to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-42

CONFIDENTIAL

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

B-43

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

B-44

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided*, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

CONFIDENTIAL

PR-INT-000014177

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

CONFIDENTIAL

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

B-47

CONFIDENTIAL

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner or to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

CONFIDENTIAL

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

B-49

CONFIDENTIAL

PR-INT-000014181

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

        Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

        If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

        Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

CONFIDENTIAL

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

B-51

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

CONFIDENTIAL

PR-INT-000014184

**APPENDIX C**

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

June __, 2010

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $1,619,404,596.60 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Fourteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Bond Resolution," the General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.  The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds and First Subordinate Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      Act 91 is valid in all respects material to the matters covered by this opinion.

2.      The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.      The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.      As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.      The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

7.      The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

8.      The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of

CONFIDENTIAL

PR-INT-000014186

the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in its Bond Resolution and Tax Certificate. We have not undertaken to independently verify the accuracy of those certifications and representations.

Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on corporations.

9.      The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

10.     Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Bonds maturing on August 1, 2035 bearing an interest rate of 5%, 2036, 2037 (Capital Appreciation Bonds), 2038 bearing an interest rate of 5.375%, 2038 (Capital Appreciation Bonds), 2039 (Capital Appreciation Bonds), 2041, and 2042 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 8 through 10 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

CONFIDENTIAL

PR-INT-000014187

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000014188

<b>APPENDIX D</b>

# BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

CONFIDENTIAL

PR-INT-000014190

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

D-3

PR-INT-000014191

Exhibit 14 Page 105 of 257

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR CAPITAL APPRECIATION BONDS

| Date | CABs Due 2037 | CABs Due 2038 | CABs Due 2039 |
|------|--------------|--------------|--------------|
| 6/30/2010 | $ 855.60 | $ 801.60 | $ 751.00 |
| 8/1/2010 | 860.40 | 806.10 | 755.25 |
| 2/1/2011 | 888.90 | 832.80 | 780.25 |
| 8/1/2011 | 918.35 | 860.40 | 806.10 |
| 2/1/2012 | 948.75 | 888.90 | 832.80 |
| 8/1/2012 | 980.20 | 918.35 | 860.40 |
| 2/1/2013 | 1,012.65 | 948.75 | 888.90 |
| 8/1/2013 | 1,046.20 | 980.20 | 918.35 |
| 2/1/2014 | 1,080.85 | 1,012.65 | 948.75 |
| 8/1/2014 | 1,116.70 | 1,046.20 | 980.20 |
| 2/1/2015 | 1,153.65 | 1,080.85 | 1,012.65 |
| 8/1/2015 | 1,191.90 | 1,116.70 | 1,046.20 |
| 2/1/2016 | 1,231.35 | 1,153.65 | 1,080.85 |
| 8/1/2016 | 1,272.15 | 1,191.90 | 1,116.70 |
| 2/1/2017 | 1,314.30 | 1,231.35 | 1,153.65 |
| 8/1/2017 | 1,357.85 | 1,272.15 | 1,191.90 |
| 2/1/2018 | 1,402.80 | 1,314.30 | 1,231.35 |
| 8/1/2018 | 1,449.30 | 1,357.85 | 1,272.15 |
| 2/1/2019 | 1,497.30 | 1,402.80 | 1,314.30 |
| 8/1/2019 | 1,546.90 | 1,449.30 | 1,357.85 |
| 2/1/2020 | 1,598.15 | 1,497.30 | 1,402.80 |
| 8/1/2020 | 1,651.05 | 1,546.90 | 1,449.30 |
| 2/1/2021 | 1,705.75 | 1,598.15 | 1,497.30 |
| 8/1/2021 | 1,762.25 | 1,651.05 | 1,546.90 |
| 2/1/2022 | 1,820.65 | 1,705.75 | 1,598.15 |
| 8/1/2022 | 1,880.95 | 1,762.25 | 1,651.05 |
| 2/1/2023 | 1,943.25 | 1,820.65 | 1,705.75 |
| 8/1/2023 | 2,007.65 | 1,880.95 | 1,762.25 |
| 2/1/2024 | 2,074.15 | 1,943.25 | 1,820.65 |
| 8/1/2024 | 2,142.85 | 2,007.65 | 1,880.95 |
| 2/1/2025 | 2,213.85 | 2,074.15 | 1,943.25 |
| 8/1/2025 | 2,287.15 | 2,142.85 | 2,007.65 |
| 2/1/2026 | 2,362.90 | 2,213.85 | 2,074.15 |
| 8/1/2026 | 2,441.20 | 2,287.15 | 2,142.85 |
| 2/1/2027 | 2,522.05 | 2,362.90 | 2,213.85 |
| 8/1/2027 | 2,605.60 | 2,441.20 | 2,287.15 |
| 2/1/2028 | 2,691.90 | 2,522.05 | 2,362.90 |
| 8/1/2028 | 2,781.10 | 2,605.60 | 2,441.20 |
| 2/1/2029 | 2,873.20 | 2,691.90 | 2,522.05 |
| 8/1/2029 | 2,968.40 | 2,781.10 | 2,605.60 |
| 2/1/2030 | 3,066.70 | 2,873.20 | 2,691.90 |
| 8/1/2030 | 3,168.30 | 2,968.40 | 2,781.10 |
| 2/1/2031 | 3,273.25 | 3,066.70 | 2,873.20 |
| 8/1/2031 | 3,381.70 | 3,168.30 | 2,968.40 |
| 2/1/2032 | 3,493.70 | 3,273.25 | 3,066.70 |
| 8/1/2032 | 3,609.45 | 3,381.70 | 3,168.30 |
| 2/1/2033 | 3,729.00 | 3,493.70 | 3,273.25 |
| 8/1/2033 | 3,852.50 | 3,609.45 | 3,381.70 |
| 2/1/2034 | 3,980.15 | 3,729.00 | 3,493.70 |
| 8/1/2034 | 4,111.95 | 3,852.50 | 3,609.45 |
| 2/1/2035 | 4,248.20 | 3,980.15 | 3,729.00 |
| 8/1/2035 | 4,388.90 | 4,111.95 | 3,852.50 |
| 2/1/2036 | 4,534.30 | 4,248.20 | 3,980.15 |
| 8/1/2036 | 4,684.50 | 4,388.90 | 4,111.95 |
| 2/1/2037 | 4,839.65 | 4,534.30 | 4,248.20 |
| 8/1/2037 | 5,000.00 | 4,684.50 | 4,388.90 |
| 2/1/2038 | - | 4,839.65 | 4,534.30 |
| 8/1/2038 | - | 5,000.00 | 4,684.50 |
| 2/1/2039 | - | - | 4,839.65 |
| 8/1/2039 | - | - | 5,000.00 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

**APPENDIX F**


**ASSURED GUARANTY** MUNICIPAL

# MUNICIPAL BOND INSURANCE POLICY

ISSUER:

BONDS: $    In aggregate principal amount of

Policy No.:    -N

Effective Date:

Premium: $

ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which     has     been     recovered     from     such     Owner     pursuant     to     the

CONFIDENTIAL

Page 2 of 2
Policy No.      -N

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.  "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment.  "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent.  From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM.  The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.  Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.    THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) has caused this Policy to be executed on its behalf by its Authorized Officer.



ASSURED GUARANTY MUNICIPAL CORP.
(FORMERLY  KNOWN  AS  FINANCIAL
SECURITY ASSURANCE INC.)


By  _____
                        Authorized Officer


(212) 826-0100

Form 500NY (5/90)

F-2

CONFIDENTIAL



Printed by: ImageMaster, Inc.

CONFIDENTIAL

PR-INT-000014197

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):

| | |
|---|---|
| S&P: | A+ |
| Moody's: | A1 |
| Fitch: | A+ |

$182,190,000

## Puerto Rico Sales Tax Financing Corporation

$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

**Dated:** Date of Delivery

**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010D Bonds, the "Offered Bonds"), to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes described herein. Concurrently with the issuance of the Offered Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds" and, together with the Offered Bonds, the "Series 2010 Bonds"). The Series 2010C Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Offered Bonds are being sold solely in Puerto Rico and their issuance is not contingent upon the issuance of the Series 2010C Bonds.

**The Series 2010 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2010 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The Series 2010 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.***

The Offered Bonds have the following characteristics:

- The Offered Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount and integral multiples thereof.

- The Offered Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Offered Bonds on the records of The Depository Trust Company and its participants.

- Interest on the Offered Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on November 1, 2010. The inside cover page of this Official Statement contains information concerning the maturity, interest rate, and price of the Offered Bonds.

- The Offered Bonds are subject to redemption, commencing on August 1, 2015, as described herein. Upon the occurrence of an Extraordinary Event, the Corporation may choose to redeem the Offered Bonds at par. See *Extraordinary Redemption* under THE OFFERED BONDS.

- This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision. Prospective investors should consider the information set forth in RISK FACTORS before investing.

- In the opinion of Special Puerto Rico Tax Counsel, under existing statutes, the Offered Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Offered Bonds will be exempt from United States income taxes to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. See TAX MATTERS herein. The Corporation has determined, based on the advice of counsel, that interest on the Offered Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Offered Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico.

- The Offered Bonds will be dated their date of delivery and are expected to be delivered through The Depository Trust Company on or about June 30, 2010.

**The Offered Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Offered Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Offered Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel.*

| Santander Securities | Popular Securities | | UBS Financial Services Incorporated of Puerto Rico |
|---|---|---|---|
| Barclays Capital | BBVAPR MSD | BofA Merrill Lynch | Citi | FirstBank Securities |
| Oriental Financial Services | Raymond James | Samuel A. Ramirez & Co. | Wells Fargo Securities, LLC |

June 24, 2010

**$182,190,000**
## Puerto Rico Sales Tax Financing Corporation
$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

### Series 2010D Bonds

| Maturity August 1 | Amount | Interest Rate | Price | CUSIP Numbers[*] |
|---|---|---|---|---|
| 2042 | $89,435,000 | 5.75% | 100% | 74529JLD5 |

### Series 2010E Bonds

| Maturity August 1 | Amount | Interest Rate | Price or Yield | CUSIP Numbers[*] |
|---|---|---|---|---|
| 2042 | $92,755,000 | 5.75% | 100% | 74529JLE3 |

---

[*] Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

CONFIDENTIAL

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Offered Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Offered Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Offered Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Offered Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Offered Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

PR-INT-000014200

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000014201

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1
  The Corporation ...............................................................1
  Sales and Use Tax ............................................................2
  Dedicated Sales Tax Fund................................................2
  The Resolution .................................................................2
  Outstanding Bonds and Parity Obligations ......................3
  Source of Payment and Security for the Bonds.................4
PLEDGED SALES TAX.........................................................5
  Commonwealth Sales Tax Revenues ................................5
  Commonwealth Sales Tax Collections and Projections......6
  Collections by Source ......................................................9
  Economic Indicators ......................................................10
  Dedicated Sales Tax Fund..............................................12
  Pledged Sales Tax Base Amount ....................................12
  Procedures for the Collection and Deposit of the Pledged
    Sales Tax in the Dedicated Sales Tax Fund ................14
  Commonwealth Sales Tax Enforcement Initiatives .........16
THE OFFERED BONDS .......................................................18
  General ..........................................................................18
  Redemption ....................................................................18
  Use of Federal Subsidy Received with Respect to the
    Offered Bonds ...........................................................19
  Book-Entry Only System ...............................................20
SECURITY FOR THE BONDS .............................................20
  General ..........................................................................20
  Commonwealth Non-Impairment Covenant ....................21
  Property Pledged for the Payment of the Offered Bonds...21
  Outstanding Bonds and Parity Obligations .....................22
  Subordination Provisions of the First Subordinate Bonds 23
  Funds and Accounts under the Resolution .......................23
  Additional Bonds, Refunding Bonds and Other
    Obligations................................................................26
  Commonwealth's Authority to Cover Deficiencies ..........28
RISK FACTORS ..................................................................29
  Economic Conditions Could Affect Commonwealth Sales
    Tax Revenues............................................................29
  Legislative Assembly Authority over the Commonwealth
    Sales Tax ...................................................................29
  Certain Constitutional Considerations Relating to Act 91 30

**Page**

  Limited Nature of Ratings; Reductions, Suspension or
    Withdrawal of a Rating ..............................................31
  Limited Nature of Remedies ..........................................31
  There is no Assurance that a Secondary Market for the
    Offered Bonds will Develop ........................................32
AGGREGATE DEBT SERVICE REQUIREMENTS ..........33
PLAN OF FINANCING .......................................................36
  Overview .......................................................................36
  Estimated Sources and Uses of Funds.............................36
THE CORPORATION ..........................................................36
  Other Obligations of the Corporation..............................37
TAX MATTERS....................................................................37
  Puerto Rico Tax Considerations for Puerto Rico
    Residents...................................................................38
  United States Federal Tax Considerations for Puerto Rico
    Residents...................................................................39
  Backup Withholding ......................................................40
  Build America Bonds......................................................40
  No Opinion as to Exclusion under Section 103(a) of the
    Code ........................................................................40
RATINGS.............................................................................41
LEGALITY FOR INVESTMENT..........................................41
UNDERWRITING.................................................................41
LEGAL MATTERS...............................................................42
CONTINUING DISCLOSURE...............................................42
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
  RICO.............................................................................43
MISCELLANEOUS ..............................................................44

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
  Provisions of the Resolution...........................................B-1
APPENDIX C – Proposed Form of Approving Opinion of
  Bond Counsel ...............................................................C-1
APPENDIX D – Proposed Form of Opinion of Special Puerto
  Rico Tax Counsel ..........................................................D-1
APPENDIX E – Book-Entry Only System.........................E-1

i

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

# $182,190,000
# Puerto Rico Sales Tax Financing Corporation

$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $182,190,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010D Bonds, the "Offered Bonds"). Concurrently with the issuance of the Offered Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds" and, together with the Offered Bonds, the "Series 2010 Bonds"). The Series 2010C Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Offered Bonds are being sold solely in Puerto Rico and are not contingent upon the issuance of the Series 2010C Bonds. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

The Corporation will issue the Series 2010D Bonds as "Build America Bonds" that are subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the Corporation will receive a subsidy payment from the federal government equal to 35% of the amount of each interest payment on the Series 2010D Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010D Bonds. Under no circumstances will the owners of the Series 2010D Bonds be entitled to a credit against any taxes imposed by the Code as a result of their ownership of the Series 2010D Bonds.

The Corporation will issue the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 45% of the amount of each interest payment on the Series 2010E Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010E Bonds. Under no circumstances will the owners of the Series 2010E Bonds be entitled to a credit against any taxes imposed by the Code as a result of their ownership of the Series 2010E Bonds.

For more information regarding the "Build America Bonds" and "Recovery Zone Economic Development Bonds" designation, see *Use of Federal Subsidy Received with Respect to the Offered Bonds* under THE OFFERED BONDS.

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the

1

Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

**Sales and Use Tax**

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund* under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See *"Dedicated Sales Tax Fund"* and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

Act 91 provides that any subsidy received by the Corporation under the Build America Bond program be deposited in the Dedicated Sales Tax Fund. See *"Use of Federal Subsidy Received with Respect to the Offered Bonds"* under SECURITY FOR THE BONDS.

**The Resolution**

The Series 2010 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Fourteenth Supplemental Sales Tax Revenue Bond

CONFIDENTIAL

PR-INT-000014205

Resolution, which provides for the terms of the Series 2010C Bonds (the "Fourteenth Supplemental Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution"), and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution") (the General Resolution, as amended by the Fourteenth Supplemental Resolution, the Fifteenth Supplemental Resolution, and the Sixteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

## Outstanding Bonds and Parity Obligations

### General

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of senior and first subordinate bonds. The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds"). The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), and (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010B Bond Anticipation Notes (the "Series 2010B Bonds" and, together with the Series 2009A Bonds, the Series 2009B Bonds, the Series 2010A Bonds, the "Outstanding First Subordinate Bonds").

Concurrently with the issuance of the Offered Bonds, the Corporation is issuing the Series 2010C Bonds in order to repay or refund certain outstanding bonds of the Corporation and for certain other Authorized Uses.

After giving effect to the issuance of the Series 2010 Bonds, the refunding of the bonds to be refunded with the proceeds of the Series 2010C Bonds and the repayment of the Series 2010B Bonds, the Corporation will have $13.4 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.2 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $328.6 million accreted on existing capital appreciation bonds as of June 1, 2010) and $8.3 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $54.9 million accreted on existing capital appreciation bonds as of June 1, 2010).

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

The Corporation routinely explores opportunities to refinance its debt to reduce debt service from time to time. As previously announced, the Corporation is considering the purchase of all or a portion of the Series 2007A Bonds issued as LIBOR-based Adjustable Rate Bonds accompanied by a termination of an equivalent amount of the interest rate exchange agreement related to such Series 2007A Bonds. If the Corporation decides to purchase the Series 2007A Bonds, such purchase would be funded through the issuance of a series of Senior Bonds. No assurance can be given that the Corporation will purchase any of its Outstanding Senior Bonds or terminate any interest rate exchange agreement in connection therewith.

3

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2010 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2010 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The Series 2010 Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the Series 2010 Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See "*Subordination Provisions of the First Subordinate Bonds*" and "*Funds and Accounts Under the Resolution*" under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The Series 2010 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Offered Bonds, the terms of the Offered Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

4

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

**Commonwealth Sales Tax Revenues**

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

5

CONFIDENTIAL

PR-INT-000014208

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 28, 2010, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday will take place during Fiscal Year 2010-2011.

## Commonwealth Sales Tax Collections and Projections

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* below for a description of the reporting and collections procedures utilized by the Treasury Department. Accordingly, the sales tax reported by the Treasury Department for November 2006 related to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change is effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through May 2010 were approximately $3.86 billion, an average of $93 million per month.

*Fiscal Year 2006-2007.* Commonwealth Sales Tax collections during the seven months of Fiscal Year 2006-2007 (December 2006 through June 2007), when the Commonwealth Sales Tax was first imposed, equaled $617.9 million, or an average of $95.1 million per month (after adjustment for December receipts which were based on 15 days of sales in November). Under the previous reporting method utilized by the Treasury Department, total collections reported attributable to sales made during the seven and one-half months of Fiscal Year 2006-2007 (November 15, 2006 through June 2007) equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.1 million per month. Under the previous reporting method utilized by the Treasury Department, total Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Such collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

6

*Fiscal Year 2008-2009.* Commonwealth Sales Tax collections during Fiscal Year 2008-2009 totaled $1.10 billion, or an average of $91.7 million per month. Under the previous reporting method utilized by the Treasury Department, Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2008-2009 would have totaled $1.098 billion, or an average of $91.5 million per month. Such collections were below the Treasury Department's revised estimate of $1.117 billion by $19 million, or 1.7%, and were $46 million, or 4%, below collections for Fiscal Year 2007-2008. The Treasury Department believes that the decline in sales tax collections during Fiscal Year 2008-2009 is due primarily to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown. The Pledged Sales Tax then in effect (1%) totaled $199.6 million, nearly $7.2 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2009-2010.* Commonwealth Sales Tax collections during the eleven month period ended May 31, 2010 totaled $999.3 million, or an average of $90.8 million per month. Such collections year-to-date are 0.8% below collections for the same period in Fiscal Year 2008-2009. The Treasury Department believes that this decline is due primarily to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions. The Treasury Department's current estimate for total Commonwealth Sales Tax collections of Fiscal Year 2009-2010 is $1.098 billion.

*Fiscal Year 2010-2011.* Commonwealth Sales Tax revenue projections for Fiscal Year 2010-2011 are $1.194 billion, or an average of $99.5 million per month. This projection represents an increase of 8.7% compared to estimated collections for Fiscal Year 2009-2010. This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives."* The first phase of this system is expected to be operational in November 2010. Whether sales tax collections meet this estimate is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2010-2011, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See *"Economic Conditions could affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010. Under the new reporting method, which is effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer. Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer. To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

7

PR-INT-000014210

## Sales and Use Tax – Collection History by Month
### (Dollars in Thousands)

|  | Fiscal Year | | | |
|---|---|---|---|---|
|  | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 |
| July | - | $ 95,460 | $ 97,526 | $94,382 |
| August | - | 96,100 | 95,592 | 88,000 |
| September | - | 90,181 | 91,353 | 84,100 |
| October | - | 86,163 | 77,788 | 83,775 |
| November | - | 93,751 | 86,191 | 85,120 |
| December | $ 50,200[1] | 96,170 | 91,996 | 95,075 |
| January | 110,000 | 121,251 | 119,836 | 118,476 |
| February | 95,000 | 89,798 | 85,763 | 88,942 |
| March | 86,200 | 86,486 | 84,608 | 82,538 |
| April | 96,400 | 89,355 | 88,065 | 93,415 |
| May | 85,700 | 93,487 | 88,788 | 85,469 |
| June | 94,400 | 103,331 | 93,302 |  |

[1]   Reflects collections for sales made between November 15 and November 30.  The sales tax became
effective on November 15, 2006.

Source:  Treasury Department



Source:  Treasury Department

CONFIDENTIAL

PR-INT-000014211

## Collections by Source

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2008-2009 (actual receipts by the Treasury Department from August 2008 thru July 2009). Of the $1.098 billion in collections (under the previous reporting method utilized by the Treasury Department), approximately 51% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 12% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3.9% from manufacturing, among other categories.

### Commonwealth Sales Tax Collections
### by Source for Fiscal Year 2008-2009



Source: Treasury Department

CONFIDENTIAL

PR-INT-000014212

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

### Compounded Annual Growth Rates for
### Gross National Product and Personal Consumption Expenditures
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
| | | | Services | Non-Durable Goods | Durable Goods |
|---|---|---|---|---|---|
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.73% | 4.90% | 5.93% | 4.76% | 0.85% |
| 1947-2009 | 7.75% | 7.64% | 8.87% | 6.73% | 8.07% |

Source: Planning Board

### Historical Components of Personal Consumption Expenditures and GNP
(Measured in Current Dollars)



Source: Government Development Bank

10

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.8% during this period.

**Personal Consumption Expenditures and GNP**
(Current Dollars)



Source: Government Development Bank

**Personal Consumption Expenditures and GNP**
(Constant Dollars)



Source: Government Development Bank

11

CONFIDENTIAL

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $13.1 billion in Fiscal Year 2008-2009, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 23.6% of personal consumption expenditures in Fiscal Year 2008-2009 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

## Dedicated Sales Tax Fund

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

## Pledged Sales Tax Base Amount

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 is $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

CONFIDENTIAL

PR-INT-000014215

The following table shows the growth of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

**Annual Pledged Sales Tax Base Amount**

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

13

CONFIDENTIAL

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

## Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day,[*] the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been

---

[*] Prior to December 2009 the return was due on the 20th day of the month.

14

deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1) Includes 1.5% Municipal Sales Tax.
(2) Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. Certain large merchants and retailers are required to file their return electronically. As of May 2010, the Treasury Department reports that 86.9% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of March 2010, 225,915 merchants and retailers were required to file a monthly return, out of which 61,014 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants'

15

Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

## Commonwealth Sales Tax Enforcement Initiatives

The Treasury Department has announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department estimates that it will collect in Fiscal Year 2010-2011 an additional $96 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has collected approximately $26.5 million in connection with 59 cases. In May 2010, the Treasury Department began a letter campaign to promote the use of the voluntary disclosure program. The Treasury Department has sent approximately 2,000 of these letters and expects to send approximately 1,000 letters a week.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts. As a result of these initiatives, the Treasury Department has collected approximately $10.3 million in fines and penalties attributable to non-compliance with legal and regulatory requirements related to the sales tax.

The Treasury Department is focusing its efforts to increase sales tax revenues by improving compliance in retail transactions. To this end, the Treasury Department undertook a request for proposals procurement process and selected a vendor to provide a new point-of-sale electronic system that would strengthen its enforcement efforts. The system was designed to (i) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets and (ii) transmit on a daily basis information regarding all sales tax transactions to the Treasury Department. This point-of-sale system, which would be provided to the majority of merchants free of charge, would also have wireless capabilities in order to capture sales by street vendors. The Treasury Department's vendor selection process was delayed by a temporary restraining order issued by the Puerto Rico Court of Appeals in connection with a challenge filed by a losing bidder. On December 11, 2009, the challenge was dismissed and the temporary restraining order was lifted. On March 12, 2010, the Treasury Department published a revised request for proposals and on May 5, 2010 received proposals from interested vendors. The Treasury Department is currently reviewing the submitted proposals and expects to select a vendor in June 2010 and have a contract in place by July 2010. The first phase of the point-of-sale system is expected to be implemented by November 2010.

16

CONFIDENTIAL

PR-INT-000014219

The Treasury Department is also focused on strengthening its enforcement workforce. It has equipped a call center to be staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. Currently, there are 714 cases under audit and, from July 2009 through April 2010, the Audit Bureau has completed 214 audits and assessed approximately $7.9 million in deficiencies. The Treasury Department expects to conclude approximately 270 additional audits by July 2010.

The Treasury Department is also increasing staffing levels in its Enforcement and Compliance Bureaus by approximately 500 employees (including the 150 tax collection agents assigned to the call center mentioned in the previous paragraph), which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently makes approximately 2,000 visits per month.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan and Caguas and is currently working with five other municipalities that have expressed interest in entering into similar agreements. In April 2010, the Treasury Department began joint interventions with the municipality of San Juan. These efforts have resulted in 336 visits to merchants and the imposition of $36,000 in fines. In May 2010, the Treasury Department began joint interventions with the municipality of Caguas.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

17

CONFIDENTIAL

## THE OFFERED BONDS

### General

The Offered Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $182,190,000. The Offered Bonds will be issued in the principal amounts, bearing interest at the rates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement. Interest on the Offered Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1, until maturity (or earlier redemption), commencing on November 1, 2010.

The Offered Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof. Interest on the Offered Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Offered Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Offered Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Offered Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the Series 2010 Bonds for the purposes described in "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

### Redemption

*Optional Redemption of the Offered Bonds.* The Offered Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2015, at the redemption prices set forth below, plus accrued interest to the date fixed for redemption:

| Redemption Period | Redemption Price |
|---|---|
| August 1, 2015 through July 31, 2016 | 101.00 |
| August 1, 2016 through July 31, 2017 | 100.50 |
| August 1, 2017 and thereafter | 100.00 |

*Extraordinary Redemption.* The Offered Bonds are subject to redemption at the option of the Corporation prior to their maturity, in whole or in part, upon the occurrence of an Extraordinary Event (defined below), at a redemption price equal to the principal amount of the Offered Bonds to be redeemed plus accrued interest to the redemption date, without premium. An "Extraordinary Event" will have occurred if the Corporation determines that a material adverse change has occurred to Section 54AA or 6431 (or 1400U-2 in the case of the Series 2010E Bonds) of the Code (as such Sections were added by Section 1531 of the American Recovery and Reinvestment Act of 2009, pertaining to "Build America Bonds") or there is any guidance published by the Internal Revenue Service or the United States Treasury with respect to such Sections or any other determination by the Internal Revenue Service or the United States Treasury, which determination is not the result of any act or omission by the Corporation to satisfy the requirements to qualify to receive the federal subsidy from the United States Treasury, pursuant to which the federal subsidy from the United States Treasury is reduced or eliminated.

18

*Notice of Redemption.* In the event any Offered Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Offered Bonds as described above, to the registered owners of the Offered Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Offered Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Offered Bonds or portions thereof so called for redemption at the place or places of payment, such Offered Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Offered Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Offered Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Offered Bonds, and the portions of the Offered Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Offered Bonds or portions thereof to be redeemed will cease to bear interest.

Any notice of optional redemption of Offered Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of and interest on the Offered Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Offered Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of and premium, if any, and interest on the Offered Bonds (or portions thereof) to be redeemed, then the Offered Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest, and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Use of Federal Subsidy Received with Respect to the Offered Bonds**

The Corporation will irrevocably designate the Series 2010D Bonds as "Build America Bonds" subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 35% of the amount of each interest payment on the Series 2010D Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010D Bonds. The Corporation will use this subsidy exclusively to pay interest on the Series 2010D Bonds. **No assurance can be given by the Corporation of the receipt of such cash subsidy payments. The Corporation is obligated to make payments of the principal of and interest on the Series 2010D Bonds whether or not it receives such subsidy payments.**

The Corporation will irrevocably designate the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" pursuant to Sections 1400U-2 and 6431 of the Code and as "Qualified Bonds" pursuant to Section 54AA(g) of the Code, subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with

19

CONFIDENTIAL

PR-INT-000014222

certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 45% of the amount of each interest payment on the Series 2010E Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010E Bonds. The Corporation will use this subsidy exclusively to pay interest on the Series 2010E Bonds. **No assurance can be given by the Corporation of the receipt of such cash subsidy payments. The Corporation is obligated to make payments of the principal of and interest on the Series 2010E Bonds whether or not it receives such subsidy payments.**

The subsidy payments for the Series 2010D Bonds and the Series 2010E Bonds constitute Build America Bond Tax Credit Receipts under the Resolution and shall be deposited when received to the credit of the related Debt Service Account relating to the Series 2010D Bonds and the Series 2010E Bonds. In addition, the Build America Bond Tax Credit Receipts factor into the calculation of the additional bonds tests described herein in *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

The Corporation has no obligation to the owners or prospective purchasers of the Offered Bonds to maintain the status of the Offered Bonds as Build America Bonds. The Code imposes certain requirements that must be met subsequent to the issuance and delivery of the Offered Bonds in order for the Corporation to receive the cash subsidy payments. If the Corporation does not comply with these requirements, the Corporation may not be entitled to receive the cash subsidy payments.

**Book-Entry Only System**

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Offered Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Offered Bonds; (ii) confirmation of ownership interest in the Offered Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Offered Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Offered Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Offered Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Offered Bonds. See *Appendix E - Book-Entry Only System.*

## SECURITY FOR THE BONDS

**General**

Pursuant to the Resolution, the Offered Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Offered Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Offered Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Offered Bonds.

20

PR-INT-000014223

## Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Offered Bonds or provides credit enhancement, sources of payment or liquidity for such Offered Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Offered Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Offered Bonds or provides credit enhancement, sources of payment or liquidity for such Offered Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

## Property Pledged for the Payment of the Offered Bonds

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2010 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of

21

the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee. Revenues include the subsidy payments received under the Build America Bonds program.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

## Outstanding Bonds and Parity Obligations

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of Senior and First Subordinate Bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.2 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

After the issuance of the Series 2010 Bonds, the refunding of the bonds to be refunded with the proceeds of the Series 2010C Bonds and the repayment of the Series 2010B Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $8.3 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued pursuant to the Fifteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, and (vi) the Series 2010E Bonds, issued pursuant to

CONFIDENTIAL

the Sixteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010.

## Subordination Provisions of the First Subordinate Bonds

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

## Funds and Accounts under the Resolution

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly into the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2) to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3) to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

23

PR-INT-000014226

(4)     to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5)     to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

(6)     if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a)     to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b)     at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest

24

component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):

CONFIDENTIAL

PR-INT-000014228

*No Debt Service Reserve deposit requirement currently exists.

**Additional Bonds, Refunding Bonds and Other Obligations**

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest

26

PR-INT-000014229

available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

### *All Bonds, Parity Obligations and Subordinate Obligations*

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

### *Additional Requirements — Senior Bonds and Parity Obligations*

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.    No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the

27

debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D.      *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

## Commonwealth's Authority to Cover Deficiencies

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

CONFIDENTIAL

PR-INT-000014231

# RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Offered Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Offered Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Offered Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Offered Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Offered Bonds. There can be no assurance that other risk factors will not become material in the future.*

## Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information.* There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

## Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable

CONFIDENTIAL

PR-INT-000014232

security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

## Certain Constitutional Considerations Relating to Act 91

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2010 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2010 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, a prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion. On June 18, 2009, in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A, the prior Secretary of Justice also issued an opinion (the "2009 Opinion") reaching substantially the same conclusion. On February 9, 2010, in connection with the issuance of the Series 2010A Bonds, the current Secretary of Justice issued an opinion (the "2010A Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2010 Opinion, the 2010A Opinion, the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the

CONFIDENTIAL

PR-INT-000014233

constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2010 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2010 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Offered Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Offered Bonds on their respective maturity or mandatory redemption dates. Any rating of the Offered Bonds is not a recommendation to purchase, hold or sell such Offered Bonds and such rating will not address the marketability of such Offered Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Offered Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Offered Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "Subordination Provisions of the Bonds" under SECURITY FOR THE BONDS. In the event the owners of the Offered Bonds shall be entitled to declare a default, the payment of the Offered Bonds by the Corporation cannot be accelerated, except for the application

31

PR-INT-000014234

of funds held by the Trustee for the benefit of the holders of the Offered Bonds on the date such default is declared.

### There is no Assurance that a Secondary Market for the Offered Bonds will Develop

The Offered Bonds are a new issue of securities. There is no assurance that a secondary market for the Offered Bonds will develop, or if it does develop, that it will provide the holders of the Offered Bonds with liquidity for their investment or that it will continue for the life of the Offered Bonds. Although the Underwriters have advised the Corporation that they presently intend to make a market for the Offered Bonds as permitted by applicable laws, the Underwriters are not obligated to do so and any such market making may be discontinued at any time at the sole discretion of the Underwriters.

CONFIDENTIAL

PR-INT-000014235

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2010D Bonds, the Series 2010E Bonds, the Series 2010C Bonds, the Outstanding Senior Bonds and Parity Obligations, and the Outstanding First Subordinate Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding First Subordinate Bonds[1] | Series 2010C Bonds Total Debt Service[2] | Series 2010D Bonds Principal | Interest[2] | Debt Service[3] | Series 2010E Bonds Principal | Interest[4] | Debt Service[4] | Total Annual Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $ 177,212,926 | $ 279,924,660 | | - | - | - | - | - | - | $ 457,137,606 |
| 2011 | 177,212,926 | 312,474,471 | $ 50,020,729 | - | 3,630,471 | $ 3,630,471 | - | $ 3,185,973 | $ 3,185,973 | 546,524,570 |
| 2012 | 177,212,926 | 290,039,858 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 555,944,075 |
| 2013 | 177,212,926 | 312,474,471 | 62,197,924 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 558,161,331 |
| 2014 | 177,212,926 | 312,474,471 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 578,378,688 |
| 2015 | 177,212,926 | 323,774,471 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 589,678,688 |
| 2016 | 177,212,926 | 356,755,721 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 622,659,938 |
| 2017 | 177,212,926 | 387,650,991 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 653,555,208 |
| 2018 | 177,212,926 | 415,938,716 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 681,842,933 |
| 2019 | 177,212,926 | 442,355,091 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 708,259,308 |
| 2020 | 177,212,926 | 473,736,310 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 739,640,527 |
| 2021 | 177,212,926 | 446,202,429 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 712,106,646 |
| 2022 | 181,942,926 | 453,621,129 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 724,255,346 |
| 2023 | 184,113,226 | 472,437,354 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 745,241,871 |
| 2024 | 259,097,926 | 495,054,504 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 842,843,721 |
| 2025 | 304,651,226 | 525,168,254 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 918,510,771 |
| 2026 | 319,309,926 | 539,331,389 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 947,332,606 |
| 2027 | 333,337,426 | 562,539,524 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 984,568,241 |
| 2028 | 352,878,526 | 612,787,641 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,054,357,458 |
| 2029 | 369,740,487 | 622,172,909 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,080,604,687 |
| 2030 | 387,153,667 | 633,673,101 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,109,518,059 |
| 2031 | 404,688,595 | 664,486,114 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,157,866,000 |
| 2032 | 422,921,795 | 697,241,714 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,208,854,800 |
| 2033 | 441,880,695 | 695,520,776 | 108,985,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,252,662,762 |
| 2034 | 461,600,180 | 754,512,026 | 81,086,781 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,303,474,997 |
| 2035 | 482,111,345 | 713,232,026 | 155,111,781 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,356,731,162 |
| 2036 | 503,444,330 | 739,260,799 | 164,145,531 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,413,126,670 |
| 2037 | 486,103,395 | 740,134,221 | 192,203,806 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,424,721,432 |
| 2038 | 507,593,361 | 551,394,076 | 418,477,725 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,483,741,172 |
| 2039 | 142,560,982 | 578,810,856 | 444,915,325 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,172,563,173 |
| 2040 | 140,477,975 | 518,982,675 | 534,391,925 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,200,128,585 |
| 2041 | 673,482,975 | 559,393,000 | 511,498,200 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,750,650,185 |
| 2042 | 700,472,975 | 700,214,900 | 157,687,500 | $89,435,000 | 3,342,633 | 92,777,633 | $92,755,000 | 2,933,377 | 95,688,377 | 1,746,841,385 |
| 2043 | 728,542,975 | 197,750,000 | - | - | - | - | - | - | - | 926,292,975 |
| 2044 | 757,732,975 | 186,375,000 | - | - | - | - | - | - | - | 944,107,975 |
| 2045 | 788,097,975 | - | - | - | - | - | - | - | - | 788,097,975 |
| 2046 | 819,672,975 | - | - | - | - | - | - | - | - | 819,672,975 |
| 2047 | 852,507,975 | - | - | - | - | - | - | - | - | 852,507,975 |
| 2048 | 886,663,066 | - | - | - | - | - | - | - | - | 886,663,066 |
| 2049 | 922,181,201 | - | - | - | - | - | - | - | - | 922,181,201 |
| 2050 | 959,121,096 | - | - | - | - | - | - | - | - | 959,121,096 |
| 2051 | 997,538,585 | - | - | - | - | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | - | - | - | - | 1,198,845,475 |
| Total | $24,716,967,424 | $17,535,530,699 | $4,529,028,135 | $89,435,000 | $107,252,098 | $196,687,098 | $92,755,000 | $94,120,656 | $186,875,656 | $47,165,089,004 |

(1) Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion is capitalized in years 2010 and 2012.
(2) These figures are reduced by the interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 but include accreted interest on Capital Appreciation Bonds.
(3) These figures are reduced by the 35% Build America Bonds subsidy.
(4) These figures are reduced by the 45% Recovery Zone Economic Development Bonds subsidy.

33

## Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,791,960 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,141,707,799 | 177,212,926 | 369,311,645 | 546,524,570 | 2.09 |
| 2012 | 1,187,380,355 | 204,756,582 | 378,731,149 | 583,487,731 | 2.03 |
| 2013 | 1,234,879,898 | 225,879,593 | 380,948,406 | 606,827,998 | 2.03 |
| 2014 | 1,284,279,510 | 229,935,655 | 401,165,763 | 631,101,417 | 2.03 |
| 2015 | 1,335,655,194 | 243,877,713 | 412,465,763 | 656,343,476 | 2.03 |
| 2016 | 1,389,085,995 | 237,150,313 | 445,447,013 | 682,597,326 | 2.03 |
| 2017 | 1,444,654,121 | 233,562,213 | 476,342,283 | 709,904,496 | 2.03 |
| 2018 | 1,502,445,065 | 233,667,213 | 504,630,008 | 738,297,221 | 2.03 |
| 2019 | 1,562,547,743 | 236,782,213 | 531,046,383 | 767,828,596 | 2.03 |
| 2020 | 1,625,054,625 | 236,117,213 | 562,427,601 | 798,544,814 | 2.03 |
| 2021 | 1,690,061,882 | 295,597,213 | 534,893,720 | 830,490,933 | 2.03 |
| 2022 | 1,757,669,531 | 321,395,613 | 542,312,420 | 863,708,033 | 2.03 |
| 2023 | 1,827,981,589 | 337,131,813 | 561,128,645 | 898,260,458 | 2.03 |
| 2024 | 1,901,106,235 | 350,442,913 | 583,745,795 | 934,188,708 | 2.03 |
| 2025 | 1,977,155,975 | 357,700,613 | 613,859,545 | 971,560,158 | 2.03 |
| 2026 | 2,056,247,813 | 382,399,013 | 628,022,680 | 1,010,421,693 | 2.03 |
| 2027 | 2,138,503,438 | 399,604,213 | 651,230,815 | 1,050,835,028 | 2.03 |
| 2028 | 2,224,049,402 | 391,389,213 | 701,478,933 | 1,092,868,146 | 2.03 |
| 2029 | 2,313,017,320 | 425,721,174 | 710,864,200 | 1,136,585,374 | 2.03 |
| 2030 | 2,405,544,075 | 459,686,155 | 722,364,393 | 1,182,050,547 | 2.03 |
| 2031 | 2,501,772,020 | 476,151,882 | 753,177,405 | 1,229,329,287 | 2.03 |
| 2032 | 2,601,849,207 | 492,568,782 | 785,933,005 | 1,278,501,787 | 2.03 |
| 2033 | 2,705,929,608 | 518,855,382 | 810,782,068 | 1,329,637,450 | 2.03 |
| 2034 | 2,814,173,354 | 540,949,867 | 841,874,818 | 1,382,824,685 | 2.03 |
| 2035 | 2,926,746,980 | 563,521,032 | 874,619,818 | 1,438,140,850 | 2.03 |
| 2036 | 3,043,823,686 | 585,979,017 | 909,682,340 | 1,495,661,357 | 2.03 |
| 2037 | 3,165,583,596 | 616,873,082 | 938,618,038 | 1,555,491,120 | 2.03 |
| 2038 | 3,292,214,042 | 641,558,048 | 976,147,811 | 1,617,705,859 | 2.03 |
| 2039 | 3,423,909,848 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 2.03 |
| 2040 | 3,560,873,630 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 2.03 |
| 2041 | 3,703,316,112 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 2.08 |
| 2042 | 3,851,456,444 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 2.17 |
| 2043 | 4,005,522,543 | 728,542,975 | 197,750,000 | 926,292,975 | 4.32 |
| 2044 | 4,165,751,443 | 757,732,975 | 186,375,000 | 944,107,975 | 4.41 |
| 2045 | 4,332,389,659 | 788,097,975 | - | 788,097,975 | 5.50 |
| 2046 | 4,505,693,566 | 819,672,975 | - | 819,672,975 | 5.50 |
| 2047 | 4,685,929,796 | 852,507,975 | - | 852,507,975 | 5.49 |
| 2048 | 4,873,375,645 | 886,666,392 | - | 886,666,392 | 5.49 |
| 2049 | 5,068,319,502 | 922,183,873 | - | 922,183,873 | 5.49 |
| 2050 | 5,271,061,289 | 959,115,612 | - | 959,115,612 | 5.49 |
| 2051 | 5,481,912,928 | 997,537,122 | - | 997,537,122 | 5.49 |
| 2052 | 5,701,198,816 | 1,037,500,321 | - | 1,037,500,321 | 5.49 |
| 2053 | 5,929,256,327 | 1,079,036,134 | - | 1,079,036,134 | 5.49 |
| 2054 | 6,166,436,329 | 1,122,257,975 | - | 1,122,257,975 | 5.49 |
| 2055 | 6,413,103,727 | 1,167,193,604 | - | 1,167,193,604 | 5.49 |
| 2056 | 6,669,638,020 | 1,213,947,975 | - | 1,213,947,975 | 5.49 |
| 2057 | 6,936,433,887 | 1,198,845,475 | - | 1,198,845,475 | 5.78 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

34

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.57%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.57% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,460,000 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,114,689,971 | 177,212,926 | 369,311,645 | 546,524,570 | 2.04 |
| 2012 | 1,132,190,450 | 204,756,582 | 378,731,149 | 583,487,731 | 1.94 |
| 2013 | 1,149,965,684 | 225,879,593 | 380,948,406 | 606,827,998 | 1.90 |
| 2014 | 1,168,019,987 | 229,935,655 | 401,165,763 | 631,101,417 | 1.85 |
| 2015 | 1,186,357,740 | 243,877,713 | 412,465,763 | 656,343,476 | 1.81 |
| 2016 | 1,204,983,393 | 237,150,313 | 445,447,013 | 682,597,326 | 1.77 |
| 2017 | 1,223,901,467 | 233,562,213 | 476,342,283 | 709,904,496 | 1.72 |
| 2018 | 1,243,116,551 | 233,667,213 | 504,630,008 | 738,297,221 | 1.68 |
| 2019 | 1,262,633,310 | 236,782,213 | 531,046,383 | 767,828,596 | 1.64 |
| 2020 | 1,282,456,479 | 236,117,213 | 562,427,601 | 798,544,814 | 1.61 |
| 2021 | 1,302,590,870 | 295,597,213 | 534,893,720 | 830,490,933 | 1.57 |
| 2022 | 1,323,041,367 | 321,395,613 | 542,312,420 | 863,708,033 | 1.53 |
| 2023 | 1,343,812,934 | 337,131,813 | 561,128,645 | 898,260,458 | 1.50 |
| 2024 | 1,364,910,612 | 350,442,913 | 583,745,795 | 934,188,708 | 1.46 |
| 2025 | 1,386,339,521 | 357,700,613 | 613,859,545 | 971,560,158 | 1.43 |
| 2026 | 1,408,104,861 | 382,399,013 | 628,022,680 | 1,010,421,693 | 1.39 |
| 2027 | 1,430,211,913 | 399,604,213 | 651,230,815 | 1,050,835,028 | 1.36 |
| 2028 | 1,452,666,043 | 391,389,213 | 701,478,933 | 1,092,868,146 | 1.33 |
| 2029 | 1,475,472,700 | 425,721,174 | 710,864,200 | 1,136,585,374 | 1.30 |
| 2030 | 1,498,637,419 | 459,686,155 | 722,364,393 | 1,182,050,547 | 1.27 |
| 2031 | 1,522,165,820 | 476,151,882 | 753,177,405 | 1,229,329,287 | 1.24 |
| 2032 | 1,546,063,614 | 492,568,782 | 785,933,005 | 1,278,501,787 | 1.21 |
| 2033 | 1,570,336,600 | 518,855,382 | 810,782,068 | 1,329,637,450 | 1.18 |
| 2034 | 1,594,990,668 | 540,949,867 | 841,874,818 | 1,382,824,685 | 1.15 |
| 2035 | 1,620,031,802 | 563,521,032 | 874,619,818 | 1,438,140,850 | 1.13 |
| 2036 | 1,645,466,078 | 585,979,017 | 909,682,340 | 1,495,661,357 | 1.10 |
| 2037 | 1,671,299,669 | 616,873,082 | 938,618,038 | 1,555,491,120 | 1.07 |
| 2038 | 1,697,538,844 | 641,558,048 | 976,147,811 | 1,617,705,859 | 1.05 |
| 2039 | 1,724,189,970 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 1.02 |
| 2040 | 1,751,259,515 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 1.00 |
| 2041 | 1,778,754,049 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 1.00 |
| 2042 | 1,806,680,242 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 1.02 |
| 2043 | 1,835,044,873 | 728,542,975 | 197,750,000 | 926,292,975 | 1.98 |
| 2044 | 1,863,854,825 | 757,732,975 | 186,375,000 | 944,107,975 | 1.97 |
| 2045 | 1,893,117,090 | 788,097,975 | - | 788,097,975 | 2.40 |
| 2046 | 1,922,838,767 | 819,672,975 | - | 819,672,975 | 2.35 |
| 2047 | 1,953,027,071 | 852,507,975 | - | 852,507,975 | 2.29 |
| 2048 | 1,983,689,327 | 886,666,392 | - | 886,666,392 | 2.24 |
| 2049 | 2,014,832,977 | 922,183,873 | - | 922,183,873 | 2.18 |
| 2050 | 2,046,465,577 | 959,115,612 | - | 959,115,612 | 2.13 |
| 2051 | 2,078,594,805 | 997,537,122 | - | 997,537,122 | 2.08 |
| 2052 | 2,111,228,457 | 1,037,500,321 | - | 1,037,500,321 | 2.03 |
| 2053 | 2,144,374,454 | 1,079,036,134 | - | 1,079,036,134 | 1.99 |
| 2054 | 2,178,040,837 | 1,122,257,975 | - | 1,122,257,975 | 1.94 |
| 2055 | 2,212,235,779 | 1,167,193,604 | - | 1,167,193,604 | 1.90 |
| 2056 | 2,246,967,576 | 1,213,947,975 | - | 1,213,947,975 | 1.85 |
| 2057 | 2,282,244,658 | 1,198,845,475 | - | 1,198,845,475 | 1.90 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

35

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2009, the average annual growth rate in personal consumption expenditures (nominal) was 7.64%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 5.03%. During Fiscal Year 2009, which constitutes the third consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 1.8% while Commonwealth Sales Tax revenues decreased by 3.6% as compared to Fiscal Year 2008.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Offered Bonds, together with other funds available to the Corporation, to (i) repay certain of its outstanding obligations, (ii) provide funds to the Commonwealth for the Authorized Uses, and (iii) pay the cost of issuance of the Offered Bonds. The Corporation will designate the Series 2010D Bonds as "Build America Bonds" under Section 54AA of the Code, and elect under Code Section 54AA(g) to receive a cash subsidy from the United States Treasury equal to 35% of the stated interest paid on such bonds as provided in Code Section 6431. The Corporation will designate the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" pursuant to Sections 1400U-2 and 6431 of the Code and as "Qualified Bonds" under Section 54AA(g) of the Code, and elect under Code Section 54AA(g) to receive a cash subsidy from the United States Treasury equal to 45% of the stated interest paid on such bonds as provided in Code Sections 1400U-1 and 6431.

### Estimated Sources and Uses of Funds

| | |
|---|---|
| **Sources** | |
| Principal Amount of the Offered Bonds | $182,190,000.00 |
| **Total Sources** | $182,190,000.00 |
| | |
| **Uses** | |
| Deposit to the Project Fund | $178,768,599.74 |
| Underwriters' Discount and Other Costs of Issuance[1] | 3,421,400.26 |
| **Total Uses** | $182,190,000.00 |

[1] Includes legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

36

CONFIDENTIAL

PR-INT-000014239

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation | Expiration of Term |
|---|---|---|
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Marcos Rodríguez-Ema | Governor's Chief of Staff | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |
| Agnes B. Suárez | Businesswoman | September 23, 2010 |
| Angel A. Fullana Olivencia | Engineer | September 23, 2010 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

**Other Obligations of the Corporation**

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of December 31, 2009, the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

TAX MATTERS

The following is a summary of the opinion of Pietrantoni Mendez & Alvarez LLP, Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Offered Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Puerto Rico Tax Counsel*.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Offered Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and**

37

conclusions set forth in this discussion. **You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

**Puerto Rico Tax Considerations for Puerto Rico Residents**

In the opinion of Pietrantoni Mendez & Alvarez LLP, based on the laws of Puerto Rico now in force:

1.     Interest on the Offered Bonds is exempt from Puerto Rico income, sale, use and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.     The Offered Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.     The transfer of the Offered Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made, (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico, and (iii) any means will not be subject to Puerto Rico sales and use taxes;

4.     Gain recognized from the sale or exchange of an Offered Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico;

5.     The Offered Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.     Interest on the Offered Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Offered Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the Offered Bonds, including but not limited to financial institutions, should be aware that ownership of the Offered Bonds may result in having a portion of their interest and other expenses attributable to interest on the Offered Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

38

CONFIDENTIAL

PR-INT-000014241

## United States Federal Tax Considerations for Puerto Rico Residents

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Offered Bonds. Each prospective purchaser of the Offered Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Offered Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Offered Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Offered Bonds under state, local or foreign tax laws.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a bona fide resident of Puerto Rico, within the meaning of Section 937 of the Code, during the entire taxable year. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

*Interest on the Offered Bonds.* Interest on the Offered Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holder during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Offered Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation and such corporation is not treated as a domestic corporation for purposes of the Code.

*Sale or Retirement of Offered Bonds.* In general, pursuant to the provisions of Section 1.937-2 of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Offered Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the Code, provided, (i) that such Offered Bonds do not constitute inventory in the hands of such individual, and (ii) the Puerto Rico U.S. Holder was a bona fide resident of Puerto Rico for the 10 years preceding the year of the gain. The regulations provide a special rule under which a Puerto Rico U.S. Holder who was not a resident of Puerto Rico for the entire 10 year period preceding the year of the gain may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the Code.

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of the Offered Bonds, provided such gain is not effectively connected or treated as effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and such corporation is not treated as a domestic corporation for purposes of the Code.

39

PR-INT-000014242

The opinion of Special Puerto Rico Tax Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Offered Bonds is limited to the above. Special Puerto Rico Tax Counsel does not express any opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or as to any other laws of any other jurisdiction or compliance therewith by any party.

**Backup Withholding**

Backup withholding of United States federal income tax may apply to payments made in respect of the Offered Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Offered Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

The United States Treasury Department has recently published the General Explanation of the Administration's Fiscal Year 2010 Revenue Proposals (the "Green Book"). Said proposals include extending the information reporting requirement to payments of interest to corporations in excess of $600 per calendar year and requiring backup withholding in certain circumstances not currently contemplated in the Code. As of this date, no bills have been filed at the United States Congress to adopt these proposals.

Prospective owners of the Offered Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," or "passive foreign investment companies," as such terms are defined by the Code.

**Build America Bonds**

The Series 2010D Bonds will be issued as "Build America Bonds" and the Corporation will elect to receive cash subsidy payments from the United States Treasury equal to thirty-five percent (35%) of the interest payable by the Corporation on the Series 2010D Bonds. Under no circumstances will the owners of the Series 2010D Bonds be entitled to a credit against the taxes imposed by the Code. Prospective owners of the Series 2010D Bonds who are not Puerto Rico U.S. Holders should consult their own independent tax advisors regarding the tax consequences of owning the Series 2010D Bonds.

The Series 2010E Bonds will be issued as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" and the Corporation will elect to receive cash subsidy payments from the United States Treasury equal to forty-five percent (45%) of the interest payable by the Corporation on the Series 2010E Bonds. Under no circumstances will the owners of the Series 2010E Bonds be entitled to a credit against the taxes imposed by the Code. Prospective owners of the Series 2010E Bonds who are not Puerto Rico U.S. Holders should consult their own independent tax advisors regarding the tax consequences of owning the Series 2010E Bonds.

**No Opinion as to Exclusion under Section 103(a) of the Code**

The Corporation has determined, based on the advice of counsel, that interest on the Offered Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Offered Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico. Special Puerto Rico Tax Counsel is not

CONFIDENTIAL

PR-INT-000014243

opining as to the status of the Offered Bonds for purposes of Section 103(a) of the United States Internal Revenue Code.

## RATINGS

The Offered Bonds have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A1" by Moody's Investors Service ("Moody's"), and "A+" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies.

In April 2010, Moody's and Fitch began to recalibrate their ratings of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across their portfolio of rated securities. As a result of this recalibration, the Corporation's First Subordinate Bonds are now rated "A1" instead of "A2" by Moody's with a stable outlook and "A+" instead of "A" by Fitch with a stable outlook. This recalibration, however, does not reflect an improvement in the credit quality or a change in Moody's or Fitch's opinion of the Corporation's credit quality. The recalibration is just an adjustment to denote a comparable level of credit risk as ratings in other sectors.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Offered Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Offered Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Offered Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $178,996,156.12 reflecting an underwriters' discount of $3,193,843.88, and to reoffer such Offered Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Offered Bonds may be offered and sold to certain dealers (including dealers depositing such Offered Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Offered Bonds if any Offered Bonds are purchased.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Offered Bonds as consideration for their professional services.

41

PR-INT-000014244

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Offered Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Offered Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel. The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and Pietrantoni Mendez & Alvarez LLP, San Juan, Puerto Rico, Special Puerto Rico Tax Counsel, are set forth as *Appendix C* and *Appendix D*, respectively, to this Official Statement.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Offered Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a) within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b) in a timely manner, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Offered Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Offered Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Offered Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Offered Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Offered Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Offered Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with

42

respect to the Offered Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Offered Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Offered Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Offered Bonds.

43

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Offered Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of opinion of Special Puerto Rico Tax Counsel (*Appendix D*), and the summary of the book-entry system for the Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____
/s/ Fernando L. Batlle
Executive Director

44

CONFIDENTIAL

APPENDIX A

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

## General

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,967,179 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,374 (420,326 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, Puerto Rico's real gross national product contracted by 1.2% and 2.8%, respectively. For fiscal year 2009, preliminary reports indicate that the real gross national product contracted by 3.7%. In March 2010, the Puerto Rico Planning Board (the "Planning Board") announced that it was projecting a contraction of 3.6% in real gross national product for fiscal year 2010 and an increase of 0.4% in real gross national product for fiscal year 2011.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

## Personal Income

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2009. In fiscal year 2009, aggregate personal income was $59 billion ($49.9 billion in 2005 prices) and personal income per capita was $14,905 ($12,589 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $13.1 billion in fiscal year 2009 ($12.2 billion in fiscal year 2008). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10 billion, or 76% of the transfer payments to individuals in fiscal year 2009 ($9.3 billion, or 73.9%, in fiscal year 2008). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2009.

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,137.5 | $20,566.2 | $20,702.9 | $20,204.8 | $21,144.9 |
| Government | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 | 9,254.2 |
| Other | 1,083.5 | 1,036.7 | 946.4 | 999.4 | 1,122.7 |
| Total Employees' compensation | $29,371.5 | $30,027.1 | $30,234.2 | $30,966.4 | $31,521.8 |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,181.0 | 2,241.9 | 2,221.2 | 2,253.3 | 2,285.0 |
| Employers | 3,064.0 | 3,167.1 | 3,074.1 | 3,121.4 | 3,192.8 |
| Total Contributions for social insurance | $5,245.0 | $5,409.0 | $5,295.3 | $5,374.7 | $5,477.8 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,687.0 | 2,832.3 | $2,219.8 | $2,232.2 | $2,246.5 |
| Dividends of domestic corporations | 286.7 | 304.3 | $322.1 | $351.9 | $355.6 |
| Miscellaneous income and dividends received from abroad | 13.4 | 13.4 | 9.9 | 17.1 | 6.6 |
| Rental income of persons | 4,201.8 | 4,387.4 | 5,529.0 | 5,825.5 | 6,747.1 |
| Personal interest income | 2,911.9 | 3,725.1 | 2,820.5 | 2,872.6 | 3,425.1 |
| Total Proprietors' income | $10,100.7 | $11,262.5 | $10,901.3 | $11,299.3 | $12,780.9 |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,323.5 | 3,390.7 | 3,569.5 | 3,813.9 | 4,371.3 |
| Federal government | 9,243.7 | 9,725.9 | 10,327.1 | 12,209.3 | 13,057.7 |
| U.S. state governments | 14.9 | 17.6 | 22.7 | 24.1 | 35.6 |
| Business | 1,190.7 | 1,184.9 | 1,741.0 | 2,126.8 | 2,251.8 |
| Other nonresidents | 820.3 | 642.6 | 610.0 | 518.7 | 493.6 |
| Total transfer payments | $14,593.0 | $14,961.8 | $16,270.3 | $18,692.8 | $20,210.0 |
| Total Personal Income | $48,820.2 | $50,842.3 | $52,110.4 | $55,583.7 | $58,856.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

CONFIDENTIAL

## Personal Consumption

During Fiscal Year 2009, at current prices, personal consumption amounted to $55.6 billion, representing an increase of $1 billion, or 1.8%, from Fiscal Year 2008. This increase was based on a 1.5% increase in nondurable goods (40% of personal consumption), 4.2% decrease in durable goods (9% of personal consumption), and 3.2% increase in services (51% of personal consumption). At constant 2005 prices, personal consumption decreased 2.4% from Fiscal Year 2008. These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2009.

### Commonwealth of Puerto Rico
### Personal Consumption Expenditures by Product
### (in millions of dollars)

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| Food | $ 6,535.4 | $ 6,982.2 | $7,315.0 | $ 7,925.8 | $ 8,559.8 |
| Alcoholic beverages and tobacco products | 1,739.3 | 1,765.8 | 1,783.1 | 1,705.3 | 1,777.5 |
| Clothing and accessories | 2,957.1 | 3,084.9 | 3,528.0 | 3,568.7 | 3,604.8 |
| Personal care | 815.5 | 984.6 | 1,031.0 | 1,213.4 | 1,281.4 |
| Housing | 7,012.3 | 7,499.7 | 8,065.8 | 8,568.6 | 9,166.7 |
| Household operations | 5,267.9 | 5,929.2 | 6,479.0 | 7,053.6 | 6,997.6 |
| Medical care and funeral expenses | 7,525.9 | 8,007.2 | 8,434.8 | 9,046.7 | 9,453.3 |
| Business services | 3,020.1 | 3,035.5 | 3,103.0 | 3,022.5 | 3,055.5 |
| Transportation | 6,136.4 | 6,325.3 | 6,079.8 | 6,252.5 | 5,509.0 |
| Recreation | 4,547.2 | 4,810.3 | 4,935.0 | 4,997.0 | 4,938.2 |
| Education | 1,627.8 | 1,819.5 | 1,776.6 | 1,788.2 | 1,845.3 |
| Religious and nonprofit organizations, not elsewhere classified | 482.3 | 505.9 | 439.2 | 449.8 | 458.7 |
| Foreign travel | 1,531.9 | 1,608.9 | 1,616.9 | 1,737.8 | 1,631.4 |
| Miscellaneous purchases | 605.8 | 704.1 | 819.5 | 822.0 | 830.0 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $49,804.9 | $53,063.1 | $55,406.7 | $58,151.8 | $59,109.2 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,269.4 | 3,403.1 | 3,457.4 | 3,590.8 | 3,544.6 |
| Total Personal Consumption Expenditures | $46,535.4 | $49,660.0 | $51,949.3 | $54,561.0 | $55,564.6 |

(1) Preliminary figures.
Source: Planning Board.

A-3

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $53,752 | $56,732 | $59,521 | $61,527 | $62,759 |
| Real gross national product – $ millions (2005 prices) | 53,752 | 54,027 | 53,400 | 51,889 | 49,951 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 1.9% | 0.5% | (1.2)% | (2.8)% | (3.7)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 3.1% | 2.8% | 1.8% | 2.8% | (2.5)% |

[1] Preliminary.
[2] In current dollars.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1995, and the forecast of the growth rate for fiscal year 2011.

A-4

CONFIDENTIAL

PR-INT-000014251



**REAL GNP GROWTH RATE**
(Percent)

*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2010).
\*\* Estimate for U.S. from IHS-Global Insight (Jun-2010).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2009 shown in this Appendix are preliminary until the revised figures are released and the forecast for fiscal year 2010 is revised. Certain information regarding current economic activity is, however, available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the table below and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that provide for an index that highly correlates to Puerto Rico's real gross national product.

As the following graph shows, the month-to-month reduction in the Government Development Bank – Economic Activity Index has begun to stabilize.

A-5



*Economic Forecast for Fiscal Years 2010 and 2011*

On March 10, 2010, the Planning Board released its revised gross national product forecast for fiscal year 2010 and its gross national product forecast for fiscal year 2011. The Planning Board revised its gross national product forecast for fiscal year 2010 from a projected growth of 0.7% to a contraction of 3.6%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2010 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2011 projects an increase in gross national product of 0.4% in constant dollars. The forecast, however, did not take into account the activity expected to be generated from funds received or expected to be received by the American Recovery and Reinvestment Act of 2009 ("ARRA"). The Planning Board's forecast for fiscal year 2011 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships.

*Fiscal Year 2009*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 3.7% (an increase of 2.0% in current dollars) over fiscal year 2008. Nominal gross national product was $62.8 billion in fiscal year 2009 ($50 billion in 2005 prices), compared to $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices). Aggregate

A-6

CONFIDENTIAL

PR-INT-000014253

personal income increased from $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices) to $59 billion in fiscal year 2009 ($49.9 billion in 2005 prices), and personal income per capita increased from $14,080 in fiscal year 2008 ($12,410 in 2005 prices) to $14,905 in fiscal year 2009 ($12,589 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. Although the situation improved significantly during fiscal year 2009, oil prices remained at relatively high levels and the impact of the increases of previous years were still felt in fiscal year 2009. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2008*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.8% (an increase of 3.4% in current dollars) over fiscal year 2007. Nominal gross national product was $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices), compared to $59.5 billion in fiscal year 2007 ($53.4 billion in 2005 prices). Aggregate personal income increased from $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices) to $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices), and personal income per capita increased from $13,244 in fiscal year 2007 ($12,319 in 2005 prices) to $14,080 in fiscal year 2008 ($12,410 in 2005 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.2%. Nominal gross national product was $59.5 billion ($53.4 billion in 2005 prices), compared to $56.7 billion in fiscal year 2006 ($54.0 billion in 2005 prices). This represents an increase in nominal gross national product of 4.9%. Aggregate personal income was $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices), as compared to $50.8 billion in fiscal year

A-7

2006 ($48.5 billion in 2000 prices), and personal income per capita was $13,244 in fiscal year 2007 ($12,319 in 2005 prices), as compared to $12,970 in fiscal year 2006 ($12,382 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,266,300 for fiscal year 2006. This increase in employment was driven by self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.0% for fiscal year 2006.

## Overview of Fiscal Condition

### Fiscal Condition

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and expenditures. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenditures significantly exceeding recurring revenues.

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from GDB or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance.

For fiscal year 2009, the estimated deficit was approximately $3.490 billion, consisting of the difference between preliminary revenues (without taking into account a one time accounting adjustment related to the sales and use tax) and estimated expenses for such fiscal year. The estimated deficit is projected to be less than $2.5 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below. The administration projects it will eliminate the deficit by fiscal year 2013.

*Results for Fiscal Year 2009.* Total preliminary General Fund revenues for fiscal year 2009 were $7.673 billion, representing a decrease of $686 million, or 8.2%, from fiscal year 2008 revenues and an increase of $73 million, or 1.0%, over the $7.6 billion revised estimate presented by the administration in February 2009. Total expenses for fiscal year 2009 were approximately $11.250 billion, consisting of budgeted General Fund expenditures of $9.484 billion and approximately $1.766 billion of additional non-budgeted expenses. The difference between preliminary General Fund revenues and total expenses for fiscal year 2009 was principally paid from proceeds of Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym) bond issues pursuant to the fiscal stabilization plan described below.

*Preliminary Results for Fiscal Year 2010 (First Ten Months).* Preliminary General Fund revenues for the first ten months of fiscal year 2010 (from July 2009 through April 2010) were $6.281 billion, a decline of $253.8 million, or 3.9%, from the $6.535 billion of revenues for the same period in the prior fiscal year and a decline of $88 million, or 1.4%, from budgeted revenues of $6.370 billion for the first ten months of fiscal year 2010. As budgeted, the decline in General Fund revenues reflects the reduction in General Fund revenues from the sales and use tax as a result of the allocation of a larger portion of such tax to COFINA (amounting to $353.8 million for the first ten months of fiscal year 2010), and the continuing impact of the ongoing economic recession, partly offset by the effect of the temporary and permanent revenue raising measures implemented as part of the fiscal stabilization plan described below (including $213.4 million in additional property taxes for the first ten months of fiscal year 2010). If the additional allocation to COFINA and additional property taxes are not taken into account, the reduction in General Fund revenues would have been $99 million, or 1.6%. The estimated General Fund revenues for fiscal year 2010 remain, as budgeted, at $7.670 billion.

A-8

Budgeted expenditures for fiscal year 2010 amount to $10.170 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.5 billion of additional expenditures to be covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance (see "Fiscal Stabilization Plan" below).

*Fiscal Stabilization Plan.* In January 2009, the administration, which controls the Executive and Legislative branches of government, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), sought to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual $2 billion operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program were and will be used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal year 2010, the administration began to design a comprehensive reform of the tax system (that it expects to adopt during fiscal year 2011) and to implement a long-term economic development plan, both of which are designed to complement the short-term economic reconstruction and supplemental stimulus initiatives described below.

As of April 30, 2010, the administration had implemented measures that are expected to result in annual savings of approximately $900 million.

*Government Reorganization Plan.* The administration has also taken the first steps to reorganize and modernize the Executive Branch. On December 11, 2009, the Governor signed Act No. 182 that seeks to reduce the number of government agencies and operational expenditures. On April 13, 2010, the administration submitted to the Legislative Assembly a bill proposing a referendum to amend the Constitution in order to restructure the Legislative Assembly by reducing the number of legislators. If the bill is approved, the referendum would be held on or prior to May 1, 2011 and any amendments to the Constitution approved in such referendum would take effect with respect to the Legislative Assembly to be installed on January 2, 2013.

*Unfunded Pension Benefit Obligations and Cash Flow Deficits of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and cash flow deficits of the three government retirement systems that are funded principally with government appropriations. As of June 30, 2009, the total unfunded accrued actuarial liability for the three retirement systems was $23.9 billion and the expected aggregate cash flow deficit for fiscal year 2010 was $640 million.

In February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The Commission is expected to submit a report to the Governor by the end of the first quarter of fiscal year 2011.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. Puerto Rico has been awarded approximately $6.5 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic

A-9

downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of April 23, 2010, Puerto Rico has disbursed $2.8 billion in ARRA funds, or 43% of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also proposes to (i) strengthen the labor market and encourage greater labor-force participation by bringing out-of-date labor laws and regulations in line with U.S. and international standards, (ii) adopt a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies, and (iii) adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. In February 2010, the Governor named a committee to review the Commonwealth's tax system and propose a tax reform. The committee's report is due by September 2010 and the administration plans to file tax reform legislation during the immediately following legislative session.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. The administration is currently evaluating and expects to commence procurement for eight public-private partnership priority projects during fiscal year 2011.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include the development of a trans-shipment port and tourism and urban redevelopment projects.

*Recalibration of Ratings of Commonwealth General Obligation Bonds*

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" with a stable outlook by Moody's, which is three categories above the previous "Baa3" rating. The administration expects that this recalibration will increase the number of potential investors for the Commonwealth's general obligation bonds and have a positive impact on the Commonwealth's financing costs.

*Proposed Fiscal Year 2011 Budget*

On April 26, 2010, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2011. The proposed budget provides for total General Fund revenues of $8.195 billion, compared to

A-10

estimated General Fund revenues of $7.670 billion for fiscal year 2010. The proposed General Fund revenues of $8.195 billion include base revenues of $7.645 billion, $241 million from tax enforcement and compliance measures, and $89 million of property taxes from the self-appraisal of real property. The proposed General Fund revenues originally included $220 million from the license fees of video lottery machines, but this measure has been withdrawn. Preparation of the budget is an ongoing process and various proposals are under review to replace these $220 million. The proposed fiscal year 2011 budget provides for total expenditures of $9.195 billion, consisting of General Fund expenditures of $8.195 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA bond issues, including a $500 million proposed bond issue during fiscal year 2011. The proposed total expenditures for fiscal year 2011 are $975 million, or 9.6%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $2.055 billion, or 18.3%, lower than estimated total expenditures of $11.250 billion for fiscal year 2009.

## Employment and Unemployment

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For fiscal year 2009, the number of persons employed averaged 1,168,200, a decrease of 4.1% compared to previous fiscal year. During the first ten months of fiscal year 2010, total employment averaged 1,106,600, a decline of 5.9% with respect to the same period of the prior year; and the unemployment rate averaged 15.9%.

The following table presents annual statistics of employment and unemployment for fiscal year 2005 through fiscal year 2009, and the average figures for the first ten months of fiscal year 2010. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.2% of total employment in fiscal year 2009.

### Commonwealth of Puerto Rico
### Employment and Unemployment[1]
### (persons age 16 and over)
### (in thousands)

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,422 | 1,266 | 156 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010[3] | 1,316 | 1,107 | 209 | 15.9 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first ten months of fiscal year 2010 (July through April 2010).

*Source:* Department of Labor and Human Resources – Household Survey

A-11

CONFIDENTIAL

## Economic Performance by Sector

From fiscal year 2005 to fiscal year 2009, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | |
|---|---|---|---|
|  | 2007 | 2008 | 2009[2] |
| Manufacturing | $37,637 | $40,548 | $43,541 |
| Service[3] | 40,190 | 41,227 | 41,028 |
| Government[4] | 8,585 | 8,762 | 9,254 |
| Agriculture | 430 | 613 | 633 |
| Construction[5] | 2,027 | 1,991 | 1,782 |
| Statistical discrepancy | (464) | (215) | (538) |
| Total gross domestic product[6] | $88,405 | $92,926 | $95,708 |
| Less: net payment abroad | (28,884) | (31,399) | (32,949) |
| Total gross national product[6] | $59,521 | $61,527 | $62,759 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.
(4) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
(5) Includes mining.
(6) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

A-12

PR-INT-000014259

The following table presents annual statistics of average employment based on NAICS for fiscal years 2005 to 2009.

### Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
| | 2005 | 2006 | 2007 | 2008 | 2009[2] |
|---|---|---|---|---|---|
| Natural resources and construction | 68,233 | 65,492 | 64,700 | 59,675 | 49,083 |
| Manufacturing | | | | | |
|   Durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
|   Non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| Sub-total | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|   Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
|   Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
|   Transportation, warehouse, and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
|     Sub-total | 187,525 | 188,783 | 184,008 | 181,342 | 176,408 |
| | | | | | |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Government[3] | 307,825 | 302,492 | 298,125 | 297,742 | 300,683 |
|     Total non-farm | 1,049,725 | 1,047,742 | 1,032,275 | 1,020,208 | 992,450 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2009 manufacturing generated $43.5 billion, or 45.5%, of gross domestic product. During fiscal year 2009, payroll employment for the manufacturing sector was 96,708, a decrease of 7.1% compared with fiscal year 2008. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2009, the average hourly manufacturing wage rate in Puerto Rico was approximately 53.8% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the

CONFIDENTIAL

last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" below.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector[1]
### (in thousands at current prices)

| | Fiscal Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009[2] |
| Food | $1,103,133 | $ 831,351 | $ 864,364 |
| Beverage and Tobacco Products | 932,301 | 1,405,111 | 1,554,799 |
| Textile Mills | 2,310 | 1,378 | 1,055 |
| Textile Product Mills | 13,944 | 13,876 | 12,221 |
| Apparel | 211,110 | 236,186 | 260,107 |
| Leather and Allied Products | 18,256 | 21,530 | 23,895 |
| Wood Products | 24,193 | 22,668 | 23,830 |
| Paper | 73,908 | 71,304 | 71,704 |
| Printing and Related Support Activities | 129,716 | 131,217 | 117,720 |
| Petroleum and Coal Products | 374,137 | 86,317 | 360,041 |
| Chemical | 26,891,695 | 27,966,500 | 29,806,137 |
| Plastics and Rubber Products | 126,642 | 127,091 | 122,338 |
| Nonmetallic Mineral Products | 295,265 | 273,670 | 236,869 |
| Primary Metals | 103,960 | 109,287 | 104,321 |
| Fabricated Metal Products | 248,929 | 247,804 | 250,066 |
| Machinery | 223,441 | 232,868 | 225,734 |
| Computer and Electronic Products | 4,222,014 | 5,957,553 | 6,266,460 |
| Magnetic and Optica | - | - | - |
| Electrical Equipment, Appliances and Components | 518,471 | 677,088 | 747,903 |
| Transportation Equipment | 81,906 | 85,913 | 78,249 |
| Furniture and Related Products | 66,039 | 62,985 | 54,217 |
| Miscellaneous | 1,975,250 | 1,986,317 | 2,359,370 |
| Total gross domestic product of manufacturing sector[3] | $37,636,619 | $40,548,014 | $43,541,398 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.

(2) Preliminary.

(3) Totals may not add due to rounding.

*Source:* Planning Board

CONFIDENTIAL

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2005 to 2009.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,467 | 4,100 | 3,825 | 3,758 | 3,058 |
| Cement and concrete products manufacturing | 3,750 | 3,533 | 3,300 | 3,367 | 2,833 |
| Fabricated metal products | 6,442 | 5,775 | 5,675 | 5,375 | 4,908 |
| Computer and electronic | 10,667 | 10,808 | 10,092 | 8,600 | 7,033 |
| Electrical equipment | 7,650 | 6,842 | 6,617 | 6,658 | 5,867 |
| Electrical equipment manufacturing | 4,975 | 4,700 | 4,508 | 4,383 | 3,917 |
| Miscellaneous manufacturing | 11,158 | 11,258 | 12,292 | 11,967 | 11,975 |
| Medical equipment and supplies manufacturing | 10,467 | 10,533 | 11,575 | 11,342 | 11,442 |
| Other durable goods manufacturing | 7,683 | 7,567 | 6,917 | 6,742 | 6,375 |
| Total – durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,050 | 12,650 | 12,183 | 11,725 | 11,392 |
| Beverage and tobacco products manufacturing | 3,175 | 3,392 | 3,258 | 3,267 | 3,125 |
| Apparel manufacturing | 8,875 | 8,258 | 7,708 | 9,633 | 9,825 |
| Cut and sew apparel manufacturing | 8,850 | 8,017 | 7,075 | 8,617 | 8,975 |
| Chemical manufacturing | 32,883 | 32,317 | 30,467 | 27,900 | 25,042 |
| Pharmaceutical and medicine manufacturing | 28,567 | 28,017 | 26,375 | 24,033 | 21,500 |
| Plastics and rubber products | 2,750 | 2,325 | 2,200 | 1,983 | 1,967 |
| Plastics product manufacturing | 2,258 | 2,133 | 2,025 | 1,850 | 1,825 |
| Other non-durable goods manufacturing | 8,517 | 7,292 | 6,625 | 6,442 | 6,142 |
| Total – non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| Total manufacturing employment | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 20,609 from fiscal year 2005 to fiscal year 2009. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in

A-15

fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008 and 2009, manufacturing employment decreased by 4.2%, 3.5% and 7.1%, respectively. For the first ten months of fiscal year 2010, the sector lost an average of 7,600 jobs, or 7.8% compared to the same period of the previous year. Given that this sector used to pay the highest wages, on average, in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2009, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.0%, while payroll employment in this sector decreased at an average annual rate of 1.4%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2009, the service sector generated $41.0 billion of gross domestic product, or 42.9% of the total. Wholesale and retail trade, information services, education and health services, professional and business services and real estate and rentals experienced growth in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. Finance and insurance, transportation and warehousing, utilities, and leisure and hospitality experienced contractions in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. From fiscal year 2007 to 2009, gross domestic product increased in the trade sector from $7.2 billion to $7.5 billion and in real estate and rentals from $11.7 billion to $13.3 billion, and decreased in finance and insurance from $6.7 billion to $5 billion.

Service-sector employment decreased from 556,350 in fiscal year 2005 to 545,975 in fiscal year 2009 (representing 55% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2009 represents a decrease of 2.3% compared to the prior fiscal year. For the first ten months of fiscal year 2010, average service-sector employment was 533,080, a decrease of 2.7% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of March 31, 2010, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico were generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of March 31, 2010 were $81.1 billion, as compared to $86.4 billion as of March 31, 2009. On April 30, 2010, the OCFI closed three of the thirteen commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption

CONFIDENTIAL

PR-INT-000014263

agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $3.4 billion as of March 31, 2010, up from $2.8 billion on March 31, 2009. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.4 billion as of March 31, 2010, up from $13.0 billion as of March 31, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of March 31, 2010, there were 38 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $39.8 billion, a decrease from $61.5 billion in total assets as of March 31, 2009. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.3 billion in assets as of March 31, 2010, a slight increase from $6.8 billion as of March 31, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2007 to 2009.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector*
### (in millions at current prices)

| | Fiscal Years ended June 30 | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009[1] |
| Wholesale trade | $ 2,751.6 | $ 2,834.6 | $ 2,885.5 |
| Retail trade | 4,471.4 | 4,508.7 | 4,583.7 |
| Transportation and warehousing | 968.3 | 998.5 | 978.0 |
| Utilities | 2,214.4 | 2,114.6 | 2,123.1 |
| Information | 2,466.5 | 2,477.4 | 2,552.8 |
| Finance and insurance | 6,694.3 | 6,693.4 | 4,951.8 |
| Real Estate and rental | 11,685.7 | 12,152.0 | 13,253.5 |
| Professional and business | 3,112.5 | 3,223.7 | 3,305.0 |
| Education and health | 3,592.5 | 3,932.1 | 4,131.4 |
| Leisure and hospitality | 1,861.5 | 1,919.1 | 1,895.6 |
| Other services[2] | 371.6 | 372.8 | 367.9 |
| Total | $40,190.3 | $41,226.9 | $41,028.3 |

---

\* Totals may not add due to rounding. For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(1) Preliminary.
(2) Includes tourism.

*Source*: Planning Board.

A-17

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector\***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
| Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
| Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
| Transportation, warehouse and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Total | 556,350 | 566,725 | 561,592 | 558,742 | 545,975 |

\*  Totals may not add due to rounding.
(1) Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006. The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

For fiscal year 2008, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,744,200, a further decline of 2.7% over the number of persons registered during fiscal year 2007. The average occupancy rate in tourist hotels during fiscal year 2008 was 70.4%, compared to 71.7% in fiscal year 2007. The average number of rooms available in tourist hotels increased by 2.1% to 10,250 rooms from fiscal year 2007 to fiscal year 2008.

During fiscal year 2009, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,708,500, a decrease of 2% over the number of persons registered during the same period of fiscal year 2008. The average occupancy rate in tourist hotels during fiscal year 2009 was 66.2%, a decrease of 5.9% from the prior fiscal year. During fiscal year 2009, the average number of rooms available in tourist hotels increased by 2.1% to 10,467 rooms compared to fiscal year 2008.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2009, employment in hotels and other lodging facilities was reduced by 6.7% to 13,300 jobs. For the first ten months of fiscal year 2010, the average decrease was 4.3% with respect to the same period for the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-18

CONFIDENTIAL

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2009.

### Commonwealth of Puerto Rico
### Tourism Data[1]

#### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |

#### Total Visitors' Expenditures
#### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009[5] | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the Convention Center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

A-19

CONFIDENTIAL

PR-INT-000014266

In fiscal year 2009, the government accounted for $9.3 billion, or 9.7%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 285,600 workers (state, including public corporations, and local), or 28.8% of total, non-farm, payroll employment in fiscal year 2009. From fiscal year 2005 to fiscal year 2009, state and municipal government employment has been reduced by approximately 7,500 positions. During the first ten months of fiscal year 2010, state and local government employment decreased by 15,100 jobs. According to the payroll survey, the distribution of these job reductions was 10,800 jobs in the state government and 4,300 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act No. 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act No. 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. The Ports Authority and the Public-Private Partnerships Authority continue to evaluate entering into a public-private partnership with respect to the Luis Muñoz Marín International Airport. The Public-Private Partnerships Authority has engaged a team of advisors to assist it in the preparation of a study required for the establishment of a public-private partnership.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

A-20

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,629 miles and 11,947 miles of local streets and adjacent roads. The highway system comprises 387 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 252 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,053 miles of tertiary highways and roads serving local, intra-regional traffic.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed in March 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. Currently, the Port of the Americas Authority is exploring entering into a concession agreement with respect to the terminal facility and is simultaneously undertaking efforts to maximize private sector interest in the related value-added zones.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2007 to 2009, however, real construction investment decreased at an average annual rate of 14.7%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 9.8%.

Public investment has been an important component of construction investment. During fiscal year 2009, approximately 52.9% of the total investment in construction was related to public projects. The total value of construction permits increased 28.0% in fiscal year 2009 as compared to fiscal year 2008 but total sales of cement decreased by 25.4%, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2009 decreased in real terms by 20.1%, following a 9.0% real decline in fiscal year 2008, due principally to the drop in private construction activity. The Planning Board expects a further construction investment decrease of 5.2% in real terms for fiscal year 2010. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, the expected positive impact of the Federal Stimulus and the Local Stimulus led it to reduce its projected decrease in construction investment to 5.2% in real terms. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2009, the number of construction permits decreased 20.7%, while the total value of construction permits dropped by 28% compared to fiscal year 2008. For the first nine months of fiscal year 2010, the total number of construction permits decreased by 19.4%, while the value of construction permits decreased by 28.9%. These figures are consistent with cement sales, which declined by 25.4% in fiscal year 2009 and by 27.2% during the first ten months of fiscal year 2010, reaching levels not seen in more than a decade.

A-21

PR-INT-000014268

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2009, gross income from agriculture was $633 million, an increase of 3.4% compared with fiscal year 2008.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

## Higher Education

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

CONFIDENTIAL

PR-INT-000014269

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
|---|---|---|---|---|---|---|
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,195 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,011 | 37.4% | 26,961,000[2] | 13,621,000 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,143,454[2] | 15,312,289 | 56.4% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 27,946,091[3] | 15,927,987 | 57.0% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,378,777[3] | 16,611,711 | 58.5% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,744,193[3] | 16,911,481 | 58.8% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,062,634[3] | 17,272,044 | 59.4% |
| 2005 | 406,547[3] | 208,032 | 51.2% | 29,134,149[3] | 17,487,475 | 60.0% |
| 2006 | 400,530[3] | 209,547 | 52.3% | 29,236,155[3] | 17,758,870 | 60.7% |
| 2007 | 396,059[3] | 225,402 | 56.9% | 29,407,260[3] | 18,248,128 | 62.1% |
| 2008 | 395,482[3] | 227,546 | 57.5% | 29,757,219[3] | 19,102,814[4] | 64.2% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | N/A | N/A |

N/A – Not available.
(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).
(4) Middle alternative projection (NCES).
*Sources:* U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2008-2009 was approximately 65,669 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2008-2009 of approximately 171,541 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

A-23

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Other legislation enacted in 2001 and 2002 provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or

A-24

PR-INT-000014271

interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate $1.137 billion for loans made or bonds issued to finance the development of twenty tourism projects representing 4,585 new hotel rooms and a total investment of $1.795 billion.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production

A-25

PR-INT-000014272

activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

CONFIDENTIAL

PR-INT-000014273

**APPENDIX B**

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Senior Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

CONFIDENTIAL

PR-INT-000014274

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

CONFIDENTIAL

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

CONFIDENTIAL

PR-INT-000014276

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

B-4

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

CONFIDENTIAL

PR-INT-000014278

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)     Government Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

CONFIDENTIAL

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi) a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i) which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii) (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

B-7

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

B-8

CONFIDENTIAL

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

CONFIDENTIAL                                                                        PR-INT-000014282

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

B-10

CONFIDENTIAL

PR-INT-000014283

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

       (i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

       (ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

       (iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

       (iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

       (v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

       (vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

B-11

CONFIDENTIAL

PR-INT-000014284

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

    4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

CONFIDENTIAL

PR-INT-000014285

5.     Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

PR-INT-000014286

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

> 1.   All Pledged Sales Tax received by the Corporation or the Trustee.

> 2.   With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

> 3.   Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

CONFIDENTIAL

PR-INT-000014288

4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

PR-INT-000014289

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

CONFIDENTIAL

PR-INT-000014290

      **Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

      **Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

      **Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

      **Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

CONFIDENTIAL

PR-INT-000014291

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

(i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)     if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-19

CONFIDENTIAL

PR-INT-000014292

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii) either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv) a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

## Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

## Qualified Hedges (Section 206)

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-20

CONFIDENTIAL

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-21

PR-INT-000014294

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

B-22

CONFIDENTIAL

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

## Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

PR-INT-000014296

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

B-24

CONFIDENTIAL

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

CONFIDENTIAL

PR-INT-000014298

FOURTH:  to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH:  to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH:  to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH:  to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH:  the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

B-26

PR-INT-000014299

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii) Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i) Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii) Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

CONFIDENTIAL

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

B-28

CONFIDENTIAL

PR-INT-000014301

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

B-29

CONFIDENTIAL

PR-INT-000014302

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

## Satisfaction of Sinking Fund Installments (Section 508)

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

B-30

PR-INT-000014303

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

## Redemption Account; Amounts to be Deposited Therein (Section 509)

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii) amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv) amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

B-31

PR-INT-000014304

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

B-33

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

B-34

CONFIDENTIAL

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

CONFIDENTIAL

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.      No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

B-36

CONFIDENTIAL

PR-INT-000014309

*Additional Requirements—Senior Bonds and Parity Obligations*

A.      (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.      No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D.      *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

B-37

CONFIDENTIAL

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

CONFIDENTIAL

PR-INT-000014311

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

CONFIDENTIAL

PR-INT-000014312

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

B-40

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

B-41

                                                          PR-INT-000014314

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

## Supplemental Resolutions (Article IX)

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i)  to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)  to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii)  to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-42

CONFIDENTIAL

PR-INT-000014315

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

B-43

PR-INT-000014316

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

B-44

PR-INT-000014317

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i) There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii) There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

B-45

PR-INT-000014318

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

B-46

PR-INT-000014319

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

B-47

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner or to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

B-48

PR-INT-000014321

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

B-49

PR-INT-000014322

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

     If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

     Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

CONFIDENTIAL

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

B-51

                                                                 PR-INT-000014324

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

### Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

### Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

### No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

### Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

B-52

**APPENDIX C**

**PROPOSED FORM OF APPROVING
OPINION OF BOND COUNSEL**

June __, 2010

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $89,435,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and its $92,755,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds," the Series 2010D Bonds and the Series 2010E Bonds being referred to herein as the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Fifteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution") and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution," the Fifteenth Supplemental Resolution and the Sixteenth Supplemental Resolution being referred to herein as the "Bond Resolution," the General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds and First Subordinate Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and

CONFIDENTIAL

PR-INT-000014326

will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      Act 91 is valid in all respects material to the matters covered by this opinion.

2.      The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.      The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.      As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.      The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

7.      The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

8.      Interest on the Bonds is not excluded from gross income for Federal income tax purposes and so will be fully subject to Federal income taxation; this opinion is not intended or provided by Bond Counsel to be used and cannot be used by an owner of the Bonds for the purpose of avoiding penalties that may be imposed on the owner of such Bonds. The opinion set forth in this paragraph is provided to support the promotion or marketing of the Bonds. Each owner of the Bonds should seek advice based on its particular circumstances from an independent tax advisor.

CONFIDENTIAL

PR-INT-000014327

9.    The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

Except as stated in paragraphs 8 and 9 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

C-3

CONFIDENTIAL

PR-INT-000014328

Exhibit 14 Part 2 Page 208 of 280

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

**APPENDIX D**

**PROPOSED FORM OF OPINION OF
SPECIAL PUERTO RICO TAX COUNSEL**

June __, 2010

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Re:     Puerto Rico Sales Tax Financing Corporation
        Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
        Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone
        Economic Development Bonds)

Gentlemen:

        We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax
Financing Corporation (the "Corporation"), a public corporation and instrumentality of the
Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity
independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of
Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $182,190,000 aggregate principal
amount of Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America
Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E
(Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together
with the Series 2010D Bonds, the "Bonds").

        The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution,
adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented
prior to the date hereof (the "General Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond
Resolution fixing the terms of the Series 2010D Bonds, and a Sixteenth Supplemental Sales Tax Revenue
Bond Resolution fixing the terms of the Series 2010E Bonds (collectively, the "Bond Resolution," the
General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the
Board of Directors of the Corporation on June 24, 2010. Capitalized terms used herein and not otherwise
defined shall have the meanings ascribed thereto in the Resolution.

        From such examination, and having regard to legal questions we deem relevant, we are of the
opinion that:

        1.      Interest on the Bonds is exempt from Puerto Rico income, sales, use and withholdings
taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal
Revenue Code of 1994, as amended (the "P.R. Code").

        2.      The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act
of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the
Municipal License Tax Act of 1974, as amended.

PR-INT-000014330

3.    The transfer of the Bonds by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made. The transfer of the Bonds by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico. The transfer of the Bonds by any means will not be subject to Puerto Rico sales and use taxes.

4.    Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico.

5.    The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

6.    Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

7.    Based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)    Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(b)    Interest received, or original issue discount accrued, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico and such interest or original issue discount is not effectively connected or treated as effectively connected with the conduct of a trade or business in the United States by such corporation, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(c)    Gain on the sale of the Bonds derived by an individual who is a bona fide resident of Puerto Rico within the meaning of Section 937 of the U. S. Code during the entire taxable year of the sale and during the ten years preceding the year of the sale who does not hold the Bonds as

D-2

inventory will be excludable from gross income for purposes of the U.S. Code under Section 933(1) thereof; provided that if the individual was not a bona fide resident of Puerto Rico during the entire ten year period preceding the year of the sale the individual may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the U.S. Code.

(d)    Gain on the sale of the Bonds derived by a Puerto Rico Corporation will not be subject to United States federal income tax provided such gain is not effectively connected or treated as effectively connected with the conduct of a trade or business by such Puerto Rico Corporation in the United States and such corporation is not treated as a domestic corporation for purposes of the U.S. Code.

Prospective owners of the Bonds should be aware that the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," or "passive foreign investment companies," as such terms are defined in the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1)    These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service,

(2)    These statements were written in connection with the promotion or marketing of the Bonds; and

(3)    Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

This opinion is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated June 24, 2010 in connection with the Bonds. We further consent to the reference made to us under the captions "Tax Matters" and "Legal Matters" in said Official Statement.

We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

Respectfully submitted,

CONFIDENTIAL

PR-INT-000014332

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

# BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

E-2

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

E-3

PR-INT-000014336

Case:17-03283-LTS Doc#:370-13 Filed:02/24/18 Entered:02/24/18 20:14:26 Desc:
Exhibit 14 Part 2 Page 284 of 286

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL
PR-INT-000014337

Exhibit 14 Part 2 Page 285 of 287

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-INT-000014338

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-INT-000014339



Printed by: ImageMaster, Inc.

CONFIDENTIAL

PR-INT-000014340

# Exhibit 15

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):

|  | |
|---|---|
| S&P: | A+ |
| Moody's: | A1 |
| Fitch: | A+ |

$182,190,000

# Puerto Rico Sales Tax Financing Corporation

$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

**Dated:** Date of Delivery                                **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010D Bonds, the "Offered Bonds"), to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes described herein. Concurrently with the issuance of the Offered Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds" and, together with the Offered Bonds, the "Series 2010 Bonds"). The Series 2010C Bonds are being offered for sale in the United States under a separate Official Statement. The Offered Bonds are being sold solely in Puerto Rico and their issuance is not contingent upon the issuance of the Series 2010C Bonds.

**The Series 2010 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2010 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The Series 2010 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See _Appendix B – Summary of Certain Definitions and Provisions of the Resolution._**

The Offered Bonds have the following characteristics:

- The Offered Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount and integral multiples thereof.

- The Offered Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Offered Bonds on the records of The Depository Trust Company and its participants.

- Interest on the Offered Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on November 1, 2010. The inside cover page of this Official Statement contains information concerning the maturity, interest rate, and price of the Offered Bonds.

- The Offered Bonds are subject to redemption, commencing on August 1, 2015, as described herein. Upon the occurrence of an Extraordinary Event, the Corporation may choose to redeem the Offered Bonds at par. See _Extraordinary Redemption_ under THE OFFERED BONDS.

- This cover page contains information for quick reference only. It is _not_ a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision. Prospective investors should consider the information set forth in RISK FACTORS before investing.

- In the opinion of Special Puerto Rico Tax Counsel, under existing statutes, the Offered Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Offered Bonds will be exempt from United States income taxes to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. See TAX MATTERS herein. The Corporation has determined, based on the advice of counsel, that interest on the Offered Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Offered Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico.

- The Offered Bonds will be dated their date of delivery and are expected to be delivered through The Depository Trust Company on or about June 30, 2010.

**The Offered Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Offered Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

_The Offered Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel._

## Santander Securities          Popular Securities          UBS Financial Services Incorporated of Puerto Rico

| | | | | |
|---|---|---|---|---|
| Barclays Capital | BBVAPR MSD | BofA Merrill Lynch | Citi | FirstBank Securities |
| Oriental Financial Services | Raymond James | Samuel A. Ramirez & Co. | | Wells Fargo Securities, LLC |

June 24, 2010

PR-CCD-0011145

**$182,190,000**

**Puerto Rico Sales Tax Financing Corporation**

$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

**Series 2010D Bonds**

| Maturity August 1 | Amount | Interest Rate | Price | CUSIP Numbers[*] |
|---|---|---|---|---|
| 2042 | $89,435,000 | 5.75% | 100% | 74529JLD5 |

**Series 2010E Bonds**

| Maturity August 1 | Amount | Interest Rate | Price or Yield | CUSIP Numbers[*] |
|---|---|---|---|---|
| 2042 | $92,755,000 | 5.75% | 100% | 74529JLE3 |

[*] Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

PR-CCD-0011146

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Offered Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Offered Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Offered Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Offered Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Offered Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

PR-CCD-0011147

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0011148

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1
   The Corporation ............................................................ 1
   Sales and Use Tax .......................................................... 2
   Dedicated Sales Tax Fund .............................................. 2
   The Resolution ............................................................... 2
   Outstanding Bonds and Parity Obligations .................. 3
   Source of Payment and Security for the Bonds ............ 4
PLEDGED SALES TAX ....................................................... 5
   Commonwealth Sales Tax Revenues ............................ 5
   Commonwealth Sales Tax Collections and Projections .. 6
   Collections by Source .................................................... 9
   Economic Indicators .................................................... 10
   Dedicated Sales Tax Fund ............................................ 12
   Pledged Sales Tax Base Amount ................................. 12
   Procedures for the Collection and Deposit of the Pledged
      Sales Tax in the Dedicated Sales Tax Fund ............. 14
   Commonwealth Sales Tax Enforcement Initiatives ........ 16
THE OFFERED BONDS ..................................................... 18
   General ......................................................................... 18
   Redemption .................................................................. 18
   Use of Federal Subsidy Received with Respect to the
      Offered Bonds .......................................................... 19
   Book-Entry Only System .............................................. 20
SECURITY FOR THE BONDS ............................................ 20
   General ......................................................................... 20
   Commonwealth Non-Impairment Covenant ................ 21
   Property Pledged for the Payment of the Offered Bonds .. 21
   Outstanding Bonds and Parity Obligations .................. 22
   Subordination Provisions of the First Subordinate Bonds 23
   Funds and Accounts under the Resolution ................... 23
   Additional Bonds, Refunding Bonds and Other
      Obligations ............................................................... 26
   Commonwealth's Authority to Cover Deficiencies ......... 28
RISK FACTORS ................................................................. 29
   Economic Conditions Could Affect Commonwealth Sales
      Tax Revenues ........................................................... 29
   Legislative Assembly Authority over the Commonwealth
      Sales Tax .................................................................. 29
   Certain Constitutional Considerations Relating to Act 91 30

**Page**

   Limited Nature of Ratings; Reductions, Suspension or
      Withdrawal of a Rating ............................................ 31
   Limited Nature of Remedies ........................................ 31
   There is no Assurance that a Secondary Market for the
      Offered Bonds will Develop ..................................... 32
AGGREGATE DEBT SERVICE REQUIREMENTS ......... 33
PLAN OF FINANCING ...................................................... 36
   Overview ....................................................................... 36
   Estimated Sources and Uses of Funds .......................... 36
THE CORPORATION ......................................................... 36
   Other Obligations of the Corporation ........................... 37
TAX MATTERS .................................................................. 37
   Puerto Rico Tax Considerations for Puerto Rico
      Residents .................................................................. 38
   United States Federal Tax Considerations for Puerto Rico
      Residents .................................................................. 39
   Backup Withholding .................................................... 40
   Build America Bonds .................................................... 40
   No Opinion as to Exclusion under Section 103(a) of the
      Code ......................................................................... 40
RATINGS .......................................................................... 41
LEGALITY FOR INVESTMENT ....................................... 41
UNDERWRITING .............................................................. 41
LEGAL MATTERS ............................................................. 42
CONTINUING DISCLOSURE ........................................... 42
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ............................................................................ 43
MISCELLANEOUS ............................................................ 44

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution ......................................... B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel .............................................................. C-1
APPENDIX D – Proposed Form of Opinion of Special Puerto
   Rico Tax Counsel ......................................................... D-1
APPENDIX E – Book-Entry Only System .......................... E-1

PR-CCD-0011149

[THIS PAGE INTENTIONALLY LEFT BLANK]

$182,190,000
# Puerto Rico Sales Tax Financing Corporation
$89,435,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
$92,755,000 Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $182,190,000 Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010D Bonds, the "Offered Bonds"). Concurrently with the issuance of the Offered Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds" and, together with the Offered Bonds, the "Series 2010 Bonds"). The Series 2010C Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Offered Bonds are being sold solely in Puerto Rico and are not contingent upon the issuance of the Series 2010C Bonds. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

The Corporation will issue the Series 2010D Bonds as "Build America Bonds" that are subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the Corporation will receive a subsidy payment from the federal government equal to 35% of the amount of each interest payment on the Series 2010D Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010D Bonds. Under no circumstances will the owners of the Series 2010D Bonds be entitled to a credit against any taxes imposed by the Code as a result of their ownership of the Series 2010D Bonds.

The Corporation will issue the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 45% of the amount of each interest payment on the Series 2010E Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010E Bonds. Under no circumstances will the owners of the Series 2010E Bonds be entitled to a credit against any taxes imposed by the Code as a result of their ownership of the Series 2010E Bonds.

For more information regarding the "Build America Bonds" and "Recovery Zone Economic Development Bonds" designation, see *Use of Federal Subsidy Received with Respect to the Offered Bonds* under THE OFFERED BONDS.

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the

1

Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

**Sales and Use Tax**

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *"Dedicated Sales Tax Fund"* under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See *"Dedicated Sales Tax Fund"* and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

Act 91 provides that any subsidy received by the Corporation under the Build America Bond program be deposited in the Dedicated Sales Tax Fund. See *"Use of Federal Subsidy Received with Respect to the Offered Bonds"* under SECURITY FOR THE BONDS.

**The Resolution**

The Series 2010 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Fourteenth Supplemental Sales Tax Revenue Bond

2

Resolution, which provides for the terms of the Series 2010C Bonds (the "Fourteenth Supplemental Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution"), and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution") (the General Resolution, as amended by the Fourteenth Supplemental Resolution, the Fifteenth Supplemental Resolution, and the Sixteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

## Outstanding Bonds and Parity Obligations

*General*

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of senior and first subordinate bonds. The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds"). The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), and (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010B Bond Anticipation Notes (the "Series 2010B Bonds" and, together with the Series 2009A Bonds, the Series 2009B Bonds, the Series 2010A Bonds, the "Outstanding First Subordinate Bonds").

Concurrently with the issuance of the Offered Bonds, the Corporation is issuing the Series 2010C Bonds in order to repay or refund certain outstanding bonds of the Corporation and for certain other Authorized Uses.

After giving effect to the issuance of the Series 2010 Bonds, the refunding of the bonds to be refunded with the proceeds of the Series 2010C Bonds and the repayment of the Series 2010B Bonds, the Corporation will have $13.4 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.2 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $328.6 million accreted on existing capital appreciation bonds as of June 1, 2010) and $8.3 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $54.9 million accreted on existing capital appreciation bonds as of June 1, 2010).

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

The Corporation routinely explores opportunities to refinance its debt to reduce debt service from time to time. As previously announced, the Corporation is considering the purchase of all or a portion of the Series 2007A Bonds issued as LIBOR-based Adjustable Rate Bonds accompanied by a termination of an equivalent amount of the interest rate exchange agreement related to such Series 2007A Bonds. If the Corporation decides to purchase the Series 2007A Bonds, such purchase would be funded through the issuance of a series of Senior Bonds. No assurance can be given that the Corporation will purchase any of its Outstanding Senior Bonds or terminate any interest rate exchange agreement in connection therewith.

3

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the Series 2010 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the Series 2010 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The Series 2010 Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the Series 2010 Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *"Subordination Provisions of the First Subordinate Bonds"* and *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The Series 2010 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Offered Bonds, the terms of the Offered Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

4

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

5

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 28, 2010, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday will take place during Fiscal Year 2010-2011.

**Commonwealth Sales Tax Collections and Projections**

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* below for a description of the reporting and collections procedures utilized by the Treasury Department. Accordingly, the sales tax reported by the Treasury Department for November 2006 related to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change is effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through May 2010 were approximately $3.86 billion, an average of $93 million per month.

*Fiscal Year 2006-2007.* Commonwealth Sales Tax collections during the seven months of Fiscal Year 2006-2007 (December 2006 through June 2007), when the Commonwealth Sales Tax was first imposed, equaled $617.9 million, or an average of $95.1 million per month (after adjustment for December receipts which were based on 15 days of sales in November). Under the previous reporting method utilized by the Treasury Department, total collections reported attributable to sales made during the seven and one-half months of Fiscal Year 2006-2007 (November 15, 2006 through June 2007) equaled $713.4 million, or an average of $95.1 million per month. Actual collections exceeded the Treasury Department's original projection by $10.3 million, or 1.4%.

*Fiscal Year 2007-2008.* Commonwealth Sales Tax collections during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.1 million per month. Under the previous reporting method utilized by the Treasury Department, total Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2007-2008 equaled $1.14 billion, or an average of $95.3 million per month. Such collections exceeded the Treasury Department's original estimate by $26.3 million, or 2.4%. The Pledged Sales Tax then in effect (1%) totaled $207.9 million, nearly $23 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

6

PR-CCD-0011156

*Fiscal Year 2008-2009.* Commonwealth Sales Tax collections during Fiscal Year 2008-2009 totaled $1.10 billion, or an average of $91.7 million per month. Under the previous reporting method utilized by the Treasury Department, Commonwealth Sales Tax collections reported attributable to sales made during Fiscal Year 2008-2009 would have totaled $1.098 billion, or an average of $91.5 million per month. Such collections were below the Treasury Department's revised estimate of $1.117 billion by $19 million, or 1.7%, and were $46 million, or 4%, below collections for Fiscal Year 2007-2008. The Treasury Department believes that the decline in sales tax collections during Fiscal Year 2008-2009 is due primarily to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown. The Pledged Sales Tax then in effect (1%) totaled $199.6 million, nearly $7.2 million more than the Pledged Sales Tax Base Amount in effect for that Fiscal Year.

*Fiscal Year 2009-2010.* Commonwealth Sales Tax collections during the eleven month period ended May 31, 2010 totaled $999.3 million, or an average of $90.8 million per month. Such collections year-to-date are 0.8% below collections for the same period in Fiscal Year 2008-2009. The Treasury Department believes that this decline is due primarily to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions. The Treasury Department's current estimate for total Commonwealth Sales Tax collections of Fiscal Year 2009-2010 is $1.098 billion.

*Fiscal Year 2010-2011.* Commonwealth Sales Tax revenue projections for Fiscal Year 2010-2011 are $1.194 billion, or an average of $99.5 million per month. This projection represents an increase of 8.7% compared to estimated collections for Fiscal Year 2009-2010. This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives."* The first phase of this system is expected to be operational in November 2010. Whether sales tax collections meet this estimate is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2010-2011, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See *"Economic Conditions could affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010. Under the new reporting method, which is effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer. Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer. To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

PR-CCD-0011157

## Sales and Use Tax – Collection History by Month
### (Dollars in Thousands)

| | Fiscal Year | | | |
| | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 |
|---|---|---|---|---|
| July | - | $ 95,460 | $ 97,526 | $94,382 |
| August | - | 96,100 | 95,592 | 88,000 |
| September | - | 90,181 | 91,353 | 84,100 |
| October | - | 86,163 | 77,788 | 83,775 |
| November | - | 93,751 | 86,191 | 85,120 |
| December | $ 50,200[1] | 96,170 | 91,996 | 95,075 |
| January | 110,000 | 121,251 | 119,836 | 118,476 |
| February | 95,000 | 89,798 | 85,763 | 88,942 |
| March | 86,200 | 86,486 | 84,608 | 82,538 |
| April | 96,400 | 89,355 | 88,065 | 93,415 |
| May | 85,700 | 93,487 | 88,788 | 85,469 |
| June | 94,400 | 103,331 | 93,302 | |

[1] Reflects collections for sales made between November 15 and November 30. The sales tax became effective on November 15, 2006.

Source: Treasury Department



Source: Treasury Department

PR-CCD-0011158

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2008-2009 (actual receipts by the Treasury Department from August 2008 thru July 2009). Of the $1.098 billion in collections (under the previous reporting method utilized by the Treasury Department), approximately 51% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 12% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3.9% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2008-2009**

Source: Treasury Department

PR-CCD-0011159

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

**Compounded Annual Growth Rates for
Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
| | | | Services | Non-Durable Goods | Durable Goods |
|---|---|---|---|---|---|
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.73% | 4.90% | 5.93% | 4.76% | 0.85% |
| 1947-2009 | 7.75% | 7.64% | 8.87% | 6.73% | 8.07% |

Source: Planning Board

**Historical Components of Personal Consumption Expenditures and GNP**
(Measured in Current Dollars)

Source: Government Development Bank

PR-CCD-0011160

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.8% during this period.

**Personal Consumption Expenditures and GNP**
(Current Dollars)



Source: Government Development Bank

**Personal Consumption Expenditures and GNP**
(Constant Dollars)



Source: Government Development Bank

11

PR-CCD-0011161

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $13.1 billion in Fiscal Year 2008-2009, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 23.6% of personal consumption expenditures in Fiscal Year 2008-2009 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 is $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

PR-CCD-0011162

The following table shows the growth of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

**Annual Pledged Sales Tax Base Amount**

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

13

PR-CCD-0011163

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day,[*] the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been

---

[*] Prior to December 2009 the return was due on the 20th day of the month.

PR-CCD-0011164

deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1)    Includes 1.5% Municipal Sales Tax.
(2)    Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. Certain large merchants and retailers are required to file their return electronically. As of May 2010, the Treasury Department reports that 86.9% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of March 2010, 225,915 merchants and retailers were required to file a monthly return, out of which 61,014 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants'

15

PR-CCD-0011165

Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 31% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

## Commonwealth Sales Tax Enforcement Initiatives

The Treasury Department has announced various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, the Treasury Department is estimated to collect approximately 52% of the potential Commonwealth Sales Tax revenues. The Treasury Department estimates that it will collect in Fiscal Year 2010-2011 an additional $96 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has collected approximately $26.5 million in connection with 59 cases. In May 2010, the Treasury Department began a letter campaign to promote the use of the voluntary disclosure program. The Treasury Department has sent approximately 2,000 of these letters and expects to send approximately 1,000 letters a week.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department is in the process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby Treasury Department officers use hand-held scanning devices to cross-check merchant licenses with sales tax receipts. As a result of these initiatives, the Treasury Department has collected approximately $10.3 million in fines and penalties attributable to non-compliance with legal and regulatory requirements related to the sales tax.

The Treasury Department is focusing its efforts to increase sales tax revenues by improving compliance in retail transactions. To this end, the Treasury Department undertook a request for proposals procurement process and selected a vendor to provide a new point-of-sale electronic system that would strengthen its enforcement efforts. The system was designed to (i) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets and (ii) transmit on a daily basis information regarding all sales tax transactions to the Treasury Department. This point-of-sale system, which would be provided to the majority of merchants free of charge, would also have wireless capabilities in order to capture sales by street vendors. The Treasury Department's vendor selection process was delayed by a temporary restraining order issued by the Puerto Rico Court of Appeals in connection with a challenge filed by a losing bidder. On December 11, 2009, the challenge was dismissed and the temporary restraining order was lifted. On March 12, 2010, the Treasury Department published a revised request for proposals and on May 5, 2010 received proposals from interested vendors. The Treasury Department is currently reviewing the submitted proposals and expects to select a vendor in June 2010 and have a contract in place by July 2010. The first phase of the point-of-sale system is expected to be implemented by November 2010.

16

PR-CCD-0011166

The Treasury Department is also focused on strengthening its enforcement workforce. It has equipped a call center to be staffed by 150 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. Currently, there are 714 cases under audit and, from July 2009 through April 2010, the Audit Bureau has completed 214 audits and assessed approximately $7.9 million in deficiencies. The Treasury Department expects to conclude approximately 270 additional audits by July 2010.

The Treasury Department is also increasing staffing levels in its Enforcement and Compliance Bureaus by approximately 500 employees (including the 150 tax collection agents assigned to the call center mentioned in the previous paragraph), which should enable it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants and currently makes approximately 2,000 visits per month.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan and Caguas and is currently working with five other municipalities that have expressed interest in entering into similar agreements. In April 2010, the Treasury Department began joint interventions with the municipality of San Juan. These efforts have resulted in 336 visits to merchants and the imposition of $36,000 in fines. In May 2010, the Treasury Department began joint interventions with the municipality of Caguas.

There can be no assurance that the Treasury Department's announced enforcement initiatives will be fully implemented or that, if implemented, they will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

PR-CCD-0011167

## THE OFFERED BONDS

**General**

The Offered Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $182,190,000. The Offered Bonds will be issued in the principal amounts, bearing interest at the rates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement. Interest on the Offered Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1, until maturity (or earlier redemption), commencing on November 1, 2010.

The Offered Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof. Interest on the Offered Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Offered Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Offered Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Offered Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See *"Book-Entry Only System"* below.

The Corporation may issue additional bonds that are senior to the Series 2010 Bonds for the purposes described in *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

**Redemption**

*Optional Redemption of the Offered Bonds.* The Offered Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2015, at the redemption prices set forth below, plus accrued interest to the date fixed for redemption:

| Redemption Period | Redemption Price |
|---|---|
| August 1, 2015 through July 31, 2016 | 101.00 |
| August 1, 2016 through July 31, 2017 | 100.50 |
| August 1, 2017 and thereafter | 100.00 |

*Extraordinary Redemption.* The Offered Bonds are subject to redemption at the option of the Corporation prior to their maturity, in whole or in part, upon the occurrence of an Extraordinary Event (defined below), at a redemption price equal to the principal amount of the Offered Bonds to be redeemed plus accrued interest to the redemption date, without premium. An "Extraordinary Event" will have occurred if the Corporation determines that a material adverse change has occurred to Section 54AA or 6431 (or 1400U-2 in the case of the Series 2010E Bonds) of the Code (as such Sections were added by Section 1531 of the American Recovery and Reinvestment Act of 2009, pertaining to "Build America Bonds") or there is any guidance published by the Internal Revenue Service or the United States Treasury with respect to such Sections or any other determination by the Internal Revenue Service or the United States Treasury, which determination is not the result of any act or omission by the Corporation to satisfy the requirements to qualify to receive the federal subsidy from the United States Treasury, pursuant to which the federal subsidy from the United States Treasury is reduced or eliminated.

18

PR-CCD-0011168

*Notice of Redemption.* In the event any Offered Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Offered Bonds as described above, to the registered owners of the Offered Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Offered Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Offered Bonds or portions thereof so called for redemption at the place or places of payment, such Offered Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Offered Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Offered Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Offered Bonds, and the portions of the Offered Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Offered Bonds or portions thereof to be redeemed will cease to bear interest.

Any notice of optional redemption of Offered Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of and interest on the Offered Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Offered Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of and premium, if any, and interest on the Offered Bonds (or portions thereof) to be redeemed, then the Offered Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest, and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Use of Federal Subsidy Received with Respect to the Offered Bonds**

The Corporation will irrevocably designate the Series 2010D Bonds as "Build America Bonds" subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 35% of the amount of each interest payment on the Series 2010D Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010D Bonds. The Corporation will use this subsidy exclusively to pay interest on the Series 2010D Bonds. **No assurance can be given by the Corporation of the receipt of such cash subsidy payments. The Corporation is obligated to make payments of the principal of and interest on the Series 2010D Bonds whether or not it receives such subsidy payments.**

The Corporation will irrevocably designate the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" pursuant to Sections 1400U-2 and 6431 of the Code and as "Qualified Bonds" pursuant to Section 54AA(g) of the Code, subject to U.S. income taxes (except to bona fide residents of Puerto Rico and Puerto Rico corporations to the extent described herein). Upon compliance with

PR-CCD-0011169

certain requirements of the Code, the Corporation will receive a subsidy payment from the federal government equal to 45% of the amount of each interest payment on the Series 2010E Bonds. This subsidy will be paid directly to the Corporation and not to the holders of the Series 2010E Bonds. The Corporation will use this subsidy exclusively to pay interest on the Series 2010E Bonds. **No assurance can be given by the Corporation of the receipt of such cash subsidy payments. The Corporation is obligated to make payments of the principal of and interest on the Series 2010E Bonds whether or not it receives such subsidy payments.**

The subsidy payments for the Series 2010D Bonds and the Series 2010E Bonds constitute Build America Bond Tax Credit Receipts under the Resolution and shall be deposited when received to the credit of the related Debt Service Account relating to the Series 2010D Bonds and the Series 2010E Bonds. In addition, the Build America Bond Tax Credit Receipts factor into the calculation of the additional bonds tests described herein in *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

The Corporation has no obligation to the owners or prospective purchasers of the Offered Bonds to maintain the status of the Offered Bonds as Build America Bonds. The Code imposes certain requirements that must be met subsequent to the issuance and delivery of the Offered Bonds in order for the Corporation to receive the cash subsidy payments. If the Corporation does not comply with these requirements, the Corporation may not be entitled to receive the cash subsidy payments.

### Book-Entry Only System

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Offered Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Offered Bonds; (ii) confirmation of ownership interest in the Offered Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Offered Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Offered Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Offered Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Offered Bonds. See *Appendix E - Book-Entry Only System*.

### SECURITY FOR THE BONDS

### General

Pursuant to the Resolution, the Offered Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Offered Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Offered Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Offered Bonds.

20

## Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Offered Bonds or provides credit enhancement, sources of payment or liquidity for such Offered Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Offered Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Offered Bonds or provides credit enhancement, sources of payment or liquidity for such Offered Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

## Property Pledged for the Payment of the Offered Bonds

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2010 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of

PR-CCD-0011171

the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee. Revenues include the subsidy payments received under the Build America Bonds program.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

## Outstanding Bonds and Parity Obligations

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of Senior and First Subordinate Bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.2 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

After the issuance of the Series 2010 Bonds, the refunding of the bonds to be refunded with the proceeds of the Series 2010C Bonds and the repayment of the Series 2010B Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $8.3 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued pursuant to the Fifteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, and (vi) the Series 2010E Bonds, issued pursuant to

PR-CCD-0011172

the Sixteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010.

**Subordination Provisions of the First Subordinate Bonds**

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited into the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2) to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3) to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

23

PR-CCD-0011173

(4)     to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5)     to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

(6)     if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2) and (4) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a)     to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b)     at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest

24

component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):

PR-CCD-0011175

```
┌─────────────────────────────────────────────┐
│         Bond Trustee-Held Revenue Account     │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│              COFINA Operating Expenses        │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│        Senior Bonds and Parity Obligations    │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│         Senior Bond Debt Service Reserve*     │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│       First Subordinate Bonds and Obligations │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│        First Subordinate Debt Service Reserve*│
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│     Until Accrued 12/15-Month Obligation is Funded│
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│   Other Payments for Credit and Liquidity     │
│   Facilities and Qualified Hedges             │
└─────────────────────────────────────────────┘
                      ↓
┌─────────────────────────────────────────────┐
│   As Directed by the Corporation, including   │
│   Release from Resolution Lien                │
└─────────────────────────────────────────────┘
```

*No Debt Service Reserve deposit requirement currently exists.

## Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest

26

available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

*Additional Requirements — Senior Bonds and Parity Obligations*

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the

27

debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D.    *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

28

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Offered Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Offered Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Offered Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Offered Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Offered Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information.* There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable

29

security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2010 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2010 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, a prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion. On June 18, 2009, in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A, the prior Secretary of Justice also issued an opinion (the "2009 Opinion") reaching substantially the same conclusion. On February 9, 2010, in connection with the issuance of the Series 2010A Bonds, the current Secretary of Justice issued an opinion (the "2010A Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2010 Opinion, the 2010A Opinion, the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the

PR-CCD-0011180

constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2010 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2010 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Offered Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Offered Bonds on their respective maturity or mandatory redemption dates. Any rating of the Offered Bonds is not a recommendation to purchase, hold or sell such Offered Bonds and such rating will not address the marketability of such Offered Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Offered Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Offered Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "Subordination Provisions of the Bonds" under SECURITY FOR THE BONDS. In the event the owners of the Offered Bonds shall be entitled to declare a default, the payment of the Offered Bonds by the Corporation cannot be accelerated, except for the application

PR-CCD-0011181

of funds held by the Trustee for the benefit of the holders of the Offered Bonds on the date such default is declared.

**There is no Assurance that a Secondary Market for the Offered Bonds will Develop**

The Offered Bonds are a new issue of securities. There is no assurance that a secondary market for the Offered Bonds will develop, or if it does develop, that it will provide the holders of the Offered Bonds with liquidity for their investment or that it will continue for the life of the Offered Bonds. Although the Underwriters have advised the Corporation that they presently intend to make a market for the Offered Bonds as permitted by applicable laws, the Underwriters are not obligated to do so and any such market making may be discontinued at any time at the sole discretion of the Underwriters.

PR-CCD-0011182

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Series 2010D Bonds, the Series 2010E Bonds, the Series 2010C Bonds, the Outstanding Senior Bonds and Parity Obligations, and the Outstanding First Subordinate Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding First Parity Obligations[1] | Payments on Outstanding First Subordinate Bonds[1] | Series 2010C Bonds Total Debt Service[2] | Series 2010D Bonds Principal | Series 2010D Bonds Interest[3] | Series 2010D Bonds Debt Service[3] | Series 2010E Bonds Principal | Series 2010E Bonds Interest[4] | Series 2010E Bonds Debt Service[4] | Total Annual Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $ 177,212,926 | $ 279,924,660 | | - | - | - | - | - | - | $ 457,137,606 |
| 2011 | 177,212,926 | 312,474,471 | $ 50,020,729 | - | 3,630,471 | $ 3,630,471 | - | $ 3,185,973 | $ 3,185,973 | 546,524,570 |
| 2012 | 177,212,926 | 290,039,858 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 555,944,075 |
| 2013 | 177,212,926 | 312,474,471 | 62,197,924 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 558,161,331 |
| 2014 | 177,212,926 | 312,474,471 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 578,378,688 |
| 2015 | 177,212,926 | 323,774,471 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 589,678,688 |
| 2016 | 177,212,926 | 356,755,721 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 622,659,938 |
| 2017 | 177,212,926 | 387,650,991 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 653,555,208 |
| 2018 | 177,212,926 | 415,938,716 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 681,842,933 |
| 2019 | 177,212,926 | 442,355,091 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 708,259,308 |
| 2020 | 177,212,926 | 473,736,310 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 739,640,527 |
| 2021 | 177,212,926 | 446,202,429 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 712,106,646 |
| 2022 | 181,942,926 | 453,621,129 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 724,255,346 |
| 2023 | 184,113,226 | 472,437,354 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 745,241,871 |
| 2024 | 259,097,926 | 495,054,504 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 842,843,721 |
| 2025 | 304,651,226 | 525,168,254 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 918,510,771 |
| 2026 | 319,309,926 | 539,331,389 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 947,332,606 |
| 2027 | 333,337,426 | 562,539,524 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 984,568,241 |
| 2028 | 352,878,526 | 612,787,641 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,054,357,458 |
| 2029 | 369,740,487 | 622,172,909 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,080,604,687 |
| 2030 | 387,153,667 | 633,673,101 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,109,518,059 |
| 2031 | 404,688,595 | 664,486,114 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,157,866,000 |
| 2032 | 422,921,795 | 697,241,714 | 82,415,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,208,854,800 |
| 2033 | 441,880,695 | 695,520,776 | 108,985,281 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,252,662,762 |
| 2034 | 461,600,180 | 754,512,026 | 81,086,781 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,303,474,997 |
| 2035 | 482,111,345 | 713,232,026 | 155,111,781 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,356,731,162 |
| 2036 | 503,444,330 | 739,260,799 | 164,145,531 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,413,126,670 |
| 2037 | 486,103,395 | 740,138,221 | 192,203,806 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,424,721,432 |
| 2038 | 507,593,361 | 551,394,076 | 418,477,725 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,483,741,172 |
| 2039 | 142,560,982 | 578,810,856 | 444,915,325 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,172,563,173 |
| 2040 | 140,477,975 | 518,962,675 | 534,391,925 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,200,128,585 |
| 2041 | 673,482,975 | 559,393,000 | 511,498,200 | - | 3,342,633 | 3,342,633 | - | 2,933,377 | 2,933,377 | 1,750,650,185 |
| 2042 | 700,472,975 | 700,214,900 | 157,687,500 | $89,435,000 | 3,342,633 | 92,777,633 | $92,755,000 | 2,933,377 | 95,688,377 | 1,746,841,385 |
| 2043 | 728,542,975 | 197,750,000 | - | - | - | - | - | - | - | 926,292,975 |
| 2044 | 757,732,975 | 186,375,000 | - | - | - | - | - | - | - | 944,107,975 |
| 2045 | 788,097,975 | - | - | - | - | - | - | - | - | 788,097,975 |
| 2046 | 819,672,975 | - | - | - | - | - | - | - | - | 819,672,975 |
| 2047 | 852,507,975 | - | - | - | - | - | - | - | - | 852,507,975 |
| 2048 | 886,663,066 | - | - | - | - | - | - | - | - | 886,663,066 |
| 2049 | 922,181,201 | - | - | - | - | - | - | - | - | 922,181,201 |
| 2050 | 959,121,096 | - | - | - | - | - | - | - | - | 959,121,096 |
| 2051 | 997,538,585 | - | - | - | - | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | - | - | - | - | 1,198,845,475 |
| Total | $24,716,967,424 | $17,535,530,699 | $4,529,028,135 | $89,435,000 | $107,252,098 | $196,687,098 | $92,755,000 | $94,120,656 | $186,875,656 | $47,165,089,004 |

(1) Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion is capitalized in years 2010 and 2012.
(2) These figures are reduced by the interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 but include accreted interest on Capital Appreciation Bonds.
(3) These figures are reduced by the 35% Build America Bonds subsidy.
(4) These figures are reduced by the 45% Recovery Zone Economic Development Bonds subsidy.

PR-CCD-0011183

## Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2010[5] | $1,097,791,960 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,141,707,799 | 177,212,926 | 369,311,645 | 546,524,570 | 2.09 |
| 2012 | 1,187,380,355 | 204,756,582 | 378,731,149 | 583,487,731 | 2.03 |
| 2013 | 1,234,879,898 | 225,879,593 | 380,948,406 | 606,827,998 | 2.03 |
| 2014 | 1,284,279,510 | 229,935,655 | 401,165,763 | 631,101,417 | 2.03 |
| 2015 | 1,335,655,194 | 243,877,713 | 412,465,763 | 656,343,476 | 2.03 |
| 2016 | 1,389,085,995 | 237,150,313 | 445,447,013 | 682,597,326 | 2.03 |
| 2017 | 1,444,654,121 | 233,562,213 | 476,342,283 | 709,904,496 | 2.03 |
| 2018 | 1,502,445,065 | 233,667,213 | 504,630,008 | 738,297,221 | 2.03 |
| 2019 | 1,562,547,743 | 236,782,213 | 531,046,383 | 767,828,596 | 2.03 |
| 2020 | 1,625,054,625 | 236,117,213 | 562,427,601 | 798,544,814 | 2.03 |
| 2021 | 1,690,061,882 | 295,597,213 | 534,893,720 | 830,490,933 | 2.03 |
| 2022 | 1,757,669,531 | 321,395,613 | 542,312,420 | 863,708,033 | 2.03 |
| 2023 | 1,827,981,589 | 337,131,813 | 561,128,645 | 898,260,458 | 2.03 |
| 2024 | 1,901,106,235 | 350,442,913 | 583,745,795 | 934,188,708 | 2.03 |
| 2025 | 1,977,155,975 | 357,700,613 | 613,859,545 | 971,560,158 | 2.03 |
| 2026 | 2,056,247,813 | 382,399,013 | 628,022,680 | 1,010,421,693 | 2.03 |
| 2027 | 2,138,503,438 | 399,604,213 | 651,230,815 | 1,050,835,028 | 2.03 |
| 2028 | 2,224,049,402 | 391,389,213 | 701,478,933 | 1,092,868,146 | 2.03 |
| 2029 | 2,313,017,320 | 425,721,174 | 710,864,200 | 1,136,585,374 | 2.03 |
| 2030 | 2,405,544,075 | 459,686,155 | 722,364,393 | 1,182,050,547 | 2.03 |
| 2031 | 2,501,772,020 | 476,151,882 | 753,177,405 | 1,229,329,287 | 2.03 |
| 2032 | 2,601,849,207 | 492,568,782 | 785,933,005 | 1,278,501,787 | 2.03 |
| 2033 | 2,705,929,608 | 518,855,382 | 810,782,068 | 1,329,637,450 | 2.03 |
| 2034 | 2,814,173,354 | 540,949,867 | 841,874,818 | 1,382,824,685 | 2.03 |
| 2035 | 2,926,746,980 | 563,521,032 | 874,619,818 | 1,438,140,850 | 2.03 |
| 2036 | 3,043,823,686 | 585,979,017 | 909,682,340 | 1,495,661,357 | 2.03 |
| 2037 | 3,165,583,596 | 616,873,082 | 938,618,038 | 1,555,491,120 | 2.03 |
| 2038 | 3,292,214,042 | 641,558,048 | 976,147,811 | 1,617,705,859 | 2.03 |
| 2039 | 3,423,909,848 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 2.03 |
| 2040 | 3,560,873,630 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 2.03 |
| 2041 | 3,703,316,112 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 2.08 |
| 2042 | 3,851,456,444 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 2.17 |
| 2043 | 4,005,522,543 | 728,542,975 | 197,750,000 | 926,292,975 | 4.32 |
| 2044 | 4,165,751,443 | 757,732,975 | 186,375,000 | 944,107,975 | 4.41 |
| 2045 | 4,332,389,659 | 788,097,975 | - | 788,097,975 | 5.50 |
| 2046 | 4,505,693,566 | 819,672,975 | - | 819,672,975 | 5.50 |
| 2047 | 4,685,929,796 | 852,507,975 | - | 852,507,975 | 5.49 |
| 2048 | 4,873,375,645 | 886,666,392 | - | 886,666,392 | 5.49 |
| 2049 | 5,068,319,502 | 922,183,873 | - | 922,183,873 | 5.49 |
| 2050 | 5,271,061,289 | 959,115,612 | - | 959,115,612 | 5.49 |
| 2051 | 5,481,912,928 | 997,537,122 | - | 997,537,122 | 5.49 |
| 2052 | 5,701,198,816 | 1,037,500,321 | - | 1,037,500,321 | 5.49 |
| 2053 | 5,929,256,327 | 1,079,036,134 | - | 1,079,036,134 | 5.49 |
| 2054 | 6,166,436,329 | 1,122,257,975 | - | 1,122,257,975 | 5.49 |
| 2055 | 6,413,103,727 | 1,167,193,604 | - | 1,167,193,604 | 5.49 |
| 2056 | 6,669,638,020 | 1,213,947,975 | - | 1,213,947,975 | 5.49 |
| 2057 | 6,936,433,887 | 1,198,845,475 | - | 1,198,845,475 | 5.78 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

34

PR-CCD-0011184

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.57%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.57% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|------|------|------|------|------|------|
| 2010[5] | $1,097,460,000 | $ 177,212,926 | $ 279,924,660 | $ 457,137,586 | 2.40 |
| 2011 | 1,114,689,971 | 177,212,926 | 369,311,645 | 546,524,570 | 2.04 |
| 2012 | 1,132,190,450 | 204,756,582 | 378,731,149 | 583,487,731 | 1.94 |
| 2013 | 1,149,965,684 | 225,879,593 | 380,948,406 | 606,827,998 | 1.90 |
| 2014 | 1,168,019,987 | 229,935,655 | 401,165,763 | 631,101,417 | 1.85 |
| 2015 | 1,186,357,740 | 243,877,713 | 412,465,763 | 656,343,476 | 1.81 |
| 2016 | 1,204,983,393 | 237,150,313 | 445,447,013 | 682,597,326 | 1.77 |
| 2017 | 1,223,901,467 | 233,562,213 | 476,342,283 | 709,904,496 | 1.72 |
| 2018 | 1,243,116,551 | 233,667,213 | 504,630,008 | 738,297,221 | 1.68 |
| 2019 | 1,262,633,310 | 236,782,213 | 531,046,383 | 767,828,596 | 1.64 |
| 2020 | 1,282,456,479 | 236,117,213 | 562,427,601 | 798,544,814 | 1.61 |
| 2021 | 1,302,590,870 | 295,597,213 | 534,893,720 | 830,490,933 | 1.57 |
| 2022 | 1,323,041,367 | 321,395,613 | 542,312,420 | 863,708,033 | 1.53 |
| 2023 | 1,343,812,934 | 337,131,813 | 561,128,645 | 898,260,458 | 1.50 |
| 2024 | 1,364,910,612 | 350,442,913 | 583,745,795 | 934,188,708 | 1.46 |
| 2025 | 1,386,339,521 | 357,700,613 | 613,859,545 | 971,560,158 | 1.43 |
| 2026 | 1,408,104,861 | 382,399,013 | 628,022,680 | 1,010,421,693 | 1.39 |
| 2027 | 1,430,211,913 | 399,604,213 | 651,230,815 | 1,050,835,028 | 1.36 |
| 2028 | 1,452,666,043 | 391,389,213 | 701,478,933 | 1,092,868,146 | 1.33 |
| 2029 | 1,475,472,700 | 425,721,174 | 710,864,200 | 1,136,585,374 | 1.30 |
| 2030 | 1,498,637,419 | 459,686,155 | 722,364,393 | 1,182,050,547 | 1.27 |
| 2031 | 1,522,165,820 | 476,151,882 | 753,177,405 | 1,229,329,287 | 1.24 |
| 2032 | 1,546,063,614 | 492,568,782 | 785,933,005 | 1,278,501,787 | 1.21 |
| 2033 | 1,570,336,600 | 518,855,382 | 810,782,068 | 1,329,637,450 | 1.18 |
| 2034 | 1,594,990,668 | 540,949,867 | 841,874,818 | 1,382,824,685 | 1.15 |
| 2035 | 1,620,031,802 | 563,521,032 | 874,619,818 | 1,438,140,850 | 1.13 |
| 2036 | 1,645,466,078 | 585,979,017 | 909,682,340 | 1,495,661,357 | 1.10 |
| 2037 | 1,671,299,669 | 616,873,082 | 938,618,038 | 1,555,491,120 | 1.07 |
| 2038 | 1,697,538,844 | 641,558,048 | 976,147,811 | 1,617,705,859 | 1.05 |
| 2039 | 1,724,189,970 | 652,415,669 | 1,030,002,191 | 1,682,417,861 | 1.02 |
| 2040 | 1,751,259,515 | 690,062,663 | 1,059,650,610 | 1,749,713,273 | 1.00 |
| 2041 | 1,778,754,049 | 701,552,975 | 1,077,167,210 | 1,778,720,185 | 1.00 |
| 2042 | 1,806,680,242 | 729,622,975 | 1,046,368,410 | 1,775,991,385 | 1.02 |
| 2043 | 1,835,044,873 | 728,542,975 | 197,750,000 | 926,292,975 | 1.98 |
| 2044 | 1,863,854,825 | 757,732,975 | 186,375,000 | 944,107,975 | 1.97 |
| 2045 | 1,893,117,090 | 788,097,975 | - | 788,097,975 | 2.40 |
| 2046 | 1,922,838,767 | 819,672,975 | - | 819,672,975 | 2.35 |
| 2047 | 1,953,027,071 | 852,507,975 | - | 852,507,975 | 2.29 |
| 2048 | 1,983,689,327 | 886,666,392 | - | 886,666,392 | 2.24 |
| 2049 | 2,014,832,977 | 922,183,873 | - | 922,183,873 | 2.18 |
| 2050 | 2,046,465,577 | 959,115,612 | - | 959,115,612 | 2.13 |
| 2051 | 2,078,594,805 | 997,537,122 | - | 997,537,122 | 2.08 |
| 2052 | 2,111,228,457 | 1,037,500,321 | - | 1,037,500,321 | 2.03 |
| 2053 | 2,144,374,454 | 1,079,036,134 | - | 1,079,036,134 | 1.99 |
| 2054 | 2,178,040,837 | 1,122,257,975 | - | 1,122,257,975 | 1.94 |
| 2055 | 2,212,235,779 | 1,167,193,604 | - | 1,167,193,604 | 1.90 |
| 2056 | 2,246,967,576 | 1,213,947,975 | - | 1,213,947,975 | 1.85 |
| 2057 | 2,282,244,658 | 1,198,845,475 | - | 1,198,845,475 | 1.90 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,040 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Senior Bonds in 2012 to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminate an interest rate swap agreement. Debt service is net of capitalized interest.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the Series 2010 Bonds. Debt service is net of capitalized interest.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2010 are assumed to be equal to Fiscal Year 2008-2009 collections of $1,098,000,000 with no escalation.

35

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2009, the average annual growth rate in personal consumption expenditures (nominal) was 7.64%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 5.03%. During Fiscal Year 2009, which constitutes the third consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 1.8% while Commonwealth Sales Tax revenues decreased by 3.6% as compared to Fiscal Year 2008.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Offered Bonds, together with other funds available to the Corporation, to (i) repay certain of its outstanding obligations, (ii) provide funds to the Commonwealth for the Authorized Uses, and (iii) pay the cost of issuance of the Offered Bonds. The Corporation will designate the Series 2010D Bonds as "Build America Bonds" under Section 54AA of the Code, and elect under Code Section 54AA(g) to receive a cash subsidy from the United States Treasury equal to 35% of the stated interest paid on such bonds as provided in Code Section 6431. The Corporation will designate the Series 2010E Bonds as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" pursuant to Sections 1400U-2 and 6431 of the Code and as "Qualified Bonds" under Section 54AA(g) of the Code, and elect under Code Section 54AA(g) to receive a cash subsidy from the United States Treasury equal to 45% of the stated interest paid on such bonds as provided in Code Sections 1400U-1 and 6431.

### Estimated Sources and Uses of Funds

| Sources | |
|---|---|
| Principal Amount of the Offered Bonds | $182,190,000.00 |
| **Total Sources** | $182,190,000.00 |
| | |
| **Uses** | |
| Deposit to the Project Fund | $178,768,599.74 |
| Underwriters' Discount and Other Costs of Issuance[1] | 3,421,400.26 |
| **Total Uses** | $182,190,000.00 |

[1] Includes legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

36

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation | Expiration of Term |
| --- | --- | --- |
| Carlos M. García | President, Government Development Bank | September 23, 2010 |
| Marcos Rodríguez-Ema | Governor's Chief of Staff | September 23, 2011 |
| Manuel H. Dubón | Attorney | September 23, 2012 |
| Pedro Ray | Engineer | September 23, 2011 |
| Juan E. Rodríguez-Díaz | Attorney | September 23, 2012 |
| Agnes B. Suárez | Businesswoman | September 23, 2010 |
| Angel A. Fullana Olivencia | Engineer | September 23, 2010 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. Fernando L. Batlle, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Victor Feliciano, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mr. Jorge A. Rivera, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## Other Obligations of the Corporation

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of December 31, 2009, the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution.

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Mendez & Alvarez LLP, Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Offered Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Puerto Rico Tax Counsel*.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Offered Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and**

PR-CCD-0011187

conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

**Puerto Rico Tax Considerations for Puerto Rico Residents**

In the opinion of Pietrantoni Mendez & Alvarez LLP, based on the laws of Puerto Rico now in force:

1.     Interest on the Offered Bonds is exempt from Puerto Rico income, sale, use and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2.     The Offered Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3.     The transfer of the Offered Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made, (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico, and (iii) any means will not be subject to Puerto Rico sales and use taxes;

4.     Gain recognized from the sale or exchange of an Offered Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico;

5.     The Offered Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6.     Interest on the Offered Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Offered Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the Offered Bonds, including but not limited to financial institutions, should be aware that ownership of the Offered Bonds may result in having a portion of their interest and other expenses attributable to interest on the Offered Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

PR-CCD-0011188

## United States Federal Tax Considerations for Puerto Rico Residents

Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Offered Bonds. Each prospective purchaser of the Offered Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Offered Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Offered Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Offered Bonds under state, local or foreign tax laws.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a bona fide resident of Puerto Rico, within the meaning of Section 937 of the Code, during the entire taxable year. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

*Interest on the Offered Bonds.* Interest on the Offered Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a Puerto Rico U. S. Holder during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to section 933(1) thereof.

Interest on the Offered Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation and such corporation is not treated as a domestic corporation for purposes of the Code.

*Sale or Retirement of Offered Bonds.* In general, pursuant to the provisions of Section 1.937-2 of the Regulations issued under the Code, the source of the income from the disposition of personal property by a Puerto Rico U.S. Holder shall be determined under the rules of Section 865 of the Code. Accordingly, the gain on the sale or exchange of the Offered Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange), recognized by a Puerto Rico U.S. Holder will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under Section 933(1) of the Code, provided, (i) that such Offered Bonds do not constitute inventory in the hands of such individual, and (ii) the Puerto Rico U.S. Holder was a bona fide resident of Puerto Rico for the 10 years preceding the year of the gain. The regulations provide a special rule under which a Puerto Rico U.S. Holder who was not a resident of Puerto Rico for the entire 10 year period preceding the year of the gain may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the Code.

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of the Offered Bonds, provided such gain is not effectively connected or treated as effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and such corporation is not treated as a domestic corporation for purposes of the Code.

PR-CCD-0011189

The opinion of Special Puerto Rico Tax Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the Offered Bonds is limited to the above. Special Puerto Rico Tax Counsel does not express any opinion as to the laws of jurisdictions other than Puerto Rico and the United States federal laws applicable to Puerto Rico, or as to any other laws of any other jurisdiction or compliance therewith by any party.

**Backup Withholding**

Backup withholding of United States federal income tax may apply to payments made in respect of the Offered Bonds to registered owners who are not "exempt recipients" and who fail to provide certain identifying information (such as the registered owner's taxpayer identification number) in the required manner. Generally, individuals are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Payments made in respect of the Offered Bonds to a Puerto Rico U.S. Holder must be reported to the IRS, unless the Puerto Rico U.S. Holder is an exempt recipient or establishes an exemption. A Puerto Rico U.S. Holder can obtain a complete exemption from the backup withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's United States federal income tax provided the required information is furnished to the IRS.

The United States Treasury Department has recently published the General Explanation of the Administration's Fiscal Year 2010 Revenue Proposals (the "Green Book"). Said proposals include extending the information reporting requirement to payments of interest to corporations in excess of $600 per calendar year and requiring backup withholding in certain circumstances not currently contemplated in the Code. As of this date, no bills have been filed at the United States Congress to adopt these proposals.

Prospective owners of the Offered Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," or "passive foreign investment companies," as such terms are defined by the Code.

**Build America Bonds**

The Series 2010D Bonds will be issued as "Build America Bonds" and the Corporation will elect to receive cash subsidy payments from the United States Treasury equal to thirty-five percent (35%) of the interest payable by the Corporation on the Series 2010D Bonds. Under no circumstances will the owners of the Series 2010D Bonds be entitled to a credit against the taxes imposed by the Code. Prospective owners of the Series 2010D Bonds who are not Puerto Rico U.S. Holders should consult their own independent tax advisors regarding the tax consequences of owning the Series 2010D Bonds.

The Series 2010E Bonds will be issued as "Build America Bonds" that are "Recovery Zone Economic Development Bonds" and the Corporation will elect to receive cash subsidy payments from the United States Treasury equal to forty-five percent (45%) of the interest payable by the Corporation on the Series 2010E Bonds. Under no circumstances will the owners of the Series 2010E Bonds be entitled to a credit against the taxes imposed by the Code. Prospective owners of the Series 2010E Bonds who are not Puerto Rico U.S. Holders should consult their own independent tax advisors regarding the tax consequences of owning the Series 2010E Bonds.

**No Opinion as to Exclusion under Section 103(a) of the Code**

The Corporation has determined, based on the advice of counsel, that interest on the Offered Bonds is <u>not</u> excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Offered Bonds are <u>not</u> being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico. Special Puerto Rico Tax Counsel is not

PR-CCD-0011190

opining as to the status of the Offered Bonds for purposes of Section 103(a) of the United States Internal Revenue Code.

## RATINGS

The Offered Bonds have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A1" by Moody's Investors Service ("Moody's), and "A+" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies.

In April 2010, Moody's and Fitch began to recalibrate their ratings of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across their portfolio of rated securities. As a result of this recalibration, the Corporation's First Subordinate Bonds are now rated "A1" instead of "A2" by Moody's with a stable outlook and "A+" instead of "A" by Fitch with a stable outlook. This recalibration, however, does not reflect an improvement in the credit quality or a change in Moody's or Fitch's opinion of the Corporation's credit quality. The recalibration is just an adjustment to denote a comparable level of credit risk as ratings in other sectors.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Offered Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, See *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Offered Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Offered Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $178,996,156.12 reflecting an underwriters' discount of $3,193,843.88, and to reoffer such Offered Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Offered Bonds may be offered and sold to certain dealers (including dealers depositing such Offered Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Offered Bonds if any Offered Bonds are purchased.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Offered Bonds as consideration for their professional services.

PR-CCD-0011191

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Offered Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Offered Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel. The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and Pietrantoni Mendez & Alvarez LLP, San Juan, Puerto Rico, Special Puerto Rico Tax Counsel, are set forth as *Appendix C* and *Appendix D*, respectively, to this Official Statement.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Offered Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a)    within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)    in a timely manner, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Offered Bonds; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Offered Bonds; (11) rating changes; and (12) failure by the Corporation to comply with clause (a) above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Offered Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Offered Bonds, see TAX MATTERS.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Offered Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Offered Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with

PR-CCD-0011192

respect to the Offered Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Offered Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Offered Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Offered Bonds.

43

PR-CCD-0011193

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Offered Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of opinion of Special Puerto Rico Tax Counsel (*Appendix D*), and the summary of the book-entry system for the Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

PUERTO RICO SALES TAX FINANCING
CORPORATION


By:        /s/ Fernando L. Batlle       
Executive Director

44

**APPENDIX A**

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the Commonwealth Sales Tax.

## General

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,967,179 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,374 (420,326 as of July 1, 2009 according to the most recent U.S. Census Bureau estimate).

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5%. For fiscal years 2007 and 2008, Puerto Rico's real gross national product contracted by 1.2% and 2.8%, respectively. For fiscal year 2009, preliminary reports indicate that the real gross national product contracted by 3.7%. In March 2010, the Puerto Rico Planning Board (the "Planning Board") announced that it was projecting a contraction of 3.6% in real gross national product for fiscal year 2010 and an increase of 0.4% in real gross national product for fiscal year 2011.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

## Personal Income

Nominal personal income, both aggregate and per capita, has increased consistently from 1947 to 2009. In fiscal year 2009, aggregate personal income was $59 billion ($49.9 billion in 2005 prices) and personal income per capita was $14,905 ($12,589 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $13.1 billion in fiscal year 2009 ($12.2 billion in fiscal year 2008). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10 billion, or 76% of the transfer payments to individuals in fiscal year 2009 ($9.3 billion, or 73.9%, in fiscal year 2008). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,137.5 | $20,566.2 | $20,702.9 | $20,204.8 | $21,144.9 |
| Government | 8,150.5 | 8,424.2 | 8,584.9 | 8,762.2 | 9,254.2 |
| Other | 1,083.5 | 1,036.7 | 946.4 | 999.4 | 1,122.7 |
| Total Employees' compensation | $29,371.5 | $30,027.1 | $30,234.2 | $30,966.4 | $31,521.8 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,181.0 | 2,241.9 | 2,221.2 | 2,253.3 | 2,285.0 |
| Employers | 3,064.0 | 3,167.1 | 3,074.1 | 3,121.4 | 3,192.8 |
| Total Contributions for social insurance | $5,245.0 | $5,409.0 | $5,295.3 | $5,374.7 | $5,477.8 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,687.0 | 2,832.3 | $2,219.8 | $2,232.2 | $2,246.5 |
| Dividends of domestic corporations | 286.7 | 304.3 | $322.1 | $351.9 | $355.6 |
| Miscellaneous income and dividends received from abroad | 13.4 | 13.4 | 9.9 | 17.1 | 6.6 |
| Rental income of persons | 4,201.8 | 4,387.4 | 5,529.0 | 5,825.5 | 6,747.1 |
| Personal interest income | 2,911.9 | 3,725.1 | 2,820.5 | 2,872.6 | 3,425.1 |
| Total Proprietors' income | $10,100.7 | $11,262.5 | $10,901.3 | $11,299.3 | $12,780.9 |
| | | | | | |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,323.5 | 3,390.7 | 3,569.5 | 3,813.9 | 4,371.3 |
| Federal government | 9,243.7 | 9,725.9 | 10,327.1 | 12,209.3 | 13,057.7 |
| U.S. state governments | 14.9 | 17.6 | 22.7 | 24.1 | 35.6 |
| Business | 1,190.7 | 1,184.9 | 1,741.0 | 2,126.8 | 2,251.8 |
| Other nonresidents | 820.3 | 642.6 | 610.0 | 518.7 | 493.6 |
| Total transfer payments | $14,593.0 | $14,961.8 | $16,270.3 | $18,692.8 | $20,210.0 |
| | | | | | |
| Total Personal Income | $48,820.2 | $50,842.3 | $52,110.4 | $55,583.7 | $58,856.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

PR-CCD-0011196

**Personal Consumption**

During Fiscal Year 2009, at current prices, personal consumption amounted to $55.6 billion, representing an increase of $1 billion, or 1.8%, from Fiscal Year 2008. This increase was based on a 1.5% increase in nondurable goods (40% of personal consumption), 4.2% decrease in durable goods (9% of personal consumption), and 3.2% increase in services (51% of personal consumption). At constant 2005 prices, personal consumption decreased 2.4% from Fiscal Year 2008. These figures are characteristic of an economy in recession, where the most affected category is durable goods.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2005** | **2006** | **2007** | **2008** | **2009**[1] |
| Food | $ 6,535.4 | $ 6,982.2 | $ 7,315.0 | $ 7,925.8 | $ 8,559.8 |
| Alcoholic beverages and tobacco products | 1,739.3 | 1,765.8 | 1,783.1 | 1,705.3 | 1,777.5 |
| Clothing and accessories | 2,957.1 | 3,084.9 | 3,528.0 | 3,568.7 | 3,604.8 |
| Personal care | 815.5 | 984.6 | 1,031.0 | 1,213.4 | 1,281.4 |
| Housing | 7,012.3 | 7,499.7 | 8,065.8 | 8,568.6 | 9,166.7 |
| Household operations | 5,267.9 | 5,929.2 | 6,479.0 | 7,053.6 | 6,997.6 |
| Medical care and funeral expenses | 7,525.9 | 8,007.2 | 8,434.8 | 9,046.7 | 9,453.3 |
| Business services | 3,020.1 | 3,035.5 | 3,103.0 | 3,022.5 | 3,055.5 |
| Transportation | 6,136.4 | 6,325.3 | 6,079.8 | 6,252.5 | 5,509.0 |
| Recreation | 4,547.2 | 4,810.3 | 4,935.0 | 4,997.0 | 4,938.2 |
| Education | 1,627.8 | 1,819.5 | 1,776.6 | 1,788.2 | 1,845.3 |
| Religious and nonprofit organizations, not elsewhere classified | 482.3 | 505.9 | 439.2 | 449.8 | 458.7 |
| Foreign travel | 1,531.9 | 1,608.9 | 1,616.9 | 1,737.8 | 1,631.4 |
| Miscellaneous purchases | 605.8 | 704.1 | 819.5 | 822.0 | 830.0 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $49,804.9 | $53,063.1 | $55,406.7 | $58,151.8 | $59,109.2 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,269.4 | 3,403.1 | 3,457.4 | 3,590.8 | 3,544.6 |
| Total Personal Consumption Expenditures | $46,535.4 | $49,660.0 | $51,949.3 | $54,561.0 | $55,564.6 |

(1) Preliminary figures.
Source: Planning Board.

PR-CCD-0011197

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2009.

### Commonwealth of Puerto Rico
### Gross National Product
### Fiscal Years Ended June 30,

|  | 2005 | 2006 | 2007 | 2008 | 2009[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $53,752 | $56,732 | $59,521 | $61,527 | $62,759 |
| Real gross national product – $ millions (2005 prices) | 53,752 | 54,027 | 53,400 | 51,889 | 49,951 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 1.9% | 0.5% | (1.2)% | (2.8)% | (3.7)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 3.1% | 2.8% | 1.8% | 2.8% | (2.5)% |

[1] Preliminary.
[2] In current dollars.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1995, and the forecast of the growth rate for fiscal year 2011.

A-4

PR-CCD-0011198

**REAL GNP GROWTH RATE**
**(Percent)**



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2010).
\*\* Estimate for U.S. from IHS-Global Insight (Jun-2010).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2009 shown in this Appendix are preliminary until the revised figures are released and the forecast for fiscal year 2010 is revised. Certain information regarding current economic activity is, however, available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the table below and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that provide for an index that highly correlates to Puerto Rico's real gross national product.

As the following graph shows, the month-to-month reduction in the Government Development Bank – Economic Activity Index has begun to stabilize.

A-5

PR-CCD-0011199



*Economic Forecast for Fiscal Years 2010 and 2011*

On March 10, 2010, the Planning Board released its revised gross national product forecast for fiscal year 2010 and its gross national product forecast for fiscal year 2011. The Planning Board revised its gross national product forecast for fiscal year 2010 from a projected growth of 0.7% to a contraction of 3.6%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2010 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2011 projects an increase in gross national product of 0.4% in constant dollars. The forecast, however, did not take into account the activity expected to be generated from funds received or expected to be received by the American Recovery and Reinvestment Act of 2009 ("ARRA"). The Planning Board's forecast for fiscal year 2011 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships.

*Fiscal Year 2009*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 3.7% (an increase of 2.0% in current dollars) over fiscal year 2008. Nominal gross national product was $62.8 billion in fiscal year 2009 ($50 billion in 2005 prices), compared to $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices). Aggregate

A-6

PR-CCD-0011200

personal income increased from $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices) to $59 billion in fiscal year 2009 ($49.9 billion in 2005 prices), and personal income per capita increased from $14,080 in fiscal year 2008 ($12,410 in 2005 prices) to $14,905 in fiscal year 2009 ($12,589 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. Although the situation improved significantly during fiscal year 2009, oil prices remained at relatively high levels and the impact of the increases of previous years were still felt in fiscal year 2009. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2008*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.8% (an increase of 3.4% in current dollars) over fiscal year 2007. Nominal gross national product was $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices), compared to $59.5 billion in fiscal year 2007 ($53.4 billion in 2005 prices). Aggregate personal income increased from $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices) to $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices), and personal income per capita increased from $13,244 in fiscal year 2007 ($12,319 in 2005 prices) to $14,080 in fiscal year 2008 ($12,410 in 2005 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the current contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.2%. Nominal gross national product was $59.5 billion ($53.4 billion in 2005 prices), compared to $56.7 billion in fiscal year 2006 ($54.0 billion in 2005 prices). This represents an increase in nominal gross national product of 4.9%. Aggregate personal income was $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices), as compared to $50.8 billion in fiscal year

A-7

PR-CCD-0011201

2006 ($48.5 billion in 2000 prices), and personal income per capita was $13,244 in fiscal year 2007 ($12,319 in 2005 prices), as compared to $12,970 in fiscal year 2006 ($12,382 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,266,300 for fiscal year 2006. This increase in employment was driven by self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.0% for fiscal year 2006.

## Overview of Fiscal Condition

*Fiscal Condition*

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and expenditures. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenditures significantly exceeding recurring revenues.

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from GDB or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance.

For fiscal year 2009, the estimated deficit was approximately $3.490 billion, consisting of the difference between preliminary revenues (without taking into account a one time accounting adjustment related to the sales and use tax) and estimated expenses for such fiscal year. The estimated deficit is projected to be less than $2.5 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below. The administration projects it will eliminate the deficit by fiscal year 2013.

*Results for Fiscal Year 2009.* Total preliminary General Fund revenues for fiscal year 2009 were $7.673 billion, representing a decrease of $686 million, or 8.2%, from fiscal year 2008 revenues and an increase of $73 million, or 1.0%, over the $7.6 billion revised estimate presented by the administration in February 2009. Total expenses for fiscal year 2009 were approximately $11.250 billion, consisting of budgeted General Fund expenditures of $9.484 billion and approximately $1.766 billion of additional non-budgeted expenses. The difference between preliminary General Fund revenues and total expenses for fiscal year 2009 was principally paid from proceeds of Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym) bond issues pursuant to the fiscal stabilization plan described below.

*Preliminary Results for Fiscal Year 2010 (First Ten Months).* Preliminary General Fund revenues for the first ten months of fiscal year 2010 (from July 2009 through April 2010) were $6.281 billion, a decline of $253.8 million, or 3.9%, from the $6.535 billion of revenues for the same period in the prior fiscal year and a decline of $88 million, or 1.4%, from budgeted revenues of $6.370 billion for the first ten months of fiscal year 2010. As budgeted, the decline in General Fund revenues reflects the reduction in General Fund revenues from the sales and use tax as a result of the allocation of a larger portion of such tax to COFINA (amounting to $353.8 million for the first ten months of fiscal year 2010), and the continuing impact of the ongoing economic recession, partly offset by the effect of the temporary and permanent revenue raising measures implemented as part of the fiscal stabilization plan described below (including $213.4 million in additional property taxes for the first ten months of fiscal year 2010). If the additional allocation to COFINA and additional property taxes are not taken into account, the reduction in General Fund revenues would have been $99 million, or 1.6%. The estimated General Fund revenues for fiscal year 2010 remain, as budgeted, at $7.670 billion.

A-8

PR-CCD-0011202

Budgeted expenditures for fiscal year 2010 amount to $10.170 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.5 billion of additional expenditures to be covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance (see "Fiscal Stabilization Plan" below).

*Fiscal Stabilization Plan.* In January 2009, the administration, which controls the Executive and Legislative branches of government, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), sought to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual $2 billion operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program were and will be used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal year 2010, the administration began to design a comprehensive reform of the tax system (that it expects to adopt during fiscal year 2011) and to implement a long-term economic development plan, both of which are designed to complement the short-term economic reconstruction and supplemental stimulus initiatives described below.

As of April 30, 2010, the administration had implemented measures that are expected to result in annual savings of approximately $900 million.

*Government Reorganization Plan.* The administration has also taken the first steps to reorganize and modernize the Executive Branch. On December 11, 2009, the Governor signed Act No. 182 that seeks to reduce the number of government agencies and operational expenditures. On April 13, 2010, the administration submitted to the Legislative Assembly a bill proposing a referendum to amend the Constitution in order to restructure the Legislative Assembly by reducing the number of legislators. If the bill is approved, the referendum would be held on or prior to May 1, 2011 and any amendments to the Constitution approved in such referendum would take effect with respect to the Legislative Assembly to be installed on January 2, 2013.

*Unfunded Pension Benefit Obligations and Cash Flow Deficits of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and cash flow deficits of the three government retirement systems that are funded principally with government appropriations. As of June 30, 2009, the total unfunded accrued actuarial liability for the three retirement systems was $23.9 billion and the expected aggregate cash flow deficit for fiscal year 2010 was $640 million.

In February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The Commission is expected to submit a report to the Governor by the end of the first quarter of fiscal year 2011.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. Puerto Rico has been awarded approximately $6.5 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic

PR-CCD-0011203

downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of April 23, 2010, Puerto Rico has disbursed $2.8 billion in ARRA funds, or 43% of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also proposes to (i) strengthen the labor market and encourage greater labor-force participation by bringing out-of-date labor laws and regulations in line with U.S. and international standards, (ii) adopt a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies, and (iii) adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. In February 2010, the Governor named a committee to review the Commonwealth's tax system and propose a tax reform. The committee's report is due by September 2010 and the administration plans to file tax reform legislation during the immediately following legislative session.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. The administration is currently evaluating and expects to commence procurement for eight public-private partnership priority projects during fiscal year 2011.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include the development of a trans-shipment port and tourism and urban redevelopment projects.

*Recalibration of Ratings of Commonwealth General Obligation Bonds*

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" with a stable outlook by Moody's, which is three categories above the previous "Baa3" rating. The administration expects that this recalibration will increase the number of potential investors for the Commonwealth's general obligation bonds and have a positive impact on the Commonwealth's financing costs.

*Proposed Fiscal Year 2011 Budget*

On April 26, 2010, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2011. The proposed budget provides for total General Fund revenues of $8.195 billion, compared to

PR-CCD-0011204

estimated General Fund revenues of $7.670 billion for fiscal year 2010. The proposed General Fund revenues of $8.195 billion include base revenues of $7.645 billion, $241 million from tax enforcement and compliance measures, and $89 million of property taxes from the self-appraisal of real property. The proposed General Fund revenues originally included $220 million from the license fees of video lottery machines, but this measure has been withdrawn. Preparation of the budget is an ongoing process and various proposals are under review to replace these $220 million. The proposed fiscal year 2011 budget provides for total expenditures of $9.195 billion, consisting of General Fund expenditures of $8.195 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA bond issues, including a $500 million proposed bond issue during fiscal year 2011. The proposed total expenditures for fiscal year 2011 are $975 million, or 9.6%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $2.055 billion, or 18.3%, lower than estimated total expenditures of $11.250 billion for fiscal year 2009.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2008 averaged 1,217,500, a 3.6% decrease from 1,262,900 in fiscal year 2007. For fiscal year 2009, the number of persons employed averaged 1,168,200, a decrease of 4.1% compared to previous fiscal year. During the first ten months of fiscal year 2010, total employment averaged 1,106,600, a decline of 5.9% with respect to the same period of the prior year; and the unemployment rate averaged 15.9%.

The following table presents annual statistics of employment and unemployment for fiscal year 2005 through fiscal year 2009, and the average figures for the first ten months of fiscal year 2010. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.2% of total employment in fiscal year 2009.

**Commonwealth of Puerto Rico**
**Employment and Unemployment**[1]
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,422 | 1,266 | 156 | 11.7 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010[3] | 1,316 | 1,107 | 209 | 15.9 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first ten months of fiscal year 2010 (July through April 2010).

*Source:* Department of Labor and Human Resources – Household Survey

A-11

**Economic Performance by Sector**

From fiscal year 2005 to fiscal year 2009, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | |
|---|---|---|---|
|  | **2007** | **2008** | **2009[2]** |
| Manufacturing | $37,637 | $40,548 | $43,541 |
| Service[3] | 40,190 | 41,227 | 41,028 |
| Government[4] | 8,585 | 8,762 | 9,254 |
| Agriculture | 430 | 613 | 633 |
| Construction[5] | 2,027 | 1,991 | 1,782 |
| Statistical discrepancy | (464) | (215) | (538) |
| Total gross domestic product[6] | $88,405 | $92,926 | $95,708 |
| Less: net payment abroad | (28,884) | (31,399) | (32,949) |
| Total gross national product[6] | $59,521 | $61,527 | $62,759 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.

(2) Preliminary.

(3) Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.

(4) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.

(5) Includes mining.

(6) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

PR-CCD-0011206

The following table presents annual statistics of average employment based on NAICS for fiscal years 2005 to 2009.

## Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2008 | 2009[2] |
| Natural resources and construction | 68,233 | 65,492 | 64,700 | 59,675 | 49,083 |
| Manufacturing | | | | | |
|     Durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
|     Non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| Sub-total | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|     Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
|     Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
|     Transportation, warehouse, and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
|       Sub-total | 187,525 | 188,783 | 184,008 | 181,342 | 176,408 |
| | | | | | |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Government[3] | 307,825 | 302,492 | 298,125 | 297,742 | 300,683 |
|     Total non-farm | 1,049,725 | 1,047,742 | 1,032,275 | 1,020,208 | 992,450 |

---

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### *Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2009 manufacturing generated $43.5 billion, or 45.5%, of gross domestic product. During fiscal year 2009, payroll employment for the manufacturing sector was 96,708, a decrease of 7.1% compared with fiscal year 2008. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2009, the average hourly manufacturing wage rate in Puerto Rico was approximately 53.8% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the

A-13

PR-CCD-0011207

last decade in the pharmaceutical and medical-equipment industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector had been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" below.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2009.

## Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector[1]
### (in thousands at current prices)

|  | Fiscal Years Ended June 30, | | |
|  | 2007 | 2008 | 2009[2] |
|---|---|---|---|
| Food | $1,103,133 | $ 831,351 | $ 864,364 |
| Beverage and Tobacco Products | 932,301 | 1,405,111 | 1,554,799 |
| Textile Mills | 2,310 | 1,378 | 1,055 |
| Textile Product Mills | 13,944 | 13,876 | 12,221 |
| Apparel | 211,110 | 236,186 | 260,107 |
| Leather and Allied Products | 18,256 | 21,530 | 23,895 |
| Wood Products | 24,193 | 22,668 | 23,830 |
| Paper | 73,908 | 71,304 | 71,704 |
| Printing and Related Support Activities | 129,716 | 131,217 | 117,720 |
| Petroleum and Coal Products | 374,137 | 86,317 | 360,041 |
| Chemical | 26,891,695 | 27,966,500 | 29,806,137 |
| Plastics and Rubber Products | 126,642 | 127,091 | 122,338 |
| Nonmetallic Mineral Products | 295,265 | 273,670 | 236,869 |
| Primary Metals | 103,960 | 109,287 | 104,321 |
| Fabricated Metal Products | 248,929 | 247,804 | 250,066 |
| Machinery | 223,441 | 232,868 | 225,734 |
| Computer and Electronic Products | 4,222,014 | 5,957,553 | 6,266,460 |
| Magnetic and Optica | - | - | - |
| Electrical Equipment, Appliances and Components | 518,471 | 677,088 | 747,903 |
| Transportation Equipment | 81,906 | 85,913 | 78,249 |
| Furniture and Related Products | 66,039 | 62,985 | 54,217 |
| Miscellaneous | 1,975,250 | 1,986,317 | 2,359,370 |
| Total gross domestic product of manufacturing sector[3] | $37,636,619 | $40,548,014 | $43,541,398 |

(1) For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(2) Preliminary.
(3) Totals may not add due to rounding.

*Source:* Planning Board

A-14

PR-CCD-0011208

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2005 to 2009.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group***
**(persons age 16 years and over)**

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009[(1)] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,467 | 4,100 | 3,825 | 3,758 | 3,058 |
| Cement and concrete products manufacturing | 3,750 | 3,533 | 3,300 | 3,367 | 2,833 |
| Fabricated metal products | 6,442 | 5,775 | 5,675 | 5,375 | 4,908 |
| Computer and electronic | 10,667 | 10,808 | 10,092 | 8,600 | 7,033 |
| Electrical equipment | 7,650 | 6,842 | 6,617 | 6,658 | 5,867 |
| Electrical equipment manufacturing | 4,975 | 4,700 | 4,508 | 4,383 | 3,917 |
| Miscellaneous manufacturing | 11,158 | 11,258 | 12,292 | 11,967 | 11,975 |
| Medical equipment and supplies       manufacturing | 10,467 | 10,533 | 11,575 | 11,342 | 11,442 |
| Other durable goods manufacturing | 7,683 | 7,567 | 6,917 | 6,742 | 6,375 |
| Total – durable goods | 48,067 | 46,350 | 45,417 | 43,100 | 39,217 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 13,050 | 12,650 | 12,183 | 11,725 | 11,392 |
| Beverage and tobacco products manufacturing | 3,175 | 3,392 | 3,258 | 3,267 | 3,125 |
| Apparel manufacturing | 8,875 | 8,258 | 7,708 | 9,633 | 9,825 |
| Cut and sew apparel manufacturing | 8,850 | 8,017 | 7,075 | 8,617 | 8,975 |
| Chemical manufacturing | 32,883 | 32,317 | 30,467 | 27,900 | 25,042 |
| Pharmaceutical and medicine manufacturing | 28,567 | 28,017 | 26,375 | 24,033 | 21,500 |
| Plastics and rubber products | 2,750 | 2,325 | 2,200 | 1,983 | 1,967 |
| Plastics product manufacturing | 2,258 | 2,133 | 2,025 | 1,850 | 1,825 |
| Other non-durable goods manufacturing | 8,517 | 7,292 | 6,625 | 6,442 | 6,142 |
| Total – non-durable goods | 69,250 | 66,233 | 62,442 | 60,950 | 57,492 |
| | | | | | |
| Total       manufacturing employment | 117,317 | 112,583 | 107,858 | 104,050 | 96,708 |

* Totals may not add due to rounding.
(1) Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 20,609 from fiscal year 2005 to fiscal year 2009. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in

A-15

PR-CCD-0011209

fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008 and 2009, manufacturing employment decreased by 4.2%, 3.5% and 7.1%, respectively. For the first ten months of fiscal year 2010, the sector lost an average of 7,600 jobs, or 7.8% compared to the same period of the previous year. Given that this sector used to pay the highest wages, on average, in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2009, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.0%, while payroll employment in this sector decreased at an average annual rate of 1.4%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2009, the service sector generated $41.0 billion of gross domestic product, or 42.9% of the total. Wholesale and retail trade, information services, education and health services, professional and business services and real estate and rentals experienced growth in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. Finance and insurance, transportation and warehousing, utilities, and leisure and hospitality experienced contractions in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. From fiscal year 2007 to 2009, gross domestic product increased in the trade sector from $7.2 billion to $7.5 billion and in real estate and rentals from $11.7 billion to $13.3 billion, and decreased in finance and insurance from $6.7 billion to $5 billion.

Service-sector employment decreased from 556,350 in fiscal year 2005 to 545,975 in fiscal year 2009 (representing 55% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2009 represents a decrease of 2.3% compared to the prior fiscal year. For the first ten months of fiscal year 2010, average service-sector employment was 533,080, a decrease of 2.7% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of March 31, 2010, there were thirteen commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of these institutions (excluding assets of units operating as international banking entities) as of March 31, 2010 were $81.1 billion, as compared to $86.4 billion as of March 31, 2009. On April 30, 2010, the OCFI closed three of the thirteen commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption

PR-CCD-0011210

agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $3.4 billion as of March 31, 2010, up from $2.8 billion on March 31, 2009. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.4 billion as of March 31, 2010, up from $13.0 billion as of March 31, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of March 31, 2010, there were 38 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $39.8 billion, a decrease from $61.5 billion in total assets as of March 31, 2009. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.3 billion in assets as of March 31, 2010, a slight increase from $6.8 billion as of March 31, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following tables set forth gross domestic product and employment for the service sector for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | |
|---|---|---|---|
| | 2007 | 2008 | 2009[1] |
| Wholesale trade | $ 2,751.6 | $ 2,834.6 | $ 2,885.5 |
| Retail trade | 4,471.4 | 4,508.7 | 4,583.7 |
| Transportation and warehousing | 968.3 | 998.5 | 978.0 |
| Utilities | 2,214.4 | 2,114.6 | 2,123.1 |
| Information | 2,466.5 | 2,477.4 | 2,552.8 |
| Finance and insurance | 6,694.3 | 6,693.4 | 4,951.8 |
| Real Estate and rental | 11,685.7 | 12,152.0 | 13,253.5 |
| Professional and business | 3,112.5 | 3,223.7 | 3,305.0 |
| Education and health | 3,592.5 | 3,932.1 | 4,131.4 |
| Leisure and hospitality | 1,861.5 | 1,919.1 | 1,895.6 |
| Other services[2] | 371.6 | 372.8 | 367.9 |
| Total | $40,190.3 | $41,226.9 | $41,028.3 |

---

* Totals may not add due to rounding. For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
(1) Preliminary.
(2) Includes tourism.

*Source*:      Planning Board.

A-17

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector\***
**(thousands of persons age 16 and over)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2005** | **2006** | **2007** | **2008** | **2009**[(1)] |
| Wholesale trade | 33,717 | 33,992 | 33,267 | 33,717 | 33,250 |
| Retail trade | 136,192 | 137,358 | 133,750 | 130,883 | 127,475 |
| Transportation, warehouse and utilities | 17,617 | 17,433 | 16,992 | 16,742 | 15,683 |
| Information | 22,608 | 22,675 | 22,642 | 21,442 | 20,217 |
| Finance | 48,633 | 49,767 | 49,108 | 48,483 | 48,417 |
| Professional and business | 103,767 | 106,517 | 108,800 | 108,150 | 103,300 |
| Educational and health | 99,967 | 103,650 | 105,225 | 108,550 | 109,967 |
| Leisure and hospitality | 72,592 | 74,767 | 73,567 | 73,408 | 70,892 |
| Other services | 21,258 | 20,567 | 18,242 | 17,367 | 16,775 |
| Total | 556,350 | 566,725 | 561,592 | 558,742 | 545,975 |

\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

   During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,792,300, a decrease of 6.8% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.7%, compared to 70.8% in fiscal year 2006. The average number of rooms available in tourist hotels decreased by 6.5% to 10,044 rooms from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

   For fiscal year 2008, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,744,200, a further decline of 2.7% over the number of persons registered during fiscal year 2007. The average occupancy rate in tourist hotels during fiscal year 2008 was 70.4%, compared to 71.7% in fiscal year 2007. The average number of rooms available in tourist hotels increased by 2.1% to 10,250 rooms from fiscal year 2007 to fiscal year 2008.

   During fiscal year 2009, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,708,500, a decrease of 2% over the number of persons registered during the same period of fiscal year 2008. The average occupancy rate in tourist hotels during fiscal year 2009 was 66.2%, a decrease of 5.9% from the prior fiscal year. During fiscal year 2009, the average number of rooms available in tourist hotels increased by 2.1% to 10,467 rooms compared to fiscal year 2008.

   In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2009, employment in hotels and other lodging facilities was reduced by 6.7% to 13,300 jobs. For the first ten months of fiscal year 2010, the average decrease was 4.3% with respect to the same period for the prior fiscal year.

   San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-18

PR-CCD-0011212

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009[5] | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes cruise ship visitors and transient military personnel.
(4) Includes visitors in homes of relatives, friends, and in hotel apartments.
(5) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the Convention Center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

A-19

PR-CCD-0011213

In fiscal year 2009, the government accounted for $9.3 billion, or 9.7%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 285,600 workers (state, including public corporations, and local), or 28.8% of total, non-farm, payroll employment in fiscal year 2009. From fiscal year 2005 to fiscal year 2009, state and municipal government employment has been reduced by approximately 7,500 positions. During the first ten months of fiscal year 2010, state and local government employment decreased by 15,100 jobs. According to the payroll survey, the distribution of these job reductions was 10,800 jobs in the state government and 4,300 jobs in local government.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government, which excludes municipal employees and employees of public corporations. Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. Currently, approximately 70,000 employees of the central government are unionized under this law.

As discussed previously, Act No. 7, enacted on March 9, 2009, establishes, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act No. 7 provides that, for a period of two years, collective bargaining agreements that have already expired or that expire while the law is in effect and that relate to public employees may not be renegotiated or renewed.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. The Ports Authority and the Public-Private Partnerships Authority continue to evaluate entering into a public-private partnership with respect to the Luis Muñoz Marín International Airport. The Public-Private Partnerships Authority has engaged a team of advisors to assist it in the preparation of a study required for the establishment of a public-private partnership.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

A-20

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,629 miles and 11,947 miles of local streets and adjacent roads. The highway system comprises 387 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 252 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,053 miles of tertiary highways and roads serving local, intra-regional traffic.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed in March 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. Currently, the Port of the Americas Authority is exploring entering into a concession agreement with respect to the terminal facility and is simultaneously undertaking efforts to maximize private sector interest in the related value-added zones.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2007 to 2009, however, real construction investment decreased at an average annual rate of 14.7%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 9.8%.

Public investment has been an important component of construction investment. During fiscal year 2009, approximately 52.9% of the total investment in construction was related to public projects. The total value of construction permits increased 28.0% in fiscal year 2009 as compared to fiscal year 2008 but total sales of cement decreased by 25.4%, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2008 was 60,000, a reduction of 9.9% from fiscal year 2007.

Total construction investment for fiscal year 2009 decreased in real terms by 20.1%, following a 9.0% real decline in fiscal year 2008, due principally to the drop in private construction activity. The Planning Board expects a further construction investment decrease of 5.2% in real terms for fiscal year 2010. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, the expected positive impact of the Federal Stimulus and the Local Stimulus led it to reduce its projected decrease in construction investment to 5.2% in real terms. Public investment in construction was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2009, the number of construction permits decreased 20.7%, while the total value of construction permits dropped by 28% compared to fiscal year 2008. For the first nine months of fiscal year 2010, the total number of construction permits decreased by 19.4%, while the value of construction permits decreased by 28.9%. These figures are consistent with cement sales, which declined by 25.4% in fiscal year 2009 and by 27.2% during the first ten months of fiscal year 2010, reaching levels not seen in more than a decade.

A-21

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2009, gross income from agriculture was $633 million, an increase of 3.4% compared with fiscal year 2008.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

## Higher Education

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

PR-CCD-0011216

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,195 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,011 | 37.4% | 26,961,000[2] | 13,621,000 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,143,454[2] | 15,312,289 | 56.4% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 27,946,091[3] | 15,927,987 | 57.0% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,378,777[3] | 16,611,711 | 58.5% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,744,193[3] | 16,911,481 | 58.8% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,062,634[3] | 17,272,044 | 59.4% |
| 2005 | 406,547[3] | 208,032 | 51.2% | 29,134,149[3] | 17,487,475 | 60.0% |
| 2006 | 400,530[3] | 209,547 | 52.3% | 29,236,155[3] | 17,758,870 | 60.7% |
| 2007 | 396,059[3] | 225,402 | 56.9% | 29,407,260[3] | 18,248,128 | 62.1% |
| 2008 | 395,482[3] | 227,546 | 57.5% | 29,757,219[3] | 19,102,814[4] | 64.2% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | N/A | N/A |

N/A – Not available.
(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).
(4) Middle alternative projection (NCES).

*Sources:* U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2008-2009 was approximately 65,669 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2008-2009 of approximately 171,541 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

A-23

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of manufacturing activity from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in their activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act") provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Other legislation enacted in 2001 and 2002 provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or

PR-CCD-0011218

interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate $1.137 billion for loans made or bonds issued to finance the development of twenty tourism projects representing 4,585 new hotel rooms and a total investment of $1.795 billion.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income from Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996, its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

For taxable years beginning after December 31, 2005 and before January 1, 2010, the special deduction granted under Section 199 of the U.S. Code against income derived from domestic production

PR-CCD-0011219

activities is extended to taxpayers operating in Puerto Rico that are subject to U.S. federal income taxation at gradual rates, such as branches of U.S. companies operating in Puerto Rico.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration has commenced evaluating the impact of these proposals and will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

PR-CCD-0011220

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

PR-CCD-0011223

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

B-4

PR-CCD-0011224

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

PR-CCD-0011225

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

      (i)    Government Obligations;

      (ii)    Defeased Municipal Obligations;

      (iii)    certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

PR-CCD-0011226

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

        (vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

        (i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

        (ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

PR-CCD-0011227

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)     Defeasance Obligations;

(ii)    Defeased Municipal Obligations;

PR-CCD-0011228

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

PR-CCD-0011230

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

(i)   any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)   Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)   Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)   Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

(v)   Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)   as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

B-11

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in a Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

    4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

PR-CCD-0011232

5. Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

PR-CCD-0011233

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

PR-CCD-0011234

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

Refunding Bonds shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

Related August 2 Computation Period shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

Reserve Account Cash Equivalent shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

Resolution shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

Revenue Account Monthly Disbursement Date shall mean the last Business Day of each calendar month.

Revenues shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1. All Pledged Sales Tax received by the Corporation or the Trustee.

    2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

    3. Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

B-15

PR-CCD-0011235

        4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

        5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

PR-CCD-0011237

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

PR-CCD-0011238

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

(i)   irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)   if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-19

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)     either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)     a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

PR-CCD-0011240

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

PR-CCD-0011241

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

PR-CCD-0011242

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

PR-CCD-0011243

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

PR-CCD-0011244

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

## Revenue Account (Section 505)

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

PR-CCD-0011245

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

PR-CCD-0011246

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)    Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)    Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)    Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

PR-CCD-0011247

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

B-28

PR-CCD-0011248

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

B-29

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

PR-CCD-0011250

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)     amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)     amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii)     amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)     amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

PR-CCD-0011251

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

PR-CCD-0011252

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

) Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

## Particular Covenants of the Corporation

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

B-33

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

PR-CCD-0011254

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

B-35

PR-CCD-0011255

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.  No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

B-36

PR-CCD-0011256

*Additional Requirements—Senior Bonds and Parity Obligations*

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

B-37

PR-CCD-0011257

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

B-38

PR-CCD-0011258

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

### Evidence on Which Trustee May Act (Section 803)

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

### Compensation and Indemnification (Section 804)

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

B-40

PR-CCD-0011260

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

B-41

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

## Supplemental Resolutions (Article IX)

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

    (i)    to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

    (ii)    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

    (iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-42

PR-CCD-0011262

(iv) to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v) to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi) to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii) to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii) to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x) to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi) as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii) to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii) to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

B-43

PR-CCD-0011263

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

PR-CCD-0011264

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

### Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

B-45

PR-CCD-0011265

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

PR-CCD-0011266

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST:  to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND:  to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD:  to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH:  to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH:  to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

PR-CCD-0011267

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

B-48

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

PR-CCD-0011269

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

PR-CCD-0011270

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

PR-CCD-0011271

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

PR-CCD-0011272

APPENDIX C

## PROPOSED FORM OF APPROVING
## OPINION OF BOND COUNSEL

June __, 2010

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $89,435,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and its $92,755,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds," the Series 2010D Bonds and the Series 2010E Bonds being referred to herein as the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Fifteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution") and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution," the Fifteenth Supplemental Resolution and the Sixteenth Supplemental Resolution being referred to herein as the "Bond Resolution," the General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds and First Subordinate Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and

will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      Act 91 is valid in all respects material to the matters covered by this opinion.

2.      The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.      The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.      As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.      The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

7.      The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

8.      Interest on the Bonds is not excluded from gross income for Federal income tax purposes and so will be fully subject to Federal income taxation; this opinion is not intended or provided by Bond Counsel to be used and cannot be used by an owner of the Bonds for the purpose of avoiding penalties that may be imposed on the owner of such Bonds. The opinion set forth in this paragraph is provided to support the promotion or marketing of the Bonds. Each owner of the Bonds should seek advice based on its particular circumstances from an independent tax advisor.

C-2

PR-CCD-0011274

9.      The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

Except as stated in paragraphs 8 and 9 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

C-3

PR-CCD-0011275

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX D**

### PROPOSED FORM OF OPINION OF
### SPECIAL PUERTO RICO TAX COUNSEL

June __, 2010

PUERTO RICO SALES TAX FINANCING CORPORATION
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
San Juan, Puerto Rico 00940

Re:    Puerto Rico Sales Tax Financing Corporation
        Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds)
        Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds)

Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $182,190,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010D Bonds, the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010D Bonds, and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Series 2010E Bonds (collectively, the "Bond Resolution," the General Resolution and the Bond Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

1.    Interest on the Bonds is exempt from Puerto Rico income, sales, use and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

2.    The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

3.     The transfer of the Bonds by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of Puerto Rico at the time the gift is made. The transfer of the Bonds by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico. The transfer of the Bonds by any means will not be subject to Puerto Rico sales and use taxes.

4.     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of Puerto Rico.

5.     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

6.     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; and (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

7.     Based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(a)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(b)     Interest received, or original issue discount accrued, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico and such interest or original issue discount is not effectively connected or treated as effectively connected with the conduct of a trade or business in the United States by such corporation, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(c)     Gain on the sale of the Bonds derived by an individual who is a bona fide resident of Puerto Rico within the meaning of Section 937 of the U. S. Code during the entire taxable year of the sale and during the ten years preceding the year of the sale who does not hold the Bonds as

D-2

PR-CCD-0011278

inventory will be excludable from gross income for purposes of the U.S. Code under Section 933(1) thereof; provided that if the individual was not a bona fide resident of Puerto Rico during the entire ten year period preceding the year of the sale the individual may elect to treat the portion of the gain attributable to the period of Puerto Rico residency as Puerto Rico source income excludable under Section 933(1) of the U.S. Code.

(d) Gain on the sale of the Bonds derived by a Puerto Rico Corporation will not be subject to United States federal income tax provided such gain is not effectively connected or treated as effectively connected with the conduct of a trade or business by such Puerto Rico Corporation in the United States and such corporation is not treated as a domestic corporation for purposes of the U.S. Code.

Prospective owners of the Bonds should be aware that the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," or "passive foreign investment companies," as such terms are defined in the U.S. Code.

In connection with the foregoing statements about certain United States tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(1) These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service,

(2) These statements were written in connection with the promotion or marketing of the Bonds; and

(3) Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

This opinion is limited to the above, and we express no other opinion regarding Puerto Rico or United States tax consequences arising from ownership or disposition of the Bonds.

This opinion is furnished by us solely for the benefit of the Corporation and the holders from time to time of the Bonds and may not be relied upon by any other person.

We hereby consent to the inclusion of this opinion as *Appendix D* to the Official Statement of the Corporation dated June 24, 2010 in connection with the Bonds. We further consent to the reference made to us under the captions "Tax Matters" and "Legal Matters" in said Official Statement.

We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

Respectfully submitted,

D-3

PR-CCD-0011279

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0011280

APPENDIX E

# BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

PR-CCD-0011282

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

PR-CCD-0011283

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0011284

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0011285

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0011286



Printed by: ImageMaster, Inc.

# Exhibit 16

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Exhibit 18 Page 1 of 1

# Exhibit 18

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 17

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):

| | |
|---|---|
| S&P: | A+ |
| Moody's: | A1 |
| Fitch: | A+ |

$45,620,000

# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2011B

**Dated:** Date of Delivery      **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds"), to refund certain outstanding bonds of the Corporation. Concurrently with the issuance of the Series 2011B Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds" and, together with the Series 2011B Bonds, the "First Subordinate Series 2011 Bonds"). The Series 2011A Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Series 2011B Bonds are being sold solely in Puerto Rico and their issuance is not contingent upon the issuance of the Series 2011A Bonds. The Corporation also proposes to issue in the near future additional Sales Tax Revenue Bonds, Senior Series in the United States taxable and tax-exempt markets and in Puerto Rico pursuant to separate official statements. See PLAN OF FINANCING. The issuance of the First Subordinate Series 2011 Bonds is not contingent upon the issuance of such additional bonds.

**The First Subordinate Series 2011 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales and use tax imposed by the Commonwealth. The First Subordinate Series 2011 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The First Subordinate Series 2011 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution*.**

The Series 2011B Bonds have the following characteristics:

- The Series 2011B Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount and integral multiples thereof.

- The Series 2011B Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2011B Bonds on the records of The Depository Trust Company and its participants.

- Interest on the Series 2011B Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on February 1, 2012. The inside cover page of this Official Statement contains information concerning the maturity, interest rate, and price of the Series 2011B Bonds.

- The Series 2011B Bonds are subject to redemption, commencing on August 1, 2021, as described herein.

- This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision. Prospective investors should consider the information set forth in RISK FACTORS before investing.

- In the opinion of Pietrantoni Méndez & Alvarez LLC, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Series 2011B Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Series 2011B Bonds will be exempt from United States Federal income taxation to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. The Series 2011B Bonds are not otherwise exempt from United States Federal income taxation. See TAX MATTERS herein.

- The Series 2011B Bonds will be dated their date of delivery and are expected to be delivered through The Depository Trust Company on or about November 23, 2011.

**The Series 2011B Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2011B Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2011B Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel.*

## Santander Securities

| | | |
|---|---|---|
| BofA Merrill Lynch | Popular Securities | UBS FS Puerto Rico |

| | | | |
|---|---|---|---|
| Barclays Capital | BBVAPR MSD | Citigroup | FirstBank Securities |
| Oriental Financial Services | Ramirez & Co., Inc. | Raymond James | Scotia MSD |

November 16, 2011

PR-CCD-0006344

$45,620,000
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2011B**

**$45,620,000 Term Bonds**[*]

| | | | |
|---|---|---|---|
| $23,230,000 5.00% | Term Bonds due August 1, 2031, to yield 5.00% | CUSIP[†] 74529JME2 |
| $22,390,000 5.15% | Term Bonds due August 1, 2036, to yield 5.15% | CUSIP[†] 74529JMF9 |

---

[*] Interest on the Current Interest Bonds will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on February 1, 2012.

[†] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

PR-CCD-0006345

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2011B Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2011B Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2011B Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2011B Bonds and other documents herein do not purport to be complete.  Reference is made to said laws, resolutions, the Series 2011B Bonds and other documents for full and complete statement of their provisions.  Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

**The Series 2011B Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act.  The registration or qualification of the Series 2011B Bonds in accordance with applicable provisions of laws of the states in which the Series 2011B Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof.  Neither these states nor any of their agencies have passed upon the merits of the Series 2011B Bonds or the accuracy or completeness of this Official Statement.  Any representation to the contrary may be a criminal offense.**

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements.  These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions.  The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements.  The Corporation does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

PR-CCD-0006346

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006347

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................. 1
  The Corporation ............................................. 1
  Sales and Use Tax ........................................... 2
  Dedicated Sales Tax Fund .................................. 2
  The Resolution .............................................. 2
  Outstanding Bonds and Parity Obligations ............. 3
  Source of Payment and Security for the Bonds......... 5
PLEDGED SALES TAX .......................................... 6
  Commonwealth Sales Tax Revenues ..................... 6
  Commonwealth Sales Tax Collections and Projections...... 8
  Collections by Source ...................................... 11
  Economic Indicators ....................................... 12
  Dedicated Sales Tax Fund .................................. 14
  Pledged Sales Tax Base Amount .......................... 14
  Procedures for the Collection and Deposit of the Pledged
    Sales Tax in the Dedicated Sales Tax Fund ............. 16
  Commonwealth Sales Tax Enforcement Initiatives ....... 18
THE SERIES 2011B BONDS .................................... 21
  General ...................................................... 21
  Redemption ................................................. 21
  Book-Entry Only System ................................... 23
SECURITY FOR THE SERIES 2011B BONDS ............... 23
  General ...................................................... 23
  Commonwealth Non-Impairment Covenant ............. 23
  Property Pledged for the Payment of the Series 2011B
    Bonds ...................................................... 24
  Outstanding Bonds and Parity Obligations ............. 25
  Subordination Provisions of the First Subordinate Bonds 26
  Subordination Provisions of the Junior Subordinate
    Bonds ...................................................... 26
  Funds and Accounts under the Resolution .............. 27
  Additional Bonds, Refunding Bonds and Other
    Obligations ................................................ 30
  Commonwealth's Authority to Cover Deficiencies ...... 33
RISK FACTORS ................................................. 33
  Economic Conditions Could Affect Commonwealth Sales
    Tax Revenues ............................................. 33
  Legislative Assembly Authority over the Commonwealth
    Sales Tax .................................................. 34

**Page**

  Certain Constitutional Considerations Relating to Act 91 35
  Limited Nature of Ratings; Reductions, Suspension or
    Withdrawal of a Rating .................................. 36
  Limited Nature of Remedies .............................. 36
AGGREGATE DEBT SERVICE REQUIREMENTS ........... 37
PLAN OF FINANCING .......................................... 40
  Overview .................................................... 40
  Estimated Sources and Uses of Funds ................... 40
THE CORPORATION ........................................... 41
  Other Obligations of the Corporation ................... 41
TAX MATTERS ................................................. 42
  Puerto Rico Tax Considerations for Puerto Rico
    Residents .................................................. 43
  United States Federal Tax Considerations for Puerto Rico
    Residents .................................................. 44
  No Opinion as to Exclusion under Section 103(a) of the
    Code ....................................................... 45
RATINGS ........................................................ 45
LEGALITY FOR INVESTMENT ................................ 46
VERIFICATION OF MATHEMATICAL
  COMPUTATIONS ............................................ 46
UNDERWRITING ............................................... 46
LEGAL MATTERS .............................................. 46
CONTINUING DISCLOSURE .................................. 47
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
  RICO .......................................................... 49
MISCELLANEOUS .............................................. 49

APPENDIX A – Commonwealth Economic Information ... A-1
APPENDIX B – Summary of Certain Definitions and
  Provisions of the Resolution .............................. B-1
APPENDIX C – Proposed Form of Approving Opinion of
  Bond Counsel .............................................. C-1
APPENDIX D – Proposed Form of Opinion of Special Puerto
  Rico Tax Counsel .......................................... D-1
APPENDIX E – Book-Entry Only System .................... E-1

PR-CCD-0006348

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006349

$45,620,000
# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2011B

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $45,620,000 Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds"). Concurrently with the issuance of the Series 2011B Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds" and, together with the Series 2011B Bonds, the "First Subordinate Series 2011 Bonds"). The Series 2011A Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Series 2011B Bonds are being sold solely in Puerto Rico and are not contingent upon the issuance of the Series 2011A Bonds. The Corporation also proposes to issue in the near future additional Sales Tax Revenue Bonds, Senior Series in the United States taxable and tax-exempt markets and in Puerto Rico pursuant to separate official statements. See PLAN OF FINANCING. The issuance of the First Subordinate Series 2011 Bonds is not contingent upon the issuance of such additional bonds.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009, as amended ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

1

PR-CCD-0006350

**Sales and Use Tax**

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund* under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2011 is $595,165,542. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See *Dedicated Sales Tax Fund* and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The First Subordinate Series 2011 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, an Eighteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011A Bonds (the "Eighteenth Supplemental Resolution") and a Nineteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011B Bonds (the "Nineteenth Supplemental Resolution") (the General Resolution, as supplemented by the Eighteenth Supplemental Resolution and the Nineteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on November 16, 2011, pursuant to which The Bank of New York Mellon acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

PR-CCD-0006351

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the First Subordinate Series 2011 Bonds, the Corporation had outstanding $13.765 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $699.8 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior, first subordinate and junior subordinate bonds.

The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds").

The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), (v) Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds"), and (vi) Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2009A Bonds, Series 2009B Bonds, Series 2010A Bonds, Series 2010C Bonds, and the Series 2010D Bonds, the "Outstanding First Subordinate Bonds").

The Corporation's outstanding junior subordinate bonds consist of Sales Tax Revenue Bonds, Junior Subordinate Series 2011A (the "Outstanding Junior Subordinate Bonds") in the aggregate principal amount of $327.5 million. The Outstanding Junior Subordinate Bonds will be refunded by the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds and for purposes of the information set forth herein under the caption AGGREGATE DEBT SERVICE REQUIREMENTS, the debt service on the Outstanding Junior Subordinate Bonds is shown as debt service on first subordinate bonds.

The Series 2011A Bonds are being issued to cover operating expenses of the Commonwealth for fiscal year 2012 and to refund certain outstanding First Subordinate Bonds and the outstanding Junior Subordinate Bonds (the "Series 2011A Refunded Bonds"). Concurrently with the issuance of the Series 2011A Bonds, the Corporation is issuing the Series 2011B Bonds. The Series 2011B Bonds will be issued in order to refund certain First Subordinate Bonds (the "Series 2011B Refunded Bonds" and, together with the Series 2011A Refunded Bonds, the "Refunded Bonds").

After giving effect to the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds, the Corporation will have $14.126 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.176 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $521 million accreted on existing capital appreciation bonds as of November 1, 2011), and $8.951 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $170.7 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011).

3

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

Additionally, the Corporation intends to issue approximately $1.1 billion of additional Sales Tax Revenue Bonds, Senior Series 2011C and $81 million of additional Sales Tax Revenue Bonds, Senior Series 2011D (collectively, the "Senior Series 2011 Bonds") for the purpose of repaying outstanding 2006 Appropriation Debt and to cover the cost of terminating certain swap agreements associated with such 2006 Appropriation Debt. See PLAN OF FINANCING.

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS and PLAN OF FINANCING.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the First Subordinate Series 2011 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the First Subordinate Series 2011 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The First Subordinate Series 2011 Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the First Subordinate Series 2011 Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate Obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *"Subordination Provisions of the First Subordinate Bonds"* and *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

4

PR-CCD-0006353

*Outstanding Junior Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Second Subordinate Bonds and the Second Subordinate Obligations. Pursuant to this authority, the Corporation issued the Outstanding Junior Subordinate Bonds, applied the net proceeds thereof to cover operating expense of the Commonwealth for fiscal year 2012, and granted, for the payment of the Outstanding Junior Subordinate Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and the First Subordinate Bonds and the First Subordinate Obligations. According to the provisions of Act No. 96 of June 16, 2011, the Corporation issued the Outstanding Junior Subordinate Bonds in an aggregate principal amount of $327.5 million and such bonds were purchased by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Government of Puerto Rico Employees Retirement System (the "Employees Retirement System").

The Corporation will refund the Outstanding Junior Subordinate Bonds with certain of the Series 2011A Bonds. Such Series 2011A Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds and are not being offered to the public and will be delivered solely to PRIFA and the Employees Retirement System. To the extent the Corporation refunds the Outstanding Junior Subordinate Bonds, no bonds or obligations of the Corporation will be outstanding that are subordinate to the First Subordinate Bonds and First Subordinate Obligations.

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, the Junior Subordinate Bonds and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations, and the Junior Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The First Subordinate Series 2011 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the First Subordinate Series 2011 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Series 2011B Bonds, the terms of the Series 2011B Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

PR-CCD-0006354

# PLEDGED SALES TAX

**Commonwealth Sales Tax Revenues**

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, (ix) boats and heavy equipment, and (x) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. Act No. 208 of the Legislative Assembly, approved on October 20, 2011 ("Act No. 208"), added an exemption from Commonwealth Sales Tax and Municipal Sales Tax to the following: (i) the Science, Technology and Research Trust of Puerto Rico, a quasi-public entity created to promote economic development through investment in fields related to science, technology and research; and (ii) machinery, equipment, parts and accessories used by (a) experimental laboratories dedicated to any activity related to technological research and development and (b) renewable energy research and development projects performed within the Puerto Rico Science, Technology and Research District during their 15 year exemption period; provided, that machinery does not include the following: (1) all construction materials and prefabricated buildings, (2) all electric material and water pipes contained within a building, (3) lubricants, grease, wax and paints not related to the manufacturing process, (4) lighting posts and bulbs installed in parking areas, and (5) water treatment facilities and electric sub-stations. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in

PR-CCD-0006355

Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 18, 2011, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday took place during Fiscal Year 2011-2012.

*Commonwealth Tax Reform.* As part of the government's efforts to promote economic growth and job creation while preserving the path towards achieving fiscal stability, in Fiscal Year 2010-2011 the Commonwealth enacted legislation that implemented a comprehensive reform of the Commonwealth's tax system. The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010 ("Act No. 171"), provided for the following changes with respect to the Commonwealth Sales Tax: (i) reduced the electronic filing and payment requirement threshold to include merchants with a volume of sales equal to or greater than $200,000 instead of $500,000; (ii) authorized the Secretary of the Treasury to change the electronic filing and payment requirement threshold by means of administrative action; (iii) created a new penalty for failure to file a Commonwealth Sales Tax return or failure to file electronically, if required, equal to the higher of (a) 10% of the amount of Commonwealth Sales Tax required to be deposited with the Treasury Department and (b) $100; (iv) created a new penalty equal to $20,000 for failure to install, obstruct or not use the electronic point of sale system required by the Treasury Department (described below); and (v) exempted IVU Loto (as defined below) prizes (currently equal to one prize of $5,000, one prize of $1,000 and eight prizes of $500 per bi-weekly drawings) from the payment of income, excise and sales and use taxes.

The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), also known as the Internal Revenue Code for a New Puerto Rico, repealed the Puerto Rico Internal Revenue Code of 1994. Act No. 1 included the changes implemented by Act No. 171 to the Commonwealth Sales Tax system and generally maintained the Commonwealth Sales Tax and Municipal Sales Tax statutory framework. Act No. 1 made the following changes applicable to the Commonwealth Sales Tax: (i) exempted boats and heavy equipment from the Commonwealth Sales Tax and imposed an excise tax on these items in order to facilitate enforcement by the Treasury Department and promote compliance among taxpayers; (ii) required promoters of events to endorse admission tickets and post a bond to secure payment of the Commonwealth Sales Tax; (iii) authorized Treasury Department agents to make purchases at retailers and merchants in order to assess compliance with the Commonwealth Sales Tax and impose administrative fines to the extent such retailer or merchant fails to deposit the Commonwealth Sales Tax with the Treasury Department; (iv) granted the Secretary of the Treasury the same powers to enforce the

PR-CCD-0006356

Commonwealth Sales Tax that it currently enjoys in enforcing excise taxes; and (v) reestablished the resellers credit to the original 6%, which was previously limited to 5.9%. The Treasury Department expects that the exemption for boats and heavy equipment will represent an aggregate loss of approximately $3.3 million in annual collections of Commonwealth Sales Tax.

**Commonwealth Sales Tax Collections and Projections**

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* below for a description of the reporting and collections procedures utilized by the Treasury Department. As an example, the sales tax reported by the Treasury Department for November 2006 related to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change was effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through October 2011 were approximately $5.44 billion, an average of $93 million per month.

The following table shows historical collections since inception of the Commonwealth Sales Tax until Fiscal Year 2010-2011 under the current reporting method, which was implemented beginning in Fiscal Year 2009-2010. Under the current reporting method, the figures for the initial estimate of collections are only available beginning in Fiscal Year 2009-2010.

PR-CCD-0006357

**Commonwealth Sales Tax – Collection History by Fiscal Year**
(Dollars in Millions)

| Fiscal Year | Actual Collections | Initial Estimate[1] | Monthly Average | Pledged Sales Tax Base Amount |
|---|---|---|---|---|
| 2007 | $ 617.9 | N/A | $95.1 | N/A |
| 2008 | 1,142 | N/A | 95.1 | $185.0 |
| 2009[2] | 1,090 | N/A | 90.9 | 192.4 |
| 2010[3] | 1,094 | $1,153 | 91.1 | 550.3 |
| 2011[4] | 1,123 | 1,216 | 93.6 | 572.3 |

[1]   These figures represent the initial estimate of Commonwealth Sales Tax collections made for budgeting purposes prior to the beginning of the fiscal year.

[2]   The decline in sales tax collections compared to the prior fiscal year is primarily attributed to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown.

[3]   The difference between estimated and actual collections is primarily attributed to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions.

[4]   The difference between estimated and actual collections is primarily attributed to the delay in the implementation of the point of sale system.

*Fiscal Year 2011-2012.*  Commonwealth Sales Tax collections for the four month period ended October 31, 2011, totaled $368.9 million, or an average of $92.2 million per month.  Such collections year-to-date are $6.5 million below the Treasury Department's estimate of $375.4 million, or 1.7%, but $12.2 million, or 3.4%, above collections for the same period in Fiscal Year 2010-2011.  The Treasury Department believes that the difference between their original estimate and actual collections is due to the delay in the implementation of the point of sale system.  Commonwealth Sales Tax revenue projections for Fiscal Year 2011-2012 are $1.366 billion.  This projection represents an increase of 22% compared to estimated collections for Fiscal Year 2010-2011.  This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives"* and an increase in personal income of 3.1% currently projected by the Planning Board.  Whether sales tax collections meet this projection is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2011-2012, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system throughout the Commonwealth, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth.  A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections.  See *"Economic Conditions Could Affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010.  Under the new reporting method, which was effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer.  Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer.  To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

9

### Sales and Use Tax – Collection History by Month
#### (Dollars in Thousands)

| | Fiscal Year | | | | | |
|---|---|---|---|---|---|---|
| | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 | 2010-2011 | 2011-2012 |
| July | - | $ 95,460 | $ 97,526 | $ 94,382 | $ 95,910 | $ 96,652 |
| August | - | 96,100 | 95,592 | 88,000 | 90,418 | 92,332 |
| September | - | 90,181 | 91,353 | 84,100 | 86,698 | 89,279 |
| October | - | 86,163 | 77,788 | 83,775 | 83,698 | 90,621 |
| November | - | 93,751 | 86,191 | 85,120 | 88,602 | N/A |
| December | $ 50,200[1] | 96,170 | 91,996 | 95,075 | 97,277 | N/A |
| January | 110,000 | 121,251 | 119,836 | 118,476 | 123,358 | N/A |
| February | 95,000 | 89,798 | 85,763 | 88,942 | 90,818 | N/A |
| March | 86,200 | 86,486 | 84,608 | 82,538 | 88,439 | N/A |
| April | 96,400 | 89,355 | 88,065 | 93,415 | 93,664 | N/A |
| May | 85,700 | 93,487 | 88,788 | 85,469 | 88,469 | N/A |
| June | 94,400 | 103,331 | 82,854 | 94,296 | 95,518 | N/A |
| **Total** | $617,900 | $1,141,533 | $1,090,360 | $1,093,588 | $ 1,122,869 | $368,884 |
| **Monthly Average** | $ 95,062 | $ 95,128 | $ 90,863 | $ 91,132 | $ 93,572 | $ 92,221 |

[1]  Reflects collections for sales made between November 15 and November 30.  The sales tax became effective on November 15, 2006.

Source:  Treasury Department



Source:  Treasury Department

10

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2010-2011 (actual receipts by the Treasury Department from July 2010 thru June 2011). Of the $1.123 billion in collections, approximately 52% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 13% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2010-2011**

Source: Treasury Department

PR-CCD-0006360

### Economic Indicators

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

**Compounded Annual Growth Rates for**
**Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
| | | | Services | Non-Durable Goods | Durable Goods |
|---|---|---|---|---|---|
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.23% | 4.37% | 5.33% | 4.20% | 0.71% |
| 2009-10 | 0.49% | 1.56% | 1.25% | 1.87% | 1.94% |
| 1947-2010 | 7.52% | 7.44% | 8.63% | 6.57% | 7.87% |

Source: Planning Board

### Historical Components of Personal Consumption Expenditures and GNP
(Measured in Current Dollars)



Source: Government Development Bank

12

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.2% during this period.

### Personal Consumption Expenditures and GNP
### (Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
### (Constant Dollars)



Source: Government Development Bank

13

PR-CCD-0006362

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $16.0 billion in Fiscal Year 2009-2010, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past fourteen years these transfers have not been negatively affected by economic downturns. The amount of federal transfers to individuals is equal to about 28% of personal consumption expenditures in Fiscal Year 2009-2010 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2011-2012 is $595,165,542. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2011-2012 is $216,423,834 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2011-2012 is $378,741,709. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

14

PR-CCD-0006363

The following table shows the legally required increase of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

**Annual Pledged Sales Tax Base Amount**

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

PR-CCD-0006364

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day, the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth

16

PR-CCD-0006365

Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1) Includes 1.5% Municipal Sales Tax.
(2) Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. As of August 2011, all merchants and retailers with a volume of sales equal to or greater than

17

PR-CCD-0006366

$200,000 are required to file their return electronically. The Treasury Department reports that, as of October 31, 2011, 92% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of August 2011, 241,625 merchants and retailers were required to file a monthly return, out of which 81,749 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants' Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 33.4% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Commonwealth Sales Tax collections among the top 20 merchants grew 12% from Fiscal Year 2007-2008 to Fiscal Year 2010-2011. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

**Commonwealth Sales Tax Enforcement Initiatives**

The Treasury Department has undertaken various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, it was estimated that at that time the Treasury Department was only collecting approximately 52% of the potential Commonwealth Sales Tax revenues. As further discussed below, the Treasury Department estimates that in Fiscal Year 2011-2012 it will collect an additional $200 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has reviewed 568 cases and collected approximately $64.2 million. In May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, the Treasury Department sent 1,000 additional letters in March 2011 and 2,200 additional letters in April 2011 as a second notice to taxpayers that did not respond to the first letter of May 2010.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed in November 2010 the integration of its general computer systems with the sales tax database in order to better detect non-compliance. The Treasury Department has also implemented a program whereby its officers use hand held scanning devices to cross-check merchant licenses. Recently, the Treasury Department discontinued the use of the hand held scanning devices and will provide tablet computers to its agents, beginning in December 2011, that will allow them to review a broader range of compliance criteria, such as merchant licenses, Commonwealth Sales Tax sales and point of sale system compliance.

18

PR-CCD-0006367

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its sales tax enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto"). The Treasury Department began a two phase implementation of this new point of sale system in December 1, 2010, through a pilot program in which 200 merchants in the Municipality of Ponce were selected to participate. The second phase, which includes the initial implementation of the point of sale system throughout the island, started in March 2011. Implementation of the new system is expected to be completed by the end of Fiscal Year 2011-2012 and is expected to increase sales tax collections by $200 million during the first year. As of November 7, 2011, the point of sale devices captured approximately 187.4 million transactions which resulted in sales of $4.4 billion and Commonwealth Sales Tax collections of $155.6 million. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants register for participation in the point of sale system program on or prior to April 30, 2011. As of October 27, 2011, 191,037 locations had registered in the program and 59,884 of such locations will be required to acquire and use the new point of sale system.

The Treasury Department has begun to detect inconsistencies between the information captured by the point of sale system and that reported by merchants and retailers. The principal inconsistencies are: (i) merchants and retailers that report sales through the point of sale system but do not file monthly returns, (ii) sales reported through the point of sale system are higher than those reported in the monthly returns, (iii) cash credits claimed through the point of sale system are equal to the sales reported, and (iv) merchants and retailers are not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department has created a task force consisting of fiscal auditors and agents from the Sales and Use Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Sales and Use Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Evasion Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the Sales and Use Tax Bureau. As a result of this initiative, as of October 5, 2011, the Treasury Department had identified approximately 33,481 unfiled monthly returns and sent notices to approximately 5,125 merchants and retailers. As of October 31, 2011, approximately 1,181 merchants and retailers had responded to the notices and approximately 2,577 unfiled monthly returns were filed resulting in taxable sales reported of approximately $24.7 million and sales and use tax collections of $1.4 million. Merchants and retailers that filed monthly returns reporting no sales will receive a deficiency notice and all other merchants and retailers that have not responded will be referred to a fiscal auditor or the Tax Evasion Bureau.

In addition, the Treasury Department established "IVU Alerta" in order to enhance Commonwealth Sales Tax compliance. The "IVU Alerta" is an internet and telephone hotline through which customers and merchants can report violations related to the Commonwealth Sales Tax. This initiative started in November 29, 2010 and, as of November 4, 2011, has received 5,610 complaints, which 4,229 have been investigated resulting in fines of approximately $5.5 million.

The Treasury Department is also focused on strengthening its enforcement workforce. It has increased staffing levels in its Enforcement and Compliance Bureaus by approximately 349 employees (including the 125 tax collection agents assigned to the call center mentioned below), which has enabled it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. It has equipped a call center staffed by 125 tax

PR-CCD-0006368

collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010 and, as of November 3, 2011, has produced approximately $57.5 million in collections. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. From July 2009 through August 2011, 3,179 cases pertaining to the Commonwealth Sales Tax were referred to the Audit Bureau, including 411 cases with a high probability of Commonwealth Sales Tax non-compliance identified through the tax intelligence program. As of August 2011, the Audit Bureau has completed 1,260 audits, which include 101 completed audits of cases identified through the tax intelligence program, and assessed approximately $34.5 million in deficiencies.

In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants. As of October 2011, the Treasury Department had visited 99,924 businesses and merchants and imposed approximately $23.2 million in fines for non-compliance with Commonwealth Sales Tax requirements. In addition, the Treasury Department is also making unannounced visits to ensure proper installation of the point of sale system, verify that businesses and merchants are complying with IVU Loto requirements and provide assistance to businesses and merchants in connection with the implementation of the IVU Loto.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7, require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

One additional initiative consists of establishing tax liens pursuant to the procedures of Act No. 12 of January 20, 2010 ("Act 12"), which enables the creation of tax liens through an expedited process. As of October 2011, the Treasury Department has established 16,000 liens in favor of the Commonwealth over approximately $742.5 million in assets.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan, Caguas, Las Piedras and Barceloneta and is currently working with other municipalities that have expressed

PR-CCD-0006369

interest in entering into similar agreements. As of October 2011, these efforts have resulted in 993 visits to merchants and the imposition of $621,500 in fines.

There can be no assurance that the Treasury Department's enforcement initiatives will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

## THE SERIES 2011B BONDS

### General

The Series 2011B Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $45,620,000. The Series 2011B Bonds will be issued in the principal amounts, bearing interest at the rates, and maturing on the dates, all as shown on the inside cover page of this Official Statement. Interest on the Series 2011B Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1, until maturity (or earlier redemption), commencing on February 1, 2012.

The Series 2011B Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof. Interest on the Series 2011B Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2011B Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Series 2011B Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2011B Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See *"Book-Entry Only System"* below.

The Corporation may issue additional bonds that are senior to the First Subordinate Series 2011 Bonds for the purposes described in *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds, including the First Subordinate Series 2011 Bonds. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

### Redemption

*Optional Redemption of the Series 2011B Bonds.* The Series 2011B Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2021, at a redemption price equal to 100% of the principal amount of the Series 2011B Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption.* The Current Interest Term Bonds maturing on August 1, 2031 and 2036, shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date,

21

PR-CCD-0006370

and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Current Interest Term Bond:

|  | Sinking Fund Installments for Current Interest Term Bonds Maturing | |
| --- | --- | --- |
| Mandatory Redemption Date | August 1, 2031 | August 1, 2036 |
| 08/01/2030 | $11,850,000 | |
| 08/01/2031 | 11,380,000* | |
| 08/01/2035 | | $19,390,000 |
| 08/01/2036 | | 3,000,000* |

* Final Maturity

*Notice of Redemption.* In the event any Series 2011B Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Series 2011B Bonds as described above, to the registered owners of the Series 2011B Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2011B Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2011B Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2011B Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2011B Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2011B Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2011B Bonds, and the portions of the Series 2011B Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2011B Bonds or portions thereof to be redeemed will cease to bear interest.

Any notice of optional redemption of Series 2011B Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of and interest on the Series 2011B Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2011B Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of and premium, if any, and interest on the Series 2011B Bonds (or portions thereof) to be redeemed, then the Series 2011B Bonds (or portions thereof) so called for

22

PR-CCD-0006371

redemption will, on the redemption date, cease to bear interest, and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2011B Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2011B Bonds; (ii) confirmation of ownership interest in the Series 2011B Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2011B Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2011B Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2011B Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2011B Bonds. See *Appendix E - Book-Entry Only System.*

## SECURITY FOR THE SERIES 2011B BONDS

**General**

Pursuant to the Resolution, the Series 2011B Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2011B Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2011B Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Series 2011B Bonds. The Corporation contemplates issuing additional Sales Tax Revenue Bonds, Senior Series, as discussed under PLAN OF FINANCING.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011B Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011B Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2011B Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

PR-CCD-0006372

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011B Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011B Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

**Property Pledged for the Payment of the Series 2011B Bonds**

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property described in clauses (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The First Subordinate Series 2011 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes

24

PR-CCD-0006373

of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Bonds and Parity Obligations**

Prior to the issuance of the First Subordinate Series 2011 Bonds, the Corporation had outstanding $13.765 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $699.8 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior, first subordinate and junior subordinate bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.176 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Senior Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. The Corporation contemplates issuing additional Sales Tax Revenue Bonds, Senior Series, as discussed under PLAN OF FINANCING.

After the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $8.951 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued pursuant to the Fifteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vi) the Series 2010E Bonds, issued pursuant to the Sixteenth

PR-CCD-0006374

Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vii) the Series 2011A Bonds, issued pursuant to the Eighteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011, and (viii) the Series 2011B Bonds, issued pursuant to the Nineteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011.

The Corporation currently has outstanding $327.5 million aggregate initial principal amount of Junior Subordinate Bonds issued to PRIFA and the Employees Retirement System pursuant to the Seventeenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 23, 2011. The Corporation expects to refund the Outstanding Junior Subordinate Bonds with the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds.

**Subordination Provisions of the First Subordinate Bonds**

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

**Subordination Provisions of the Junior Subordinate Bonds**

The Junior Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations and are payable from the Pledged Sales Tax. As a result, the Junior Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations, as provided in the Resolution. Moreover, the Junior Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations have been paid in full.

Additional subordinate bonds may be issued under the Resolution subject to the provisions of the Resolution, solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

The Corporation expects to refund the Outstanding Junior Subordinate Bonds with a portion of the Series 2011A Bonds. Such Series 2011A Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds. To the extent the Corporation refunds the Outstanding Junior Subordinate Bonds, no bonds or obligations of the Corporation will be outstanding that are subordinate to the First Subordinate Bonds and First Subordinate Obligations.

PR-CCD-0006375

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2) to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3) to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4) to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5) to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds; and

PR-CCD-0006376

(6)    to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

(7)    to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

(8)    if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2), (4) and (6) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a)    to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b)    at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

PR-CCD-0006377

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):

PR-CCD-0006378

*No Debt Service Reserve deposit requirement currently exists.

## Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month

30

PR-CCD-0006379

Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

*Additional Requirements — Senior Bonds and Parity Obligations*

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

31

PR-CCD-0006380

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement — Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the

32

PR-CCD-0006381

amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the coverage test contained in the supplemental resolution setting forth the terms and conditions of the applicable Second Subordinate Bonds or Second Subordinate Obligations.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2011B Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2011B Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2011B Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2011B Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2011B Bonds. There can be no assurance that other risk factors will not become material in the future.*

**Economic Conditions Could Affect Commonwealth Sales Tax Revenues**

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the

33

PR-CCD-0006382

Commonwealth, see *Appendix A – Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

**Legislative Assembly Authority over the Commonwealth Sales Tax**

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

34

PR-CCD-0006383

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the First Subordinate Series 2011 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2011 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. In connection with the issuance of each series of Outstanding Senior Bonds and First Subordinate Bonds, the then Secretary of Justice issued an opinion reaching the same conclusion (the "Secretary of Justice Opinions").

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2011 Opinion and the Secretary of Justice Opinions and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the First Subordinate Series 2011 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for

PR-CCD-0006384

purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes of the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the First Subordinate Series 2011 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2011B Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2011B Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2011B Bonds is not a recommendation to purchase, hold or sell such Series 2011B Bonds and such rating will not address the marketability of such Series 2011B Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2011B Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2011B Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "*Subordination Provisions of the Bonds*" under SECURITY FOR THE BONDS. In the event the owners of the Series 2011B Bonds shall be entitled to declare a default, the payment of the Series 2011B Bonds by the Corporation cannot be accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2011B Bonds on the date such default is declared.

36

PR-CCD-0006385

# AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Outstanding Senior Bonds and Parity Obligations, the Outstanding First Subordinate Bonds, the Series 2011A Bonds, and the Series 2011B Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption and excluding the Refunded Bonds:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding Subordinate Bonds[1][2][3] | Total Debt Service on Series 2011A Bonds | Series 2011B Bonds | | | Total Annual Debt Service[2] |
|---|---|---|---|---|---|---|---|
| | | | | Principal | Interest[4] | Debt Service[4] | |
| 2011 | $ 177,212,926 | $ 369,311,645 | - | - | - | - | $ 546,524,570 |
| 2012 | 177,212,926 | 355,813,478 | $ 2,760,632 | - | $ 1,594,492 | $ 1,594,492 | 537,381,528 |
| 2013 | 177,212,926 | 375,924,048 | 5,733,735 | - | 314,641 | 314,641 | 559,185,350 |
| 2014 | 177,212,926 | 396,141,405 | 5,090,030 | - | 2,314,585 | 2,314,585 | 580,758,945 |
| 2015 | 177,212,926 | 407,441,405 | 18,201,500 | - | 2,314,585 | 2,314,585 | 605,170,416 |
| 2016 | 177,212,926 | 434,012,655 | 18,201,500 | - | 2,314,585 | 2,314,585 | 631,741,666 |
| 2017 | 177,212,926 | 461,319,325 | 18,201,500 | - | 2,314,585 | 2,314,585 | 659,048,336 |
| 2018 | 177,212,926 | 489,714,800 | 18,201,500 | - | 2,314,585 | 2,314,585 | 687,443,811 |
| 2019 | 177,212,926 | 519,244,175 | 18,201,500 | - | 2,314,585 | 2,314,585 | 716,973,186 |
| 2020 | 177,212,926 | 547,919,594 | 18,201,500 | - | 2,314,585 | 2,314,585 | 745,648,604 |
| 2021 | 177,212,926 | 532,198,250 | 18,201,500 | - | 2,314,585 | 2,314,585 | 729,927,261 |
| 2022 | 181,942,926 | 539,616,950 | 18,201,500 | - | 2,314,585 | 2,314,585 | 742,075,961 |
| 2023 | 184,113,226 | 558,433,175 | 59,256,500 | - | 2,314,585 | 2,314,585 | 804,117,486 |
| 2024 | 259,097,926 | 581,050,325 | 38,916,500 | - | 2,314,585 | 2,314,585 | 881,379,336 |
| 2025 | 304,651,226 | 596,509,075 | 18,201,500 | - | 2,314,585 | 2,314,585 | 921,676,386 |
| 2026 | 319,309,926 | 623,648,837 | 18,201,500 | - | 2,314,585 | 2,314,585 | 963,474,848 |
| 2027 | 333,337,426 | 649,577,155 | 18,201,500 | - | 2,314,585 | 2,314,585 | 1,003,430,666 |
| 2028 | 352,878,526 | 676,830,272 | 18,201,500 | - | 2,314,585 | 2,314,585 | 1,050,224,883 |
| 2029 | 369,740,487 | 706,152,250 | 18,201,500 | - | 2,314,585 | 2,314,585 | 1,096,408,822 |
| 2030 | 387,153,667 | 722,364,392 | 18,201,500 | $11,850,000 | 2,314,585 | 14,164,585 | 1,141,884,145 |
| 2031 | 404,688,595 | 753,177,405 | 18,201,500 | 11,380,000 | 1,722,085 | 13,102,085 | 1,189,169,585 |
| 2032 | 422,921,795 | 785,933,005 | 28,331,500 | - | 1,153,085 | 1,153,085 | 1,238,339,385 |
| 2033 | 441,880,695 | 810,782,068 | 35,666,500 | - | 1,153,085 | 1,153,085 | 1,289,482,347 |
| 2034 | 461,600,180 | 841,874,818 | 18,201,500 | - | 1,153,085 | 1,153,085 | 1,322,829,582 |
| 2035 | 482,111,345 | 874,619,818 | 18,201,500 | 19,390,000 | 1,153,085 | 20,543,085 | 1,395,475,747 |
| 2036 | 503,444,330 | 909,682,340 | 18,201,500 | 3,000,000 | 154,500 | 3,154,500 | 1,434,482,670 |
| 2037 | 486,103,395 | 938,618,038 | 18,201,500 | - | - | - | 1,442,922,932 |
| 2038 | 507,593,360 | 976,147,811 | 18,201,500 | - | - | - | 1,501,942,672 |
| 2039 | 142,560,982 | 1,030,002,191 | 18,201,500 | - | - | - | 1,190,764,673 |
| 2040 | 140,477,975 | 1,059,650,610 | 18,201,500 | - | - | - | 1,218,330,085 |
| 2041 | 673,482,975 | 1,077,167,210 | 34,521,500 | - | - | - | 1,785,171,685 |
| 2042 | 700,472,975 | 1,046,368,410 | 18,201,500 | - | - | - | 1,765,042,885 |
| 2043 | 728,542,975 | 197,750,000 | 782,726,500 | - | - | - | 1,709,019,475 |
| 2044 | 757,732,975 | 186,375,000 | 455,000,000 | - | - | - | 1,399,107,975 |
| 2045 | 788,097,975 | - | 540,525,000 | - | - | - | 1,328,622,975 |
| 2046 | 819,672,975 | - | 507,590,000 | - | - | - | 1,327,262,975 |
| 2047 | 852,507,975 | - | 509,665,000 | - | - | - | 1,362,172,975 |
| 2048 | 886,663,066 | - | 475,510,000 | - | - | - | 1,362,173,066 |
| 2049 | 922,181,201 | - | 439,995,000 | - | - | - | 1,362,176,201 |
| 2050 | 959,121,096 | - | 403,055,000 | - | - | - | 1,362,176,096 |
| 2051 | 997,538,585 | - | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | - | 1,198,845,475 |
| Total | $24,539,754,484 | $22,031,371,936 | $4,742,977,897 | $45,620,000 | $47,746,003 | $93,366,003 | $51,407,470,319 |

(1) Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion of the interest is capitalized in 2012.

(2) These figures are reduced by the (i) 35% Build America Bonds subsidy on the Series 2010D Bonds, (ii) 45% Recovery Zone Economic Development Bonds subsidy on the Series 2010E Bonds, and (iii) interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 but exclude accreted interest on Capital Appreciation Bonds.

(3) After giving effect to the issuance of the Series 2011 Bonds and the refunding of the Refunded Bonds.

(4) These figures are reduced by interest that was capitalized.

PR-CCD-0006386

### Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2011[5] | $1,122,656,758 | $177,212,926 | $369,311,645 | $546,524,570 | 2.05 |
| 2012 | 1,167,567,274 | 210,076,377 | 360,168,602 | 570,244,979 | 2.05 |
| 2013 | 1,214,274,294 | 224,850,008 | 381,972,424 | 606,822,433 | 2.00 |
| 2014 | 1,262,849,682 | 227,546,984 | 403,546,020 | 631,093,004 | 2.00 |
| 2015 | 1,313,368,174 | 228,379,073 | 427,957,490 | 656,336,563 | 2.00 |
| 2016 | 1,365,907,496 | 228,062,958 | 454,528,740 | 682,591,698 | 2.00 |
| 2017 | 1,420,548,482 | 228,060,153 | 481,835,410 | 709,895,563 | 2.00 |
| 2018 | 1,477,375,202 | 228,062,008 | 510,230,885 | 738,292,893 | 2.00 |
| 2019 | 1,536,475,086 | 228,062,283 | 539,760,260 | 767,822,543 | 2.00 |
| 2020 | 1,597,939,063 | 230,102,296 | 568,435,679 | 798,537,974 | 2.00 |
| 2021 | 1,661,861,699 | 277,769,946 | 552,714,335 | 830,484,281 | 2.00 |
| 2022 | 1,728,341,341 | 303,569,146 | 560,133,035 | 863,702,181 | 2.00 |
| 2023 | 1,797,480,273 | 278,246,422 | 620,004,260 | 898,250,682 | 2.00 |
| 2024 | 1,869,384,867 | 311,897,347 | 622,281,410 | 934,178,757 | 2.00 |
| 2025 | 1,944,165,753 | 354,522,177 | 617,025,160 | 971,547,337 | 2.00 |
| 2026 | 2,021,937,984 | 366,241,177 | 644,164,922 | 1,010,406,099 | 2.00 |
| 2027 | 2,102,821,216 | 380,733,404 | 670,093,240 | 1,050,826,644 | 2.00 |
| 2028 | 2,186,939,892 | 395,508,804 | 697,346,357 | 1,092,855,162 | 2.00 |
| 2029 | 2,274,423,432 | 409,908,214 | 726,668,335 | 1,136,576,549 | 2.00 |
| 2030 | 2,365,406,431 | 427,310,570 | 754,730,477 | 1,182,041,047 | 2.00 |
| 2031 | 2,460,028,873 | 444,840,257 | 784,480,990 | 1,229,321,247 | 2.00 |
| 2032 | 2,558,436,335 | 463,078,457 | 815,417,590 | 1,278,496,047 | 2.00 |
| 2033 | 2,660,780,222 | 482,032,357 | 847,601,653 | 1,329,634,010 | 2.00 |
| 2034 | 2,767,217,994 | 521,591,842 | 861,229,403 | 1,382,821,245 | 2.00 |
| 2035 | 2,877,913,407 | 524,763,007 | 913,364,403 | 1,438,127,410 | 2.00 |
| 2036 | 2,993,036,771 | 564,622,242 | 931,038,340 | 1,495,660,582 | 2.00 |
| 2037 | 3,112,765,206 | 598,669,382 | 956,819,538 | 1,555,488,920 | 2.00 |
| 2038 | 3,237,282,917 | 623,359,348 | 994,349,311 | 1,617,708,659 | 2.00 |
| 2039 | 3,366,781,480 | 634,211,969 | 1,048,203,691 | 1,682,415,661 | 2.00 |
| 2040 | 3,501,460,129 | 671,863,087 | 1,077,852,110 | 1,749,715,197 | 2.00 |
| 2041 | 3,641,526,072 | 702,021,112 | 1,111,688,710 | 1,813,709,822 | 2.01 |
| 2042 | 3,787,194,804 | 730,208,775 | 1,064,569,910 | 1,794,778,685 | 2.11 |
| 2043 | 3,938,690,439 | 759,457,787 | 980,476,500 | 1,739,934,287 | 2.26 |
| 2044 | 4,096,246,056 | 789,892,900 | 641,375,000 | 1,431,267,900 | 2.86 |
| 2045 | 4,260,104,058 | 821,534,137 | 540,525,000 | 1,362,059,137 | 3.13 |
| 2046 | 4,430,516,543 | 854,452,837 | 507,590,000 | 1,362,042,837 | 3.25 |
| 2047 | 4,607,745,694 | 852,507,975 | 509,665,000 | 1,362,172,975 | 3.38 |
| 2048 | 4,792,064,181 | 886,663,066 | 475,510,000 | 1,362,173,066 | 3.52 |
| 2049 | 4,983,755,580 | 922,181,201 | 439,995,000 | 1,362,176,201 | 3.66 |
| 2050 | 5,183,114,812 | 959,121,096 | 403,055,000 | 1,362,176,096 | 3.81 |
| 2051 | 5,390,448,594 | 997,538,585 | - | 997,538,585 | 5.40 |
| 2052 | 5,606,075,910 | 1,037,491,756 | - | 1,037,491,756 | 5.40 |
| 2053 | 5,830,328,507 | 1,079,043,813 | - | 1,079,043,813 | 5.40 |
| 2054 | 6,063,551,398 | 1,122,257,975 | - | 1,122,257,975 | 5.40 |
| 2055 | 6,306,103,401 | 1,167,202,556 | - | 1,167,202,556 | 5.40 |
| 2056 | 6,558,357,682 | 1,213,947,975 | - | 1,213,947,975 | 5.40 |
| 2057 | 6,820,702,338 | 1,198,845,475 | - | 1,198,845,475 | 5.69 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Sales Tax Revenue Bonds, Senior Series in Fiscal Year 2011-2012 in the principal amount of approximately $1.1 billion. The proceeds of such additional Sales Tax Revenue Bonds, Senior Series will be used to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminating certain related interest rate swap agreements. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy. Actual interest and interest requirements will vary based on the actual principal and interest on the additional Sales Tax Revenue Bonds, Senior Series.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

38

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.61%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.61% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2011[5] | $1,122,656,758 | $177,212,926 | $369,311,645 | $546,524,570 | 2.05 |
| 2012 | 1,140,751,752 | 210,076,377 | 360,168,602 | 570,244,979 | 2.00 |
| 2013 | 1,159,138,397 | 224,850,008 | 381,972,424 | 606,822,433 | 1.91 |
| 2014 | 1,177,821,395 | 227,546,984 | 403,546,020 | 631,093,004 | 1.87 |
| 2015 | 1,196,805,523 | 228,379,073 | 427,957,490 | 656,336,563 | 1.82 |
| 2016 | 1,216,095,633 | 228,062,958 | 454,528,740 | 682,591,698 | 1.78 |
| 2017 | 1,235,696,658 | 228,060,153 | 481,835,410 | 709,895,563 | 1.74 |
| 2018 | 1,255,613,608 | 228,062,008 | 510,230,885 | 738,292,893 | 1.70 |
| 2019 | 1,275,851,576 | 228,062,283 | 539,760,260 | 767,822,543 | 1.66 |
| 2020 | 1,296,415,736 | 230,102,296 | 568,435,679 | 798,537,974 | 1.62 |
| 2021 | 1,317,311,345 | 277,769,946 | 552,714,335 | 830,484,281 | 1.59 |
| 2022 | 1,338,543,746 | 303,569,146 | 560,133,035 | 863,702,181 | 1.55 |
| 2023 | 1,360,118,366 | 278,246,422 | 620,004,260 | 898,250,682 | 1.51 |
| 2024 | 1,382,040,721 | 311,897,347 | 622,281,410 | 934,178,757 | 1.48 |
| 2025 | 1,404,316,416 | 354,522,177 | 617,025,160 | 971,547,337 | 1.45 |
| 2026 | 1,426,951,146 | 366,241,177 | 644,164,922 | 1,010,406,099 | 1.41 |
| 2027 | 1,449,950,698 | 380,733,404 | 670,093,240 | 1,050,826,644 | 1.38 |
| 2028 | 1,473,320,951 | 395,508,804 | 697,346,357 | 1,092,855,162 | 1.35 |
| 2029 | 1,497,067,881 | 409,908,214 | 726,668,335 | 1,136,576,549 | 1.32 |
| 2030 | 1,521,197,558 | 427,310,570 | 754,730,477 | 1,182,041,047 | 1.29 |
| 2031 | 1,545,716,153 | 444,840,257 | 784,480,990 | 1,229,321,247 | 1.26 |
| 2032 | 1,570,629,932 | 463,078,457 | 815,417,590 | 1,278,496,047 | 1.23 |
| 2033 | 1,595,945,265 | 482,032,357 | 847,601,653 | 1,329,634,010 | 1.20 |
| 2034 | 1,621,668,625 | 521,591,842 | 861,229,403 | 1,382,821,245 | 1.17 |
| 2035 | 1,647,806,587 | 524,763,007 | 913,364,403 | 1,438,127,410 | 1.15 |
| 2036 | 1,674,365,835 | 564,622,242 | 931,038,340 | 1,495,660,582 | 1.12 |
| 2037 | 1,701,353,158 | 598,669,382 | 956,819,538 | 1,555,488,920 | 1.09 |
| 2038 | 1,728,775,456 | 623,359,348 | 994,349,311 | 1,617,708,659 | 1.07 |
| 2039 | 1,756,639,739 | 634,211,969 | 1,048,203,691 | 1,682,415,661 | 1.04 |
| 2040 | 1,784,953,131 | 671,863,087 | 1,077,852,110 | 1,749,715,197 | 1.02 |
| 2041 | 1,813,722,871 | 702,021,112 | 1,111,688,710 | 1,813,709,822 | 1.00 |
| 2042 | 1,842,956,314 | 730,208,775 | 1,064,569,910 | 1,794,778,685 | 1.03 |
| 2043 | 1,872,660,933 | 759,457,787 | 980,476,500 | 1,739,934,287 | 1.08 |
| 2044 | 1,902,844,323 | 789,892,900 | 641,375,000 | 1,431,267,900 | 1.33 |
| 2045 | 1,933,514,200 | 821,534,137 | 540,525,000 | 1,362,059,137 | 1.42 |
| 2046 | 1,964,678,406 | 854,452,837 | 507,590,000 | 1,362,042,837 | 1.44 |
| 2047 | 1,996,344,907 | 852,507,975 | 509,665,000 | 1,362,172,975 | 1.47 |
| 2048 | 2,028,521,799 | 886,663,066 | 475,510,000 | 1,362,173,066 | 1.49 |
| 2049 | 2,061,217,309 | 922,181,201 | 439,995,000 | 1,362,176,201 | 1.51 |
| 2050 | 2,094,439,795 | 959,121,096 | 403,055,000 | 1,362,176,096 | 1.54 |
| 2051 | 2,128,197,751 | 997,538,585 | - | 997,538,585 | 2.13 |
| 2052 | 2,162,499,807 | 1,037,491,756 | - | 1,037,491,756 | 2.08 |
| 2053 | 2,197,354,733 | 1,079,043,813 | - | 1,079,043,813 | 2.04 |
| 2054 | 2,232,771,439 | 1,122,257,975 | - | 1,122,257,975 | 1.99 |
| 2055 | 2,268,758,980 | 1,167,202,556 | - | 1,167,202,556 | 1.94 |
| 2056 | 2,305,326,557 | 1,213,947,975 | - | 1,213,947,975 | 1.90 |
| 2057 | 2,342,483,517 | 1,198,845,475 | - | 1,198,845,475 | 1.95 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Sales Tax Revenue Bonds, Senior Series in Fiscal Year 2011-2012 in the principal amount of approximately $1.1 billion. The proceeds of such additional Sales Tax Revenue Bonds, Senior Series will be used to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminating certain related interest rate swap agreements. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy. Actual principal and interest requirements will vary based on the actual principal and interest on the additional Sales Tax Revenue Bonds, Senior Series.

(3) Debt service for the year ending and including August 1. Debt service is based on all Subordinate Senior Bonds and First Subordinate Obligations after the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

PR-CCD-0006388

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2010, the average annual growth rate in personal consumption expenditures (nominal) was 7.6%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 4.7%. During Fiscal Year 2010, which constitutes the fourth consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 3.1% while Commonwealth Sales Tax revenues grew by 0.3% as compared to Fiscal Year 2009. The average annual growth rate of Commonwealth Sales Tax collections from Fiscal Year 2008 (the first full fiscal year after the implementation of the Commonwealth Sales Tax in November 2006) to Fiscal Year 2011 has been -0.61%.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of the Series 2011B Bonds, together with other funds available to the Corporation, to (i) refund prior to maturity certain of its First Subordinate Bonds on the redemption dates and at the redemption prices set forth below plus accrued interest to the redemption dates, and (ii) pay the cost of issuance of the Series 2011B Bonds.

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date | Redemption Price (% of Par) | Redemption Date |
|---|---|---|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2009B | $38,490,000 | 6.050% | 08/01/2029 | 101.00 | 08/01/2014 |

### Estimated Sources and Uses of Funds

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2011B Bonds............................ | $45,620,000.00 |
| Other Available Sources............................................................ | 2,031,255.33 |
| **Total Sources** ...................................................................... | $47,651,255.33 |

**Uses**

| | |
|---|---|
| Deposit to the Escrow Fund ..................................................... | $44,881,495.53 |
| Capitalized Interest.................................................................. | 1,991,522.74 |
| Underwriters' Discount and Other Costs of Issuance[1] ............ | 778,237.06 |
| **Total Uses**........................................................................... | $47,651,255.33 |

[1] Includes legal, printing and other financing expenses.

The Corporation will deposit a portion of the net proceeds of the Series 2011B Bonds with the Trustee, as escrow agent, under the terms of an escrow deposit agreement. Such amount of net proceeds of the Series 2011B Bonds will be invested in Government Obligations, the principal of and interest on which when due will provide moneys sufficient to pay the principal of or the redemption price of the Refunded Bonds and the interest coming due on the Refunded Bonds through their date of redemption or maturity date, as applicable.

Upon the deposit with the Trustee, the Refunded Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the Resolution and the Refunded Bonds will thereupon be defeased. In rendering the foregoing opinion, Bond Counsel will rely on the report of Samuel Klein and

PR-CCD-0006389

Company, Certified Public Accountants, as verification agent, dated the date of delivery of the Series 2011B Bonds, relating to the verification of certain mathematical computations with respect to the moneys and Government Obligations deposited with the escrow agent under the terms of the escrow deposit agreement.

Additionally, the Corporation intends to issue on or about December 13, 2011, approximately $1.1 billion of the Senior Series 2011 Bonds for the purpose of repaying outstanding 2006 Appropriation Debt and covering the cost of terminating certain swap agreements associated with such 2006 Appropriation Debt. The Senior Series 2011 Bonds are being issued after the First Subordinate 2011 Bonds in order to maximize the amount of net proceeds for the Corporation of the Senior Series 2011 Bonds. No assurance can be given that any such Sales Tax Revenue Bonds, Senior Series will be issued for such purposes.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Member | Commencement of Term | Expiration Date |
| --- | --- | --- |
| Marcos Rodríguez-Ema, Chairman | January 15, 2009 | September 23, 2015 |
| Juan Carlos Batlle, Vice Chairman | March 2, 2011 | September 23, 2012 |
| Manuel H. Dubón, Esq. | February 2, 2009 | September 23, 2012 |
| Juan E. Rodríguez Díaz, Esq. | February 20, 2009 | September 23, 2012 |
| Eduardo R. Emanuelli | May 11, 2011 | September 23, 2015 |
| Jesús F. Méndez | May 18, 2011 | September 23, 2014 |
| Eugenio L. Torres | July 5, 2011 | September 23, 2014 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. José Otero, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Ignacio Canto, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mrs. Zulema Martínez, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

### Other Obligations of the Corporation

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that

PR-CCD-0006390

are not secured under the Resolution. As of August 31, 2011 the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution. The Corporation expects to terminate this swap agreement in connection with the issuance of the Senior Series 2011 Bonds, the proceeds of which will be used to repay certain outstanding 2006 Appropriation Debt and the termination payment associated with the termination of this swap agreement.

In connection with the Corporation's termination in November 2008 of an interest rate exchange agreement with a notional amount of $218 million relating to the Corporation's Sales Tax Revenue Bonds, Series 2007A, the Corporation made a termination payment to its counterparty. The counterparty has asserted to the Corporation that it is entitled to recover a termination payment in excess of that paid by the Corporation, plus interest at a default rate. The Corporation's management believes that any resolution of this dispute would not have a material adverse impact on the amount of Revenues available to pay debt service on the Corporation's bonds.

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Mendez & Alvarez LLC, Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Series 2011B Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Puerto Rico Tax Counsel*.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Series 2011B Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained. Moreover, this section is not to be construed as a substitute for careful tax planning. Prospective investors are urged to consult their own tax advisors with specific reference to their own tax situations, including the application and effect of other tax laws and any possible changes in the tax laws after the date of this Official Statement.

PR-CCD-0006391

**Puerto Rico Tax Considerations for Puerto Rico Residents**

In the opinion of Pietrantoni Mendez & Alvarez LLC, based on the laws of Puerto Rico now in force:

1.    Interest on the Series 2011B Bonds is:

(a)    exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico (the "PR Code") and Article 2 of Act 91;

(b)    exempt from Puerto Rico alternative minimum taxes under Section 1022.04(b)(2) of the PR Code;

(c)    exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

(d)    exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it exempts from the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which is currently pending approval by the Legislative Assembly of Puerto Rico, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 2(b) above, we assume that the AMT exemption provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may not be exempt from Puerto Rico alternative minimum taxes.

2.    The Series 2011B Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3.    The Series 2011B Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4.    The Series 2011B Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05(g) of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

The PR Code does not contain any provisions regarding the treatment of the excess of a Series 2011B Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount is treated as interest.

PR-CCD-0006392

Prospective owners of the Series 2011B Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Series 2011B Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Series 2011B Bonds.

## United States Federal Tax Considerations for Puerto Rico Residents

IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Series 2011B Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Series 2011B Bonds.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Series 2011B Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Series 2011B Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code, as amended (the "US Code") and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also does not address the consequences to holders of the Series 2011B Bonds under state, local or foreign tax laws.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a bona fide resident of Puerto Rico, within the meaning of Section 937 of the US Code, during the entire taxable year. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, in the opinion of Pietrantoni Mendez & Alvarez LLC:

1.      Interest or original issue discount on the Series 2011B Bonds is excludable from the gross income of the recipient thereof for United States federal income tax purposes under Section 933 of the US Code if the recipient is a bona fide resident of Puerto Rico during the entire taxable year in which such interest is derived.

2.      Interest or original issue discount on the Series 2011B Bonds derived by a corporation organized under the laws of Puerto Rico is not subject to United States federal income tax under the US Code if: (a) such interest is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.      United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Series 2011B Bonds. Pursuant to Notice 89-40, issued by the IRS on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Series 2011B Bonds by an individual who is a

PR-CCD-0006393

bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Series 2011B Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the seller located outside of Puerto Rico and (iii) the individual has been a resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Series 2011B Bonds or (2) the ten year period preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Special Puerto Rico Tax Counsel's opinion is limited to the above, and Special Puerto Rico Tax Counsel has not expressed any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds. Such opinion is based upon Special Puerto Rico Tax Counsel's reliance upon the continued accuracy of the representations, warranties and covenants made by the Corporation in the Resolution.

Prospective owners of the Series 2011B Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Series 2011B Bonds.

**No Opinion as to Exclusion under Section 103(a) of the Code**

The Corporation has determined, based on the advice of counsel, that interest on the Series 2011B Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. As a result, the Series 2011B Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico. Special Puerto Rico Tax Counsel is not opining as to the status of the Series 2011B Bonds for purposes of Section 103(a) of the United States Internal Revenue Code.

## RATINGS

The Series 2011B Bonds have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A1" by Moody's Investors Service ("Moody's), and "A+" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2011B Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, see *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

PR-CCD-0006394

## LEGALITY FOR INVESTMENT

The Series 2011B Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Samuel Klein and Company, Certified Public Accountants, will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Series 2011B Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the Defeasance Obligations and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (2) the computations of yield on both the Defeasance Obligations and the Series 2011B Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Series 2011B Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Series 2011B Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2011B Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $45,016,474.89 reflecting an underwriters' discount of $603,525.11, and to reoffer such Series 2011B Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2011B Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2011B Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2011B Bonds if any Series 2011B Bonds are purchased.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2011B Bonds as consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2011B Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2011B Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel. The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and Pietrantoni Mendez & Alvarez LLC, San Juan, Puerto Rico, Special Puerto Rico Tax Counsel, are set forth as *Appendix C* and *Appendix D*, respectively, to this Official Statement.

PR-CCD-0006395

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2011B Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a) within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b) in a timely manner, not in excess of ten business days after the occurrence of the event, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds: (1) principal and interest payment delinquencies; (2) non-payment related defaults, if material; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2011B Bonds, or other material events affecting the tax status of the Series 2011B Bonds; (7) modifications to rights of security holders (including Beneficial Owners, of the Series 2011 A Bonds, if material; (8) bond calls, if material; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2011B Bonds, if material; (11) rating changes; (12) tender offers; (13) bankruptcy, insolvency, receivership, or similar proceedings of the Corporation; (14) the consummation of a merger, consolidation or acquisition involving the Corporation or the sale of substantially all of the assets of the Corporation, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; (15) the appointment of a successor or additional trustee, or the change of name of a trustee, if material; and (16) failure by the Corporation to comply with clause (a) above.

With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2011B Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2011B Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2011B Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

PR-CCD-0006396

Event (13). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2011B Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

48

PR-CCD-0006397

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2011B Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2011B Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2011B Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2011B Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of opinion of Special Puerto Rico Tax Counsel (*Appendix D*), and the summary of the book-entry system for the Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing under the heading UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**PUERTO RICO SALES TAX FINANCING
CORPORATION**

By:        /s/ Jose R. Otero Freiria
Executive Director

PR-CCD-0006398

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006399

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables that may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the future level of Commonwealth Sales Tax revenues.

## General

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2008 and 2009, the real gross national product contracted by 2.9% and 4.0%, respectively. For fiscal year 2010, preliminary reports indicate that the real gross national product contracted by 3.8%. The Puerto Rico Planning Board (the "Planning Board") projects a decrease in real gross national product of 1.0% for fiscal year 2011 and an increase of 0.7% for fiscal year 2012.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

## Personal Income

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2010. In fiscal year 2010, aggregate personal income was $60.4 billion ($50.0 billion at 2005 prices) and personal income per capita was $15,203 ($12,592 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $16.0 billion in fiscal year 2010 ($14.0 billion in fiscal year 2009). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.4 billion, or 65% of the transfer payments to individuals in fiscal year 2010 ($9.8 billion, or 70.1%, in fiscal year 2009). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

PR-CCD-0006400

The following table shows the personal income for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010**[1] |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,566.2 | $20,702.9 | $21,107.1 | $20,572.1 | $20,480.6 |
| Government | 8,424.2 | 8,584.9 | 8,762.2 | 9,047.4 | 8,275.6 |
| Other | 1,036.7 | 946.4 | 999.4 | 1,123.8 | 1,137.4 |
| Total Employees' compensation | $30,027.1 | $30,234.2 | $30,868.8 | $30,743.3 | $29,893.7 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,241.9 | 2,221.2 | 2,167.5 | 2,213.4 | 2,192.7 |
| Employers | 3,167.1 | 3,074.1 | 3,066.0 | 3,202.7 | 3,081.7 |
| Total Contributions for social insurance | $5,409.0 | $5,295.3 | $5,233.4 | $5,416.1 | $5,274.4 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,832.3 | $2,219.8 | $2,334.2 | $2,429.8 | $2,465.1 |
| Dividends of domestic corporations | 304.3 | $322.1 | $351.9 | $355.6 | $272.0 |
| Miscellaneous income and dividends received from abroad | 13.4 | 9.9 | 17.1 | 7.8 | 8.4 |
| Rental income of persons | 4,387.4 | 5,529.0 | 5,829.7 | 6,702.3 | 6,906.2 |
| Personal interest income | 3,725.1 | 2,820.5 | 2,719.0 | 2,810.8 | 2,420.6 |
| Total Proprietors' income | $11,262.5 | $10,901.3 | $11,251.9 | $12,306.3 | $12,072.3 |
| | | | | | |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,390.7 | 3,569.5 | 4,040.6 | 4,470.4 | 4792.3 |
| Federal government | 9,725.9 | 10,327.1 | 12,279.3 | 13,537.3 | 15,633.0 |
| U.S. state governments | 17.6 | 22.7 | 24.1 | 35.6 | 44.8 |
| Business | 1,184.9 | 1,741.0 | 2,301.1 | 2,392.2 | 2,745.7 |
| Other nonresidents | 642.6 | 610.0 | 591.7 | 493.6 | 493.6 |
| Total transfer payments | $14,961.8 | $16,270.3 | $19,236.8 | $20,929.1 | $23,709.4 |
| | | | | | |
| Total Personal Income | $50,842.3 | $52,110.4 | $56,124.1 | $58,562.6 | $60,400.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

PR-CCD-0006401

**Personal Consumption**

During Fiscal Year 2010, at current prices, personal consumption amounted to $57.2 billion, representing an increase of $1.7 billion, or 3.1%, from Fiscal Year 2009. This increase was based on a 3.8% increase in nondurable goods (40.1% of personal consumption), 3.9% increase in durable goods (9% of personal consumption), and 2.5% increase in services (50.9% of personal consumption). At constant 2005 prices, personal consumption increased 0.6% from Fiscal Year 2009. Real consumption expenditures in durable goods, however, decreased by 0.5%. The decline in expenditures of durable goods is characteristic of economies in recession.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010**[1] |
| Food | $ 6,982.2 | $ 7,315.0 | $ 7,913.5 | $ 8,467.5 | $ 8,556.9 |
| Alcoholic beverages and tobacco products | 1,765.8 | 1,783.1 | 1,704.7 | 1,784.2 | 1,903.9 |
| Clothing and accessories | 3,084.9 | 3,528.0 | 3,530.7 | 3,556.6 | 3,265.0 |
| Personal care | 984.6 | 1,031.0 | 1,157.1 | 1,212.0 | 1,439.4 |
| Housing | 7,499.7 | 8,065.8 | 8,568.6 | 9,011.3 | 9,221.2 |
| Household operations | 5,929.2 | 6,479.0 | 6,914.3 | 6,831.5 | 6,748.7 |
| Medical care and funeral expenses | 8,007.2 | 8,434.8 | 9,394.4 | 9,898.0 | 10,665.9 |
| Business services | 3,035.5 | 3,103.0 | 3,021.7 | 3,074.3 | 3,079.7 |
| Transportation | 6,325.3 | 6,079.8 | 6,236.3 | 5,488.1 | 6,088.5 |
| Recreation | 4,810.3 | 4,935.0 | 4,865.7 | 4,810.5 | 4,858.6 |
| Education | 1,819.5 | 1,776.6 | 1,826.3 | 1,928.6 | 1,955.6 |
| Religious and nonprofit organizations, not elsewhere classified | 505.9 | 439.2 | 435.4 | 488.3 | 439.9 |
| Foreign travel | 1,608.9 | 1,616.9 | 1,653.9 | 1,531.4 | 1,614.4 |
| Miscellaneous purchases | 704.1 | 819.5 | 858.4 | 860.9 | 972.3 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | 53,063.1 | 55,406.7 | 58,081.0 | 58,943.3 | 60,810.0 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,403.1 | 3,457.4 | 3,580.1 | 3,520.1 | 3,647.9 |
| Total Personal Consumption Expenditures | $49,660.0 | $51,949.3 | $54,500.9 | $55,423.2 | $57,162.1 |

(1) Preliminary figures.
Source: Planning Board.

A-3

PR-CCD-0006402

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

|  | 2006 | 2007 | 2008 | 2009 | 2010 [1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $56,732 | $59,521 | $61,665 | $62,678 | $63,292 |
| Real gross national product – $ millions (2005 prices) | $54,027 | $53,400 | $51,832 | $49,775 | $47,898 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 0.5% | (1.2)% | (2.9)% | (4.0)% | (3.8)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 2.9% | 1.7% | 2.5% | (3.5)% | 0.4% |

[1] Preliminary.
[2] In current dollars.
*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

A-4

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2011 and 2012.



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2011).
\*\* Estimate for U.S. from IHS-Global Insight (Oct-2011).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2010 shown in this Report are preliminary until the revised figures for fiscal year 2010 and the preliminary figures of fiscal year 2011 are released and the forecast for fiscal year 2012 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index (the "EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following table and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. The average contraction rate of the index for fiscal year 2011 was 2.9%, after a reduction of 5.6% for fiscal year 2010.

A-5

For the first quarter of fiscal year 2012, this index decreased by 1.2%. The month of September 2011, however, reflected the smallest year-over-year reduction in the EAI since October 2006.



*Economic Forecast for Fiscal Years 2011 and 2012*

On March 2011, the Planning Board released its revised gross national product forecast for fiscal year 2011 and its gross national product forecast for fiscal year 2012. The Planning Board revised its gross national product forecast for fiscal year 2011 from a projected growth of 0.4% to a contraction of 1.0%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2011 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2012 projects an increase in gross national product of 0.7% in constant dollars. The Planning Board's forecast for fiscal year 2012 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

PR-CCD-0006405

*Fiscal Year 2010*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.8% (an increase of 1.0% in current dollars) over fiscal year 2009. Nominal gross national product was $63.3 billion in fiscal year 2010 ($47.9 billion in 2005 prices), compared to $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices). Aggregate personal income increased from $58.6 billion in fiscal year 2009 ($49.8 billion in 2005 prices) to $60.4 billion in fiscal year 2010 ($50.0 billion in 2005 prices), and personal income per capita increased from $14,786 in fiscal year 2009 ($12,558 in 2005 prices) to $15,203 in fiscal year 2010 ($12,592 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the West Texas Intermediate oil barrel (WTI) increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of previous years were still felt in fiscal year 2009. Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand. On the other hand, the continuation of the difficulties associated with the financial crisis kept short-term interest rates at historically low levels, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2009*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 4.0% (an increase of 1.6% in current dollars) over fiscal year 2008. Nominal gross national product was $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices), compared to $61.7 billion in fiscal year 2008 ($51.8 billion in 2005 prices). Aggregate personal income increased from $56.1 billion in fiscal year 2008 ($49.6 billion in 2005 prices) to $58.6 billion in fiscal year 2009 ($49.7 billion in 2005 prices), and personal income per capita increased from $14,217 in fiscal year 2008 ($12,557 in 2005 prices) to $14,786 in fiscal year 2009 ($12,558 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% compared to 1,217,500 for fiscal year 2008. At the same time, the unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

A-7

## Overview of the Commonwealth's Fiscal Condition

*Fiscal Imbalance and Fiscal Stabilization Plan.* Since 2000, the Commonwealth has experienced an imbalance between its General Fund total revenues and expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. In January 2009, the Government of Puerto Rico ("Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act 7"), sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) certain financial measures.

The Government estimates that the fiscal stabilization plan's operating expense reduction measures have resulted in annual savings of approximately $837 million, and that the tax revenue enforcement measures, and the temporary and permanent revenue raising measures resulted in additional revenues of $420 million during fiscal year 2011.

The principal financial measure taken has been a bond issuance program through the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. The proceeds from the COFINA bond issuance program (such proceeds are deposited in an account referred to herein as the "Stabilization Fund" managed by GDB) have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and will be used in fiscal year 2012 to cover operating expenses included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA.

Another financial measure taken has been the restructuring of a portion of the Commonwealth's debt service on the Commonwealth's general obligation bonds and bonds of the Public Buildings Authority ("PBA") that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on PBA bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by PBA.

During fiscal year 2012, the Government expects to refinance approximately $537.4 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

*Results for Fiscal Year 2009.* General Fund total revenues for fiscal year 2009 were $7.583 billion (this amount excludes approximately $126.7 million of revenues attributable to the Electronic and Traditional lotteries, which are not included in General Fund revenues on a budget basis), representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009

A-8

were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the Government also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, resulted in approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of COFINA bond issues and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion (this amount excludes approximately $122.8 million of revenues attributable to the Electronic and Traditional lotteries, which are not included in General Fund revenues on a budget basis), representing an increase of $9.8 million from fiscal year 2009 revenues. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were $10.369 billion (which included $216 million of expenditures related to a Government local stimulus program), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded General Fund total revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal year 2010 were approximately $9.691 billion and exceeded General Fund total revenues (excluding other financing sources) by $2.098 billion, or 27.6%. Approximately $2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the fiscal stabilization plan ($1 billion) and (ii) additional expenses ($1 billion) incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Preliminary Results for Fiscal Year 2011.* Preliminary General Fund total revenues for fiscal year 2011 (from July 1, 2010 to June 30, 2011) were $8.165 billion (this amount includes approximately $101.9 million of revenues attributable to the Electronic and Traditional lotteries), an increase of $449.3 million, or 5.8%, from $7.716 billion of net revenues for the same period in the prior fiscal year (this amount includes approximately $122.8 million of revenues attributable to the Electronic and Traditional lotteries), and an increase of $31 million from the revised estimate of net revenues, which took into account the effect of the tax reform discussed below under "Tax Reform."

The increase in General Fund total revenues is mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.8 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform. This increase was partially offset by a decrease of $407 million and $18.5 million in collections from income tax on individuals and entertainment machine licenses, respectively. The decrease in individual income taxes is due to the tax relief provided to individual taxpayers as part of the tax reform and to current economic conditions. The Government had expected that the decrease in General Fund net revenues as a result of the tax relief provided to taxpayers as part of the tax

PR-CCD-0006408

reform would be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. For fiscal year 2011, the first five monthly excise tax payments (from February through June 2011) amounted to $677.6 million, which was consistent with the Government's projection of collections from the excise tax. The Government's expectations with respect to the impact of the tax reform on fiscal year 2011 revenues were met.

Preliminary General Fund total expenses for fiscal year 2011 amounted to $9.153 billion, which excludes $638.7 million of debt service amounts that were refinanced, and exceeded General Fund total revenues (excluding other financing sources) by $988 million, or 12.1%. The difference between preliminary revenues and expenses for fiscal year 2011 was covered principally by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

*Budget for Fiscal Year 2012*

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for General Fund total revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), non-resident withholding taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8,650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed Authority bonds which are expected to be refinanced during fiscal year 2012. See "Commonwealth's Fiscal Imbalance" above. The budgeted total expenditures for fiscal year 2012 are $110 million, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1.109 billion, or 10.7%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2 million).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

*Preliminary Results for the First Three Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit.* Preliminary General Fund revenues for the first three months of fiscal year 2012 (from July 1, 2011 to September 30, 2011) were $1.696 billion, an increase of $129.3 million, or 8.25%, from $1.567 billion of revenues for the same period in the prior fiscal year and a decrease of $33.3 million, or 1.9%, from the revised estimate of revenues of $1.729 billion made in September 2011. The increase in General Fund revenues for the first three months of fiscal year 2012, compared to the same period in the prior fiscal year, is mainly due to the collections of $478 million from the new temporary excise tax under Act No. 154, which

A-10

was not in effect during the first three months of fiscal year 2011. This increase was partially offset by a decrease in collections from individual and corporate income taxes of $115 million and $75 million, respectively.

Preliminary General Fund total expenses (on a cash basis) for the first three months of fiscal year 2011 amounted to $1.858 billion, which is $13.5 million, or 1%, lower than $1.872 billion of budgeted expenditures for the same period. The lower expenditures are mainly due to timing differences in disbursements for general government expenditures of $29.4 million, safety and protection of $6.3 million and welfare of $4.5 million. These lower expenditures were partially offset by increased expenditures in health of $26 million and transportation and communication of $2.4 million. The difference between preliminary revenues for the first three months of fiscal year 2012 was covered principally by funds on deposit in the Stabilization Fund and the issuance of tax revenue anticipation notes by the Commonwealth.

The deficit for fiscal year 2012 is projected to be approximately $610 million, which excludes approximately $691.2 million of debt service payments on Commonwealth general obligation bonds and Commonwealth guaranteed PBA bonds that will be refinanced. In addition, the Office of Management and Budget has indicated that the sectors of health and safety carry risk of budget overruns for fiscal year 2012 as they are undergoing operational changes that were not considered during the preparation of the budget for that fiscal year.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $749 million, $274 million and $7.8 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems. As a result of the increases in employer contributions to the Employees Retirement

A-11

PR-CCD-0006410

System and the Teachers Retirement System adopted in July 2011, as described below, the Administrator of the Retirement Systems projects that the period before depletion of the assets of these two systems will be extended by three to four years.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $121.6 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of its multi-year fiscal imbalances mentioned above, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition. One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act No. 96"). On June 23, 2011, in accordance with Act No. 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of the Puerto Rico Infrastructure Financing Authority ("PRIFA") were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 114 of July 5, 2011 and Act No. 116 of July 6, 2011 ("Act 116"). These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have

A-12

been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $6.3 million, $12.8 million and $19.7 million in fiscal years 2012, 2013 and 2014, respectively.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowers the maximum amount of those loans from $15,000 to $5,000. This change is expected to gradually improve the Employees Retirement System's liquidity.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of October 14, 2011, the Commonwealth had disbursed $5.5 billion in ARRA funds, or 78.8%, of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also enacted Acts No. 82 and 83 of July 19, 2010, which provide for a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the administration adopted a comprehensive tax reform (described below) that takes into account the Commonwealth's current financial situation.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the administration engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the administration published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. As of September 30, 2011, the administration had completed the concession of toll roads PR-22 and PR-5 and short-listed proponents for the Luis Muñoz Marín International Airport and school infrastructure projects.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional

PR-CCD-0006412

projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

*Tax Reform*

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The collections for the first ten monthly excise tax payments (from February through October 2011) were $1.325 billion. These amounts are consistent with the Government's projection of collections from the excise tax.

PR-CCD-0006413

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. It is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

A-15

PR-CCD-0006414

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2011 averaged 1,077,000, a decrease of 2.3% compared to previous fiscal year; and the unemployment rate averaged 15.9%. During the first three months of fiscal year 2012, total employment averaged 1,064,200, a decline of 1.0% with respect to the same period of the prior year; and the unemployment rate decreased to 16.0%.

The following table presents annual statistics of employment and unemployment for fiscal year 2007 through fiscal year 2011, and the average figures for the first two months of fiscal year 2012. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2011.

**Commonwealth of Puerto Rico**
**Employment and Unemployment**[1]
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011 | 1,287 | 1,077 | 204 | 15.9 |
| 2012[3] | 1,267 | 1,064 | 203 | 16.0 |

[1]   Totals may not add due to rounding.
[2]   Unemployed as percentage of labor force.
[3]   Average figures for the first three months of fiscal year 2011 (July 2011 through September 2011).

*Source:* Department of Labor and Human Resources – Household Survey

PR-CCD-0006415

**Economic Performance by Sector**

From fiscal year 2007 to fiscal year 2010, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | | |
|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010[1]** |
| Manufacturing | $37,637 | $40,234 | $44,019 | $44,641 |
| Service[2] | 40,190 | 41,372 | 40,333 | 41,472 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,276 |
| Agriculture | 430 | 519 | 506 | 553 |
| Construction[4] | 2,027 | 2,032 | 1,818 | 1,658 |
| Statistical discrepancy | (464) | (312) | (512) | (340) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,211 | $96,261 |
| Less: net payment abroad | (28,884) | (30,941) | (32,534) | (32,969) |
| Total gross national product[5] | $59,521 | $61,665 | $62,678 | $63,292 |

[1]  Preliminary.
[2]  Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3]  Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4]  Includes mining.
[5]  Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

PR-CCD-0006416

The following table presents annual statistics of average employment based on NAICS for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[2] | 2011 |
| Natural resources and construction | 64,700 | 59,675 | 49,067 | 35,917 | 28,683 |
| Manufacturing | | | | | |
|    Durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
|    Non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| Sub-total | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
|    Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
|    Transportation, warehouse, and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
|       Sub-total | 184,008 | 181,342 | 176,450 | 173,325 | 170,933 |
| | | | | | |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Government[3] | 298,125 | 297,742 | 300,708 | 277,333 | 263,717 |
|    Total non-farm | 1,032,275 | 1,020,208 | 992,583 | 939,700 | 918,375 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2010 manufacturing generated $44.6 billion, or 46.4%, of gross domestic product. Manufacturing, however, only generated $15.8 billion, or 24.9%, of real gross national product in fiscal year 2010. During fiscal year 2011, payroll employment for the manufacturing sector was 84,617, a decrease of 4.1% compared with fiscal year 2010. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2011, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.6% of the average mainland U.S. rate.

PR-CCD-0006417

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity.

PR-CCD-0006418

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector[1]**
**(in thousands at current prices)**

| | Fiscal Years Ended June 30, | | | |
| --- | ---: | ---: | ---: | ---: |
| | **2007** | **2008** | **2009** | **2010[1]** |
| Food | $1,083,300 | $822,008 | $ 1,018,486 | $ 1,040,339 |
| Beverage and Tobacco Products | 924,900 | 1,243,200 | 1,197,325 | 1,203,142 |
| Textile Mills | 2,200 | 1,295 | 975 | 791 |
| Textile Product Mills | 13,200 | 13,438 | 12,072 | 12,418 |
| Apparel | 200,700 | 252,062 | 270,251 | 296,192 |
| Leather and Allied Products | 17,000 | 19,982 | 22,052 | 21,997 |
| Wood Products | 23,600 | 22,011 | 18,809 | 20,228 |
| Paper | 70,600 | 66,066 | 66,233 | 69,664 |
| Printing and Related Support Activities | 124,400 | 118,525 | 111,416 | 109,457 |
| Petroleum and Coal Products | 370,900 | 94,986 | 355,598 | 353,757 |
| Chemical | 27,016,500 | 29,338,802 | 31,013,076 | 31,384,322 |
| Plastics and Rubber Products | 121,700 | 117,556 | 111,835 | 119,614 |
| Nonmetallic Mineral Products | 284,900 | 218,469 | 198,717 | 197,925 |
| Primary Metals | 101,900 | 150,693 | 138,708 | 139,063 |
| Fabricated Metal Products | 239,200 | 247,860 | 227,572 | 209,446 |
| Machinery | 217,500 | 234,410 | 196,456 | 213,689 |
| Computer and Electronic Products | 4,217,200 | 4,462,560 | 6,308,916 | 6,384,137 |
| Magnetic and Optical | - | - | - | - |
| Electrical Equipment, Appliances and Components | 510,900 | 657,298 | 639,313 | 593,777 |
| Transportation Equipment | 78,000 | 77,560 | 66,111 | 61,243 |
| Furniture and Related Products | 65,500 | 56,439 | 47,045 | 47,761 |
| Miscellaneous | 1,955,500 | 2,018,693 | 1,998,060 | 2,162,405 |
| Total gross domestic product of manufacturing sector[2] | $37,636,600 | $40,233,913 | $44,019,025 | $44,641,368 |

[1]  Preliminary.
[2]  Totals may not add due to rounding.

*Source:* Planning Board

A-20

PR-CCD-0006419

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2007 to 2011.

## Commonwealth of Puerto Rico
## Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010[1] | 2011[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 3,825 | 3,758 | 3,058 | 2,500 | 2,133 |
| Fabricated metal products | 5,675 | 5,375 | 4,908 | 4,042 | 3,583 |
| Computer and electronic | 10,092 | 8,600 | 7,042 | 5,708 | 5,867 |
| Electrical equipment | 6,617 | 6,658 | 5,867 | 5,058 | 5,033 |
| Miscellaneous manufacturing | 12,292 | 11,967 | 11,975 | 11,675 | 11,400 |
| Other durable goods manufacturing | 6,917 | 6,742 | 6,392 | 5,808 | 5,633 |
| Total – durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,183 | 11,725 | 11,383 | 11,592 | 11,600 |
| Beverage and tobacco products manufacturing | 3,258 | 3,267 | 3,133 | 3,275 | 2,983 |
| Apparel manufacturing | 7,708 | 9,633 | 9,825 | 8,808 | 8,108 |
| Chemical manufacturing | 30,467 | 27,900 | 25,042 | 22,392 | 21,425 |
| Plastics and rubber products | 2,200 | 1,983 | 1,967 | 1,867 | 1,567 |
| Other non-durable goods manufacturing | 6,625 | 6,442 | 6,133 | 5,550 | 5,283 |
| Total – non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| | | | | | |
| Total manufacturing employment | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

    Total employment in the manufacturing sector decreased by 32,700 from fiscal year 2005 to fiscal year 2011. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009, 2010 and 2011, manufacturing employment decreased by 4.2%, 3.5%, 7.0%, 8.7% and 4.1%, respectively. For the first three months of fiscal year 2012, the sector lost an average of 4,300 jobs, or 5.0%, compared to the same period of the previous year. Given that this sector used to pay, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto

A-21

Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2010, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 0.9% between fiscal years 2007 and 2011. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2010, the service sector generated $41.5 billion, or 43.1%, of gross domestic product, while it generated $36.3 billion, or 57.3%, of real gross national product. Trade, information services, education and health services, finance, insurance and real estate and rentals experienced growth in fiscal year 2010, as measured by gross domestic product and by gross national product at current prices. Transportation, professional and technical, and management services experienced a contraction in fiscal year 2010, as measured by gross domestic product and gross national product at current prices. Service-sector employment decreased from 561,592 in fiscal year 2007 to 541,358 in fiscal year 2011 (representing 58.9% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2011 represents a decrease of 0.6% compared to the prior fiscal year. For the first three months of fiscal year 2012, average service-sector employment was 532,476, an increase of 0.5% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of June 30, 2011, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of June 30, 2011 were $73.7 billion, as compared to $75.5 billion as of December 31, 2010. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. To date, the amount of jobs lost as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $5.5 billion as of

PR-CCD-0006421

June 30, 2011, as compared to $6.0 billion on December 31, 2010. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.3 billion as of June 30, 2011, as compared to $14.2 billion as of December 31, 2010 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of June 30, 2011, there were 31 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $43.6 billion, an increase from $40.6 billion in total assets as of December 31, 2010. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.6 billion in assets as of June 30, 2011, a slight increase from $7.5 billion as of December 31, 2010.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | | |
| --- | --- | --- | --- | --- |
| | **2007** | **2008** | **2009** | **2010**[(1)] |
| Wholesale trade | $ 2,751.6 | $ 2,950.9 | $ 2,934.8 | $ 2,984.0 |
| Retail trade | 4,471.4 | 4,569.4 | 4,614.5 | 4,723.7 |
| Transportation and warehousing | 968.3 | 978.5 | 908.6 | 891.0 |
| Utilities | 2,214.4 | 2,118.0 | 1,971.9 | 1,943.8 |
| Information | 2,466.5 | 2,363.1 | 2,306.4 | 2,359.2 |
| Finance and insurance | 6,694.3 | 7,120.4 | 5,174.7 | 5,543.2 |
| Real Estate and rental | 11,685.7 | 12,064.2 | 13,030.8 | 13,318.3 |
| Professional and business | 3,112.5 | 3,183.6 | 3,132.0 | 3,246.5 |
| Education and health | 3,592.5 | 3,786.2 | 4,125.7 | 4,278.5 |
| Leisure and hospitality | 1,861.5 | 1,874.7 | 1,783.3 | 1,828.1 |
| Other services | 371.6 | 119.3 | 112.3 | 115.9 |
| Total | $40,190.3 | $41,371.9 | $40,333.2 | $41,471.8 |

*Source*: Puerto Rico Planning Board

PR-CCD-0006422

The following table sets forth employment for the service sector for fiscal years 2007 to 2011.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[1] | 2011[1] |
| Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
| Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
| Transportation, warehouse and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Total | 561,592 | 558,742 | 546,083 | 538,175 | 541,358 |

\* Totals may not add due to rounding.
[1] Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,906,900, an increase of 5.7% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during fiscal year 2011 was 68.9%, a decrease of 0.3% from the prior fiscal year. Also, during fiscal year 2011, the average number of rooms available in tourist hotels increased by 5.8% to 11,509 rooms compared to the same period of fiscal year 2010.

During the first month of fiscal year 2012, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 234,200, an increase of 18.4% over the number of persons registered during the same period of fiscal year 2011. The average occupancy rate in tourist hotels during the first month of fiscal year 2012 was 80.2%, a decrease of 0.7% from the prior fiscal year. Also, during the first month of fiscal year 2012, the average number of rooms available in tourist hotels increased by 4.1% to 12,056 rooms compared to the same period of fiscal year 2011.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2011, employment in hotels and other lodging facilities increased by 2.3% to 12,700 jobs. Nevertheless, for the first three months of fiscal year 2012, the average decrease in employment in hotels and other lodging facilities was 2.9% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 70,300 for fiscal year 2011, a decrease of 0.8% over employment for fiscal year 2010. For the first three months of fiscal year 2012, employment decreased by 3.6% to 68,500 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2010.

A-24

PR-CCD-0006423

### Commonwealth of Puerto Rico
### Tourism Data[1]

#### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |
| 2010[5] | 1,347,487 | 1,193,549 | 2,331,393 | 4,872,429 |

#### Total Visitors' Expenditures
#### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009 | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |
| 2010[5] | 1,546.1 | 168.6 | 1,883.5 | 3,598.2 |

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2010, the government (state and local) accounted for $8.3 billion, or 8.6%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 248,800 workers (state, including public corporations, and local), or 27.1% of total, non-farm, payroll employment in fiscal year 2011. From fiscal year 2007 to fiscal year 2011, state and municipal government employment averaged approximately 272,300. During fiscal year 2010, state and municipal government employment decreased by

A-25

24,900 jobs, or 8.7%. According to the payroll survey, the distribution of the job reductions during fiscal year 2010 was 20,600 jobs in the state government and approximately 4,200 jobs in municipal government. During fiscal year 2011, state and municipal government employment decreased by 11,900 jobs, or 4.6%, during fiscal year 2010. According to the payroll survey, the distribution of the job reductions during fiscal year 2011 was 12,000 jobs in the state government and an increase of approximately 100 jobs in municipal government. During the first three months of fiscal year 2012, government employment increased by 2.8% from the previous fiscal year, or by an average of 6,900 jobs, due to recent increases in state government.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment, collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-private partnership. On July 5, 2011 the PPP Authority published its "Request for Qualifications to Acquire a Concession to Finance, Operate, Maintain and Improve the Luis Muñoz Marin International Airport". On August 8, 2011, the PPP Authority and the Puerto Rico Ports Authority received statements of qualifications from twelve (12) from world-class consortia and, on September 23, 2011, it published a short-list of six consortia. The PPP Authority expects to publish the Request for Proposals for the Airport during October 2011 and to select a winning bidder in the first quarter of calendar 2012.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban

PR-CCD-0006425

system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. On September 22, 2011, the PPP Authority and the Highways and Transportation Authority completed the procurement for a concession of toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. Since its peak in fiscal year 2000, real construction investment has declined at an average annual growth rate of 8.7%. Such rates of interest started to decrease significantly in fiscal year 2005, as a consequence of the current contraction of the local economic activity. During the last four fiscal years (from fiscal year 2007 to 2010) real construction investment decreased at an average annual rate of 17.0%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%.

Public investment has been an important component of construction investment. During fiscal year 2010, approximately 49.3% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. The total value of construction permits decreased 29.2% in fiscal year 2010 as compared to fiscal year 2009, and total sales of cement decreased by 5.0% between 2010 and 2011. During the first semester of fiscal year 2012, the total value of construction permits decreased by 22.6%. Average payroll employment in the construction sector during fiscal year 2011 was 28,700, a reduction of 20.1% from fiscal year 2010. During the first three months of fiscal year 2012, payroll employment in the construction sector averaged 29,000, a further reduction of 7.3% for the same period in fiscal year 2011.

Total construction investment for fiscal year 2010 decreased in real terms by 18.8%, following a 22.2% real decline in fiscal year 2009. The Planning Board expects a further construction investment decrease of 7.8% in real terms for fiscal year 2011. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. During the first six months of fiscal year 2011, the total value of construction permits decreased by 22.6%. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010 and by 5.0% in 2011, respectively, reaching levels not seen in almost three decades. During the first three months of fiscal year 2012, cement sales decreased by 3.7% from the previous fiscal year.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising

PR-CCD-0006426

inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided by Act 132 were effective from September 1, 2010 through June 30, 2011, and were subsequently extended until October 31, 2011 by Act No. 115 of July 5, 2011. Certain permanent incentives are also available for rental housing. On November 1, 2011, the Government approved Act 216, which provides incentives similar to the ones available under Act 132 and establishes an orderly transition to gradually reduce those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216 are limited to residential real property and are effective from November 1, 2011 to December 31, 2012, with certain reductions after December 31, 2011 and June 30, 2012. New incentives are also available for property that constitutes the seller's principal residence, as defined in Act 216.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2010, gross income from agriculture was $822 million, an increase of 3.8% compared with fiscal year 2009.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

A-28

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,539,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 14,791,000 | 54.5% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 28,001,302[3] | 15,312,298 | 54.7% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,488,500[3] | 15,927,986 | 55.9% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,912,095[3] | 16,611,710 | 57.5% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,285,846[3] | 16,911,486 | 57.7% |
| 2005 | 406,548[3] | 208,032 | 51.2% | 29,404,797[3] | 17,272,043 | 58.7% |
| 2006 | 400,529[3] | 209,547 | 52.3% | 29,540,873[3] | 17,487,481 | 59.2% |
| 2007 | 396,056[3] | 225,402 | 56.9% | 29,733,951[3] | 17,758,872 | 59.7% |
| 2008 | 395,503[3] | 227,546 | 57.5% | 30,090,148[3] | 18,248,133 | 60.6% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | 19,102,814 | 62.8% |

[1] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2010-2011 was approximately 61,630 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

PR-CCD-0006428

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

A-30

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale. The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies. In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%. Moreover, the Green Energy Incentives Act creates a rebate program of up to 6% of the acquisition, installation, and related costs of the physical plant and the machinery and equipment of small and medium green energy projects located in Puerto Rico. In the case of large scale green energy projects developed in Puerto Rico, the Green Energy Incentives Act creates a renewal green energy certificates program.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United

A-31

PR-CCD-0006430

States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

On September 22, 2011, HR No. 3020 was presented in the U.S. Congress House of Representatives, which allows corporations organized under the laws of Puerto Rico which derive fifty percent (50%) or more of their gross income from Puerto Rico sources to elect to be treated as domestic U.S. corporations for almost all provisions of the U.S. Code, including Section 243 of the U.S. Code pertaining to the dividends received deduction. By way of exception, the electing Puerto Rico corporations would not consider as part of their gross income for federal income tax purposes income derived from sources within Puerto Rico.

PR-CCD-0006431

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

B-2

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

PR-CCD-0006434

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

B-4

PR-CCD-0006435

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

B-5

PR-CCD-0006436

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

      (i)     Government Obligations;

      (ii)    Defeased Municipal Obligations;

      (iii)   certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

B-6

PR-CCD-0006437

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

B-7

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)      Defeasance Obligations;

        (ii)     Defeased Municipal Obligations;

PR-CCD-0006439

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

PR-CCD-0006440

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

PR-CCD-0006441

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

     (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

     (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

     (iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

     (iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

     (v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

     (vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

PR-CCD-0006442

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

    4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

B-12

PR-CCD-0006443

5. Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

B-13

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

PR-CCD-0006445

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

Refunding Bonds shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

Related August 2 Computation Period shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

Reserve Account Cash Equivalent shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

Resolution shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

Revenue Account Monthly Disbursement Date shall mean the last Business Day of each calendar month.

Revenues shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

       1.     All Pledged Sales Tax received by the Corporation or the Trustee.

       2.     With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

       3.     Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

PR-CCD-0006446

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

PR-CCD-0006447

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

PR-CCD-0006448

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

PR-CCD-0006449

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

### Resolution to Constitute Contract (Section 103)

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

### Authorization of Bonds (Section 201)

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

### Special Provisions for Refunding Bonds (Section 203)

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

   (i)  irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

   (ii)  if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

B-19

PR-CCD-0006450

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

        (iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

        (iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

        Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

        In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

        Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

        The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-20

PR-CCD-0006451

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

PR-CCD-0006452

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

PR-CCD-0006453

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

PR-CCD-0006454

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

   (i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

   (ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

PR-CCD-0006455

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

PR-CCD-0006456

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

B-26

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

      (i)    Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

      (ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

      (iii)    Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

      (i)    Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

      (ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

PR-CCD-0006458

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

PR-CCD-0006459

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

PR-CCD-0006460

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

B-30

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii) amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv) amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

B-31

PR-CCD-0006462

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

PR-CCD-0006463

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

## Particular Covenants of the Corporation

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

PR-CCD-0006464

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

PR-CCD-0006465

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

PR-CCD-0006466

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1. No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

PR-CCD-0006467

*Additional Requirements—Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

B-37

PR-CCD-0006468

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

> *Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

PR-CCD-0006469

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

PR-CCD-0006470

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

### Evidence on Which Trustee May Act (Section 803)

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

### Compensation and Indemnification (Section 804)

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

PR-CCD-0006471

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

B-41

PR-CCD-0006472

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

## Supplemental Resolutions (Article IX)

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)     to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii)     to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

PR-CCD-0006473

       (iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

       (v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

       (vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

       (vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

       (viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

       (ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

       (x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

       (xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

       (xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

       (xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

       At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

PR-CCD-0006474

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

B-44

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i) There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii) There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

PR-CCD-0006476

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

B-46

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

B-47

PR-CCD-0006478

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

PR-CCD-0006479

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

PR-CCD-0006480

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

B-50

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

B-51

PR-CCD-0006482

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

## Moneys Held for Particular Bonds (Section 1203)

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

## Preservation and Inspection of Documents (Section 1204)

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

## No Personal Liability (Section 1206)

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

## Governing Law (Section 1211)

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

PR-CCD-0006483

APPENDIX C

PROPOSED FORM OF APPROVING
OPINION OF BOND COUNSEL

NIXON PEABODY LLP
A T T O R N E Y S   A T   L A W

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

November __, 2011

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $45,620,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Nineteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Bond Resolution," and together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on November 16, 2011. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are payable and accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and will be registered in the name of the Owners of the Bonds.

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      Act 91 is valid in all respects material to the matters covered by this opinion.

2.      The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.      The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.      As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.      The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

PR-CCD-0006485

Puerto Rico Sales Tax Financing Corporation

November __, 2011
Page 3

7.    The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

We express no opinion as to any Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

PR-CCD-0006486

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006487

APPENDIX D

**PROPOSED FORM OF OPINION OF
SPECIAL PUERTO RICO TAX COUNSEL**

[Closing Date]

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have acted as Special Puerto Rico Tax Counsel in connection with the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $45,620,000 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Nineteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Nineteenth Supplemental Resolution," the General Resolution and the Nineteenth Supplemental Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on November 16, 2011. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

From such examination and based on the provision of the laws of Puerto Rico and the United States as now in force, and having regard to legal questions we deem relevant, we are of the opinion that:

1.    Interest on the Bonds is:

    (a)    exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico, Act No. 1 of the Legislature of Puerto Rico, approved January 31, 2011 (the "PR Code"), and Article 2 of Act 91;

    (b)    exempt from Puerto Rico alternative minimum taxes under Section 1022.04(b)(2) of the PR Code;

    (c)    exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

    (d)    exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it exempts from the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which is currently pending approval by the Legislative Assembly of Puerto Rico,

provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 1(b) above, we assume that the AMT exemption provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may not be exempt from Puerto Rico alternative minimum taxes.

2. The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3. The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4. The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05(g) of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Bonds.

**IRS Circular 230 Disclosure: The following tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on a taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Bonds. Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.**

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, it is our opinion that:

1. Interest or original issue discount on the Bonds is excludable from the gross income of the recipient thereof for United States federal income tax purposes under Section 933 of the US Code if the recipient is a bona fide resident of Puerto Rico during the entire taxable year in which such interest is derived.

2. Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico is not subject to United States federal income tax under the US Code if: (a) such interest is not, and is not treated as, income effectively connected with,

D-2

PR-CCD-0006489

or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3. United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the seller located outside Puerto Rico and (iii) the individual has been a resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) the ten year period preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

This opinion is limited to the above, and we do not express any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Authority and the holders from time to time of the Bonds and may not be relied upon by any other person.

Respectfully submitted,

D-3

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006491

# BOOK-ENTRY SYSTEM

## The Depository Trust Company

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series 2011B Bonds. The Series 2011B Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2011B Bond certificate will be issued for each stated maturity of the Series 2011B Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 2011B BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES 2011B BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2011B BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a S&P rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Series 2011B Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2011B Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2011B Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2011B Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will

not receive certificates representing their ownership interests in the Series 2011B Bonds, except in the event that use of the book-entry system for the Series 2011B Bonds is discontinued.

To facilitate subsequent transfers, the Series 2011B Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series 2011B Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2011B Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2011B Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2011B Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2011B Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2011B Bonds documents. For example, Beneficial Owners of Series 2011B Bonds may wish to ascertain that the nominee holding the Series 2011B Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2011B Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2011B Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2011B Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Series 2011B Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee, on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2011B Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in

E-2

PR-CCD-0006493

the event that a successor depository is not obtained, Series 2011B Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Security certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES 2011B BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES 2011B BONDS.

PR-CCD-0006494

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006495

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006496

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006497



Printed by: ImageMaster
www.ImageMaster.com

# Exhibit 19

| | | |
|---|---|---|
| NEW ISSUE | | RATINGS |
| Full-Book-Entry | | Moody's:   MIG 1 |
| (See "Book-Entry Only System" under *The Notes*) | | S&P:   SP-1+ |

*In the opinion of Squire, Sanders & Dempsey L.L.P., Bond Counsel, under existing law (i) assuming continuing compliance with certain covenants and the accuracy of certain representations, interest on the Notes is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, and (ii) the Notes and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation. Interest on the Notes may be subject to certain federal taxes imposed only on certain corporations, including the corporate alternative minimum tax on a portion of that interest. For a more complete discussion of the tax aspects of the Notes, see "TAX MATTERS" herein.*

**$1,010,000,000**

## COMMONWEALTH OF PUERTO RICO
### Tax and Revenue Anticipation Notes
### Series 2008

| | | | |
|---|---|---|---|
| Dated: | Date of Delivery | Yield: | 3.40% |
| Due: | July 30, 2008 | Interest Rate: | 4.25% |

The Notes bear interest at the annual rate shown above, computed on the basis of twelve 30-day months and a 360-day year. Principal of and interest on the Notes are payable in immediately available funds at maturity. The Notes are not subject to redemption prior to maturity. The Notes are issuable in fully registered form in denominations of $5,000 and any integral multiple thereof.

Payment of the principal of and interest on the Notes are secured by and payable from an irrevocable direct pay letter of credit issued on a several and not joint basis by a syndicate of seven (7) banks as set forth in the table below (the "Letter of Credit Banks") in the amounts and the percentages set forth therein (the "Letter of Credit"):

| Name of Bank | Maximum Amount of Principal | Several Obligation |
|---|---|---|
| THE BANK OF NOVA SCOTIA | $202,000,000 | 20.00% |
| BNP PARIBAS | 191,900,000 | 19.00% |
| DEXIA CREDIT LOCAL | 191,900,000 | 19.00% |
| FORTIS BANK, S.A./N.V. | 151,500,000 | 15.00% |
| BANCO BILBAO VIZCAYA ARGENTARIA S.A. | 141,400,000 | 14.00% |
| KBC BANK N.V. | 101,000,000 | 10.00% |
| BANCO SANTANDER, S.A. | 30,300,000 | 3.00% |
| | **$1,010,000,000** | **100.00%** |

Principal of and interest on the Notes are payable (i) from amounts drawn under the Letter of Credit, and (ii) in the event one or more Letter of Credit Banks fail to honor their several portions under the Letter of Credit, from the Special Fund for the Redemption of Tax and Revenue Anticipation Notes as further described herein (the "Note Fund"). Banco Popular de Puerto Rico, Trust Division, on behalf of the Commonwealth, is the Paying Agent and will deliver payment of the principal of and interest on the Notes at maturity from a drawing on the Letter of Credit. The Note Fund is funded solely from taxes and revenues in the General Fund collected after July 1, 2007 and on or prior to June 30, 2008, as described herein. During the term of the Notes, the Commonwealth may also borrow funds pursuant to a Revolving Credit Agreement, as further described herein. Amounts in the Note Fund will be used to repay the Letter of Credit Note and the Revolving Credit Note, and the Notes to the extent one or more Letter of Credit Banks fail to honor their several portions under the Letter of Credit, as further described herein. See "Payment of and Security for the Notes" under The Notes.

The Notes do not constitute obligations of the Commonwealth of Puerto Rico for the payment of which the full faith, credit and taxing power of the Commonwealth of Puerto Rico, nor that of any of its political subdivisions, are pledged.

The Notes are offered when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Squire, Sanders & Dempsey L.L.P., Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Quiñones & Sánchez PSC, and for the Letter of Credit Banks by Chapman and Cutler LLP. It is expected that settlement of the Notes, in immediately available funds, will occur in Puerto Rico, on or about November 1, 2007.

### Wachovia Capital Markets, LLC

| | | |
|---|---|---|
| Banc of America Securities LLC | BBVAPR MSD | Bear, Stearns & Co., Inc. |
| Citi | DEPFA First Albany Securities, LLC | Goldman, Sachs & Co. |
| JPMorgan | Lehman Brothers | Loop Capital |
| Merrill Lynch & Co. | Morgan Stanley | Oriental Financial Services |
| Popular Securities | RBC Capital Markets | Samuel A. Ramírez & Co., Inc. |
| Santander Securities | Scotia Capital | TCM Capital |
| | UBS Investment Bank | |

October 18, 2007

# Commonwealth of Puerto Rico

## Governor

ANÍBAL ACEVEDO VILÁ

## Members of the Cabinet

JORGE P. SILVA PURAS
*Chief of Staff*

FERNANDO J. BONILLA
*Secretary of State*

ROBERTO J. SÁNCHEZ RAMOS
*Secretary of Justice*

JUAN C. MÉNDEZ TORRES
*Secretary of the Treasury*

RAFAEL ARAGUNDE TORRES
*Secretary of Education*

ROMÁN M. VELASCO
GONZÁLEZ
*Secretary of Labor and
Human Resources*

ROSA PÉREZ PERDOMO
*Secretary of Health*

SALVADOR E. RAMÍREZ
CARDONA
*Acting Secretary of Agriculture*

CARLOS GONZÁLEZ MIRANDA
*Secretary of Transportation
and Public Works*

RICARDO RIVERA CARDONA
*Secretary of Economic
Development and Commerce*

FÉLIX MATOS RODRÍGUEZ
*Secretary of Family Affairs*

JORGE RIVERA JIMÉNEZ
*Secretary of Housing*

JAVIER VÉLEZ AROCHO
*Secretary of Natural and
Environmental Resources*

VÍCTOR SUÁREZ
*Acting Secretary of Consumer
Affairs*

DAVID E. BERNIER RIVERA
*Secretary of Sports and Recreation*

MIGUEL A. PEREIRA CASTILLO
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

KENNETH D. MCCLINTOCK
HERNÁNDEZ
President, Senate

JOSÉ F. APONTE HERNÁNDEZ
Speaker, House of
Representatives

*Fiscal Officers*

JOSÉ G. DÁVILA-MATOS
Director, Office of Management
and Budget

JORGE IRIZARRY HERRANS
Acting President, Government
Development
Bank for Puerto Rico

ii

No dealer, broker, sales representative or other person has been authorized by the Commonwealth of Puerto Rico or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth of Puerto Rico or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Notes by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth of Puerto Rico and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstance, create any implication that there has been no change in the affairs of the Commonwealth of Puerto Rico since the date hereof. This Official Statement is submitted in connection with the sale of the Notes referred to herein and may not be reproduced or used, in whole or in part, for any other purpose. The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information. Each of the Letter of Credit Banks has supplied the information relating to it and included in *Appendix III*. Neither the Commonwealth nor the Underwriters make any representation as to the accuracy or completeness of the information contained in *Appendix III*.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE NOTES AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

| | Page | | | Page |
|---|---|---|---|---|
| INTRODUCTORY STATEMENT | 1 | | General Fund Monthly Cash Flow for Fiscal | |
| OVERVIEW | 2 | | Year 2007 and Fiscal Year 2008 | 10 |
| RECENT DEVELOPMENTS | 3 | | Inter-Fund Borrowings | 14 |
| THE NOTES | 4 | | TAX MATTERS | 14 |
| General | 4 | | Original Issue Premium | 15 |
| Book-Entry Only System | 4 | | LEGAL MATTERS | 16 |
| Payments and Transfers | 6 | | LEGAL INVESTMENT | 16 |
| Discontinuance of the Book-Entry Only | | | UNDERWRITING | 16 |
| System | 6 | | GOVERNMENT DEVELOPMENT BANK FOR | |
| Authorization of Notes | 6 | | PUERTO RICO | 17 |
| Purpose of the Notes | 6 | | RATINGS | 17 |
| Payment of and Security for the Notes | 7 | | CONTINUING DISCLOSURE | 17 |
| Provision for Prior Payment of Full Faith and | | | MISCELLANEOUS | 20 |
| Credit Obligations of the Commonwealth | 9 | | APPENDIX I – FORM OF LETTER OF | |
| Debt Limitation with Respect to Full Faith and | | | CREDIT | I-1 |
| Credit Obligations | 9 | | APPENDIX II – FORM OF OPINION OF | |
| Estimated Note Revenues | 10 | | BOND COUNSEL | II-1 |
| Debt Limitation with Respect to Additional | | | APPENDIX III – DESCRIPTION OF LETTER | |
| Parity Notes | 10 | | OF CREDIT BANKS | III-1 |
| Payment Record | 10 | | | |

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010729

**$1,010,000,000**
# COMMONWEALTH OF PUERTO RICO
## Tax and Revenue Anticipation Notes
## Series 2008

### INTRODUCTORY STATEMENT

This Official Statement sets forth certain information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and the $1,010,000,000 Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series 2008 (the "Notes").

The Notes are being issued under Act No. 1 of the Legislature of Puerto Rico (the "Legislature"), approved on June 26, 1987, as amended by Act No. 139 of the Legislature, approved on November 9, 2005 (collectively, the "Act"), and pursuant to a resolution adopted by the Secretary of the Treasury of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on October 18, 2007 (the "Note Resolution"), for the purpose of: (i) repaying certain amounts borrowed by the Commonwealth under a line of credit provided by the Revolving Credit Banks (as defined below) and related note issued pursuant to the Act in advance of the issuance of the Notes, which amounts were borrowed to provide funds to pay the appropriations made for fiscal year 2008 in anticipation of the receipt of taxes and revenues required to be deposited in the Commonwealth's General Fund and estimated in the budget of the Commonwealth to be realized in cash during fiscal year 2008, and (ii) paying certain of the costs of issuance of the Notes (including certain fees associated with the Letter of Credit).

Without the issuance of the Notes, the Commonwealth estimates that the General Fund would incur monthly cash deficits which would reach a cumulative maximum deficit of approximately $979 million in March 2008. For a breakdown of the fiscal year 2008 General Fund cash flow projections, before and after taking into account the issuance of the Notes, see "General Fund Monthly Cash Flow for Fiscal Year 2007 and Fiscal Year 2008" under *The Notes*.

The Notes are secured by the Letter of Credit, which is an irrevocable direct pay letter of credit issued on a several and not joint basis by the Letter of Credit Banks pursuant to a Reimbursement Agreement dated as of November 1, 2007 among the Commonwealth and The Bank of Nova Scotia, acting through its New York Agency, as Lead Arranger and Administrative Agent, and as a Letter of Credit Bank through its Hato Rey Branch; BNP Paribas, acting through its San Francisco Branch, and Dexia Credit Local, acting through its New York Branch as Co-Agents and as Letter of Credit Banks; Fortis Bank S.A./N.V., acting through its New York Branch; Banco Santander, S.A., acting through its New York Branch; Banco Bilbao Vizcaya Argentaria S.A., acting through its New York Branch; and KBC Bank N.V., acting through its New York Branch (the "Reimbursement Agreement"). For a discussion of the payment source and the security for the Notes, including the Letter of Credit and the Reimbursement Agreement, see "Payment of and Security for the Notes" under *The Notes*.

This Official Statement incorporates (i) the Commonwealth of Puerto Rico Financial Information and Operating Data Report dated as of July 1, 2007 (the "Commonwealth Report") and which is appended as *Appendix I* to the Official Statement of the Commonwealth dated September 19, 2007 relating to the issuance by the Commonwealth of its $408,800,000 Public Improvement Bonds of 2007, Series A (the "2007 A PIB Official Statement"), which is incorporated herein by this reference, (ii) the proposed Bond Counsel Opinion, attached hereto as *Appendix II*, (iii) a description of each of the Letter of Credit Banks, attached hereto as *Appendix III*, and (iv) the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2006, as amended, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated herein by this reference. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2006, together with the independent auditor's report thereon, dated August 1, 2007, of KPMG LLP, certified public accountants. KPMG LLP did not audit the financial statements of the Public Buildings Authority's capital project fund or the Children's Trust special revenue fund (major funds), and certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds, and component units, is based solely on the reports of the other auditors. The report of KPMG LLP contains an emphasis paragraph for the adoption of

Governmental Accounting Standards Board (GASB) Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for the Insurance Recoveries*, as of June 30, 2006.

The Commonwealth Report includes important information about the Commonwealth, including information about its economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results for the fiscal year 2007 budget, the fiscal year 2008 budget, and the debt of the Commonwealth's public sector, and should be read in its entirety. The Commonwealth Report and the Commonwealth's Annual Financial Report were filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR") as *Appendix I* and *Appendix II*, respectively, to the 2007 A PIB Official Statement.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report, or to the Commonwealth's Annual Financial Report that is filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB"), or any new or revised Commonwealth Report or Commonwealth Annual Financial Report, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Notes, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report or in the Commonwealth Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report, the Commonwealth's Annual Financial Report, the Note Resolution and the Reimbursement Agreement. Requests should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 666 Fifth Avenue, 15th Floor, New York, New York 10103-1599, telephone number (212) 422-6420 or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the 2007 A PIB Official Statement, which contains the Commonwealth Report and the Commonwealth's Annual Financial Report, may also be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The Commonwealth expects that its Comprehensive Annual Financial Report for the fiscal year ended June 30, 2007, including its audited general purpose financial statements for such fiscal year, will be available to investors during the first quarter of calendar year 2008. Promptly after its release, said report will be filed with and available from each NRMSIR.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. The words "may", "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## OVERVIEW

Puerto Rico is located approximately 1,600 miles southeast of New York City. According to the United States Census Bureau, its population was 3,808,610 in 2000. Puerto Rico's political status is that of a commonwealth. The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth government exercises virtually the same control over its internal affairs as is exercised by the state governments of each of the fifty states over their respective internal affairs, with similar separation of powers among the executive, legislative and judicial branches. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes, which are imposed by mutual consent, are not levied in Puerto Rico. No federal income

PR-CCD-0010731

tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2006 (which ended on June 30, 2006), the Commonwealth's gross product (preliminary, in current dollars) was $56.688 billion, and personal income per capita (preliminary, in current dollars) was $12,997.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or the "Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations, and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the estimated year-end results of fiscal year 2007, the budget for fiscal year 2008, and the debt of the Commonwealth's public sector. The Commonwealth Report should be read in its entirety.

### RECENT DEVELOPMENTS

This section summarizes and updates certain information about the Commonwealth's current fiscal situation appearing in the Commonwealth Report. This section should be read in conjunction with the information included in the Commonwealth Report, which shall be deemed modified to the extent the information provided therein is different from that appearing below.

Under Act No. 117 of the Legislature, approved on July 4, 2006, as amended (the "Sales Tax Act"), a general sales and use tax of 5.5% is imposed by the central government (the "Central Government Sales Tax") and of 1.5% is imposed by each municipality (the "Municipal Sales Tax" and, together with the Central Government Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those contained in the Central Government Sales Tax. The Sales Tax Act also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

Pursuant to Act No. 91 of the Legislature, approved on May 13, 2006, as amended (the "Sales Tax Financing Corporation Act"), Puerto Rico Sales Tax Financing Corporation (the "Sales Tax Financing Corporation") was created for the purpose of refinancing certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which obligations are payable solely from Commonwealth budgetary appropriations and are generally referred to as "extra constitutional debt."

Under the Sales Tax Financing Corporation Act, 1% of the 5.5% Central Government Sales Tax (subject to an annually inflated minimum amount if greater) is deposited by the Secretary of the Treasury upon receipt into the dedicated Sales Tax fund (the "Sales Tax Fund"), which is held and owned by the Sales Tax Financing Corporation separate and apart from the Commonwealth's General Fund. Amounts on deposit in the Sales Tax Fund are applied to the payment of debt issued by the Sales Tax Financing Corporation to refinance the above extra constitutional debt outstanding. On July 31, 2007, the Sales Tax Financing Corporation issued $2,667,603,572.60 of Sales Tax Revenue Bonds, Series 2007 A and $1,333,101,779.90 of Sales Tax Revenue Bonds, Series 2007 B, the proceeds of which were used as the first installment in the refinancing of the Commonwealth's extra constitutional debt.

3

PR-CCD-0010732

On October 4, 2007, the Commonwealth issued $408,800,000 of Public Improvement Bonds, Series 2007 A and $91,200,000 of Public Improvement Bonds, Series 2007 B each under the provisions of Act No. 74 of the Legislature, approved on July 23, 2007, as amended by Act No. 115 of the Legislature, approved on August 31, 2007, Joint Resolution No. 116 of the Legislature, approved on July 23, 2007, and Joint Resolution No. 117 of the Legislature, approved on July 23, 2007. On October 16, 2007, the Commonwealth issued $926,570,000 of Public Improvement Refunding Bonds, Series 2007 A (the "2007 A Refunding Bonds") and $60,545,000 of Public Improvement Refunding Bonds, Series 2007 B each under the provisions of Act No. 52 of the Legislature, approved on October 10, 1985, and Joint Resolution No. 57 of the Legislature, approved on July 12, 1993.

## THE NOTES

*Set forth below is a narrative description of certain legislative and contractual provisions relating to the authorization of sources of payment and security for the Notes. These provisions have been summarized and this description does not purport to be complete. Reference should be made to the Act, the Note Resolution, the Letter of Credit, the Revolving Credit Agreement (as defined herein) and the Reimbursement Agreement, copies of which are available to potential purchasers of the Notes. See Introductory Statement.*

### General

The Notes are dated their date of delivery, mature on July 30, 2008 and bear interest at 4.25%. Interest is computed on the basis of twelve 30-day months and a 360-day year. The Notes are issuable in fully registered form in denominations of $5,000 and any integral multiple thereof. The Notes are not subject to redemption prior to maturity. Principal of and interest on the Notes are payable in immediately available funds at maturity.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, New York will act as securities depository for the Notes. The Notes will be issued as fully-registered Notes registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. Because the aggregate principal amount of the Notes exceeds $500 million, one fully-registered Note certificate will be issued with respect to each $500 million principal amount and an additional certificate will be issued with respect to any remaining principal amount, and all such Note certificates will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 2.2 million issuers of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: "AAA." The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com. and www.dtc.org.

Purchases of Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note (a "Beneficial

4

Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Notes, except in the event that use of the book-entry system for the Notes is discontinued.

To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Notes with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Notes, such as redemptions, tenders, defaults, and proposed amendments to the note documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Notes for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Notes within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Notes unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from Banco Popular de Puerto Rico, Trust Division, as paying agent (the "Paying Agent"), on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, nor its nominee, the Paying Agent, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Notes at any time by giving reasonable notice to the Commonwealth or the Paying Agent. Under such circumstances, in the event that a successor securities depository is not obtained, Note certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Note certificates will be printed and delivered to DTC.

5

**Payments and Transfers**

No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising, or reviewing records maintained by DTC or Participants.

For every transfer and exchange of the Notes, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee, or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

In the event that the book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Notes shall be payable in lawful money of the United States of America at the principal office of the Paying Agent in Hato Rey, Puerto Rico. Interest on the Notes will be payable by check mailed to the respective addresses of the registered owners determined as of the fifteenth (15th) day of the month preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Paying Agent. The Notes will be issued only as registered notes without coupons in denominations of $5,000 or any integral multiple thereof. The transfer of the Notes will be registrable and they may be exchanged at the corporate trust office of the Paying Agent in Hato Rey, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization of Notes**

Section 2 of Article VI of the Constitution of Puerto Rico provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislature. Pursuant to this power, the Legislature enacted the Act which authorizes the issuance of the Notes. The Notes are issued pursuant to the Act and the Note Resolution adopted by the Secretary of the Treasury and approved by the Governor. As part of the authorization process for the Notes, Government Development Bank, as financial advisor and fiscal agent to the Commonwealth, has reviewed and made its favorable recommendations as to the Notes.

**Purpose of the Notes**

The Notes are being issued to (i) repay certain amounts borrowed by the Commonwealth under a line of credit provided by the Revolving Credit Banks and related note issued pursuant to the Act in advance of the issuance of the Notes, which amounts were borrowed to provide funds to pay the appropriations made for fiscal year 2008 in anticipation of the receipt of taxes and revenues required to be deposited in the Commonwealth's General Fund and estimated in the budget of the Commonwealth to be realized in cash during fiscal year 2008, and (ii) pay certain of the costs of issuance of the Notes (including certain fees associated with the Letter of Credit).

PR-CCD-0010735

**Payment of and Security for the Notes**

*Letter of Credit*

The Notes are secured by and payable from the Letter of Credit issued by the Letter of Credit Banks, on a several and not joint basis, in the amount of the principal of and interest due on the Notes at maturity, pursuant to the Reimbursement Agreement. A form of the Letter of Credit is attached as *Appendix I* hereto. A description of each of the Letter of Credit Banks is attached as *Appendix III* hereto. Each of the Letter of Credit Banks has supplied the information relating to it included in *Appendix III*. Neither the Commonwealth nor the Underwriters make any representation as to the accuracy or completeness of the information contained in *Appendix III*. The Letter of Credit Banks may not assign their obligations under the Letter of Credit without (i) receipt of prior written confirmation from Moody's and S&P that the ratings on the Notes will not be suspended, withdrawn or lowered, (ii) the prior written consent of the Commonwealth, the Administrative Agent and each Letter of Credit Bank, and (iii) providing twenty-five (25) days prior written notice to the Paying Agent and the Secretary of the Treasury of any such assignment. The Paying Agent will, within five (5) days of its receipt of said notice from a Letter of Credit Bank, provide notice to the Noteholders of any such assignment.

The following table sets forth the names of the Letter of Credit Banks, the maximum amount of their several payment obligations under the Letter of Credit, the corresponding amount of interest that will accrue on such amounts until the Notes' maturity date (based on an interest rate of 4.25% accruing over a period of 269 days) and the percentage of their several payment obligations under the Letter of Credit:

| Name of Bank | Maximum Amount of Principal Secured | Interest to Accrue on Principal Secured | Maximum Amount of Principal and Interest Secured | Several Obligation |
|---|---|---|---|---|
| THE BANK OF NOVA SCOTIA | $202,000,000 | $6,414,902.78 | $208,414,902.78 | 20.00% |
| BNP PARIBAS | 191,900,000 | 6,094,157.64 | 197,994,157.64 | 19.00% |
| DEXIA CREDIT LOCAL | 191,900,000 | 6,094,157.64 | 197,994,157.64 | 19.00% |
| FORTIS BANK S.A./N.V. | 151,500,000 | 4,811,177.08 | 156,311,177.08 | 15.00% |
| BANCO BILBAO VIZCAYA ARGENTARIA S.A. | 141,400,000 | 4,490,431.94 | 145,890,431.94 | 14.00% |
| KBC BANK N.V. | 101,000,000 | 3,207,451.39 | 104,207,451.39 | 10.00% |
| BANCO SANTANDER, S.A. | 30,300,000 | 962,235.42 | 31,262,235.42 | 3.00% |
| | $1,010,000,000 | $32,074,513.89 | $1,042,074,513.89 | 100.00% |

Pursuant to the Letter of Credit, the Paying Agent is authorized and expected to present a draw on or prior to 10:00 a.m., New York time, on July 29, 2008, for payment on July 30, 2008, equal to the principal amount of the Notes, together with any accrued and unpaid interest thereon (the "Drawing"), to be deposited in a payment fund to be held by the Paying Agent solely for the benefit of the Noteholders. The Letter of Credit shall expire at 5:00 p.m., New York time, on the date which is the earliest of: (i) August 1, 2008, (ii) the date of payment of the Drawing by the Administrative Agent, on behalf of the Letter of Credit Banks, to the Paying Agent, (iii) the Administrative Agent's, on behalf of the Letter of Credit Banks, receipt of a cancellation certificate signed by a duly authorized officer of the Paying Agent, or (iv) the date when the Paying Agent surrenders the original of the Letter of Credit to the Administrative Agent on behalf of the Letter of Credit Banks, for cancellation.

The Notes are secured by and payable from (i) the Drawing pursuant to the Letter of Credit, and (ii) in the event one or more Letter of Credit Banks fail to honor their several portions of the Drawing Amount under the Letter of Credit, from the Note Fund. The Commonwealth's payment obligations relating to the Drawing shall be evidenced by a note of the Commonwealth issued pursuant to the Act and designated "Tax and Revenue Anticipation Note of the Commonwealth of Puerto Rico (Letter of Credit), Series 2008" (the "Letter of Credit Note"). The Letter of Credit Note shall be issued to The Bank of Nova Scotia, as the Administrative Agent for the Letter of Credit Banks, under the Reimbursement Agreement on the date of issuance of the Notes, and shall mature on the Notes' maturity date. The Letter of Credit Note, which is authorized by and shall be considered a note under the Act, will evidence draws made under the Letter of Credit for payment of the Notes and not a duplicate of such obligations.

Pursuant to the terms of a Revolving Credit Agreement dated as of June 28, 2007 (the "Revolving Credit Agreement"), The Bank of Nova Scotia, acting through its New York Agency, as Administrative Agent, and acting

PR-CCD-0010736

through its Hato Rey Branch as a Bank; Banco Popular de Puerto Rico; BNP Paribas, acting through its San Francisco Branch, and Dexia Credit Local, acting through its New York Branch, each as Co-Agents and as Banks; Fortis Bank S.A./N.V., acting through its New York Branch; Banco Bilbao Vizcaya Argentaria S.A., acting through its New York Branch; Banco Bilbao Vizcaya Argentaria, Puerto Rico; KBC Bank N.V., acting through its New York Branch; and Banco Santander Puerto Rico (collectively, the "Revolving Credit Banks"), advanced to the Commonwealth funds to cover cash requirements in anticipation of the issuance of the Notes evidenced by a note maturing on July 30, 2008. A portion of the outstanding principal amount of approximately $1.2 billion under the Revolving Credit Agreement and related note will be repaid from the proceeds of the Notes. The Revolving Credit Agreement and related note were authorized by a resolution adopted on June 27, 2007 by the Secretary of the Treasury and approved by the Governor.

### The Note Fund

The payment obligations under the Notes, the Letter of Credit Note and the Revolving Credit Note are payable solely from the taxes and revenues in the General Fund collected by the Secretary of the Treasury after July 1, 2007 and on or prior to June 30, 2008 and deposited in the Note Fund as more fully described below. All moneys in the Note Fund required for such purpose shall be used on a *pari passu* basis to pay the amounts due under the Notes, Letter of Credit Note and the Revolving Credit Note, and shall be used for no other purpose; provided, however, that pursuant to certain constitutional and statutory authorizations, payments on general obligation bonds and notes of the Commonwealth and, on bonds and notes of its public corporations guaranteed by the Commonwealth, have a claim on Commonwealth taxes and revenues, including amounts on deposit in the Note Fund, prior to the claim thereon of the Notes, the Letter of Credit Note and the Revolving Credit Note.

After any required transfers from the General Fund to the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Redemption Fund"), the Secretary of the Treasury, beginning on April 1, 2008, will withdraw from the General Fund all taxes and revenues required to be deposited therein from April 1, 2008 through June 30, 2008, together with any taxes and revenues collected after July 1, 2007 and then on deposit in the General Fund. Such taxes and revenues will be deposited in the Note Fund until the amount on deposit in the Note Fund by the last calendar day of the months indicated below equals the following percentages of the sum of (1) the principal of and interest on the Notes to be paid at maturity and (2) the outstanding principal balance of the Revolving Credit Note and accrued interest thereon to be paid from time to time as the same becomes due and payable (such sum being herein called the "Note Fund Requirement"):

| 2008 | Percentage of Note Fund Requirement |
|------|-------------------------------------|
| April | 33⅓% |
| May | 66⅔% |
| June | 100% |

The Secretary of the Treasury covenants in the Note Resolution to compute on a cash basis on or before the tenth (10th) day of each month, commencing on November 10, 2007, projected taxes and revenues expected to be deposited in, expenditures from, and fund balances of the General Fund for each month remaining in fiscal year 2008. If, on the basis of such computations, the Secretary of the Treasury determines that the Note Fund Requirement less any amount then on deposit in the Note Fund equals or exceeds 85% of the sum of all taxes and revenues expected to be deposited in the General Fund from the later of the date of such determination and April 1, 2008 through June 30, 2008 after accounting for any required transfers from the General Fund to the Redemption Fund, the Secretary of the Treasury shall immediately withdraw sufficient amounts of taxes and revenues as received from the General Fund, shall make any required transfers to the Redemption Fund, and thereafter shall transfer to the Note Fund sufficient amounts of such taxes and revenues as received as will cause the amount on deposit in the Note Fund to equal the Note Fund Requirement.

Neither the full faith, credit and taxing power of the Commonwealth nor that of any of its political subdivisions are pledged for the payment of principal of or interest on the Notes, the Letter of Credit Note or the Revolving Credit Note.

8

PR-CCD-0010737

**Provision for Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions heretofore rendered by the Secretary of Justice of Puerto Rico, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations.

The Notes do not constitute public debt.

Under the provisions of Act No. 39 of the Legislature, approved on May 13, 1976, as amended, the Secretary of the Treasury is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Redemption Fund. As of October 18, 2007, the amount on deposit in the Redemption Fund was approximately $45.2 million, which was the required amount. Fiscal year 2008 deposits from the General Fund to the Redemption Fund to fund the projected debt service through July 1, 2008 are expected to total $450.7 million. In addition to moneys from the General Fund, the Redemption Fund receives a certain portion of moneys collected by the municipalities from property tax collections which portion for fiscal year 2008 is expected to total $120.8 million.

Moneys in the Redemption Fund are not available to pay the Notes.

**Debt Limitation with Respect to Full Faith and Credit Obligations**

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then-current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Puerto Rico Highway Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.

All or a portion of the proceeds of certain general obligation refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's and S&P), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments"). Since general obligation bonds refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% constitutional debt limitation.

Joint Resolution No. 2104 of September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004 B (the "Series 2004 B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreements entered into by the Commonwealth in connection with the Series 2004 B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004 A (the "Series 2004 A Bonds") and any Series 2004 B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004 B Bonds. In addition, in connection with the issuance of the portion of the 2007 A Refunding Bonds bearing interest at floating interest rates (collectively, the "2007 A variable rate bonds"), the Commonwealth will enter into certain interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay an estimated fixed rate of interest in respect of the 2007 A variable rate bonds.

9

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $859,632,840 in the fiscal year ending June 30, 2020 (based on the assumption that (i) the bonds refunded with non-eligible investment are treated as being outstanding, (ii) the Series 2004 A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and (iii) the Series 2004 B Bonds, the variable rate bonds issued as part of the Public Improvement Bonds of 2006, Series A (the "CPI Bonds") and the 2007 A variable rate bonds bear interest at 12% per annum. The sum of those amounts, $859,632,840, is equal to 10.3% of $8,344,210,500, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2006 and the currently estimated adjusted internal revenues for the fiscal year ended June 30, 2007. If the bonds refunded with non-eligible investments were treated as not being outstanding, and the interest on the Series 2004 B Bonds, the CPI Bonds and the 2007 A variable rate bonds is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 8.63%.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during each of the last two fiscal years and, thus, is not included in the calculation of the 15% debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations* in the Commonwealth Report. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent to be paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

The Notes are not subject to the above described constitutional debt limitation.

**Estimated Note Revenues**

The Commonwealth estimates that the taxes and revenues available for deposit in the Note Fund for fiscal year 2008 (consisting of taxes and revenues projected to be collected after the date of issuance of the Notes and prior to June 30, 2008, minus required deposits to the Redemption Fund) will be approximately $6.365 billion. For fiscal year 2007, taxes and revenues which would have been available for deposit in the Note Fund were approximately $5.957 billion.

**Debt Limitation with Respect to Additional Parity Notes**

The aggregate principal amount of notes issued under the Act with respect to any fiscal year and outstanding at any time shall not exceed, at the date such notes are issued, the lesser of (i) $1.5 billion and (ii) eighteen percent (18%) of the net revenues of the General Fund for the previous fiscal year. Preliminary net revenues for fiscal year 2007 amounted to $8.890 billion, such that the aggregate principal amount of notes issued under the Act during fiscal year 2008 shall not exceed $1.5 billion. The Act provides that any notes issued thereunder shall mature on such date or dates not exceeding thirty (30) days after the close of the fiscal year in which such notes are issued. The Commonwealth has issued notes under the Act for prior fiscal years, which notes have since matured and been paid in full. Under the Note Resolution, the Commonwealth covenants not to create or suffer to be created any lien or charge upon the revenues in the Note Fund ranking equally or prior to the Notes, the Letter of Credit Note and the Revolving Credit Note. The aggregate principal amount of the Notes and the Revolving Credit Note shall not exceed the maximum permitted under the Act.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**General Fund Monthly Cash Flow for Fiscal Year 2007 and Fiscal Year 2008**

The Secretary of the Treasury has custody of the funds of the Commonwealth's central government and is responsible for the accounting, disbursement and investment of such funds. The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income taxes and Sales Taxes in substitution of certain excise taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services. A detailed description of the Commonwealth's major

10

sources of General Fund revenues and components of General Fund expenditures, along with a Summary and Management's Discussion of the General Fund Results for fiscal years 2004 through 2006, a discussion of the preliminary fiscal year 2007 results and a comparison of the fiscal year 2008 budget with the preliminary fiscal year 2007 results, appears under *Puerto Rico Taxes, Other Revenues, and Expenditures* in the Commonwealth Report.

The tables which follow set forth the actual monthly cash flow for the Commonwealth General Fund for fiscal year 2007 and the estimated monthly cash flow for fiscal year 2008. The monthly cash flow for fiscal 2007 is preliminary and does not take into account any audit adjustments.

The monthly cash flow estimates for fiscal year 2008 are based upon the constitutionally-mandated budget for fiscal year 2008 and upon historical experience as adjusted to reflect economic conditions, statutory and administrative changes and anticipated payment dates for grants and subsidies, personal and other services, materials and supplies, equipment, capital outlays, debt service and transfers. These estimates are based on present circumstances and currently available information and are believed to be reasonable. Such estimates may be affected by numerous factors, including the continuing validity of the assumptions underlying the estimates, and there can be no assurance that such estimates will be achieved.

*[Remainder of page intentionally left blank]*

11

PR-CCD-0010740

**Commonwealth of Puerto Rico**
**Preliminary General Fund Cash Flows**
**Fiscal Year 2006-2007**
**(in thousands)**

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ - | $ 202,431 | $ 64,715 | $ 28,721 | $ 197,181 | $ 228,989 | $ 333,420 | $ 245,914 | $ 85,758 | $ 14,578 | $ (122,300) | $ (514,314) | $ - |
| **Receipts:** | | | | | | | | | | | | | |
| Income taxes | 482,576 | 381,304 | 580,677 | 375,907 | 355,963 | 581,116 | 384,345 | 263,175 | 391,311 | 1,125,702 | 419,511 | 892,749 | 6,234,336 |
| Commonwealth excise taxes | 111,171 | 120,578 | 125,044 | 118,866 | 107,061 | 84,868 | 72,529 | 64,476 | 65,635 | 97,777 | 72,182 | 83,753 | 1,123,940 |
| Inheritance and gift taxes | 1,042 | 247 | 108 | 396 | 299 | 713 | 280 | 213 | 203 | 179 | 103 | 880 | 4,663 |
| Sales and use tax | - | - | - | - | 41,180 | 90,000 | 77,700 | 70,500 | 78,900 | 70,100 | 77,400 | 76,860 | 582,560 |
| Licenses | 5,189 | 5,656 | 11,397 | 23,533 | 8,786 | 7,920 | 6,478 | 4,900 | 4,703 | 6,059 | 7,392 | 6,581 | 98,594 |
| Other internal sources | 24,463 | 29,984 | 36,211 | 50,697 | 26,054 | 52,564 | 53,833 | 22,088 | 44,537 | 29,216 | 38,872 | 50,396 | 458,915 |
| Non-Commonwealth sources | 22,593 | 35,390 | 22,478 | 26,340 | 22,445 | 38,207 | 45,632 | 62,577 | 13,141 | 18,300 | 14,695 | 65,241 | 387,039 |
| Subtotal receipts | 647,034 | 573,159 | 775,915 | 595,739 | 561,708 | 855,388 | 640,797 | 487,929 | 598,430 | 1,347,333 | 630,155 | 1,176,460 | 8,890,047 |
| Other income (refunds) [a] | (98,897) | 31,602 | 30,806 | 34,495 | 39,943 | 37,701 | 51,202 | 38,083 | (3,689) | 9,126 | 37,579 | (216,286) | (8,335) |
| (Transfer) Refunding to Redemption Fund [b] | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,683) | (42,684) | (512,197) |
| Proceeds of notes and other borrowings [c] | 600,000 | - | - | 872,096 (e) | 400,000 | - | - | - | - | - | - | - | 1,872,096 |
| Repayment of notes and other borrowings [d] | (328) | (3,857) | (3,300) | (603,374) | - | (1,937) | (2,141) | (2,001) | (2,100) | (703,849) | (301,693) | (301,693) | (1,926,273) |
| Total available cash from operations | 1,105,126 | 558,221 | 760,738 | 856,273 | 958,968 | 848,469 | 647,175 | 481,328 | 549,958 | 609,927 | 323,358 | 615,797 | 8,315,338 |
| **Disbursements:** | | | | | | | | | | | | | |
| Grants and subsidies | 525,011 | 188,929 | 286,105 | 231,835 | 369,960 | 339,610 | 267,187 | 131,612 | 297,812 | 284,963 | 292,880 | 171,295 | 3,387,199 |
| Personal services | 321,432 | 395,905 | 389,712 | 404,436 | 510,894 | 369,121 | 377,053 | 365,028 | 362,095 | 397,922 | 352,570 | 344,795 | 4,590,962 |
| Other services | 23,274 | 76,587 | 83,141 | 43,464 | 28,763 | 28,933 | 78,757 | 36,321 | 45,114 | 44,016 | 58,064 | 47,912 | 594,345 |
| Materials and supplies | 1,492 | 2,610 | 5,945 | 7,021 | 5,628 | 5,966 | 9,477 | 7,298 | 8,816 | 9,651 | 10,776 | 4,505 | 79,186 |
| Equipment purchases | 563 | 983 | 905 | 1,057 | 11,915 | 408 | 2,207 | 1,225 | 2,495 | 1,262 | 1,049 | 3,896 | 27,965 |
| Other debt service and capital outlays | - | - | - | - | - | - | - | - | 4,806 | 8,991 | 34 | 7,745 | 21,576 |
| PY Other disbursements | 30,923 | 30,923 | 30,924 | - | - | - | - | - | - | - | - | - | 92,770 |
| Total disbursements | 902,695 | 695,937 | 796,732 | 687,813 | 927,160 | 744,038 | 734,681 | 541,484 | 721,138 | 746,804 | 715,373 | 580,148 | 8,794,003 |
| Total available cash less transfers and disbursements | 202,431 | (137,716) | (35,994) | 168,460 | 31,808 | 104,431 | (87,506) | (60,156) | (171,180) | (136,877) | (392,015) | 35,649 | (478,665) |
| **Ending Cash Balance** | $ 202,431 | $ 64,715 | $ 28,721 | $ 197,181 | $ 228,989 | $ 333,420 | $ 245,914 | $ 185,758 | $ 14,578 | $ (122,300) | $ (514,314) | $ (478,665) | $ (478,665) |

(a) Consists of net revenue form General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by actual and estimated tax refunds.
(b) Consists of amounts to pay principal of and interest on general obligation bonds of the Commonwealth. Does not include amounts directly to the Redemption Fund from non-General Fund revenues.
(c) Consists of proceeds of borrowing from the private Bank Syndicate and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(d) Consists of amounts of repayments of borrowing from the private Bank Syndicate and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(e) Proceeds from Commonwealth's Tax and Revenue Anticipation Notes, Series 2007, net of costs of issuance.

12

PR-CCD-0010741

**Commonwealth of Puerto Rico**
**Estimated General Fund Cash Flows**
**Fiscal Year 2007-2008**
**(in thousands)**

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ (478,665) (a) | $ 49,172 | $ (13,618) | 300,470 | $ 399,079 | $ 241,949 | $ 369,010 | $ 342,427 | 207,688 | $ 196,763 | $ 156,347 | $ (229,770) | $ (478,665) |
| **Receipts:** | | | | | | | | | | | | | |
| Income taxes | 431,400 | 374,500 | 566,200 | 413,800 | 369,500 | 613,700 | 494,300 | 328,000 | 512,100 | 1,082,900 | 430,200 | 670,400 | 6,287,000 |
| Commonwealth excise taxes | 64,700 | 70,800 | 70,000 | 75,900 | 81,900 | 92,500 | 76,400 | 67,100 | 78,300 | 93,300 | 76,900 | 91,200 | 939,000 |
| Inheritance and gift taxes | 300 | 400 | 300 | 400 | 300 | 300 | 300 | 300 | 300 | 400 | 300 | 400 | 4,000 |
| Sales and use tax | - (b) | - (b) | 78,700 | 92,600 | 95,900 | 119,900 | 89,000 | 84,600 | 89,200 | 88,600 | 95,400 | 77,100 | 911,000 |
| Licenses | 4,800 | 5,800 | 12,600 | 31,800 | 9,500 | 6,400 | 6,300 | 5,200 | 7,500 | 5,700 | 4,800 | 6,600 | 107,000 |
| Other internal sources | 29,300 | 29,700 | 42,400 | 29,300 | 32,100 | 62,700 | 28,700 | 27,400 | 46,500 | 30,700 | 34,300 | 60,900 | 454,000 |
| Non-Commonwealth sources | 28,000 | 33,700 | 37,200 | 31,400 | 31,800 | 38,100 | 27,700 | 27,000 | 29,300 | 28,700 | 33,500 | 28,600 | 375,000 |
| Subtotal receipts | 558,500 | 514,900 | 807,400 | 675,200 | 621,000 | 933,600 | 722,700 | 539,600 | 763,200 | 1,330,300 | 675,400 | 935,200 | 9,077,000 |
| Other sources (c) | - | - | - | 6,000 | 10,000 | 59,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Other income (refunds) (d) | 43,500 | 43,500 | 43,500 | 43,500 | 43,500 | 43,500 | 43,500 | 34,381 | (48,038) | (73,651) | (5,513) | (211,679) | - |
| (Transfer) Refunding to Redemption Fund (e) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,558) | (37,564) | (450,702) |
| Proceeds of notes and other borrowings (f) | 800,000 | 100,000 | 200,000 | 100,000 | 1,010,000 | - | - | - | - | - | - | - | 2,210,000 |
| Repayment of notes and other borrowings (g) | (3,918) | (4,310) | (4,944) | (6,344) | (1,010,895) | (925) | (1,180) | (836) | (925) | (539,480) | (348,155) | (348,155) | (2,270,069) |
| Total available cash from operations | 1,360,524 | 616,532 | 1,008,398 | 780,798 | 636,047 | 997,617 | 739,962 | 548,087 | 689,179 | 692,111 | 296,674 | 350,302 | 8,716,229 |
| **Disbursements:** | | | | | | | | | | | | | |
| Grant and subsidies | 285,840 | 176,374 | 207,450 | 139,102 | 172,959 | 241,817 | 199,790 | 155,234 | 176,514 | 168,898 | 173,591 | 164,946 | 2,262,516 |
| Personal services | 475,381 | 432,315 | 426,159 | 457,682 | 526,161 | 537,987 | 461,185 | 437,086 | 456,843 | 502,044 | 444,825 | 435,016 | 5,592,684 |
| Other services | 44,858 | 50,945 | 33,426 | 68,941 | 56,218 | 50,640 | 70,113 | 65,509 | 35,226 | 34,369 | 45,338 | 37,411 | 592,994 |
| Materials and supplies | 9,612 | 14,119 | 18,740 | 12,434 | 7,877 | 14,133 | 10,664 | 20,177 | 14,151 | 15,490 | 17,297 | 7,231 | 161,924 |
| Equipment purchases | 16,995 | 5,569 | 6,847 | 3,944 | 2,832 | 4,578 | 3,546 | 4,313 | 4,052 | 2,050 | 1,703 | 6,327 | 62,757 |
| Other debt service and capital outlays | - | - | 1,689 | 85 | 27,130 | 21,401 | 21,247 | 508 | 13,318 | 9,676 | 36 | 8,335 | 103,424 |
| Total disbursements | 832,687 | 679,322 | 694,311 | 682,188 | 793,176 | 870,556 | 766,545 | 682,826 | 700,104 | 732,527 | 682,790 | 659,266 | 8,776,298 |
| Total available cash less transfers and disbursements | 527,837 | (62,789) | 314,088 | 98,609 | (157,130) | 127,061 | (26,583) | (134,739) | (10,925) | (40,416) | (386,116) | (308,964) | (60,069) |
| **Ending Cash Balance** | $ 49,172 | $ (13,618) | $ 300,470 | $ 399,079 | $ 241,949 | $ 369,010 | $ 342,427 | $ 207,688 | $ 196,763 | $ 156,347 | $ (229,770) | $ (538,734) | $ (538,734) |
| Ending cash balance without considering TRANS (h) | $ (746,910) | $ (905,390) | $ (786,358) | $ (781,405) | $ (937,639) | $ (809,653) | $ (835,056) | $ (968,960) | $ (978,959) | $ (479,895) | $ (517,856) | $ (478,665) | |

(a) This amount includes fiscal year 2006 and fiscal year 2007 cash deficits, the latter of which (the 2007 cash deficit) does not take into account the potential application of approximately $260 million of special tax measures, which the Secretary of the Treasury has requested that the Legislature assign toward such deficit.
(b) Pursuant to the Sales Tax Financing Corporation Act, a certain amount of the Sales Tax is to be deposited into the Sales Tax Fund prior to deposit into the General Fund, thus the $0 balance in the first two months of fiscal year 2008.
(c) Includes $150 million related to sale of properties.
(d) Consists of net revenue from General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by actual and estimated tax refunds.
(e) Consists of amounts to pay principal of and interest on general obligation bonds of the Commonwealth. Does not include amounts deposited into the Redemption Fund from non-General Fund revenues.
(f) Consists of proceeds of borrowing from the private Bank Syndicate and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(g) Consists of amount of repayments of borrowing from the private Bank Syndicate and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(h) Amount is net of cost of issuance.

13

PR-CCD-0010742

**Inter-Fund Borrowings**

The Commonwealth historically has used inter-fund borrowings to meet temporary imbalances of receipts and disbursements in the General Fund. Act No. 147 of the Legislature, approved on June 18, 1980, provides that in any fiscal year where revenues of the General Fund are not sufficient to meet approved appropriations for such year, the Governor may authorize the Secretary of the Treasury to borrow funds from Government Development Bank and, if necessary, from any funds of the Commonwealth under his custody, on such terms and conditions as the Secretary of the Treasury deems advisable. Funds available for this purpose do not include public pension funds and funds of public employees' associations. No moneys are currently borrowed from Government Development Bank under this Act 147. Moneys so borrowed must be repaid as soon as there is sufficient money in the General Fund to do so. Moneys borrowed and repaid by the General Fund are accounted for as "Operating Transfers In" and "Operating Transfers Out," respectively, in the financial statements of the Commonwealth and included in certain revenue and expenditure line items in the table entitled "General Fund Revenues, Expenditures, and Changes in Cash Balance" in "Summary and Management's Discussion of General Fund Results" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in the Commonwealth Report.

As of October 18, 2007, funds aggregating approximately $30.2 million under the custody of the Secretary of the Treasury were available for inter-fund borrowings, if necessary.

## TAX MATTERS

In the opinion of Squire, Sanders & Dempsey L.L.P., Bond Counsel, under existing law: (i) interest on the Notes is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, and (ii) the Notes and the interest thereon are exempt from state, Commonwealth and local income taxation. Bond Counsel will express no opinion as to any other tax consequences regarding the Notes.

The opinion on tax matters will be based on and will assume the accuracy of certain representations and certifications, and continuing compliance with certain covenants, of the Commonwealth contained in the transcript of proceedings and that are intended to evidence and assure the foregoing, including that the Notes are and will remain obligations the interest on which is excluded from gross income for federal income tax purposes. Bond Counsel will not independently verify the accuracy of the Commonwealth's certifications and representations or the continuing compliance with the Commonwealth's covenants.

The opinion of Bond Counsel is based on current legal authority and covers certain matters not directly addressed by such authority. It represents Bond Counsel's legal judgment as to exclusion of interest on the Notes from gross income for federal income tax purposes but is not a guaranty of that conclusion. The opinion is not binding on the Internal Revenue Service ("IRS") or any court. Bond Counsel expresses no opinion about (i) the effect of future changes in the Code and the applicable regulations under the Code or (ii) the interpretation and the enforcement of the Code or those regulations by the IRS.

The Code prescribes a number of qualifications and conditions for the interest on state and local government obligations to be and to remain excluded from gross income for federal income tax purposes, some of which require future or continued compliance after issuance of the obligations. Noncompliance with these requirements by the Commonwealth may cause the loss of such status and result in the interest on the Notes being included in gross income for federal income tax purposes retroactively to the date of issuance of the Notes. The Commonwealth has covenanted, to the extent permitted by the Constitution and the laws of the Commonwealth, to take the actions required of it for the interest on the Notes to be and to remain excluded from gross income for federal income tax purposes, and not to take any actions that would adversely affect that exclusion. After the date of issuance of the Notes, Bond Counsel will not undertake to determine (or to so inform any person) whether any actions taken or not taken, or any events occurring or not occurring, or any other matters coming to Bond Counsel's attention, may adversely affect the exclusion from gross income for federal income tax purposes of interest on the Notes or the market prices of the Notes. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth that would prevent the Commonwealth from complying with the requirements of the Code.

14

PR-CCD-0010743

A portion of the interest on the Notes earned by certain corporations may be subject to a federal corporate alternative minimum tax. In addition, interest on the Notes may be subject to a federal branch profits tax imposed on certain foreign corporations doing business in the United States and to a federal tax imposed on excess net passive income of certain S corporations.

Under the Code, the exclusion of interest from gross income for federal income tax purposes may have certain adverse federal income tax consequences on items of income, deduction or credit for certain taxpayers, including financial institutions, certain insurance companies, recipients of Social Security and Railroad Retirement benefits, those that are deemed to incur or continue indebtedness to acquire or carry tax-exempt obligations, and individuals otherwise eligible for the earned income tax credit. The applicability and extent of these and other tax consequences will depend upon the particular tax status or other tax items of the owner of the Notes. Bond Counsel will express no opinion regarding those consequences.

Ownership of tax-exempt obligations, including the Notes, may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Legislation affecting tax-exempt obligations is regularly considered by the United States Congress. There can be no assurance that legislation enacted or proposed, or actions by a court, after the date of issuance of the Notes, will not have an adverse effect on the tax status of interest on the Notes or the market value of the Notes.

On May 21, 2007, the United States Supreme Court agreed to hear *Dep't of Revenue of Kentucky v. Davis*. In the *Davis* case, the Kentucky Court of Appeals held that Kentucky's exemption from taxation of interest on bonds issued by Kentucky and its political subdivisions and its taxation of interest on bonds issued by other states and their political subdivisions violates the Commerce Clause of the United States Constitution. This ruling does not apply directly to bonds and notes of the Commonwealth (including the Notes) because the interest on those bonds and notes is exempt from state and local income taxation by virtue of federal law. If the United States Supreme Court sustains the *Davis* decision, however, one possible outcome could be that states with income tax laws similar to Kentucky's would cease to tax interest on bonds and notes of other states and adversely affect the market value of the Notes, as such legislation could reduce the current tax advantage of bonds and notes of the Commonwealth. It is not possible to predict how the United States Supreme Court will decide the *Davis* case or to predict any change in state law that would be occasioned by the affirmance of the *Davis* decision, nor is it possible to predict the effect, if any of that affirmance or any change in state law on the market value of the Notes.

Prospective purchasers of the Notes should consult their own tax advisers regarding pending or proposed federal and state tax legislation, the *Davis* case, and other court proceedings, and prospective purchasers of the Notes at other than their original issuance at the price indicated on the cover of this Official Statement should also consult their tax advisers regarding other tax considerations such as the consequences of market discount, as to all of which Bond Counsel expresses no opinion.

Bond Counsel's engagement with respect to the Notes ends with the issuance of the Notes, and, unless separately engaged, Bond Counsel is not obligated to defend the Commonwealth or the beneficial owners regarding the tax status of interest on the Notes in the event of an audit examination by the IRS. The IRS has a program to audit tax-exempt obligations to determine whether the interest thereon is includible in gross income for federal income tax purposes. If the IRS does audit the Notes, under current IRS procedures, the IRS will treat the Commonwealth as the taxpayer and the beneficial owners of the Notes will have only limited rights, if any, to obtain and participate in judicial review of such audit. Any action of the IRS, including but not limited to selection of the Notes for audit, or the course or result of such audit, or an audit of other obligations presenting similar tax issues, may affect the market prices for the Notes.

**Original Issue Premium**

The Notes were offered and sold to the public at a price in excess of their stated redemption price (the principal amount) at maturity. That excess constitutes bond premium. For federal income tax purposes, bond premium is amortized over the period to maturity of a Note, based on the yield to maturity of that Note, compounded semiannually. No portion

15

of that bond premium is deductible by the owner of a Note. For purposes of determining the owner's gain or loss on the sale, redemption (including redemption at maturity) or other disposition of a Note, the owner's tax basis in the Note is reduced by the amount of bond premium that accrues during the period of ownership. As a result, an owner may realize taxable gain for federal income tax purposes from the sale or other disposition of a Note for an amount equal to or less than the amount paid by the owner for that Note. A purchaser of a Note in the initial public offering at the price for that Note stated on the cover of this Official Statement who holds that Note to maturity will realize no gain or loss upon the retirement of that Note.

Owners of Notes should consult their own tax advisers as to the determination for federal income tax purposes of the amount of bond premium properly accruable in any period with respect to the Notes and as to other federal tax consequences and the treatment of bond premium for purposes of state, Commonwealth and local taxes on, or based on, income.

## LEGAL MATTERS

The proposed form of opinion of Squire, Sanders & Dempsey L.L.P., Miami, Florida, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Quiñones & Sánchez PSC, San Juan, Puerto Rico. Certain legal matters will be passed on for the Letter of Credit Banks by Chapman and Cutler LLP, Chicago, Illinois.

## LEGAL INVESTMENT

The Notes will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Notes from the Commonwealth at an aggregate discount of $995,997.83 from the initial offering price of the Notes. The obligations of the Underwriters are subject to certain conditions precedent, and the Underwriters will be obligated to purchase all the Notes, if any Notes are purchased. The Underwriters may offer to sell the Notes to certain dealers (including dealers depositing the Notes into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering price, and such offering price may be changed, from time to time, by the Underwriters.

BBVAPR Division de Valores Municipales ("BBVAPR MSD") and RBC Dain Rauscher, Inc., doing business under the name RBC Capital Markets ("RBC"), have entered into an agreement to jointly pursue underwritings with the Commonwealth and its issuers. In furtherance of the agreement, BBVAPR MSD and RBC will form a joint account and will allocate the agreed participations in any bond offering to one another.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Notes as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLP ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the agreement SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Notes in consideration for their professional services.

Oriental Financial Services Corporation ("OFS") and Bear, Stearns & Co., Inc. ("Bear Stearns") have entered into a joint venture agreement under which the parties shall provide services and advice to each other and take risk

16

related to the structuring and execution of certain municipal finance transactions with governmental entities located in the Commonwealth. Pursuant to the terms of such joint venture agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Notes as consideration for their professional services.

Loop Capital LLC ("LC") and TCM Capital, Inc. ("TCM") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the agreement LC and TCM will be entitled to receive a portion of each other's revenues from the underwriting of the Notes in consideration for their professional services.

J.P. Morgan Securities Inc. ("JPMSI") and Scotia Capital (USA) Inc. ("SCUSA") have entered into an agreement to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of their municipal securities. For each issuance of municipal securities for which both parties act as co-senior manager or co-manager, any sales commissions or takedowns shall be allocated based on actual sales of municipal securities by JPMSI or SCUSA.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature, approved on May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Notes.

As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Notes. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

Moody's and S&P have given the Notes ratings of MIG 1 and SP-1+, respectively, after taking into account the security provided by the Letter of Credit. The ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Notes and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Notes.

There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market price of the Notes.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the U.S. Securities and Exchange Commission, the Commonwealth has covenanted for the benefit of the Underwriters and beneficial owners (generally the tax owners of the Notes as follows):

To file in a timely manner, with each NRMSIR or with the MSRB, and with any Commonwealth and state information depository ("SID"), notice of the occurrence of any of the following events with respect to the Notes, if material:

PR-CCD-0010746

(a)   principal and interest payment delinquencies;

(b)   non-payment related defaults;

(c)   unscheduled draws on debt service reserves reflecting financial difficulties;

(d)   unscheduled draws on credit enhancements reflecting financial difficulties;

(e)   substitution of credit or liquidity providers, or their failure to perform;

(f)   adverse opinions or events affecting the tax-exempt status of Notes;

(g)   modifications to rights of the holders (including beneficial owners) of the Notes;

(h)   Note calls;

(i)   defeasances;

(j)   release, substitution, or sale of property securing repayment of the Notes; and

(k)   rating changes.

Events (c), (d) and (e) are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. Event (c) may not be applicable, since the terms of the Notes do not provide for "debt service reserves." Events (h) and (i) are not applicable since the terms of the Notes and the Note Resolution do not contain any "call" or "defeasance" provisions. In addition, with respect to the following events:

Events (d) and (e). The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Notes, unless the Commonwealth applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the Notes, see "*Tax Matters.*"

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Notes, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth has made similar continuing disclosure covenants in connection with prior securities issuances, and has complied with all such covenants, except as follows. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003, because of delays in finalizing such financial statements resulting from the implementation of Governmental Accounting Standards Board Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004 and 2006 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005 and 2007, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's annual financial statements were filed with each NRMSIR on August 16, 2007, and an amended and restated version thereof was filed with each NRMSIR on September 13, 2007.

As of the date of this Official Statement, there is no Commonwealth SID, and the name and address of each NRMSIR is: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn:

PR-CCD-0010747

NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Commonwealth acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the beneficial owners of the Notes, and shall be enforceable by any such beneficial owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth obligations thereunder.

No beneficial owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such beneficial owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all beneficial owners of the outstanding Notes benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Proceedings filed by beneficial owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved on June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Notes, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of beneficial owners, as determined by parties unaffiliated with the Commonwealth; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.  The Covenants have been made in order to assist the Underwriters to comply with the Rule.

19

PR-CCD-0010748

## MISCELLANEOUS

The foregoing summaries of or references to the various acts, the Notes, the Note Resolution, the Letter of Credit, the Revolving Credit Agreement, the Reimbursement Agreement, the Commonwealth Report, the Commonwealth's Annual Financial Report, and the summaries of or references to the various acts and provisions contained in such documents are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement is the form of Letter of Credit (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II*) and Description of Letter of Credit Banks (*Appendix III*).

The information included in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, the information appearing in Underwriting and the descriptions of the Letter of Credit Banks, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

### COMMONWEALTH OF PUERTO RICO

By:     /s/ Juan C. Méndez Torres
        Juan C. Méndez Torres
        Secretary of the Treasury
        Commonwealth of Puerto Rico

20

PR-CCD-0010749

APPENDIX I

**FORM OF LETTER OF CREDIT**

IRREVOCABLE DIRECT-PAY LETTER OF CREDIT
No. 92342/80085 (THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS HATO REY BRANCH); DCL0710240
(DEXIA CREDIT LOCAL, ACTING THROUGH ITS NEW YORK BRANCH); 91899001 (BNP PARIBAS, ACTING
THROUGH ITS SAN FRANCISCO BRANCH); FOUSNYY001077 (FORTIS BANK S.A./N.V., ACTING THROUGH ITS
NEW YORK BRANCH); No. 20421 (KBC BANK N.V., ACTING THROUGH ITS NEW YORK BRANCH); No.
SBLC7703224NY (BANCO BILBAO VIZCAYA ARGENTARIA, ACTING THROUGH ITS NEW YORK BRANCH);
No. S027781 (BANCO SANTANDER, SA)

November 1, 2007

Banco Popular
  de Puerto Rico,
  as Paying Agent
Trust Division
153 Ponce de Leon Avenue, Suite 800
Hato Rey, Puerto Rico  00918

Attention: Corporate Trust Department

Ladies and Gentlemen:

1.     At the request of the Commonwealth of Puerto Rico (the *"Commonwealth"*), the Banks listed on the
signature pages hereto (the *"Banks"*) hereby establish in favor of Banco Popular de Puerto Rico, as paying agent
(together with its successors and assigns, the *"Paying Agent"*), their Irrevocable Direct-Pay Letter of Credit
No. 92342/80085 (The Bank of Nova Scotia, acting through its Hato Rey Branch); DCL0710240 (Dexia Credit Local,
acting through its New York Branch); 91899001 (BNP Paribas, acting through its San Francisco Branch);
FOUSNYY001077 (Fortis Bank S.A./N.V., acting through its New York Branch); No. 20421 (KBC Bank N.V., acting
through its New York Branch); No. SBLC7703224NY (Banco Bilbao Vizcaya Argentaria, acting through its New York
Branch); No. S027781 (Banco Santander, SA, acting through its New York Branch) (this *"Letter of Credit"*) issued
pursuant to that certain Reimbursement Agreement dated as of November 1, 2007 (the *"Reimbursement Agreement"*), by
and among the Commonwealth, the Banks listed on the signature pages thereof, The Bank of Nova Scotia, acting through
its New York Agency, as Lead Arranger and Administrative Agent (referred to in such capacity as the *"Administrative
Agent"*), and BNP Paribas, acting through its San Francisco Branch (*"BNP Paribas"*), and Dexia Credit Local, acting
through its New York Branch (*"Dexia"*), as Co-Agents (the *"Co-Agents"*), in the initial stated amount of
$1,042,074,513.89 in Dollars (as defined in the Reimbursement Agreement) (said initial stated amount equal to the
principal amount of the Notes (as defined herein) on the Effective Date (as defined in the Reimbursement Agreement),
plus interest thereon at an assumed rate of 4.25% per annum for a period of 269 days based upon a year of 360 days as
such amount may be reduced from time to time as herein provided, herein referred to as the *"Stated Amount"*), which
may be drawn upon by the Paying Agent to pay the principal of the Commonwealth's Tax and Revenue Anticipation

PR-CCD-0010750

Notes, Series 2008 (the *"Notes"*) on the stated maturity thereof together with accrued and unpaid interest thereon. Anything in this Letter of Credit to the contrary notwithstanding, the obligations of the Banks as issuers hereof shall be several and not joint. The obligations of (i) The Bank of Nova Scotia, acting through its Hato Rey Branch (*"Scotiabank"*) hereunder shall not exceed $208,414,902.79, (ii) BNP Paribas hereunder shall not exceed $197,994,157.64, (iii) Dexia hereunder shall not exceed $197,994,157.64, (iv) Fortis Bank S.A./N.V., acting through its New York Branch (*"Fortis"*) hereunder shall not exceed $156,311,177.08, (v) KBC Bank N.V., acting through its New York Branch ("*KBC*") hereunder shall not exceed $104,207,451.39; (vi) Banco Bilbao Vizcaya Argentaria S.A., acting through its New York Branch (*"BBVA"*) hereunder shall not exceed $145,890,431.94 and (vii) Banco Santander, SA, acting through its New York Branch (*"Santander"*) hereunder shall not exceed $31,262,235.42. Subject to the foregoing limitation, the several obligation of Scotiabank hereunder shall equal 20.0% of the Drawing, the several obligation of BNP Paribas hereunder shall equal 19.0% of the Drawing, the several obligation of Dexia hereunder shall equal 19.0% of the Drawing, the several obligation of Fortis hereunder shall equal 15.0% of the Drawing, the several obligation of KBC hereunder shall equal 10.0%, the several obligation of BBVA hereunder shall equal 14.0% of the Drawing and the several obligation of Santander hereunder shall equal 3.0% of the Drawing.

2. This Letter of Credit shall expire at 5:00 p.m., New York City time, on the date (the *"Termination Date"*) which is the earliest of: (i) August 1, 2008 (the *"Stated Expiration Date"*), (ii) the date of payment of the Drawing by the Administrative Agent to the Paying Agent, (iii) the Administrative Agent's, on behalf of the Banks, receipt of a certificate signed by your duly authorized officer in the form of Annex B attached hereto appropriately completed, or (iv) the date when you surrender the original of this Letter of Credit to the Administrative Agent on behalf of the Banks, for cancellation. You agree to surrender the original of this Letter of Credit to the Administrative Agent on behalf of the Banks, after the Termination Date.

3. Funds under this Letter of Credit are available to you against your presentation of a drawing certificate in the form of Annex A attached hereto (the *"Drawing"*) to the Administrative Agent, on behalf of the Banks, at The Bank of Nova Scotia, New York Agency, One Liberty Plaza, 24th Floor, New York, New York 10006, Attention: Letter of Credit, Telephone: (212) 225-5424, Telecopy: (212) 225-6464, or at such other address and/or number which may be designated by the Administrative Agent by written notice delivered to the Paying Agent. Drafts may be presented to us by facsimile transmission to facsimile number (212) 225-6464. Such facsimile transmission shall be deemed the sole and exclusive presentation of the original documents provided that you simultaneously advise us by telephone, attention: Manager, Standby Letter of Credit Department at (212) 225-5424 and that the Manager of the Standby Letter of Credit Department confirms to you at the same time the good receipt of your facsimile transmission. Without limiting the obligations of the Banks under this Letter of Credit, the Administrative Agent, on behalf of the Banks, shall receive the Drawing, determine whether it complies with the terms and conditions hereof and promptly notify each Bank of the Drawing. The Drawing so presented shall have all blanks appropriately filled in and shall be signed by a person who purports to be an authorized officer of the Paying Agent and shall be in the form of a letter on the letterhead of the Paying Agent delivered or telecopied to the Administrative Agent.

4. The Administrative Agent, on behalf of the Banks, hereby agrees that demand for payment made under and in strict compliance with the terms of this Letter of Credit will be duly honored upon receipt of the Drawing request as specified in paragraph 3 hereof and if presented at the aforesaid office on or before the Termination Date. If the Drawing is received by the Administrative Agent at or prior to 10:00 a.m., New York time, on July 29, 2008, and provided that the documents presented in connection therewith strictly conform to the terms and conditions hereof, payment shall be made of the amount specified in immediately available funds, on July 30, 2008, no later than 11:00 a.m. New York time. If the Drawing is received by the Administrative Agent after 10:00 a.m., New York time, on July 29, 2008, but at or prior to 10:00 a.m., New York time, on July 30, 2008, and *provided* that the documents presented in

I-2

PR-CCD-0010751

connection therewith strictly conform to the terms and conditions hereof, payment shall be made of the amount specified in immediately available funds, no later than 11:00 a.m., New York time, on July 31, 2008. If the Drawing is received hereunder after 10:00 a.m., New York time, on July 30, 2008, payment shall be made of the amount specified in immediately available funds, no later than 11:00 a.m., New York time, on the second Business Day immediately succeeding the date of such Drawing. Payment under this Letter of Credit shall be made by the Banks by wire transfer of immediately available funds of each Bank to the Administrative Agent who shall remit such amounts to the Paying Agent in accordance with the instructions specified by the Paying Agent in the drawing certificate relating to the Drawing hereunder. Such account may be changed only by presentation to the Administrative Agent of a letter in form satisfactory to the Administrative Agent specifying a different account with the Paying Agent and executed by the Paying Agent. As used in this Letter of Credit, "Business Day" shall mean a day other than (i) a Saturday or Sunday, (ii) any other day on which banks located in New York, New York or the cities in which the principal office of the Administrative Agent and the Paying Agent are located are authorized by law to close or (iii) a day on which the New York Stock Exchange is closed. The obligations of the Banks under this Letter of Credit shall be several and not joint, and each Bank shall pay in respect of the Drawing presented in accordance with the terms hereof an amount equal to such Bank's percentage of the amount of the Drawing as specified above. The Administrative Agent will promptly remit such amounts received from the Banks to the Paying Agent. Neither the Administrative Agent nor any Bank shall be responsible or otherwise liable for any other Bank's failure to perform its obligations under this Letter of Credit, nor shall the failure of any Bank to perform its obligations under this Letter of Credit relieve any other Bank of its obligations hereunder. The Administrative Agent shall not be liable for the failure of any Bank to perform its obligations under this Letter of Credit.

5.   Only the Paying Agent may make the Drawing under this Letter of Credit. Upon payment as provided in paragraph 4 of the amount specified in the Drawing drawn hereunder, the Banks shall be fully discharged of their obligation under this Letter of Credit with respect to such Drawing.

6.   This Letter of Credit is intended to apply only to the payment of the principal amount of the Notes through and including August 1, 2008 and accrued interest thereon through and including July 30, 2008.

7.   To the extent not inconsistent with the express terms hereof, this Letter of Credit shall be governed by and construed in accordance with the Uniform Customs and Practices for Documentary Credits, International Chamber of Commerce Publication No. 600 (the *"Uniform Customs"*), except for the second sentence of Article 38(d) thereof and notwithstanding the provisions of the second sentence of Article 36 of the Uniform Customs, if this Letter of Credit expires during an interruption of business (as defined in Article 36 of the Uniform Customs), the Banks agree to effect payment under this Letter of Credit if a drawing which strictly conforms to the terms and conditions of this Letter of Credit is made within 15 days after the resumption of business and, as to matters not governed by the Uniform Customs, this Letter of Credit shall be governed by the internal laws of the State of New York, including, without limitation, the Uniform Commercial Code as in effect in the State of New York. Communications with respect to this Letter of Credit shall be in writing and shall be addressed to the Administrative Agent at The Bank of Nova Scotia, New York Agency, One Liberty Plaza, 26th Floor, New York, New York 10006, Attention: Public Finance (or to such other address as the Administrative Agent, on behalf of the Banks, may specify to you in writing), specifically referring thereon to this Letter of Credit by its number.

8.   You may transfer your rights under this Letter of Credit in their entirety (but not in part) to any transferee who has succeeded to you as Paying Agent under the Paying Agency Agreement (as defined in the Reimbursement Agreement) and such transferred rights may be successively transferred. Transfer of your rights under this Letter of

I-3

PR-CCD-0010752

Credit to any such transferee shall be effected upon the presentation to the Administrative Agent of this Letter of Credit accompanied by a transfer letter in the form attached hereto as Annex C.

     9.    This Letter of Credit sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein (including, without limitation, the Notes), except only the certificates and letters referred to herein; and no such reference shall be deemed to incorporate herein by reference any document, instrument or agreement.

Very truly yours,

> THE BANK OF NOVA SCOTIA, acting through its
> New York Agency, as Administrative Agent
>
> THE BANK OF NOVA SCOTIA, acting through its
> Hato Rey Branch, as a Bank
>
> BNP PARIBAS, acting through its San Francisco
> Branch, as a Bank
>
> DEXIA CREDIT LOCAL, acting through its New York
> Branch, as a Bank
>
> FORTIS BANK S.A./N.V., acting through its New York
> Branch, as a Bank
>
> BANCO BILBAO VIZCAYA ARGENTARIA S.A.,
> acting through its New York Branch
>
> KBC BANK N.V., acting through its New York
> Branch as a Bank
>
> BANCO SANTANDER, SA, acting through its New
> York Branch as a Bank

I-4

PR-CCD-0010753

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

*Upon delivery of the Notes, Squire, Sanders & Dempsey L.L.P. is prepared to render its final opinion with respect to the Notes in substantially the following form:*

November __, 2007

Honorable Juan Carlos Méndez
Secretary of the Treasury of
Puerto Rico
San Juan, Puerto Rico

Re:      $1,010,000,000 Tax and Revenue Anticipation Notes of the Commonwealth of
         Puerto Rico, Series 2008

Dear Sir:

We have served as bond counsel in connection with the issuance by the Commonwealth of Puerto Rico (the "Commonwealth") of its $1,010,000,000 aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series 2008 (the "Notes"). The Notes are dated their initial date of delivery, mature on July 30, 2008 and bear interest at the rate of 4.25%, payable on July 30, 2008, all as set forth in the Note Resolution referred to hereinbelow. The Notes are issuable as registered notes without coupons in denominations of $5,000 or any multiple thereof, in the manner and in accordance with the terms and conditions of the Note Resolution. The Notes are not subject to redemption or acceleration prior to maturity.

In our capacity as bond counsel, we have examined the transcript of the proceedings (the "Transcript") of the Commonwealth relating to the issuance of the Notes, including, without limitation, Act No. 1 of the Legislature of Puerto Rico, approved on June 26, 1987, as amended by Act No. 139 of the Legislature of Puerto Rico, approved on November 9, 2005 (collectively, the "Act"), and resolutions adopted on October 18, 2007 by the Secretary of the Treasury of Puerto Rico and approved by the Governor of Puerto Rico (collectively, the "Note Resolution"), and such other documents as we have deemed necessary to render this opinion.

We have also examined a copy of a Note as executed and authenticated. We assume that all other Notes have been similarly executed and authenticated.

From such examination, we are of the opinion that:

1.      The Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Notes have been duly authorized and issued to fund a portion of the projected cash flow requirements of the Commonwealth's General Fund in fiscal 2008, which requirements result from timing differences between expected disbursements and receipts of taxes and revenues, including, without limitation, to repay amounts borrowed by the Commonwealth under a revolving line of credit (the "Line of Credit") obtained in advance of the issuance of the Notes. The Notes are valid and binding obligations of the Commonwealth and are payable (i) first from amounts drawn under an irrevocable direct-pay Letter of Credit of even date hereof (the "Letter of Credit") issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, Dexia Credit Local, acting through its New York Branch, BNP Paribas, acting through its San Francisco Branch, Fortis Bank S.A./N.V., acting through its New York Branch, KBC Bank N.V., acting through its New York Branch, Banco Bilbao Vizcaya Argentaria S.A., acting through its New York Branch and Banco Santander, S.A., acting through its New York Branch (collectively, the "Banks") and (ii) in the

II-1

event one or more Banks fail to honor their obligations under the Letter of Credit, from the special fund created by the Act designated "Special Fund for the Redemption of Tax and Revenue Anticipation Notes" (the "Note Fund"), to the credit of which Note Fund the Secretary of the Treasury of Puerto Rico is required by and in the manner set forth in the Note Resolution and that certain resolution adopted on June 27, 2007 by the Secretary of the Treasury and approved by the Governor to deposit all taxes and revenues required to be deposited in the General Fund of the Commonwealth received after March 31, 2008 and on or prior to June 30, 2008 plus any balance in the General Fund on April 1, 2008 in respect of taxes and revenues received by the General Fund after July 1, 2007 (and if certain coverage requirements are not met, taxes and revenues so deposited prior to April 1, 2008), subject to certain prior applications as specified in the Act. Amounts in the Note Fund shall also be applied to pay the Letter of Credit Note and the Revolving Credit Note (as such terms are defined in the Note Resolution) as provided in the Note Resolution. The full faith, credit and taxing power of the Commonwealth are not pledged to the payment of the Notes.

4.      The interest on the Notes is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. The Notes and the interest thereon are exempt from state, Commonwealth and local income taxation. We express no opinion as to any other tax consequences regarding the Notes.

Under the Code, a portion of the interest on the Notes earned by certain corporations may be subject to a federal corporate alternative minimum tax and interest on the Notes may be subject to a federal branch profits tax imposed on certain foreign corporations doing business in the United States and to a federal tax imposed on excess net passive income of certain S corporations.

In giving the opinion set forth in numbered paragraph 4 hereof, we have relied upon, and assumed continuing compliance with, the Commonwealth's covenants and the accuracy, which we have not independently verified, of the representations and certifications of the Commonwealth contained in the Transcript. The accuracy of those representations and certifications, and the Commonwealth's continuing compliance with those covenants, may be necessary for the interest on the Notes to be and to remain excluded from gross income for federal income tax purposes. Failure to comply with certain of those covenants subsequent to issuance of the Notes may cause interest on the Notes to be included in gross income for federal income tax purposes retroactively to the date of issuance of the Notes. The Commonwealth has covenanted to comply with the requirements of the Code to the extent permitted by the Constitution and laws of the Commonwealth. We are not aware of any provisions of the Constitution or laws of the Commonwealth that would prevent the Commonwealth from complying with the requirements of the Code.

In rendering the opinions set forth herein, we have assumed the accuracy and truthfulness of all public records and of all certifications, documents and other proceedings examined by us that have been executed or certified by public officials acting within the scope of their official capacities and have not verified the accuracy or truthfulness thereof. We have also assumed the genuineness of the signatures appearing upon such public records, certifications, documents and proceedings. As to questions of fact material to our opinion, we have relied on representations of the Commonwealth furnished to us, without undertaking to verify such representations by independent investigation.

It is to be understood that the rights of the holders of the Notes and the enforceability of the Note Resolution and the Notes may be subject to judicial discretion and valid bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights generally, and subject to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Respectfully submitted,


[To be signed "Squire, Sanders & Dempsey L.L.P."]



II-2

PR-CCD-0010755

APPENDIX III

## DESCRIPTION OF LETTER OF CREDIT BANKS

### BANK OF NOVA SCOTIA

The Bank of Nova Scotia ("Scotiabank" or the "Bank"), founded in 1832, is a Canadian chartered bank with its principal office located in Toronto, Ontario.  Scotiabank is one of North America's premier financial institutions and Canada's most international bank. With 48,000 employees, Scotiabank and its affiliates serve over 10 million customers throughout the world.

Scotiabank provides a full range of personal, commercial, corporate and investment banking services through its network of branches located in all Canadian provinces and territories. Outside Canada, Scotiabank has branches and offices in over 50 countries and provides a wide range of banking and related financial services, both directly and through subsidiary and associated banks, trust companies and other financial firms.

For the fiscal year ended October 31, 2006, Scotiabank recorded total assets of CDN$379.0 billion (US$337.6 billion) and total deposits of CDN$263.9 billion (US$235.1 billion). Net income for the fiscal year ended October 31, 2006 equaled CDN$3.579 billion (US$3.188 billion), compared to CDN$3.209 billion (US$2.717 billion) for the prior fiscal year.  Amounts above are shown in Canadian dollars and also reflect the United States dollar equivalent as of October 31, 2006 (1.0000 United States dollar equals 1.1227 Canadian dollars).

For the quarter ended July 31, 2007, Scotiabank recorded total assets of CDN$408.1 billion (US$382.5 billion) and total deposits of CDN$287.0 billion (US$269.0 billion). Net income for the quarter ended July 31, 2007 equaled CDN$1.0 billion (US$937 million), compared to CDN$936 million (US$877 million) for the same period the prior year. Amounts above are shown in Canadian dollars and also reflect the United States dollar equivalent as of Tuesday, July 31, 2007 (1.0000 United States dollar equals 1.0668 Canadian dollars).

Scotiabank will provide to anyone, upon written request, a copy of its most recent annual report, as well as a copy of its most recent quarterly financial report.  Requests should be directed to: The Bank of Nova Scotia, New York Agency, One Liberty Plaza, 26th Floor, New York, NY, 10006.  Attention:  Public Finance Department.

The information concerning the Bank contained herein is furnished solely to provide limited introductory information regarding the Bank and does not purport to be comprehensive.  Such information is qualified in its entirety by the detailed information appearing in the documents and financial statements referenced above.

The delivery of this disclosure information by the Bank shall not create any implication that there has been no change in the affairs of the Bank since the date hereof, or that the information contained or referred to in this disclosure information is correct as of any time subsequent to its date.

III-1

PR-CCD-0010756

## BNP PARIBAS

The BNP Paribas Group (the "Group") (of which BNP Paribas, a French corporation (société anonyme), is the parent company) is a European leader in banking and financial services. It has approximately 150,500 employees, 118,700 of whom are based in Europe. The Group occupies leading positions in three significant fields of activity: Corporate and Investment Banking, Asset Management & Services and Retail Banking. It is present in 85 countries and has a strong presence in all the key financial centers. Present throughout Europe, in all its business lines, France and Italy are its two domestic markets in retail banking. BNP Paribas has a significant and growing presence in the United States and leading positions in Asia and in emerging markets.

The Group has three divisions: Retail Banking, Asset Management and Services and Corporate and Investment Banking, the latter two of which also constitute "core businesses." Operationally, the Retail Banking division is itself comprised of three core businesses: French Retail Banking, International Retail Banking and Financial Services, Italian Retail Banking (BNL bc). The Group has additional activities, including those of its listed real estate subsidiary, Klépierre, which are conducted outside of its core businesses.

As of June 30, 2007, the Group had consolidated assets of €1,663.6 billion (compared to €1,440.3 billion as of December 31, 2006), consolidated loans and receivables due from customers of €426.8 billion (compared to €393.1 billion as of December 31, 2006), consolidated items due to customers of €321.9 billion (compared to €298.7 billion as of December 31, 2006) and shareholders' equity (Group share including income as of June 30, 2007) of €52.2 billion (compared to €49.5 billion as of December 31, 2006). Pre-tax net income as of June 30, 2007 was €6.8 billion (compared to €10.6 billion for the year ended December 31, 2006). Net income, Group share as of June 30, 2007 was €4.8 billion (compared to €7.3 billion for the year ended December 31, 2006). Revenues as of June 30, 2007 were €16.4 billion (compared to €27.9 billion for the year ended December 31, 2006).

The Group currently has long-term senior debt ratings of "Aa1" with stable outlook from Moody's, "AA+" with stable outlook from Standard & Poor's and "AA" with stable outlook from Fitch Ratings.

The information concerning the BNP Paribas and the Group contained herein is furnished solely to provide limited introductory information regarding the BNP Paribas and the Group and does not purport to be comprehensive.

The delivery of the information contained in this section shall not create any implication that there has been no change in the affairs of the BNP Paribas or the Group since the date hereof, or that the information contained or referred to in this section is correct as of any time subsequent to its date.

PR-CCD-0010757

# DEXIA CREDIT LOCAL

Dexia Credit Local ("Dexia") is a subsidiary of the Dexia Group, which was created in 1996. The Dexia Group is a major European banking organization that is the product of several cross-border mergers. Dexia is an authentically European bank in terms of both its management organization and the scope of its different lines of business. The Dexia Group is listed on the Brussels, Paris and Luxembourg stock exchanges. With a stock market capitalization of over 24 billion euros as of December 31, 2006, the Dexia Group ranks in the top third of the Euronext 100 companies.

Dexia specializes in the Dexia Group's first line of business – public and project finance and financial services for the public sector. Dexia has recognized expertise in local public sector financing and project finance. It is backed by a network of specialized banks, which employ over 3,500 professionals. Through this network of subsidiaries, affiliates and branches, Dexia is present in almost all of the countries of the European Union as well as Central Europe, the United States of America and Canada. Dexia also has operations in Latin America, the Asian-Pacific Region including Australia, and the countries around the Mediterranean.

Dexia is a bank with its principal office located in Paris, France. In issuing the facility, Dexia will act through its New York Branch, which is licensed by the Banking Department of the State of New York as an unincorporated branch of Dexia Credit Local, Paris. Dexia is the leading local authority lender in Europe, funding its lending activities in 2006 primarily through the issuance of euro and U.S. dollar-denominated bonds. In 2006, total funding raised by Dexia and Dexia Municipal Agency was 15.7 billion euros.

The Dexia Group is the owner of Financial Security Assurance Holdings Ltd. ("FSA Holdings"), the holding company for Financial Security Assurance Inc., a leading financial guaranty insurer.

As of December 31, 2006, Dexia had total consolidated assets of 304 billion euros, outstanding medium and long-term loans to customers of 241 billion euros and shareholders' equity of over 7.98 billion euros (Tier I plus Tier II), and for the year then ended had consolidated net income of 1.082 billion euros. These figures were determined in accordance with generally accepted accounting principles in France. Dexia maintains its records and prepares its financial statements in euros. At December 31, 2006, the exchange rate was 1.0000 euro equals 1.317 United States dollar. Such exchange rate fluctuates from time to time.

Dexia is rated Aa1 long-term and P-1 short-term by Moody's, AA long-term and A-1+ short-term by S&P, and AA+ long-term and F1+ short-term by Fitch.

Dexia will provide without charge a copy of its most recent publicly available annual report. Written requests should be directed to: Dexia Credit Local, New York Branch, 445 Park Avenue, 7th Floor, New York, New York 10022, Attention: General Manager. The delivery of this information shall not create any implication that the information contained or referred to herein is correct as of any time subsequent to its date.

III-3

PR-CCD-0010758

# FORTIS BANK S.A./N.V.

Fortis Bank S.A./N.V. ("Fortis Bank") conducts the banking activities of Fortis, an international financial services provider active in the fields of banking, insurance and investment.

Fortis Bank is a wholly-owned indirect subsidiary of Fortis SA/NV and Fortis N.V., whose principal offices are located in Brussels (Belgium) and Utrecht (the Netherlands) respectively.

Fortis Bank is a commercial bank offering a full range of banking and insurance products and services to a wide range of customers. In its home market, the Benelux countries, Fortis Bank occupies a leading position. Fortis is the largest bank in Belgium, the second-largest in Luxembourg, and the fourth-largest in the Netherlands. The bank had full-time staff of over 43,000 in 2006. Outside its home market, Fortis Bank concentrates on selected market segments. Its business is subject to examination and regulation by the Belgian Banking, Finance and Insurance Commission ("CBFA").

As of December 31, 2006 Fortis Bank had total assets of EUR 674.7 billion.

Fortis Bank's New York branch (the "New York Branch") has been licensed by the New York State Banking Department (the "NY Banking Department") to carry on the business of a branch as of November 15, 2002. The New York Branch is subject to examination by the Banking Department and the Federal Reserve Bank of New York. In addition, the New York Branch is required to file periodic and other reports containing financial information with the Banking Department and the Federal Reserve Bank of New York.

Additional information, including the Fortis Annual Report for 2006, may be obtained without charge by each person to whom this Official Statement is delivered upon the written request of any such person to Fortis Bank, 520 Madison Avenue, New York, New York 10022. This information is also available at www.Fortis.com.

The financial statements appearing in the Fortis Annual Report for 2006 were prepared in accordance with International Financial Reporting Standards as adopted by the European Union, which differ from generally accepted accounting principles in use in the United States.

The information in this Appendix has been obtained from Fortis Bank, which is solely responsible for its content. The delivery of the Official Statement shall not create any implication that there has been no change in the affairs of Fortis Bank since the date hereof, or that the information contained or referred to in this Appendix is correct as of any time subsequent to its date.

PR-CCD-0010759

## BANCO BILBAO VIZCAYA ARGENTARIA

Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA") is a multinational financial services group. Its 7,526 branches and 101,401 employees provide banking and financial services solutions to a global customer base of 35 million customers in 32 countries. The financial services include corporate and consumer lending, credit card services, ATMs, telephone and Internet banking. Internationally, BBVA provides investment banking and brokerage services, venture capital, private banking and investment management.

As of the second quarter ENDED June 30, 2007, BBVA's total assets were 466,443 million euros and net attributed profit was 2,624 million euros (excluding non-recurrent items).

The BBVA and its subsidiaries four business areas are:

**Spain and Portugal:** this includes Corporate Banking and Financial Services for individual customers, small companies and businesses in the domestic market, plus consumer finance provided by Finanzia and Uno-e, mutual and pension fund managers, the insurance business and BBVA Portugal.

**Global Businesses:** this area consists of SMEs, large companies and global institutions. Global Businesses covers the global customer unit, investment banking, treasury management, private banking and distribution. The area also services of business and real estate projects.

**Mexico and the United States:** this area includes the banking, insurance and pension businesses in Mexico and the United States (including Puerto Rico).

**South America:** this consists of banking, insurance and pension businesses in Argentina, Chile, Colombia, Panama, Paraguay, Peru, Uruguay and Venezuela.

*For further information log on to www.bbva.com*

III-5

PR-CCD-0010760

## KBC BANK N.V.

KBC Bank N.V., New York Branch ("KBC NYB") is an unincorporated branch of KBC Bank N.V., a naamloze vennootschap (public company of limited liability) organized under the laws of Belgium, whose principal office is located in Brussels, Belgium. KBC Bank N.V. conducts operations through additional offices and agencies in the United States and around the world. Created on June 4, 1998 through the combination of two predecessor Belgian banks, Kredietbank N.V. and CERA Bank C.V., KBC Bank N.V. is subject to regulation by the Belgium Banking Commission and to Belgian banking and accounting law. KBC Bank N.V. maintains its records and prepares its financial statements in accordance with accounting principles generally accepted in Belgium. Such records and financial statements are maintained and prepared in Euro currency (EUR).

One of the largest commercial banks in Belgium, KBC Bank N.V. operates as a universal bank, engaged in commercial and investment banking, and offers comprehensive financial services. In contrast with the two other major Belgian banks, KBC Bank N.V.'s branches in Belgium are located exclusively in Flanders and Brussels. KBC Bank N.V. is indirectly represented through CBC Banque S.A., a majority-owned subsidiary with branches in the Walloon region and Brussels.

KBC NYB was originally established in 1977 as a New York Branch of Kredietbank N.V., and has been relicensed by the Banking Department of the State of New York as a New York Branch of KBC Bank N.V. to provide a full range of services in New York. In addition to handling foreign exchange transactions, KBC NYB is active in international payment transactions and the clearing of commercial payments and professional transactions in U.S. Dollars. KBC NYB is also involved in providing financial services, particularly credit, for European (including Belgian) companies operating in the United States, as well as for United States corporations.

### Selected Consolidated Financial Data of KBC Bank N.V.

Year Ended

### December 31, 2006
(EUR Millions)

| | | |
|---|---|---|
| Total Assets | EUR | 325,400 |
| Amounts Owed to Customers | | 180,031 |
| Loans and Advances to Customers | | 132,400 |
| Total Equity | | 17,219 |
| Net Income | | 3,430 |

Conversion Rate: As of December 31, 2006, EUR 0.759 = US$1.00

KBC NYB will provide, upon written request and without charge, a copy of KBC Bank N.V.'s Annual Report for the year ended December 31, 2006. Written requests should be directed to: KBC Bank N.V., New York Branch, 1177 Avenue of the Americas, New York, New York 10036, Attention: Controller.

The delivery of this Official Statement shall not create any implication that there has been no change in the affairs of KBC Bank N.V. since December 31, 2006 or that information contained or referred to in this Appendix III is current as of any time subsequent to such date.

III-6

## BANCO SANTANDER, S.A.

Banco Santander, S.A. ("Santander") was established on March 21, 1857 and incorporated in its present form by a public deed executed in Santander, Spain, on January 14, 1875, recorded in the Mercantile Registry (Finance Section) of the Government of the Province of Santander.

Santander's activities comprise a full range of retail, commercial and corporate banking services, including investment banking, treasury and capital markets and insurance.

As of June 30, 2007 Santander on a consolidated basis had:

- Assets of 885,603 million Euros.
- Total managed funds of 1,071,815 million Euros.
- Market capitalization of 85,621 million Euros.
- Shareholders' equity of 43,956 million Euros.

For further details, please access Santander's website at www.gruposantander.com. For the website in the English language, click on the "English" link and access "Information for Shareholders and Investors."

PR-CCD-0010762

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010763



Printed on Recycled Paper
IMAGEMASTER 800.452.5152

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statement of Plan Net Assets***
**As of June 30, 2006 and 2007 and as of December 31, 2007**

| | 2008[1] Unaudited | 2007[1] | 2006[1] |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and Investments: | | | |
| Cash and Cash Equivalents: | $ 16,904,000 | $ 41,365,000 | $ 27,849,000 |
| Deposited with GDB: | | | |
| Unrestricted | 38,391,000 | 266,633,000 | 25,777,000 |
| Restricted | 2,458,000 | 2,310,000 | 2,156,000 |
| Total Cash | 57,753,000 | 310,308,000 | 55,783,000 |
| Marketable Securities: | | | |
| Notes and Bonds | 183,931,000 | 149,639,000 | 6,667,000 |
| Stocks | 1,689,931,000 | 1,693,144,000 | 1,376,901,000 |
| Master Repo | - | - | 148,158,000 |
| Alternative investments | 51,250,000 | 47,784,000 | 41,609,000 |
| Total Cash and Investments | 1,925,112,000 | 1,890,566,000 | 1,573,336,000 |
| LOANS TO PLAN MEMBERS: | | | |
| Mortgage | 107,687,000 | 107,680,000 | 96,542,000 |
| Personal | 702,447,000 | 440,167,000 | 406,883,000 |
| Cultural Trips | 29,179,000 | 28,933,000 | 24,894,000 |
| PEC | 529,000 | 533,000 | 233,000 |
| Total Loans to Plan Members | 839,841,000 | 577,314,000 | 528,552,000 |
| Investment in PRTA Holdings | - | - | 495,318,000 |
| Total cash, investments and loans to plan members | 2,822,707,000 | 2,778,188,000 | 2,652,988,000 |
| RECEIVABLES: | | | |
| Employer | 98,777,000 | 117,420,000 | 43,343,000 |
| General Fund of the Commonwealth | 2,236,000 | 4,615,000 | 10,405,000 |
| The Commonwealth of PR Judiciary | 11,974,000 | 5,113,000 | 3,161,000 |
| Investment Sales | 652,000 | 2,470,000 | 1,279,000 |
| Accrued Interest | 3,438,000 | 3,119,000 | 2,385,000 |
| Dividend Receivable | - | - | 23,720,000 |
| Other | 25,183,000 | 4,527,000 | 23,575,000 |
| Total Receivables | 142,261,000 | 137,264,000 | 107,868,000 |
| PROPERTY: | 6,851,000 | 7,101,000 | 7,694,000 |
| OTHER ASSETS: | 7,091,000 | 7,371,000 | 7,592,000 |
| Construction in Progress | 2,938,000 | 1,375,000 | |
| Total Assets | 2,981,848,000 | 2,931,299,000 | 2,776,142,000 |
| **LIABILITIES** | | | |
| Book overdraft | 43,403,000 | 1,566,0000 | |
| Short Term Obligations | - | - | 139,074,000 |
| Repurchase Obligations | - | - | 1,245,000 |
| Escrow Funds to Plan Members and Guarantee | 9,353,000 | 8,914,000 | 8,433,000 |
| Investment Purchases | 1,499,000 | 2,172,000 | 1,179,000 |
| Accounts Payable and Accrued Liabilities | 99,366,000 | 10,125,000 | |
| Line of Credit | - | - | 60,000,000 |
| Other Liabilities | 9,893,000 | 17,022,000 | 24,880,000 |
| Total Liabilities | 163,515,000 | 39,780,000 | 209,931,000 |
| **Net Assets Held in Trust for Pension Benefits** | $2,818,332,000 | $2,891,499,000 | $2,566,210,000 |

---

\* Totals may not add due to rounding.

(1) Rounded to the nearest thousand.

PR-CCD-0006904

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statement of Changes in Plan Net Assets\***
**As of June 30, 2006 and 2007 and as of December 31, 2007**

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statement of Changes in Plan Net Assets\***
**As of June 30, 2006 and 2007 and as of December 31, 2007**

|  | 2008[1] Unaudited | 2007[1] | 2006[1] |
|---|---|---|---|
| ADDITIONS: |  |  |  |
| Contributions: |  |  |  |
| Employer | $ 187,493,000 | $ 374,394,000 | $ 398,521,000 |
| Participating Employees | 169,935,000 | 338,791,000 | 342,830,000 |
| Special | 16,789,000 | 17,000,000 | 16,684,000 |
| Retirement Benefits | 13,457,000 | 69,097,000 | - |
| Total Contributions | 387,674,000 | 799,282,000 | 758,035,000 |
| Investment Income: |  |  |  |
| Realized Gain or Loss | 23,356,000 | 74,304,000 | 33,023,000 |
| Unrealized Gain or Loss | (15,277,000) | 289,881,000 | 156,492,000 |
| Dividend Income | 2,531,000 | 14,494,000 | 49,939,000 |
| Interest Income | 48,890,000 | 68,231,000 | 63,486,000 |
| Total | 59,501,000 | 446,910,000 | 302,939,000 |
| Less Investment Expense | (569,000) | (12,940,000) | (10,123,000) |
| Insurance Premiums | 4,260,000 | 2,441,000 | 14,492,000 |
| Other Income | 5,178,000 | 17,431,000 | 8,496,000 |
| Net Investment Income | 68,370,000 | 453,841,000 | 315,804,000 |
| Total Additions | 456,044,000 | 1,253,123,000 | 1,073,839,000 |
| DEDUCTIONS: |  |  |  |
| Annuities | 465,164,000 | 800,787,000 | 772,647,000 |
| Special | 16,789,000 | 17,000,000 | 16,684,000 |
| Death Benefits | 9,260,000 | 13,872,000 | 14,984,000 |
| Refunds: |  |  |  |
| Employers | 2,060,000 | 5,296,000 | 1,666,000 |
| Participating Employees | 18,025,000 | 28,009,000 | 20,707,000 |
| Personal Loans Adjustments | - |  | 1,658,000 |
| Loan Premium Death Benefits | 495,000 | 2,118,000 | 1,216,000 |
| Other Expense | 15,054,000 | 6,666,000 |  |
| Administrative Expenses | 2,364,000 | 29,208,000 | 30,817,000 |
| Net Adjustment in the conversion to a new loan application |  |  |  |
| Total Deductions | 529,210,000 | 902,955,000 | 860,379,000 |
| Net Increase | (73,167,000) | 350,168,000 | 213,459,000 |
| Net Assets Restated per Auditors | - | - | - |
| Net Assets Held in Trust for Pension Benefits: |  |  |  |
| Beginning of the Year | 2,891,499,000 | 2,541,331,000 | 2,327,871,000 |
| End of Year | $ 2,818,332,000 | $ 2,891,499,000 | $ 2,541,331,000 |

\*   Totals may not add due to rounding.
(1) Rounded to the nearest thousand.

I-55

### The Commonwealth of Puerto Rico
### Judiciary Retirement System
### Statement of Plan Net Assets*
### As of June 30, 2006 and 2007 and as of December 31, 2007

|  | 2008[1] Unaudited | 2007[1] | 2006[1] |
|---|---|---|---|
| **ASSETS** |  |  |  |
| Cash and Investments: |  |  |  |
| Cash and Cash Equivalents | $ 3,110,000 | $ 2,735,000 | $ 1,599,000 |
| Cash Deposited with GDB |  |  |  |
| Unrestricted | 1,542,000 | 197,000 | 179,000 |
| Restricted | 76 | 192 | 781 |
| Total Cash | 4,652,000 | 2,932,000 | 1,779,000 |
| Receivables: |  |  |  |
| Accrued Interest | 231,000 | 237,000 | 250,000 |
| Investment Sales | 106,000 | 179,000 | 561,000 |
| Other | 18,000 | 86,000 | 45,000 |
| Total Receivables | 355,000 | 502,000 | 856,000 |
| Marketable Securities: |  |  |  |
| Notes and Bonds | 21,468,000 | 20,728,000 | 19,822,000 |
| Stock | 68,345,000 | 68,345,000 | 56,108,000 |
| Total Marketable Securities | 89,812,000 | 89,812,000 | 75,930,000 |
| **LOANS TO PLAN MEMBERS** |  |  |  |
| (including accrued interest receivables) |  |  |  |
| Mortgage | 13,000 | 17,000 | 34,000 |
| Personal | 363,000 | 195,000 | 191,000 |
| Cultural Trips | 39,000 | 44,000 | 49,000 |
| Total Loans to Plan Members | 415,000 | 256,000 | 274,000 |
| Total Cash, Investments and Loans to Plan Members | 95,235,000 | 93,072,000 | 78,838,000 |
| **LIABILITIES** |  |  |  |
| Book Overdraft | 1,436,000 | 5,415,000 | 1,902,000 |
| Due to the Employees Retirement System of the Government of Puerto Rico | 11,974,000 | 5,113,000 | 3,161,000 |
| Escrow Funds to Plan Members and Guarantee Insurance | 55,000 | 53,000 | 52,000 |
| Investment Purchases | 193,000 | 180,000 | 67,000 |
| Other Liabilities | 2,183,000 | 838,000 | 807,000 |
| Total Liabilities | 15,841,000 | 11,599,000 | 5,989,000 |
| **Net Assets Held in Trust for Pension Benefits** | $79,394,000 | $81,473,000 | $72,849,000 |

---

\* Totals may not add due to rounding.

(1) Rounded to the nearest thousand.

PR-CCD-0006906

### The Commonwealth of Puerto Rico
### Judiciary Retirement System
### Statement of Changes in Plan Net Assets*
### As of June 30, 2005, 2006, and 2007 and as of December 31, 2007

| | 2008[1] Unaudited | 2007[1] | 2006[1] |
|---|---|---|---|
| **ADDITIONS:** | | | |
| Contributions: | | | |
| Employer | $ 3,309,000 | $ 6,632,000 | $ 6,727,000 |
| Participating employees | 1,490,000 | 2,828,000 | 2,960,000 |
| Special | | | |
| Total Contributions | 4,800,000 | 9,460,000 | 9,687,000 |
| | | | |
| Investment Income: | | | |
| Realized Gain or Loss | 906,000 | 1,484,000 | 1,189,000 |
| Unrealized Gain or Loss | (1,108,000) | 10,954,000 | 4,630,000 |
| Dividend Income | 123,000 | 224,000 | 205,000 |
| Interest Income | 823,000 | 1,447,000 | 1,219,000 |
| Total | 744,000 | 14,110,000 | 7,243,000 |
| Less Investment Expense | | (192,000) | (279,000) |
| Other Income | | | 1,000 |
| Net Investment Income | 744,000 | 13,918,000 | 6,965,000 |
| | | | |
| Total Additions | 5,543,000 | 23,378,000 | 16,652,000 |
| | | | |
| **DEDUCTIONS:** | | | |
| Annuities | 6,895,000 | 13,461,000 | 12,273,000 |
| Refunds: | | | |
| Employers | 46,000 | | |
| Participating Employees | 19,000 | 38,000 | 130,000 |
| Administrative Expenses | 666,000 | 1,254,000 | 1,197,000 |
| Net Adjustment in the conversion to new loans application | | | |
| Total Deductions | 7,623,000 | 14,753,000 | 13,600,000 |
| | | | |
| Net Increase | (2,079,000) | 8,624,000 | 3,052,000 |
| | | | |
| Net Assets Held in Trust for Pension Benefits: | | | |
| Beginning of the Year | 81,473,000 | 72,849,000 | 69,797,000 |
| | | | |
| **End of the Year** | $79,394,000 | $81,473,000 | $72,849,000 |

---

\* Totals may not add due to rounding.
(1) Rounded to nearest thousand.

I-57

PR-CCD-0006907

**The Commonwealth of Puerto Rico**
**Annuities and Pensions for Teachers**
**Statement of Plan Net Assets\***
**As of June 30 of the Indicated Years**
**(in thousands)**

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash: | | | |
| Cash and cash equivalents | $ 33,542 | $ 53,515 | $ 79,017 |
| Cash with fiscal agent | - | - | 2,853 |
| Cash restricted | - | 1,717 | 1,595 |
| Cash deposited with Government Development Bank for Puerto Rico | 3,123 | 2,993 | 3,536 |
| Total Cash | 36,665 | 58,225 | 87,001 |
| Investments, at fair value: | | | |
| Bonds and notes | 468,452 | 463,474 | 257,030 |
| Stocks | 2,218,033 | 1,886,625 | 1,833,168 |
| Total investment at fair value | 2,686,485 | 2,350,099 | 2,090,198 |
| Other investments: | | | |
| Mortgage notes acquired from third parties | | - | - |
| Private equity investments | 46,686 | 46,215 | 44,747 |
| Total investments | 2,733,171 | 2,396,314 | 2,134,945 |
| Loan to plan members: | | | |
| Mortgage | 102,684 | 104,830 | 109,605 |
| Personal | 260,066 | 246,074 | 234,335 |
| Cultural trips | 1,371 | 1,429 | 1,338 |
| Total loans to plan members | 364,121 | 352,333 | 345,278 |
| Total investments and loans | 3,133,957 | 2,806,872 | 2,567,224 |
| Accounts receivable: | | | |
| Receivable for investments sold | 12,242 | 12,163 | 10,516 |
| Accrued interest and dividends receivable | 6,312 | 6,371 | 4,449 |
| Other | 14,640 | 14,932 | 2,593 |
| Total accounts receivable | 33,194 | 33,466 | 17,558 |
| Property and equipment, net | 25,890 | 25,665 | 26,206 |
| Other assets | 700 | 691 | 600 |
| Total Assets | 3,193,741 | $2,866,694 | $2,611,588 |
| **LIABILITIES** | | | |
| Investments purchased | 11,258 | $11,422 | $14,262 |
| Cash overdraft in cash with fiscal agent | 5,619 | 13,949 | - |
| Accounts payable | 4,152 | 3,043 | 3,768 |
| Obligation under capital lease | 35 | 57 | 78 |
| Accrued expenses | 4,270 | 4,289 | 4,314 |
| Line of credit | 4 | 4 | 4 |
| Escrow fund of mortgage loans and guarantee insurance reserve for loans to plan members | 4,916 | 5,988 | 6,069 |
| Bonds payable | - | 20,430 | 21,285 |
| Other liabilities | 567 | 625 | 669 |
| Total liabilities | 31,021 | 59,807 | 50,449 |
| **Net Assets Held in Trust for Pension Benefits** | $3,162,720 | $2,806,887 | $2,561,139 |

\* Totals may not add due to rounding.

I-58

PR-CCD-0006908

**The Commonwealth of Puerto Rico**
**Annuities and Pensions for Teachers**
**Statement of Changes in Plan Net Assets***
**As of June 30 of the Indicated Years**
**(in thousands)**

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **ADDITIONS:** |  |  |  |
| Contributions: |  |  |  |
| Participating Employees | $127,809 | $ 129,473 | $ 131,481 |
| Employer | 116,320 | 119,199 | 120,887 |
| Contributions transferred from other systems** | 12,396 | 921 | - |
| Special | 57,960 | 61,066 | 60,853 |
| Total contributions | 314,485 | 310,659 | 313,221 |
| Investment Income: |  |  |  |
| Interest income | 65,367 | 57,899 | 47,577 |
| Dividend Income | 13,654 | 14,684 | 20,339 |
| Net appreciation (depreciation) in fair value of investments | 406,131 | 258,182 | 161,685 |
|  | 485,152 | 330,765 | 229,601 |
| Less investment expense | 6,217 | 5,792 | 4,986 |
| Net investment income | 478,935 | 324,973 | 224,615 |
| Other income | 1,299 | 13,085 | 1,167 |
| **Total additions** | $ 794,719 | $ 648,717 | $ 539,003 |
| **DEDUCTIONS:** |  |  |  |
| Benefit paid to participants: |  |  |  |
| Annuities and death benefits | 364,998 | 332,425 | 313,551 |
| Special benefits | 45,564 | 42,837 | 38,592 |
| Refunds of contributions | 5,447 | 4,135 | 2,912 |
| Administrative expenses | 22,877 | 22,651 | 25,804 |
| **Total deductions** | 438,886 | 402,969 | 380,859 |
| Net increase in net assets held in trust for pension benefits | 355,833 | 245,748 | 158,144 |
| **Net assets held in trust for pension benefits** |  |  |  |
| Beginning of year | 2,806,887 | 2,561,139 | 2,402,995 |
| **End of year** | $3,162,720 | $2,806,887 | $2,561,139 |

\* Totals may not add due to rounding.
\*\* This line item was segregated from Refunds of Contributions for 2006 and 2007, but not in 2005.

## COMMONWEALTH FINANCIAL STATEMENTS

For fiscal year 2006, the basic financial statements of the Commonwealth were audited by KPMG LLP. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund or The Children's Trust special revenue funds (major funds), and certain activities, funds and component units identified separately in its report. Those financial statements were audited by other independent auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The report of KPMG LLP contains an emphasis paragraph for the adoption of Governmental Accounting Standards Board (GASB)

PR-CCD-0006909

Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, as of June 30, 2006.

The Comprehensive Annual Financial Report of the Commonwealth ("CAFR") for fiscal year 2006, which includes the basic financial statements of the Commonwealth for fiscal year 2006, was filed by the Commonwealth with each nationally recognized municipal securities information repository (each, a "NRMSIR") in August 2007, and an amendment thereto was filed with each NRMSIR in September 2007.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income taxes and excise and sales taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal year 2004 through fiscal year 2006, and the preliminary and projected revenues and expenditures for fiscal years 2007 and 2008, respectively.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. In fiscal years 2004 and 2005, there were approximately $85 million and $98.6 million, respectively, of such expenditures that are not reflected in the table. A discussion of the budget for fiscal years 2007 and 2008 appears below under *Budget of the Commonwealth of Puerto Rico.*

PR-CCD-0006910

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the latter statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

PR-CCD-0006911

## Commonwealth of Puerto Rico
## General Fund Revenues, Expenditures, and Changes in Cash Balance
### (in thousands)

| | 2004 | 2005 | 2006 | 2007[*] | 2008[+] |
|---|---|---|---|---|---|
| Beginning cash balance | $ 179,058 | $ 108,512 | $ 42,933 | $ (0) | $ (478,665) |
| Revenues from internal sources: | | | | | |
| Income Taxes: | | | | | |
| Individuals | 2,720,920 | 2,885,903 | 3,087,748 | 3,112,892 | 2,898,000 |
| Corporations | 1,831,027 | 1,870,937 | 1,872,458 | 2,007,902 | 1,730,000 |
| Partnerships | 3,005 | 3,245 | 2,787 | 2,960 | 3,000 |
| Withheld from non-residents | 631,100 | 612,005 | 921,260 | 933,728 | 1,206,000 |
| Tollgate taxes | 31,579 | 22,973 | 27,396 | 25,082 | 14,000 |
| Interest | 10,108 | 10,489 | 11,556 | 12,112 | 13,000 |
| Dividends | 70,192 | 80,398 | 66,721 | 138,860 | 64,000 |
| Total income taxes | 5,297,931 | 5,485,950 | 5,989,906 | 6,233,536 | 5,928,000 |
| Sales and use tax | - | - | - | 582,560 | 911,000 |
| Commonwealth excise taxes: | | | | | |
| Alcoholic beverages | 296,302 | 298,235 | 292,180 | 279,028 | 279,000 |
| Cigarettes | 144,733 | 146,527 | 135,267 | 132,398 | 116,000 |
| Motor vehicles | 551,181 | 606,662 | 533,957 | 396,667 | 394,000 |
| Other excise taxes | 701,129 | 740,921 | 682,477 | 315,847 | 94,000 |
| Total Commonwealth excise taxes | 1,693,345 | 1,792,345 | 1,643,881 | 1,123,940 | 883,000 |
| Property taxes | - | 3,949 | 1,106 | 800 | |
| Inheritance and gift taxes | 15,691 | 7,129 | 9,466 | 4,663 | 7,000 |
| Licenses | 84,231 | 85,216 | 91,310 | 98,594 | 93,000 |
| Other: | | | | | |
| Lottery | 65,387 | 64,638 | 62,729 | 65,508 | 58,000 |
| Electronic lottery | 86,115 | 68,011 | 55,212 | 72,253 | 96,000 |
| Miscellaneous non-tax revenues | 379,501 | 430,534 | 431,803[6] | 321,154 | 329,000 |
| Total Other | 531,003 | 563,183 | 549,744 | 458,915 | 483,000 |
| Total revenues from internal sources | 7,622,201 | 7,937,772 | 8,285,413 | 8,503,008 | 8,305,000 |
| Revenues from non-Commonwealth sources: | | | | | |
| Federal excise taxes[1] | 328,921 | 341,166 | 346,272 | 372,536 | 361,000 |
| Customs | 34,266 | 26,731 | 9,553 | 14,503 | 5,000 |
| Total revenues from non-Commonwealth sources | 363,187 | 367,897 | 355,825 | 387,039 | 366,000 |
| Total net revenues | 7,985,388 | 8,305,669 | 8,641,238 | 8,890,047 | 8,671,000 |
| Other Income (refunds)[2] | 62,789 | (55,409) | 76,085 | (8,335) | 183,917[8] |
| Transfers to Redemption Fund[3] | (341,538) | (369,985) | (484,812) | (512,197) | (450,702) |
| Proceeds of notes and other borrowings[4] | 3,940,397 | 4,925,595 | 4,115,897[7] | 1,872,096 | 2,520,000 |
| Repayment of notes and other borrowings[5] | (3,713,634) | (3,909,434) | (3,005,838) | (1,926,273) | (2,585,620) |
| Adjusted revenues | 7,933,402 | 8,896,436 | 9,342,570 | 8,315,338 | 8,338,595 |
| Expenditures: | | | | | |
| Grants and subsidies | 3,468,531 | 3,617,386 | 3,944,349 | 3,387,199 | 2,031,701 |
| Personal services | 3,951,387 | 4,783,567 | 4,796,382 | 4,590,962 | 5,990,308 |
| Other services | 400,594 | 389,346 | 525,377 | 594,345 | 426,185 |
| Materials and supplies | 73,757 | 72,411 | 50,227 | 79,186 | 161,924 |
| Equipment purchases | 20,572 | 20,707 | 19,378 | 27,965 | 62,757 |
| Capital outlays and other debt service | 675 | 78,598 | 49,789 | 21,576 | 103,423 |
| Transfers to agencies | - | - | - | 92,770 | |
| Other disbursements | 88,432 | | | | |
| Total expenditures | 8,003,948 | 8,962,015 | 9,385,503 | 8,794,003 | 8,776,298 |
| Adjusted revenues less expenditures | (70,546) | (65,579) | (42,933) | (478,665) | (437,703) |
| Ending cash balance | $ 108,512 | $ 42,933 | $ (0) | $ (478,665) | $ (916,368) |

(*) Preliminary.

(+) Estimated.

(1) Excludes transfers by the Commonwealth to the Conservation Trust Fund and amounts deposited by the Secretary of the Treasury into a separate account for the promotion of Puerto Rico rums in foreign markets.

(2) Consists of net revenues from the General Fund's non budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.

(3) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.

(4) Consists of proceeds of borrowing from GDB and proceeds from Commonwealth's Tax and Revenue Anticipation Notes, including a $741 million loan from GDB authorized by the Legislature in 2000.

(5) Consists of repayments of borrowing from GDB and repayments of Commonwealth's Tax and Revenue Anticipation Notes.

(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.

(7) Includes $50 million from the Emergency Fund used for operating expenses.

(8) Includes $150 million related to the sale of properties.

*Source*: Department of the Treasury

I-62

PR-CCD-0006912

*Fiscal Year 2008*

Original General Fund estimated revenues were revised from $9.227 billion to $8.821 billion due to the economic recession and the fact that the Puerto Rico Planning Board revised its estimates on the economic growth to -2.1% for fiscal year 2008. The $406 million revision is reflected in revenue categories associated with economic activity, such as individual, corporate and excise taxes. For fiscal year 2008, as revised, the major revenue categories include: (i) $2.898 billion in individual income taxes, (ii) $1.730 billion in corporate income taxes, (iii) $1.206 billion in non-resident withholdings and (iv) $911 million in sales and use tax.

General Fund expenses for fiscal year 2008 are currently projected to be $9.227 billion, which is the same amount as originally estimated. The difference between revenues, as revised, and expenses for fiscal year 2008 will be covered by federal funds recovery (already received) of approximately $300 million and delinquent income tax receivables of approximately $60 million. The remaining shortfall will be covered by cash management procedures.

*Fiscal Year 2007*

Preliminary collections for the fiscal year ended on June 30, 2007 totaled $8.890 billion, $7 million more than the Treasury Department's revised estimate for that period. This amount includes (i) $933 million in non-resident withholding, (ii) $1.123 billion in excise taxes, (iii) $583 million of sales tax revenues, and (iv) $269 million from special temporary tax measures.

General Fund expenses for fiscal year 2007 are currently projected to be $9.221 billion, which is $267 million below the amount initially budgeted and takes into consideration $160 million in a portion of savings from the 10% budget reserve and $107 in million in health-related expenditure reductions. The $9.221 billion amount does not include $522 million of debt service payments on a portion of the Commonwealth's outstanding appropriation debt, which debt service was excluded from the budget based on the provisions of Act No. 91 of May 13, 2006, which created the Dedicated Sales Tax Fund to service in part the repayment of such appropriation debt.

The difference between projected revenues and expenses for fiscal year 2007 will be covered, if legislation is approved, by a $240 million transfer of funds from Government Development Bank that was originally set aside from General Fund appropriations to cover a portion of debt service payments on the Commonwealth's appropriation debt which set aside is no longer needed on account of the passage of Act No. 91 referred to above. The remaining shortfall (about $100 million) will be covered by cash management procedures such as delaying payments to certain vendors for a short period of time (carrying over into fiscal year 2008).

*Fiscal Year 2006*

General Fund total revenues for fiscal year 2006 were $8.541 billion (approximately $235 million, or 2.8%, more than received in fiscal year 2005). This increase was attributable to increases in income taxes ($504 million, including $309 million in taxes withheld from non-residents), together with decreases in external revenues ($12 million), excise taxes ($147 million), and miscellaneous non-tax revenues ($113 million). The increase in revenues from individual income taxes is mainly attributable to administrative measures and economic activity.

PR-CCD-0006913

The increase in the withholding tax on non-residents includes two extraordinary payments amounting to $200 million.

Total cash expenditures for fiscal year 2006 were $9.596 billion (excluding about $500 million in expenditures that occurred "off budget" for items such as refinanced debt service on general obligation debt and payment of vendor debts from prior years for Public Buildings Authority and subsidy and operational expenses of Agricultural Services and Development Administration) which exceeded original budgeted expenditures by $651 million, attributed mainly to increases in the area of education ($321 million), public safety and protection ($99 million), health ($207 million), and special contributions to pensions ($42 million), and reductions in the area of general government ($4 million), welfare ($3 million), contributions to municipalities ($1 million), and other debt service ($10 million).

The approximately $1.6 billion shortfall was covered by the release of $64 million in reserve funds held at GDB, borrowings from GDB and other sources of about $1.4 billion and about $150 million of "cash management" practices which had the effect of delaying payment of certain expenses until the start of fiscal year 2007. Also, during a two-week period in early May 2006, the Commonwealth was forced to furlough non-essential government workers because it was projected to run out of cash until the above borrowings were implemented in the aftermath of the passage of fiscal and tax reform legislation described below in order to allow the workers to return to work.

*Fiscal Year 2005*

General Fund total net revenues for fiscal year 2005 were $8.306 billion, representing an increase of $320 million or 4%, from fiscal year 2004 net revenues. This amount excludes proceeds of a loan of $550 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The major changes in revenues from fiscal year 2004 were: (i) increases in total income taxes of $188 million, mainly resulting from increases in income taxes collected from individuals of $165 million and in income taxes collected from corporations of $40 million; (ii) increases in total excise taxes of $99 million; and (iii) net increases in other revenues of $32 million, mainly as a result of an increase in miscellaneous non-tax revenues of $51 million.

Total cash expenditures for fiscal year 2005 were $9.220 billion (excluding $98.6 million covered with funds from the Budgetary Fund), which exceeded budgeted expenditures by $366 million, attributed mainly to increases in the area of education ($300.5 million), public safety and protection ($18.6 million), health ($28.7 million), welfare ($10.2 million), and economic development ($8 million). This amount also excludes approximately $98.6 million of additional expenditures that were not originally budgeted. Various financing transactions were entered into to cover this imbalance.

*Fiscal Year 2004*

General Fund total net revenues for fiscal year 2004 were $7.985 billion, representing an increase of $394 million, or 5.2%, from fiscal year 2003 net revenues. This amount excludes proceeds of a loan of $233 million obtained from GDB, which is included as part of "Proceeds of

PR-CCD-0006914

notes and other borrowings." This amount also excludes $88 million of additional non-recurring revenues. The major changes in revenues from fiscal year 2003 were: (i) increases in total income taxes of $377 million, mainly resulting from increases in income taxes from individuals of $203 million and in income taxes withheld from non-residents of $114 million; (ii) increases in total excise taxes of $42 million; and (iii) decreases in other revenues of $65 million, mainly as a result of a decrease in miscellaneous non-tax revenues of $59 million. Approximately $170 million of the increase in total income taxes for fiscal year 2004 relates to the collection of past taxes as a result of an incentives plan implemented by the Treasury.

Total cash expenditures for fiscal year 2004 were $8.004 billion, which amount excludes certain amounts related to fiscal year 2004 but disbursed in fiscal year 2005. This amount also excludes approximately $293 million of additional expenditures that were not originally budgeted and were covered with reserve funds ($50 million), the reimbursement of certain federal education funds ($141 million), and other sources. After considering (i) debt service payments (separately identified in the table as "Transfers to Redemption Fund"), (ii) $227 million in net borrowings from GDB and other sources, and (iii) $63 million in other income from the General Fund's non-budgetary funds, the ending cash balance of the General Fund decreased from $179 million at the end of fiscal year 2003 to $109 million at the end of fiscal year 2004.

**Tax Reform**

Act No. 117 of July 4, 2006 ("Act 117") amended the Puerto Rico Internal Revenue Code of 1994 (the "PR Code") to provide, among other things, for a general sale and use tax of 5.5% to be imposed by the central government (the "Central Government Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Central Government Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Central Government Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) taxable items acquired by merchants for resale, (ii) taxable items acquired by manufacturing plants, (iii) taxable items acquired for use and consumption outside of Puerto Rico, (iv) certain food products that do not need to be heated before their sale, (v) prescription drugs, (vi) the rental payments received by a lessor of real property which is used for residential or commercial purposes, (vii) services provided by designated professionals, (viii) cash, cash equivalents, stocks, bonds, notes, mortgage loans, insurance, securities and interest derived for the use or forbearance of money, (ix) sales of real property, and (x) leases in which the Industrial Development Company is the owner of the property.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as

I-65

PR-CCD-0006915

fuel, crude oil and petroleum products, and vehicles, however, will remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006, and most have done so. The revenues derived from the Sales Tax are distributed as follows: (i) municipal governments retain 13/15 of the Municipal Sales Tax (equivalent to a tax of 1.5% out of the total 7% Sales Tax), (ii) the Dedicated Sales Tax Fund, created by Act No. 91 of May 13, 2006, as amended, receives one-seventh of the Sales Tax (equivalent to a tax of 1% out of the total 7% Sales Tax), and (iii) the General Fund receives the balance of the Sales Tax (equivalent to a tax of 4.5% out of the total 7% Sales Tax). The Secretary of the Treasury projects for fiscal year 2008 that each percentage point of the Sales Tax will generate annually approximately $202 million of gross revenues and that the Sales Tax will generate total annual gross revenues for the General Fund of approximately $911 million. For fiscal year 2007, the corresponding projections are $191 million and $576 million. The increase in revenues to be generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

Act 117 also provided for special income tax rates with respect to certain transactions occurring on and between July 1, 2006 and December 31, 2006 (the "Transition Period"). Eligible dividends declared by domestic corporations or partnerships during the Transition Period will qualify for a 5% special income tax. The dividend does not need to be distributed to qualify for the 5% special income tax rate. During the Transition Period, Act 117 also provides a special tax rate of 5% (10% in the case of resident corporations and partnerships) in connection with "built-in" gains associated to capital assets held for periods in excess of six months (the "Special Capital Gains Tax"). In order to take advantage of the Special Capital Gains Tax, a taxpayer must file an election with the Secretary of the Treasury. The sale of the capital asset is not required to qualify for the Special Capital Gains Tax. In addition to the other conditions mentioned herein, the Special Capital Gains Tax is only available in connection with capital assets consisting of stock or participations of domestic and foreign corporations and partnerships, and real property located in Puerto Rico. However, in the case of resident corporations and partnerships, the Special Capital Gains Tax applies only to real property located in Puerto Rico.

For a discussion of the budget imbalance in fiscal year 2007 and the revenues generated through March 31, 2007 from the provisions of Act 117, see "Fiscal Year 2007" under "Summary and Management's Discussion of General Fund Results" above.

**Major Sources of General Fund Revenues**

*Income Taxes*

The Commonwealth's income tax law, the Internal Revenue Code of 1994, as amended (the "P.R. Code"), imposes a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax is imposed on certain payments made to non-residents of Puerto Rico, which is collected through an income tax withholding.

PR-CCD-0006916

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The P.R. Code has four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at a rate of 10%.

Gain realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at a rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at a rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for a special 10% tax rate.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the industrial incentives program (see "Tax Incentives" under *The Economy* above), it is subject to tax at graduated rates.

In general, the P.R. Code provides for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Also, Act No. 41 of August 1, 2005 was enacted to impose a temporary additional tax of 2.5% on corporations and partnerships with a net taxable income of $20,000 or more. In addition, Act No. 98 of May 16, 2006, provides for an extraordinary tax of 5% on resident corporations and partnerships engaged in business for pecuniary profit and whose gross income for the immediately preceding taxable year ended on or prior to December 31, 2005 exceed $10 million. The 5% tax must be paid on or prior to July 31, 2006 and such amount may be subsequently claimed as a tax credit against such entity's income tax liability. Act No. 89 of May 13, 2006 also imposes an additional special tax for the taxable year commencing in 2006 of 2% on the net income subject to standard taxation of all corporations operating under the provisions of the Puerto Rico Banking Law.

Gains realized from the sale or exchange of a capital asset, if held for more than six months, are taxed at a maximum rate of 15%. Dividends received by Puerto Rico corporations and partnerships of foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. A special tax rate of 17% is applicable to dividend distributions of REITs received by corporations. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and partnerships operating under a new grant of tax exemption issued under the 1998 Tax Incentives Act are subject to a maximum income tax rate of 7%

PR-CCD-0006917

during their basic exemption period. Certain corporations and partnerships covered by the tax incentives acts continue to be subject to a maximum tax rate of 45% on their taxable income. Corporations and partnerships covered by the Puerto Rico Tourism Incentives Act of 1993, as amended, are subject to a maximum tax rate of 42% on their taxable income. The P.R. Code also provides for an alternative minimum tax of 22%.

The P.R. Code imposes a branch profits tax on resident foreign corporations less than 80% of whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 15%. Dividends distributed by corporations (including Section 936 Corporations) operating under new grants of tax exemption issued under the 1998 Tax Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by such corporations to non-resident recipients are subject to a 15% withholding tax. The basic tax on dividends paid to foreign corporate shareholders of Section 936 Corporations operating under grants of tax exemption issued under prior incentives laws is 10% but is subject to reduction if a percentage of the profits are invested in certain eligible instruments for specified periods of time.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% withholding tax.

*Sales and Use Taxes*

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and combined transactions, subject to certain exceptions and limitations. The Sales Tax is not imposed on, among other things: (i) taxable items acquired by merchants for resale, (ii) taxable items acquired by manufacturing plants, (iii) taxable items acquired for use and consumption outside of Puerto Rico, (iv) certain food products that do not need to be heated before their sale, (v) prescription drugs, (vi) the rental payments received by a lessor of real property which is used for residential or commercial purposes, (vii) services provided by designated professionals, (viii) cash, cash equivalents, stocks, bonds, notes, mortgage loans, insurance, securities and interest derived for the use or forbearance of money, (ix) sales of real property, and (x) leases in which the Industrial Development Company is the owner of the property. The Sales Tax was effective starting on November 15, 2006 and is projected to generate for the General Fund approximately $911 million for fiscal year 2008.

PR-CCD-0006918

*Excise Taxes*

The P.R. Code imposed an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles and certain petroleum products, which are taxed at different rates. The excise tax imposed on articles and commodities imported into Puerto Rico for consumption in Puerto Rico ended on October 16, 2006 and has been replaced by the previously described sales and use tax on November 15, 2006.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from the island to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is $13.50 per gallon. Of this amount, the lesser of $13.25 per proof gallon and the actual excise tax imposed is currently returned to the Treasury.

*Property Taxes*

Personal property, which accounts for approximately 48% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, a special 1.03% tax on the assessed value of all property (other than exempted property) imposed by the Commonwealth for purposes of paying the Commonwealth's general obligation debt is deposited in the Commonwealth's Redemption Fund.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years ending June 30, 2003 through June 30, 2007.

PR-CCD-0006919

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2003 | $23,316,400 | $834,974 | $671,163 | $79,421 | $750,584 |
| 2004 | 23,841,557 | 874,294 | 706,677 | 79,772 | 786,449 |
| 2005 | 25,277,795 | 899,893 | 738,074 | 50,751 | 788,825 |
| 2006 | 25,606,121 | 925,618 | 801,497 | 70,908 | 872,405 |
| 2007 | 26,898,519 | 982,400 | 813,700 | 79,720 | 893,420 |

(1) Valuation set as of July 1 of each fiscal year.
(2) During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM. In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source: Municipal Revenues Collection Center.*

## Collections of Income, Sales and Excise Taxes

The Treasury has continued its program for improving tax collections. The program consists, in part, of taking the initiative in sponsoring and implementing tax reform, particularly in the areas of excise taxes and income taxes, in order to decrease the incidences of nonpayment of taxes and to expand the taxpayer base. The program has also included (i) improving the methods by which delinquent taxpayers are identified, primarily through the use of computer analyses, (ii) computerizing the processing of tax returns, and (iii) identifying and eliminating taxpayer evasion. With the elimination of the general excise tax last October, Treasury excise tax personnel have been reassigned to monitor compliance with the new sales tax.

## Transfers to General Obligation Redemption Fund

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

## Components of General Fund Expenditures

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

PR-CCD-0006920

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, *per diems*, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligations payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law.

PR-CCD-0006921

**Federal Grants**

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government, including public corporations, are estimated to be $4.150 billion for fiscal year 2009, a decrease of $65.2 million, or 1.5%, from fiscal year 2008. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury. The figures for fiscal years 2005 through 2007 are actual figures. The figures for fiscal year 2008 are estimates based on the information submitted by each agency to OMB and the figures for fiscal year 2009 are the amounts included in the recommended budget.

### The Commonwealth of Puerto Rico
### Federal Grants
### (in thousands)

|  | 2005 | 2006 | 2007 | 2008[1] | 2009[2] |
|---|---|---|---|---|---|
| Education | $ 963,032 | $1,004,138 | $ 986,574 | $ 972,708 | $ 971,873 |
| Social Services | 1,952,405 | 1,888,150 | 1,923,845 | 1,989,398 | 1,989,692 |
| Health | 383,635 | 432,868 | 436,892 | 466,921 | 479,925 |
| Labor and Human Resources[3] | 150,612 | 197,296 | 183,228 | 225,191 | 231,500 |
| Crime | 29,313 | 41,461 | 29,631 | 28,770 | 26,172 |
| Housing[4] | 524,856 | 371,104 | 375,581 | 440,028 | 343,975 |
| Drug and Justice | 6,781 | 36,979 | 35,321 | 16,219 | 31,609 |
| Agriculture and Natural Resources | 9,439 | 11,402 | 12,484 | 9,859 | 8,083 |
| Contributions to Municipalities | 56,371 | 53,744 | 48,531 | 48,531 | 48,531 |
| Other | 14,256 | 18,251 | 17,095 | 17,766 | 18,852 |
| TOTAL | $4,090,700 | $4,055,393 | $4,049,182 | $4,215,391 | $4,150,212 |

(1) Estimated.
(2) Recommended.
(3) Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
(4) Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

**Office of Management and Budget**

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the Administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In

I-72

PR-CCD-0006922

each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the succeeding fiscal year, as was the case for fiscal year 2006, the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislative Assembly and the Governor. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Fiscal Reform**

On May 25, 2006, the Governor signed Act No. 103 providing for a fiscal reform of the Commonwealth government (the "Fiscal Reform Legislation"). The Fiscal Reform Legislation applies to every instrumentality and entity of the Executive Branch funded, in whole or in part, from the General Fund and sets forth, as the public policy of the Commonwealth, the reduction of government spending, the elimination or consolidation of redundant agencies, the reduction of government payroll without causing the layoff of regular employees or increasing the actuarial liability of the retirement systems, the limitation of unnecessary, extravagant or excessive spending, and the limitation of public relations and other similar expenses. Despite his approval of the Fiscal Reform Legislation, the Governor has stated that certain of its provisions may be unconstitutional because they infringe on Executive Branch prerogatives. As such, the Governor

PR-CCD-0006923

has informed the Legislative Assembly that certain provisions of the Fiscal Reform Legislation will be implemented at the Executive Branch's discretion and through the use of the Executive Branch's prerogatives. There is no assurance that the Fiscal Reform Legislation will result in the intended reduction of expenditures or that it will be implemented as enacted or that it will not be judicially challenged.

## Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Treasury, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. As of March 31, 2008, the Budgetary Fund balance was $0.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year.

I-74

PR-CCD-0006924

Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year and was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency. The 2005 amendment also authorizes GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of March 31, 2008, the balance in the Emergency Fund was less than $1 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)  General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)  General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judiciary Branch and for capital expenditures are authorized by separate law for one or more years for special programs or activities, which may be permanent or transitory.

(iii)  Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)  Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures occur in one or more years.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities.

For fiscal year 2007, approximately 47% of the General Fund was committed for payment of the central government payroll. In addition, approximately 26% of the General Fund was committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, funding for the judicial branch, among others, and debt service on the direct debt of the Commonwealth. For fiscal year 2008, it is proposed that approximately 47% and 6% of the General Fund be committed for payment of the central government payroll (not including the University of Puerto Rico and judicial branch) and debt service on the direct debt of the Commonwealth, respectively. Commencing with fiscal year 2004, the Commonwealth appropriates annually to the judicial branch an amount initially equal to 3.3% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage will increase until it reaches 4% in fiscal year 2008, and may be further increased upon review, with scheduled reviews every five years.

I-75

PR-CCD-0006925

**Budget for Fiscal Year 2008**

The consolidated budget for fiscal year 2008 totals $26.9 billion. Of this amount, $14.3 billion is assigned to the central government. This includes General Fund total appropriations of $9.227 billion, which represents an increase of $3 million over expenditures for fiscal year 2007. The following table presents a summary of the Commonwealth's proposed central government budget appropriations for the fiscal year ending June 30, 2008.

PR-CCD-0006926

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2008**
**(in thousands)***

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ 0 | $ - | $ 120,726 | $ 120,726 |
| Personal income taxes | 2,898,000 | - | - | 2,898,000 |
| Retained non-resident income tax | 1,206,000 | - | - | 1,206,000 |
| Corporate income taxes | 1,730,000 | - | - | 1,730,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 14,000 | - | - | 14,000 |
| 17% withholding tax on interest | 13,000 | - | - | 13,000 |
| 10% withholding tax on dividends | 64,000 | - | - | 64,000 |
| Inheritance and gift taxes | 7,000 | - | - | 7,000 |
| Sales and use taxes | 911,000 | - | - | 911,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 279,000 | - | - | 279,000 |
| Motor vehicles and accessories | 394,000 | - | - | 394,000 |
| Cigarettes | 116,000 | - | - | 116,000 |
| Other (excise taxes) | 94,000 | - | 24,400 | 118,400 |
| Licenses | 93,000 | - | - | 93,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 58,000 | - | - | 58,000 |
| Electronic lottery | 96,000 | - | - | 96,000 |
| Registration and document certification fees | 184,000 | - | - | 184,000 |
| Other | 145,000 | - | 346,469 | 491,469 |
| Total revenues from internal sources | 8,305,000 | - | 491,595 | 8,796,595 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 361,000 | - | | 361,000 |
| Federal grants | | - | 4,215,391 | 4,215,391 |
| Customs | 5,000 | - | | 5,000 |
| Total revenues from non-Commonwealth sources | 366,000 | - | 4,215,391 | 4,581,391 |
| Total revenues | 8,671,000 | - | 4,706,986 | 13,377,986 |
| Other: | | | | |
| Other Income | 150,000 | - | | 150,000 |
| Balance from previous year | | - | 744,251 | 744,251 |
| Bonds authorized | - | - | | |
| Total other sources | 150,000 | - | 744,251 | 894,251 |
| Total resources | 8,821,000 | - | 5,451,237 | 14,272,237 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 825,110 | - | 59,936 | 885,046 |
| Education | 3,340,777 | - | 1,209,947 | 4,550,724 |
| Health | 1,480,448 | - | 505,587 | 1,986,035 |
| Welfare | 365,106 | - | 2,335,248 | 2,700,354 |
| Economic development | 187,454 | - | 97,182 | 284,636 |
| Public safety and protection | 1,692,489 | - | 72,984 | 1,765,473 |
| Transportation and communication | 86,440 | - | 70,801 | 157,241 |
| Housing | 26,139 | - | 268,267 | 294,406 |
| Contributions to municipalities | 360,779 | - | 1,781 | 362,560 |
| Special pension contributions | 296,132 | - | - | 296,132 |
| Debt service | 450,702 | - | 120,726 | 571,428 |
| Other debt service (appropriations) | 103,424 | - | 56,348 | 159,772 |
| Total appropriations – current expenses | 9,215,000 | - | 4,798,807 | 14,013,807 |
| Capital improvements | 12,000 | - | 182,419 | 194,419 |
| Total appropriations | 9,227,000 | - | 4,981,226 | 14,208,226 |
| Year-end balance | (406,000) | | 470,011 | 64,011 |
| Total appropriations and year-end balance | $ 8,821,000 | | $ 5,451,237 | $14,272,237 |

* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury.
(2) Act No. 93 of August 20, 1997 establishes that resources that do not represent revenues become part of the Budgetary Fund.

*Sources*: Department of the Treasury and Office of Management and Budget

I-77

PR-CCD-0006927

Projected expenses and capital improvements of all budgetary funds total $14.2 billion, a decrease of $42.7 million from fiscal year 2007. The major changes in General Fund expenditures by program in fiscal year 2008 are mainly due to increases in health (up $99.1 million), public safety and protection (up $76.2 million), special pension contributions (up $30.1 million), transportation and communication (up $9.4 million), other debt service (up $8.9 million), housing (up $1.6 million) and decreases in welfare (down $100.8 million), debt service on Commonwealth's general obligation and guaranteed debt (down $49.2 million), contributions to municipalities (down $26.9 million), economic development (down $21.3 million), education (down $20.8 million) and general government (down $2 million).

### Proposed Budget for Fiscal Year 2009

The proposed consolidated budget for fiscal year 2009 totals $26.3 billion. Of this amount, $14.6 billion is assigned to the central government. This includes General Fund total resources and appropriations of $9.488 billion, which represents an increase of $261 million over approved expenditures for fiscal year 2008. The fiscal year 2009 budget marks the third consecutive year in which budgeted expenditures are below the fiscal year 2006 level. The increase in expenditures is mainly due to University of Puerto Rico, judiciary and municipal formula increases and salary increases mandated by law or collective bargaining agreements. An additional $42.3 million is budgeted for the State Election Commission. The General Fund revenue projection for fiscal year 2009 is $8.488 billion, a decrease of $183 million, or 2.1%, from estimated net revenues for fiscal year 2008 of $8.671 billion. The Commonwealth's budgeted expenditures for fiscal year 2009 of $9.488 billion exceed projected revenues of $8.488 by approximately $1 billion. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize the budget risk. In addition, the Governor has proposed two special measures which are expected to generate close to $1 billion in fiscal year 2009. These measures consist of tax receivable financings and proceeds received from a concession agreement for operation of the electronic lottery. Legislation authorizing these two measures was submitted by the Governor along with the budget. No assurance can be given that either of these measures will be enacted, or that if enacted, they will be in the forms recommended by the Governor. The following table presents a summary of the Commonwealth's proposed central government budget appropriations for the fiscal year ending June 30, 2009.

PR-CCD-0006928

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2009**
**(in thousands)**[*]

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ - | $ - | $ 121,330 | $ 121,330 |
| Personal income taxes | 2,770,000 | - | - | 2,770,000 |
| Retained non-resident income tax | 1,015,000 | - | - | 1,015,000 |
| Corporate income taxes | 1,751,000 | - | - | 1,751,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 10,000 | - | - | 10,000 |
| 17% withholding tax on interest | 12,000 | - | - | 12,000 |
| 10% withholding tax on dividends | 67,000 | - | - | 67,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 977,000 | - | - | 977,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 292,000 | - | - | 292,000 |
| Motor vehicles and accessories | 414,000 | - | - | 414,000 |
| Cigarettes | 121,000 | - | - | 121,000 |
| Other (excise taxes) | 95,000 | - | 21,701 | 116,701 |
| Licenses | 96,000 | - | - | 96,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 59,000 | - | - | 59,000 |
| Electronic lottery | 89,000 | - | - | 89,000 |
| Registration and document certification fees | 195,000 | - | - | 195,000 |
| Other | 140,000 | - | 358,747 | 498,747 |
| Total revenues from internal sources | 8,111,000 | - | 501,778 | 8,612,778 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 372,000 | - | - | 372,000 |
| Federal grants | - | - | 4,150,212 | 4,150,212 |
| Customs | 5,000 | - | - | 5,000 |
| Total revenues from non-Commonwealth sources | 377,000 | - | 4,150,212 | 4,527,212 |
| Total revenues | 8,488,000 | - | 4,651,990 | 13,139,990 |
| Other: | | | | |
| Other Income | 1,000,000 | - | - | 1,000,000 |
| Balance from previous year | - | - | 470,011 | 470,011 |
| Bonds authorized | - | - | - | - |
| Total other sources | 1,000,000 | - | 470,011 | 1,470,011 |
| Total resources | 9,488,000 | - | 5,122,001 | 14,610,001 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 898,263 | - | 59,554 | 957,817 |
| Education | 3,430,540 | - | 1,372,284 | 4,802,824 |
| Health | 1,560,237 | - | 501,945 | 2,062,182 |
| Welfare | 492,816 | - | 2,345,347 | 2,838,163 |
| Economic development | 180,378 | - | 94,356 | 274,734 |
| Public safety and protection | 1,706,674 | - | 69,105 | 1,775,779 |
| Transportation and communication | 96,515 | - | 75,670 | 172,185 |
| Housing | 29,240 | - | 274,863 | 304,103 |
| Contributions to municipalities | 378,190 | - | 1,781 | 379,971 |
| Special pension contributions | 313,641 | - | 0 | 313,641 |
| Debt service | 288,000 | - | 121,330 | 409,330 |
| Other debt service (appropriations) | 113,506 | - | 56,644 | 170,150 |
| Total appropriations – current expenses | 9,488,000 | - | 4,972,879 | 14,460,879 |
| Capital improvements | - | - | 92,635 | 92,635 |
| Total appropriations | 9,488,000 | - | 5,065,514 | 14,553,514 |
| Year-end balance | - | - | 56,487 | 56,487 |
| Total appropriations and year-end balance | $ 9,488,000 | - | $ 5,122,001 | $14,610,001 |

* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury.
(2) Act No. 93 of August 20, 1997 establishes that resources that do not represent revenues become part of the Budgetary Fund.

*Sources*: Department of the Treasury and Office of Management and Budget

I-79

Projected expenses and capital improvements of all budgetary funds total $14.6 billion, an increase of $345.3 million from fiscal year 2008. The major changes in General Fund expenditures by program in fiscal year 2009 are mainly due to increases in welfare (up $127.7 million), education (up $89.8 million), health (up $79.8 million), general government (up $73.2 million), special pension contribution (up $17.5 million), contributions to municipalities (up $17.4 million), public safety and protection (up $14.2 million), other debt service (up $10.1 million), transportation and communication (up $10.1 million), housing (up $3.1 million) and decreases in debt service on Commonwealth's general obligation and guaranteed debt (down $162.7 million) and economic development (down $7.1 million).

**Differences between Budget and Basic Financial Statements**

Revenues and expenditures, as reported by the Treasury in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i) The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury include accruals and other adjustments as required by government accounting standards.

(ii) Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii) Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended ("Act No. 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act No. 104 for damages up to a maximum amount of $75,000 or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act No. 9.

With respect to pending and threatened litigation, as of June 30, 2006, the Commonwealth has included in its financial statements reported liabilities of approximately $306 million for awarded and anticipated unfavorable judgments. While amounts claimed

I-80

PR-CCD-0006930

exceed $9 billion, such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the United States District Court for the District of Puerto Rico, by an association of primary care health centers seeking to recover from the Commonwealth $800 million of Medicaid funds retained by the Department of Health since 1997. In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must return those funds. The Supreme Court of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the centers certain of the payments received by the centers from the federal government. Currently, audits are being carried out on the plaintiff centers. As of June 30, 2006, the Commonwealth has accrued $55 million for this legal contingency. With respect to the federal case, a preliminary injunction was issued by the court against the Commonwealth requiring it to disburse approximately $20 million in six payments beginning in October 2005.

The Commonwealth is also a defendant in a class action presented by parents of special education students alleging deficient services to these students in the areas of education and health care before Commonwealth Courts. One court recently decided in favor of the parents' request to include damage claims in the same class action case. This court may now award damages to the class action members, and in doing so may consider the claims in groups or each case individually. This will require that the parents prove the damages suffered. The Commonwealth plans to defend vigorously each case. As of June 30, 2006, the Commonwealth had accrued $440 million for this legal contingency.

This decision is appealable and thus, not final at this time. The Commonwealth does not anticipate any final determination or damages award, in any case, to be granted in this fiscal year.

The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $7.8 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

PR-CCD-0006931

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006932

# APPENDIX II

## COMPREHENSIVE ANNUAL FINANCIAL REPORT
## OF THE COMMONWEALTH FOR THE FISCAL YEAR ENDED JUNE 30, 2006

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006934

# COMMONWEALTH OF PUERTO RICO

Comprehensive Annual Financial Report

Fiscal Year Ended June 30, 2006

PR-CCD-0006935

# COMPREHENSIVE ANNUAL FINANCIAL REPORT

*Fiscal Year Ended June 30, 2006*



## Commonwealth of Puerto Rico

*Honorable Aníbal Acevedo Vilá*
*Governor*

*Prepared by:*

### Puerto Rico Department of the Treasury

**Juan C. Méndez, ESQ.,CPA**
*Secretary of the Treasury*

**Juan B. Torré Martínez, CPA**
*Assistant Secretary of Central Accounting*

*This document is available on the Puerto Rico Department of the Treasury homepage*
*On the World Wide Web: http://www.hacienda.gobierno.pr*

PR-CCD-0006936

**COMMONWEALTH OF PUERTO RICO**

Comprehensive Annual Financial Report

Year ended June 30, 2006

**Table of Contents**

|  | Page |
|---|---|
| **Introductory Section** | |
| Letter of Transmittal | 1 |
| Principal Officials | 13 |
| Organization Chart | 14 |
| Certificate of Achievement for Excellence in Financial Reporting | 15 |
| **Financial Section** | |
| Independent Auditors' Report | 1 |
| Management's Discussion and Analysis | 3 |
| Basic Financial Statements: | |
|   Government-wide Financial Statements: | |
|     Statement of Net Assets (Deficit) | 21 |
|     Statement of Activities | 23 |
|   Fund Financial Statements: | |
|     Balance Sheet – Governmental Funds | 24 |
|     Reconciliation of the Balance Sheet to the Statement of Net Assets – Governmental Funds | 26 |
|     Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds | 27 |
|     Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances to the Statement of Activities – Governmental Funds | 28 |
|     Statement of Revenue and Expenditures – Budget and Actual – Budget Basis – General Fund | 29 |
|     Statement of Net Assets – Proprietary Funds | 30 |
|     Statement of Revenue, Expenses, and Changes in Net Assets – Proprietary Funds | 31 |

**COMMONWEALTH OF PUERTO RICO**

Comprehensive Annual Financial Report

Year ended June 30, 2006

| | |
|---|---|
| Statement of Cash Flows – Proprietary Funds | 32 |
| Statement of Fiduciary Net Assets | 33 |
| Statement of Changes in Fiduciary Net Assets – Pension Trust Funds | 34 |
| Combining Statement of Net Assets – Major Component Units | 35 |
| Combining Statement of Activities – Major Component Units | 37 |
| Notes to Basic Financial Statements | 38 |
| **Combining, Individual Fund Financial Statements and Schedules** | |
| General Fund: | 157 |
| Supplemental Schedule of Expenditures by Agency – Budget and Actual – Statutory Basis – General Fund | 158 |
| Nonmajor Governmental Funds: | 161 |
| Combining Balance Sheet – Nonmajor Governmental Funds | 162 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances – Nonmajor Governmental Funds | 163 |
| Nonmajor Proprietary Funds: | 164 |
| Combining Statement of Net Assets – Nonmajor Proprietary Funds | 165 |
| Combining Statement of Revenue, Expenses, and Changes in Net Assets – Nonmajor Proprietary Funds | 166 |
| Combining Statement of Cash Flows – Nonmajor Proprietary Funds | 167 |
| Fiduciary Funds: | 168 |
| Combining Statement of Fiduciary Net Assets – Pension Trust Funds | 169 |
| Combining Statement of Changes in Fiduciary Net Assets – Pension Trust Funds | 170 |
| Statement of Changes in Assets and Liabilities – Agency Fund | 171 |

# COMMONWEALTH OF PUERTO RICO

Comprehensive Annual Financial Report

Year ended June 30, 2006

| | |
|---|---|
| Nonmajor Component Units: | 172 |
| Nonmajor Discretely Presented Component Units – Statement of Net Assets | 173 |
| Nonmajor Discretely Presented Component Units – Statement of Activities | 179 |
| **Statistical Section** | |
| Changes in Net Assets for the Last Four Fiscal Years | 1 |
| Net Assets by Component for the Last Four Fiscal Years | 2 |
| Changes in Fund Balances of Governmental Funds<br>All Governmental Fund Types for the Last Ten Fiscal Years | 3 |
| Fund Balances of Governmental Funds for the Last Four Fiscal Years | 4 |
| General Fund Net Revenue for the Last Ten Fiscal Years | 5 |
| Legal Debt Margin Information for the Last Ten Fiscal Years | 6 |
| Ratio of Annual Debt Service for General Bonded Debt to Total General Expenditures<br>for the Last Ten Fiscal Years | 7 |
| Demographic and Economic Statistics for the Last Ten Years | 8 |
| Average Employment by Sector for the Last Ten Fiscal Years | 9 |
| Tourism Indicators for the Last Ten Fiscal Years | 10 |
| Operating Indicators by Function for the Last Ten Fiscal Years | 11 |

PR-CCD-0006939

# INTRODUCTORY SECTION



**Juan C. Méndez Torres, Esq., CPA**
Secretary

August 6, 2007

To the Honorable Governor of Puerto Rico,
Members of the Legislature, and People of Puerto Rico:

It is a pleasure to submit, for your information, the Comprehensive Annual Financial Report (CAFR) of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the fiscal year ended June 30, 2006. This report, presented in three sections, Introductory, Financial, and Statistical, is the primary means of reporting the Commonwealth's financial activities.

The introductory section, which is not audited, includes this letter of transmittal, general information about the Commonwealth, a list of the Commonwealth's principal elected and appointed officials at the balance sheet date, an organizational chart, and a reproduction of the Certificate of Achievement for Excellence in Financial Reporting that the Commonwealth received for its June 30, 2005 CAFR. The financial section contains the independent auditors' report, management's discussion and analysis (MD&A), and the basic financial statements as listed in the table of contents. The financial section also includes the notes to the basic financial statements, required supplementary information, and other supplementary information. The statistical section, which is not audited, includes selected financial and demographic information, generally presented on a multiyear basis.

### PROFILE OF THE COMMONWEALTH

The Puerto Rico Department of the Treasury is responsible for the preparation of this report. The responsibility for the accuracy of presented data and the completeness and fairness of the presentation, including all of the disclosures, rests on the Commonwealth's management. To the best of our knowledge and belief, the following data, as presented, is accurate in all material respects, and is presented in a manner designed to set forth the financial position and the results of operations of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth as of June 30, 2006 and the respective changes in financial position and cash flows, where applicable, thereof and the respective budgetary comparison for the general fund for the year then ended in conformity with accounting principles generally accepted in the United States of America. We have included all the necessary disclosures to enable the reader to gain a thorough understanding of the Commonwealth's activities.

PR-CCD-0006941

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 2


The financial reporting entity includes all funds of the Commonwealth, which comprises the primary government, as well as all its component units. In accordance with Governmental Accounting Standards Board's Statement No. 14, the Commonwealth's financial reporting entity includes 48 component units: 6 are blended component units including 3 fiduciary component units, 7 major discretely presented component units, and 35 nonmajor discretely presented component units. Component units are legally separate entities for which the primary government is financially accountable, or other organizations; the nature and significance of whose relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading and incomplete. Blended component units, although legally separate entities, are, in substance, part of the primary government's operations and are included as part of the primary government. Discretely presented component units, both major and nonmajor, are reported in a separate column in the government-wide financial statements to emphasize that they are not part of the primary government and to differentiate their financial position and results of operations from those of the primary government.

Generally, each component unit issues audited financial statements, which can be obtained from the component unit's administrative offices. The basic financial statements included in the financial section of this CAFR provide descriptions of the operations of each of the following component units of the Commonwealth:

*Blended Component Units:*

Public Buildings Authority
Puerto Rico Maritime Shipping Authority
The Children's Trust

*Discretely Presented Component Units:*

Agricultural Services and Development Administration
Automobile Accident Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Caribbean Basin Projects Financing Authority
Economic Development Bank for Puerto Rico
Employment and Training Enterprises Corporation
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Governing Board of the 9-1-1 Service
Government Development Bank for Puerto Rico
Institutional Trust of the National Guard of Puerto Rico
Musical Arts Corporation
National Parks Company of Puerto Rico
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 3


Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Higher Education
Puerto Rico Electric Power Authority
Puerto Rico Government Investment Trust Fund
Puerto Rico Health Insurance Administration
Puerto Rico Highway and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities
Financing Authority
Puerto Rico Infrastructure Financing Authority
Puerto Rico Land Administration
Puerto Rico Land Authority
Puerto Rico Maritime Transportation Authority
Puerto Rico Medical Services Administration
Puerto Rico Metropolitan Bus Authority
Puerto Rico Municipal Finance Agency
Puerto Rico Ports Authority
Puerto Rico Public Broadcasting Corporation
Puerto Rico Solid Waste Authority
Puerto Rico Telephone Authority
Puerto Rico Trade and Export Company
Right to Employment Administration
Special Communities Perpetual Trust
State Insurance Fund Corporation
Tourism Company of Puerto Rico
University of Puerto Rico

*Fiduciary Component Units:*

Employees Retirement System of the Government of Puerto Rico and its Instrumentalities
Puerto Rico Judiciary Retirement System
Puerto Rico System of Annuities and Pensions for Teachers



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 4


**Independent Auditors**

Commonwealth statutes require an annual audit by independent certified public accountants. The firm of KPMG LLP was selected by the Commonwealth to perform the audit of the basic financial statements in accordance with auditing standards generally accepted in the United States of America for the fiscal year 2005-2006. The goal of the independent audit was to provide reasonable assurance that the financial statements of the Commonwealth for the fiscal year ended June 30, 2006 are free of material misstatements. The independent auditors' report on the basic financial statements is included in the financial section of this report.

**Internal Controls**

The management of the Commonwealth is responsible for establishing and maintaining internal controls to ensure that assets of the Commonwealth are protected from loss, theft, or misuse, and that adequate accounting data is compiled for the preparation of financial statements in conformity with accounting principles generally accepted in the United States of America. The internal controls are designed to provide reasonable, but not absolute, assurance that these objectives are met. The concept of reasonable assurance recognizes that: (1) the cost of a control should not exceed the benefits likely to be derived, and (2) the valuation of costs and benefits requires estimates and judgments by management.

As a recipient of federal assistance, the Commonwealth is also responsible for ensuring that internal controls are in place to ensure that documents and processes are in compliance with applicable laws and regulations related to such federal financial assistance programs.

Certain departments, agencies, and political subdivisions are subject to the requirements of the U.S. Office of Management and Budget Circular A-133. As a result, these entities are audited for compliance with the requirements of the federal financial assistance programs. These audits are performed at the department or agency level. The Commonwealth has provided for the possible cost disallowance that may arise from these audits, as well as from other audits that may be performed by federal grantors.

**Budget and Fiscal Policy**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the Central Government for the ensuing fiscal year.

The annual budget is prepared by the Puerto Rico Office of Management and Budget, working with the Puerto Rico Planning Board, the Puerto Rico Department of the Treasury, and other government offices and agencies. Section 7 of Article 6 of the Constitution provides that *"The appropriations made for any fiscal year shall not exceed the total revenue, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."*

 SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 5

The Commonwealth maintains extensive budgetary controls. The objective of these controls is to ensure compliance with legal provisions embodied in the annual appropriated budget approved by the Legislature. Activities of the general fund are included in the annual appropriated budget. Budgetary control resides at the department level. The Commonwealth also maintains an encumbrance accounting system as one method of maintaining budgetary control.

The annual budget, which is developed using elements of performance-based program budgeting and zero-based budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under laws existing at the time the budget is submitted and legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient and in conformity with the four-year investment plan prepared by the Puerto Rico Planning Board.

The Legislature may amend the budget submitted by the Governor, but may not increase items that would cause a deficit without imposing additional taxes to cover such deficit. Once approved by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item, but may not increase or insert new items in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, as originally approved by the Legislature and the Governor, it is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This allows the Commonwealth to continue to pay operating and other expenses until a new budget is approved.

**Governmental Activities**

General governmental activities of the Commonwealth are accounted for in four governmental funds. These funds are: general, special revenue, debt service, and capital project. The general fund is the primary operating fund of the Commonwealth. The general fund is used to account for resources traditionally associated with government, which are not required legally or by sound financial management to be accounted for in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. Other major funds are the debt service fund, which accounts for the accumulation of resources predominantly for, and the payment of the Commonwealth general long-term bonds' principal, interest and related costs; the Public Buildings Authority capital project fund, which accounts for the financial resources used for the acquisition and construction of major capital facilities; and The Children's Trust special revenue fund, which accounts for the moneys received by the Commonwealth from a global settlement agreement dated November 23, 1998, between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico. Nonmajor governmental

 SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 6

funds are combined in a single column in the governmental fund financial statements, and individually
identified in the supplementary combining nonmajor governmental funds financial statements of this report.

### Business-Type Activities

Proprietary funds are used to account for operations that are financed and operated in a manner similar to
private business enterprises, where the intent of the government is that the costs of providing goods or
services to the general public on a continuing basis be financed or recovered primarily through user charges or
where the government has decided that periodic determination of net income is appropriate for accountability
purposes.

The Commonwealth's proprietary operations comprise the following activities: the Unemployment Insurance
Trust Fund, the Lottery of Puerto Rico and the Additional Lottery System (the Lotteries Fund), both major
funds. The Puerto Rico Water Pollution Control Revolving Fund, the Puerto Rico Safe Drinking Water
Treatment Revolving Loan Fund, the Disability Insurance Fund, and the Drivers' Insurance Fund are all
nonmajor proprietary funds combined in a single column in the proprietary fund financial statements, and
individually identified in the supplementary combining nonmajor proprietary funds financial statements of
this report.

### Fiduciary Operations

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity or as an agent
for individuals, private organizations, and other governmental units. These include the pension trust and
agency funds. Pension trust funds are established through trust agreements specifying how the fund will
operate. Agency funds are custodial in nature and do not report fund balances. The pension trust funds include
the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities, the Puerto
Rico Judiciary Retirement System, and the Puerto Rico System of Annuities and Pensions for Teachers.

Agency funds consist of the Special Deposits Fund. This agency fund includes deposits under the custody of
the Courts of Justice for alimony payments, deposits under the custody of the Commissioner of Insurance of
the Commonwealth for escheated property, and for insurance companies under bankruptcy.

### Cash Management Policies and Practices

The Commonwealth maintains a cash pool for its cash and cash equivalents. The balance in the pooled cash
accounts is available to meet current operating requirements and any excess is invested in various interest-
bearing accounts in the Government Development Bank for Puerto Rico (GDB), a discretely presented
component unit. In addition, the Puerto Rico Government Investment Trust Fund (PRGITF), was created by
the Commonwealth pursuant to Act No. 176 of August 11, 1995, and began operations on December 4, 1995.
PRGITF is a no-load diversified collective investment trust that was created for the purpose of providing
eligible investors with a convenient and economical way to invest in a professionally managed money market

 SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 7

portfolio. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

The Commonwealth's investment policy is to minimize credit and market risk while maintaining a competitive yield on its portfolio. The cash temporarily idle during this year was invested mainly in U.S. government securities, stocks, corporate bonds, repurchase agreements, Commonwealth securities, trading securities, and short-term investments. These are primary government investments that are restricted and unrestricted.

### Capital Assets

These basic financial statements include the capital assets of the Commonwealth. A discussion of capital assets accounting is included in the MD&A that is part of the basic financial statements. More detailed information about capital assets can be found in the notes to the basic financial statements.

### Debt Administration

As of June 30, 2006, the Commonwealth had a number of debt issues outstanding. The Commonwealth has a BBB- credit rating from Standard & Poor's Corporation and a Baa3 from Moody's Investor Service on general obligation bond issues, these classifications may vary in future years.

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued, which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on accounts of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenue raised under the provisions of the Commonwealth Legislation and covered into Treasury of Puerto Rico in the two fiscal year preceding the current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. See the computation of the Legal Debt Margin on page 6 in the Statistical Section. More detailed information about long-term debt can be found in the notes to the basic financial statements.

### Risk Financing

The Commonwealth purchases commercial insurance to cover casualty, theft, tort claims, and other losses. The current insurance policies have not been canceled or terminated. As it relates to worker's compensation, the Commonwealth's discretely presented component unit, the State Insurance Fund Corporation, provides workers' compensation to both public and private employees.



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
Members of the Legislature
and People of Puerto Rico
August 6, 2007
Page 8

**Financial Advisor and Fiscal Agent**

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities, and public corporations, in connection with the issuance of bonds and notes, and to make loans to private enterprises to aid the economic development of Puerto Rico. GDB was the first governmental entity in Puerto Rico to obtain a Certificate of Achievement for Excellence in Financial Reporting for its CAFR. It has received the award for the years ended June 30, 1994 through 2005. GDB is presented as a major discretely presented component unit.

## ECONOMIC CONDITIONS AND OUTLOOK

Puerto Rico enjoyed almost two decades of economic expansion through fiscal year 2001. Almost every sector of the economy participated, and record levels of employment were achieved. Factors behind this expansion included government-sponsored economic development programs, periodic declines in the value of the U.S. dollar, which is the currency used in the Commonwealth, increases in the level of federal transfers, a significant expansion in construction investment driven by infrastructure projects and private investment, primarily in housing, and the relatively low cost of borrowing.

The economy of Puerto Rico is closely linked to the United States economy. The following exogenous variables are affected by the United States economy: exports, direct investment, transfer payments, interest rates, inflation, and tourist expenditures.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Manufacturing is the largest sector in terms of gross domestic product. Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor.

The services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism, and other services has shown a strong interaction with manufacturing, tourism, construction, and agriculture.

Tourism makes a significant contribution to economic activity. An estimated $3.4 billion were spent by visitors in Puerto Rico during fiscal year 2006. San Juan has become the largest home port for cruise ships in the Caribbean and the fourth largest home port for cruise ships in the world. During the year 2006, the numbers of persons registered in tourist hotels maintain the same occupancy rate of the fiscal year 2005. The construction sector is an integral part of the economic activity from fiscal year 1999 through fiscal year 2006. Puerto Rico is heavily dependent on oil imports for the production of electricity; however, as a result of the construction of two cogeneration plants, one of which is fueled by liquefied natural gas and the other by coal, Puerto Rico's dependence on oil imports for the production of electricity has been reduced from 99% to 72%.

The Puerto Rico Planning Board's preliminary reports of the performance of the Puerto Rico economy during fiscal year 2006 indicate that the economy registered an increase of 0.7% in total real gross product. Gross



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 9

product in fiscal year 2000 was $41.4 billion and gross product in fiscal year 2006 was $56.7 billion. This represents an increase in gross product of 36.9% from fiscal year 2000 to fiscal year 2006.

In terms of personal income, in fiscal year 2006, personal income per capita was $12,997 compared to 12,365 in 2005 and $10,204 in 2000.

According to the Department of Labor and Human Resources, during fiscal year 2006 the labor force was 1.42 million compared to 1.39 million in fiscal year 2005. Unemployment, although at relative low historical levels, remains above the United States average. The average unemployment rate increased from 10.6% during fiscal year 2005 to 11.7% in fiscal year 2006.

## Major Initiatives

### *Individual Income Taxes*

Resident individuals are subject to tax on their taxable income from all sources. As a result of legislation enacted in 1999 and 2000, there are several changes in income tax brackets applicable to future taxable years. However, due to significant limitation of available resources, the Commonwealth has deferred further reduction in income tax rates through fiscal year 2006, in an effort to maintain revenue levels, and avoid budgetary shortfalls. The Commonwealth worked on a fiscal and tax reform based on sales and uses tax and implemented it during fiscal year 2007.

### *Proposed New U.S. Tax Regime for Companies Doing Business in Puerto Rico*

In order to enhance the attractiveness for U.S. companies of establishing operations in Puerto Rico, the Commonwealth has been seeking to provide for a new and permanent tax regime applicable to U.S.-based businesses that have operations in the Commonwealth or other U.S. possessions. During the past three years, the Commonwealth has been pursuing an amendment to Section 956 of the U.S. Internal Revenue Code of 1986, as amended (the Code), that would establish a regime based on the tax rules generally applied to U.S. companies with international operations, but with certain modifications intended to promote employment both in the Commonwealth and the United States. The U.S. Congress, however, has not acted upon the proposed amendment to Section 956 of the Code. Also, due to the phase-out of Sections 30A and 936 of the Code, the U.S. Senate designated a special commission through the General Accounting Office to study the economic impact of said phase-out and to present recommendations on alternative tax incentives for U.S.-based companies operating in Puerto Rico. In the meantime, most U.S.-based companies operating under Sections 30A and 936 of the Code have converted from U.S. corporations to Puerto Rico or foreign corporations, which has lessened the impact of the phase-out of those sections.



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 10

*Public Sector Debt*

Historically, the Commonwealth has maintained, as a matter of fiscal policy, a prudent relationship between
the growth of public sector debt and the growth of the economic base required to service that debt. During
certain fiscal years, however, public sector debt increased at a greater rate than the rate of gross product
primarily due to an increase in the amount of debt incurred to finance certain key infrastructure projects,
which are important to the development of the economy and are expected to produce long-term economic
benefits, and debt incurred to refinance outstanding debt to enable Puerto Rico to benefit from the historically
low levels of interest rates and realize debt service savings. During fiscal year 2006, public sector debt
increased 15%.

*Prospects for the Future*

The Commonwealth is committed to research and pursue solutions to improve the Commonwealth's
competitive economic performance and the quality of life for its citizens. The Governor of Puerto Rico has
established three long-range priorities which he expressed in his March 2005 state of the Commonwealth
message. Those priorities, named "El Triangulo del Exito," are: (1) to provide a new economy that generates
new employments providing its citizens with the best quality of life, (2) to provide a safe society (3) to
establish an excellent educational system for the benefit of the children.

The Commonwealth's economic development program is based on the fundamental, interrelated changes in
technology, demographics, and institutions, which are transforming the global economy. These changes
provide the challenges and opportunities that encompass the economic development strategy.

The economic program is based on: (1) refocus the economy on biotechnology, telecommunications,
technology information, and related sectors, (2) "Apoyo al de aquí" to create new Puerto Rican enterprises,
and (3) infrastructure economic planning.

Initiatives to achieve the economic development program objectives have begun in the following five areas:
(1) legislation towards economic development through tax and fiscal reform; (2) consolidation and reductions
of governmental entities; (3) refocused strategic projects towards excise taxes; (4) reduction of subsidies
provided to governmental entities; and (5) refocused strategic projects related to the citizen's health.

The tax reform which is in force since November 15, 2006 replaced the Commonwealth's current excise tax
with the sales and use tax, included compensatory income tax credits in order to address any regressive effect
the proposed consumption tax may have, eliminate the marriage penalty, establish an earned income tax
credit, increase the deduction for charitable contributions, restructure the estate tax system, provide incentives
for investments in technological infrastructure and research and development activities, and adopt additional
measures to foster individual savings. The Department of the Treasury expects that the tax reform will
provide a net increase in the General Fund's annual revenues, after taking into consideration projected



SECRETARY OF THE TREASURY

Honorable Governor of Puerto Rico,
   Members of the Legislature
   and People of Puerto Rico
August 6, 2007
Page 11

reductions in income taxes, in an amount sufficient to reduce and eventually eliminate the structural imbalance.

The proposed fiscal reform includes a long-term plan to reduce and improve the management of the Commonwealth's public debt. Upon the elimination of the structural budget imbalance, which elimination must be certified to the Legislative Assembly and the Governor by the Secretary of the Treasury, the Director of OMB, and the President of GDB, the Commonwealth's operating budget will include an annual contribution to the public improvement fund equal to two percent (2%) of the total amount of the public improvement bonds authorized for that fiscal year. The annual contribution to the public improvement fund will increase by an additional two percent (2%) of the then-current authorization for each fiscal year thereafter, up to a maximum of twenty percent (20%) of the current year's authorized public improvement bond issuance. This contribution is intended to reduce proportionally each year the amount of the Commonwealth's public improvement bond issues.

The Commonwealth faces other fiscal challenges besides its current budgetary issues. The principal one involves resolving the increasing unfunded pension liability of the Employees Retirement System of the government of Puerto Rico and its instrumentalities (Employees Retirement System) and the Puerto Rico System of Annuities and Pensions for Teachers (the Teachers Retirement System). The Commonwealth expects to reduce the unfunded liability of the Employees Retirement System based on proposed legislation which provides for increased employer and employee contributions and the issuance of up to $2 billion of pension obligation bonds, which would be payable from the Commonwealth's general fund. Besides the Employees Retirement System is considering an issue of bonds to improve unfunded pension liability of the fund. The Employees Retirement System and the Teachers Retirement System are also seeking reimbursement from the Commonwealth for certain special retirement benefits paid by them in prior fiscal years under legislation providing such retirement benefits.

**Financial Condition**

The MD&A, which can be found immediately following the independent auditors' report, provides an overview of the Commonwealth's financial activities addressing both governmental and business-type activities reported in the government-wide financial statements. In addition, the MD&A focuses on the Commonwealth's major funds. Component units and fiduciary activities are excluded from the MD&A.

*Preliminary Fiscal Year 2007 Compared to Actual Fiscal Year 2006*

Preliminary general fund total revenue for fiscal year 2007 was $8,890 million, representing an increase of $349 million, or 4.1%, from fiscal year 2006 revenue. The 2006 proposed budget package included several new revenue-raising measures sufficient to cover budgeted expenditures, most of which required legislative approval. However, the Legislative Assembly did not approve the budget proposed by the Governor.



SECRETARY OF THE TREASURY

PR-CCD-0006951

Honorable Governor of Puerto Rico,
  Members of the Legislature
  and People of Puerto Rico
August 6, 2007
Page 12


## Other Information

### *Certificate of Achievement*

The Government Finance Officers Association of the United States and Canada (GFOA) awarded a *Certificate of Achievement for Excellence in Financial Reporting* to the Commonwealth for its CAFR for the fiscal years ended from June 1996 through 2002 and 2004 to 2005. The Certificate of Achievement is a prestigious national award recognizing conformance with the highest standards for the preparation of state and local government financial reports.

In order to be awarded a Certificate of Achievement, a government unit must publish an easily readable and efficiently organized CAFR, whose contents conform to program standards. The CAFR must satisfy both accounting principles generally accepted in the United States of America and applicable legal requirements. A Certificate of Achievement is valid for a period of only one year.

We believe the Comprehensive Annual Financial Report of the Commonwealth of Puerto Rico as of and for the fiscal year ended June 30, 2006 continues to conform to GFOA standards and we are submitting it to the GFOA to determine its eligibility for a Certificate of Achievement for Excellence in Financial Reporting.

### *Acknowledgements*

The preparation of this report requires the collective efforts of numerous finance personnel throughout the Commonwealth and is made possible only with the cooperation and support of the Executive, Legislative, and Judicial branch agencies, and component units of the Commonwealth. We sincerely appreciate the dedicated efforts of all these individuals.

The report could not have been accomplished without the professionalism and dedication of Juan Torré Martínez, CPA, from our accounting team as well as the rest of the personnel of the Central Government Accounting area. Also, we would like to give special thanks to our independent auditors, KPMG LLP, for their advice and commitment.

This report continues our commitment to the citizens of the Commonwealth of Puerto Rico, the Governor, the Legislature, and the financial community to maintain our general purpose financial statements in conformance with the highest standards of financial accountability.

Respectfully submitted,

Juan C. Méndez
Secretary of the Treasury

SECRETARY OF THE TREASURY

# COMMONWEALTH OF PUERTO RICO

## PRINCIPAL OFFICIALS
As of June 30, 2007

**Aníbal Acevedo Vilá**
Governor

Members of Cabinet

**Jorge Silva Puras**
Chief of Staff

| | | |
|---|---|---|
| **Fernando Bonilla Ortiz**<br>Secretary of State | **Roberto Sánchez Ramos**<br>Secretary of Justice | **Juan C. Méndez Torres**<br>Secretary of the Treasury |
| **Rafael Aragunde Torres**<br>Secretary of Education | **Román Velasco González**<br>Secretary of Labor and<br>Human Resources | **Rosa Pérez Perdomo**<br>Secretary of Health |
| **José Orlando Fabre Laboy**<br>Secretary of Agriculture | **Carlos González Miranda**<br>Secretary of Transportation and<br>Public Works | **Ricardo Rivera Cardona**<br>Secretary of Economic<br>Development and Commerce |
| **Felix Matos Rodríguez**<br>Secretary of Family Affairs | **Jorge Rivera Jiménez**<br>Secretary of Housing | **Javier Vélez Arocho**<br>Secretary of Natural and<br>Environmental Resources |
| **Alejandro García Padilla**<br>Secretary of Consumer Affairs | **David E. Bernier Rivera**<br>Secretary of Sports and<br>Recreation | **Miguel A. Pereira Castillo**<br>Secretary of Corrections and<br>Rehabilitation |

## LEGISLATIVES OFFICERS
As of June 30, 2006

| | |
|---|---|
| **Kenneth McClintock Hernández**<br>President, Senate | **José Aponte Hernández**<br>Speaker, House of<br>Representatives |

## FISCAL OFFICERS
As of September 1, 2006

| | |
|---|---|
| **José G. Dávila Matos**<br>Director, Office of Management<br>and Budget | **Alfredo Salazar Conde**<br>President, Government<br>Development Bank for<br>Puerto Rico |

PR-CCD-0006953

PR-CCD-0006954



# Certificate of Achievement for Excellence in Financial Reporting

Presented to

## Commonwealth of Puerto Rico

For its Comprehensive Annual
Financial Report
for the Fiscal Year Ended
June 30, 2005

A Certificate of Achievement for Excellence in Financial
Reporting is presented by the Government Finance Officers
Association of the United States and Canada to
government units and public employee retirement
systems whose comprehensive annual financial
reports (CAFRs) achieve the highest
standards in government accounting
and financial reporting.

President

Executive Director

# FINANCIAL SECTION

PR-CCD-0006956



**KPMG LLP**
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

The Honorable Governor and Legislature
Commonwealth of Puerto Rico
San Juan, Puerto Rico

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the year ended June 30, 2006, which collectively comprise the Commonwealth's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Commonwealth's management. Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the Public Buildings Authority capital project fund or The Children's Trust special revenue fund (major funds), which represents 2% and 0%, respectively, of the assets and revenue of the governmental activities. We also did not audit the financial statements of the following activities, funds, and component units:

- Puerto Rico Public Housing Administration, Human Resources and Occupational Development Council, and the Office for the Administration of the Assets of the Urban Renovation and Housing Corporation of the Commonwealth of Puerto Rico, which collectively represent 16% and 3%, respectively, of the assets and revenue of the general fund and 6% and 3%, respectively, of the assets and revenue of the governmental activities,

- Public Buildings Authority special revenue and The Children Trust, Public Building Authority, and Puerto Rico Maritime Shipping Authority debt service funds, which collectively represent 7% and 4%, respectively, of the assets and revenue of the aggregate remaining fund information and 4% and 1%, respectively, of the assets and revenue of the governmental activities;

- The Additional Lottery System, which represents 66% and 39%, respectively, of the assets and revenue of the lotteries fund and 12% and 33%, respectively, of the assets and revenue of the business-type activities;

- Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund which collectively represent 3% and 2% respectively, of the assets and revenue of the aggregate remaining fund information and 21% and 3% of the assets and revenue of the business-type activities;

- The pension trust funds, which represents 71% and 91%, respectively, of the assets and revenue of the aggregate remaining fund information; and

- Entities identified in note 2 that are presented as discretely presented component units, which collectively represent 88% and 91%, respectively, of the assets and revenue of the aggregate discretely presented component units.

These financial statements were audited by other auditors whose reports thereon have been furnished to us, and our opinions, insofar as they relate to the amounts included for the activities, funds, and component units indicated above, are based on the reports of the other auditors.

1

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.



We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Commonwealth's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

In our opinion, based on our audit and the reports of the other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth of Puerto Rico as of June 30, 2006, and the respective changes in financial position, and, where applicable, cash flows thereof and the respective budgetary comparison for the general fund for the year then ended in conformity with U.S. generally accepted accounting principles.

As described in note 12, the Commonwealth adopted GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries* as of June 30, 2006.

The management's discussion and analysis on pages 3 through 20 and the schedule of funding progress on pages 149 and 150 are not a required part of the basic financial statements but are supplementary information required by U.S. generally accepted accounting principles. We and the other auditors have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Commonwealth's basic financial statements. The combining and individual fund financial statements and schedules listed in the table of contents are presented for purposes of additional analysis and are not a required part of the basic financial statements. These combining and individual fund financial statements have been subjected to the auditing procedures applied by us and the other auditors in the audit of the basic financial statements and, in our opinion, are fairly stated in all material respects in relation to the basic financial statements taken as a whole. The introductory and statistical sections listed in the table of content have not been subjected to the auditing procedures applied in the audit of the basic financial statements and, accordingly, we express no opinion on them.

KPMG LLP

August 1, 2007

Stamp No. 2221579 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

2

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

Management of the Commonwealth of Puerto Rico (the Commonwealth) provides this Management's Discussion and Analysis for the readers of the Commonwealth's basic financial statements. This narrative overview and analysis of the financial activities of the Commonwealth is for the fiscal year ended June 30, 2006, and is intended to provide an easily readable explanation of the information provided in the attached basic financial statements. We encourage readers to consider this information with the Commonwealth's basic financial statements that follow.

### Financial Highlights – Primary Government

#### Government-wide Highlights

- The Commonwealth reported a deficit of $16.4 billion as of June 30, 2006, a deterioration in the financial position of $1.2 billion from last year's balances. The accumulated deficit is principally the result of the Commonwealth's practice of issuing debt and transferring such funds to its discretely presented component units in order for them to carry out the corresponding construction programs.

- The Commonwealth's total deficit increased by $1.2 billion (an 7% increase) as a result of this year's operations. The governmental activities' deficit increased by $1.3 billion (an 8% increase), while net assets of the business-type activities showed an increase of $97 million (a 16% increase).

- The Commonwealth's governmental activities had total revenue of $14.3 billion, which were exceeded by total expenses of $15.8 billion, excluding transfers received from business-type activities amounting to $243 million.

- The Commonwealth's business-type activities had total revenue of $1.2 billion, which exceeded total expenses of $903 million, excluding transfers made to the governmental activities amounting to $243 million.

#### Fund Highlights

- As of June 30, 2006, the Commonwealth's governmental funds reported a combined ending fund balance of $411 million, an increase of $18 million in comparison with the prior year, while the business-type activities increased by $97 million to reach $778 million.

- The general fund reported a deficit of $384 million as of June 30, 2006, a decrease of $120 million in comparison with the prior year.

- The unemployment insurance trust fund reported net assets of $543 million while the lotteries fund reported a deficit of $170 million. The deficit in the lottery funds was a result of the transfers of investments made to the general fund a few years ago.

#### Long-Term Debt

- Total long-term obligations as of June 30, 2006 were $27 billion, from which $2 billion are due within one year. The long-term obligation of the governmental activities increased by $2 billion (8%) to $27 billion when compared to the prior year, while the business-type activities decreased by $26 million (6%) to $382 million. The increase in governmental activities' long-term obligations was mainly due to notes payables of the Department of the Treasury to cover operations needs.

3                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Overview of the Financial Statements**

This discussion and analysis is intended to serve as an introduction to the Commonwealth's basic financial statements. The Commonwealth's basic financial statements include three components: (1) government-wide financial statements, (2) fund financial statements, and (3) notes to the financial statements. This report also contains additional required supplementary information in addition to the basic financial statements themselves. These components are described below:

*Basic Financial Statements*

The basic financial statements include two kinds of financial statements that present different views of the Commonwealth—the government-wide financial statements and the fund financial statements and combining major component units financial statements. These financial statements also include the notes to the basic financial statements that explain some of the information in the financial statements and provide more detail.

**Government-wide Financial Statements**

The government-wide financial statements provide a broad view of the Commonwealth's operations in a manner similar to a private sector business. The statements provide both short- and long-term information about the Commonwealth's financial position, which assists in assessing the Commonwealth's economic condition at the end of the fiscal year. These are prepared using the flow of economic resources measurement focus and the accrual basis of accounting. This basically means they follow methods that are similar to those used by most businesses. They take into account all revenue and expenses connected with the fiscal year even if cash involved has not been received or paid. The government-wide financial statements include two statements:

- *Statement of Net Assets* – This presents all of the government's assets and liabilities with the difference between the two reported as net assets (deficit). Over time, increases or decreases in the Commonwealth's net assets (deficit) may serve as a useful indicator of whether the financial position of the Commonwealth is improving or deteriorating.

- *Statement of Activities* – This presents information showing how the government's net assets changed during the most recent fiscal year. All changes in net assets are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenue and expenses are reported in this statement for some items that will not result in cash flows until future fiscal periods (such as uncollected taxes and earned but unused vacation leave). This statement also presents a comparison between direct expenses and program revenue for each function of the Commonwealth.

Both of the above financial statements have separate sections for three different types of Commonwealth programs or activities. These three types of activities are as follows:

- *Governmental Activities* – The activities in this section are mostly supported by taxes and intergovernmental revenue (federal grants). Most services normally associated with Commonwealth government fall into this category, including general government, public safety, health, public housing and welfare, education, and economic development.

- *Business-Type Activities* – These functions normally are intended to recover all or a significant portion of their costs through user fees and charges to external users of goods and services. These business-type activities of the Commonwealth include the operations of the following major funds: unemployment insurance trust fund (administered by the Commonwealth Employment Security Bureau) and the lotteries.

4 (Continued)

PR-CCD-0006960

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

- *Component Units* – These are organizations that are legally separate from the Commonwealth, but the Commonwealth is either financially accountable for them, or the nature and significance of their relationship with the Commonwealth are such that their exclusion would cause the Commonwealth's financial statements to be misleading or incomplete. The Commonwealth has both blended and discretely presented component units.

- *Blended Component Units* – Although legally separate entities, these are in substance part of the primary government's operations. Therefore, data from blended component units are integrated into the appropriate funds for reporting purposes.

  The Commonwealth's three blended component units are:

  - Public Buildings Authority

  - Puerto Rico Maritime Shipping Authority

  - The Children's Trust

- *Discretely Presented Component Units* – These are operations for which the Commonwealth has financial accountability but they have certain independent qualities as well. For the most part, these entities operate similar to private sector businesses and the business-type activities described above. The Commonwealth's discretely presented component units are presented in two categories, major and nonmajor. This separation is determined by the relative size of the entities' assets, liabilities, revenue, and expenses in relation to the total of all component units.

  The Commonwealth's 34 discretely presented nonmajor component units are combined into a single column for reporting in the fund financial statements. Complete financial statements of the individual component units can be obtained from their respective administrative offices. Addresses and other additional information about the Commonwealth's component units are presented in note 1 to the basic financial statements.

  The Commonwealth's seven discretely presented major component units are:

  - Government Development Bank for Puerto Rico

  - Puerto Rico Highways and Transportation Authority

  - Puerto Rico Electric Power Authority

  - Puerto Rico Aqueduct and Sewer Authority

  - Puerto Rico Infrastructure Financing Authority

  - Puerto Rico Health Insurance Administration

  - University of Puerto Rico

The government-wide financial statements can be found immediately following this discussion and analysis.

PR-CCD-0006961

Case:17-03283-LTS Doc#:47812 Filed:02/24/19 Entered:02/24/19 20:19:25 Desc:
Exhibit 20 (PG Part III) Page 769 of 1000

# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

## Fund Financial Statements

A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The Commonwealth, like other states and local governments, uses fund accounting to help ensure and demonstrate compliance with finance-related legal requirements. The fund financial statements focus on individual parts of the Commonwealth government, reporting the Commonwealth's operations in more detail than the government-wide financial statements. All of the funds of the Commonwealth can be divided into three categories. It is important to note that these fund categories use different accounting approaches and should be interpreted differently. The three categories of funds are the following:

- *Governmental Funds Financial Statements* – Most of the basic services provided by the Commonwealth are financed through governmental funds. Governmental funds are used to account for essentially the same functions reported as governmental activities in the government-wide financial statements. However, unlike the government-wide financial statements, the governmental fund financial statements focus on near-term inflows and outflows of expendable resources. They also focus on the balances of expendable resources available at the end of the fiscal year. Such information may be useful in evaluating the government's near-term financing requirements. This approach is known as using the flow of current financial resources measurement focus and the modified-accrual basis of accounting. These statements provide a detailed short-term view of the Commonwealth's finances that assists in determining whether there will be adequate financial resources available to meet the current needs of the Commonwealth. Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental fund balance sheet and the governmental fund statement of revenue, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and the governmental activities. These reconciliations are presented on the page immediately following each governmental fund financial statement.

  The Commonwealth has four major governmental funds. That is, each major fund is presented in a separate column in the governmental funds balance sheet and in the governmental funds statement of revenue, expenditures, and changes in fund balances. The Commonwealth's four major governmental funds are the general fund, The Children's Trust special revenue fund, the debt service fund, and the Public Buildings Authority capital projects fund. The remaining nonmajor governmental funds are grouped and presented in a single column in the governmental funds financial statements. The basic governmental funds financial statements can be found immediately following the government-wide financial statements.

- *Proprietary Funds Financial Statements* – These funds are used to show activities that operate more like those of commercial enterprises. Because these funds charge fees for services provided to outside customers including local governments, they are known as enterprise funds. Proprietary funds present the same type of information as the government-wide financial statements, only in more detail. Like the government-wide financial statements, proprietary fund financial statements use the accrual basis of accounting. There is no reconciliation needed between the government-wide

(Continued)

PR-CCD-0006962

### COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

financial statements for business-type activities and the proprietary fund financial statements. The Commonwealth has two major enterprise funds. As previously mentioned, they are the operations of the unemployment insurance trust fund (administered by the Commonwealth's Employment Security Bureau) and the lotteries. Other nonmajor proprietary funds are grouped and presented in a separate column in the proprietary funds financial statements. The basic proprietary funds financial statements can be found immediately following the governmental fund financial statements.

- *Fiduciary Funds and Similar Component Units Financial Statements* – These funds are used to account for resources held for the benefit of parties outside the Commonwealth government. Fiduciary funds are not reflected in the government-wide financial statements because the resources of these funds are not available to support the Commonwealth's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds. They use the accrual basis of accounting. The Commonwealth's fiduciary funds are the pension trust funds (three separate retirement systems for employees, which are fiduciary component units of the Commonwealth), and the agency funds (which account for the assets held for distribution by the Commonwealth as an agent for other governmental units, other organizations, or individuals). The basic fiduciary funds and similar component units' financial statements can be found immediately following the proprietary funds financial statements.

### Component Units Financial Statements

As mentioned above, these are operations for which the Commonwealth has financial accountability, but they have certain independent qualities as well, and they operate similar to private-sector businesses. The government-wide financial statements present information for the component units in a single column on the statement of net assets. Also, some information on the statement of changes in net assets is aggregated for component units. The combining statements of net assets and the combining statement of activities provide detail for each major component unit and the nonmajor component units in aggregate. The basic combining financial statements for major component units can be found immediately following the fiduciary funds financial statements.

### Notes to Basic Financial Statements

The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and the fund financial statements. The notes to the basic financial statements can be found immediately following the component units' financial statements.

### Required Supplementary Information

The basic financial statements include within its notes a section of required supplementary information. This section includes information of funding progress for the Commonwealth's three separate retirement systems.

### Government-Wide Financial Analysis

*Net Assets*

As noted earlier, net assets may serve over time as a useful indicator of a government's financial position. Total assets and total liabilities of the Commonwealth's primary government at June 30, 2006 amounted to

7                                                                                          (Continued)

COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

$14.9 billion and $31.3 billion, respectively, for a net deficit of $16.4 billion, compared to a $15.2 billion net deficit at the beginning of the current year, as restated.

A portion of the Commonwealth's net assets (deficit) reflects its investment in capital assets such as land, buildings, and equipment, less any related debt used to acquire those assets that are still outstanding. The Commonwealth uses these capital assets to provide services to its residents; consequentially, these assets are not available for future spending. Although the Commonwealth's investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

An additional portion of the Commonwealth's net assets (deficit) represents resources that are subject to external restrictions on how they may be used. An otherwise positive remaining balance would be used to meet the Commonwealth's ongoing obligations to its residents and creditors. Internally imposed designations of resources are not presented as restricted net assets. At the end of the current fiscal year, the Commonwealth is able to report positive balances in two categories of net assets, and a deficit, both for the government as a whole, as well as for its separate governmental and business-type activities.

As explained earlier, the net deficit of the primary government primarily results from the Commonwealth's practice of issuing debt and transferring such funds to the component units so that they can carry out the construction projects. The primary government retains the debt while the component units report the corresponding asset financed by such debt.

Total assets increased by $1.5 billion during fiscal year 2006 when compared to the prior fiscal year. The key elements for this increase are as follows:

- Restricted cash increased by $647 million when compared to the prior year. The increase was due to approximately $250 million in cash restricted for tax revenue anticipation notes, and an overall increase in cash restricted for the payment of other long-term debt.

- Taxes receivable increased $120 million when compared to the prior year.

- Additions of capital assets and depreciation expense amounted to $816 million and $223 million, respectively.

8                                                                                    (Continued)

PR-CCD-0006964

### COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

Total liabilities increased $3 billion during the current fiscal year when compared to the prior fiscal year. The key elements for this increase are mostly due to the net increase in debt issued of $1.64 billion, which consisted of issuances during fiscal year 2006 of Commonwealth bonds and notes payable amounting to $141 million and $3.2 billion, respectively, offset by repayments of such debt in the amount of $209 million and $140 million, respectively. Increases were also experienced in the net pension obligation of $261 million and accounts payable and tax revenue anticipation notes of $298 million and $250 million, respectively.

**Commonwealth's Net Assets – Primary Government**
**June 30, 2006**
(expressed in thousands)

|  | | Governmental activities | Business-type activities | Total |
|---|---|---:|---:|---:|
| Current assets | $ | 3,665,245 | 939,895 | 4,605,140 |
| Capital assets | | 7,183,178 | 1,008 | 7,184,186 |
| Other assets | | 2,817,053 | 255,993 | 3,073,046 |
| Total assets | $ | 13,665,476 | 1,196,896 | 14,862,372 |
| Current liabilities | $ | 6,378,707 | 149,673 | 6,528,380 |
| Noncurrent liabilities | | 24,496,332 | 269,723 | 24,766,055 |
| Total liabilities | $ | 30,875,039 | 419,396 | 31,294,435 |
| Invested in capital assets, net of related debt | $ | 3,485,882 | 1,008 | 3,486,890 |
| Restricted | | 280,078 | 947,507 | 1,227,585 |
| Unrestricted | | (20,975,523) | (171,015) | (21,146,538) |
| Total net assets (deficit) | $ | (17,209,563) | 777,500 | (16,432,063) |

(Continued)

PR-CCD-0006965

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Commonwealth's Net Assets – Primary Government**
**June 30, 2005**
(expressed in thousands)

| | | Governmental activities | Business-type activities | Total |
|---|---|---|---|---|
| Current assets | $ | 2,897,994 | 886,219 | 3,784,213 |
| Capital assets | | 7,119,033 | 1,367 | 7,120,400 |
| Other assets | | 2,187,383 | 222,748 | 2,410,131 |
| Total assets | $ | 12,204,410 | 1,110,334 | 13,314,744 |
| Current liabilities | $ | 5,268,743 | 142,818 | 5,411,561 |
| Noncurrent liabilities | | 22,852,456 | 296,666 | 23,149,122 |
| Total liabilities | $ | 28,121,199 | 439,484 | 28,560,683 |
| Invested in capital assets, net of related debt | $ | 3,623,158 | 847 | 3,624,005 |
| Restricted | | 296,692 | 872,215 | 1,168,907 |
| Unrestricted | | (19,836,639) | (202,212) | (20,038,851) |
| Total net assets (deficit) | $ | (15,916,789) | 670,850 | (15,245,939) |

### Changes in Net Assets

The Commonwealth's net deficit increased by $1.2 billion or 8% from last year's total net deficit. Approximately 52% of the Commonwealth's total revenue came from taxes, while 29% resulted from grants and contributions (primarily federal financial assistance). Charges for various goods and services provided represented 13% of the total revenue. The Commonwealth's expenses cover a range of services. The largest expenses were for education, public housing and welfare, general government, and public safety. In 2006, governmental activities' expenses exceeded program revenue by $10.5 billion, resulting in the use of $9.2 billion in general revenue (mostly taxes) and transfers. On the other hand, program revenue from business-type activities in 2006 exceeded expenses by approximately $306 million. In addition, the business-type activities had unrestricted investments earnings of $33 million and transfer to the governmental activities amounting to $243 million.

Governmental activities decreased the Commonwealth's net assets by $1.2 billion, which is $1.7 billion less than $2.9 billion experienced in the prior year. The Commonwealth made efforts to decrease overall expenses; these efforts resulted in a decrease $1.2 billion, but revenues were still lower than total expenses. The Commonwealth implemented the 5.5% sales and use tax during fiscal year 2007. This sales and use tax results in higher tax revenues. The Commonwealth expects that the effort to decrease expenses and the increase in tax revenue with the sales and use tax will eliminate or significantly lower the deficit in future years.

Business-type activities increased the Commonwealth's net assets by $97 million. The two main factors that contributed to the increase in net assets were the reduction of $30 million in the operating expenses in lottery funds and the increase in nonoperating revenue of $37.3 million of contributions from federal government on unemployment fund, water pollution control and treatment revolving loan funds.

(Continued)

PR-CCD-0006966

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Commonwealth of Puerto Rico's Changes in Net Assets – Primary Government**
**Year ended June 30, 2006**
(expressed in thousands)

|  | Governmental activities | Business-type activities | Total |
|---|---|---|---|
| **Revenue:** | | | |
| Program revenue: | | | |
| Charges for services | $ 828,993 | 1,149,426 | 1,978,419 |
| Operating grants and contributions | 4,365,711 | 59,613 | 4,425,324 |
| Capital grants and contributions | 100,990 | — | 100,990 |
|  | 5,295,694 | 1,209,039 | 6,504,733 |
| General revenue: | | | |
| Income taxes | 6,255,391 | — | 6,255,391 |
| Excise taxes | 2,013,998 | — | 2,013,998 |
| Other taxes | 15,145 | — | 15,145 |
| Revenue from component units | 68,745 | — | 68,745 |
| Other | 601,225 | 33,165 | 634,390 |
|  | 8,954,504 | 33,165 | 8,987,669 |
| Total revenue | 14,250,198 | 1,242,204 | 15,492,402 |
| **Expenses:** | | | |
| General government | 2,844,494 | — | 2,844,494 |
| Public safety | 2,217,294 | — | 2,217,294 |
| Health | 1,422,813 | — | 1,422,813 |
| Public housing and welfare | 3,287,559 | — | 3,287,559 |
| Education | 4,110,669 | — | 4,110,669 |
| Economic development | 564,447 | — | 564,447 |
| Intergovernmental | 440,390 | — | 440,390 |
| Interest and other | 882,163 | 25,043 | 907,206 |
| Lotteries | — | 670,425 | 670,425 |
| Unemployment | — | 207,483 | 207,483 |
| Total expenses | 15,769,829 | 902,951 | 16,672,780 |
| (Decrease) increase in net assets before transfers | (1,519,631) | 339,253 | (1,180,378) |
| Transfers | 242,642 | (242,642) | — |
| (Decrease) increase in net assets | (1,276,989) | 96,611 | (1,180,378) |
| Net assets (deficit), beginning of year (as restated) | (15,932,574) | 680,889 | (15,251,685) |
| Net assets (deficit), end of year | $ (17,209,563) | 777,500 | (16,432,063) |

11

(Continued)

PR-CCD-0006967

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Commonwealth of Puerto Rico's Changes in Net Assets – Primary Government**
**Year ended June 30, 2005**
(expressed in thousands)

|  | | Governmental activities | Business-type activities | Total |
|---|---|---:|---:|---:|
| Revenue: | | | | |
| Program revenue: | | | | |
| Charges for services | $ | 702,691 | 1,187,009 | 1,889,700 |
| Operating grants and contributions | | 4,096,204 | 22,315 | 4,118,519 |
| Capital grants and contributions | | 121,083 | — | 121,083 |
| | | 4,919,978 | 1,209,324 | 6,129,302 |
| General revenue: | | | | |
| Income taxes | | 5,526,006 | — | 5,526,006 |
| Excise taxes | | 2,101,216 | — | 2,101,216 |
| Other taxes | | 7,128 | — | 7,128 |
| Revenue from component units | | 474,069 | — | 474,069 |
| Other | | 648,083 | 32,284 | 680,367 |
| | | 8,756,502 | 32,284 | 8,788,786 |
| Total revenue | | 13,676,480 | 1,241,608 | 14,918,088 |
| Expenses: | | | | |
| General government | | 1,827,816 | — | 1,827,816 |
| Public safety | | 2,580,951 | — | 2,580,951 |
| Health | | 2,364,110 | — | 2,364,110 |
| Public housing and welfare | | 3,443,886 | — | 3,443,886 |
| Education | | 5,000,686 | — | 5,000,686 |
| Economic development | | 1,006,945 | — | 1,006,945 |
| Interest and other | | 845,556 | 32,437 | 877,993 |
| Lotteries | | — | 699,407 | 699,407 |
| Unemployment | | — | 197,967 | 197,967 |
| Total expenses | | 17,069,950 | 929,811 | 17,999,761 |
| (Decrease) increase in net assets before transfers | | (3,393,470) | 311,797 | (3,081,673) |
| Transfers | | 492,776 | (492,776) | — |
| Decrease in net assets | | (2,900,694) | (180,979) | (3,081,673) |
| Net assets (deficit), beginning of year (as restated) | | (13,016,095) | 851,829 | (12,164,266) |
| Net assets (deficit), end of year as presented in 2005 | $ | (15,916,789) | 670,850 | (15,245,939) |

12                                                                 (Continued)

PR-CCD-0006968

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Revenue – Governmental Activities**
**Year ended June 30, 2006**



Taxes
58%

Grants &
Contributions
31.5%

Charges for services
6%

Other
4%

Revenue from
component units
0.5%

**Expenses – Governmental Activities**
**Year ended June 30, 2006**
(expressed in thousands)

| Functions | | Expenses |
|---|---|---|
| Primary government: | | |
| Governmental activities: | | |
| General government | $ | 2,844,494 |
| Public safety | | 2,217,294 |
| Health | | 1,422,813 |
| Public housing and welfare | | 3,287,559 |
| Education | | 4,110,669 |
| Economic development | | 564,447 |
| Intergovernmental | | 440,390 |
| Interest and other | | 882,163 |
| Total governmental activities | $ | 15,769,829 |

13

(Continued)

PR-CCD-0006969

# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

### Governmental Activities

Governmental activities increased the Commonwealth's net deficit to $17.2 billion. The decrease in net assets by the business-type activities is explained below. A comparison of the cost of services by function for the Commonwealth's governmental activities is shown below, along with the revenue used to cover the net expenses of the governmental activities (expressed in thousands).

### Governmental Activities – Expenses Net of Program Revenue
### Year ended June 30, 2006
(expressed in thousands)

| | |
|---|---:|
| Net (expense) revenue: | |
| General government | $ (2,025,403) |
| Public safety | (2,061,914) |
| Health | (662,913) |
| Public housing and welfare | (804,088) |
| Education | (3,111,106) |
| Economic development | (486,887) |
| Intergovernmental | (439,661) |
| Interest and other | (882,163) |
| Total governmental activities expenses, net program revenue | (10,474,135) |
| General revenue: | |
| Taxes | 8,284,534 |
| Revenue from component units | 68,745 |
| Transfers from business-type activities | 242,642 |
| Other revenue | 601,225 |
| Increase in governmental activities net deficit | $ (1,276,989) |

14

(Continued)

PR-CCD-0006970

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

**Expenses and Program Revenue – Governmental Activities**
**Year ended June 30, 2006**
(expressed in thousands)

| Functions | | Expenses | Charges for services |
|---|---|---|---|
| Primary government: | | | |
| Governmental activities: | | | |
| General government | $ | 2,844,494 | 576,791 |
| Public safety | | 2,217,294 | 58,284 |
| Health | | 1,422,813 | 105,264 |
| Public housing and welfare | | 3,287,559 | 29,534 |
| Education | | 4,110,669 | 2,423 |
| Economic development | | 564,447 | 55,968 |
| Intergovernmental | | 440,390 | 729 |
| Interest and other | | 882,163 | — |
| Total governmental activities | $ | 15,769,829 | 828,993 |

*Business-Type Activities*

The business-type activities increased the Commonwealth's net assets by $97 million. This resulted from a reduction of lottery awards of $30 million and contributions of federal government of $37.3 million explained previously.

**Financial Analysis of the Commonwealth's Individual Funds**

As noted earlier, the Commonwealth uses fund accounting to help ensure and demonstrate compliance with finance-related legal requirements.

*Governmental Funds*

The focus of the Commonwealth's governmental funds is to provide information on near-term inflows, outflows, and balances of expendable resources. Such information is useful in assessing the Commonwealth's financing requirements. In particular, unreserved fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year. As of the end of fiscal year 2006, the Commonwealth's governmental funds reported combined ending fund balance of $411 million, an increase of $18 million in comparison with the prior year. Although the expenditures exceeded the revenues by $1.8 billion, the result of the other financing sources amounting to $1.8 billion led to a break-even situation in the fund balance of the governmental funds. This year the excess of expenditures over revenue decreased by $1.1 billion compared with the prior year. There is $844 million of fund balance reserved to indicate that it is not available for new spending because it has already been committed (1) to liquidate contracts and purchase orders of the prior fiscal year, or (2) for a variety of other restricted purposes.

The general fund is the chief operating fund of the Commonwealth. At the end of the current fiscal year, unreserved fund deficit of the general fund was $1.1 billion, while the total fund balance has a total deficit of

(Continued)

PR-CCD-0006971

# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

$384 million. The fund balance of the Commonwealth's general fund increased by $120 million as a result of the current fiscal year's change in financial position. This is a 24% increase when compared to total fund balance reported in fiscal year 2005. Also, see additional related comments in the following section titled General Fund Budgetary Highlights.

The debt service fund is the fund in which the Commonwealth accumulates the resources for the payment of the long-term debt. At end of the year the fund balance increased by $41 million due to the transfers received from the general fund. Cash and cash equivalents increased by $20 million or 2% compared with the prior year mainly due to investments of the transfers received from the general fund for the payment of debt.

The PBA capital project fund received resources only from transfers from other funds and had expenditures of $176 million, which resulted in a deficit of $32 million for the fund. The fund total assets decreased $153 million or 73% compared with the prior year because of a decrease in restricted cash in commercial banks, which was used to acquire capital assets.

The fund balance of The Children's Trust special revenue fund had an increase of $17 million. The increase was mainly due to $54 million transferred from GDB from investments related to QZAB bonds.

Although the revenue of other governmental funds (nonmajor) increased by $18 million or 18% during the year compared with the prior year, the expenditures decreased by $387 million or 41%, the most significant reduction in expenditures was noted in general government, education, capital outlays, and public safety of $188 million, $128 million, $48 million, and $43 million, respectively. Nevertheless the fund had $408 million in other financing sources that led to a net decrease of $23 million in the fund balance. Total assets of nonmajor funds increased by $386 million or 45% compared with the prior year. The most significant contributions to this increase arose from the cash and cash equivalents, due from other funds and restricted cash and cash equivalents by $318 million or 56%, $39 million or 34%, and $25 million or 22%, respectively.

## *Proprietary Funds*

The Commonwealth's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail. As discussed in the business-type activities above, the Commonwealth's net assets increased by $97 million as a result of operations in the proprietary funds. This resulted from a $21 million increase in net assets by the lotteries fund, an increase in net assets of $41 million by the unemployment insurance trust fund, and an increase of net assets of $35 million by the Commonwealth's other nonmajor enterprise funds.

## General Fund Budgetary Highlights

Actual revenues were less than final budgeted revenue by $365 million. The net decrease was primarily attributed to unachieved income and excise taxes of $208 million and $117 million, respectively, in comparison with the budgeted amounts. The reduction is attributable to the current economic slowdown, caused primarily by the current price of oil and its derivatives being at a historically high level, the government's fiscal crisis, which resulted in a two-week shutdown of nonessential government services, and the uncertainty surrounding the enactment of the tax and fiscal reform to address the government's fiscal crisis.

The actual expenditures reflected an increase of $388 million when compared to the final budgeted amounts. The excess in expenditures was predominantly caused by the Department of Education with $137 million, the Office

16                                                                                                   (Continued)

PR-CCD-0006972

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

of Management and Budget with $45 million, the Municipal Service Administration with $32.5 million, the Correction Administration with $27 million, the Department of Health with $26 million, the Puerto Rico Health Insurance Administration with $21 million, and the Puerto Rico General Court of Justice with $19 million. Most of these variances were financed through the use of borrowings which provided resources of $1,345 million. These financing resources came primarily from Government Development Bank for Puerto Rico loans of $1,109 million and proceeds generated by the issuance of the Commonwealth's Public Improvement Refunding of $100 million.

**Expenditures – General Fund**
**Budget vs. Actual**
**Year ended June 30, 2006**
(expressed in thousands)

As of June 30, 2006, there was an excess of expenditures and other financing uses over revenue and other financing sources of $461 million.

**Capital Assets and Debt Administration**

*Capital Assets*

The Commonwealth's investment in capital assets for its governmental and business-type activities as of June 30, 2006 amounts to $9.7 billion, less accumulated depreciation of $2.5 billion, leaving a book value of $7.2 billion. This investment in capital assets includes land, buildings, building improvements, equipment, and construction in progress as infrastructure.

The net book value of capital assets at June 30, 2006 is distributed by function/activity in the following proportions: general government, 42%; public safety, 5%; health, 1%; public housing and welfare, 33%; education, 7%; and economic development 12%. Actual expenditures to purchase or construct capital assets were approximately $816 million for the year. Depreciation charges for the year totaled $223 million.

17

(Continued)

PR-CCD-0006973

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis

June 30, 2006

The infrastructure assets representing items that are normally immovable and of value only to the Commonwealth as roads, highways, bridges, toll facilities, water and sewer systems, lighting production, transmission and distribution systems, and similar items are principally owned by the component units of the Commonwealth. Therefore, the infrastructure assets are reported within depreciable capital assets under the discretely presented component units column. Additional information on the Commonwealth's capital assets can be found in note 12 to the basic financial statements that accompany this report.

**Commonwealth's Capital Assets – Primary Government**
**Year ended June 30, 2006**
(expressed in thousands)

|  | | Governmental activities | Business-type activities |
|---|---|---|---|
| Land | $ | 848,443 | — |
| Construction in progress | | 1,381,823 | — |
| Buildings and building improvements, net | | 4,395,150 | — |
| Equipment, net | | 200,213 | 1,008 |
| Infrastructure, net | | 357,549 | — |
| Total capital assets | $ | 7,183,178 | 1,008 |



*Debt Administration*

General obligation bonds are backed by the full faith and credit of the Commonwealth, including the Commonwealth's power to levy additional taxes to help ensure repayment of the debt.

The Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth are not to be issued if

18

(Continued)

PR-CCD-0006974

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes issued thereafter which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and conveyed into the Treasury in the two fiscal years preceding the then current fiscal year. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the 15% limitation is not exceeded. At June 30, 2006, the Commonwealth is in compliance with the debt limitation requirement.

Moody's lowered the rating on the Commonwealth's outstanding general obligation bonds from "Baa1" to "Baa2" earlier in the year. Standard & Poor's Rating Services (S&P) had also lowered its rating on the Commonwealth's general obligation bonds earlier in the year.

On May 22, 2007, S&P lowered its long-term rating on the Commonwealth's general obligation debt to 'BBB-' from 'BBB', reflecting a long history of structural imbalance and the ongoing difficulties anticipated with further efforts to reduce the accrued deficit. The outlook was defined as stable.

The rating on the appropriation debt, typically rated one notch below the general obligation debt, has not been lowered, reflecting the improvements that have been made. S&P does not believe that Puerto Rico's appropriation credit is speculative grade.

S&P noted that Puerto Rico's debt, which is already high, is likely to increase. Although a major new revenue source of a 5.5% sales and use tax was added in the current fiscal year, balances remain difficult to achieve, requiring expense cuts and use of one-time revenue sources. Gap forecast suggest that balance will not be achieved until 2010 and that forecast is based on the expectation of flat expense growth.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency.

The Commonwealth's total long-term obligations increased by $2 billion during the current fiscal year, representing an 8% increase. Additional information on the Commonwealth's long-term obligations can be found in note 14 to the basic financial statements of this report.

### Economic Factors and Next Year's Budgets and Rates

The unemployment rate for the Commonwealth of Puerto Rico is currently 11.7%, which is an increase from a rate of 10.6% a year ago.

Based on the projections of the Puerto Rico Planning Board, the Puerto Rico economy is expected to reflect a real growth of 1.2% for the fiscal year 2006.

In an effort to address the Commonwealth's structural budget imbalance and its other fiscal difficulties, the Executive Branch and the Legislative Assembly enacted and the Governor signed legislation providing for tax reform and fiscal reforms. The tax reform legislation is aimed at increasing revenues by expanding the tax base through the implementation of a broad-based sales tax. The fiscal reform legislation is aimed at limiting expenditures in relation to past spending rates and stabilizing expenditure growth at a level below that of recurring revenues.

PR-CCD-0006975

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis

June 30, 2006

On July 4, 2006 was approved Act No. 117 (Act 117) which amends the Puerto Rico Internal Revenue Code of 1994 (the PR Code) to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the Central Government Sales Tax). Act 117 also authorizes each municipal government to impose a municipal sales and use tax of 1.5% (the Municipal Sales Tax and, together with the Central Government Sales Tax, the Sales Tax). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Central Government Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets. Act 117 repeals the 5% general excise tax imposed on imported goods and on goods manufactured in Puerto Rico. Certain items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items and will not be subject to the Sales Tax. The effective date of the repeal of the 5% general excise tax was October 17, 2006 pursuant to Act 229.

The Sales Tax will be effective on November 15, 2006. Municipalities, however, were authorized to implement the Municipal Sales Tax starting on July 1, 2006, and some have already done so. The revenues derived from the Sales Tax will be distributed as follows: (i) municipal governments will retain 1.3% of the Sales Tax, (ii) the Financial Assistance Fund, created by Act No. 91 on May 13, 2006, will receive 1% of the Sales Tax, and (iii) the General Fund will receive 4.7% of the Sales Tax. The revenues to be generated by the Sales Tax will be partly offset by the partial elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

Act 117 also provides for special income tax rates with respect to certain transactions occurring on and between July 1, 2006 and December 31, 2006. These special tax rates will apply to eligible dividends declared by domestic corporations or partnerships and "built-in" gains associated with capital assets held for periods in excess of six months, as well as certain withdrawals from retirement accounts. These special tax rates are only available for transactions in connection with capital assets consisting of stock or participations of domestic and foreign corporations and partnerships, and real property located in Puerto Rico. In the case of resident corporations and partnerships, these special tax rates apply only to real property located in Puerto Rico.

The consolidated budget for the fiscal year 2005-06 amounts to $21.8 billion. From this amount, $15.9 billion is assigned to operating expenses, $3.3 billion to a permanent capital improvements program, and $2.7 billion for the debt service.

### Requests for Information

This financial report is designed to provide a general overview of the Commonwealth's finances for all of the Commonwealth's residents, taxpayers, customers, investors, and creditors. This financial report seeks to demonstrate the Commonwealth's accountability for the money it receives. Questions concerning any of the information provided in this report or requests for additional information should be addressed to: Department of the Treasury of the Commonwealth of Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, Puerto Rico 00902-4140.

20

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Assets (Deficit)

June 30, 2006

(In thousands)

| | Primary Government | | | |
| | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents in commercial banks and U.S. Treasury | $    522,056 | 87,191 | 609,247 | 2,788,852 |
| Cash and cash equivalents in governmental banks | 1,035,991 | 747,049 | 1,783,040 | 635,650 |
| Investments | 188,169 | — | 188,169 | 2,474,477 |
| Receivables, net of allowance for uncollectibles: | | | | |
| Taxes | 1,209,961 | — | 1,209,961 | — |
| Unemployment and other insurance premiums | — | 64,800 | 64,800 | 109,780 |
| Intergovernmental | 300,104 | — | 300,104 | 41,001 |
| Accounts | 94,459 | — | 94,459 | 787,415 |
| Loans | 6,790 | — | 6,790 | 5,009,012 |
| Accrued interest | 12,421 | 2,853 | 15,274 | 332,243 |
| Other | 108,200 | 13,866 | 122,066 | 116,292 |
| Due from: | | | | |
| Primary government | — | — | — | 280,148 |
| Component units | 125,395 | 7,605 | 133,000 | 2,378,592 |
| Other governmental entities | 13,866 | — | 13,866 | 201,089 |
| Internal balances | (16,531) | 16,531 | — | — |
| Inventories | 23,490 | — | 23,490 | 338,127 |
| Prepaid expenses | 7,269 | — | 7,269 | 56,101 |
| Other assets | 33,605 | — | 33,605 | — |
| Restricted assets: | | | | |
| Cash and cash equivalents in commercial banks and U.S. Treasury | 692,637 | — | 692,637 | 828,368 |
| Cash and cash equivalents in governmental banks | 1,896,060 | — | 1,896,060 | 797,044 |
| Investments and other restricted assets | — | 33,473 | 33,473 | 6,787,159 |
| Long-term investments | — | — | — | 1,470,098 |
| Long-term receivables from: | | | | |
| Loans | — | — | — | 123,683 |
| Interest-bearing deposits with other banks | — | — | — | 6,659 |
| Long-term amounts due from: | | | | |
| Primary government | — | — | — | 92,754 |
| Component units | — | 180,450 | 180,450 | 17,303 |
| Other governmental entities | — | — | — | 32,663 |
| Other | — | — | — | 531 |
| Real estate held for sale | 48,705 | — | 48,705 | 212,097 |
| Deferred expenses and other assets | 179,651 | 42,070 | 221,721 | 453,430 |
| Capital assets (net of accumulated depreciation): | | | | |
| Land and other nondepreciable assets | 2,230,266 | — | 2,230,266 | 8,774,212 |
| Depreciable assets | 4,952,912 | 1,008 | 4,953,920 | 17,836,723 |
| Total assets | $   13,665,476 | 1,196,896 | 14,862,372 | 52,981,503 |

See accompanying notes to basic financial statements.

(Continued)

PR-CCD-0006977

COMMONWEALTH OF PUERTO RICO

Statement of Net Assets (Deficit)

June 30, 2006

(In thousands)

| | Primary Government | | | |
| | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---:|---:|---:|---:|
| **Liabilities:** | | | | |
| Accounts payable and accrued liabilities | $ 2,051,175 | 6,569 | 2,057,744 | 2,315,969 |
| Deposits and escrow liabilities | — | — | — | 6,645,956 |
| Tax refunds payable | 264,289 | — | 264,289 | — |
| Due to: | | | | |
| Primary government | — | — | — | 126,402 |
| Component units | 258,251 | — | 258,251 | 656,136 |
| Other governmental entities | 19,103 | — | 19,103 | 37,610 |
| Securities lending transactions | | | | |
| and reverse repurchase agreements | — | — | — | 792,844 |
| Interest payable | 535,336 | — | 535,336 | 542,251 |
| Deferred revenue | 124,633 | 30,786 | 155,419 | 126,555 |
| Tax revenue anticipation notes payable | 1,050,037 | — | 1,050,037 | — |
| Due to primary government – long-term portion | — | — | — | 187,048 |
| Due to component units – long-term portion | — | — | — | 1,731,685 |
| Deferred revenue – long-term portion | — | — | — | 23,385 |
| Insurance benefits payable | — | 70,973 | 70,973 | — |
| Liability for automobile accident insurance | | | | |
| and workers' compensation claims | — | — | — | 811,310 |
| Liabilities payable within one year: | | | | |
| Commonwealth appropriation bonds | 84,190 | — | 84,190 | 4,031 |
| Bonds | 253,559 | — | 253,559 | 777,337 |
| Notes | 625,373 | — | 625,373 | 1,557,936 |
| Capital leases | 4,476 | — | 4,476 | — |
| Compensated absences | 962,323 | 3,857 | 966,180 | 232,701 |
| Lottery prizes | — | 37,488 | 37,488 | — |
| Other long-term liabilities | 145,962 | — | 145,962 | 152,254 |
| Liabilities payable after one year: | | | | |
| Commonwealth appropriation bonds | 2,558,004 | — | 2,558,004 | 1,021,097 |
| Bonds | 12,125,648 | — | 12,125,648 | 18,733,632 |
| Notes | 3,194,405 | — | 3,194,405 | 2,764,437 |
| Capital leases | 140,025 | — | 140,025 | — |
| Net pension obligation | 4,740,806 | — | 4,740,806 | — |
| Compensated absences | 721,630 | 3,508 | 725,138 | 324,783 |
| Lottery prizes | — | 266,215 | 266,215 | — |
| Other long-term liabilities | 1,015,814 | — | 1,015,814 | 331,520 |
| Total liabilities | $ 30,875,039 | 419,396 | 31,294,435 | 39,896,879 |
| **Net assets (deficit):** | | | | |
| Invested in capital assets, net of related debt | $ 3,485,882 | 1,008 | 3,486,890 | 10,815,299 |
| Restricted for: | | | | |
| Trust – nonexpendable | — | — | — | 1,387,419 |
| Capital projects | — | 247,741 | 247,741 | 653,115 |
| Debt service | 192,490 | — | 192,490 | 909,008 |
| Payment of unemployment and related benefits | — | 699,766 | 699,766 | — |
| Affordable housing and related loan insurance programs | 87,588 | — | 87,588 | 781,131 |
| Student loans and other educational purposes | — | — | — | 17,321 |
| Other | — | — | — | 150,790 |
| Unrestricted (deficit) | (20,975,523) | (171,015) | (21,146,538) | (1,629,459) |
| Total net assets (deficit) | $ (17,209,563) | 777,500 | (16,432,063) | 13,084,624 |

See accompanying notes to basic financial statements.

22

**COMMONWEALTH OF PUERTO RICO**
Statement of Activities
Year ended June 30, 2006
(In thousands)

| Functions | Expenses | Program revenue — Charges for services | Program revenue — Operating grants and contributions | Program revenue — Capital grants and contributions | Net (Expense) Revenue and Changes in Net Assets — Primary Government — Governmental activities | Net (Expense) Revenue and Changes in Net Assets — Primary Government — Business-type activities | Net (Expense) Revenue and Changes in Net Assets — Primary Government — Total | Component units |
|---|---|---|---|---|---|---|---|---|
| **Primary government:** | | | | | | | | |
| **Governmental activities:** | | | | | | | | |
| Current: | | | | | | | | |
| General government | $ 2,844,494 | 576,791 | 242,300 | — | (2,025,403) | — | (2,025,403) | — |
| Public safety | 2,217,294 | 58,234 | 92,550 | 4,546 | (2,061,914) | — | (2,061,914) | — |
| Health | 1,422,813 | 105,264 | 654,586 | 50 | (662,913) | — | (662,913) | — |
| Public housing and welfare | 3,287,559 | 29,534 | 2,357,917 | 96,020 | (804,088) | — | (804,088) | — |
| Education | 4,110,669 | 2,423 | 596,766 | 374 | (3,511,106) | — | (3,511,106) | — |
| Economic development | 564,447 | 55,948 | 21,592 | — | (486,887) | — | (486,887) | — |
| Intergovernmental | 440,390 | 729 | — | — | (439,661) | — | (439,661) | — |
| Interest and other | 882,163 | — | — | — | (882,163) | — | (882,163) | — |
| Total governmental activities | 15,769,829 | 828,993 | 4,365,711 | 100,990 | (10,474,135) | — | (10,474,135) | — |
| **Business-type activities:** | | | | | | | | |
| Lotteries | 670,425 | 868,347 | — | — | — | 197,922 | 197,922 | — |
| Unemployment | 207,483 | 251,254 | 35,418 | — | — | 43,771 | 43,771 | — |
| Other | 25,043 | 29,825 | 24,195 | — | — | 64,395 | 64,395 | — |
| Total business-type activities | 902,951 | 1,149,426 | 59,613 | — | — | 306,088 | 306,088 | — |
| Total primary government | $ 16,672,780 | 1,978,419 | 4,425,324 | 100,990 | (10,474,135) | 306,088 | (10,168,047) | — |
| **Component units:** | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 688,830 | 593,004 | — | 156,365 | — | — | — | 60,539 |
| Puerto Rico Highway and Transportation Authority | 904,973 | 245,109 | — | 83,788 | — | — | — | (576,096) |
| Puerto Rico Electric Power Authority | 3,780,539 | 3,716,082 | — | — | — | — | — | (64,457) |
| Puerto Rico Aqueduct and Sewer Authority | 841,300 | 469,939 | 8,719 | — | — | — | — | (362,572) |
| Puerto Rico Infrastructure Financing Authority | 126,469 | — | — | — | — | — | — | (126,469) |
| Puerto Rico Health Insurance Administration | 1,561,451 | 452,965 | — | — | — | — | — | (1,108,486) |
| University of Puerto Rico | 1,237,194 | 166,023 | 238,149 | — | — | — | — | (833,022) |
| Other component units | 2,485,772 | 1,829,229 | 37,742 | 24,254 | — | — | — | (594,547) |
| Total component units | $ 11,626,528 | 7,472,351 | 284,610 | 264,317 | | | | (3,605,110) |
| **General revenue:** | | | | | | | | |
| Taxes: | | | | | | | | |
| Income taxes | | | | | $ 6,255,391 | — | 6,255,391 | — |
| Excise taxes | | | | | 2,013,998 | — | 2,013,998 | 363,091 |
| Other taxes | | | | | 15,145 | — | 15,145 | — |
| Revenue from global tobacco settlement agreement | | | | | 66,796 | — | 66,796 | — |
| Revenue from Tourism Company of Puerto Rico | | | | | 23,200 | — | 23,200 | — |
| Revenue from Governing Board of 9-1-1 Services | | | | | 8,828 | — | 8,828 | — |
| Revenue from State Insurance Fund Corporation | | | | | 36,717 | — | 36,717 | — |
| Grants and contributions not restricted to specific programs | | | | | 196,721 | — | 196,721 | 77,912 |
| Special Item–Defeased QZAB bonds | | | | | (2,485) | — | (2,485) | — |
| Payments from primary government | | | | | — | — | — | 2,427,161 |
| Unrestricted investment earnings | | | | | 117,080 | 33,165 | 150,245 | 79,773 |
| Gain on sale of assets | | | | | 19,588 | — | 19,588 | 8,737 |
| Other | | | | | 203,525 | — | 203,525 | 20,346 |
| Transfers | | | | | 242,642 | (242,642) | — | — |
| Total general revenue and transfers | | | | | 9,197,146 | (209,477) | 8,987,669 | 2,977,020 |
| Change in net assets | | | | | (1,276,989) | 96,611 | (1,180,378) | (628,090) |
| Net assets – beginning of year (as restated) | | | | | (15,932,574) | 680,889 | (15,251,685) | 13,712,714 |
| Net assets – end of year | | | | | $ (17,209,563) | 777,500 | (16,432,063) | 13,084,624 |

See accompanying notes to basic financial statements.

23

PR-CCD-0006979

COMMONWEALTH OF PUERTO RICO

Balance Sheet – Governmental Funds

June 30, 2006

(In thousands)

| Assets | General | Debt service | PRA capital projects | The Children's Trust special revenue | Other governmental | Totals governmental |
|---|---|---|---|---|---|---|
| Cash and cash equivalents in commercial banks | $ 36,017 | — | 48,742 | — | 437,297 | 522,056 |
| Cash and cash equivalents in governmental banks | 67,943 | 421,172 | 7,922 | 96,336 | 442,618 | 1,035,991 |
| Investments | — | — | — | 73,716 | 114,453 | 188,169 |
| Receivables, net of allowance for uncollectibles: | | | | | | |
| Taxes | 1,193,211 | 16,750 | — | — | — | 1,209,961 |
| Intergovernmental | 300,104 | — | — | — | — | 300,104 |
| Accounts | 81,424 | — | — | — | 13,035 | 94,459 |
| Loans | 6,754 | — | — | — | 36 | 6,790 |
| Accrued interest | 10,114 | 1,676 | — | 162 | 469 | 12,421 |
| Other | 8,330 | — | — | — | — | 8,330 |
| Due from: | | | | | | |
| Other funds | 433,039 | — | — | — | 156,142 | 589,181 |
| Component units | 83,209 | — | — | — | 42,186 | 125,395 |
| Other governmental entities | — | — | — | — | 13,866 | 13,866 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 692,621 | — | — | — | 16 | 692,637 |
| Cash and cash equivalents in governmental banks | 1,896,060 | — | — | — | — | 1,896,060 |
| Other assets | 33,605 | — | — | — | — | 33,605 |
| Real estate held for future development | 32,466 | — | — | — | 16,239 | 48,705 |
| Total assets | $ 4,874,897 | 439,598 | 56,664 | 170,214 | 1,236,357 | 6,777,730 |

See accompanying notes to basic financial statements.

24

PR-CCD-0006980

**COMMONWEALTH OF PUERTO RICO**

Balance Sheet – Governmental Funds

June 30, 2005

(In thousands)

| Liabilities and Fund Balances | General | Debt service | PBA capital projects | The Children's Trust special revenue | Other governmental | Totals governmental |
|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $ 1,916,682 | 10,236 | 88,690 | 4,102 | 63,788 | 2,083,498 |
| Tax refunds payable | 264,289 | — | — | — | — | 264,289 |
| Due to: | | | | | | |
| Other funds | 232,325 | — | — | — | 373,385 | 605,710 |
| Other governmental entities | 19,103 | — | — | — | — | 19,103 |
| Component units | 244,570 | — | — | — | 13,681 | 258,251 |
| Notes payable | 495,446 | — | — | — | 30,598 | 526,044 |
| Bonds payable | — | 199,186 | — | — | 69,935 | 269,121 |
| Interest payable | 47,818 | 181,417 | — | — | 73,122 | 302,357 |
| Deferred revenues | 988,382 | — | — | — | — | 988,382 |
| Tax revenue anticipation notes | 1,050,037 | — | — | — | — | 1,050,037 |
| Total liabilities | 5,258,652 | 390,839 | 88,690 | 4,102 | 624,509 | 6,366,792 |
| **Fund balances (deficit):** | | | | | | |
| Reserved for: | | | | | | |
| Encumbrances | 611,419 | — | — | — | 24,587 | 636,006 |
| Debt service | — | 48,759 | — | — | — | 48,759 |
| Assets in liquidation | 71,621 | — | — | — | — | 71,621 |
| Inventories | — | — | — | — | — | |
| Long-term receivables | — | — | — | — | — | |
| Low income housing assistance | 87,588 | — | — | — | — | 87,588 |
| Other specified purposes | — | — | — | — | — | |
| Unreserved (deficit): | | | | | | |
| General fund | (1,154,383) | — | — | — | — | (1,154,383) |
| Debt service funds | — | — | — | — | 143,732 | 143,732 |
| Special revenue funds | — | — | — | 166,112 | 192,340 | 358,452 |
| Capital projects funds | — | — | (32,026) | — | 251,189 | 219,163 |
| Total fund balances (deficit) | (383,755) | 48,759 | (32,026) | 166,112 | 611,848 | 410,938 |
| Total liabilities and fund balances (deficit) | $ 4,874,897 | 439,598 | 56,664 | 170,214 | 1,236,357 | 6,777,730 |

See accompanying notes to basic financial statements.

25

PR-CCD-0006981

## COMMONWEALTH OF PUERTO RICO

Reconciliation of the Balance Sheet to the Statement of Net Assets
Governmental Funds

Year ended June 30, 2006

(In thousands)

Amounts reported for governmental activities in the statement of net assets
are different because:

| | |
|---|---:|
| Total fund balances of governmental funds | $ 410,938 |
| Inventories and prepaid expenses that are not available to pay for current period expenditures and therefore are not recognized in the funds | 30,759 |
| Capital assets used in governmental activities are not financial resources and therefore are not reported in the funds | 7,183,178 |
| Long-term account receivable from Global tobacco settlement agreement and PBA | 99,870 |
| Deferred revenue in governmental funds that are recognized as revenue in the governmental activities | 863,747 |
| Debt issued by the Commonwealth have associated costs that are paid from current available resources in the funds. However, these costs are deferred on the statement of net assets | 172,366 |
| Net pension asset of the Puerto Rico Judiciary Retirement System recognized in governmental activities is not a financial resource and therefore is not reported in the funds | 7,285 |
| Liabilities, including Commonwealth accounts payable $32,323, appropriation bonds ($2,642,194), bonds payable ($12,110,086), notes payable ($3,293,734), capital leases payable ($144,501), compensated absences ($1,683,953), net pension obligation ($4,740,806), and other long-term liabilities ($1,161,776) are not due and payable in the current period and therefore are not reported in the funds | (25,744,727) |
| Interest liabilities are not due and payable in the current period and therefore are not reported in the funds | (232,979) |
| Deficit of governmental activities | $ (17,209,563) |

See accompanying notes to basic financial statements.

26

PR-CCD-0006982

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenditures, and Changes in Fund Balances -
Governmental Funds

Year ended June 30, 2006

(In thousands)

| | General | Debt service | PBA capital projects | The Children's Trust special revenue | Other governmental | Totals governmental |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $ 6,181,995 | — | — | — | — | 6,181,995 |
| Excise taxes | 2,013,998 | — | — | — | — | 2,013,998 |
| Other taxes | 15,145 | — | — | — | — | 15,145 |
| Charges for services | 828,993 | — | — | — | — | 828,993 |
| Revenue from global tobacco settlement agreement | — | — | — | — | 65,602 | 65,602 |
| Revenues from component units: | | | | | | |
| Governing Board of 9-1-1 Services | 8,828 | — | — | — | — | 8,828 |
| Tourism Company of Puerto Rico | 23,200 | — | — | — | — | 23,200 |
| State Insurance Fund Corporation | 36,717 | — | — | — | — | 36,717 |
| Intergovernmental | 4,522,786 | 118,326 | — | — | 22,310 | 4,663,422 |
| Proceeds from sale of capital assets | 15,943 | — | — | — | — | 15,943 |
| Interest and investment earnings | 97,929 | 2,046 | — | 4,590 | 12,515 | 117,080 |
| Other | 167,526 | — | — | — | 16,775 | 184,301 |
| Total revenue | 13,913,060 | 120,372 | — | 4,590 | 117,202 | 14,155,224 |
| **Expenditures:** | | | | | | |
| Current: | | | | | | |
| General government | 2,334,326 | — | — | — | 154,767 | 2,489,093 |
| Public safety | 2,107,355 | — | — | — | 797 | 2,108,152 |
| Health | 1,421,328 | — | — | 2,572 | 5,988 | 1,429,888 |
| Public housing and welfare | 3,119,011 | — | — | — | 11,362 | 3,130,373 |
| Education | 4,091,772 | — | — | 10,208 | — | 4,101,980 |
| Economic development | 465,875 | — | — | 1,959 | 48,610 | 516,444 |
| Intergovernmental | 408,039 | — | — | — | 1,688 | 409,727 |
| Capital outlays | 261,992 | — | 175,536 | — | 64,820 | 502,348 |
| Debt service: | | | | | | |
| Principal | 168,360 | 199,186 | — | — | 78,735 | 446,281 |
| Interest and other | 274,827 | 364,579 | — | 383 | 181,073 | 820,862 |
| Debt issuance costs | — | 1,372 | — | — | — | 1,372 |
| Total expenditures | 14,652,885 | 565,137 | 175,536 | 15,122 | 547,840 | 15,956,520 |
| Excess of expenditures over revenue | (739,825) | (444,765) | (175,536) | (10,532) | (430,638) | (1,801,296) |
| **Other financing sources (uses):** | | | | | | |
| Transfers in | 607,039 | 484,368 | 38,002 | 391 | 293,440 | 1,423,240 |
| Transfers out | (1,046,651) | (100,000) | — | (26,688) | (7,259) | (1,180,598) |
| Long-term debt issued | 1,295,239 | 101,695 | — | — | 121,421 | 1,518,355 |
| Bond issue discount | — | (323) | — | — | — | (323) |
| Special item | — | — | — | 54,135 | — | 54,135 |
| Capital leases | 4,580 | — | — | — | — | 4,580 |
| Total other financing sources | 860,207 | 485,740 | 38,002 | 27,838 | 407,602 | 1,819,389 |
| Net change in fund balances | 120,382 | 40,975 | (137,534) | 17,306 | (23,036) | 18,093 |
| Fund balances (deficit) at beginning of year (as restated) | (504,137) | 7,784 | 105,508 | 148,806 | 634,884 | 392,845 |
| Fund balances (deficit) at end of year | $ (383,755) | 48,759 | (32,026) | 166,112 | 611,848 | 410,938 |

See accompanying notes to basic financial statements.

27

PR-CCD-0006983

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances
to the Statement of Activities – Governmental Funds

Year ended June 30, 2006

(In thousands)

|  |  |  |
|---|---|---|
| Amounts reported for governmental activities in the statement of activities<br>are different because: |  |  |
| Net change in fund balances – total governmental funds | $ | 18,093 |
| Governmental funds report capital outlays as expenditures. However,<br>in the statement of activities, the cost of those assets is allocated over<br>their estimated useful lives as depreciation expense. This is the amount<br>by which capital outlays ($502,348) exceeded depreciation ($222,794)<br>in the current period. |  | 279,554 |
| Impairment of capital assets are expensed in the statement of activities, but not reported in the<br>governmental funds as such impairment does not requires the use of current financial resources. |  | (62,895) |
| In the statement of activities, only the gain on the sale of capital assets are reported,<br>whereas in the governmental funds, the proceeds from the sale increase financial resources.<br>Therefore, the change in the net assets differs from the change in fund balance<br>by the cost of the asset sold. |  | (20,643) |
| Revenue in the statement of activities that do not provide current financial<br>resources are not reported as revenue in the governmental funds. |  | 7,404 |
| Debt proceeds provide current financial resources to governmental funds,<br>but issuing debt increases long-term liabilities in the statement of net assets.<br>Repayment of debt principal is an expenditure in the governmental funds,<br>but the repayment reduces long-term liabilities in the statement of net assets.<br>This is the amount by which net proceeds ($1,522,612) exceeded repayments ($446,281). |  | (1,076,331) |
| Repayments of advances from a component unit provided current financial resources to<br>governmental funds, but reduced the liability to component units in the statement of net assets. |  | 13,050 |
| Income tax revenue that are not currently available are deferred in the<br>governmental funds, but are accruable as revenue in the statement of activities.<br>This is the amount by which deferred revenue increased during the year. |  | 3,396 |
| Governmental funds do not report transfers of long-term assets or liabilities<br>because such transfers do not represent financial resources; however, they are<br>recorded in the statement of activities. This amount represents the transfer<br>of property by the Commonwealth to certain municipalities (see note 12). |  | (78,958) |
| Generally, inventory and prepayments are recorded as expenditures in the<br>governmental funds when purchased rather than capitalized as an asset.<br>However, these assets are capitalized in the statement of net assets. This is the<br>sum of the decrease in inventory ($0) and net pension asset ($2,826) for the year. |  | (2,826) |
| Debt issuance costs are expenditures to governmental funds, but are deferred assets in the<br>statement of net assets. This is the amount of debt issue costs for the year. |  | 1,372 |
| Certain interest and other costs reported in the statement of activities do not<br>require the use of current financial resources and therefore are not reported as<br>expenditures in the governmental funds. This is the amount equivalent to the<br>increase in interest payable ($7,060), combined with the amortization of debt<br>issue costs ($18,107), and the net accretion and amortization of debt issue<br>discount and deferred losses ($61,910). |  | (87,078) |
| Some expenses reported in the statement of activities do not require the use of<br>current financial resources and therefore are not reported as expenditures<br>in the governmental funds. This is the amount by which the net increases in<br>net pension obligation ($261,011), accrued compensated absences ($214,607),<br>and other liabilities ($54,060) exceeded the net decreases in Christmas bonus liability ($64,971),<br>liability in federal cost disallowances ($70,321), and liability for legal claims and judgments ($125,819). |  | (214,507) |
| Effect of reversal of QZAB defeasance is reported as an expense in the statement of activities<br>but not reported in the governmental funds. |  | (56,620) |
| Change in deficit of governmental activities | $ | (1,276,989) |

See accompanying notes to basic financial statements.

28

PR-CCD-0006984

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue and Expenditures – Budget and Actual –
Budget Basis – General Fund

Year ended June 30, 2006

(In thousands)

| | Original budget | Amended budget | Actual | Variance |
|---|---|---|---|---|
| Revenue: | | | | |
| Income taxes | $ 5,969,000 | 6,198,000 | 5,989,906 | (208,094) |
| Excise taxes | 2,210,000 | 2,084,000 | 1,966,986 | (117,014) |
| Other taxes | 112,000 | 106,000 | 101,882 | (4,118) |
| Charge for services | 231,000 | 253,000 | 228,663 | (24,337) |
| Intergovernmental | 26,000 | 20,000 | 9,553 | (10,447) |
| Revenue from component units | 20,000 | 20,000 | 23,167 | 3,167 |
| Other | 131,000 | 107,000 | 103,140 | (3,860) |
| Total revenue | 8,699,000 | 8,788,000 | 8,423,297 | (364,703) |
| Expenditures: | | | | |
| Current: | | | | |
| General government | 454,364 | 458,607 | 507,050 | (48,443) |
| Public safety | 1,927,738 | 2,036,528 | 2,109,969 | (73,441) |
| Health | 1,399,675 | 1,600,416 | 1,662,309 | (61,893) |
| Public housing and welfare | 458,402 | 458,052 | 481,600 | (23,548) |
| Education | 3,109,607 | 3,443,028 | 3,580,049 | (137,021) |
| Economic development | 475,204 | 481,930 | 492,779 | (10,849) |
| Intergovernmental | 384,321 | 384,376 | 416,949 | (32,573) |
| Debt service: | | | | |
| Principal | 78,365 | 78,365 | 78,365 | — |
| Interest and other | 131,689 | 131,689 | 131,689 | — |
| Total expenditures | 8,419,365 | 9,072,991 | 9,460,759 | (387,768) |
| Excess (deficiency) of revenue over (under) expenditures | 279,635 | (284,991) | (1,037,462) | (752,471) |
| Other financing sources (uses): | | | | |
| Notes payable issued | 100,000 | 1,064,726 | 1,344,897 | 280,171 |
| Transfer in | 146,000 | 157,000 | 167,941 | 10,941 |
| Transfer out | (525,635) | (936,735) | (936,617) | 118 |
| Total other financing sources (uses) | (279,635) | 284,991 | 576,221 | 291,230 |
| Excess (deficiency) of revenue and other sources over (under) expenditures and other uses | $ — | — | (461,241) | (461,241) |

See accompanying notes to basic financial statements.

29

PR-CCD-0006985

Case:17-03283-LTS Doc#:478-22 Filed:02/24/18 Entered:02/24/18 20:19:25 Desc:
Exhibit 20 (PG Part 2) Page 793 of 1000

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Assets – Proprietary Funds

June 30, 2006

(In thousands)

| Assets | | Unemployment insurance | Lotteries | Other proprietary | Totals |
|---|---|---|---|---|---|
| Current assets: | | | | | |
| Cash and cash equivalents in commercial banks and U.S. Treasury | $ | — | 49,434 | 37,757 | 87,191 |
| Cash and cash equivalents in governmental banks | | 535,651 | 71,775 | 139,623 | 747,049 |
| Receivables, net: | | | | | |
| Insurance premiums, net | | 56,766 | — | 8,034 | 64,800 |
| Component units | | — | — | 7,605 | 7,605 |
| Due from other funds | | 23,010 | 53,175 | — | 76,185 |
| Accrued interest | | 566 | — | 2,287 | 2,853 |
| Other | | 8,769 | 4,555 | 542 | 13,866 |
| Investments: | | | | | |
| Restricted investments | | — | — | 33,473 | 33,473 |
| Total current assets | | 624,762 | 178,939 | 229,321 | 1,033,022 |
| Noncurrent assets: | | | | | |
| Loans receivable, excluding current portion, net: | | | | | |
| Component units | | — | — | 180,450 | 180,450 |
| Intergovernmental | | — | — | 1,819 | 1,819 |
| Capital assets, net | | — | 1,008 | — | 1,008 |
| Other | | — | 40,251 | — | 40,251 |
| Total assets | $ | 624,762 | 220,198 | 411,590 | 1,256,550 |
| **Liabilities and Net Assets (Deficit)** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable and accrued liabilities | $ | — | 3,585 | 2,984 | 6,569 |
| Due to other funds | | — | 59,654 | — | 59,654 |
| Deferred revenue | | 11,745 | 19,015 | 26 | 30,786 |
| Compensated absences | | — | 2,338 | 1,519 | 3,857 |
| Lottery awards | | — | 37,488 | — | 37,488 |
| Insurance benefits payable | | 69,833 | — | 1,140 | 70,973 |
| Total current liabilities | | 81,578 | 122,080 | 5,669 | 209,327 |
| Noncurrent liabilities: | | | | | |
| Compensated absences | | — | 1,910 | 1,598 | 3,508 |
| Lottery awards | | — | 266,215 | — | 266,215 |
| Total liabilities | $ | 81,578 | 390,205 | 7,267 | 479,050 |
| Net assets: | | | | | |
| Invested in capital assets | $ | — | 1,008 | | 1,008 |
| Restricted for: | | | | | |
| Payment of insurance benefits | | 543,184 | — | 156,582 | 699,766 |
| Capital projects | | — | — | 247,741 | 247,741 |
| Unrestricted | | — | (171,015) | — | (171,015) |
| Total net assets (deficit) | $ | 543,184 | (170,007) | 404,323 | 777,500 |

See accompanying notes to basic financial statements.

PR-CCD-0006986

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenses, and Changes in Net Assets –
Proprietary Funds

Year ended June 30, 2006

(In thousands)

| | Unemployment insurance | Lotteries | Other proprietary | Totals |
|---|---|---|---|---|
| Operating revenues: | | | | |
| Lottery ticket sales | $ — | 868,295 | — | 868,295 |
| Insurance premiums | 251,254 | — | 24,099 | 275,353 |
| Interest | — | — | 5,726 | 5,726 |
| Other | — | 52 | — | 52 |
| Total operating revenues | 251,254 | 868,347 | 29,825 | 1,149,426 |
| Operating expenses: | | | | |
| Lottery awards | — | 532,793 | — | 532,793 |
| Insurance benefits | 207,483 | — | 4,277 | 211,760 |
| General, administrative, and other operating expenses | — | 137,244 | 20,766 | 158,010 |
| Depreciation and amortization | — | 388 | — | 388 |
| Total operating expenses | 207,483 | 670,425 | 25,043 | 902,951 |
| Operating income | 43,771 | 197,922 | 4,782 | 246,475 |
| Nonoperating revenue: | | | | |
| Contributions from federal government | 35,418 | — | 24,195 | 59,613 |
| Interest and investment earnings | 25,892 | 6,380 | 893 | 33,165 |
| Total nonoperating revenue | 61,310 | 6,380 | 25,088 | 92,778 |
| Income before transfers | 105,081 | 204,302 | 29,870 | 339,253 |
| Transfers from general fund | 204,330 | 21,318 | 4,802 | 230,450 |
| Transfers to general fund | (268,790) | (204,302) | — | (473,092) |
| Net change in net assets | 40,621 | 21,318 | 34,672 | 96,611 |
| Net assets (deficit) at beginning of year as restated | 502,563 | (191,325) | 369,651 | 680,889 |
| Net assets (deficit) at end of year | $ 543,184 | (170,007) | 404,323 | 777,500 |

See accompanying notes to basic financial statements.

31

PR-CCD-0006987

**COMMONWEALTH OF PUERTO RICO**

Statement of Cash Flows

Proprietary Funds

Year ended June 30, 2006

(In thousands)

| | | Unemployment insurance | Lotteries | Other proprietary | Totals |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Receipts from customers and users | $ | 250,923 | 865,952 | 21,025 | 1,137,900 |
| Other receipts | | — | 52 | 15,248 | 15,300 |
| Payments to suppliers and employees | | 3,242 | (146,000) | (20,601) | (163,359) |
| Payment of lottery prizes | | — | (558,199) | — | (558,199) |
| Payments of insurance benefits | | (207,483) | — | (4,332) | (211,815) |
| Other payments | | — | — | (43,759) | (43,759) |
| Net cash provided by (used in) operating activities | | 46,682 | 161,805 | (32,419) | 176,068 |
| Cash flows from noncapital financing activities: | | | | | |
| Intergovernmental grants and contributions | | 35,418 | — | 24,107 | 59,525 |
| Principal payments of notes payable | | — | (520) | — | (520) |
| Transfers from other funds | | 175,531 | — | 4,802 | 180,333 |
| Transfers to other funds | | (268,790) | (159,791) | — | (428,581) |
| Net cash provided by (used in) noncapital financing activities | | (57,841) | (160,311) | 28,909 | (189,243) |
| Cash flows from capital and related financing activities: | | | | | |
| Capital expenditures | | — | (29) | — | (29) |
| Net cash used in capital and related financing activities | | — | (29) | — | (29) |
| Cash flows from investing activities: | | | | | |
| Interest received on deposits and investments | | 25,905 | 6,380 | 1,391 | 33,676 |
| Net cash provided by investing activities | | 25,905 | 6,380 | 1,391 | 33,676 |
| Net increase (decrease) in cash and cash equivalents | | 14,746 | 7,845 | (2,119) | 20,472 |
| Cash and equivalents at beginning of year | | 520,905 | 113,364 | 179,499 | 813,768 |
| Cash and cash equivalents at end of year | $ | 535,651 | 121,209 | 177,380 | 834,240 |
| Reconciliation of operating income to net cash provided by (used in) operating activities: | | | | | |
| Operating income | $ | 43,771 | 197,922 | 4,782 | 246,475 |
| Adjustments to reconcile operating income to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | | — | 388 | — | 388 |
| Interests earned on deposits loans and investments | | — | — | (371) | (371) |
| Changes in operating assets and liabilities: | | | | | |
| Increase in accounts and loans receivable | | (331) | (2,343) | (35,564) | (38,238) |
| Decrease in obligation for unpaid lottery awards | | — | (25,405) | — | (25,405) |
| Decrease in due to other funds | | — | (9,514) | — | (9,514) |
| Increase (decrease) in deferred revenues | | 3,242 | 1,911 | (3) | 5,150 |
| Increase (decrease) in compensated absences | | — | (589) | 1,451 | 862 |
| Decrease in liability for insurance benefits payable | | — | — | (407) | (407) |
| Decrease in accounts payable and accrued liabilities | | — | (243) | (2,307) | (2,550) |
| Decrease in other assets | | — | (322) | — | (322) |
| Total adjustments | | 2,911 | (36,117) | (37,201) | (70,407) |
| Net cash provided by (used in) operating activities | $ | 46,682 | 161,805 | (32,419) | 176,068 |

See accompanying notes to basic financial statements.

32

**COMMONWEALTH OF PUERTO RICO**

Statement of Fiduciary Net Assets

June 30, 2006

(In thousands)

| Assets | | Pension trust | Special deposits – agency |
|---|---|---|---|
| Cash and cash equivalents in commercial banks and U.S. Treasury: | | | |
| Unrestricted | $ | 82,963 | 583,196 |
| Restricted | | 1,717 | — |
| Cash and cash equivalents in governmental banks: | | | |
| Unrestricted | | 28,951 | 46,984 |
| Restricted | | 2,156 | — |
| Investments: | | | |
| Debt and equity securities, at fair value | | 3,957,755 | 27,013 |
| Investment in PRTA Holdings, at appraised value | | 495,318 | — |
| Other | | 87,824 | — |
| Receivables, net: | | | |
| Accounts | | 44,622 | — |
| Loans and advances | | 881,159 | — |
| Accrued interest and dividends | | 32,726 | — |
| Due from general fund | | 10,401 | — |
| Other | | 51,280 | — |
| Capital assets, net | | 33,359 | — |
| Other assets | | 8,283 | — |
| Total assets | | 5,718,514 | 657,193 |
| **Liabilities** | | | |
| Accounts payable and accrued liabilities | | 77,938 | 657,193 |
| Repurchase agreements | | 139,074 | — |
| Due to component unit | | 4 | — |
| Other liabilities | | 60,000 | — |
| Bonds payable | | 20,430 | — |
| Total liabilities | | 297,446 | 657,193 |
| **Net Assets** | | | |
| Net assets held in trust for pension and other benefits | $ | 5,421,068 | — |

See accompanying notes to basic financial statements.

PR-CCD-0006989

**COMMONWEALTH OF PUERTO RICO**

Statement of Changes in Fiduciary Net Assets – Pension Trust Funds

Year ended June 30, 2006

(In thousands)

| | | |
|---|---|---:|
| Additions: | | |
| Contributions: | | |
| Sponsor | $ | 524,298 |
| Participants | | 475,130 |
| Special | | 77,750 |
| Total contributions | | 1,077,178 |
| Interest and investment income: | | |
| Interest | | 122,605 |
| Dividends | | 64,827 |
| Net change in fair value of investments | | 453,515 |
| Investment expenses | | (16,194) |
| Net interest and investment income | | 624,753 |
| Other income | | 36,355 |
| Total additions | | 1,738,286 |
| Deductions: | | |
| Pension and other benefits | | 1,191,980 |
| Refunds of contributions | | 26,508 |
| General and administrative | | 57,537 |
| Total deductions | | 1,276,025 |
| Net change in net assets held in trust for pension and other benefits | | 462,261 |
| Net assets held in trust for pension and other benefits: | | |
| Beginning of year | | 4,958,807 |
| End of year | $ | 5,421,068 |

See accompanying notes to basic financial statements.

34

PR-CCD-0006990

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Assets —
Major Component Units

June 30, 2006

(In thousands)

| Assets | Government Development Bank for Puerto Rico | Puerto Rico Highway and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Infrastructure Financing Authority | Puerto Rico Health Insurance Administration | University of Puerto Rico | Total nonmajor component units | Total component units |
|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | |
| **Current assets:** | | | | | | | | | |
| Cash and cash equivalents | $ 2,479,515 | 73,093 | 18,614 | 7,764 | — | 44,095 | 45,916 | 119,855 | 2,788,852 |
| Cash and cash equivalents in governmental banks | — | — | — | 65,374 | 49,892 | 34,676 | 46,923 | 438,785 | 635,650 |
| Investments, including collateral from securities lending transactions | 821,945 | — | — | — | — | — | — | 1,652,532 | 2,474,477 |
| **Receivables, net:** | | | | | | | | | |
| Insurance premiums | — | — | — | — | — | — | — | 109,780 | 109,780 |
| Intergovernmental | — | — | — | 10,661 | — | — | 28,415 | 1,925 | 41,001 |
| Accounts | — | 3,791 | 549,048 | 44,111 | — | — | 14,182 | 176,283 | 787,415 |
| Loans and advances | 4,955,136 | — | — | — | — | — | — | 53,876 | 5,009,012 |
| Accrued interest | 292,392 | — | 3,449 | — | 934 | 136 | — | 35,332 | 352,243 |
| Other governmental entities | — | — | 88,656 | 40,756 | 5,436 | 7,150 | 17,699 | 41,992 | 201,089 |
| Other | — | — | — | 3,594 | 34,226 | 3,629 | 1,821 | 73,022 | 116,292 |
| **Due from:** | | | | | | | | | |
| Primary government | — | — | 133,608 | — | — | 23,857 | 50,134 | 72,549 | 280,148 |
| Component units | 2,313,577 | — | 25,844 | — | — | — | 18,030 | 21,141 | 2,378,592 |
| Inventories | — | — | 277,802 | 13,745 | — | — | 7,115 | 39,465 | 338,127 |
| Prepaids | — | 5,294 | 5,406 | 1,905 | 591 | 18 | 32,284 | 10,603 | 56,101 |
| Total current assets | 10,862,565 | 82,178 | 1,102,427 | 187,910 | 91,079 | 113,561 | 261,919 | 2,847,140 | 15,548,779 |
| **Noncurrent assets:** | | | | | | | | | |
| **Restricted assets:** | | | | | | | | | |
| Cash and cash equivalents | 52,675 | 4,099 | 337,744 | 150 | 90,958 | — | 15,766 | 326,976 | 828,368 |
| Cash and cash equivalents in governmental banks | — | 30,438 | — | 32,596 | 17,988 | — | — | 716,022 | 797,044 |
| Investments | 1,673,479 | 820,143 | 374,676 | — | 1,555,704 | — | 148,462 | 2,214,695 | 6,787,159 |
| Investments | — | — | — | — | — | — | — | 1,470,098 | 1,470,098 |
| **Receivables:** | | | | | | | | | |
| Loans, interest, and other | — | — | — | — | — | — | 2,469 | 121,214 | 123,683 |
| Interest-bearing deposits with other | — | — | — | — | — | — | — | 6,659 | 6,659 |
| Other governmental entities | — | — | — | — | — | — | — | 32,663 | 32,663 |
| Other | — | — | — | — | — | — | — | 531 | 531 |
| **Due from:** | | | | | | | | | |
| Primary government | — | — | 36,754 | — | — | — | 56,000 | — | 92,754 |
| Component units | — | — | — | — | — | — | — | 17,303 | 17,303 |
| Property held for sale and future development | 70,898 | — | — | — | — | — | — | 141,199 | 212,097 |
| Capital assets, not being depreciated | 13,546 | 3,203,805 | 2,103,257 | 845,345 | 1,052,993 | — | 266,407 | 1,288,859 | 8,774,212 |
| Capital assets, depreciable, net | 14,313 | 7,953,943 | 3,334,404 | 4,081,278 | 85 | 828 | 491,170 | 1,960,702 | 17,836,723 |
| Deferred expenses and other assets | 59,336 | 133,180 | 128,849 | 28,738 | 58,829 | — | — | 44,498 | 453,430 |
| Total noncurrent assets | 1,884,247 | 12,145,608 | 6,315,684 | 4,988,107 | 2,776,557 | 828 | 980,274 | 8,341,419 | 37,432,724 |
| Total assets | $ 12,746,812 | 12,227,786 | 7,418,111 | 5,176,017 | 2,867,636 | 114,389 | 1,242,193 | 11,188,559 | 52,981,503 |

35

(Continued)

PR-CCD-0006991

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Assets –
Major Component Units

June 30, 2006

(In thousands)

| Liabilities and Net Assets | Government Development Bank for Puerto Rico | Puerto Rico Highway and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Infrastructure Financing Authority | Puerto Rico Health Insurance Administration | University of Puerto Rico | Total nonmajor component units | Total component units |
|---|---|---|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | | | | |
| **Current liabilities:** | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 111,017 | 144,452 | 570,097 | 368,600 | 77,140 | 84,648 | 112,978 | 847,037 | 2,315,969 |
| Deposits and escrow liabilities | 5,838,162 | — | 155,366 | 5,271 | — | — | — | 647,157 | 6,645,956 |
| Due to: | | | | | | | | | |
| Primary government | — | — | — | 8,115 | — | 25,800 | — | 92,487 | 126,402 |
| Component units | — | 29,996 | 113,467 | 39,449 | 925 | — | 86,781 | 385,518 | 656,136 |
| Other governmental entities | — | — | — | — | — | — | 125 | 37,485 | 37,610 |
| Securities lending transactions and reverse repurchase agreements | 515,000 | — | — | — | — | — | — | 277,844 | 792,844 |
| Interest payable | 51,144 | 163,073 | 136,696 | 11,263 | 67,842 | — | 4,765 | 107,468 | 542,251 |
| Deferred revenue | — | — | — | — | 2,199 | — | 25,598 | 98,758 | 126,555 |
| Notes payable, current portion | 1,048,867 | — | 379,835 | — | — | — | — | 129,234 | 1,557,936 |
| Commonwealth appropriation bonds, current portion | 45 | — | — | 2,733 | 46 | — | — | 1,207 | 4,031 |
| Bonds payable, current portion | 94,111 | 98,520 | 377,532 | 26,641 | 30,695 | — | 20,625 | 129,213 | 777,337 |
| Accrued compensated absences | 3,547 | 15,739 | 75,428 | 16,962 | 129 | 442 | 22,506 | 97,948 | 232,701 |
| Worker's compensation claims | — | — | — | — | — | — | — | 696,922 | 696,922 |
| Reserves for automobile accident benefit payments | — | — | — | — | — | — | — | 114,388 | 114,388 |
| Current portion of other long-term liabilities | — | 4,149 | 90,002 | — | — | — | 1,779 | 56,324 | 152,254 |
| Total current liabilities | 7,661,893 | 455,929 | 1,898,423 | 479,034 | 178,976 | 110,890 | 275,157 | 3,718,990 | 14,779,292 |
| **Noncurrent liabilities:** | | | | | | | | | |
| Due to: | | | | | | | | | |
| Primary government | — | — | — | 179,940 | — | — | — | 7,108 | 187,048 |
| Component units | — | — | 59,200 | 685,701 | 44,089 | — | 9,864 | 932,831 | 1,731,685 |
| Interest payable | 4,499 | — | — | — | — | — | — | — | 4,499 |
| Deferred revenue | — | — | — | — | — | — | — | 23,383 | 23,383 |
| Notes payable | 1,686,090 | — | 32,000 | — | — | — | — | 1,046,347 | 2,764,437 |
| Commonwealth appropriation bonds | 10,199 | — | — | 704,035 | 10,507 | — | — | 296,356 | 1,021,097 |
| Bonds payable | 1,285,986 | 6,542,692 | 4,778,998 | 802,717 | 2,551,562 | — | 445,561 | 2,326,116 | 18,733,632 |
| Accrued compensated absences | 1,709 | 12,380 | 138,306 | 35,342 | 143 | 294 | 112,569 | 24,040 | 324,783 |
| Other long-term liabilities | — | 31,940 | — | 65,432 | 5,998 | — | 68,827 | 154,824 | 327,021 |
| Total noncurrent liabilities | 2,988,483 | 6,587,012 | 5,008,504 | 2,473,167 | 2,612,299 | 294 | 636,821 | 4,811,007 | 25,117,587 |
| Total liabilities | 10,650,376 | 7,042,941 | 6,906,927 | 2,952,201 | 2,791,275 | 111,184 | 911,978 | 8,529,997 | 39,896,879 |
| **Net assets:** | | | | | | | | | |
| Invested in capital assets, net of related debt | 27,859 | 4,478,815 | 269,241 | 3,201,573 | 1,053,079 | 828 | 207,168 | 1,576,736 | 10,815,299 |
| Restricted for: | | | | | | | | | |
| Trust – nonexpendable | — | — | — | — | 1,335,171 | — | 52,248 | — | 1,387,419 |
| Capital projects | — | 72,417 | 206,748 | 32,746 | 225,353 | — | 35,235 | 80,616 | 653,115 |
| Debt service | 55,682 | 605,864 | — | — | 307 | — | 37,558 | 209,597 | 909,008 |
| Affordable housing and related loan insurance programs | 254,219 | — | — | — | — | — | — | 526,912 | 781,131 |
| Student loans and other educational purposes | — | — | — | — | — | — | 7,867 | 9,454 | 17,321 |
| Other specified purposes | — | — | — | — | 17,989 | — | 32,520 | 100,281 | 150,790 |
| Unrestricted | 1,758,676 | 27,749 | 35,195 | (1,010,503) | (2,555,538) | 2,377 | (42,381) | 154,966 | (1,629,459) |
| Total net assets | 2,096,436 | 5,184,845 | 511,184 | 2,223,816 | 76,361 | 3,205 | 330,215 | 2,658,562 | 13,084,624 |
| Total liabilities and net assets | $ 12,746,812 | 12,227,786 | 7,418,111 | 5,176,017 | 2,867,636 | 114,389 | 1,242,193 | 11,188,559 | 52,981,503 |

See accompanying notes to basic financial statements.

PR-CCD-0006992

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Activities –
Major Component Units

Year ended June 30, 2006

(In thousands)

| | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Net revenues (expenses) and changes in net assets | Payments from primary government | Payments from (to) other component units | Contributions not restricted to specific programs | Taxes | Interest and investment earnings | Gain in sale of assets | Miscellaneous | Change in net assets | Net assets, beginning of year, as restated | Net assets, end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major component units:** | | | | | | | | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 688,850 | 593,604 | — | 156,365 | 60,339 | 65,316 | (252) | — | — | — | — | 8,670 | 134,273 | 1,962,163 | 2,096,436 |
| Puerto Rico Highway and Transportation Authority | 904,973 | 245,109 | — | 83,768 | (576,096) | — | — | — | 296,814 | 31,438 | — | — | (247,844) | 5,432,689 | 5,184,845 |
| Puerto Rico Electric Power Authority | 3,780,539 | 3,716,082 | — | — | (64,457) | — | — | 56,378 | — | 24,475 | — | — | 16,396 | 494,788 | 511,184 |
| Puerto Rico Aqueduct and Sewer Authority | 841,300 | 469,939 | 8,789 | — | (362,572) | 19,096 | 53,396 | 12,380 | — | 3,180 | — | 5,670 | (268,850) | 2,492,666 | 2,223,816 |
| Puerto Rico Infrastructure Finance Authority | 126,469 | — | — | — | (126,469) | 72,450 | (53,396) | — | — | (175,665) | — | — | (283,080) | 359,441 | 76,361 |
| Puerto Rico Health Insurance Administration | 1,561,451 | 452,965 | — | — | (1,108,486) | 1,134,152 | — | — | — | 2,232 | — | 27,398 | (24,692) | 256,130 | 3,205 |
| University of Puerto Rico | 1,237,194 | 166,023 | 238,149 | — | (833,022) | 812,594 | 69,025 | 5,639 | — | 5,802 | — | 14,237 | 74,085 | 256,130 | 330,215 |
| Nonmajor component units | 2,485,773 | 1,829,229 | 37,742 | 24,254 | (594,547) | 322,553 | (84,783) | 3,715 | 66,277 | 118,311 | 4,737 | (8,231) | (80,968) | 2,739,530 | 2,658,562 |
| Total component units | $ 11,626,518 | 7,473,351 | 284,680 | 264,317 | (3,605,110) | 2,427,161 | — | 77,912 | 363,091 | 79,773 | 8,737 | 29,346 | (623,090) | 15,712,714 | 13,084,624 |

See accompanying notes to basic financial statements.

37

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

(1) **Summary of Significant Accounting Policies**

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of its Constitution as approved by the people of Puerto Rico and the U.S. Congress. The Commonwealth's Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for public safety, health, public housing and welfare, education, and economic development.

The accompanying basic financial statements of the Commonwealth have been prepared in conformity with U.S. generally accepted accounting principles (GAAP) as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds, the results of operations of the Commonwealth and its various funds and fund types, and the cash flows of the proprietary funds. The basic financial statements are presented as of June 30, 2006, and for the year then ended. The basic financial statements include the various departments, agencies, boards, commissions, public trusts and public corporations, and any other organizational units governed by the Puerto Rico Legislature and/or officers of the Commonwealth.

(a) *The Financial Reporting Entity*

The accompanying basic financial statements include all departments, agencies, and governmental entities whose funds are under the custody and control of the Secretary of the Treasury of the Commonwealth and the Commonwealth's component units pursuant to Act No. 230 of July 23, 1974, as amended, known as Commonwealth of Puerto Rico Accounting Law. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include appointing a voting majority of an organization's governing body and (1) the ability of the Commonwealth to impose its will on that organization or (2) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

As required by U.S. GAAP, these basic financial statements present the Commonwealth and its component units.

(b) *Component Units*

Component units are entities that are legally separate organizations for which the Commonwealth's elected officials are financially accountable or other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading and incomplete. GAAP details two methods of presentation: blending the financial data of the component units' balances and transactions in a manner similar to the presentation of the Commonwealth's balances and transactions; or discrete presentation of the component units' financial data in columns separate from the Commonwealth's balances and transactions. The Commonwealth is financially accountable

38 (Continued)

PR-CCD-0006994

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

because it appoints the members of the governing authorities of each of the component units and because it is able to impose its will on these organizations or because the organizations provide financial benefits or impose financial burdens on the Commonwealth. The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GASB Statement No. 14, *The Financial Reporting Entity*, as amended by GASB 39 *Determining Whether Certain Organization are Component Units*.

**Blended Component Units**

The following entities, while legally separate from the Commonwealth, meet the criteria to be reported as part of the primary government because they provide services entirely or almost entirely to the Commonwealth.

*Public Buildings Authority (PBA)* – PBA is governed by a six-member board comprised by the Secretary of the Department of Transportation and the Public Works (DTPW), the Secretary of the Department of Education of the Commonwealth, the Interim President of the Government Development Bank for Puerto Rico (GDB), and three members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. It is a legally separate entity, whose activities are blended within the primary government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by PBA to finance such facilities are payable from lease collections, which are largely derived from Commonwealth appropriations and are further secured by the Commonwealth's guaranty.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of GDB. The operations of PRMSA consist of servicing the long-term liability to third parties that resulted from the sale of certain maritime operations formerly owned and operated by PRMSA. The Commonwealth is required to annually appropriate funds in its general operating budget to provide for the payment of principal and interest on such debt [see note 14 (d)].

*The Children's Trust (the Trust)* – The Trust is governed by a seven-member board comprised by the Governor, who designated the president of the board, the President of GDB, the Director of the Office of Management and Budget (OMB) of the Commonwealth, the Secretary of Justice of the Commonwealth, and three private citizens appointed by the Governor with the consent of the Senate. The Trust's sole operation consists of providing financial assistance principally to the Commonwealth's departments to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico, especially in the areas of education, recreation, and health. The operation of the Trust is financed with the moneys being received by the Commonwealth from a global settlement agreement dated November 23, 1998, between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The agreement calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. After 2025, the tobacco companies shall continue making contributions in perpetuity.

The blended component units are composed of various funds. The PBA capital projects and the Children's Trust special revenue fund are presented as major governmental funds. All other funds are

PR-CCD-0006995

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

reported in the other governmental column. Complete financial statements of the blended component units can be obtained directly by contacting their respective administrative offices at:

Public Buildings Authority
P.O. Box 41029 Minillas Station
San Juan, PR 00940-1029

Puerto Rico Maritime
Shipping Authority
P.O. Box 42001
San Juan, PR 00940-2001

The Children's Trust
P.O. Box 42001
San Juan, PR 00940-2001

**Discretely Presented Component Units**

The following component units, consistent with GASB No. 14, are discretely presented in the basic financial statements because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because the component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth. These have been classified by management between major and nonmajor component units.

**Major Component Units**

*Government Development Bank for Puerto Rico (GDB)* – is governed by a seven-member board appointed by the Governor. GDB acts as fiscal agent, depository of funds, disbursing agent, and financial advisor for the Commonwealth, its public corporations, and municipalities in connection with the issuance of bonds and notes; and it also makes loans and advances funds predominantly to the Commonwealth's departments, component units, and municipalities. GDB's board of directors members are executives on a trustworthy position, named and supervised by the Governor. The Commonwealth provides financial support to GDB through legislative appropriations.

*Puerto Rico Aqueduct and Sewer Authority (PRASA)* – PRASA is governed by a nine-member board comprised of five members appointed by the Governor, the Secretary of DTPW, the President of GDB, and two members elected in a referendum carried out by the Puerto Rico Consumer Affairs Department. PRASA owns and operates the system of public water supply and sanitary sewer facilities. PRASA is authorized, among other things, to borrow money and issue revenue bonds for any of its corporate purposes. Through the approval of Act No. 328 of 1998, as discussed in note 15 (a), the Commonwealth guarantees the principal and interest payments of certain outstanding bonds and of all future bonds issued to refinance those outstanding bonds, and other loans under the State Revolving Fund Program. The Commonwealth provides financial support to PRASA through legislative appropriations.

*Puerto Rico Electric Power Authority (PREPA)* – PREPA is governed by a nine-member board comprised of the Secretary of DTPW, six members appointed by the Governor with the consent of the Senate, and two members representing the consumers' interest elected in a referendum carried out by the Puerto Rico Consumer Affairs Department. Board members are appointed or elected for a period of four years. PREPA is responsible for conserving, developing, and utilizing the power

(Continued)

PR-CCD-0006996

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

resources of Puerto Rico and owns and operates the Commonwealth's electrical power generation, transmission, and distribution system. The Commonwealth provides financial support to PREPA through legislative appropriation.

*Puerto Rico Health Insurance Administration (PRHIA)* – PRHIA is governed by a nine-member board comprised by the Secretary of Health of the Commonwealth, the Secretary of the Treasury of the Commonwealth, and the Insurance Commissioner of Puerto Rico, being these members inherent by law, and six additional members appointed by the Governor, with the consent of the Senate. PRHIA was created for implementing, administering, and negotiating a health insurance system through contracts with insurance underwriters to provide quality medical and hospital care to low income individuals, employees of the Commonwealth, and policeman who voluntarily subscribe to the Puerto Rico health insurance medical plan. The board of directors' president is elected by the Governor and all board of directors' members are executives on a trustworthy position. The Commonwealth provides financial support to PRHIA through legislative appropriations.

*Puerto Rico Highways and Transportation Authority (PRHTA)* – PRHTA is governed by the Secretary of DTPW. PRHTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by PRHTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. PRHTA plans and manages the construction of all major projects relating to the Commonwealth toll highway system, undertakes major repairs, and maintains the toll ways. The Commonwealth has the ability to significantly influence rates charged by PRHTA.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by the board of directors of GDB and the Secretary of the Treasury of the Commonwealth. Its responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's board of directors' members are executives on a trustworthy position, named and supervised by the Governor. The Commonwealth provides financial support to PRIFA through legislative appropriations.

*University of Puerto Rico (UPR)* – UPR is governed by a thirteen-member board of trustees comprised of one full-time student, two permanent professors, and ten community citizens of the private sector, of which at least one must be graduated from the institution. Community citizens are designated by the Governor with the advice and consent of the Senate. Members designated by the Governor are appointed for a period of four to eight years. The terms for the student and professors are one year. The Commonwealth provides financial support to UPR through legislative appropriations.

(Continued)

PR-CCD-0006997

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

**Nonmajor Component Units**

*Agricultural Services and Development Administration (ASDA)* – ASDA is governed by the Secretary of Agriculture of the Commonwealth. The purpose of ASDA is to provide a wide variety of services and incentives to the agricultural sector. Therefore, the government has the ability to impose its will. The Commonwealth provides financial support to ASDA through legislative appropriations.

*Automobile Accidents Compensations Administration (AACA)* – AACA is governed by a four-member board appointed by the Governor with the advice and consent of the Senate. AACA operates a system of compulsory insurance coverage for all registered motor vehicles and compensates citizens for injuries arising from motor vehicle accidents. The Commonwealth has the ability to significantly influence rates charged by AACA.

*Cardiovascular Center Corporation of Puerto Rico and the Caribbean (CCCPRC)* – CCCPRC is governed by a five-member board comprised of the Secretary of Health of the Commonwealth, the Director of the Medical Sciences Campus of the UPR, the Executive Director of the Puerto Rico Medical Services Administration, and two additional members appointed by the Governor with the consent of the Senate, one of which should be from the Cardiology Society of Puerto Rico and another a member of a cardiology foundation properly registered in the Department of State of the Commonwealth. The purpose of the CCCPRC is to provide special treatment to patients suffering from cardiovascular diseases. The Commonwealth provides financial support to CCCPRC through legislative appropriations.

*Caribbean Basin Projects Financing Authority (CBPFA)* – CBPFA is governed by a seven-member board comprised of the Secretary of State of the Commonwealth, the Executive Director of the Puerto Rico Industrial Development Company (PRIDCO), the President of GDB, the President of the Economic Development Bank for Puerto Rico, and three citizens, including at least two from the private sector, appointed by the Governor with the advice and consent of the Senate. CBPFA is authorized to issue revenue bonds and to lend the proceeds thereof to finance projects for the development of the Caribbean Basin countries that were authorized to receive investments of funds under the provisions of Section 936 of the U.S. Internal Revenue Code. The Commonwealth has access to CBPFA's resources.

*Culebra Conservation and Development Authority (CCDA)* – CCDA is a component unit of the Commonwealth of Puerto Rico created by Law No. 66 of June 22, 1975, as amended, to formulate, adopt, and administer the program and plan for the conservation, use, and development of natural resources of the Municipality of Culebra. CCDA is administered through a board of directors composed of seven members, including the Mayor of Culebra. The administration and operations of the Authority are conducted by an Executive Director elected by the board of directors. Law No. 66 of June 22, 1975 was amended by Law No. 76 of June 6, 2002 to ascribe CCDA to the Municipality of Culebra.

(Continued)

PR-CCD-0006998

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Economic Development Bank for Puerto Rico (EDB)* – EDB is governed by a eleven-member board comprised of the President of GDB, who is the Chairman, the Secretary of Agriculture of the Commonwealth, the Secretary of the Department of Economic Development and Commerce of the Commonwealth, the Executive Director of the Puerto Rico Industrial Development Company, the Executive Director of the Tourism Company of Puerto Rico, and six other members representing the private sector and appointed by the Governor with the consent of the Senate. Private sector members are appointed for a period of three years. EDB is responsible for the promotion and development of the private sector economy of the Commonwealth. This purpose is to be met by granting direct loans, loan guarantees, and/or direct investments to any person or business organization devoted to manufacturing, agriculture, trade, tourism, or other service enterprises with preference to but not limited to economic activities that may have the effect of substituting imports. The Commonwealth has the ability to impose its will on this component unit.

*Employment and Training Enterprises Corporation (ETEC)* – ETEC is governed by a consultant board, which includes two private citizens appointed by the Governor with the consent of the Senate. The purpose of ETEC is to provide training, management, development, and employment for inmates of the correctional institutions of the Commonwealth. The Commonwealth provides financial support to ETEC through legislative appropriations.

*Farm Insurance Corporation of Puerto Rico (FICPR)* – FICPR is governed by a four-member board consisting of the Secretary of Agriculture of the Commonwealth, the Dean of the Agricultural Sciences Faculty of the UPR Mayaguez Campus, a representative of GDB, and one bona fide farmer appointed by the Governor with the consent of the Senate. The purpose of the FICPR is to provide insurance to farmers against losses on their farms caused by natural disasters.

*Fine Arts Center Corporation (FACC)* – FACC is governed by a nine-member board comprised of the President of the Musical Arts Corporation and eight members named by the Governor. FACC was created with the purpose of administering the Fine Arts Center. The Commonwealth provides financial support to FACC through legislative appropriations.

*Governing Board of the 9-1-1 Service (911 Service)* – The Governing Board of 911 Service (the Board) is governed by a five-member board comprised of the Chief of Police, the Executive Director of the Medical Emergency Services, the Director of the State Emergency Management Agency, the Chief of the Puerto Rico Firefighters Corps, and one member appointed by consensus of the four ex-officio members to represent the public interest. The 911 Service is responsible for providing an efficient service of fast response to emergency calls through the 911 number and transferring these to the appropriate response agencies using technological and human resources to safeguard lives and properties. The Commonwealth has access to 911 Service's resources.

*Institutional Trust of the National Guard of Puerto Rico (ITNGPR)* – ITNGPR is governed by a six-member board comprised of the National Guard Special Assistant, the President of GDB, the Secretary of Justice of the Commonwealth, two militaries from the Puerto Rico National Guard, and one representative from the community recommended by the National Guard Special Assistant and appointed by the Governor. ITNGPR's purpose is to provide life insurance, retirement benefits, and economic assistance to the active members of the Puerto Rico National Guard and their families. The Commonwealth provides financial support to ITNGPR through legislative appropriations.

PR-CCD-0006999

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Land Authority of Puerto Rico (LAPR)* – LAPR is governed by a six-member board consisting of the Secretary of Agriculture of the Commonwealth and five members appointed by the Governor. LAPR was created to carry out the provisions of the Land Law of Puerto Rico. LAPR maintains debt that is paid with Commonwealth appropriations.

*Musical Arts Corporation (MAC)* – MAC is governed by a seven-member board appointed by the Governor with the consent of the Senate. MAC was created to promote the development of the arts and cultural programs of the Commonwealth. The Commonwealth provides financial support to MAC through legislative appropriations.

*National Parks Company of Puerto Rico (NPCPR)* – NPCPR is governed by a nine-member board comprised of the Secretary of Recreation and Sports of the Commonwealth (the Secretary), who is the chairman, the Secretary of Education of the Commonwealth, the Executive Director of the Puerto Rico Tourism Company (PRTC), the Secretary of Natural and Environmental Resources of the Commonwealth, and five members appointed by the Governor with the recommendation from the Secretary and with known interest in the development and preservation of parks in the private sector. NPCPR is responsible for the operation of all national parks and the protection, conservation, and use of parks, beaches, forests, and natural and historical monuments for the optimum enjoyment of present and future generations. The Commonwealth provides financial support to NPCPR through legislative appropriations.

*Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (PCSDIPRC)* – PCSDIPRC is governed by a nine-member board consisting of the Administrator of the Cooperative Development Administration, the Commissioner of Financial Institutions of Puerto Rico (the Commissioner of Financial Institutions), the Commissioner of Insurance of Puerto Rico, the Secretary of the Treasury of the Commonwealth, the Inspector of Cooperatives, four citizens representing the cooperative movement, and one private citizen representing the public interest. PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, for monitoring the financial condition of the insured cooperatives, and of uninsured cooperatives when requested by the Commissioner of Financial Institutions.

*Puerto Rico Conservatory of Music Corporation (PRCMC)* – PRCMC is governed by a six-member board appointed by the Governor, with the consent of the Senate. PRCMC is responsible for providing the Puerto Rican community and especially its youths with the required facilities to educate and perfect their musical skills, including secondary education programs for developing musical arts. It prepares the artistic element that nourishes the Puerto Rico Symphony Orchestra and other musical organizations, and coordinates the governmental efforts to interested industries, private enterprises, and particular citizens. The Commonwealth provides financial support to PRCMC through legislative appropriations.

44

(Continued)

PR-CCD-0007000

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Puerto Rico Convention Center District Authority (PRCCDA)* – PRCCDA is governed by a board comprised of nine members, four of which shall be from the public sector and five from the private sector. The public sector members are comprised of the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Executive Director of the Puerto Rico Tourism Company, the president of GDB, and one member from the public sector. The private sector members are individuals having experience in the areas of hospitality, tourism, real estate, or convention centers who are appointed by the Governor with the advice and consent of the Senate. PRCCDA was created to develop, own, finance, plan, design, construct, operate, manage, and promote the new Puerto Rico Convention Center. The Commonwealth provides financial support to PRCCDA through legislative appropriations.

*Puerto Rico Council on Higher Education (PRCHE)* – PRCHE is governed by a board comprised of eight members appointed by the Governor with the consent of the Senate and the Secretary of Education of the Commonwealth as an ex-officio member. Its purpose is to develop higher education, to administer the licensing and certification of institutions of higher education, and to administer scholarship funds. The Commonwealth provides financial support to PRCHE through legislative appropriations.

*Puerto Rico Government Investment Trust Fund (PRGITF)* – PRGITF is governed by the Secretary of the Treasury of the Commonwealth. GDB is its trustee, custodian, and administrator. PRGITF's main objective is to provide investment opportunities in a professionally managed money market portfolio by investing in high-quality securities with minimal credit risk. Qualified investors include the Commonwealth's central government, its public corporations, instrumentalities and agencies, and the municipalities of Puerto Rico. In conformity with GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*, the financial statements of the PRGITF are not included in the accompanying basic financial statements because the primary government and each component unit investor is already presenting as cash or investment their corresponding share of the assets of the PRGITF (see note 5).

*Puerto Rico Industrial Development Company (PRIDCO)* – PRIDCO is governed by a seven-member board comprised of the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Secretary of the Treasury of the Commonwealth, the President of GDB, the President of the Planning Board of Puerto Rico, and three members from the private sector appointed by the Governor with the advice and consent of the Senate. The private sector members are appointed for a period of four years. PRIDCO administers the Commonwealth-sponsored economic development program by providing facilities, general assistance, and special incentive grants to manufacturing companies operating in Puerto Rico. PRIDCO has issued interim notes and revenue bonds to finance manufacturing plants and other facilities. Rentals derived from the leasing of specified facilities of PRIDCO are pledged for the payment of PRIDCO's revenue bonds. PRIDCO maintains debt that is paid with Commonwealth appropriations.

(Continued)

PR-CCD-0007001

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (known as AFICA by its Spanish acronym)* – AFICA is governed by a seven-member board consisting of the Secretary of Economic Development and Commerce, the President of GDB, the Executive Director of PRIFA, the Executive Director of the Tourism Company of Puerto Rico, the President of the Environmental Quality Board, and two private citizens appointed by the Governor. AFICA is authorized to issue revenue bonds to finance industrial, tourist, environmental control, medical, and educational facilities in Puerto Rico and the United States for use by private companies, nonprofit entities, or governmental agencies. The bonds are payable solely from collections from such private companies, nonprofit entities, or governmental agencies, and do not constitute debt of the Commonwealth or any of its other component units. The Commonwealth has access to AFICA's resources. AFICA maintains debt that is paid with Commonwealth appropriations.

*Puerto Rico Land Administration (PRLA)* – PRLA is governed by an eight-member board comprised of the Secretary of Economic Development and Commerce of the Commonwealth, who serves as president, the Secretary of the Treasury of the Commonwealth, the Secretary of Agriculture of the Commonwealth, the Secretary of DTPW of the Commonwealth, the Secretary of Housing of the Commonwealth, the President of the Planning Board of Puerto Rico, and two other members appointed by the Governor with the consent of the Senate. PRLA acquires parcels of land on behalf of government instrumentalities through negotiation or expropriation. The Commonwealth provides financial support to the PRLA through legislative appropriations.

*Puerto Rico Medical Services Administration (PRMSA)* – PRMSA is governed by a ten-member board comprised of the Secretary of Health of the Commonwealth, who is the Chairman, the Dean of the Medical Sciences Faculty of the UPR, the President of the Board of the Puerto Rican Cancer Society, the Mayor of the Municipality of San Juan, the Administrator of the State Insurance Fund Corporation (SIFC), the Executive Director of PRMSA, the Administrator of the Administration of Mental Health and Anti-Addiction Services, the President of the Medical Policy and Administration Committee, and two consumers appointed by the Secretary of Health of the Commonwealth. Its purpose is to plan, organize, operate, and administer the centralized health services, provided in support of the hospital and other functions, offered by the member institutions and users of the medical complex known as the Puerto Rico Medical Center. The Commonwealth provides financial support to PRMSA through legislative appropriations.

*Puerto Rico Metropolitan Bus Authority (PRMBA)* – PRMBA is governed by the Secretary of DTPW of the Commonwealth. PRMBA provides bus transportation to passengers within the San Juan Metropolitan Area. The Commonwealth provides financial support to PRMBA through legislative appropriations.

*Puerto Rico Municipal Finance Agency (PRMFA)* – PRMFA is governed by a five-member board comprised of the President of GDB, who is the Chairman, the Commissioner of Municipal Affairs, and three additional members appointed by the Governor, one of whom shall be either the mayor or chief financial officer of a municipality. PRMFA was organized to create a capital market to assist the municipalities of Puerto Rico in financing their public improvement programs.

(Continued)

PR-CCD-0007002

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Puerto Rico Ports Authority (PRPA)* – PRPA is governed by a five-member board consisting of the Secretary of DTPW of the Commonwealth, who is the Chairman, the Secretary of Economic Development and Commerce of the Commonwealth, the Executive Director of PRIDCO, the Executive Director of the Puerto Rico Tourism Company, and one private citizen appointed by the Governor with the consent of the Senate. The purpose of PRPA is to administer all ports and aviation transportation facilities of the Commonwealth and to render other related services. The Commonwealth provides financial support to PRPA through legislative appropriations.

*Puerto Rico Public Broadcasting Corporation (PRPBC)* – PRPBC is governed by an eleven-member board of directors comprised of the Secretary of Education of the Commonwealth, the President of the UPR, the Executive Director of IPRC, and eight private citizens, appointed by the Governor with the advice and consent of the Senate. At least three of these private citizens must have proven interest, knowledge, and experience in education, culture, art, science, or radio and television. PRPBC was created for the purpose of integrating, developing, and operating the radio, television, and electronic communication facilities that belong to the Commonwealth. The Commonwealth provides financial support to PRPBC through legislative appropriations.

*Puerto Rico School of Plastic Arts (PRSPA)* – PRSPA is governed by a seven-member board. Four members are appointed by the board of directors of IPRC, representing the public educational and cultural interests. Board members may not be employees of the PRSPA. The remaining three members are elected from among the members of the board of directors of IPRC, one of whom will serve as president. PRSPA was created to develop, promote, plan, and coordinate programs of study in higher education oriented to the plastic arts, teaching, artistic techniques, and to help students to develop humanistic values. The Commonwealth provides financial support to PRSPA through legislative appropriations.

*Puerto Rico Solid Waste Authority (PRSWA)* – PRSWA is governed by a government board appointed by the Secretary of the Department of Natural Resources, whereby, the Secretary and the Executive Director of PRSMA periodically meet. PRSWA provides alternatives for processing of solid waste and encourages recycling, reuse, and recovery of resources from waste. The Commonwealth provides financial support to PRSWA through legislative appropriations.

*Puerto Rico Telephone Authority (PRTA)* – PRTA is governed by a five-member board comprised of the President of GDB and four members that are appointed by the board of directors of GDB. PRTA is the legal entity responsible to account for the equity interest in Telecomunicaciones de Puerto Rico, Inc. for the benefit of the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities. The Commonwealth provides financial support to PRTA through legislative appropriations.

*Puerto Rico Tourism Company (PRTC)* – PRTC is governed by a seven-member board comprised of representatives of different tourist-related sectors appointed by the Governor with the consent of the Senate. At least one member must represent internal tourism and two must not be residents of the metropolitan area. Its purpose is to promote the tourism industry of Puerto Rico. The Commonwealth provides financial support to PRTC through legislative appropriations.

PR-CCD-0007003

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Puerto Rico Trade and Export Company (PRTEC)* – PRTEC is governed by an eight-member board comprised of the Secretary of Department of Economic Development and Commerce, who is the Chairman, the Executive Director of the Ports Authority, the Secretary of the Department of Agriculture, the President of EDB, the Executive Director of PRIDCO, the Legal Division Director of PRTEC, and two private citizens. PRTEC has the responsibility to promote the highest efficiency in the services provided to the commercial sector, with emphasis on small and medium-sized enterprises while promoting the export of products and services from Puerto Rico to other countries. The Commonwealth provides financial support to PRTEC through legislative appropriations.

*Right to Employment Administration (REA)* – REA is governed by an administrator appointed by the Governor with the consent of the Senate. In addition, a consultative board comprised of the Secretary of Labor and Human Resources of the Commonwealth, the Secretary of Agriculture of the of the Commonwealth, the Secretary of the DTPW of the Commonwealth, the Secretary of Education of the Commonwealth, and five additional members appointed by the Governor, with the Consent of the Senate, will advise the administrator on the implementation of the Right to Employment Act. The Commonwealth provides financial support to REA through legislative appropriations.

*Special Communities Perpetual Trust (SCPT)* – SCPT is governed by a board of directors composed of eleven members: the Secretary of Housing of the Commonwealth, the Secretary of the DTPW of the Commonwealth, the Coordinator for the Social and Economic Financing of the Special Communities, one mayor of the municipality of Puerto Rico, one community leader resident in one special community, four private citizens representing the public interest, and two public employees. All members of the Board of directors are appointed by the Governor. SCPT's principal purpose is to fund development projects that address the infrastructure and housing needs of the underprivileged communities. The Commonwealth of Puerto Rico provides financial support to SCPT through legislative appropriations.

*State Insurance Fund Corporation (SIFC)* – SIFC is governed by a six-member board appointed by the Governor with the advice and consent of the Senate. The board is comprised of the Commissioner of Insurance of Puerto Rico, an officer from the Department of Labor and Human Resources of the Commonwealth, an officer from the Department of Health of the Commonwealth, a representative of the employer's interest, a representative of the employees' interest, and two members without any of these interests. One of these members is appointed by the Governor as president of the board for a period of six years. The three public officials are appointed for a period of five years, and the rest of the members for four, three, two, and one year, respectively. SIFC provides workers' compensation and disability insurance to public and private employees. The Commonwealth has access to SIFC's resources. Payments made by SIFC to the Commonwealth during the year ended June 30, 2006 amounted to approximately $37.3 million.

48 (Continued)

PR-CCD-0007004

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Complete financial statements of the discretely presented component units can be obtained directly by contacting their administrative offices:

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, PR 00940 – 2001

Puerto Rico Aqueduct and Sewer Authority
P.O. Box 7066
San Juan, PR 00916-7066

Puerto Rico Electric Power Authority
P.O. Box 364267
San Juan, PR 00936-4267

Puerto Rico Health Insurance Administration
P.O. Box 195661
San Juan PR 00919-5661

Puerto Rico Highways and Transportation
Authority
P.O. Box 42007
San Juan, PR 00940-2007

Puerto Rico Infrastructure Financing Authority
Capital Center
235 Ave. Arterial Hostos, Suite 1600
San Juan, PR 00918-1433

University of Puerto Rico
Jardin Botanico Sur 1187
Calle Flamboyan
San Juan, PR 00926-1117

Agricultural Services and Development
Administration
P.O. Box 9200
San Juan, PR 00908-0202

Automobile Accidents Compensations
Administration
P.O. Box 364847
San Juan, PR 00936-4847

Cardiovascular Center Corporation of
Puerto Rico and the Caribbean
P.O. Box 366528
San Juan, PR 00936-6528

Caribbean Basin Projects Financing Authority
P.O. Box 42001
San Juan, PR 00940-2001

Culebra Conservation and Development
Authority
P.O. Box 217
Culebra, PR 00775-0217

Economic Development Bank for Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Employment and Training Enterprises
Corporation
P.O. Box 366505
San Juan, PR 00936-6505

Farm Insurance Corporation of Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Fine Arts Center Corporation
P.O. Box 41287 – Minillas Station
San Juan, PR 00940-1287

Governing Board of the 9-1-1 Service
P.O. Box 270200
San Juan, PR 00927-0200

Institutional Trust of the National Guard of
Puerto Rico
P.O. Box 9023786
San Juan, PR 00902-3786

49

(Continued)

PR-CCD-0007005

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Land Authority of Puerto Rico
P.O. Box 9745
San Juan, PR 00908-9745

National Parks Company of Puerto Rico
P.O. Box 902098
San Juan, PR 00902-2089

Puerto Rico Conservatory of Music Corporation
350 Lamar Street and Roosevelt Avenue
San Juan, PR 00918-2199

Puerto Rico Council on Higher Education
P.O. Box 19900
San Juan, PR 00910-1900

Puerto Rico Industrial Development Company
P.O. Box 362350
San Juan, PR 00936-2350

Puerto Rico Land Administration
P.O. Box 363767
San Juan, PR 00936-3767

Puerto Rico Metropolitan Bus Authority
P.O. Box 195349
San Juan, PR 00919-5349

Puerto Rico Ports Authority
P.O. Box 362829
San Juan, PR 00936-2829

Puerto Rico School of Plastic Arts
P.O. Box 9021112
San Juan, PR 00902-1112

Puerto Rico Telephone Authority
P.O. Box 42001
San Juan, PR 00940-2001

Musical Arts Corporation
P.O. Box 41227 – Minillas Station
San Juan, PR 00940-1227

Public Corporation for the Supervision and
Deposit Insurance of Puerto Rico Cooperatives
P.O. Box 195449
San Juan, PR 00919-5449

Puerto Rico Convention Center District Authority
P.O. Box 19269
San Juan, PR 00910-1269

Puerto Rico Government Investment Trust Fund
P.O. Box 42001 – Minillas Station
San Juan, PR 00940-2001

Puerto Rico Industrial, Tourist, Educational,
Medical, and Environmental Control
Facilities Financing Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Medical Services Administration
P.O. Box 2129
San Juan, PR 00922-2129

Puerto Rico Municipal Finance Agency
P.O. Box 42001
San Juan, PR 00940

Puerto Rico Public
Broadcasting Corporation
P.O. Box 19-0909
San Juan, PR 00919-0909

Puerto Rico Solid Waste Authority
P.O. Box 40285 – Minillas Station
San Juan, PR 00940-0285

Puerto Rico Tourism Company
P.O. Box 902-3960
Old San Juan Station
San Juan, PR 00902-3960

50

(Continued)

PR-CCD-0007006

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

| | |
|---|---|
| Puerto Rico Trade and Export Company | Right to Employment Administration |
| P.O. Box 195009 | P.O. Box 364452 |
| San Juan, PR 00919-5009 | San Juan, PR 00936-4452 |
| | |
| Special Communities | State Insurance Fund |
| Perpetual Trust | Corporation |
| P.O. Box 42001 | P.O. Box 365028 |
| San Juan, PR 00940-2001 | San Juan, PR 00936-5028 |

The financial statements of the discretely presented component units have a year-end of June 30, 2006, except for the Puerto Rico Telephone Authority, which has a year-end of December 31, 2005.

**Fiduciary Component Units**

The three employee retirement systems administer pension funds for the Commonwealth and its political subdivisions. The three systems are subject to legislative and executive controls, and the administrative expenses are subject to legislative budget controls. These component units, while meeting the definition of a component unit and are legally separate, are presented in the fund financial statements along with other fiduciary funds of the Commonwealth. They have been omitted from the government-wide financial statements.

***Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities (ERS)*** – ERS is governed by a board of trustees, which is composed of the Secretary of the Treasury of the Commonwealth, who is the President, the President of GDB, the Commissioner for Municipal Affairs, the Director of the Puerto Rico Central Office of Personnel Administration, two participating employees, and one retiree, who are appointed by the Governor. The Commonwealth reports ERS as a single-employer pension plan. ERS is the administrator of a defined-benefit pension plan, which covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and component units not covered by their own retirement systems. On September 24, 1999, an amendment to the law that created ERS was enacted with the purpose of establishing a new defined-contribution plan (System 2000) for employees hired by the government on or after January 1, 2000.

***Puerto Rico Judiciary Retirement System (JRS)*** – JRS is governed by the same board of trustees as ERS. JRS is a single-employer defined-benefit plan, administered by ERS, which covers all individuals holding a position as Justice of the Supreme Court, Judge of the Superior Court or the District Court, or Municipal Judges of the Commonwealth.

(Continued)

PR-CCD-0007007

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*Puerto Rico System of Annuities and Pensions for Teachers (TRS)* – TRS is governed by a nine member board comprised of the Secretary of Education of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the President of GDB, two active teachers (one of them is a representative of the teachers' organization according to Act No. 45 of February 1998), two retired teachers, one representative of the teachers' organization and one representative of the public interest appointed by the Governor with the advice and consent of the Senate for four years. The Commonwealth reports TRS as a single-employer pension plan. TRS provides retirement benefits to all teachers of the Department of Education of the Commonwealth, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education of the Commonwealth, teachers who work in the Teachers' Association of Puerto Rico, and those who practice in private institutions accredited by the Department of Education of the Commonwealth. TRS provides retirement, death, and disability benefits.

Complete financial statements of these component units can be obtained directly by contacting their respective administrative offices at:

Employees' Retirement System of the
Government of Puerto Rico and its
Instrumentalities
P.O. Box 42003 – Minillas Station
Santurce, PR 00940

Puerto Rico Judiciary
Retirement System
P.O. Box 42003 – Minillas Station
Santurce, PR 00940

Puerto Rico System of Annuities and Pensions for
Teachers
P.O. Box 191879
San Juan, PR 00919-1879

(c) *Government-wide Financial Statements*

The government-wide financial statements (the statement of net assets and the statement of activities) report information of all of the nonfiduciary activities of the Commonwealth and its component units. For the most part, the effect of interfund activity has been removed from these government-wide financial statements. Governmental activities, which normally are supported by taxes and intergovernmental revenue, are reported separately from business-type activities, which rely to a significant extent on fees and charges for support. Likewise, the primary government is reported separately from the legally separate component units for which the primary government is financially accountable. The statement of net assets presents the reporting entities' nonfiduciary assets and liabilities, with the difference reported as net assets. Net assets are reported in three categories:

- *Invested in Capital Assets, Net of Related Debt* – These consist of capital assets, net of accumulated depreciation and amortization and reduced by outstanding balances for bonds, notes, and other debt that are attributed to the acquisition, construction, or improvement of those assets.

52

(Continued)

PR-CCD-0007008

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

- *Restricted Net Assets* – These result when constraints placed on net assets use on either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

  The government-wide statement of net assets reports $1,195,559 of restricted net assets, none restricted by enabling legislation.

- *Unrestricted Net Assets* – These consist of net assets that do not meet the definition of the two preceding categories. Unrestricted net assets often are designated to indicate that management does not consider them to be available for general operations. Unrestricted net assets often have constraints on resources that are imposed by management, but can be removed or modified.

When both restricted and unrestricted resources are available for use, generally it is the Commonwealth's policy to use restricted resources first, then the unrestricted resources as they are needed.

The statement of activities demonstrates the degree to which the direct expenses of a given function, segment, or component unit are offset by program revenue. Direct expenses are those that are clearly identifiable with a specific function, segment, or component unit. Program revenue includes charges to customers who purchase, use, or directly benefit from goods or services provided by a given function, segment, or component unit. Program revenue also includes grants and contributions that are restricted to meeting the operational or capital requirements of a particular function, segment, or component unit. Taxes and other items not properly included among program revenue are reported instead as general revenue. Resources that are dedicated internally are reported as general revenue rather than as program revenue. The Commonwealth does not allocate general government (indirect) expenses to other functions.

*(d)* **Measurement Focus, Basis of Accounting, and Financial Statement Presentation**

*Government-wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

*Governmental Fund Financial Statements* – The governmental fund financial statements are reported using the current financial resources measurement focus and the modified-accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Commonwealth considers revenue to be available if collected within 120 days after the end of the current fiscal year-end. Principal revenue sources considered susceptible to accrual include tax revenue, net of estimated overpayments (refunds) and amounts considered not collectible, which are recorded as taxpayers earn income (income taxes), as sales are made (consumption and use taxes), and as cash is received (miscellaneous taxes). In applying the susceptible to accrual concept to federal grants, there are essentially two types of revenue. For the majority of grants, moneys must be expended by the

PR-CCD-0007009

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Commonwealth on the specific purpose or project before any amounts will be reimbursed. Revenue is, therefore, recognized as expenditures are incurred to the extent available. For the other revenue, moneys are virtually unrestricted and are generally revocable only for failure to comply with prescribed compliance requirements. These resources are reflected as revenue at the time of receipt or earlier if the susceptible to accrual criteria is met. Expenditures are generally recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include the following:

- Employees' vested annual vacation and sick leave are recorded as expenditures when utilized. The amount of accumulated annual vacation and sick leave unpaid at June 30, 2006 has been reported only in the government-wide financial statements.

- Interest and principal on general long-term obligations are recorded when due, except for interest and principal due on July 1 of the following fiscal year, if resources are available for its payment as of June 30.

- Executory purchase orders and contracts are recorded as a reservation of fund balance.

- Debt service expenditures, federal funds cost disallowances, other long-term obligations, and amounts subject to judgments under litigation are recorded only when payment is due.

***Proprietary Funds, Fiduciary Funds, and Discretely Presented Component Units Financial Statements*** – The financial statements of the proprietary funds, fiduciary funds, and discretely presented component units are reported using the economic measurement focus and the accrual basis of accounting, similar to the government-wide financial statements described above.

Each enterprise fund has the option under GASB Statement No. 20 to elect and apply all Financial Accounting Standards Board (FASB) pronouncements issued after November 30, 1989, unless these conflict with a GASB pronouncement. The primary government's major enterprise funds have elected not to apply FASB pronouncements issued after November 30, 1989 and two nonmajor enterprise funds elected to adopt the FASB's pronouncements issued after November 30, 1989. Also, certain discretely presented component units have disclosed their election in their separately issued financial statements. The component units follow U.S. GAAP as issued by GASB and FASB as applicable to each component unit based on the nature of their operations. In addition, the Puerto Rico Government Investment Trust Fund adopted GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*; however, such financial statements are not included in the accompanying basic financial statements because the primary government and each component unit's investor already present their corresponding share of the assets of the PRGITF as cash or investments.

54 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. Revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses. The major operating revenue of the Commonwealth enterprise funds is as follows:

- Unemployment Insurance Trust Fund – Amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

- Lotteries Fund – Amounts collected from the sale of traditional lottery tickets and electronic lotto games.

*(e)* *Fund Accounting*

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, and discrete presentations of those component units, which are not required to be blended. The operations of each fund are accounted for within a set of self-balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. Major funds are determined using a predefined percentage of the assets, liabilities, revenue, or expenditures/expenses of either the fund category or the governmental and enterprise funds combined. The nonmajor funds are combined in a single column in the fund financial statements. The Commonwealth reports the following major funds:

**Governmental Funds**

*General Fund* – The general fund is the primary operating fund of the Commonwealth. It is used to account for all financial transactions, except those required to be accounted for in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, and education.

*Debt Service Fund* – The debt service fund accounts for the accumulation of resources predominantly for, and the payment of, general long-term bonds' principal, interest and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

*Public Buildings Authority's Capital Projects Fund* – The Public Buildings Authority's capital projects fund is used to account for the financial resources used for the acquisition or construction of major capital facilities not financed by proprietary fund types, pension trust funds, and discretely presented component units.

*The Children's Trust Special Revenue Fund* – The Children's Trust special revenue fund is used to account for the moneys received by the Commonwealth from a global settlement agreement dated November 23, 1998, between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The financial resources

55 (Continued)

PR-CCD-0007011

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

**Proprietary Funds**

These funds account for those activities for which the intent of management is to recover, primarily through user charges, the cost of providing goods or services to the general public.

*Unemployment Insurance Trust Fund* – This fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

*Lotteries Fund* – This fund accounts for the assets and operations of two lottery systems administered by the Commonwealth.

**Fiduciary Funds**

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, and other governmental units. The following are the Commonwealth's fiduciary funds:

*Pension Trust Funds* – These are used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees' retirement systems.

*Agency Funds* – These are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

**Discretely Presented Component Units**

Discrete presentation of component units is used to present the financial information of entities that do not qualify to be blended, in accordance with GASB No. 14, with the funds of the primary government. The component units column in the government-wide financial statements is used to report the financial activities of the Commonwealth's discretely presented component units. The financial statements of these component units are presented following the accrual basis of accounting. Under the accrual basis, revenue is recognized when earned and expenses are recorded as liabilities when incurred, without regard to receipt or payment of cash.

*(f)*   *Statutory (Budgetary) Accounting*

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with GAAP. Revenue is generally recognized when cash is received, net of tax refunds claimed by taxpayers as of year-end. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue. Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances lapse the year following the end of the fiscal year when the encumbrance was established, as established by Act No. 123 of August 17, 2001, which amended the then existing appropriations and encumbrances lapsing provisions of Act No. 230 of July 23, 1974. Unencumbered appropriations lapse at year-end. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.

56                                                                                      (Continued)

PR-CCD-0007012

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Under the statutory basis of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts, and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.

The statement of revenue and expenditures – budget and actual – budget basis – general fund, only presents the information for the general fund for which there is a legally adopted budget, as required by GAAP. See note 3 for a reconciliation of the statement of revenue and expenditures – budget and actual – budget basis – general fund with the statement of revenue, expenditures, and changes in fund balance (deficit) for the general fund. The special revenue funds do not have a legally mandated budget.

### (g) *Cash and Short-term Investments*

The Commonwealth follows the practice of pooling cash. The balance in the pooled cash accounts is available to meet current operating requirements, and any excess is invested in various interest bearing accounts with GDB and with the PRGITF. At June 30, 2006, excess of checks drawn over the pooled bank balance amounted to approximately $1.4 billion and is reported within accounts payable and accrued liabilities of the governmental activities.

Cash and cash equivalents include investments with original maturities of 90 days or less from the date of acquisition.

The Commissioner of Financial Institutions requires that private financial institutions deposit collateral securities to secure the deposits of the Commonwealth and all other governmental entities in each of these institutions. The amount of collateral securities to be pledged for the security of public deposits shall be established by the rules and regulations promulgated by the Commissioner of Financial Institutions.

The Puerto Rico Unemployment Insurance Trust Fund is maintained to account for the collection of unemployment insurance contributions from employers and the payment of unemployment benefits to eligible claimants. As required by federal law, all resources not necessary for current benefit payments are placed on deposit with the U.S. Treasury. Interest earned over such deposit is retained in the fund.

Cash and short-term investments and cash equivalents of the component units are maintained in separate bank accounts, from those of the primary government, in their own names.

### (h) *Securities Purchased Under Agreements to Resell*

Certain component units of the Commonwealth enter into purchases of securities with simultaneous agreements to resell. The securities underlying these agreements mainly consist of U.S. government obligations, mortgage-backed securities, and interest-bearing deposits with other banks.

### (i) *Securities Lending Transactions*

Certain component units of the Commonwealth enter into securities lending transactions in which governmental entities (lenders) transfer their securities to broker-dealers and other entities

57

(Continued)

PR-CCD-0007013

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

(borrowers) for collateral with a simultaneous agreement to return the collateral for the same securities in the future. Securities received as collateral are generally reflected as investments with a corresponding liability resulting from the obligation to return such collateral.

*(j)* *Investments*

Investments include U.S. government and agencies obligations, mortgage-backed securities, repurchase agreements, commercial paper, local government obligations, investment contracts, and corporate debt and equity obligations. Investment securities, including investments in limited partnerships, are presented at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts, which are presented at cost. Changes in the fair value of investments are presented as investment earnings in the statement of activities, the statement of revenue, expenditures, and changes in balance – governmental funds, and the statement of revenue, expenses, and changes in fund net assets – proprietary funds. Fair value is determined based on quoted market prices. When securities are not listed on national exchanges, quotations are obtained from brokerage firms.

The PRGITF is considered a 2a7-like external investment pool and, as such, reports its investments at amortized cost.

The reverse repurchase agreements reported by certain discretely presented component units are authorized transactions under their respective enabling legislation and authorized by GDB.

*(k)* *Receivables*

Tax receivables in the general fund include predominantly amounts owed by taxpayers for individual and corporate income taxes, net of estimated uncollectible amounts. Income tax receivables are recognized as revenue when they become measurable and available based on actual collections during the 120 days following the fiscal year-end related to tax returns due before year-end. Tax receivables also include amounts owed by taxpayers on income earned in periods prior to June 30, 2006, estimated to be collectible but not currently available, and thus are reported as deferred revenue in the general fund. Unemployment, disability, and driver's insurance receivables in the enterprise funds are stated net of estimated allowances for uncollectible accounts.

Accounts receivable are stated net of estimated allowances for uncollectible accounts, which are determined based upon past collection experience and current economic conditions. Intergovernmental receivables primarily represent amounts owed to the Commonwealth for reimbursement of expenditures incurred pursuant to federally funded programs. Intergovernmental receivables also include taxes that the Municipal Revenue Collection Center (CRIM, as per its Spanish acronym), a municipal corporation, is required to remit to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligations of the Commonwealth. The amount to be remitted is based on the special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation, which is levied by the CRIM [see note 14(c)].

(Continued)

PR-CCD-0007014

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The accounts receivable from nongovernmental customers of the component units are net of estimated uncollectible amounts. These receivables arise primarily from service charges to users. Accounts receivable from the primary government and other component units that arise from service charges do not have allowances for uncollectible accounts, as these are deemed fully collectible.

Loans of the general fund represent predominantly amounts owed by public corporations and municipalities for public insurance and rent paid by the general fund on their behalf.

The loans of the pension trust funds do not have allowances for uncollectible amounts since such loans are secured by mortgage deeds, plan members' contributions, and any unrestricted amounts remaining in escrow. Loans of the component units consist predominantly of loans to the primary government, other component units and municipalities, and do not have allowances for uncollectible accounts as those are deemed fully collectible. The remaining loans of the component units are to small and medium businesses, agricultural, and low-income housing loans from nongovernmental customers, and are presented net of estimated losses on such portfolios.

*(l)*    *Inventories*

Generally, inventories are valued at cost and predominantly on the first-in, first-out basis. Governmental fund inventories are recorded as expenditures when purchased rather than capitalized as an asset. Only significant amounts of inventory at the end of the year are capitalized in the governmental funds. However, inventories are always capitalized in the statement of net assets of governmental activities.

*(m)*    *Restricted Assets*

Funds set aside for the payment and guarantee of notes and interest payable and for other specified purposes are classified as restricted assets since their use is limited for this purpose by applicable agreements or required by law. Restricted assets in the proprietary funds mainly include amounts set aside for the payment of insurance benefits.

*(n)*    *Real Estate Held for Sale*

Real estate held for sale are carried at the lower of fair value or cost, which is established by a third party professional assessment or based upon an appraisal, minus estimated costs to sell. Subsequent declines in the value of real estate available for sale are charged to expenditure/expense.

*(o)*    *Capital Assets*

Capital assets, which include land, buildings, building improvements, equipment, vehicles, construction in process, and infrastructure assets, are reported in the applicable governmental, business-type activities and component unit columns in the government-wide financial statements. The Commonwealth's primary government defines capital assets as assets that have an initial, individual cost of $25,000 or more at the date of acquisition and have a useful life of five or more years. Capital assets are recorded at historical cost or at estimated historical cost if actual historical cost is not available.

     (Continued)

PR-CCD-0007015

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The method to deflate the current cost of the same or a similar asset using an approximate price index was used to estimate the historical cost of certain land, buildings, and building improvements because invoices and similar documentation was no longer available in certain instances. Donated capital assets are recorded at fair market value at the time of donation. Major outlays for capital assets and improvements are capitalized as projects are constructed. Interest costs are capitalized during the construction period only for business-type activities and most component units. The costs of normal maintenance and repairs that do not add value to the assets or materially extend asset lives are not capitalized.

GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis for State and Local Governments*, provides transition standards that make available an extended period of deferral (fiscal year 2006) before the requirement to record and depreciate general infrastructure assets acquired before implementation date (July 1, 2001) becomes effective. General infrastructure assets acquired prior to July 1, 2001 were recorded during the fiscal year ended June 30, 2006.

Capital assets utilized in the governmental funds are recorded as expenditures in the governmental fund financial statements. Depreciation expense is recorded in the government-wide financial statements, as well as the proprietary funds and component units' financial statements.

Capital assets of the primary government are depreciated on the straight-line method over the assets' estimated useful life. There is no depreciation recorded for land and construction in progress. The estimated useful life of capital assets is as follows:

|  | Years |
|---|---|
| Buildings and building improvements | 20 – 50 |
| Equipment, furniture, fixtures, and vehicles | 5 – 15 |
| Infrastructure | 50 |

The capital assets of the component units are recorded in accordance with the applicable standards of the component units and under their own individual capitalization thresholds. Depreciation has been recorded when required by these standards based on the types of assets, use and estimated useful lives of the respective assets, and on the nature of each of the component unit's operations.

The estimated useful lives of capital assets reported by the component units are as follows:

|  | Years |
|---|---|
| Buildings and building improvements | 3 – 50 |
| Equipment, furniture, fixtures, and vehicles | 3 – 20 |
| Infrastructure | 10 – 50 |

60

(Continued)

PR-CCD-0007016

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The Commonwealth adopted the provision of GASB Statement No. 42 *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, an amendment to GASB Statement No. 34. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries.

### (p) Tax Refunds Payable

During the calendar year, the Commonwealth collects individual income taxes through withholdings and payments from taxpayers. At June 30, the Commonwealth estimates the amount owed to taxpayers for overpayments during the first half of the calendar year. These estimated amounts and the actual tax refunds claimed for prior years but not paid at year-end are recorded as tax refunds payable and as a reduction of tax revenue.

### (q) Deferred Revenue

Deferred revenue at the governmental fund level arises when potential revenue does not meet either the "measurable" or the "available" criteria for revenue recognition in the current period. Deferred revenue also arises when resources are received before the Commonwealth has a legal claim to them, as when grant moneys are received prior to incurring the qualifying expenditures. In subsequent periods, when the revenue recognition criteria is met, or when the Commonwealth has a legal claim to the resources, the liability for deferred revenue is removed from the balance sheet and the revenue is recognized. Deferred revenue at the government-wide and proprietary fund levels arises only when the Commonwealth receives resources before it has a legal claim to them.

### (r) Long-term Debt

The liabilities reported in the government-wide financial statements include Commonwealth general obligation bonds and long-term notes, obligations under lease/purchase agreements, and long-term liabilities including vacation, sick leave, long-term liabilities to other governmental entities, net pension obligation, legal claims, and noncurrent federal fund cost disallowances related to expenditures of federal grants. Long-term obligations financed by proprietary fund types and component units are recorded as liabilities in those funds and in the discretely presented component units column.

Premiums, discounts, and issuance costs – in the government-wide financial statements, long-term debt and other long-term obligations are presented in the columns for governmental and business-type activities. The same is presented in the proprietary fund financial statements. Bond and note premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the debt. Bonds and notes payable are reported net of the applicable bond premium or discount. Bond issuance costs are reported as deferred charges in other assets and are amortized over the term of the related debt. In the governmental fund financial statements, governmental funds recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuance are reported as other financing sources while discounts are reported as other financing uses. Issuance costs, whether or not withheld from the actual debt proceeds received, are reported as expenditures.

61

(Continued)

PR-CCD-0007017

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*(s)* *Reservations of Fund Balance – Governmental Funds*

The governmental fund financial statements present fund balance reserves for those portions of fund balance (1) not available for appropriation for expenditures or (2) legally segregated for a specific future use. Reserves for encumbrances, debt service, and other specific purposes are examples of the latter.

*(t)* *Accounting for Pension Costs*

For the purpose of applying the requirements of GASB Statement No. 27, *Accounting for Pensions by State and Local Government Employers*, the Commonwealth's financial reporting entity is considered to be a sponsor of three single-employer defined-benefit pension plans: ERS, JRS, and the TRS. This is because substantially all the participants in the three pension trust funds are part of the financial reporting entity of the Commonwealth. For the purpose of the basic financial statements, and as disclosed in note 19, the Commonwealth's annual pension cost, measured on the accrual basis of accounting, for the year ended June 30, 2006 amounted to approximately $866 million. However, the amount recognized as pension expenditure in the governmental funds was recorded under the modified-accrual basis, and amounted to approximately $602 million. The excess of the annual required contribution over the statutorily required contributions increased the net pension obligation at June 30, 2006 to approximately $4.7 billion. This amount is presented in the statement of net assets of the governmental activities as of June 30, 2006.

For purposes of the stand-alone financial statements of each of the blended and discretely presented component units, the entities accounted for pension costs from the standpoint of a participant in a multiple-employer cost-sharing plan. Accordingly, pension costs recognized are equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions. The basis of accounting used by the component units was either modified-accrual basis or accrual basis, depending upon individual fund structure and type of entity. Most component units did not have pension-related assets or liabilities at transition because they have contributed the statutorily required contributions.

*(u)* *Post-employment Benefits*

In addition to the pension benefits described in note 19, the Commonwealth provides post-employment healthcare benefits and a Christmas bonus for its retired employees in accordance with local law. Substantially all of the employees may become eligible for these benefits if they reach normal retirement age while working for the Commonwealth. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share of not more than $100 per month for each retiree. During the year ended June 30, 2006, the cost of providing healthcare benefits amounted to approximately $148 million for approximately 123,534 retirees. The Christmas bonus paid to these retired employees during the year ended June 30, 2006 was $400 per retiree and the total amount was approximately $49.4 million. These benefits are recorded as expenditures when paid in the general fund.

*(v)* *Compensated Absences*

The vacation policy of the Commonwealth generally provides for the accumulation of 2.5 days per month, except for the teachers who accrue 4 days per month. Vacation time accumulated is fully

62

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

vested to the employees from the first day of work up to a maximum of 60 days. Employees accumulate sick leave generally at a rate of 1.5 days per month up to a maximum of 90 days. Upon retirement, an employee receives compensation for all accumulated unpaid leave at the current rate, if the employee has at least 10 years of service with the Commonwealth. Accrued compensated absences of the primary government at June 30, 2006 amounting to approximately $1.7 billion are presented in the statement of net assets. Compensated absence accumulation policies for the blended component units and discretely presented component units vary from entity to entity based on negotiated agreements and other factors agreed upon between the management of these entities and their employees.

The Public Service Personnel Law requires certain component units and the primary government of the Commonwealth to annually pay the employees the accumulated vacation and sick leave earned in excess of the limits mentioned above.

*(w) Interfund and Intraentity Transactions*

The Commonwealth has the following types of transactions among funds:

*Interfund Transfer* – Legally required transfers that are reported when incurred as transfer-in by the recipient fund and as transfers-out by the disbursing fund, with receivables and payables presented as amounts due to and due from other funds. Advances between funds are also presented as amounts due to and due from other funds. However, these transfers and related amounts receivable and payable are considered internal balances and activities that have been eliminated in the government-wide financial statements.

*Intraentity Transactions* – There are two types of intraentity transactions. First, are resource flows between the primary government and its component units and among the component units. These resource flows and related outstanding balances are reported as if they were external transactions. However, resource flows between the primary government and blended component units are classified as interfund transactions, as described above. Second, are intraentity balances between the primary government funds and discretely presented component units that are tantamount to long-term debt financing. The primary government's liability is reported in the statement of net assets, the proceeds in the primary government's funds, and the asset in the discretely presented component units' statement of net assets.

*(x) Lottery Revenue and Prizes*

The revenue, expenses, and prizes awarded by the Lottery of Puerto Rico and the Additional Lottery System, reported within the lotteries enterprise fund, are recognized as drawings are held. Moneys collected prior to June 30 for tickets related to drawings to be conducted subsequent to June 30 are reported as deferred revenue. Unpaid prizes awarded as of June 30 are reported as a fund liability.

*(y) Risk Management*

The Commonwealth purchases commercial insurance covering casualty, theft, tort claims, and other losses for the primary government, most component units, and the municipalities. The Commonwealth is reimbursed for premium payments made on behalf of the component units and the municipalities. The current insurance policies have not been canceled or terminated. For workers'

63 (Continued)

PR-CCD-0007019

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

compensation, the Commonwealth has a discretely presented component unit, the SIFC, which provides workers' compensation to both public and private employees. In the past three years, the Commonwealth has not settled claims that exceed insurance coverage.

Certain component units combine commercial insurance with internal self-insurance funds covering specific risks related to their specialized operations.

(z) *GASB Technical Bulletin No. 2004-1*

The Children's Trust (the Trust) follows GASB Technical Bulletin No. 2004-1, Tobacco Settlement Recognition and Financial Reporting Entity Issue (the TB), which provides accounting guidance for entities created to obtain the rights to all or a portion of future tobacco settlement resources and for the governments that create such entities.

The TB indicates that the entity created to obtain the rights, which is called the Tobacco Settlement Authority (TSA), should be considered a component unit of the government that created it and the component unit should be blended. The TB also states that the government receiving the payments from the tobacco companies under the Agreement, which are called settling governments, should recognize a receivable and revenue for tobacco settlement resources (TSRs) when an event occurs. The event that results in the recognition of an asset and revenue by the settling government is the domestic shipment of cigarettes. The TB indicates that accruals should be made by the settling government and TSAs for estimates for estimated shipments from January 1 to their respective fiscal year-ends, since the annual payments are based on a calendar year. However, under the modified-accrual basis of accounting at the fund level, revenue should be recognized only to the extent that resources are available.

(aa) *Reclassifications*

Certain reclassifications have been made to the information presented in the separately issued financial statements of certain blended component units and agencies included within the special revenue, debt service, capital projects, proprietary funds, and discretely presented component units to conform to the accounting classifications used by the Commonwealth in the basic financial statements.

(bb) *Use of Estimates*

The preparation of the basic financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the basic financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

(Continued)

PR-CCD-0007020

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*(cc)* *Future Adoption of Accounting Pronouncements*

The GASB has issued the following accounting standards that have effective dates after June 30, 2006:

- GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Post-employment Benefits Other Than Pensions*, which is effective for fiscal years beginning after December 15, 2006.

- GASB Statement No. 48, *Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfer of Assets and Future Revenues*, which is effective for periods ending after December 31, 2007.

- GASB Technical Bulletin No. 2004-2, *Recognition of Pensions and Other Post-employment Benefit Expenditures/Expense and Liability by Cost-Sharing Employers*. As it relates to pension transactions, this Technical Bulletin is effective for financial statements for periods ending after December 15, 2004. As it relates to OPEB transactions, it is effective for financial statements for periods beginning after December 15, 2006. The effect of this Technical Bulletin on the accompanying basic financial statements was not considered material as it relates to pension transactions.

The impact of these statements on the Commonwealth's basic financial statements has not yet been determined.

**(2) Component Units**

The Commonwealth follows the provisions of GASB No. 14. The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

Blended component units:

> Public Buildings Authority
> Puerto Rico Maritime Shipping Authority
> The Children's Trust

Discretely presented component units:

> Agricultural Services and Development Administration
> Automobile Accidents Compensations Administration
> Cardiovascular Center Corporation of Puerto Rico and the Caribbean
> Caribbean Basin Projects Financing Authority
> Culebra Conservation and Development Authority
> Employment and Training Enterprises Corporation
> Farm Insurance Corporation of Puerto Rico
> Fine Arts Center Corporation
> Governing Board of the 9-1-1 Service
> Government Development Bank for Puerto Rico

65

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Musical Arts Corporation
National Parks Company of Puerto Rico
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Higher Education
Puerto Rico Electric Power Authority
Puerto Rico Government Investment Trust Fund
Puerto Rico Health Insurance Administration
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical, Environmental
     Control Facilities Financing Authority
Puerto Rico Infrastructure Financing Authority
Puerto Rico Land Administration
Puerto Rico Medical Services Administration
Puerto Rico Metropolitan Bus Authority
Puerto Rico Municipal Finance Agency
Puerto Rico Ports Authority
Puerto Rico Public Broadcasting Corporation
Puerto Rico School of Plastic Arts
Puerto Rico Solid Waste Authority
Puerto Rico Trade and Export Company
Puerto Rico Telephone Authority
Right to Employment Administration
Special Communities Perpetual Trust
State Insurance Fund Corporation
University of Puerto Rico

(3) **Stewardship, Compliance, and Accountability**

(a) *Budgetary Control*

The Governor is constitutionally required to submit to the Legislature an annual balanced budget of the Commonwealth for the ensuing fiscal year. The annual budget is prepared by the Commonwealth's Office of Management and Budget (OMB) and takes into consideration the advice provided by the Puerto Rico Planning Board (annual economic growth forecasts, and four-year capital improvements plan), the Department of the Treasury of the Commonwealth (revenue estimates, accounting records, and the comprehensive annual financial report), GDB (fiscal agent), and other governmental offices and agencies. Section 7 of Article VI of the Constitution of Puerto Rico provides that "The appropriations made for any fiscal year shall not exceed the total revenue, including available surplus, estimated for said fiscal year, unless the imposition of taxes sufficient to cover said appropriations is provided by law."

66

(Continued)

PR-CCD-0007022

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The annual budget, which is developed utilizing elements of performance-based program budgeting and zero-based budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under: (1) laws existing at the time the budget is submitted; and (2) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year capital improvements plan adopted by the Puerto Rico Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying other sources of revenue to cover such deficit. Upon approval by the Legislature, the budget is referred to the Governor who may decrease or eliminate any line item but may not increase or insert any new line item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, the annual budget for the preceding fiscal year, as approved by the Legislature and the Governor, is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments for its operating and other expenses until the new budget is approved. The appropriated annual budget for fiscal year 2006 amounted to approximately $5.5 billion. The Legislature also made several special budgetary appropriations to the general fund throughout the year, which amounted to approximately $3.4 billion.

The OMB has authority to amend the budget within a department, agency, or government unit without legislative approval.

For budgetary purposes, encumbrance accounting is used. The encumbrances (that is, purchase orders, contracts) are considered expenditures when a commitment is made. For GAAP reporting purposes, encumbrances outstanding at year-end are reported as reservations of budgetary appropriations within GAAP fund balances and do not constitute expenditures or liabilities on a GAAP basis because the commitments will be honored during the subsequent year. The unencumbered balance of any appropriation of the general fund at the end of the fiscal year lapses immediately. Appropriations, other than in the general fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending.

In addition, the Legislature may direct that certain revenue be retained and made available for spending within a specific appropriation account. Generally, expenditures may not exceed the level of spending authorized for an individual department. However, the Commonwealth is statutorily required to pay debt service, regardless of whether such amounts are appropriated. Appropriations are enacted for certain departments, agencies, and government units included in the balance sheet of the general fund. For these funds, a statement of revenue and expenditures – budget and actual budget basis – general fund is included. Appropriations for capital projects are made for each bond issue and the authorization continues for the expected construction period.

The Commonwealth's Department of the Treasury and OMB have the responsibility to ensure that budgetary spending control is maintained on an individual department basis. OMB may transfer part

PR-CCD-0007023

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

or all of any unencumbered balance within a department to another department subject to legislative approval. Budgetary control is exercised through the Puerto Rico Integrated Financial Accounting System (PRIFAS). PRIFAS ensures that encumbrances or expenditures are not processed if they exceed the department's total available spending authorization, which is considered its budget. The legal level of budgetary control is at the individual department level for general fund expenditures, principal and interest due for the year for the debt service fund, and by bond authorization for capital expenditures.

*(b)* ***Budget/GAAP Reconciliation***

The following schedule presents comparisons of the legally adopted budget with actual data on a budget basis. Because accounting principles applied for purposes of developing data on a budget basis differ significantly from those used to present financial statements in conformity with GAAP, a reconciliation of entity, timing, and basis differences in the excess (deficiency) of revenue and other financing sources over expenditures and other financing uses for the year ended June 30, 2006 is presented below for the general fund (expressed in thousands):

| | | |
|---|---|---:|
| Deficiency of revenue and other financing sources over expenditures and other financing uses – budget basis | $ | (461,241) |
| Entity differences: | | |
| Excess (deficiency) of revenue and other financing sources over expenditures and other financing uses for: | | |
| Non-budgeted funds | | 402,864 |
| Inclusion of agencies with independent treasuries | | (66,354) |
| Timing differences: | | |
| Adjustment for encumbrances | | 39,370 |
| Current year expenditure against prior year encumbrances | | (30,718) |
| Basis of accounting differences: | | |
| Net increase in taxes receivable (net of tax refunds) | | 108,079 |
| Net increase in other receivables | | 90,580 |
| Net decrease in deferred revenue | | 37,802 |
| Excess of revenue and other financing sources over expenditures and other financing uses (GAAP basis) | $ | 120,382 |

68

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*(c)*    *Deficit Net Assets*

The following activities, funds, and discretely presented component units reflect deficit fund balance/net assets at June 30, 2006 (expressed in thousands):

Primary government:

| | | |
|---|---|---:|
| Governmental activities | $ | 17,209,563 |
| General fund | $ | 383,755 |
| PBA capital projects fund | $ | 32,026 |
| Enterprise fund – lotteries | $ | 170,007 |

Component units:

| | | |
|---|---|---:|
| Land Authority of Puerto Rico | $ | 124,912 |
| Agricultural Services Development Administration | $ | 107,674 |
| Puerto Rico Medical Services Administration | $ | 48,264 |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | $ | 32,889 |
| Employment and Training Enterprises Corporation | $ | 6,034 |
| Right to Employment Administration | $ | 2,527 |
| Musical Arts Corporation | $ | 950 |

The Commonwealth's governmental activities show a deficit of approximately $17.2 billion, mostly attributed to long-term obligations amounting to approximately $26 billion, which is recognized in the statement of net assets. On the other hand, the discretely presented component units report net assets of approximately $13.1 billion. This inverse relationship between the governmental activities and component units' net assets reveal the operational structure of the Commonwealth where the primary government issues debt, the proceeds of which are predominantly transferred to the component units and to other governments as well, to finance their capital projects and other operational needs. The Commonwealth includes within the annual budgetary appropriation process the necessary funds to cover the annual debt service requirements of the aforementioned debt, most of which are the result of Act No. 164 of December 17, 2001, described in note 14(d). Also, as part of the fiscal reform referred to below, certain component units will be subject to reductions in future legislative appropriations provided by the primary government, requiring the affected component units to increase their revenue base and fee structure currently being charged to the general public.

In an effort to address the Commonwealth's structural budget imbalance and its other fiscal difficulties, the Executive Branch and the Legislative Assembly enacted and the Governor signed legislation providing for tax reform and fiscal reforms. The tax reform legislation is aimed at increasing revenues by expanding the tax base through the implementation of a broad-based sales tax. The fiscal reform legislation is aimed at limiting expenditures in relation to past spending rates and stabilizing expenditure growth at a level below that of recurring revenues.

69                                                                                          (Continued)

PR-CCD-0007025

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

On July 4, 2006 the legislative assembly approved Act No. 117 (Act 117) which amends the Puerto Rico Internal Revenue Code of 1994 (the PR Code) to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the Central Government Sales Tax). Act 117 also authorizes each municipal government to impose a municipal sales and use tax of 1.5% (the Municipal Sales Tax and, together with the Central Government Sales Tax, the Sales Tax). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods), and limitations as those provided for the Central Government Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets. Act 117 repeals the 5% general excise tax imposed on imported goods and on goods manufactured in Puerto Rico. Certain items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items and will not be subject to the Sales Tax. The effective date of the repeal of the 5% general excise tax was October 17, 2006 pursuant to Act 229.

The Sales Tax will be effective on November 15, 2006. Municipalities, however, were authorized to implement the Municipal Sales Tax starting on July 1, 2006, and some have already done so. The revenues derived from the Sales Tax will be distributed as follows: (i) municipal governments will retain 1.3% of the Sales Tax, (ii) the Financial Assistance Fund, created by Act No. 91 of May 13, 2006, will receive 1% of the Sales Tax, and (iii) the General Fund will receive 4.7% of the Sales Tax. The revenues to be generated by the Sales Tax will be partly offset by the partial elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

Act 117 also provides for special income tax rates with respect to certain transactions occurring on and between July 1, 2006 and December 31, 2006. These special tax rates will apply to eligible dividends declared by domestic corporations or partnerships and "built-in" gains associated with capital assets held for periods in excess of six months, as well as certain withdrawals from retirement accounts. These special tax rates are only available for transactions in connection with capital assets consisting of stock or participations of domestic and foreign corporations and partnerships, and real property located in Puerto Rico. In the case of resident corporations and partnerships, these special tax rates apply only to real property located in Puerto Rico.

The Additional Lottery System (electronic Lotto Games) activities show a deficit of approximately $170 million, mostly attributed to a payment amounting to $200 million made in the prior year to the Commonwealth. This transaction was authorized pursuant to Law No. 171, dated July 29, 2004, which among other things authorizes the Secretary of the Treasury of the Commonwealth to provide funding for the payment of Lotto prize annuities upon depletion of other resources available at the Additional Lottery.

It is the opinion of the Additional Lottery Management that the deficiency is not an indication of financial difficulties for the payment of long-term Lotto prizes because funds will always be provided from either the Additional Lottery or from financial assistance from the Commonwealth.

(Continued)

PR-CCD-0007026

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

**(4)  Changes in Reporting Entity and Restatement**

The following table illustrates the change to net assets at the beginning of the year as previously reported in the governmental activities' statement of net assets and to fund balances at the beginning of the year as reported in the statement of revenue, expenditures, and changes in fund balances – governmental funds. The changes resulted from the effect of a correction of housing units and land lot held for resale, cash accounts not recorded in prior years, and to correct miscellaneous accounts resulting in a net effect of $67.8 million. In addition, capital assets were decreased by $22.9 million. The beginning balances have been restated as follows (expressed in thousands):

|  | Net assets – governmental activities | Fund balances – general fund |
|---|---|---|
| Beginning balance, as previously reported | $ (15,916,789) | (511,271) |
| Correction of errors | 7,134 | 7,134 |
| Over capitalization of capital assets | (22,919) | — |
| Beginning balance, as restated | $ (15,932,574) | (504,137) |

The following table summarizes changes to net assets at the beginning of the year as previously reported in the statement of net assets by certain discretely presented component units. The changes resulted primarily from exclusions of nonmajor component units in the current year's presentation, and restatements to correct errors in the prior year's financial statements of certain component units (expressed in thousands):

| | |
|---|---|
| Beginning net assets, as previously reported | $ 17,763,736 |
| Restatement of major component units: | |
|     Puerto Rico Highways and Transportation Authority | (4,027,913) |
|     Puerto Rico Infrastructure Financing Authority | 1,394 |
| Restatements of non-major component units | (8,954) |
| Non-major component units excluded in fiscal year 2005, but included in fiscal year 2006 | 11,526 |
| Non-major component units included in fiscal year 2005, but excluded in fiscal year 2006 | (27,075) |
| Beginning net assets, as restated | $ 13,712,714 |

The Puerto Rico Highways and Transportation Authority has restated its financial statements principally for projects included as construction in progress that had also been included as roads, bridges, and for certain other projects for which capitalized interest has been overstated. The net effect of the restatement was to decrease capital assets and beginning balance of net assets by approximately $4 billion.

**(5)  Puerto Rico Government Investment Trust Fund (PRGITF)**

PRGITF was created by Act No. 176, of August 11, 1995, and began operations on December 4, 1995. PRGITF is a no-load diversified collective investment trust administered by GDB that was created for the purpose of providing eligible governmental investors of Puerto Rico with a convenient and economical

(Continued)

PR-CCD-0007027

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

way to invest in a professionally managed money market portfolio. PRGITF is not an investment company or a mutual fund and is not subject to regulation or registration under the investment company Act of 1940. Units issued by PRGITF are not subject to regulation or registration under the Securities and Exchange Act of 1933, as amended, because the units are issued by a government entity. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

PRGITF is considered a 2a7-like external investment pool, and as such, reports its investment at amortized cost.

The investment securities on hand at June 30, 2006, consisted of certificates of deposit, bank notes, corporate obligations, commercial paper, and U.S. government and agencies obligations, all of which may be considered highly liquid. However, the participants' investments are subject to the ability of PRGITF to receive payment from the securities' issuer when due. The liquidity of certain investments and changes in interest rates may affect PRGITF's yield and the fair value of its investments.

72                                                                              (Continued)

PR-CCD-0007028

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The dollar amount of the deposits on hand at June 30, 2006, at $1.00 per unit of participation, was reported in the individual financial statements of each of the participants, and combined in the basic financial statements as follows (expressed in thousands):

| | Balance outstanding | Percentage of total |
|---|---|---|
| Primary government: | | |
| Commonwealth | $ 231,207 | 66.80% |
| The Children's Trust | 73,648 | 21.28% |
| Public Buildings Authority | 78 | 0.02% |
| Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities | 2 | 0.00% |
| Total for primary government | 304,935 | 88.10% |
| Discretely presented component units: | | |
| Puerto Rico Aqueduct and Sewer Authority | 18,304 | 5.30% |
| Government Development Bank for Puerto Rico | 16,157 | 4.67% |
| Institutional Trust of National Guard of Puerto Rico | 3,510 | 1.01% |
| Puerto Rico Land Administration | 611 | 0.18% |
| Puerto Rico Solid Waste Authority | 560 | 0.16% |
| State Insurance Fund Corporation | 413 | 0.12% |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | 409 | 0.12% |
| Puerto Rico Electric Power Authority | 155 | 0.04% |
| Puerto Rico Infrastructure Financing Authority | 148 | 0.04% |
| Puerto Rico Highways and Transportation Authority | 97 | 0.03% |
| National Parks Company of Puerto Rico | 43 | 0.01% |
| Puerto Rico Convention Center District Authority | 5 | 0.00% |
| | 40,412 | 11.68% |
| Other governmental entities | 776 | 0.22% |
| Total for all participants | $ 346,123 | 100.00% |

The deposits at June 30, 2006 were invested in securities with a cost which approximates fair value, plus accrued interest, for approximately $346 million. The external portion of PRGITF was not considered significant for separate reporting in the accompanying basic financial statements.

**(6)  Deposits and Investments**

Pursuant to the provisions of Act No. 91 of March 29, 2004 that superseded Act No. 218 of 1951, as amended, the primary government may invest in different types of securities, including domestic, international, and fixed income securities, among others.

The primary government maintains a cash and investment pool that is available for use by all funds, except for the fiduciary funds. Each fund's portion of this pool is reported on the statement of net assets as cash

PR-CCD-0007029

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

and cash equivalents. The fiduciary funds investments are held and managed separately from those of other primary government funds.

### *Primary Government*

Cash and cash equivalents consist of demand deposits, interest-bearing accounts, certificates of deposit, and bank investment contracts.

The carrying amount of deposits of the primary government at June 30, 2006 consists of the following (expressed in thousands):

| | Carrying amount | | | |
|---|---|---|---|---|
| | **Unrestricted** | **Restricted** | **Total** | **Bank balance** |
| Commercial banks and U.S. Treasury | $ 609,247 | 692,637 | 1,301,884 | 870,144 |
| Component unit banks | 1,783,040 | 1,896,060 | 3,679,100 | 2,775,618 |
| Total | $ 2,392,287 | 2,588,697 | 4,980,984 | 3,645,762 |

Custodial credit risk is the risk that in the event of bank failure, the primary government's deposit might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

At year-end, the Commonwealth's bank balance of deposits in commercial banks amounting to $337 million was covered by Federal depository insurance or by collateral held by the Commonwealth's agent in the Commonwealth's name. Deposits of approximately $533 million with the U.S. Treasury represent unemployment insurance taxes collected from employers that are transferred to the Federal Unemployment Insurance Trust Fund in the U.S. Treasury. These deposits are uninsured and uncollateralized. The bank balance of deposits in component unit banks, which as of June 30, 2006 amounted to approximately $2.8 billion, are also uninsured and uncollateralized. These deposits in component unit banks are maintained with GDB and EDB. Deposits maintained in GDB and EDB are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk because in the event of GDB's or EDB's failure, the Commonwealth may not be able to recover these deposits.

(Continued)

PR-CCD-0007030

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Deposits in component unit banks represent the balance of interest and noninterest-bearing accounts in GDB and EDB. The deposit liability at GDB and EDB is substantially related to deposits from other component units and of the Commonwealth. The deposit liability does not agree with the governmental cash balances shown above because of reconciling items such as outstanding checks and deposits in transit. The bank balance of GDB's and EDB's deposits at June 30, 2006 is broken down as follows (expressed in thousands):

| | | |
|---|---|---:|
| Primary government | $ | 2,698,709 |
| Discretely presented components units | | 1,901,906 |
| Total pertaining to the Commonwealth | | 4,600,615 |
| Municipalities of Puerto Rico | | 526,905 |
| Other nongovernmental entities | | 790,517 |
| Certificates of indebtedness | | 54,884 |
| Escrow accounts | | 153,487 |
| Total deposits per GDB and EDB | $ | 6,126,408 |

Unrestricted deposits include approximately $231 million that are invested in PRGITF (see note 5). Such amount has been included as cash and cash equivalents in the primary government's statement of net assets.

**Investments**

***Custodial Credit Risk***

Custodial credit risk for investments is the risk that, in the event of the failure of the counterparty to the transaction, the primary government may not be able to recover the value of the investment or collateral securities that are in the possession of an outside party. At June 30, 2006, securities investments were registered in the name of the Commonwealth and were held in the possession of the Commonwealth's custodian bank.

***Primary Government***

The fair value by investment type, credit quality ratings, and maturity of the unrestricted investments reported by the governmental activities at June 30, 2006 consist of the following (expressed in thousands):

| | | Fair market value | Investment rating | | Investment Maturity less than 1 year |
|---|---|---:|---:|---:|---:|
| | | | AAA to A | Not rated | |
| Guaranteed investment contract | $ | 83,684 | 83,684 | — | 83,684 |
| PRGITF | | 73,647 | 73,647 | — | 73,647 |
| Investment pool | | 30,769 | 30,769 | — | 30,769 |
| Non participating contracts | | 69 | 69 | — | 69 |
| Total investments | $ | 188,169 | 188,169 | — | 188,169 |

75

(Continued)

PR-CCD-0007031

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

*Business-type Activities*

The fair value by investment type, credit quality ratings, and maturity of the restricted investments reported by the business-type activities at June 30, 2006 consist of the following (expressed in thousands):

| | Fair value | | Investment rating | | |
| | Restricted | Total | AAA to A | BBB+ | Not rated |
|---|---|---|---|---|---|
| Mortgage-backed securities | $ 5,132 | 5,132 | 1,676 | — | 3,456 |
| U.S. government and agency securities | 8,044 | 8,044 | 8,044 | — | — |
| U.S. equity securities | 12,199 | 12,199 | 12,199 | — | — |
| U.S. corporate debt securities | 5,216 | 5,216 | 4,527 | 689 | — |
| Other | 2,882 | 2,882 | 2,882 | — | — |
| Total | $ 33,473 | 33,473 | 29,328 | 689 | 3,456 |

| | | Maturity (in years) | | | |
| | Fair value | Less than 1 year | 1 to 5 years | 6 to 10 years | More than 10 years |
|---|---|---|---|---|---|
| Mortgage-backed securities | $ 5,132 | — | — | — | 5,132 |
| U.S. government and agency securities | 8,044 | — | 6,797 | — | 1,247 |
| U.S. equity securities | 12,199 | 12,199 | — | — | — |
| U.S. corporate debt securities | 5,216 | — | — | 5,216 | — |
| Other | 2,882 | 1,697 | 1,185 | — | — |
| Total | $ 33,473 | 13,896 | 7,982 | 5,216 | 6,379 |

*Component Units*

Cash, cash equivalents, and investments of the component units at June 30, 2006 consist of (expressed in thousands):

| | Carrying amount | | | Bank balance |
| | Unrestricted | Restricted | Total | |
|---|---|---|---|---|
| Commercial banks | $ 2,788,852 | 828,368 | 3,617,220 | 3,653,669 |
| Component units banks | 635,650 | 797,044 | 1,432,694 | 1,481,361 |
| Total | $ 3,424,502 | 1,625,412 | 5,049,914 | 5,135,030 |

Cash and cash equivalents consist of demand deposits, interest-bearing accounts, certificates of deposit, and bank investment contracts.

Custodial credit risk is the risk that in the event of bank failure, the component unit's deposits might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

76 (Continued)

PR-CCD-0007032

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Deposits maintained in GDB and EDB are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk because in the event of GDB's or EDB's failure, the Commonwealth may not be able to recover the deposits.

The component units were exposed to the following custodial credit risk arising from the balance of deposits maintained in commercial and component unit banks at June 30, 2006 (expressed in thousands):

| | | |
|---|---|---|
| Uninsured and uncollateralized | $ | 4,176,000 |
| Uninsured and collateralized, with securities held by the pledging financial institutions | | 957,071 |
| Uninsured and collateralized, with securities held by the pledging financial institutions | | 1,959 |
| Total | $ | 5,135,030 |

*Investments*

The component units' investment policies allow management to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations

- Certificates and time deposits

- Bankers' acceptances

- Obligations of the Commonwealth of Puerto Rico and municipalities

- Federal funds sold

- Securities purchased under agreements to resell

- World Bank securities

- Corporate debt, including investment contracts

- External investment pools

- Stock of corporations created under the laws of the United States of America or the Commonwealth

- Options, futures, and interest-rates swap agreements for hedging and risk control purposes, as well as for the creation of synthetic products that qualify under any of the foregoing investment categories.

- Open-end mutual funds with acceptable underlying assets and rated AAA by Standard & Poor's or AAA by Moody's Investors Service

- A few component units, principally SIFC, are also allowed to enter into foreign currency investments, under certain limitations

The component units' investment policies establish limitations and other guidelines on amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by

77 (Continued)

# COMMONWEALTH OF PUERTO RICO

## Notes to Basic Financial Statements

June 30, 2006

country. In addition, such policies provide guidelines on the institutions with which investment transactions can be entered into.

The component unit's investment policies provide that investments transactions shall be entered into only with counterparties that are rated BBB+/A-1 or better by the Standard & Poor's or equivalent rating by Fitch or Moody's Investors Service, depending on the type and maturity of the investment and the counterparty to the transaction. Also, the investment policy specifies that no more than 5% of a manager's assets at fair value shall be invested in the securities of any single issuer.

All investments in U.S. treasury securities and mortgage-backed securities guaranteed by GNMA carry the explicit guarantee of the U.S. government and are presented as "not rated" in the table below. The credit qualifying rating for investments held by the component units at June 30, 2006 are as follows (expressed in thousands):

| | | Fair value | | | Investing rating | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Unrestricted | Restricted | Total | Rating AAA to A | BBB+ | Not rated |
| Mortgage-backed securities | $ | 593,693 | 985,805 | 1,579,498 | 1,573,483 | — | 6,015 |
| U.S. government and agency securities | | 711,972 | 2,466,220 | 3,178,192 | 3,177,905 | 205 | 82 |
| Negotiable certificates of deposit | | 306,075 | 261,148 | 567,223 | 438,825 | — | 128,398 |
| U.S. corporate stocks | | 79,196 | 16,790 | 95,986 | 16,790 | — | 79,196 |
| Non-U.S. corporate stocks | | 22,652 | 1,850 | 24,502 | — | — | 24,502 |
| U.S. corporate bonds | | 487,681 | 15,950 | 503,631 | 357,340 | 145,992 | 299 |
| Commercial paper | | — | 5,986 | 5,986 | 5,986 | — | — |
| Repurchase agreement | | 16,185 | — | 16,185 | 16,185 | — | — |
| Foreign and municipal bonds | | 9,674 | 1,521,251 | 1,530,925 | 6,753 | 1,523,473 | 699 |
| Money market fund | | 157,804 | 30,726 | 188,530 | 30,726 | — | 157,804 |
| Guaranteed investment contract | | 239,587 | 1,208,172 | 1,447,759 | 1,392,228 | — | 55,531 |
| P.R. government investment trust fund | | 17,535 | — | 17,535 | 17,126 | — | 409 |
| Investment pool | | 583,314 | 20,614 | 603,928 | 577,834 | — | 26,094 |
| Security lending transactions | | 161,705 | — | 161,705 | — | — | 161,705 |
| Investment in other equity securities | | 404,136 | — | 404,136 | — | — | 404,136 |
| Non-participating contracts | | 79,232 | 44,479 | 123,711 | — | — | 123,711 |
| Other | | 74,134 | 52,709 | 126,843 | 9,189 | 49,890 | 67,764 |
| Total investments | $ | 3,944,575 | 6,631,700 | 10,576,275 | 7,620,370 | 1,719,560 | 1,236,345 |

Certain component units classified approximately $23 million of investments presented in PRGITF as cash and cash equivalents.

78 (Continued)

PR-CCD-0007034

Case:17-03283-LTS Doc#:478-22 Filed:02/24/18 Entered:02/24/18 20:14:25 Desc:
Exhibit DX (Part II) Page 842 of 1000

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The following table summarizes the type and maturities of investments held by the component units at June 30, 2006 (expressed in thousands):

| | Fair value | Maturity (in years) | | | | |
|---|---|---|---|---|---|---|
| | | Less than 1 year | 1-5 years | 6-10 years | More than 10 years | No stated maturity date |
| Mortgage-backed securities | $ 1,579,498 | 36,605 | 59,183 | 24,520 | 1,459,190 | — |
| U.S. government and agency securities | 3,178,192 | 332,981 | 920,042 | 375,018 | 1,550,103 | 48 |
| Negotiable certificates of deposit | 567,223 | 315,378 | 2,428 | — | 249,417 | — |
| U.S. equity securities | 95,986 | — | — | — | — | 95,986 |
| Non-U.S. equity securities | 24,502 | — | — | — | 1,850 | 22,652 |
| U.S. corporate debts securities | 503,631 | 78,059 | 267,626 | 87,184 | 70,762 | — |
| Commercial paper | 5,986 | 5,986 | — | — | — | — |
| Repurchase agreement | 130,316 | 130,316 | — | — | — | — |
| Foreign and municipal bonds | 1,530,925 | 102,118 | 375,169 | 454,771 | 598,867 | — |
| Money market fund | 188,530 | 157,804 | — | — | — | 30,726 |
| Guaranteed investment contract | 1,447,759 | 261,354 | 301,554 | — | 884,851 | — |
| PRGITF | 17,535 | 17,122 | — | — | — | 413 |
| Investment pool | 603,928 | 577,834 | — | — | — | 26,094 |
| Security lending transactions | 47,574 | 27,569 | 13,205 | 6,800 | — | — |
| Investment in other equity securities | 404,136 | 352,123 | — | — | 800 | 51,213 |
| Non-participating contracts | 123,711 | 99,773 | — | — | 23,938 | — |
| Other | 126,843 | 3,996 | 63,944 | — | — | 58,903 |
| Total investments | $ 10,576,275 | 2,499,018 | 2,003,151 | 948,293 | 4,839,778 | 286,035 |

The component units were exposed to the following custodial credit risk for investments held at June 30, 2006 (expressed in thousands):

| | | |
|---|---|---|
| Insured or registered | $ | 2,385,461 |
| Uninsured and registered, with securities held by the counterparty's trust department or agent in the component units' name | | 8,013,984 |
| Uninsured and unregistered, with securities held by the counterparty's trust department or agent, but not in the component units' name | | 176,830 |
| Total | $ | 10,576,275 |

(Continued)

PR-CCD-0007035

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

**Foreign Currency Risk**

SIFC limits its exposure to foreign currency risk by limiting the total amount invested to 5% of the portfolio. The SIFC investments were presented as follow (in thousands):

| Investment type | Local currency | Fair value |
|---|---|---:|
| Money market funds | Canadian Dollar | $ 1 |
| | Euro | 55 |
| | Japanese Yen | 57 |
| | | $ 113 |
| Common stocks | Australian Dollar | $ 995 |
| | British Pound | 14,930 |
| | Canadian Dollar | 995 |
| | Danish Krone | 974 |
| | Euro | 16,739 |
| | Hong Kong Dollar | 1,351 |
| | Japanese Yen | 12,905 |
| | Norwegian Krone | 1,051 |
| | Swedish Krone | 823 |
| | Swiss Franc | 6,379 |
| | | $ 57,142 |

Unrestricted repurchase agreements of approximately $16 million belongs to EDB. As of June 30, 2006, the fair value of the collateral for the repurchase agreements amounted to approximately $16 million for EDB, which consisted primarily of investment securities held in custody by EDB's agent.

*Fiduciary Funds*

Cash and cash equivalents of the fiduciary funds at June 30, 2006 consist of the following (expressed in thousands):

| | Carrying amount | | | Bank balance |
|---|---|---|---|---|
| | Unrestricted | Restricted | Total | |
| Commercial banks | $ 666,159 | 1,717 | 667,876 | 670,331 |
| Governmental banks | 75,935 | 2,156 | 78,091 | 23,031 |
| Total | $ 742,094 | 3,873 | 745,967 | 693,362 |

Cash and cash equivalents consist of demand deposits, interest-bearing accounts, certificates of deposit, and bank investment contracts.

80 (Continued)

PR-CCD-0007036

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*Custodial Risk*

Custodial credit risk is the risk that, in the event of a bank failure, the fiduciary funds' deposits might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

Deposits maintained in component unit banks are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk because in the event of the component unit bank's failure, the Commonwealth may not be able to recover these deposits.

As of June 30, 2006, $47.2 million was exposed to custodial credit risk. Cash exposed to foreign currency risk as of June 30, 2006 is as follows (expressed in thousands):

| Investment type | Currency | Fair value at U.S. dollar currency |
|---|---|---|
| Foreign currency | South African Rand | $ 719 |
| Foreign currency | Japanese Yen | 312 |
| Foreign currency | Swiss Franc | 27 |
| Foreign currency | Singapore Dollar | 18 |
| Foreign currency | Australian Dollar | 2 |
| Foreign currency | New Turkish Lira | 1 |
| | | $ 1,079 |

81

(Continued)

PR-CCD-0007037

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*Investments*

The investment policies of the pension trust funds limit the investment in corporate debt securities to the top rating issued by nationally recognized credit rating organizations. The portfolio is expected to maintain a minimum weighted average credit quality of either "A" or better using either Standard and Poor's or Moody's credit ratings. The following table summarizes the fair value by investment type and maturities of investments held by the pension trust funds at June 30, 2006 (expressed in thousands):

| Investments type | Less than 1 year | 1-5 years | 6-10 years | More than 10 years | No stated maturity date | Total |
|---|---|---|---|---|---|---|
| Non-U.S. securities and other investments | $ — | — | — | — | 989,438 | 989,438 |
| U.S. equity securities | — | — | — | — | 2,330,196 | 2,330,196 |
| U.S. government and agencies securities | 101,778 | 113,732 | 37,799 | 142,385 | — | 395,694 |
| Mortgage-backed securities | — | — | — | 7 | — | 7 |
| Money market funds | — | — | — | — | 5,961 | 5,961 |
| Municipal bonds | 100 | — | — | — | — | 100 |
| U.S. corporate debt securities | 4,016 | 59,154 | 94,160 | 85,099 | 1,435 | 243,864 |
| Limited partnership/private equity | — | — | — | — | 87,824 | 87,824 |
| Investment in PRTA Holdings | — | — | — | — | 495,318 | 495,318 |
| Other | — | — | — | — | 19,508 | 19,508 |
| Total | $ 105,894 | 172,886 | 131,959 | 227,491 | 3,929,680 | 4,567,910 |

Expected maturities will differ from contractual maturities, because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

The following table summarizes the credit quality ratings for investments held by the pension trust funds at June 30, 2006 (expressed in thousands):

| Investments type | Fair value | AAA to A | BBB+ | Not rated |
|---|---|---|---|---|
| Non-U.S. equity securities | $ 989,438 | — | — | 989,438 |
| U.S. equity securities | 2,330,196 | — | — | 2,330,196 |
| U.S. government and agencies securities | 395,694 | 387,444 | 536 | 7,714 |
| Mortgage-backed securities | 7 | — | — | 7 |
| Money market funds | 5,961 | — | — | 5,961 |
| Municipal bonds | 100 | — | 100 | — |
| U.S. debt securities | 243,864 | 120,794 | 120,344 | 2,726 |
| Limited partnership/private equity | 87,824 | — | — | 87,824 |
| Investment in PRTA Holdings | 495,318 | — | — | 495,318 |
| Other | 19,508 | — | — | 19,508 |
| Total | $ 4,567,910 | 508,238 | 120,980 | 3,938,692 |

82

(Continued)

PR-CCD-0007038

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

As of June 30, 2006 the investments of the pension trust funds were exposed to custodial credit risk as follows (expressed in thousands):

Uninsured or unregistered investments not held in the name of the
Commonwealth, but held by the counterparty's trust department, or the
counterparty's agent, but not held in the Commonwealth's name          $     16,801

At June 30, 2006, securities investments amounting to $4,055,793 were registered in the name of the pension trust funds and were held in the possession of the pension's trust funds custodian banks. Additionally, securities investments amounting to $495,318 were registered in the name of the ERS and held in its possession.

The investment in non-U.S. stocks is expected to achieve long-term, aggressive capital appreciation by investing in Core EAFE (Europe Australasia and the Far East) securities. The portfolio is expected to be broadly diversified with respect to exposures to countries, economic sectors, industries, and individual stock. No single issue is expected to exceed 5% (at market) of the portfolio.

Investments exposed to foreign currency risk as of June 30, 2006 are as follows (expressed in thousands):

| Investment type | Currency | Fair value at U.S. dollar currency |
|---|---|---|
| Equity securities | Euro | $ 270,033 |
| Equity securities | Japanese Yen | 246,779 |
| Equity securities | Pound Sterling | 223,110 |
| Equity securities | Swiss Franc | 66,699 |
| Equity securities | Australian Dollar | 38,397 |
| Equity securities | Swedish Krona | 30,358 |
| Depository receipts | Commingled | 24,246 |
| Equity securities | Hong Kong Dollar | 23,910 |
| Mutual funds | Pound Sterling | 17,726 |
| Equity securities | New Zealand Dollar | 10,020 |
| Equity securities | Russia Rubles | 8,858 |
| Equity securities | Danish Krone | 5,650 |
| Equity securities | Canadian Dollar | 5,570 |
| Equity securities | Turkey Libra | 4,429 |
| Equity securities | Brazil Real | 4,429 |
| Equity securities | Mexico Pesos | 4,286 |
| Equity securities | Poland Zlotys | 2,286 |
| Equity securities | Thailand Baht | 2,143 |
| Equity securities | Singapore | 366 |
| Equity securities | South African | 143 |
| | | $ 989,438 |

83                                                                (Continued)

PR-CCD-0007039

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

(7) **Securities Lending Transactions**

During the year, the pension trust funds, included within the fiduciary funds, and SIFC and AACA, two discretely presented component units, entered into securities lending transactions. These transactions are explained below:

**Pension Trust Funds**

The Retirements System participates in a security lending program whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and irrevocable bank letters of credit equal to approximately 102% of the market value of the domestic securities on loan and 105% of the market value of the international securities on loan, with a simultaneous agreement to return the collateral for the same securities in the future. Collateral is marked to market daily and the agent places a request for additional collateral from brokers if needed. The custodian bank is the agent for the securities lending program.

Securities lending obligations for which collateral was received as of June 30, 2006 consist of the following (expressed in thousands):

| Securities lent | | FV of underlying securities |
|---|---|---|
| U.S. corporate debt securities | $ | 19,672 |
| U.S. government securities | | 61,925 |
| U.S. equity securities | | 110,496 |
| Non U.S. equity securities | | 49,819 |
| | $ | 241,912 |

(Continued)

PR-CCD-0007040

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The collateral received amounted to approximately $247.2 million. The collateral securities cannot be pledged or sold unless the borrower defaults; therefore, these transactions are not reported as assets and liabilities in the statements of fiduciary net assets. Collateral received was invested as follows:

| Collateral | | Fair value |
|---|---|---|
| Commercial paper | $ | 72,105 |
| Certificate of deposit | | 47,129 |
| Corporate | | 38,023 |
| Bank note | | 17,506 |
| TD | | 14,329 |
| Repo | | 12,107 |
| ABCP | | 7,331 |
| CP | | 3,115 |
| Deposit note | | 42 |
| Reverse repurchase agreement U.S. agency delivered | | 5,541 |
| Reverse repurchase agreement U.S. mortgage-backed tri-party | | 30,000 |
| | $ | 247,228 |

The relationship between the investment maturities and the Retirement Systems' loans cannot be determined.

At year-end, the Retirement Systems have no credit risk exposure to borrowers because the amounts that the Retirement Systems owe the borrowers exceed the amounts the borrowers owe to the Retirement Systems. The Retirement Systems' rights to collateral are defined in the contractual agreements. The borrower's creditworthiness is also proactively reviewed by the lending agent.

*Component Units*

SIFC

The Commonwealth statutes and the SIFC's board of directors' policies permit SIFC to use its investments to enter into securities lending transactions. The SIFC's securities custodian, as agent of SIFC, manages the securities lending program and receives cash, securities, or irrevocable bank letters of credit as collateral. The collateral securities cannot be pledged or sold by SIFC unless the borrower defaults. The collateral requirement is equal to 102% for securities issued in the United States and 105% for securities issued outside of the United States of the fair value of the securities lent. Additional collateral has to be provided by the next business day if its value falls to less than 100% of the fair value of the securities lent. At year-end, SIFC has no credit risk exposure to borrowers because the amounts SIFC owes the borrowers exceed the amounts the borrowers owe SIFC. Contracts with the lending agents require them to indemnify SIFC if the borrowers fail to return the securities (and if the collateral is inadequate to replace the securities lent) or fail to pay SIFC for income distributions by the securities' issuers while the securities are on loan.

All security loans can be terminated on demand by either SIFC or the borrower, although the average term of the loans is two weeks. In lending securities, the term to maturity of the securities loans is matched with the term to maturity of the investment of the cash collateral. Such matching existed at year-end. Securities

85 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

lending obligations for which cash was received as collateral as of June 30, 2006 consist of the following (expressed in thousands):

| Securities lent | | Fair value of underlying securities |
|---|---|---|
| Equity securities | $ | 58,300 |
| U.S. government, agencies, instrumentalities obligations | | 47,986 |
| U.S. corporate debt and notes | | 5,916 |
| | $ | 112,202 |

Cash collateral received amounted to $114 million and it was invested in repurchase agreements. These secured lending activities are included in the accompanying statement of net assets, since cash was received as collateral but reinvested as explained above.

In addition, SIFC had the following securities lending obligations collateralized by securities as of June 30, 2006 (expressed in thousands):

| Securities lent | | Fair value of underlying securities | Securities collateral received |
|---|---|---|---|
| U.S. government, agencies, instrumentalities obligations | $ | 37,630 | 40,067 |

These securities lending transactions are collateralized by securities that cannot be pledged or sold unless the borrower defaults; therefore, they are not reported as assets and liabilities in the accompanying balance sheets.

**AACA**

AACA lends securities to broker/dealers and other entities (borrowers) for collateral that will be returned in the future for the same securities. The custodial bank manages the securities lending program and receives cash, government securities, and letters of credit as collateral. The program provides for an initial minimum collateralization of 102% of the market value of the securities lent plus accrued income. Additional collateral has to be provided by the close of the next business day if its value falls to less than 100%. The contract with the custodial bank requires that should a collateral deficiency occur beyond the custodian's responsibilities, the deficiency should be allocated pro rata among all client lenders within the program.

Either the custodian bank or the borrower can terminate all security loans at any time. Cash collateral is invested in the program's agent short-term investment pools, which at fiscal year-end had a weighted average maturity of approximately 30 days. The relationship between securities of the investment pool and AACA loans cannot be determined.

86

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The following represents the balances relating to the securities lending transactions as of June 30, 2006 (expressed in thousands):

| Securities lent | | Fair value of underlying securities | Cash collateral received | Noncash collateral received |
|---|---|---|---|---|
| U.S. Treasury bills, bonds, and notes | $ | 17,700 | 15,832 | 2,161 |
| Common stocks and preferred stocks | | 20,882 | 20,790 | 476 |
| Corporate bonds | | 2,844 | 2,603 | 292 |
| U.S. agencies | | 8,206 | 8,349 | 1 |
| Totals | $ | 49,632 | 47,574 | 2,930 |

Secured lending transactions where cash collateral was received and reinvested are presented as assets and liabilities in the accompanying statement of net assets. Securities lending transactions collateralized by noncash collateral that cannot be pledged or sold unless the borrower defaults are not reported as assets and liabilities in the statement of net assets. At year-end, AACA has no credit risk exposure to borrowers because the amounts AACA owes the borrowers exceed the amounts the borrowers owe AACA.

(8) **Investments in Limited Partnerships**

Pursuant to the Statement of Investment Guidelines for the Government of Puerto Rico, the pension trust funds and a component unit invested approximately $7.3 million in limited partnerships during the fiscal year ended June 30, 2006. The investments were as follows:

- During fiscal year 2006, there were no contributions to Guayacán Funds of Funds, L.P., a Delaware limited partnership, organized by Grupo Guayacán, Inc. as general partner, that has total commitments of $55.5 million (of which $45 million are from pension trust funds and the remaining balance from the private corporate investors). This fund invests in United States and international private equity partnerships that in turn invest in private companies.

- During fiscal year 2006, there were no contributions to Guayacán Fund of Funds II, L.P., a Delaware limited partnership, organized by Grupo Guayacán, Inc. as general partner, that has total commitments of $62 million (of which $50 million are from the pension trust funds and the remaining balance from the private corporate investors in Puerto Rico). This fund invests in a broad range of United States and international private equity investment partnerships that, in turn, will make equity and equity-related investments primarily in private businesses.

- During the fiscal year 2006, $3.1 million was invested in Guayacán Private Equity Fund, L.P., a Delaware limited partnership, organized by Advent/Morro Partners as general partner, that has total commitments of $42 million (of which $10 million is from the pension trust funds, $22.5 million are from a component unit, and the remaining balance from the private corporate investors in Puerto Rico). This fund invests in Puerto Rico private equity.

- During the fiscal year 2006, $752,000 was invested in Invesco Venture Partnership Fund III, L.P. a Delaware limited partnership, organized by IPC Partnership Associates III, LLC as general partner in which the pension trust funds have a total commitment of $5.5 million. The Partnership was

PR-CCD-0007043

# Exhibit 20

Supplement, dated May 7, 2008, to Official Statement,
dated April 25, 2008, relating to:

$908,990,000
**COMMONWEALTH OF PUERTO RICO**
$735,015,000 Public Improvement Refunding Bonds, Series 2008 A
$173,975,000 Public Improvement Refunding Bonds, Series 2008 B
(General Obligation Bonds)

Base CUSIP 74514L

Please note the following changes to the Official Statement, dated April 25, 2008, relating to the above bonds (all terms used below have the same meanings given to them in said Official Statement, dated April 25, 2008):

1.  The first sentence under the heading "*Plan of Financing* - Refunding Plan" is deleted and in its place the following sentence is added to read as follows:

The Bonds, together with the Series 2008 C Bonds, are being issued for the purpose of refunding certain public improvement and public improvement refunding bonds of the Commonwealth (the "Refunded Bonds") and repaying a portion of a line of credit obtained from Government Development Bank in the amount of $87,697,139.43 (the "Line of Credit").

[Remainder of Page Intentionally Left Blank]

2.    The table under the heading *"Plan of Financing* - Refunding Plan" is deleted and in its place the following table is added:

| Public Improvement Bonds[1] | Principal Amount to be Refunded | Interest Rate | Maturity Date July 1. | Redemption Date | Redemption Price (% of Par) | CUSIP Number |
|---|---|---|---|---|---|---|
| 1988A[2] | $ 10,740,000 | [3] | 2008 | At maturity | N/A | 7451435F0 |
| 1989A | 2,880,000 | [3] | 2008 | At maturity | N/A | 7451436N2 |
| 1989A | 7,000,000 | [3] | 2009 | At maturity | N/A | 7451436P7 |
| 1990 | 12,245,000 | [3] | 2008 | At maturity | N/A | 745144AT2 |
| 1993[2] | 21,380,000 | 9.000% | 2008 | At maturity | N/A | 745144LE3 |
| 1993[2] | 3,560,000 | 9.000 | 2009 | At maturity | N/A | 745144ME2 |
| 1993[2] | 40,680,000 | 9.000 | 2009 | At maturity | N/A | 745144MH6 |
| 1995 | 8,705,000 | 6.250 | 2009 | At maturity | N/A | 745144Z73 |
| 1996 | 9,400,000 | 6.000 | 2009 | At maturity | N/A | 7451444M4 |
| 1998B[2] | 10,000,000 | 5.750 | 2009 | At maturity | N/A | 745145FK3 |
| 1998[2] | 9,715,000 | [3] | 2008 | At maturity | N/A | 745145EC2 |
| 1999A | 9,260,000 | 5.250 | 2009 | At maturity | N/A | 745145HF2 |
| 2002, Series B | 6,080,000 | 5.400 | 2009 | At maturity | N/A | 745145ZU9 |
| Series 2003 | 5,105,000 | 3.500 | 2008 | At maturity | N/A | 7451457D8 |
| Series 2003 | 5,285,000 | 3.800 | 2009 | At maturity | N/A | 7451457E6 |
| Series 2003 B[2] | 360,000 | 3.000 | 2008 | At maturity | N/A | 745145Y22 |
| 2003, Series B | 730,000 | 3.500 | 2008 | At maturity | N/A | 7451455V0 |
| 2003, Series B | 760,000 | 3.800 | 2009 | At maturity | N/A | 7451455W8 |
| Series 2003 C[2] | 36,450,000 | 6.000 | 2013 | 07/01/2008 | 100% | 745145Y30 |
| Series 2003 C[2] | 5,585,000 | 3.500 | 2014 | 07/01/2008 | 100 | 745145Y48 |
| Series 2003 C[2] | 229,215,000 | 5.000 | 2018 | 07/01/2008 | 100 | 745145Y55 |
| 2004, Series B | 1,515,000 | 3.500 | 2008 | At maturity | N/A | 7451456M9 |
| 2004, Series B | 1,570,000 | 3.800 | 2009 | At maturity | N/A | 7451456N7 |
| Series 2004 B-5[2] | 50,000,000 | ARS | 2029 | 05/14/2008 | 100 | 7451458H8 |
| Series 2004 B-6[2] | 50,000,000 | ARS | 2029 | 05/16/2008 | 100 | 7451458J4 |
| Series 2004 B-7[2] | 61,975,000 | ARS | 2031 | 05/12/2008 | 100 | 7451458K1 |
| Series 2004 B-8[2] | 62,000,000 | ARS | 2032 | 06/02/2008 | 100 | 7451458L4 |
| 2005, Series B | 9,825,000 | 3.150 | 2008 | At maturity | N/A | 74514LCK1 |
| 2005, Series B | 10,130,000 | 3.500 | 2009 | At maturity | N/A | 74514LCL9 |
| Series 2006 A[2] | 2,515,000 | 5.000 | 2008 | At maturity | N/A | 74514LGT8 |
| 2006, Series C | 7,825,000 | 5.100 | 2008 | At maturity | N/A | 74514LKK2 |
| 2006, Series D | 12,500,000 | 5.150 | 2009 | At maturity | N/A | 74514LKL0 |
| Series 2006C[2] | 7,665,000 | 5.200 | 2009 | At maturity | N/A | 74514LKV8 |
| 2007, Series B | 7,750,000 | 5.150 | 2009 | At maturity | N/A | 74514LLK1 |
| Series 2007A-7[2] | 100,000,000 | ARS | 2032 | 05/27/2008 | 100 | 745145NN3 |
| Series 2007B[2] | 46,625,000 | 5.125 | 2009 | At maturity | N/A | 74514LMS3 |

(1) Represents the principal amount of the Refunded Bonds; Refunded Bonds for which only interest (in the amount of $252,206,644.29) was refunded are not listed.
(2) Public Improvement Refunding Bonds.
(3) Capital Appreciation Bond.

2

PR-CCD-0006789

3.    The table under the heading *"Plan of Financing* - Sources and Uses of Funds" is deleted and in its place the following table is added:

**Sources and Uses of Funds**

**Sources:**

| | |
|---|---:|
| Principal amount of the Bonds | $ 908,990,000.00 |
| Original issue premium | 4,918,914.25 |
| Moneys from Redemption Fund | 157,443,501.94 |
| Total sources | $1,071,352,416.19 |

**Uses:**

| | |
|---|---:|
| Deposit into the Escrow Fund for Refunded Bonds | $ 979,085,417.16 |
| Underwriting discount, bond insurance premium, legal, printing, and other financing expenses[1] | 21,668,802.57 |
| Repayment of Line of Credit | 70,598,196.46 |
| Total uses | $1,071,352,416.19 |

---

[1]   Includes costs of issuance associated with the conversion of certain series of public improvement and public improvement refunding bonds included in the Commonwealth's plan of finance and the cost to the Commonwealth (approximately $9,536,750) of terminating certain interest rate swaps originally entered into in connection with the issuance of certain of the Refunded Bonds and certain other public improvement and public improvement refunding bonds being converted to other interest rate modes and remarketed.

4.    The last sentence in the fourth paragraph under the heading *"The Bonds* - Debt Limitation" is deleted.

5.    The first sentence under the heading *"Underwriting"* is deleted and in its place the following sentence is added to read as follows:

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2008 A Bonds from the Commonwealth at an aggregate discount of $3,843,636.56 from the initial offering prices of the Series 2008 A Bonds set forth or derived from information set forth on the inside cover page hereof.

This Supplement will be filed with each NRMSIR and with the MSRB.

COMMONWEALTH OF PUERTO RICO

By: /s/ José Guillermo Dávila
    Secretary of the Treasury

Dated:  May 7, 2008

3

PR-CCD-0006790

NEW ISSUE - BOOK-ENTRY ONLY
See "Book-Entry Only System" under *The Bonds*

*In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force, (i) subject to continuing compliance with certain tax covenants, interest on the Bonds will not be includable in gross income for federal income tax purposes, and (ii) the Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation under existing law. However, see "Tax Matters" for a description of alternative minimum tax consequences with respect to interest on the Bonds and other tax considerations.*

$908,990,000
# COMMONWEALTH OF PUERTO RICO
$735,015,000 Public Improvement Refunding Bonds, Series 2008 A
$173,975,000 Public Improvement Refunding Bonds, Series 2008 B
(General Obligation Bonds)

**Dated: Date of Delivery**           **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. **Purchasers will not receive delivery of the Bonds. So long as any purchaser is the beneficial owner of a Bond, he must maintain an account with a broker or dealer who is, or acts through, a DTC Participant to receive payment of principal and interest on such Bond.** See "Book-Entry Only System" under *The Bonds*. The Commonwealth will issue a portion of the Bonds with interest rates that are fixed to maturity (the "Series 2008 A Bonds") and a portion of the Bonds with interest rates that will be periodically reset by a remarketing agent in accordance with the provisions of the Bond Resolution (the "Series 2008 B Bonds" and, together with the Series 2008 A Bonds, the "Bonds"). Series 2008 A Bonds offered hereby will be available to purchasers in denominations of $5,000 and whole multiples thereof only under the book-entry system maintained by DTC through brokers and dealers who are, or act through, DTC Participants. Series 2008 B Bonds (prior to the time any such Series 2008 B Bonds are converted as herein described to an interest rate that is fixed to maturity) will be available to purchasers in denominations of $100,000 and multiples of $5,000 in excess of that amount only under said DTC book-entry system. Interest on the Bonds will accrue from their date of issuance at the annual rates described on the inside front cover, and, with respect to the Series 2008 A Bonds, will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2009, and, with respect to the Series 2008 B Bonds, will be payable initially monthly, as further described herein. The Bonds are subject to redemption prior to maturity as set forth herein.

**THE BONDS ARE GENERAL OBLIGATIONS OF THE COMMONWEALTH. THE GOOD FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH ARE IRREVOCABLY PLEDGED FOR THE PROMPT PAYMENT OF THE PRINCIPAL OF AND INTEREST ON THE BONDS. THE CONSTITUTION OF PUERTO RICO PROVIDES THAT PUBLIC DEBT OF THE COMMONWEALTH, WHICH INCLUDES THE BONDS, CONSTITUTES A FIRST CLAIM ON AVAILABLE COMMONWEALTH RESOURCES.**

In connection with the Series 2008 B Bonds, the Commonwealth will obtain an irrevocable, transferable, direct-pay letter of credit (the "Letter of Credit") from Wachovia Bank, National Association, concurrently with the issuance of such Bonds. The scheduled payment of principal of and interest on the Series 2008 B Bonds will be payable from draws upon the Letter of Credit. In addition, the Tender Agent will be entitled to draw upon the Letter of Credit to pay the Tender Price of Series 2008 B Bonds that are tendered and not remarketed. The Letter of Credit may expire, subject to earlier termination under certain circumstances or extension, prior to the final maturity of the Series 2008 B Bonds. Wachovia Bank, National Association will also serve as Remarketing Agent for the Series 2008 B Bonds.

The scheduled payment of principal of and interest on a portion of the Series 2008 A Bonds when due will be guaranteed by a financial guaranty insurance policy to be issued concurrently with the delivery of such Series 2008 A Bonds by Assured Guaranty Corp.

The Series 2008 A Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Sidley Austin LLP, New York, New York, Bond Counsel, and certain other conditions. The Series 2008 B Bonds are offered for delivery when, as and if issued and accepted by Wachovia Capital Markets LLC, subject to the approval of legality by Sidley Austin LLP, New York, New York, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Squire, Sanders & Dempsey L.L.P., Miami, Florida. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about May 7, 2008.

| UBS Investment Bank | Lehman Brothers | Wachovia Capital Markets LLC |
|---|---|---|
| Banc of America Securities LLC | BBVAPR MSD | Bear, Stearns & Co. Inc. |
| Citi | DEPFA First Albany Securities LLC | Eurobank MSD |
| Goldman, Sachs & Co. | JPMorgan | Loop Capital Markets |
| Merrill Lynch & Co. | Morgan Stanley | Oriental Financial Services |
| Popular Securities | RBC Capital Markets | Samuel A. Ramírez & Co. |
| Santander Securities | Scotia Capital | Oppenheimer & Co. Inc. |

April 25, 2008

PR-CCD-0006791

**COMMONWEALTH OF PUERTO RICO**

**$735,015,000 Public Improvement Refunding Bonds, Series 2008 A
(General Obligation Bonds)**

| Maturity July 1, | Amount | Interest Rate | Price or Yield | CUSIP |
|---|---|---|---|---|
| 2010 | $ 17,780,000 | 5.000% | 4.000% | 74514LSX6 |
| 2010 | 14,665,000 | 4.250 | 4.000 | 74514LTX5 |
| 2011 | 10,200,000 | 5.000 | 4.200 | 74514LSY4 |
| 2011 | 23,635,000 | 4.000 | 4.200 | 74514LSZ1 |
| 2012 | 14,375,000 | 5.000 | 4.350 | 74514LTA5 |
| 2012 | 20,785,000 | 4.125 | 4.350 | 74514LTB3 |
| 2013 | 29,770,000 | 5.000 | 4.450 | 74514LTC1 |
| 2013 | 6,840,000 | 4.250 | 4.450 | 74514LTD9 |
| 2014[1] | 36,110,000 | 5.000 | 3.760 | 74514LTE7 |
| 2014[1] | 27,360,000 | 4.000 | 3.760 | 74514LTF4 |
| 2015[1] | 50,220,000 | 5.000 | 3.910 | 74514LTG2 |
| 2015[1] | 15,995,000 | 4.000 | 3.910 | 74514LTH0 |
| 2016[1] | 53,955,000 | 5.000 | 4.050 | 74514LTJ6 |
| 2016 | 12,965,000 | 5.000 | 4.900 | 74514LTK3 |
| 2016[1] | 16,605,000 | 4.000 | 4.050 | 74514LTL1 |
| 2019 | 15,305,000 | 5.000 | 5.080 | 74514LTN7 |
| 2020 | 16,065,000 | 5.000 | 5.170 | 74514LTP2 |
| 2021 | 16,870,000 | 5.000 | 5.220 | 74514LTQ0 |
| 2022 | 17,715,000 | 5.000 | 5.270 | 74514LTR8 |
| 2023[2] | 18,600,000 | 5.500 | 5.260 | 74514LTS6 |
| 2024 | 19,625,000 | 5.125 | 5.350 | 74514LTT4 |
| 2025 | 20,630,000 | 5.250 | 5.400 | 74514LTU1 |
| 2026 | 21,715,000 | 5.250 | 5.450 | 74514LTV9 |

$28,555,000, 4.750% Term Bond Due July 1, 2018, Yield 5.000%, Initial CUSIP 74514LTM9
$208,675,000, 5.500% Term Bond Due July 1, 2032, Yield 5.630%, Initial CUSIP 74514LTW7

**$173,975,000 Public Improvement Refunding Bonds, Series 2008 B
(General Obligation Bonds)**

$173,975,000[3] Term Bond Due July 1, 2032, Price 100%, Initial CUSIP 74514LUA3

The interest rates on the Series 2008 B Bonds will be determined by the Remarketing Agent on May 6, 2008 and will be effective as of May 7, 2008. Such rate shall be the lowest rate that in the sole judgment of the Remarketing Agent would be necessary to market the Series 2008 B Bonds at par on May 7, 2008 for the period ending May 7, 2008. Thereafter, while bearing interest in a Daily Interest Rate Period, the Series 2008 B Bonds will bear interest at rates and in the manner described under "Description of the Series 2008 B Bonds" under *The Bonds.*

---

[1] Insured by Assured Guaranty Corp.
[2] Priced to the first optional redemption date of July 1, 2018.
[3] Bears interest initially in a Daily Interest Rate Period; Wachovia Bank, National Association, Remarketing Agent and Provider.

# Commonwealth of Puerto Rico

## Governor

ANÍBAL ACEVEDO VILÁ

## Members of the Cabinet

JORGE P. SILVA-PURAS
*Chief of Staff*

FERNANDO J. BONILLA
*Secretary of State*

ROBERTO J. SÁNCHEZ RAMOS
*Secretary of Justice*

JOSÉ GUILLERMO DÁVILA
*Secretary of the Treasury*

RAFAEL ARAGUNDE TORRES
*Secretary of Education*

ROMÁN M. VELASCO GONZÁLEZ
*Secretary of Labor and
Human Resources*

ROSA PÉREZ PERDOMO
*Secretary of Health*

GABRIEL FIGUEROA HERRERA
*Secretary of Agriculture*

CARLOS GONZÁLEZ MIRANDA
*Secretary of Transportation
and Public Works*

BARTOLOMÉ GAMUNDI CESTERO
*Secretary of Economic
Development and Commerce*

FÉLIX MATOS
*Secretary of Family Affairs*

JORGE RIVERA JIMÉNEZ
*Secretary of Housing*

JAVIER VÉLEZ AROCHO
*Secretary of Natural and
Environmental Resources*

VÍCTOR A. SUÁREZ
*Secretary of
Consumer Affairs*

DAVID E. BERNIER RIVERA
*Secretary of Sports and
Recreation*

MIGUEL A. PEREIRA
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

KENNETH D. MCCLINTOCK
President, Senate

JOSÉ F. APONTE
Speaker, House of
Representatives

*Fiscal Officers*

ARMANDO A. VALDEZ
Director, Office of
Management and Budget

JORGE IRIZARRY HERRÁNS
President,
Government Development
Bank for Puerto Rico

PR-CCD-0006793

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006794

No dealer, broker, sales representative or other person has been authorized by the Commonwealth to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information set forth herein regarding the Provider has been obtained from the Provider. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS, AS WELL AS THE OUTSTANDING GENERAL OBLIGATION BONDS OF THE COMMONWEALTH, AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

CERTAIN STATEMENTS CONTAINED IN THIS OFFICIAL STATEMENT REFLECT NOT HISTORICAL FACTS BUT FORECASTS AND "FORWARD-LOOKING STATEMENTS". THESE STATEMENTS ARE BASED UPON A NUMBER OF ASSUMPTIONS AND ESTIMATES THAT ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMMONWEALTH OF PUERTO RICO. IN THIS RESPECT, THE WORDS "ESTIMATES", "PROJECTS", "ANTICIPATES", "EXPECTS", "INTENDS", "BELIEVES" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL PROJECTIONS, FORECASTS, ASSUMPTIONS, EXPRESSIONS OF OPINIONS, ESTIMATES AND OTHER FORWARD-LOOKING STATEMENTS ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THIS CAUTIONARY STATEMENT: ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED BY FORWARD-LOOKING STATEMENTS.

Assured Guaranty Corp. makes no representations regarding the Bonds or the advisability of investing in the Bonds. In addition, Assured Guaranty Corp. has not independently verified, make no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding Assured Guaranty Corp. supplied by Assured Guaranty Corp. and presented under the heading *Bond Insurance* and Appendix IV – Specimen Bond Insurance Policy.

PR-CCD-0006795

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006796

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT .................................................................................. 1

OVERVIEW ................................................................................................................. 3

RECENT DEVELOPMENTS ....................................................................................... 4

    Fiscal Year 2008 Projected Revenues and Expenditures ............................ 4
    Fiscal Year 2009 Projected Revenues and Expenditures ............................ 4
    Indictment of Governor of Puerto Rico ....................................................... 5
    Proposed Sales Tax and Excise Tax Changes ............................................. 5
    Employees Retirement Systems Funding Improvement ............................... 6
    Planning Board Revised Economic Growth Estimates ................................ 6
    Additional Debt Guaranteed by the Commonwealth .................................... 6

PLAN OF FINANCING ................................................................................................ 6

    Refunding Plan ............................................................................................. 7
    Conversion and Remarketing Plan ............................................................... 8
    Sources and Uses of Funds .......................................................................... 9
    Letter of Credit ............................................................................................ 9

THE BONDS ................................................................................................................ 9

    General ......................................................................................................... 9
    Description of the Series 2008 B Bonds ..................................................... 10
    Conversion Provisions ................................................................................ 11
    Purchase of the Series 2008 B Bonds ........................................................ 12
    Tender Process and Sales of Series 2008 B Bonds by Remarketing Agent ... 15
    Letter of Credit and Reimbursement Agreement ........................................ 17
    Provider ...................................................................................................... 20
    Book-Entry Only System ........................................................................... 21
    Payments and Transfers ............................................................................. 24
    Discontinuance of the Book-Entry Only System ........................................ 24
    Authorization ............................................................................................. 24
    Redemption ................................................................................................. 25
    Notice of Redemption; Effect of Redemption ............................................ 26
    Security ....................................................................................................... 27
    Payment Record .......................................................................................... 28
    Debt Limitation .......................................................................................... 28
    Maturity Limitation .................................................................................... 31

BOND INSURANCE ................................................................................................... 31

    The Insurance Policy ................................................................................... 31
    Assured ....................................................................................................... 32
    Capitalization of Assured ........................................................................... 32
    Incorporation of Certain Documents by Reference ..................................... 33

i

## TABLE OF CONTENTS
(continued)

|  | Page |
|---|---|
| PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 34 |
| Public Sector Debt | 34 |
| Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 35 |
| TAX MATTERS | 36 |
| Discount Bonds | 37 |
| Premium Bonds | 38 |
| Information Reporting and Backup Withholding | 38 |
| Future Developments | 39 |
| APPROVAL OF LEGAL PROCEEDINGS | 39 |
| LEGAL INVESTMENT | 40 |
| UNDERWRITING | 40 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 41 |
| RATINGS | 42 |
| CONTINUING DISCLOSURE | 42 |
| MISCELLANEOUS | 45 |

| | | |
|---|---|---|
| Appendix I | – | Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated January 2, 2008 |
| Appendix II | – | Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2006, as amended |
| Appendix III | – | Form of Opinion of Bond Counsel |
| Appendix IV | – | Specimen Bond Insurance Policy |

ii

PR-CCD-0006798

$908,990,000
## COMMONWEALTH OF PUERTO RICO
**$735,015,000 Public Improvement Refunding Bonds, Series 2008 A**
**$173,975,000 Public Improvement Refunding Bonds, Series 2008 B**
**(General Obligation Bonds)**

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $735,015,000 aggregate principal amount of Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2008 A (the "Series 2008 A Bonds") and $173,975,000 aggregate principal amount of Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2008 B (the "Series 2008 B Bonds" and, together with the Series 2008 A Bonds, the "Bonds").

The Bonds are being issued under the provisions of Act No. 33 of the Legislature of Puerto Rico, approved December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of Puerto Rico (the "Secretary" or the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on April 25, 2008. Concurrently with the issuance of the Bonds, the Commonwealth is issuing its $190,135,000 aggregate principal amount of Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2008 C (the "Series 2008 C Bonds"), under the provisions of the Act.

*Bond Insurance.* The Series 2008 A Bonds maturing July 1 of the years 2014, 2015 and 2016 (other than the $12,965,000 principal amount maturing July 1, 2016) (collectively, the "Insured Bonds") are insured by a financial guaranty insurance policy (the "Policy") issued by Assured Guaranty Corp. ("Assured").

*Variable Rate Bonds; Letter of Credit.* The Series 2008 B Bonds bear interest at rates that will be periodically reset by the Remarketing Agent in accordance with the provisions of the Bond Resolution, as described herein. Banco Popular de Puerto Rico, San Juan, Puerto Rico, will serve as tender agent for the Series 2008 B Bonds.

The Commonwealth and Wachovia Bank, National Association (the "Provider"), will enter into a reimbursement agreement (the "Reimbursement Agreement") pursuant to which the Provider will issue an irrevocable, transferable, direct-pay letter of credit (the "Letter of Credit"), for the payment of the principal of and interest on, or Tender Price of, the Series 2008 B Bonds. Wachovia Bank, National Association will serve as remarketing agent (the "Remarketing Agent") for the Series 2008 B Bonds under a remarketing agreement with the Commonwealth (the "Remarketing Agreement").

Reference is made to the Bond Resolution for the complete terms of the Series 2008 B Bonds, including the mechanism for determining interest rates. Terms used in this Official Statement and not defined herein have the respective meanings given to them in the Bond Resolution, copies of which may be obtained by contacting Executive Vice President,

Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Executive Vice President – General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

*Security.* Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

*Additional Documents.* This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated January 2, 2008 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Commonwealth's Comprehensive Annual Financial Report for the fiscal year ended June 30, 2006, as amended, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), attached hereto as *Appendix II*. The Commonwealth Report attached hereto as *Appendix I* includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the estimated year-end results of fiscal year 2007, the budget for fiscal years 2007 and 2008, and the debt of the Commonwealth's public sector, and should be read in its entirety and in conjunction with the *Recent Developments* herein. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2006, which have been audited by KPMG LLP, independent auditors, as stated in their report dated August 1, 2007, accompanying such financial statements. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund or the Children's Trust special revenue funds (major funds), and certain activities, funds and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and its opinions, insofar as they relate to the amounts included for activities, funds and component units, separately identified in its report, are based solely on the reports of the other auditors. The report of KPMG LLP contains an explanatory paragraph referring to the Commonwealth's adoption of Governmental Accounting Standards Board ("GASB") Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, as of June 30, 2006. The Commonwealth's Annual Financial Report has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR").

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with each NRMSIR and the Municipal Securities Rulemaking Board, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a

2

statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

Under its existing continuing disclosure agreements, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial and demographic information through the end of the prior fiscal year, including the Commonwealth's Annual Financial Report. In the recent past, the Commonwealth has been unable, due to accounting rules changes and other reasons (mostly related to delays in receipt of component units' audited financial statements), to file the Commonwealth's Annual Financial Report by the May 1 continuing disclosure update filing deadline. The Commonwealth's Annual Financial Report for the fiscal year ended June 30, 2006 was filed with each NRMSIR on August 16, 2007 and an amended and restated version thereof was filed with each NRMSIR on September 13, 2007. The Commonwealth's audited financial statements for fiscal year ended June 30, 2007 are expected to be filed after the current filing deadline of May 1, 2008, because various component units did not submit their audited financial statements to the central government's external auditors on time.

## OVERVIEW

Puerto Rico is located approximately 1,600 miles southeast of New York City. According to the United States Census Bureau, its population was 3,808,610 in 2000. Puerto Rico's political status is that of a commonwealth. The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth government exercises virtually the same control over its internal affairs as is exercised by the state governments of each of the fifty states over their respective internal affairs, with similar separation of powers among the executive, legislative and judicial branches. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes, which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2007 (which ended on June 30, 2007, the Commonwealth's gross product (preliminary, in current dollars) was $58.712 billion, and personal income per capita (preliminary, in current dollars) was $13,491.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation.

3

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or the "Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2006, the estimated year-end results for fiscal year 2007 and the approved budget for fiscal year 2008, and the debt of the Commonwealth's public sector. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Fiscal Year 2008 Projected Revenues and Expenditures

As discussed in greater detail in the Commonwealth Report, the General Fund budget for fiscal year 2008 is $9.227 billion. General Fund revenues for the eight-month period ending on February 29, 2008 totaled $5.081 billion, which is $291.5 million less than the Department of the Treasury's estimate for that period. This amount includes $2.662 billion in revenues from individual and corporate income taxes, $658.6 million from non-resident withholding taxes, $553.8 million from excise taxes and $572.7 million of sales tax revenues. During fiscal year 2008, the Commonwealth recovered approximately $287 million more in federal funds than it had budgeted. This federal funds recovery represented reimbursement of amounts advanced by the Commonwealth's Department of Education during fiscal years 2006 and 2007. The Commonwealth currently anticipates that for the full fiscal year 2008, total expenditures will roughly equal the budgeted amounts. However, expenditures relating to the Health Insurance Program could exceed the budgeted amounts. As a result of the foregoing, the Commonwealth currently projects a budget deficit of approximately $119 million for fiscal year 2008 (before giving effect to the refunding of the Refunded Bonds). The Commonwealth's economic team is working together to enforce the spending control measures that have been established to attempt to minimize this budget risk.

### Fiscal Year 2009 Projected Revenues and Expenditures

On March 13, 2008, the Governor submitted a proposed General Fund budget for fiscal year 2009 of $9.488 billion, or approximately $261 million more than the estimated expenditures for fiscal year 2008 of $9.227 billion. The fiscal year 2009 budget marks the third consecutive year in which budgeted expenditures are below the fiscal year 2006 level. The increase in

4

expenditures over fiscal year 2008 is mainly due to University of Puerto Rico, judiciary and municipal formula increases and salary increases mandated by law or collective bargaining agreements. An additional $42.3 million is budgeted for the State Election Commission. The Secretary's General Fund revenue projection for fiscal year 2009 is $8.488 billion, a decrease of $183 million, or 2.1%, from estimated net revenues for fiscal year 2008 of $8.671 billion. The Commonwealth's budgeted expenditures for fiscal year 2009 of $9.488 billion exceed projected revenues of $8.488 by approximately $1 billion. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize the budget risk. In addition, the Governor has proposed two special measures which are expected to generate close to $1 billion in fiscal year 2009. These measures consist of tax receivable financings and proceeds received from a concession agreement for operation of the electronic lottery. Legislation authorizing these two measures was submitted by the Governor to the Legislature along with the budget. No assurance can be given that either of these measures will be enacted, or that if enacted, they will be in the forms recommended by the Governor.

**Indictment of Governor of Puerto Rico**

On March 27, 2008, the Governor of Puerto Rico and several other individuals were named in federal grand jury indictments relating to the use of political contributions and campaign funds during the period when the Governor was Resident Commissioner in Washington, D.C. The Governor has denied any wrongdoing and has stated his intention to remain in his position and present his defense. It is not expected that such developments will have any impact on the fiscal affairs of the Commonwealth or on the payment of any obligations issued by the Commonwealth since (i) the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal and interest on its general obligation bonds, and (ii) the Constitution of Puerto Rico provides that public debt of the Commonwealth, including its general obligation bonds, constitute a first claim on available Commonwealth revenues.

**Proposed Sales Tax and Excise Tax Changes**

On February 6, 2008, the Governor, in his State of the Commonwealth address, proposed suspending a portion of the current sales and use tax, for a reduction from 7% to 2.5%, and re-instituting a revamped excise tax on goods imported into Puerto Rico to help stimulate the Commonwealth's economy. The proposal will require passage of legislation to become law, and includes provisions that will continue the earmarking of sales tax revenues equal to 1% of the total sales tax rate to the Dedicated Sales Tax Fund and other mechanisms currently in place to ensure the security for the outstanding bonds of the Puerto Rico Sales Tax Financing Corporation ("COFINA"). See "Tax Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures*, "Government Development Bank for Puerto Rico – Sales Tax Financing Corporation" under *Public Corporations* and "Public Sector Debt" under *Debt* in the Commonwealth Report in *Appendix I*. On February 7, 2008, the Governor stated that any proposal from his administration would not impair the rights of bondholders and that he will veto any counter-proposal from the Legislature of Puerto Rico that would constitute a possible impairment of the rights of bondholders. On February 7, 2008, Standard & Poor's Ratings Service ("S&P") placed the COFINA bonds on CreditWatch Negative and Fitch Ratings Ltd. ("Fitch") placed the same bonds on Rating Watch. On March 14, 2008, the Governor submitted to the Legislature a

PR-CCD-0006803

proposed bill establishing the conditions for suspending the collection of the 4.5% sales and use tax (which is the portion of the total sales and use tax to be collected for the General Fund), establishing and funding a debt service reserve fund for the benefit of the COFINA bonds and re-instituting the revamped excise tax. Said bill has been structured to safeguard the rights of COFINA bondholders and is aimed at preserving the current rating of the COFINA bonds. This action is expected to be revenue neutral for the General Fund. No assurance can be given that the above proposal will be enacted, or that if it is enacted, it will be in the form recommended by the Governor.

**Employees Retirement Systems Funding Improvement**

On January 31, 2008, the Employees Retirement System (the "System") issued $1,588,810,799.60 principal amount of its Senior Pension Funding Bonds, Series A (the "Series A Pension Bonds"). The net proceeds of the Series A Pension Bonds have been deposited into the trusteed assets of the System reducing the unfunded accrued actuarial liability of the System. See *Retirement Systems* in the Commonwealth Report in *Appendix I*. The Series A Pension Bonds are secured by a pledge of contributions to be made into the System by all of the participating government employers, including the Commonwealth, its municipalities and certain public corporations. The System anticipates issuing additional Senior Pension Funding Bonds during 2008 for the same purpose and having the same security as the Series A Pension Bonds.

**Planning Board Revised Economic Growth Estimates**

On February 21, 2008, the Planning Board, as part of its final review of fiscal year 2007 economic statistics indicated that it expected to reduce the 2007 economic growth rate to -1.8% from -1.4% and that the forecast for fiscal years 2008 and 2009 will be lowered on account of the projected length of the current recession. The factors that influenced the Board's fiscal year 2007 indication included reductions in retail sales, private investment (especially in the construction sector) and government investment. Price increases in certain key areas such as energy and raw materials contributed to the Board's numbers as well.

**Additional Debt Guaranteed by the Commonwealth**

On March 18, 2008, the Puerto Rico Aqueduct and Sewer Authority issued $159,055,000 of Revenue Refunding Bonds, 2008 Series A, and $125,700,000 of Revenue Refunding Bonds, 2008 Series B, Guaranteed by the Commonwealth of Puerto Rico (collectively, the "PRASA Bonds"). Although these bonds were not issued by the Commonwealth, the payment of principal of and interest on said bonds is guaranteed by the Commonwealth.

## PLAN OF FINANCING

The Commonwealth's plan of financing includes the refunding of certain outstanding public improvement and public improvement refunding bonds, the repayment of a line of credit, and the conversion of the interest rate mode and remarketing of certain other outstanding public improvement and public improvement refunding bonds for the purpose of (i) reducing the Commonwealth's market risk associated with certain types of variable rate products, including auction rate securities and variable rate demand obligations insured by monoline bond insurers

PR-CCD-0006804

who have recently been downgraded by the rating agencies, and (ii) realizing debt service savings.

**Refunding Plan**

The Bonds, together with the Series 2008 C Bonds, are being issued for the purpose of refunding certain public improvement and public improvement refunding bonds of the Commonwealth (the "Refunded Bonds") at their respective maturities and repaying a portion of a line of credit obtained from Government Development Bank in the amount of $93,261,018.25 (the "Line of Credit"). The table below sets forth the Refunded Bonds.

| Public Improvement Bonds [1] | Principal Amount to be Refunded | Interest Rate | Maturity Date July 1, | CUSIP Number |
|---|---|---|---|---|
| 1988A[2] | $10,740,000 | [3] | 2008 | 7451435F0 |
| 1989A | 2,880,000 | [3] | 2008 | 7451436N2 |
| 1989A | 7,000,000 | [3] | 2009 | 7451436P7 |
| 1990 | 12,245,000 | [3] | 2008 | 745144AT2 |
| 1993[2] | 21,380,000 | 9.000% | 2008 | 745144LE3 |
| 1993[2] | 3,560,000 | 9.000 | 2009 | 745144ME2 |
| 1995 | 8,705,000 | 6.250 | 2009 | 745144Z73 |
| 1996 | 9,400,000 | 6.000 | 2009 | 7451444M4 |
| 1998B[2] | 10,000,000 | 5.750 | 2009 | 745145FK3 |
| 1998[2] | 9,715,000 | [3] | 2008 | 745145EC2 |
| 1999A | 9,260,000 | 5.250 | 2009 | 745145HF2 |
| 2002, Series B | 6,080,000 | 5.400 | 2009 | 745145ZU9 |
| Series 2003 | 5,105,000 | 3.500 | 2008 | 7451457D8 |
| Series 2003 | 5,285,000 | 3.800 | 2009 | 7451457E6 |
| Series 2003 B[2] | 360,000 | 3.000 | 2008 | 745145Y22 |
| 2003, Series B | 730,000 | 3.500 | 2008 | 7451455V0 |
| 2003, Series B | 760,000 | 3.800 | 2009 | 7451455W8 |
| 2004, Series B | 1,515,000 | 3.500 | 2008 | 7451456M9 |
| 2004, Series B | 1,570,000 | 3.800 | 2009 | 7451456N7 |
| 2005, Series B | 9,825,000 | 3.150 | 2008 | 74514LCK1 |
| 2005, Series B | 10,130,000 | 3.500 | 2009 | 74514LCL9 |
| Series 2006A[2] | 2,515,000 | 5.000 | 2008 | 74514LGT8 |
| 2006, Series C | 7,825,000 | 5.100 | 2008 | 74514LKK2 |
| 2006, Series D | 12,500,000 | 5.150 | 2009 | 74514LKL0 |
| Series 2006C[2] | 7,665,000 | 5.200 | 2009 | 74514LKV8 |
| 2007, Series B | 7,750,000 | 5.150 | 2009 | 74514LLK1 |
| Series 2007B[2] | 46,625,000 | 5.125 | 2009 | 74514LMS3 |

[1] Represents the principal amount of the Refunded Bonds; Refunded Bonds for which only interest (in the amount of $252,206,644.29) was refunded are not listed.
[2] Public Improvement Refunding Bonds.
[3] Capital Appreciation Bond.

The Secretary of the Treasury will deposit the net proceeds of the Bonds and the Series 2008 C Bonds and certain other available moneys into one or more escrow funds (collectively, the "Escrow Fund") with Banco Popular de Puerto Rico (the "Escrow Agent"). Said net proceeds and other available moneys will be invested in noncallable direct obligations of the United States, the principal of and interest on which will be sufficient to pay the principal of and

PR-CCD-0006805

premium, if any, on the Refunded Bonds on the redemption or maturity dates mentioned above, which dates will be irrevocably designated by the Secretary of the Treasury, and to pay the interest thereon to such redemption or maturity dates.

Upon the deposit with the Escrow Agent referred to above, the Refunded Bonds will cease to be outstanding under the terms of their respective authorizing resolutions. Under the Act, once the above deposit of cash and noncallable obligations has been made, all the Refunded Bonds are expected to be deemed not to be outstanding for the purpose of applying the debt limitation under Section 2 of Article VI of the Commonwealth's Constitution.

The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the Refunded Bonds referred to above, will be verified by Causey Demgen & Moore Inc. (the "Verification Agent").

**Conversion and Remarketing Plan**

Concurrently with the refunding of the Refunded Bonds, the Commonwealth expects to convert the interest rate mode and remarket the following public improvement and public improvement refunding bonds:

| Public Improvement Refunding Bonds | Principal Amount | Interest or Interest Rate Period | Conversion Date | CUSIP Number |
|---|---|---|---|---|
| Series 2003 C | $ 46,385,000 | 5.50%[1] | 07/01/08[2] | 745145Y63 |
| Series 2003 C | 233,615,000 | 5.00[1] | 07/01/08[2] | 745145Y71 |
| Series 2003 C | 15,730,000 | 3.00[1] | 07/01/08[2] | 745145Y89 |
| Series 2003 C | 50,000,000 | 4.25[1] | 07/01/08[2] | 745145Y97 |
| Series 2003 C | 401,265,000 | 5.00[1] | 07/01/08[2] | 745145Z21 |
| Series 2004 B-1 | 49,325,000 | ARS | 07/01/08[2] | 7451458R6 |
| Series 2004 B-2 | 56,000,000 | ARS | 07/01/08[2] | 7451458S4 |
| Series 2004 B-3 | 56,000,000 | ARS | 07/01/08[2] | 7451458T2 |
| Series 2004 B-4 | 55,975,000 | ARS | 07/01/08[2] | 7451458U9 |
| Series 2007 A-6 | 50,000,000 | ARS | 05/13/08[3] | 74514LUB1 |
| Series 2007 A-7 | 50,000,000 | ARS | 05/09/08[3] | 74514LUC9 |
| Series 2007 A-8 | 50,000,000 | ARS | 05/08/08[3] | 74514LUE5 |
| Series 2007 A-9 | 50,000,000 | ARS | 05/07/08[3] | 74514LUF2 |

(1) Reflects the interest rate to mandatory put date of July 1, 2008.

(2) Expected to be converted to other floating interest rate modes on or about July 1, 2008, after the delivery of the Bonds.

(3) Expected to be converted to other floating interest rate modes on or about the same date as the delivery of the Bonds.

8

PR-CCD-0006806

**Sources and Uses of Funds**

**Sources:**

| | |
|---|---|
| Principal amount of the Bonds | $ 908,990,000.00 |
| Original issue premium | 4,918,914.25 |
| Moneys from Redemption Fund | 157,443,501.94 |
| Total sources | $1,071,352,416.19 |

**Uses:**

| | |
|---|---|
| Deposit into the Escrow Fund for Refunded Bonds | $ 972,915,321.81 |
| Underwriting discount, bond insurance premiums, legal, printing, and other financing expenses[1] | 21,668,802.57 |
| Repayment of Line of Credit | 76,768,291.81 |
| Total uses | $1,071,352,416.19 |

---

[1] Includes costs of issuance associated with the conversion of certain series of public improvement and public improvement refunding bonds included in the Commonwealth's plan of finance and the cost to the Commonwealth (approximately $9,536,750) of terminating certain interest rate swaps originally entered into in connection with the issuance of certain of the Refunded Bonds.

### Letter of Credit

In connection with the Series 2008 B Bonds, the Commonwealth will enter into a Reimbursement Agreement with the Provider, pursuant to which the Provider will issue the Letter of Credit to pay when due the principal of and interest on the Series 2008 B Bonds. Unless certain events have occurred, the Letter of Credit may also be drawn to provide funds to the Tender Agent to enable it to purchase Series 2008 B Bonds which are optionally or mandatorily tendered by their Owners and are not remarketed, including a draw in connection with a mandatory tender upon the Provider's giving notice to the Tender Agent of the occurrence of an event of default under the Reimbursement Agreement related to and resulting in a termination of the Letter of Credit. See "Purchase of the Series 2008 B Bonds" under *The Bonds*.

### THE BONDS

### General

The Bonds will be dated, bear interest at such rates, and mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. Interest on the Series 2008 A Bonds will be payable semi-annually on January 1 and July 1, beginning on January 1, 2009, and interest on the Series 2008 B Bonds will initially be payable monthly as described under "Description of the Series 2008 B Bonds." The Bonds are subject to redemption at the times and at the prices set forth below under "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

PR-CCD-0006807

### Description of the Series 2008 B Bonds

The following is a summary of certain provisions of the Series 2008 B Bonds while bearing interest at variable rates. Reference is made to the Series 2008 B Bonds for their complete text and to the Bond Resolution for a more detailed description of the provisions of the Series 2008 B Bonds.

*General.* As more fully described below, the Series 2008 B Bonds will initially bear interest at the Daily Interest Rate for a Daily Interest Rate Period. At the direction of the Commonwealth, from time to time, the Series 2008 B Bonds may be converted in whole, from the Daily Interest Rate Period to another Interest Rate Period, including the Daily Interest Rate Period, the Weekly Interest Rate Period, the Long-Term Interest Rate Period, the Short-Term Interest Rate Period and the ARS Rate Period. *This Official Statement provides information concerning the Series 2008 B Bonds while bearing interest at a Daily Interest Rate. There are significant differences in the terms of the Series 2008 B Bonds if they are bearing interest at a Weekly Interest Rate, a Long-Term Interest Rate, a Bond Interest Term Rate or an Auction Period Rate. This Official Statement does not provide information with respect to the Series 2008 B Bonds in any period other than in a Daily Interest Rate Period.*

The Series 2008 B Bonds are issuable in the form of fully registered bonds without coupons initially in the denomination of $100,000 or multiples of $5,000 in excess thereof. As described below under the caption "Book-Entry Only System", when issued, the Series 2008 B Bonds will be registered in the name of Cede & Co., as Bondholder and nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Series 2008 B Bonds.

*Interest Payment.* All Series 2008 B Bonds will bear interest at the same interest rate. Series 2008 B Bonds bearing interest at the Daily Interest Rate shall not, at any time, bear interest in excess of the maximum rate permitted under Commonwealth law, currently being 12% per annum (the "Maximum Bond Interest Rate"). Interest on the Series 2008 B Bonds will be paid on each Interest Payment Date, any redemption date and on the Maturity Date. Series 2008 B Bonds in the Daily Interest Rate Period shall accrue interest on the basis of the actual number of days elapsed during the Interest Rate Period and a year of 365 days (366 in a leap year). The initial Interest Payment Date for interest accrued on the Series 2008 B Bonds will be June 2, 2008. Thereafter, the Interest Payment Date for Series 2008 B Bonds in the Daily Interest Rate Period will be the first Business Day of each calendar month.

*Place of Payment.* The principal and Tender Price of and premium, if any, and interest on the Series 2008 B Bonds in the Daily Interest Rate Period shall be paid by the Registrar by wire transfer of immediately available funds to the respective Holders thereof on the applicable Record Date to an account specified by the Holder thereof in a writing delivered to the Registrar.

*Remarketing Agent; Tender Agent.* Wachovia Bank, National Association has been appointed Remarketing Agent for the Series 2008 B Bonds, and Banco Popular de Puerto Rico will serve as Tender Agent for the Series 2008 B Bonds. All determinations of interest rates for the Series 2008 B Bonds shall be conclusive and binding upon the Commonwealth, the Registrar, the Tender Agent, the Remarketing Agent, the Provider and the Bondholders, as applicable. At

PR-CCD-0006808

the direction of the Secretary, the Series 2008 B Bonds may be converted, in whole, from the Daily Interest Rate Period to another Interest Rate Period.

*Daily Interest Rate and Daily Interest Rate Period.* During each Daily Interest Rate Period, the Series 2008 B Bonds shall bear interest at the Daily Interest Rate, which shall be determined by the Remarketing Agent on each Business Day for such Business Day.

The Daily Interest Rate shall be the rate of interest per annum determined by the Remarketing Agent (based on an examination of tax-exempt obligations comparable, in the judgment of the Remarketing Agent, to the Series 2008 B Bonds and known by the Remarketing Agent to have been priced or traded under then-prevailing market conditions) on or before 10:30 a.m., New York City time, on a Business Day to be the minimum interest rate which, if borne by such Series 2008 B Bonds, would enable the Remarketing Agent to sell all of such Series 2008 B Bonds on such Business Day at a price (without regard to accrued interest) equal to the principal amount thereof. The Daily Interest Rate for any day which is not a Business Day shall be the same as the Daily Interest Rate for the immediately preceding Business Day. If for any reason a Daily Interest Rate for the Series 2008 B Bonds is not so established for any Business Day by the Remarketing Agent, the Daily Interest Rate for such Business Day shall be equal to the Index.

**Conversion Provisions**

If the Secretary elects to convert the interest rate of the Series 2008 B Bonds, the written direction furnished by the Secretary to the Registrar, the Tender Agent, the Provider and Remarketing Agent as required shall be made by registered or certified mail, or by telecopy confirmed by registered or certified mail. In connection with any Conversion of the Interest Rate Period for the Series 2008 B Bonds, the Secretary shall have the right to deliver to the Registrar, the Tender Agent, Remarketing Agent and the Provider on or prior to 11:00 a.m., New York City time, on the second Business Day preceding the effective date of any such Conversion a notice to the effect that the Secretary elects to rescind its election to make such Conversion. If such election to convert is rescinded, then the Series 2008 B Bonds shall continue to bear interest at the Daily Interest Rate commencing on the date which would have been the effective date of the Conversion. In any event, if notice of a Conversion has been mailed to the Holders of such Bonds and the Secretary rescinds its election to make such Conversion, then the Series 2008 B Bonds shall still be subject to mandatory tender for purchase on the date which would have been the effective date of the Conversion.

No Conversion from the Daily Rate Period to another Interest Rate Period shall take effect unless each of the following conditions, to the extent applicable, shall have first been satisfied:

(1)     With respect to the new Interest Rate Period, there shall be in effect a Liquidity Facility if and as required under the Bond Resolution, and with the number of days and coverage required by the Rating Agency.

(2)     The Registrar shall have received a Favorable Opinion of Bond Counsel with respect to such Conversion, dated the effective date of such Conversion.

11

PR-CCD-0006809

(3) In the case of any Conversion with respect to which there shall be no Liquidity Facility in effect to provide funds for the purchase of Series 2008 B Bonds on the Conversion Date, the remarketing proceeds available on the Conversion Date shall not be less than the amount required to purchase all of the Series 2008 B Bonds at the Tender Price (not including any premium).

(4) In the case of any Conversion to an ARS Rate Period, prior to the Conversion Date the Secretary shall have appointed an Auction Agent, and one or more Broker-Dealers and there shall have been executed and delivered an Auction Agreement and one or more Broker-Dealer Agreements.

In the case of failure to meet these conditions: (1) except as otherwise set forth in the Bond Resolution, the Series 2008 B Bonds shall bear interest at the Daily Interest Rate commencing on the date which would have been the effective date of the Conversion; and (2) the Series 2008 B Bonds shall continue to be subject to mandatory tender for purchase on the date which would have been the effective date of the Conversion.

### Purchase of the Series 2008 B Bonds

*Optional Tender.* The Holder of any Series 2008 B Bond (other than a Bank Bond) bearing interest at a Daily Interest Rate shall have the option to tender his Bond for purchase in an Authorized Denomination on any Business Day at a purchase price equal to the Tender Price, payable in immediately available funds, upon delivery to the Tender Agent, to the Registrar and to the Remarketing Agent, by no later than 10:00 a.m., New York City time, on such Business Day, of an irrevocable notice by Electronic Means, which states the principal amount of such Bonds to be purchased and the Business Day on which the same shall be purchased. Bank Bonds may not be tendered for purchase at the option of the Holder thereof. For payment of such purchase price on the Business Day specified in such notice, such Series 2008 B Bonds must be delivered, at or prior to 10:00 a.m., New York City time, on such Business Day, to the Tender Agent at its principal office for delivery of Series 2008 B Bonds, accompanied by an instrument of transfer thereof, in form satisfactory to such Tender Agent, executed in blank by the Bondholder thereof or its duly-authorized attorney, with such signature guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

During any Daily Interest Rate Period for which the book-entry-only system (see "Book-Entry Only System" herein) is in effect, the beneficial owner of any Series 2008 B Bond bearing interest at the Daily Interest Rate or portion thereof in an Authorized Denomination shall have the option to have his Series 2008 B Bond purchased on the date specified in the notice referred to below at the Tender Price by having his Participant give irrevocable notice by Electronic Means on any Business Day to the Tender Agent, to the Registrar and to the Remarketing Agent prior to 10:00 a.m., New York City time. That notice shall state the principal amount of such Series 2008 B Bonds or portion thereof to be purchased and the Business Day on which the same shall be purchased. Upon confirmation by the Securities Depository to the Registrar that such Participant has an ownership interest in the applicable Series 2008 B Bonds at least equal to the amount of Series 2008 B Bonds specified in such irrevocable written notice, payment of the Tender Price of such Series 2008 B Bonds shall be made by 4:00 p.m., New York City time, on the Business Day specified in said notice, or as soon as practical thereafter, upon the receipt by

PR-CCD-0006810

the Registrar of the Tender Price, subject to its receipt of notice of the transfer on the registration books of the Securities Depository of the beneficial ownership interest in such Bonds tendered for purchase to the account of the Tender Agent, or a Participant acting on behalf of such Tender Agent, at or prior to 2:30 p.m., New York City time, on such specified date.

*Mandatory Tender for Purchase on Conversion Date.* The Series 2008 B Bonds shall be subject to mandatory tender for purchase on each Conversion Date at the Tender Price, payable in immediately available funds. For payment of the Tender Price on the Tender Date, Series 2008 B Bonds must be delivered at or prior to 11:00 a.m., New York City time, on the Tender Date. If delivered after that time, the Tender Price shall be paid on the next succeeding Business Day.

*Mandatory Tender for Purchase upon Termination, Replacement or Expiration of Letter of Credit (or alternate liquidity/credit facility) or on Bond Insurance Substitution Date; Mandatory Standby Tender.* If at any time the Registrar gives notice that the Tender Price on applicable Series 2008 B Bonds tendered for purchase shall cease to be payable from draws on the Letter of Credit or any alternate liquidity/credit facility then in effect as a result of (i) the termination, replacement or expiration of the term, as extended, of such Letter of Credit or any alternate liquidity/credit facility then in effect, or (ii) the occurrence of a Mandatory Standby Tender (as hereinafter defined), then each such Series 2008 B Bond shall be purchased or deemed purchased at the Tender Price on the dates specified in the next sentence. Any purchase of such Series 2008 B Bonds pursuant to the foregoing events shall occur: (1) on the fifth Business Day preceding any such termination, replacement or expiration of such Letter of Credit or any alternate liquidity/credit facility then in effect without replacement by an Alternate Credit Facility or upon any termination thereof as a result of a Mandatory Standby Tender, and (2) on the date of the replacement of such Letter of Credit or any alternate liquidity/credit facility then in effect, in any case where an alternate liquidity/credit facility has been delivered to the Tender Agent. In the case of any replacement, the existing Letter of Credit or existing alternate liquidity/credit facility will be drawn to pay the Tender Price, if necessary, rather than the replacement alternate liquidity/credit facility. No such mandatory tender will be effected upon the replacement of a Letter of Credit or an alternate liquidity/credit facility in the case where such Letter of Credit or alternate liquidity/credit facility is failing to honor conforming draws. "Mandatory Standby Tender" means the mandatory tender of the applicable Series 2008 B Bonds upon receipt by the Registrar of written notice from the Provider or the applicable alternate liquidity/credit facility provider that an event with respect to the Letter of Credit or its alternate liquidity/credit facility, as applicable, has occurred which gives such provider the option to terminate the Letter of Credit or its alternate liquidity/credit facility, as applicable, upon notice.

If at any time the Registrar receives notice that a substitute bond insurance policy or a Successor Credit Facility will be delivered, then each affected Series 2008 B Bond shall be purchased or deemed purchased at the Tender Price. Any purchase of such Series 2008 B Bonds shall occur on the Business Day preceding the delivery of a substitute bond insurance policy or a Successor Credit Facility.

The Series 2008 B Bonds are subject to mandatory tender for purchase by the Provider on the date specified by the Provider, which date shall be a Business Day not later than the next

13

PR-CCD-0006811

Interest Payment Date succeeding the date the Registrar receives the notice mentioned below (not later than the tenth day following receipt of such notice in the case of a failure of the Provider to reinstate the Letter of Credit or any alternate liquidity/credit facility with respect to interest) and not earlier than one Business Day following receipt of such notice by the Registrar from the Provider (but in any case not later than two Business Days before termination of the Letter of Credit or alternate liquidity/credit facility) in writing by hand delivery, certified mail or Electronic Means, that an event of default under the Reimbursement Agreement has occurred and is continuing, at a purchase price equal to 100% of the outstanding principal amount thereof, plus accrued interest, if any, to such Date.

Payment of the Tender Price of any such Series 2008 B Bonds shall be made in immediately available funds by 4:00 p.m., New York City time, on the Tender Date upon delivery of such Series 2008 B Bonds to the Tender Agent at its principal office for delivery of applicable Series 2008 B Bonds, accompanied by an instrument of transfer, in form satisfactory to the Tender Agent, executed in blank by the Bondholder with the signature of such Bondholder guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange, at or prior to 12:00 noon, New York City time, on the Tender Date. If subsequent to any such mandatory tender, a Series 2008 B Bond is no longer subject to purchase pursuant to such Letter of Credit or alternate liquidity/credit facility, the Tender Agent (upon receipt from the Holder thereof in exchange for payment of the Tender Price thereof) shall present such Series 2008 B Bond to the Registrar for notation of such fact thereon.

*Consent and Notice.* The Secretary may not enter into any agreement or consent to or participate in any arrangement pursuant to which Series 2008 B Bonds are tendered or purchased for any purpose other than as specified in the Bond Resolution or the redemption and cancellation of such Series 2008 B Bonds without the prior written consent of the Provider. In connection with any mandatory tender for purchase of applicable Series 2008 B Bonds, the Registrar shall give notice thereof in accordance with the Bond Resolution.

Such notice shall state (i) in the case of a mandatory tender for purchase on the first day of each Interest Rate Period, the type of Interest Rate Period to commence on such mandatory purchase date; (ii) in the case of a mandatory tender for purchase upon termination, replacement or expiration of a Letter of Credit or any alternate liquidity/credit facility, on a bond insurance substitution date or Mandatory Standby Tender, that the affected Letter of Credit or alternate liquidity/credit facility will expire, terminate or be replaced and that the applicable Series 2008 B Bonds will no longer be payable from that Letter of Credit or alternate liquidity/credit facility then in effect or that the bond insurance policy is being substituted and that in either case any rating applicable to such Series 2008 B Bonds may be reduced or withdrawn; (iii) that the Tender Price of any Series 2008 B Bonds subject to mandatory tender for purchase shall be payable only upon surrender of that Series 2008 B Bond or Series 2008 B Bonds to the Tender Agent at its principal office for delivery of applicable Series 2008 B Bonds, accompanied by an instrument of transfer, in form satisfactory to the Tender Agent, executed in blank by the Bondholder or its duly-authorized attorney, with such signature guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange; (iv) that, if moneys sufficient to effect such purchase shall have been provided through the remarketing of such Series 2008 B Bonds by the applicable Remarketing Agent, through said Letter of Credit or alternate liquidity/credit facility then in effect or funds provided by the Commonwealth, all Series 2008 B Bonds subject to

PR-CCD-0006812

mandatory tender for purchase shall be purchased on the mandatory Tender Date; and (v) that if any Holder of a Series 2008 B Bond subject to mandatory tender for purchase does not surrender that Bond to the Tender Agent for purchase on the mandatory Tender Date, then such Series 2008 B Bond shall be deemed to be an Undelivered Bond, no interest shall accrue on that Bond on and after the mandatory Tender Date and the Holder shall have no rights under the Bond Resolution other than to receive payment of the Tender Price.

*Payment of Tender Price by Secretary.* If all or a portion of the applicable Series 2008 B Bonds tendered for purchase cannot be remarketed and are not purchased under the applicable Letter of Credit or alternate liquidity/credit facility then in effect on a Tender Date, the Secretary may at its option, but shall not be obligated to, pay to the Tender Agent as soon as practicable on a Tender Date immediately available funds (together with any remarketing proceeds and any funds provided under said Letter of Credit or alternate liquidity/credit facility then in effect) sufficient to pay the Tender Price on such Series 2008 B Bonds. The Tender Agent shall deposit the amount paid by the Secretary, if any, in the Commonwealth Purchase Account of the Bond Purchase Fund pending application of the money to the payment of the Tender Price.

## Tender Process and Sales of Series 2008 B Bonds by Remarketing Agent

*The Remarketing Agent is Paid by the Commonwealth.* The Remarketing Agent's responsibilities include determining the interest rate from time to time and remarketing Series 2008 B Bonds that are optionally or mandatorily tendered to it by the beneficial owners thereof (subject, in each case, to the terms of the Remarketing Agreement and the Bond Resolution). The Remarketing Agent is appointed by the Commonwealth and is paid by the Commonwealth for its services. As a result, the interests of the Remarketing Agent may differ from those of beneficial owners and potential purchasers of Series 2008 B Bonds.

*Determination of Interest Rates by the Remarketing Agent.* The Remarketing Agent is required to determine the interest rate that will be effective with respect to Series 2008 B Bonds on the dates specified in the Bond Resolution. That rate is required by the Bond Resolution to be the minimum interest rate which, if borne by such Series 2008 B Bonds, would enable the Remarketing Agent to sell all of such Series 2008 B Bonds on the effective date of that rate at a price (without regard to accrued interest) equal to the principal amount thereof.

*Tenders to the Tender Agent.* Beneficial owners of Series 2008 B Bonds may elect to tender their Series 2008 B Bonds for purchase by the Tender Agent by giving notice on the same Business Day as the requested purchase as described under "Purchase of the Series 2008 B Bonds" herein while the Series 2008 B Bonds are in book-entry form through its Participant by causing the Participant to transfer its interest in the Series 2008 B Bonds for such owner, on DTC's records, to the Tender Agent. Tendering Bondholders will receive par, plus accrued interest, if any on the purchase date specified either by said beneficial owner or, in the case of manadatory tender, by the terms of the Bond Resolution. Tendering Bondholders will be paid from the proceeds of the remarketing of the Series 2008 B Bonds and, to the extent those proceeds are insufficient, from the proceeds of draws on the Letter of Credit or any alternate liquidity/credit facility then in effect by the Tender Agent.

15

*The Remarketing Agent Routinely Purchases Series 2008 B Bonds for its Own Account.*
The Remarketing Agent acts as remarketing agent for a variety of variable rate demand
obligations issued by many issuers and, in its sole discretion, routinely purchases such
obligations for its own account. The Remarketing Agent is permitted, but not obligated, to
purchase tendered Series 2008 B Bonds for its own account and, in its sole discretion, may
acquire such tendered Series 2008 B Bonds in order to achieve a successful remarketing of the
Series 2008 B Bonds (*i.e.*, because there otherwise are not enough buyers to purchase the Series
2008 B Bonds) or for other reasons. The Remarketing Agent is not obligated, however, to
purchase Series 2008 B Bonds, and may cease doing so at any time without notice, in which case
it may be necessary for the Tender Agent to draw on the Letter of Credit or any alternate
liquidity/credit facility then in effect to pay tendering Bondholders.

The Remarketing Agent may also make a secondary market in the Series 2008 B Bonds
by purchasing and selling Series 2008 B Bonds other than in connection with an optional or
mandatory tender and remarketing. Such purchases and sales must be at fair market value,
which may be at, above, or below par. No notice period is required for such purchases. The
Remarketing Agent is not required, however, to make a secondary market in the Series 2008 B
Bonds. Thus, investors who purchase the Series 2008 B Bonds, whether in a remarketing or
otherwise, should not assume that they will be able to sell their Series 2008 B Bonds other than
by tendering the Series 2008 B Bonds in accordance with the tender process.

The Remarketing Agent may also sell any Series 2008 B Bonds it has purchased to one or
more affiliated investment vehicles for collective ownership or enter into derivative
arrangements with affiliates or others in order to reduce its exposure to the Series 2008 B Bonds.
The purchase of Series 2008 B Bonds by the Remarketing Agent may create the appearance that
there is greater third party demand for the Series 2008 B Bonds in the market than is actually the
case. The practices described above also may result in fewer Series 2008 B Bonds being
tendered in a remarketing.

*Series 2008 B Bonds May be Offered at Prices Other Than Par.* Pursuant to the
Remarketing Agreement, the Remarketing Agent is required to determine the interest rate that
will be effective with respect to the Series 2008 B Bonds. That rate is required by the Bond
Resolution to be the minimum interest rate which, if borne by such Series 2008 B Bonds, would
enable the Remarketing Agent to sell all of such Series 2008 B Bonds on the effective date of
that rate at a price (without regard to accrued interest) equal to the principal amount thereof. The
interest rate will reflect, among other factors, the level of market demand for the Series 2008 B
Bonds (including whether the Remarketing Agent is willing to purchase Series 2008 B Bonds for
its own account). There may or may not be Series 2008 B Bonds tendered and remarketed on the
effective date of an interest rate, and the Remarketing Agent may or may not be able to remarket
any Series 2008 B Bonds tendered for purchase on such date at par. The Remarketing Agent is
not obligated to advise purchasers in a remarketing if it does not have third-party buyers for all
of the Series 2008 B Bonds at the remarketing price. If the Remarketing Agent owns Series
2008 B Bonds for its own account, in its sole discretion, it may sell those Series 2008 B Bonds at
fair market value, which may be at prices above or below par only on days other than the date of
determination of an interest rate or the effective date of such interest rate after the interest rate
for the succeeding interest rate effective date has been set or, in the case of Series 2008 B Bonds
bearing interest at a Daily Interest Rate, after 11:00 a.m. on the effective date of the Daily

16

PR-CCD-0006814

Interest Rate. The Remarketing Agent may not agree in advance of the Effective Date to sell Series 2008 B Bonds to a customer at a price below par.

*Under Certain Circumstances, the Remarketing Agent May Be Removed, Resign or Cease Remarketing the Series 2008 B Bonds, Without a Successor Being Named.* Under certain circumstances the Remarketing Agent may be removed or have the ability to resign or cease its remarketing efforts, without a successor having been named, subject to the terms of the Remarketing Agreement. In the event there is no Remarketing Agent, Bondholders will be required to tender their Series 2008 B Bonds to the Tender Agent. In that event, the Series 2008 B Bonds will bear interest at the rate set in accordance with the Index, remarketings of the Series 2008 B Bonds will cease until a successor remarketing agent has been appointed, and tendering Bondholders will be paid from draws on the Letter of Credit or any alternate liquidity/credit facility then in effect.

### Letter of Credit and Reimbursement Agreement

*General.* The Commonwealth has initially arranged for the Provider to provide a Letter of Credit issued pursuant to the Reimbursement Agreement. The discussion below is a summary of certain terms of the Reimbursement Agreement and the Letter of Credit and is not intended to be determinative. Investors are urged to obtain and review the Reimbursement Agreement and the Letter of Credit for a more detailed description of the provisions thereof.

*Letter of Credit.* The Letter of Credit will be issued in an amount equal to the aggregate outstanding principal amount of the Series 2008 B Bonds, plus 52 days' of interest (calculated at an assumed rate of 12% per annum). The Tender Agent, upon compliance with the terms of the Letter of Credit and the Bond Resolution, is authorized and directed to draw upon the Letter of Credit to make payment with respect to the principal of and interest on, or Tender Price of, the Series 2008 B Bonds.

The amount available under the Letter of Credit will be reduced automatically by the amount of any drawing thereunder, subject to reinstatement as described below. With respect to a drawing by the Tender Agent solely to pay interest on the Series 2008 B Bonds on an interest payment date, the amount available under the Letter or Credit will be automatically reinstated on the fifth calendar day following such drawing if the Tender Agent has not received notice to the contrary from the Provider under the Reimbursement Agreement and, as a result thereof, the amount of such drawing shall not be reinstated and the Provider shall direct the Tender Agent to cause a mandatory tender of the Series 2008 B Bonds pursuant to the Bond Resolution. After payment by the Provider of a Liquidity Drawing (as defined in the Reimbursement Agreement), the amount available to be drawn under the Letter of Credit will be automatically reduced by the amount specified in such Liquidity Drawing. In addition, prior to the Conversion Date (as defined in the Reimbursement Agreement), in the event of the remarketing of the Series 2008 B Bonds (or portions thereof) previously purchased with the proceeds of a Liquidity Drawing, the amount available to be drawn under the Letter of Credit will be automatically reinstated when and to the extent, but only when and to the extent, that the Provider is reimbursed for any amount drawn pursuant to such Liquidity Drawing.

PR-CCD-0006815

The Letter of Credit will terminate on the earliest of the Provider's close of business on (a) the stated expiration date (May 6, 2011, unless renewed or extended); (b) the earlier of (i) the date which is five (5) days following the Conversion Date of all of the corresponding Series 2008 B Bonds as specified in a notice from the Tender Agent to the Provider, or (ii) the date on which the Provider honors a drawing under such Letter of Credit on or after such Conversion Date; (c) the date which is fifteen (15) days following the Provider's receipt of written notice from the Tender Agent that all Series 2008 B Bonds covered by the Letter of Credit have been paid or that another facility has been issued in substitution for the Letter of Credit in accordance with the terms of the Bond Resolution and the Reimbursement Agreement; and (d) the date which is fifteen (15) days following the date the Tender Agent receives a written notice from the Provider specifying the occurrence of an event of default under the Reimbursement Agreement and directing the Tender Agent to cause a mandatory tender of the Series 2008 B Bonds.

*Reimbursement Agreement.* "Events of Default" under the initial Reimbursement Agreement include the following:

(a)     default in the payment when due of (i) any payments required to be made by the Commonwealth for reimbursement to the Provider of any drawings, (ii) any principal or interest with respect to any Bank Bonds (as defined in the Reimbursement Agreement) or any Liquidity Advance or (iii) any other amount owing by the Commonwealth under the Reimbursement Agreement and such default continues for a period of ten (10) Business Days; or

(b)     (i) the Commonwealth defaults in the performance or observance of any term, covenant, condition or agreement on its part to be performed or observed under certain sections of the Reimbursement Agreement or (ii) the Commonwealth defaults in the performance or observance of any other term, covenant, other condition or agreement on its part to be performed or observed and such other default continues unremedied for thirty (30) days after written notice thereof shall have been given to the Commonwealth by the Provider; or

(c)     any of the Commonwealth's representations or warranties made in the Reimbursement Agreement or in any statement or certificate at any time made or deemed made by or on behalf of the Commonwealth pursuant to the Reimbursement Agreement or in connection with the Reimbursement Agreement, and/or in any of the Related Documents (as defined in the Reimbursement Agreement) is false or misleading in any material respect when made or deemed made; or

(d)     (i) the Commonwealth commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, (A) relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or the Commonwealth shall make a general assignment for the benefit of its creditors; or

(ii)     there is commenced against the Commonwealth any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in an order for

PR-CCD-0006816

such relief or in the appointment of a receiver or similar official or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or

(iii)   there is commenced against the Commonwealth any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(iv)   the Commonwealth takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or

(v)   the Commonwealth shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts; or

(vi)   the Commonwealth or any other Governmental Authority (as defined in the Reimbursement Agreement) having jurisdiction over the Commonwealth imposes a debt moratorium, debt restructuring, or comparable restriction on the repayment when due and payable of the principal of or interest on any General Obligation Debt (as defined in the Reimbursement Agreement) of the Commonwealth; or

(e)   the occurrence any "event of default" on the part of the Commonwealth under any of the Related Documents to which it is a party shall have occurred and be continuing; or

(f)   one or more judgments or orders for the payment of money in an aggregate amount in excess of $10,000,000 payable from the general fund of the Commonwealth shall be rendered against the Commonwealth and such judgments or orders shall remain undischarged or unstayed for a period of thirty (30) days, or any action shall be taken by a judgment creditor to levy upon assets or properties of the Commonwealth  to enforce any such judgment or order; or

(g)   any material provision of the Reimbursement Agreement or any other Related Document to which the Commonwealth is a party shall at any time for any reason cease to be valid and binding on the Commonwealth, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by the Commonwealth, or a proceeding shall be commenced by any governmental agency or authority having jurisdiction over the Commonwealth seeking to establish the invalidity or unenforceability thereof, or the Commonwealth shall deny that it has any or further liability or obligation under the Reimbursement Agreement or any other Related Document to which it is a party; or

(h)   the Commonwealth shall fail to pay when due and payable any General Obligation Debt in excess of $10,000,000 and such failure shall continue beyond any applicable period of grace specified in any underlying resolution, indenture, contract or instrument providing for the creation of or concerning such General Obligation Debt, or pursuant to the provisions of any such resolution, indenture, contract or instrument, the maturity of any such General Obligation Debt, as a result of the occurrence of a default in the payment of principal or interest by the Commonwealth of any General Obligation Debt, may be accelerated, or may be required to be prepaid prior to the stated maturity thereof; or

19

PR-CCD-0006817

(i)      the rating assigned by S&P or Moody's to any of the Commonwealth's General Obligation Debt (without taking into account third party credit enhancement) is withdrawn, suspended or reduced below BBB- (or its equivalent rating) by S&P or Baa3 (or its equivalent rating) by Moody's.

Upon the occurrence and during the continuance of any Event of Default, the Provider at its option, may, upon notice to the Tender Agent and the Commonwealth, do any one or more of the following:

(a)      require, in accordance with the Bond Resolution, the Tender Agent to give notice of a Mandatory Standby Tender of Series 2008 B Bonds and to purchase all such Series 2008 B Bonds on the applicable tender date at a price equal to the principal amount thereof and interest accrued with respect thereto (each, a "Mandatory Tender Date") and to register the Series 2008 B Bonds in the name or at the direction of the Provider, thereby causing the Letter of Credit to expire 15 days thereafter; or

(b)      declare all other amounts payable to the Provider by the Commonwealth under the Reimbursement Agreement immediately due and payable on the applicable Mandatory Tender Date, whereupon the same shall be immediately due and payable on such Mandatory Tender Date; or

(c)      exercise any or all rights provided or permitted by law or granted pursuant to any of the Related Documents in such order and in such manner as the Provider may, in its sole judgment, determine.

**Provider**

Wachovia Bank, National Association (referred to in this section as the "Bank") is a subsidiary of Wachovia Corporation (the "Corporation"), whose principal office is located in Charlotte, North Carolina. The Corporation is the fourth largest bank holding company in the United States based on approximately $783 billion in total assets as of December 31, 2007.

The Bank is a national banking association with its principal office in Charlotte, North Carolina and is subject to examination and primary regulation by the Office of the Comptroller of the Currency of the United States. The Bank is a commercial bank offering a wide range of banking, trust and other services to its customers. As of December 31, 2007, the Bank had total assets of approximately $653 billion, total net loans of approximately $397 billion, and total deposits of approximately $458 billion and equity capital of approximately $72 billion.

The Bank submits quarterly to the Federal Deposit Insurance Corporation (the "FDIC") a "Consolidated Report of Condition and Income for a Bank with Domestic and Foreign Offices" (each, a "Call Report", and collectively, the "Call Reports"). The publicly available portions of the Call Reports with respect to the Bank (and its predecessor banks) are on file with the FDIC, and copies of such portions of the Call Reports may be obtained from the FDIC, Division of Insurance and Records, 550 17th Street, NW, Washington, DC 20429-9990, (800) 688-3342, at prescribed rates. In addition, such portions of the Call Reports are available to the public free of charge at the FDIC's web site at http://www.fdic.gov.

20

PR-CCD-0006818

The Corporation is subject to the information requirements of the Securities Exchange Act of 1934, as amended, and in accordance therewith files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "Commission"). Such documents can be read and copied at the Commission's public reference room in Washington, D.C. Please call the Commission at 1-800-SEC-0330 for further information on the public reference rooms. In addition, such documents are available to the public free of charge at the SEC's web site at http://www.sec.gov. Reports, documents and other information about the Corporation also can be inspected at the offices of the New York Stock Exchange, 20 Broad Street, New York, New York.

Upon request, the Bank will provide at no cost to any person to whom this Official Statement is delivered copies of the most recent Wachovia Corporation Annual Report to Shareholders, the publicly available portion of the most recent Call Report that the Bank has filed with the FDIC and the Corporation's most recent periodic reports under the Securities Exchange Act of 1934 on Form 10-K and Form 10-Q and any Current Report on Form 8-K subsequent to its most recent report on Form 10-K. Copies of these documents may be requested by writing to or telephoning the Bank at the following address and telephone number: Wachovia Corporation, Investor Relations, 301 South College Street, Charlotte, NC 28288-0206, (704) 374-6782.

The information contained under this heading relates to and has been obtained from the Bank. The information concerning the Bank contained herein is furnished solely to provide limited introductory information regarding the Bank and does not purport to be comprehensive. Such information regarding the Bank is qualified in its entirety by the detailed information appearing in the documents referenced above.

The delivery hereof shall not create any implication that there has been no change in the affairs of the Bank since the date hereof, or that the information contained in this section is correct as of any time subsequent to its date.

THE LETTER OF CREDIT IS AN OBLIGATION OF THE BANK AND IS NOT AN OBLIGATION OF THE CORPORATION. NO BANKING OR OTHER AFFILIATE CONTROLLED BY THE CORPORATION, EXCEPT THE BANK, IS OBLIGATED TO MAKE PAYMENTS UNDER THE LETTER OF CREDIT.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC. The Commonwealth does not take any responsibility for the accuracy thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered bond will be issued for each maturity (and within a maturity, each subseries) of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

21

PR-CCD-0006819

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has the highest rating issued by S&P: "AAA". The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of a Bond ("Beneficial Owner") will in turn be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchases. Beneficial Owners are, however, expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

22

PR-CCD-0006820

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the bond documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on such record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, its nominee, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

A Beneficial Owner shall give notice to elect to have its Bonds purchased or tendered, through its Participant, to the Registrar, and shall effect delivery of such Bonds by causing the Direct Participant to transfer the Participant's interest in the Bonds, on DTC's records, to the Registrar. The requirement for physical delivery of Bonds in connection with an optional tender or a mandatory purchase will be deemed satisfied when the ownership rights in the Bonds are transferred by Direct Participants on DTC's records and followed by a book-entry credit of tendered Bonds to the Registrar's DTC account.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under

23

PR-CCD-0006821

such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds will be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor depository). In that event, definitive Bonds will be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

In the event that the book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the principal office of the Registrar in San Juan, Puerto Rico. Interest on the Bonds will be payable by check mailed to the respective addresses (shown on the registration books of the Commonwealth maintained by the Registrar) of the registered owners determined, with respect to the Series 2008 B Bonds, as of the 15th day of the month preceding the interest payment date and, with respect to the Series 2008 B Bonds, as of the record date established pursuant to the Bond Resolution, as shown on the registration books of the Commonwealth maintained by the Registrar. The Bonds offered by virtue of this Official Statement will be issued only as registered bonds without coupons in denominations of $5,000 and whole multiples thereof, in the case of the Series 2008 A Bonds, and in denominations of $100,000 or any multiple $5,000 in excess thereof, in the case of the Series 2008 B Bonds. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust office of the Registrar in San Juan, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary of the Treasury to issue the Bonds pursuant to one or more resolutions adopted by the Secretary of the Treasury and approved by the Governor. In accordance with the Act, the Secretary of the Treasury adopted and the Governor approved the Bond Resolution.

PR-CCD-0006822

**Redemption**

*Optional Redemption of Series 2008 A Bonds.*  At the option of the Secretary and upon at least 30 days' notice, the Series 2008 A Bonds maturing after July 1, 2018 may be redeemed prior to their respective maturities, from any moneys that may be available for that purpose (other than from moneys set aside in respect of any amortization requirement), on or after July 1, 2018, either in whole or in part (and if in part, in such order of maturity as the Secretary shall determine), on any date, at the principal amount of the Series 2008 A Bonds to be redeemed, together with accrued interest to the date fixed for redemption, without premium.

*Optional Redemption of Series 2008 B Bonds.*  The Series 2008 B Bonds are subject to redemption prior to their maturity, at the option of the Secretary, from any moneys that may be available for that purpose (other than from moneys set aside in respect of any amortization requirement), in whole or in part at any time, at a redemption price of 100% of the principal amount of the Series 2008 B Bonds to be redeemed, plus accrued interest to the redemption date, without premium.

*Mandatory Redemption.*  The Series 2008 A Bonds maturing July 1, 2018 and July 1, 2032 and the Series 2008 B Bonds are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon at least 30 days' notice, on July 1, 2017, and July 1, 2027, and July 1, 2029, respectively, and on July 1 in each year thereafter at a redemption price of par plus accrued interest to the dates fixed for redemption:

25

PR-CCD-0006823

**Amortization Requirements**
**(due July 1,)**

| Year | 2018 (Series 2008 A) | 2032 (Series 2008 A) | 2032 (Series 2008 B) |
|---|---|---|---|
| 2017 | $13,945,000 | | |
| 2018 | 14,610,000* | | |
| 2019 | | | |
| 2020 | | | |
| 2021 | | | |
| 2022 | | | |
| 2023 | | | |
| 2024 | | | |
| 2025 | | | |
| 2026 | | | |
| 2027 | | $22,850,000 | |
| 2028 | | 70,205,000 | |
| 2029 | | 8,975,000 | $60,525,000 |
| 2030 | | 0 | 50,900,000 |
| 2031 | | 22,375,000 | 30,700,000 |
| 2032 | | 84,270,000* | 31,850,000* |

*Maturity

If the amount of such Bonds purchased or redeemed in a fiscal year exceeds the amount of the amortization requirement for such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice by mail to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

PR-CCD-0006824

If less than all of a subseries of Series 2008 B Bonds are called for redemption, Bank Bonds of such subseries shall be selected for redemption by the Registrar by such method as it deems proper, before any other Series 2008 B Bonds of such subseries shall be selected. All other Series 2008 B Bonds of such subseries so called for redemption shall be selected (in Authorized Denominations) by the Registrar by such method as it deems fair and appropriate.

## Security

### Provision for Payment of Public Debt

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highway and Transportation Authority (the "Highway Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

In 2006, the Commonwealth allocated a portion of the sales tax to service the bonds issued by Sales Tax Financing Corporation to refinance a portion of the Commonwealth's outstanding extra constitutional debt (including the Sales Tax Bonds). The legislation making such allocation provides that the portion so set aside is not "available Commonwealth revenues"

PR-CCD-0006825

for purposes of the above Constitutional provision. No ruling from the Puerto Rico Supreme Court has been solicited as to the validity of such "set aside" vis-a-vis the Constitutional provision referred to above, and the Commonwealth cannot give any assurance that the Puerto Rico Supreme Court when faced with this issue in a properly briefed and litigated proceeding would agree that such segregated sales tax revenues are "unavailable".

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of the Treasury to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislature of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislature of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It may also apply to the payment of Commonwealth guaranteed obligations of public corporations outstanding prior to the date of its adoption but not to the payment of bonds and other obligations of such public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the

28

Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico and motor vehicle fuel taxes and license fees, which are allocated to the Highway Authority, are not included as internal revenues for the purpose of calculating the debt limit, although some of these revenues may be available for the payment of debt service. In addition, the portion of the sales tax allocated to the Sales Tax Financing Corporation is also not included as internal revenues consistent with the legislation creating the Sales Tax Financing Corporation, which legislation provides that such portion is not "available resources" under the Constitutional provisions relating to the Bonds.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's and S&P), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments"). Since bonds refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Joint Resolution No. 2104 of September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004 B (the "Series 2004 B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004 B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004 A (the "Series 2004 A Bonds") and any Series 2004 B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004 B Bonds.

Act No. 39 of 2005 authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index, and in connection with such consumer price index floating rate bonds (said portion, the "2006 CPI Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof. In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said

PR-CCD-0006827

portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104. In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments (1) on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap") and (2) on $850,000,000 notional amount of public improvement bonds based on the published short-term SIFMA municipal swap rate and is receiving from its counterparties payments on the same notional amount based on a published index of municipal bonds having a maturity of 10 years (the "constant maturity swap"). Finally, in connection with the issuance of a portion of the Series 2008 B Bonds (the "2008 Swap Bonds"), the Commonwealth may enter into the Interest Rate Swaps.

After giving effect to the issuance of the Bonds and the Series 2008 C Bonds, and the refunding of the Refunded Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $929,044,644 in the fiscal year ending June 30, 2016 (based on the assumption that (i) the bonds refunded with non-eligible investments are treated as being outstanding, (ii) the Series 2004 A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (iii) the Series 2004 B Bonds, the 2006 CPI Bonds and the 2007 Swap Bonds bear interest at 12% per annum and (iv) the public improvement bonds to which the basis swap and the constant maturity swap relate bear interest at their stated interest rates rather than the rates set forth in said swaps). This amount ($929,044,644) is equal to 11.13% of $8,346,104,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2006 and the currently estimated adjusted internal revenues for the fiscal year ended June 30, 2007. If the bonds refunded with non-eligible investments were treated as not being outstanding, and the interest on the Series 2004 B Bonds, the 2006 CPI Bonds and the 2007 Swap Bonds is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 9.19%.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations* in *Appendix I*. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

PR-CCD-0006828

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

The following information is not complete and reference is made to *Appendix IV* for a specimen of the Policy.

**The Insurance Policy**

Assured has made a commitment to issue the Policy relating to the Insured Bonds, effective as of the date of issuance of the Insured Bonds. Under the terms of the Policy, Assured will unconditionally and irrevocably guarantee to pay that portion of principal of and interest on the Insured Bonds that becomes Due for Payment but shall be unpaid by reason of Nonpayment by the Commonwealth (the "Insured Payments"). Insured Payments shall not include any additional amounts owing by the Commonwealth solely as a result of the failure by the Registrar to pay such amount when due and payable, including without limitation any such additional amounts as may be attributable to penalties or to interest accruing at a default rate, to amounts payable in respect of indemnification, or to any other additional amounts payable by the Registrar by reason of such failure. The Policy is non-cancelable for any reason, including without limitation the non-payment of premium.

"Due for Payment" means, when referring to the principal of the Insured Bonds, the stated maturity date thereof, or the date on which the Insured Bonds shall have been duly called for mandatory sinking fund redemption, and does not refer to any earlier date on which payment is due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity (unless Assured in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and, when referring to interest on the Insured Bonds, means the stated dates for payment of interest.

"Nonpayment" means, in respect of the Insured Bonds, the failure of the Commonwealth to have provided sufficient funds to the Registrar for payment in full of all principal and interest Due for Payment on the Insured Bonds. It is further understood that the term Nonpayment in respect of an Insured Bond also includes any amount previously distributed to the Holder (as such term is defined in the Policy) of such Insured Bond in respect of any Insured Payment by or on behalf of the Commonwealth which amount has been recovered from such Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court having competent jurisdiction that such payment constitutes an avoidable preference with respect to such Holder. Nonpayment does not include nonpayment of principal or interest caused by the failure of the Registrar to pay such amount when due and payable.

Assured will pay each portion of an Insured Payment that is Due for Payment and unpaid by reason of Nonpayment, on the later to occur of (i) the date such principal or interest becomes Due for Payment, or (ii) the business day next following the day on which Assured shall have received a completed notice of Nonpayment therefor in accordance with the terms of the Policy.

31

Assured shall be fully subrogated to the rights of the Holders of the Insured Bonds to receive payments in respect of the Insured Payments to the extent of any payment by the Bond Insurer under the Policy.

The Policy is not covered by any insurance or guaranty fund established under New York, California, Connecticut or Florida insurance law.

**Assured**

Assured is a Maryland-domiciled insurance company regulated by the Maryland Insurance Administration and licensed to conduct financial guaranty insurance business in all fifty states, the District of Columbia and Puerto Rico. Assured commenced operations in 1988. Assured is a wholly owned, indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO." AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, structured finance and mortgage markets. Neither AGL nor any of its shareholders is obligated to pay any debts of Assured or any claims under any insurance policy issued by Assured

Assured is subject to insurance laws and regulations in Maryland and in New York (and in other jurisdictions in which it is licensed) that, among other things, (i) limit Assured's business to financial guaranty insurance and related lines, (ii) prescribe minimum solvency requirements, including capital and surplus requirements, (iii) limit classes and concentrations of investments, (iv) regulate the amount of both the aggregate and individual risks that may be insured, (v) limit the payment of dividends by Assured, (vi) require the maintenance of contingency reserves, and (vii) govern changes in control and transactions among affiliates. Certain state laws to which Assured is subject also require the approval of policy rates and forms.

Assured's financial strength is rated "AAA" by S&P, "AAA" by Fitch, Inc. and "Aaa" by Moody's. Each rating of Assured should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by Assured. Assured does not guaranty the market prices of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

**Capitalization of Assured**

As of December 31, 2007, Assured Guaranty had total admitted assets of $1,361,538,502 (unaudited), total liabilities of $961,967,238 (unaudited), total surplus of $399,571,264 (unaudited) and total statutory capital (surplus plus contingency reserves) of $982,045,695 (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of December 31, 2006, Assured had total admitted assets of $1,248,270,663 (audited), total liabilities of $962,316,898 (audited), total surplus of

32

PR-CCD-0006830

$285,953,765 (audited) and total statutory capital (surplus plus contingency reserves) of $916,827,559 (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. The Maryland Insurance Administration recognizes only statutory accounting practices for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the Maryland Insurance Code, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. No consideration is given by the Maryland Insurance Administration to financial statements prepared in accordance with accounting principles generally accepted in the United States ("GAAP") in making such determinations.

**Incorporation of Certain Documents by Reference**

The portions of the following documents are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

- The Annual Report on Form 10-K of AGL for the fiscal year ended December 31, 2007 (which was filed by AGL with the Securities and Exchange Commission (the "SEC") on February 29, 2008); and

- The Current Reports on Form 8-K filed by AGL with the SEC, as they relate to Assured.

All consolidated financial statements of Assured and all other information relating to Assured included in documents filed by AGL with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this Official Statement and prior to the termination of the offering of the Insured Bonds shall be deemed to be incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such consolidated financial statements.

Any statement contained in a document incorporated herein by reference or contained herein under this heading *Bond Insurance* shall be modified or superseded for purposes of this Official Statement to the extent that a statement contained under this heading or in any subsequently filed document which is incorporated by reference under this heading also modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

Copies of the consolidated financial statements of Assured incorporated by reference under this heading and of the statutory financial statements filed by Assured with the Maryland Insurance Administration are available upon request by contacting Assured at 1325 Avenue of the Americas, New York, New York 10019 or by calling Assured at (212) 974-0100. In addition, the information regarding Assured that is incorporated by reference in this Official Statement that has been filed by AGL with the SEC is available to the public over the Internet at the SEC's web site at *http://www.sec.gov* and at AGL's web site at *http://www.assuredguaranty.com,* from the SEC's Public Reference Room at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549, and at the office of the New York Stock Exchange at 20 Broad Street, New York, New York 10005.

PR-CCD-0006831

Assured makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, Assured has not independently verified, makes no representation regarding, nor does it accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding Assured supplied by Assured and presented under this heading.

## PUBLIC SECTOR DEBT OF THE COMMONWEALTH

### Public Sector Debt

The following table presents a summary of the public sector debt of the Commonwealth as of December 31, 2007. The table also shows the public sector debt as further adjusted by the following bond issuances and events that have occurred after December 31, 2007: (i) the issuance of the Series A Pension Bonds, the PRASA Bonds, the $1,316,204,456 principal amount of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series A (Senior Lien) and the $22,445,000 principal amount of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series B (Senior Lien), and (ii) the issuance of the Bonds and the Series 2008 C Bonds and the refunding of the Refunded Bonds. The table should be read in conjunction with the information set forth under *Debt* in *Appendix I*.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in thousands)

|  | December 31, 2007 | As Adjusted |
|---|---|---|
| Puerto Rico direct debt[1] | $10,701,206 | $10,924,775 |
| Municipal debt | 2,420,487 | 2,420,487 |
| Public corporations debt |  |  |
| Puerto Rico guaranteed debt | 864,547 | 1,149,302 |
| Debt supported by Puerto Rico appropriations or taxes | 19,694,714 | 19,694,714 |
| Other non-guaranteed debt | 12,252,019 | 15,179,479 |
| Total public corporations debt | $32,811,280 | $36,023,495 |
| Total public sector debt | $45,932,973 | $49,368,757 |

---

* For a complete recital of all notes to this table, see "Public Sector Debt" under Debt in Appendix I.

(1) Includes general obligation bonds, tax and revenues anticipation notes, and lines of credit provided by Government Development Bank. The amount excludes certain Commonwealth general obligations bonds that have been refunded with proceeds that were invested in non-eligible investments, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.

Source: Government Development Bank

PR-CCD-0006832

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on December 31, 2007; (ii) the Bonds; (iii) the Series 2008 C Bonds; and (iv) total Commonwealth general obligation bonds, adjusted for the issuance of the Bonds and the Series 2008 C Bonds and the refunding of the Refunded Bonds. The table excludes debt service on Commonwealth general obligation bonds that have been refunded with the proceeds of refunding bonds invested in non-eligible investments, notwithstanding that such bonds will be considered to be outstanding under their authorizing resolution and for purposes of calculating the Commonwealth's debt limitation. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

35

PR-CCD-0006833

**Commonwealth of Puerto Rico**
**Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30. | Outstanding Bonds Total Debt Service[1] | The Bonds Principal | The Bonds Interest | The Series 2008 C Bonds Principal | The Series 2008 C Bonds Interest | Grand Total[2] |
|---|---|---|---|---|---|---|
| 2008 | $ 492,513 | $ - | $ 927 | $ - | $ - | $ 239,721 |
| 2009 | 678,784 | - | 48,459 | - | 10,582 | 395,179 |
| 2010 | 685,299 | 32,445 | 42,944 | - | 10,582 | 739,368 |
| 2011 | 682,919 | 33,835 | 41,432 | - | 10,582 | 736,989 |
| 2012 | 682,647 | 35,160 | 39,976 | 7,215 | 10,582 | 743,923 |
| 2013 | 685,930 | 36,610 | 38,400 | 7,530 | 10,264 | 747,208 |
| 2014 | 673,668 | 63,470 | 36,621 | 7,870 | 9,925 | 734,948 |
| 2015 | 688,149 | 66,215 | 33,721 | 8,245 | 9,551 | 749,430 |
| 2016 | 688,515 | 83,525 | 30,570 | 8,655 | 9,139 | 749,798 |
| 2017 | 688,204 | 13,945 | 26,560 | 9,105 | 8,689 | 676,262 |
| 2018 | 680,009 | 14,610 | 25,898 | 9,600 | 8,197 | 661,062 |
| 2019 | 684,345 | 15,305 | 25,204 | 10,125 | 7,669 | 731,168 |
| 2020 | 719,927 | 16,065 | 24,438 | 10,705 | 7,092 | 766,748 |
| 2021 | 548,797 | 16,870 | 23,635 | 11,315 | 6,482 | 595,619 |
| 2022 | 478,647 | 17,715 | 22,792 | 11,960 | 5,837 | 525,471 |
| 2023 | 431,844 | 18,600 | 21,906 | 12,640 | 5,156 | 478,665 |
| 2024 | 428,368 | 19,625 | 20,883 | 13,360 | 4,435 | 475,191 |
| 2025 | 409,122 | 20,630 | 19,877 | 14,150 | 3,647 | 455,946 |
| 2026 | 400,320 | 21,715 | 18,794 | 14,985 | 2,812 | 447,146 |
| 2027 | 399,957 | 22,850 | 17,654 | 15,870 | 1,928 | 446,779 |
| 2028 | 398,507 | 70,205 | 16,397 | 16,805 | 991 | 448,251 |
| 2029 | 400,793 | 69,500 | 12,536 | - | - | 405,540 |
| 2030 | 398,897 | 50,900 | 9,880 | - | - | 401,244 |
| 2031 | 398,325 | 53,075 | 8,061 | - | - | 404,122 |
| 2032 | 219,015 | 116,120 | 5,752 | - | - | 223,993 |
| 2033 | 186,032 | - | - | - | - | 186,032 |
| 2034 | 132,007 | - | - | - | - | 132,007 |
| 2035 | 61,497 | - | - | - | - | 61,497 |
| 2036 | 33,676 | - | - | - | - | 33,676 |
| 2037 | 3,680 | - | - | - | - | 3,680 |
| Total | $14,060,393 | $908,990 | $613,317 | $190,135 | $144,143 | $14,396,664 |

* Totals may not add due to rounding.
(1) In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund.
(2) Debt service requirements on all general obligation bonds outstanding, adjusted to include the issuance of the Bonds and the Series 2008 C Bonds and the refunding of the Refunded Bonds.
Sources: Government Development Bank and Department of the Treasury

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which must continue to be satisfied after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes

36

retroactive to their date of issuance. The Commonwealth has covenanted to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be includable in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the Bonds will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. Bond Counsel expresses no opinion as to the effect of any change to any document pertaining to the Bonds or of any action taken or not taken where such change is made or action is taken or not taken without its approval or in reliance upon the advice of counsel other than such firm with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes. Bond Counsel is further of the opinion that under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations such as the Bonds may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to the applicability and impact of any collateral consequences.

**Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the Bonds over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. In general, the issue price of a maturity of the Bonds is the first price at which a substantial amount of Bonds of that maturity was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue

PR-CCD-0006835

discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond will be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to a Bond owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bond of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Bond to a purchaser in the initial public offering of the Bonds (other than a purchaser who holds such Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) over the amount payable at maturity of that Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (in the case of a Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such Bond). No deduction is allowed for such amortization of Bond Premium. Bond Premium is, however, treated as an offset to qualified stated interest received on the Bonds. An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable bond premium attributable to each taxable year such Bond is held. An owner of such Bond should consult his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to Commonwealth, state, and local income tax consequences of owning and disposing of such Bond.

**Information Reporting and Backup Withholding**

Interest paid on tax-exempt obligations is subject to information reporting in a manner similar to interest paid on taxable obligations. While this reporting requirement does not, by

PR-CCD-0006836

itself, affect the excludability of interest from gross income for federal income tax purposes, the reporting requirement causes the payment of interest on the Bonds to be subject to backup withholding if such interest is paid to beneficial owners that (a) are not "exempt recipients," and (b) either fail to provide certain identifying information (such as the beneficial owner's taxpayer identification number) in the required manner or have been identified by the Internal Revenue Service (the "IRS") as having failed to report all interest and dividends required to be shown on their income tax returns. Generally, individuals are not exempt recipients, whereas corporations and certain other entities are exempt recipients. Amounts withheld under the backup withholding rules from a payment to a beneficial owner are allowed as a refund or credit against such beneficial owner's federal income tax liability so long as the required information is furnished to the IRS.

**Future Developments**

On November 5, 2007, the United States Supreme Court heard oral argument in the matter of *Kentucky v. Davis*, in which the Court of Appeals of Kentucky held that it was a violation of the Commerce Clause of the United States Constitution for the Commonwealth of Kentucky to grant a state income tax exemption to the interest on bonds issued by or on behalf of the Commonwealth of Kentucky and its political subdivisions while subjecting interest on bonds issued by or on behalf of other states and their political subdivisions to Kentucky state income tax.

If the decision in *Kentucky v. Davis* is affirmed by the Supreme Court, it may in effect overturn more than 35 state income tax provisions that are substantially similar to Kentucky's (the Puerto Rico internal revenue code does not favor the interest income on Puerto Rico bonds over state or territory bonds; it exempts all such interest from Puerto Rico income taxation). Should that happen, an affected state might decide to extend its "home state" tax exemption to "out of state" bonds, to tax the interest on its "home state" bonds to the same degree as it taxes the interest on "out of state" bonds or possibly to take some other course consistent with the holding of the Supreme Court. The income tax laws of cities, counties and other local taxing jurisdictions outside of Puerto Rico may be similarly affected. It is not possible to know at this time how the Supreme Court will decide *Kentucky v. Davis*. Should it uphold the appellate decision, it is also not possible to know how each state or other local taxing jurisdiction would respond to such decision and what impact such decision would have on the market price for, or the marketability of, the Bonds.

Future legislative proposals, if enacted into law, regulations, rulings or court decisions may cause interest on the Bonds to be subject to state or local income taxation, or otherwise prevent beneficial owners from realizing the full current benefit of the exclusion of such interest with respect to the Bonds from income taxation by a state and its political subdivisions.

## APPROVAL OF LEGAL PROCEEDINGS

Legal matters incident to the authorization and issuance of the Bonds are subject to the approval of Sidley Austin LLP, New York, New York, Bond Counsel, the proposed forms of whose opinions are included herein as *Appendix III*. Certain legal matters will be passed upon for the Underwriters by Squire, Sanders & Dempsey L.L.P., Miami, Florida.

PR-CCD-0006837

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2008 A Bonds from the Commonwealth at an aggregate discount of $3,805,429.14 from the initial offering prices of the Series 2008 A Bonds set forth or derived from information set forth on the inside cover page hereof. The obligation of the Underwriters to purchase the Series 2008 A Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Series 2008 A Bonds if any Series 2008 A Bonds are purchased. The Underwriters may offer to sell the Series 2008 A Bonds to certain dealers and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters.

Wachovia Capital Markets LLC has agreed, subject to certain conditions, to purchase the Series 2008 B Bonds from the Commonwealth at a discount of $434,937.50 from the initial offering price of the Series 2008 B Bonds set forth or derived from information set forth on the inside cover page hereof. The obligation of Wachovia Capital Markets LLC to purchase the Series 2008 B Bonds is subject to certain conditions precedent. Wachovia Capital Markets LLC may offer to sell the Series 2008 B Bonds to certain dealers and others at a price lower than the initial public offering price. The offering price may be changed, from time to time, by Wachovia Capital Markets LLC.

BBVAPR MSD ("BBVA") and RBC Capital Markets Corporation ("RBC"), have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVA and RBC share in the risk from the underwriting of the Series 2008 A Bonds as part of the consideration for their professional services.

Popular Securities, Inc, ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2008 A Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLP ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the agreement SSC and BAS will be entitled to receive a portion of each

PR-CCD-0006838

other's revenues from the underwriting of the Series 2008 A Bonds in consideration for their professional services.

Oriental Financial Services Corporation ("OFS") and Bear, Stearns & Co., Inc. ("Bear Stearns") have entered into a joint venture agreement under which the parties shall provide services and advice to each other and take risk related to the structuring and execution of certain municipal finance transactions with governmental entities located in the Commonwealth. Pursuant to the terms of such joint venture agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2008 A Bonds as consideration for their professional services.

JPMorgan Chase & Co. announced it is acquiring The Bear Stearns Companies Inc. The Boards of Directors of both companies have unanimously approved the transaction. JPMorgan Chase is guaranteeing the trading obligations of Bear Stearns and its subsidiaries and is providing management oversight for its operations. Other than shareholder approval, the closing is not subject to any material conditions. The transaction is expected to have an expedited close by the end of the calendar second quarter 2008. The Federal Reserve, the Office of the Comptroller of the Currency (OCC) and other federal agencies have given all necessary approvals.

Loop Capital LLC ("LC") and TCM Capital, Inc. ("TCM") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the agreement LC and TCM will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2008 A Bonds in consideration for their professional services.

J.P. Morgan Securities Inc. ("JPMSI") and Scotia Capital (USA) Inc. ("SCUSA") have entered into an agreement to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of their municipal securities. For each issuance of municipal securities for which both parties act as co-senior manager or co-manager, any sales commissions or takedowns shall be allocated based on actual sales of municipal securities by JPMSI or SCUSA.

Oppenheimer & Co. Inc. ("Oppenheimer") and Eurobank Municipal Securities Dealer ("Eurobank MSD") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the agreement Oppenheimer and Eurobank MSD will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2008 A Bonds in consideration for their professional services.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

41

PR-CCD-0006839

## RATINGS

Moody's and S&P have given the Bonds underlying ratings of "Baa3" and "BBB-," respectively. Moody's and S&P have given the Insured Bonds ratings of "Aaa" and "AAA," respectively, on the strength of the issuance concurrently with the delivery of the Insured Bonds of the Policy.

The Series 2008 B Bonds have been given the ratings of "Aaa/VMIG1" from Moody's on the strength of the issuance concurrently with the delivery of the Series 2008 B Bonds of the Letter of Credit by the Provider. The "Aaa/VMIG1" ratings on the Series 2008 B Bonds reflect Moody's approach to rating jointly supported transactions and is based upon a rating of "Baa3" for the Commonwealth and ratings of "Aa1/Prime-1" for the Provider.

The Series 2008 B Bonds have been given the ratings of "AA+/A-1+" from S&P on the strength of the issuance concurrently with the delivery of the Series 2008 B Bonds of the Letter of Credit by the Provider. The "AA+/A-1+" ratings on the Series 2008 B Bonds are based on the application of S&P's low correlation joint criteria where the Commonwealth is rated "BBB-" and the Provider is rated "AA/A-1+".

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth, the Bonds and the Provider and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission (the "SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution):

1.    to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2008, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.    to file, in a timely manner, with each NRMSIR or with the Municipal Securities Rulemaking Board and with each Commonwealth SID, notice of any failure of the Commonwealth to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Bonds, if material:

42

PR-CCD-0006840

a. principal and interest payment delinquencies;
b. non-payment related defaults;
c. unscheduled draws on debt service reserves reflecting financial difficulties;
d. unscheduled draws on credit enhancements reflecting financial difficulties;
e. substitution of credit or liquidity facility providers, or their failure to perform;
f. adverse opinions or events affecting the tax-exempt status of the Bonds;
g. modifications to rights of the holders (including Beneficial Owners) of the Bonds;
h. bond calls;
i. defeasances;
j. release, substitution, or sale of property securing repayment of the Bonds; and
k. rating changes.

Event (c) is included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. However, event (c) may not be applicable, since the terms of the Bonds do not provide for "debt service reserves." In addition, with respect to the following events:

Events (d) and (e). The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the Bonds, see *Tax Matters*.

Event (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "*The Bonds* — Redemption", the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB

PR-CCD-0006841

34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2004 and 2006 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005 and 2007, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for fiscal year ended June 30, 2007 are not expected to be filed by current filing deadline of May 1, 2008 because various component units did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements.

As of the date of this Official Statement, there is no Commonwealth SID, and the NRMSIRs are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

PR-CCD-0006842

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution, the Letters of Credit, the Remarketing Agreement, the Escrow Deposit Agreement and the other documents and agreements referred to herein and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the Commonwealth's Annual Financial Report (*Appendix II*), the proposed form of opinion of Bond Counsel (*Appendix III*) and the specimen of the Policy (*Appendix IV*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC and the Provider, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC. The information pertaining to the Provider was supplied by the Provider.

PR-CCD-0006843

This Official Statement will be filed with each NRMSIR and with the Municipal Securities Rulemaking Board.

**COMMONWEALTH OF PUERTO RICO**

By:  /s/ José Guillermo Dávila
    Secretary of the Treasury

46

PR-CCD-0006844

# APPENDIX I

## COMMONWEALTH OF PUERTO RICO FINANCIAL
## INFORMATION AND OPERATING DATA REPORT, DATED JANUARY 2, 2008

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006846

APPENDIX I

# COMMONWEALTH OF PUERTO RICO
## Financial Information and Operating Data Report
### January 2, 2008

PR-CCD-0006847

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0006848

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

    General ...................................................................................................................... 1
    Geographic Location and Demography ................................................................... 1
    Relationship with the United States ........................................................................ 1
    Governmental Structure .......................................................................................... 2
    Principal Officials Responsible for Fiscal Matters ................................................ 2
    Political Trends ........................................................................................................ 3

THE ECONOMY ............................................................................................................. 4

    General ...................................................................................................................... 4
    Economic Development Program ............................................................................ 9
    Employment and Unemployment .......................................................................... 13
    Economic Performance by Sector .......................................................................... 14
    Higher Education ................................................................................................... 26
    Tax Incentives ....................................................................................................... 28

DEBT ............................................................................................................................. 31

    Public Sector Debt ................................................................................................ 31
    Debt Service Requirements for Commonwealth General Obligation Bonds ........ 34
    Ratings of Commonwealth General Obligation Bonds ......................................... 36
    Commonwealth Guaranteed Debt ......................................................................... 36
    Trends of Public Sector Debt ................................................................................ 36

PUBLIC CORPORATIONS ............................................................................................ 38

    Government Development Bank for Puerto Rico ................................................... 39
    Other Public Corporations .................................................................................... 42

INSURANCE MATTERS ............................................................................................... 48

RETIREMENT SYSTEMS ............................................................................................. 48

COMMONWEALTH FINANCIAL STATEMENTS ...................................................... 59

PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES ...................... 60

    Summary and Management's Discussion of General Fund Results ....................... 60
    Tax Reform ........................................................................................................... 65
    Major Sources of General Fund Revenues ........................................................... 66
    Collections of Income, Sales and Excise Taxes .................................................... 70
    Transfers to General Obligation Redemption Fund .............................................. 70
    Components of General Fund Expenditures ........................................................... 70
    Federal Grants ....................................................................................................... 72

PR-CCD-0006849

**TABLE OF CONTENTS**
(continued)

<strong>Page</strong>

BUDGET OF THE COMMONWEALTH OF PUERTO RICO ................................................. 72

    Office of Management and Budget .................................................................................. 72
    Budgetary Process .......................................................................................................... 73
    Fiscal Reform .................................................................................................................. 73
    Financial Control and Adjustment Procedures ............................................................. 74
    Appropriations ................................................................................................................ 75
    Budget for Fiscal Year 2008 .......................................................................................... 76
    Proposed Budget for Fiscal Year 2009 ......................................................................... 78
    Differences between Budget and Basic Financial Statements ........................................ 80

LITIGATION .................................................................................................................................. 80

PR-CCD-0006850

## COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### January 2, 2008

## INTRODUCTION

### General

The operating and financial information about the Commonwealth included in this Report has been updated as of December 31, 2007, except as to certain information which has been updated as of later dates, as set forth herein.

### Geographic Location and Demography

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

### Relationship with the United States

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent,

are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an L.L.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

CPA José Guillermo Dávila Matos was appointed Secretary of the Treasury in January, 2008 (confirmation by the Senate is pending). Before that he served as Executive Director of the Commonwealth of Puerto Rico Office of Management and Budget and before that he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB. Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions. He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras. He is also a member of the American Institute of Certified Public Accountants.

Armando A. Valdez was appointed Executive Director of the Commonwealth of Puerto Rico Office of Management and Budget in January, 2008. Before that he served as Advisor to the Governor from January 2005 to December 2007, as Executive Director of the Incoming Transition Committee from November 2004 to December 2004, and as Director of

PR-CCD-0006852

Intergovernmental Affairs to the Puerto Rico Federal Affairs Administration form June 2001 to December 2003. He earned a Bachelor of Arts degree in Architecture from Yale University and a Masters degree in Government (thesis pending) from John Hopkins University.

Jorge Irizarry Herrans was appointed President of Government Development Bank ("GDB") on December 4, 2007. Mr. Irizarry served as Executive Vice President and Director of Financing of GDB from 2005 until his appointment as Acting President, and has over 30 years of experience in banking, investments and consulting, which he acquired while working at Chase Manhattan, Booz Allen Hamilton, Inc., Banco Mercantil, Banco de Ponce, PaineWebber, Inc., and Sandoval Associates. Mr. Irizarry has a Bachelor's degree in finance from New York University and holds a Masters Degree in Business Administration from Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|                                 | 1988  | 1992  | 1996  | 2000  | 2004  |
|---------------------------------|-------|-------|-------|-------|-------|
| Popular Democratic Party        | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party           | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party  | 5.4%  | 4.2%  | 3.8%  | 5.2%  | 2.7%  |
| Others                          | 0.1%  | -     | 0.6%  | 0.5%  | 0.6%  |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|                                 | Senate | House |
|---------------------------------|--------|-------|
| Popular Democratic Party        | 9      | 18    |
| New Progressive Party           | 17     | 32    |
| Puerto Rico Independence Party  | 1      | 1     |
| Total                           | 27     | 51    |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

I-3

PR-CCD-0006853

# THE ECONOMY

**General**

The Commonwealth has established policies and programs directed principally at developing the manufacturing and services sectors of the economy and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico's economy has expanded, on average, for more than two decades. Virtually every sector of the economy has participated in this expansion, and record levels of employment have been achieved. Factors contributing to this expansion include government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing. In some years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. In the three fiscal years after the previous recession, during fiscal year 2002, the economy expanded at a moderate annual rate of 2.2%. During fiscal year 2007, real gross national product decreased by 1.8%. This contraction has continued into the current fiscal year 2008. The Planning Board expects a reduction of 2.1% of real gross national product for fiscal year 2008 and a recovery of 2.1% for fiscal year 2009.

Personal income, both aggregate and per capita, has increased consistently each fiscal year from 1985 to 2007. In fiscal year 2007, aggregate personal income was $53.1 billion ($44.4 billion in 2000 prices) and personal income per capita was $13,491 ($11,279 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $12 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Eighty two percent (82%) of the transfer payments to individuals in fiscal year 2007 ($8.9 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

Total average annual employment (as measured by the Department of Labor and Human Resources Household Employment Survey (the "Household Survey")) has also increased. From fiscal year 2003 to fiscal year 2007, annual employment increased 6.3% to 1,262,900.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over

---

[1] Different price deflators are used for gross national product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

I-4

PR-CCD-0006854

the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2007.

### Commonwealth of Puerto Rico
### Gross National Product
### Fiscal Years Ended June 30,

|  | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $47,479 | $50,709 | $53,752 | $56,733 | $58,712 |
| Real gross national product – $ millions (2000 prices) | 42,795 | 43,967 | 44,819 | 45,061 | 44,252 |
| Annual percentage increase in real gross national product (2000 prices) | 2.1% | 2.7% | 1.9% | 0.5% | (1.8)% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 1.9% | 4.0% | 3.0% | 3.1% | 2.0% |

(1) Preliminary.

(2) In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2007 (from July 1, 2006 to June 30, 2007) approximately 77% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 50% of Puerto Rico's imports. Consequently, the current slowdown of the United States' economy could be reflected in Puerto Rico's economy.

The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2008 and 2009.

I-5

PR-CCD-0006855

## REAL GNP GROWTH RATE



* Global Insight 3/08.

Since the 1950s, the Puerto Rico Planning Board (the "Planning Board") has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2007 shown in this report are preliminary until the revised figures are released and the forecasts for fiscal years 2008 and 2009 revised. Certain information regarding current economic activity is, however, available in the form of the economic activity index of Puerto Rico, a coincident indicator of ongoing economic activity. This index, which is shown in the table below, is composed of several variables (total employment, retail sales, electric power generation, motor vehicle registrations, and indices for manufacturing, construction, tourism, and external trade), which gauge virtually all sectors of the economy. The Planning Board is revising the methodology used to compile the Index.

PR-CCD-0006856

As the following graph shows, the economic activity index has been declining on a year-over-year basis for fiscal year 2007.

## COINCIDENT ECONOMIC ACTIVITY INDEX



### Forecast for Fiscal Year 2008

The Planning Board's gross national product forecast for fiscal year 2008, which was released in March 2008, projected a decline of 2.1% in constant dollars, or an increase of 3.4% in current dollars. Personal income is expected to increase by 0.8% in real terms, or 4.3% in nominal terms (see footnote 1 on page I-4). The Planning Board expects real growth to return in fiscal year 2009, at 2.1%, or 7.1% in current dollars. The major factors affecting the economy at this point are, among others, the continued increase of oil prices, the slowdown of the U.S. economic activity, and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis. These factors and the effects on economic activity of the implementation of the new sales tax are persuading consumers to adjust their behavior to the new economic conditions.

According to the Household Survey, total employment for the first eight months of fiscal year 2008 averaged 1,214,800, a decrease of 3.8% compared to 1,262,900 for the same period of fiscal year 2007. At the same time, the unemployment rate for the first eight months of fiscal year 2008 was 11.2%, an increase from 10.3% for the same period of fiscal year 2007.

### Fiscal Year 2007

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2007 indicate that real gross national product decreased 1.8% (3.5% in current dollars) over fiscal year 2006. Nominal gross national product was $58.7 billion in fiscal year 2007 ($44.3 billion in 2000 prices), compared to $56.7 billion in fiscal year 2006 ($45.1

I-7

billion in 2000 prices). Aggregate personal income increased from $51.1 billion in fiscal year 2006 ($44.0 billion in 2000 prices) to $53.9 billion in fiscal year 2007 ($44.4 billion in 2000 prices), and personal income per capita increased from $13,033 in fiscal year 2006 ($11,229 in 2000 prices), to $13,491 in fiscal year 2007 ($11,279 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, an increase of 0.8% compared to 1,253,400 for fiscal year 2006. The driving force behind total employment is self-employment. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.7% for fiscal year 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, and the current slowdown of the United States economy. Moreover, the continuing weakness of local construction investment has aggravated the current situation. The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of local income in fiscal year 2008. The current financial difficulties associated with the subprime mortgage crisis have resulted in lowering of short-term interest rates. This could help alleviate the situation of the construction sector, which historically has been a major contributor to economic growth. The implementation of the tax reform legislation discussed below may reduce net disposable income even after giving effect to certain income tax reductions provided in the tax reform legislation. For a discussion of the Commonwealth's fiscal difficulties and the recently enacted tax reform, see "Tax Reform" under Puerto Rico Taxes, Other Revenues, and Expenditures.

*Fiscal Year 2006*

The Planning Board's reports of the performance of the Puerto Rico economy during fiscal year 2006 indicate that the economy (as registered by real gross national product) grew by 0.5%. Nominal gross national product was $56.7 billion ($45.1 billion in 2000 prices), compared to $53.8 billion in fiscal year 2005 ($44.8 billion in 2000 prices). This represents an increase in nominal gross national product of 5.5%. Aggregate personal income increased from $48.8 billion ($44.0 billion in 2000 prices) to $51.1 billion in fiscal year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased from $12,507 in fiscal year 2005 ($11,267 in 2000 prices), to $13,033 in fiscal year 2006 ($11,229 in 2000 prices).

According to the Household Survey, total employment for fiscal year 2006 averaged 1,253,400, an increase of 1.3% compared to 1,237,600 for fiscal year 2005. The unemployment rate for fiscal year 2006 was 11.7%, an increase from 10.6% for fiscal year 2005, due to the partial government shutdown in May 2006 that resulted in the two week furlough of many government employees. As in the past, the economy of Puerto Rico followed the performance and general trends of the United States economy but did not reach the level of U.S. real economic growth.

PR-CCD-0006858

**Economic Development Program**

The Commonwealth's economic development program is now focused on initiatives aimed at producing more diversified and sustainable economic development. The six principal elements of these initiatives, as expressed in the Governor's Economic Development and Government Transformation Plan for Puerto Rico, are the following: (i) developing world-class infrastructure, while encouraging private investment with innovative financial models and agile, effective evaluation processes; (ii) accelerating Puerto Rico's entry into the knowledge economy by creating a center of excellence in biotechnology, engineering and computing; (iii) promoting local enterprise and supporting local businesses (in Spanish, Apoyo al de Aquí) by providing innovative financing alternatives and access to domestic and foreign markets; (iv) transforming the tourist industry into a vehicle for Puerto Rico's economic development; (v) diversifying energy-generating sources to reduce dependence on petroleum by half; and (vi) transforming Puerto Rico's government, without the need for layoffs or privatization, through effective agency consolidation and decentralization functions to offer first-class services to all citizens in a sensible, effective and agile manner and to contribute to Puerto Rico's socio-economic development.

The Commonwealth has formulated a strategic plan to increase its competitiveness in knowledge-based economic sectors, such as research and development of science and technology products. Four major components of this strategic plan are: (i) building on the strong presence in Puerto Rico of multinational companies in the science and technology sectors; (ii) building on Puerto Rico's skilled workforce to promote the expansion of research and development facilities by companies currently operating in Puerto Rico; (iii) attracting new companies in such sectors; and (iv) providing incentives for companies and entrepreneurs to engage in the process of innovation and commercialization of new products and to establish research and development facilities in Puerto Rico. The last initiative includes the creation of the Puerto Rico Science & Technology Trust, a government-sponsored trust (currently capitalized at $4.9 million and expected to grow to $25 million in three years), that will provide grants and financing to companies, entrepreneurs, and universities that engage in these activities. As part of this plan, construction has begun on a biotechnology plant in Mayagüez and a molecular sciences building on the main campus of the University of Puerto Rico in Río Piedras. Additionally, the Department of Transportation has transferred land to the University of Puerto Rico for the construction of a cancer center.

As part of this strategic plan, the Commonwealth is actively pursuing local participation in the aerospace industry, including engineering design services and the outsourcing of business activities. Also, recently Industrial Development Company ("PRIDCO") began a program to improve local entrepreneurial capacity by evaluating local businesses with worldwide best practices, and the Economic Development Bank started a new venture capital program offering financing to entrepreneurs that present projects with great potential for commercialization.

The Commonwealth is also providing incentives to promote the establishment of distribution and call centers, the acquisition and development of patents, and the development of a local entrepreneurial class. Distribution and call centers located in the Commonwealth will benefit from a preferential tax rate of 4% for call centers located in Puerto Rico if they offer services to Latin America and 2% if they offer hemisphere or worldwide services. The

PR-CCD-0006859

Commonwealth has decided to focus on this type of industry because it is labor intensive, presents no environmental concerns, and is generally able to start operations quickly. Over two dozen call centers have recently been established with employment of over 2,500 persons.

With respect to the acquisition and development of patents, under newly enacted legislation, the Secretary of the Treasury may (i) negotiate the payment of taxes on patent royalties; and (ii) reduce the tax rate on patent royalties to a rate as low as 2%. These incentives are in addition to those already enacted for research and development carried out in the Commonwealth. To further develop a local entrepreneurial class, the Commonwealth has enacted legislation providing local entrepreneurs with the following benefits: (i) tax incentives to retailers that use their distribution channels to sell products made in Puerto Rico in other jurisdictions; (ii) requiring at least 15% of products and services purchased by government agencies to be locally manufactured or provided; and (iii) the use of government-sponsored financing, marketing and/or training to promote the production of economically feasible products or services for Puerto Rico markets.

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years. See "Tax Incentives" below.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any fiscal year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto

I-10

PR-CCD-0006860

Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs is expected to encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

The tax incentives under the 1998 Tax Incentives Act will be available until December 31, 2007 (although tax incentive concessions granted thereunder will continue to be in effect until their respective dates of expiration). Currently, the Puerto Rico Legislature is considering whether to amend, replace, or extend the effectiveness of the 1998 Tax Incentives Act.

*Reduction of the Costs of Doing Business*

The Commonwealth believes that to make Puerto Rico more competitive and foster investment it needs to reduce the cost of doing business in Puerto Rico. In order to accomplish this, the Commonwealth proposes to (i) promote the creation of more cogeneration power plants to diversify energy fuel sources and reduce oil imports for electric power generation; (ii) streamline the permitting process to accelerate and reduce the cost of investment in Puerto Rico; and (iii) create a multi-agency task force to expedite critical projects. The Commonwealth has also implemented additional initiatives to restructure certain government agencies in order to improve the services offered by these agencies and provide such services in a more efficient

PR-CCD-0006861

manner. Both PRIDCO and Tourism Company have completed restructurings resulting in their being able to respond more quickly to the needs of their constituents while shedding over 500 employment positions.

The Commonwealth is in the process of diversifying its energy fuel sources. Two cogeneration power plants, one of which is fueled by coal and the other by liquefied natural gas, have reduced Puerto Rico's dependence on oil imports for the generation of electricity by approximately 25%, from 99% to 74%. Currently, as part of the Electric Power Authority's capital improvement plan, the Authority is considering building an additional cogeneration power plant fueled by liquefied natural gas in the municipality of Mayagüez.

The Department of Economic Development and Commerce initiated a reengineering of the Commonwealth's investment project evaluation process in which all branches of the Commonwealth government participated. The first phase, completed in December 2006, evaluated and developed the model. Currently, the project is in second phase, which should be completed by the end of fiscal year 2007, and which consists of evaluating all laws, bylaws and management styles. The third phase – the implementation and measurement of the reengineering – is scheduled to start during the first semester of fiscal year 2008 and is expected to be completed the following fiscal year.

*Federal Tax Incentives*

In connection with the phase-out of Sections 30A and 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code") (see "Tax Incentives – Incentives under the U.S. Code" below), the United States Senate requested the Joint Commission on Taxation ("JCT") and the United States Government Accountability Office ("GAO") to study the economic impact of this phase-out and present recommendations on alternative tax incentives for U.S.-based companies operating in Puerto Rico. In anticipation of the final phase-out of Sections 30A and 936 of the U.S. Code, most U.S.-based companies operating under Sections 30A and 936 converted from United States corporations to Controlled Foreign Corporations ("CFCs"), thus lessening the impact of the phase-out of those sections on their operations.

In May 2006, the GAO published its study titled "Fiscal Relations with the Federal Government and Economic Trends during the phase-out of the Possessions Tax Credit." The GAO study found that Puerto Rico's per capita gross domestic product and gross national product were significantly lower compared to United States averages, and the absolute gap between the per capita gross national product of Puerto Rico residents and that of United States residents has increased. The GAO study further found that, although the value-added by United States companies claiming the possessions tax credit decreased by about two-thirds during the period 1993-2003, much of the decline was offset by growth in other corporations, such as pharmaceuticals. Finally, the GAO study determined that although residents of Puerto Rico pay considerably less total tax per capita than residents of the United States, they pay approximately the same percentage of their personal income in taxes. The GAO study, which is informative in nature, is intended to help the United States Congress decide which economic development initiatives will best suit Puerto Rico's current situation.

PR-CCD-0006862

In June 2006, the JCT published its pamphlet titled "An Overview of the Special Tax Rules related to Puerto Rico and an Analysis of the Tax and Economic Policy Implications of Recent Legislative Options" (the "JCT Report"). The JCT Report provides an overview of the tax and non-tax rules applicable to United States possessions, the special tax rules applicable to Puerto Rico and an economic analysis of such special tax rules. The JCT Report also presents certain legislative options and specific proposals that have been advocated by various parties in order to stimulate economic growth in Puerto Rico. Although these legislative options and specific proposals are not recommendations, the JCT Report does state that federal and Commonwealth tax policy must be coordinated in order to design and implement new tax proposals aimed at enhancing development in Puerto Rico by targeting problems unique to Puerto Rico, instead of problems common to the United States and Puerto Rico, which proposals are likely to induce business to relocate from the United State to Puerto Rico.

Recently, the United States Congress approved legislation to extend to production activities that take place in Puerto Rico the benefit of section 199 of the U.S. Code, which provides a nine percent reduction in the federal income tax rate, phased-in over five years (from 35% to 31.85% after 2009). This extension applies to activities occurring on the island of branches of U.S. corporations that are not controlled foreign corporations ("CFCs"). The Commonwealth is also seeking the extension of additional sections of the U.S. Code that provide a dividends received deduction for a percentage of profits generated in Puerto Rico by CFCs, as well as deductions that would encourage investments in research and development activities.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2007 averaged 1,262,900, a 0.8% increase from 1,253,400 in fiscal year 2006. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate decreased from 11.7% in fiscal year 2006 to 10.4% in fiscal year 2007.

The following table presents annual statistics of employment and unemployment for fiscal year 2003 through fiscal year 2007 and monthly statistics, seasonally adjusted, for the first eight months of fiscal year 2008. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

PR-CCD-0006863

## Commonwealth of Puerto Rico
## Employment and Unemployment[1]
### (persons age 16 and over)
### (in thousands)

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2003 ..................................... | 1,352 | 1,188 | 164 | 12.1% |
| 2004 ..................................... | 1,360 | 1,206 | 155 | 11.4 |
| 2005 ..................................... | 1,385 | 1,238 | 147 | 10.6 |
| 2006 ..................................... | 1,420 | 1,253 | 167 | 11.7 |
| 2007 ..................................... | 1,409 | 1,263 | 147 | 10.4 |
| **Fiscal Year 2008** | | (Seasonally Adjusted) | | |
| July........................................ | 1,389 | 1,226 | 163 | 11.8% |
| August................................... | 1,412 | 1,279 | 133 | 9.4 |
| September .............................. | 1,364 | 1,213 | 151 | 11.1 |
| October ................................. | 1,372 | 1,210 | 163 | 11.9 |
| November............................... | 1,369 | 1,217 | 151 | 11.0 |
| December ............................... | 1,361 | 1,209 | 152 | 11.2 |
| January .................................. | 1,374 | 1,226 | 148 | 10.8 |
| February ................................ | 1,374 | 1,216 | 158 | 11.5 |

(1) Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

## Economic Performance by Sector

From fiscal year 2003 to fiscal year 2007, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

I-14

PR-CCD-0006864

The following table presents annual statistics of gross domestic product by sector and gross national product for the five fiscal years ended June 30, 2003 through 2007.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Sector and Gross National Product
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Manufacturing | $31,532 | $33,267 | $34,534 | $36,547 | $36,717 |
| Services[2] | 28,919 | 30,476 | 32,449 | 33,948 | 35,925 |
| Government[3] | 6,948 | 7,389 | 8,150 | 8,424 | 8,586 |
| Transportation, communication and public utilities | 5,178 | 5,343 | 5,309 | 5,701 | 5,971 |
| Agriculture, forestry and fisheries | 333 | 414 | 375 | 385 | 441 |
| Construction[4] | 1,772 | 1,905 | 1,848 | 1,807 | 1,875 |
| Statistical discrepancy | 146 | 415 | 144 | 131 | 186 |
| Total gross domestic product[5] | $74,827 | $79,209 | $82,809 | $86,943 | $89,701 |
| Less: net payment abroad | (27,348) | (28,501) | (29,056) | (30,210) | (30,989) |
| Total gross national product[5] | $47,479 | $50,709 | $53,753 | $56,733 | $58,712 |

(1) Preliminary.

(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.

(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.

(4) Includes mining.

(5) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

PR-CCD-0006865

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2003 to 2007.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007[2]** |
| Natural Resources and Construction | 68,525 | 69,300 | 68,233 | 67,442 | 67,392 |
| Manufacturing | | | | | |
| Durable Goods | 48,567 | 48,808 | 48,067 | 46,492 | 44,850 |
| Non-Durable Goods | 70,192 | 69,633 | 69,250 | 66,367 | 60,958 |
| Sub Total | 118,759 | 118,441 | 117,317 | 112,859 | 105,808 |
| Trade, Transportation, Warehouse & Utilities | | | | | |
| Wholesale Trade | 32,183 | 33,300 | 33,717 | 33,992 | 33,158 |
| Retail Trade | 130,183 | 132,008 | 136,192 | 137,800 | 135,058 |
| Transportation, Warehouse & Utilities | 17,358 | 17,042 | 17,617 | 17,433 | 16,700 |
| Sub Total | 179,724 | 182,350 | 187,526 | 189,225 | 184,916 |
| Information | 21,617 | 21,917 | 22,608 | 22,600 | 21,733 |
| Finance | 44,667 | 46,850 | 48,633 | 49,767 | 49,975 |
| Professional & Business | 98,500 | 101,900 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 92,408 | 98,108 | 99,967 | 103,583 | 105,842 |
| Leisure & Hospitality | 67,917 | 70,317 | 72,592 | 74,767 | 73,433 |
| Other Services | 18,858 | 20,671 | 21,257 | 21,267 | 22,283 |
| Government | 297,717 | 303,408 | 307,825 | 302,025 | 297,450 |
| Total Non-Farm | 1,008,692 | 1,033,262 | 1,049,725 | 1,049,935 | 1,033,599 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2007 manufacturing generated $36.7 billion, or 40.9%, of gross domestic product. During fiscal year 2007, payroll employment for the manufacturing sector was 105,808, a decrease of 6.2% compared with fiscal year 2006. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws

I-16

PR-CCD-0006866

are applicable in Puerto Rico. As of February 2008, the average hourly manufacturing wage rate in Puerto Rico was 68.0% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. This change has had a long-term impact on local manufacturing activity. See "Tax Incentives – Incentives under the U.S. Code" under *The Economy*.

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2002 through June 30, 2006.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Manufacturing Sector
### (in millions at current prices)

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,705 | $21,837 |
| Machinery and metal products: |  |  |  |  |  |
|   Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,307 | 3,215 |
|   Electrical machinery | 1,757 | 1,771 | 1,818 | 1,904 | 1,852 |
|   Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,698 | 4,157 |
|   Other machinery and metal products | 312 | 288 | 274 | 283 | 285 |
| Food products | 2,092 | 1,903 | 2,202 | 2,312 | 2,958 |
| Other chemical and allied products | 578 | 502 | 591 | 613 | 624 |
| Apparel | 530 | 353 | 344 | 325 | 228 |
| Other[1] | 1,258 | 1,231 | 1,312 | 1,387 | 1,391 |
| Total gross domestic product of manufacturing sector[2] | $31,243 | $31,532 | $33,267 | $34,534 | $36,547 |

(1) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.

(2) Totals may not add due to rounding.

*Source:* Planning Board

PR-CCD-0006867

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2003 to 2007.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry Group | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,444 | 4,706 | 4,471 | 4,108 | 3,792 |
| Cement and Concrete Products Manufacturing | 3,543 | 3,867 | 3,750 | 3,542 | 3,208 |
| Fabricated Metal Products | 6,198 | 6,490 | 6,427 | 5,808 | 5,817 |
| Computer and Electronic | 11,623 | 10,581 | 10,673 | 10,808 | 10,133 |
| Electrical Equipment | 7,415 | 7,744 | 7,645 | 6,858 | 6,567 |
| Electrical Equipment Manufacturing | 4,399 | 4,935 | 4,971 | 4,708 | 4,525 |
| Miscellaneous Manufacturing | 12,308 | 12,070 | 11,157 | 11,225 | 11,200 |
| Medical Equipment and Supplies Manufacturing | 11,336 | 11,059 | 10,473 | 10,492 | 10,467 |
| Other Durable Goods Manufacturing | 7,646 | 8,185 | 7,693 | 7,685 | 7,341 |
| Total – Durable Goods | 49,634 | 49,776 | 48,066 | 46,492 | 44,850 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 13,628 | 13,244 | 13,050 | 12,667 | 12,433 |
| Beverage and Tobacco Products Manufacturing | 3,159 | 3,038 | 3,175 | 3,425 | 3,267 |
| Apparel Manufacturing | 8,988 | 8,522 | 8,873 | 8,400 | 7,250 |
| Cut and Sew Apparel Manufacturing | 8,969 | 8,518 | 8,846 | 8,183 | 6,933 |
| Chemical Manufacturing | 31,183 | 31,385 | 32,885 | 32,335 | 30,067 |
| Pharmaceutical and Medicine Manufacturing | 26,645 | 27,187 | 28,572 | 28,017 | 25,742 |
| Plastics and Rubber Products | 3,340 | 3,210 | 2,744 | 2,350 | 2,217 |
| Plastics Product Manufacturing | 3,030 | 2,917 | 2,266 | 2,158 | 2,083 |
| Other Non-Durable Goods Manufacturing | 8,823 | 9,261 | 8,529 | 7,200 | 5,724 |
| Total – Non-Durable Goods | 69,121 | 68,660 | 69,256 | 66,367 | 60,958 |
| | | | | | |
| Total Manufacturing Employment | 118,755 | 118,436 | 117,322 | 112,869 | 105,808 |

* Totals may not add due to rounding.
(1) Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 12,947 from fiscal year 2003 to fiscal year 2007. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling -10.6% and -4.8%,

PR-CCD-0006868

respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in fiscal year 2006 with the sector experiencing another significant drop of -3.8%. For fiscal year 2007 the employment decline accelerated further to -6.2%. During the last year the economy has lost around 7,050 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

PR-CCD-0006869

# Leading United States and Foreign Companies
## with Manufacturing Operations in Puerto Rico[1]

| Employment 2,500 and over | Product |
|---|---|
| Abbot Laboratories | Pharmaceuticals |
| Baxter International, Inc. | Medical Devices |
| Johnson and Johnson | Surgical Products |
| Pfizer Pharmaceuticals LLC | Pharmaceuticals |
| Wyeth | Pharmaceuticals |
| Zimmer Holdings, Inc. | Pharmaceuticals |

| Employment 1,000 to 2,499 | Product |
|---|---|
| Altadis | Cigars |
| Amgen, Inc. | Pharmaceuticals |
| Atento Teleservicios | Communications |
| Eaton Corporation | Electronic Instruments |
| Edwards Lifesciences LLC | Surgical Instruments |
| Eli Lilly and Company | Pharmaceuticals |
| General Electric Industrial Systems | Electronic Instruments |
| Glaxo Smithkline | Pharmaceuticals |
| Hewlett-Packard Co. | Computers |
| Medtronic Europe SA | Surgical Instruments |
| Merck & Co., Inc. | Pharmaceuticals |
| Propper International Company | Apparel |
| Sara Lee Corp | Apparel |
| Schering Plough Corporation | Pharmaceuticals |
| The Cooper Companies | Ophthalmic Products |
| Tyco International | Surgical Products |

| Employment 500 to 999 | Product |
|---|---|
| Advanced Medical Optics, Inc. | Ophthalmic Products |
| Astra Zeneca PLC | Pharmaceuticals |
| Becton-Dickinson & Co. | Surgical Instruments |
| Bumble Bee Seafoods | Food |
| Cardinal Health, Inc. | Surgical Instruments |
| Grupo Gloria | Food |
| Guidant Corp. | Medical Instruments |
| Hamilton Sundstrand Corp. | Electrical Instruments |
| Hubbell Incorporated | Electrical Instruments |
| Ingersoll-Rand Co. | Electrical Instruments |
| Ivax Pharmaceutical | Pharmaceuticals |
| Pall Corporation | Ophthalmic Filters |
| Patheon Inc. | Pharmaceuticals |
| Procter & Gamble Co. | Pharmaceuticals |
| Stryker Corp. | Surgical Instruments |
| Unilever PLC | Consumer Products |
| Wellco Enterprises, Inc. | Footwear |

| Employment 200 to 499 | Product |
|---|---|
| Alcan Finance (BDA) LTC | Plastics |
| Bacardí Limited | Food |
| Biovail Corporation International | Pharmaceuticals |
| Carolina Underwear Co. | Apparel |
| CEMEX | Cement |
| Centennial Communication | Communications |
| Checkpoint Systems Inc. | Electronic Instruments |
| Coca Cola Company | Food |
| Colgate-Palmolive Company | Consumer Products |
| C.R. Bard | Surgical Instruments |
| Curtis Instruments Inc. | Electrical Instruments |
| Davis Creek Managing Partners | Metal Products |
| E.I. DuPont de Nemours & Co. | Chemicals |
| Eastern Canvas Products | Textile Products |
| Espace Europee de Lenterpise | Pharmaceuticals |
| Essilor International | Ophthalmic Products |
| ICN Pharmaceuticals Inc. | Pharmaceuticals |
| IDT Dutch Holding, BV | Communications |
| Loctite Corporation | Chemicals |
| Lutron Electronics Co. Inc. | Electronic Instruments |
| Millipore Corporation | Surgical Instruments |
| Mylan Laboratories, Inc. | Chemicals |
| Northrop Grumman Corporation | Electrical Instruments |
| Novartis Holding AG | Ophthalmic Products |
| Nypro International | Medical Devices |
| Owens Illinois Inc. | Glass and Plastics |
| Packaging Coordinators Inc. | Packaging Products |
| PepsiCo, Inc. | Food |
| Pilgrim's Pride Corporation | Food |
| Positronic Industries, Inc. | Electronics |
| Rocky Shoes & Boots | Footwear |
| Siemens AG | Electrical Instruments |
| Sitnasuak Native Corporation | Apparel |
| Solectron Corporation | Electronic Instruments |
| St. Jude Medical, Inc. | Surgical Instruments |
| Standard Motor Products Inc. | Motor Vehicle Parts |
| Storage Technology Corp. | Electronics |
| SwissAir Services Corp. | Transportation |
| Symmetricom Inc. | Electronic Equipment |
| Thomas & Betts Corporation | Electrical Instruments |
| Timberland Company | Leather |
| Warner Chilcott | Pharmaceuticals |
| Watson Pharmaceutical, Inc. | Pharmaceuticals |

---

[1] Based on the last employment figures reported by each company to PRIDCO.

*Source*: PRIDCO; Economic Analysis and Strategic Planning Area.

PR-CCD-0006870

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2003 and 2007, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.4%, while payroll employment in this sector increased at an average annual rate of 1.8%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2007, services generated $35.9 billion of gross domestic product, or 40% of the total. Services employment grew from 523,691 in fiscal year 2003 to 562,949 in fiscal year 2007 (representing 54.5% of total, non-farm, payroll employment). This represents a cumulative increase of 7.5% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2003 to 2007, as measured by gross domestic product. From fiscal year 2003 to 2007, gross domestic product increased in wholesale and retail trade from $9.2 billion to $11.1 billion, and in finance, insurance, and real estate from $12.5 billion to $16.3 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2007 were $113.9 billion. As of December 31, 2007, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $75.8 billion.

I-21

PR-CCD-0006871

The following tables set forth gross domestic product for fiscal years 2003 to 2007 and employment for the services sector for fiscal years 2003 to 2007.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Wholesale and retail trade | $ 9,150 | $ 9,802 | $10,217 | $10,709 | $11,061 |
| Finance, insurance and real estate | 12,508 | 13,029 | 14,267 | 14,998 | 16,336 |
| Other services[2] | 7,261 | 7,646 | 7,965 | 8,241 | 8,529 |
| Total | $28,919 | $30,476 | $32,449 | $33,948 | $35,925 |

\* Totals may not add due to rounding.
(1) Preliminary.
(2) Includes tourism.

*Source*: Planning Board.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007**[1] |
| Wholesale Trade | 32,181 | 33,299 | 33,710 | 33,992 | 33,158 |
| Retail Trade | 130,180 | 132,008 | 136,189 | 137,800 | 135,058 |
| Transportation, Warehouse & Utilities | 17,352 | 17,054 | 17,615 | 17,433 | 16,700 |
| Trade, Transportation, Warehouse & Utilities | 179,713 | 182,361 | 187,514 | 189,225 | 184,916 |
| Information | 21,619 | 21,907 | 22,598 | 22,600 | 21,733 |
| Finance | 44,648 | 46,852 | 48,621 | 49,767 | 49,975 |
| Professional and Business | 98,498 | 101,899 | 103,767 | 106,400 | 104,767 |
| Educational & Health | 92,409 | 98,101 | 99,963 | 103,583 | 105,842 |
| Leisure & Hospitality | 67,912 | 70,310 | 72,586 | 74,767 | 73,433 |
| Other Services | 18,808 | 20,671 | 21,257 | 21,267 | 22,283 |
| Total | 523,607 | 542,101 | 556,306 | 567,609 | 562,949 |

\* Totals may not add due to rounding.
(1) Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During fiscal year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in fiscal year 2005. The number of non-resident tourists registered in tourist hotels during fiscal year 2006 increased 4.6% compared to fiscal year 2005. Hotel rooms available during fiscal year 2006 increased 3.9% compared to fiscal year 2005. The average number of rooms rented in

I-22

PR-CCD-0006872

tourist hotels increased 3.9% during fiscal year 2006 compared to fiscal year 2005. The average occupancy rate in tourist hotels during fiscal years 2005 and 2006 was 70.8%.

During fiscal year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,798,300, a decrease of 6.5% over the number of persons registered during fiscal year 2006. The average occupancy rate in tourist hotels during fiscal year 2007 was 71.3%, compared to 70.1% in fiscal year 2006. The average number of rooms rented in tourist hotels decreased 5.0% during fiscal year 2007 compared with fiscal year 2006. The average number of rooms available in tourist hotels decreased 6.3% from fiscal year 2006 to fiscal year 2007 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) took longer to complete than in the past.

The number of persons registered in tourist hotels during the first four months of fiscal year 2008, was 688,100, a decrease of 2.2% over the number of persons registered during the same period of fiscal year 2007. The average occupancy rate in tourist hotels during the first four months of fiscal year 2008 was 68.2%, compared to 68.4% in the period for fiscal year 2007. During the first four months of fiscal year 2008, the average number of rooms rented in tourist hotels decreased 2.3% and the average number of rooms available in tourist hotels decreased 2.7% compared with the same period in fiscal year 2007.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2006.

## Commonwealth of Puerto Rico
## Tourism Data[1]
## Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2003 | $1,239,200 | $1,163,900 | $1,999,200 | $4,402,300 | $2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006[4] | 1,424,170 | 1,300,120 | 2,297,840 | 5,022,130 | 3,369.3 |
| 2007[4] | 1,353,380 | 1,375,430 | 2,333,600 | 5,062,410 | 3,143.9 |

(1) Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2) Includes visitors in guesthouses.
(3) Includes visitors in homes of relatives, friends, and in hotel apartments.
(4) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-

PR-CCD-0006873

acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In fiscal year 2007, the government accounted for $8.6 billion of Puerto Rico's gross domestic product, or 9.6% of the total. The government is also a significant employer, providing jobs for 297,400 workers, or 28.8% of total, non-farm, payroll employment in fiscal year 2006. This total includes municipal employees. As of January 31, 2008, central government employment has been reduced by approximately 11,500 positions since September 2004.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During fiscal year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material impact on the General Fund.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system

PR-CCD-0006874

highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2008. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is completed, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

As of September 30, 2007, PAA had an outstanding balance of $94.6 million under various lines of credit from GDB. PAA is authorized to borrow up to $250 million under these lines of credit. This debt is payable from annual legislative appropriations until the PAA starts generating revenues sufficient to cover debt service and is also guaranteed by the Commonwealth. Partial operation of the Port of the Americas, at a capacity of up to 250,000 TEUs per year, could begin in early 2008.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity, due to its multiplier effect on the whole economy. During the period from fiscal year 2003 through fiscal year 2007, however, real construction investment has decreased at an average annual growth rate of 5.9%. The total value of construction permits decreased by 5.4% during the same five fiscal year period.

Public investment has been an important component of construction investment. During fiscal year 2007, approximately 43.4% of the total investment in construction was related to public projects. For fiscal year 2007 compared to fiscal year 2006, the total value of construction permits decreased 22.2% and total sales of cement, including imports, decreased 8.2%. Average payroll employment in the construction sector during fiscal year 2007 was 67,400, a reduction of 0.1% from fiscal year 2006. Cement sales (including imports) continued their decline, during the first three quarters of fiscal year 2008, falling 11.4% compared to the same period in fiscal year 2007.

I-25

PR-CCD-0006875

Total construction investment for fiscal year 2007 decreased (in real terms) by 6.3% (following a 10.4% real decline in fiscal year 2006) due principally to the drop in construction related public projects. For fiscal year 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 5.3% and stagnation (0% real growth) for fiscal year 2009. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first six months of fiscal year 2008, the number of construction permits decreased 18.5% and the total value of construction permits increased 23% compared to the same period in fiscal year 2007.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2007, gross income from agriculture was $814.2 million, an increase of 1.6% compared with fiscal year 2006. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During fiscal year 2007, starchy vegetables, coffee, livestock products and ornamental plants contributed a higher percentage of the sector's income than in the previous fiscal year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and

I-26

PR-CCD-0006876

1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
### Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.

(2) Based on census population as of April 1 of the stated year.

(3) Estimated population (reference date July 1 of the stated year).

*Sources*: United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2006-2007 was approximately 62,340 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing,

I-27

PR-CCD-0006877

medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, which are designed to promote investment in Puerto Rico, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these industrial incentives laws is the 1998 Tax Incentives Act.

The benefits provided by the 1998 Tax Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. Companies qualifying thereunder can benefit from income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, the 1998 Tax Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 60% and 80% thereafter, and 100% exemption from excise taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities. The 1998 Tax Incentives Act also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

Under the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments are fully exempt from income and municipal license taxes. Individual

PR-CCD-0006878

shareholders of an exempted business are allowed a credit against their Puerto Rico income taxes up to 30% of their proportionate share of the exempted business's income tax liability. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period is subject to a 4% income tax rate.

Under the 1998 Tax Incentives Act, core pioneer industries that employ innovative technologies in their operations, including high technology industries with activities that produce a significant economic impact, can be eligible for income tax rates below 2%. Eligible manufacturing industries may also qualify for certain payroll and training deductions, building and construction expense deductions, a 25% credit for purchases of products manufactured in Puerto Rico, and a 35% credit for purchases of locally recycled products and products manufactured with locally recycled materials.

The 1998 Tax Incentives Act also provides investors who acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or assets. Also, exempted businesses that produce high technology products may be eligible for a credit equal to the amount in excess of $100 million of the annual taxes retained on the payment of rights, rents, royalties and licenses related to the production of such goods. Finally, call centers servicing markets outside Puerto Rico are exempt from paying excise taxes on the purchase of equipment needed for the operation of such call centers.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects. See "Government Development Bank for Puerto Rico – Tourism Development Fund" under *Public Corporations*.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,900 new hotel rooms.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976,

PR-CCD-0006879

under Section 931 of the U.S. Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the U.S. Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the U.S. Code made in 1996 (the "1996 Amendments"), its income tax credit based on operating and certain investment income was phased out over a ten-year period for companies that were operating in Puerto Rico in 1995, and is no longer available.

*Controlled Foreign Corporations*

Because of the modification and phase out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a fifteen percent Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

I-30

PR-CCD-0006880

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury and motor vehicle fuel taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the Sales Tax (as defined under "Tax Reform" under *Puerto Rico Taxes, Other Revenues, and Expenditures* below) allocated to the Puerto Rico Sales Tax Financing Corporation is also not included as internal revenues consistent with the legislation creating the Sales Tax Financing Corporation, which legislation provides that such portion is not "available resources" under the Constitutional provisions relating to the Bonds.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest category by Moody's and S&P, none of which is eligible to be used for a legal defeasance under Puerto Rico law ("non-eligible investments")). Since bonds refunded with proceeds of non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $859,632,840 in the fiscal year ending June 30, 2020 (based on the assumption that the Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and the Public Improvement Refunding Bonds, Series 2004 B, a portion of the Public Improvement Bonds of 2006, Series A, and a portion of the Public Improvement Refunding Bonds, Series 2007A, each of which are also variable rate bonds, bear interest at 12% per annum). This amount ($859,632,840) is equal to 10.30% of $8,344,210,500, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2006 and June 30,

PR-CCD-0006881

2007. If bonds refunded with non-eligible investments described in the preceding paragraph were treated as not being outstanding, and the interest on the Public Improvement Refunding Bonds, Series 2004 B, the portion of the Public Improvement Bonds of 2006, Series A, and the portion of the Public Improvement Refunding Bonds, Series 2007A, was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the percentage referred to in the preceding sentence would be 8.63% and future maximum annual debt service for the Commonwealth's outstanding general obligation debt would be $719,927,041 in the fiscal year ending June 30, 2020. Annual debt service payments on the PRASA guaranteed bonds are not included in the calculation of the 15% debt limitation. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.

The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See *Public Corporations.* However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal assemblies. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2007. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products, some of which debt is set forth in footnote 4 below. Also excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.4 billion of outstanding bonds (as of December 31, 2007) issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $2.4 billion of obligations of the Public Finance Corporation issued to purchase certain Commonwealth public sector debt.

I-32

PR-CCD-0006882

## Commonwealth of Puerto Rico
## Public Sector Debt
### (in thousands)

|  | December 31, 2007 |
|---|---|
| Puerto Rico direct debt[1] | $10,701,206 |
| Municipal debt | 2,420,487 |
| Public corporations debt |  |
| Puerto Rico guaranteed debt[2] | 864,547 |
| Debt supported by Puerto Rico appropriations or taxes[3] | 19,694,714 |
| Other non-guaranteed debt[4] | 12,252,019 |
| Total public corporations debt | 32,811,280 |
| Total public sector debt | $45,932,973 |

(1) Includes general obligation bonds, tax and revenue anticipation notes, and lines of credit provided by GDB. Excludes certain Commonwealth general obligation bonds in the principal amount of $1.1 billion that have been refunded with proceeds that were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.

(2) Consists of $509.1 million of bonds issued by Aqueduct and Sewer Authority, $255.5 million of State Revolving Fund Loans incurred under various federal water laws, and $99.9 million of bonds issued by Port of the Americas Authority. Excludes Public Buildings Authority bonds in the principal amount of $3.099 billion and $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents, among others, bonds and notes issued by Highway and Transportation Authority, Housing Finance Authority, Infrastructure Financing Authority, Public Buildings Authority and Public Finance Corporation.

(4) Excludes the following: $1 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.2 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $596.3 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $81.2 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $111 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities. The bonds listed in this footnote are subsequently collectively referred to as the "Excluded Bonds." If the principal amounts of the Excluded Bonds were included in the above table, total public corporations' debt would be $36,107,778,000 and total public sector debt would be $49,229,473,000.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

PR-CCD-0006883

**Debt Service Requirements for Commonwealth General Obligation Bonds**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding as of December 31, 2007.

The table excludes debt service on $1.08 billion of general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds will be considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation described above. In addition, in respect of certain variable rate, general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

I-34

PR-CCD-0006884

**Puerto Rico Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
| | Principal | Interest | Total Debt Service[1] |
|---|---|---|---|
| 2008 | $ 64,137 | $ 428,376 | $ 492,513 |
| 2009 | 266,840 | 411,944 | 678,784 |
| 2010 | 288,540 | 396,759 | 685,299 |
| 2011 | 301,872 | 381,047 | 682,919 |
| 2012 | 323,305 | 359,342 | 682,647 |
| 2013 | 346,325 | 339,605 | 685,930 |
| 2014 | 332,043 | 341,625 | 673,668 |
| 2015 | 362,250 | 325,899 | 688,149 |
| 2016 | 380,185 | 308,330 | 688,515 |
| 2017 | 397,802 | 290,402 | 688,204 |
| 2018 | 408,715 | 271,294 | 680,009 |
| 2019 | 447,781 | 236,564 | 684,345 |
| 2020 | 513,180 | 206,747 | 719,927 |
| 2021 | 367,095 | 181,702 | 548,797 |
| 2022 | 314,635 | 164,012 | 478,647 |
| 2023 | 282,545 | 149,299 | 431,844 |
| 2024 | 291,535 | 136,833 | 428,368 |
| 2025 | 284,035 | 125,087 | 409,122 |
| 2026 | 287,480 | 112,840 | 400,320 |
| 2027 | 300,190 | 99,767 | 399,957 |
| 2028 | 313,290 | 85,217 | 398,507 |
| 2029 | 326,875 | 73,918 | 400,793 |
| 2030 | 341,510 | 57,387 | 398,897 |
| 2031 | 356,450 | 41,875 | 398,325 |
| 2032 | 193,095 | 25,920 | 219,015 |
| 2033 | 167,910 | 18,122 | 186,032 |
| 2034 | 120,785 | 11,222 | 132,007 |
| 2035 | 55,380 | 6,117 | 61,497 |
| 2036 | 30,400 | 3,276 | 33,676 |
| 2037 | 32,000 | 1,680 | 3,680 |
| | $8,498,183 | $5,592,209 | $14,090,392 |

---

* Totals may not add due to rounding. Excludes the debt service on certain economically (but not legally) defeased, general obligation bonds and includes the effective fixed rate on certain variable rate, general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

(1) In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the from the General Fund. See "Other Public Corporations - Aqueduct and Sewer Authority" under *Public Corporations* below.

*Sources*: Government Development Bank for Puerto Rico and Department of the Treasury

PR-CCD-0006885

**Ratings of Commonwealth General Obligation Bonds**

On May 22, 2007, Moody's Investors Service ("Moody's") confirmed its "Baa3" and "Ba1" rating on the Commonwealth's general obligation debt and its appropriation debt, respectively, and its negative ratings outlook thereon.

On May 22, 2007, Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), lowered its rating on the Commonwealth's general obligation debt to "BBB-", changed its negative ratings outlook thereon to stable, and confirmed its "BBB-" rating on the Commonwealth's appropriation debt.

**Commonwealth Guaranteed Debt**

As of December 31, 2007, $3.09 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $236.2 million in fiscal year ending June 30, 2011, with their final maturity being July 1, 2037. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of December 31, 2007, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of December 31, 2007, GDB held approximately $99.9 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The Authority is authorized to issue and GDB is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. No payments under the Commonwealth guaranty have been required for these bonds.

As of December 31, 2007, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $764.6 million. This amount consisted of $262.8 million in revenue bonds sold to the public, $246.3 million in bonds issued to the United States Department of Agriculture, Rural Development, and $255.5 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations. PRASA has resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations* below.

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of Gross National Product (in current dollars) for the five fiscal years ended June 30, 2007 and the first six months of fiscal year 2008. As of December 31, 2007, outstanding short-term debt, relative to total debt, was 11.1%.

I-36

PR-CCD-0006886

## Commonwealth of Puerto Rico
## Public Sector Debt and Gross National Product
### (dollars in millions)*

| June 30, | | Public Sector | | | | Gross National Product[1] | |
| | Long Term[2] | Short Term[3] | Short Term as % of Total | Total | Rate of Increase | Amount | Rate of Increase |
|---|---|---|---|---|---|---|---|
| 2003 | $28,102 | $1,605[4] | 5.4% | $29,707 | 6.1% | $47,479 | 5.3% |
| 2004 | 31,767 | 2,175[4] | 6.4 | 33,942 | 14.3 | 50,709 | 6.8 |
| 2005 | 34,789 | 1,914[4] | 5.2 | 36,703 | 8.1 | 53,601 | 5.7 |
| 2006 | 37,313 | 2,620[4][5] | 6.6 | 39,933 | 8.8 | 56,689 | 5.8 |
| 2007 | 39,492 | 3,326 | 7.8 | 42,818 | 7.2 | N/A | N/A |
| December 31, 2007 | 40,821 | 5,112 | 11.1 | 45,933 | 7.3 | N/A | N/A |

* Totals may not add due to rounding.
(1) In current dollars.
(2) Does not include the Excluded Bonds identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
(3) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(4) Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(5) Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source*: Government Development Bank for Puerto Rico

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2007 and the first six months of fiscal year 2008.

## Commonwealth of Puerto Rico
## Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth | | | Municipalities | | | Public Corporation[1] | | | Total | | |
| | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | $6,709 | $177[3] | $6,886 | $1,754 | $201 | $1,955 | $19,639 | $1,227 | $20,866 | $28,102 | $1,605 | $29,707 |
| 2004 | 7,758 | 761[3] | 8,519 | 1,820 | 226 | 2,046 | 22,190 | 1,187 | 23,377 | 31,767 | 2,175 | 33,942 |
| 2005 | 8,761 | 257[3] | 9,018 | 1,927 | 254 | 2,181 | 24,101 | 1,403 | 25,504 | 34,789 | 1,914 | 36,703 |
| 2006 | 9,841 | 552[3][4] | 10,393 | 2,037 | 293 | 2,330 | 25,435 | 1,775 | 27,210 | 37,313 | 2,620 | 39,933 |
| 2007 | 10,335 | 224 | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| December 31, 2007 | 9,131 | 1,570 | 10,701 | 2,122 | 299 | 2,421 | 29,568 | 3,243 | 32,811 | 40,821 | 5,112 | 45,933 |

* Totals may not add due to rounding.
(1) Includes Commonwealth guaranteed debt; does not include the Excluded Bonds.
(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(3) Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(4) Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source*: Government Development Bank for Puerto Rico

PR-CCD-0006887

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2007 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

PR-CCD-0006888

## Commonwealth of Puerto Rico
## Outstanding Debt of Public Corporations
## December 31, 2007
### (in thousands)

| | With Guaranty | Bonds Without Guaranty | Total | With Guaranty | Notes Without Guaranty | Total | With Guaranty | Total Bonds and Notes Without Guaranty | Total |
|---|---|---|---|---|---|---|---|---|---|
| Aqueduct and Sewer Authority | $ 509,139 | $ - | $ 509,139 | $255,481 | $1,231,797 | $1,487,278 | $ 764,620 | $ 1,231,797 | $ 1,996,417 |
| Convention Center District Authority | - | 465,800 | 465,800 | - | 150,692 | 150,692 | - | 616,492 | 616,492 |
| Electric Power Authority | - | 5,498,238 | 5,498,238 | - | 1,074,218 | 1,074,218 | - | 6,572,456 | 6,572,456 |
| Highway and Transportation Authority | - | 6,428,074[1] | 6,428,074 | - | 300,474 | 300,474 | - | 6,728,548 | 6,728,548 |
| Housing Finance Authority[2] | - | 493,804 | 493,804 | - | 49,003 | 49,003 | - | 542,807 | 542,807 |
| Industrial Development Company | - | 263,744 | 263,744 | - | 86,710 | 86,710 | - | 350,454 | 350,454 |
| Infrastructure Financing Authority | - | 1,876,578[3] | 1,876,578 | - | 21,283 | 21,283 | - | 1,897,861 | 1,897,861 |
| Public Buildings Authority | 3,098,773 | - | 3,098,773 | - | 75,000 | 75,000 | 3,098,773 | 75,000 | 3,173,773 |
| Public Finance Corporation | - | 2,427,604[4] | 2,427,604 | - | 103,936 | 103,936 | - | 2,531,540 | 2,531,540 |
| Port of the Americas Authority | 99,927 | - | 99,927 | - | - | - | 99,927 | - | 99,927 |
| Ports Authority | - | 61,315[5] | 61,315 | - | 594,578 | 594,578 | - | 655,893 | 655,893 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 4,500,702 | 4,500,702 | - | - | - | - | 4,500,702 | 4,500,702 |
| University of Puerto Rico | - | 604,758[6] | 604,758 | - | 24,703 | 24,703 | - | 629,461 | 629,461 |
| Others | - | - | - | - | 2,514,949 | 2,514,949 | - | 2,514,949 | 2,514,949 |
| Total[7] | $3,707,839 | $22,620,617 | $26,328,456 | $255,481 | $6,226,803 | $6,482,284 | $3,963,320 | $28,847,960 | $32,811,280 |

(1) Excludes $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

(2) Excludes the $596.3 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development.

(3) Excludes $1 billion of outstanding bonds of Infrastructure Financing Authority, which bonds are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(4) Payable primarily from Commonwealth appropriations.

(5) Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which bonds are payable solely from by the pledge of certain payments made by a private corporation under a special facilities agreement.

(6) Excludes $81.2 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which bonds are payable from rent payments made by the University of Puerto Rico.

(7) Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.2 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico

### Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 2007, just under $2 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $1.5 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2007. As of said date, GDB also had $4.4 billion in loans

PR-CCD-0006889

outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act No. 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act No. 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB did not make a payment to the General Fund under Act No. 82 for fiscal years 2005, 2006 and 2007 and does not expect to make a payment for fiscal year 2008.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Trust") of $500 million and provided the Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Trust were deposited in two investment accounts held by GDB for the benefit of the Trust. As December 31, 2007, the Trust had repaid $123.9 million of its line of credit and had an outstanding balance of $376 million. The line of credit is payable from legislative appropriations.

GDB has several subsidiaries which perform various functions. The principal subsidiaries and their functions are listed below:

*Housing Finance Authority.* Housing Finance Authority (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority. Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency. As of December 31, 2007, Housing Finance Authority's total outstanding loans to the private sector for development of housing projects targeted to low and moderate income families were $104.1 million. The Authority's mortgage loans to low and moderate income homeowners represented an additional $78.2 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds and notes that were issued to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units. Such bonds and notes are generally limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions. As of December 31, 2007, $1.097 billion of Housing Finance Authority bonds were outstanding.

As of December 31, 2007, the Authority also had outstanding $486.6 million of bonds and notes issued to fund certain payments of the Commonwealth under its mortgage subsidy and other programs for low and moderate income families, and to guarantee certain insurance obligations of the former Housing Bank and Finance Agency.

PR-CCD-0006890

As of December 31, 2007, the Authority had total notes and bonds outstanding of $1.209 billion (including $101.4 million of debt outstanding under GDB lines of credit and repos $10.2 million with other banks) and total unrestricted net assets of $324.8 million.

*Tourism Development Fund.* The Tourism Development Fund promotes Puerto Rico's hotel and tourism industry by making available direct loans and guarantees to secure the private financing for new hotel development projects. The Tourism Development Fund is also authorized to make capital investments in tourism related projects. As of December 31, 2007, the Tourism Development Fund had outstanding direct loans in an aggregate principal amount of $257.4 million and guarantees issued in the outstanding amount of $127.9 million to finance several hotels and tourism-related projects.

The Tourism Development Fund has made payments under its guarantees and letters of credit in the aggregate amount of approximately $313.4 million with respect to several projects, including $282 million disbursed to pay in full the bonds issued to finance three projects, which bonds had been declared due and payable at the direction of the Tourism Development Fund due to the failure of the applicable borrowers to comply with their obligations under the related reimbursement agreements. Of the total amount disbursed, the Tourism Development Fund has been able to recover approximately $199.7 million from the borrowers. After taking these payments and all related recoveries into account, the unrestricted net assets of the Tourism Development Fund as of December 31, 2007, were approximately $146.2 million, and its allowances for losses on guarantees, loans, other assets and letters of credit were approximately $24.7 million.

*Capital Fund.* The Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") invests and trades in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. As of December 31, 2007, the Capital Fund had assets of $89.1 million, of which $58.9 million were invested in an equity index fund that invests mainly in growth, value, small cap and international stocks.

*Development Fund.* The Puerto Rico Development Fund (the "Development Fund") provides an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund also guarantees obligations of these enterprises and invests in their equity securities. As of December 31, 2007, the Development Fund had no investments due to the sale of most of its assets to the Economic Development Bank for Puerto Rico in June 2006.

*Public Finance Corporation.* Puerto Rico Public Finance Corporation ("Public Finance Corporation") provides agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. Public Finance Corporation currently holds notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health, and the Aqueduct and Sewer Authority, among others. As of December 31, 2007, it had $2.4 billion aggregate principal amount of bonds outstanding. All such bonds are limited, non-recourse obligations of Public Finance Corporation payable from the Puerto Rico Sales Tax Financing Corporation and/or Commonwealth appropriations made to pay the notes held by Public Finance Corporation. In addition, Public Finance Corporation had $104 million of notes outstanding under a line of credit

PR-CCD-0006891

with GDB whose proceeds were used to pay fiscal year 2007 debt service on its bonds due to the failure of the Commonwealth to make the required debt service appropriations on account of its fiscal problems.

*Sales Tax Financing Corporation* ("COFINA") was created by Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006. Act 91 vested COFINA with all the powers conferred on Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. Act 91 provides that present and future collections of the pledged sales tax be transferred to COFINA in exchange for, and in consideration of, COFINA's commitment to pay, or establish mechanisms to pay, all or part of virtually all appropriation-backed debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by COFINA and with other funds and resources available to COFINA. As of December 31, 2007, $4.5 billion of COFINA's bonds were outstanding, the net proceeds of all of which bonds were used to refinance and retire outstanding debt of Public Finance Corporation.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates the island's public water supply and sanitary sewer facilities systems (the "Systems").

PRASA needs to make substantial investments in infrastructure and a major overhaul of its operations to maintain the viability of the Systems and to finance its expansion for new users. Funds for this investment will be provided through a combination of revenues from PRASA, financing transactions, federal grants and other sources. Debt service on revenue bonds is payable from net revenues of the Systems after payment of current expenses. Due to PRASA's financial difficulties and its inability to access the bond market, the Commonwealth guarantees the principal and interest payments to the bondholders of all outstanding revenue bonds issued by PRASA, including those issued to the United States Department of Agriculture, Rural Development, and loans granted by the Clean Water and Drinking Water State Revolving Funds for the benefit of PRASA. In February 2004, this guaranty was extended through new legislation to include debt obligations issued until 2010.

PRASA reported net operational losses of $361 million and net operational income of $31.2 million during fiscal years 2006 and 2007, respectively. The total debt of PRASA was $2 billion as of December 31, 2007.

Beginning in fiscal year 2006, the Commonwealth's General Fund ceased to provide financial assistance to PRASA, including making payments on PRASA's guaranteed revenue bonds (as of January 1, 2006). As part of its efforts to regain fiscal independence, PRASA

PR-CCD-0006892

implemented substantial increases in water and wastewater service rates in two phases. The first phase took effect on October 10, 2005. The second phase took effect on July 1, 2006. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund. PRASA has also begun to pay from its revenues the debt service on a note it issued to Public Finance Corporation (in the principal amount of $368.3 million), which note financed the cost of the north coast super-aqueduct, as well as notes issued to Public Finance Corporation (in the principal amount of approximately $747 million), which notes financed its operations.

In June 2006, PRASA entered into an agreement to plead guilty to an indictment charging 15 felony counts of violating the federal Clean Water Act through the illegal discharge of pollutants from nine sanitary wastewater treatment plants and five drinking water treatment plants. Under the plea agreement, PRASA will pay a criminal fine of $9 million and was placed on five years' probation. PRASA and the United States also reached a comprehensive civil settlement to resolve repeated environmental violations at 62 wastewater treatment plants throughout the Commonwealth. According to the civil settlement, PRASA will spend an estimated $1.7 billion implementing approximately 145 capital improvement projects and other remedial measures at all of its wastewater treatment plants and related collection systems over the next 15 years. In December 2006, PRASA and the Commonwealth Department of Health executed a settlement agreement superseding 180 administrative orders against, and three prior settlement agreements with, PRASA. Under the terms of this agreement, PRASA paid a civil penalty of $1.0 million and agreed to implement short, medium and long-term work plans, as well as interim mitigation and preventative measures, all to bring PRASA's water system into compliance with federal and Commonwealth potable water regulations. The total cost of complying with this settlement agreement is expected to be between $700 and $800 million.

*Children's Trust* is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.2 billion Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. On June 30, 2005, the Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth. As of December 31, 2007, the outstanding principal amount of the Trust's bonds was $1.2 billion. These bonds and any other additional senior bonds issued by Children's Trust are secured by a statutory pledge of the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement. To date, all principal and interest payments required to be made by the Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

PR-CCD-0006893

*Convention Center District Authority.* The Convention Center District Authority was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote a new convention center and designated private parcels located within the Convention Center District in San Juan. The convention center opened on November 17, 2005.

The Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") financed the construction of a multi-purpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum, with a line of credit provided by GDB. The Coliseum was transferred to the Convention Center District Authority along with the associated line of credit. As of December 31, 2007, this line of credit with GDB had an outstanding balance of $150.7 million, which is expected to be paid from the proceeds of Commonwealth general obligation bonds. The Authority's debt as of May 31, 2007 was $624 million including $468.8 million of bonds issued in March 2006 to finance the Convention Center and payable from a portion of a hotel room tax.

*Electric Power Authority.* The Authority owns and operates the island's electric system. The capital improvement program for the five-year period ending June 30, 2012 is estimated to cost approximately $2.3 billion and will be financed primarily by borrowed funds, supplemented by internally generated funds. The Authority's bonded debt consists of Power Revenue Bonds, secured by a lien on net revenues of the electric system. As of December 31, 2007, the Authority's total debt was $6.6 billion, including $5.5 billion of bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As a means of reducing its dependency on oil, the Authority has entered into long-term power purchase agreements with the operators of two co-generation plants that use fuels other than oil. Currently, these two co-generation plants provide approximately 27% of the Authority's energy needs.

*Health Insurance Administration* was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of eight designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers the entire island, and approximately 1.5 million persons were covered by the system during fiscal year 2007.

In January 2006, the Commonwealth entered into various contracts with several Medicare Advantage Organizations for the provision of health coverage to approximately 200,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage Organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

The total cost of the health insurance program for fiscal year 2007 was $1.59 billion, compared to $1.56 billion for fiscal year 2006 and $1.46 billion for fiscal year 2005. For fiscal year 2007, the General Fund covered $934.5 million of the total cost of the health insurance program, $203 million of costs were covered with a loan from the GBD, and the remaining $457 million was paid from federal, municipal and other sources. The fiscal year 2008 budget pegs the cost of the health insurance program at $1.67 billion, of which the General Fund is expected

I-44

to cover $1.061 billion, while the remaining $611 million will be paid from federal, municipal and other sources. The health insurance program projects a $394 million deficit for fiscal year 2009. Negotiations with insurance companies will be focused on cost containment strategies that will seek to reduce this cost to the amount appropriated. See *Budget of the Commonwealth of Puerto Rico.*

*Highways and Transportation Authority.* The Authority is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of the Authority, and federal and Commonwealth grants. Debt service on the Authority's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment. As of December 31, 2007, the Authority's total debt was $6.7 billion, including $6.4 billion in outstanding bonds.

The Authority has completed the first phase of a new mass transit system, known as Tren Urbano, to serve a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at the Authority's election. The cost of the first phase was $2.25 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and the Authority's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005.

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of the Authority, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require the Authority, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including low toll revenues, exist at this time, but the Authority does not currently anticipate that the operator will exercise its remedy against the Authority.

*Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. The Company was merged with the Economic Development Administration in January 1998. Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds. As of December 31, 2007, the Company's total debt was $350.4 million. The Company restructured its operations in

PR-CCD-0006895

order to allow it to react quickly to changing business situations. Part of this restructuring included a significant reduction in the number of its employees.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2007, approximately $1.6 billion of AFICA's bonds were outstanding.

*Infrastructure Financing Authority* was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. The Authority is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities. The Authority oversees the Puerto Rico Infrastructure Fund, which is funded with annual fixed amounts from the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. Currently, this amount is $90 million through fiscal year 2009 and will then increase to $117 million annually through fiscal year 2052. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury. The Authority is using these amounts to provide financial support for various infrastructure and other projects. As of December 31, 2007, the Authority's total debt was $1.9 billion.

The Authority will invest approximately $405 million in new infrastructure projects in connection with the holding of the Central American and Caribbean Games in Mayagüez, Puerto Rico, in 2010. In September 2006, the Authority issued $469.8 million of bonds to finance these and other infrastructure projects.

*Municipal Finance Agency* is the municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds and notes held by the Agency and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2007, the Agency had $1.4 billion of bonds outstanding.

*Port of the Americas Authority.* Port of the Americas Authority is responsible for the development and operation of the Port of the Americas (the "Port"), a deep draft port on the south coast of Puerto Rico. In December of 2004, the first phase of the Port was completed at a

PR-CCD-0006896

cost of $40 million. The Authority is authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port. Currently, GDB is authorized to purchase bonds of the Authority in an aggregate principal amount not to exceed $250 million. As of December 31, 2007, GDB held approximately $99.9 million of the Authority's outstanding bonds, which are guaranteed by the Commonwealth.

*Ports Authority.* The Authority owns and operates the major airport and seaport facilities in Puerto Rico. The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. As of December 31, 2007, the Authority had $655.9 million in debt.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. The Authority is authorized by law to have outstanding at any one time up to $3.325 billion of bonds guaranteed by the Commonwealth. As of December 31, 2007, $3.098 billion of such bonds of the Authority were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of December 31, 2007, Public Building Authority's line of credit with GDB had an outstanding balance of $75 million.

*Special Communities Perpetual Trust.* The Special Communities Perpetual Trust, a public corporation, is an irrevocable and permanent trust. The Trust's principal purpose is to fund development projects which address the infrastructure and housing needs of underprivileged communities. GDB has made a special capital contribution to the Special Communities Perpetual Trust of $500 million and provided the Trust with a $500 million, non-revolving, line of credit. The amounts transferred by GDB were deposited in two investment accounts held by GDB for the benefit of the Special Communities Irrevocable Trust, of which $698.2 million had been disbursed to the Trust as of December 31, 2007. As of December 31, 2007, the Special Communities Perpetual Trust's line of credit with GDB had an outstanding balance of $376.1 million. The line of credit is payable from legislative appropriations.

*Telephone Authority* was created in July 1974 when the Commonwealth purchased the Puerto Rico Telephone Company ("PRTC") from International Telephone and Telegraph Corporation. PRTC operates the principal telephone system in Puerto Rico.

In 1999, the Telephone Authority sold a controlling interest in PRTC to a consortium led by a predecessor of Verizon Communications, Inc ("Verizon"). The net proceeds of $1.2 billion, after PRTC's outstanding debt was retired and certain employee benefits were paid, was deposited into the Infrastructure Development Fund held by the Infrastructure Financing Authority. In 2002, Verizon exercised an option to purchase additional shares from the Telephone Authority for $172 million, leaving the Authority with a 28% ownership interest in PRTC. In 2007, the Authority sold its remaining interest in PRTC to a subsidiary of América

PR-CCD-0006897

Móvil, S.A. de C.V. for $529 million, the proceeds from which were transferred to the Employees Retirement System of the Commonwealth.

*University of Puerto Rico* (the "University"), with approximately 62,340 students in academic year 2006-2007, is by far the largest institution of higher education on the island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been financed mainly by revenue bonds. As of December 31, 2007, the University's total debt was $629.5 million, including $604.8 million of outstanding revenue bonds.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

*Other public corporations* (not described above) have outstanding debt in the aggregate amount of $1.8 billion as of December 31, 2007. Debt service on $685 million of such outstanding debt is being paid from legislative appropriations and sales tax receipts. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by the Electric Power Authority and PRASA, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System, the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System"), and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System").

The University Retirement System and the Electric Power Authority Retirement System apply to employees of the University of Puerto Rico and Electric Power Authority, respectively.

PR-CCD-0006898

The Commonwealth is not required to contribute directly to those two systems, although a large portion of University revenues is derived from legislative appropriations.

*Covered Employees.* The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Substantially all active teachers of the Commonwealth's Department of Education are covered by Act No. 91 of March 29, 2004 which superseded Act No. 218 of 1951. The new law establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Education Department employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied. The Judiciary Retirement System covers judges, and the Employees Retirement System covers all other employees of the Commonwealth, its municipalities and instrumentalities. As of June 30, 2007, the total number of participants, including active participants and retirees, in the three systems was as follows: Employees Retirement System, 276,688; Teachers Retirement System, 77,500; and Judiciary Retirement System, 685. The three systems are financed by contributions made by employers (the Commonwealth, public corporations, and municipalities) and employees, and investment income.

*Funding Requirements.* The central government is responsible for approximately 64% of total employer contributions to the Employees Retirement System, and the other 36% is the responsibility of public corporations and municipalities. The central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the systems and required contributions to the systems by employers and employees are determined by law rather than by actuarial requirements. For the Employees Retirement System, required employer contributions are 9.275% of applicable payroll. Required employee contributions for the Employees Retirement System vary according to salary and how the individual employee's retirement benefits are coordinated with social security benefits. For the Judiciary Retirement System, required contributions are 20% of applicable payroll for the employer and 8% for the employees. For the Teachers Retirement System, required contributions are 8.5% of applicable payroll for the employer and 9.0% for the employees.

*Actuarial Valuation of Employees and Judiciary Retirement System.* According to the most recent actuarial valuation of the Employees Retirement System and Judiciary Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2005, the total pension benefit obligations for the Employees Retirement System and Judiciary Retirement System were $12.284 billion and $179 million, respectively. The unfunded pension benefit obligations of the Employees Retirement System and Judiciary Retirement System for the same period were $9.956 billion and $104 million, respectively, representing funding ratios of 19% and 40%, respectively. Any amounts receivable from the Commonwealth with respect to benefits under special benefits laws (discussed below) are considered in the actuarial evaluation process to determine the unfunded pension benefit obligation of the Employees Retirement

PR-CCD-0006899

System to the extent receivables are recognized as such by the Employees Retirement System. The June 30, 2005 actuarial valuation was completed in accordance with the "Projected Unit Credit" method and assumed an investment return of 8.5% per year and a salary increase of 5% per year. Insofar as the statutorily mandated annual deposit to the Employees Retirement System and Judiciary Retirement System is insufficient to cover the actuarial pension benefit obligation, the unfunded pension benefit obligation of the System will continue to increase in the short term, and additional funding from the Commonwealth may ultimately be necessary to cover such unfunded obligation.

*Actuarial Valuation of Teachers Retirement System.* According to the most recent actuarial valuation of the Teachers Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2007 the accrued actuarial liability of the system was $7.756 billion and the value of its assets amounted to $3.163 billion, representing a funding ratio of 41%, and the resulting unfunded accrued liability was $4.593 billion. The actuarial valuation assumed an investment return of 8%, yearly salary increases of 3.5%, employee and employer contributions of 9% and 8.5%, respectively, an inflation rate of 2.5%, and a remaining amortization period of 30 years for the unfunded accrued liability. Under the same above assumptions, but without taking into account benefits paid under special benefits laws (described below) and does not include the obligation with respect to the prospective payments under special benefits laws because these are not obligations of the Teachers Retirement System, and the funding for such benefits will originate from the Commonwealth's General Fund, as of June 30, 2007, the accrued actuarial liability was $7.227 billion and the value of its assets amounted to $3.163 billion, representing a funding ratio of 44%, and the resulting unfunded accrued liability was $4.064 billion. Insofar as the statutorily mandated annual deposit to the Teachers Retirement System is insufficient to cover the actuarial pension liability, the unfunded pension benefit obligation will continue to increase, and additional funding from the Commonwealth may ultimately be necessary to cover such unfunded liability.

*Special Benefits.* Various special benefits laws enacted in previous years provided for additional benefits for the Employees Retirement System, Teachers Retirement System, and Judiciary Retirement System. Specifically, in the case of the Employees Retirement System, Act No. 10 of May 21, 1992 provided for special benefit increases of 3% every three years. The first 3% increase was granted to retirees who had been receiving their annuities for three or more years as of that date. The second 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1995. This increase is being financed by additional contributions from the employers. The third 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1998. This third increase is being partially funded with additional contributions from some of the employers. In June 2001, the Legislative Assembly approved a fourth 3% increase, effective as of January 1, 2001, in post-retirement annuity payments granted on or prior to January 1, 1998. This increase will be funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees. In June 2003, the Legislative Assembly approved a fifth increase of 3% in post retirement benefits effective January 1, 2004. This increase will also be funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees. In June 2007, the Legislative Assembly approved a sixth increase of 3% in post retirement benefits effective January 1, 2007. This increase will also be

PR-CCD-0006900

funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees. Subsequent increases will depend upon the express approval of the Board of Trustees of the Employees Retirement System and the Legislative Assembly, and must provide a funding source. In the case of the Judiciary Retirement System, Act No. 41 of June 13, 2001 provided a 3% special benefit increase in annuity payments, commencing on January 1, 2002 and every three years thereafter, to retirees who have been receiving their annuities for three or more years as of that date. This increase will be funded by the General Fund.

The Teachers Retirement System is seeking reimbursement from the Commonwealth's Office of Management and Budget in the amount of $119 million for special benefits paid by the System to its beneficiaries through June 30, 2004 pursuant to special benefit laws enacted by the Legislative Assembly. The Teachers Retirement System's interpretation of these special benefit laws, to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such special benefits paid, is being disputed by OMB. This dispute is currently under inter-agency arbitration proceedings. The Employees Retirement System is also seeking reimbursement from the Commonwealth (in connection with other special benefits laws applicable to its beneficiaries) in the amount of $73.8 million, representing cumulative benefits paid to beneficiaries through June 30, 2005. OMB believes that the basis of the claims from the Employees Retirement System is valid but that the amounts claimed remain to be verified and reconciled.

*Amendments to Employees Retirement System.* In February 1990, the organic act of the Employees Retirement System was amended to reduce the future pension liabilities of the Employees Retirement System. Among other provisions, the legislation increased the level of contributions to the Employees Retirement System and limited the retirement benefits for new employees by increasing the length of employment required for the vesting of certain benefits and reducing the level of benefits in the case of early retirement. The legislation also reduced the level of occupational disability benefits and death benefits received by new employees.

In 1999, the organic act of the Employees Retirement System was further amended to change it, prospectively, from a defined benefit system to a defined contribution system. This amendment provides for the establishment of an individual account for each employee hired by the Commonwealth after December 31, 1999 and for those current employees who elect to transfer from the existing defined benefit system. The individual account of each current employee is credited initially with an amount equal to his aggregate contributions to the Employees Retirement System, plus interest. Current employees who did not elect to transfer to the new defined contribution system will continue accruing benefits under the current defined benefit system. The individual account of each participant of the new defined contribution system is credited monthly with the participant's contribution and is credited semiannually with a rate of return based on either of two notional investment returns. Such accounts are not credited with any contribution by the employer. Instead, employer contributions will now be used completely to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

The law approving the sale of a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated (subsequently acquired by Verizon

PR-CCD-0006901

Communications Inc.) (see *Public Corporations* – Other Public Corporations – Telephone Authority) provides that any future proceeds received by the government from the sale of its then remaining 43% stock ownership in PRTC will be transferred to the Employees Retirement System to reduce its accumulated unfunded pension benefit obligation. In January 2002, Verizon exercised its option to purchase an additional 15% of the stock of PRTC for $172 million. The proceeds of the sale were transferred to the Employees Retirement System. The Commonwealth has decided to exercise its "tag along" rights in connection with the sale by Verizon of its PRTC stock to Sercotel. As a result of the exercise of such rights, the Employees Retirement System received in June 2007 approximately $529 million from the sale of its remaining stock participation in PRTC.

Historically, the Employees Retirement System achieved a return on investment of less than 2% on the PRTC stock, while the average return of the other assets in its portfolio was approximately 10.8%. In order to improve its funding ratio and address its continuing cash shortfalls, the Employees Retirement System intends to use the proceeds received from the sale of the PRTC stock to acquire other, higher-yield assets, such as personal and mortgage loans to participants of the System.

*Cash Flow Shortfalls.* The Employees Retirement System's disbursements of benefits during fiscal years 2003 through 2007 exceeded contributions and investment income for those years. The cash shortfall for fiscal year 2003 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC and a loan received from the Department of the Treasury. The cash shortfall for fiscal year 2004 was covered with a loan received from the Department of the Treasury. Balances owed to the Department of the Treasury and other pending working capital needs through fiscal year 2005 were refinanced through a repurchase agreement with a financial institution in an amount of $138 million collateralized with the assets of the Employees Retirement System. The cash shortfall for fiscal year 2006 was approximately $70 million. This shortfall was covered with a line of credit provided by a private financial institution and collateralized with the assets of the Employees Retirement System. There was no cash shortfall for fiscal year 2007 on account of the receipt of the proceeds from the sale of the PRTC stock. Also with these proceeds the Employees Retirement System paid off the balances of the 2005 repurchase agreement and the 2006 line of credit used to cover the respective year's cash shortfalls.

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.* The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants are likely to exceed the sum of the employer and employee contributions received and its investment and other recurring income. The Employees Retirement System is also evaluating other measures to improve its cash flows and funding ratio. Some of these measures include, but are not limited to, the establishment of a maximum salary to calculate pension benefits, aggressive collection efforts with respect to employer contributions owed by the Commonwealth, the municipalities and public corporations, and the transfer to the Employees Retirement System of any amounts remaining in the Children's Trust after payment of all the outstanding bonds. See "Tax Reform" under *Puerto Rico Taxes, Other Revenues, and Expenditures.*

PR-CCD-0006902

In addition, the Employees Retirement System is currently undertaking a financing that would significantly increase the System's funding ratio and reduce its unfunded pension benefit obligation. The financing involves the issuance by the Employees Retirement System of debt secured by a pledge of future employer contributions over the next 50 years. All net cash generated by this financing would be deposited into the Employees Retirement System trust to be invested along with its other assets as described above. The Employees Retirement System estimates that the financing will be undertaken during fiscal year 2008 and subsequent years.

The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of the Employees Retirement System, the Judiciary Retirement System and the Teacher's Retirement System for the fiscal years 2006 and 2007 and as of the period ended December 31, 2007.

PR-CCD-0006903

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

organized to invest in other collective investment funds investing in alternative assets, including primarily United States and international funds that focus on both early- and later-stage venture capital investments.

- During the fiscal year 2006, $677,000 was invested in Invesco Non- U.S. Partnership Fund III, L.P. a Delaware limited partnership, organized by IPC Partnership Associates III, LLC as general partner, in which the pension trust funds have a total commitment of $4.5 million. The Partnership was organized to invest in other collective investment funds investing in alternative assets, including primarily investments focusing on non-U.S. buyouts, expansion capital, turnaround, mezzanine, and distressed investment partnership.

- During the fiscal year 2006, $910,000 was invested in Invesco U.S. Buyout & Expansion Capital Partnership Fund III, L.P., a Delaware limited partnership, organized by IPC Partnership Associates III, LLC as General Partner in which the pension trust funds have a total commitment of $3.7 million. The Partnership was organized to invest in other collective funds investing in alternative assets, including primarily investments focusing on small, mid-size, and large domestic buyout transactions.

- During the fiscal year 2006, $1,900,000 was invested in Chase Capital Partners Private Equity Fund of Funds II, LTD, a limited partnership, organized by Chase as general partner in which the pension trust funds have a total commitment of $35 million. The fund's investment strategy is to capitalize on a globally diversified portfolio of private equity investments opportunities across various sectors, including buyouts, growth equity, venture capital, and other special situations through partnership, investments, and direct investments.

The fair value of these investments at June 30, 2006 amounted to $87.8 million and is presented within investments in the statement of net assets. The fair values of these investments have been estimated by the corresponding general partner or fund manager of these partnerships and disclosed in its respective separate audited financial statement. The allocations of net gain and net loss to the limited partners are based on certain percentages, as established in the limited partnership agreements. The difference between the fair value of the investments and the total cumulative contributions is mostly due to distributions made.

(Continued)

PR-CCD-0007044

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

As of June 30, 2006, the pension trust funds and a discretely presented component unit had capital commitments and contributions as follows (expressed in thousands):

| Guayacán Funds of Funds, L.P. | Public sector commitments | Fiscal year contributions | Cumulative contributions |
|---|---|---|---|
| Primary government: | | | |
| Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities | $ 25,000 | — | 23,279 |
| Puerto Rico System of Annuities and Pensions for Teachers | 20,000 | — | 18,623 |
| Subtotal | 45,000 | — | 41,902 |
| **Guayacán Fund of Funds II, L.P.** | | | |
| Primary government: | | | |
| Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities | 25,000 | — | 19,639 |
| Puerto Rico System of Annuities and Pensions for Teachers | 25,000 | — | 19,639 |
| Subtotal | 50,000 | — | 39,278 |
| **Guayacán Private Equity Fund, L.P.** | | | |
| Primary government: | | | |
| Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities | 5,000 | 477 | 4,407 |
| Puerto Rico System of Annuities and Pensions for Teachers | 5,000 | 477 | 4,407 |
| Component unit: | | | |
| Governmental Development Bank | 20,000 | 1,907 | 17,624 |
| UPR Employees' Retirement System | 2,500 | 238 | 2,203 |
| Subtotal | 32,500 | 3,099 | 28,641 |
| **Other Funds** | | | |
| Primary government: | | | |
| Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities | 22,596 | 1,266 | 18,903 |
| Puerto Rico System of Annuities and Pensions for Teachers | 28,714 | 2,972 | 23,547 |
| Subtotal | 51,310 | 4,238 | 42,450 |
| Total | $ 178,810 | 7,337 | 152,271 |

89

(Continued)

PR-CCD-0007045

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Public sector commitments represent the overall commitment established since the first day the pension trust funds began investing in the limited partnerships. Cumulative contributions represent the total contributions made through December 31, 2006, without considering distributions already made by the limited partnerships since its inception.

(9) **Receivables and Payables**

Receivables in the governmental funds include approximately $1.2 billion of accrued income and excise taxes and $300 million receivable from the federal government and $17 million from the Municipal Revenue Collection Center. In addition, the enterprise funds include $65 million of unemployment, disability, and drivers' insurance premium receivable.

Payables in the governmental funds include approximately $580 million of trade accounts due to suppliers for purchase of merchandise and services rendered and $264 million of tax refunds liability. Also at June 30, 2006, excess of checks drawn over the pooled bank balance amounted to approximately $1.4 billion and is reported within accounts payable and accrued liabilities of the governmental activities.

In accordance with GASB Technical Bulletin No. 2004-1, Tobacco Settlement Recognition and Financial Reporting Entity Issue (the TB), a receivable of $36 million was recorded in the government-wide financial statements for estimated shipments from January 1 to June 30, 2006, which will be applied to debt service upon collection. Additionally, the TB indicated that the Children's Trust (the Trust) designated as the Tobacco Settlement Authority (TSA) should recognize a liability for the bonds payable and an expense (and liability if unpaid) in the same period in its stand-alone financial statements. The expense (and liability if unpaid) recognizes the contractual obligation to remit the proceeds of the bond sold. Since the Trust is reported as a blended component unit, the TB indicates these remittances should be reported as transfers into the fund receiving the proceeds and transfers out in the fund that accounts for the activities of the TSA. Since the Trust has no contractual obligation, under its enabling legislation or elsewhere, to remit all bond proceeds or assets related to the global settlement agreement (GSA) to the settling government (the Commonwealth), the Trust has not recognized an expense and liability for unpaid proceeds from the bonds since it records the expense as amounts are disbursed as grants to its settling government (including its instrumentalities) or third parties.

(10) **Interfund and Intraentity Transactions**

Interfund receivables and payables at June 30, 2006 are summarized as follows (expressed in thousands):

| Receivable fund | Payable fund | | Amount |
|---|---|---|---|
| Nonmajor governmental fund | General fund | $ | 156,142 |
| General fund | Nonmajor governmental fund | | 373,385 |
| Unemployment insurance | General fund | | 23,010 |
| Lotteries | General fund | | 53,174 |
| General fund | Lotteries | | 59,654 |
| | | $ | 665,365 |

(Continued)

PR-CCD-0007046

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Transfers from/to other funds for the year ended June 30, 2006 are summarized as follows (expressed in thousands):

| Transferee fund | Transferor fund | Amount |
|---|---|---|
| General | Nonmajor governmental | $ 7,259 |
| General | The Children's Trust special revenue | 26,688 |
| Nonmajor governmental | General | 293,440 |
| Unemployment | General | 204,330 |
| General | Unemployment | 268,790 |
| Debt service | General | 484,368 |
| General | Debt service | 100,000 |
| General | Lotteries | 204,302 |
| Lotteries | General | 21,318 |
| Nonmajor enterprise | General | 4,802 |
| The Children's Trust special revenue | General | 391 |
| PBA capital projects | General | 38,002 |
| | | $ 1,653,690 |

The principal purposes of the interfund transfers are to (amounts expressed in thousands):

1.  Distribute the increase in net assets of the lotteries fund for the use of the general fund, as required by the lotteries enabling legislation ($204,302).

2.  Make funds available for debt service payments in the debt service fund and the general fund ($484,368).

3.  Reimburse from the debt service fund for a portion of the fiscal year 2006 debt service financed by the general fund.

4.  Unemployment insurance trust fund's distribution of surplus cash belonging to the general fund for the payment of administrative expenses ($268,790).

5.  Recognize as transfers the rental payments made by the Commonwealth's agencies on properties leased by PBA, a blended component unit of the Commonwealth ($293,440 to the nonmajor funds of PBA and $38,002 to the PBA capital project fund).

6.  Transfer from the general fund to the Additional Lottery to cover prizes settlement pursuant Act No. 171 of July 24, 2004 ($21,318).

7.  Transfer from the Children's Trust to the general fund in order to provide financial assistance to carry out project aimed at promoting the well-being of children and youth of Puerto Rico ($26,688).

(Continued)

PR-CCD-0007047

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

8.  Transfer from capital project fund for repayment of general fund's lines of credit, pursuant to such line of credit agreement ($7,259).

9.  To provide local matching funds from the general fund related to the federal capital grants of the Puerto Rico Water Pollution Revolving Fund and Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, two enterprise funds of the Commonwealth ($4,802).

10. Transfer of $391 from the Tobacco Settlement Asset-Backed Bonds debt service fund to the Children's Trust special revenue fund in order to provide funds for operating expenses.

Interfund receivables and payables represent the pending settlements of the aforementioned transfers.

Due from/to primary government and component units are as follows (expressed in thousands):

| Receivable entity/fund | Amount | Payable entity/fund | Amount |
|---|---|---|---|
| Business-type activities | $ 188,055 | Puerto Rico Aqueduct and Sewer Authority | $ 188,055 |
| | | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | 42,186 |
| | | Puerto Rico Medical Services Administration | 27,012 |
| | | Puerto Rico Health Insurance Administration | 25,800 |
| | | Puerto Rico Tourism Company | 17,993 |
| | | Employment & Training Enterprises Corporation | 7,108 |
| Governmental activities | 125,395 | Governing Board of the 911 Service | 5,296 |
| | $ 313,450 | | $ 313,450 |
| | | | |
| Puerto Rico Electric Power Authority | $ 170,362 | Governmental activities | $ 372,902 |
| University of Puerto Rico | 106,134 | | |
| Puerto Rico Conservatory of Music | 23,908 | | |
| Puerto Rico Health Insurance Administration | 23,857 | | |
| Puerto Rico Industrial Development Company | 23,403 | | |
| Puerto Rico Medical Services Administration | 19,937 | | |
| Land Authority of Puerto Rico | 5,301 | | |
| | $ 372,902 | | $ 372,902 |

(Continued)

PR-CCD-0007048

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The amount owed by PRASA of $188 million represents construction loans granted by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, nonmajor enterprise funds, to finance the construction of capital assets for PRASA.

The amount receivable by PREPA from the primary government includes approximately $43 million representing an agreement with the Commonwealth by which the Commonwealth will pay the outstanding fuel adjustment subsidy and certain other accumulated debt. The amount owed by the Commonwealth is presented within notes payable in the statement of net assets of the governmental activities.

The amount receivable by the UPR from the primary government includes a resolution approved by the Legislature of the Commonwealth to pay $94.7 million to the UPR on behalf of the Department of Health of the Commonwealth over eight years, including the financing of additional debts of approximately $71.2 million. The related outstanding balance of $71.5 million is presented by the Commonwealth within notes payable in the statement of net assets of the governmental activities.

93                                                                 (Continued)

PR-CCD-0007049

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Due from/to component units are as follows (expressed in thousands):

| Receivable entity/fund | Amount | Payable entity/fund | Amount |
|---|---|---|---|
| Puerto Rico Electric Power Authority | $ 25,844 | Puerto Rico Medical Services Administration | $ 38,720 |
| University of Puerto Rico | 18,030 | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | 5,154 |
| State Insurance Fund Corporation | 3,500 | Puerto Rico Solid Waste Authority | 3,500 |
| Puerto Rico Land Administration | 4,627 | Puerto Rico Industrial Development Company | 4,627 |
| Farm Insurance Corporation of Puerto Rico | 13,386 | Agricultural Services and Development Administration | 23,886 |
| Land Authority of Puerto Rico | 16,931 | Farm Insurance Corporation of Puerto Rico | 6,431 |
| | 82,318 | Sub total | 82,318 |
| Governmental Development Bank for Puerto Rico | 2,313,577 | Puerto Rico Aqueduct and Sewer Authority | 725,150 |
| | | Special Communities Perpetual Trust | 425,107 |
| | | Puerto Rico Ports Authority | 301,560 |
| | | Puerto Rico Electric Power Authority | 172,667 |
| | | Puerto Rico Convention Center District Authority | 154,846 |
| | | Agricultural Services and Development Administration | 117,758 |
| | | University of Puerto Rico | 96,645 |
| | | Puerto Rico Solid Waste Authority | 84,333 |
| | | Puerto Rico Industrial Development Company | 69,641 |
| | | Puerto Rico Infrastructure Financing Authority | 45,014 |
| | | Puerto Rico Land Authority | 41,444 |
| | | Puerto Rico Highways and Transportation Authority | 29,996 |
| | | Puerto Rico Metropolitan Bus Authority | 22,304 |
| | | Economic Development Bank for Puerto Rico | 12,207 |
| | | National Parks Company of Puerto Rico | 6,831 |
| | | | 2,305,503 |
| | $ 2,395,895 | | $ 2,387,821 |

The difference amounting to $8.1 million between due from/to component units resulted from the time lag between the dates that transactions are recorded by each discretely presented component unit and other reconciling items. The balance due to GDB amounting to approximately $2.3 billion represents loans payable to GDB at June 30, 2006.

94

(Continued)

PR-CCD-0007050

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The rest of the loans receivable reported by GDB consist of the following (expressed in thousands):

| | | |
|---|---|---|
| Primary government: | | |
| Governmental activities | $ | 3,705,127 |
| Pension trust funds | | 4 |
| | | 3,705,131 |
| Other governmental entities and municipalities | | 737,386 |
| Private sector (net of $11,748 presented within restricted assets) | | 512,619 |
| Total loans receivable reported by GDB | $ | 4,955,136 |

The loans to the primary government are presented by the Commonwealth within notes payable in the statement of net assets and in the statement of fiduciary net assets.

Expenses of the primary government include approximately $2.4 billion in capital and operational contributions made by the primary government to the component units, comprised of the following (expressed in thousands):

| | | |
|---|---|---|
| Puerto Rico Health Insurance Administration | $ | 1,134,152 |
| University of Puerto Rico | | 812,594 |
| Puerto Rico Infrastructure Financing Authority | | 72,450 |
| Government Development Bank for Puerto Rico | | 65,316 |
| Puerto Rico Aqueduct and Sewer Authority | | 19,096 |
| Nonmajor component units | | 323,553 |
| Total contributions made by primary government to component units | $ | 2,427,161 |

(11) **Restricted Assets**

Restricted assets of the primary government included in the basic financial statements at June 30, 2006 consist of cash, investments, and other assets to be used for the following purposes (expressed in thousands):

| | | |
|---|---|---|
| Debt service and sinking fund | $ | 1,762,404 |
| Public Housing Administration – funds received from HUD | | 596,390 |
| Construction and betterment funds | | 47,155 |
| Emergency fund | | 100,000 |
| Assets held in trust for repayment of QZAB | | 39,618 |
| Assets held for development of urban forest | | 19,200 |
| Investment held for disability insurance benefits | | 33,473 |
| Construction of governmental agencies | | 6,200 |
| Residual receipts from sale of properties | | 17,730 |
| | $ | 2,622,170 |

95 (Continued)

PR-CCD-0007051

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Liabilities of the primary government payable from restricted assets consist of the following (expressed in thousands):

| | | |
|---|---|---:|
| Qualified Zone Academic Bonds | $ | 184,124 |
| Tax revenue anticipation notes | | 1,050,037 |
| Deferred revenue | | 988,382 |
| Interest payable | | 302,357 |
| Liabilities payable from restricted assets – governmental activities | $ | 2,524,900 |
| Business-type activities: | | |
| Disability insurance benefit payable | $ | 33,473 |
| Liabilities payable from restricted assets – business-type activities | $ | 33,473 |
| Governmental activities restricted net assets: | | |
| Restricted for debt service | $ | 192,490 |
| Other purpose | | 87,588 |
| Total restricted net assets | $ | 280,078 |

Restricted assets of the component units included in the basic financial statements at June 30, 2006 are to be used for the following purposes (expressed in thousands):

| | | |
|---|---|---:|
| Debts service and sinking fund requirements | $ | 4,701,124 |
| Construction and betterments funds | | 2,164,918 |
| Escrow | | 597,126 |
| Collateral for underlying securities | | 418,043 |
| Incentives to farmers | | 183,286 |
| Other uses | | 100,055 |
| Industrial incentives | | 76,298 |
| Malpractice insurance fund | | 65,654 |
| Maintenance reserve fund | | 53,591 |
| Educational fund | | 52,476 |
| Total for components units | $ | 8,412,571 |

(Continued)

PR-CCD-0007052

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

(12) **Capital Assets**

Capital assets activity for the year ended June 30, 2006 is as follows (expressed in thousands):

*Primary Government*

| | | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|---|
| Governmental activities: | | | | | |
| Capital assets, not being depreciated: | | | | | |
| Land | $ | 930,466 | 5,655 | 87,678 | 848,443 |
| Construction in progress | | 1,254,123 | 450,371 | 322,671 | 1,381,823 |
| Total capital assets, not being depreciated | | 2,184,589 | 456,026 | 410,349 | 2,230,266 |
| Capital assets, being depreciated: | | | | | |
| Buildings and building improvements | | 6,492,175 | 292,454 | 189,327 | 6,595,302 |
| Equipment | | 373,368 | 43,949 | 26,686 | 390,631 |
| Infrastructure | | 417,336 | 24,164 | — | 441,500 |
| Total capital assets, being depreciated | | 7,282,879 | 360,567 | 216,013 | 7,427,433 |
| Less accumulated depreciation for: | | | | | |
| Buildings and building improvements | | 2,115,330 | 178,604 | 93,782 | 2,200,152 |
| Equipment | | 180,654 | 35,602 | 25,838 | 190,418 |
| Infrastructure | | 75,363 | 8,588 | — | 83,951 |
| Total accumulated depreciation | | 2,371,347 | 222,794 | 119,620 | 2,474,521 |
| Total capital assets, being depreciated, net | | 4,911,532 | 137,773 | 96,393 | 4,952,912 |
| Governmental activities capital assets, net | $ | 7,096,121 | 593,799 | 506,742 | 7,183,178 |
| Business-type activities: | | | | | |
| Total capital assets, being depreciated – equipment | $ | 5,014 | 29 | — | 5,043 |
| Less accumulated depreciation of equipment | | 3,647 | 388 | — | 4,035 |
| Total business-type activities capital assets, being depreciated, net | $ | 1,367 | (359) | — | 1,008 |

(Continued)

PR-CCD-0007053

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Depreciation expense was charged to functions/programs of the primary government for the year ended June 30, 2006 as follows (expressed in thousands):

| Governmental activities: | | |
|---|---|---|
| General government | $ | 70,038 |
| Public safety | | 21,573 |
| Health | | 6,105 |
| Public housing and welfare | | 81,512 |
| Education | | 29,335 |
| Economic development | | 14,231 |
| Total depreciation expense – governmental activities | $ | 222,794 |
| Total depreciation business-type activities – lotteries | $ | 388 |

The net book value of capital assets of the primary government as of beginning of the year was decreased by approximately $22.9 million to correct prior years' understatement of depreciation.

The Commonwealth adopted the provision of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, an amendment to GASB Statement No. 34. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries. As a result of the adoption of this statement, the Commonwealth recognized an impairment loss of $63 million in the statement of activities, related to the closing of educational, health, and correctional facilities ($51 million) and idle projects due to lack of funding ($12 million).

General infrastructure assets include $417 million representing the estimated cost of assets transferred to the Department of Natural and Environmental Resources (DNER) of the Commonwealth in 1997 upon completion of the Cerrillos Dam and Reservoir and the Portugues-River and Bucana-River Projects by the U.S. Army Corps of Engineers. These infrastructure assets are reported within governmental activities and include dams, intake facilities, and similar items built for flood control, water supply, and recreational purposes. The Commonwealth also recorded a payable due to the U.S. Army Corps of Engineers, amounting to $205 million, for its estimated allocated share of the construction costs associated with these projects, including accrued interest of $5 million. The final debt agreement between DNER and the U.S. Army Corps of Engineers has not been finalized and therefore terms and conditions could differ from those estimated. The depreciation is computed using the straight-line method over an estimated useful life of 50 years from the transfer date of the property. The related debt is expected to be payable on an annual basis over a 50-year period. However, the debt has been presented as a long-term payable after one year in the accompanying statement of net assets since the commencement date of repayment has not yet been determined.

On August 17, 2001, the Legislature of the Commonwealth approved Act No. 120, which requires the conditional transfer of the ownership of certain real properties under the name of the Department of Recreation and Sports (DRS) of the Commonwealth to the municipalities of the Commonwealth. The land and the facilities were transferred at no cost to the municipalities. During fiscal year ended June 30, 2006, land, building, and building improvements with a total carrying amount of $79 million, were transferred to several municipalities and recorded as an expense in the accompanying statement of activities.

(Continued)

PR-CCD-0007054

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

*Discretely Presented Component Units*

| | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Capital assets, not being depreciated: | | | | |
| Land | $ 2,444,784 | 102,235 | 7,709 | 2,539,310 |
| Art works | 2,986 | 71 | — | 3,057 |
| Construction in progress | 5,533,365 | 1,849,082 | 1,150,602 | 6,231,845 |
| Total capital assets, not being depreciated | 7,981,135 | 1,951,388 | 1,158,311 | 8,774,212 |
| Capital assets, being depreciated: | | | | |
| Buildings and buildings improvements | 8,474,986 | 474,624 | 97,892 | 8,851,718 |
| Equipment | 1,123,649 | 207,043 | 26,505 | 1,304,187 |
| Infrastructure | 22,065,174 | 513,229 | 1,649 | 22,576,754 |
| Total capital assets, being depreciated | 31,663,809 | 1,194,896 | 126,046 | 32,732,659 |
| Less accumulated depreciation for: | | | | |
| Buildings and buildings improvements | 4,692,692 | 345,674 | 35,892 | 5,002,474 |
| Equipment | 680,724 | 100,678 | 19,949 | 761,453 |
| Infrastructure | 8,641,970 | 490,969 | 930 | 9,132,009 |
| Total accumulated depreciation | 14,015,386 | 937,321 | 56,771 | 14,895,936 |
| Total capital assets, being depreciated, net | 17,648,423 | 257,575 | 69,275 | 17,836,723 |
| Capital assets, net | $ 25,629,558 | 2,208,963 | 1,227,586 | 26,610,935 |

The principal restatement in the beginning balance of capital assets corresponds to Puerto Rico Highways and Transportation Authority's approximately $4 billion correction for projects included as construction in progress that had already been included as infrastructure assets and for other projects with overcapitalized interest. The remaining $89.1 million correcting reduction in the beginning balance of capital assets is related to the other component units sustaining restatements included in note 4.

**(13) Tax Revenue Anticipation Notes Payable**

Tax revenue anticipation notes (TRANS) reported in the general fund were issued on December 29, 2005 at interest rates ranging from 3.79% to 4.5% and were paid on July 28, 2006. The TRANS amounted to $1,050 million at June 30, 2006 plus accrued interest of approximately $23 million. The proceeds of the TRANS were used to cover temporary cash deficiencies resulting from the timing differences between tax collections and the payments of current expenditures.

99 (Continued)

PR-CCD-0007055

Case:17-03283-LTS Doc#:478-3 Filed:02/24/18 Entered:02/24/18 28:19:25 Desc:
Exhibit 20 (Part b III) Page 980 of 1000

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

## (14) Short and Long-term Obligations

### Primary Government

#### (a) Summary of Short and Long-term Obligations

Short and long-term obligations at June 30, 2006 and changes for the fiscal year then ended are as follows (expressed in thousands):

| | Balance at June 30, 2005 | Debt issued | Capitalized interest | Debt paid | Original issue (discounts) premiums | Other net increases (decreases) | Balance at June 30, 2006 | Due within one year |
|---|---|---|---|---|---|---|---|---|
| Governmental activities: | | | | | | | | |
| General obligation and revenue bonds | $ 12,247,121 | 101,695 | 30,409 | (209,280) | (323) | 25,461 | 12,195,083 | 253,559 |
| Commonwealth appropriation bonds | 2,715,239 | — | 1,516 | (78,365) | — | 3,804 | 2,642,194 | 84,190 |
| Qualified Zone Academy Bonds | 47,936 | 39,353 | — | — | — | 96,835 | 184,124 | — |
| Notes payable to component units: | | | | | | | | |
| GDB (short-term) | 186,510 | 1,940,096 | — | (1,600,562) | — | — | 526,044 | 526,044 |
| GDB | 1,871,381 | 1,377,310 | — | (39,608) | — | (30,000) | 3,179,083 | 99,329 |
| Other | 136,548 | — | — | (21,897) | — | — | 114,651 | — |
| Total bonds and notes payable | 17,204,735 | 3,458,454 | 31,925 | (1,949,712) | (323) | 96,100 | 18,841,179 | 963,122 |
| Compensated absences | 1,451,320 | — | — | (838,933) | — | 1,071,566 | 1,683,953 | 962,323 |
| Net pension obligation | 4,479,795 | — | — | — | — | 261,011 | 4,740,806 | — |
| Obligation under capital lease arrangements | 146,676 | 4,580 | — | (6,755) | — | — | 144,501 | 4,476 |
| Other liabilities: | | | | | | | | |
| Employees' Christmas bonus | 167,533 | — | — | (287,199) | — | 222,228 | 102,562 | 102,562 |
| Liability for federal cost disallowances | 123,368 | — | — | (2,867) | — | (67,454) | 53,047 | — |
| Liability for legal claims and judgments | 941,283 | — | — | (43,451) | — | (96,665) | 801,167 | 43,400 |
| Other | 150,940 | — | — | — | — | 54,060 | 205,000 | — |
| Total governmental activities | 24,665,650 | 3,463,034 | 31,925 | (3,128,917) | (323) | 1,540,846 | 26,572,215 | 2,075,883 |
| Business-type activities: | | | | | | | | |
| Notes payable to component units | 520 | — | — | (520) | — | — | — | — |
| Compensated absences | 6,842 | — | — | (3,468) | — | 3,991 | 7,365 | 3,857 |
| Obligation for unpaid lottery prizes | 329,108 | — | — | — | — | (25,405) | 303,703 | 37,488 |
| Claims liability for insurance benefits | 71,028 | 211,370 | — | (211,425) | — | — | 70,973 | 70,973 |
| Total business-type activities | 407,498 | 211,370 | — | (215,413) | — | (21,414) | 382,041 | 112,318 |
| Total governmental and business-type | $ 25,073,148 | 3,674,404 | 31,925 | (3,344,330) | (323) | 1,519,432 | 26,954,256 | 2,188,201 |

(Continued)

PR-CCD-0007056

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The balances of long-term debt issued included with other financing sources and debt service principal expenditures as reported in the statement of revenue, expenditures, and changes in fund balances – governmental funds do not agree with amounts reported as debt issued and paid in the above table primarily because the above table includes debt issued and paid on short-term obligations which amounted to approximately $1.9 billion and $1.6 billion, respectively. The receipt and payment of short-term obligations is reported as a balance sheet transaction in the fund financial statements.

The other net increases in bonds and notes payable consist of deferred losses on refunding, net of amortization, and net amortization of premiums and discounts on bonds. These adjustments did not require any source or use of cash.

Compensated absences, net pension obligation, obligation for unpaid lottery awards, liability for insurance benefits, and other long-term liabilities reflect other net increases (decreases) resulting from adjustments and changes to agree these obligations to their new estimated balances at June 30, 2006.

*(b) Debt Limitation*

The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth are not to be issued if the amounts of the principal of, and interest on, such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenue raised under the provisions of Commonwealth legislation and conveyed into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the then current fiscal year. Section 2, Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenue consists principally of income taxes and excise taxes. Certain revenue, such as federal excise taxes on offshore shipments of alcoholic beverages, tobacco products, and customs duties, which are collected by the U.S. government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the PRHTA, a discrete component unit, are not included as revenue for the purpose of calculating the debt limit, although they may be available for the payment of debt service. At June 30, 2006, the Commonwealth is in compliance with the debt limitation requirement.

*(c) Bonds Payable*

The Constitution of the Commonwealth provides that public debt will constitute a first claim on the available revenue of the Commonwealth. Public debt includes general obligations and notes of the Commonwealth and any payment required to be made by the Commonwealth under its guarantees of bonds issued by blended or discretely presented component units. The good faith, credit, and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal and interest of the general obligation bonds.

(Continued)

PR-CCD-0007057

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Act No. 83 of August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation. The levy is made by CRIM, a municipal corporation, not a component unit of the Commonwealth. CRIM is required to remit the 1.03% of property tax collected to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligations of the Commonwealth. During the year ended June 30, 2006, the total revenue and receivable reported by the Commonwealth amounted to approximately $118 million and $16.8 million, respectively, which are included in the debt service fund.

For financial reporting purposes, the outstanding amount of bonds represents the total principal to be repaid, net of unamortized premiums, discount, and deferred refunding losses; for capital appreciation bonds, it represents total principal and accreted interest to be repaid.

Bonds payable outstanding at June 30, 2006 are as follows (expressed in thousands):

|  | General obligation | Revenue bonds | Total |
|---|---|---|---|
| Term bonds payable through 2036; interest payable semiannually at rates varying from 3% to 8%. | $ 2,818,195 | 1,588,655 | 4,406,850 |
| Serial bonds payable through 2024; interest payable semiannually at rates varying from 3.75% to 7.5%. | 4,091,580 | 1,097,975 | 5,189,555 |
| Capital appreciation bonds payable through 2031; no interest rate, yield ranging from 4.42% to 7.8%. Net of accreted discount of $190 million. | 256,116 | 163,518 | 419,634 |
| The Children's Trust Fund tobacco settlement asset-backed bonds payable through 2026; interest payable annually at rates varying from 4.625% to 6%. | — | 1,239,015 | 1,239,015 |
| Capital Fund Program Bonds, maturing in various dates payable through 2024; interest payable at rates varying from 2% to 5%. | — | 641,325 | 641,325 |
| Bond payment obligation payable through 2010; interest payable at rates varying from 1.5% to 5.5%. | 125,910 | — | 125,910 |
| Balance carried forward | $ 7,291,801 | 4,730,488 | 12,022,289 |

102

(Continued)

PR-CCD-0007058

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

| | General obligation | Revenue bonds | Total |
|---|---|---|---|
| Balance brought forward | $ 7,291,801 | 4,730,488 | 12,022,289 |
| Yield curve bonds payable from 2009 through 2011; no interest rate, yield of 8.914%. | 15,000 | — | 15,000 |
| Yield retail bonds payable from 2009 through 2011; interest payable at rates varying from 2.875% to 5%. | 24,000 | — | 24,000 |
| Tax-exempt components maturing through 2007 and 2008; interest payable at rates ranging from 5.5% to 5.6%. | — | 72,160 | 72,160 |
| Inverse rate bonds payable from 2009 through 2011; interest payable at a rate of 6%. | 15,000 | — | 15,000 |
| Insured bonds payable from 2014 through 2018; interest payable at a rate of 5%. | 64,360 | — | 64,360 |
| Total | 7,410,161 | 4,802,648 | 12,212,809 |
| Unamortized premium, net | 220,204 | 23,245 | 243,449 |
| Deferred charges arising from debt refunding | (106,792) | (154,614) | (261,406) |
| Savings bonds | 231 | — | 231 |
| Total bonds payable | $ 7,523,804 | 4,671,279 | 12,195,083 |

103

(Continued)

PR-CCD-0007059

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

During the year ended June 30, 2006, the following changes occurred in the bonds payable (expressed in thousands):

| | Outstanding at June 30, 2005 | Issued | Premiums/ discount (redemptions) | Outstanding at June 30, 2006 |
|---|---|---|---|---|
| Term bonds | $ 4,383,350 | 23,500 | — | 4,406,850 |
| Serial bonds | 5,272,710 | 78,195 | (161,350) | 5,189,555 |
| Capital appreciation bonds | 412,031 | — | 7,603 | 419,634 |
| The Children's Trust Fund tobacco settlement asset-backed bonds | 1,240,404 | — | (1,389) | 1,239,015 |
| Capital Fund Program Bonds | 663,060 | — | (21,735) | 641,325 |
| Appropriation refunding bonds | — | — | — | — |
| Bond payment obligations | 125,910 | — | — | 125,910 |
| Yield curve bonds | 15,000 | — | — | 15,000 |
| Yield retail bonds | 26,000 | — | (2,000) | 24,000 |
| Tax-exempt components | 72,160 | — | — | 72,160 |
| Inverse rate bonds | 79,360 | — | — | 79,360 |
| Subtotal | 12,289,985 | 101,695 | (178,871) | 12,212,809 |
| Unamortized premium | 267,001 | — | (23,552) | 243,449 |
| Deferred charges arising from debt refunding | (310,096) | — | 48,690 | (261,406) |
| Savings bonds | 231 | — | — | 231 |
| Total | $ 12,247,121 | 101,695 | (153,733) | 12,195,083 |

(Continued)

PR-CCD-0007060

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Maturities of general obligations and of revenue bonds payable, including accrued interest of capital appreciation bonds, are as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2007 | $ 253,559 | 610,820 | 864,379 |
| 2008 | 280,914 | 593,516 | 874,430 |
| 2009 | 319,191 | 559,516 | 878,707 |
| 2010 | 364,425 | 537,792 | 902,217 |
| 2011 | 429,800 | 518,118 | 947,918 |
| 2012-2016 | 1,946,707 | 2,269,971 | 4,216,678 |
| 2017-2021 | 2,559,212 | 1,817,195 | 4,376,407 |
| 2022-2026 | 2,114,438 | 1,232,503 | 3,346,941 |
| 2027-2031 | 1,892,647 | 737,479 | 2,630,126 |
| 2032-2036 | 1,238,766 | 372,485 | 1,611,251 |
| 2037-2041 | 545,847 | 113,308 | 659,155 |
| 2042-2046 | 88,515 | 13,478 | 101,993 |
| Total | 12,034,021 | $ 9,376,181 | 21,410,202 |
| Plus accreted discount | 179,019 | | |
| Plus unamortized premium | 243,449 | | |
| Less deferred charges arising from debt refunding | (261,406) | | |
| Total | $ 12,195,083 | | |

*(d)* *Commonwealth Appropriation Bonds*

Over the years, GDB, as fiscal agent and bank for the Commonwealth, had extended lines of credit, advances, and loans to several agencies and component units in order to finance their capital improvement projects and to cover their operational deficits at the time. At different points in time, these loans were refunded through the issuance of Commonwealth appropriation bonds issued by the Puerto Rico Public Finance Corporation (PFC), a blended component unit of GDB. PFC is the financing arm of GDB, which serves only as a conduit for the issuance of the bonds.

During June 2004, PFC advance refunded through the PFC 2004 Series A and B and PFC 2003 Series A through C Refunding Commonwealth Appropriation Bonds, a portion of certain of its outstanding Commonwealth Appropriation Bonds issued in prior years (except for the Health Facilities and Services Administration bonds described below, where no portion was refunded). The Commonwealth recognized a mirror effect of this advance refunding by PFC in its own debt in proportion to the portion of the Commonwealth's notes included in the PFC refunding. As a result, the Commonwealth considered defeased and therefore removed from the balance sheet the portion refunded of $775.7 million. The repayment source for these bonds (both the refunding and unrefunded portions) consists of Commonwealth appropriations submitted for approval of the Legislature annually during the budget preparation process of the Commonwealth. The Legislature is not legally bound to appropriate funds for such repayments.

105 (Continued)

PR-CCD-0007061

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The outstanding balance of the Commonwealth appropriation bonds (both the refunding and unrefunded portion combined) is comprised of the following obligations (expressed in thousands):

| | | |
|---|---|---|
| Act No. 164 Restructuring | $ | 1,481,583 |
| Health Facilities and Services Administration | | 447,781 |
| Office for the Improvement of Public Schools | | 328,602 |
| Puerto Rico Maritime Shipping Authority | | 278,039 |
| Property tax settlement | | 106,189 |
| Total Commonwealth appropriation bonds | $ | 2,642,194 |

On December 17, 2001, Act No. 164 was approved, which authorized certain government agencies and discretely presented component units to refund approximately $2.4 billion of their outstanding obligations with GDB, for which no repayment source existed, over a period not exceeding 30 years, and to be repaid with annual Commonwealth appropriations not to exceed $225 million. This refunding was done with Commonwealth appropriation bonds through several series issued by PFC during the period between December 2001 and June 2002.

Approximately $1.5 billion of the aforementioned outstanding obligations belonged to the primary government, predominantly the Department of Health of the Commonwealth (health reform financing and other costs for approximately $1.1 billion) and the Department of the Treasury of the Commonwealth (the fiscal year 2001 deficit financing of $268 million and the obligation assumed for defective tax liens in the amount of approximately $132 million). The new combined bonds balance of the Act No. 164 restructuring bears interest at rates ranging from 1.25% to 5.80%. Debt service requirements in future years are as follows (expressed in thousands):

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2007 | $ | 23,355 | 83,725 | 107,080 |
| 2008 | | 35,076 | 81,944 | 117,020 |
| 2009 | | 37,031 | 79,997 | 117,028 |
| 2010 | | 34,707 | 80,860 | 115,567 |
| 2011 | | 35,799 | 77,198 | 112,997 |
| 2012-2016 | | 229,027 | 347,762 | 576,789 |
| 2017-2021 | | 311,137 | 264,451 | 575,588 |
| 2022-2026 | | 373,106 | 136,893 | 509,999 |
| 2027-2031 | | 421,881 | 45,922 | 467,803 |
| Total | | 1,501,119 | $ 1,198,752 | 2,699,871 |
| Plus unamortized premium | | 23,234 | | |
| Less deferred charges arising from debt refunding | | (42,770) | | |
| Total | $ | 1,481,583 | | |

106 (Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

As of July 1, 1999, approximately $595 million (including unpaid interest) of a promissory note of the Health Facilities and Services Administration (HFSA) due to GDB was transferred to the Department of Health of the Commonwealth and restructured through Commonwealth appropriation bonds. The bonds bear interest at rates ranging between 5.90% and 6.20%. Principal and interest on the bonds are payable solely from legislative appropriations to be made pursuant to Act No. 223 of August 9, 1998. The act provides that OMB shall include in the annual budget of the Commonwealth an amount equal to $56.5 million for the fiscal year 1998-99, and for the next succeeding 15 fiscal years the amount necessary to pay the principal of and interest on the bonds, up to a maximum annual amount of $57.7 million. As of June 30, 2006, approximately $448 million was still outstanding.

Debt service requirements in future years are as follows (expressed in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2007 | $ 37,080 | 20,652 | 57,732 |
| 2008 | 39,600 | 18,133 | 57,733 |
| 2009 | 42,125 | 15,607 | 57,732 |
| 2010 | 44,865 | 12,867 | 57,732 |
| 2011 | 25,018 | 32,714 | 57,732 |
| 2012-2016 | 219,967 | 65,623 | 285,590 |
| 2017-2018 | 39,126 | 76,297 | 115,423 |
| Total | $ 447,781 | 241,893 | 689,674 |

Previous public schools infrastructure improvement loans provided additional funds for major repairs and improvements to the public schools in Puerto Rico. This activity is administered by the Office for the Improvement of the Public Schools of Puerto Rico (OIPS), included as part of the general fund of the primary government. These loans were refunded originally through the issuance of Commonwealth appropriation bonds pursuant to Act No. 85 of June 13, 1998 (Act 85). The new combined bonds bear interest at rates ranging from 5.0% to 5.85%. As of June 30, 2006, approximately $328.6 million was outstanding.

(Continued)

PR-CCD-0007063

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Debt service requirements in future years are as follows (expressed in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2007 | $ 9,470 | 18,121 | 27,591 |
| 2008 | 9,945 | 17,648 | 27,593 |
| 2009 | 10,465 | 17,125 | 27,590 |
| 2010 | 10,990 | 16,602 | 27,592 |
| 2011 | 11,580 | 16,011 | 27,591 |
| 2012-2016 | 74,025 | 61,401 | 135,426 |
| 2017-2021 | 82,620 | 39,124 | 121,744 |
| 2022-2026 | 127,060 | 15,570 | 142,630 |
| Total | 336,155 | $ 201,602 | 537,757 |
| Plus unamortized premium | 6,503 | | |
| Less deferred charges arising from debt refunding | (14,056) | | |
| Total | $ 328,602 | | |

A promissory note payable owed by PRMSA to GDB was assumed by the Commonwealth in connection with the sale of the maritime operations of PRMSA. Commonwealth appropriation bonds were issued to refund this liability. The new combined bonds balance bears interest at a variable rate ranging from 3.00% to 7.30%. Debt service requirements in future years are as follows (expressed in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2007 | $ — | 16,907 | 16,907 |
| 2008 | — | 16,907 | 16,907 |
| 2009 | — | 16,907 | 16,907 |
| 2010 | 3,415 | 16,793 | 20,208 |
| 2011 | 9,390 | 16,443 | 25,833 |
| 2012-2016 | 59,910 | 74,728 | 134,638 |
| 2017-2021 | 81,845 | 56,221 | 138,066 |
| 2022-2026 | 103,990 | 31,993 | 135,983 |
| 2027-2030 | 69,945 | 5,138 | 75,083 |
| Total | 328,495 | $ 252,037 | 580,532 |
| Less unamortized discount | (643) | | |
| Less deferred charges arising from debt refunding | (49,813) | | |
| Total | $ 278,039 | | |

108

(Continued)

PR-CCD-0007064

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

During fiscal year 1996, the Commonwealth refinanced the liability for the settlement of the property taxes owed to the municipalities of Puerto Rico. Commonwealth appropriation bonds were issued to refund this liability. The new combined bonds balance bears interest at rates ranging from 5.87% to 7.25%. Debt service requirements in future years are as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2007 | $ 14,285 | 4,103 | 18,388 |
| 2008 | 15,350 | 3,040 | 18,390 |
| 2009 | 16,505 | 1,885 | 18,390 |
| 2010 | 17,750 | 643 | 18,393 |
| 2011 | 13,813 | 4,582 | 18,395 |
| 2012-2016 | 47,432 | 26,152 | 73,584 |
| Total | 125,135 | $ 40,405 | 165,540 |
| Plus accreted discount | 7,412 |  |  |
| Less deferred charges arising from debt refunding | (26,358) |  |  |
| Total | $ 106,189 |  |  |

*(e)* *Qualified Zone Academy Bonds*

During November 2001, the Department of Education of the Commonwealth issued a certification whereby certain Commonwealth public schools were designated as a "qualified zone academy" pursuant to Section 1397E of the U.S. Internal Revenue Code of 1986, as amended. On May 18, 2004, PFC, a blended component unit of GDB, issued $47.9 million of Qualified Zone Academic Bonds (QZAB) to finance expenditures of the Department of Education of the Commonwealth under the aforementioned program, including rehabilitation and repairs of school buildings and other facilities, the development and implementation of academic curricula, technology training for some schools, and the costs of issuance of the bonds. This May 2004 QZAB is payable upon its maturity on May 2020, since the U.S. government grants tax exemptions to bond holders in lieu of an interest rate. Beginning in August 2004, annual appropriations from the general fund in the amount of approximately $2.2 million are expected to be made over the next 16 years and deposited in an escrow account, which along with accumulated earned interest will be sufficient to repay these bonds upon their maturity in 2020.

During January 2006, another QZAB in the amount of $39.4 million was issued for similar purposes. The January 2006 QZAB is payable upon its maturity in January 2022. Beginning in fiscal year 2007, annual appropriations from the general fund in the amount of $2.1 million are expected to be made over the next 16 years and deposited in an escrow account, which along with accumulated earned interest will be sufficient to repay these bonds upon its maturity in 2022.

Also during January 2006, the Commonwealth unwinded the 2001 defeasance of the QZAB issued in December 2001, therefore, reverting back the transaction and recognizing in the statement of net assets for the governmental activities such QZAB obligation in the amount of $96.8 million.

(Continued)

PR-CCD-0007065

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

Beginning in fiscal year 2007, annual appropriations from the general fund in the amount of $8.1 million are expected to be made over the next 10 years and deposited in an escrow account, which along with accumulated earned interest will be sufficient to repay these bonds upon their maturity in 2016. See more details about this transaction, which has been classified as a special item, in note 23.

*(f)    Notes Payable to Component Units*

The Commonwealth has entered into various interim line of credit agreements with GDB. One $800 million line of credit with the Department of the Treasury had drawings and repayments within the same year for the same amount of $1.3 billion. These drawings and repayments related to advances in anticipation of the 2006 TRANS and to cover temporary cash deficiencies between tax collections and payments of current expenditures, which were later repaid upon the TRANS issuance and the actual tax collection and replenishment of the aforementioned deficiency. The remaining interim financing outstanding at June 30, 2006 consisted of the following (expressed in thousands):

| Agency | Purpose | Interest rate | Line of credit | Outstanding balance |
|---|---|---|---|---|
| Department of the Treasury | Revolving advances in anticipation of TRANS | 175bp over GDB's commercial paper rate | $ 695,000 | 319,741 |
| Department of the Treasury | Resources to meet appropriations in annual budget of Commonwealth (Fiscal year 2004) and Federal program expenditures | 125bp over three-month LIBOR | 640,000 | 156,744 |
| Public Building Authority | Interim construction activities | 150bp over GDB's | 256,000 | 30,598 |
| Department of Transportation and Public Works | Construction and repavement of roads | 150bp over GDB's commercial paper rate | 15,000 | 15,000 |
| Department of Recreation and Sports | Recreational projects at various municipalities | 150bp over GDB's commercial paper rate | 16,000 | 3,961 |
| | | | $ 1,622,000 | 526,044 |

110

(Continued)

PR-CCD-0007066

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

The Commonwealth financed certain other long-term liabilities through GDB and other component units. The outstanding balance on the financing provided by GDB is comprised of the following (expressed in thousands), all within governmental activities:

**GDB:**

| | | |
|---|---|---|
| Department of the Treasury | $ | 2,570,623 |
| Department of Education | | 126,575 |
| Public Building Authority | | 75,000 |
| Department of Transportation and Public Work | | 72,190 |
| Department of Agriculture | | 67,022 |
| Office of Management & Budget | | 54,915 |
| Department of Health | | 39,682 |
| Puerto Rico Court Administration Office | | 37,867 |
| Department of Justice | | 37,549 |
| Correction Administration | | 21,292 |
| Department of Recreation and Sports | | 18,241 |
| Office of the Superintendent of the Capitol | | 17,338 |
| Police Department | | 14,553 |
| Department of Natural Resources | | 12,121 |
| Administration for the Care and Development of the Childhood | | 5,257 |
| Public Housing Administration | | 4,183 |
| State Office for the Historic Conservation | | 3,540 |
| Office of Veterans' Affairs | | 1,135 |
| Notes Payable to GDB | $ | 3,179,083 |

**Other Components Unit:**

| | | |
|---|---|---|
| Health facilities agreement payable to the Medical Science Campus of UPR | $ | 71,570 |
| Note payable to PREPA | | 43,081 |
| Notes payable to other component unit | $ | 114,651 |

(Continued)

PR-CCD-0007067

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

As of June 30, 2006, the Department of the Treasury of the Commonwealth has entered into various line of credit agreements with GDB amounting to a maximum of $3 billion for different purposes as presented in the following tables. The purpose, interest rate, maturity date, and amount outstanding under each individual agreement at June 30, 2006 consist of the following (expressed in thousands):

| Purpose | Interest rate | Maturity | Line of credit | Outstanding balance |
|---|---|---|---|---|
| To finance payroll and operational expenditures of the Commonwealth for fiscal period 2006 | 5.50% | June 30, 2036 | $ 741,000 | 741,000 |
| To provide additional resources to meet the appropriations in the annual budget of the Commonwealth (fiscal year 2005) | 125 bp over three-month LIBOR | June 30, 2014 | 550,000 | 550,000 |
| Resources for repayment of agencies' old debts | 125 bp over three-month LIBOR | September 30, 2015 | 368,200 | 368,200 |
| Replenishment of income tax refund reserve (fiscal year 2004) | 125 bp over three-month LIBOR | June 30, 2008 | 250,000 | 238,924 |
| Resources to meet appropriations in annual budget of Commonwealth and partial repayments of TRANS (fiscal year 2004) | 125 bp over three-month LIBOR | June 31, 2009 | 233,000 | 233,000 |
| Capital improvement projects of agencies and municipalities | 150 bp over GDB's commercial paper rate | June 30, 2019 | 130,000 | 96,187 |
| Acquisition of safety and security equipment for certain Commonwealth agencies | 150 bp over GDB's commercial paper rate | September 30, 2007 | 105,000 | 94,552 |
| Resources to cover the operational needs of the catastrophic disasters fund (fiscal year 2004) | 125bp three-month LIBOR | July 31, 2006 | 100,000 | 78,130 |
| Balance brought forward | | | $ 2,477,200 | 2,399,993 |

112

(Continued)

PR-CCD-0007068

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

| Purpose | Interest rate | Maturity | Line of credit | Outstanding balance |
|---|---|---|---|---|
| Balance brought forward | | | $ 2,477,200 | 2,399,993 |
| To meet program expenditures of the Puerto Rico Health Insurance Administration and the Department of the Family | 125bp over three-month LIBOR | September 30, 2015 | 79,930 | 45,716 |
| To cover deficit in certain elderly and child care programs of the Department of the Family | 125 bp over three-month LIBOR | September 30, 2011 | 30,000 | 29,928 |
| To fund information technology project | 150 bp over GDB's commercial paper rate | September 30, 2008 | 44,868 | 22,333 |
| To pay debt with Municipal Revenue Collection Center | 125 bp over three-month LIBOR | September 30, 2011 | 16,241 | 16,241 |
| Resources to various agencies to pay outstanding debt with PBA | 125bp over three-month LIBOR | September 30, 2008 | 40,000 | 14,182 |
| To estimate economy in municipalities of Ceiba and Naguabo | 125 bp over three-month LIBOR | September 30, 2012 | 14,500 | 12,665 |
| To pay outstanding debt of various agencies with the Puerto Rico Telephone Company | 125 bp over three-month LIBOR | September 30, 2008 | 16,000 | 12,157 |
| To acquire correctional facilities | 125 bp over three-month LIBOR | September 30, 2012 | 15,000 | 11,552 |
| Resources to cover the operational needs of the catastrophic disasters fund (fiscal year 2004) | 125 bp over three-month LIBOR | July 31, 2006 | 8,000 | 5,825 |
| Purchase of mobile X-ray machines | 125bp over three-month LIBOR | June 30, 2008 | 12,000 | 31 |
| | | | $ 2,753,739 | 2,570,623 |

(Continued)

PR-CCD-0007069

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

On February 6, 2003, the Department of Education of the Commonwealth entered into a $25 million line-of-credit agreement with GDB for the purchase of equipment and for school improvements. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2008. As of June 30, 2006, $11.6 million was outstanding. The line-of-credit agreement will be repaid from future legislative appropriations. On August 4, 2002, the Department of Education entered into an additional $140 million line-of-credit agreement with GDB in order to reimburse the Department of the Treasury for payments made on their behalf for state funds used to fund federal program expenditures. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on June 30, 2007. As of June 30, 2006, $115 million was outstanding related to the borrowing. The line-of-credit will be repaid with federal grants. On August 30, 2002, the Department of Education also entered into a $2.3 million line-of-credit agreement with GDB for the construction of school facilities. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on July 1, 2006. At June 30, 2006, no amounts had been drawn under this line-of-credit.

On April 6, 2006, the Public Building Authority executed a loan agreement with GDB for $75 million bearing interest at a variable rate based on 125 basis points over the three-month LIBOR index. The loan, obtained for operational needs, is due on June 30, 2010 and is collateralized with two of PBA's properties. Debt service requirements will come from Commonwealth appropriations. On June 30, 2006, PBA exchanged one of the collateralized properties in partial settlement of $30 million of the loan, upon which a gain of $8.7 million resulted and was recognized in the accompanying statement of activities. At that moment, PBA borrowed an additional $30 million. At June 30, 2006, $75 million remained outstanding.

On March 8, 2004, the Department of Transportation and Public Works (DTPW), entered into a $26 million line-of-credit agreement with GDB for the improvement and maintenance of the roads around the island. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2010. As of June 30, 2006, this line-of-credit has an outstanding balance of approximately $22 million. On November 16, 2004, the DTPW entered into another $33 million line-of-credit agreement with GDB for similar purposes. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on October 31, 2010. As of June 30, 2006, $12 million remains outstanding related to these borrowings. On June 23, 2005, the DTPW entered into an additional $44 million line-of-credit agreement with GDB to meet program expenditures. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 2.5% and are payable upon the maturity of the line of credit on September 30, 2008. As of June 30, 2006, this line-of-credit has an outstanding balance of approximately $38 million.

On August 9, 1999, the Department of Agriculture of the Commonwealth entered into a $125 million nonrevolving line-of-credit agreement with GDB to provide economic assistance to the agricultural sector which sustained severe damages caused by Hurricane Georges in 1998. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on June 30, 2014. As of June 30, 2006, $67 million remains outstanding. The line-of-credit will be repaid from future legislative appropriations.

114 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

On June 5, 2006, the Office of Management and Budget entered into a $150 million line-of-credit agreement with GDB to provide economic assistance for disasters and emergencies. Borrowings under this line-of-credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR, and are payable upon the maturity of the line-of-credit on September 30, 2011. As of June 30, 2006, $54.9 million was outstanding.

On August 2003, the Department of Health of the Commonwealth entered into a $30 million line-of-credit agreement with GDB in order to repay certain outstanding debts that the Puerto Rico Medical Services Administration (PRMSA) had with other agencies and suppliers. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon maturity of the line-of-credit on June 30, 2012. As of June 30, 2006, $28.9 million related to this line-of-credit agreement was outstanding. On November 8, 2004, the Department of Health entered into an additional $58.5 million line-of-credit agreement with GDB for the financing of a project of the Department of Health and PRMSA. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on October 31, 2014. As of June 30, 2006, this line-of credit agreement amounted to $10.8 million.

On May 7, 2001, the Puerto Rico Court Administration Office (the Office) entered into a $49.4 million nonrevolving line-of-credit agreement with GDB for operating purposes. Borrowings under this line-of-credit agreement bear interest at a variable rate of three-month London Inter bank Offered Rate (LIBOR) plus 1%, not to exceed 8%. The Office must deposit $6 million a year, from the total fees collected on the filing of civil cases, in a special fund created by the Department of the Treasury of the Commonwealth, which is pledged for repayment until July 31, 2015. As of June 30, 2006, approximately $38 million remains outstanding.

On October 2, 2002, the Department of Justice of the Commonwealth entered into a $90 million line-of-credit agreement with GDB for the financing of 12 public improvement projects for the Municipality of Ponce pursuant to a court order. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on September 30, 2014. As of June 30, 2006, $21.5 million related to this line of credit agreement was outstanding. The line-of-credit will be repaid from future Commonwealth appropriations. On July 8, 2005, the Department of Justice entered into an additional $63.4 million line-of-credit agreement with GDB for various projects in Ponce. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on September 30, 2014. As of June 30, 2006, this line-of credit agreement amounted to $16 million.

On August 28, 2000, GDB approved an amendment to the terms of two line-of-credit agreements of the Correction Administration by which such debts would be repaid between fiscal years 2000 and 2007. The two agreements were issued by GDB in August 1998 to partially fund permanent improvements to correctional facilities. The agreements have variable interest rates and limits of $60 million and $15 million. Their outstanding balance as of June 30, 2006 is $7.5 million. On May 12, 2004, the Correction Administration entered into an additional $60 million line-of-credit agreement with GDB for improvements to certain correctional facilities. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on June 30, 2010. As of June 30, 2006, $13.8 million was outstanding. The line-of-credit will be repaid from future Commonwealth appropriations.

(Continued)

PR-CCD-0007071

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

On October 23, 2002, the Department of Recreation and Sports of the Commonwealth (DRS) entered into a $17.5 million line-of-credit agreement with GDB for the development of a recreational complex and other facilities in San Juan, which will eventually become the DRS' principal office headquarters. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on September 30, 2008. As of June 30, 2006, $14.4 million remains outstanding. The line-of-credit will be repaid from future Commonwealth appropriations. On January 18, 2005, the DRS also entered into a $17.2 million line-of-credit agreement with GDB for the development of a series of recreational projects at different municipalities. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2010. As of June 30, 2006, $2.2 million was outstanding. On May 25, 2006, the DRS entered into an additional $3 million line-of-credit agreement with GDB for the development of a series of recreational projects at different municipalities. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on September 30, 2008. As of June 30, 2006, $1.6 million was outstanding.

On June 21, 2001, the Office of the Superintendent of the Capitol (Superintendent) entered into a $10 million line-of-credit agreement with GDB for the construction of a parking lot. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 8% and are payable from future Commonwealth appropriations commencing in fiscal year 2003 through fiscal year 2007. As of June 30, 2006, $5.1 million related to the line-of-credit agreement was outstanding. On February 15, 2002, the Superintendent entered into an additional $35 million line-of-credit agreement with GDB for the acquisition and remodeling of several buildings under their jurisdiction. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 8% and are payable from future legislative appropriations commencing in fiscal year 2003 through fiscal year 2008. As of June 30, 2006, $12.2 million remained outstanding from the line-of-credit agreement.

On June 10, 2004, the Police Department entered into a $48 million line-of-credit agreement with GDB for the acquisition of vehicles and high technology equipment. Borrowings under this line-of credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on September 30, 2014. The outstanding balance of this line-of-credit agreement amounted to $14.6 million at June 30, 2006.

On August 21, 2002, the Department of Natural and Environmental Resources of the Commonwealth (DNER) entered into a $22.7 million line-of-credit agreement with GDB for the canalization of the Bucana River. Borrowings under this line of credit agreement bear interest at variable rates and were payable upon the maturity of the line-of-credit on June 30, 2007. As of June 30, 2006, $8.3 million remains outstanding under the line-of credit agreement. The line-of-credit will be repaid from future Commonwealth appropriations. On September 3, 2003, the DNER entered into a $2 million line-of-credit agreement with GDB for the canalization of Guayanilla River. Borrowings under this line-of-credit agreement bear interest at variables rates and are payable upon the maturity of the line of-credit on June 30, 2007. As of June 30, 2006, $1 million was outstanding. On August 22, 2005, the DNER entered into an additional $3.5 million line-of-credit agreement with GDB for the canalization of Fajardo River. Borrowings under this line-of-credit agreement bear interest at variables rates and are payable upon the maturity of the line-of-credit on September 30, 2007. As of June 30, 2006, $2.8 million was outstanding.

PR-CCD-0007072

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2006

On February 24, 2006 the Administration for the Care & Development of the Childhood entered into an $8 million line-of-credit agreement with GDB to provide economic assistance for the summer program known as "Care and Development of the Child Program". Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on September 30, 2009. As of June 30, 2006, $5.3 million was outstanding.

The Public Housing Administration has available a $97.1 million of a line-of-credit secured by The Department of Housing and Urban Development of the United States. It bears interest at the daily weighted average rate of the GDB outstanding commercial paper notes plus a required margin cost (5.67% at June 30, 2006). At June 30, 2006, the outstanding balance under this line of credit was $4.1 million.

On August 1, 2001, the State Office for the Historic Conservation entered into a $4.5 million line-of-credit agreement with GDB for the construction and conservation of the Santa Catalina Palace and the Real Audiencia building. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on December 31, 2008. As of June 30, 2006, the outstanding balance of this line-of-credit agreement amounts to $3.5 million. The line-of-credit will be repaid from future Commonwealth appropriations.

On October 20, 2004, the Office of Veterans' Affairs entered into a $1.6 million line-of-credit agreement with GDB to provide economic assistance and housing-leasing services to Puerto Rican veterans. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line-of-credit on June 30, 2006. As of June 30, 2006, $1.1 million was outstanding.

As of July 1, 1999, debts of approximately $102 million from various agreements payable to UPR, a discretely presented component unit, in relation to outstanding noninterest-bearing debt accumulated in prior years by HFSA were transferred to the Commonwealth. On September 7, 2004, additional debts of approximately $71.2 million were also restructured and combined with the previous financing arrangement. During fiscal year 2006, an installment of $15.6 million was paid by the Commonwealth under this arrangement. As of June 30, 2006, $71.6 million remains outstanding. Future amounts required to pay principal balances at June 30, 2006 are as follows (expressed in thousands):

| Year ending June 30: | | |
|---|---|---|
| 2007 | $ | 15,570 |
| 2008 | | 15,570 |
| 2009 | | 7,570 |
| 2010 | | 7,570 |
| 2011 | | 7,570 |
| 2012-2014 | | 17,720 |
| Total | $ | 71,570 |

117

(Continued)

PR-CCD-0007073

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The noninterest-bearing note payable to PREPA, a discretely presented component unit, consists of $19 million of fuel adjustment subsidy due by the Commonwealth and the refinancing during 2004 of $24.1 million of other accumulated debt by the Commonwealth's agencies with PREPA. Future amounts required to pay principal balances at June 30, 2006 are as follows (expressed in thousands):

| Year ending June 30: | |
|---|---|
| 2007 | $ 6,327 |
| 2008 | 6,327 |
| 2009 | 6,327 |
| 2010 | 24,100 |
| Total | $ 43,081 |

**(g)** **Compensated Absences**

Long-term debt includes approximately $1,691 million accrued vacation and sick leave benefits at June 30, 2006. The total liability of compensated absences recorded as governmental and business-type activities amounted to $1,684 million and $7 million, respectively.

**(h)** **Net Pension Obligation**

The amount reported as net pension obligation of approximately $4.7 billion represents the cumulative amount owed by the Commonwealth for the unfunded prior years' actuarially required pension contributions to the ERS and the TRS (collectively known as the pension plans) (see note 19). The net pension obligation has been recorded as a liability in governmental activities in the accompanying statement of net assets.

**(i)** **Unpaid Lottery Prizes**

The amount reported as unpaid lottery prizes represents the lottery prizes payable of the Lottery of Puerto Rico (commonly known as Traditional Lottery) and the additional lottery system (commonly known as Lotto) jointly known as the Lottery Systems at June 30, 2006. The minimum annual payments related to unpaid awards of both lotteries are as follows (expressed in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2007 | $ 37,488 | — | 37,488 |
| 2008 | 32,890 | 1,733 | 34,623 |
| 2009 | 31,297 | 3,326 | 34,623 |
| 2010 | 29,806 | 4,817 | 34,623 |
| 2011 | 24,409 | 10,214 | 34,623 |
| 2012-2016 | 98,363 | 39,386 | 137,749 |
| 2017-2021 | 40,602 | 33,186 | 73,788 |
| 2022-2026 | 8,848 | 11,725 | 20,573 |
| Total | $ 303,703 | 104,387 | 408,090 |

(Continued)

PR-CCD-0007074

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

The liability for unpaid lottery prizes is reported in the accompanying statement of net assets and the statement of net assets – business-type activities – proprietary funds.

## (j) Claims Liability for Insurance Benefits

The Commonwealth provides unemployment compensation, nonoccupational disability, and drivers' insurance coverage to public and private employees through various insurance programs administered by the Department of Labor and Human Resources of the Commonwealth. These insurance programs cover workers against unemployment, temporary disability, or death because of work or employment-related accidents or because of illness suffered as a consequence of their employment.

The Commonwealth establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. Insurance benefit claim liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors. The liability for insurance benefits claims is reported as a current liability in the accompanying statement of net assets and the statement of net assets – business-type activities – proprietary funds.

## (k) Obligations Under Capital Lease Arrangements

The Commonwealth is obligated under capital leases with third parties that expire through 2034 for land, buildings, and equipment. At June 30, 2006, the capitalized cost of the land, buildings, and equipment amounted to approximately $165 million and is included in the accompanying government-wide statement of net assets within capital assets.

The present value of future minimum capital lease payments at June 30, 2006 reported in the accompanying government-wide statement of net assets is as follows (expressed in thousands):

| Year ending June 30: | |
|---|---:|
| 2007 | $ 4,476 |
| 2008 | 15,365 |
| 2009 | 14,331 |
| 2010 | 14,068 |
| 2011 | 13,660 |
| 2012-2016 | 66,495 |
| 2017-2021 | 59,782 |
| 2022-2026 | 56,934 |
| 2027-2031 | 52,516 |
| 2032-2034 | 18,057 |
| Total future minimum lease payments | 315,684 |
| Less amount representing interest costs | (171,183) |
| Present value of minimum lease payments | $ 144,501 |

119

(Continued)

PR-CCD-0007075

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2006

Leased land, buildings, and equipment under capital leases in capital assets at June 30, 2006, include the following (expressed in thousands):

| | | |
|---|---|---:|
| Land | $ | 7,960 |
| Buildings | | 146,202 |
| Equipment | | 11,060 |
| Subtotal | | 165,222 |
| Less accumulated amortization | | (25,738) |
| Total | $ | 139,484 |

Amortization charge applicable to capital leases and included within depreciation expense of capital assets amounted to approximately $6 million in 2006.

The Commonwealth is also committed under numerous operating leases, covering land, office facilities, and equipment. Rental expenditures within the governmental funds for the year ended June 30, 2006 under such operating leases were approximately $145 million.

The future minimum lease payments for these leases are as follows (expressed in thousands):

| Year ending June 30: | | |
|---|---|---:|
| 2007 | $ | 93,160 |
| 2008 | | 74,839 |
| 2009 | | 54,279 |
| 2010 | | 30,177 |
| 2011 | | 19,074 |
| 2012-2016 | | 49,201 |
| 2017-2021 | | 4,848 |
| 2022-2026 | | 2,923 |
| Total future minimum lease payments | $ | 328,501 |

*(l) Other Long-term Liabilities*

The remaining long-term liabilities of governmental activities at June 30, 2006 include (expressed in thousands):

| | | |
|---|---|---:|
| Employees' Christmas bonus | $ | 102,562 |
| Liability for federal cost disallowances | | 53,047 |
| Liability for legal claims and judgments (note 18) | | 801,167 |
| Liability to U.S. Army Corps of Engineers (note 12) | | 205,000 |
| Total | $ | 1,161,776 |

120

(Continued)

PR-CCD-0007076