The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2010 and for the first three months of the fiscal year 2011.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2006 | 9,841 | 552[4][5] | 10,393 | 2,037 | 293 | 2,330 | 25,435 | 1,775 | 27,210 | 37,313 | 2,620 | 39,933 |
| 2007 | 10,335 | 224[4] | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| 2008 | 9,273 | 519[4] | 9,792 | 2,507 | 313 | 2,820 | 31,633 | 2,437 | 34,070 | 43,413 | 3,269 | 46,682 |
| 2009 | 9,382 | 557[4] | 9,939 | 2,691 | 306 | 2,997 | 36,259 | 3,785 | 40,044 | 48,332 | 4,648 | 52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| September 30, 2010 | 9,731 | 1,268 | 11,000 | 2,922 | 281 | 3,202 | 40,267 | 3,122 | 43,389 | 52,920 | 4,671 | 57,591 |

\*   Totals may not add due to rounding.

[1]  Does not include the Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[2]  Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[3]  Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

[4]  Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

[5]  Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:*  Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of September 30, 2010 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service

PR-CCD-0005558

reserve funds. More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**September 30, 2010**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 601,339 | $1,338,650 | $1,939,989 | $383,880 | $1,046,370 | $1,430,250 | $ 985,219 | $2,385,020 | $ 3,370,239 |
| Convention Center District Authority | - | 447,160 | 447,160 | - | 151,076 | 151,076 | - | 598,236 | 598,236 |
| Electric Power Authority | - | 7,422,875 | 7,422,875 | - | 147,468 | 147,468 | - | 7,570,343 | 7,570,343 |
| Highway and Transportation Authority | - | 6,119,949[(1)] | 6,119,949 | - | 1,032,393 | 1,032,393 | - | 7,152,342 | 7,152,342 |
| Housing Finance Authority[(2)] | - | 316,672 | 316,672 | - | 65,648 | 65,648 | - | 382,320 | 382,320 |
| Industrial Development Company | - | 241,195 | 241,195 | - | 89,075 | 89,075 | - | 330,270 | 330,270 |
| Infrastructure Financing Authority[(3)] | - | 1,882,938 | 1,882,938 | - | 3,470 | 3,470 | - | 1,846,408 | 1,846,408 |
| Port of the Americas Authority | 198,724 | - | 198,724 | - | - | - | 198,724 | - | 198,724 |
| Ports Authority | - | 46,326[(4)] | 46,326 | - | 696,071 | 696,071 | - | 742,397 | 742,397 |
| Public Buildings Authority | 3,069,539 | - | 3,069,539 | - | 193,690 | 193,690 | 3,069,539 | 193,690 | 3,263,229 |
| Public Finance Corporation | - | 1,618,284[(5)] | 1,618,284 | - | - | - | - | 1,618,284 | 1,618,284 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 13,437,045 | 13,437,045 | - | 0 | 0 | - | 13,437,045 | 13,437,045 |
| University of Puerto Rico | - | 554,289[(6)] | 554,289 | - | - | - | - | 554,289 | 554,289 |
| Others[(7)] | - | - | - | - | 2,284,468 | 2,284,468 | - | 2,284,468 | 2,284,468 |
| Total[(8)] | $3,869,602 | $33,425,383 | $37,294,985 | $383,880 | $5,709,729 | $6,093,609 | $4,253,482 | $39,135,112 | $43,388,594 |

[(1)] Excludes $151 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

[(2)] Excludes the $189 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the U.S. Department of Housing and Urban Development.

[(3)] Includes $42.2 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement.

[(4)] Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[(5)] Payable primarily from Commonwealth appropriations.

[(6)] Excludes $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[(7)] Includes lines of credit with GDB.

[(8)] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.3 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico

### Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009 and 2010, GDB entered into fiscal oversight agreements with the Aqueduct and

PR-CCD-0005559

Sewer Authority, Electric Power Authority, Highway and Transportation Authority, and Ports Authority. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of September 30, 2010, GDB had total assets of $14.7 billion and total liabilities of $13.0 billion. GDB's total capital as of such date was $1.7 billion and its total capital ratio was 11.69%. GDB's debt is currently rated A3 and BBB by Moody's and S&P, respectively, with a stable outlook.

As of June 30, 2010, $3.2 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $3 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of September 30, 2010. As of said date, GDB also had $7.1 billion in loans outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB has not made any payment to the General Fund under Act 82 since fiscal year 2004.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of September 30, 2010, the Perpetual Trust had repaid $123.9 million of its line of credit and had an outstanding balance of $376 million and no interest due. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover operating expense, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and liquidity.

PR-CCD-0005560

GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.* Puerto Rico Housing Finance Authority ("Housing Finance Authority") (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority. Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency. As of September 30, 2010, Housing Finance Authority's total outstanding loans to the private sector for development of housing projects targeted to low and moderate income families were $115.7 million. The Authority's mortgage loans to low and moderate income homeowners represented an additional $92.5 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds and notes that were issued to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units. Such bonds and notes are generally limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions. As of September 30, 2010, the Housing Finance Authority had total notes and bonds outstanding of $982.3 million (including $865.5 million in outstanding bonds, $104.2 million of debt outstanding under GDB lines of credit, and $4.8 million in notes payable), and total unrestricted net assets of $266.2 million.

*Puerto Rico Tourism Development Fund.* Puerto Rico Tourism Development Fund ("TDF") promotes Puerto Rico's hotel and tourism industry by working with private sector financial institutions in structuring financings for new hotel projects. TDF can provide guarantees to interim and permanent financings for new hotel development projects. In certain cases, TDF acts as a direct lender, guarantees mezzanine financings and provides preferred equity capital. As of September 30, 2010, TDF had outstanding direct loans in an aggregate principal amount of $377 million and guarantees in the amount of $339 million.

TDF has made payments under its guarantees and letters of credit in the aggregate amount of approximately $210 million with respect to several projects. Of the total amount disbursed, TDF has been able to recover approximately $156 million from the borrowers.

As of June 30, 2010, TDF had net assets of $171 million (including approximately $72.1 in equity investments transferred from the Capital Fund), and its allowance for losses on guarantees, loans, other assets and letters of credit was approximately $77.1 million.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") invests and trades in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to the Tourism

I-63

Development Fund, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of September 30, 2010, the Capital Fund had assets of $247,000.

*Development Fund.* Puerto Rico Development Fund (the "Development Fund") provides an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund also guarantees obligations of these enterprises and invests in their equity securities. As of September 30, 2010, the Development Fund had $35.3 million in assets of consisting of (i) $7.1 million in loans, (ii) $5.7 million in preferred shares of various private entities, (iii) $15 million in loan guarantees under the "Key to Your Business" program of the Economic Development Bank, and (iv) $22.4 million in an interest bearing account.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") provides agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. PFC currently holds notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health, and the Aqueduct and Sewer Authority, among others. As of September 30, 2010, it had $1.6 billion aggregate principal amount of bonds outstanding. All such bonds are limited, non-recourse obligations of PFC payable from Commonwealth appropriations made to pay the notes held by PFC.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* PRASA owns and operates Puerto Rico's public water supply and wastewater systems.

PRASA reported an operating loss of $58.3 million for fiscal year 2010, compared to operating losses of $63.7 million and $101.2 million for fiscal years 2009 and 2008, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

As of September 30, 2010, PRASA's total debt was $3.4 billion. This debt includes outstanding bonds in the principal amount of $1.9 billion and interim financing for capital improvements in the principal amount of 1.4 billion. PRASA's senior debt is rated Baa1, BBB- and BBB+ by Moody's, S&P and Fitch Ratings ("Fitch"), respectively. On November 9, 2010, Moody's affirmed PRASA's rating but revised its outlook to negative from stable. The negative outlook reflects PRASA's continued reliance on GDB and the Commonwealth for financial support, as well as the operational challenges it faces to reduce the significant amount of water lost through its system.

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the

PR-CCD-0005562

event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

On April 28, 2006, the Authority entered into a consent decree with the U.S. Environmental Protection Agency ("EPA") that requires the Authority to implement system wide remedial measures at all of the wastewater treatment plants operated by the Authority. The EPA consent decree establishes deadlines for the compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between the Authority and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. The Authority agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the agreements signed with the EPA and DOH agencies. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

PRASA has already invested $941 million in capital investment projects covering the first 5-year term of the above mentioned agreements.

During fiscal year 2011, PRASA has received $85 million in Commonwealth appropriations and $20 million in other Commonwealth available funds. According to the provisions of PRASA's trust agreement, these moneys are taken into account for purposes of determining its revenues and its compliance with certain covenants therein.

*Children's Trust.* Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.2 billion Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. On June 30, 2005, Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth. On May 1, 2008, Children's Trust issued an additional $195.9 million of subordinate Tobacco Settlement Asset-Backed Bonds. As of September 30, 2010, Children's Trust had outstanding bonds in the principal amount of $1.3 billion. These bonds and any, other additional senior bonds issued by Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement

PR-CCD-0005563

Agreement. To date, all principal and interest payments required to be made by Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.*  PRDCA was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Roselló González Convention Center, a new convention center, and designated private parcels located within the Convention Center District in San Juan.  The convention center opened in November 2005. PRDCA also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum.  As of September 30, 2010, Convention Center District Authority's debt was $598.2 million, consisting of $447.1 million in outstanding bonds issued to finance the convention center that are payable from a portion of a hotel room tax and $151.0 million line of credit with GDB used to finance the construction of the Coliseum that is payable from the Commonwealth's General Fund.

*Electric Power Authority.*  Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported net operating income of $377.7 million (unaudited), $362.6 million, $181.1 million and $370.9 million during fiscal years 2010, 2009, 2008 and 2007, respectively. The total debt of PREPA was $7.6 billion as of September 30, 2010. This debt includes outstanding bonds of $7.4 billion and interim financing for operations of $147.5 million. PREPA's debt is rated A3, BBB+ and BBB+ by Moody's, S&P and Fitch, respectively.

In October 2010, PREPA issued its Power Revenue Refunding Bonds, Series DDD in the amount of $218,225,000 to refund a portion of its outstanding Power Revenue and Power Revenue Refunding Bonds for present value savings.  PREPA has used and will use the proceeds of these bonds to repay outstanding lines of credit used to fund capital improvements and finance working capital needs as well as to refund a portion of its outstanding bonds and provide for the termination of certain synthetic fixed swaps associated with the refunded bonds.

In December 2010, PREPA issued its Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) in an aggregate principal amount of $355,730,000.  The proceeds of these bonds will be utilized to fund its capital improvement program, including the construction of a new natural gas pipeline.

As a means of reducing its dependency on oil, PREPA has entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil.  Currently, these two co-generation plants provide approximately 31% of PREPA's energy needs.  PREPA has also commenced developing plans for the conversion of its main oil-fired units into natural gas and clean-coal fired units.

*Health Insurance Administration.*  The Health Insurance Administration was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents.  Under this system, the government selects, through a bidding system, one private health insurance company in each of eight designated regions of the island and pays such insurance company the insurance premium for

PR-CCD-0005564

each eligible beneficiary within such region. The health insurance system covers the entire island, and approximately 1.5 million persons were covered by the system during fiscal year 2010.

The Commonwealth has entered into various contracts with several Medicare Advantage organizations for the provision of health coverage to approximately 200,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

The total cost of the health insurance program for fiscal year 2010 was $1.962 billion, compared to $1.861 billion for fiscal year 2009 and $1.735 billion for fiscal year 2008. For fiscal year 2010, the General Fund covered $1.2 billion of the total cost of the health insurance program. The remaining $762 million will be paid from federal, municipal, internal and other sources.

On October 1, 2010, the administration implemented "Mi Salud," which is the health program that replaced the government's Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. During the implementation of the program's second phase, eligibility requirements will also be expanded to include small to medium businesses. The estimated cost for "Mi Salud" during fiscal year 2011 is $1.930 billion. The General Fund is expected to cover $1.122 billion, while the remaining $808 million will be paid from federal, municipal and other sources. This projection, however, does not take into account increases in the enrollment of new beneficiaries, which could affect this estimate.

Recently, the Governor signed into law a bill that authorizes the Health Insurance Administration to borrow approximately $187 million from GDB in order to pay amounts owed to its suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

*Highways and Transportation Authority.* Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA, and federal and Commonwealth grants.

PRHTA reported a net operating loss of $492.0 million for fiscal year 2009, compared to net operating losses of $448.7 million and $386.0 million for fiscal years 2008 and 2007, respectively.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general

PR-CCD-0005565

obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

As of September 30, 2010, PRHTA's total debt was $7.2 billion, including $6.1 billion in outstanding bonds and interim, subordinated financings with GDB in the aggregate principal amount of $1.032 billion. PRHTA's Highway Revenue Bonds are rated A2 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated A3 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at PRHTA's election. The cost of the project was $2.25 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005 and currently has ridership of about 35,000 persons per day. The operation of the Tren Urbano generated a loss of $64.5 million, $62.5 million and $60.2 million in fiscal years 2009, 2008, and 2007, respectively.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

During the second quarter of fiscal year 2011, PRHTA and PPP Authority commenced a procurement process intended to lead to the establishment of a concession agreement for the operation of two toll roads. Future procurement processes will lead to the establishment of concession agreements for the principal toll roads in Puerto Rico.

*Industrial Development Company.* Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. PRIDCO reported consolidated net operating losses of $10.3 million for fiscal year 2010, compared to consolidated net operating losses of $6.0 million for fiscal year 2009 and consolidated net income of $6.1 million for fiscal year 2008. The total debt of PRIDCO was $412.6 million as of September 30, 2010. This debt includes outstanding bonds of $241.2 million and financings for operations of $171.4 million (including loans from its subsidiary Puerto Rico Industrial Investment Corporation). PRIDCO's debt is rated Baa1 and BBB- by Moody's and S&P, respectively.

PR-CCD-0005566

During fiscal years 2006 and 2007 PRIDCO entered into a company reorganization plan establishing an early retirement plan and a voluntary separation plan with the objective of reducing workforce and to achieve expense reductions. This plan was financed by a line of credit from GDB, which had an outstanding balance of $45.7 million as of September 30, 2010.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.* Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of September 30, 2010, approximately $1.4 billion of AFICA's bonds were outstanding. In addition, as of September 30, 2010, AFICA has a $67 million line of credit with GDB with a principal outstanding balance of $59.2 million used for the acquisition of assets from PREPA.

*Infrastructure Financing Authority.* Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.

As of September 30, 2010, PRIFA's total debt was $1.84 billion. This debt includes bonds outstanding of $1.84 billion and interim financing for capital improvements of $3.4 million. PRIFA's debt is rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually thru fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. The Authority is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account were being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used

PR-CCD-0005567

the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also has responsibility for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of September 30, 2010, MFA had $1.1 billion of bonds outstanding.

*Port of the Americas Authority.* Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas (the "Port"), a deep draft port on the south coast of Puerto Rico.

PAA is authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port. Currently, GDB is authorized by law to purchase bonds of PAA in an aggregate principal amount not to exceed $250 million. As of September 30, 2010, GDB held approximately $198.7 million of PAA's outstanding bonds, which are guaranteed by the Commonwealth.

The first phase of the Port was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5, and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. The second phase of the Port was completed on February 2009. This phase, which was designed to provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU") per year, included (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet, (ii) reconstructing the container terminals, (iii) commencing certain required environmental risk mitigation procedures, and (iv) preparing final construction schematics.

A third phase, which provides for the expansion of the Port's capacity, was initiated in May 2007. This phase includes (i) infrastructure improvements related to access roads, (ii) the development of utility infrastructure, namely, a new storm canal and the relocation of electricity lines and the water and sanitation system, (iii) additional dredging at certain pier locations, and (iv) the expansion of the container terminal. The first expansion under this phase will provide

PR-CCD-0005568

sufficient capacity to process 500,000 TEU annually and is expected to be finished in the second half of 2011.

*Ports Authority.* Puerto Rico Ports Authority ("Ports Authority") owns and operates the major airport and seaport facilities in Puerto Rico. Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Ports Authority reported operating losses of $38.7 million and $47.6 million during fiscal years 2010 and 2009, respectively. The total debt of PRPA was $742.3 million as of September 30, 2010. This debt includes outstanding bonds of $46.3 million, credit facilities for capital improvements with GDB and private financial institutions of $309.3 million and a loan for operational purposes with private financial institutions of $386.7 million. The loan for operational purposes and a portion of the credit facilities for capital improvements are guaranteed by GDB.

As of September 30, 2010, the outstanding balance of the credit facilities for capital improvements with private financial institutions was $153.2 million, which is due on June 30, 2010. Of this amount, $71.8 million, plus interest, is guaranteed by GDB.

*Public Buildings Authority.* Puerto Rico Public Buildings Authority ("PBA") is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.325 billion of bonds guaranteed by the Commonwealth. As of September 30, 2010, $3.070 billion of such bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of September 30, 2010, PBA's line of credit with GDB had an outstanding balance of $193.7 million. PBA debt is rated A3 and BBB– by Moody's and S&P, respectively.

*Public-Private Partnerships Authority.* PPP Authority is an independent governmental instrumentality of the Commonwealth created by Act No. 29 of June 8, 2009. The Authority is tasked with implementing the Commonwealth's public policy regarding public-private partnerships to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. As of April 2010, the Authority had engaged various financial advisors to assist it in the evaluation of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the Authority has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marin International Airport. As of September 30, 2010, the Authority has a $20 million revolving line of credit with GDB with an outstanding balance of $3.3 million.

PR-CCD-0005569

*Sales Tax Financing Corporation.* COFINA is an independent governmental instrumentality of the Commonwealth created by Act 91. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.

In 2009, the Legislative Assembly of Puerto Rico expanded the purposes for which COFINA was created and, correspondingly, increased its revenues by increasing from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion that is transferred to COFINA of the sales and use tax imposed by the central government. As a result, COFINA was authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Government of Puerto Rico, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund. As of June 30, 2010, COFINA had approximately $13.4 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds). COFINA's Sales Tax Revenue Bonds are rated Aa2, AA- and AA- by Moody's, S&P and Fitch, respectively, and the Sales Tax Revenue Bonds, First Subordinate Series are rated A1, A+ and A+ by Moody's, S&P and Fitch, respectively.

*Special Communities Perpetual Trust.* Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB has made a special capital contribution to Perpetual Trust of $500 million and provided the Trust with a $500 million, non-revolving, line of credit. The amounts transferred by GDB were deposited in two investment accounts held by GDB for the benefit of Perpetual Trust, which generated interests ascending to $90.6 million as of June 30, 2010. These additional funds were distributed among 56 new identified special communities for the construction of new infrastructure projects in these communities, and a portion was assigned to complete construction projects in the original 686 special communities. Perpetual Trust has disbursed the total amount of $910.3 million as of June 30, 2010. As of September 30, 2010, Perpetual Trust's line of credit with GDB had an outstanding balance of $376.1 million. The line of credit is payable from legislative appropriations.

*University of Puerto Rico.* University of Puerto Rico (the "University"), with approximately 65,669 students in academic year 2009-2010, is the largest institution of higher education on the island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been

PR-CCD-0005570

financed mainly by revenue bonds. As of September 30, 2010, University's total debt was $554.3 million, consisting of outstanding revenue bonds (excluding $19.6 million owed by the University's Medical Services). University's debt is rated Baa2 and BBB- by Moody's and S&P, respectively.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2007, the Board of Trustees of the University approved Certification No. 60 establishing a new policy and methodology for tuition fees structure. This new structure covers the tuition fees to be charged to new students until academic year 2012-2013. This policy was adopted to pursue continued development and financial stability of the University.

In June 2010, the Board of Trustees of the University approved Certification No. 146 establishing a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University. This stabilization fee was imposed to address the University's fiscal difficulties and is expected to increase annual revenues by approximately $40 million.

As a result of a student-led strike that lasted approximately two months, on June 26, 2010, the Middle States Commission on Higher Education ("MSCHE"), the entity that accredits the University's campuses, placed 10 of its 11 campuses on probation due to deficiencies in connection with two of 14 applicable standards and requested information with respect to a third standard. MSCHE also requested a report outlining the University's plan in order to achieve and maintain compliance with said standards. Probationary periods are designed to last up to 24 months and the affected University campuses will maintain their MSCHE accreditation while on probation.

*Other public corporations.* Public corporations not described above have outstanding debt in the aggregate amount of $1.469 billion as of September 30, 2010. Debt service on $701 million of such outstanding debt is being paid from legislative appropriations. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

I-73

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of the Commonwealth (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System covers employees of the University of Puerto Rico and Electric Power Authority, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951 ("Act 447") and is a hybrid defined benefit plan consisting of different benefit structures. Members who entered the Employees Retirement System on or before December 31, 1999 generally participate in a defined benefit program. Members participating in the defined benefit program prior to February 1990 ("Act 447 Participants") are entitled to the highest benefits structure, while those who became members after February 1990 ("Act 1 Participants") are subject to a longer vesting period and a reduced level of benefits.

In 1999, Act 447 was amended to close the defined benefit program and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Under the System 2000 benefits structure, a participant is entitled to receive a lump-sum payment, which may be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed by such participant. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer

I-74

PR-CCD-0005572

contributions with respect to System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the original defined benefit structure and System 2000 will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined benefit pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

*Covered Employees.* The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico or the Electric Power Authority) and municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied. Currently, there are no teachers from private schools or other educational institutions participating in the Teachers Retirement System.

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2009, the date of the latest actuarial valuations for the Retirement Systems.

I-75

PR-CCD-0005573

**Participant Data**
**(as of June 30, 2009)**

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| Act 447 Participants | 38,249 | 73,836 | 16,836 | 12,200 | - | 141,121 |
| Act 1 Participants | 56,991 | 1,861 | 237 | 1 | - | 59,090 |
| System 2000 Participants | 64,813 | - | - | - | - | 64,813 |
| **Total** | 160,053 | 75,697 | 17,703 | 12,201 | - | 265,024 |
| **Teachers Retirement System** | 46,295 | 27,936 | 2,035 | 2,578 | 675 | 79,519 |
| **Judiciary Retirement System** | 345 | 314 | 0 | 59 | 46 | 764 |

[1] Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.  There are terminated vested members of the Employees Retirement System, but the Employees Retirement System does not possess reliable data on the amount of such members.

As of June 30, 2010, the total number of participants in the Retirement Systems was as follows:  Employees Retirement System, 247,010; Teachers Retirement System, 79,052; and Judiciary Retirement System, 759.

The Commonwealth central government (consisting of department and agencies) is not the only employer participating in the Employees Retirement System.  The municipalities and most public corporations participate as employers as well with respect to their employees.  However, the assets contributed by the Commonwealth central government and all other employers are invested together and not otherwise segregated.  As of June 30, 2009, the central government was responsible for making contributions with respect to 100,811 active members of the Employees Retirement System, or 63.0% of total active members (consisting of 24,545 Act 447 Participants, 38,066 Act 1 Participants and 38,200 System 2000 Participants).  Municipalities were responsible for 34,987, or 21.9%, active members, and public corporations were responsible for 24,255, or 15.2%, active members.

*Funding Requirements.*  The Commonwealth central government is responsible for approximately 64% of total employer contributions to the Employees Retirement System, and the other 36% is the responsibility of public corporations and municipalities.  The Commonwealth central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively.  Retirement and related benefits provided by the Retirement Systems and required contributions to the Retirement Systems by employers and employees are determined by law rather than by actuarial requirements.

For the Employees Retirement System, the statutory employer contribution is at least 9.275% of covered payroll.  Covered payroll is the compensation regularly paid to active employees on which contributions to the retirement systems are computed and is generally equivalent to their annual salary.  The current employer contribution rate has been in effect since February 1990; prior to that date, Commonwealth departments, agencies and public corporations were required to make employer contributions of at least 8% of their covered payroll, while municipalities were required to make employer contributions of at least 7% of their covered payroll.  Required employee contributions for the Employees Retirement System vary according

I-76

PR-CCD-0005574

how the individual employee's retirement benefits are coordinated with social security benefits. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the System, plus administrative costs, and (ii) the contributions that employees are required to make to the System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

For the Teachers Retirement System, the statutory employer contribution is 8.5% of covered payroll and 9.0% for the employees. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and 8% for the employees. The employer contribution rate for the Judiciary Retirement System increased from 20.0% to 30.34% of payroll as of July 1, 2008. The Commonwealth is also ultimately responsible for any funding deficiency in the Teachers Retirement System and the Judiciary Retirement System.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2009 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been received by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. In July 2010, the Teachers Retirement System received the first installment.

I-77

PR-CCD-0005575

The Employees Retirement System is also seeking reimbursement from the Commonwealth, the municipalities and public corporations in the amount of $79.2 million, $30.5 million and $62.1 million, respectively, for cumulative System Administered Pension Benefits paid to its beneficiaries through June 30, 2010. As of June 30, 2010, the Teachers Retirement System was also seeking reimbursement from the Commonwealth of $491,000 (excluding the aforementioned $53.8 million) on account of System Administered Pension Benefits paid.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.467 billion, compared to $4.603 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 36.3% of U.S. domestic and international equity investments, 14.8% of fixed-income securities, 29.7% of internally managed mortgage and personal loans portfolio, 17.8% of short-term cash equivalents and 1% of other investments. As of September 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.338 billion. The decrease in the value of the investment portfolio since June 30, 2009 principally reflects the continued use of investment portfolio assets to pay current benefits, as discussed below.

As of June 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.204 billion, compared to $2.180 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 60.4% of U.S. domestic and international equity investments, 19.1% of fixed-income securities, 19.2% of internally managed mortgage and personal loans portfolio, 0.20% of short-term cash equivalents and 1% of other investments. As of September 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.314 billion.

As of June 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $83.9 million, compared to $76.1 million as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 63.9% of U.S. domestic and international equity investments, 34.8% of fixed-income securities, 1% of internally managed mortgage and personal loans portfolio and 0.40% of short-term cash equivalents. As of September 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $87.9 million.

*Actuarial Valuations of the Retirement Systems.* Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2009. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems will now be conducting annual actuarial valuations. Preliminary results of new actuarial valuations as of June 30, 2010 are being evaluated by the Employees Retirement System and the Teachers Retirement System. These actuarial valuations are expected to be completed by the end of February 2011.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System as well as other financial information are available on the website of the Administration of the Retirement Systems at http://www.asr.gobierno.pr. Informational copies of the actuarial valuation report of the Teachers Retirement System as well as other financial information are available at the website of the Teachers Retirement System at

PR-CCD-0005576

http://www.srm.gobierno.pr. No information contained on these websites is deemed incorporated herein by reference.

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislature.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal year 2009 was significantly lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of each of the Retirement Systems for fiscal year 2010, however, was higher than the assumed investment return utilized to prepare the actuarial accrued liability.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 9.7%, negative 16.0% and negative 18.2%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal

PR-CCD-0005577

year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively.

The June 30, 2009 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method and assumed an investment return of 7.5% per year and yearly salary increases of 3% per year. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service. The preliminary actuarial valuations of the Employees Retirement System and the Judiciary Retirement System as of June 30, 2010 presented in this Report have been performed under the same assumptions in all material respects.

The June 30, 2009 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 8% per year and yearly salary increases of 3.5%. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The preliminary actuarial valuation of the Teachers Retirement System as of June 30, 2010 presented in this Report has been performed under the same assumptions in all material respects.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

PR-CCD-0005578

## Funding Status
## Actuarial Valuations as of June 30, 2009
### (in millions)

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,851 | $18,944 | $17,092 | 9.8% | $4,293 | 398.4% |
| Teachers Retirement System | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.9 |
| Judiciary Retirement System | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| Total | $4,060 | $27,990 | $23,929 | 14.5% | $5,742 | 416.7% |

[1] The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

[4] The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.

[6] The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System.

Source: Actuarial valuation reports as of June 30, 2009 for each of the Retirement Systems.

## Historical Funding Status[1]
## Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2005 | $2,328 | $13,969 | $11,641 | 16.7% | $4,126 | 282.2% |
| 2007 | 2,892 | 16,770 | 13,878 | 17.2 | 4,246 | 326.8 |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.4 |
| 2010[2] | 1,667 | 19,502 | 17,834 | 8.5 | 3,818 | 467.1 |
| **Teachers Retirement System** | | | | | | |
| 2004 | $2,403 | $4,702 | $2,299 | 51.1% | $1,294 | 177.7% |
| 2007 | 3,163 | 7,756 | 4,593 | 40.8 | 1,370 | 335.3 |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.9 |
| 2010[2] | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| **Judiciary Retirement System** | | | | | | |
| 2005 | $70 | $174 | $105 | 40.0% | $29 | 356.8% |
| 2007 | 81 | 259 | 177 | 31.5 | 31 | 566.6 |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010[2] | 55 | 338 | 283 | 16.4 | 32 | 882.0 |

[1] Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.

[2] Preliminary.

Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

I-81

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last three fiscal years and the current fiscal year.

### Schedule of Employer Contributions to Retirement Systems
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $1,191 | $581 | $610 | 48.8% |
| 2009 | 1,259 | 595 | 664 | 47.2 |
| 2010 | 1,460 | 534 | 926 | 36.6 |
| 2011 | 1,547 | 542 | 1,005 | 35.0 |
| **Teachers Retirement System** | | | | |
| 2008 | $341 | $159 | $182 | 46.6% |
| 2009 | 394 | 173 | 221 | 43.9 |
| 2010 | 477 | 166 | 311 | 34.9 |
| 2011 | 528 | 165 | 363 | 31.3 |
| **Judiciary Retirement System** | | | | |
| 2008 | $20 | $7 | $13 | 36.7% |
| 2009 | 22 | 11 | 11 | 50.0 |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.1 |
| **Total** | | | | |
| 2008 | $1,553 | $748 | $805 | 48.1% |
| 2009 | 1,675 | 778 | 897 | 46.4 |
| 2010 | 1,965 | 710 | 1,255 | 36.1 |
| 2011 | 2,105 | 718 | 1,387 | 34.1 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2009 and, in the case of fiscal year 2011, the preliminary actuarial valuations as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the preliminary actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2009 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

Based on the current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems will continue to increase indefinitely into the future instead of being amortized and future scheduled contributions at the current funding rates will not be sufficient to make future benefit payments when due. Additional funding from the Commonwealth will ultimately be necessary to cover such unfunded obligation. It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding

PR-CCD-0005580

shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the System's assets. During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds increased the funds of the Employees Retirement System currently available to pay pension benefits. Although the original expectation was that the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds would exceed the cost of the debt, as further discussed below, the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds have in fact been lower than the cost of the Pension Bonds. As a result of market declines since the issuance of the Pension Bonds, the market value of some of the investments made with Pension Bonds proceeds is below their original cost. Thus, to date, the Pension Bonds transactions have negatively affected the UAAL of the Employees Retirement System.

PR-CCD-0005581

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

### Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2006 | $741.4 | ($803.5) | ($62.1) |
| 2007 | 713.2 | (823.1) | (109.9) |
| 2008 | 726.4 | (1,011.3) | (284.9) |
| 2009 | 762.4 | (1,190.3) | (427.9) |
| 2010* | 726.5 | (1,268.8) | (542.3) |
| **Teachers Retirement System** | | | |
| 2006 | $248.7 | ($355.1) | ($106.4) |
| 2007 | 244.1 | (387.9) | (143.7) |
| 2008 | 244.6 | (439.9) | (195.2) |
| 2009 | 261.5 | (468.0) | (206.6) |
| 2010* | 248.0 | (498.1) | (250.1) |
| **Judiciary Retirement System** | | | |
| 2006 | $9.7 | ($13.5) | ($3.8) |
| 2007 | 9.5 | (14.7) | (5.3) |
| 2008 | 9.8 | (15.4) | (5.6) |
| 2009 | 13.1 | (16.5) | (3.4) |
| 2010* | 13.1 | (17.8) | (4.7) |

* Preliminary.
[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benfits.
[2] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2008, 2009 and 2010 in the amounts of $47 million, $187 million and $188 million, respectively.
Source: Information obtained from each of the Retirement Systems.

The Employees Retirement System anticipates that, based on the current contributions and benefit structure, its future cash flow needs for disbursement of benefits to participants are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income. Based on the preliminary actuarial valuation report as of June 30, 2010, the Employees Retirement System expects to have a funding shortfall (after payment of debt service on the Pension Bonds) of $752 million for fiscal year 2011 and this negative trend is expected to continue. Based on the Employees Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being rapidly disfunded and projects that its net assets (total assets minus the Pension Bonds and other liabilities) will be depleted by fiscal year 2014 and its gross assets will be depleted by fiscal year 2019. This means that during the period from fiscal year 2014 through fiscal year 2019, benefits are expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits.

The Teachers Retirement System has also covered funding shortfalls during the prior five fiscal years through the sale of investment portfolio assets. Based on the preliminary

I-84

PR-CCD-0005582

actuarial valuation report as of June 30, 2010, the Teachers Retirement System expects to have a funding shortfall of approximately $274 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being gradually disfunded and projects that its net and gross assets will be depleted by fiscal year 2020.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. Based on the preliminary actuarial valuation report as of June 30, 2010, the Judiciary Retirement System expects to have a funding shortfall of approximately $7.7 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being disfunded and projects that its net and gross assets will be depleted by fiscal year 2018.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.

*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.* On June 30, 2010, the Employees Retirement System and GDB, as fiscal agent, retained Conway MacKenzie, Inc ("CMI"), a financial advisory firm, to identify and analyze key events and decisions that have contributed to the current financial crisis of the Employees Retirement System, including the deterioration of its funded ratio. CMI issued its report in October 2010. In its report, CMI identified the following five factors as fundamental in the deterioration of the financial health of the Employees Retirement System: (i) historical inadequate funding procedures, (ii) special laws, (iii) early retirement programs, (iv) personal loans, and (v) the 2008 issuances of Pension Bonds.

The report reviews the historical funding levels of the Employees Retirement System and concludes that the Employees Retirement System has been underfunded since its inception in 1951, essentially as a result of statutory funding rates that fall below actuarially determined contribution rates. In addition to inadequate annual contributions, CMI notes that investment returns and other recurring income have been insufficient to cover annual benefit payments and operating expenses, resulting in cash flow shortfalls that have forced the Employees Retirement System to liquidate plan assets.

CMI also identified the enactment of numerous special laws, which have granted incremental retirement benefits to participants beyond those provided by Act 447 and Act 1, as having exacerbated the deteriorating financial condition of the Employees Retirement System,

PR-CCD-0005583

Many special laws were adopted without the Government securing a viable, long-term source of funding for such additional benefits, including the adoption of special laws during periods when the Government was incurring in budgetary deficits. As a result, the Employees Retirement System was forced to fund the benefits granted under these special laws, resulting in significant past-due receivables from the Commonwealth and participating public corporations and municipalities.

The adoption of several early retirement programs is also identified as having affected the financial solvency of the Employees Retirement System. These programs were adopted in order to reduce the size of the public workforce and thereby decrease payroll costs. These programs, however, were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the System funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality. In addition, the CMI report notes that it appears that many of these programs did not ultimately result in their intended goals of reducing the size of the public workforce.

Another factor identified by CMI as having contributed to the deterioration of the Employees Retirement System is the adoption in 2007 of an increase in the maximum loan balance for personal loans to members, from $5,000 to $15,000. This increase has resulted in a significant cash flow drain to the Employees Retirement System, amounting to approximately $600 million during the last four fiscal years. Although the loans are secured by the employee contributions and collected through payroll withholdings, the significant cash flow to provide personal loans has required the liquidation of plan assets. As a result, a significant percentage of the Employees Retirement System's assets are now invested in personal loans that are illiquid investments.

The CMI report also addressed the 2008 issuances of approximately $2.9 billion in Pension Bonds. The Pension Bonds were issued with the intent of increasing the funds available to the Employees Retirement System to pay benefit obligations and to reduce the UAAL. The Employees Retirement System expected to achieve these goals by investing the proceeds of the Pension Bonds at a higher return than the cost of the debt, thereby achieving a positive arbitrage. However, CMI found that potential risks were not thoroughly or properly analyzed. In fact, the investment of the Pension Bonds proceeds have resulted in a negative arbitrage as the Pension Bonds are currently costing the System more than what it is earning on the investment proceeds. Thus, to date, the transactions have worsened the funded ratio of the Employees Retirement System.

Finally, the CMI report addresses governance deficiencies and states that many of the measures described above, and in particular the issuances of Pension Bonds, were adopted and implemented without conducting any rigorous analysis of their impact on the financial condition of the Employees Retirement System and the risks associated with the measures. The report concludes that immediate and dramatic changes to the structure of the Employees Retirement System are necessary to avoid full depletion of the System's net assets in the near future, as discussed above.

PR-CCD-0005584

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.* The Retirement Systems and the current administration are evaluating measures to improve the financial solvency of the Retirement Systems. In order to maintain the long-term fiscal integrity of the Retirement Systems and their ability to pay required benefits to their members, a combination of some or all of the following will be required: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems. Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.

In March 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the Retirement Systems. The Commission issued its report on October 21, 2010. The Commission's report does not make a consensus set of recommendations for addressing the financial solvency of the Retirement Systems, but rather discusses the principal recommendations made by different members of the Commission in the following areas: (i) employer and employee contributions, (ii) benefit structure, (iii) retirement age, (iv) benefits under special laws, (v) early retirement programs, (vi) mortgage loans and personal loans, and (vii) governance structure. All members of the Commission agreed that there has to be an increase in employer contributions, while some members also recommended an increase in employee contribution rates. One of the proposals is that employer contribution rates be increased by 1% of payroll per year for the next 10 to 15 years. In the benefits areas, the recommendations include various proposals to reduce or limit benefits, such as eliminating merit pensions, establishing caps on benefits, increasing the retirement age in order to receive full benefits and modifying or eliminating some benefits granted under special laws. Some members of the Commission also recommended prohibiting all future early retirement programs unless they are actuarially positive to the Retirement Systems. In order to address the liquidity position of the Retirement Systems, various members of the Commission recommended eliminating the loan programs or restricting their use. Various members also commented that improvements to the governance structure of the Retirement Systems was necessary, as it appeared that in the past governance had not been as rigorous as it should have been. Other recommendations included increasing penalties for late payments by participating employers and creating other dedicated revenue sources for the Retirement Systems, such as a special lottery drawing or a special tax on government contractors.

The administration has assigned to a task force headed by the Secretary of Labor the evaluation of the Commission's recommendations in order to determine which of its recommendations or other alternatives will be formally proposed. The implementation of most of the recommendations or other alternatives will require adopting legislation, which the administration expects to submit during 2011. At this time, there can be no assurance as to which changes, if any, to the Retirement Systems will be proposed and adopted. Because of the Commonwealth's current budgetary constraints and the significant underfunding of the Retirement Systems discussed above, however, improving the financial solvency of the Retirement Systems will require the adoption of several of the measures mentioned above and it will take several years before a significant improvement is achieved. In the short-term, the financial situation of the Retirement Systems may have an adverse impact on the Commonwealth's budgetary situation.

I-87

PR-CCD-0005585

On July 2, 2010, the Government enacted Act 70, which is designed to reduce Government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria opted for early retirement by January 14, 2011 (or during such other period that may be established by a designated committee) and receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. The Government expects approximately 4,000 employees to participate of the benefits provided by Act 70.

*Impact of Funding Shortfall on the Commonwealth.* The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems. The depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. However, due to the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

*Statements of Plan Net Assets and Changes in Plan Net Assets.* The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2007, 2008, 2009 and 2010.

I-88

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

| ASSETS | 2010\*\* | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| CASH AND SHORT TERM INVESTMENTS | | | | |
| Deposits at Commercial Banks | $ 54,175 | $ 21,792 | $ 84,439 | $ 41,365 |
| Deposits with Treasury Department | 110,931 | 103,527 | 23,099 | -- |
| Deposits with GDB: | | | | |
| Unrestricted | 51,446 | 79,500 | 54,438 | 266,633 |
| Restricted | 741,082 | 1,028,878 | 1515,042 | 2,310 |
| Restricted Cash Bonds | 172,226 | 193,537 | | |
| Total Cash and Short Term Investment | 1,129,860 | 1,427,234 | 1,677,018 | 310,308 |
| SECURITIES LENDING, COLLATERAL INVESTED | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 563,454 | 565,366 | 547,414 | 149,638 |
| Stocks | 1,492,386 | 1,477,945 | 2,018,090 | 1,693,144 |
| Master Repo | | | | |
| Private Equity Investments | 55,307 | 34,922 | 42,294 | 47,784 |
| Total Investments | 2,111,147 | 2,078,233 | 2,607,798 | 1,890,566 |
| LOANS TO PLAN MEMBERS | | | | |
| Mortgage | 141,588 | 128,365 | 116,022 | 107,680 |
| Personal | 1,018,498 | 916,934 | 771,367 | 440,167 |
| Cultural Trips | 63,729 | 50,317 | 38,344 | 28,933 |
| PEC | 2,340 | 1,827 | 1,098 | 533 |
| Total Loans to Plan Members | 1,226,155 | 1,097,443 | 926,831 | 577,313 |
| Investment in PRTA Holdings | -- | -- | -- | -- |
| Total cash, investments and loans to plan members | 4,467,162 | 4,602,910 | 5,211,647 | 2,778,187 |
| RECEIVABLES: | | | | |
| Employers | 273,139 | 289,427 | 246,167 | 117,420 |
| General Fund | 11,222 | 7,833 | 854 | 4,615 |
| Judiciary Retirement System | 19,138 | 17,942 | 16,714 | 5,113 |
| Investment Sales | 12,189 | 24,509 | 9,800 | 2,470 |
| Accrued Interest | 6,597 | 6,939 | 3,279 | 3,119 |
| Dividend Receivable | | | | |
| Other | 3,893 | 5,081 | 58,210 | 4,527 |
| Total Receivables | 326,178 | 351,731 | 335,024 | 137,264 |
| CAPITAL ASSETS | 8,964 | 9,171 | 9,839 | 8,476 |
| OTHER ASSETS | 7,224 | 8,892 | 8,292 | 7,371 |
| Prepaid Bond Cost | 33,267 | 34,363 | 35,462 | |
| Total assets | 4,842,795 | 5,007,067 | 5,600,264 | 2,931,298 |
| LIABILITIES | | | | |
| Book overdraft | 22,933 | 37,961 | -- | 1,566 |
| Short Term Obligations | | | | |
| Payables for securities lending | 110,931 | 103,527 | | |
| Funds of Mortgage Loans and Guarantee Insurance Reserve for Loans | 6,597 | 6,372 | 3,863 | 8,914 |
| Investment Purchases | 5,277 | 13,926 | 12,694 | 2,172 |
| Accounts Payable and Accrued Liabilities | 12,250 | 14,228 | 9,310 | 10,125 |
| Line of Credit | | | | -- |
| Bonds Payable | 2,981,775 | 2,961,359 | 2,942,183 | -- |
| Other Liabilities | 21,798 | 13,675 | 12,946 | 17,022 |
| Bonds Interest Payable | 13,876 | 13,876 | 12,182 | -- |
| Total Liabilities | 3,175,437 | 3,164,924 | 2,993,178 | 39,799 |
| Net Assets Held in Trust for Pension Benefits | $1,667,358 | $1,842,143 | $2,607,086 | $2,891,499 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-89

## The Commonwealth of Puerto Rico
## Employees' Retirement System
### Statements of Changes in Plan Net Assets*
### As of June 30, 2007, 2008, 2009, and 2010**
### (in thousands)

| | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $ 381,243 | $ 400,405 | $ 374,394 | $ 398,521 |
| Participating employees | 345,265 | 362,040 | 338,791 | 342,830 |
| Other Special Laws | 171,842 | 175,254 | | |
| Early Retirement | 3,399 | 47,146 | 69,097 | -- |
| Special Laws 127 | 188,843 | 17,000 | 17,000 | -- |
| Total Contributions | 918,750 | 1,001,845 | 799,282 | 758,035 |
| | | | | |
| Investment (loss) Income: | | | | |
| Realized Gain or Loss | 148,173 | (152,583) | 74,304 | 33,023 |
| Unrealized Gain or Loss | 67,838 | (405,969) | 289,881 | 156,492 |
| Dividend Income | 10,663 | 15,774 | 14,494 | 49,939 |
| Interest Income | 179,586 | 198,734 | 68,231 | 63,486 |
| Total | 406,259 | (344,044) | 446,910 | 302,939 |
| | | | | |
| Less Investment Expense | (7,649) | (7,589) | (12,940) | (10,123) |
| Insurance Premium | | | 2,441 | 14,492 |
| Other Income | 31,783 | 35,878 | 17,431 | 8,496 |
| Net Investment Income | 430,393 | (315,755) | 453,841 | 315,804 |
| | | | | |
| Total Additions | 1,349,143 | 686,090 | 1,253,124 | 1,073,839 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 1,047,695 | 970,843 | 793,883 | 772,647 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 | 16,684 |
| Benefits under Special Laws | 171,842 | 175,254 | | |
| Death Benefits | 12,968 | 11,532 | 13,872 | 14,984 |
| Refunds of Contributions: | | | | |
| Employers | 1,469 | 2,013 | 5,296 | 1,666 |
| Participating Employees | 43,677 | 32,517 | 28,009 | 20,707 |
| Personal Loans Adjustment | -- | -- | | 1,658 |
| Insurance Claims on Loans | | | 2,118 | 1,216 |
| Other Expenses | 7,888 | 22,415 | 13,569 | -- |
| Administrative Expenses | 33,063 | 32,590 | 29,207 | 30,817 |
| Interest on Bonds | 188,055 | 186,869 | -- | -- |
| | | | | |
| Total Deductions | 1,523,928 | 1,451,033 | 902,954 | 860,379 |
| | | | | |
| Net (decrease) Increase | (174,785) | (764,943) | 350,170 | 213,459 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 1,842,143 | 2,607,086 | 2,541,331 | 2,327,871 |
| End of Year | $1,667,358 | $1,842,143 | $2,891,501 | $2,541,331 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

PR-CCD-0005588

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Plan Net Assets***
**As of June 30, 2007, 2008, 2009, and 2010****
**(in thousands)**

|  | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $ 72,692 | $ 65,885 | $ 324,846 | $ 273,982 |
| Cash with fiscal agent | - | 450 | 297 | - |
| Cash restricted | - | - | - | - |
| Cash deposited with Government Development Bank for Puerto Rico | 3,288 | 3,276 | 3,255 | 3,123 |
| Total Cash | 75,980 | 69,611 | 328,398 | 277,105 |
| Investments, at fair value: | | | | |
| Bonds and notes | 397,109 | 425,911 | 490,007 | 468,452 |
| Stocks | 1,295,232 | 1,259,169 | 1,796,817 | 2,218,033 |
| Total investment at fair value | 1,692,341 | 1,685,080 | 2,286,824 | 2,686,485 |
| Other investments: | | | | |
| Mortgage notes acquired from third parties | | | | |
| Private equity investments | 26,683 | 26,139 | 37,630 | 46,686 |
| Total investments | 1,719,024 | 1,711,219 | 2,324,454 | 2,733,171 |
| Loan to plan members: | | | | |
| Mortgage | 119,937 | 109,508 | 103,759 | 102,684 |
| Personal | 288,463 | 288,410 | 271,510 | 260,066 |
| Cultural trips | 1,480 | 1,462 | 1,355 | 1,371 |
| Total loans to plan members | 409,879 | 399,380 | 376,624 | 364,121 |
| Total investments and loans | 2,204,884 | 2,180,210 | 3,029,476 | 3,374,397 |
| Accounts receivable: | | | | |
| Receivable for investments sold | 332 | 23,231 | 4,693 | 12,242 |
| Accrued interest and dividends receivable | 4,584 | 5,445 | 6,395 | 6,312 |
| Other | 56,085 | 2,930 | 15,141 | 14,640 |
| Total accounts receivable | 61,001 | 31,606 | 26,229 | 33,194 |
| Property and equipment, net | 22,970 | 26,167 | 26,223 | 25,890 |
| Other assets | 832 | 876 | 451 | 700 |
| Total Assets | 2,289,687 | 2,238,859 | 3,082,379 | 3,434,181 |
| **LIABILITIES** | | | | |
| Investments purchased | 2,722 | 18,981 | 7,952 | 11,258 |
| Payable for securities lending | 48,673 | 46,751 | 274,372 | 240,440 |
| Cash overdraft in cash with fiscal agent | 2,199 | - | - | 5,619 |
| Accounts payable | 1,476 | 4,188 | 3,688 | 4,152 |
| Obligation under capital lease | - | - | 12 | 35 |
| Accrued expenses | 6,184 | 5,925 | 5,361 | 4,470 |
| Line of credit | - | - | - | 4 |
| Escrow fund of mortgage loans and guarantee insurance reserve for loans to plan members | 5,763 | 4,580 | 4,641 | 4,916 |
| Bonds payable | - | - | - | - |
| Other liabilities | 694 | 841 | 1,007 | 567 |
| Total liabilities | 67,710 | 81,266 | 297,033 | 271,461 |
| **Net Assets Held in Trust for Pension Benefits** | $2,221,977 | $2,157,593 | $2,785,346 | $3,162,720 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

PR-CCD-0005589

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

|  | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Participating Employees | $129,888 | $136,305 | $127,566 | $127,809 |
| Employer | 118,127 | 125,165 | 117,065 | 116,320 |
| Contributions transferred from other systems** | 1,265 | 1,479 | 4,181 | 12,396 |
| Special | 46,572 | 75,548 | 68,085 | 57,960 |
| Total contributions | 295,852 | 338,497 | 316,897 | 314,485 |
| Investment Income: | | | | |
| Interest income | 61,303 | 66,927 | 67,825 | 65,367 |
| Dividend Income | 10,111 | 13,194 | 15,629 | 13,654 |
| Net appreciation (depreciation) in fair value of investments | 203,265 | (518,862) | (276,573) | 406,131 |
|  | 274,679 | (438,741) | (193,119) | 485,152 |
| Less investment expense | 4,735 | 4,660 | 6,847 | 6,217 |
| Net investment income | 269,944 | (443,401) | (199,966) | 478,935 |
| Other income | 52,454 | 2,444 | 1,735 | 1,299 |
| **Total additions** | $ 618,250 | ($131,794)) | $ 118,666 | $ 794,719 |
| **DEDUCTIONS:** | | | | |
| Benefit paid to participants: | | | | |
| Annuities and death benefits | 470,683 | 442,542 | 414,334 | 364,998 |
| Special benefits | 47,870 | 51,951 | 49,742 | 45,564 |
| Refunds of contributions | 7,847 | 5,313 | 6,427 | 5,447 |
| Administrative expenses | 27,466 | 25,485 | 25,537 | 22,877 |
| **Total deductions** | 553,866 | 525,291 | 496,040 | 438,886 |
| Net increase in net assets held in trust for pension benefits | 64,384 | (627,753) | (377,374) | 355,833 |
| **Net assets held in trust for pension benefits** | | | | |
| Beginning of year | 2,157,593 | 2,785,346 | 3,162,720 | 2,806,887 |
| **End of year** | $2,221,977 | $2,157,593 | $2,785,346 | $3,162,720 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-92

PR-CCD-0005590

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

| ASSETS | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| Cash and Investments: | | | | |
| Cash and Cash Equivalents | $ 4,007 | $3,985 | $ 2,519 | $ 2,735 |
| Cash Deposited with GDB or Treasury Department: | 30 | 2,353 | 267 | 197 |
| Collateral from Securities Lending | 2,474 | 1,482 | | |
| Total Cash | 6,511 | 7,820 | 2,786 | 2,932 |
| | | | | |
| Receivables: | | | | |
| Accrued Interest | 271 | 215 | 237 | 237 |
| Investment Sales | 41 | 117 | 196 | 179 |
| Other | 27 | 28 | 25 | 86 |
| Total receivables | 339 | 360 | 458 | 502 |
| | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 25,973 | 22,805 | 22,169 | 20,728 |
| Stocks | 50,275 | 44,634 | 61,377 | 68,654 |
| Total Investments | 76,248 | 67,439 | 83,546 | 89,382 |
| | | | | |
| Loans and Interest Receivable from Members: | | | | |
| Mortgage | 20 | 8 | 8 | 17 |
| Personal | 702 | 462 | 394 | 195 |
| Cultural Trips | 46 | 60 | 45 | 44 |
| Total Loans to Plan Members | 768 | 530 | 448 | 256 |
| | | | | |
| Total cash, investments and loans to plan members | 83,866 | 76,149 | 87,239 | 93,072 |
| | | | | |
| LIABILITIES | | | | |
| Due to Treasury Department | 5,841 | 4,513 | -- | 5,415 |
| Due to the Employee's Retirement System of the Government of Puerto Rico | 19,138 | 17,942 | 16,714 | 5,113 |
| Collateral from Securities ending | 2,474 | 1,482 | | |
| Escrow Funds to plan Members and Guarantee Insurance | 62 | 59 | 56 | 53 |
| Investment Purchases | 869 | 867 | 345 | 180 |
| Other Liabilities | 72 | 720 | 812 | 838 |
| Total Liabilities | 28,456 | 25,583 | 17,927 | 11,599 |
| | | | | |
| Net Assets Held in trust for Pension Benefits | $ 55,410 | $ 50,566 | $ 69,311 | $ 81,473 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-93

PR-CCD-0005591

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

|  | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $ 10,021 | $9,970 | $6,705 | $6,632 |
| Participating employees | 3,104 | 3,138 | 3,076 | 2,828 |
| Special Laws | 629 | 691 | | |
| Total Contributions | 13,754 | 13,799 | 9,781 | 9,460 |
| | | | | |
| Investment Income: | | | | |
| Realized Gain or Loss | 5,644 | (3,158) | 1,031 | 1,484 |
| Unrealized Gain | 1,741 | (13,582) | (8,988) | 10,954 |
| Dividend Income | 211 | 218 | 267 | 224 |
| Interest Income | 1,284 | 1,313 | 1,553 | 1,447 |
| | | | | |
| Total | 8,880 | (15,209) | (6,137) | 14,110 |
| Less Investment Expense | 164 | (170) | (197) | (192) |
| Other Income | 804 | 50 | -- | 1 |
| Net Investment Income | 9,520 | (15,329) | (6,333) | 13,918 |
| | | | | |
| Total Additions | 23,274 | (1,530) | 3,448 | 23,378 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 17,268 | 15,538 | 14,419 | 13,461 |
| Benefits Under Special Laws | 629 | 691 | | |
| Refunds to Participating Employees | -- | -- | 169 | 38 |
| Administrative Expenses | 533 | 986 | 1,022 | 1,255 |
| Total Deductions | 18,430 | 17,215 | 15,610 | 14,754 |
| | | | | |
| Net Increase | 4,844 | (18,745) | (12,162) | 8,624 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 50,566 | 69,311 | 81,473 | 72,849 |
| | | | | |
| **End of Year** | $55,410 | $50,566 | $69,311 | $81,473 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-94

PR-CCD-0005592

## POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

In addition to the pension benefits, the Commonwealth provides non-pension post-employment benefits that consist of a medical insurance plan contribution for retired employees meeting the service credit eligibility requirements. These benefits are administered by the Retirement Systems. The medical insurance plan contribution is a payment of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

The Commonwealth funds these post-employment benefits on a "pay-as-you-go" basis from the General Fund, which means that the Commonwealth does not pre-fund, or otherwise establish a reserve or other pool of assets against the medical insurance plan contribution expenses that the Commonwealth may incur in future years. For fiscal year 2010, the Commonwealth paid $114.2 million for these benefits for the eligible retirees of the Retirement Systems (including retirees of public corporations and municipalities, which are also paid for by the Commonwealth). For fiscal year 2011, these benefits are expected to amount to $122.2 million.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The most recent actuarial valuation reports of these benefits are dated as of June 30, 2009. The Retirement Systems are currently evaluating the preliminary results of new actuarial valuations as of June 30, 2010. Many of the actuarial assumptions used to project the actuarial accrued liability for these benefits are the same as those used to determine the accrued actuarial liabilities of the Retirement Systems. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### Actuarial Valuations as of the Indicated Fiscal Years
#### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | - | $1,567 | $1,567 | 0% | $4,246 | 37% |
| 2009 | - | 1,633 | 1,633 | 0 | 4,293 | 38 |
| 2010[2] | - | 1,646 | 1,646 | 0 | 3,818 | 43 |
| **Teachers Retirement System** | | | | | | |
| 2007 | - | $652 | $652 | 0% | $1,370 | 48% |
| 2009 | - | 750 | 750 | 0 | 1,418 | 53 |
| 2010[2] | - | 694 | 694 | 0 | 1,370 | 51 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | - | $5 | $5 | 0% | $31 | 15.0% |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010[2] | - | 6 | 6 | 0 | 32 | 18.1 |

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

[2] Preliminary.

PR-CCD-0005593

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits other than pensions administered by each of the Retirement Systems' for the last three fiscal years and the current fiscal year.

## Schedule of Employer Contributions to Retirement Systems on Account of Post-Employment Benefits Other Than Pensions
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $111 | $80 | $31 | 72.1% |
| 2009 | 112 | 87 | 25 | 77.7 |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 128 | 90 | 38 | 70.3 |
| **Teachers Retirement System** | | | | |
| 2008 | $37 | $26 | $11 | 70.6% |
| 2009 | 38 | 28 | 10 | 73.1 |
| 2010 | 42 | 28 | 14 | 66.7 |
| 2011 | 40 | 32 | 8 | 80.7 |
| **Judiciary Retirement System** | | | | |
| 2008 | $0.4 | $0.2 | $0.2 | 55.4% |
| 2009 | 0.4 | 0.3 | 0.1 | 62.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 61.6 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.5 |
| **Total** | | | | |
| 2008 | $148.4 | $106.2 | $42.2 | 71.6% |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 168.5 | 122.3 | 46.2 | 72.6 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2009 and, in the case of fiscal year 2011, the preliminary actuarial valuations as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the expected pay-as-you-go amounts for the post-employment benefits other than pensions, as set forth in the preliminary actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

## COMMONWEALTH AUDITED FINANCIAL STATEMENTS

### General

For fiscal year 2009, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of the Public Buildings Authority capital project fund and certain activities, funds and component units identified separately in its report dated October 22, 2010 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Pension Trust Funds whose fair values have been estimated in the absence of readily determinable fair values and the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2009). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements

PR-CCD-0005594

pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth ("CAFR") for fiscal year 2009, which includes the basic financial statements of the Commonwealth for fiscal year 2008, was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through its Electronic Municipal Markets Access System ("EMMA") on October 25, 2010. The Commonwealth's basic financial statements for fiscal year 2010 are being audited by Deloitte & Touche LLP and are expected to be filed with the MSRB through EMMA on or before May 1, 2011.

**Prior Non-Compliance with Continuing Disclosure Obligations**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for such Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Report, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such

PR-CCD-0005595

new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of the Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements. For the fiscal year 2010 audit, Treasury and the auditors are holding weekly status meetings regarding the fiscal year 2010 financial statements.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2006, 2007, 2008, 2009 and the estimated revenues and expenditures for fiscal year 2010. Once the audited financial statements have been completed, the Commonwealth will provide the General Fund revenue and expenditure data for fiscal year 2010. The numbers for fiscal year 2010 have not been audited and are subject to audit related adjustments.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used

PR-CCD-0005596

to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal years 2010 and 2011 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

PR-CCD-0005597

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2006 | 2007 | 2008 | 2009 | 2010* |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | 3,087,748 | 3,071,655 | 2,759,305 | 2,648,261 | 2,574,707 |
| Corporations | 1,872,458 | 2,002,718 | 1,565,534 | 1,375,596 | 1,677,691 |
| Partnerships | 2,787 | 2,960 | 1,942 | 1,839 | 1,589 |
| Withheld from non-residents | 921,260 | 933,728 | 1,087,782 | 1,081,739 | 830,350 |
| Tollgate taxes | 27,396 | 25,083 | 21,610 | 19,372 | 15,034 |
| Interest | 11,536 | 12,112 | 13,657 | 11,738 | 9,901 |
| Dividends | 66,721 | 138,859 | 59,770 | 48,663 | 29,774 |
| Total income taxes | 5,989,906 | 6,187,115 | 5,509,600 | 5,187,208 | 5,139,046 |
| Sales and use tax | | 582,560 | 911,000 | 797,194 | 538,902 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 292,180 | 279,028 | 268,094 | 277,401 | 284,796 |
| Cigarettes | 135,267 | 132,399 | 119,124 | 129,429 | 182,501 |
| Motor vehicles | 533,957 | 396,667 | 366,341 | 310,920 | 344,424 |
| Other excise taxes | 682,477 | 314,340 | 110,014 | 86,874 | 77,886 |
| Total Commonwealth excise taxes | 1,643,881 | 1,122,434 | 863,573 | 804,624 | 889,607 |
| Property taxes | 1,106 | 800 | 219 | 1,011 | 227,533 |
| Inheritance and gift taxes | 9,466 | 4,663 | 6,600 | 5,064 | 3,617 |
| Licenses | 91,310 | 97,610 | 87,690 | 96,423 | 95,291 |
| **Other:** | | | | | |
| Lottery | 62,729 | 73,014 | 46,636 | 51,480 | 45,576 |
| Electronic lottery | 55,212 | 71,815 | 105,298 | 75,213 | 80,007 |
| Miscellaneous non-tax revenues | 431,803[6] | 330,064 | 466,741 | 284,436 | 318,819 |
| Total Other | 549,744 | 474,893 | 618,675 | 411,129 | 770,843 |
| Total revenues from internal sources | 8,285,413 | 8,470,075 | 7,997,357 | 7,302,653 | 7,338,398 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[1] | 346,272 | 377,872 | 356,827 | 404,265 | 352,301 |
| Customs | 9,553 | 14,504 | 4,846 | 3,269 | - |
| Total revenues from non-Commonwealth sources | 355,825 | 392,376 | 361,673 | 407,534 | 352,301 |
| Total revenues | 8,641,238 | 8,862,451 | 8,359,030 | 7,710,187 | 7,690,699 |
| Other Income (refunds)[2] | 76,085 | (8,335) | (10,797) | 148,966 | (142,678)[8] |
| (Transfer) Refunding to Redemption Fund[3] | (484,812) | (512,197) | (202,954) | (607,305) | (403,617) |
| Proceeds of notes and other borrowings[4] | 4,115,897[7] | 1,872,096 | 2,710,000 | 3,982,893 | 2,375,000 |
| Repayment of notes and other borrowings[5] | (3,005,838) | (1,926,273) | (2,580,764) | (3,858,393) | (2,302,237) |
| Receipt of COFINA Bond Proceeds | | | | 3,051,008 | 2,104,372[9] |
| Adjusted revenues | 9,342,570 | 8,287,742 | 8,274,515 | 10,427,356 | 9,321,539 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,944,349 | 3,387,199 | 3,471,922 | 3,117,817 | 3,591,186 |
| Personal services | 4,796,382 | 4,590,962 | 4,563,192 | 5,273,590 | 4,352,537 |
| Other services | 525,377 | 594,345 | 685,112 | 859,323 | 815,636 |
| Materials and supplies | 50,227 | 79,186 | 99,486 | 109,386 | 73,072 |
| Equipment purchases | 19,378 | 27,965 | 49,498 | 51,204 | 43,528 |
| Capital outlays and other debt service | 49,789 | 21,576 | 11,222 | 211,499 | 100,117 |
| Prior year disbursements | | 92,770 | - | - | - |
| Total expenditures | 9,385,503 | 8,794,003 | 8,880,432 | 9,622,818 | 8,976,076 |
| Adjusted revenues less expenditures | (42,933) | (506,261) | (605,917) | 804,538 | 345,463 |
| Ending cash balance | 0 | (506,261) | (1,112,178) | (307,640) | 37,823 |

* Preliminary.
(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.
(2) Consists of net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(3) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.
(7) Includes $50 million from the Emergency Fund used for operating expenses.
(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.
(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund

*Source:* Treasury Department

I-100

PR-CCD-0005598

*Preliminary General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009.*

Preliminary General Fund total revenues for fiscal year 2010 were $7.691 billion, representing a decrease of $19.5 million from fiscal year 2009 revenues and an increase of $21 million from budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $258.3 million due to the increased allocation of this tax to COFINA, as discussed in "Major Sources of General Fund Revenues – Sales and Use Taxes" below. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $226.5 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act 7. See "Major Sources of General Fund Revenues – Income Taxes" below. Preliminary revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Preliminary total General Fund expenses (on a cash basis) for fiscal year 2010 amounted to $9.380 billion, which were composed of $8.976 billion of operational expenses and $403.6 million transferred to the redemption fund. The difference between preliminary revenues and expenses for fiscal year 2010 of $1.3 billion was covered principally by proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2009 Compared to Fiscal Year 2008*

General Fund total revenues for fiscal year 2009 were $7.710 billion, representing a decrease of $648.8 million, or 7.8%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $111 million and in corporate income taxes of $189.9 million, (ii) a decrease of $58.9 million in excise taxes, (iii) a decrease of $182.3 million in miscellaneous non-tax revenues, and (iv) a decrease of $113.8 million in the sales and use tax revenues due primarily to a one-time change in the manner sales and use tax collections are reported by the Treasury Department. Please refer to "Major Sources of General Fund Revenues – Sales and Use Taxes" below for further information regarding this reporting change. The decreases in revenues in these categories for fiscal year 2009 as compared to fiscal year 2008 reflect the acceleration of the economic recession during that fiscal year.

Total General Fund expenses (on a cash basis) for fiscal year 2009 amounted to $10.230 billion, which were composed of $9.623 billion of operational expenses and $607 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2009 of $2.5 billion was covered principally by proceeds from COFINA bond issues.

*Fiscal Year 2008 Compared to Fiscal Year 2007*

Total General Fund revenues for fiscal year 2008 were $8.359 billion, representing a decrease of $234.4 million, or 2.7%, from actual revenues for fiscal year 2007 (excluding the collection of $269 million from special temporary tax measures in fiscal year 2007). The major changes from fiscal year 2007 were: (i) decreases in income taxes from individuals of $312.4 million and in corporate income taxes of $437.2 million, (ii) a decrease of $258.9 million in

PR-CCD-0005599

excise taxes, and (iii) an increase of $328.4 million in the sales and use tax revenues, which had only been in effect for seven and a half months during fiscal year 2007. The decrease in 2008 revenues was principally due to the ongoing economic recession and high oil prices, which directly affected income and excise tax collections.

Total General Fund expenses (on a cash basis) for fiscal year 2008 amounted to $9.083 billion, which were composed of $8.880 billion of operational expenses and $203 million transferred to the redemption fund. The difference between adjusted revenues and expenses for fiscal year 2008 of $605.9 million was covered principally by cash-management procedures such as delaying payments to certain vendors and a GDB loan of $190 million.

*Fiscal Year 2007 Compared to Fiscal Year 2006*

General Fund total revenues for the fiscal year 2007 were $8.862 billion, an increase of $221 million, or 2.6%, from fiscal year 2006. This amount includes (i) $5.074 billion in individual and corporate income taxes, (ii) $934 million in non-resident withholding taxes, (iii) $1.122 billion in excise taxes, (iv) $583 million of sales and use tax revenues, and (v) $269 million from special temporary tax measures. A decrease of $521 million in excise taxes was offset by revenues from the sales and use tax, as the repeal of the general excise tax on imported goods and goods manufactured in Puerto Rico was replaced with the sales and use tax commencing on November 15, 2006.

Total General Fund expenses (on a cash basis) for fiscal year 2007 were $9.306 billion. This amount does not include $522 million of debt service payments on a portion of the Commonwealth's outstanding appropriation debt, which debt service was excluded from the budget based on the provisions of Act 91, which created the Dedicated Sales Tax Fund to service in part the repayment of such appropriation debt.

The difference between revenues and expenses for fiscal year 2007 of $444 million was covered by a $240 million transfer of funds from GDB that was originally set aside from General Fund appropriations to cover a portion of debt service payments on the Commonwealth's appropriation debt, which set-aside was no longer needed on account of the passage of Act 91. The remaining shortfall was covered principally by cash-management procedures such as delaying payments to certain vendors (carrying over into fiscal year 2008).

**Major Sources of General Fund Revenues**

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Internal Revenue Code for a New Puerto Rico, Act No. 1 of January 31, 2011, which will apply for taxable years commencing after December 31, 2010 ("Act No. 1"). See "Tax Reform" below. Many of the provisions of Act No. 1 are identical to the equivalent provisions of the PR Code. Thus unless otherwise noted, the discussion below refers to the provisions of both the PR Code and Act No. 1.

PR-CCD-0005600

The PR Code imposed a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax was imposed on certain payments made to non-residents of Puerto Rico, which was collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000. Under Act No. 1, the highest income tax bracket gradually increases every year for the next six years from $60,000 to $121,500. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under Act No. 1. After January 1, 2016, the top individual rate is lowered to 30%. See "Tax Reform" below for certain requirements that must be satisfied in order for tax benefits under Act No. 1 to enter into effect for taxable years starting after December 31, 2013. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at an income tax rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at an income tax rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for an income tax rate of 10%.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the PR Code provided for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, were taxed at a maximum regular income tax rate of 15%. Under Act No. 1, for taxable years commencing after December 31, 2010, the highest corporate income tax rate is lowered to 30% for net taxable income in excess of $1,750,000 (it will be reduced to 25% for taxable years starting after December 31, 2013 subject to the satisfaction of certain conditions) and the alternative minimum tax is also reduced from a rate of 22% to the greater of (i) the amount produced by applying a minimum rate of 20% to the alternative minimum net income or, (ii) subject to certain exceptions, the amount produced by applying a 1% excise tax on the purchase from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $50 million or more during any of three preceding taxable years. Dividends received by Puerto Rico corporations and partnerships from foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general

PR-CCD-0005601

income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations and partnerships covered by the Tourism Development Act are subject to a maximum tax rate of 39% on their taxable income after applying the 90% exemption granted under the Tourism Development Act, which results in a maximum effective tax rate of 3.9% on their net tourism development income. Under Act No. 1, the net income of corporations and partnerships covered under the Tourism Development Act is subject generally to a maximum effective tax rate of 3%.

The PR Code generally imposes a branch profits tax on resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding.

*Act No. 7 – Special Tax Measures Implemented as part of the New Administration's Fiscal Stabilization Plan.* Act 7 was enacted as part of the new administration's Fiscal Plan, and sought, among other things, to increase the tax revenues of the Puerto Rico government by imposing certain permanent and temporary tax increases.

With respect to income taxes, Act 7 included the following temporary measures that are applicable for taxable years commenced after December 31, 2008 and before January 1, 2012:

(i) taxable corporations and individuals whose adjusted gross income equal or exceeds $100,000 (for single individuals) or $150,000 (in the case of married persons filing jointly) are subject to a surtax of 5% on their total tax liability (for

I-104

PR-CCD-0005602

taxable years commencing after December 31, 2010, Act No. 1 eliminates this surtax);

(ii)     international banking entities that do not operate as bank units will be subject to a 5% income tax on their entire net income computed in accordance with the PR Code (international banking entities operating as bank units are subject to this 5% tax on their net income that does not constitute excess net income);

(iii)    credit unions, their subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7), however, if the Government of Puerto Rico collects $690 million prior to January 1, 2012, the 5% tax will not be applicable for the remaining period;

(iv)    the Cooperative Bank, its subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7);

(v)     insurance cooperatives are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7); and

(vi)    international insurers and holding companies of international insurers are subject to a 5% tax on their net income (these entities were totally exempt before the enactment of Act 7).

Act 7 also provided as a permanent measure a change in the method of computing the net income subject to alternative minimum tax ("AMT") in the case of individuals by including in the computation various categories of exempt income and income subject to preferential tax rates under the PR Code, such as: (a) long-term capital gains, which enjoy a preferential tax rate of 10% under the PR Code; (b) dividends that are taxable at the rate of 10% under the PR Code; (c) interest on bank deposits and individual retirement accounts subject to the special 10% and 17% preferential income tax rates, respectively; and (d) interest from notes or bonds eligible for the special 10% tax rate provided by the PR Code.

Another change introduced by Act 7, for taxable years commenced after December 31, 2008 and before January 1, 2012 was an adjustment to the calculation of the net income subject to the AMT in the case of entities taxed as corporations that denies a deduction for expenses paid or accrued for services rendered outside of Puerto Rico by a related party. Lastly, different income tax credits awarded to investors under certain special laws for activities such as revitalization of urban centers (only in part), venture capital, solid waste, housing infrastructure, and rehabilitation of social-interest housing (only projects without qualification certifications as of March 9, 2009), among others, may not be claimed or granted for taxable years commenced after December 31, 2008 and before January 1, 2012. Tax credits associated to manufacturing, tourism, and cinematographic projects, however, were not affected by Act 7.

PR-CCD-0005603

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform consists of two phases focused on providing tax relief to individual and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform is projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The first phase, enacted as Act No. 171 of November 15, 2010, applies to the 2010 tax return and provides a tax credit to each individual and corporate taxpayer. The tax credit applicable to individuals and determined by reference to the tax liability ranges from 7% for those taxpayers in higher brackets to 15% for taxpayers in the lowest bracket. Corporate taxpayers will also be entitled to a 7% tax credit determined by reference to the tax liability; provided, that such taxpayer paid the statutorily required Christmas bonus for 2010. Also, the corporate net operating loss carryforward is extended from 7 years to 10 years. This first phase is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010.

The second phase, enacted as Act No. 1, (i) promotes employment by doubling the earning income credit and increasing the maximum applicable income to qualify for such credit; (ii) provides a $400 tax credit to individuals over 65 years of age with an income below $15,000; (iii) significantly reduces individual income tax rates and only allow the following five deductions (a) mortgage interest up to 30% of adjusted gross income, (b) charitable contributions up to 50% of adjusted gross income, (c) medical expenses in excess of 6% of adjusted gross income, (d) interest on student loans, and (e) contributions to retirement plans and accounts, including individual retirement accounts, health savings accounts and education savings accounts; and (iv) significantly reduces corporate income tax rates.

The reduction in income tax revenues resulting from the implementation of the tax reform is expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures is expected to be revenue positive. Act No. 1 conditions the implementation of the tax reductions applicable to individuals and corporations after fiscal year 2014 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals and corporations for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. There is no assurance that sufficient revenues will be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform.

I-106

PR-CCD-0005604

*Act 154 – Expanded Income Taxation and New Excise Tax.*  Act 154, approved on October 25, 2010, as amended, seeks, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Government.  Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships (each a taxpayer) by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and the act imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico.  Act 154 applies to income realized and acquisitions occurring after December 31, 2010.

The Act provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group.  Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, will instead be subject to the excise tax in lieu of any income tax.  The excise tax will apply for a period of six years.  The excise tax is based on the value of the personal property or services acquired and will be 4% for calendar year 2011, declining to 3.75% in 2012, 2.75% in 2013, 2.5% in 2014, 2.25% in 2015 and 1% in 2016.  On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax.  These regulations became effective on January 1, 2011.  The first monthly excise tax payment is due on February 15, 2011.  The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions.  The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics.  The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

While the Government expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their U.S. federal income tax liabilities, it is uncertain how this new tax will affect each individual taxpayer.  The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

Since Act 154 became effective on January 1, 2011, there can be no assurance as to the amount of revenues that will be collected by its application.

In connection with the expansion of the income tax and the imposition of the new excise tax, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes.  The opinion concludes that the excise tax should be creditable against U.S. federal income tax.  That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce clause, for reasons discussed therein.  Act 154 has not been challenged in court; consequently, no court has not passed on the

I-107

constitutionality of Act 154. There can be no assurance that constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as content in a manufactured good, whether or not bound for export.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department has reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

I-108

PR-CCD-0005606

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated total annual gross revenues for the General Fund of approximately $539 million for fiscal year 2010.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7 require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid on merchandise acquired for resale that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages, the increase ranges between $0.30 and $0.70 per standard gallon. Motor vehicles, motorcycles, all terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10%.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

PR-CCD-0005607

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

One of the amendments incorporated in Act 7 was that, for fiscal years 2010 through 2013, the appraisal values of real property in Puerto Rico were increased tenfold and the real personal property tax rates applicable to such values were reduced tenfold so as to offset any increased tax that would have otherwise been applicable due to the increase in appraisal values. This temporary amendment, which is expected to be revenue neutral, was intended to increase the borrowing capacity of Puerto Rico's municipalities.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax will apply during fiscal years 2010, 2011 and 2012, or until $690 million is collected. The additional real property tax, to be collected by the Treasury Department, will be equal to 0.591% of such properties' appraised value as determined by CRIM. Act No. 1 eliminated this additional real property tax for fiscal year 2012.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2005 to 2009.

### Commonwealth of Puerto Rico
### Assessed Valuations and Real and Personal Property Taxes
### (Commonwealth and Municipalities Combined)
### (in thousands)

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2005 | 25,277,795 | 899,893 | 738,074 | 50,751 | 788,825 |
| 2006 | 25,606,121 | 925,618 | 801,497 | 70,908 | 872,405 |
| 2007 | 26,898,519 | 982,400 | 813,700 | 79,720 | 893,420 |
| 2008 | 27,941,285 | 1,031,277 | 788,364 | 119,062 | 907,426 |
| 2009 | 28,903,996 | 1,032,570 | 634,040 | 244,411 | 878,451 |

[1] Valuation set as of July 1 of each fiscal year.
[2] During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM. In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source:* Municipal Revenues Collection Center.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

I-110

PR-CCD-0005608

*Revenues from Non-Commonwealth Sources*

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products or new rum distilleries are established in Puerto Rico.

In an effort to maintain the local rum industry and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act 178 and contains identical provisions.

The Government of Puerto Rico is in discussions with certain rum producers to provide them a series of subsidies and incentives, as permitted under Act No. 1, in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this would allow such companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

I-111

PR-CCD-0005609

**Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes**

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to foster tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosures agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, the creation of technological solutions to improve collections, and the establishment of cooperation agreements with federal and local governmental agencies. The Treasury Department is also integrating its databases and establishing a tax intelligence project to identify tax evasion and improve its audit selection process.

Specifically, the Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Commonwealth sales tax through the implementation of various enforcement and compliance programs. Among these initiatives is a voluntary disclosure program, which began on July 1, 2009 and has since then allowed for the review of more than 75 cases and collection of approximately $29.5 million, by providing certain taxpayers the opportunity to pay taxes and interest owed on past income taxes and sales transactions and to avoid the payment of surcharges and penalties. During May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,000 letters and had received responses from 1,500 taxpayers. This initiative has resulted in an additional 171 cases of which 81 have been pre-qualified for participation in the program. The Treasury Department expects to collect approximately $30 million as a result of the program.

Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department is also in process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby officers from the Treasury Department use hand held scanning devices to cross-check merchant licenses with sales tax receipts. The Treasury Department has also created a specialized unit to implement a tax intelligence program that aims to detect tax evasion through the application of economic models and algorithms to the taxpayer information in the Treasury Department's database.

On September 28, 2010, the Treasury Department signed an agreement with Evertec, Inc. and Softek for the implementation of a new point of sale system to strengthen its sales tax enforcement efforts (the "IVU Loto"). The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets. The Treasury Department will implement this new point of sale system in two phases. The first phase entails a pilot program in which 200 businesses are expected to participate. Once the pilot

PR-CCD-0005610

program has concluded, a business certification program will take place followed by full scale implementation expected to begin in January 2011. The implementation of this new system is expected to increase sales tax collections by $100 million during the first year; $200 million during the second year and $400 million during the third year.

The IVU Loto pilot program started on December 1, 2010. Two hundred merchants in the municipality of Ponce were selected to participate in the program. As of January 10, 2011, the IVU Loto devices captured 608,949 transactions which resulted in sales of $16,942,914 and state and municipal sales and use tax withholdings of $592,280 and $115,467, respectively. On January 11, 2011, merchants filed their monthly sales and use tax returns for the month of December and the Treasury Department is in the process of comparing sales and use tax withholdings reported by the IVU Loto system with the information filed by merchants that participated in the pilot program. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants acquire and use an IVU Loto device on or prior to April 30, 2011.

Another initiative has focused on strengthening the Treasury Department's enforcement workforce. It has equipped a call center staffed by 105 tax collection agents, which began operations on February 24, 2010 and has produced approximately $11.7 million in collections. The Treasury Department has also increased staffing levels in its Enforcement and Compliance Bureaus by approximately 322 employees, therefore allowing an increase in unannounced field audits of businesses and merchants. The Treasury Department currently makes approximately 2,000 visits per month.

Other initiatives include the establishment of tax liens pursuant to the procedures of Act No. 12 of January 20, 2010, which enables the creation of tax liens through an expedited process. Since the enactment of Act No. 12, the Treasury Department has established 7,719 liens in favor of the Commonwealth over approximately $288 million in assets. The Treasury Department is also enforcing a provision of Act 7 that allows the Treasury Department to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month. Also, the Treasury Department will begin to seize the assets of businesses that are delinquent on their sales tax payments. In addition, the Treasury Department has entered into agreements with various municipalities to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts as the ones described above.

With respect to property taxes, Act 71 of July 2, 2010 ("Act 71") established a 120 day amnesty program available from August 16, 2010 until December 13, 2010, in which taxpayers may pay outstanding property tax debts with a discount of 100% of any penalties, interest and surcharges (the "Program"). Pursuant to Act 71 and CRIM's Administrative Order No. 2010-05, the Program is available with respect to taxable year 2008-2009 and previous years in the case of real property taxes, and for taxable year 2008 and previous years with respect to personal property taxes. To benefit from the Program the taxpayer must: (i) have paid property taxes for fiscal year 2009-2010 and the first semester of 2010-2011 in the case of real property taxes, and tax year 2009 in the case of personal property taxes; and (ii) certify to the CRIM that it will pay real and personal property taxes related to fiscal year 2010-2011.

PR-CCD-0005611

Act No. 172 of November 15, 2010, established that taxpayers which apply for a voluntary disclosure program on or before April 15, 2011 will be eligible for a 20% flat income tax rate on the gross amounts reported and will not be subject to interest, surcharges and penalty fees. This legislation extends the benefits of the program to municipal license tax declarations for which taxpayers will pay principal on the municipal tax determined, but will not be subject to interest, surcharges and penalty fees. Declarations by taxpayers must relate to tax years commenced after July 1, 2003 and ending on or before December 31, 2009, and payment of tax determined under the program must be paid no later than June 30, 2011.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

PR-CCD-0005612

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law reviewed to be reimbursed to the General Fund.

*Federal Grants*

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government are estimated to be $5.020 billion for fiscal year 2011, a decrease of $869 million, or 15%, from fiscal year 2010. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2007 through 2009 are actual figures. The figures for fiscal years 2010 and 2011 are the amounts included in the approved budget.

One of the sources of federal grants received by the Government, beginning on 2009, was ARRA. Puerto Rico expects to receive a total of approximately $6.966 billion in stimulus funds from ARRA, of which $508.9 million and $2.687 billion were disbursed by the government during fiscal years 2009 and 2010, respectively, and $2.442 billion are expected to be disbursed by the government during fiscal year 2011. The table below only included the portion of these funds disbursed by agencies whose accounting systems are centralized in the Treasury Department.

I-115

PR-CCD-0005613

## The Commonwealth of Puerto Rico
### Federal Grants*
### (in thousands)

| | 2007 | 2008 | 2009 | 2010[1] | 2011[2] |
|---|---|---|---|---|---|
| Education | $ 986,574 | $ 992,087 | $1,032,387 | $1,779,542 | $1,313,153 |
| Social Services | 1,923,845 | 2,054,897 | 3,033,365 | 2,536,021 | 2,473,611 |
| Health | 436,892 | 465,466 | 593,925 | 605,896 | 485,263 |
| Labor and Human Resources[3] | 183,228 | 140,186 | 277,267 | 216,189 | 128,080 |
| Crime | 29,631 | 20,319 | 21,377 | 74,197 | 29,238 |
| Housing[4] | 375,581 | 363,589 | 574,196 | 522,765 | 464,911 |
| Drug and Justice | 35,321 | 19,394 | 26,350 | 48,995 | 23,355 |
| Agriculture and Natural Resources | 12,484 | 11,054 | 12,625 | 30,043 | 38,171 |
| Contributions to Municipalities | 48,531 | 49,543 | 47,656 | 60,559 | 47,806 |
| Other | 17,095 | 15,782 | 17,803 | 15,068 | 16,355 |
| TOTAL | $4,049,182 | $4,132,317 | $5,636,951 | $5,889,275 | $5,019,943 |

* *Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.*

[1] Approved budget.
[2] Estimated.
[3] Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
[4] Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

### Office of Management and Budget

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch.  In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies.  In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1.  The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year.  The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies.  Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

PR-CCD-0005614

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to

PR-CCD-0005615

one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last two fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficits. As of December 28, 2010, the balance in the Budgetary Fund was $844,925

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of December 28, 2010, the balance in the Emergency Fund was $1.4 million and $0.5 million was available to be borrowed from GDB.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)     *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.*  These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)    *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

(iii)   *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)    *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources

I-118

for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

For fiscal year 2010, approximately 34% of the General Fund was committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to the Public Buildings Authority, and debt service on the direct debt of the Commonwealth. This proportion is expected to decrease to 29% in fiscal year 2011. For fiscal year 2010, approximately 48% of the controllable funds portion of the General Fund was committed for the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2010 and 2011.

### General Fund Expenses Breakdown
### (in millions)

|  | 2010[1] | 2011[2] |
|---|---|---|
| **Non-Controllable Expenses** | | |
| Mandated Expenses (Formula) | | |
| Contributions to Municipalities | $335 | $355 |
| University of Puerto Rico | 729 | 691 |
| Judicial Branch | 348 | 348 |
| Rent Payments to Public Buildings Authority | 297 | 217 |
| General Obligation Debt Service | 521 | 201 |
| Other Debt Service | 373 | 517 |
| Total of Non-Controllable Expenses | $2,603 | $2,329 |
| Percent of Total General Fund Expenses | 34% | 29% |
| | | |
| **Controllable Expenses** | $5,067 | $5,805 |
| Payroll and Related Costs[3] | 2,309 | 2,789 |
| Payroll as a Percentage of Controllable Expenses | 46% | 48% |
| | | |
| **Total General Fund Expenses** | $7,670 | $8,134 |
| | | |
| **Other Expenses** | | |
| Total Non-Budgeted Expenses | - | - |
| COFINA Stabilization Fund | $2,500 | $1,000 |
| | | |
| **Total Expenses** | $10,170 | $9,134 |

[1] Preliminary.
[2] Estimated.
[3] Excludes University of Puerto Rico and Judicial Branch.
Source: Office of Management and Budget

PR-CCD-0005617

## Budget for Fiscal Year 2010

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ended June 30, 2010.

### Commonwealth of Puerto Rico
### Summary of Central Government Annual Budget
### Fiscal Year Ended June 30, 2010
### (in thousands)*

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $230,000 | - | $115,657 | $345,167 |
| Personal income taxes | 2,614,000 | - | - | 2,614,000 |
| Retained non-resident income tax | 878,000 | - | - | 878,000 |
| Corporate income taxes | 1,556,000 | - | - | 1,556,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 11,000 | - | - | 11,000 |
| 17% withholding tax on interest | 16,000 | - | - | 16,000 |
| 10% withholding tax on dividends | 34,000 | - | - | 34,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 545,000 | - | - | 545,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 279,000 | - | - | 279,000 |
| Motor vehicles and accessories | 334,000 | - | - | 334,000 |
| Cigarettes | 177,000 | - | - | 177,000 |
| Other (excise taxes) | 86,000 | - | 638,453 | 724,453 |
| Licenses | 94,000 | - | - | 94,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 46,000 | - | - | 46,000 |
| Electronic lottery | 76,000 | - | - | 76,000 |
| Registration and document certification fees | 128,000 | - | - | 128,000 |
| Other | 203,000 | - | 403,920 | 606,920 |
| Total revenues from internal sources | 7,314,000 | - | 1,157,540 | 8,471,540 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 356,000 | - | - | 356,000 |
| Federal grants[1] | 0 | - | 5,889,275 | 5,889,275 |
| Customs | 0 | - | - | 0 |
| Total revenues from non-Commonwealth sources | 356,000 | - | 5,889,275 | 6,245,275 |
| Total revenues | 7,670,000 | - | 7,046,815 | 14,716,815 |
| Other: | | | | |
| Balance from previous year | 0 | - | 1,648,236 | 1,648,236 |
| Bonds authorized | 0 | 0 | - | - |
| Total other sources | 0 | 0 | 1,648,236 | 1,648,236 |
| Total resources | 7,670,000 | 0 | 8,695,051 | 16,365,051 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 714,269 | - | 57,640 | 771,909 |
| Education | 3,038,896 | - | 1,889,044 | 4,927,940 |
| Health | 1,361,284 | - | 603,533 | 1,964,817 |
| Welfare | 253,149 | - | 2,977,834 | 3,230,983 |
| Economic development | 127,305 | - | 108,436 | 235,741 |
| Public safety and protection | 490,235 | - | 133,066 | 623,301 |
| Transportation and communication | 93,294 | - | 83,724 | 177,018 |
| Housing | 9,975 | - | 312,892 | 322,867 |
| Contributions to municipalities | 369,727 | - | 13,709 | 383,436 |
| Special pension contributions | 313,626 | - | 0 | 313,626 |
| Debt service | 520,600 | - | 115,167 | 635,767 |
| Other debt service (appropriations) | 373,140 | - | 682,708 | 1,055,848 |
| Total appropriations – current expenses | 7,665,500 | - | 6,977,753 | 14,643,253 |
| Capital improvements | 4,500 | - | 250,278 | 254,778 |
| Total appropriations | 7,670,000 | - | 7,228,031 | 14,898,031 |
| Year-end balance | 0 | - | 1,467,020 | 1,467,020 |
| Total appropriations and year-end balance | $7,670,000 | - | $8,695,051 | $16,365,051 |

---

\* Totals may not add due to rounding.

(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.

*Sources: Treasury Department and Office of Management and Budget*

PR-CCD-0005618

Estimated revenues for fiscal year 2010 total $16.4 billion and projected General Fund Revenues total $7.7 billion. The principal changes in general fund revenues are accounted mainly by increases in property taxes (up $229 million), corporate income tax (up $191.7 million), excise taxes on motor vehicles and accessories (up to $19.6 million), cigarettes and alcoholic beverages (up $49.2 million), and decreases in sales and use taxes (down $349.9 million, due principally to the increase in the portion of the tax transferred to COFINA), retained non-resident income taxes (down $203.3 million), federal excise taxes on offshore shipments (down $39.7 million), and 10% withholding taxes on dividends (down $14.7 million).

Estimated expenses and capital improvements for the central government of all budgetary funds total $14.9 billion, a decrease of $2.0 billion from fiscal year 2009. General Fund expenditures are estimated to total $9.833 billion. The principal changes in General Fund expenditures by program in fiscal year 2010 compared to fiscal year 2009 are mainly attributable to increases in general obligation bonds debt service (up $255.4 million), and decreases in general government (down $1.5 billion), public safety and protection (down $1.2 billion), education (down $409.9 million), welfare (down $243.4 million), other debt service appropriations (down $195.8 million), health (down $194.2 million), economic development (down $55.6 million), transportation and communication (down $22.2 million), contributions to municipalities (down $18.5 million), and housing (down $17.7 million).

For fiscal year 2010, the government incurred an additional $2.2 billion in expenses, for a total of $9.833 billion in expenses. Approximately $2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the Fiscal Plan ($1 billion) and (ii) additional expenses ($1 billion) to be incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). These additional expenses are included in the consolidated budget of the Commonwealth and were covered from proceeds of COFINA bond issues.

PR-CCD-0005619

**Budget for Fiscal Year 2011**

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2011.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2011**
**(in thousands)\***

| | General Fund | Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|---|
| **Revenues from internal sources:** | | | | | |
| Property taxes | $340,000 | | | $115,743 | $455,743 |
| Personal income taxes | 2,812,000 | | | | 2,812,000 |
| Retained non-resident income tax | 851,500 | | | | 851,500 |
| Corporate income taxes | 1,657,000 | | | | 1,657,000 |
| Partnership income taxes | 3,000 | | | | 3,000 |
| Tollgate taxes | 5,000 | | | | 5,000 |
| 17% withholding tax on interest | 12,000 | | | | 12,000 |
| 10% withholding tax on dividends | 34,000 | | | | 34,000 |
| Inheritance and gift taxes | 5,000 | | | | 5,000 |
| Sales and use taxes | 604,000 | | | | 604,000 |
| **Excise taxes:** | | | | | |
| Alcoholic beverages | 283,000 | | | | 283,000 |
| Motor vehicles and accessories | 349,000 | | | | 349,000 |
| Cigarettes | 166,000 | | | | 166,000 |
| Other (excise taxes) | 116,000 | | | 617,500 | 733,500 |
| Licenses | 77,000 | | | | 77,000 |
| **Miscellaneous non-tax revenues:** | | | | | |
| Contributions from lottery fund | 52,000 | | | | 52,000 |
| Electronic lottery | 104,000 | | | | 104,000 |
| Registration and document certification fees | 131,000 | | | | 131,000 |
| Other | 188,000 | | | 373,940 | 561,940 |
| Total revenues from internal sources | 7,789,500 | | | 1,107,183 | 8,896,683 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes on off-shore shipments | 344,000 | | | 0 | 344,000 |
| Federal grants[1] | 0 | | | 5,019,943 | 5,019,943 |
| Customs | 0 | | | 0 | 0 |
| Total revenues from non-Commonwealth sources | 344,000 | | | 5,019,943 | 5,363,943 |
| Total revenues | 8,133,500 | | | 6,127,126 | 14,260,626 |
| **Other:** | | | | | |
| Balance from previous year | 0 | | | 1,467,020 | 1,467,020 |
| Bonds authorized | 0 | 1,000,000 | | 0 | 1,000,000 |
| Total other sources | 0 | 1,000,000 | | 1,467,020 | 2,467,020 |
| Total resources | 8,133,500 | 1,000,000 | 0 | 7,594,146 | 16,727,646 |
| **Appropriations:** | | | | | |
| **Current expenses:** | | | | | |
| General government | 725,284 | 152,725 | - | 49,387 | 927,396 |
| Education | 2,914,349 | 31,013 | - | 1,753,995 | 4,699,357 |
| Health | 1,500,061 | 77,635 | - | 517,592 | 2,095,288 |
| Welfare | 274,781 | 191,525 | - | 2,701,258 | 3,167,564 |
| Economic development | 199,115 | 53,866 | - | 117,019 | 370,000 |
| Public safety and protection | 1,009,443 | 420,991 | - | 85,937 | 1,516,371 |
| Transportation and communication | 88,232 | 52,142 | - | 64,312 | 204,686 |
| Housing | 4,003 | 18,481 | - | 351,451 | 373,935 |
| Contributions to municipalities | 365,510 | 1,622 | - | 956 | 368,088 |
| Special pension contributions | 334,553 | - | - | 0 | 334,553 |
| Debt service | 200,813 | - | - | 126,743 | 327,556 |
| Other debt service (appropriations) | 517,156 | - | - | 652,035 | 1,169,191 |
| Total appropriations – current expenses | 8,133,300 | 1,000,000 | - | 6,420,685 | 15,553,985 |
| Capital improvements | 200 | - | 0 | 219,439 | 219,639 |
| Total appropriations | 8,133,500 | 1,000,000 | 0 | 6,640,124 | 15,773,624 |
| Year-end balance | 0 | - | - | 954,022 | 954,022 |
| Total appropriations and year-end balance | $8,133,500 | $1,000,000 | $0 | $7,594,146 | $16,727,646 |

\* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

I-122

PR-CCD-0005620

On July 2, 2010, the Governor signed the Commonwealth's central government budget for fiscal year 2011. The budget provides for total resources of $15.8 billion and total General Fund revenues of $8.134 billion, compared to preliminary General Fund revenues of $7.691 billion for fiscal year 2010. The budgeted General Fund revenues of $8.134 billion include base revenues of $7.691 billion, $302.5 million from tax enforcement and compliance measures, $110 million in expected revenues from the implementation of the property tax appraisal provisions included in Act No. 71 of July 2, 2010, and $30 million in additional revenues from casinos.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2010 budget are accounted mainly by projected increases in personal income taxes (up $198 million), property taxes (up $110 million), corporate income tax (up $101 million), excise taxes on motor vehicles and accessories (up $15 million) and sales and use taxes (up $59 million), and projected decreases in retained non-resident income taxes (down $26.5 million) and federal excise taxes on offshore shipments (down $12 million).

The fiscal year 2011 budget provides for total expenditures of $9.134 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2011 are $9.134 billion, or 10.1%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $756 million, or 16.1%, lower than total expenditures of $10.890 billion for fiscal year 2009.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $15.8 billion, an increase of $875.6 million from fiscal year 2010 budgeted appropriations. The principal changes in General Fund expenditures by program in fiscal year 2011 compared to the fiscal year 2010 budget are mainly due to increases in public safety and protection (up $519.2 million), other debt service appropriations (up $144.0 million), health (up $138.8 million), economic development (up $71.8 million), welfare (up $21.6 million) and special pension contributions (up $20.9 million), and decreases in general obligation bonds debt service (down $319.8 million) and education (down $124.5 million).

### Differences between Budget and Basic Financial Statements

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

PR-CCD-0005621

(iii)    Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program.  Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

*General.*  The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations.  Under Act No. 104 of June 25, 1955, as amended ("Act 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act.  The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them.  There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation, as of June 30, 2009, the Commonwealth has included in its financial statements reported liabilities of approximately $621 million for awarded and anticipated unfavorable judgments.  While amounts claimed exceed $7 billion, such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment.  The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

*Constitutionality of Act 7.*  On April 13, 2009, a group of government employees along with labor organizations that represent governmental employees filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor of Puerto Rico and several agency heads.  In the complaint, the plaintiffs challenge the constitutionality of Act 7 and seek, among other relief, an injunction to stop the Government of Puerto Rico from implementing the cost-cutting provisions of Act 7, described above in "Fiscal and Economic Reconstruction—Expense Reduction Measures" under "The Economy."

On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint.  Plaintiffs have appealed the Court's decision.  The Government will continue to vigorously defend this case.  As discussed under "The Economy- Fiscal Stabilization and Economic Reconstruction", the Supreme Court of Puerto Rico has upheld the constitutionality of the

PR-CCD-0005622

provisions of Act 7 relating to employee dismissals and the administration continues with its implementation.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997. In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must make Medicaid "wraparound" payments to the health centers to cover the difference between the reimbursement they are owed and what they are paid by managed care organizations. The Court of Appeals of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the FQHCs certain grants received by these centers from the federal government. Currently, attorneys in the case filed in Commonwealth court are trying to determine the amounts due to FQHCs thereunder.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings. Since mid-2009, the parties have been presenting evidence before a Special Master in order to determine the precise amounts of payments due to the health centers.

As of June 30, 2010, the Commonwealth had accrued $147 million in its financial statements for this legal contingency. This contingency, however, only covers amounts claimed in the federal lawsuit in connection with the period from July 2006 through June 2009. According to various recent rulings in this case, the Department of Justice believes that the total ultimate liability to the Commonwealth in the federal lawsuit should not exceed $28 million. Notwithstanding the foregoing, any amounts not paid in connection with the resolution of the federal lawsuit must ultimately be paid in connection with the Commonwealth lawsuit. In addition, the Department of Health must continue to comply with the federal Medicaid statute which requires that wraparound payments be issued to FQHCs every three to four months. These wraparound payments equal approximately $10 million each quarter. The Commonwealth, however, is currently challenging in federal court the wraparound payment formula pursuant to which these amounts are determined.

*Special Education Students.* The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and

I-125

PR-CCD-0005623

were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court approved damages for the class as a whole. The Commonwealth appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least $5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs have approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. The Commonwealth has requested that plaintiffs provide a reasonable settlement amount in order to analyze and formally address the settlement proposal. As of the date of this Report, the Commonwealth has not received a formal settlement request from the plaintiffs.

As of June 30, 2009, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $5 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

PR-CCD-0005624

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

**GT** GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

Re:  $356,520,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
    Series 2011 A (General Obligation Bonds)

Dear Mr. Secretary:

    We have acted as bond counsel to the Commonwealth of Puerto Rico in connection with the issuance of the above-captioned bonds, dated the date of delivery thereof (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended (the "Act"), such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary") and approved by the Governor of the Commonwealth of Puerto Rico (the "Resolution"). We also have examined one of the Bonds as executed and authenticated.

    The Bonds are issued pursuant to the Act and the Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Resolution.

    Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

    Based on the foregoing, we are of opinion that, under existing law:

1.    The Act is valid.

2.    Said proceedings have been validly and legally taken.

3.    The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth of Puerto Rico for the payment of the principal of and the interest on the

II-1

PR-CCD-0005625

Bonds, to which the good faith, credit and taxing power of the Commonwealth of Puerto Rico are pledged.

4. Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth of Puerto Rico has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent the Commonwealth of Puerto Rico from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,


Greenberg Traurig, LLP


II-2

PR-CCD-0005626

APPENDIX III



# MUNICIPAL BOND
# INSURANCE POLICY

ISSUER:                                          Policy No.:      -N

BONDS:  $   in aggregate principal amount of     Effective Date:

                                                 Premium: $

     ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

     On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

     Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which        has        been        recovered        from        such        Owner        pursuant        to        the

III-1

PR-CCD-0005627

Page 2 of 2
Policy No.    -N

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.  "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment.  "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent.  From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM.  The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.  Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.    THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.) has caused this Policy to be executed on its behalf by its Authorized Officer.

ASSURED GUARANTY MUNICIPAL CORP.
(FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.)

By _____
Authorized Officer

(212) 826-0100

Form 500NY (5/90)

III-2



PR-CCD-0005629

Printed by: ImageMaster, Inc.

Exhibit 27 Page 1 of 180

# Exhibit 27

| | RATINGS: | Moody's: | A3 |
|---|---|---|---|
| NEW ISSUE - BOOK-ENTRY ONLY | See RATINGS | Fitch: | BBB+ |
| See "Book-Entry Only System" under THE BONDS | | S&P: | BBB |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$442,015,000**

**COMMONWEALTH OF PUERTO RICO**

**Public Improvement Refunding Bonds, Series 2011 C**

**(General Obligation Bonds)**

**Dated: Date of Delivery**                              **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2011. The Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2021 (July 1, 2016 in the case of the Bonds maturing on July 1, 2027, July 1, 2028, July 1, 2032, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037).

The scheduled payment of principal of and interest on the Bonds maturing July 1, 2026, July 1, 2027, July 1, 2028, July 1, 2032 bearing interest at a rate of 5.50%, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 17, 2011.

| **Morgan Stanley** | | | **Barclays Capital** |
|---|---|---|---|
| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citi** | **Goldman, Sachs & Co.** |
| **Jefferies & Company** | **J.P. Morgan** | **Ramirez & Co. Inc.** | **Raymond James** |
| **RBC Capital Markets** | **UBS Financial Services Incorporated of Puerto Rico** | | **Wells Fargo Securities** |
| BBVAPR MSD  FirstBank Puerto Rico Securities  Oriental Financial Services  Popular Securities  Santander Securities  VAB FINANCIAL | | | |

March 10, 2011

**$442,015,000**
**COMMONWEALTH OF PUERTO RICO**
**Public Improvement Refunding Bonds, Series 2011 C**
**(General Obligation Bonds)**

| Maturity Date July 1 | Principal Amount | Interest Rate | Yield/Price | CUSIP[*] |
|---|---|---|---|---|
| 2026[†] | $ 16,435,000 | 5.25% | 5.38% | 74514LWY9 |
| 2027[†] | 17,865,000 | 5.25 | 5.40 | 74514LXD4 |
| 2028[†] | 10,700,000 | 5.375 | 5.49 | 74514LXE2 |
| 2032 | 5,000,000 | 5.75 | 6.00 | 74514LXA0 |
| 2032 | 15,000,000 | 6.00 | 100.00 | 74514LXB8 |
| 2032[†] | 20,000,000 | 5.50 | 5.75 | 74514LXF9 |
| 2035 | 35,000,000 | 6.00 | 6.20 | 74514LWZ6 |
| 2036[†] | 40,000,000 | 6.00 | 100.00 | 74514LXC6 |
| 2037[†] | 105,000,000 | 5.75 | 6.00 | 74514LXG7 |
| 2040 | 50,000,000 | 6.50 | 6.25[‡] | 74514LWX1 |

$127,015,000   5.75% Term Bonds due July 1, 2036   -Yield 6.25%   CUSIP[*] 74514LXH5

---

[*] Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

[†] Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

[‡] Priced at the stated yield to the July 1, 2021 optional redemption date at a redemption price of 100%. See *Optional Redemption* under DESCRIPTION OF THE BONDS.

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

KENNETH D. MCCLINTOCK
*Secretary of State*

GUILLERMO SOMOZA COLOMBANI
*Secretary of Justice*

JESÚS F. MÉNDEZ
*Secretary of the Treasury*

JESÚS RIVERA SÁNCHEZ
*Secretary of Education*

MIGUEL ROMERO LUGO
*Secretary of Labor and
Human Resources*

DR. LORENZO GONZÁLEZ
*Secretary of Health*

JAVIER RIVERA AQUINO
*Secretary of Agriculture*

RUBÉN A. HERNÁNDEZ GREGORAT
*Secretary of Transportation
and Public Works*

JOSÉ R. PÉREZ-RIERA
*Secretary of Economic
Development and Commerce*

YANITSIA IRIZARRY
*Secretary of Family Affairs*

MIGUEL HERNÁNDEZ VIVONI
*Secretary of Housing*

DANIEL J. GALÁN KERCADÓ
*Secretary of Natural and
Environmental Resources*

LUIS G. RIVERA MARÍN
*Secretary of
Consumer Affairs*

HENRY NEUMANN ZAYAS
*Secretary of Sports and Recreation*

CARLOS M. MOLINA RODRÍGUEZ
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

PR-CCD-0005632

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.**

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and *Appendix III - Specimen Municipal Bond Insurance Policy.*

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

# TABLE OF CONTENTS

Page

INTRODUCTORY STATEMENT .............................................................................................1
OVERVIEW ..............................................................................................................................3
RECENT DEVELOPMENTS .....................................................................................................4
    Commonwealth's Structural Imbalance...................................................................................4
    Preliminary Result for the First Six Months of Fiscal Year 2011.............................................5
    Tax Reform.........................................................................................................................5
    Financial Condition of Retirement Systems ...........................................................................7
    Reduction in Expenditures through Early Retirement ..............................................................9
    Local Incentives for Rum Producers ......................................................................................9
    Recent Rating Actions ........................................................................................................10
    Appointment of New President of GDB and Director of OMB.................................................11
    Recent Bond Issue by the Commonwealth.............................................................................11
PLAN OF FINANCING............................................................................................................12
    Sources and Uses of Funds .................................................................................................12
THE BONDS ...........................................................................................................................13
    General .............................................................................................................................13
    Book-Entry Only System.....................................................................................................13
    Discontinuance of the Book-Entry Only System.....................................................................15
    Authorization.....................................................................................................................16
    Redemption........................................................................................................................16
    Notice of Redemption; Effect of Redemption .........................................................................17
    Security..............................................................................................................................18
    Payment Record..................................................................................................................19
    Debt Limitation..................................................................................................................20
    Maturity Limitation ...........................................................................................................22
BOND INSURANCE ................................................................................................................22
    Bond Insurance Policy .......................................................................................................22
    Assured Guaranty Municipal Corp.......................................................................................23
    Bond Insurance Provisions under the Bond Resolution...........................................................24
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ...........................................................25
    Public Sector Debt .............................................................................................................25
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ..........26
TAX MATTERS ......................................................................................................................27
    Discount Bonds ..................................................................................................................28
    Premium Bonds .................................................................................................................28
LEGAL MATTERS .................................................................................................................29
LEGAL INVESTMENT............................................................................................................29
UNDERWRITING ...................................................................................................................29
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ..............................................31
RATINGS................................................................................................................................32
CONTINUING DISCLOSURE ..................................................................................................32
    Continuing Disclosure Undertaking .....................................................................................32
    Prior Continuing Disclosure Non-Compliance ......................................................................35
MISCELLANEOUS..................................................................................................................36

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated February 10, 2011 ...........................................................................................I-1

Appendix II – Proposed Form of Opinion of Bond Counsel.......................................................II-1

Appendix III – Specimen Municipal Bond Insurance Policy .....................................................III-1

PR-CCD-0005634

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0005635

$442,015,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2011 C
## (General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $442,015,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 C (the "Bonds").

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the Governor of Puerto Rico on March 10, 2011. The Bonds are being issued to provide funds to repay advances made to the Commonwealth under a Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB") line of credit used to make deposits to the Commonwealth's Redemption Fund (as defined below) for the payment of interest on certain general obligation bonds and notes, as discussed under PLAN OF FINANCING.

The scheduled payment of principal of and interest on the Bonds maturing on July 1, 2026, July 1, 2027, July 1, 2028, July 1, 2032 bearing interest at a rate of 5.50%, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM"), as indicated on the inside cover of this Official Statement.

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated February 10, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*. The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, preliminary unaudited year-end results of fiscal year 2010, the budget for fiscal year 2011, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems, and certain litigation involving the Commonwealth, and should be read in its entirety.

The Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2009 was prepared by the Department of the Treasury of the Commonwealth (the

1

"Commonwealth's Annual Financial Report") and is incorporated by reference herein. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2009, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2009), dated October 22, 2010, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on October 25, 2010 (after the May 1, 2010 requirement discussed below) by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. The Commonwealth complies with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings, as discussed below.

2

In the case of the Commonwealth's Annual Financial Report for fiscal years 2006, 2007 and 2008, the Commonwealth failed to file such report by the May 1 continuing disclosure update deadline due to accounting rules changes and other reasons (mostly related to delays in receipt of component units' audited financial statements). For each fiscal year in which it did not comply with the filing deadline, the Commonwealth filed the Commonwealth's Annual Financial Report by the end of the first quarter of the following fiscal year. The Commonwealth's Annual Financial Report for the fiscal year ended June 30, 2009 was not filed prior to the continuing disclosure update deadline of May 1, 2010 due to delays in the engagement of and transition to new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. Such report was filed on October 25, 2010.

In the case of the Commonwealth Report, except for the Commonwealth Report relating to fiscal year ended June 30, 2008, the Commonwealth has timely filed such reports. The Commonwealth Report for the fiscal year ended June 30, 2008 was filed on June 1, 2009. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report and the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a

3

PR-CCD-0005638

voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2009 (which ended on June 30, 2009), the Commonwealth's gross national product (preliminary, in current dollars) was $62.8 billion, and personal income per capita (preliminary, in current dollars) was $14,905.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank. The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, preliminary unaudited year-end results of fiscal year 2010, the approved budget for fiscal year 2011, the debt of the Commonwealth's public sector, the fiscal situation of the Government's retirement systems, and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

Certain of the information appearing below is discussed in greater detail in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Structural Imbalance

Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and total expenditures. The structural imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total recurring revenues of $7.583 billion and total expenditures of $10.890 billion. The

4

administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. It is estimated that the deficit for fiscal year 2010 was approximately $2.1 billion and it is estimated that the deficit for fiscal year 2011 will be approximately $1.0 billion. The Government expects to present the budget for fiscal year 2012 in April 2011, which will be designed to advance the Government's efforts to reduce the deficit, and expects that the deficit for that fiscal year to be lower than for fiscal year 2011. See "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in *Appendix I*.

### Preliminary Results for the First Six Months of Fiscal Year 2011

Preliminary General Fund net revenues for the first six months of fiscal year 2011 (from July 1, 2010 to December 31, 2010) were $3.207 billion, a decrease of $207 million, or 6.06%, from $3.414 billion of net revenues for the same period in the prior fiscal year, and a decrease of $165 million, or 4.89%, from the original estimate of revenues of $3.372 billion made for budget purposes prior to the design and implementation of the tax reform described below. Preliminary General Fund net revenues for the month of December 2010 were $566 million, representing a decrease of $156 million, or 21.6%, from $722 million of revenues for December 2009.

The decrease in preliminary General Fund net revenues for the first six months of fiscal year 2011 and December 2010 is due mostly to the implementation of the first phase of the tax reform, which immediately granted taxpayers the benefit of the reduction in tax rates effected as part of the tax reform by eliminating the withholding required for wages paid to employees during December 2010: As a result of the implementation of the first phase of the tax reform, the Treasury Department had revised its December 2010 revenue estimate from $754 million to $560 million. Preliminary collections for December 2010 exceeded the Treasury Department revised estimate by approximately $6 million, or 1.07%.

The Treasury Department also reported that preliminary collections from corporate income taxes for December 2010 increased by $30 million, or 16.1%, compared to December 2009. Sales and use tax preliminary collections for December 2010 were $97.3 million, an increase of 2.3% compared to December 2009, and preliminary collections for January 2011 were $124 million, an increase of approximately 4.5% compared to January 2010.

The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154 (as defined below). The first monthly excise tax payment was due on February 15, 2011 and amounted to approximately $108.9 million, which is consistent with the Government's projection of annual collections from the excise tax. For more information on the tax reform and Act No. 154, see "Tax Reform" below.

See "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in *Appendix I*.

### Tax Reform

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at promoting economic growth and job

5

PR-CCD-0005640

creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to Puerto Rico's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed at a declining rate (from 4% for 2011 to 1% for 2016) on certain acquisitions from related parties, and (iv) an expansion of taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships that are members of controlled groups that have members that are engaged in manufacturing or production or manufacturing services in Puerto Rico. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154 of October 25, 2010, as amended ("Act No. 154"). In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six year period that the excise tax is in place.

6

The first monthly excise tax payment was due on February 15, 2011. The Treasury Department recently announced that preliminary collections for the first excise tax payment were $108.9 million. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Act No. 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with government appropriations. As of June 30, 2009, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.092 billion, $6.564 billion and $273 million, respectively, and the funded ratios were 9.8%, 24.7% and 15.6%, respectively. According to preliminary actuarial valuations as of June 30, 2010, the unfunded actuarial accrued liability of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System increased to $17.834 billion, $7.058 billion and $283 million, respectively, the funded ratios of the Employees Retirement System and Teachers Retirement System decreased to 8.5%

PR-CCD-0005642

and 23.9%, respectively, and the funded ratio of the Judiciary Retirement System increased to 16.4%.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $752 million, $274 million and $8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest preliminary actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three government retirement systems, in February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010. The individual recommendations made by the members of the special commission, which included increasing the amount of the employer and

PR-CCD-0005643

employee annual contributions and changing the benefits structure, are being analyzed with the intent of presenting a comprehensive, consensus legislation package during 2011. The Secretary of Labor, who chaired the special commission, is evaluating proposing additional employer contributions to improve the funding ratio, the impact of special laws that have provided additional retirement benefits, and the impact on the system's cash flow of prior increases in the amount that members may borrow from the systems under various loan programs.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems, see RETIREMENT SYSTEMS in *Appendix I*.

**Reduction in Expenditures through Early Retirement**

Act No. 70, approved by the Legislative Assembly on July 2, 2010, is designed to reduce government expenditures by providing an early retirement window for eligible employees (who opted to retire by January 14, 2011) under a formula that results in a positive actuarial impact for the government's retirement systems. Employees that elected to participate in the program will receive retirement benefits based on a lower salary and a lower pension rate than what they would otherwise have been entitled to if they had continued in their employment until full vesting, but at a higher rate than what they would be entitled to based on their current years of service. Approximately 2,398 employees opted for early retirement under Act No. 70.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $ 352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery

9

("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act 1 replaced Act No. 178 and contains identical provisions.

Pursuant to Act No. 178, the Government entered into a definitive agreement with one of the local rum producers providing it with certain subsidies and incentives and allowing it to benefit from the cover-over program rebate. The Government is also in discussions with certain other rum producers to provide them similar subsidies and incentives in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this would allow such other companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

**Recent Rating Actions**

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth of Puerto Rico (the "Commonwealth") general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook and assigned such rating to the Bonds. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measure that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

PR-CCD-0005645

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems.

**Appointment of New President of GDB and Director of OMB**

On February 16, 2011, the Governor announced the appointment of Juan Carlos Batlle as President of GDB and of José R. Otero-Freiría as Executive Vice President for Financing, each effective March 2, 2011. The appointment of Mr. Batlle and Mr. Otero-Freiría follows the resignation of Carlos M. García, the current President of GDB, and Fernando L. Batlle, the current Executive Vice President for Financing and Treasury, each of which will step down from their respective positions on March 1, 2011. In order to ensure an orderly transition for the new management team, Mr. García and Mr. Batlle will remain at GDB as the Chairman of the Board of Directors and as Special Aide to the President of the Board of Directors, respectively, until March 30, 2011.

Mr. Juan Carlos Batlle has approximately 15 years of experience in the banking industry, most recently serving as one of the top executives in the Santander Group's operations in Puerto Rico. Mr. Otero-Freiría has served in the Office of the Governor as Advisor to the Governor for Economic Development and Finance and Deputy Chief of Staff for Public Policy. He also has held top positions in the financial field at top U.S. and Puerto Rico companies.

The Governor also announced on February 16, 2011 the appointment of Mr. Juan Carlos Pavía as the new director of OMB. Mr. Pavía replaced Ms. Maritza Garay, who held the position since January 2011 on an interim basis. Mr. Pavía has served as Assistant Advisor to the Governor for Economic Development and Finance, Senior Advisor to the President of GDB, Executive Director of the Board of Fiscal Stability and Reconstruction and, most recently, as Executive Vice President and Fiscal Agent of GDB. Prior to his government service, Mr. Pavía was employed in the commercial banking field.

**Recent Bond Issue by the Commonwealth**

On February 17, 2011, the Commonwealth issued $356,520,000 of its Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds) (the "Series 2011 A Bonds") and terminated approximately $231 million of synthetic fixed rate swaps associated to the general obligation bonds refunded by the Series 2011 A Bonds.

11

PR-CCD-0005646

On March 2, 2011, the Commonwealth issued $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (General Obligation Bonds) (the "Series 2011 B Bonds"). The Series 2011 B Bonds were directly purchased by an institutional investor and the proceeds were used to refund on a current basis the Commonwealth's Public Improvement Refunding Bonds, Series 2007A-8, Series 2007A-9 and Series 2008 B.

## PLAN OF FINANCING

The Bonds are being issued to provide funds to (i) repay advances made to the Commonwealth under a GDB line of credit used to make deposits to the Commonwealth's Redemption Fund for the payment of interest (but not principal) due during fiscal year 2011 on certain general obligation bonds and notes, (ii) pay capitalized interest on the Bonds, and (iii) pay the cost of issuance of the Bonds.

### Sources and Uses of Funds

Sources:

| | |
|---|---:|
| Principal amount of the Bonds | $442,015,000.00 |
| Net Original Issue Discount | (12,849,202.45) |
| Total sources | $429,165,797.55 |

Uses:

| | |
|---|---:|
| Repayment of a GDB line of credit | $412,500,254.91 |
| Capitalized Interest | 7,440,113.06 |
| Underwriting discount and other financing expenses* | 9,225,429.58 |
| Total uses | $429,165,797.55 |

* Includes bond insurance premium, legal, printing and other financing expenses.

The Commonwealth routinely explores opportunities to restructure its debt to reduce debt service. The Commonwealth expects to issue from time to time additional Public Improvement Refunding Bonds to refund certain of its outstanding general obligation bonds. The Commonwealth is also considering refunding, converting or remarketing certain variable rate bonds and may terminate the interest rate exchange agreements related to any such refunded, converted or remarketed debt. If the Commonwealth decides to proceed with any or all of the aforementioned transactions, the refunding and termination of interest rate exchange agreements would be funded through the issuance of additional Public Improvement Refunding Bonds. No assurance can be given that the Commonwealth will refund, convert or remarket any of its outstanding general obligation bonds or terminate any interest rate exchange agreement in connection therewith.

In addition, subject to the approval of the Legislative Assembly, the Commonwealth expects to issue additional general obligation bonds to finance capital improvement projects.

PR-CCD-0005647

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities

PR-CCD-0005648

and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

14

PR-CCD-0005649

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

PR-CCD-0005650

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

## Authorization

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

## Redemption

The Bonds are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2021 (July 1, 2016 in the case of the Bonds maturing on July 1, 2027, July 1, 2028, July 1, 2032, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037), either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The Bonds maturing July 1, 2036 bearing interest at a rate of 5.75% are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2035, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

PR-CCD-0005651

## Amortization Requirements for the Bonds

| Year | Term Bonds due July 1, 2036 |
|------|-----------------------------|
| 2035 | $63,145,000 |
| 2036 | 63,870,000* |

\* Maturity

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

## Notice of Redemption; Effect of Redemption

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

17

PR-CCD-0005652

**Security**

*Provision for Payment of Public Debt*

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym) for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the

18

PR-CCD-0005653

Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010 and 2011, the Secretary of the Treasury satisfied his obligation to deposit moneys in the Redemption Fund by drawing on a line of credit provided by Government Development Bank. Commencing in fiscal year 2012, the Secretary of the Treasury will not be able to use borrowed funds to satisfy his obligation to make deposits in the Redemption Fund. On December 31, 2010, the amount on deposit in the Redemption Fund was $33.6 million, which was the required amount.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

PR-CCD-0005654

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with

20

issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in *Appendix I* for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of December 31, 2010.

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $957,900,517.25 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2008 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to

PR-CCD-0005656

which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($957,900,517.25) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $968,391,820.25, is equal to 13.23% of $7,320,525,500, which is the average of the adjusted preliminary internal revenues for the fiscal years ended June 30, 2009 and 2010. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 11.97%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% constitutional debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations* in *Appendix I*. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

As of September 30, 2010, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $198.7 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2010, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million. See "Commonwealth Guaranteed Debt" under *Debt* in *Appendix I*.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

**BOND INSURANCE**

**Bond Insurance Policy**

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix III to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

22

PR-CCD-0005657

**Assured Guaranty Municipal Corp.**

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA+" (stable outlook) by Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("S&P") and "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's"). An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

*Current Financial Strength Ratings*

On January 24, 2011, S&P published a Request for Comment: Bond Insurance Criteria (the "Bond Insurance RFC") in which it requested comments on its proposed changes to its bond insurance ratings criteria. In the Bond Insurance RFC, S&P notes that it could lower its financial strength ratings on existing investment-grade bond insurers (including AGM) by one or more rating categories if the proposed bond insurance ratings criteria are adopted, unless those bond insurers (including AGM) raise additional capital or reduce risk. Reference is made to the Bond Insurance RFC, a copy of which is available at www.standardandpoors.com , for the complete text of S&P's comments.

On October 25, 2010, S&P published a Research Update in which it downgraded AGM's counterparty credit and financial strength rating from "AAA" (negative outlook) to "AA+" (stable outlook). Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2010,

23

PR-CCD-0005658

which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 1, 2011.

*Capitalization of AGM*

At December 31, 2010, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,578,146,678 and its total net unearned premium reserve was approximately $2,298,456,380, in each case, in accordance with statutory accounting principles.

*Incorporation of Certain Documents by Reference*

Portions of the following documents filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i) The Annual Report on Form 10-K for the fiscal year ended December 31, 2010 (which was filed by AGL with the SEC on March 1, 2011);

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "Assured Guaranty Municipal Corp." under BOND INSURANCE or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE.

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

PR-CCD-0005659

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

## Public Sector Debt

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of September 30, 2010, as adjusted for the issuance of the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded by the issuance of the Series 2011 A Bonds and the Series 2011 B Bonds. The table also shows the public sector debt as adjusted for the issuance of the Bonds. The table should be read in conjunction with the information set forth under DEBT in *Appendix I*.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

| | September 30, 2010, as adjusted by the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded thereby | As Adjusted by the Bonds |
|---|---|---|
| GENERAL FUND RELATED DEBT | | |
| Direct full faith and credit obligations | $ 9,232 | $9,674 |
| Puerto Rico guaranteed debt[1] | 4,254 | 4,254 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,389 | 3,389 |
| Tax and Revenue Anticipation Notes[3] | 900 | 900 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $20,723 | $21,165 |
| Sales and Use Tax (COFINA) debt | $13,437 | $13,437 |
| Public corporations and agencies | 23,574 [5] | 23,574 [5] |
| Municipal Debt | 3,202 | 3,202 |
| Limited Obligations/non-recourse debt [6] | 2,431 | 2,431 |
| TOTAL PUBLIC SECTOR DEBT | $63,367 | $63,809 |

---

\* Totals may not add due to rounding.

[1] Consists of $601 million of bonds issued by Aqueduct and Sewer Authority, $384 million of State Revolving Fund Loans incurred under various federal water laws, $198.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.

[3] Includes related short-term financings.

[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5] Includes the Electric Power Authority's $218,225,000 Power Revenue Refunding Bonds issued in October 2010 and $355,730,000 Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) issued in December 2010.

[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $189 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

25

PR-CCD-0005660

### Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on September 30, 2010, as adjusted for the issuance of the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded by the issuance of the Series 2011 A Bonds and the Series 2011 B Bonds; (ii) the Bonds; and (iii) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds | | Grand Total |
|---|---|---|---|---|
| | | Principal | Interest | |
| 2011 | $ 486,120 | - | $ 7,440 | $ 493,560 |
| 2012 | 821,678 | - | 25,754 | 847,432 |
| 2013 | 824,774 | - | 25,754 | 850,528 |
| 2014 | 812,291 | - | 25,754 | 838,045 |
| 2015 | 826,366 | - | 25,754 | 852,120 |
| 2016 | 826,219 | - | 25,754 | 851,974 |
| 2017 | 751,884 | - | 25,754 | 777,638 |
| 2018 | 735,988 | - | 25,754 | 761,742 |
| 2019 | 804,852 | - | 25,754 | 830,606 |
| 2020 | 839,960 | - | 25,754 | 865,714 |
| 2021 | 687,855 | - | 25,754 | 713,609 |
| 2022 | 597,813 | - | 25,754 | 623,567 |
| 2023 | 550,911 | - | 25,754 | 576,666 |
| 2024 | 551,215 | - | 25,754 | 576,969 |
| 2025 | 539,766 | - | 25,754 | 565,520 |
| 2026 | 514,430 | $ 16,435 | 25,754 | 556,619 |
| 2027 | 513,866 | 17,865 | 24,891 | 556,623 |
| 2028 | 521,884 | 10,700 | 23,953 | 556,537 |
| 2029 | 466,464 | - | 23,378 | 489,843 |
| 2030 | 463,588 | - | 23,378 | 486,966 |
| 2031 | 465,924 | - | 23,378 | 489,303 |
| 2032 | 261,158 | 40,000 | 23,378 | 324,537 |
| 2033 | 229,645 | - | 21,091 | 250,736 |
| 2034 | 230,553 | - | 21,091 | 251,643 |
| 2035 | 185,277 | 98,145 | 21,091 | 304,513 |
| 2036 | 185,279 | 103,870 | 15,360 | 304,509 |
| 2037 | 185,279 | 105,000 | 9,288 | 299,567 |
| 2038 | 185,279 | - | 3,250 | 188,529 |
| 2039 | 185,276 | - | 3,250 | 188,526 |
| 2040 | 85,415 | 50,000 | 3,250 | 138,665 |
| Total | $15,337,009 | $442,015 | $633,782 | $16,412,806 |

---

\*   Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1]   Since fiscal year 1997, the Commonwealth had been paying approximately $30 million annual debt service on PRASA bonds and other obligations guaranteed by the Commonwealth. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making such payments and PRASA resumed making all payments due on and after such date from its net revenues. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

[2]   Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.

Sources:  Government Development Bank and Department of the Treasury

PR-CCD-0005661

# TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

PR-CCD-0005662

**Discount Bonds**

Under the Code, the difference between the principal amount of the Bonds and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Bonds maturing July 1 of the years 2026 through 2028, July 1, 2032 bearing interest at a rate of 5.75%, July 1, 2032 bearing interest at a rate of 5.50%, July 1, 2035, July 1, 2036 bearing interest at a rate of 5.75%, and July 1, 2037 (collectively, the "Discount Bonds") was sold is original issue discount. Original issue discount on the Discount Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owners of such Discount Bonds in each year, as described below, is, however, included in the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption TAX MATTERS in the year of accrual. Consequently, Beneficial Owners of Discount Bonds should be aware that the accrual of original issue discount in each year may result in additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Discount Bonds will accrue over the terms of such Bonds based on the constant yield method, compounded semiannually (or over a shorter permitted compounding interval selected by the Beneficial Owner). Original issue discount accruing during the period a Beneficial Owner holds such Discount Bond will increase the adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Discount Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Discount Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Discount Bonds and with respect to the state and local tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of the Bonds maturing July 1, 2040 (the "Premium Bonds") and the tax basis of Premium Bonds to a purchaser (other than a purchaser who holds Premium Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) is "bond premium." Bond Premium is amortized over the period to maturity of a Premium Bond, based on the yield to maturity of that Premium Bond (or, in the case of a Premium Bond callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on that Premium Bond), compounded semiannually (or over a shorter permitted corresponding interval selected by the Beneficial Owner). No portion of that bond premium is deductible by the Beneficial Owner of a Premium Bond. For purposes of determining the Beneficial Owner's gain or loss on the sale, redemption (including redemption at maturity) or other disposition of a Premium Bond, the Beneficial Owner's tax basis in the Premium Bond is reduced by the amount of bond premium that accrues during the period of ownership. As a result, a Beneficial Owner may realize taxable gain for federal income tax purposes from the sale or other disposition of a Premium Bond for an amount equal to or less than the amount paid by the Beneficial Owner of that Premium Bond. A purchaser of a Premium Bond in the initial public offering at the price for that Premium Bond stated on the cover

PR-CCD-0005663

of this Official Statement who holds that Premium Bond to maturity (or, in the case of a callable Premium Bond, to its earlier call date that results in the lowest yield on that Premium Bond) will realize no gain or loss upon the retirement of that Premium Bond. Beneficial Owners of Premium Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $2,648,794.69 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

29

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. Incorporated ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, and Barclays Capital Inc. established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of Harris Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

PR-CCD-0005665

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

PR-CCD-0005666

# RATINGS

The Bonds have been assigned ratings of "A3" by Moody's, "BBB+" by Fitch, and "BBB" by S&P.  For more information regarding rating action affecting the Commonwealth, see "Recent Rating Actions" under RECENT DEVELOPMENTS.  The Insured Bonds are expected to be assigned insured ratings of "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency.  Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such expected ratings will be the final rating issued or, if issued, that they will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant.  Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

# CONTINUING DISCLOSURE

## Continuing Disclosure Undertaking

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1. to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2010, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2. to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

   a. principal and interest payment delinquencies;

   b. non-payment related defaults, if material;

   c. unscheduled draws on debt service reserves reflecting financial difficulties;

32

d.   unscheduled draws on credit enhancements reflecting financial difficulties;

e.   substitution of credit or liquidity facility providers, or their failure to perform;

f.   adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

g.   modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

h.   Bond calls, if material;

i.   defeasances;

j.   release, substitution, or sale of property securing repayment of the Bonds, if material;

k.   rating changes;

l.   tender offers;

m.   bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.   the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.   the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Items 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official

33

PR-CCD-0005668

Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if

(1)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

34

(2)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such

PR-CCD-0005670

new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements. For the fiscal year 2010 audit, Treasury and the auditors have agreed to schedule weekly status meetings regarding the fiscal year 2010 financial statements.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II* ), and the specimen of the municipal bond insurance policy to be issued by AGM (*Appendix III*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

### COMMONWEALTH OF PUERTO RICO

By: _____ /s/ Jesús F. Méndez _____
Secretary of the Treasury

36

APPENDIX I

# COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### February 10, 2011

PR-CCD-0005672

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0005673

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................I-1

    General ...........................................................................................................I-1
    Forward-Looking Statements.........................................................................I-1
    Overview of Economic and Fiscal Condition................................................I-2
    Geographic Location and Demographic Trends............................................I-10
    Relationship with the United States...............................................................I-10
    Governmental Structure.................................................................................I-11
    Principal Officers Responsible for Fiscal Matters .......................................I-11
    Political Trends .............................................................................................I-13

THE ECONOMY ...................................................................................................I-14

    General ...........................................................................................................I-14
    Fiscal Stabilization and Economic Reconstruction.......................................I-19
    Employment and Unemployment ..................................................................I-28
    Economic Performance by Sector..................................................................I-29
    Higher Education ...........................................................................................I-43
    Tax Incentives ...............................................................................................I-44

DEBT .....................................................................................................................I-48

    Public Sector Debt ........................................................................................I-48
    Debt Service Requirements for Commonwealth General Obligation Bonds ................I-51
    Interest Rate Exchange Agreements ..............................................................I-52
    Variable Rate Bonds and Mandatory Tender Bonds .....................................I-55
    Ratings of Commonwealth General Obligation Bonds .................................I-57
    Commonwealth Guaranteed Debt..................................................................I-57
    Trends of Public Sector Debt.........................................................................I-59

PUBLIC CORPORATIONS...................................................................................I-60

    Government Development Bank for Puerto Rico ...........................................I-61
    Other Public Corporations ............................................................................I-64

INSURANCE MATTERS ......................................................................................I-74

RETIREMENT SYSTEMS ....................................................................................I-74

POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS ..........................I-95

COMMONWEALTH AUDITED FINANCIAL STATEMENTS ............................I-96

    General ...........................................................................................................I-96
    Prior Non-Compliance with Continuing Disclosure Obligations ..................I-97

PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES...............I-98

    Summary and Management's Discussion of General Fund Results................I-98
    Major Sources of General Fund Revenues ...................................................I-102

PR-CCD-0005674

Measures to Increase Collections of Income, Sales, and Excise Taxes and
    Property Taxes ....................................................................................... I-112
Transfers to General Obligation Redemption Fund..................................... I-114
Components of General Fund Expenditures ................................................ I-114

BUDGET OF THE COMMONWEALTH OF PUERTO RICO ............................. I-116

Office of Management and Budget................................................................ I-116
Budgetary Process......................................................................................... I-116
Financial Control and Adjustment Procedures ........................................... I-117
Appropriations ........................................................................................... I-118
Budget for Fiscal Year 2010 ........................................................................ I-120
Budget for Fiscal Year 2011 ........................................................................ I-122
Differences between Budget and Basic Financial Statements..................... I-123

LITIGATION.................................................................................................... I-124

PR-CCD-0005675

# INDEX OF DEFINED TERMS

| | |
|---|---|
| 1998 Tax Incentives Act | 44 |
| Act 1 | 23 |
| Act 1 Participants | 74 |
| Act 104 | 124 |
| Act 117 | 108 |
| Act 132 | 25 |
| Act 154 | 8, 32 |
| Act 178 | 111 |
| Act 29 | 26 |
| Act 3 | 23, 69 |
| Act 447 | 74 |
| Act 447 Participants | 74 |
| Act 7 | 3 |
| Act 70 | 6 |
| Act 71 | 113 |
| Act 82 | 7, 62 |
| Act 83 | 7, 45 |
| Act 91 | 23 |
| Act 91 of 1966 | 118 |
| Act 91 of 2004 | 75 |
| Act No. 1 | 8, 102 |
| AFICA | 50, 69 |
| AMT | 105 |
| ARRA | 2 |
| basic swaps | 53 |
| Basic System Pension Benefits | 77 |
| basis annuity | 53 |
| BEA | 16 |
| Budgetary Fund | 117 |
| CAFR | 97 |
| Capital Fund | 63 |
| CFCs | 46 |
| CMI | 85 |
| COFINA | 3 |
| Commonwealth | 1 |
| Commonwealth Sales Tax | 108 |
| constant maturity swap | 53 |
| Corpus Account | 23 |
| credit/liquidity facilities | 55 |
| CRIM | 110 |
| DEDC | 25 |
| Development Fund | 64 |
| Diageo | 111 |
| District | 27 |
| DOH | 65 |

| | |
|---|---|
| Economic Plan | 19 |
| Electric Power Authority Retirement System | 74 |
| Emergency Fund | 118 |
| EMMA | 97 |
| Employees Retirement System | 74 |
| EPA | 65 |
| FAA | 40 |
| FDIC | 36 |
| Federal Stimulus | 24 |
| FINRA | 36 |
| Fiscal Board | 22 |
| Fiscal Plan | 19 |
| Fitch | 9, 64 |
| FQHC | 125 |
| GASB 34 | 97 |
| GDB | 3 |
| Green Energy Incentives Act | 45 |
| Household Survey | 14 |
| Housing Finance Authority | 63 |
| IBEs | 36 |
| internal revenues | 48 |
| IVU Loto | 112 |
| Judiciary Retirement System | 74 |
| LIBOR | 53 |
| Local Stimulus | 24 |
| Mandatory Tender Bonds | 56 |
| MFA | 70 |
| Moody's | 10 |
| MSCHE | 73 |
| MSRB | 97 |
| Municipal Sales Tax | 108 |
| NAICS | 29 |
| NIPA | 16 |
| non-career employees | 20 |
| notes | 48 |
| OCFI | 36 |
| OMB | 12 |
| PAA | 70 |
| Payroll Survey | 28 |
| PBA | 71 |
| Perpetual Trust | 62 |
| PFC | 64 |
| Planning Board | 2 |
| POA Guaranteed Bonds | 49 |

PR-CCD-0005676

Port............................................................70
Ports Authority.......................................71
PPP Authority.........................................26
PPPs..........................................................26
PR Code..................................................102
PRCDA......................................................39
PREPA................................................53, 66
PRHTA.....................................................67
PRIDCO.....................................................68
PRIFA...................................................23, 69
Program..................................................113
Puerto Rico................................................1
remarketing date.....................................55
Retirement System..................................74
Retirement Systems.................................74
S&P.............................................................9
Sales Tax................................................108
Section 936 Corporations........................46
Serralles.................................................111
SIC............................................................29
SIFMA.......................................................53
Stabilization Fund.....................................4
synthetic fixed rate swap.........................53
System 2000..............................................74
System 2000 Participants.........................74
System Administered Pension Benefits......77
TDF...........................................................63
Teachers Retirement System....................74
TEU...........................................................70
Tourism Development Act........................46
Treasury Department...............................12
U.S. Code..................................................32
University.................................................72
University Retirement System..................74
USVI.........................................................111
VRDO Bonds.............................................55

PR-CCD-0005677

## COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### February 10, 2011

## INTRODUCTION

**General**

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of February 10, 2011, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the U.S. government or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors,

nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

## Overview of Economic and Fiscal Condition

### Economic Condition

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked to the United States economy, for fiscal years 2007, 2008 and 2009, Puerto Rico's real gross national product decreased by 1.2%, 2.8%, and 3.7%, respectively, while the United States economy grew at a rate of 1.8% and 2.8% during fiscal years 2007 and 2008, respectively, and contracted during fiscal year 2009 at a rate of 2.5%. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections made in March 2010, which take into account the preliminary results for fiscal year 2009, the economic impact of a delay in the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors, the gross national product for fiscal year 2010 is forecasted to contract by 3.6%. The gross national product for fiscal year 2011, however, is forecasted to grow by 0.4%.

### Fiscal Condition

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and total expenditures. The table set forth below shows recurring revenues*, total expenditures and the ensuing deficit for each fiscal year of the past decade. The deficit shown in this table for each fiscal year, however, does not include certain unbudgeted additional expenditures incurred by the Commonwealth in various fiscal years. Thus, the actual structural imbalance is underestimated in this table.

**Historical Deficit**
Fiscal Years ended June 30,
(in millions)

|      | Recurring Revenues | Total Expenditures | Deficit |
|------|-------------------|-------------------|---------|
| 2000 | $7,003 | $7,576 | $ (573) |
| 2001 | 6,872 | 8,123 | (1,250) |
| 2002 | 7,186 | 9,126 | (1,940) |
| 2003 | 7,341 | 8,043 | (702) |
| 2004 | 7,834 | 8,923 | (1,089) |
| 2005 | 8,603 | 9,717 | (1,114) |
| 2006 | 8,423 | 10,397 | (1,974) |
| 2007 | 8,718 | 9,707 | (989) |
| 2008 | 8,207 | 9,324 | (1,117) |
| 2009 | 7,583 | 10,890 | (3,306) |
| 2010 | 7,691 | 9,833 | (2,142) |

---

\* Recurring revenues are revenues from taxes, licenses and other internal or external sources received on a recurring basis by virtue of existing laws. Non-recurring revenues include revenues from financings and other one shot measures described in this section.

PR-CCD-0005679

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance. These steps are discussed below under "The Economy—Fiscal Stabilization and Economic Reconstruction."

For fiscal year 2009, the deficit was $3.306 billion, consisting of the difference between total recurring revenues of $7.583 billion and total expenditures for such fiscal year of $10.890 billion. The estimated deficit is projected to be approximately $2.1 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below.

*Results for Fiscal Year 2009.* Total General Fund revenues for fiscal year 2009 were $7.583 billion, representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the current administration also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, provides for approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of bond issues made by Puerto Rico Sales Tax Financing Corporation ("COFINA") by its Spanish-language acronym) and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan described below. See "Fiscal Stabilization and Economic Reconstruction – Fiscal Stabilization Plan" under THE ECONOMY.

*Preliminary Results for Fiscal Year 2010.* Preliminary General Fund revenues for fiscal year 2010 (from July 1, 2009 to June 30, 2010) were $7.691 billion, a decrease of $19 million from the $7.710 billion of revenues for fiscal year 2009 and $21 million, or 0.3%, from the $7.670 billion of estimated revenues for fiscal year 2010. The major changes in revenues from fiscal year 2009 were a decrease of $258 million and $251.4 million in sales and use tax and withholding taxes from non-residents, respectively. The decrease in sales and use taxes was due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax while the decrease in withholding taxes from non-residents is due to a one time payment received in fiscal year 2009. These decreases were offset by an increase in property taxes of $226.5 million (which were not received in fiscal year 2009) and excise taxes of approximately $85 million, principally due to revenue raising measures implemented as part of Act. No. 7 of March 9, 2009, as amended ("Act 7"), discussed below. Income taxes from corporations also increased by $302 million due in part to increased enforcement initiatives.

Preliminary total expenditures for fiscal year 2010 amount to $9.833 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.163 billion of

PR-CCD-0005680

additional expenditures covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance (see "Fiscal Stabilization Plan" below). Preliminary total expenditures were approximately $337 million, or 3.3%, below originally budgeted expenditures of $10.170 billion.

*Preliminary Results for the First Five Months of Fiscal Year 2011.* Preliminary General Fund revenues for the first five months of fiscal year 2011 (from July 1, 2010 to November 30, 2010) were $2.641 billion, a decrease of $51 million, or 1.9%, from $2.692 billion of revenues for the same period in the prior fiscal year and a decrease of $14.1 million, or 0.5%, from the original estimate of revenues of $2.655 billion made for budget purposes.

The decline in General Fund revenues is mainly due to a decrease of $113.4 million, $26.2 million, $70.7 million and $23.3 million in collections from income tax on corporations, withholding on non-residents, other non-tax revenues and federal excise taxes on off-shore shipments of rum, respectively. These declines were partially offset by increases of $146.5 million, $30.2 million and $18.3 million in collections from income tax on individuals, property taxes and excise taxes on cigarettes, respectively.

The decrease in corporate income taxes and withholding taxes from non-residents is due to current economic conditions. The decrease in federal excise taxes on off-shore shipments of rum is due to the delay in the approval of federal legislation extending the reimbursement rate per proof gallon. This legislation was approved in December 2010 and, in January 2011, the Government received from the federal government $50 million of such federal excise taxes on off-shore rum shipments related to the period from July through December 2010. For more information regarding federal excise taxes on off-shore rum shipments, see "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*Fiscal Stabilization Plan.* In January 2009, the administration, which gained control of the Executive and Legislative branches of government in the November 2008 elections, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act 7, sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program (such proceeds are held by GDB in an account referred to herein as the "Stabilization Fund") have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and may be used for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below.

I-4

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with government appropriations. As of June 30, 2009, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.092 billion, $6.564 billion and $273 million, respectively, and the funded ratios were 9.8%, 24.7% and 15.6%, respectively. According to preliminary actuarial valuations as of June 30, 2010, the unfunded actuarial accrued liability of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System increased to $17.834 billion, $7.058 billion and $283 million, respectively, the funded ratios of the Employees Retirement System and Teachers Retirement System decreased to 8.5% and 23.9%, respectively, and the funded ratio of the Judiciary Retirement System increased to 16.4%.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liabilities will continue to increase significantly, with a corresponding decrease in the funded ratios, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liabilities. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $752 million, $274 million and $8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

I-5

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest preliminary actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three government retirement systems, in February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010. The individual recommendations made by the members of the special commission, which included increasing the amount of the employer and employee annual contributions and changing the benefits structure, are being analyzed with the intent of presenting a comprehensive, consensus legislation package during 2011. The Secretary of Labor, who chaired the special commission, is evaluating, in particular, proposing additional employer contributions to improve the funding ratio, the impact of special laws that have provided additional retirement benefits, and the impact on the system's cash flow of previously approved increases in the amount that members may borrow from the systems under various loan programs.

On July 2, 2010, the Government enacted Act No. 70 ("Act 70"), which is designed to reduce government expenditures by providing an early retirement window for eligible employees (who opted to retire by January 14, 2011 or during such other period that may be established by a designated committee) under a formula that results in a positive actuarial impact for the government's retirement systems. Employees that elected to participate in the program will receive retirement benefits based on a lower salary and a lower pension rate than what they would otherwise have been entitled to if they had continued in their employment until full vesting, but at a higher rate than what they would be entitled to based on their current years of service. Approximately 4,000 employees opted for early retirement under Act 70.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the financial condition of the retirement systems and the Government's efforts to address the unfunded pension and non-pension benefit obligations and cash flow shortfalls of the retirement systems, see RETIREMENT SYSTEMS.

PR-CCD-0005683

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of December 15, 2010, the Commonwealth had disbursed $4.3 billion in ARRA funds, or 63%, of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also enacted Acts No. 82 and 83 of July 19, 2010, which provide for a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the administration proposes to adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. See "Proposed Tax Reform" below.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the administration engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the administration published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The administration has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the administration has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marin International Airport.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout

PR-CCD-0005684

the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

The fiscal stabilization plan, the economic reconstruction plan, and the long-term economic development plan are described in further detail below under "The Economy—Fiscal Stabilization and Economic Reconstruction."

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to Puerto Rico's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed at a declining rate (from 4% for 2011 to 1% for 2016) on certain acquisitions from related parties, and (iv) an expansion of taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships that are members of controlled groups that have members that are engaged in manufacturing or production or manufacturing services in Puerto Rico. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154 of October 25, 2010, as amended ("Act 154"). In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures,

I-8

PR-CCD-0005685

which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The first monthly excise tax payment is due on February 15, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform and Act 154, see "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*Ratings of Commonwealth General Obligation Bonds*

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On November 29, 2010, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), confirmed its "BBB–" rating on the Commonwealth's general

PR-CCD-0005686

obligation and appropriation debt and changed the outlook on general obligation debt to positive from stable. In taking this rating action, S&P stated that while the ratings continue to reflect their opinion on the Commonwealth's history of chronic budget deficits, the revision in the outlook of the Commonwealth's general obligation debt was based on their view as to the recent implementation of expenditure controls and revenue enhancement measures that they believe could help restore budget balance within the next two years.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems. See "Retirement Systems."

*Budget for Fiscal Year 2011*

On July 2, 2010, the Governor signed the Commonwealth's central government budget for fiscal year 2011. The approved budget provides for total resources of $15.8 billion and total General Fund revenues of $8.134 billion, compared to preliminary General Fund revenues of $7.691 billion for fiscal year 2010. The budgeted General Fund revenues of $8.134 billion include base revenues of $7.691 billion, $302.5 million from tax enforcement and compliance measures, $110 million in expected revenues from the implementation of the property tax appraisal provisions included in Act. No. 71 of July 2, 2010 and $30 million in additional revenues from casinos. The approved fiscal year 2011 budget provides for total expenditures of $9.134 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.0 billion that are expected to be covered from moneys deposited in the Stabilization Fund funded with the proceeds of a COFINA bond issue completed in June 2010. The budgeted total expenditures for fiscal year 2011 are $699 million, or 7.1%, lower than preliminary total expenditures of $9.833 billion for fiscal year 2010, and $1.756 billion, or 16%, lower than total expenditures of $10.890 billion for fiscal year 2009.

**Geographic Location and Demographic Trends**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 420,326 as of July 1, 2009 (according to the most recent U.S. Census Bureau estimate) compared to 434,374 in 2000.

**Relationship with the United States**

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress.

PR-CCD-0005687

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government, Congress enacted Public Law 600, which provided that the existing political, economic and fiscal relationship between Puerto Rico and the United States would remain the same, but Puerto Rico would be authorized to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the United States.

The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States under the same conditions as decisions from state courts. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officers Responsible for Fiscal Matters**

*Luis G. Fortuño* was sworn in as Governor of Puerto Rico on January 2, 2009. From 2005 until becoming Governor, Mr. Fortuño was Puerto Rico's elected Resident Commissioner in the U.S. House of Representatives. Mr. Fortuño was an attorney in private practice from 1985 to 1993, and again from 1997 to 2003. Mr. Fortuño was the Executive Director of the Tourism

I-11

Company from 1993 to 1996. From 1994 to 1996, Mr. Fortuño served as the first Secretary of the Department of Economic Development and Commerce. Mr. Fortuño holds a Bachelor's Degree from the Edmund A. Walsh School of Foreign Service at Georgetown University and a Juris Doctor from the University of Virginia School of Law.

*Jesús F. Méndez* was designated as Secretary of the Department of the Treasury (the "Treasury Department") on January 7, 2011 and confirmed by the Senate of Puerto Rico on January 24, 2011. Before his appointment as Secretary of the Treasury Department, Mr. Méndez served as Executive Vice President and Director of Administration, Operation and Controllership of GDB and as Executive Director of the Public Buildings Authority. From 2005 to 2008, Mr. Méndez held the position of President and Chief Executive Officer of Tresamici Management, Inc., a closely held corporation dedicated to the administration of assisted living facilities. From 1996 to 2004, he held several senior management positions within Banco Santander S.A. operating entities in Puerto Rico, including President of Santander Asset Management and First Senior Vice President and Trust Officer of Banco Santander Puerto Rico and Managing Director of Santander Securities Corporation. Prior to joining Santander Securities, Mr. Méndez served as Chief Financial Officer and Managing Director of BP Capital Markets. He also worked for Credit Suisse First Boston (Puerto Rico, Inc.) as Vice President and Deloitte & Touche as Senior Auditor. In addition, Mr. Méndez also held the position of Assistant Bank Examiner at the Federal Deposit Insurance Corporation in New York City. Mr. Méndez has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is a Certified Public Accountant.

*Maritza Garay* was appointed Acting Executive Director of the Office of Management and Budget ("OMB") on January 7, 2011. Before her designation as Executive Director of OMB, Mrs. Garay served as the Deputy Director of OMB. From 2009 to 2010, Mrs. Garay was the Associate Director for the Budget Department of OMB. Prior to 2009, Mrs. Garay worked at the Puerto Rico Senate Treasury Committee and at Oriental Bank of Puerto Rico. Mrs. Garay holds a Bachelor's Degree from the University of Puerto Rico – Mayagüez Campus, where she majored in Accounting.

*Carlos M. García* was ratified as President and Chairman of the Board of GDB on January 7, 2009. Mr. García served as President of Banco Santander Puerto Rico from August 2008 to January 2009 and Senior Executive Vice President and Chief Operating Officer of Santander BanCorp and Banco Santander Puerto Rico from January 2004 to January 2009. Mr. García served as a member of the Board of Directors of Santander BanCorp and several of Santander BanCorp's subsidiaries and affiliates. Mr. García serves as Director of Make-a-Wish Foundation of Puerto Rico. Mr. García served as President and Chief Executive Officer of Santander Securities Corporation from August 2001 to January 2006. Mr. García joined Santander Securities Corporation in 1997 as Director of its Investment Banking Department, and Banco Santander Puerto Rico in October 2003 as Executive Vice President of Wholesale Banking. From 1993 to 1995, Mr. García worked at Credit Suisse First Boston Puerto Rico, Inc., which later was acquired by Popular Securities, Inc., for which he worked from 1995 to 1997. Mr. García holds a dual degree in Business from the Wharton School and in Comparative Literature from the College of Arts and Sciences of the University of Pennsylvania.

I-12

PR-CCD-0005689

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring statehood, represented by the New Progressive Party, and the other favoring the existing commonwealth status, represented by the Popular Democratic Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1992 | 1996 | 2000 | 2004 | 2008 |
|---|---|---|---|---|---|
| New Progressive Party | 49.9% | 51.1% | 45.7% | 48.2% | 52.8% |
| Popular Democratic Party | 45.9% | 44.5% | 48.6% | 48.4% | 41.3% |
| Puerto Rico Independence Party | 4.2% | 3.8% | 5.2% | 2.7% | 2.0% |
| Others, Blank or Void | - | 0.5% | 0.5% | 0.6% | 3.9% |

With the results of the 2008 election, the New Progressive Party gained control of the Executive Branch and retained control of the Legislative Branch. The current membership of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| New Progressive Party | 21 | 37 |
| Popular Democratic Party | 8 | 17 |
| Total | 29 | 54 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2012.

PR-CCD-0005690

# THE ECONOMY

## General

The Commonwealth in the past has established policies and programs directed principally at developing the manufacturing sector and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have historically been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico's economy experienced a considerable transformation during the second half of the twentieth century, from an agriculture economy to an industrial one. Factors contributing to this transformation included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing. In some years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. Nevertheless, the significant oil price increases experienced from January 2002 to June 2008, the continuous contraction of the manufacturing sector, and the budgetary pressures on government finances triggered a general contraction in the economy.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2007 and 2008, the real gross national product contracted by 1.2% and 2.8%, respectively. For fiscal year 2009, preliminary reports indicate that the real gross national product contracted by 3.7%. In March 2010, the Planning Board announced that it was projecting a contraction of 3.6% in real gross national product for fiscal year 2010. The Planning Board projects an increase in real gross national product of 0.4% for fiscal year 2011.

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2009. In fiscal year 2009, aggregate personal income was $59 billion ($49.9 billion at 2005 prices) and personal income per capita was $14,905 ($12,589 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $13.1 billion in fiscal year 2009 ($12.2 billion in fiscal year 2008). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10 billion, or 76% of the transfer payments to individuals in fiscal year 2009 ($9.3 billion, or 73.9%, in fiscal year 2008). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

Total average annual employment (as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey") also increased during the last decade. From fiscal year 2000 to fiscal year 2010, total employment

PR-CCD-0005691

decreased at an average annual rate of 5.6% to 1,102,700. A steep decline in total employment began in fiscal year 2007 and has continued in fiscal year 2010 due to the current recession.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, has played a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2009.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

| | 2005 | 2006 | 2007 | 2008 | 2009[1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $53,752 | $56,732 | $59,521 | $61,527 | $62,759 |
| Real gross national product – $ millions (2005 prices) | 53,752 | 54,027 | 53,400 | 51,889 | 49,951 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 1.9% | 0.5% | (1.2)% | (2.8)% | (3.7)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 3.1% | 2.8% | 1.8% | 2.7% | (3.0)% |

[1]  Preliminary.
[2]  In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2009, approximately 71.6% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 46.9% of Puerto Rico's imports. In fiscal year 2009, Puerto Rico experienced a positive merchandise trade balance of $20.2 billion. During fiscal year 2010, approximately 68.1% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 51.2% of Puerto Rico's imports. In fiscal year 2010, Puerto Rico experienced a positive merchandise trade balance of $20.8 billion.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2010 and 2011.

I-15

**REAL GNP GROWTH RATE**
**(Percent)**



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2010).
\*\* Estimate for U.S. from IHS Global Insight (Mar-2010).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2009 shown in this Report are preliminary until the revised figures are released and the forecast for fiscal year 2010 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the following table and published by GDB since October 2009, is composed of several variables (total payroll employment based on the

PR-CCD-0005693

Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product.



*Economic Forecast for Fiscal Years 2010 and 2011*

On March 10, 2010, the Planning Board released its revised gross national product forecast for fiscal year 2010 and its gross national product forecast for fiscal year 2011. The Planning Board revised its gross national product forecast for fiscal year 2010 from a projected growth of 0.7% to a contraction of 3.6%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2010 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2011 projects an increase in gross national product of 0.4% in constant dollars. The forecast, however, did not take into account the activity expected to be generated from funds received or expected to be received by ARRA. The Planning Board's forecast for fiscal year 2011 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships.

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

PR-CCD-0005694

*Fiscal Year 2009*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 3.7% (an increase of 2.0% in current dollars) over fiscal year 2008. Nominal gross national product was $62.8 billion in fiscal year 2009 ($50 billion in 2005 prices), compared to $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices). Aggregate personal income increased from $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices) to $59 billion in fiscal year 2009 ($49.9 billion in 2005 prices), and personal income per capita increased from $14,080 in fiscal year 2008 ($12,410 in 2005 prices) to $14,905 in fiscal year 2009 ($12,589 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 49,300, or 4.1%, from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. Although the situation improved significantly during fiscal year 2009, oil prices remained at relatively high levels and the impact of the increases of previous years were still felt in fiscal year 2009. The current difficulties associated with the financial crisis resulted in lower short-term interest rates, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2008*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2008 indicate that real gross national product decreased 2.8% (an increase of 3.4% in current dollars) over fiscal year 2007. Nominal gross national product was $61.5 billion in fiscal year 2008 ($51.9 billion in 2005 prices), compared to $59.5 billion in fiscal year 2007 ($53.4 billion in 2005 prices). Aggregate personal income increased from $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices) to $55.6 billion in fiscal year 2008 ($49 billion in 2005 prices), and personal income per capita increased from $13,244 in fiscal year 2007 ($12,319 in 2005 prices) to $14,080 in fiscal year 2008 ($12,410 in 2005 prices). The significant increase in personal income in fiscal year 2008 is due in part to the tax rebate program implemented by the Bush Administration during that fiscal year.

According to the Household Survey, total employment for fiscal year 2008 averaged 1,217,500, a decrease of 3.6% compared to 1,262,900 for fiscal year 2007. At the same time, the unemployment rate for fiscal year 2008 was 11.0%, an increase from 10.4% for fiscal year 2007.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices

PR-CCD-0005695

during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

*Fiscal Year 2007*

The Planning Board's reports on the performance of the Puerto Rico economy during fiscal year 2007 indicate that the real gross national product fell by 1.2%. Nominal gross national product was $59.5 billion ($53.4 billion in 2005 prices), compared to $56.7 billion in fiscal year 2006 ($54.0 billion in 2005 prices). This represents an increase in nominal gross national product of 4.9%. Aggregate personal income was $52.1 billion in fiscal year 2007 ($48.5 billion in 2005 prices), as compared to $50.8 billion in fiscal year 2006 ($48.5 billion in 2000 prices), and personal income per capita was $13,244 in fiscal year 2007 ($12,319 in 2005 prices), as compared to $12,970 in fiscal year 2006 ($12,382 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2007 averaged 1,262,900, a decrease of 0.3% compared to 1,266,300 for fiscal year 2006. The unemployment rate for fiscal year 2007 was 10.4%, a decrease from 11.7% for fiscal year 2006.

## Fiscal Stabilization and Economic Reconstruction

In January 2009, the administration began to implement a multi-year Fiscal Stabilization Plan (the "Fiscal Plan") and Economic Reconstruction Plan (the "Economic Plan") that sought to achieve fiscal balance and restore economic growth. The Fiscal Plan was central to safeguarding the Commonwealth's investment-grade credit rating and restoring Puerto Rico's economic growth and development. As of September 30, 2010, the Legislative Assembly had enacted eleven bills providing for the implementation of the Fiscal Plan and the Economic Plan.

In addition, the administration designed and began to implement the *Strategic Model for a New Economy*, a series of economic development initiatives which aim to enhance Puerto Rico's competitiveness and strengthen specific industry sectors. These economic development initiatives were intended to support the prospects of long-term and sustainable growth.

*Fiscal Stabilization Plan*

The Fiscal Plan had three main objectives: (i) stabilize the short-term fiscal situation, (ii) safeguard and strengthen the Commonwealth's investment-grade credit rating, and (iii) achieve budgetary balance. The Fiscal Plan, which was generally contained in Act 7, included operating expense-reduction measures, tax revenue enforcement measures, temporary and permanent revenue raising measures, and financial measures, as discussed below.

*Expense Reduction Measures.* A significant portion of Puerto Rico's budget deficit is attributable to the accumulated effect of high operating expenses in the government. The Fiscal

PR-CCD-0005696

Plan sought to reduce the government's recurring expense base to make it consistent with the level of government revenues. The Fiscal Plan established a government-wide operating expense-reduction program aimed at reducing operating expenses, including payroll.

Payroll expense is the most significant component of the government's recurring expense base. The reduction in payroll expenses contemplated by the Fiscal Plan was implemented in three phases and included certain benefits conferred to participating employees, as follows:

- *Phase I: Incentivized Voluntary Resignation and Voluntary Permanent Workday Reduction Programs:* The Incentivized Voluntary Resignation Program offered public employees a compensation incentive based on the time of service in the government. The Voluntary Permanent Workday Reduction Program was available to public employees with 20 or more years of service. The Workday Reduction Program consisted of a voluntary reduction of one regular workday every fifteen calendar days, which is equivalent to approximately a 10% reduction in annual workdays. Phase I commenced in March 2009 and public employees had until April 27, 2009 to submit the required information to participate in the voluntary programs available under Phase I and be eligible for the Public Employees Alternatives Program. Under Phase I, 2,553 employees resigned under the Incentivized Voluntary Resignation Program and 27 employees took advantage of the Voluntary Permanent Workday Reduction Program. Based on the number of employees who agreed to participate in these programs, the administration estimates that expenses for fiscal year 2010 were reduced by $90.9 million.

- *Phase II: Involuntary Layoff Plan:* As provided in Act 7, Phase II went into effect because the objective of reducing $2 billion in expenses was not achieved after implementation of Phase I and Phase III (see below). Under Phase II, subject to certain exceptions, employees with transitory or non-permanent positions were terminated. As a result, 1,990 positions were eliminated, representing an estimated savings of $44.7 million annually. In addition, Phase II provided for one or more rounds of involuntary layoffs and applied to most central government public employees unless excluded pursuant to Act 7, strictly according to seniority in public service, starting with employees with the least seniority. The plan excluded certain employees providing "essential" services, certain employees paid by federal funds, those on military leave, and political appointees and their trust employees (political appointees and their trust employees, who do not hold a permanent or career position in the government, are referred to herein as "non-career employees"). Employees in Phase II received a severance package that included health coverage payment for up to a maximum of six months or until the former public employee became eligible for health insurance coverage at another job. As of September 30, 2010, total government employees dismissed under Phase II (excluding the 2,237 transitory or non-permanent positions eliminated) was approximately 12,604, representing an estimated savings of $325.4 million annually. This amount excludes approximately 1,945 employees rehired by the Department of Education as a result of an agreement with the union providing for certain salary and workday reductions and the inclusion of

PR-CCD-0005697

additional service requirements, among other things. The negotiation of this agreement by the administration resulted in annual savings of $53 million, an increase of $27 million over the estimated savings achievable through the termination of such employees.

- *Phase III: Temporary Suspension of Certain Provisions of Laws, Collective Bargaining Agreements, and Other Agreements:* Phase III went into effect on March 9, 2009 and imposed a temporary freeze on salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. Phase III will remain in effect for a period of two years. The administration estimates that savings from the implementation of these measures was approximately $186.9 million for fiscal year 2010.

- *Public Employees Alternatives Program:* The employees that elected to participate in the Incentivized Voluntary Resignation Program under Phase I or that were subject to involuntary layoffs under Phase II, were eligible to participate in the Public Employees Alternatives Program. This program assists public employees in their transition to other productive alternatives, and offers vouchers for college education, technical education, and professional training, as well as for establishing a business and for relocation.

Act 7 extended the term of collective bargaining agreements with public employees that had expired at the time of its enactment or that expire while it is in effect for a period of two years (until March 9, 2011) and provided that during this period such collective bargaining agreements may not be renegotiated or renewed.

The following table summarizes the amount of employees affected by the workforce and labor related expense reduction measures included in Act 7 and the expected annual savings in operational expenses from the implementation of Phases I through III of the Fiscal Plan.

| Phase | Affected Employees | Savings (in millions) |
|---|---|---|
| Phase I: Voluntary Resignation | 2,553 | $90.9 |
| Phase II: Involuntary Layoffs | | |
| Termination of transitory and non-permanent employees | 1,990 | 44.7 |
| Layoffs (as of April 30, 2010) | 12,604 | 325.4 |
| Phase III: Suspension of Certain Benefits | - | 186.9 |
| Total | 17,147 | $647.9 |

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies. On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint.

I-21

PR-CCD-0005698

Plaintiffs have appealed the Court's decision. The District Court's decision allowed the Government to continue with the implementation of Act 7. The Government plans to vigorously defend the constitutionality of Act 7. See "Litigation."

The second element of the expense-reduction measures, which pertains to other operating expenses, was conducted through an austerity program in combination with other expense reduction measures. The austerity program mandated a 10% reduction in other operational expenses, including cellular phone use, credit cards, and official vehicles.

In July 2010, the Governor renewed an executive order issued in September 2009 requiring all agencies and public corporations to reduce, modify or cancel service contracts to achieve a cost reduction of at least 15%. The executive order covers advertising, consulting, information technology, accounting, legal and other services (except for direct services to the public), and grants the Fiscal Restructuring and Stabilization Board created under Act 7 (the "Fiscal Board") the power to monitor agencies and public corporations in order to ensure the required 15% minimum cost reduction. Each agency or public corporation had 30 days to report the following to the Fiscal Board: (i) all service contracts currently in effect, (ii) all canceled and/or modified contracts and the corresponding savings, (iii) justification for any remaining contracts in light of the mission of the agency or public corporation, and (iv) the reasonableness of the fees or compensation terms for each remaining contract.

In July 2010, the Governor also renewed another executive order issued in September 2009 requiring all agencies and public corporations to report the following to the Fiscal Board within 30 days: (i) all lease contracts currently in effect, (ii) the uses of leased premises, (iii) the needs for such premises, (iv) the terms and conditions of each lease, and (v) budgeted amounts for rent and other related expenses. During fiscal year 2010, the administration achieved savings by, among other things, consolidating operations of one or more agencies or public corporations and renegotiating leases to obtain more favorable terms. The administration expects to achieve annual savings of at least 15% of rent and related expenses, or approximately $22 million, in future fiscal years.

As of September 30, 2010, the administration had already reduced operating expenses through expense reduction measures other than Phase I through III of the Fiscal Plan by $150 million, and professional service contracts and lease agreements by $42 million through the implementation of the executive orders referred to above.

*Tax Revenue Enforcement Measures.* The Fiscal Plan also sought to increase tax revenues by implementing a more rigorous and ongoing tax enforcement and compliance strategy. Specific tax enforcement initiatives included: (i) enhancements to the administration of federal grants and fund receipts, (ii) stronger collections and auditing efforts on Puerto Rico's sales and use tax, and (iii) a voluntary tax compliance program.

*Revenue Raising Measures.* The goal of achieving fiscal and budgetary balance required a combination of measures that included the introduction of permanent and temporary tax increases. The Fiscal Plan included six temporary and four permanent revenue increasing measures. The temporary revenue increasing measures consisted of: (i) a 5% surtax on income of certain individuals that was expected to generate $58 million in additional revenues, (ii) a 5%

PR-CCD-0005699

surtax on income of certain corporations that was expected to generate $41 million in additional revenues, (iii) a 5% income tax on credit unions (commonly known as "cooperativas" in Puerto Rico) that was expected to produce $5 million in additional revenues, (iv) a 5% income tax on Puerto Rico international banking entities that was expected to produce $20 million in additional revenues, (v) a special property tax on residential and commercial real estate that was expected to produce $230 million in additional revenues, and (vi) a moratorium on certain tax credits. The temporary measures are to be in effect for up to three fiscal years beginning in fiscal year 2010. The permanent measures include (i) modifications to the alternative minimum tax for individuals and corporations each of which is expected to generate $10 million annually, (ii) an increase in the excise tax on cigarettes, (iii) a new excise tax on motorcycles, and (iv) an increase in the excise tax on alcoholic beverages. The permanent increases in the excise taxes on cigarette, motorcycles and alcoholic beverages are expected to generate $48 million, $1 million and $5 million, respectively, in additional revenues. The total preliminary revenues from these temporary and permanent measures for fiscal year 2010 are $428 million. The total estimated revenues from these temporary and permanent measures for fiscal year 2011 are $420 million.

*Financial Measures.* The administration has also carried out several financial measures designed to achieve fiscal stability throughout the Fiscal Plan implementation period. These measures included, among others, (i) a financing or bond issuance program, the proceeds of which were used to bridge the structural budgetary imbalance during the Fiscal Plan implementation period and fund some of the Economic Plan initiatives, (ii) the restructuring of the securities held in the Corpus Account of the Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of the Puerto Rico Infrastructure Financing Authority ("PRIFA") (see "Infrastructure Financing Authority" under PUBLIC CORPORATIONS for a description of the Corpus Account), and (iii) the restructuring of a portion of the Commonwealth's debt service.

These financial measures were anchored on the bond-issuance program of COFINA. Act 7, in conjunction with Act No. 91 of May 13, 2006, as amended ("Act 91"), and Act No. 1 of January 14, 2009 ("Act 1"), allocated to COFINA, commencing on July 1, 2009, 2.75% (one-half of the tax rate of 5.5%) of the sales and use tax imposed by the central government, thus increasing COFINA's financing capacity and allowing the Commonwealth to achieve fiscal stability throughout the implementation period of the Fiscal Plan.

During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds from these bond issues have been used for, among other uses, paying approximately $1.9 billion of Commonwealth obligations that did not have a designated source of repayment, paying or financing approximately $4.8 billion of operational expenses constituting a portion of the Commonwealth's deficit, and funding the Local Stimulus Fund (described below) and the Stabilization Fund for fiscal year 2011 with approximately $500 million and $1.0 billion, respectively.

Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to, among other things, make a deposit to the General Fund of approximately $319 million, which was applied to cover a portion of the

PR-CCD-0005700

Commonwealth's budget deficit and make a transfer to GDB of approximately $159 million as a capital contribution. The gross proceeds resulting from the sale were approximately $884 million.

The Fiscal Plan has provided more fiscal stability, thereby safeguarding and strengthening Puerto Rico's credit. The fiscal structure resulting from the full implementation of the plan will be sustainable and conducive to economic growth and development.

*Economic Reconstruction Plan*

To balance the impact of the Fiscal Plan, the administration developed and is implementing an economic reconstruction program designed to stimulate growth in the short term and lay the foundation for long-term economic development. The Economic Plan consists of two main components: (i) two economic stimulus programs, and (ii) a supplemental stimulus plan.

*Economic Stimulus Programs.* The cornerstone of Puerto Rico's short-term economic reconstruction plan was the implementation of two economic stimulus programs aimed at reigniting growth and counterbalancing any adverse effects associated with the Fiscal Plan. The economic stimulus programs consisted of Puerto Rico's participation in ARRA (also referred to herein as the "Federal Stimulus") and a local plan (the "Local Stimulus") designed to complement the Federal Stimulus.

- *Federal Stimulus Program:* Puerto Rico was awarded $6.8 billion in stimulus funds from ARRA. The funds are distributed in four main categories: relief to individuals, budgetary and fiscal relief, taxpayers' relief, and capital improvements. In terms of government programs, the Federal Stimulus allocates funds to education, agriculture and food assistance, health, housing and urban development, labor, and transportation, among others. As of September 2010, PRIFA, which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $3.6 billion in ARRA funds had been disbursed.

- *Local Stimulus Program:* The administration formulated the Local Stimulus to supplement the Federal Stimulus and address specific local challenges associated with the local mortgage market, the availability of credit, and the infrastructure and construction sectors. Despite the fact that the Local Stimulus amounted to a $500 million investment by the government, it is estimated that its effect would be greater due to certain lending programs, which are being coordinated in collaboration with commercial banks in Puerto Rico. The administration has been disbursing funds under the $500 million local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The administration has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system. In addition, $399 million of Local Stimulus funds will be used mainly to promote infrastructure projects.

PR-CCD-0005701

*Supplemental Stimulus Plan.*  The Supplemental Stimulus Plan was designed to provide investment in strategic areas with the objective of laying the foundations for long-term growth in Puerto Rico. The coordinated implementation of the Supplemental Stimulus Plan is expected to reinforce continuity in reigniting economic growth while making key investments for long-term development.

The Supplemental Stimulus Plan is being conducted through a combination of direct investments and guaranteed lending.   Specifically, the Supplemental Stimulus Plan targets critical areas such as key infrastructure projects, public capital improvement programs, private-sector lending to specific industries, and the export and research-and-development knowledge industries.  The Supplemental Stimulus Plan takes into account the strategic needs that Puerto Rico must fulfill in order to become a more competitive player in its region and in the global economy.

On September 1, 2010 the Governor signed Act No. 132, also known as the Real Estate Market Stimulus Act of 2010 ("Act 132"), which provides certain incentives to help reduce the existing housing inventory. The incentives provided by Act 132 will be effective from September 1, 2010 through June 30, 2011. See "Economic Performance by Sector—Construction."

*Economic Development Program*

The Department of Economic Development and Commerce ("DEDC"), in coordination with other government agencies, is in the process of implementing the *Strategic Model for a New Economy*, which consists of a comprehensive, long-term, economic development program aimed at improving Puerto Rico's overall global relevance, competitiveness, and business environment, and increasing private-sector capital formation and participation in the economy.   These initiatives are centered on the dual mission of fostering multi-sector growth while reducing costs and barriers to business and investment, and are a medium-to-long-term counterpart to the Economic Plan and the Supplemental Stimulus Plan described above.

The administration is emphasizing the following initiatives to enhance Puerto Rico's competitive position: (i) overhauling the permitting process, (ii) reducing energy costs, (iii) reforming the tax system, (iv) promoting the development of various projects through public-private partnerships, (v) implementing strategic initiatives targeted at specific economic sectors, and (vi) promoting the development of certain strategic/regional projects.

*Permitting Process.*  The first initiative, the reengineering of Puerto Rico's permitting and licensing process, has already been achieved. On December 1, 2009, the Governor signed into law Act No. 161, which overhauls the existing permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development.  In the short term, this restructuring is focused on eliminating the significant backlog of unprocessed permits that are currently in the pipeline of various government agencies. Longer term, this law seeks to significantly reduce the number of inter-agency processes and transactions currently required by creating a centralized, client-focused system that simplifies and shortens the permitting process for applicants.  On December 1, 2010, a new permitting agency created under Act No. 161, which centralized permitting processes previously carried out by various agencies, commenced operations.

PR-CCD-0005702

*Energy Policy.*  On July 19, 2010, the Governor signed Acts No. 82 and 83, providing for, among other things, the adoption of a new energy policy, which is critical for Puerto Rico's competitiveness.  Presently, fluctuations in oil prices have a significant effect on Puerto Rico's overall economic performance.  Act No. 82 focuses on reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies.  This new energy policy seeks to lower energy costs, reduce energy-price volatility, and establish environmentally sustainable energy production through a reduction in ecologically harmful emissions.  This legislation also is expected to facilitate the development of several initiatives, including the wheeling of energy, conservation efforts, and the installation of new renewable generation capacity, among others.  Moreover, Act No. 83 created a green energy incentives program to promote the development of renewable energy projects as well as a Renewable Portfolio Standards Program. These initiatives are expected to address energy prices in Puerto Rico and provide a means of attracting investment in the energy sector.

*Tax Reform.*  In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates.  The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.  Legislation to implement the first phase of the tax reform was enacted as Act No. 171 of November 15, 2010.  Legislation to implement the second phase of the tax reform was enacted as Act No. 1.  See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

*Public-Private Partnerships.*  The administration believes that Public-Private Partnerships ("PPPs") represent an important tool for economic development, particularly in times of fiscal difficulties.  PPPs are contracts between government and non-governmental entities—such as private companies, credit unions, and municipal corporations—to develop infrastructure projects, manage government assets or provide government services.  The non-governmental partner takes on certain responsibilities and risks related to the development and/or operation of the project in exchange for certain benefits.

PPPs provide the opportunity for the government to lower project development costs, accelerate project development, reduce financial risk, create additional revenue sources, establish service quality metrics, and re-direct government resources to focus on the implementation of public policy.  Puerto Rico has opportunities for the establishment of PPPs in the areas of toll roads, ports, public schools, water provision, correctional facilities, and energy, among others.

On June 8, 2009, the Legislative Assembly approved Act No. 29 ("Act 29"), which established a clear public policy and legal framework for the establishment of public-private partnerships in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs.  Act 29 created the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding public-private partnerships.  On December 19, 2009, the PPP Authority approved regulations establishing the administrative framework for the procurement, evaluation, selection, negotiation and award process for public-private partnerships in Puerto Rico.

PR-CCD-0005703

During fiscal year 2010, the PPP Authority engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the PPP Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The PPP Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the PPP Authority has made substantial progress in the preparation of a PPP procurement for the Luis Muñoz Marin International Airport.

*Sector Initiatives.* The administration will complement the previously mentioned initiatives with specific strategic initiatives with the objective of creating jobs and increasing economic activity across various sectors of the Puerto Rico economy. The Commonwealth has natural or structural competitive advantages in several areas, such as pharmaceutical and biotechnology manufacturing. These advantages provide opportunities for the development of regional clusters in high-tech manufacturing, research and development, tourism, renewable energy, international trade and professional services. The specific initiatives will be designed to promote sustainable economic growth while accelerating to a knowledge-based and innovation driven economy, focused mainly in the development of human capital and intellectual property, thus diversifying Puerto Rico's economic base.

*Strategic/Regional Projects.* The administration has also targeted strategic/regional projects that will generate investments in various regions of the Island in order to foster balanced economic development. One of the strategic projects for the northern region is called the Urban Bay (formerly known as the Golden Triangle), an urban redevelopment project that incorporates the areas of Old San Juan, Puerta de Tierra, Isla Grande, including the Puerto Rico Convention Center District (the "District"), and Condado, as well as other communities in the vicinity of historic San Juan Bay. The aim of the Urban Bay project is to develop San Juan Bay into a major tourism, recreation, commercial and residential sector which serves the local community and becomes a major attraction for leisure and business travelers, both local and external. Also in the northern region, Science City represents a critical part of the administration's efforts to move Puerto Rico to the forefront of the science, technology and research and development. It seeks to leverage the significant competitive advantages in the knowledge-based sectors that put Puerto Rico in an ideal position to undertake this type of development.

In the eastern region, the Caribbean Riviera entails the redevelopment of the old Roosevelt Roads navy facility in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. This tourist complex will include hotels, casinos, eco-tourist attractions, international airport, retail, yacht marina, and cruise ship ports.

In the western region, the administration is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub.

I-27

PR-CCD-0005704

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2010 averaged 1,102,700, a decrease of 5.6% compared to previous fiscal year. During the first six months of fiscal year 2011, total employment averaged 1,084,500, a decline of 2.5% with respect to the same period of the prior year; and the unemployment rate averaged 15.9%.

The following table presents annual statistics of employment and unemployment for fiscal year 2006 through fiscal year 2010, and the average figures for the first six months of fiscal year 2011. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2009.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over, in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | (Annual Average) | | | |
| 2006 | 1,422 | 1,266 | 156 | 11.0 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011[3] | 1,289 | 1,085 | 205 | 15.9 |

---

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first six months of fiscal year 2011 (July through December 2010).

*Source:* Department of Labor and Human Resources – Household Survey

PR-CCD-0005705

**Economic Performance by Sector**

From fiscal year 2007 to fiscal year 2009, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009[2] |
| Manufacturing | $37,637 | $40,548 | $43,541 |
| Service[3] | 40,190 | 41,227 | 41,028 |
| Government[4] | 8,585 | 8,762 | 9,254 |
| Agriculture | 430 | 613 | 633 |
| Construction[5] | 2,027 | 1,991 | 1,782 |
| Statistical discrepancy | (464) | (215) | (538) |
| Total gross domestic product[6] | $88,405 | $92,926 | $95,708 |
| Less: net payment abroad | (28,884) | (31,399) | (32,949) |
| Total gross national product[6] | $59,521 | $61,527 | $62,759 |

[1] For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.
[2] Preliminary.
[3] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.
[4] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[5] Includes mining.
[6] Totals may not add due to rounding.

*Source:* Planning Board

Traditionally, the Government has presented the industrial distribution of production in Puerto Rico using gross domestic product because the Planning Board had not published such a distribution using real gross national product as a base measurement. Recently, the Planning Board presented an industrial distribution of production based on real gross national product, which shows significant differences in the importance of the manufacturing sector to the Puerto Rico economy:

PR-CCD-0005706

**Commonwealth of Puerto Rico**
**Gross National Product by Sector [1]**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009 [2] |
| Service [3] | $35,443 | $38,956 | $36,909 |
| Manufacturing | 12,570 | 12,870 | 13,623 |
| Government [4] | 9,529 | 9,757 | 10,373 |
| Construction [5] | 2,013 | 1,964 | 1,757 |
| Agriculture | 430 | 614 | 634 |
| Statistical discrepancy | (464) | (215) | (538) |
| Total gross national product [6] | $59,520 | $63,946 | $62,759 |

[1] For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using the North American Industry Classification System ("NAICS") rather than the Standard Industrial Codes ("SIC") used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.

[2] Preliminary.

[3] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services.

[4] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.

[5] Includes mining.

[6] Totals may not add due to rounding.

*Source:* Planning Board

The service sector's (which includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services) share appears significantly higher than manufacturing when compared to the industrial distribution of production in Puerto Rico based on gross domestic product. This variance occurs because manufacturing activity is principally carried out by non-resident entities whose income is not accounted for in Puerto Rico's real gross national product.

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

PR-CCD-0005707

The following table presents annual statistics of average employment based on NAICS for fiscal years 2006 to 2010.

### Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010[2] |
| Natural resources and construction | 65,492 | 64,700 | 59,675 | 49,083 | 33,642 |
| Manufacturing | | | | | |
|   Durable goods | 46,350 | 45,417 | 43,100 | 39,217 | 35,267 |
|   Non-durable goods | 66,233 | 62,442 | 60,950 | 57,492 | 54,725 |
| Sub-total | 112,583 | 107,858 | 104,050 | 96,708 | 89,992 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|   Wholesale trade | 33,992 | 33,267 | 33,717 | 33,250 | 32,467 |
|   Retail trade | 137,358 | 133,750 | 130,883 | 127,475 | 122,900 |
|   Transportation, warehouse, and utilities | 17,433 | 16,992 | 16,742 | 15,683 | 13,667 |
|     Sub-total | 188,783 | 184,008 | 181,342 | 176,408 | 169,033 |
| | | | | | |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,175 |
| Finance | 49,767 | 49,108 | 48,483 | 48,417 | 46,683 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,300 | 99,300 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,967 | 112,725 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,892 | 70,958 |
| Other services | 20,567 | 18,242 | 17,367 | 16,775 | 16,008 |
| Government[3] | 302,492 | 298,125 | 297,742 | 300,683 | 285,517 |
|     Total non-farm | 1,047,742 | 1,032,275 | 1,020,208 | 992,450 | 942,033 |

---

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

PR-CCD-0005708

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2009 manufacturing generated $43.5 billion, or 45.5%, of gross domestic product. Manufacturing, however, only generated $13.6 billion, or 21.7%, of real gross national product in fiscal year 2009. During fiscal year 2010, payroll employment for the manufacturing sector was 89,992, a decrease of 6.9% compared with fiscal year 2009. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2010, the average hourly manufacturing wage rate in Puerto Rico was approximately 53.2% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under THE ECONOMY and "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

PR-CCD-0005709

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector[1]**
**(at current prices, in thousands)**

|  | Fiscal Years Ended June 30, | | |
|---|---|---|---|
|  | 2007 | 2008 | 2009[2] |
| Food | $1,103,133 | $ 831,351 | $ 864,364 |
| Beverage and Tobacco Products | 932,301 | 1,405,111 | 1,554,799 |
| Textile Mills | 2,310 | 1,378 | 1,055 |
| Textile Product Mills | 13,944 | 13,876 | 12,221 |
| Apparel | 211,110 | 236,186 | 260,107 |
| Leather and Allied Products | 18,256 | 21,530 | 23,895 |
| Wood Products | 24,193 | 22,668 | 23,830 |
| Paper | 73,908 | 71,304 | 71,704 |
| Printing and Related Support Activities | 129,716 | 131,217 | 117,720 |
| Petroleum and Coal Products | 374,137 | 86,317 | 360,041 |
| Chemical | 26,891,695 | 27,966,500 | 29,806,137 |
| Plastics and Rubber Products | 126,642 | 127,091 | 122,338 |
| Nonmetallic Mineral Products | 295,265 | 273,670 | 236,869 |
| Primary Metals | 103,960 | 109,287 | 104,321 |
| Fabricated Metal Products | 248,929 | 247,804 | 250,066 |
| Machinery | 223,441 | 232,868 | 225,734 |
| Computer and Electronic Products | 4,222,014 | 5,957,553 | 6,266,460 |
| Magnetic and Optical | - | - | - |
| Electrical Equipment, Appliances and Components | 518,471 | 677,088 | 747,903 |
| Transportation Equipment | 81,906 | 85,913 | 78,249 |
| Furniture and Related Products | 66,039 | 62,985 | 54,217 |
| Miscellaneous | 1,975,250 | 1,986,317 | 2,359,370 |
| Total gross domestic product of manufacturing sector[3] | $37,636,619 | $40,548,014 | $43,541,398 |

---

[1] For fiscal year 2009, the Planning Board published all macroeconomic account data for fiscal years 2007, 2008 and 2009 using NAICS rather than SIC, which was used in prior years. As a result, macroeconomic data for fiscal years prior to 2007 are not comparable and have not been included in this table.

[2] Preliminary.

[3] Totals may not add due to rounding.

*Source:* Planning Board

PR-CCD-0005710

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2006 to 2010.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry group | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010[(1)] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,100 | 3,825 | 3,758 | 3,058 | 2,417 |
| Cement and concrete products manufacturing | 3,533 | 3,300 | 3,367 | 2,833 | 2,225 |
| Fabricated metal products | 5,775 | 5,675 | 5,375 | 4,908 | 3,842 |
| Computer and electronic | 10,808 | 10,092 | 8,600 | 7,033 | 5,958 |
| Electrical equipment | 6,842 | 6,617 | 6,658 | 5,867 | 5,025 |
| Electrical equipment manufacturing | 4,700 | 4,508 | 4,383 | 3,917 | 3,242 |
| Miscellaneous manufacturing | 11,258 | 12,292 | 11,967 | 11,975 | 11,875 |
| Medical equipment and supplies manufacturing | 10,533 | 11,575 | 11,342 | 11,442 | 11,392 |
| Other durable goods manufacturing | 7,567 | 6,917 | 6,742 | 6,375 | 6,150 |
| Total – durable goods | 46,350 | 45,417 | 43,100 | 39,217 | 35,267 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,650 | 12,183 | 11,725 | 11,392 | 11,567 |
| Beverage and tobacco products manufacturing | 3,392 | 3,258 | 3,267 | 3,125 | 3,125 |
| Apparel manufacturing | 8,258 | 7,708 | 9,633 | 9,825 | 9,133 |
| Cut and sew apparel manufacturing | 8,017 | 7,075 | 8,617 | 8,975 | 8,833 |
| Chemical manufacturing | 32,317 | 30,467 | 27,900 | 25,042 | 23,192 |
| Pharmaceutical and medicine manufacturing | 28,017 | 26,375 | 24,033 | 21,500 | 19,808 |
| Plastics and rubber products | 2,325 | 2,200 | 1,983 | 1,967 | 1,867 |
| Plastics product manufacturing | 2,133 | 2,025 | 1,850 | 1,825 | 1,758 |
| Other non-durable goods manufacturing | 7,292 | 6,625 | 6,442 | 6,142 | 5,842 |
| Total – non-durable goods | 66,233 | 62,442 | 60,950 | 57,492 | 54,725 |
| | | | | | |
| Total manufacturing employment | 112,583 | 107,858 | 104,050 | 96,708 | 89,992 |

\* Totals may not add due to rounding.
[(1)] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

I-34

PR-CCD-0005711

Total employment in the manufacturing sector decreased by 22,591 from fiscal year 2006 to fiscal year 2010. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009 and 2010, manufacturing employment decreased by 4.2%, 3.5%, 7.1% and 6.9%, respectively. For the first six months of fiscal year 2011, the sector lost an average of 1,400 jobs, or 1.6%, compared to the same period of the previous year. Given that this sector used to pay, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector is facing increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2009, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 2.6% between fiscal years 2007 and 2010. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2009, the service sector generated $41.0 billion, or 42.9%, of gross domestic product, while it generated $36.9 billion, or 58.8%, of real gross national product. Wholesale and retail trade, information services, education and health services, professional and business services and real estate and rentals experienced growth in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. Finance and insurance, transportation and warehousing, utilities, and leisure and hospitality experienced

PR-CCD-0005712

contractions in fiscal years 2007 to 2009, as measured by gross domestic product at current prices. From fiscal year 2007 to 2009, gross domestic product increased in the trade sector from $7.2 billion to $7.5 billion and in real estate and rentals from $11.7 billion to $13.3 billion, and decreased in finance and insurance from $6.7 billion to $5 billion.

Service-sector employment decreased from 566,725 in fiscal year 2006 to 532,883 in fiscal year 2010 (representing 56.6% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2010 represents a decrease of 2.4% compared to the prior fiscal year. For the first six months of fiscal year 2011, average service-sector employment was 536,050, a decrease of 0.3% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of September 30, 2010, there were ten commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of September 30, 2010 were $78.4 billion, as compared to $89.2 billion as of December 31, 2009. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. To date, the amount of jobs lost as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $5.5 billion as of September 30, 2010, up from $2.6 billion on September 30, 2009. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $13.8 billion as of September 30, 2010, up from $13.7 billion as of September 30, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of September 30, 2010, there were 34 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $37.8 billion, a decrease from $52.0 billion in total assets as of September 30, 2009. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.4 billion in assets as of September 30, 2010, a slight increase from $7.0 billion as of September 30, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

PR-CCD-0005713

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2009.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

|  | Fiscal Years ended June 30 | | |
|---|---|---|---|
|  | 2007 | 2008 | 2009[1] |
| Wholesale trade | $ 2,751.6 | $ 2,834.6 | $ 2,885.5 |
| Retail trade | 4,471.4 | 4,508.7 | 4,583.7 |
| Transportation and warehousing | 968.3 | 998.5 | 978.0 |
| Utilities | 2,214.4 | 2,114.6 | 2,123.1 |
| Information | 2,466.5 | 2,477.4 | 2,552.8 |
| Finance and insurance | 6,694.3 | 6,693.4 | 4,951.8 |
| Real Estate and rental | 11,685.7 | 12,152.0 | 13,253.5 |
| Professional and business | 3,112.5 | 3,223.7 | 3,305.0 |
| Education and health | 3,592.5 | 3,932.1 | 4,131.4 |
| Leisure and hospitality | 1,861.5 | 1,919.1 | 1,895.6 |
| Other services | 371.6 | 372.8 | 367.9 |
| Total | $40,190.3 | $41,226.9 | $41,028.3 |

*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2006 to 2010.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector\***
**(thousands of persons age 16 and over)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | 2006 | 2007 | 2008 | 2009 | 2010[1] |
| Wholesale trade | 33,992 | 33,267 | 33,717 | 33,250 | 32,467 |
| Retail trade | 137,358 | 133,750 | 130,883 | 127,475 | 122,900 |
| Transportation, warehouse and utilities | 17,433 | 16,992 | 16,742 | 15,683 | 13,667 |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,175 |
| Finance | 49,767 | 49,108 | 48,483 | 48,417 | 46,683 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,300 | 99,300 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,967 | 112,725 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,892 | 70,958 |
| Other services | 20,567 | 18,242 | 17,367 | 16,775 | 16,008 |
| Total | 566,725 | 561,592 | 558,742 | 545,975 | 532,883 |

\* Totals may not add due to rounding.
[1] Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

I-37

PR-CCD-0005714

*Hotels and Related Services—Tourism*

For fiscal year 2010, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,803,900, an increase of 5.5% over the number of persons registered during fiscal year 2009. The average occupancy rate in tourist hotels during fiscal year 2010 was 69.0%, compared to 66.2% in fiscal year 2009. The average number of rooms available in tourist hotels increased by 3.6% to 11,403 rooms from fiscal year 2009 to fiscal year 2010.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2010, employment in hotels and other lodging facilities was reduced by 3.5% to 12,800 jobs. For the first five months of fiscal year 2011, the average decrease in employment in hotels and other lodging facilities was 0.3% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 71,000 for fiscal year 2010, an increase of 0.1% over employment for fiscal year 2009. For the first five months of fiscal year 2011, employment has declined by 1.5% to 70,200 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2009.

PR-CCD-0005715

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,361,643 | 1,386,925 | 2,324,274 | 5,072,842 |
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2005 | 1,428.4 | 167.1 | 1,643.1 | 3,238.6 |
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009[5] | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.
*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Roselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

I-39

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2009, the government accounted for $9.3 billion, or 9.7%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 285,600 workers (state, including public corporations, and local), or 28.8% of total, non-farm, payroll employment in fiscal year 2009. From fiscal year 2006 to fiscal year 2009, state and municipal government employment averaged approximately 284,900. During fiscal year 2010, state and municipal government employment decreased by 17,600 jobs, or 6.2%. According to the payroll survey, the distribution of these job reductions was 13,400 jobs in the state government and 4,200 jobs in municipal government.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment, collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7. See "Litigation."

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-

PR-CCD-0005717

private partnership. The PPP Authority expects to issue a request for qualifications by the third quarter of fiscal year 2011.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. During the first half of fiscal year 2011, the PPP Authority commenced the procurement process for the establishment of a concession for toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed in March 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. During the period from fiscal year 2007 to 2009, however, real construction investment decreased at an average annual rate of 14.7%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 9.8%.

Public investment has been an important component of construction investment. During fiscal year 2009, approximately 52.9% of the total investment in construction was related to public projects. The total value of construction permits decreased 29.2% in fiscal year 2010 as compared to fiscal year 2009, and total sales of cement decreased by 26.3% between 2009 and 2010, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2010 was 33,600, a reduction of 31.5% from fiscal year 2009. During the first six months of fiscal year 2011, payroll employment in the construction sector averaged

I-41

27,100, a further reduction of 24.6% for the same period in fiscal year 2010 and the lowest level of construction sector employment in a decade.

Total construction investment for fiscal year 2009 decreased in real terms by 20.1%, following a 9.0% real decline in fiscal year 2008, due principally to the drop in private construction activity. The Planning Board expects a further construction investment decrease of 5.2% in real terms for fiscal year 2010. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. While the Planning Board had originally projected a further construction investment decrease of 10.5% in real terms for fiscal year 2010, the expected positive impact of the Federal Stimulus and the Local Stimulus led it to reduce its projected decrease in construction investment to 5.2% in real terms. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010 and by 14.1% during the first six months of fiscal year 2011, reaching levels not seen in almost three decades.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided under Act No. 132 will be available from September 1, 2010 to June 30, 2011. Certain permanent incentives are also available for rental housing.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2009, gross income from agriculture was $633 million, an increase of 3.4% compared with fiscal year 2008.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

I-42

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 15,312,298 | 56.4% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 27,946,091[3] | 15,927,986 | 57.0% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,378,777[3] | 16,611,710 | 58.5% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,744,193[3] | 16,911,486 | 58.8% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,062,634[3] | 17,272,043 | 59.4% |
| 2005 | 406,547[3] | 208,032 | 51.2% | 29,134,149[3] | 17,487,481 | 60.0% |
| 2006 | 400,530[3] | 209,547 | 52.3% | 29,236,155[3] | 17,758,872 | 60.7% |
| 2007 | 396,059[3] | 225,402 | 56.9% | 29,407,260[3] | 18,248,133 | 62.1% |
| 2008 | 395,482[3] | 227,546 | 57.5% | 29,757,219[3] | 19,102,814[4] | 62.8% |

[1] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).
[4] Middle alternative projection (NCES).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

I-43

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2009-2010 was approximately 65,699 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

## Tax Incentives

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

### Industrial Incentives Program

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on

PR-CCD-0005721

royalty payments.  Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%).  In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes.  In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes.  Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale.  The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies.  In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

PR-CCD-0005722

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a

PR-CCD-0005723

renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

PR-CCD-0005724

# DEBT

## Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the Sales Tax (as defined under "Major Sources of General Fund Revenues—Sales and Use Taxes" under "Puerto Rico Taxes, Other Revenues, and Expenditures" below) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $939,262,955 in the fiscal year ending June 30, 2015 (based on the assumption that the (i) Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) Public Improvement Refunding Bonds, Series 2004 B and the Public Improvement Refunding Bonds, Series 2008 B, which are variable rate bonds, bear interest at 12% per annum, and (iii) portion of each of the Public Improvement Refunding Bonds, Series 2003 C, Public Improvement Bonds of 2006, Series A, and Public Improvement Refunding Bonds, Series 2007 A that are variable rate bonds, bear interest at 12% per annum). This amount ($939,262,955) *plus* the amount paid by the Commonwealth in fiscal year 2010 on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $949,238,499, is equal to 12.97% of $7,320,525,500, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2009 and June 30, 2010. If the interest on the outstanding bonds described in items (i) through (iii) above was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the

I-48

percentage referred to in the preceding sentence would be 11.44% and future maximum annual debt service for the Commonwealth's outstanding general obligation debt would be $826,812,043 in the fiscal year ending June 30, 2020. The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of September 30, 2010, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $198.7 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2010, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million. See "Commonwealth Guaranteed Debt" below.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of September 30, 2010. This table includes debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products, some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.1 billion of outstanding bonds (as of September 30, 2010) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.6 billion of obligations of Public Finance Corporation issued to purchase certain Commonwealth public sector debt.

PR-CCD-0005726

**Commonwealth of Puerto Rico**
**Public Sector Debt\***
**(in millions)**

|                                                              | September 30, 2010 |
|--------------------------------------------------------------|-------------------:|
| GENERAL FUND RELATED DEBT                                    |                    |
| Direct full faith and credit obligations                     | $ 9,193            |
| Puerto Rico guaranteed debt[1]                               | 4,254              |
| Debt supported by Puerto Rico appropriations or taxes[2]     | 3,389              |
| Tan and Revenue Anticipation Notes[3]                        | 900                |
| Pension Obligation Bonds[4]                                  | 2,948              |
|    TOTAL GENERAL FUND RELATED DEBT            | $20,684            |
|                                                              |                    |
| Sales Tax debt                                               | $13,437            |
| Public corporations and agencies[5]                          | 23,216             |
| Municipal Debt                                               | 3,202              |
| Limited Obligations/non-recourse debt[6]                     | 2,431              |
|    TOTAL PUBLIC SECTOR DEBT                   | $62,970            |

\* Totals may not add due to rounding.

[1] Consists of $601 million of bonds issued by Aqueduct and Sewer Authority, $384 million of State Revolving Fund Loans incurred under various federal water laws, $198.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of Public Buildings Authority bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

[3] Includes related short-term financings.

[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5] Excludes the Electric Power Authority's $218,225,000 Power Revenue Refunding Bonds issued in October 2010 and $355,730,000 Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) issued in December 2010.

[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $189 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

I-50

PR-CCD-0005727

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Debt Service Requirements for Commonwealth General Obligation Bonds**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding on February 10, 2011. This table, however, does not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

PR-CCD-0005728

**Puerto Rico Debt Service Requirements\***
**(In thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2011 | $ 259,735 | $ 236,380 | $ 496,115[(1)] |
| 2012 | 362,335 | 458,496 | 820,831 |
| 2013 | 387,005 | 437,019 | 824,024 |
| 2014 | 395,445 | 416,080 | 811,525 |
| 2015 | 428,575 | 397,020 | 825,595 |
| 2016 | 449,490 | 375,975 | 825,465 |
| 2017 | 396,915 | 354,122 | 751,037 |
| 2018 | 400,370 | 334,882 | 735,252 |
| 2019 | 487,525 | 316,585 | 804,110 |
| 2020 | 546,400 | 292,810 | 839,210 |
| 2021 | 421,540 | 265,581 | 687,121 |
| 2022 | 351,420 | 245,633 | 597,053 |
| 2023 | 321,255 | 228,925 | 550,180 |
| 2024 | 336,215 | 214,237 | 550,452 |
| 2025 | 340,610 | 198,392 | 539,002 |
| 2026 | 332,845 | 180,813 | 513,658 |
| 2027 | 349,140 | 163,952 | 513,092 |
| 2028 | 375,640 | 145,956 | 521,596 |
| 2029 | 339,095 | 126,627 | 465,722 |
| 2030 | 352,240 | 110,573 | 462,813 |
| 2031 | 371,395 | 93,717 | 465,112 |
| 2032 | 184,545 | 75,786 | 260,331 |
| 2033 | 163,245 | 66,400 | 229,645 |
| 2034 | 172,615 | 57,938 | 230,553 |
| 2035 | 135,555 | 49,722 | 185,277 |
| 2036 | 143,245 | 42,034 | 185,279 |
| 2037 | 151,790 | 33,489 | 185,279 |
| 2038 | 160,675 | 24,604 | 185,279 |
| 2039 | 170,105 | 15,171 | 185,276 |
| 2040 | 80,450 | 4,965 | 85,415 |
| | $9,367,415 | $5,963,884 | $15,331,299 |

\*  Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds
   as to which the Commonwealth has entered into interest rate exchange agreements.
(1)  Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.

*Sources*:  Government Development Bank for Puerto Rico and Treasury Department

## Interest Rate Exchange Agreements

*General.*  The Commonwealth and various public corporations are party to various
interest rate exchange agreements or swaps.  Except for the basis swaps discussed below, the
purpose of all of the interest rate exchange agreements currently in place is to hedge the
Commonwealth's variable rate debt exposure and the interest rate risks associated therewith.
When the Commonwealth or a public corporation has issued variable rate bonds, it has entered
into an interest rate exchange agreement with a counterparty pursuant to which the
Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the
counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to

PR-CCD-0005729

match the variable rate payable on the bonds (a "synthetic fixed rate swap"). In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate payments on the bonds and, thus, the Commonwealth or the public corporation is left with a net fixed rate payment to a counterparty. The intention of these swaps was to lower the all-in cost of borrowing below what could have been achieved by issuing fixed rate bonds.

*Basis Swap.* The Commonwealth and the Puerto Rico Electric Power Authority ("PREPA") are also party to agreements ("basis swaps" ), entered into in June 2006 and March 2008, respectively, pursuant to which they are making payments on a specified notional amount based on a short-term interest rate index published by the Securities Industry and Financial Markets Association ("SIFMA") and are receiving from their counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate ("LIBOR") plus a specified fixed rate payment (the "basis annuity"). For fiscal year 2010 and the first six months of fiscal year 2011, the Commonwealth received $6.9 million and $3.8 million, respectively, from its counterparties under the basis swap, net of the Commonwealth's payments to the counterparties, and PREPA received $9.5 million and $4.8 million, respectively, from its counterparty under the basis swap, net of PREPA's payments to the counterparty.

*Risks.* By using derivative financial instruments, the Commonwealth exposes itself, among other risks, to credit risk (based on the counterparty's ability to perform under the terms of the agreement), market risk (based on the changes in the value of the instrument resulting from changes in interest rates and other market factors) and, in the case of basis swaps, basis risk (based on changes to the correlation between different indexes used in connection with a derivative and the variable rate debt they hedge). GDB, as fiscal agent, regularly monitors the exposure of the Commonwealth and the public corporations under the interest rate exchange agreements and attempts to minimize the risks. To minimize some of the credit risk, the Commonwealth and the public corporations enter into agreements with counterparties that have good credit ratings. The outstanding interest rate exchange agreements are with eleven different counterparties, all of which are rated in one of the three highest rating categories by either Moody's or S&P. In addition, all of the agreements contain requirements of posting collateral by the counterparties based on certain valuation thresholds and credit ratings.

During fiscal years 2009 and 2010, in order to reduce the risks associated with the swaps portfolio, the Commonwealth and the public corporations terminated approximately $2.0 billion of swaps. In May and September 2009, the Commonwealth terminated a swap with an $850 million notional amount pursuant to which the Commonwealth was making payments based on the published short-term SIFMA municipal swap rate and was receiving payments based on the 10-year SIFMA (the "constant maturity swap") at an aggregate gain of approximately $24.8 million. Besides the basis swaps, the constant maturity swap was the only other interest rate exchange agreement that did not hedge specific variable rate debt of the Commonwealth. The aggregate notional amount of the swaps for the Commonwealth and the public corporations has decreased from $9.2 billion as of June 30, 2008, to $7.9 billion as of June 30, 2009 and $7.1 billion as of December 31, 2010, an aggregate decrease of 22.8%.

*Notional Amounts.* The table below shows the aggregate notional amount as of December 31, 2010 of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

PR-CCD-0005730

**Swap Portfolio Breakdown**
**Notional Amount**
(as of December 31, 2010)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $1,533,675,000 | $1,698,370,000 | $3,232,045,000 |
| Electric Power Authority | 411,825,000 | 1,375,000,000 | 1,786,825,000 |
| Highways and Transportation Authority | 647,025,000 | — | 647,025,000 |
| Ports Authority | 411,705,000 | — | 411,705,000 |
| Sales Tax Financing Corporation | 1,043,000,000 | — | 1,043,000,000 |
| Total | $4,047,230,000 | $3,073,370,000 | $7,120,600,000 |

*Market Value.* Generally, the interest rate exchange agreements may be terminated by the Commonwealth or the public corporations at any time at their then current market values. The agreements may also be terminated upon the occurrence of certain credit events. If a termination occurs due to a credit event, the Commonwealth or the public corporations may be obligated to pay to the applicable swap counterparty an amount based on the terminating swap's market value, which may be substantial, or vice versa, with other termination costs being paid by the defaulting party. The mark-to-market value of the swaps fluctuates with interest rates and other market conditions. The Commonwealth's obligations under the interest rate exchange agreements are secured by the full faith, credit and taxing power of the Commonwealth.

The following table shows, as of December 31, 2010, the net mark-to-market value of all outstanding interest rate exchange agreements. Since the mark-to-market value of all swaps was negative as of December 31, 2010, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements had been terminated as of that date.

**Swap Portfolio Mark-to-Market Valuation**
(as of December 31, 2010)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $(213,368,840) | $(68,199,368) | $(281,568,208) |
| Electric Power Authority | (49,312,732) | (38,809,946) | (88,122,678) |
| Highways and Transportation Authority | (96,445,669) | — | (96,445,669) |
| Ports Authority | (47,304,890) | — | (47,304,890) |
| Sales Tax Financing Corporation | (193,330,947) | — | (193,330,947) |
| Total | $(599,763,078) | $(107,009,314) | $(706,772,392) |

*Collateral Requirements.* Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. During the fourth quarter of 2008, as a result of the U.S. financial market crisis, the Commonwealth and the public corporations were required to post collateral of approximately $251.8 million and $82.5 million, respectively, to their counterparties on certain interest rate exchange agreements. Based on an improvement in the mark-to-market value of the swap portfolio since then, the Commonwealth had $37.7 million of collateral posted to its

I-54

PR-CCD-0005731

counterparties as of December 31, 2010 and the public corporations had no collateral posted as of that date. However, if the mark-to-market value of the swaps portfolio deteriorates or the credit ratings of the Commonwealth or the public corporations are lowered, the collateral posting obligations contained in the agreements may require further deliveries of collateral.

**Variable Rate Bonds and Mandatory Tender Bonds**

*Variable Rate Bonds.* The Commonwealth and various public corporations have outstanding variable rate bonds, consisting of variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds") and other bonds where the interest rate changes periodically based on the LIBOR rate or a particular index but that are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers with respect to all variable rate bonds. Pursuant to these agreements, the Commonwealth and the public corporations receive a variable rate payment expected to approximate the interest cost of the variable rate bonds, and pay a fixed rate. See "Interest Rate Exchange Agreements."

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of December 31, 2010.

## Variable Rate Debt Breakdown
(as of December 31, 2010)

| | VRDO Bonds | Other Variable Rate Debt | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $865,900,000 | $ 601,790,000 | $1,340,965,000 |
| Electric Power Authority | — | 411,825,000 | 411,825,000 |
| Highways and Transportation Authority | 200,000,000 | 447,025,000 | 647,025,000 |
| Sales Tax Financing Corporation | — | 136,000,000 | 136,000,000 |
| Total | $1,065,900,000 | $1,596,640,000 | $2,535,815,000 |

The VRDO Bonds bear a floating interest rate adjusted at specified intervals, such as daily or weekly (each, a "remarketing date") and provide investors the option to tender or put the bonds at par on each remarketing date. The tendered bonds are then resold by a remarketing agent in the secondary market to other investors. Most of the VRDO Bonds are secured by letters of credit or other liquidity or credit facilities ("credit/liquidity facilities") that provide for the payment of the purchase price payable upon the tender of the bonds. The credit/liquidity facilities expire prior to the final maturity of the bonds. If upon the expiration or termination of any credit/liquidity facility with respect to a series of VRDO Bonds the Commonwealth or the applicable public corporation is unable to renew or replace such facility with an alternate credit/liquidity facility, the VRDO Bonds of such series are subject to mandatory tender for purchase by the credit/liquidity facility provider and generally become subject to higher interest rates and accelerated amortization schedules pursuant to the terms of each expiring credit/liquidity facility.

I-55

PR-CCD-0005732

The recent U.S. financial market crisis has resulted in a significant reduction in the availability of credit/liquidity facilities to support VRDO Bonds, and a related increase in the price of these facilities when they can be obtained. Thus, if the Commonwealth and the public corporations are not able to renew or rollover the expiring credit/liquidity facilities with respect to VRDO Bonds, or are not able to do so at an acceptable price, the Commonwealth and the public corporations would have to refinance the VRDO Bonds or otherwise obtain financing for such bonds in order to avoid the higher interest rates and accelerated amortization schedules set forth in the expiring credit/liquidity facility.

In addition, since there are interest rate exchange agreements with respect to all VRDO Bonds, if the Commonwealth or the applicable public corporation cannot renew or replace a credit/liquidity facility upon its expiration or remarket the related series of bonds successfully upon their mandatory tender as variable rate bonds, the Commonwealth or the applicable public corporation may have to terminate the interest rate exchange agreements associated with such series of VRDO Bonds. Termination of the applicable interest rate exchange agreement may result, depending on then current interest rate levels and market conditions, in the payment of a termination amount, which may be substantial, by the Commonwealth to compensate the counterparty for its economic losses. As of December 31, 2010, the mark-to-market value of all the interest rate exchange agreements with respect to VRDO Bonds was negative $127.6 million for the Commonwealth and negative $30.8 million for the public corporations. See "Interest Rate Exchange Agreements – Market Value."

The following table shows, by fiscal year, the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit/liquidity facilities.

**VRDO Bonds Rollover**
(by Fiscal Year)

|  | 2011 | 2012 | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $273,975,000 | $591,925,000 | $865,900,000 |
| Highways and Transportation Authority | 200,000,000 | — | 200,000,000 |
| Total | $473,975,000 | $591,925,000 | $1,065,900,000 |

*Mandatory Tender Bonds.* As of December 31, 2010, the Commonwealth and the public corporations also had outstanding bonds bearing interest at a fixed rate but subject to mandatory tender for purchase prior to maturity, payable from the remarketing of the bonds, on certain specified dates (the "Mandatory Tender Bonds"). After the mandatory tender date, the Commonwealth or the applicable public corporation may from time to time change the method of determining the interest on the Mandatory Tender Bonds, which may be a fixed or variable rate. The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds.

PR-CCD-0005733

The following table shows, as of December 31, 2010, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

### Mandatory Tender Bonds Breakdown
#### (as of December 31, 2010)

|  | Mandatory Tender Bonds | Mandatory Tender Date |
|---|---|---|
| Commonwealth (General Obligation) | $279,240,000 | July 1, 2012 |
| Public Finance Corporation | 1,206,130,000 | February 1, 2012 |
| Public Buildings Authority | 464,880,000 | July 1, 2012 ($335,580,000) |
|  |  | July 1, 2017 ($129,300,000) |
| Total | $1,950,250,000 |  |

The Commonwealth has entered into forward starting interest rate exchange agreements with respect to approximately $69.2 million of its Mandatory Tender Bonds. COFINA has also entered into forward starting interest rate exchange agreement with respect to approximately $907 million of Mandatory Tender Bonds of Public Finance Corporation. The forward starting interest rate exchange agreements assume that the Commonwealth Mandatory Tender Bonds will be remarketed as variable rate bonds after their mandatory tender date and that COFINA will issue variable rate bonds to refund the Public Finance Corporation Mandatory Tender Bonds on their mandatory tender date. If the Commonwealth and COFINA cannot remarket or issue these bonds as variable rate bonds at that time, they may have to terminate their respective forward starting interest rate exchange agreements, which may result in the payment of a termination amount. As of December 31, 2010, the mark-to-market value of these forward starting swaps to the Commonwealth and COFINA was negative $7.7 million and negative $154.3 million, respectively, which are the amounts the Commonwealth and COFINA would have been required to pay to terminate the swaps on that date.

### Ratings of Commonwealth General Obligation Bonds

The Commonwealth's general obligation and appropriation debt is currently rated "A3" with a negative outlook by Moody's, "BBB+" with a stable outlook by Fitch, and "BBB−" with a positive outlook by S&P.

### Commonwealth Guaranteed Debt

As of September 30, 2010, $3.07 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $258.8 million in fiscal year 2011, with their final maturity being July 1, 2039. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of September 30, 2010, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of September 30, 2010, GDB held approximately $198.7 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The

PR-CCD-0005734

Authority is authorized to issue and GDB is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. Payments of $38.1 million under the Commonwealth guaranty have been required to pay interest and principal on these bonds. See "Other Public Corporations—Port of the Americas Authority" under "Public Corporations" below.

As of September 30, 2010, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $985.3 million. This amount consisted of $284.8 million in revenue bonds sold to the public, $316.6 million in bonds issued to the United States Department of Agriculture, Rural Development, and $383.9 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under "Public Corporations" below.

PR-CCD-0005735

## Trends of Public Sector Debt

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2010 and for the first three months of the fiscal year 2011. As of September 30, 2010, outstanding short-term debt, relative to total debt, was 8.1%.

### Commonwealth of Puerto Rico
### Public Sector Debt and Gross National Product
### (dollars in millions)*

| June 30, | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Gross National Product[1] Amount | Rate of Increase |
|---|---|---|---|---|---|---|---|
| 2006 | 37,313 | 2,620[4][5] | 39,933 | 6.6 | 8.8 | 56,732 | 5.5 |
| 2007 | 39,492 | 3,326[4] | 42,818 | 7.8 | 7.2 | 59,521 | 4.9 |
| 2008 | 43,663 | 3,269[4] | 46,932 | 7.0 | 10.0 | 61,527 | 3.4 |
| 2009 | 48,332 | 4,648[4] | 52,980 | 8.8 | 13.0 | 62,759 | 2.0 |
| 2010 | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 63,866 | 1.8 |
| September 30, 2010 | 52,920 | 4,671 | 57,591 | 8.1 | 1.3 | - | - |

\* Totals may not add due to rounding.

[1] In current dollars.

[2] Does not include the (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.

[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

[4] Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

[5] Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:* Government Development Bank for Puerto Rico

I-59

PR-CCD-0005736

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2010 and for the first three months of the fiscal year 2011.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2006 | 9,841 | 552[4][5] | 10,393 | 2,037 | 293 | 2,330 | 25,435 | 1,775 | 27,210 | 37,313 | 2,620 | 39,933 |
| 2007 | 10,335 | 224[4] | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| 2008 | 9,273 | 519[4] | 9,792 | 2,507 | 313 | 2,820 | 31,633 | 2,437 | 34,070 | 43,413 | 3,269 | 46,682 |
| 2009 | 9,382 | 557[4] | 9,939 | 2,691 | 306 | 2,997 | 36,259 | 3,785 | 40,044 | 48,332 | 4,648 | 52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| September 30, 2010 | 9,731 | 1,268 | 11,000 | 2,922 | 281 | 3,202 | 40,267 | 3,122 | 43,389 | 52,920 | 4,671 | 57,591 |

\*    Totals may not add due to rounding.

[1]   Does not include the Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[2]   Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[3]   Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

[4]   Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

[5]   Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:* Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of September 30, 2010 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service

PR-CCD-0005737

reserve funds. More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**September 30, 2010**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 601,339 | $ 1,338,650 | $ 1,939,989 | $383,880 | $ 1,046,370 | $1,430,250 | $ 985,219 | $ 2,385,020 | $ 3,370,239 |
| Convention Center District Authority | - | 447,160 | 447,160 | - | 151,076 | 151,076 | - | 598,236 | 598,236 |
| Electric Power Authority | - | 7,422,875 | 7,422,875 | - | 147,468 | 147,468 | - | 7,570,343 | 7,570,343 |
| Highway and Transportation Authority | - | 6,119,949[1] | 6,119,949 | - | 1,032,393 | 1,032,393 | - | 7,152,342 | 7,152,342 |
| Housing Finance Authority[2] | - | 316,672 | 316,672 | - | 65,648 | 65,648 | - | 382,320 | 382,320 |
| Industrial Development Company | - | 241,195 | 241,195 | - | 89,075 | 89,075 | - | 330,270 | 330,270 |
| Infrastructure Financing Authority[3] | - | 1,882,938 | 1,882,938 | - | 3,470 | 3,470 | - | 1,846,408 | 1,846,408 |
| Port of the Americas Authority | 198,724 | - | 198,724 | - | - | - | 198,724 | - | 198,724 |
| Ports Authority | - | 46,326[4] | 46,326 | - | 696,071 | 696,071 | - | 742,397 | 742,397 |
| Public Buildings Authority | 3,069,539 | - | 3,069,539 | - | 193,690 | 193,690 | 3,069,539 | 193,690 | 3,263,229 |
| Public Finance Corporation | - | 1,618,284[5] | 1,618,284 | - | - | - | - | 1,618,284 | 1,618,284 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 13,437,045 | 13,437,045 | - | - | - | - | 13,437,045 | 13,437,045 |
| University of Puerto Rico | - | 554,289[6] | 554,289 | - | 0 | 0 | - | 554,289 | 554,289 |
| Others[7] | - | - | - | - | 2,284,468 | 2,284,468 | - | 2,284,468 | 2,284,468 |
| Total[8] | $3,869,602 | $33,425,383 | $37,294,985 | $383,880 | $5,709,729 | $6,093,609 | $4,253,482 | $39,135,112 | $43,388,594 |

[1] Excludes $151 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.
[2] Excludes the $189 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the U.S. Department of Housing and Urban Development.
[3] Includes $42.2 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement.
[4] Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.
[5] Payable primarily from Commonwealth appropriations.
[6] Excludes $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.
[7] Includes lines of credit with GDB.
[8] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.3 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below.

*Sources:* Government Development Bank for Puerto Rico

## Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009 and 2010, GDB entered into fiscal oversight agreements with the Aqueduct and

PR-CCD-0005738

Sewer Authority, Electric Power Authority, Highway and Transportation Authority, and Ports Authority. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of September 30, 2010, GDB had total assets of $14.7 billion and total liabilities of $13.0 billion. GDB's total capital as of such date was $1.7 billion and its total capital ratio was 11.69%. GDB's debt is currently rated A3 and BBB by Moody's and S&P, respectively, with a stable outlook.

As of June 30, 2010, $3.2 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $3 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of September 30, 2010. As of said date, GDB also had $7.1 billion in loans outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB has not made any payment to the General Fund under Act 82 since fiscal year 2004.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of September 30, 2010, the Perpetual Trust had repaid $123.9 million of its line of credit and had an outstanding balance of $376 million and no interest due. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover operating expense, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and liquidity.

PR-CCD-0005739

GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.* Puerto Rico Housing Finance Authority ("Housing Finance Authority") (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority. Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency. As of September 30, 2010, Housing Finance Authority's total outstanding loans to the private sector for development of housing projects targeted to low and moderate income families were $115.7 million. The Authority's mortgage loans to low and moderate income homeowners represented an additional $92.5 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds and notes that were issued to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units. Such bonds and notes are generally limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions. As of September 30, 2010, the Housing Finance Authority had total notes and bonds outstanding of $982.3 million (including $865.5 million in outstanding bonds, $104.2 million of debt outstanding under GDB lines of credit, and $4.8 million in notes payable), and total unrestricted net assets of $266.2 million.

*Puerto Rico Tourism Development Fund.* Puerto Rico Tourism Development Fund ("TDF") promotes Puerto Rico's hotel and tourism industry by working with private sector financial institutions in structuring financings for new hotel projects. TDF can provide guarantees to interim and permanent financings for new hotel development projects. In certain cases, TDF acts as a direct lender, guarantees mezzanine financings and provides preferred equity capital. As of September 30, 2010, TDF had outstanding direct loans in an aggregate principal amount of $377 million and guarantees in the amount of $339 million.

TDF has made payments under its guarantees and letters of credit in the aggregate amount of approximately $210 million with respect to several projects. Of the total amount disbursed, TDF has been able to recover approximately $156 million from the borrowers.

As of June 30, 2010, TDF had net assets of $171 million (including approximately $72.1 in equity investments transferred from the Capital Fund), and its allowance for losses on guarantees, loans, other assets and letters of credit was approximately $77.1 million.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") invests and trades in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to the Tourism

PR-CCD-0005740

Development Fund, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of September 30, 2010, the Capital Fund had assets of $247,000.

*Development Fund.* Puerto Rico Development Fund (the "Development Fund") provides an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund also guarantees obligations of these enterprises and invests in their equity securities. As of September 30, 2010, the Development Fund had $35.3 million in assets of consisting of (i) $7.1 million in loans, (ii) $5.7 million in preferred shares of various private entities, (iii) $15 million in loan guarantees under the "Key to Your Business" program of the Economic Development Bank, and (iv) $22.4 million in an interest bearing account.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") provides agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. PFC currently holds notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health, and the Aqueduct and Sewer Authority, among others. As of September 30, 2010, it had $1.6 billion aggregate principal amount of bonds outstanding. All such bonds are limited, non-recourse obligations of PFC payable from Commonwealth appropriations made to pay the notes held by PFC.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* PRASA owns and operates Puerto Rico's public water supply and wastewater systems.

PRASA reported an operating loss of $58.3 million for fiscal year 2010, compared to operating losses of $63.7 million and $101.2 million for fiscal years 2009 and 2008, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

As of September 30, 2010, PRASA's total debt was $3.4 billion. This debt includes outstanding bonds in the principal amount of $1.9 billion and interim financing for capital improvements in the principal amount of 1.4 billion. PRASA's senior debt is rated Baa1, BBB- and BBB+ by Moody's, S&P and Fitch Ratings ("Fitch"), respectively. On November 9, 2010, Moody's affirmed PRASA's rating but revised its outlook to negative from stable. The negative outlook reflects PRASA's continued reliance on GDB and the Commonwealth for financial support, as well as the operational challenges it faces to reduce the significant amount of water lost through its system.

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the

PR-CCD-0005741

event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

On April 28, 2006, the Authority entered into a consent decree with the U.S. Environmental Protection Agency ("EPA") that requires the Authority to implement system wide remedial measures at all of the wastewater treatment plants operated by the Authority. The EPA consent decree establishes deadlines for the compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between the Authority and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. The Authority agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the agreements signed with the EPA and DOH agencies. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

PRASA has already invested $941 million in capital investment projects covering the first 5-year term of the above mentioned agreements.

During fiscal year 2011, PRASA has received $85 million in Commonwealth appropriations and $20 million in other Commonwealth available funds. According to the provisions of PRASA's trust agreement, these moneys are taken into account for purposes of determining its revenues and its compliance with certain covenants therein.

*Children's Trust.* Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.2 billion Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. On June 30, 2005, Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth. On May 1, 2008, Children's Trust issued an additional $195.9 million of subordinate Tobacco Settlement Asset-Backed Bonds. As of September 30, 2010, Children's Trust had outstanding bonds in the principal amount of $1.3 billion. These bonds and any, other additional senior bonds issued by Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement

I-65

PR-CCD-0005742

Agreement. To date, all principal and interest payments required to be made by Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.* PRDCA was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Roselló González Convention Center, a new convention center, and designated private parcels located within the Convention Center District in San Juan. The convention center opened in November 2005. PRDCA also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum. As of September 30, 2010, Convention Center District Authority's debt was $598.2 million, consisting of $447.1 million in outstanding bonds issued to finance the convention center that are payable from a portion of a hotel room tax and $151.0 million line of credit with GDB used to finance the construction of the Coliseum that is payable from the Commonwealth's General Fund.

*Electric Power Authority.* Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported net operating income of $377.7 million (unaudited), $362.6 million, $181.1 million and $370.9 million during fiscal years 2010, 2009, 2008 and 2007, respectively. The total debt of PREPA was $7.6 billion as of September 30, 2010. This debt includes outstanding bonds of $7.4 billion and interim financing for operations of $147.5 million. PREPA's debt is rated A3, BBB+ and BBB+ by Moody's, S&P and Fitch, respectively.

In October 2010, PREPA issued its Power Revenue Refunding Bonds, Series DDD in the amount of $218,225,000 to refund a portion of its outstanding Power Revenue and Power Revenue Refunding Bonds for present value savings. PREPA has used and will use the proceeds of these bonds to repay outstanding lines of credit used to fund capital improvements and finance working capital needs as well as to refund a portion of its outstanding bonds and provide for the termination of certain synthetic fixed swaps associated with the refunded bonds.

In December 2010, PREPA issued its Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) in an aggregate principal amount of $355,730,000. The proceeds of these bonds will be utilized to fund its capital improvement program, including the construction of a new natural gas pipeline.

As a means of reducing its dependency on oil, PREPA has entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil. Currently, these two co-generation plants provide approximately 31% of PREPA's energy needs. PREPA has also commenced developing plans for the conversion of its main oil-fired units into natural gas and clean-coal fired units.

*Health Insurance Administration.* The Health Insurance Administration was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of eight designated regions of the island and pays such insurance company the insurance premium for

PR-CCD-0005743

each eligible beneficiary within such region. The health insurance system covers the entire island, and approximately 1.5 million persons were covered by the system during fiscal year 2010.

The Commonwealth has entered into various contracts with several Medicare Advantage organizations for the provision of health coverage to approximately 200,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

The total cost of the health insurance program for fiscal year 2010 was $1.962 billion, compared to $1.861 billion for fiscal year 2009 and $1.735 billion for fiscal year 2008. For fiscal year 2010, the General Fund covered $1.2 billion of the total cost of the health insurance program. The remaining $762 million will be paid from federal, municipal, internal and other sources.

On October 1, 2010, the administration implemented "Mi Salud," which is the health program that replaced the government's Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. During the implementation of the program's second phase, eligibility requirements will also be expanded to include small to medium businesses. The estimated cost for "Mi Salud" during fiscal year 2011 is $1.930 billion. The General Fund is expected to cover $1.122 billion, while the remaining $808 million will be paid from federal, municipal and other sources. This projection, however, does not take into account increases in the enrollment of new beneficiaries, which could affect this estimate.

Recently, the Governor signed into law a bill that authorizes the Health Insurance Administration to borrow approximately $187 million from GDB in order to pay amounts owed to its suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

*Highways and Transportation Authority.* Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA, and federal and Commonwealth grants.

PRHTA reported a net operating loss of $492.0 million for fiscal year 2009, compared to net operating losses of $448.7 million and $386.0 million for fiscal years 2008 and 2007, respectively.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general

PR-CCD-0005744

obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

As of September 30, 2010, PRHTA's total debt was $7.2 billion, including $6.1 billion in outstanding bonds and interim, subordinated financings with GDB in the aggregate principal amount of $1.032 billion. PRHTA's Highway Revenue Bonds are rated A2 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated A3 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at PRHTA's election. The cost of the project was $2.25 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005 and currently has ridership of about 35,000 persons per day. The operation of the Tren Urbano generated a loss of $64.5 million, $62.5 million and $60.2 million in fiscal years 2009, 2008, and 2007, respectively.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

During the second quarter of fiscal year 2011, PRHTA and PPP Authority commenced a procurement process intended to lead to the establishment of a concession agreement for the operation of two toll roads. Future procurement processes will lead to the establishment of concession agreements for the principal toll roads in Puerto Rico.

*Industrial Development Company.* Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. PRIDCO reported consolidated net operating losses of $10.3 million for fiscal year 2010, compared to consolidated net operating losses of $6.0 million for fiscal year 2009 and consolidated net income of $6.1 million for fiscal year 2008. The total debt of PRIDCO was $412.6 million as of September 30, 2010. This debt includes outstanding bonds of $241.2 million and financings for operations of $171.4 million (including loans from its subsidiary Puerto Rico Industrial Investment Corporation). PRIDCO's debt is rated Baa1 and BBB- by Moody's and S&P, respectively.

PR-CCD-0005745

During fiscal years 2006 and 2007 PRIDCO entered into a company reorganization plan establishing an early retirement plan and a voluntary separation plan with the objective of reducing workforce and to achieve expense reductions. This plan was financed by a line of credit from GDB, which had an outstanding balance of $45.7 million as of September 30, 2010.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.* Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of September 30, 2010, approximately $1.4 billion of AFICA's bonds were outstanding. In addition, as of September 30, 2010, AFICA has a $67 million line of credit with GDB with a principal outstanding balance of $59.2 million used for the acquisition of assets from PREPA.

*Infrastructure Financing Authority.* Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.

As of September 30, 2010, PRIFA's total debt was $1.84 billion. This debt includes bonds outstanding of $1.84 billion and interim financing for capital improvements of $3.4 million. PRIFA's debt is rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually thru fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. The Authority is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account were being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used

PR-CCD-0005746

the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also has responsibility for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of September 30, 2010, MFA had $1.1 billion of bonds outstanding.

*Port of the Americas Authority.* Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas (the "Port"), a deep draft port on the south coast of Puerto Rico.

PAA is authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port. Currently, GDB is authorized by law to purchase bonds of PAA in an aggregate principal amount not to exceed $250 million. As of September 30, 2010, GDB held approximately $198.7 million of PAA's outstanding bonds, which are guaranteed by the Commonwealth.

The first phase of the Port was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5, and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. The second phase of the Port was completed on February 2009. This phase, which was designed to provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU") per year, included (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet, (ii) reconstructing the container terminals, (iii) commencing certain required environmental risk mitigation procedures, and (iv) preparing final construction schematics.

A third phase, which provides for the expansion of the Port's capacity, was initiated in May 2007. This phase includes (i) infrastructure improvements related to access roads, (ii) the development of utility infrastructure, namely, a new storm canal and the relocation of electricity lines and the water and sanitation system, (iii) additional dredging at certain pier locations, and (iv) the expansion of the container terminal. The first expansion under this phase will provide

PR-CCD-0005747

sufficient capacity to process 500,000 TEU annually and is expected to be finished in the second half of 2011.

*Ports Authority.* Puerto Rico Ports Authority ("Ports Authority") owns and operates the major airport and seaport facilities in Puerto Rico. Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Ports Authority reported operating losses of $38.7 million and $47.6 million during fiscal years 2010 and 2009, respectively. The total debt of PRPA was $742.3 million as of September 30, 2010. This debt includes outstanding bonds of $46.3 million, credit facilities for capital improvements with GDB and private financial institutions of $309.3 million and a loan for operational purposes with private financial institutions of $386.7 million. The loan for operational purposes and a portion of the credit facilities for capital improvements are guaranteed by GDB.

As of September 30, 2010, the outstanding balance of the credit facilities for capital improvements with private financial institutions was $153.2 million, which is due on June 30, 2010. Of this amount, $71.8 million, plus interest, is guaranteed by GDB.

*Public Buildings Authority.* Puerto Rico Public Buildings Authority ("PBA") is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.325 billion of bonds guaranteed by the Commonwealth. As of September 30, 2010, $3.070 billion of such bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of September 30, 2010, PBA's line of credit with GDB had an outstanding balance of $193.7 million. PBA debt is rated A3 and BBB– by Moody's and S&P, respectively.

*Public-Private Partnerships Authority.* PPP Authority is an independent governmental instrumentality of the Commonwealth created by Act No. 29 of June 8, 2009. The Authority is tasked with implementing the Commonwealth's public policy regarding public-private partnerships to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. As of April 2010, the Authority had engaged various financial advisors to assist it in the evaluation of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the Authority has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marín International Airport. As of September 30, 2010, the Authority has a $20 million revolving line of credit with GDB with an outstanding balance of $3.3 million.

PR-CCD-0005748

*Sales Tax Financing Corporation.*    COFINA is an independent governmental instrumentality of the Commonwealth created by Act 91.  COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.

In 2009, the Legislative Assembly of Puerto Rico expanded the purposes for which COFINA was created and, correspondingly, increased its revenues by increasing from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion that is transferred to COFINA of the sales and use tax imposed by the central government.  As a result, COFINA was authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Government of Puerto Rico, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund.  As of June 30, 2010, COFINA had approximately $13.4 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds).  COFINA's Sales Tax Revenue Bonds are rated Aa2, AA- and AA- by Moody's, S&P and Fitch, respectively, and the Sales Tax Revenue Bonds, First Subordinate Series are rated A1, A+ and A+ by Moody's, S&P and Fitch, respectively.

*Special Communities Perpetual Trust.*  Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust.  Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities.  GDB has made a special capital contribution to Perpetual Trust of $500 million and provided the Trust with a $500 million, non-revolving, line of credit.  The amounts transferred by GDB were deposited in two investment accounts held by GDB for the benefit of Perpetual Trust, which generated interests ascending to $90.6 million as of June 30, 2010.  These additional funds were distributed among 56 new identified special communities for the construction of new infrastructure projects in these communities, and a portion was assigned to complete construction projects in the original 686 special communities.  Perpetual Trust has disbursed the total amount of $910.3 million as of June 30, 2010.  As of September 30, 2010, Perpetual Trust's line of credit with GDB had an outstanding balance of $376.1 million.  The line of credit is payable from legislative appropriations.

*University of Puerto Rico.*    University of Puerto Rico (the "University"), with approximately 65,669 students in academic year 2009-2010, is the largest institution of higher education on the island.  Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources.  University capital improvements have been

PR-CCD-0005749

financed mainly by revenue bonds.  As of September 30, 2010, University's total debt was $554.3 million, consisting of outstanding revenue bonds (excluding $19.6 million owed by the University's Medical Services).  University's debt is rated Baa2 and BBB- by Moody's and S&P, respectively.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University.  The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due.  These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2007, the Board of Trustees of the University approved Certification No. 60 establishing a new policy and methodology for tuition fees structure.  This new structure covers the tuition fees to be charged to new students until academic year 2012-2013.  This policy was adopted to pursue continued development and financial stability of the University.

In June 2010, the Board of Trustees of the University approved Certification No. 146 establishing a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University.  This stabilization fee was imposed to address the University's fiscal difficulties and is expected to increase annual revenues by approximately $40 million.

As a result of a student-led strike that lasted approximately two months, on June 26, 2010, the Middle States Commission on Higher Education ("MSCHE"), the entity that accredits the University's campuses, placed 10 of its 11 campuses on probation due to deficiencies in connection with two of 14 applicable standards and requested information with respect to a third standard.  MSCHE also requested a report outlining the University's plan in order to achieve and maintain compliance with said standards.  Probationary periods are designed to last up to 24 months and the affected University campuses will maintain their MSCHE accreditation while on probation.

*Other public corporations.*  Public corporations not described above have outstanding debt in the aggregate amount of $1.469 billion as of September 30, 2010.  Debt service on $701 million of such outstanding debt is being paid from legislative appropriations.  The Commonwealth is not, however, obligated to make any such appropriations.  Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

PR-CCD-0005750

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of the Commonwealth (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System covers employees of the University of Puerto Rico and Electric Power Authority, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951 ("Act 447") and is a hybrid defined benefit plan consisting of different benefit structures. Members who entered the Employees Retirement System on or before December 31, 1999 generally participate in a defined benefit program. Members participating in the defined benefit program prior to February 1990 ("Act 447 Participants") are entitled to the highest benefits structure, while those who became members after February 1990 ("Act 1 Participants") are subject to a longer vesting period and a reduced level of benefits.

In 1999, Act 447 was amended to close the defined benefit program and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Under the System 2000 benefits structure, a participant is entitled to receive a lump-sum payment, which may be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed by such participant. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer

PR-CCD-0005751

contributions with respect to System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the original defined benefit structure and System 2000 will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined benefit pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

*Covered Employees.* The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico or the Electric Power Authority) and municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied. Currently, there are no teachers from private schools or other educational institutions participating in the Teachers Retirement System.

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2009, the date of the latest actuarial valuations for the Retirement Systems.

I-75

**Participant Data**
**(as of June 30, 2009)**

|  | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** |  |  |  |  |  |  |
| Act 447 Participants | 38,249 | 73,836 | 16,836 | 12,200 | - | 141,121 |
| Act 1 Participants | 56,991 | 1,861 | 237 | 1 | - | 59,090 |
| System 2000 Participants | 64,813 | - | - | - | - | 64,813 |
| **Total** | 160,053 | 75,697 | 17,703 | 12,201 | - | 265,024 |
| **Teachers Retirement System** | 46,295 | 27,936 | 2,035 | 2,578 | 675 | 79,519 |
| **Judiciary Retirement System** | 345 | 314 | 0 | 59 | 46 | 764 |

[1] Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon. There are terminated vested members of the Employees Retirement System, but the Employees Retirement System does not possess reliable data on the amount of such members.

As of June 30, 2010, the total number of participants in the Retirement Systems was as follows: Employees Retirement System, 247,010; Teachers Retirement System, 79,052; and Judiciary Retirement System, 759.

The Commonwealth central government (consisting of department and agencies) is not the only employer participating in the Employees Retirement System. The municipalities and most public corporations participate as employers as well with respect to their employees. However, the assets contributed by the Commonwealth central government and all other employers are invested together and not otherwise segregated. As of June 30, 2009, the central government was responsible for making contributions with respect to 100,811 active members of the Employees Retirement System, or 63.0% of total active members (consisting of 24,545 Act 447 Participants, 38,066 Act 1 Participants and 38,200 System 2000 Participants). Municipalities were responsible for 34,987, or 21.9%, active members, and public corporations were responsible for 24,255, or 15.2%, active members.

*Funding Requirements.* The Commonwealth central government is responsible for approximately 64% of total employer contributions to the Employees Retirement System, and the other 36% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the Retirement Systems and required contributions to the Retirement Systems by employers and employees are determined by law rather than by actuarial requirements.

For the Employees Retirement System, the statutory employer contribution is at least 9.275% of covered payroll. Covered payroll is the compensation regularly paid to active employees on which contributions to the retirement systems are computed and is generally equivalent to their annual salary. The current employer contribution rate has been in effect since February 1990; prior to that date, Commonwealth departments, agencies and public corporations were required to make employer contributions of at least 8% of their covered payroll, while municipalities were required to make employer contributions of at least 7% of their covered payroll. Required employee contributions for the Employees Retirement System vary according

I-76

PR-CCD-0005753

how the individual employee's retirement benefits are coordinated with social security benefits. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the System, plus administrative costs, and (ii) the contributions that employees are required to make to the System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

For the Teachers Retirement System, the statutory employer contribution is 8.5% of covered payroll and 9.0% for the employees. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and 8% for the employees. The employer contribution rate for the Judiciary Retirement System increased from 20.0% to 30.34% of payroll as of July 1, 2008. The Commonwealth is also ultimately responsible for any funding deficiency in the Teachers Retirement System and the Judiciary Retirement System.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2009 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been received by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. In July 2010, the Teachers Retirement System received the first installment.

PR-CCD-0005754

The Employees Retirement System is also seeking reimbursement from the Commonwealth, the municipalities and public corporations in the amount of $79.2 million, $30.5 million and $62.1 million, respectively, for cumulative System Administered Pension Benefits paid to its beneficiaries through June 30, 2010. As of June 30, 2010, the Teachers Retirement System was also seeking reimbursement from the Commonwealth of $491,000 (excluding the aforementioned $53.8 million) on account of System Administered Pension Benefits paid.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.467 billion, compared to $4.603 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 36.3% of U.S. domestic and international equity investments, 14.8% of fixed-income securities, 29.7% of internally managed mortgage and personal loans portfolio, 17.8% of short-term cash equivalents and 1% of other investments. As of September 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.338 billion. The decrease in the value of the investment portfolio since June 30, 2009 principally reflects the continued use of investment portfolio assets to pay current benefits, as discussed below.

As of June 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.204 billion, compared to $2.180 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 60.4% of U.S. domestic and international equity investments, 19.1% of fixed-income securities, 19.2% of internally managed mortgage and personal loans portfolio, 0.20% of short-term cash equivalents and 1% of other investments. As of September 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.314 billion.

As of June 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $83.9 million, compared to $76.1 million as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 63.9% of U.S. domestic and international equity investments, 34.8% of fixed-income securities, 1% of internally managed mortgage and personal loans portfolio and 0.40% of short-term cash equivalents. As of September 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $87.9 million.

*Actuarial Valuations of the Retirement Systems.* Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2009. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems will now be conducting annual actuarial valuations. Preliminary results of new actuarial valuations as of June 30, 2010 are being evaluated by the Employees Retirement System and the Teachers Retirement System. These actuarial valuations are expected to be completed by the end of February 2011.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System as well as other financial information are available on the website of the Administration of the Retirement Systems at http://www.asr.gobierno.pr. Informational copies of the actuarial valuation report of the Teachers Retirement System as well as other financial information are available at the website of the Teachers Retirement System at

PR-CCD-0005755

http://www.srm.gobierno.pr. No information contained on these websites is deemed incorporated herein by reference.

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislature.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal year 2009 was significantly lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of each of the Retirement Systems for fiscal year 2010, however, was higher than the assumed investment return utilized to prepare the actuarial accrued liability.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 9.7%, negative 16.0% and negative 18.2%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal

I-79

year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively.

The June 30, 2009 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method and assumed an investment return of 7.5% per year and yearly salary increases of 3% per year. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service. The preliminary actuarial valuations of the Employees Retirement System and the Judiciary Retirement System as of June 30, 2010 presented in this Report have been performed under the same assumptions in all material respects.

The June 30, 2009 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 8% per year and yearly salary increases of 3.5%. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The preliminary actuarial valuation of the Teachers Retirement System as of June 30, 2010 presented in this Report has been performed under the same assumptions in all material respects.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

PR-CCD-0005757

**Funding Status**
**Actuarial Valuations as of June 30, 2009**
**(in millions)**

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,851 | $18,944 | $17,092 | 9.8% | $4,293 | 398.4% |
| Teachers Retirement System | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.9 |
| Judiciary Retirement System | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| Total | $4,060 | $27,990 | $23,929 | 14.5% | $5,742 | 416.7% |

[1]   The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2]   The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3]   The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

[4]   The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System.  The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

[5]   The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.

[6]   The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System.

Source: Actuarial valuation reports as of June 30, 2009 for each of the Retirement Systems.

**Historical Funding Status[1]**
**Actuarial Valuations as of the Indicated Fiscal Years**
**(in millions)**

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2005 | $2,328 | $13,969 | $11,641 | 16.7% | $4,126 | 282.2% |
| 2007 | 2,892 | 16,770 | 13,878 | 17.2 | 4,246 | 326.8 |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.4 |
| 2010[2] | 1,667 | 19,502 | 17,834 | 8.5 | 3,818 | 467.1 |
| **Teachers Retirement System** | | | | | | |
| 2004 | $2,403 | $ 4,702 | $ 2,299 | 51.1% | $1,294 | 177.7% |
| 2007 | 3,163 | 7,756 | 4,593 | 40.8 | 1,370 | 335.3 |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.9 |
| 2010[2] | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| **Judiciary Retirement System** | | | | | | |
| 2005 | $70 | $174 | $105 | 40.0% | $29 | 356.8% |
| 2007 | 81 | 259 | 177 | 31.5 | 31 | 566.6 |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010[2] | 55 | 338 | 283 | 16.4 | 32 | 882.0 |

[1]   Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.

[2]   Preliminary.

Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

I-81

PR-CCD-0005758

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last three fiscal years and the current fiscal year.

## Schedule of Employer Contributions
## to Retirement Systems
## (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $1,191 | $581 | $610 | 48.8% |
| 2009 | 1,259 | 595 | 664 | 47.2 |
| 2010 | 1,460 | 534 | 926 | 36.6 |
| 2011 | 1,547 | 542 | 1,005 | 35.0 |
| **Teachers Retirement System** | | | | |
| 2008 | $341 | $159 | $182 | 46.6% |
| 2009 | 394 | 173 | 221 | 43.9 |
| 2010 | 477 | 166 | 311 | 34.9 |
| 2011 | 528 | 165 | 363 | 31.3 |
| **Judiciary Retirement System** | | | | |
| 2008 | $20 | $7 | $13 | 36.7% |
| 2009 | 22 | 11 | 11 | 50.0 |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.1 |
| **Total** | | | | |
| 2008 | $1,553 | $748 | $805 | 48.1% |
| 2009 | 1,675 | 778 | 897 | 46.4 |
| 2010 | 1,965 | 710 | 1,255 | 36.1 |
| 2011 | 2,105 | 718 | 1,387 | 34.1 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2009 and, in the case of fiscal year 2011, the preliminary actuarial valuations as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the preliminary actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2009 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

Based on the current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems will continue to increase indefinitely into the future instead of being amortized and future scheduled contributions at the current funding rates will not be sufficient to make future benefit payments when due. Additional funding from the Commonwealth will ultimately be necessary to cover such unfunded obligation. It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding

PR-CCD-0005759

shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the System's assets. During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds increased the funds of the Employees Retirement System currently available to pay pension benefits. Although the original expectation was that the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds would exceed the cost of the debt, as further discussed below, the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds have in fact been lower than the cost of the Pension Bonds. As a result of market declines since the issuance of the Pension Bonds, the market value of some of the investments made with Pension Bonds proceeds is below their original cost. Thus, to date, the Pension Bonds transactions have negatively affected the UAAL of the Employees Retirement System.

PR-CCD-0005760

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

## Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2006 | $741.4 | ($803.5) | ($62.1) |
| 2007 | 713.2 | (823.1) | (109.9) |
| 2008 | 726.4 | (1,011.3) | (284.9) |
| 2009 | 762.4 | (1,190.3) | (427.9) |
| 2010* | 726.5 | (1,268.8) | (542.3) |
| **Teachers Retirement System** | | | |
| 2006 | $248.7 | ($355.1) | ($106.4) |
| 2007 | 244.1 | (387.9) | (143.7) |
| 2008 | 244.6 | (439.9) | (195.2) |
| 2009 | 261.5 | (468.0) | (206.6) |
| 2010* | 248.0 | (498.1) | (250.1) |
| **Judiciary Retirement System** | | | |
| 2006 | $9.7 | ($13.5) | ($3.8) |
| 2007 | 9.5 | (14.7) | (5.3) |
| 2008 | 9.8 | (15.4) | (5.6) |
| 2009 | 13.1 | (16.5) | (3.4) |
| 2010* | 13.1 | (17.8) | (4.7) |

* Preliminary.
[1]  Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benfits.
[2]  Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2008, 2009 and 2010 in the amounts of $47 million, $187 million and $188 million, respectively.
Source: Information obtained from each of the Retirement Systems.

The Employees Retirement System anticipates that, based on the current contributions and benefit structure, its future cash flow needs for disbursement of benefits to participants are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income.  Based on the preliminary actuarial valuation report as of June 30, 2010, the Employees Retirement System expects to have a funding shortfall (after payment of debt service on the Pension Bonds) of $752 million for fiscal year 2011 and this negative trend is expected to continue.  Based on the Employees Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being rapidly disfunded and projects that its net assets (total assets minus the Pension Bonds and other liabilities) will be depleted by fiscal year 2014 and its gross assets will be depleted by fiscal year 2019.  This means that during the period from fiscal year 2014 through fiscal year 2019, benefits are expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits.

The Teachers Retirement System has also covered funding shortfalls during the prior five fiscal years through the sale of investment portfolio assets.  Based on the preliminary

I-84

actuarial valuation report as of June 30, 2010, the Teachers Retirement System expects to have a funding shortfall of approximately $274 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being gradually disfunded and projects that its net and gross assets will be depleted by fiscal year 2020.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. Based on the preliminary actuarial valuation report as of June 30, 2010, the Judiciary Retirement System expects to have a funding shortfall of approximately $7.7 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the preliminary actuarial valuation as of June 30, 2010 states that the System is being disfunded and projects that its net and gross assets will be depleted by fiscal year 2018.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.

*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.* On June 30, 2010, the Employees Retirement System and GDB, as fiscal agent, retained Conway MacKenzie, Inc ("CMI"), a financial advisory firm, to identify and analyze key events and decisions that have contributed to the current financial crisis of the Employees Retirement System, including the deterioration of its funded ratio. CMI issued its report in October 2010. In its report, CMI identified the following five factors as fundamental in the deterioration of the financial health of the Employees Retirement System: (i) historical inadequate funding procedures, (ii) special laws, (iii) early retirement programs, (iv) personal loans, and (v) the 2008 issuances of Pension Bonds.

The report reviews the historical funding levels of the Employees Retirement System and concludes that the Employees Retirement System has been underfunded since its inception in 1951, essentially as a result of statutory funding rates that fall below actuarially determined contribution rates. In addition to inadequate annual contributions, CMI notes that investment returns and other recurring income have been insufficient to cover annual benefit payments and operating expenses, resulting in cash flow shortfalls that have forced the Employees Retirement System to liquidate plan assets.

CMI also identified the enactment of numerous special laws, which have granted incremental retirement benefits to participants beyond those provided by Act 447 and Act 1, as having exacerbated the deteriorating financial condition of the Employees Retirement System.

PR-CCD-0005762

Many special laws were adopted without the Government securing a viable, long-term source of funding for such additional benefits, including the adoption of special laws during periods when the Government was incurring in budgetary deficits.  As a result, the Employees Retirement System was forced to fund the benefits granted under these special laws, resulting in significant past-due receivables from the Commonwealth and participating public corporations and municipalities.

The adoption of several early retirement programs is also identified as having affected the financial solvency of the Employees Retirement System.  These programs were adopted in order to reduce the size of the public workforce and thereby decrease payroll costs.  These programs, however, were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the System funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality.  In addition, the CMI report notes that it appears that many of these programs did not ultimately result in their intended goals of reducing the size of the public workforce.

Another factor identified by CMI as having contributed to the deterioration of the Employees Retirement System is the adoption in 2007 of an increase in the maximum loan balance for personal loans to members, from $5,000 to $15,000.  This increase has resulted in a significant cash flow drain to the Employees Retirement System, amounting to approximately $600 million during the last four fiscal years.  Although the loans are secured by the employee contributions and collected through payroll withholdings, the significant cash flow to provide personal loans has required the liquidation of plan assets.  As a result, a significant percentage of the Employees Retirement System's assets are now invested in personal loans that are illiquid investments.

The CMI report also addressed the 2008 issuances of approximately $2.9 billion in Pension Bonds.  The Pension Bonds were issued with the intent of increasing the funds available to the Employees Retirement System to pay benefit obligations and to reduce the UAAL.  The Employees Retirement System expected to achieve these goals by investing the proceeds of the Pension Bonds at a higher return than the cost of the debt, thereby achieving a positive arbitrage.  However, CMI found that potential risks were not thoroughly or properly analyzed.  In fact, the investment of the Pension Bonds proceeds have resulted in a negative arbitrage as the Pension Bonds are currently costing the System more than what it is earning on the investment proceeds.  Thus, to date, the transactions have worsened the funded ratio of the Employees Retirement System.

Finally, the CMI report addresses governance deficiencies and states that many of the measures described above, and in particular the issuances of Pension Bonds, were adopted and implemented without conducting any rigorous analysis of their impact on the financial condition of the Employees Retirement System and the risks associated with the measures.  The report concludes that immediate and dramatic changes to the structure of the Employees Retirement System are necessary to avoid full depletion of the System's net assets in the near future, as discussed above.

PR-CCD-0005763

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.*  The Retirement Systems and the current administration are evaluating measures to improve the financial solvency of the Retirement Systems.  In order to maintain the long-term fiscal integrity of the Retirement Systems and their ability to pay required benefits to their members, a combination of some or all of the following will be required: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems.  Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.

In March 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the Retirement Systems.  The Commission issued its report on October 21, 2010.  The Commission's report does not make a consensus set of recommendations for addressing the financial solvency of the Retirement Systems, but rather discusses the principal recommendations made by different members of the Commission in the following areas: (i) employer and employee contributions, (ii) benefit structure, (iii) retirement age, (iv) benefits under special laws, (v) early retirement programs, (vi) mortgage loans and personal loans, and (vii) governance structure.  All members of the Commission agreed that there has to be an increase in employer contributions, while some members also recommended an increase in employee contribution rates.  One of the proposals is that employer contribution rates be increased by 1% of payroll per year for the next 10 to 15 years.  In the benefits areas, the recommendations include various proposals to reduce or limit benefits, such as eliminating merit pensions, establishing caps on benefits, increasing the retirement age in order to receive full benefits and modifying or eliminating some benefits granted under special laws.  Some members of the Commission also recommended prohibiting all future early retirement programs unless they are actuarially positive to the Retirement Systems.  In order to address the liquidity position of the Retirement Systems, various members of the Commission recommended eliminating the loan programs or restricting their use.  Various members also commented that improvements to the governance structure of the Retirement Systems was necessary, as it appeared that in the past governance had not been as rigorous as it should have been.  Other recommendations included increasing penalties for late payments by participating employers and creating other dedicated revenue sources for the Retirement Systems, such as a special lottery drawing or a special tax on government contractors.

The administration has assigned to a task force headed by the Secretary of Labor the evaluation of the Commission's recommendations in order to determine which of its recommendations or other alternatives will be formally proposed.  The implementation of most of the recommendations or other alternatives will require adopting legislation, which the administration expects to submit during 2011.  At this time, there can be no assurance as to which changes, if any, to the Retirement Systems will be proposed and adopted.  Because of the Commonwealth's current budgetary constraints and the significant underfunding of the Retirement Systems discussed above, however, improving the financial solvency of the Retirement Systems will require the adoption of several of the measures mentioned above and it will take several years before a significant improvement is achieved.  In the short-term, the financial situation of the Retirement Systems may have an adverse impact on the Commonwealth's budgetary situation.

I-87

PR-CCD-0005764

On July 2, 2010, the Government enacted Act 70, which is designed to reduce Government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria opted for early retirement by January 14, 2011 (or during such other period that may be established by a designated committee) and receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. The Government expects approximately 4,000 employees to participate of the benefits provided by Act 70.

*Impact of Funding Shortfall on the Commonwealth.* The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems. The depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. However, due to the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

*Statements of Plan Net Assets and Changes in Plan Net Assets.* The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2007, 2008, 2009 and 2010.

I-88

PR-CCD-0005765

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

| | 2010\*\* | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CASH AND SHORT TERM INVESTMENTS** | | | | |
| Deposits at Commercial Banks | $   54,175 | $   21,792 | $   84,439 | $   41,365 |
| Deposits with Treasury Department | 110,931 | 103,527 | 23,099 | -- |
| Deposits with GDB: | | | | |
| Unrestricted | 51,446 | 79,500 | 54,438 | 266,633 |
| Restricted | 741,082 | 1,028,878 | 1515,042. | 2,310 |
| Restricted Cash Bonds | 172,226 | 193,537 | -- | -- |
| Total Cash and Short Term Investment | 1,129,860 | 1,427,234 | 1,677,018 | 310,308 |
| | | | | |
| **SECURITIES LENDING, COLLATERAL INVESTED** | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 563,454 | 565,366 | 547,414 | 149,638 |
| Stocks | 1,492,386 | 1,477,945 | 2,018,090 | 1,693,144 |
| Master Repo | -- | -- | -- | -- |
| Private Equity Investments | 55,307 | 34,922 | 42,294 | 47,784 |
| Total  Investments | 2,111,147 | 2,078,233 | 2,607,798 | 1,890,566 |
| | | | | |
| **LOANS TO PLAN MEMBERS** | | | | |
| Mortgage | 141,588 | 128,365 | 116,022 | 107,680 |
| Personal | 1,018,498 | 916,934 | 771,367 | 440,167 |
| Cultural Trips | 63,729 | 50,317 | 38,344 | 28,933 |
| PEC | 2,340 | 1,827 | 1,098 | 533 |
| Total Loans to Plan Members | 1,226,155 | 1,097,443 | 926,831 | 577,313 |
| | | | | |
| Investment in PRTA Holdings | -- | -- | -- | -- |
| Total cash, investments and loans to plan members | 4,467,162 | 4,602,910 | 5,211,647 | 2,778,187 |
| | | | | |
| **RECEIVABLES:** | | | | |
| Employers | 273,139 | 289,427 | 246,167 | 117,420 |
| General Fund | 11,222 | 7,833 | 854 | 4,615 |
| Judiciary Retirement System | 19,138 | 17,942 | 16,714 | 5,113 |
| Investment Sales | 12,189 | 24,509 | 9,800 | 2,470 |
| Accrued Interest | 6,597 | 6,939 | 3,279 | 3,119 |
| Dividend Receivable | -- | -- | -- | -- |
| Other | 3,893 | 5,081 | 58,210 | 4,527 |
| Total Receivables | 326,178 | 351,731 | 335,024 | 137,264 |
| | | | | |
| CAPITAL ASSETS | 8,964 | 9,171 | 9,839 | 8,476 |
| OTHER ASSETS | 7,224 | 8,892 | 8,292 | 7,371 |
| Prepaid Bond Cost | 33,267 | 34,363 | 35,462 | -- |
| Total assets | 4,842,795 | 5,007,067 | 5,600,264 | 2,931,298 |
| **LIABILITIES** | | | | |
| Book overdraft | 22,933 | 37,961 | -- | 1,566 |
| Short Term Obligations | -- | -- | -- | -- |
| Payables for securities lending | 110,931 | 103,527 | -- | -- |
| Funds of Mortgage Loans and Guarantee | | | | |
| Insurance Reserve for Loans | 6,597 | 6,372 | 3,863 | 8,914 |
| | | | | |
| Investment Purchases | 5,277 | 13,926 | 12,694 | 2,172 |
| Accounts Payable and Accrued Liabilities | 12,250 | 14,228 | 9,310 | 10,125 |
| Line of Credit | -- | -- | -- | -- |
| Bonds Payable | 2,981,775 | 2,961,359 | 2,942,183 | -- |
| Other Liabilities | 21,798 | 13,675 | 12,946 | 17,022 |
| Bonds Interest Payable | 13,876 | 13,876 | 12,182 | -- |
| Total Liabilities | 3,175,437 | 3,164,924 | 2,993,178 | 39,799 |
| | | | | |
| **Net Assets Held in Trust for Pension Benefits** | **$1,667,358** | **$1,842,143** | **$2,607,086** | **$2,891,499** |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-89

PR-CCD-0005766

### The Commonwealth of Puerto Rico
### Employees' Retirement System
### Statements of Changes in Plan Net Assets*
### As of June 30, 2007, 2008, 2009, and 2010**
### (in thousands)

| | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $ 381,243 | $ 400,405 | $ 374,394 | $ 398,521 |
| Participating employees | 345,265 | 362,040 | 338,791 | 342,830 |
| Other Special Laws | 171,842 | 175,254 | | |
| Early Retirement | 3,399 | 47,146 | 69,097 | -- |
| Special Laws 127 | 188,843 | 17,000 | 17,000 | -- |
| Total Contributions | 918,750 | 1,001,845 | 799,282 | 758,035 |
| | | | | |
| Investment (loss) Income: | | | | |
| Realized Gain or Loss | 148,173 | (152,583) | 74,304 | 33,023 |
| Unrealized Gain or Loss | 67,838 | (405,969) | 289,881 | 156,492 |
| Dividend Income | 10,663 | 15,774 | 14,494 | 49,939 |
| Interest Income | 179,586 | 198,734 | 68,231 | 63,486 |
| Total | 406,259 | (344,044) | 446,910 | 302,939 |
| | | | | |
| Less Investment Expense | (7,649) | (7,589) | (12,940) | (10,123) |
| Insurance Premium | | | 2,441 | 14,492 |
| Other Income | 31,783 | 35,878 | 17,431 | 8,496 |
| Net Investment Income | 430,393 | (315,755) | 453,841 | 315,804 |
| | | | | |
| Total Additions | 1,349,143 | 686,090 | 1,253,124 | 1,073,839 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 1,047,695 | 970,843 | 793,883 | 772,647 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 | 16,684 |
| Benefits under Special Laws | 171,842 | 175,254 | | |
| Death Benefits | 12,968 | 11,532 | 13,872 | 14,984 |
| Refunds of Contributions: | | | | |
| Employers | 1,469 | 2,013 | 5,296 | 1,666 |
| Participating Employees | 43,677 | 32,517 | 28,009 | 20,707 |
| Personal Loans Adjustment | -- | -- | -- | 1,658 |
| Insurance Claims on Loans | | | 2,118 | 1,216 |
| Other Expenses | 7,888 | 22,415 | 13,569 | -- |
| Administrative Expenses | 33,063 | 32,590 | 29,207 | 30,817 |
| Interest on Bonds | 188,055 | 186,869 | -- | -- |
| | | | | |
| Total Deductions | 1,523,928 | 1,451,033 | 902,954 | 860,379 |
| | | | | |
| Net (decrease) Increase | (174,785) | (764,943) | 350,170 | 213,459 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 1,842,143 | 2,607,086 | 2,541,331 | 2,327,871 |
| End of Year | $1,667,358 | $1,842,143 | $2,891,501 | $2,541,331 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

PR-CCD-0005767

## The Commonwealth of Puerto Rico
### Teachers Retirement System
#### Statements of Plan Net Assets*
As of June 30, 2007, 2008, 2009, and 2010**
(in thousands)

| | 2010** | 2009 | 2008 | 2007 |
|---|---:|---:|---:|---:|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $ 72,692 | $ 65,885 | $ 324,846 | $ 273,982 |
| Cash with fiscal agent | - | 450 | 297 | - |
| Cash restricted | - | - | | - |
| Cash deposited with Government | | | | |
| Development Bank for Puerto Rico | 3,288 | 3,276 | 3,255 | 3,123 |
| Total Cash | 75,980 | 69,611 | 328,398 | 277,105 |
| Investments, at fair value: | | | | |
| Bonds and notes | 397,109 | 425,911 | 490,007 | 468,452 |
| Stocks | 1,295,232 | 1,259,169 | 1,796,817 | 2,218,033 |
| Total investment at fair value | 1,692,341 | 1,685,080 | 2,286,824 | 2,686,485 |
| Other investments: | | | | |
| Mortgage notes acquired from third parties | | | | |
| Private equity investments | 26,683 | 26,139 | 37,630 | 46,686 |
| Total investments | 1,719,024 | 1,711,219 | 2,324,454 | 2,733,171 |
| Loan to plan members: | | | | |
| Mortgage | 119,937 | 109,508 | 103,759 | 102,684 |
| Personal | 288,463 | 288,410 | 271,510 | 260,066 |
| Cultural trips | 1,480 | 1,462 | 1,355 | 1,371 |
| Total loans to plan members | 409,879 | 399,380 | 376,624 | 364,121 |
| Total investments and loans | 2,204,884 | 2,180,210 | 3,029,476 | 3,374,397 |
| Accounts receivable: | | | | |
| Receivable for investments sold | 332 | 23,231 | 4,693 | 12,242 |
| Accrued interest and dividends receivable | 4,584 | 5,445 | 6,395 | 6,312 |
| Other | 56,085 | 2,930 | 15,141 | 14,640 |
| Total accounts receivable | 61,001 | 31,606 | 26,229 | 33,194 |
| Property and equipment, net | 22,970 | 26,167 | 26,223 | 25,890 |
| Other assets | 832 | 876 | 451 | 700 |
| Total Assets | 2,289,687 | 2,238,859 | 3,082,379 | 3,434,181 |
| **LIABILITIES** | | | | |
| Investments purchased | 2,722 | 18,981 | 7,952 | 11,258 |
| Payable for securities lending | 48,673 | 46,751 | 274,372 | 240,440 |
| Cash overdraft in cash with fiscal agent | 2,199 | - | - | 5,619 |
| Accounts payable | 1,476 | 4,188 | 3,688 | 4,152 |
| Obligation under capital lease | - | - | 12 | 35 |
| Accrued expenses | 6,184 | 5,925 | 5,361 | 4,470 |
| Line of credit | - | - | - | 4 |
| Escrow fund of mortgage loans and guarantee | | | | |
| insurance reserve for loans to plan members | 5,763 | 4,580 | 4,641 | 4,916 |
| Bonds payable | | | | |
| Other liabilities | 694 | 841 | 1,007 | 567 |
| Total liabilities | 67,710 | 81,266 | 297,033 | 271,461 |
| **Net Assets Held in Trust for Pension Benefits** | $2,221,977 | $2,157,593 | $2,785,346 | $3,162,720 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

PR-CCD-0005768

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

| | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Participating Employees | $129,888 | $136,305 | $127,566 | $127,809 |
| Employer | 118,127 | 125,165 | 117,065 | 116,320 |
| Contributions transferred from other systems** | 1,265 | 1,479 | 4,181 | 12,396 |
| Special | 46,572 | 75,548 | 68,085 | 57,960 |
| Total contributions | 295,852 | 338,497 | 316,897 | 314,485 |
| Investment Income: | | | | |
| Interest income | 61,303 | 66,927 | 67,825 | 65,367 |
| Dividend Income | 10,111 | 13,194 | 15,629 | 13,654 |
| Net appreciation (depreciation) in fair value of investments | 203,265 | (518,862) | (276,573) | 406,131 |
| | 274,679 | (438,741) | (193,119) | 485,152 |
| Less investment expense | 4,735 | 4,660 | 6,847 | 6,217 |
| Net investment income | 269,944 | (443,401) | (199,966) | 478,935 |
| Other income | 52,454 | 2,444 | 1,735 | 1,299 |
| **Total additions** | $ 618,250 | ($131,794)) | $ 118,666 | $ 794,719 |
| **DEDUCTIONS:** | | | | |
| Benefit paid to participants: | | | | |
| Annuities and death benefits | 470,683 | 442,542 | 414,334 | 364,998 |
| Special benefits | 47,870 | 51,951 | 49,742 | 45,564 |
| Refunds of contributions | 7,847 | 5,313 | 6,427 | 5,447 |
| Administrative expenses | 27,466 | 25,485 | 25,537 | 22,877 |
| **Total deductions** | 553,866 | 525,291 | 496,040 | 438,886 |
| Net increase in net assets held in trust for pension benefits | 64,384 | (627,753) | (377,374) | 355,833 |
| **Net assets held in trust for pension benefits** | | | | |
| Beginning of year | 2,157,593 | 2,785,346 | 3,162,720 | 2,806,887 |
| **End of year** | $2,221,977 | $2,157,593 | $2,785,346 | $3,162,720 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

PR-CCD-0005769

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2007, 2008, 2009, and 2010\*\***
**(in thousands)**

| ASSETS | 2010\*\* | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| Cash and Investments: | | | | |
| Cash and Cash Equivalents | $ 4,007 | $ 3,985 | $ 2,519 | $ 2,735 |
| Cash Deposited with GDB or Treasury Department: | 30 | 2,353 | 267 | 197 |
| Collateral from Securities Lending | 2,474 | 1,482 | | |
| Total Cash | 6,511 | 7,820 | 2,786 | 2,932 |
| | | | | |
| Receivables: | | | | |
| Accrued Interest | 271 | 215 | 237 | 237 |
| Investment Sales | 41 | 117 | 196 | 179 |
| Other | 27 | 28 | 25 | 86 |
| | | | | |
| Total receivables | 339 | 360 | 458 | 502 |
| | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 25,973 | 22,805 | 22,169 | 20,728 |
| Stocks | 50,275 | 44,634 | 61,377 | 68,654 |
| | | | | |
| Total Investments | 76,248 | 67,439 | 83,546 | 89,382 |
| | | | | |
| Loans and Interest Receivable from Members: | | | | |
| Mortgage | 20 | 8 | 8 | 17 |
| Personal | 702 | 462 | 394 | 195 |
| Cultural Trips | 46 | 60 | 45 | 44 |
| | | | | |
| Total Loans to Plan Members | 768 | 530 | 448 | 256 |
| | | | | |
| Total cash, investments and loans to plan members | 83,866 | 76,149 | 87,239 | 93,072 |
| | | | | |
| LIABILITIES | | | | |
| Due to Treasury Department | 5,841 | 4,513 | -- | 5,415 |
| Due to the Employee's Retirement System of the | | | | |
| Government of Puerto Rico | 19,138 | 17,942 | 16,714 | 5,113 |
| Collateral from Securities ending | 2,474 | 1,482 | | |
| Escrow Funds to plan Members and Guarantee | | | | |
| Insurance | 62 | 59 | 56 | 53 |
| Investment Purchases | 869 | 867 | 345 | 180 |
| | | | | |
| Other Liabilities | 72 | 720 | 812 | 838 |
| | | | | |
| Total Liabilities | 28,456 | 25,583 | 17,927 | 11,599 |
| | | | | |
| Net Assets Held in trust for Pension Benefits | $ 55,410 | $ 50,566 | $ 69,311 | $ 81,473 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-93

PR-CCD-0005770

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2007, 2008, 2009, and 2010****
**(in thousands)**

| | 2010** | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $ 10,021 | $9,970 | $6,705 | $6,632 |
| Participating employees | 3,,104 | 3,138 | 3,076 | 2,828 |
| Special Laws | 629 | 691 | | |
| Total Contributions | 13,754 | 13,799 | 9,781 | 9,460 |
| | | | | |
| Investment Income: | | | | |
| Realized Gain or Loss | 5,644 | (3,158) | 1,031 | 1,484 |
| Unrealized Gain | 1,741 | (13,582) | (8,988) | 10,954 |
| Dividend Income | 211 | 218 | 267 | 224 |
| Interest Income | 1,284 | 1,313 | 1,553 | 1,447 |
| | | | | |
| Total | 8,880 | (15,209) | (6,137) | 14,110 |
| Less Investment Expense | 164 | (170) | (197) | (192) |
| Other Income | 804 | 50 | -- | 1 |
| Net Investment Income | 9,520 | (15,329) | (6,333) | 13,918 |
| | | | | |
| Total Additions | 23,274 | (1,530) | 3,448 | 23,378 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 17,268 | 15,538 | 14,419 | 13,461 |
| Benefits Under Special Laws | 629 | 691 | | |
| Refunds to Participating Employees | -- | -- | 169 | 38 |
| Administrative Expenses | 533 | 986 | 1,022 | 1,255 |
| Total Deductions | 18,430 | 17,215 | 15,610 | 14,754 |
| | | | | |
| Net Increase | 4,844 | (18,745) | (12,162) | 8,624 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 50,566 | 69,311 | 81,473 | 72,849 |
| | | | | |
| End of Year | $55,410 | $50,566 | $69,311 | $81,473 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

I-94

PR-CCD-0005771

## POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

In addition to the pension benefits, the Commonwealth provides non-pension post-employment benefits that consist of a medical insurance plan contribution for retired employees meeting the service credit eligibility requirements. These benefits are administered by the Retirement Systems. The medical insurance plan contribution is a payment of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

The Commonwealth funds these post-employment benefits on a "pay-as-you-go" basis from the General Fund, which means that the Commonwealth does not pre-fund, or otherwise establish a reserve or other pool of assets against the medical insurance plan contribution expenses that the Commonwealth may incur in future years. For fiscal year 2010, the Commonwealth paid $114.2 million for these benefits for the eligible retirees of the Retirement Systems (including retirees of public corporations and municipalities, which are also paid for by the Commonwealth). For fiscal year 2011, these benefits are expected to amount to $122.2 million.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The most recent actuarial valuation reports of these benefits are dated as of June 30, 2009. The Retirement Systems are currently evaluating the preliminary results of new actuarial valuations as of June 30, 2010. Many of the actuarial assumptions used to project the actuarial accrued liability for these benefits are the same as those used to determine the accrued actuarial liabilities of the Retirement Systems. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | - | $1,567 | $1,567 | 0% | $4,246 | 37% |
| 2009 | - | 1,633 | 1,633 | 0 | 4,293 | 38 |
| 2010[2] | - | 1,646 | 1,646 | 0 | 3,818 | 43 |
| **Teachers Retirement System** | | | | | | |
| 2007 | - | $652 | $652 | 0% | $1,370 | 48% |
| 2009 | - | 750 | 750 | 0 | 1,418 | 53 |
| 2010[2] | - | 694 | 694 | 0 | 1,370 | 51 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | - | $5 | $5 | 0% | $31 | 15.0% |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010[2] | - | 6 | 6 | 0 | 32 | 18.1 |

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

[2] Preliminary.

PR-CCD-0005772

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits other than pensions administered by each of the Retirement Systems' for the last three fiscal years and the current fiscal year.

### Schedule of Employer Contributions to Retirement Systems
### on Account of Post-Employment Benefits Other Than Pensions
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $111 | $80 | $31 | 72.1% |
| 2009 | 112 | 87 | 25 | 77.7 |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 128 | 90 | 38 | 70.3 |
| **Teachers Retirement System** | | | | |
| 2008 | $37 | $26 | $11 | 70.6% |
| 2009 | 38 | 28 | 10 | 73.1 |
| 2010 | 42 | 28 | 14 | 66.7 |
| 2011 | 40 | 32 | 8 | 80.7 |
| **Judiciary Retirement System** | | | | |
| 2008 | $0.4 | $0.2 | $0.2 | 55.4% |
| 2009 | 0.4 | 0.3 | 0.1 | 62.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 61.6 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.5 |
| **Total** | | | | |
| 2008 | $148.4 | $106.2 | $42.2 | 71.6% |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 168.5 | 122.3 | 46.2 | 72.6 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2009 and, in the case of fiscal year 2011, the preliminary actuarial valuations as of June 30, 2010.
[2] The actual employer contributions for fiscal year 2011 are based on the expected pay-as-you-go amounts for the post-employment benefits other than pensions, as set forth in the preliminary actuarial valuations as of June 30, 2010.
[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

## COMMONWEALTH AUDITED FINANCIAL STATEMENTS

### General

For fiscal year 2009, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated October 22, 2010 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Pension Trust Funds whose fair values have been estimated in the absence of readily determinable fair values and the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2009). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the

PR-CCD-0005773

amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth ("CAFR") for fiscal year 2009, which includes the basic financial statements of the Commonwealth for fiscal year 2008, was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through its Electronic Municipal Markets Access System ("EMMA") on October 25, 2010. The Commonwealth's basic financial statements for fiscal year 2010 are being audited by Deloitte & Touche LLP and are expected to be filed with the MSRB through EMMA on or before May 1, 2011.

**Prior Non-Compliance with Continuing Disclosure Obligations**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for such Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Report, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such

PR-CCD-0005774

new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of the Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements. For the fiscal year 2010 audit, Treasury and the auditors are holding weekly status meetings regarding the fiscal year 2010 financial statements.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2006, 2007, 2008, 2009 and the estimated revenues and expenditures for fiscal year 2010. Once the audited financial statements have been completed, the Commonwealth will provide the General Fund revenue and expenditure data for fiscal year 2010. The numbers for fiscal year 2010 have not been audited and are subject to audit related adjustments.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used

PR-CCD-0005775

to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal years 2010 and 2011 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

PR-CCD-0005776

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2006 | 2007 | 2008 | 2009 | 2010[*] |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | 3,087,748 | 3,071,655 | 2,759,305 | 2,648,261 | 2,574,707 |
| Corporations | 1,872,458 | 2,002,718 | 1,565,534 | 1,375,596 | 1,677,691 |
| Partnerships | 2,787 | 2,960 | 1,942 | 1,839 | 1,589 |
| Withheld from non-residents | 921,260 | 933,728 | 1,087,782 | 1,081,739 | 830,350 |
| Tollgate taxes | 27,396 | 25,083 | 21,610 | 19,372 | 15,034 |
| Interest | 11,536 | 12,112 | 13,657 | 11,738 | 9,901 |
| Dividends | 66,721 | 138,859 | 59,770 | 48,663 | 29,774 |
| Total income taxes | 5,989,906 | 6,187,115 | 5,509,600 | 5,187,208 | 5,139,046 |
| Sales and use tax | | 582,560 | 911,000 | 797,194 | 538,902 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 292,180 | 279,028 | 268,094 | 277,401 | 284,796 |
| Cigarettes | 135,267 | 132,399 | 119,124 | 129,429 | 182,501 |
| Motor vehicles | 533,957 | 396,667 | 366,341 | 310,920 | 344,424 |
| Other excise taxes | 682,477 | 314,340 | 110,014 | 86,874 | 77,886 |
| Total Commonwealth excise taxes | 1,643,881 | 1,122,434 | 863,573 | 804,624 | 889,607 |
| Property taxes | 1,106 | 800 | 219 | 1,011 | 227,533 |
| Inheritance and gift taxes | 9,466 | 4,663 | 6,600 | 5,064 | 3,617 |
| Licenses | 91,310 | 97,610 | 87,690 | 96,423 | 95,291 |
| **Other:** | | | | | |
| Lottery | 62,729 | 73,014 | 46,636 | 51,480 | 45,576 |
| Electronic lottery | 55,212 | 71,815 | 105,298 | 75,213 | 80,007 |
| Miscellaneous non-tax revenues | 431,803[(8)] | 330,064 | 466,741 | 284,436 | 318,819 |
| Total Other | 549,744 | 474,893 | 618,675 | 411,129 | 770,843 |
| Total revenues from internal sources | 8,285,413 | 8,470,075 | 7,997,357 | 7,302,653 | 7,338,398 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[(1)] | 346,272 | 377,872 | 356,827 | 404,265 | 352,301 |
| Customs | 9,553 | 14,504 | 4,846 | 3,269 | |
| Total revenues from non-Commonwealth sources | 355,825 | 392,376 | 361,673 | 407,534 | 352,301 |
| Total revenues | 8,641,238 | 8,862,451 | 8,359,030 | 7,710,187 | 7,690,699 |
| Other Income (refunds)[(2)] | 76,085 | (8,335) | (10,797) | 148,966 | (142,678)[(8)] |
| (Transfer) Refunding to Redemption Fund[(3)] | (484,812) | (512,197) | (202,954) | (607,305) | (403,617) |
| Proceeds of notes and other borrowings[(4)] | 4,115,897[(7)] | 1,872,096 | 2,710,000 | 3,982,893 | 2,375,000 |
| Repayment of notes and other borrowings[(5)] | (3,005,838) | (1,926,273) | (2,580,764) | (3,858,393) | (2,302,237) |
| Receipt of COFINA Bond Proceeds | - | - | - | 3,051,008 | 2,104,372[(9)] |
| Adjusted revenues | 9,342,570 | 8,287,742 | 8,274,515 | 10,427,356 | 9,321,539 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,944,349 | 3,387,199 | 3,471,922 | 3,117,817 | 3,591,186 |
| Personal services | 4,796,382 | 4,590,962 | 4,563,192 | 5,273,590 | 4,352,537 |
| Other services | 525,377 | 594,345 | 685,112 | 859,323 | 815,636 |
| Materials and supplies | 50,227 | 79,186 | 99,486 | 109,386 | 73,072 |
| Equipment purchases | 19,378 | 27,965 | 49,498 | 51,204 | 43,528 |
| Capital outlays and other debt service | 49,789 | 21,576 | 11,222 | 211,499 | 100,117 |
| Prior year disbursements | - | 92,770 | - | - | - |
| Total expenditures | 9,385,503 | 8,794,003 | 8,880,432 | 9,622,818 | 8,976,076 |
| Adjusted revenues less expenditures | (42,933) | (506,261) | (605,917) | 804,538 | 345,463 |
| Ending cash balance | 0 | (506,261) | (1,112,178) | (307,640) | 37,823 |

----

* Preliminary.

(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.

(2) Consists of net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.

(3) Consists of amounts to pay principal and interest on general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.

(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.

(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.

(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.

(7) Includes $50 million from the Emergency Fund used for operating expenses.

(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.

(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund.

*Source:* Treasury Department

PR-CCD-0005777

*Preliminary General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009.*

Preliminary General Fund total revenues for fiscal year 2010 were $7.691 billion, representing a decrease of $19.5 million from fiscal year 2009 revenues and an increase of $21 million from budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $258.3 million due to the increased allocation of this tax to COFINA, as discussed in "Major Sources of General Fund Revenues – Sales and Use Taxes" below. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $226.5 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act 7. See "Major Sources of General Fund Revenues – Income Taxes" below. Preliminary revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Preliminary total General Fund expenses (on a cash basis) for fiscal year 2010 amounted to $9.380 billion, which were composed of $8.976 billion of operational expenses and $403.6 million transferred to the redemption fund. The difference between preliminary revenues and expenses for fiscal year 2010 of $1.3 billion was covered principally by proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2009 Compared to Fiscal Year 2008*

General Fund total revenues for fiscal year 2009 were $7.710 billion, representing a decrease of $648.8 million, or 7.8%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $111 million and in corporate income taxes of $189.9 million, (ii) a decrease of $58.9 million in excise taxes, (iii) a decrease of $182.3 million in miscellaneous non-tax revenues, and (iv) a decrease of $113.8 million in the sales and use tax revenues due primarily to a one-time change in the manner sales and use tax collections are reported by the Treasury Department. Please refer to "Major Sources of General Fund Revenues – Sales and Use Taxes" below further information regarding this reporting change. The decreases in revenues in these categories for fiscal year 2009 as compared to fiscal year 2008 reflect the acceleration of the economic recession during that fiscal year.

Total General Fund expenses (on a cash basis) for fiscal year 2009 amounted to $10.230 billion, which were composed of $9.623 billion of operational expenses and $607 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2009 of $2.5 billion was covered principally by proceeds from COFINA bond issues.

*Fiscal Year 2008 Compared to Fiscal Year 2007*

Total General Fund revenues for fiscal year 2008 were $8.359 billion, representing a decrease of $234.4 million, or 2.7%, from actual revenues for fiscal year 2007 (excluding the collection of $269 million from special temporary tax measures in fiscal year 2007). The major changes from fiscal year 2007 were: (i) decreases in income taxes from individuals of $312.4 million and in corporate income taxes of $437.2 million, (ii) a decrease of $258.9 million in

PR-CCD-0005778

excise taxes, and (iii) an increase of $328.4 million in the sales and use tax revenues, which had only been in effect for seven and a half months during fiscal year 2007. The decrease in 2008 revenues was principally due to the ongoing economic recession and high oil prices, which directly affected income and excise tax collections.

Total General Fund expenses (on a cash basis) for fiscal year 2008 amounted to $9.083 billion, which were composed of $8.880 billion of operational expenses and $203 million transferred to the redemption fund. The difference between adjusted revenues and expenses for fiscal year 2008 of $605.9 million was covered principally by cash-management procedures such as delaying payments to certain vendors and a GDB loan of $190 million.

*Fiscal Year 2007 Compared to Fiscal Year 2006*

General Fund total revenues for the fiscal year 2007 were $8.862 billion, an increase of $221 million, or 2.6%, from fiscal year 2006. This amount includes (i) $5.074 billion in individual and corporate income taxes, (ii) $934 million in non-resident withholding taxes, (iii) $1.122 billion in excise taxes, (iv) $583 million of sales and use tax revenues, and (v) $269 million from special temporary tax measures. A decrease of $521 million in excise taxes was offset by revenues from the sales and use tax, as the repeal of the general excise tax on imported goods and goods manufactured in Puerto Rico was replaced with the sales and use tax commencing on November 15, 2006.

Total General Fund expenses (on a cash basis) for fiscal year 2007 were $9.306 billion. This amount does not include $522 million of debt service payments on a portion of the Commonwealth's outstanding appropriation debt, which debt service was excluded from the budget based on the provisions of Act 91, which created the Dedicated Sales Tax Fund to service in part the repayment of such appropriation debt.

The difference between revenues and expenses for fiscal year 2007 of $444 million was covered by a $240 million transfer of funds from GDB that was originally set aside from General Fund appropriations to cover a portion of debt service payments on the Commonwealth's appropriation debt, which set-aside was no longer needed on account of the passage of Act 91. The remaining shortfall was covered principally by cash-management procedures such as delaying payments to certain vendors (carrying over into fiscal year 2008).

**Major Sources of General Fund Revenues**

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Internal Revenue Code for a New Puerto Rico, Act No. 1 of January 31, 2011, which will apply for taxable years commencing after December 31, 2010 ("Act No. 1"). See "Tax Reform" below. Many of the provisions of Act No. 1 are identical to the equivalent provisions of the PR Code. Thus unless otherwise noted, the discussion below refers to the provisions of both the PR Code and Act No. 1.

PR-CCD-0005779

The PR Code imposed a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax was imposed on certain payments made to non-residents of Puerto Rico, which was collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000. Under Act No. 1, the highest income tax bracket gradually increases every year for the next six years from $60,000 to $121,500. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under Act No. 1. After January 1, 2016, the top individual rate is lowered to 30%. See "Tax Reform" below for certain requirements that must be satisfied in order for tax benefits under Act No. 1 to enter into effect for taxable years starting after December 31, 2013. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at an income tax rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at an income tax rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for an income tax rate of 10%.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the PR Code provided for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, were taxed at a maximum regular income tax rate of 15%. Under Act No. 1, for taxable years commencing after December 31, 2010, the highest corporate income tax rate is lowered to 30% for net taxable income in excess of $1,750,000 (it will be reduced to 25% for taxable years starting after December 31, 2013 subject to the satisfaction of certain conditions) and the alternative minimum tax is also reduced from a rate of 22% to the greater of (i) the amount produced by applying a minimum rate of 20% to the alternative minimum net income or, (ii) subject to certain exceptions, the amount produced by applying a 1% excise tax on the purchase from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $50 million or more during any of three preceding taxable years. Dividends received by Puerto Rico corporations and partnerships from foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general

I-103

income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations and partnerships covered by the Tourism Development Act are subject to a maximum tax rate of 39% on their taxable income after applying the 90% exemption granted under the Tourism Development Act, which results in a maximum effective tax rate of 3.9% on their net tourism development income. Under Act No. 1, the net income of corporations and partnerships covered under the Tourism Development Act is subject generally to a maximum effective tax rate of 3%.

The PR Code generally imposes a branch profits tax on resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding.

*Act No. 7 – Special Tax Measures Implemented as part of the New Administration's Fiscal Stabilization Plan.* Act 7 was enacted as part of the new administration's Fiscal Plan, and sought, among other things, to increase the tax revenues of the Puerto Rico government by imposing certain permanent and temporary tax increases.

With respect to income taxes, Act 7 included the following temporary measures that are applicable for taxable years commenced after December 31, 2008 and before January 1, 2012:

(i)     taxable corporations and individuals whose adjusted gross income equal or exceeds $100,000 (for single individuals) or $150,000 (in the case of married persons filing jointly) are subject to a surtax of 5% on their total tax liability (for

PR-CCD-0005781

taxable years commencing after December 31, 2010, Act No. 1 eliminates this surtax);

(ii)    international banking entities that do not operate as bank units will be subject to a 5% income tax on their entire net income computed in accordance with the PR Code (international banking entities operating as bank units are subject to this 5% tax on their net income that does not constitute excess net income);

(iii)    credit unions, their subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7), however, if the Government of Puerto Rico collects $690 million prior to January 1, 2012, the 5% tax will not be applicable for the remaining period;

(iv)    the Cooperative Bank, its subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7);

(v)    insurance cooperatives are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7); and

(vi)    international insurers and holding companies of international insurers are subject to a 5% tax on their net income (these entities were totally exempt before the enactment of Act 7).

Act 7 also provided as a permanent measure a change in the method of computing the net income subject to alternative minimum tax ("AMT") in the case of individuals by including in the computation various categories of exempt income and income subject to preferential tax rates under the PR Code, such as: (a) long-term capital gains, which enjoy a preferential tax rate of 10% under the PR Code; (b) dividends that are taxable at the rate of 10% under the PR Code; (c) interest on bank deposits and individual retirement accounts subject to the special 10% and 17% preferential income tax rates, respectively; and (d) interest from notes or bonds eligible for the special 10% tax rate provided by the PR Code.

Another change introduced by Act 7, for taxable years commenced after December 31, 2008 and before January 1, 2012 was an adjustment to the calculation of the net income subject to the AMT in the case of entities taxed as corporations that denies a deduction for expenses paid or accrued for services rendered outside of Puerto Rico by a related party. Lastly, different income tax credits awarded to investors under certain special laws for activities such as revitalization of urban centers (only in part), venture capital, solid waste, housing infrastructure, and rehabilitation of social-interest housing (only projects without qualification certifications as of March 9, 2009), among others, may not be claimed or granted for taxable years commenced after December 31, 2008 and before January 1, 2012. Tax credits associated to manufacturing, tourism, and cinematographic projects, however, were not affected by Act 7.

PR-CCD-0005782

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform consists of two phases focused on providing tax relief to individual and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform is projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The first phase, enacted as Act No. 171 of November 15, 2010, applies to the 2010 tax return and provides a tax credit to each individual and corporate taxpayer. The tax credit applicable to individuals and determined by reference to the tax liability ranges from 7% for those taxpayers in higher brackets to 15% for taxpayers in the lowest bracket. Corporate taxpayers will also be entitled to a 7% tax credit determined by reference to the tax liability; provided, that such taxpayer paid the statutorily required Christmas bonus for 2010. Also, the corporate net operating loss carryforward is extended from 7 years to 10 years. This first phase is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010.

The second phase, enacted as Act No. 1, (i) promotes employment by doubling the earning income credit and increasing the maximum applicable income to qualify for such credit; (ii) provides a $400 tax credit to individuals over 65 years of age with an income below $15,000; (iii) significantly reduces individual income tax rates and only allow the following five deductions (a) mortgage interest up to 30% of adjusted gross income, (b) charitable contributions up to 50% of adjusted gross income, (c) medical expenses in excess of 6% of adjusted gross income, (d) interest on student loans, and (e) contributions to retirement plans and accounts, including individual retirement accounts, health savings accounts and education savings accounts; and (iv) significantly reduces corporate income tax rates.

The reduction in income tax revenues resulting from the implementation of the tax reform is expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures is expected to be revenue positive. Act No. 1 conditions the implementation of the tax reductions applicable to individuals and corporations after fiscal year 2014 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals and corporations for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. There is no

I-106

PR-CCD-0005783

assurance that sufficient revenues will be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform.

*Act 154 – Expanded Income Taxation and New Excise Tax.* Act 154, approved on October 25, 2010, as amended, seeks, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Government. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships (each a taxpayer) by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and the act imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010.

The Act provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, will instead be subject to the excise tax in lieu of any income tax. The excise tax will apply for a period of six years. The excise tax is based on the value of the personal property or services acquired and will be 4% for calendar year 2011, declining to 3.75% in 2012, 2.75% in 2013, 2.5% in 2014, 2.25% in 2015 and 1% in 2016. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The first monthly excise tax payment is due on February 15, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

While the Government expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their U.S. federal income tax liabilities, it is uncertain how this new tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

Since Act 154 became effective on January 1, 2011, there can be no assurance as to the amount of revenues that will be collected by its application.

In connection with the expansion of the income tax and the imposition of the new excise tax, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that the excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the

I-107

expansion of the taxation of foreign persons and the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce clause, for reasons discussed therein. Act 154 has not been challenged in court; consequently, no court has not passed on the constitutionality of Act 154. There can be no assurance that constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as content in a manufactured good, whether or not bound for export.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department has reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes

PR-CCD-0005785

corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated total annual gross revenues for the General Fund of approximately $539 million for fiscal year 2010.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7 require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid on merchandise acquired for resale that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages, the increase ranges between $0.30 and $0.70 per standard gallon. Motor vehicles, motorcycles, all terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10%.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially

I-109

PR-CCD-0005786

lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

One of the amendments incorporated in Act 7 was that, for fiscal years 2010 through 2013, the appraisal values of real property in Puerto Rico were increased tenfold and the real personal property tax rates applicable to such values were reduced tenfold so as to offset any increased tax that would have otherwise been applicable due to the increase in appraisal values. This temporary amendment, which is expected to be revenue neutral, was intended to increase the borrowing capacity of Puerto Rico's municipalities.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax will apply during fiscal years 2010, 2011 and 2012, or until $690 million is collected. The additional real property tax, to be collected by the Treasury Department, will be equal to 0.591% of such properties' appraised value as determined by CRIM. Act No. 1 eliminated this additional real property tax for fiscal year 2012.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2005 to 2009.

### Commonwealth of Puerto Rico
### Assessed Valuations and Real and Personal Property Taxes
### (Commonwealth and Municipalities Combined)
### (in thousands)

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2005 | 25,277,795 | 899,893 | 738,074 | 50,751 | 788,825 |
| 2006 | 25,606,121 | 925,618 | 801,497 | 70,908 | 872,405 |
| 2007 | 26,898,519 | 982,400 | 813,700 | 79,720 | 893,420 |
| 2008 | 27,941,285 | 1,031,277 | 788,364 | 119,062 | 907,426 |
| 2009 | 28,903,996 | 1,032,570 | 634,040 | 244,411 | 878,451 |

[1] Valuation set as of July 1 of each fiscal year.
[2] During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM. In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source:* Municipal Revenues Collection Center.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

I-110

PR-CCD-0005787

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

*Revenues from Non-Commonwealth Sources*

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products or new rum distilleries are established in Puerto Rico.

In an effort to maintain the local rum industry and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act 178 and contains identical provisions.

The Government of Puerto Rico is in discussions with certain rum producers to provide them a series of subsidies and incentives, as permitted under Act No. 1, in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this

PR-CCD-0005788

would allow such companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

**Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes**

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to foster tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosures agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, the creation of technological solutions to improve collections, and the establishment of cooperation agreements with federal and local governmental agencies. The Treasury Department is also integrating its databases and establishing a tax intelligence project to identify tax evasion and improve its audit selection process.

Specifically, the Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Commonwealth sales tax through the implementation of various enforcement and compliance programs. Among these initiatives is a voluntary disclosure program, which began on July 1, 2009 and has since then allowed for the review of more than 75 cases and collection of approximately $29.5 million, by providing certain taxpayers the opportunity to pay taxes and interest owed on past income taxes and sales transactions and to avoid the payment of surcharges and penalties. During May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,000 letters and had received responses from 1,500 taxpayers. This initiative has resulted in an additional 171 cases of which 81 have been pre-qualified for participation in the program. The Treasury Department expects to collect approximately $30 million as a result of the program.

Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department is also in process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby officers from the Treasury Department use hand held scanning devices to cross-check merchant licenses with sales tax receipts. The Treasury Department has also created a specialized unit to implement a tax intelligence program that aims to detect tax evasion through the application of economic models and algorithms to the taxpayer information in the Treasury Department's database.

On September 28, 2010, the Treasury Department signed an agreement with Evertec, Inc. and Softek for the implementation of a new point of sale system to strengthen its sales tax enforcement efforts (the "IVU Loto"). The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales

PR-CCD-0005789

through the implementation of a special lottery using sales receipts as lottery tickets. The Treasury Department will implement this new point of sale system in two phases. The first phase entails a pilot program in which 200 businesses are expected to participate. Once the pilot program has concluded, a business certification program will take place followed by full scale implementation expected to begin in January 2011. The implementation of this new system is expected to increase sales tax collections by $100 million during the first year, $200 million during the second year and $400 million during the third year.

The IVU Loto pilot program started on December 1, 2010. Two hundred merchants in the municipality of Ponce were selected to participate in the program. As of January 10, 2011, the IVU Loto devices captured 608,949 transactions which resulted in sales of $16,942,914 and state and municipal sales and use tax withholdings of $592,280 and $115,467, respectively. On January 11, 2011, merchants filed their monthly sales and use tax returns for the month of December and the Treasury Department is in the process of comparing sales and use tax withholdings reported by the IVU Loto system with the information filed by merchants that participated in the pilot program. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants acquire and use an IVU Loto device on or prior to April 30, 2011.

Another initiative has focused on strengthening the Treasury Department's enforcement workforce. It has equipped a call center staffed by 105 tax collection agents, which began operations on February 24, 2010 and has produced approximately $11.7 million in collections. The Treasury Department has also increased staffing levels in its Enforcement and Compliance Bureaus by approximately 322 employees, therefore allowing an increase in unannounced field audits of businesses and merchants. The Treasury Department currently makes approximately 2,000 visits per month.

Other initiatives include the establishment of tax liens pursuant to the procedures of Act No. 12 of January 20, 2010, which enables the creation of tax liens through an expedited process. Since the enactment of Act No. 12, the Treasury Department has established 7,719 liens in favor of the Commonwealth over approximately $288 million in assets. The Treasury Department is also enforcing a provision of Act 7 that allows the Treasury Department to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month. Also, the Treasury Department will begin to seize the assets of businesses that are delinquent on their sales tax payments. In addition, the Treasury Department has entered into agreements with various municipalities to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts as the ones described above.

With respect to property taxes, Act 71 of July 2, 2010 ("Act 71") established a 120 day amnesty program available from August 16, 2010 until December 13, 2010, in which taxpayers may pay outstanding property tax debts with a discount of 100% of any penalties, interest and surcharges (the "Program"). Pursuant to Act 71 and CRIM's Administrative Order No. 2010-05, the Program is available with respect to taxable year 2008-2009 and previous years in the case of real property taxes, and for taxable year 2008 and previous years with respect to personal property taxes. To benefit from the Program the taxpayer must: (i) have paid property taxes for fiscal year 2009-2010 and the first semester of 2010-2011 in the case of real property taxes, and

PR-CCD-0005790

tax year 2009 in the case of personal property taxes; and (ii) certify to the CRIM that it will pay real and personal property taxes related to fiscal year 2010-2011.

Act No. 172 of November 15, 2010, established that taxpayers which apply for a voluntary disclosure program on or before April 15, 2011 will be eligible for a 20% flat income tax rate on the gross amounts reported and will not be subject to interest, surcharges and penalty fees. This legislation extends the benefits of the program to municipal license tax declarations for which taxpayers will pay principal on the municipal tax determined, but will not be subject to interest, surcharges and penalty fees. Declarations by taxpayers must relate to tax years commenced after July 1, 2003 and ending on or before December 31, 2009, and payment of tax determined under the program must be paid no later than June 30, 2011.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

PR-CCD-0005791

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law reviewed to be reimbursed to the General Fund.

*Federal Grants*

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government are estimated to be $5.020 billion for fiscal year 2011, a decrease of $869 million, or 15%, from fiscal year 2010. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2007 through 2009 are actual figures. The figures for fiscal years 2010 and 2011 are the amounts included in the approved budget.

One of the sources of federal grants received by the Government, beginning on 2009, was ARRA. Puerto Rico expects to receive a total of approximately $6.966 billion in stimulus funds from ARRA, of which $508.9 million and $2.687 billion were disbursed by the government during fiscal years 2009 and 2010, respectively, and $2.442 billion are expected to be disbursed by the government during fiscal year 2011. The table below only included the portion of these funds disbursed by agencies whose accounting systems are centralized in the Treasury Department.

PR-CCD-0005792

**The Commonwealth of Puerto Rico**
**Federal Grants***
**(in thousands)**

| | 2007 | 2008 | 2009 | 2010[1] | 2011[2] |
|---|---|---|---|---|---|
| Education | $ 986,574 | $ 992,087 | $1,032,387 | $1,779,542 | $1,313,153 |
| Social Services | 1,923,845 | 2,054,897 | 3,033,365 | 2,536,021 | 2,473,611 |
| Health | 436,892 | 465,466 | 593,925 | 605,896 | 485,263 |
| Labor and Human Resources[3] | 183,228 | 140,186 | 277,267 | 216,189 | 128,080 |
| Crime | 29,631 | 20,319 | 21,377 | 74,197 | 29,238 |
| Housing[4] | 375,581 | 363,589 | 574,196 | 522,765 | 464,911 |
| Drug and Justice | 35,321 | 19,394 | 26,350 | 48,995 | 23,355 |
| Agriculture and Natural Resources | 12,484 | 11,054 | 12,625 | 30,043 | 38,171 |
| Contributions to Municipalities | 48,531 | 49,543 | 47,656 | 60,559 | 47,806 |
| Other | 17,095 | 15,782 | 17,803 | 15,068 | 16,355 |
| TOTAL | $4,049,182 | $4,132,317 | $5,636,951 | $5,889,275 | $5,019,943 |

\*    *Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.*

---

[1]    Approved budget.
[2]    Estimated.
[3]    Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
[4]    Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

### Office of Management and Budget

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

I-116

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to

I-117

PR-CCD-0005794

one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last two fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficits. As of December 28, 2010, the balance in the Budgetary Fund was $844,925

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of December 28, 2010, the balance in the Emergency Fund was $1.4 million and $0.5 million was available to be borrowed from GDB.

## Appropriations

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)    *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.* These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)    *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

(iii)    *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)    *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources

I-118

PR-CCD-0005795

for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

For fiscal year 2010, approximately 34% of the General Fund was committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to the Public Buildings Authority, and debt service on the direct debt of the Commonwealth. This proportion is expected to decrease to 29% in fiscal year 2011. For fiscal year 2010, approximately 48% of the controllable funds portion of the General Fund was committed for the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2010 and 2011.

**General Fund Expenses Breakdown**
**(in millions)**

|  | 2010[1] | 2011[2] |
|---|---|---|
| **Non-Controllable Expenses** | | |
| Mandated Expenses (Formula) | | |
| Contributions to Municipalities | $335 | $355 |
| University of Puerto Rico | 729 | 691 |
| Judicial Branch | 348 | 348 |
| Rent Payments to Public Buildings Authority | 297 | 217 |
| General Obligation Debt Service | 521 | 201 |
| Other Debt Service | 373 | 517 |
| Total of Non-Controllable Expenses | $2,603 | $2,329 |
| Percent of Total General Fund Expenses | 34% | 29% |
| | | |
| **Controllable Expenses** | $5,067 | $5,805 |
| Payroll and Related Costs[3] | 2,309 | 2,789 |
| Payroll as a Percentage of Controllable Expenses | 46% | 48% |
| | | |
| **Total General Fund Expenses** | $7,670 | $8,134 |
| | | |
| **Other Expenses** | | |
| Total Non-Budgeted Expenses | - | - |
| COFINA Stabilization Fund | $2,500 | $1,000 |
| | | |
| **Total Expenses** | $10,170 | $9,134 |

[1] Preliminary.
[2] Estimated.
[3] Excludes University of Puerto Rico and Judicial Branch.
Source: Office of Management and Budget

I-119

## Budget for Fiscal Year 2010

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ended June 30, 2010**
**(in thousands)[*]**

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $230,000 | - | $115,657 | $345,167 |
| Personal income taxes | 2,614,000 | - | - | 2,614,000 |
| Retained non-resident income tax | 878,000 | - | - | 878,000 |
| Corporate income taxes | 1,556,000 | - | - | 1,556,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 11,000 | - | - | 11,000 |
| 17% withholding tax on interest | 16,000 | - | - | 16,000 |
| 10% withholding tax on dividends | 34,000 | - | - | 34,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 545,000 | - | - | 545,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 279,000 | - | - | 279,000 |
| Motor vehicles and accessories | 334,000 | - | - | 334,000 |
| Cigarettes | 177,000 | - | - | 177,000 |
| Other (excise taxes) | 86,000 | - | 638,453 | 724,453 |
| Licenses | 94,000 | - | - | 94,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 46,000 | - | - | 46,000 |
| Electronic lottery | 76,000 | - | - | 76,000 |
| Registration and document certification fees | 128,000 | - | - | 128,000 |
| Other | 203,000 | - | 403,920 | 606,920 |
| Total revenues from internal sources | 7,314,000 | - | 1,157,540 | 8,471,540 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 356,000 | - | - | 356,000 |
| Federal grants[(1)] | 0 | - | 5,889,275 | 5,889,275 |
| Customs | 0 | - | - | 0 |
| Total revenues from non-Commonwealth sources | 356,000 | - | 5,889,275 | 6,245,275 |
| Total revenues | 7,670,000 | - | 7,046,815 | 14,716,815 |
| Other: | | | | |
| Balance from previous year | 0 | - | 1,648,236 | 1,648,236 |
| Bonds authorized | 0 | 0 | - | - |
| Total other sources | 0 | 0 | 1,648,236 | 1,648,236 |
| Total resources | 7,670,000 | 0 | 8,695,051 | 16,365,051 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 714,269 | - | 57,640 | 771,909 |
| Education | 3,038,896 | - | 1,889,044 | 4,927,940 |
| Health | 1,361,284 | - | 603,533 | 1,964,817 |
| Welfare | 253,149 | - | 2,977,834 | 3,230,983 |
| Economic development | 127,305 | - | 108,436 | 235,741 |
| Public safety and protection | 490,235 | - | 133,066 | 623,301 |
| Transportation and communication | 93,294 | - | 83,724 | 177,018 |
| Housing | 9,975 | - | 312,892 | 322,867 |
| Contributions to municipalities | 369,727 | - | 13,709 | 383,436 |
| Special pension contributions | 313,626 | - | 0 | 313,626 |
| Debt service | 520,600 | - | 115,167 | 635,767 |
| Other debt service (appropriations) | 373,140 | - | 682,708 | 1,055,848 |
| Total appropriations – current expenses | 7,665,500 | - | 6,977,753 | 14,643,253 |
| Capital improvements | 4,500 | - | 250,278 | 254,778 |
| Total appropriations | 7,670,000 | - | 7,228,031 | 14,898,031 |
| Year-end balance | 0 | - | 1,467,020 | 1,467,020 |
| Total appropriations and year-end balance | $7,670,000 | - | $8,695,051 | $16,365,051 |

\* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.

*Sources: Treasury Department and Office of Management and Budget*

I-120

Estimated revenues for fiscal year 2010 total $16.4 billion and projected General Fund Revenues total $7.7 billion. The principal changes in general fund revenues are accounted mainly by increases in property taxes (up $229 million), corporate income tax (up $191.7 million), excise taxes on motor vehicles and accessories (up to $19.6 million), cigarettes and alcoholic beverages (up $49.2 million), and decreases in sales and use taxes (down $349.9 million, due principally to the increase in the portion of the tax transferred to COFINA), retained non-resident income taxes (down $203.3 million), federal excise taxes on offshore shipments (down $39.7 million), and 10% withholding taxes on dividends (down $14.7 million).

Estimated expenses and capital improvements for the central government of all budgetary funds total $14.9 billion, a decrease of $2.0 billion from fiscal year 2009. General Fund expenditures are estimated to total $9.833 billion. The principal changes in General Fund expenditures by program in fiscal year 2010 compared to fiscal year 2009 are mainly attributable to increases in general obligation bonds debt service (up $255.4 million), and decreases in general government (down $1.5 billion), public safety and protection (down $1.2 billion), education (down $409.9 million), welfare (down $243.4 million), other debt service appropriations (down $195.8 million), health (down $194.2 million), economic development (down $55.6 million), transportation and communication (down $22.2 million), contributions to municipalities (down $18.5 million), and housing (down $17.7 million).

For fiscal year 2010, the government incurred an additional $2.2 billion in expenses, for a total of $9.833 billion in expenses. Approximately $2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the Fiscal Plan ($1 billion) and (ii) additional expenses ($1 billion) to be incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). These additional expenses are included in the consolidated budget of the Commonwealth and were covered from proceeds of COFINA bond issues.

PR-CCD-0005798

## Budget for Fiscal Year 2011

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2011.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2011**
**(in thousands)\***

| | General Fund | Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|---|
| Revenues from internal sources: | | | | | |
| Property taxes | $340,000 | | | $115,743 | $455,743 |
| Personal income taxes | 2,812,000 | | | | 2,812,000 |
| Retained non-resident income tax | 851,500 | | | | 851,500 |
| Corporate income taxes | 1,657,000 | | | | 1,657,000 |
| Partnership income taxes | 3,000 | | | | 3,000 |
| Tollgate taxes | 5,000 | | | | 5,000 |
| 17% withholding tax on interest | 12,000 | | | | 12,000 |
| 10% withholding tax on dividends | 34,000 | | | | 34,000 |
| Inheritance and gift taxes | 5,000 | | | | 5,000 |
| Sales and use taxes | 604,000 | | | | 604,000 |
| Excise taxes: | | | | | |
| Alcoholic beverages | 283,000 | | | | 283,000 |
| Motor vehicles and accessories | 349,000 | | | | 349,000 |
| Cigarettes | 166,000 | | | | 166,000 |
| Other (excise taxes) | 116,000 | | | 617,500 | 733,500 |
| Licenses | 77,000 | | | | 77,000 |
| Miscellaneous non-tax revenues: | | | | | |
| Contributions from lottery fund | 52,000 | | | | 52,000 |
| Electronic lottery | 104,000 | | | | 104,000 |
| Registration and document certification fees | 131,000 | | | | 131,000 |
| Other | 188,000 | | | 373,940 | 561,940 |
| Total revenues from internal sources | 7,789,500 | | | 1,107,183 | 8,896,683 |
| Revenues from non-Commonwealth sources: | | | | | |
| Federal excise taxes on off-shore shipments | 344,000 | | | 0 | 344,000 |
| Federal grants[1] | 0 | | | 5,019,943 | 5,019,943 |
| Customs | 0 | | | 0 | 0 |
| Total revenues from non-Commonwealth sources | 344,000 | | | 5,019,943 | 5,363,943 |
| Total revenues | 8,133,500 | | | 6,127,126 | 14,260,626 |
| Other: | | | | | |
| Balance from previous year | 0 | | | 1,467,020 | 1,467,020 |
| Bonds authorized | 0 | 1,000,000 | | 0 | 1,000,000 |
| Total other sources | 0 | 1,000,000 | | 1,467,020 | 2,467,020 |
| Total resources | 8,133,500 | 1,000,000 | 0 | 7,594,146 | 16,727,646 |
| Appropriations: | | | | | |
| Current expenses: | | | | | |
| General government | 725,284 | 152,725 | - | 49,387 | 927,396 |
| Education | 2,914,349 | 31,013 | - | 1,753,995 | 4,699,357 |
| Health | 1,500,061 | 77,635 | - | 517,592 | 2,095,288 |
| Welfare | 274,781 | 191,525 | - | 2,701,258 | 3,167,564 |
| Economic development | 199,115 | 53,866 | - | 117,019 | 370,000 |
| Public safety and protection | 1,009,443 | 420,991 | - | 85,937 | 1,516,371 |
| Transportation and communication | 88,232 | 52,142 | - | 64,312 | 204,686 |
| Housing | 4,003 | 18,481 | - | 351,451 | 373,935 |
| Contributions to municipalities | 365,510 | 1,622 | - | 956 | 368,088 |
| Special pension contributions | 334,553 | - | - | 0 | 334,553 |
| Debt service | 200,813 | - | - | 126,743 | 327,556 |
| Other debt service (appropriations) | 517,156 | - | - | 652,035 | 1,169,191 |
| Total appropriations – current expenses | 8,133,300 | 1,000,000 | - | 6,420,685 | 15,553,985 |
| Capital improvements | 200 | - | 0 | 219,439 | 219,639 |
| Total appropriations | 8,133,500 | 1,000,000 | 0 | 6,640,124 | 15,773,624 |
| Year-end balance | 0 | - | | 954,022 | 954,022 |
| Total appropriations and year-end balance | $8,133,500 | $1,000,000 | $0 | $7,594,146 | $16,727,646 |

---

\*   Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

I-122

On July 2, 2010, the Governor signed the Commonwealth's central government budget for fiscal year 2011. The budget provides for total resources of $15.8 billion and total General Fund revenues of $8.134 billion, compared to preliminary General Fund revenues of $7.691 billion for fiscal year 2010. The budgeted General Fund revenues of $8.134 billion include base revenues of $7.691 billion, $302.5 million from tax enforcement and compliance measures, $110 million in expected revenues from the implementation of the property tax appraisal provisions included in Act No. 71 of July 2, 2010, and $30 million in additional revenues from casinos.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2010 budget are accounted mainly by projected increases in personal income taxes (up $198 million), property taxes (up $110 million), corporate income tax (up $101 million), excise taxes on motor vehicles and accessories (up $15 million) and sales and use taxes (up $59 million), and projected decreases in retained non-resident income taxes (down $26.5 million) and federal excise taxes on offshore shipments (down $12 million).

The fiscal year 2011 budget provides for total expenditures of $9.134 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2011 are $9.134 billion, or 10.1%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $756 million, or 16.1%, lower than total expenditures of $10.890 billion for fiscal year 2009.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $15.8 billion, an increase of $875.6 million from fiscal year 2010 budgeted appropriations. The principal changes in General Fund expenditures by program in fiscal year 2011 compared to the fiscal year 2010 budget are mainly due to increases in public safety and protection (up $519.2 million), other debt service appropriations (up $144.0 million), health (up $138.8 million), economic development (up $71.8 million), welfare (up $21.6 million) and special pension contributions (up $20.9 million), and decreases in general obligation bonds debt service (down $319.8 million) and education (down $124.5 million).

**Differences between Budget and Basic Financial Statements**

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

I-123

PR-CCD-0005800

(iii)    Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

*General.* The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended ("Act 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation, as of June 30, 2009, the Commonwealth has included in its financial statements reported liabilities of approximately $621 million for awarded and anticipated unfavorable judgments. While amounts claimed exceed $7 billion, such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

*Constitutionality of Act 7.* On April 13, 2009, a group of government employees along with labor organizations that represent governmental employees filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor of Puerto Rico and several agency heads. In the complaint, the plaintiffs challenge the constitutionality of Act 7 and seek, among other relief, an injunction to stop the Government of Puerto Rico from implementing the cost-cutting provisions of Act 7, described above in "Fiscal and Economic Reconstruction—Expense Reduction Measures" under "The Economy."

On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. Plaintiffs have appealed the Court's decision. The Government will continue to vigorously defend this case. As discussed under "The Economy- Fiscal Stabilization and Economic Reconstruction", the Supreme Court of Puerto Rico has upheld the constitutionality of the

PR-CCD-0005801

provisions of Act 7 relating to employee dismissals and the administration continues with its implementation.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997. In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must make Medicaid "wraparound" payments to the health centers to cover the difference between the reimbursement they are owed and what they are paid by managed care organizations. The Court of Appeals of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the FQHCs certain grants received by these centers from the federal government. Currently, attorneys in the case filed in Commonwealth court are trying to determine the amounts due to FQHCs thereunder.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings. Since mid-2009, the parties have been presenting evidence before a Special Master in order to determine the precise amounts of payments due to the health centers.

As of June 30, 2010, the Commonwealth had accrued $147 million in its financial statements for this legal contingency. This contingency, however, only covers amounts claimed in the federal lawsuit in connection with the period from July 2006 through June 2009. According to various recent rulings in this case, the Department of Justice believes that the total ultimate liability to the Commonwealth in the federal lawsuit should not exceed $28 million. Notwithstanding the foregoing, any amounts not paid in connection with the resolution of the federal lawsuit must ultimately be paid in connection with the Commonwealth lawsuit. In addition, the Department of Health must continue to comply with the federal Medicaid statute which requires that wraparound payments be issued to FQHCs every three to four months. These wraparound payments equal approximately $10 million each quarter. The Commonwealth, however, is currently challenging in federal court the wraparound payment formula pursuant to which these amounts are determined.

*Special Education Students.* The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and

I-125

PR-CCD-0005802

were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court approved damages for the class as a whole. The Commonwealth appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least $5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs have approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. The Commonwealth has requested that plaintiffs provide a reasonable settlement amount in order to analyze and formally address the settlement proposal. As of the date of this Report, the Commonwealth has not received a formal settlement request from the plaintiffs.

As of June 30, 2009, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $5 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

PR-CCD-0005803

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL



[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

Re:   $442,015,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
      Series 2011 C (General Obligation Bonds)

Dear Mr. Secretary:

      We have acted as bond counsel to the Commonwealth of Puerto Rico in connection with the issuance of the above-captioned bonds, dated the date of delivery thereof (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended (the "Act"), such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary") and approved by the Governor of the Commonwealth of Puerto Rico (the "Resolution"). We also have examined one of the Bonds as executed and authenticated.

      The Bonds are issued pursuant to the Act and the Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Resolution.

      Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

      Based on the foregoing, we are of opinion that, under existing law:

1.     The Act is valid.

2.     Said proceedings have been validly and legally taken.

3.     The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth of Puerto Rico for the payment of the principal of and the interest on the

PR-CCD-0005804

Bonds, to which the good faith, credit and taxing power of the Commonwealth of Puerto Rico are pledged.

4.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth of Puerto Rico has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent the Commonwealth of Puerto Rico from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,


Greenberg Traurig, LLP


II-2

APPENDIX III



**MUNICIPAL BOND
INSURANCE POLICY**

ISSUER:

Policy No:   -N

BONDS:   $ in aggregate principal amount of

Effective Date:

Premium: $

     ASSURED GUARANTY MUNICIPAL CORP. ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

     On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

     Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which     has     been     recovered     from     such     Owner     pursuant     to     the

III-1

PR-CCD-0005806

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM. The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. has caused this Policy to be executed on its behalf by its Authorized Officer.



ASSURED GUARANTY MUNICIPAL CORP.


By _____
                Authorized Officer


Form 500NY (5/90)


III-2

PR-CCD-0005807

Case:17-03283-LTS Doc#:4781-4 Filed:01/14/19 Entered:01/14/19 18:19:25 Desc:
Exhibit 27 Page 180 of 500

MIX
From responsible sources
FSC® C017146

Printed by: ImageMaster

PR-CCD-0005808

# Exhibit 28

| NEW ISSUE - BOOK-ENTRY ONLY | RATINGS: | Moody's: | A3 |
|---|---|---|---|
| See "Book-Entry Only System" under THE BONDS | See RATINGS | Fitch: | BBB+ |
| | | S&P: | BBB |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$602,105,000**

**COMMONWEALTH OF PUERTO RICO**

| | |
|---|---|
| **$304,000,000** | **Public Improvement Bonds of 2011** |
| **$52,190,000** | **Public Improvement Refunding Bonds, Series 2011 D** |
| **$245,915,000** | **Public Improvement Refunding Bonds, Series 2011 E** |
| | **(General Obligation Bonds)** |

**Dated: Date of Delivery**                    **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2012. The Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041).

The scheduled payment of principal of and interest on the Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about July 12, 2011.

| **J.P. Morgan** | | | **Barclays Capital** |
|---|---|---|---|
| BMO Capital Markets | BofA Merrill Lynch | Citi | Goldman, Sachs & Co. |
| Jefferies & Company | Morgan Stanley | Ramirez & Co. Inc. | Raymond James |
| RBC Capital Markets | UBS Financial Services Incorporated of Puerto Rico | | Wells Fargo Securities |

BBVAPR MSD   FirstBank Puerto Rico Securities   Oriental Financial Services   Popular Securities   Santander Securities   Scotia MSD   VAB FINANCIAL

June 29, 2011

CONFIDENTIAL

**$602,105,000**

**Commonwealth of Puerto Rico**

**$304,000,000** **Public Improvement Bonds of 2011**
**$52,190,000** **Public Improvement Refunding Bonds, Series 2011 D**
**$245,915,000** **Public Improvement Refunding Bonds, Series 2011 E**
**(General Obligation Bonds)**

**Public Improvement Bonds of 2011**

$304,000,000    5.75% Term Bonds due July 1, 2041    Yield – 5.95%    CUSIP[*] 74514LYW1

## Public Improvement Refunding Bonds, Series 2011 D

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2013 | $  470,000 | 3.000% | 1.80% | 74514LYX9 |
| 2014 | 485,000 | 3.000 | 2.24 | 74514LYY7 |
| 2015 | 500,000 | 3.000 | 2.83 | 74514LYZ4 |
| 2016 | 515,000 | 3.125 | 100.00 | 74514LZA8 |
| 2017 | 530,000 | 3.500 | 3.55 | 74514LZB6 |
| 2018 | 550,000 | 3.875 | 3.90 | 74514LZC4 |
| 2019 | 15,000,000 | 5.000 | 4.26[†] | 74514LZH3 |
| 2019 | 8,870,000 | 4.250 | 4.26 | 74514LZF7 |
| 2019[‡] | 5,900,000 | 3.875 | 100.00 | 74514LZD2 |
| 2020 | 10,000,000 | 5.000 | 4.50[†] | 74514LZJ9 |
| 2020 | 4,870,000 | 4.500 | 100.00 | 74514LZG5 |
| 2020[‡] | 4,500,000 | 4.125 | 100.00 | 74514LZE0 |

## Public Improvement Refunding Bonds, Series 2011 E

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2029 | $70,315,000 | 6.000% | 5.070%[†] | 74514LZK6 |
| 2030 | 60,255,000 | 5.375 | 5.610 | 74514LZL4 |
| 2031 | 35,970,000 | 5.500 | 5.680 | 74514LZM2 |
| 2032 | 38,435,000 | 5.625 | 5.750 | 74514LZN0 |
| 2033 | 40,565,000 | 5.625 | 5.800 | 74514LZP5 |
| 2034 | 375,000 | 5.625 | 5.830 | 74514LZQ3 |

---

[*]    Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]    Priced at the stated yield to the July 1, 2016 optional redemption date at a redemption price of 100%. See *Redemption* under THE BONDS.

[‡]    Insured by Assured Guaranty Municipal Corp.

CONFIDENTIAL

# Government of Puerto Rico

## Governor

### LUIS G. FORTUÑO

## Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

KENNETH D. MCCLINTOCK
*Secretary of State*

GUILLERMO SOMOZA COLOMBANI
*Secretary of Justice*

JESÚS F. MÉNDEZ
*Secretary of the Treasury*

JESÚS RIVERA SÁNCHEZ
*Secretary of Education*

MIGUEL ROMERO LUGO
*Secretary of Labor and
Human Resources*

DR. LORENZO GONZÁLEZ
*Secretary of Health*

JAVIER RIVERA AQUINO
*Secretary of Agriculture*

RUBÉN A. HERNÁNDEZ GREGORAT
*Secretary of Transportation
and Public Works*

JOSÉ R. PÉREZ-RIERA
*Secretary of Economic
Development and Commerce*

YANITSIA IRIZARRY
*Secretary of Family Affairs*

MIGUEL HERNÁNDEZ VIVONI
*Secretary of Housing*

DANIEL J. GALÁN KERCADÓ
*Secretary of Natural and
Environmental Resources*

LUIS G. RIVERA MARÍN
*Secretary of
Consumer Affairs*

HENRY NEUMANN ZAYAS
*Secretary of Sports and Recreation*

CARLOS M. MOLINA RODRÍGUEZ
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

*Fiscal Officers*

THOMAS RIVERA SCHATZ
President, Senate

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

ii

CONFIDENTIAL

PR-CCD-0026058

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.  The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof.  The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time.**

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and *Appendix III - Specimen Municipal Bond Insurance Policy*.

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth.  In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements.  All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

iii

PR-CCD-0026059

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| OVERVIEW | 3 |
| RECENT DEVELOPMENTS | 4 |
| Commonwealth's Fiscal Imbalance | 4 |
| Fiscal Year 2012 Government Budget | 5 |
| Preliminary Results for the First Ten Months of Fiscal Year 2011 | 6 |
| Tax Reform | 7 |
| Financial Condition of Retirement Systems | 9 |
| Local Incentives for Rum Producers | 11 |
| Recent Rating Actions | 12 |
| PLAN OF FINANCING | 13 |
| Sources and Uses of Funds | 14 |
| THE BONDS | 14 |
| General | 14 |
| Book-Entry Only System | 14 |
| Discontinuance of the Book-Entry Only System | 17 |
| Authorization | 17 |
| Redemption | 18 |
| Notice of Redemption; Effect of Redemption | 18 |
| Security | 19 |
| Payment Record | 21 |
| Debt Limitation | 21 |
| Maturity Limitation | 24 |
| BOND INSURANCE | 24 |
| Bond Insurance Policy | 24 |
| Assured Guaranty Municipal Corp. | 24 |
| Bond Insurance Provisions under the Bond Resolution | 26 |
| PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 27 |
| Public Sector Debt | 27 |
| Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 28 |
| TAX MATTERS | 29 |
| Discount Bonds | 30 |
| Premium Bonds | 30 |
| LEGAL MATTERS | 31 |
| LEGAL INVESTMENT | 31 |
| VERIFICATION OF MATHEMATICAL COMPUTATIONS | 31 |
| UNDERWRITING | 31 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 34 |
| RATINGS | 34 |
| CONTINUING DISCLOSURE | 35 |
| Continuing Disclosure Undertaking | 35 |
| Prior Continuing Disclosure Non-Compliance | 38 |
| MISCELLANEOUS | 39 |
| Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated April 30, 2011 | I-1 |
| Appendix II – Proposed Form of Opinion of Bond Counsel | II-1 |
| Appendix III – Specimen Municipal Bond Insurance Policy | III-1 |

iv

[This Page Intentionally Left Blank]

CONFIDENTIAL

**$602,105,000**
**Commonwealth of Puerto Rico**
**$304,000,000  Public Improvement Bonds of 2011**
**$52,190,000  Public Improvement Refunding Bonds, Series 2011 D**
**$245,915,000  Public Improvement Refunding Bonds, Series 2011 E**
**(General Obligation Bonds)**

## INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011 (the "2011 Bonds"), $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D (the "Series D Bonds") and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E (the "Series E Bonds" and together with the Series D Bonds, the "Refunding Bonds"). The 2011 Bonds and the Refunding Bonds are collectively referred to herein as the "Bonds."

The 2011 Bonds are being issued under the provisions of Act No. 79 of the Legislative Assembly of Puerto Rico, approved on June 1, 2011 ("Act 79"), and pursuant to a resolution authorizing the issuance of the 2011 Bonds (the "2011 Bond Resolution") adopted in accordance with Act 79 by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on June 29, 2011.

The Refunding Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended ("Act 33"), and pursuant to a resolution authorizing the issuance of the Refunding Bonds (the "Refunding Bond Resolution") adopted in accordance with Act 33 by the Secretary of the Treasury and approved by the Governor of Puerto Rico on June 29, 2011.

The scheduled payment of principal of and interest on the Refunding Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

Under Act 79 and Act 33, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated April 30, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

CONFIDENTIAL

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on May 1, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in

2

PR-CCD-0026063

each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. The Commonwealth complies with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

-3-

CONFIDENTIAL

PR-CCD-0026064

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Fiscal Imbalance

Since 2000, the Commonwealth has experienced an imbalance between recurring government revenues and total expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. The current administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. For fiscal year 2010, total expenditures of $10.369 billion exceeded total revenues (excluding other financing sources) of $7.593 billion by $2.775 billion; if debt service amounts that were refinanced during fiscal year 2010 are excluded, however, total expenditures were approximately $9.691 billion and exceeded total revenues (excluding other financing sources) by $2.098 billion. It is estimated that the deficit for fiscal year 2011 will be

4

PR-CCD-0026065

approximately $1.0 billion. See "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I*.

In order to address the fiscal imbalance, the Government of Puerto Rico (the "Government") has taken multiple steps, including the implementation of a multi-year Fiscal Stabilization Plan (the "Fiscal Plan"). The Fiscal Plan included operating expense reduction measures (which the Government estimates have resulted in annual savings of approximately $837 million), tax revenue enforcement measures, temporary and permanent revenue raising measures (which the Government estimates will result in additional revenues of $420 million during fiscal year 2011) and financial measures. The principal financial measure taken has been the bond issuance program of the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds of the COFINA bond issuance program (which are deposited in an account referred to as the "Stabilization Fund" managed by Government Development Bank) have been used to repay existing government debt (including debts with Government Development Bank), finance operating expenses for fiscal years 2008 through 2011 (including costs related to the implementation of the expense reduction measures of the Fiscal Plan), and fund an economic stimulus plan. Another financial measure has been the restructuring of a portion of the Commonwealth's debt service. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest due in such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest due in such fiscal year on the Commonwealth guaranteed bonds issued by Public Buildings Authority ("PBA"). During fiscal year 2011 to date, the Commonwealth has refinanced $490.9 million of principal and interest due in such fiscal year on the Commonwealth's general obligation bonds. The Government expects to refinance approximately $537.4 million and $153.8 million of debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds, respectively, during fiscal year 2012. The Fiscal Plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in *Appendix I*.

**Fiscal Year 2012 Government Budget**

On April 12, 2011, the Governor of Puerto Rico, Luis G. Fortuño (the "Governor"), presented the proposed budget for fiscal year 2012 to the Legislature of Puerto Rico. The proposed budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of bond issues made by COFINA, which proceeds are deposited in the Stabilization Fund.

The principal changes in General Fund revenues under the proposed fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 of October 25, 2010, as amended ("Act No. 154") (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes

5

PR-CCD-0026066

on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 proposed budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues available in the Stabilization Fund. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA Bonds which are expected to be refinanced during fiscal year 2012, as previously discussed. The budgeted total expenditures for fiscal year 2012 are 1.2% higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1,109.0 million, or 12.0%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 proposed budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $79 million), education (up $148.3 million), economic development (up $117.6 million), transportation (up $12.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $26.0 million), and decreases in debt service (down $58.4 million), welfare (down $24.0 million), health (down $212.7 million), and governmental management (down $61.4).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

**Preliminary Results for the First Ten Months of Fiscal Year 2011**

Preliminary General Fund net revenues for the first ten months of fiscal year 2011 (from July 1, 2010 to April 30, 2011) were $6.406 billion, an increase of $125 million, or 2.0%, from $6.281 billion of net revenues for the same period in the prior fiscal year, and an increase of $105 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed below.

The increase in General Fund net revenues is mainly due to an increase of $111 million in withholdings from non-residents and the collection of $407 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 in October 2010 as part of the tax reform. This increase was partially offset by a decrease of $245 million, $69 million, and $84.8 million in collections from income tax on individuals, income tax on corporations, and miscellaneous non-tax revenues, respectively. This decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first three monthly excise tax payments due in February, March and April 2011 amounted to approximately $108.7 million, $125.8 million and $172.5 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

CONFIDENTIAL

PR-CCD-0026067

The Treasury Department also reported that preliminary sales and use tax collections for the first eleven months of fiscal year 2011 were $1.031 billion, an increase of $31.8 million, or 3.2%, from the sales and use tax collections for the same period in the prior fiscal year. Sales and use tax preliminary collections for May 2011 were $89.2 million, an increase of 4.3% compared to May 2010. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund. See "Security" under THE BONDS and "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

For more information on the tax reform and Act No. 154, see "Tax Reform" below and "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I*.

**Tax Reform**

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers' aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as

7

effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The Treasury Department recently announced that preliminary collections for the first four monthly excise tax payments (from February through May 2011) were $108.7 million, $125.8 million, $172.5 million and $130.2 million, respectively. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Therefore, it is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending

8

PR-CCD-0026069

issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with Government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $7.8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending

9

on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems, see RETIREMENT SYSTEMS in *Appendix I.*

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly that seek to address the retirement systems' financial condition. One of such bills, which was enacted as Act No. 96 of June 16, 2011, provides for an immediate contribution of $162.5 million to the Employees Retirement System from funds currently on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund, which would be invested in a capital appreciation bond issued by COFINA with a maturity of at least thirty years, but not to exceed forty years, and bearing interest at a rate of 7%. The principal amount of the COFINA bond, which would grow to approximately $1.2 billion in thirty years, would be available to pay certain pension obligation bonds and other obligations of the Employees Retirement System.

10

PR-CCD-0026071

House Bill 3407 ("HB 3407") proposes to increase employer contributions to the Employee Retirement System and the Teachers Retirement System by 1% in each of the next five fiscal years and by 1.25% in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. HB 3407 would also divide the Employees Retirement System into three separate systems: the Government Employee System, the Municipal Employee System and the Public Corporation Employee System, which would divide the actuarial liability among the three systems. There can be no assurance that HB 3407 will be enacted or, if enacted, will be enacted in the form proposed.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") each month to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Destilería Serrallés, Inc. ("Serrallés") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund

11

CONFIDENTIAL

PR-CCD-0026072

will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act No. 178 and contains identical provisions.

As permitted under Act No. 1, the Government has entered into a definitive agreement with one rum producer and is currently in negotiations with two others to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of General Fund revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

**Recent Rating Actions**

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook and assigned such rating to the bonds issued by the Commonwealth. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measures that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years, in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's unenhanced general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's unenhanced general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's unenhanced general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems.

12

CONFIDENTIAL

PR-CCD-0026073

On May 3, 2011, Moody's placed the "A3" general obligation rating of the Commonwealth on watchlist for possible downgrade citing the weak funding ratio of the Commonwealth's retirement systems and the significant strain that their future funding requirements will likely exert on the Commonwealth's financial condition. In its May 3 announcement, Moody's stated that it expected to conclude its review within 90 days.

## PLAN OF FINANCING

The net proceeds of the 2011 Bonds will be deposited in the Public Improvements Fund of 2011 established under the Act. The proceeds of the Bonds will be used to carry out certain capital improvements programs authorized by the Legislative Assembly in Act 79 and the refunding of bond anticipation notes issued under Act 79 to finance, on an interim basis, portions of certain such capital improvement programs.

The net proceeds of the Refunding Bonds will be used to: (i) refund in full certain other general obligation bonds and notes of the Commonwealth set forth in the Bond Resolution (the "Refunded Bonds") as set forth below, (ii) fund termination payments under certain interest rate swap agreements and a debt service deposit agreement entered into in connection with the issuance of the Refunded Bonds, (iii) pay capitalized interest on the Refunding Bonds, and (iv) pay the expenses related to the issuance and sale of the Refunding Bonds.

| Series of Bonds | Original Principal Amount | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2000 | $29,200,000 | $29,200,000 | 5.625% | 2019 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2000 | 22,635,000 | 22,635,000 | 5.700 | 2020 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 60,525,000 | 60,525,000 | Variable | 2029 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 50,900,000 | 50,900,000 | Variable | 2030 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 30,700,000 | 30,700,000 | Variable | 2031 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 31,850,000 | 31,850,000 | Variable | 2032 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 32,625,000 | 32,625,000 | Variable | 2033 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 67,950,000 | 300,000 | Variable | 2034 | July 14, 2011 |

The Secretary of the Treasury will deposit the net proceeds of the Refunding Bonds to be utilized to pay the Refunded Bonds into an escrow fund (the "Escrow Fund") with an escrow agent to be selected by the Commonwealth (the "Escrow Agent"). The net proceeds of the Refunding Bonds deposited in the Escrow Fund will be invested either in cash or in noncallable direct obligations of the United States ("Government Obligations"), the principal of and interest on which will be sufficient to pay the Refunded Bonds on the redemption dates set forth above.

The sufficiency of the amount so deposited, with investment earnings thereon, to pay the Refunded Principal, will be verified by Causey, Demgen & Moore, Inc. (the "Verification Agent").

13

CONFIDENTIAL

PR-CCD-0026074

## Sources and Uses of Funds

Sources:

| | |
|---|---:|
| Principal amount of the Bonds | $602,105,000.00 |
| Net Original Issue Discount | 8,774,359.30 |
| Total sources | $593,330,640.70 |

Uses:

| | |
|---|---:|
| Deposit into the Public Improvement Fund of 2011 | $267,337,500.00 |
| Refunding of Bond Anticipation Notes | 162,971.69 |
| Deposit into the Escrow Fund | 259,957,441.67 |
| Capitalized Interest | 25,197,444.89 |
| Underwriting discount and other financing expenses* | 40,675,282.45 |
| Total uses | $593,330,640.70 |

\* Includes the cost to the Commonwealth of terminating interest rate swap agreements entered into in connection with the issuance of the Refunded Bonds (approximately $34,698,000), the partial termination of a debt service deposit agreement (approximately $137,000), bond insurance premium, legal, printing and other financing expenses.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, will receive a portion of the proceeds from this offering in connection with the termination of such swap agreements. See UNDERWRITING.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

14

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

15

CONFIDENTIAL

PR-CCD-0026076

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that

16

PR-CCD-0026077

DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

### Discontinuance of the Book-Entry Only System

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

### Authorization

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

CONFIDENTIAL

PR-CCD-0026078

**Redemption**

The Bonds maturing on or after July 1, 2017 are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041), either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The 2011 Bonds are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such 2011 Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2038, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

| Year | Term Bonds Maturing July 1, 2041 |
|------|----------------------------------|
| 2038 | $  14,395,000 |
| 2039 | 15,225,000 |
| 2040 | 65,960,000 |
| 2041 | 208,420,000* |

\* Maturity

If the amount of the 2011 Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such 2011 Bonds for such fiscal year, the amortization requirement for such 2011 Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such

18

CONFIDENTIAL

PR-CCD-0026079

notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

## Security

### Provision for Payment of Public Debt

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but

19

CONFIDENTIAL

PR-CCD-0026080

only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the

CONFIDENTIAL

PR-CCD-0026081

amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010 and 2011, the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to fund deposits to the Redemption Fund. The Commonwealth expects to enter into loan agreements with Government Development Bank the proceeds of which would be used to fund deposits to the Redemption Fund during fiscal years 2012 and 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to fund deposits to the Redemption Fund after June 30, 2013. On June 15, 2011, the amount on deposit in the Redemption Fund was $446.7 million, which was the required amount.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

## Payment Record

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

## Debt Limitation

### Constitutional Debt Limitation

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

21

PR-CCD-0026082

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the

CONFIDENTIAL

PR-CCD-0026083

purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In March 2011, the Commonwealth issued its $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (the "Series 2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in *Appendix I* for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of March 31, 2011.

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2011 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($981,295,893) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $991,787,196, is equal to 13.53% of $7,333,246,000, which is the average of the adjusted preliminary internal revenues for the fiscal years ended June 30, 2009 and 2010. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 12.20%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% constitutional debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under Public Corporations in Appendix I. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

CONFIDENTIAL

PR-CCD-0026084

As of May 31, 2011, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $212.9 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal years 2010 and 2011 to date, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million and $16.5 million, respectively. See "Commonwealth Guaranteed Debt" under Debt in *Appendix I*.

## Maturity Limitation

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

### Bond Insurance Policy

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as *Appendix III* to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

### Assured Guaranty Municipal Corp.

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

CONFIDENTIAL

PR-CCD-0026085

*Current Financial Strength Ratings*

On June 13, 2011, S&P issued a release stating that it had affirmed the "AA+" financial strength rating of AGM, with a stable outlook. Reference is made to the release, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On January 24, 2011, S&P published a Request for Comment: Bond Insurance Criteria (the "Bond Insurance RFC") in which it requested comments on its proposed changes to its bond insurance ratings criteria. In the Bond Insurance RFC, S&P notes that it could lower its financial strength ratings on existing investment-grade bond insurers (including AGM) by one or more rating categories if the proposed bond insurance ratings criteria are adopted, unless those bond insurers (including AGM) raise additional capital or reduce risk. Reference is made to the Bond Insurance RFC, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 1, 2011, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, which was filed by AGL with the SEC on May 10, 2011.

*Capitalization of AGM*

At March 31, 2011, AGM's consolidated policyholders' surplus and contingency reserves were approximately $3,058,791,206 and its total net unearned premium reserve was approximately $2,285,987,748, in each case, in accordance with statutory accounting principles.

Incorporation of Certain Documents by Reference

Portions of the following document filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2010 (which was filed by AGL with the SEC on March 1, 2011); and

(ii)     the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011 (which was filed by AGL with the SEC on May 10, 2011).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the

CONFIDENTIAL

PR-CCD-0026086

filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp., 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the heading *Assured Guaranty Municipal Corp.* under BOND INSURANCE or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE.

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

26

CONFIDENTIAL

PR-CCD-0026087

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

## Public Sector Debt

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of March 31, 2011. The table also shows the public sector debt as adjusted for the issuance of the Bonds and the refunding of the Refunded Bonds. The table should be read in conjunction with the information set forth under DEBT in *Appendix I*.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

| | March 31, 2011 | As Adjusted by the Bonds and the refunding of the Refunded Bonds |
|---|---|---|
| **GENERAL FUND RELATED DEBT** | | |
| Direct full faith and credit obligations | $9,681 | $10,025 |
| Puerto Rico guaranteed debt[1] | 4,287 | 4,287 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,642 | 3,642 |
| Tax and Revenue Anticipation Notes[3] | 900 | 900 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $21,458 | $21,802 |
| | | |
| Sales and Use Tax (COFINA) debt | $13,437 | $13,437 |
| Public corporations and agencies | 24,031 | 24,031 |
| Municipal Debt | 3,409 | 3,409 |
| Limited Obligations/non-recourse debt [5] | 2,410 | 2,410 |
| TOTAL PUBLIC SECTOR DEBT | $64,745 | $65,089 |

---

* Totals may not add due to rounding.
[1] Consists of $598 million of bonds issued by Aqueduct and Sewer Authority, $406 million of State Revolving Fund Loans incurred under various federal water laws, $212.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of Government Development Bank bonds payable from available moneys of Government Development Bank.
[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.
[3] Includes related short-term financings.
[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.
[5] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

CONFIDENTIAL

PR-CCD-0026088

## Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on June 29, 2011 (after giving effect to the refunding of the Refunded Bonds); (ii) the Bonds; and (iii) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

### Commonwealth of Puerto Rico
### Debt Service Requirements*
### (in thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds | | Grand Total |
|---|---|---|---|---|
| | | Principal | Interest | |
| 2011[2] | $ 486,345 | - | | $ 486,345 |
| 2012[3] | 833,638 | - | $ 15,764 | 849,402 |
| 2013[3] | 836,797 | $ 470 | 25,489 | 862,756 |
| 2014 | 824,282 | 485 | 33,727 | 858,494 |
| 2015 | 838,357 | 500 | 33,712 | 872,570 |
| 2016 | 838,211 | 515 | 33,697 | 872,423 |
| 2017 | 763,812 | 530 | 33,681 | 798,023 |
| 2018 | 748,010 | 550 | 33,662 | 782,223 |
| 2019 | 788,307 | 29,770 | 33,641 | 851,718 |
| 2020 | 832,253 | 19,370 | 32,286 | 883,909 |
| 2021 | 704,768 | - | 31,381 | 736,149 |
| 2022 | 615,424 | - | 31,381 | 646,805 |
| 2023 | 568,523 | - | 31,381 | 599,904 |
| 2024 | 568,827 | - | 31,381 | 600,207 |
| 2025 | 557,378 | - | 31,381 | 588,758 |
| 2026 | 548,476 | - | 31,381 | 579,857 |
| 2027 | 548,480 | - | 31,381 | 579,861 |
| 2028 | 548,881 | - | 31,381 | 580,262 |
| 2029 | 421,207 | 70,315 | 31,381 | 522,903 |
| 2030 | 430,086 | 60,255 | 27,162 | 517,503 |
| 2031 | 454,442 | 35,970 | 23,923 | 514,335 |
| 2032 | 289,603 | 38,435 | 21,945 | 349,983 |
| 2033 | 217,248 | 40,565 | 19,783 | 277,596 |
| 2034 | 251,643 | 375 | 17,501 | 269,520 |
| 2035 | 304,513 | - | 17,480 | 321,993 |
| 2036 | 304,509 | - | 17,480 | 321,989 |
| 2037 | 299,567 | - | 17,480 | 317,047 |
| 2038 | 188,529 | 14,395 | 17,480 | 220,404 |
| 2039 | 188,526 | 15,225 | 16,652 | 220,403 |
| 2040 | 138,665 | 65,960 | 15,777 | 220,401 |
| 2041 | - | 208,420 | 11,984 | 220,404 |
| Total | $15,939,307 | $602,105 | $782,734 | $17,324,146 |

\* Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.
[1] Since fiscal year 1997, the Commonwealth had been paying approximately $30 million annual debt service on PRASA bonds and other obligations guaranteed by the Commonwealth. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making such payments and PRASA resumed making all payments due on and after such date from its net revenues. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the applicable constitutional debt limit.
[2] Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.
[3] The figures for interest and total debt service have been reduced by the interest that was capitalized through the issuance of the 2011 Bonds in the following amounts: approximately $16.9 million due during fiscal year 2012 and $8.3 million due during fiscal year 2013.

Sources: Government Development Bank and Department of the Treasury

CONFIDENTIAL
PR-CCD-0026089

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

CONFIDENTIAL

PR-CCD-0026090

**Discount Bonds**

Under the Code, the difference between the principal amount of the Bonds maturing July 1 of the years 2017, 2018, 2019 bearing interest at a rate of 4.25%, 2030 through 2034 and 2041 (collectively, the "Discount Bonds") and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Discount Bonds was sold is original issue discount. Original issue discount on the Discount Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owners of such Discount Bonds in each year, as described below, is, however, included in the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption TAX MATTERS in the year of accrual. Consequently, Beneficial Owners of Discount Bonds should be aware that the accrual of original issue discount in each year may result in additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Discount Bonds will accrue over the terms of such Bonds based on the constant yield method, compounded semiannually (or a shorter permitted compounding interval selected by the Beneficial Owner). Original issue discount accruing during the period a Beneficial Owner holds such Discount Bond will increase the adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Discount Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Discount Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Discount Bonds and with respect to the state and local tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of the Bonds maturing July 1 of the years 2013 through 2015, 2019 bearing interest at a rate of 5.00%, 2020 bearing interest at a rate of 5.00% and 2029 (collectively, the "Premium Bonds") and the tax basis of Premium Bonds to a purchaser (other than a purchaser who holds Premium Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) is "bond premium." Bond Premium is amortized over the period to maturity of a Premium Bond, based on the yield to maturity of that Premium Bond (or, in the case of a Premium Bond callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on that Premium Bond), compounded semiannually (or over a shorter permitted corresponding interval selected by the Beneficial Owner). No portion of that bond premium is deductible by the Beneficial Owner of a Premium Bond. For purposes of determining the Beneficial Owner's gain or loss on the sale, redemption (including redemption at maturity) or other disposition of a Premium Bond, the Beneficial Owner's tax basis in the Premium Bond is reduced by the amount of bond premium that accrues during the period of ownership. As a result, a Beneficial Owner may realize taxable gain for federal income tax purposes from the sale or other disposition of a Premium Bond for an amount equal to or less than the amount paid by the Beneficial Owner of that Premium Bond. A purchaser of a Premium Bond in the initial public

CONFIDENTIAL

PR-CCD-0026091

offering at the price for that Premium Bond stated on the cover of this Official Statement who holds that Premium Bond to maturity (or, in the case of a callable Premium Bond, to its earlier call date that results in the lowest yield on that Premium Bond) will realize no gain or loss upon the retirement of that Premium Bond. Beneficial Owners of Premium Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore, Inc. will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the Refunded Bonds, and (2) the computations of yield on both the securities and the Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $3,585,168.85 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and

31

PR-CCD-0026092

brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, an affiliate of Goldman, Sachs & Co. will receive approximately $29,550,000 of the proceeds from this offering in connection with the termination of the swap agreements between the Commonwealth and an affiliate of Goldman, Sachs & Co.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, and Barclays Capital Inc. established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

32

CONFIDENTIAL

PR-CCD-0026093

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of Harris Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services

CONFIDENTIAL

PR-CCD-0026094

and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "A3" by Moody's, "BBB+" by Fitch, and "BBB" by S&P. For more information regarding rating action affecting the Commonwealth, see "Recent Rating Actions" under RECENT DEVELOPMENTS. The Insured Bonds are expected to be assigned insured ratings of "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such expected ratings will be the final rating issued or, if issued, that they will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

34

CONFIDENTIAL

# CONTINUING DISCLOSURE

## Continuing Disclosure Undertaking

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1. to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2010, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2. to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

   a. principal and interest payment delinquencies;

   b. non-payment related defaults, if material;

   c. unscheduled draws on debt service reserves reflecting financial difficulties;

   d. unscheduled draws on credit enhancements reflecting financial difficulties;

   e. substitution of credit or liquidity facility providers, or their failure to perform;

   f. adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

   g. modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

   h. Bond calls, if material;

   i. defeasances;

   j. release, substitution, or sale of property securing repayment of the Bonds, if material;

   k. rating changes;

35

PR-CCD-0026096

l.    tender offers;

m.    bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.    the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.    the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event (h): The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

Event (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding

CONFIDENTIAL

PR-CCD-0026097

fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons

37

PR-CCD-0026098

for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal

CONFIDENTIAL

PR-CCD-0026099

resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II*), and the specimen of the municipal bond insurance policy to be issued by AGM (*Appendix III*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in BOND INSURANCE and UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

COMMONWEALTH OF PUERTO RICO

By:  /s/ Jesús F. Méndez
Secretary of the Treasury

39

PR-CCD-0026100

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-CCD-0026101

APPENDIX I

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**April 30, 2011**

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| General | 1 |
| Forward-Looking Statements | 1 |
| Overview of Economic and Fiscal Condition | 1 |
| Geographic Location and Demographic Trends | 10 |
| Relationship with the United States | 10 |
| Governmental Structure | 11 |
| Principal Officers Responsible for Fiscal Matters | 11 |
| Political Trends | 12 |
| THE ECONOMY | 13 |
| General | 13 |
| Fiscal Stabilization and Economic Reconstruction | 18 |
| Employment and Unemployment | 27 |
| Economic Performance by Sector | 28 |
| Higher Education | 42 |
| Tax Incentives | 44 |
| DEBT | 47 |
| Public Sector Debt | 47 |
| Debt Service Requirements for Commonwealth General Obligation Bonds | 50 |
| Interest Rate Exchange Agreements | 51 |
| Variable Rate Bonds and Mandatory Tender Bonds | 54 |
| Ratings of Commonwealth General Obligation Bonds | 56 |
| Commonwealth Guaranteed Debt | 56 |
| Trends of Public Sector Debt | 58 |
| PUBLIC CORPORATIONS | 59 |
| Government Development Bank for Puerto Rico | 60 |
| Other Public Corporations | 63 |
| INSURANCE MATTERS | 73 |
| RETIREMENT SYSTEMS | 73 |
| POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS | 94 |
| COMMONWEALTH AUDITED FINANCIAL STATEMENTS | 95 |
| General | 95 |
| Prior Non-Compliance with Continuing Disclosure Obligations | 96 |
| PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES | 97 |
| Summary and Management's Discussion of General Fund Results | 97 |
| Major Sources of General Fund Revenues | 101 |

i

Measures to Increase Collections of Income, Sales, and Excise Taxes and
Property Taxes ...................................................................................111
Transfers to General Obligation Redemption Fund.......................................113
Components of General Fund Expenditures ..................................................114

BUDGET OF THE COMMONWEALTH OF PUERTO RICO ...........................................116
Office of Management and Budget................................................................116
Budgetary Process.......................................................................................116
Financial Control and Adjustment Procedures ..............................................117
Appropriations ...........................................................................................118
Budget for Fiscal Year 2011 ........................................................................120
Proposed Budget for Fiscal Year 2012 .........................................................122
Differences between Budget and Basic Financial Statements.........................123

LITIGATION...........................................................................................................124

ii

## INDEX OF DEFINED TERMS

| | |
|---|---|
| 1998 Tax Incentives Act | 44 |
| Act 1 | 22 |
| Act 1 Participants | 73 |
| Act 104 | 124 |
| Act 117 | 107 |
| Act 132 | 24 |
| Act 154 | 7, 31 |
| Act 178 | 111 |
| Act 29 | 25 |
| Act 3 | 22, 69 |
| Act 447 | 73 |
| Act 447 Participants | 73 |
| Act 7 | 2 |
| Act 70 | 5 |
| Act 71 | 113 |
| Act 82 | 6, 61 |
| Act 83 | 6, 45 |
| Act 91 | 22 |
| Act 91 of 1966 | 117 |
| Act 91 of 2004 | 74 |
| Act No. 1 | 7, 101 |
| AFICA | 49, 68 |
| AMT | 104 |
| ARRA | 1 |
| basic swaps | 52 |
| Basic System Pension Benefits | 76 |
| basis annuity | 52 |
| BEA | 15 |
| Budgetary Fund | 117 |
| CAFR | 96 |
| Capital Fund | 63 |
| CFCs | 46 |
| CMI | 84 |
| COFINA | 2 |
| Commonwealth | 1 |
| Commonwealth Sales Tax | 107 |
| constant maturity swap | 52 |
| Corpus Account | 22 |
| credit/liquidity facilities | 54 |
| CRIM | 109 |
| DEDC | 24 |
| Development Fund | 63 |
| Diageo | 110 |
| District | 26 |
| DOH | 64 |

| | |
|---|---|
| Economic Plan | 18 |
| Electric Power Authority Retirement System | 73 |
| Emergency Fund | 117 |
| EMMA | 96 |
| Employees Retirement System | 73 |
| EPA | 64 |
| FAA | 39 |
| FDIC | 35 |
| Federal Stimulus | 23 |
| FINRA | 35 |
| Fiscal Board | 21 |
| Fiscal Plan | 18 |
| Fitch | 9, 64 |
| GASB 34 | 96 |
| GDB | 2 |
| Green Energy Incentives Act | 45 |
| Household Survey | 14 |
| Housing Finance Authority | 62 |
| IBEs | 35 |
| internal revenues | 47 |
| IRS | 8 |
| IVU Loto | 112 |
| Judiciary Retirement System | 73 |
| LIBOR | 52 |
| Local Stimulus | 23 |
| Mandatory Tender Bonds | 55 |
| MFA | 69 |
| Moody's | 9 |
| MSCHE | 72 |
| MSRB | 96 |
| Municipal Sales Tax | 107 |
| NIPA | 15 |
| non-career employees | 19 |
| notes | 47 |
| OCFI | 35 |
| OMB | 12 |
| PAA | 69 |
| Payroll Survey | 27 |
| PBA | 70 |
| Perpetual Trust | 61 |
| PFC | 63 |
| Planning Board | 1 |
| POA Guaranteed Bonds | 48 |
| Port | 69 |

CONFIDENTIAL

PR-CCD-0026106

Ports Authority.................................70
PPP Authority ..............................25
PPPs .............................................25
PR Code ......................................101
PRCDA .........................................38
PREPA ....................................52, 65
PRHTA .........................................66
PRIDCO........................................67
PRIFA .....................................22, 68
Program.......................................113
Puerto Rico....................................1
remarketing date.........................54
Retirement System .....................73
Retirement Systems ...................73
S&P ................................................8
Sales Tax....................................107
Section 936 Corporations..........46
Serralles.....................................110
SIFMA .........................................52
Stabilization Fund ........................3
synthetic fixed rate swap...........52
System 2000.................................73
System 2000 Participants ...........73
System Administered Pension Benefits ......76
TDF ..............................................62
Teachers Retirement System......73
TEU..............................................69
Tourism Development Act..........45
Treasury Department ..................11
U.S. Code .....................................31
University.....................................71
University Retirement System ...73
USVI ...........................................110
VRDO Bonds ..............................54

iv

CONFIDENTIAL

## COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### April 30, 2011

## INTRODUCTION

**General**

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of December 31, 2010, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the U.S. government or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors,

I-1

nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

## Overview of Economic and Fiscal Condition

### Economic Condition

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked to the United States economy, for fiscal years 2007, 2008, 2009 and 2010 Puerto Rico's real gross national product decreased by 1.2%, 2.9%, 4.0% and 3.8%, respectively, while the United States real gross domestic product grew at a rate of 1.9% and 2.0% during fiscal years 2007 and 2008, respectively, contracted during fiscal year 2009 at a rate of 2.8%, and grew by 0.7% in fiscal year 2010. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections made in March 2011, which take into account the preliminary results for fiscal year 2010, the economic impact of the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors, the real gross national product for fiscal year 2011 is forecasted to contract by 1.0%. The real gross national product for fiscal year 2012, however, is forecasted to grow by 0.7%.

### Fiscal Condition

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and total expenditures. The table set forth below shows recurring revenues*, total expenditures and the ensuing deficit for each fiscal year of the past decade. The deficit shown in this table for each fiscal year, however, does not include certain unbudgeted additional expenditures incurred by the Commonwealth in various fiscal years. Thus, the actual structural imbalance is underestimated in this table.

**Historical Deficit**
Fiscal Years ended June 30,
(in millions)

|  | Recurring Revenues | Total Expenditures | Deficit |
|---|---|---|---|
| 2000 | $7,003 | $7,576 | $ (573) |
| 2001 | 6,872 | 8,123 | (1,250) |
| 2002 | 7,186 | 9,126 | (1,940) |
| 2003 | 7,341 | 8,043 | (702) |
| 2004 | 7,834 | 8,923 | (1,089) |
| 2005 | 8,603 | 9,717 | (1,114) |
| 2006 | 8,423 | 10,397 | (1,974) |
| 2007 | 8,718 | 9,707 | (989) |
| 2008 | 8,207 | 9,324 | (1,117) |
| 2009 | 7,583 | 10,890 | (3,306) |

* Recurring revenues are revenues from taxes, licenses and other internal or external sources received on a recurring basis by virtue of existing laws. Non-recurring revenues include revenues from financings and other one shot measures described in this section.

I-2

CONFIDENTIAL

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance. These steps are discussed below in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Results for Fiscal Year 2009.* Total General Fund revenues for fiscal year 2009 were $7.583 billion, representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the current administration also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, provides for approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of bond issues made by Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym) and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan described below. See "Fiscal Stabilization and Economic Reconstruction – Fiscal Stabilization Plan" under THE ECONOMY.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion, representing an increase of $9.8 million from fiscal year 2009 revenues and of $45.3 million from revised budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act. No. 7 of March 9, 2009, as amended ("Act 7"), discussed below. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were approximately $10.369 billion (which includes approximately $216 million of expenditures related to the Government's local stimulus program described below in "Fiscal Stabilization and Economic Reconstruction – Economic Reconstruction Plan" under THE ECONOMY), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded total General Fund revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal

CONFIDENTIAL

PR-CCD-0026110

year 2010 were approximately $9.691 billion and exceeded total General Fund revenues (excluding other financing sources) by $2.098 billion, or 27.6%. Approximately $2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the Fiscal Plan ($1 billion) and (ii) additional expenses ($1 billion) incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Preliminary Results for the First Eight Months of Fiscal Year 2011.* Preliminary General Fund revenues for the first eight months of fiscal year 2011 (from July 1, 2010 to February 28, 2011) were $4.305 billion, a decrease of $175.6 million, or 3.9%, from $4.481 billion of revenues for the same period in the prior fiscal year and a decrease of $16 million, or 0.4%, from the original estimate of revenues of $4.321 billion made for budget purposes.

The decline in General Fund revenues is mainly due to a decrease of $93.5 million, $84.8 million, $48 million and $77.8 million in collections from income tax on individuals, income tax on corporations, withholding on non-residents and other non-tax revenues, respectively. These declines were partially offset by collections from the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted in October 2010 as part of the tax reform discussed below. The decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. For more information regarding the tax reform, see "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

The deficit for fiscal year 2011 is estimated to be approximately $1.0 billion, as discussed below.

*Fiscal Stabilization Plan.* In January 2009, the administration, which gained control of the Executive and Legislative branches of government in the November 2008 elections, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act 7, sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program (such proceeds are held by GDB in an account referred to herein as the "Stabilization Fund") have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and may be used for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below.

I-4

PR-CCD-0026111

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.834 billion, $7.058 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liabilities will continue to increase significantly, with a corresponding decrease in the funded ratios, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liabilities. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

I-5

CONFIDENTIAL

PR-CCD-0026112

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three government retirement systems, in February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010. The individual recommendations made by the members of the special commission, which included increasing the amount of the employer and employee annual contributions and changing the benefits structure, are being analyzed with the intent of presenting a comprehensive, consensus legislation package during 2011. The Secretary of Labor, who chaired the special commission, is evaluating, in particular, proposing additional employer contributions to improve the funding ratio, the impact of special laws that have provided additional retirement benefits, and the impact on the system's cash flow of previously approved increases in the amount that members may borrow from the systems under various loan programs.

On July 2, 2010, the Government enacted Act No. 70 ("Act 70"), which is designed to reduce government expenditures by providing an early retirement window for eligible employees (who opted to retire by January 14, 2011) under a formula that results in a positive actuarial impact for the government's retirement systems. Employees that elected to participate in the program will receive retirement benefits based on a lower salary and a lower pension rate than what they would otherwise have been entitled to if they had continued in their employment until full vesting, but at a higher rate than what they would be entitled to based on their current years of service. Approximately 2,398 employees opted for early retirement under Act 70.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the financial condition of the retirement systems and the Government's efforts to address the unfunded pension and non-pension benefit obligations and cash flow shortfalls of the retirement systems, see RETIREMENT SYSTEMS.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in

I-6

CONFIDENTIAL

education, healthcare and infrastructure, among others. As of March 31, 2011, the Commonwealth had disbursed $4.795 billion in ARRA funds, or 68.2%, of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also enacted Acts No. 82 and 83 of July 19, 2010, which provide for a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the administration adopted a comprehensive tax reform that takes into account the Commonwealth's current financial situation. See "Tax Reform" below.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the administration engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the administration published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The administration has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the administration has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marín International Airport.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

The fiscal stabilization plan, the economic reconstruction plan, and the long-term economic development plan are described in further detail below in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at promoting economic growth and job

CONFIDENTIAL

creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to Puerto Rico's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed at a declining rate (from 4% for 2011 to 1% for 2016) on certain acquisitions from related parties, and (iv) an expansion of taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships that are members of controlled groups that have members that are engaged in manufacturing or production or manufacturing services in Puerto Rico. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154 of October 25, 2010, as amended ("Act 154"). In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

I-8

CONFIDENTIAL

PR-CCD-0026115

Preliminary collections for the first two monthly excise tax payments, which were due on February 15, 2011 and March 15, 2011, were $108.9 million and $125.1 million, respectively. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform and Act 154, see "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*Ratings of Commonwealth General Obligation Bonds*

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth's general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term

CONFIDENTIAL

budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measure that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems. See RETIREMENT SYSTEMS.

*Budget for Fiscal Year 2011*

On July 2, 2010, the Governor signed the Commonwealth's central government budget for fiscal year 2011. The approved budget provides for total resources of $15.8 billion and total General Fund revenues of $8.134 billion, compared to General Fund revenues of $7.593 billion for fiscal year 2010. The budgeted General Fund revenues of $8.134 billion included base revenues of $7.691 billion, $302.5 million from tax enforcement and compliance measures, $110 million in expected revenues from the implementation of the property tax appraisal provisions included in Act. No. 71 of July 2, 2010 and $30 million in additional revenues from casinos. The approved fiscal year 2011 budget provides for total expenditures of $9.134 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.0 billion that are expected to be covered from moneys deposited in the Stabilization Fund funded with the proceeds of a COFINA bond issue completed in June 2010. The budgeted total expenditures for fiscal year 2011 are $557 million, or 5.75%, lower than total expenditures of $9.691 billion for fiscal year 2010 (excluding the debt service amounts that were refinanced), and $1.756 billion, or 16%, lower than total expenditures of $10.890 billion for fiscal year 2009.

*Proposed Budget for Fiscal Year 2012*

On April 12, 2011, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2012. The proposed budget provides for total General Fund revenues of $8.650 billion, compared to estimated General Fund revenues of $8.134 billion for fiscal year

CONFIDENTIAL

PR-CCD-0026117

2011.  The proposed fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues.  The proposed total expenditures for fiscal year 2012 are $8.650 million, or 1.21%, higher than budgeted total expenditures of $9.134 billion for fiscal year 2011.

**Geographic Location and Demographic Trends**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City.  It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000.  The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

**Relationship with the United States**

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War.  Puerto Ricans have been citizens of the United States since 1917.  In 1950, after a long evolution toward greater self-government, Congress enacted Public Law 600, which provided that the existing political, economic and fiscal relationship between Puerto Rico and the United States would remain the same, but Puerto Rico would be authorized to draft and approve its own Constitution, guaranteeing a republican form of government.  The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the United States.

The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states.  It differs from the states, however, in its relationship with the federal government.  The people of Puerto Rico are citizens of the United States but do not vote in national elections.  They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs).  Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico.  No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.  Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

CONFIDENTIAL

PR-CCD-0026118

## Governmental Structure

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States under the same conditions as decisions from state courts. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

## Principal Officers Responsible for Fiscal Matters

*Luis G. Fortuño* was sworn in as Governor of Puerto Rico on January 2, 2009. From 2005 until becoming Governor, Mr. Fortuño was Puerto Rico's elected Resident Commissioner in the U.S. House of Representatives. Mr. Fortuño was an attorney in private practice from 1985 to 1993, and again from 1997 to 2003. Mr. Fortuño was the Executive Director of the Tourism Company from 1993 to 1996. From 1994 to 1996, Mr. Fortuño served as the first Secretary of the Department of Economic Development and Commerce. Mr. Fortuño holds a Bachelor's Degree from the Edmund A. Walsh School of Foreign Service at Georgetown University and a Juris Doctor from the University of Virginia School of Law.

*Jesús F. Méndez* was designated as Secretary of the Department of the Treasury (the "Treasury Department") on January 7, 2011 and confirmed by the Senate of Puerto Rico on January 24, 2011. Before his appointment as Secretary of the Treasury Department, Mr. Méndez served as Executive Vice President and Director of Administration, Operation and Controllership of GDB and as Executive Director of the Public Buildings Authority. From 2005 to 2008, Mr. Méndez held the position of President and Chief Executive Officer of Tresamici Management, Inc., a closely held corporation dedicated to the administration of assisted living facilities. From 1996 to 2004, he held several senior management positions within Banco Santander S.A. operating entities in Puerto Rico, including President of Santander Asset Management and First Senior Vice President and Trust Officer of Banco Santander Puerto Rico and Managing Director of Santander Securities Corporation. Prior to joining Santander Securities, Mr. Méndez served as Chief Financial Officer and Managing Director of BP Capital Markets. He also worked for Credit Suisse First Boston (Puerto Rico, Inc.) as Vice President and Deloitte & Touche as Senior Auditor. In addition, Mr. Méndez also held the position of Assistant Bank Examiner at the Federal Deposit Insurance Corporation in New York City. Mr. Méndez has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is a Certified Public Accountant.

I-12

CONFIDENTIAL

*Juan Carlos Pavía* was appointed Director of the Office of Management and Budget of the Government of Puerto Rico ("OMB") on February 16, 2011. Prior to being named Director of the OMB, Mr. Pavía was Executive Vice President and Fiscal Agent of GDB as well as Executive Director of the Fiscal Stabilization and Reconstruction Board, where he was responsible for the compliance, oversight and economic studies areas of GDB. Before being named Executive Vice President and Fiscal Agent of GDB, he was a senior advisor to the President of GDB and Deputy Advisor to the Governor. Prior to entering public service, Mr. Pavía was employed in the commercial banking field. Mr. Pavía earned a bachelor's degree in Business Administration from The George Washington University in Washington D.C.

*Juan Carlos Batlle* was appointed President of GDB effective March 2, 2011. Before entering public service, Mr. Batlle served 14 years as a top executive for Santander Group in Puerto Rico. As part of the Investment Banking Group of Santander Securities Corporation, he served consecutively as Assistant Vice President in 1999, Vice President in 2001, and Senior Vice President and Director in 2003. In 2005, Mr. Batlle was named First Senior Vice President of Banco Santander Puerto Rico and President and Chief Executive Officer of Santander Asset Management Corporation. In 2008, Mr. Batlle was named Managing Director of Santander Securities Corporation. Prior to joining Santander in 1997, Mr. Batlle was employed by Popular Securities, Inc. Mr. Batlle has also been a member of the Boards of Directors of Santander Securities Corporation, Santander Asset Management Corporation and the First Puerto Rico Family of Funds. In addition, he has been a member of the Boards of Directors of the Puerto Rico Tourism Company, the Convention Center District Authority and the Hotel Development Corporation. He holds a degree in Economics from the College of Literature, Science and the Arts of the University of Michigan.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring statehood, represented by the New Progressive Party, and the other favoring the existing commonwealth status, represented by the Popular Democratic Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1992 | 1996 | 2000 | 2004 | 2008 |
|---|---|---|---|---|---|
| New Progressive Party | 49.9% | 51.1% | 45.7% | 48.2% | 52.8% |
| Popular Democratic Party | 45.9% | 44.5% | 48.6% | 48.4% | 41.3% |
| Puerto Rico Independence Party | 4.2% | 3.8% | 5.2% | 2.7% | 2.0% |
| Others, Blank or Void | — | 0.5% | 0.5% | 0.6% | 3.9% |

I-13

CONFIDENTIAL

With the results of the 2008 election, the New Progressive Party gained control of the Executive Branch and retained control of the Legislative Branch. The current membership of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| New Progressive Party | 21 | 37 |
| Popular Democratic Party | 8 | 17 |
| Total | 29 | 54 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2012.

## THE ECONOMY

**General**

The Commonwealth in the past has established policies and programs directed principally at developing the manufacturing sector and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have historically been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico's economy experienced a considerable transformation during the second half of the twentieth century, from an agriculture economy to an industrial one. Factors contributing to this transformation included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing. In some years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. Nevertheless, the significant oil price increases experienced from January 2002 to June 2008, the continuous contraction of the manufacturing sector, and the budgetary pressures on government finances triggered a general contraction in the economy.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2008 and 2009, the real gross national product contracted by 2.9% and 4.0%, respectively. For fiscal year 2010, preliminary reports indicate that the real gross national product contracted by 3.8%. The Planning Board projects a decrease in real gross national product of 1.0% for fiscal year 2011 and a slight increase of 0.7% for fiscal year 2012.

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2010. In fiscal year 2010, aggregate personal income was $60.4 billion ($47.9 billion at 2005 prices) and personal income per capita was $15,203 ($12,592 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $16.0 billion in

I-14

CONFIDENTIAL

fiscal year 2010 ($14.0 billion in fiscal year 2009). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.4 billion, or 65% of the transfer payments to individuals in fiscal year 2010 ($9.8 billion, or 70.1%, in fiscal year 2009). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

Total average annual employment (as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey") decreased during the last decade. From fiscal year 2000 to fiscal year 2010, total employment decreased at an average annual rate of 0.4% to 1,102,680. A steep decline in total employment began in fiscal year 2008 and has continued in fiscal year 2010 due to the current recession.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, has played a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

|  | 2006 | 2007 | 2008 | 2009 | 2010 [1] |
|---|---|---|---|---|---|
| Gross national product – $ millions [2] | $56,732 | $59,521 | $61,665 | $62,678 | $63,292 |
| Real gross national product – $ millions (2005 prices) | $54,027 | $53,400 | $51,832 | $49,775 | $47,898 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 0.5% | (1.2)% | (2.9)% | (4.0)% | (3.8)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 2.8% | 1.8% | 2.7% | (3.0)% | 0.9% |

[1] Preliminary.
[2] In current dollars.

*Sources:* Puerto Rico Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2010, approximately 68.1% of Puerto

CONFIDENTIAL

PR-CCD-0026122

Rico's exports went to the United States mainland, which was also the source of approximately 53.3% of Puerto Rico's imports. In fiscal year 2010, Puerto Rico experienced a positive merchandise trade balance of $22.4 billion.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2011 and 2012.



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2011).
\*\* Estimate for U.S. from IHS Global Insight (Apr-2011).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2010 shown in this Report

I-16

are preliminary until the revised figures for fiscal year 2010 and the preliminary figures of fiscal year 2011 are released and the forecast for fiscal year 2012 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the following table and published by GDB since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product.



*Economic Forecast for Fiscal Years 2011 and 2012*

On March 2011, the Planning Board released its revised gross national product forecast for fiscal year 2011 and its gross national product forecast for fiscal year 2012. The Planning Board revised its gross national product forecast for fiscal year 2011 from a projected growth of 0.4% to a contraction of 1.0%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2011 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of ARRA funds, the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic

I-17

conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2012 projects an increase in gross national product of 0.7% in constant dollars. The Planning Board's forecast for fiscal year 2012 took into account the estimated projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

*Fiscal Year 2010*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.8% (an increase of 1.0% in current dollars) over fiscal year 2009. Nominal gross national product was $63.3 billion in fiscal year 2010 ($47.9 billion in 2005 prices), compared to $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices). Aggregate personal income increased from $58.6 billion in fiscal year 2009 ($49.8 billion in 2005 prices) to $60.4 billion in fiscal year 2010 ($50.0 billion in 2005 prices), and personal income per capita increased from $14,786 in fiscal year 2009 ($12,558 in 2005 prices) to $15,203 in fiscal year 2010 ($12,592 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the West Texas Intermediate oil barrel (WTI) increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of previous years were still felt in fiscal year 2009. Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand. On the other hand, the continuation of the difficulties associated with the financial crisis has kept short-term interest rates at historically low levels, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2009*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 4.0% (an increase of 1.6% in current dollars) over fiscal year 2008. Nominal gross national product was $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices), compared to $61.7 billion in fiscal year 2008 ($51.8 billion in 2005 prices). Aggregate personal income increased from $56.1 billion in fiscal

I-18

PR-CCD-0026125

year 2008 ($49.6 billion in 2005 prices) to $58.6 billion in fiscal year 2009 ($49.7 billion in 2005 prices), and personal income per capita increased from $14,217 in fiscal year 2008 ($12,557 in 2005 prices) to $14,786 in fiscal year 2009 ($12,558 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% compared to 1,217,500 for fiscal year 2008. At the same time, the unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

## Fiscal Stabilization and Economic Reconstruction

In January 2009, the administration began to implement a multi-year Fiscal Stabilization Plan (the "Fiscal Plan") and Economic Reconstruction Plan (the "Economic Plan") that sought to achieve fiscal balance and restore economic growth. The Fiscal Plan was central to safeguarding the Commonwealth's investment-grade credit rating and restoring Puerto Rico's economic growth and development. As of December 31, 2010, the Legislative Assembly had enacted thirteen bills providing for the implementation of the Fiscal Plan and the Economic Plan.

In addition, the administration designed and began to implement the *Strategic Model for a New Economy*, a series of economic development initiatives which aim to enhance Puerto Rico's competitiveness and strengthen specific industry sectors. These economic development initiatives were intended to support the prospects of long-term and sustainable growth.

### Fiscal Stabilization Plan

The Fiscal Plan had three main objectives: (i) stabilize the short-term fiscal situation, (ii) safeguard and strengthen the Commonwealth's investment-grade credit rating, and (iii) achieve budgetary balance. The Fiscal Plan, which was generally contained in Act 7, included operating expense-reduction measures, tax revenue enforcement measures, temporary and permanent revenue raising measures, and financial measures, as discussed below.

*Expense Reduction Measures.* A significant portion of Puerto Rico's budget deficit is attributable to the accumulated effect of high operating expenses in the government. The Fiscal Plan sought to reduce the government's recurring expense base to make it consistent with the level of government revenues. The Fiscal Plan established a government-wide operating expense-reduction program aimed at reducing operating expenses, including payroll.

CONFIDENTIAL

PR-CCD-0026126

Payroll expense is the most significant component of the government's recurring expense base. The reduction in payroll expenses contemplated by the Fiscal Plan was implemented in three phases and included certain benefits conferred to participating employees, as follows:

- _Phase I: Incentivized Voluntary Resignation and Voluntary Permanent Workday Reduction Programs:_ The Incentivized Voluntary Resignation Program offered public employees a compensation incentive based on the time of service in the government. The Voluntary Permanent Workday Reduction Program was available to public employees with 20 or more years of service. The Workday Reduction Program consisted of a voluntary reduction of one regular workday every fifteen calendar days, which is equivalent to approximately a 10% reduction in annual workdays. Phase I commenced in March 2009 and public employees had until April 27, 2009 to submit the required information to participate in the voluntary programs available under Phase I and be eligible for the Public Employees Alternatives Program. Under Phase I, 2,553 employees resigned under the Incentivized Voluntary Resignation Program and 27 employees took advantage of the Voluntary Permanent Workday Reduction Program. Based on the number of employees who agreed to participate in these programs, the administration estimates that expenses for fiscal year 2010 were reduced by $90.9 million.

- _Phase II: Involuntary Layoff Plan:_ As provided in Act 7, Phase II went into effect because the objective of reducing $2 billion in expenses was not achieved after implementation of Phase I and Phase III (see below). Under Phase II, subject to certain exceptions, employees with transitory or non-permanent positions were terminated. As a result, 1,986 positions were eliminated, representing an estimated savings of $44.6 million annually. In addition, Phase II provided for one or more rounds of involuntary layoffs and applied to most central government public employees unless excluded pursuant to Act 7, strictly according to seniority in public service, starting with employees with the least seniority. The plan excluded certain employees providing "essential" services, certain employees paid by federal funds, those on military leave, and political appointees and their trust employees (political appointees and their trust employees, who do not hold a permanent or career position in the government, are referred to herein as "non-career employees"). Employees in Phase II received a severance package that included health coverage payment for up to a maximum of six months or until the former public employee became eligible for health insurance coverage at another job. As of September 30, 2010, total government employees dismissed under Phase II (excluding the 1,986 transitory or non-permanent positions eliminated) was approximately 12,505, representing an estimated savings of $322.8 million annually. This amount excludes approximately 1,784 employees rehired by the Department of Education as a result of an agreement with the union providing for certain salary and workday reductions and the inclusion of additional service requirements, among other things. The negotiation of this agreement by the administration resulted in annual savings of $51 million, an increase of $25 million over the estimated savings achievable through the termination of such employees.

I-20

CONFIDENTIAL

PR-CCD-0026127

- _Phase III: Temporary Suspension of Certain Provisions of Laws, Collective Bargaining Agreements, and Other Agreements_: Phase III went into effect on March 9, 2009 and imposed a temporary freeze on salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. Phase III remained in effect for a period of two years. The administration estimates that savings from the implementation of these measures was approximately $186.9 million for fiscal year 2010.

- _Public Employees Alternatives Program_: The employees that elected to participate in the Incentivized Voluntary Resignation Program under Phase I or that were subject to involuntary layoffs under Phase II, were eligible to participate in the Public Employees Alternatives Program. This program assists public employees in their transition to other productive alternatives, and offers vouchers for college education, technical education, and professional training, as well as for establishing a business and for relocation.

Act 7 extended the term of collective bargaining agreements with public employees that had expired at the time of its enactment or that expire while it is in effect for a period of two years (until March 9, 2011) and provided that during this period such collective bargaining agreements may not be renegotiated or renewed.

The following table summarizes the amount of employees affected by the workforce and labor related expense reduction measures included in Act 7 and the expected annual savings in operational expenses from the implementation of Phases I through III of the Fiscal Plan. The implementation of the workforce and labor related expense reduction measures included in Act 7 concluded on June 30, 2010.

| Phase | Affected Employees | Savings (in millions) |
|---|---|---|
| Phase I: Voluntary Resignation | 2,553 | $90.9 |
| Phase II: Involuntary Layoffs | | |
| Termination of transitory and non-permanent employees | 1,986 | 44.6 |
| Layoffs (as of April 30, 2010) | 12,505 | 322.8 |
| Phase III: Suspension of Certain Benefits | - | 186.9 |
| Total | 17,044 | $645.2 |

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies. On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. On December 15, 2009, the plaintiffs appealed the District Court's decision to the U.S. Court of Appeals for the First Circuit and, on January 27, 2011, the District Court's decision was affirmed. See LITIGATION.

CONFIDENTIAL

PR-CCD-0026128

The second element of the expense-reduction measures, which pertains to other operating expenses, was conducted through an austerity program in combination with other expense reduction measures. The austerity program mandated a 10% reduction in other operational expenses, including cellular phone use, credit cards, and official vehicles.

In July 2010, the Governor renewed an executive order issued in September 2009 requiring all agencies and public corporations to reduce, modify or cancel service contracts to achieve a cost reduction of at least 15%. The executive order covers advertising, consulting, information technology, accounting, legal and other services (except for direct services to the public), and grants the Fiscal Restructuring and Stabilization Board created under Act 7 (the "Fiscal Board") the power to monitor agencies and public corporations in order to ensure the required 15% minimum cost reduction. Each agency or public corporation had 30 days to report the following to the Fiscal Board: (i) all service contracts currently in effect, (ii) all canceled and/or modified contracts and the corresponding savings, (iii) justification for any remaining contracts in light of the mission of the agency or public corporation, and (iv) the reasonableness of the fees or compensation terms for each remaining contract.

In July 2010, the Governor also renewed another executive order issued in September 2009 requiring all agencies and public corporations to report the following to the Fiscal Board within 30 days: (i) all lease contracts currently in effect, (ii) the uses of leased premises, (iii) the needs for such premises, (iv) the terms and conditions of each lease, and (v) budgeted amounts for rent and other related expenses. During fiscal year 2010, the administration achieved savings by, among other things, consolidating operations of one or more agencies or public corporations and renegotiating leases to obtain more favorable terms. The administration expects to achieve annual savings of at least 15% of rent and related expenses, or approximately $22 million, in future fiscal years.

As of September 30, 2010, the administration had already reduced operating expenses through expense reduction measures other than Phase I through III of the Fiscal Plan by $150 million, and professional service contracts and lease agreements by $42 million through the implementation of the executive orders referred to above.

*Tax Revenue Enforcement Measures.* The Fiscal Plan also sought to increase tax revenues by implementing a more rigorous and ongoing tax enforcement and compliance strategy. Specific tax enforcement initiatives included: (i) enhancements to the administration of federal grants and fund receipts, (ii) stronger collections and auditing efforts on Puerto Rico's sales and use tax, and (iii) a voluntary tax compliance program.

*Revenue Raising Measures.* The goal of achieving fiscal and budgetary balance required a combination of measures that included the introduction of permanent and temporary tax increases. The Fiscal Plan included six temporary and four permanent revenue increasing measures. The temporary revenue increasing measures consisted of: (i) a 5% surtax on income of certain individuals, (ii) a 5% surtax on income of certain corporations, (iii) a 5% income tax on credit unions (commonly known as "cooperativas" in Puerto Rico), (iv) a 5% income tax on Puerto Rico international banking entities, (v) a special property tax on residential and commercial real estate, and (vi) a moratorium on certain tax credits. The temporary measures are to be in effect for up to three fiscal years beginning in fiscal year 2010. The permanent

CONFIDENTIAL

PR-CCD-0026129

measures include (i) modifications to the alternative minimum tax for individuals and corporations, (ii) an increase in the excise tax on cigarettes, (iii) a new excise tax on motorcycles, and (iv) an increase in the excise tax on alcoholic beverages. The total revenues from these temporary and permanent measures for fiscal year 2010 are $428 million. The total estimated revenues from these temporary and permanent measures for fiscal year 2011 are $420 million.

*Financial Measures.* The administration has also carried out several financial measures designed to achieve fiscal stability throughout the Fiscal Plan implementation period. These measures included, among others, (i) a financing or bond-issuance program, the proceeds of which were used to bridge the structural budgetary imbalance during the Fiscal Plan implementation period and fund some of the Economic Plan initiatives, (ii) the restructuring of the securities held in the Corpus Account of the Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of PRIFA (see "Infrastructure Financing Authority" under PUBLIC CORPORATIONS for a description of the Corpus Account), and (iii) the restructuring of a portion of the Commonwealth's debt service.

These financial measures were anchored on the bond-issuance program of COFINA. Act 7, in conjunction with Act No. 91 of May 13, 2006, as amended ("Act 91"), and Act No. 1 of January 14, 2009 ("Act 1"), allocated to COFINA, commencing on July 1, 2009, 2.75% (one-half of the tax rate of 5.5%) of the sales and use tax imposed by the central government, thus increasing COFINA's financing capacity and allowing the Commonwealth to achieve fiscal stability throughout the implementation period of the Fiscal Plan.

During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds from these bond issues have been used for, among other uses, paying approximately $1.9 billion of Commonwealth obligations that did not have a designated source of repayment, paying or financing approximately $4.8 billion of operational expenses constituting a portion of the Commonwealth's deficit, and funding the Local Stimulus Fund (described below) and the Stabilization Fund for fiscal year 2011 with approximately $500 million and $1.0 billion, respectively.

Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to, among other things, make a deposit to the General Fund of approximately $319 million, which was applied to cover a portion of the Commonwealth's budget deficit and make a transfer to GDB of approximately $159 million as a capital contribution. The gross proceeds resulting from the sale were approximately $884 million.

The Fiscal Plan has provided more fiscal stability, thereby safeguarding and strengthening Puerto Rico's credit. The fiscal structure resulting from the full implementation of the plan will be sustainable and conducive to economic growth and development.

CONFIDENTIAL

*Economic Reconstruction Plan*

To balance the impact of the Fiscal Plan, the administration developed and is implementing an economic reconstruction program designed to stimulate growth in the short term and lay the foundation for long-term economic development. The Economic Plan consists of two main components: (i) two economic stimulus programs, and (ii) a supplemental stimulus plan.

*Economic Stimulus Programs.* The cornerstone of Puerto Rico's short-term economic reconstruction plan was the implementation of two economic stimulus programs aimed at reigniting growth and counterbalancing any adverse effects associated with the Fiscal Plan. The economic stimulus programs consisted of Puerto Rico's participation in ARRA (also referred to herein as the "Federal Stimulus") and a local plan (the "Local Stimulus") designed to complement the Federal Stimulus.

- *Federal Stimulus Program:* Puerto Rico was awarded $6.8 billion in stimulus funds from ARRA. The funds are distributed in four main categories: relief to individuals, budgetary and fiscal relief, taxpayers' relief, and capital improvements. In terms of government programs, the Federal Stimulus allocates funds to education, agriculture and food assistance, health, housing and urban development, labor, and transportation, among others. As of September 2010, PRIFA, which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $3.6 billion in ARRA funds had been disbursed.

- *Local Stimulus Program:* The administration formulated the Local Stimulus to supplement the Federal Stimulus and address specific local challenges associated with the local mortgage market, the availability of credit, and the infrastructure and construction sectors. Despite the fact that the Local Stimulus amounted to a $500 million investment by the government, it is estimated that its effect would be greater due to certain lending programs, which are being coordinated in collaboration with commercial banks in Puerto Rico. The administration has been disbursing funds under the $500 million local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The administration has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system. In addition, $399 million of Local Stimulus funds will be used mainly to promote infrastructure projects.

*Supplemental Stimulus Plan.* The Supplemental Stimulus Plan was designed to provide investment in strategic areas with the objective of laying the foundations for long-term growth in Puerto Rico. The coordinated implementation of the Supplemental Stimulus Plan is expected to reinforce continuity in reigniting economic growth while making key investments for long-term development.

The Supplemental Stimulus Plan is being conducted through a combination of direct investments and guaranteed lending. Specifically, the Supplemental Stimulus Plan targets critical

CONFIDENTIAL

PR-CCD-0026131

areas such as key infrastructure projects, public capital improvement programs, private-sector lending to specific industries, and the export and research-and-development knowledge industries. The Supplemental Stimulus Plan takes into account the strategic needs that Puerto Rico must fulfill in order to become a more competitive player in its region and in the global economy.

On September 1, 2010 the Governor signed Act No. 132, also known as the Real Estate Market Stimulus Act of 2010 ("Act 132"), which provides certain incentives to help reduce the existing housing inventory. The incentives provided by Act 132 will be effective from September 1, 2010 through June 30, 2011. See "Economic Performance by Sector—Construction" below.

*Economic Development Program*

The Department of Economic Development and Commerce ("DEDC"), in coordination with other government agencies, is in the process of implementing the *Strategic Model for a New Economy*, which consists of a comprehensive, long-term, economic development program aimed at improving Puerto Rico's overall global relevance, competitiveness, and business environment, and increasing private-sector capital formation and participation in the economy. These initiatives are centered on the dual mission of fostering multi-sector growth while reducing costs and barriers to business and investment, and are a medium-to-long-term counterpart to the Economic Plan and the Supplemental Stimulus Plan described above.

The administration is emphasizing the following initiatives to enhance Puerto Rico's competitive position: (i) overhauling the permitting process, (ii) reducing energy costs, (iii) reforming the tax system, (iv) promoting the development of various projects through public-private partnerships, (v) implementing strategic initiatives targeted at specific economic sectors, and (vi) promoting the development of certain strategic/regional projects.

*Permitting Process.* The first initiative, the reengineering of Puerto Rico's permitting and licensing process, has already been achieved. On December 1, 2009, the Governor signed into law Act No. 161, which overhauls the existing permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. In the short term, this restructuring is focused on eliminating the significant backlog of unprocessed permits that are currently in the pipeline of various government agencies. Longer term, this law seeks to significantly reduce the number of inter-agency processes and transactions currently required by creating a centralized, client-focused system that simplifies and shortens the permitting process for applicants. On December 1, 2010, a new permitting agency created under Act No. 161, which centralized permitting processes previously carried out by various agencies, commenced operations.

*Energy Policy.* On July 19, 2010, the Governor signed Acts No. 82 and 83, providing for, among other things, the adoption of a new energy policy, which is critical for Puerto Rico's competitiveness. Presently, fluctuations in oil prices have a significant effect on Puerto Rico's overall economic performance. Act No. 82 focuses on reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies. This new energy policy seeks to lower energy costs, reduce energy-price volatility, and establish environmentally sustainable energy production through a reduction in ecologically harmful

CONFIDENTIAL

PR-CCD-0026132

emissions. This legislation also is expected to facilitate the development of several initiatives, including the wheeling of energy, conservation efforts, and the installation of new renewable generation capacity, among others. Moreover, Act No. 83 created a green energy incentives program to promote the development of renewable energy projects as well as a Renewable Portfolio Standards Program. These initiatives are expected to address energy prices in Puerto Rico and provide a means of attracting investment in the energy sector.

*Tax Reform.* In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. Legislation to implement the first and second phases of the tax reform was enacted as Act No. 171 of November 15, 2010 and Act No. 1, respectively. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

*Public-Private Partnerships.* The administration believes that Public-Private Partnerships ("PPPs") represent an important tool for economic development, particularly in times of fiscal difficulties. PPPs are contracts between government and non-governmental entities—such as private companies, credit unions, and municipal corporations—to develop infrastructure projects, manage government assets or provide government services. The non-governmental partner takes on certain responsibilities and risks related to the development and/or operation of the project in exchange for certain benefits.

PPPs provide the opportunity for the government to lower project development costs, accelerate project development, reduce financial risk, create additional revenue sources, establish service quality metrics, and re-direct government resources to focus on the implementation of public policy. Puerto Rico has opportunities for the establishment of PPPs in the areas of toll roads, ports, public schools, water provision, correctional facilities, and energy, among others.

On June 8, 2009, the Legislative Assembly approved Act No. 29 ("Act 29"), which established a clear public policy and legal framework for the establishment of public-private partnerships in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. Act 29 created the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding public-private partnerships. On December 19, 2009, the PPP Authority approved regulations establishing the administrative framework for the procurement, evaluation, selection, negotiation and award process for public-private partnerships in Puerto Rico.

During fiscal year 2010, the PPP Authority engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the PPP Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The PPP Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the PPP Authority has made

I-26

substantial progress in the preparation of a PPP procurement for the Luis Muñoz Marin International Airport.

*Sector Initiatives.* The administration will complement the previously mentioned initiatives with specific strategic initiatives with the objective of creating jobs and increasing economic activity across various sectors of the Puerto Rico economy. The Commonwealth has natural or structural competitive advantages in several areas, such as pharmaceutical and biotechnology manufacturing. These advantages provide opportunities for the development of regional clusters in high-tech manufacturing, research and development, tourism, renewable energy, international trade and professional services. The specific initiatives will be designed to promote sustainable economic growth while accelerating to a knowledge-based and innovation driven economy, focused mainly in the development of human capital and intellectual property, thus diversifying Puerto Rico's economic base.

*Strategic/Regional Projects.* The administration has also targeted strategic/regional projects that will generate investments in various regions of the Island in order to foster balanced economic development. One of the strategic projects for the northern region is called the Urban Bay (formerly known as the Golden Triangle), an urban redevelopment project that incorporates the areas of Old San Juan, Puerta de Tierra, Isla Grande, including the Puerto Rico Convention Center District (the "District"), and Condado, as well as other communities in the vicinity of historic San Juan Bay. The aim of the Urban Bay project is to develop San Juan Bay into a major tourism, recreation, commercial and residential sector which serves the local community and becomes a major attraction for leisure and business travelers, both local and external. Also in the northern region, Science City represents a critical part of the administration's efforts to move Puerto Rico to the forefront of the science, technology and research and development. It seeks to leverage the significant competitive advantages in the knowledge-based sectors that put Puerto Rico in an ideal position to undertake this type of development.

In the eastern region, the Caribbean Riviera entails the redevelopment of the old Roosevelt Roads navy facility in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. This tourist complex will include hotels, casinos, eco-tourist attractions, international airport, retail, yacht marina, and cruise ship ports.

In the western region, the administration is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub.

CONFIDENTIAL

PR-CCD-0026134

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2010 averaged 1,102,700, a decrease of 5.6% compared to previous fiscal year; and the unemployment rate averaged 16.0%. During the first nine months of fiscal year 2011, total employment averaged 1,079,700, a decline of 2.6% with respect to the same period of the prior year; and the unemployment rate remained virtually unchanged at 16.0%.

The following table presents annual statistics of employment and unemployment for fiscal year 2006 through fiscal year 2010, and the average figures for the first nine months of fiscal year 2011. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2010.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over, in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2006 | 1,422 | 1,266 | 156 | 11.0 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011[3] | 1,285 | 1,080 | 205 | 16.0 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first nine months of fiscal year 2011 (July through March 2011).
*Source:* Department of Labor and Human Resources – Household Survey

I-28

CONFIDENTIAL

PR-CCD-0026135

**Economic Performance by Sector**

From fiscal year 2007 to fiscal year 2010, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010**[1] |
| Manufacturing | $37,637 | $40,234 | $44,019 | $44,641 |
| Service[2] | 40,190 | 41,372 | 40,333 | 41,472 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,276 |
| Agriculture | 430 | 519 | 506 | 553 |
| Construction[4] | 2,027 | 2,032 | 1,818 | 1,658 |
| Statistical discrepancy | (464) | (312) | (512) | (340) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,211 | $96,261 |
| Less: net payment abroad | (28,884) | (30,941) | (32,534) | (32,969) |
| Total gross national product[5] | $59,521 | $61,665 | $62,678 | $63,292 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

Traditionally, the Government has presented the industrial distribution of production in Puerto Rico using gross domestic product because the Planning Board had not published such a distribution using real gross national product as a base measurement. Recently, the Planning Board presented an industrial distribution of production based on real gross national product, which shows significant differences in the importance of the manufacturing sector to the Puerto Rico economy:

I-29

CONFIDENTIAL

PR-CCD-0026136

**Commonwealth of Puerto Rico**
**Gross National Product by Sector**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010**[1] |
| Service[2] | $35,443 | $36,127 | $35,429 | $36,252 |
| Manufacturing | 12,570 | 13,556 | 15,282 | 15,769 |
| Government[3] | 9,529 | 9,757 | 10,167 | 9,411 |
| Construction[4] | 2,013 | 2,018 | 1,805 | 1,646 |
| Agriculture | 430 | 520 | 507 | 553 |
| Statistical discrepancy | (464) | (312) | (12) | (340) |
| Total gross national product[5] | $59,520 | $61,665 | $62,678 | $63,292 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

The service sector's (which includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services) share appears significantly higher than manufacturing when compared to the industrial distribution of production in Puerto Rico based on gross domestic product. This variance occurs because manufacturing activity is principally carried out by non-resident entities whose income is not accounted for in Puerto Rico's real gross national product.

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

CONFIDENTIAL

PR-CCD-0026137

The following table presents annual statistics of average employment based on NAICS for fiscal years 2006 to 2010.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010[2]** |
| Natural resources and construction | 65,492 | 64,700 | 59,675 | 49,067 | 35,917 |
| Manufacturing | | | | | |
|     Durable goods | 46,350 | 45,417 | 43,100 | 39,242 | 34,792 |
|     Non-durable goods | 66,233 | 62,442 | 60,950 | 57,483 | 53,483 |
|     Sub-total | 112,583 | 107,858 | 104,050 | 96,725 | 88,275 |
| Trade, transportation, warehouse, and Utilities | | | | | |
|     Wholesale trade | 33,992 | 33,267 | 33,717 | 33,267 | 32,533 |
|     Retail trade | 137,358 | 133,750 | 130,883 | 127,492 | 126,242 |
|     Transportation, warehouse, and utilities | 17,433 | 16,992 | 16,742 | 15,692 | 14,550 |
|     Sub-total | 188,783 | 184,008 | 181,342 | 176,450 | 173,325 |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,767 |
| Finance | 49,767 | 49,108 | 48,483 | 48,492 | 45,883 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,333 | 102,492 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,992 | 111,108 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,933 | 70,850 |
| Other services | 20,567 | 18,242 | 17,367 | 16,667 | 15,750 |
| Government[3] | 302,492 | 298,125 | 297,742 | 300,708 | 277,333 |
|     Total non-farm | 1,047,742 | 1,032,275 | 1,020,208 | 992,583 | 939,700 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
[2] Preliminary.
[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

I-31

CONFIDENTIAL

PR-CCD-0026138

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2010 manufacturing generated $44.6 billion, or 46.4%, of gross domestic product. Manufacturing, however, only generated $15.8 billion, or 24.9%, of real gross national product in fiscal year 2010. During fiscal year 2010, payroll employment for the manufacturing sector was 88,275, a decrease of 8.7% compared with fiscal year 2009. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2010, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.6% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under THE ECONOMY and "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

CONFIDENTIAL

PR-CCD-0026139

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2010.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector
### (at current prices, in thousands)

| | Fiscal Years Ended June 30, | | | |
| | 2007 | 2008 | 2009 | 2010[1] |
|---|---|---|---|---|
| Food | $1,083,300 | $822,008 | $ 1,018,486 | $ 1,040,339 |
| Beverage and Tobacco Products | 924,900 | 1,243,200 | 1,197,325 | 1,203,142 |
| Textile Mills | 2,200 | 1,295 | 975 | 791 |
| Textile Product Mills | 13,200 | 13,438 | 12,072 | 12,418 |
| Apparel | 200,700 | 252,062 | 270,251 | 296,192 |
| Leather and Allied Products | 17,000 | 19,982 | 22,052 | 21,997 |
| Wood Products | 23,600 | 22,011 | 18,809 | 20,228 |
| Paper | 70,600 | 66,066 | 66,233 | 69,664 |
| Printing and Related Support Activities | 124,400 | 118,525 | 111,416 | 109,457 |
| Petroleum and Coal Products | 370,900 | 94,986 | 355,598 | 353,757 |
| Chemical | 27,016,500 | 29,338,802 | 31,013,076 | 31,384,322 |
| Plastics and Rubber Products | 121,700 | 117,556 | 111,835 | 119,614 |
| Nonmetallic Mineral Products | 284,900 | 218,469 | 198,717 | 197,925 |
| Primary Metals | 101,900 | 150,693 | 138,708 | 139,063 |
| Fabricated Metal Products | 239,200 | 247,860 | 227,572 | 209,446 |
| Machinery | 217,500 | 234,410 | 196,456 | 213,689 |
| Computer and Electronic Products | 4,217,200 | 4,462,560 | 6,308,916 | 6,384,137 |
| Magnetic and Optical | - | - | | |
| Electrical Equipment, Appliances and Components | 510,900 | 657,298 | 639,313 | 593,777 |
| Transportation Equipment | 78,000 | 77,560 | 66,111 | 61,243 |
| Furniture and Related Products | 65,500 | 56,439 | 47,045 | 47,761 |
| Miscellaneous | 1,955,500 | 2,018,693 | 1,998,060 | 2,162,405 |
| Total gross domestic product of manufacturing sector[2] | $37,636,600 | $40,233,913 | $44,019,025 | $44,641,368 |

[1]   Preliminary.
[2]   Totals may not add due to rounding.

*Source:*  Planning Board

I-33

CONFIDENTIAL

PR-CCD-0026140

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2006 to 2010.

## Commonwealth of Puerto Rico
## Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010**[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,100 | 3,825 | 3,758 | 3,058 | 2,500 |
| Cement and concrete products manufacturing | 3,533 | 3,300 | 3,367 | 2,833 | 2,225 |
| Fabricated metal products | 5,775 | 5,675 | 5,375 | 4,908 | 4,042 |
| Computer and electronic | 10,808 | 10,092 | 8,600 | 7,042 | 5,708 |
| Electrical equipment | 6,842 | 6,617 | 6,658 | 5,867 | 5,058 |
| Electrical equipment manufacturing | 4,700 | 4,508 | 4,383 | 3,917 | 3,575 |
| Miscellaneous manufacturing | 11,258 | 12,292 | 11,967 | 11,975 | 11,675 |
| Medical equipment and supplies  manufacturing | 10,533 | 11,575 | 11,342 | 11,442 | 11,158 |
| Other durable goods manufacturing | 7,567 | 6,917 | 6,742 | 6,392 | 5,808 |
| Total – durable goods | 46,350 | 45,417 | 43,100 | 39,242 | 34,792 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,650 | 12,183 | 11,725 | 11,383 | 11,592 |
| Beverage and tobacco products manufacturing | 3,392 | 3,258 | 3,267 | 3,133 | 3,275 |
| Apparel manufacturing | 8,258 | 7,708 | 9,633 | 9,825 | 8,808 |
| Cut and sew apparel manufacturing | 8,017 | 7,075 | 8,617 | 8,975 | 8,833 |
| Chemical manufacturing | 32,317 | 30,467 | 27,900 | 25,042 | 22,392 |
| Pharmaceutical and medicine manufacturing | 28,017 | 26,375 | 24,033 | 21,500 | 19,058 |
| Plastics and rubber products | 2,325 | 2,200 | 1,983 | 1,967 | 1,867 |
| Plastics product manufacturing | 2,133 | 2,025 | 1,850 | 1,825 | 1,758 |
| Other non-durable goods manufacturing | 7,292 | 6,625 | 6,442 | 6,133 | 5,550 |
| Total – non-durable goods | 66,233 | 62,442 | 60,950 | 57,483 | 53,483 |
| | | | | | |
| Total manufacturing employment | 112,583 | 107,858 | 104,050 | 96,725 | 88,275 |

\*    Totals may not add due to rounding.
[1]   Preliminary.

*Source*:  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

I-34

CONFIDENTIAL

Total employment in the manufacturing sector decreased by 29,000 from fiscal year 2005 to fiscal year 2010. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009 and 2010, manufacturing employment decreased by 4.2%, 3.5%, 7.0% and 8.7%, respectively. For the first nine months of fiscal year 2011, the sector lost an average of 3,900 jobs, or 3.9%, compared to the same period of the previous year. Given that this sector used to pay, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on those changes. During the period between fiscal years 2007 and 2010, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 1.4% between fiscal years 2007 and 2010. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2010, the service sector generated $41.5 billion, or 43.1%, of gross domestic product, while it generated $36.3 billion, or 57.3%, of real gross national product. Trade, information services, education and health services, finance, insurance and real estate and rentals experienced growth in fiscal year 2010, as measured by

CONFIDENTIAL

PR-CCD-0026142

gross domestic product and by gross national product at current prices. Transportation, professional and technical, and management services experienced a contraction in fiscal year 2010, as measured by gross domestic product and gross national product at current prices. Service-sector employment decreased from 566,725 in fiscal year 2006 to 538,175 in fiscal year 2010 (representing 54.4% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2010 represents a decrease of 1.4% compared to the prior fiscal year. For the first nine months of fiscal year 2011, average service-sector employment was 538,778, an increase of 0.5% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of December 31, 2010, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of December 31, 2010 were $75.6 billion, as compared to $89.6 billion as of December 31, 2009. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. To date, the amount of jobs lost as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $6.0 billion as of December 31, 2010, up from $3.3 billion on December 31, 2009. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.2 billion as of December 31, 2010, up from $13.9 billion as of December 31, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of December 31, 2010, there were 32 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $40.6 billion, a decrease from $42.1 billion in total assets as of December 31, 2009. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.5 billion in assets as of December 31, 2010, a slight increase from $7.2 billion as of December 31, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2010.

I-36

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010[1]** |
| Wholesale trade | $ 2,751.6 | $ 2,950.9 | $ 2,934.8 | $ 2,984.0 |
| Retail trade | 4,471.4 | 4,569.4 | 4,614.5 | 4,723.7 |
| Transportation and warehousing | 968.3 | 978.5 | 908.6 | 891.0 |
| Utilities | 2,214.4 | 2,118.0 | 1,971.9 | 1,943.8 |
| Information | 2,466.5 | 2,363.1 | 2,306.4 | 2,359.2 |
| Finance and insurance | 6,694.3 | 7,120.4 | 5,174.7 | 5,543.2 |
| Real Estate and rental | 11,685.7 | 12,064.2 | 13,030.8 | 13,318.3 |
| Professional and business | 3,112.5 | 3,183.6 | 3,132.0 | 3,246.5 |
| Education and health | 3,592.5 | 3,786.2 | 4,125.7 | 4,278.5 |
| Leisure and hospitality | 1,861.5 | 1,874.7 | 1,783.3 | 1,828.1 |
| Other services | 371.6 | 119.3 | 112.3 | 115.9 |
| Total | $40,190.3 | $41,371.9 | $40,333.2 | $41,471.8 |

*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2006 to 2010.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010[1]** |
| Wholesale trade | 33,992 | 33,267 | 33,717 | 33,267 | 32,533 |
| Retail trade | 137,358 | 133,750 | 130,883 | 127,492 | 126,242 |
| Transportation, warehouse and utilities | 17,433 | 16,992 | 16,742 | 15,692 | 14,550 |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,767 |
| Finance | 49,767 | 49,108 | 48,483 | 48,492 | 45,883 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,333 | 102,492 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,992 | 111,108 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,933 | 70,850 |
| Other services | 20,567 | 18,242 | 17,367 | 16,667 | 15,750 |
| Total | 566,725 | 561,592 | 558,742 | 546,083 | 538,175 |

---

\* Totals may not add due to rounding.
[1] Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

I-37

CONFIDENTIAL

*Hotels and Related Services—Tourism*

For fiscal year 2010, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,804,100, an increase of 5.6% over the number of persons registered during fiscal year 2009. The average occupancy rate in tourist hotels during fiscal year 2010 was 69.0%, compared to 66.2% in fiscal year 2009. The average number of rooms available in tourist hotels increased by 3.9% to 10,880 rooms from fiscal year 2009 to fiscal year 2010.

During the first six months of fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 906,000, an increase of 4.2% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during the first six months of fiscal year 2011 was 65.3%, a decrease of 2.5% from the prior fiscal year. Also, during the first six months of fiscal year 2011, the average number of rooms available in tourist hotels increased by 7.6% to 11,798 rooms compared to the same period of fiscal year 2010.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. Nevertheless, employment in this sector has shown a slight recovery during the first nine months of fiscal year 2011. For fiscal year 2010, employment in hotels and other lodging facilities was reduced by 6.5% to 12,400 jobs. For the first nine months of fiscal year 2011, the average decrease in employment in hotels and other lodging facilities was 2.7% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 70,900 for fiscal year 2010, a decrease of 0.1% over employment for fiscal year 2009. For the first nine months of fiscal year 2011, employment has increased by 0.2% to 70,800 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2010 and the first six months of fiscal year 2011.

CONFIDENTIAL

PR-CCD-0026145

### Commonwealth of Puerto Rico
### Tourism Data[1]

#### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |
| 2010[5] | 1,347,487 | 1,193,549 | 2,331,393 | 4,872,429 |

#### Total Visitors' Expenditures
#### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009 | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |
| 2010[5] | 1,546.1 | 168.6 | 1,883.5 | 3,598.2 |

---

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

I-39

CONFIDENTIAL

PR-CCD-0026146

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2010, the government (state and local) accounted for $8.3 billion, or 8.6%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 260,700 workers (state, including public corporations, and local), or 27.7% of total, non-farm, payroll employment in fiscal year 2010. From fiscal year 2006 to fiscal year 2009, state and municipal government employment averaged approximately 285,000. During fiscal year 2010, state and municipal government employment decreased by 24,900 jobs, or 8.7%. According to the payroll survey, the distribution of these job reductions was 20,600 jobs in the state government and 4,200 jobs in municipal government.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment, collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7. See "Litigation."

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-

CONFIDENTIAL

private partnership. The PPP Authority expects to issue a request for qualifications by the third quarter of fiscal year 2011.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. During the first half of fiscal year 2011, the PPP Authority commenced the procurement process for the establishment of a concession for toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. Since its peak in fiscal year 2000, real construction investment has declined at an average annual growth rate of 8.7%. Such rates of interest started to decrease significantly in fiscal year 2005, as a consequence of the current contraction of the local economic activity. During the last four fiscal years (from fiscal year 2007 to 2010) real construction investment decreased at an average annual rate of 17.0%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%.

Public investment has been an important component of construction investment. During fiscal year 2010, approximately 49.3% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment

I-41

CONFIDENTIAL

PR-CCD-0026148

compared to 37.9% in fiscal year 2000. The total value of construction permits decreased 29.2% in fiscal year 2010 as compared to fiscal year 2009, and total sales of cement decreased by 26.3% between 2009 and 2010, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2010 was 35,900, a reduction of 26.8% from fiscal year 2009. During the first nine months of fiscal year 2011, payroll employment in the construction sector averaged 29,200, a further reduction of 20.8% for the same period in fiscal year 2010 and the second lowest level of construction sector employment in a decade.

Total construction investment for fiscal year 2010 decreased in real terms by 18.8%, following a 22.2% real decline in fiscal year 2009. The Planning Board expects a further construction investment decrease of 7.8% in real terms for fiscal year 2011. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010, reaching levels not seen in almost three decades. During the first nine months of fiscal year 2011, cement sales decreased by 6.7% from the previous fiscal year.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided under Act No. 132 will be available from September 1, 2010 to June 30, 2011. Certain permanent incentives are also available for rental housing.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2010, gross income from agriculture was $822 million, an increase of 3.8% compared with fiscal year 2009.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income

CONFIDENTIAL

PR-CCD-0026149

from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

I-43

CONFIDENTIAL

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,539,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 14,791,000 | 54.5% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 28,001,302[3] | 15,312,298 | 54.7% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,488,500[3] | 15,927,986 | 55.9% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,912,095[3] | 16,611,710 | 57.5% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,285,846[3] | 16,911,486 | 57.7% |
| 2005 | 406,548[3] | 208,032 | 51.2% | 29,404,797[3] | 17,272,043 | 58.7% |
| 2006 | 400,529[3] | 209,547 | 52.3% | 29,540,873[3] | 17,487,481 | 59.2% |
| 2007 | 396,056[3] | 225,402 | 56.9% | 29,733,951[3] | 17,758,872 | 59.7% |
| 2008 | 395,503[3] | 227,546 | 57.5% | 30,090,148[3] | 18,248,133 | 60.6% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | 19,102,814 | 62.8% |

[1] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2009-2010 was approximately 65,699 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

I-44

CONFIDENTIAL

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%; but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico

I-45

CONFIDENTIAL

PR-CCD-0026152

financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale. The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies. In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

I-46

CONFIDENTIAL

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

CONFIDENTIAL

PR-CCD-0026154

# DEBT

**Public Sector Debt**

   Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

   Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.   Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the Sales Tax (as defined under "Major Sources of General Fund Revenues—Sales and Use Taxes" under "Puerto Rico Taxes, Other Revenues, and Expenditures" below) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

   As of March 31, 2011, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $957,900,517.25 in the fiscal year ending June 30, 2015 (based on the assumption that the (i) Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum; (ii) Public Improvement Refunding Bonds, Series 2004 B and the Public Improvement Refunding Bonds, Series 2008 B, which are variable rate bonds, bear interest at 12% per annum; and (iii) portion of each of the Public Improvement Refunding Bonds, Series 2003 C, Public Improvement Bonds of 2006, Series A, and Public Improvement Refunding Bonds, Series 2007 A that are variable rate bonds, bear interest at 12% per annum).  This amount ($957,900,517.25) *plus* the amount paid by the Commonwealth in fiscal year 2010 on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $968,391,820.25, is equal to 13.21% of $7,333,246,000, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2009 and June 30, 2010.  If the interest on the outstanding bonds described in items (i) through (iii) above was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements

CONFIDENTIAL

entered into in respect thereof, the percentage referred to in the preceding sentence would be 11.95% and future maximum annual debt service for the Commonwealth's outstanding general obligation debt (excluding guaranteed bonds or notes) would be $865,713,983 in the fiscal year ending June 30, 2020. The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of December 31, 2010, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $209 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2010, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million. See "Commonwealth Guaranteed Debt" below.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2010. This table includes debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products, some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.0 billion of outstanding bonds (as of December 31, 2010) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.6 billion of obligations of Public Finance Corporation issued to purchase certain Commonwealth public sector debt.

CONFIDENTIAL

PR-CCD-0026156

## Commonwealth of Puerto Rico
## Public Sector Debt*
### (in millions)

|                                                              | December 31, 2010 |
|--------------------------------------------------------------|-------------------|
| **GENERAL FUND RELATED DEBT**                                |                   |
| Direct full faith and credit obligations                     | $ 9,193           |
| Puerto Rico guaranteed debt[1]                               | 4,281             |
| Debt supported by Puerto Rico appropriations or taxes[2]     | 3,470             |
| Tax and Revenue Anticipation Notes[3]                        | 900               |
| Pension Obligation Bonds[4]                                  | 2,948             |
| TOTAL GENERAL FUND RELATED DEBT                              | $20,792           |
|                                                              |                   |
| Sales Tax debt                                               | $13,437           |
| Public corporations and agencies[5]                          | 23,914            |
| Municipal Debt                                               | 3,331             |
| Limited Obligations/non-recourse debt[6]                     | 2,410             |
| TOTAL PUBLIC SECTOR DEBT                                     | $63,884           |

*  Totals may not add due to rounding.

[1]  Consists of $601 million of bonds issued by Aqueduct and Sewer Authority, $401 million of State Revolving Fund Loans incurred under various federal water laws, $209 million of bonds issued by Port of the Americas Authority and $3.070 billion of Public Buildings Authority bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2]  Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

[3]  Includes related short-term financings.

[4]  Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5]  Excludes the Electric Power Authority's $218,225,000 Power Revenue Refunding Bonds issued in October 2010 and $355,730,000 Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) issued in December 2010.

[6]  Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

I-50

CONFIDENTIAL

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

On February 17, 2011, the Commonwealth issued $356,520,000 of its Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds) (the "Series 2011 A Bonds") and terminated approximately $231 million of synthetic fixed rate swaps associated to the general obligation bonds refunded by the Series 2011 A Bonds. On March 2, 2011, the Commonwealth issued $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (General Obligation Bonds) (the "Series 2011 B Bonds"). The Series 2011 B Bonds were directly purchased by an institutional investor and the proceeds were used to refund on a current basis the Commonwealth's Public Improvement Refunding Bonds, Series 2007A-8, Series 2007A-9 and Series 2008 B. On March 17, 2011, the Commonwealth issued $442,015,000 of its Public Improvement Refunding Bonds, Series 2011 C (General Obligation Bonds) (the "Series 2011 C Bonds"). The proceeds of the Series 2001 C Bonds were used to repay advances made to the Commonwealth under a GDB line of credit used to make deposits to the Commonwealth's Redemption Fund for the payment of interest (but not principal) due during fiscal year 2011 on certain general obligation bonds and notes. The public sector debt tables as of December 31, 2010 in this Report have not been adjusted to reflect the issuance of the Series 2011 A Bonds, Series 2011 B Bonds and the Series 2011 C Bonds, and the refunding of the bonds refunded by the Series 2011 A Bonds and the Series 2011 B Bonds.

## Debt Service Requirements for Commonwealth General Obligation Bonds

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding on April 15, 2011. This table, however, does not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

CONFIDENTIAL

PR-CCD-0026158

## Puerto Rico Debt Service Requirements*
### (In thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2011 [(1)] | $252,605 | $240,955 | $493,560 |
| 2012 | 362,335 | 485,097 | 847,432 |
| 2013 | 387,005 | 463,523 | 850,528 |
| 2014 | 374,613 | 463,433 | 838,045 |
| 2015 | 406,765 | 445,356 | 852,120 |
| 2016 | 426,790 | 425,183 | 851,974 |
| 2017 | 373,392 | 404,247 | 777,638 |
| 2018 | 376,110 | 385,632 | 761,742 |
| 2019 | 479,356 | 351,250 | 830,606 |
| 2020 | 546,400 | 319,314 | 865,714 |
| 2021 | 421,540 | 292,069 | 713,609 |
| 2022 | 351,420 | 272,147 | 623,567 |
| 2023 | 321,255 | 255,411 | 576,666 |
| 2024 | 336,215 | 240,754 | 576,969 |
| 2025 | 340,610 | 224,910 | 565,520 |
| 2026 | 349,280 | 207,339 | 556,619 |
| 2027 | 367,005 | 189,618 | 556,623 |
| 2028 | 386,340 | 170,197 | 556,537 |
| 2029 | 339,095 | 150,748 | 489,843 |
| 2030 | 352,240 | 134,726 | 486,966 |
| 2031 | 371,395 | 117,908 | 489,303 |
| 2032 | 224,545 | 99,992 | 324,537 |
| 2033 | 163,245 | 87,491 | 250,736 |
| 2034 | 172,615 | 79,028 | 251,643 |
| 2035 | 233,700 | 70,813 | 304,513 |
| 2036 | 247,115 | 57,394 | 304,509 |
| 2037 | 256,790 | 42,777 | 299,567 |
| 2038 | 160,675 | 27,854 | 188,529 |
| 2039 | 170,105 | 18,421 | 188,526 |
| 2040 | 130,450 | 8,215 | 138,665 |
| | $9,681,005 | $6,731,801 | $16,412,806 |

\*   Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[(1)] Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.

*Sources*: Government Development Bank for Puerto Rico and Treasury Department

## Interest Rate Exchange Agreements

*General.* The Commonwealth and various public corporations are party to various interest rate exchange agreements or swaps. Except for the basis swaps discussed below, the purpose of all of the interest rate exchange agreements currently in place is to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith. When the Commonwealth or a public corporation has issued variable rate bonds, it has entered into an interest rate exchange agreement with a counterparty pursuant to which the Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to

CONFIDENTIAL

PR-CCD-0026159

match the variable rate payable on the bonds (a "synthetic fixed rate swap"). In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate payments on the bonds and, thus, the Commonwealth or the public corporation is left with a net fixed rate payment to a counterparty. The intention of these swaps was to lower the all-in cost of borrowing below what could have been achieved by issuing fixed rate bonds.

*Basis Swap.* The Commonwealth and the Puerto Rico Electric Power Authority ("PREPA") are also party to agreements ("basis swaps"), entered into in June 2006 and March 2008, respectively, pursuant to which they are making payments on a specified notional amount based on a short-term interest rate index published by the Securities Industry and Financial Markets Association ("SIFMA") and are receiving from their counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate ("LIBOR") plus a specified fixed rate payment (the "basis annuity"). For fiscal year 2010 and the first nine months of fiscal year 2011, the Commonwealth received $6.9 million and $5.4 million, respectively, from its counterparties under the basis swap, net of the Commonwealth's payments to the counterparties, and PREPA received $9.5 million and $7.1 million, respectively, from its counterparty under the basis swap, net of PREPA's payments to the counterparty.

*Risks.* By using derivative financial instruments, the Commonwealth exposes itself, among other risks, to credit risk (based on the counterparty's ability to perform under the terms of the agreement), market risk (based on the changes in the value of the instrument resulting from changes in interest rates and other market factors) and, in the case of basis swaps, basis risk (based on changes to the correlation between different indexes used in connection with a derivative and the variable rate debt they hedge). GDB, as fiscal agent, regularly monitors the exposure of the Commonwealth and the public corporations under the interest rate exchange agreements and attempts to minimize the risks. To minimize some of the credit risk, the Commonwealth and the public corporations enter into agreements with counterparties that have good credit ratings. The outstanding interest rate exchange agreements are with eleven different counterparties, all of which are rated in one of the three highest rating categories by either Moody's or S&P. In addition, all of the agreements contain requirements of posting collateral by the counterparties based on certain valuation thresholds and credit ratings.

During fiscal years 2009 and 2010, in order to reduce the risks associated with the swaps portfolio, the Commonwealth and the public corporations terminated approximately $2.0 billion of swaps. In May and September 2009, the Commonwealth terminated a swap with an $850 million notional amount pursuant to which the Commonwealth was making payments based on the published short-term SIFMA municipal swap rate and was receiving payments based on the 10-year SIFMA (the "constant maturity swap") at an aggregate gain of approximately $24.8 million. Besides the basis swaps, the constant maturity swap was the only other interest rate exchange agreement that did not hedge specific variable rate debt of the Commonwealth. The aggregate notional amount of the swaps for the Commonwealth and the public corporations has decreased from $9.2 billion as of June 30, 2008, to $7.9 billion as of June 30, 2009 and $6.9 billion as of March 31, 2011, an aggregate decrease of 24.8%.

*Notional Amounts.* The table below shows the aggregate notional amount as of March 31, 2011 of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

CONFIDENTIAL

PR-CCD-0026160

### Swap Portfolio Breakdown
### Notional Amount
### (as of March 31, 2011)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $1,302,700,000 | $1,698,370,000 | $3,001,070,000 |
| Electric Power Authority | 411,825,000 | 1,375,000,000 | 1,786,825,000 |
| Highways and Transportation Authority | 647,025,000 | | 647,025,000 |
| Ports Authority | 411,705,000 | | 411,705,000 |
| Sales Tax Financing Corporation | 1,043,000,000 | | 1,043,000,000 |
| Total | $3,816,255,000 | $3,073,370,000 | $6,889,625,000 |

*Market Value.* Generally, the interest rate exchange agreements may be terminated by the Commonwealth or the public corporations at any time at their then current market values. The agreements may also be terminated upon the occurrence of certain credit events. If a termination occurs due to a credit event, the Commonwealth or the public corporations may be obligated to pay to the applicable swap counterparty an amount based on the terminating swap's market value, which may be substantial, or vice versa, with other termination costs being paid by the defaulting party. The mark-to-market value of the swaps fluctuates with interest rates and other market conditions. The Commonwealth's obligations under the interest rate exchange agreements are secured by the full faith, credit and taxing power of the Commonwealth.

The following table shows, as of March 31, 2011, the net mark-to-market value of all outstanding interest rate exchange agreements. Since the mark-to-market value of all swaps was negative as of March 31, 2011, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements had been terminated as of that date.

### Swap Portfolio Mark-to-Market Valuation
### (as of March 31, 2011)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $(150,020,616) | $(35,227,774) | $(185,248,390) |
| Electric Power Authority | (44,143,867) | (14,636,678) | (58,780,545) |
| Highways and Transportation Authority | (84,004,382) | | (84,004,382) |
| Ports Authority | (43,134,090) | | (43,134,090) |
| Sales Tax Financing Corporation | (174,238,498) | | (174,238,498) |
| Total | $(495,541,452) | $(49,864,452) | $(545,405,904) |

*Collateral Requirements.* Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. During the fourth quarter of 2008, as a result of the U.S. financial market crisis, the Commonwealth and the public corporations were required to post collateral of approximately $251.8 million and $82.5 million, respectively, to their counterparties on certain interest rate exchange agreements. Based on an improvement in the mark-to-market value of the swap portfolio since then, the Commonwealth and the public corporations had no collateral posted as

I-54

of March 31, 2011. However, if the mark-to-market value of the swaps portfolio deteriorates or the credit ratings of the Commonwealth or the public corporations are lowered, the collateral posting obligations contained in the agreements may require deliveries of collateral.

**Variable Rate Bonds and Mandatory Tender Bonds**

*Variable Rate Bonds.* The Commonwealth and various public corporations have outstanding variable rate bonds, consisting of variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds") and other bonds and notes where the interest rate changes periodically based on the LIBOR rate or a particular index but that are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers with respect to all variable rate bonds. Pursuant to these agreements, the Commonwealth and the public corporations receive a variable rate payment expected to approximate the interest cost of the variable rate bonds, and pay a fixed rate. See "Interest Rate Exchange Agreements."

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of April 1, 2011.

**Variable Rate Debt Breakdown**
(as of April 1, 2011)

| | VRDO Bonds | Other Variable Rate Debt | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $491,450,000 | $ 742,660,000 | $1,234,110,000 |
| Electric Power Authority | — | 411,825,000 | 411,825,000 |
| Highways and Transportation Authority | 200,000,000 | 447,025,000 | 647,025,000 |
| Ports Authority | — | 411,705,000 | 411,705,000 |
| Sales Tax Financing Corporation | — | 136,000,000 | 136,000,000 |
| Total | $691,450,000 | $2,149,215,000 | $2,840,665,000 |

The VRDO Bonds bear a floating interest rate adjusted at specified intervals, such as daily or weekly (each, a "remarketing date") and provide investors the option to tender or put the bonds at par on each remarketing date. The tendered bonds are then resold by a remarketing agent in the secondary market to other investors. Most of the VRDO Bonds are secured by letters of credit or other liquidity or credit facilities ("credit/liquidity facilities") that provide for the payment of the purchase price payable upon the tender of the bonds. The credit/liquidity facilities expire prior to the final maturity of the bonds. If upon the expiration or termination of any credit/liquidity facility with respect to a series of VRDO Bonds the Commonwealth or the applicable public corporation is unable to renew or replace such facility with an alternate credit/liquidity facility, the VRDO Bonds of such series are subject to mandatory tender for purchase by the credit/liquidity facility provider and generally become subject to higher interest rates and accelerated amortization schedules pursuant to the terms of each expiring credit/liquidity facility.

I-55

CONFIDENTIAL

The recent U.S. financial market crisis has resulted in a significant reduction in the availability of credit/liquidity facilities to support VRDO Bonds, and a related increase in the price of these facilities when they can be obtained. Thus, if the Commonwealth and the public corporations are not able to renew or rollover the expiring credit/liquidity facilities with respect to VRDO Bonds, or are not able to do so at an acceptable price, the Commonwealth and the public corporations would have to refinance the VRDO Bonds or otherwise obtain financing for such bonds in order to avoid the higher interest rates and accelerated amortization schedules set forth in the expiring credit/liquidity facility.

In addition, since there are interest rate exchange agreements with respect to all VRDO Bonds, if the Commonwealth or the applicable public corporation cannot renew or replace a credit/liquidity facility upon its expiration or remarket the related series of bonds successfully upon their mandatory tender as variable rate bonds, the Commonwealth or the applicable public corporation may have to terminate the interest rate exchange agreements associated with such series of VRDO Bonds. Termination of the applicable interest rate exchange agreement may result, depending on then current interest rate levels and market conditions, in the payment of a termination amount, which may be substantial, by the Commonwealth to compensate the counterparty for its economic losses. As of March 31, 2011, the mark-to-market value of all the interest rate exchange agreements with respect to VRDO Bonds was negative $61.4 million for the Commonwealth and negative $27.8 million for the public corporations. See "Interest Rate Exchange Agreements – Market Value."

The following table shows, by fiscal year, the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit/liquidity facilities.

### VRDO Bonds Rollover
(by Fiscal Year)

|  | 2011 | 2012 | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | — | $491,450,000 | $491,450,000 |
| Highways and Transportation Authority | $200,000,000 | — | 200,000,000 |
| Total | $200,000,000 | $491,450,000 | $691,450,000 |

*Mandatory Tender Bonds.* As of April 1, 2011, the Commonwealth and the public corporations also had outstanding bonds bearing interest at a fixed rate but subject to mandatory tender for purchase prior to maturity, payable from the remarketing of the bonds, on certain specified dates (the "Mandatory Tender Bonds"). After the mandatory tender date, the Commonwealth or the applicable public corporation may from time to time change the method of determining the interest on the Mandatory Tender Bonds, which may be a fixed or variable rate. The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds.

The following table shows, as of April 1, 2011, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

I-56

CONFIDENTIAL

**Mandatory Tender Bonds Breakdown**
(as of April 1, 2010)

| | Mandatory Tender Bonds | Mandatory Tender Date |
|---|---|---|
| Commonwealth (General Obligation) | $279,240,000 | July 1, 2012 |
| Public Finance Corporation | 1,206,130,000 | February 1, 2012 |
| Public Buildings Authority | 464,880,000 | July 1, 2012 ($335,580,000) |
| | | July 1, 2017 ($129,300,000) |
| Total | $1,950,250,000 | |

The Commonwealth has entered into forward starting interest rate exchange agreements with respect to approximately $69.2 million of its Mandatory Tender Bonds. COFINA has also entered into forward starting interest rate exchange agreement with respect to approximately $907 million of Mandatory Tender Bonds of Public Finance Corporation. The forward starting interest rate exchange agreements assume that the Commonwealth Mandatory Tender Bonds will be remarketed as variable rate bonds after their mandatory tender date and that COFINA will issue variable rate bonds to refund the Public Finance Corporation Mandatory Tender Bonds on their mandatory tender date. If the Commonwealth and COFINA cannot remarket or issue these bonds as variable rate bonds at that time, they may have to terminate their respective forward starting interest rate exchange agreements, which may result in the payment of a termination amount. As of March 31, 2011, the mark-to-market value of these forward starting swaps to the Commonwealth and COFINA was negative $6.9 million and negative $141.2 million, respectively, which are the amounts the Commonwealth and COFINA would have been required to pay to terminate the swaps on that date.

**Ratings of Commonwealth General Obligation Bonds**

The Commonwealth's general obligation and appropriation debt is currently rated "A3" with a negative outlook by Moody's, "BBB+" with a stable outlook by Fitch, and "BBB" with a stable outlook by S&P.

**Commonwealth Guaranteed Debt**

As of December 31, 2010, $3.070 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $258.8 million in fiscal year 2011, with their final maturity being July 1, 2039. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of December 31, 2010, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of December 31, 2010, GDB held approximately $209.2 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The Authority is authorized to issue and GDB is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. Payments of $38.1 million under the Commonwealth guaranty have been required to pay interest and

I-57

CONFIDENTIAL

PR-CCD-0026164

principal on these bonds. See "Other Public Corporations—Port of the Americas Authority" under "Public Corporations" below.

As of December 31, 2010, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $1.002 billion. This amount consisted of $284.8 million in revenue bonds sold to the public, $316.6 million in bonds issued to the United States Department of Agriculture, Rural Development, and $401.0 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under "Public Corporations" below.

I-58

CONFIDENTIAL

### Trends of Public Sector Debt

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2010 and for the first six months of the fiscal year 2011. As of December 31, 2010, outstanding short-term debt, relative to total debt, was 8.4%.

### Commonwealth of Puerto Rico
### Public Sector Debt and Gross National Product
### (dollars in millions)*

| June 30, | Public Sector | | | | | Gross National Product[1] | |
|---|---|---|---|---|---|---|---|
| | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Amount | Rate of Increase |
| 2006 | 37,313 | 2,620[4][5] | 39,933 | 6.6 | 8.8 | 56,732 | 5.5 |
| 2007 | 39,492 | 3,326[4] | 42,818 | 7.8 | 7.2 | 59,521 | 4.9 |
| 2008 | 43,663 | 3,269[4] | 46,932 | 7.0 | 10.0 | 61,527 | 3.4 |
| 2009 | 48,332 | 4,648[4] | 52,980 | 8.8 | 13.0 | 62,759 | 2.0 |
| 2010 | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 63,866 | 1.8 |
| December 31, 2010 | 53,572 | 4,954 | 58,526 | 8.4 | 2.9 | - | - |

* Totals may not add due to rounding.
[1] In current dollars.
[2] Does not include the (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
[4] Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
[5] Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:* Government Development Bank for Puerto Rico

I-59

CONFIDENTIAL

PR-CCD-0026166

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2010 and for the first six months of the fiscal year 2011.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2006 | 9,841 | 552[4][5] | 10,393 | 2,037 | 293 | 2,330 | 25,435 | 1,775 | 27,210 | 37,313 | 2,620 | 39,933 |
| 2007 | 10,335 | 224[4] | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| 2008 | 9,273 | 519[4] | 9,792 | 2,507 | 313 | 2,820 | 31,633 | 2,437 | 34,070 | 43,413 | 3,269 | 46,682 |
| 2009 | 9,382 | 557[4] | 9,939 | 2,691 | 306 | 2,997 | 36,259 | 3,785 | 40,044 | 48,332 | 4,648 | 52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| December 31, 2010 | 9,852 | 1,268 | 11,120 | 3,038 | 293 | 3,331 | 40,683 | 3,393 | 44,075 | 53,572 | 4,954 | 58,526 |

* Totals may not add due to rounding.
[1] Does not include the Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."
[2] Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."
[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
[4] Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
[5] Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

Source: Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2010 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service

CONFIDENTIAL
PR-CCD-0026167

reserve funds. More detailed information about the major public corporations is presented in the following sections.

## Commonwealth of Puerto Rico
## Outstanding Debt of Public Corporations
## December 31, 2010
## (in thousands)

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 601,339 | $ 1,338,650 | $ 1,939,989 | $401,052 | $1,131,816 | $1,532,868 | $ 1,002,391 | $ 2,470,466 | $ 3,472,857 |
| Convention Center District Authority | | 447,160 | 447,160 | | 147,782 | 151,076 | | 594,942 | 594,942 |
| Electric Power Authority | | 7,780,890 | 7,780,890 | | 170,212 | 170,212 | | 7,951,102 | 7,951,102 |
| Highway and Transportation Authority | | 6,119,949[1] | 6,119,949 | | 1,126,689 | 1,126,689 | | 7,246,638 | 7,246,638 |
| Housing Finance Authority[2] | | 306,059 | 306,059 | | 66,704 | 66,704 | | 372,763 | 372,763 |
| Industrial Development Company | | 241,195 | 241,195 | | 89,075 | 89,075 | | 330,270 | 330,270 |
| Infrastructure Financing Authority[3] | | 1,840,308 | 1,840,308 | | 7,854 | 7,854 | | 1,848,162 | 1,848,162 |
| Port of the Americas Authority | 209,220 | | 209,220 | | | | 209,220 | | 209,220 |
| Ports Authority[4] | | 46,326[4] | 46,326 | | 683,741 | 683,741 | | 730,067 | 730,067 |
| Public Buildings Authority | 3,069,539 | | 3,069,539 | | 254,380 | 254,380 | 3,069,539 | 254,380 | 3,323,919 |
| Public Finance Corporation | | 1,618,284[5] | 1,618,284 | | | | | 1,618,284 | 1,618,284 |
| P.R. Sales Taxes Financing Corp. (COFINA) | | 13,437,045 | 13,437,045 | | | | | 13,437,045 | 13,437,045 |
| University of Puerto Rico | | 554,289[6] | 554,289 | | 37,994 | 37,994 | | 592,283 | 592,283 |
| Others[7] | | | | | 2,347,801 | 2,347,801 | | 2,347,801 | 2,347,801 |
| Total[8] | $3,880,098 | $33,730,155 | $37,610,253 | $401,052 | $6,064,048 | $6,465,100 | $4,281,150 | $39,794,203 | $44,075,353 |

[1] Excludes $151 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

[2] Excludes the $180 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the U.S. Department of Housing and Urban Development.

[3] Includes $42.2 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement.

[4] Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5] Payable primarily from Commonwealth appropriations.

[6] Excludes $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7] Includes lines of credit with GDB.

[8] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.3 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico.

## Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with the

CONFIDENTIAL

PR-CCD-0026168

Aqueduct and Sewer Authority, Electric Power Authority, Highway and Transportation Authority, Ports Authority, Health Insurance Administration and Medical Services Administration. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of December 31, 2010, GDB had total assets of $13.3 billion and total liabilities of $11.6 billion. GDB's total capital as of such date was $1.7 billion and its total capital ratio was 11.69%. GDB's debt is currently rated A3 and BBB by Moody's and S&P, respectively, with a stable outlook.

As of December 31, 2010, $4.8 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $4.6 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2011. As of said date, GDB also had approximately $7.8 billion in loans outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB has not made any payment to the General Fund under Act 82 since fiscal year 2004.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of December 31, 2010, the Perpetual Trust had repaid $131.8 million of its line of credit and had an outstanding balance of $368.4 million and no interest due. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover operating expense, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and liquidity.

I-62

CONFIDENTIAL

GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.* Puerto Rico Housing Finance Authority ("Housing Finance Authority") (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority. Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency. As of December 31, 2010, Housing Finance Authority's total outstanding principal balance of loans to the private sector for development of housing projects targeted to low and moderate income families were $120.7 million. The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $100.4 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions. As of December 31, 2010, $787 million of these bonds were outstanding.

As of December 31, 2010, the Housing Finance Authority had total notes and bonds outstanding of $1,047.1 million (including $107.3 million of debt outstanding under GDB lines of credit and $839.8 million in bonds issued to fund certain payments under its mortgage subsidy programs for low and moderate income families). As of December 31, 2010, Housing Finance Authority had total unrestricted net assets of $283.3 million.

*Puerto Rico Tourism Development Fund.* Puerto Rico Tourism Development Fund ("TDF") was created in November 1993 to facilitate the development of Puerto Rico's hotel and tourism industry. TDF works with private sector financial institutions to structure financings for new hotel projects. TDF is also authorized to make capital investments in tourism related projects. As of December 31, 2010, TDF had outstanding direct loans in an aggregate principal amount of $410.9 million, and outstanding guarantees and letters of credit issued in the amount of $333.6 million (with a maximum commitment amount of guarantees and letters of credit of $546.9 million). In addition, TDF has a $50 million preferred equity investment in a tourism-related project.

Since 1993, TDF has made payments under its guarantees and letters of credit in the aggregate amount of approximately $210 million with respect to several projects. Of the total amount disbursed, TDF has been able to recover approximately $156 million from the borrowers.

CONFIDENTIAL

As of December 31, 2010, the unrestricted net assets of TDF were approximately $176.2 million and its allowances for losses on loans and guarantees and letters of credit were approximately $81.7 million.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") was created in November 1992 for the purpose of investing and trading in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to the Tourism Development Fund, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of December 31, 2010, the Capital Fund had assets of $261,621, consisting principally of money market investments.

*Puerto Rico Development Fund.* Puerto Rico Development Fund (the "Development Fund") was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. On December 31, 2010, the Development Fund acquired for $8.5 million a commercial loan from a private commercial bank, secured by a first mortgage over a 2.34 acre parcel of land in the Convention Center District. As of December 31, 2010, the Development Fund had assets of $35.4 million, including investments of $17.6 million in loans to private entities, $11.9 million in an interest bearing account, and $5.8 million in preferred shares of various private entities.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health and the Aqueduct and Sewer Authority, among others. All such bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay the notes held by the bond trustees. As of December 31, 2010, PFC had $1.6 billion aggregate principal amount of limited obligation bonds outstanding.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

## Other Public Corporations

*Aqueduct and Sewer Authority.* PRASA owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 58% of the Commonwealth's population, respectively.

PRASA reported an operating loss of $58.3 million for fiscal year 2010, compared to operating losses of $63.7 million and $101.2 million for fiscal years 2009 and 2008, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

I-64

CONFIDENTIAL

As of December 31, 2010, PRASA's total debt was $3.5 billion, including approximately $888.6 million of outstanding indebtedness with GDB. PRASA's senior debt is rated Baa1, BBB- and BBB by Moody's, S&P and Fitch Ratings ("Fitch"), respectively. On November 9, 2010, Moody's affirmed PRASA's rating but revised its outlook to negative from stable. The negative outlook reflects PRASA's continued reliance on GDB and the Commonwealth for financial support, as well as the operational challenges it faces to reduce the significant amount of water lost through its Systems.

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

During fiscal year 2011, PRASA received a $105 million assignment from the OMB in Commonwealth appropriations and other Commonwealth available funds. According to the provisions of PRASA's trust agreement, these moneys are taken into account for purposes of determining its revenues and its compliance with certain covenants therein.

On April 28, 2006, the Authority entered into a consent decree with the U.S. Environmental Protection Agency ("EPA") that requires the Authority to implement system wide remedial measures at all of the wastewater treatment plants operated by the Authority. The EPA consent decree establishes deadlines for the compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between the Authority and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. The Authority agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the Systems, to finance its expansion for new users and to implement remedial measures required by a consent decree between PRASA and the EPA and a settlement agreement with the DOH. Funds for this investment will be provided through a combination of revenues from PRASA, financing transactions, federal grants and other sources. PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the consent decree and the settlement agreement. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

*Children's Trust.* Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's

CONFIDENTIAL

PR-CCD-0026172

Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $397 billion Tobacco Settlement Asset-Backed Bonds in November 2002. The proceeds were used to pay certain capital expenditures, to fund the Liquidity Reserve account and certain costs of issuance. On June 30, 2005, Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth. On May 1, 2008, Children's Trust issued an additional $195.9 million of subordinate Tobacco Settlement Asset-Backed Bonds to make grants to third parties, pay certain expenses of the Commonwealth and cost of issuance. As of December 31, 2010, Children's Trust had outstanding bonds in the principal amount of $1.3 billion. These bonds and any other additional senior bonds issued by Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement. To date, all principal and interest payments required to be made by Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.* Convention Center District Authority was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center, a new convention center, and designated private parcels located within the Convention Center District in San Juan. The convention center opened in November 17, 2005. Convention Center District Authority also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum. As of December 31, 2010, Convention Center District Authority's debt was $447.2 million in outstanding bonds issued in March 2006 to finance the Convention Center and payable from a portion of a hotel room tax. As of December 31, 2010, Convention Center District Authority also had outstanding indebtedness to GDB of approximately $147.8 million related to the financing of the Coliseum.

*Electric Power Authority.* Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported net operating income of $359.5 million and $362.6 million during fiscal years 2010 and 2009 respectively. The total debt of PREPA was $8.0 billion as of December 31, 2010. This debt includes outstanding bonds of $7.8 billion and interim financing for operations of $170.2 million. PREPA's debt is rated A3, BBB+ and BBB+ by Moody's, S&P and Fitch, respectively.

As a means of reducing its dependency on oil, PREPA has entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil. Currently, these two co-generation plants provide approximately 31% of PREPA's energy needs. PREPA has also commenced developing plans for the conversion of its main oil-fired units into natural gas and clean-coal fired units.

CONFIDENTIAL

PR-CCD-0026173

*Health Insurance Administration.* The Health Insurance Administration was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of eight designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers the entire island, and approximately 1.5 million persons were covered by the system during fiscal year 2010.

The Commonwealth has entered into various contracts with several Medicare Advantage organizations for the provision of health coverage to approximately 200,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

The total cost of the health insurance program for the current fiscal year December 31, 2010 was $975 million, $1.962 billion for fiscal year 2010 and $1.861 billion for fiscal year 2009. For fiscal year 2011, the General Fund covered $715 million of the total cost of the health insurance program. The remaining $260 million will be paid from federal, municipal, internal and other sources.

On October 1, 2010, the administration implemented "Mi Salud," which is the health program that replaced the government's Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. During the implementation of the program's second phase, eligibility requirements will also be expanded to include small to medium businesses. The estimated cost for "Mi Salud" during fiscal year 2012 is $2,068 billion. The General Fund is expected to cover $945 million, while the remaining $1.123 billion will be paid from federal, municipal and other sources. This projection, however, does not take into account increases in the enrollment of new beneficiaries, which could affect this estimate.

Recently, the Governor signed into law a bill that authorizes the Health Insurance Administration to borrow approximately $186 million from GDB in order to pay amounts owed to its suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

*Highways and Transportation Authority.* Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA, and federal and Commonwealth grants.

PRHTA reported a net operating loss of $445.3 million for fiscal year 2010, compared to the net operating loss of $492.0 million of fiscal year 2009 and $448.7 million for fiscal year 2008. As of December 31, 2010, PRHTA's total debt was $7.3 billion, including $1.1 billion from GDB's financings.

I-67

CONFIDENTIAL

PR-CCD-0026174

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

PRHTA's Highway Revenue Bonds are rated A2 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated A3 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at PRHTA's election. The cost of the project was $2.4 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005. The operation of the Tren Urbano generated a loss of $51.7 million, $64.5 million, and $62.5 million in fiscal years 2010, 2009, and 2008, respectively.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

During the second quarter of fiscal year 2011, PRHTA and PPP Authority commenced a procurement process intended to lead to the establishment of a concession agreement for the operation of two toll roads, i.e. PR-22 and PR-5. Future procurement processes will lead to the establishment of concession agreements for the principal toll roads in Puerto Rico.

*Industrial Development Company.* Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. PRIDCO reported consolidated net operating losses of $10.3 million for fiscal year 2010, compared to consolidated net operating losses of $6.0 million for fiscal year 2009 and consolidated net income of $6.1 million for fiscal year 2008. Rentals derived from the leasing of

I-68

PR-CCD-0026175

specified facilities of PRIDCO are pledged to the payment of PRIDCO's revenue bonds. As of December 31, 2010, PRIDCO's total debt was $411.4 million, including approximately $89.1 million from GDB financings and the outstanding debt of Puerto Rico Industrial Investment Corporation, a subsidiary of PRIDCO. PRIDCO's debt is rated Baa1 and BBB- by Moody's and S&P, respectively.

During fiscal years 2006 and 2007 PRIDCO entered into a company reorganization plan establishing an early retirement plan and a voluntary separation plan with the objective of reducing workforce and to achieve expense reductions. This plan was financed by a line of credit from GDB, which had an outstanding balance of $45.7 million as of December 31, 2010.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.*   The Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2010, approximately $1.3 billion of AFICA's bonds were outstanding. In addition, as of December 31, 2010, AFICA has a $67 million line of credit with GDB with a principal outstanding balance of $59.1 million used for the acquisition of assets from PREPA.

*Infrastructure Financing Authority.*   Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.

As of December 31, 2010, PRIFA's total debt was $1.85 billion. This debt includes bonds outstanding of $1.84 billion and interim financing for capital improvements of $7.9 million. PRIFA's debt is rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually thru fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. The Authority is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

I-69

CONFIDENTIAL

PR-CCD-0026176

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account were being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a payment to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also has responsibility for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2010, MFA had $1.0 billion of bonds outstanding.

*Port of the Americas Authority.* Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas (the "Port"), a deep draft port on the south coast of Puerto Rico.

PAA is authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port. Currently, GDB is authorized by law to purchase bonds of PAA in an aggregate principal amount not to exceed $250 million. As of December 31, 2010, GDB held approximately $209.2 million of PAA's outstanding bonds, which are guaranteed by the Commonwealth.

The first phase of the Port was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. The second phase of the Port was completed during the first quarter of calendar year 2009. This phase, which was designed to provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU") per year, included (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet, (ii) reconstructing the container terminals,

I-70

(iii) commencing certain required environmental risk mitigation procedures, and (iv) preparing final construction schematics.

A third phase, which provides for the expansion of the Port's capacity, was initiated in August 2008. This phase includes, among other improvements, (i) infrastructure improvements related to access roads, (ii) relocation of the storm sewer channel, (iii) relocation of the server, water and power distribution systems, (iv) additional dredging at certain pier locations, (v) the expansion of the container terminal, and (vi) additional mitigation at Coffin Island. The first expansion under this phase will provide sufficient capacity to process 500,000 TEU annually. This phase is expected to be finished in the second half of calendar year 2011.

*Ports Authority.* Puerto Rico Ports Authority ("Ports Authority") owns and operates the major airport and seaport facilities in Puerto Rico. Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Ports Authority reported operating losses of $38.7 million and $46.7 million during fiscal years 2010 and 2009, respectively. As of December 31, 2010, the Ports Authority had $730.1 million in debt, including approximately $146.0 million from GDB financings.

As of December 31, 2010, the outstanding balance of the credit facilities for capital improvements with private financial institutions was $151.0 million, which is guaranteed by GDB.

*Public Buildings Authority.* Puerto Rico Public Buildings Authority ("PBA") is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.3 billion of bonds guaranteed by the Commonwealth. As of December 31, 2010, $3.07 billion of such bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of December 31, 2010, PBA's line of credit with GDB had an outstanding balance of $254.4 million. PBA debt is rated A3 and BBB− by Moody's and S&P, respectively.

*Public-Private Partnerships Authority.* PPP Authority is an independent governmental instrumentality of the Commonwealth created by Act No. 29 of June 8, 2009. The Authority is tasked with implementing the Commonwealth's public policy regarding public-private partnerships to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. As of April 2010, the Authority had engaged various financial advisors to assist it in the evaluation of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the Authority has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marin International Airport. As of September 30, 2010, the

I-71

CONFIDENTIAL

Authority has a $20 million revolving line of credit with GDB with an outstanding balance of $3.3 million.

*Sales Tax Financing Corporation.* COFINA is an independent governmental instrumentality of the Commonwealth created by Act 91. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.

In 2009, the Legislative Assembly of Puerto Rico expanded the purposes for which COFINA was created and, correspondingly, increased its revenues by increasing from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion that is transferred to COFINA of the sales and use tax imposed by the central government. As a result, COFINA was authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Government of Puerto Rico, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund. As of December 31, 2010, COFINA had approximately $13.4 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds). COFINA's Sales Tax Revenue Bonds are rated Aa2, AA- and AA- by Moody's, S&P and Fitch, respectively, and the Sales Tax Revenue Bonds, First Subordinate Series are rated A1, A+ and A+ by Moody's, S&P and Fitch, respectively.

*Special Communities Perpetual Trust.* The Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB has made a special capital contribution to Perpetual Trust of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred by GDB were deposited in two investment accounts held by GDB for the benefit of Perpetual Trust, of which $888.7 million has been disbursed to the Perpetual Trust as of December 31, 2010. As of December 31, 2010, Perpetual Trust's line of credit with GDB had an outstanding balance of $368.4 million. The line of credit is payable from legislative appropriations.

*University of Puerto Rico.* The University of Puerto Rico (the "University"), with approximately 62,342 students at the beginning of academic year 2010-2011, is by far the largest institution of higher education on the Island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements

I-72

CONFIDENTIAL

PR-CCD-0026179

have been financed mainly by revenue bonds. As of December 31, 2010, the University's total debt was $592.3 million (excluding $19.4 million owed by the University's Medical Services). The University's debt is rated Baa2 and BBB- by Moody's and S&P, respectively.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2007, the Board of Trustees of the University approved Certification No. 60 establishing a new policy and methodology for tuition fees structure. This new structure covers the tuition fees to be charged to new students until academic year 2012-2013. This policy was adopted to pursue continued development and financial stability of the University.

In June 2010, the Board of Trustees of the University approved Certification No. 146 establishing a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University. This stabilization fee was imposed to address the University's fiscal difficulties and is expected to increase annual revenues by approximately $40 million.

As a result of a student-led strike that lasted approximately two months, on June 26, 2010, the Middle States Commission on Higher Education ("MSCHE"), the regional accreditation entity of the eleven units that comprise the University system, placed on probation ten of the University's units for lack of evidence of compliance with two of fourteen accreditation standards. This action was prompted by a student stoppage that interrupted the operations of these units for up to 62 days, but less in most cases. The ten affected units will remain fully accredited while on probation. After a Monitoring Report submitted by the ten affected units in September 2010 and a subsequent evaluation visit, the Commission lifted probation over one of the questioned standards and added an additional standard, thereby continuing the review over two of the fourteen accreditation standards.

A second Monitoring Report was submitted to the Commission by the ten affected units on March 1, 2011 to further substantiate compliance with these two standards. Evaluation visits to the eleven units of the University were conducted between March and April 2011 as a follow up to the probationary process as well as the regular decennial re-accreditation review for some of the units. Following these visits, the evaluation teams reported that they intend to inform the Commission that 95% of all accreditation standards evaluated throughout the system were found in compliance, and significant progress was evidenced in the remaining 5%.. The Commission will make its final determination at its June 2011 meeting. The University anticipates that probation will be lifted for all units after said meeting.

*Other public corporations.* Public corporations not described above have outstanding debt in the aggregate amount of $1.522 billion as of September 30, 2010. Debt service on $725

CONFIDENTIAL

PR-CCD-0026180

million of such outstanding debt is being paid from legislative appropriations. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of the Commonwealth (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System covers employees of the University of Puerto Rico and Electric Power Authority, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951 ("Act 447") and is a hybrid defined benefit plan consisting of different benefit structures. Members who entered the Employees Retirement System on or before December 31, 1999 generally participate in a defined benefit program. Members participating in the defined benefit program prior to April 1, 1990 ("Act 447 Participants") are entitled to the highest benefits structure, while those who became members on or after April 1, 1990 ("Act 1 Participants") are subject to a longer vesting period and a reduced level of benefits.

In 1999, Act 447 was amended to close the defined benefit program and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Under the

CONFIDENTIAL

PR-CCD-0026181

System 2000 benefits structure, a participant is entitled to receive a lump-sum payment, which may be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed by such participant. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions with respect to System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the original defined benefit structure and System 2000 will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

*Covered Employees.* The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico or the Electric Power Authority) and municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied. Currently, there are no teachers from private schools or other educational institutions participating in the Teachers Retirement System.

I-75

CONFIDENTIAL

PR-CCD-0026182

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2010, the date of the latest actuarial valuations for the Retirement Systems.

**Participant Data**
**(as of June 30, 2010)**

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| Act 447 Participants | 34,079 | 75,100 | 16,521 | 12,157 | - | 137,857 |
| Act 1 Participants | 51,284 | 2,428 | 318 | 14 | - | 54,044 |
| System 2000 Participants | 55,279 | - | - | - | - | 55,279 |
| Total | 140,642 | 77,528 | 16,839 | 12,171 | - | 247,180 |
| **Teachers Retirement System** | 44,679 | 28,799 | 2,061 | 2,744 | 769 | 79,052 |
| **Judiciary Retirement System** | 362 | 333 | 0 | 61 | 45 | 801 |

[1] Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon. There are terminated vested members of the Employees Retirement System, but the Employees Retirement System does not possess reliable data on the amount of such members.

The Commonwealth central government (consisting of department and agencies) is not the only employer participating in the Employees Retirement System. The municipalities and most public corporations participate as employers as well with respect to their employees. However, the assets contributed by the Commonwealth central government and all other employers are invested together and not otherwise segregated. As of June 30, 2010, the central government was responsible for making contributions with respect to 85,643 active members of the Employees Retirement System, or 60.9% of total active members (consisting of 22,074 Act 447 Participants, 34,343 Act 1 Participants and 29,226 System 2000 Participants). Municipalities were responsible for 32,310, or 23.0%, active members, and public corporations were responsible for 22,689, or 16.1%, active members.

*Funding Requirements.* The Commonwealth central government is responsible for approximately 64% of total employer contributions to the Employees Retirement System, and the other 36% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the Retirement Systems and required contributions to the Retirement Systems by employers and employees are determined by law rather than by actuarial requirements.

For the Employees Retirement System, the statutory employer contribution is at least 9.275% of covered payroll. Covered payroll is the compensation regularly paid to active employees on which contributions to the retirement systems are computed and is generally equivalent to their annual salary. The current employer contribution rate has been in effect since February 1990; prior to that date, Commonwealth departments, agencies and public corporations were required to make employer contributions of at least 8% of their covered payroll, while municipalities were required to make employer contributions of at least 7% of their covered payroll. Required employee contributions for the Employees Retirement System vary according

I-76

CONFIDENTIAL

PR-CCD-0026183

to how the individual employee's retirement benefits are coordinated with social security benefits. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the System, plus administrative costs, and (ii) the contributions that employees are required to make to the System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

For the Teachers Retirement System, the statutory employer contribution is 8.5% of covered payroll and 9.0% for the employees. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and 8% for the employees. The employer contribution rate for the Judiciary Retirement System increased from 20.0% to 30.34% of payroll as of July 1, 2008. The Commonwealth is also ultimately responsible for any funding deficiency in the Teachers Retirement System and the Judiciary Retirement System.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2010 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been received by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. In July 2010, the Teachers Retirement System received the first installment.

CONFIDENTIAL

PR-CCD-0026184

The Employees Retirement System is also seeking reimbursement from the Commonwealth, the municipalities and public corporations in the amount of $79.2 million, $30.5 million and $62.1 million, respectively, for cumulative System Administered Pension Benefits paid to its beneficiaries through June 30, 2010. As of June 30, 2010, the Teachers Retirement System was also seeking reimbursement from the Commonwealth of $491,000 (excluding the aforementioned $53.8 million) on account of System Administered Pension Benefits paid.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.138 billion, compared to $4.219 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 36.3% of U.S. domestic and international equity investments, 14.8% of fixed-income securities, 29.7% of internally managed mortgage and personal loans portfolio, 17.8% of short-term cash equivalents and 1% of other investments. As of December 31, 2010, the market value of the Employees Retirement System's investment portfolio was $4.176 billion. The decrease in the value of the investment portfolio since June 30, 2009 principally reflects the continued use of investment portfolio assets to pay current benefits, as discussed below.

As of June 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.157 billion, compared to $2.136 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 60.4% of U.S. domestic and international equity investments, 19.1% of fixed-income securities, 19.2% of internally managed mortgage and personal loans portfolio, 0.30% of short-term cash equivalents and 1% of other investments. As of December 31, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.425 billion.

As of June 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $80.5 million, compared to $71.5 million as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 63.9% of U.S. domestic and international equity investments, 34.8% of fixed-income securities, 1% of internally managed mortgage and personal loans portfolio and 0.40% of short-term cash equivalents. As of December 31, 2010, the market value of the Judiciary Retirement System's investment portfolio was $66.5 million.

*Actuarial Valuations of the Retirement Systems.* Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems began conducting annual actuarial valuations effective June 30, 2009. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2010.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System as well as other financial information are available on the website of the Administration of the Retirement Systems at http://www.asr.gobierno.pr. Informational copies of the actuarial valuation report of the Teachers Retirement System as well as other financial information are available at the website of the Teachers Retirement System at http://www.srm.gobierno.pr. No information contained on these websites is deemed incorporated herein by reference.

CONFIDENTIAL

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislature.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal year 2009 was significantly lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of each of the Retirement Systems for fiscal year 2010, however, was higher than the assumed investment return utilized to prepare the actuarial accrued liability.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 10.0%, negative 16.0% and negative 18.2%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively.

CONFIDENTIAL

PR-CCD-0026186

The June 30, 2010 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method and assumed an investment return of 7.5% per year and yearly salary increases of 3% per year. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service.

The June 30, 2010 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 8% per year and yearly salary increases of 3.5%. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

I-80

CONFIDENTIAL

PR-CCD-0026187

## Funding Status
### Actuarial Valuations as of June 30, 2010
#### (in millions)

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,667 | $19,502 | $17,834 | 8.5% | $3,818 | 467.1% |
| Teachers Retirement System | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| Judiciary Retirement System | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| **Total** | $3,944 | $29,120 | $25,175 | 13.5% | $5,220 | 482.3% |

[1] The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

[4] The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.

[6] The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System.

Source: Actuarial valuation reports as of June 30, 2010 for each of the Retirement Systems.

## Historical Funding Status[1]
### Actuarial Valuations as of the Indicated Fiscal Years
#### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2005 | $2,328 | $13,969 | $11,641 | 16.7% | $4,126 | 282.2% |
| 2007 | 2,892 | 16,770 | 13,878 | 17.2 | 4,246 | 326.8 |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 19,502 | 17,834 | 8.5 | 3,818 | 467.1 |
| **Teachers Retirement System** | | | | | | |
| 2004 | $2,403 | $4,702 | $2,299 | 51.1% | $1,294 | 177.7% |
| 2007 | 3,163 | 7,756 | 4,593 | 40.8 | 1,370 | 335.3 |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| **Judiciary Retirement System** | | | | | | |
| 2005 | $70 | $174 | $105 | 40.0% | $29 | 356.8% |
| 2007 | 81 | 259 | 177 | 31.5 | 31 | 566.6 |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |

[1] Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.

Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

CONFIDENTIAL

PR-CCD-0026188

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last three fiscal years and the current fiscal year.

## Schedule of Employer Contributions
## to Retirement Systems
## (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $1,191 | $581 | $610 | 48.8% |
| 2009 | 1,259 | 595 | 664 | 47.2 |
| 2010 | 1,460 | 534 | 926 | 36.6 |
| 2011 | 1,547 | 542 | 1,005 | 35.0 |
| **Teachers Retirement System** | | | | |
| 2008 | $341 | $159 | $182 | 46.6% |
| 2009 | 394 | 173 | 221 | 43.9 |
| 2010 | 477 | 166 | 311 | 34.9 |
| 2011 | 528 | 165 | 363 | 31.3 |
| **Judiciary Retirement System** | | | | |
| 2008 | $20 | $7 | $13 | 36.7% |
| 2009 | 22 | 11 | 11 | 50.0 |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.1 |
| **Total** | | | | |
| 2008 | $1,553 | $748 | $805 | 48.1% |
| 2009 | 1,675 | 778 | 897 | 46.4 |
| 2010 | 1,965 | 710 | 1,255 | 36.1 |
| 2011 | 2,105 | 718 | 1,387 | 34.1 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2010 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

Based on the current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems will continue to increase indefinitely into the future instead of being amortized and future scheduled contributions at the current funding rates will not be sufficient to make future benefit payments when due. Additional funding from the Commonwealth will ultimately be necessary to cover such unfunded obligation. It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding

I-82

CONFIDENTIAL

PR-CCD-0026189

shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the System's assets. During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds increased the funds of the Employees Retirement System currently available to pay pension benefits. Although the original expectation was that the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds would exceed the cost of the debt, as further discussed below, the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds have in fact been lower than the cost of the Pension Bonds. As a result of market declines since the issuance of the Pension Bonds, the market value of some of the investments made with Pension Bonds proceeds is below their original cost. Thus, to date, the Pension Bonds transactions have negatively affected the UAAL of the Employees Retirement System.

CONFIDENTIAL

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

## Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2006 | $741.4 | ($803.5) | ($62.1) |
| 2007 | 713.2 | (823.1) | (109.9) |
| 2008 | 726.4 | (1,011.3) | (284.9) |
| 2009 | 762.4 | (1,190.3) | (427.9) |
| 2010 | 726.5 | (1,269.0) | (542.5) |
| **Teachers Retirement System** | | | |
| 2006 | $248.7 | ($355.1) | ($106.4) |
| 2007 | 244.1 | (387.9) | (143.7) |
| 2008 | 244.6 | (439.9) | (195.2) |
| 2009 | 261.5 | (468.0) | (206.6) |
| 2010 | 248.0 | (498.1) | (250.1) |
| **Judiciary Retirement System** | | | |
| 2006 | $9.7 | ($13.5) | ($3.8) |
| 2007 | 9.5 | (14.7) | (5.3) |
| 2008 | 9.8 | (15.4) | (5.6) |
| 2009 | 13.1 | (16.5) | (3.4) |
| 2010 | 13.1 | (17.8) | (4.7) |

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits.
[2] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2008, 2009 and 2010 in the amounts of $47 million, $187 million and $188 million, respectively.
Source: Information obtained from each of the Retirement Systems.

The Employees Retirement System anticipates that, based on the current contributions and benefit structure, its future cash flow needs for disbursement of benefits to participants are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income. Based on the actuarial valuation report as of June 30, 2010, the Employees Retirement System expects to have a funding shortfall (after payment of debt service on the Pension Bonds) of $749 million for fiscal year 2011 and this negative trend is expected to continue. Based on the Employees Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being rapidly disfunded and projects that its net assets (total assets minus the Pension Bonds and other liabilities) will be depleted by fiscal year 2014 and its gross assets will be depleted by fiscal year 2019. This means that during the period from fiscal year 2014 through fiscal year 2019, benefits are expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits or debt service on the pension obligation bonds.

The Teachers Retirement System has also covered funding shortfalls during the prior five fiscal years through the sale of investment portfolio assets. Based on the actuarial valuation

I-84

report as of June 30, 2010, the Teachers Retirement System expects to have a funding shortfall of approximately $274 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being gradually disfunded and projects that its net and gross assets will be depleted by fiscal year 2020.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. Based on the actuarial valuation report as of June 30, 2010, the Judiciary Retirement System expects to have a funding shortfall of approximately $7.7 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being disfunded and projects that its net and gross assets will be depleted by fiscal year 2018.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.

*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.* On June 30, 2010, the Employees Retirement System and GDB, as fiscal agent, retained Conway MacKenzie, Inc ("CMI"), a financial advisory firm, to identify and analyze key events and decisions that have contributed to the current financial crisis of the Employees Retirement System, including the deterioration of its funded ratio. CMI issued its report in October 2010. In its report, CMI identified the following five factors as fundamental in the deterioration of the financial health of the Employees Retirement System: (i) historical inadequate funding procedures, (ii) special laws, (iii) early retirement programs, (iv) personal loans, and (v) the 2008 issuances of Pension Bonds.

The report reviews the historical funding levels of the Employees Retirement System and concludes that the Employees Retirement System has been underfunded since its inception in 1951, essentially as a result of statutory funding rates that fall below actuarially determined contribution rates. In addition to inadequate annual contributions, CMI notes that investment returns and other recurring income have been insufficient to cover annual benefit payments and operating expenses, resulting in cash flow shortfalls that have forced the Employees Retirement System to liquidate plan assets.

CMI also identified the enactment of numerous special laws, which have granted incremental retirement benefits to participants beyond those provided by Act 447 and Act 1, as having exacerbated the deteriorating financial condition of the Employees Retirement System.

I-85

CONFIDENTIAL

Many special laws were adopted without the Government securing a viable, long-term source of funding for such additional benefits, including the adoption of special laws during periods when the Government was incurring in budgetary deficits. As a result, the Employees Retirement System was forced to fund the benefits granted under these special laws, resulting in significant past-due receivables from the Commonwealth and participating public corporations and municipalities.

The adoption of several early retirement programs is also identified as having affected the financial solvency of the Employees Retirement System. These programs were adopted in order to reduce the size of the public workforce and thereby decrease payroll costs. These programs, however, were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the System funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality. In addition, the CMI report notes that it appears that many of these programs did not ultimately result in their intended goals of reducing the size of the public workforce.

Another factor identified by CMI as having contributed to the deterioration of the Employees Retirement System is the adoption in 2007 of an increase in the maximum loan balance for personal loans to members, from $5,000 to $15,000. This increase has resulted in a significant cash flow drain to the Employees Retirement System, amounting to approximately $600 million during the last four fiscal years. Although the loans are secured by the employee contributions and collected through payroll withholdings, the significant cash flow to provide personal loans has required the liquidation of plan assets. As a result, a significant percentage of the Employees Retirement System's assets are now invested in personal loans that are illiquid investments.

The CMI report also addressed the 2008 issuances of approximately $2.9 billion in Pension Bonds. The Pension Bonds were issued with the intent of increasing the funds available to the Employees Retirement System to pay benefit obligations and to reduce the UAAL. The Employees Retirement System expected to achieve these goals by investing the proceeds of the Pension Bonds at a higher return than the cost of the debt, thereby achieving a positive arbitrage. However, CMI found that potential risks were not thoroughly or properly analyzed. In fact, the investment of the Pension Bonds proceeds has resulted in a negative arbitrage as the Pension Bonds are currently costing the System more than what it is earning on the investment proceeds. Thus, to date, the transactions have worsened the funded ratio of the Employees Retirement System.

Finally, the CMI report addresses governance deficiencies and states that many of the measures described above, and in particular the issuances of Pension Bonds, were adopted and implemented without conducting any rigorous analysis of their impact on the financial condition of the Employees Retirement System and the risks associated with the measures. The report concludes that immediate and dramatic changes to the structure of the Employees Retirement System are necessary to avoid full depletion of the System's net assets in the near future, as discussed above.

I-86

CONFIDENTIAL

PR-CCD-0026193

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.* The Retirement Systems and the current administration are evaluating measures to improve the financial solvency of the Retirement Systems. In order to maintain the long-term fiscal integrity of the Retirement Systems and their ability to pay required benefits to their members, a combination of some or all of the following will be required: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems. Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.

In March 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the Retirement Systems. The Commission issued its report on October 21, 2010. The Commission's report does not make a consensus set of recommendations for addressing the financial solvency of the Retirement Systems, but rather discusses the principal recommendations made by different members of the Commission in the following areas: (i) employer and employee contributions, (ii) benefit structure, (iii) retirement age, (iv) benefits under special laws, (v) early retirement programs, (vi) mortgage loans and personal loans, and (vii) governance structure. All members of the Commission agreed that there has to be an increase in employer contributions, while some members also recommended an increase in employee contribution rates. One of the proposals is that employer contribution rates be increased by 1% of payroll per year for the next 10 to 15 years. In the benefits areas, the recommendations include various proposals to reduce or limit benefits, such as eliminating merit pensions, establishing caps on benefits, increasing the retirement age in order to receive full benefits and modifying or eliminating some benefits granted under special laws. Some members of the Commission also recommended prohibiting all future early retirement programs unless they are actuarially positive to the Retirement Systems. In order to address the liquidity position of the Retirement Systems, various members of the Commission recommended eliminating the loan programs or restricting their use. Various members also commented that improvements to the governance structure of the Retirement Systems was necessary, as it appeared that in the past governance had not been as rigorous as it should have been. Other recommendations included increasing penalties for late payments by participating employers and creating other dedicated revenue sources for the Retirement Systems, such as a special lottery drawing or a special tax on government contractors.

The administration has assigned to a task force headed by the Secretary of Labor the evaluation of the Commission's recommendations in order to determine which of its recommendations or other alternatives will be formally proposed. The implementation of most of the recommendations or other alternatives will require adopting legislation, which the administration expects to submit during 2011. At this time, there can be no assurance as to which changes, if any, to the Retirement Systems will be proposed and adopted. Because of the Commonwealth's current budgetary constraints and the significant underfunding of the Retirement Systems discussed above, however, improving the financial solvency of the Retirement Systems will require the adoption of several of the measures mentioned above and it will take several years before a significant improvement is achieved. In the short-term, the financial situation of the Retirement Systems may have an adverse impact on the Commonwealth's budgetary situation.

CONFIDENTIAL

PR-CCD-0026194

On July 2, 2010, the Government enacted Act 70, which is designed to reduce Government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria who opted for early retirement by January 14, 2011 receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. The Government expects approximately 2,398 employees to participate of the benefits provided by Act 70.

*Impact of Funding Shortfall on the Commonwealth.* The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems. The depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. However, due to the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

*Statements of Plan Net Assets and Changes in Plan Net Assets.* The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2008, 2009 and 2010 and as of and for the six months ended in December 31, 2010.

I-88

CONFIDENTIAL

PR-CCD-0026195

The Commonwealth of Puerto Rico
Employees' Retirement System
Statements of Plan Net Assets*
As of June 30, 2008, 2009, and 2010 and December 31, 2010**
(in thousands)

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CASH AND SHORT TERM INVESTMENTS** | | | | |
| Deposits at Commercial Banks | 47,935 | $ 54,175 | $ 21,792 | $ 84,439 |
| Deposits with Treasury Department | 196,487 | 110,931 | 103,527 | 23,099 |
| Deposits with GDB: | | | | |
| Unrestricted | 40,198 | 51,446 | 79,500 | 54,438 |
| Restricted | 357,117 | 741,082 | 1,028,878 | 1515,042 |
| Restricted Cash Bonds | 233,960 | 172,226 | 193,537 | -- |
| Total Cash and Short Term Investment | 875,697 | 1,129,860 | 1,427,234 | 1,677,018 |
| | | | | |
| **SECURITIES LENDING, COLLATERAL INVESTED** | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 586,656 | 563,454 | 565,366 | 547,414 |
| Stocks | 1,851,790 | 1,492,386 | 1,477,945 | 2,018,090 |
| Master Repo | -- | -- | -- | -- |
| Private Equity Investments | 57,779 | 55,307 | 34,922 | 42,294 |
| Total Investments | 2,496,225 | 2,111,147 | 2,078,233 | 2,607,798 |
| | | | | |
| **LOANS TO PLAN MEMBERS** | | | | |
| Mortgage | 144,849 | 141,588 | 128,365 | 116,022 |
| Personal | 1,042,582 | 1,018,498 | 916,934 | 771,367 |
| Cultural Trips | 67,030 | 63,729 | 50,317 | 38,344 |
| PEC | 3,163 | 2,340 | 1,827 | 1,098 |
| Total Loans to Plan Members | 1,257,624 | 1,226,155 | 1,097,443 | 926,831 |
| | | | | |
| Investment in PRTA Holdings | -- | -- | -- | -- |
| Total cash, investments and loans to plan members | 4,629,546 | 4,467,162 | 4,602,910 | 5,211,647 |
| | | | | |
| **RECEIVABLES:** | | | | |
| Employers | 231,645 | 273,139 | 289,427 | 246,167 |
| General Fund | 8,278 | 11,222 | 7,833 | 854 |
| Judiciary Retirement System | 224 | 19,138 | 17,942 | 16,714 |
| Investment Sales | 9,025 | 12,189 | 24,509 | 9,800 |
| Accrued Interest | 6,291 | 6,597 | 6,939 | 3,279 |
| Dividend Receivable | | | | |
| Other | 10,646 | 3,893 | 5,081 | 58,210 |
| Total Receivables | 266,109 | 326,178 | 351,731 | 335,024 |
| | | | | |
| CAPITAL ASSETS | 8,686 | 8,964 | 9,171 | 9,839 |
| OTHER ASSETS | 6,880 | 7,224 | 8,892 | 8,292 |
| Prepaid Bond Cost | 33,267 | 33,267 | 34,363 | 35,462 |
| Total assets | 4,944,488 | 4,842,795 | 5,007,067 | 5,600,264 |
| **LIABILITIES** | | | | |
| Book overdraft | | 22,933 | 37,961 | -- |
| Short Term Obligations | | -- | -- | -- |
| Payables for securities lending | | 110,931 | 103,527 | -- |
| Funds of Mortgage Loans and Guarantee Insurance Reserve for Loans | 11,148 | 6,597 | 6,372 | 3,863 |
| Investment Purchases | 1,942 | 5,277 | 13,926 | 12,694 |
| Accounts Payable and Accrued Liabilities | 8,948 | 12,250 | 14,228 | 9,310 |
| Line of Credit | | -- | -- | -- |
| Bonds Payable | 2,981,775 | 2,981,775 | 2,961,359 | 2,942,183 |
| Other Liabilities | 112,935 | 21,798 | 13,675 | 12,946 |
| Bonds Interest Payable | 13,876 | 13,876 | 13,876 | 12,182 |
| Total Liabilities | 3,130,624 | 3,175,437 | 3,164,924 | 2,993,178 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits | $1,813,864 | $1,667,358 | $1,842,143 | $2,607,086 |

* Totals may not add due to rounding.

** Preliminary, unaudited numbers.

CONFIDENTIAL

PR-CCD-0026196

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | 178,926 | $ 381,243 | $ 400,405 | $ 374,394 |
| Participating employees | 163,036 | 345,265 | 362,040 | 338,791 |
| Other Special Laws | 149,928 | 171,842 | 175,254 | 69,097 |
| Early Retirement | 4,054 | 3,399 | 47,146 | |
| Special Laws 127 | 17,000 | 188,843 | 17,000 | 17,000 |
| Total Contributions | 512,944 | 918,750 | 1,001,845 | 799,282 |
| | | | | |
| Investment (loss) Income: | | | | |
| Realized Gain or Loss | 10,657 | 148,173 | (152,583) | 74,304 |
| Unrealized Gain or Loss | 350,691 | 67,838 | (405,969) | 289,881 |
| Dividend Income | 4,586 | 10,663 | 15,774 | 14,494 |
| Interest Income | 85,544 | 179,586 | 198,734 | 68,231 |
| Total | 451,478 | 406,259 | (344,044) | 446,910 |
| | | | | |
| Less Investment Expense | (287) | (7,649) | (7,589) | (12,940) |
| Insurance Premium | | | | 2,441 |
| Other Income | 7,733 | 31,783 | 35,878 | 17,431 |
| Net Investment Income | 458,924 | | 430,393 | (315,755) |
| | | | | |
| Total Additions | 971,868 | 1,349,143 | 686,090 | 1,253,124 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 513,048 | 1,047,695 | 970,843 | 793,883 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 | 17,000 |
| Benefits under Special Laws | 149,928 | 171,842 | 175,254 | |
| Death Benefits | 5,032 | 12,968 | 11,532 | 13,872 |
| Refunds of Contributions: | | | | |
| Employers | 469 | 1,469 | 2,013 | 5,296 |
| Participating Employees | 46,386 | 43,677 | 32,517 | 28,009 |
| Personal Loans Adjustment | | -- | -- | |
| Insurance Claims on Loans | | | | |
| Other Expenses | 7,028 | 7,888 | 22,415 | 13,569 |
| Administrative Expenses | 14,719 | 33,063 | 32,590 | 29,207 |
| Interest on Bonds | 69,385 | 188,055 | 186,869 | |
| | | | | |
| Total Deductions | 882,995 | 1,523,928 | 1,451,033 | 902,954 |
| | | | | |
| Net (decrease) Increase | 148,873 | (174,785) | (764,943) | 350,170 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 1,664,991 | 1,842,143 | 2,607,086 | 2,541,331 |
| End of Year | $1,813,864 | $1,667,358 | $1,842,143 | $2,891,501 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-90

CONFIDENTIAL

PR-CCD-0026197

The Commonwealth of Puerto Rico
Teachers Retirement System
Statements of Plan Net Assets*
As of June 30, 2008, 2009, and 2010 and December 31, 2010**
(in thousands)

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $ 91,593 | $ 72,692 | $ 65,885 | $ 324,846 |
| Cash with fiscal agent | - | - | 450 | 297 |
| Cash restricted | - | - | - | - |
| Cash deposited with Government | | | | |
| Development Bank for Puerto Rico | 3,289 | 3,288 | 3,276 | 3,255 |
| Total Cash | 94,882 | 75,980 | 69,611 | 328,398 |
| Investments, at fair value: | | | | |
| Bonds and notes | 365,881 | 397,109 | 425,911 | 490,007 |
| Stocks | 1,621,792 | 1,295,232 | 1,259,169 | 1,796,817 |
| Total investment at fair value | 1,987,673 | 1,692,341 | 1,685,080 | 2,286,824 |
| Other investments: | | | | |
| Mortgage notes acquired from third parties | | | | |
| Private equity investments | 26,683 | 26,683 | 26,139 | 37,630 |
| Total investments | 2,014,356 | 1,719,024 | 1,711,219 | 2,324,454 |
| Loan to plan members | | | | |
| Mortgage | 123,899 | 119,937 | 109,508 | 103,759 |
| Personal | 279,547 | 288,463 | 288,410 | 271,510 |
| Cultural trips | 1,470 | 1,481 | 1,462 | 1,355 |
| Total loans to plan members | 404,916 | 409,881 | 399,380 | 376,624 |
| Total investments and loans | 2,419,272 | 2,128,905 | 2,180,210 | 3,029,476 |
| Accounts receivable: | | | | |
| Receivable for investments sold | 626 | 332 | 23,231 | 4,693 |
| Accrued interest and dividends receivable | 4,065 | 4,584 | 5,445 | 6,395 |
| Other | 45,315 | 56,085 | 2,930 | 15,141 |
| Total accounts receivable | 50,006 | 61,001 | 31,606 | 26,229 |
| Property and equipment, net | 22,774 | 22,970 | 26,167 | 26,223 |
| Other assets | 759 | 832 | 876 | 451 |
| Total Assets | 2,587,693 | 2,289,688 | 2,238,859 | 3,082,379 |
| **LIABILITIES** | | | | |
| Investments purchased | 581 | 2,722 | 18,981 | 7,952 |
| Payable for securities lending | 65,795 | 48,673 | 46,751 | 274,372 |
| Cash overdraft in cash with fiscal agent | 55,904 | 2,199 | - | - |
| Accounts payable | 1,152 | 1,476 | 4,188 | 3,688 |
| Obligation under capital lease | - | - | - | 12 |
| Accrued expenses | 6,187 | 6,184 | 5,925 | 5,361 |
| Line of credit | - | - | - | - |
| Escrow fund of mortgage loans and guarantee | | | | |
| insurance reserve for loans to plan members | 5,873 | 5,763 | 4,580 | 4,641 |
| Bonds payable | - | - | - | - |
| Other liabilities | 726 | 694 | 841 | 1,007 |
| Total liabilities | 136,218 | 67,711 | 81,266 | 297,033 |
| **Net Assets Held in Trust for Pension Benefits** | $2,451,477 | $2,221,977 | $2,157,593 | $2,785,346 |

---

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

CONFIDENTIAL

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

|  | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** |  |  |  |  |
| Contributions: |  |  |  |  |
| Participating Employees | $60,656 | $129,888 | $136,305 | $127,566 |
| Employer | 55,013 | 118,127 | 125,165 | 117,065 |
| Contributions transferred from other systems** |  | 1,265 | 1,479 | 4,181 |
| Special | 51,026 | 46,572 | 75,548 | 68,085 |
| Total contributions | 166,695 | 295,852 | 338,497 | 316,897 |
| Investment Income: |  |  |  |  |
| Interest income | 28,936 | 61,303 | 66,927 | 67,825 |
| Dividend Income | 2,468 | 10,111 | 13,194 | 15,629 |
| Net appreciation (depreciation) in fair value of investments | 355,237 | 203,265 | (518,862) | (276,573) |
|  | 386,641 | 274,679 | (438,741) | (193,119) |
| Less investment expense | 2,233 | 4,735 | 4,660 | 6,847 |
| Net investment income | 384,408 | 269,944 | (443,401) | (199,966) |
| Other income | 969 | 53,771 | 2,444 | 1,735 |
| **Total additions** | $ 552,072 | $ 619,567 | ($ 131,794)) | $ 118,666 |
| **DEDUCTIONS:** |  |  |  |  |
| Benefit paid to participants: |  |  |  |  |
| Annuities and death benefits | 264,251 | 470,683 | 442,542 | 414,334 |
| Special benefits | 41,716 | 47,870 | 51,951 | 49,742 |
| Refunds of contributions | 4,792 | 7,847 | 5,313 | 6,427 |
| Administrative expenses | 11,813 | 28,783 | 25,485 | 25,537 |
| **Total deductions** | 322,572 | 555,183 | 525,291 | 496,040 |
| Net increase in net assets held in trust for pension benefits | 229,500 | 64,384 | (627,753) | (377,374) |
| **Net assets held in trust for pension benefits** |  |  |  |  |
| Beginning of year | 2,221,977 | 2,157,593 | 2,785,346 | 3,162,720 |
| End of year | $2,451,477 | $2,221,977 | $2,157,593 | $2,785,346 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

I-92

CONFIDENTIAL

### The Commonwealth of Puerto Rico
### Judiciary Retirement System
### Statements of Plan Net Assets*
### As of June 30, 2008, 2009, and 2010 and December 31, 2010**
### (in thousands)

| ASSETS | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| Cash and Investments: | | | | |
| Cash and Cash Equivalents | 3,547 | $ 4,008 | $ 3,985 | $ 2,519 |
| Cash Deposited with GDB or Treasury Department: | 6,076 | 28 | 2,353 | 267 |
| Collateral from Securities Lending | | 1 | 1,482 | |
| Total Cash | 9,623 | 4,037 | 7,820 | 2,786 |
| | | | | |
| Receivables: | | | | |
| Accrued Interest | 277 | 271 | 215 | 237 |
| Investment Sales | 21 | 41 | 117 | 196 |
| Other | 27 | 27 | 28 | 25 |
| Total receivables | 325 | 339 | 360 | 458 |
| | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 26,428 | 25,973 | 22,805 | 22,169 |
| Stocks | 35,383 | 50,275 | 44,634 | 61,377 |
| Total Investments | 61,811 | 76,248 | 67,439 | 83,546 |
| | | | | |
| Loans and Interest Receivable from Members: | | | | |
| Mortgage | 10 | 20 | 8 | 8 |
| Personal | 760 | 702 | 462 | 394 |
| Cultural Trips | 58 | 47 | 60 | 45 |
| Total Loans to Plan Members | 828 | 769 | 530 | 448 |
| | | | | |
| Total cash, investments and loans to plan members | 72,587 | 81,393 | 76,149 | 87,239 |
| | | | | |
| LIABILITIES | | | | |
| Due to Treasury Department | 6,283 | 5,842 | 4,513 | -- |
| Due to the Employee's Retirement System of the Government of Puerto Rico | 224 | 19,138 | 17,942 | 16,714 |
| Collateral from Securities ending | | | 1,482 | |
| Escrow Funds to plan Members and Guarantee Insurance | 63 | 63 | 59 | 56 |
| Investment Purchases | | 868 | 867 | 345 |
| Other Liabilities | 2,020 | 72 | 720 | 812 |
| Total Liabilities | 8,590 | 25,983 | 25,583 | 17,927 |
| | | | | |
| Net Assets Held in trust for Pension Benefits | $63,997 | $ 55,410 | $ 50,566 | $ 69,311 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

I-93

CONFIDENTIAL

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
(in thousands)

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $4,949 | $10,021 | $9,970 | $6,705 |
| Participating employees | 1,334 | 3,104 | 3,138 | 3,076 |
| Special Laws | 629 | 629 | 691 | |
| Total Contributions | 6,912 | 13,754 | 13,799 | 9,781 |
| | | | | |
| Investment Income: | | | | |
| Realized Gain or Loss | 4,483 | 5,644 | (3,158) | 1,031 |
| Unrealized Gain | 5,988 | 1,741 | (13,582) | (8,988) |
| Dividend Income | 132 | 211 | 218 | 267 |
| Interest Income | 656 | 1,284 | 1,313 | 1,553 |
| Total | 11,259 | 8,880 | (15,209) | (6,137) |
| Less Investment Expense | | 164 | (170) | (197) |
| Other Income | 10 | 804 | 50 | -- |
| Net Investment Income | 11,269 | 9,520 | (15,329) | (6,333) |
| | | | | |
| Total Additions | 18,181 | 23,274 | (1,530) | 3,448 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 8,728 | 17,268 | 15,538 | 14,419 |
| Benefits Under Special Laws | 629 | 629 | 691 | |
| Refunds to Participating Employees | | -- | -- | 169 |
| Administrative Expenses | 237 | 533 | 986 | 1,022 |
| Total Deductions | 9,594 | 18,430 | 17,215 | 15,610 |
| | | | | |
| Net Increase | 8,587 | 4,844 | (18,745) | (12,162) |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 55,410 | 50,566 | 69,311 | 81,473 |
| | | | | |
| End of Year | $63,997 | $55,410 | $50,566 | $69,311 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

I-94

CONFIDENTIAL

PR-CCD-0026201

## POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

In addition to the pension benefits, the Commonwealth provides non-pension post-employment benefits that consist of a medical insurance plan contribution for retired employees meeting the service credit eligibility requirements. These benefits are administered by the Retirement Systems. The medical insurance plan contribution is a payment of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

The Commonwealth funds these post-employment benefits on a "pay-as-you-go" basis from the General Fund, which means that the Commonwealth does not pre-fund, or otherwise establish a reserve or other pool of assets against the medical insurance plan contribution expenses that the Commonwealth may incur in future years. For fiscal year 2010, the Commonwealth paid $114.2 million for these benefits for the eligible retirees of the Retirement Systems (including retirees of public corporations and municipalities, which are also paid for by the Commonwealth). For fiscal year 2011, these benefits are expected to amount to $122.2 million.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The most recent actuarial valuation reports of these benefits are dated as of June 30, 2010. Many of the actuarial assumptions used to project the actuarial accrued liability for these benefits are the same as those used to determine the accrued actuarial liabilities of the Retirement Systems. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | - | $1,557 | $1,557 | 0% | $4,246 | 36.7% |
| 2009 | - | 1,633 | 1,633 | 0 | 4,293 | 38.0 |
| 2010 | - | 1,646 | 1,646 | 0 | 3,818 | 43.1 |
| **Teachers Retirement System** | | | | | | |
| 2007 | - | $652 | $652 | 0% | $1,370 | 47.6% |
| 2009 | - | 750 | 750 | 0 | 1,418 | 52.9 |
| 2010 | - | 694 | 694 | 0 | 1,370 | 50.7 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | - | $5 | $5 | 0% | $31 | 15.0% |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010 | - | 6 | 6 | 0 | 32 | 18.1 |

---

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

CONFIDENTIAL

PR-CCD-0026202

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits other than pensions administered by each of the Retirement Systems' for the last three fiscal years and the current fiscal year.

### Schedule of Employer Contributions to Retirement Systems on Account of Post-Employment Benefits Other Than Pensions (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $111 | $80 | $31 | 72.1% |
| 2009 | 112 | 87 | 25 | 77.7 |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 128 | 90 | 38 | 70.3 |
| **Teachers Retirement System** | | | | |
| 2008 | $37 | $26 | $11 | 70.6% |
| 2009 | 38 | 28 | 10 | 73.1 |
| 2010 | 42 | 28 | 14 | 66.7 |
| 2011 | 40 | 32 | 8 | 80.7 |
| **Judiciary Retirement System** | | | | |
| 2008 | $0.4 | $0.2 | $0.2 | 55.4% |
| 2009 | 0.4 | 0.3 | 0.1 | 62.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 61.5 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.4 |
| **Total** | | | | |
| 2008 | $148.4 | $106.2 | $42.2 | 71.6% |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 168.5 | 122.3 | 46.2 | 72.6 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2010.
[2] The actual employer contributions for fiscal year 2011 are based on the expected pay-as-you-go amounts for the post-employment benefits other than pensions, as set forth in the actuarial valuations as of June 30, 2010.
[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

## COMMONWEALTH AUDITED FINANCIAL STATEMENTS

### General

For fiscal year 2010, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated April 27, 2011 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Pension Trust Funds whose fair values have been estimated in the absence of readily determinable fair values and the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2010). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic

CONFIDENTIAL PR-CCD-0026203

financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth ("CAFR") for fiscal year 2010, which includes the basic financial statements of the Commonwealth for fiscal year 2010, was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through its Electronic Municipal Markets Access System ("EMMA") on April 29, 2011.

**Prior Non-Compliance with Continuing Disclosure Obligations**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for such Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Report, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been

CONFIDENTIAL

timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of the Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

**Summary and Management's Discussion of General Fund Results**

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2006, 2007, 2008, 2009 and the estimated revenues and expenditures for fiscal year 2010. Once the audited financial statements have been completed, the Commonwealth will provide the General Fund revenue and expenditure data for fiscal year 2010. The numbers for fiscal year 2010 have not been audited and are subject to audit related adjustments.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in

I-98

CONFIDENTIAL

excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal years 2010 and 2011 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

CONFIDENTIAL

PR-CCD-0026206

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | 3,087,748 | 3,071,655 | 2,759,305 | 2,648,261 | 2,593,598 |
| Corporations | 1,872,458 | 2,002,718 | 1,565,534 | 1,375,596 | 1,682,321 |
| Partnerships | 2,787 | 2,960 | 1,942 | 1,839 | 1,688 |
| Withheld from non-residents | 921,260 | 933,728 | 1,087,782 | 1,081,739 | 830,352 |
| Tollgate taxes | 27,396 | 25,083 | 21,610 | 19,372 | 15,034 |
| Interest | 11,536 | 12,112 | 13,657 | 11,738 | 9,902 |
| Dividends | 66,721 | 138,859 | 59,770 | 48,663 | 29,774 |
| Total income taxes | 5,989,906 | 6,187,115 | 5,509,600 | 5,187,208 | 5,162,669 |
| | | | | | |
| Sales and use tax | | 582,560 | 911,000 | 797,194 | 540,348 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 292,180 | 279,028 | 268,094 | 277,401 | 284,796 |
| Cigarettes | 135,267 | 132,399 | 119,124 | 129,429 | 182,501 |
| Motor vehicles | 533,957 | 396,667 | 366,341 | 310,920 | 350,764 |
| Other excise taxes | 682,477 | 314,340 | 110,014 | 86,874 | 77,978 |
| Total Commonwealth excise taxes | 1,643,881 | 1,122,434 | 863,573 | 804,624 | 896,039 |
| | | | | | |
| Property taxes | 1,106 | 800 | 219 | 1,011 | 227,812 |
| Inheritance and gift taxes | 9,466 | 4,663 | 6,600 | 5,064 | 3,617 |
| Licenses | 91,310 | 97,610 | 87,690 | 96,423 | 95,768 |
| **Other:** | | | | | |
| Lottery | 62,729 | 73,014 | 46,636 | 51,480 | 42,826 |
| Electronic lottery | 55,212 | 71,815 | 105,298 | 75,213 | 80,006 |
| Miscellaneous non-tax revenues | 431,803[6] | 330,064 | 466,741 | 284,436 | 314,754 |
| Total Other | 549,744 | 474,893 | 618,675 | 411,129 | 770,843 |
| Total revenues from internal sources | 8,285,413 | 8,470,075 | 7,997,357 | 7,302,653 | 7,363,839 |
| | | | | | |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[1] | 346,272 | 377,872 | 356,827 | 404,265 | 352,301 |
| Customs | 9,553 | 14,504 | 4,846 | 3,269 | |
| Total revenues from non-Commonwealth sources | 355,825 | 392,376 | 361,673 | 407,534 | 352,301 |
| Total revenues | 8,641,238 | 8,862,451 | 8,359,030 | 7,710,187 | 7,716,140 |
| Other Income (refunds)[2] | 76,085 | (8,335) | (10,797) | 148,966 | (57,241)[8] |
| (Transfer) Refunding to Redemption Fund[3] | (484,812) | (512,197) | (202,954) | | (447,312) |
| Proceeds of notes and other borrowings[4] | 4,115,897[7] | 1,872,096 | 2,710,000 | 3,982,893 | 2,375,000 |
| Repayment of notes and other borrowings[5] | (3,005,838) | (1,926,273) | (2,580,764) | (3,858,393) | (2,698,818) |
| Receipt of COFINA Bond Proceeds | | | | 3,051,008 | 2,501,053[9] |
| Adjusted revenues | 9,342,570 | 8,287,742 | 8,274,515 | 10,427,356 | 9,388,822 |
| | | | | | |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,944,349 | 3,387,199 | 3,471,922 | 3,117,817 | 3,581,751 |
| Personal services | 4,796,382 | 4,590,962 | 4,563,192 | 5,273,590 | 4,355,111 |
| Other services | 525,377 | 594,345 | 685,112 | 859,323 | 822,019 |
| Materials and supplies | 50,227 | 79,186 | 99,486 | 109,386 | 85,906 |
| Equipment purchases | 19,378 | 27,965 | 49,498 | 51,204 | 44,381 |
| Capital outlays and other debt service | 49,789 | 21,576 | 11,222 | 211,499 | 110,850 |
| Prior year disbursements | | 92,770 | | | |
| Total expenditures | 9,385,503 | 8,794,003 | 8,880,432 | 9,622,818 | 9,000,018 |
| Adjusted revenues less expenditures | (42,933) | (506,261) | (605,917) | 804,538 | 388,804 |
| Ending cash balance | 0 | (506,261) | (1,112,178) | (307,640) | 81,164 |

(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.
(2) Consists of net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(3) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.
(7) Includes $50 million from the Emergency Fund used for operating expenses.
(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.
(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund

*Source:* Treasury Department

I-100

*General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009.*

General Fund total revenues for fiscal year 2010 were $7.716 billion, representing an increase of $133 million from fiscal year 2009 revenues and an increase of $47 million from budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $256.8 million due to the increased allocation of this tax to COFINA, as discussed in "Major Sources of General Fund Revenues – Sales and Use Taxes" below. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $226.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act 7. See "Major Sources of General Fund Revenues – Income Taxes" below. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total General Fund expenses (on a cash basis) for fiscal year 2010 amounted to $9.447 billion, which were composed of $9.0 billion of operational expenses and $447.3 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2010 of $1.3 billion was covered principally by proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2009 Compared to Fiscal Year 2008*

General Fund total revenues for fiscal year 2009 were $7.710 billion, representing a decrease of $648.8 million, or 7.8%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $111 million and in corporate income taxes of $189.9 million, (ii) a decrease of $58.9 million in excise taxes, (iii) a decrease of $182.3 million in miscellaneous non-tax revenues, and (iv) a decrease of $113.8 million in the sales and use tax revenues due primarily to a one-time change in the manner sales and use tax collections are reported by the Treasury Department. Please refer to "Major Sources of General Fund Revenues – Sales and Use Taxes" below further information regarding this reporting change. The decreases in revenues in these categories for fiscal year 2009 as compared to fiscal year 2008 reflect the acceleration of the economic recession during that fiscal year.

Total General Fund expenses (on a cash basis) for fiscal year 2009 amounted to $10.230 billion, which were composed of $9.623 billion of operational expenses and $607 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2009 of $2.5 billion was covered principally by proceeds from COFINA bond issues.

*Fiscal Year 2008 Compared to Fiscal Year 2007*

Total General Fund revenues for fiscal year 2008 were $8.359 billion, representing a decrease of $234.4 million, or 2.7%, from actual revenues for fiscal year 2007 (excluding the collection of $269 million from special temporary tax measures in fiscal year 2007). The major changes from fiscal year 2007 were: (i) decreases in income taxes from individuals of $312.4 million and in corporate income taxes of $437.2 million, (ii) a decrease of $258.9 million in excise taxes, and (iii) an increase of $328.4 million in the sales and use tax revenues, which had

CONFIDENTIAL

only been in effect for seven and a half months during fiscal year 2007. The decrease in 2008 revenues was principally due to the ongoing economic recession and high oil prices, which directly affected income and excise tax collections.

Total General Fund expenses (on a cash basis) for fiscal year 2008 amounted to $9.083 billion, which were composed of $8.880 billion of operational expenses and $203 million transferred to the redemption fund. The difference between adjusted revenues and expenses for fiscal year 2008 of $605.9 million was covered principally by cash-management procedures such as delaying payments to certain vendors and a GDB loan of $190 million.

*Fiscal Year 2007 Compared to Fiscal Year 2006*

General Fund total revenues for the fiscal year 2007 were $8.862 billion, an increase of $221 million, or 2.6%, from fiscal year 2006. This amount includes (i) $5.074 billion in individual and corporate income taxes, (ii) $934 million in non-resident withholding taxes, (iii) $1.122 billion in excise taxes, (iv) $583 million of sales and use tax revenues, and (v) $269 million from special temporary tax measures. A decrease of $521 million in excise taxes was offset by revenues from the sales and use tax, as the repeal of the general excise tax on imported goods and goods manufactured in Puerto Rico was replaced with the sales and use tax commencing on November 15, 2006.

Total General Fund expenses (on a cash basis) for fiscal year 2007 were $9.306 billion. This amount does not include $522 million of debt service payments on a portion of the Commonwealth's outstanding appropriation debt, which debt service was excluded from the budget based on the provisions of Act 91, which created the Dedicated Sales Tax Fund to service in part the repayment of such appropriation debt.

The difference between revenues and expenses for fiscal year 2007 of $444 million was covered by a $240 million transfer of funds from GDB that was originally set aside from General Fund appropriations to cover a portion of debt service payments on the Commonwealth's appropriation debt, which set-aside was no longer needed on account of the passage of Act 91. The remaining shortfall was covered principally by cash-management procedures such as delaying payments to certain vendors (carrying over into fiscal year 2008).

**Major Sources of General Fund Revenues**

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Internal Revenue Code for a New Puerto Rico, Act No. 1 of January 31, 2011, which will apply for taxable years commencing after December 31, 2010 ("Act No. 1"). See "Tax Reform" below. Many of the provisions of Act No. 1 are identical to the equivalent provisions of the PR Code. Thus unless otherwise noted, the discussion below refers to the provisions of both the PR Code and Act No. 1.

CONFIDENTIAL

PR-CCD-0026209

The PR Code imposed a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax was imposed on certain payments made to non-residents of Puerto Rico, which was collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000. Under Act No. 1, the highest income tax bracket gradually increases every year for the next six years from $60,000 to $121,500. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under Act No. 1. After January 1, 2016, the top individual rate is lowered to 30%. See "Tax Reform" below for certain requirements that must be satisfied in order for tax benefits under Act No. 1 to enter into effect for taxable years starting after December 31, 2013. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at an income tax rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at an income tax rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for an income tax rate of 10%.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the PR Code provided for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, were taxed at a maximum regular income tax rate of 15%. Under Act No. 1, for taxable years commencing after December 31, 2010, the highest corporate income tax rate is lowered to 30% for net taxable income in excess of $1,750,000 (it will be reduced to 25% for taxable years starting after December 31, 2013 subject to the satisfaction of certain conditions) and the alternative minimum tax is also reduced from a rate of 22% to the greater of (i) the amount produced by applying a minimum rate of 20% to the alternative minimum net income or, (ii) subject to certain exceptions, the amount produced by applying a 1% excise tax on the purchase from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $50 million or more during any of three preceding taxable years. Dividends received by Puerto Rico corporations and partnerships from foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general

I-103

income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations and partnerships covered by the Tourism Development Act are subject to a maximum tax rate of 39% on their taxable income after applying the 90% exemption granted under the Tourism Development Act, which results in a maximum effective tax rate of 3.9% on their net tourism development income. Under Act No. 1, the net income of corporations and partnerships covered under the Tourism Development Act is subject generally to a maximum effective tax rate of 3%.

The PR Code generally imposes a branch profits tax on resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding.

*Act No. 7 – Special Tax Measures Implemented as part of the New Administration's Fiscal Stabilization Plan.* Act 7 was enacted as part of the new administration's Fiscal Plan, and sought, among other things, to increase the tax revenues of the Puerto Rico government by imposing certain permanent and temporary tax increases.

With respect to income taxes, Act 7 included the following temporary measures that are applicable for taxable years commenced after December 31, 2008 and before January 1, 2012:

(i)     taxable corporations and individuals whose adjusted gross income equal or exceeds $100,000 (for single individuals) or $150,000 (in the case of married persons filing jointly) are subject to a surtax of 5% on their total tax liability (for

I-104

taxable years commencing after December 31, 2010, Act No. 1 eliminates this surtax);

(ii)   international banking entities that do not operate as bank units will be subject to a 5% income tax on their entire net income computed in accordance with the PR Code (international banking entities operating as bank units are subject to this 5% tax on their net income that does not constitute excess net income);

(iii)   credit unions, their subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7), however, if the Government of Puerto Rico collects $690 million prior to January 1, 2012, the 5% tax will not be applicable for the remaining period;

(iv)   the Cooperative Bank, its subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7);

(v)   insurance cooperatives are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7); and

(vi)   international insurers and holding companies of international insurers are subject to a 5% tax on their net income (these entities were totally exempt before the enactment of Act 7).

Act 7 also provided as a permanent measure a change in the method of computing the net income subject to alternative minimum tax ("AMT") in the case of individuals by including in the computation various categories of exempt income and income subject to preferential tax rates under the PR Code, such as: (a) long-term capital gains, which enjoy a preferential tax rate of 10% under the PR Code; (b) dividends that are taxable at the rate of 10% under the PR Code; (c) interest on bank deposits and individual retirement accounts subject to the special 10% and 17% preferential income tax rates, respectively; and (d) interest from notes or bonds eligible for the special 10% tax rate provided by the PR Code.

Another change introduced by Act 7, for taxable years commenced after December 31, 2008 and before January 1, 2012 was an adjustment to the calculation of the net income subject to the AMT in the case of entities taxed as corporations that denies a deduction for expenses paid or accrued for services rendered outside of Puerto Rico by a related party. Lastly, different income tax credits awarded to investors under certain special laws for activities such as revitalization of urban centers (only in part), venture capital, solid waste, housing infrastructure, and rehabilitation of social-interest housing (only projects without qualification certifications as of March 9, 2009), among others, may not be claimed or granted for taxable years commenced after December 31, 2008 and before January 1, 2012. Tax credits associated to manufacturing, tourism, and cinematographic projects, however, were not affected by Act 7.

I-105

CONFIDENTIAL

PR-CCD-0026212

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform consists of two phases focused on providing tax relief to individual and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform is projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The first phase, enacted as Act No. 171 of November 15, 2010, applies to the 2010 tax return and provides a tax credit to each individual and corporate taxpayer. The tax credit applicable to individuals and determined by reference to the tax liability ranges from 7% for those taxpayers in higher brackets to 15% for taxpayers in the lowest bracket. Corporate taxpayers will also be entitled to a 7% tax credit determined by reference to the tax liability; provided, that such taxpayer paid the statutorily required Christmas bonus for 2010. Also, the corporate net operating loss carryforward is extended from 7 years to 10 years. This first phase is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010.

The second phase, enacted as Act No. 1, (i) promotes employment by doubling the earning income credit and increasing the maximum applicable income to qualify for such credit; (ii) provides a $400 tax credit to individuals over 65 years of age with an income below $15,000; (iii) significantly reduces individual income tax rates and only allow the following five deductions (a) mortgage interest up to 30% of adjusted gross income, (b) charitable contributions up to 50% of adjusted gross income, (c) medical expenses in excess of 6% of adjusted gross income, (d) interest on student loans, and (e) contributions to retirement plans and accounts, including individual retirement accounts, health savings accounts and education savings accounts; and (iv) significantly reduces corporate income tax rates.

The reduction in income tax revenues resulting from the implementation of the tax reform is expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures is expected to be revenue positive. Act No. 1 conditions the implementation of the tax reductions applicable to individuals and corporations after fiscal year 2014 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals and corporations for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. There is no

I-106

CONFIDENTIAL

PR-CCD-0026213

assurance that sufficient revenues will be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform.

*Act 154 – Expanded Income Taxation and New Excise Tax.* Act 154, approved on October 25, 2010, as amended, seeks, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Government. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships (each a taxpayer) by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and the act imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010.

The Act provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, will instead be subject to the excise tax in lieu of any income tax. The excise tax will apply for a period of six years. The excise tax is based on the value of the personal property or services acquired and will be 4% for calendar year 2011, declining to 3.75% in 2012, 2.75% in 2013, 2.5% in 2014, 2.25% in 2015 and 1% in 2016. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

While the Government expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their U.S. federal income tax liabilities, it is uncertain how this new tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

Preliminary collections for the first two monthly excise tax payments, which were due on February 15, 2011 and March 15, 2011, were $108.9 million and $125.1 million, respectively. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on

CONFIDENTIAL

PR-CCD-0026214

January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the IRS issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as content in a manufactured good, whether or not bound for export.

I-108

CONFIDENTIAL

PR-CCD-0026215

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department has reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated total annual gross revenues for the General Fund of approximately $539 million for fiscal year 2010.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7 require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid on merchandise acquired for resale that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

I-109

CONFIDENTIAL

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages, the increase ranges between $0.30 and $0.70 per standard gallon. Motor vehicles, motorcycles, all terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10%.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $150,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

One of the amendments incorporated in Act 7 was that, for fiscal years 2010 through 2013, the appraisal values of real property in Puerto Rico were increased tenfold and the real personal property tax rates applicable to such values were reduced tenfold so as to offset any increased tax that would have otherwise been applicable due to the increase in appraisal values. This temporary amendment, which is expected to be revenue neutral, was intended to increase the borrowing capacity of Puerto Rico's municipalities. Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax will apply during fiscal years 2010, 2011 and 2012, or until $690 million is collected. The additional real property tax, to be collected by the Treasury Department, will be equal to 0.591% of such properties' appraised value as determined by CRIM. Act No. 1 eliminated this additional real property tax for fiscal year 2012.

I-110

CONFIDENTIAL

PR-CCD-0026217

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2005 to 2010.

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2005 | 25,277,795 | 899,893 | 738,074 | 50,751 | 788,825 |
| 2006 | 25,606,121 | 925,618 | 801,497 | 70,908 | 872,405 |
| 2007 | 26,898,519 | 982,400 | 813,700 | 79,720 | 893,420 |
| 2008 | 27,941,285 | 1,031,277 | 788,364 | 119,062 | 907,426 |
| 2009 | 28,903,996 | 1,032,570 | 634,040 | 244,411 | 878,451 |
| 2010 | 175,025,782 | 1,093,769 | 666,429 | 269,857 | 936,286 |

[1] Valuation set as of July 1 of each fiscal year.
[2] During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM. In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source:* Municipal Revenues Collection Center.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

*Revenues from Non-Commonwealth Sources*

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar

I-111

CONFIDENTIAL

PR-CCD-0026218

year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products or new rum distilleries are established in Puerto Rico.

In an effort to maintain the local rum industry and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act 178 and contains identical provisions.

The Government of Puerto Rico is in discussions with certain rum producers to provide them a series of subsidies and incentives, as permitted under Act No. 1, in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this would allow such companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

**Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes**

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to foster tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosures agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, the creation of technological solutions to improve collections, and the establishment of cooperation agreements with federal and local governmental agencies. The Treasury Department is also integrating its databases and establishing a tax intelligence project to identify tax evasion and improve its audit selection process.

Specifically, the Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Commonwealth sales tax through the implementation of various enforcement and compliance programs. Among these initiatives is a voluntary disclosure program, which began on July 1, 2009 and has since then allowed for the review of more than 130 cases and collection of approximately $32.1 million, by providing certain taxpayers the opportunity to pay taxes and interest owed on past income taxes and sales

I-112

CONFIDENTIAL

PR-CCD-0026219

transactions and to avoid the payment of surcharges and penalties. During May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, in March 2011, the Treasury Department sent 1,000 additional letters as a second notice to taxpayers that did not respond to the first letter of May 2010.

Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department is also in process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby officers from the Treasury Department use hand held scanning devices to cross-check merchant licenses with sales tax receipts. The Treasury Department has also created a specialized unit to implement a tax intelligence program that aims to detect tax evasion through the application of economic models and algorithms to the taxpayer information in the Treasury Department's database.

On September 28, 2010, the Treasury Department signed an agreement with Evertec, Inc. and Softek for the implementation of a new point of sale system to strengthen its sales tax enforcement efforts (the "IVU Loto"). The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets. The Treasury Department will implement this new point of sale system in two phases. The first phase was a pilot program with 200 businesses. The same concluded in December 31, 2010 and was approved by the Treasury Department. The second phase started in January 2011 with the business certification program followed by the full scale implementation. The implementation of this new system is expected to increase sales tax collections by $200 million during the first year.

The IVU Loto pilot program started on December 1, 2010. Two hundred merchants in the municipality of Ponce were selected to participate in the program. As of March 31, 2011, the IVU Loto devices captured 2,007,982 transactions which resulted in sales of $48,186,649 and state and municipal sales and use tax withholdings of $1,632,449 and $323,050, respectively. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants acquire and use an IVU Loto device on or prior to April 30, 2011.

In addition, the Treasury Department established "IVU Alerta" in order to enhance compliance of sales and use tax. The "IVU Alerta" is a hotline that receives complaints through internet and telephone made by customers and merchants related to violations of the Sales Tax. This initiative started in November 29, 2010 and has since then received 553 complaints, which 294 have been investigated resulting in $1,177,500 fines imposed. Another initiative has focused on strengthening the Treasury Department's enforcement workforce. It has equipped a call center staffed by 125 tax collection agents, which began operations on February 24, 2010 and has produced approximately $31.9 million in collections. The Treasury Department has also increased staffing levels in its Enforcement and Compliance Bureaus by approximately 366 employees, therefore allowing an increase in unannounced field audits of businesses and merchants. The Treasury Department currently makes approximately 2,000 visits per month.

CONFIDENTIAL

PR-CCD-0026220

Other initiatives include the establishment of tax liens pursuant to the procedures of Act No. 12 of January 20, 2010, which enables the creation of tax liens through an expedited process. Since the enactment of Act No. 12, the Treasury Department has established 11,292 liens in favor of the Commonwealth over approximately $494.5 million in assets. The Treasury Department is also enforcing a provision of Act 7 that allows the Treasury Department to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month. Also, the Treasury Department will begin to seize the assets of businesses that are delinquent on their sales tax payments. In addition, the Treasury Department has entered into agreements with various municipalities to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts as the ones described above.

With respect to property taxes, Act 71 of July 2, 2010 ("Act 71") established a 120 day amnesty program available from August 16, 2010 until December 13, 2010, in which taxpayers may pay outstanding property tax debts with a discount of 100% of any penalties, interest and surcharges (the "Program"). Pursuant to Act 71 and CRIM's Administrative Order No. 2010-05, the Program is available with respect to taxable year 2008-2009 and previous years in the case of real property taxes, and for taxable year 2008 and previous years with respect to personal property taxes. To benefit from the Program the taxpayer must: (i) have paid property taxes for fiscal year 2009-2010 and the first semester of 2010-2011 in the case of real property taxes, and tax year 2009 in the case of personal property taxes; and (ii) certify to the CRIM that it will pay real and personal property taxes related to fiscal year 2010-2011.

Act No. 172 of November 15, 2010, established that taxpayers which apply for a voluntary disclosure program on or before April 15, 2011 will be eligible for a 20% flat income tax rate on the gross amounts reported and will not be subject to interest, surcharges and penalty fees. This legislation extends the benefits of the program to municipal license tax declarations for which taxpayers will pay principal on the municipal tax determined, but will not be subject to interest, surcharges and penalty fees. Declarations by taxpayers must relate to tax years commenced after July 1, 2003 and ending on or before December 31, 2009, and payment of tax determined under the program must be paid no later than June 30, 2011. Recently, the Governor signed Act No. 64 of April 19, 2011, which extended the disclosure period until June 30, 2011.

The Treasury Department has also implemented a temporary measure to collect on payroll and employer withholding debts. This measure allows employers to enter into payment plans with the Treasury Department, subject to employer making a down payment of 25%, in the case of payroll debts, and 40%, in the case of employer withholding debts, of the total outstanding debt. The payment plans do not provide for the abatement of interest, surcharges and penalties and the same must be initiated on or before June 30, 2011.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

I-114

CONFIDENTIAL

PR-CCD-0026221

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

CONFIDENTIAL

PR-CCD-0026222

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law reviewed to be reimbursed to the General Fund.

*Federal Grants*

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government are estimated to be $4.784 billion for fiscal year 2012, a decrease of $111 million, or 2%, from fiscal year 2011. This decrease in federal grants is due to the termination of the ARRA program. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2008 through 2010 are actual figures. The figures for fiscal years 2011 and 2012 are the amounts included in the approved and proposed budget, respectively.

Puerto Rico expects to receive a total of approximately $6.873 billion in stimulus funds from ARRA, of which $1.720 billion and $1.387 billion were disbursed by the government during fiscal years 2009 and 2010, respectively. The amount of $301 million and $21.4 million are expected to be disbursed by the government during fiscal years 2011 and 2012. The table below only included the portion of these funds disbursed by agencies whose accounting systems are centralized in the Treasury Department.

### The Commonwealth of Puerto Rico
### Federal Grants*
### (in thousands)

| | 2008 | 2009 | 2010 | 2011[1] | 2012[2] |
|---|---|---|---|---|---|
| Education | $992,087 | $1,813,455 | $1,377,389 | $1,254,959 | $1,128,176 |
| Social Services | 2,054,897 | 2,453,605 | 2,484,920 | 2,440,457 | 2,437,661 |
| Health | 465,466 | 583,190 | 655,060 | 482,524 | 502,744 |
| Labor and Human Resources[3] | 140,186 | 277,127 | 138,425 | 109,391 | 109,391 |
| Crime | 20,319 | 64,155 | 29,459 | 29,900 | 24,819 |
| Housing[4] | 363,589 | 416,667 | 534,987 | 425,940 | 424,413 |
| Drug and Justice | 19,394 | 53,067 | 23,175 | 21,730 | 24,813 |
| Agriculture and Natural Resources | 11,054 | 114,920 | 26,886 | 14,466 | 14,661 |
| Contributions to Municipalities | 49,543 | 47,656 | 60,559 | 52,087 | 52,087 |
| Other | 15,782 | 67,017 | 72,875 | 63,574 | 65,506 |
| TOTAL | $4,132,317 | $5,890,859 | $5,403,735 | $4,895,028 | $4,784,271 |

\* Does not include grants received by agencies whose accounting systems are not centralized at the Treasury Department.
[1] Approved budget.
[2] Estimated.
[3] Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
[4] Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

CONFIDENTIAL

PR-CCD-0026223

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

**Office of Management and Budget**

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

CONFIDENTIAL                                                                 PR-CCD-0026224

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last two fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficits. As of April 26, 2011, the balance in the Budgetary Fund was $844,925.

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding

CONFIDENTIAL

for emergency and disaster needs. As of April 26, 2011, the balance in the Emergency Fund was $1.4 million and $0.5 million was available to be borrowed from GDB.

**Appropriations**

    Appropriations in the central government budget of Puerto Rico consist of the following:

    (i)   *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.* These are made by a single annual law known as the Joint Resolution of the General Budget.

    (ii)   *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

    (iii)   *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

    (iv)   *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

    In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

    For fiscal year 2011, approximately 25% of the General Fund is committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to the Public Buildings Authority, and debt service on the direct debt of the Commonwealth. This proportion is expected to remain at 25% for fiscal year 2012.

    For fiscal year 2009, over 64% of the controllable funds portion of the General Fund was committed to the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). In fiscal year 2011 and 2012, the Commonwealth decreased this proportion to an average of 56% due mainly to the savings in operational expenses from the implementation of the Fiscal Plan. The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2009 through 2012.

I-119

CONFIDENTIAL

PR-CCD-0026226

## Expenses Breakdown for the General and Stabilization Funds
### (in millions)

|  | 2009 | 2010 | 2011[1] | 2012[2] |
|---|---|---|---|---|
| **Non-Controllable Expenses** | | | | |
| Mandated Expenses (Formula) | | | | |
| Contributions to Municipalities | 368 | 335 | 355 | 380 |
| University of Puerto Rico | 835 | 729 | 691 | 704 |
| Judicial Branch | 348 | 348 | 348 | 328 |
| Rent Payments to Public Buildings Authority | 206 | 299 | 217 | 215 |
| General Obligation Debt Service | 288 | 289 | 201 | 179 |
| Other Debt Service | 105 | 373 | 517 | 492 |
| Total of Non-Controllable Expenses | 2,150 | 2,000 | 2,329 | 2,298 |
| Percent of Total General Fund Expenses | 23% | 20% | 25% | 25% |
| **Controllable Expenses** | | | | |
| Payroll and Related Costs[3] | 7,334 | 8,170 | 6,821 | 6,962 |
| Payroll as a Percentage of Controllable Expenses | 4,695 | 3,785 | 3,789 | 3,863 |
|  | 64% | 46% | 56% | 55% |
| **Total General Fund Expenses** | 9,484 | 10,170 | 9,150 | 9,260 |
| **Other Expenses** | | | | |
| Total Non-Budgeted Expenses | 1,406 [4] | 0 | 0 | 0 |
| **Total Expenses** | 10,890 | 10,170 | 9,150 | 9,260 |

[1]   Preliminary.
[2]   Estimated.
[3]   Excludes University of Puerto Rico and Judicial Branch.
[4]   Represents non-budgeted operating expenses that have been identified and that were paid for with proceeds of COFINA bond issues.

*Source:  Office of Management and Budget.*

CONFIDENTIAL

PR-CCD-0026227

## Budget for Fiscal Year 2011

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2011.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2011**
**(in thousands)\***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $238,000 | - | $115,743 | $353,743 |
| Personal income taxes | 2,348,000 | - | - | 2,348,000 |
| Retained non-resident income tax | 951,500 | - | - | 951,500 |
| Corporate income taxes | 1,566,000 | - | - | 1,566,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 9,000 | - | - | 9,000 |
| 17% withholding tax on interest | 8,000 | - | - | 8,000 |
| 10% withholding tax on dividends | 27,000 | - | - | 27,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 555,000 | - | - | 555,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 289,000 | - | - | 289,000 |
| Foreign (Act 154) | 609,000 | - | - | 609,000 |
| Motor vehicles and accessories | 369,000 | - | - | 369,000 |
| Cigarettes | 210,000 | - | - | 210,000 |
| Other (excise taxes) | 79,000 | - | 637,625 | 716,625 |
| Licenses | 77,000 | - | - | 77,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 43,000 | - | - | 43,000 |
| Electronic lottery | 79,000 | - | - | 79,000 |
| Registration and document certification fees | 152,000 | - | - | 152,000 |
| Other | 175,000 | - | 340,978 | 515,978 |
| Total revenues from internal sources | 7,792,500 | - | 1,094,346 | 8,886,846 |
| | | | | |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 337,000 | - | - | 337,000 |
| Federal grants[1] | 0 | - | 4,895,028 | 4,895,028 |
| Customs | 4,000 | - | - | 4,000 |
| Total revenues from non-Commonwealth sources | 341,000 | - | 4,895,028 | 5,236,028 |
| Total revenues | 8,133,500 | - | 5,989,374 | 14,122,874 |
| Other: | | | | |
| Balance from previous year | 0 | - | 1,805,803 | 1,805,803 |
| COFINA Stabilization Fund | 1,016,000 | - | 0 | 1,016,000 |
| Bonds authorized | - | - | - | 0 |
| Total other sources | 1,016,000 | - | 1,805,803 | 2,821,803 |
| Total resources | 9,149,500 | - | 7,795,177 | 16,944,671 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 883,215 | | 55,125 | 938,340 |
| Education | 2,945,862 | - | 1,847,992 | 4,793,854 |
| Health | 1,576,377 | - | 611,249 | 2,187,626 |
| Welfare | 466,677 | - | 2,781,594 | 3,248,271 |
| Economic development | 253,021 | - | 103,305 | 356,326 |
| Public safety and protection | 1,443,594 | - | 125,785 | 1,569,379 |
| Transportation and communication | 140,374 | - | 34,701 | 175,075 |
| Housing | 20,526 | - | 402,118 | 422,644 |
| Contributions to municipalities | 367,132 | - | 6,766 | 373,898 |
| Special pension contributions | 334,553 | - | 0 | 334,553 |
| Debt service | 200,813 | - | 115,743 | 316,556 |
| Other debt service (appropriations) | 517,156 | - | 659,435 | 1,176,591 |
| Total appropriations – current expenses | 9,149,300 | - | 6,743,813 | 15,893,113 |
| Capital improvements | 200 | - | 192,686 | 192,886 |
| Total appropriations | 9,149,500 | - | 6,936,499 | 16,085,999 |
| Year-end balance | 0 | - | 858,678 | 858,678 |
| Total appropriations and year-end balance | 9,149,500 | - | 7,795,177 | 16,944,677 |

\*   Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget.*

CONFIDENTIAL
PR-CCD-0026228

The budget for fiscal year 2011 provides for total resources of $16.9 billion and total General Fund revenues of $9.150 billion, compared to General Fund revenues of $10.191 billion for fiscal year 2010. The budgeted General Fund revenues of $9.150 billion include base revenues of $7.525 billion, $609 million from tax enforcement and compliance measures and $1.016 billion in additional revenues from COFINA Stabilization Fund.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2010 budget are accounted mainly by projected increases in new temporary excise tax under Act 154 (up $609.0 million), retained non-resident income taxes (up $121.2 million), excise taxes on motor vehicles and accessories (up $24.6 million), cigarettes taxes (up $27.5 million), sales and use taxes (up $16.1 million) and property taxes (up $10.5 million) and projected decreases in federal excise taxes on offshore shipments (down $15.3 million), corporate income tax (down $111.7 million) and personal income taxes (down $226.8 million).

The fiscal year 2011 budget provides for total expenditures of $9.150 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.016 billion that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2011 are $9.150 billion, or 10%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $1.740 billion, or 16%, lower than total expenditures of $10.890 billion for fiscal year 2009.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $16.1 billion, a decrease of $1,043.8 million from fiscal year 2010 budgeted appropriations. The principal changes in General Fund expenditures by program areas in fiscal year 2011 compared to the fiscal year 2010 budget are mainly due to increases in other debt service appropriations (up $144.0 million), economic development (up $59.9 million), and special pension contributions (up $20.9 million) and decreases in general government (down $834 million), welfare (down $5.2 million), public safety and protection (down $37.9 million), general obligation bonds debt service (down $88.9 million), health (down $102.4 million) and education (down $120.8 million).

I-122

PR-CCD-0026229

# Proposed Budget for Fiscal Year 2012

The following table presents a summary of the Commonwealth's central government proposed budget for the fiscal year ending June 30, 2012.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2012**
**(in thousands)\***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| **Revenues from internal sources:** | | | | |
| Property taxes | $ 76,000 | - | $ 116,321 | $ 192,321 |
| Personal income taxes | 2,109,000 | - | | 2,109,000 |
| Retained non-resident income tax | 980,000 | - | | 980,000 |
| Corporate income taxes | 1,515,000 | - | | 1,515,000 |
| Partnership income taxes | 2,000 | - | | 2,000 |
| Tollgate taxes | 5,000 | - | | 5,000 |
| 17% withholding tax on interest | 8,000 | - | | 8,000 |
| 10% withholding tax on dividends | 28,000 | - | | 28,000 |
| Inheritance and gift taxes | 5,000 | - | | 5,000 |
| Sales and use taxes | 680,000 | - | | 680,000 |
| **Excise taxes:** | | | | |
| Alcoholic beverages | 298,000 | - | | 298,000 |
| Foreign (Act 154) | 1,578,000 | - | | 1,578,000 |
| Motor vehicles and accessories | 361,000 | - | | 361,000 |
| Cigarettes | 210,000 | - | | 210,000 |
| Other (excise taxes) | 78,000 | - | 724,573 | 802,573 |
| Licenses | 79,000 | - | | 79,000 |
| **Miscellaneous non-tax revenues:** | | | | |
| Contributions from lottery fund | 45,000 | - | | 45,000 |
| Electronic lottery | 83,000 | - | | 83,000 |
| Registration and document certification fees | 154,000 | - | | 154,000 |
| Other | 85,000 | - | 423,978 | 508,978 |
| Total revenues from internal sources | 8,379,000 | - | 1,264,872 | 9,643,872 |
| **Revenues from non-Commonwealth sources:** | | | | |
| Federal excise taxes on off-shore shipments | 271,000 | - | | 271,000 |
| Federal grants[(1)] | | - | 4,784,271 | 4,784,271 |
| Customs | 0 | - | | 0 |
| Total revenues from non-Commonwealth sources | 271,000 | - | 4,784,271 | 5,055,271 |
| Total revenues | 8,650,000 | - | 6,049,143 | 14,699,143 |
| **Other:** | | | | |
| Balance from previous year | 0 | - | 858,678 | 858,678 |
| COFINA Stabilization Fund | 610,000 | - | | 610,000 |
| Bonds authorized | 0 | - | | 0 |
| Total other sources | 610,000 | - | 858,678 | 1,468,678 |
| Total resources | 9,260,000 | - | 6,907,821 | 16,167,821 |
| **Appropriations:** | | | | |
| **Current expenses:** | | | | |
| General government | 821,799 | - | 61,252 | 883,051 |
| Education | 3,094,207 | - | 1,728,895 | 4,823,102 |
| Health | 1,363,697 | - | 541,763 | 1,905,460 |
| Welfare | 442,723 | - | 2,685,719 | 3,128,442 |
| Economic development | 370,643 | - | 110,088 | 480,731 |
| Public safety and protection | 1,522,577 | - | 104,387 | 1,626,964 |
| Transportation and communication | 152,561 | - | 38,107 | 190,668 |
| Housing | 18,814 | - | 402,647 | 421,461 |
| Contributions to municipalities | 393,085 | - | 5,643 | 398,728 |
| Special pension contributions | 420,312 | - | 0 | 420,312 |
| Debt service | 179,359 | - | 116,321 | 295,680 |
| Other debt service (appropriations) | 480,223 | - | 735,181 | 1,215,404 |
| Total appropriations – current expenses | 9,260,000 | - | 6,530,003 | 15,790,003 |
| Capital improvements | | - | 153,123 | 153,123 |
| Total appropriations | 9,260,000 | - | 6,683,126 | 15,943,126 |
| Year-end balance | 0 | - | 224,695 | 224,695 |
| Total appropriations and year-end balance | $9,260,000 | - | $6,907,821 | $16,167,821 |

\* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

I-123

CONFIDENTIAL

PR-CCD-0026230

The proposed budget provides for total resources of $16.2 billion and total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes base revenues of $7.072 billion, $1.578 billion from tax enforcement and compliance measures and $610.0 million in additional revenues from COFINA Stabilization Fund.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2011 budget are accounted mainly by the projected collections from the new temporary excise tax under Act 154 (up $969.0 billion), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $28.5 million), alcoholic beverage (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 proposed budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2012 are $9.260 billion, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $910.0 million, or 8.9%, lower than total expenditures of $10.170 billion for fiscal year 2010.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations. The principal changes in General Fund expenditures by program in fiscal year 2012 compared to the fiscal year 2011 budget are mainly due to increases in education (up $148.3 million), economic development (up $117.6 million), special pension contributions (up $85.8 million), contributions to municipalities (up $25.9 million) public safety and protection (up $79.0 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $24.0 million), other debt service appropriations (down $36.9 million) and health (down $212.7 million).

**Differences between Budget and Basic Financial Statements**

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from

CONFIDENTIAL

PR-CCD-0026231

the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

*General*. The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended ("Act 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2010, the Commonwealth has included in its financial statements reported liabilities of approximately $421 million for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed exceed $7 billion; however, the ultimate liability cannot be presently determined. The Commonwealth believes that the claims are excessive and that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

*Constitutionality of Act 7*. On April 13, 2009, a group of government employees along with labor organizations that represent governmental employees filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor of Puerto Rico and several agency heads. In the complaint, the plaintiffs challenge the constitutionality of Act 7 and seek, among other relief, an injunction to stop the Government of Puerto Rico from implementing the cost-cutting provisions of Act 7, described above in "Fiscal and Economic Reconstruction—Expense Reduction Measures" under THE ECONOMY.

On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. Plaintiffs have appealed the Court's decision. On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. On December 15, 2009, the plaintiffs appealed the District Court's decision to the U.S. Court of Appeals for the First Circuit and, on January 27, 2011, the

CONFIDENTIAL

PR-CCD-0026232

District Court's decision was affirmed. The Supreme Court of Puerto Rico previously upheld the constitutionality of the provisions of Act 7 relating to employee dismissals.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997. In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must make Medicaid "wraparound" payments to the health centers to cover the difference between the reimbursement they are owed and what they are paid by managed care organizations. The Court of Appeals of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the FQHCs certain grants received by these centers from the federal government. Currently, attorneys in the case filed in Commonwealth court are trying to determine the amounts due to FQHCs thereunder.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction entered against two of the FQHCs and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings.

Recently, the Court entered a preliminary injunction as to the remaining 15 health centers, and granted a request by the Department of Health for Eleventh Amendment sovereign immunity. The plaintiff FQHCs immediately filed an appeal regarding the issue of Eleventh Amendment.

Meanwhile, the Department of Health filed a counter appeal regarding the Court's interpretation of certain components of the wraparound formula that must be used under the preliminary injunction to calculate wraparound payments owed to the plaintiffs. The Department has already made approximately $8 million in uncontested wraparound payments owed under the injunction. However, the Court granted the Department's request for a stay pending appeal regarding payment of an additional $14.5 million that are owed under the Court's wraparound formula.

As of June 30, 2010, the Commonwealth accrued $280 million in its financial statements for this legal contingency.

*Special Education Students.* The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be

CONFIDENTIAL

provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court of First Instance denied damages for the class as a whole. The plaintiffs appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages within this case. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least $5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2010, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

CONFIDENTIAL

PR-CCD-0026234

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PR-CCD-0026235

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

 GT GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:    $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011,
       $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
       Series 2011 D and $245,915,000 Commonwealth of Puerto Rico Public Improvement
       Refunding Bonds, Series 2011 E

Dear Mr. Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico (the
"Commonwealth") in connection with the issuance of $304,000,000 Commonwealth of Puerto
Rico Public Improvement Bonds of 2011 (the "2011 Bonds"), and $52,190,000 Commonwealth
of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D and $245,915,000
Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E (together
the "Refunding Bonds," and collectively with the 2011 Bonds, the "Bonds"). In such capacity
we have examined Act No. 79 of the Legislative Assembly of Puerto Rico, approved June 1,
2011 ("Act No. 79"), Act No. 33 of the Legislative Assembly of Puerto Rico, approved
December 7, 1942, as amended ("Act No. 33," and together with Act No. 79, the "Acts"), and
such other law and such certified proceedings and other documents as we have deemed necessary
to render this opinion, including a resolution adopted by the Secretary of the Treasury of the
Commonwealth (the "Secretary") and approved by the Governor of the Commonwealth on June
29, 2011 (the "Bond Resolution"). We also have examined one of the Bonds of each series as
executed and authenticated.

The 2011 Bonds are issued pursuant to Act No. 79 and the Bond Resolution and the
Refunding Bonds are issued pursuant to Act No. 33 and the Bond Resolution. The Bonds mature
on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set
forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the
manner and in accordance with the terms and conditions of the Bond Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of
the Secretary contained in the Bond Resolution, and the certified proceedings and other
certifications of public officials and others furnished to us without undertaking to verify the same
by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.      The Acts are valid.

II-1

CONFIDENTIAL                                                PR-CCD-0026236

2.      Said proceedings have been validly and legally taken.

3.      The Acts and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged.

4.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations.  However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent.  The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof.  Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof.  We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,

Greenberg Traurig, LLP

II-2

CONFIDENTIAL

PR-CCD-0026237

APPENDIX III



**MUNICIPAL BOND
INSURANCE POLICY**

ISSUER:

Policy No:      -N

BONDS:   $ in aggregate principal amount of

Effective Date:

Premium: $

ASSURED GUARANTY MUNICIPAL CORP. ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the

III-1

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM. The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. has caused this Policy to be executed on its behalf by its Authorized Officer.



ASSURED GUARANTY MUNICIPAL CORP.

By _____
Authorized Officer

Form 500NY (5/90)

III-2

CONFIDENTIAL

PR-CCD-0026239

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

SUPPLEMENT TO OFFICIAL STATEMENT DATED JUNE 29, 2011

RELATING TO

$602,105,000
Commonwealth of Puerto Rico
$304,000,000   Public Improvement Bonds of 2011
$52,190,000   Public Improvement Refunding Bonds, Series 2011 D
$245,915,000   Public Improvement Refunding Bonds, Series 2011 E
(General Obligation Bonds)

SUPPLEMENT DATED JULY 11, 2011

This Supplement updates certain information appearing in the Official Statement dated June 29, 2011 (the "Official Statement") relating to the above referenced bonds (the "Bonds"). The Bonds are expected to be issued by the Commonwealth of Puerto Rico (the "Commonwealth") on July 12, 2011. Capitalized terms used in this Supplement and not otherwise defined herein have the meanings ascribed to them in the Official Statement.

**Preliminary Results for the First Eleven Months of Fiscal Year 2011**

Preliminary General Fund net revenues for the first eleven months of fiscal year 2011 (from July 1, 2010 to May 31, 2011) were $7.031 billion, an increase of $213 million, or 3.1%, from $6.818 billion of net revenues for the same period in the prior fiscal year, and an increase of $38 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed in the Official Statement.

The increase in General Fund net revenues is mainly due to an increase of $93 million in withholdings from non-residents and the collection of $537 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform.  This increase was partially offset by a decrease of $289 million, $48 million, and $109 million in collections from income tax on individuals, income tax on corporations, and miscellaneous non-tax revenues, respectively. The decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first four monthly excise tax payments (from February through May 2011) amounted to $108.7 million, $125.8 million, $172.5 million and $130.2 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

Based on the Treasury Department's preliminary revenue collection numbers for the full fiscal year 2011, the Government expects that fiscal year 2011 revenues will be in line with the budgeted General Fund revenues of $8.134 billion.

CONFIDENTIAL

**Fiscal Year 2012 Government Budget**

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA Bonds which are expected to be refinanced during fiscal year 2012, as discussed in the Official Statement. The budgeted total expenditures for fiscal year 2012 are 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1,109.0 million, or 12.0%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

On July 7, 2011, the Secretary of Health of the Commonwealth announced the cancellation of the contract through which MCS HMO administered five regions, with approximately 850,000 insureds, of the Government's health insurance program, "Mi Salud". For a discussion of the health program, see "Other Public Corporations – Health Insurance Administration" under PUBLIC CORPORATIONS in the Commonwealth Report. Although MCS HMO will continue to render services to covered insureds during a 90 day transition period, the government is currently evaluating alternatives to assure continued services to the affected insureds. The Government is also evaluating the impact, if any, of this termination on the budget of the health insurance program for fiscal year 2012.

2

CONFIDENTIAL

**Increase in Employer Contribution to the Retirement Systems**

On July 6, 2011, the Governor signed Act No. 116 ("Act 116"), which provides an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $7 million in fiscal year 2012. Act 116 did not include the division of the Employees Retirement System into three separate systems corresponding to the central government, public corporations and municipalities as had been proposed under House Bill 3407.

On June 23, 2011, in accordance with Act No. 96 of June 16, 2011, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

## MISCELLANEOUS

The information set forth in this Supplement was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Supplement on the authority of such officials or the authority of such publications as official public documents. The Commonwealth has authorized the delivery of this Supplement to holders of the Bonds.

This Supplement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By: _____/s/ Jesús F. Méndez_____
Secretary of the Treasury

3

PR-CCD-0026244

**Increase in Employer Contribution to the Retirement Systems**

On July 6, 2011, the Governor signed Act No. 116 ("Act 116"), which provides an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $7 million in fiscal year 2012. Act 116 did not include the division of the Employees Retirement System into three separate systems corresponding to the central government, public corporations and municipalities as had been proposed under House Bill 3407.

On June 23, 2011, in accordance with Act No. 96 of June 16, 2011, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

## MISCELLANEOUS

The information set forth in this Supplement was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Supplement on the authority of such officials or the authority of such publications as official public documents. The Commonwealth has authorized the delivery of this Supplement to holders of the Bonds.

This Supplement will be filed with the MSRB through EMMA.

COMMONWEALTH OF PUERTO RICO

By: _____/s/ Jesús F. Méndez_____
Secretary of the Treasury

CONFIDENTIAL

Exhibit 29 Page 1 of 191

# Exhibit 29

SUPPLEMENT TO OFFICIAL STATEMENT DATED JUNE 29, 2011

RELATING TO

$602,105,000
**Commonwealth of Puerto Rico**
$304,000,000   Public Improvement Bonds of 2011
$52,190,000   Public Improvement Refunding Bonds, Series 2011 D
$245,915,000   Public Improvement Refunding Bonds, Series 2011 E
(General Obligation Bonds)

SUPPLEMENT DATED JULY 11, 2011

This Supplement updates certain information appearing in the Official Statement dated June 29, 2011 (the "Official Statement") relating to the above referenced bonds (the "Bonds"). The Bonds are expected to be issued by the Commonwealth of Puerto Rico (the "Commonwealth") on July 12, 2011. Capitalized terms used in this Supplement and not otherwise defined herein have the meanings ascribed to them in the Official Statement.

**Preliminary Results for the First Eleven Months of Fiscal Year 2011**

Preliminary General Fund net revenues for the first eleven months of fiscal year 2011 (from July 1, 2010 to May 31, 2011) were $7.031 billion, an increase of $213 million, or 3.1%, from $6.818 billion of net revenues for the same period in the prior fiscal year, and an increase of $38 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed in the Official Statement.

The increase in General Fund net revenues is mainly due to an increase of $93 million in withholdings from non-residents and the collection of $537 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform. This increase was partially offset by a decrease of $289 million, $48 million, and $109 million in collections from income tax on individuals, income tax on corporations, and miscellaneous non-tax revenues, respectively. The decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first four monthly excise tax payments (from February through May 2011) amounted to $108.7 million, $125.8 million, $172.5 million and $130.2 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

Based on the Treasury Department's preliminary revenue collection numbers for the full fiscal year 2011, the Government expects that fiscal year 2011 revenues will be in line with the budgeted General Fund revenues of $8.134 billion.

PR-CCD-0005884

**Fiscal Year 2012 Government Budget**

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA Bonds which are expected to be refinanced during fiscal year 2012, as discussed in the Official Statement. The budgeted total expenditures for fiscal year 2012 are 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1,109.0 million, or 12.0%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

On July 7, 2011, the Secretary of Health of the Commonwealth announced the cancellation of the contract through which MCS HMO administered five regions, with approximately 850,000 insureds, of the Government's health insurance program, "Mi Salud". For a discussion of the health program, see "Other Public Corporations – Health Insurance Administration" under PUBLIC CORPORATIONS in the Commonwealth Report. Although MCS HMO will continue to render services to covered insureds during a 90 day transition period, the government is currently evaluating alternatives to assure continued services to the affected insureds. The Government is also evaluating the impact, if any, of this termination on the budget of the health insurance program for fiscal year 2012.

PR-CCD-0005885

**Increase in Employer Contribution to the Retirement Systems**

On July 6, 2011, the Governor signed Act No. 116 ("Act 116"), which provides an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $7 million in fiscal year 2012. Act 116 did not include the division of the Employees Retirement System into three separate systems corresponding to the central government, public corporations and municipalities as had been proposed under House Bill 3407.

On June 23, 2011, in accordance with Act No. 96 of June 16, 2011, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

## MISCELLANEOUS

The information set forth in this Supplement was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Supplement on the authority of such officials or the authority of such publications as official public documents. The Commonwealth has authorized the delivery of this Supplement to holders of the Bonds.

This Supplement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By: _____/s/ Jesús F. Méndez_____
Secretary of the Treasury

3

PR-CCD-0005886

| | | |
|---|---|---|
| NEW ISSUE - BOOK-ENTRY ONLY | **RATINGS:** | Moody's: **A3** |
| See "Book-Entry Only System" under THE BONDS | **See RATINGS** | Fitch: **BBB+** |
| | | S&P: **BBB** |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$602,105,000**

## COMMONWEALTH OF PUERTO RICO

| | |
|---|---|
| **$304,000,000** | **Public Improvement Bonds of 2011** |
| **$52,190,000** | **Public Improvement Refunding Bonds, Series 2011 D** |
| **$245,915,000** | **Public Improvement Refunding Bonds, Series 2011 E** |

**(General Obligation Bonds)**

**Dated: Date of Delivery**                              **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2012. The Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041).

The scheduled payment of principal of and interest on the Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about July 12, 2011.

| | | | |
|---|---|---|---|
| **J.P. Morgan** | | | **Barclays Capital** |
| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citi** | **Goldman, Sachs & Co.** |
| **Jefferies & Company** | **Morgan Stanley** | **Ramirez & Co. Inc.** | **Raymond James** |
| **RBC Capital Markets** | **UBS Financial Services Incorporated of Puerto Rico** | | **Wells Fargo Securities** |

BBVAPR MSD     FirstBank Puerto Rico Securities     Oriental Financial Services     Popular Securities     Santander Securities     Scotia MSD     VAB FINANCIAL

June 29, 2011

**$602,105,000**

**Commonwealth of Puerto Rico**

$304,000,000    **Public Improvement Bonds of 2011**

$52,190,000    **Public Improvement Refunding Bonds, Series 2011 D**

$245,915,000    **Public Improvement Refunding Bonds, Series 2011 E**

**(General Obligation Bonds)**

## Public Improvement Bonds of 2011

$304,000,000    5.75% Term Bonds due July 1, 2041    Yield – 5.95%    CUSIP[*] 74514LYW1

## Public Improvement Refunding Bonds, Series 2011 D

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2013 | $ 470,000 | 3.000% | 1.80% | 74514LYX9 |
| 2014 | 485,000 | 3.000 | 2.24 | 74514LYY7 |
| 2015 | 500,000 | 3.000 | 2.83 | 74514LYZ4 |
| 2016 | 515,000 | 3.125 | 100.00 | 74514LZA8 |
| 2017 | 530,000 | 3.500 | 3.55 | 74514LZB6 |
| 2018 | 550,000 | 3.875 | 3.90 | 74514LZC4 |
| 2019 | 15,000,000 | 5.000 | 4.26[†] | 74514LZH3 |
| 2019 | 8,870,000 | 4.250 | 4.26 | 74514LZF7 |
| 2019[‡] | 5,900,000 | 3.875 | 100.00 | 74514LZD2 |
| 2020 | 10,000,000 | 5.000 | 4.50[†] | 74514LZJ9 |
| 2020 | 4,870,000 | 4.500 | 100.00 | 74514LZG5 |
| 2020[‡] | 4,500,000 | 4.125 | 100.00 | 74514LZE0 |

## Public Improvement Refunding Bonds, Series 2011 E

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2029 | $70,315,000 | 6.000% | 5.070%[†] | 74514LZK6 |
| 2030 | 60,255,000 | 5.375 | 5.610 | 74514LZL4 |
| 2031 | 35,970,000 | 5.500 | 5.680 | 74514LZM2 |
| 2032 | 38,435,000 | 5.625 | 5.750 | 74514LZN0 |
| 2033 | 40,565,000 | 5.625 | 5.800 | 74514LZP5 |
| 2034 | 375,000 | 5.625 | 5.830 | 74514LZQ3 |

---

[*]   Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Priced at the stated yield to the July 1, 2016 optional redemption date at a redemption price of 100%. See *Redemption* under THE BONDS.

[‡]   Insured by Assured Guaranty Municipal Corp.

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| | | |
|---|---|---|
| KENNETH D. MCCLINTOCK<br>*Secretary of State* | GUILLERMO SOMOZA COLOMBANI<br>*Secretary of Justice* | JESÚS F. MÉNDEZ<br>*Secretary of the Treasury* |
| JESÚS RIVERA SÁNCHEZ<br>*Secretary of Education* | MIGUEL ROMERO LUGO<br>*Secretary of Labor and<br>Human Resources* | DR. LORENZO GONZÁLEZ<br>*Secretary of Health* |
| JAVIER RIVERA AQUINO<br>*Secretary of Agriculture* | RUBÉN A. HERNÁNDEZ GREGORAT<br>*Secretary of Transportation<br>and Public Works* | JOSÉ R. PÉREZ-RIERA<br>*Secretary of Economic<br>Development and Commerce* |
| YANITSIA IRIZARRY<br>*Secretary of Family Affairs* | MIGUEL HERNÁNDEZ VIVONI<br>*Secretary of Housing* | DANIEL J. GALÁN KERCADÓ<br>*Secretary of Natural and<br>Environmental Resources* |
| LUIS G. RIVERA MARÍN<br>*Secretary of<br>Consumer Affairs* | HENRY NEUMANN ZAYAS<br>*Secretary of Sports and Recreation* | CARLOS M. MOLINA RODRÍGUEZ<br>*Secretary of Corrections<br>and Rehabilitation* |

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

ii

PR-CCD-0005889

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.**

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and *Appendix III - Specimen Municipal Bond Insurance Policy.*

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

iii

PR-CCD-0005890

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| OVERVIEW | 3 |
| RECENT DEVELOPMENTS | 4 |
| Commonwealth's Fiscal Imbalance | 4 |
| Fiscal Year 2012 Government Budget | 5 |
| Preliminary Results for the First Ten Months of Fiscal Year 2011 | 6 |
| Tax Reform | 7 |
| Financial Condition of Retirement Systems | 9 |
| Local Incentives for Rum Producers | 11 |
| Recent Rating Actions | 12 |
| PLAN OF FINANCING | 13 |
| Sources and Uses of Funds | 14 |
| THE BONDS | 14 |
| General | 14 |
| Book-Entry Only System | 14 |
| Discontinuance of the Book-Entry Only System | 17 |
| Authorization | 17 |
| Redemption | 18 |
| Notice of Redemption; Effect of Redemption | 18 |
| Security | 19 |
| Payment Record | 21 |
| Debt Limitation | 21 |
| Maturity Limitation | 24 |
| BOND INSURANCE | 24 |
| Bond Insurance Policy | 24 |
| Assured Guaranty Municipal Corp. | 24 |
| Bond Insurance Provisions under the Bond Resolution | 26 |
| PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 27 |
| Public Sector Debt | 27 |
| Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 28 |
| TAX MATTERS | 29 |
| Discount Bonds | 30 |
| Premium Bonds | 30 |
| LEGAL MATTERS | 31 |
| LEGAL INVESTMENT | 31 |
| VERIFICATION OF MATHEMATICAL COMPUTATIONS | 31 |
| UNDERWRITING | 31 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 34 |
| RATINGS | 34 |
| CONTINUING DISCLOSURE | 35 |
| Continuing Disclosure Undertaking | 35 |
| Prior Continuing Disclosure Non-Compliance | 38 |
| MISCELLANEOUS | 39 |
| Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated April 30, 2011 | I-1 |
| Appendix II – Proposed Form of Opinion of Bond Counsel | II-1 |
| Appendix III – Specimen Municipal Bond Insurance Policy | III-1 |

PR-CCD-0005891

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0005892

**$602,105,000**
**Commonwealth of Puerto Rico**

| | |
|---|---|
| **$304,000,000** | **Public Improvement Bonds of 2011** |
| **$52,190,000** | **Public Improvement Refunding Bonds, Series 2011 D** |
| **$245,915,000** | **Public Improvement Refunding Bonds, Series 2011 E** |
| | **(General Obligation Bonds)** |

**INTRODUCTORY STATEMENT**

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011 (the "2011 Bonds"), $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D (the "Series D Bonds") and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E (the "Series E Bonds" and together with the Series D Bonds, the "Refunding Bonds"). The 2011 Bonds and the Refunding Bonds are collectively referred to herein as the "Bonds."

The 2011 Bonds are being issued under the provisions of Act No. 79 of the Legislative Assembly of Puerto Rico, approved on June 1, 2011 ("Act 79"), and pursuant to a resolution authorizing the issuance of the 2011 Bonds (the "2011 Bond Resolution") adopted in accordance with Act 79 by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on June 29, 2011.

The Refunding Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended ("Act 33"), and pursuant to a resolution authorizing the issuance of the Refunding Bonds (the "Refunding Bond Resolution") adopted in accordance with Act 33 by the Secretary of the Treasury and approved by the Governor of Puerto Rico on June 29, 2011.

The scheduled payment of principal of and interest on the Refunding Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

Under Act 79 and Act 33, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated April 30, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on May 1, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in

2

each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. The Commonwealth complies with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

### OVERVIEW

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

3

PR-CCD-0005895

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Fiscal Imbalance

Since 2000, the Commonwealth has experienced an imbalance between recurring government revenues and total expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. The current administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. For fiscal year 2010, total expenditures of $10.369 billion exceeded total revenues (excluding other financing sources) of $7.593 billion by $2.775 billion; if debt service amounts that were refinanced during fiscal year 2010 are excluded, however, total expenditures were approximately $9.691 billion and exceeded total revenues (excluding other financing sources) by $2.098 billion. It is estimated that the deficit for fiscal year 2011 will be

4

approximately $1.0 billion. See "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I.*

In order to address the fiscal imbalance, the Government of Puerto Rico (the "Government") has taken multiple steps, including the implementation of a multi-year Fiscal Stabilization Plan (the "Fiscal Plan"). The Fiscal Plan included operating expense reduction measures (which the Government estimates have resulted in annual savings of approximately $837 million), tax revenue enforcement measures, temporary and permanent revenue raising measures (which the Government estimates will result in additional revenues of $420 million during fiscal year 2011) and financial measures. The principal financial measure taken has been the bond issuance program of the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds of the COFINA bond issuance program (which are deposited in an account referred to as the "Stabilization Fund" managed by Government Development Bank) have been used to repay existing government debt (including debts with Government Development Bank), finance operating expenses for fiscal years 2008 through 2011 (including costs related to the implementation of the expense reduction measures of the Fiscal Plan), and fund an economic stimulus plan. Another financial measure has been the restructuring of a portion of the Commonwealth's debt service. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest due in such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest due in such fiscal year on the Commonwealth guaranteed bonds issued by Public Buildings Authority ("PBA"). During fiscal year 2011 to date, the Commonwealth has refinanced $490.9 million of principal and interest due in such fiscal year on the Commonwealth's general obligation bonds. The Government expects to refinance approximately $537.4 million and $153.8 million of debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds, respectively, during fiscal year 2012. The Fiscal Plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in *Appendix I.*

**Fiscal Year 2012 Government Budget**

On April 12, 2011, the Governor of Puerto Rico, Luis G. Fortuño (the "Governor"), presented the proposed budget for fiscal year 2012 to the Legislature of Puerto Rico. The proposed budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of bond issues made by COFINA, which proceeds are deposited in the Stabilization Fund.

The principal changes in General Fund revenues under the proposed fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 of October 25, 2010, as amended ("Act No. 154") (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes

5

on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 proposed budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues available in the Stabilization Fund. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA Bonds which are expected to be refinanced during fiscal year 2012, as previously discussed. The budgeted total expenditures for fiscal year 2012 are 1.2% higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1,109.0 million, or 12.0%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 proposed budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $79 million), education (up $148.3 million), economic development (up $117.6 million), transportation (up $12.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $26.0 million), and decreases in debt service (down $58.4 million), welfare (down $24.0 million), health (down $212.7 million), and governmental management (down $61.4).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

**Preliminary Results for the First Ten Months of Fiscal Year 2011**

Preliminary General Fund net revenues for the first ten months of fiscal year 2011 (from July 1, 2010 to April 30, 2011) were $6.406 billion, an increase of $125 million, or 2.0%, from $6.281 billion of net revenues for the same period in the prior fiscal year, and an increase of $105 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed below.

The increase in General Fund net revenues is mainly due to an increase of $111 million in withholdings from non-residents and the collection of $407 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 in October 2010 as part of the tax reform. This increase was partially offset by a decrease of $245 million, $69 million, and $84.8 million in collections from income tax on individuals, income tax on corporations, and miscellaneous non-tax revenues, respectively. This decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first three monthly excise tax payments due in February, March and April 2011 amounted to approximately $108.7 million, $125.8 million and $172.5 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

6

PR-CCD-0005898

The Treasury Department also reported that preliminary sales and use tax collections for the first eleven months of fiscal year 2011 were $1.031 billion, an increase of $31.8 million, or 3.2%, from the sales and use tax collections for the same period in the prior fiscal year. Sales and use tax preliminary collections for May 2011 were $89.2 million, an increase of 4.3% compared to May 2010. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund. See "Security" under THE BONDS and "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

For more information on the tax reform and Act No. 154, see "Tax Reform" below and "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I*.

**Tax Reform**

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as

7

effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The Treasury Department recently announced that preliminary collections for the first four monthly excise tax payments (from February through May 2011) were $108.7 million, $125.8 million, $172.5 million and $130.2 million, respectively. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Therefore, it is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending

8

PR-CCD-0005900

issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with Government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $7.8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending

9

on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems, see RETIREMENT SYSTEMS in *Appendix I.*

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly that seek to address the retirement systems' financial condition. One of such bills, which was enacted as Act No. 96 of June 16, 2011, provides for an immediate contribution of $162.5 million to the Employees Retirement System from funds currently on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund, which would be invested in a capital appreciation bond issued by COFINA with a maturity of at least thirty years, but not to exceed forty years, and bearing interest at a rate of 7%. The principal amount of the COFINA bond, which would grow to approximately $1.2 billion in thirty years, would be available to pay certain pension obligation bonds and other obligations of the Employees Retirement System.

10

PR-CCD-0005902

House Bill 3407 ("HB 3407") proposes to increase employer contributions to the Employee Retirement System and the Teachers Retirement System by 1% in each of the next five fiscal years and by 1.25% in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. HB 3407 would also divide the Employees Retirement System into three separate systems: the Government Employee System, the Municipal Employee System and the Public Corporation Employee System, which would divide the actuarial liability among the three systems. There can be no assurance that HB 3407 will be enacted or, if enacted, will be enacted in the form proposed.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") each month to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Destilería Serrallés, Inc. ("Serrallés") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund

PR-CCD-0005903

will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act No. 178 and contains identical provisions.

As permitted under Act No. 1, the Government has entered into a definitive agreement with one rum producer and is currently in negotiations with two others to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of General Fund revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

**Recent Rating Actions**

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook and assigned such rating to the bonds issued by the Commonwealth. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measures that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years, in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's unenhanced general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's unenhanced general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's unenhanced general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems.

12

On May 3, 2011, Moody's placed the "A3" general obligation rating of the Commonwealth on watchlist for possible downgrade citing the weak funding ratio of the Commonwealth's retirement systems and the significant strain that their future funding requirements will likely exert on the Commonwealth's financial condition. In its May 3 announcement, Moody's stated that it expected to conclude its review within 90 days.

## PLAN OF FINANCING

The net proceeds of the 2011 Bonds will be deposited in the Public Improvements Fund of 2011 established under the Act. The proceeds of the Bonds will be used to carry out certain capital improvements programs authorized by the Legislative Assembly in Act 79 and the refunding of bond anticipation notes issued under Act 79 to finance, on an interim basis, portions of certain such capital improvement programs.

The net proceeds of the Refunding Bonds will be used to: (i) refund in full certain other general obligation bonds and notes of the Commonwealth set forth in the Bond Resolution (the "Refunded Bonds") as set forth below, (ii) fund termination payments under certain interest rate swap agreements and a debt service deposit agreement entered into in connection with the issuance of the Refunded Bonds, (iii) pay capitalized interest on the Refunding Bonds, and (iv) pay the expenses related to the issuance and sale of the Refunding Bonds.

| Series of Bonds | Original Principal Amount | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2000 | $29,200,000 | $29,200,000 | 5.625% | 2019 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2000 | 22,635,000 | 22,635,000 | 5.700 | 2020 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 60,525,000 | 60,525,000 | Variable | 2029 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 50,900,000 | 50,900,000 | Variable | 2030 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 30,700,000 | 30,700,000 | Variable | 2031 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 31,850,000 | 31,850,000 | Variable | 2032 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 32,625,000 | 32,625,000 | Variable | 2033 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 67,950,000 | 300,000 | Variable | 2034 | July 14, 2011 |

The Secretary of the Treasury will deposit the net proceeds of the Refunding Bonds to be utilized to pay the Refunded Bonds into an escrow fund (the "Escrow Fund") with an escrow agent to be selected by the Commonwealth (the "Escrow Agent"). The net proceeds of the Refunding Bonds deposited in the Escrow Fund will be invested either in cash or in noncallable direct obligations of the United States ("Government Obligations"), the principal of and interest on which will be sufficient to pay the Refunded Bonds on the redemption dates set forth above.

The sufficiency of the amount so deposited, with investment earnings thereon, to pay the Refunded Principal, will be verified by Causey, Demgen & Moore, Inc. (the "Verification Agent").

13

## Sources and Uses of Funds

Sources::

| | |
|---|---|
| Principal amount of the Bonds.......................................................................... | $602,105,000.00 |
| Net Original Issue Discount............................................................................. | 8,774,359.30 |
| Total sources ............................................................................ | $593,330,640.70 |

Uses:

| | |
|---|---|
| Deposit into the Public Improvement Fund of 2011 ........................................... | $267,337,500.00 |
| Refunding of Bond Anticipation Notes ............................................................. | 162,971.69 |
| Deposit into the Escrow Fund .......................................................................... | 259,957,441.67 |
| Capitalized Interest ......................................................................................... | 25,197,444.89 |
| Underwriting discount and other financing expenses* ...................................... | 40,675,282.45 |
| Total uses ................................................................................. | $593,330,640.70 |

---

\*   Includes the cost to the Commonwealth of terminating interest rate swap agreements entered into in connection with the issuance of the Refunded Bonds (approximately $34,698,000), the partial termination of a debt service deposit agreement (approximately $137,000), bond insurance premium, legal, printing and other financing expenses.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, will receive a portion of the proceeds from this offering in connection with the termination of such swap agreements. See UNDERWRITING.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

PR-CCD-0005906

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

PR-CCD-0005907

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that

PR-CCD-0005908

DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

PR-CCD-0005909

**Redemption**

The Bonds maturing on or after July 1, 2017 are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041), either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The 2011 Bonds are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such 2011 Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2038, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

| Year | Term Bonds Maturing July 1, 2041 |
|------|-----------------------------------|
| 2038 | $ 14,395,000 |
| 2039 | 15,225,000 |
| 2040 | 65,960,000 |
| 2041 | 208,420,000* |

* Maturity

If the amount of the 2011 Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such 2011 Bonds for such fiscal year, the amortization requirement for such 2011 Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such

18

notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

## Security

### Provision for Payment of Public Debt

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but

PR-CCD-0005911

only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the

20

amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010 and 2011, the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to fund deposits to the Redemption Fund. The Commonwealth expects to enter into loan agreements with Government Development Bank the proceeds of which would be used to fund deposits to the Redemption Fund during fiscal years 2012 and 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to fund deposits to the Redemption Fund after June 30, 2013. On June 15, 2011, the amount on deposit in the Redemption Fund was $446.7 million, which was the required amount.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

## Payment Record

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

## Debt Limitation

### Constitutional Debt Limitation

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

PR-CCD-0005913

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the

22

purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In March 2011, the Commonwealth issued its $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (the "Series 2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in *Appendix I* for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of March 31, 2011.

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2011 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($981,295,893) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $991,787,196, is equal to 13.53% of $7,333,246,000, which is the average of the adjusted preliminary internal revenues for the fiscal years ended June 30, 2009 and 2010. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 12.20%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% constitutional debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under Public Corporations in Appendix I. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

PR-CCD-0005915

As of May 31, 2011, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $212.9 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal years 2010 and 2011 to date, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million and $16.5 million, respectively. See "Commonwealth Guaranteed Debt" under Debt in *Appendix I*.

## Maturity Limitation

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

### Bond Insurance Policy

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as *Appendix III* to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

### Assured Guaranty Municipal Corp.

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

24

PR-CCD-0005916

*Current Financial Strength Ratings*

On June 13, 2011, S&P issued a release stating that it had affirmed the "AA+" financial strength rating of AGM, with a stable outlook. Reference is made to the release, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On January 24, 2011, S&P published a Request for Comment: Bond Insurance Criteria (the "Bond Insurance RFC") in which it requested comments on its proposed changes to its bond insurance ratings criteria. In the Bond Insurance RFC, S&P notes that it could lower its financial strength ratings on existing investment-grade bond insurers (including AGM) by one or more rating categories if the proposed bond insurance ratings criteria are adopted, unless those bond insurers (including AGM) raise additional capital or reduce risk. Reference is made to the Bond Insurance RFC, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 1, 2011, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, which was filed by AGL with the SEC on May 10, 2011.

*Capitalization of AGM*

At March 31, 2011, AGM's consolidated policyholders' surplus and contingency reserves were approximately $3,058,791,206 and its total net unearned premium reserve was approximately $2,285,987,748, in each case, in accordance with statutory accounting principles.

Incorporation of Certain Documents by Reference

Portions of the following document filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2010 (which was filed by AGL with the SEC on March 1, 2011); and

(ii)     the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011 (which was filed by AGL with the SEC on May 10, 2011).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the

PR-CCD-0005917

filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the heading *Assured Guaranty Municipal Corp.* under BOND INSURANCE or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE.

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

26

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

## Public Sector Debt

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of March 31, 2011. The table also shows the public sector debt as adjusted for the issuance of the Bonds and the refunding of the Refunded Bonds. The table should be read in conjunction with the information set forth under DEBT in *Appendix I*.

**Commonwealth of Puerto Rico**
**Public Sector Debt\***
**(in millions)**

|  | March 31, 2011 | As Adjusted by the Bonds and the refunding of the Refunded Bonds |
|---|---|---|
| GENERAL FUND RELATED DEBT |  |  |
| Direct full faith and credit obligations | $9,681 | $10,025 |
| Puerto Rico guaranteed debt[1] | 4,287 | 4,287 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,642 | 3,642 |
| Tax and Revenue Anticipation Notes[3] | 900 | 900 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $21,458 | $21,802 |
| Sales and Use Tax (COFINA) debt | $13,437 | $13,437 |
| Public corporations and agencies | 24,031 | 24,031 |
| Municipal Debt | 3,409 | 3,409 |
| Limited Obligations/non-recourse debt [5] | 2,410 | 2,410 |
| TOTAL PUBLIC SECTOR DEBT | $64,745 | $65,089 |

\*  Totals may not add due to rounding.
[1]  Consists of $598 million of bonds issued by Aqueduct and Sewer Authority, $406 million of State Revolving Fund Loans incurred under various federal water laws, $212.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of Government Development Bank bonds payable from available moneys of Government Development Bank.
[2]  Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.
[3]  Includes related short-term financings.
[4]  Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.
[5]  Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

PR-CCD-0005919

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on June 29, 2011 (after giving effect to the refunding of the Refunded Bonds); (ii) the Bonds; and (iii) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements\***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds | | Grand Total |
| | | Principal | Interest | |
|---|---|---|---|---|
| 2011[2] | $ 486,345 | - | - | $ 486,345 |
| 2012[3] | 833,638 | - | $ 15,764 | 849,402 |
| 2013[3] | 836,797 | $ 470 | 25,489 | 862,756 |
| 2014 | 824,282 | 485 | 33,727 | 858,494 |
| 2015 | 838,357 | 500 | 33,712 | 872,570 |
| 2016 | 838,211 | 515 | 33,697 | 872,423 |
| 2017 | 763,812 | 530 | 33,681 | 798,023 |
| 2018 | 748,010 | 550 | 33,662 | 782,223 |
| 2019 | 788,307 | 29,770 | 33,641 | 851,718 |
| 2020 | 832,253 | 19,370 | 32,286 | 883,909 |
| 2021 | 704,768 | - | 31,381 | 736,149 |
| 2022 | 615,424 | - | 31,381 | 646,805 |
| 2023 | 568,523 | - | 31,381 | 599,904 |
| 2024 | 568,827 | - | 31,381 | 600,207 |
| 2025 | 557,378 | - | 31,381 | 588,758 |
| 2026 | 548,476 | - | 31,381 | 579,857 |
| 2027 | 548,480 | - | 31,381 | 579,861 |
| 2028 | 548,881 | - | 31,381 | 580,262 |
| 2029 | 421,207 | 70,315 | 31,381 | 522,903 |
| 2030 | 430,086 | 60,255 | 27,162 | 517,503 |
| 2031 | 454,442 | 35,970 | 23,923 | 514,335 |
| 2032 | 289,603 | 38,435 | 21,945 | 349,983 |
| 2033 | 217,248 | 40,565 | 19,783 | 277,596 |
| 2034 | 251,643 | 375 | 17,501 | 269,520 |
| 2035 | 304,513 | - | 17,480 | 321,993 |
| 2036 | 304,509 | - | 17,480 | 321,989 |
| 2037 | 299,567 | - | 17,480 | 317,047 |
| 2038 | 188,529 | 14,395 | 17,480 | 220,404 |
| 2039 | 188,526 | 15,225 | 16,652 | 220,403 |
| 2040 | 138,665 | 65,960 | 15,777 | 220,401 |
| 2041 | - | 208,420 | 11,984 | 220,404 |
| Total | $15,939,307 | $602,105 | $782,734 | $17,324,146 |

---

\* Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1] Since fiscal year 1997, the Commonwealth had been paying approximately $30 million annual debt service on PRASA bonds and other obligations guaranteed by the Commonwealth. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making such payments and PRASA resumed making all payments due on and after such date from its net revenues. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

[2] Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.

[3] The figures for interest and total debt service have been reduced by the interest that was capitalized through the issuance of the 2011 Bonds in the following amounts: approximately $16.9 million due during fiscal year 2012 and $8.3 million due during fiscal year 2013.

Sources: Government Development Bank and Department of the Treasury

PR-CCD-0005920

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

29

PR-CCD-0005921

**Discount Bonds**

Under the Code, the difference between the principal amount of the Bonds maturing July 1 of the years 2017, 2018, 2019 bearing interest at a rate of 4.25%, 2030 through 2034 and 2041 (collectively, the "Discount Bonds") and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Discount Bonds was sold as original issue discount. Original issue discount on the Discount Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owners of such Discount Bonds in each year, as described below, is, however, included in the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption TAX MATTERS in the year of accrual. Consequently, Beneficial Owners of Discount Bonds should be aware that the accrual of original issue discount in each year may result in additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Discount Bonds will accrue over the terms of such Bonds based on the constant yield method, compounded semiannually (or over a shorter permitted compounding interval selected by the Beneficial Owner). Original issue discount accruing during the period a Beneficial Owner holds such Discount Bond will increase the adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Discount Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Discount Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Discount Bonds and with respect to the state and local tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of the Bonds maturing July 1 of the years 2013 through 2015, 2019 bearing interest at a rate of 5.00%, 2020 bearing interest at a rate of 5.00% and 2029 (collectively, the "Premium Bonds") and the tax basis of Premium Bonds to a purchaser (other than a purchaser who holds Premium Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) is "bond premium." Bond Premium is amortized over the period to maturity of a Premium Bond, based on the yield to maturity of that Premium Bond (or, in the case of a Premium Bond callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on that Premium Bond), compounded semiannually (or over a shorter permitted corresponding interval selected by the Beneficial Owner). No portion of that bond premium is deductible by the Beneficial Owner of a Premium Bond. For purposes of determining the Beneficial Owner's gain or loss on the sale, redemption (including redemption at maturity) or other disposition of a Premium Bond, the Beneficial Owner's tax basis in the Premium Bond is reduced by the amount of bond premium that accrues during the period of ownership. As a result, a Beneficial Owner may realize taxable gain for federal income tax purposes from the sale or other disposition of a Premium Bond for an amount equal to or less than the amount paid by the Beneficial Owner of that Premium Bond. A purchaser of a Premium Bond in the initial public

30

offering at the price for that Premium Bond stated on the cover of this Official Statement who holds that Premium Bond to maturity (or, in the case of a callable Premium Bond, to its earlier call date that results in the lowest yield on that Premium Bond) will realize no gain or loss upon the retirement of that Premium Bond. Beneficial Owners of Premium Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore, Inc. will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the Refunded Bonds, and (2) the computations of yield on both the securities and the Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $3,585,168.85 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and

PR-CCD-0005923

brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, an affiliate of Goldman, Sachs & Co. will receive approximately $29,550,000 of the proceeds from this offering in connection with the termination of the swap agreements between the Commonwealth and an affiliate of Goldman, Sachs & Co.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, and Barclays Capital Inc. established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

32

PR-CCD-0005924

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of Harris Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services

33

and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "A3" by Moody's, "BBB+" by Fitch, and "BBB" by S&P. For more information regarding rating action affecting the Commonwealth, see "Recent Rating Actions" under RECENT DEVELOPMENTS. The Insured Bonds are expected to be assigned insured ratings of "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such expected ratings will be the final rating issued or, if issued, that they will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

PR-CCD-0005926

# CONTINUING DISCLOSURE

## Continuing Disclosure Undertaking

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1.  to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2010, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.  to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

    a.  principal and interest payment delinquencies;

    b.  non-payment related defaults, if material;

    c.  unscheduled draws on debt service reserves reflecting financial difficulties;

    d.  unscheduled draws on credit enhancements reflecting financial difficulties;

    e.  substitution of credit or liquidity facility providers, or their failure to perform;

    f.  adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

    g.  modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

    h.  Bond calls, if material;

    i.  defeasances;

    j.  release, substitution, or sale of property securing repayment of the Bonds, if material;

    k.  rating changes;

35

PR-CCD-0005927

l.      tender offers;

m.      bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.      the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.      the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

Event (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding

PR-CCD-0005928

fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons

37

PR-CCD-0005929

for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal

PR-CCD-0005930

resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II*), and the specimen of the municipal bond insurance policy to be issued by AGM (*Appendix III*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in BOND INSURANCE and UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By: _____/s/ Jesús F. Méndez_____
                        Secretary of the Treasury

39

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0005932

**APPENDIX I**

# COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### April 30, 2011

Exhibit 29 Page 495 of 500

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0005934

# TABLE OF CONTENTS

                                                 **Page**

INTRODUCTION ....................................................................................................1

    General ...........................................................................................................1
    Forward-Looking Statements..........................................................................1
    Overview of Economic and Fiscal Condition..................................................1
    Geographic Location and Demographic Trends...............................................10
    Relationship with the United States..................................................................10
    Governmental Structure ...................................................................................11
    Principal Officers Responsible for Fiscal Matters ..........................................11
    Political Trends ................................................................................................12

THE ECONOMY.......................................................................................................13

    General ...........................................................................................................13
    Fiscal Stabilization and Economic Reconstruction.........................................18
    Employment and Unemployment .....................................................................27
    Economic Performance by Sector....................................................................28
    Higher Education .............................................................................................42
    Tax Incentives .................................................................................................44

DEBT ........................................................................................................................47

    Public Sector Debt...........................................................................................47
    Debt Service Requirements for Commonwealth General Obligation Bonds ...50
    Interest Rate Exchange Agreements ................................................................51
    Variable Rate Bonds and Mandatory Tender Bonds .......................................54
    Ratings of Commonwealth General Obligation Bonds ....................................56
    Commonwealth Guaranteed Debt....................................................................56
    Trends of Public Sector Debt...........................................................................58

PUBLIC CORPORATIONS.......................................................................................59

    Government Development Bank for Puerto Rico .............................................60
    Other Public Corporations ...............................................................................63

INSURANCE MATTERS ..........................................................................................73

RETIREMENT SYSTEMS ........................................................................................73

POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS ...............................94

COMMONWEALTH AUDITED FINANCIAL STATEMENTS..................................95

    General ...........................................................................................................95
    Prior Non-Compliance with Continuing Disclosure Obligations ....................96

PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES..................97

    Summary and Management's Discussion of General Fund Results...................97
    Major Sources of General Fund Revenues ......................................................101

i

Measures to Increase Collections of Income, Sales, and Excise Taxes and
  Property Taxes ................................................................................111
Transfers to General Obligation Redemption Fund.........................................113
Components of General Fund Expenditures ...................................................114

BUDGET OF THE COMMONWEALTH OF PUERTO RICO ...............................................116

Office of Management and Budget.............................................................116
Budgetary Process..............................................................................116
Financial Control and Adjustment Procedures ...............................................117
Appropriations .................................................................................118
Budget for Fiscal Year 2011 ...................................................................120
Proposed Budget for Fiscal Year 2012 ........................................................122
Differences between Budget and Basic Financial Statements.............................123

LITIGATION.........................................................................................124

PR-CCD-0005936

# INDEX OF DEFINED TERMS

1998 Tax Incentives Act ..............................44
Act 1 .........................................................22
Act 1 Participants ......................................73
Act 104 .....................................................124
Act 117 .....................................................107
Act 132 .......................................................24
Act 154 ....................................................7, 31
Act 178 .....................................................111
Act 29 .........................................................25
Act 3 .....................................................22, 69
Act 447 .......................................................73
Act 447 Participants ...................................73
Act 7 ...........................................................2
Act 70 ...........................................................5
Act 71 .......................................................113
Act 82 .....................................................6, 61
Act 83 .....................................................6, 45
Act 91 .........................................................22
Act 91 of 1966 .........................................117
Act 91 of 2004 ...........................................74
Act No. 1 ..............................................7, 101
AFICA ....................................................49, 68
AMT .........................................................104
ARRA ...........................................................1
basic swaps ................................................52
Basic System Pension Benefits .................76
basis annuity ..............................................52
BEA ...........................................................15
Budgetary Fund .......................................117
CAFR .........................................................96
Capital Fund ..............................................63
CFCs ...........................................................46
CMI ...........................................................84
COFINA .......................................................2
Commonwealth ............................................1
Commonwealth Sales Tax .......................107
constant maturity swap ..............................52
Corpus Account .........................................22
credit/liquidity facilities ...........................54
CRIM .......................................................109
DEDC .........................................................24
Development Fund .....................................63
Diageo .....................................................110
District .......................................................26
DOH ...........................................................64

Economic Plan ...........................................18
Electric Power Authority Retirement
    System ...................................................73
Emergency Fund ......................................117
EMMA .......................................................96
Employees Retirement System .................73
EPA ...........................................................64
FAA ...........................................................39
FDIC ...........................................................35
Federal Stimulus .......................................23
FINRA .......................................................35
Fiscal Board ..............................................21
Fiscal Plan .................................................18
Fitch ......................................................9, 64
GASB 34 ....................................................96
GDB .............................................................2
Green Energy Incentives Act .....................45
Household Survey ......................................14
Housing Finance Authority .......................62
IBEs ...........................................................35
internal revenues .......................................47
IRS ...............................................................8
IVU Loto ..................................................112
Judiciary Retirement System .....................73
LIBOR .......................................................52
Local Stimulus ..........................................23
Mandatory Tender Bonds ..........................55
MFA ...........................................................69
Moody's .......................................................9
MSCHE .......................................................72
MSRB .........................................................96
Municipal Sales Tax ................................107
NIPA ...........................................................15
non-career employees ................................19
notes ...........................................................47
OCFI ...........................................................35
OMB ...........................................................12
PAA ...........................................................69
Payroll Survey ...........................................27
PBA ...........................................................70
Perpetual Trust ..........................................61
PFC ...........................................................63
Planning Board ............................................1
POA Guaranteed Bonds .............................48
Port ...........................................................69

PR-CCD-0005937

Ports Authority ............................................70
PPP Authority ............................................25
PPPs ............................................25
PR Code ............................................101
PRCDA ............................................38
PREPA ............................................52, 65
PRHTA ............................................66
PRIDCO ............................................67
PRIFA ............................................22, 68
Program ............................................113
Puerto Rico ............................................1
remarketing date ............................................54
Retirement System ............................................73
Retirement Systems ............................................73
S&P ............................................8
Sales Tax ............................................107
Section 936 Corporations ............................................46
Serralles ............................................110
SIFMA ............................................52
Stabilization Fund ............................................3
synthetic fixed rate swap ............................................52
System 2000 ............................................73
System 2000 Participants ............................................73
System Administered Pension Benefits ............................................76
TDF ............................................62
Teachers Retirement System ............................................73
TEU ............................................69
Tourism Development Act ............................................45
Treasury Department ............................................11
U.S. Code ............................................31
University ............................................71
University Retirement System ............................................73
USVI ............................................110
VRDO Bonds ............................................54

iv

# COMMONWEALTH OF PUERTO RICO
## Financial Information and Operating Data Report
### April 30, 2011

## INTRODUCTION

**General**

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of December 31, 2010, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the U.S. government or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors,

PR-CCD-0005939