Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction entered against two of the FQHCs and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings.

Recently, the Court entered a preliminary injunction as to the remaining 15 health centers, and granted a request by the Department of Health for Eleventh Amendment sovereign immunity. The plaintiff FQHCs immediately filed an appeal regarding the issue of Eleventh Amendment.

Meanwhile, the Department of Health filed a counter appeal regarding the Court's interpretation of certain components of the wraparound formula that must be used under the preliminary injunction to calculate wraparound payments owed to the plaintiffs. The Department has already made approximately $12 million in uncontested wraparound payments owed under the injunction. However, the Court granted the Department's request for a stay pending appeal regarding payment of an additional $14.5 million that are owed under the Court's wraparound formula. This sum has been consigned with the Court pending appeal, but may have to be increased to reflect the difference between the amounts owed under the Court's formula and the Department's formula since the consignment.

As of June 30, 2010, the Commonwealth accrued $280 million in its financial statements for this legal contingency.

*Special Education Students.* The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court of First Instance denied damages for the class as a whole. The plaintiffs appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages within this case. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least

PR-CCD-0010531

$5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2010, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

PR-CCD-0010532

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

**GT GreenbergTraurig**

[Closing Date]

Secretary of the Treasury of the
   Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:  $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
     Series 2012 B (General Obligation Bonds)

Dear Mr. Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico (the
"Commonwealth") in connection with the issuance of $415,270,000 Commonwealth of Puerto
Rico Public Improvement Refunding Bonds, Series 2012 B (the "Bonds"). In such capacity we
have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7,
1942, as amended (the "Act"), and such other law and such certified proceedings and other
documents as we have deemed necessary to render this opinion, including a resolution adopted
by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the
Governor of the Commonwealth on March 7, 2012 (the "Bond Resolution"). We also have
examined one of the Bonds of each series as executed and authenticated.

The Bonds are issued pursuant to the Act and the Bond Resolution. The Bonds mature
on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set
forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the
manner and in accordance with the terms and conditions of the Bond Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of
the Secretary contained in the Bond Resolution, and the certified proceedings and other
certifications of public officials and others furnished to us without undertaking to verify the same
by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.  The Act is valid.

2.  Said proceedings have been validly and legally taken.

3.  The Act and such proceedings and certifications show lawful authority for the
issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of
the Commonwealth for the payment of the principal of and the interest on the Bonds, to which
the good faith, credit and taxing power of the Commonwealth are pledged.

PR-CCD-0010533

Secretary of the Treasury
_____, 2012
Page 2

    4.    Interest on the Bonds is not excludable from gross income for federal income tax purposes.

    The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

                        Respectfully submitted,

                        Greenberg Traurig, LLP

PR-CCD-0010534

APPENDIX III

FORM OF OPINION OF SPECIAL PUERTO RICO TAX COUNSEL

[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:     $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012
        B (General Obligation Bonds)

Dear Mr. Secretary:

        We have acted as Special Puerto Rico Tax Counsel in connection with the issuance by the
Commonwealth of Puerto Rico (the "Commonwealth") of $415,270,000 Commonwealth of Puerto Rico
Public Improvement Refunding Bonds, Series 2012 B (the "Bonds"). As such counsel, we have
examined, among other things, the provisions of the Internal Revenue Code for a New Puerto Rico, Act
No. 1-2011 of the Legislative Assembly of Puerto Rico, approved January 31, 2011, as amended (the "PR
Code"), and of the United States Internal Revenue Code of 1986, as amended (the "US Code").

        From such examination and based on the provisions of the laws of the Commonwealth and the
United States of America as now in force, and having regard to legal questions we deem relevant, we are
of the opinion that:

        1.      Interest on the Bonds is:

                (a)     exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the PR
Code;

                (b)     excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book
income" of a corporation for purposes of computing the alternative minimum tax imposed by Section
1022.03(a) of the PR Code;

                (c)     exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of
the PR Code; and

                (d)     exempt from Puerto Rico municipal license taxes under Section 9(25) of the
Puerto Rico Municipal License Tax Act of 1974, as amended.

        2.      The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of
the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican
Federal Relations Act.

        3.      The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are
residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents

III-1

who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

    4.    The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

    5.    Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with eligible funds, as such term is defined in the Acts.

    6.    Gain recognized from the sale or exchange of the Bonds will be subject to income tax under the PR Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations organized under the laws of Puerto Rico.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Sections 1033.17(a)(5), 1033.17(a)(10) and 1033.17(f) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for regular and alternative minimum Puerto Rico income tax purposes, of interest expense and other expenses related to an investment in the Bonds.

**IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Bonds.**

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, it is our opinion that:

    1.    Interest or original issue discount on the Bonds owned by an individual is excludable from the gross income of the individual for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue discount is to be recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business within the United States by such individual under the US Code. In addition, for US federal income tax purposes, no deduction or credit will be allowed that is allocable to or chargeable against amounts so excluded from the Puerto Rico individual's gross income.

    2.    Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or

PR-CCD-0010536

business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.     United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such individual, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside of Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) each of the ten years preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

4.     Puerto Rico corporations generally will not be subject to income or withholding tax under the US Code on gain recognized on the sale or exchange of the Bonds, unless the gain is effectively connected, or treated as effectively connected, with the conduct by the Puerto Rico corporation of a trade or business in the United States.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

The preceding opinions are based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change (including with retroactive effect) or possible differing interpretations. The opinions only deal with Bonds held as capital assets and do not address the tax consequences relevant to investors that are treated as pass-through entities or are subject to special tax regimes under the PR Code or the US Code.

Our opinion is limited to the above, and we do not express any other opinion regarding the Puerto Rico or United States federal income tax consequences arising from the ownership or disposition of the Bonds. Moreover, we do not express any opinion as to the tax consequences under the laws of any state or of any other taxing jurisdiction.

This letter is furnished by us solely for the benefit of the Commonwealth of Puerto Rico and the holders from time to time of the Bonds and may not be relied upon by any other person.

Respectfully submitted,

[To be signed by O'Neill & Borges LLC]

PR-CCD-0010537

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010538

Appendix IV

Table of Refunded Bonds

| Series of Bonds | Principal Amount Outstanding Prior to Refundings | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date | Redemption Price | CUSIP |
|---|---|---|---|---|---|---|---|
| Public Improvement Bonds, Series 2003B | $ 855,000 | $ 250,000 | 4.600% | 2012 | 4/28/2012 | 101.000 | 7451455Z1 |
| Public Improvement Bonds, Series 2003B | 895,000 | 895,000 | 4.800% | 2013 | 4/28/2012 | 101.000 | 7451456A5 |
| Public Improvement Bonds, Series 2003B | 935,000 | 935,000 | 5.000% | 2014 | 4/28/2012 | 101.000 | 7451456B3 |
| Public Improvement Bonds, Series 2003B | 3,305,000 | 3,305,000 | 5.500% | 2019 | 4/28/2012 | 101.000 | 7451456C1 |
| Public Improvement Bonds, Series 2003B | 4,825,000 | 4,825,000 | 5.500% | 2021 | 4/28/2012 | 101.000 | 7451456D9 |
| Public Improvement Bonds, Series 2003B | 8,000,000 | 8,000,000 | 5.600% | 2026 | 4/28/2012 | 101.000 | 7451456E7 |
| Public Improvement Bonds, Series 2003B | 15,600,000 | 15,600,000 | 5.650% | 2033 | 4/28/2012 | 101.000 | 7451456G2 |
| Special Obligation Bonds, Series 2003 | 6,230,000 | 6,230,000 | 4.800% | 2013 | 4/28/2012 | 101.000 | 7451457J5 |
| Special Obligation Bonds, Series 2003 | 27,005,000 | 27,005,000 | 5.500% | 2019 | 4/28/2012 | 101.000 | 7451457L0 |
| Special Obligation Bonds, Series 2003 | 36,020,000 | 36,020,000 | 5.500% | 2021 | 4/28/2012 | 101.000 | 7451457M8 |
| Public Improvement Bonds, Series 2004B | 1,850,000 | 1,850,000 | 4.800% | 2013 | 4/28/2012 | 101.000 | 7451456S6 |
| Public Improvement Bonds, Series 2004B | 1,940,000 | 1,940,000 | 5.000% | 2014 | 4/28/2012 | 101.000 | 7451456T4 |
| Public Improvement Bonds, Series 2004B | 6,835,000 | 6,835,000 | 5.500% | 2019 | 4/28/2012 | 101.000 | 7451456U1 |
| Public Improvement Bonds, Series 2004B | 10,000,000 | 10,000,000 | 5.500% | 2021 | 4/28/2012 | 101.000 | 7451456V9 |
| Public Improvement Bonds, Series 2004B | 16,570,000 | 16,570,000 | 5.600% | 2026 | 4/28/2012 | 101.000 | 7451456W7 |
| Public Improvement Bonds, Series 2004B | 32,300,000 | 32,300,000 | 5.650% | 2033 | 4/28/2012 | 101.000 | 7451456Y3 |
| Public Improvement Bonds, Series 2005B | 11,790,000 | 11,790,000 | 4.300% | 2013 | 7/1/2012 | 101.000 | 74514LCQ8 |
| Public Improvement Bonds, Series 2005B | 3,735,000 | 3,735,000 | 4.500% | 2014 | 7/1/2012 | 101.000 | 74514LCR6 |
| Public Improvement Bonds, Series 2006C | 23,405,000 | 13,000,000 | 5.500% | 2012 | 4/28/2012 | 101.500 | 74514LKP1 |
| Public Improvement Bonds, Series 2006C | 24,635,000 | 24,635,000 | 5.600% | 2013 | 4/28/2012 | 101.500 | 74514LKQ9 |
| Public Improvement Bonds, Series 2006C | 52,965,000 | 52,965,000 | 5.700% | 2015 | 4/28/2012 | 101.500 | 74514LKS5 |
| Public Improvement Bonds, Series 2006C | 6,000,000 | 6,000,000 | 5.750% | 2016 | 4/28/2012 | 101.500 | 74514LKT3 |
| Public Improvement Bonds, Series 2006D | 12,000,000 | 12,000,000 | 5.700% | 2016 | 4/28/2012 | 101.500 | 74514LLC9 |
| Public Improvement Bonds, Series 2007B | 9,500,000 | 9,500,000 | 5.500% | 2013 | 7/1/2012 | 101.500 | 74514LLP0 |
| Public Improvement Bonds, Series 2007B | 10,050,000 | 10,050,000 | 5.550% | 2014 | 7/1/2012 | 101.500 | 74514LLQ8 |
| Public Improvement Bonds, Series 2007B | 10,600,000 | 10,600,000 | 5.600% | 2015 | 7/1/2012 | 101.500 | 74514LLR6 |
| Public Improvement Bonds, Series 2007B | 11,200,000 | 11,200,000 | 5.650% | 2016 | 7/1/2012 | 101.500 | 74514LLS4 |
| Public Improvement Bonds, Series 2007B | 11,850,000 | 11,850,000 | 5.700% | 2017 | 7/1/2012 | 101.500 | 74514LLT2 |
| Public Improvement Bonds, Series 2007B | 4,500,000 | 4,500,000 | 5.750% | 2018 | 7/1/2012 | 101.500 | 74514LLU9 |

IV - 1

PR-CCD-0010539

[THIS PAGE INTENTIONALLY LEFT BLANK]

PR-CCD-0010540

COMMONWEALTH OF PUERTO RICO • Public Improvement Refunding Bonds, Series 2012 B (General Obligation Bonds)

MIX
From renewable
sources
FSC
www.fsc.org
FSC® C017146

Printed by: ImageMaster
www.imagemaster.com

PR-CCD-0010541

Case:17-03283-LTS Doc#:470-6 Filed:02/24/18 Entered:02/24/18 20:14:46 Desc:
Exhibit 32 Page 1 of 1

# Exhibit 32

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 33

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Exhibit 34 Page 1 of 1

# Exhibit 34

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Exhibit 35 Page 1 of 1

# Exhibit 35

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 36

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 37

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 38

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 39

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Case:17-03283-LTS Doc#:5046 Filed:01/24/18 Entered:01/24/18 20:14:10 Desc:
Exhibit DX-GG Part 5 Page 20 of 541

# Exhibit 40

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Exhibit 41 Page 1 of 1

# Exhibit 41

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Case:17-03283-LTS Doc#:370-49 Filed:02/24/18 Entered:02/24/18 20:14:45 Desc:
Exhibit 42 Page 1 of 1

# Exhibit 42

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Exhibit 43 Page 1 of 1

# Exhibit 43

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Case:17-03283-LTS Doc#:370-51 Filed:01/24/18 Entered:01/24/18 18:18:25 Desc:
Exhibit 44 Page 1 of 1

# Exhibit 44

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Exhibit 45 Page 1 of 1

# Exhibit 45

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 46

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Case:17-03283-LTS Doc#:510-54 Filed:02/24/18 Entered:02/24/18 20:14:26 Desc:
Exhibit 47 Page 136 74 of 541

# Exhibit 47



---

# The Commonwealth of Puerto Rico
## Update on Fiscal and Economic Progress

*FY 2014 Q1 Investor Webcast - October 15, 2013*

---

CONFIDENTIAL

# Forward-Looking Statements

The information included in this presentation contains certain "forward-looking" statements. These forward-looking statements may relate to the fiscal and economic condition, economic performance, plans and objectives of the Commonwealth of Puerto Rico (the "Commonwealth") and/or its agencies or instrumentalities. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth and/or its agencies or instrumentalities that are difficult to predict. The economic and financial condition of the Commonwealth and its agencies or instrumentalities is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and/or its agencies or instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's or its agencies or instrumentalities' projections.

The projections set forth in this presentation were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the officers of the Commonwealth or its agencies or instrumentalities responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth and/or its agencies or instrumentalities, as applicable. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this presentation are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's nor any agency or instrumentality's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's nor any agency or instrumentality's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this presentation, which is solely the product of the Commonwealth and/or its agencies or instrumentalities, and the independent auditors assume no responsibility for its content.

2

# Agenda

| | |
|---|---|
| **1** | **Principal Credit Accomplishments** |

| | |
|---|---|
| 2 | Revenue and Expense Update |

| | |
|---|---|
| 3 | Economic Development |

| | |
|---|---|
| 4 | Financial Highlights |

| | |
|---|---|
| 5 | Concluding Remarks |

# We have tackled the key challenges faced by Puerto Rico for decades in order to strengthen our credit and protect bondholders

| Challenges faced… | …Puerto Rico has taken action: | |
|---|---|---|
| **① Size of the General Fund's Deficit** | • Approved budget for fiscal year 2014 was designed to reduce the budget deficit from $2.375 billion in FY2012, and a projected $1.290 billion in FY2013, to $820 million in FY2014, by enhancing and diversifying our revenue base, including through an increase in the Act 154 excise tax to 4%, and by reducing our reliance on debt service restructuring.<br><br>• Q1 preliminary revenues are above estimates and Q1 preliminary expenditures are in line with budgeted appropriations. | ✓ |
| **② Funding of the Commonwealth's Pension System** | • Act 3 delivered on the long-standing promise of enacting meaningful and comprehensive pension reform to the ERS that reduces the projected need for approximately $900 million in annual pay-as-you-go contributions in the future and ensures cash flow sufficient to pay pension obligations when due. | ✓ |
| **③ Public Corporations Dependent on General Fund and GDB support** | • Significant steps have been taken to turn the Commonwealth's main public corporations, including PRASA, PRHTA, PRPA and PREPA, into entities capable of operating without budgetary subsidies or deficit financing from the General Fund or GDB. | ✓ |
| **④ Need for Meaningful Spending Controls** | • During the second half of FY2013, the Commonwealth reduced General Fund expenses, turning a $140 million over expenditure projection as of January into approximately $50 million of under spending. For FY2014, General Fund payroll for July and August reflects an 11% decrease over the same period in the prior year. As of August 30, 2013, cumulative General Fund headcount was approximately 5,000 less than January 1, 2013. | ✓ |
| **⑤ Need to Jumpstart Economic Growth** | • We are currently executing a short-term, aggressive outreach plan with clear and achievable goals and benchmarks that we are confident will result in thousands of new jobs and reposition Puerto Rico as a competitive business and investment destination. Our focus on job creation has already led to commitments expected to generate approximately 25,000 direct and indirect jobs.<br><br>• This presentation includes a description of the five-year economic plan developed by the Commonwealth with the input of Boston Consulting Group. We are confident this plan will jumpstart our economic engine and lead us to sustainable, long-term economic growth. | ✓ |

CONFIDENTIAL



# 1

# Puerto Rico has taken actions to reduce the General Fund deficit



## Historical and Projected Deficit [a] (in millions)

$(2,864)    FY 2009
$(2,724)    FY 2010
$(1,801)    FY 2011
$(2,375)    FY 2012
$(1,290) [b]
$(2,213) [b]    FY 2013e
$(820)    FY 2014e

Projected deficit as of January 31, 2013 was reduced by $923 million

(a)  Source: "Commonwealth of Puerto Rico – Financial Information and Operating Data Report", dated October 15, 2013. Deficit for fiscal year 2013 and 2014 is preliminary and subject to change. Results presented for FY 2009 and FY 2010 exclude approximately $442 million and $50 million, respectively, of non-recurring expenses accrued during prior fiscal years that have been previously accounted as part of total expenditures for such fiscal years.

(b)  After implementation of corrective measures by current Administration, deficit for FY 2013 was initially revised from $2.213 billion as of January 31, 2013 to $1.602 billion as of April 30, 2013, and again revised to $1.290 billion as of June 30, 2013. The approximately $2.213 billion deficit found in January 31, 2013 was composed of (i) a revenue shortfall of $965 million, (ii) $333 million COFINA deficit financing, (iii) $775 million in debt refinancing and (iv) $140 million of overspending (eliminated by OMB by June 30, 2013).

E: Estimated, preliminary and subject to change.

CONFIDENTIAL

PR-CCD-0448383



# We are phasing out of the practice of restructuring GO and PBA debt service payments for budgetary relief



- General Fund budgets for FY 2013 and FY 2014 were designed with a debt service restructuring of $775 million ($600 million in GO and $175 million in PBA bonds) and $575 million (in GOs), respectively.

- For the first time since FY 2009, there will be no PBA debt service restructuring in FY 2014.

- Our plan is to significantly reduce debt service restructuring for FY 2015 and eliminate the practice by FY 2016.

Source: "Commonwealth of Puerto Rico – Financial Information and Operating Data Report, dated October 15, 2013." Debt restructuring for fiscal year 2014 is preliminary and subject to change without prior notice, including as a result of market and general economic conditions
*Total debt service due for each fiscal year before any restructuring

6

CONFIDENTIAL

PR-CCD-0448384

**2** We enacted meaningful pension reform

- The Employees Retirement System's pension reform, which has been labeled a "credit positive" by the rating agencies, provides a **cash-flow solution** to ensure that all the System's obligations are paid when due.

- Changes enacted by Act 3-2013 include moving participants to a **defined contribution plan, annuitizing the defined contribution benefits, increasing retirement age**, **increasing employee contribution**, modifying (and eliminating for future retirees) "Special Law" benefits, eliminating disability benefits and changing survivor benefits.

- With an additional annual contribution through 2033 ($120 million for FY 2014), **it is projected that the system's $900 million average cash flow deficit is eliminated**.

- The Puerto Rico Supreme Court has already **upheld the constitutionality** of the reform.

- In **contrast to other U.S. jurisdictions**, Puerto Rico has shown **political courage** and taken decisive action to tackle the long-term risk presented by its largest retirement system.



**Cash Flow Deficit Projection After Act 3 and Act 32 of 2013** (in millions)

Legend:
- **Remaining Shortfall**
- **Reduction in Cash Flow Deficit**
- **Projected Total Assets (After Pension Reform)**

**Average Annual Shortfall:**
- Prior to reform: $900 mm
- Post-reform: $0

Note: The amounts presented are estimates, the end result could vary. This chart takes into account an investment rate of return of 6.00% and does not take into account the retirement of ERS covered employees that may have retired as a result of the reform.

7

PR-CCD-0448385

**3** **Significant steps have been taken to turn public corporations into self-sufficient entities capable of operating without budgetary subsidies or GDB deficit financing**



- In July 2013, PRASA implemented a 60% rate increase (on average) that will provide additional revenues to cover operational expenses and improve debt service coverage.
- As a result of this increase, in contrast with prior years, the Commonwealth does not anticipate having to appropriate funds to PRASA for its operational expenses.



- Acts 30 and 31 of 2013, signed into law on June 25, 2013, increase HTA's recurring annual revenues by approximately $270 million.
- These new revenue measures allow HTA to (i) begin amortizing its lines of credit outstanding with GDB and other financial institutions, (ii) access the capital markets over time to repay GDB lines and (iii) fund operational expenses.



- On February 27, 2013, Puerto Rico finalized the P3 transaction involving the Luis Muñoz Marín International Airport and received an upfront payment of $615 million.
- This transaction strengthened the Ports Authority's fiscal position and reduced both the Port Authority's and GDB's risk position by repaying over $490 million most of which had been either owed to or guaranteed by the GDB.



- Conversion to natural gas as a fuel source has been completed at PREPA's 2nd largest generating plant, reducing oil dependency by another 11%; negotiations to permit the conversion of PREPA's largest generating plant (18% of total capacity) are underway.
- In August 2013, with over $1.6 billion of orders from investors, PREPA successfully completed a $673 million bond issuance to fund its capital improvement program, including the conversion to natural gas of existing oil-fired generation units, which is expected to enable PREPA to improve its operating efficiency.

These public corporations are key drivers of Puerto Rico's economic growth with a combined CIP of approximately $1,206 million in FY 2014. At this point, GDB does not expect any of these public corporations to need budgetary subsidies or operational loans from GDB for FY 2014.

8

# Next Steps of Fiscal Plan



## Reform the Teachers Retirement System

- Before the end of the calendar year, we will present legislation to reform our teacher's pension system to ensure that the system does not run out of assets and pension benefits can be paid when due.

- Similar to the reform of the ERS, the reform of the TRS will be a cash flow solution that will alleviate future pay-as-you go pressure on the General Fund.



## Finish the Job of Eliminating the Budget Deficit

- For FY2015, the Commonwealth will reduce its budget deficit by at least an additional 50% versus FY2014's budgeted deficit ($820 million).

- We expect to have a balanced budget by no later than FY2016.

- We are committed to cutting expenses this fiscal year if revenue targets are not substantially met.

> The Commonwealth is committed to continue demonstrating its willingness and ability to further strengthen its fiscal health.

9

PR-CCD-0448387

# Agenda

| 1 | Principal Credit Accomplishments |

| 2 | **Revenue and Expense Update** |

| 3 | Economic Development |

| 4 | Financial Highlights |

| 5 | Concluding Remarks |

PR-CCD-0448388

# FY2013 and FY2014 Revenue Update

CONFIDENTIAL

PR-CCD-0448389

# After significant corrective measures were adopted, the FY2013 revenue shortfall was reduced to $247 million. Funds to reduce the remaining shortfall have been identified.

The following measures were undertaken to reduce the $965 million revenue shortfall:



**Effect of Corrective Measures**

| Measures | Amount (in millions) |
|---|---|
| - Cash Receipt Tax Amnesty | $90 |
| - Redemption Fund | $241 |
| - Royalty Prepayments | $235 |
| - Closing Agreements over Budgeted Amount | $80 |
| - Reimbursement of US Treasury Dept. for American Opp. Tax Credit | $49 |
| - COFINA Surplus | $16 |
| - Others | $7 |
| **Subtotal** | **$718** |
| Preliminary Shortfall as of June 2013 * | $247 |
| **Total** | **$965** |

* Shortfall is expected to be reduced or eliminated through (i) sale of old ($128 million) and new payment plans ($199 million) from Tax Amnesty and (ii) the closing of pending transactions with two pharmaceutical companies ($98 million), expected later this month.

12

PR-CCD-0448390

# FY 2014 Budget - General Fund Revenue Projection



**Preliminary Revenue Projection for Fiscal Year 2014** (in millions)

| | | | | | | |
|---|---|---|---|---|---|---|
| $7,785 | **A** $360 | $8,145 | **B** $1,071 | **C** $309 | **D** $245 | $9,770 |
| Base Ending FY2013 | Base Increment* | Base for FY2014 | New Tax Measures | Expansion SUT Base | Gap / Stabilization Fund | Revenue Estimate FY2014 |

**A** Results primarily from the increase of the Act 154 excise tax, minus a reduction due to royalty pre-payments received in FY 2012-13 as part of deferral of amendments to Act 154, minus $62 million of vehicle license fees transferred to PR Highways.

**B** Approved FY 2014 Budget includes new tax measures expected to raise $1.071 billion of additional revenues, excluding the expansion to the "SUT" base.

**C** Expansion of Sales and Use Tax ("SUT") base of approximately $309 million principally relies on the extension of the SUT to certain business-to-business services and the elimination of exemptions for certain institutions and resellers.

**D** Budget contemplates a Stabilization Fund of $245 million.

*Economic growth projections reflect the most up-to-date PR Planning Board projections for FY 2014 (+0.2%).

13

CONFIDENTIAL

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:19:25 Desc:
Exhibit Exhibit 4F al Page 190of 74 of 541

# Adopted budget for FY 20 includes new tax measures expected to result in $1.071 billion of additional revenues, excluding the SUT expansion



| New Tax Measures = $1.071 billion* | Commentary |

**(in millions)**

| | |
|---|---|
| Corporate Taxes — $808 | Measures include among others:<br>• Gross Receipts Tax, AMT adjustment and 2010 tax rate code.<br>• Modified corporate AMT – Adjustment Net Operational Loss and Book-Tax Adjustment |
| Tax Credit Limit — $78 | • Tax credits with questionable impact on economic growth legislated over time reduced by 50% |
| Self-Employed Tax Surcharge — $66 | • 2% top-line tax on sole proprietorships and self employed professionals earning over $200,000<br>• Limit on mortgage interest deductions |
| Insurance premiums — $47 | • 1% tax on underwriting premiums |
| Lottery Revenue Initiatives — $40 | • Lottery revenue from certain initiatives (changes in modality)<br>• Effect of already repealed UPR scholarship extraction |
| "Sin" Taxes — $17 | • Increase excise tax on cigarettes<br>• Effect calculated net of demand elasticity |
| Casino Revenues — $15 | • More casino (slot) machines allowed in hotels |

* Numbers are preliminary estimates and subject to change.

14

PR-CCD-0448392

Case:17-03283-LTS   Doc#:4781-6   Filed:01/14/19   Entered:01/14/19 18:12:25   Desc:
Exhibit DX-GG Part 6   Page 42 of 541

# FY 2014 General Fund budget deficit represents a reduction of 65% vs. audited FY 2012 results*



* The FY2014 GF deficit represents a reduction of 65% when compared to audited June 30, 2012 deficit results, 63% when compared to preliminary FY2013 deficit projection as of January 31, 2013, and a reduction of 37% when compared to most recent estimates of the FY2013 deficit.

CONFIDENTIAL

PR-CCD-0448393

# FY 2014 Q1 revenues are above estimates...



### Q1 FY 2013 vs. Q1 FY 2014

FY 2013 YTD Results: $1,611 million
FY 2014 YTD Results: $1,699 million



### FY 2014 Q1 Budget vs. FY 2014 Q1 Results

FY 2014 YTD Budget: $1,688 million
FY 2014 YTD Results: $1,699 million

General Fund July-September (Q1) preliminary revenues are higher by (i) $88 million above FY 2013 Q1 results and (ii) $10.4 million over budgeted estimates for FY 2014 Q1.

\* Detailed revenue numbers are available in the Appendix A.

[1] Sales and Use tax revenues flow to COFINA until receiving the Pledged Sales Tax Base Amount.

16

# ...and Sales Tax Fiscal YTD revenue is also above projections

SUT Revenues for FY 2014 Q1 were $16 million higher than for the same period in FY2013, even without the full effect of SUT base expansion.





July-September (Q1) preliminary SUT collections of $305.3 million are
(i) 5.5% above the same period of FY 2013 and (ii) 1.3% above budgeted estimates.

CONFIDENTIAL

PR-CCD-0448395

# FY2013 and FY2014 Expense Update

CONFIDENTIAL

PR-CCD-0448396

# FY 2013 Preliminary GF Results show a $56 million under spending vs. budget overview



**Corrections to the overspending forecast during the 2nd Semester (January – June) of FY 2013:**

| | | |
|---|---|---:|
| **Excess Spending Estimate at Jan 2013** | | **$140M** |
| (-) | Freezing of account balances per spending control Executive Order (transferred in June to the Dep. Ed.) | $29M |
| (-) | Department of Education year-end spending versus initial projections at January 2013 | $32M |
| (-) | Payment of excess sick leave for the Police Department covered with one-time transfer of non-General Fund balance | $30M |
| (-) | Payment of excess sick leave for certain agencies paid with non-General Fund, internal sources (fee income, federal) | $28M |
| (-) | Additional factors (slowdown of spending due to transition effect; austerity measures; conservative forecast) | $76M |
| **Year End Excess (+) or Under (-) Spending Estimate at Sep 2013** | | **-$56M** |

(1) All results per PRIFAS Central Accounting System balances, as adjusted by OMB, in its best judgment, to reflect pending obligations or disbursements, unsynchronized independent platforms at different agencies, and other adjustments. As with all estimates, final results will vary. At this date, with the Department of Education final balance certified, we expect no substantial changes to the outlook.

CONFIDENTIAL

19

PR-CCD-0448397

# FY 2014 Approved Budget
## Non Discretionary Pre-Legislated Expenses

| Non Discretionary | Semi Discretionary | Discretionary |
|---|---|---|
| UPR Formula | Public Health Insurance | Special Appropriations - Agencies/Programs |
| Judicial Branch Formula | Special Appropriations – OMB Custody | Department of Education – Operating Cost |
| Municipalities Formula & Legislature (Fixed) | Contributions to Legislature | All Other Agencies – Operating Cost |
| General Obligations & 3rd Party Debt | Contributions to Municipalities | All Other Agencies - Payroll |
| Debt to GDB | Special Appropriations – To Public Corp's | Department of Education - Payroll |
| Retirement Systems – Special Laws | | |

**32%**

**Total Non Discretionary $3,167M**

**12%**

**Total Semi Discretionary $1,168M**

**56%**

**Total Discretionary $5,435M**

### Non Discretionary Expenses - $3,167M

| | |
|---|---|
| UPR Formula | $834M |
| Retirement System – Special Laws | $691M |
| General Obligations and 3rd Party Debt | $521M |
| Municipalities & Legislature Formulas | $480M |
| Judicial Branch Formula | $349M |
| Debt to GDB | $291M |

*In $ millions*



Debt 813
Retirement Systems 691
Formulas 1,663

20

CONFIDENTIAL

PR-CCD-0448398

# FY 2014 Approved Budget
## Semi-Discretionary Expenses (Primarily Entitlements and Contributions)

| Non Discretionary | Semi Discretionary | Discretionary |
|---|---|---|
| UPR Formula | Public Health Insurance | Special Appropriations - Agencies/Programs |
| Judicial Branch Formula | Special Appropriations – OMB Custody | Department of Education – Operating Cost |
| Municipalities Formula & Legislature (Fixed) | Contributions to Legislature | All Other Agencies – Operating Cost |
| General Obligations & 3rd Party Debt | Contributions to Municipalities | All Other Agencies - Payroll |
| Debt to GDB | Special Appropriations – To Public Corp's | Department of Education - Payroll |
| Retirement Systems – Special Laws | | |

**32%**

**Total Non Discretionary $3,167M**

**12%**

**Total Semi Discretionary $1,168M**

**56%**

**Total Discretionary $5,435M**

### Semi Discretionary Expenses - $1,168M

| | |
|---|---|
| Public Health Insurance – ASES (Public Corporation) | $895M |
| Special Appropriations - OMB Custody | $104M |
| Operational Subsidies – Public Corporations | $96M |
| Contributions to Municipalities | $39M |
| Contributions to Legislature | $34M |

*In $ millions*

Public Health Insurance

895

104 OMB Custody

96 Operational Subsidies

39 Municipalities

34 Legislature

21

PR-CCD-0448399

# FY 2014 Approved Budget
## Discretionary Expenses (Commonwealth Agencies)

| Non Discretionary | Semi Discretionary | Discretionary |
|---|---|---|
| UPR Formula | Public Health Insurance | Special Appropriations - Agencies/Programs |
| Judicial Branch Formula | Special Appropriations – OMB Custody | Department of Education – Operating Cost |
| Municipalities Formula & Legislature (Fixed) | Contributions to Legislature | All Other Agencies – Operating Cost |
| General Obligations & 3rd Party Debt | Contributions to Municipalities | All Other Agencies - Payroll |
| Debt to GDB | Special Appropriations – To Public Corp's | Department of Education - Payroll |
| Retirement Systems – Special Laws | | |

**32%**

**Total Non Discretionary $3,167M**

**12%**

**Total Semi Discretionary $1,168M**

**56%**

**Total Discretionary $5,435M**

In $ millions

| Non Payroll Expenses - $1,782M | | | |
|---|---|---|---|
| Rent and Utilities | $532M | Transportation | $146M |
| PBA Rent (Excluding Debt) | $214M | Professional Services | $106M |
| PREPA & PRASA | $149M | Materials | $90M |
| Non Distributed Appropriations | $398M | Others | $55M |
| Purchased Services | $257M | Equipment | $32M |
| Subsidies and Incentives | $151M | Federal Funds Matching | $15M |

3,653 Payroll

1,782 Non Payroll

*Reconciliation with Joint Resolution for Operating Expenses: Discretionary Expenses of $5,435M plus (i) add-back $171M in PBA Rent that were reclassified as Non Discretionary - Debt Service; (ii) add-back of Legislature budget of $119M that were reclassified as Non-Discretionary - Legislature; and (iii) subtract Special Appropriations ($351M) which are substantially Discretionary in nature but not included in the Joint Resolution for Operating Expenses. This reconciles with the $5,375M in Joint Resolution total appropriations.

CONFIDENTIAL

PR-CCD-0448400

# FY 2014 Approved Budget
## Detail on Appropriation Increments



CONFIDENTIAL

Case:17-03283-LTS Doc#:4779-3 Filed:01/14/19 Entered:01/14/19 18:12:25 Desc:
Exhibit DX-GC Part 5 Page 51 of 541
Exhibit 47 Part 5 Page 25 of 74

**①** **Year over Year Payroll (Jul to Sept)**



**616.8** (In $ millions)

-5.3%

-32.9

**583.9**

FY 2013    FY 2014

- Reduction primarily due to employee attrition from Act 70 (early retirement); unusual retirement pattern due to the enactment of Act 3 ERS Reform; and austerity in hiring and rehiring measures, including political appointees.

- Figures exclude payroll at 22 smaller agencies with autonomous platforms that have a separate payroll from Treasury (for example, the State Elections Commission; Office of the Comptroller; et cet).

> **Payroll accounts (excluding *Schoolwide* appropriation) represent ~$2.6 billion or 27% of the General Fund Budget**

**Department of Education**

- These numbers do not include the *Schoolwide Program* mixed federal and state funds pool, which covers much of the payroll at the individual schools. Not charged as a payroll account but rather a non-distributed appropriation. The process of allocating expenses to state or federal has a lag.

- Dep. Of Education as of August 31st reported projected expenses over budget, mostly related to summer hiring for the new school year. However, this is preliminary and corrective measures are expected to be effective so that an over-spending forecast is not currently warranted. Corrective measures include carryforward reserve; applicable of eligible federal resources, actions to reduce security & transportation; application of surpluses at other agencies and overall OMB contingencies.

- Going forward, teachers retirement system reform will also probably result in attrition, representing an opportunity for school consolidation and payroll adjustments.

**②** **Budget vs Actual Payroll (Jul to Sept)**



**587.5** (In $ millions)

-0.6%

-3.6

**583.9**

FY 2014 Budget    FY 2014 Actual

- Not all of the year over year reduction flows into budget vs actual savings since
- reserves of ~$140 million for one-time liquidation payments were budgeted or have since been transferred to OMB custody and are excluded from the budget figures
- some payroll savings were already built into the budget, particularly to cover previously agreed-upon collective bargaining increases
- Budget includes other adjustments upward or downward, including higher annuity payments for those retirees under Act 70 incentive program

- OMB has issued re-hiring guidelines with respect to employees that retired on June 30 due to the effect of Act 3 Employee Retirement System Reform. A limited number will be rehired.

CONFIDENTIAL

PR-CCD-0448402

# Calendar YTD Cumulative Headcount Reduction
## January 2013 – August 2013



**Cumulative Headcount Reduction – January to August 2013 (By Information Source)**

19,600
18,000
8,362
8,485
5,310

January February March April May June July August

### DEPARTMENT OF EDUCATION
- 7,071 Attrition
+ 5,743 Hires
- 1,328 Net

### OTHER CENTRAL GOVERNMENT
- 5,841 Attrition
+ 1,859 Hires
- 3,982 Net

| Source | Scope | Comments |
|---|---|---|
| PR Department of Labor – Payroll Register | • Includes <u>all government employees</u>, including Municipal, Federal, and Public Corporations<br>• Monthly official statistics from the Statistics Bureau of the Dep. of Labor. | • Relies on payroll surveys of actual salaried employees. |
| PR Department of Labor – Workforce Poll | | • Relies on polls from a statistical sample. Depends on self-reported employer classification. |
| Office of the Comptroller | • Includes <u>government agencies</u> whose operating expenses are <u>funded by the Budget Joint Resolution</u>. Excludes, for example, UPR, Judicial Branch and Municipalities.<br>• Excludes 22 smaller agencies funded by General Fund remittances whose payroll is independent from the central Treasury System, except for the Police, which was included as self-reported. | • Figures are self reported by agencies. May include statistical input for blank data. Includes all sources, state and federal. |
| Dep. Treasury – Payroll Database (1) | | • Includes only employees covered by General Fund sources and by Schoolwide mixed state and federal funding pool. |

(1) Data from RHUM Dep. Treasury payroll database extracted by manual queries, subject to data quality issues. Should be used directionally only and not as a valid statistical source.

25

CONFIDENTIAL
PR-CCD-0448403

# Agenda

| | |
|---|---|
| **1** | Principal Credit Accomplishments |
| **2** | Revenue and Expense Update |
| **3** | **Economic Development** |
| **4** | Financial Highlights |
| **5** | Concluding Remarks |

CONFIDENTIAL

# Puerto Rico Economic Roadmap: Overview

**Vision**

Build upon Puerto Rico's historic strengths to achieve a *more diversified, knowledge-driven economy* that addresses the challenges of globalization and seizes upon emerging opportunities

**Goals**

**Near-term goal**
Shore up and diversify the economy by leveraging Puerto Rico's competitive advantages and consolidating its productive base

**Long-term goal**
Build sustainable competitive advantage with a diversified, adaptive economy and workforce driven by technology and innovation

**Policy Priorities**

1. *Defend anchor industries* while diversifying job sources on the Island
2. *Stimulate local entrepreneurship* – drive growth of small and medium enterprises (SMEs)
3. Support Puerto Rico's status as a *stable, business-friendly jurisdiction*
4. Take full advantage of opportunities tied to *Puerto Rico's relative fiscal autonomy*

**Impact**

**By beginning of 2016**
Over 90,000 jobs created
$6 to $7 billion in incremental GDP

**By beginning of 2018**
Over 130,000 jobs created
$10 to $12 billion in incremental GDP

27

PR-CCD-0448405

# Strategic Priorities

## Four themes drive the focus on and strategies behind the priority sectors

- Seize our capabilities to provide **high-quality products and services at competitive costs**
- **Leverage our unique geographic positioning** between the US, Latin America, and the Caribbean
- **Identify and win emerging opportunities** – sectors and niche markets
- Bring technology and innovation to **build upon historic strengths and "move up value chain"**

## Five priority sectors identified

| Global | Life Sciences | • **Defend traditional Pharmaceutical base** and **pursue innovative opportunities** (generics, biologics, contract manufacturing) <br> • Consolidate Puerto Rico's position as a **global manufacturing hub for medical devices** <br> • Bolster Puerto Rico as the **Center for Scientific R&D in the Americas** (Agricultural Biotechnology) |
|  | Knowledge Services | • Become the **Knowledge Services Center of the Americas** <br> • Pursue niche plays to grow **Insurance and Financial Services** |
|  | Tourism | • **Re-capture historic strengths in tourism** to become a premier U.S. and global travel destination <br> • Additionally, target **emerging niche markets** including ecotourism, **medical**, cultural and sports tourism |
| Internal | SMEs | • Build **world-class SME support** through a full-suite of coordinated programs targeting SMEs at all levels of development |
|  | Agriculture | • **Reduce reliance on food imports** by investing in high-productivity agricultural production |

## Investments in infrastructure will support longer-term competitiveness

- **Infrastructure investment** required to support growth in sectors and boost long-term competitiveness (e.g. airports, seaports, roads etc.)
- **Strategic initiatives** such as developing Roosevelt Roads and the Science City that can add significant long-term lift to Puerto Rico's economy

28

PR-CCD-0448406

# Recent successes underline Puerto Rico's potential (I/II)

| Area | Recent wins |
|------|-------------|
| **Life sciences** | **Biopharma manufacturing**<br>• Expansion of **Johnson & Johnson** with 308 new jobs and $226 million in investment<br>• Expansion of **Bristol Myers Squibb** with the creation of 100 new jobs and an investment of $200 million in expansion and renovation of the physical plant and factor equipment<br>**Medical devices manufacturing**<br>• Expansion of **CooperVision's** manufacturing facilities attracting $250 million investment and 350 new jobs<br>• Expansion of **Covidien's** manufacturing facilities attracting 200 new jobs<br>• Expansion of **Saint Jude Medical** with the creation of 150 new jobs over a period of 5 years, with estimated payroll expansion worth $6.2 million |
| **Knowledge services** | • Expansion of **IBM / True North** with the creation of 400 new jobs<br>• Expansion of **AON Hewitt** with the creation of 200 new jobs |
| **Tourism** | • **Increased air access** (Southwest to Orlando, Avianca to Bogota, expanded Caribbean services via Seabourne); with focus on LatAm. expansion ongoing (e.g. Brazil)<br>• **Cruise ships visits increased 84%** in August 2013 vs. year before and targeted incentives in place to drive traffic in years to come, supported by Pier 3 infrastructure improvement<br>• **Over 900 hotel rooms under construction** and hundreds more in the pipeline |

29

CONFIDENTIAL

# Recent successes underline Puerto Rico's potential (II/II)

| Area | Recent wins |
|------|-------------|
| **Other key wins** | **Jobs and investments**<br>• Commitments for 5,860 new jobs in small and medium-size enterprises under the incentives of the **Jobs Now Act**<br>• Commitments for over 7,500 new jobs under incentives offered by **PRIDCO**<br>• **Federal contract** win: $137 million 3-year military apparel mfg contract worth 2,200 jobs<br>• **Putnam Bridge Company** to invest $450 million in renovating Marina Puerto Del Rey, creating up to 400 construction jobs and up to 500 permanent jobs<br>• **Paulson & Co.** acquired an 80% interest in the Bahía Beach Resort & Golf Club, including the St. Regis Resort, and plans to invest $500 million in further development<br>**Recognition around the world**<br>• Ranked #30 in **2013 World Economic Forum ranking**, higher than last year and top Latin American country<br>• Included in **FutureBrand Top LatAm countries** for first time (ranked in top ten) |
| **Promising leads** | • Outreach negotiations at advanced stages with multiple new KS players<br>• Life sciences: Promising opps. in emerging areas (e.g. Generics, Med. Devices) |
| **Supporting reforms** | • **Energy** transition to natural gas has begun, first plant converted June 2013; Major Aguirre plant scheduled for early 2015<br>• Plan to increase share of energy produced with natural gas from 24% to 72% by 2017<br>• **Permitting** IT systems improvement plan in place and contracted |

CONFIDENTIAL

PR-CCD-0448408

# Estimated jobs creation and resulting tax revenues

## Jobs created by strategic initiatives in Economic Roadmap

## Potential gross tax revenue from Roadmap's strategic initiatives





**The economy is expected to benefit from imported capital which will create jobs and generate tax revenues**

1. Jobs added in non-focus sectors based on La Fortaleza's job tracker, but excludes jobs which overlap w/ strategic initiatives in Economic Roadmap (eg. Jobs Now). Assumes all committed jobs will be created within 18 months, given current run-rate of 22k jobs created in 7 months.  2. Includes strategic bets (RR, Port of the Americas);  3. Total number of jobs will depend on degree of overlap between indirect jobs created from strategic initiatives and jobs projected outside of strategic initiatives;  Note: Initiative job impacts estimated by PR initiative leads w/ BCG validation; Sources: BCG economic model, PR Economic Planning Board, Bureau of Labor Statistics, Bureau of Economic analysis, Initiative leads, La Fortaleza jobs tracker

1. Upper range assumes historical average effective tax rates from 2008 to 2012 multiplied by incremental GDP over baseline. Note that recent tax changes and revenue collection efforts may push average effective tax rates upwards in the future. 2. Includes impact from both direct and indirect jobs created. Source: Puerto Rico Planning Board, Puerto Rico Treasury Department, BCG analysis

31

# Proposed Implementation Taskforce structure



CONFIDENTIAL

PR-CCD-0448410

# Cumulative <u>direct</u> jobs estimates by initiative (I/II)

| Group | Initiative | 2013 | 2014 | 2015 | 2016 | 2017 | Description |
|-------|-----------|------|------|------|------|------|-------------|
| Life sciences | Biopharma. mfg. | - | 400 | 1,100 | 1,800 | 2,600 | 1. Defend pharma: Goal to defend projected jobs loss.  2. Generics, co-mfg, supply chain: Goal of 5 plants / packing operations each |
| | Medical devices mfg | 400 | 800 | 2,700 | 4,500 | 5,800 | Target of 40 new projects in 5 yrs. Attract global giants, cardiac, high growth segments. |
| | Ag-bio (scientists) | 100 | 200 | 300 | 400 | 500 | Jobs growth driven by creation and expansion of seed research laboratories. |
| | Ag-bio (contract farmers) | 400 | 800 | 1,300 | 1,900 | 2,600 | Assumes 5x contract farmer jobs created per scientist job created. Contract farmer works 8-12 months/yr |
| Services | Knowledge services | 750 | 1,600 | 3,200 | 5,600 | 8,700 | Target of 28 new co's in 5 yrs. Attract ITO, BPO, KPO, Integrated outsourcers, Aerospace & defense. |
| | Insurance & financial services | 40 | 60 | 150 | 200 | 300 | Target attract 90 insurers incl. 15 class 4 co's in 5 yrs. |
| Tourism | Traditional tourism | 400 | 2,900 | 5,500 | 6,500 | 7,500 | 90% jobs growth is in new hotel, diversifying offerings |
| | Medical tourism & related health services | - | 300 | 500 | 900 | 2,700 | Based on PRHA projections for US and LatAm market penetration |
| SMEs | SMEs | 3,900 | 7,500 | 7,700 | 8,100 | 8,300 | Jobs mostly driven by Jobs Now. Others include incubator, Urban Center programs. |
| Agriculture | Traditional agriculture | 2,500 | 5,000 | 7,500 | 10,000 | 10,000 | Jobs driven by 5.5k jobs in coffee, 4k in sugarcane and 500 jobs in greenhouses |
| | Agriculture - seasonal workers | 1,600 | 3,300 | 4,900 | 6,500 | 6,500 | Seasonal workers for coffee picking |
| Other | Film & media production | - | 100 | 100 | 200 | 200 | Jobs driven by Film Co's incentive promotions |
| | MRO | - | - | 400 | 400 | 400 | Potential MRO facility – currently in discussion w/ co's |
| | Military apparel mfg | - | 2,200 | 2,200 | 2,200 | 2,200 | Jobs growth from one large Federal contract. |
| INITIATIVES TOTAL | | 10,100 | 24,900 | 37,300 | 49,200 | 58,400 | |

33

# Cumulative <u>direct</u> jobs estimates by initiative (II/II)

| Group | Initiative | 2013 | 2014 | 2015 | 2016 | 2017 | Description |
|---|---|---|---|---|---|---|---|
| **Strategic bets** | Roosevelt Roads | - | 100 | 1,600 | 1,700 | 1,700 | *Construction of Industrial Zone, Academic project, Eco-tourism, Marina* |
| | Science Trust | - | - | 100 | 200 | 300 | *Estimates for Oso Blanco, Cancer Center, Biomolecular bldg, & Bioprocess Dev't Complex – to be refined* |
| | Port of the Americas | - | - | 400 | 400 | 400 | *350 operating jobs once begins operations.* |
| | **Strategic bets total** | - | 100 | 2,000 | 2,200 | 2,300 | |
| **Infra-structure** | Airport P3 | - | 600 | 600 | 600 | 600 | *PPP w/ $195M investment in 3yrs, $1,400M in 40 yrs* |
| | Highways (PR-22) | - | - | 4,000 | 4,000 | 4,000 | *$1B investment across 2015-2017.* |
| | Caguas Commuter Rail | - | - | 1,200 | 1,200 | 1,200 | *$400M investment. Currently in feasibility / desirability phase.* |
| | PRASA (water) | - | 1,300 | 1,300 | 1,300 | - | *$354M construction for Valencia water treatment plant and reservoir* |
| | Correctional facilities | - | - | 900 | 900 | 900 | *$220M investment. Feasibility / desirability phase set to finish Oct. 2013* |
| | Natural Gas Infrastructure | - | 1,300 | 1,300 | - | - | *$180M-$300M investment . Feasibility / desirability phase set to finish Dec. 2013* |
| | **Infrastructure total** | - | 3,200 | 9,300 | 8,000 | 6,700 | |
| | **TOTAL DIRECT JOBS** | 10,100 | 28,200 | 48,700 | 59,400 | 67,500 | |

34

CONFIDENTIAL

# Agriculture, Tourism and SMEs

CONFIDENTIAL

PR-CCD-0448413

# Target Growth Sector: Agriculture

| Focus sector | Vision |
|---|---|
| **Agriculture** | Reduce reliance on food imports by building on Puerto Rico's traditional strengths and increasing capacity for high-productivity industrial agricultural production |

## Why this sector?

**Once a major component of the Puerto Rican economy, still significant room for growth**
- Puerto Rico currently produces only 15-20% of total food needs
- Opportunity to reduce roughly $3.5B in agricultural imports per year, keeping money in local economy

**New opportunities for innovative, high-productivity agricultural production**
- Room to expand both cultivated land and modern production technology

## Why PR can win

**Favorable climatic conditions**
- Allow PR to have several harvests per year, including year-round mango production

**Strong internal infrastructure**
- Allows quick and efficient transportation of high-value crops

**Close proximity to the U.S.**
- Ability to access one of the largest agricultural importers in the world

**Highly skilled and technically proficient workforce**

## Key initiatives

**Expand dairy production** – Support partnerships with local dairy producers and processing facility workers

**Invest in sugarcane processing** – Partner with the Puerto Rican Rum Association to invest in the expansion of sugarcane production and processing

**Build high technology greenhouses** – Develop five high technology greenhouses to pilot the production of high-value vegetables for export markets

**Expand coffee cultivation** – Increase the acreage available for coffee production by 16,000 acres

36

PR-CCD-0448414

# Target Growth Sector: Tourism

| Focus sector | Vision |
|---|---|
| Tourism | Capitalize on Puerto Rico's diverse tourism offerings to develop new niche markets and become premier U.S. and global travel destination |

## Why this sector?

**Tourism is a fundamental driver of the local economy and job creation**
• Represents 6% of total GDP

**Puerto Rico's tourism sector has significant room for growth**
• Global average of 9% GDP
• Opportunity to meet global average

**U.S. economic recovery provides base to drive tourism sector recovery**
• Puerto Rico highly dependent on U.S. tourism, which declined significantly in 2008-2009, but has been steadily improving since

## Why PR can win

**Most developed air access within all the Caribbean**
• Makes travel to/from PR faster and more convenient than any other Caribbean destination

**Relationship with the U.S.:**
• Tourists do not need passports to come to the Island (making PR easy for short-term vacation segment)
• Tourists have the advantage of being in U.S. territory where medical and legal services are similar to their home states, making PR a safer destination.

**Highest skilled labor force in the Caribbean, largely bilingual**

**Modern infrastructure (roads, convention and meeting facilities, etc)**

## Key initiatives

**Promote and market Puerto Rico** – Roll out "Five Star Reviews" and "Puerto Rico: All-Star Island" campaigns

**Improve air and maritime access** - Expand into Lat Am., recover position as hub of Caribbean, grow cruise access, rebuild European connections

**Tourism product development -** Expand range of accommodations, from ultra luxury to urban bed and breakfasts.

**Grow niche markets** - Particular emphasis on luxury, nature, adventure, gastronomy, and sports tourism

**Strengthen quality and service** – Ally with key academic institutions to develop tourism and quality and service educational programs

37

CONFIDENTIAL

PR-CCD-0448415

# Tourism: 408 jobs created and 1,025 committed (Jan – Sep 2013)



**Jobs committed and created by category, as of Sept 24th**

Created / Committed Jobs

# Key Tourism metrics are up in 2013 compared to 2012



Source: PRTC - Registration and Occupancy %/ Average Room Rate (ARR$) Report Surveys, April 2013; Puerto Rico Ports Authority

CONFIDENTIAL

PR-CCD-0448417

# Target Growth Sector: Small & Medium Size Enterprises

| Focus sector | Vision |
|---|---|
| **Small and Medium- Sized Enterprises** | Build world-class SME support through a full suite of coordinated programs targeting SMEs at all levels of development |

## Why is this sector important?

**Small and medium-sized enterprises (SMEs) are the largest sector in Puerto Rico's economy** – representing ~65% of employment[1] and up to 90% of companies[2]

**SMEs have struggled to recover from the economic downturn -** small business bankruptcies in PR increased by over 8% from 2009-2011, compared to a decrease in 7.5% for the U.S. overall[3]

## Where is Puerto Rico today?

**Today, there is no overarching strategy to support and grow SMEs**
- ~ 11 government agencies and nongovernmental organizations (NGOs) are involved in supporting SMEs
- Many have overlapping missions – offering redundant services or leaving open gaps
- No central coordination mechanism to ensure that SMEs receive needed support (e.g., Puerto Rico Trade and Export Company cannot expedite loans from the Economic Development Bank)

**Because services are spread through many agencies, additional burden on small businesses seeking support**
- No "one-stop shop" where SMEs can seek help in a central location

## Key initiatives

- **Improve coordination of SME support services** around the Island

- **Support entrepreneurial culture and development of innovative companies** through educational programs, mentoring, and the establishment of incubators

- **Help SMEs start, expand, and succeed** through targeted incentives/credit, business advisory programs, and coordinated financing

- **Take mature SMEs to the next level** through trade and export programs, taking advantage of increased air and sea connectivity to Latin America and other key trade partners

1. "Puerto Rico: Small and medium-sized business sector initiatives for job creation." Presentation by the Economic Development Bank, May 2012. SME defined here as a company with up to 250 employees and less than $5M in sales. 2. U.S. Census Bureau, 2011 County Business Patterns. SMEs defined here as a company with up to 20 employees; Nearly 99% of all establishments counted had fewer than 250 employees. 3. Small Business Administration and the US Territories Small Business Profile 2012.

CONFIDENTIAL

40

# Jobs Now Act Commitments: 5,860 jobs (Mar – Oct 2013)

## Jobs Now Act Overview

Jobs Now Act objective is to foster immediate job creation across the Island
- Eases the permitting process to enable the establishment and expansion of businesses
- Reduces costs of doing business by offering several tax and energy related credit incentives

Eligible businesses will then receive, the following incentives, among others:
- Discounts on worker compensation premiums to developing businesses (15 employees or less)
- Salary subsidies for hiring certain former public sector employees, women who are 40 or older, and indigent persons who are 25 or younger
- Salary subsidies for certain new co-op businesses
- Property and municipal tax exemptions for new businesses
- Special rental rates for certain PRIDCO and CCE properties
- Expedited application process  for loans with the Economic Development Bank
- Credits for the payment of electricity

## Jobs committed by type of eligible business, as of October 2



| # companies | 186 | 55 | 102 | 343 |

1. Total approved cases by LEA committee
Source: Consejo de Empleos a Corto Plazo, La Fortaleza (Week of Sep 24, 2013)

CONFIDENTIAL

PR-CCD-0448419

# Life Sciences and Services

CONFIDENTIAL

PR-CCD-0448420



Our goal is to position **PUERTO RICO** as a GLOBAL LEADER **in the KNOWLEDGE ECONOMY,** based upon our competitive advantages to generate:

◆ **SUSTAINABLE ECONOMIC GROWTH**

◆ **JOB CREATION**

43

PR-CCD-0448421

# Strategic Priorities

- Protect existing industrial base

- Enable the expansion of existing companies through cluster strategies

- Attract new global (and local) companies to invest in Puerto Rico

- Identify emergent segments that match Puerto Rico's capabilities



44

PR-CCD-0448422

# Puerto Rico Strategic Clusters



## Based on three major pillars:

| Human Capital | Infrastructure | Regulatory, Financial and Institutional Environment |
|---|---|---|

CONFIDENTIAL

PR-CCD-0448423

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:10:25 Desc:
Exhibit 47 Page 73 of 84

# Puerto Rico is already the Center of Excellence in Pharma, Biotech Medical Devices, Hi-Tech Manufacturing and Ag-Bio



*Innovative driven country-highly specialized (WEF)/(Battelle Report 2012

CONFIDENTIAL

PR-CCD-0448424

# Target Growth Sector: BioPharma Manufacturing

| Focus sector | Vision |
|---|---|
| **BioPharma manufacturing** | Preserve Puerto Rico's status as key BioPharma manufacturing location and increase share of growing sub-segments (generics) & advanced technologies (biologics) |

## Why this sector?

**BioPharma manufacturing represents ~25% of PR's GDP**

**To date, ~17K people work in the sector**

**Special attention needed to preserve jobs in this sector**

**Focus to be placed in generics and biologics / biosimilars**
- Generics sub-sector expected to continue fast growth
- Most new products in innovation pipeline are biologics
- Biologic technologies require higher quality manufacturing sites

## Why PR can win

**PR is a proven, high-quality manufacturing location**

**Opportunity to acquire high quality plants at low prices**

**PR well suited for large batch production**
- Benefit for biologics and niche drugs as they grow in scale

**Low manufacturing cost compared to US and western countries**

**PR uniquely advantaged of potential contract manufacturing opportunity**
- High industry concentration
- No IP concerns with generics

## Key initiatives

- **Defend existing Pharma operations**

- **Opportunistically pursue generics and biologics / biosimilars**
  - I.e. support repurpose of assets

- **Make innovative bets**
  - Establish contract manufacturing operation
  - Enable direct to retail distribution
  - Invest in education for advanced technologies

47

PR-CCD-0448425

# Target Growth Sector: Medical Device Manufacturing

| Focus sector | Vision |
|---|---|
| **Medical device manufacturing** | Consolidate Puerto Rico's position as a global manufacturing hub for the medical technology sector |

## Why this sector?

**The medical technology sector has seen significant growth over the past decade ($300B in sales with 7-8% growth projected through 2020)**

**The U.S. med tech market is the world's largest (~$120 billion in sales in 2012)**

**U.S. manufacturers shifting to low cost and tax-advantaged locations abroad (e.g., Ireland, Latin America), in order to re-import to the U.S.**

**At $4.5B in exports, Puerto Rico supplies ~2% of global med tech export market, on par with Singapore**

**Med tech sector supports over 19,000 jobs in Puerto Rico today**

## Why PR can win

**PR has a 50-year history of life sciences manufacturing experience**

**Puerto Rico has a competitive advantage given tax incentives, skilled workforce, and U.S. jurisdiction (FDA, IP protection)**

**Industry trends favor Puerto Rico's positioning**
- Industry consolidation leading to larger facilities, manufacturing network optimization
- Affordable Care Act's med device excise tax makes PR tax advantage more important

**Opportunity to target companies seeking low-cost nearshore manufacturing for U.S. market**

## Key initiatives

**Grow share from global giants already present in Puerto Rico -** Support process innovation and production of higher value products

**Create the Cardiac Cluster of the Americas -** Establish PR as a global destination for cardiovascular device manufacturing

**Attract companies from high-growth segments aligned with PR's strengths** – Orthopedics/trauma, minimally invasive surgery, and vision/ophthalmic devices

**Attract med tech suppliers to establish an advanced supply chain ecosystem** – Opportunity to create significant competitive advantage for Puerto Rico

CONFIDENTIAL

# Target Growth Sector: Agriculture Biotechnology

| Focus sector | Vision |
|---|---|
| **Agriculture Biotechnology** | Bolster Puerto Rico as the center for scientific crop R&D in the Americas |

## Why this sector?

**Agricultural Biotechnology (R&D) employment expected to increase by 5.5% annually**
- Result of rapid adoption of biotech crop technology in developing countries

## Why PR can win

**Major Ag Biotech companies are already operating in Puerto Rico:**
- Monsanto, Illinois Crop, Pioneer, Ag Reliant Genetics, Dow Agro, Rice Tec, Syngenta Seeds, etc.

**Puerto Rico offers major advantages to Ag Biotech companies:**
- Positive weather and environmental conditions ideal for agriculture
- Quality labor force and employee availability
- Excellent soil quality
- Government incentives
- Easy transport to mainland U.S.
- Same regulatory environment as U.S.

## Key initiatives

**Vertical integration of research activities within established companies** - Explore possibility of integrating trait identification and selection laboratories and genetic modification of seeds with companies already on Island

**Diversify and add research capabilities to existing companies in PR** - Expand research on improved seed varieties to include greenhouse vegetables (tomato, bell pepper, etc) and sugarcane varieties

**Grow the availability of contract research in Agriculture Biotechnology** - Expand and diversify contract research opportunities to smaller companies operating throughout the world

49

PR-CCD-0448427

# Target Growth Sector: Knowledge Services

| Focus sector | Vision |
|---|---|
| Knowledge Services | Establish Puerto Rico as a global center for the Knowledge Services industry, especially focused on near-shoring |

## Why this sector?

**Companies are seeking to specialize in core business and outsource other activities**
- Solid growth for KS in past 10 years

**Outsourcing shifting from pure cost arbitrage (low-cost focus) to higher productivity, better workforce profile**
- Trend favors Puerto Rico, given highly-trained and bilingual labor pool

**Ease of operations becoming increasingly important**
- Clients want more control over outsourcing operations
  - Near-shoring, same time zone, ease of communications
- PR offers compelling proposition given proximity to mainland U.S.
- Talent pools in some areas becoming saturated (e.g., Chile, Costa Rica)

## Why PR can win

**PR has convincing value proposition for America-focused near-shoring**
- Low cost structure and solid tax incentives (Act 20, 22 and 73)
- Highly-skilled workforce, better trained than region's competitors

**As U.S. jurisdiction, PR has access to industries with U.S. soil requirement**
- PR ideal destination for US A&D, financial services

**Recognized through high ranking from World Economic Forum (#30), higher than Chile, other competitors**

## Key initiatives

**Establish PR as a worldwide KPO hub:** Provide knowledge services to clients worldwide, with focus on the Americas and mainland U.S.

**Selectively go after integrated outsourcers:** Large integrated outsourcers with presence across the sector, with high potential for job creation

**Expand ITO and BPO sectors:** Focus on clients with presence in the Americas, seeking to expand to U.S./Caribbean – promote software development

**Build on initial progress to expand in Aerospace & Defense:** Focus on U.S. industry across all KS sectors, with concentration in ER&D and support functions

50

PR-CCD-0448428

# Sample deals achieved YTD 2013

| Company | Job Commitment / Date | Segment |
|---|---|---|
| AON Hewitt | 200 / February 2013 | Knowledge Services |
| Covidien | 200 / April 2013 | Medical Devices |
| CooperVision | 350 / April 2013 | Medical Devices |
| IBM / True North | 400 / May 2013 | Knowledge Services |
| Proper International | 2,200 / September 2013 | Military Apparel |

Source: PRIDCO

CONFIDENTIAL

51

PR-CCD-0448429

# Job Commitments (January – September 2013): 7,500



Source: PRIDCO

CONFIDENTIAL

PR-CCD-0448430

# Expected new jobs based upon ongoing negotiation: 9,280 in the next 12 months



**Life Sciences Sector** includes: Pharmaceuticals, Bio Technology, Ag-Bio & Medical Devices
**Knowledge Services Sector** includes: Aerospace & Defense, Information Technology, telecommunications
**General Industries Sector** includes: Electronics, Engineering & Construction, Textile / Military Apparel, and Others

53

PR-CCD-0448431

# Agenda

**1** Credit Accomplishments

**2** Revenue and Expense Update

**3** Economic Development

**4** Financing Highlights

**5** Concluding Remarks

PR-CCD-0448432

# GDB promotes fiscal stability and economic development through four primary roles

**1** **Lending Institution**

Structures and approves all permanent financing and provides interim and permanent lending, together with private financial institutions, to government entities

**2** **Fiscal Agent**

Oversees the credit and financial management of the Commonwealth, its municipalities, agencies and public corporations

**3** **Financial Advisor**

Manages all financings and capital market activities for the Commonwealth, its municipalities, agencies and public corporations

**4** **Economic Development**

Promotes investment in strategic projects to fuel economic development and growth

CONFIDENTIAL

PR-CCD-0448433

# GDB, as fiscal agent, oversees the Commonwealth's credit and approves the terms of any debt issuance



## Puerto Rico outstanding debt by category as of June 30, 2013 (in millions)

| Category | Amount | Description |
|---|---|---|
| Public Corporations and Agencies | $25,575 | Payable and secured solely from internal revenues of such corporations from rates charged for services or products or from specific external revenue sources |
| Sales Tax / COFINA Debt | $15,224 | Payable and secured solely from Sales and Use Tax Revenues |
| General Obligation Debt | $10,599 | Full faith and credit debt payable from and secured by General Fund revenues |
| Commonwealth Guaranteed Debt | $5,634 | Debt guaranteed by the Commonwealth's full faith and credit (principally PBA guaranteed debt, which amounts to $4.3 billion) |
| Limited Obligations/Non Recourse/POBs | $5,086 | Payable and secured solely from certain streams of revenue (e.g. payments under tobacco litigation settlements, federal housing assistance payments, annual allocation of HUD funds, and in the case of POBs, employer contributions to ERS) |
| Appropriations Debt | $4,043 | Payable from budget appropriations or taxes, but not guaranteed by full faith and credit of the Commonwealth |
| Municipalities | $3,882 | Payable and secured solely by real and personal property taxes and municipal license taxes |

The consolidated budget of the Commonwealth, its agencies, and instrumentalities, including federal funds, but excluding municipalities, is approximately $29 billion per year.

Note: For a comprehensive description of the outstanding debt of the Commonwealth, its agencies and instrumentalities, see "Commonwealth of Puerto Rico—Financial Information and Operating Data Report—DEBT—Public Sector Debt", dated October 15, 2013.

56

CONFIDENTIAL
PR-CCD-0448434

# GDB believes that any comparison of debt levels of Puerto Rico with the states should include state, local and federal debt

> If one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions*

## Puerto Rico Debt Per Capita vs the USA Comparison Analysis as of June 30, 2011
### (in millions)



### State Level Debt[1]

| | |
|---|---|
| US Avg: | $2,390 per capita |
| PR: | $2,805 per capita |
| **Rank:** | **#12 of 51** |

| State | | Rank (of 51) |
|---|---|---|
| HI | $5,376 | 3 |
| CT | $5,087 | 4 |
| NY | $4,976 | 5 |
| AK | $3,825 | 6 |
| RI | $3,787 | 7 |
| DE | $3,668 | 8 |
| CA | $3,122 | 9 |
| IL | $2,874 | 10 |
| NH | $2,847 | 11 |
| PR | $2,805 | 12 |



### State & Local Level Debt[2]

| | |
|---|---|
| US Avg: | $7,355 per capita |
| PR: | $15,956 per capita |
| **Rank:** | **#1 of 51** |

| State | | Rank (of 51) |
|---|---|---|
| PR | $15,956 | 1 |
| NY | $13,552 | 2 |
| CA | $9,971 | 3 |
| NJ | $9,739 | 4 |
| NV | $9,500 | 5 |
| WA | $9,379 | 6 |
| HI | $9,340 | 7 |
| MA | $9,258 | 8 |
| IL | $8,991 | 9 |
| AK | $8,927 | 10 |



### State, Local, Federal Level Debt[3]

| | |
|---|---|
| US Avg: | $57,024 per capita |
| PR: | $15,956 per capita |
| **Rank:** | **#51 of 51** |

| State | | Rank (of 51) |
|---|---|---|
| MS | $53,766 | 42 |
| OH | $53,690 | 43 |
| NC | $53,676 | 44 |
| SD | $53,042 | 45 |
| WV | $52,887 | 46 |
| AR | $52,819 | 47 |
| MT | $51,895 | 48 |
| ID | $51,698 | 49 |
| WY | $51,334 | 50 |
| PR | $15,956 | 51 |

*Source: US Bureau of the Census and the Government Development Bank for Puerto Rico
(1) For Puerto Rico State Debt includes GO debt.
(2) For Puerto Rico local debt includes debt of Municipalities and Public Corporations.
(3) US Federal Debt per capita is $49,669

57

PR-CCD-0448435

# The strength of GDB's balance sheet enables it to continue providing liquidity support to the Commonwealth

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:12:25 Desc: Exhibit Exhibit 47 a Page 5 of 6 541



**Key Financial Highlights – GDB Bank Only\***
**(preliminary and unaudited as of September 30, 2013)**

$ In billions

Net Assets /Capital $2.27

Assets $12.44

Liabilities $10.17

| Loans, net: | $9.08 billion |
| --- | --- |
| Capital Ratio: | 18.2% |

\* GDB serves a multi-purpose economic development mandate through the direct oversight of 5 subsidiaries. "GDB Bank Only" information refers only to the bank's operating activities, excluding subsidiaries and other component units.

CONFIDENTIAL

PR-CCD-0448436

# GDB's investment portfolio consists principally of high quality, liquid securities*



\* Preliminary financial information is unaudited and subject to change as of September 30, 2013.

CONFIDENTIAL

# GDB has a diversified and stable source of funding

## Diversified Funding Sources

- Approximately $5 billion in GDB notes provide locked-in rates and multi-year, staggered maturity structure.

- The primary source of short-term funding are public sector deposits ($4.1 billion).

- The Office of the Commissioner of Financial Institutions informed that there are currently approx. $2.8 billion in governmental deposits at private institutions, a significant portion which could be brought to the GDB in short order.

- GDB has nine Master Repurchase Agreements (MRAs) with primary dealers which provided aggregate REPO commitments in excess of $2 billion dollars as of September 30, 2013.

## Cost and Average Life of Funding Sources*

|  | Average Cost | Average Life |
|---|---|---|
| **Liabilities** | **2.72%** | **2.70 Y** |

in $ millions



Repo $437 (4%)
Other $75 (1%)
Deposits** $4,581 (45%)
Bonds & Notes $4,995 (50%)

\* Unaudited and preliminary financial information as of September 30, 2013.
\*\* Includes demand deposits, CDs and private deposits.

60

CONFIDENTIAL

PR-CCD-0448438

# Staggered maturities of our Series Notes program reduce roll-over risk



* As of September 30, 2013. Outstanding amount distributed as of fiscal year.

CONFIDENTIAL

# Projected Transaction Calendar*

| Current Calendar Year | Calendar Year 2014 |
|---|---|
| **Sales Tax Financing Corp. (COFINA)**<br>Restructuring FYs 2013-2014 (103) | **Sales Tax Financing Corp. (COFINA)**<br>Restructuring FYs 2013-2014 (103)<br><br>**Highways and Trans. Auth. (HTA)**<br>GDB L/C's (Take-out)(103) |

- GDB's capital markets plan for the remainder of the calendar year is limited to between $500 million and $1.2 billion of debt, depending on market conditions.

- The GDB is only contemplating a bond issuance through COFINA for the rest of the calendar year.

- Measures taken to provide HTA with approximately $270 million in new revenues have significantly diminished HTA's needs to access the capital markets in the short-term.

> The Commonwealth and the GDB have the financial flexibility to adjust its financing plan and transaction calendar as necessary

*Preliminary and subject to change without notice, including as a result of changing market conditions.

62

CONFIDENTIAL

# New COFINA Legislation

- With the enactment of Act 116-2013, the Sales and Use Tax percentage allocated to COFINA is increased from 2.75 percent to 3.50 percent, increasing Puerto Rico's financing capacity.

## COFINA's credit is bolstered by strong legal protections for bondholders

### COFINA is secured by a stable stream of revenues that is not subject to "claw-back"

- Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales Tax to COFINA and provided that any transferred portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

- COFINA will close, by resolution, its Senior and First Subordinate liens (except for refundings that generate savings).

- Law provides that no amendments to the law shall impair any obligation to COFINA bondholders.

- For a future legislature to exercise its constitutional power to limited or restrict the SUT, COFINA's bond documents require written confirmation of all outstanding ratings, taking the substitution into account, and opinions confirming that new revenue would not constitute "available resources".

- US-based Bond Counsel, PR-based Underwriter's Counsel and the PR Secretary of Justice have provided, for each COFINA transaction (13 in total), strong legal opinions that the SUT is not subject to "claw-back" by GO bondholders under the PR Constitution.

- "Claw-back" opinion enjoys broad bipartisan support: four different Secretaries of Justice, serving three different administrations (of alternating political parties), have issued official opinions that the SUT allocated to COFINA is not subject to "claw-back".

- Any new COFINA transaction would again receive "claw-back" opinions from Bond Counsel, Underwriter's Counsel and the PR Secretary of Justice.

- Legal opinions can be made available for review by existing and prospective bondholders

**COFINA is the best rated credit among Puerto Rico issuers and has historically been the most attractive source of financing for the Commonwealth.**

63

PR-CCD-0448441

# GDB expects to have the liquidity necessary to fund the Commonwealth's needs through at least fiscal year 2014

- The GO has $786 million in short-term financings maturing during FY 2014 that the Commonwealth expects to manage through refinancings, or repayments in full.

- GDB has addressed the short-term financing needs of our main public corporations.

  – PRASA does not need funding from the Commonwealth or GDB to cover its operational expenses or finance its capital improvement plan as a result of its recent rate increase.

  – HTA's $270 million in additional recurring revenues allows HTA to begin amortizing its outstanding financing with GDB and other financial institutions and fund its operational expenses.

  – PREPA issued approximately $673 million in bonds in August 2013, funding PREPA's capital improvement plan for the next two years.

  – The Commonwealth's cash flow needs for FY2014 have been met through the issuance of $1.2 billion in Tax and Revenue Anticipations Notes.

- Additional financing alternatives available to the Commonwealth and GDB include:

  – Accessing, within a short timeframe, a significant amount of the approximately $2.8 billion in unrestricted government deposits in private financial institutions.

  – Entering into secured or unsecured credit lines with private financial institutions.

  – Securing medium-term or long-term private placements with institutional investors.

**Even without extraordinary measures, Puerto Rico can choose not to access the capital markets during FY 2014.**

CONFIDENTIAL

# Agenda

| 1 | Principal Credit Accomplishments |
|---|---|

| 2 | Revenue and Expense Update |
|---|---|

| 3 | Economic Development |
|---|---|

| 4 | Financial Highlights |
|---|---|

| 5 | **Concluding Remarks** |
|---|---|

PR-CCD-0448443

# We have delivered on our investors' expressed concerns

✓ Our track record proves that we have the political will and ability to address each of our investors' concerns in a swift, decisive and unprecedented manner.

✓ The tough decisions made by this Administration stand in stark contrast with the failure of many other U.S. jurisdictions, and previous Commonwealth administrations, to take similar steps to address their fiscal and economic challenges.

✓ We know that there is yet work to be done.  Our plans include:

- Filing, before the end of the calendar year, a comprehensive reform of our teacher's pension system in order to ensure that the system never runs out of assets, alleviating future pressure on the General Fund.

- Cutting our deficit by submitting a budget for fiscal year 2015 that contains no new deficit financing and reduces to approximately $400 million or less our need for debt service restructurings.

- Taking necessary action to eliminate the budget deficit completely by no later than fiscal year 2016.

- Ensuring that tax revenues remain on track with estimates and acting decisively to address any projected revenue shortfall or overspending.

- Executing the economic growth plan that will result in immediate and long-term results.

> The people of Puerto Rico are confident that investors will recognize what we have accomplished responsibly through hard work and shared sacrifice.

66

Case:17-03283-LTS   Doc#:4781-56   Filed:01/14/19   Entered:01/14/19 18:19:25   Desc:
Exhibit 47 Page 95 of 541

# Puerto Rico will take action to improve disclosure practices and increase information available to investors

## Actions to improve disclosure practices

GDB will begin holding regular investor webcasts at least once per quarter

GDB will publish the Commonwealth Report on a regular quarterly basis

Treasury and OMB will continue providing revenue and expense updates at least once per month

Consistent with PREPA's disclosure practices, PRASA and HTA will begin posting their quarterly and, when ready, their monthly results on their webpage

GDB will continue to hold its annual Credit Conference in Puerto Rico

GDB will require disclosure counsel for all bond issuances

The Commonwealth and GDB are committed to observe best disclosure practices and improve our relationship with our investor base

67

PR-CCD-0448445

# Appendix A - YTD Revenue Detail

PR-CCD-0448446

# Fiscal 2014 YTD General Fund Revenues

| YTD General Fund Revenues (July - September) | | | | | | | |
|---|---|---|---|---|---|---|---|
| (in millions) | YTD Results | | | | Estimated Jul-Sep FY2014 | Revenues vs Estimated ($) | Revenues vs Estimated (%) |
| Tax Type | FY13 | FY14 | Variance | % Change | | | |
| Individual | $438.90 | $415.40 | ($23.50) | -5.35% | $448.10 | ($32.70) | -7.30% |
| Corporations | $233.90 | $357.70 | $123.80 | 52.93% | $344.50 | $13.20 | 3.83% |
| Non-Resident Witholdings | $142.50 | $119.70 | ($22.80) | -16.00% | $129.70 | ($10.00) | -7.71% |
| Sales and Use Tax | $0.00 | $0.00 | $0.00 | 0.00% | $0.00 | $0.00 | 0.00% |
| Property Taxes | $3.30 | $7.00 | $3.70 | 112.12% | $0.00 | $7.00 | 0.00% |
| Foreign (Act 154) | $446.20 | $435.00 | ($11.20) | -2.51% | $416.40 | $18.60 | 4.47% |
| Alcoholic Beverages | $62.30 | $63.70 | $1.40 | 2.25% | $63.80 | ($0.10) | -0.16% |
| Tobacco Products | $43.70 | $37.70 | ($6.00) | -13.73% | $37.90 | ($0.20) | -0.53% |
| Motor Vehicles | $78.90 | $80.70 | $1.80 | 2.28% | $72.50 | $8.20 | 11.31% |
| Off-Shore Shipment Rum Excise | $72.50 | $88.20 | $15.70 | 21.66% | $84.40 | $3.80 | 4.50% |
| Others | $88.60 | $93.70 | $5.10 | 5.76% | $91.10 | $2.60 | 2.85% |
| **Total YTD Results** | $1,610.80 | $1,698.80 | **$88.00** | **5.46%** | $1,688.40 | $10.40 | 0.62% |

69

PR-CCD-0448447

# Sales Tax Fiscal 2014 YTD Revenue

| SUT Revenues (in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY13 to FY14 Variance | FY13 to FY14 % | FY2014 Budget | FY2014 Actual Vs Budget ($) | FY2014 Actual Vs Budget (%) |
| July | $102.90 | $111.50 | $8.60 | 8.36% | $105.20 | $6.30 | 5.99% |
| August | $93.90 | $96.30 | $2.40 | 2.56% | $96.10 | $0.20 | 0.21% |
| September | $92.60 | $97.50 | $4.90 | 5.29% | $99.30 | ($1.80) | -1.81% |
| YTD Results | $289.40 | $305.30 | $15.90 | 5.49% | $300.60 | $4.70 | 1.56% |

70

CONFIDENTIAL

# Appendix B – GDB-EAI

PR-CCD-0448449

# Understanding the GDB Economic Activity Index

The GDB-EAI is an indicator of the general economic activity, not a direct measurement of the real GNP. **The GDB-EAI annual growth rates are not the same as the real GNP growth rates**, because the former are more volatile than the latter.

- When it is annualized, the level of the EAI is highly correlated with the level of the real GNP. Nevertheless, the annual growth rate of the EAI IS NOT the same as the annual growth rate of the real GNP. Being highly correlated does not mean being equal.

- The negative indicators of the GDB-EAI for 2013 may have been accentuated by the consequences of the election cycle in 2012, which activated particularly the construction and the services sectors, and the revision of the payroll employment benchmark, which increased the employment base for 2012. Finally, the employment reductions during the past three months have been more noticeable due to the significant reduction in state and local public employment, both related to Act 3 of 2013.



GDB Economic Activity Index

CONFIDENTIAL

PR-CCD-0448450



# The Commonwealth of Puerto Rico
## Update on Fiscal and Economic Progress

*Q & A Session*

PR-CCD-0448451

# Exhibit 48

<TELSPAN Event Information>
<Confirmation Number:  >
<Date and Time:  10/31/2013 2pm ET>
<Customer Name:  Government Development Bank for Puerto Rico>
<Conference Title: Investor's Conference Call>
<Length of Call: 45mins>


Operator: Good morning, and welcome to the Government
Development Bank for Puerto Rico conference call. My name is
Kellen and I will be your conference operator today. A replay of
the call will be available on the GDB website as soon as
possible after the call ends. All lines have been placed on mute
to prevent any background noise. Once the presentation concludes
there will be a Questions and Answers session. Questions that
have been sent in advance will be answered. If you are having
technical problems with the audio, press *0 for technical
support. On behalf of all of us at the Government Development
Bank for Puerto Rico, I would like to welcome everyone to this
call. The participants for today's call will be: José Pagán,
Interim President of the GDB, José Coleman-Tió, Executive Vice
President and General Counsel of the GDB, Virginia Wong, Jim
Montes, John Bove, Arthur McMahon, Ken Lind, all partners at
Nixon Peabody, and Manuel Pietrantoni, Manuel Rodriguez Boissen,
and Eduardo Arias, all partners at Pietrantoni Mendez & Alvarez.
I will now turn the call over to the Interim President of the
GDB, José Pagán for the opening remarks.

Jose P: Good afternoon. The Government Development Bank for
Puerto Rico and the Puerto Rico Sales Tax Financing Corporation,
which most of you know as COFINA, welcome you to this conference
call. We truly appreciate the time everyone has taken to join.
As announced in the investor webcast held by the Commonwealth on
October 16, 2013, GDB is taking affirmative actions to improve
its disclosure practices and increase the amount of information
available to investors. In particular, GDB will begin holding
an investor webcast at least once per quarter and will update
the Commonwealth Report on a quarterly basis. The Department of
the Treasury and the Office of Management and Budget will also
continue to provide revenue and expense updates at least once
per month. The Commonwealth and GDB are committed to observing
best disclosure practices and improving our relationship with
our investor base. As a further step in this direction, in
response to specific investor requests, GDB and COFINA made
available last week the legal opinions delivered in connection
with COFINA's last public transaction. These legal opinions,
delivered by the Puerto Rico Secretary of Justice, Nixon Peabody

GDBPR – 10/31/13                                              Page 1

                                 PR-CCD-0374039

as U.S.-based Bond Counsel and Pietrantoni Mendez & Alvarez LLC
as P.R.-based Underwriters' Counsel, are now available at our
website: bgfpr.com. As a further testament to our commitment to
transparency, today we take the unprecedented step of holding a
conference call with the outside legal advisors that authored
these legal opinions. We hope that you find this call
informative. As stated during our webcast, COFINA's credit is
bolstered by strong legal protections for bondholders. COFINA
is the best-rated credit among Puerto Rico issuers and has
historically been the most attractive and cost-effective source
of financing for the Commonwealth. U.S.-based Bond Counsel,
P.R.-based Underwriter's Counsel and the Puerto Rico Secretary
of Justice have provided, for each COFINA transaction (we count
13 in total), opinions concluding that the SUT allocated to
COFINA is not subject to "claw-back" by GO bondholders under the
PR Constitution. Importantly, the Secretary of Justice opinions
enjoy broad bipartisan support, a rare thing in Puerto Rico:
four Secretaries of Justice, serving three different
administrations (of alternating political parties), have issued
opinions that the SUT allocated to COFINA is not subject to
"claw-back". While no new COFINA transaction has been announced,
I want to emphasize that no such transaction would be completed
unless opinions reaching the same legal conclusion as those
being discussed today are again delivered at closing by the
Secretary of Justice and each of the firms acting as Bond
Counsel and Underwriters' Counsel in the particular transaction.
I now leave you with Jose Coleman, GDB's Executive Vice-
President and General Counsel.

Jose C.: Thanks Jose. I want to welcome you all to this
conference call and provide you with additional information
about the focus and purpose of the call. As previously
announced, this conference call is being held to discuss the
COFINA legal opinions, dated December 13, 2011, provided by
external legal counsel in connection with the issuance of the
Senior Series 2011C and Senior Series 2011D Bonds. The opinions,
which were provided by Nixon Peabody LLP, as Bond Counsel, and
Pietrantoni Mendez & Alvarez LLC, as Underwriters Counsel, were
posted on GDB s website on October 23, 2013. We hope that
everyone on the call has had an opportunity to review them. We
want to thank Nixon Peabody and PMA for making themselves
available to answer questions related to their respective
opinions. Nixon Peabody and PMA will each begin by providing a
brief overview of the legal analysis underpinning their opinion.
We will then proceed to answer questions submitted to GDB prior
to this call. As stated in GDB s press release, the purpose of
this call is solely to address questions related to these legal

CONFIDENTIAL                                              PR-CCD-0374040

opinions. As such, questions determined to be unrelated to the opinions will not be addressed. All participants are also advised that the none of GDB, COFINA or the law firms participating in this call are providing legal advice of any nature whatsoever to the call participants, that the information provided and discussed during the call is for informational purposes only, that only the parties to whom the opinions are addressed may rely thereon, and that participants should consult their own legal advisors with respect to any matter discussed in the opinions or this call. Furthermore, we emphasize that the COFINA legal opinions are subject to all of the qualifications and assumptions set forth therein. We strongly encourage all call participants to read the legal opinions in their entirety. It is important to stress that an opinion of counsel is not a prediction of what a particular court that reached an issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law. I want to add that a recording of this call will be made available as soon as possible on GDB s website. A notice will be posted on EMMA in order to provide notice to the market that the replay has been made available. Finally, we want to make clear that information provided in this call is not an offer to sell or the solicitation of an offer to buy any securities. I now leave you with Virginia Wong, partner at Nixon Peabody who acted as bond counsel for COFINA Senior Series 2011 C and Senior Series 2011 D bonds.

Virginia: Thank you Jose and thank you for the opportunity to discuss our opinion. The opinion that was posted on the GDB website as a note concludes that if the issues addressed by it are properly presented for judicial decision, a court would fine that Act 91 validly transferred the Pledge Sales tax, including the right to receive the tax to COFINA. The Pledge Sales tax does not constitute available resources for purposes of the Puerto Rico Constitutional Debt Priority Provision and that Act 91 validly provides that the Pledge Sales Tax is not available for use by the Secretary of the Treasury. These conclusions were based on our analysis review and consideration of several factors, including various cases decided by other jurisdictions including those that are specifically referenced in our opinion and those cases that analyze legislative provision that divert revenues from State treasuries and dedicate them without annual appropriations to a specific purpose. We also reviewed COFINA's

CONFIDENTIAL                                                                PR-CCD-0374041

act as amended as of the date of the 2011 opinion and our
analysis of the structure of COFINA's act in light of what other
courts typically considered in deciding whether similar
legislation had violated a state's constitutional appropriation
provision. We focused on the fact as identified by those courts
as important including the fact that the legislation was
designed specifically to comply with the well-recognized Special
Fund Doctrine. The Special Fund Doctrine holds that legislation
that is enacted due to an urgent need impressed the revenues
with a trust for a particular beneficiary requires the revenues
to be deposited into a special fund and provides that that
special fund be dedicated exclusively to certain purposes,
provides that the revenues not be received on account of the
state but rather on the count of the entity created to
accomplish the specified purpose that the legislation sets forth
limitations and conditions governing the disbursement of
revenues, provides for a monetary cap on the amount of revenues
that can be diverted from the state treasury, and finally
provides that any debt secured by revenues shall not constitute
a debt of the state. That is the Special Fund Doctrine and
courts have held that entities that are created following the
majority of those factors, those types of transaction will be
upheld. We reviewed the various opinions issued by the Secretary
of Justice to Puerto Rico to COFINA, including the opinion
relating to the 2011 C and D bonds. Those opinions conclude that
the Pledge Sales Tax does not constituted available resources of
the Commonwealth for purposes of the Constitution nor would they
be available for use by the Secretary of the Treasury of the
Commonwealth. Finally, we reviewed the conclusions of PMA as to
certain matters under Puerto Rico law on which we relied
including the fact that there are no controlling precedents in
Puerto Rico and that the Puerto Rico Supreme Court generally
defers to the acts of the legislature and opinions of the
Secretary of Justice. I think that summarizes the factors that
we analyzed and reached in our opinion.

Jose: I would like to thank Nixon Peabody for providing an
overview of the opinion. We hope that you find that informative
and I now leave you with Manual Pietrantoni, a partner with PMA,
who acted as underwriter's counsel for the COFINA Senior Series
2011 Cs and Ds.

Manuel: Good afternoon everyone and thank you Jose for this
opportunity to discuss our opinion. I'd like to reiterate that
the opinion for the Series 2011C and 2011D bonds, which are the
opinions being discussed, was rendered to the COFINA and

CONFIDENTIAL                                              PR-CCD-0374042

underwriter's representative. Let me review the elements of the analysis underlying the conclusion in our opinion that the Pledge Sales Tax would not constitute and I quote "available resources including surplus" for purposes of the priority provisions of the Commonwealth, general obligation bonds and notes included in section 2 of article 6 of the Constitution or for purposes of section 8 of article 6 of the Constitution. Those elements are: as to the standard of review, first the substantial deference provided to the legislative accomplishes judgment especially mattered involving the use of public funds and regulation of the economy. Second, the presumption of constitutionality that attaches to every statute approved by the legislative assembly, and third, the persuasive weight afforded to the Secretary of Justice opinions as the highest executive of the Commonwealth charged with the administration of Justice. As mentioned before in this call, several Secretaries of Justice have provided favorable opinions as to "no claw back". As to substantive matters, first, presidents from other jurisdictions that provide support to the legality to COFINA structure in the face of no controlling president in Puerto Rico. Second, nothing in the Puerto Rico constitution provides that a specific source of revenues be available or created [sic] for many revenues for the payment of general obligation bonds nor is there any evidence in the records of the Puerto Rico Constitutional Convention that this was considered. Third, nothing in the Puerto Rico Constitution restricts the Commonwealth authority to sell or transfer attachments. Fourth, Constitutions of other jurisdictions of the United Sates which were in effect at the time the Puerto Rico Constitution was approved included classes that limited a state's ability to earmark or dedicate revenues for a specific purpose. Those provisions were not includes in the Puerto Rico Constitution. Fifth, the safeguards included in the COFINA act to limit the amount of bonds that may be issued, and sixth and finally, the structure created in the COFINA act keeps the assigned revenues from becoming part of the Commonwealth General Fund. As I said at the outset, these are the elements that underlie our analysis.

GDBPR – 10/31/13                                                                Page 5

CONFIDENTIAL                                                          PR-CCD-0374043

Jose: Thank you Manuel for your remarks. I think now that we can turn now to the questions we have received. The operator can provide those.

Operator: Thank you. We received various questions regarding the possibility of having the Puerto Rico Supreme Court address the "claw back" issue and thereby create controlling precedent in Puerto Rico. We chose the following question to address this matter: "The final official statement for the COFINA Senior Series 2011D Bonds indicates, under "Risk Factors", that the Supreme Court of Puerto Rico has never ruled whether the sales tax pledged as payment for COFINA bonds constitutes "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions. Please address, and this question comes from Gregory A. Clark, why the Court has never been asked to address this issue and whether there are any plans to have it do so now."

Manuel: The short answer for this question is that under Puerto Rico's jurisdictional requirement, parties cannot bring a test case or seek an advisory opinion from the courts. The leading case in this matter involving instrumentality of the Commonwealth of Puerto Rico that providing assistance to the plaintiff in the creation of a case or controversy in order to provide certainty to certain federal agencies and bondholders as to the validity of a housing assistance program. In that case, the court held that it could not exercise jurisdiction with a claim because no real case or controversy existed. In light of this, COFINA has not set a ruling of this nature because [sic] real case or controversy, the court would not have jurisdiction to go on this matter.

Virginia: Manuel, it is fair to say right that that is not even a path that is available. Several of the questions that we received cited what other jurisdictions have done in terms of seeking declaratory judgment or having the court provide an advisory opinion with respect to certain legislative acts, but Puerto Rico law doesn't provide for that procedure right? So, no such request can be made. Is that fair to say?

Male: That's fair to say.

Virginia: The next question?

GDBPR - 10/31/13                                             Page **6**

CONFIDENTIAL                                        PR-CCD-0374044

Operator: Thank you! The next question we have is, "Both bond
opinions cite Quirk in NY State. Can you expand your views on
this statement "A different case would be presented if,
realistically, the city were stripped of all sources of revenue,
other than the real estate tax, and its outcome would be, at
this time, unpredictable (cf. Mobile v Watson, 116 U.S. 289,
305)." As COFINA issues more debt and captures an increased
share of general fund revenues, what level of resource shifting
would cause concern?" This comes from Brian Dubin from Meehan
Combs.

John: My name is John Bove and I am partner at Nixon Peabody. I
have been asked to address this question, I think in part
because of I was present at the creation of the controversy. I
was an assistance counsel to the Governor of the state of New
York at the time the governor proposed and the legislature
enacted the legislation that was the issue in the Quirk case.
So, I am very familiar with both the origin and its ultimate
outcome. I think it's important to put the quote that is both in
our opinion and in the question in the context of the issue when
the court was addressing when it made that statement. The
background of the case was that legislation was being enacted by
New York State in 1975 and afterwards to address the very severe
fiscal crisis of the city of New York that the state became
aware of 1975 and continued on to the 70s and the early 80s. As
part of the legislative solutions to the city's fiscal problems
was to create a new public benefit corporation or public
authority that would have the power to do a number of things to
ease the city's problems and one was to fund out cumulative
deficits to fund for a few current year deficits that were
projected to continue and ultimately through another eight or
nine years to fund long-term capital needs for the city of New
York as it was locked out of the capital market at the time. In
order to give that entity the municipal assistance corporation
for the city of New York a revenue stream in order to service
its debt, they stripped the city of New York through legislation
of the Sales and Use Taxes and Stop Transfer taxes and instead
dedicated those taxes to the municipal assistance corporations
to service its debt. That legislation was challenged my [sic]
who was challenged as a tax payer on a number of grounds. The
ground that is relevant to the quote that is in the opinions and
in the questions is a state constitutional ground charging that
the stripping of the Sales and Use Taxes and the Stop Transfer
taxes from the city deprived bond holders of the right to have
those taxes set aside and applied to the payment of general
obligation bonds of the city if general obligation bonds became
due and were not paid. New York state constitution includes a

GDBPR – 10/31/13                                          Page 7

CONFIDENTIAL                                          PR-CCD-0374045

provision that obligates that first revenues be set aside to pay
unpaid the general obligation debt. The court going through this
analysis ultimately concluded that this was a constitutional
enactment. It noted in particular that the constitution does not
give a right to general obligation bond holders to insist upon
any particular existing tax to maintain or impose new ones to
produce the required revenues for the general obligation bonds.
The analysis was predominantly based on the fact that what was
being stripped of the city was only a portion of the revenues
that would otherwise been available for the set aside. The
language is the quote and the question both in the opinion
essentially that we might have reached a different conclusion if
substantially more of the revenues had been stripped from the
city. In fact, the actual quote is "If they were stripped of all
sources of revenue other than the real property taxes". We in
the governor's counsel office view that as an admission going
forward as to what we can do and what we can't do in helping
solve the city's financial crisis. The facts of that case are
substantially the same as we have here in COFINA. The
Commonwealth has been stripped of only a portion of one source
of revenue available to [sic] to which the certified provision
of the constitution applied. All of the other sources remain
available to general obligation bond holders under the Set Aside
provision. I think we are entirely on all fours with the
conclusion of the court in the court case.

Jose: Thank you John! I think we can go to our next question.

Operator: Thank you. Our next question is, "What would it take
to have the Supreme Court on the question of whether the sales
tax revenue was subject to the claim of GO bonds having first
claim on available revenue? This comes from Joe Rosenblum,
Alliance Bernstein.

Manuel: Yes, as I stated in our response to the first question,
there will need to be a real case or controversy as well as
certain other jurisdictional elements would have to be present
in order for this to happen....in order for the court to have
jurisdiction to address this type of claim.

Jose: I think it goes to the point that has been raised in a
couple of questions which is, "Can you go on and have some sort
of advisory opinion?" The answer is that in Puerto Rico,
different from other jurisdictions, you simply cannot do that.
We can go to the next question.

Operator: Thank you. Our next question is, "Have there been any

GDBPR – 10/31/13                                              Page 8

CONFIDENTIAL                                            PR-CCD-0374046

updates to case law or legislative or administrative actions
relevant to the cases reviewed or jurisdictions referenced in
the opinions? If so, do any of these updates or actions change
the opinions of Nixon Peabody, Pietrantoni Mendez & Alvarez or
the Secretary of Justice? This comes from Ben Herbert, Lord,
Abbett & Co. LLC.

Manuel: The opinions alluded to address the facts and
circumstances surrounding the issuance of the Series 2011C and
2011D bonds and as stated in the opinion, the firms do not have
an obligation to update the opinions. We note however that in
April 2013 we issued an opinion reaching the same conclusion in
connection with certain junior lien bond anticipation notes, so
the Barclays Capital. So, there were no updates to the relevant
case law or legislation that would have changed the opinions.

Virginia: Right and I think as it was mentioned that Nixon
Peabody as bond council on that issuance also delivered an
opinion [sic] to the 2011 opinion. We see no reason......we saw
no reason at the time that there had been no changes in case law
around the country that would change the conclusions that we
reached in our opinion.

Jose: We can go to the next question.

Andrew Start 25 minutes in:

Operator: Thank you. And our next question comes from Elin
Daniels from Stone Lying Capital Partners, and his question is,
"Would the same opinions be offered again today? If not, what
other qualifications or analysis now would be included?"

Virginia: As the acknowledgement said, the opinions addressed
are facts of the circumstances in the state of the law that were
in effect at the time that the 2011C and the 2011D bonds were
issued. Obviously there's no new COFINA transaction on the
table right now, but we have been tracking the legislation, the
COFINA legislation and the changes that have been made, and we
don't see any reason currently that we would change the
conclusion of our opinions. The state of the law remains the
same. There have been no new cases around the country that have
dealt with this issue. The legislative change is increasing the
percentage of sales tax revenues that are available to COFINA
wouldn't cause us to change our conclusion in any way. So, you
know, while we're not being asked to deliver an opinion today,
we don't see any reason why our opinion would change in any
significant way or material way from what we delivered in 2011

GDBPR – 10/31/13                                                    Page 9

CONFIDENTIAL                                                    PR-CCD-0374047

or from what we delivered in April of 2013.

Jose C: And this is Jose Coleman from GDB, I want to add that as noted by the GDB President, while no new COFINA transaction has been announced, no such transaction would be completed without the delivery of opinions from the Puerto Rico Secretary of Justice. And each of the firms acting as bond counsel and underwriter's council on such deal, that reach exactly the same conclusions as the opinions being discussed today. And we are confident that opinions reaching the same conclusion would be delivered in connection with any new [issuances]. Unless somebody has anything else to add we can go to the next question.

Operator: Thank you. And our next question is, "Is there any legislation being contemplated or discussed that would provide bond holders with additional security in light of the lack of any applicable case law testing in the courts of Act 91 COFINA?" This comes from Melissa Haskell from MFS Investment Management.

Jose C: This is Jose Coleman from GDB. Now the [sic] of GDB or COFINA are currently contemplating specific legislation of this nature. We feel comfortable with the structure as is.

Operator: Thank you. And our next question is, "Could you please tell us how the flow of funds works specifically? How the money is allocated, how it is deposited, and how it is protected from being deposited into the general fund prior to payment of debt service?" This comes from Cynthia Brown Manulife Asset Management.

Jose P: Yes what I'm about to explain is discussed in greater detail in the official statement for the series 2011C and 2011D bonds. The entities authorized by the Secretary of the Treasury received the sales and use tax monthly returns and the amount of sales tax [sic] [under]. These amounts are then deposited into the sales tax account, which is a joint GDB and COFINA account held at Banco Popular de Puerto Rico. On a daily basis, Banco Popular sweeps amounts and deposits it in this sales tax account, other than sales and use taxes which are allocated to the municipalities under the law. They sweep this into the dedicated sales tax fund, which is held by Banco Popular's trust department in the name of COFINA. Banco Popular's trust department then sends all amounts in the dedicated sales tax fund to the COFINA trustee until such amounts reach the pledge sales tax [sic] amount. They're after the amounts of the commonwealth sales and use tax are allocated to COFINA and the

GDBPR — 10/31/13                                                      Page 10

CONFIDENTIAL

Treasury Department according to the corresponding percentages,
which are established in the COFINA law. Pledged sales tax
revenues are not coming into the general fund revenues. I
repeat, for more detail regarding this flow of funds, please
review the description there off in the official statement.

Jose C: I think the fundamental point here is they are not
coming up with general fund revenues, and those are an important
factor in each of these opinions. One thing I wanted to add is,
you know, for the [sic], this flow of funds applies also to all
revenues. It applies to all revenues received by COFINA and it
includes any new revenues directed to COFINA arising from the
expansion of the SUT, allocated to COFINA, that was basically
just legislated in October. I think we can go to the next
question.

Operator: Thank you. Our next question is, "Also is the
increased allocation already being set aside? The increase from
2.5% to the 3.75%" This comes from Cynthia Brown, again,
Manulife Asset Management.

Jose C: This [jives] a little bit with a previous question. You
know, just discussed the increased allocation is currently being
set aside, and will be subject to a flow of funds that I
described in the previous question. I think that is began
appearing when the legislation was passed. I would like to
clarify though I think that the question says the increase from
250 to 375. The reason expansion of the FUT allocated to COFINA
was from 275 to 350, not 250 to 375. In fact, we should know
that the recent COFINA expansion is the smallest expansion of
the COFINA program in percentage terms, and the original 2007
pledge was of one full percentage point, and the 2009 expansion
was 175 basis points. The latest one, it was only 75 basis
points from, you know, purposes of reference. Anyone...so I
think with that we can go to the next question.

Operator: Thank you. And the next question is, "Can you post
copies of the COFINA indentures (in addition to the
prospectuses) on the GDB website? And this comes from Brian
Dubin, Meehan Combs.

Jose C: This is Jose Coleman from the GDB. Yes, we will post
copies. In fact, as if I am the president of the bank referred
our...there's a renewed commitment to observe disclosure
practices and improve our relationship with our investor base.
And to that end we will begin to post on our website copies of
all indentures related to outstanding bonds, of [sic] and it's

GDBPR - 10/31/13                                          Page 11

instrumentalities, including COFINA. Obviously given the
heightened market interest in our COFINA bond issuances, we will
get priority to COFINA related indentures. Those should be up
shortly.

Virginia: Yeah I think it's just worth mentioning that there
have been a number of amendments, and so what we need to do is
do an amended and restated indenture that incorporates all those
amendments into one single document. I think that will
facilitate the review for investors rather than have them try to
put together an indenture on a [PCL] base.

Jose C: A [PCL] base, yeah. Okay.

Operator: Thank you. And out next question is, "Some in the
market have speculated that a future legislature could
theoretically repeal Act 91 and thus the entire COFINA
structure. Our understanding is that both parties have been in
power at times when COFINA legislation has successfully been
passed, and, more importantly, that all of the COFINA bonds were
issued with a non-impairment covenant. This covenant stipulates
that if the COFINA structure is materially altered, there must
be a substituted like or comparable security, which needs to be
confirmed by the rating agencies and the various legal opinions.
Thus, given seemingly limited alternatives for similarly strong
security, are we correct to assume that risk of materially
negatively altering the COFINA structure via legislative action
is very low? And this comes from Jon Pruchansky, Arrowgrass
Capital Partners.

Virginia: The straightforward answer is yes. There's a very low
risk to a legislative change to the COFINA act that would be
materially adverse to bond holders. Given the common loss non-
impairment covenant, any legislative action that takes security
away from bond holders without providing a comparable substitute
and reigning confirmation would violate both the COFINA
Resolution and the COFINA Act. Now there's nothing we can do
that would [partly] bond future legislatures. Future
legislatures could take action if deemed appropriate. However,
given the strong statutory and resolution covenants, any such
action, if it was an impairment, violated of those covenants,
would give raise to the exercise of remedies by bond holders
under the resolution.

Jose C: Yeah and something, you know, to add, you know, the
person who asked the question is correct that both Puerto Rico's
main political parties have been in power when COFINA

GDBPR - 10/31/13                                              Page 12

legislation has been successfully passed and that, you know...and we see that with all the...with the Secretary of Justice's [opinions]. In fact the COFINA [sic] was created by the administration of then Governor Aníbal Acevedo Vilá, who was Governor from 2005 to 2008. And this is done in collaboration with a then PNP "statehood controlled" legislature. In other words, the COFINA program has really been bipartisan since its inception. As many people know this is a very rate and precious thing in Puerto Rico. As people well know, the PNP affiliated Fortuño administration implemented the largest expansion of the COFINA program during the 2009-2012 term. The current PDP administration legislated a new, more limited expansion to the COFINA program.

Virginia: And I think it's probably worth also mentioning that with respect to impairment of the structure, the COFINA structure, it's really no different than you would see for any other revenue backed issue around the country. You know New York State [sic] has the same provisions. It's a very common structure. There's no greater risk inherent in COFINA with respect to the non-impairment covenants that you would see anywhere else.

Jose C: I think we can go to the next question.

Operator: Thank you. And our next question is, "In addition to the opinions of the Secretary of Justice, bond counsel and underwriters counsel, has the GDB provided any independent, outside legal opinions to the rating agencies regarding the validity of the assignment to COFINA of the Commonwealth's portion of the Sales and Use Tax? If so, please describe." And this comes from Robert A. Meyer from SMC Fixed Income Management, LP.

Jose C: This is Jose Coleman from GDB. The answer is no. The rating agencies have only been provided with the opinions delivered in connection with the issuance of the bonds, such as the opinions being discussed today. No other opinions have been requested by or provided to the rating agencies. I don't know...that's... I think we can go to the next question.

Operator: Thank you. And our next question is, "In the last 5 years, has the Supreme Court ruled any law enacted by the Puerto Rico legislature to be unconstitutional? If so, please discuss the cases." Again, from Robert A. Meyer, SMC Fixed Income Management, LP.

GDBPR – 10/31/13                                                       Page 13

CONFIDENTIAL

Jose C: This is Jose Coleman from GDB. To my knowledge, and you
know I haven't done a thorough checking of this, there have only
been I think two recent instances where the Puerto Rico Supreme
Court declare a law unconstitutional. I think one instance
involved certain 14th Amendment rights of a particular person,
and the other one involved a law that attempted to restrict the
Puerto Rico Supreme Court's jurisdiction. I think one thing to
bear in mind in this, as Manual Pietrantoni from PMA stated in
his presentation and also in the opinion, there is substantial
[sic] provided to a legislative assembly's judgment,
particularly by the Supreme Court, especially in matters
involving the use of public funds and regulation of the economy.
There's obviously also the general presumption of
constitutionality that attaches to every statute approved by the
legislative assembly. I don't think we've seen anything out of
the ordinary from the Supreme Court either historically or in
the past couple of years. Unless anyone else has something to
add to that...next question.

Operator: Thank you. Our next question is, "Do COFINA's legal
opinions cover the accuracy of the economic and financial data
used as the basis for COFINA's sales tax projections?" Again,
from Robert A. Meyer, SMC Fixed Income Management, LP.

Virginia: This is Virginia. No, and in accordance with
established opinion practice, the opinions, our opinions, PMA's
opinions, do not address or pass judgment upon the accuracy of
any economic or financial data that's used as the basis for
COFINA's sales tax provision. Would you say that...?

Manuel: That's absolutely right, which is typically the role of
the opinion is not to speculate or pass judgment on the economic
or financial data, or any other data which is underlined [sic].

Virginia: And there are certificates delivered at closing that
provide comfort on that information.

Jose C: Thanks Virginia. I think we can go to the next
question.

Operator: Thank you. And our next questions is, "According to
page 4/9, the Supreme Court of Puerto Rico traditionally shown
substantial deference to the Legislature's judgment and has
consistently ruled that there is a presumption of
constitutionality that attaches to every statute adopted by the
Legislature. The Supreme Court of Puerto Rico has reiterated
that when the constitutionality of a statute is questioned, the

GDBPR – 10/31/13                                              Page 14

CONFIDENTIAL                                              PR-CCD-0374052

Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy. Since there is no controlling precedent please provide more details or the extent to which the court would weigh?" from Michael Ginestro, Bel Air Investment Advisors.

Manuel: This is Manuel Pietrantoni. The answer is that we would expect the Puerto Rico Supreme Court to follow an analysis similar to the analysis that is described in the opinions, the elements of which I discussed in the introduction to my remarks. Those we think would be the elements that the Supreme Court would weigh in reaching its conclusion.

Jose C: And as we've stated, those elements include the standard of review that's a substantial deference in certain particular matters. I think we can go to the next question.

Operator: Thank you. Our next question is, "If bond counsel believes the pledged revenues would not be subject to clawback, why did bond counsel and underwriters' counsel issue a "would hold" opinion versus a "should hold" opinion?" This comes from Steve Hong, HIMCO.

Virginia: For purposes of opinion practice the American Bar Association Legal Opinions Committee and the Tri-Bar Opinions Committee has taken a position that should and would are synonymous. So there's really no distinction between the two and there was no distinction intended between the would and should in our opinions. It's a distinction without difference and it's important for participants to understand that the opinions are reasoned opinions in large part due to the fact that no precedent exists in Puerto Rico. And as such, these opinions are each firm's opinion as to the proper result to be reached by a court applying existing rules and principles to the facts it's properly found after appropriate briefing and argument. So we just don't want...there was no...there was no intentional choice between should and would, we were just following established opinions practice and there was no distinction intended.

Jose C: I don't know if Manuel you want to add to any of that?

Manuel: No that's exactly...agree with that.

GDBPR – 10/31/13                                                    Page 15

CONFIDENTIAL                                                    PR-CCD-0374053

Jose C: We can go to the next question.

Operator: Thank you. And our final question comes from, "Is there an ability to appeal any Puerto Rico Supreme Court ruling related to claw-back to the US Supreme Court? And this is coming from Ben Herbert, Lord, Abbett & Co. LLC.

Jose P: The answer is that rulings of the Puerto Rico Supreme Court may be appealed to the United States Supreme Court to the extent that a matter of Federal Law is in question. And as you know, this appeals process would work in the same manner as any other appeal to the United States Supreme Court from a decision of the highest court of any state, and that regards Puerto Rico as no different.

Jose C: I think we've had this question a couple times, and people don't know, and I kind of think it's important to emphasize that Puerto Rico's Supreme Court decisions are appealable to the US Supreme Court.

Operator: Thank you. And at this time I would now turn the call back over to Mr. Coleman-Tió for any closing remarks.

Jose C: We want to thank everyone for their attention. We hope this call has been informative. Again, our replay of it will be posted to the GDB website soon, and thank you again, and have a great afternoon.

Operator: Thank you all for your attention. This concludes today's conference call. All participants may now disconnect.

<END OF TRANSCRIPT>

GDBPR – 10/31/13                                                    Page **16**

CONFIDENTIAL

# Exhibit 49



# PRESS RELEASE

CONTACT: BETSY NAZARIO

Tel. (787) 728-9200 • (787) 722-2525 exts. 15310 and 15311
Cel. (787) 415-1231 • betsy.nazario@bgfpr.com • www.gdbpr.com

COMMONWEALTH OF
**PUERTO RICO**
Government Development Bank
for Puerto Rico

October 31, 2013

### GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO COMMENTS ON
### CONFERENCE CALL ABOUT COFINA LEGAL OPINIONS

**San Juan** – Government Development Bank for Puerto Rico (GDB) Interim President José V. Pagán Beauchamp thanked all investors and analysts who participated in and submitted questions for this afternoon's conference call, which discussed legal opinions provided by external legal counsel in 2011 in connection with the issuance by the Puerto Rico Sales Tax Financing Corporation ("COFINA") of its Sales Tax Revenue Bonds, Senior Series 2011C and Senior Series 2011D.

"Today's call is another example of this administration's focus on transparency and maintaining a productive, ongoing dialogue with the investment community. We would like to thank all those who joined the GDB, our legal team, and our outside counsel for their participation in today's conference call."

As a reminder, the legal opinions discussed in today's conference call are available for review on the GDB's website: http://www.gdb-pur.com/investors_resources/cofina.html.

Key points addressed in today's conference call include the following:

- Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales and Use Tax ("SUT") to COFINA and provided that any transferred portion are not "available resources" under the Constitutional provisions relating to full faith and credit general obligation ("GO") bonds.

- The law provides that the Commonwealth agrees not to limit or restrict the rights granted by the COFINA Act or the rights of COFINA to meet its obligations to its bondholders.

- COFINA's bond documents require written confirmation of all outstanding ratings and opinions confirming that new revenue would not constitute "available resources" in the event the SUT were to be replaced with another source of revenues.

- The Puerto Rico Secretary of Justice has provided, for each COFINA transaction (13 in total), a legal opinion that the SUT allocated to COFINA is not subject to "claw-back" by GO bondholders under the PR Constitution. US-based Bond Counsel and PR-based Underwriters' Counsel have delivered legal opinions reaching the same conclusion.

Exhibit 49 Page 3 of 30

*Page 2*

- This "claw-back" opinion enjoys broad bipartisan support: four different Secretaries of Justice, serving three different administrations (of alternating political parties), have issued official opinions that the SUT allocated to COFINA is not subject to "claw-back."

- In contrast to other state jurisdictions but similar to the standard applicable in federal court, Puerto Rico law establishes a matter may come before a court only if a real "case or controversy" exists. As a result, COFINA has not sought and may not seek an advisory ruling or opinion from the Puerto Rico Supreme Court on any matter.

- While no new COFINA transaction has been announced, no such transaction would be completed without again receiving closing opinions from each of Bond Counsel, Underwriters Counsel and the Puerto Rico Secretary of Justice, that reached exactly the same conclusions as the opinions discussed on the conference call today.

### 

PR-CCD-0374056

# Exhibit 50

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Exhibit 51 Page 191 of 191

# Exhibit 51



# Commonwealth of Puerto Rico Fiscal Plan

October 14, 2016

PR-CCD-0556832

# Disclaimer

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Commonwealth of Puerto Rico (the "Commonwealth"), the Government Development Bank for Puerto Rico ("GDB"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF, the Commonwealth and GDB, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Commonwealth and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Commonwealth and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Commonwealth, GDB, or any government instrumentality in the Commonwealth or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- By accepting this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

- The following does not express any opinion or contain any analysis as to the priority or validity of the debt or any purported security interest described herein and therefore is without prejudice to any legal or other argument that may now or in the future be asserted by the Commonwealth or any of its instrumentalities in any legal or other proceeding.



1

PR-CCD-0556833

# Table of Contents

**I.   Executive Summary**......................................................................................Page 3

**II.  Core Principles of the Fiscal Plan**.................................................................Page 14

   A.   Minimize Impact of Austerity on Economic Growth

   B.   Improve Budgetary Controls and Financial Transparency

   C.   Rationalize Expenditures and Tax Policy to Promote Efficiency

   D.   Enact Structural Economic Measures and Invest in Growth

   E.   Protect Vulnerable Stakeholders

   F.   Create a Sustainable Debt Level That Allows for Growth

   G.   Partner with the Federal Government to Generate Growth

**III. Fiscal Plan Projections** ...............................................................................Page 79

**IV. Footnotes**................................................................................................Page 94

**V.   Appendix – Additional Detail on Fiscal Plan Projections**...............................Page 96

**VI. Additional Information Provided Separately**

   A.   Additional Detail on Bonded Debt Stock

   B.   Summary of Creditor Negotiations To Date



2



# Executive Summary

CONFIDENTIAL

PR-CCD-0556835

# Introduction

**The Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") has experienced a persistent fiscal and economic crisis for the last decade, despite taking proactive steps to close its budgetary gaps and generate economic growth**

- Puerto Rico's GDP has contracted for nine of the last ten years in real terms, driven by the expiration of incentives provided under Section 936 of the U.S. tax code and the U.S. financial crisis, and exacerbated by outmigration and extraordinary austerity measures taken by the Commonwealth
- The extraordinary austerity measures taken in the last decade include:
  - Reducing government consumption by 12% in real terms from 2006 through 2015[1]
  - Reducing public administration headcount by approximately 24%[2]
  - Reducing or deferring critical capital expenditures
  - Delaying tax refunds and vendor payments
  - Implementing significant new revenue measures, including recent sales and petroleum products tax increases generating approximately $1.4 billion annually
  - Depleting liquidity and undertaking extraordinary short-term borrowings from pension and insurance systems
  - Reforming pensions, converting defined benefit plans to defined contribution plans
- These austerity measures have not been enough to eliminate deficits, which led to significant deficit financing and a ballooning debt load during the period. Economic decline has also persisted, driving emigration to the U.S. mainland, as evidenced by Puerto Rico's population declining by 9% over the decade
- In 2015, based on the work of a team led by former IMF First Deputy Managing Director Anne Krueger, the Commonwealth determined that a broad debt restructuring was necessary
- The Commonwealth commenced an effort to consensually renegotiate its debts based on a detailed Fiscal and Economic Growth Plan ("FEGP") but such negotiations have, to date, not resulted in a definitive agreement with its creditors
- PROMESA was enacted in mid-2016 to provide Puerto Rico with the tools necessary to address its fiscal and economic crisis
- This Fiscal Plan is being presented pursuant to PROMESA and is the first step toward a permanent resolution of the Commonwealth's ongoing crisis
  - This Fiscal Plan identifies the resources available to support basic governmental services and promote growth; a specific debt restructuring proposal will be provided after receipt of input from the Oversight Board, as described further herein

---



(1) U.S. Bureau of Labor Statistics, Seasonally Adjusted Government Employment. Represents state and local government employees.
(2) Puerto Rico Planning Board. GDB Statistical Appendix – Table 3: Gross National Product in Constant 1954 Dollars. Government Consumption Expenditures.

4

PR-CCD-0556836

# Under Current Laws and Policies, Puerto Rico Will Have a Significant Financing Gap

## Puerto Rico projects a cumulative shortfall of revenues as compared to expenditures (a "financing gap") of approximately $59 billion over the next ten years (the "Base Financing Gap" or the "Base Projections")

- The Commonwealth's current revenues are not sufficient to support existing current operations and debt service, despite the Commonwealth's recent extraordinary efforts to close the financing gap. Three approaching fiscal cliffs, with an estimated ten year cumulative impact of $35.3 billion, will only further exacerbate the current crisis:

  1. The depletion of Affordable Care Act ("ACA") funds, which is estimated to occur in fiscal year ("FY") 2018

  2. The estimated loss of tax revenues from the conversion of Act 154 excise tax to a modified source income rule in FY 2018

  3. The depletion of liquid assets in the retirement systems, expected to occur on or before FY 2018, will require increased contributions to the pension systems to avoid an interruption of benefit payments

- In addition, based on current policies and macroeconomic trends, economic contraction is expected to continue at an average rate of approximately 1.7% per year, resulting in an increase to the financing gap of $5.5 billion over the next decade as compared to a case in which the economy experiences 0% real growth[1]

- The size of the financing gap detailed below assumes no measures are taken to fill the gap; if the Commonwealth were forced to only pursue austerity-type measures to address this shortfall, it is estimated real GDP contraction would intensify

### Summary of Cumulative "Financing Gap" Under Current Laws and Policies from FY 2017 to FY 2026 ($ millions)[2]





(1) Inflation is illustratively held constant under both real growth assumptions at an average rate of 1.8% from 2018 to 2026.
(2) Base Projections shown correspond to the revenues and expenses only of those entities included in the Fiscal Plan presented herein. See the "Fiscal Plan Projections" for greater details on entities included in the Plan.
(3) Note that for illustrative purposes, debt service excludes loans from GDB and certain bonded indebtedness of Commonwealth entities held by GDB. Numbers also include past due amounts and are net of debt service reserves.
(4) Incremental contributions represent the Annual Additional Contributions ("AAC") required to be paid to the Teachers and Judicial Retirement Systems and the Additional Uniform Contribution ("AUC") required to be paid to the Employees Retirement System based on estimates provided by the Commonwealth's actuaries incorporating updated assumptions regarding items such as changes in the size of the active membership and future payroll assumptions consistent with the Fiscal Plan. The amount shown includes payments of certain past-due amounts from previous years, as such amounts are assumed to have been paid in work performed by the actuaries.
(5) Estimated impact of economic contraction corresponds to the estimated impact of real GDP growth going from 0% to an average of negative 1.7% from FY 2018 and FY 2026.

# To Address the Base Financial Crisis and Create Economic Growth, the Commonwealth Must Adhere to the Following Seven Principles

After a decade of recession, Puerto Rico's economy must grow for the government to provide essential services to the 3.5 million Americans living in Puerto Rico, as well as to support a sustainable debt burden. Without economic growth, any level of debt service will be unsustainable and Puerto Rico will continue to face fiscal and economic crises



**Minimize Impact of Austerity on Economic Growth**

- The past decade's material austerity measures, ranging from layoffs to tax increases, have not abated the Commonwealth's fiscal and economic crisis. Further austerity will only exacerbate outmigration and accelerate the Commonwealth's economic decline

- The Commonwealth's Fiscal Plan ensures that critical fiscal discipline does not come at the expense of long-term economic growth

---



**Improve Budgetary Controls and Financial Transparency**

- Puerto Rico has experienced persistent deficits, routinely overestimating revenue and failing to control spending

- New rules and regulations must be implemented to enforce budgetary discipline, including improving recently instituted third-party revenue validation, budgeting in compliance with GAAP, mandating all spending to be approved through the annual budgetary process and improving regular budgetary reporting and tracking

- The Commonwealth's ability to properly monitor its fiscal position is hindered by obsolete financial, accounting and payroll systems. This, in turn, impedes informed decision-making and the ability to publish timely financial statements

- To correct this, Puerto Rico must invest in new IT infrastructure, reform financial reporting processes and centralize treasury functions

- Finally, Puerto Rico must improve its regular economic and statistical reporting to enhance long-term economic forecasting and tracking. Multi-year budgeting that reflects long-term economic forecasts should be required



6

PR-CCD-0556838

# To Address the Base Financial Crisis and Foster Economic Growth, the Commonwealth Must Adhere to the Following Seven Principles (cont'd)



**Rationalize Expenditures and Tax Policy to Promote Efficiency**

- While further austerity is not the solution, the Commonwealth must stabilize its revenue base, improve its revenue collections, and rationalize expenditures. The selection and structure of any fiscal measures, and the timing of their implementation, must be designed to foster long-term growth and minimize negative economic effects

- The Fiscal Plan should focus on efficiency gains by prioritizing tax enforcement, consolidating agencies with overlapping functions and underutilized schools, further centralizing procurement to create economies of scale, reducing workforce through retirement and attrition, and eliminating automatic expenditure increases where there is no demonstrated need. Savings due to such efficiency gains should be reinvested to promote growth

- The Fiscal Plan should also reform tax policy, including to transition the taxation of multinationals away from the Act 154 excise tax in a manner that minimizes the impact on the Commonwealth's revenue base



**Enact Structural Economic Measures and Invest in Growth**

- Although Puerto Rico does not control U.S. federal policies that have a significant impact on its economy, the Fiscal Plan must implement structural reforms within Puerto Rico's control. Overhauls are needed to local policies to boost labor participation and productivity and create a business-friendly environment and attract private investment

- The Plan includes investment to maintain existing infrastructure and invest in strategic growth-promoting projects. Public-private partnerships must be leveraged to achieve efficiency gains

- The government must also catch-up on past-due payments to businesses and taxpayers, and build minimum liquidity reserves to ensure government stability, another necessary predicate to growth



**Protect Vulnerable Stakeholders**

- Shocks to Puerto Rico's most vulnerable constituencies, including the elderly, young, disabled and low-income residents, are likely to have a higher negative multiplier effect on the island's already weak economy

- Nearly half the island's population lives in poverty and relies on a public healthcare system overburdened by inequitable treatment under U.S. healthcare laws. Cuts to the system, even in the face of reductions in federal transfers, would leave Puerto Rico residents without access to healthcare and promote outmigration and further economic decline.

- The underperformance of local schools, together with crime rates that remain higher than the U.S. states, suggest investments in education and public safety must also be protected

- Public pension plans must be adequately funded. The plans must build on prior reforms and ensure the payment of an already meager average benefit that is only 53 percent of the average U.S. state

- The Fiscal Plan must also protect credit union depositors, who are generally low-income, as well as the cooperative banking system in general, subject to recapitalization plans and effective governance reforms



7

# To Address the Base Financial and Underlying Economic Growth, the Commonwealth Must Adhere to the Following Seven Principles (cont'd)



**Create a Sustainable Debt Level That Allows for Growth**

- Without a substantial debt restructuring resulting in a sustainable debt burden, Puerto Rico's growth potential will continue to be hindered by the fear of future defaults, lower public and private investment and further outmigration

- The sustainability of the debt burden must rely on objective criteria and realistic growth and fiscal assumptions. The Fiscal Plan must provide the island with sufficient breathing space to guarantee the provision of essential services, to implement smart, pro-growth fiscal and economic policies and to invest in its economy

- The restructuring plan must also offer a holistic solution for the Commonwealth's tax-supported debt burden, which is reliant on the single Commonwealth economy. Individual restructurings would be extremely challenging given the interrelatedness of holders, insurers and sources of credit support. Accordingly, the Fiscal Plan includes the tax-supported central government agencies and component units, including those identified by the Oversight Board for inclusion in the Fiscal Plan[1]

- Finally, the debt proposal must include restrictions on the issuance of new indebtedness, including limitations on the aggregate amount of tax supported debt, and must account for the impact on local holders



**Partner with the Federal Government to Generate Growth**

- Even after Puerto Rico implements the measures within its control, fiscal and economic recovery will be immeasurably more difficult if the U.S. government does not act affirmatively to address some of Puerto Rico's most conspicuous fiscal and economic inequities

- The Commonwealth suffers from inequitable healthcare treatment relative to the U.S. states. Its Medicaid reimbursement is capped

- Affordable Care Act funds that helped alleviate this inequity are expected to be depleted in FY 2018. Thereafter, only local funds will be available to cover shortfalls for Puerto Rico's struggling healthcare system. If not addressed by the U.S. government, this deficiency in funding would devastate the Commonwealth's fiscal accounts and social safety net

- The economic damage left by the repeal of Section 936 demonstrates the need for pro-growth federal policies that are tailored to increase private-sector employment and investment, such as funding a Puerto Rico Earned Income Tax Credit ("EITC") and permanent, cost-effective tax incentives for business investment



(1) See the list of entities specified by the Oversight Board for the first Fiscal Plan submission included in the document issued by the Board entitled "Covered Entities Under the PROMESA Act."

8

# Implementing the Policies Within Puerto Rico's Control Would Reduce the Ten-Year Base Financing Gap by an Estimated $19 Billion

**Even after implementation of revenue and expenditure measures that are within Puerto Rico's control and the attendant growth it could generate, the Commonwealth would still face a ten-year financing gap of nearly $5.7 billion**

- The $19 billion reduction in the deficit *includes* the potential benefits of a change in the Commonwealth's real economic trajectory in the Base Projections from negative 1.7% to an average of 0.1%[1] growth, driven in part by new spending to promote stability and growth

  - This revised growth rate assumes elimination of all debt service such that the Commonwealth can spend up to the amount of its internally generated surplus in any year to promote growth (i.e., no external financing of any remaining primary deficits, after the removal of debt service, is assumed)

    - Given there is still a deficit after excluding all debt service, the economic impact of the measures may be muted

- The projections also assume no losses from Act 154 based on the assumption of a temporary extension of the excise tax via local legislation while the Commonwealth reforms its tax code[2]

**Projections Including Measures ($ millions)**



Note: See later in the presentation for the complete list of entities included in the Fiscal Plan, covered entities specifically identified by the Oversight Board are included. Additional details on how the projections were prepared are provided later in the presentation.
(1)   Represents average real growth over the period FY 2018 to FY 2026.
(2)   The projection assumes that Act 154 excise tax credit is not ruled to be uncreditable under U.S. tax law.
(3)   Includes principal and interest payments that may have been missed in FY 2016 and FY 2017. Debt service shown net of existing reserves used to pay debt service. Note that for illustrative purposes, debt service excludes debt held by GDB and excludes revenues otherwise allocated to COFINA FY 2017 debt service.



9

# The U.S. Government Must Implement Certain Growth-Achieving Growth to Fully Eliminate the Commonwealth's Financing Gaps

## Equitable treatment under U.S. healthcare laws, combined with certain changes to other U.S. policies, are critical to Puerto Rico's future

- U.S. citizens living in Puerto Rico do not receive the same level of healthcare funding as citizens living in the 50 states
  - Federal healthcare dollars, including Medicaid, are subject to a cap that does not apply to the states
- ACA funds temporarily and partially offset this inequitable treatment, but such funds are expected to be exhausted in FY 2018 and the already struggling healthcare system cannot afford to be deprived of additional funding
  - Puerto Rico's hospitals are already struggling to retain doctors and pay their vendors
- Equitable treatment under the U.S. healthcare laws that, at the very least, restores funding at least equal to the level provided by ACA is essential for Puerto Rico to provide basic healthcare services to U.S. citizens living on the island and to help eliminate the Commonwealth's financing gaps prior to debt service
- If Federal healthcare funding is kept at least at the level under current policies, (so the Commonwealth is not forced to dedicate other revenues to replace the loss of ACA funding), those Commonwealth revenues can be dedicated to additional investments that will drive a higher economic growth rate (the change in economic trajectory shown below represents an increase from 0.1% to an average of 1.4% over the period FY 2018 to FY 2026)[1]
  - Additional actions from the U.S. government to increase private sector employment and investment, such as funding an Earned Income Tax Credit, the Child Tax Credit, Supplemental Social Security Income, and permanent, cost-effective tax incentives for business investment, could spark further growth than that estimated below
- Note that *no allocation* to creditors of the potential surplus before debt service shown below has been included in this Plan submission and the Commonwealth believes that creditors should share in both the benefits and risks of economic growth projections such as those included below

### Estimated 10-Year Financing Gap Reductions From Certain U.S. Government Actions ($ millions)





Note: See later in the presentation for the fulsome list of entities included in the Fiscal Plan; covered entities specifically identified by the Oversight Board are included. Additional details on how the projections were prepared are provided later in the presentation.

(1) The change in economic trajectory also represents an increase in inflation from 2.0% to an average of 2.50% over the period FY 2018 to FY 2026.
(2) Represents average real GDP growth of 1.4% and average inflation of 2.5% over the period FY 2018 through FY 2026.
(3) Includes principal and interest payments that may have been missed in FY 2016 and FY 2017. Debt service shown net of existing reserves used to pay debt service. Note that for illustrative purposes, debt service excludes debt held by GDB and excludes revenues otherwise allocated to COFINA FY 2017 debt service.

10

PR-CCD-0556842

# Fiscal Plan Compliance with PROMESA

**Given PROMESA envisions an iterative process with the Oversight Board, full compliance with the 14 requirements of PROMESA is dependent upon feedback and recommendations from the Oversight Board. The Fiscal Plan contained herein, however, is a comprehensive proposal that provides a basis for full compliance and certification in the near-term, depending on the nature and timing of the Oversight Board's feedback**

| Fiscal Plan Requirements[1] | Comments |
|---|---|
| 1. Provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws, or (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan | ▪ The Fiscal Plan submitted herein was prepared on a basis generally consistent with modified accrual approach, with the exception of certain elements.[2] All revenues and expenses are based on current Puerto Rico and federal law, unless otherwise provided for in proposed measures, the specific statutory changes for which can be developed in conjunction with the Oversight Board |
| 2. Ensure the funding of essential public services | ▪ The Plan is specifically designed to provide for essential services such as healthcare funding, public safety and education and to protect Puerto Rico's most vulnerable residents and provide for sustainable economic growth. Catch up in payables to suppliers of essential services ensures stability of such services |
| 3. Provide adequate funding for public pension systems | ▪ Building upon previous pension reforms, the Fiscal Plan provides for funding of retirement benefits through payments of the actuarially-determined AACs and AUCs for the entities included in the Fiscal Plan, and additional reforms |
| 4. Provide for the elimination of structural deficits | ▪ The Fiscal Plan provides for the elimination of structural deficits *assuming* certain specified actions are taken by Puerto Rico and the U.S. government |



(1) See Title II, Section 201(b) of PROMESA.
(2) Certain items, such as the payment of past-due payable amounts, are purposefully projected on a cash basis as they were expenses incurred in prior periods and therefore would not be captured by modified accrual.

11

PR-CCD-0556843

# Fiscal Plan Compliance with PROMESA (cont'd)

| Fiscal Plan Requirements[1] | Comments |
|---|---|
| 5. For fiscal years covered by a Fiscal Plan in which a stay under titles III or IV is not effective, provide for a debt burden that is sustainable | ▪ The Fiscal Plan provides principles to achieve a sustainable debt burden. A specific debt restructuring proposal will be provided following receipt of the Board's recommendations and clarity regarding assumptions for U.S. government actions and appropriate economic growth rates. The final debt service level cannot exceed the projected surplus before debt service in the final Fiscal Plan and will be targeted not to exceed 15% of projected revenues |
| 6. Improve fiscal governance, accountability and internal controls | ▪ The Fiscal Plan includes specific measures to improve governance, accountability and internal controls |
| 7. Enable the achievement of fiscal targets | ▪ The Fiscal Plan is based on fiscal and growth targets developed in conjunction with outside advisors and mandates updates to reporting requirements to allow tracking of progress toward meeting fiscal targets. The growth targets are contingent upon the adoption and implementation of recommended Puerto Rico and federal government measures |
| 8. Create independent forecasts of revenues for the period covered by the Fiscal Plan | ▪ Revenue forecasts were developed in conjunction with outside advisors. The Commonwealth looks forward to validating its projections with the Board and its staff |
| 9. Include a debt sustainability analysis ("DSA") | ▪ The Fiscal Plan shows that existing debt service is clearly not sustainable. A formal DSA of restructured debt service will be developed in conjunction with specific restructuring proposals |



(1) See Title II, Section 201(b) of PROMESA.

12

# Fiscal Plan Compliance with PROMESA (cont'd)

| Fiscal Plan Requirements[1] | Comments |
|---|---|
| 10. Provide for capital expenditures and investment necessary to promote economic growth | ▪ The Fiscal Plan includes specifically identified capital projects intended to rebuild aging infrastructure and promote economic growth. Investments in the repayment of past-due amounts to suppliers and taxpayers are also intended to generate growth |
| 11. Adopt appropriate recommendations submitted by the Oversight Board (under Section 205(a) of PROMESA) | ▪ The Fiscal Plan includes specific fiscal and structural measures which are of the type covered under Section 205(a) of PROMESA. The Governor welcomes for consideration any additional recommendations by the Board |
| 12. Include such additional information as the Oversight Board deems necessary | ▪ The Fiscal Plan includes a significant number of specific fiscal and structural measures. The Governor welcomes for consideration any additional recommendations of the Board |
| 13. Ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI | ▪ The Fiscal Plan suggests a holistic solution to the Commonwealth's fiscal and economic challenges is necessary and suggests the total amount of resources available to pay any debt service. The Fiscal Plan does not provide a specific debt restructuring proposal or prescribe any treatment for any specific credit. And such proposal may require an adjustment plan for Qualifying Modification under title VI or numerous credits under title III. The debt restructuring proposal that will be submitted will comply with Sections 201(m) and 201(n) of PROMESA |
| 14. Respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA | ▪ The Fiscal Plan does not provide a specific debt restructuring proposal. The Fiscal Plan suggests a holistic solution to the Commonwealth's debt burden, which may require an adjustment plan for numerous credits under title III and/or a Qualifying Modification under title VI. As noted above, the debt restructuring proposal that will be submitted will comply with Sections 201(m) and 201(n) of PROMESA |

(1) See Title II, Section 201(b) of PROMESA.

13

CONFIDENTIAL

PR-CCD-0556845



# Core Principles of the Fiscal Plan
*1. Minimize Impact of Austerity on Economic Growth*

14

PR-CCD-0556846

# Since 2006, Puerto Rico's Government Has Taken Significant Austerity Measures, Including a Large Headcount Reduction

**The Government has taken significant steps to control and reduce expenses, including a significant reduction in public sector employment that has brought such employment as a percentage of the total population in line with state averages.[1] In contrast to prior administrations, the current administration decided that headcount reduction should occur through attrition, not layoffs**

Puerto Rico Public Sector Employees (thousands)[2]



The significant reduction in public sector employment has reduced its share of total population to approximately 6%, which compares favorably to mainland states, where the typical share is between 5% and 8%

Public Sector Employment as a % of Total Population[3][4]





(1) Public sector employment includes both Commonwealth government and municipality employment headcounts.
(2) U.S. Bureau of Labor Statistics, Seasonally Adjusted Government Employment. Represents state and local government employees.
(3) U.S. Department of Labor. Employment as of July 2016 and population as of July 2015.
(4) U.S. Census Bureau.

15

CONFIDENTIAL

PR-CCD-0556847

# The Commonwealth Has Also Imposed a Partial Freeze on Public Sector Salaries and Other Spending

**The Commonwealth has taken steps to control expenditures such as freezing employee salaries and cutting non-salary compensation, in recognition that salaries are already well below equivalent salaries in the states**

▪ The Commonwealth's Special Fiscal and Operational Sustainability Act (Act No. 66-2014) addresses Commonwealth spending by implementing various measures such as freezing increases in payroll costs and/or collective bargaining agreements, cutting non-salary compensation, freezing formula appropriations and reducing rates for school transportation costs and professional and purchased services[2]

Police and Teacher Salaries in Puerto Rico and Other Financially Stressed Jurisdictions[1]



(1) U.S. Bureau of Labor Statistics, Occupational Employment Statistics and National Education Association. Teachers salaries shown herein represent salaries for Elementary School Teachers, except Special Education, which has the highest number of teachers.
(2) Act No. 66-2014, June 17, 2014, GDB. http://www.gdb-pur.com/investors_resources/documents/A-066-2014.pdf.



16

CONFIDENTIAL

PR-CCD-0556848

# As a Result of Austerity Measures, Government Consumption Expenditures Have Declined Below 2006 Levels

**Per the Puerto Rico Planning Board, government consumption expenditures were 12% lower in FY 2015 than in FY 2006 *on a real* basis**

Real Government Consumption Expenditures in FY 2006 and FY 2015[1]

($ millions, fixed at 1954 dollars)



Note: All figures are presented on a Puerto Rico fiscal year basis (July to June).
(1)   Puerto Rico Planning Board. GDB Statistical Appendix – Table 3: Gross National Product in Constant 1954 Dollars. Government Consumption Expenditures.



CONFIDENTIAL

# Critical Capital Investment Has Been Dramatically Reduced, Leaving the Commonwealth's Infrastructure in Disarray

**Capital expenditures for Puerto Rico's major agencies and component units (including PREPA and PRASA) have fallen by approximately 70% from FY 2007 to FY 2015. When excluding the impact of PREPA and PRASA capital expenditures, total investment declined by approximately 76% over the period**

▪ Note that the numbers shown below are *inclusive* of federal grants related to capital spending and are as reported by the Office of Management and Budget[1]

Actual Capital Expenditures of Major Commonwealth Agencies[2]





(1) Note that the numbers shown will not correspond to the CAFR.
(2) Office of Management and Budget, *Presupuesto Consolidado de Mejoras Permanentes por Agencia*. Actual figures shown unless indicated otherwise
(3) FY 2017 budgeted figures shown reflect the Office of Management and Budget's recommended budget for FY 2017.

18

PR-CCD-0556850

# The Government Has Also Been Deferring Certain Payments to Vendors and Taxpayers, as Well as Contributions to the Pension Systems

**Since 2007, past-due obligations of the Primary Government and Component Units owed to third-party vendors, taxpayers, and the pension systems have all markedly increased**

Primary Government and Component Unit Total Accounts Payable, Tax Refunds Payable, and Net Pension Obligation[1]



Note that the net pension obligation of the Primary Government is based upon an actuarial valuation and is distinct from the full unfunded liability of the retirement systems, instead representing the Primary Government's obligation as a sponsor to fund its pensions.

(1)   Commonwealth Comprehensive Annual Financial Reports. Figures sourced from Statement of Net Position. Note that accounts payable figures include both primary government and component units but exclude fiduciary funds. Payables are not limited to past-due balances.



19

# These Expense Reductions Have Occurred in Hand with Significant Revenue Increases, Which Have Reduced Disposable Income

**Revenues from the Act 154 excise tax imposed in 2011 and the 2015 increase in the Sales and Use Tax ("SUT") to 11.5% now account for approximately 30% of General Fund revenues**

FY 2017[1] General Fund Revenues



($ millions)

| | FY 2017 Budget | % of Total |
|---|---|---|
| **General Fund Revenue (Pre-Measures)** | | |
| Individual Income Taxes | $1,966 | 21.6% |
| Corporate Income Taxes | 1,525 | 16.8% |
| Non-Resident Withholding | 763 | 8.4% |
| Sales and Use Tax | 1,608 | 17.7% |
| Act 154 Excise Tax | 1,924 | 21.1% |
| Alcoholic Beverages Excise Tax | 272 | 3.0% |
| Tobacco Products Excise Tax | 117 | 1.3% |
| Motor Vehicles Excise Tax | 293 | 3.2% |
| Rum "Cover Over" Revenues | 206 | 2.3% |
| Other General Fund Revenues | 426 | 4.7% |
| **Total General Fund Revenues** | **$9,100** | **100.0%** |

*SUT increase from 7% to 11.5%, the highest in the U.S.[2], resulted in approximately $1 billion of incremental GF revenues in FY 2016 and represents approximately 11% of projected FY 2017 GF Revenues*

*Act 154 excise tax revenues represent 21% of total projected FY 2017 GF Revenues*

*Note that Fiscal Plan projections have subsequently been reduced to $9,045 million due to lower lottery revenues*

**There have also been significant increases in taxes and charges outside of the General Fund. For example, the recent increases in the excise tax on petroleum products from $3.00 to $15.50 generates approximately $360 million of incremental revenues and the 2013 60% increase in water rates by PRASA generates approximately $330 million of incremental revenues**

(1) Note that the Puerto Rico fiscal year runs from July to June.
(2) "Puerto Rico, At 11.5%, Has America's Highest Sales Tax." August 17, 2015, Forbes.



20

PR-CCD-0556852

# All of These Austerity Measures May Have Been Counterproductive and May Have in Fact Contributed to a Decade of Economic Contraction

**The combination of the 2006 elimination of Section 936 of the U.S. tax code, the onset of the U.S. financial crisis, and the aforementioned pro-cyclical austerity measures, have led to negative real GNP growth in every year but one since 2006**

- The GNP declines would have been even worse had it not been for large stimulus spending, such as the approximately $7.1 billion of funds allocated to Puerto Rico under the 2009 American Recovery and Reinvestment Act (ARRA) and the creation of a $500 million "Local Stimulus Fund" funded from the Puerto Rico Sales Tax Financing Corporation ("COFINA") bond issuances in 2009 and 2010[1]

  - Furthermore, tax reform enacted in 2011 sought to jumpstart the economy by reducing individual and corporate taxes by approximately $706 million, some provisions of which were later modified to address resulting revenue shortfalls

Real GNP Growth Rates – Puerto Rico vs. United States[2][3]





(1)  2011 Comprehensive Annual Financial Report p. 27.
(2)  Puerto Rico Fiscal Authority Agency and Financial Advisory Authority. Economic Activity Index ("EAI") Reports for Puerto Rico GNP data and the U.S. Bureau of Economic Analysis for the United States GNP data. Both Puerto Rico and U.S. fiscal data reported on a Puerto Rico fiscal year basis (July to June).
(3)  Puerto Rico values are based on real GNP calculated at 1954 prices, U.S. values are based on real GNP at 2009 prices.

CONFIDENTIAL

PR-CCD-0556853

# The Economic Crisis Has Compromised the Government's Ability to Provide Essential Services

**Past due payments to suppliers have called into question the government's ability to provide its residents with essential police, education and healthcare services**

*"The island reached a tentative deal…with Total Petroleum Puerto Rico Corp. after the company **warned it would no longer supply state vehicles with gasoline** because of the government's $16 million debt"*

-Danny Hernández,
Spokesman for the General Services Administration[1]

*"Carmen Warrel, spokesperson for the Special Education Steering Committee parent's association, highlighted that there are cases, such as the **Instituto Modelo de Enseñanza, which is contracted by the Department of Education to serve students with autism, who have announced closure at the end of the month if not paid"***

-Univision[2]

*"Administrators detailed both delayed funding from insurers and government sources, and how the **hospital had to delay and prioritize payments to provide basic care for its patients**. '**We are hanging by a thread**,' said Dr. Juan Nazaro, executive director of the hospital"*

-The Atlantic[3]





(1) "Puerto Rico's Crisis Threatens to cut Gas, Power Supplies," January 11, 2016, Caribbean Business. http://caribbeanbusiness.com/puerto-ricos-crisis-threatens-to-cut-gas-power-supplies/.
(2) "Servicios de Educación Especial afectados por falta de liquidez en Puerto Rico," January 18, 2016, Univision Agencia EFE. http://www.univision.com/noticias/educacion-especial/servicios-de-educacion-especial-afectados-por-falta-de-liquidez-en-puerto-rico.
(3) "Will Puerto Rico's Debt Crisis Spark a Humanitarian Disaster," May 13, 2016, The Atlantic. http://www.theatlantic.com/politics/archive/2016/05/puerto-rico-treasury-visit/482562/.

22

PR-CCD-0556854

# The Economic Crisis Has Led to Meaningful Outmigration from the Island, the Pace of Which Appears to Be Intensifying

**Puerto Rico's population declined by approximately 9% from 2006 to 2015 and the rate of outmigration appears to be increasing**



Puerto Rico Population 2006 to 2015[1]

Puerto Rico lost approximately 331,000 people in the period from 2006 to 2015



Puerto Rico Net Outgoing Air Passenger Traffic (Total on a Rolling Last Twelve Month Basis)[2]

Based on outgoing passengers less incoming passengers, it appears the pace of those migrating from the island may be increasing

**Outmigration has only exacerbated the Commonwealth's fiscal and economic challenges and has a material impact on the Commonwealth's long-term economic potential**



(1) U.S. Census Bureau, Population Division. Yearly data shown as of July 1.
(2) Puerto Rico Institute of Statistics.

23

PR-CCD-0556855

# In Fact, Puerto Rico's Outmigration-Induced Population Default Dwarfs that Experienced by Other Troubled Jurisdictions

**On a percentage basis, outmigration from the island has exceeded that experienced in Washington D.C. prior to the implementation of a control board and is comparable to that experienced in Detroit prior to its Chapter 9 filing; however, in absolute terms, Puerto Rico's total population loss is far greater than either Detroit or D.C.**



Puerto Rico Population (thousands)[1]

Puerto Rico's population declined by approximately **6%,** or **205K,** from 2011-2015

Detroit Population (thousands)[2]

Detroit's population declined by approximately **6%,** or **41K,** from 2009-2013

Washington, D.C. Population (thousands)[3]

The District of Columbia's population declined by approximately **3%,** or **20K,** from 1991-1995. While over a longer time period (through 2000), D.C. had a larger economic and demographic shift, if current trends continue, Puerto Rico's shift may surpass that of D.C. not only on a nominal basis but also on a percentage basis[4]



(1) U.S. Census Bureau, Population Division, Annual Estimates of the Resident Population.
(2) Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015. Source: U.S. Census Bureau, Population Division.
(3) Time Series of District of Columbia Intercensal Population Estimates by County: April 1, 1990 to April 1, 2000. Source: Population Division, U.S. Census Bureau.
(4) Compares D.C.'s population from 1980-2000, during such period there was a 10.4% decline. U.S. Census Bureau Intercensal Population Estimates of the Total Resident Population of States.

24

CONFIDENTIAL

PR-CCD-0556856

# The Economic Crisis and Austerity Measures to Date Have Negatively Impacted the Population, Nearly Half of Whom Live Below the Poverty Line

**Puerto Rico's economic collapse has created deteriorating conditions for those living in poverty, while they continue to face a cost of living comparable to the U.S.**



Population below the Poverty Level (2014)[1]



Per Capita Disposable Income[2]

### Cost of Living[3][4]

| Rank | Urban Area | Cost of Living Index |
|---|---|---|
| 1. | Manhattan, NY | 227 |
| 2. | Honolulu, HI | 188 |
| 3. | San Francisco, CA | 176 |
| 4. | Brooklyn, NY | 173 |
| ... | | |
| 47. | San Juan, PR | 112 |
| ... | | |
| 296. | Richmond, IN | 81 |
| 297. | Harlingen, TX | 80 |
| 298. | McAllen, TX | 78 |
| | **Average = 100** | |

Though Puerto Rico's per capita disposable income is only ~40% of the U.S. average, ~70% of the population of Puerto Rico lives in the San Juan MSA, which is ranked 47th highest out of 298 U.S. metropolitan areas and 11.6% above the average due to some of the highest prices for utilities, groceries and goods and services in the country[3]



(1) U.S. Census Bureau. Current Population Survey, Annual Social and Economic Supplement, 2015 United States data. Puerto Rico poverty level based on 2014 American Community Survey 1-Year estimates.
(2) GDB Statistical Appendix (Selected Series of Income and Product, Total and Per Capita). U.S. Bureau of Economic Analysis (U.S. Personal Income and Population).
(3) The Institute of Statistics of Puerto Rico. Index Cost of Living, June 17, 2016.
(4) Council for Community and Economic Research.

25

PR-CCD-0556857

# Breaking the Vicious Cycle



Austerity measures have not reversed Puerto Rico's economic decline nor helped Puerto Rico's impoverished residents. All the measures outlined further in the Fiscal Plan are based on the guiding principle that more austerity measures are simply not the answer to Puerto Rico's current crisis.



26

PR-CCD-0556858



# Core Principles of the Fiscal Plan
## *2. Improve Budgetary Controls and Financial Transparency*

CONFIDENTIAL

# Fiscal Plan Must Address Legacy of Weak Fiscal Controls, Fragmented Decision-Making and Delays in Presentation of Fiscal and Economic Information

**The Commonwealth has historically failed to meet revenue estimates, failed to control spending, and failed to consistently produce timely financial statements**

General Fund Revenues[1] ($ millions)



■ Original Budget  ▪ Actuals

General Fund Actual Deficit[1] ($ millions)



Days to Produce Fiscal Year Audited Financial Statements[1]



(1)   Commonwealth of Puerto Rico CAFR, Statement of Revenues, Expenditures, and Changes – Budget and Actual – Budget Basis – General Fund.

28

PR-CCD-0556860

# Institute New Budgetary Rules and Practices to Impose Budgetary Discipline

*In light of the Commonwealth's chronic budget deficits and repeated failure to meet revenue estimates, it should institute new rules and practices to impose budgetary discipline. Without effective budgetary and other controls, it will be challenging to measure performance under the Fiscal Plan and make necessary real-time adjustments*

### Budgetary Planning and Implementation

- Require Budgets to be prepared in accordance with "Modified Accrual Accounting Standards" (as defined by GASB)
- Implement multi-year budgeting requirement to identify trends and enable long-term planning
- Eliminate Commonwealth's Special Revenue Funds, and account and budget for all revenue and expenditure transactions in the General Fund (except for Federal Grants)
- Improve revenue projections by relying on third-party validation process
- Implement quarterly General Fund budgetary revision process based on actual revenues and expenditures in order to make timely budgetary adjustments

**Reform Budgetary Rules and Processes**

### Tax Expenditure Inventory and Budget

- Require perpetual inventory of tax credits issued and outstanding in order to measure impact on revenue estimates
- Require periodic reporting on cost/benefit analysis of tax expenditures
- Require Annual Tax Expenditure Budget that prepares annual revenue estimates on a "gross basis", then adjusts to reflect the impact of existing and proposed tax exemptions, exclusions and deductions
- Require annual budgetary approval of tax credits, like any other budget line item

### Additional Controls

- Enact regulations so that OMB/Treasury can hold UPR, Legislative Assembly and dependent agencies and public corporations accountable for their expenditures
- Require periodic measurement and reporting of the capture rate of all taxes
- Prohibit legislation with fiscal or budgetary impact to be approved during the fiscal year without new sources of revenues
- Close all operating funds at the end of each fiscal year
- Require Federal Funds reimbursement reconciliation on a monthly basis

29

PR-CCD-0556861

# Make Fiscal and Economic Data Transparent, Reliable and Timely

**Invest in Systems to Develop and Report Accurate Financial Data**

*Obsolete financial and accounting systems, combined with a lack of integration of agencies under the same platform, hinders the ability to timely monitor expenses, complete annual audits and publish fiscal and financial data*

- Invest in new financial, accounting and payroll systems to streamline internal accounting and reporting processes and sharing of information in order to provide real-time data and accelerate the preparation and publication of interim and audited financial statements
- Execute agency and public corporation consolidation plan (described in Section 3), which will reduce the number of reporting entities in the Commonwealth's financial statements and simplify related audit procedures
- Consolidate agencies' finance divisions, supplier payment processing and management of federal grants in a shared service center
- Create Commonwealth Financial Reporting Office in order to properly coordinate the production and dissemination of fiscal and financial data within the newly created Department of Treasury and Finance

---

**Strengthen Economic and Statistical Analysis**

*The Commonwealth must be equipped with transparent, reliable and timely macroeconomic data that allows for better economic forecasting*

- Adopt the Institute of Statistics and the Planning Board's five-year plan to strengthen the economic statistical system and analysis by modernizing national accounts with an estimated investment of $3 million per year
- Reorganize and expand Puerto Rico's current five national accounts into seven accounts (Net Income and Gross Product, Personal Income and Outlays, Government Receipts and Expenditures, Foreign Transactions-Current, Foreign Transactions-Capital, Gross Savings and Investment and Private Sector Income)
- Present national accounting statistics in accordance with the 2008 United Nations standards and publish full sets of quarterly statistics
- Develop a new forecasting model for Puerto Rico's national accounts with technical assistance from the U.S. Bureau of Labor Statistics and the U.S. Bureau of Economic Analysis



30

# Enhance Financial Controls and Fiscal and Economic Decision-Making

**Ensure all Spending Flows Through a Single Treasury**

*The Commonwealth currently has a highly fragmented treasury system that lacks emphasis on fiscal and financial controls and provides little visibility of the Government's consolidated financial position. The centralization of treasury functions in the central government can provide significant communication, visibility and efficiency benefits*

- Establish by legislation centralized single treasury functions across Commonwealth agencies and dependent public corporations to enhance visibility, reduce financing costs and improve cash flow management
- Single Treasury account should be used for all spending to make sure it is controlled and consistent with the budget
- Single Treasury account will also provide visibility into the Commonwealth's consolidated fiscal position

---

**Develop Performance Metrics**

*Agencies lack proper KPI's and benchmarking data that facilitate budget development and execution*

- Complete the development of performance metrics for the principal agencies and departments of the Government: Education, Health, Police, Justice and Children and Families
- Establish an electronic system to publish performance metrics in order to improve execution and enhance transparency

---

**Reorganize Fiscal and Economic Decision Making Structures**

*A well-structured approach towards financial and economic development decisions will help improve forecasting and financial and economic decision-making*

- Consolidate the functions of the Treasury Department, OMB and AAFAF into new Department of Treasury and Finance to better manage and coordinate fiscal and financial policy
- Submit and pass legislation to implement new Department of Economic Development and Commerce organizational structure and business plan



31

PR-CCD-0556863



# Core Principles of the Fiscal Plan
*3. Rationalize Expenditures and Tax Policy To Promote Efficiency*

32

PR-CCD-0556864

# The Commonwealth Can Achieve Operational Efficiency by Consolidating Overlapping Agencies and by Further Centralizing Procurement to Capture Cost Savings

**Puerto Rico's government is composed of 114 agencies and public corporations with over 519 local and regional offices throughout the island, creating a highly fragmented structure with redundancies and limited economies of scale**

- In order for the Commonwealth to achieve operational efficiencies, it must pursue the following measures:
    - Continue implementation of the Government Reorganization and Efficiency Plan (EO 2015-23), so as to consolidate local government offices and increase the use of technology and shared services
    - A redesign of governmental structures as proposed by OMB and UPR's Public Administration Faculty, which will lead to a consolidation of approximately 48 government entities, generating savings in rent and utilities and facilitating future workforce attrition
- The Commonwealth can benefit from additional operational efficiencies by continuing efforts to ensure that certain purchases of materials and supplies are managed by a new, modern, procurement system in the Puerto Rico General Services Administration, as well as facilitating the process by which local businesses become vendors of the U.S. General Services Administration
    - This is estimated to achieve approximately 4% in savings. Economies of scale made available by Section 406 of PROMESA, which allows the Commonwealth to make purchases through the U.S. GSA, can help meet this goal

Number of Agencies and Public Corporations[1]



Estimated Impact vs. Base Projections ($ millions)



 (1) Centro de Estudios Multidisciplinarios Sobre Gobierno y Asuntos Públicos; "Estudio sobre la Organización y el Desempeño de la Rama Ejecutiva".

33

PR-CCD-0556865

# In Addition to Consolidating Agencies the Commonwealth Should Continue to Implement its School Consolidation and Reinvestment Program

**Since 2005, enrollment at PR public schools has declined 37%, which has led to a reduction in school utilization and a decrease in the student to teacher ratio to 12:1, as compared to the U.S. average of 16:1**

- In light of the continued decline in enrollment and school utilization, the Puerto Rico Department of Education ("PRDE") will continue to execute its School Consolidation Plan, which it has been carrying out over the last three years (155 schools already consolidated with academic performance increasing in consolidated schools[1])
    - The consolidation process is based on specific parameters such as academic performance, enrollment, school utilization and distance. As it continues to right-size its resources, the PRDE will ultimately position itself to deliver higher quality education with better compensated teachers
- The Commonwealth will complete the remaining phases of PRDE's restructuring plan, which requires overhauling management and operations to focus on moving personnel from administrative positions back into school-based positions

Actual and Projected Student Enrollment (in thousands) [2]



Estimated Impact vs. Base Projections ($ millions)



(1) Based on standardiszed tests (META PR)
(2) Department of Education's historic, actual and projected student enrollment as of October 2016.

34

CONFIDENTIAL

# Given the Interconnectedness of the Government's Hospital Systems, the Commonwealth Can Also Achieve Cost Savings Via Hospital Consolidations

**The Puerto Rico's hospital system is highly fragmented and can capture significant efficiency gains by integrating hospital administration and leveraging P3s**

- Creating the Puerto Rico Medical Center Campus organized around specialty institutions will integrate all government hospitals into a single organization
    - Phase 1 contemplates merging Administration of Medical Services of Puerto Rico ("ASEM"), the University Hospital and University Pediatric Hospital ("HOPU")
    - Phase 2 would further merge the Industrial Hospital, currently run by the State Insurance Fund, as well as other government-run hospitals
- Implementing functional P3s at state hospitals (billings, admissions, maintenance and food services, among other support services) will bring best in class practices, centralize functions and streamline processes



Interconnected Relationship Among Health Care System[1]

Estimated Impact vs. Base Projections ($ millions)

(1) Interviews, V2A Analysis. "RCM" stands for UPR's Medical Sciences Campus.

35

CONFIDENTIAL

# Puerto Rico Must Implement Measures to Control Increasing Health Care Costs

**Puerto Rico's health care system should implement initiatives designed to improve medical quality, utilization and cost**

- Implement STAR-like[1] rating system and establish a provider payment scale based on performance
    - ASES is developing a Primary Medical Group ("PMG") quality monitoring program that would allow the agency to monitor quality, utilization and cost of the Commonwealth healthcare program ("Reforma")
- Standardize health protocols and fee schedules by creating a uniform guide for medical procedures and corresponding medical service fee schedules
    - These initiatives are designed to decrease medical costs close the per member per month ("PMPM") gap among PMGs, as shown in the graph below
- Reduce the number of federally qualified healthcare centers receiving grants under Section 330 of the Federal Public Health Service Act that are located near existing hospitals or clinics and adjust the wrap-around payment formula for services rendered by these centers to beneficiaries of Reforma

PMGs Max and Average PMPM Cost[2]



Estimated Impact vs. Base Projections ($ millions)



(1) Centers for Medicare and Medicaid Services ("CMS") Five Star Quality Rating System.
(2) ASES' "Proyecto de Evaluación y Monitoreo de Calidad de Proveedores" 2015-2016.

36

# Additional Cost Savings Can Be Achieved by Avoiding Programmed Expenditure Increases That Are Not Based on Assessments of Need

**Act No. 66-2011, which froze new hires, salaries and formula-based appropriations, is due to expire in June 2017. The Fiscal Plan extends most of Act 66's fiscal control measures and proposes to permanently repeal formula appropriations and convert them to fixed amounts adjusted annually by inflation**

- The Fiscal Plan proposes to extend through FY 2021 Act 66's freeze of new hires, formula-based appropriations for UPR, the Judicial Branch and municipalities, as well as a freeze of service costs, increases in salaries and collective bargaining agreements

- After FY 2021, the Fiscal Plan permanently fixes these appropriations at their fiscal year 2014 levels and only allows them to grow after 2021 at the rate of the previous fiscal year's inflation[1]



Adjusted General Fund Budgeted Expenses[2] ($ millions)

Estimated Impact vs. Base Projections ($ millions)

(1) Net Revisions to GF Budget Formulas, Payroll, Operating Expenses and Water Utilities represents the effective replacement for the reduction in municipalities subsidies and Extend Act 66 measures after FY2021 to continue capturing savings already achieved
(2) Adjusted General Fund Budget excluding debt service and AUC's embedded in the General Fund.

37

CONFIDENTIAL

PR-CCD-0556869

# To Reduce Their Potential Economic Impact, Budgeted Workforce Related Cost Savings Are to Occur Through Retirement or Attrition

**The Fiscal Plan calls for the Commonwealth to reduce its payroll costs, but does so through a 2% annual payroll attrition target that relies on the Commonwealth replacing departing workers only when necessary**

- In order to achieve these attrition targets, the Office of Management and Budget ("OMB") will:

  - Implement Act 211-2015 offering Pre-Retirement Program (PRP) windows to select public sector employees

  - Implement new government-wide employee classification programs to improve mobility and allocation of human resources

- The Commonwealth will benchmark public sector benefits to those of the private sector, which would also work to increase productivity and facilitate attrition efforts

Estimated Employee Headcount Attrition[1]



Estimated Payroll Costs[2] ($ millions)



Estimated Impact vs. Base Projections ($ millions)



(1) Estimated headcount based on OMB's analysis of General Fund and Component Units employees included in the Base Projections, excluding the University of Puerto Rico. Impact of Act 211-2015 based on preliminary analysis of employees that meet basic criteria.
(2) Act 211-2015 attrition estimate based on initial estimates of eligible employees.

38

PR-CCD-0556870

# Reduce Subsidies and Other Special Appropriations

**The central government's precarious fiscal situation is exacerbated by sizable subsidies to other governmental entities, including municipalities, as well as by benefits legislated through special laws**

- The Commonwealth would enact legislation beginning in FY 2018 to gradually adjust subsidies provided to the municipalities by the central government, while also empowering the municipalities with the proper legal, administrative and operational tools to offset such a decrease

  - Municipalities may present revenue generation and expense reduction initiatives, which may include changes to municipal license fees, modernization of property tax regimes and municipal consolidations, among others

- Note that the municipalities are contributors to the Employees Retirement System and the Fiscal Plan assumes that the central government does not cover any amounts related to the municipalities (approximately $100MM per year). The municipalities ability to contribute such amount could be at risk, particularly if they are not made covered entities

- In addition, the Commonwealth would modify special laws benefits granted to the Department of Education's employees that retired before 2014, Christmas bonus, medicine bonus, and medical insurance plan continuation, which are in addition to the benefits related to pensions

- Formula appropriation to UPR is to be frozen until 2021 and thereafter only grown at inflation. No further cuts are contemplated due to the importance of higher education to the island's economic development

  - UPR will need to implement measures to enhance efficiency and re-invest in education

Adjusted FY2016 General Fund Budgeted Expenses [1] ($ millions)     Estimated Impact vs. Base Projections ($ millions)



(1)   Adjusted General Fund Budget excluding debt service.

39

# The Commonwealth Must Increase Its Tax Collections by Boosting its Capture Rate and Reducing Tax Evasion

**The Commonwealth lacks an effective tax administration infrastructure, resulting in significant tax evasion and high administrative and compliance costs. In order to increase capture rates the Commonwealth will:**

- Upgrade technology and leverage its use by:
    - Improving Integrated Merchant Portal System (PICO)
    - Implementing New Internal Revenue Integrated System (SURI)
    - Implementing Automated System for Customs Data (ASYCUDA)
- Expand alternative delivery and payment channels' capabilities by:
    - Increasing transactions and services online, through a call center and in banks and credit unions
    - Transforming its 89 collection centers into 27 Integrated Service Centers throughout the island
- Improve tax enforcement by:
    - Restricting the use of amnesties and closing agreements to increase revenue certainty and reduce tax evasion
    - Leveraging joint ventures between the Central Government and municipalities for greater SUT oversight [2]
    - Creating the Office of Tax Return Compliance and Office of Transfer Pricing Policies
- Tackling widespread use of illegal video lottery machines that erode Puerto Rico's tax base by implementing and enforcing tax on, and regulating, video lottery games
- Require periodic measurement and reporting of the capture rate of all taxes



Estimated Impact (\$ millions)

Estimated Impact of Video Lottery[1] vs. Base Projections (\$ millions)

(1) Video Lottery estimates based on Christiansen Capital Advisors, LLC study adjusted for Puerto Rico income levels. Estimates are net of ~35% allocation to CRIM.
(2) Joint Ventures exist for 48 municipalities. Remaining 30 joint ventures are expected to be completed under this measure.

40

PR-CCD-0556872

# The Commonwealth Must Address its Act 154 Revenue Cliff by Changing its Tax Code to Substitute Projected Revenue Shortfalls

**The Commonwealth is currently highly dependent on receipts from the Act 154 excise tax (approximately 21% of General Fund revenues), which is due to be replaced by a "Modified Source Income Rule" tax in December 2017 (FY 2018). Extension of Act 154's excise tax for a short transition period is necessary in order to ensure revenue certainty while a new corporate tax regime for multinationals is implemented**

- Act 154's transition in FY2018 to a tax based on the Modified Source Income Rule is estimated to result in a loss of half of estimated tax revenues. The Commonwealth proposes to temporarily extend Act 154 excise tax (2-3 years) to give the government sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full to current levels

  - Assumes no adverse decisions by the IRS during this interim period



Act 154 Projected Revenues - Pre Measure ($ millions)

Impact of Measure ($ millions)

CONFIDENTIAL

PR-CCD-0556873



# Core Principles of the Fiscal Plan
*4. Enact Structural Economic Measures and Invest in Growth*

42

CONFIDENTIAL

PR-CCD-0556874

# The Plan Must Boost Private Sector Jobs and Labor Force Participation Levels, Which Are the Lowest in the United States

**The number of private sector jobs in Puerto Rico as a percentage of the total population is materially lower than any mainland state, helping drive high unemployment, which is double that of the U.S. average, and a low labor force participation as Puerto Rico residents face dismal job prospects[1]**

Private Payroll Employment as a Percentage of Total Population by State – 2015[2][3]



Puerto Rico Unemployment Rate 2006-2015[4]



Labor Force Participation 2006-2015[5]





(1) Reflects percentage of people working or looking for work over the total population over 16 years of age.
(2) U.S. Department of Labor. Employment as of July 2016 and population as of July 2015.
(3) U.S. Census Bureau.

(4) Bureau of Labor Statistics (Non-Farm Payroll Employment Survey).
(5) Puerto Rico Fiscal Authority Agency and Financial Advisory Authority. U.S. figures from the Bureau of Labor Statistics Current Population Survey and represent January values.

43

# The Commonwealth Must Implement Labor Reforms to Increase Labor Demand and Participation

**Only 40% of Puerto Rico's adult population (vs. 63% in the U.S.) is employed or looking for work. A significant portion of the population is either receiving welfare, informally employed or both. The Commonwealth must adopt pro-growth labor market policies, implement an earned income tax credit program and reform welfare programs**

- The Puerto Rico private labor market is subject to federal labor regulations and unique local regulations such as 8-hour work days based on calendar days (instead of 24-hour periods) and mandatory Christmas bonus and severance payments

- For Puerto Rico to increase its competitiveness and labor participation, and cognizant of the fact that Puerto Ricans can move freely to the mainland, the Commonwealth must review its labor laws in order to pursue two dual objectives:

  - Preserve its revenue base

  - Increase labor participation rates

> **In the FEGP, the Commonwealth previously proposed to enact labor reforms that included: paying overtime calculated based on hours worked in excess of 40 hours per week, easing the process to waive the Christmas bonus, and limiting the mandatory severance to six months. Puerto Rico's continuing economic contraction and increasing outmigration illustrates an urgent need not to reduce personal incomes of Puerto Rico's residents, which could induce further outmigration. Any labor reform must be evaluated in light of those circumstances. Further, the Commonwealth believes that any reduction in the minimum wage would be an incentive for people to migrate to the mainland**



44

# The Commonwealth Must Implement Structural Reforms to Increase Labor Demand and Labor Participation (cont.)

| | Initiative | Highlights |
|---|---|---|
| **Establish EITC** | ▪ Establish an EITC that targets families with children, headed by working age persons, to stimulate employment among low-wage workers, reduce informal economy activities, bring families into the tax system and offset sales tax regressivity | ✓ Invest ~$150 million per year in EITC program<br>✓ Former Commonwealth EITC program (2006-2014) did not differentiate among claimants by filing status, presence of dependents or age of the tax filers |
| **Welfare Reform** | ▪ Reform Nutritional Assistance Program ("NAP") Benefits | ✓ Modify NAP income thresholds for the Commonwealth so that program participants experience a more gradual and income-targeted reduction in NAP benefits when entering the workforce to eliminate the current cliff effect on benefit reduction |
| | ▪ Apply to US Department of Housing and Urban Development ("HUD")'s "Moving to Work" program to receive waivers of rules that govern public housing and federal Section 8 voucher program | ✓ Program's goal is to give incentives to families with children, where the head of household is working, seeking work, or is preparing for work to obtain employment, become economically self-sufficient and increase housing choices for low income families<br>✓ After receiving waiver, local Housing Department to develop rent structures that allow residents to increase their earnings through work without penalty |
| | ▪ Apply to HUD's "Jobs Plus Pilot Program" | ✓ Program incentivizes employment through income-disregards for working families, and provides a set of services designed to support work including employer linkages, job placement and counseling, educational advancement, and financial counseling |



45

# The Plan Must Set Forth Reforms Designed to Reverse Recent Dramatic Declines in Private Sector Investment

**Following the full phase-out of Section 936 in 2006, private investment in Puerto Rico has declined dramatically. Today, private investment as a percent of GNP[1] is nearly half of the level in 2006, when the phase out of Section 936 began. Furthermore, Puerto Rico has not created an attractive platform to attract and replace foregone investments**

Puerto Rico's Nominal Gross Fixed Investment – Private Sector (Construction, Machinery & Equipment) 2006 to 2015[2]



Puerto Rico's 2016 Ease of Doing Business Ranks (Overall Ranking Out of 189 Countries)[3]



(1) By Final Demand Category.
(2) GDB Statistical Appendix.
(3) World Bank Group Doing Business rankings.

46

PR-CCD-0556878

# Reduce Energy and Transportation Costs, Implement a Pro-Growth Tax Regime and Streamline Permitting to Foster Investment and Ease of Doing of Business

**Puerto Rico has been losing competitiveness as measured by global reports produced by the World Economic Forum and the World Bank, where it currently ranks worse than over 50 countries. To jumpstart its economy, Puerto Rico must be equipped with a business-friendly environment that is conducive to sustained economic growth**

| Initiative | Highlights |
|---|---|
| **Enact Permit Reform** • Pass legislation to centralize and streamline permitting process | ✓ Pass legislation to centralize and streamline permitting process <br>• Centralize permit application processes in the Office of Management of Permits ("OGPe"), providing a single access point and electronic permit interface for all agencies and municipalities <br>• Provide for a 7-day agency response period for "Categorical Exclusions" (e.g., minor lot designation variations for low impact environmental construction works); applications deemed granted if agency has not ruled on permit during said period <br>• Require municipalities to adopt simplified uniform general permitting regulations ("*Reglamento Conjunto*") <br>• Adopt a joint general construction permit and expedited application procedure for "low impact" construction projects |
| • Consolidate Environmental Quality Board, Solid Waste Authority and Natural and Environmental Resources Department in order to simplify and streamline the environmental review process | |



CONFIDENTIAL

# Reduce Energy and Transportation Costs, Implement a Pro-Growth Tax Regime and Streamline Permitting to Foster Investment and Ease of Doing of Business (cont.)

| | Initiative | Highlights |
|---|---|---|
| **Implement Pro Growth Corporate Tax Regime**[1] | ▪ Enact legislation to amend Puerto Rico's Internal Revenue Code to implement flatter, lower-rate corporate tax regime for both new and existing companies | ✓ Reduce nominal corporate tax rates<br>✓ Eliminate inefficient corporate deductions and tax credits; eliminate or reduce alternative minimum tax<br>✓ Enact legislation, after dialogue with existing multinationals, to retain and attract foreign direct investment |
| **Enact Reform to Stabilize Energy Rates** | ▪ Develop a holistic island-wide energy strategy to reduce and control energy rates to increase Puerto Rico's competitiveness and decrease the cost of doing business | ✓ Restructure PREPA's debt and operations to produce cash flow relief to invest in necessary infrastructure and stabilize rates<br>✓ Seek P3 opportunities to upgrade existing generation capacity and build new, efficient generation plants, allowing PREPA to transition into a transmission and distribution company<br>✓ Depoliticize PREPA by attracting professional, external management and directors |
| **Reduce Transportation Costs** | ▪ Ask U.S. Congress to repeal Jones Act's application to the Commonwealth in order to reduce maritime transport costs to the island<br><br>▪ Review current ground transportation regulatory framework and associated costs | ✓ Insist upon temporary administrative waiver from US Government in energy related transports |



(1)   Impact of this measure is not incorporated in the model, as reform is being designed. But it presents another risk on the revenue projections of the Commonwealth.

48

PR-CCD-0556880

# Puerto Rico Should Utilize these Liquidity Emergency Measures to Fund Investment and Build a Liquidity Cushion to Promote Stability and Spark Growth

**The Fiscal Plan includes measures to repay estimated outstanding third-party payables so that tax refunds are no longer delayed and payables remain outstanding for a maximum of 60 days**

- The Commonwealth's liquidity crisis has been exacerbated by the Commonwealth's lack of "TRANs" financing to cover intra-year working capital needs. Such needs have increased materially during the last decade due in part to the assignment to COFINA of the first revenues from the SUT

- The National Association of State Budget Officers produces semi-annual fiscal surveys, which indicate that cash balances as a percentage of expenditures were approximately 9% from FY 2014 through FY 2017[1]

| Paying local businesses for past services and paying tax refunds in a timely manner will both stimulate the economy and provide certainty that the Government will be able to continue providing essential services | The Fiscal Plan calls for the Commonwealth to build deposits in order to provide confidence to businesses and residents that it will have sufficient reserves to maintain uninterrupted essential services and respond to crises, and not disrupt private sector activities |
|---|---|

Projected Change in Tax Refund Payables and Other Payables FY2017-FY2022[1] ($ millions)



Projected Deposit Balance at Beginning of FY2017-2022[3] ($ millions)



---



(1) Data analyzed for Puerto Rico includes Golf Coast States, excluding Texas. 2014 and 2015 data represent actual figures, 2016 are estimated and 2017 are recommended.
(2) Includes police back pay.
(3) Starting FY 2017 deposit balance represents estimated starting balance of the TSA and certain entities included in the Fiscal Plan.

49

PR-CCD-0556881

# Capital Expenditures Must Be Increased to Maintain the Existing Infrastructure Base

**The Fiscal Plan includes spending on capital projects required to catch-up on deferred maintenance on roads, bridges, buildings and other critical infrastructure**

- PREPA and PRASA are not included in the Fiscal Plan and incremental capital expenditures at those entities is also necessary
- Additionally, the amounts shown below are only for maintaining the Commonwealth's current infrastructure and complying with current regulatory regimes; the totals shown do not include new infrastructure projects aimed at improving growth, which are discussed elsewhere
  - The "Base Capital Expenditures" shown below in FY 2017 are based on the OMB budget after deducting estimated federal funding. FY2018-2026 in the Base Projections are based on a review of recent historical data, while spending on existing infrastructure in the measures is based on a set of specifically identified projects needed for maintenance and judgement related capital expenditures. The grey amounts correspond to the incremental total spending required for the specific projects over the Base Capital Expenditures

Projected Necessary Base Capital Expenditures and Incremental Non-Growth Capital Expenditures, 2017-2026





# Plan Must Also Invest in Strategic, Growth Enhancing Infrastructure

**Puerto Rico's economic growth will be driven by investing in significant infrastructure projects that improve and facilitate transportation (roads and highways), modernize airport and port facilities and boost strategic economic development sectors (e.g. life sciences, knowledge services, research, tourism)**



($ millions)

| | |
|---|---|
| Transportation | 1,406 |
| Ports/Airports | 234 |
| Industrial | 408 |
| Research/Education | 289 |
| Tourism | 235 |
| Total | 2,572 |

Complete large-scale strategic projects to improve accesses and competitiveness including the **Northwest Corridor (PR-22 highway from Hatillo to Aguadilla), the redevelopment of Roosevelts Roads, and the Caguas Commuter Rail**

Attract economic development, private investment, and tourism by expanding the **Port of the Americas value added zone, improving the Aguadilla airport, and expanding the Panamericano docks** to attract Quantum-like mega cruise ships

To effectively compete in the world stage, strategic investments are needed in industrial parks and key economic sectors including **Aerospace and Defense, Life Sciences, Knowledge Services, Agriculture** and other sectors

Establish the UPR as a prominent scientific research center to provide a boost to the local economy **(Molecular Science Complex, Mayaguez Campus, Medical Science Campus, Other)**

Position Puerto Rico as one of the premiere travel destinations of the world for local, domestic and foreign travelers by supporting the financing of 9 hotel construction projects currently on hold



51

CONFIDENTIAL

# Plan Identifies Strategic Projects Aimed at Promoting Growth

**Puerto Rico would need to invest $2.6 billion in these projects in addition to any potential federal or private funds**



($ millions)

**Transportation**

| 1,027 | 17 | 355 | 7 | | | 1,406 |
| PR-22 Expansion (NW Corridor) | PR-18 Improvements | Caguas Commuter Rail | Roosevelt Roads Parcel 3 Improvements | | | Total |

**Ports/ Airports**

| 80 | 66 | 42 | 27 | 14 | 4 | 234 |
| Aguadilla Airport | Army Terminal | Panamericano Dock | Port of the Americas | Tourism Pier 4 | Isla Grande Airport | Total |

**Industrial**

| 131 | 101 | 96 | 75 | 5 | 408 |
| Life Sciences | Knowledge Services | Aerospace | Agriculture | Other | Total |

**Education**

| 120 | 62 | 59 | 41 | 7 | 289 |
| Molecular Science Complex | Mayaguez Campus | Medical Science Campus | Research Laboratories | Aerospace Institute - Aguadilla | Total |

**Tourism**

| 124 | 107 | 4 | 235 |
| East Region | North Region | South Region | Total |

# Hotels: (2) (6) (1) (9)



52

CONFIDENTIAL

# Commonwealth's Investment Capital will also be Implemented by Strategic Investments in the Island's Utilities That Support Long-Term Competitiveness

## PREPA and PRASA's capital improvement programs are essential elements of the Commonwealth's long-term growth and competitiveness

- Independent public enterprises not included in the Fiscal Plan, such as PREPA and PRASA, will separately undertake significant capex programs (either directly or through P3s):
- PREPA plans to invest more than $4.6 billion over the next ten years to upgrade existing infrastructure and invest in strategic projects such as the Aguirre Offshore Gas Port ("AOGP")
- PREPA's capex includes projects for:
  - Maintenance capex (transmission & distribution, generation & others) – $2.7 billion
  - Investment capex
    - New Units /Repowering – $1.1 billion,
    - "AOGP" – ~$470 million
    - Investments in transmission & distribution – ~$300 million
- PRASA also contemplates finance approximately $3 billion in capex during the next ten-years
- PRASA's capex includes projects for:
  - Water/waste water infrastructure renewal and replacement – $1.4 billion
  - Environmental compliance – $540 million
  - Meter replacements, fleet renewal and technology – $500 million
  - Water loss control, quality assurance and others – $620 million

---

 Note that the development of the AOGP, as well as other major capex projects, is subject to certain material risks, including obtainment of necessary permits and final approval by the Puerto Rico Energy Commission.

53

PR-CCD-0556885

# Public Private Partnerships Serve as a Viable Strategy to Improve Operations, Boost Private Sector Participation and Fund Necessary Capital Spending

**LMM International Airport and other P3 transactions demonstrate that public private partnerships are a viable model and an effective tool to develop necessary infrastructure, reduce operational costs and improve services. Potential P3 projects are included below. Due to uncertainty regarding timing, financial impact, and economic viability, the effect of these P3s is not incorporated herein, implying there could be additional upside to the Fiscal Plan**

- Concession remaining toll roads, including PR-20, PR-52 and PR-66 in consultation with U.S. Department of Transportation
  - Improve, intra-Island connectivity, road and bridge quality and safety
  - Continuous investment in roads' maintenance would be mandatory as set forth in a Concession Agreement
  - Concessions would help transform HTA into a contract administrator
- Merge Public Building Authority and Office for the Improvements of Public Schools ("OMEP")
  - Transform PBA into a more efficient and effective public corporation and outsource services
  - Consider transferring the construction function to PRIFA to avoid duplicity of functions and gain efficiencies
- Concession maritime transport and bus system operations
  - Complete ongoing procurement process for the operation and maintenance of the public maritime transportation services and the metropolitan bus system
- Evaluate potential concessions for ports and airport operations or facilities, and work with the Federal Aviation Administration ("FAA") to consolidate underutilized or geographically unnecessary airports



CONFIDENTIAL



# Core Principles of the Fiscal Plan
## *5. Protect Vulnerable Stakeholders*

CONFIDENTIAL

# As a Result of Elevated Poverty and Low Salaries, Much of the Population Is Dependent on the State Healthcare System

**Approximately 1.6 million Puerto Ricans, or just under half of the island's population, are beneficiaries of the government's healthcare plan. Outmigration appears to have recently lowered the number of residents dependent on the plan, but has also drastically reduced the number of available physicians**



Puerto Rico Population Insured under Public Health Programs[1] (millions)

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Total Eligible Members | 1,642 | 1,686 | 1,688 | 1,666 | 1,585 |
| % of PR Population | 45% | 47% | 48% | 48% | N/A[2] |

■ Total Eligible Members — % of PR Population

"We had 14,000 physicians in 2006. Now we have 9,000 physicians … The salary in the United States is three to four times more" - Victor Ramos, president of the College of Physicians and Surgeons and Pediatricians[3]

According to a survey by the Puerto Rico Hospitals Association, 76% of hospitals have struggled to find and hire specialists[3]

(1) Puerto Rico Department of Health. https://medicaid.pr.gov/Statistics.aspx. Represents total eligible members under Medicaid, CHIP, Estatal, and Estatal (Otros). Total eligible members as of July 1 of each year shown.
(2) Puerto Rico population data for FY 2016 not yet available as of the date of this presentation.
(3) Hospitales, Publicacion Oficial de la Asociacion de Hospitales de Puerto Rico, "Dos Logros Historicos en el Trato de Medicare a Puerto Rico," 2016. http://hospitalespr.org/revista_pdf/revista_feb16.pdf.

CONFIDENTIAL

# The Healthcare System Suffers from an Unfavorable Treatment Under U.S. Health Care Laws and Is Struggling to Provide Adequate Care

**Puerto Rico's Medicaid and other healthcare reimbursement amounts are capped annually even though no such cap is applicable to the states. Today the healthcare system is struggling to provide adequate care to Puerto Rico's residents and faces increasing challenges due to the Zika epidemic**

According to a study conducted by the Catholic University of Puerto Rico on a sample of 600 people, many residents have experienced problems with **long wait times in primary care** facilities and hospital emergency rooms as well as with the **lack of physician availability**[1]



*"Puerto Rico is in the midst of a Zika epidemic. The virus is silently and rapidly spreading in Puerto Rico... this could lead to hundreds of infants being born with microcephaly or other birth defects in the coming year. We must do all we can to protect pregnant women from Zika and to prepare to care for infants born with microcephaly"*[2]

-Lyle R. Petersen, M.D.,
M.P.H, Incident Manager for CDC's Zika Response and Director,
Division of Vector-Borne Diseases

According to a survey by the Puerto Rico Hospitals Association, 57% of hospitals have shut down entire floors, 36% have fired employees and **66% have been forced to structure payment plans with suppliers**[3]

**The Fiscal Plan that Puerto Rico will not cut spending to the already struggling healthcare system even if Affordable Care Act funds are not replaced when they are depleted in FY 2018. A lack of adequate healthcare not only will lead to a humanitarian crisis, but also provides an incentive for additional residents to leave the island, further harming the economy**



(1) "La percepción de la calidad y la satisfacción con los servicios médicos hospitalarios en Puerto Rico," June 24, 2015. Pontifical Catholic University of Puerto Rico. https://gcu.universia.net/net/files/2015/6/24/hoja-de-datos-estudio-salud-final.pdf.
(2) "Zika infections increasing rapidly in Puerto Rico," July 29, 2016. Centers for Disease Control and Prevention. http://www.cdc.gov/media/releases/2016/p0729-zika-infections-puerto-rico.html.
(3) Hospitales, Publicacion Oficial de la Asociacion de Hospitales de Puerto Rico, "Dos Logros Historicos en el Trato de Medicare a Puerto Rico," 2016. http://hospitalespr.org/revista_pdf/revista_feb16.pdf.

CONFIDENTIAL

PR-CCD-0556889

# Puerto Rico's Education System Struggles in Part Due to Low Per Pupil Expenditures and the Need to Direct Funds Towards Food and Support Services

**In addition to spending less per student than in the U.S., Puerto Rico spends a greater percentage on non-instructional assistance, such as food and other support, due in part to the poverty of the student population. While the U.S. spends $6,543 on instruction per student, Puerto Rico is able to spend only $3,522 or less than 54% of that amount per student**

Total Current Expenditure per Pupil per type of Expense (%)[1]



**In a message to Speaker of the House Paul Ryan, R-Wisc., Puerto Rico Education Secretary Rafael Roman Melendez:**

"The programs I oversee are in distress as there is simply insufficient cash to address the needs of 379,818 children that attend public schools in Puerto Rico"…"children are paying the consequences as a result of the congressional inaction, such as payments for classroom services, transportation, breakfast and lunch food supplies, "which are often the only meals some children consume during the day"[2]



(1) The National Center for Education Statistics' Revenue and Expenditures for Public Elementary and Secondary Education FY 2013.
(2) Latin Post article "Puerto Rico Education Secretary: Debt Crisis Rapidly Affecting Children's Health, Safety, Education Experience" published March 23, 2016.

58

PR-CCD-0556890

# Lower Levels of Per Student Education Spending Have Contributed to Poor Educational Outcomes

## Puerto Rico's students have shown significantly lower math assessment outcomes relative to the United States



2015 Fourth Grade Public School Student Math Assessment[1]

2015 Eighth Grade Public School Student Math Assessment[1]

> **The Fiscal Plan recognizes that the Department of Education could deliver services in a more efficient manner that would result in cost savings. However, those savings must come from narrowly tailored policies that do not further harm the already struggling educational system, in particular given the reliance of impoverished students on non-instructional support spending. An educated populace is critical to retaining residents, boosting labor productivity and attracting private investment**

 (1) The Nation's Report Card's National Assessment of Educational Progress in Mathematics, 2015.

59

PR-CCD-0556891

# Puerto Rico Residents Are Confronting Higher Crime Levels Than Any State

## Despite recent improvements, key crime statistics, such as homicide rates, remain higher than in any state

Annual Homicide Rate (per 100,000 people)[1]



"High unemployment rates, coupled with a strategic geographic location (mid-point between the United States and South America) make the islands attractive to illicit drug traffickers and money launderers"

-U.S. Department of Justice, Drug Enforcement Administration[2]

"Due to enforcement successes by Dominican authorities and interdiction efforts by the U.S. Coast Guard, traffickers have been **forced to send multi-ton quantities of cocaine** from Venezuela and Colombia **directly into Puerto Rico**, bypassing the Dominican Republic. This resulted in...**increased smuggling movements directly to Puerto Rico**"

-U.S. Department of Justice, Drug Enforcement Administration[2]

**In the face of crime rates higher than the 50 states and police officer pay already well below the average of the 50 states, the Fiscal Plan does not include public safety spending cuts. Rising crime makes businesses less likely to invest in the island and makes individuals more likely to leave**



(1) Federal Bureau of Investigation, Uniform Crime Report.
(2) 2015 National Drug Threat Assessment Summary, November 4, 2015, U.S. Department of Justice, Drug Enforcement Administration. https://www.dea.gov/docs/2015%20NDTA%20Report.pdf.

60

CONFIDENTIAL

PR-CCD-0556892

# The Elderly Face the Risk of Losing Their Already Meager Pension Payments

**The ability of the government pension fund to honor benefits to elderly retirees (the levels of which are far below those in the states) is threatened by rapidly diminishing plan assets**

- The large unfunded liability of the pension system threatens pensioners, who receive significantly less than the average pensioner in the 50 states. In fact, 30,000 pensioners receive only the minimum monthly pension payment of $500

- The Fiscal Plan includes a measures whereby the assets of the ERS Defined Benefit ("DB") and Defined Contribution ("DC") plans are separated prospectively, which protects future proprietary member contributions from potential insolvency and the unfunded liability growing rapidly in the future

  - While such a measure removes a source of financing for DB plan benefits and thus requires additional contributions to the system by the Commonwealth in the early years, this expense is offset in part by stretching the AUC payment period over a 30-year period (until 2043, as opposed to 20 years, or 2033, under current law)



Average Pension Benefit Payments Per Beneficiary[1]

Actuarial Valuations of Puerto Rico's Retirement Systems[2] ($ billions)

$43.6 billion net pension liability

Impact of Pension System Reform Measures vs. Base Projections[3] ($ mm)

(1) State Employee Retirement System of Illinois. Teachers Retirement System of Illinois. Retirement System of the City of Detroit. Michigan Annual Report. Annual Survey of Public Pensions.
(2) Actuarial estimates as of July 30, 2014. November 2015 Commonwealth Operating Report.
(3) Illustratively includes the reduction in the estimated portion of AUC as result of the exclusion of debt service, which is estimated to amount to approximately $80 million over the 10-year projection period.



61

PR-CCD-0556893

# Health, Public Safety, Education and Pension Systems Are Expected to Make Up Approximately 71% of 2017 General Fund Expenditures

**The challenges facing the healthcare, education and pension systems, combined with the need to continue providing adequate funds for public safety, illustrate the difficulty in finding areas for potential cost reduction as these areas are expected to account for approximately 71% of the Commonwealth's budget**

▪ Note that FY 2017 approved General Fund budget data is displayed below

| General Fund 2017 Approved Budget | |
|---|---|
| *$ thousands* | **% of Total** |
| General Government | 3.1% |
| Social Welfare | 3.8% |
| Economic Development | 1.3% |
| Infrastructure | 2.7% |
| Health | 15.7% |
| Public Safety | 18.4% |
| Legislative Assembly | 2.3% |
| Labor Affairs | 0.2% |
| Education | 28.4% |
| Culture and Recreation | 0.9% |
| Legal | 0.2% |
| Prosecutor's Office | 5.0% |
| Election Process | 0.4% |
| Debt | 0.0% |
| Entity Deposit Funding | 2.9% |
| Retirement System | 8.8% |
| Budget and Emergency Fund | 2.4% |
| Legal Responsibility Fund | 1.3% |
| Utilities | 1.9% |
| Debt | 0.0% |
| TRANs | 0.3% |
| **Total** | **100.0%** |

Retirement systems account for 8.8% of all expenses in the 2017 approved General Fund Budget.

Note that other line items may fund payroll that results in *further* contributions to the retirement system not accounted for in the 71%



Source: Office of Management and Budget, Summary of General Fund Expenditures by Spending Area (FY 2017 Approved Budget). Note that debt service in the FY 2017 budget has been reduced.

CONFIDENTIAL

# Cooperative Credit Unions, Which Hold a Significant Exposure to the Commonwealth's Debt, Must Be Protected in Any Restructuring

**Puerto Rico's cooperative credit unions (the "Coops") hold deposits for roughly 1/3 of all Puerto Ricans and have investment portfolios that are approximately 75% invested in Commonwealth securities (with more than 46%[1] of the combined Coop government investment portfolio invested in GDB notes)**

- Approximately 116 Coops function as retail outlets for financial services for about one million consumers that retain accounts on island. As of March 2016, total insured "shares" and deposits in the Coops amounted to approximately $8.2 billion

- Due to the recent defaults on GDB and GO debt, among others, the Coops are expected to sustain substantial losses in their investment portfolios and will likely suffer additional losses if, as expected, the Commonwealth ultimately executes a broader restructuring of its debt

- The consequences of an undercapitalized Coop system and the Coop failures that could result include:

  - Loss of deposits for roughly 1/3 of Puerto Ricans

  - Limited resources available to Coops to continue to lend and drive economic growth

  - Loss of jobs for employees of Coops that fail

  - Potential collapse of the Coop system as depositors move funds to FDIC-insured institutions

---

**The Fiscal Plan must also protect credit union depositors, which are generally low-income, as well as the cooperative banking system more generally, conditioned on recapitalization plans and effective governance reforms. The cost of this protection is estimated at approximately $1.2 billion, which is not included in the Fiscal Plan, but must be accounted for in any debt restructuring**

---



(1) Estimated system-wide holdings based on the G25 Group's holdings of Commonwealth securities.

63

PR-CCD-0556895



# Core Principles of the Fiscal Plan
*6. Create a Sustainable Debt Level That Allows for Growth*

64

CONFIDENTIAL

# The Commonwealth Must Achieve a Sustainable Debt Stock

As the Commonwealth economy has contracted, its debt burden has grown by ~$26 billion since FY 2006, with the result that the aggregate debt stock now exceeds the entire GNP of Puerto Rico

Puerto Rico Public Sector Debt[1][2]



Rising debt and declining real GNP contributed to ratings downgrades and increases in debt yields, meaning any refinancing had to be done at higher rates. Ultimately the debt burden became so high and the economic trend became so negative that the Commonwealth lost market access

Yield to Worst of Illustrative GO, GDB non-Guaranteed, HTA '98 Senior and COFINA Senior and Subordinate Bonds[3]





(1) Balances shown do not include the accreted value of capital appreciation bonds. Balances are on a Puerto Rico fiscal year basis (July to June) and sourced from Puerto Rico's Public Debt Monthly Report (Tiered Operational Management Information System). Values exclude GDB and MFA bond issuance and include loans from these entities to other Commonwealth entities. 2016 balance as of July 2, 2016 and calculated in a manner consistent with prior reporting per data provided by the Commonwealth. Default balance assumes no interest on unpaid amounts.
(2) Does not include unfunded pension liabilities. Based on valuation reports as of June 30, 2014, the Employees Retirement System, Teachers Retirement System and Judiciary Retirement System ("JRS") net pension liabilities were $30 billion, $13 billion and $442 million, respectively. See the May 7, 2015 Commonwealth of Puerto Rico Quarterly Report for more details.
(3) Data as provided by Bloomberg.

65

# The Commonwealth Must Achieve a Sustainable Debt Stock (cont'd)

Without access to capital markets to fund its deficits and refinance its maturing debt, the Treasury Single Account ("TSA")[1] balance fell to approximately $244 million at the end of FY 2016, as compared to approximately $780 million[2] of direct General Obligation debt service due on July 1, 2016. **The Commonwealth thus defaulted on GO debt as well as debt of certain other issuers, an event creditors had been specifically warned may occur** (from the 2014 GO offering statement: *"If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights"*)

Total Debt Service Payments Missed in FY 2016 (including July 1, 2016 payments)[3] ($millions)

|  | Amount Due | Amount Paid | Amount Not Paid | Dates of Missed Payments |
|---|---|---|---|---|
| GO | $1,125 | $346 | $779 | July 1, 2016 |
| GDB[4] | 1,064 | 664 | 360 | May 1, 2016 |
| PBA | 276 | 251 | 25 | July 1, 2016 |
| PFC | 94 | 1 | 93 | August 1, 2015 to July 1, 2016 |
| PRIFA Rum | 113 | – | 113 | January 1, 2016 and July 1, 2016 |
| HTA[5] | 322 | 318 | 4 | July 1, 2016 |
| **Total** | **$2,995** | **$1,580** | **$1,375** | |

The default occurred despite the Commonwealth's austerity measures and certain extraordinary liquidity measures, such as delaying payments to suppliers and critical infrastructure spending, all of which produced a *drag* on economic growth. **It is only through a return of economic growth that creditor recoveries can be maximized** while the Commonwealth can also continue to provide essential services to its residents. As such, a restructuring of outstanding debt to sustainable levels that allows the Commonwealth time to implement the fiscal and structural policies outlined herein and to invest in its economy is an essential principle of the Fiscal Plan



(1) The Treasury Single Account is the Commonwealth's operational bank account in which it deposits receipts from governmental funds except for blended component units (COFINA, PBA, PRIFA, etc.). Approximately $780 million represents $1,125 million of total principal and interest due as of July 1, 2016.
(2) Net of the escrowed amounts and capitalized interest amounts.
(3) Amounts not paid represents amounts not paid by the Commonwealth and has not been reduced by amounts paid by insurers, if any. Excludes PRASA Rural Development bonds (reached forbearance agreement ahead of its payment on July 1, 2016) and GO Notes (line of credit from GDB to Treasury whose debt service on July 1, 2016 was not paid).
(4) GDB unpaid debt service is net of $40 million of agreed upon maturity extension, which reduces the amount of unpaid debt service.
(5) Unpaid amounts for the HTA bonds reflect missed payments on the 1998 Resolution Bonds, Series 1998 Subordinate Bonds.

66

CONFIDENTIAL

PR-CCD-0556898

# Debt of Entities Included in the Fiscal Plan

**Per the Oversight Board, "the Commonwealth's Fiscal Plan shall include all agencies, departments, offices, administrations, programs and functions that are part of the central government" as well as specifically enumerated bond issuer entities, as outlined below**

- Inclusive of missed interest payments and accrued interest on capital appreciation bonds ("CABs", *e.g.*, zero coupon bonds), these entities have approximately $50 billion of bonds and third-party loans outstanding (i.e., excluding GDB or other intergovernmental loans[1])

Summary of Debt Outstanding for Plan and Non-Plan Entities[2] ($ millions)

| | Bond Principal[2] | CAB Accretion[3] | Missed Bond Interest[4] | Private Loans[5] | Total Bonds and Private Loans | Memo: Loans from GDB/MFA/ & CW Entities[6] | Memo: Total Entity Indebtedness |
|---|---|---|---|---|---|---|---|
| **Issuers Specifically Identified By the Board** | | | | | | | |
| 1. GO | $12,470 | $49 | $353 | $24 | $12,896 | $169 | $13,066 |
| 2. COFINA | 15,213 | 2,082 | – | – | 17,294 | – | 17,294 |
| 3. HTA[7] | 4,253 | 63 | 1 | – | 4,317 | 1,734 | 6,051 |
| 4. PBA | 3,995 | 10 | – | – | 4,005 | 182 | 4,187 |
| 5. GDB[8] | 3,811 | – | – | 204 | 4,015 | – | 4,015 |
| 6. ERS | 2,948 | 193 | – | – | 3,141 | – | 3,141 |
| 7. PRIFA[9] | 1,926 | 160 | 72 | – | 2,158 | 49 | 2,207 |
| 8. PFC | 1,091 | – | 57 | – | 1,147 | – | 1,147 |
| 9. UPR[10] | 496 | – | – | 0 | 496 | 76 | 573 |
| 10. PRCCDA | 386 | – | – | – | 386 | 145 | 532 |
| 11. PRIDCO | 154 | 5 | – | – | 159 | 78 | 237 |
| **Other Debt Issuers Primarily Supported by Central Government Revenues** | | | | | | | |
| 12. AMA | – | – | – | 28 | 28 | – | 28 |
| 13. Other Central Gov't Entities[11] | 226 | – | – | 16 | 242 | 3,521 | 3,763 |
| **Total Entities in Plan** | **$46,969** | **$2,561** | **$483** | **$272** | **$50,286** | | |
| **Debt Issuers Not Incl. in the Plan** | | | | | | | |
| 1. PREPA[12] | 8,259 | – | – | 696 | 8,955 | 37 | 8,992 |
| 2. PRASA[13] | 3,948 | 28 | – | 4 | 3,981 | 590 | 4,571 |
| 3. Children's Trust | 1,151 | 288 | – | – | 1,439 | – | 1,439 |
| 4. HFA | 496 | – | – | – | 496 | 85 | 581 |
| 5. PRIICO | – | – | – | 86 | 86 | – | 86 |
| 6. Municipality Related Debt[14] | 632 | – | – | 1,200 | 1,832 | 2,711 | 4,542 |
| **Total Entities Outside of Plan** | **$14,485** | **$316** | – | **$1,986** | **$16,787** | | |
| **Total** | **$61,454** | **$2,877** | **$483** | **$2,259** | **$67,073** | | |
| *Memo: Bridge to Public Sector Debt* | | | | | | | |
| *Less: CAB Accretion* | | | | | (2,877) | | |
| *Less: Missed Bond Interest* | | | | | (483) | | |
| *Less: GDB Bonds[15]* | | | | | (3,766) | | |
| *Less: MFA Bonds* | | | | | (618) | | |
| *Plus: Loans From GDB/MFA/Other CW Entities* | | | | | 9,379 | | |
| **Public Sector Debt** | | | | | **$68,707** | | |

*In addition to these debt issuers, all of the Commonwealth's retirement systems are also incorporated into the plan*

Debt Issuers Included in the Fiscal Plan

Debt Issuers Excluded From the Fiscal Plan



Note: All debt balances shown are preliminary, unaudited estimates based on bonded debt outstanding as of July 2, 2016 and loan balances of June 30, 2016.
(1)  Note that balances also exclude MFA loans (though there are no MFA loans to entities included in the Fiscal Plan). Also note that in the Fiscal Plan bonds held by GDB are eliminated in consolidation.
(2)  See the appendix for footnotes.

67

# Debt of Entities Included in the Fiscal Plan Rely, Directly or Indirectly, on the Commonwealth's Taxing Authority

**All of the entities included in the Fiscal Plan rely on the Commonwealth central government's taxing authority, either directly from tax revenues allocated by law or indirectly from appropriations included in the Commonwealth's General Fund (the Commonwealth's primary operational fund)**

- Certain entities that have issued debt backed by allocated tax revenues have revenues that are either explicitly "available revenues" that may be diverted to pay Commonwealth general obligations (HTA, PRCCDA, AMA, PRIFA) or have been alleged in litigation by general obligation debt holders to be an "available revenue" (COFINA)



| PBA | • 93%[1] of revenues from the lease payments budgeted in the GF (also fully guaranteed by the CW) |
| GDB | • Appropriations made to pay loans owed by CW entities to GDB, which GDB uses to pay its own debt |
| ERS | • The Commonwealth is typically responsible for approximately 79%[2] of the total AUC contributions to ERS (of which the central government contributes approximately 62%) and nearly all of the contributions to TRS and JRS |
| PFC | • Directly reliant on appropriations to pay debt service; does not have any other revenues |
| UPR | • Receives ~74%[3] of annual revenues from General Fund appropriations and allocated tax revenues |
| PRIDCO[4] | • Receives withholding and rum taxes; rental revenue dependent on ability to grant tax subsidies |
| Other | • Consists of certain discretely presented non-major component units, including entities such as ADEA that receive transfers from the central government |



[1] Source: Conway MacKenzie PBA 5-Year Projections dated July 20, 2015. Percentage shown (93%) represents FY 2016 lease payments made by agencies in the General Fund (i.e., excluding agencies outside the General Fund and municipalities).
[2] Percentages shown per ERS and includes the AUC contributions for component units that are included in the Fiscal Plan and does not include municipalities. (67% to 70%) represent special law, AUC, and employer contributions from the General Fund as a percentage of total contributions, excluding investment income.
[3] Source: Conway MacKenzie UPR projection included in FEGP dated January 18, 2016. Percentage shown (74%) represents FY 2016 Commonwealth appropriations and dedicated tax revenues including collections from slot machines (excluding federal transfers and Pell Grant funding) as a percentage of total cash inflows (excluding debt proceeds which are non-recurring). Excluding slot revenues, UPR receives 70% of revenue from General Fund appropriations.
[4] While PRIDCO receives appropriations for portions of the non-resident withholdings tax and rum excise taxes, such revenues are not specifically dedicated to the payment of debt service. However, PRIDCO's rent revenues are attributable to its ability to provide tax subsidies to private sector companies.

68

CONFIDENTIAL

PR-CCD-0556900

# There is Significant Cross-Ownership of Commonwealth Debt

**In addition to the reliance of many Commonwealth entities on a single tax base, it is also important to note that there are many holders that individually own bonds of multiple Commonwealth entities**

- Puerto Rico has hired Bondholder Communications Group ("BondCom") to develop a registry of ultimate beneficial owners ("UBOs") of the Commonwealth's bonds; to date over 350,000 UBOs have been identified, representing 68% of the Commonwealth's total bonded debt
- Shown below is a select set of large mutual funds that own significant amounts of bonds of numerous Commonwealth issuers, illustrating the large number of crossholdings

### Estimated Holdings by Credit of Certain Large Funds[1] ($ millions)

| Entity | Holdings ($)[1] | | | |
|---|---|---|---|---|
| | Large Mutual Fund Holder #1 | Large Mutual Fund Holder #2 | Large Mutual Fund Holder #3 | Total |
| **Fiscal Plan Entities** | | | | |
| GO | $516 | $1,045 | $231 | $1,793 |
| GDB | – | < 1 | – | 0 |
| PBA | 172 | 702 | 18 | 891 |
| PFC | 134 | 417 | – | 551 |
| COFINA | 1,371 | 2,060 | 882 | 4,313 |
| PRIFA | 9 | 411 | 6 | 427 |
| UPR[2] | – | 196 | – | 196 |
| PRCCDA | – | 1 | – | 1 |
| PRIDCO | – | – | – | – |
| HTA | – | 392 | 27 | 418 |
| ERS | 2 | – | – | 2 |
| MFA | – | 59 | – | 59 |
| **Fiscal Plan Entities Total** | **$2,205** | **$5,283** | **$1,164** | **$8,652** |
| PREPA | 803 | 969 | 178 | 1,949 |
| PRASA | – | 420 | 216 | 636 |
| CTF | 61 | 1,068 | – | 1,129 |
| HFA | 6 | < 1 | – | 6 |
| AFICA - Guaynabo | – | 6 | – | 6 |
| **Entities Excl. From Fiscal Plan Total** | **$870** | **$2,463** | **$394** | **$3,726** |
| **Total** | **$3,075** | **$7,746** | **$1,557** | **$12,378** |

*BondCom's work is ongoing. In addition to the three large mutual funds shown here, over 7,300 other retail and institutional investors have been identified that own bonds issued by five or more Puerto Rican issuers. In aggregate, these cross-credit investors are estimated to hold over $12.7 billion of debt issued by various Puerto Rico issuers (in addition to the holdings of the mutual funds shown)*



(1) Information shown based on data provided by Bondholder Communications Group ("BondCom"). Balances as of September 28, 2016 and include CAB accretion as of June 30, 2016. Bondcom is in the midst of updating the registry to October 2016, and it is also expanding the registry's coverage beyond the 68% portion included currently. As a result, these amounts are subject to change. Note that some of these holdings may be insured.
(2) Includes bonds issued by AFICA – Desarrollos Universitarios, a component unit of the University of Puerto Rico.

CONFIDENTIAL

PR-CCD-0556901

# Insurance Providers Also Have Exposure to Multiple Issuers

**In addition to the cross-holdings of individual holders, certain monoline insurers also have significant exposure to multiple entities**

- Monolines insuring Commonwealth debt include:
  - AMBAC Assurance Corporation ("AMBAC")
  - Assured Guaranty ("Assured")
  - Financial Guaranty Insurance Company ("FGIC")
  - MBIA Inc./National Public Finance Guarantee Corporation ("MBIA")/("National")
  - Syncora Holdings ("Syncora")
- Note that the total insured amounts as shown below are as listed in the most recently available insurer financial statements. Reporting methodology may vary materially across insurer

Estimated Select Insurer Exposure Summary ($ millions)

| Entity | Assured[1] | MBIA[2] | FGIC[3] | AMBAC[4] | Syncora[5] |
|---|---|---|---|---|---|
| Commonwealth (GO) | $1,615 | $795 | $279 | $56 | $218 |
| HTA | 1,279 | 715 | 437 | 472 | 7 |
| COFINA | 270 | 684 | – | 805 | – |
| PRIFA | 18 | – | 349 | 503 | – |
| PBA | 188 | 190 | 8 | 191 | – |
| PRCCDA | 164 | – | 97 | 137 | – |
| UPR | 1 | 89 | – | – | – |
| PRIDCO | – | 7 | – | – | – |
| **Total Exposure to Fiscal Plan Entities** | **$3,535** | **$2,480** | **$1,169** | **$2,163** | **$225** |
| PREPA | 744 | 1,354 | – | – | 241 |
| PRASA | 388 | – | – | – | – |
| MFA | 387 | – | – | – | – |
| All Other | – | 26 | – | – | 29 |
| **Total Exposure** | **$5,054** | **$3,860** | **$1,169** | **$2,163** | **$494** |

Note: Insurer exposure shown herein based on 2Q 2016 company filings and/or investor presentations. Excludes CIFGNA, which is pending a merger with Assured as of March 31, 2016.
(1) Values represent net par outstanding. Includes CABs that reflect gross par amount at time the policy was issued.
(2) Values represent gross par outstanding.
(3) Values represent net par in force.
(4) Data derived from Ambac Financial Group document titled "Puerto Rico Exposure Second Quarter 2016." Amounts shown based on a net par basis (net of reinsurance), including CABs which are reported at the par amount at the time of issuance of the insurance policy.
(5) Data derived from Syncora Guarantee Second Quarter 2016 Highlights Investor Presentation dated September 21, 2016. Includes reinsurance and bonds purchased for remediation (which are reported at GAAP carrying value for the insured bonds). Excludes total interest outstanding of $104.7 million as of June 30, 2016.

CONFIDENTIAL

PR-CCD-0556902

# Puerto Rico Residents are Estimated to Hold at Least $6 Billion of Commonwealth Bonds and Have Additional Coops Exposure

**While due diligence into the exact amount of local holdings remains ongoing, based on BondCom's work to date it is believed that a sizeable portion of Commonwealth debt is held on-Island, with holdings across the Commonwealth credits, but particularly concentrated in the bonds that are not triple-tax exempt issued by COFINA, ERS, GDB, and PFC**

Current Estimate of Local Holdings as Identified by Bondcom[1]

| ($ millions) Issuer | Local Coop Holdings | Local Non-Coop Holdings | Total Local Holdings |
|---|---|---|---|
| GO | 92 | 307 | 399 |
| COFINA | 181 | 2,642 | 2,823 |
| HTA | 3 | 54 | 57 |
| PBA | 39 | 242 | 281 |
| GDB | 369 | 986 | 1,356 |
| ERS | 4 | 1,224 | 1,228 |
| PRIFA[2] | 4 | 16 | 19 |
| PFC | 63 | 204 | 267 |
| UPR[3] | – | 2 | 2 |
| CCDA | < 1 | 11 | 11 |
| PRIDCO | 15 | 72 | 86 |
| PREPA | 55 | 305 | 360 |
| PRASA | 52 | 216 | 268 |
| CTF | – | < 1 | < 1 |
| MFA | – | 3 | 3 |
| HFA | < 1 | 91 | 91 |
| **Total** | **$876** | **$6,376** | **$7,252** |

Market information indicates that the Coop systems have exposure of approximately $1.1 billion of Puerto Rico debt; the numbers above represent only those CUSIPs identified by BondCom to date

In addition to the Coops, it is currently estimated that at least $6 billion of Commonwealth debt is held locally, illustrating the need to promote economic growth so as to maximize recovery for these creditors. A restructuring that provides minimal recovery to local bondholders is effectively an austerity measure



(1) Information shown above based on data provided by Bondholder Communications Group ("BondCom"). Balances as of September 28, 2016 and include CAB accretion as of June 30, 2016. BondCom is currently working to update the bondowner registrey to October 2016.
(2) Excludes PRIFA BANs.
(3) Include bonds issued by AFICA – Desarrollos Universitarios, a component unit of the University of Puerto Rico.

CONFIDENTIAL

PR-CCD-0556903

# In Light of the Characteristics of Puerto Rico's Currently Outstanding Debt, Certain Key Principles Must Guide Any Restructuring Offer

**While including a specific debt restructuring proposal as part of the Fiscal Plan would be premature at this time, there are a number of key principles that are necessary as part of any debt restructuring proposal that aims for a sustainable level of debt service**

- PROMESA envisions an iterative process with the Oversight Board, specifically requiring that the final Fiscal Plan include the recommendations of the Board and providing explicitly for a process for the Commonwealth to submit multiple versions of the Fiscal Plan

- Without having received the recommendations of the Oversight Board, it would be premature to propose a specific debt restructuring proposal at this time

| Principles | Considerations |
|---|---|
| **Holistic Solution** | ▪ A holistic solution is required to produce a sustainable debt level given the general reliance on the Commonwealth's taxing authority for debt service and the fact that single bondholders and insurers have exposure to multiple credits |
| | ▪ Actions by creditors to date have already proven the need for a holistic solution |
| |    ▪ GO bondholders have instituted litigation alleging that the COFINA revenues are "available revenues" to pay the GO and Commonwealth guaranteed indebtedness (*e.g.*, PBA) |
| |    ▪ Insurers have instituted litigation challenging the "clawback" of certain revenues, which in turn could influence the available revenues to pay the GO holders and Commonwealth guaranteed holders |
| |    ▪ Large mutual funds have challenged the efficacy and rationale of a public restructuring proposal made by holders of COFINA senior bonds |
| | ▪ A holistic solution is essential in order to permanently solve these intercreditor disputes so that the Commonwealth is not bogged down in years of litigation that delay its ability to regain market access |
| | ▪ To the extent possible, a debt restructuring should simplify the Commonwealth capital structure and rely on a restructuring currency that is both free from embedded intercreditor conflicts and available to all creditors |



72

# In Light of the Characteristics of Puerto Rico's Currently Outstanding Debt, Certain Key Principles Must Guide Any Restructuring Offer (cont'd)

| Principles | Considerations |
|---|---|
| **Time and Capacity to Invest in the Economy and Implement Plan** | ▪ The Commonwealth must be given a breathing space to invest in its economy and implement the reforms outlined previously so as to spur economic growth<br><br>▪ The early years of the Fiscal Plan are especially critical so as to stem the tide of outmigration from the island and make the island attractive for private investment<br><br>▪ Consequently, the debt service levels set should have lower or minimal *cash* debt service during the early years of the Fiscal Plan ("payment-in-kind" or other such non-cash interest elements could be considered to protect creditors) |
| **Reasonable Maximum Annual Mandatory Debt Service** | ▪ The final debt service level cannot exceed the projected surplus before debt service in the final Fiscal Plan<br><br>▪ Reasonable growth projections must be used for purposes of setting the offer size, though contingent payment amounts tied to growth levels in excess of expectations could also be used to make creditors partners in trying to promote economic growth<br><br>▪ Debt service levels should be based on objective criteria consistent with those used by credit rating agencies so as to facilitate, over time, a return to an investment grade credit rating |
| **Creditors Become Partners in Growth** | ▪ In return for being given breathing space to implement the Plan, creditors should share in the potential upside if the benefits of the plan are realized or exceeded<br><br>▪ A contingent value right or growth bond that pays creditors in the event growth targets set in the plan are exceeded should therefore be considered as part of any debt restructuring |
| **Consideration Given to the Impact on Local Holders** | ▪ Given significant local holdings of Commonwealth debt, consideration must be given to the impact any restructuring proposal will have on the economy<br><br>▪ In particular, the coops must be given sufficient recovery, either through new debt or otherwise, to ensure that they are adequately capitalized |
| **Restrictions on New Indebtedness** | ▪ The final restructuring offer must also include restrictions on how new indebtedness may be issued<br><br>▪ Such restrictions must take into account *all* Commonwealth debt supported by tax revenues so that the debt service burden on the Commonwealth economy as a whole is never again allowed to grow to extreme levels and the Commonwealth can only issue debt commensurate with its ability to pay |



73

PR-CCD-0556905



# Core Principles of the Fiscal Plan
*7. Partner with the Federal Government to Generate Growth*

74

PR-CCD-0556906

# Puerto Rico's Economic Decline Was Caused in Part by U.S. Policy Decisions in the Mid-90s

**The phase out of Section 936 of the U.S. tax code combined with expanded U.S. free trade agreements may have contributed to the disappearance of over half of Puerto Rico manufacturing jobs**

- As a result of Section 936's tax benefits, the manufacturing sector in Puerto Rico had grown significantly, in particular for firms, such as pharmaceutical companies, that could transfer patents to Puerto Rico and then source income generated by those patents to Puerto Rico in order to receive tax credits under Section 936

  - Manufacturing sector growth took place in spite of Puerto Rico's comparatively higher labor costs relative to other, non-U.S. mainland manufacturing centers due to the applicability of U.S. minimum wage laws

- In 1996, the U.S. enacted legislation to phase out Section 936 over a ten-year period, removing a key competitive advantage Puerto Rico had in attracting business and foreign investment to the island

- Manufacturing jobs immediately began to decline following the Section 936 phase out

- Additionally, NAFTA which expanded the right to provide duty free imports to the U.S. (a right that had already been enjoyed by Puerto Rico), had been signed two years prior, potentially contributing to the loss

Decline in Puerto Rico Manufacturing Payrolls[1]



(1)  Bureau of Labor Statistics State and Area Employment, Hours, and Earnings - January totals.

75

# Today, Puerto Rico Faces Several Challenges That Federal Government Action Could Help Resolve and Ensure a Virtuous Cycle

**A replacement for ACA funding (potentially through providing Puerto Rico with Medicare/Medicaid funding equivalent to that of the 50 states) is a critical element of stabilizing Puerto Rico's fiscal position**

- ACA funds provided to Puerto Rico are currently projected to be exhausted by FY 2018. After the expiration of those funds, the Commonwealth would still receive healthcare funding from the U.S. Federal Government, but at a much lower rate than the 50 states.

- In addition, the Commonwealth's Medicare Advantage match is lower than 41 states and the Commonwealth is subject to a federal spending cap on Medicaid dollars of approximately $300 million (excluding $150 million for the Children's Health Insurance Program ("CHIP")) - there is no cap for U.S. states



Impact of ACA Funding Loss[1] ($ millions)

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|------|------|------|------|------|------|------|------|------|------|
|  | (865) | (1,517) | (1,583) | (1,681) | (1,835) | (1,954) | (2,070) | (2,253) | (2,384) |



(1)  ASES projections for FY 2017 through FY 2026.

76

# Additional Federal Government Action Would Help Spur Growth

**A replacement for ACA funding merely maintains the current level of support the U.S. Government provides Puerto Rico. Additional actions by the U.S. government, such as those outlined below, could spur new growth on the island**

| Action Type | Request |
|---|---|
| **Equitable Treatment Under U.S. Healthcare Law** | ▪ Include PR in the Medicaid/Medicare disproportionate share hospital ("DSH") program and ensure PR is treated fairly under the Medicare DSH program<br><br>Medicaid<br>▪ Remove statutory limits on Medicaid funding. In FY 2018, Medicaid funding granted under the Affordable Care Act will be depleted Avert incoming fiscal cliff in ACA<br>  – Medicaid funding level is capped at less than $350 million and the Federal Medical Assistance Percentage ("FMAP") rate set at 55%, which equals an effective rate of 15% to 20%, whereas according to Puerto Rico's income levels the FMAP should be set at 83%<br><br>Medicare<br>▪ Automatically enroll in Medicare Part B individuals enrolled in Medicare Part A, and develop a mechanism to reduce or eliminate penalties to seniors that enrolled late in Part B<br>▪ Provide Puerto Rico doctors fair treatment under the Practice Expense, Physician Work, and Malpractice Geographic Practice Cost Index ("GPCI") payment formula<br>▪ Ensure adequate PMPM payments to Medicare Advantage plans in Puerto Rico<br>▪ Exempt Puerto Rico health insurers from the Health Insurance Providers Fee<br>▪ Authorize Puerto Rico to participate in Medicare Part D Low-Income Subsidy ("LIS") program |
| **Stimulate Employment and Labor Participation** | ▪ Pro employment requests with respect to NAP and public housing programs<br>▪ Extend the EITC, the Child Tax Credit and Supplemental Security Income to Puerto Rico residents to increase labor participation in the formal economy and help stimulate economic growth |



77

# Additional Federal Government Action Would Help Spur Growth (cont'd)

| Action Type | Request |
|---|---|
| **Implement Pro-Growth Corporate Tax Regime** | ■ Provide Puerto Rico with a tax treatment that encourages investment and job creation, such as modifications to Section 245a of the U.S. Internal Revenue Code and extension of Section 1031<br><br>■ The 245a proposal would incentivize companies that invest in Puerto Rico to repatriate income back to the mainland U.S. by reducing the cost of repatriation<br><br>■ Importantly, the proposal would also reduce taxes paid over other foreign tax jurisdictions if Congress enacts broader international tax reform. This provides a critical incentive to keep jobs in Puerto Rico instead of companies moving overseas<br><br>■ To reduce the fiscal impact on the U.S. Treasury and ensure the proposal does not allow companies to manipulate it to reduce taxes on income earned outside of Puerto Rico, the proposal will establish limits on the use of foreign tax credits<br><br>■ Maintain Act 154 excise tax creditability during a transition period in order not to impact the multinationals on the island nor the Commonwealth's revenue base |
| **Assistance in P3 Efforts and Infrastructure Spending** | ■ Executive approval or Congressional authorization to sell accumulated Federal Highway toll credits<br><br>■ DOE financing for the Aguirre Offshore Gas Port and finalize remaining federal permits related to the project<br><br>■ Maximize use of financing opportunities available through the USDA Rural Utilities Service<br><br>■ Provide funding to the U.S. Department of Energy to complete the electric rates study authorized by the Consolidated and Further Appropriations Act of 2015 |
| **Reduce Operating Costs and Improve Fiscal Decision-Making** | ■ Exemption from Jones Act application to reduce transportation costs and increase competitiveness<br><br>■ Provide appropriate funding to include Puerto Rico in the 2017 U.S. Census of Governments, the National Agricultural Statistical Service surveys, and the Current Population Survey; have OMB and other appropriate federal agencies conduct a comprehensive federal review of Puerto Rico's exclusion from other critical national datasets, such as the Job Opening Labor Turnover Survey, the American Time Use Survey, and the National Health Interview Survey<br><br>■ Coordinate technical assistance and education efforts by BEA, Census Bureau, BLS, EDA, MBDA, SBA, and other federal agencies on processes to improve Puerto Rico's statistical forecasting capacity and federal grant opportunities<br><br>■ Encourage World Economic Forum to include Puerto Rico in its Global Competitiveness Report |



78



# Fiscal Plan Projections

CONFIDENTIAL

PR-CCD-0556911

# Overview of the Fiscal Plan Projection Approach[1]

**Given that the entities included in the Fiscal Plan generally mirror those that were included in the FEGP developed by the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), the Fiscal Plan adopts a similar approach to the FEGP**

- **Projections for revenues and expenses are developed on a *consolidated* basis given the need for a holistic solution**
  - This implies that certain intragovernmental transactions are effectively eliminated from the projections, as they have no impact on the Commonwealth's ultimate fiscal position; for example, a loan payment from HTA to the GDB would simply move assets from one entity included in the Plan to another entity included in the Plan without changing the Commonwealth's overall financing needs, and is therefore excluded
- **The fiscal projections are presented in two parts: first, the "Base Projections," followed by projections that reflect the impact of measures consistent with the principles previously outlined**
  - The Base Projections illustrate the financing needs of the Commonwealth in the status quo and assume that current laws remain unchanged
    - Illustratively, the Base Projections include all contractual debt service owed during the period of the projections, which demonstrates the shortfall the Commonwealth would have to fill with measures and/or new financing if it were to pay its existing debt in full
  - The Base Projections are then adjusted to account for the impact of the measures associated with the principles outlined previously insofar as such measures are in the Commonwealth's control to implement
    - The Measures include the projected benefits of improved growth in the Commonwealth economy
    - Illustratively all debt service is removed in this scenario to show what *could* be paid to creditors; a specific allocation of any surplus between credits has not been made at this time, pending further discussions with the Oversight Board
- **U.S. Federal Government action, while a critical component of returning the island to growth, is not assumed under either the "Base Projections" or in the measures**
  - For reference, however, the potential benefits of certain U.S. federal government actions, in particular continued programmatic support for the Commonwealth's healthcare system at current levels are shown for illustrative purposes in the following section

---



(1) The economic forecasts presented rely on the existing fiscal reporting systems in the Commonwealth of Puerto Rico and reflect existing economic uncertainty as well as any limitations stemming from reporting systems, the data extract transform and load processes, as well as the inherent uncertainty of developing forward projections in this context. Although DevTech Systems takes all possible care to ensure the accuracy of the information reported, no warranty can be accepted regarding the correctness, precision, timeliness, reliability and completeness of the content of this information. DevTech has obtained the information provided from sources that should be considered reliable, but cannot guarantee its accuracy or completeness. The information provided is purely of an indicative nature and is subject to change without notice at any time. DevTech does not accept any liability arising from any information provided or for the consequences of any actions taken in reliance on of this projection.

80

# Key Macroeconomic Assumptions Used in the Base Projection

## The following provides an overview of the key macroeconomic assumptions used in the development of the Commonwealth's Base Projections

- The growth and inflation assumptions used in the Base Projections were developed by Dr. Rafael Romeu, a former IMF economist hired by AAFAF who is the President and CEO of DevTech Systems, Inc. ("DevTech"), an international economic consulting firm founded in 1984 that has provided advisory services in over 100 countries

- ***Understanding the "Base" Projections:***

- The Base Projection is intended to reflect a starting point for calculating the tradeoffs of potential future policies. With limitations on certain financial data and a lack of knowledge of the outcome of critical future decisions of not only Puerto Rico, but also the Oversight Board and the U.S. Government, the Base Projections are the best available starting point for analysis of future policy changes

- The Base Projection serves only as a tool for costing measures and informing policy tradeoffs for the Commonwealth. The Base Projection *is not* a viable economic scenario because it does not incorporate any package of measures, policies and/or financing that would resolve the inconsistency of persistent deficits combined with a lack of market access

- ***Methodology***:

- Against this backdrop, DevTech developed a set of growth and inflation projections for the Base Projection using factors exogenous to Puerto Rico's fiscal position, as summarized below

    - **Growth**[1] – The forecast of real growth is a function of the following variables:

        - U.S. real GDP variables published in the International Monetary Fund (IMF)'s Spring 2016 World Economic Outlook (WEO)

        - Working age population forecasts for Puerto Rico[2]

        - Food and fuel price indices per the IMF

    - **Inflation** – modeling inflation follows a simple Phillips curve specification, where inflation is a function of:

        - Food and fuel price indices, reflecting pass-through from international prices

        - The output gap (in lieu of unemployment) and past inflation



(1) The departure point for understanding DevTech's approach to projecting real growth was identifying macroeconomic drivers of growth that are not necessarily endogenous to economic policies.
(2) Population is a critical determinant for the growth of any economy, and given PR status as a U.S. territory, the ability to migrate into or away from the island makes this variable an even greater anchor on growth. The population of the island has declined every year in the last decade. The United Nations publishes population projections for Puerto Rico through the year 2100.

81

PR-CCD-0556913

# Key Macroeconomic Assumptions Used in the Base Projection (cont'd)

## The following provides an overview of the real GDP growth and inflation assumptions that result from the methodology outline previously

- The revised Base Projection reflects the trend deterioration in economic activity since the early 2000's
  - The Commonwealth has contracted 9 of the past 10 years from 2006-2015
  - The population of the Commonwealth has declined every year during that period
- Puerto Rico's position in the broader U.S. economy (given it is not a state) complicates the interpretation of a consistently declining real GDP
  - The decline in Commonwealth income is not reflected directly in per capita measures as population declines
  - Conversely, the Commonwealth could grow very quickly by reversing the migration flows and increasing labor participation rates (currently below 40%)

| (annual percent change) | Gross domestic product | Consumer prices (period average) |
|---|---|---|
| 2006-15 | (0.9%) | 2.3% |

Fiscal Plan Base Growth and Inflation Projections[1]

| | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P |
|---|---|---|---|---|---|---|---|---|---|
| Real GDP | (1.54%) | (1.79%) | (1.78%) | (1.79%) | (1.78%) | (1.77%) | (1.75%) | (1.71%) | (1.67%) |
| Inflation | 1.89% | 1.84% | 1.79% | 1.77% | 1.77% | 1.78% | 1.80% | 1.83% | 1.89% |
| **Nominal GDP** | **0.35%** | **0.05%** | **0.01%** | **(0.02%)** | **(0.01%)** | **0.01%** | **0.05%** | **0.12%** | **0.22%** |

- The Base Nominal growth rate is used to grow most revenue items included in the Commonwealth Fiscal Plan beyond FY 2017, with certain exceptions where revenues are either capped by statute or where the Commonwealth believes that the revenues are unlikely to correlate with Puerto Rico GDP growth
- The base inflation rate is used to drive many of the expenses included in the Fiscal Plan past FY 2017
- *The following pages summarize the revenues and expenses in the Base Projections based on the approach, measures and macroeconomic assumptions detailed previously*

 (1) Note that FY 2017 is not shown as it is based largely on budgetary numbers.

82

# The Base Projection Building Blocks - FY '17 to FY '26

## BASE PROJECTION INFLOW BUILD ($ billions)

| General Fund ("GF") Revenues | $81.1 | GF includes majority of taxes, such as income, withholding and the GF portion of the sales and use tax; projection based on FY 2017 budget, generally grown at Base Nominal Rate; note that the effect of the expiration of the 154 excise tax is included herein (reduces revenues by $8.2 bn) |
|---|---|---|
| Additional Sales and Use Tax ("SUT") | $9.9 | Includes additional SUT collections historically allocated to entities outside the GF (the GF revenues include a portion of SUT); projected based on actual FY 2017 GF revenue projections grown at the Base Nominal Rate |
| Other Tax Revenues | $14.0 | Other Tax Revenues recorded outside of the GF, including those assigned to component units. The largest single amounts in this group are Petroleum Products and Gas taxes ($ 6.5 bn), Cigarette Taxes ($ 0.7 bn, and Casino Slot Revenues ($1.5 bn) |
| Other Non-Tax Revenues (Excl. Fed. Grants and GDB revenues)[1] | $6.5 | Largest single amounts of non-tax revenues relate to charges for services, such as tuition and fees at UPR ($1.8 bn), net lottery revenues ($0.5 bn), HTA revenues such as road and train tolls ($2.6 bn)[1] |

## BASE PROJECTION OUTFLOW BUILD ($ billions)

| GF Expenses (Ex. Debt, AUC/AAC) | $88.4 | Includes expenses to fund the primary functions of the central government, such as healthcare, public safety and education; projection based on FY 2017 budget generally grown by inflation; excludes debt service and shown after a reduction of debt service for entities largely funded by appropriations, such as PBA and UPR |
|---|---|---|
| AAC/AUC ("Incr. Retirement System Funding") | $11.0 | Represents estimates, developed in conjunction with actuarial work done by Milliman, of the legally required AUC and AAC, as well as "catch-up" payments from previous years, required to adequately fund ERS, TRS and JRS retirement systems |
| Estimated Run-Rate Capex | $4.2 | FY 2017 based on OMB Budget and FY 2018-2026 based on a review of recent historical data |
| Special Revenue Funds, Enterprise Funds and Component Units | $12.1 | Includes the net result of blended and non-blended component units other than entities such as PREPA and PRASA, which are excluded from the plan; also includes projections of Special Revenue[2] and Enterprise Funds |
| Cigarette, Rum, SUT and Lotto Disbursements to Entities Outside Plan | $3.1 | Includes tax and other revenues (such as cigarette excise tax, rum excise tax and lottery related outflows) to entities outside of the model (such as to the rum producers and municipalities)[3] |

| **Base "Adjusted" Revenues** | **$111.5** |
|---|---|

| **Base "Adjusted" Expenses** | **$118.8** |
|---|---|



Note: Revenues shown already reflect the economic contraction referenced on page 5. Base Adjusted Expenses include retirement system "catch-up" payments.
(1) Note that Federal Grants and GDB revenues are included in the Fiscal Plan, but they are excluded from "Base Adjusted Revenues." Base Adjusted Revenues are developed as a metric that is meant to be comparable to state revenue collections apart from Federal Funding as a proxy for the discretionary revenues a state has available. Federal Grant revenues are provided for specific purposes and generally could not be repurposed for something such as debt service (unless specifically provided for debt service) which is only a very small portion of Federal Grants). GDB loan revenues have been excluded as they are not expected to be recurring since GDB is currently not extending new lines of credit.
(2) Special Revenue Funds shown on a net operating deficit basis, excluding tax revenues which are shown separately under revenues. The revenues and expenses embedded in the cumulative ten-year $1.6bn net deficit related to Special Revenue Funds include $4.7bn and $6.3bn, respectively. The Special Revenue Funds consist mostly of charges for services for public corporations and Commonwealth agencies
(3) Includes, among others, estimated outflows of $1.3bn and $500mm to private rum producers and municipalities for rum and lottery related outflows, respectively. Other outflows include outflows related to cigarette excise taxes and other rum excise tax outflows to other entities.

83

CONFIDENTIAL

PR-CCD-0556915

# Base Projection Building Blocks - FY '17 to FY '26 (cont'd)

| BASE PROJECTION INFLOW BUILD *($ billions)* | BASE PROJECTION OUTFLOW BUILD *($ billions\*)* |
|---|---|

| **Adjusted Revenues** | **$111.5** | | **Adjusted Expenses** | **$118.8** |
|---|---|---|---|---|

| GDB Inflows[1] | **$2.0** | Represents GDB net loan and deposit inflows from entities excluded from the Fiscal Plan; excludes intra-governmental transfers from entities included in the Fiscal Plan | GDB Outflows | **$1.9** | Represents GDB net loan and deposit outflows to entities excluded from the Fiscal Plan; excludes intra-governmental transfers to entities included in the Fiscal Plan |
|---|---|---|---|---|---|

**+**

| Federal Transfers Before Loss of ACA Funding | **$75.1** | Represents transfers from the Federal Government that are applied to specific required expenditures and therefore are set equal to the transfers out, resulting in a net zero impact on the financing gap |
|---|---|---|

**—**

| Loss of ACA Funding | **$16.1** | Represents the estimated impact from the depletion of ACA funding, estimated to occur in FY 2018; the total size of the impact grows over time based on the assumed increase in healthcare expenses |
|---|---|---|

| Federal Transfers Before Loss of ACA Funding | **$ 75.1** | Represents transfers from the Federal Government that are applied to specific required expenditures and therefore are set equal to the transfers out, resulting in a net zero impact on the financing gap |
|---|---|---|

*Note that the impact of the ACA funding loss is illustratively shown as a reduction of revenues. Federal Transfer associated expenses are not shown as reduced, though in reality the Federal Transfer expenses would be reduced and in its place the Commonwealth would have to expend more of its own resources in order to continue operating its current healthcare system*

**+**

| Oversight Board Costs | **$370 mm** | Based on Congressional Budget Office June 3, 2016 Cost Estimate of H.R. 5278 (PROMESA), as ordered by the House Committee on Natural Resources |
|---|---|---|

| **Total Inflows** | **$172.5** | **Outflows Excl. Debt Service** | **$196.2** |
|---|---|---|---|

\*Except where otherwise noted.
(1)  Note GDB inflows include certain inflows related to TDF, though TDF payments on account of guarantees are included in debt service.

84

# Base Projection Building Blocks - FY '17 to FY '26

| BASE PROJECTION INFLOW BUILD *($ billions)* | | BASE PROJECTION OUTFLOW BUILD *($ billions)* | |
|---|---|---|---|
| **Total Inflows** | **$172.5** | **Outflows Excl. Debt Service** | **$196.2** |

**Total Inflows Less Total Outflows Excl. Debt Service Results In**….

| A Base Financing Surplus/(Gap) ex. Debt Service | **($23.7)** |
|---|---|

| Debt Service | **$35.0** | Includes bonded debt service of entities included in the Fiscal Plan, including GO (including GSA loans), GDB, PBA, PFC, PRIFA (Bonds and BANs), UPR, PRCCDA, PRIDCO, HTA, ERS, and COFINA; Note that missed debt service payments from FY 2016 and 2017 are assumed to be paid in FY 2017[1] |
|---|---|---|

| **Total Base Financing Surplus/(Gap)** | **($58.7)** |
|---|---|



(1)   Note that for illustrative purposes, debt service excludes debt held by GDB and certain guaranteed debt including guaranteed debt of PRASA. Debt service is shown net of existing reserves.

85

CONFIDENTIAL

# Summary of Annual Base Projections

## The following presents the Base Projections outlined on the previous pages, on an annual basis

- As shown below, the financing needs of the Commonwealth under the Base Projections are highest in the early years of the projections as the Commonwealth attempts to reinvest in its economy and pay back suppliers, many of whom are local businesses

### Annual Summary of Financing Gap in the Base Projections from FY 2017 to FY 2026 ($ millions)

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adjusted Revenues** | | | | | | | | | | | | |
| GF Revs. after Act 154 / Foreign Company Tax Losses | $9,045 | $8,564 | $8,056 | $8,024 | $7,989 | $7,954 | $7,918 | $7,884 | $7,853 | $7,825 | $41,678 | $81,111 |
| Additional Sales and Use Tax ("SUT") | 844 | 873 | 904 | 935 | 967 | 1,001 | 1,036 | 1,073 | 1,111 | 1,151 | 4,523 | 9,897 |
| Other Tax Revenues | 1,342 | 1,404 | 1,407 | 1,413 | 1,416 | 1,412 | 1,407 | 1,403 | 1,400 | 1,398 | 6,982 | 14,002 |
| Other Non-Tax Revenues | 598 | 612 | 623 | 633 | 661 | 663 | 665 | 667 | 670 | 680 | 3,128 | 6,474 |
| **Total Adjusted Revenues** | **$11,829** | **$11,454** | **$10,990** | **$11,005** | **$11,033** | **$11,029** | **$11,027** | **$11,028** | **$11,034** | **$11,055** | **$56,312** | **$111,484** |
| Federal Transfers | 7,000 | 7,114 | 7,226 | 7,337 | 7,448 | 7,561 | 7,676 | 7,794 | 7,917 | 8,046 | 36,124 | 75,118 |
| GDB Net Inflows | 236 | 233 | 233 | 211 | 186 | 183 | 181 | 181 | 178 | 176 | 1,098 | 1,998 |
| **Total Revenues pre-ACA Funding Loss** | **$19,065** | **$18,801** | **$18,448** | **$18,553** | **$18,667** | **$18,773** | **$18,884** | **$19,003** | **$19,128** | **$19,276** | **$93,534** | **$188,599** |
| Loss of ACA Funding[1] | – | (865) | (1,517) | (1,583) | (1,681) | (1,835) | (1,954) | (2,070) | (2,253) | (2,384) | (5,646) | (16,141) |
| **Total Revenues post-ACA Funding Loss** | **$19,065** | **$17,935** | **$16,931** | **$16,970** | **$16,986** | **$16,939** | **$16,930** | **$16,933** | **$16,876** | **$16,893** | **$87,888** | **$172,458** |
| **Adjusted Expenses** | | | | | | | | | | | | |
| General Fund Expenses (ex. Debt Serv. and AUC/AAC) | ($8,102) | ($8,456) | ($8,597) | ($8,694) | ($8,888) | ($8,887) | ($8,971) | ($9,128) | ($9,355) | ($9,354) | ($42,737) | ($88,432) |
| AAC/AUC[2] | (1,046) | (572) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (5,134) | (10,993) |
| Maintenance Capital Expenditures | (283) | (400) | (407) | (415) | (422) | (429) | (437) | (445) | (453) | (462) | (1,928) | (4,154) |
| Spec. Rev. Funds, Enterprise Funds and Comp. Units | (855) | (781) | (845) | (984) | (1,092) | (1,234) | (1,365) | (1,494) | (1,664) | (1,793) | (4,557) | (12,107) |
| Disbursement of Tax Revs. to Entities Outside Plan | (330) | (300) | (304) | (307) | (313) | (314) | (315) | (316) | (317) | (325) | (1,553) | (3,139) |
| **Total Adjusted Expenses** | **($10,616)** | **($10,508)** | **($11,326)** | **($11,571)** | **($11,887)** | **($12,036)** | **($12,260)** | **($12,554)** | **($12,960)** | **($13,105)** | **($55,908)** | **($118,824)** |
| Federal Programs | (7,000) | (7,114) | (7,226) | (7,337) | (7,448) | (7,561) | (7,676) | (7,794) | (7,917) | (8,046) | (36,124) | (75,118) |
| GDB Net Outflows | (236) | (277) | (315) | (308) | (186) | (113) | (114) | (115) | (115) | (116) | (1,322) | (1,895) |
| Oversight Board Costs | (200) | (150) | (5) | (5) | (5) | (5) | – | – | – | – | (365) | (370) |
| **Total Expenses** | **($18,052)** | **($18,049)** | **($18,872)** | **($19,221)** | **($19,526)** | **($19,715)** | **($20,049)** | **($20,463)** | **($20,992)** | **($21,267)** | **($93,720)** | **($196,206)** |
| **Total Fin. Gap Pre-Measures before Debt Serv.** | **$1,013** | **($114)** | **($1,941)** | **($2,251)** | **($2,540)** | **($2,777)** | **($3,120)** | **($3,530)** | **($4,116)** | **($4,374)** | **($5,832)** | **($23,748)** |
| Less: Debt Service[3] | (4,618) | (3,294) | (3,872) | (3,493) | (3,438) | (3,197) | (3,138) | (3,554) | (3,055) | (3,308) | (18,715) | (34,967) |
| **Total Fin. Gap Pre-Measures after Debt Serv.** | **($3,605)** | **($3,408)** | **($5,813)** | **($5,744)** | **($5,978)** | **($5,974)** | **($6,258)** | **($7,084)** | **($7,171)** | **($7,682)** | **($24,547)** | **($58,716)** |
| *Memo: Embedded Impact of Act 154 / Foreign Company Tax Losses* | | | | | | | | | | | | |
| GF Revs. before Act 154 / Foreign Company Tax Losses | $9,045 | $9,045 | $9,018 | $8,986 | $8,951 | $8,916 | $8,880 | $8,846 | $8,815 | $8,787 | $45,045 | $89,288 |
| Act 154 / Foreign Company Tax Losses | – | (481) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (3,367) | (8,177) |
| GF Revs. after Act 154 / Foreign Company Tax Losses | $9,045 | $8,564 | $8,056 | $8,024 | $7,989 | $7,954 | $7,918 | $7,884 | $7,853 | $7,825 | $41,678 | $81,111 |
| *Memo: Macroeconomic Assumptions* | | | | | | | | | | | | |
| Real Revenue Growth | N/A | (1.5%) | (1.8%) | (1.8%) | (1.8%) | (1.8%) | (1.8%) | (1.7%) | (1.7%) | (1.7%) | | |
| Inflation | N/A | 1.9% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.9% | | |



(1) Assumes that the Commonwealth directly offsets the loss of ACA funding with local spend.
(2) Includes AUC catch-up payments
(3) Includes principal and interest payments that may have been missed in FY 2016 and FY 2017. Debt service shown net of existing reserved used to pay debt service. Note that for illustrative purposes, debt service excludes debt held by GDB and certain guaranteed debt including guaranteed debt of PRASA. Debt service is shown net of existing reserves.

86

PR-CCD-0556918

# Estimated Impact of Financial Measures

**As illustrated below, the measures resulting from the principles outlined previously would be expected, before the benefit of a change in the trajectory of the Commonwealth economy, to reduce the Base Financing Gap by $10 billion**

## Annual Summary of Measures ($ millions)

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Meas. Aimed at Impr. Budg. Controls and Fiscal & Econ. Dec.-Making** | | | | | | | | | | | | |
| Adopt Institute of Statistics / Planning Board Five-Year Plan | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($15) | ($30) |
| Install New Accounting and Financial Systems | (30) | – | – | – | – | – | – | – | – | – | (30) | (30) |
| **Improve Budg. Controls and Fiscal & Econ. Dec.-Making** | **(33)** | **(3)** | **(3)** | **(3)** | **(3)** | **(3)** | **(3)** | **(3)** | **(3)** | **(3)** | **(45)** | **(60)** |
| **Meas. Aimed at Rationalizing Exps. and Tax Policy to Promote Effic.** | | | | | | | | | | | | |
| *Expense Measures* | | | | | | | | | | | | |
| Reduce Operating Costs | – | 397 | 528 | 723 | 807 | 798 | 790 | 781 | 773 | 766 | 2,455 | 6,364 |
| Right-Size Department of Education | – | 42 | 71 | 99 | 127 | 129 | 131 | 134 | 136 | 139 | 339 | 1,008 |
| Control Healthcare Costs | (4) | 65 | 93 | 93 | 93 | 95 | 96 | 98 | 100 | 102 | 340 | 830 |
| Cut Governmental Subsidies | – | 47 | 96 | 145 | 244 | 343 | 342 | 341 | 340 | 339 | 532 | 2,237 |
| *Total Expense Measures* | *(4)* | *551* | *788* | *1,059* | *1,271* | *1,365* | *1,359* | *1,354* | *1,349* | *1,346* | *3,665* | *10,439* |
| *Revenue Measures* | | | | | | | | | | | | |
| Improve Tax Enforcement and Administration | 10 | 121 | 151 | 171 | 169 | 167 | 163 | 161 | 158 | 156 | 622 | 1,428 |
| Address Upcoming Act 154 Revenue Cliff | – | 481 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 3,367 | 8,177 |
| *Total Revenue Measures* | *10* | *602* | *1,113* | *1,133* | *1,131* | *1,129* | *1,125* | *1,123* | *1,120* | *1,118* | *3,989* | *9,605* |
| **Total Rationalizing Exps. and Tax Policy** | **6** | **1,153** | **1,901** | **2,192** | **2,403** | **2,494** | **2,485** | **2,477** | **2,470** | **2,464** | **7,655** | **20,044** |
| **Meas. Aimed at Enacting Structural Reform and Growth** | | | | | | | | | | | | |
| Establish a Local EITC Program | – | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (600) | (1,350) |
| Pay Local Businesses for Past Services and Pay Tax Refunds | (565) | (272) | (272) | (272) | (272) | – | – | – | – | – | (1,653) | (1,653) |
| Build Deposits to Provide Confidence | (214) | (214) | (214) | (214) | (214) | – | – | – | – | – | (1,069) | (1,069) |
| Invest in Incr. Main. Capex over Run-Rate | (141) | (528) | (397) | (273) | (103) | (104) | (106) | (108) | (110) | (112) | (1,442) | (1,983) |
| Invest in Economic Growth Projects | (54) | (400) | (466) | (476) | (353) | (316) | (187) | (113) | (103) | (103) | (1,749) | (2,572) |
| **Total Enacting Struct. Reform and Growth** | **(974)** | **(1,564)** | **(1,499)** | **(1,385)** | **(1,091)** | **(570)** | **(443)** | **(371)** | **(363)** | **(366)** | **(6,514)** | **(8,627)** |
| **Meas. Aimed at Protecting Vuln. Stakeholders** | | | | | | | | | | | | |
| Implement Pension System Reform[1] | (166) | (166) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (681) | (1,263) |
| **Total Protecting Vulnerable Stakeholders** | **(166)** | **(166)** | **(116)** | **(116)** | **(116)** | **(116)** | **(116)** | **(116)** | **(116)** | **(116)** | **(681)** | **(1,263)** |
| **Total Measures Impact** | **($1,167)** | **($581)** | **$283** | **$687** | **$1,193** | **$1,804** | **$1,922** | **$1,987** | **$1,987** | **$1,979** | **$415** | **$10,094** |
| *Memo: Estimated Impact on Economic Growth* | | | | | | | | | | | | |
| Change in Economic Trajectory | – | 202 | 340 | 501 | 718 | 939 | 1,185 | 1,427 | 1,612 | 1,782 | 1,761 | 8,707 |
| Total Measures incl. Change in Economic Trajectory | ($1,167) | ($378) | $623 | $1,188 | $1,910 | $2,743 | $3,108 | $3,414 | $3,599 | $3,761 | $2,176 | $18,801 |
| *Memo: Macroeconomic Assumptions* | | | | | | | | | | | | |
| Real Revenue Growth | N/A | 0.6% | (0.3%) | (0.1%) | 0.2% | 0.2% | 0.4% | 0.3% | (0.0%) | (0.2%) | | |
| Inflation | N/A | 2.1% | 2.0% | 1.9% | 1.9% | 1.9% | 2.0% | 2.1% | 2.0% | 1.9% | | |



(1) Illustratively includes the reduction in the estimated portion of AUC as result of the exclusion of debt service, which amounts to approximately $80 million over the 10-year projection period.

87

# Incremental Saving / (Spend) from Measures

**The Fiscal Plan is not intended to be an austerity plan, but rather largely redirects spending from inefficient uses towards uses more likely to produce economic growth**

- As illustrated below, excluding (1) certain measures aimed at maintaining current revenues and spending (such as reforms to the corporate tax code to replace Act 154 revenues and an extension of Act 66) and (2) the build in deposits, the Commonwealth's revenue reforms and expenditure cuts largely fund the incremental spending the Commonwealth projects to stimulate growth in the economy

- The spending is highest in the early years so as to jumpstart growth and stop outmigration as the Commonwealth implements structural reforms

### Annual Summary of Incremental Savings / (Spend) from Measures ($ millions)

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Measures Impact** | ($1,167) | ($581) | $283 | $687 | $1,193 | $1,804 | $1,922 | $1,987 | $1,987 | $1,979 | $415 | $10,094 |
| Less: Measures Aimed at Maintaining Current Revs./Exps. | | | | | | | | | | | | |
| Address Upcoming Act 154 Revenue Cliff | – | (481) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (3,367) | (8,177) |
| Extend Law 66 / Implement Long-Term Budg. Reform | – | (178) | (257) | (336) | (416) | (400) | (384) | (368) | (353) | (338) | (1,187) | (3,030) |
| Measures Aimed at Maintaining Current Revs./Exps. | – | ($659) | ($1,219) | ($1,298) | ($1,378) | ($1,362) | ($1,346) | ($1,330) | ($1,315) | ($1,300) | (4,554) | (11,207) |
| Plus: Deposit Build | $214 | $214 | $214 | $214 | $214 | – | – | – | – | – | $1,069 | $1,069 |
| **Total Incremental Savings / (Spend) from Measures** | ($953) | ($1,026) | ($723) | ($397) | $28 | $443 | $576 | $656 | $672 | $679 | ($3,071) | ($844) |



# Macroeconomic Projections for the Post-Measures Scenario

## The following provides an overview of the post-measures scenario

- The starting point is the Base Projections, reflecting current policies projected from FY 2017 - FY 2026

- The post-measures scenario shows the projected impact of fiscal and growth measures over the period, including:

  - The improvement in the fiscal position resulting from the measures

  - The improvement in long-term (potential) growth from growth enhancing measures, including Earned Income Tax Credit, capital expenditure, better public financial management and repaying overstretched suppliers

  - The cyclical impact of measures, which reduce (expand) short-term real GDP growth when policies increase (cut) fiscal revenues (expenditures)

    - The cyclical impact is captured by the fiscal multiplier of 1.3 (Nakamura and Steinsson: Fiscal Stimulus in a Monetary Union, American Economic Review, 2014)

- As the economy contracts (expands), output falls below potential real GDP, creating slack in the economy, lowering wages and prices

89

## Macroeconomic Projections for the Post-Measures Scenario (cont'd)

### The following provides an overview of the post-measures scenario

- Eventually, low wages and prices create attractive investment opportunities
  - This is the primary mechanism to close the output gap and undo the cyclical impact of measures
  - This adjustment can be slow, as the Commonwealth (and U.S. States) cannot devalue its currency relative to other U.S. States (unlike countries) to quickly and easily make labor and investment more attractive
  - This again underscores the need to enhance growth measures, and take structural reforms to make markets more efficient and adjust as quickly and painlessly as possible
  - Growth enhancing measures create opportunities and investment to ensure potential GDP growth does not remain negative because people move to the U.S. mainland
- The resulting nominal GDP feeds revenues and produces a new primary fiscal deficit
  - Puerto Rico is assumed to self-finance this fiscal reform package since there is no new financing available. Hence, the package of measures is adjusted to close the primary deficit, which feeds back to real GDP, the output gap, inflation and nominal GDP
  - This feedback loop continues until it converges on a stable fiscal deficit, growth and nominal GDP growth path; the output gap assumed to slowly close at the end of the ten-year projection period
- It is critical to underscore that the macro-fiscal scenarios focus on self-financing the primary deficit. Existing interest and amortization schedules are assumed to be financed at 0% so as to arrive at a reasonable estimate of size of the fiscal and growth problem going forward, apart from the legacy of past decisions and growth challenges, as reflected in the existing debt service schedule

Fiscal Plan Post-Measures Growth and Inflation Projections

|             | 2018P | 2019P    | 2020P    | 2021P | 2022P | 2023P | 2024P | 2025P    | 2026P   |
|-------------|-------|----------|----------|-------|-------|-------|-------|----------|---------|
| Real GDP    | 0.58% | (0.27%)  | (0.11%)  | 0.20% | 0.19% | 0.36% | 0.26% | (0.02%)  | (0.18%) |
| Inflation   | 2.06% | 2.05%    | 1.94%    | 1.92% | 1.92% | 2.00% | 2.07% | 2.03%    | 1.89%   |
| **Nominal GDP** | **2.64%** | **1.77%** | **1.84%** | **2.11%** | **2.11%** | **2.36%** | **2.33%** | **2.02%** | **1.72%** |



90

# Annual Projections Including Measures

## The following shows the annual projected financing surplus/(gap) after incorporating the measures outlined previously

- As shown below, in all years of the plan a deficit remains even after excluding all debt service and after incorporating the potential benefits of economic growth
  - The larger deficits in the early years are driven by the large capital expenditures made during the period as well as the payments of past-due payables
    - Note that the growth rate is estimated only based on the potential surplus available to fund these spending amounts (*i.e.,* Puerto Rico is assumed only be able to spend up to the amount until the surplus goes to zero); no external financing is assumed to fund the deficits shown and further financing could increase future deficits due to associated debt service costs
  - Assuming average real GDP growth that averages 0.1% between FY 2018 and FY 2026 as compared to negative 1.7% in the base, **there is still projected to be a deficit of $5.7 billion** over ten years

### Annual Summary of Financing Gap in the Post-Measures Projections from FY 2017 to FY 2026 ($ millions)

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fin. Gap Pre-Measures after Debt Serv.** | ($3,605) | ($3,408) | ($5,813) | ($5,744) | ($5,978) | ($5,974) | ($6,258) | ($7,084) | ($7,171) | ($7,682) | ($24,547) | ($58,716) |
| Plus: Debt Service[1] | 3,909 | 3,294 | 3,872 | 3,493 | 3,438 | 3,197 | 3,138 | 3,554 | 3,055 | 3,308 | 18,007 | 34,258 |
| **Fin. Gap Pre-Measures before Debt Serv.** | $304 | ($114) | ($1,941) | ($2,251) | ($2,540) | ($2,777) | ($3,120) | ($3,530) | ($4,116) | ($4,374) | ($6,541) | ($24,457) |
| *Measures Impact* | | | | | | | | | | | | |
| Impr. Budg. Controls & Fiscal and Econ. Dec.-Making | (33) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (45) | (60) |
| Rationalize Exp. and Tax Policy to Promote Effic. | 6 | 1,153 | 1,901 | 2,192 | 2,403 | 2,494 | 2,485 | 2,477 | 2,470 | 2,464 | 7,655 | 20,044 |
| Enact Struct. & Econ. Measures and Invest in Growth | (974) | (1,564) | (1,499) | (1,385) | (1,091) | (570) | (443) | (371) | (365) | (366) | (6,514) | (8,627) |
| Protect Vulnerable Stakeholders[2] | (166) | (166) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (681) | (1,263) |
| *Total Measures Impact* | (1,167) | (581) | 283 | 687 | 1,193 | 1,804 | 1,922 | 1,987 | 1,987 | 1,979 | 415 | 10,094 |
| **Fin. Gap Post-Meas. ex. Debt Serv. & Econ. Impact** | ($863) | ($694) | ($1,658) | ($1,563) | ($1,347) | ($972) | ($1,197) | ($1,543) | ($2,129) | ($2,395) | ($6,126) | ($14,363) |
| Est. Incr. Inc. from Econ. Dev. and Struct. Reforms | – | 202 | 340 | 501 | 718 | 939 | 1,185 | 1,427 | 1,612 | 1,782 | 1,761 | 8,707 |
| **Fin. Gap Post-Meas. incl. Growth ex. Debt Serv.** | ($863) | ($492) | ($1,318) | ($1,063) | ($629) | ($34) | ($12) | ($116) | ($517) | ($613) | ($4,365) | ($5,656) |
| *Memo: Macroeconomic Assumptions* | | | | | | | | | | | | |
| Real Revenue Growth | N/A | 0.6% | (0.3%) | (0.1%) | 0.2% | 0.2% | 0.4% | 0.3% | (0.0%) | (0.2%) | | |
| Inflation | N/A | 2.1% | 2.0% | 1.9% | 1.9% | 1.9% | 2.0% | 2.1% | 2.0% | 1.9% | | |



(1) Includes principal and interest payments that may have been missed in FY 2016 and FY 2017. Debt service shown net of existing reserves used to pay debt service. Note that for illustrative purposes, debt service excludes debt held by GDB and excludes revenues otherwise allocated to COFINA FY 2017 debt service

(2) Illustratively includes the reduction in the estimated portion of AUC as result of the exclusion of debt service, which amounts to approximately $80 million over the 10-year projection period.

91

PR-CCD-0556923

# A Replacement for ACA Funding and Potential to Improve Puerto Rico's Fiscal Position

**Given a financing gap remains even after Puerto Rico implements the measures in its control, it is essential that the U.S. Government become a partner in promoting economic growth in Puerto Rico through items such as equitable healthcare treatment to replace ACA funding**

- Shown below is the illustrative impact of the U.S. Government providing the Commonwealth with more equitable healthcare treatment, which is assumed to at least replace the loss of ACA funding

- Even with actions of the U.S. Federal Government, there are still negative cash flows in the early years of the projections driven by large capital expenditures and past-due payable payments that may potentially require either delay or new, interim financing (for illustrative purposes no incremental financing cost is assumed)

- By FY 2018, however, these actions combined with the measures outlined previously and the potential benefit of incremental economic growth that would result from the elimination of the deficits that existed prior to ACA funding could remove structural deficits and would produce a ten year financing *surplus* before debt service of $18.9 billion

  - Note that this growth would not be possible without ACA type funding and that, even if ACA funding were received, it may not be advisable to use as a level for setting fixed (vs. contingent) debt service given it would be such a drastic turnaround for the Commonwealth economy

### Annual Summary of Financing Gap After Select Federal Actions ($ millions)

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fin. Gap Before U.S. Gov't Action** | ($863) | ($492) | ($1,318) | ($1,063) | ($629) | ($34) | ($12) | ($116) | ($517) | ($613) | ($4,365) | ($5,656) |
| Replacement of ACA Funding | – | 865 | 1,517 | 1,583 | 1,681 | 1,835 | 1,954 | 2,070 | 2,253 | 2,384 | 5,646 | 16,141 |
| **Fin. Gap After U.S. Gov't Action** | ($863) | $374 | $199 | $520 | $1,052 | $1,801 | $1,942 | $1,954 | $1,736 | $1,771 | $1,281 | $10,485 |
| Change in Economic Trajectory | – | 67 | 312 | 602 | 849 | 1,001 | 1,130 | 1,277 | 1,460 | 1,682 | 1,830 | 8,378 |
| **Fin. Gap After U.S. Gov't Action & Econ. Imp.** | ($863) | $441 | $512 | $1,122 | $1,901 | $2,802 | $3,072 | $3,231 | $3,195 | $3,452 | $3,112 | $18,863 |
| *Memo: Financing Gap After Debt Service* | | | | | | | | | | | | |
| Inclusion of Debt Service [1] | (3,909) | (3,294) | (3,872) | (3,493) | (3,438) | (3,197) | (3,138) | (3,554) | (3,055) | (3,308) | (18,007) | (34,258) |
| Fin. Gap Incl. Debt Serv. After U.S. Gov't Action | ($4,772) | ($2,853) | ($3,361) | ($2,371) | ($1,538) | ($396) | ($66) | ($323) | $141 | $144 | ($14,895) | ($15,395) |
| *Memo: Macroeconomic Assumptions* | | | | | | | | | | | | |
| Real Revenue Growth | N/A | 1.3% | 1.9% | 1.9% | 1.6% | 1.1% | 1.2% | 1.3% | 1.2% | 1.2% | | |
| Inflation | N/A | 2.2% | 2.7% | 3.1% | 3.1% | 2.9% | 2.6% | 2.3% | 2.0% | 1.6% | | |



(1) Includes principal and interest payments that may have been missed in FY 2016 and FY 2017. Debt service shown net of existing reserves used to pay debt service. Note that for illustrative purposes, debt service excludes debt held by GDB and excludes revenues otherwise allocated to COFINA FY 2017 debt service

92

# Fiscal Plan Macroeconomic Assumptions

**The following tables summarize the projected real and nominal GDP growth rates used in the Base Projections, as well as the growth rates assumed post-measures including and excluding U.S. government assistance in the form of ACA type funding, illustrating the potential positive impacts of actions by the U.S. government**

Base Projections

|  | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P |
|---|---|---|---|---|---|---|---|---|---|
| Real GDP | (1.54%) | (1.79%) | (1.78%) | (1.79%) | (1.78%) | (1.77%) | (1.75%) | (1.71%) | (1.67%) |
| Inflation | 1.89% | 1.84% | 1.79% | 1.77% | 1.77% | 1.78% | 1.80% | 1.83% | 1.89% |
| **Nominal GDP** | **0.35%** | **0.05%** | **0.01%** | **(0.02%)** | **(0.01%)** | **0.01%** | **0.05%** | **0.12%** | **0.22%** |

Post-Measures, Without U.S. Government Action Projections

|  | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P |
|---|---|---|---|---|---|---|---|---|---|
| Real GDP | 0.58% | (0.27%) | (0.11%) | 0.20% | 0.19% | 0.36% | 0.26% | (0.02%) | (0.18%) |
| Inflation | 2.06% | 2.05% | 1.94% | 1.92% | 1.92% | 2.00% | 2.07% | 2.03% | 1.89% |
| **Nominal GDP** | **2.64%** | **1.77%** | **1.84%** | **2.11%** | **2.11%** | **2.36%** | **2.33%** | **2.02%** | **1.72%** |

Post-Measures, With U.S. Government Action Projections

|  | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P |
|---|---|---|---|---|---|---|---|---|---|
| Real GDP | 1.34% | 1.90% | 1.88% | 1.63% | 1.15% | 1.21% | 1.31% | 1.19% | 1.22% |
| Inflation | 2.15% | 2.69% | 3.06% | 3.15% | 2.93% | 2.63% | 2.32% | 1.97% | 1.61% |
| **Nominal GDP** | **3.49%** | **4.59%** | **4.94%** | **4.78%** | **4.08%** | **3.84%** | **3.63%** | **3.16%** | **2.83%** |



CONFIDENTIAL

PR-CCD-0556925



# Footnotes

CONFIDENTIAL

# Footnotes to "Debt of Entities Included in the Fiscal Plan"

## The following footnotes provide additional detail to page 67

2. Please note that all figures are subject to ongoing diligence and numbers may change materially. All bonds are included as of July 2, 2016; loans as of June 30, 2016 and do not include unpaid interest, if any, and do not include payments made by insurers, where applicable.

3. Excludes estimated CAB accretion, which is shown separately as of July 2, 2016. Capital Appreciation Bonds ("CAB") are zero coupon bonds that accrete in value until maturity instead of making regularly scheduled interest payments. This accretion is treated in reporting as 'interest' rather than principal and is broken out separately from initial par values.

4. Missed interest is for FY 2016 and as of July 2, 2016.

5. Private loan figures are representative of loans at non-government entities. Figures include non-bank municipal loans.

6. Includes operational loans from GDB to the PR Treasury Department, including $102 million of loans from other CW entities representing Trade and Export Company ($14 million), GDB loans to various minor CW entities, and operational loans payable from GDB to PR Treasury representing long-term credit facilities of $100 million from the SIF and $2 million from the Automobile Accidents Compensation Administration ("AACA").

7. HTA includes Teodoro Moscoso bonds and VRDOs held by GDB.

8. GDB bonds include $110mm of CW-guaranteed bonds issued to the SIF. Where there are TDF guaranteed bonds and loans that TDF is paying out on, they have been reflected in the GDB bonds and loans.

9. Includes PRIFA Rum bonds, PRIFA Petroleum Products Excise Tax BANs, PRIFA Ports Authority bonds and PRIFA ASSMCA bonds.

10. Includes the AFICA - Desarrollos Universitarios University Plaza Project bonds. Desarrollos Universitarios, a component unit of UPR, although legally separate, is reported as if it was part of the primary government because its debt is expected to be repaid entirely, or almost entirely, with resources of UPR (via lease payments from UPR to Desarrollos Universitarios).

11. APLA is excluded as the debt is owned by GDB and thus debt service is intragovernmental. See footnote 6. Additional diligence is required to determine if entities are included in or excluded from the plan but it is believed that most are Fiscal Plan entities.

12. Includes Series 2016 A, B, C, D and E Bonds.

13. PRASA includes CW-guaranteed debt of (i) $521 million in Loans from Other CW Entities representing the CWSRF and DWSRF, (ii) $285 million in bonds representing the 2008 Sub. Refunding bonds, and (iii) $394 million in bonds representing the Rural Development bonds.

14. Note that Municipality Related Debt includes MFA, CAE, IVU, and other municipal debt. Loans from other CW entities includes $570 million in loans from MFA to be repaid by the CAE tax. Also includes municipalities general fund resources, the AFICA Guaynabo Municipal Gov. Center ($8.3 million) and the AFICA - Guaynabo Warehouse for Emergencies ($6.7 million) bonds.

15. Excludes TDF guaranteed bonds and loans that TDF is paying out on to third parties.



95

PR-CCD-0556927



# Additional Detail on Fiscal Plan Projections

**96**

PR-CCD-0556928

# Summary Page - Revenues

## The following table presents a detailed summary of revenues included in the Fiscal Plan Base Projections

| | | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Revenues before Measures** | | | | | | | | | | | | |
| | *General Fund Revenues (incl. Act 154 / Excise Tax Losses)* | | | | | | | | | | | | |
| 1 | Individual Income Taxes | $1,966 | $1,972 | $1,973 | $1,972 | $1,971 | $1,970 | $1,970 | $1,970 | $1,972 | $1,975 | $9,854 | $19,711 |
| 2 | Corporate Income Taxes | 1,525 | 1,505 | 1,505 | 1,505 | 1,504 | 1,503 | 1,503 | 1,503 | 1,505 | 1,368 | 7,784 | 15,606 |
| 3 | Non-Resident Withholdings | 763 | 763 | 763 | 763 | 763 | 763 | 763 | 763 | 763 | 763 | 3,815 | 7,630 |
| 4 | Act 154 / Excise Tax Revenues | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 1,924 | 9,620 | 19,240 |
| 5 | Estimated Loss of Act 154 / Foreign Company Tax Revenues | – | (481) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (962) | (3,367) | (8,177) |
| 6 | Excise Taxes on Alcoholic Beverages | 272 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 1,363 | 2,727 |
| 7 | Motor Vehicle Excise Taxes | 293 | 294 | 294 | 294 | 294 | 294 | 294 | 294 | 294 | 294 | 1,469 | 2,938 |
| 8 | Excise Taxes on Off-Shore Shipments Rum | 206 | 168 | 170 | 171 | 172 | 174 | 175 | 176 | 178 | 179 | 887 | 1,769 |
| 9 | General Fund Portion of 11.5% SUT | 1,608 | 1,586 | 1,557 | 1,525 | 1,491 | 1,456 | 1,420 | 1,384 | 1,348 | 1,310 | 7,767 | 14,685 |
| 10 | Cigarette Excise Taxes | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 118 | 586 | 1,173 |
| 11 | Casino Slot Revenues | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 90 | 180 |
| 12 | Lotteries | 65 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 386 | 787 |
| 13 | Other General Fund Tax Revenues | 117 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 113 | 566 | 1,128 |
| 14 | Other General Fund Non-Tax Revenues | 171 | 172 | 172 | 172 | 171 | 171 | 171 | 171 | 171 | 172 | 857 | 1,714 |
| 15 | General Fund Revenues (incl. Act 154 / Excise Tax Losses) | 9,045 | 8,564 | 8,056 | 8,024 | 7,989 | 7,954 | 7,918 | 7,884 | 7,853 | 7,825 | 41,078 | 81,111 |
| | *Additional Sales and Use Tax ("SUT")* | | | | | | | | | | | | |
| 16 | COFINA Portion of 6% SUT | 724 | 753 | 783 | 815 | 847 | 881 | 916 | 953 | 991 | 1,031 | 3,922 | 8,694 |
| 17 | Portion of 11.5% SUT - FAM | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 585 | 1,171 |
| 18 | Portion of 11.5% SUT - Cine | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 16 | 32 |
| 19 | Additional Sales and Use Tax ("SUT") | 844 | 873 | 904 | 935 | 967 | 1,001 | 1,036 | 1,073 | 1,111 | 1,151 | 4,523 | 9,897 |
| | *Other Tax Revenues* | | | | | | | | | | | | |
| 20 | Non-Resident Withholdings (Special Revenue Fund) | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 295 | 590 |
| 21 | Excise Taxes on Off-Shore Shipments Rum (Special Revenue Fund) | 174 | 136 | 137 | 138 | 139 | 140 | 141 | 142 | 143 | 144 | 724 | 1,436 |
| 22 | Room Taxes | 77 | 81 | 85 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 419 | 858 |
| 23 | Cigarette Excise Taxes (Special Revenue Fund) | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 337 | 674 |
| 24 | Petroleum Products (Crudita) Excise Tax | 411 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 2,451 | 5,001 |
| 25 | Gas Oil and Diesel Excise Taxes | 13 | 13 | 13 | 13 | 13 | 12 | 12 | 12 | 11 | 11 | 65 | 119 |
| 26 | Gasoline Excise Tax Revenue | 151 | 146 | 145 | 146 | 148 | 143 | 139 | 132 | 129 | 126 | 736 | 1,407 |
| 27 | Vehicle License Fees | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 463 | 927 |
| 28 | Other Special Revenue Fund Tax Revenues | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 263 | 527 |
| 29 | Casino Slot Revenues | 140 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 143 | 709 | 1,420 |
| 30 | CRIM Property Tax Inflows | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 521 | 1,042 |
| 31 | Other Tax Revenues | 1,342 | 1,404 | 1,407 | 1,413 | 1,416 | 1,412 | 1,407 | 1,403 | 1,400 | 1,398 | 6,982 | 14,002 |
| | *Other Non-Tax Revenues* | | | | | | | | | | | | |
| 32 | Lotteries - Minus & Other | 38 | 46 | 48 | 50 | 56 | 56 | 55 | 55 | 55 | 62 | 239 | 522 |
| 33 | HTA Non-Tax Revenues (ex. Teodoro Moscoso) | 240 | 245 | 249 | 252 | 252 | 252 | 252 | 252 | 252 | 253 | 1,238 | 2,500 |
| 34 | Teodoro Moscoso Bridge Revenues | – | – | – | – | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 120 |
| 35 | PRIDCO Rent and Other Non-Tax Revenues | 67 | 67 | 69 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 344 | 699 |
| 36 | UPR Tuition, Fees and Other Non-Tax Revenues[2] | 169 | 171 | 174 | 176 | 178 | 180 | 183 | 185 | 188 | 190 | 868 | 1,795 |
| 37 | PRCCDA Rent and Other Non-Tax Revenues | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 20 | 40 |
| 38 | Net Income of Select Component Units[2] | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 399 | 799 |
| 39 | Other Non-Tax Revenues | 598 | 612 | 623 | 633 | 661 | 663 | 663 | 667 | 670 | 680 | 3,128 | 6,474 |
| 40 | **Total Adjusted Revenue before Measures pre-ACA Funding Loss** | **$11,829** | **$11,454** | **$10,990** | **$11,005** | **$11,033** | **$11,029** | **$11,027** | **$11,028** | **$11,034** | **$11,053** | **$56,312** | **$111,484** |
| 41 | GDB Loan Inflows | 236 | 233 | 233 | 211 | 186 | 182 | 181 | 181 | 178 | 176 | 1,098 | 1,998 |
| 42 | Federal Transfers | 7,000 | 7,114 | 7,226 | 7,337 | 7,448 | 7,561 | 7,676 | 7,794 | 7,917 | 8,046 | 36,124 | 75,118 |
| 43 | **Total Revenues before Measures pre-ACA Funding Loss** | **$19,065** | **$18,801** | **$18,448** | **$18,553** | **$18,667** | **$18,773** | **$18,884** | **$19,003** | **$19,128** | **$19,276** | **$93,534** | **$188,599** |
| 44 | Loss of Affordable Care Act ("ACA") Funding | – | (865) | (1,517) | (1,583) | (1,681) | (1,833) | (1,954) | (2,070) | (2,253) | (2,384) | (5,646) | (16,141) |
| 45 | **Total Revenues before Measures post-ACA Funding Loss** | **$19,065** | **$17,935** | **$16,931** | **$16,970** | **$16,986** | **$16,939** | **$16,930** | **$16,933** | **$16,876** | **$16,893** | **$87,888** | **$172,458** |



(1) Excludes Federal Grants.
(2) Represents the net income estimates of entities without bonded debt that have historically provided a surplus. Net numbers are shown as these entities generally receive independent revenues that would not be generated absent the associated expenses. Note that numbers are shown excluding capital expenditures, which are shown elsewhere and forward estimates are based on a review of historical results.

97

CONFIDENTIAL

# Summary Page - Expenses

**The following table presents a detailed summary of non-interest expenditures included in the Fiscal Plan Base Projections**

| | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Non-Debt Expenditure before Measures** | | | | | | | | | | | | |
| *General Fund Expenses (ex. AUC/AAC and Debt Service)* | | | | | | | | | | | | |
| 44 Direct Payroll | ($3,271) | ($3,333) | ($3,394) | ($3,455) | ($3,510) | ($3,578) | ($3,642) | ($3,707) | ($3,775) | ($3,847) | ($16,969) | ($35,519) |
| 45 Direct Operational Expenses | (907) | (924) | (941) | (958) | (975) | (992) | (1,010) | (1,028) | (1,047) | (1,066) | (4,705) | (9,848) |
| 46 Utilities | (260) | (332) | (352) | (360) | (374) | (373) | (370) | (375) | (388) | (396) | (1,678) | (3,580) |
| 47 Special Appropriations - UPR Formula | (791) | (836) | (836) | (836) | (836) | (836) | (836) | (836) | (836) | (848) | (4,136) | (8,329) |
| 48 Special Appropriations - Judicial Formula | (324) | (366) | (366) | (366) | (365) | (366) | (366) | (366) | (366) | (366) | (1,789) | (3,619) |
| 49 Special Appropriations - Municipalities Formula | (361) | (371) | (371) | (371) | (371) | (371) | (371) | (371) | (371) | (371) | (1,845) | (3,701) |
| 50 Special Appropriations - Retirement Systems | (371) | (424) | (480) | (536) | (543) | (535) | (529) | (595) | (593) | (587) | (2,354) | (5,193) |
| 51 Special Appropriations - Health Insurance | (885) | (885) | (885) | (885) | (885) | (885) | (888) | (885) | (885) | (885) | (4,425) | (8,850) |
| 52 Special Appropriations - Other | (932) | (984) | (972) | (926) | (1,021) | (950) | (962) | (964) | (1,093) | (987) | (4,836) | (9,790) |
| 53 General Fund Expenses (ex. AUC/AAC and Debt Service) | (8,102) | (8,456) | (8,597) | (8,694) | (8,888) | (8,887) | (8,971) | (9,128) | (9,355) | (9,354) | (42,737) | (88,432) |
| *AAC/AUC* | | | | | | | | | | | | |
| 54 AUC and AAC ex. Catch-Up Payments[1] | (642) | (572) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (4,729) | (10,588) |
| 55 AAC/AUC | (642) | (572) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (1,172) | (4,729) | (10,588) |
| *Maintenance Capital Expenditures* | | | | | | | | | | | | |
| 56 Run-Rate Capital Expenditures (excl. growth Capex) | (283) | (400) | (407) | (413) | (422) | (429) | (437) | (445) | (453) | (462) | (1,928) | (4,154) |
| 57 Maintenance Capital Expenditures | (283) | (400) | (407) | (415) | (422) | (429) | (437) | (445) | (453) | (462) | (1,928) | (4,154) |
| *Component Units, Non-GF Funds and Enterprise Funds* | | | | | | | | | | | | |
| 58 Net Deficit of Special Revenue Funds ex. Tax Revenues[2] | (109) | (118) | (129) | (140) | (151) | (162) | (174) | (185) | (197) | (209) | (648) | (1,575) |
| 59 PRCCDA Expenses | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (24) | (49) |
| 60 PRIDCO Expenses | (104) | (105) | (106) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (528) | (1,070) |
| 61 UPR Expenses | (178) | (137) | (143) | (151) | (173) | (195) | (218) | (242) | (266) | (280) | (779) | (1,980) |
| 62 Net Op. Deficit of Other Independently Projected Component Units ex. Tax Revs. [2] | (204) | (171) | (213) | (331) | (402) | (504) | (595) | (683) | (811) | (908) | (1,320) | (4,820) |
| 63 Net Deficit of Select Component Units ex. Tax Revenues[2] | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (13) | (26) |
| 64 Net Deficit of Enterprise Funds[2] | (6) | (6) | (7) | (7) | (7) | (8) | (8) | (8) | (9) | (9) | (34) | (76) |
| 65 HTA Operational Expenses (excl. Debt Service, T. Moscoso and Capex) | (246) | (232) | (236) | (238) | (237) | (241) | (246) | (250) | (255) | (259) | (1,191) | (2,442) |
| 66 Teodoro Moscoso Expenses (excl. Debt Service and Capex) | – | – | – | – | (4) | (4) | (4) | (4) | (5) | (5) | (4) | (26) |
| 67 Allocation of SUT to Cine | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (16) | (32) |
| 68 Component Units, Non-GF Funds and Enterprise Funds | (855) | (781) | (845) | (984) | (1,092) | (1,234) | (1,365) | (1,491) | (1,664) | (1,793) | (4,557) | (12,107) |
| *Disbursements of Tax Revenues to Entities Outside Plan* | | | | | | | | | | | | |
| 69 Cigarette and Rum Shipment Excise Tax Related Outflows | (175) | (137) | (138) | (139) | (140) | (141) | (142) | (143) | (144) | (145) | (729) | (1,446) |
| 70 Lotteries Related Outflows - Munis & Other | (38) | (46) | (48) | (50) | (56) | (56) | (58) | (55) | (55) | (62) | (239) | (522) |
| 71 Allocation of SUT to FAM | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (585) | (1,171) |
| 72 Disbursements of Tax Revenues to Entities Outside Plan | (330) | (300) | (304) | (307) | (313) | (314) | (315) | (316) | (317) | (325) | (1,553) | (3,139) |
| 73 **Adjusted Expenses** | ($10,212) | ($10,508) | ($11,326) | ($11,571) | ($11,887) | ($12,036) | ($12,260) | ($12,554) | ($12,960) | ($13,105) | ($55,504) | ($118,419) |
| 74 GDB Loan and Net Deposit Outflows | (236) | (277) | (315) | (308) | (186) | (113) | (114) | (115) | (115) | (116) | (1,322) | (1,895) |
| 75 Federal Programs | (7,000) | (7,114) | (7,226) | (7,337) | (7,448) | (7,561) | (7,676) | (7,791) | (7,917) | (8,046) | (36,124) | (75,118) |
| 76 Federal Oversight Board Implemented by PROMESA | (200) | (150) | (5) | (5) | (5) | (5) | – | – | – | – | (365) | (370) |
| 77 AUC Catch-Up Payments[6] | (405) | – | – | – | – | – | – | – | – | – | (405) | (405) |
| 78 **Total Noninterest Expenditures** | ($18,052) | ($18,049) | ($18,872) | ($19,221) | ($19,526) | ($19,715) | ($20,049) | ($20,463) | ($20,992) | ($21,267) | ($93,720) | ($196,206) |



(1) Incremental contributions represent the Annual Additional Contributions ("AAC") required to be paid to the Teachers and Judicial Retirement Systems and the Additional Uniform Contribution ("AUC") required to be paid to the Employees Retirement System based on estimates provided by the Commonwealth's actuaries incorporating updated assumptions regarding items such as changes in the size of the active membership and future payroll assumptions consistent with the Fiscal Plan.

(2) Deficit for Special Revenue Funds calculated after removing tax revenues, which are shown separately.

(3) Certain component unit projections were developed by consulting with management including: ASEM, ASES, ADEA, Cardiovascular Center, PBA, PRITA, Ports Authority and Tourism Company.

(4) Represents the net income estimates of entities without bonded debt that have historically resulted in a deficit. Note that numbers are shown excluding capital expenditures, which are shown elsewhere. Forward estimated based on review of historical results.

(5) Includes Unemployment Insurance and 9-1-1 Services Governing Board. Excludes Drivers Insurance and Disability Insurance, which are restricted funds.

(6) Catch-up payments are AUC or AAC payments due in 2014, 2015 and/or 2016 that were not paid by the General Fund but are assumed to be paid in 2017.

98

CONFIDENTIAL

# Summary Page – Financing Gap

## The following table presents a detailed summary of the Base Financing Gap after debt service and the financing gap after the measures identified in the Fiscal Plan

- Note that no U.S. government action related to equitable healthcare treatment is assumed below
- The incremental income from economic development below includes the potential benefits of a change in the Commonwealth's real economic trajectory in the Base Projections from negative 1.7% to an average of 0.1% growth, driven in part by $10 billion in new spending to promote stability and growth

| | | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | 2026P | Total 5 Yr | Total 10 Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 70 | **Financing Gap Pre-Debt Service, Pre-Measures** | 1,013 | (814) | (1,941) | (2,251) | (2,540) | (2,777) | (3,320) | (3,330) | (4,26) | (4,374) | (5,851) | (23,748) |
| | **Debt Service Net of Existing Reserves**[1] | | | | | | | | | | | | |
| 80 | Consolidated Interest | (2,373) | (2,316) | (2,259) | (2,166) | (2,118) | (2,060) | (2,025) | (0,974) | (0,972) | (1,916) | (11,217) | (21,160) |
| 81 | Consolidated Principal | (1,094) | (957) | (1,608) | (1,299) | (1,315) | (1,130) | (1,109) | (1,575) | (1,078) | (1,394) | (6,194) | (12,579) |
| 82 | Missed Principal and Interest Payments | (1,275) | – | – | – | – | – | – | – | – | – | (1,275) | (1,275) |
| 83 | TDF Guaranteed Debt Service[2] | (135) | (37) | (6) | (21) | (3) | (5) | (3) | (3) | (4) | (5) | (202) | (251) |
| 84 | Use of Existing Debt Service Reserves | 278 | 19 | – | – | – | – | – | – | – | – | 398 | 398 |
| 85 | **Total Debt Service Net of Existing Reserves** | (4,618) | (3,294) | (3,870) | (3,495) | (3,438) | (3,197) | (3,158) | (3,534) | (3,055) | (3,308) | (18,745) | (34,907) |
| 86 | **Total Estimated Financing Gap before Measures** | (3,603) | (3,408) | (5,813) | (5,744) | (5,978) | (5,974) | (6,258) | (7,084) | (7,171) | (7,682) | (24,547) | (58,76) |
| | **Improve Budgetary Controls and Fiscal and Economic Decision-Making** | | | | | | | | | | | | |
| 87 | Adopt Institute of Statistics / Planning Board Five-Year Plan | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (15) | (30) |
| 88 | Install New Accounting and Financial Systems | (30) | – | – | – | – | – | – | – | – | – | (30) | (30) |
| 89 | **Total Meas. Aimed at Improve Budg. Controls and Decision-Making** | (33) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (45) | (60) |
| | **Rationalize Expenditures and Tax Policy to Promote Efficiency** | | | | | | | | | | | | |
| | *Expense Measures* | | | | | | | | | | | | |
| | *Reduce Operating Costs* | | | | | | | | | | | | |
| 90 | Achieve Operational Efficiencies | – | 28 | 30 | 31 | 42 | 43 | 44 | 45 | 45 | 46 | 148 | 374 |
| 91 | Establish Centralized Procurement System | – | 80 | 86 | 120 | 130 | 132 | 182 | 137 | 129 | 131 | 380 | 1,035 |
| 92 | Employee Attrition Incl. Department of Education | – | 131 | 155 | 225 | 229 | 233 | 257 | 240 | 206 | 251 | 740 | 1,949 |
| 93 | Extend Law 66 / Implement Long-Term Budgetary Reform | – | 178 | 257 | 336 | 440 | 490 | 564 | 368 | 355 | 358 | 1,187 | 3,070 |
| 94 | *Reduce Operating Costs* | – | 397 | 526 | 725 | 807 | 798 | 780 | 781 | 772 | 766 | 7,455 | 6,364 |
| | *Right-Size Department of Education* | | | | | | | | | | | | |
| 95 | Execute School Consolidation Plan | – | 28 | 57 | 85 | 113 | 115 | 117 | 119 | 121 | 125 | 283 | 878 |
| 96 | Overhaul School-Based Management and Operations | – | 14 | 14 | 14 | 14 | 14 | 15 | 15 | 15 | 15 | 56 | 130 |
| 97 | *Right-Size Department of Education* | – | 42 | 71 | 99 | 127 | 129 | 131 | 134 | 136 | 139 | 339 | 1,008 |
| | *Control Healthcare Costs* | | | | | | | | | | | | |
| 98 | Implement Functional P31 at State Hospitals | (2) | 12 | 24 | 24 | 24 | 24 | 25 | 25 | 26 | 26 | 82 | 209 |
| 99 | Integrate Government Hospitals Into Single Organization | (2) | 13 | 15 | 15 | 15 | 15 | 16 | 16 | 16 | 16 | 83 | 185 |
| 100 | Implement STAR Ratings System and Scale Payments | – | 8 | 15 | 15 | 15 | 15 | 16 | 16 | 16 | 16 | 53 | 137 |
| 101 | Standardize Health Protocols and Impose Uniform Fee Schedules | – | 30 | 30 | 30 | 30 | 31 | 31 | 32 | 32 | 32 | 120 | 278 |
| 102 | Reduce Number of 330s as IPAs Under Mi Salud | – | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 20 | 40 |
| 103 | *Control Healthcare Costs* | (4) | 68 | 93 | 92 | 93 | 95 | 99 | 98 | 100 | 100 | 340 | 830 |
| | *Cut Governmental Subsidies* | | | | | | | | | | | | |
| 104 | Reduce Subsidies to Municipalities | – | – | 50 | 100 | 200 | 300 | 300 | 300 | 300 | 300 | 350 | 1,850 |
| 105 | Modify Special Laws Benefits | – | 47 | 46 | 45 | 44 | 43 | 42 | 41 | 46 | 39 | 182 | 587 |
| 106 | *Cut Governmental Subsidies* | – | 47 | 96 | 145 | 244 | 343 | 342 | 341 | 340 | 339 | 532 | 2,737 |
| | *Revenue Measures* | | | | | | | | | | | | |
| | *Implement and Enforce Tax Policy* | | | | | | | | | | | | |
| 107 | Leverage Tech and Training to Incr. Capture Rates and Improve Tax Admin | 10 | 41 | 56 | 65 | 67 | 67 | 97 | 97 | 67 | 97 | 259 | 574 |
| 108 | Restrict Use of Tax Amnesties and Closings | – | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 100 | 225 |
| 109 | Implement and Enforce Tax on Video Lottery Games | – | 55 | 70 | 81 | 77 | 73 | 72 | 69 | 68 | 64 | 295 | 620 |
| 110 | Address Upcoming Act 154 Revenue Cliff | – | 182 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 3,567 | 8,127 |
| 111 | *Implement and Enforce Tax Policy* | 10 | 600 | 1,113 | 1,135 | 1,131 | 1,126 | 1,125 | 1,123 | 1,120 | 1,118 | 3,989 | 9,605 |
| 112 | **Total Measures Aimed at Rationalizing Expenditures and Tax Policy** | 6 | 1,153 | 1,901 | 2,192 | 2,403 | 2,494 | 2,485 | 2,477 | 2,470 | 2,464 | 7,655 | 20,044 |
| | **Enact Structural Economic Measures and Invest in Growth** | | | | | | | | | | | | |
| 113 | Establish a Local EITC Program | – | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (600) | (1,350) |
| 114 | Pay Local Businesses for Past Services and Pay Tax Refunds | (585) | (272) | (272) | (272) | (272) | – | – | – | – | – | (1,655) | (1,655) |
| 115 | Build Deposits to Provide Confidence | (204) | (204) | (204) | (204) | (204) | – | – | – | – | – | (1,060) | (1,060) |
| 116 | Invest in Incremental Maintenance Capex over Run-Rate | (121) | (308) | (397) | (273) | (103) | (100) | (106) | (108) | (110) | (112) | (1,020) | (1,963) |
| 117 | Invest in Economic Growth Projects | (55) | (400) | (466) | (476) | (555) | (520) | (487) | (115) | (103) | (105) | (1,740) | (3,573) |
| 118 | **Total Measures Aimed at Enacting Structural Reform and Growth** | (974) | (1,564) | (1,499) | (1,385) | (1,091) | (570) | (443) | (373) | (363) | (366) | (6,514) | (8,627) |
| | **Protect Vulnerable Stakeholders** | | | | | | | | | | | | |
| 118 | Implement Pension System Reform | (150) | (160) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (110) | (681) | (1,205) |
| 119 | **Total Measures Aimed at Protecting Vulnerable Stakeholders** | (160) | (166) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (116) | (681) | (1,205) |
| 120 | **Total Measures Impact** | (1,167) | (580) | 3283 | 3687 | 3,193 | 3,804 | 3,922 | 3,987 | 3,987 | 3,979 | 3,415 | 10,014 |
| 121 | **Residual Est. Financing Gap after Measures ex. Growth** | (4,772) | (3,988) | (2,550) | (3,026) | (2,785) | (4,260) | (4,333) | (3,097) | (3,184) | (3,703) | (21,132) | (48,821) |
| 122 | Est. Incremental Income from Econ. Dev. and Structural Reforms | – | 202 | 510 | 501 | 718 | 939 | 1,185 | 1,427 | 1,622 | 1,792 | 1,761 | 8,707 |
| 123 | **Residual Est. Financing Gap after Measures Incl. Growth** | (4,772) | (3,786) | (3,040) | (2,556) | (2,068) | (3,531) | (3,500) | (3,670) | (3,572) | (3,921) | (22,371) | (39,034) |



(1) The debt service payment schedule is based in part on publicly available information from the GDB website and Bloomberg as well as information provided by Hacienda and GDB. All parties should consult the relevant governing debt documents to determine their own views as to the debt service obligations for the debt shown below. Note that, as in the Krueger Report, the following debt service payment schedule only summarizes bonded debt service for the entities included in the Fiscal Plan (with the exception of the 2013B GDB notes and GSA lines, both of which are private lending arrangements). Other debt service for private bank lines may be embedded in **99** the projections for certain component units and public corporations. Such amounts are not material.

(2) Includes debt service of certain TDF guaranteed bonds and loans.

# Exhibit 52

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

Case:17-03283-LTS Doc#:478-66 Filed:02/24/18 Entered:02/24/18 19:12:25 Desc:
Exhibit 53 Page 1 of 1

# Exhibit 53

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 54

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 55

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 56

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 57

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 58

COMMONWEALTH OF PUERTO RICO
# Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

| | |
|---|---|
| Guillermo A. Somoza Colombani<br>Secretary of Justice | Tel. (787) 723-4983<br>(787) 721-7771 |

December 13, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico  00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico  00940-2001

Attention:     Mr. Juan Carlos Batlle
                     President and Vice-Chairman of the Board

Inquiry No. 11-145-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales Tax Revenue Bonds, Senior Series 2011D, I hereby issue my opinion that:

1.     Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

2.     Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

CONFIDENTIAL                                                                                                      PR-INT-000018899

Case:17-03283-LTS   Doc#:478165   Filed:02/24/18   Entered:02/24/18 18:18:25   Desc:
Exhibit DX-GG Part 5   Page 231 of 541
Exhibit 58   Page 2 of 4

Inquiry No. 11-145-B
Page 2

3.      The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.      Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.      The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.      Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

CONFIDENTIAL

Inquiry No. 11-145-B
Page 3

7.     The Corporation is a duly constituted and validly existing independent
governmental instrumentality of the Commonwealth with the power to
receive revenues produced by the Dedicated Sales Tax, to issue bonds for
its corporate purposes, including the Permitted Uses, to adopt the
Resolution under which its bonds are issued and to pledge the Dedicated
Sales Tax to the repayment of such bonds.

8.     Act 91, as authority for the application of the Dedicated Sales Tax to the
Permitted Uses, satisfies the requirements of Section 9 of Article VI of the
Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the
Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

CONFIDENTIAL

# Exhibit 59

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 60

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 61

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 62

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 63

# Hawkins Delafield & Wood LLP

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

June 18, 2009

To Each of the Addressees Named on Exhibit A Hereto

We are acting as Bond Counsel to the Puerto Rico Sales Tax Financing Corporation (the "Corporation") in connection with its issuance on the date hereof of $4,118,153,700 aggregate principal amount at issuance of Sales Tax Revenue Bonds, First Subordinate Series 2009A and of $237,875,000 aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2009C (collectively, the "Series 2009 Bonds") pursuant to the provisions of resolutions adopted by the Corporation on July 13, 2007 and June 10, 2009 (collectively, as amended and supplemented to the date hereof, the "Resolution").

This opinion is rendered in connection with the issuance of the Series 2009A Bonds only and may not be relied upon in connection with any other series of Bonds or notes under the Resolution, including in particular the proposed issuance in the Commonwealth securities market of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009B, as to which other law firms are rendering opinions regarding the matters covered by this letter. Reliance on this opinion by persons and entities other than the addressees named on Exhibit A is also restricted as set forth in the last paragraph of this letter.

Pursuant to the provisions of the Resolution, the Series 2009 Bonds are primarily secured by a security interest granted by the Corporation in its receipts of a portion (and the right to receive the same) of the sales and use tax imposed by law in the Commonwealth of Puerto Rico (the "Commonwealth"). Pursuant to Act No. 91 of May 13, 2006, as amended ("Act 91"), the Corporation was created as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, and such portion of the sales and use tax (including the additional portions designated in amendments to Act 91), and the right to receive the same (referred to herein and in the Resolution as the "Pledged Sales Tax"), were by the terms of Act 91 made the property of the Corporation, and not the property of the Commonwealth Treasury, in consideration for provision by the Corporation of bond proceeds and other funds to be applied for the various purposes stated in Act 91.

1

557064.5 032563 OPN

PR-INT-000020410

Section 8 of Article VI of the Constitution of Puerto Rico provides that "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Section 2 of Article VI of the Constitution of Puerto Rico provides in the last paragraph thereof that "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." These provisions of the Constitution of Puerto Rico are sometimes referred to herein as the "Specified Constitutional Provisions." The official English version of the Specified Constitutional Provisions uses the term "available revenues including surplus," but this letter will refer to "available resources including surplus" in translation of the term "recursos" used in the official Spanish version of the provisions. The questions addressed by this letter are whether Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, whether said asset and right do not constitute "available resources including surplus" for purposes of the Specified Constitutional Provisions and therefore are not subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "claw-back") in the event total available resources including surplus for a particular fiscal year are not sufficient for the purposes of meeting appropriations in that fiscal year, and whether Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

We are members of the bar of several states, including the State of New York, and do not express any opinion with respect to the laws of any jurisdiction other than the laws of the United States and of such states as to which we are members of the bar. In particular, we are not members of the bar of the Commonwealth of Puerto Rico. We note that the Corporation and we have received opinion letters, of even date herewith and addressed to the Corporation, from the Secretary of Justice of Puerto Rico (and received an opinion letter dated July 31, 2007 from the prior Secretary of Justice on prior transactions of the Corporation) and the law firm of Pietrantoni Mendez & Alvarez LLP, which is acting as Underwriters' Counsel (the "Puerto Rico Counsel") with respect to, among other things, matters governed by the laws of Puerto Rico. In rendering the opinions expressed herein, we are relying, with the consent of Puerto Rico Counsel, on certain conclusions governed by Puerto Rico law (described below) contained in the letter of Puerto Rico Counsel.

Act 91 creates the Corporation as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth. Act 91 creates a special fund to be known as the Dedicated Sales Tax Fund, to be administered by GDB, and transfers the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and "all the future funds that must be deposited therein pursuant to the provisions of [Act 91]," to the Corporation as property of the Corporation. This transfer is made in consideration for the Corporation's commitment to pay, or establish mechanisms to pay, the debts or obligations of the Commonwealth set forth in Article 2(b) of Act 91 with net proceeds of bonds issued by the Corporation and with the other funds and resources available to the Corporation. The Dedicated Sales Tax Fund is required by the terms of Act 91 to be funded in each fiscal year by the first collections of a portion of the sales and use tax imposed by law in

2

557064.5 032563 OPN

the Commonwealth, with the portion relevant to this opinion (the Pledged Sales Tax) being generally equal to the greater of (i) the product of the amount of the tax collected during such fiscal year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%), and the denominator of which is five and one-half percent (5.50%), and (ii) an amount of such receipts equal to a fixed base amount stated in Act 91 for each fiscal year as adjusted in accordance with the provisions of Act 91. Act 91 requires that the Pledged Sales Tax shall "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the General Fund of the Commonwealth of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico." In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

We are relying on the conclusions of Puerto Rico Counsel that the questions addressed by this letter have never been addressed by the Supreme Court of Puerto Rico and that there is no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention. We are also relying on the conclusions of Puerto Rico Counsel that there are no precedents in Puerto Rico cases controlling or directly on point with the questions addressed in this letter. We note the statements made by Puerto Rico Counsel in their letter that the Puerto Rico Supreme Court has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. We have reviewed applicable precedent in other jurisdictions, including especially the State of New York, and we find strong precedent for confirmation that certain revenues can by law be collected and held, away from "available resources including surplus." See, in particular, *Saratoga Harness Racing v. Agriculture,* 238 N.E. 2d 730 (New York Court of Appeals, 1968), *Quirk v. Municipal Assistance Corporation for the City of New York,* 363 N.E. 2d 549 (New York Court of Appeals, 1977), *Local Government Assistance Corp. v. Sales Tax Asset Receivable Corporation,* 813 N.E. 2d 587 (New York Court of Appeals, 2004), and *Anderson v. Regan,* 425 N.E. 2d 792 (New York Court of Appeals, 1981). In the face of a New York constitutional provision prohibiting the expenditure of state funds except pursuant to appropriation by the state legislature, the court in *Saratoga* approved the law which requires certain receipts due from racing associations to be delivered to a special development fund to be held away from the state's general treasury (stating that even though these receipts had been a source of substantial revenue over the years for the support of government, "there is nothing in [the constitutional provision] which requires that all revenue in excess of expenses be devoted to the direct support of government..."). In the *Quirk* case and in response to the New York City fiscal crisis in the middle 1970s, a New York City sales tax, historically an important revenue source for the City, was suspended and an identical sales tax was imposed by the State of New York which by law was to be delivered to the newly-created New York City Municipal Assistance Corporation ("MAC") to be pledged as security for MAC bonds. In the face of a New York constitutional provision, very similar to the Specified Constitutional Provisions in Puerto Rico, that requires that if appropriations by a municipality are not sufficient for the purpose of payment of debt service on the municipality's general obligation

3

557064.5 032563 OPN

PR-INT-000020412

bonds then the "first revenues thereafter received" must be applied to the payment of those bonds, the court stated that "this 'first lien' on the city's revenues does not give bondholders the right to insist that any particular existing taxes be maintained or new ones imposed to produce those revenues." In addition, in the *Anderson* case, the court was persuaded that the mechanics of deposit and holding of funds were important factors in determining whether funds belonged to the general treasury and were subject to state constitutional restrictions. In *Anderson*, certain federal grant funds were held in the state's general treasury ("for convenience") and the legislature never expressly designated them as "off budget" funds. By contrast, the court noted, the funds in the *Saratoga* case, as to which constitutional requirements for appropriation were not imposed by the court, never became funds of the state treasury and were immediately deposited in a separate fund to be administered by a separate public benefit corporation.

"Public debt," as referenced in the Specified Constitutional Provisions, refers to debt of the Commonwealth as to which the full faith, credit and taxing power of the Commonwealth are pledged. The general meaning of these terms in jurisdictions across the country is that the governmental body will exercise all of its revenue-producing powers, including the power of taxation, to assure payment of its general obligation debt. As noted in *Flushing National Bank v. Municipal Assistance Corporation*, 358 N.E. 2d 848 (New York Court of Appeals, 1976), "the effect of such pledge of 'full faith and credit' is not to create a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds, but is to acknowledge an indebtedness for the amount of money received as a consideration for the bonds..." See, also, cases such as *Highway District No. 1 v. Fremont County*, 185 P. 66 (Idaho S. Ct. 1919) (road and bridge taxes assessed and collected by a highway district were reduced subsequent to a district bond issue, but bondowners were not impaired because the law provided that the highway district was to pay its bonds from a levy of property tax). As a factual matter, we note that representatives of the Government of Puerto Rico have on many occasions stated, and the statement of motives of Act No. 1 of January 14, 2009, which amended Act 91, also recites, that this transaction is intended to deal with the unprecedented magnitude of the fiscal and budgetary crisis currently facing the Commonwealth, and to address in a positive manner the Commonwealth's recurring financial structural imbalances and budgetary concerns. Attainment of that goal is expected to inure to the benefit of general creditors of the Commonwealth including the holders of its public debt.

We note as a supplemental matter that Act 91 and this transaction by the Corporation are generally structured in the same fashion as securitizations of governmental cash flows undertaken across the country where, typically, a property right is identified by legislation and the governmental entity exercises its inherent and explicit right to convey property for adequate consideration. Such transactions are typified by the securitizations of tobacco settlement revenues, the Puerto Rico version of which was the Children's Trust transaction. In Children's Trust, the Commonwealth's right to receive tobacco settlement revenues from tobacco companies for a defined period of years, otherwise deliverable to the General Treasury of the Commonwealth, was assigned to a trust in consideration for the trust's issuance of bonds and application of the proceeds for a specified purpose. Here, while the Pledged Sales Tax will be free of the Specified Constitutional Provisions, the consideration for legislative conveyance of the Pledged Sales Tax to the Corporation (the proceeds of the issuance of the Corporation's bonds) will be delivered to the Commonwealth General Treasury for the payment of the purposes

4

PR-INT-000020413

stated in Act 91 and will be made fully subject to the Specified Constitutional Provisions. We are sensitive to the application of these principles to the conveyance of a traditional tax revenue as was noted by the Alaska Supreme Court in *Myers v. Alaska Housing Finance Corporation*, 68 P. 3d 386 (Supreme Court of Alaska, 2003) (including, as a factor in upholding the constitutionality of the sale of tobacco settlement revenues, that such revenues did not constitute traditional kinds of state revenues, like taxes) and the sale of substantially all of the revenues of a governmental entity (in the *Quirk* case, the court noted that "a different case would be presented" if the city were by the subject legislation stripped of all revenue sources other than its property tax). We note, though, as a factual matter, that the Pledged Sales Tax was created by legislation which assigned it to the Corporation specifically for the purposes stated in Act 91 and is never to be included in the General Treasury, and it represents a portion of the total of the Commonwealth's sales and use tax, which in turn is a portion of the total revenues of the Commonwealth budget.

We note also that Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico. Thus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely. This is clearly disclosed in the Corporation's Official Statement (as supplemented by the Supplement thereto) relating to the issuance of the Series 2009 Bonds.

In rendering this opinion, we considered legal theories that an opponent of this transaction would advance in an attempt to make the Specified Constitutional Provisions applicable to the assignment of the Pledged Sales Tax to the Corporation. The outcome of any challenge to this transaction cannot be predicted with certainty. It is also of significance that there are at present no Puerto Rico precedents controlling or directly on point. We note that a court's decision regarding the matters upon which we are opining herein would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. Thus, different conclusions could be reached by a court and would not necessarily constitute reversible error. Consequently, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. This opinion is not a guaranty, warranty or representation, but is merely this law firm's informed judgment as to a specific question of law.

Based upon and subject to the foregoing, as of the date hereof, we are of the opinion that a court, applying existing legal principles to the facts as properly found after appropriate briefing and argument, would find that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that said asset and right of the Corporation shall not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

557064.5 032563 OPN

PR-INT-000020414

The opinion expressed herein is based on an analysis of existing laws and court decisions. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law), after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

This opinion letter, which is summarized in the Corporation's Official Statement (and incorporated by reference in the Supplement thereto) relating to the issuance of the Series 2009 Bonds, is rendered for the sole and exclusive benefit of each addressee hereof specified in Exhibit A, and no other person or entity (including present and future Bondowners) is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Series 2009 Bonds upon their request, or may otherwise be posted on an Internet web site maintained by the Corporation or Government Development Bank for Puerto Rico, but no attorney-client relationship exists between any such investor or any person reviewing such postings and Hawkins Delafield & Wood LLP and none of such investors or other persons are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity other than those addressees specified in Exhibit A, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document other than said Official Statement.

Very truly yours,

Hawkins Delafield + Wood LLP

6

557064.5 032563 OPN

PR-INT-000020415

<u>ADDRESSEES</u>

Puerto Rico Sales Tax Financing Corporation

Moody's Investors Service

Standard & Poor's Ratings Services

FitchRatings

Underwriters of the Series 2009 Bonds, represented by Citigroup Global Markets Inc.

7

557064.5 032563 OPN

PR-INT-000020416

# Exhibit 64

Withheld pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 65

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 66

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 67

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

Exhibit 68 Page 1 of 1

# Exhibit 68

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 69

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 70



# NIXON PEABODY LLP
ATTORNEYS AT LAW

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

October 22, 2013

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

Attached is a copy of the opinion we delivered as Bond Counsel to the Puerto Rico Sales Tax Financing Corporation ("COFINA") on December 13, 2011 (the "Opinion") relating to the treatment of the Pledged Sales Tax (as such term is defined in the Opinion) under the Constitution of the Commonwealth of Puerto Rico. We hereby consent to the Opinion being made available on the Government Development Bank website and to the filing of this Opinion on the EMMA system. **This Opinion is being made available for informational purposes only.**

We note that the Opinion is subject to all of the qualifications and assumptions set forth therein and that, in the absence of Puerto Rico precedents which are controlling or directly on point, the Opinion relies entirely on precedents from other jurisdictions.

No purchaser or holder of COFINA securities is entitled to rely on the Opinion and no advice under such Opinion is rendered to any such purchaser or holder of COFINA securities. Purchasers or holders of COFINA securities should consult their own legal advisors as to (a) such legal advisor's own analysis and conclusions of the treatment of the Pledged Sales Tax, (b) any current laws and court decisions which could adversely affect the conclusions of the Opinion and (c) any changes or amendments, since the date of the Opinion, to (i) COFINA's authorizing act or (ii) the collection, treatment, suspension, limitation or exemption of the Commonwealth's sales and use tax.

An opinion of counsel is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, an opinion is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law. Opinions of counsel are not binding on any court or party to a court proceeding. A court's decision regarding the matters upon which a lawyer is opining would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles.

Respectfully submitted,

*Nixon Peabody LLP*

14684064.1

CONFIDENTIAL

PR-CCD-0405640



NIXON PEABODY LLP
ATTORNEYS AT LAW

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

December 13, 2011

To Each of the Addressees Named on Exhibit A Hereto

We are serving as Bond Counsel to the Puerto Rico Sales Tax Financing Corporation (the "Corporation") in connection with its issuance on the date hereof of $1,006,474,702 aggregate principal amount at issuance of Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds") and $91,155,000 aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D Bonds," and together with the Series 2011C Bonds, the "Series 2011 Bonds") pursuant to the provisions of certain resolutions adopted by the Corporation on July 13, 2007 and December 1, 2011 (collectively, as amended and supplemented to the date hereof, the "Resolution").

**The Corporation.** Act No. 91 of May 13, 2006, as amended ("Act 91"), created the Corporation as a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth. P.R.LAWS ANN. TIT. 13, § 12 (2006). The Corporation was created to address a financial and economic situation that Act 91 describes as one of the worst fiscal crises in the Commonwealth's history. The Board of Directors of the Corporation is the Board of Directors of the Government Development Bank for Puerto Rico ("GDB").

**The Bonds.** The Series 2011 Bonds are primarily secured by a security interest granted by the Corporation in its receipts of a portion (and the right to receive the same) of the sales and use tax imposed by law in the Commonwealth. Such portion of the sales and use tax (including the additional portions designated in amendments to Act 91), and the right to receive the same (referred to herein and in the Resolution as the "Pledged Sales Tax"), were, by the terms of Act 91, made the property of the Corporation, and not the property of the Commonwealth Treasury.

**The Special Fund.** Act 91 creates a special fund (to be known as the Dedicated Sales Tax Fund), to be administered by GDB, and transfers the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and "all the future funds that must be deposited therein pursuant to the provisions of [Act 91]," to the Corporation as property of the Corporation. This transfer is made in consideration for the Corporation's commitment to pay, or establish mechanisms to pay, the debts or other obligations of the Commonwealth set forth in Article 2(b) of Act 91 with net proceeds of bonds issued by the Corporation and with the other funds and resources available to the Corporation.

13680383.3

CONFIDENTIAL

PR-CCD-0405641

Each of the Addresses Named             December 13, 2011
On Exhibit A Hereto                             Page 2

     The Dedicated Sales Tax Fund is required to be funded in each fiscal year by the first collections of a portion of the sales and use tax specified in Article 3 of Act 91 (the "Pledged Sales Tax"). Act 91 requires that the Pledged Sales Tax shall "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the General Fund of the Commonwealth of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."

     In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

     **Constitutional Provisions.** The Constitution of Puerto Rico provides that "in case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. CONST. ART. VI, §8. The Constitution of Puerto Rico also provides in the last paragraph of Section 2 of Article 4 thereof that "the Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." P.R. CONST. ART. VI, §2.

     These provisions of the Constitution of Puerto Rico are sometimes referred to herein as the "Constitutional Debt Priority Provisions." The official English version of the Constitutional Debt Priority Provisions uses the term "available revenues including surplus," but this opinion refers to "available resources including surplus" in translation of the term "recursos" used in the official Spanish version of the provisions.

     **Questions Addressed.** The questions addressed by this opinion are whether (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) said asset and right constitute "available resources including surplus" for purposes of the Constitutional Debt Priority Provisions and therefore are subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "claw-back") in the event total available resources including surplus for a particular fiscal year are not sufficient for the purposes of meeting appropriations in that fiscal year, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

     **Prior Opinions, Reliance.** We have received opinion letters, of even date herewith and addressed to the Corporation, from the Secretary of Justice of Puerto Rico (and the Corporation received opinion letters dated July 31, 2007, June 18, 2009, February 9, 2010, June 30, 2010, June 23, 2011 and November 23, 2011 from the Secretary of Justice on prior transactions of the

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL                                              PR-CCD-0405642

Corporation) and the law firm of Pietrantoni Mendez & Alvarez LLP, which is acting as Underwriters' Counsel (the "Puerto Rico Counsel") with respect to, among other things, matters governed by the laws of Puerto Rico. In rendering the opinions expressed herein, we are relying, with the consent of Puerto Rico Counsel, on certain conclusions governed by Puerto Rico law (described below) contained in the letter of Puerto Rico Counsel.

We are relying on the conclusions of Puerto Rico Counsel that the questions addressed herein have never been addressed by the Supreme Court of Puerto Rico, that (1) there is no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention, (2) there are no precedents in Puerto Rico cases controlling or directly on point with the questions addressed herein, (3) the Puerto Rico Supreme Court has consistently ruled that acts of the Legislature are entitled to a strong presumption of constitutionality and have traditionally showed substantial deference to the Legislature's judgment, especially in matters involving the use of public funds and the regulation of the economy and (4) the Supreme Court of Puerto Rico accords substantial persuasive weight to the opinions of the Secretary of Justice.

**Cases Reviewed.** The questions presented in this opinion essentially raise the issue of whether certain funds of the Commonwealth may validly be placed beyond the control of the legislative and executive branches of the Commonwealth such that they do not constitute available resources within the meaning of the Constitutional Debt Priority Provisions. This question has arisen in several jurisdictions, usually in the context of whether money becomes part of the state treasury such that the expenditure of such funds cannot be made without an appropriation.

In that context, it is useful to consider cases from other jurisdictions involving state constitutional provisions requiring, in one form or another, that all moneys or revenues received on account of or on behalf of the state from any source be paid into the state's treasury or general fund and spent only pursuant to an appropriation. Notwithstanding these provisions, legislatures have enacted laws over the years diverting specific revenues from the state treasury, dedicating them to a particular purpose and thereby making them unavailable for the general needs of the state, including the ability to pay general obligation bondholders. Court decisions analyzing legislative provisions diverting revenues from the state treasury and dedicating them, without annual appropriation, to a specified purpose form our framework for analyzing Act 91 in light of the Constitutional Debt Priority Provisions.

We have found no case that holds that state constitutional provisions of this type cover all revenues, notwithstanding that these constitutional provisions are often written in all inclusive language. In reviewing that state's provision, the Supreme Judicial Court of Massachusetts stated: "In spite of its language, art. 63 has never been conceived as without exceptions." Opinion of the Justices, 396 Mass. 1201, 1205 (1985).

The New York Court of Appeals stated:

> [N]ot every fund made up of public moneys raised by taxation or otherwise comes within purview of Section 7 of Article VII [the

13696742.2

NIXON PEABODY LLP

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 4

appropriation clause].  <u>Saratoga Harness Racing v. Agriculture</u>,
238 N.E.2d 730 (1968).[1]

   In reviewing legislation that makes exceptions to constitutional appropriation provisions,
courts have upheld such legislation when it contains certain features and struck down legislation
when all or several of those features are absent.  The characteristics identified below are not
present in all of the cases reviewed; however, in each case at least one of these elements is relied
on by the court.  The features that courts have identified as important are the following:

The legislation:

(1)   is enacted due to an urgent need;

(2)   impresses the revenues with a trust designated for particular beneficiaries and not
      for the public at large;

(3)   requires the revenues to be deposited into a special fund;

(4)   provides that the special fund be dedicated exclusively to specified purposes;

(5)   provides explicitly that the revenues not be received on account of the state, but
      rather, be received on account of the entity created to accomplish the specified
      purposes;

(6)   sets forth limitations and conditions governing the disbursement of the revenues,
      particularly to the effect that (a) the decision regarding the project or projects to
      be funded with the revenues be subject to varying degrees of legislative, executive
      or local government involvement or control and (b) the project involve traditional,
      central and basic governmental activities;

(7)   provides a monetary cap, either by dollar amount or formula, on the amount of
      revenues that may be diverted from the state treasury and spent without an
      appropriation; and

---

[1]   The New Jersey Supreme Court, in reviewing that state's constitutional provision, stated: "There is no general
mandate that all revenues generated by operation of every department or agency or authority of State
government be deposited in the general treasury. In fact, history negates such a view....[T]he omission to write
such a mandate into our 1947 charter seems to have been a studied one, and indicative of the purpose to permit
the Legislature to decide what revenues should go into the general fund." <u>New Jersey Sports & Exposition
Authority v. McCrane</u>, 292 A.2d 545, 553 (N.J. 1972).

The Washington Supreme Court stated: "Arguably the literal language of the constitution would require a
legislative appropriation to disburse any funds from the state treasury under the express words of [art. VIII,
section 4].  However, for many years, there has stood the commonsense interpretation by this court that the
Treasurer may be made custodian of particular funds of a proprietary nature which are held for a specific
purpose. Funds so held are distributable without specific legislative appropriation." <u>Municipality of Metro,
Seattle v. O'Brien</u>, 544 P.2d 729 (Wash. 1976).

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 5

(8)     provides that any debt secured by such revenues shall not constitute debt of the state.

Several examples illustrate the analysis courts have employed.

In Opinion of the Justices, the Supreme Judicial Court of Massachusetts considered a bill that would impose on specified business corporations a business infrastructure development assessment payable in the same manner and at the same time as the corporate excise tax. 471 N.E.2d 1266 (1984). The assessment revenues would be used to secure bonds issued by the Massachusetts Development Bank ("Mass/Bank") for infrastructure projects.

The court held that the bill did not violate a section of the Massachusetts Constitution stating that "[a]ll money received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof." In upholding the bill, the Court relied on, inter alia, provisions of the bill stating that the revenues would be received in trust for designated beneficiaries, dedicated exclusively to Mass/Bank, and disbursed solely in accordance with specified limitations and conditions for carefully defined public purposes.

Rulings from other jurisdictions reach similar conclusions:

- Friedman v. American Surety Co., 151 S.W.2d 570 (Texas 1941) - creation of an Unemployment Compensation Fund as a special fund, held in trust from its inception, separate and apart from State funds, administered by a state created commission, consisting of state excise taxes and providing that the excise taxes are never to be paid into the State Treasury and can be used only for specified purposes for particular beneficiaries does not violate constitutional provision that no money shall be drawn from the Treasury except pursuant to an appropriation;

- Saratoga Harness Racing, 238 N.E.2d 730 (N.Y. 1968) - statute authorizing funds derived from private racing associations authorized to be deposited at inception, not in the State Treasury, but in segregated accounts of the Agriculture and New York State Horse Breeding Development Fund and used only for specified purposes does not violate constitutional provision prohibiting expenditures of State funds without an appropriation;

- Baro v. Murphy, 207 N.E.2d 593 (Ill. 1965) - law enacted to meet a particular need dedicates revenues from State parks, previously deposited in the State Treasury, to be placed in a special trust fund to secure bonds of the State Parks Revenue Bond Commission and used only for specified purposes where state debt is not created does not violate a constitutional provision prohibiting continuing appropriations of State funds. "[The court] upheld the power of the legislature to divert revenues, other than taxes and fees of State officers to a special use, and to eliminate them from the State Treasury." Id. at 462;

- Graham v. Illinois State Toll Highway Authority, 695 N.E.2d 360 (Ill. 1998) - toll revenues, but not state taxes or fees, could be spent without annual legislative

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 6

appropriation where the revenues are held in a special fund disbursed only for the
purposes specified in the statute and state debt is not created, does not violate a
constitutional requirement that the state budget set forth the estimated balance of
funds available for appropriation of every department, authority and public
corporation of the state and that the General Assembly make appropriations for all
expenditures of public funds by the state;

- Tatum v. Wheeless, 178 So. 95 (Miss. 1938) – excises levied by the state
legislature on employers doing business in the state and deposited into a trust fund
outside the state treasury for the benefit of specific beneficiaries (employees) not
subject to Mississippi's constitutional appropriation provision;

- Gipson v. Ingram, 223 S.W.2d 595 (Ark. 1949) – state's appropriation provision
refers only to state money that actually reaches the state treasury and does not
apply to money collected by state agencies and, pursuant to legislation, held in a
separate trust fund and pledged for the benefit of specific beneficiaries;

- New Jersey Sports & Exposition Authority, 292 A.2d 545 (N.J. 1972) - devotion
of revenues from pari-mutuel horse racing wagering to public authority to secure
its debt and used only for specified purposes where State debt is not created does
not violate constitutional appropriation clause prohibiting drawing of money from
State Treasury except by annual appropriation;

- Hickel v. Cowper, 874 P.2d 922 (Alaska 1994) – court upheld statute defining
"amount available for appropriation" for purposes of a constitutional provision
authorizing appropriations from a budget reserve fund when the amount available
for appropriation is less than the amount appropriated in the previous year, stating
it does not include funds established by the legislature, dedicating funds pursuant
to an appropriation to a particular use and authorizing their expenditure without
further legislative action, such as the oil and hazardous substance release response
fund and seven other funds; amounts available for appropriation includes "all
funds over which the legislature has retained the power to appropriate." Id. at
927;

- King County v. Taxpayers of King County, 949 P.2d 1260 (Wash. 1997) -
legislation for assisting King County in financing a new stadium for the Seattle
Mariners imposes a sales and use tax and authorizes the revenues therefrom to be
used solely to secure bonds issued to finance the stadium and related purposes is
upheld against claim that the tax is unconstitutionally diverted to the County in
violation of state constitutional provision requiring an appropriation for all state
money where the purpose for which the funds can be expended is prescribed by
statute and the money is paid into a special fund.

Courts have invalidated legislation making exceptions to constitutional appropriation
requirements in situations where several of the above described features were absent. In Opinion
of the Justices, the Supreme Judicial Court of Massachusetts invalidated a legislative effort to

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL

PR-CCD-0405646

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 7

dedicate funds for the benefit of the Massachusetts Convention Center Authority ("MCCA"). 396 Mass. 1201 (1985). The court found that the proposed legislation failed to provide a significant limit on the purposes for which the MCCA could expend the dedicated revenue. The court distinguished the MCAA legislation from the Mass/Bank bill which required specified State, local and executive control over Mass/Bank's expenditure of funds. The court also faulted the MCCA legislation on the ground that convention centers are not the "traditional, central and basic governmental activities that were the basis of the Mass/Bank proposal." Id. at 1210.

Act 91 follows the Mass/Bank structure rather than the MCCA model. Act 91 requires the Corporation to transfer the proceeds of its bonds and notes to the Commonwealth to allow the Commonwealth to pay its debt and other obligations specified in Article 2(b) of Act 91 (the "Commonwealth Obligations"). The Corporation is authorized to spend the funds assigned to it solely to pay its bonds and notes, related financing expenses and its own operating expenses, and for no other purposes. As such, all expenditures of the Corporation's obligations and of revenues paid to the Corporation are to support public purposes decided by appropriate Commonwealth officials following the provisions specified in the Constitution and laws of the Commonwealth for the incurrence of the Commonwealth Obligations.

While the purposes of Commonwealth Obligations may include public facilities such as convention centers or other purposes which the Massachusetts court considers not traditional, central and basic governmental activities, we believe the more important consideration is the level of executive or legislative control in determining expenditures. We also note that other courts have not followed Massachusetts in restricting exceptions from appropriation or available revenues provisions to traditional governmental activities.

In Anderson v. Regan, 425 N.E. 2d 792 (N.Y. 1981), the court reviewed a practice of the State executive branch of placing Federal funds in the State treasury and disbursing them without an appropriation. Noting that there has been "little or no legislative participation in the expenditure of Federal moneys" and that the Federal funds are placed in the State Treasury, the court held the practice violates New York's constitutional appropriation provision: "When the appropriation rule is bypassed . . . the Legislature is effectively deprived of its right to participate in the spending decisions of the State, and the balance of power is tipped irretrievably in favor of the Executive branch." Id. at 797.

The court contrasted the situation in Anderson with Saratoga Harness Racing. In Saratoga Harness Racing the money at issue never became the property of the state and was never placed in the state treasury. Rather, the money was deposited in a separate fund administered by a "legislatively created public benefit corporation." Id. at 793. The lack of accountability and legislative oversight that raised serious concerns for the court in Anderson was not present in the Saratoga Harness Racing context.

Other examples where courts have invalidated legislation diverting revenues in light of constitutional provisions similar to the Constitutional Debt Priority Provisions include the following: Opinion of the Justices, 300 Mass. 630 (1938) (specified revenue stream not dedicated at time of its creation); Opinion of the Justices, 334 Mass. 716 (1956) (hunting and fishing license and permit fees not impressed with a trust); Dallas County v. McCombs, 140

13696742.2

NIXON PEABODY LLP

S.W. 2d 1109 (Tex. 1940) (general ad valorem taxes levied and collected as state revenues could not be diverted).

One of the questions that arises in certain cases is whether it is significant that the money being diverted constitutes tax revenues.[2]  Whether the revenues involved are tax revenues or non-tax revenues should not be controlling.  This is particularly true with respect to sales and use taxes where the legislature retains the right to abolish the tax entirely, to reduce it or to direct it to another purpose.  The critical feature that courts have relied on in reviewing legislation of this type is whether the decision regarding the control over the tax revenues rests with the legislative branch.  See e.g., Opinion of the Justices, 334 Mass. 716 (1956), supra, Taxpayers of King County., supra, Friedman., supra.

A separate element of the analysis involves the question of whether owners of the Commonwealth's public debt have a lien or claim on any particular revenues of the Commonwealth such that the diversion of those revenues would constitute an impairment of contract under the contract clause of the Federal Constitution (Art. I, § 10) and the Puerto Rico Constitution (Art. II, § 7).

"Public debt," as referenced in the Constitutional Debt Priority Provisions, refers to debt of the Commonwealth as to which the full faith, credit and taxing power of the Commonwealth are pledged.  The general meaning of these terms in jurisdictions across the country is that the governmental body will exercise all of its revenue-producing powers, including the power of taxation, to assure payment of its general obligation debt.  As noted in Flushing National Bank v. Municipal Assistance Corporation, 358 N.E. 2d 848 (New York Court of Appeals, 1976), "the effect of such pledge of 'full faith and credit' is not to create a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds, but is to acknowledge an indebtedness for the amount of money received as a consideration for the bonds...."  See also, Highway District No. 1 v. Fremont County, 185 P. 66 (Idaho S. Ct. 1919) (road and bridge taxes assessed and collected by a highway district were reduced subsequent to a district bond issue, but bondowners were not impaired because the law provided that the highway district was to pay its bonds from a levy of property tax).

In Quirk v. Municipal Assistance Corporation, 363 N.E. 2d 549 (N.Y. 1977) the court reviewed state legislation, enacted in response to the New York City fiscal crisis in the mid-1970s, that suspended a New York City sales tax, and imposed an identical state sales tax for the benefit of a newly-created New York City Municipal Assistance Corporation ("MAC") to be pledged as security for MAC bonds.  This matter involved a New York constitutional provision,

---

[2]  One of the cases that holds that tax revenues cannot be diverted involved general ad valorem tax revenues that were to be used for general governmental purposes. Dallas County v. McCombs, 140 S.W. 2d 1109 (Tex. 1940). See also Green v. Black, 186 N.E. 462 (Ill. 1933). Other cases, in dicta, have suggested that the conclusion reached might or would be different if tax revenues were involved. See e.g., Tatum, Gibson, Baro v. Murphy, supra, Myers v. Alaska Housing Finance Corporation, 68 P.3d 386 (Alaska 2003) (including as a factor in upholding the constitutionality of the sale of tobacco revenues, that such revenues did not constitute traditional kinds of state revenues, like taxes).

13696742.2

NIXON PEABODY LLP

similar to the Constitutional Debt Priority Provisions in Puerto Rico, that requires that if appropriations by a municipality are not sufficient for the purpose of payment of debt service on the municipality's general obligation bonds then the "first revenues thereafter received" must be applied to the payment of those bonds. The court stated that "this 'first lien' on the city's revenues does not give bondholders the right to insist that any particular existing taxes be maintained or new ones imposed to produce those revenues."

In Quirk, the court noted that "a different case would be presented" if the legislation stripped the city of all revenue sources other than its property tax. We note that the Pledged Sales Tax assigned to the Corporation represents a portion of the total of the Commonwealth's sales and use tax, which in turn is a portion of the total revenues of the Commonwealth's budget.

**Characteristics of Act 91.** When Act 91 is reviewed in light of the relevant precedent, we find that the Act is structured to include virtually all of the elements that courts have relied on in upholding legislation against a claim that the legislature acted unconstitutionally in diverting a particular revenue stream:

1. Urgent Need. Act 91 was enacted due to one of the worst fiscal crises in the history of Puerto Rico with a budgetary deficit of $3.2 billion. (Statement of Motives, Act. No. 1 of January 14, 2009)

2. Impressed with a Trust. Section 3 impresses the Pledged Sales Tax with a trust from the moment of their receipt in the Dedicated Sales Tax Fund and dedicates those moneys as security for particular beneficiaries, that is, owners of the Corporation's bonds and notes.

3. Special Fund. Section 3 establishes a special fund to be known as the Dedicated Sales Tax Fund, to be administered by GDB and provides that all moneys deposited in the Fund shall be the property of the Corporation.

4. Specified Purposes. The purposes of the Corporation and the use of its funds are expressly set forth in Sections 2(b) and (d) and are limited to paying or financing the specific purposes or projects described therein.

5. Not Commonwealth Revenue. Section 3 provides explicitly that the money shall be deposited in the Fund upon receipt and shall not be deposited in the Treasury of Puerto Rico nor shall it constitute resources available to the Commonwealth nor shall it be available for use by the Secretary of the Treasury.

6. Limitations and Conditions. Article 4 specifies the exclusive purposes for which the Corporation's revenues may be used. Since the Corporation is primarily a financing corporation established to finance or refinance Commonwealth projects or Commonwealth Obligations, the Corporation does not independently review all of the projects financed or refinanced through its activities. However, each of these projects or purposes has been authorized pursuant to a legislative enactment, including Act 91.

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL

Each of the Addresses Named                                    December 13, 2011
On Exhibit A Hereto                                                      Page 10

      7.    <u>Monetary Cap</u>. Section 3 specifies the portion of the tax that shall be deposited to the Fund and in so doing places a cap on the amount of revenues that can be used for the Corporation's purposes.

      8.    <u>Not Commonwealth Debt</u>. Section 4(d) makes clear that the obligations of the Corporation shall not constitute a debt of the Commonwealth nor shall the Commonwealth have any liability thereon.

We note as a supplemental matter that Act 91 and this transaction by the Corporation are generally structured in the same fashion as securitizations undertaken across the country of governmental cash flows which, while not tax revenues, typically involve a property right which is identified by legislation and where the governmental entity exercises its inherent and explicit right to convey property for adequate consideration. Such transactions are typified by the securitizations of tobacco settlement revenues, the Puerto Rico version of which was the Children's Trust transaction.

In Children's Trust, the Commonwealth's right to receive tobacco settlement revenues from tobacco companies for a defined period of years, otherwise deliverable to the General Treasury of the Commonwealth, was assigned to a trust in consideration for the trust's issuance of bonds and application of the proceeds for a specified purpose. Here, while the Pledged Sales Tax will be free of the Constitutional Debt Priority Provisions, the consideration for legislative conveyance of the Pledged Sales Tax to the Corporation (the proceeds of the issuance of the Corporation's bonds) will be delivered to the Commonwealth General Treasury for the payment of the purposes stated in Act 91 and will be made fully subject to the Constitutional Debt Priority Provisions.

We note also that Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico. Thus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely. This is clearly disclosed in the Corporation's Official Statement relating to the issuance of the Series 2011 Bonds.

In rendering this opinion, we considered legal theories that an opponent of this transaction would advance in an attempt to make the Constitutional Debt Priority Provisions applicable to the assignment of the Pledged Sales Tax to the Corporation. The outcome of any challenge to this transaction cannot be predicted with certainty. It is of significance that there are at present no Puerto Rico precedents controlling or directly on point. We note that a court's decision regarding the matters upon which we are opining herein would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. Thus, different conclusions could be reached by a court and would not necessarily constitute reversible error. Consequently, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. This

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL
PR-CCD-0405650

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 11

opinion is not a guaranty, warranty or representation, but is merely this law firm's informed judgment as to a specific question of law.

**Opinion**. Based upon and subject to the foregoing, as of the date hereof, we are of the opinion that a court, applying existing legal principles to the facts as properly found after appropriate briefing and argument, would find that (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) said asset and right of the Corporation shall not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico and therefore are not subject to a first claim by the owners of public debt of the Commonwealth in the event total available resources including surplus for a particular fiscal year are not sufficient for the purposes of meeting appropriations in that fiscal year and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

The opinion expressed herein is based on an analysis of existing laws and court decisions. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law), after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

This opinion letter, which is summarized in the Corporation's Official Statements relating to the issuance of the Series 2011 Bonds, is rendered for the sole and exclusive benefit of each addressee hereof specified in Exhibit A, and no other person or entity (including present and future Bondowners) is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Series 2011 Bonds upon their request, or may otherwise be posted on an Internet web site maintained by the Corporation or GDB, but no attorney-client relationship exists between any such investor or any person reviewing such postings and Nixon Peabody LLP and none of such investors or other persons are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity other than those addressees specified in Exhibit A, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document other than said Official Statements.

Very truly yours,

*Nixon Peabody LLP*

13696742.2

NIXON PEABODY LLP

Each of the Addresses Named                                    December 13, 2011
On Exhibit A Hereto                                                       Page 12

Exhibit A – Addressees

Puerto Rico Sales Tax Financing Corporation

Moody's Investors Service

Standard & Poor's Ratings Services

Fitch Ratings

Underwriters of the Series 2011C Bonds represented by Citigroup Global Markets Inc.

Underwriters of the Series 2011D Bonds represented by Santander Securities Corporation

13696742.2

NIXON PEABODY LLP

CONFIDENTIAL                                                      PR-CCD-0405652

# Exhibit 71

PIETRANTONI MENDEZ & ALVAREZ LLC

POPULAR CENTER 19TH FLOOR
208 PONCE DE LEON AVENUE
SAN JUAN, PUERTO RICO 00918

TEL: (787) 274-1212
FAX: (787) 274-1470
WWW.PMALAW.COM

October 22, 2013

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

Attached is a copy of the opinion we delivered as Underwriters' Counsel to the Puerto Rico Sales Tax Financing Corporation ("COFINA") and the Underwriter Representatives on December 13, 2011 (the "Opinion") relating to the treatment of the Pledged Sales Tax (as such term is defined in the Opinion) under the Constitution of the Commonwealth of Puerto Rico. We hereby consent to the Opinion being made available on the website of Government Development Bank for Puerto Rico and to the filing of this Opinion on the EMMA system. **This Opinion is being made available for informational purposes only. No purchaser or holder of COFINA securities is entitled to rely on the Opinion and no advice under such Opinion is rendered to any such purchaser or holder of COFINA securities.**

We note that the Opinion is subject to all of the qualifications and assumptions set forth therein and that, in the absence of Puerto Rico precedents which are controlling or directly on point, the Opinion relies entirely on precedents from other jurisdictions.

Purchasers or holders of COFINA securities should consult their own legal advisors as to (a) such legal advisor's own analysis and conclusions of the treatment of the Pledged Sales Tax, (b) any current laws and court decisions which could adversely affect the conclusions of the Opinion and (c) any changes or amendments, since the date of the Opinion, to (i) COFINA's authorizing act or (ii) the collection, treatment, suspension, limitation or exemption of the Commonwealth's sales and use tax.

An opinion of counsel is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law. Opinions of counsel are not binding on any court or party to a court proceeding. A court's decision regarding the matters upon which a lawyer is opining would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles.

Respectfully submitted,

Pietrantoni Mendez & Alvarez LLC

PR-CCD-0405455

PIETRANTONI MENDEZ & ALVAREZ LLC
POPULAR CENTER 19TH FLOOR
208 PONCE DE LEON AVENUE
SAN JUAN, PUERTO RICO 00918

TEL: (787) 274-1212
FAX: (787) 274-1470
WWW.PMALAW.COM

December 13, 2011

To:     Each of the Addressees Named on Exhibit A hereto

This opinion is being provided in connection with the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation") on the date hereof of $1,006,474,702 aggregate initial principal amount of its Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds") and $91,155,000 initial aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D and, together with the Series 2011C Bonds, the "Offered Bonds").

This opinion is rendered in connection with the issuance of the Offered Bonds only and may not be relied upon in connection with any other series of Bonds or notes under the Resolution referred to below. Reliance on this opinion by persons and entities other than the addressees identified in Exhibit A is restricted as set forth in the last paragraph of this letter.

**The Corporation.** The Corporation is a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of May 13, 2006, as amended ("Act 91").

**The Offered Bonds and the Resolution.** The Offered Bonds are being issued pursuant to the provisions of resolutions adopted by the Corporation (collectively, as amended and supplemented to the date hereof, the "Resolution").

Pursuant to the provisions of Act 91 and the Resolution, the Offered Bonds are primarily secured by a security interest granted by the Corporation in receipts of a portion (and the right to receive the same) of the sales and use tax imposed by the Commonwealth. Such portion of the sales and use tax and the right to receive the same (referred to herein collectively as the "Pledged Sales Tax"), are by the terms of Act 91 made the property of the Corporation.

Under the terms of the Resolution, the lien on the Pledged Sales Tax granted to the holders of the Offered Bonds will be on a parity with the lien on the Pledged Sales Tax granted to the holders of the Sales Tax Revenue Bonds and senior to the lien on Pledged Sales Tax granted to the holders of the Sales Tax Revenue Bonds issued by the Corporation as First Subordinate Bonds.

PR-CCD-0405456

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 2 of 9

**Constitutional Provisions.** Section 8 of Article VI of the Constitution of Puerto Rico (the "Constitution") provides that "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Section 2 of Article VI of the Constitution provides in its last paragraph that "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." These provisions of the Constitution are sometimes referred to herein as the "Constitutional Debt Priority Provisions." The official English version of the Constitutional Debt Priority Provisions uses the term "available *revenues* including surplus," but this opinion will refer to "available *resources* including surplus" as the translation of the term "recursos" used in the official Spanish version of the Constitution.

**Opinion Requested.** You have asked for our opinion as to whether (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" for purposes of the Constitutional Debt Priority Provisions and, therefore, are not subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "clawback") in the event available resources including surplus for a particular fiscal year, are not sufficient for the purposes of meeting appropriations in that fiscal year, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

**Act 91.** Act 91 created a special fund known as the Dedicated Sales Tax Fund, to be administered by GDB, and transferred the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and any future funds required by Act 91 to be deposited therein, to the Corporation as property of the Corporation. This transfer was made in consideration for the Corporation's commitment to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all of part of the Commonwealth's debt and other obligations specified in Article 2(b) of Act 91 (the "Commonwealth Obligations"), with the net proceeds of bonds issued by the Corporation and with other funds and resources available to the Corporation.[1]

The Dedicated Sales Tax Fund is required by the terms of Act 91 to be funded in each fiscal year of the Commonwealth with the first collections of the Pledged Sales Tax. The

---

[1] We have assumed for purposes of this opinion that the Corporation will not pay any of the Commonwealth Obligations (other than Commonwealth Obligations consisting of indebtedness of the Commonwealth being refunded) directly, but will instead transfer the proceeds of its bonds and notes to the Commonwealth in order to allow the Commonwealth to pay the Commonwealth Obligations. We have assumed that the Corporation will use the funds assigned to it solely to pay its bonds and notes, related financing expenses and its operating expenses.

CONFIDENTIAL

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 3 of 9

Pledged Sales Tax consists of the greater of (i) a fixed base amount specified in Act 91 for each fiscal year (the "Fixed Base Amount"); and (ii) the product of the amount of the sales and use tax collected during such fiscal year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%),[2] and the denominator of which is the aggregate sales and use tax rate of five point fifty percent (5.50%).

Act 91 limits the amount of bonds that may be issued by the Corporation to those that can be serviced with the Fixed Base Amount. The Fixed Base Amount, which was initially set at $185 million, increases annually until it reaches a maximum of $1.85 billion.

Act 91 requires that the Pledged Sales Tax "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the Treasury of Puerto Rico." Moreover, Act 91 states that the Pledged Sales Tax shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary [of the Treasury]." In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico not its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

On the date hereof, the Secretary of Justice of Puerto Rico issued an opinion (the "2011 Opinion") in which he concluded that the Pledged Sales Tax does not constitute "available resources" for purposes of the Constitutional Debt Priority Provisions. On each of November 23, 2011, June 23, 2011, February 9, 2010 and June 30, 2010, the Secretary of Justice of Puerto Rico issued an opinion reaching the same conclusion in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2011B, Sales Tax Revenue Bonds, Junior Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2010A and Sales Tax Revenue Bonds, First Subordinate Series 2010C, respectively (the "Prior Opinions"). Moreover, his immediate predecessors reached the same conclusion in opinions dated July 31, 2007 (the "2007 Opinion") issued in connection with the issuance of the Series 2007A and Series 2007B Sales Tax Revenue Bonds of the Corporation and July 18, 2009 (the "2009 Opinion") issued in connection with the issuance of the Corporation's Sales Tax Revenues Bonds, First Subordinate Series 2009A and Series 2009B.

**General Legal Principles.** Under Article VI, Section 2 of the Constitution, the Legislature of Puerto Rico (the "Legislature") is vested with broad authority over the levying and application of taxes and, therefore, has the power to determine how such tax revenues are applied

---

[2] Act 91 was amended by Act No. 1 of January 14, 2009 ("Act 1") and Act No. 7 of March 9, 2009 ("Act 7") to, among other things, increase the numerator of the fraction referred to in clause (i) from one percent (1%) to two point seventy-five percent (2.75%).

PR-CCD-0405458

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 4 of 9

and who receives them. The principal issue covered by this opinion is whether any designation or earmarking by the Legislature of Commonwealth resources for a particular purpose, while valid, is nevertheless subject to a clawback under the Constitutional Debt Priority Provisions. More specifically, whether notwithstanding the express provisions of Act 91, the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions and, thus, must be made available to pay principal and interest on general obligation bonds of the Commonwealth to the extent the Commonwealth does not otherwise have sufficient resources for such purpose.

This issue has never been addressed by the Supreme Court of Puerto Rico and there are no precedents in Puerto Rico cases controlling or directly on point with the issues addressed on this letter. There is also no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention. In the absence of direct judicial precedent on this issue or clear evidence of the intent of the framers of the Constitution, the issue addressed herein needs to be analyzed under general principles of constitutional and statutory interpretation applicable in Puerto Rico.

**Standard of Review.** At the outset, we believe it is important to discuss the standard of review that a Puerto Rico court would use to decide this issue. The Supreme Court of Puerto Rico has traditionally shown substantial deference to the Legislature's judgment and has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislature. See Rexach v. Ramírez Vélez, 162 D.P.R. 130, 148 (2004); Berberena v. Echegoyen, 128 D.P.R. 864 (1991); Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1996). The Supreme Court of Puerto Rico has reiterated that when the constitutionality of a statute is questioned, the Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy.[3] In these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest. Berberena, supra at 882. Courts in the State of New York, in reviewing analogous issues, have also acknowledged that significant deference should be given to the state legislature in these matters. See Local Government Assistance Corporation v. Sales Tax Asset Receivable Corporation, 813 N.E. 2d 587 (New York Court of Appeals, 2004).

In reviewing statutory and constitutional questions, the Supreme Court of Puerto Rico has also stated that, while opinions of the Secretary of Justice are not binding on the courts, they are entitled to great persuasive weight, because the Secretary of Justice is the highest executive officer charged with the administration of justice. San Geronimo Caribe Project, Inc. v.

---

[3] We note that the higher degree of scrutiny generally applicable to contract impairment cases involving obligations of the Commonwealth does not apply to the threshold issue of whether the statute being questioned in fact impairs existing contractual rights. See Bayrón Toro y Otros v. Rafael Serra, 119 D.P.R. 605,620 (1983).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 5 of 9

Administración de Reglamentos y Permisos, 2008 W.L. 3834098 (Puerto Rico, 2008), Maldonado v. Junta de Planificación, 2007 W.L. 1582244 (Puerto Rico, 2007). We believe that an opinion from the Secretary of Justice, such as the 2010 Opinion, would be granted even more persuasive weight by the Supreme Court of Puerto Rico, where, as occurs in this case, it reaffirms opinions issued by prior Secretaries of Justice.

**Judicial Precedents from Other Jurisdictions.** Since there is no controlling precedent in Puerto Rico, it is appropriate to examine precedents from other jurisdictions to which the Supreme Court of Puerto Rico might look for guidance. There exists a number of precedents from the State of New York, that while not involving identical statutory and constitutional provisions to Act 91 and the Constitutional Debt Priority Provisions, provide support for the proposition that the Legislature may designate a specific source of state revenues for a specific purpose, even though such designation has the effect of reducing the amount of revenues that would otherwise be "available" to pay principal and interest on the Commonwealth's full faith and credit obligations. See Saratoga Harness Racing v. Agriculture, 238 N.E. 2d 730 (New York Court of Appeals, 1968), Quirk v. Municipal Assistance Corporation, 363 N.E. 2d 549 (New York Court of Appeals, 1977) and Anderson v. Regan, 425 N.E. 2d 792 (New York Court of Appeals, 1981).

The Saratoga case involved a challenge to the validity of a statute that assigned future state revenues for a specific purpose in the face of a provision of the New York State Constitution which prohibited the expenditure of state funds except pursuant to appropriation by the state legislature. The statute in question required that certain receipts due from state assessments imposed on racing associations be delivered to a special development fund which would in turn be authorized to use such funds for the specific purpose of fostering the continued growth and prosperity of the horse racing industry. The Court noted that, similar to the policy behind the Constitutional Debt Priority Provisions, the New York State constitutional provision under discussion had been motivated by a concern that the state not incur obligations in excess of its actual income and thus "leave burdens for the future, and severe taxation or repudiation, the meanest of all things." Saratoga, supra at 124. The New York State Court of Appeals upheld the constitutionality of the statute and stated that "not every fund made of public moneys raised through taxation or otherwise" came within purview of the New York State constitutional provision in question. Saratoga, supra at 123. In reviewing its prior discussion in Saratoga, the New York State Court of Appeals in the Anderson case made clear that the operational structure of the statutory scheme in the Saratoga case was an important factor in upholding its constitutionality. The Court stated that its holding in Saratoga was clearly predicated upon the fact that the money at issue there, although raised through legislative assessment, never became the property of the State and was never placed within the State treasury, but rather was immediately deposited in a separate fund administered by a legislatively created public benefit corporation. Anderson, supra at 406. We do not believe that the fact that the Pledged Sales Tax is initially payable to the Secretary of the Treasury is a substantive distinction from the Saratoga case, since Act 91 explicitly provides that the Pledged Sales Tax is property of the Corporation,

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 6 of 9

and the Pledged Sales Tax collection are deposited in accounts outside the control of the Secretary of the Treasury (see footnote 3).

In addition to the <u>Saratoga</u> case, there exist a number of cases upholding the constitutionality of statutes that contemplated the assignment by a state or municipality of its interest in certain future revenues to a public corporation to support the payment of bonds issued by such corporation. See <u>Quirk</u>, supra, <u>Local Government Assistance Corp. v. Sales Tax Asset Receivable Corporation</u>, 813 N.E. 2d 587 (New York Court of Appeals, 2004)) and <u>Myers v. Alaska Housing Finance Corporation</u>, 68 P. 3d 386 (2003). The <u>Myers</u> case involved the assignment of periodic payments from the tobacco settlement litigation to the Alaska Housing Finance Corporation. We note that the Commonwealth has made a similar assignment of its tobacco settlement payments to the Children's Trust to support bonds issued by the Trust, the proceeds of which were to be used for specific purposes and are not entitled to the full faith and credit of the Commonwealth.

**Analysis of Act 91 Statutory Scheme under General Legal Principles and in Light of Precedents from Other Jurisdictions.** As recited in its Statement of Motives, Act 91 was originally enacted by the Legislature to deal with the high level of Commonwealth appropriation debt, which had adversely affected the credit of the Commonwealth and had created a fiscal crisis that forced a government shutdown. In 2009, Act 91 was further amended by Act 1 and Act 7 to increase the amount of the Pledged Sales Tax in an effort to address the unprecedented magnitude of the fiscal crisis currently facing the Commonwealth. The fiscal difficulties that Act 91 seeks to address represent a legitimate government interest. Thus, under these circumstances, we believe that the Supreme Court of Puerto Rico would give great deference to the judgment of the Legislature on how best to exercise its taxing power to address this fiscal crisis, and would find that there is a rational relationship between Act 91 and this legitimate government interest.

There is nothing in the text of the Puerto Rico Constitution or in the records of the Puerto Rico Constitutional Convention that provides that specified resources be available to pay general obligation bonds, nor that holders of general obligations bonds shall have a lien on all future revenues of the Commonwealth, nor otherwise restrict the authority of the Commonwealth to sell or transfer assets. As stated by the Court in <u>Flushing National Bank v. Municipal Assistance Corporation</u>, 358 N.E. 2d 848 (New York State Court of Appeals, 1976), the issuance of full faith and credit bonds does not create a general or special lien or charge upon unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds. <u>Flushing</u>, supra at 736. We note that had the framers of the Puerto Rico Constitution desired to limit the ability of the Legislature to assign future tax revenues they could have done so by including in the Puerto Rico Constitution an explicit anti-dedication clause such as those contained in the Alaska and Georgia constitutions, which in turn are based on a similar provision included in the Model State Constitution prepared by The Committee on State Government of the National Municipal League. We note that the Georgia Constitution and the

CONFIDENTIAL

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 7 of 9

Model State Constitution were in existence at the time of adoption of the Puerto Rico
Constitution and that the Alaska Constitution was adopted soon thereafter in 1955.[4]

The fact that certain prior financing structures of other Commonwealth instrumentalities
have provided that the revenues pledged under those structures constitute "available resources"
for purposes of the Constitutional Debt Priority Provisions does not alter our conclusion. For
example, in Act No. 74 approved June 23, 1965, as amended ("Act 74"), creating Puerto Rico
Highways and Transportation Authority (the "Highways Authority"), the Legislature provided a
mechanism for the Highways Authority to issue bonds to finance needed highway and other
transportation projects and to secure said bonds by a pledge of "the proceeds of any tax or other
funds which may be made available to the Authority by the Commonwealth" (Section 4(1) of
said Act 74). This pledge, however, is expressly made "subject to the provisions of Section 8 of
Article VI of the Constitution of the Commonwealth." Similarly, in Act No. 44 approved
June 21, 1988, as amended ("Act 44"), creating Puerto Rico Infrastructure Financing Authority
("AFI"), the power of AFI to pledge its revenues to secure its bonds is expressly made "subject
to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth." In that
case, the pledge involved "all or any portion of the federal excise taxes [remitted to the
Department of the Treasury of the Commonwealth under applicable provisions of the United
States Internal Revenue Code] or other funds which [are] transferred by the Commonwealth to
the Authority" (Section 7(m) of said Act 44).

We believe that there is a clear distinction between the statutory schemes of Act 74 and
Act 44 on the one hand, and Act 91 on the other. Under both Act 74 and Act 44, the Legislature
expressly provided that the revenues to be pledged were part of the general resources of the
Commonwealth and thus, authorized the pledge of such revenues subject to the provisions of the
Constitutional Debt Priority Provisions. In both cases, the revenues in question were made
available to the Highways Authority and AFI from revenues on deposit in the Commonwealth
General Fund. In the case of Act 91, the Legislature expressly provided that the Pledged Sales
Tax is not to be deposited in the General Fund and shall not constitute resources available to the
Commonwealth of Puerto Rico. The fact that in Act 74 and Act 44 the Legislature chose to
designate the pledged revenues in question as "available resources" does not imply that the
Legislature cannot exercise its constitutional taxing authority to explicitly provide that the
Commonwealth shall not have ownership and control over a portion of the Commonwealth
imposed sales and use tax, as provided in Act 91.

---

[4] We also note that Jaime Benítez, the Chancellor of the University of Puerto Rico at that time, wrote a foreword to
the Fifth Edition of the Model State Constitution published in 1948 in which he thanked the National Municipal
League for granting their permission to make reprints of the Model State Constitution for circulation to the
delegation of the Puerto Rico Constitutional Convention and acknowledged that the Model would be suggestive
for the delegation.

CONFIDENTIAL

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 8 of 9

In rendering our opinion, we believe that the Supreme Court of Puerto Rico will give substantial persuasive weight to the opinions of Secretaries of Justice as expressed in the 2007 Opinion, the 2009 Opinion, the Prior Opinions, and the 2011 Opinion. We understand that this persuasive weight will be bolstered by the fact that two Secretaries of Justice from different administrations have reached the same conclusion.

We have also considered specific elements of Act 91 that we understand help support its validity if ever faced with a legal challenge. First, following the example of the statutory scheme in Saratoga, the Legislature has clearly stated its intention that the Pledged Sales Tax is not to be considered general funds of the Commonwealth and is not available for use by the Commonwealth, and has mandated that from the moment of collection, the Pledged Sales Tax is to be segregated from the general fund of the Commonwealth.

Second, as stated previously, Act 91 incorporates safeguards to limit the amount of bonds that may be issued by the Corporation backed by the Pledged Sales Tax.[5] This provision reflects the Legislature's attempt to resolve the current fiscal crisis while addressing the concerns expressed by the Court in Quirk that an otherwise constitutionally permissible assignment of revenues might be held to violate constitutional provisions protecting general obligation bondholders if, realistically, it stripped the government of all or a substantial source of its revenues and, therefore, adversely affected the ability of the Commonwealth to service its general obligation debt. See Quirk, supra at 648.

**Opinion.** It is our opinion, based on our examination of the law and other matters which we consider pertinent, and after applying general legal principles to the facts summarized herein, that, if the appropriate issues are properly presented for judicial decision, a court would hold that (1) Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

We note, however, that in view of the lack of direct judicial precedent in Puerto Rico there can be no certainty as to the outcome of any litigation with respect to the applicability of the "clawback" to the Pledged Sales Tax. We note further that because there is no controlling

---

[5] Under Act 91, the amount of bonds that may be issued by the Corporation is limited to those that may be repaid from the Fixed Base Amount, which is capped at $1.85 billion (which is reached in 2041). We note that the Fixed Base Amount for fiscal year 2010-2011 ($572 million) represented six point five percent (6.5%) of the preliminary General Fund total revenues for that fiscal year ($8,726,000,000) (for purposes of this computation, we have included the Pledged Sales Tax for that fiscal year ($572 million) as part of General Fund total revenues).

CONFIDENTIAL

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 9 of 9

Puerto Rico precedent on the matters upon which we are opining herein, a court's decisions on such matters would be based on the court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. As a result, a court faced with these issues could reach a contrary result which would not necessarily constitute reversible error. Accordingly, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) of the Commonwealth that reviewed the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by such court applying existing legal rules and principles to the facts as properly found after appropriate briefing and argument. This opinion is not a guaranty, warranty or representation of a particular result, but is merely this law firm's informed judgment as to a specific question of law.

The opinion expressed herein is based on an analysis of existing laws and court decisions. It also assumes strict compliance with the provisions of Act 91 and the Resolution, including those provisions requiring segregation of the Pledged Sales Tax from the general funds of the Commonwealth. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law) or in the manner of segregating the Pledged Sales Tax from the general revenues of the Commonwealth, after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

We are admitted to practice in the Commonwealth, and express no opinion whatsoever with respect to any laws other than the laws of the Commonwealth.

This opinion letter is rendered for the sole and exclusive benefit of the addressee hereof, and no other person or entity is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Offered Bonds upon their request, but no attorney-client relationship exists between any such investor and Pietrantoni Mendez & Alvarez LLC and none of such investors are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document.

Very truly yours,

Pietrantoni Mendez Alvarez LLP

187581

CONFIDENTIAL

PIETRANTONI MENDEZ & ALVAREZ LLC

**EXHIBIT A**

<u>ADDRESSEES</u>

Puerto Rico Sales Tax Financing Corporation

Underwriter Representatives

PR-CCD-0405465

# Exhibit 72

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

# Exhibit 73

## COMMONWEALTH OF PUERTO RICO MOODY'S HISTORICAL RATING

| DATE | RATING | OUTLOOK |
|---|---|---|
| July 2015 | Caa3 | Negative |
| May 2015 | Caa2 | Negative |
| Feb 2015 | Caa1 | Negative |
| Jul 2014 | B2 | Negative |
| Feb 2014 | Ba2 | Negative |
| Dec 2012 | Baa3 | Negative |
| Aug 2011 | Baa1 | Negative |
| May 2011 | A3 | Negative/Credit Watch |
| Aug 2010 | A3 | Negative |
| Apr 2010 | A3 | Stable |
| Nov 2007 | Baa3 | Stable |
| May 2007 | Baa3 | Negative |
| Jul 2006 | Baa3 | Negative |
| May 2006 | Baa3 | Negative/Credit Watch |
| Feb 2006 | Baa2 | Negative/Credit Watch |
| May 2005 | Baa1 | Negative |
| Sep 2004 | Baa1 | Negative |
| Apr 2004 | Baa1 | Stable |
| Oct 2003 | Baa1 | Stable |
| Aug 2002 | Baa1 | Stable |
| Jun 2002 | Baa1 | Stable |
| Dec 2001 | Baa1 | Stable |
| Oct 2001 | Baa1 | Stable |
| May 2001 | Baa1 | Stable |
| Apr 2001 | Baa1 | Stable |
| Mar 2001 | Baa1 | Positive |
| Mar 2000 | Baa1 | Positive |
| Dec 1999 | Baa1 | Stable |
| Mar 1999 | Baa1 | Stable |
| Nov 1998 | Baa1 | Stable |
| Apr 1998 | Baa1 | Stable |
| Mar 1998 | Baa1 | Stable |
| May 1997 | Baa1 | Favorable |
| Apr 1997 | Baa1 | Positive |
| Apr 1995 | Baa1 | N/A |
| Jun 1993 | Baa1 | N/A |
| Aug 1992 | Baa1 | N/A |
| Apr 1992 | Baa1 | N/A |
| Feb 1989 | Baa1 | N/A |
| Nov 1985 | Baa1 | N/A |
| Sep 1982 | Baa1 | N/A |
| Nov 1978 | Baa1 | N/A |

PR-CCD-0009349

Exhibit 7   Page 3 of 8

| Jan 1976 | Baa1 | N/A |
| May 1975 | A1 | N/A |
| Jan 1975 | A1 | N/A |
| Sep 1970 | A1 | N/A |

PR-CCD-0009350

# Exhibit 74



## INVESTORS SERVICE

**New Issue:** MOODY'S ASSIGNS A1 RATING AND STABLE OUTLOOK TO PUERTO RICO SALES TAX FINANCING CORPORATION SALES TAX REVENUE BONDS

Global Credit Research - 27 Jun 2007

**INAUGURAL ISSUE OF APPROXIMATELY $4.0 BILLION**

State
PR

**Moody's Rating**

| ISSUE | RATING |
|---|---|
| Sales Tax Revenue Bonds, Series 2007A | A1 |

**Sale Amount**   $2,599,000,000

**Expected Sale Date** 07/09/07

**Rating Description**  Sales Tax Revenue Bonds

**Moody's Outlook**   Stable

**Opinion**

NEW YORK, Jun 27, 2007 -- Moody's Investors Service has assigned an A1 rating and stable outlook to the Puerto Rico Sales Tax Financing Corporation's Sales Tax Revenue Bonds, Series 2007A and B. The inaugural issuance is expected to be sold in the near future, and to be in the amount of $2.599 billion tax-exempt (Series A) and $1.5 billion federally taxable offered in the Puerto Rico market (Series B). The purpose of the Sales Tax Revenue Bonds is to provide funds to the Commonwealth to be applied to the repayment of certain of its debt obligations owed to Government Development Bank (GDB) and Puerto Rico Public Finance Corporation (PFC), commonly referred to as "extraconstitutional" or appropriation-supported debt. The high-quality rating assigned reflects:

* A strong legal structure, including a pledge of the larger of 1% of the Commonwealth's 5.5% sales tax revenues or a base amount, that does not flow through the General Fund and may only be used for repayment of the appropriation-supported debt.

* A broad and diversified economic base supporting the sales tax pledge, which has produced strong long-term growth of consumption expenditures and is expected to produce strong long-term growth in the sales tax revenues.

* More than 5 times coverage of scheduled debt service by the projected sales tax revenues, increasing annual debt service, and a 50-year final maturity. The structure does not include a debt service reserve account.

* Coverage that could fall if growth in the sales tax is less than expected, but could rise if growth is higher than expected. Additional revenues must be used to pay down any outstanding extraconstitutional debt, or prepay existing sales tax revenue bonds

BONDS BACKED BY NEW COMMONWEALTH SALES TAX

The Commonwealth of Puerto Rico instituted a 7% sales tax on November 15, 2006. The tax applies to most goods and services, excluding: healthcare services, prescription medicines, non-prepared foods, gas, cars, services by designated professionals, financial services, and electricity and water provided by Commonwealth. Of the 7%, 5.5% goes to the Commonwealth, and 1.5% goes to municipalities. Of the Commonwealth's 5.5%,

1% is pledged to the Sales Tax Bonds. The authorizing legislation gives the 1% to repay or otherwise refinance the "extraconstitutional debt" (appropriation debt), which is made up of $4.3 B in PFC bonds and $2.8 B in GDB loans. This issue will pay off some of the outstanding GDB loans and PFC bonds. Some of the proceeds may also be used to pay debt service on extraconstitutional debt that remains outstanding for the next few years.

The portion of the Commonwealth sales tax that is pledged consists of the first collections in each fiscal year up to 1% of the 5.5% sales tax, or a base amount, whichever is greater. The base amount is $185 million in fiscal 2008, and grows by 4% each year thereafter. Regardless of the level of sales tax collections based on the 1% share, all of the 5.5% Commonwealth sales tax must be applied directly to the base amount before any money is released to the General Fund. As the base amount is set at approximately one-fifth of the expected sales tax collections for fiscal 2008, this provides over 5 times coverage in the first year.

COVERAGE MAY FALL IF TAX GROWTH IS BELOW EXPECTATIONS

Additional bonds may only be issued if debt service in each fiscal year does not exceed the expected base amount (including the 4% growth). There is capacity under the ABT to issue approximately $6.5 billion under current market conditions. The original issue will be approximately $4 billion including $1.5 billion taxable bonds to be sold on the local market. They will have a 50-year final maturity. The remaining $2.5 billion will likely be issued within a year. At full issuance, debt service will essentially equal the base amount each year. The coverage will then depend on the strength of the tax revenue collections. If they grow at 4% per year, coverage will remain above 5 times per year. If they grow at a faster pace, coverage will exceed 5 times. If growth is slower than the 4%, coverage will fall. Moody's views it as highly unlikely that revenues would fall to anything close to 1 times coverage, as the sales tax collections would have to grow by only 0.25% to have coverage fall to 1 times by the final year of maturity. Indeed, given the consumption-based nature of the Puerto Rico economy, and the relatively conservative forecast (personal consumption expenditure growth on the island has averaged 6% per year), Moody's believes sales tax revenues are more likely to exceed the 4% average annual growth. This would provide excess coverage and excess revenues.

FLOW OF FUNDS TRANSFERS REVENUES DAILY TO TRUSEE

The merchant or retailer pays the sales taxes on a monthly basis to Banco Popular or another authorized collector. The collector then transfers the money on a daily basis to a bridge account at Banco Popular in the name of the Treasury. Banco Popular then transfers money on a daily basis (with a two-day delay) to the Trustee until the base amount has been deposited into the revenue account. After the base amount has been deposited, the revenues will be transferred daily to the Treasury Department's account at the Government Development Bank, until the Treasury Department's account has received its share (4.5%/5.5%) of the collections received to date in the fiscal year. After that time, GDB divides the additional receipts of the sales tax between the Sales Tax Revenue Account and the Treasury Account on the basis of the 1%/4.5% split.

REVENUES NOT SUBJECT TO COMMONWEALTH "CLAWBACK"

We note that the rating on the Sales Tax Revenue Bonds is significantly higher than our current Baa3/negative rating on the Commonwealth's G.O. bonds, primarily reflecting our assessment of the strength of the pledged sales tax security, as well as the fact that the sales tax revenues are not subject to the Commonwealth's "clawback" provisions. Importantly, we view the sales tax pledge to be insulated from the state's broader budget and financial problems that have caused the downgrading of the G.O. bonds to their current low investment-grade level of Baa3 with a negative outlook.

The Commonwealth's Secretary of Justice and outside bond counsel are expected to provide clean validity opinions for the sales tax bonds. These will include specific opinions that the pledged sales tax revenues are not available to the Treasury or the General Fund. That is, the revenues are not subject to the "clawback" provision that affects many Commonwealth revenues. The Commonwealth has also covenanted not to impair bondholder's rights.

**Outlook**

The rating outlook for the Sales Tax Revenue Bonds is stable. The outlook reflects the expected stability of the sales tax revenues, as well as the separation in the structure between the credit and the Commonwealth.

**Analysts**

Emily Raimes

Analyst
Public Finance Group
Moody's Investors Service

Mark Tenenhaus
Backup Analyst
Public Finance Group
Moody's Investors Service

Robert A. Kurtter
Senior Credit Officer
Public Finance Group
Moody's Investors Service

Gail Sussman
Director
Public Finance Group
Moody's Investors Service

**Contacts**

Journalists: (212) 553-0376
Research Clients: (212) 553-1653



© 2017 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. AND ITS RATINGS AFFILIATES ("MIS") ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MOODY'S PUBLICATIONS MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

MOODY'S CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS OR MOODY'S PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE

REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing the Moody's publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any rating, agreed to pay to Moody's Investors Service, Inc. for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be reckless and inappropriate for retail investors to use MOODY'S credit ratings or publications when making an investment decision. If in doubt you should contact your financial or other professional adviser.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned

subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any rating, agreed to pay to MJKK or MSFJ (as applicable) for appraisal and rating services rendered by it fees ranging from JPY200,000 to approximately JPY350,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

MDYS PUERTO RICO 000005

# Exhibit 76

**TRANSLATOR AFFIDAVIT**

I, Jennifer De La Cruz, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation for this matter.

I am fluent in both the Spanish and English languages. My qualifications include 21 years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification 06-014.

I have received and translated from Spanish into English 2007 TSPR 92, P.R. Offic. Trans., and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

_____
Jennifer De La Cruz
(Affiant's Printed Name)

State of California

County of Riverside

Subscribed to and sworn before me this 17th day of February , 2018,

by Jennifer Lyn De La Cruz

_____
Notary Public

GLADYS GARCIA
COMM. #2143199
NOTARY PUBLIC • CALIFORNIA
SAN MATEO COUNTY
Commission Expires FEB 19, 2020

**171 P.R. Dec. 140, 2007 WL 1630877 (P.R.), 2007 TSPR 92, P.R. Offic. Trans.**

PUERTO RICAN ASSOCIATION OF BEER
IMPORTERS, INC.,
HEINEKEN BROUWERIJEN B.V., V.
SUÁREZ & CO. INC., MÉNDEZ & CO., INC.,
B. FERNÁNDEZ & HERMANOS, INC. and
BALLESTER HERMANOS, INC., petitioners,
v.
COMMONWEALTH OF PUERTO
RICO, JOSÉ A. FLORES GALARZA, in his
official capacity as SECRETARY OF THE
TREASURY, CERVECERÍA INDIA, INC. and
CC1 BEER DISTRIBUTORS, INC., respondents.

**In the Supreme Court of Puerto Rico.**
*Number:* CC-2003-831
*Decided:* May 16, 2007
May 16, 2007

**Synopsis**

WRIT OF *CERTIORARI* to review a DECISION of Liana
Fiol Matta, *Roberto González Rivera and Carlos Rivera
Martínez, JJ. of the Court of Appeals,* that affirmed the
decision handed down by the Court of First Instance
denying a claim presented by the petitioners.
*Judgment is issued affirming the Court of First
Instance and the Court of Appeals.*

*Sarah Y. Rosado Morales,* Assistant Attorney General,
*and* **\*141** *Maite D. Oronoz Rodríguez,* deputy
attorney general; *Debbie E. Rivera Rivera,* of *Sánchez,
Betances & Sifre, C.S.P., Luis Sánchez Betances,
Sánchez de Jesús Annoni,* attorneys for the
Commonwealth of Puerto Rico; *Gerardo J. Rivera-
Fourquet,* of *Maymi & Rivera-Fourquet,* attorney for
Cervecería India, Inc., respondent; *Jorge E. Pérez Díaz*
and *Heidi L. Rodriguez,* of *Pietrantoni Méndez &
Álvarez, LLP,* attorneys for CC1 Beers [sic]
Distributors, Inc., respondent; *Juan A. Marqués
Valdés* and *Verónica Ferraiuoli,* of *McConnell Valdés;
Ana Matilde Nin* and *Mayra I. Ruiz Muñiz,* attorneys
for the Puerto Rican Association of Beer Importers
and Heineken Brouwerijen B.V., petitioners; *Federico
Calaf Legrand,* of *Richard & Calaf, PSC,* attorney for
Ballester Hermanos, Inc.,

petitioner; *Ramón Walker Merino,* attorney for
Fernández & Hermanos, Inc., petitioner; *Horacio
Subirá,* attorney for V. Suárez & Co., petitioner.

**DECISION**

Law No. 69 of May 30, 2002 (Law No. 69) amended
Sections 4002 and 4023 of the Internal Revenue
Code of Puerto Rico, 13 P.R. LAWS ANN. secs. 9521
and 9574. The amendment was enacted for the
purpose of increasing the taxes applicable to distilled
spirits, wine and beer. Said Law No. 69, however,
grants relief by establishing in Art. 2 thereof (13 P.R.
LAWS ANN. sec. 9574) a graduated tax exemption for
all beer, malt extract and other similar fermented
and non-fermented products, whose alcohol content
does not exceed one and one-half percent by volume
and that are produced or manufactured by persons
whose total production during their most recent
fiscal year does not exceed 31 million gallons.

The petitioners here, the Puerto Rican Association of
Beer Importers, Inc. *et al.,* filed a petition for
declaratory judgment before the Upper Chamber of
the Court of First Instance in San Juan against the
Commonwealth of Puerto Rico *et al.* asking that it
**\*142** declare the aforementioned Art. 2 of Law No.
69 unconstitutional. They argued that, in their view,
the referenced statutory provision had the purpose
and effect of favoring beer produced on our Island
and, obviously, causing prejudice to imported beer.
They argued further that said provision violated the
interstate commerce clause of the Constitution of the
United States and Art. 3 of the Puerto Rico Federal
Relations Act, 48 U.S.C.A. sec. 741 (a) and P.R. LAWS
ANN., Vol. 1, Sec. 3, respectively.

The respondent party asked that the petition be
denied, arguing, in short, that the decision of this
Court in *U.S. Brewers Assoc. v. Srio. de Hacienda,* 109
P.R. Dec. 456 (1980), had resolved the issue raised
and that there was no constitutional violation. The
trial court *denied* the petition; the decision was
*affirmed* by the Court of Appeals.

The petitioners then came before this court, alleging
that the Court of Appeals committed three errors,
namely:

. . . by affirming the denial of the Sworn Application without having ascertained the facts asserted in the complaint and assuming as true others that did not arise therefrom, contrary to the standard for denial under Civil Procedure Rule 10.2 and relevant case law.

. . . by deciding that Article 2 did not violate Sec. 3 of the Puerto Rico Federal Relations Act or the Commerce Clause, applying erroneously the decision in the case of *U.S. Brewers v. Srio. de Hacienda,* 109 P.R. Dec. 456 (1980).

. . . by restricting its analysis concerning the purpose of Article 2 to the text of Law 69, thus ignoring the standard of interpretation put forth by this Honorable Court. Writ of *certiorari,* p. 5.

*We decide* as follows. Having examined the case file and analyzed carefully all of the arguments of the parties, *a decision is rendered affirming the decision issued by the Court of Appeals* **\*143** *and denying the claim presented by the petitioning party.*

So declared and ordered by the Court and certified by the Secretary of the Supreme Court. Associate Justices Rebollo López and Fuster Berlingeri issued concurring opinions. Associate Justice Fiol Matta abstained. Associate Justice Rodríguez Rodríguez did not participate.

/s/ Aida Ileana Oquendo Graulau, *Secretary of the Supreme Court.*

**--O--**

Concurring opinion of Associate Justice Rebollo López.

On July 13, 1978, Law No. 37 was approved, pursuant to which Law No. 143 of June 30, 1969, known as the Puerto Rico Beverage Law (13 P.R. LAWS ANN. secs. 6006 and 6021a), was amended. Said amendment increased the tax on beer that is sold and consumed in our jurisdiction and established a special exemption for beer-producing companies whose annual production does not exceed 31 million gallons.

A short time later, the U.S. Brewers Association, an entity that then included 95% of United States

beer manufacturers, brought a petition before the local court challenging the aforementioned exemption; because, in its view, it violated Sec. 3 of the Puerto Rico Federal Relations Act, P.R. LAWS ANN., Vol. 1 (48 U.S.C.A. sec. 741a) and the equal protection clause in Section 7 of Art. II of the Constitution of the Commonwealth of Puerto Rico, P.R. LAWS ANN., Vol. 1. In deciding this controversy, this Court found that the exemption did not violate the aforementioned provisions; because, among other things, it had a **\*144** legitimate, non-discriminatory purpose and because the classification established therein could favor both local and foreign enterprises. *U.S. Brewers Assoc. v. Srio. de Hacienda,* 109 P.R. Dec. 456 (1980).

After having been amended on two subsequent occasions, for the sole purpose of increasing the amount of the tax,[1] the Legislative Assembly approved *Law No. 69 of May 30, 2002,* pursuant to which it amended Secs. 4002 and 4023 of the Internal Revenue Code of Puerto Rico, 13 P.R. LAWS ANN. sects. 9521 and 9574. Said amendments, among other things, had the purpose of increasing the taxes applicable to distilled spirits, wine and *beer.* As relief from the increase, the Legislature granted in Art. 2 of the aforementioned law, 13 P.R. LAWS ANN. sec. 9574, a *graduated tax exemption* to all beer, malt extract and similar fermented or non-fermented products whose alcohol content did not exceed 1½% by volume, that are produced or manufactured by persons whose total production during their most recent fiscal year did not exceed 31 million gallons (unit of measurement).[2] **\*145**

In this context, on June 13, 2002, the Puerto Rican Association of Beer Importers, Inc. (APIC); Heineken Brouwerijen B.V.; V. Suárez & Co., Inc.; Méndez y Co., Inc.; B. Fernández & Hnos., Inc., and Ballester Hermanos, Inc. (the petitioners) filed a petition for declaratory judgment in the Court of First Instance, San Juan Upper Chamber, against the Commonwealth of Puerto Rico, the Secretary of the Treasury, Cervecería India, Inc. and CC1 Beer Distributors, Inc. (the respondents). They asked that Art. 2 of Law No. 69, *supra,* be declared unconstitutional; because, in their view, it had the effect and purpose of favoring beer produced in Puerto Rico and causing prejudice to imported beer. They requested,

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

furthermore, pursuant to the aforementioned declaratory judgment, that the Court hold that the aforementioned Art. 2 violated both the interstate commerce clause of the Constitution of the United States[3] and Sec. 3 of the Puerto Rico Federal Relations Act, *supra*. Finally, they asked that a preliminary injunction be granted in which the Government of Puerto Rico would be prevented from implementing the legislative provision, pending a decision on the merits.

Subsequently, all of the respondents requested *denial* of the claim presented, opposing the request for preliminary injunction.[4] Essentially, they alleged that, even assuming as true the facts properly alleged in the claim presented, the petitioning party had not set forth *146 a claim that justified the grant of relief requested. They argued, in support of their petition, that the decision in *U.S. Brewers Assoc. v. Srio. de Hacienda, supra,* governed the issue raised in the case; that there was no violation of the interstate commerce clause, since the exemption was totally neutral and did not discriminate against interstate or international commerce either on its face or in its purpose or effect, and that there was no violation of the Puerto Rico Federal Relations Act, since this Court had upheld the legality of said provision.

After considering the position of both parties in their respective written submissions and the arguments offered at a hearing, the lower court issued a judgment in which it *denied* the claim presented by the petitioners. The aforementioned court held that: (1) this Court's decision in *U.S. Brewers Assoc. v. Srio. de Hacienda, supra,* disposed of the claim of the petitioners concerning whether Art. 2 of Law No. 69, *infra,* violated Sec. 3 of the Puerto Rico Federal Relations Act, *supra*; (2) the allegation that the effect of the challenged exemption was to infringe the interstate and international commerce clause lacked merit since in *U.S. Brewers Assoc. v. Srio. de Hacienda, supra,* this Court had held, although it was not stated specifically, that said exemption had the legitimate purpose of distributing the tax burden among the breweries consistent with their earnings potential,[5] and (3) the analysis called for in the context of allegations of *147 supposed violations of the interstate and international commerce clause, due to the supposed discriminatory effect of some law, showed that the article of legislation challenged in this case was not discriminatory.

Dissatisfied with the decision of the lower court, the petitioners sought recourse—pursuant to a Writ of *certiorari*—before the Court of Appeals. They argued, in short, that the trial court had erred in denying the claim presented without ascertaining the facts alleged in the complaint and by not admitting evidence offered concerning the purpose and discriminatory effect of the exemption. They argued, furthermore, that the trial court had interpreted the case of *U.S. Brewers Assoc. v. Srio. de Hacienda, supra,* incorrectly by holding that the challenged exemption did not violate either Sec. 3 of the Puerto Rico Federal Relations Act, *infra,* or the aforementioned interstate and international commerce clause.

The Court of Appeals *affirmed* the decision of the trial court. Essentially, the intermediate appellate court held that the trial court acted correctly in denying the claim presented, since it did ascertain the facts correctly stated in the complaint; and that the rest of the "facts" set forth therein were conclusions of law or speculative statements. With respect to the alleged proffers of evidence, the intermediate appellate court concluded that the trial court did determine them to be true but that, even so, this did not merit a grant of relief in favor of petitioners. Finally, the aforementioned appellate court determined that, in accordance with the doctrine of *stare decisis,* the decision of this court in *U.S. Brewers Assoc. v. Srio. de Hacienda, supra*, was applicable to this dispute with respect to the claim concerning Sec. 3 of the Puerto Rico Federal Relations Law, *supra,* and that it also did not have the protectionist purposes that would invalidate it pursuant to the interstate and international commerce clause of the Constitution of the United States. *148

Dissatisfied, the petitioners sought recourse—pursuant to a Writ of *certiorari*—before this Court. They argue that it is appropriate to overturn the judgment issued by the intermediate appellate court since said court erred

. . . by affirming the denial of the Sworn Application without having ascertained the facts asserted in the complaint and assuming as true others that did not arise therefrom, contrary to the standard for denial under Civil Procedure Rule 10.2 and relevant case law.

. . . by deciding that Article 2 did not violate Sec. 3 of the Puerto Rico Federal Relations Act or the Commerce Clause, applying

Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)
207 TSPR 92, P.R. Offic. Trans.

erroneously the decision in the case of *U.S. Brewers v. Srio. de Hacienda,* 109 P.R. Dec. 456 (1980).

. . . by restricting its analysis concerning the purpose of Article 2 to the text of Law 69, thus ignoring the standard of interpretation put forth by this Honorable Court. Writ of *certiorari*, p. 5.

### I

A. We will first discuss, briefly, the first point of error, regarding the alleged inappropriateness of the denial on the basis of the provisions of Civil Procedure Rule 10.2, 32 P.R. LAWS ANN. App. III.

As we know, pleadings have the purpose of giving notice in broad strokes of what are the claims and defenses of the parties. #*Alamo Pérez v. Supermercado Grande, Inc.,* 158 P.R. Dec. 93 (2002); *Bco. Central Corp. v. Capitol Plaza Inc.,* 135 P.R. Dec. 760 (1994). It is for this reason that Civil Procedure Rule 6.1, 32 P.R. LAWS ANN. App. III, only requires that the pleadings in the complaint contain a succinct and simple narrative of the claim showing that the petitioner has a right to relief and a prayer for relief to which the petitioner believes it is entitled. *See* J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil [Treatise on the Law of Civil Procedure]*, San Juan, Pubs. J.T.S. 2000, Vol. 1, pp. 202-208.

Nonetheless, Civil Procedure Rule 10.2, *supra*, establishes, as a basis by which a party **\*149** may request the denial of a complaint filed against it, that the pleadings fail to set forth a claim upon which a grant of relief is justified. We have decided many times that, in the face of a request for denial on the aforementioned basis, courts must accept as true the pleadings contained in the complaint and consider them in the manner most favorable to the petitioner. *García v. E.L.A.,* 163 P.R. Dec. 800 (2005).

In order for a respondent to prevail pursuant to a motion to dismiss pursuant to the aforementioned rule of civil procedure, respondent must show with certainty that the petitioner has no right to any remedy, pursuant to any rule of law that may be proved in support of its claim, even interpreting the complaint as liberally as possible in petitioner's favor. Notwithstanding the foregoing, this doctrine is applied only to facts properly pleaded and expressed in a clear and compelling way, that on their face leave no room for doubt. *Pressure Vessels P.R. v. Empire Gas P.R.,* 137 P.R. Dec. 497, 504-505 (1994).

In other words, only facts correctly pleaded without considering conclusions of law or pleadings drafted such that their content appears hypothetical will be taken as true. Cuevas Segarra, *op. cit.,* p. 272.

It can be seen from an analysis of the sworn application presented by the petitioners that, basically, they argue that the tax exemption granted to beer distributors that produce fewer than 31,000,000 gallons was unconstitutional; because it violates the federal interstate commerce clause and Sec. 3 of the Puerto Rico Federal Relations Act, *supra*. In support of the foregoing, they made a number of allegations pursuant to which they claim to show the discriminatory effect of this exemption. Some of these allegations are as follows: **\*150**

18. This action seeks the avoidance, as [being] contrary to the Puerto Rico Federal Relations Act and the Commerce Clause of the Constitution of the United States, of those sections that create an exception to the tax rate in favor of a private manufacturing company in Puerto Rico, at the expense of international and interstate commerce and of the property interests of other local, United States and foreign companies, which are suffering and will continue to suffer irreparable harm . . . .

19. Indeed, and as we argue below, the legislation at issue creates discrimination of such a nature that it practically eliminates the right of consumers to acquire the beer they prefer and promotes a monopoly sanctioned by the state in favor of a sole producer and its exclusive distributor.

..........

38. All of the petitioning parties are affected by the law, the special exemption not being applicable to them.

39. On information and belief, only the local producer, Cervecería India, and its distributor for Medalla Light, its principal product, will benefit from the special exemption; that is, now they are required to pay only the $2.15 tax that applied to them under the prior legislation. This is so, because the total production of the local brewery does not exceed nine million gallons nor has it for years.

..........

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

43. Although neither the measure nor its statement of motives express on their face discriminatory or protectionist, unconstitutional or statutorily prohibited animus, it undoubtedly has this effect.

44. If one looks at the legislative history and the speeches given before the Legislature and the legislative debates and other public pronouncements of the legislators, it will be seen clearly that, despite the initial reticence of the Executive and Legislative branches to perpetuate the discrimination created by the special exemption, neither the measure nor the budget pending approval would have obtained the necessary votes were it not for the excessive preferential treatment that this measure proposes, solely for the benefit of the local brewery. See, Speech of the Executive Vice-President of Cervecería India, of April 8, 2002; Speech of the Mayor of Mayagüez, in support of the applications for preferential treatment for the local brewery, *inter alia*.

..............

46. Article 2 of Law 69 of May 30, 2002, 13 P.R. LAWS ANN. [sec.] 4023, in its effects and application, creates a restriction **\*151** prohibited in interstate commerce, by promoting irrational, restrictive and unjust discrimination in favor of a single local producer and to the detriment of the free flow of commerce.

47. The brunt of the increase, even though on the face of the Law it seems to apply equally to Puerto Rico and United States entities, in effect falls entirely on Puerto Rican distributors that sell beer manufactured in the United States, with the prohibited purpose of hindering the importation, marketing and sale of beer originating in the United States.

...............

50. Article 2 of Law 69 of May 30, 2002, 13 P.R. LAWS ANN. [sec.] 4023, in its effects and application, creates a restriction prohibited in international commerce, by promoting irrational, restrictive and unjust discrimination in favor of a single local producer and to the detriment of the free flow of commerce.

51. The brunt of the increase, even though on the face of the Law it seems to apply equally to Puerto Rico and United States entities, in effect falls entirely on Puerto Rican distributors that sell beer

manufactured outside Puerto Rico, with the prohibited purpose of hindering the importation, marketing and sale of beer originating abroad.

.............

55. Article 2 of Law No. 69 of May 30, 2002, 13 P.R. LAWS ANN. § 4023, in its application and effects, as previously stated, violate[s] the clear and transparent language of Article 3 of the Federal Relations Act. Sworn Application, pp. 5-15, Appendix, pp. 42-52.

Even though the cited arguments are not a model of perfection, a simple reading is sufficient to realize that they may be considered as well-crafted pleadings for purposes of granting the relief requested. In fact, both the trial court and the intermediate appellate court analyzed the basic allegations made by petitioners and, ultimately, determined that they were without merit.

Accordingly, we will proceed to analyze the validity of petitioners' principal argument to the effect that *Art. 2 of Law No. 69, supra, discriminates against interstate and international commerce and, therefore, violates the* **\*152** *interstate commerce clause or Sec. 3 of the Puerto Rico Federal Relations Act, supra.*

B. The Constitution of the Commonwealth of Puerto Rico provides that "the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as provided by the Legislative Assembly, and it shall never be surrendered or suspended." Art. VI, Sec. 2, Const. E.L.A., P.R. LAWS ANN., Vol. 1, ed. 1999, p. 401. This taxing authority is fundamental to the life of the State and, therefore, the government's power of taxation is constitutionally of a broad and all-encompassing nature. *Café Rico, Inc. v. Mun. de Mayagüez.* 155 P.R. Dec. 548 (2001); *Continental Ins. Co. v. Srio de Hacienda,* 154 P.R. Dec. 146 (2001); *F.D.I.C. v. Mun. de San Juan,* 134 P.R. Dec. 385 (1993); *Coca-Cola Bottling Co. v. Srio. De Hacienda,* 112 P.R. Dec. 707 (1982); *U.S. Brewers Assoc. v. Srio. de Hacienda, supra.*

Nevertheless, the aforementioned broad power yields to constitutional or other limitations. One of these limitations is established in Sec. 3 of the Puerto Rico

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

Federal Relations Act, *supra,* ed. 1999, p. 210, which states in pertinent part that

. . . the internal revenue taxes that the Legislative Assembly of Puerto Rico imposes pursuant to the authority granted by this law on any articles, effects, goods or commodities may be imposed and collected on the articles subject to said tax, as determined by the aforementioned Legislative Assembly, as soon as they have been manufactured, sold, used or imported in or into the Island; provided, however, that, *there shall be no distinction whatsoever made between articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. . . .* (Emphasis added.)

Similarly, the interstate commerce clause of the Constitution of the United States provides:

The Congress shall have Power To lay and collect Taxes, Duties, imposts and excises . . . . **\*153**

. . . . . . .

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes… Art. 1, Sec. 8, U.S. Const., P.R. LAWS ANN., Vol. 1, ed. 1999, p. 167.

The purpose of this constitutional provision was to grant power to Congress to regulate both interstate and international commerce. Therefore, it has been said that this is the greatest source of congressional power. L. H. Tribe, *American Constitutional Law,* 3rd ed., New York, Foundation Press, 2000, Vol. 1, pp. 801-808.

On the other hand, despite the fact that the federal Constitution nowhere limits state interference with interstate commerce, the U.S. Supreme Court since 1852 has interpreted the commerce clause as also containing an implicit prohibition on the power of the states to regulate interstate and international commerce, even in the absence of express federal legislation. See: Tribe, *op. cit.,* p. 1029; *Cooley v. Broad [sic] of Wardens,* 53 U.S. 299 (1851). This element of the commerce clause is called "the dormant or negative aspect." *U.S. v. South-Eastern Underwriters Assn.,* 322 U.S. 533, 552 (1944); *Southern Pacific Co. v. Arizona,* 325 U.S. 761 (1965). This negative aspect prevents the states from putting the welfare of the Nation at risk "by plac[ing] burdens on the flow of

commerce across its borders that commerce wholly within those borders would not bear." (Citations omitted.) *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n,* 545 U.S. 429 (2005), citing *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 180 (1995).

With respect to the application of the commerce clause in our jurisdiction, this Court has stated, both before and after the approval of our Constitution, that this clause does not apply to the Commonwealth. *South P.R. Sugar Corp. v. Com. de Servicio Púb.,* 93 P.R. Dec. 12 (1966); *R.C.A. v. Gobierno de la Capital,* 91 P.R. Dec. 416 (1964); **\*154** *Ballester Hnos. v. Tribunal de Contribuciones,* 66 P.R. Dec. 560 (1946). Among the scenarios that we have mapped in order to reach this determination are, among others, the status of the unincorporated territory of Puerto Rico before the approval of the Constitution and the various contours that have existed in commercial relations between Puerto Rico and the United States and among the states of the United States.

Notwithstanding the foregoing, *in more recent decisions we have moved away from this position and we have pointed out that the controversy is not entirely resolved.*[6] Specifically, in *M. & B.S., Inc. v. Depto. de Agricultura,* 118 P.R. Dec. 319 (1987), we stated that, at that time, it was unnecessary to decide whether the interstate commerce clause in its "dormant state" was applicable to Puerto Rico. Similarly, in *Gómez Hnos., Inc. v. Secretario de Hacienda,* 114 P.R. Dec. 367 (1983), we utilize, in order to determine the validity of a local tax, the requirements that federal case law had embraced in order to evaluate the appropriateness of state tax laws vis-á-vis the commerce clause. Finally, in *Banco Popular v. Mun. de Mayagüez,* 126 P.R. Dec. 653 (1990), although we did not decide the dispute according to the analysis created for the "dormant state" of the commerce clause, *we did describe part of it as if it were applicable in its entirety in our jurisdiction to the point of stating that the law challenged there could be unconstitutional according to that analysis.*[7]

This case presents us with the opportunity to decide, once and for all, *the question whether the commerce clause in its "dormant state" is applicable to Puerto Rico.* Thus, before entering into a discussion of the merits of the pleadings **\*155** of petitioners in this case, we will proceed to discuss the issue. Let's take a look.

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

1. From an exhaustive study of the case law—both local as well as federal—and of writers of treatises on constitutional law we can see that the issue raised has not been discussed broadly, resulting in a paucity of legal sources to help us to resolve it. Nevertheless, it emerges from the existing sources that, over the years, several arguments in favor of and against the application of the commerce clause to our jurisdiction have been delineated.

Among the strongest bases *against* the application are, among others, that: (1) the federal Constitution has never been applied fully to Puerto Rico, since it has never been considered a state; (2) that the relationship between Puerto Rico and the United States, beginning in 1952, is unique, for which reason Puerto Rico cannot be classified as a state or as an unincorporated territory for purposes of the referenced clause; (3) that neither in our Constitution, nor in Public Law 600, nor in the Puerto Rico Federal Relations Act was it stated that said clause would be applicable to Puerto Rico, which is why it was not part of the agreement between the United States and Puerto Rico. See: *Sancho v. Bacardí Corporation of America,* 109 F.2d 57 (1st Cir. 1940) (reversed on other grounds in *Bacardi Corp. v. Domenech,* 311 U.S. 150 (1940)); *Mora v. Torres,* 113 F. Supp. 309 (P.R. Dec. 1953); *R.C.A. v. Gobierno de la Capital, supra.*

In contrast, the most persuasive arguments *in favor* of the application of the commerce clause to Puerto Rico are: (1) that it is applicable to Puerto Rico by way of the territorial clause; (2) that the intent of Congress in permitting the approval of the Constitution of the Commonwealth (E.L.A.) was to organize a local government, which is why its adoption at no time alters the applicability to Puerto Rico of the laws of the United States and of **\*156** federal jurisdiction in Puerto Rico; (3) the broad powers of Congress to regulate commerce in general, including in Puerto Rico; (4) the obvious applicability to Puerto Rico of the principle of uniformity in common trade and commerce. See: *Starlight Sugar Inc. v. Soto,* 253 F.3d 137 (1st Cir. 2001); *Sea-Land Services, Inc. v. Municipality of San Juan,* 505 F. Supp. 533 (P.R. Dec. 1980)); R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico [Constitutional Law of the United States and Puerto Rico],* San Juan, Ed. C. Abo. P.R., Vol. I, p. 341.[8]

The majority of the aforementioned approaches originate in several decisions of the Federal District Court for the District of Puerto Rico and of the First Circuit Court of Appeals. At first, both courts had held that the commerce clause was *not* applicable to Puerto Rico. *Morra v. Torres, supra; Buscaglia v. Ballester,* 162 F.2d 805 (1st Cir. 1947); *Lugo v. Suazo,* 59 F. 2d 386 (1st Cir. 1932). Later, these courts *changed their approach* and held that the commerce clause *was applicable fully to the Commonwealth.*

The first of these cases decided in favor of the aforementioned clause was *Sea-Land Services, Inc. v. Municipality of San Juan, supra.* On that occasion, the Federal District Court for the District of Puerto Rico held that the power granted to Congress under the territorial clause[9] required a determination that **\*157** the commerce clause was applicable to Puerto Rico *both in its positive and dormant aspects.* The aforementioned court added that the reasons that led the framers to approve the commerce clause apply to commercial relations between Puerto Rico and the states or foreign countries, and to hold that the clause was not applicable to Puerto Rico would provoke rivalries with the states and would prevent regulatory uniformity in cases in which Congress believed it to be appropriate.

Notwithstanding the preceding decision, it was not until 1992 that the First Circuit Court of Appeals had the opportunity to revise the pronouncements it made in *Buscaglia v. Ballester, supra,* and in *Lugo v. Suazo, supra,* among others, with respect to the inapplicability of the commerce clause to Puerto Rico. Such an opportunity arose in the case *Trailer Marine Transport Corp. v. Rivera Vazquez,* 977 F.2d 1, 8-9 (1st Cir. 1992), in which among other things that court stated:

> . . . *Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine.* In the Supreme Court's words, "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with the States of the Union . . . " *Examining Board v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed. 2d 65 (1976). (Emphasis added.)

That court stated, *in addition:*

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce. *This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union.* In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an "intermediate boundary" separating it from the rest of the country. There is no reason **\*158** to believe that Congress intended to authorized Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise. (Citations omitted and emphasis added.)

In order to reach this result, the First Circuit also relied upon court decisions in other circuits. Among those, the decision of the Ninth Circuit in *Anderson v. Mullaney,* 191 F.2d 123, 127 (9th Cir. 1951), in which it was held that the doctrine of the dormant commerce clause applied to the then territory of Alaska and the decision of the Third Circuit in *JDS Realty Corp. v. Government of Virgin Islands,* 824 F.2d 256, 259-260 (3rd Cir. 1987), which did the same for the current territory of the Virgin Islands.

With respect to these decisions—those concerning Alaska and the Virgin Islands—we most point out, beyond the differences between the type of relationship that they have with the United States in comparison with Puerto Rico, the language contained in *Anderson v. Mullaney, supra,* p. 128:

> But we cannot conceive that in granting legislative power to the Territorial Legislature it was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce. The words "all rightful subjects of legislation" describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. 77, do not include

the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. "All rightful subjects of legislation" must be held to refer to matters local to Alaska.

In subsequent decisions, the First Circuit Court of Appeals has reiterated, without further explanation, the applicability of the commerce clause to Puerto Rico. To such effect, see: *United Egg Producers v. Department of Agriculture, 77 F.3d 567 (1st Cir. 1996); Starlight Sugar, Inc. v. Soto, supra.* Finally, it is worthwhile to point out that as recently as April 2005, the aforementioned federal court decided the case of **\*159** *Walgreens Co. v. Rullan,* 405 F.3d 50 (1st Cir. 2005), in which *it reiterated* the aforementioned in holding that a local law that required certificates of necessity and convenience from all persons interested in acquiring or constructing a health care facility on the island—including pharmacies—violated the dormant aspect of the commerce clause of the federal Constitution and, therefore, was invalid. That decision was appealed, by a writ of *certiorari* to the Supreme Court of the United States, on November 4, 2005. Subsequently, on January 9, 2006, the Supreme Court *denied* the appeal. *See, Pérez Perdomo v. Walgreen Co. et al.,* 163 L.Ed.2d 928 (2006).

Surely, all the aforementioned arguments are highly persuasive and include political aspects that would have to be resolved in a non-judicial forum. Nonetheless, we believe that, given the particular circumstances of our relationship with the United States, *the arguments in favor of the application of the commerce clause to Puerto Rico, in its dormant state, are more persuasive than the arguments against it.*

First, the facts are incontrovertible that the relationship of Puerto Rico with the United States is *sui generis*[10]—that it cannot be categorized as an incorporated or as an unincorporated territory—and that, regardless of what the relationship is, Congress has the power—through the territorial clause—to regulate both interstate and international commerce in Puerto Rico. On this basis, it would not be correct to address the issue of the applicability of the dormant aspect of the commerce clause to our jurisdiction simply by contending that the commerce clause does not apply by its own force to unincorporated territories.

Case:17-03283-LTS Doc#:4781-36 Filed:01/24/18 Entered:01/24/18 18:12:25 Desc:
Exhibit Exhibit 36 (Part C) Page 293 of 541

Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)
207 TSPR 92, P.R. Offic. Trans.

Thus, despite the existence of a special and unique relationship between the United States and Puerto Rico, there should be *no* doubt **\*160** that, in terms of the powers granted for self-governance, the Commonwealth and the states that comprise the American Union are extremely similar. See: *Examining Bd. v. Flores de Otero, 426 U.S. 572, 595 (1976); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 671 (1974). Surely, Puerto Rico is neither a country nor an independent territory with freedom to approve laws that infringe upon the stability of interstate commerce. See, Trailer Marine Transport Corp. v. Rivera Vazquez, supra.*

In addition to the above, we believe that there are other arguments that support with equal vigor the application of the dormant aspect of the commerce clause in our jurisdiction. To such effect, we highlight the statements of the First Circuit Court of Appeals in *Trailer Marine Transport Corp. v. Rivera Vazquez, supra,* that full economic integration—*a fundamental purpose of the commerce clause*—is as essential for Puerto Rico as for any state of the American Nation. Said in another way, there is *no* valid legal basis for maintaining that Puerto Rico—in the absence of federal legislation—can discriminate against products of other states, or of foreigners, thus benefitting its own.

Surely, there should remain no doubt in anyone's mind that—at least with respect to commercial matters—the United States enjoys broad power to avoid what the United States Supreme Court has called "the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Granholm v. Heald, 544 U.S. 460, 472 (2005),* citing *Hughes v. Oklahoma, 441 U.S. 322, 325-326 (1979).*

Finally, in the absence of an express provision that excludes Puerto Rico from the application of the dormant aspect **\*161** of the commerce clause,[11] there is *no* reason to believe that Congress authorized Puerto Rico to discriminate against interstate and international commerce. In the same way, it would be risky to make a contrary argument, as there exists in the Puerto Federal Relations Act a provision that prevents the Legislature of the Commonwealth from making *"any distinction between articles imported from the United States or from foreign countries and similar items produced or manufactured in Puerto Rico."* (Emphasis added.) Sec. 3 of the Puerto Rico Federal Relations Act, *supra*, p. 210.

In virtue of all that is stated above, *we believe that the case law relative to the dormant state of the commerce clause of the United States Constitution applies to the Commonwealth of Puerto Rico, as has been stated by the Federal Supreme Court.*

C. Now then, having stated the foregoing, it is relevant for us to ask ourselves what is the required analysis in the face of an alleged violation of the case law.

As we already stated, the negative or dormant aspect of the commerce clause *prevents*, even in the face of the absence of binding federal law, a state from approving laws that affect interstate or international commerce that would adversely affect foreign products or benefit local products. In other words, and as the federal Supreme Court has stated, "[t]he negative or dormant implication **\*162** of the Commerce Clause prohibits state regulation that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace' ". (Citations omitted.) *General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997).*

As the well-known treatise writers Rotunda and Nowak point out, the dormant aspect of the commerce clause seeks to prevent states from imposing economically protectionist measures. They further state that it is irrelevant whether the advantage is for local businesses or for local consumers, and that both situations violate the negative implication of the commerce clause. 2. *Rotunda and Nowak, Treatise on Constitutional Law 3rd,* Sec. 11.1, p. 133 (1999).

The current focus of the federal Supreme Court, according to the well-known treatise writer Laurence H. Tribe, is directed at placing greater emphasis on the question of whether the statute at issue discriminates against interstate or international commerce. Tribe, *op. cit.,* p. 1059. In this manner, a state law that discriminates against interstate commerce, *either on its face or by its effect,* will be voided unless the state demonstrates that the statute seeks a legitimate local purpose, and if said purpose cannot be fulfilled by non-discriminatory measures.

*Idem.*

Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)
207 TSPR 92, P.R. Offic. Trans.

Now then, a law that is not discriminatory either on its face or by its effect, but that indirectly affects interstate commerce, may be invalid if the burden imposed on commerce is clearly excessive in relation to the local putative benefits. *Oregon Waste Systems, Inc. v. Department of Environment Quality of Ore.*, 511 U.S. 93, 99 (1944).[12]

With regard to the specific aspect regarding state tax legislation, the federal Supreme Court **\*163** has established a *cardinal rule,* that in form is compatible with the commerce clause, which specifies that no state may impose a tax that discriminates against interstate commerce, providing a direct commercial benefit to local businesses. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 268 (1984). See: *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 329 (1977); *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458 (1959).

With the passage of time, the case law relative to the analysis of the referenced state laws has been expressed as follows: a state tax, in the face of an attack based on the commerce clause, will be deemed valid if: (1) there is a substantial nexus between the activity subject to the contribution and the state that imposes the contribution; (2) the contribution is equitably distributed or proportioned; (3) *the contribution in question does not discriminate against interstate commerce;*[13] (4) the contribution is related appropriately to the services provided by the state. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977). See also *Iberia v. Srio. de Hacienda,* 135 P.R. DEC. 57 (1994).[14]

With regard to said criteria, it has been claimed that the *third requirement is the dominant requirement* and that the first as well as the fourth are intended to demonstrate that the state has sufficient relationship to the activity that it intends to tax. Lastly, the second requirement is intended to ensure that the **\*164** taxes do not force the interstate business to pay more than what is applicable. Tribe, *op. cit.,* pp. 1106-1107.

D. After having stated the rule of law relative to the dormant aspect of the commerce clause, we will proceed to analyze together the second and third error indications. In essence, the petitioners allege that Article 2 of Law No. 69, *supra,* discriminates in its purpose and in its effect against interstate commerce

and therefore, it violates the commerce clause and the referenced Section 3 of the Puerto Rico Federal Relations Act.

First, we must dispel, without further analysis, the possible controversy as to whether Law No. 69, *supra,* challenged herein is discriminatory *prima facie, emphasizing* that in the sworn petition presented to the primary jurisdiction, the petitioners acknowledge that this law is *not.* Furthermore, we noted that in this case there is no dispute with regard to the challenged law being equally applicable to local, state or international companies, since the stated companies will have to pay a contribution that will be based on their *production volume,* independent of their place of origin.

In spite of this, the petitioners claim that the primary jurisdiction as well as the intermediate appeals court erred in not using the legislative record of Law No. 69, *supra,* in order to determine that the measure had a *discriminatory purpose* or, in other words, that it was discriminatory *prima facie.*

With regard to this position, it is necessary to note that on repeated occasions we have ruled that "if [a] law lacks a statement of purpose, it generally states the purpose that inspired its creation. Nevertheless, in those cases in which the law lacks a statement of purpose, or when it has one, but *does not contain the legislative intent,* it is helpful to consult other documents, such as the reports of the committees that reviewed the **\*165** bill and the debates that occurred when the measure was discussed on the floor, as noted in the record of proceedings". *Vicenti v. Saldaña,* 157 P.R. DEC. 37, 48 (2002). See *Chévere v. Levis, supra.* In other words, *the standard regarding how the legislative intention of a statute must be analyzed* is to look for it in the statement of purpose and that only in cases in which there is no statement of purpose, or if the *legislative intent* is *not stated there,* should one resort to other documents.

And it cannot be otherwise, since to interpret the legislative intention of a law based on documents other than the statement of purpose—of course, when the former contains the aforementioned intention—would be to state *sub-silentio* that the Legislative Assembly "says one thing but wants another". Similarly, it is not the same thing to interpret a statute to be able to apply it, as to interpret it with a view towards determining the intention of the legislature at the time they approved it. With regards to said

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

dilemma, the following statements by the federal Supreme Court are illustrative:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. *It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.* We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it. (Emphasis added and commentary omitted) *United States v. O'Brien,* 391 U.S. 367, 383–384 (1968).

This Court has made similar statements with regard **\*166** to the use of expressions of the legislator, during legislative debate when interpreting a law. To this end, we have stated that "it is a generally accepted rule that the statements of a legislator, on the floor of the legislative body to which he belongs, are not sufficiently representative of the collective intent of the body that approves the statute". *F. Vázquez, Inc. v. Srio. de Hacienda,* 103 P.R. DEC. 388, 390 (1975). In addition, it is a reiterated standard that laws "must be interpreted based on what the Legislative Assembly did, and not based on what it did not do, or the personal action of one of its members". *Elicier v. Sucn. Cautiño,* 70 P.R. DEC. 432, 437 (1949).

Having stated the foregoing, we will analyze the Statement of purpose of Law No. 69, *supra,* in order to determine whether it is necessary to consult other documents to establish the intention of the legislators when they approved it. The Statement of Purpose, in its relevant section, states:

> The tax measures that are established by this measure must not affect other areas of the economic basis of the country. Therefore, in the case of beer, the mechanism guaranteed by the Supreme Court of Puerto Rico in *U.S. Brewers Assoc. v. Srio. de Hacienda,* 109 P.R. DEC. 456 (1980), in order to ensure that industries with lower production are able to continue operations unchanged. In those cases, as manufacturing capacity increases, and as a result, their economic stability does the same, their liability vis-à-vis the Treasury increases. In light of this, *it is public policy of the Commonwealth to encourage small industries that produce beer not to bear the weight of the new increase in the tax until its annual production and commercial capacity warrant it ...* (Emphasis added). 2002 (Part I) Laws of Puerto Rico 263, 265-266.

From an analysis of the aforementioned text, we can clearly and without ambiguity see that the intention of the Legislative Assembly when it approved said law was to approve a new tax while it guaranteed, at the same time, that small breweries could continue **\*167** operations without bearing the burden of the tax, until its annual production warranted it. Let us remember that "when the law is clear and free of any ambiguity, the letter of the law must be respected". Art. 14 of the Civil Code, 31 P.R. LAWS ANN. Sect. 14. See *E.L.A. v. Rodríguez,* 163 P.R. DEC. 825 (2005).

As was stated above, we believe that the Trial Courts and Appeals Courts *acted correctly* in ruling that the

legislative intent that led to the approval of Law No. 69, *supra*, is *not* discriminatory *prima facie,* since it is transparent from its statement of purpose. Similarly, and contrary to what is stated by the petitioners, we believe that in order to reach said conclusion, it was *not* necessary to examine the statements by several legislators during the legislative debate process.

On the other hand, the petitioners claim that the challenged law has a *discriminatory effect* on interstate commerce. For this purpose, they rely on *Bacchus Imports, Ltd. v. Dias, supra*, in which case the federal Supreme Court invalidated a Hawaii state law that established a tax on alcoholic beverages with the sole exceptions of two beverages that were only produced in said state.[15]

Upon examining the purpose of the aforementioned legislation, the federal Supreme Court stated that "examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce". *Bacchus Imports, Ltd. v. Dias, supra,* p. 270. Notwithstanding the foregoing, the highest federal jurisdiction stated: "Likewise, the effect of the exemption is clearly discriminatory, in that *it applies only to locally produced beverages, even though it does not apply to all such products.* Consequently, as long as there is some **\*168** competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect." *Idem.*, p. 271.

As may be seen from the foregoing, the federal Supreme Court declared the challenged law to be unconstitutional due to the fact that it was discriminatory *prima facie*—in its purpose—and by its effects. Based on the latter, the petitioners outline their argument inasmuch as Law No. 69, *supra*, is discriminatory by its effect. Nevertheless, we are of the opinion that the judgment in *Bacchus Imports, Ltd. v. Dias, supra,* with regard to the discriminatory effect of the law, does *not* apply to this case.

First, the laws involved in both cases are *clearly distinct.* While *Bacchus Imports, Ltd. v. Dias, supra*, intended to only protect the Hawaiian liquor market, exempting several drinks that were only produced in Hawaii from the application of the tax, in the present case it is intended to guarantee that industries with lower production, *independent of their provenance,* can

absorb the contribution imposed without ceasing operations. It arises from the law itself that in order to comply with said purpose, the Legislative Assembly of Puerto Rico established a system of staggered exemptions which is intended to allow the liability of companies vis-à-vis the Treasury to increase gradually while their economic stability increases.[16]

As we saw, in *Bacchus Imports, Ltd. v. Dias, supra*, the federal Supreme Court gave special emphasis to the fact that the only drink that benefited from the exemption was Hawaiian, *which is not true in the present case.* From the case file **\*169** before us it may be seen that the *petitioners themselves admit* that there are foreign beverages, such as Mike's Hard Lemonade and Cruzan I Sland [sic] Cocktails, that benefit from the special exemption, and there are others, such as Samuel Adams and Bacardi Breezers, that were eligible or that discontinued production, therefore the local brewery is *not* the only one that benefited from the exemptions offered by said law.

In addition, it is an undisputed fact that the exemptions that were approved do and may apply equally to local, state or foreign breweries, allowing the tax level to vary *depending on their annual production.* So, a brewery that today benefits from some of the exemptions enacted, next year may benefit from a lesser exemption or even none, depending on how its production changes. Furthermore, it is hardly risky to state that small foreign breweries could receive the aforementioned benefit if they decide to sell their products in Puerto Rico.

In other words, in order to rule that the effect of Art. 2 of Law No. 69, *supra*, is discriminatory against interstate commerce, a determination is required that said law has the effect of not permitting entities outside of Puerto Rico receive their benefits, which as we have seen is not correct.

Furthermore, although it is true that the commerce clause in its dormant state prohibits states from approving economic laws that discriminate against foreign products by reason of their place of origin, we cannot state that said clause prohibits a state from approving a law that, in technical terms, is applied differently to various products or producers. Of course, this would be the case, provided that said difference has nothing to do with the provenance of the products, but rather

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

with common or neutral aspects that may vary from one company to the next independent of their place of origin. In this respect, **\*170** the following statements by the federal Supreme Court are relevant: "[T]he Commerce Clause *is not violated* when the *differential tax treatment* of two categories of companies '*results solely from differences' between the nature of their businesses,* not from the location of their activities." (Emphasis added.) *Kraft Foods v. Iowa Dept. of Rev.,* 505 U.S. 71, 78 (1992).

For said reasons, we are of the opinion that Art. 2 of Law No. 69, *supra, does not discriminate by its application or effect against interstate commerce.* However, our analysis does *not* end here. As we stated above, state tax laws, in addition to not being discriminatory, must comply with other criteria in order to survive an attack under the commerce clause. These criteria are, that: (1) the tax apply to any activity that has a substantial nexus with the state; (2) is fairly distributed; and (3) correctly relates to the services offered by the state.

The petitioners have not outlined any argument intended to show that Art. 2 of Law No. 69, *supra,* does not comply with any of the aforementioned criteria. Nevertheless, it is clear that the tax established by Law No. 69, *supra,* and therefore, the challenged exemption, applies to an activity that has a substantial nexus with Puerto Rico and it is related to services offered by Puerto Rico, i.e. the authorization for the sale of alcoholic beverages in our jurisdiction. In addition, it is fairly distributed, since the exemption is lesser, as the company's production increases.

Lastly, we must state that when a state law that imposes a tax to allegedly discriminate against *international* commerce is challenged, the following criteria must also be analyzed: (1) "whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation", and (2) "whether the tax prevents the Federal Government from 'speaking **\*171** with one voice when regulating commercial relations with foreign governments.'" *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 451 (1979).

With regard to the first criterion, the federal Supreme Court has stated that a state tax will be validated unless the risk of double taxation is inevitable. *Barclays*

*Bank PLC v. Franchise Tax Board of Cal.,* 512 U.S. 298 (1994); *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159 (1983).* It is obvious that the tax that gives rise to the exemption challenged herein does *not* expose a risk of double taxation, since it only affects the beverage that is sold in Puerto Rico.

On the second criterion, what is intended is to avoid devaluing the Congressional interest in establishing uniformity with regard to commercial relationships with other countries. This criterion presupposes that the Congress has clearly stated its intent of creating the aforementioned uniformity. *Barclays Bank PLC v. Franchise Tax of Cal., supra.* In this *case,* there is no congressional intent to maintain the aforementioned uniformity, and furthermore, there are countless states with various laws that impose distinct taxes on beer and other beverages.[17]

We reiterate that we are of the opinion that Art. 2 of Law No. 69, *supra,* does *not* violate the interstate commerce clause, since: (1) it has no discriminatory purpose; (2) it does not have a discriminatory effect; (3) it applies to an activity that has a substantial nexus with Puerto Rico; (4) it is fairly distributed; (5) it is properly related to services offered by the state; (6) it does not constitute a substantial risk of multiple-taxation, and (7) it does not affect any possible interest of the federal government in maintaining uniformity **\*172** with international commerce.[18] In conclusion, we believe that the Trial Court as well as the Appeals Court *acted correctly* in rejecting the sworn petition that brought about this case.

For all the reasons stated above, we *agree* with the ruling handed down by the Court in this case.

--O--

Opinion in agreement issued by Associate Justice Fuster Berlingeri.

**I**

I agree with the ruling issued by the Court in this case. To me, it is clear that Art. 2 of Law No. 69 dated May 30, 2002 (13 P.R. LAWS ANN. Sect. 9574) *has no constitutional defect whatsoever,* therefore it is lawful to reject the action filed by the

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

plaintiffs, as they correctly ruled in the first instance and on appeal.

In order to resolve this case, it is only necessary to apply to its facts what was ruled by this Court in *U.S. Brewers Assoc. v. Srio. de Hacienda,* 109 P.R. DEC. 456 (1980), *which presented a situation basically identical to that in this case,* as was correctly done by the lower courts. *U.S. Brewers Assoc. v. Srio. de Hacienda, supra,* is a clear determinative precedent of the matter at dispute in the **\*173** present case, which may be adjudicated simply by just applying the referenced precedent here.

Nevertheless, I would like in this opinion to take on the thorny matter of whether the limitations resulting from the interstate commerce clause of the federal Constitution are applicable *ex proprio vigore* to Puerto Rico. The matter was asserted in the present case and it provoked the other opinion in accordance with what was stated here, which I believe to be erroneous and likely to cause confusion. Therefore, it seems to me to be necessary to consider this matter in depth.

This is a matter that has been before us several times before, but that this Court has treated *with ambivalence,* at least in recent times. On the initial occasions when the matter came before us, this Court ruled very deliberately that *the so-called "dormant" aspect of the commerce clause of the federal Constitution did not apply to Puerto Rico.* We ruled in that way *prior* to the establishment of the Commonwealth, in the significant ruling *of Ballester Hnos. v. Tribunal de Contribuciones,* 66 P.R. DEC. 560 (1946). After the establishment of the Commonwealth, we returned to the matter and ruled in the carefully considered and fundamental ruling in *R.C.A. v. Gobierno de la Capital,* 91 P.R. DEC. 416 (1964), and in *South P.R. Sugar Corp. v. Com. de Servicio Púb.,* 93 P.R. DEC. 12 (1966). Nevertheless, in spite of these clear and substantial precedents, more recently, in a case in which the matter was brought up again, this Court hesitated and chose not to reiterate the prior rulings in the three cited judgments. It preferred to stop a noting that although the commerce clause applied, the facts in question did not constitute a violation of that clause. *M. & B.S., Inc. v. Depto de Agricultura,* 118 P.R. DEC. 319, 336 (1987).

In my opinion, the matter referenced merits greater study and reflection, for the simple reason that the erroneous notion that the interstate commerce clause of the federal Constitution applies to Puerto Rico *ex proprio*

*vigore,* places on **\*174** the backs of the Government of the country an unnecessary legal burden that serves *as one further limitation on its capacity to successfully confront the serious economic problems of Puerto Rico.* So, there is no other alternative than to vehemently reject the alleged applicability of the referenced clause and to explain the foundations of our opinion. Let's take look.

**II**

Why do some in Puerto Rico still have the erroneous opinion that our country is subject to the limitations arising from the interstate commerce clause of the United States Constitution? Why do they not adhere to the three opinions of this Court, cited two paragraphs above, that definitively rule on the federal regulations in question not being applicable to Puerto Rico? What is the reason behind determination to introduce into our legal scholarship the erroneous legal criterion that Puerto Rico is subject to the dormant aspect of the interstate commerce clause of the American Constitution?

The answer to the foregoing questions is found in an alleged "key case" of the federal First Circuit Court of Appeals, which is the bases for the other concurring opinion in this case. Said opinion apparently is nothing more than a consequence of the referenced federal ruling that was adopted here in imitation thereof. Therefore, one must go to the original source of the matter, in order to critically examine the ruling there.

**III**

The federal First Circuit had ruled since 1932 that the interstate commerce clause of the United States Constitution was not applicable to Puerto Rico. It did so in **\*175** *Lugo v. Suazo,* 59 F.2d 386 (1st Circuit 1932), and it was reiterated in *Buscaglia v. Ballester,* 162 F.2d 805 (1st Circuit 1947), *cert.* denied, 332 U.S. 816 (1947). So, for decades, both the Supreme Court of Puerto Rico and the federal Appeals Court for the First Circuit repeatedly held that this clause did not apply to Puerto Rico. The grounds for what was ruled by both courts was essentially the same, and they can be explained as follows.

From the start, the relationship between the United States and Puerto Rico has been subject to the fundamental principle that the *Federal Constitution does not apply in its entirety to Puerto Rico, since the island was never a territory incorporated into the American Union or*

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

*an integral part of the United States.* The federal Supreme Court repeatedly ruled that only the guarantees if the primary fundamental rights of individuals provided by the United States constitution were applicable in full to Puerto Rico, which by its nature always limited the exercise of Federal Legislative and Executive Power. One of the clauses of said Constitution that no federal court ever had applied to Puerto Rico was specifically that related to commerce, which states that the Congress has the authority to regulate commerce between various states ("commerce … among the several States"). Puerto Rico, of course, is not a "state", therefore it had been repeatedly ruled that the island was not covered by the congressional authority to regulate commerce between the states. *This did not mean that commerce between Puerto Rico and the United States was not subject to the power of Congress;* only that it was governed only by the clause that granted to Congress the authority to govern the territories of the United States, the so-called Territorial Clause. This is why the commerce clause, in its "dormant" aspect, always **\*176** had been conceived only as a *limitation on the powers of the states;* never as a limitation on the governmental powers of the territories.

Regarding what is stated in the previous paragraph, one must also take into consideration the known refusal of the Supreme Court of the United States to grant force to any provision of the federal Constitution that literally referred to the "states" of the Union with regard to Puerto Rico. So, in *Puerto Rico v. Branstad,* 483 U.S. 219 (1987), the federal Supreme Court applied to Puerto Rico the *federal Extradition Act,* which expressly covers territories of the United States, to not have to rule whether the Extradition Clause of the federal Constitution—Art. IV, Sec. 2, U.S. Const., P.R. LAWS ANN., Vol. 1—applied to Puerto Rico.[1] The highest federal court stated as follows:

> It is true that the words of the [Extradition] clause apply only to "States" and we have never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred upon the States under the Constitution. We need not decide today what applicability the Extradition Clause may have to the Commonwealth of Puerto Rico, however, for the Extradition Act clearly applies. The Act requires rendition of fugitives at the request of a demanding

"Territory", as well as a State. *Puerto Rico v. Branstad, supra,* p. 229.

The referenced refusal, illustrated by the case *Puerto Rico v. Branstad, supra,* has been stated in other significant decisions of the US. Supreme Court regarding Puerto Rico. So, in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663 (1974), said Court determined that the guarantees of due process of law and of the equal protection of laws applied to Puerto Rico, but it refused to rule that the Fourteenth Amendment **\*177** of the federal Constitution, which expressly extends such guarantees to the states of the Union, was applicable to Puerto Rico since it is not a state. The Court chose to rule that the referenced constitutional standards applied to Puerto Rico under the Fifth or the Fourteenth Amendment, without specifying which one *(either-or).* the same occurred in *Examining Bd. v. Flores Otero,* 426 U.S. 572 (1976). In this case, one of the Justices of the Court, Justice Rehnquist, who was later the Chief Justice, stated the following in his own dissent, in part:

> The Fourteenth Amendment is by its terms applicable to States: Puerto Rico is not a State. … I would be inclined to reject the claim that the Fourteenth Amendment is applicable to Puerto Rico until a case sufficiently strong to overcome this "plain meaning" obstacle, found in the language of the Amendment itself, is made out. Idem., p. 607.

In light of the foregoing, which refers to cases ruled *after* the creation of the Commonwealth, it seems apparent that the U.S. Supreme Court itself would not be disposed to holding that the provision of the federal Constitution governing commerce between various states ("among … the several States") in no way referred to Puerto Rico, which is clearly not a state.

When the federal First Circuit Court decided to reverse itself on this matter in 1992, it did so with a very limited and superficial analysis, that did not in any way replicate the grounds of the previous contrary rulings of either the same court or of this Court. Its "analysis" was limited, in essence, to holding on two statements. First, that the creation of the Commonwealth allowed Puerto Rico to be granted the degree

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
207 TSPR 92, P.R. Offic. Trans.

of autonomy and independence that is normally associated with the states of the Union. Therefore, said Court reasoned, the limitations that applied to the states of the Union applied to Puerto Rico. *178

Note that this first argument has the anomaly, not to mention the error, *of deriving a limitation of power by invoking the granting of autonomy of power.* The erroneous argument is that since Puerto Rico, when the Commonwealth was created, was granted a greater degree of autonomy than what it had previously, comparable to that of the states of the Union, at the same time it was subject to a limitation of power that it did not have previously. That is, to the repeated statement made by the federal Supreme Court, acknowledging the *greater autonomy* that the creation of the Commonwealth entailed for Puerto Rico (*Puerto Rico v. Branstad, supra; Examining Bd. v. Flores de Otero, supra),* the First Circuit Court added as its own *a limitation,* that does not in any way arise from what is stated by the highest federal Court, and that in no way is compatible with the apparent intent of the Supreme Court of the United States to *underline* the importance of what was created by Public Law 600 (64 Stat. 319). The federal Supreme Court, which has claimed for itself alone the authority to determine which clauses of the federal Constitution apply to Puerto Rico, in the absence of any Congressional provision in this regard (*Torres v. Puerto Rico,* 442 U.S. 465 (1979); *Examining Bd. v. Flores de Otero, supra),* it never determined that the commerce clause applied to Puerto Rico, even after having laid out the matter. In spite of that, nevertheless, the intermediate federal appeals court believed that it was authorized meddle in the matter, to decree that the highest Court did not deem it applicable to rule.

Furthermore, the notion of the federal Supreme Court that the creation of the Commonwealth equated Puerto Rico to the states of the Union in terms of autonomy and independence, could hardly be handled with the laxness that is employed by the First Circuit Court in the case law that concerns us here. This, not only by the fact that the congressional reports with respect to Public Law 600 *179 (64 Stat. 319) stress that the creation of the Commonwealth was not intended to *fundamentally* alter the relationship between the United States and Puerto Rico (see *U.S. v. López Andino,* 831 F.2d 1164, 1172 (1st Circuit 1987), concurring opinion of Justice Torruellas), but also by the undeniable fact that the very autonomy

of the states of the Union is to a large extent rooted in their political powers of full congressional representation and presidential voting—neither of which Puerto Rico has—and in the guarantee provided by the Tenth Amendment to the American Constitution, which in no way includes Puerto Rico. Therefore, it is necessary to be cautious and not attempt to derive new and strange conclusions, starting from the premise that Puerto Rico has "the autonomy and independence" of a state of the Union.

Lastly, by weighting the matter that is before us, regarding the meaning that may derive from the creation of the commonwealth of Puerto Rico, it is necessary to consider what has also been stated by the federal Supreme Court:

> … Puerto Rico … is an autonomous political entity, "sovereign over matters not ruled by the Constitution …". *Posadas de P.R. Assocs. v. Tourism Co.,* 478 U.S. 328, 339 (1986). See *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 8 (1982).

It would seem that the intention to impose a limitation on the legislative powers of Puerto Rico under the "dormant" aspect of the commerce clause is clearly unlawful and incompatible with this other statement by the American Supreme Court. What's more, the posture of the other concurring opinion in this case echoing now the decree in question of the First Circuit is not consistent in any way with the repeated statements by the Supreme Court of Puerto Rico regarding the broad judicial authority of the Commonwealth. See: *Ramirez de Ferrer v. Mari Brás,* 144 P.R. DEC. 141 (1997); *Pueblo v. Castro Garcia,* 120 P.R. DEC. 740 (1988); *180 *R.C.A. v. Gobierno de la Capital,* 91 P.R. DEC. 416 (1964); *Pueblo v. Figueroa,* 77 P.R. DEC. 188 (1954).

### IV

The other statement that the First Circuit used as a basis in its referenced 1992 ruling is the notion that Puerto Rico shares full economic integration with the United States as any state of the Union. The alleged "logic" of this other statement is that since Puerto Rico is in a situation comparable to that of a state of the Union with regard to the "economic integration of the United States", the same limitation must be applied to Puerto Rico as is applicable to the states of the Union with regard to interstate commerce.

Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)
207 TSPR 92, P.R. Offic. Trans.

The problem with this other argument is that it is as misleading as the first, which was discussed in the paragraphs above.

The notion that Puerto Rico shares with the states of the Union a comparable economic integration into the United States hits head-on with several realities that are known to those who deal with these matters. Puerto Rico, to start with, is not subject to federal internal revenue laws, as the states of the Union are. On one hand, residents of Puerto Rico do not pay federal taxes or contributions, as do the residents of the states of the Union. In addition, the funds that are obtained from federal taxes that are collected in the United States with respect to items and materials manufactured in Puerto Rico—excise taxes on rum— are directed to our treasury, contrary to what occurs with all the other federal excise taxes that are collected in the states of the Union on articles and materials manufactured therein, that enter the federal treasury as is natural. The special tax situation of Puerto Rico, which represents in and of itself billions of dollars annually that benefit the economy **\*181** of Puerto Rico in a manner not attainable by any state of the Union, is clearly contrary to the erroneous notion mentioned above of equal "economic integration".

Another difference between the states of the Union and Puerto Rico relative to economic matters is that the federal *Interstate Commerce Act* is expressly not applicable to the island although it intensely regulates transportation aspects of the states of the Union. This information presents a serious problem for those who claim that the interstate commerce clause of the federal Constitution is applicable to Puerto Rico. Evidently it is much less incompatible for it to be deemed that Congress tacitly extended the referenced constitutional provision to Puerto Rico, but that one of the primary acts enacted by the same Congress under said provision would not extend to Puerto Rico. In the other concurring opinion issued in this case, no attempt is made at explaining this point of confusion. In any event, the law in question applies to the states of the Union but not to Puerto Rico, which is part of the extensive differences between the states and Puerto Rico with regard to economic matters.

Another very specific difference must be mentioned: that relative to tariffs on coffee. In virtue of Sec. 10 of Art. I of the federal Constitution,

P.R. LAWS ANN., Vol. 1, the states of the Union are generally prevented from imposing taxes on imports. Nevertheless, Puerto Rico has been expressly authorized to impose tariffs on imported coffee although the states of the Union cannot do so. See: *19 U.S.C.A. Sec. 1319; Miranda v. People of Puerto Rico, 101 F.2d 26 (1st Circuit 1938).* In this manner, Puerto Rico can protect its own coffee industry from the competition represented by cheaper coffee imports from abroad.

In addition to matters related to internal revenue and tariffs on coffee, there are several other legal schemes and federal regulations, that are also *economic in nature,* the **\*182** application of which to Puerto Rico is very different from that of the states of the Union. It would be tedious to list them all here. It is sufficient to note that these are matters of great economic importance with respect to which the situation of Puerto Rico is notably different from that of any state in the Union. So then, economic assistance programs, including those related to food assistance, Social Security, the federal minimum wage, some banking laws and federal labor laws, laws on customs tariffs, laws related to the admiralty and maritime transportation and various laws regarding other matters, apply or have historically applied in a different manner in Puerto Rico in comparison to their force in the states of the Union. See A.H. Leibowitz, *The Applicability of Federal Law To The Commonwealth of Puerto Rico,* 37 Rev. Jur. U.P.R. 615 (1968).

In relation to the foregoing, it is also necessary to take into consideration the repeated position of the federal Supreme Court that validates the distinct treatment by Congress with regard to Puerto Rico, as compared to the treatment Congress gives to the states of the Union in all these economic matters. The highest federal Court has expressly ruled *that Congress does not have to give Puerto Rico the same economic treatment as it gives to the states,* thus legitimizing the significant differences that exist or that have existed between Puerto Rico and the states. In this manner, the federal Supreme Court has rejected the notion that the island and the states of the Union share the same economic integration with the American nation. Some of these rulings, just to cite the most recent, are *Harris v. Rosario, 446 U.S. 651 (1980),* in which the federal Supreme Court ruled that Congress was not required to treat Puerto Rico the same as a state in the *Aid to Families with Dependent Children* program, and *Califano v.*

*Torres,* 435 U.S. 1 (1978), in which the federal Supreme Court ruled the same with respect to the *Supplemental Security Income (SSI)* program. **\*183**

It must be noted that the federal Supreme court held the validity of the distinct treatment of Puerto Rico not only when Congress has given *less* to the island than what it ordered for the benefit of residents of the states of the Union, as in the two cases cited in the preceding paragraph, but also when the distinct treatment consisted of giving Puerto Rico *more* than what it could do for the states of the Union, as occurred in *West India Oil Co. v. Domenech,* 311 U.S. 20 (1940), relative to the authority to impose excise taxes on imports, in which the federal Supreme Court validated a power granted by Congress to Puerto Rico that the states of the Union did not have.

It is for all the foregoing reasons that it cannot accurately be stated that Puerto Rico is comparable to any state of the Union with regard to national economic integration. *Puerto Rico, as the unincorporated territories, has always been subject to significant standards that were distinct* from those that applied to the states of the Union. Through this distinct treatment it has been possible to provide the economic flexibility necessary so that the Congress and Puerto Rico itself could successfully confront the significant substantive differences that have existed and that still exist between the island and the jurisdictions that are an integral part of the United States. It seems necessary to mention the known reality that Puerto Rico, with all the economic progress that it has made since the terrible years of 1898 through 1940, is still separated by an abysmal difference between its fragile economic situation and the much superior condition of the poorest state of the United States. It makes no sense whatsoever, then, to attempt to impose an artificial limitation on the authority of Puerto Rico to confront its own economic problems, only by pure judicial whim. Neither the First Circuit nor the other concurring opinion in the case before us have stated *what*

*purpose of public order is intended to be achieved by the obfuscated decree.* What justification exists to issue it? Beyond its **\*184** erroneous conceptualization, what does the inattention of the three preceding rulings of this same Jurisdiction serve? Who does it harm for Puerto Rico to be able to have an authority that the states of the Union do not have?

### V

The questions posed in the previous paragraph lead to a critical statement. The issue of whether the interstate commerce clause of the federal Constitution must or must not be applied to Puerto Rico, as well as the more general issue of which federal constitutional provisions must be extended to the island, beyond those relative to the fundamental rights of individuals, *is in the ultimate instance a prerogative of Congress.* See *Torres v. Puerto Rico, supra,* pp. 469-470. This is an eminently political matter, that is further included within the broad powers that the Supreme Court itself has acknowledged for Congress, even recently. *Harris v. Rosario, supra,* pp. 653-656. This is why the rulings of the First Circuit in which Puerto Rico is subjected *ex proprio vigore* to the limitations of the commerce clause in its "dormant" phase is an *ultra vires* action of that court, a clearly undue ruling of the Court in a matter that goes beyond its authority. There is nothing in the legislative text that would allow one to even presume that Congress had the intent to extend the referenced clause to apply to Puerto Rico. Therefore, it may not be considered in any manner that the rulings of the First Circuit Court are only declarative of Congressional intent. They comprise, therefore, an action to unduly become involved in a matter that is a clear prerogative solely attributable to Congress.

It is, after all, based on the previous point, in particular, that I believe the other concurring opinion in the present case is unsustainable, since it echoes the federal appeals court, **\*185** copying here its very mistaken and erroneous rulings regarding the matter in question.

---

Footnotes

1    See*:* Law No. 12 of June 10, 1981 (13 P.R. LAWS ANN. sec. 6006) and Law No. 22 of July 14, 1989 (13 P.R. LAWS ANN. secs. 6006 and 6021a).

2    The aforementioned Art. 2 provides, in pertinent part, as follows:
     "(a) Instead of the tax imposed in [sec. 9521(c)(2) and (3) of Title 13 of P.R. LAWS ANN.,] on all beer, malt extract and other similar fermented or non-fermented products whose alcohol content exceeds one and one-half per cent (1 ½%) by volume to which section [9521(c)(2) and (3) of title 13 of P.R. LAWS ANN.] refers, that are produced or

**Asoc. Importadores de Cerveza v. E.L.A., 171 P.R. DEC. 140(2007)**
**207 TSPR 92, P.R. Offic. Trans.**

manufactured by persons whose total production, if any, of such products during their most recent fiscal year has not exceeded thirty-one million (31,000,000) gallons (unit of measurement), a tax will be charged as follows:

"Two dollars and fifteen cents ($2.15) for each metered gallon produced up to nine million (9,000,000) measured gallons;

"Two dollars and 36 cents ($2.36) for each metered gallon produced in excess of nine million (9,000,000) but less than 10 million (10,000,000);

"Two dollars and 57 cents ($2.57) for each metered gallon produced in excess of 10 million (10,000,000) but less than 11 million (11,000,000);

"Two dollars and 78 cents ($2.78) for each metered gallon produced in excess of 11 million (11,000,000) but less than 12 million (12,000,000);

"Two dollars and 99 cents ($2.99) for each metered gallon produced in excess of 12 million (12,000,000) but less than 31 million (31,000,000).

"Subject to the provisions of [secs. 9575 to 9579 of title 13 of P.R. LAWS ANN.], the benefits of this section shall apply to a person in any fiscal year following a year in which its total production of the products described in this paragraph, if any, has not exceeded thirty-one million (31,000,000) gallons (unit of measurement)." 2002 (Part 1) Laws of Puerto Rico 263, 270.

3   Art. 1, Sec. 8, U.S. Const., P.R. LAWS ANN., Vol. 1.

4   The respondents made appearances in two different motions. On the one hand, Cervecería India and its distributor and, on the other, the Commonwealth and the Secretary of the Treasury.

5   The trial court made this determination because, among other things, "decisions whether the Legislature of Puerto Rico had discriminatory purposes against imported beer and whether the Law applies solely to local enterprises and therefore has discriminatory effect, are the same independent of whether the claim is for violation of [Sec. 3] of the Federal Relations Act and equal protection of the law, or for alleged violation of the interstate and international commerce clause." Judgment of the Court of First Instance, p. 12, Appendix, p. 774

6   It is worthwhile noting that in *South P.R. SugarCorp. V. Com. de Servicio Púb., 93 P.R. Dec. 12 (1966),* we stated that the tariff imposed by a Commission was valid, even if the interstate commerce clause were applicable to Puerto Rico in the same way it is to the states.

7   Nevertheless, we upheld the effectiveness of the challenged law on the basis of a reasonable interpretation that addressed the possible flaws that this interpretation could have. See*, Banco Popular v. Mun. de Mayagüez, 126 P.R. Dec. 653 (1990).*

8   Over the years the controversy concerning this issue has focused on the possible application of the dormant aspect of the commerce clause and has set to one side the controversy concerning the application of the commerce clause as it relates to the power of Congress to regulate interstate commerce. In that respect, we believe the following statements of the First Circuit Court of Appeals in *Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 7-8,* No. 3 (1st Cir. 1992) are extremely relevant:

"Both the Supreme Court and this court have long held or assumed that Congress has power under the Commerce Clause to regulate commerce with Puerto Rico. See *Secretary of Agric. V. Central Roig Refining Co., 338 U.S. 604, 616 (1950)* (Sugar Act of 1948 applied to Puerto Rico through the Commerce Clause); *Puerto Rico Tel. Co. v. F.C.C., 553, F.2d 694, 701 (1st Cir. 1977)* (Federal Communications Commission regulations applied via the Commerce Clause to government-owned telephone company in Puerto Rico). Thus, in one aspect, the question "whether the Commerce Clause applies to Puerto Rico" has been settled in the affirmative for many years . . . . "

9   Art. IV, Sec. 3 of the U.S. Constitution, P.R. LAWS ANN., Vol. 1.

10  *Califano v. Torres, 435 U.S. 1 (1978); Examining Bd. v. Flores de Otero, 426 U.S. 572 (1976).*

11  The only reference to the exclusion of Puerto Rico from any legislation relative to interstate commerce is in Sec. 38 of the Puerto Rico Federal Relations Act., P.R. LAWS ANN., Vol. 1, which provides that the Law of Interstate Commerce shall not apply to Puerto Rico. However, this article cannot prohibit more than what it expressly provides, which is why it cannot be seen to have a reach such as would prevent the application in our jurisdiction of a constitutional provision like the interstate commerce clause. For similar statements, see, *Sea-Land Services, Inc. v. Municipality of San Juan, 505 F.Supp. 533, 544,* n. 46 (P.R. Dec. 1980), citing D. M. Helfeld, *How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?* XXXIX (No. 2) Rev Jur. U.P.R. [University of Puerto Rico Law Review] 169 (1969).

12  "[T]he burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Oregon Waste Systems, Inc. v. Department of Environment Quality of Ore., 511 U.S. 93, 99 (1994).*

13  This third element has been analyzed based on the traditional focus that is used when a law is attacked as allegedly violating the dormant aspect of the interstate commerce clause. L.H. Tribe, *American Constitutional*

*Law*, 3rd ed., New York, Ed. Foundation Press, 2000, Vol. 1, p. 1106. That is, a state law that discriminates against interstate or international commerce –either *prima facie* or by its effect–is virtually invalid or invalid *per se*. *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992); *Philadelphia v. New Jersey*, 437 U.S. 617 (1978); *Brown-Forman Distillers v. N.Y. Liquor Auth.*, 476 U.S. 573 (1986); *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). See, also, Tribe, *op. cit.*, p. 1059.

14   This test also contains the requirements of due process of the law. See Tribe, *op. cit.*, p. 1106.

15   Said beverages were Okolehao, a beverage produced from the root of a plant from Hawaii, and fruit wines.

16   We must emphasize that the Legislative Assembly has broad discretion in the area of taxation and that "[t]raditionally 'classification' has been one method for adjusting tax programs to the local customs and needs, in order to achieve equitable distribution of the tax burden". *U.S. Brewers Assoc. v. Srio. de Hacienda*, *supra*, p. 460, citing *Miranda v. Sec. de Hacienda*, 77 P.R. DEC. 171, 178 (1954).

17   See, by way of example: *Wyo. Stat. Sec. 12–3-101* (Wyoming); W. *Va. Stat. Sec. 11–16*-13 (West Virginia); 72 P.S. Sec. 9010 (Pennsylvania); *N.M. Stat. Ann. Sec. 7–17-2* (New Mexico); *Wis. Stat. Sec. 139.02*(1) (Wisconsin); *Tex. Alco. Bev. Code Sec. 203.01* (Texas).

18   The petitioners also argue that Art. 2 of Law No. 69, *supra*, violates Sec. 3 of the Puerto Rico Federal Relations Act, *supra*. Of course, given our opinion with regards to the commerce clause, *it is not necessary to fully consider the proposal, since the analysis required by the commerce clause is, at least, stricter than what is required by Sec. 3 of the Puerto Rico Federal Relations Act*, *supra*. So then, we believe that a law that exceeds the analysis required by the commerce clause, such as Art. 20 of Law No. 69, *supra*, will obligatorily survive an attack under Sec. 3 of the Puerto Rico Federal Relations Act.

1   The Extradition Clause, in the relevant portion, provides:
    "Any person accused of … crime … that flees the state where he is accused and is found in another state, shall be … returned to the state that had jurisdiction to hear the criminal matter." U.S. Const., P.R. LAWS ANN., Vol. 1, ed. 1999, p. 175.

---

End of Document                                    ©2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 76 Page 23 of 43

171 D.P.R. 140, 2007 WL 1630877
(P.R.), 2007 TSPR 92, P.R. Offic. Trans.

ASOCIACIÓN PUERTORRIQUEÑA DE
IMPORTADORES DE CERVEZA, INC.,
HEINEKEN BROUWERIJEN B.V., V.
SUÁREZ & CO., INC., MÉNDEZ & CO., INC.,
B. FERNÁNDEZ & HERMANOS, INC. y
BALLESTER HERMANOS, INC., peticionarios,

v.

ESTADO LIBRE ASOCIADO DE PUERTO
RICO, JOSÉ A. FLORES GALARZA, en su
capacidad oficial como SECRETARIO DE
HACIENDA, CERVECERÍA INDIA, INC. y
CC1 BEER DISTRIBUTORS, INC., recurridos.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2003-831
*Resuelto:* 16 de mayo de 2007
May 16, 2007.

**Synopsis**
PETICIÓN DE *CERTIORARI* para revisar una
SENTENCIA de Liana Fiol Matta, *Roberto González
Rivera* y *Carlos Rivera Martínez*, Js. del Tribunal de
Apelaciones, que confirmó la dictada por el Tribunal de
Primera Instancia en la que se desestimó una demanda
presentada por los peticionarios. *Se dicta sentencia en
la que se confirma al Tribunal de Primera Instancia y al
Tribunal de Apelaciones.*

*Sarah Y. Rosado Morales*, procuradora general auxiliar,
y **\*141** *Maite D. Oronoz Rodríguez*, subprocuradora
general; *Debbie E. Rivera Rivera*, de *Sánchez, Betances
& Sifre, C.S.P.*, *Luis Sánchez Betances, Sánchez de Jesús
Annoni* y *Gerardo de Jesús Annoni*, abogados del Estado
Libre Asociado de Puerto Rico; *Gerardo J. Rivera-
Fourquet*, de *Maymí & Rivera-Fourquet*, abogado de
Cervecería India, Inc., parte recurrida; *Jorge E. Pérez Díaz*
y *Heidi L. Rodríguez*, de *Pietrantoni Méndez & Álvarez,
LLP*, abogados de CC1 Beers Distributors, Inc., parte
recurrida; *Juan A. Marqués Valdés* y *Verónica Ferraiuoli*,
de *McConnell Valdés*; *Ana Matilde Nin* y *Mayra I. Ruiz
Muñiz*, abogadas de la Asociación Puertorriqueña de
Importadores de Cerveza y Heineken Brouwerijen B.V.,
parte peticionaria; *Federico Calaf Legrand*, de *Richard
& Calaf, PSC*, abogado de Ballester Hermanos, Inc.,

parte peticionaria; *Ramón Walker Merino*, abogado de
Fernández & Hermanos, Inc., parte peticionaria; *Horacio
Subirá*, abogado de V. Suárez & Co., parte peticionaria.

**SENTENCIA**

La Ley Núm. 69 de 30 de mayo de 2002 (Ley Núm. 69)
enmendó las Secs. 4002 y 4023 del Código de Rentas
Internas de Puerto Rico, 13 L.P.R.A. secs. 9521 y 9574.
La enmienda realizada tuvo el propósito de aumentar los
impuestos aplicables a los espíritus destilados, los vinos y
las cervezas. Dicha Ley Núm. 69, sin embargo, concede un
alivio al establecer en su Art. 2 (13 L.P.R.A. sec. 9574) una
exención contributiva escalonada a toda cerveza, extracto
de malta y otros productos análogos fermentados, o no
fermentados, cuyo contenido alcohólico no exceda del uno
y medio por ciento por volumen, que sean producidos o
fabricados por personas cuya producción total durante su
año contributivo más reciente no exceda de treinta y un
millones de galones.

Los aquí peticionarios, la Asociación Puertorriqueña de
Importadores de Cerveza, Inc. y otros, presentaron una
solicitud de sentencia declaratoria ante la Sala Superior
de San Juan del Tribunal de Primera Instancia contra el
Estado Libre Asociado de Puerto Rico y otros para que se
**\*142** decretara la inconstitucionalidad del mencionado
Art. 2 de la Ley Núm. 69. Plantearon que, a su juicio,
la referida disposición estatutaria tenía el propósito y
efecto de favorecer la cerveza producida en nuestra Isla
y, naturalmente, de perjudicar a las cervezas importadas.
Adujeron, además, que dicha disposición violaba la
cláusula de comercio interestatal de la Constitución de
Estados Unidos y el Art. 3 de la Ley de Relaciones
Federales con Puerto Rico, 48 U.S.C.A. sec. 741(a) y
L.P.R.A., Tomo 1, Sec. 3, respectivamente.

La parte demandada solicitó la desestimación de la
demanda presentada alegando, en síntesis, que la decisión
emitida por este Tribunal en *U.S. Brewers Assoc. v.
Srio. de Hacienda*, 109 D.P.R. 456 (1980), había resuelto
la controversia planteada y que no existía violación
constitucional alguna. El tribunal de instancia *desestimó*
la demanda presentada, decisión que fue *confirmada* por
el Tribunal de Apelaciones.

Los demandantes peticionarios acudieron, entonces, ante
este Tribunal, señalando la alegada comisión de tres
errores de parte del Tribunal de Apelaciones, a saber:

Case: 17-03283-LTS   Doc#: 4781-6   Filed: 01/24/18   Entered: 01/24/18 18:12:25   Desc:
Exhibit Exhibit 7 Part 5 Page 313 of 541

Asociación de Importadores de Cerveza v. Srio. de..., 2007 TSPR 92...
2007 TSPR 92, P.R. Offic. Trans.

... al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.

... al determinar que el Artículo 2 no viola la Sec. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980).

... al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal. Petición de *certiorari*, pág. 5.

*Expedimos* el recurso. Examinado el expediente del caso y habiendo analizado cuidadosamente todos los planteamientos de las partes, *se procede a dictar una sentencia confirmatoria de la emitida por el Tribunal de Apelaciones* **\*143** *y decretar la desestimación de la acción presentada por la parte demandante peticionaria.*

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri emitieron sendas opiniones de conformidad. La Juez Asociada Señora Fiol Matta se inhibió. La Juez Asociada Señora Rodríguez Rodríguez no interviene.

(*Fdo.*) Aida Ileana Oquendo Graulau *Secretaria del Tribunal Supremo*

**--O--**

Opinión de conformidad emitida por el Juez Asociado Señor Rebollo López.

El 13 de julio de 1978 se aprobó la Ley Núm. 37, mediante la cual se enmendó la Ley Núm. 143 de 30 de junio de 1969, conocida como la Ley de Bebidas de Puerto Rico de 1969 (13 L.P.R.A. secs. 6006 y 6021a). Dicha enmienda consistió en aumentar la contribución sobre la cerveza que se vende y consume en nuestra jurisdicción y establecer una exención especial para las compañías productoras de cerveza, cuya producción anual no sobrepase los treinta y un millones de galones.

Poco tiempo después, la U.S Brewers Association, entidad que entonces agrupaba al 95% de los manufactureros de cerveza de Estados Unidos, presentó ante el foro local una demanda para impugnar la referida exención porque, a su entender, violaba la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1 (48 U.S.C.A. sec. 741a) y la cláusula sobre la igual protección de las leyes en la Sec. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Al resolver la controversia, este Tribunal determinó que la exención no violaba las disposiciones mencionadas porque, entre otras cosas, tenía un **\*144** propósito legítimo, no discriminatorio, y porque la clasificación allí establecida podía favorecer tanto a las empresas locales como a las extranjeras. *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980).

Luego de ser enmendada en dos ocasiones posteriores, para los únicos efectos de aumentar el monto de la contribución,[1] la Asamblea Legislativa aprobó *la Ley Núm. 69 de 30 de mayo de 2002*, mediante la cual enmendó las Secs. 4002 y 4023 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. secs. 9521 y 9574. Dichas enmiendas, entre otras cosas, tuvieron el propósito de aumentar los impuestos aplicables a los espíritus destilados, los vinos y *las cervezas*. Como alivio para el aumento, la Legislatura concedió en el Art. 2 de la mencionada ley, 13 L.P.R.A. sec. 9574, una *exención contributiva escalonada* a toda cerveza, extracto de malta y otros productos análogos fermentados, o no fermentados, cuyo contenido alcohólico no excediera de 1 12% por volumen, que sean producidas o fabricadas por personas cuya producción total durante su año contributivo más reciente no haya excedido de treinta y un millones galones medida.[2] **\*145**

[1]  Véanse: Leyes Núms. 12 de 10 de junio de 1981 (13 L.P.R.A. sec. 6006) y 22 de 14 de julio de 1989 (13 L.P.R.A. secs. 6006 y 6021a).

[2]  El Art. 2 mencionado dispone, en lo pertinente, lo siguiente:
"(a) En lugar del impuesto establecido en [la sec. 9521(c)(2) y (3) del título 13 de L.P.R.A.,] sobre toda la cerveza, extracto de malta y otros productos análogos fermentados o no fermentados cuyo contenido alcohólico exceda de uno y medio por ciento (1 12%) por volumen a que se [refiere la sec. 9521(c)(2) y (3) del título 13 de L.P.R.A.], que sean producidos o fabricados por personas cuya producción total, si alguna, de dichos productos durante su más reciente año contributivo no haya

excedido de treinta y un millones (31,000,000) de galones medida, se cobrará un impuesto de la siguiente forma:

"Dos dólares con quince centavos ($2.15) por cada galón medida producido, hasta nueve millones (9,000,000) de galones medida;

"Dos dólares con treinta y seis centavos ($2.36) por cada galón medida producido en cantidad mayor a nueve millones (9,000,000) pero menor a diez millones (10,000,000);

"Dos dólares con cincuenta y siete centavos ($2.57) por cada galón medida producido en cantidad mayor a diez millones (10,000,000) pero menor a once millones (11,000,000);

"Dos dólares con setenta y ocho centavos ($2.78) por cada galón medida producido en cantidad mayor a once millones (11,000,000) pero menor a doce millones (12,000,000);

"Dos dólares con noventa y nueve centavos ($2.99) por cada galón medida producido en cantidad mayor a doce millones (12,000,000) pero menor a treinta y un millones (31,000,000).

"Sujeto a las disposiciones de [las secs. 9575 a 9579 del título 13 de L.P.R.A.], los beneficios de esta sección procederán para una persona en cualquier año contributivo siguiente a aquel año en que su producción total de los productos descritos en este apartado, si alguno, no haya excedido de treinta y un millones (31,000,000) de galones medida." 2002 (Parte 1) Leyes de Puerto Rico 263, 270.

Así las cosas, el 13 de junio de 2002, la Asociación Puertorriqueña de Importadores de Cerveza, Inc. (APIC); Heineken Brouwerijen B.V.; V. Suárez & Co., Inc.; Méndez & Co., Inc.; B. Fernández & Hnos., Inc., y Ballester Hermanos, Inc. (los peticionarios) presentaron una solicitud de sentencia declaratoria ante el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Estado Libre Asociado de Puerto Rico, el Secretario de Hacienda, Cervecería India, Inc. y CC1 Beer Distributors, Inc. (los recurridos). Solicitaron que se decretara la inconstitucionalidad del Art. 2 de la Ley Núm. 69, ante, porque, a su entender, tenía el efecto y propósito de favorecer a la cerveza producida en Puerto Rico y perjudicar a las cervezas importadas. Solicitaron, además, que se decretara, mediante la referida sentencia declaratoria, que el citado Art. 2 violaba tanto la cláusula de comercio interestatal de la Constitución de Estados Unidos [3] como la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Finalmente, solicitaron que se dictara un interdicto preliminar en el que se le impidiera

al Gobierno de Puerto Rico poner en vigor la disposición legal, en lo que se dilucidaba el pleito en sus méritos.

[3]    Art. I, Sec. 8, Const. EE. UU., L.P.R.A., Tomo 1.

Posteriormente, todos los demandados solicitaron la *desestimación* de la acción presentada, oponiéndose a la solicitud de interdicto preliminar. [4] En esencia alegaron que, aun asumiendo como ciertos los hechos bien alegados en la acción presentada, la parte demandante no había expuesto **\*146** una reclamación que justificara la concesión de los remedios solicitados. Plantearon, en apoyo a su solicitud, que lo resuelto en *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante, controlaba la controversia surgida en el caso; que no existía violación alguna a la cláusula de comercio interestatal, ya que la exención era totalmente neutral y no discriminaba contra el comercio interestatal o internacional ni de su faz ni por su propósito o efecto, y que no existía violación alguna a la Ley de Relaciones Federales con Puerto Rico, ya que este Tribunal había determinado la legalidad de dicha disposición.

[4]    Los demandados comparecieron en dos mociones diferentes. Por un lado, comparecieron la Cervecería India y su distribuidora, y por el otro lado, comparecieron el Estado Libre Asociado y el Secretario de Hacienda.

Luego de evaluar la posición de ambas partes en sus respectivos escritos y los argumentos expuestos en una vista argumentativa, el foro primario emitió una sentencia en la que *desestimó* la acción presentada por los demandantes. El referido foro sostuvo que: (1) lo resuelto por este Tribunal en *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante, disponía de la reclamación de los demandantes, relativa a que el Art. 2 de la Ley Núm. 69, ante, contravenía la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante; (2) la alegación en torno a que el efecto de la exención impugnada atentaba contra la cláusula de comercio interestatal e internacional era inmeritoria debido a que en *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante, este Tribunal había resuelto, aunque no se planteó específicamente, que dicha exención tenía el propósito legítimo de distribuir la carga contributiva entre las cervecerías, de acuerdo con su potencial para producir ganancias, [5] y (3) el análisis exigido ante alegaciones de **\*147** supuestas violaciones a la cláusula de comercio interestatal e internacional, por el supuesto efecto discriminatorio de alguna ley, revelaba que el artículo de ley impugnado en el caso no era discriminatorio.

[5] El foro primario tomó dicha determinación debido a que, entre otras cosas, "las determinaciones de si la Legislatura de Puerto Rico tuvo propósitos discriminatorios contra la cerveza importada y si la Ley aplica solamente a empresas locales y por ello tiene efecto discriminatorio, es la misma independientemente de si el reclamo es por violación a [la Sec. 3] de la Ley de Relaciones Federales y a la igual protección de las leyes, o por alegada violación a la cláusula de comercio interestatal e internacional". Sentencia del Tribunal de Primera Instancia, pág. 12, Apéndice, pág. 774.

Inconformes con la determinación del foro primario, los demandantes acudieron —mediante una Petición de *certiorari*— ante el Tribunal de Apelaciones. Adujeron, en síntesis, que el foro de instancia había errado al desestimar la acción presentada sin dar como ciertos los hechos alegados en la demanda y al no recibir prueba ofrecida sobre el propósito y efecto discriminatorio de la exención. Alegaron, además, que el tribunal de instancia había interpretado incorrectamente el caso *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante, al resolver que la exención impugnada no violaba la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, ni la mencionada cláusula de comercio interestatal e internacional.

El Tribunal de Apelaciones *confirmó* la decisión del foro primario. En esencia, el tribunal apelativo intermedio sostuvo que actuó correctamente el foro de instancia, al desestimar la acción presentada debido a que éste sí dio como ciertos los hechos correctamente alegados en la demanda y que el resto de los "hechos" allí expuestos eran conclusiones de derecho o manifestaciones especulativas. En cuanto a los alegados ofrecimientos de prueba, el foro apelativo intermedio concluyó que el foro primario sí los dio como ciertos pero que, aun así, ello no ameritaba la concesión de un remedio a favor de los demandantes. Finalmente, el referido foro apelativo estimó que, conforme a la doctrina de *stare decisis*, lo resuelto por este Tribunal en *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante, aplicada a esta controversia en cuanto a la alegación referente a la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, y que tampoco tenía los propósitos proteccionistas que la invalidaran a la luz de la cláusula de comercio interestatal e internacional de la Constitución de Estados Unidos. **\*148**

Inconformes, los demandantes acudieron —mediante una Petición de *certiorari*— ante este Tribunal. Alegan que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió

... al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.

... al determinar que el Artículo 2 no viola la Sec. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980).

... al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal. Petición de *certiorari*, pág. 5.

## I

A. De entrada discutiremos, brevemente, el primer señalamiento de error, relativo a la alegada improcedencia de la desestimación al amparo de las disposiciones de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Como se sabe, las alegaciones tienen el propósito de notificar a grandes rasgos cuáles son las reclamaciones y defensas de las partes. #*Alamo Pérez v. Supermercado Grande, Inc.*, 158 D.P.R. 93 (2002); *Bco. Central Corp. v. Capitol Plaza Inc.*, 135 D.P.R. 760 (1994). Es por ello que la Regla 6.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, sólo exige que las alegaciones de la demanda contengan una relación sucinta y sencilla de la reclamación demostrativa de que el peticionario tiene derecho a un remedio y una solicitud del remedio a que crea tener derecho. Véase J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. 1, págs. 202–208.

A pesar de ello, la Regla 10.2 de Procedimiento Civil, ante, establece como fundamento por el cual una parte **\*149** puede solicitar la desestimación de una demanda presentada en su contra, que las alegaciones dejan de exponer una reclamación que justifique la concesión de un remedio. Reiteradamente hemos resuelto que, ante una solicitud de desestimación por el fundamento antes mencionado, los tribunales deben aceptar como ciertas las alegaciones contenidas en la demanda y considerarlas de la manera más favorable a la parte demandante. *García v. E.L.A.*, 163 D.P.R. 800 (2005).

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   4

Para que un demandado prevalezca, mediante una moción de desestimación según el mencionado precepto procesal civil, éste tiene que demostrar que con toda certeza el demandante no tiene derecho a remedio alguno, según cualquier estado de derecho que pueda ser probado en apoyo a su reclamación, aún interpretando la demanda de la manera más liberal posible a su favor. No obstante lo anterior, esta doctrina se aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 504–505 (1994). Dicho de otra manera, solamente se darán como ciertos los hechos correctamente alegados sin considerar las conclusiones de derecho o las alegaciones redactadas, de tal forma que su contenido resulte hipotético. Cuevas Segarra, *op. cit.*, pág. 272.

De un análisis de la petición jurada presentada por los peticionarios se desprende que éstos, básicamente, alegaron que la exención contributiva concedida a los distribuidores de cerveza que produjeran menos de 31,000,000 galones era inconstitucional por violar la cláusula constitucional federal sobre el comercio interestatal y la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. En apoyo de lo anterior hicieron una serie de alegaciones mediante las cuales pretenden establecer el efecto discriminatorio de dicha exención. Algunas de estas alegaciones son las siguientes:  **150

18. Esta acción pretende la anulación, por [ser] contraria a la Ley de Relaciones Federales [con] Puerto Rico y a la Cláusula de Comercio de la Constitución de Estados Unidos, de aquellas secciones que crean una excepción en la tasa impositiva a favor de una empresa manufacturera privada de Puerto Rico, en detrimento del comercio internacional e interestatal y de los intereses propietarios de otras compañías locales, estadounidenses y extranjeras, las que están sufriendo y continuarán sufriendo daños irreparables ....

19. En efecto, y como adelante se alega, la legislación en cuestión crea un discrimen de tal naturaleza, que prácticamente elimina el derecho de los consumidores a adquirir la cerveza de su preferencia y propende a un monopolio sancionado por el estado a favor de una única productora y su distribuidor exclusivo.

........

38. Todas las partes demandantes quedan afectadas por el arbitrio de ley, no aplicándoles la exención especial.

39. Por información o creencia, solo la productora local, Cervecería India, y su distribuidor para la Medalla Light, su principal producto, se beneficiarán de la exención especial, o sea, ahora están sujetas a pagar solamente el arbitrio de $2.15 que prevalecía para ellos bajo la legislación anterior. Ello es así porque la producción total de la cervecería local no excede de 9 millones de galones ni lo ha excedido por años.

........

43. Aunque la medida ni su exposición de motivos expresan de su faz un ánimo discriminatorio o proteccionista, inconstitucional y estatutariamente prohibido, en su efecto, sin lugar a dudas lo tiene.

44. A poco que se examine el historial legislativo y las ponencias presentadas ante la Legislatura, y los debates legislativos y otras manifestaciones públicas de los legisladores, se verá claramente que, a pesar de la reticencia en un principio del Ejecutivo y el Legislativo en perpetuar el discrimen creado por la exención especial, ni la medida ni el presupuesto pendiente de aprobación hubieran obtenido los votos necesarios de no darse el trato preferente excesivo que esta medida propone, únicamente para el beneficio de la cervecería local. Véase, Ponencia de la Vice-Presidenta Ejecutiva de la Cervecería India, del 8 de abril de 2002; Ponencia del Alcalde de Mayagüez, en apoyo a las peticiones de trato preferente a la cervecería local, entre otros.

........

46. El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. [sec.] 4023, en sus efectos y aplicación, crea una restricción **151 prohibida al comercio interestatal, al promover un discrimen, irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo de comercio.

47. El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de Estados Unidos, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas en Estados Unidos, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen estadounidense.

........

50. El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. [sec.] 4023, en sus efectos y aplicación, crea una restricción prohibida al comercio internacional, al promover un discrimen irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo del comercio.

51. El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de fuera de Puerto Rico, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas fuera de Puerto Rico, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen extranjero.

........

55. El Artículo 2 de la Ley Núm. 69 del 30 de mayo de 2002, 13 L.P.R.A. § 4023, en su aplicación y efectos, según anteriormente alegados, violan la clara y diáfana disposición del Artículo 3 de la Ley de Relaciones Federales. Petición jurada, págs. 5–15, Apéndice, págs. 42–52.

Aun cuando las transcritas alegaciones no son un modelo de perfección, una mera lectura es suficiente para percatarse de que éstas pueden considerarse como alegaciones bien hechas, para los efectos de conceder el remedio solicitado. De hecho, tanto el tribunal de instancia como el foro apelativo intermedio entraron a analizar las alegaciones esenciales efectuadas por los peticionarios y, finalmente, determinaron que eran inmeritorias.

En consecuencia, pasamos a evaluar la validez del planteamiento principal de los peticionarios relativo a que *el Art. 2 de la Ley Núm. 69, ante, discrimina contra el comercio interestatal e internacional y, por lo tanto, viola la cl #ausula* **\*152** *de comercio interestatal o la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante.*

B. La Constitución del Estado Libre Asociado de Puerto Rico dispone que "el poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido". Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 401. Dicha

autoridad contributiva es fundamental a la vida del Estado y, por lo tanto, el poder fiscal gubernamental es constitucionalmente de naturaleza amplia y abarcadora. *Café Rico, Inc. v. Mun. de Mayagüez*, 155 D.P.R. 548 (2001); *Continental Ins. Co. v. Srio. de Hacienda*, 154 D.P.R. 146 (2001); *F.D.I.C. v. Mun. de San Juan*, 134 D.P.R. 385 (1993); *Coca-Cola Bottling Co. v. Srio. de Hacienda*, 112 D.P.R. 707 (1982); *U.S. Brewers Assoc. v. Srio. de Hacienda*, ante.

No obstante, el amplio poder mencionado cede ante las limitaciones constitucionales o de otra índole. Una de esas limitaciones la establece la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, ed. 1999, pág. 210, que, en lo pertinente, indica que

> ... las contribuciones de rentas internas que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías o mercancías podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la Isla; Disponiéndose, *que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico ....* (Énfasis suplido.)

Asimismo, la cláusula de comercio interestatal de la Constitución de Estados Unidos establece:

> El Congreso tendrá facultad: Para imponer y recaudar contribuciones, derechos, impuestos y arbitrios .... **\*153**

........

Para reglamentar el comercio con naciones extranjeras, así como entre los estados y con las tribus indias... Art. I, Sec. 8, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1999, pág. 167.

El propósito de dicho precepto constitucional fue conceder poder al Congreso para regular tanto el comercio interestatal como el internacional. Por ello, se ha dicho que ésta es la máxima fuente del poder congresional. L.H. Tribe, *American Constitutional Law*, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, págs. 801–808.

2007 TSPR 92, P.R. Offic. Trans.

Por otro lado, y a pesar de que la Constitución federal en ningún lugar limita la interferencia estatal con el comercio interestatal, el Tribunal Supremo federal ha interpretado desde 1852 que la cláusula de comercio también contiene una prohibición implícita al poder de los estados de regular el comercio interestatal e internacional, aun en ausencia de legislación federal expresa. Véanse: Tribe, *op. cit.*, pág. 1029; *Cooley v. Broad of Wardens*, 53 U.S. 299 (1851). A este aspecto de la cláusula de comercio se le llama el "aspecto durmiente o negativo". *U.S. v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 552 (1944); *Southern Pacific Co. v. Arizona*, 325 U.S. 761 (1965). Este aspecto negativo previene que los estados arriesguen el bienestar de la Nación "by plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear". (Citas omitidas.) *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429 (2005), citando a *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995).

Respecto a la aplicación de la cláusula de comercio en nuestra jurisdicción, este Tribunal ha expresado, tanto antes como después de la aprobación de nuestra Constitución, que esa cláusula no aplica al Estado Libre Asociado. *South P.R. Sugar Corp. v. Com. de Servicio Púb.*, 93 D.P.R. 12 (1966); *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964); **\*154** *Ballester Hnos. v. Tribunal de Contribuciones*, 66 D.P.R. 560 (1946). Entre los argumentos que hemos esbozado para llegar a tal determinación están, entre otros, el estatus de territorio no incorporado de Puerto Rico antes de la aprobación de la Constitución y los perfiles distintos que han tenido las relaciones comerciales entre Puerto Rico y Estados Unidos, y entre los estados de Estados Unidos.

No obstante lo anterior, *en decisiones más recientes nos hemos alejado de esa postura y hemos dejado entrever que la controversia no está resuelta del todo.* [6] Específicamente, en *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987), indicamos que, en ese momento, era innecesario resolver si la cláusula de comercio interestatal en su "estado durmiente" aplicaba a Puerto Rico. Asimismo, en *Gómez Hnos., Inc. v. Secretario de Hacienda*, 114 D.P.R. 367 (1983), utilizamos, para resolver la validez de un impuesto local, los requisitos que la jurisprudencia federal había acogido para evaluar la procedencia de legislaciones tributarias estatales frente a la cláusula de comercio. Finalmente, en *Banco Popular v. Mun. de Mayagüez*, 126 D.P.R. 653 (1990), aunque no resolvimos la controversia

según el análisis creado para el "aspecto durmiente" de la cláusula de comercio, *sí describimos parte de éste como si aplicara totalmente en nuestra jurisdicción hasta el punto de indicar que la ley allí impugnada podría ser inconstitucional según el aludido análisis.* [7]

[6]   Vale la pena destacar que en *South P.R. Sugar Corp. v. Com. de Servicio Púb.*, 93 D.P.R. 12 (1966), indicamos que la tarifa impuesta por una Comisión era válida, aun cuando la cláusula de comercio interestatal fuera aplicable a Puerto Rico en la misma forma que a los estados federales.

[7]   A pesar de ello se sostuvo la vigencia de la ley impugnada amparándonos en una interpretación razonable que subsanaba las posibles fallas que ésta podría tener. Véase *Banco Popular v. Mun. de Mayagüez*, 126 D.P.R. 653 (1990).

Este caso nos brinda la oportunidad de resolver, en forma definitiva, *la interrogante relativa a si la cláusula de comercio en su "estado durmiente" aplica a Puerto Rico.* Así pues, antes de entrar a discutir los méritos de las alegaciones **\*155** de los peticionarios en el caso, procederemos a discutir la interrogante. Veamos.

1. De un examen exhaustivo de la jurisprudencia — tanto local como federal— y de los tratadistas de derecho constitucional se desprende que la interrogante expresada no ha sido ampliamente discutida, provocando así que sea escaso el número de fuentes de derecho que nos ayuden a resolverla. Sin embargo, surge de las fuentes existentes que, con el pasar de los años, se han esbozado varios argumentos a favor y contra la aplicación de la cláusula de comercio a nuestra jurisdicción.

Entre los fundamentos más contundentes *contra* la aplicación están, entre otros, que: (1) a Puerto Rico nunca se le ha aplicado la Constitución federal en toda su extensión, ya que nunca ha sido considerado como un estado; (2) que la relación de Puerto Rico con Estados Unidos, a partir de 1952, es única, por lo que Puerto Rico no puede catalogarse como estado ni como territorio no incorporado para los efectos de la cláusula aludida; (3) que ni en nuestra Constitución, ni en la Ley Pública 600, ni en la Ley de Relaciones Federales con Puerto Rico se estableció que dicha cláusula aplicaría a Puerto Rico, por lo que no formó parte del pacto efectuado entre Estados Unidos y Puerto Rico. Véanse: *Sancho v. Bacardi Corporation of America*, 109 F.2d 57 (1er Cir. 1940)* (revocado por otros motivos en *Bacardi Corp. v. Domenech*, 311 U.S. 150 (1940)); *Mora v. Torres*, 113 F.

Case 17-03283-LTS    Doc#4781-6    Filed 01/24/18    Entered 01/24/18 18:12:25    Desc:
Exhibit Exhibit 7 Part B Page 318 of 541

Supp. 309 (D. P.R. 1953); *R.C.A. v. Gobierno de la Capital*, ante.

Por otro lado, los argumentos más persuasivos *a favor* de la aplicación de la cláusula de comercio a Puerto Rico son: (1) que aplica a Puerto Rico a través de la cláusula territorial; (2) que la intención del Congreso al permitir la aprobación de la Constitución del Estado Libre Asociado (E.L.A.) era organizar un gobierno local, por lo que su adopción en ningún momento altera la aplicabilidad a Puerto Rico de las leyes de Estados Unidos y de la jurisdicción **\*156** federal en Puerto Rico; (3) los amplios poderes del Congreso para regular el comercio en general incluyendo el de Puerto Rico; (4) la obvia aplicabilidad a Puerto Rico del principio de uniformidad en el comercio y mercado común. Véanse *Starlight Sugar Inc. v. Soto*, 253 F.3d 137 (1er Cir. 2001); *Sea-Land Services, Inc. v. Municipality of San Juan*, 505 F. Supp. 533 (D. P.R. 1980); R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 341.[8]

[8]    Con el pasar de los años la controversia en cuanto a este tema se ha ceñido a la posible aplicación del aspecto durmiente de la cláusula de comercio y se ha dejado a un lado la controversia relativa a la aplicación de la cláusula de comercio en su aspecto relativo al poder del Congreso de regular el comercio interestatal. En cuanto a ello, nos parecen sumamente pertinentes las expresiones siguientes del Primer Circuito de Apelaciones en *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 7–8 esc. 3 (1er Cir. 1992):

"Both the Supreme Court and this court have long held or assumed that Congress has power under the Commerce Clause to regulate commerce with Puerto Rico. See *Secretary of Agric. v. Central Roig Refining Co.*, 338 U.S. 604, 616 (1950)(Sugar Act of 1948 applied to Puerto Rico through the Commerce Clause); *Puerto Rico Tel. Co. v. F.C.C.*, 553 F.2d 694, 701 (1st Cir. 1977)(Federal Communications Commission regulations applied via the Commerce Clause to government-owned telephone company in Puerto Rico). Thus, in one aspect, the question "whether the Commerce Clause applies to Puerto Rico" has been settled in the affirmative for many years ...."

La mayoría de los planteamientos mencionados provienen de varias decisiones del Tribunal de Distrito Federal para el Distrito de Puerto Rico y del Primer Circuito de Apelaciones. En un principio, ambos foros habían

determinado que la cláusula de comercio *no* aplicaba a Puerto Rico. *Mora v. Torres*, ante; *Buscaglia v. Ballester*, 162 F.2d 805 (1er Cir. 1947); *Lugo v. Suazo*, 59 F.2d 386 (1er Cir. 1932). Luego, los referidos foros *variaron su criterio* y resolvieron que *era de completa aplicación al Estado Libre Asociado*.

El primero de los casos, en los que se resolvió a favor de la aplicación de la mencionada cláusula, fue *Sea-Land Services, Inc. v. Municipality of San Juan*, ante. En aquella ocasión el Tribunal de Distrito Federal para el Distrito de Puerto Rico concluyó que el poder otorgado al Congreso a través de la cláusula territorial[9] obligaba a resolver que **\*157** la cláusula de comercio aplicaba a Puerto Rico *tanto en su aspecto positivo como en su aspecto durmiente*. Añadió el aludido foro, que las razones que llevaron a los constituyentes a aprobar la cláusula de comercio aplican a las relaciones comerciales entre Puerto Rico y los estados o países extranjeros, y que resolver que la cláusula no aplica a Puerto Rico provocaría rivalidades con los estados y evitaría la uniformidad regulatoria en casos en los que el Congreso lo entendiera pertinente.

[9]    Art. IV, Sec. 3 de la Constitución federal, L.P.R.A., Tomo 1.

A pesar de la determinación anterior, no fue hasta 1992 que el Primer Circuito de Apelaciones tuvo la oportunidad de variar sus pronunciamientos hechos en *Buscaglia v. Ballester*, ante, y en *Lugo v. Suazo*, ante, entre otros, referentes a la inaplicabilidad de la cláusula de comercio a Puerto Rico. Dicha oportunidad surgió en el caso *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 8–9 (1er Cir. 1992), en el cual entre otras cosas el referido foro indicó:

*... Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine.* In the Supreme Court's words, "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union ..." *Examinig Board v. Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed. 2d 65 (1976). (Énfasis suplido.)

El mencionado foro expresó, *además*:

The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court

has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce. *This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as any state in the Union.* In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an "intermediate boundary" separating it from the rest of the country. There is no reason **\*158** to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise. (Citas omitidas y énfasis suplido.)

Para llegar a dicho resultado, el Primer Circuito también se apoyó en pronunciamientos jurisprudenciales hechos por otros circuitos. Entre ellos el hecho por el Noveno Circuito en *Anderson v. Mullaney*, 191 F.2d 123, 127 (9no Cir. 1951), en el cual se determinó que la doctrina de la cláusula de comercio durmiente aplicaba al entonces territorio de Alaska y al hecho por el Tercer Circuito en *JDS Realty Corp. v. Goverment of Virgin Islands*, 824 F.2d 256, 259–260 (3er Cir. 1987), que hizo lo propio para el actual territorio de las Islas Vírgenes.

En cuanto a dichas decisiones —las relativas a Alaska y a las Islas Vírgenes— debemos resaltar, más allá de las diferencias entre el tipo de relación que tienen con Estados Unidos en comparación con Puerto Rico, el lenguaje contenido en *Anderson v. Mullaney*, ante, pág. 128:

But we cannot conceive that in granting legislative power to the Territorial Legislature it was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce. The words "all rightful subjects of legislation" describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. "All rightful subjects of legislation" must be held to refer to matters local to Alaska.

En decisiones posteriores, el Primer Circuito de Apelaciones ha reiterado, sin mayor explicación, la aplicabilidad de la cláusula de comercio a Puerto Rico. A tales efectos, véanse: *United Egg Producers v. Department of Agriculture*, 77 F.3d 567 (1er Cir. 1996); *Starlight Sugar, Inc. v. Soto*, ante. Finalmente, vale la pena destacar que tan reciente como en abril de 2005, el referido foro federal resolvió el caso **\*159** *Walgreens Co. v. Rullan*, 405 F.3d 50 (1er Cir. 2005), en el cual *reiteró* lo mencionado al determinar que una ley local que exigía certificados de necesidad y conveniencia a toda persona que interesara adquirir o construir un establecimiento para el cuidado de la salud en la isla —entre ellos las farmacias— violaba el aspecto durmiente de la cláusula de comercio de la Constitución federal y, por ende, era inválida. Dicha decisión fue recurrida, mediante una petición de *certiorari*, ante el Tribunal Supremo federal el 4 de noviembre de 2005. Posteriormente, el 9 de enero de 2006 el Supremo federal *denegó* la expedición del recurso solicitado. Véase *Pérez Perdomo v. Walgreen Co. et al.*, 163 L.Ed.2d 928 (2006).

Ciertamente, todos los argumentos mencionados son altamente persuasivos e incluyen aspectos políticos que deberían resolverse en un foro diferente al judicial. No obstante, creemos que, dadas las circunstancias particulares de nuestra relación con Estados Unidos, *los argumentos a favor de la aplicación a Puerto Rico de la cláusula de comercio, en su estado durmiente, son más persuasivos que los argumentos en contra.*

Primeramente, son hechos que no pueden ser controvertidos que la relación de Puerto Rico con Estados Unidos es *sui generis*[10] —que no puede ser catalogada como de territorio incorporado o de territorio no incorporado— y que, sea cual sea dicha relación, el Congreso tiene el poder —a través de la cláusula territorial— de regular tanto el comercio interestatal como el internacional en Puerto Rico. A raíz de lo anterior, no resultaría correcto atender la controversia relativa a la aplicabilidad del aspecto durmiente de la cláusula de comercio a nuestra jurisdicción, según la simple aseveración de que la cláusula de comercio no aplica por su propio vigor a los territorios no incorporados.

10   *Califano v. Torres*, 435 U.S. 1 (1978); *Examinig Bd. v. Flores de Otero*, 426 U.S. 572 (1976).

Así pues, a pesar de existir una relación especial y única entre Estados Unidos y Puerto Rico, *no debe quedar duda*

Case: 17-03283-LTS    Doc#:4781-6    Filed:01/24/18    Entered:01/24/18 18:12:25    Desc:
Exhibit Exhibit 7 Part 5 Page 33 of 541

Asociación de Importadores de Cerveza v. Com.... 2007 TSPR 92, ...

2007 TSPR 92, P.R. Offic. Trans.

**\*160** de que, en términos de los poderes conferidos para autogobernarse, el Estado Libre Asociado y los estados que componen la Unión Americana son extremadamente semejantes. Véanse: *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 595 (1976); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 671 (1974). *Ciertamente, Puerto Rico no es un país ni un territorio independiente para poder tener la libertad de aprobar leyes que atenten contra la estabilidad del comercio interestatal.* Véase *Trailer Marine Transport Corp. v. Rivera Vazquez*, ante.

Además de lo antes expresado, consideramos que existen otros argumentos que sustentan con igual contundencia la aplicación del aspecto durmiente de la cláusula de comercio en nuestra jurisdicción. A tales efectos, enfatizamos las expresiones del Primer Circuito de Apelaciones en *Trailer Marine Transport Corp. v. Rivera Vazquez*, ante, relativas a que la completa integración económica —*propósito fundamental de la cláusula de comercio*—es igual de esencial para Puerto Rico como para cualquier estado de la Nación Americana. Dicho de otra manera, *no* existe fundamento jurídico válido para sustentar que Puerto Rico —en ausencia de legislación federal— pueda discriminar contra productos de otros estados, o extranjeros, beneficiando así a los suyos.

Ciertamente, no debe quedar duda en la mente de persona alguna que —por lo menos en materia comercial— Estados Unidos ostentan un amplio poder para evitar lo que el Tribunal Supremo federal ha denominado como "the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation". *Granholm v. Heald*, 544 U.S. 460, 472 (2005), citando a *Hughes v. Oklahoma*, 441 U.S. 322, 325–326 (1979).

Finalmente, en ausencia de disposición expresa que excluya a Puerto Rico de la aplicación del aspecto durmiente **\*161** de la cláusula de comercio, [11] *no* existe razón para creer que el Congreso autorizó a Puerto Rico a discriminar contra el comercio interestatal e internacional. De igual forma, sería arriesgado sostener lo contrario existiendo en la Ley de Relaciones Federales con Puerto Rico una disposición que impide que la Legislatura del Estado Libre Asociado establezca "*distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico*". (Énfasis suplido.) Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, pág. 210.

[11]    La única referencia a la exclusión de Puerto Rico sobre alguna legislación relativa al comercio interestatal está en la Sec. 38 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1, que dispone que la Ley de Comercio Interestatal no aplicará a Puerto Rico. No obstante, dicho artículo no puede prohibir más de lo que expresamente dispone, por lo que no se le puede conceder el alcance de impedir la aplicación en nuestra jurisdicción de una disposición constitucional como lo es la cláusula de comercio interestatal. Para expresiones similares, véase *Sea-Land Services, Inc. v. Municipality of San Juan*, 505 F. Supp. 533, 544 esc. 46 (D.P.R. 1980), citando a D.M. Helfeld, *How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?* XXXIX (Núm. 2) Rev. Jur. U.P.R. 169 (1969).

En virtud de todo lo antes expuesto, *entendemos que la doctrina relativa al estado durmiente de la cláusula de comercio de la Constitución de Estados Unidos aplica al Estado Libre asociado de Puerto Rico, según la ha desglosado el Tribunal Supremo federal.*

C. Ahora bien, expresado lo anterior procede que nos preguntemos cuál es el análisis requerido ante una alegada violación a la doctrina.

Como ya mencionamos, el aspecto durmiente o negativo de la cláusula de comercio *impide* que —aun ante la ausencia de legislación federal vinculante—un estado apruebe leyes que afecten el comercio interestatal o internacional que perjudiquen productos extranjeros o beneficien productos locales. En otras palabras, y según ha expresado el Tribunal Supremo federal, "[t]he negative or dormant implication **\*162** of the Commerce Clause prohibits state regulation that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace' ". (Citas omitidas.) *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997).

Como señalan los conocidos tratadistas Rotunda y Nowak, el aspecto durmiente de la cláusula de comercio busca prevenir que los estados impongan medidas económicamente proteccionistas. Asimismo indican que es irrelevante si la ventaja es para los comerciantes locales o para los consumidores locales, y que ambas situaciones violan el aspecto negativo de la cláusula de comercio. 2 *Rotunda and Nowak, Treatise on Constitutional Law 3rd*, Sec. 11.1 pág. 133 (1999).

El enfoque actual del Tribunal Supremo federal, según el reconocido tratadista Laurence H. Tribe, va dirigido a otorgar un mayor énfasis en la pregunta relativa a si el estatuto en controversia discrimina con el comercio interestatal o internacional. Tribe, *op. cit.*, pág. 1059. De este modo, una ley estatal que discrimine contra el comercio interestatal, *ya sea de su faz o por su efecto*, será invalidada a menos que el estado demuestre que el estatuto persigue un propósito local legítimo y que dicho propósito no puede ser cumplido con medidas no discriminatorias. Íd.

Ahora bien, una ley que no sea discriminatoria ni de su faz ni por su efecto, pero que afecte indirectamente al comercio interestatal, podrá ser inválida si el peso impuesto al comercio es claramente excesivo en relación con los beneficios putativos locales. *Oregon Waste Systems, Inc. v. Department of Enviroment Quality of Ore.*, 511 U.S. 93, 99 (1994). [12]

[12] "[T]he burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Oregon Waste Systems, Inc. v. Department of Enviroment Quality of Ore.*, 511 U.S. 93, 99 (1994).

En lo que respecta al aspecto específico sobre legislaciones contributivas estatales, el Tribunal Supremo federal **\*163** ha establecido una *regla cardinal*, de forma compatible con la cláusula de comercio, que dispone que ningún estado podrá imponer un impuesto que discrimine contra el comercio interestatal, proveyendo una ventaja comercial directa a los comercios locales. *Bacchus Imports, LTD. v. Dias*, 468 U.S. 263, 268 (1984). Véanse: *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 329 (1977); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959).

Con el pasar de los años, la doctrina relativa al análisis de las referidas leyes estatales ha quedado plasmada de la manera siguiente: un impuesto estatal —ante un ataque fundamentado en la cláusula de comercio— será considerado válido si: (1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; (2) la contribución está distribuida o proporcionada equitativamente; (3) *la contribución en cuestión no discrimina contra el comercio interestatal*; [13] (4) la contribución está relacionada apropiadamente con los servicios provistos por el estado. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). Véase, además, *Iberia v. Srio. de Hacienda*, 135 D.P.R. 57 (1994). [14]

[13] Este tercer elemento, se ha analizado de acuerdo con el enfoque tradicional que se utiliza cuando una ley es atacada por alegadamente violar el aspecto durmiente de la cláusula de comercio interestatal. L.H. Tribe, *American Constitutional Law*, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, pág. 1106. Es decir, que una ley estatal que discrimina contra el comercio interestatal o internacional —ya sea de su faz o por su efecto— es virtualmente inválida o inválida *per se. Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992); *Philadelphia v. New Jersey*, 437 U.S. 617 (1978); *Brown-Forman Distillers v. N.Y. Liquor Auth.*, 476 U.S. 573 (1986); *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Véase, además, Tribe, *op. cit.*, pág. 1059.

[14] Este *test* también recoge requisitos del debido proceso de ley. Véase Tribe, *op. cit.*, pág. 1106.

En cuanto a dichos criterios, se ha sostenido que *el tercer requisito es el dominante* y que tanto el primero como el cuarto van dirigidos a demostrar que el estado tiene suficiente relación con la actividad que pretende tributar. Finalmente, el segundo va dirigido a asegurarse de que los **\*164** impuestos no obliguen al comercio interestatal a pagar más de lo que le corresponde. Tribe, *op. cit.*, págs. 1106–1107.

D. Luego de haber expuesto el estado de derecho relativo al aspecto durmiente de la cláusula de comercio, procedemos a analizar en conjunto los señalamientos de error segundo y tercero. En esencia, los peticionarios alegan que el Art. 2 de la Ley Núm. 69, ante, discrimina en su propósito y en su efecto contra el comercio interestatal y, por ende, viola la cláusula de comercio y la referida Sec. 3 de la Ley de Relaciones Federales con Puerto Rico.

En primer lugar, debemos despachar, sin mayor análisis, la posible controversia de si la Ley Núm. 69, ante, aquí impugnada es discriminatoria de su faz, *resultando que* en la petición jurada presentada ante el foro primario, los propios peticionarios reconocen que esta ley *no* lo es. Asimismo, destacamos que en este caso no existe disputa en cuanto a que la ley impugnada aplica por igual a empresas locales, estatales o internacionales, ya que las mencionadas empresas tendrán que pagar una contribución que dependerá del *volumen de producción* que tengan, independientemente de su lugar de origen.

A pesar de ello, los peticionarios alegan que erraron tanto el foro primario como el foro apelativo intermedio al no utilizar el historial legislativo de la Ley Núm.

69, ante, para determinar que la medida tenía un *propósito discriminatorio* o, en otras palabras, que sí era discriminatoria de su faz.

En cuanto a dicha postura, es menester señalar que en reiteradas ocasiones hemos resuelto que "si [una] ley carece de exposición de motivos, ésta generalmente recoge el propósito que inspiró su creación. No obstante, en aquellos casos en los cuales la ley carece de una exposición de motivos o, cuando aun teniéndola, *no contiene la intención legislativa*, es útil consultar otros documentos tales como los informes de las comisiones que estudiaron el proyecto **\*165** de ley y los debates celebrados cuando la medida fue discutida en el hemiciclo, según aparecen en el Diario de Sesiones". *Vicenti v. Saldaña*, 157 D.P.R. 37, 48 (2002). Véase *Chévere v. Levis*, ante. En otras palabras, *la norma en cuanto a cómo se debe analizar la intención legislativa de un estatuto* es buscarla en la exposición de motivos y que solamente en casos en los que no exista una exposición de motivos o que la *intención legislativa no esté allí expresada* es que se recurre a otros documentos.

Y es que no puede ser de otra manera, ya que interpretar la intención legislativa de una ley a base de otros documentos diferentes a la exposición de motivos —claro está, cuando ésta contiene la susodicha intención —sería afirmar *sub-silentio* que la Asamblea Legislativa "dice una cosa pero quiere otra". De igual forma, no es lo mismo interpretar un estatuto para poder aplicarlo, que interpretarlo con miras a determinar la intención del legislador a la hora de aprobarlo. En cuanto a dicha disyuntiva, resultan ilustradoras las expresiones siguientes del Tribunal Supremo federal:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. *It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a*

> *handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.* We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it. (Énfasis suplido y escolios omitidos.) *United States v. O'Brien*, 391 U.S. 367, 383–384 (1968).

Este Tribunal ha hecho expresiones similares en cuanto **\*166** a la utilización de las expresiones de los legisladores durante el debate legislativo a la hora de interpretar una ley. A tales efectos hemos expresado que "es regla generalmente aceptada que las expresiones de un legislador, en el hemiciclo del cuerpo legislativo a que pertenece, no son suficientemente representativas de la intención colectiva del cuerpo que aprueba el estatuto". *F. Vázquez, Inc. v. Srio. de Hacienda*, 103 D.P.R. 388, 390 (1975). Además, es norma reiterada que las leyes "han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer, ni de la actuación personal de uno de sus miembros". *Elicier v. Sucn. Cautiño*, 70 D.P.R. 432, 437 (1949).

Expresado lo anterior, analizamos la Exposición de Motivos de la Ley Núm. 69, ante, para determinar si es necesario recurrir a otros documentos para establecer cuál fue la intención de los legisladores a la hora de aprobarla. La Exposición de Motivos, en su parte pertinente, dispone:

> Las medidas impositivas que se establecen mediante esta medida no deben afectar otras áreas de la base económica del país. Por ello, en el caso de la cerveza, se utiliza el mecanismo avalado por el Tribunal Supremo de Puerto Rico en *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980), para garantizar que las industrias de menor producción

Case: 17-03283-LTS Doc#:4781-6 Filed:01/24/18 Entered:01/24/18 18:19:25 Desc:
Exhibit 7 Part 5 Page 323 of 541

Asociación de Importadores de Cerveza v. E.L.A., 171 D.P.R. 140 (2007)
2007 TSPR 92, P.R. Offic. Trans.

puedan continuar operaciones de forma inalterada. En esos casos, según aumente su capacidad productiva, y como resultado, su estabilidad económica, se aumenta paulatinamente su responsabilidad con el fisco. Ante eso, *es política pública del Estado Libre Asociado fomentar que industrias pequeñas que producen cervezas no reciban el peso del nuevo aumento de arbitrio hasta que su producción anual y capacidad económica lo justifiquen ....* (Énfasis suplido.) 2002 (Parte 1) Leyes de Puerto Rico 263, 265–266.

De un análisis del texto antes citado se desprende con meridiana claridad y libre de ambigüedades que la intención de la Asamblea Legislativa a la hora de aprobar dicha ley fue la de aprobar un nuevo arbitrio mientras garantizaba, a su vez, que las cervecerías pequeñas pudieran continuar **\*167** operaciones sin recibir el peso de éste, hasta que su producción anual lo justificara. Recordemos que "cuando la ley es clara y libre de toda ambigüedad, se debe observar su letra". Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véase *E.L.A. v. Rodríguez*, 163 D.P.R. 825 (2005).

Conforme a lo expresado anteriormente, creemos que *actuaron correctamente* los Tribunales de Primera Instancia y el de Apelaciones al resolver que la intención legislativa que llevó a la aprobación de la Ley Núm. 69, ante, *no* es discriminatoria de su faz, ya que surge diáfanamente de su exposición de motivos. De igual forma, y contrario a lo sostenido por los peticionarios, entendemos que para llegar a dicha conclusión *no* había que auscultar las expresiones de varios legisladores durante el proceso del debate legislativo.

Por otro lado, los peticionarios sostienen que la ley impugnada tiene un *efecto discriminatorio* en el comercio interestatal. Para ello, se apoyan en *Bacchus Imports, LTD v. Dias*, ante, caso en el que el Tribunal Supremo federal invalidó una ley del estado de Hawaii, que establecía un impuesto a las bebidas alcohólicas con las únicas excepciones de dos bebidas que se producían únicamente en dicho estado. [15]

15     Dichas bebidas eran el Okolehao, bebida elaborada a base de la raíz de una planta oriunda de Hawaii, y los vinos de frutas.

Al examinar el propósito de la mencionada legislación, el Tribunal Supremo federal expresó que "examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce". *Bacchus Imports, LTD v. Dias*, ante, pág. 270. No obstante lo anterior, el máximo foro federal expresó: "Likewise, the effect of the exemption is clearly discriminatory, in that *it applies only to locally produced beverages, even though it does not apply to all such products.* Consequently, as long as there is some **\*168** competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect." *Íd.*, pág. 271.

Como se puede apreciar de lo anterior, el Tribunal Supremo federal declaró inconstitucional la ley impugnada debido a que era discriminatoria de su faz —en su propósito— y por sus efectos. A raíz de esto último es que los peticionarios esbozan su argumento en cuanto a que la Ley Núm. 69, ante, es discriminatoria por su efecto. No obstante, somos del criterio que lo resuelto en *Bacchus Imports, LTD v. Dias*, ante, en cuanto al efecto discriminatorio de la ley, *no* aplica a este caso.

Primeramente las leyes involucradas en ambos casos son claramente *diferentes.* Mientras la de *Bacchus Imports, LTD v. Dias*, ante, intentaba proteger exclusivamente la industria hawaiana de licores, eximiendo de la aplicación del impuesto a varias bebidas que únicamente se producían en Hawái, la del caso de autos pretende garantizar que las industrias de menor producción —*independientemente de su lugar de procedencia*— puedan absorber la contribución impuesta sin cesar operaciones. Surge de la propia ley que para cumplir dicho propósito la Asamblea Legislativa de Puerto Rico estableció un sistema de exenciones escalonadas el cual intenta permitir que la responsabilidad de las compañías ante el fisco aumente paulatinamente mientras aumenta la estabilidad económica de éstas. [16]

16     Debemos resaltar que la Asamblea Legislativa posee una amplia discreción en el campo contributivo y que "[t]radicionalmente la 'clasificación' ha sido un método para ajustar los programas contributivos a las necesidades y usos locales a fin de lograr una distribución equitativa en la carga contributiva". *U.S.*

Asoc. Importadores de Cerveza v. Srio. de Hacienda, 2007 TSPR 92 (2007)

2007 TSPR 92, P.R. Offic. Trans.

Case: 17-03283-LTS    Doc#:4781-6    Filed:01/24/18    Entered:01/24/18 18:19:25    Desc:
Exhibit Exhibit 6 Part 6 Page 99 of 343

*Brewers Assoc. v. Srio. de Hacienda*, ante, pág. 460, citando a *Miranda v. Sec. de Hacienda*, 77 D.P.R. 171, 178 (1954).

Como vimos, en *Bacchus Imports, LTD v. Dias*, ante, el Tribunal Supremo federal le dio especial énfasis a que la única bebida beneficiada por la exención era hawaiana, *cosa que no ocurre en este caso.* Del expediente del caso **\*169** ante nuestra consideración se desprende que los *propios peticionarios admiten* que existen bebidas extranjeras —como Mike's Hard Lemonade y Cruzan I Sland Cocktails— que se benefician de la exención especial y otras —como Samuel Adams y Bacardí Breezers— que fueron elegibles o descontinuaron su producción, por lo cual la cervecería local *no* es la única beneficiada por las exenciones ofrecidas por dicho estatuto.

Además, es un hecho no disputado que las exenciones aprobadas aplican y pueden aplicar de igual manera a las cervecerías locales, estatales o extranjeras, permitiendo que el nivel contributivo varíe *dependiendo de la producción anual de éstas.* O sea, que una cervecería que hoy se beneficie de alguna de las exenciones impuestas, al año siguiente puede beneficiarse de una menor o hasta de ninguna, dependiendo de cómo varíe su producción. Asimismo, resulta poco arriesgado afirmar que las cervecerías extranjeras pequeñas pudieran acogerse al mencionado beneficio si deciden vender sus productos en Puerto Rico.

En otras palabras, para resolver que el efecto del Art. 2 de la Ley Núm. 69, ante, es discriminatorio contra el comercio interestatal se requiere una determinación de que dicha ley tiene el efecto de no permitir que entidades fuera de Puerto Rico se acojan a sus beneficios, lo que según hemos visto no es correcto.

Asimismo, aunque es cierto que la cláusula de comercio en su estado durmiente prohíbe que los estados aprueben leyes económicas que discriminen contra productos extranjeros por razón de su lugar de origen, no podemos afirmar que dicha cláusula prohíbe que un estado apruebe una ley que, en términos técnicos, aplique de forma diferente a diversos productos o productores. Claro, ello será así siempre y cuando dicha diferencia no tenga nada que ver con la procedencia de los productos, sino con aspectos comunes o neutrales que puedan variar de compañía en compañía independientemente de su lugar de origen. Al respecto resultan **\*170** pertinentes las expresiones siguientes del Tribunal Supremo federal: "[T]he Commerce Clause *is not violated* when the

*differential tax treatment* of two categories of companies '*results solely from differences*' between the nature of their businesses, not from the location of their activities." (Énfasis suplido.) *Kraft Foods v. Iowa Dept. of Rev.*, 505 U.S. 71, 78 (1992).

Por dichos fundamentos, somos del criterio que el Art. 2 de la Ley Núm. 69, ante, *no discrimina por su aplicación o efecto contra el comercio interestatal.* Ahora bien, aquí *no* termina nuestro análisis. Como mencionamos anteriormente, las leyes contributivas estatales, además de que no sean discriminatorias, deben cumplir con otros criterios para sobrevivir a un ataque al amparo de la cláusula de comercio. Estos criterios son, que: (1) el impuesto aplique a alguna actividad que tenga un nexo sustancial con el estado, (2) esté justamente distribuido y (3) se relaciona adecuadamente con servicios ofrecidos por el estado.

Los peticionarios no han esbozado argumento alguno dirigido a demostrar que el Art. 2 de la Ley Núm. 69, ante, no cumple con algunos de los criterios mencionados. No obstante ello, resulta claro que el impuesto que establece la Ley Núm. 69, ante —y, por ende, la exención impugnada — aplica a una actividad con nexo sustancial con Puerto Rico y se relaciona con servicios ofrecidos por éste, o sea, la autorización para la venta de bebidas alcohólicas en nuestra jurisdicción. Además, está justamente distribuido, ya que la exención es menor mientras más producción tenga la empresa.

Finalmente, debemos mencionar que cuando se impugna una ley estatal que impone un impuesto por alegadamente discriminar contra el comercio *internacional* también hay que analizar los criterios siguientes: (1) "whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation", y (2) "whether the tax prevents the Federal Government from 'speaking **\*171** with one voice when regulating commercial relations with foreign governments' ". *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 451 (1979).

En cuanto al primer criterio, el Tribunal Supremo federal ha indicado que un impuesto estatal será validado a menos que el riesgo de doble tributación sea inevitable. *Barclays Bank PLC v. Franchise Tax Board of Cal.*, 512 U.S. 298 (1994); *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159 (1983). Resulta obvio que el impuesto que da pie a la exención aquí impugnada *no* expone un riesgo para la

doble tributación, ya que solamente recae sobre la bebida que se vende en Puerto Rico.

Sobre el segundo criterio, lo que se pretende es evitar que se desvirtúe el interés Congresional en establecer una uniformidad en cuanto a las relaciones comerciales con otros países. Dicho criterio presupone que el Congreso haya expresado de forma clara su intención de crear la mencionada uniformidad. *Barclays Bank PLC v. Franchise Tax of Cal.*, ante. En el *caso* no existe intención congresional de mantener la mencionada uniformidad y, además, existe un sinnúmero de estados con leyes diferentes que imponen distintos impuestos a las cervezas y demás bebidas. [17]

[17]  Véanse, a modo de ejemplo: Wyo. Stat. Sec. 12–3-101 (Wyoming); W. Va. Stat. Sec. 11–16-13 (West Virginia); 72 P.S. Sec. 9010 (Pennsylvania); N.M. Stat. Ann. Sec. 7–17-2 (Nuevo México); Wis. Stat. Sec. 139.02(1) (Wisconsin); Tex. Alco. Bev. Code Sec. 203.01 (Texas).

Somos del criterio, repetimos, que el Art. 2 de la Ley Núm. 69, ante, *no* viola la cláusula de comercio interestatal, ya que: (1) no tiene un propósito discriminatorio; (2) no tiene un efecto discriminatorio; (3) aplica a una actividad que tiene un nexo sustancial con Puerto Rico; (4) está justamente distribuido; (5) se relaciona adecuadamente con servicios ofrecidos por el estado; (6) no constituye un riesgo sustancial de múltiple tributación, y (7) no afecta algún posible interés del gobierno federal en mantener una uniformidad **\*172** con el comercio internacional. [18] En conclusión, opinamos que *actuaron correctamente* tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones al desestimar la petición jurada que motivó el caso de autos.

[18]  Los peticionarios también arguyen que el Art. 2 de la Ley Núm. 69, ante, viola la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Ciertamente, ante nuestra opinión con respecto a la cláusula de comercio, *resulta innecesario atender dicho planteamiento, ya que el análisis requerido por la cláusula de comercio es, por lo menos, más estricto que el que requiere la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Así pues, entendemos que una ley que supere el análisis requerido por la cláusula de comercio —como lo es el Art. 2 de la Ley Núm. 69, ante— obligatoriamente superará un ataque al amparo de la Sec. 3 de la Ley de Relaciones Federales con Puerto Rico, ante.*

Por todo lo anteriormente expuesto, es que estamos *conformes* con la sentencia emitida por el Tribunal en el presente caso.

--O--

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

**I**

Estoy conforme con la sentencia emitida por el Tribunal en el caso de autos. Para mí es claro que el Art. 2 de la Ley Núm. 69 de 30 de mayo de 2002 (13 L.P.R.A. sec. 9574) *no tiene defecto constitucional alguno*, por lo que procede la desestimación de la acción incoada por los demandantes, como correctamente lo decidieron antes el foro de instancia y el foro apelativo.

Para resolver este caso sólo es menester aplicar a sus hechos lo resuelto antes por este Foro en *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980) —*que presentaba una situación esencialmente idéntica a la del caso de autos*— tal como lo hicieron correctamente los foros *a quo. U.S. Brewers Assoc. v. Srio. de Hacienda*, supra, es un claro precedente determinativo de la controversia en el **\*173** caso de autos, que puede adjudicarse sencillamente con sólo aplicar aquí el precedente referido.

No obstante, deseo tratar en esta opinión el espinoso asunto de si aplica *ex proprio vigore* a Puerto Rico las limitaciones que proceden de la cláusula de comercio interestatal de la Constitución federal. El asunto fue planteado en el caso de autos y provocó la otra opinión de conformidad que se ha emitido aquí, la cual considero errada y propensa a causar confusión. Por ello, me parecer menester entrar a considerar a fondo esta cuestión.

Se trata de un asunto que ha estado ante nuestra consideración varias veces antes, pero que este Tribunal ha tratado *con ambivalencia*, al menos en épocas recientes. En las primeras ocasiones que el asunto se planteó, este Tribunal resolvió muy deliberadamente que *el llamado aspecto "durmiente" de la cláusula de comercio de la Constitución federal no aplicaba a Puerto Rico*. Lo resolvimos así *antes* del establecimiento del Estado Libre Asociado, en la enjundiosa decisión de *Ballester Hnos. v. Tribunal de Contribuciones*, 66 D.P.R. 560 (1946). Luego del establecimiento del Estado Libre Asociado, lo volvimos a resolver en la muy ponderada y medular decisión de *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964), al igual que en *South P.R. Sugar Corp. v.*

Asociación de Importadores de Cerveza V. P.R....
2007 TSPR 92, P.R. Offic. Trans.

*Com. de Servicio Púb.*, 93 D.P.R. 12 (1966). Sin embargo, a pesar de esos claros y substanciosos precedentes, más recientemente, en un caso en que se volvió a plantear el asunto, este Foro titubeó y optó por no reiterar lo resuelto antes en las tres opiniones citadas. Prefirió limitarse a señalar que aun si la cláusula de comercio aplicara, los hechos en cuestión no constituían una violación a dicha cláusula. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 336 (1987).

En mi criterio, el tema aludido merece el mayor estudio y reflexión por la sencilla razón de que la errada noción de que la cláusula de comercio interestatal de la Constitución federal aplica Puerto Rico *ex proprio vigore*, pone sobre **\*174** las espaldas del Gobierno del país una innecesaria carga jurídica que opera *como una limitación más a su capacidad de encarar con éxito los graves problemas económicos de Puerto Rico.* No queda, pues, otra alternativa que denunciar con vehemencia la supuesta aplicabilidad de la cláusula referida y explicar los fundamentos de nuestro parecer. Veamos.

## II

¿Por qué prevalece aún entre algunos en Puerto Rico la errada noción de que nuestro país está sujeto a las limitaciones que proceden de la cláusula sobre el comercio interestatal de la Constitución norteamericana? ¿Por qué no se acatan las tres opiniones de este Tribunal, citadas dos párrafos atrás, que resuelven definitivamente la inaplicabilidad a Puerto Rico de la normativa federal en cuestión? ¿Cuál es la razón detrás del empeño por introducir en nuestra jurisprudencia el erróneo criterio jurídico de que a Puerto Rico le obliga el aspecto durmiente de la cláusula de comercio interestatal de la Constitución americana?

La respuesta a las interrogantes anteriores la encontramos en un supuesto "caso clave" del Tribunal del Primer Circuito de Apelaciones federal en el que se fundamenta la otra opinión de conformidad emitida en este caso. Dicha opinión evidentemente no es nada más que una secuela de la sentencia federal aludida, que se ha adoptado aquí de modo mimético. Por ello, hay que ir a la fuente originaria del asunto, para examinar críticamente lo decretado allí.

## III

El Primer Circuito federal había resuelto desde 1932 que la cláusula de comercio interestatal de la Constitución de Estado Unidos no aplicaba a Puerto Rico. Lo hizo así en **\*175** *Lugo v. Suazo*, 59 F.2d 386 (1er Cir. 1932), y lo

reiteró en *Buscaglia v. Ballester*, 162 F.2d 805 (1er Cir. 1947), *cert.* denegado, 332 U.S. 816 (1947). Así que, por décadas, tanto el Tribunal Supremo de Puerto Rico como el Tribunal de Apelaciones del Primer Circuito federal sostuvieron reiteradamente que no aplicaba a Puerto Rico esta cláusula. Los fundamentos para lo resuelto por uno y otro foro fueron esencialmente los mismos y pueden resumirse como se explica a continuación.

Desde sus inicios, la relación entre Estado Unidos y Puerto Rico ha estado sujeta al principio fundamental de que la *Constitución federal no aplica enteramente a Puerto Rico, por no ser ni haber sido nunca la isla un territorio incorporado a la Unión Americana ni formar parte integral de Estados Unidos.* El Tribunal Supremo federal ha resuelto reiteradamente que sólo aplican con plenitud a Puerto Rico las garantías de los principales derechos fundamentales de las personas provistas por la Constitución de Estados Unidos, que por su propia naturaleza siempre limitan el ejercicio del Poder Ejecutivo y Legislativo federal. Una de las cláusulas de dicha Constitución que nunca ningún tribunal federal había aplicado a Puerto Rico era precisamente la relativa al comercio, que dispone que el Congreso tiene la facultad de regular el comercio entre varios estados ("commerce … among the several States"). Puerto Rico, claro está, no es un "estado", por lo que se había resuelto reiteradamente que la isla no estaba cobijada dentro del poder congresional de regular el comercio entre los estados. *Lo anterior no significaba que el comercio entre Puerto Rico y Estados Unidos no estuviese sujeto al poder del Congreso*; sólo que ello se regulaba únicamente mediante la cláusula que le otorga al Congreso el poder de reglamentar los territorios de Estados Unidos, la llamada Cláusula Territorial. Es por lo anterior que la cláusula de comercio, en su aspecto "durmiente", siempre **\*176** había sido concebida sólo como una *limitación a los poderes de los estados*; nunca como una limitación a los poderes gubernamentales de los territorios.

Sobre lo señalado en el párrafo anterior, debe tenerse en cuenta, además, la conocida renuncia del Tribunal Supremo de Estados Unidos a atribuirle vigencia a Puerto Rico sobre cualquier disposición de la Constitución federal que se refiera literalmente a los "estados" de la Unión (*states*). Así, pues, en *Puerto Rico v. Branstad*, 483 U.S. 219 (1987), el Tribunal Supremo federal aplicó a Puerto Rico *el estatuto federal de extradición*, que abarca expresamente a los territorios de Estados Unidos, para no tener que resolver si la Cláusula de Extradición de la

Asociacion de Maestros de Puerto Rico v. Torres, 2007 TSPR 92...
2007 TSPR 92, P.R. Offic. Trans.

Constitución federal —Art. IV, Sec. 2, Const. EE. UU., L.P.R.A., Tomo 1— aplicaba a Puerto Rico. [1] El más alto foro federal señaló lo siguiente:

[1]    La Cláusula de Extradición, en lo pertinente, dispone: "Toda persona acusada de ... delito ... que huye del estado en donde se le acusa y fuera hallada en otro estado, será ... devuelta al estado que tuviera jurisdicción para conocer del delito." Const. EE. UU., L.P.R.A., Tomo 1, ed. 1999, pág. 175.

It is true that the words of the [Extradition] clause apply only to "States" and we have never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred upon the States under the Constitution. We need not decide today what applicability the Extradition Clause may have to the Commonwealth of Puerto Rico, however, for the Extradition Act clearly applies. The Act requires rendition of fugitives at the request of a demanding "Territory", as well as a State. *Puerto Rico v. Branstad*, ante, pág. 229.

La renuncia aludida, ilustrada por el caso *Puerto Rico v. Branstad*, supra, ha sido manifestada en varias otras decisiones importantes del Tribunal Supremo de Estados Unidos concernientes a Puerto Rico. Así pues, en *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974), dicho Foro determinó que las garantías del debido proceso de ley y de la igual protección de las leyes aplicaban a Puerto Rico, pero rehusó resolver que la Decimocuarta Enmienda **\*177** de la Constitución federal, que extiende tales garantías expresamente a los estados de la Unión, aplicase a Puerto Rico por no ser éste un estado. El Tribunal optó por resolver que las normas constitucionales referidas aplicaban a Puerto Rico al amparo de la Quinta o de la Decimocuarta Enmienda, sin precisar cuál (*either-or*). Así mismo sucedió en *Examining Bd. v. Flores Otero*, 426 U.S. 572 (1976). En este caso, uno de los Jueces del Tribunal, el Juez Rehnquist, quien luego fue Juez Presidente, expresó lo siguiente en su propia opinión disidente, en parte:

The Fourteenth Amendment is by its terms applicable to States: Puerto Rico is not a State. ... I would be inclined to reject the claim that the Fourteenth Amendment is applicable to Puerto Rico until a case sufficiently strong to overcome this "plain meaning" obstacle, found

in the language of the Amendment itself, is made out. *Íd.*, pág. 607.

A la luz de lo anterior, que alude a casos resueltos *después* de la creación del Estado Libre Asociado, parece evidente que el propio Tribunal Supremo de Estados Unidos no estaría dispuesto a sostener que la disposición de la Constitución federal que regula el comercio entre varios estados ("among ... the several States") de modo alguno se refiera a Puerto Rico, que claramente no es un estado.

Cuando el Tribunal del Primer Circuito federal decidió revocarse sobre este asunto en 1992, lo hizo mediante un análisis muy limitado y superficial, que no replicaba de modo alguno los fundamentos de los precedentes contrarios tanto de ese mismo foro como los de este Tribunal. Su "análisis" se limitó, en esencia, a apoyarse en dos señalamientos. Primero, que la creación del Estado Libre Asociado procuró conceder a Puerto Rico el grado de autonomía e independencia que normalmente se asocia con los estados de la Unión. Por ende, razonó dicho Foro, aplicaban a Puerto Rico las limitaciones que aplican a los estados de la Unión. **\*178**

Nótese que este primer argumento tiene la anomalía, para no decir el desatino, *de derivar una limitación de poder invocando una concesión de autonomía de poder*. El argumento falaz es que como a Puerto Rico se le concedió, al crearse el Estado Libre Asociado, un mayor grado de autonomía que el que tenía antes, comparable al de los estados de la Unión, se le impuso a la vez una limitación de poder que no tenía antes. Es decir, a la reiterada afirmación formulada por el propio Tribunal Supremo federal, reconociendo la *mayor autonomía* que significaba para Puerto Rico la creación del Estado Libre Asociado (*Puerto Rico v. Branstad*, supra; *Examining Bd. v. Flores de Otero*, supra), el Tribunal del Primer Circuito le añadió como cosa suya *una limitación*, que no surge de ningún modo de lo expresado por el más Alto Foro federal, y que no es de manera alguna compatible con la evidente intención del Tribunal Supremo de Estados Unidos de *resaltar* la importancia de lo creado mediante la Ley Pública 600 (64 Stat. 319). El Tribunal Supremo federal —que ha reclamado sólo para sí la autoridad de determinar qué cláusulas de la Constitución federal le aplican a Puerto Rico, en ausencia de alguna disposición congresional al respecto (*Torres v. Puerto Rico*, 442 U.S. 465 (1979); *Examining Bd. v. Flores de Otero*, supra)— nunca ha determinado que la cláusula de comercio aplica a Puerto Rico, aun luego de habérsele planteado el asunto.

A pesar de ello, sin embargo, el foro apelativo intermedio federal se ha creído facultado a inmiscuirse en el tema, para decretar lo que el más Alto Foro judicial no ha estimado procedente resolver.

Más aún, la noción del Tribunal Supremo federal de que la creación del Estado Libre Asociado aparejó a Puerto Rico a los estados de la Unión en autonomía e independencia, escasamente puede manejarse con la laxitud que la utiliza el Tribunal del Primer Circuito en la jurisprudencia que aquí nos concierne. Ello, no sólo por el hecho de que los informes congresionales con respecto a la Ley Pública 600 **\*179** (64 Stat. 319) hacen hincapié en que con la creación del Estado Libre Asociado no se pretendió alterar *fundamentalmente* la relación entre Estados Unidos y Puerto Rico (véase *U.S. v. López Andino*, 831 F.2d 1164, 1172 (1er Cir. 1987), opinión concurrente del Juez Torruellas), sino, además, por el otro hecho innegable de que la propia autonomía de los estados de la Unión se afinca en gran medida en sus poderes políticos de representación congresional plena y de voto presidencial —ninguna de las cuales tiene Puerto Rico— y en la garantía que provee la Décima Enmienda de la Constitución americana, que de ningún modo abarca a Puerto Rico. Por ello, es menester ser cauteloso y no pretender derivar nuevas y extrañas conclusiones, partiendo de la premisa de que Puerto Rico posee "la autonomía y la independencia" de un estado de la Unión.

Finalmente, al ponderar el asunto que aquí nos concierne, sobre el significado que puede derivarse de la creación del Estado Libre Asociado de Puerto Rico, es menester considerar lo que ha dicho también el propio Tribunal Supremo federal:

> ... Puerto Rico ... is an autonomous political entity, "sovereign over matters not ruled by the Constitution ...". *Posadas de P.R. Assocs. v. Tourism Co.*, 478 U.S. 328, 339 (1986). Véase *Rodríguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982).

Parecería que la pretensión de imponer una limitación sobre los poderes legislativos de Puerto Rico al amparo del aspecto "durmiente" de la cláusula de comercio es claramente improcedente e incompatible con esta otra expresión del Tribunal Supremo americano. Cuando menos, la postura de la otra opinión de conformidad en este caso haciéndole eco ahora al decreto en cuestión del Primer Circuito no armoniza de modo alguno con las reiteradas expresiones del Tribunal Supremo de Puerto

Rico sobre la amplia autoridad jurídica del Estado Libre Asociado. Véanse: *Ramírez de Ferrer v. Mari Brás*, 144 D.P.R. 141 (1997); *Pueblo v. Castro García*, 120 D.P.R. 740 (1988); **\*180** *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964); *Pueblo v. Figueroa*, 77 D.P.R. 188 (1954).

## IV

El otro señalamiento en que se apoyó el Primer Circuito en su referida decisión de 1992 es la noción de que Puerto Rico comparte la plena integración económica con Estados Unidos como cualquier estado de la Unión. La supuesta "lógica" de este otro señalamiento es que al estar Puerto Rico en una situación comparable a la de un estado de la Unión en lo que se refiere a la "integración económica de los Estados Unidos", debe aplicarle a Puerto Rico la misma limitación que le aplica a los estados de la Unión en cuanto al comercio interestatal. El problema con este otro argumento es que es tan falaz como el primero, que se discutió en los párrafos anteriores.

La noción de que Puerto Rico comparte con los estados de la Unión una comparable integración económica a Estados Unidos choca de frente con varias realidades que son conocidas por los que tratan bien con estos asuntos. Puerto Rico, para comenzar, no está sujeto a las leyes de rentas internas federales como lo están los estados de la Unión. Por un lado, los residentes de Puerto Rico no pagan impuestos ni contribuciones federales como lo hacen los residentes de los estados de la Unión. Por otro lado, los fondos que se obtienen de los arbitrios federales que se cobran en Estados Unidos con respecto a los artículos y materiales manufacturados en Puerto Rico — los arbitrios sobre el ron— se destinan al erario nuestro, contrario a lo que sucede con todos los otros arbitrios federales que se cobran en los estados de la Unión sobre los artículos y materiales manufacturados en éstos, que ingresan al erario federal como es natural. La situación contributiva especial de Puerto Rico mencionada, que representa por sí sola miles de millones de dólares anualmente que benefician a la economía **\*181** de Puerto Rico de un modo no asequible a ningún estado de la Unión, es claramente contraria a la falaz noción de igual "integración económica" mencionada.

Otra diferencia entre los estados de la Unión y Puerto Rico relativa a lo económico es que la *Ley sobre Comercio Interestatal* federal expresamente no aplica a la isla aunque regula intensamente aspectos de la transportación de los estados de la Unión. Este dato presenta un

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   18

Case: 17-03283-LTS   Doc#:4781-6   Filed:01/24/19   Entered:01/24/19 18:19:25   Desc:
Exhibit Exhibit 7 Part 15 Page 328 of 541

Asociación de Maestros de P.R. v. ..., 2007 TSPR 92 (2007)
2007 TSPR 92, P.R. Offic. Trans.

problema serio para los que afirman que la cláusula de comercio interestatal de la Constitución federal aplica a Puerto Rico. Evidentemente resulta cuando menos incompatible que se considere que la referida disposición constitucional ha sido extendido a la isla tácitamente por el Congreso, pero que uno de los estatutos principales legislado por el mismo Congreso al amparo de dicha disposición no se extiende a Puerto Rico. En la otra opinión de conformidad emitida en este caso ni se intenta explicar este enredo. De cualquier modo, el estatuto en cuestión aplica a los estados de la Unión pero no a Puerto Rico, lo que forma parte de las amplias diferencias entre los estados y Puerto Rico en lo referente a asuntos económicos.

También debe mencionarse otra diferencia muy particular, que es la relativa a las tarifas sobre el café. En virtud de la Sec. 10 del Art. I de la Constitución federal, L.P.R.A., Tomo 1, los estados de la Unión están, de ordinario, impedidos de imponer contribuciones sobre las importaciones. No obstante, Puerto Rico ha sido expresamente autorizado a imponer tarifas sobre el café importado aunque los estados de la Unión no pueden hacerlo. Véanse: *19 U.S.C.A. sec. 1319*; *Miranda v. People of Puerto Rico*, 101 F.2d 26 (1er Cir. 1938). De esta forma, Puerto Rico puede proteger su propia industria del café de la competencia que representa la importación del café más barato del extranjero.

Además de lo relativo a rentas internas y a las tarifas sobre el café, existen varios otros esquemas jurídicos y reglamentarios federales, también *de índole económica*, cuya **\*182** aplicación a Puerto Rico es muy distinta a la de los estados de la Unión. Sería prolijo enumerarlas todas aquí. Basta con señalar que se trata de asuntos de gran importancia económica con respecto a los cuales la situación de Puerto Rico es notablemente distinta a la de cualquier estado de la Unión. Así pues, programas de ayuda económica, incluyendo los de asistencia para alimentos, el Seguro Social, el salario mínimo federal, algunas leyes bancarias y leyes laborales federales, las leyes sobre tarifas aduaneras, las relativas a almirantazgo y transportación marítima y varias sobre otros asuntos, aplican o han aplicado históricamente de manera diferente en Puerto Rico en comparación con su vigencia en los estados de la Unión. Véase A.H. Leibowitz, *The Applicability of Federal Law To The Commonwealth of Puerto Rico*, 37 Rev. Jur. U.P.R. 615 (1968).

Con relación a lo anterior, también es menester tomar en cuenta la reiterada postura del Tribunal Supremo federal que valida el trato distinto del Congreso con respecto a Puerto Rico, en comparación con el trato del Congreso a los estados de la Unión en todas estas cuestiones económicas. El más Alto Foro federal ha resuelto expresamente *que el Congreso no tiene que darle a Puerto Rico el mismo trato económico que le da a los estados*, legitimando así las importantes diferencias que existen o han existido entre Puerto Rico y éstos. De este modo, el propio Tribunal Supremo federal ha rechazado la noción de que la isla y los estados de la Unión comparten una misma integración económica con la nación americana. Algunas de tales decisiones, para citar sólo las más recientes, son *Harris v. Rosario*, 446 U.S. 651 (1980), en la cual el Tribunal Supremo federal determinó que el Congreso no estaba obligado a tratar a Puerto Rico igual que un estado en el programa *Aid to Families with Dependent Children*, y *Califano v. Torres*, 435 U.S. 1 (1978), en el cual el Tribunal Supremo federal determinó lo mismo con respecto al programa *Supplemental Security Income* (SSI).   **\*183**

Debe señalarse que el Tribunal Supremo federal ha sostenido la validez del trato diferente a Puerto Rico no sólo cuando el Congreso le ha dado *menos* a la isla que lo que ha dispuesto en beneficio de los residentes de los estados de la Unión, como en los dos casos citados en el párrafo anterior, sino también cuando el trato diferente ha consistido en darle a Puerto Rico *más* que lo que pueden hacer los estados de la Unión, como sucedió en *West India Oil Co. v. Domenech*, 311 U.S. 20 (1940), relativo a los poderes de imponer arbitrios sobre importaciones, en el cual el Tribunal Supremo federal validó un poder otorgado por el Congreso a Puerto Rico que los estados de la Unión no poseían.

Es por todo lo anterior que no puede afirmarse verazmente que Puerto Rico es comparable a cualquier estado de la Unión en lo que se refiere a la integración económica nacional. *Puerto Rico, como los territorios no incorporados, siempre ha estado sujeto a importantes normas diferentes* a las que aplican a los estados de la Unión. Con tal trato diferente se ha procurado proveer la flexibilidad económica necesaria para que tanto el Congreso como Puerto Rico mismo puedan encarar exitosamente las significativas diferencias materiales que han existido y todavía existen entre la isla y las jurisdicciones que forman parte integral de Estados

Unidos. Parece necesario mencionar la conocida realidad de que Puerto Rico, con todo lo que ha progresado económicamente desde los años terribles de 1898 a 1940, sigue estando separado por una abismal diferencia entre su frágil situación económica y la muy superior condición del estado más pobre de la nación americana. No tiene sentido alguno, pues, que se pretenda imponer una limitación artificial a las facultades de Puerto Rico para encarar sus propios problemas económicos, sólo por puro capricho judicial. Ni el Primer Circuito ni la otra opinión de conformidad en el caso de autos han identificado *qué propósitos de orden público persiguen lograr con su ofuscado decreto.* ¿Qué justificación existe para su dictamen? Más allá de su **\*184** errado conceptualismo, ¿a qué responde la desatención a los tres precedentes de este mismo Foro? ¿A quién le causa daño que Puerto Rico pueda tener una facultad que los estados de la Unión no tienen?

### V

Las interrogantes plantadas en el párrafo anterior conducen a un último señalamiento crítico. La cuestión de si la cláusula sobre comercio interestatal de la Constitución federal debe aplicarse o no a Puerto Rico, como la cuestión más general de qué disposiciones constitucionales federales deben extenderse a la isla, más allá de las relativas a los derechos fundamentales

de las personas, *es en última instancia una prerrogativa congresional.* Véase *Torres v. Puerto Rico*, supra, págs. 469–470. Se trata de un asunto eminentemente político, que está comprendido, además, dentro de los amplios poderes que el propio Tribunal Supremo le ha reconocido al Congreso aun recientemente. *Harris v. Rosario*, supra, págs. 653–656. Es por ello que las decisiones del Primer Circuito en las que se somete a Puerto Rico *ex proprio vigore* a las limitaciones de la cláusula de comercio en su fase "durmiente" es un acto *ultra vires* de ese tribunal, una intervención claramente indebida de ese foro en un asunto que rebasa su autoridad. No hay nada en el expediente legislativo que permita siquiera suponer que el Congreso ha tenido la intención de extender la cláusula referida a Puerto Rico. Por ende, no puede considerarse de modo alguno que las decisiones del Tribunal del Primer Circuito son sólo declarativas de la intención congresional. Constituyen, por ende, un acto de inmiscuirse indebidamente en un asunto que es una clara prerrogativa sólo del Congreso.

Es, en fin de cuentas, por lo anterior sobre todo que considero insostenible la otra opinión de conformidad en el caso de autos de servirle de eco al foro apelativo federal, **\*185** copiando aquí sus muy desacertadas y erróneas decisiones sobre el asunto en cuestión.

---

**End of Document**     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 75

## TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: Asociación De Empleados Gerenciales De La Corporación...2015-WL 4075649 and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

<u>Stephanie Penn</u>
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by _____

Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

2015 WL 4075649 (TCA)

ASOCIACIÓN DE EMPLEADOS GERENCIALES

DE LA CORPORACIÓN DEL FONDO DEL SEGURO

DEL ESTADO, Appellant

v.

CORPORACIÓN DEL FONDO DEL SEGURO DEL
ESTADO; Liza Estrada Figueroa;

Administradora De La Corporación Del Fondo Del Seguro
Del Estado;
Commonwealth of Puerto Rico; Hon. Alejandro
García Padilla, Governor of Puerto Rico, Appellees.

COURT OF APPEALS
Case No.: SJ2014CV00204 (907)
KLAN201500471
In San Juan, Puerto Rico on May 29, 2015.
May 29, 2015.

*Appeal* Of ruling by the Court of First Instance, San Juan Division
On: Pleading for Mandamus, Injunction, Declaratory Judgment

Panel comprising the Chief Justice, Justice García García, Justice
Hernández Sánchez and Justice Soroeta Kodesh

**RULING**

SOROETA KODESH, JUSTICE WRITING THE OPINION

**\*1** The Asociación de Empleados Gerenciales de la Corporación
del Fondo del Seguro del Estado (hereinafter, the Asociación or the
appellant), appeared in an appeal filed on April 01, 2015. It asked
that we revoke a *Ruling* handed down on January 29, 2015, and
notified on February 2, 2015, in which the Court of First Instance
(hereinafter, CFI), San Juan Division, dismissed the *Complaint*
filed by the appellant and declared the constitutionality of Articles
11 and 17 of Law No. 66 of 2014, known as the Special Fiscal
Sustainability and Operational Law of the Government of the
Commonwealth (hereinafter, Law No. 66). On February 12, 2015,
the appellant filed for reconsideration, which was ruled
*Inadmissible* in a *Ruling* handed down on March 02, 2015.

Based on the grounds set forth below, the *Ruling* appealed is
confirmed.

**I.**

On October 24, 2014, the appellant filed a *Complaint* on
mandamus, injunction, and declaratory judgment against the
Corporación del Fondo del Seguro del Estado [State Insurance
Fund Corporation] (hereinafter, the CFSE). In that *Complaint*, the
Asociación questioned the constitutionality of Articles 11 and 17
of Law No. 66, *supra.* The appellant alleged that the
implementation of Law No. 66, *supra,* established an
unreasonable, suspect, discriminatory classification that put non-
union management and/or supervisory employees in a situation of
inferiority to unionized employees. As a result, it asked for the
issuance of a preliminary injunction to halt the unconstitutional
application of Articles 11 and 17 of Law No. 66, *supra.* [1]

The Asociación also asked the CFI to hand down a writ of
mandamus for the CFSE to perform the ministerial obligation of
turning over the following public documents to it: savings target
set by the CFSE; report on management level positions and
amounts; plan proposed for compliance with Articles 8– 11 and
17–18; report on occupied and vacant management positions, as set
forth in Article 11, section (i), of Law No. 66; and other related
documents necessary for compliance with the provisions and
savings targets set forth in Law No. 66, *supra.* Finally, the
appellant petitioned the court of first instance to hand down a
declaratory judgment ruling Articles 11 and 17, *supra*
unconstitutional and requiring the CFSE to pay costs and attorneys'
fees.

The State subsequently petitioned for dismissal of the *Complaint*
and a declaratory judgment in its favor recognizing the
constitutionality of Law No. 66, *supra.* It argued that this law does
not violate the constitutional clauses that prohibit the impairment
of contractual obligations and guarantee equal protection under the
law since it involves a reasonable socioeconomic measure
necessary to confront the fiscal crisis of the Government of Puerto
Rico. It furthermore questioned the admissibility of the injunction
since the appellant had other remedies available under the law,
given that the Comisión Apelativa del Servicio Público [Public
Employees Appeals Commission] (hereinafter, the CASP) is the
agency with exclusive primary jurisdiction to handle claims
pursuant to Law No. 66, *supra.*

**\*2** The CFSE joined the petition for dismissal of the *Complaint* and adopted the arguments offered by the State regarding the constitutionality of Law No. 66, *supra,* and the dismissal of the injunction. It also petitioned for the dismissal of the petition for mandamus, since there is no ministerial obligation to turn over the information requested by the appellant. The appellant stated its opposition to the motions for dismissal filed by the State and the CFSE.

Thus, on Thursday, January 29, 2015, the Court of First Instance handed down the *Ruling* appealed, dismissing the *Complaint* in the record. The Court of First Instance upheld the constitutionality of Articles 11 and 17 of Law No. 66, *supra* because they do not establish a suspect classification that is discriminatory against the career management employees of the CFSE violating equal protection under the law. It further concluded that neither did they violate the constitutional prohibition against the approval of laws that impair contractual obligations given the urgent interest pursued by Law No. 66, *supra.*

The Court of First Instance ruled that Law No. 66, *supra,* treats CFSE career management employees and unionized employees equally, since neither of the two (2) groups is excluded from the application of the savings measures. It ruled that the fact that only unionized employees covered by collective bargaining agreements submit to the alternate participatory process does not imply that the measure is arbitrary or capricious. This conclusion is based on the fact that the ultimate purpose and the foundation of the negotiation is precisely to ensure that the agreements under the collective bargaining agreements adhere to the savings contemplated in Law No. 66, *supra.*

Likewise, the Court of First Instance concluded that there is an urgent interest of the State that justifies its intervention in the contractual relationship between the CFSE and the appellant, as well as the substantive impairment of its employment conditions. The Court of First Instance also stated that the measures under Law No.66, *supra,* are the least onerous measures and the State has unequivocally rejected other, more drastic measures such as firings and layoffs of career government employees.

Moreover, the Court of First Instance ruled that it did not have jurisdiction on the matter to rule on the petitions for mandamus and preliminary injunction filed by the appellant.

According to the Court of First Instance, the exclusive primary jurisdiction to rule on disputes regarding the request for information and halting of the application of Articles 11 and 17 of Law No. 66, *supra,* pertain to the CASP.

Pursuant to its conclusions of law, the CFI ruled the motions for dismissal filed by the CFSE and the State *Admissible,* handed down a declaratory judgment recognizing the constitutionality of Articles 11 and 17 of Law No. 66, *supra,* declared that it did not have jurisdiction on the matter to rule on the petitions for mandamus and dismissed the captioned *Complaint.*

**\*3** On February 12, 2015, the appellant filed a *Motion for Reconsideration* in which it included some facts that it alleged should be reconsidered. On February 27, 2015, the State filed a *Motion to Enforce Order and Opposing Petition for Reconsideration.* Moreover, on that same date, the CFSE also filed an opposing petition entitled *Opposition to Motion for Reconsideration.* On March 2, 2015, the Court of First Instance handed down a *Ruling* declaring the petition for reconsideration *Inadmissible.*

The appellant was not satisfied with the ruling and on April 01, 2015, it filed the captioned appeal alleging that the Court of First Instance committed the following errors:

> The Honorable Court of First Instance erred in not including in its Ruling a determination on the essential, pertinent facts not disputed by the appellee; this omission resulted in errors in the conclusions of law in the Ruling.

> The Honorable Court of First Instance erred in ruling that Articles 11 and 17 of Law 66–2014 are constitutional because they do not violate the principles of equal protection under the law and the prohibition against the impairment of contractual obligations.

> The Honorable Court of First Instance erred in ruling that it lacks jurisdiction to rule on the petition for mandamus requiring the Administrator of the CFSE to grant access and turn over the public documents and the order to cease and desist applying Articles 11 and 17 of Law 66–2014 to the appellant.

Subsequently, on May 01, 2015, the CFSE and the State each filed separately their respective briefs opposing the appeal.

With the benefit of the appearance of the parties, we proceed to state the applicable law.

## II.

### A.

Rule 59.1 of Civil Procedure, 32 L.P.R.A. Ap. V R 59.1, authorizes the Court of First Instance to rule on rights, status, and other legal relationships even if other remedies are or could be pursued. The ruling may be in form and effect affirmative or negative and shall have the efficacy and force of final rulings and decisions. Declaratory judgments result in a court ruling on any dispute on the interpretation of the law. Declaratory judgments are intended to dispel and legal uncertainty in cases in which there is substantive dispute between parties with opposing legal interests. The legal entities empowered to file for declaratory judgments are those whose rights, status, or other legal relationships are affected by a statute. *Mun. Fajardo v. Srio. Justicia et al.,* 187 D.P.R. 245, 254 (2012).

### B.

Moreover, Rule 10.2 of Civil Procedure of 2009, 32 L.P.R.A. Ap. V R. 10.2, sets forth that any defense of facts or law against a claim shall be laid out in the response pleading. Nonetheless, this Rule allows the party against whom the complaint was filed to file a motion for dismissal in which it alleges any of the following defenses: (1) lack of jurisdiction in the matter; (2) lack of jurisdiction over the person; (3) insufficiency of the summons; (4) insufficiency in the service of the summons; (5) failure to offer a claim justifying the granting of relief; and (6) failure to include an indispensable part. *Trans–Oceanic Life Ins. v. Oracle Corp.,* 184 D.P.R. 689, 701 (2012).

**\*4** This Rule also provides that in the case of a motion for dismissal the court must consider true all the facts properly alleged in the complaint and interpret the assertions in the form most favorable to the complainant and make all inferences that could aid in its claim. *Ortiz Matías et al. v. Mora Development,* 187 D.P.R. 649, 654 (2013); *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 D.P.R. 920, 935 (2011); *Candal Vicente v. CT Radiology Office, Inc.,* 112 D.P.R. 227, 231 (1981).

In these cases, the complaint shall only be dismissed if it is demonstrated that the complainant is not entitled to any remedy whatsoever under any of the facts that may be proven in the lawsuit. Ortiz Matías et al. v. Mora Development, supra; *Pressure Vessels P.R. v. Empire Gas P.R.,* 137 D.P.R. 497, 505 (1994).

Nonetheless, this doctrine applies only to the facts properly alleged and stated clearly and conclusively which on their face leave no room for doubt. *Pressure Vessels P.R. v. Empire Gas P. R.,* supra. Only all the facts properly alleged without considering the conclusions of law or allegations offered will be deemed true, such that the content thereof is hypothetical and make it impossible for the judge to detect in the final, properly alleged facts any margin for error. *Asoc. Importadores de Cerveza v. E.L.A.,* 171 D.P.R. 140, 149 (2007).

Moreover, it is a firmly established standard that appellate courts ordinarily must not intervene in the exercise of the discretion of the forums of first instance unless it is demonstrated that there was a gross abuse of discretion, prejudice, manifest error, or partiality. *Trans–Oceanic Life Ins. v. Oracle Corp.,* supra; *Lluch v. España Service Sta.,* 117 D.P.R. 729, 745 (1986). The party adversely affected by a ruling to dismiss pursuant to Rules 10.2 and 10.3 of Civil Procedure does not have available the mechanism for determinations of additional facts since the court is not obligated to make determinations of facts. We believe the judge presumed as true and took into consideration the facts properly alleged in the complaint. Thus the Court of First Instance is not obligated to state in the ruling the determinations of fact that underlie its ruling. *Roldán Rosario v. Lutrón S.M.,* 151 D.P.R. 883, 889 (2000). Rule 42.2. of Civil Procedure, 32 L.P.R.A. Ap. V R. 42.2(a), sets forth that it is not necessary to specify the facts proven and set forth separately the conclusions of law when ruling on motions for relief under Rule 10 of Civil Procedure, *supra.*

### C.

All statutes are and are presumed to be constitutional until it is otherwise determined. When the Supreme Court of Puerto Rico examines the validity of a statute, it does so bearing in mind the deference the legislative branch merits and in accordance with the system of separation of powers. Our Supreme Court seeks to achieve interpretations that sustain the validity of the law in view of attacks of unconstitutionality. *E.L.A. v. Northwestern Selecta,* 185 D.P.R. 40, 71 (2012).

Asociación De Empleados Gerenciales De La Corporación..., 2013 WL 3895009...

**\*5** A law can be declared unconstitutional on its face as well as in its application. In evaluating whether it is unconstitutional on its face we must consider whether the defect arises from the text itself. Nonetheless, in order to determine unconstitutionality in its application, one must analyze the context in which it was applied. *E.L.A. v. Northwestern Selecta,* supra, pp. 71–72. Laws may be discriminatory on their face given their purpose or their effect; in both cases, they are considered invalid on their face. Regulatory entities are bound to defend them and offer evidence that they serve a legitimate purpose that is impossible to achieve through other reasonable, non-discriminatory means. Nonetheless, laws are presumed to be legal if they are written in neutral terms and their application is not biased *E.L.A. v. Northwestern Selecta,* supra, on pp. 73–74.

### D.

Section 7 of Article II of the Constitution of Puerto Rico provides that no person shall be deprived of their liberty or property without due process under the law, nor shall any person whosoever in Puerto Rico be denied equal protection under the law. Nor shall laws that impair contractual obligations be passed. Const. of P.R., Art. II, Section 7, L.P.R.A., Volume 1; *López v. E.L.A.,* 165 D.P.R. 280, 296–297 (2005).

Equal protection under the law is grounded in the cardinal principle of "similar treatment for similarly situated persons." The Government may divide persons into classifications for any legitimate purposes, but in doing so it must conform to that basic standard. The State needs to establish classifications in order to be able to govern such a complex, varied society, with different individual and group interests and diverse social relationships. This means that it is impossible to govern any society, and particularly a modern society, without instituting classifications among people without creating inequalities that favor some and prejudice others. *López v. E.L.A.,* supra, on p. 297.

The State may divide persons into classifications without infringing on the equal protection under the law provided that such classification is reasonable and is intended to achieve or protect a legitimate public interest.

Not all discrimination violates the precept of equal protection under the law, although the law does prohibit unjustified unequal treatment. *López v. E.L.A.,* supra, on pp. 297–298.

In performing a constitutional analysis of the reasonableness of a legislative classification the courts must apply one of two (2) forms of scrutiny established in case law. We refer to the application of: (1) strict scrutiny; or the (2) minimum traditional or rational nexus scrutiny. The State has broad latitude to establish classifications with respect to social and economic issues. The analysis of laws that establish classifications in these areas must be carried out applying the minimum traditional or rational nexus scrutiny. Applying such scrutiny, the classifications are not deemed invalid unless they are clearly arbitrary and there is no legitimate interest of the State. Classifications will also not pass the constitutional test if a rational nexus and the interest of the State cannot be established. When rational scrutiny is applied, the challenged enjoys a presumption of constitutionality and the person challenging its validity bears the burden of refuting such presumption. *López v. E.L.A.,* supra, on pp. 298-299.

**\*6** On the other hand, in order to justify the application of rigorous or strict scrutiny, the court must identify whether or not the classification adversely affects any fundamental citizen's right or whether or not it establishes any suspect classification that is not related to the ability or aptitude of the persons affected. When these classifications are identified, it is presumed that the law is not unconstitutional and the State must prove the existence of an urgent or higher authority interest justifying it. This scrutiny has been applied to certain laws that establish suspect distinctions such as those based on race, nationality, citizenship, poverty, or birth. *López v. E.L.A.,* supra, on p. 299; *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 278 (1975).

### E.

Article II, Section 7 of the Constitution of Puerto Rico, *supra,* also prohibits the approval of laws that impair contractual obligations. This constitutional guarantee limits the intervention of the government in contractual obligations among private parties and those undertaken by the State.

Its purpose is to ensure the stability of contractual relationships. However, the protection it offers is not absolute since it must be harmonized with the power of regulation of the State for the benefit of the public interest. The Supreme Court of Puerto Rico has repeatedly held that not every impairment of a contractual obligation is unconstitutional. *AMPR v. Sist. Retiro–Maestros V,* 190 D.P.R. 854, 868 (2014). The analysis of this constitutional clause depends on whether the contract modified is by and between private entities or it is one to which the State is party.

Private contracts are analyzed applying reasonableness scrutiny whereby it is taken into account how substantial the public interest promoted is and the extension of the contractual impairment. The first step is to determine if there is a contractual relationship and if its amendment represents a substantive or severe impairment. If it is determined that there is severe impairment, then one must evaluate whether or not the government intervention responds to a legitimate interest and if it is rationally related to the achievement of such objective. *AMPR v. Sist. Retiro Maestros V,* supra, on p. 869.

More careful scrutiny is applied when the State is party to the contractual relationship since it could act for its own benefit. The contractual impairment must be reasonable and necessary to advance an important government purpose. In evaluating the necessity and reasonableness of a law one must defer to some extent to the judgment of the Legislative Assembly. The greater the degree of impairment, the greater the rigor of the court in analyzing the law challenged. Nonetheless, the law's validity will be sustained if the impairment arises as a result of a reasonable, necessary amendment intended to advance a public interest. *AMPR v. Sist. Retiro Maestros V,* supra, on pp. 869–870; *Trinidad Hernandez et al. v. ELA et al.,* 188 D.P.R. 828, 835 (2013).

**F.**

**\*7** Law No. 66, *supra,* declared the state of fiscal emergency the Government of Puerto Rico is in. This crisis is described as "the most critical the country has experienced in its history." Government-owned corporations are not exempt from the fiscal crisis and therefore they too have been impacted by the plan, which includes: (1) cost cutting measures of the Executive Branch;

(2) rules and restrictions on awarding increases in economic benefits or one-off economic compensation; (3) provisions on collective bargaining agreements; and (4) provisions on fiscal control of government-owned corporations. Preliminary Recitals and Article 2 of Law No. 66, *supra.* This special socioeconomic law was passed pursuant to the power of reason of the State in order to guarantee sufficient liquidity to pay the payroll of public employees and to cover the essential services offered to citizens. Preliminary Recitals of Law No. 66, *supra.*

Article 2 sets forth the adoption of a plan to manage the consequences of the fiscal crisis and to permit the continuity of essential health, security, education, social work, and development and other services. In addition, it sets forth the restoration of government credit as public policy of the State. These objectives are to be achieved through the elimination in the short term of the General Fund deficit and improvement of the fiscal condition of government-owned corporations, but without firing public employees or adversely affecting essential services.

Law No. 66, *supra,* takes precedence over any other legislation since it was passed pursuant to the power of reason of the State and the constitutional power of the Legislative Assembly to pass laws that protect the life, health, and welfare of the People when essential government services are in grave peril. Article 3 of Law No. 66, *supra.*

During the validity of Law No. 66, *supra,* employees of the Executive Branch will not receive increases in economic benefits or one-off monetary compensation, except as set forth in paragraph (d) of Article 11. Article 11(a) of Law No. 66, *supra.* The limitations set forth in Article 11 apply to all employees of the Executive Branch regardless of their classification as management, regular, or career, temporary or hourly, and irrespective of their specific function within the Executive Branch entity. Furthermore, they apply without distinction of any provision to the contrary, even if set forth in a law, standard, regulation, collective bargaining agreement, policies, employment manuals, circular letters, contractual letters, certifications, regulations, rules, and employment conditions, regulatory letters, classification or compensation plans. Article 11(f) and (h) of Law No. 66, *supra.*

*8 Paragraph (i) of Article 11 expressly sets forth that:

In recognition of the importance of the unionization of public employees, not only to represent the economic welfare of workers, but also to elevate public service to its utmost potential and maintain labor peace, an alternate, uniform participatory process is established to achieve the public policy objectives of this Law, including the necessary savings within the parameters set forth in paragraphs (j) and (k), as appropriate, following collective bargaining as a guiding principle. The agreements reached with the authorized representatives of the unionized employees and in turn ratified in writing by the union membership involved and the authorized representative of the Executive Branch entity through and in accordance with the negotiating parameters hereby permitted shall replace the provisions set forth in paragraphs (a), (b), (c) and (d) of this Article and any other pertinent provision of this law that has been subject to negotiation.

Furthermore, paragraph (j) authorizes Executive Branch entities subject to Law No. 45–1998, knows as the Puerto Rico Public Service Labor Relations Law, 3 L.P.R.A. sec. 1454 *et seq.,* using the process of negotiation to amend collective bargaining agreements and modify the economic conditions of employment set forth in Article 11, *supra.* Nonetheless, such amendments must guarantee an average savings per unionized employee comparable to that which would have been obtained through the application of the aforesaid paragraphs. Article 11(j) of Law No. 66, *supra.*

Article 14 sets forth the forum for resolving disputes related to Law No. 66, *supra.* The text thereof sets forth the following:

The Comisión Apelativa del Servicio Público [Public Employees Appeals Commission] (CASP), or its successor entity, with respect to labor matters or matters which otherwise would ordinarily fall without the jurisdiction of the CASP,

shall have exclusive primary jurisdiction to hear appeals arising as a result of actions taken or decisions made pursuant to this Chapter for employees who are or not covered by the provisions of Law No. 45–1998, as amended, known as the Public Service Labor Relations Law; as well as non-unionized employees of Executive Branch entities excluded from the application of the provisions of Law No. 184–2004, as amended, known as the Commonwealth of Puerto Rico Public Service Human Resources Management Law and employees of non-union Executive Branch entities and the provisions of Law No. 184–2004 apply to them.

*9 Moreover, the Labor Relations Board, or its successor entity, shall have exclusive primary jurisdiction to hear appeals arising as a result of actions taken or decisions made pursuant to this Chapter for employees covered by Law No. 130 of May 8, 1945, as amended. It is set forth that pursuant to the provisions of this Law, no action taken pursuant to its provisions shall constitute a violation of existing collective bargaining agreements or a refusal to negotiate in good faith or an illegal practice.

Moreover, Article 17 of Law No. 66, *supra,* sets forth the fiscal control measures that government-owned corporations must take. This Article suspends compliance with the non-economic clauses negotiated in prevailing agreements that have direct or indirect economic effects on the operations of government-owned corporations, worsen their budgetary situation, or which must be suspended to alleviate the budgetary situation. It also includes a list of some non-economic clauses that may have a direct or indirect economic effect.

### G.

As we know, the term "jurisdiction" means the power or the authority that a court or an administrative body has to hear and decide cases or controversies. CBS Outdoor v. Billboard One, Inc. et al, 179 P.R. Dec. 391, 403 (2010). As a general rule, courts in Puerto Rico are courts of general jurisdiction. That is, they have authority to hear any cause of action that raises an issue to be adjudicated. Clases A, B y C. v. PRTC,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 6

183 P.R. Dec. 666 (2011), citing *Mun. Arecibo v. Mun Quebradillas,* 161 P.R. Dec. 109, 114 (2004); *Junta Dir. Cond. Montebello v. Fernández,* 136 P.R. Dec. 223, 230 (1994).

The rule of general jurisdiction obtains, except when the court lacks subject matter jurisdiction. *Rodríguez v. De León,* 191 P.R. Dec. 700 (2014). Subject matter jurisdiction refers to the court's power to hear and decide a controversy about a [particular] legal matter. Subject matter jurisdiction may not be granted by the parties. Neither may the court assume it; since only the State, through its laws, can grant or deny subject matter jurisdiction to courts. *Rodriguez v. De León, supra.*

For their part, administrative agencies only have the powers granted expressly by enabling legislation and those that are indispensable for carrying out their duties and responsibilities. As a result, situations may arise in which courts and agencies may hear the same matter. It is in such a case where the doctrine of primary jurisdiction plays an important role. *CBS Outdoor v. Billboard One, Inc. et al.,* supra.

**\*10** Exclusive or statutory primary jurisdiction occurs when the legislature enacts a law to confer exclusive primary jurisdiction upon an administrative body. Exclusive primary jurisdiction permits no other means of resolution, redress or preventive measures and is not a matter of shared or concurrent jurisdiction. On the contrary, it is subject matter jurisdiction that the legislature placed exclusively within the scope of jurisdiction of the agency. As a result, courts are excluded from intervening at the trial level in issues or matters over which exclusive jurisdiction has been conferred upon agencies. *Rodríguez v. De León,* supra.

The doctrine of primary jurisdiction is a creation of the courts. *CBS Outdoor v. Billboard One, Inc. et al., supra,* pp. 403-404. This doctrine does not deprive courts of jurisdiction; rather it addresses an issue of priority of jurisdiction. Its principal purpose is to promote harmony between tribunals and administrative bodies. Specifically, the doctrine of primary jurisdiction provides which forum, judicial or administrative, is to hear a case in the first instance. To this effect, the doctrine has two aspects: (1) exclusive jurisdiction and (2) concurrent jurisdiction. *Id.* at 404.

In the first aspect, exclusive primary jurisdiction, a law or statute confers jurisdiction upon a specific administrative body and states that this will be the sole forum with power to hear, in the first instance, a particular controversy. *Id.* In contrast, "the second facet comes into play when the judicial forum and the administrative forum share the power to elucidate the same issue. On these occasions one may speak of true primary jurisdiction or concurrent primary jurisdiction." *Id.* at 405. The cornerstone of this aspect lies in the judicial deference that administrative agencies deserve in light of their training, specialization, expertise and knowledge to address certain subjects. *Id.*

The application of the doctrine of primary jurisdiction requires that courts examine the parameters of the enabling legislation of an administrative agency and determine whether the subject matter falls strictly within its scope. In addition, it requires that courts consider and decide whether it is essential and necessary to rule in favor of a hearing by the agency in the first instance. *Consejo Titulares v. Gómez Estremera, et al.,* 184 P.R. Dec. 407, 430-431 (2012).

### H.

The extraordinary remedy of the *injunction* is meant to prohibit or order the performance of an act to avoid imminent prejudice or irreparable harm to a person, when there is no other adequate remedy at law. *Next Step Medical v. Bromedicon, et al.,* 190 P.R. Dec. 474, 485-486 (2014); *Mun. Fajardo v. Srio. Justicia et al., supra,* 255. Our legal system has three modalities of this type of remedy, which are: temporary restraining order, preliminary injunction and permanent injunction. *Next Step Medical v. Bromedicon, et al., supra,* at 486.

**\*11** A preliminary injunction or injunction *pendente lite* is a remedy that the court issues before holding a trial on the merits and, ordinarily, subsequent to holding a hearing where the parties have the opportunity to present evidence in support of or in opposition to its issuance. The principal purpose of this remedy is to maintain the *status quo* until such time as the trial on the merits takes place, so that the case does not become moot. Subsequently, the substantive law will be aired in a plenary proceeding just as in any type of action. The preliminary injunction is aimed at requiring or prohibiting

Asociacion De Empleados Gerenciales De La Corporacion. . . , 2015 WL 4075649...

the performance of a particular act, with the goal of preventing imminent prejudice or irreparable harm during the pendency of the litigation. The key factor that governs the granting of this extraordinary remedy, closely linked to the doctrine of equity, is the existence of a real threat of suffering some detriment for which there is no adequate remedy at law. *Next Step Medical v. Bromedicon et al., supra.*

So, in weighing the issuance of a preliminary injunction, the court must consider the following criteria: (1) the nature of the harm that may be caused to the parties by granting or denying the remedy; (2) the irreparable nature of the harm or the non-existence of an adequate remedy at law; (3) the probability that the moving party will eventually prevail when the litigation is decided on the merits; (4) the probability that the case will become moot if the injunction is not granted; and (5) the possible public interest impact of the remedy that is being sought. Besides the enumerated criteria, Rule 57.3 of the Rules of Civil Procedure adds that the court must consider the criterion of "the diligence and good faith of the petitioning party." 32 P.R. LAWS ANN. App. V. R. 57.3; *Next Step Medical v. Bromedicon et al., supra.*

These requirements are not absolute, as they are guidelines that give direction to the court when deciding whether the evidence presented justifies the issuance of the relief. The grant of the remedy will rest in the sound discretion of the court, which will be exercised in consideration of both the interests and the needs of the parties involved in the case. The injunction must be issued in a measured way and only in the context of a clear and unequivocal showing of the violation of a right. The decision of the court shall not be revoked on appeal, unless it is shown that the trial court abused its authority. *Next Step Medical v. Bromedicon et al.,* supra, at 487.

In determining whether to proceed to grant a permanent injunction, the court must consider the following criteria: (1) whether the petitioner has prevailed in a trial on the merits; (2) whether the petitioner has an adequate remedy at law; (3) the public interest involved; and (4) the balance of equities. These criteria are not absolute in nature; rather they are guidelines that channel the discretion of the court in determining whether the evidence justifies the injunction. *Plaza Las Américas v. N&H,* 166 P.R. Dec. 631, 643-644 (2005).

## I.

**\*12** With respect to the remedy of *mandamus*, the Supreme Court of Puerto Rico has held that, in accordance with the provisions of Article 649 of the Code of Civil Procedure, 32 P.R. LAWS ANN. Sec. 3421, "the writ of mandamus is a highly exceptional and discretionary remedy that is issued to order any natural person, corporation or lower court to perform or execute an act that is included among its duties and attributes." *AMPR v. Srio. Educación, E.L.A.,* 178 P.R. Dec. 253, 263 (2010). This remedy is appropriate only when performance of a duty imposed by law is required. This refers to a duty categorized as ministerial and that, therefore, allows no discretion in its performance but rather is mandatory and imperative. *Noriega v. Hernández Colón,* 135 P.R. Dec. 406, 447-448 (1994); *Hernández Agosto v. Romero Barceló,* 112 P.R. Dec. 407, 418 (1982); *%21 Alvarez de Choudens v. Tribunal Superior,* 103 P.R. Dec. 235, 242 (1975). That is, it must concern "a specific mandate that the respondent party must perform and that does not permit it to decide whether or not to perform the requested act. *AMPR v. Srio. Educación, E.L.A., supra,* at 264.

On the other hand, "when the performance of the act or action that is described depends upon the discretion or judgment of the functionary, such duty is deemed non-ministerial." *Id. See also, Díaz Saldaña v. Acevedo Vilá,* 168 P.R. Dec. 359, 365 (2006); *%21 Alvarez de Choudens v. Tribunal Superior, supra.* Consequently, as they are not ministerial, discretionary duties remain outside the scope of the remedy of *mandamus. AMPR v. Srio. Educación, E.L.A., supra.* In addition, it should be noted that, since it constitutes a highly exceptional remedy, the issuance of the writ of *mandamus* is not treated as a question of law but rather rests in the sound discretion of the court. *Báez Galib y otros v. C.E.E. II,* 152 P.R. Dec. 382, 391-392 (2000). Therefore, the issuance of the writ of mandamus is inappropriate if there is another adequate remedy at law; since the principal purpose of the writ is not to replace available legal remedies but rather to make up for the lack of them. *AMPR v. Srio. Educación, E.L.A., supra,* at 266-267; *Hernández Agosto v. Romero Barceló, supra; Dávila v. Superintendente de Elecciones,* 82 P.R. Dec. 264, 274 (1960).

It is necessary to reiterate that mandamus may be considered when the petitioning party does not have

available an adequate and effective legal remedy in the ordinary course of the law. See, Art. 651 of the Code of Civil Procedure, 32 P.R. LAWS ANN. SEC. 3423. The petition for mandamus must be evaluated in light of several requirements. These are: (1) that the respondent have a ministerial duty or obligation imposed by law; (2) that the petitioner has a special interest in the right that it asserts; (3) that the duty of the agency to act and the right of the petitioner arise from the law in a clear and evident way; (4) that the petitioner has no other remedy to enforce its right; and (5) that, considering the effect that the issuance of the writ will have, the Court believes that the ends of justice require its issuance. *Dávila v. Superintendente de Elecciones, supra* at 274-275. See also, Arts. 649 and 651 of the Code of Civil Procedure, 32 P.R. LAWS ANN. Secs. 3421-3423.

**\*13** In accordance with the legal framework delineated above, we proceed to decide the issues before us.

### III.

In the petition before us, in its first point of error, the appellant questioned the refusal of the court of first instance in not including in the appealed *Judgment* the findings of additional facts requested in a motion for reconsideration submitted by the appellant. In addition, it argued that the lower court did not comply with the requirements of Rule 42.2 of the Code of Civil Procedure, *supra*, because it handed down a summary judgment without ruling on uncontested facts. The arguments delineated by the appellant on this point are without merit. In this regard, it should be noted that the appealed *Judgment* was handed down pursuant to Rule 10.2, *supra*, which is why the court of first instance was not even required to make findings of fact. It is assumed that said court accepted as true the facts that were well pleaded in the *Complaint*. We should note that Rule 42.2, *supra*, provides that when a judgement is handed down in favor of a motion to dismiss, it is not necessary to specify the facts proven and to identify conclusions of law separately.

Nevertheless, even taking as true the well-pleaded facts in the *Complaint*, the court of first instance held that the appellant did not have a cause of action that justified the granting of a remedy. Consequently, it handed down a declaratory judgment recognizing the constitutionality of Articles 11 and 17 of Law No. 66, *supra*. In addition, it declared itself to be

without subject matter jurisdiction to address the remedy of *mandamus* and to issue the requested order of injunction; because the claim of the appellant is a controversy under the exclusive jurisdiction of the CASP.

As its second point of error, the appellant attacked the constitutionality of Articles 11 and 17 of Law No. 66, *supra*. The Association argued that the application of these Articles violates the right of non-unionized management employees of the CFSE to equal protection of the laws and infringes upon the prohibition against undermining contractual rights. The appellant argued that the cited Articles establish an irrational classification between career employees and unionized employees who enjoy the benefits of collective bargaining agreements. It argued that this classification infringes upon and reduces dramatically the economic benefits of its constituents in comparison with those of the unionized employees.

According to the appellant, these Articles create unequal and discriminatory treatment, because: (1) they exclude non-unionized career managerial employees from the alternative participatory process; (2) the average savings rate imposed upon managerial employees is two and a half times greater than that set for unionized employees; (3) they give preferential treatment to unionized employees *vis-à-vis* non-unionized career managerial employees affiliated with bona fide labor organizations, the effect of which is the imposition of a greater burden; (4) they permit agreements with labor organizations that set working conditions and economic benefits superior to those of the Association's employees; and (5) they do not provide the members of the Association with the same economic benefits and working conditions agreed with the labor organizations.

**\*14** For its part, the Government affirmed that Law No. 66, *supra*, does not establish arbitrary or capricious classifications and stated that said legislation complies with the compelling interest of the Government to address and resolve the grave fiscal crisis that the Government of Puerto Rico is facing. Similarly, the Government submitted that Law No. 66, *supra*, was promulgated in order to guarantee the continuity of public management in essential areas such as health, public safety, education and social services. In addition, it has the purposes of restoring the credit of the Government and eliminating the fiscal deficit of the general fund, without resorting to the dismissal of public employees or affecting essential functions of Government agencies. In turn, the

**WESTLAW** ©2018 Thomson Reuters. No claim to original U.S. Government Works.

Asociacion De Empleados Gerenciales De La Corporacion. . . , 2015 WL 4075649...

CFSE adopted the arguments of the Government in favor of the constitutionality of Law No. 66, *supra*.

A ruling on the constitutionality of Articles 11 and 17 of Law No. 66, *supra*, requires an analysis of the text of the law in order to determine whether they are discriminatory on their face and of the context in which they have been used in order to see whether their application is discriminatory. See*, E.L.A. v. Northwestern Selecta, supra.* Article 11 of Law No. 66, *supra*, prohibits the increase of economic benefits and extraordinary monetary compensation received by employees of the Executive Branch, except as determined by the legislature. This Article contains a list of the economic benefits and extraordinary monetary compensation that will not be granted while Law Num. 66, *supra*, is in effect.

The suspension of economic benefits and extraordinary monetary compensation makes no exception, since it extends to all employees of the Executive Branch and includes government-owned corporations. The measure affects all employees of the Executive Branch irrespective of whether their classification is management level, regular career employees, temporary or specially appointed employees and irrespective of their particular functions. Article 11, *supra,* permits employees organized collectively to negotiate economic benefits different from those permitted under Law No. 66, *supra*, but subject to their achieving savings within the parameters that this law establishes.

For its part, Article 17 of Law No. 66, *supra*, sets forth the fiscal control measures that government-owned corporations must take. This Article suspends fulfillment of non-economic clauses negotiated in agreements in force that have direct or indirect economic effects on the operation of the public corporation, that exacerbate its budgetary situation or that need to be suspended in order to alleviate the budget situation. The referenced Article contains a list of certain non-economic clauses that may have a direct or indirect effect.

**\*15** The analysis of the text of Articles 11 and 17, *supra*, makes clear that the Government did not violate the constitutional provision that guarantees equal protection of the laws. The Articles, whose constitutionality the appellant questions, do not create a suspect classification based on race, color, sex place of birth, origin or social status, political or religious ideas or nationality

that infringes fundamental rights of the appellant and justifies the use of strict scrutiny and the triggering of the presumption of unconstitutionality of the law. See*, López v. E.L.A., supra.* However, even were it the case that said presumption was triggered, it was proven that Law No. 66, *supra*, complies with public policy and the compelling interest of the Government to combat and resolve the grave fiscal crisis of the country that puts at risk the health, safety and public services essential to its citizens.

Law No. 66, *supra*, is clearly a law of an economic nature, whose principal purpose is to pull the country out of the fiscal crisis. Consequently, its constitutionality must be analyzed based upon traditional scrutiny. Articles 11 and 17, *supra,* pass the filter of minimum traditional or rational nexus scrutiny. The appellant did not overcome the presumption of constitutionality, since it did not prove the existence of an arbitrary classification. The Government, on the other hand, did succeed in proving the existence of a legitimate purpose. The fiscal crisis is an incontrovertible fact. The reduction of economic benefits to all members of the Executive Branch, including government-owned corporations, is among the cost-cutting measures necessary to salvage the credit of the country and to guarantee essential services.

The measures of Article 11, *supra*, extend to all public employees of the Executive Branch independent of their classification. Nonetheless, the appellant argued that Law No. 66, *supra*, is unconstitutional, because it permits only employees organized collectively to negotiate economic benefits different from those permitted in Law No. 66, *supra*. However, the appellant ignored the fact that negotiation with the appointing authority has the purpose of, and is subject to, the achievement of savings within the parameters that this law establishes. The managerial employees represented by appellant are not disadvantaged, since the possibility that employees organized collectively may negotiate with the appointing authority is precisely to guarantee that the savings contemplated in Law No. 66, *supra*, are achieved.

Article 17 of Law No. 66, *supra*, also does not put appellant at a disadvantage with respect to employees covered by collective bargaining agreements. On the contrary, said Article only affects the rights of employees organized collectively, since it suspends fulfillment of the

non-economic provisions negotiated in their agreements, but that have a direct or indirect economic impact on the operation of the corporation and that exacerbate its budgetary situation. Let us remember that the appellant does not have a constitutional right to negotiate collectively terms and conditions of employment. Therefore, what Law No. 66, *supra*, seeks to achieve is precisely to adapt this right of the organized employees to the need that Law No. 66, supra, seeks to alleviate.

**\*16** Law No. 66, *supra*, makes no arbitrary or suspect classification as between non-unionized career service managerial employees of the CFSE and unionized employees covered by collective bargaining agreements. On the contrary, we find that the law accords them similar treatment. Both groups have been affected by the cost-cutting measures that involve all employees of the Executive Branch, including government-owned corporations, and without regard to the position they occupy. The measures in Articles 11 and 17, far from creating a suspect classification to the detriment of the appellant, have the intent of avoiding the economic collapse of the Government and guaranteeing that the collective bargaining agreements comply with the savings established in Law No. 66, *supra*.

As we stated above, the appellant has not overcome the presumption of constitutionality of Articles 11 and 17 of Law No. 66, *supra*. The Government, on the other hand, has proven that said legislation has the legitimate and compelling purpose of avoiding the collapse of the finances of the Government of Puerto Rico and guaranteeing basic and essential services to citizens. Articles 11 and 17, *supra*, also do not subvert the constitutional prohibition of approval of laws that undermine contractual obligations. We cannot ignore that this protection is not absolute, as it must be harmonized with the regulatory power of the state for the public benefit.

The constitutionality of the cited Articles is unquestionable. The measures taken by the Government in Law No. 66, *supra*, are without a doubt reasonable and necessary to advance the important government purpose of salvaging the finances of Puerto Rico. Furthermore, they are the least onerous they can be, since

the intent of the Government is to achieve the economic stability of the Government without affecting the provision of essential services and without laying off public employees. *AMPR v. Sist. Retiro Maestros V, supra; Trinidad Hernandez et al. V. ELA et al., supra.*

Finally, the appellant argued that the court of first instance erred in not issuing the writ of *mandamus* requested for the CFSE to comply with its ministerial duty to hand over certain public documents. The appellant referred specifically to the following documents: (1) the savings goal created by the CFSE; (2) the report on management level positions and numbers; (3) the plan proposed for compliance with Articles 8-11, 17-18; (4) the report of occupied and vacant management positions, as enumerated in Article 11, section (i) of Law No. 66; and (5) other related documents necessary for compliance with the provisions and savings goals set forth in Law No. 66, *supra*.

Appellant's exposition is erroneous. The court of first instance acted correctly in declaring itself without subject matter jurisdiction and not addressing the *mandamus* petition. The CASP is a body with exclusive primary jurisdiction to address controversies related to the implementation of the cost-cutting measures taken by the Executive Branch under Law No. 66, *supra*. By express provision of the legislature, the appellant should have resorted in the first instance to the CASP to question the cost-cutting measures taken by the CFSE that it alleges affect its economic benefits. In the same way, we conclude that the issuance of the extraordinary writ of injunction[7] was also inappropriate; since the appellant has at its disposal the remedies provided by the CASP. Consequently, the appealed is affirmed.

### IV.

**\*17** On the grounds delineated above, the appealed *Judgment* is affirmed.

The Court so agrees and orders and the Secretary of the Court of Appeals so certifies.

Dimarie Alicea Lozada

Secretary of the Court of Appeals

Asociacion De Empleados Gerenciales De La Corporacion. . . , 2015 WL 4075649...

Footnotes

1    *See,* Appendix of Notice of Appeal, pp. 206-229.

2    It is imperative to point out that once the constitutionality of Articles 11 and 17 of Law No. 66, *supra*, has been declared, any discussion whether the trial court erred by not issuing an injunction to avoid the alleged unconstitutional application of the law is without merit and irrelevant.

2015 WL 4075649 (TCA)

ASOCIACIÓN DE EMPLEADOS GERENCIALES
DE LA CORPORACIÓN DEL FONDO
DEL SEGURO DEL ESTADO, Apelante
v.
CORPORACIÓN DEL FONDO DEL SEGURO
DEL ESTADO; Liza Estrada Figueroa;
Administradora De La Corporación Del
Fondo Del Seguro Del Estado; Estado Libre
Asociado De Puerto Rico; Hon. Alejandro García
Padilla, Gobernador De Puerto Rico, Apelados.

TRIBUNAL DE APELACIONES
Caso Núm.: SJ2014CV00204 (907)
KLAN201500471
En San Juan, Puerto Rico a 29 de mayo de 2015.
May 29, 2015.

*Apelación* Procedente del Tribunal de Primera Instancia,
Sala de San Juan
Sobre: Solicitud de *Mandamus, Injunction* y Sentencia
Declaratoria

Panel integrado por su presidenta, la Juez García García,
el Juez Hernández Sánchez y la Jueza Soroeta Kodesh

**SENTENCIA**

SOROETA KODESH, JUEZA PONENTE

 **\*1** Comparece la Asociación de Empleados Gerenciales
de la Corporación del Fondo del Seguro del Estado
(en adelante, la Asociación o la apelante), mediante un
recurso de apelación presentado el 1 de abril de 2015. Nos
solicita que revoquemos una *Sentencia* dictada el 29 de
enero de 2015 y notificada el 2 de febrero de 2015 en la
que el Tribunal de Primera Instancia (en adelante, TPI),
Sala de San Juan, desestimó la *Demanda* incoada por la
apelante y decretó la constitucionalidad de los Artículos
11 y 17 de la Ley Núm. 66 de 2014, conocida como
Ley Especial de Sostenibilidad Fiscal y Operacional del
Gobierno del Estado Libre Asociado (en adelante, Ley
Núm. 66). El 12 de febrero de 2015, la apelante solicitó
reconsideración, la cual fue declarada *No Ha Lugar* en una
*Resolución* emitida el 2 de marzo de 2015.

Por los fundamentos que se expresan a continuación, se
confirma la *Sentencia* apelada.

**I.**

El 24 de octubre de 2014, la apelante presentó
una *Demanda* sobre *mandamus, injunction* y sentencia
declaratoria en contra de la Corporación del Fondo del
Seguro del Estado (en adelante, la CFSE). En dicha
*Demanda*, la Asociación cuestionó la constitucionalidad
de los Artículos 11 y 17 de la Ley Núm. 66, *supra.*
La apelante adujo que la implantación de la Ley
Núm. 66, *supra,* establece una clasificación irrazonable,
sospechosa y discriminatoria que coloca al empleado
no unionado gerencial y/o supervisor de carrera en
una situación de inferioridad frente a los empleados
unionados. En consecuencia, solicitó la expedición de un
auto de *injunction* preliminar para que cesara la aplicación
inconstitucional de los Artículos 11 y 17 de la Ley Núm.
66, *supra.* [1]

La Asociación también solicitó al TPI que expidiera
un auto de *mandamus* para que la CFSE cumpliera
con el deber ministerial de entregarle los siguientes
documentos públicos: meta de ahorro establecida por la
CFSE; informe de plazas de confianza y cuantías; plan
propuesto para el cumplimiento con los Artículos 8–
11, y 17–18; informe de puestos gerenciales ocupados y
vacantes, según enumerados en el Artículo 11, sección (i),
de la Ley Núm. 66; y otros documentos relacionados y
necesarios para el cumplimiento con las disposiciones y
metas de ahorro dispuestas en la Ley Núm. 66, *supra.*
Por último, la apelante peticionó al tribunal de instancia
que dictara una sentencia declaratoria determinando la
inconstitucionalidad de los Artículos 11 y 17, *supra,* y la
imposición del pago de las costas y honorarios de abogado
a la CFSE.

Con posterioridad, el Estado solicitó la desestimación
de la *Demanda* y sentencia declaratoria a su favor
reconociendo la constitucionalidad de la Ley Núm. 66,
*supra.* Argumentó que dicha legislación no violenta las
cláusulas constitucionales que prohíben el menoscabo
de obligaciones contractuales y garantizan la igual
protección de las leyes debido a que se trata de una medida
socioeconómica razonable y necesaria para atender la
crisis fiscal del Gobierno de Puerto Rico. Además,
cuestionó la procedencia del *injunction* debido a que la
apelante tenía otros remedios disponibles en ley, toda
vez que la Comisión Apelativa del Servicio Público (en
adelante, la CASP) es el organismo con jurisdicción

Asociación De Empleados Gerenciales De La Corporación..., 2015 WL 11651645...

Case:17-03283-LTS   Doc:4781-6   Filed:01/14/19   Entered:01/14/19 18:19:25   Desc:
Exhibit Exhibit 75 Part 6 Page 346 of 541

primaria exclusiva para atender las reclamaciones al amparo de la Ley Núm. 66, *supra.*

 *2  La CFSE se unió a la solicitud de desestimación de la *Demanda* y adoptó los argumentos esgrimidos por el Estado sobre la constitucionalidad de la Ley Núm. 66, *supra,* y la desestimación del *injunction.* Asimismo, solicitó la desestimación de la solicitud de *mandamus,* ya que no existe un deber ministerial de entregar la información requerida por apelante. Por su parte, la apelante expresó su oposición a las mociones de desestimación presentas por el Estado y la CFSE.

Así las cosas, el 29 de enero de 2015, el TPI dictó la *Sentencia* apelada en la que desestimó la *Demanda* de autos. El foro apelado sostuvo la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* porque no establecen una clasificación sospechosa y discriminatoria contra los empleados gerenciales de carrera de la CFSE que atente contra la igual protección de las leyes. Asimismo, concluyó que tampoco violentaban la prohibición constitucional contra la aprobación de leyes que menoscaben las obligaciones contractuales debido al interés apremiante que persigue la Ley Núm. 66, *supra.*

El tribunal de instancia resolvió que la Ley Núm. 66, *supra,* trata por igual a los empleados gerenciales de carrera y a los empleados unionados de la CFSE, ya que ninguno de los dos (2) grupos está excluido de la aplicación de las medidas de ahorro. Dictaminó que el hecho de que solo los empleados unionados cobijados por convenios colectivos se sometan al proceso participativo alterno, no implica que la medida sea arbitraria o caprichosa. Esta conclusión está basada en que el fin último y el propósito de la negociación es precisamente garantizar que los acuerdos de los convenios colectivos cumplan con los ahorros contemplados en la Ley Núm. 66, *supra.*

Igualmente, el foro de instancia concluyó que existe un interés apremiante del Estado que justifica su intromisión en la relación contractual entre la CFSE y la apelante, así como el menoscabo sustancial en sus condiciones de empleo. El TPI, además, expresó que las medidas de la Ley Núm. 66, *supra,* son las menos onerosas y el Estado ha rechazado tajantemente otras más drásticas como el despido y cesantías de los empleados públicos de carrera.

Por otro lado, el tribunal de instancia se declaró sin jurisdicción sobre la materia para atender las solicitudes de *mandamus* e *injunction* preliminar presentadas por la

apelante. Según el foro apelado, la jurisdicción primaria exclusiva para atender las controversias sobre la solicitud de información y el cese de la aplicación de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* le pertenecen a la CASP.

De conformidad con sus conclusiones de derecho, el TPI declaró *Ha Lugar* las mociones de desestimación presentadas por la CFSE y el Estado, dictó sentencia declaratoria donde reconoce la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* se declaró sin jurisdicción sobre la materia para atender la solicitud de *mandamus* y desestimó la *Demanda* de epígrafe.

 *3  El 12 de febrero de 2015, la apelante interpuso una *Moción de Reconsideración* en la que incluyó unos hechos que alegó debían ser reconsiderados. El 27 de febrero de 2015, el Estado presentó una *Moción en Cumplimiento de Orden y en Oposición a Escrito de Reconsideración.* Por otro lado, y en esa misma fecha, la CFSE también expresó su oposición mediante escrito intitulado *Oposición a Moción de Reconsideración.* El 2 de marzo de 2015, el TPI emitió una *Resolución* en la que declaró *No Ha Lugar* la solicitud de reconsideración.

Inconforme con el aludido resultado, el 1 de abril de 2015, la apelante presentó el recurso de apelación de epígrafe y adujo que el TPI cometió los siguientes errores:

> Erró el Honorable Tribunal de Primera Instancia al no incluir en su Sentencia una determinación de los hechos esenciales y pertinentes no controvertidos por la parte apelada, omisión que acarrea errores en las conclusiones de derecho de la Sentencia.

> Erró el Honorable Tribunal de Primera Instancia al resolver que los Artículos 11 y 17 de la Ley 66–2014 son constitucionales porque no violentan los principios de igual protección de las leyes y la prohibición al menoscabo de obligaciones contractuales.

> Erró el Honorable Tribunal de Primera Instancia al resolver que carece de jurisdicción para atender la solicitud de *Mandamus* requiriendo a la Administradora de la CFSE el acceso y entrega a los documentos públicos y la orden de cese y desista de aplicar los Artículos 11 y 17 de la Ley 66–2014 a la parte apelante.

Subsecuentemente, el 1 de mayo de 2015, la CFSE y el Estado presentaron por separado sus respectivos alegatos en oposición al recurso de apelación.

Asociacion De Empleados Gerenciales De La Corporacion..., 2016 WL 8716206...

Con el beneficio de la comparecencia de las partes, procedemos a exponer el derecho aplicable.

## II.

### A.

La Regla 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V R 59.1, autoriza al TPI a declarar derechos, estados y otras relaciones jurídicas aunque se inste o pueda instarse otro remedio. La declaración podrá ser en forma y efectos, afirmativa o negativa, y tendrá la eficacia y vigor de las sentencias o resoluciones definitivas. La solicitud de sentencia declaratoria tiene como resultado una decisión judicial sobre cualquier divergencia en la interpretación de la ley. La sentencia declaratoria tiene el propósito de disipar la incertidumbre jurídica, en aquellos casos en que existe una controversia sustancial entre partes con intereses legales adversos. Las personas jurídicas facultadas para solicitar sentencia declaratoria son aquellas cuyos derechos, estado u otras relaciones jurídicas son afectadas por un estatuto. *Mun. Fajardo v. Srio. Justicia et al.,* 187 D.P.R. 245, 254 (2012).

### B.

Por otro lado, la Regla 10.2 de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V R. 10.2, establece que cualquier defensa de hechos o de derecho que se tenga contra una reclamación se expondrá en la alegación responsiva. No obstante, esta misma Regla permite que la parte contra quien se ha instado la demanda presente una moción de desestimación, en la que se alegue cualquiera de las siguientes defensas: (1) falta de jurisdicción sobre la materia; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; (5) dejar de exponer una reclamación que justifique la concesión de un remedio; y(6) dejar de acumular una parte indispensable. *Trans–Oceanic Life Ins. v. Oracle Corp.,* 184 D.P.R. 689, 701 (2012).

**\*4** Esta Regla también dispone que ante una moción de desestimación, el tribunal debe tomar como ciertos todos los hechos bien alegados en la demanda e interpretar las aseveraciones de la forma más favorable para el demandante y hacer todas las inferencias que puedan asistirle en su reclamación. *Ortiz Matías et al. v. Mora Development,* 187 D.P.R. 649, 654 (2013); *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 D.P.R. 920, 935

(2011); *Candal Vicente v. CT Radiology Office, Inc.,* 112 D.P.R. 227, 231 (1981). En estos casos, únicamente se desestimará la demanda si se demuestra que el demandante no tiene derecho a remedio alguno bajo cualesquiera hechos que se puedan probar en el juicio. *Ortiz Matías et al. v. Mora Development,* supra; *Pressure Vessels P.R. v. Empire Gas P.R.,* 137 D.P.R. 497, 505 (1994).

No obstante, esta doctrina aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no dan margen a dudas. *Pressure Vessels P.R. v. Empire Gas P. R.,* supra. Únicamente se darán como ciertos todos los hechos correctamente alegados sin considerar las conclusiones de derecho o las alegaciones redactadas, de tal forma que su contenido resulte hipotético y hagan imposible que el juzgador detecte sin margen de error los hechos definitiva y correctamente alegados. *Asoc. Importadores de Cerveza v. E.L.A.,* 171 D.P.R. 140, 149 (2007).

De otra parte, constituye norma firmemente establecida que de ordinario los tribunales apelativos no debemos intervenir en el ejercicio de la discreción de los foros de instancia, salvo que se demuestre que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad. *Trans–Oceanic Life Ins. v. Oracle Corp.,* supra; *Lluch v. España Service Sta.,* 117 D.P.R. 729, 745 (1986). La parte afectada por una sentencia de desestimación al amparo de las Reglas 10.2 y 10.3 de Procedimiento Civil, no tiene disponible el mecanismo de determinaciones de hecho adicionales, debido a que el tribunal no está obligado a hacer determinaciones de hecho. Se entiende que el juez presumió como ciertos y tomó en consideración los hechos bien alegados en la demanda. De modo que el TPI no está obligado a exponer en la sentencia las determinaciones de hecho que sustenten su decisión. *Roldán Rosario v. Lutrón S.M.,* 151 D.P.R. 883, 889 (2000). La Regla 42.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V R. 42.2(a), establece que no será necesario especificar los hechos probados y consignar separadamente las conclusiones de derecho al resolver mociones al amparo de la Regla 10 de Procedimiento Civil, *supra.*

### C.

Todo estatuto es y se presume constitucional hasta que se determine lo contrario. Cuando el Tribunal Supremo de Puerto Rico ausculta la validez de un estatuto, lo hace consciente de la deferencia que merece el poder

legislativo y de acuerdo al esquema de separación de poderes. Nuestro Tribunal Supremo busca lograr aquellas interpretaciones que sostengan la validez de la ley frente a los ataques de inconstitucionalidad. *E.L.A. v. Northwestern Selecta,* 185 D.P.R. 40, 71 (2012).

**\*5** Una ley puede ser declarada inconstitucional tanto de su faz como en su aplicación. Al evaluar si es inconstitucional de su faz, hay que considerar si el vicio surge de su propio texto. No obstante, para determinar la inconstitucionalidad en su aplicación, hay que analizar el contexto en el cual ha sido empleada. *E.L.A. v. Northwestern Selecta,* supra, a las págs. 71–72. Las leyes pueden resultar discriminatorias de su faz por el propósito que persiguen o por su efecto y en ambos casos se consideran inválidas de por sí. El ente regulador tiene la obligación de defenderlas y presentar evidencia de que sirven para un propósito legítimo que es imposible de atender por otros medios razonables y no discriminatorios. No obstante, las leyes se presumen lícitas si están redactadas en términos neutrales y su aplicación no resulta parcializada. *E.L.A. v. Northwestern Selecta,* supra, a las págs. 73–74.

### D.

La Sección 7 del Artículo II de la Constitución de Puerto Rico dispone que ninguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. Tampoco se aprobarán leyes que menoscaben las obligaciones contractuales. Const. de P.R., Art. II, Sec. 7, L.P.R.A., Tomo 1; *López v. E.L.A.,* 165 D.P.R. 280, 296–297 (2005).

La igual protección de las leyes se funda en el principio cardinal de "trato similar para personas similarmente situadas". El Gobierno puede hacer clasificaciones entre las personas para cualesquiera propósitos legítimos, pero al realizarlas tiene que observar esa norma básica. El Estado necesita establecer clasificaciones para poder gobernar una sociedad tan compleja y variada, con distintos intereses individuales y grupales, y diversas relaciones sociales. Significa que es imposible gobernar cualquier sociedad y en especial una sociedad moderna sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y perjudiquen a otros. *López v. E.L.A.,* supra, a la pág. 297.

El Estado puede hacer clasificaciones entre las personas sin infringir la igual protección de las leyes, siempre

y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo. No toda discriminación viola el precepto de igual protección ante la ley, aunque este si prohíbe un tratamiento desigual injustificado. *López v. E.L.A.,* supra, a las págs. 297–298.

Los tribunales al hacer un análisis constitucional sobre la razonabilidad de una clasificación legislativa, deben usar uno de los dos (2) escrutinios establecidos jurisprudencialmente. Nos referimos al uso del: (1) escrutinio estricto; o el (2) escrutinio tradicional mínimo o de nexo racional. El Estado tiene una amplia latitud para el establecimiento de clasificaciones relativas a cuestiones sociales y económicas. El análisis de leyes que establecen clasificaciones en esos campos debe ser realizado mediante el escrutinio del nexo racional o tradicional mínimo. Al amparo de dicho escrutinio, las clasificaciones no se considerarán inválidas, salvo que sean claramente arbitrarias y no exista un interés legítimo del Estado. Las clasificaciones tampoco pasarán el cedazo constitucional, si no puede establecerse un nexo racional entre estas y el interés estatal. Cuando se utiliza el escrutinio racional, la ley impugnada goza de una presunción de constitucionalidad y la persona que impugna su validez tiene el peso de rebatir la presunción. *López v. E.L.A.,* supra, a las págs. 298–299.

**\*6** Por otro lado, para que se justifique el uso del escrutinio riguroso o estricto, el tribunal tiene que identificar, si la clasificación afecta algún derecho fundamental del ciudadano o si establece alguna clasificación sospechosa que no guarde relación con la habilidad o aptitud de las personas afectadas. Cuando se identifican esas clasificaciones, se presume que la legislación es inconstitucional y el Estado tiene que probar la existencia de un interés apremiante o de superior jerarquía que lo justifique. Este escrutinio ha sido aplicado a ciertas leyes que establecen distinciones sospechosas como las basadas en raza, nacionalidad, ciudadanía, pobreza o nacimiento. *López v. E.L.A.,* supra, a la pág. 299; *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 278 (1975).

### E.

El Artículo II, Sección 7, de la Constitución de Puerto Rico, *supra,* también prohíbe la aprobación de leyes que menoscaben las obligaciones contractuales. Esta garantía constitucional limita la intervención del gobierno con

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit 75 Part 5 Page 209 of 541
Asociación De Empleados Gerenciales Del Centro..., 2018 WL 2215125 (2018)

Exhibit 75 Part 5 Page 209 of 541

las obligaciones contractuales entre partes privadas y las contraídas por el Estado. Su propósito es asegurar la estabilidad de las relaciones contractuales. Sin embargo, su protección no es absoluta, ya que debe ser armonizada con el poder de reglamentación del Estado en beneficio del interés público. El Tribunal Supremo de Puerto Rico ha expresado reiteradamente que no todo menoscabo de una obligación contractual es inconstitucional. *AMPR v. Sist. Retiro–Maestros V,* 190 D.P.R. 854, 868 (2014). El análisis de esta cláusula constitucional depende de si el contrato que se modifica es entre entes privados o es uno en el que el Estado es parte.

Los contratos privados se analizan mediante un escrutinio de razonabilidad en el que se toma en cuenta cuán sustancial es el interés público promovido y la extensión del menoscabo contractual. El primer paso es determinar si existe una relación contractual, y si su modificación representa un menoscabo sustancial o severo. Si se determina que existe un menoscabo severo, entonces es necesario evaluar, si la intervención gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de ese objetivo. *AMPR v. Sist. Retiro Maestros V,* supra, a la pág. 869.

Un escrutinio más cuidadoso es aplicado cuando el Estado es parte de la relación contractual debido a que podría actuar para su propio beneficio. El menoscabo contractual tiene que ser razonable y necesario para adelantar un propósito gubernamental importante. Al evaluar la necesidad y razonabilidad de una ley procede conferir alguna deferencia al criterio de la Asamblea Legislativa. A mayor severidad del menoscabo, mayor rigor debe tener el foro judicial en el análisis de la legislación impugnada. No obstante, la validez será sostenida, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público. *AMPR v. Sist. Retiro Maestros V,* supra, a las págs. 869–870; *Trinidad Hernandez et al. v. ELA et al.,* 188 D.P.R. 828, 835 (2013).

### F.

**\*7** La Ley Núm. 66, *supra,* declaró el estado de emergencia fiscal en que se encuentra el Gobierno de Puerto Rico. Esta crisis es descrita como "la más crítica que ha atravesado el país en su historia". Las corporaciones públicas no están ajenas a la crisis fiscal, por lo que también han sido impactadas por el plan que incluye: (1) medidas de reducción de gastos de la Rama Ejecutiva; (2) normas y restricciones sobre concesión de aumentos en beneficios económicos o compensaciones económicas extraordinarias; (3) disposiciones sobre convenios colectivos; y(4) disposiciones sobre el control fiscal de las corporaciones públicas. Exposición de Motivos y Art. 2 de la Ley Núm. 66, *supra.* Esta legislación especial de carácter socio económico fue aprobada en virtud del poder de razón del Estado, con el objetivo de garantizar la liquidez suficiente para pagar la nómina de los empleados públicos y sufragar los servicios esenciales que se ofrecen a la ciudadanía. Exposición de Motivos de la Ley Núm. 66, *supra.*

El Artículo 2 establece la adopción de un plan para manejar las consecuencias de la crisis fiscal y permitir la continuidad de los servicios esenciales de salud, seguridad, educación, trabajo social y desarrollo, entre otros. Además, establece la restauración del crédito público como política pública del Estado. Estos objetivos serán conseguidos mediante la eliminación a corto plazo del déficit del Fondo General y el mejoramiento de la condición fiscal de las corporaciones públicas, pero sin despedir empleados públicos ni afectar los servicios esenciales.

La Ley Núm. 66, *supra,* tiene primacía sobre cualquier otra legislación, toda vez que fue aprobada al amparo del poder de razón del Estado y la facultad constitucional de la Asamblea Legislativa de aprobar leyes que protejan la vida, salud y bienestar del Pueblo cuando estén en grave peligro los servicios gubernamentales esenciales. Art. 3 de la Ley Núm. 66, *supra.*

Durante la vigencia de la Ley Núm. 66, *supra,* los empleados de la Rama Ejecutiva no recibirán aumentos en beneficios económicos ni compensaciones monetarias extraordinarias, con excepción a lo establecido en el inciso (d) del Artículo 11. Art. 11(a) de la Ley Núm. 66, *supra.* Las limitaciones establecidas en el Artículo 11 aplican a todos los empleados de la Rama Ejecutiva independientemente de su clasificación de confianza, regular o de carrera, transitorio o irregular, e irrespectivamente de su función particular dentro de la entidad de la Rama Ejecutiva. Además, aplican sin distinción de cualquier disposición contraria, bien sea en una ley, normativa, reglamento, convenio colectivo, políticas, manuales de empleo, cartas circulares, cartas contractuales, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de

clasificación o retribución. Art. 11(f) y(h) de la Ley Núm. 66, *supra.*

**\*8** El inciso (i) del Artículo 11 dispone expresamente que:

En reconocimiento de la importancia de la sindicalización de empleados públicos no solamente para representar el bienestar económico de los trabajadores, sino para elevar el servicio público al máximo de su potencial y mantener la paz laboral, se establece un proceso participativo alterno y uniforme para lograr los objetivos de política pública de esta Ley, incluyendo el ahorro necesario dentro de los parámetros establecidos en los incisos (j) y(k), según sea el caso, siguiendo como principio rector la negociación colectiva. Los acuerdos alcanzados con los representantes autorizados de los empleados unionados, y a su vez, ratificados por escrito por la matrícula de unionados concernida y el representante autorizado de la Entidad de la Rama Ejecutiva mediante y conforme a los parámetros de la negociación aquí permitida, sustituirán lo dispuesto en los incisos (a), (b), (c) y(d) de este Artículo y cualquier otra disposición que resulte pertinente en esta ley y que haya sido objeto de la negociación.

Por su parte, el inciso (j) autoriza que las entidades de la Rama Ejecutiva sujetas a la Ley Núm. 45–1998, conocida como la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, *3 L.P.R.A. sec. 1454 et seq.,* utilicen el proceso de negociación para enmendar los convenios colectivos y modificar las condiciones económicas de empleo y establecidas en el Artículo 11, *supra.* No obstante, dichas modificaciones deben garantizar un ahorro promedio por empleado unionado, comparable al que hubiese sido obtenido mediante la aplicación de los referidos incisos. Art. 11(j) de la Ley Núm. 66, *supra.*

El Artículo 14 dispone cuál es el foro para dirimir las controversias relacionadas a la Ley Núm. 66, *supra.* Su texto dispone como sigue a continuación:

La Comisión Apelativa del Servicio Público (CASP), o la entidad sucesora de esta, en lo que corresponde a asuntos de naturaleza laboral o que de otra forma ordinariamente caerían dentro de la jurisdicción de CASP, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este

Capítulo, de aquellos empleados cubiertos o no cubiertos por las disposiciones de la Ley Número 45–1998, según enmendada, conocida como la Ley de Relaciones del Trabajo para el Servicio Público; así como de aquellos empleados no organizados sindicalmente de aquellas Entidades de la Rama Ejecutiva excluidas de la aplicación de las disposiciones de la Ley Núm. 184–2004, según enmendada, conocida como la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, y empleados de aquellas Entidades de la Rama Ejecutiva que no están organizados y les aplica las disposiciones de la Ley Núm. 184–2004.

**\*9** Por su parte, la Junta de Relaciones del Trabajo, o la entidad sucesora de esta, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este Capítulo, de aquellos empleados cubiertos por la Ley Núm. 130 de 8 de mayo de 1945, según enmendada. Disponiéndose, que conforme a lo indicado en esta Ley, ninguna actuación llevada conforme a sus disposiciones constituirá una violación a los convenios colectivos existentes, o una negativa a negociar de buena fe o una práctica ilícita.

Por otro lado, el Artículo 17 de la Ley Núm. 66, *supra,* establece las medidas de control fiscal que deben tomar las corporaciones públicas. Este Artículo suspende el cumplimiento de las cláusulas no económicas negociadas en los convenios vigentes, que tienen efectos económicos directos o indirectos en la operación de las corporaciones públicas, agravan su situación presupuestaria, o que es necesario suspenderlas para aliviar la situación presupuestaria. Además, incluye una lista de algunas cláusulas no económicas que pueden tener un efecto económico directo o indirecto.

### G.

Como es sabido, el término "jurisdicción" significa el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir casos o controversias. *CBS Outdoor v. Billboard One, Inc. et al.,* 179 D.P.R. 391, 403 (2010). Como norma general, los foros judiciales de Puerto Rico son de jurisdicción general. Es decir, tienen autoridad para entender en cualquier causa de acción que presente una controversia para adjudicación. *Clases A, B y C v. PRTC,* 183 D.P.R.

666 (2011), citando a *Mun. Arecibo v. Mun. Quebradillas,* 161 D.P.R. 109, 114 (2004); *Junta Dir. Cond. Montebello v. Fernández,* 136 D.P.R. 223, 230 (1994).

La norma de la jurisdicción general prevalece, salvo que el tribunal adolezca de jurisdicción sobre la materia. *Rodríguez v. De León,* 191 D.P.R. 700 (2014). La jurisdicción sobre la materia se refiere a la capacidad del tribunal para atender y resolver una controversia sobre un aspecto legal. La jurisdicción sobre la materia no puede ser otorgada por las partes. El tribunal tampoco puede arrogársela debido a que solo el Estado, a través de sus leyes, puede otorgar o privar a los tribunales de jurisdicción sobre la materia. *Rodríguez v. De León,* supra.

Por su parte, las agencias administrativas solamente tienen los poderes otorgados expresamente por una ley habilitadora y aquellos que sean indispensables para llevar a cabo sus deberes y responsabilidades. De lo anterior, pueden surgir situaciones en las que los tribunales y las agencias puedan entender en un mismo asunto, en cuyo caso, es aquí donde la doctrina de jurisdicción primaria juega un papel importante. *CBS Outdoor v. Billboard One, Inc. et al.,* supra.

 **\*10** La jurisdicción primaria exclusiva o estatutaria, ocurre cuando el legislador legisla para conferir jurisdicción primaria exclusiva a un organismo administrativo. La jurisdicción primaria exclusiva no admite ningún otro medio de solución, ajuste o prevención y no se trata de jurisdicción compartida o concurrente. Por el contrario, es una jurisdicción sobre la materia que el legislador depositó en el ámbito jurisdiccional de la agencia de forma exclusiva. Como resultado, los tribunales quedan excluidos de intervenir en primera instancia en los asuntos o materias sobre las cuales se les ha conferido la jurisdicción exclusiva a las agencias. *Rodríguez v. De León,* supra.

La doctrina de jurisdicción primaria es una de creación jurisprudencial. *CBS Outdoor v. Billboard One, Inc. et al.,* supra, a las págs. 403–404. Esta doctrina no priva de jurisdicción a los foros judiciales, sino que atiende una cuestión de prioridad de jurisdicción. Su principal propósito es promover la armonía entre los tribunales y los organismos administrativos. Específicamente, la doctrina de jurisdicción primaria dispone cuál foro, judicial o administrativo, debe atender inicialmente una controversia. Para ello, la doctrina tiene dos (2) vertientes: (1) la exclusiva; y(2) la concurrente. *Id.,* a la pág. 404.

En la primera vertiente, la jurisdicción primaria exclusiva, una ley o estatuto le confiere jurisdicción a determinado organismo administrativo e indica que este será el único foro con facultad para atender, inicialmente, determinada controversia. *Id.* Por otro lado, "la segunda vertiente se manifiesta cuando el foro judicial y el foro administrativo comparten la facultad para dilucidar un mismo asunto. En estas ocasiones se habla de verdadera jurisdicción primaria o jurisdicción primaria concurrente." *Id.,* a la pág. 405. El fundamento de esta vertiente reside en la deferencia judicial que las agencias administrativas merecen en atención a su preparación, especialización, pericia y conocimiento para atender determinados asuntos. *Id.*

La aplicación de la doctrina de jurisdicción primaria requiere que los tribunales examinen los alcances de la ley habilitadora de una agencia administrativa y determinen si el asunto cae estrictamente dentro de su ámbito. Además, exige que los tribunales ponderen y determinen si es imprescindible y necesario que se resuelva en favor de que intervenga inicialmente la agencia. *Consejo Titulares v. Gómez Estremera, et al.,* 184 D.P.R. 407, 430–431 (2012).

## H.

El recurso extraordinario del *injunction* pretende prohibir u ordenar la ejecución de un acto para evitar que se causen perjuicios inminentes o daños irreparables a alguna persona, cuando no existe otro remedio adecuado en ley. *Next Step Medical v. Bromedicon, et al.,* 190 D.P.R. 474, 485–486 (2014); *Mun. Fajardo v. Srio Justicia et al.,* supra, a la pág. 255. Nuestro ordenamiento jurídico cuenta con tres (3) modalidades de este tipo de recurso que son: el entredicho provisional, el *injunction* preliminar y el *injunction* permanente. *Next Step Medical v. Bromedicon, et al.,* supra, a la pág. 486.

 **\*11** El *injunction* preliminar o *pendente lite* es un recurso que emite el tribunal antes de la celebración del juicio en su fondo y, de ordinario, posterior a la celebración de una vista en donde las partes tienen la oportunidad de presentar prueba en apoyo y oposición a la expedición del mismo. El objetivo principal de este recurso es mantener el estado actual de las cosas hasta tanto se celebre el juicio en sus méritos, para que el caso no se convierta en académico. Posteriormente, el derecho sustantivo será ventilado en un juicio plenario como en cualquier tipo de acción. El *injunction* preliminar va dirigido a requerir o prohibir

hacer determinado acto, con el objetivo de impedir que se causen perjuicios inminentes o menoscabos irreparables a alguna persona durante la pendencia del litigio. El factor cardinal que gobierna la expedición de este remedio extraordinario estrechamente ligado a la doctrina de equidad es la existencia de una amenaza real de sufrir algún menoscabo para el cual no existe un remedio adecuado en ley. *Next Step Medical v. Bromedicon et al.,* supra.

Ahora bien, al ponderar la expedición de un *injunction* preliminar, el tribunal debe considerar los siguientes criterios: (1) la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el recurso; (2) la irreparabilidad del daño o la inexistencia de un remedio adecuado en ley; (3) la probabilidad de que eventualmente la parte promovente prevalezca al resolverse el litigio en su fondo; (4) la probabilidad de que la causa se torne académica de no concederse el *injunction;* y(5) el posible impacto sobre el interés público del remedio que se solicita. Además de los criterios enumerados, la Regla 57.3 de Procedimiento Civil añade que el tribunal deberá considerar el criterio de "la diligencia y la buena fe de la parte peticionaria". 32 L.P.R.A. Ap. V R. 57.3; *Next Step Medical v. Bromedicon et al.,* supra.

Estos requisitos no son absolutos, ya que son directrices que dirigen al tribunal al momento de decidir si la evidencia presentada justifica la expedición del recurso. La concesión del remedio descansará en la sana discreción judicial, que se ejercerá al considerar tanto los intereses como las necesidades de las partes involucradas en el caso. El mismo debe expedirse con mesura y únicamente ante una demostración clara e inequívoca de la violación de un derecho. La determinación del tribunal no será revocada en apelación, a menos que se demuestre que el foro de instancia abusó de su facultad. *Next Step Medical v. Bromedicon et al.,* supra, a la pág. 487.

Al determinar si procede otorgar un interdicto permanente, el tribunal debe considerar los siguientes criterios: (1) si el demandante ha prevalecido en un juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público involucrado; y(4) el balance de equidades. Estos criterios no son de naturaleza absoluta, sino de directrices que encausan la discreción del tribunal al determinar si la evidencia justifica el interdicto. *Plaza Las Américas v. N & H,* 166 D.P .R. 631, 643–644 (2005).

## I.

**\*12**  Con relación a un recurso de *mandamus,* el Tribunal Supremo de Puerto Rico ha resuelto que, de conformidad con lo dispuesto por el Artículo 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3421, "el auto de mandamus es un recurso altamente privilegiado y discrecional que se expide para ordenar a cualquier persona natural, corporación o a un tribunal de inferior jerarquía que cumpla o ejecute un acto que forma parte de sus deberes y atribuciones". *AMPR v. Srio. Educación, E.L.A.,* 178 D.P.R. 253, 263 (2010). Dicho recurso únicamente procede cuando se exige el cumplimiento de un deber impuesto por la ley. Esto se refiere a un deber calificado de ministerial y que, por ende, no admite discreción en su ejercicio, sino que es mandatorio e imperativo. *Noriega v. Hernández Colón,* 135 D.P.R. 406, 447–448 (1994); *Hernández Agosto v. Romero Barceló,* 112 D.P.R. 407, 418 (1982); *% 21Alvarez de Choudens v.. Tribunal Superior,* 103 D.P.R. 235, 242 (1975). Es decir, debe tratarse de "un mandato específico que la parte demandada tiene que cumplir y que no le permite decidir si cumple o no el acto solicitado". *AMPR v. Srio. Educación, E.L.A.,* supra, a la pág. 264.

Por el contrario, "cuando la ejecución del acto o la acción que se describe depende de la discreción o juicio del funcionario, tal deber es considerado como no ministerial". *Id.* Véanse, además, *Díaz Saldaña v. Acevedo Vilá,* 168 D.P.R. 359, 365 (2006); *%21Alvarez de Choudens v. Tribunal Superior,* supra. Por consiguiente, al no ser ministeriales, los deberes discrecionales quedan fuera del ámbito del recurso de *mandamus. AMPR v. Srio. Educación, E.L.A.,* supra. Además, cabe señalar que, al constituir un recurso altamente privilegiado, la expedición del auto de *mandamus* no procede como cuestión de derecho, sino que descansa en la sana discreción del tribunal. *Báez Galib y otros v. C.E.E. II,* 152 D.P.R. 382, 391–392 (2000). En consecuencia, la expedición del auto de mandamus resulta improcedente si existe otro remedio adecuado en ley, ya que el propósito principal del auto no es remplazar remedios legales disponibles, sino suplir la falta de ellos. *AMPR v. Srio. Educación, E.L.A.,* supra, a las págs. 266–267; *Hernández Agosto v. Romero Barceló,* supra; *Dávila v. Superintendente de Elecciones,* 82 D.P.R. 264, 274 (1960).

Resulta menester reiterar que un mandamus puede ser considerado cuando la parte peticionaria no tiene

disponible un recurso legal adecuado y eficaz en el curso ordinario de la ley. Véase, Art. 651 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3423. La petición de mandamus tiene que evaluarse a la luz de varios requisitos. Estos son: (1) que el demandado tenga un deber u obligación ministerial impuesto por ley; (2) que el peticionario tenga un interés especial en el derecho que reclama; (3) que el deber de actuar de la agencia y el derecho del peticionario surjan de la ley de forma clara y patente; (4) que el peticionario no tiene otro remedio legal para hacer valer su derecho; y(5) que, estimado el efecto que tendrá la expedición del auto, el Tribunal entienda que los fines de la justicia obligan a su expedición. *Dávila v. Superintendente de Elecciones,* supra, a las págs. 274–275. Véanse, además, Arts. 649 al 651 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421–3423.

**\*13** Conforme al marco doctrinal antes delineado, procedemos a resolver las controversias ante nuestra consideración.

### III.

En el recurso que nos ocupa, en su primer señalamiento de error, la apelante cuestionó la negativa del TPI a no hacer parte de la *Sentencia* apelada las determinaciones de hechos adicionales solicitadas en una moción de reconsideración interpuesta por la apelante. Además, argumentó que el foro primario incumplió con los requisitos de la Regla 42.2 de Procedimiento Civil, *supra,* porque dictó una sentencia sumaria sin determinar los hechos incontrovertidos. Los planteamientos esbozados por la apelante en torno a este particular son inmeritorios. A tales efectos, cabe destacar que la *Sentencia* apelada fue dictada al amparo de la Regla 10.2, *supra,* por lo que el TPI ni siquiera estaba obligado a formular determinaciones de hechos. Se presume que dicho foro tomó como ciertos los hechos que fueron bien alegados en la *Demanda.* Resulta menester indicar que la Regla 42.2, *supra,* establece que cuando se dicta sentencia a favor de una moción de desestimación, no es necesario especificar los hechos probados y consignar por separado las conclusiones de derecho.

No obstante, aun tomando como ciertos los hechos bien alegados en la *Demanda,* el TPI resolvió que la apelante no tenía una causa de acción que justificara la concesión de un remedio. En consecuencia, dictó sentencia declaratoria reconociendo la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra.* Además, se declaró sin

jurisdicción sobre la materia para atender el recurso de *mandamus* y expedir el auto de *injunction* solicitado debido a que el reclamo de la apelante es una controversia de la jurisdicción exclusiva de la CASP.

Como segundo señalamiento de error, la apelante atacó la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra.* La Asociación alegó que la aplicación de esos Artículos violenta el derecho de los empleados gerenciales no unionados de la CFSE a la igual protección de las leyes y atenta contra la prohibición al menoscabo de las obligaciones contractuales. La apelante adujo que los Artículos citados establecen una clasificación irrazonable entre los empleados de carrera y los unionados que gozan de los beneficios de convenios colectivos. Sostuvo que dicha clasificación atenta y reduce dramáticamente los beneficios económicos de sus representados, en comparación a los de los empleados unionados.

Según la apelante, dichos Artículos establecen un trato desigual y discriminatorio debido a que: (1) excluyen a los empleados no unionados gerenciales de carrera del proceso participativo alterno; (2) la cuota de ahorro promedio impuesta a los empleados gerenciales es dos veces y medio mayor que la establecida para empleados unionados; (3) dan un trato preferencial a los empleados unionados *vis à vis* los empleados no unionados gerenciales de carrera afiliados a organizaciones laborales bonafides, cuyo efecto es la imposición de una carga mayor; (4) permiten acuerdos con las organizaciones laborales que otorguen condiciones de trabajo y beneficios económicos superiores a los de los empleados de la Asociación; y(5) no proveen a los miembros de la Asociación los mismos beneficios económicos y condiciones de trabajo acordados con las organizaciones laborales.

**\*14** Por su parte, el Estado afirmó que la Ley Núm. 66, *supra,* no establece clasificaciones arbitrarias o caprichosas y manifestó que dicha legislación cumple con el interés apremiante del Estado de atender y resolver la grave crisis fiscal que enfrenta el Gobierno de Puerto Rico. Asimismo, el Estado planteó que la Ley Núm. 66, *supra,* fue promulgada para garantizar la continuidad de la gestión pública en áreas esenciales como la salud, seguridad pública, educación y trabajo social. Además, tiene los objetivos de restaurar el crédito del Estado y eliminar el déficit fiscal del fondo general, sin recurrir al despido de empleados públicos, ni afectar las funciones esenciales de las agencias del Gobierno. A su vez, la

CFSE adoptó los argumentos del Estado a favor de la constitucionalidad de la Ley Núm. 66, *supra.*

La determinación sobre la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* requiere un análisis del texto de la ley para establecer si son discriminatorios de su faz y del contexto en que han sido empleados para ver si su aplicación es discriminatoria. Véase, *E.L.A. v. Northwestern Selecta,* supra. El Artículo 11 de la Ley Núm. 66, *supra,* prohíbe el aumento de los beneficios económicos y las compensaciones monetarias extraordinarias, recibidos por los empleados de la Rama Ejecutivo, salvo las excepciones determinadas por el legislador. Dicho Artículo contiene una lista de los beneficios económicos y compensaciones monetarias extraordinarias que no serán concedidas durante la vigencia de la Ley Núm. 66, *supra.*

La suspensión de beneficios económicos y compensaciones monetarias extraordinarias no hace exclusiones, ya que es extensiva a todos los empleados de la Rama Ejecutiva e incluye a las corporaciones públicas. La medida afecta a todos los empleados de la Rama Ejecutiva irrespectivamente de si su clasificación es de confianza, regular de carrera, transitorio o irregular y de sus funciones particulares. El Artículo 11, *supra,* permite a los empleados organizados colectivamente negociar beneficios económicos distintos a los permitidos en la Ley Núm. 66, *supra,* pero sujeto a que se logren ahorros dentro de los parámetros que establece esa legislación.

Por su parte, el Artículo 17 de la Ley Núm. 66, *supra,* establece las medidas de control fiscal que deben tomar las corporaciones públicas. Este Artículo suspende el cumplimiento de las cláusulas no económicas negociadas en los convenios vigentes que tienen efectos económicos directos o indirectos en la operación de la corporación pública, agravan su situación presupuestaria, o que es necesario suspenderlas para aliviar la situación presupuestaria. El aludido Artículo tiene un listado de algunas cláusulas no económicas que pueden tener un efecto económico directo o indirecto.

 **\*15** El análisis del texto de los Artículos 11 y 17, *supra,* hace evidente que el Estado no violó la cláusula constitucional que garantiza la igual protección de las leyes. Los Artículos, cuya constitucionalidad cuestiona la apelante, no establecen una clasificación sospechosa basada en raza, color, sexo, nacimiento, origen o condición social, ideas políticas, religiosas o nacionalidad,

que violente derechos fundamentales de la apelante y justifique el uso de un escrutinio estricto y la activación de la presunción de inconstitucionalidad de la ley. Véase, *López v. E.L.A.,* supra. Sin embargo, aun en el caso de que dicha presunción fuera activada, se probó que la Ley Núm. 66, *supra,* obedece a la política pública e interés apremiante del Estado de combatir y solucionar la grave crisis fiscal del país que pone en riesgo la salud, seguridad y los servicios públicos esenciales a la ciudadanía.

La Ley Núm. 66, *supra,* evidentemente es una legislación de carácter económico, cuyo objetivo principal es sacar al país de la crisis fiscal. Por consiguiente, su constitucionalidad debe ser analizada a base de un escrutinio tradicional. Los Artículos 11 y 17, *supra,* pasan el cedazo del escrutinio del nexo racional o tradicional mínimo. La apelante no derrotó la presunción de constitucionalidad, ya que no probó la existencia de una clasificación arbitraria. El Estado, en cambio, sí logró probar la existencia de un fin legítimo. La crisis fiscal es un hecho incontrovertido. La reducción de beneficios económicos a todos los componentes de la Rama Ejecutiva, incluyendo a las corporaciones públicas, es parte de las medidas de reducción de gastos necesarias para salvar el crédito del país y garantizar los servicios esenciales.

Las medidas del Artículo 11, *supra,* son extensivas a todos los empleados públicos de la Rama Ejecutiva independientemente de su clasificación. No obstante, la apelante alegó que la Ley Núm. 66, *supra,* es inconstitucional porque únicamente les permite a los empleados organizados colectivamente negociar beneficios económicos distintos a los permitidos en la Ley Núm. 66, *supra.* Sin embargo, la apelante obvió que la negociación con la autoridad nominadora tiene el propósito y está sujeta a que se logren ahorros dentro de los parámetros que establece esa legislación. Los empleados gerenciales representados por la apelante no están en una posición de desventaja debido a que la posibilidad de negociar de los empleados organizados colectivamente con la autoridad nominadora es precisamente para garantizar que se logren los ahorros proyectados en la Ley Núm. 66, *supra.*

El Artículo 17 de la Ley Núm. 66, *supra,* tampoco pone en desventaja a la apelante frente a los empleados cobijados por convenios colectivos. Por el contrario, dicho Artículo solo afecta los derechos de los empleados organizados colectivamente, ya que suspende el cumplimiento de las

cláusulas no económicas negociadas en sus convenios, pero que tienen un impacto económico directo o indirecto en la operación de la corporación y que agravan su situación presupuestaria. Recordemos que a la apelante no le asiste un derecho constitucional a negociar colectivamente términos y condiciones de empleo. Por lo tanto, lo que se persigue con la Ley Núm. 66, *supra*, es precisamente ajustar ese derecho de los empleados organizados a la necesidad que pretende aliviar la Ley Núm. 66, *supra*.

**\*16** La Ley Núm. 66, *supra*, no hace una clasificación arbitraria ni sospechosa entre los empleados gerenciales no unionados del servicio de carrera de la CFSE y los empleados unionados cobijados por convenios colectivos. Por el contrario, sostenemos que la ley les da un trato similar. Ambos grupos han sido afectados por las medidas de reducción de gastos que involucran a todos los empleados de la Rama Ejecutiva, incluyendo a las corporaciones públicas y sin distinción del puesto que ocupen. Las medidas de los Artículos 11 y 17 lejos de establecer una clasificación sospechosa en detrimento de la apelante, tienen la intención de evitar el colapso económico del Gobierno y garantizar que los acuerdos de los convenios colectivos cumplan con los ahorros establecidos en la Ley Núm. 66, *supra*.

Como expresamos anteriormente, la apelante no ha derrotado la presunción de constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra*. El Estado, en cambio, sí ha probado que dicha legislación tiene el fin legítimo y apremiante de evitar el colapso de las finanzas del Gobierno de Puerto Rico y garantizar a la ciudadanía los servicios básicos y esenciales. Los Artículos 11 y 17, *supra*, tampoco atentan contra la prohibición constitucional a la aprobación de leyes que menoscaban las obligaciones contractuales. No podemos obviar que esa protección no es absoluta, toda vez que debe ser armonizada con el poder reglamentario del Estado en beneficio del interés público.

La constitucionalidad de los Artículos citados es incuestionable. Las medidas tomadas por el Estado en la Ley Núm. 66, *supra*, sin lugar a dudas son razonables y necesarias para adelantar el importante propósito gubernamental de salvar las finanzas de Puerto Rico. Además, resultan ser lo menos onerosas posibles, ya que

la intención del Estado es lograr la estabilidad económica del Gobierno sin afectar la prestación de los servicios esenciales y sin despedir empleados públicos. *AMPR v. Sist. Retiro Maestros V,* supra; *Trinidad Hernandez et al. v. ELA et al.,* supra.

Por último, la apelante argumentó que incidió el TPI al no expedir el auto de *mandamus* solicitado para que la CFSE cumpla con su deber ministerial de entregarle unos documentos públicos. La apelante se refirió específicamente a los siguientes documentos: (1) la meta de ahorro establecida por la CFSE; (2) el informe de plazas de confianza y cuantías; (3) el plan propuesto para el cumplimiento con los Artículos 8–11, 17–18; (4) el informe de puestos gerenciales ocupados y vacantes, según enumerados en el Artículo 11, sección (i) de la Ley Núm. 66; y(5) otros documentos relacionados necesarios para el cumplimiento con las disposiciones y metas de ahorro dispuestas en la Ley Núm. 66, *supra*.

El planteamiento de la apelante es errado. El TPI actuó correctamente al declararse sin jurisdicción sobre la materia y no atender la petición de *mandamus*. La CASP es el organismo con jurisdicción primaria exclusiva para atender las controversias relacionadas con la implementación de las medidas de reducción de gastos tomadas por la Rama Ejecutiva al amparo de la Ley Núm. 66, *supra*. Por disposición expresa del legislador, la apelante debió acudir en primera instancia a la CASP para cuestionar las medidas de reducción de gastos tomadas por la CFSE que alega afectan sus beneficios económicos. Del mismo modo, concluimos que tampoco procedía la expedición del auto extraordinario de *injunction*[2] debido a que la apelante tiene como remedios disponibles los provistos por la CASP. En consecuencia, procede confirmar la *Sentencia* apelada.

### IV.

**\*17** En atención a los fundamentos antes esbozados, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada

Secretaria del Tribunal de Apelaciones

Footnotes

Asociación De Empleados Gerenciales..., 2013 WL 2452834...

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:19:25 Desc:
Exhibit Exhibit 75 Part 6 Page 29 of 27 of 541

1    Véase, Apéndice del recurso de apelación, págs. 206–229.

2    Es imprescindible destacar que una vez decretada la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* es inmeritorio e improcedente discutir si el TPI erró al no emitir un *injunction* para evitar la supuesta aplicación inconstitucional de la ley.

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 77

# TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: 940-29 Monge Historia Constitucional de Puerto Rico, and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

(Affiant's Signature)

<u>Stephanie Penn</u>
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by <u>Stephanie Penn</u>.

Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

# CONSTITUTIONAL HISTORY
# OF PUERTO RICO

VOLUME III

[signature]

## JOSE TRIAS MONGE

Chief Justice
Supreme Court of Puerto Rico
LL.B., A.M., Harvard University
J.S.D., Yale University

# CONSTITUTIONAL HISTORY
# OF PUERTO RICO

### VOLUME III



EDUPR

PUBLISHING COMPANY OF THE UNIVERSITY OF PUERTO RICO
1982

JOSÉ TRÍAS MONGE

[…] approval of the law."[20] It was clear in the record that "currently effective electoral legislation" would be understood to mean legislation that was in force at the time the referendum was held and not legislation in force at the time of the Convention.[21]

It was also clarified that the phrase "general welfare" used in the first paragraph of the section was to be interpreted in the broadest way possible. At that time, in order to qualify for participation in certain slum-elimination programs, reconstruction of deteriorated zones and re-urbanization, extreme clarity in the law was essential. For those purposes primarily, the vice-president of the Commission and future President of the Chamber and Resident Commissioner in Washington, Santiago Polanco Abreu, made the corresponding clarifications for the record.[22]

Part of the intention when drafting this part of the report of the Commission of General Affairs had been the desire to establish the bases—by reproducing the essence of article 37 of the Organic Law—for the future repeal of at least those parts of the Law of Bases copied by the Constitution of Puerto Rico. Something of that was suspected by Iriarte, who argues at the Constituent Convention that, given the fact that article 37 was part of the Law of Federal Relations, the Convention could not introduce any change with respect to the matter under discussion.[23] Muñoz Marin fought that interpretation of the limitations that allegedly arose from incorporating a specific provision in the Law of Federal Relations into the Constitution of Puerto Rico.[24]

## 2.   THE POWER TO LEVY TAXES AND TO CONTRACT DEBTS: SECTION 2 OF ARTICLE VI

The Commission of General Affairs recommended including the following language in the Constitution:

"2. The power of the Commonwealth of Puerto Rico to assess and collect taxes and to authorize their assessment and collection by the municipalities, shall be exercised as determined by law the Legislative Assembly, and shall never be surrendered, suspended or object of contract. The power of the Commonwealth of Puerto Rico to contract and authorize debts shall be exercised as the Legislative Assembly determines by law."[25]

The inspiration for that text, which, except for an important amendment—which we will discuss later becomes section 2 of article VI of the Constitution—came primarily from the proposal that the president and vice-president of the Commission, Yldefonso Solá Morales and

---

[20] *Ibid.*, pages 2051-2056, 2077. The text of the amendment was written by Samuel Quiñones and Miguel Angel García Méndez.
[21] Ibid., p 2054.
[22] Ibid., pages 2204-2209 and especially 2206.
[23] Ibid., pages 2058
[24] Loc. cit.
[25] Ibid., vol. IV, page 2619.

CONSTITUTIONAL HISTORY OF PUERTO RICO                217

Santiago Polanco Abreu, offered on this point,[26] as well as from article 3 of the Organic Law.[27]

The possibility was discussed with Muñoz Marin of at least repeating in that article the provisions of Art. 3 of the Law of Federal Relations on the borrowing margin, as a basis for in the future eliminating that aspect of local government from the aforementioned law and obtaining the consequent autonomy of the people of Puerto Rico over such an important matter.[28]

Strong republican opposition to that step anticipated,[29] however, as were possible difficulties in the Congress. Therefore, the referenced section was limited to delegating to the Legislative Assembly the broadest power possible to assess taxes and to contract debts.[30]

The socialist position did not vary much from the proposal in the original first draft by Solá Morales and Polanco Abreu, except that part of it was seriously hindering, if not impeding, the program of industrial tax exemption, which was in full swing at that time, although with a long way yet to go.

The republican position was very different from the position of the popular leadership. The republican delegation was in favor of limiting as much as possible the powers of the government of Puerto Rico and its political subdivisions to levy taxes. Hence Ferré, García Méndez and Iriarte insisted on reducing the territorial tax and on authorizing the legislature to establish a maximum rate of just one percent (1%), which could be increased only through the people's approval in a referendum.[31] Of course, the difficulties experienced by the states that were operating under that mode of constitutional restriction were well known. In terms of the real constitution of other places, that type of limitation often resulted in defending plutocracy more than democracy.

The republican attitude toward loans followed the same pattern. According to another proposal from Iriarte, García Méndez, Ferré, and other republican leaders, no loan could be contracted without the advance approval of the people in an island-wide or municipal referendum, depending on the case.[32]

The section under study was the subject of little debate. Iriarte tried fruitlessly, in the first round, to get it completely eliminated, based on the familiar argument that the Law of Federal Relations governed the issue, for which reason the Legislative Assembly already enjoyed the

---

[26] See prop. No. 285.
[27] Seventeen state constitutions contained provisions similar to the one recommended. Notes and Comments..., page 100.
[28] See art. 1002 of the first internal draft of the Constitution.
[29] See, for example, Prop. 303, commented on in greater detail later, below, page. In the referendum of December 10, 1961, however, after the corresponding action in Congress, section 2 of art. VI was amended to increase the borrowing margin, the setting of which has since then been at the discretion of the people of Puerto Rico.
[30] For other proposals on matters covered by said section, see numbers 25, 59, 94 (VI, 17), 103 (III), 301 and 303.
[31] See Prop. No. 301.
[32] See Prop. No. 303.

powers that they wanted to confer to it there.[33] Figueroa also tried without success to limit the power of the people of Puerto Rico to contract loans, except after approval by referendum.[34]

Finally, Polanco Abreu offered an amendment, which was approved, to eliminate from the text recommended by the Commission the reference to the effect that the power to authorize taxes would not have to be the object of contract. That was done in order to avoid any harmful effect that said phrase might have on the tax exemption program.[35]

## 3.   THE REQUIREMENT OF UNIFORMITY IN TAXES

We will remember that the Organic Law decreed that "The laws for levying taxes in Puerto Rico shall be uniform."[36] Because this topic was originally addressed in the Bill of Rights of the Jones Law, this Commission was the one that understood this matter and not the Commission of General Affairs, which made the initial recommendation on the subject, which later was transferred, along with others, to article VI of the Constitution.

The recommendation of the Commission of Bill of Rights[37] was to repeat in the Constitution the exact language of the provision repealed by the Jones Law. The Constitution of the United States, along with those of 38 states, contained a similar rule.[38] Although neither of the two internal drafts of the Constitution considered such a measure necessary, because it constituted, among other things, a source of disputes, and potential obstacle, even though eroded by case law, to imaginative reforms of the tax system to achieve a fair distribution of wealth, by the time the Constituent Convention had begun its work, its inclusion in the Constitution was already considered an appropriate precaution. The provision came from the first draft of the Bill of Rights prepared by Jaime Benítez.[39]

The Commission's recommendations on that point were accepted by the Constituent Convention, but after an extensive debate on an amendment proposed by Mr. Luis A. Ferré. Ferré supported adding a sentence that read as follows:

"No arbitrary assessment shall be imposed nor shall any confiscatory tax be approved. The maximum rate of tax on real and personal property shall be two percent."[40]

The well-known Ponce industrialist and future Governor of Puerto Rico argued his amendment as follows:

"I, fellow delegates, am a firm believer that the main purpose of all citizen activity is not

---

[33] Journal of Sessions, vol. III, page 2063.
[34] Loc. cit.
[35] Ibid., pages 2063-2064.
[36] Art. 2, paragraph 22.
[37] See section 9 of its preliminary draft. Journal of Sessions, vol. IV, page 2556.
[38] See: Notes and Comments…, for the exact quotations.
[39] Prop. 272, section 6.
[40] Journal of Sessions, vol. III, page 1556. The amendment differed from its original proposal, in which it was set at 1%, and offered the unrestricted opportunity to increase that margin through referendum. See Prop. 301.

CONSTITUTIONAL HISTORY OF PUERTO RICO 219

only the personal profit of the individual, but it is primarily his service to the community. I want people to understand clearly that that is my standard, that is my philosophy and that in my life I have always tried to live in accordance with that standard and that philosophy. But I am also a practical man, and I believe that the happiness of the people, and their prosperity, cannot be achieved unless we are careful not to kill the mechanisms or incentives, in other words, that help the people's prosperity to become a reality…

"We believe that it is necessary to establish that assessments must be of such nature that they do not establish discrimination and that they are not arbitrary in how they are established. We believe that they should not be confiscatory in nature either… Any amount higher than two percent in fact constitutes a mortgage that can, sooner or later, become a power of confiscation of the government to take from the citizen the right to use what he has produced with his work."[41]

The two percent to which Mr. Ferré was referring was less than the normal rate of territorial tax established at that time, which was producing such scant funds. The amendment, which was also fought by the socialist delegation,[42] deepened the division with his old electoral comrades and was defeated.

## 4. THE ELECTORAL PROCESS: SECTION 4 OF ARTICLE VI

The Commission of General Affairs recommended the following on this matter:

"Starting in the year 1952, general elections shall be held every four years on the day in November that the Legislative Assembly shall determine by law. A Governor, a Lieutenant Governor, the members of the Legislative Assembly and the Resident Commissioner in the United States shall be elected in that election. The other officials of popular election shall be chosen in that same election unless otherwise provided by law.

"Any person who has turned twenty-one years of age, and meets the other conditions that are determined by law, shall be a voter and no one shall be deprived of the right to vote because he/she does not know how to read or write, does not own property or for other reasons of an economic nature.

"The legislative assembly shall determine by law everything concerning the electoral process and registration of voters in the electoral registers, as well as regarding the registration of political parties.

"Any popularly elected official shall be elected by direct vote and the candidate for a position who obtains a greater number of votes than those obtained by any of the other candidates for the same position shall be declared elected."[43] The first draft underwent numerous amendments, but none of a vital nature. The distance between the various parties on the […]

---

[41] Ibid., page 1557.
[42] Ibid., page 1558.
[43] Ibid., vol. IV, pages 2619-2620.

# HISTORIA  CONSTITUCIONAL
## DE  PUERTO  RICO

VOLUMEN III

Case:17-03283-LTS Doc#:4781-6 Filed:02/14/19 Entered:02/14/19 18:19:25 Desc:
Exhibit DX-GG-Part 5 Page 367 of 541
Exhibit 77 Page 39 of 16

## JOSE TRIAS MONGE

Juez Presidente
Tribunal Supremo de Puerto Rico
LL.B., A.M., Universidad de Harvard
J.S.D., Universidad de Yale

# HISTORIA CONSTITUCIONAL
# DE PUERTO RICO

## VOLUMEN III



EDITORIAL DE LA UNIVERSIDAD DE PUERTO RICO
1982

216                                JOSÉ TRÍAS MONGE

aprobación de la ley."[20] Quedó claro en el récord que por "legislación elec-
toral vigente" se entendería la que estuviera en vigor al momento de la cele-
bración del referendo y no la vigente al tiempo de la Convención.[21]

Se aclaró igualmente que la frase "bienestar general" empleada en el pri-
mer párrafo de la sección debía interpretarse del modo más lato posible.
Para esa época, para fines de cualificar para la participación en ciertos pro-
gramas de eliminación de arrabales, reconstrucción de zonas deterioradas y
reurbanización era imprescindible una gran claridad en la ley. Para tales fines
principalmente, el vicepresidente de la Comisión y futuro Presidente de la
Cámara y Comisionado Residente en Washington, Santiago Polanco Abreu,
hizo las correspondientes aclaraciones para el récord.[22]

Parte de la intención al redactar esta parte del informe de la Comisión
de Asuntos Generales había sido el deseo de sentar las bases, al reproducir
lo esencial del artículo 37 de la Ley Orgánica, para la derogación futura de al
menos dichas partes de la Ley de Bases calcadas por la Constitución de Puer-
to Rico. Algo de esto se sospechó Iriarte, quien argumenta ante la Convención
Constituyente que, dado el hecho de que el artículo 37 era parte de la Ley
de Relaciones Federales, la Convención no podía introducir cambio alguno
en lo referente al asunto en discusión.[23] Muñoz Marín combatió esta interpre-
tación de las limitaciones que alegadamente surgían de integrar en la Cons-
titución de Puerto Rico una disposición específica en la Ley de Relaciones
Federales.[24]

## 2. EL PODER PARA IMPONER CONTRIBUCIONES Y CONTRAER DEUDAS: LA SECCION 2 DEL ARTICULO VI

La Comisión de Asuntos Generales recomendó la inclusión del siguiente
lenguaje en la Constitución:

"2. El poder del Estado Libre Asociado de Puerto Rico para imponer
y cobrar contribuciones y autorizar su imposición y cobro por los municipios,
se ejercerá según determine por ley la Asamblea Legislativa, y nunca será
rendido, suspendido u objeto de contrato. El poder del Estado Libre Asociado
de Puerto Rico para contraer y autorizar deudas, se ejercerá según determine
por ley la Asamblea Legislativa."[25]

La inspiración de este texto, que con la excepción de una enmienda de
importancia que discutiremos luego se convierte en la sección 2 del artícu-
lo VI de la Constitución, provino principalmente de la proposición que sobre
este particular ofrecieron el presidente y el vicepresidente de la Comisión,

20.  *Ibid.*, págs. 2051-2056, 2077. El texto de la enmienda fue redactado entre Samuel
      Quiñones y Miguel Angel García Méndez.
21.  *Ibid.*, pág. 2054.
22.  *Ibid.*, págs. 2204-2209 y en especial, la 2206.
23.  *Ibid.*, pág. 2058.
24.  *Loc. cit.*
25.  *Ibid.*, vol. IV, pág. 2619.

Yldefonso Solá Morales y Santiago Polanco Abreu,[26] así como de parte del artículo 3 de la Ley Orgánica.[27]

Se discutió con Muñoz Marín la posibilidad de al menos repetir en este artículo lo dispuesto en el art. 3 de la Ley de Relaciones Federales sobre el margen prestatario, como base para la obtención futura de la eliminación de dicho aspecto de gobierno local de la referida ley y de la consiguiente autonomía del pueblo de Puerto Rico sobre tan importante asunto.[28] Se anticipaba fuerte oposición republicana a tal paso,[29] sin embargo, así como posibles dificultades en el Congreso. Se limitó, por tanto, la sección de referencia a delegarle a la Asamblea Legislativa el poder más amplio posible para imponer contribuciones y contraer deudas.[30]

La posición socialista no variaba mucho de la propuesta en el anteproyecto original de Solá Morales y Polanco Abreu, excepto que parte de ella dificultaba seriamente, si no impedía, el programa de exención contributiva industrial, entonces en plena marcha, aunque con mucho camino por recorrer.

La posición republicana era muy distinta a la del liderato popular. La delegación republicana respaldaba limitar en lo posible los poderes del gobierno de Puerto Rico y de sus subdivisiones políticas para imponer tributos. De ahí que Ferré, García Méndez e Iriarte insistieran en reducir la contribución territorial y en autorizar a la legislatura a establecer tan sólo un tipo máximo del uno por ciento (1%), el cual podría ser aumentado tan sólo mediante la aprobación del pueblo en referéndum.[31] Eran bien conocidas, por supuesto, las dificultades experimentadas por los estados que operaban sujeto a este modo de restricción constitucional. En términos de la constitución real de otros lugares, este tipo de limitación redundaba a menudo más en defensa de la plutocracia que de la democracia.

La actitud republicana respecto a los empréstitos respondían al mismo patrón. Conforme a otra proposición de Iriarte, García Méndez, Ferré y otros líderes republicanos, no podría ser contratado ningún empréstito sin la previa aprobación del pueblo en referéndum insular o municipal, según fuere el caso.[32]

La sección bajo estudio fue objeto de escaso debate. Iriarte intentó infructuosamente, en primer término, obtener su eliminación completa, a base del familiar argumento que la Ley de Relaciones Federales disponía sobre el particular, por lo que la Asamblea Legislativa gozaba ya de los po-

26. Véase la prop. núm. 285.
27. Diecisiete constituciones estaduales contenían disposiciones parecidas a la recomendada. *Notes and Comments...*, pág. 100.
28. Véase el art. 1002 del primer anteproyecto interno de Constitución.
29. Véase por ejemplo, la Prop. 303, comentada en más detalle más adelante, *infra*, pág. En referendo de 10 de diciembre de 1961, sin embargo, tras la acción correspondiente en el Congreso, se enmendó la sección 2 del art. VI para aumentar el margen prestatario, la fijación del cual queda desde entonces a discreción del pueblo de Puerto Rico.
30. Para otras proposiciones sobre los asuntos cubiertos por dicha sección, véanse los números 25, 59, 94 (VI, 17), 103 (III), 301 y 303.
31. Véase la Prop. Núm. 301.
32. Véase la Prop. Núm. 303.

218                          JOSÉ TRÍAS MONGE

deres que allí se le querían conferir.[33] Figueroa ensayó también sin éxito
limitar el poder del pueblo de Puerto Rico a contraer empréstitos, excepto
previa aprobación por referéndum.[34]

Finalmente, Polanco Abreu ofreció una enmienda, la cual fue aprobada,
para eliminar del texto recomendado por la Comisión la referencia a que el
poder de autorizar contribuciones no habría de ser objeto de contrato. Esto
se hizo a fines de evitar cualquier efecto nocivo que la dicha frase pudiese
tener sobre el programa de exención contributiva.[35]

## 3. EL REQUISITO DE UNIFORMIDAD EN LAS CONTRIBUCIONES

Se recordará que la Ley Orgánica decretaba que "Las leyes para la impo-
sición de contribuciones en Puerto Rico serán uniformes."[36] Por tratarse ori-
ginalmente este asunto en la Carta de Derechos de la Ley Jones, fue esta
Comisión la que entendió en tal materia y no la Comisión de Asuntos Gene-
rales la que hizo la recomendación inicial sobre el asunto, el que más tarde
se trasladó, junto a otros, al artículo VI de la Constitución.

La recomendación de la Comisión de Carta de Derechos[37] fue la de repe-
tir en la Constitución el lenguaje exacto de la disposición derogada por la
Ley Jones. La Constitución de los Estados Unidos, así como las de 38 estados
contenían una regla similar.[38] Aunque ninguno de los dos borradores internos
de Constitución consideró necesaria tal medida, por constituir, entre otras
cosas, fuente de litigios y obstáculo potencial, aunque desgastado por la juris-
prudencia, a reformas imaginativas del sistema contributivo para el logro de
una justa distribución de la riqueza, para el tiempo en que comenzó sus tra-
bajos la Convención Constituyente su inclusión en la Constitución se consi-
deraba ya una precaución indicada. La disposición provino del anteproyecto
de Carta de Derechos preparado por Jaime Benítez.[39]

Las recomendaciones de la Comisión sobre este particular fueron acep-
tadas por la Convención Constituyente, mas luego de un extenso debate sobre
una enmienda propuesta por el señor Luis A. Ferré. Ferré apoyaba la adición
de una oración que leyese así:

"No se impondrá ninguna tasación arbitraria ni se aprobará ninguna
contribución confiscatoria. El tipo máximo de contribución sobre propiedad
real y personal será de un dos por ciento."[40]

El conocido industrial ponceño y futuro Gobernador de Puerto Rico ar-
gumentó así su enmienda:

"Yo, compañeros delegados, soy un firme creyente en que el fin principal

---

33. *Diario de Sesiones*, vol. III, pág. 2063.
34. *Loc. cit.*
35. *Ibid.*, págs. 2063-2064.
36. Art. 2, párrafo 22.
37. Véase la sección 9 de su anteproyecto. *Diario de sesiones*, vol. IV, pág. 2556.
38. Véase: *Notes and Comments...*, para las citas exactas.
39. Prop. 272, sec. 6.
40. *Diario de Sesiones*, vol. III, pág. 1556. La enmienda difería de su propuesta original
    en que se fijaba el 1 % y se ofrecía la oportunidad irrestricta de aumentar tal margen
    mediante referéndum. Véase la Prop. 301.

Case:17-03283-LTS Doc#:310-84 Filed:02/24/18 Entered:02/24/18 20:14:40 Desc:
Exhibit DX-GG Part 5 Page 371 of 541
Exhibit 7 Page 15 of 15

de toda la actividad ciudadana no es solamente el lucro personal del individuo, sino que es principalmente su servicio a la comunidad. Quiero que se entienda claramente que ésa es mi norma, ésa es mi filosofía y que en mi vida siempre he tratado de vivir de acuerdo con esa norma y con esa filosofía. Pero también soy un hombre práctico, y creo que la felicidad del pueblo, y su prosperidad, no se pueden conseguir si no tenemos cuidado de no matar los mecanismos o los incentivos, mejor dicho, que ayudan a que la prosperidad del pueblo pueda concretarse en una realidad...

"Creemos que es necesario que se establezca que las tasaciones deben ser de tal naturaleza que no establezcan discrímenes y que no sean arbitrarias en su manera de ser establecidas. Creemos que tampoco deben ser de naturaleza confiscatoria... Cualquier cantidad superior al dos por ciento de hecho constituye una hipoteca que puede, tarde o temprano, convertirse en un poder de confiscación del gobierno para quitarle al ciudadano el derecho a usar de aquello que ha producido con su trabajo." [41]

El dos por ciento a que se refería el señor Ferré era inferior al tipo normal de contribución territorial entonces establecido, que tan escasos fondos producía. La enmienda, la cual fue combatida también por la delegación socialista,[42] ahondó la división con sus antiguos compañeros electorales y fue derrotada.

## 4. EL PROCESO ELECTORAL: LA SECCION 4 DEL ARTICULO VI

La Comisión de Asuntos Generales recomendó lo siguiente sobre esta materia:

"Comenzando en el año 1952 se celebrarán elecciones generales cada cuatro años en el día del mes de noviembre que determine por ley la Asamblea Legislativa. En dicha elección serán elegidos un Gobernador, un Vicegobernador, los miembros de la Asamblea Legislativa y el Comisionado Residente en los Estados Unidos. Los demás funcionarios de elección popular serán elegidos en esa misma elección salvo que otra cosa se disponga por ley.

"Será elector toda persona que haya cumplido veintiún años de edad, y reúna las demás condiciones que se determinen por ley y nadie será privado del derecho al voto por no saber leer o escribir, por no poseer propiedad o por otras razones de índole económica.

"La Asamblea Legislativa determinará por ley todo lo concerniente al proceso electoral y de inscripción de electores en los registros electorales, así como lo relativo a la inscripción de partidos políticos.

"Todo funcionario de elección popular será electo por voto directo y se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo." [43] El anteproyecto sufrió numerosas enmiendas, pero ninguna de naturaleza vital. La distancia entre los distintos partidos sobre los

---

41. *Ibid.*, pág. 1557.
42. *Ibid.*, pág. 1558.
43. *Ibid.*, vol. IV, págs. 2619-2620.

# Exhibit 78

**TRANSLATOR AFFIDAVIT**

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: 940-29 Diario de Sesiones Pages and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

Stephanie Penn
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by <u>Stephanie Penn</u>.

_____
Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

"Commonwealth of Puerto Rico
Senate of Puerto Rico

San Juan, Puerto Rico
September 4, 1961

**Report**

To the Senate of Puerto Rico:

The Special Committee designated to study and consider the P. Conc. of S. 3 has the honor of reporting to this Distinguished Body that it recommends approval of the measure without amendments.

Your Committee held hearings jointly with the Special Committee designated by the Chamber of Representatives on August 21, 22, 23, 24, 25, 28, and 29, 1961. The following gave statements at these hearings: José Ramón Noguera, Secretary of the Treasury; Rafael Picó, President of the Government Development Bank for Puerto Rico; Francis Bowen, First Vice President of said Bank, and Ramón García Santiago, chairman of the Planning Board – all public officials. Moreover, the following individuals gave testimony: Rodolfo Aponte, Vice President of Banco Popular; Esteban Bird, Executive Vice President of Banco Crédito y Ahorro Ponceño, who also appeared in the name of the Association of Bankers; César Vizcarrondo and S. L. Descartes, who appeared in the name of the Chamber of Commerce of Puerto Rico; Webster Pullen, Vice President of First National City Bank of New York, in charge of Puerto Rico business; Roberto de Jesús, President of Banco de Ponce; Francisco de Jesús, Vice President of Chase Manhattan Bank in Puerto Rico; Leandro Cabranes, executive director of the Association of Mayors of Puerto Rico; Emiliano Pol, certified public accountant; and Juan Diez de Andino, as a private citizen. The Committee also had before it written briefs in support of the resolution, from José R. Noguera, Secretary of the Treasury; Francis Bowen, First Vice President of the Government Development Bank; Dr. Rafael Picó, President of said Bank; and Ramón García Santiago, Chairman of the Planning Board.

The aforementioned public officials and individuals who appeared in the name of the listed institutions or on their own behalf favored, with the exception of Mr. Diez de Andino, the principle involved in the constitutional amendment under consideration which would set the borrowing limit of the Commonwealth of Puerto Rico on the basis of a relationship to the Government's revenue instead of the current system, which is based on a percentage of the appraised value of the property.

By means of Joint Resolution number 1, approved on June 23, 1958, the Legislative Assembly of Puerto Rico asked the United States Congress to remove from Section 3 of the Puerto Rico Federal Relations Act the provisions relating to the establishment of a borrowing limit for the Commonwealth and the municipalities of Puerto Rico.

In accordance with said request, the United States Congress approved Public Law number 87-121, which was sanctioned by the President on August 3 of this year. This Law abolishes Section 3 of the Puerto Rico Federal Relations Act, employing the following language:

"Providing, however, that no public debt of Puerto Rico and the municipalities of San Juan, Ponce, Mayagüez, Arecibo, and Río Piedras will be authorized if it exceeds 10 percent of the total appraised value of its properties, and no public debt of any other subdivision or municipality of Puerto Rico will be authorized from here on out if it exceeds 5 percent of the total appraised valuation of the property existing in any of those subdivisions or municipalities…. In computing the debt of the People of Puerto Rico, municipal bonds for the payment of whose principal and interest the good faith of the People of Puerto Rico would have been pledged up until this time will not be counted, and neither will the bonds issued by the People of Puerto Rico guaranteed by an equivalent sum of bonds of the municipal corporations or school boards of Puerto Rico; but all the bonds issued from here on out by any municipality or subdivision within 5 percent of what is authorized herein, for which the good faith of the People of Puerto Rico is pledged, will be counted."

Said Federal statute also specifies that its provisions will take effect as soon as the eligible voters of Puerto Rico have voted in a referendum in accordance with Article VII, Section 1 of the Constitution of the Commonwealth of Puerto Rico to include in said Constitution provisions that replace the above-transcribed pertinent provisions of Section 3 of the Puerto Rico Federal Relations Act, limiting the borrowing capacity of the Commonwealth and its municipalities in accordance with those proposed in a Concurrent Resolution approved by the Legislative Assembly.

Concurrent Resolution number 3 of the Senate and Concurrent Resolution number 5 of the Chamber, which are identical and are now being considered by the Legislative Assembly, contain provisions to totally and fully comply with the provisions of Public Law number 87-121 of the United States Congress. When approved by the Legislative Assembly and the eligible voters of Puerto Rico in a referendum, they will abolish the already-transcribed provisions of the Puerto Rico Federal Relations Act and include appropriate provisions in our Constitution establishing the borrowing capacity of the Commonwealth and the municipalities of Puerto Rico.

Currently, under the provisions of the Puerto Rico Federal Relations Act, the borrowing limit of the Commonwealth and the municipalities of San Juan, Ponce, Mayagüez, and Arecibo is established at 10 percent of the appraised value of the property and 5 percent of said appraised value for the rest of the municipalities. This formula, while flexible, since the borrowing capacity grows with the increase of property value and the increase in its appraisal, has failed to provide the appropriate means of contracting the Commonwealth's public debt in view of Puerto Rico's great economic growth in recent years and the correlative need of having to offer bigger and better public services to the people of Puerto Rico.

The need to increase Puerto Rico's borrowing margin becomes glaringly evident in view of the fact that as of July 31, 1961,

The Legislative Assembly will set limits for the issuance of direct obligations by any municipality of Puerto Rico for money borrowed directly by said municipality made evident by bonds or promissory notes for the payment of which said municipality's good faith, credit, and power to impose taxes are pledged; providing, however, that none of said bonds or promissory notes will be issued by any municipality in an amount which, together with the amount of all of such bonds and promissory notes issued up until that point by said municipality and in circulation exceeds the percentage established by the Legislative Assembly, which will not be less than five (5) percent or more than ten percent (10%) of the total amount of the valuation of the property located in said municipality.

The Secretary of the Treasury may be required to allocate the available resources, including surpluses, to payment of the interest on the public debt and the amortization thereof in any situation to which Section 8 of this Article VI is applicable by means of a lawsuit filed by any holder of bonds or promissory notes issued in evidence thereof."

Article 2. – This amendment will take effect when ratified by the majority of the voters who vote on it in a referendum held for that purpose.

Ca borrowing margin of approximately $3,000,000 remained available to the Commonwealth. Since we were aware of this situation, which was anticipated some years earlier, the Concurrent Resolutions currently under consideration by the Legislative Assembly contain provisions that must be included in our Constitution, establishing the borrowing margin of the Commonwealth and the municipalities of Puerto Rico in a more flexible, realistic manner and in keeping with sound economic principles. The proposed provisions use the amount of the revenue collected by the Government from internal sources during the fiscal year prior to the one for which a debt would be contracted as a basis for establishing the Commonwealth's borrowing margin. This revenue does not include income from federal contributions, customs duties, and taxes on shipments because the imposition of these public revenues is not under the control of the Legislative Assembly of Puerto Rico. This makes the formula more conservative, since said revenues can also be used to pay the debt.

The limitation is established in terms of requirements for payment of principal and interest higher than in any year of maturity of the existing debt and the debt whose authorization is contemplated at that time, plus any payment that the Commonwealth may have had to make in the previous fiscal year for bonds guaranteed by the Commonwealth issued by public agencies or corporations. When the aforementioned payment requirements plus the amount that the Government may have had to make for secured bonds comes to 15 percent of the revenue from Commonwealth sources during the previous fiscal year, the Government may not incur more direct obligations and it may not guarantee more bonds of public instrumentalities. For example, assuming that Government revenue from internal sources in the fiscal year prior to the one for which there is intention to sell a certain number of authorized bonds is $200,000,000, 15 percent of this amount would be $30,000,000. Supposing that the requirements for payment of higher principal and interest in the remaining years of life of the already-issued bonds were $15,000,000, an additional $15,000,000 would remain for assuming payment of the annual requirements of future obligations.

Consequently, one will note that under the proposed formula, the limit of debt that can be incurred is expressed in terms of the amount of money available to amortize the debt, rather than being expressed as it currently is, in terms of the total amount of money that can be borrowed at a certain time. Under the current system of law, the borrowing margin is approximately $190,000,000, in other words, 10 percent of the appraised value of the property, which is approximately $1,900,000,000.

If one wanted to translate this borrowing margin of $30,000,000 (15 percent of $200,000,000 in revenue) to a more-or-less fixed sum, one could calculate historically on the basis of the average interest rate and the pattern of maturities of the existing debt or, if one wanted a more exact basis, one could use the pattern of maturity and the interest rate paid in the most recent bond issuance. Basing ourselves on the

most recent bond issuance of the Commonwealth for $40,000,000 sold in March of this year, and using a pattern of maturities for a maximum of twenty years and an interest rate of 4 percent per annum, we could say that the Government's currently available borrowing margin would be $212.4 million, with available revenue in fiscal year 1960-61 of $204,000,000. In performing this calculation we assumed that there would be a free margin of $15,000,000 for the contracting of new debt, and that the remainder of the 15 percent of $204,000,000 (over $15,000,000) would already be committed for payment of principal and interest on the bonds in circulation.

We want to emphasize, however, that we are using these examples for the sole purpose of demonstrating in practice how the mechanics of the proposed formula for establishing the borrowing limit through the constitutional amendment under consideration would work. The true limitation is based on the capacity to repay the borrowed money, expressed in terms of a fixed percentage (15 percent) of the annual revenue available to pay the principal and interest on the direct obligations issued by the Commonwealth. Once the amount reflected by that percentage is committed to paying, annually, the requirements of the debt made evident through bonds and promissory notes directly by the Commonwealth, the borrowing capacity will be exhausted.

As one can see from this analysis, the proposed formula for establishing the Commonwealth's borrowing margin is more flexible and realistic than the one currently being used. It is based on the Government's available resources, which is the true source for addressing the Commonwealth's obligations, and not on a percentage of the appraised value of property, which is not a true index of the payment capacity. It should be noted that the proposed formula is actually in harmony with Article VI, Section 8 of our Constitution which, in summary, provides that the Commonwealth's available resources will be used first to pay interest on and amortization of the public debt. Although currently, as a factual issue, the property taxes are used to address payment of the public debt, the truth is that, because of the terms of the aforementioned constitutional provision, all Government resources are committed to those items. These days the proceeds of the property tax represent just 7 percent of Government revenues.

Under the current system, the borrowing margin grows with the increase of property value and the increase in the value of its appraisal. These factors are not necessarily under the control of the Legislative Assembly. However, under the proposed formula, the Legislative Assembly would have more absolute control over the borrowing margin.

Although the principle of the proposed formula of establishing the borrowing margin at a percentage of the Commonwealth's available resources seems novel in the context of public fiscal policy, it has long been used as a basis for authorizing the issuance of income bonds by public and private corporations. In general, the capacity to issue these types of bonds is based on a percentage of the income or of the requirements for payment of said corporations' debt. Moreover,

the states of Connecticut and Mississippi recently adopted legislation establishing the State's borrowing limit at a percentage of its annual income. Although the system used in said states is not the same as the formula proposed in the constitutional amendment under consideration, it follows the general principle of relating the public debt to the Government's income.

Regarding income bonds, it should be made clear that the bonds which have been and may be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into consideration in computing the Commonwealth's borrowing margin since the good faith of the People of Puerto Rico is not committed for their payment, and they will continue to be paid only from said corporations' revenues. Only when the Commonwealth guarantees any of these bonds, which it has not done to date, and has to pay, in a certain year, a deficiency of their debt requirements, will the amount thus paid be counted against the Commonwealth's borrowing margin.

The proposed constitutional amendment limits the public debt to obligations of the Commonwealth made evident only through bonds and promissory notes issued directly by the Commonwealth. Bonds and promissory notes means the type of classic, negotiable obligation sold on the U.S. securities market. It does not include the current or contingent obligations or debts of the Commonwealth normally incurred to address the Government's operation. The language used in the amendment clarifies the rule that has been followed in practice until now.

The proposed amendment to the Constitution will not affect the credit and the sale of the bonds of the Commonwealth of Puerto Rico in any way. On the contrary, a survey conducted by the Secretary of the Treasury and the President of the Government Development Bank for Puerto Rico on the U.S. securities market with prominent figures from the banking community shows that the proposed formula not only has the approval and acceptance of all of them, but that, in their opinion, it will improve the credit and viability in the sale of Puerto Rico bonds. Puerto Rico's good credit on the U.S. securities market is based mainly on its promptness, throughout its history, in paying its obligations, on the good judgment it has exercised in contracting the public debt, and on not using subterfuges to evade the limitations imposed on it. The record contains interesting testimony from various public figures in the U.S. financial arena frankly and openly endorsing the proposed constitutional amendment. There has not been a single source of credit of the principal sources that the People of Puerto Rico use in selling its bonds that has come out against the new formula. Some of them believe that it gives Puerto Rico the opportunity to make a valuable contribution in the field of fiscal policy science with the approval of this amendment.

Another provision of the proposed constitutional amendment that it is believed will substantially help in the sale and rating of Puerto Rico bonds is the one that gives the bondholders the right to sue the Commonwealth in the event of non-payment of the debt. This provision makes reality the provisions of Article VI, Section 8,

which commits the Government's revenue to preferential payment of the principal and interest on the public debt. The State of New York and other States of the Union have analogous provisions in their Constitutions. This waiver of the Commonwealth's immunity from lawsuits will result in greater acceptance and higher rating[s] of our obligations.

As for the municipalities, the constitutional amendment provides that the same method that is currently used under the Puerto Rico Federal Relations Act to establish their borrowing margin will continue to be used. The only difference is that, instead of setting a limit of 10 percent of the appraised value of property for the municipalities of San Juan, Ponce, Mayagüez, and Arecibo, and 5 percent for the rest of the municipalities, it is provided in general terms that the Legislature will set the borrowing limits, which may not be less than 5 percent or greater than 10 percent. Naturally, any limit between 5 and 10 percent may be established.

It is the intention to use the value of all the appraised property in the various municipalities with the exception of that which is not subject to taxation. However, in calculating the borrowing margin of the various municipalities, the appraised value of those properties that are used as their owners' homes and for which, by legislative action, the tax to be paid on them has been or will be reduced to a certain amount of the appraised value, will be included. This distinction between the property that is totally exempt from taxation and the properties used by their owners as homes is made, because this latter has to be retained on the lists of properties subject to taxation, inasmuch as if it is assessed for tax purposes in an amount greater than the tax-exempt amount, taxes will be collected on the remainder, and also because if it stops being used as the owner's home it is again subject to taxation. There is also another reason for including this class of property when calculating the municipalities' borrowing margin, and that is the fact that they will not be subject to a decrease in their revenue because of the legislation reducing taxes on properties used as their owners' homes, since the Legislative Assembly has taken steps to reimburse the municipalities for the amount they stop receiving because of such reduction.

This type of property would be available in the future for the payment of taxes if the Legislative Assembly considers this advisable and necessary for addressing the payment of the public debt.

In recommending favorable approval of this measure, the Special Committee is aware that its approval is necessary for our People's economic development.

Respectfully submitted,

**Yldefonso Solá Morales,**
Secretary

**Cruz Ortiz Stella,**
Chair."

Mr. García Méndez: Mr. President.

President Pro Tempore (Mr. Reyes Delgado): Mr. Senator.

Mr. García Méndez: We wanted to emphasize and have it clearly placed on the record that this report by the Special Committee appointed to examine and consider Concurrent Senate Resolution 3, does not clarify that the vote against was cast by those of us Senators who represent this minority sector of the Senate to specify the grounds in the discussion today of the Resolution on its merits, and we want it to be made clear so that it will not appear to be a unanimous report.

Mr. Ortiz Stella: Mr. President, Mr. García Méndez is correct. The report was approved by the majority.

President Pro Tempore (Mr. Reyes Delgado): This must be noted in the record.

Mr. Ortiz Stella: I don't have any objections to that being noted in the record.

Mr. Chairman, I am going to request permission to use my time now to speak in defense of the resolution and the report.

Mr. García Méndez: Mr. President, before my distinguished colleague uses his turn, we would like to state for the record that we have two amendments which, in our opinion, are important to make to the text of the Concurrent Resolution.

If my colleague would like to use his turn to defend the report as written, he will obviously not be able to address the matter related to the amendments that we will propose. The practice has normally been to discuss the amendments and then request a turn to defend the draft as amended, if it has been amended, or as written if it has not been amended. However, I would not object to my colleague stating his arguments in this report defense turn, but making it clear that we have not relinquished and that, on the contrary, we reserve the right to raise these amendments that we've brought in order to submit them for the Senate's consideration.

Mr. Ortiz Stella: I'll go even further, Mr. Chairman. So that it's perfectly clear, uh, that this turn of mine to make a statement in defense of the report and resolution as it was submitted by the Special Committee, completely preserves the right of Mr. García Méndez to propose any amendments to this resolution that he deems appropriate.

President Pro Tempore (Mr. Reyes Delgado): Is this to use your turn now?

Mr. Ortiz Stella: Yes, Mr. President.

President Pro Tempore (Mr. Reyes Delgado): Go ahead.

Mr. Ortiz Stella: Mr. President and colleagues of the Senate: I am going to defend the report of the Special Committee to which the Concurrent Senate Resolution No. 3 refers and I am going to request a vote in favor of that resolution.

As co-author of the report that was just read, necessarily some of the concepts already set forth in that report will need to be repeated during this turn of mine that I am going to use now.

I do not have the imagination of Victor Hugo to prepare a report on this Resolution and then make a statement setting forth completely new ideas. Therefore, I wanted to inform my colleagues that what I am going to say is most likely already stated in the report.

The provisions on the public debt of the Commonwealth and its municipalities are included presently in Article 3 the Federal Relations Act, which in pertinent part states as follows:

"It is ordered, however, that public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Mayagüez, Arecibo and Río Piedras shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality;

"In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

By virtue of public law No. 87,121 of the United States Congress, these provisions on public indebtedness shall be stricken from the Federal Relations Act as soon as the qualified voters of Puerto Rico approve an amendment to the Constitution containing all matters related to such public indebtedness. Article 2 of said Public Law No. 87,121 states as follows:

"Article 2. –

This is Article 2 of the Joint Resolution of the Federal House of Representatives which became Public Law No. 87,121.

"Article 1 of this Act shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to Article VII of the Constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of Article 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities, as proposed in the Concurrent Resolution of the Legislative Assembly of the Commonwealth."

This means that once this Resolution is passed by both Chambers, given that it is a Concurrent Resolution it does not have to be signed by the Executive Branch, until the people of Puerto Rico approve this proposed amendment to the Constitution, the provisions on the debt-incurring capacity of the Commonwealth and its municipalities will remain valid in the Federal Relations Act.

In accordance with the provisions of said Congressional Act, Concurrent Resolution No. 3 is hereby presented to this Senate, and Concurrent Resolution No. 5 is filed in the House, which resolutions propose an amendment to Section 2 of Article VI of the Constitution of the Commonwealth

headquartered in New York, stated on that occasion that said method should not be changed. And now we will change it if you vote to do so on the grounds that it is obsolete. You've asked us to cast our vote in favor and we will, if you can ensure us that there is a guarantee of a maximum limit so that it will be noble, and noble refers to the portion that it is still part of an experimental process. Noble is not what is already guaranteed with the patina of experience, the way that old system is. A system that has been in place ever since the change of power in Puerto Rico, that noble system we have to accept as something "non plus ultra" and does not serve the system that was defended by the experts.

And the piece of legislation, Mr. President and colleagues of the Senate, installs the same system for the municipalities as stated by Senator Colón when he proposed his amendment, Thus, it is obsolete at the state level, but is still magnificent for municipalities.

Is it possible that we are being asked to simply vote, without explanation, in a case such as that? Why is it that the system of 15% availability with respect to State revenue is used, but the 5 to 10% assessed property valuation system is used for municipalities? Why? Because the state system, the first model, the first method, the first formula, produces even more than what is necessary. And the second method, for municipalities, produces much more than what is necessary. If someone asks at the public hearings: how is it possible if in the municipalities, where the impact of the $15,000 per household tax exemption is felt, that this is produced? Answer: It doesn't matter because in the budget municipality expenses are covered through allocations. Thus, they have the allocations in the budget, and moreover, they can issue bonds for up to the maximum limit allowed in the budget based on the assessed property valuation. Third gap for expanding the infinite limit, and I believe I have used the customary phrasing to refer to it, to that 15% availability limit.

We must not, and I have said it four times already, impede increases in public services, or the growth of the economy. But I do not believe, fellow Senators, that we should sign a blank check for 50 years. When in amendment is made to the Constitution and it is done by referendum, what does that mean? When we speak of the constitutional realm, unlike the legislative realm, what does that mean? That means that the people who have to approve this are not the municipalities, or even the legislators with their representative power, but rather the people in a direct vote. That is what that means. So then, the purpose set forth in this bill, what is it? It is to not make amendments to the Constitution in 50 years.

That does not fulfill the congressional purpose. No. It does not fulfill it. Because the purpose has been for us to secure the authority that Congress had before. But for us to put it in the place where it is most guaranteed, which is

in the Constitution. And every time we get close to the outer limit, then another amendment comes for the people to have the opportunity to vote in a referendum and in that way it is not an empty provision. It is not a myth, it is a provision that means what it says, not merely words in the Constitution, because it is for them to be there for 50 years, without people having a chance to vote again on whether or not to increase the debt-incurring capacity.

There are risks of there not being enough money for the 10 or 12 or 15 or 20 years. According to the amendment that we prepared and submitted for the consideration on our colleagues, answer, there is no risk. Why is there no risk? Because the ceiling does not prohibit flexibility. And I am going to repeat this because it is part of my presentation so that it is clear in the record.

If the people of Puerto Rico, based on this noble method, as the expert himself has stated, and is not using anything more than in two other similar states, not identical, can use 30 million this year to pay the principal and interest of the bonds that are issued on the promissory notes that are executed, and reporting the additional public debt of the people of Puerto Rico plus the debt that Puerto Rico already has. It must not be forgotten that as the years go by and that amount is amortized over time, when 30 million are paid, 25 million in principal, that 25 million has automatically increased the debt-incurring capacity. And the ceiling in no way impairs that flexibility, because the ceiling continues to be the amount that is available, and that is being used, because the debt is much less given that it has amortized one year, or two, or three, or four, or ten years.

But moreover, we must emphasize that the Secretary of the Treasury provided us with a very illustrative exhibit. And that exhibit states that there is a normal progressive increase in income of the Commonwealth's treasury, which indicates that on average, the increase results in 18.5 per year. Thus, given that it boosts the economy, and that 15% automatically grows as well because it is 15% of an amount that has risen by 18.5 million. Also because when the first 25 million is paid, the margin has increased because there are funds available for use. And if it's two years then it's fifty, and if it's three years then it's seventy-five. Flexibility is still working, and the only thing that creates the ceiling is guaranteeing against potential excesses and calling attention to them, nothing more. Remember that that's where the ceiling is. Remember that that's where this ceiling is. That is what the members of Congress asked about when this legislation was put to a vote.

I repeat what I said at the beginning. If I use a strong tone of voice it doesn't mean that I am being brazen, or that I wish to debate argumentatively, but is simply the result of improvisation, just so that my distinguished colleagues do not misunderstand me.

What was discussed in that record?

Listen to these words that I am going to translate, so that you can tell me, and our colleagues who have this record know that I am speaking the absolute truth.

On Page 10, Congressman, Vice President Mr. O'Brien gives the floor to Congressman Westland, and Mr. Westland makes the following statements.

Page 10, record of the public hearings before the Sub Committee on Territorial and Insular Affairs of the United States House of Representatives, Washington D.C., March 1961.

"I have a couple of questions I would like to ask. I have no basic objection to this legislation. In fact, it appears as though a father is saying it to a son, you are already a grown up, and you should know how to use money in the way that a grownup does. But I understand that if this resolution is passed, this resolution 124, it will only take effect when the voters of Puerto Rico, by a majority of votes, have passed a law that provides for a limitation that automatically curbs the limit of the debt margin. Is that correct or not?

Dr. Fernós: Correct. That is correct. There will be no lapses between the effective date of this resolution and the start of the amendments to the Constitution. There will be no time periods where there is no limit at all. It will be this one or the other one that is being written into the Constitution of Puerto Rico, but there will always be a clear limit.

Mr. Westland, once again: I would like to ask the Treasury Secretary of Puerto Rico, what type of debt-incurring limit proposition are you proposing?

Mr. Noguera, José R. Noruera, Treasury Secretary: Responds, I cite and translate: A resolution is being studied by both Houses proposing an addition of 10% to be allocated to schools and roads. They haven't finished. There may be some change, he says in English. But that is the proposition. An increase of 10%.

Mr. Westland: So then you are going to have a limit of 20%, is that right?

Mr. Noguera, answer: Of our assessed property valuation.

Mr. Westland: What is the assessed property valuation there, now? Is it 10%? Suppose that a person has a house worth $20,000. What is the assessed valuation of that property? \

Mr. Noguera: The assessed valuation is computed on the basis of 90% of the market value of 1957.

Mr. Westland: It would be assessed at 90% of the market value?

Mr. Noguera: Yes, in 1957 which was the last time we made a recomputation of value. And it is 90% of the market value of 1957 for assessed valuations.

Mr. Westland: That is a pretty high-assessed valuation. What are we doing in the state of Washington? Ours is way below that. Is it not?

Mr. Hansen (another congressman, who had not yet spoken): Ours is way too low.

Mr. Westland: And you could issue bonds up to twenty percent of ninety percent of the market value property, is that it? You could then, with the amendment, make loans, issue bonds up to twenty percent of ninety percent of the market value property, is that it?

Mr. Noguera: With the condition that these are 1957 values. And as time goes on, the percentage is not                very                realistic

Mr. Westland: Because the market value will increase, you assume?

Mr. Noguera: That is correct.

Mr. Westland: Let me ask you this. Say there is a 20-year bond, what interest are you paying now?

Mr. Noguera: The last issue was paid 3.89%.

Mr. Westland: And that is a tax exempt bond?

Mr. Noguera: A tax exempt bond.

Mr. Westland: Would it be a tax exempt bond if I were to buy it?

Mr. Noguera: Yes sir.

That is a fairly high rate of interest, is it not, for tax-exempt security with the kind of credit that Puerto Rico has?

Mr. Noguera: In June it usually comes to about half percent more.

The Treasury Secretary was very honest answering you without subterfuge. No, in June it was still a half percent more. No, in June it usually goes up a half percent more.

Mr. Westland: How are your bonds rated? Double A, Triple A.

Mr. Noguera: A.

Mr. Westland: Well, that does not sound too good, Mr. Noguera. If this resolution passes, and I am sure you have considered this part more than I and are far better qualified to consider it if an increase in your debt limit goes up to 20%, would you not get a corresponding increase in the coupons on your bonds?

Mr. Noguera: "No Sir, I do not think we will. I do not think we will because in the last issue, May and June, it was considered, explained and put in the papers given to the syndicate that there is a plan to do just this that is being considered by this Committee and did not have any effect."

Mr. Westland: "Is there any indenture of any of your present issues outstanding to the effect that you will not increase your debt ceiling during the life of the bonds?"

Listen closely to the question: That limit, not the unlimited, but rather the limit or the ceiling of what Westland is asking him.

Mr. Noguera: "No Sir." There is not one on the bonds today.

Mr. Westland: "So then you have about one million nine assessed valuation and this would give you 380 million."

Mr. Noguera: Three hundred eighty millions."

Mr. Westland: "That is a little better than double, of course what you have now."

Mr. Noguera: "Yes."

And he continues asking questions, and the response follows, related to details that do not make the point that we are discussing, but rather if the good faith of the people of Puerto Rico is used and applied, and concludes, so as not to make this citation long, longer, with these words:

"Just as a note of caution, may I say that you have done real well under this present set up and I can understand, as your economy grows, you will perhaps need more working capital, but it has been doing real good and do not through an increased debt limit and just putting that much more money in the back of your people of Puerto Rico spoil it."

That is what Westland said before voting on the resolution and this is what many more congressmen say, in particular another one who is here and in the end states it with a much longer reference.

Aside from that statement, Mr. President and Senate colleagues, not another word was spoken in the public hearings about what the limit would be, except for this, which was on March 6, 1961. We are no longer with those resolutions, No. 24 and No. 1302, no. We are just a few months away from coming to discuss this legislation and the Treasury Secretary of Puerto Rico, when he is asked, says that what is being studied is an increase of 10%. And this representation, he has said to you, that if you want, we will pass the bill right now, not based on the 15% which was the settlement that we were going to reach two years ago, but based on 20%, that is, in order to not make the Treasury Secretary of Puerto Rico look bad, to defend the integrity of the highest officer on treasury matters of Puerto Rico, we would pass this amendment and you would not only be pleased with the limit of 380 million today, which is doable, because today we have a margin of 190 million, but rather with the flexibility that I've already discussed, which works in two ways: one, through the increase that there has been year after year in the income of Puerto Rico, and two: through the reduction there has been with the amortization of the annual payments.

Is this clear or is this not clear, fellow Senators? It is not 380 million, it is much, much more than 380 million. But what is more, the restrictions of the Federal Relations Act [Ley de Relaciones Federales] were the basis for the assessed property value and the basis for the assessed value had an inflexible limit. This limit, as fellow Senator Ortiz Stella has so perfectly and correctly observed, this limit's most valid factor is flexibility. Yes, that is true, it is flexible in those two ways and it is also flexible in this third way, which has not been discussed, that rather than issuing bonds or signing promissory notes, burdening the good faith of the people of Puerto Rico for ten years, this project says 30 years, which means that that 380 million may become 600-and-something million if it is based on 20 years as an invariable rule, and may be closer to 900 million.

If I am mistaken it is only in that it is necessary to reduce it for interest payments, but it is mathematically accurate that a loan of 100 thousand, taken for 10 years, can become 200 thousand for 20 years, after the higher interest rate declines to 190 or to 185, because in the first years it is necessary to pay more interest, but as each year passes, the interest automatically goes down, because it is applied to the balance after amortization, which is not the original debt.

Thus, there is also that flexibility, but now, fellow Senators, we are not opposing that flexibility. We are saying that you should accept the 15% formula. You don't like it, you believe it is obsolete. We are joining with you in paying homage to that gentleman who is an expert in finance, who tells us that this method is the most appropriate, even though it is new and since he is the one who is in the trenches with the bondholders, since he is responsible for convincing them to continue buying bonds, in that regard we have to be pragmatic.

We accept that method, but we are accepting it under the condition that it not be a blank check, we are applying our amendment, and we are leaving you the alternative, first of all: either you apply the 10%, which is the only thing Congress was told was going to increase and we are not opposed. Or, you increase it based on that flexibility of 15% availability, but we apply to it a

ceiling so you don't say later on, "Well, you have done to us what Guillermo Rodríguez said you would. You have done it to us. " You may very well say that, God knows you shouldn't say it, but you may say this, which Guillermo Rodríguez said today, May 23, '58. He said: "Evading the law hurts credit. Creating authorities for the lending limit, creating authorities when the lending limit is based on the same property, should not be done." In other words, one may very well say: "Fine, but this is what you told us and now this other thing is happening."

And this other thing is happening despite the fact that the obsolescence argument has no validity, fellow Senator Cruz Ortiz Stella. Why? Because the same method applies to municipalities. And this here is in the very text of the law itself. And then you say: "Ah, well, that's going along a tangent in order to make the loan bigger and bigger and bigger and bigger." And then you will think, where is the austerity? Where is the soundness in a method for a people that has just given the authority to do that, for it to set its limit, where is the self-control? It is nowhere. And you might say that, and you will say that, possibly, for the obvious reason that here is a report, of which you have a copy, which says that a highway department could be declared or established, similar to one of the authorities, and why not, the authorities' debts are calculated against Puerto Rico's public debt, since another amount could be applied to highways without need for that 10%. This Legislature's report said that when the resolution was approved, or rather, when Senate Resolution No. 24 was discussed, that this could be done, but you did not want to do that.

So now you're going to say, "Well, here, the right thing has been done in another way," circling around the congressional provision that said, "Sure, why not, do it yourselves. But listen carefully, pay attention, use your self-control, don't go too far."

I don't want to exhaust your attention too much, although I could go on explaining even much greater and stronger fundamental issues, but note, this thing about the ceiling did not originate with me. Look at the monthly letter from First National City Bank on the economic and business situation. The chairman of that bank came, from this First National City Bank, and he is human, he is human, and if you call him and invite him, then he will come and make a statement, and he says:

"Yes, the method appears sound. Current writers and economists believe it is the best, it offers the greatest flexibility."

That is all he says, and that is what Chase Manhattan Bank Vice President Francisco de Jesús said, but his brother, Roberto de Jesús said: "I believe in that method and I believe that method should also be used in the municipalities, but I believe in clear limits."

That is what the Chairman of Banco de Ponce said, who is the brother of the Chase Manhattan Vice President. But both First National City Bank and Chase Manhattan, as well as Banco de Ponce, their representatives came and they were asked to say something and they said what we ourselves are saying here. That even though he isn't a Nobel prizewinner, as one expert says, we trust the expert's word and we are voting in favor of creating a new system, establishing a new system, with the natural reservations that this is bad and so therefore we are changing our vote to prevent exaggerations

from being made or excesses from being committed based on this unlimited margin. But the same bank, whose chairman came here the other day in August, in his monthly letter for that same August, for that same August – I believe this has greater authority than the other. What does it say here? "Public Debt Limit." Note here that this is now the national debt – and pardon me if I am taking up a bit of your time, even though it is not very long, it is quite short.

"Since the Administration requested only a temporary increase …"

That is, the Administration goes to Congress every year and tells it: "Look, we are reaching the limit, raise it." And it is asking Congress to do that. But when the budgets are balanced, as happened, unless I am mistaken, in '54 or '55 and one more year afterwards, when President Eisenhower presented balanced budgets with surpluses, Congress lowers the limit, it lowers it and raises it. In the national system that is the system by law. That is, Congress is the one that acts. And it says here:

"Since the Administration requested only a temporary increase, the Money and Credit Committee report requests abrogation of the limit with a view to extending the range of the discretional management authority exercised by the federal government's Executive Branch. The debt limit does not restrict it."

I am reading this word for word, from page 88 of this report:

"The debt limit does not restrict it. Over time the debt increases or decreases as a result of the federal budget deficit or surplus, not because of any law that establishes an extreme that cannot be exceeded."

Of course, why? Because of that revenue flexibility. And what has happened? What happened here. Here we have exceeded the budget margin. Let us speak clearly. Here we recently passed, because of certain needs the Authority had, and for that reason we passed that law, transferring 6 million to one of the Authorities and now, as fellow Senator Ortiz Stella has said with complete intellectual honesty, we are by law at 3 million in another margin. That does not mean it cannot be exceeded. There is the flexibility that ever more comes in, and also property values are higher. Reason: Well, the increase in the economy's growth. These are values, these are factors of the economy itself, that simply function and each day improve the situation for a country's development. And then it says:

"The Commission noted that not only did debt limits fail in the attempt to encourage fiscal responsibility and control expenditures …

Notice that there was no complete control even under the limit, but rather they restricted the Treasury's freedom in its management tasks. And then it says:

"… it has been a trend to restrict government power with regard to incurring debt. As a reaction to past difficulties caused by excessive borrowing, the constitutions of almost all states prohibit or restrict borrowing, except by constitutional amendment or popular referendum. For that very reason, the importance of the federal government's limits as borrower is doubled if it is necessary to preserve the value of the dollar and prevent a creeping inability to pay due to inflation. Under the Federal Constitution, the government has the power to coin money. The first power has been delegated to the Federal Reserve, which reports to Congress. The second power, to borrow money, was delegated to the Executive Branch, with two principal restrictions: the debt limit, and the interest rate of 4 1/2% that it pays on Treasury bonds."

Thus, the Congress of the United States has never, never been willing to delegate that right. The Congress of the United States has firmly maintained that there must be two limits: the debt limit itself, and the interest rate limit.

Then, this same monthly letter reads:

"During his term as Treasury Secretary, George M. Humphrey declared himself a firm supporter of the idea of limiting the debt, saying: 'I believe it is very healthy to apply the brakes, which means the current debt limit for the Executive Branch, for Congress and for all interested parties, and I believe it is equivalent to penetrating a safety barrier, an explosion is produced upon passing it and that is as it should be. Public opinion is in favor of it and I believe it prevents spending beyond the fixed amount. Therefore, I declare myself to be in favor.'"

The letter then ends saying:

"When the debt limit is debated, Representatives and Senators, newspaper editors and citizens in general have the opportunity to stop and weigh the harm caused by unlimited federal expenditures, and these losses are enormous, erosion in the value of the currency and of all promises of future payment and taxation that ends up suffocating productive effort.

"The archives of Congressional debates are tarnished with examples of how expenditures have been rising, which require lifting the debt limit.

"A few years ago, one of the debates on increasing the limit gave rise to this comment by Congressman Forester of Georgia:

"'This day is a dark one for the country. In the end, we find ourselves at a point we should all have anticipated. Spending that ignores the future has led us to this situation. I wonder whether the President's request to increase the debt limit has restored any sobriety to us. It is clear that the country long ago fell into a drunken stupor, but unless we wake from it now, there will be nothing to prevent us from continuing that course.'

"And Senator Clinton P. Anderson of New Mexico stated:

"There were a lot of people who realized we were going to have to increase the debt limit unless we applied a brake to spending. I believe that the general attitude of the Senators would have been somewhat different if the Congress had clearly come down on the side of cutting a project or facing the alternative of an increase in the debt limit. Congress has often voted many smaller sums than the one requested by the Administration and would probably have borrowed and perhaps spent it had there not been any limits whatsoever. Most certainly the Treasury has found ways to exceed the legal limit at times."

Thus, what was not done here, or what was almost done, but what has also been done at the Federal Treasury, but First National City Bank basically claims, in an article it published with your approval, is that the role played by the clear debt limit, in limiting the trend toward a higher deficit and a growing public debt, is thus more important than ever in our times.

That concludes this piece, and I ask you, in conclusion: what is more important, fellow Senators, the fact that the representatives of several banks, which is natural for them to explain their points of view without entering into further details, but rather generically, that they declare they believe the method is good – good, we also accept the method in principle – or, what the Bank itself says, with your approval, officially for the entire Nation? Not for here, where each of those banks, as would be natural, must have a certain reluctance to attack new things, because they have their large deposits, but rather because it is now the official bank, speaking for the entire Continent. Which carries more weight? That check, that clear limit, which in Hawaii comes in two ways: 60 million in round numbers, and 15% of national revenue. And here we are willing to accept, in an amendment, first 150% and if necessary that it will go up to 200. It seems to me that our position is extremely reasonable, it seems to me that we have established our position clearly and conclusively.

Finally, I wish to repeat that the use of freedom is not what we sometimes believe. Freedom must be used with self-control in the very exercise of that freedom. I believe that in that way, by applying a definitive, clear limit, without prejudice to flexibility of the method or formula we accept, we will have made great forward progress.

I believe, in complete honesty, that you are convinced it has not been our purpose, as liberal as our acceptance might be, to restrict the Government's resources. And I will say it now for the fifth time, because I believe I must emphasize this point to avoid misinterpretation.

And to conclude, I would say here that I have a study from the National Planning Association, and that study, which is an in-depth study, approved by the current Government of Puerto Rico, establishes that when methods such as this are used, involving availability and percent of revenue, it is done with a view to reducing tax payments. Thus, there is no argument possible on the basis that we do not want tax payments. Tax payments today are paid by everyone, big and small. Some through a type of tax payment and others through another way. No, quite the contrary, the method you all are approving and that we are accepting in principle is in substitution of the method we would have accepted, the one you proposed to us two years ago, laying the foundation for a reduction in tax payments, whether or not they are actually reduced.

220            DIARIO DE SESIONES            SEPTIEMBRE 5

tamente por el Estado Libre Asociado de Rico por dinero tomado a préstamo directamente por el Estado Libre Asociado de Puerto Rico evidenciada mediante bonos o pagarés para el pago de la cual la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico fueren empeñados será emitida por el Estado Libre Asociado de Puerto Rico si el total de (i) el monto del principal de e intereses sobre dichos bonos y pagarés, junto con el monto del principal de e intereses sobre la totalidad de tales bonos y pagarés hasta entonces emitidos por el Estado Libre Asociado y en circulación, pagaderos en cualquier año económico, y (ii) cualesquiera cantidades pagadas por el Estado Libre Asociado en el año económico corriente en concepto de principal e intereses correspondientes a cualesquiera obligaciones evidenciadas mediante bonos o pagarés garantizadas por el Estado Libre Asociado, excediere el 15 por ciento del monto total de las rentas obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre Asociado e ingresadas en el Tesoro de Puerto Rico en el año económico inmediatamente anterior al año económico corriente; y ninguno de dichos bonos o pagarés emitidos por el Estado Libre Asociado para cualquier fin que no fuere facilidades de vivienda vencerá con posterioridad a un término de 30 años desde la fecha de su emisión y ningún bono o pagaré emitido para fines de vivienda vencerá con posterioridad a un término de 40 años desde la fecha de su emisión; y el Estado Libre Asociado no garantizará obligación alguna evidenciada mediante bonos o pagarés si el total de la cantidad pagadera en cualquier año económico en concepto de principal de intereses sobre la totalidad de las antes referidas obligaciones directas hasta entonces emitidas por el Estado Libre Asociado y en circulación y las cantidades a que se hace referencia en la cláusula (ii) excediere el 15 por ciento de dicho monto total de rentas.

La Asamblea Legislativa fijará límites para la emisión de obligaciones directas por cualquier municipio de Puerto Rico por dinero tomado a préstamo directamente por dicho municipio evidenciadas mediante bonos o pagarés para el pago de las cuales la buena fe, el crédito y el poder para imponer contribuciones de dicho municipio fueren empeñados; disponiéndose, sin embargo, que ninguno de dichos bonos o pagarés será emitido por municipio alguno en una cantidad que, junto con el monto de la totalidad de tales bonos y pagarés hasta entonces emitidos por dicho municipio y en circulación, exceda el por ciento determinado por la Asamblea Legislativa, el cual no será menor del cinco por ciento (5) ni mayor del diez por ciento (10%) del valor total de la tasación de la propiedad situada en dicho municipio.

El Secretario de Hacienda podrá ser requerido para que destine los recursos disponibles incluyendo sobrantes al pago de los intereses sobre la deuda pública y la amortización de la misma en cualquier caso al cual fuere aplicable la Sección 8 de este Artículo VI mediante demanda incoada por cualquier tenedor de bonos o pagarés emitidos en evidencia de la misma".

Artículo 2.—Esta enmienda entrará en vigor al ser ratificada por la mayoría de los electores que voten sobre la misma en un referéndum celebrado con ese propósito.

"Estado Libre Asociado de Puerto Rico
Senado de Puerto Rico

San Juan, Puerto Rico
4 de septiembre de 1961

Informe

Al Senado de Puerto Rico:

La Comisión Especial designada para estudiar y considerar la P. Conc. del S. 3 tiene el honor de informar a este Alto Cuerpo que recomienda la aprobación de la medida sin enmiendas.

Vuestra Comisión celebró audiencias conjuntamente con la Comisión Especial designada por la Cámara de Representantes durante los días 21, 22, 23, 24, 25, 28 y 29 de agosto de 1961. En estas vistas declararon los señores José Ramón Noguera, Secretario de Hacienda; Rafael Picó, Presidente del Banco Gubernamental de Fomento para Puerto Rico; Francis Bowen, primer vicepresidente de dicho Banco, y Ramón García Santiago, presidente de la Junta de Planificación, todos éstos funcionarios públicos. Además, prestaron testimonio las siguientes personas particulares: Lcdo. Rodolfo Aponte, vicepresidente del Banco Popular; Esteban Bird, vicepresidente ejecutivo del Banco Crédito y Ahorro Ponceño, quien compareció también a nombre de la Asociación de Banqueros; César Vizcarrondo y S. L. Descartes, quienes comparecieron a nombre de la Cámara de Comercio de Puerto Rico; Webster Pullen, vicepresidente del First National City Bank of New York a cargo de los negocios de Puerto Rico; Roberto de Jesús, presidente del Banco de Ponce; Francisco de Jesús, vicepresidente del Chase Manhattan Bank en Puerto Rico; Leandro Cabranes, director ejecutivo de la Asociación de Alcaldes de Puerto Rico; Emiliano Pol, contador público autorizado; y Juan Diez de Andino, en calidad de ciudadano particular. La Comisión tuvo ante sí, además, memoriales escritos en apoyo de la resolución, del Sr. José R. Noguera, Secretario de Hacienda; del Sr. Francis Bowen, primer vicepresidente del Banco Gubernamental de Fomento; del Dr. Rafael Picó, presidente de dicho Banco; y del Sr. Ramón García Santiago, Presidente de la Junta de Planificación.

Tanto los funcionarios públicos como las personas particulares mencionadas que comparecieron a nombre de las instituciones relacionadas o en su carácter personal, favorecieron, con excepción del señor Diez de Andino, el principio envuelto en la enmienda constitucional bajo consideración de fijar el límite prestatario del Estado Libre Asociado a base de una relación con los ingresos del Gobierno en lugar del sistema actual que se basa en un por ciento del valor de tasación de la propiedad.

Por la Resolución Conjunta número 1 aprobada el 23 de junio de 1958, la Asamblea Legislativa de Puerto Rico solicitó del Congreso de los Estados Unidos que se suprimiesen de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico las disposiciones relativas a la fijación de un límite prestatario al Estado Libre Asociado y a los municipios de Puerto Rico.

A tenor con dicha solicitud, el Congreso de los Estados Unidos aprobó la Ley Pública número 87-121, la cual fue sancionada por el Presidente el 3 de agosto de este año. Esta Ley provee que se suprima de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico el siguiente lenguaje:

"Disponiéndose, sin embargo, que ninguna deuda pública de Puerto Rico y de los municipios de San Juan, Ponce, Mayagüez, Arecibo y Río Piedras, será autorizada si excediere del 10 por ciento del valor total de la tasación de sus propiedades, y ninguna deuda pública de ninguna otra subdivisión o municipio de Puerto Rico se autorizará en lo sucesivo si excediera del 5 por ciento de la valoración total de la propiedad existente en cualquiera de esas subdivisiones o municipios... Al computar la deuda de el Pueblo de Puerto Rico, no se contarán los bonos municipales para el pago de cuyo capital e intereses se hubiere hasta la fecha empeñado la buena fe del Pueblo de Puerto Rico, ni los bonos emitidos por el Pueblo de Puerto Rico garantizados por una suma equivalente de bonos de las corporaciones municipales o juntas escolares de Puerto Rico; pero sí se contarán todos los bonos que en lo sucesivo emitiere cualquier municipio o subdivisión dentro del 5 por ciento que por la presente se autoriza, para los cuales se pignore la buena fe del Pueblo de Puerto Rico".

Provee además dicho estatuto federal, que las disposiciones del mismo entrarán en vigor tan pronto los electores capacitados de Puerto Rico hayan votado en un referéndum de acuerdo con la Sección 1 del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico para que se incluyan en dicha Constitución disposiciones que sustituyan las disposiciones pertinentes de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico arriba—transcritas, limitando la capacidad prestataria del Estado Libre Asociado y sus municipios, a tenor con los propuesto en una Resolución Concurrente aprobada por la Asamblea Legislativa.

La Resolución Concurrente del Senado número 3 y la Resolución Concurrente de la Cámara número 5, las cuales son idénticas y están ahora bajo la consideración de la Asamblea Legislativa, contienen disposiciones para cumplir total y cabalmente con las disposiciones de la Ley Pública número 87-121 del Congreso de los Estados Unidos. Al ser aprobadas por la Asamblea Legislativa y por los electores capacitados de Puerto Rico en un referéndum, tendrán el efecto de suprimir las disposiciones ya transcritas de la Ley de Relaciones Federales con Puerto Rico e incluir en nuestra Constitución disposiciones adecuadas limitando el límite de la capacidad prestataria del Estado Libre Asociado y de los municipios de Puerto Rico.

Actualmente, bajo las disposiciones de la Ley de Relaciones Federales, el límite prestatario del Estado Libre Asociado y de los municipios de San Juan, Ponce, Mayagüez y Arecibo se establece en términos de un 10 por ciento del valor de tasación de la propiedad y un 5 por ciento de dicha valoración para el resto de los municipios. Esta fórmula, aunque flexible, ya que la capacidad prestataria aumenta con el incremento de la propiedad y el aumento en la tasación de la misma, ha dejado de proveer el medio adecuado en la contratación de la deuda pública del Estado en vista del gran auge económico de Puerto Rico en los últimos años y la necesidad correlativa de tener que ofrecer mayores y mejores servicios públicos al pueblo de Puerto Rico.

La necesidad de ampliar el margen prestatario de Puerto Rico se hace imperativamente evidente al confrontarnos con el hecho de que al 31 de julio de 1961 sólo le quedaba disponible al Estado Libre Asocia-

do un margen prestatario de alrededor de $3,000,000. Conscientes de esta situación, la cual fue prevista hace ya unos cuantos años, las Resoluciones Concurrentes actualmente ante la consideración de la Asamblea Legislativa recogen disposiciones que han de ser incluidas en nuestra Constitución, fijando el margen prestatario del Estado Libre Asociado y de los municipios de Puerto Rico en una forma más flexible, realista y a tono con sanos principios económicos. Las disposiciones propuestas usan como base para fijar el margen prestatario del Estado Libre Asociado el monto de los ingresos recaudados por el Gobierno provenientes de fuentes internas durante el año fiscal anterior al que se haya de contratar una deuda. No se incluyen en los ingresos las recaudaciones provenientes de apropiaciones federales, derechos de aduana y arbitrios sobre embarques, por no estar la imposición de estas rentas públicas bajo el control de la Asamblea Legislativa de Puerto Rico. Esto hace que la fórmula sea más conservadora, ya que dichos ingresos pueden utilizarse también para el pago de la deuda.

La limitación se fija en términos de requerimientos de pago de capital e intereses más alto en cualquier año de vencimiento de la deuda existente y la que se contempla autorizar en ese momento, más cualquier pago que el Estado haya tenido que hacer en el año fiscal anterior por concepto de bonos garantizados por el Estado emitidos por agencias o corporaciones públicas. Cuando los requerimientos de pago mencionados más la cantidad que el Gobierno haya tenido que pagar por concepto de bonos garantizados asciendan a un 15 por ciento de los ingresos de fuentes estatales durante el año económico anterior, el Gobierno no podrá incurrir en más obligaciones directas ni podrá garantizar más bonos de instrumentalidades públicas. Por ejemplo, asumiendo que los ingresos del Gobierno provenientes de fuentes internas en el año fiscal anterior al que se intente vender determinada cantidad de bonos autorizados sea $200 millones, el 15 por ciento de esta cantidad sería $30 millones. Suponiendo que los requerimientos de pago de capital e intereses más altos en los años de vida que le quedan a los bonos ya emitidos fuese de $15 millones, restarían $15 millones adicionales para asumir el pago de los requerimientos anuales de futuras obligaciones.

Se notará, por lo tanto, que bajo la fórmula propuesta el límite de la deuda en que puede incurrirse se expresa en términos de la cantidad de dinero disponible para amortizar la deuda, en lugar de expresarse como actualmente, en términos de la cantidad de dinero total que puede tomarse a préstamo en determinado momento. Bajo las disposiciones de las actuales, el margen prestatario es de aproximadamente $190 millones, o sea un 10 por ciento del valor de tasación de la propiedad, que es aproximadamente de $1,900 millones.

Si se desease traducir este margen prestatario de $30 millones (15 por ciento de $200 millones de ingresos) a una suma más o menos fija, podría calcularse históricamente a base del tipo de interés promedio y el patrón de vencimientos de la deuda existente o, si se desea una base más exacta, podría usarse el patrón de vencimiento y el tipo de interés pagado en la más reciente emisión de bonos. Basándonos en la última emisión de bonos del Estado Libre Asociado por

$40 millones vendida en marzo de este año, y usando un patrón de vencimientos por un máximo de veinte años y un tipo de interés de 4 por ciento anual, podríamos decir que el margen prestatario disponible actualmente del Gobierno sería de $212.4 millones, con ingresos disponibles en el año fiscal 1960-61 de $204 millones. Al hacer este cálculo asumimos que habría un margen libre de $15 millones para la contratación de deuda nueva, y que al remanente del 15 por ciento de $204 millones (sobre $15 millones) estaría ya comprometido para el pago de capital e intereses de los bonos en circulación.

Deseamos recalcar, sin embargo, que usamos estos ejemplos con el solo propósito de demostrar en la práctica cómo funcionaría la mecánica de la fórmula propuesta para fijar el límite prestatario a través de la enmienda constitucional bajo consideración. La verdadera limitación estriba en la capacidad para pagar el dinero tomado a préstamo, expresada en términos de un por ciento fijo (15 por ciento) de los ingresos anuales disponibles para pagar el capital y los intereses de las obligaciones directas emitidas por el Estado. Una vez la cantidad reflejada por dicho por ciento se encuentre comprometida para pagar anualmente los requerimientos de la deuda evidenciada a través de bonos y pagarés directamente por el Estado la capacidad prestataria estará agotada.

Según podrá verse por este análisis, la fórmula propuesta para fijar el margen prestatario del Estado es más flexible y realista que la usada actualmente. La misma se basa en los recursos disponibles del Gobierno que es la verdadera fuente para afrontar las obligaciones del Estado y no en un por ciento del valor de tasación de la propiedad, que no es un verdadero índice de la capacidad para pagar. Conviene anotar que la fórmula propuesta está en realidad en armonía con la Sección 8 del Artículo VI de nuestra Constitución, que en síntesis provee que los recursos disponibles del Estado se usarán en primer término para el pago de intereses y amortización de la deuda pública. Aunque actualmente, como cuestión de hecho, se usan las contribuciones sobre la propiedad para atender el pago de la deuda pública, la verdad es que por los términos de la disposición constitucional referida todos los recursos del Gobierno están comprometidos para dichas atenciones. El producto de la contribución sobre la propiedad representa hoy en día para el Gobierno solamente el 7 por ciento de los ingresos.

Bajo el actual sistema, el margen prestatario aumenta con el incremento en la propiedad y el aumento en el valor de tasación de la misma. Estos factores no están necesariamente bajo el control de la Asamblea Legislativa. Sin embargo, bajo la fórmula propuesta la Asamblea Legislativa tendría un control más absoluto sobre el margen prestatario.

El principio de la fórmula propuesta de fijar el margen prestatario en un por ciento de los recursos disponibles del Estado, aunque parece ser novel en el ámbito de la política pública fiscal, ha sido usado sin embargo como base por bastante tiempo para autorizar emisiones de bonos de rentas por corporaciones públicas y privadas. Por lo general la capacidad para emitir este tipo de bonos se basa en un por ciento de los ingresos o de los requerimientos de pago de la deuda de dichas corporaciones. Además, los estados de Connecticut y Mississippi adoptaron recientemente legislación fijando el límite prestatario del Estado en un por ciento de los ingresos anuales del mismo. Aunque el sistema usado en dichos estados no es igual a la fórmula propuesta en la enmienda constitucional bajo consideración, sigue, sin embargo, el principio general de relacionar la deuda pública con los ingresos del Gobierno.

Al hablar de bonos de rentas, conviene aclarar que los bonos emitidos y que emitan las corporaciones públicas del Estado Libre Asociado de Puerto Rico no se tendrán en cuenta al calcular el margen prestatario del Estado, ya que para el pago de los mismos no está comprometida la buena fe del Pueblo de Puerto Rico y se seguirán pagando solamente de las rentas derivadas por dichas corporaciones. Únicamente en el caso de que el Estado garantice alguno de estos bonos, cosa que no ha hecho hasta el presente, y que tenga que pagar en determinado año una deficiencia de los requerimientos de deuda de los mismos, es que se contará la cantidad así pagada contra el margen prestatario del Estado Libre Asociado.

La enmienda constitucional propuesta circunscribe la deuda pública a obligaciones del Estado Libre Asociado evidenciadas únicamente por bonos y pagarés emitidos directamente por el Estado. Por bonos y pagarés se entiende el tipo de obligación clásica y negociable que se vende en el mercado de valores de Estados Unidos. No incluye las obligaciones o deudas corrientes o contingentes del Estado en que se incurre normalmente para atender el funcionamiento del Gobierno. El lenguaje usado en la enmienda aclara la norma que se ha seguido en la práctica hasta el presente.

La propuesta enmienda a la Constitución no afectará en forma alguna el crédito y la venta de los bonos del Estado Libre Asociado de Puerto Rico. Al contrario, una encuesta hecha por el Secretario de Hacienda y el Presidente del Banco Gubernamental de Fomento para Puerto Rico en el mercado de valores de los Estados Unidos con prominentes figuras de la banca, revela que la fórmula propuesta no sólo tiene el visto bueno y la aceptación de todos ellos, sino que en su opinión mejorará el crédito y la viabilidad en la venta de los bonos de Puerto Rico. El buen crédito que tiene Puerto Rico en el mercado de valores de los Estados Unidos se basa principalmente en su puntualidad a través de toda su historia en el pago de sus obligaciones, en el buen juicio que ha ejercido en la contratación de la deuda pública y en el no hacer uso de subterfugios para evadir las limitaciones impuestas a la misma. En el récord hay interesantes testimonios de distintas personalidades del mundo financiero norteamericano endosando franca y abiertamente la propuesta enmienda constitucional. No ha habido una sola fuente de crédito de las principales que usa el Pueblo de Puerto Rico en la venta de sus bonos que se haya manifestado en contra de la nueva fórmula. Algunos de ellos creen que se le presenta a Puerto Rico la oportunidad de hacer una valiosa aportación en el campo de la ciencia político-fiscal con la aprobación de esta enmienda.

Otra disposición de la enmienda constitucional propuesta que se estima ayudará sustancialmente en la venta y clasificación de los bonos de Puerto Rico es la que concede el derecho a los tenedores de bonos de demandar al Estado en caso de incum-

222                                    DIARIO DE SESIONES                                    SEPTIEMBRE 5

plimiento en el pago de la deuda. Esta disposición le dá realidad a lo dispuesto en la Sección 8, Artículo VI que compromete los ingresos del Gobierno al pago preferente del capital e intereses de la deuda pública. El Estado de Nueva York, así como otros estados análogos incluidas en sus Constituciones. Esta renuncia a la inmunidad del Estado a ser demandado, ha de redundar en una mejor aceptación y clasificación de nuestras obligaciones.

En cuanto a los municipios, la enmienda constitucional provee que se siga usando el mismo método que se usa actualmente bajo la Ley de Relaciones Federales con Puerto Rico para fijar el margen prestatario de los mismos. La única diferencia consiste en que en lugar de fijarle un límite del 10 por ciento sobre el valor de tasación de la propiedad a los municipios de San Juan, Ponce, Mayagüez y Arecibo y un 5 por ciento al resto de los municipios, se dispone en términos generales que la Legislatura fijará los límites prestatarios, los cuales no podrán ser menor del 5 por ciento ni mayor del 10 por ciento. Naturalmente, se podrá fijar cualquier límite entre un 5 y un 10 por ciento.

Es la intención usar el valor de toda la propiedad tasada en los distintos municipios con excepción de aquella que no está sujeta al pago de contribuciones. Al calcular el margen prestatario de los distintos municipios, se incluirá, sin embargo, el valor de tasación de aquellas propiedades que se usan como vivienda de sus dueños y que por acción legislativa se haya reducido o se reduzca en el futuro la contribución a pagar sobre las mismas hasta determinada cantidad del valor tasado. Se hace esta distinción entre la propiedad exenta totalmente del pago de contribuciones y la propiedad usada por sus dueños como hogares, toda vez que ésta última hay que conservarla en las listas de propiedades sujetas a contribución, ya que si la misma está tasada para efectos contributivos en una cantidad mayor que la cantidad exenta para contribuciones, se cobrará sobre el remanente, y además porque si deja de ser usada como hogar del dueño está sujeta de nuevo al pago de contribuciones. Existe otra razón, además, para incluir esta clase de propiedad al calcular el margen prestatario de los municipios, y es el hecho de que éstos no sufrirán merma en sus ingresos por motivo de la legislación reduciendo las contribuciones a las propiedades que sean usadas por sus dueños como su vivienda, ya que la Asamblea Legislativa ha tomado medidas para reembolsar a los municipios la cantidad que dejen de recibir con motivo de tal reducción.

Este tipo de propiedad estaría disponible en el futuro para el pago de contribuciones en caso de que la Asamblea Legislativa lo estime aconsejable y necesario para afrontar el pago de la deuda pública.

La Comisión Especial, al recomendar que se apruebe favorablemente esta medida, está consciente de que su aprobación es indispensable para el desarrollo económico de nuestro Pueblo.

Respetuosamente sometido

Yldefonso Solá Morales,
Secretario.

Cruz Ortiz Stella,
Presidente."

**Sr. García Méndez:** Señor Presidente.

**Presidente Acc. (Sr. Reyes Delgado):** Señor Senador.

**Sr. García Méndez:** Queríamos llamar la atención y hacer que se consigne en el récord claramente, que este informe de la Comisión Especial designada para estudiar y considerar la Resolución Concurrente del Senado 3, no aclara que se consignó el voto en contra de los Senadores que representamos este sector minoritario de la discusión de la Resolución en su fondo en el día de hoy, y queremos que quede así claro, a los fines de que no pudiera aparecer como que es un informe por unanimidad.

**Sr. Ortiz Stella:** Señor Presidente, tiene razón el compañero García Méndez. El informe fue aprobado por mayoría.

**Presidente Acc. (Sr. Reyes Delgado):** Que se haga constar.

**Sr. Ortiz Stella:** No tengo inconveniente en que así se haga constar.

Señor Presidente, voy a pedir un turno, para consumirlo ahora, defendiendo la resolución y el informe.

**Sr. García Méndez:** Señor Presidente, antes que el compañero distinguido comience a hacer uso de su turno, queremos hacer constar que tenemos dos enmiendas fundamentales, a nuestro juicio, para ofrecer al texto de la Resolución Concurrente.

Si el compañero desea hacer uso del turno de defensa del informe como está, claro que no podrá entrar en la cuestión relativa a las enmiendas que vamos a formular. La práctica normalmente ha sido discutir las enmiendas y entonces pedir turno para defender el proyecto tal como ha sido enmendado, si ha sido enmendado, o tal como está si no ha sido enmendado. Sin embargo, yo no tendría inconveniente en que el compañero exponga su tésis al través de este turno defensor del informe, pero haciendo claro que no hemos renunciado y que, por el contrario, nos reservamos el derecho a formular estas enmiendas que hemos traído para someter a la consideración del Senado.

**Sr. Ortiz Stella:** Voy más lejos, señor Presidente. Para que quede bien claro, o sea, que este turno mío de exposición defendiendo el informe y la resolución, tal como ha sido sometida por la Comisión Especial, deja enteramente a salvo el derecho del compañero García Méndez a formular las enmiendas que él estime convenientes a esta resolución.

**Presidente Acc. (Sr. Reyes Delgado):** ¿Esto es para consumirlo ahora?

**Sr. Ortiz Stella:** Sí, señor Presidente.

**Presidente Acc. (Sr. Reyes Delgado):** Adelante.

**Sr. Ortiz Stella:** Señor Presidente y compañeros del Senado: Voy a defender el informe de la Comisión Especial a la cual fue referida la Resolución Concurrente del Senado número 3, y a pedir un voto favorable para esa resolución.

Como coautor del informe que se acaba de leer, necesariamente algunos de los conceptos ya vertidos en ese Informe, estarán necesariamente repetidos en este turno de exposición que voy a consumir ahora.

No tengo la imaginación de Victor Hugo, para hacer un informe sobre esta Resolución y después un turno de exposición exponiendo ideas completamente nuevas. De modo, que quiero advertirle a mis compañeros que lo que voy a decir, probablemente ya estará dicho en el informe.

Las disposiciones sobre la deuda pública del Estado Libre Asociado y de sus muni-

cipios, están contenidas, al presente, en el Artículo 3 de la Ley de Relaciones Federales que en lo pertinente dice de esta manera:

"Disponiéndose, sin embargo, que ninguna deuda pública de Puerto Rico y de los municipios de San Juan, Ponce, Mayagüez, Arecibo y Río Piedras, será autorizada si excediere del diez por ciento del valor total de la tasación de sus propiedades, y ninguna deuda pública de ninguna otra subdivisión o municipio de Puerto Rico se autorizará en lo sucesivo si excediera del cinco por ciento de la valoración total de la propiedad existente en cualquiera de esas subdivisiones o municipios;

"Al computar la deuda de El Pueblo de Puerto Rico, no se contarán los bonos municipales, para el pago de cuyo capital e intereses se hubiere hecho la fecha empeñado la buena fe de El Pueblo de Puerto Rico, ni los bonos emitidos por El Pueblo de Puerto Rico garantizados por una suma equivalente de bonos de las corporaciones municipales o juntas escolares de Puerto Rico; pero sí se contarán todos los bonos que el lo sucesivo emitiere cualquier municipio o subdivisión dentro del 5 por ciento que por la presente se autoriza, para los cuales se pignore la buena fe de El Pueblo de Puerto Rico".

A virtud de la ley pública número 87.121 del Congreso de Estados Unidos, esas disposiciones sobre la deuda pública quedarían eliminadas de la Ley de Relaciones Federales tan pronto los electores capacitados de Puerto Rico aprueben una enmienda a la Constitución conteniendo todo lo relativo a la deuda pública. El Artículo 2 de dicha Ley Pública número 87.121 dice así:

"Artículo 2.—

Este es el Artículo 2 de la Resolución Conjunta de la Cámara de Representantes Federal que se convirtió en la Ley Pública 87.121.

"El Artículo 1 de esta ley empezará a regir cuando una mayoría de los electores capacitados de Puerto Rico haya votado en un referéndum de acuerdo con el Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico para incluir disposiciones en la Constitución del Estado Libre Asociado en lugar de las disposiciones del Artículo 3 de la Ley de Relaciones Federales con Puerto Rico que en la presente se especifican limitando el márgen prestatario del Estado Libre Asociado y sus municipios, según se propone en la Resolución Concurrente de la Asamblea Legislativa del Estado Libre Asociado."

Quiérese decir, que aprobándose esta Resolución por ambas Cámaras, —siendo una Resolución Concurrente no tiene que ser firmada por el Ejecutivo—hasta que el pueblo de Puerto Rico no apruebe esa propuesta enmienda a la Constitución, quedarían vigentes en el estatuto de Relaciones Federales las disposiciones sobre el márgen prestatario del Estado Libre Asociado y de sus municipios. Solamente cuando electores capacitados en un referéndum aprueben la propuesta enmienda, entonces es que ya deja de existir la disposición en el estatuto de Relaciones Federales y entonces surte efecto la enmienda constitucional.

Dando cumplimiento a las disposiciones de dicha ley del Congreso, se radica en este Senado la Resolución Concurrente número 3, y en la Cámara la Resolución Concurrente número 5, en las cuales se propone una enmienda a la Sección 2 del Artículo VI de la Constitución del Estado Libre Aso-

DIARIO DE SESIONES

sede en Nueva York, dijo en aquella ocasión que no se debía cambiar ese método. Y ahora si cambiamos si ustedes dan el voto, por el fundamento de que es obsoleto. Nos piden que demos el voto nosotros, y lo damos, si se nos complace en que haya garantía con un techo para que eso que es nobel, y lo nobel quiere decir lo que es todavía parte de un proceso experimental. Nobel no es lo que está ya garantizado con la pátina de la experiencia, como está ese viejo sistema. Sistema que lleva ya desde el cambio de dominación en Puerto Rico, ese nobel sistema tenemos que aceptarlo como una cosa que es el "non plus ultra" y no sirve el sistema que defendieron los peritos.

Y la propia pieza legislativa, señor Presidente y compañeros del Senado, pone el mismo sistema para los municipios, como se expuso por el senador Colón cuando formuló su enmienda. De modo, que es obsoleto para el ámbito estatal, pero sigue siendo magnífico para el ámbito municipal.

¿Es posible que se nos pida que dejemos nuestro voto sencillamente, sin explicación, en un caso como ése? ¿Por qué es que se usa el sistema del 15% de disponibilidad en cuanto a los ingresos para lo estatal, y se usa el 5 al 10% para lo municipal del valor tasado de la propiedad? ¿Por qué? Porque lo estatal, el primer modelo, el primer método, la primera fórmula produce todavía más de lo que se necesita. Y el segundo método a los municipios los produce también mucho más de lo que se necesita. Si cuando uno pregunta en las vistas públicas, ¿cómo es posible que le puede de producir, si en los municipios en donde se siente el impacto de la exención contributiva de $15,000 a cada hogar? Contestación, no importa porque en el presupuesto se cubren al través de asignaciones las gastos de los municipios. De modo, que tienen las asignaciones en el presupuesto, y además, pueden emitir bonos hasta donde se lo permita el límite en el margen prestaatrio, a base del valor tasado de la propiedad. Tercer hueco para ampliación del límite ilimitado, como yo creo que he encontrado la frase típica para llamarlo, a ese límite del 15% de disponibilidad.

No debemos, y lo he dicho ya cuatro veces, obstaculizar el incremento en los servicios públicos, ni el crecimiento de la economía. Pero no creo, compañeros del Senado, que debemos firmar un cheque en blanco por cincuenta años. Cuando se hace una enmienda a la Constitución y se hace por referéndum, ¿qué quiere se decir? Cuando se habla del ámbito constitucional a distinción del ámbito legislativo, ¿qué quiere eso decir? Eso quiere decir que los que tienen que aprobar esto no son los municipios, ni siquiera los legisladores con su poder representativo, sino el pueblo en una votación directa. Eso es lo que eso quiere decir. Entonces, el propósito enmarcado en este proyecto, ¿cuál es? Que no haya que hacer enmiendas a la Constitución en cincuenta años.

Se cumple de esa manera con el propósito congresional. No. No se cumple. Porque el propósito ha sido que nosotros obtengamos la autoridad que antes tenía el Congreso. Pero que lo pongamos en el sitio donde más garantizada debe haber, que es en la Constitución. Y cada vez que se llegue cerca del margen, venga entonces otra enmienda para que el pueblo tenga la oportunidad de votar en referéndum y de esa manera no es una disposición en el vacío.

No es un mito, es una disposición que significa lo que dice, y no meras palabras en la Constitución, porque es para que estén allí por cincuenta años, sin que el pueblo tenga oportunidad de volver a votar sobre si quiere que se aumente o no se aumente el margen prestatario.

Hay peligros de que por los diez o doce o quince o veinte años faltara dinero. De acuerdo con la enmienda que nosotros produjimos y sometimos a la consideración de los compañeros, contestación, no hay peligro. ¿Por qué no hay peligro? Porque el techo no destruye la flexibilidad. Y voy a repetir esto porque es parte de mi exposición, para que quede claro en el récord.

Si el pueblo de Puerto Rico a base de este método nobel, como dice el propio perito, que no está usándose nada más que en otros dos estados parecidamente, no igual, puede usar de treinta millones este año para pagar el principal e intereses de los bonos que se emitan a los pagarés que suscriban informando la deuda pública adicional del pueblo de Puerto Rico más la deuda que ya tiene el pueblo de Puerto Rico, no se puede olvidar que a medida que pasan los años y se va amortizando esa cantidad, cuando se pagan de treinta millones, veinticinco millones de principal, esos veinticinco millones por automaticidad han incrementado el margen prestatario. Y el techo no hace daño ninguno a esa flexibilidad, porque el techo sigue siendo la cantidad de que se disponga, y se está disponiendo de ella, porque ya la deuda es mucho menos porque se ha amortizado un año, o dos, o tres, o cuatro, o diez. Pero, además, no podemos dejar de entalizar con todas nuestras fuerzas, que el Hon. Secretario de Hacienda nos ofreció un exhibit muy ilustrativo. Y ese exhibit indica que hay un aumento normal progresivo en los ingresos del Erario del Estado Libre Asociado que indica, haciendo un promedio, que el aumento viene resultando de 18½ millones al año. De manera, que ya por que aumenta la economía, y ese 15% automáticamente se aumenta también por que es un 15% de una cantidad que ha aumentado en 18½ millones. Si que también porque al pagarse los primeros veinticinco millones ha aumentado el margen que se tiene disponibles para usar. Y si son dos años son cuarenta, y si son tres años son scenticinco. Sigue la flexibilidad funcionando, y lo único que hace el techo es garantizar contra posibles excesos y llamar la atención, nada más. Acuérdense que ahí está ese techo. Acuérdense que ahí esta ese techo. Sobre eso fué que preguntaron los congresistas cuando fué a aprobarse esta legislación.

Repito lo que dije al empezar, el que yo dé entonación fuerte a mi voz no quiere decir que tenga coraje, ni que desee debatir con coraje, sino que meramente es el producto de la improvisación, para que no vayan a mal entenderme los distinguidos compañeros.

¿Qué se discutió en ese récord?

Oigan estas palabras que voy a traducir, para que me digan, y los compañeros que tienen este récord saben que estoy cumpliendo con la estricta verdad.

En la página 10, el congresista—el vicepresidente Mr. O'Brien le da la palabra al congresista Westland, y Mr. Westland hace las siguientes manifestaciones:

Página 10, récord de las vistas públicas ante Subcomité Territorial de Asuntos Insulares de la Cámara de Representantes de Estados Unidos, Washington D. C., de marzo de 1961.

"Tengo un par de preguntas que quisiera hacer. No tengo objeción básica a esta legislación. De hecho, tal parece como que un padre le está diciendo a un hijo, usted ya es mayor de edad, y usted debe saber hacer uso del dinero, en la forma que lo hace una persona mayor de edad. Pero yo entiendo que si esta resolución es aprobada, esta resolución 124, solamente tendrá efecto cuando los votantes de Puerto Rico, por mayoría de votos, hayan pasado una legislación que provea una limitación que sea un autofreno de limitación al margen prestatario. ¿Es correcto eso o no?

Dr. Fernós: Correcto. Es correcto. Que no habrá lapsos entre la efectividad de esta resolución y el principio de las enmiendas a la Constitución. No habrá tiempos en que no haya limitación alguna. Será esta o la otra que se escriba en la Constitución de Puerto Rico, pero siempre habrá una clara limitación.

Mr. Westland, otra vez: Yo le quisiera preguntar al Secretario de Hacienda de Puerto Rico, ¿qué clase de proposición de limitación prestataria está usted proponiendo?

Sr. Noguera, José R. Noguera, Secretario de Hacienda: Contesta, cito y traduzco: Esta resolución se está estudiando por ambas Cámaras proponiendo una adición del 10%, para ser dedicadas a escuelas y carreteras. Ellos no han terminado. Puede que haya algún cambio, (some change), dice en inglés. (But that is the proposition), pero esa es la proposición. Un aumento del 10%.

Mr. Westland: ¿Ustedes entonces van a tener una limitación del 20%, no es eso?

Mr. Noguera, contestación: De nuestro valor tasado de la propiedad (Of our assessed valuation).

Mr. Westland: ¿Cuál es el valor tasado de la propiedad allá, ahora? ¿Es el 10%? Supóngase que una persona tenga una casa de $20,000, ¿cuál es el valor tasable de esa propiedad?

Mr. Noguera: El valor tasable se computa sobre la base del 90% del valor en el mercado, en el año 1957. The assessed valuation is computed on de bassis of 90% of the market value of 1957.

Mr. Westland: It would be assessed at 90% of the market value?

Mr. Noguera: Yes, in 1957 which was the last time we make a recomputation of value. And it is 90% of the market value of 1957 for assessed valuations.

Mr. Westland: That is a pretty high assessed valuation. What are we doing in the State of Washington? Ours is way below that. Is it not?

Mr. Hansen (otro congresista, que no había dicho nada antes): Ours is way too low.

Mr. Westland: And you could issue bonds up to twenty percent of ninety percent of the market value of property, is that it?

¿Ustedes pueden entonces, con la enmienda, hacer préstamos, expedir bonos de un 20% sobre el 90% del valor del mercado de la propiedad?

Mr. Noguera: With the conditions, and the restrictions, that this are 1957 values. Con la condición de que estos son valores tasables del '57. And as time goes on, the percentage is not very realistic. Y a medida que pasa el tiempo el porcentaje no es muy realista.

Mr. Westland: Because the market value will increase, you assume? ¿Por qué el valor del mercado va subiendo, asume usted?

Mr. Noguera: Eso es correcto. That is correct.

Mr. Westland: Let me ask you this. Say there is a twenty years bond, what interest are you paying now?

Mr. Noguera: The last issue was paid 3.89%.

Mr. Westland: And that is a tax exempt bond?

Mr. Noguera: A tax exempt bond.

Mr. Westland: Would it be a tax exempt bond if I were to buy it?

Mr. Noguera: Yes sir.

Mr. Westland: That is a fairly high rate of interest, is it not, for a tax exempt security with the kind of credit that Puerto Rico has?

Mr. Noguera: In June it usually comes to about half per cent more.

Fué muy honesto el Secretario de Hacienda contestándole sin subterfugio; no si en junio fué todavía medio por ciento más. No en junio por lo general sube a medio por ciento más.

Mr. Westland: How are your bonds rated? Doble A, Triple A.

Mr. Noguera: A.

Mr. Westland: Well, that does not sounds too good, Mr. Noguera. If this resolution passes, and I am sure you have considered this part more than I and are far better qualified to consider it if an increase in your debt limit goes up to 20%, would you not get a corresponding increase in the cupons on your bonds?"

Mr. Noguera: "No Sir, I do not think we will. I do not think we will because in the last issue, May and June, it was considered, explained and put in the papers given to the syndicate that there is plan to do just this that is being considered by this Committee and it did not have any effect."

Mr. Westland: "Is there any indenture of any of your present issues outstanding to the effect that you will not increase your debt ceiling during the life of the bonds?"

Fíjense en la pregunta: El límite ese, no el ilimitado, sino el límite o el techo de que le está preguntando Westland.

Mr. Noguera: "No Sir". No lo hay en los bonos hoy.

Mr. Westland: "So then you have about one million nine assessed valuation and this would give you 380 millions".

Mr. Noguera: "Three hundred eighty millions".

Mr. Westland: "That is a little better than double, of course what you have now."

Mr. Noguera: "Yes".

Y sigue entonces haciendo preguntas y viene la respuesta, en relación con detalles que no hacen al punto que estamos discutiendo, sino si la buena fe del pueblo de Puerto Rico se utiliza y se aplica, terminando, para no hacer larga, más larga esta cita, con estas palabras:

"Just as a note of caution, may I say that you have done real well under this present set up and I can understand, as your economy grows, you will perhaps need more working capital, but it has been doing real good and do not through an increased debt limit and just putting that much more money in the back of your people of Puerto Rico spoil it."

Esto dijo Westland antes de votar la resolución y esto dicen varios congresistas más, especialmente otro, que está aquí que al final, se expresa con una remisión mucho mayor.

Fuera de esa declaración, señor Presidente y compañeros del Senado, no se habló en la vistas públicas una palabra más sobre cuál iba a ser el límite, excepto esto que fue en marzo 6 del '61. Ya no estamos con las resoluciones aquellas números 24 y número 1302, no. Estamos a unos meses de venir a discutir esta legislación y al Secretario de Hacienda de Puerto Rico, cuando se le pregunta, dice que lo que se está estudiando es un aumento de un 10%. Y esta representación les ha dicho a ustedes que sí quieren aprobamos ahora mismo el proyecto de ley, no a base del 15% que era la transacción a que íbamos a llegar hace dos años, sino a base del 20%, o sea, para no hacer quedar mal al Secretario de Hacienda de Puerto Rico, para defender la integridad del más alto funcionario en materia de hacienda de Puerto Rico, aprobaríamos nosotros esa enmienda y ustedes quedarían no solamente complacidos con el límite hoy de 380 millones que es el doble, porque hoy tenemos un margen de 190 millones, sino con la flexibilidad de que ya he hablado que es de dos formas: una, por el aumento que va haciendo no tras año en el ingreso de Puerto Rico y dos; por la reducción que va habiendo con la amortización de los pagos anuales.

¿Está eso claro o no está claro, compañeros del Senado? No es 380 millones, es muchísimo más de 380 millones. Pero, además, las restricciones de la Ley de Relaciones Federales eran a base del valor tasado de la propiedad y a base del valor tasado había un límite inflexible. Este límite, como bien lo ha descrito y con razón, el compañero Ortiz Stella, no es factor de mayor validez es la flexibilidad. Sí, es verdad, es flexible en esas dos formas y es flexible, además, en esta tercera forma, que no se ha discutido, que en lugar de hacer expedición de bonos o firma de pagarés, gravando la buena fe del pueblo de Puerto Rico por diez años, este proyecto dice 30 años, lo cual quiere decir que esos 380 millones pueden ser 600 y pico de millones si es a base de 20 años como una regla invariable y pueden ser cerca de 900 millones.

Si me equivoco es exclusivamente en lo que hay que reducir para los pagos de interés, pero es exacto matemáticamente que un préstamo tomado a 10 años de 100 mil puede ser de 200 mil a 20 años, después que se le rebaje el interés mayor para que baje a 190 o a 185, porque los primeros años hay que pagar más interés, pero a medida que pasa cada año, por automaticidad baja también el interés, porque se sobre un balance después de las amortizaciones, que no es la deuda original.

De manera, que hay esa flexibilidad también, pero ahora, compañeros del Senado, nosotros no nos oponemos tampoco a esa flexibilidad. Nosotros le decimos a ustedes que aceptamos la fórmula del 15%. A ustedes no les gusta, ustedes creen que es obsoleta. Nosotros nos unimos a ustedes para rendirle tributo a ese caballero experto en finanzas, que nos dice que mejor conviene este método aunque sea novel y como él es el que brega con los bonistas, pues él se encargará de convencerlos de que sigan comprando bonos y en esto tenemos que ser pragmáticos.

Nosotros aceptamos ese método, pero lo aceptamos con la condición de que no sea

un cheque en blanco, y ponemos nuestra enmienda y le dejamos a ustedes la alternativa, primero: o ponen el 10% que es lo único que se le dijo al Congreso que se iba a hacer de aumento y no nos oponemos. O, aumentan a base de esa flexibilidad del 15% de disponibilidad, pero le ponemos un techo para que no digan al allá, "Pues nos han hecho lo que decía Guillermo Rodríguez. Nos han hecho". Pueden muy bien decirlo, Dios quiera que no lo digan, pero pueden decir esto que dijo Guillermo Rodríguez en las vistas del día 23 de mayo del '58. El dijo: "Darle la vuelta a la ley le hace daño al crédito. Creando autoridades al límite prestatario, creando autoridades cuando el límite prestatario está basado en la misma propiedad no debe hacerse." En otras palabras, muy bien pueden decir: "Bueno, pero nos dijeron esto y ahora resulta que viene esto otro".

Y viene esto otro sin que el argumento de obsolescencia tenga fuerza, compañero Cruz Ortiz Stella. ¿Por qué? Porque el mismo método está para los municipios. Y está ahí, en la letra escrita de la propia ley. Y entonces dicen: "Ah, pues eso es yéndose por la tangente para que sea más y más y más el crédito." Y entonces pensarán, ¿dónde está la austeridad? ¿Dónde está la salud de un método de un pueblo que acaba de dársele la autoridad de hacerlo él, de él fijar su límite, dónde está el autofreno? No está en ninguna parte. Y eso lo pueden decir y lo dirán, posiblemente, por la razón obvia de que ahí hay un informe que ellos tienen copia en donde se dice que podría declararse o establecerse un departamento de carreteras, similar a una de las autoridades y que como no se computan las deudas de las autoridades contra la deuda pública de Puerto Rico, pues se podría coger otra cantidad para carreteras sin necesidad de ese 10%. Eso dice el informe de esta Legislatura cuando se aprobó la resolución, o mejor dicho, cuando se discutía la resolución número 24 del Senado, que se podía hacer eso, pero que no querían hacer eso.

Entonces, ahora van a decir: "Pues aquí se ha hecho lo propio de otra manera", circunvalando la disposición congresional que le ha dicho: "Sí, como no, háganlo ustedes. Pero oigan, tengan cuidado, usen su propio freno, no se excedan."

No quiero cansar exageradamente la atención de ustedes, aunque podía estar exponiendo fundamentos mucho mayores y mucho más fuertes todavía, pero fíjense que esto del techo no es una cosa original mía. Miren lo que dice la carta mensual del First National City Bank sobre la situación económica y comercial. Vino el Presidente del banco, de este First National City Bank y es humano, es humano y lo llaman, lo invitan, pues venga a declarar y dice:

"Sí, el método parece bueno. Los tratadistas y los economistas actuales creen que es mejor, que da mayor flexibilidad."

Eso es todo lo que dice y eso dijo Francisco de Jesús, Vicepresidente del Chase Manhattan Bank, pero el hermano, Roberto de Jesús dijo: "Yo creo en ese método y creo que ese método también debería usarse en los municipios, pero yo creo en la limitación clara."

Eso dijo el Presidente del Banco de Ponce que es hermano del Vicepresidente del Chase Manhattan. Pero tanto el First National City como el Chase Manhattan, como el Banco de Ponce, viene su represen-

242                           DIARIO DE SESIONES                          SEPTIEMBRE 5

tante y se les pide que digan algo y dicen lo que estamos diciendo nosotros aquí. Que aunque eso no es nobel, como lo dice un experto, nosotros confiamos en la palabra del experto y votamos a favor de que se haga un sistema nuevo, se establezca un sistema nuevo con las naturales reservas de que eso está mal y por eso entonces cambiamos nuestro voto para que no se hagan erogaciones ni se cometan excesos a base de un margen tan ilimitado. Pero el mismo Banco, el Presidente del cual vino aquí el otro día en el mes de agosto, en su carta mensual del propio agosto, del propio agosto—yo creo que esto es de una autoridad mayor que lo otro. ¿Qué dice aquí? "Límite de la Deuda Pública." Fíjense que esto es ahora la deuda nacional—y perdóneme si les tomo un poco de tiempo, aunque no es muy largo, es muy corto.

"En tanto que la Administración solicitó tan solo un incremento temporal...

O sea, la Administración a todos los años al Congreso y le dice: "Mire, se nos está agotando el límite, auméntenlo". Y le pide al Congreso. Pero cuando los presupuestos se balancean como pasó, si mal no recuerdo, en el '54 o '55 y otro año más después, que el Presidente Eisenhower presentó presupuestos balanceados con sobrantes, el Congreso baja el límite, lo baja y lo sube. En el sistema nacional es sistema por ley. O sea, el Congreso es el que actúa. Y dice aquí:

"En tanto que la Administración solicitó tan solo un incremento temporal el informe de la Comisión de Moneda y de Crédito pide la abrogación del límite con el objeto de extender la gama de la potestad gestora discrecional que ejerce la Rama Ejecutiva del gobierno federal. La limitación de la deuda no la restringe.

Estoy leyendo textualmente, de la página 88 de este informe:

"La limitación de la deuda no la restringe. A la larga la deuda aumenta o disminuye como resultado del déficit o del superávit en el presupuesto federal, no a causa de ninguna ley que fije el extremo infranqueable."

Claro, ¿por qué? Por la flexibilidad esa de los ingresos. ¿Y qué ha pasado? Lo que pasó aquí. Si aquí hemos pasado del margen prestatario. Vamos a hablar claro. Aquí nos pasamos recientemente, con motivo de unas necesidades que tenía la Autoridad y por eso pasamos aquella ley pasándole 6 millones a una de las Autoridades y ahora, como ha dicho con toda honestidad intelectual el compañero Ortiz Stella, estamos a ley de 3 millones del margen prestatario. Pero eso no quiere decir que es infranqueable. Tiene la flexibilidad de que cada año ingresa más y también el valor de la propiedad es mayor. Razón: Pues, el aumento en el crecimiento de la economía. Son valores, son factores de la economía misma que ellos solo funcionan y hacen que cada día sea mejor la situación en donde se está desarrollando un país. Y entonces dice:

"La Comisión observó que no tan solo los confines de la deuda fracasaron en el intento de alentar la responsabilidad fiscal y frenar los expendios...

Fíjense que ni aún con el límite hubo el freno completo, sino que han restringido la libertad de la Tesorería en su labor gestora. Y entonces dice:

"... ha sido corriente confinar la potestad de los gobiernos en cuanto a incurrir en deudas. Como reacción por las pasadas dificultades debido a préstamos excesivos, la Constitución de casi la totalidad de los estados prohibe o restringe los préstamos, excepto mediante una enmienda constitucional o referéndum popular. Por ese mismo hecho redoblaba la importancia de las limitaciones del gobierno federal en calidad de prestatario si se ha de preservar el valor del dólar y evitar la falta de pago furtiva que ocasiona la inflación. Bajo la Constitución Federal el gobierno tiene la potestad de acuñar dinero. La primera potestad ha sido delegada a la reserva federal responsable ante el Congreso. La segunda, de tomar dinero prestado, quedó delegada en el Poder Ejecutivo, con dos restricciones principales: el límite de la deuda y el del tipo de interés de 4½% que paga sobre los bonos de la Tesorería."

De modo, que el Congreso de Estados Unidos nunca, nunca ha estado dispuesto a delegar este derecho. El Congreso de Estados Unidos ha mantenido, de una manera firme, que debe haber dos límites: el límite de la deuda en sí y el límite del tipo de interés.

Entonces, dice esta misma carta mensual:

"Durante su actuación como Secretario del Tesoro George M. Humphrey, se manifestó muy partidario de la idea de limitar la deuda, diciendo: 'Creo que es muy saludable disponer del freno que significa el actual límite de la deuda para el Poder Ejecutivo, para el Congreso y para todo el interesado y creo que equivale a la penetración de una barrera segura, se produce una explosión al atravesarla y así debe ser. El sentir general lo aprueba y creo que evita los expendios más allá de la suma fijada. De modo, que me declaro a favor'."

Y entonces, termina la carta diciendo:

"Cuando se debate el límite de la deuda, los Diputados y Senadores, los redactores de los periódicos y los ciudadanos en general disponen de la oportunidad de detenerse a pesar del daño que ocasionan los expendios federales sin atajos y dichos perjuicios son enormes, erosión del valor de la moneda y de todas las promesas de pago venideras y una tributación que llega a sofocar el esfuerzo productivo.

"Los archivos de los debates del Congreso se hallan tachonados de ejemplos de la manera cómo se han aumentado los expendios que obligan a elevar el límite de la deuda.

"Una de las preguntas de acrecentar el confín hace algunos años, dio lugar al comentario del congresista Forester, de Georgia, así:

'Este día es sombrío para el país. Al fin nos encontramos en un punto que todos debíamos haber previsto. Los dispendios que hacen caso omiso del futuro nos han conducido a esta situación. Me pregunto, si la solicitud del Presidente de elevar el límite de la deuda, nos ha restituido algo de sobriedad. Es evidente que el país cayó en la bocelza por largo tiempo, pero si ahora no nos sosegamos no nos quedaría valla alguna.'

Y el senador Clinton P. Anderson, de New Mexico, declaró:

"Hubo mucha gente que se dio cuenta de que íbamos a tener que aumentar el confín de la deuda a menos que pusiéramos un freno a los expendios. Creo que la actitud general de los Senadores hubiese sido algo diferente si el Congreso se hubiera pronunciado en forma clara en el sentido de recortar el proyecto o confrontar la alternativa de un aumento en el límite de la deuda. El Congreso ha votado a menudo muchas sumas menores que la solicitada por la Administración y probablemente había tomado prestado y quizás desembolsado si no hubiera existido atajo alguno. Por cierto que la Tesorería ha hallado la manera de rebasar a veces el límite legal."

De modo, que no se hizo aquí, o casi se hizo, sino que se ha hecho también en el Tesoro Federal, pero sostiene básicamente el First National City Bank, en un artículo que publica con su aprobación, que así resulta más importante que nunca el papel que desempeña el límite claro de la deuda en nuestros días, en que priva la tendencia hacia un mayor déficit y una ascendente deuda pública.

Eso termina este trabajo y yo pregunto, para terminar: ¿qué es más importante, compañeros del Senado, el que los representantes de varios bancos, que es natural que expongan su punto de vista sin entrar en más detalles, sino genéricamente, declaren que creen bueno el método—bueno, nosotros también estamos aceptando en principio el método—o, lo que dice, con su aprobación, el propio Banco, oficialmente para toda la Nación? No para aquí donde cada uno de esos bancos, como es natural, tienen que tener cierta remisión a atacar a las cosas noveles, porque tienen sus grandes depósitos, sino por el hecho de que es el banco ahora oficialmente, el que habla para todo el Continente. ¿Qué es de más peso? Que ese atajo, ese límite claro que en Hawaii es de dos maneras: 60 millones en números redondos y el 15% de los ingresos nacionales. Y nosotros aquí estamos dispuestos a aceptar en una enmienda, primero: el 150% y si es necesario que se llegue al 200. Me parece que nuestra posición es harto razonable, me parece que hemos fijado nuestra posición de una manera clara y terminante.

Y por última vez quiero repetir que el uso de la libertad no es el que a veces creemos. La libertad hay que usarla autofrenándonos nosotros en el ejercicio de esa libertad. Yo creo que de esa manera, poniendo un techo definitivo, claro, sin perjuicio de la flexibilidad del método o fórmula que aceptamos, habríamos logrado un gran cambio de avance.

Creo con toda honestidad que ustedes están convencidos de que no ha sido nuestro propósito, por lo liberal de nuestra aceptación, el que se restrinjan los recursos del Gobierno. Y ya lo digo por quinta vez, porque creo que debo enfatizar ese punto para evitar malas interpretaciones.

Y termino, diciendo que aquí tengo yo el estudio de la National Planning Association, y que ese estudio, que es un estudio profundo, con la aceptación del Gobierno actual de Puerto Rico, establece que cuando se hace uso de métodos como éste, de disponibilidad, de por ciento de ingresos, se hace contemplando rebajar las contribuciones. De manera, que no hay argumento posible a base de que nosotros no queremos contribuciones. Las contribuciones hoy la pagan todos, grandes y chicos. Unos al través de una clase de contribuciones y otros al través de otra. No, todo lo contrario, el método que ustedes están aprobando y que nosotros en principio aceptamos en sustitución del método que le aceptaríamos, que es el que ustedes nos propusieron hace dos años, establece la premisa para la reducción de las contribuciones, redúzcanse o no se reduzcan.

# Exhibit 79

# TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: 940-29 Diario de Sesiones de la Convencion Constituyente pgs 1090-1092_EN and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

Stephanie Penn
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by _____.

_____
Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

Mr. PRESIDENT: The Office of the President is not certain. Those who are in favor, will you be so kind as to stand up. Those who are against will stand up to vote … Amendment defeated.

Mr. RIVERA COLON: Mr. President …

Mr. GUTIERREZ FRANQUI: Mr. President: A question.

Mr. PRESIDENT: Mr. Delegate.

Mr. GUTIERREZ FRANQUI: Mr. President: A question.

Mr. PRESIDENT: Mr. Delegate.

Mr. GUTIERREZ FRANQUI: Mr. President: Before considering preparing an amendment, I would like to ask a question of the President of the committee that reported this substitute proposal. We would like the Committee President to answer us, for the record, how does the committee understand the meaning of the phrase, "total resources calculated for that fiscal year." On page 7, lines 17 and 18.

Mr. NEGRON LOPEZ: I can answer the question. Reading it in order to determine the difference in the text – the provision corresponding to the Jones Law, I read in Article 34 of the Jones Law, the last paragraph: "The Legislative Assembly shall make no allocation nor authorize any spending by virtue of which or from which the expenses of the Government of Puerto Rico, during any fiscal year, exceed total projected revenue for the year, by law, applicable to said allocation or expense, including any available surplus in the Treasury, unless the Legislative Assembly, upon making said allocation, provides for the assessment of tax contributions sufficient as to pay the aforementioned allocation or expense during the referenced fiscal year."

The concept of "total revenue" that appears in the Jones Law expresses the idea that existed at the time of approval of this law, that government resources consisted of tax revenue and any surplus there might be from previous fiscal years. However, in modern finance, I say, in 1951 finance, this term, total revenue, no longer covers everything that total government revenue covered. Total resources include tax payment revenue or total general or special revenue. It also includes any surplus there might be from fiscal years, from previous fiscal years; it includes non-tax revenue such as proceeds from the sale of properties, royalties from public corporations paid to the State, surplus earnings by public corporations, federal aid, so-called federal grants-in-aid, and funding claimed through the issuance of bonds, which is one of the ways the State has of raising funds for developing its program.

Thus, the term "total calculated resources" includes resources already known, because it is known what they are going to be, such as federal aid, fixed income, surplus, etc.; and those calculated, those that depend on proceeds from contributions and other factors, that cannot be projected as of the start of the fiscal year.

Mr. GUTIERREZ FRANQUI: There is no amendment, Mr. President.

1090

Mr. RIVERA COLON: Mr. President.

Mr. PRESIDENT: Mr. Delegate.

Mr. RIVERA COLON: I would like to ask a question of the Legislative Committee President. I would like Mr. Committee President to explain to me the scope of this ruling, of these words: "assessment of tax contributions." That is to say, Article 20. Does it mean that when the funds are all depleted, then taxes will be able to be assessed to cover any shortfall there might be in the budget items? I say, the term, these words, "assessment of tax contributions." I want Mr. President to give me an explanation. I understand that the assessment of tax contributions is discretionary, based on using the budget margin, based on increasing income tax items; I would like him to give me an explanation on this specific point regarding the assessment of tax contributions, or whether it would be better to properly clarify this situation.

Mr. NEGRON LOPEZ: I would say, the intent … of course, it seems to me that the Style Committee should, in choosing the outcome of this discussion, it should use words that clarify, that express the concept with the desired clarity.

The committee's intent was that after considering all resources that are estimated or calculated for a fiscal year, if the legislative branch wishes to provide for allocations above and beyond those resources, i.e., after considering any bond issuances, after considering federal aid, after considering any existing tax and non-tax revenue …

Mr. RIVERA COLON: (Interrupting) I understand, I want to understand, that insofar as it is possible, all resources available to the government will be used, and then, when all those resources have been depleted, we can move on to the assessment of tax contributions.

Mr. NEGRON LOPEZ: Absolutely.

Mr. RIVERA COLON: Thank you very much.

Mr. NEGRON LOPEZ: Absolutely.

Mr. PRESIDENT: Are there any other amendments to Article 20?

Mr. GELPI: An amendment.

Mr. PRESIDENT: Mr. Delegate.

Mr. IRIARTE: Mr. President.

Mr. MUÑOZ RIVERA: Mr. President.

Mr. PRESIDENT: Delegate Gelpí has the floor.

1091

Mr. GELPI: Article 20, page 7, line 17, after the word "exceed," in line 17, insert "90 percent." Then it would read as follows: "Allocations made for a fiscal year may not exceed 90 percent of total resources calculated for said fiscal year," etc., etc. And I will argue it briefly.

Mr. PRESIDENT: You have the floor, Mr. Delegate.

Mr. GELPI: What would be logical would be if the provision for Article 20 were drafted this way, all revenue calculated for the government can be spent in a fiscal year and, as the Committee President explained just now, all resources available to the government before assessing tax contributions could be depleted, why would it not also be better to be economical, and rather than make an allocation to spend all the funds, leave even a margin for any emergency, such as 10 percent of total revenue calculated to formulate the budget, i.e., the government program?

I believe, Mr. President and Delegates, that by acting conservatively, these being poor people, and creating a government for poor people as it has been said will be created, we should be economical and not spend all the government's funds on allocations.

Mr. BARRETO PEREZ: We object.

Mr. PRESIDENT: Any other discussion on the proposal?

Mr. ALVARADO: Mr. President…

Mr. PRESIDENT: Mr. Delegate…

Mr. MUÑOZ RIVERA: A question for the President…

SEVERAL DELEGATES: We can't hear…

Mr. PRESIDENT: We have a proposal for amendment before the commission, from Mr. Gelpí. Is it on that amendment that Mr. Delegate is going to speak? So, is there any discussion on Mr. Gelpí's amendment? If there is none, it is placed up for vote. Those in favor, say aye… Opposed, nay… Amendment defeated. The delegate Mr. Iriarte has the floor, as he requested it.

Mr. IRIARTE: Mr. President and fellow delegates: In approved Article 12 of this bill, of this replacement proposal, there is a provision that reads, in line 20: "No bill shall be approved," in article 12, page 4, line 20… I want the Committee President to follow along with me. In article 12, line 20, page 4, it says: "No bill shall be approved, with the exception of those for the general budget." Now, we have the draft general budget of which I was speaking a moment ago. Now, as I said a moment ago, there is no provision whatsoever concerning the draft general budget. Currently, our Basic Charter has a provision that reads:

1092

Sr. PRESIDENTE: La Presidencia tiene duda. Los que estén por la afirmativa, tendrán la bondad de ponerse de pie. Los que estén en contra, se pondrán de pie para votar... Derrotada la enmienda.

Sr. RIVERA COLON: Señor Presidente...

Sr. GUTIERREZ FRANQUI: Señor Presidente: Para una pregunta.

Sr. PRESIDENTE: Señor Delegado.

Sr. GUTIERREZ FRANQUI: Señor Presidente: Antes de considerar el formular una enmienda, desearía hacerle una pregunta al presidente de la comisión que informó esta proposición sustituta. Quisiéramos que el Presidente de la Comisión nos contestase, para el [acta], qué es lo que entiende la comisión, qué significa la frase, "los recursos totales calculados para dicho año económico". En la página 7, líneas 17 y 18.

Sr. NEGRON LOPEZ: Puedo contestar la pregunta. Leyendo para que se vea la diferencia en el texto—la disposición correspondiente de la Ley Jones, leo del artículo 34 de la Ley Jones, el último párrafo: "La Asamblea Legislativa no hará ninguna asignación ni autorizará ningún gasto en virtud de la cual o del cual los gastos del Gobierno de Puerto Rico, durante cualquier año económico, excedan de las rentas totales provistas a la sazón por ley, y aplicables a dicha asignación o gasto, incluyendo cualquier superávit disponible en el Tesoro, a menos que la Asamblea Legislativa, al hacer dicha asignación, disponga la imposición de una contribución suficiente para pagar la mencionada asignación o gasto dentro del referido año económico".

El concepto de "rentas totales" que aparece en la Ley Jones expresa la idea que existía al tiempo de aprobarse esta ley, de que los recursos del gobierno consistían en los ingresos contributivos y en el superávit que pudiera haber de ejercicios económicos anteriores. Sin embargo, en las finanzas modernas, digo, en las finanzas del año 1951, este término de rentas totales, ya no abarca todo lo que abarcan los recursos totales del gobierno. Los recursos totales incluyen los ingresos contributivos o totales de índole general o de índole especial. Incluyen además, cualquier superávit que pueda haber de años económicos, de ejercicios económicos anteriores; incluye ingresos no contributivos como el producto de la venta de propiedades, royalties, o regalías de corporaciones públicas hechas al Estado, sobrantes de beneficios obtenidos por corporaciones públicas, ayudas federales, los llamados grant [in] aids federales, y los recursos que se alleguen mediante la emisión de bonos, que es una de las maneras que tiene el Estado de levantar fondos para el desarrollo de su programa.

De manera que la frase, "recursos totales calculados", son aquellos recursos que se conocen ya, porque se sabe cuáles van a ser, tales como ayudas federales, como ingresos fijos, como superávit, etc.; y los calculados, los que dependen del producto de las contribuciones y de otros factores, que no se pueden prever al comienzo del año fiscal.

Sr. GUTIERREZ FRANQUI: No hay enmienda, señor Presidente.

1090

Sr. RIVERA COLON: Señor Presidente.

Sr. PRESIDENTE: Señor Delegado.

Sr. RIVERA COLON: Quiero hacer una pregunta al señor Presidente de la Comisión Legislativa. Quiero que el señor Presidente de la Comisión me explique el alcance de esta sentencia, de estas palabras: "imposición de contribuciones". Es decir, del artículo 20. Quiere decir que cuando ya se agoten todos los recursos, ¿entonces podrán imponerse contribuciones para cubrir cualquier déficit que haya en las partidas presupuestales? Digo, el vocablo, las palabras éstas "imposición de contribuciones". Yo quiero que el señor Presidente me dé una explicación. Yo entiendo que la imposición de contribuciones es a base de arbitrios, a base de usar el margen prestatario, a base de aumentar las partidas de income tax; que me dé una explicación sobre este punto específico de la imposición de contribuciones, o si sería mejor aclarar bien esa situación.

Sr. NEGRON LOPEZ: Digo, la intención... claro, me parece que la Comisión de Estilo debe, escogiendo el producto de esta deliberación, consignar las palabras que aclaren, que expresen el concepto con la claridad que se desea.
      La intención que ha tenido la comisión es que después de considerados todos los recursos que se estimen o se calculen para un año económico si desea el poder legislativo proveer para que haya asignaciones por encima de esos recursos, o sea, después de considerar cualquier emisión de bonos, después de considerar la ayuda federal, después de considerar los ingresos contributivos y no contributivos que existan...

Sr. RIVERA COLON: (Interrumpiendo) Yo entiendo, yo quiero entender, que hasta donde sea posible se utilizarán todos los recursos con que cuenta el gobierno y entonces, cuando se terminen todos esos recursos, podemos ir a la imposición de contribuciones.

Sr. NEGRON LOPEZ: Absolutamente.

Sr. RIVERA COLON: Muchas gracias.

Sr. NEGRON LOPEZ: Absolutamente.

Sr. PRESIDENTE: ¿Alguna otra enmienda al artículo 20?

Sr. GELPI: Para una enmienda.

Sr. PRESIDENTE: Señor Delegado.

Sr. IRIARTE: Señor Presidente.

Sr. MUÑOZ RIVERA: Señor Presidente.

Sr. PRESIDENTE: Tiene la palabra el delegado señor Gelpí.

1091

Sr. GELPI: El artículo 20, página 7, línea 17, después de la palabra "exceder", en la línea 17, intercalar, "del 90 por ciento". Entonces diría así: "Las asignaciones hechas para un año económico no podrán exceder del 90 por ciento de los recursos totales calculados para dicho año económico", etc., etc. Y voy a argumentarla brevemente.

Sr. PRESIDENTE: Tiene la palabra el señor Delegado.

Sr. GELPI: Lo lógico es que si tal como está redactada la disposición del artículo 20 se pueden gastar en un año económico todos los ingresos calculados para el gobierno y, según explicó ahora el Presidente de la Comisión, se podrían agotar todos los recursos que tenga el gobierno antes de imponer contribuciones, ¿por qué no es mejor, también, ser económicos, y en vez de hacer una asignación para gastar todos los recursos, dejar siquiera un margen para cualquier emergencia, como el 10 por ciento de la cantidad total de ingresos calculados para formular el presupuesto, o sea el programa del gobierno?

Yo creo, señor Presidente y señores delegados, que actuando conservadoramente, siendo éste un pueblo de pobres y creándose, como se dice que se va a crear, un gobierno para pobres, debemos ser económicos y no gastar en asignaciones todos los recursos del gobierno.

Sr. BARRETO PEREZ: Nos oponemos.

Sr. PRESIDENTE: ¿Algún otro debate sobre la proposición?

Sr. ALVARADO: Señor Presidente...

Sr. PRESIDENTE: Señor Delegado...

Sr. MUÑOZ RIVERA: Una pregunta al presidente...

VARIOS DELEGADOS: No se oye...

Sr. PRESIDENTE: Tenemos una proposición de enmienda ante la comisión del señor Gelpí. ¿No es sobre esa enmienda que va a hablar el señor Delegado? Entonces ¿hay discusión sobre la enmienda del señor Gelpí? Si no la hay, se pone a votación. Los que estén por la afirmativa, dirán que sí... En contra, no... Derrotada la enmienda. El delegado, señor Iriarte, tiene la palabra, que la había solicitado.

Sr. IRIARTE: Señor Presidente y compañeros delegados: En el artículo 12 aprobado, de este proyecto de ley, de esta proposición sustituta, hay una disposición que dice, en la línea 20: "No se aprobará", en el artículo 12, página 4, línea 20... Quiero que el Presidente del Comité me siga. En el artículo 12, línea 20, página 4, se dice: "No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general". Aquí viene el proyecto de presupuesto general de que yo hablaba hace un momento. Ahora, según dije hace un momento, no hay disposición alguna con respecto al proyecto de presupuesto general. Actualmente nuestra Carta Orgánica tiene una disposición que dice:

1092

# Exhibit 80

# TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: Maldonado v. Junta Planificación, 171 D.P.R. 46 (2007) and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

Stephanie Penn
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by ___<u>Stephanie Penn</u>___.

_____
Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

KeyCite Yellow Flag – Negative Treatment
Distinguished by Oficina De Gerencia De Permisos v.
Pacheco Cruz, TCA, April 18, 2016
171 D.P.R. 46, 2007 WL 1582244 (P.R.), 2007 TSPR
87

VÍCTOR S. MALDONADO, respondent,
Vs.
JUNTA DE PLANIFICACIÓN, petitioner

In the Supreme Court of Puerto Rico.
*Number:* CC-2003-791

**Synopsis**
PETITION OF *CERTIORARI* for review of a
JUDGMENT of *Gilberto Gierbolini Rodríguez, Héctor
Cordero Vázquez* and *Carlos Rodríguez Muñiz,* Judges
of the Appellate Court, which revoked a decision of the
Junta de Planificación [Planning Board] and returned
the case so that the Board could, among other things,
evaluate an inquiry concerning proposed location in
accordance with the Special Zoning Regulations for the
Tortuguero Lagoon Drainage Basin in force on the date
of its filing. *Judgment is issued revoking the judgment
handed down by the Appellate Court and the Planning
Board's decision is re-established.*

*Aida del C. Silver Cintrón,* attorney for the petitioner;
*Heidi Rodríguez,* of the *Bufete* [Law Firm] *Pietrantoni,
Méndez & Álvarez,* attorney for the respondent.

ASSOCIATE JUDGE REBOLLO LÓPEZ issued the
opinion of the Court.

On September 5, 2000, Víctor S. Maldonado, through
Eng. Manuel A. *Novas,* filed with the Planning Board
(Board) *an inquiry concerning location for the
development of a heavy industrial park of approximately
forty-five cuerdas in the Cotto Norte district of the
Manatí municipality, as well as the possible amendment
of the Special Zoning Map of the Tortuguero Lagoon
Drainage Basin.*[1] The land where the proposed project
would be located is classified as an LT-A1 (Tortuguero
Lagoon- Agricultural capable of Mechanization) and
LT-B1 (Tortuguero Lagoon - Interior Forests) District.

The proposed project was submitted for the
consideration of various governmental agencies,
including the Electrical Energy Authority (AEE), the

Aqueducts and Sewers Authority (AAA), the Roads and
Transportation Authority (ACT), the Compañía de
Fomento Industrial (CFI), the Institute of Puerto Rican
Culture (ICP), the Department of Natural and
Environmental Resources (DRNA), the Department of
Agriculture (DA), and the municipality of Manatí.

After evaluating the requested project, the AEE, CFI,
and DA said that they had *no* objection to the Board's
approving the project. The AAA and the ACT
*conditioned* their favorable recommendation on making
various improvements to the infrastructure of the site,
while the ICP and the DRNA requested an
*archeological assessment* and an environmental
document in order to be able to issue their opinion.
Finally, the municipality of Manatí *favorably endorsed*
the project, in the belief that "it was of *52 extreme
importance for the economic development of the
Municipality of Manatí."

On October 25, 2000, the Board asked Mr. Maldonado
to submit various documents, including an
environmental assessment, in order to hold a public
hearing. Thus, on February 13, 2001, the
aforementioned hearing was held, receiving the
opposition – by oral and written presentation[s] – of the
Instituto Ambiental COTICAM de Puerto Rico
(COTICAM).[2]

After various steps had been taken, including Engineer
Novas' reply to COTICAM's opposition, the Board re-
evaluated the requested inquiry and gave the parties a
period of time to issue their comments. Subsequently,
the examining official issued her recommendation and
the Board decided to shelve the inquiry without
prejudice for thirty days until the requesting party could
submit the requested documents.

Meanwhile, *on October 28, 2000, the Plan and Special
Regulations for the Tortuguero Lagoon Drainage Basin
went into effect. Its objectives include establishment of
the public policy that will guide land use in the area.*

Thus, and after the requesting party complied with the
aforementioned request from the Board – with respect to
the production of documents on January 17, 2002,
notice of which was given on February 25 of the same
year – the Board issued a decision *denying* the inquiry
concerning location. In summary, the aforementioned
agency

Maldonado v. Junta de Planificación, 171 D.P.R. 46 (2007)
2007 TSPR 87

Case: 17-03283-LTS Doc#:4781-6 Filed:02/24/18 Entered:02/24/18 28:12:25 Desc:
Exhibit DRCCA Part 5 Page 4 of 33
Exhibit Part Page 399 of 541

decided that the proposed project did *not* comply with the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000, and conflicted with Law No. 292 of *53 August 21, 1999, known as the Law for the Protection and Conservation of the Karstic Physiography of Puerto Rico, 12 L.P.R.A. sec. 1151 *et seq.,* and other established public policies.

Maldonado filed a timely petition for reconsideration with the Board. It was accepted on April 2 of the same year. When ninety days had passed after the Board accepted the motion for reconsideration without expressing itself or granting any extension, Maldonado turned – by means of an appeal for administrative review – to the Appellate Court. In summary, he put forth that the Board erred in using the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 to deny the requested inquiry concerning location and in determining that the proposed project conflicts with the document "Objectives and Public Policies of the Land Use Plan of Puerto Rico."

After analyzing both parties' arguments, the intermediate-level appellate court *revoked* the appealed decision and returned the case so that the Board could, among other things, evaluate the inquiry concerning proposed location in accordance with the Special Zoning Regulations for the Tortuguero Lagoon Drainage Basin *in force on the date of its filing.* Moreover, it ordered that, when evaluating the petition, objectives 5.02, 5.03, 5.04, 5.05, and 5.06 of the document "Objectives and Public Policies of the Land Use Plan of Puerto Rico" be considered and that the environmental assessment prepared by the petitioner be remitted to the Environmental Quality Board.

Not satisfied, the Planning Board turned – by means of an appeal for *certiorari* – to this Court. It puts forward that it is in order to revoke the judgment issued by the intermediate-level appellate body because said body erred

… by hearing the appeal for review when it did not have jurisdiction therefor. *54

… by determining that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 was not applicable to the inquiry concerning location at hand.

… by determining that the Planning Board, regardless of whether it already had sufficient criteria for denying the inquiry, had to submit the [Environmental Assessment] to the Environmental Quality Board for consultation.

… by determining that the Planning Board had to analyze other provisions of the document "Objectives and Public Policies [of the] Land Use Plan of Puerto Rico" despite indicating that the Planning Board had based its determination on this aspect. Petition for *certiorari,* pp. 4-5.

*We order* the requested remedy. Taking into consideration the position of both parties and being in a position to resolve it, we proceed to do so.

## I

To begin with, we evaluate the first indication of error, wherein it is held that the Appellate Court lacked jurisdiction to hear the appeal.

The Board puts forth that the intermediate-level appellate body lacked jurisdiction to hear the appeal before it *because it was allegedly filed late.* In support of its contention, it puts forth that the respondent filed the appeal with the Appellate Court when the thirty days following the ninety days after timely filing of the motion for reconsideration which the Board accepted had elapsed, in violation of Section 3.15 of Law No. 170 of August 12, 1988, better known as The Uniform Administrative Procedure Law of the Commonwealth of Puerto Rico (L.P.A.U.), 3 L.P.R.A. section 2165. *It is incorrect.*
[1] As is known, questions of jurisdiction are exceptional, wherefore an assertion of that kind can be filed with the Trial Court and in the appellate phase of the case. *J.P.* *55 v. Frente Unido I,* 165 D.P.R. 445 (2005); *Morán v. Martí,* 165 D.P.R. 356 (2005). In other words, the courts must be faithful guardians of their jurisdiction, regardless of whether or not the matter has been raised before. Id.

[2-3] Jurisdiction is not presumed because, prior to consideration on the merits of an appeal or once its jurisdiction has been questioned, it is the ministerial duty of every court to evaluate whether it possesses it, because that has a direct bearing on the very power to adjudicate a dispute. *Carattini v. Collazo Syst. Analysis, Inc.,* 158 D.P.R. 345 (2003); *Soc. de Gananciales v. A.F.F.,* 108 D.P.R. 644 (1979). The absence of jurisdiction cannot be

corrected and the parties cannot voluntarily give jurisdiction over the matter to a court, and neither can it appropriate it. *Vázquez v. A.R.PE.*, 128 D.P.R. 513 (1991).

[4] The courts do not have discretion to assume jurisdiction where it does not exist. Consequently, when a court hands down a judgment without having jurisdiction over the parties or the matter, its decree is juridically non-existent or *ultra vires. Empress Hotel, Inc. v. Acosta,* 150 D.P.R. 208 (2000).

[5] As for the time period for turning to the Appellate Court to petition for review of a decision issued by an administrative agency, Section 3.15 of the L.P.A.U., supra, provides:

> The party adversely affected by a decision or partial or final order may, within twenty (20) days of the date of filing in the record of notification of the decision or order, file a motion for reconsideration of the decision or order. Within fifteen (15) days of the filing of said motion, the agency must consider it. If it summarily rejects it or fails to act within the fifteen (15) days, the time period for petitioning for review will start to run again from notification of said rejection or from the expiration of those fifteen (15) days, as the case may be. If, in considering it, a decision is made, the time period for requesting review will start to be counted from the date on *56 which a copy of the notification of the agency's decision, definitively ruling on the motion for reconsideration, is filed in the record. Such decision must be issued and filed in the record within ninety (90) days following the filing of the motion for reconsideration. *If the agency accepts the motion for reconsideration but fails to take any action in connection with the motion within ninety (90) days of its filing, it will lose jurisdiction over it and the time period for petitioning for judicial review will start to be counted from the expiration of said term of*

*ninety (90) days,* unless the agency, for just cause and within those ninety (90) days, extends the time period for making a decision by not more than thirty (30) additional days. (Emphasis ours.)

We should emphasize, in turn, that the Planning Board's Regulations on Adjudicative Procedures, Regulation No. 6031 dated October 13, 1999 (Board's Regulations on Adjudicative Procedures) contain a provision practically identical to the above-transcribed Sec. 315 of the L.P.A.U.[3]

As we can note, both provisions establish, in summary, that once the Board – or an administrative agency – accepts a timely motion for reconsideration, it has ninety days counted from the filing *57 of the aforementioned motion to rule on it. Otherwise, the Board will lose jurisdiction over the case and the time period of thirty days for turning to the Appellate Court to petition for review of the decision will start to be counted once the aforementioned ninety day period expires. In other words, the time period for appealing will expire one hundred twenty days after the filing of the motion for reconsideration, accepted and not ruled on by the Board.[4]

In the case before us, the motion for reconsideration was filed on March 18, 2002, and the Board accepted it on April 2, 2002. Despite having accepted it in a timely manner, the Board let ninety days pass from the date on which the motion for reconsideration was filed without issuing any decision. On July 31, 2002 – 135 days after the filing of the motion for reconsideration – Maldonado filed an appeal for administrative review with the Appellate Court. From the foregoing it is inferred that the aforementioned appeal – *a priori* – was *late* because it was filed after the one hundred twenty days from submission of the motion for reconsideration.

*Now, our analysis does not end here; because the* respondent, *Maldonado, puts forth that the notices included in the notification of the decision appealed herein were defective.*

**[6-7]** As we know, Sec. 3.14 of the L.P.A.U. provides that any order or decision issued by an agency *will give notice of the right to petition for its reconsideration or review with statement of the respective facts and that, when this requirement has been fulfilled, said time periods will begin to govern.* 3 L.P.R.A. sec 2164. In keeping with said precept, *we have determined that the right to an adequate notification **\*58** is part of due process under law and that, consequently, the defective notification of a decision does not activate the time periods for using the post-judgment mechanisms, these being subject to the doctrine of per incuriam.* See: *Caro v. Cardona, 158 D.P.R. 592 (2003); Asoc. Vec. Altamesa Este v. Mun. San Juan, 140 D.P.R. 24 (1996); Rivera v. Depto. de Servicios Sociales, 132 D.P.R. 240 (1992); Aponte v. Srio. de Hacienda, E.L.A., 125 D.P.R. 610 (1990).*

**[8]** Under the aforementioned doctrine of per incuriam, a party is prevented from filing an appeal when, due to its carelessness or negligence, together with the passage of time and other pertinent circumstances, the other is harmed. *IM Winner, Inc. v. Mun. de Guayanilla,* 151 D.P.R. 30 (2000). With regard to that, we have reiterated that the mere passage of time is insufficient to prevent exercise of the cause of action, but other circumstances must be evaluated before dismissing the appeal that has been filed, such as: (1) *the justification, if any, for the delay;* (2) *the harm that the latter may cause,* and (3) *the effect on involved public or private interests.* Id.; *Pérez, Pellot v. J.A.S.A.P.,* 139 D.P.R. 588 (1995).

**[9]** In short, *the cases should be examined in accordance with the facts and the particular circumstances,* also considering that

"[a]bove all[,] the merits and other circumstances of the specific case must be taken into consideration, since the doctrine of per incuriam remains linked to the fundamental idea of equity: one resorts to 'reason' and 'conscience' to find just solutions, departing from the intransigent strictness of the fatal terms." (Emphasis removed.) *Pueblo v. Valentín,* 135 D.P.R. 245, 256 (1994). From a reading of the notices the

Board gave to the petitioner in the appealed decision, *it is inferred that they were not completely clear and could – as they in fact did – cause confusion.* Let us see. **\*59**

The aforementioned notices provide, first, that:

> If the Board accepts the Petition for Reconsideration it must rule on it within *ninety (90) days after the filing of said petition.* The period of thirty (30) days for petitioning for Judicial Review will start to be counted from the date on which a copy of the notification of the Board's Decision definitively ruling on the Petition for Reconsideration is filed in the record – which decision must be issued and filed in the record. (Emphasis ours.) Appendix, p. 475.

However, later on they say:

> If the Board fails to take action on the Petition for Reconsideration *within ninety (90) days of its having been accepted for examination,* it will lose jurisdiction over it, and the time period for petitioning for Judicial Review will start to be counted as of the expiration of said time period of ninety (90) days, unless the Board, for just cause and within those ninety (90) days, extends the time period for making a decision by not more than thirty (30) additional days. (Emphasis ours.) Appendix, p. 475.

As one can see, said notification is *contradictory* when it says, on the one hand, that the period of ninety days which the Board has to rule on a timely filed and accepted motion for reconsideration *will start with its filing* and, on the other hand, that the Board will lose jurisdiction to address the

motion for reconsideration *ninety days after its acceptance for examination.*

[10] In the face of said inconsistency – which is clearly contrary to the L.P.A.U. and the Board's Regulations on Adjudicative Procedures – we have *no* alternative but to rule that the notices included in the decision issued by the Board in this case *were defective* and that, consequently, *they did not activate the time period for appeal to the Appellate Court.* Consequently, and as we said before, *60 the lateness in filing the appeal to the intermediate-level appellate body must be analyzed in accordance with the doctrine of per incuriam.

From a careful analysis of the record under consideration, it is clear that the respondent, Maldonado, acted in accordance with one of the circumstances included in the notice that was included in the decision of which he was notified. Moreover, he did not sit back or display carelessness or negligence in filing the petition for administrative review with the Appellate Court fifteen days after expiration of the period provided for by the L.P.A.U. and the Board's Regulations on Adjudicative Procedures. Finally, it is pertinent to point out that the petitioner's lateness was not excessive and that the Board has not put forth any harm because of it or harm to any public or private interest that would merit dismissal of the case. On the contrary, we believe that this case contains disputes of high public interest, which deserve a hearing on the merits.

Therefore, we decide that, as regards the appeal filed by the respondent, Maldonado, before the Appellate Court, *the aforementioned court had jurisdiction to address it.*

## II

[11] As is known, the Constitution of the Commonwealth of Puerto Rico provides that "the most effective conservation of its natural resources and the fullest development and use thereof for the general benefit of the community" [w]ill be public policy of the Commonwealth." *Art. VI, Sec. 19, Constitution* E.L.A., L.P.R.A., Volume 1, ed. 1999, p. 421. See also: *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908 (1998); *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449 (1995).

[12] In accordance with said constitutional mandate, in the *61 past we have stated that "it has been public policy of the Government of the Commonwealth of Puerto Rico to direct our Island's planning process toward comprehensive sustainable development,

ensuring judicious use of the land and promoting conservation of the natural resources for the enjoyment and benefit of all." *A.R.PE. v. Rivera*, 159 D.P.R. 429 (2003), citing *Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico*, 23 R.P.R. sec. 650.821 *et seq.*

[13] In keeping with the aforementioned public policy, the Legislative Assembly approved the Law on Public Environmental Policy, Law No. 416 of September 22, 2004 (12 L.P.R.A. sec 8001 *et seq.),* which repealed the previous Law on Public Environmental Policy, Law No. 9 of June 18, 1970. Among the Legislature's objectives in approving the aforementioned law were: (1) to establish a public policy that stimulates a desirable and advisable harmony between man and his environment; (2) to promote efforts that would prevent or eliminate damage to the environment and the biosphere and stimulate man's health and well-being; (3) to enrich understanding of the ecological systems and important natural sources for Puerto Rico.[5]

[14] Law No. 416, supra – like its predecessor, Law No. 9, mentioned above – provides, in turn, in Art. 4 (12 L.P.R.A. sec 8001a), that all departments, agencies, municipalities, corporations, and public instrumentalities of the Commonwealth of Puerto Rico and its political subdivisions must, to the maximum extent possible, interpret, apply, and administer all the laws and regulations which are in force and which may be approved in the future, in strict conformance with the public policy set forth in said law. *62

Also, the Legislative Assembly approved the Organic Law of the Planning Board of Puerto Rico, Law No. 75 of June 24, 1975 (23 L.P.R.A. sec. 62 *et seq.)*, with the general purpose of

> … guiding the comprehensive development of Puerto Rico in a coordinated, appropriate, economical manner, which, in accordance with current and future social needs and the human, environmental, physical, and economic resources, would best promote the health, safety, order, coexistence, prosperity,

Maldonado v. Junta Planificación, 2007 TSPR 87
2007 TSPR 87

Case: 17-03283-LTS Doc#:4781-6 Filed:02/24/18 Entered:02/24/18 28:12:25 Desc:
Exhibit DX-GG Part 5 Page 4 of 43
Exhibit Part Page 404 of 541

defense, culture, economic soundness, and general well-being of the current and future inhabitants, and that efficiency, economy, and social well-being in the process of development, in the population distribution, in use of the land and other natural resources, and in the public improvements aimed at creating favorable conditions to enable society to develop comprehensively. Art. 4 of Law No. 75, supra, 23 L.P.R.A. sec 62c. See *Hernández #Alvarez v. Centro Unido*, 168 D.P.R. 592 (2006).

[15] The authorities that the Legislature gave the Board so that it could achieve the objectives include adopting and approving the regulations authorized by law, the Zoning Regulations, and the Regulations on Division into Lots, and any others that are necessary or that it is authorized to promulgate by any other law. 23 L.P.R.A. sec. 62j(4).

Moreover, and regarding the karstic zone of Puerto Rico, on August 21, 1999, the Law for Protection and Conservation of the Karstic Physiography of Puerto Rico was approved.[6] This law stated that "it is public policy of the Commonwealth of Puerto Rico to protect, conserve, and manage, for the benefit of this and future generations, the karstic physiography of Puerto Rico." Art. 2 of Law No. 292, supra, 1999 (Part 2) Laws of Puerto Rico 1272, 1275. Likewise, the aforementioned law provides:

The Secretary of the Department of Natural and Environmental Resources will order the Bureaus of Geology, Water *63 Resources, Coastal Zone Program, and Natural Heritage, and the Bureau of Fishing and Wildlife, to *conduct a study that establishes the areas which, due to their importance and geologic, hydrologic, and ecosystemic function, cannot be used under any circumstance for the extraction of materials from the earth's crust for commercial purposes, or for commercial exploitation. Said study will offer alternatives for carrying out the aforementioned activities under appropriate conditions in other areas of the karstic zone. The recommendations of this study will be included in the Regulations for Extraction of Materials from the Earth's Crust and the regulations of the Planning Board for zoning those areas of the karstic zone that must be conserved.* (Emphasis ours.) 12 L.P.R.A. sec. 1153.

In accordance with the aforementioned law, on *October 28, 2000,* the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin and the Zoning Map of the Tortuguero Lagoon Drainage Basin were approved, which repealed the 1978 Regulations on the Tortuguero Lagoon Drainage Basin. Said Plan and Regulations establish special zoning for the Tortuguero Lagoon drainage basin, *which determines the use and basic intensity of the current and proposed activities in the area.* Moreover, they provide that any project submitted to the Board and the Regulations and Permits Administration must comply with everything established therein and with the Law on Public Environmental Policy. Finally, and as pertinent, it indicates that *injection wells should not be approved and that "other industrial projects will not be approved in the Basin."*

[16] As one can see from the foregoing, in Puerto Rico – *by constitutional mandate* – there is a clear public policy aimed at protecting our natural resources. Moreover, one infers that said policy has been established in countless general and specific laws, and that all adjudicating bodies have the inescapable duty to use it when *64 making decisions that could affect the environment.

[17] Moreover, we cannot ignore the fact that, since 1979, regulations aimed at protecting the sensitive karstic zone of Puerto Rico have been approved. Said interest in conservation is so important that, in 1999, it went beyond the area of regulations and was embodied in an independent law, which imposes administrative fines on those who carry out certain activities in the area without permission from the Secretary of the Department of Natural and Environmental Resources of Puerto Rico.[7]

The environmental public policy in Puerto Rico and the particular governmental interest in protecting the karstic area having been set forth, we must address the specific disputes that have arisen between the parties.

A. In its second indication of error, the Board argues that the intermediate-level appellate forum erred in ruling that, for analyzing the proposed project, the Board could not use the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin, approved days after the inquiry concerning location was submitted. For his part,

the respondent, Maldonado, puts forth that the Appellate Court acted correctly in so ruling, since using the new regulations – which contain a prohibition on approving new industrial projects in the drainage basin and on permitting injection wells – to analyze his petition would entail the retroactive application of regulations that did not exist on the date when it was filed.

Said arguments having been evaluated, we believe that the principal dispute that arose between the parties can be summarized as follows: *Whether Zoning Regulations approved after the filing of* \*65 *a petition for inquiry concerning location can be used as a basis for denying the inquiry.* Let us see.

The aforementioned dispute *has not been addressed or resolved before by this Court.* In view of that – and for merely illustrative purposes – let us look at U.S. case law and the comments of various scholars on the matter. The aforementioned analysis shows that in most of the States in the U.S., the filing of an application for a permit prior to new zoning regulations taking effect does *not* grant the right to obtain it for some use that the new ordinance prohibits.[8]

> Several jurisdictions have required, as a condition for application of the aforementioned general rule, that the new regulations be in process of approval ("pending") when the permit in dispute is applied for. (Translation ours.) *Urey v. Zoning Hearing Bd. of Hermitage*, 806 A.2d 502 (2002).

Concerning the concept of "legally pending," it has been decided that new regulations will be considered "pending approval" when the governing body has decided to change a particular zoning plan and has initiated a process of regulation, announcing to the citizens its intention of holding public hearings. *Sherman v. Reavis*, 257 S.E.2d 735, 737 (1979);[9] *Continental S.E. Group v. City of Folly Beach*, 348 S.E.2d 837 (1986).

In short, the aforementioned doctrine – known in the U.S. jurisdiction as "the pending ordinance doctrine" – allows a \*66 construction permit to be denied on the basis of regulations approved subsequently but that would be in a formal process of approval – pending –

prior to submission of the petition. In turn, regulations in process of approval are considered those that have begun to be evaluated, whether through the publication of notices or the holding of public hearings, prior to the submission date of the application. What is fundamental for determining whether the regulations are pending is evaluating whether the process of their approval had already officially begun and if steps had been taken to inform the people.

**[18]** An additional basis in support of the application of the pending ordinance doctrine in our jurisdiction *is that here, as in the States where the doctrine has been mostly adopted, an application for permit does not grant an acquired right for its approval.* As far as that goes, we have said that, for construction permits, the person acquires a right – that a subsequent law cannot revoke – once it has been issued and he acts in accordance with it and incurs substantial expenses. *Phi Delta Pi v. Junta Planificación*, 76 D.P.R. 585, 591 (1954), citing Yokley, *Zoning Law and Practice*, 2nd ed., p. 234.

**[19]** Thus, an applicant does *not* acquire a right to obtain an inquiry concerning location by the mere act of filing his application at a time permitted by the current regulations. Consequently, if, on the date of submission of the application there are new regulations pending approval, *and they are approved before the application is decided upon,* said regulations may be used when granting or denying the petition for inquiry. Of course, the case in which the inquiry concerning location has been granted before the new regulations take effect is different, since at that time the \*67 applicant already has an acquired right that cannot be taken away from him without due process of law.

We have an opinion that the Secretary of Justice of Puerto Rico issued in 1970 on a dispute similar to the one before us, in which the same position was "adopted" that now mostly prevails in the U.S. jurisdiction on this point.[10] Even if the opinions issued by the Secretary of Justice of Puerto Rico *are not* binding on the courts,[11] we point it out because of the persuasive value it may have. It is noteworthy that

on said occasion, the aforementioned official determined that a Permits Officer on the Board *could use* Regulation No. 4 of February 7, 1970 to evaluate the applications for permits that were unresolved when it took effect.[12]

[20] In view of the foregoing, and given that protecting the environment and natural resources in our jurisdiction is a matter of significant public interest, we hereby rule that the aforesaid regulations must be adopted in our jurisdiction. In this regard, we cite the following text from Sherman v. Reavis, supra, at p. 737:

> It would be utterly illogical to hold that, after a zoning commission had prepared a comprehensive zoning ordinance or an amendment thereto, which was on file and open to public inspection and upon which public hearings had been held, and *68 while the ordinance was under consideration, any person could by merely filing an application compel the municipality to issue a permit which would allow him to establish a use which he either *knew or could have known* would be forbidden by the proposed ordinance, and by so doing nullify the entire work of the municipality in endeavoring to carry out the purpose for which the zoning law was enacted. (Emphasis added).

With the above having been decided, it is now necessary to determine whether the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 were pending approval when the inquiry concerning location now in dispute was filed. If so, we must decide if, according to the provisions included in said Plan and Regulations, the Board acted properly in denying the requested inquiry concerning location. We will now examine this.

B. An analysis of the case before us shows that the inquiry concerning location now in dispute was filed by the respondent on September 5, 2000 and that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin was signed by then-Governor of Puerto Rico, Honorable Pedro Rosselló González on October 28, 2000, which means that said regulations took effect forty-three days after the disputed inquiry concerning location was filed. The same document also shows that on November 23, 1999, almost ten months before the inquiry concerning

location was filed, the Board held public hearings so that government organizations, landowners and other interested groups could participate and comment on the regulations.

In view of the foregoing, we conclude that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 was a document that was "pending approval" when the respondent Maldonado filed the inquiry concerning location. It is clear that the Board had intended to prepare said plan and regulations, and *69 had commenced the approval process far before the respondent requested permission to build a heavy industrial park on the lands located in the Tortuguero Lagoon Drainage Basin. This is evidenced by the fact that on November 23, 1999, the Board presented the aforesaid document in a public hearing where government organizations, land owners and other interested parties were in attendance.

Based on the above, we believe that, according to the "pending approval" doctrine mentioned above, which we are adopting today in our jurisdiction, the Board was able to use the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 to evaluate the inquiry concerning location filed by the respondent. Therefore, it is necessary to determine whether it was proper to deny the inquiry request according to the provisions set forth in said document.

C. We have already mentioned that the respondent Maldonado requested an inquiry concerning location to build a heavy industrial park on a land measuring approximately fifty-four *cuerdas*, plus three or four *cuerdas* of a property to be divided, located in the Cotto Norte de Manatí district, and said land is located on the premises protected under both the previous and new Special Regulations for the Tortuguero Lagoon Drainage Basin.

Said regulations classify the lands where the requested project is to be located as LT-A1 and LT-B1 (essentially the same category as the previous regulations). Specifically, for the lands located in

District LT-A1, said regulations establish the following uses: (1) agricultural, such as the sowing of agricultural products, provided that non-polluting organic pesticides and fertilizers are used; (2) ancillary buildings and uses closely related or complementary to the crops, which is the primary use of the farm land; (3) a family residence. The following uses are established for the lands located in *70 District LT-B1: (1) agricultural; (2) buildings for uses ancillary to the primary uses; (3) sale of products harvested on the land, including wood; (4) craft studios; (5) house for one or two families with certain requirements.

[21] We must also note that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 provides, in addition to other strategies for industrial uses, that "*other industrial projects in the Basin shall not be approved*". It also establishes that in order to protect natural systems – such as gullies – "*the construction of injection wells used to dispose of rainwater is prohibited, [given that] such wells alter the hydrogeological balance.*"

According to the above, it is abundantly clear that the project proposed by the respondent does not fall within the uses permitted under the aforesaid Plan and Special Regulations. *Worse still*, approval of industrial parks, as the respondent seeks, *is expressly prohibited in said document.* This is what the Board stated in its resolution and this is what we find in our review of the Regulations. Moreover, in the Board's resolution, it is shown that the requested project proposes using two injection wells (Class V and Type B5) for runoff water, *which is also expressly prohibited in said document.*

In addition to the above grounds, the Board also determined that the proposed project infringes upon many of the aims and public policies of the Land Use Plan of Puerto Rico.[13] We will not discuss these, given that *71 we believe that with the initial grounds regarding the prohibition on approving new industrial parks in the area and new injection wells were sufficient basis for not approving the requested project.

[22] Before concluding, we must reiterate that the courts must defer to the decisions of administrative agencies, particularly when the dispute in question involves matters related to the areas of specialization or expertise of such agencies. We have also decided that such deference shall only be relinquished when the

determination is not based on substantial evidence, when there is an error in the application of the law or in the event of unreasonable or illegal conduct;[14] situations which, as we have seen, have not occurred in the present case.

[23] We must also remember that the karst area has one of the largest phreatic aquifers in Puerto Rico and is unmatched in scenic, natural, cultural and historic value, and thus has great potential as a tourist, ecological and scientific research area.[15] Therefore, we believe that it is fully covered under the public policy of the Government Puerto Rico aimed *72 at achieving comprehensive sustainable development that ensures *the judicious use of lands and promotes conservation of natural resources for the enjoyment and benefit of all.* See *A.RPe. v. Rivera*, *supra*.

*Based on the above-stated grounds, we have determined that it was possible to apply the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin of October 28, 2000 to the inquiry concerning location that was filed by the respondent and, in accordance with the provisions of same, that it was proper to deny it.* [16] *As a result, the Court of Appeals erred in ordering the remand of the case to the Board for additional proceedings.*

In view of the foregoing, *it is proper to revoke the Judgment handed down by the Court of Appeals on August 29, 2003 and, therefore, to restore the Planning Board's decision issued on January 17, 2002 denying request for an inquiry concerning location No. 2000-08-0804-JP U.*

*A judgment shall be issued to that effect.*

Associate Judge Fiol Matta issued a concurring and dissenting opinion, which Associate Judge Rodríguez Rodríguez joined. Associate Judge Fuster Berlingeri did not participate.

**-- O –**

Concurring and dissenting opinion issued by Associate Judge Fiol Matta issued a concurring and dissenting opinion, which Associate Judge Rodríguez Rodríguez joined.

I concur with this Court's decision that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin were applicable to the location inquiry **73** filed by the respondent and that in light of the provisions of the regulations, it was proper to deny the inquiry. However, I understand that we should not adopt the rule of "pending regulations" in our jurisdiction due to the limitation it places on the authorities delegated to the Planning Board of Puerto Rico (Planning Board) for the comprehensive and harmonious planning of the development of our country.

## I

The dispute raised in this case as to whether the Planning Board should have used a zoning regulation that was approved after an inquiry concerning location was filed as a basis for denying it is, in essence, a dispute regarding the retroactive application of said regulation, which we must address in accordance with civil doctrine on non-retroactivity of the laws.[1]

Article 3 of the Civil Code of Puerto Rico establishes the principle of non-retroactivity of the laws:

> Laws shall not have a retroactive effect unless they expressly stipulate the opposite.
>
> In no case may the retroactive effect of a law prejudice any rights acquired under prior legislation. 31 L.P.R.A. sec. 3

On previous occasions, we have stated that this principle is not an absolute rule and that it must be applied as **74** a general rule for interpreting statutes. For this reason, a law may have a retroactive effect if the legislative intent expressly or tacitly provides for such effect. *Warner Lambert Co. v. Superior Court*, 101 D.P.R. 378, 384-388 (1973). See also: *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 542 (1984); *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006). Now, then, Article 3 of the Civil Code, *supra*, limits the retroactive effect of a law so as not to prejudice the rights acquired under a previous law. Therefore, in order to determine if the retroactive effect of a law is valid, we must examine whether said effect arises expressly or tacitly from the legislative intent and if it affects rights acquired under a previous law.

In the field of administrative law, we must take into account that the power of agencies to issue regulations comes from the authority delegated to them by the legislative branch. Therefore, when applying the principle of non-retroactivity of laws to a set of regulations, it is necessary to determine, first, if the regulations have a retroactive effect; second, if the agency adopting such regulations has the delegated authority to give retroactive effect to such regulations, and third, if the retroactive effect of the regulations is valid. The regulations will have a retroactive effect if they affect completed legal transactions, legal situations that arise or events that occurred prior to their entry into force. L. Diez-Picazo and A. Gullón Ballesteros, *Civil Law System*, 9th ed., Madrid, Ed. Tecnos, 1997, Vol. I, p. 106.

The authority to give retroactive effect to regulations may be delegated expressly or tacitly by the legislative branch. If it does not arise expressly from law, then it will be necessary to examine whether, according to the legislative intent and the nature of the authority to give retroactive effect, it is reasonable to conclude that the delegation of same to the agency was tacit. The tacitly delegated authority must be necessary in order for the agency to carry out the **75** purposes of its enabling act and must fall within the broad powers expressly delegated by the Legislative Assembly. *Caribe Comms Inc. v. P.R.T. Co.*, 157 D.P.R. 203 (2002). See also, *M. & B.S., Inc. v. Dept. of Agriculture*, 118 D.P.R. 319, 325-326 (1987).

After establishing whether the agency has the authority to ascribe retroactive effect to regulations, it is necessary to evaluate the validity of such retroactive effect, taking into account whether it arises expressly or tacitly from the regulations and if it affects rights acquired under previous regulations.

## II

We will apply explanatory case law to the present case. In this case, the Planning Board used the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin as one of the grounds for denying the inquiry concerning location that was filed by the respondent before said Plan took effect. The regulations now under analysis clearly have a retroactive effect, given that they affect an event that took place before they entered into force.

The Planning Board of Puerto Rico Law, Law No. 75 of June 24, 1975, ascribed to the Planning Board the authority to create Land Use Plans and Zoning Regulations

with the purpose of guiding the comprehensive development of Puerto Rico. 23 L.P.R.A. Sections 62c, 62m and 62o. Based on the delegated authority and its specialized knowledge, the Planning Board has adopted Zoning Regulations which establish the fundamental rules on how and where the social and economic activities of Puerto Rico must be located. [2] *76

The authority to regulate zoning is a special authority. Its purpose is to achieve harmony and integrated planning among the designated uses of the country's lands. When adopting or amending zoning regulations, the Planning Board attempts to avoid approval of incompatible uses that violate the public policy established in the new regulations. Thus, given the very nature of this authority, it is reasonable for the agency to grant retroactive effect to said regulations. This authority is necessary in order for the agency to effectively perform its zoning functions.

The authority to give retroactive effect to the Zoning Regulations does not arise expressly from the Planning Board Law. However, given that the legislative intent is to achieve the integral development of the country, the authority to give retroactive effect to the Zoning Regulations is necessary in order for the Board to carry out the purpose of the law. We must therefore conclude that this authority was tacitly delegated to the Board within its broad power to adopt Zoning Regulations.

Having determined that the Planning Board has the authority to give retroactive effect to the Zoning Regulations, it is necessary to examine the validity of the retroactive effect of the regulations under analysis. These regulations, referred to as the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin, were adopted by the Planning Board for the purpose of controlling the uses of lands in this basin and to protect, conserve and restore its natural systems. Chapter V, on Tools for Implementing the regulations, provides that the established zoning "shall determine the use and basic intensity of the *current and proposed activities* in the study area." (Emphasis added). Chapter V(A) (1) del Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin, *77 October 28, 2000, p. 52. It also adds that all *projects submitted* to the Planning Board and the Department of Regulations and Permits must comply with the provisions of the regulations and that they will take effect immediately. Id.

In view of the clear express intention of the Planning Board to retroactively apply these regulations to the activities proposed or projects presented to the agency, we must examine the possibility that the regulations may affect rights acquired under previous regulations. We must remember in this analysis that the mere request for a permit does not confer any vested right to the applicant. *Phi Delta Pi* v. *Planning Board*, 76 D.P.R. 585, 591 (1954). In order for such a right to exist, the respective agency must have already approved the permit and the party obtaining it must have incurred considerable expenses acting in reliance on said permit. In this regard, we have stated the following:

> Indeed, the generally established rule, which we now adopt, determines that once a construction permit has been issued by a duly authorized official, and the person who obtained the permit has acted in reliance thereon and has incurred considerable expenses, the right acquired for the construction becomes a vested right that the government cannot rescind due to a revocation of the permit. Yokley, *Zoning Law and Practice,* second ed. p. 234, et seq., Section 100, and cases cited and discussed therein. (Emphasis added). *Phi Delta Pi v.* Planning Board, supra, p. 591.

The submission of an inquiry concerning location is the first step in an evaluation process carried out by the Planning Board to determine whether it will allow the proposed use on a specific property.[3] In an inquiry concerning location, the proposed use *78 is, on its own, *a use that is not authorized* by the zoning applicable to the specific property, thereby leaving its evaluation and potential authorization to the discretion of the agency. Section 3.03 of the Regulations on Planning Board Award Procedures, Regulations No. 6031 of October 13, 1999. This evaluation process does not conclude until the approval or final denial of the permit. Given that the mere

act of filing an inquiry concerning location does not imply or guarantee approval of the permit, it therefore cannot grant a right under the regulations in effect at the time the inquiry is filed.

In this case, the respondent filed an inquiry concerning location on September 5, 2000. The Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin entered into force on October 28, 2000. Finally, the respondent's inquiry concerning location was denied on January 17, 2002, based on the regulations that applied to the Tortuguero Lagoon Drainage Basin more than one year ago.

According to the Regulations on Planning Board Award Procedures, when approving or denying an inquiry concerning location, the Board must take into consideration, in addition to other factors, the Zoning Regulations.[4] Given that the retroactive effect of the regulations in this case did not affect a right acquired under the previous regulations, we have a valid retroactive effect and the Planning Board correctly applied the regulations now under **\*79** analysis by denying the inquiry concerning location filed by the respondent.[5]

The general rule in U.S. state jurisdictions supports this conclusion. The majority of these jurisdictions have adopted, as a general rule and in the context of municipal zoning ordinances, that a construction permit applied for prior to the effective date of a zoning ordinance does not grant any right for a use prohibited by said ordinance. The adopted rule adds that the rights of the parties must be determined based on the regulations in effect at the time the permitted use is exercised, rather than the regulations in effect at the time the permit application is filed. See **8** *McQuillin, The Law of Municipal Corporations* Sec. 25.155, pp. 567-568 (3rd ed. rev. 2000)**.**[6] See also: *Metro. Dev. Comm'n v. Pinnacle Media, LLC*, 836 N.E.2d 422, 428 (2005); *Fillmore* **v.** *Town of Sanbornton*, 319 A.2d 103, 104-105 (1974).

We must note that the general rule in U.S. jurisdictions is broader than the one proposed here, given that it is not necessary to evaluate the authority delegated to the agency nor the validity of the retroactive effect of the new ordinance; **\*80** but rather recognizes retroactivity as a general rule:

> As a general rule, a newly enacted

zoning ordinance will apply *retroactively* to block a building permit applied for but not granted before the effective date of the new ordinance. (Emphasis added) 2 *Yokley, Zoning Law and Practice* Sec. 14-7, p. 14-29 (4th ed. 2003)

### III

In our jurisdiction, the majority opinion proposes adopting not the general rule explained above, but instead the rule of "pending regulations" developed in some jurisdictions of the United States. According to this rule, if regulations are approved after a permit application is submitted, the new regulations may be applied to the requested permit only if approval of such regulations was pending when the application was submitted. This rule, however, is used in U.S. jurisdictions that have decided not to apply the general rule:

> Although there are major exceptions, the rule followed in most jurisdictions is that a newly adopted prohibitory zoning regulation may ordinarily be applied with retroactive effect to bar issuance of a building permit that was duly applied for prior to the adoption or the effective date of the new regulation. *Some jurisdictions, however, refuse to follow the general rule if the new zoning regulation was not "pending"* – that is, officially proposed or in actual process of enactment – when the application for the building permit was filed. (Emphasis added and footnotes omitted) Annotation, *Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit*, 50 A.L.R.3d 596, 602, Sec. 2[a] (1973).[7] **\*81**

I do not believe that in this case we should deviate from the rule applied in the majority of jurisdictions. By making retroactivity conditional upon there being new regulations

Maldonado v. Junta de Planificación..., 171 D.P.R. 46 (2007)
2007 TSPR 87

Case: 17-03283-LTS   Doc#:4781-6   Filed:02/24/18   Entered:02/24/18 28:12:25   Desc:
Exhibit DX-GG Part 15   Page 410 of 541
Exhibit 80   Page 13 of 33

pending approval at the time the inquiry request is filed, the minority rule of "pending regulations" implicitly recognizes that the applicant has the right to have their application evaluated under the regulations in effect at the time it is filed. *McQuillin*, *supra*, Sec. 25.155, page 571.[8] This limits and places conditions on the administrative authority to retroactively apply the new regulations.

It is my opinion that recognizing this right would unnecessarily restrict administrative discretion and would result in a legal contradiction. On the one hand, the rule of "pending regulations" would recognize a vested right to have the application decided under the regulations in effect at the time an inquiry concerning location is filed, while on the other hand, our laws do not recognize the acquisition of any right until final approval of the inquiry request is granted and considerable expenses have been incurred acting in reliance on such approval. *Phi Delta Pi v. Planning Board*, supra.

Moreover, the rule of "pending regulations" would limit the application of a regulation with valid retroactive effect, given that such application would be conditional upon there being new regulations pending approval at the time the permit application or location inquiry request **\*82** is filed. In practice, this would result in the approval of permits that would not comply with the regulations in effect at a given point in time and would also be subject to repealed regulations. In the context of zoning regulations, it would mean the approval of uses that do not conform to current zoning requirements, which is precisely the effect that the Planning Board must avoid.

In the present case, the respondent proposed the development of a heavy industrial park to be located in the Tortuguero Lagoon Drainage Basin. In accordance with the rule established today by the Majority of this Court, if the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin had not been pending approval when the respondent filed the inquiry concerning location, the Planning Board would not have been able to apply them, and when deciding on the inquiry, it would have been obligated to violate the regulations in effect on that date, which regulations *expressly prohibit* the approval of industrial projects like the one proposed here in said drainage basin. The contradiction appears to be clear.

### IV

In view of all of the above, I concur with the majority opinion that the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin were applicable to the location inquiry filed by the respondent and that, in light of the provisions of the regulations, it was proper to deny the inquiry. However, I dissent from the adoption of the rule of "pending regulations" in our jurisdiction.

Our law addresses the present dispute without the need to introduce new sources of vested rights or non-retroactivity. In the case of a dispute regarding the **\*83** retroactive application of regulations, we must first determine whether the regulations have a retroactive effect; second, if the agency adopting such regulations has the delegated authority to give retroactive effect to such regulations, and third, if the retroactive application of the regulations is valid. The moment at which the new regulations were proposed or pending approval should really not be pertinent.

Footnotes

1   Said request was numbered 2000-08-0804-JPU.

2   The grounds offered by the Instituto Ambiental COTICAM de Puerto Rico (COTICAM) for its opposition were based on environmental considerations with respect to the location of the proposed project in the Tortuguero Lagoon Drainage Basin, the poor practices in the handling and use of pesticides in the sector, the obstruction of rainwater, and the existence of more than ten wells in the area closed due to contamination.

3   In pertinent part, Sec. 9 of the Planning Board's Regulations on Adjudicative Procedures provide:
"In the [D]ecision, the affected party will be notified of his right to petition for reconsideration of the Board's determination within twenty (20) days of the date of filing of notification in the record.
"The Board must consider said motion within fifteen (15) days of its submission. If it summarily rejects it or fails to act within the fifteen (15) days, the time period for petitioning for review will start to run again, from notification of said rejection or from the expiration of those fifteen (15) days, as [the]

case may be. If, in considering it, a decision is made, the time period of thirty (30) days for requesting Judicial Review will start to be counted from the date on which a copy of the notification of the Board's Decision, definitively ruling [on] the motion for reconsideration, is filed in the record. Such decision must be issued and filed in the record within ninety (90) days following [the filing] of said petition. *If the Board fails to take any action in connection with the petition for reconsideration within ninety (90) days of the filing of a petition accepted for decision, it will lose jurisdiction over it and the time period for petitioning for Judicial Review will start to be counted from the expiration of said term of ninety (90) days ….*" (Emphasis ours.) Regulation No. 6031 of October 13, 1999, pp. 39-40.

4  Unless the Planning Board, for just cause and in a timely manner, extends the period.

5  It must be pointed out that the Legislature's objectives for approving both laws are identical.

6  Law No. 292 of August 21, 1999 (12 L.P.R.A. sec. 1151 et seq.).

7  The prohibited activities include the extraction, excavation, and removal of limestone rock for commercial purposes or to level the terrain. 12 L.P.R.A. sec. 1152.

8  "Ordinarily an application for a permit made before a zoning ordinance becomes effective gives in itself no right to a use excluded by the ordinance." 8 *McQuilin, The Law of Municipal Corporations* Sec. 25.155, p. 567 (3rd ed. rev. 2000). See also: *Coral Springs Street Systems v. City of Sunrise*, 371 F.3d 1320 (11th Cir. 2004); *County of Santa Fe v. Public Service Co. of N.M.*, 311 F.3d 1031 (10th Cir. 2002); Stratos v. Town of Ravenel, 376 S.E.2d 783 (S.C. App. 1989).

9  "An ordinance is legally pending when the governing body has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning."

10  Op. Sec. Just. No. 1970-30.

11  See In re *Secretario de Justicia*, 118 D.P.R. 827, 855 (1987).

12  The statements of the Secretary of Justice in note 2 of the aforementioned opinion, in which he cites 101 C.J.S., *Zoning*, 221, are pertinent to our dispute:
   "According to some authorities, where, after the making of an application for a permit but before a decision thereon, the regulations applicable to the subject matter of the permit sought are changed, the application is governed by the regulations as changed, and a municipality may properly refuse a building permit for a land use repugnant to a pending and later-enacted zoning ordinance even though the application for the permit is made when the intended use conforms to existing regulations, *provided that no permit has been issued and relied on in good faith to the substantial detriment of the holder of the permit*." (Emphasis removed.)

13  Specifically, it cited Public Policies 30.02 and 31.00, which establish the following obligations:
   "*Public Policy 30.02*: Control land development, construction and plot division activities that could have an adverse impact on water quality, in particular in the recharge areas of aquifers and basins near lakes and reservoirs, including, among others, activities such as excessive paving that increases levels of water, runoff, indiscriminate use of fertilizers and pesticides that deteriorate the quality of our bodies of water, clearing, removal of the topsoil and earthworks that cause erosion and sedimentation .
   "*Public Policy 31.00*: Provide protection for areas with karst soils which due to their calcareous formations and hydrogeological characteristics provide benefits to aquifers, protect surface water and maintain the ecologic integrity of natural systems.
   "Promote conservation of natural karst mogotes.
   "Maintain the natural integrity of drainage systems on karst soils, discouraging changes in the charging and recharge areas of bodies of groundwater and hydrographic basins of surface water. "Prevent hydromodifications in vital karst areas.
   "Prevent changes in the ecological and hydrogeological balance in karst areas where edaphology and geology studies recommend protection for said processes."

14  *Otero v. Toyota*, 163 D.P.R. 716 (2005); *Reyes Salcedo v. P.R. Police*, 143 D.P.R. 85, 94 (1997); *Rivera Santiago v. Secretary of the Treasury*, 119 D.P.R. 265 (1987).

15  See *Executive Order of the Governor approving the Plan and Special Regulations for the Tortuguero Lagoon Drainage Basin*, 2000-OE-56.

16  In view of the conclusion we have reached, it is not necessary to discuss the other indications of error of the petitioner.

1     The principle of non-retroactivity of laws extends to the application of administrative regulations: "The word Laws as used by Article [3] must be understood in the broad sense, and therefore the principle of non-retroactivity must be applied to all other legal provisions, such as administrative provisions." F. Bonet Ramón, *Compendium of Civil Law*, Madrid, Ed. Rev. Private Law, 1959, Volume. I, p. 203.
In U.S. case law these disputes have also been subject to the retroactive effect of zoning regulations. See Annotation, *Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit, 50 A.L.R.3d 596 (1973).*

2     Introduction to the Zoning Regulations of Puerto Rico, Regulation No. 6211 of November 5, 2000.

3     Section 2.00(7) Regulations on Planning Board Award Procedures defines an inquiry concerning location, in pertinent part, as "the proceeding before the Planning Board, requesting that it evaluate, issue an opinion and make the decision it deems appropriate on the proposed land uses that *are not permitted* under the regulations applicable to the zoned areas, but which are provided for under regulatory provisions as subject to consideration by Planning Board". (Emphasis added). Regulations on Planning Board Award Procedures, Regulations No. 6031, October 13, 1999, p. 5.

4     Section 7.01 of the Regulations on Planning Board Award Procedures, Regulation No. 6031, November 12, 1999.

5     Identical conclusion stated by the Minister of Justice in an opinion recognizing that regulations may have a retroactive effect on a permit application, although in a broader sense, given that it is not necessary to analyze the authority delegated to the agency or the validity of the retroactive effect of the regulations. The opinion states:
"As a general rule, a mere permit application does not create a right in favor of the petitioner; therefore, if there is a change to the conditions required for the issuance of a permit before a decision on a pending application is issued, my understanding is that such decision must be based on the provisions in effect at that moment. The above rule does not apply, however, when the applicant has acted in good faith in reliance on some form of authorization." (footnote omitted.) Op. Min. Just. No. 1970-30, p. 149.

6     "In most jurisdictions it is clear that, as a general rule, the denial of an application for a building permit may be based on a zoning regulation enacted or becoming effective after the application was made, or to State the rule conversely, a zoning regulation may be retroactively applied to deny an application for a building permit, even though the permit could have been lawfully issued at the time of application." (footnote omitted) Annotation, supra, Sec. 3, p. 607.

7     "We consider first the threshold question as to whether the applicant's rights are to be measured under Ordinance 85 in effect at the time of the application, or under Ordinance 133 in effect at the time this case went to trial. Idaho has adopted the minority view that the applicant's rights are measured under the law in effect at the time of the application. See: McQuillin, The Law of Municipal Corporations, [Sec.] 25.155 (3d ed.1965). In [*Ben Lomond, Inc. v. City of Idaho Falls*, 92 Idaho 595, 601,448 P.2d 209, 215 (1968)], we stated:
" 'At least in those cases like the present one, in which no zoning ordinance was pending at the time an application for a building permit is filed, it is our opinion that an applicant is entitled to a building permit upon compliance with the then existing ordinance.' " (Emphasis added and in the original) *Ready-To-Pour, Inc. v. McCoy*, 511 P.2d 792, 795 (1973).

8     "However, even if he has not made the substantial expenditures in reliance upon the city's position necessary to create an estoppel, he is still entitled to obtain a building permit which is within the provisions of existing zoning so long as the rezoning ordinance which would prelude the intended use is not pending at the time when a proper application is made." (Emphasis added) Smith v. City of Clearwater, 383 So.2d 681, 689 (1980).

---

End of Document           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

📒 KeyCite Yellow Flag - Negative Treatment
Distinguished by *Oficina De Gerencia De Permisos v. Pacheco Cruz*,
TCA, April 18, 2016

171 D.P.R. 46, 2007 WL 1582244 (P.R.), 2007 TSPR 87

VÍCTOR S. MALDONADO, recurrido,

v.

JUNTA DE PLANIFICACIÓN, peticionaria.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2003-791

**Synopsis**
PETICIÓN DE *CERTIORARI* para revisar de una
SENTENCIA de *Gilberto Gierbolini Rodríguez, Héctor
Cordero Vázquez* y *Carlos Rodríguez Muñiz*, Js. del
Tribunal de Apelaciones, que revocó una resolución de la
Junta de Planificación y devolvió el caso para que la Junta,
entre otras cosas, evaluara una consulta de ubicación
propuesta según el Reglamento de Zonificación Especial
para la Cuenca Hidrográfica de la Laguna Tortuguero,
vigente a la fecha de su presentación. *Se dicta sentencia
que revoca la emitida por el Tribunal de Apelaciones y se
restablece la resolución de la Junta de Planificación.*

*Aida del C. Silver Cintrón*, abogada de la parte
peticionaria; *Heidi Rodríguez*, del *Bufete Pietrantoni,
Méndez & Álvarez*, abogada de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ
emitió la opinión del Tribunal.

El 5 de septiembre de 2000, el Sr. Víctor S. Maldonado,
por conducto del Ing. Manuel A. Novas, presentó
ante la Junta de Planificación (Junta) *una consulta
de ubicación para el desarrollo de un parque industrial
pesado de aproximadamente cuarenta y cinco cuerdas en
el barrio Cotto Norte del municipio de Manatí, así como
la posible enmienda al Mapa de Zonificación Especial
de la Cuenca Hidrográfica de la Laguna Tortuguero.* [1]
El terreno donde ubicaría el proyecto propuesto está
clasificado como un Distrito LT-A1 (Laguna Tortuguero-
Agrícola Mecanizable) y LT-B1 (Laguna Tortuguero-
Bosques Interiores).

El proyecto propuesto fue sometido ante la consideración
de diversas agencias gubernamentales, entre las que se
encontraban la Autoridad de Energía Eléctrica (AEE),
la Autoridad de Acueductos y Alcantarillados (AAA),
la Autoridad de Carreteras y Transportación (ACT),
la Compañía de Fomento Industrial (CFI), el Instituto
de Cultura Puertorriqueña (ICP), el Departamento
de Recursos Naturales y Ambientales (DRNA), el
Departamento de Agricultura (DA) y municipio de
Manatí.

Luego de evaluar el proyecto solicitado, tanto la AEE
como la CFI y el DA indicaron que *no* tenían objeción a
que la Junta aprobara el proyecto. Por su parte, la AAA
y la ACT *condicionaron* su recomendación favorable a
que se realizaran diferentes mejoras a la infraestructura
del lugar, mientras que el ICP y el DRNA solicitaron
una *evaluación arqueológica* y un documento ambiental
para poder emitir su opinión. Por último, el municipio de
Manatí *endosó favorablemente* el proyecto por entender
que "era de **\*52** suma importancia para el desarrollo
económico del Municipio de Manatí".

El 25 de octubre de 2000, la Junta solicitó del señor
Maldonado que sometiera varios documentos, entre los
que se encontraba una evaluación ambiental para celebrar
una vista pública. Así las cosas, el 13 de febrero de
2001 se celebró la mencionada vista, recibiéndose en ella
la oposición — mediante ponencia oral y escrita— de
parte del Instituto Ambiental COTICAM de Puerto Rico
(COTICAM). [2]

Luego de varios trámites, entre los que se encuentra la
réplica del ingeniero Novas a la oposición de COTICAM,
la Junta volvió a evaluar la consulta solicitada y le
concedió un término a las partes para que emitieran
sus comentarios. Posteriormente, la oficial examinadora
emitió su recomendación y la Junta decidió archivar sin
perjuicio la consulta por treinta días hasta que la parte
solicitante sometiera los documentos solicitados.

Mientras todo lo anterior ocurría, *el 28 de octubre de 2000
entró en vigor el Plan y Reglamento Especial para la Cuenca
Hidrográfica de la Laguna Tortuguero* el cual tiene entre
sus objetivos establecer la política pública que guiará el
uso de los terrenos del área.

Así las cosas, y luego que el solicitante cumplió con
la solicitud de la Junta antes mencionada —sobre
producción de documentos el 17 de enero de 2002, y
notificada el 25 de febrero del mismo año— la Junta
emitió una resolución mediante la que *denegó* la consulta
de ubicación. En síntesis, la referida agencia resolvió

que el proyecto propuesto *no* cumplía con el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 e iba contra la Ley Núm. 292 de 21 de **\*53** agosto de 1999, conocida como la Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico, 12 L.P.R.A. sec. 1151 *et seq.*, y con otras políticas públicas establecidas.

Oportunamente, Maldonado presentó una solicitud de reconsideración ante la Junta, la cual fue acogida el 2 de abril del mismo año. Transcurridos noventa días desde que la Junta acogió la moción de reconsideración sin que ésta se expresara ni concediera prórroga alguna, Maldonado acudió —mediante un recurso de revisión administrativa— ante el Tribunal de Apelaciones. Adujo, en síntesis, que la Junta erró al utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 para denegar la consulta de ubicación solicitada y al determinar que el proyecto propuesto atenta contra el documento Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico.

Tras analizar los argumentos de ambas partes, el foro apelativo intermedio *revocó* la resolución recurrida y devolvió el caso para que la Junta, entre otras cosas, evaluara la consulta de ubicación propuesta según el Reglamento de Zonificación Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, *vigente a la fecha de su presentación.* Además ordenó que, al evaluar la solicitud, se consideraran los objetivos 5.02, 5.03, 5.04, 5.05 y 5.06 del documento Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico y que se remitiera a la Junta de Calidad Ambiental la evaluación ambiental que preparó el solicitante.

Insatisfecha, la Junta de Planificación acudió —mediante un recurso de *certiorari*— ante este Tribunal. Alega que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió

> ... al entender en el recurso de revisión instado cuando no tenía jurisdicción para ello. **\*54**

> .. al determinar que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna de Tortuguero, de 28 de octubre de 2000, no era de aplicación a la consulta de ubicación de auto[s].

> ... al determinar que la Junta de Planificación, indistintamente de si ya tenía criterios suficientes para

denegar la consulta, debía someter la [Evaluación Ambiental] a la consulta de la Junta de Calidad Ambiental.

> ... al determinar que la Junta de Planificación debía analizar otras disposiciones del documento de Objetivos y Políticas Públicas [del] Plan de Terrenos a pesar de señalar que la Junta de Planificación había fundamentado su determinación en este aspecto. Petición de *certiorari*, págs. 4–5.

*Expedimos* el recurso solicitado. Contando con la posición de ambas partes y estando en posición de resolverlo, procedemos a así hacerlo.

**I**

Evaluamos, en primer término, el primer señalamiento de error en el cual se sostiene que el Tribunal de Apelaciones carecía de jurisdicción para entender en el recurso.

La Junta aduce que el foro apelativo intermedio carecía de jurisdicción para atender el recurso ante su consideración *porque éste alegadamente se presentó tardíamente.* En apoyo a su contención, alega que el recurrido presentó el recurso ante el Tribunal de Apelaciones transcurridos los treinta días siguientes a los noventa días posteriores a la oportuna presentación de la moción de reconsideración que la Junta acogió, ello en contravención con la Sec. 3.15 de la Ley Núm. 170 de 12 de agosto de 1988, mejor conocida como la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.), 3 L.P.R.A. sec. 2165. *No tiene razón.*

[1] Como es conocido, las cuestiones de jurisdicción son de carácter privilegiado, por lo que un planteamiento de esa índole se puede presentar tanto ante el Tribunal de Primera Instancia como en la fase apelativa del caso. *J.P.* **\*55** *v. Frente Unido I*, 165 D.P.R. 445 (2005); *Morán v. Martí*, 165 D.P.R. 356 (2005). En otras palabras, los tribunales deben ser fieles guardianes de su jurisdicción, independientemente de que el asunto haya sido planteado anteriormente o no. Íd.

[2–3] La jurisdicción no se presume ya que, previo a la consideración en los méritos de un recurso o una vez cuestionada su jurisdicción, es deber ministerial de todo tribunal evaluar si la posee, pues ello incide directamente sobre el poder mismo para adjudicar una controversia. *Carattini v. Collazo Syst. Analysis, Inc.*, 158 D.PR. 345 (2003); *Soc. de Gananciales v. A.F.F.*, 108 D.P.R. 644 (1979). La ausencia de jurisdicción no es susceptible de

ser subsanada y las partes no pueden voluntariamente otorgarle jurisdicción sobre la materia a un tribunal ni éste puede adjudicársela. *Vázquez v. A.R.P.E.*, 128 D.P.R. 513 (1991).

**[4]** Los tribunales no tienen discreción para asumir jurisdicción donde no la hay. Por ello, cuando un tribunal dicta una sentencia sin tener jurisdicción sobre las partes o la materia, su decreto es jurídicamente inexistente o *ultra vires*. *Empress Hotel, Inc. v. Acosta*, 150 D.P.R. 208 (2000).

**[5]** En cuanto al término para acudir ante el Tribunal de Apelaciones para solicitar la revisión de una resolución emitida por una agencia administrativa, la Sec. 3.15 de la L.P.A.U., ante, dispone:

> La parte adversamente afectada por una resolución u orden parcial o final podrá, dentro del término de veinte (20) días desde la fecha de archivo en autos de la notificación de la resolución u orden, presentar una moción de reconsideración de la resolución u orden. La agencia dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a correr nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea el caso. Si se tomare alguna determinación en su consideración, el término para solicitar revisión empezará a contarse desde la fecha en **\*56** que se archive en autos una copia de la notificación de la resolución de la agencia resolviendo definitivamente la moción de reconsideración. Tal resolución deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes a la radicación de la moción de reconsideración. *Si la agencia acoge la moción de reconsideración pero deja de tomar alguna acción con relación a la moción dentro de los*

> *noventa (90) días de ésta haber sido radicada, perderá jurisdicción sobre la misma y el término para solicitar la revisión judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días* salvo que la agencia, por justa causa y dentro de esos noventa (90) días, prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. (Énfasis suplido.)

Debemos destacar, a su vez, que el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 de 13 de octubre de 1999 (Reglamento de Procedimientos Adjudicativos de la Junta), contiene una disposición prácticamente idéntica a la antes transcrita Sec. 3.15 de la L.P.A.U. [3]

Como podemos notar, ambas disposiciones establecen, en síntesis, que una vez la Junta —o una agencia administrativa— acoge una oportuna moción de reconsideración, ésta tiene noventa días, contados a partir de la presentación **\*57** de la referida moción, para resolverla. De lo contrario, la Junta perderá jurisdicción sobre el caso y el término de treinta días para acudir al Tribunal de Apelaciones para solicitar la revisión del dictamen comenzará a contar una vez venzan los noventa días antes mencionados. En otras palabras, el término para acudir en alzada vencerá transcurridos los ciento veinte días de la presentación de la moción de reconsideración, acogida y no resuelta por la Junta. [4]

En el caso ante nuestra consideración, la moción de reconsideración se presentó el 18 de marzo de 2002 y la Junta la acogió el 2 de abril de 2002. No obstante haberla acogido oportunamente, la Junta dejó transcurrir noventa días desde la fecha en que se presentó la moción de reconsideración sin emitir dictamen alguno. El 31 de julio de 2002 —135 días después de presentada la moción de reconsideración— Maldonado instó un recurso de revisión administrativa ante el Tribunal de Apelaciones. De lo anterior se deduce que el recurso antes mencionado —a priori— fue *tardío* por haberse presentado transcurridos los ciento veinte días de la presentación de la moción de reconsideración.

Maldonado v. Junta Planificación, 171 D.P.R. 46 (2007)
2007 TSPR 87

Case:17-03283-LTS Doc#:4781-36 Filed:01/24/18 Entered:01/24/18 18:12:25 Desc:
Exhibit Exhibit 56 Page 417 of 541
Exhibit D-I Part 5 Page 22 of 38

*Ahora bien, nuestro análisis no termina aquí; ello porque el recurrido Maldonado alega que las advertencias incluidas en la notificación de la resolución aquí recurrida fueron defectuosas.*

**[6–7]** Como se sabe, la Sec. 3.14 de la L.P.A.U. establece que toda orden o resolución emitida por una agencia *advertirá el derecho de solicitar su reconsideración o revisión con la expresión de los hechos correspondientes, y que cumplido este requisito comenzarán a regir dichos términos.* 3 L.P.R.A. sec. 2164. Cónsono con dicho precepto, *hemos resuelto que el derecho a una notificación adecuada* **\*58** *es parte del debido proceso de ley y que, por ello, la notificación defectuosa de una resolución no activa los términos para utilizar los mecanismos postsentencia, quedando éstos sujetos a la doctrina de incuria.* Véanse: *Caro v. Cardona*, 158 D.P.R. 592 (2003); *Asoc. Vec. Altamesa Este v. Mun. San Juan*, 140 D.P.R. 24 (1996); *Rivera v. Depto. de Servicios Sociales*, 132 D.P.R. 240 (1992); *Aponte v. Srio. de Hacienda, E.L.A.*, 125 D.P.R. 610 (1990).

**[8]** Mediante la antes mencionada doctrina de incuria se impide a una parte instar un recurso cuando por su dejadez o negligencia, en conjunto con el transcurso del tiempo y otras circunstancias pertinentes, se causa perjuicio a la otra. *IM Winner, Inc. v. Mun. de Guayanilla*, 151 D.P.R. 30 (2000). En cuanto a ello, hemos reiterado que no basta el mero transcurso del tiempo para impedir el ejercicio de la causa de acción, sino que se deben evaluar otras circunstancias antes de desestimar el recurso instado, tales como: (1) *la justificación, si alguna, de la demora*; (2) *el perjuicio que esta última acarrea*, y (3) *el efecto sobre intereses privados o públicos involucrados.* Íd.; *Pérez, Pellot v. J.A.S.A.P.*, 139 D.P.R. 588 (1995).

**[9]** En resumidas cuentas, *los casos se deben examinar según los hechos y las circunstancias particulares*, considerando, además, que

> "[s]obre todo[,] es preciso tener en cuenta los méritos y demás circunstancias del caso específico, ya que la doctrina de incuria sigue vinculada a la idea fundamental de la equidad: se acude a la 'razón' y a la 'conciencia' para encontrar soluciones justas, apartándose del rigorismo intransigente de los términos fatales." (Énfasis suprimido.) *Pueblo v. Valentín*, 135 D.P.R. 245, 256 (1994).

De una lectura de las advertencias que le hizo la Junta al peticionario en la resolución recurrida *se infiere que no fueron del todo claras y podían —como en efecto lo hicieron— causar confusión.* Veamos. **\*59**

Las mencionadas advertencias establecen, en primera instancia, que:

> Si la Junta acoge la Solicitud de Reconsideración deberá resolver la misma dentro de los *noventa (90) días siguientes a la radicación de dicha solicitud.* El término de treinta (30) días para solicitar la Revisión Judicial comenzará a contarse desde la fecha en que se archiva en autos una copia de la notificación de la Resolución de la Junta resolviendo definitivamente la Solicitud de Reconsideración, cuya resolución deberá ser emitida y archivada en autos. (Énfasis suplido.) Apéndice, pág. 475.

Sin embargo, más adelante indican lo siguiente:

> Si la Junta dejare de tomar alguna acción con relación a la Solicitud de Reconsideración *dentro de los noventa (90) días de haber sido acogida bajo estudio*, perderá jurisdicción sobre la misma y el término para solicitar la Revisión Judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días, salvo que la Junta, por justa causa y dentro de esos noventa (90) días prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. (Énfasis suplido.) Apéndice, pág. 475.

Como se puede apreciar, dicha advertencia resulta *contradictoria* al expresar, por un lado, que el término de noventa días que tiene la Junta para resolver una moción de reconsideración oportunamente presentada y acogida *comenzará su decurso con su presentación* y, por el otro, indicar que la Junta perderá jurisdicción para atender la

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 4

Maldonado v. Junta Planificación, 169 TSPR 87 (2006)
2007 TSPR 87

Case: 17-03283-LTS Doc#:4781-6 Filed:02/24/18 Entered:02/24/18 18:12:25 Desc:
Exhibit Exhibit Part F Page 23 of 33
Exhibit F Page 23 of 541

moción de reconsideración *transcurridos los noventa días de haber sido acogida para estudio.*

**[10]** Ante dicha incongruencia —la cual es claramente contraria a la L.P.A.U. y al Reglamento de Procedimientos Adjudicativos de la Junta— *no nos queda otra alternativa que resolver que las advertencias incluidas en la resolución emitida por la Junta en el presente caso fueron defectuosas* y que, por lo tanto, *no activaron el término para recurrir en alzada al Tribunal de Apelaciones.* Como consecuencia de ello, y según expresamos anteriormente, **\*60** la tardanza en presentar el recurso ante el foro apelativo intermedio se debe analizar conforme la doctrina de incuria.

De un análisis cuidadoso del expediente ante nuestra consideración se desprende que el recurrido Maldonado actuó conforme a uno de los supuestos incluidos en la advertencia que se incluyó en la resolución que le fue notificada. Asimismo, éste no se cruzó de brazos ni mostró dejadez o negligencia al presentar el recurso de revisión administrativa ante el Tribunal de Apelaciones quince días después de vencido el término que disponen, tanto la L.P.A.U. como el Reglamento de Procedimientos Adjudicativos de la Junta. Finalmente, resulta pertinente destacar que la tardanza del peticionario no fue excesiva y que la Junta no ha alegado perjuicio alguno por ella o para algún interés público o privado que amerite desestimar el caso. Por el contrario, consideramos que el presente caso contiene controversias de alto interés público, las cuales ameritan que se atiendan en sus méritos.

En vista de lo antes expuesto, resolvemos que con relación al recurso presentado por el recurrido Maldonado ante el Tribunal de Apelaciones, *el aludido foro tenía jurisdicción para atenderlo.*

## II

**[11]** Como es sabido, la Constitución del Estado Libre Asociado de Puerto Rico establece que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". *Art. VI, Sec. 19, Const.* E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 421. Véanse, además: *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908 (1998); *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449 (1995).

**[12]** Conforme dicho mandato constitucional, en el **\*61** pasado hemos expresado que "ha sido política pública del Gobierno del Estado Libre Asociado de Puerto Rico dirigir el proceso de planificación de nuestra isla hacia un desarrollo integral sostenible asegurando el juicioso uso de las tierras y fomentando la conservación de los recursos naturales para el disfrute y beneficio de todos". *A.R.PE. v. Rivera*, 159 D.P.R. 429 (2003), citando a *Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico*, 23 R.P.R. sec. 650.821 *et seq.*

**[13]** Siguiendo la política pública antes mencionada, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. sec. 8001 *et seq.*), la cual derogó la anterior Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970. Entre los fines que tuvo la Legislatura para aprobar la mencionada ley están, entre otros, los siguientes: (1) establecer una política pública que estimule una deseable y conveniente armonía entre el hombre y su medio ambiente; (2) fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y la biosfera, y estimular la salud y el bienestar del hombre; (3) enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico. [5]

**[14]** La Ley Núm. 416, ante —así como su predecesora, la Ley Núm. 9 antes mencionada— dispone, a su vez, en su Art. 4 (12 L.P.R.A. sec. 8001a), que todos los departamentos, las agencias, los municipios, las corporaciones e instrumentalidades públicas del Estado Libre Asociado de Puerto Rico y sus subdivisiones políticas deberán, al máximo grado posible, interpretar, aplicar y administrar todas las leyes y los cuerpos reglamentarios vigentes, y los que en el futuro se aprueben en estricta conformidad con la política pública enunciada en dicha ley. **\*62**

Asimismo, la Asamblea Legislativa aprobó la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. sec. 62 *et seq.*), con el propósito general de

> ... guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado, económico, el cual, de acuerdo con las actuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos, hubiere de fomentar en la mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la

Maldonado v. Junta Planificación, 171 DPR 384 (2007)
2007 TSPR 87

Case: 17-03283-LTS   Doc#: 478136   Filed: 02/14/18   Entered: 02/14/18 18:19:25   Desc:
Exhibit Exhibit Part 5   Page 24 of 33
Exhibit Page 419 of 541

defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella eficiencia, economía y bienestar social en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente. Art. 4 de la Ley Núm. 75, ante, 23 L.P.R.A. sec. 62c. Véase *Hernández*, #*Alvarez v. Centro Unido*, 168 D.P.R. 592 (2006).

**[15]** Entre las facultades que la Legislatura otorgó a la Junta para que pudiera lograr los propósitos propuestos están adoptar y aprobar los reglamentos que autoriza la ley, el Reglamento de Zonificación y el Reglamento de Lotificación, y cualesquiera otros necesarios o que le autorice promulgar cualquier otra ley. 23 L.P.R.A. sec. 62j(4).

Por otro lado, y en lo relativo a la zona cárstica de Puerto Rico, el 21 de agosto de 1999 se aprobó la Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico. [6] En esta ley se expresó que "es política pública del Estado Libre Asociado de Puerto Rico proteger, conservar y manejar para beneficio de ésta y futuras generaciones la fisiografía cárs[t]ica de Puerto Rico". Art. 2 de la Ley Núm. 292, ante, 1999 (Parte 2) Leyes de Puerto Rico 1272, 1275. De igual forma, en la mencionada ley se establece:

El Secretario del Departamento de Recursos Naturales y Ambientales ordenará a los Negociados de Geología, Recursos **\*63** de Agua, Programa de Zona Costanera, Patrimonio Natural y al Negociado de Pesca y Vida Silvestre que *lleven a cabo un estudio que defina las áreas que, debido a su importancia y función geológica, hidrológica y ecosistémica, no puedan ser utilizados bajo ningún concepto para la extracción de materiales de la corteza terrestre con propósitos comerciales, ni para explotaciones comerciales. Dicho estudio ofrecerá alternativas para que las actividades antes señaladas puedan llevarse a cabo bajo condiciones apropiadas en otras áreas de la zona cárstica. Las recomendaciones de este estudio se incorporarán en el Reglamento para la Extracción de Materiales de la Corteza Terrestre y en los reglamentos de la Junta de Planificación para zonificar aquellas áreas de la zona cárstica que deban conservarse.* (Énfasis suplido.) 12 L.P.R.A. sec. 1153.

Conforme a la antes mencionada ley, *el 28 de octubre de 2000* se aprobó el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero y el Mapa de Zonificación de la Cuenca Hidrográfica de la Laguna Tortuguero, el cual derogó el Reglamento de la Cuenca Hidrográfica de la Laguna Tortuguero de 1978. Dicho Plan y Reglamento establece una zonificación especial para la cuenca hidrográfica de la Laguna Tortuguero, *la cual determina el uso y la intensidad básica de las actividades actuales y propuestas en el área.* Además, dispone que todo proyecto presentado ante la Junta y la Administración de Reglamentos y Permisos deberá cumplir con lo allí establecido y con la Ley sobre Política Pública Ambiental. Finalmente, y en lo pertinente, se indica que *no se deberán aprobar pozos de inyección y que "no se aprobarán otros proyectos industriales en la Cuenca".*

**[16]** Como se puede apreciar de lo antes mencionado, en Puerto Rico —*por mandato constitucional*— existe una clara política pública dirigida a proteger nuestros recursos naturales. Asimismo, se deduce que dicha política se ha establecido, tanto en un sinnúmero de leyes de carácter general como de carácter específico, y que todo organismo adjudicativo tiene el deber ineludible de utilizarla a la **\*64** hora de tomar decisiones que puedan afectar el medio ambiente.

**[17]** Por otro lado, no podemos pasar por alto que desde 1979 se han aprobado reglamentos dirigidos a proteger la sensitiva zona cárstica de Puerto Rico. Dicho interés de conservación es tan importante que en 1999 transcendió el área reglamentaria para enmarcarse en una ley independiente, la cual penaliza con multas administrativas a las personas que realicen ciertas actividades en el área sin el permiso del Secretario del Departamento de Recursos Naturales y Ambientales de Puerto Rico. [7]

Expuesta la política pública ambiental en Puerto Rico y el interés gubernamental particular de proteger el área cárstica, nos corresponde atender las controversias específicas que han surgido entre las partes.

A. En su segundo señalamiento de error, la Junta arguye que el foro apelativo intermedio erró al resolver que para analizar el proyecto propuesto la Junta no podía utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, aprobado días después de haberse presentado la consulta de ubicación. Por su

parte, el recurrido Maldonado alega que el Tribunal de Apelaciones actuó correctamente al así resolver, ya que utilizar el nuevo reglamento —el cual contiene una prohibición de aprobar nuevos proyectos industriales en la cuenca y de permitir pozos de inyección— para analizar su solicitud implicaría la aplicación retroactiva de un reglamento inexistente a la fecha de la presentación de la misma.

Evaluadas dichas alegaciones, consideramos que la controversia principal que surgió entre las partes se puede resumir de la manera siguiente: *Si un Reglamento de Zonificación aprobado con posterioridad a la presentación de* **\*65** *una solicitud de consulta de ubicación se puede utilizar como fundamento para denegar la consulta.* Veamos.

La controversia antes expresada *no ha sido atendida ni resuelta anteriormente por este Tribunal.* En vista de ello —y con fines meramente ilustrativos—examinamos la jurisprudencia norteamericana sobre la materia y los comentarios al respecto de diversos tratadistas. El mencionado análisis revela que en la mayoría de los estados de la Nación Americana, la presentación de una solicitud de un permiso antes de entrar en vigor una nueva reglamentación de zonificación, *no* concede el derecho a obtenerlo para algún uso que prohíba la nueva ordenanza. [8]

Varias jurisdicciones han requerido, como condición a la aplicación de la referida regla general, que la nueva regulación ya esté en proceso de aprobación ("pending") al solicitarse el permiso en controversia. (Traducción nuestra.) *Urey v. Zoning Hearing Bd. of Hermitage*, 806 A.2d 502 (2002).

En cuanto al concepto "legally pending", se ha resuelto que un nuevo reglamento se considerará "pendiente de aprobación" cuando el cuerpo rector ha decidido revisar un esquema de zonificación en particular y ha iniciado un procedimiento de reglamentación, anunciando a la ciudadanía sus intenciones de celebrar vistas públicas sobre el mismo. *Sherman v. Reavis*, 257 S.E.2d 735, 737 (1979); [9] *Continental S.E. Group v. City of Folly Beach*, 348 S.E.2d 837 (1986).

En resumidas cuentas, la doctrina antes expuesta —conocida en las jurisdicción norteamericana como "the pending ordinance doctrine"— permite que un permiso de **\*66** construcción se deniegue utilizando como

fundamento un reglamento aprobado posteriormente pero que estuviera en proceso formal de aprobación —*pending*— antes de la presentación de la petición. A su vez, se considera un reglamento en proceso de aprobación aquel que haya comenzado a evaluarse, ya sea mediante la publicación de avisos o la celebración de vistas públicas, antes de la fecha de presentación de la solicitud. Lo primordial para determinar si la reglamentación está pendiente es evaluar si el proceso de su aprobación ya había comenzado oficialmente y si se habían hecho gestiones para informar al pueblo sobre el particular.

**[18]** Un fundamento adicional en apoyo a la aplicación de la doctrina de la reglamentación pendiente —*pending ordinance doctrine*— en nuestra jurisdicción es que aquí, al igual que en los estados en donde mayoritariamente se ha adoptado la doctrina, una solicitud de permiso no concede un derecho adquirido para su aprobación. En cuanto a ello, hemos expresado que en materia de permisos de construcción la persona adquiere un derecho —que no lo puede derogar una ley posterior— una vez se haya expedido y ésta actúe conforme el mismo e incurra en gastos sustanciales. *Phi Delta Pi v. Junta Planificación*, 76 D.P.R. 585, 591 (1954), citando a Yokley, *Zoning Law and Practice*, 2da ed., pág. 234.

**[19]** Así, pues, un solicitante *no* adquiere un derecho a obtener una consulta de ubicación por el mero hecho de presentar su solicitud en un momento en el que la reglamentación vigente la permite. Por ende, si a la fecha de la presentación de la solicitud existe una nueva reglamentación pendiente de aprobación, *y ésta se aprueba antes de que la solicitud se resuelva,* dicha reglamentación se puede utilizar a la hora de conceder o denegar la solicitud de consulta. Claro está, distinto es el caso en el que la consulta de ubicación se haya concedido antes de entrar en vigor la nueva reglamentación, ya que en ese momento el **\*67** solicitante ya tiene un derecho adquirido del cual no puede ser despojado sin un debido proceso de ley.

Contamos con una opinión que el Secretario de Justicia de Puerto Rico emitió en 1970 sobre una controversia similar a la hoy ante nuestra consideración, en la cual se "adoptó" la misma posición que hoy mayoritariamente prevalece en la jurisdicción norteamericana sobre este punto. [10] Aun cuando las opiniones emitidas por el Secretario de Justicia de Puerto Rico *no* obligan a los tribunales, [11] la señalamos por el valor persuasivo que pueda tener. Es de notar que

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/18 Entered:01/24/18 18:12:25 Desc:
Exhibit DX-GG Part 5 Page 423 of 541
Maldonado v. Junta Planificación, 2007 TSPR 87 (2007)

2007 TSPR 87

en dicha ocasión, el mencionado funcionario determinó que un Oficial de Permisos de la Junta *podía utilizar* el Reglamento Núm. 4 de 7 de febrero de 1970 para evaluar las solicitudes de permisos que estaban sin resolver al entrar el mismo en vigor. [12]

[20] En vista de todo lo anteriormente expuesto, y del alto interés público que tiene la protección del medio ambiente y de los recursos naturales en nuestra jurisdicción, *resolvemos que la normativa antes mencionada es una que debe ser adoptada en nuestra jurisdicción.* Al respecto, citamos las expresiones siguientes en *Sherman v. Reavis*, ante, pág. 737:

> It would be utterly illogical to hold that, after a zoning commission had prepared a comprehensive zoning ordinance or an amendment thereto, which was on file and open to public inspection and upon which public hearings had been held, and **\*68** while the ordinance was under consideration, any person could by merely filing an application compel the municipality to issue a permit which would allow him to establish a use which he either *knew or could have known* would be forbidden by the proposed ordinance, and by so doing nullify the entire work of the municipality in endeavoring to carry out the purpose for which the zoning law was enacted. (Énfasis suplido.)

Una vez resuelto lo anterior, corresponde determinar si el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 estaba *pendiente de aprobación* cuando se presentó la consulta de ubicación en controversia. De esto ser así, debemos resolver si, según las disposiciones incluidas en el mencionado Plan y Reglamento, la Junta actuó correctamente al denegar la consulta de ubicación solicitada. Veamos.

B. De un análisis del expediente ante nuestra consideración se deduce que la consulta de ubicación en controversia la presentó el recurrido el 5 de septiembre de 2000 y que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero lo firmó el entonces Gobernador de Puerto Rico, Hon. Pedro

Rosselló González, el 28 de octubre de 2000, o sea que el referido reglamento entró en vigor cuarenta y tres días después de la presentación de la consulta de ubicación en controversia. Asimismo, del propio documento inferimos que el 23 de noviembre de 1999 —casi diez meses antes de la presentación de la consulta de ubicación— la Junta celebró unas vistas públicas para que los organismos gubernamentales, los propietarios de terrenos y otros grupos interesados participaran y comentaran el reglamento.

Por lo anterior, concluimos que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 era un documento "pendiente de aprobación" cuando el recurrido Maldonado presentó la consulta de ubicación. Resulta obvio que la Junta tenía intenciones de preparar ese plan y reglamento, y que **\*69** había comenzado el proceso de aprobación mucho antes de que el recurrido solicitara permiso para establecer un parque industrial pesado en los terrenos ubicados en la cuenca hidrográfica de la Laguna Tortuguero. Tan es así que el 23 de noviembre de 1999 la Junta presentó el referido documento en una vista pública a la cual asistieron organismos gubernamentales, propietarios de terrenos y otras personas con interés.

Según lo anterior, consideramos que de acuerdo con la doctrina "pendiente de aprobación" antes mencionada —*la cual hoy adoptamos en nuestra jurisdicción*— la Junta podía utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 para evaluar la consulta de ubicación que solicitó el recurrido. Así, pues, corresponde determinar si procedía denegarla según las normas establecidas en dicho documento.

C. Ya mencionamos que el recurrido Maldonado solicitó una consulta de ubicación para construir un parque industrial pesado en un terreno de aproximadamente cuarenta y cinco cuerdas, más tres o cuatro cuerdas de una finca a segregarse, sita en el barrio Cotto Norte de Manatí, y que dicho terreno ubica en los predios protegidos tanto por el antiguo como por el nuevo Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero.

El referido Reglamento clasifica los terrenos donde se propone la ubicación del proyecto solicitado como LT-A1 y LT-B1 (esencialmente la misma categoría que el anterior reglamento). Específicamente, para los

Case:17-03283-LTS Doc#:4781-6 Filed:02/24/18 Entered:02/24/18 18:12:25 Desc:
Exhibit DX-G Part 5 Page 422 of 541
Exhibit Page 29 of 33

terrenos ubicados en el Distrito LT-A1, dicho reglamento establece los usos siguientes: (1) agrícola, tales como siembra de productos, siempre y cuando se utilicen fertilizantes y plaguicidas orgánicos que no contaminen; (2) usos y edificios accesorios estrechamente relacionados o complementarios a los cultivos, que es el uso principal de la finca; (3) vivienda para una familia. Por otro lado, para los terrenos ubicados en el **70** Distrito LT-B1 se disponen los usos siguientes: (1) agrícola; (2) edificios de usos accesorios a los usos principales; (3) venta de productos cosechados en la finca, incluso la madera; (4) talleres de artesanía; (5) casa para una o dos familias con ciertos requisitos.

[21] De igual forma, debemos destacar que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 dispone, entre las estrategias para los usos industriales, que *"no se aprobarán otros proyectos industriales en la Cuenca"*. Además, establece que para proteger los sistemas naturales —como los sumideros— se prohibirá "*la construcción de pozos de inyección que se usan para disponer de las aguas pluviales,* [*ya que*] *éstos alteran el equilibrio hidrogeológico subterráneo*".

Según lo anterior, resulta meridianamente claro que el proyecto que propuso el recurrido *no* está entre los usos permitidos por el Plan y Reglamento Especial antes mencionado. *Peor aún*, la aprobación de parques industriales, como el que el recurrido pretende establecer, *está expresamente prohibida en dicho documento*. Así lo dejó establecido la Junta en su resolución y así lo observamos al analizar el Reglamento. Además, de la resolución de la Junta se deduce que el proyecto solicitado propone que se utilicen dos pozos de inyección (Clase V y Tipo B5) para las aguas de escorrentías, *lo que también prohíbe expresamente el aludido documento*.

Además de los anteriores fundamentos, la Junta también resolvió que el proyecto propuesto atenta contra varios objetivos y políticas públicas del Plan de Usos de Terrenos de Puerto Rico. [13] No los discutiremos, ya que **71** consideramos que con los fundamentos iniciales —relacionados con la prohibición de aprobar nuevos parques industriales en el área y nuevos pozos de inyección — era suficiente para denegar el proyecto solicitado.

[22] Antes de finalizar, debemos reiterar que los tribunales debemos deferencia a las determinaciones de las agencias administrativas, máxime cuando en la controversia planteada se incluyen asuntos relacionados con sus áreas de especialización o pericia. También hemos resuelto que dicha deferencia solamente cederá cuando la determinación no está basada en evidencia sustancial, cuando se haya errado en la aplicación de la ley o cuando ha mediado una actuación irrazonable o ilegal; [14] situaciones que, como vimos, no se dan en el presente caso.

[23] Asimismo, debemos recordar que la zona cárstica contiene uno de los mayores acuíferos freáticos de Puerto Rico y es de incomparable valor escénico, natural, cultural e histórico, lo que la hace un área con un gran potencial turístico, ecológico y de investigación científica. [15] Por esto consideramos que le aplica en todo su vigor la política pública del Gobierno de Puerto Rico dirigida **72** a lograr un desarrollo integral sostenible que asegure *el uso juicioso de las tierras y fomente la conservación de los recursos naturales para el disfrute y beneficio de todos.* Véase *A.R.Pe. v. Rivera*, ante.

*Por los fundamentos antes expresados, resolvemos que se podía aplicar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 a la consulta de ubicación que presentó el recurrido y que, según las disposiciones del mismo procedía que se denegara.* [16] *En consecuencia, erró el Tribunal de Apelaciones al ordenar la devolución del caso a la Junta para celebrar procedimientos adicionales.*

En mérito de lo antes expuesto, *procede revocar la Sentencia emitida por el Tribunal de Apelaciones el 29 de agosto de 2003 y, en consecuencia, restablecer la Resolución de la Junta de Planificación emitida el 17 de enero de 2002, la cual denegó la consulta de ubicación Número 2000-08-0804-JPU.*

*Se dictará sentencia de conformidad.*

La Jueza Asociada Señora Fiol Matta emitió una opinión concurrente y disidente, a la cual se unió la Juez Asociada Señora Rodríguez Rodríguez. El Juez Asociado Señor Fuster Berlingeri no interviene.

**--O--**

Opinión concurrente y disidente emitida por la Jueza Asociada Señora Fiol Matta, a la cual se une la Jueza Asociada Señora Rodríguez Rodríguez.

Case:17-03283-LTS Doc#:4781-6 Filed:02/14/18 Entered:02/14/18 18:12:25 Desc:
Exhibit DD (Part 5, Page 28 of 33) Page 423 of 541

Concurro con la decisión de este Tribunal respecto a que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero aplicaba a la consulta de ubicación **\*73** que presentó el recurrido y que a la luz de las disposiciones del reglamento procedía denegar la consulta. Sin embargo, entiendo que no debemos adoptar la norma de la "reglamentación pendiente" en nuestra jurisdicción por la limitación que ello supone a las facultades delegadas a la Junta de Planificación de Puerto Rico (Junta de Planificación) para la planificación integral y armoniosa del desarrollo de nuestro país.

**I**

La controversia planteada en este caso, sobre si la Junta de Planificación debió utilizar un reglamento de zonificación aprobado con posterioridad a la presentación de una consulta de ubicación como fundamento para denegarla es, en esencia, una controversia sobre la aplicación retroactiva de dicho reglamento que debemos atender conforme a la doctrina civilista sobre la irretroactividad de las leyes. [1]

El Artículo 3 del Código Civil de Puerto Rico establece el principio de irretroactividad de las leyes:

> Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.
>
> En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior. 31 L.P.R.A. sec. 3.

En ocasiones anteriores hemos señalado que este principio no es una norma absoluta y que se debe aplicar como **\*74** una regla general de interpretación de estatutos. Por esta razón, una ley podrá tener efecto retroactivo si la intención legislativa así lo dispone expresa o tácitamente. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 384–388 (1973). Véanse, además: *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 542 (1984); *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006). Ahora bien, el Artículo 3 del Código Civil, *supra*, limita el efecto retroactivo de una ley para que no se perjudiquen los derechos adquiridos al amparo de una ley anterior. Por lo tanto, para determinar si el efecto retroactivo de una ley es válido se debe evaluar si dicho efecto surge de forma expresa o tácita, según la intención legislativa, y si éste afecta derechos adquiridos al amparo de una ley anterior.

En el campo del derecho administrativo tenemos que tener en cuenta que el poder de reglamentación de las agencias

proviene de la facultad que les delega la rama legislativa. Por consiguiente, al aplicar el principio de irretroactividad de las leyes a un reglamento es necesario determinar, en primer lugar, si el reglamento tiene efecto retroactivo; en segundo lugar, si la agencia que lo adopta tiene la facultad delegada de otorgarle efecto retroactivo a ese reglamento, y en tercer lugar, si el efecto retroactivo del reglamento es válido. El reglamento tendrá efecto retroactivo si afecta actos jurídicos realizados, situaciones jurídicas nacidas o hechos acaecidos antes de su vigencia. L. Díez-Picazo y A. Gullón Ballesteros, *Sistema de Derecho Civil*, 9na ed., Madrid, Ed. Tecnos, 1997, Vol. I, pág. 106.

La facultad de concederle efecto retroactivo a un reglamento puede ser delegada de forma expresa o tácita por la rama legislativa. Si no surge de forma expresa en la ley, entonces habrá que evaluar si según la intención legislativa y la naturaleza de la facultad a la que se le intenta dar efecto retroactivo, es razonable concluir que la delegación a la agencia fue tácita. La facultad tácitamente delegada debe ser necesaria para que la agencia pueda adelantar los **\*75** propósitos de su ley habilitadora y debe estar dentro de los amplios poderes expresamente delegados por la Asamblea Legislativa. *Caribe Comms., Inc. v. P.R.T. Co.*, 157 D.P.R. 203 (2002). Véase, además, *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 325–326 (1987).

Luego de determinar si la agencia tiene la facultad de atribuirle efecto retroactivo a un reglamento, se debe evaluar la validez de ese efecto retroactivo, tomando en consideración si éste surge de forma expresa o tácita del reglamento y si afecta derechos adquiridos al amparo de un reglamento anterior.

**II**

Apliquemos el marco doctrinal explicado al caso que nos ocupa. En este caso, la Junta de Planificación utilizó el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero como uno de los fundamentos para denegar la consulta de ubicación que presentó el recurrido antes de que dicho Plan estuviera vigente. Evidentemente, el reglamento bajo análisis tiene efecto retroactivo, ya que afecta un hecho que aconteció antes de su vigencia.

La Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975, delegó a la Junta de Planificación la facultad de crear Planes de Uso de Terrenos y Reglamentos de Zonificación con

el propósito de guiar el desarrollo integral de Puerto Rico. 23 L.P.R.A. secs. 62c, 62m y 62o. A base de la facultad delegada y de su conocimiento especializado, la Junta de Planificación ha adoptado Reglamentos de Zonificación en los cuales establece las normas esenciales sobre cómo y dónde deben ubicarse las actividades sociales y económicas de Puerto Rico. [2] **76**

La facultad de zonificar es una facultad especializada. Su objetivo es buscar la armonía y la planificación integrada entre los usos designados en los terrenos del país. Al adoptar o enmendar un reglamento de zonificación, la Junta de Planificación intenta evitar la aprobación de usos no conformes y contrarios a la política pública establecida en la nueva reglamentación. Por esto, de acuerdo con la propia naturaleza de esta facultad, es razonable que la agencia pueda otorgarle efecto retroactivo a dichos reglamentos. Esta facultad es necesaria para que la agencia ejerza efectivamente su función de zonificar.

La facultad de concederle efecto retroactivo a los Reglamentos de Zonificación no surge de forma expresa en la Ley Orgánica de la Junta de Planificación. Sin embargo, dado que la intención legislativa es lograr el desarrollo integral del país, la facultad de darle efecto retroactivo a los Reglamentos de Zonificación resulta necesaria para que la Junta pueda adelantar el propósito de la ley. Por eso, es forzoso concluir que esta facultad se le delegó tácitamente a la Junta dentro de su amplio poder de adoptar Reglamentos de Zonificación.

Una vez determinado que la Junta de Planificación tiene la facultad de otorgarle efecto retroactivo a los Reglamentos de Zonificación, corresponde evaluar la validez del efecto retroactivo del reglamento bajo análisis. Este reglamento, llamado el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, fue adoptado por la Junta de Planificación con el propósito de controlar los usos de los terrenos en esta cuenca y proteger, conservar y restaurar los sistemas naturales que la componen. En el Capítulo V, sobre Instrumentos de Implantación del reglamento, se dispone que la zonificación establecida "determinará el uso y la intensidad básica de las *actividades actuales y propuestas* en el área estudiada". (Énfasis suplido.) Capítulo V(A)(1) del Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, **77** 28 de octubre de 2000, pág. 52. Además, añade que todo *proyecto presentado* ante la Junta de Planificación y la Administración de Reglamentos y Permisos deberá

cumplir con lo establecido en el reglamento y que su vigencia será inmediata. Íd.

Ante la evidente intención expresa de la Junta de Planificación de aplicar retroactivamente este reglamento a las actividades propuestas o proyectos presentados en la agencia, debemos examinar la posibilidad de que el reglamento afecte derechos adquiridos al amparo de un reglamento anterior. En ese análisis no podemos olvidar que la mera solicitud de un permiso de construcción no confiere ningún derecho adquirido al solicitante. *Phi Delta Pi v. Junta Planificación*, 76 D.P.R. 585, 591 (1954). Para que exista tal derecho es necesario que la agencia pertinente apruebe previamente el permiso y que la persona que lo obtenga haya incurrido en gastos sustanciales actuando a base de dicho permiso. Al respecto hemos expresado lo siguiente:

> Efectivamente, la regla generalmente establecida, que ahora adoptamos, determina que una vez se haya expedido un permiso de construcción por un funcionario debidamente autorizado, y la persona que ha obtenido el permiso ha actuado a base de ese permiso y ha incurrido en gastos sustanciales, el derecho logrado en virtud de la construcción se convierte en un *derecho adquirido* que el gobierno no puede destruir en virtud de una revocación del permiso. Yokley, *Zoning Law and Practice*, segunda ed. pág. 234, et seq., sec. 100, y casos allí citados y discutidos. (Énfasis suplido.) *Phi Delta Pi v. Junta Planificación*, supra, pág. 591.

La presentación de una consulta de ubicación es el inicio de un proceso de evaluación que hace la Junta de Planificación para determinar si permitirá el uso propuesto en un predio determinado. [3] En una consulta de ubicación el uso **78** propuesto es, de por sí, un *uso no permitido* por la zonificación aplicable al predio determinado, dejando a la discreción de la agencia su consideración y posible autorización. Sección 3.03 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031, 13 de octubre de 1999. Este proceso de evaluación no concluye sino hasta la aprobación o denegación final del permiso. Debido a

que el solo acto de presentar una consulta de ubicación no supone, ni garantiza, la aprobación del permiso, tampoco puede conceder un derecho bajo la reglamentación vigente al momento de presentarse la consulta.

En este caso, el recurrido presentó una consulta de ubicación el 5 de septiembre de 2000. El Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero entró en vigencia el 28 de octubre de 2000. Finalmente, la consulta de ubicación del recurrido fue denegada el 17 de enero de 2002, tomando en consideración el reglamento aplicable a la Cuenca Hidrográfica de la Laguna Tortuguero hacía más de un año.

Según el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, al aprobar o denegar una consulta de ubicación la Junta debe tomar en consideración, entre otras cosas, los Reglamentos de Zonificación. [4] Dado que el efecto retroactivo del reglamento en este caso no afectó un derecho adquirido al amparo del reglamento anterior, estamos ante un efecto retroactivo válido y la Junta de Planificación aplicó correctamente el reglamento bajo **\*79** análisis al denegar la consulta de ubicación que presentó el recurrido. [5]

La regla general en las jurisdicciones estatales de Estados Unidos apoya esta conclusión. La mayor parte de estas jurisdicciones han adoptado, como norma general y bajo el contexto de las ordenanzas municipales de zonificación, que la solicitud de un permiso de construcción presentada antes de que una ordenanza de zonificación entre en vigor no otorga ningún derecho sobre un uso prohibido por dicha ordenanza. La norma acogida añade que los derechos de las partes se deben determinar a base de la reglamentación vigente al momento en que se ejerce el uso permitido, en vez de la reglamentación vigente al momento en que se presenta la solicitud del permiso. Véase 8 *McQuilin, The Law of Municipal Corporations* Sec. 25.155, págs. 567–568 (3ra ed. rev. 2000). [6] Véanse, además: *Metro. Dev. Comm'n v. Pinnacle Media, LLC*, 836 N.E.2d 422, 428 (2005); *Fillmore v. Town of Sanbornton*, 319 A.2d 103, 104–105 (1974).

Debemos señalar que la regla general en las jurisdicciones estadounidenses es más amplia que la aquí propuesta, ya que no requiere evaluar la facultad delegada a la agencia ni la validez del efecto retroactivo de la nueva ordenanza; **\*80** más bien reconoce la retroactividad como la regla general:

> As a general rule, a newly enacted zoning ordinance will apply *retroactively* to block a building permit applied for but not granted before the effective date of the new ordinance. (Énfasis suplido.) 2 *Yokley, Zoning Law and Practice* Sec. 14-7, pág. 14-29 (4ta ed. 2003).

### III

La opinión mayoritaria propone adoptar en nuestra jurisdicción, no la norma general antes explicada, sino la norma de la "reglamentación pendiente" desarrollada en algunas jurisdicciones de Estados Unidos. Según esta norma, si se aprueba un reglamento después de haberse presentado una solicitud de permiso, este nuevo reglamento se podrá aplicar a lo solicitado solamente si estaba pendiente de aprobación al momento en que se presentó la solicitud. Esta norma, sin embargo, proviene de las jurisdicciones estadounidenses que han decidido no aplicar la norma general:

> Although there are major exceptions, the rule followed in most jurisdictions is that a newly adopted prohibitory zoning regulation may ordinarily be applied with retroactive effect to bar issuance of a building permit that was duly applied for prior to the adoption or the effective date of the new regulation. *Some jurisdictions, however, refuse to follow the general rule if the new zoning regulation was not "pending"* —that is, officially proposed or in actual process of enactment— when the application for the building permit was filed. (Énfasis suplido y escolios omitidos.) Anotación, *Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit*, 50 A.L.R.3d 596, 602, Sec. 2[a] (1973). [7] **\*81**

No creo que en este caso debamos desviarnos de la regla aplicada por la mayoría de las jurisdicciones. Al condicionar la retroactividad a que la nueva

reglamentación esté pendiente de aprobación cuando se presenta la consulta, la norma minoritaria de la "reglamentación pendiente" reconoce, implícitamente, que el solicitante tiene el derecho a que su solicitud sea evaluada bajo la reglamentación vigente al momento en que la presenta. *McQuillin*, supra, Sec. 25.155, pág. 571.[8] Esto limita y condiciona la facultad administrativa de aplicar retroactivamente la nueva reglamentación.

Opino que reconocer este derecho constreñiría innecesariamente la discreción administrativa y resultaría en una incongruencia jurídica. Por un lado, la norma de la "reglamentación pendiente" reconocería un derecho adquirido a que se adjudique la solicitud bajo la reglamentación vigente al momento de presentarse una consulta de ubicación, mientras que por el otro, nuestro ordenamiento no reconoce la adquisición de derecho alguno sino hasta que se logre la aprobación final de la consulta y se haya incurrido en gastos sustanciales actuando a base de dicha aprobación. *Phi Delta Pi v. Junta Planificación*, supra.

Además, la norma de la "reglamentación pendiente" limitaría la aplicación de un reglamento con efecto retroactivo válido, ya que condiciona dicha aplicación a que el reglamento esté pendiente de aprobación al momento de presentarse la solicitud de un permiso o consulta de **\*82** ubicación. Esto traería como consecuencia práctica la aprobación de permisos que no estarían conformes con la reglamentación vigente en determinado momento y que responderían, en vez, a una reglamentación derogada. En el contexto de un reglamento de zonificación implicaría la aprobación de usos no conformes a la zonificación vigente, precisamente el efecto que la Junta de Planificación debe evitar.

En el caso ante nuestra consideración, el recurrido propuso el desarrollo de un parque industrial pesado a ser ubicado en la Cuenca Hidrográfica de la Laguna Tortuguero. Conforme a la norma hoy establecida por la Mayoría de este Tribunal, si el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero no hubiese estado pendiente de aprobación cuando el recurrido presentó la consulta de ubicación, la Junta de Planificación no hubiera podido aplicarlo y al resolver la consulta se habría visto obligada a desacatar el reglamento vigente a esa fecha que prohíbe *de forma expresa* la aprobación en esa cuenca hidrográfica de proyectos industriales como el aquí propuesto. La incongruencia me parece evidente.

### IV

Por todo lo anterior, concurro con la opinión mayoritaria respecto a que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero aplicaba a la consulta de ubicación presentada por el recurrido y que, a la luz de las disposiciones del reglamento, procedía la denegación de la consulta. Sin embargo, disiento de la adopción de la norma de la "reglamentación pendiente" en nuestra jurisdicción.

Nuestro derecho atiende la presente controversia sin necesidad de introducir nuevas fuentes de derechos adquiridos o irretroactividad. Ante una controversia sobre la **\*83** aplicación retroactiva de un reglamento, debemos determinar, en primer lugar, si el reglamento tiene efecto retroactivo; en segundo lugar, si la agencia que lo adopta tiene la facultad delegada de otorgarle efecto retroactivo a ese reglamento, y en tercer lugar, si se trata de una aplicación retroactiva válida. El momento en que fue propuesto o estaba pendiente de aprobación el nuevo reglamento realmente no debe ser pertinente.

### Footnotes

1     Dicha solicitud recibió el número 2000-08-0804-JPU.

2     Los fundamentos ofrecidos por el Instituto Ambiental COTICAM de Puerto Rico (COTICAM) para su oposición se basaron en consideraciones ambientales en cuanto a la ubicación del proyecto propuesto en la Cuenca Hidrográfica de la Laguna Tortuguero, las malas prácticas en el manejo y el uso de pesticidas en el sector, la obstrucción de las aguas pluviales y la existencia de más de diez pozos cerrados en el área por contaminación.

3     En lo pertinente, la Sec. 9 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación dispone lo siguiente:

"En la [R]esolución, se advertirá a la parte afectada de su derecho a solicitar una reconsideración de la determinación de la Junta, dentro del término de veinte (20) días a partir de la fecha del archivo en autos de la notificación.

"La Junta, dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión, comenzará a correr nuevamente,

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.      13

Maldonado v. Junta Planificación, 171 D.P.R. 359 (2007)
2007 TSPR 87

Case:17-03283-LTS Doc#:478-36 Filed:02/24/18 Entered:02/24/18 18:19:25 Desc:
Exhibit DF-16 (Part 5) Page 423 of 541
Exhibit 36 Part 5 Page 427 of 541

desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea [el] caso. Si se tomare alguna determinación en su consideración, el término de treinta (30) días para solicitar Revisión Judicial, comenzará a contarse, desde la fecha en que se archiva en autos una copia de la notificación de la Resolución de la Junta, resolviendo definitivamente, la solicitud de reconsideración, cuya resolución, deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes [a la] radicación de dicha solicitud. *Si la Junta, dejare de tomar alguna acción con relación a la solicitud de reconsideración dentro de los noventa (90) días de haber sido radicada una solicitud acogida para resolución, perderá jurisdicción sobre la misma y el término para solicitar Revisión Judicial, comenzará a contarse, a partir de la expiración de dicho término de noventa (90) días ....*" (Énfasis suplido.) Reglamento Núm. 6031 de 13 de octubre de 1999, págs. 39–40.

4    Salvo que la Junta de Planificación, por justa causa y oportunamente, extienda el término.

5    Es menester desatacar que los fines que tuvo la Legislatura para aprobar ambas leyes son idénticos.

6    Ley Núm. 292 de 21 de agosto de 1999 (12 L.P.R.A. sec. 1151 *et seq.*).

7    Entre las actividades prohibidas está la extracción, excavación y remoción de roca caliza con propósitos comerciales o de nivelación de terrenos. 12 L.P.R.A. sec. 1152.

8    "Ordinarily an application for a permit made before a zoning ordinance becomes effective gives in itself no right to a use excluded by the ordinance." 8 *McQuilin, The Law of Municipal Corporations* Sec. 25.155, pág. 567 (3ra ed. rev. 2000). Véanse, además: *Coral Springs Street Systems v. City of Sunrise*, 371 F.3d 1320 (11mo Cir. 2004); *County of Santa Fe v. Public Service Co. of N.M.*, 311 F.3d 1031 (10mo Cir. 2002); *Stratos v. Town of Ravenel*, 376 S.E.2d 783 (S.C. App. 1989).

9    "An ordinance is legally pending when the governing body has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning."

10   Op. Sec. Just. Núm. 1970-30.

11   Véase *In re Secretario de Justicia*, 118 D.P.R. 827, 855 (1987).

12   Son pertinentes a nuestra controversia las expresiones del Secretario de Justicia en el escolio 2 de la mencionada opinión, en la cual cita a 101 C.J.S., *Zoning*, 221:

"According to some authorities, where, after the making of an application for a permit but before a decision thereon, the regulations applicable to the subject matter of the permit sought are changed, the application is governed by the regulations as changed, and a municipality may properly refuse a building permit for a land use repugnant to a pending and later-enacted zoning ordinance even though the application for the permit is made when the intended use conforms to existing regulations, *provided that no permit has been issued and relied on in good faith to the substantial detriment of the holder of the permit.*" (Énfasis suprimido.)

13   Específicamente utilizó la Política Pública 30.02 y 31.00 las cuales obligan a lo siguiente:

"*Política Pública 30.02*: Controlar las actividades de desarrollo de terrenos, la construcción y las lotificaciones que pudieran afectar adversamente la calidad de las aguas, en particular en las áreas de recarga de los acuíferos y en las cuencas inmediatas de los lagos y embalses, incluyendo entre otros, actividades tales como la pavimentación excesiva que aumenta el caudal de aguas de escorrentía, el uso indiscriminado de fertilizantes y plaguicidas que desmerecen la calidad de nuestros cuerpos de agua, el desmonte, la remoción de la capa vegetal y los movimientos de tierra que provocan la erosión y sedimentación.

"*Política Pública 31.00*: Propiciar la protección de áreas con suelos kársticos que por las formaciones calcáreas y por sus características hidrogeológicas proveen beneficios para los acuíferos, protegen las aguas superficiales y mantienen la integridad ecológica de los sistemas naturales.

"Estimular la conservación de mogotes de naturales kárstica.

"Mantener la integridad natural de los sistemas de drenaje en suelos kársticos, desestimulando las alteraciones en las áreas de carga y recarga de los cuerpos de aguas subterráneas y de las cuencas hidrográficas de aguas superficiales.

"Evitar las hidromodificaciones en áreas kársticas de vital importancia.

"Evitar las alteraciones del equilibrio ecológico e hidrogeológico en aquellas áreas kársticas donde los estudios edafológicos y geológicos recomiendan la protección de dichas funciones."

14   *Otero v. Toyota*, 163 D.P.R. 716 (2005); *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85, 94 (1997); *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987).

15   Véase *Orden Ejecutiva del Gobernador aprobando el Plan y Reglamento Especial para la Cuenca hidrográfica de la Laguna Tortuguero*, 2000-OE-56.

16   En vista del resultado al que hemos llegado, resulta innecesario discutir los restantes señalamientos de error de la peticionaria.

1    El principio de la irretroactividad de las leyes se extiende a la aplicación de los reglamentos administrativos: "La palabra Leyes utilizada por el artículo [3] ha de entenderse en sentido amplio, por lo que el principio de irretroactividad deberá aplicarse a las demás normas jurídicas; por ejemplo, a las disposiciones administrativas." F. Bonet Ramón, *Compendio de Derecho Civil*, Madrid, Ed. Rev. Der. Privado, 1959, T. I, pág. 203.

     En la jurisprudencia estadounidense también se han tratado estas controversias como regidas por el efecto retroactivo de los reglamentos de zonificación. Véase Anotación, *Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit*, 50 A.L.R.3d 596 (1973).

2    Introducción del Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 6211 de 5 de noviembre de 2000.

3    La Sección 2.00(7) del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación define una consulta de ubicación, en lo pertinente, como "el procedimiento ante la Junta de Planificación, para que evalúe, pase juicio y tome la determinación que estime pertinente, sobre propuestos usos de terrenos que *no son permitidos ministerialmente* por la reglamentación aplicable en áreas zonificadas, pero que las disposiciones reglamentarias proveen para que se consideren por la Junta de Planificación". (Énfasis suplido.) Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031, 13 de octubre de 1999, pág. 5.

4    Sección 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031, 12 de noviembre de 1999.

5    Idéntica conclusión expresó el Secretario de Justicia en una opinión en la cual reconoce que un reglamento puede tener efecto retroactivo sobre la solicitud de un permiso, aunque de una forma más amplia, ya que no requiere analizar la facultad delegada a la agencia ni la validez del efecto retroactivo del reglamento. Según la opinión:

     "Como regla general, una mera solicitud de permiso no crea un derecho a favor del peticionario; por lo tanto, si hay un cambio en las condiciones requeridas para la expedición del permiso, antes de emitirse decisión sobre una solicitud pendiente, entiendo que tal decisión debe basarse en las disposiciones en vigor en este momento. No aplica la anterior regla, sin embargo, cuando el solicitante ha actuado de buena fe basándose en algún tipo de autorización." (Escolio omitido.) Op. Sec. Just. Núm. 1970–30, pág. 149.

6    "In most jurisdictions it is clear that, as a general rule, the denial of an application for a building permit may be based on a zoning regulation enacted or becoming effective after the application was made, or to state the rule conversely, a zoning regulation may be retroactively applied to deny an application for a building permit, even though the permit could have been lawfully issued at the time of application." (Escolio omitido.) Anotación, *supra*, Sec. 3, pág. 607.

7    "We consider first the threshold question as to whether the applicant's rights are to be measured under Ordinance 85 in effect at the time of the application, or under Ordinance 133 in effect at the time this case went to trial. Idaho has adopted the *minority* view that the applicant's rights are measured under the law in effect at the time of the application. *See*: McQuillin, The Law of Municipal Corporations, [Sec.] 25.155 (3d ed.1965). In [*Ben Lomond, Inc. v. City of Idaho Falls*, 92 Idaho 595, 601, 448 P.2d 209, 215 (1968)], we stated:

     " 'At least in those cases like the present one, in which no zoning ordinance was pending at the time an application for a building permit is filed, it is our opinion that an applicant is *entitled* to a building permit upon compliance with the then existing ordinance.' " (Énfasis suplido y en el original.) *Ready-To-Pour, Inc. v. McCoy*, 511 P.2d 792, 795 (1973).

8    "However, even if he has not made the substantial expenditures in reliance upon the city's position necessary to create an estoppel, he is still *entitled* to obtain a building permit which is within the provisions of existing zoning so long as the rezoning ordinance which would preclude the intended use is not pending at the time when a proper application is made." (Énfasis suplido.) *Smith v. City of Clearwater*, 383 So.2d 681, 689 (1980).

---

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 81

## TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: Matos v Junta Examinadora, 165 D.P.R 741-(2005) and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

Stephanie Penn
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this <u>19</u> day of <u>February</u>, 2018,

by _____

_____
Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

165 D.P.R. 741, 2005 WL
2387182 (P.R.), 2005 TSPR 138

RAMÓN MATOS MATOS, petitioner,
v.
BOARD OF REVIEW [*Junta Examinadora*] OF
ENGINEERS AND SURVEYORS, respondent.

In the Supreme Court of Puerto Rico.
*Number:* CC-2002-555

**Synopsis**
WRIT OF *CERTIORARI* to review a DECISION
by *Liana Fiol Matta, Dolores Rodriguez de
Oronoz* and *Roberto González Rivera,* Appellant
Court Justices, denying the requested motion and
upholding an opinion of the Board of Review of
Engineers and Surveyors to exclude the now
petitioner from the Permanent Registry for the
Practice of Surveying and suspend his engineer in
training certificate for one year. *Ruling handed
down upholding the decision of the Board of
Review of Engineers, Architects and Surveyors.*

*Harold Rivera Vázquez* and *Solanya Vargas
González*, attorneys for the petitioner; *Carmen
Riera Cintrón* and *Gilberto Oliver Vázquez*,
attorneys for the respondent.

ASSOCIATE JUSTICE MRS. RODRÍGUEZ
RODRÍGUEZ wrote the opinion of the Court.

We have the opportunity to decide whether the
Law on the Board of Review of Engineers,
Architects and Surveyors of Puerto Rico, as
amended, provides for engineers in training to be
listed on the Permanent Registry of Engineers
Authorized to Practice Surveying and
consequently to be able to practice the profession
of surveyor in Puerto Rico. Our decision is to deny
it.

**I**
Petitioner Román Matos Matos (Mr. Matos)
studied civil engineering at Puerto Rico
Polytechnic University and earned a bachelor's
degree in that field in November 1978. He passed
only the basic section of the qualifying
examination, while failing the professional section.
In April 1989 the Board of Review of Engineers,
Architects and Surveyors (Board of Review)
issued Certification No. 10161EIT ("engineer in
training"), by which Mr. Matos was classified as
an "engineer in training," pursuant to the Law of

the Board of Review of Engineers, Architects and
Surveyors, Law No. 173 of August 12, 1988, as
amended, 20 L.P.R.A. Sec. 711 *et seq.* (Law 173).[1]
He was subsequently registered with the State
Department as an engineer in training. It is
important to note that the case file does not
indicate the date when Mr. Matos took his
qualifying examination nor what he practiced from
the time he graduated in 1978 until he requested
certification as an engineer in training eleven years
later. *745

On July 7, 1989, Mr. Matos asked to be listed on
the Permanent Registry of Authorized Engineers
for the Practice of Surveying (Permanent
Registry), which lists all engineers qualified to
practice surveying under the transitory provisions
of Law 173. In his application, Mr. Matos limited
himself to noting his personal information,
referencing his license number 10161EIT and
confirming the courses he took that qualified him
to practice surveying.[2] Appendix to the writ of
*certiorari*, Page 3. The application was
accompanied by a transcript of the credits attesting
to his having taken the required courses.

On June 6, 1990, the Board of Review issued Mr.
Matos a provisional permit authorizing him to
practice surveying. This communication informed
him that official certification was contingent upon
review and final approval of his application by the
Board of Review.[3] It was not until November 1995
that the College of Engineers and Surveyors of
Puerto Rico (C.I.A.P.R.) noted the irregularity in
the provisional permit he had been awarded. By
letter, the C.I.A.P.R. questioned the Board of
Review as to the procedure used, by which an
engineer in training was provisionally authorized
to practice surveying, while the law only permits
licensed engineers to be listed on the Permanent
Registry. Appendix to the writ of *certiorari*, Page
13.

Despite having disputed the permit that had been
awarded, that same month (November 1995) the
C.I.A.P.R. issued a certification attesting that the
petitioner, in addition to *746 being an engineer in
training, was authorized

to practice surveying. Appendix to the writ of *certiorari*, Page 15. In a letter dated April 1996, the Board of Review expressed itself in those same terms. It is to be noted that during that entire time, Mr. Matos resorted to the C.I.A.P.R. on a number of occasions, requesting guidance as to how he should present his credentials.

Thus things stood until June 1996, when the Regulations and Permits Administration (A.R.PE.) complained to the C.I.A.P.R. because Mr. Matos had illegally presented some projects under a professional engineer's seal without being authorized to do so.[4] In a decision dated March 6, 1998, the College of Engineers Disciplinary Court ruled, as a question of fact, that the defendant was a surveyor and engineer in training and that he had illegally represented on his seal that he was an engineer. Since the projects in question involved surveying and not engineering, the Disciplinary Court limited the penalty to a warning and admonished the defendant "not to continue this conduct."[5] Mr. Matos did not appeal the ruling.

Consistent with this decision, the petitioner prepared a new professional seal to certify surveying projects, and in March 1999 requested that the Board of Review *747 approve said seal and renew his surveyor's license. Upon evaluating the request, the Board of Review noted that Mr. Matos was not a licensed engineer and that he had been practicing surveying since 1989 under an illegal authorization. The Board of Review filed an administrative action and notified Mr. Matos of its intent to revoke his certificate as an engineer in training and his temporary surveyor's license for violation of the C.I.A.P.R.'s ethical standards. Nevertheless, that letter did not communicate to him the facts characterizing his violation, nor did it specify the standards allegedly violated.[6] A hearing was held on April 18, 2001, in which Mr. Matos had the opportunity to make a statement and present evidence in his favor.

On December 26, 2001, the Board of Review handed down a decision suspending Mr. Matos' certificate as an engineer in training for one (1) year and revoking his temporary surveyor's license, since it was void for having been granted in violation of the law. Once again, the Board of Review based its decision on the fact that Mr. Matos had been illegally listed on the Permanent Registry of Surveyors, since only licensed engineers have access to said registry.

In disagreement, and after being outright denied a motion for reconsideration, Mr. Matos resorted to the appeals court by filing for an administrative review. He argued that the Board of Review had erroneously interpreted Law 173, excluding him from the registry that allowed him to practice surveying and concluding that he had violated an order of the College of Engineers' Disciplinary Court to refrain from practicing as a surveyor.

The appeals court considered the parties' cases and concluded that only a licensed engineer or licensed surveyor *748 can practice engineering. It found that the Board of Review's actions were reasonable and consistent with its legislative mandate. Consequently, it denied the requested appeal. Upon that decision, Mr. Matos resorted to us, and referred to us the following description of error:

> The Honorable Circuit Appellate Court erred in upholding the "decision" handed down by the Board of Review of Engineers and Surveyors of Puerto Rico, revoking the permit authorizing the now petitioner to practice surveying in Puerto Rico and suspending him from the permanent registry to practice surveying. Writ of *certiorari*, page 9.

We expedited the appeal and, having heard the parties' cases, we proceeded to decide.

## II

The central dispute in question revolves around the correct interpretation of the transitory provisions of Law 173. In his document, the petitioner maintains that although the appeals court's interpretation is largely correct, in the sense that only "licensed engineers" may practice surveying in Puerto Rico, that is not actually the case. He claims that the transitory provision contained in Art. 3(i) of Law 173 (20 L.P.R.A., Sec. 711a(i)) authorizes an "engineer in training" to request listing on the Permanent Registry and, therefore, to practice as a surveyor.

Given, then, that the petitioner is certified as an "engineer in training," he is authorized to practice surveying.

[1] In interpreting a law, we judges have the obligation to consider the social purposes that prompted the Legislative Assembly to approve it. *Dept. of the Family v. Ramos*, 158 D.P.R. 892 (2003); *Piñero v. AAA*, 146 D.P.R. 890 (1998); *Col. Ópticos P.R. v. Pearle Vision Center*, 142 D.P.R. 221 (1997). It is therefore necessary *789 that our interpretation harmonize, to the extent possible, all legal provisions with a view to achieving an integrated, logical and reasonable interpretation of legislative intent.

[2] The various provisions comprising a law must not be interpreted in isolation, but rather analyzed as a whole. However, we must not lose sight of the fact that the law's clear language is the best expression of legislative intent. *Finance Department v. Telefónica*, 164 D.P.R. 195 (2005); *Rexach v. Ramírez*, 162 D.P.R. 130 (2004) and other cases cited therein.

In light of the above regulations, let us move on to assess the legal provisions related to this dispute.

The petitioner argued that the appeals court erred in not considering that his status as engineer in training qualified him to adhere to the time extension provided for in Art. 30(g) of Law 173. He based his contention on the use of the word "certified" in Art. 30(g) of said law, a term he claims refers to engineers in training. This is incorrect.

[3] Law 173, which was current at the time the petitioner requested classification as an engineer in training, was approved for purposes of harmonizing the legal provisions governing the professional practice of engineering, architecture and surveying in Puerto Rico, to ensure quality and rigor in those services. It seeks to temper the rigors of the law to the profession's modern requirements, benefiting not only the professionals it regulates but also the country's socioeconomic development. Explanation of Grounds of Law 173 (1988 Laws of Puerto Rico 860). This law revoked Law No. 399 of May 10, 1951 (Law 399), 1951 Laws of Puerto Rico 1011, which up to then had been regulating the engineering, architecture and surveying professions, and introduced a number of significant changes.

Law 399 classified engineers and architects as *750 graduate engineers or architects, and licensed engineers and architects, a distinction that made little–if any–practical sense, since both graduate engineers and architects, and licensed engineers or architects had to pass the same qualifying examination and had the same right to practice their profession without restriction. To be authorized to practice as a graduate engineer, the Board issued a "certificate," attesting that the applicant had completed the necessary requirements.[7] On the other hand, licensed engineers received a "license" issued in their name by the Board of Review.[8] Art. 3(d), 20 L.P.R.A. Sec. 711a(d).

As for surveying, *under Law 399, to be a licensed surveyor it was sufficient that the individual have taken studies in engineering*, provided they met certain requirements. In addition to the corresponding studies–at least two years of engineering studies or completion of studies in surveying–the law required at least two years of professional experience that would attest to his surveying qualifications to the satisfaction of the Board of Review, and the passing of written examinations in basic surveying materials. Art. 9(3) of Law 399 (1951 Laws of Puerto Rico 1025).

Law 173 *eliminated the classification of graduate engineer and created the classification of "engineer in training."*[9] To qualify as an engineer in training, *751 the individual is required to prove having passed a course of no fewer than four academic years, or its equivalent, from any accredited university, and pass the qualifying examination in basic engineering materials. Art. 9(5)(a), 1988 Laws of Puerto Rico 869. In turn, to be a licensed engineer it is necessary to have passed, in addition to the above requirements, the qualifying test in professional engineering materials.[10] Art. 9(5)(b) of Law 173 (1988 Laws of Puerto Rico 869). Only a licensed engineer may have a seal and certify projects, designs and measurements in engineering.

As to the practice of surveying, Law 173 also distinguishes between surveyors in training and licensed surveyors. It stipulated as a requirement to qualify as a surveyor in

**Matos v. Board of Review, 165 D.P.R. 741 (2005)**

2005 TSPR 138

training, having completed four years of a surveying course or plan of studies, and having passed the basic qualifying exam; and both qualifying exams, basic and the professional, in the case of licensed surveyors. Art. 9(5)(e) and (f) of Law 173 (1988 Laws of Puerto Rico 870). The above clearly demonstrates that Law 173 made the requirements for the practice of surveying equivalent to those of engineering and eliminated the possibility that engineers who had not actually studied surveying might practice as surveyors.

However, a transitory provision included in Law 173 sought to protect engineers who, since that law became valid, had been practicing surveying under a professional engineer's license, and individuals who, at the time of approval of the *752 law, had at least started their engineering studies. To this end, Art. 30(g) of Law 173 provided that:

(g) Any engineer duly licensed as such by the Board and qualified to practice surveying may continue to practice it under his engineering license, without need to also hold a surveyor's license. For purposes of this provision, the Board will establish a Permanent Registry on which engineers under these circumstances must be listed within one (1) year of the date this provision enters into force. After the lapse of this period, only engineers thus registered and professionals with a surveying license may practice surveying in Puerto Rico. …

Engineering students who have started their first year of engineering studies as of the date of approval of this law may ask to be included in said Permanent Registry after passing the qualifying examination required in the same year, and become members. Said request must be made within one (1) years of the date of issuance of their corresponding engineer's certificate or license and the Board may include on the Permanent Registry any applicant who, in its judgment, is qualified to practice surveying.

For purposes of the Permanent Registry as provided for in this section, "qualified engineer" means anyone who has passed Surveying I and II and Field and Road Surveying as academic requirements, or who alternatively presents evidence attesting to having been practicing surveying since the law's entry into force. Once this law was approved, all licensed engineers excluded from the above clauses and who wish to be

listed on the Permanent Registry must certifiably demonstrate having taken the courses needed for a concentration in surveying at an accredited institution, as required by the Board of Review for surveyors. 1988 Laws of Puerto Rico 883-884.

So too, Law 173 provided that engineers or architects who had obtained "graduate" certification under Law 399 could request an engineer's license within one (1) year of approval of Law 173. Art. 30(f) of Law 173 (1988 Laws of Puerto Rico 883).

[4] It follows from the above that the transitory provisions of Law 173 sought to protect graduate engineers *753 for them to obtain their corresponding license, and licensed engineers who were already practicing surveying for them to be certified as licensed surveyors without having to meet the additional academic requirements of the new law. We would point out that even with the benefit of this transitory provision, the law provided for a period of three years within which the individual must pass the surveying qualifying examination. Art. 30(h) of Law 173 (1988 Laws of Puerto Rico 884).

[5] It is not reasonable to conclude, as the petitioner has asked us to, that through these transitory provisions, the lawmakers sought to protect engineers in training, since that classification did not exist under the previous law. Rather, we conclude that the word "certified" in the second paragraph of Art. 30(g) *supra* is a reference to graduate engineers, who according to Law 399 could practice engineering without restriction, with the corresponding certificate.

Contrary to the petitioner's argument, we do not believe the Appellate Court's interpretation has the effect of affording greater rights to engineering students than those offered to engineers in training. What the aforementioned Art. 30(g) did was to provide for individuals who were studying engineering at the time of approval of the law to be able to apply to practice surveying once

**Matos v. Board of Review, 165 D.P.R. 741 (2005)**
2005 TSPR 138

they had completed their studies and obtained their engineering license–as licensed engineers were permitted to do–without having to actually take surveying classes. It is clear that in order to do so they had to meet the same requirements as did licensed engineers, i.e.: complete their studies; be a licensed engineer; take the surveying courses required by law in Art. 30(g) *supra*; and pass the surveying qualifying examination. The same requirement applied to engineers in training. **\*754**

**[6]** After comprehensively considering the provisions of Law 173 and its predecessor Law 399, we have decided that only licensed engineers qualified to practice surveying and licensed surveyors may practice surveying in Puerto Rico. Engineering students who benefited from the transitory provision of Law 173 must meet the same requirements as licensed engineers to be able to practice surveying.

With the above doctrinal background, we will now move on to applying the facts of the case, but not without first reiterating the standard governing our legal order for the review of administrative decisions.

**[7-9]** Administrative decisions have in their favor a presumption of legality and correction that must be respected, unless the disputing party presents sufficient evidence to defeat it. *A.D.C.V.P. v. Superior Court, 101* D.P.R. 876 (1974). The conclusions and interpretations of specialized administrative entities merit great consideration and respect by the courts, and administrative review is limited to determining whether the entity acted so arbitrarily or unreasonably that its actions might be considered an abuse of discretion. *Murphy Bernabé v. Superior Court,* 103 D.P.R. 692 (1975); *Fuertes et al. v. A.R.P.E.,* 134 D.P.R. 947 (1993). We have noted that the deference due to administrative agencies applies only in the following circumstances: when a finding is not based on material evidence; when an administrative entity errs in applying the law; and in the case of an unreasonable or illegal action. See *Otero v. Toyota,* 163 D.P.R. 716 (2005), and other cases cited therein.

**III**

After analyzing applicable law, we have decided that the Appellate Court did not err in upholding the Board of Review's finding **\*755**. When the aforementioned Law 173 was approved in August 1988, Mr. Román Matos Matos had completed his engineering studies and had taken the required

surveying courses. It is clear that, at that time, he was not an engineering student. What is more, at that time, the petitioner held neither a graduate engineering certificate nor an engineering license under the previous Law 399. On the contrary, he requested certification as an engineer in training in April 1989, after Law 173 had already been approved. Clearly, Mr. Matos did not qualify for the classifications the lawmakers sought to protect through the transitory provision of Law 173. Nor is the fact in dispute that the petitioner is not a licensed engineer, as he has not passed the professional section of the engineering qualifying examination.[11] Nor has he passed the surveying qualifying examination. Consequently, we must conclude that he does not meet the requirements of Law 173 to practice surveying in Puerto Rico.

**[10]** We acknowledge that Mr. Matos acted under the protection of a provisional permit that did not authorize him to practice surveying. This was not an impediment, it was a permit issued illegally, since he was not a licensed engineer, an *indispensable requirement for validity of the permit*. We have noted that although everyone is entitled to practice any profession or business, this is not an absolute right, but rather a right subordinate to the State's regulating authority. *Infante v. P.R. Board of Medical Examiners*, 43 D.P.R. 325 (1932), cited with approval in *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405, 413 (1993). In the exercise of reasoning power by the state, the latter regulates professions or offices to protect the public wellbeing, while at the same time avoiding fraud and incompetence. What is more, the State can validly make **\*756** the practice of a profession contingent upon obtaining the corresponding license or permit. See: *San Miguel Lorenzana v. E.L.A.* supra; *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993).

**[11]** Nor does the fact that the State awarded a license erroneously, under the mistaken assumption that the person met the requirements qualifying him to practice the profession in question, give said person the right to continue practicing it. Administrative errors do not create rights binding on agencies nor prevent their correction, and thus the petitioner cannot be protected in an incorrect or illegal administrative

action. See: *Magriz v. Empresas Nativas,* 143 D.P.R. 63 (1997); *Director Of. Inspección Notarias v. Colón,* 131 D.P.R. 102 (1992); *Del Rey v. J.A.C.L.,* 107 D.P.R. 348 (1978).

**IV**

For the reasons set forth above, *we uphold the decision of the Appellate Court which, in turn, upholds the decision of the Board of Review of*

*Engineers, Architects and Surveyors, revoking the permit granted to the petitioner to temporarily practice surveying. The corresponding ruling shall be decreed.*

Associate Justice Mrs. Fiol Matta concurred without a written opinion. Associate Justice Mr. Fuster Berlingeri dissented without a written opinion.

---

Footnotes

1      This law was amended by Law No. 185 of December 26, 1997.

2      The pre-printed form supplementing it states the following:
     "I hereby set forth that I am a Licensed Engineer and I request to be listed on the Permanent Registry in Article 30, Section G of Law No. 173 of August 12, 1998, to allow me to practice surveying in Puerto Rico." Appendix to the writ of *certiorari*, page 3.

3      The case file contains no information whatsoever that indicates that the Board of Review of Engineers, Architects and Surveyors (Board of Review) did, in effect, rule on Mr. Matos' request.

4      Pursuant to a letter of February 15, 1996, sent to the Board of Review, the petitioner admitted using the title of engineer in his seal. He stated that:
     "Because it was thought (*sic*) the same that I myself believed that the change of laws had favored me (*sic*) and that I was being transferred form the category of Certified Engineer to Licensed Engineer I also began thinking that since the certification says that according to Law 173 of August 12, 1988, Part G speaks here of granting this permit to Qualified Licensed Engineers and does not mention Engineers in Training who would submit their application within the one-year time extension [syntax *sic* in source]." Appendix of the writ of *certiorari*, page 16.

5      The decision is not clear as to whether "the conduct" from which it is understood he must refrain refers to representing himself as a surveyor or as an engineer. According to a subsequent decision of December 26, 2001, the Board of Review interpreted that the College of Engineers Disciplinary Court understood Mr. Matos would refrain from using the titles of both surveyor and licensed engineer. Appendix to the writ of *certiorari*, page 42.

6      In a subsequent letter they informed him that the illegality arose from the "nullity *ab initio* of his listing on the Permanent Registry of Surveyors because it had been done in a form contrary to the law." Appendix 23, page 40.

7      The requirements for qualifying as a graduate engineer were: have graduated from an engineering program of no less than four years and have passed the qualifying examination in basic engineering or architecture materials. Art. 9(1)(a) of Law No. 399 of May 10, 1951 (Law 399), 1951 Laws of Puerto Rico 1023.

8      Licensed engineers, in addition to having the same requirements as graduates, must provide a detailed list of no less than four years' professional experience. Art. 9(2)(a) of Law 399, *supra*, 1951 Laws of Puerto Rico 1023 and 1025.

9      The classification was defined in Law No. 173 of August 12, 1988 (Law 173) as follows:
     "(c) 'Engineer in training' means any individual with a diploma or certificate attesting to satisfactory completion of the requirements of this discipline at a school with a program recognized by the Board, who has met the requirement for listing on the Official Registry of the Board, and to whom the Board has issued the corresponding certificate." Art. 3(c) of Law 173 (1988 Laws of Puerto Rico 862).

10      It is to be noted that under Law 173, licensed engineers must pass qualifying exams in two subjects: basic and professional; while under the predecessor Law 399, they were only required to pass the qualifying exam in basic materials.

11      As we mentioned, the case file does not show the date the petitioner took the engineering qualifying exam. The fact that he failed the professional section indicates that he took the qualifying exam upon approval of Law 173.

---

End of Document       © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** (c) 2018 Thomson Reuters. No claim to original U.S. Government Works.     6

Exhibit 51   Page 9 of 13

165 D.P.R. 741, 2005 WL
2387182 (P.R.), 2005 TSPR 138

RAMÓN MATOS MATOS, peticionario,

v.

JUNTA EXAMINADORA DE INGENIEROS
Y AGRIMENSORES, recurrida.

En El Tribunal Supremo De Puerto Rico.

*Número:* CC-2002-555

**Synopsis**

PETICIÓN DE *CERTIORARI* para revisar una
RESOLUCIÓN de *Liana Fiol Matta, Dolores Rodríguez
de Oronoz* y *Roberto González Rivera*, Js. del Tribunal de
Apelaciones, mediante la cual se denegó el auto solicitado
y se confirmó un dictamen de la Junta Examinadora
de Ingenieros y Agrimensores, que excluyó al aquí
peticionario del Registro Permanente para la Práctica de
la Agrimensura y le suspendió su certificado de ingeniero
en entrenamiento por un año. *Se dicta sentencia en la
que se confirma la resolución de la Junta Examinadora de
Ingenieros, Arquitectos y Agrimensores.*

*Harold Rivera Vázquez* y *Solanya Vargas González*,
abogados de la parte peticionaria; *Carmen Riera Cintrón*
y *Gilberto Oliver Vázquez*, abogados de la recurrida.

LA JUEZ ASOCIADA SEÑORA RODRÍGUEZ
RODRÍGUEZ emitió la opinión del Tribunal.

Tenemos ocasión de resolver si la Ley de la Junta
Examinadora de Ingenieros, Arquitectos y Agrimensores
de Puerto Rico, según enmendada, provee para que los
ingenieros en entrenamiento puedan ser ingresados en el
Registro Permanente de Ingenieros Autorizados para la
Práctica de la Agrimensura y puedan, en consecuencia,
ejercer la profesión de la agrimensura en Puerto Rico.
Resolvemos en la negativa.

**I**

El peticionario Román Matos Matos (señor Matos)
cursó ingeniería civil en la Universidad Politécnica
de Puerto Rico y obtuvo un bachillerato en dicho
campo en noviembre de 1978. Aprobó el examen
de revalida únicamente en su parte fundamental,
mientras que fracasó en su parte profesional. En
abril de 1989 la Junta Examinadora de Ingenieros,

Arquitectos y Agrimensores (Junta Examinadora) emitió
la Certificación Núm. 10161EIT ("engineer in training"),
mediante la cual se clasificó al señor Matos como
"ingeniero en entrenamiento", conforme a la Ley de
la Junta Examinadora de Ingenieros, Arquitectos y
Agrimensores, Ley Núm. 173 de 12 de agosto de
1988, según enmendada, 20 L.P.R.A. sec. 711 *et
seq.* (Ley 173). [1] Posteriormente, obtuvo su inscripción
en el Departamento de Estado como ingeniero en
entrenamiento. Es importante destacar que no surge del
expediente la fecha cuando el señor Matos tomó su
examen de revalida ni en qué se desempeñó desde que se
graduó en 1978 hasta que solicitó su certificación como
ingeniero en entrenamiento once años después. **\*745**

[1]     Esta ley fue enmendada por la Ley Núm. 185 de 26 de
        diciembre de 1997.

El 7 de julio de 1989 el señor Matos solicitó la admisión
al Registro Permanente de Ingenieros Autorizados para
la Práctica de la Agrimensura (Registro Permanente),
registro que incluye todos los ingenieros capacitados
para ejercer la agrimensura según los requisitos de las
disposiciones transitorias de la Ley 173. En su solicitud,
el señor Matos se limitó a indicar sus señas personales,
la referencia a su número de licencia 10161EIT y a
hacer constar los cursos aprobados que lo cualificaban
a practicar la agrimensura. [2] Apéndice de la Petición
de *certiorari*, pág. 3. La solicitud fue acompañada con
la transcripción de créditos acreditativa de que había
tomado los cursos requeridos.

[2]     El formulario preimpreso que cumplimentó indica lo
        siguiente:
        "Por la presente hago constar que soy Ingeniero
        Licenciado y solicito se me incluya en el Registro
        Permanente contenido en el Artículo 30, Sección G,
        de la Ley Núm. 173, del 12 de agosto de 1988, para
        que se me permita practicar la Agrimensura en Puerto
        Rico." Apéndice de la Petición de *certiorari*, pág. 3.

El 6 de junio de 1990, la Junta Examinadora le notificó
al señor Matos un permiso provisional que lo facultó a
ejercer la práctica de la agrimensura. Se le indicó en esta
comunicación que la certificación oficial estaba sujeta a
la revisión y aprobación final de su solicitud por la Junta
Examinadora. [3] No fue hasta noviembre de 1995 que el
Colegio de Ingenieros y Agrimensores de Puerto Rico
(C.I.A.P.R.) se percató de la irregularidad del permiso
provisional concedido. Mediante carta, el C.I.A.P.R.
cuestionó a la Junta Examinadora sobre el procedimiento
utilizado, mediante el cual se autorizó provisionalmente a

un ingeniero en entrenamiento a practicar la agrimensura, cuando la ley solamente permite la inclusión en el Registro Permanente a los ingenieros licenciados. Apéndice de la Petición de *certiorari*, pág. 13.

[3]   No consta en el expediente información alguna que indique que la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores (Junta Examinadora), en efecto, haya pasado juicio sobre la solicitud del señor Matos.

No obstante haber impugnado el permiso concedido, el mismo mes de noviembre de 1995 el C.I.A.P.R. emitió una certificación, acreditando que el peticionario, además de **\*746** ser ingeniero en entrenamiento, estaba autorizado a ejercer la agrimensura. Apéndice de la Petición de *certiorari*, pág. 15. La Junta Examinadora, mediante una correspondencia de abril de 1996, se expresó a esos mismos efectos. Cabe destacar que durante todo este tiempo el señor Matos había acudido, en repetidas ocasiones, al C.I.A.P.R. solicitando orientación sobre cómo debía presentar sus credenciales.

Así las cosas, en junio de 1996 la Administración de Reglamentos y Permisos (A.R.PE.) se querelló ante el C.I.A.P.R., porque el señor Matos había presentado ilegalmente unos proyectos bajo un sello profesional de ingeniero sin estar autorizado para ello.[4] Mediante Resolución de 6 de marzo de 1998, el Tribunal Disciplinario del Colegio de Ingenieros determinó, como cuestión de hecho, que el querellado era agrimensor e ingeniero en entrenamiento y que ilegalmente éste representaba en su sello que era ingeniero. En vista que los proyectos involucrados eran de agrimensura y no de ingeniería, el Tribunal Disciplinario limitó la sanción a una amonestación y advirtió al querellado "a no proseguir con esta conducta".[5] El señor Matos no apeló esta determinación.

[4]   Mediante Carta de 15 de febrero de 1996, dirigida a la Junta Examinadora, el peticionario admitió haber utilizado el título de ingeniero en su sello. Éste indicó que:

"Porque se pensó (sic) lo mismo que yo me creía que la transición de leyes me había favorecido (sic) y que se me estaba cambiando de categoría de Ingeniero Certificado a Ingeniero Licenciado además yo llegué a pensar que como la certificación dice que de acuerdo a la Ley 173 del 12 de agosto de 1988 inciso G aquí habla de otorgarle este permiso a Ingenieros Licenciados Capacitados y no habla de Ingenieros en Entrenamiento que presentaran su solicitud dentro

del tiempo de la moratoria de un año." Apéndice de la Petición de *certiorari*, pág. 16.

[5]   No surge claro de la resolución si "esta conducta" de la que se le apercibe que debe abstenerse se refiere a representarse como agrimensor o como ingeniero. Según una posterior Resolución de 26 de diciembre de 2001, la Junta Examinadora interpretó que el Tribunal Disciplinario del Colegio de Ingenieros apercibió al señor Matos a desistir de utilizar tanto el título de agrimensor como el de ingeniero licenciado. Apéndice de la Petición de *certiorari*, pág. 42.

Conforme dicha resolución, el peticionario preparó un nuevo sello profesional para certificar proyectos de agrimensura, y en marzo de 1999 solicitó ante la Junta Examinadora **\*747** la aprobación de dicho sello y la renovación de su licencia de agrimensor. Al evaluar la solicitud, la Junta Examinadora se percató que el señor Matos no era ingeniero licenciado y que desde 1989 practicaba la agrimensura con una autorización otorgada ilegalmente. La Junta Examinadora inició el trámite administrativo y le notificó al señor Matos la intención de revocar su certificado de ingeniero en entrenamiento y su licencia provisional de agrimensor por éste haber violado los cánones de ética del C.I.A.P.R. No obstante, en esta misiva no se le comunicaron los hechos constitutivos de esta violación ni se especificó cuáles fueron los cánones alegadamente violados.[6] Se celebró una vista el 18 de abril de 2001, en la cual el señor Matos tuvo la oportunidad de declarar y de presentar prueba a su favor.

[6]   En una carta posterior le indicaron que la ilegalidad surgía de la "nulidad ab initio de su inclusión en el Registro Permanente de Agrimensura por la misma haber sido hecha de forma contraria a las leyes". Apéndice 23, pág. 40.

El 26 de diciembre de 2001 la Junta Examinadora emitió una resolución mediante la cual se le suspendió al señor Matos por el término de un (1) año el certificado de ingeniero en entrenamiento y se le revocó su licencia provisional de agrimensor, ya que era nula por haber sido otorgada en contravención a la ley. Nuevamente, la Junta Examinadora fundamentó su determinación en el hecho que el señor Matos había sido incluido en el Registro Permanente de agrimensores ilegalmente, ya que sólo los ingenieros licenciados tienen acceso a dicho registro.

Inconforme, y luego de denegarse de plano una moción de reconsideración, el señor Matos acudió al foro apelativo con un recurso de revisión administrativa. Argumentó que la Junta Examinadora había interpretado erróneamente

la Ley 173, al excluirlo del registro que le permitía ejercer la agrimensura y al concluir que había violado una orden del Tribunal Disciplinario del Colegio de Ingenieros de abstenerse a ejercer como agrimensor.

El tribunal *a quo* consideró la comparecencia de las partes y concluyó que sólo un ingeniero licenciado o agrimensor **\*748** licenciado pueden ejercer la agrimensura. Determinó que la actuación de la Junta Examinadora fue razonable y conforme al mandato legislativo. En consecuencia, denegó el recurso solicitado. De esa resolución el señor Matos acudió ante nosotros y nos planteó el señalamiento de error siguiente:

> Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar la "resolución" emitida por la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico revocando el permiso que autorizaba al aquí peticionario a practicar la agrimensura en Puerto Rico y suspendiéndolo del registro permanente para la práctica de la agrimensura. Petición de *certiorari*, pág. 9.

Expedimos el recurso y, contando con el beneficio de la comparecencia de las partes, procedemos a resolver.

### II

La controversia central que nos ocupa gira en torno a la correcta interpretación de las disposiciones transitorias de la Ley 173. En su escrito, el peticionario sostiene que si bien es correcta, como regla general, la interpretación del foro apelativo, en el sentido que sólo los "ingenieros licenciados" pueden ejercer la agrimensura en Puerto Rico, no es así en su caso. Sostiene que la disposición transitoria contenida en el Art. 3(i) de la Ley 173 (20 L.P.R.A. sec. 711a(i)) autoriza a un "ingeniero en entrenamiento" a solicitar su ingreso al Registro Permanente y, por tanto, ejercer como agrimensor. Habida cuenta entonces de que el peticionario tiene una certificación de "ingeniero en entrenamiento", él está autorizado a practicar la agrimensura.

**[1]** Al interpretar una ley, los tribunales tenemos la obligación de considerar cuáles fueron los propósitos sociales que motivaron a la Asamblea Legislativa a aprobarla. *Depto. de la Familia v. Ramos*, 158 D.P.R. 892 (2003); *Piñero v. A.A.A.*, 146 D.P.R. 890 (1998);

*Col. Ópticos P.R. v. Pearle Vision Center*, 142 D.P.R. 221 (1997). Resulta necesario **\*749** que en nuestra interpretación armonicemos, hasta donde sea posible, todas las disposiciones de la ley con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa.

**[2]** Las distintas disposiciones que componen una ley no deben ser interpretadas de manera aislada, sino que deben ser analizadas en conjunto. Sin embargo, no debemos perder de vista que el lenguaje claro de la ley es la mejor expresión de la intención legislativa. *Departamento Hacienda v. Telefónica*, 164 D.P.R. 195 (2005); *Rexach v. Ramírez*, 162 D.P.R. 130 (2004), y otros casos allí citados.

A la luz de la normativa anterior, pasemos a evaluar las disposiciones legales relacionadas con esta controversia.

El peticionario argumentó que el foro apelativo erró al no considerar que su condición de ingeniero en entrenamiento lo cualificaba para acogerse a la moratoria provista en el Art. 30(g) de la Ley 173. Fundamentó su contención en el uso de la palabra "certificado" en el Art. 30(g) de dicha ley, término que aduce se refiere a los ingenieros en entrenamiento. No tiene razón.

**[3]** La Ley 173, disposición vigente al momento de que el peticionario solicitara la clasificación como ingeniero en entrenamiento, fue aprobada con el propósito de armonizar las disposiciones legales que rigen la práctica profesional de la ingeniería, arquitectura y agrimensura en Puerto Rico, para garantizar la calidad y exigencia en dichos servicios. Mediante ella se pretendió atemperar los rigores de la ley a las exigencias modernas de la profesión, en beneficio no tan sólo de los profesionales que regula, sino también del desarrollo socioeconómico del país. Exposición de Motivos de la Ley 173 (1988 Leyes de Puerto Rico 860). Esta ley derogó la Ley Núm. 399 de 10 de mayo de 1951 (Ley 399), 1951 Leyes de Puerto Rico 1011, ley que hasta entonces reglamentaba las profesiones de ingeniería, arquitectura y agrimensura, e introdujo una serie de cambios significativos.

La Ley 399 clasificaba a los ingenieros y arquitectos en **\*750** ingenieros o arquitectos graduados, e ingenieros y arquitectos licenciados, distinción que tenía poco sentido práctico —si alguno— ya que tanto los ingenieros y arquitectos graduados como los ingenieros o arquitectos licenciados tenían que aprobar el mismo examen de reválida y tenían el mismo derecho a ejercer su profesión sin limitaciones. Para estar autorizado a ejercer como

ingeniero graduado, la Junta expedía un "certificado", acreditativo de que el solicitante cumplía con los requisitos necesarios.[7] De otro lado, los ingenieros licenciados recibían una "licencia" expedida a su nombre por la Junta Examinadora.[8] Art. 3(d), 20 L.P.R.A. sec. 711a(d).

[7] Los requisitos para cualificar como ingeniero graduado eran: haberse graduado de ingeniería en un programa de no menos de cuatro años y haber aprobado la reválida en las materias fundamentales de la ingeniería o la arquitectura. Art. 9(1)(a) de la Ley Núm. 399 de 10 de mayo de 1951 (Ley 399), 1951 Leyes de Puerto Rico 1023.

[8] Los ingenieros licenciados, además de los requisitos del graduado, debían proveer una relación detallada de experiencia profesional de no menos de cuatro años. Art. 9(2)(a) de la Ley 399, *supra*, 1951 Leyes de Puerto Rico 1023 y 1025.

En cuanto a la agrimensura, *bajo la Ley 399 era suficiente para ser agrimensor licenciado que la persona hubiera cursado estudios en ingeniería, sin necesariamente haber aprobado cursos en agrimensura*, siempre que probaran cumplir con ciertos requisitos. La ley requería, además de los correspondientes estudios —por lo menos dos años de estudios en ingeniería o haber terminado estudios en agrimensura— al menos dos años de experiencia profesional que acreditara su capacitación en la agrimensura a satisfacción de la Junta Examinadora, y la aprobación de exámenes escritos en las materias fundamentales de la agrimensura. Art. 9(3) de la Ley 399 (1951 Leyes de Puerto Rico 1025).

La Ley 173 *eliminó la clasificación de ingenieros graduados y creó la clasificación de "ingenieros en entrenamiento"*.[9] Para cualificar como ingeniero en entrenamiento **\*751** es requisito que la persona presente una prueba acreditativa de haberse graduado de un curso de no menos de cuatro años académicos, o su equivalencia, de cualquier universidad acreditada, y haber aprobado la reválida en las materias fundamentales de la disciplina de la ingeniería. Art. 9(5)(a), 1988 Leyes de Puerto Rico 869. Por su parte, para ser ingeniero licenciado es necesario haber aprobado, además de los requisitos anteriores, la reválida en las materias profesionales de la ingeniería.[10] Art. 9(5)(b) de la Ley 173 (1988 Leyes de Puerto Rico 869). Sólo el ingeniero licenciado podrá tener un sello y certificar planos, diseños y mediciones en la ingeniería.

[9] La clasificación quedó definida en la Ley Núm. 173 de 12 de agosto de 1988 (Ley 173) de la manera siguiente:

"(c) 'Ingeniero en entrenamiento' significa toda persona que posea un diploma o certificado acreditativo de haber completado satisfactoriamente los requisitos de esta disciplina en una escuela cuyo programa esté reconocido por la Junta, que haya cumplido con el requisito de inscripción en el Registro Oficial de la Junta y que la Junta le haya expedido el correspondiente certificado." Art. 3(c) de la Ley 173 (1988 Leyes de Puerto Rico 862).

[10] Adviértase que en virtud de la Ley 173 los ingenieros licenciados deben aprobar reválidas en dos materias: fundamental y profesional; mientras que bajo la predecesora Ley 399, sólo se les requería aprobar la reválida en la materia fundamental.

En cuanto a la práctica de la agrimensura, la Ley 173 también distingue entre los agrimensores en entrenamiento y los agrimensores licenciados. Se impuso como exigencia para cualificar como agrimensor en entrenamiento, haber estudiado cuatro años en un curso o plan de estudios de agrimensura, y aprobar la reválida fundamental; y ambas reválidas, la fundamental y la profesional, en el caso de los agrimensores licenciados. Art. 9(5)(e) y (f) de la Ley 173 (1988 Leyes de Puerto Rico 870). De lo anterior surge con claridad que la Ley 173 equiparó los requisitos para la práctica de la agrimensura con los de la ingeniería y eliminó la posibilidad de que los ingenieros que no hubiesen estudiado propiamente la agrimensura pudieran desempeñarse como agrimensores.

No obstante, mediante una disposición transitoria contemplada en la Ley 173, se procuró proteger a los ingenieros que para la fecha de efectividad de la ley ya ejercían la agrimensura bajo su licencia profesional de ingeniero, y a aquellas personas que al momento de la aprobación de la **\*752** ley habían, al menos, comenzado estudios en ingeniería. A estos efectos, la Ley 173 dispuso, en su Art. 30(g), que:

(g) Todo ingeniero debidamente licenciado como tal por la Junta y que esté capacitado para ejercer la agrimensura podrá continuar practicándola bajo su licencia de ingeniero, sin necesidad de poseer además una licencia de agrimensor. A los fines de esta disposición, la Junta establecerá un Registro Permanente en el cual deberán inscribirse los ingenieros en tales circunstancias dentro de un (1) año a partir de la fecha en que entre en vigor esta disposición. Transcurrido este término, sólo podrán practicar la agrimensura en Puerto Rico los ingenieros así

Matos v. Junta Examinadora, 165 D.P.R. 918 (2005)
2005 TSPR 138

Case: 17-03283-LTS    Doc: 47816    Filed: 02/24/18    Entered: 02/24/18 18:19:25    Desc:
Exhibit Exhibit B Part 5    Page 442 of 541
Exhibit Exhibit B Part 5    Page 442 of 541

registrados y los profesionales que posean una licencia de agrimensor. ...

Los estudiantes de ingeniería que a la fecha de aprobación de esta ley hayan comenzado su primer año de estudios de ingeniería podrán solicitar ser incluidos en dicho Registro Permanente después de haber aprobado el examen de reválida requerido en la misma y estar colegiados. Tal solicitud deberá hacerse dentro de un (1) año contado a partir de la fecha de expedición de su correspondiente certificado o licencia de ingeniero y la Junta podrá incluirlo en el Registro Permanente siempre que, a su juicio, el solicitante esté capacitado para practicar la agrimensura.

A los fines del Registro Permanente dispuesto en este inciso, "ingeniero capacitado" significa toda persona que haya aprobado los cursos de Agrimensura I y II, Campamento de Agrimensura y Cursos de Carreteras, como requisitos académicos, o que en la alternativa, presente prueba acreditativa de haber estado practicando la agrimensura al entrar en vigor la ley. Una vez aprobada esta ley, todo ingeniero licenciado que quede excluido de las cláusulas anteriores y que desee ser incluido en el Registro Permanente deberá demostrar fehacientemente haber aprobado los cursos conducentes a la concentración en agrimensura en una institución acreditada, según requerido por la Junta Examinadora para los agrimensores. 1988 Leyes de Puerto Rico 883–884.

Así también, la Ley 173 consideró que los ingenieros o arquitectos que hubieran obtenido una certificación de "graduados" según la Ley 399 pudieran solicitar su licencia de ingeniero dentro del término de un (1) año de la aprobación de la Ley 173. Art. 30(f) de la Ley 173 (1988 Leyes de Puerto Rico 883).

**[4]** De lo anterior se desprende que las disposiciones transitorias de la Ley 173 intentaron proteger a los ingenieros **\*753** graduados para que obtuvieran su licencia correspondiente, y a los ingenieros licenciados que ya estuvieran practicando la agrimensura a que pudieran ser certificados como agrimensores licenciados sin tener que cumplir con los requerimientos académicos adicionales de la nueva ley. Cabe destacar que aun con el beneficio de esta disposición transitoria, la ley dispuso un término de tres años dentro de los cuales la persona debía tomar la reválida de agrimensura. Art. 30(h) de la Ley 173 (1988 Leyes de Puerto Rico 884).

**[5]** No es razonable concluir, como nos solicita el peticionario, que el legislador haya pretendido proteger mediante estas disposiciones transitorias a los ingenieros en entrenamiento, pues la clasificación no existía bajo la ley anterior. Más bien, concluimos que la palabra "certificado" en el segundo párrafo del Art. 30(g), *supra*, es una referencia a los ingenieros graduados, quienes según la Ley 399 podían ejercer la ingeniería sin restricciones, con el certificado correspondiente.

Contrario al argumento del peticionario, no consideramos que la interpretación del Tribunal de Apelaciones tenga el efecto de brindarle mayores derechos al estudiante de ingeniería de los que le brinda al ingeniero en entrenamiento. El referido Art. 30(g) lo que hizo fue proveer para que las personas que estuvieran estudiando ingeniería al momento de la aprobación de la ley pudieran solicitar ejercer la agrimensura una vez hubieran terminado sus estudios y obtuvieran su licencia de ingeniero —tal y como se le permitió a los ingenieros licenciados— sin necesidad de cursar estudios propiamente de agrimensura. Es evidente que para así hacerlo tenían que cumplir con los mismos requisitos impuestos a los ingenieros licenciados, a saber: finalizar sus estudios; ser ingeniero licenciado; haber tomado los cursos en agrimensura que exige la ley en su Art. 30(g), *supra*, y aprobar la reválida de agrimensura. La misma exigencia aplica a los ingenieros en entrenamiento.  **\*754**

**[6]** Luego de considerar de manera integrada las disposiciones de la Ley 173 y de su predecesora, la Ley 399, resolvemos que solamente un ingeniero licenciado capacitado para ejercer la agrimensura y un agrimensor licenciado pueden ejercer la agrimensura en Puerto Rico. Los estudiantes de ingeniería a los que benefició la disposición transitoria de la Ley 173 deberán cumplir con los mismos requisitos que aplican a los ingenieros licenciados para poder practicar la agrimensura.

Con el anterior trasfondo doctrinal pasemos a aplicar los hechos del caso, no sin antes reiterar la norma que rige en nuestro ordenamiento jurídico sobre la revisión de las determinaciones administrativas.

**[7–9]** Las decisiones administrativas tienen a su favor una presunción de legalidad y corrección que debe ser respetada mientras la parte que la impugne no presente suficiente evidencia para derrotarla. *A.D.C.V.P. v. Tribunal Superior*, 101 D.P.R. 875 (1974). Las conclusiones e interpretaciones de los

Case: 17-03283-LTS   Doc#: 4781-36   Filed: 01/24/18   Entered: 01/24/18 18:12:25   Desc:
Exhibit 31 (Part 5   Page 443 of 541

organismos administrativos especializados merecen gran consideración y respeto por parte de los tribunales, y la revisión administrativa se limita a determinar si la agencia actuó de manera tan arbitraria o irrazonable que pueda considerarse su actuación como un abuso de discreción. *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692 (1975); *Fuertes y otros v. A.R.PE.*, 134 D.P.R. 947 (1993). Hemos indicado que la deferencia reconocida a las agencias administrativas sólo cede en las circunstancias siguientes: cuando la determinación no está basada en evidencia sustancial; cuando el organismo administrativo erró al aplicar la ley, y cuando se trata de una actuación irrazonable o ilegal. Véase *Otero v. Toyota*, 163 D.P.R. 716 (2005), y otros casos allí citados.

### III

Luego de analizar el derecho aplicable, resolvemos que no erró el Tribunal de Apelaciones al confirmar la determinación **\*755** de la Junta Examinadora. Al aprobarse la citada Ley 173 en agosto de 1988, el Sr. Román Matos Matos había terminado sus estudios en ingeniería y había tomado los cursos requeridos para ser agrimensor. Es evidente que al momento no era estudiante de ingeniería. Más aún, en ese momento el peticionario no era poseedor, bajo la anterior Ley 399, ni de una certificación de ingeniero graduado ni de una licencia de ingeniero. Por el contrario, solicitó su certificación como ingeniero en entrenamiento en abril de 1989, ya aprobada la Ley 173. Claramente, el señor Matos no cualificaba dentro de las clasificaciones que el legislador quiso proteger mediante la disposición transitoria de la Ley 173. Tampoco está en controversia el hecho que el peticionario no es un ingeniero licenciado, por no haber aprobado la reválida de ingeniería en su parte profesional. [11] Tampoco ha tomado la reválida de agrimensura. En consecuencia, debemos concluir que no cumple con los requisitos de la Ley 173 para practicar la agrimensura en Puerto Rico.

[11]      Como mencionamos, no surge del expediente la fecha en la que el peticionario tomó la reválida de ingeniería. El hecho que haya fracasado la materia profesional es indicativo que revalidó luego de la aprobación de la Ley 173.

[10] Reconocemos que el señor Matos actuó amparado en un permiso provisional que lo facultaba a ejercer

la agrimensura. No empece, se trató de un permiso ilegalmente expedido, ya que no era un ingeniero licenciado, *requisito indispensable para la validez del permiso.* Hemos señalado que si bien toda persona tiene derecho a ejercer cualquier profesión o negocio, no se trata de un derecho absoluto, sino de un derecho subordinado al poder de reglamentación del Estado. *Infante v. Junta de Médicos Exam. de P.R.*, 43 D.P.R. 325 (1932), citado con aprobación en *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405, 413 (1993). En el ejercicio de su poder de razón de estado, éste regula las profesiones u oficios en aras de proteger el bienestar público, a la vez que evita el fraude y la incompetencia. Además, el Estado puede válidamente condicionar **\*756** la práctica de una profesión a la obtención de la correspondiente licencia o permiso. Véanse: *San Miguel Lorenzana v. E.L.A.*, supra; *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735, (1992); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993).

[11] Tampoco el hecho que el Estado haya otorgado una licencia erróneamente, bajo la premisa equivocada que la persona reúne los requisitos que la cualifican a ejercer la profesión en cuestión, otorga a dicha persona un derecho de continuar ejerciéndola. Los errores administrativos no crean derechos que obliguen a las agencias ni impiden su corrección, por cuanto el peticionario no puede ampararse en una actuación administrativa incorrecta o ilegal. Véanse: *Magriz v. Empresas Nativas*, 143 D.P.R. 63 (1997); *Director Of. Inspección Notarías v. Colón*, 131 D.P.R. 102 (1992); *Del Rey v. J.A.C.L.*, 107 D.P.R. 348, (1978).

### IV

Por los fundamentos anteriormente expuestos, *se confirma la sentencia del Tribunal de Apelaciones que, a su vez, confirma la resolución de la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores, mediante la cual se revocó el permiso otorgado al peticionario para ejercer la agrimensura provisionalmente. Se dictará la sentencia correspondiente.*

La Jueza Asociada Señora Fiol Matta concurrió sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    6

# Exhibit 82

## TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: PR Telephone Co v Tribunal de Contribuciones y..., 81 D.P.R 982-(160) and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
(Affiant's Signature)

Stephanie Penn
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this _19_ day of _February_, 2018,

by _Stephanie Penn_.

_____
Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

Case: 17-03283-LTS   Doc#: 4781-6   Filed: 01/14/19   Entered: 01/14/19 18:19:25   Desc:
Exhibit Exhibit 52 Part 6   Page 3 of 45 of 541

81 D.P.R. 982, 1960 WL 13992 (P.R.)

Porto Rico Telephone Company, plaintiff

v.

Puerto Rico Tax Court, defendant; Hon. Sol Luis Descartes,
Secretary of the Treasury, intervenor.

In the Supreme Court of Puerto Rico.
Numbers: 295, 296, and 297
Reassigned: October 13, 1959
Decisions: June 30, 1960
JUN 30, 1960

**Synopsis**

Writ of certiorari to review Tax Court Rulings (C. Santana
Becerra, Judge, San Juan), rejecting demands for tax
refunds. The rulings are confirmed.

Franceschi & Sifre, attorneys for the defendant; Hon.
Secretary of Justice Hiram R. Cancio (J. B. Fernández
Badillo, former Acting Secretary of Justice, and C. Santiago
Matos, Assistant Prosecutor, in the argument), attorneys for
the intervenor.

Associate Justice Serrano Geyls wrote the opinion for the
Court.

**\*\*1** In this appeal the plaintiff, Porto Rico Telephone Co.,
challenged the constitutionality of sec. 2, Law no. 301 dated
May 15, 1945 (Laws, p. 1147; 27 LPRA sec. 342), which
sets forth the following:

'The Secretary of Finance is hereby authorized and ordered
to impose and collect a contribution or tax of two percent on
the gross operating income earned by any public service
company or **\*986** government entity of the Commonwealth
of Puerto Rico, for the transmission of telephone and
telegraph communications, including wire transfers. All
sums received by the Secretary of Finance pursuant to the
provisions of this section shall be deposited by the Secretary
in a special fund called the Special Fund for the
Development of Communications. These funds will from
time to time be made available to the Board of Directors of
the Communications Authority of Puerto Rico, upon its
request, for such Board to invest them, or for investment at
its direction, in such improvements, extensions, research,
experiments, and special research as it deems advisable in
order to extend and improve the quality of the telephone and
telegraph communications system and facilities in Puerto
Rico. This tax shall be paid by utility companies or by the
government entities providing such service with sixty (60)

days of the closing of the books for each fiscal year. Under
no circumstances shall it be charged to the persons using
their services."

The plaintiff filed a demand for a refund before the former
Tax Court; the Tax Court denied it and ruled that the
provision challenged was valid. In its lengthy, well-reasoned
opinion, the lower court ruled that certain facts were proven;
it is appropriate to discuss them before analyzing the legal
issues. They are the following:

In the years to which the lawsuit refers there were in Puerto
Rico (and there still are) two organizations, one
governmental and the other private, engaged in offering
telephone services. The first is called the Puerto Rican
Communications Authority [*Autoridad de Comunicaciones
de Puerto Rico*]; it provides services to the city of Caguas
and nine other nearby towns. It also operates a telegraph
system covering the entire country. The second, the plaintiff
in this case, operates under the name Porto Rico Telephone
Company and offers service throughout the island, except
for the area covered by the Authority. The telephone systems
of the two organizations are interconnected via **\*987** long
distance lines. The Public Service Commission regulates the
plaintiff's services and rates, but not those of the Authority.
The Authority can set its prices freely.

**\*\*2** Both the Porto Rico Telephone Company and the
Authority paid the tax imposed by Law no. 301.[1] During the
years 1945, 1946, and 1947, the Authority requested and
obtained money from the special fund created by this law
"and with such money ... it improved the quality of the
telephone service in the area it serves, replacing an old
system in ruins received from the Negociado del Telégrafo
del Gobierno Insular with a new service. In addition, it
increased and extended its original capacity, primarily the
telephone system, to Vieques and Culebra."

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

The Authority has received from the special fund more funds than it is contributed to it; however, most of the funds used for such improvements were appropriated from general funds by the Legislative Assembly. The Authority has not used any of these funds for "direct improvements" to the plaintiffs' system. The plaintiff "benefits indirectly from the improvements made by the Authority, that is, through the interconnection or unification of the two services. The improvement of the Authority's service has resulted in a benefit to both entities due to such interconnection."

"The Authority has replaced the system that it acquired with a new, automatic, more efficient system in all the towns it serves. Telephone communications have been extended on the island and even Vieques and Culebras and the quality of the service has improved." By 1947, there was a 340 percent increase in the number of Authority subscribers. "The improvements made by the Authority to its telephone system have benefited the public in general, including the plaintiff's subscribers and they also benefit the government."

**\*988** From 1945 to 1947, Porto Rico Telephone neither requested nor obtained from the Public Service Commission any increase in its rates. In 1948, it submitted a request for an increase, which it later withdrew, and then submitted another in 1949. The following year the Commission authorized an increase.

"The plaintiff's net operating earnings in the year 1944 were $67,214; in 1945, $121,881; in 1946, $277,509; and in 1947, $281,019. Based on investments and property, plant and equipment, previous net earnings represented 2.4% in 1944, 2.61% in 1945, 4.39% in 1946, and 4.10% in 1947. "Both the income-based contribution and the 2% special contribution pursuant to Law no. 301 were considered in the computation of earnings. Upon granting the provisional increase in 1950, the Public Service Commission did so on the basis of the minimum 5 percent earnings authorized by Law no. 12 of April 09, 1941 (Laws, p. 343). The increase in the plaintiff's gross income during the years cited was due to (1) the increase in the number of telephones and (2) the development of long distance service.

**\*\*3** During the years prior to 1948, the plaintiff's operating expenses increased continually. One of the principal causes was the wage hikes and other concessions to workers, which resulted in spending of more than 1.5 million dollars from 1943 to 1948.

"The additional expense incurred for the contribution of 2 percent was not the reason causing the plaintiff to apply to the Public Service Commission to increase its rates."

Considering this law and these facts, the plaintiff alleges the following grounds to support its pleading for a ruling of unconstitutionality. (1) The law challenged violates Article 3 of the Charter of Puerto Rico because the contribution it imposes is not "for the purposes of the island and municipal governments." (2) The law leaves the investment of the tax to the whim of the Communications Authority and therefore constitutes an improper delegation of legislative powers. (3) La contribution constitutes a **\*989** forced exaction of the plaintiff's property under the pretext of the power of taxation. (4) The law violates the doctrine of uniformity and deprives the plaintiff of its property without the due process of law. (5) The law is void because it prohibits passing along the contribution to the consumer. We will analyze each of these allegations one by one.

I. "Purposes of the island and municipal governments."

Section 3 of the Charter prevailing in the years cited in this lawsuit, [2] sets forth that ... "contributions and taxes may be imposed on property, income, internal revenue, and through permits, franchises, privileges and concessions when such contributions are for the purposes of the island and municipal governments, respectively, are imposed pursuant to the provisions and prescriptions set forth by the Legislative Assembly of Puerto Rico." (Emphasis added.)

In view of this provision, the plaintiff, in summary, maintains that the phrase "for the purposes of the island and municipal governments" is not equivalent to the phrase "for a public purpose" which as part of the due process of law [3] defines the power to impose taxes; that "a contribution implies an exaction for the maintenance of the government and to sustain the services that are a logical and natural function of the government"; that the improvement of telecommunications is not a "purpose of government"; and that the Communications Authority is not part of the government, nor does it exercise a government function.

To support its restrictive interpretation of the phrase "for the purposes of the island and municipal governments," the plaintiff cites excerpts of court opinions including discussions of the well-known doctrines of reciprocal tax immunity **\*990** between the federal government and the states and the immunity of municipalities from damages caused by the exercise of their "governmental" functions, as opposed to their "property" functions.[4]

P.R. Telephone Co. v Tribunal de Contribuciones, 81 P.R.R. (1959)
Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:19:25 Desc:
Exhibit 52 Part 5 Page 5 of 45 Page 448 of 541

Besides the fact that both doctrines are long outdated, there is no doubt whatsoever that they are clearly inapplicable to the situation at hand. The first of these doctrines is intended to protect the stability of the U.S. federal system and the autonomy of its entities; it prevents the national government and the states from imposing taxes on each other that would weaken or destroy their functions. This doctrine wound its way over many bumpy paths and in recent years many of the extremes to which its initial application led were corrected. Phillips Chemical Co. v. Dumas School District, 4 L. ed. 2d 384 (1960); United States v. City of Detroit, 355 U. S. 466 (1958); United States v. Township of Muskegon, 355 U.S. 484 (1958); City of Detroit v. Murray Corp., 355 U.S. 489 (1958); Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633 (1945). The second doctrine constitutes one of the means by which the courts tried to mitigate the harsh effects of the doctrine of sovereign immunity in the area of tortious actions. For these purposes municipal functions were divided into **991 "governmental" and "property," ruling that when municipalities exercise "property" functions, there were no sound reasons to challenge the doctrine of immunity of the affected. Gobierno de la Capital v. Consejo Ejecutivo, 63 D.P.R. 434, 437-439 (1944); Serra v. Autoridad de Transporte, 67 D.P.R. 611 (1947); Rodríguez v. Pueblo, 75 D.P.R. 401, 412 (1953); Symposium--Governmental Tort Liability, 9 L. & Contemp. Prob. 179-370 (1942); Municipal Corporations - Sovereign Immunity, 11 Vand. L. Rev. 253 (1957).

**4 Obviously, these distinctions are based on legal and social circumstances very different from the issue we have before us today. The plaintiff did not offer us nor have we been able to find any substantial reasons justifying its use as a measure involving the powers to impose taxes and spend government funds that the Congress conferred upon the Legislative Assembly of Puerto Rico. We certainly would need much more than those fragile analogies to restrict taxing authority to the narrow concepts offered by the plaintiff. See Puget Sound Co. v. Seattle, 291 U. S. 619, 623-626 (1934).

It is therefore necessary to look to other sources. The legislative history of the Charter - 53 Congressional Record, Parts 6-9; *992 Congress no. 64, House Report no. 77 and Senate Report no. 579 does not include any specific expression regarding the aforesaid phrase in section 3.

However, it clearly demonstrates that Congress intended to confer upon the Government of Puerto Rico powers similar to those of the states of the Union.

On several occasions the Federal Supreme Court has concurred with that interpretation standard. Stated in Puerto Rico v. Shell Co., 302 U. S. 253, 261-262 (1937):

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. The effect was to confer upon the territory many of the attributes of quasi-sovereignty possessed by the states -- as, for example, immunity from suit without their consent. By those acts, the typical American governmental structure, consisting of the three independent departments -- legislative, executive and judicial -- was erected. A 'body politic' -- a commonwealth -- was created. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And, so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures." (Citations were omitted.) See also Puerto Rico v. Rubert Hnos., 309 U. S. 543, 547 (1940); See De Castro v. Board of Commissioners, 322 U. S. 451 (1944); Bonet v. Yabucoa Sugar Co., 306 U. S. 505 (1939); Bonet v. Texas Co., 308 U. S. 463 (1940); Domenech v. National City Bank, 294 U. S. 199 (1935).

We think it is absurd to accept that the legislators intended anything else when the powers of the dimensions and vital importance of imposing taxes. Certainly, Congress intended to confer this power upon the government of Puerto Rico, [5] subject to the general doctrine of "public purpose" that *993 constitutionally limits both the federal government[6] and state governments. There is no reason whatsoever to believe that Congress intended to shackle the government of Puerto Rico to the extent it would hinder the expenditure of government funds for activities that for decades constituted common places in the federal and state experience. [6a] A legal instrument that defines the powers of a government cannot be interpreted with that spirit of a bellwether.

**\*\*5** More than half a century [7] of government practice confirms the intent of the Congress. From 1900 to 1952, and particularly in the last decade of that period, the Legislative Assembly of Puerto Rico authorized contributions **\*994** and expenditures for the thousand and one purposes [8] that modern governments are obligated to carry out. The pertinent laws were signed by governors appointed by the President and reported to Congress pursuant to the provisions of section 23 of the Charter, and at no time were they voided nor was there any doubt expressed about local power to approve them. In 1950, Congress, obviously familiar with economic development in Puerto Rico and the active intervention of its government in economic processes, often through the performance of activities of an industrial and commercial nature, maintained with the approval of the Puerto Rican electors exactly the same limitation in the "Puerto Rico Federal Relations Act." In view of the sound, commonplace logic of the words used, the grave importance of the power of taxation, the intention of Congress to confer upon Puerto Rico governing powers similar to those of a state, and the **\*995** invariable practice dating back more than half a century, we conclude that the meaning of the phrase "for the purposes of the island and municipal governments" of section 3 of the Charter is not narrower than the phrase "for a public purpose," limiting the powers of Congress and the states. We thus reaffirm what we inferred in Márquez & Cía. v. Tesorero, 57 D.P.R. 322 (1940). (See P. R. Distilling Co. v. Sancho Bonet, 52 D.P.R. 672, 679 (1938); P. R. Tobacco Corp. v. Buscaglia, 62 D.P.R. 811, 830 (1944).)

We therefore move on to consider whether the legislative purposes set forth in section 2 of Law no. 301 - "investment... in... improvements, extensions, research, experiments, and special research....in order to extend and improve the quality of the telephone and telegraph communications system and facilities in Puerto Rico" - constitute a "public purpose." [9] Before ruling on this specific issue, however, we must mention some underlying principles.

One: Considered on its own the tax challenged today is perfectly valid. The challenge to the validity of the tax is based on the law that imposes it while simultaneously appropriating it for a specific purpose, rather than setting forth that it be deposited as general government funds.

That circumstance confers upon the payer of such tax special standing to challenge the constitutionality of the expenditure and therefore the tax, which otherwise, as part of the general body of taxpayers, such payer would not have. United States v. Butler, 297 U.S. 1, 57-58 (1936); Massachusetts v. Mellon, 262 U. S. 447 (1923); Suárez v. Tugwell, 67 D.P.R. 180 (1947); Cafeteros de Puerto Rico v. Tesorero, 74 D.P.R. 752 (1953). 'However, if the contribution in and of itself is valid... and the specific purpose is one which would sustain a subsequent, separate appropriation**\*996** of general Treasury funds, neither of the two would be void because of its linking to the other in same piece of legislation. Our only concern with respect to this aspect of the case is to determine whether Congress can, without violating the Charter, make an appropriation for the purpose specified. If Congress, for reasons deemed satisfactory, decided to adopt all revenues from this special tax as a means of appropriation, we do not find any valid basis whatsoever to challenge its power to do so." Cincinnati Soap Co. v. United States, 301 U.S. 308, 313 (1937); Bergman, op. cit., pp. 350-353.

**\*\*6** Two: The function of the courts in reviewing legislative decisions regarding what constitutes a "public purpose" in imposing taxes is extremely limited. [10] In addition to the usual criteria of self-limitation guiding the "serious, delicate" judicial "function" of judging the constitutional validity of legislative measures - E.L.A. v. Aguayo, 80 D.P.R. 552, 595-597 (1958) - in this case there is also the special circumstance that the determination by the lawmaker is based on various elements of public policy whose scrutiny is beyond the competence of judges. The approval of a tax measure requires a detailed study of difficult political, social, and administrative issues and, above all, weighing the economic effect of the new tax on consumption, investments, production, employment, income, and savings. This explains the courts' repeated refusal to actively intervene in this matter.

Approval of a tax regulation requires analyzing political, social and administrative problems and weighing the economic effect of the new tax on consumption, investment, production, employment, income and savings. This is why the courts don't usually second guess legislative decisions.

On several occasions the Federal Supreme Court has determined the depth of court incursions in this area. In Carmichael v. Southern Coal Co., 301 U.S. 495, 514-515 (1937) the Court explained that since the adoption of the 14th Amendment states may only impose taxes for a **997** public purpose, not for private purposes, but that the requirements of due process leave "free scope for the exercise of a wide legislative discretion in determining what expenditures will serve the public interest." Such discretion naturally includes the appropriation of funds for the "general welfare." "The ways in which the public interest benefits are specifically within the competence of the Legislature" and "it is the duty and responsibility of the Legislature, not the courts, to select among the possible methods." Therefore, in order to justify the intervention of a court, "a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court" would be required, or, as stated in Helvering v. Davis, 301 U.S. 619, 640 (1937) "a display of arbitrary power, not an exercise of judgment."

> To justify judicial intervention, there would need to be a clear case of deviation from any reasonably conceivable public purpose or a display of arbitrary power.

. And that judicial authority, Everson v. Board of Education, 330 U. S. 1, 6 (1947) added, must be exercised with the "utmost caution." See also United States v. Butler, supra, p. 67; Magnano Co. v. Hamilton, 292 U.S. 40-44 (1934); Milheim v. Moffat Tunnel District, 262 U. S. 710, 717 (1923); Green v. Frazier, 253 U. S. 233, 239 (1920).

Three: The concept of "public purpose" is not static, always linked to the ideas that at a given moment in history defined the powers and responsibilities of the government. On the other hand, it is indivisibly linked to the general welfare and, like the general welfare, it must adapt to the changing social conditions of a specific community and the specific issues that those conditions create, along with the new obligations that citizens impose on their rulers in a highly complex democratic society. Helvering v. Davis, supra, p. 641.

We note that "did not strip the states of their power to meet problems previously left for individual solution." Everson v. Board of Education, supra, p. 7.

 **7** Four: A law does not pursue a private purpose simply because it orders payments to be made **998** to individuals or companies in order to thus carry out a public program. "Subsidies and loans to individuals such as farmers and home owners, and to privately owned transportation systems, as well as many other kinds of businesses, have been commonplace practices in our state and national history." Everson v. Board of Education, supra, p. 7; Carmichael v. Southern Coal Co., supra, p. 518. *A fortiori*, this standard applies with greater force to a government-owned company.

Five: Although the imposition of a tax cannot be voided by the mere circumstance that its purpose is novel, unquestionably a tax whose purposes have been proven by the government and the public over a long period of time is further bolstered. Loan Association v. Topeka, supra, pp. 664-665; Cincinnati Soap Co. v. United States, supra, pp. 314-315; State v. Johnson, 175 N. W. 589, 595-596 (Wisc. 1919).

Once these basic principles have been established, any objections to the law are dispelled. It seems obvious to us that in the economic and social circumstances prevailing in 1945-47, the development of telecommunications and maintenance of the telephone and telegraph system constituted, and even today constitute, an appropriation of funds for a public purpose. In truth, it is surprising that in this day and age that power of the government is being questioned. On several occasions both the Federal Supreme Court and other appeals courts have approved the imposition of taxes and the use of public funds for state activities virtually identical to those cited. Following are some examples: manufacturing and marketing of agricultural byproducts, construction of low-cost homes, establishment of a bank - Green v. Frazier, 253 U.S. 233 (1920); railroad administration - Boston v. Jackson, 260 U. S. 309 (1922); construction of a tunnel for lease to railroad, telephone, electric, etc. companies - Milheim v. Moffat Tunnel District, supra; development of river resources for domestic uses, irrigation, and electric power **999** -

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit DX-GG Part 5 Page 451 of 541

Gallardo v. Porto Rico Ry., Light and Power Co., 18 F.2d 918 (1 Cir. 1927); coffee advertising and export plan - Márquez & Cía. v. Tesorero, supra; advertising for a key industry - C. V. Lloyd Fruit Co. v. Florida Citrus Commission, 170 So. 248 (Fla. 1937).

And even in the area of municipal law, where by tradition the courts tend to be stricter, there are numerous examples of this same attitude. Jones v. City of Portland, 245 U. S. 217 (1917) - warehouse for the sale of fuel; Spangler v. City of Mitchell, 152 N. W. 339 (S. D. 1915) - construction and operation of a telephone system; Standard Oil Co. v. City of Lincoln, 207 N. W. 172 (Neb. 1926) conf. in 275 U. S. 504 (1927) - sale of gasoline and oil; City of Tombstone v. Macia, 245 Pac. 677 (Ariz. 1926) - ice plant; Bank v. Bell, 217 Pac. 538 (1923) - market for the sale of foods; City of Frostburg v. Jenkins, 136 A.2d 852 (Md. 1957) - construction of a building for private industry; Mitchell v. City of Negaunee, 71 N. W. 646 (Mich. 1897 - electric plant; Turner v. City of Reidsville, 29 S.E.2d 211 (N. C. 1944) - construction of an airport; Allbritton v. City of Winona, 178 So. 799 (Miss. 1938), appeal dismissed, 303 U. S. 627 (1938) - construction of buildings for factories. See Antieau, Municipal Power to Tax--Its Constitutional Limitations, 8 V and L. Rev. 698, 732-738 (1955).

 **8 Any doubt that may remain about these matters evaporates when we consider that without interruption, since the beginning of the century, [11] and *1000 up to the present, and as evidenced by the opinion of the court of first instance, the government of Puerto Rico has maintained a telegraph and telephone communications system which received appropriations of public funds for many millions of dollars. This service has been offered during the administrations of all the political parties and with the consent of all the governors. Only in a case of manifest dedication of public funds to a completely private use would there be justification for the courts to void a government activity that on so many occasions has been approved by the government and the people.

Only in a case where public funds are allocated to a completely private use would there be justification to judicially annul a governmental activity that has on prior occasions received approval by the government and the people.

The plaintiff is also down the wrong path in telling us that the Communications Authority is not part of the government, nor does it exercise a "government function." Only the legislature has the power to determine what type of organization is best suited to perform a public function. If the legislature prefers a board or a department or a government-owned corporation to a business, that preference, unless there are constitutional provisions that expressly prohibit it, is definitive for the courts. [12] The Legislative Assembly of Puerto Rico, for reasons which it deemed sufficient, decided that beginning in 1942, the telephone and telegraph services that the government provided would be assigned to a "government-owned corporation or entity of the People of Puerto Rico" (Laws, p. 1065), which would have separate legal personality apart from the government and the officials that had administered it. As the court of first instance stated. "It is sufficient to read the law creating it to conclude that it is a government-owned corporation, which belongs to the community at large, which operates for the exclusive benefit of such community, and not any private interest whatsoever and that *1001 it is an agency or vehicle through which the Government of Puerto Rico discharges certain public functions. The fact that it is structured as a corporation for reasons beneficial to it involving a government administrative nature or involving a commercial nature does not affect its previously described nature."

If we were to accept the contention of the plaintiff we would place ourselves in the unsustainable position of resolving that until 1942, the telegraph and telephone services were a "part and function of the government" because they were under the aegis of a business of the Department of the Interior, but that thereafter they were no long a "part and function of the government" because they were the responsibility of a government-owned corporation held entirely by that government. [13]

In view of all of the foregoing, we rule that the tax imposed by Law no. 301 does not violate Article 3 of the Charter.

P.R. Telephone Co. v Tribunal de Contribuciones, 81 P.R.R. 382 (1959)
Case: 17-03283-LTS   Doc#:4781-6   Filed:01/24/19   Entered:01/24/19 18:19:25   Desc:
Exhibit 62 Part 1 Page 9 of 122 of 541

**\*9** II. The improper delegation of powers

The plaintiff tells us that the law challenged leaves the proceeds of the tax to be invested "at the whim of the Authority," that it does not set standards for investing the tax, and that for these reasons it constitutes an improper delegation of powers. It is unnecessary to spend inordinate amounts of time on this point. As the court of first instance stated: The Legislature imposed the tax and determined its amount; it selected the purpose as well as the subject thereof, and it set the purpose or use it would be put to. From there on, all the rest falls within the sphere of the execution and implementation of the law to carry out its purposes.

Even in the hypothesis, which is not unquestionable, Cincinnati Soap Co. v. United States, supra, pp. 321-322, that the requirement of adequate standards **\*1002** applicable to the regulatory functions of the state is just as valid in the sphere of government spending, it is clear that the standards set forth in Law no. 301 pass the constitutionality test. Certainly, they are not less necessary that that of the "public interest, advisability, and need" approved in NBC v. United States, 319 U. S. 190 (1943) or that of "excessive earnings" approved in Lichter v. United States, 334 U. S. 742 (1948) or that of " illicit methods of competence" approved in Federal Trade Commission v. Gratz, 253 U. S. 421 (1920). Let us also examine Yakus v. United States, 321 U. S. 414 (1944); United States v. Rock Royal Cooperative, 307 U. S. 533 (1939); 1 Davis, Administrative Law Treatise, (1959) pp. 81-87.

III. Forced exaction of the plaintiff's property under the pretext of the power of taxation.

IV. Lack of uniformity and deprivation of property without the due process of law.

We discuss these objections together because in reality they are just one. In summary, the plaintiff maintains that only it, as a matter of practice, pays the tax and that the proceeds of the tax have been spent for the "direct" benefit of the inhabitants of Caguas and neighboring towns to which the Communications Authority provides services. The inhabitants of other towns only benefit "indirectly" from the interconnection of the plaintiff's system to the Authority in long distance calls.

In addition, the plaintiff does "not receive any benefit whatsoever from the investment that has been the purpose of the tax..." while "the entire conglomerate of taxpayers has been exempted from contributing any money whatsoever to the special fund..." Therefore, it maintains that the tax is a forced exaction, it violates the doctrine of uniformity, and it deprives [the plaintiff] of its property without the due process of law. Let us review the applicable considerations.

One: The issue of whether or not the plaintiff receives "direct" benefits from the fund set forth in section 2 of Law no. 301 is not **\*1003** directly addressed in this appeal. It is, in addition, unnecessary to rule on it because the pertinent constitutional standards are not grounded in the determination of that fact. [14] Nonetheless, we note that while in the years to which this lawsuit refers only the Authority received money from this fund, the evidence demonstrates that the plaintiff at no time requested appropriations from the fund nor that any part of the money be used for "experiments or research" that would benefit it directly. Furthermore, it is rather euphemistic to categorize as "indirect" the benefits that the plaintiff admittedly receives for long distance calls to towns served by the Authority in which, as demonstrated by the evidence, through the use of the moneys from the special fund and of considerable appropriations of general funds, the number of subscribers has grown exponentially and the service has been extended and considerably improved.

**\*\*10** Two: In no way whatsoever is a tax unconstitutional because the investment of the proceeds thereof does not benefit those who pay it.[15] "There is nothing more common in the field of taxation than the imposition of a tax to a class or to individuals who do not enjoy any direct benefit from their investment or that are not responsible for the conditions to be remediated."

"A tax is not a prorating of benefits. It is, as we have said, a means of distributing the burden of the cost of government. A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is **\*1004** that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other criteria would hinder the imposition of taxes except as compensation for the encumbrance burdening those who pay it and would require the abandonment of the most fundamental principle of government - that it exists for the common good.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him." Carmichael v. Southern Coal Co., supra, pp. 521-523. See also Rapid Transit Corp. v. New York, 303 U. S. 573, 584-587 (1938); Magnano Co. v. Hamilton, supra, p. 43."

Three: The plaintiff does not affirm, nor is it in a position to affirm, that the tax under Law no. 301 violates the due process of law and equal protection under the law because it applies exclusively to telephone and telegraph companies operating in Puerto Rico. Considering the broad legislative power to establish reasonable classifications when imposing taxes, the aforesaid classification is neither arbitrary, nor oppressive, nor capricious. Citizens' Telephone Co. v. Fuller, 229 U. S. 322 (1913); Nashville C. & St. L. Ry. v. Browning, 310 U. S. 362, 368 (1940); Steward Machine Co. v. Davis, 301 U. S. 548, 584 (1937); Rapid Transit Corp. v. New York, supra, pp. 578-581; Carmichael v. Southern Coal Co., supra, p. 509; Walters v. City of St. Louis, 347 U. S. 231, 237 (1954); South Porto Rico Sugar Co. v. Buscaglia, 154 F.2d 96, 100 (1 Cir. 1946). And it is **\*1005** obvious that " the provisions of the law that designate the use of the funds collected is not important in determining whether or not the classification set forth by the law challenged is discriminatory." Rapid Transit Corp. v. New York, supra, p. 587.

**\*\*11** Legislative discretion is not restricted because the class described in the law in actuality includes only a single taxpayer. Utility companies - particularly telephone, telegraph, electric, water, and some transport companies - are usually in that position. For well-known reasons, the state very frequently grants these companies a monopoly on the service in specific areas, subject, as we know, to in-depth regulation of its activities. The granting of that monopoly does not, however, impede the state from imposing on it special taxes for the privilege conferred upon it or reasonably including them within a particular class of taxpayers.

Otherwise would imply that the company had acquired, along with the monopoly, a tax exemption on the privilege of its franchise and on its business activities and that the state could not impose on it any special tax whatsoever. It would only be able to impose on it general taxes - income, property, and excise taxes - those which all other taxpayers pay. That hypothesis has been repeatedly rejected by the Federal Supreme Court. Puget Sound Co. v. Seattle, supra, p. 627; Cf. Rapid Transit Corp. v. New York, supra, pp. 588-596.

Four: The rulings of the Federal Supreme Court "leave no doubt that in the benefit of the public interest a state may constitutionally engage in a business that is generally performed by private enterprise, impose a tax to maintain it, and compete with the private interests participating in the same activity." Puget Sound Co. v. Seattle, supra, p. 624; Constitutional Limitation on Sovereign Competition, 13 Temple L. Q. 415, 457-458 (1939).

**\*1006** Five: The doctrine of tax uniformity incorporated in the Charter, as with the federal provision, requires geographical, not intrinsic uniformity - Steward Machine Co. v. Davis, supra, p. 583; South Porto Rico Sugar Co. v. Buscaglia, supra, p. 100; Rullán v. Buscaglia, 168 F.2d 401, 403 (1 Cir. 1948) - and it is obvious that it is not violated in this case. How the proceeds of the tax are spent is also not linked in any way whatsoever with that doctrine. This is something that pertains to the determination of whether or not the tax is for a "public purpose." And, of course, the that a group of citizens receives more benefit than others from an improvement or utility is not, as we have already seen, in and of itself an indication that the tax invested in such improvement or service is not for a "public purpose." [16] We are surrounded by hundreds of works and utilities that due to the physical fact of their location benefit more " directly" some citizens than others. It would be impossible to administer government funds if we adopted a contrary standard.

Once it is established that the tax is for a "public purpose" and that the tax classification is valid and complies with the doctrine of geographical uniformity, it is appropriate to sustain its constitutionality even if the investment of the proceeds thereof benefits some citizens more than others and in no way, if were so in this case, the taxpayer paying it.

**\*\*12** V. The law is void because it prohibits passing along the contribution to the consumer.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 8

The plaintiff maintains that the provision of Law no. 301 that prohibits charging the tax to the persons using the telephone and telegraph services is void "because one who sells commercial goods cannot be constitutionally obligated to *1007 in the end absorb the burden of a tax, which is an expense, and prohibit him from recovering it in some way."

The court of first instance ruled correctly that said prohibition of the law applies in practice only to the Communications Authority, since it is the Authority that is the only party authorized to set its rates without the intervention of any other official entity. The plaintiff, however, cannot increase its rates without the intervention of the Public Service Commission. We thus have to accept that the legislators were aware of this basic fact. We must likewise accept, as did the court of first instance, that the Legislative Assembly, upon approving Law no. 301, knew that the plaintiff had the right, under the Constitution and under the law, to obtain reasonable earnings for its company and that it did not attempt to prohibit taking into account the tax pursuant to Law no. 301 in determining its rates. Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 399 (1922); Georgia Railway and Power Co. v. Railroad Commission, 262 U. S. 625, 633 (1923). It was therefore before the Public Service Commission that the plaintiff had to first allege the effects of the new tax in an application for a rate increase. [17] It could have done this as soon as Law no. 301 entered into force, and since the tax is paid annually, it would have had *1008 ample opportunity to recover it if the Commission had granted it the necessary authorization.

Nevertheless, the plaintiff preferred to wait until 1949 to apply for an increase. That application, as we saw in the recitation of facts proven, was due to considerable wage increases and other employment conditions that the plaintiff gave its employees over several years. The only conclusion that arises from these facts is that the Porto Rico Telephone Co., for reasons that it deemed appropriate, decided that the increase in its expenses caused by the tax pursuant to Law no. 301 was not sufficient reason to apply to the Commission for a rate increase. Once that decision was made, the plaintiff cannot now allege as grounds for unconstitutionality that Law no. 301 prohibited from passing the tax along to the users of the service.

We should further clarify that the legislative prohibition against passing a tax along to the consumer is not in and of itself and in all circumstances grounds for unconstitutionality. Rapid Transit Corp. v. New York, supra, pp. 581-582; Southern Boulevard R. Co. v. City of New York, 86 F.2d 633, 637 (2 Cir. 1936) cert. denied 301 U. S. 703 (1937). Our ruling in Pyramid Products v. Buscaglia, 64 D.P.R. 828, 850 (1945), principal precedent cited by the plaintiff, is based on the retroactive nature of the tax. This circumstance does not apply in the case at hand.

**13 For the reasons set forth in this opinion, we find that section 2 of Law no. 301 of May 15, 1945, is constitutional, considering both the applicable provisions of the Charter of 1917, and the provisions of the federal Constitution.

The ruling appealed is confirmed.

Chief Justice Negrón Fernández and Associate Justice Santana Becerra did not intervene.

Footnotes

1    The plaintiff paid $18,850.59 in 1945, $34,693.88 in 1946, and $38,246.93 in 1947. The Authority paid $6,000 in 1945, and nearly $8,000 in the other years.

2    This provision is still in force as part of the Puerto Rico Federal Relations Act. 64 Stat. 320.

3    In addition, in some states it is expressly required by constitutional provision that taxes be for a "public purpose." McAllister, Public Purpose in Taxation, 18 Cal.L.Rev. 137, 138 (1929). Section 9, Article VI of the Constitution of the Commonwealth of Puerto Rico, in force since 1952, provides that: "Public property and funds shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law."

4    In addition to the case law cited, the plaintiff grounds his appeal on two other lines of precedents. The plaintiff cites, on the one hand, rulings handed down by some U.S. courts early in the second half of the 19th century, when a very narrow concept of government functions and, therefore, what constituted a "public purpose" prevailed. This class includes Lowell v. City of Boston, 15 Am. Rep. 39 (1873) - a city cannot issue bonds to extend loans to people whose houses were destroyed by a fire;

P.R. Teléfono Co. v. Tribunal de Contribuciones ... 86 D.P.R. 451 (1962)

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit Exhibit J-2 Part 6 Page 105 of 541
Exhibit 82 Page 455 of 541

Weimer v. Village of Douglas, 21 Am. Rep. 586 (1876) - a municipality cannot issue bonds to buy shares in a corporation in order to induce it to establish itself in that municipality; Loan Association v. Topeka, 87 U.S. 655 (1875) - a city cannot issue bonds to help manufacturing companies establish themselves in the city. As will be demonstrated later in this opinion, the specific determinations in those cases were abandoned several decades ago and their current value is primarily historic. Moreover, the plaintiff cites rulings - State ex rel. City of Reno v. Boyd, 74 Pac. 654 (1903); State v. Lafayette Fire Ins. Co., 63 So. 630 (1913); Peterson v. Hancock, 54 N.W.2d 85 (1952) - that declare the nullity of a tax imposed by a city or district for the benefit of other districts or cities. That case law is grounded on the strong tradition of municipal autonomy that exists in the United States and, based on the facts, does not apply whatsoever to the matter at hand.

On several occasions the plaintiff also grounded its appeal on United States v. Butler, 297 U.S. 1 (1936), which ruled that a tax imposed by the Congress was unconstitutional because the proceeds thereof were going to be used not for a private purpose, but rather as part of a plan of regulation of agriculture that the Federal Supreme Court deemed to exceed the powers conferred by the Constitution to the federal government. Besides the fact that this ruling in Butler was finally dismissed -Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381 (1940); Wickard v. Filburn, 317 U.S. 111 (1942)- in this case the question of whether the proceeds of the tax will be used to support a plan of regulation beyond the scope of the powers of the government of Puerto Rico is not set forth, but rather only whether such tax is or is not for a "public purpose," which matter the Court expressly avoided in Butler. 297 U.S. 68.

5   The limitation that we are analyzing was incorporated in the organic acts of other territories, using identical or very similar wording. Virgin Islands -48 U.S.C. sec. 1406 i; Guam--48 U.S.C. sec. 1423 a; Philippine Islands - 39 Stat. 548; Alaska--48 U.S.C. sec. 79.

6   The limitation imposed on Congress by the 'general welfare' clause - Article I, Section 8, Cl. 1 of the Constitution of the United States - and on the states by the " due process" clause of the Fourteenth Amendment . The applicable principles, nonetheless, are similar.

6a  Other provisions of the two organic acts clarify the purpose of Congress. Foraker: section 4 - all money collected in Puerto Rico for taxes and contributions prior to the entry into force of the law shall be deposited in the Treasury of Puerto Rico "to be used by the Government of the Island and to be invested for the benefit of the Island"; sec. 12 - orders the Treasury to pay from island funds "all expenses and obligations contracted for the internal improvement or development of the island;"; section 38 - in cases in which it was necessary to advance taxes and revenues bonds could be issued "to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys which have been or may be expended out of the emergency fund of the War Department for the relief of the industrial conditions of Puerto Rico caused by the hurricane..." Organic (Jones) Act of 1917: Article 6 -- orders the Treasury to pay from island funds "all expenses and obligations contracted for the internal improvement or development of the island;" Article 18 - "The Agriculture and Trade Commissioner shall be responsible in general for businesses and branches of the government established by law for the study, advancement, and benefit of agriculture, trade, and other industries..."

7   The limitation that we are discussing was originally incorporate in section 38 of the Foraker Act of 1900. We have reviewed Volume 33, Part 4 of the Congressional Record (1900) and Senate Report no. 249, Congress no. 56, submitted by Senator Foraker, and we do not find therein any explanation whatsoever of the provision cited. It has not been possible to use sources of legislative history other than the two organic acts.

8   It would be beyond the pale and completely unnecessary to enumerate all the laws sustaining this affirmation. It is sufficient to indicate that since the beginning of the century and through the years to which this lawsuit refers the Government of Puerto Rico, besides performing its customary functions, has appropriated funds for numerous other functions. A random search demonstrates that the island government imposed taxes and appropriated money for the sale of electricity, for water for irrigation, and for port facilities and services, and municipalities did so for aqueducts, electric plants, and some also for ports. Agricultural and livestock activity was fostered by various means - subsidies, schools, experimental stations, campaigns against diseases, fairs, expositions, advertising, etc. - establishing for these purposes numerous separate funds funded by special taxes or other sources. Industry also received aid, although to a lesser extent. There was also legislation to fund low-cost housing programs, various services for low-income classes, and cultural development programs. As is general knowledge, beginning in 1941, these activities intensified and others were added. The government appropriate large sums for economic development and participated directly in the ownership and administration of agricultural, industrial, and commercial companies. For salient examples, see the following volumes and pages of the Laws of Puerto Rico: 1903-34 49; 1911-88, 167; 1912-83; 1913-149; 1914-165; 236; 1917-369; 1917 II-293; 1919-349; 1921-91; 1925-327; 1930-131; 1934-217, 273; 1936-543; 1937-230, 235, 243;

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    10

1938-194, 292, 413, 511; 1939-715; 1940-325, 727, 1145; 1941-389, 685, 763, 863, 935, 945; 1942-573, 711, 935, 1065, 1365; 1946-331, 1067.

9    Regarding what constitutes a "public purpose" see, in general, Judson, Public Purposes for Which Taxation is Justifiable, 17 Yale L. J. 162 (1908); McAllister, op. cit., supra; Bergman, The Federal Power to Tax and to Spend, 31 Minn. L. Rev. 328 (1947).

10    With respect to the scope of the judicial function in reviewing what constitutes a "public purpose" in the expropriation of private property, see Berman v. Parker, 348 U.S. 26 (1954); E.L.A. v. Sucn. Gautier, 81 D.P.R. 580 (1959).

11    The first telegraph line in Puerto Rico was installed by Samuel F. Morse in 1849. By the end of the century, the Spanish government managed a system of 41 stations; it was destroyed by a cyclone in 1899. The U.S. military regime rebuilt the system and in 1901, the military transferred it to the island government. It was placed under the management of the Commissioner of the Interior and extended to all populations of the island. On March 14, 1907, a law (Laws, p. 388) was passed authorizing the Commissioner to build and manage a system of short- and long-distance telephone lines. It was not until 1914, that the plaintiff received the franchise to establish the telephone system it now owns. See Fernández García, The Blue Book of Puerto Rico, 1923, p. 702-712.

12    Since McCulloch v. Maryland, 4 Wheat. 316, 421 (1819) the federal Supreme Court has recognized that Congress can create government-owned corporations to exercise the powers conferred upon them by the Constitution. With respect to Puerto Rico, see People of Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316, 325 (1946) cert. denied, 329 U.S. 772 (1946).

13    Our ruling on this matter is limited to the constitutional issue on which it is grounded and should not be construed to extend to other matters (contractual liability or liability for damages, etc.), which are governed by the pertinent legislative determinations. See Gobierno de la Capital v. Consejo Ejecutivo, supra, p. 450. The case law cited by the plaintiff to support its contention refers precisely to these issues.

14    As evident in the case file, Authority officials are of the opinion that they cannot make improvements in the territory served by the Porto Rico Telephone Co. That determination, of course, is not binding upon the plaintiff or the courts and must be examined in an appropriate court proceeding.

15    Of course, it is also not binding due to the mere fact that it restricts or destroys certain occupations or businesses. Magnano Co. v. Hamilton, supra, pp. 44-47; Cushman, Social and Economic Control Through Federal Taxation, 18 Minn. L. Rev. 757, 763-764 (1934).

16    The same doctrine applies to expropriations of property for "public use." Rindge Co. v. Los Angeles, 262 U. S. 700 (1923); Mt. Vernon Cotton Co. v. Alabama Power Co., 240 U. S. 30, 32 (1916).

17    The plaintiff alleges that the practice of the utility commissions in the United States is to authorize companies "to charge their customers directly for the tax on monthly bills as a surcharge... and not to open a rate process... each time a new tax is enacted." The plaintiff alleges that Law no. 301 prohibits this procedure. Besides the fact that the plaintiff in reality is complaining that it would have been denied something that it never applied for, we do not believe that Law no. 301 in and of itself constitutes an obstacle to such procedure if it is authorized by our utility laws.

---

End of Document                                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

81 D.P.R. 982, 1960 WL 13992 (P.R.)

Porto Rico Telephone Company, peticionaria

v.

Tribunal de Contribuciones de Puerto
Rico, demandado; Hon. Sol Luis Descartes,
Secretario de Hacienda, interventor.

En El Tribunal Supremo De Puerto Rico.

Números: 295 296 y 297
Reasignados: 13 de octubre de 1959
Resueltos: 30 de junio de 1960.
JUN 30, 1960

**Synopsis**
Certiorarispara revisar Sentencias del Tribunal de
Conrtibuciones (C. Santana Becerra, Juez, San Juan),
declarando sin lugar demandas sobre reintegro de
contribuciones. Confirmadas las sentencias.

Franceschi & Sifre, abogados de la peticionaria; Hon.
Secretario de Justicia Hiram R. Cancio (J. B. Fernández
Badillo, ex-Secretario de Justicia Interino y J. C. Santiago
Matos, Procurador Auxiliar, en el alegato), abogados del
interventor.

El Juez Asociado Señor Serrano Geyls emitió la opinión
del Tribunal.

**\*\*1** En este recurso la peticionaria, Porto Rico
Telephone Co., impugna la constitucionalidad de la sec.
2 de la Ley núm. 301 de 15 de mayo de 1945 (Leyes, pág.
1147; 27 LPRA sec. 342), la cual dispone lo siguiente:

'Por la presente se autoriza y ordena al Secretario de
Hacienda para imponer y cobrar una contribución o
impuesto de dos por ciento sobre el ingreso bruto de
operación bruto de cualquier compañía de servicio
público o **\*986** instrumentalidad gubernamental del
Estado Libre Asociado de Puerto Rico, por la trasmisión
de mensajes telefónicos y telegráficos, incluyendo giros
telegráficos. Toda cantidad recibida por el Secretario
de Hacienda a virtud de las disposiciones de esta
sección será depositada por él en un fondo especial
que se denominará Fondo Especial para el Fomento de
Comunicaciones. Dichos fondos serán puestos, de tiempo
en tiempo, a la disposición de la Junta de Directores de la
Autoridad de Comunicaciones de Puerto Rico, mediante

su requerimiento para su inversión por dicha junta, o
bajo sus órdenes, en aquellas mejoras, extensiones,
investigaciones, experimentos e investigaciones especiales,
que crea conveniente, con el fin de extender y mejorar la
calidad del sistema y facilidades de las comunicaciones
telefónicas y telegráficas en Puerto Rico. Dicho impuesto
deberá ser pagado por las compañías de servicio público
o por las instrumentalidades públicas que rindan dicho
servicio, dentro de los sesenta (60) días después de haber
cerrado la contabilidad de cada año económico; y bajo
ningún concepto deberá cargarse el mismo a las personas
que utilicen sus servicios.'

La peticionaria interpuso demanda de reintegro ante el
antiguo Tribunal de Contribuciones, el cual la denegó y
sostuvo la validez de la disposición impugnada. En su
extensa y hábil opinión, el tribunal de instancia consideró
probados ciertos hechos que conviene exponer antes de
analizar los problemas legales. Son los siguientes:

En los años a que se refiere el litigio existían en
Puerto Rico (y todavía existen) dos organizaciones, una
gubernamental y otra privada, que se dedicaban a ofrecer
servicios telefónicos. La primera tiene el nombre de
Autoridad de Comunicaciones de Puerto Rico y presta
servicios a la ciudad de Caguas y otros nueve pueblos
limítrofes. También administra un sistema telegráfico
que cubre todo el país. La segunda, demandante en
esta causa, funciona bajo el nombre de Porto Rico
Telephone Company y ofrece el servicio en toda la
isla, con excepción del área cubierta por la Autoridad.
Los sistemas telefónicos de las dos organizaciones están
interconectados con **\*987** líneas de larga distancia. La
Comisión de Servicio Público reglamenta los servicios y
las tarifas de la demandante, pero no los de la Autoridad.
Esta tiene completa libertad para fijar sus precios.

**\*\*2** Tanto la Porto Rico Telephone Company como
la Autoridad han pagado la contribución que impone
la Ley núm. 301. [1] Durante los años 1945, 1946 y 1947
la Autoridad solicitó y obtuvo dinero del fondo especial
creado por esa ley 'y con dicho dinero ... ha mejorado
la calidad del servicio telefónico en el área en que sirve,
sustituyendo un sistema viejo y en ruinas que recibiera
del Negociado del Telégrafo del Gobierno Insular por
otro nuevo, además de haber aumentado y extendido su
capacidad original, principalmente el sistema telefónico a
Vieques y Culebra.' La Autoridad ha recibido del fondo
especial más cantidades de las que ella ha aportado al
mismo, pero la mayor parte de los fondos utilizados en

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

Case:17-03283-LTS Doc:4781a6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit DF Part 5 Page 459 of 541
Exhibit Part 5 Page 459 of 541

las mencionadas mejoras han sido asignados de fondos generales por la Asamblea Legislativa. La Autoridad no ha utilizado parte alguna de esos fondos para hacer 'mejoras directas' en el sistema de la demandante. Esta 'se beneficia de las mejoras hechas por la Autoridad en forma indirecta, o sea, a través de la interconexión o unificación de ambos servicios. El mejoramiento del servicio de la Autoridad ha resultado en beneficio para ambas entidades debido a dicha interconexión.'

'La Autoridad ha sustituido el sistema que adquirió con uno nuevo automático y más eficiente en todos los pueblos que sirve. Se han extendido las comunicaciones telefónicas en la isla y hasta Vieques y Culebras y la calidad del servicio ha mejorado.' Hasta 1947 había habido un aumento de 340 por ciento en el número de abonados de la Autoridad. 'Las mejoras hechas por la Autoridad en su sistema telefónico han beneficiado al público en general, inclusive los abonados de la demandante; y benefician al gobierno.'

**\*988** Entre los años 1945 y 1947 la Porto Rico Telephone no solicitó ni obtuvo de la Comisión de Servicio Público un aumento en sus tarifas. En 1948 hizo una petición de aumento que luego retiró y luego hizo otra en 1949. En el año siguiente la Comisión autorizó un aumento.

'Las ganancias netas de operación de la demandante en el año 1944 fueron de $67,214; en 1945 $121,881; en 1946 $277,509; y en 1947 $281,019. A base de la inversión y de la planta, las anteriores ganancias netas representan un 2.4% en el año 1944, 2.61% en 1945, 4.39% en el 1946 y 4.10% en 1947.' Tanto la contribución sobre ingresos como la especial de 2% de la Ley núm. 301 fueron tomadas en consideración en el cómputo de las mencionadas ganancias. Al conceder el aumento provisional en 1950, la Comisión de Servicio Público le hizo a base del mínimo de 5 por ciento de ganancia que autorizaba la Ley núm. 12 de 9 de abril de 1941 (Leyes, pág. 343). El aumento en el ingreso bruto de la demandante durante los años mencionados se debió (1) al aumento en el número de teléfonos y (2) al desarrollo del servicio de larga distancia.

**\*\*3** Durante los años anteriores al 1948 aumentaron continuamente los gastos de funcionamiento de la demandante. Una de las causas principales fue el alza en salarios y otras concesiones a los trabajadores que resultaron en un gasto de más de un millón y medio de dólares desde 1943 a 1948. 'El gasto adicional causado por la contribución del 2 por ciento no fue la razón que indujo

a la demandante a solicitar de la Comisión de Servicio Público el aumento en sus tarifas.'

Frente a esa ley y esos hechos, la peticionaria aduce los siguientes fundamentos en apoyo de su solicitud de inconstitucionalidad: (1) La ley impugnada viola el art. 3 de la Carta Orgánica de Puerto Rico porque la contribución que impone no es 'para los fines de los gobiernos insular y municipal'. (2) La ley deja la inversión del impuesto al capricho de la Autoridad de Comunicaciones y constituye, por lo tanto, una indebida delegación de poderes legislativos. (3) La contribución constituye una **\*989** exacción forzosa de la propiedad de la peticionaria, so pretexto del poder contributivo. (4) La ley viola la regla de uniformidad y priva a la peticionaria de su propiedad sin el debido proceso de ley. (5) La ley es nula porque prohíbe pasar la contribución al consumidor. Analizaremos cada una de esas alegaciones separadamente.

I. 'Fines de los gobiernos insular y municipal'

La sec. 3 de la Carta Orgánica, vigente en los años a que se refiere este litigio,[2] dispone que ... 'podrán imponerse contribuciones e impuestos sobre la propiedad, ingresos, rentas internas, y por licencias, franquicias, privilegios y concesiones, cuando dichas contribuciones sean para los fines de los gobiernos insular y municipal, respectivamente, y se impongan según las disposiciones y prescripciones de la Asamblea Legislativa de Puerto Rico. ' (Énfasis suplido.)

A la luz de esa disposición, la peticionaria en síntesis sostiene que la frase 'para los fines de los gobiernos insular y municipal' no es equivalente a la frase 'para un fin público'[3] que como parte del debido procedimiento de ley define el poder de imponer tributos; que 'una contribución significa una exacción para el mantenimiento del gobierno y para sostener aquellos servicios que son función lógica y natural del gobierno'; que el mejoramiento de las telecomunicaciones no es un 'fin de gobierno'; y que la Autoridad de Comunicaciones no es parte del gobierno, ni ejerce una función de gobierno.

En apoyo de su interpretación restrictiva de la frase 'para los fines de los gobiernos insular y municipal' la peticionaria nos cita trozos de opiniones judiciales en las cuales se discuten las conocidas doctrinas de inmunidad **\*990** fiscal recíproca entre el gobierno federal y los estados y de inmunidad de los

municipios por daños causados en el ejercicio de sus funciones 'gubernativas', a diferencia de sus funciones 'de propiedad'. [4] Independientemente de que ambas doctrinas vieron ya hace tiempo sus mejores días, no hay duda de que son claramente inaplicables a la situación de este caso. La primera se propone proteger la estabilidad del sistema federal norteamericano y la autonomía de sus integrantes e impide que el gobierno nacional y los estados se impongan mutuamente contribuciones que debiliten o destruyan sus funciones. Esa doctrina recorrió caminos muy accidentados y en los últimos años se han corregido muchos de los extremos a que llevó su aplicación inicial. Phillips Chemical Co. v. Dumas School District, 4 L. ed. 2d 384 (1960); United States v. City of Detroit, 355 U. S. 466 (1958); United States v. Township of Muskegon, 355 U. S. 484 (1958); City of Detroit v. Murray Corp., 355 U. S. 489 (1958); Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633 (1945). La segunda constituye una de las maneras mediante las cuales los tribunales trataron de mitigar los duros efectos de la doctrina de inmunidad del soberano en el campo de los actos torticeros. Para esos fines se dividieron las funciones **991** municipales en 'gubernamentales' y de 'propiedad', resolviéndose que al ejercer los municipios las segundas, no había buenas razones para oponerle la doctrina de inmunidad a los damnificados. Gobierno de la Capital v. Consejo Ejecutivo, 63 D.P.R. 434, 437-439 (1944); Serra v. Autoridad de Transporte, 67 D.P.R. 611 (1947); Rodríguez v. Pueblo, 75 D.P.R. 401, 412 (1953); Symposium--Governmental Tort Liability, 9 L. & Contemp. Prob. 179-370 (1942); Municipal Corporations--Sovereign Immunity, 11 Vand. L. Rev. 253 (1957).

**4** Es evidente que esas distinciones obedecen a circunstancias jurídicas y sociales muy alejadas del problema que hoy confrontamos. La peticionaria no nos brinda ni hemos podido hallar razones de peso que justifiquen su uso como medida de los poderes de imponer tributos y de gastar los fondos públicos que el Congreso delegó en la Asamblea Legislativa de Puerto Rico. Sin duda, necesitaríamos mucho más que esas frágiles analogías para aherrojar la autoridad fiscal a los estrechos conceptos que nos suministra la peticionaria. Cf. Puget Sound Co. v. Seattle, 291 U. S. 619, 623-626 (1934).

Es indispensable, por lo tanto, acudir a otras fuentes. El historical legislativo de la Carta Orgánica--53 Congressional Record, Partes 6-9; **992** Congreso núm. 64, House Report núm. 77 y Senate Report núm. 579--

no contiene expresión específica alguna sobre la antedicha frase de la sec. 3. Demuestra palpablemente, sin embargo, que el Congreso se propuso delegar en el Gobierno de Puerto Rico poderes similares a los que poseían los estados de la Unión.

En varias ocasiones, el Tribunal Supremo federal ha sancionado esa norma de interpretación. Dijo en Puerto Rico v. Shell Co., 302 U. S. 253, 261-262 (1937):

'El propósito del Acta Foraker y el Acta Orgánica fue el de conceder a Puerto Rico completos poderes de autodeterminación local, con una autonomía parecida a las de los estados y los territorios incorporados. El resultado fue conferir al territorio muchos de los atributos de cuasi-soberanía poseídos por los estados-- como por ejemplo inmunidad contra pleitos sin su consentimiento. Por medio de esas actas, se erigió la típica estructura gubernamental norteamericana que consiste de tres ramas independientes-- legislativa, ejecutiva y judicial. Se creó un 'cuerpo político'--una comunidad (commonwealth). El poder de imponer contribuciones, el poder de aprobar leyes y ponerlas en vigor, y otros poderes característicamente gubernamentales fueron concedidos. Y en lo que se refiere a asuntos locales, como hemos ya demostrado con relación a los territorios continentales, se otorgaron poderes legislativos casi tan extensos, aunque no totalmente, como los que ejercían las legislaturas estatales.' (Se han eliminado las citas.) Véanse, además, Puerto Rico v. Rubert Hnos., 309 U. S. 543, 547 (1940); Cf. De Castro v. Board of Commissioners, 322 U. S. 451 (1944); Bonet v. Yabucoa Sugar Co., 306 U. S. 505 (1939); Bonet v. Texas Co., 308 U. S. 463 (1940); Domenech v. National City Bank, 294 U. S. 199 (1935).

Nos parece absurdo aceptar que otra fuera la voluntad legislativa cuando se trata de un poder de las dimensiones y la importancia vital del de imponer tributos. Seguramente, el Congreso se propuso darle ese poder al gobierno de Puerto Rico, [5] sujeto a la norma general del 'fin público' que limita **993** constitucionalmente tanto al gobierno federal [6] como a los de los estados. No hay razón alguna para creer que intentó encasacar al gobierno de Puerto Rico de tal manera que estuviese impedido de expender los fondos públicos en actividades que desde hace varias décadas constituyen lugares comunes en la experiencia federal y estatal. [6a] Un instrumento legal que define los poderes de un gobierno no puede interpretarse con ese espíritu de campanario.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    3

P.R. Telephone Co. v. Tribunal de Contribuciones, 81 D.P.R. 982 (1960)

Case: 17-03283-LTS Doc#:4781a6 Filed:01/24/19 Entered:01/24/19 28:14:25 Desc:
Exhibit D3 part 15 Page 189 of 541
Exhibit 82 Page 189 of 525

**\*\*5** Más de medio siglo [7] de práctica de gobierno confirma el propósito del Congreso. Desde 1900 hasta 1952, y particularmente en la última década de ese período, la Asamblea Legislativa de Puerto Rico autorizó contribuciones **\*994** y erogaciones para los mil y un propósitos [8] que los gobiernos modernos se ven obligados a cumplir. Las leyes pertinentes fueron firmadas por gobernadores de nombramiento presidencial e informadas al Congreso de acuerdo con lo dispuesto en la sec. 23 de la Carta Orgánica, sin que en ningún momento se desaprobaran o ni tan siquiera se pusiera en duda el poder local para aprobarlas. En 1950 el Congreso, obviamente familiarizado con el desarrollo económico de Puerto Rico y la activa intervención de su gobierno en los procesos económicos, muchas veces mediante el desempeño de actividades de tipo industrial y comercial, mantuvo, con la aprobación de los electores puertorriqueños, exactamente la misma limitación en la 'Ley de Relaciones Federales con Puerto Rico'. Concluimos, a la luz del significado lógico y corriente de las palabras usadas, de la gravísima importancia del poder fiscal, de la intención del Congreso de dotar a Puerto Rico con poderes de gobierno similares a los de un estado, y de la práctica **\*995** invariable de más de medio siglo, que la frase 'para los fines de los gobiernos insular y municipal' de la sec. 3 de la Carta Orgánica no tiene un significado más estrecho que la frase 'para un fin público', limitativa de los poderes del Congreso y los estados. Reafirmamos así lo que implícitamente habíamos resuelto en Márquez & Cía. v. Tesorero, 57 D.P.R. 322 (1940). (Cf. P. R. Distilling Co. v. Sancho Bonet, 52 D.P.R. 672, 679 (1938); P. R. Tobacco Corp. v. Buscaglia, 62 D.P.R. 811, 830 (1944).)

Pasamos, por consiguiente, a considerar si los propósitos legislativos expresados en la sec. 2 de la Ley núm. 301--'inversión....en....mejoras, extensiones, investigaciones, experimentos e investigaciones especiales....con el fin de extender y mejorar la calidad del sistema y facilidades de las comunicaciones telefónicas y telegráficas en Puerto Rico' --constituyen un 'fin público'. [9] Antes de fallar sobre este problema específico es indispensable, sin embargo, mencionar algunos principios que le sirven de trasfondo.

Primero: Considerada por sí sola la contribución que hoy se impugna es perfectamente válida. La objeción en su contra surge del hecho de que la ley que la impone al mismo tiempo la destina a un propósito específico, en vez

de ordenar su ingreso en los fondos generales del gobierno. Esa circunstancia concede a quien la paga una facultad especial (standing) para impugnar la constitucionalidad de la erogación, y en consecuencia la del tributo, que de otro modo y como parte del cuerpo general de contribuyentes no tendría. United States v. Butler, 297 U. S. 1, 57-58 (1936); Massachusetts v. Mellon, 262 U. S. 447 (1923); Suárez v. Tugwell, 67 D.P.R. 180 (1947); Cafeteros de Puerto Rico v. Tesorero, 74 D.P.R. 752 (1953). 'Pero si la contribución, qua contribución, fuere válida....y el propósito especificado fuere uno que sostendría una asignación subsiguiente y separada **\*996** hecha de los fondos generales del Tesoro, ninguno de los dos sería nulo por estar unido al otro en la misma pieza de legislación. La única preocupación que tenemos en cuanto a este aspecto del caso es la de determinar si el Congreso puede, sin violar la ley fundamental, hacer una asignación para el propósito especificado. Si el Congreso, por razones que consideró satisfactorias, decidió adoptar el quantum de ingresos de esta contribución especial como medida de la asignación, no hallamos fundamento válido alguno para atacar su poder de así hacerlo.' Cincinnati Soap Co. v. United States, 301 U.S. 308, 313 (1937); Bergman, ob. cit., págs. 350-353.

**\*\*6** Segundo: Es extremadamente reducida la función judicial de revisar las determinaciones legislativas sobre lo que constituye un 'fin público' en la imposición de tributos. [10] A los criterios usuales de autolimitación que guían la 'grave y delicada función' judicial de juzgar la validez constitucional de las medidas legislativas--E.L.A. v. Aguayo, 80 D.P.R. 552, 595-597 (1958) --se une en este caso la especial circunstancia de que la determinación del legislador tiene por base variados elementos de la política pública cuyo escrutinio está fuera de la competencia de los jueces. La aprobación de una medida contributiva requiere el estudio detenido de difíciles problemas políticos, sociales y administrativos, y, sobre todo, pesar el efecto económico de la nueva imposición sobre el consumo, las inversiones, la producción, el empleo, el ingreso y el ahorro. Se explica así la reiterada renuncia de los tribunales a intervenir activamente en este asunto.

En repetidas ocasiones el Tribunal Supremo federal ha fijado la profundidad de las incursiones judiciales en esta área. En Carmichael v. Southern Coal Co., 301 U. S. 495, 514-515 (1937) el Tribunal explicó que desde la adopción de la Enmienda XIV los estados sólo pueden imponer contribuciones para un **\*997** fin público y no

para propósitos privados, pero que los requisitos del debido procedimiento dejan 'campo libre para el ejercicio de una amplia discreción legislativa al determinar qué erogaciones servirán el interés p #ublico.' Esa discreción incluye, desde luego, la asignación de fondos para el 'bienestar general'. 'Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de la Legislatura' y 'es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos'. Por consiguiente para justificar la intervención de un tribunal se requiere 'un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse', o como se dijo en Helvering v. Davis, 301 U.S. 619, 640 (1937) 'un despliegue de poder arbitrario, no una demostración de juicio'. Y esa autoridad judicial, se añadió en Everson v. Board of Education, 330 U. S. 1, 6 (1947) debe ejercitarse con la 'más extrema cautela'. Véanse, además, United States v. Butler, supra, pág. 67; Magnano Co. v. Hamilton, 292 U. S. 40-44 (1934); Milheim v. Moffat Tunnel District, 262 U. S. 710, 717 (1923); Green v. Frazier, 253 U. S. 233, 239 (1920).

Tercero: El concepto de 'fin público' no es uno estát? co, atado de por siempre a las ideas que en un momento histórico particular definieron los poderes y responsabilidades del gobierno. Está, por el contrario, indisolublemente ligado al bienestar general y, como éste, tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean, y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja. Helvering v. Davis, supra, pág. 641. Debe recordarse que 'la Enmienda XIV no privó a los estados de su facultad de enfrentarse a problemas que anteriormente habían sido dejados para ser resueltos por los individuos '. Everson v. Board of Education, supra, pág. 7.

**7 Cuarto: Una ley no persigue un propósito privado porque ordene hacer pagos *998 a individuos o empresas para así dar cumplimiento a un programa público. 'Los subsidios y préstamos a individuos tales como agricultores y dueños de hogares y a sistemas de transportación poseídos privadamente, al igual que a muchas otras clases de negocios, constituyen prácticas comunes en nuestra historia nacional y estatal.' Everson v. Board of Education, supra, pág. 7; Carmichael v. Southern Coal Co., supra, pág. 518. A fortiori, la norma se aplica con mayor fuerza a una empresa pública.

Quinto: Aunque la imposición contributiva no puede anularse por la única circunstancia de que su propósito sea novedoso, no hay duda de que viene adicionalmente acreditada aquella cuyos objetivos hayan sido aprobados durante largo tiempo por el gobierno y el público. Loan Association v. Topeka, supra, págs. 664-665; Cincinnati Soap Co. v. United States, supra, págs. 314-315; State v. Johnson, 175 N. W. 589, 595-596 (Wisc. 1919).

Una vez establecidos estos principios básicos, se desvanecen las objeciones contra la ley. Nos parece obvio que el fomento de las telecomunicaciones y el mantenimiento de un sistema telefónico y telegráfico constituían en las circunstancias económicas y sociales de 1945-47, y constituyen hoy día, una dedicación de fondos para un fin público. En verdad, es sorprendente que a estas alturas se cuestione esa facultad del gobierno. En numerosas ocasiones, tanto el Tribunal Supremo federal como otros tribunales de apelación, han aprobado la imposición de tributos y el uso de fondos públicos para actividades estatales prácticamente idénticas a las mencionadas. Algunos ejemplos son los siguientes: manufactura y mercadeo de productos derivados de la agricultura, construcción de hogares a bajo costo, establecimiento de un banco--Green v. Frazier, 253 U. S. 233 (1920); administración de un ferrocarril--Boston v. Jackson, 260 U. S. 309 (1922); construcción de un túnel para alquilarlo a empresas de ferrocarril, teléfonos, electricidad, etc.--Milheim v. Moffat Tunnel District, supra; desarrollo de recursos fluviales para usos domésticos, riego y energía *999 eléctrica-- Gallardo v. Porto Rico Ry., Light and Power Co., 18 F.2d 918 (1 Cir. 1927); plan de anuncios y exportación del café-- Márquez & Cía. v. Tesorero, supra; anuncios para una industria importante--C. V. Lloyd Fruit Co. v. Florida Citrus Commission, 170 So. 248 (Fla. 1937).

Y aun en el área del derecho municipal, donde por tradición los tribunales tienden a ser más estrictos, también existen ejemplos numerosos de la misma actitud. Jones v. City of Portland, 245 U. S. 217 (1917) -- almacén para la venta de combustible; Spangler v. City of Mitchell, 152 N. W. 339 (S. D. 1915) --construcción y funcionamiento de un sistema telefónico; Standard Oil Co. v. City of Lincoln, 207 N. W. 172 (Neb. 1926) conf. en 275 U. S. 504 (1927) --venta de gasolina y aceite; City of Tombstone v. Macia, 245 Pac. 677 (Ariz. 1926) --planta de hielo; Bank v. Bell, 217 Pac. 538 (1923) -- mercado para la venta de alimentos; City of Frostburg v. Jenkins, 136

P.R. Telephone Co. v. Tribunal de Contribuciones...

Case: 17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit Exhibit6 a Page 206 of 541
Exhibit 6 Page 206 of 541

A.2d 852 (Md. 1957) --construcción de un edificio para industria privada; *Mitchell v. City of Negaunee, 71 N. W. 646* (Mich. 1897--planta eléctrica; *Turner v. City of Reidsville, 29 S.E.2d 211 (N. C. 1944)* --construcción de un aeropuerto; *Allbritton v. City of Winona, 178 So. 799 (Miss. 1938)*, apelación desestimada, *303 U. S. 627 (1938)* --construcción de edificios para factorías. Véase, Antieau, Municipal Power to Tax--Its Constitutional Limitations, 8 V and. L. Rev. 698, 732-738 (1955).

**\*\*8** Cualquier duda que pudiera quedar sobre estos extremos desaparece cuando consideramos que ininterrumpidamente desde principios de siglo [11] y **\*1000** hasta el presente y, según consta de la opinión del tribunal de instancia, el gobierno de Puerto Rico ha mantenido un sistema de comunicaciones telegráficas y telefónicas al cual se han hecho asignaciones de fondos públicos por muchos millones de dólares. Se ha ofrecido el servicio durante la administración de todos los partidos políticos y con el consentimiento de todos los gobernadores. Solamente en un caso de manifiesta dedicación de los fondos públicos a un uso completamente privado habría justificación para anular judicialmente una actividad gubernamental que en tantas ocasiones ha recibido la aprobación del gobierno y del pueblo.

Tampoco va por buen camino la peticionaria cuando nos dice que la Autoridad de Comunicaciones no es 'parte del gobierno', ni ejerce una 'función de gobierno.' Es facultad exclusiva del legislador la de determinar qué tipo de organización se presta mejor para el desempeño de una función pública. Si el legislador prefiere una junta o un departamento o una corporación pública a un negociado, esa preferencia, salvo disposiciones constitucionales que expresamente la prohiban, es definitiva para los tribunales. [12] La Asamblea Legislativa de Puerto Rico, por razones que a ella le parecieron suficientes, decidió que a partir de 1942 los servicios de teléfono y telégrafo que prestaba el gobierno deberían asignarse a una 'corporación pública o instrumentalidad de El Pueblo de Puerto Rico' (Leyes, pág. 1065), la cual tendría personalidad legal separada y aparte de las del gobierno y de los funcionarios que habrían de administrarla. Como expresó el tribunal de instancia. 'Basta leer la ley de su creación para concluir que es una corporación pública, que pertenece a la comunidad en general, que opera para beneficio exclusivo de ésta y no de interés privado alguno y que **\*1001** es una agencia o vehículo a través del cual el Gobierno de Puerto Rico descarga ciertas funciones

públicas. El que use la forma corporativa por razones de conveniencias internas de índole administrativas del gobierno, o por conveniencias de índole comerciales, no desvirtúa su naturaleza anteriormente descrita.'

Si aceptáramos la contención de la peticionaria nos colocaríamos en la insostenible posición de resolver que hasta 1942 los servicios telegráficos y telefónicos eran 'parte y función del gobierno' porque estaban a cargo de un negociado del Departamento del Interior, pero que a partir de esa fecha dejaron de ser 'parte y función del gobierno' porque fueron de la responsabilidad de una corporación pública enteramente poseída por el mismo gobierno. [13]

En vista de todo lo anterior, resolvemos que la contribución impuesta por la Ley núm. 301 no viola el art. 3 de la Carta Orgánica.

**\*\*9** II. La indebida delegación de poderes

Nos dice la peticionaria que la ley impugnada deja el producto de la contribución para ser invertido 'al capricho de la Autoridad', que no fija normas (standards) para invertir la contribución y que por esas razones constituye una indebida delegación de poderes. Es innecesario detenernos largamente en este punto. Como expresó el tribunal de instancia: 'La Legislatura impuso la contribución y determinó su cuantía; seleccionó el objeto así como el sujeto de la misma, y fijó el propósito o uso que debía dársele. De ahí en adelante, todo lo demás cae dentro del campo de la ejecución e instrumentación de la ley para dar cumplimiento a sus propósitos.'

Aún en la hipótesis, no exenta de dudas, *Cincinnati Soap Co. v. United States*, supra, págs. 321-322, de que el requisito de normas adecuadas **\*1002** (standards) aplicable a las funciones reguladoras del estado tenga igual vigencia en el campo de las erogaciones públicas, es claro que las normas provistas por la Ley núm. 301 pasan la prueba constitucional. Ciertamente, no son menos precisas que la del 'interés, conveniencia y necesidad públicos' aprobada en *NBC v. United States, 319 U. S. 190 (1943)* o la de 'ganancias excesivas' aprobada en *Lichter v. United States, 334 U. S. 742 (1948)* o la de 'métodos ilícitos de competencia' aprobada en *Federal Trade Commission v. Gratz, 253 U. S. 421 (1920)*. Examínense además, *Yakus v. United States, 321 U. S. 414 (1944)*; *United States v. Rock Royal Cooperative, 307 U. S. 533 (1939)*; 1 Davis, Administrative Law Treatise, (1959) págs. 81-87.

Case:17-03283-LTS Doc#:4781-6 Filed:01/24/19 Entered:01/24/19 18:12:25 Desc:
Exhibit DX-GG Part 15 Page 296 of 541
Exhibit B2 Page 464 of 541

III. Exacción forzosa de la propiedad de la peticionaria so pretexto del poder contributivo.

IV. Falta de uniformidad y privación de la propiedad sin el debido proceso de ley.

Discutimos estas objeciones conjuntamente porque en realidad constituyen una sola. En síntesis la peticionaria sostiene que solamente ella, como cuestión práctica, paga la contribución y que el producto de la misma se ha gastado para el beneficio 'directo' de los habitantes de Caguas y pueblos limítrofes a los cuales presta servicios la Autoridad de Comunicaciones. Los habitantes de los demás pueblos sólo se benefician 'indirectamente' por la interconexión del sistema de la peticionaria con el de la Autoridad en llamadas de larga distancia. Además, la peticionaria 'no recibe ningún beneficio peculiar de la inversión de que ha sido objeto la contribución ...', mientras 'que todo el conglomerado de contribuyentes ha sido eximido de aportar dinero alguno al fondo especial....' Por esas razones sostiene que la contribución constituye una exacción forzosa, viola la regla de uniformidad y le priva de su propiedad sin el debido proceso de ley. Veamos las consideraciones aplicables.

Primera: El problema de si la peticionaria puede o no recibir beneficios 'directos' del fondo que establece la sec. 2 de la Ley núm. 301 no está **\*1003** planteado frontalmente en este recurso. Es, además, innecesario resolverlo porque las normas constitucionales pertinentes no se fundan en la determinación de ese hecho. [14] Conviene indicar, sin embargo, que si bien en los años a los cuales se refiere este litigio solamente la Autoridad recibió dinero de dicho fondo, la prueba demuestra que la peticionaria en ningún momento solicitó asignaciones del mismo ni que se destinara parte del dinero para 'experimentos o investigaciones' que le beneficiaran directamente. Además, es un tanto eufemístico catalogar de 'indirectos' los beneficios que la peticionaria admitidamente recibe por llamadas de larga distancia a los pueblos que sirve la Autoridad, en los cuales, como demostró la prueba, mediante el uso de los dineros del fondo especial y de cuantiosas asignaciones de los fondos generales, se ha multiplicado el número de abonados y se ha extendido y mejorado notablemente el servicio.

**\*\*10** Segunda: En modo alguno es inconstitucional una contribución porque la inversión de su producto no beneficie a aquéllos que la pagan. [15] 'Nada hay más corriente en el campo contributivo que la imposición de un tributo a una clase o a individuos que no gozan de ningún beneficio directo de su inversión o que no son responsables de las condiciones que se desea remediar.

'Una contribución no es un prorrateo de beneficios. Es, como hemos dicho, una manera de distribuir el peso del costo del gobierno. Como cuestión constitucional, el único beneficio al cual tiene derecho el contribuyente es **\*1004** el que deriva de su participación en el privilegio de vivir en una sociedad organizada, establecida y protegida por la dedicación de las contribuciones a propósitos públicos. Cualquier otro criterio impediría la imposición de contribuciones excepto como compensación por el gravamen que pesa sobre aquéllos que las pagan, y requeriría el abandono del principio más fundamental de gobierno--que el mismo existe para proveer para el bien común. Por el hecho de que no tenga niños, una corporación no puede objetar que se usen las contribuciones que paga para el sostenimiento de las escuelas. Este Tribunal ha repudiado la idea, cada vez que se le ha ofrecido, de que la Constitución requiere que los beneficios que se derivan del gasto de los fondos públicos se distribuyan de acuerdo con las cargas del contribuyente, o que éste puede resistir el pago de una contribución, porque no se gasta para propósitos que le benefician especialmente.' Carmichael v. Southern Coal Co., supra, págs. 521-523. Véanse, además, Rapid Transit Corp. v. New York, 303 U. S. 573, 584-587 (1938); Magnano Co. v. Hamilton, supra, pág. 43.

Tercera: La peticionaria no afirma, ni está en posición de afirmar, que el impuesto de la Ley núm. 301 viole el debido procedimiento de ley y la igual protección de las leyes porque se aplique exclusivamente a las compañías de teléfono y telégrafo que funcionen en Puerto Rico. Considerada la amplísima potestad legislativa de establecer clasificaciones razonables en la imposición de contribuciones, la ya descrita clasificación no es arbitraria ni opresiva ni caprichosa. Citizens' Telephone Co. v. Fuller, 229 U. S. 322 (1913); Nashville C. & St. L. Ry. v. Browning, 310 U. S. 362, 368 (1940); Steward Machine Co. v. Davis, 301 U. S. 548, 584 (1937); Rapid Transit Corp. v. New York, supra, págs. 578-581; Carmichael v. Southern Coal Co., supra, pág. 509; Walters v. City of St. Louis, 347 U. S. 231, 237 (1954); South Porto Rico Sugar Co. v. Buscaglia, 154 F.2d 96, 100 (1 Cir. 1946). Y es **\*1005** obvio que 'las disposiciones de la ley que designan el uso de los fondos recaudados, no tienen importancia

al determinarse si es o no discriminatoria la clasificación establecida por la ley impugnada.' Rapid Transit Corp. v. New York, supra, pág. 587.

 **11  La discreción legislativa no se reduce porque la clase descrita en la ley, como cuestión de realidad, incluya un solo contribuyente. Las empresas de servicio público--en especial las de teléfono, telégrafo, electricidad, agua y algunas de transporte--usualmente se encuentran en esa posición. Por razones conocidas, el estado con gran frecuencia concede a esas empresas el monopolio del servicio en áreas específicas, sujeto como sabemos a una detallada reglamentación de sus actividades. El otorgar ese monopolio no impide al estado, sin embargo, imponerle contribuciones especiales por el privilegio que les dispensa o incluirlas razonablemente dentro de una clase particular de contribuyentes. Lo contrario significaría que la empresa habría adquirido, junto al monopolio, una exención contributiva sobre el privilegio de su franquicia y sobre sus actividades de negocio y que el estado no podría imponerle contribución especial alguna y sí únicamente aquellas de tipo general--ingreso, propiedad, arbitrios--que pagan todos los demás contribuyentes. Esa tesis ha sido rechazada repetidamente por el Tribunal Supremo federal. Puget Sound Co. v. Seattle, supra, pág. 627; Cf. Rapid Transit Corp. v. New York, supra, págs. 588-596.

Cuarta: Las sentencias del Tribunal Supremo federal 'no dejan dudas de que en beneficio del interés público, un estado puede constitucionalmente ocuparse en un negocio que corrientemente realiza la empresa privada, imponer una contribución para mantenerlo y competir con los intereses privados que participan en la misma actividad'. Puget Sound Co. v. Seattle, supra, pág. 624; Constitutional Limitation on Sovereign Competition, 13 Temple L. Q. 415, 457-458 (1939).

 *1006  Quinta:La regla de uniformidad contributiva incorporada en la Carta Orgánica exige, al igual que la disposición federal, uniformidad geográfica y no intrínseca--Steward Machine Co. v. Davis, supra, pág. 583; South Porto Rico Sugar Co. v. Buscaglia, supra, pág. 100; Rullán v. Buscaglia, 168 F.2d 401, 403 (1 Cir. 1948) --y es obvio que no se viola en el presente caso. Tampoco guarda relación alguna con esa regla la manera en que se gaste el producto de la contribución. Esto es algo que pertenece a la determinación de si el impuesto es para un 'fin público' o no. Y, desde luego, el hecho de que un grupo de ciudadanos resulte más beneficiado que

otros por una mejora o un servicio público no es, como ya hemos visto, por sí solo índice de que la contribución invertida en tal mejora o servicio no sea para un 'fin público'.[16] Estamos rodeados de cientos de obras y servicios públicos que por el hecho físico de su ubicación benefician más 'directamente' a unos ciudadanos que a otros. Sería imposible administrar los fondos públicos si se adoptara la norma contraria.

Una vez establecido que el impuesto es para un 'fin público' y que la clasificación impositiva es válida y cumple con la regla de uniformidad geográfica, procede sostener su constitucionalidad aun cuando la inversión de su producto beneficie más a unos ciudadanos que a otros y en modo alguno, si así fuera en este caso, al contribuyente que la paga.

 **12  V. La ley es nula porque prohíbe pasar la contribución al consumidor.

Sostiene la peticionaria que la disposición de la Ley núm. 301 que prohíbe cargar el impuesto a las personas que utilicen los servicios telefónicos y telegráficos es nula 'porque no puede constitucionalmente obligarse al que  *1007  vende artículos de comercio a absorber al fin el peso de una contribución, que es un gasto, y prohibírsele que la recobre en alguna forma'.

El tribunal de instancia resolvió correctamente que la mencionada prohibición de la ley se aplica en la práctica únicamente a la Autoridad de Comunicaciones debido a que ésta es la única autorizada a fijar sus tarifas sin la intervención de ningún otro organismo oficial. La peticionaria, por el contrario, no puede aumentar sus tarifas sin la intervención de la Comisión de Servicio Público. Tenemos que aceptar, desde luego, que el legislador conocía ese hecho básico. Igualmente debemos aceptar, como lo hizo el tribunal de instancia, que la Asamblea Legislativa al momento de aprobar la Ley núm. 301 sabía que la peticionaria tenía derecho, como cuestión constitucional y de ley, a obtener ganancias razonables de su empresa y que no intentó prohibir que se tomara en cuenta el impuesto de la Ley núm. 301 en la determinación de las tarifas. Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 399 (1922); Georgia Railway and Power Co. v. Railroad Commission, 262 U. S. 625, 633 (1923). Era, por consiguiente, ante la Comisión de Servicio Público que la peticionaria tenía que plantear, en primera instancia, los efectos del nuevo impuesto, en una solicitud de aumento de tarifas.[17] Pudo haber hecho

esto tan pronto entró en vigor la Ley núm. 301, y como el impuesto se paga anualmente, hubiese tenido **\*1008** amplia oportunidad de recobrarlo si la Comisión le hubiese otorgado la necesaria autorización. Sin embargo, la peticionaria prefirió esperar a 1949 para solicitar un aumento. Esa solicitud, como vimos en la relación de hechos probados, se debió a aumentos considerables en salarios y otras condiciones de empleo que durante varios años la peticionaria hizo a sus empleados. La única conclusión que surge de esos hechos es la de que la Porto Rico Telephone Co., por razones que ella estimó buenas, decidió que el aumento en sus gastos causado por el impuesto de la Ley núm. 301 no era razón suficiente para solicitar de la Comisión un aumento de tarifas. Tomada esa decisión, no puede ahora la peticionaria aducir como causa de inconstitucionalidad que la Ley núm. 301 le prohibió pasar el impuesto a los usuarios del servicio.

Conviene aclarar, además, que la prohibición legislativa de pasar un tributo al consumidor no es por sí sola y en todas las circunstancias, fundamento de inconstitucionalidad. Rapid Transit Corp. v. New York, supra, págs. 581-582; Southern Boulevard R. Co. v. City of New York, 86 F.2d 633, 637 (2 Cir. 1936) cert. denegado 301 U. S. 703 (1937). Nuestro fallo en Pyramid Products v. Buscaglia, 64 D.P.R. 828, 850 (1945), principal precedente que cita la peticionaria, tiene por base la retroactividad del impuesto. Esa circunstancia no está presente en el caso que nos ocupa.

**\*\*13** Por las razones vertidas en esta opinión, fallamos que la sec. 2 de la Ley núm. 301 de 15 de mayo de 1945 es constitucional tanto a la luz de las disposiciones aplicables de la Carta Orgánica de 1917 como de aquellas de la Constitución federal.

Se confirmará la sentencia recurrida.

Los Jueces Presidente Sr. Negrón Fernández y Asociado Sr. Santana Becerra no intervinieron.

1   La peticionaria pagó $18,850.59 en 1945, $34,693.88 en 1946 y $38,246.93 en 1947. La Autoridad pagó $6,000 en 1945 y cerca de $8,000 en los otros años.

2   Esta disposición sigue vigente como parte de la 'Ley de Relaciones Federales con Puerto Rico'. 64 Stat. 320.

3   Además, en algunos estados se exige expresamente por disposición constitucional que las contribuciones sean para 'un fin público'. McAllister, Public Purpose

in Taxation, 18 Cal.L.Rev. 137, 138 (1929). La Sección 9 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico, vigente desde 1952, provee que: 'Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.'

4   Además de la mencionada jurisprudencia, la peticionaria se apoya en dos otras líneas de precedentes. Nos cita, de una parte, sentencias dictadas por algunos tribunales norteamericanos a principios de la segunda mitad del siglo 19, cuando prevalecía un concepto muy estrecho de las funciones del gobierno y, por consiguiente, de lo que constituía un 'fin público'. A esa clase pertenecen Lowell v. City of Boston, 15 Am. Rep. 39 (1873) --una ciudad no puede emitir bonos para hacer préstamos a personas cuyos hogares fueron destruidos por un incendio; Weimer v. Village of Douglas, 21 Am. Rep. 586 (1876)--un municipio no puede emitir bonos para comprar acciones en una corporación con el propósito de inducirla a establecerse en dicho municipio; Loan Association v. Topeka, 87 U.S. 655 (1875) --una ciudad no puede emitir bonos para ayudar a compañías manufactureras a establecerse en la ciudad. Como se demostrará más adelante en esta opinión, las determinaciones específicas de esos casos han sido abandonadas desde hace varias décadas y su valor actual es principalmente histórico De otra parte, la peticionaria nos cita sentencias--State ex rel. City of Reno v. Boyd, 74 Pac. 654 (1903); State v. Lafayette Fire Ins. Co., 63 So. 630 (1913); Peterson v. Hancock, 54 N.W.2d 85 (1952)--que decretan la nulidad de una contribución impuesta por una ciudad o un distrito para el beneficio de otros distritos o ciudades. Esa jurisprudencia se funda en la fuerte tradición de autonomía municipal que existe en los Estados Unidos, y, por sus hechos, no tiene aplicación alguna al problema que hoy consideramos.

En repetidas ocasiones, la peticionaria también se apoya en United States v. Butler, 297 U. S. 1 (1936) el cual resolvió que era inconstitucional una contribución impuesta por el Congreso porque su producto iba a ser utilizado, no para un fin privado, sino como parte de un plan de reglamentación de la agricultura que el Tribunal Supremo federal consideró estaba fuera de los poderes delegados por la Constitución al gobierno federal. Aparte de que esta última determinación de Butler ha sido definitivamente descartada--Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381 (1940);

P.R. Valenzino 60: P. Tribunal de comunicaciones...

Case: 17-03283-LTS   Doc#: 4781a6   Filed: 01/24/19   Entered: 01/24/19 28:19:25   Desc:
Exhibit Exhibit a 15   Page 467 of 541
Exhibit 22a-5 Page 46 #25 of 541

Wickard v. Filburn, 317 U.S. 111 (1942)--en el presente caso no se nos plantea el problema de si el producto de la contribución va a ser utilizado en apoyo de un plan de reglamentación fuera del ámbito de poder del gobierno de Puerto Rico, sino escuetamente si dicha contribución es o no para un 'fin público', asunto éste que el Tribunal expresamente soslayó en Butler. 297 U.S. 68.

5    La limitación que estamos analizando se incorporó a las actas orgánicas de otros territorios usándose palabras idénticas o muy similares. Islas Vírgenes--48 U.S.C. sec. 1406 i; Guam--48 U.S.C. sec. 1423 a; Islas Filipinas--39 Stat. 548; Alaska--48 U.S.C. sec. 79.

6    La limitación se impone al Congreso por vía de la cláusula de 'bienestar general'--Artículo I, Sección 8, Cl. 1 de la Constitución de los Estados Unidos-- y a los estados a través de la cláusula del 'debido procedimiento' de la Enmienda XIV. Los principios aplicables, sin embargo, son similares.

6a   Otras disposiciones de las dos actas orgánicas aclaran el propósito del Congreso. Foraker: sec. 4--todo el dinero recaudado en Puerto Rico por derechos y contribuciones con anterioridad a la vigencia de la ley, entrará en el Tesoro de Puerto Rico 'destinado al Gobierno de la Isla y para ser invertido en provecho de la misma'; sec. 12--ordena al Tesorero pagar de fondos insulares 'todos los gastos y obligaciones contraídos para mejoras internas o fomento de la Isla'; sec. 38--en los casos en que fuere necesario anticipar contribuciones y rentas se podrán emitir bonos' para proveer a gastos legítimos, proteger el crédito público, y reembolsar a los Estados Unidos por dinero gastado o que pueda gastarse del fondo de imprevistos del Departamento de la Guerra para socorrer la...situación industrial de Puerto Rico causada por el hurac #an...' Acta Orgánica (Jones) de 1917: art. 6-- ordena al Tesorero pagar de fondos insulares 'todos los gastos y obligaciones contraídos para mejores internas o fomento de la Isla'; art. 18 --'El Comisionado de Agricultura y Comercio tendrá a su cargo en general aquellos negociados y ramas del gobierno que hayan sido legalmente constituidos para el estudio, adelantamiento y beneficio de la agricultura, del comercio y de otras industrias...'

7    La limitación que estamos discutiendo se incorporó originalmente en la sec. 38 del Acta Foraker de 1900. Hemos examinado el Vol. 33, Parte 4 del Congressional Record (1900) y el Senate Report núm. 249, Congreso núm. 56, sometido por el Senador Foraker, y tampoco hemos hallado explicación

alguna sobre la citada disposición. No ha sido posible utilizar otras fuentes del historial legislativo de las dos actas orgánicas.

8    Sería prolijo y es completamente innecesario enumerar todas las leyes que sostienen esta afirmación. Basta señalar que desde principios de siglo hasta los años a que se refiere el presente litigio, el Gobierno de Puerto Rico, aparte de desempeñar sus funciones clásicas, ha asignado fondos para numerosas otras. Una búsqueda al azar demuestra que el gobierno insular impuso contribuciones y asignó dinero para la venta de electricidad, de agua para riego, y de facilidades y servicios de muelles, y los municipios para acueductos, plantas eléctricas y algunos también para muelles. Se fomentó la actividad agrícola y ganadera por diversos medios-- subsidios, escuelas, estaciones experimentales, campañas contra enfermedades, ferias, exposiciones, anuncios, etc. --estableciéndose para esos propósitos numerosos fondos separados que se nutrían de contribuciones especiales o de otras fuentes. La industria recibió también ayuda aunque en menor escala. También se legisló para programas de viviendas a bajo costo, variados servicios para las clases menesterosas y actividades de fomento cultural. Como es sabido, a partir de 1941 se intensificaron estas actividades y se añadieron otras. El gobierno asignó cuantiosas sumas para el fomento económico y participó directamente en la posesión y administración de empresas agrícolas, industriales y comerciales. Véanse como ejemplos salteados los siguientes tomos y páginas de las Leyes de Puerto Rico: 1903-34 49; 1911-88, 167; 1912-83; 1913-149; 1914-165; 236; 1917-369; 1917 II-293; 1919-349; 1921-91; 1925-327; 1930-131; 1934-217, 273; 1936-543; 1937-230, 235, 243; 1938-194, 292, 413, 511; 1939-715; 1940-325, 727, 1145; 1941-389, 685, 763, 863, 935, 945; 1942-573, 711, 935, 1065, 1365; 1946-331, 1067.

9    Sobre lo que constituye un 'fin público' véanse, en general, Judson, Public Purposes for Which Taxation is Justifiable, 17 Yale L. J. 162 (1908); McAllister, ob. cit., supra; Bergman, The Federal Power to Tax and to Spend, 31 Minn. L. Rev. 328 (1947).

10   En cuanto al alcance de la función judicial al revisar lo que constituye un 'uso público' en la expropiación de propiedad privada, véanse Berman v. Parker, 348 U.S. 26 (1954); E.L.A. v. Sucn. Gautier, 81 D.P.R. 580 (1959).

**11**  La primera línea telegráfica de Puerto Rico la instaló Samuel F. Morse en 1849. A fines de siglo el gobierno español administraba un sistema de 41 estaciones, el cual fue destruido por un ciclón en 1899. El régimen militar norteamericano reconstruyó el sistema y en 1901 lo traspasó al gobierno insular. Fue puesto bajo la administración del Comisionado del Interior y extendido a todas las poblaciones de la isla. En 14 de marzo de 1907 se aprobó una ley (Leyes, pág. 388) que autorizó al Comisionado a construir y administrar un sistema de líneas telefónicas de corta y larga distancia. No fue hasta 1914 que la peticionaria recibió la franquicia para establecer el sistema telefónico que hoy posee. Véase, Fernández García, El Libro Azul de Puerto Rico, 1923, págs. 702-712.

**12**  Desde McCulloch v. Maryland, 4 Wheat. 316, 421 (1819) el Tribunal Supremo federal reconoció que el Congreso puede crear corporaciones públicas para efectuar los poderes conferídoles por la Constitución. En cuanto a Puerto Rico, examínese People of Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316, 325 (1946) cert. denegado, 329 U.S. 772 (1946).

**13**  Nuestro fallo sobre esta cuestión se limita al problema constitucional que lo causa y no debe extenderse a otros campos (responsabilidad contractual o por daños, etc.) los cuales se rigen por las determinaciones legislativas pertinentes. Cf. Gobierno de la Capital v. Consejo Ejecutivo, supra, pág. 450. La jurisprudencia citada por la peticionaria en apoyo de su contención se refiere precisamente a estos últimos problemas.

**14**  Según consta del expediente, los funcionarios de la Autoridad son de opinión que no pueden hacer mejoras en el territorio servido por la Porto Rico Telephone Co. Esa determinación, desde luego, no obliga a la peticionaria ni a los tribunales y deberá dilucidarse en un procedimiento judicial apropiado.

**15**  Tampoco lo es, desde luego, por el solo hecho de que restrinja o destruya ciertas ocupaciones o negocios. Magnano Co. v. Hamilton, supra, págs. 44-47; Cushman, Social and Economic Control Through Federal Taxation, 18 Minn. L. Rev. 757, 763-764 (1934).

**16**  La misma regla prevalece en las expropiaciones de propiedad para 'uso público'. Rindge Co. v. Los Angeles, 262 U.S. 700 (1923); Mt. Vernon Cotton Co. v. Alabama Power Co., 240 U.S. 30, 32 (1916).

**17**  Nos señala la peticionaria que la práctica de las comisiones de servicio público en los Estados Unidos, es la de autorizar a las empresas 'a cobrarle directamente a sus clientes la contribución en las facturas mensuales como un recargo...y no abrir un proceso tarifario...cada vez que surge una nueva contribución'. Afirma que la Ley núm. 301 prohibe este procedimiento. Aparte de que la peticionaria en realidad se está quejando de que se le hubiese podido negar algo que ella nunca solicitó, no creemos que la Ley núm. 301 por si sola constituya un obstáculo para el antedicho procedimiento, si es que el mismo está autorizado por nuestras leyes de servicio público.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 83

Exhibit 83 Page 1 of 10

## TRANSLATOR AFFIDAVIT

I, Andre Moskowitz, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation for this matter.

I am fluent in both the Spanish and English languages. My qualifications include 33 years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification #00-050.

I have received and translated from Spanish into English the document titled: "Opiniones del Secretario de Justicia de Puerto Rico Número 1974-15," and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Andre Moskowitz_

(Affiant's Signature)

Andre Moskowitz
(Affiant's Printed Name)

State of California

County of Contra Costa

Subscribed to and sworn before me this 17ᵗʰ day of February, 2018,

by Andre Moskowitz.

See Attached Jurat

_____

Notary Public

1

# CALIFORNIA JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State Of: **California**
County Of: **Contra Costa**

Subscribed and sworn to *(or affirmed)* before me on the ___17___ day of __Feb.__, 2018
by __Andre Moskowitz__ _____,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: **Kenneth Wilson**

KENNETH WILSON
COMM. # 2198337
**NOTARY PUBLIC • CALIFORNIA**
CONTRA COSTA COUNTY
My Commission Expires
MAY 21, 2021

Title of Document: __Translator Affidavit__

Total Number of Pages including Attachment: ___2___

Notary Commission Expiration Date: **May 21, 2021**

Notary Commission Number: **2198337**



P.R. Op. Attn. Gen. 1974-15, 1974 WL 326062 (P.R. Atty. Gen.)

Opinions of the Puerto Rico Secretary of Justice Number 1974-15

Puerto Rico Attorney General
No. 1974-15
May 21, 1974

**Banco Gubernamental de Fomento Para Puerto Rico** [Puerto Rico Government Development Bank]
**1. Public funds – State Resources – Tax contributions owed**
Tax contributions owed to the public treasury constitute a State resource according to constitutional language, to develop a balanced budget for the coming fiscal year, in light of the conceptual scope of the term "resource" given upon adopting the Constitution, and on the understanding that it constitutes an asset easier to define than others expressly included in said term. Const., Art. VI, Sec. 7, L.P.R.A., Volume 1.

**2. Words and phrases – "Resources"**
The Constituent Assembly gave the word "resources" its broadest meaning, i.e., assets, finance, wealth or property, replacing the term "total revenue" in the Basic Charter of 1917 with "total resources." Const., Art. VI, Sec. 7, L.P.R.A., Volume 1.

Mr. Juan Albors, Chairman

Banco Gubernamental de Fomento para Puerto Rico

Avenida Ponce de León 1311

Santurce, Puerto Rico

Dear Mr. Chairman:
Concerning your consultation last April 11, 1974, which may be summarized as follows:

"Accounts receivable of the Commonwealth for tax contributions corresponding to previous fiscal years do indeed constitute resources, as said word is used in Section 7, Article VI of the Constitution, available for developing a balanced budget for the coming fiscal year."

The aforementioned constitutional provision specifically reads as follows:

"Allocations made for a fiscal year may not exceed *total resources* calculated for said fiscal year, unless so provided by law for the assessment of sufficient tax contributions so as to cover said allocations." (Emphasis added.)

This section constitutes a variation of the provision contained in Section 34 of the Basic Charter of 1917 [L.P.R.A., Volume 1], which provides as follows:

"The Legislative Assembly shall make no allocation nor authorize any spending by virtue of which or from which the expenses of the Government of Puerto Rico, during any fiscal year, exceed *total revenue* provided at the time, by law, and applicable to said allocation or expense, including any available surplus in the Treasury, unless the Legislative Assembly, upon making said allocation, provides for the assessment of a tax contribution sufficient as to pay the aforementioned allocation or expense during the referenced fiscal year." (Emphasis added.)

We see that upon adopting the Constitution, the term *total revenue* is replaced by the term *total resources*. This change is highly important in light of the information provided in the Constituent Convention by Honorable Luis Negrón López, Committee Chairman, who reported the provision of Section 7, Article VI as it was ultimately drafted. Let us see:

"Mr. GUTIERREZ FRANQUI: Mr. Chairman: Before considering preparing an amendment, I would like to ask a question of the chairman of the committee that reported this substitute proposal. We would like the Committee Chairman to answer us, for the record, how does the committee understand the meaning of the phrase, "total resources calculated for that fiscal year." On page 7, lines 17 and 18.

"Mr. NEGRON LOPEZ: I can answer the question. Reading it in order to determine the difference in the text – the provision corresponding to the Jones Law, I read in Article 34 of the Jones Law, the last paragraph: "The Legislative Assembly shall make no allocation nor authorize any spending by virtue of which or from which the expenses of the Government of Puerto Rico, during any fiscal year, exceed the total revenue provided at the time, by law, and applicable to said allocation or expense, including any available surplus in the Treasury, unless the Legislative Assembly, upon making said allocation, provides for the assessment of tax contributions sufficient as to pay the aforementioned allocation or expense during the referenced fiscal year."

"The concept of 'total revenue' that appears in the Jones Law expresses the idea that existed at the time of approval of this law, that government resources consisted of tax revenue and any surplus there might be from previous fiscal years. However, in modern finance, that is, in 1951 finance, this term, total revenue, no longer covers everything that total government revenue cover. Total resources include tax payment revenue or total general or special revenue. It also includes any surplus there might be from fiscal years, from previous fiscal years; it includes non-tax revenue such as proceeds from the sale of properties, royalties from public corporations paid to the State, surplus earnings by public corporations, federal aid, so-called federal grants-in-aid, and funding obtained through the issuance of bonds, which is one of the ways the State has of raising funds for developing its program.

"Thus, the term '*total calculated resources' includes resources already known, because it is known what they are going to be, such as federal aid, fixed income, surplus, etc.; and those calculated, those that depend on proceeds from contributions and other factors, that cannot be projected as of the start of the fiscal year*. (Emphasis added.)

"Mr. GUTIERREZ FRANQUI: There is no amendment, Mr. Chairman.[2]

As we can see in this language, the change that is of concern to us is oriented toward expanding the availability of State assets, revenue and financing mechanisms for the development of its programs. I would call your attention to the fact that Delegate Negrón López refers to "modern financing," which affords the State greater maneuvering room in pursuing its economic activities. Clearly, the legislative intent is to expand the availability of financing mechanisms and resources for public management.

The word "resources" is not defined by the Constituent Assembly beyond the statements cited earlier.[3] We can see, however, that resources are of two classes. Those defined, set and known at the time the budget is adopted, and those other ones that, although not defined in fixed fashion, may be calculated when adopting the

budget and that will be defined during the fiscal year. Examples of the former are a surplus from the previous year and a royalty from some public corporation that is established by law. Examples of the second category are the new tax contributions to be assessed and the possible sale of assets and property. Under these classifications, we understand that the meaning given to the word resource by the Constituent Assembly is generally accepted.

Let us now examine the characteristics of tax contributions due and receivable. These are liquid and payable and easily defined because they have already been assessed.

It is my opinion, then, that tax contributions due and receivable constitute a State resource. Their characteristics are more easily defined and may be calculated in greater detail than contributions yet to be assessed, which the Assembly itself refers to as a resource. I believe that their availability to the State, along with the possibility of defining them precisely, constitute the essential elements to be classified as "resources."[4] Like any asset or resource, these may be financed and the State may use the proceeds resulting from said financing not only for the development of its Government programs, but also as a resource for developing a balanced budget for the coming fiscal year.

In summary, I believe that tax contributions owed to the public treasury constitute a State resource according to the language of Section 7, Article VI of the Constitution for preparing a balanced budget for the coming fiscal year, in light of how broadly the term resource has been defined upon being adopted in the Constituent Convention and by understanding that it constitutes an asset more easily defined than others that are expressly included in the term resources.


Sincerely,

Francisco de Jesús Schuck, *Attorney General*

FN1. Constitution of the Commonwealth of Puerto Rico, Art. VI, Section 7 [L.P.R.A., Volume 1].


Footnotes

. *Diario de Sesiones*, Constituent Convention of Puerto Rico, Vol. II, page 893.

. *Diccionario General Ilustrado de la Lengua Española* [Illustrated General Dictionary of the Spanish Language] VOX, defines resources as assets and in turn defines assets as financing, wealth, property.

. Another factor to be taken into consideration is the recognition of this financing mechanism in private financing. The financing of accounts receivable, which are considered a current asset, is included in modern financing models in the private sector.

---

**End of Document** (c) 2018 Thomson Reuters. No claim to original U.S. Government Works.



Exhibit 63 Page 200470 of 541

Case:17-03283-LTS Doc#:478106 Filed:01/14/19 Entered:02/24/18 28:14:16 Desc:
Opiniones del Secretario de Justicia de Puerto Rico...1974-15...P.R. Op. Sec. Just...476
Exhibit Exhibit 53 Part Page 3 of 10 of 541



P.R. Op. Sec. Just. 1974-15, 1974 WL 326062 (P.R. Atty. Gen.)

Opiniones del Secretario de Justicia de Puerto Rico Número 1974-15

Puerto Rico Attorney General

Núm. 1974-15

21 de mayo de 1974

**Banco Gubernamental de Fomento para Puerto Rico**

**1. Fondos públicos--Recursos del Estado--Contribuciones adeudadas**

Las contribuciones adeudadas al erario público constituyen un recurso del Estado dentro del lenguaje constitucional para confeccionar un presupuesto balanceado para el año fiscal entrante, a la luz de la amplitud conceptual del término "recurso" dada al adoptarse la Constitución y por entender que constituye un bien de más fácil determinación que otros que están expresamente incluidos en dicho término. Const., art. VI, sec. 7, L.P.R.A., Tomo 1.

**2. Palabras y frases--"Recursos"**

La Asamblea Constituyente dio a la palabra "recursos" su sentido más general de bienes, hacienda, riqueza o caudal, al sustituir la frase "rentas totales" de la Carta Orgánica de 1917 con "recursos totales". Const., art. VI, sec. 7, L.P.R.A., Tomo 1.

Sr. Juan Albors, Presidente

Banco Gubernamental de Fomento para Puerto Rico

Avenida Ponce de León 1311

Santurce, Puerto Rico

Estimado señor Presidente:

Me refiero a su consulta del pasado 11 de abril de 1974 la cual se resume en los siguientes términos:

"Si cuentas a cobrar del Estado Libre Asociado por contribuciones impuestas correspondientes a años fiscales anteriores, constituyen recursos según se usa dicho vocablo en la Sección 7 del Artículo VI de la Constitución disponibles para confeccionar un presupuesto balanceado para el año fiscal entrante."

La citada disposición constitucional lee específicamente de la siguiente forma:

"Las asignaciones hechas para un año económico no podrán exceder de los *recursos totales* calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones". (Bastardillas nuestras.)

Esta sección constituye una variación de lo dispuesto en la Sección 34 de la Carta Orgánica de 1917 [L.P.R.A., Tomo 1] la cual disponía lo siguiente:

"La Asamblea Legislativa no hará ninguna asignación ni autorizará ningún gasto, en virtud de la cual o del cual los gastos del Gobierno de Puerto Rico durante cualquier año económico excedan de las *rentas totales* provistas a la sazón por ley y aplicables a dicha asignación o gasto, incluyendo cualquier superávit disponible en el Tesoro, a menos que la Asamblea Legislativa al hacer dicha asignación disponga la imposición de una contribución suficiente para pagar la mencionada asignación o gasto dentro del referido año económico." (Bastardillas nuestras.)

Vemos que al adoptar la Constitución se sustituye el concepto *rentas totales* por el concepto *recursos totales.* Este cambio es sumamente significativo a la luz del señalamiento que hace en la Convención Constituyente el Honorable Luis Negrón López, Presidente de la Comisión que informó la disposición de la Sección 7 del Artículo VI según quedó finalmente redactada. Veamos:

"Sr. GUTIERREZ FRANQUI: Señor Presidente: Antes de considerar el formular una enmienda, desearía hacerle una pregunta al presidente de la comisión que informó esta proposición sustituta. Quisiéramos que el Presidente de la Comisión nos contestase, para el [acta], qué es lo que entiende la comisión, qué significa la frase, "los recursos totales calculados para dicho año económico". En la página 7, líneas 17 y 18.

"Sr. NEGRON LOPEZ: Puedo contestar la pregunta. Leyendo para que se vea la diferencia en el texto--la disposición correspondiente de la Ley Jones, leo del artículo 34 de la Ley Jones, el último párrafo: 'La Asamblea Legislativa no hará ninguna asignación ni autorizará ningún gasto en virtud de la cual o del cual los gastos del Gobierno de Puerto Rico, durante cualquier año económico, excedan de las rentas totales provistas a la sazón por ley, y aplicables a dicha asignación o gasto, incluyendo cualquier superávit disponible en el Tesoro, a menos que la Asamblea Legislativa, al hacer dicha asignación, disponga la imposición de una contribución suficiente para pagar la mencionada asignación o gasto dentro del referido año económico."

"El concepto de 'rentas totales' que aparece en la Ley Jones expresa la idea que existía al tiempo de aprobarse esta ley, de que los recursos del gobierno consistían en los ingresos contributivos y en el superávit que pudiera haber de ejercicios económicos anteriores. Sin embargo, en las finanzas modernas, digo, en las finanzas del año 1951, este término de rentas totales, ya no abarca todo lo que abarcan los recursos totales del gobierno. Los recursos totales incluyen los ingresos contributivos o totales de índole general o de índole especial. Incluyen, además, cualquier superávit que pueda haber de años económicos, de ejercicios económicos anteriores; incluye ingresos no contributivos como el producto de la venta de propiedades, royalties, o regalías de corporaciones públicas hechas al Estado, sobrantes de beneficios obtenidos por corporaciones públicas, ayudas federales, los llamados grant [in] aids federales, y los recursos que se alleguen mediante la emisión de bonos, que es una de las maneras que tiene el Estado de levantar fondos para el desarrollo de su programa.

"De manera que la frase, '*recursos totales calculados*', *son aquellos recursos que se conocen ya, porque se sabe cuáles van a ser, tales como ayudas federales, como ingresos fijos, como superávit, etc.; y los calculados, los que dependen del producto de las contribuciones y de otros factores, que no se pueden prever al comienzo del año fiscal.* (Bastardillas nuestras.)

"Sr. GUTIERREZ FRANQUI: No hay enmienda, señor Presidente." [2]

Como podemos ver de este lenguaje, el cambio que nos ocupa va encaminado a ampliar la disponibilidad de bienes, ingresos y mecanismos de financiamiento del Estado para el desarrollo de sus programas. Llamo la atención al hecho de que el delegado Negrón López hace referencia a las "finanzas modernas" que dan mayor latitud de acción al Estado en el desarrollo de sus actividades económicas. Claramente, la intención legislativa es ampliar la disponibilidad de mecanismos de financiamiento y recursos para la gestión pública.

La palabra "recursos" no la define la Asamblea Constituyente más allá de las expresiones antes citadas. [3] Podemos ver, sin embargo, que los recursos son de dos clases. Aquellos determinados, fijos y conocidos al momento de adoptar el presupuesto y aquellos otros que aunque no determinados de manera fija son calculables al momento de adoptar el

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:02/14/19 28:42:25 Desc:
Exhibit Exhibit 53 Page 10 of 10

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:19:25 Desc:
Exhibit DX-II Page 9 of 541

presupuesto y que se determinarán en el curso del año fiscal. Ejemplos de los primeros, es un superávit del año anterior y una regalía de alguna corporación pública que por ley se establezca. Ejemplos de la segunda categoría son las nuevas contribuciones a imponerse y posible venta de activos y propiedades. Bajo estas clasificaciones entendemos que el sentido dado a la palabra recurso por la Asamblea Constituyente es el de su acepción general.

Veamos ahora las características de las contribuciones vencidas por cobrar. Estas son líquidas y exigibles y de fácil determinación porque ya han sido impuestas.

Es mi opinión, pues, que las contribuciones vencidas por cobrar, constituye un recurso del Estado. Las características de éstas son de mayor determinación y calculables en mayor detalle que contribuciones a imponerse, las cuales la propia Asamblea señala como recurso. Considero que la disponibilidad para el Estado junto a la posibilidad de determinarlos con precisión constituye los elementos esenciales para clasificar como "recurso". [4] Como todo activo o recurso éste puede ser financiado y el Estado puede utilizar el monto resultante de dicho financiamiento no solamente para el desarrollo de sus programas de Gobierno, sino también como recurso para confeccionar un presupuesto balanceado para el año fiscal entrante.

En resumen, considero que las contribuciones adeudadas al erario público constituyen un recurso del Estado dentro del lenguaje de la Sección 7 del Artículo VI de la Constitución para confeccionar un presupuesto balanceado para el año fiscal entrante, a la luz de la amplitud con que se definió el concepto recurso al adoptarse en la Convención Constituyente y por entender que constituye un bien de más fácil determinación que otros que están expresamente incluidos en el término recursos.

Cordialmente,

Francisco De Jesús Schuck*Secretario de Justicia*

FN1. Constituci ón del Estado Libre Asociado de Puerto Rico, Art. VI, Sección 7 [L.P.R.A., Tomo 1].

## Footnotes

. *Diario de Sesiones*, Convención Constituyente de Puerto Rico Vol. II, página 893.

. El *Diccionario General Ilustrado de la Lengua Española* VOX, define recursos como bienes y define bienes a su vez como hacienda, riqueza, caudal.

. Otro factor que debe tomarse en cuenta es el reconocimiento de este mecanismo de financiamiento en las finanzas privadas. El financiamiento de cuentas por cobrar, las cuales son consideradas un activo corriente es parte de los modelos de financiamiento moderno en el mundo privado.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.



# Exhibit 84

## TRANSLATOR AFFIDAVIT

I, <u>Stephanie Penn</u>, being duly sworn, make this my affidavit and state:

I am a professional translator. I work as an independent contractor. I was contracted by Divergent Language Solutions, LLC to provide document translation review for this matter.

I am fluent in both the Spanish and English languages. My qualifications include <u>34</u> years of experience as a translator of written documents from Spanish to English. Furthermore, I am a Federally Certified Court Interpreter by the Administrative Office of the United States Courts, certification # 300599.

I have received and reviewed the Spanish into English translation of: 940-29 Telefonica Larga Distancia De Puerto Rico Inc v Departamento De Hacienda, and hereby attest that the attached English translation is a full and accurate translation of the Spanish original.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

(Affiant's Signature)

<u>Stephanie Penn</u>
(Affiant's Printed Name)

State of <u>California</u>

County of <u>Los Angeles</u>

Subscribed to and sworn before me this _19_ day of _February_, 2018,

by _Stephanie Penn_ .

Notary Public

MICHAEL J. HEGEDUS
Notary Public – California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

2001 WL 1764054 (TCA)

TELEFONICA LARGA DISTANCIA DE
PUERTO RICO, INC., AT & T DE PUERTO
RICO, INC. and SPRINT COMMUNICATIONS
COMPANY, L.P., Plaintiffs–Appellants,
v.
TREASURY DEPARTMENT,
Defendant–Appellee.

IN THE CIRCUIT COURT OF APPEALS
Civil Case No. KCO97–0021
KLAN0100568, KLAN0100727, KLAN0100770
In San Juan, Puerto Rico, on November 26, 2001.
Nov. 26, 2001.

Appeal originating from the Court of First Instance, San
Juan Superior Division

Panel comprised of Chief Judge Fiol Matta, Judge
Rodríguez de Oronoz and Judge González Rivera.

### JUDGMENT

RODRÍGUEZ DE ORONOZ, JUDGE WRITING FOR
THE COURT

**\*1** We have been asked to review the judgment handed
down by the Court of First Instance, San Juan Superior
Division, on October 29, 2000. The aforementioned
judgment ruled to uphold the constitutionality of the tax
imposed by Act No. 69 of August 9, 1993, on long-
distance telecommunications companies.

Having examined the case record in its entirety and the
applicable law, we hold that it is appropriate to affirm the
appealed judgment.

### I

In 1999, the appellants, Telefónica Larga Distancia de
Puerto Rico, Inc. ("TLD"), AT & T de Puerto Rico, Inc.
("AT & T") and Sprint Communications Company, L.P.
("SPRINT"), filed separate complaints against the
Treasury Department ("Treasury") challenging the
constitutionality of Act No. 69 of August 9, 1993 ("Act
No. 69"), which imposed a tax of two percent (2%) on the
gross operating income from telecommunications services
provided by any long-distance company.[1]

TLD filed its complaint on March 23, 1999. It alleged that
on June 22, 1998, it filed a request for refund with
Treasury of the 2% tax paid pursuant to Act No. 69 for the
years 1994, 1995 and 1996 (period from January 1 to
September 11, 1996), in the amount of $3,576,456.30 plus
interest, which was denied. It claimed that Act No. 69
violated the prohibition put into place by the United States
Constitution against taxation on interstate commerce in
order to favor or protect state commerce. It argued that
said act was unconstitutional because it taxed the same
activity more heavily when it crossed state lines than when
it occurred entirely within Puerto Rico, as it applied a 2%
tax on the gross operating income [generated] in the
"provision of telecommunication services to any long-
distance company" and did not levy a similar tax on the
gross income derived from providing interstate
telecommunication services for companies who provided
that type of service. It asked the lower court to find such
tax unconstitutional and to order Treasury to refund TLD
the amount claimed of $3,576,456.30, plus interest at 6%
per annum as of the date of payment.

For its part, SPRINT filed its complaint on March 26,
1999. It argued that on December 30, 1998, it filed a
request for refund with Treasury of the 2% tax paid
pursuant to Act No. 69 for the years 1994, 1995 and 1996
(period from January 1 to September 11, 1996), but that it
was denied. It claimed a refund for the following
payments: $288,719.00 in 1994; $351,034.00 in 1995; and
$288,790.00 in 1996, for a total amount of $928,542.00
plus interest as provided for under law. Like TLD, it
alleged that Act No. 69 violated the prohibition put into
place by the United States Constitution against taxation on
interstate commerce in order to favor or protect state
commerce. It argued that said act was unconstitutional
because it taxed the same activity more heavily when it
crossed state lines than when it occurred entirely within
Puerto Rico, which amounted to unequal and
discriminatory treatment under the commerce clause. It
asked the lower court to find such tax unconstitutional and
to order Treasury to refund SPRINT the amount claimed
of $928,543.00, plus 6% interest from the date of payment
to Treasury until its refund to SPRINT.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

Teléfonica Larga Distancia De Puerto Rico, Inc. v., Not Reported in A.3d (2004)

Case:17-03283-LTS Doc#:478106 Filed:01/14/19 Entered:01/14/19 18:12:25 Desc:
Exhibit DX-QQ Part 5 Page 402 of 541
Exhibit 54 Page 482 of 541

**\*2** Finally, AT & T filed its complaint on March 29, 1999. It submitted that on December 28, 1998, it filed a request for refund with Treasury of the 2% tax paid pursuant to Act No. 69 for the years 1993 to 1997, in which it claimed a refund for the following payments: (1) $1,018,317.30 in 1993; $1,340,700.50 in 1994; $1,453,228.19 in 1995; $1,678,998.19 in 1996; and $1,533,156.82 in 1997. It explained that Treasury denied its request for refund. It alleged that Act No. 69 was unconstitutional and discriminated against interstate commerce because it required payment of taxes on operating income from long-distance interstate telecommunications services, but did not require companies that offered long-distance Telecommunications services within the territorial limits of Puerto Rico to pay such tax, or any other amount, on income derived from those services.

The appellant companies requested consolidation of the cases and on May 26, 1999, the lower court consolidated the same under number KCO97–0021, exclusively to address the matter of the constitutionality of the tax. Once the cases were consolidated, Treasury answered the complaint, denying all allegations and raising as an affirmative defense, among others, that the actions of the Treasury Secretary were protected by a presumption of correctness, which had neither been contested nor refuted by the cause of action filed. In addition, it filed a motion requesting summary judgment or dismissal of the consolidated cases.

The appellant companies challenged this request and in turn moved for summary judgment in its favor. Following submission by the parties of their respective memoranda of law, on October 19, 2000, the lower court issued a judgment finding that the tax at issue was constitutional. Although the judgment was originally served on November 2, 2000, notice was defective, so amended notice was required, which was carried out on June 6, 2001. TLD, Sprint and AT & T, disagreeing with the judgment, each filed a notice of appeal on June 14, July 23 and August 6, 2001. The parties raised the following claims of error:

### TLD

THE HONORABLE COURT OF FIRST INSTANCE ERRED IN DETERMINING THAT ACT 69 DOES NOT VIOLATE THE INTERSTATE COMMERCE CLAUSE OF THE

UNITED STATES CONSTITUTION.

### SPRINT

THE HONORABLE COURT OF FIRST INSTANCE ERRED IN DETERMINING THAT ACT 69 OF AUGUST 9, 1993, DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE AND IS THEREFORE CONSTITUTIONAL.

BECAUSE ACT NO. 69 IS DISCRIMINATORY, THE HONORABLE COURT OF FIRST INSTANCE ERRED IN CONSIDERING OTHER FACTORS THAT ALLEGEDLY SUPPORT ITS CONSTITUTIONALITY.

### **\*3** AT & T

THE HONORABLE COURT OF FIRST INSTANCE ERRED IN DETERMINING AS A QUESTION OF FACT THAT THE TAX APPLIES TO ALL LONG-DISTANCE TELECOMMUNICATION COMPANIES AND THAT SUCH TAX IS RELATED TO THE SERVICES THAT PUERTO RICO PROVIDES TO SUCH COMPANIES, AND IN DISREGARDING EVIDENCE ON FACTS RELEVANT TO THE DISPUTE, WHICH EVIDENCE IS NOT IN DISPUTE AND SHOWS THE DISCRIMINATORY NATURE OF THE TAX.

THE HONORABLE COURT OF FIRST INSTANCE ERRED IN DETERMINING UNDER LAW THAT THE TAX DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE AND IS CONSTITUTIONALLY VALID.

In essence, the appellant companies are challenging the constitutionality of Act No. 69 in alleging that it violates the prohibition in the commerce clause of the United

States Constitution against taxation on interstate commerce in order to favor or protect state commerce. They submit that the tax is discriminatory because it applies to gross income generated from interstate communications services, whereas gross income generated from inter-island communications services is exempt from such tax.

In response to the Attorney General's request, we ordered consolidation of the cases in a ruling dated August 16, 2001. We find as follows.

## II

The Commonwealth's taxation power is the most fundamental of all its public and government powers. *Burlington Air Express v. Mun. de Carolina,* ___ D.P.R. ___ (2001), 2001 T.S.P.R. 98; *RCA v. Gob. de la Capital,* 91 D.P.R. 416, 428 (1964). This power is "essential to its subsistence and for its survival" as a political State. *Id.* It has a "very deep and vital significance." *P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982 (1960). As such, the Supreme Court has ruled that the Commonwealth exercises this broad power "free from higher authority, subject only to the limitations of its own Constitution..., and to those obligations that the people assumed when accepting the federal relationships that would and do exist with the United States under Public Act 600." *Burlington Air Express v. Mun. de Carolina, supra,* citing *RCA v. Gob. de la Capital, supra.*

When states exercise the power to levy taxes, they have broad discretion in selecting the subjects and objects to be taxed. The right to due process or to equal protection of the law does not impose a strict rule demanding equality in taxation. The Legislative Assembly has ample discretion to establish classifications and such classifications are justified if they are reasonably related to the legislation's purpose. *Coca Cola Bottling Co. v. Srio. De Treasury,* 112 D.P.R. 702 (1982).

**\*4** Federal Case law has deferred to states when regulations are not discriminatory on their face and their objective is to protect the public from potentially deceptive or prejudicial practices on the part of outside interests. *M. & B.S., Inc. v. Depto. de Agricultura,* 118 D.P.R. 319 (1987). "The fact that regulations affect interstate commerce does not necessarily mean they should be annulled, particularly if the benefits to public health or welfare are decisive in their approval, while their impact

on interstate commerce is secondary or incidental." *M.&B.S., Inc. v. Depto. de Agricultura, supra,* citing *Mintz v. Baldwin,* 289 U.S. 346 (1933). "[A] state law may not be struck down on the mere showing that its administration affects interstate commerce in some way." *Id.,* citing *Head v. New Mexico Board,* 374 U.S. 424, 429 (1963).

In *RCA v. Gob. de la Capital, supra,* the Supreme Court took stock of the Commonwealth's authority with respect to taxation based on the Federal Relations Act, also known as Act 600. In that case claims were filed against the Municipality of San Juan, requesting a refund of certain amounts paid to the municipality as municipal fees. The plaintiffs claimed that the collection of fees from companies exclusively engaged in communications between the United States and foreign countries was an undue interference by the Municipality of San Juan in U.S. interstate commerce.

The Supreme Court began its analysis by reiterating the historical fact that "the United States Constitution, on its face and due to its very force, did not extend to the residents of Puerto Rico due to the fact of the cession under the Treaty of Paris." *RCA v. Gob. de la Capital, supra,* at pp. 430–431. It went on to explain that the United States Congress "from the outset, did not extend, nor has extended, the same provisions of the Constitution directly to Puerto Rico as it did in relation to other communities." *Id.* In addition, the Supreme Court reiterated that "the constitutional provision that reserves Congress the power to regulate commerce with foreign nations, between the States, and with Indian tribes, not only has not applied and does not apply by its own force in Puerto Rico, but, to the contrary, Congress expressly provided that the Interstate Commerce Act and its various past or future amendments…or an act regulating commerce of February 4, 1887, and its amending laws…which still prevails as a part of the Federal Relations Act, would not apply to Puerto Rico." *RCA v. Gob. de la Capital, supra.*

Based on the aforementioned historical and legal backdrop, the Supreme Court found in *RCA v. Gob. de la*

*Capital, supra,* that the interstate commerce relationship in effect between Puerto Rico and the United States always "has had and still does have distinct contours from that in effect between the States of the Union under the Constitution." The Court also stated that as a result of that difference the Commonwealth may today exercise its taxation authority in terms of interstate commerce in a way that "perhaps would not be permissible for a State covered by the provisions of the Federal Constitution."

**\*5** In *RCA v. Gob. de la Capital, supra,* the Supreme Court also analyzed case law from the United States Supreme Court. In relevant part, and extensively citing *General Motors Corp. v. State of Washington,* 377 U.S. 436 (1964), it indicated that "...the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. ... [T]he question is whether the State has exerted its power in proper proportion to appellant's activities within the State, and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded." *RCA v. Gob. de la Capital, supra,* at p. 435. In *General Motors, supra,* citing *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444 (1940), the United States Supreme Court reiterated that "the simple but controlling question is whether the state has given anything for which it can ask return."

### III

In examining Act No. 301 of May 15, 1945, 27 L.P.R.A. §§ 341 *et seq.,* the legislation that originally imposed the 2% tax, we find that it was enacted in response to the urgent situation created by the development of infrastructure to drive telecommunications development in Puerto Rico. This tax would be paid by companies that rendered telephonic and telegraphic message transmission services. Bearing this purpose in mind, Section 2 of Act No. 301, 27 L.P.R.A. § 342, provided as follows:

> Section 2— The Treasury of Puerto Rico is hereby authorized and ordered to impose and collect a tax of two percent on the gross operating income obtained by any public service company or government instrumentality of the People of Puerto Rico, for the transmission of telephonic and telegraphic messages, including wire transfers.

The Treasury of Puerto Rico shall deposit all amounts it receives pursuant to the provisions of this section into a special fund to be called the Special Fund for Communications Development. Such funds shall, from time to time, be made available to the Board of Directors of the Puerto Rico Communications Authority, upon its request, for investment by such board, or pursuant to its orders, in improvements, expansions, research, or special experiments or research, as it deems suitable for purposes of expanding and improving the quality of the telephonic and telegraphic communication system and facilities in Puerto Rico. Said tax must be paid by public service companies or by government instrumentalities providing such service, within sixty (60) days of the accounting close for each fiscal year; and under no circumstances shall this tax be charged to persons who utilize their services.

**\*6** The 2% tax consisted of an ongoing source of funds aimed at telecommunications development. It should be noted that the 2% tax, as provided under Section 2 of Act No. 301, was declared constitutional by our Supreme Court, both in light of the applicable provisions of the 1917 Charter and those of the United States Constitution. *See P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982, 992–994 (1960).

Teléfonica Larga Distancia De Puerto Rico, Inc. v. Gobierno..., No. 2014054...

Case:17-03283-LTS   Doc#:4781-6   Filed:01/14/19   Entered:02/14/19 18:12:25   Desc:
Exhibit D Exhibit Part 5 Page 2 of 5
Exhibit 54   Page 2 of 5

Following the creation of the Puerto Rico Telecommunications Regulatory Commission in 1990, Section 2 of Act No. 301 was amended by Act No. 64 of August 23, 1990.[2] The purpose of the amendment was to "order and authorize the Treasury Secretary to collect the taxes imposed on telecommunications companies not covered by the Telecommunications Regulatory Commission Act." In addition, this act ordered that the amounts collected from such tax be deposited in a special fund and that all funds deposited in the Special Fund for Communications Development be transferred to a special fund called the "Telecommunications Regulatory Commission Special Fund."

Moreover, Act No. 69 clearly stated in its title that it was approved to amend Section 2 of Act No. 301 of 1945, as amended, "in order to maintain the order and authorization of the Treasury Secretary to collect the taxes imposed on long-distance telecommunication companies, so that the amounts collected in this regard may be deposited into the General Fund; and to authorize the transfer to the General Fund of all monies deposited in the Telecommunications Regulatory Commission Special Fund." Moreover, its Statement of Legislative Intent provided that:

> "Pressing considerations of public order require that long-distance telecommunication companies continue paying the tax required by law. To that end, those funds must be channeled to areas of need in order to comply with government programs."

As we can see, the tax provided for under Act No. 69 was imposed for the same purpose for which it was originally implemented under Act No. 301, i.e., for the development of telecommunications. That 2% tax on the gross income of companies offering long-distance telecommunications service created a source of constant revenue. It is clear that the funds obtained through this tax have driven the technological advances present in the provision of telecommunications services.

In this way, the Commonwealth thus began to get involved in the telecommunications sector by investing in development and infrastructure for over a half a century. Out of this have grown the infrastructure and communications that now allow us to be both on par with more commercially developed nations and that also drive the economic development of the Island.

*7 The appellant companies, all of which are participants in Puerto Rico's telecommunications market, fully benefit from the development driven by the funds collected since 1945 through the tax in question. A situation thus arises which, in accordance with the federal case law cited by our Supreme Court in *RCA v. Gob. de la Capital, supra,* "the state has given [something] for which it can ask return."

The appellant companies have a variety of activities within the Commonwealth, such as the marketing and advertising of their products and the use of the telecommunications infrastructure developed on the Island, which are sufficient local incidences on which to base the tax imposed by Act No. 301, as amended. This is not, then, a case where the Treasury is attempting to impose a tax for the mere privilege of engaging in interstate commerce; rather it is a tax levied on aspects of the business that are subject to the broad sovereign power of the state.

At first glance, the appellants' argument that the 2% tax imposed on the gross income of overseas long-distance telecommunications companies, while excluding that of inter-island long-distance companies, is discriminatory, would appear to be viable. The appellants achieve that appearance of validity by referring indiscriminately to both types of calls—overseas calls as well as those that do not leave the geographical limits of Puerto Rico—as long-distance calls, regardless of their geographic scope. If all calls outside the metropolitan area are characterized as long-distance calls, there would appear to be no reasonable explanation for the State to only impose the 2% tax on income generated from long-distance services outside of Puerto Rico.

A more deliberate analysis of the alleged discrimination, however, reveals that there is a material difference between one type of long-distance call and another, which supports the distinction in terms of tax treatment. This difference arises from the fact that when

Telefonica Larga Distancia De Puerto Rico, Inc. v. Tribunal..., Not Reported in...

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:12:25 Desc:
Exhibit DX-BCG Part 5 Page 8 of 63
Exhibit 54 Page 486 of 541

telecommunications service is provided outside the territorial limits of Puerto Rico, the service provided by the appellant companies becomes a transoceanic service. Therefore, the use of the telecommunications infrastructure by the appellant companies is different from the use of that same infrastructure by companies offering telecommunications services limited to the territorial confines of Puerto Rico.

To allege discrimination in the tax statute in dispute, the appellant companies must establish that there was no technological or public policy justification specific to the telecommunications sector that would warrant application of a tax on one type of call (long-distance calls outside the territorial limits of Puerto Rico) and not on another (long-distance calls within the territorial limits). The appellant companies failed to establish this. They merely grouped all calls outside of the metropolitan area together under the category of "long-distance calls," and alleged, sweepingly, that the tax treatment of some companies, compared with that for others, was discriminatory. They omitted that the tax differentiation was due to technology and infrastructure considerations related to Puerto Rico's condition as an island.

They failed to take into account that the infrastructure and technology used for long-distance transoceanic calls are different than those used for long-distance inter-island calls. This is the distinction that justifies applying a different tax treatment to each activity.

**\*8** The appellant companies have not shown that the tax imposed by Act No. 69 affects interstate commerce. Nor have they shown that this tax discriminates between companies that offer long-distance transoceanic service by favoring companies that offer long-distance inter-island services. We find that the determination of the Court of First Instance was correct in upholding the constitutionality of the challenged act.

**IV**

In view of the foregoing grounds, the appealed judgment is affirmed.

As agreed and sent by the Court and certified by the Clerk of Court.

Aida Ileana Oquendo Graulau

Clerk of Court

---

Footnotes

1    In 1997 the appellant companies filed complaints against the Treasury Department alleging that as of September 12, 1996, they were not responsible for payment of the tax imposed by Act No. 69, given that Law No. 213 of September 12, 1996, 27 L.P.R.A. §§ 265–272, repealed this tax. On July 3, 2000, the Court of First Instance issued a partial summary judgment (Case No. KCO97–0021), in which it determined that Act No. 213 repealed the 2% tax that Act No. 69 imposed on companies providing long-distance telecommunication service. That determination was appealed before this Court (Case No. KLAN0000945), which handed down a judgment on January 24, 2001, affirming the appealed judgment. This matter is currently pending before the Supreme Court (CC–2001–223).

2    This act was repealed by Act No. 213 of September 12, 1996. *See* footnote 1.

---

End of Document        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 54 Page 9 of 43

2001 WL 1764054 (TCA)

TELEFONICA LARGA DISTANCIA DE
PUERTO RICO, INC., AT & T DE PUERTO
RICO, INC. y SPRINT COMMUNICATIONS
COMPANY, L.P., Demandantes–Apelantes,
v.
DEPARTAMENTO DE
HACIENDA, Demandado–Apelado.

EN EL TRIBUNAL DE CIRCUITO DE APELACIONES
Civil Núm. KCO97–0021
KLAN0100568, KLAN0100727, KLAN0100770
En San Juan, Puerto Rico, a 26 de noviembre de 2001.
Nov. 26, 2001.

Apelación procedente del Tribunal de Primera Instancia,
Sala Superior de San Juan

Panel integrado por su presidenta, la Jueza Fiol Matta, la
Jueza Rodríguez de Oronoz y el Juez González Rivera.

### SENTENCIA

RODRÍGUEZ DE ORONOZ, JUEZA PONENTE

*1 Se nos solicita la revisión de la sentencia emitida por el
Tribunal de Primera Instancia, Sala Superior de San Juan,
el 29 de octubre de 2000. Mediante la referida sentencia se
decretó la constitucionalidad de la contribución impuesta
por la Ley Núm. 69 de 9 de agosto de 1993 a las compañías
de telecomunicaciones de larga distancia.

Examinados en su totalidad los autos del caso y el derecho
aplicable, resolvemos que procede confirmar la sentencia
apelada.

### I

En el año 1999 las apelantes, Telefónica Larga Distancia
de Puerto Rico, Inc. ("TLD"), AT & T de Puerto Rico,
Inc. ("AT & T") y Sprint Communications Company, L.P.
("SPRINT"), radicaron por separado demandas contra el
Departamento de Hacienda ("Hacienda") cuestionando
la constitucionalidad de la Ley Núm. 69 de 9 de agosto de
1993 ("Ley Núm. 69"), la cual imponía una contribución
de dos por ciento (2%) sobre el ingreso bruto de operación
en la prestación de servicios de telecomunicaciones por
cualquier compañía de larga distancia. [1]

TLD presentó su demanda el 23 de marzo de 1999. Alegó
que el 22 de junio de 1998 presentó ante Hacienda una
solicitud de reintegro de la contribución de 2% pagada a
tenor con lo dispuesto en la Ley Núm. 69 correspondiente
a los años 1994, 1995 y 1996 (período del 1 de enero al 11
de septiembre de 1996), por la cantidad de $3,576,456.30
más intereses, la cual le fue denegada. Adujo que la
Ley Núm. 69 violaba la prohibición impuesta por la
Constitución de Estados Unidos contra la imposición
de gravámenes al comercio interestatal con el propósito
de favorecer o proteger el comercio estatal. Argumentó
que dicha ley era inconstitucional porque tributaba más
opresivamente una misma actividad cuando cruzaba los
límites estatales que cuando ocurría enteramente dentro
de Puerto Rico pues le imponía una contribución de 2%
sobre el ingreso bruto de operación en la "prestación de
servicios de telecomunicaciones a cualquier compañía de
larga distancia" y no le imponía una contribución similar
al ingreso bruto derivado de la prestación de servicios
de telecomunicaciones intraestatales a las compañías que
prestaban ese tipo de servicio. Solicitó que el tribunal de
instancia declarara inconstitucional dicha contribución y
que le ordenara a Hacienda reintegrar a TLD la suma
reclamada de $3,576,456.30 más intereses al 6% anual a
partir de la fecha de pago.

Por su parte, SPRINT presentó su demanda el 26 de
marzo de 1999. Argumentó que el 30 de diciembre de 1998
presentó ante Hacienda una solicitud de reintegro de la
contribución de 2% pagada a tenor con lo dispuesto en
la Ley Núm. 69 correspondiente a los años 1994, 1995
y 1996 (período del 1 de enero al 11 de septiembre de
1996), pero la misma le fue denegada. Reclamó el reintegro
de los siguientes pagos: $288,719.00 en el año 1994;
$351,034.00 en el 1995; y 288,790.00 en el 1996, para una
cantidad total de $928,542.00 más los intereses dispuestos
por ley. Al igual que TLD, alegó que la Ley Núm. 69
violaba la prohibición impuesta por la Constitución de
Estados Unidos contra la imposición de gravámenes al
comercio interestatal con el propósito de favorecer o
proteger el comercio estatal. Argumentó que dicha ley
era inconstitucional porque tributaba más opresivamente
una misma actividad cuando cruzaba los límites estatales
que cuando ocurría enteramente dentro de Puerto Rico,
lo que constituía un trato desigual y discriminatorio
bajo la cláusula de comercio. Solicitó que el tribunal de
instancia declarara inconstitucional dicha contribución y
que le ordenara a Hacienda reintegrar a SPRINT la suma

reclamada de $928,543.00 más el 6% de interés desde la fecha de pago a Hacienda hasta su reintegro a SPRINT.

*2 Por último, AT & T presentó su demanda el 29 de marzo de 1999. Sostuvo que el 28 de diciembre de 1998 presentó ante Hacienda una solicitud de reintegro de la contribución de 2% pagada a tenor con lo dispuesto en la Ley Núm. 69 correspondiente a los años 1993 al 1997, en la que reclamó el reintegro de los siguientes pagos: (1) $1,018,317.30 en el año 1993; $1,340,700.50 en el 1994; $1,453,228.19 en el 1995; $1,678,998.19 en el 1996; y $1,533,156.82 en el 1997. Explicó que Hacienda denegó su solicitud de reintegro. Alegó que la Ley Núm. 69 era inconstitucional y discriminaba contra el comercio interestatal pues exigía el pago de contribuciones sobre ingresos de las operaciones de servicios de telecomunicaciones de larga distancia interestatales pero a las compañías que ofrecían servicios de Telecomunicaciones de larga distancia dentro de los límites territoriales de Puerto Rico no se le exigía que pagaran dicha contribución ni alguna otra cantidad por los ingresos derivados de tales servicios.

Las compañías apelantes solicitaron la consolidación de los casos y el 26 de mayo de 1999 el tribunal de instancia consolidó los mismos bajo el número KCO97–0021, exclusivamente para tratar el asunto de la constitucionalidad del impuesto. Una vez consolidados los casos, Hacienda contestó las demandas negando todas las alegaciones y planteando como defensa afirmativa, entre otras, que las actuaciones del Secretario de Hacienda estaban protegidas por una presunción de corrección, la cual no había sido controvertida ni derrotada por la causa de acción presentada. Además, presentó una moción solicitando sentencia sumaria o desestimación de los casos consolidados.

Las compañías apelantes se opusieron a tal solicitud y a su vez solicitaron se dictara sentencia sumaria a su favor. Luego de que las partes sometieran sus respectivos memorandos de derecho, el 19 de octubre de 2000 el tribunal de instancia emitió sentencia decretando la constitucionalidad de la contribución en controversia. A pesar de que la sentencia fue notificada originalmente el 2 de noviembre de 2000, su notificación fue defectuosa por lo que se requirió realizar una notificación enmendada, la cual se llevó a cabo el 6 de junio de 2001. Inconformes, TLD, Sprint y AT & T presentaron sendos escritos de apelación el 14 de junio, 23 de julio y 6 de agosto de

2001. Las partes plantearon los siguientes señalamientos de error:

*TLD*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA LEY 69 NO VIOLA LA CLÁUSULA DE COMERCIAL INTERESTATAL DE LA CONSTITUCIÓN DE ESTADOS UNIDOS.

*SPRINT*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA LEY NÚM. 69 DE 9 DE AGOSTO DE 1993 NO DISCRIMINA CONTRA EL COMERCIO INTERESTATAL Y, POR TANTO, ES CONSTITUCIONAL.

SIENDO LA LEY NÚM. 69 DISCRIMINATORIA, ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONSIDERAR OTROS FACTORES QUE ALEGADAMENTE SUSTENTAN SU CONSTITUCIONALIDAD.

*3 *AT & T*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR COMO CUESTIÓN DE HECHO QUE LA CONTRIBUCIÓN ES APLICABLE A TODAS LAS COMPAÑÍAS DE TELECOMUNICACIONES DE LARGA DISTANCIA Y QUE LA MISMA ESTÁ RELACIONADA CON LOS SERVICIOS QUE PUERTO RICO LES PROVEE A DICHAS COMPAÑÍAS Y AL IGNORAR EVIDENCIA SOBRE HECHOS RELEVANTES A LA CONTROVERSIA LA CUAL NO ESTÁ EN DISPUTA Y DEMUESTRA LA NATURALEZA DISCRIMINATORIA DEL IMPUESTO.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR CONFORME A DERECHO QUE LA CONTRIBUCIÓN NO DISCRIMINA CONTRA EL COMERCIO INTERESTATAL Y QUE LA MISMA ES VÁLIDA CONSTITUCIONALMENTE.

En esencia, las compañías apelantes impugnan la constitucionalidad de la Ley Núm. 69 alegando que dicha ley viola la prohibición de la cláusula de comercio de la

Constitución de Estados Unidos contra la imposición de gravámenes al comercio interestatal con el propósito de favorecer o proteger el comercio estatal. Sostienen que la contribución es discriminatoria pues se aplica al ingreso bruto generado por los servicios de comunicaciones interestatales y se exime de la misma al ingreso bruto generado por servicios de comunicaciones intraisla.

Ante la solicitud del Procurador General, ordenamos la consolidación de los casos mediante resolución del 16 de agosto de 2001. Pasamos a resolver.

## II

La facultad de tributación del Estado Libre Asociado es el más fundamental de sus poderes públicos y gubernamentales. *Burlington Air Express v. Mun. de Carolina,* ___ D.P.R. ___ (2001), 2001 T.S.P.R. 98; *RCA v. Gob. de la Capital,* 91 D.P.R. 416, 428 (1964). Se trata de un poder que es "esencial a su subsistencia y para su supervivencia" como un Estado político. *Id.* Tiene una "gravísima y vital importancia". *P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982 (1960). Por ello el Tribunal Supremo ha resuelto que este amplio poder lo ejerce el Estado Libre Asociado "libre de autoridad superior, sujeto sólo a las limitaciones de su propia Constitución ..., y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de existir y existen con los Estados Unidos a tenor de la Ley Pública 600". *Burlington Air Express v. Mun. de Carolina, supra,* citando a *RCA v. Gob. de la Capital, supra.*

Cuando los estados ejercen el poder de imponer contribuciones, tienen amplia discreción de seleccionar los sujetos y los objetos a ser tributados. El derecho al debido proceso de ley o a la igual protección de las leyes no impone una regla rígida que exija igualdad en la imposición de las contribuciones. La Asamblea Legislativa tiene vasta discreción para establecer clasificaciones y se justifica una clasificación si está razonablemente relacionada con el propósito de la legislación. *Coca Cola Bottling Co. v. Srio. De Hacienda,* 112 D.P.R. 702 (1982).

*\*4* La jurisprudencia federal ha mostrado deferencia hacia los estados cuando la reglamentación no es discriminatoria de su faz y su objetivo es proteger a la ciudadanía de posibles prácticas engañosas o perjudiciales por parte de intereses extraños a la localidad. *M. & B.S., Inc. v. Depto. de Agricultura,* 118 D.P.R. 319 (1987). "Porque la reglamentación afecte al comercio interestatal

no debe ser invalidada necesariamente, particularmente si los beneficios de salud o bienestar público son determinantes al aprobarla, mientras que su impacto sobre el comercio interestatal es secundario o incidental". *M. & B.S., Inc. v. Depto. de Agricultura, supra,* citando a *Mintz v. Baldwin,* 289 U.S. 346 (1933). "[U]na ley estatal no debe ser dejada sin efecto con meramente demostrar que su administración afecta el comercio interestatal de alguna forma". *Id.,* citando a *Head v. New Mexico Board,* 374 U.S. 424, 429 (1963).

En *RCA v. Gob. de la Capital, supra,* el Tribunal Supremo hizo un recuento de la autoridad del Estado Libre Asociado respecto a la imposición de impuestos a partir de la Ley de Relaciones Federales, conocida también como la Ley 600. En ese caso se presentaron demandas contra el Municipio de San Juan solicitando la devolución de unas cantidades pagadas al municipio por concepto de patentes municipales. Las demandantes alegaron que el cobro de las patentes a las compañías dedicadas exclusivamente a las comunicaciones entre Estados Unidos y países extranjeros era una intervención indebida por parte del Municipio de San Juan en el comercio interestatal de los Estados Unidos.

El Tribunal Supremo comenzó su análisis reiterando el hecho histórico que "la Constitución de los Estados Unidos, de su faz y por su propia fuerza, no se extendió a los habitantes de Puerto Rico por el hecho mismo de la cesión en el Tratado de París". *RCA v. Gob. de la Capital, supra,* a las págs. 430–431. Continuó explicando que el Congreso de los Estados Unidos "desde un principio no extendió ni ha extendido directamente a Puerto Rico las disposiciones mismas de la constitución, como hizo en relación con otras comunidades". *Id.* Además, el Tribunal Supremo reiteró que "la disposición constitucional que reserva al Congreso el poder de reglamentar el comercio con naciones extranjeras, entre los Estados y con las tribus indias, no sólo no ha regido ni rige por su propia fuerza en Puerto Rico sino que por el contrario, el Congreso dispuso de manera expresa que no serían aplicables a Puerto Rico la Ley sobre Comercial Interestatal y las varias enmiendas hechas o que se hicieran a ella ... ni tampoco una Ley para regular el comercio, de 4 de febrero de 1887 y las leyes enmendatorias de la misma ... y que aún prevalece formando parte de la Ley de Relaciones Federales". *RCA v. Gob. de la Capital, supra.*

Basado en el antes mencionado trasfondo históricolegal, el Tribunal Supremo concluyó en *RCA v. Gob. de la*

*Capital, supra,* que la relación de comercio interestatal que rige entre Puerto Rico y los Estados Unidos siempre "ha tenido y aún tiene perfiles distintos de la que por virtud de la Constitución rige entre los Estados de la Unión". Expresó también el Tribunal que como resultado de esa diferencia el Estado Libre Asociado puede ejercer hoy su facultad de tributación en cuanto al comercio interestatal en una forma que "tal vez a un Estado cubierto por las disposiciones de la constitución Federal no le sería permisible".

**\*5** En *RCA v. Gob. de la Capital, supra,* el Tribunal Supremo también analizó jurisprudencia del Tribunal Supremo de Estados Unidos. En lo aquí pertinente, y citando extensamente el caso de *General Motors Corp. v. State of Washington,* 377 U.S. 436 (1964), se indicó que "... la legalidad de la contribución descansa en el hecho de si el Estado hace una demanda constitucionalmente razonable sobre aquel aspecto del comercio interestatal con el que guarda especial relación ... [L]a cuestión es si el Estado ha ejercido su facultad en proporción adecuada a las actividades de la apelante dentro del Estado y al consiguiente disfrute por la apelante dentro de las oportunidades y protecciones que el Estado ha brindado". *RCA v. Gob. de la Capital, supra,* a la pág. 435. En *General Motors, supra,* citando a *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444 (1940), el Tribunal Supremo de Estados Unidos reiteró que "la cuestión simple pero decisiva es si el Estado ha concedido algo a cambio de lo cual puede solicitar recompensa".

### III

Al examinar la Ley Núm. 301 de 15 de mayo de 1945, 27 L.P.R.A. §§ 341 *et seq.,* legislación que originalmente impuso el impuesto de 2%, encontramos que la misma se promulgó para responder a la situación de carácter urgente que presentaba el desarrollo de la infraestructura para propulsar el desarrollo de las telecomunicaciones en Puerto Rico. Dicho impuesto sería pagado por las compañías que rindieran servicio de transmisión de mensajes telefónicos y telegráficos. Con ese propósito en mente, la Sección 2 de la Ley Núm. 301, 27 L.P.R.A. § 342, estableció lo siguiente:

> Sección 2—Por la presente se autoriza y ordena al Tesorero de Puerto Rico para imponer y cobrar una contribución o impuesto de dos por ciento sobre el ingreso bruto

de operación cobrado por cualquier compañía de servicio público o instrumentalidad gubernamental de El Pueblo de Puerto Rico, por la transmisión de mensajes telefónicos y telegráficos, incluyendo giros telegráficos. Toda cantidad recibida por el Tesorero de Puerto Rico a virtud de las disposiciones de esta sección será depositada por él en un fondo especial que se denominará Fondo Especial para el Fomento de Comunicaciones. Dichos fondos serán puestos, de tiempo en tiempo, a la disposición de la Junta de Directores de la Autoridad de Comunicaciones de Puerto Rico, mediante su requerimiento para su inversión por dicha junta, o bajo sus órdenes, en aquellas mejoras, extensiones, investigaciones, experimentos o investigaciones especiales, que crea conveniente, con el fin de extender y mejorar la calidad del sistema y facilidades de las comunicaciones telefónicas y telegráficas en Puerto Rico. Dicho impuesto deberá ser pagado por las compañías de servicio público o por las instrumentalidades públicas que rindan dicho servicio, dentro de los sesenta (60) días después de haber cerrado la contabilidad de cada año económico; y bajo ningún concepto deberá cargarse el mismo a personas que utilicen sus servicios.

**\*6** El impuesto de 2% se constituyó en una fuente de recaudos constante que se dirigiría al fomento de las telecomunicaciones. Cabe señalar que el impuesto de 2%, tal y como fue dispuesto en la Sección 2 de la Ley Núm. 301, fue declarado constitucional por nuestro Tribunal Supremo, tanto a la luz de las disposiciones aplicables de la Carta Orgánica de 1917 como de aquellas de la Constitución de los Estados Unidos. Véase *P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982, 992–994 (1960).

Luego que se creara la Comisión Reguladora de Telecomunicaciones de Puerto Rico en 1990 se enmendó la Sección 2 de la Ley Núm. 301 mediante la Ley Núm. 64 de 23 de agosto de 1990. [2] El propósito de la enmienda fue "imponer y autorizar al Secretario de Hacienda a cobrar las contribuciones impuestas a las compañías de telecomunicaciones no cubiertas por la Ley de la Comisión Reguladora de Telecomunicaciones". Además, en dicha ley se ordenó que las cantidades recaudadas por dicho concepto fueran depositadas en un fondo especial y que los fondos depositados en el Fondo Especial para al Fomento de las Comunicaciones fueran transferidos al fondo especial denominado "Fondo Especial de la Comisión Reguladora de Telecomunicaciones".

Por otro lado, la Ley Núm. 69 claramente expresó en su título que la misma se aprobó para enmendar la Sección 2 de la Ley Núm. 301 de 1945, según enmendada, "a fin de mantener la imposición y autorización del Secretario de Hacienda a cobrar las contribuciones impuestas a las compañías de telecomunicaciones de larga distancia; para que las cantidades recaudadas por dicho concepto sean depositadas en el Fondo General; y autorizar la transferencia al Fondo General de los dineros depositados en el Fondo Especial de la Comisión Reguladora de Telecomunicaciones". Además, en su Exposición de Motivos se expresó que:

"Consideraciones imperiosas de orden público requieren que las compañías de telecomunicaciones de larga distancia continúen pagando el impuesto requerido por ley. A este fin es necesario canalizar esos fondos a áreas de necesidad a fin de cumplir con los programas de gobierno".

Como podemos ver, la contribución dispuesta en la Ley Núm. 69 se impuso con el mismo propósito por el cual se impuso originalmente bajo la Ley Núm. 301, es decir, con el propósito de fomentar las telecomunicaciones. Mediante impuesto del 2% del ingreso bruto de las compañías que ofrecían servicio de telecomunicaciones de larga distancia se creó una fuente de recaudos constantes. Es evidente que los fondos obtenidos mediante este impuesto han propulsado los avances tecnológicos habidos en la provisión de servicios de telecomunicaciones.

De esta manera el Estado Libre Asociado comenzó a involucrarse en el campo de las telecomunicaciones,

invirtiendo en desarrollo e infraestructura por más de medio siglo. De ella ha crecido la infraestructura de las comunicaciones que hoy en día nos permite no sólo estar a la par con los países más desarrollados comercialmente sino también propulsar el desarrollo económico de la Isla.

*7 Las compañías apelantes, participantes todas ellas en el mercado de las telecomunicaciones en Puerto Rico, se benefician plenamente del desarrollo propulsado con los fondos recolectados desde el 1945 mediante la contribución en controversia. Surge de esta forma una situación en que, de acuerdo a la jurisprudencia federal citada por nuestro Tribunal Supremo en *RCA v. Gob. de la Capital, supra,* "el Estado ha concebido algo a cambio de lo cual puede solicitar recompensa".

Existen variadas actividades de las compañías apelantes dentro del Estado Libre Asociado, como por ejemplo, la actividad de mercadeo y publicidad de sus productos y la utilización de la infraestructura de telecomunicaciones desarrollada en la Isla, son incidentes locales suficientes sobre los que puede basarse la contribución impuesta por la Ley Núm. 301, según enmendada. No se trata pues de un caso donde Hacienda intenta imponer una contribución por el mero privilegio de dedicarse al comercio interestatal sino que se trata de una contribución impuesta sobre aspectos del negocio que están sujetos al amplio poder soberano del estado.

A primera vista, el argumento presentado por las apelantes que la contribución del 2% impuesta sobre el ingreso bruto de las compañías de telecomunicaciones de larga distancia ultramarinas, a exclusión de las compañías de larga distancia intraisla, es discriminatorio, aparenta ser uno viable. Las apelantes logran esta apariencia de validez refiriéndose indistintamente a ambos tipos de llamadas, tanto las ultramarinas como las que no salen del límite geográfico de Puerto Rico, como llamadas de larga distancia. Clasificando todas las llamadas fuera del área metropolitana como llamadas de larga distancia, sin distinción de su alcance geográfico, aparentemente no surge una explicación razonable para que el Estado sólo le imponga el impuesto del 2% a los ingresos derivados de servicios de larga distancia fuera de Puerto Rico.

Sin embargo, un análisis más pausado de la alegada discriminación revela que existe una diferencia sustancial entre un tipo y otro de llamadas de larga distancia que sostiene la distinción en cuanto al tratamiento contributivo. Esta diferencia estriba en que al proveer

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 5

Teléfonica Larga Distancia De Puerto Rico, Inc. v. Hacienda, Not Reported in...

Case:17-03283-LTS Doc#:4781-6 Filed:01/14/19 Entered:01/14/19 18:12:25 Desc:
Exhibit EX-JCC28 Page 15 of 19

servicio de telecomunicaciones fuera de los límites territoriales de Puerto Rico, el servicio provisto por las compañías apelantes se convierte en uno transoceánico. Por lo tanto, la utilización de la infraestructura de telecomunicaciones que hacen las compañías apelantes es una distinta a la utilización de esa misma infraestructura por las compañías que ofrecen servicio de telecomunicaciones limitado a la extensión territorial de Puerto Rico.

Para alegar discriminación en el estatuto contributivo en controversia, las compañías apelantes venían obligadas a establecer que no existía una justificación tecnológica o de política pública específica al área de las telecomunicaciones que justificara que se aplicara un impuesto a un tipo de llamada (llamadas de larga distancia fuera de los límites territoriales de Puerto Rico) y no a otro (llamadas de larga distancia dentro de los límites territoriales). Las compañías apelantes no lograron así establecerlo. Meramente se limitaron a aglomerar todas las llamadas fuera del área metropolitana bajo la clasificación de "llamadas de larga distancia" y alegaron, de forma genérica, que existía discrimen en el trato contributivo de unas compañías y otras. Obviaron que la diferenciación contributiva obedecía a consideraciones tecnológicas y de infraestructura relacionadas a la condición de Puerto Rico como isla.

No tomaron en consideración que la infraestructura y la tecnología utilizadas para las llamadas de larga distancia transoceánicas son distintas a las utilizadas para las llamadas de larga distancia intraisla. Es esa la distinción que justifica que se aplique un trato contributivo diferente a cada actividad.

**\*8** Las compañías apelantes no han demostrado que la contribución impuesta por la Ley Núm. 69 afecta el comercio interestatal. Tampoco han demostrado que mediante dicho impuesto se discrimina contra las compañías que ofrecen servicios de larga distancia transoceánico, favoreciendo a las compañías que ofrecen servicios de larga distancia intraisla. Resolvemos que fue correcta la determinación del Tribunal de Primera Instancia al declarar la constitucionalidad de la ley impugnada.

## IV

Por los fundamentos expresados, se confirma la sentencia apelada.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau

Secretaria General

---

Footnotes

1   En 1997 las compa ñías apelantes presentaron demandas contra el Departamento de Hacienda alegando que a partir del 12 de septiembre de 1996 no eran responsables del pago de la contribución impuesta por la Ley Núm. 69 por razón de que la Ley Núm. 213 del 12 de septiembre de 1996, 27 L.P.R.A. §§ 265–272, derogó dicha contribución. El 3 de julio de 2000 el Tribunal de Primera Instancia emitió una sentencia sumaria parcial (Caso Núm. KCO97–0021) en la que determinó que la Ley Núm. 213 derogó la contribución del 2% que la Ley Núm. 69 le imponía a las compañías que prestaban servicio de telecomunicaciones de larga distancia. Esa determinación fue apelada ante este Tribunal (Caso Núm. KLAN0000945), el cual emitió sentencia el 24 de enero de 2001 confirmando la sentencia apelada. Al presente, esa controversia está pendiente ante el Tribunal Supremo (CC–2001–223).

2   Esta ley fue derogada por la Ley N úm. 213 del 12 de septiembre de 1996. Véase nota al calce núm. 1.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 85

Withheld pursuant to the Stipulation and Order for the Production and
Exchange of Confidential Information [Dkt. No. 56].

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------ x

*In re*                                                       :
                                                              :
THE FINANCIAL OVERSIGHT AND                                   :
MANAGEMENT BOARD FOR PUERTO RICO,                             :     PROMESA
                                                              :     Title III
          as representative of                                :     Case No. 17-BK-3283 (LTS)
                                                              :     (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICO *et al.,*                     :
                                                              :
          Debtors.[1]                                         :
------------------------------------------------------------------ x
THE OFFICIAL COMMITTEE OF UNSECURED                           :
CREDITORS OF THE COMMONWEALTH OF                              :
PUERTO RICO,                                                  :
                                                              :
          as agent of                                         :
                                                              :
THE FINANCIAL OVERSIGHT AND                                   :
MANAGEMENT BOARD FOR PUERTO RICO                              :
                                                              :
          as representative of                                :     Adv. Proc. No. 17-00257-LTS
                                                              :
THE COMMONWEALTH OF PUERTO RICO,                              :
                                                              :
          Plaintiff,                                          :
                                                              :
v.                                                            :
                                                              :
BETTINA WHYTE,                                                :
                                                              :
          as agent of                                         :
                                                              :
                                                              :

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

THE FINANCIAL OVERSIGHT AND      :
MANAGEMENT BOARD FOR PUERTO RICO  :
                                             :
              as representative of         :
                                             :
THE PUERTO RICO SALES TAX FINANCING  :
CORPORATION,                             :
                                           :
            Defendant.               :
------------------------------------------------------------------ x

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BY THE COFINA AGENT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF UNDISPUTED FACTS ..............................................................4

    A.    The Legislative Assembly Creates COFINA And Transfers Ownership Of
           The Dedicated Sales Tax Fund And The Stream Of Pledged Sales Tax
           Revenue To COFINA. ...............................................................................4

    B.    COFINA Issues Bonds Secured By The Pledged Sales Tax. .................7

    C.    The Commonwealth Repeatedly Affirms COFINA's Ownership Of The
           Dedicated Sales Tax Fund And The Pledged Sales Tax...........................10

STANDARD.............................................................................................................11

ARGUMENT ...........................................................................................................12

I.    The Legislative Assembly Is Empowered By The Puerto Rico Constitution To
    Enact Legislation Transferring The Dedicated Sales Tax Fund And The Pledged
    Sales Tax To COFINA...........................................................................................12

    A.    The Legislative Assembly Properly Exercised Its Broad Taxing And
           Police Powers To Enact Legislation Addressing The Financial Needs Of
           The Commonwealth....................................................................................12

    B.    The Transfer Is Not Prohibited By The Debt Limit Provisions Of The
           Puerto Rico Constitution...........................................................................16

    C.    The Transfer Is Not Prohibited By The Balanced Budget Provision Of The
           Puerto Rico Constitution...........................................................................21

II.    The Legislative Assembly Transferred Ownership Of The Dedicated Sales Tax
    Fund And The Pledged Sales Tax Revenue Stream To COFINA. ....................24

    A.    The Unambiguous Text Of The COFINA-Enabling Legislation Provides
           That COFINA Owns The Dedicated Sales Tax Fund And The Pledged
           Sales Tax Revenue Stream.........................................................................24

    B.    COFINA's Ownership Of The Dedicated Sales Tax Fund And The
           Pledged Sales Tax Revenue Stream Is Consistent With The Legislative
           Assembly's Intent And The Purpose Of The COFINA Structure. .........30

III.    The Dedicated Sales Tax Fund And The Pledged Sales Tax Revenue Stream Are
     Not Available Resources Of The Commonwealth...........................................33

CONCLUSION........................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Asoc. Importadores de Cerveza v. Commonwealth of P.R.*,
    171 D.P.R. 140 (P.R. 2007) ......................................................................30, 31

*Asoc. Maestros P.R. v. Srio. Educacion*,
    137 D.P.R. 528 (P.R. 1994) .............................................................................24

*Asociación De Empleados Gerenciales De La Corporación Del Fondo Del Seguro
    Del Estado v. Corporación Del Fondo Del Seguro Del Etado*,
    No. KLAN201500471, 2015 WL 4075649 (P.R. Cir. May 29, 2015) ......................12, 16

*Assured Guar. Corp. v. Garcia-Padilla*,
    214 F. Supp. 3d 117 (D.P.R. 2016) ..................................................................19

*Barnhill v. Johnson*,
    503 U.S. 393 (1992) ......................................................................................29

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) ......................................................................................29

*In re Boswell*,
    20 F. Supp. 748 (S.D. Cal. 1937) .....................................................................13

*Casiano-Montañez v. State Ins. Fund Corp.*,
    707 F.3d 124 (1st Cir. 2013) ...........................................................................29

*Coca-Cola Bottling Co. v. Srio. de Hacienda*,
    112 D.P.R. 707 (P.R. 1982) .............................................................................19

*Commonwealth of Puerto Rico v. Northwestern Selecta, Inc.*,
    185 D.P.R. 40 (P.R. 2012) ..............................................................................12

*Cabán Hernández v. Philip Morris USA, Inc.*,
    486 F.3d 1 (1st Cir. 2007) ..............................................................................11

*Caquías v. Asoc. De Residentes de Mansiones de Río Piedras*,
    134 D.P.R. 181 (P.R. 1993) .............................................................................12

*Chicago, B. & Q.R. Co. v. City of Chicago*,
    166 U.S. 226 (1897) ......................................................................................29

*Defendini Collazo v. Commonwealth of Puerto Rico*,
    134 D.P.R. 28 (P.R. 1993) .........................................................................15, 16

*Díaz v. Srio. de Hacienda*,
    114 D.P.R. 865 (P.R. 1983) .............................................................................25

*Estate of Ellington v. Am. Society of Composers, Authors, and Publishers*,
  25 A.D.3d 426 (N.Y. App. Div. 1st Dep't 2006)................................................28

*F.D.I.C. v. Municipality of Ponce*,
  904 F.2d 740 (1st Cir. 1990).............................................................................16

*Federacíon de Maestros de Puerto Rico v. Acevedo-Vilá*,
  545 F. Supp. 2d 219 (D.P.R. 2008)..................................................................13

*Flushing Nat'l Bank v. Mun. Assistance Corp. for City of New York*,
  40 N.Y.2d 731 (1976) ......................................................................................19

*Fornaris v. Ridge Tool Co.*,
  400 U.S. 41 (1970)............................................................................................13

*FS Media Holding Co. (Jersey) Ltd. v. Harrison*,
  No. 13 Civ 3144 (SAS), 2013 WL 5780771 (S.D.N.Y. Oct. 25, 2013) ...........28

*General Motors Corp. v. Darling's*,
  444 F.3d 98 (1st Cir. 2006)..............................................................................27

*Grand River Dam Auth. v. Jarvis*,
  124 F.2d 914 (10th Cir. 1942) .........................................................................13

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)..........................................................................................17

*Harris Cnty. Comm'rs Court v. Moore*,
  420 U.S. 77 (1974)............................................................................................16

*King v. Burwell*,
  135 S. Ct. 2480 (2015)......................................................................................32

*Lance v. McGreevey*,
  853 A.2d 856 (N.J. 2004)..................................................................................24

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)..........................................................................................29

*Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*,
  2 N.Y.3d 524 (2004).........................................................................................28

*Lozada Tirado v. Testigos Jehovas*,
  177 D.P.R. 893 (P.R. 2010)..............................................................................12

*Maldonado v. Junta de Planificación*,
  171 D.P.R. 46 (P.R. 2007)................................................................................16

*Marina Indus., Inc. v. Brown Boveri Corp.*,
  114 D.P.R. 64 (P.R. 1983) ...........................................................15, 16, 18, 19

*In re Marriage of Leland*,
  847 P.2d 518 (Wash. Ct. App. 1993) .......................................................28, 29

*Martínez v. Ofic. del Gobernador*,
  152 D.P.R. 586 (P.R. 2000) ...........................................................................30

*Matos v. Junta Examinadora de Ingenieros y Agrimensores*,
  165 D.P.R. 741 (P.R. 2000) ...........................................................................30

*Michigan Cent. R. Co. v. Powers*,
  201 U.S. 245 (1906)........................................................................................13

*Myers v. Alaska Housing Fin. Corp.*,
  68 P.3d 386 (Alaska 2003)..............................................................................28

*N. Little Rock Transp. Co. v. Cas. Reciprocal Exch.*,
  85 F. Supp. 961 (E.D. Ark. 1949)...................................................................13

*New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*,
  779 F. Supp. 646 (D.P.R. 1991) .....................................................................14

*In re Okla. Capitol Improvement Auth.*,
  958 P.2d 759 (Okla. 1998)........................................................................20, 21

*P.R. Tele. Co. v. Tribunal de Contribuciones*,
  81 D.P.R. 982 (P.R. 1960) ......................................14, 15, 16, 18, 24, 34

*In re Plaza Resort at Palmas, Inc.*,
  741 F.3d 269 (1st Cir. 2014)......................................................................25, 35

*Pritzker v. Yari*,
  42 F.3d 53 (1st Cir. 1994)..........................................................................25, 35

*Quirk v. Mun. Assistance Corp. for City of N.Y.*,
  41 N.Y.2d 644 (N.Y. 1977) ......................................................................28, 34

*In re Request for Advisory Opinion Enrolled Senate Bill 558*,
  254 N.W.2d 544 (Mich. 1977).......................................................................19

*Savage v. State*,
  774 S.E.2d 624 (Ga. 2015).......................................................................20, 21

*Schowalter v. State*,
  822 N.W.2d 292 (Minn. 2012)..................................................................20, 21

*Schulz v. State*,
   639 N.E.2d 114 (N.Y. 1994)..................................................................................21

*Teamcare Infusion Orlando, Inc. v. Humana Health Plans of Puerto Rico, Inc.*,
   No. 14-1741, 2017 WL 5441832 (D.P.R. Nov. 1, 2017)...................................11

*Telefonica Larga Distancia de Puerto Rico, Inc. v. Departamento de Hacienda*,
   No. KC097-0021, 2001 WL 1764054 (P.R. Nov. 26, 2001) .............................14

*In re Town Ctr. Flats, LLC*,
   855 F.3d 721 (6th Cir. 2017) .............................................................................28

*U.S. v. Ron Pair Enterprises, Inc.*,
   489 U.S. 235 (1989)....................................................................................25, 35

*U.S. Brewers Ass'n v. Srio de Hacienda*,
   109 D.P.R. 456 (P.R. 1980) ..............................................................................14

*In re Ventura-Louise Props.*,
   490 F.2d 1141 (9th Cir. 1974) ...........................................................................28

*Walinske v. Detroit-Wayne Joint Bldg. Auth.*,
   39 N.W.2d 73 (Mich. 1949).........................................................................20, 21

*Winkler v. State School Bldg. Auth.*,
   434 S.E.2d 420 (W. Va. 2003)...........................................................................24

**Statutes**

31 L.P.R.A. § 31 .....................................................................................................22, 23

Act No. 91 of May 13, 2006 (codified at P.R. Laws Ann. tit. 13, §12)...........5, 6, 7, 29

Act No. 291-2006 of Dec. 26, 2006,
   (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) .............................5

Act No. 56 of July 5, 2007
   (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) .........5, 6,7, 25, 26, 27, 30, 33

Act No. 1-2009 of Jan. 14, 2009
   (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) ...........6, 7, 10, 26

Act No. 7-2009 of March 9, 2009
   (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) .............................6

Act No. 18-2009 of May 22, 2009
   (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) ..........................6, 9

Act No. 116-2013 of Oct. 10, 2013
    (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) ..............................................6

Act No. 101-2015 of July 1, 2015
    (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a -16) ...............................6, 10, 26

Fed. R. Bankr. P. 7056.................................................................................................11

Fed. R. Civ. P. 56 .........................................................................................................11

P.R. Const. art. II .....................................................................................................15, 25

P.R. Const. art. VI........................................................................14, 16, 22,25, 33, 34

## Other Authorities

3 Jose Trias Monge, Historia Constitucional de Puerto Rico 216 (1st ed. 1982)..............14

P.R. Op. Sec. Just. 1974-15, 1974 WL 326062 (May 21, 1974) ....................................23

Bettina M. Whyte (the "**COFINA Agent**"), in her capacity as the appointed agent of the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") as representative of the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), respectfully submits this memorandum of law in support of her motion for summary judgment (the "**Motion**").

## PRELIMINARY STATEMENT

This adversary proceeding was commenced to determine "[w]hether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt (the 'Pledged Sales Taxes') are property of the Commonwealth or COFINA under applicable law." *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Case No. 17-BK-3283, Dkt No. 996). No genuine dispute of fact exists based on the plain language of COFINA's lawfully enacted enabling statutes that the Pledged Sales Taxes are COFINA's property. The COFINA Agent is entitled to entry of summary judgment in her favor as a matter of law.

The basis for this conclusion is straightforward. In 2006, the Commonwealth faced a severe economic crisis that led to the shutdown of the Puerto Rico government and imperiled essential government services. To permit the Commonwealth to emerge from that crisis, the Legislative Assembly exercised its broad legislative powers to create COFINA as part of a strategy to raise low-cost capital for the Commonwealth. The Legislative Assembly passed unambiguous legislation (i) imposing a new sales and use tax in Puerto Rico, (ii) creating a fund (the "**Dedicated Sales Tax Fund**") and directing that a portion of the stream of future sales and use tax revenue (the "**Pledged Sales Tax**") be deposited directly into that fund, (iii) creating COFINA as an independent corporation, (iv) transferring to COFINA present ownership of the Dedicated Sales Tax Fund and the stream of Pledged Sales Tax revenue that was required to be deposited directly into the fund, and (v) authorizing COFINA to issue bonds secured not by the full faith and credit

of the Commonwealth (in which the market had little trust), but by the steady stream of Pledged Sales Tax revenue owned by COFINA.

To resolve this adversary proceeding, the Court need look no further than the unambiguous language of the Commonwealth statute that transferred ownership of the Pledged Sales Tax to COFINA. That statute provides that the Dedicated Sales Tax Fund and "***all the future funds that must be deposited***" in the Dedicated Sales Tax Fund "pursuant to the provisions of this law ***are hereby transferred to, and shall be the property of COFINA***." Consistent with COFINA's ownership of those "future funds," the same statute provides that the "future funds" "shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall [they] constitute resources available to the Commonwealth of Puerto Rico, nor shall [they] be available for use by the Secretary."

These clear and unambiguous statutory provisions transferred to COFINA ownership of the Dedicated Sales Tax Fund and the Pledged Sales Tax. The legislation providing for the transfer was duly passed and signed into law. The transfer was well within the broad taxing and police powers vested in the Legislative Assembly by the Puerto Rico Constitution. And it was based on this transfer—and the clear legislative authority to have effected the transfer—that investors purchased the highly-rated COFINA-issued bonds, allowing the Commonwealth to raise over $16 billion.

Even if the Court were to look beyond the plain statutory text (and it should not), there is ample additional evidence that the Legislative Assembly intended for COFINA to own the stream of Pledged Sales Tax revenue and that COFINA does in fact own those tax proceeds. Indeed, the Legislative Assembly expressly stated in the Statement of Motives accompanying the statute that the "future funds" would be "***owned by COFINA***." The Legislative Assembly

2

repeatedly reaffirmed COFINA's ownership of the Pledged Sales Tax over the course of a decade. And three Secretaries of Justice opined after reviewing the statute that ownership had been transferred to COFINA. Interpreting the statute to grant COFINA ownership of the stream of revenue from the Pledged Sales Tax is the only way to give effect not only to the Legislative Assembly's words but also its purpose in creating COFINA in the first place. The Legislative Assembly needed to transfer ownership away from the Commonwealth to provide holders of bonds issued by COFINA with adequate security for their investments and thereby obtain the most advantageous terms for critically needed new financing at a time of serious financial crisis.

None of the arguments raised by the Commonwealth Agent or the Commonwealth-side Permitted Intervenors justifies a different result. The Commonwealth Agent asserts that the COFINA legislation merely reflects a promise by the Commonwealth to transfer future tax revenues that can be reneged upon at any time. That, however, is inconsistent with the plain language of the statutes and the Legislative Assembly's clear intent to create a present property interest in favor of COFINA. The Commonwealth Agent further asserts that the transfer is void either because it is legally impossible to transfer future tax revenue or because the transfer constitutes an unlawful "evasion" of provisions in the Puerto Rico Constitution limiting the debt that the Commonwealth can incur. But far from being impossible, courts regularly uphold present ownership rights in streams of future revenue, and nothing in the Puerto Rico Constitution prohibited the Legislative Assembly from transferring ownership of future tax proceeds to COFINA. And the separate assertion (principally advanced by the Ad Hoc Group of General Obligation Bondholders (the "**GO Bondholders**")) that the Pledged Sales Tax proceeds are "available resources" under the Puerto Rico Constitution is unavailing, principally because the

3

COFINA statutes themselves make clear that the Pledged Sales Tax proceeds are not "available for use by the Secretary" because the Pledged Sales Tax was transferred to COFINA.

More fundamentally, all of these arguments are based on the unsupportable assumption that Puerto Rico legislators, executives, and advisors were all either mistaken or lying when they repeatedly assured the market for a decade that the Pledged Sales Tax belonged to COFINA. And the effect of adopting these arguments would be to raise serious doubts about the integrity of municipal financing structures commonly used throughout the United States. The COFINA structure and the transfer of tax proceeds to COFINA are far from unique—states and municipalities around the country have employed similar tax-backed securitization plans to raise needed funds for decades. If the Commonwealth Agent is correct, the integrity of all those bonds would be called into doubt.

## STATEMENT OF FACTS

A.  The Legislative Assembly Creates COFINA And Transfers Ownership Of The Dedicated Sales Tax Fund And The Stream Of Pledged Sales Tax Revenue To COFINA.

In 2006, the Commonwealth faced a serious financial crisis that resulted in a government shutdown for approximately two weeks.[2] Tens of thousands of public employees were left without pay and hundreds of thousands of children could not attend school.[3] In response, the Commonwealth enacted new measures to raise cost-effective capital, including legislation implementing a plan to issue tax-backed securities. As part of the plan, the Legislative Assembly of the Commonwealth passed Act No. 91 of May 13, 2006 (codified at P.R. Laws Ann. tit. 13, § 12) ("**Act 91**"), pursuant to which a portion of the sales and use tax (the Pledged Sales Tax) that

---

[2] (SUF ¶¶ 1, 2.)  References to "SUF" are to the Statement of Undisputed Material Fact In Further Support Of The Motion For Summary Judgment By The COFINA Agent, filed contemporaneously with and in support of the Motion.

[3] (SUF ¶¶ 2, 3.)

was imposed was to be deposited in the Dedicated Sales Tax Fund.  Act 91 § 2.[4]  Pursuant to

Act 91, the Dedicated Sales Tax Fund was to be used for the purposes expressly provided in the

statute, including the payment or refinancing of the Commonwealth's outstanding

extraconstitutional debt.  Act 91 § 3.

　　　　　To effectuate its financing plan, the Legislative Assembly also passed legislation

providing for the creation of COFINA—originally called the Puerto Rico Urgent Interest Fund

Corporation—as a subsidiary of the Development Bank of Puerto Rico (the "**GDB**").  *See* Act No.

291-2006 of Dec. 26, 2006 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 291**").

On July 5, 2007, the Legislative Assembly amended Act 91 by passing Act 56, which made

COFINA "a corporate and political entity independent and separate from the Commonwealth,"

rather than a subsidiary of the GDB.  Act 56 § 1; codified as amended at P.R. Laws Ann. tit. 13,

§§ 11a-16 ("**Act 56**," and together with Act 91, the "**COFINA-Enabling Legislation**").[5]  Act 56

also effected a statutory transfer to COFINA of the Dedicated Sales Tax Fund and the stream of

Pledged Sales Tax revenue.  Specifically, Act 56 provides that:

> [t]he [Dedicated Sales Tax Fund] and all the funds deposited therein
> on the effective date of this act ***and all the future funds that must
> be deposited*** in the [Dedicated Sales Tax Fund] pursuant to the
> provisions of this law ***are hereby transferred to, and shall be the
> property of COFINA***.

Act 56 § 2 (emphasis added).  Act 56 also identifies "the future funds that must be deposited" in

the Dedicated Sales Tax Fund, providing that the Dedicated Sales Tax Fund "***shall*** be funded each

fiscal year from" a specified portion of the "[t]he first revenues of the sales and use tax."  *Id.*

---

[4] (*See also* SUF ¶¶ 7, 8, 11.)

[5] (*See also* SUF ¶ 10.)

5

Consistent with its transfer of the Dedicated Sales Tax Fund and the Pledged Sales Tax to COFINA, Act 56 provides that the Pledged Sales Tax shall not be deposited in the Commonwealth's Treasury nor be available to the Commonwealth. *Id*. The Legislative Assembly further made clear in the Statement of Motives accompanying Act 56 that the statute was intended "to increase the amount of funds that are deposited in the Dedicated Sales Tax Fund . . . , ***that they be owned by COFINA*** . . . , and that such funds ***shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose*** . . . ." *Id*., Statement of Motives (emphasis added). This statement of intent was repeated in subsequent amendments to the legislation. *See, e.g.*, Act No. 101-2015 of July 1, 2015 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 101**") § 1; Act No. 116-2013 of Oct. 10, 2013 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 116**") § 2; Act No. 18-2009 of May 22, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 18**") § 2; Act No. 7-2009 of March 9, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 7**") § 5; Act No. 1-2009 of Jan. 14, 2009 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("**Act 1**") § 2. As the owner of the Pledged Sales Tax, COFINA was also granted the ability to issue bonds secured by that revenue stream. Act 56 § 3.

Transferring the Dedicated Sales Tax Fund and the Pledged Sales Tax to COFINA—and prohibiting the Commonwealth from using those tax proceeds for any other purpose—was an essential component of the plan to raise lower-cost capital. Insulating COFINA and its bonds from the Commonwealth's known credit risk was also necessary for the bonds to carry a lower interest rate than the Commonwealth's general obligation debt.[6]

---

[6] (*See* SUF ¶¶ 12, 14, 19, 20, 21.)

The Legislative Assembly separately made clear that the obligations on bonds issued by COFINA would be solely the responsibility of COFINA. Act 56 states:

> The bonds and other obligations of COFINA ***shall not constitute a debt or obligation of the Commonwealth*** of Puerto Rico nor of its other instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which ***the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged***.

Act 56 § 3(d) (emphasis added). The Commonwealth was also explicit in Act 56 that it would never interfere with COFINA's rights to satisfy its obligations to its bondholders:

> ***The Commonwealth of Puerto Rico hereby agrees and promises*** any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico that subscribe or acquire bonds issued by COFINA, ***to not limit nor restrain the rights or powers hereby conferred by this Act or the rights of COFINA to meet its agreements with bondholders***, until such time as such bonds, regardless of their date, together with the interest accrued, shall be completely paid and redeemed. ***No amendment*** to Act No. 91 of May 13, 2006, as amended, ***shall undermine any obligation or commitment of COFINA***.

*Id*. at § 5(d) (emphasis added). The Commonwealth re-affirmed that commitment in 2009 in Act 1. *See*, Act 1 § 4.

The legislation creating COFINA and transferring the Pledged Sales Tax and Dedicated Sales Tax Fund to COFINA was passed with the support of both major political parties of the Commonwealth of Puerto Rico.[7]

B.    COFINA Issues Bonds Secured By The Pledged Sales Tax.

Beginning in 2007, COFINA issued bonds pursuant to the Amended and Restated Sales Tax Revenue Resolution (as amended and supplemented, the "**Resolution**") entered into

---

[7] (SUF ¶ 13.)

among COFINA, the Bank of New York Mellon (as trustee), the COFINA bondholders, and certain other beneficiaries.[8]  Pursuant to the Resolution, COFINA issued four types of bonds: (a) senior "current interest" bonds; (b) senior "capital appreciation" bonds; (c) subordinate "current interest" bonds; and (d) subordinate "capital appreciation" bonds (together, the "**COFINA Bonds**").[9]  The Resolution makes clear that the COFINA Bonds are payable solely from the Pledged Sales Tax and the "███████████████████████████████ █████."[10]

> Prospective investors, moreover, were advised that "the [Dedicated Sales Tax Fund] and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, [COFINA]" and that the "Commonwealth agrees and commits . . . that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of [COFINA] to comply with its agreements with [COFINA bondholders] until said bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of [COFINA]."[11]  Investors were told that the COFINA Bonds "will be payable from and secured by a security interest [in the Pledged Sales Tax] . . . imposed by a newly-enacted statute of the Commonwealth that grants to [COFINA] *ownership* of the Pledged Sales Tax . . . ."[12]  And investors were also told that the COFINA Bonds "do not constitute a debt, obligation or

---

[8] (SUF ¶ 16; Ex. 2 (Resolution) at Ex. A.)  Exhibits cited herein are annexed to the Declaration of Antonio Yanez, Jr., dated February 21, 2018 (the "**Yanez Declaration**").  Certified English language translations of Spanish language authorities cited herein are annexed to the Yanez Declaration in support of the Motion as Exhibits 75-85.

[9] (SUF ¶ 15.)

[10] (Ex. 2 (Resolution) at 23.)

[11] (Ex. 6 (Puerto Rico Sales Tax Financing Corp., $2,667,603,572.60 Sales Tax Revenue Bonds Series 2007A, Official Statement at 17, 22 (July 13, 2007)).)

[12] (*Id*. at 1.)

pledge of the full faith, credit and taxing power of the Commonwealth or any of its . . . instrumentalities (other than the Corporation)," and that the Commonwealth is not "liable for the payment" of the bonds.[13]

Rating agencies assigned the COFINA Bonds strong credit ratings based on these legislative statements and official legal opinions (discussed below), concluding that the COFINA Bonds were "insulated from the [Commonwealth's] broader budget and financial problems. . . ."[14] These high ratings were in contrast to the substantially lower ratings issued to the Commonwealth's general obligation bonds ("**GO Bonds**"), which are supported only by the Commonwealth's full faith and credit.[15]

The Commonwealth raised more than $16 billion through COFINA Bonds, and financing using COFINA Bonds has saved the Commonwealth between $1.1 and $2.2 billion in borrowing costs.[16] Many of the investors who purchased COFINA Bonds are individual Puerto Ricans. In fact, the COFINA Bonds represent the most widely held investment by retirees and

---

[13] (*Id.*)

[14] (*See, e.g.*, Ex. 74 (Moody's Investors Service, Moody's Assigns A1 Rating and Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, Jun. 27, 2007) at 2; *see also* Ex. 3 (Memorandum from Citigroup Global Markets to F. Batlle re: Roadmap for COFINA I Ratings Upgrade to "AA" Category (Feb. 18, 2009) at 2 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.")).)

[15] (Ex. 48 (Transcript of GBD Conference Call re: COFINA Legal Opinions at 2 (Oct. 31, 2013) (José Pagán, Interim President of the GDB: "COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth."))); Act 18, Statement of Motives ("These bonds enjoy a credit rating higher that that [sic] of the general obligation bonds of the Commonwealth of Puerto Rico. The Government of Puerto Rico Economic and Fiscal Reconstruction Plan includes a financing program that relies mainly on the issue of COFINA bonds.").

[16] (*See* Ex. 4 (Press Release, *Treasury Secretary and Interim GDB President Announce Amendments to COFINA Act that Will Facilitate More Cost-effective Financing for the Commonwealth*, PRNewswire, Sept. 25, 2013 (available at https://www.prnewswire.com/news-releases/treasury-secretary-and-interim-gdb-president-announce-amendments-to-cofina-act-that-will-facilitate-more-cost-effective-financing-for-the-commonwealth-225219522.html) (estimating "between $66 million and $132 million [of savings] for every $1 billion issued in bonds.")).)

retail investors in Puerto Rico.[17]   Individuals and other investors in Puerto Rico own at least $2.8 billion in COFINA Bonds.[18]

> **C.** **The Commonwealth Repeatedly Affirms COFINA's Ownership Of The Dedicated Sales Tax Fund And The Pledged Sales Tax.**

For nearly ten years following the Legislative Assembly's enactment of Act 56, COFINA's ownership of the Dedicated Sales Tax Fund and the Pledged Sales Tax was never questioned.  To the contrary, in connection with a 2009 statute that increased the percentage of the sales and use tax deposited into the Dedicated Sales Tax Fund, the Legislative Assembly reiterated that the Pledged Sales Tax shall not "be available for use by the Secretary of Treasury of the Commonwealth."  Act 1 § 2.  In 2014, the Commonwealth told holders of GO Bonds and potential investors that "███████████████████████████████████████████████████████ ██████████████████████████████████████████████████" and that "████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████."[19]  And, as recently as 2015, the Legislative Assembly again reaffirmed that the Pledged Sales Tax "shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of Treasury of the Commonwealth of Puerto Rico."  Act 101 § 1.

---

[17] (SUF ¶ 24.)

[18] (Ex. 51 (Commonwealth Fiscal Plan at 71 (Oct. 14, 2016).)

[19] (Ex. 32 (Commonwealth of Puerto Rico, $3,500,000,000 Gen. Obligation Bonds of 2014, Series A, Official Statement at 29 (Mar. 11, 2014)) (emphasis added).)

Along the same lines, Secretaries of Justice serving three different administrations have all opined that COFINA owns the Pledged Sales Tax and Dedicated Sales Tax Fund.[20]  A catalogue of the Commonwealth's many admissions over the last decade reaffirming COFINA's ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund is annexed to the Yanez Declaration as Exhibit 1.

## STANDARD

Under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, a motion for summary judgment must be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; *Teamcare Infusion Orlando, Inc. v. Humana Health Plans of Puerto Rico, Inc.*, No. 14-1741, 2017 WL 5441832, at *3 (D.P.R. Nov. 1, 2017).  "[I]t is well settled that the mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment."  *Teamcare Infusion*, 2017 WL 5441832, at *3 (citations omitted).  And, although the Court should construe all reasonable inferences in the light most favorable to the non-moving party, a Court must not "draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective."  *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) (citations omitted) (emphasis in original).

Based on these standards, the Court should grant summary judgment in the COFINA Agent's favor.[21]

---

[20] (*See, e.g.*, Ex. 52 (Letter from Roberto J. Sánchez Ramos, Secretary, Department of Justice, to Alfredo Salazar Conde, Chairman, COFINA, Consulta Núm. 06-63-B ¶¶ 2-3 (July 31, 2007) (" ███████████████████████████████████ ") (emphasis added)); *see also* SUF ¶ 27.)

[21] The COFINA Agent's Motion seeks summary judgment on the following claims, which the COFINA Agent believes remain within the scope of this adversary proceeding pursuant to this Court's orders:  (i) the Commonwealth Agent's

## ARGUMENT

I. **THE LEGISLATIVE ASSEMBLY IS EMPOWERED BY THE PUERTO RICO CONSTITUTION TO ENACT LEGISLATION TRANSFERRING THE DEDICATED SALES TAX FUND AND THE PLEDGED SALES TAX TO COFINA.**

A. The Legislative Assembly Properly Exercised Its Broad Taxing And Police Powers To Enact Legislation Addressing The Financial Needs Of The Commonwealth.

The Supreme Court of Puerto Rico has made clear that "every statute is, and is presumed to be constitutional," because "deference [is] due to the Legislative Power in the exercise of its constitutional mandate, in accordance with the roles assigned to each branch of government under the separation of powers scheme prescribed in the Constitution." *Commonwealth of Puerto Rico v. Northwestern Selecta, Inc.*, 185 D.P.R. 40, 71 (P.R. 2012).[22] This deferential principle is reflected in Article V, Section 4 of the Constitution of Puerto Rico, which mandates that statutes duly enacted by the Legislative Assembly may only be declared unconstitutional by a majority of the sitting justices of the Puerto Rico Supreme Court.

---

First Cause of Action (declaratory judgment that the Legislative Assembly did not transfer present ownership of future SUT revenues to COFINA), Second Cause of Action (declaratory judgment that COFINA was not assigned the Commonwealth's "right to receive" the Pledged Sales Tax), Twelfth Cause of Action (declaratory judgment that the transfer of the Pledged Sales Tax to COFINA is an unlawful evasion of the debt limit provisions of the Puerto Rico Constitution), and Thirteenth Cause of Action (declaratory judgment that the transfer to COFINA was a violation of the balanced budget provision of the Puerto Rico Constitution); (ii) the GO Bondholders' First Cause of Action (declaratory judgment that all revenues derived from the SUT constitute property of the Commonwealth); and (iii) the COFINA Agent's First Counterclaim (declaratory judgment that the statutes transferring the Pledged Sales Tax are constitutional, and COFINA owns the Pledged Sales Tax). The COFINA Agent does not address issues that she understands from the Court's orders are outside of the scope of this dispute. However, the COFINA Agent reserves her rights to argue, at the appropriate time, that those issues should also be resolved in her favor and to respond to any arguments raised by any other party in connection with summary judgment. The COFINA Agent also reserves the right to challenge the scope rulings on appeal.

[22] *See also Asociación De Empleados Gerenciales De La Corporación Del Fondo Del Seguro Del Estado v. Corporación Del Fondo Del Seguro Del Estado*, No. KLAN201500471, 2015 WL 4075649, at *4 (P.R. Cir. May 29, 2015) ("When the Supreme Court of Puerto Rico examines the validity of a statute, it does so bearing in mind the deference the legislative branch merits and in accordance with the system of separation of powers."); *Lozada Tirado v. Testigos Jehovas*, 177 D.P.R. 893, 926 (P.R. 2010) ("It is well known that legislative acts enjoy a presumption of constitutionality.") (citations omitted); *Caquías v. Asoc. de Residentes de Mansiones de Río Piedras*, 134 D.P.R. 181, 189 (P.R. 1993) ("[W]e reiterate the traditional rule that laws are, and are presumed to be constitutional until a court with competent jurisdiction rules otherwise.") (citation omitted).

Federal courts also routinely recognize that state laws should not be invalidated under state constitutions except in the rarest of cases and only when the unconstitutionality of the law is beyond any doubt.  *See Grand River Dam Auth. v. Jarvis*, 124 F.2d 914, 917 (10th Cir. 1942) ("It is well established by federal decisions that [where a federal court is asked to declare a state law unconstitutional] all doubt and uncertainty will be resolved in favor of constitutionality and that ***only in the clearest of cases*** will a federal court hold that the [state] legislature has violated the state constitution.") (emphasis added); *N. Little Rock Transp. Co. v. Cas. Reciprocal Exch.*, 85 F. Supp. 961, 964 (E.D. Ark. 1949) ("In the absence of a decision of the Supreme Court of the State, a federal court will not hold a state statute unconstitutional under the State Constitution, ***unless no other course is possible***.") (emphasis added); *In re Boswell*, 20 F. Supp. 748, 750 (S.D. Cal. 1937) ("[T]he asserted unconstitutionality [of a state law] must appear ***clear, certain, and conclusive*** before the federal courts of the first instance should strike down state legislation.") (emphasis added).

The Supreme Court has held that this doctrine is particularly potent where (as here) a federal court is asked to opine on an issue of state law—and especially one relating to state finances—that has not yet been addressed by the courts of that particular state.  *See Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 43 (1970) (remanding to the district court with instructions to wait until the Puerto Rico Supreme Court had authoritatively ruled on the local law question); *Michigan Cent. R. Co. v. Powers*, 201 U.S. 245, 291 (1906) ("Federal courts will be reluctant to adjudge a state statute to be in conflict with the state Constitution before that question has been considered by the state tribunals.  Especially is this true when the statute is one affecting the revenues of the [state], and therefore of general public interest."); *Federación de Maestros de Puerto Rico v. Acevedo-Vilá*, 545 F. Supp. 2d 219, 225-26 (D.P.R. 2008) (refusing to resolve an unsettled

13

question of Puerto Rico law that had not yet been reviewed by the Puerto Rico Supreme Court);
*New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*, 779 F. Supp. 646, 653-
54 (D.P.R. 1991) (refusing to opine on matters of solely Puerto Rico law).[23]

> Against this requirement of deference, the Puerto Rico Constitution vests the
Legislative Assembly with broad powers to address the financial needs of the Commonwealth.
Article VI Section 2 of the Puerto Rico Constitution addresses the legislature's taxing powers and
provides that "[t]he power of the Commonwealth of Puerto Rico to impose and collect taxes and
to authorize their imposition and collection by municipalities shall be exercised *as determined by
the Legislative Assembly*[.]"  P.R. CONST. art. VI, § 2 (emphasis added).  "The wide discretion
possessed by the Legislature in the field of taxation has long been recognized."  *U.S. Brewers
Ass'n v. Srio de Hacienda*, 109 D.P.R. 456, 459-460 (P.R. 1980) (quotation omitted); *see also*
3 JOSE TRIAS MONGE, HISTORIA CONSTITUCIONAL DE PUERTO RICO 216-18 (1st ed. 1982)
(explaining that drafters of the Puerto Rico Constitution intended to grant the Legislative Assembly
the broadest possible taxing power).  Accordingly, the Legislative Assembly's taxing power
includes the power to allocate tax proceeds, limited only by a requirement that the proceeds be
used for a "public purpose."  *See P.R. Tele. Co. v. Tribunal de Contribuciones*, 81 D.P.R. 982 (P.R.
1960) (upholding appropriation of tax proceeds for "a specific purpose" instead of being
"deposited as general government funds" where the funds were used for a "public purpose"); *see
also Telefonica Larga Distancia de Puerto Rico, Inc. v. Departamento de Hacienda*, No. KCO97-
0021, 2001 WL 1764054, at *3 (P.R. Nov. 26, 2001) (tax allocated to a special fund).

> The Puerto Rico Constitution separately grants the Legislative Assembly broad
"police powers."  Article II, Section 18 provides that "[n]othing herein contained shall impair the

---

[23] For these reasons, the COFINA Agent reserves its rights to move this Court to certify these questions to the Supreme
Court of Puerto Rico.

authority of the Legislative Assembly to enact laws to deal with grave emergencies that clearly imperil the public health or safety or essential public services," and Article II, Section 19 provides that "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively." The courts of Puerto Rico have adopted a "hands-off" approach to the Legislative Assembly's broad police power to enact economic legislation, *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (P.R. 1983), which is "restricted only by due process guarantees," *Defendini Collazo v. Commonwealth of Puerto Rico*, 134 D.P.R. 28 (P.R. 1993) (citations omitted).

Transferring ownership of the Dedicated Sales Tax Fund and the Pledged Sales Tax to COFINA was plainly within the Legislative Assembly's broad powers, particularly given the well-established principle of deference to legislative acts. The taxing power permits the Legislative Assembly to impose taxes as it determines, and to allocate those taxes as it sees fit for a public purpose. *P.R. Tele. Co.*, 81 D.P.R. 982. That is what the Legislative Assembly did with respect to the Pledged Sales Tax—it imposed a tax and then transferred a stream of proceeds from that tax to COFINA to raise low-cost funds for the Commonwealth.

The COFINA-Enabling Legislation and its transfer of tax proceeds to COFINA was also permissible as an exercise of the Legislative Assembly's police powers. The 2006 financial crisis was a "grave emergenc[y]" that threatened "public health [and] safety" as well as "essential public services." P.R. CONST. art. II, § 18. The government of Puerto Rico shut down, schools were closed, and there existed widespread concerns about whether essential government services could properly function, including health and security agencies. The Legislative Assembly was empowered to respond to that crisis by creating COFINA, transferring the Pledged Sales Tax to COFINA, and authorizing COFINA to issue bonds secured by the Pledged Sales Tax. P.R. CONST.

15

art. VI, § 2; *id*. at Art. II, §§ 18-19; *P.R. Tele. Co.*, 81 D.P.R. 982; *Defendini Collazo*, 134 D.P.R.
28; *Marina Indus.*, 114 D.P.R. 64; *see also Asociación De Empleados Gerenciales De La
Corporación Del Fondo Del Seguro Del Estado*, 2015 WL 4075649, at *15 (upholding
constitutionality of Puerto Rico law that was "of an economic nature, whose principal purpose
[was] to pull the country out of the fiscal crisis").

The Legislative Assembly's power to transfer tax revenue to COFINA is further
confirmed by three Secretaries of Justice, whose opinions are themselves afforded substantial
deference under Puerto Rico law. *Maldonado v. Junta de Planificación*, 171 D.P.R. 46, 67 (P.R.
2007) ("Even if the opinions issued by the Secretary of Justice of Puerto Rico *are not* binding on
the courts, we point it out because of the persuasive value it may have.") (emphasis in original);
*F.D.I.C. v. Municipality of Ponce*, 904 F.2d 740, 746 (1st Cir. 1990) ("Although opinions of the
Attorney General or the Puerto Rican equivalent, the Secretary of Justice, are not binding on the
courts, the Supreme Court of the United States has recognized that they are 'entitled to careful
consideration by the courts, and quite generally regarded as highly persuasive.'") (quoting *Harris
Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 87 n.10 (1974)).

B.    The Transfer Is Not Prohibited By The Debt Limit Provisions Of The Puerto Rico
      Constitution.

In its Twelfth Cause of Action, the Commonwealth Agent alleges that the
COFINA-Enabling Legislation "constitutes an unconstitutional evasion" of two provisions found
in Article VI, Section 2 of the Puerto Rico Constitution. The first—which the Commonwealth
Agent refers to as the "Debt Service Limit"—imposes a limit on "direct obligations of the
Commonwealth for money borrowed directly by the Commonwealth . . . for the payment of which
the full faith credit and taxing power of the Commonwealth shall be pledged." P.R. CONST. art.
VI, § 2. The second—referred to in the Second Amended Complaint as the "Debt Maturity Limit"

16

(and together with the Debt Service Limit, the "**Constitutional Debt Limits**")—provides that no direct obligation "bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date." *Id.*

Neither of the Constitutional Debt Limits prohibits the transfer of the Pledged Sales Tax to COFINA; in fact, neither is in any way implicated by the COFINA Bonds.  The COFINA Bonds are not "direct obligations of the Commonwealth," and proceeds from the bonds do not constitute "money borrowed directly by the Commonwealth."  Rather, the COFINA Bonds are obligations of COFINA, an independent corporation, and the COFINA bondholders have no recourse to the Commonwealth for default on the bonds.

The Commonwealth Agent concedes that the Constitutional Debt Limits do not actually apply to the COFINA Bonds.  (2d Am. Compl. ¶ 142.)  In fact, as the Commonwealth Agent acknowledges, when the Constitutional Debt Limits were enacted, the drafters specifically contemplated that public corporations like COFINA could issue debt that would not be subject to the debt limit:

> *[B]onds issued and to be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when calculating the State's borrowing margin*, since for the payment of the same the good faith of the People of Puerto Rico is not committed and they will continue to be paid only from the income derived by said corporations.  *Only in the event that the State guarantees any of these bonds*, which it has not done so far, *and that it has to pay in a given year a deficiency of the debt requirements thereof, with which the amount thus paid be counted against the borrowing margin of the Commonwealth.*[24]

---

[24] One senator argued that the constitutional debt limit should be expanded to cover debt not directly issued by the Commonwealth, but his view was rejected.  (*See* Ex. 78 (Diario de Sesiones de la Asemblea Legislativa, Sept. 4-5, 1961) at 241); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges weighs heavily against the Government's interpretation.") (citation omitted).

(2d Am. Compl. ¶ 141; Ex. 78 (Diario de Sesiones de la Asemblea Legislativa, Sept. 4-5, 1961) at 221 (emphasis added).)

Nevertheless, the Commonwealth Agent contends that the COFINA structure somehow constitutes an "evasion" of the Constitutional Debt Limits, rendering the transfer of the Pledged Sales Tax ineffective. Specifically, the Commonwealth Agent contends that the Legislative Assembly can *only* pass laws causing the issuance of bonds that are either (i) issued by a public corporation and secured by revenues generated by that public corporation or (ii) general obligation debt backed by the full faith credit of the Commonwealth and subject to the Constitutional Debt Limits. According to the Commonwealth Agent, since the COFINA Bonds are neither, the Legislative Assembly's transfer of the Pledged Sales Tax to COFINA is void.

Neither of these arguments has merit. Nothing in the Puerto Rico Constitution prohibits the Legislative Assembly from transferring ownership of a stream of tax revenue to a public corporation or causing the corporation to issue bonds secured by that stream of revenue. Far from it, the Puerto Rico Constitution grants the Legislative Assembly broad powers to enact economic and financial legislation. *See P.R. Tele. Co.*, 81 D.P.R. at 995 (the Legislative Assembly can allocate tax proceeds to a "specific purpose"); *Defendini Collazo*, 134 D.P.R. 28 (police powers include the power to set economic regulations "that promote the general welfare"); *Marina Indus.*, 14 D.P.R. at 107 (the Legislative Assembly "has ample power to regulate the economic sector" under its police powers). Indeed, for at least 50 years, the Commonwealth has backed bonds issued by public corporations with Commonwealth tax revenues—such as the petroleum taxes and hotel occupancy taxes that secure bonds issued by the Puerto Rico Highways

Transportation Authority and Puerto Rico Convention Center District Authority bonds, respectively.[25]

       Nor can the Commonwealth Agent point to authority limiting the Legislative Assembly's financial prerogatives, much less authority that would override its broad powers to enact legislation that it determined to be necessary to address a financial crisis.  *See Marina Indus.*, 14 P.R. Offic. Trans. at 106 (making clear that deference to Legislative Assembly's police power is particularly strong when it enacts legislation addressing "emergencies caused by, among others, economic inflation or recession"); *Coca-Cola Bottling Co. v. Srio. de Hacienda*, 112 D.P.R. 707, 713 (P.R. 1982) (upholding exercise of taxing power "in order to meet the needs of the government in a time of economic crisis").

       The Commonwealth Agent also claims that the transfer of the Pledged Sales Tax was somehow improper because COFINA Bonds are not "revenue bonds" since they are not paid from "income derived by [COFINA]."  But, regardless of whether or not these are "revenue bonds" within the Commonwealth Agent's definition, the critical point is that the COFINA Bonds are beyond the scope of the Constitutional Debt Limits because they are not backed by the full faith and credit of the Commonwealth.[26]  And, even assuming that the issuance of COFINA Bonds to

---

[25] Other examples of lawful bonds that are not secured solely by revenues generated by the public corporation include Puerto Rico Infrastructure Financing Authority ("**PRIFA**") bonds (secured by federal rum excise taxes remitted to the Commonwealth government) and bonds issued by the Commonwealth's pension systems (secured in part by the Commonwealth's contribution as a public employer).  Under the Commonwealth Agent's theory, all such bonds would be illegal.

[26] (Ex. 78 (Diario de Sesiones de la Asemblea Legislativa, Sept. 4-5, 1961) at 221 ("[B]onds which have been and may be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into consideration in computing the Commonwealth's borrowing margin *since the good faith of the People of Puerto Rico is not committed for their payment*, and they will continue to be paid only from said corporations' revenues.") (emphasis added)); *see also Assured Guar. Corp. v. Garcia-Padilla*, 214 F. Supp. 3d 117, 121 (D.P.R. 2016) (PRIFA bonds secured by remitted federal rum excise taxes are revenue bonds); *In re Request for Advisory Opinion Enrolled Senate Bill 558*, 254 N.W.2d 544, 547-58 (Mich. 1977) (holding that bonds that do not "pledg[e] the general obligation of the state to their repayment" are revenue bonds that are not subject to constitutional debt limitations, even though the bonds will be repaid with "rental payments" drawn from the state's "general tax fund"); *Flushing Nat'l Bank v. Mun. Assistance Corp. for City of New York*, 40 N.Y.2d 731, 733, 735 (1976) ("A 'faith and credit' obligation is[] entirely different

investors violated the Puerto Rico Constitution, that violation could only have occurred *after* the Legislative Assembly transferred ownership of the Pledged Sales Tax to COFINA, and therefore does not void the transfer itself. *See Bonin v. Vannaman*, 929 P.2d 754, 772 (Kan. 1996) (rejecting argument that subsequent action by legislature "can somehow cause" a constitutional statute enacted earlier "to retroactively become unconstitutional").

Notably, the Commonwealth Agent's "evasion" argument has been specifically rejected by at least two state supreme courts. The Minnesota Supreme Court and the Michigan Supreme Court have both held that creating bonds that are not subject to state constitutional debt restrictions is not an improper "evasion" of those restrictions. *Walinske v. Detroit-Wayne Joint Bldg. Auth.*, 39 N.W.2d 73, 78 (Mich. 1949) (rejecting argument that it was an "illegal method of circumventing the law and constitutional [debt limitation] provisions" for an independent corporation to issue bonds not backed by the full faith and credit of the city of Detroit); *Schowalter v. State*, 822 N.W.2d 292, 300 (Minn. 2012) (rejecting argument that bonds not backed by the full faith and credit of the state "improperly circumvent the State's balanced biennial budget requirement").

Other state courts have reached similar conclusions. *See, e.g., Savage v. State*, 774 S.E. 2d 624, 631-37 (Ga. 2015) (rejecting argument that a county's decision to issue bonds to fund a stadium violated the debt restrictions in the state constitution where the county was not liable for the bonds); *In re Okla. Capitol Improvement Auth.*, 958 P.2d 759, 767-77 (Okla. 1998) (holding that proposal to issue revenue bonds secured by tax proceeds was not prohibited by constitutional debt limit provision, and explaining that "[i]n construing constitutional debt-limitation provisions, it is the judiciary's duty to guard against indebtedness, not against modern

---

from a 'revenue' obligation, which is limited to a pledge of revenues from a[ny] designated source or fund" and can include "revenues which the city may [itself] raise *or receive from the State*.") (emphasis added) (citations omitted).

methods of financing").[27]   These decisions accord with the well-settled rule that "[i]t is not unconstitutional to accomplish a desired result, lawful in itself, by innovative, legal measures." *In re Okla. Capitol Improvement Auth.*, 958 P.2d at 763.[28]

All of this, finally, is without considering the impact that adopting the Commonwealth Agent's position here would have on other states' and municipalities' fundraising structures.  States and municipalities around the country rely on bonds backed by a stream of tax revenue, like the COFINA Bonds, to raise money.  Those fundraising structures, like the COFINA structure, are often outside state constitutional debt limits.  *See Schowalter*, 822 N.W.2d at 302; *Savage*, 774 S.E.2d at 631-37; *In re Okla. Capitol Improvement Auth.*, 958 P.2d at 767-77; *Schulz*, 639 N.E.2d at 1149.  Adopting the Commonwealth Agent's position here would raise grave doubts, particularly among investors on whom those states and municipalities rely, about whether such bonds are actually secured by anything.  That would seriously undermine municipal finance efforts around the country, including in Puerto Rico as it seeks a way out of its current financial situation.

C.    The Transfer Is Not Prohibited By The Balanced Budget Provision Of The Puerto Rico Constitution.

The Commonwealth Agent claims in its Thirteenth Cause of Action that the COFINA-Enabling Legislation violates the Balanced Budget Provision of the Puerto Rico Constitution, which provides that "[t]he appropriations made for any given fiscal year shall not exceed **the total resources, including available surplus** [*recursos totales*], estimated for said fiscal

---

[27] *See also Schowalter*, 822 N.W.2d at 302 (holding bonds secured by state's tobacco settlement proceeds, and not the full faith and credit of the state, were not public debt and therefore not subject to constitutional debt restrictions); *Schulz v. State*, 639 N.E.2d 1140, 1150 (N.Y. 1994) (dedication of funds to support public corporation's bond issuance was not "indebtedness of the State," and therefore not subject to constitutional debt limits).

[28] *See also Schulz*, 639 N.E.2d at 1150 (upholding validity of bonds against debt limit challenge notwithstanding plaintiffs' argument that "modern ingenuity, even gimmickry, [had] stretched the words of the Constitution beyond the point of prudence"); *Walinske*, 39 N.W.2d at 80 ("The fact that the proposed plan might be termed an evasion of the Constitution would not condemn it unless such evasion was illegal.").

Year unless the imposition of taxes sufficient to cover said appropriations is provided by law."
P.R. Const. art. VI, § 7 (emphasis added). According to the Commonwealth Agent, the governing
version of the Puerto Rico Constitution is the official English translation, which translates
"*recursos totales*" as "total revenues," and not "total resources." Based on this, the
Commonwealth Agent claims that the Balanced Budget Provision prohibits annual appropriations
of the Legislative Assembly from exceeding total tax revenues plus available surplus. The
Commonwealth Agent further claims that Act 91 violates the Balanced Budget Provision because
it allowed the Commonwealth to retire its extraconstitutional debt with proceeds from the COFINA
Bonds, "thereby financing deficit spending by reducing the 'appropriations' side of the budget
equation." (2d Am. Compl. ¶ 170.)

These arguments fail. First, nothing in the Balanced Budget Provision precludes
the Legislative Assembly from transferring ownership of tax proceeds to COFINA, which is all
that is in dispute here. The Commonwealth Agent alleges that *after* the Legislative Assembly
transferred the Pledged Sales Tax to COFINA, the Commonwealth violated the Balanced Budget
Provision by using proceeds from COFINA Bonds to pay down its constitutional debt. Even if
that were true (and it is not), that does not undermine the Legislative Assembly's broad power to
transfer sales and use tax proceeds as it sees fit. In any event, the Commonwealth Agent does *not*
allege that the transfer of the Pledged Sales Tax to COFINA caused "appropriations" to exceed
either "total resources" or "total revenues" of the Commonwealth.

Second, the Commonwealth Agent's position directly conflicts with how Puerto
Rico law requires such inconsistencies to be resolved. Under Puerto Rico law, in the "case of
discrepancy between the English and Spanish texts of a statute passed by the Legislative Assembly
of Puerto Rico, the text in which the same originated in either house, shall prevail on the

construction of said statute."  *See* 31 L.P.R.A. § 13.  The Commonwealth Agent concedes that, the phrase "total resources" in the Spanish text includes revenue from bonds.  (2d Am. Compl. ¶ 162.) Indeed, the drafters of the current Balanced Budget Provision replaced the phrase "total revenue" ("rentas totales") in an earlier draft of the provision with "total resources" ("recursos totales") in order to include non-tax revenues, such as federal aid, proceeds from bond issuances, and proceeds from the sale of public property.  (*See* Ex. 79 (Diario de Sesiones de la Convención Constituyente de Puerto Rico, December 12, 1951) at 1090; Ex. 83 (P.R. Op. Sec. Just. 1974-15, 1974 WL 326062, Opiniones del Secretario de Justicia de Puerto Rico, May 21, 1974).)  Therefore, the Commonwealth's receipt and use of proceeds from COFINA Bonds does not "reduc[e] the 'appropriations' side of the budget equation" as the Commonwealth Agent alleges—instead, it *increases* the "total resources" available to the Commonwealth.

Third, the COFINA Bonds do not implicate the Balanced Budget Provision because they are not debts of the Commonwealth.  The Pledged Sales Tax is COFINA's property, and its debts are its own.  As a result, COFINA's payments to bondholders are properly excluded from the "appropriations" side of the constitutional balanced-budget equation, and the stream of revenue from the Pledged Sales Tax that COFINA owns is properly excluded from the "revenues" side. Put more simply, the money flowing in and out of COFINA has no effect on whether Puerto Rico's budget is balanced because neither COFINA's debts nor its revenues belong to the Commonwealth.

Fourth, even if the Commonwealth's use of proceeds from the COFINA Bonds to pay extraconstitutional debt violated the Balanced Budget Provision, that does not render the transfer of tax proceeds to COFINA void.  Under Puerto Rico law, if a statute is partially unconstitutional, courts will uphold the constitutional portions if they are capable of standing on

their own and the Legislative Assembly likely would have passed the law without the defective

provisions. *Asoc. Maestros P.R. v. Srio. Educacion*, 137 D.P.R. 528 (P.R. 1994). Here, it is likely

that the Legislative Assembly would have transferred the Pledged Sales Tax to COFINA even if

it could not use the proceeds from COFINA Bonds to pay extraconstitutional debt because it

needed the proceeds for other vital purposes. Indeed, the Commonwealth actually used COFINA

Bond proceeds to fund operating expenses. (2d Am. Compl. ¶ 171.) And a finding that the

COFINA Bonds violated the Balanced Budget Provision would not require the COFINA Bonds to

be rendered void either.[29] *See Lance v. McGreevey*, 853 A.2d 856, 861 (N.J. 2004) (holding that

use of proceeds of certain revenue bonds to finance current government expenditures violated

balanced budget clause, but declining to prevent contemplated new issuance of such bonds or to

invalidate any previously-issued bonds); *Winkler v. State School Bldg. Auth.*, 434 S.E.2d 420, 436-

37 (W. Va. 2003) (finding that bonds violated provisions in state constitution prohibiting state

debt, but refusing to apply that decision retroactively to void already-issued bonds, which "would

bring considerable financial chaos to the state").

## II.  THE LEGISLATIVE ASSEMBLY TRANSFERRED OWNERSHIP OF THE DEDICATED SALES TAX FUND AND THE PLEDGED SALES TAX REVENUE STREAM TO COFINA.

### A.  <u>The Unambiguous Text Of The COFINA-Enabling Legislation Provides That COFINA Owns The Dedicated Sales Tax Fund And The Pledged Sales Tax Revenue Stream.</u>

Puerto Rico law and established principles of statutory construction require that

courts enforce unambiguous statutes according to their terms. P.R. Laws Ann. tit. 31, § 14 ("When

---

[29] The Commonwealth Agent further claims that "an assignment of a direct right to collect and enforce the SUT . . . would have entailed an unconstitutional transfer of the Commonwealth's taxing power." (2d Am. Compl. ¶ 68.) But even assuming that were true, none of the parties in this dispute are claiming that the COFINA-Enabling Legislation gave COFINA the right to collect and enforce the sales and use tax. The Legislative Assembly gave COFINA ownership over the stream of revenue from the Pledged Sales Tax, which it is plainly empowered to do under the Puerto Rico Constitution. P.R. Const. art. VI, § 2; *id*. Art. II, §§ 18-19; *P.R. Tele. Co.*, 81 D.P.R. at 982.

a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof."); *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (citation omitted); *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous.").  "[A]s a fundamental principle of statutory construction, [courts] will not depart from, or otherwise embellish, the language of a statute absent either undeniable textual ambiguity, or some other extraordinary consideration, such as the prospect of yielding a patently absurd result." *Pritzker v. Yari*, 42 F.3d 53, 67–68 (1st Cir. 1994) (citations omitted).

Here, the COFINA-Enabling Legislation unambiguously transferred ownership of the Dedicated Sales Tax Fund and the stream of future Pledged Sales Tax revenue to COFINA. Act 56 provides that the Dedicated Sales Tax Fund "and all the funds deposited therein . . . ***and all the future funds that must be deposited in the [Dedicated Sales Tax Fund]*** pursuant to the provisions of this law *are hereby transferred to, and shall be the property of COFINA*."  Act 56 § 2 (emphasis added).  The Act also makes clear that "all the future funds that must be deposited" in the Dedicated Sales Tax Fund are a statutorily defined portion of the "[t]he first revenues of the sales and use tax." *Id*.  Accordingly, those "first revenues of the sales and use tax" with which the Dedicated Sales Tax Fund "shall be funded" are the "property of COFINA" pursuant to Act 56. By using the phrase "***are*** hereby transferred," the Legislative Assembly made plain that COFINA became the owner of those "future funds" immediately upon the enactment of Act 56. *See Díaz v. Srio. de Hacienda*, 114 D.P.R. 865, 871-72 (P.R. 1983) (the tense used in a statute is itself an expression of "the lawmaker's intent"; statutory language which "expresses an action which has

already taken place" was determinative of the statute's interpretation). This is also confirmed by

the statute's directive that the "future funds that must be deposited" in the Dedicated Sales Tax

Fund "shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall

not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the

Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary."[30]  *Id.*; Act 1

§ 2; Act 101 § 1.

       The Commonwealth Agent does not (because it cannot) dispute that the plain

language of the COFINA-Enabling Legislation provides for "**a present transfer ('are hereby**

**transferred') of funds to be deposited in the future ('future funds that must be deposited')**."

(2d Am. Compl. ¶ 43 (emphasis in original).)  Instead, the Commonwealth Agent attempts to inject

ambiguity in the statute by claiming that it is legally impossible to transfer a present ownership

interest in future revenues.  (*Id.* at ¶¶ 44-45.)  The Commonwealth Agent argues that, as a result,

an ambiguity arises "as to whether the transfer purportedly occurred on the effective date of the

Act or occurs as and when future SUT revenues are deposited into the Dedicated Sales Tax Fund."

(*Id.* at ¶ 43.)  The Commonwealth Agent further argues that a present transfer of future tax revenue

is inconsistent with (i) the Commonwealth's inalienable right to amend or repeal Act 91

(*id.* at ¶¶ 56-59); (ii) the provision in Act 91 that the Commonwealth can "limit or restrain the

nature or the amount of such [SUT] or other revenues or to substitute similar or comparable

collateral [in the form of] other taxes, fees, charges or other income to be deposited into the

[Dedicated Sales Tax Fund]" if they are of "equal or greater" value than the Pledged Sales Tax

---

[30] The Opinions of the Secretaries of Justice also make clear that the transfer of ownership to COFINA occurred immediately.  (*See, e.g.*, Ex. 52 (Letter of Roberto J. Sanchez Ramos, Secretary, Department of Justice, to Alfredo Salazar Conde, Chairman, COFINA, Consulta Núm. 06-63-B, ¶¶ 2-3 (July 31, 2007) ("███████████████████████████████████████████████████████████████████████████████████" (emphasis added)); *see also* SUF ¶ 27.)

(*id*. at ¶¶ 51-52); and (iii) the provision in Act 91 that any tax revenues remaining in the Dedicated Sales Tax Fund when all COFINA bonds have been repaid may be returned to the Commonwealth (*id*. at ¶¶ 54-55).  For these reasons, the Commonwealth Agent contends it is entitled to declarations that the COFINA-Enabling Legislation did not "transfer present ownership of future SUT revenues to COFINA" (*id*. at ¶ 60) or "assign to COFINA the Commonwealth's 'right to receive' the dedicated portion of future SUT revenues" (*id*. at ¶ 70).

None of the Commonwealth Agent's arguments renders the statute ambiguous or undermines the conclusion that the Pledged Sales Tax was transferred to COFINA.  Act 56 itself plainly states that "***all the future funds that must be deposited in the [Dedicated Sales Tax Fund]*** pursuant to the provisions of this law ***are hereby transferred to, and shall be the property of COFINA***."  Act 56 § 2 (emphasis added).  It is not reasonable to interpret this provision, as the Commonwealth Agent does, as giving COFINA ownership of *only* those funds that "are deposited" in the Dedicated Sales Tax Fund (2d Am. Compl. ¶ 43) when the statute states that COFINA also owns "all the future funds that ***must be*** deposited" in the fund.  The only reasonable interpretation of this provision is that it is a statutory transfer to COFINA of "present ownership of future SUT revenues," and that, as owner, COFINA has the "right to receive the dedicated portion of future SUT revenues."[31]  Therefore, the statute is not ambiguous and both of the Commonwealth Agent's requested declarations in its First and Second Causes of Action must be rejected.  *See General Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006) ("A statute is ambiguous only if it admits of more than one reasonable interpretation.") (citation omitted).

---

[31] The Commonwealth Agent's First and Second Causes of Action seek, respectively, declarations that "Act 91 did not transfer present ownership of future SUT revenues to COFINA" and that "Act 91 did not assign to COFINA the Commonwealth's 'right to receive' the dedicated portion of future SUT revenues."

Contrary to the Commonwealth Agent's assertion, it also is not "impossible" to make a present transfer of future revenue. For decades, municipalities around the country have relied on securitization programs involving a present transfer of future tax proceeds, and courts have routinely recognized the validity of such transfers. *See Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*, 2 N.Y.3d 524, 541 (2004) (statutory provision making a stream of sales-and-use tax payments "the property of" a public corporation transferred "full ownership of the entire revenue stream" to that entity); *Quirk v. Mun. Assistance Corp. for City of N.Y.*, 41 N.Y.2d 644, 646 (N.Y. 1977) (upholding financing structure where New York imposed a sales tax and committed the revenues to a public corporation); *see also Myers v. Alaska Housing Fin. Corp.*, 68 P.3d 386, 388, 391-94 (Alaska 2003) (upholding financing scheme in which state of Alaska sold the right to receive a future stream of revenue generated from tobacco settlements to a public corporation to issue bonds).

Outside the public finance context, courts similarly recognize property rights in future revenues. *See In re Town Ctr. Flats, LLC*, 855 F.3d 721, 726 (6th Cir. 2017) (holding that debtor "transfer[red] ownership in the assigned rents to [its mortgage lender] before the bankruptcy petition was filed in this case"); *In re Ventura-Louise Props.*, 490 F.2d 1141, 1143-44 (9th Cir. 1974) (holding that mortgage agreement validly assigned ownership of future rent payments); *FS Media Holding Co. (Jersey) Ltd. v. Harrison*, No. 13 Civ. 3144 (SAS), 2013 WL 5780771 (S.D.N.Y. Oct. 25, 2013) (construing agreement providing for transfer of future revenues derived from musical composition); *Estate of Ellington v. Am. Society of Composers, Authors, and Publishers*, 25 A.D.3d 426 (N.Y. App. Div. 1st Dep't 2006) (enforcing agreement providing for "the irrevocable transfer of the future royalties"). The fact that the property right is contingent, or that the future funds do not yet exist, is irrelevant. *See, e.g., In re Marriage of Leland*, 847 P.2d

28

518, 526 (Wash. Ct. App. 1993) ("[A] contingent future interest [in potential disability insurance payments] is property no matter how improbable the contingency.") (citation omitted).

Nor is the Legislative Assembly's power to amend or repeal the COFINA-Enabling Legislation, or to substitute the Pledged Sales Tax revenue with other collateral for the COFINA Bonds, inconsistent with COFINA's ownership of future Pledged Sales Tax revenue. "Property interests are creatures of state law." *Casiano-Montañez v. State Ins. Fund Corp.*, 707 F.3d 124, 129 (1st Cir. 2013); *see also Barnhill v. Johnson*, 503 U.S. 393 (1992) (applying state property law to determine whether the transfer of a bank check constituted a transfer of "an interest in property" under the Bankruptcy Code); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."). Act 56, by its plain terms, vested COFINA with ownership of the Pledged Sales Tax. And the fact that the Legislative Assembly retains the power to amend its laws in a way that may alter COFINA's property rights— subject to constitutional requirements that "just compensation" be paid, limitations under the Contracts Clause, and the COFINA-Enabling Legislation's requirement that "similar or comparable" collateral for the COFINA Bonds be substituted[32]—does not mean that ownership in the Pledged Sales Tax was not transferred to COFINA in the first place.[33] It simply means that

---

[32] Act 91 § 5(c), as amended, P.R. Law Ann. tit. 13 § 14(c).

[33] Under the Commonwealth Agent's view, if a legislature passed a law taking away someone's property rights, that means that she never had any property right to begin with. That is inconsistent with well-established law recognizing property rights protected by the takings clauses of the United States and Puerto Rico Constitutions. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of *vested property rights* except for a 'public use' and upon payment of 'just compensation.'") (emphasis added); *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 236 (1897) ("The legislature may prescribe a form of procedure to be observed in the taking of *private property* for public use, but it is not due process of law if provision be not made for compensation.") (emphasis added).

COFINA owns the revenue stream whether it is funded by the Pledged Sales Tax or its substituted

equivalent.

    B.    <u>COFINA's Ownership Of The Dedicated Sales Tax Fund And The Pledged Sales Tax Revenue Stream Is Consistent With The Legislative Assembly's Intent And The Purpose Of The COFINA Structure.</u>

Even if this Court were to determine that Act 56 is ambiguous—and it is not—the

COFINA Agent would still be entitled to summary judgment because the legislative intent behind

the COFINA-Enabling Legislation is clear.  Puerto Rico law directs courts to look to the Statement

of Motives accompanying a statute to discern legislative intent when the statute is ambiguous or

unclear.  *Asoc. Importadores de Cerveza v. Commonwealth of P.R.,* 171 D.P.R. 140, 165 (P.R.

2007) (López, J., concurring) ("[*T*]*he standard regarding how the legislative intention of a statute*

*must be analyzed* is to look for it in the statement of purpose . . . .") (emphasis in original).

Furthermore, a court interpreting an ambiguous statute must consider "the reason and spirit" of the

law and the "cause or motives which induced its enactment" in deriving its meaning.  P.R. Laws

Ann. tit. 13, § 19; *see also Matos v. Junta Examinadora de Ingenieros y Agrimensores*, 165 D.P.R.

741, 748–749 (2005) ("In interpreting a law, we judges have the obligation to consider the social

purposes that prompted the Legislative Assembly to approve it."); *Martínez v. Ofic. del*

*Gobernador*, 152 D.P.R. 586, 591 (P.R. 2000) (explaining that Puerto Rico law requires a court to

consider "the social purpose that inspired" a statute when interpreting its provisions).

Here, the Statement of Motives for Act 56 could not be more clear.  It provides that

Act 56 was intended "to increase the amount of funds that are deposited in the Dedicated Sales

Tax Fund . . ., ***that they be owned by COFINA*** . . . and that such funds ***shall not constitute***

***available resources of the Commonwealth of Puerto Rico for any purpose*** . . . ."  Act 56,

Statement of Motives.   The Commonwealth Agent would have the Court disregard this

unambiguous pronouncement of the Legislative Assembly's intent, contrary to Puerto Rico law. *Asoc. Importadores de Cerveza*, 171 D.P.R. 140.

Beyond that, after the Legislative Assembly passed the COFINA-Enabling Legislation, the Commonwealth repeatedly and publicly acknowledged that the purpose of the law was to raise funds through the issuance of bonds secured by the Pledged Sales Tax, and that COFINA's ownership of the Pledged Sales Tax was essential to those fundraising efforts.[34] COFINA's ownership of the funds was confirmed by numerous legal opinions that COFINA obtained and made public in connection with each issuance of the COFINA Bonds.[35] It was further confirmed by three separate opinions issued by Secretaries of Justice serving three different administrations of alternating political parties.[36]

The GDB touted these opinions and COFINA's present ownership of the stream of Pledged Sales Tax revenue to investors.[37] And, in connection with each of the 18 issuances or remarketings of the GO Bonds since the creation of COFINA, the Commonwealth warned holders of GO Bonds and potential investors that the Pledged Sales Tax is owned by COFINA and cannot be used to satisfy the Commonwealth's obligations under the GO Bonds.[38]

---

[34] (*See* Ex. 1 (Catalogue of Select Commonwealth Admissions).)

[35] (*See, e.g.*, Ex. 63 (Opinion Letter of Hawkins Delafield & Wood LLP at 5 (June 18, 2009) ("[A] court . . . would find that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to [COFINA] . . . .")); *see also* SUF ¶ 28.)

[36] (*See, e.g.*, Ex. 52 (Letter of Roberto J. Sánchez Ramos, Secretary, Department of Justice, to Alfredo Salazar Conde, Chairman, COFINA, Consulta Núm. 06-63-B, ¶¶ 2-3 (July 31, 2007) (" ███████████████████████████████████████████████████ ")); *see also* SUF ¶ 27.)

[37] (*See* Ex. 1 (Catalogue of Select Commonwealth Admissions).)

[38] (*See, e.g.*, Ex. 23 (Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2009 A (Sept. 11, 2009) (COFINA-Enabling Legislation "transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not 'available resources' under the Constitutional provisions relating to the [GO] Bonds")); *see also* SUF ¶¶ 20, 21.)

Interpreting the COFINA-Enabling Legislation to transfer ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund to COFINA is also the only way to effect the law's stated purpose. The Commonwealth Agent's proposed contrary construction is totally at odds with the Legislative Assembly's stated reasons for passing the law. Construing the law in a way that results in COFINA holding only a "promise" from the Commonwealth, as the Commonwealth Agent asserts, would render illusory the whole notion that the COFINA Bonds were secured by a stream of reliable tax revenue beyond the reach of the Commonwealth and its creditors. Such an interpretation must be rejected. *King v. Burwell*, 135 S. Ct. 2480, 2492–93 (2015) (statutes cannot be interpreted "to negate their own stated purposes.") (citation omitted).

Indeed, the principal distinction between the COFINA Bonds and the GO Bonds that allowed the Commonwealth to raise over $16 billion from investors through the COFINA structure was that the COFINA Bonds were secured by a stream of revenue owned by COFINA, while the GO Bonds were backed only by an unsecured promise of the Commonwealth. If the Commonwealth Agent's position were adopted, holders of COFINA Bonds—including many of Puerto Rico's retirees and other individuals—and holders of the Commonwealth's other debts would be paid *pari passu*. That would be an absurd and plainly inequitable result in light of the unambiguous language of the COFINA-Enabling Legislation and the numerous assurances given to COFINA Bondholders and others that COFINA owns the Pledged Sales Tax. *Id*.[39]

---

[39] The Commonwealth Agent may contend that the Commonwealth accounted for the funds as if they belonged to the Commonwealth. But even if that were true, the financial reporting is irrelevant to the legal question of ownership. How the Commonwealth applied accounting guidelines to the transfer of the Pledged Sales Tax does not override unambiguous Puerto Rico law directing that the funds are owned by COFINA.

## III.  THE DEDICATED SALES TAX FUND AND THE PLEDGED SALES TAX REVENUE STREAM ARE NOT AVAILABLE RESOURCES OF THE COMMONWEALTH.

In its Complaint in Intervention, the Ad Hoc Group of General Obligation Bondholders (the "**GO Bondholders**") alleges that the Legislative Assembly is not empowered to declare certain tax proceeds beyond the reach of the Commonwealth, and therefore the Pledged Sales Tax revenues transferred to COFINA are "available resources" of and belong to the Commonwealth.  (*See, e.g.*, GO Bondholders Compl. ¶ 6.)  The Commonwealth Agent makes a similar argument.  (2d Am. Compl. ¶¶ 143-45.)  This position is meritless.[40]

The Debt Priority Provision of the Puerto Rico Constitution states that "[i]n case the available resources including surplus [*recursos disponibles*] for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. CONST. art. VI, § 8.

As discussed above, the COFINA-Enabling Legislation transferred ownership of the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA.  As a result, they are not "available resources" of the Commonwealth.  This is confirmed by the statutory text, which unambiguously states that the Pledged Sales Tax "shall not be deposited in the Treasury of Puerto Rico, nor shall it be available for use by the Secretary."  Act 56 § 2 (codified as amended at P.R.

---

[40] The GO Bondholders' and Commonwealth Agent's "available resources" arguments are beyond the scope of this dispute because they assume that COFINA owns the Pledged Sales Tax.  Nevertheless, the COFINA Agent sets forth the reasons it would also be entitled to summary judgment on this claim.  However, the Court cannot fully resolve this issue without also resolving the COFINA Agent's Eighth Cause of Action, which the Court also dismissed as beyond the scope of this dispute.  In that counterclaim, the COFINA Agent alleged that to the extent the Pledged Sales Tax proceeds are "available resources," the Commonwealth is only entitled to use the Pledged Sales Tax to the extent necessary to pay validly issued debt that is supported by the full faith and credit and the taxing power of the Commonwealth.  The COFINA Agent further alleged that the Commonwealth issued billions of dollars of GO Bonds, Public Buildings Authority bonds ("**PBA Bonds**"), and potentially other bonds in excess of Constitutional Debt Limits.  Therefore, the Court should not determine how much of the Pledged Sales Tax belongs to the Commonwealth as "available resources" without also determining whether (and how many) bonds backed by the Commonwealth's full faith and credit were issued in violation of the Puerto Rico Constitution.

Law. Ann. tit. 13, §§ 11a-16).  Likewise, the Statement of Motives for the legislation confirms that

the Pledged Sales Tax is "owned by COFINA" and "shall not constitute available resources of the

Commonwealth of Puerto Rico for any purpose."  *Id.*  The Legislative Assembly repeatedly stated

its intention, over several years and in numerous legislative acts, to make the Pledged Sales Tax

and Dedicated Sales Tax Fund unavailable to the Commonwealth by force of law.  These

unambiguous legislative provisions control, because the Puerto Rico Constitution vests in the

Legislative Assembly the power to determine what resources are available to the Commonwealth

by imposing, collecting, and allocating taxes, and passing legislation to support the general welfare

of the people of Puerto Rico.  P.R. CONST. art. VI, §§ 2 (the taxing power), 18-19 (police powers);

*P.R. Tele. Co.*, 81 D.P.R. 982 (providing that Legislative Assembly has the power to direct how

tax proceeds are used).

      The Dedicated Sales Tax Fund also is not "available" to the Commonwealth simply

because it is funded by a general tax.  The Puerto Rico Constitution does not dictate what funds

are "available," and there is nothing in the Constitution requiring that all proceeds from a general

tax *must* be deemed "available" to the Commonwealth.  Nor is there anything in the Constitution

that prohibits the Legislative Assembly from designating certain tax proceeds unavailable to the

Commonwealth, as it did when it transferred the stream of Pledged Sales Tax revenue to COFINA.

*See Quirk*, 363 N.E.2d at 550-51 (upholding transfer of tax revenue to a public corporation, and

holding that state constitutional requirement that "first revenues" be set aside to pay bondholders

"does not give bondholders the right to insist that any particular existing tax be maintained or new

ones imposed to produce those revenues").

      The Debt Priority Provision explicitly provides that only some resources will be

"available" to the Commonwealth, and the Legislative Assembly acted within its authority in

unambiguously providing in the COFINA-Enabling Legislation that the Pledged Sales Tax and Dedicated Sales Tax Fund were transferred to COFINA and, accordingly, are not "available resources" of the Commonwealth. Because both the constitutional and statutory provisions are unambiguous, that ends the inquiry as a matter of law. P.R. Laws Ann. tit. 13, § 14; *Ron Pair Enterprises, Inc.,* 489 U.S. at 241; *In re Plaza Resort at Palmas, Inc.*, 741 F.3d at 274; *Pritzker*, 42 F.3d at 67–68.

## <u>CONCLUSION</u>

For the foregoing reasons, the COFINA Agent respectfully requests that the Court grant her motion for summary judgment on all claims in this dispute.

Dated:  February 21, 2018
      New York, New York

By:  _/s/ Antonio Yanez, Jr._

Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Antonio Yanez, Jr. (*pro hac vice*)
Martin L. Seidel (*pro hac vice*)
James C. Dugan (*pro hac vice*)
Jeffrey B. Korn (*pro hac vice*)
Paul V. Shalhoub (*pro hac vice*)
Alexander L. Cheney (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email: mfeldman@willkie.com
      jminias@willkie.com
      ayanez@willkie.com
      mseidel@willkie.com
      jdugan@willkie.com
      jkorn@willkie.com
      pshalhoub@willkie.com
      acheney@willkie.com

*Counsel to the COFINA Agent*

Kenneth N. Klee (*pro hac vice*)
Daniel J. Bussel (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
1999 Avenue of the Stars
39th Floor
Los Angeles, California 90067
Telephone:  (310) 407-4000
Facsimile:  (310) 407-9090
Email:  kklee@ktbslaw.com
      dbussel@ktbslaw.com
      jweiss@ktbslaw.com

*Special Municipal Bankruptcy Counsel
to the COFINA Agent*

Respectfully submitted,

By:  _/s/ Nilda M. Navarro-Cabrer_

Nilda M. Navarro-Cabrer
USDC – PR No. 201212
**NAVARRO-CABRER LAW OFFICES**
El Centro I, Suite 206
500 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Telephone:  (787) 764-9595
Facsimile:  (787) 765-7575
Email:  navarro@navarrolawpr.com

*Local Counsel to the COFINA Agent*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------ x

*In re*                                                       :
                                                              :
THE FINANCIAL OVERSIGHT AND                                   :
MANAGEMENT BOARD FOR PUERTO RICO,                             :     PROMESA
                                                              :     Title III
as representative of                                          :     Case No. 17-BK-3283 (LTS)
                                                              :     (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICO *et al.,*                     :
                                                              :
Debtors.[1]                                                   :
------------------------------------------------------------------ x
THE OFFICIAL COMMITTEE OF UNSECURED                           :
CREDITORS OF THE COMMONWEALTH OF                              :
PUERTO RICO,                                                  :
                                                              :
as agent of                                                   :
                                                              :
THE FINANCIAL OVERSIGHT AND                                   :
MANAGEMENT BOARD FOR PUERTO RICO                              :
                                                              :
as representative of                                          :     Adv. Proc. No. 17-00257-LTS
                                                              :
THE COMMONWEALTH OF PUERTO RICO,                              :
                                                              :
Plaintiff,                                                    :
                                                              :
v.                                                            :
                                                              :
BETTINA WHYTE,                                                :
                                                              :
as agent of                                                   :
                                                              :
THE FINANCIAL OVERSIGHT AND                                   :
MANAGEMENT BOARD FOR PUERTO RICO                              :

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

|  | : |
| as representative of | : |
|  | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|  | : |
| Defendant. | : |
| ------------------------------------------------------------------ | x |

### [PROPOSED] ORDER
### GRANTING MOTION FOR SUMMARY JUDGMENT BY THE COFINA AGENT

Upon consideration of the Motion for Summary Judgment by the COFINA Agent

(the "**Motion**"), the accompanying Memorandum of Law in Support of the Motion for Summary

Judgment by the COFINA Agent, the Declaration of Antonio Yanez, Jr., dated February 21, 2018,

the exhibits annexed thereto, and the Statement of Undisputed Material Facts in Further Support

of the Motion for Summary Judgment by the COFINA Agent; and the Court having found it has

subject matter jurisdiction over this matter pursuant to section 306(a) of PROMESA; and the Court

having reviewed the Motion; and after due deliberation thereon, the Court having found that good

and sufficient cause exists for the granting of the relief as set forth herein,

THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion is granted to the extent set forth herein.

2. Judgment as a matter of law is granted in favor of the COFINA Agent on

(i) the Commonwealth Agent's First Cause of Action (declaratory judgment that the Legislative

Assembly did not transfer present ownership of future SUT revenues to COFINA), Second Cause

of Action (declaratory judgment that COFINA was not assigned the Commonwealth's "right to

receive" the Pledged Sales Tax), Twelfth Cause of Action (declaratory judgment that the transfer

of the Pledged Sales Tax to COFINA is an unlawful evasion of the debt limit provisions of the

Puerto Rico Constitution), and Thirteenth Cause of Action (declaratory judgment that the transfer

to COFINA was a violation of the balanced budget provision of the Puerto Rico Constitution); (ii) the GO Bondholders' First Cause of Action (declaratory judgment that all revenues derived from the SUT constitute property of the Commonwealth); and (iii) the COFINA Agent's First Counterclaim (declaratory judgment that the statutes transferring the Pledged Sales Tax are constitutional, and COFINA owns the Pledged Sales Tax).

3.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

4.     The Court shall retain jurisdiction to hear and to determine all matters arising from or related to implementation of this Order.

SO ORDERED.


Dated: _____, 2018


_____
LAURA TAYLOR SWAIN
United States District Judge