# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

---------------------------------------------------------------------- x

### OMNIBUS OBJECTION OF (I) FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, ACTING THROUGH ITS SPECIAL CLAIMS COMMITTEE, AND (II) OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO BANKRUPTCY CODE SECTION 502 AND BANKRUPTCY RULE 3007, TO CLAIMS FILED OR ASSERTED BY HOLDERS OF CERTAIN COMMONWEALTH GENERAL OBLIGATION BONDS

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

IMPORTANCE OF OBJECTION TO PLAN OF ADJUSTMENT PROCESS .......................... 5

RESERVATION OF RIGHTS ................................................................................ 5

BACKGROUND ................................................................................................ 6

I.     CONSTITUTIONAL DEBT SERVICE LIMIT AND CONSTITUTIONAL BALANCED BUDGET CLAUSE ................................................................ 6

II.    COMMONWEALTH GO BONDS ................................................................ 7

    A.    Invalid GO Bond Issuances ................................................................ 8

        i.    2012 A GO Bonds ................................................................ 8

        ii.    2012 B GO Bonds ................................................................ 9

        iii.    2014 GO Bonds ................................................................ 10

    B.    Use Of GO Bonds To Finance Deficit Spending ................................ 11

    C.    GO Bondholder Proofs Of Claim ................................................... 13

III.   COMMONWEALTH PBA BONDS .......................................................... 13

    A.    Puerto Rico Public Buildings Authority ......................................... 13

    B.    PBA Bond Issuances .................................................................. 14

    C.    PBA Financing Structure ............................................................ 14

        i.    Source of Payment: Rents and Guaranty Payments .................. 14

        ii.    Rent Payments: Tied To Amount Of PBA Bond Debt Service And Guaranteed By Commonwealth Full Faith And Credit Pledge ................................................................ 15

        iii.    Payment Of PBA Bond Debt Service: Guaranteed By Commonwealth ................................................................ 16

        iv.    Treatment Of Rents As Commonwealth Obligations For Purposes Of Balancing Commonwealth Budget ...................... 17

        v.    Termination Of PBA Lease Agreements Tied To PBA Bond Payment ................................................................ 17

JURISDICTION AND STATUTORY PREDICATE ...................................................... 18

RELIEF REQUESTED ...................................................................................... 18

BASIS FOR RELIEF ....................................................................................... 18

I.     INVALID GO BONDS WERE ISSUED IN VIOLATION OF CONSTITUTIONAL DEBT SERVICE LIMIT ........................................... 19

# <u>TABLE OF CONTENTS</u>
(continued)

**Page**

A.  Debt Service Limit Was Exceeded If Calculation Had Included PBA Bonds ............................................................................................. 19

B.  PBA Bonds Should Be Included In Debt Service Limit Calculation ................. 20

C.  Issuance Of 2014 GO Bonds Violated Debt Service Limit Even If Calculation Does Not Include PBA Bonds ........................................... 30

II.  INVALID GO BONDS WERE ALSO ISSUED IN VIOLATION OF CONSTITUTIONAL BALANCED BUDGET CLAUSE ............................... 32

III.  INVALID GO BONDS ARE NULL AND VOID AND BONDHOLDERS HAVE NO EQUITABLE REMEDY AGAINST THE COMMONWEALTH ....................... 35

IV.  BONDHOLDERS HAVE NO REMEDY UNDER UCC ARTICLE 8 ......................... 39

A.  No Statute Can Nullify The Constitution ........................................... 40

B.  UCC Section 8-202 Is Otherwise Inapplicable .................................... 41

i.  Neither Objector Is An "Issuer" Within Meaning Of UCC Section 8-202 ..................................................................... 43

ii.  Commonwealth Had No Power to Issue Invalid GO Bonds for Improper Purpose .......................................................... 46

iii.  Bondholders Must Prove Eligibility For Validation .................. 46

iv.  UCC Section 8-202 Is Expressly Inapplicable To Original Issue Purchasers ................................................................ 48

V.  ALTERNATIVELY, CLAIMS BASED ON INVALID GO BONDS MUST BE DISALLOWED TO THE EXTENT THEY INCLUDE UNAMORTIZED ORIGINAL ISSUE DISCOUNT ................................................................ 48

NOTICE ................................................................................................ 49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Access Equip, Inc.*,
   62 B.R. 642 (Bankr. D. Mass. 1986) ....................................................................27

*Alan v. Wayne Cty.*,
   388 Mich. 210, *opinion adhered to on denial of reh'g*, 388 Mich. 626 (1972)......................30

*Ayer v. Commissioner of Administration*,
   340 Mass. 586 (1960) .............................................................................22, 23, 24

*Banco de La Republica de Colombia v. Bank of New York Mellon*,
   No. 10 Civ. 536(AKH), 2013 WL 3871419 (S.D.N.Y. July 26, 2013) ...................................44

*In re Blondheim Real Estate, Inc.*,
   91 B.R. 639 (Bankr. D.N.H. 1988) ....................................................................42

*Book v. State Office Bldg. Comm'n.*,
   238 Ind. 120 (1958).....................................................................................29

*In re Burm*,
   554 B.R. 5 (Bankr. D. Mass. 2016) ...................................................................27

*Cecort Realty Dev., Inc. v. Llompart- Zeno*,
   100 F. Supp. 3d 145 (D.P.R. 2015)..................................................................38

*In re Chateaugay Corp.*,
   109 B.R. 51 (Bankr. S.D.N.Y. 1990)..................................................................49

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014)...............................................................28

*CMI CapitalMkt. Inv., LLC v. Municipality of Bayamon*,
   410 F.Supp. 2d 61 (D.P.R. 2006)....................................................................37

*In re Dena Corp.*,
   312 B.R. 162 (Bankr. N.D. Ill. 2004) .................................................................27

*In re Doctors Hosp. of Hyde Park, Inc.*,
   463 B.R. 93 (Bankr. N.D. Ill. 2011) ..................................................................27

*In re Doctors Hosp. of Hyde Park, Inc.*,
   508 B.R. 697 (Bankr. N.D. Ill. 2014) .................................................................49

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Eaton v. Shiawassee Cty.*,
   218 F. 588 (6th Cir. 1914) ................................................................................36

*Enourato v. New Jersey Building Authority*,
   90 N.J. 396 (1982) ..........................................................................................29

*In re Eureka S. R.R., Inc.*,
   72 B.R. 813 (Bankr. N.D. Cal. 1987) .............................................................27

*Farmers State Bank & Trust Co. v. City of Yates Ctr.*,
   229 Kan. 330 (1981) .......................................................................................40

*In re Fin. Oversight & Mgmt. Bd.*,
   297 F. Supp. 3d 261 (D.P.R. 2017).................................................................18

*Gillette-Herzog Mfg. Co. v. Canyon Cty.*,
   85 F. 396 (C.C.D. Idaho 1898) ......................................................................39

*In re Gull Air, Inc.*,
   890 F.2d 1255 (1st Cir. 1989).........................................................................28

*Hatton v. Mun. de Ponce*,
   134 D.P.R. 1001 (1994) ..................................................................................38

*In re Hawaii Corporation*,
   59 B.R. 410 (D. Haw. 1986) ...........................................................................45

*Martin v. Oregon Building Authority*,
   276 Or. 135 (1975)...................................................................................24, 25

*McCurdy v. Shiawassee Cty.*,
   154 Mich. 550 (1908) ...............................................................................36, 38

*McPherson v. Foster Bros.*,
   43 Iowa 48 (1876)...........................................................................................41

*Mendoza Aldarondo v. Asociacion de Empleados*,
   94 D.P.R. 564 (1967) ......................................................................................37

*Morales v. Mun. De Toa Baja*,
   119 D.P.R. 682 (1987) ....................................................................................37

*Moscato v. Technologies, Inc.*,
   No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2015)...................44

*Nolan Cty. v. State*,
   83 Tex. 182 (1891)..........................................................................................41

TABLE OF AUTHORITIES

(continued)

Page(s)

*State ex rel. Nuveen v. Greer*,
    88 Fla. 249 (1924).................................................................................................36

*Olds v. Alvord*,
    133 Fla. 221 (1938), *on reh'g*, 139 Fla. 745 (1939) ...........................................38

*In re PCH Assocs.*,
    804 F.2d 193 (2d Cir. 1986)..................................................................................27

*In re Pengo Indus., Inc.*,
    962 F.2d 543 (5th Cir. 1992) ................................................................................49

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
    91 F. Supp. 3d 267 (D.P.R. 2015)........................................................................36

*In re PT-1 Commc's, Inc.*,
    304 B.R. 601 (Bankr. E.D.N.Y. 2004)..................................................................43

*State ex rel. Pub. Institutional Bldg. Auth. v. Neffner*,
    137 Ohio St. 390 (1940).......................................................................................26

*In re Public Serv. Co. of N.H.*,
    129 B.R. 3 (Bankr. D.N.H. 1991) .........................................................................43

*In re Public Serv. Co. of N.H.*,
    114 B.R. 800 (Bankr D.N.H. 1990) ................................................................48, 49

*Real Estate Inv. Tr. of Am. v. Comm'r*,
    334 F.2d 986 (1st Cir. 1964).................................................................................49

*Reynolds v. City of Waterville*,
    92 Me. 292 (1898)............................................................................................21, 22

*Scroggs v. Kansas City*,
    499 S.W.2d 500 (Mo. 1973) .................................................................................26

*State v. Spring City*,
    123 Utah 471 (1955) .............................................................................................36

*State v. Volusia Cty. Sch. Bldg. Auth.*,
    60 So. 2d 761 (Fla. 1952).....................................................................................26

*In re The Ground Round, Inc.*,
    482 F.3d 15 (1st Cir. 2007)...................................................................................28

*In re Three Star Telecast, Inc.*,
    73 B.R. 270 (Bankr. D.P.R. 1987) .......................................................................27

### TABLE OF AUTHORITIES

(continued)

Page(s)

*United States v. Midland-Ross Corp.*,
381 U.S. 54 (1965) ..................................................................................................49

*Walinske v. Detroit-Wayne Joint Bldg. Auth.*,
325 Mich. 562 (1949) .............................................................................................29

*State ex rel. Wash. State Bldg. Fin. Auth. v. Yelle*,
47 Wash. 2d 705 (1955) ..........................................................................................26

*Weinberger v. Board of Public Instruction of St. Johns Cty.*,
93 Fla. 470 (1927) ...................................................................................................40

*Winkler v. State Sch. Bldg. Auth.*,
189 W.Va. 748 (1993) .......................................................................................25, 26

*Wisniewski v. Murphy*,
454 N.J. Super. Ct. App. Div., 508, 524 (2018) ....................................................29

**Statutes**

3 L.P.R.A. App. § 7 ..........................................................................................................14

22 L.P.R.A. § 907(g)........................................................................................................15

48 U.S.C.
§§ 2101-2241 ...........................................................................................................1
§ 2101(b)(2) ...........................................................................................................44
§ 2103 .....................................................................................................................44
§ 2161(a) .................................................................................................................45
§ 2231(a)(2) ...........................................................................................................44
§ 2231(a)(8) ...........................................................................................................44
§ 2231(a)(15) .........................................................................................................44
§ 2231(e) .................................................................................................................44

2008 Ann. Surv. of Bankr. Law 6 ....................................................................................48

Bankruptcy Code
§ 365(d)(3) ...............................................................................................................2
§ 502(b)(2) ...........................................................................................................5, 48
§ 510(b) ...............................................................................................................39, 42
§ 541 .......................................................................................................................49
§ 1109(b) .................................................................................................................18

P.R. Fed. Relations Act of 1950, Pub. L. No. 81-600, 64 Stat. 319 (1950)...................34

Jones Act .........................................................................................................................33

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

P.R. Laws Ann. 19

§ 1751(a) ............................................................................43
§ 1752(b) ......................................................................42, 46
§ 1760(a) ............................................................................40
§ 1760(b) ............................................................................42
§ 1760(c) ............................................................................40
§ 1760(d) ............................................................................40

P.R. Laws Ann. 22

§ 901 *et seq* .......................................................................13
§ 902 ...................................................................................13
§ 904 ...................................................................................14
§ 916 ..............................................................................15, 16

P.R. Laws Ann. 31 § 7 ............................................................37

1995 P.R. Laws 208

art. 8-201(a) .......................................................................43
art. 8-202(b) ...................................................................42, 46
art. 8-210(a) .......................................................................40
art. 8-210(b) .......................................................................42
art. 8-210(c) .......................................................................40
art. 8-210(d) .......................................................................40

PBA Bond Resolution

art. II, § 202 .......................................................................17
art. II, § 208 .......................................................................15
art. II, § 209 .......................................................................15
art. VII, § 701 ....................................................................15
art. VII, § 703 ....................................................................15
art. VIII § 709 ....................................................................16

PROMESA

§ 301(a) ..........................................................................1, 18
§ 306(a) ..............................................................................18
§ 307(a) ..............................................................................18
§ 310 ...............................................................................1, 18

Public Law

447 ......................................................................................34
600 ......................................................................................34

**TABLE OF AUTHORITIES**

(continued)

Page(s)

UCC

§ 8-114 ..............................................................................................46, 47

§ 8-114(4) ..................................................................................................47

§ 8-114, cmt. ............................................................................................47

§ 8-201(a) ..........................................................................................43, 44

§ 8-201(a)(4) ............................................................................................45

§ 8-202 ..............................................................................................*passim*

§ 8-202, cmt. ............................................................................................42

§ 8-202, cmt. 3 ........................................................................................46

§ 8-207 ......................................................................................................45

§ 8-210 ..............................................................................................*passim*


**Rules**

Bankruptcy Rule 2019 ..........................................................................49

Federal Rule of Bankruptcy Procedure 3007 ..........................................1, 18

**Other Authorities**

7A Hawkland UCC Series

§ 8-105:6 ..................................................................................................47

§ 8-201:3 [Rev] ........................................................................................45

8 Anderson UCC § 8-201:11 [Rev] (3rd. Ed.) ..........................................45

Act 39-1976 of the Puerto Rico Legislative Assembly, as amended, and as
affected by Act 5-2017, art. 203 ........................................................8

Act of July 3, 1952, Pub. L. No. 82-447, 66 Stat. 327-328 (1952) ................34

Barron's Dictionary of Finance and Investment Terms (10th Ed. 2018) ..................1, 7

P.R. LAWS ANN. CONST. art. VI

§ 2 ..............................................................................................6, 19, 31

§ 6 ................................................................................................................7

§ 7 ..........................................................................................................7, 33

§ 9 ..............................................................................................................35

Richard J. Cooper, *et al.*, *Issues To Expect In A Title III Puerto Rico
Restructuring* (March 8, 2017, 11:07 AM),
https://www.law360.com/articles/898663/issues-to-expect-in-a-title-iii-puerto-
rico-restructuring ..................................................................................47

Robert C. Morris, *Evading Debt Limitations with Public Building Authorities: The
Costly Subversion of State Constitutions*, 68 YALE L. J. 234 (1958) ......................28

**<u>TABLE OF AUTHORITIES</u>**

(continued)

**Page(s)**

U.S. CONST., Territories Clause........................................................................................40

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico, acting through its

Special Claims Committee (the "FOMB"), and the Official Committee of Unsecured Creditors of

all Title III Debtors (other than COFINA) (the "Committee" and, together with the FOMB, the

"Objectors") hereby file this omnibus objection (the "Objection") pursuant to section 502 of

Title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III

cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act

("PROMESA"),[2] and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), made applicable to these Title III cases by section 310 of PROMESA, requesting entry

of an order, substantially in the form attached hereto as **Exhibit A**, disallowing all claims based

on Commonwealth of Puerto Rico general obligation ("GO") bonds issued in or after March

2012 (as described more fully below, the "Invalid GO Bonds")[3] or, alternatively, disallowing

such claims to the extent they include unamortized original issue discount ("OID").[4]  In support

of this Objection, the Objectors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Commonwealth's $13 billion in outstanding GO bonds is among the largest

remaining components of Puerto Rico's crushing debt burden.  The Objectors believe that more

than $6 billion of those GO bonds are invalid and that no claims based on those bonds are

---

[2]      PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

[3]      Through its review of public documents (including the Debtors' claims register), the Objectors have identified
numerous proofs of claim filed by holders or insurers of Invalid GO Bonds.  All such claims exceeding $50
million, which are among the claims to which the Objectors hereby object, are listed on Appendix I attached
hereto.  The Objectors are filing, contemporaneously with the filing of this Objection, a motion seeking entry of
a procedural order providing for, among other things, broad notice of this Objection to potential holders of
Invalid GO Bonds and procedures for parties in interest to participate in the litigation of the Objection, either in
support or in opposition.  The Objectors propose that the deadline to file a substantive response to this
Objection be suspended pending the Court's consideration of said motion.

[4]      OID is the discount from par value at the time a bond or other debt instrument is issued.  *See* Barron's
Dictionary of Finance and Investment Terms (10th Ed. 2018) (defining "original issue discount").

allowable against the Commonwealth.  This debt is invalid because, among other reasons, it was

issued in violation of the Commonwealth's constitutional Debt Service Limit (as defined below)

when properly calculated to include debt service on bonds issued by the Puerto Rico Public

Buildings Authority (the "PBA").  As discussed more fully below, the Commonwealth's 2014

GO bonds are invalid even without including debt service on PBA bonds.

2.      In form and form alone, PBA bonds are not direct obligations of the

Commonwealth subject to the Commonwealth's constitutional Debt Service Limit.  Rather, they

purport to be obligations of a separate legal entity.  In economic substance, however, PBA bonds

are just as much direct obligations of the Commonwealth as any GO bond issued by the

Commonwealth itself.  PBA bonds are issued to finance the construction and improvement of

office space and other facilities that are purportedly leased[5] to departments, agencies,

instrumentalities, authorities, public corporations, and municipalities of the Commonwealth.  The

rents are paid in whatever amount is sufficient to cover the debt service on the PBA bonds until

those bonds are paid off.  In the meantime, the rents must continue to be paid even if a building

is destroyed through no fault of the lessee.  If the debt service on the PBA bonds increases or

decreases in a particular year, the "rents" are adjusted accordingly.

3.      Moreover, the PBA's entire board of directors is appointed, directly or indirectly,

by the Puerto Rico Governor, who is also designated under the purported leases as the binding

---

[5]    The use of the words "lease," "Lease Agreement," and "rent" (or variants thereof) in this Objection should not
be construed to suggest that the purported leases are "true leases" or that payments due thereunder are entitled
to Bankruptcy Code section 365(d)(3) treatment.  On the contrary, the Objectors have commenced an adversary
proceeding seeking disallowance of administrative rent claims on the grounds that the PBA Lease Agreements
(as defined below) are not "true leases" but rather components of disguised financing transactions.  *See
Complaint for Declaratory Relief and Disallowance of Administrative Rent Claims,* Dkt. No. 4559 (complaint
jointly filed by the FOMB and the Committee on December 21, 2018).  Even if the PBA Lease Agreements
were "true leases" (they are not), this would not change the fact that PBA bonds are, in economic substance,
direct obligations of the Commonwealth for the reasons set forth in this Objection, including that the rents paid
(directly or indirectly) from the Commonwealth's general revenues are tied directly to the amount of debt
service on the bonds and are the sole source of debt service payment.  Accordingly, the merits of this Objection
do not depend on the outcome of the adversary proceeding.

arbiter of any disputes between the PBA and its Commonwealth lessees. Thus, the "lessor" and the "lessee" are ultimately controlled by the same person.

4.      Finally, both the PBA bonds and the rent payments of the PBA lessees (other than any municipality) are backed by Commonwealth guaranties for which the Commonwealth has pledged its full faith and credit. For all practical intents and purposes, the PBA is nothing but an intermediary between the Commonwealth and PBA bondholders, who lend based on the perceived creditworthiness of the Commonwealth, **not** the PBA. The rents paid under the purported leases (and, eventually, the Commonwealth's guaranties) are the sole sources of payment for debt service on the PBA Bonds.

5.      **Courts throughout the country have seen such public building authority structures for what they really are—transparent shams designed to circumvent constitutional debt limits. In the words of one such court, public building authority structures are "a scheme which would fool only a lawyer."** Although some courts have found that public building authority structures do not implicate constitutional debt limits, no court has ever reached such a conclusion where, as here, the state or municipality that created the authority had explicitly pledged its full faith and credit to the payment of the bonds, let alone, as here, to the payment of both the bonds and the rents from which the bonds are paid.

6.      When the debt service on PBA bonds is properly included along with GO bond debt service, the Commonwealth's Debt Service Limit was exceeded as early as March 2012. From then on, every issuance of GO bonds violated the Debt Service Limit. Even if PBA bond debt service is not included in the calculation, the 2014 GO Bonds (as defined below) were issued in violation of the Debt Service Limit when properly calculated to include interest on the 2014 GO Bonds payable from the proceeds of the bonds themselves. In addition, in the

Committee's view, the Invalid GO Bonds were issued in violation of the Commonwealth's
constitutional Balanced Budget Clause (as defined below), which prohibits deficit financing.

7.      As a consequence, the Invalid GO Bonds are null and void, and the bondholders
have no remedy against the Commonwealth on account of such bonds.  Where a government
transaction is found to have violated a clear public policy embodied in statutory or constitutional
law, allowing any remedy to a private counterparty would undermine that public policy, which
exists to protect the people of Puerto Rico as a whole (and Puerto Rico taxpayers in particular).
Constitutional provisions such as the Debt Service Limit and the Balanced Budget Clause
unquestionably embody clear and important public policies regarding fiscal responsibility and
the perils of political expediency.

8.      Furthermore, the Invalid GO Bonds cannot be validated pursuant to section 8-202
of the Uniform Commercial Code (as adopted in Puerto Rico, the "UCC"), which provides for
the validation of securities under specified conditions as a defense to an issuer's assertion of
invalidity.  First and foremost, section 8-202 is itself unconstitutional to the extent it purports to
validate bonds issued in violation of the Commonwealth Constitution.  There is no more basic
principle than that a constitutional protection cannot be nullified by statute.  For the same reason,
holders of Invalid GO Bonds cannot recover their purchase price under UCC section 8-210,
which governs "overissues" of securities in excess of an issuer's borrowing power.

9.      Accordingly, any claims based on Invalid GO Bonds should be disallowed in their
entirety.[6]  Alternatively, even if the Invalid GO Bond claims are not disallowed in full, any such
claims should be disallowed to the extent they include unamortized OID, which courts have

---

[6]  The Objectors reserve their respective rights to seek to recover any debt service payments made by the
Commonwealth on account of certain Invalid GO Bonds, including any Invalid GO Bonds that were repaid in
full prior to the Petition Date.

uniformly recognized as a form of "unmatured interest" within the meaning of section 502(b)(2)

of the Bankruptcy Code and thus unrecoverable as part of an unsecured claim. The Objectors

believe that more than $230 million of OID on the Invalid GO Bonds remained unamortized as

of the Petition Date (as defined below).

## IMPORTANCE OF OBJECTION TO PLAN OF ADJUSTMENT PROCESS

10.     The issues raised in this Objection are gating issues for the Commonwealth's plan

of adjustment process. From the outset, holders of GO bonds have claimed entitlement to a so-

called "constitutional priority of payment" such that, in their view, no other unsecured creditor of

the Commonwealth can receive a single penny of plan distribution until all GO bondholders have

been paid in full. For a number of reasons beyond the scope of this Objection, the Objectors and

numerous Commonwealth creditors (including retirees and essential services providers) do not

agree that the GO bondholders are entitled to such a priority. Nevertheless, whether more than

$6 billion of GO bondholder claims should be disallowed is unquestionably a critical gating

issue.

## RESERVATION OF RIGHTS

11.     The Objectors reserve their right to raise additional objections to the validity of

other issuances of GO bonds, including on the basis that such bonds were issued in violation of

the Debt Service Limit, whether because certain other debt was not properly included in the Debt

Service Limit calculation or otherwise. In addition, the Objectors reserve their right to object to

the Invalid GO Bonds on grounds other than those set forth in this Objection. Finally, the

Objectors reserve their right to seek disallowance of any claims asserted against the

Commonwealth relating to the PBA bonds, whether arising directly or from the

Commonwealth's guaranties, including as to any payments under the PBA Lease Agreements

and/or the PBA bond issuances.

## BACKGROUND

### I.   CONSTITUTIONAL DEBT SERVICE LIMIT AND CONSTITUTIONAL BALANCED BUDGET CLAUSE

12.    The Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution" or the "Constitution") became effective in 1952.

13.    At that time, the federal Jones Act limited Puerto Rico's borrowing on the basis of the aggregate tax valuation of property on the island.

14.    In 1961, the Constitution was amended to limit the Commonwealth's borrowing on the basis of the amount of debt service the Commonwealth would have to pay relative to its historical revenues (the "Debt Service Limit").

15.    Specifically, Article VI, Section 2 of the Constitution provides that:

> no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

P.R. LAWS ANN. CONST. art. VI, § 2.

16.    The annual revenues "raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico" are known as the Commonwealth's "internal revenues" and consist primarily of revenues from income taxes, property taxes, sales and use taxes, and excise taxes (subject to certain exceptions).  Official Statement, dated March 11, 2014,

for Series 2014 GO Bonds (as defined below) (the "2014 A Official Statement"), at 31, Exhibit 6.[7]

17.     As an additional measure of protection against fiscal irresponsibility, Article VI, Section 7 of the Commonwealth Constitution (the "Balanced Budget Clause") provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. LAWS ANN. CONST. art. VI, § 7.

18.     The appropriations that must be covered by estimated total revenues, including available surplus, or the imposition of sufficient taxes consist of "the ordinary operating expenses of the Commonwealth" and "the payment of interest on and amortization of the public debt."  P.R. LAWS ANN. CONST. art. VI, § 6.

19.     Because borrowed funds are not "revenues," the Balanced Budget Clause prohibits deficit financing (*i.e.*, borrowing money to cover ordinary operating expenses and debt service payments that the Commonwealth is unable to fund from its total revenues, including available surplus).  *Id.*

## II.     COMMONWEALTH GO BONDS

20.     A GO bond is a bond that is backed by the issuing entity's full faith and credit (which generally includes its taxing power) rather than revenues from any particular source.  *See* Barron's Dictionary of Finance and Investment Terms (10th Ed. 2018) (defining "general obligation bond").

---

[7]     All citations to exhibits (Exhibit _) in this Objection are exhibits to the *Declaration of James R. Bliss In Support of Omnibus Objection of (I) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant To Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds.*

21.     Since the imposition of the Debt Service Limit in 1961, the Commonwealth has issued billions of dollars of GO bonds purportedly backed by its full faith, credit, and taxing power.  Approximately $13 billion of GO bonds remained outstanding as of the Commonwealth's May 3, 2017 petition date (the "Petition Date").  Certified Fiscal Plan for Puerto Rico, dated March 13, 2017, at 27, Exhibit 24.

### A.     Invalid GO Bond Issuances

22.     The Invalid GO Bonds were issued as follows:

i.     2012 A GO Bonds

23.     On April 3, 2012, the Commonwealth issued $2,318,190,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 A (General Obligation Bonds) (the "2012 A GO Bonds").  Official Statement, dated March 7, 2012, for Series 2012 A GO Bonds (the "2012 A Official Statement") at cover pages & 1, Exhibit 12.

24.     The stated purposes of the 2012 A GO Bonds were:

(i) to repay advances under GDB lines of credit, the proceeds of which refinanced deposits to the Commonwealth Redemption Fund[8] for the payment of principal and interest due on January 1, 2012 and July 1, 2012 on certain GO bonds and notes of the Commonwealth;

(ii) to refund certain other GO bonds of the Commonwealth (the "2012 A Refunded Bonds");

(iii) to fund termination payments under an investment agreement and interest rate exchange agreements relating to the 2012 A Refunded Bonds;

(iv) to pay interest on a portion the 2012 A GO Bonds themselves through April 3, 2015; and

---

[8]     Pursuant to Act 39-1976 of the Puerto Rico Legislative Assembly, as amended, and as affected by Act 5-2017, Article 203, prior to fiscal year 2015, the Commonwealth was required to make monthly transfers to a fund, referred to herein as the "Commonwealth Redemption Fund," to provide for the payment of debt service on all of the Commonwealth's GO bonds and notes.  Each monthly transfer was required to be in an amount sufficient to cause the moneys in the Commonwealth Redemption Fund to equal the sum of (i) one-sixth of the interest to be paid during the next six months and (ii) one-twelfth of the principal to be paid or required to be amortized during the next twelve months, in each case on all of the Commonwealth's GO bonds and notes.

(v) to pay the cost of issuing the 2012 A GO Bonds.

*Id.* at 7.

25.     The 2012 A GO Bonds were issued with a net OID of $4,261,947, leaving $2.3 billion in net proceeds, $446.3 million of which was used to pay costs of issuance (including the cost of terminating interest rate swaps relating to the 2012 A Refunded Bonds) and interest on the 2012 A GO Bonds themselves.  *Id.*

      ii.     <u>2012 B GO Bonds</u>

26.     On March 29, 2012, the Commonwealth issued $415,270,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 B (General Obligation Bonds) (the "<u>2012 B GO Bonds</u>").  Official Statement, dated March 7, 2012, for Series 2012 B GO Bonds (the "<u>2012 B Official Statement</u>"), at cover pages & 1, Exhibit 13.

27.     The stated purposes of the 2012 B GO Bonds were:

    (i)  to repay advances under a GDB line of credit, the proceeds of which refinanced deposits to the Commonwealth Redemption Fund for the payment of principal and interest from February 1, 2012 to July 1, 2012 on certain GO bonds and notes of the Commonwealth;

    (ii) to refund certain other GO bonds of the Commonwealth (the "<u>2012 B Refunded Bonds</u>");

    (iii) to pay interest on a portion of the 2012 B GO Bonds themselves; and

    (iv) to pay the cost of issuing the 2012 B GO Bonds.

*Id.* at 7.

28.     The 2012 B GO Bonds were issued with a net OID of $315,024, leaving $415.0 million in net proceeds, $12.1 million of which was used to pay costs of issuance and interest on the 2012 B GO Bonds themselves.  *Id.*

iii. 2014 GO Bonds

29. On March 17, 2014, the Commonwealth issued $3,500,000,000 in aggregate

principal amount of General Obligation Bonds of 2014, Series A (the "2014 GO Bonds"). 2014

A Official Statement, at cover pages & 1, Exhibit 6.

30. The 2014 GO Bonds, the largest by far of any GO bond offering by the

Commonwealth, were issued when the Commonwealth was already on the brink of economic

collapse and had already retained bankruptcy counsel.

31. The stated purposes of the 2014 GO Bonds were:

(i) to repay to GDB:

    a. bond anticipation notes issued by the Commonwealth to GDB, then
outstanding in the aggregate principal amount of $221,850,921, the
proceeds of which were used by the Commonwealth to finance and/or
refinance on an interim basis a portion of the costs of certain public
improvements, until such time as bonds could be issued for that
purpose;

    b. notes issued by the Commonwealth to GDB (the "Commonwealth
BANs"), then outstanding in the aggregate principal amount of
$92,500,000, the proceeds of which were used to finance or refinance
working capital of the Commonwealth for fiscal year 2014;

    c. a portion of notes issued by the Commonwealth to GDB, the proceeds
of which were used to finance: (A) monthly principal deposits to the
Commonwealth Redemption Fund during fiscal year 2013 and fiscal
year 2014; (B) monthly interest deposits to the Commonwealth
Redemption Fund during fiscal year 2014; and (C) monthly principal
deposits to the Commonwealth Redemption Fund during fiscal year
2014;

    d. a portion of notes issued by the Commonwealth under various lines of
credit from, and loan agreements with, GDB, evidencing borrowings
used by the Commonwealth to fund working capital needs of the
Commonwealth; and

    e. a portion of notes issued by the PBA to GDB, the proceeds of which
were used to finance and/or refinance certain monthly interest deposits
and certain monthly principal deposits required during fiscal year 2014
with respect to certain of the PBA's outstanding obligations;

(ii) to refund bond anticipation notes issued by COFINA (the "COFINA BANs"), the proceeds of which were used to finance operational expenses of the Commonwealth for fiscal year 2013;

(iii) to refund certain Public Improvement Refunding Bonds of the Commonwealth (the "2014 Refunded Bonds");

(iv) to pay certain amounts in connection with the termination of certain interest rate swap agreements;

(v) to fund interest on a portion of the 2014 GO Bonds themselves through July 1, 2016 by deposit to the Commonwealth Redemption Fund; and

(vi) to pay the cost of issuing the 2014 GO Bonds.[9]

32.     The 2014 GO Bonds were issued under a single CUSIP number with an OID of $245,000,000, leaving $3.255 billion in net proceeds, $550 million of which was used to pay costs of issuance, costs of terminating swaps relating to the refunded bonds, and interest on the 2014 GO Bonds themselves.  2014 A Official Statement, at 24, Exhibit 6.

### B.     Use Of GO Bonds To Finance Deficit Spending

33.     For many years leading up to the Petition Date, the Commonwealth was running a structural deficit, *i.e.*, recurring revenues were insufficient to cover recurring expenses.  *See, e.g.,* 2014 A Official Statement, at 8 & II-9, Exhibit 6.

34.     Rather than balance the budget by raising taxes and/or reducing spending, the Commonwealth borrowed money from GDB and bondholders to fund annual operating expenses and debt service.

35.     As disclosed in the 2014 A Official Statement, "[t]hese [budget] deficits, including the payment of a portion of the Commonwealth's debt service obligations, have been covered principally with the net proceeds of bonds issued by COFINA **and Commonwealth**

---

[9]     2014 A Official Statement, at 24, Exhibit 6; Series 2014 GO Bonds Resolution, "whereas" clauses, §§ 26 & 27, Exhibit 7; Certificate of the Secretary of the Treasury, dated March 17, 2014, for 2014 GO Bonds, at 4, Exhibit 9; Arbitrage and Tax Certificate of the Commonwealth, dated March 17, 2014, for 2014 GO Bonds, § 4, Exhibit 8.

**general obligation bonds**, with interim financings provided by GDB . . . ." 2014 A Official

Statement, at I-8, Exhibit 6 (emphasis added). Specifically, and at a minimum:

> (i) $655 million in net proceeds of the 2012 A GO Bonds were used to finance deficit spending by repaying GDB lines of credit that were used to refinance deposits to the Commonwealth Redemption Fund for the payment of principal and interest due on Commonwealth GO bonds;[10]

> (ii) A portion of the $1.2 billion balance of net proceeds of the 2012 A GO Bonds was used to refund, indirectly, other Commonwealth GO bonds that repaid a borrowing by the Commonwealth from GDB that was used to make deposits to the Commonwealth Redemption Fund to pay debt service on Commonwealth GO bonds;[11] and

> (iii) $40.4 million in net proceeds of the 2012 B Bonds were used to finance deficit spending by repaying a GDB line of credit that was used to refinance deposits to the Commonwealth Redemption Fund for the payment of principal and interest from February 1, 2012 to July 1, 2012 on Commonwealth GO bonds (and the balance of the $362.5 million in net proceeds of the 2012 B Bonds were used to refund the 2012 B Refunded Bonds).[12]

36. The 2014 GO Bonds were used to finance deficit spending as follows:

> (i) $342.4 million in net proceeds were used to refund the COFINA BANs (the proceeds of which were used to pay operating expenses of the Commonwealth);

---

[10] *See* 2012 A Official Statement at 7, Exhibit 12.

[11] *Id.* The 2012 A Refunded Bonds included Commonwealth Public Improvement Refunding Bonds, Series 2001(General Obligation Bonds) (the "2001 GO Bonds"). 2012 A Official Statement, at IV-1 & IV-2, Exhibit 12. Proceeds of the 2001 GO Bonds were used for deficit spending by repaying borrowings by the Commonwealth from GDB to make deposits to the Commonwealth Redemption Fund for the payment of debt service on Commonwealth GO bonds. Official Statement, dated May 24, 2001, for (among other bonds) the Series 2001 GO Bonds, at 5 & 6, Exhibit 16. The bonds refunded by the 2001 GO Bonds also included Commonwealth Public Improvement Refunding Bonds of additional series that, in turn, refunded, directly or indirectly, Commonwealth Public Improvement Bonds with respect to which (i) there is no publicly available information but (ii) which may have financed deficit spending. Therefore, there could be additional deficit financing that was indirectly financed by the 2012 A Bonds. For example, (i) as indicated in the 2012 A Official Statement, at IV-1 & IV-2, Exhibit 12, the 2012 A Refunded Bonds included Commonwealth Public Improvement Refunding Bonds, Series 2004 A and Series 2004 B (of several subseries) (General Obligation Bonds); which (ii) as indicated in the Official Statement, dated April 30, 2004, at 4, Exhibit 17, in turn, refunded Commonwealth Public Improvement Refunding Bonds, Series 1999; which (iii) as indicated in the Official Statement, dated December 1, 1998, at 6, Exhibit 18, in turn, refunded Commonwealth Public Improvement Refunding Bonds, Series 1987, for which there is no publicly available information.

[12] *See* 2012 B Official Statement, at 7, Exhibit 13.

(ii)     $1.7 billion in net proceeds were used to repay GDB notes that financed working capital needs of the Commonwealth and to repay GDB lines of credit that financed debt service on Commonwealth GO bonds; and

(iii)    $466.6 million in net proceeds were used to refund other Commonwealth GO bonds, including GO bonds that indirectly financed deficit spending by paying a portion of $207 million of advances under a GDB line of credit that was used to pay debt service on Commonwealth GO bonds.[13]

### C.     GO Bondholder Proofs Of Claim

37.     Numerous holders and insurers of Invalid GO Bonds have filed proofs of claim against the Commonwealth.  Upon information and belief, many (if not all) of these proofs of claim include claims for unamortized OID.

38.     As of the Petition Date, more than $230 million of OID on Invalid GO Bonds had not yet been amortized.

## III.    COMMONWEALTH PBA BONDS

### A.     Puerto Rico Public Buildings Authority

39.     The PBA is an instrumentality of the Commonwealth that was created on June 19, 1958 by Act No. 56-1958 of the Puerto Rico Legislative Assembly (as amended and as codified at P.R. LAWS ANN. 22 § 901 *et seq.,* the "PBA Enabling Act").  P.R. LAWS ANN. 22 § 902.

40.     As authorized by the PBA Enabling Act, the PBA issues bonds to finance the acquisition, construction, and/or improvement of office space and other facilities (collectively, the "PBA Facilities"), which it then purportedly leases to departments, agencies,

---

[13]   *See* 2014 A Official Statement, at 24, Exhibit 6; Series 2014 GO Bonds Resolution, "whereas" clauses, §§ 26 & 27, Exhibit 7.  The 2014 Refunded Bonds included $29.8 million principal amount of Commonwealth Public Improvement Refunding Bonds, Series 2007 A (of two subseries) (General Obligation Bonds) (the "2007 A GO Bonds").  2014 A Official Statement, at 24, Exhibit 6.  Proceeds of 2007 A GO Bonds were used to refund $207.4 million aggregate principal amount of Commonwealth Public Improvement Refunding Bonds, Series 2006 B Bonds (General Obligation Bonds) (the "2006 B Bonds").  Official Statement, dated October 3, 2007, for 2007 A GO Bonds at 7 & 8, Exhibit 14.  Proceeds of 2006 B Bonds were used to pay a portion of advances under a GDB line of credit that were used  to pay a portion of debt service on Commonwealth GO bonds for fiscal year 2006.  Official Statement, dated August 2, 2006, for Series 2006  B GO Bonds at 10, Exhibit 15.

instrumentalities, authorities, public corporations, and municipalities of the Commonwealth

pursuant to purported lease agreements (the "PBA Lease Agreements").

41.    The PBA is governed by a seven-member board, the members of which are,

directly or by virtue of holding executive branch positions, appointed by the Puerto Rico

Governor.  P.R. LAWS ANN. 22. § 904; 3 L.P.R.A. App. § 7.

42.    The PBA Lease Agreements provide that any disputes between the PBA and its

lessees will be resolved by the Governor and that the resolution will be final and binding.  *See,

e.g.*, Master Sublease Contract, dated as of December 22, 2011, between the PBA, as sub-lessor,

and the Commonwealth Department of Education, as sub-lessee (the "PBA Series T Lease

Agreement"), § 6.02, Exhibit 21.

43.    Thus, for all practical intents and purposes, the Commonwealth, the PBA, and the

lessees of the PBA Facilities are all under the Governor's control.

### B.    PBA Bond Issuances

44.    As of February 2017, the PBA had $3.995 billion in principal amount of bonds

outstanding under Resolution No. 468, adopted by the PBA on June 22, 1995, as amended and

supplemented (the "PBA Bond Resolution"), Exhibit 22, and approximately $37.3 million in

principal amount of bonds outstanding under Resolution No. 77, adopted by the PBA on

November 16, 1970, as amended and supplemented.[14]

### C.    PBA Financing Structure

i.    Source of Payment: Rents and Guaranty Payments

45.    The bonds issued under the PBA Bond Resolution (the "PBA Bonds") are payable

solely from (i) the funds in specified accounts held by the fiscal agent under the PBA Resolution

---

[14]    These principal amounts exclude all accretion on outstanding capital appreciation bonds and convertible capital
appreciation bonds.  Certified Fiscal Plan for Puerto Rico, dated March 13, 2017, at 27, Exhibit 24.

into which the rents derived from the PBA Facilities financed by the PBA Bonds are required to be deposited and (ii) the funds, if any, paid by the Commonwealth under its guaranty of the principal of and interest on the PBA Bonds. PBA Bond Resolution, art. VII, § 703, Exhibit 22.

46. Neither the PBA Lease Agreements nor any rights or remedies of the PBA under or in respect of the PBA Lease Agreements are pledged or assigned as security for the PBA Bonds. Nor are the PBA Facilities mortgaged or otherwise encumbered to secure the PBA Bonds. Official Statement, dated June 8, 2012, for PBA Government Facilities Revenue Refunding Bonds, Series U Guaranteed by the Commonwealth of Puerto Rico (the "PBA Series U Official Statement"), at 14, Exhibit 20.

      ii.    Rent Payments: Tied To Amount Of PBA Bond Debt Service And Guaranteed By Commonwealth Full Faith And Credit Pledge

47. The PBA Lease Agreements provide (as required by the PBA Enabling Act and the PBA Bond Resolution) for the payment of rents that, in the aggregate, are sufficient to pay debt service on the PBA Bonds as such debt service becomes due and payable. PBA Bond Resolution art. II, §§ 208, 209 & art. VII, § 701, Exhibit 22; P.R. LAWS ANN. 22 § 916. The rents under the PBA Lease Agreements are periodically reviewed by the PBA and, to the extent necessary, adjusted to ensure their sufficiency for that purpose. PBA Series U Official Statement, at 16, Exhibit 20; 22 L.P.R.A. § 907(g). In other words, the PBA "rents" can increase or decrease in any given year depending solely on whether the debt service on the PBA Bonds has increased or decreased.

48. The PBA Lease Agreements provide (as required by the PBA Bond Resolution) that the rent obligations of the lessees under the PBA Lease Agreements are absolute and unconditional, requiring the continued payment of rent even if the PBA Facilities have been sold or destroyed and regardless of any fault of the lessee. *See, e.g.,* PBA Series T Lease Agreement,

§ 2.02 and art. V, Exhibit 21; PBA Bond Resolution, art. VIII § 709, Exhibit 22; PBA Series U

Official Statement, at 16, Exhibit 20.  Thus, even if a lessee cannot use or occupy the PBA

Facilities leased pursuant to a PBA Lease Agreement (and therefore receives no benefit from that

agreement), the lessee must continue to pay rent and thereby provide a source of payment for the

PBA Bonds.

49.     The rents payable under the PBA Lease Agreements are supported by a pledge of

the Commonwealth's full faith and credit.  In this regard, the PBA Enabling Act provides that:

- The full faith and credit of the Commonwealth are pledged for the payment of rents under any PBA Lease Agreement with any department, agency, instrumentality, authority, or public corporation of the Commonwealth.

- If any rent payable under any PBA Lease Agreement with any department, agency, instrumentality, authority, or public corporation of the Commonwealth is not paid when due, the Commonwealth must advance the unpaid balance to the PBA.

- The Commonwealth's full faith and credit are pledged to support such advances, and the Commonwealth Secretary of the Treasury is directed to make such advances from any available unencumbered funds in the Puerto Rico Treasury.

P.R. LAWS ANN. 22 § 916.

iii.     Payment Of PBA Bond Debt Service: Guaranteed By Commonwealth

50.     The Commonwealth guarantees the payment of the principal of, and interest on,

the PBA Bonds pursuant to Act No. 17-1968 of the Puerto Rico Legislative Assembly, as

amended (the "PBA Guaranty Act").

51.     The PBA Guaranty Act provides that, if the revenues or income and any other

moneys of the PBA pledged for the payment of the principal of and interest on the Bonds (*i.e.*,

the rents payable under the PBA Lease Agreements) are ever insufficient to pay such principal

and interest when due, the Commonwealth Secretary of the Treasury shall (i) withdraw from any

available funds in the Puerto Rico Treasury such sums as may be necessary to cover the

deficiency and (ii) direct that such sums be applied to such payment.

52.    Any payments required under the PBA Guaranty Act are backed by a "pledge" of

the Commonwealth's full faith, credit, and taxing power.[15]

### iv.    Treatment Of Rents As Commonwealth Obligations For Purposes Of Balancing Commonwealth Budget

53.    In fiscal year 2011, and as part of the Commonwealth's strategy for balancing its

General Fund budget, the Commonwealth and the PBA temporarily suspended the rent payment

obligations of the lessees under the PBA Lease Agreements in respect of debt service on the PBA

Bonds.  This resulted in rent reductions of approximately $149 million, $154 million, and $175

million for fiscal years 2011, 2012, and 2013, respectively.  The rent obligations in respect of

debt service on the PBA Bonds were reinstated effective July 31, 2013.  PBA Audited Financial

Statements for Fiscal Years ended June 30, 2013 and June 30, 2014, at n. 3, Exhibit 19.

### v.    Termination Of PBA Lease Agreements Tied To PBA Bond Payment

54.    Each PBA Lease Agreement with respect to a PBA Facility terminates when the

PBA Bonds issued to finance or refinance the acquisition or construction of that PBA Facility

have been paid in full.  PBA Series U Official Statement, at 16, Exhibit 20.

55.    The maturities of each series of PBA Bonds are required to be determined in

accordance with the expiration of the PBA Lease Agreements covering the PBA Facilities to be

financed or refinanced by those PBA Bonds so as to ensure that the principal of, and interest on,

those PBA Bonds can be paid from the rents payable under those PBA Lease Agreements.  PBA

Bond Resolution, art. II, §§ 202, 208, & 209, Exhibit 22.

---

[15]    The use of the word "pledge" in this Objection should not be construed to suggest that the Commonwealth has granted a security interest to PBA bondholders or that there is any Commonwealth collateral securing the PBA bonds.

## JURISDICTION AND STATUTORY PREDICATE

56.     The Court has jurisdiction over this Objection pursuant to section 306(a) of

PROMESA.  Venue is proper in this district pursuant to section 307(a) of PROMESA.

57.     The statutory predicate for the relief sought herein is section 502 of the

Bankruptcy Code, as incorporated by section 301(a) of PROMESA, and Bankruptcy Rule 3007,

as incorporated by section 310 of PROMESA.

58.     Each Objector is a "party in interest" pursuant to section 1109(b) of the

Bankruptcy Code, as incorporated by section 301(a) of PROMESA.  *See In re Fin. Oversight &*

*Mgmt. Bd.,* 297 F. Supp. 3d 261, 264 (D.P.R. 2017) ("Pursuant to 11 U.S.C. § 1109(b), a

provision of the Bankruptcy Code that was expressly incorporated by PROMESA, '[a] party in

interest, including . . . a creditors' committee . . . may raise and may appear and be heard on any

issue in a case under this chapter.'").

## RELIEF REQUESTED

59.     The Objectors respectfully request entry of an order, substantially in the form

attached hereto as **Exhibit A**, disallowing all claims based on Invalid GO Bonds or, alternatively,

disallowing such claims to the extent they include unamortized OID.

## BASIS FOR RELIEF

60.     All claims based on Invalid GO Bonds should be disallowed because the bonds

were issued in violation of the Debt Service Limit and, in the Committee's view, the Balanced

Budget Clause,[16] and, therefore, the bonds are null and void and the holders of such bonds have

no remedy against the Commonwealth.

---

[16]     *See infra* at 32, n. 18.

## I.   INVALID GO BONDS WERE ISSUED IN VIOLATION OF CONSTITUTIONAL DEBT SERVICE LIMIT

61.     The Debt Service Limit in Article VI, Section 2 of the Commonwealth

Constitution limits the amount of debt the Commonwealth can issue by limiting the amount of

future debt service the Commonwealth can take on relative to its past internal revenues.  New

debt cannot be issued if, when added to any payments by the Commonwealth in the prior fiscal

year on account of debt guaranties, debt service on direct, full faith and credit obligations of the

Commonwealth would exceed (in the current or any future fiscal year) 15% of the

Commonwealth's average internal revenues for the prior two fiscal years.  The Invalid GO Bonds

were issued in violation of the Debt Service Limit when properly calculated to include debt

service on the PBA Bonds.

62.     Even if PBA Bond debt service is not included in the calculation, the 2014 GO

Bonds were issued in violation of the Debt Service Limit when properly calculated to include

interest on the 2014 GO Bonds payable from the proceeds of the 2014 GO Bonds themselves.

### A.   Debt Service Limit Was Exceeded If Calculation Had Included PBA Bonds

63.     There can be no dispute that, if debt service on the PBA Bonds is included in the

calculation, the Debt Service Limit was first exceeded with the issuance of the Series 2012 B GO

Bonds on March 29, 2012.

64.     The Commonwealth's average internal revenues for the prior two fiscal years

(2010 and 2011) was $7.6004 billion.  With the issuance of the 2012 B GO Bonds, the maximum

debt service in any fiscal year (including PBA Bond debt service) was $1.2291 billion in 2020

(inclusive of $16.5 million of Commonwealth guaranteed debt payments made in fiscal year

2011), which is more than 15% (16.2% to be precise) of the Commonwealth's average internal

revenues for the prior two fiscal years.  2012 B Official Statement at 15, Exhibit 13; Official

Statement, dated December 19, 2011, for PBA Government Facilities Revenue Refunding Bonds,

Series Q, at 34, Exhibit 28.  The Commonwealth proceeded to issue another $5.8 billion in GO

bonds over the next two years, all of which also violated the Debt Service Limit.

### B.    PBA Bonds Should Be Included In Debt Service Limit Calculation

65.    In form, the PBA Bonds are not "direct obligations" of the Commonwealth

subject to the Debt Service Limit.  In economic substance, however, they are exactly that.

Simply put, the PBA structure is a sham.  It serves no other purpose than to finance the

construction and improvement of buildings for the Commonwealth through the issuance of debt

that, while not in the Commonwealth's name, is payable (directly or indirectly) from the

Commonwealth's general revenues and depends solely on the Commonwealth's credit.  The

Official Statements for the PBA Bonds give away the game, as nearly all of the disclosure in the

Official Statements is focused on the creditworthiness and activities of the Commonwealth, **not**

the PBA.  *See, e.g.*, PBA Series U Official Statement, at 1-2, 3-8, 19-22, App. I and App II,

Exhibit 20.  The same is true of the credit rating agencies' reports.  *See, e.g.*, Report, dated June

5, 2012, of Moody's Investors Service with respect to the PBA Series U Bonds, Exhibit 11;

Report, dated June 5, 2012, of Fitch Ratings with respect to the PBA Series U Bonds, *available

at* https://www.fitchratings.com/site/pr/751662.

66.    The Commonwealth is hardly the first government entity to create a "public

building authority" (or other public entity of similar title).  In fact, the first public building

authority was created in the 19th Century.  From the beginning, public building authorities have

had but one purpose—the circumvention of constitutional debt limits.  Historically, most public

building authority financings have shared the same basic structure; specifically, a state (or

municipality) creates a new entity that is authorized to borrow money to finance the construction

of a building(s) and to lease the building(s) to state entities for rents tied to the amount of debt

service on the borrowing, which rents are paid from the state's general revenues and used to pay

off the borrowing, at which point the rent payment obligation terminates.

67.     Although the PBA structure differs in certain details from the traditional structure,

it is no less a sham—in fact, it is more so.  As with the traditional structure, the rent payments

and lease durations are not determined by the commercial real estate market or the fair market

value of the property leased; rather, they are tied directly to the payment of debt service on the

PBA Bonds and are paid (directly or indirectly) from the Commonwealth's general revenues.  In

addition, the PBA Lease Agreements require the payment of rent even if the PBA Facilities are

destroyed through no fault of the lessee, and any disputes are subject to binding resolution by the

Governor, who appoints, directly or indirectly, all of the PBA's board members.  Moreover, the

bonds and the rent payments are both guaranteed by the Commonwealth and backed by a pledge

of the Commonwealth's full faith and credit.

68.     Since the advent of public building authorities as a debt limit evasion device,

courts in various jurisdictions have refused to countenance such a transparent artifice.  In perhaps

the first case to address a public building authority financing structure, *Reynolds v. City of

Waterville*, 92 Me. 292 (1898), taxpayers of the city of Waterville, Maine, which had already

exceeded Maine's constitutional limit on municipal debt, challenged the city's creation of a "City

Hall Commission" to issue bonds and contract for the construction of a new city hall to be leased

by the city for rents paid from city tax revenues.  The Supreme Court of Maine held that the

structure was nothing but a disguised financing for the city's purchase of a new city hall in

violation of the debt limit.  *Id.* at 312-13.  In structuring the transaction as a lease from the

Commission, the city "attempted to make it one thing in form, while in reality it is something

else," and thus the court found that "[i]t would not be a misinterpretation to say that the city of

Waterville, instead of leasing the property, undertakes to purchase or pay for it on the installment plan, and that what are called rentals for the hall are merely partial payments on its cost." *Id.* at 303-04.

69.     A half century later, in *Ayer v. Commissioner of Administration,* 340 Mass. 586 (1960), the Commonwealth of Massachusetts legislature created a public building authority structure designed to evade a constitutional requirement that the incurrence of debt over a certain amount be approved by a vote of two-thirds of each house of the legislature then present.  At issue was an emergency act (passed without such a two-thirds vote) that created a non-profit corporation "for the purpose of constructing a State office building to house various departments, commissions and agencies of [Massachusetts]." *Id.* at 588.

70.     After the act was signed into law, the Commonwealth of Massachusetts and the corporation entered into a "contract of lease" under which Massachusetts was "about to expend money raised, or to be raised, by the general taxation of the inhabitants of [Massachusetts] and to incur obligations purporting to bind [Massachusetts]." *Id.*  The corporation, in turn, was about to borrow money under a trust agreement and "issue and sell bonds whose repayment is secured by a pledge of rentals" to be paid by Massachusetts under the contract of lease. *Id.*  The proceeds of the bonds and other borrowings were to be used to construct office space for use by Massachusetts as part of a "government center" development project. *Id.* at 589.

71.     Taxpayers attacked the structure on the primary grounds that it was unconstitutional in that "the statutory scheme [was] in substance a borrowing of money by [Massachusetts] without a vote, taken by the yeas and nays, of two thirds of each house of the [legislature] present and voting." *Id.* at 591.  The Supreme Judicial Court of Massachusetts agreed.

72.     The court began by noting that, "[i]f [Massachusetts] itself were to borrow on bonds issued by it for the purpose of erecting an office building, this could be done only by a [two-thirds] vote," and thus "[t]he question [was] whether this is substantially the situation presented by the corporation created by [the statute at issue] and the contract of lease." *Id.*at 592 (internal quotations marks omitted).  Stated another way, the question was whether "this somewhat elaborate statute created an entity sufficiently apart from [Massachusetts] itself to avoid being classified as 'colorable' or as a 'subterfuge to evade the [Massachusetts constitution] when the scheme embodied in it is viewed as a whole." *Id.*

73.     The court concluded that, while the corporation was a legitimate legal entity capable of issuing bonds and suing and being sued, "these attributes [were] not enough to meet the [taxpayers'] present constitutional challenge." *Id.* at 592-93.  This was because, "viewing the project as a whole, the [corporation was] nothing more than a mere intermediary to carry out only one purpose." *Id.*

74.     In this regard, the court observed that the corporation was not like other municipal entities, which "exist for more than a single, temporary purpose" and "perform services for others than the sovereign itself," acquiring "income from those for whom their services are performed." *Id.* at 595.  The court further observed that "[t]he statute and the 'contract of lease' which it permits, when scrutinized together, have all the earmarks of a State operation," including that "[t]he members of the [corporation] appear to be public officers." *Id.* at 597.

75.     For these reasons, the court went on to hold that the statute at issue was unconstitutional and "void upon its face" because "[t]o hold otherwise would be to exalt artifice above reality." *Id.* at 598 (internal quotations marks omitted).  Indeed, "[t]he creation of the

[corporation] to execute the 'contract of lease' [was] merely one phase of an integrated plan of which the substantial result [was] constitutional evasion." *Id.*

76.     Likewise, in *Martin v. Oregon Building Authority,* 276 Or. 135 (1975), the Supreme Court of Oregon held that bonds to be issued by a public building authority should be considered debts of the state for purposes of the state's constitutional debt limit.  The court began by observing that:

> The most accurate characterization of the effect of the public building authority device is that it divorces the borrowing function from the paying function in what is essentially one integral transaction.  That is, the borrowing power is located in one entity (the Authority) while the money for retiring the debt comes from another (the state) . . . [and thus] [t]he question, in essence, is whether the interposition of the Authority between the state and the lenders sufficiently isolates the state from the debt so as not to contravene the constitutional limitation.

*Id.* at 141-42.

77.     Upon careful analysis, the court answered the essential question in the negative, finding that the public building authority structure "is a scheme which would fool only a lawyer," as "[t]he Authority's only function is to effectuate the creditor-debtor relationship which exists in fact between the bondholders and the state, the state being the sole source of funds [for payment of the Authority's bonds]."  *Id.* at 145.  The Authority was, in the court's blunt words, "a gutless intermediary whose sole reason for existence [was] to insulate the state from the constitutional debt limitation."  *Id.*

78.     The court began its analysis by dispensing with any argument that the Authority's bonds could be viewed as self-liquidating "revenue bonds" on account of the fact that the source of payment would be the rents generated by the bond-financed buildings.  *Id.* at 143.  As the court correctly noted, revenue bonds are exempted from constitutional restrictions on the theory that "[t]he financed project usually resembles a commercial enterprise, and bond payments are

24

limited to the fund created by the charges paid by third parties who are the users of the project.

The state in effect merely acts as a conduit between the users and the bondholders; no threat is

posed to the tax coffers since general tax revenues are not subject to bondholder claims." *Id.*

Where, however, "the revenue for bond payment comes from the general fund of the state and is

not generated from charges by the state to third parties for facilities or services, the rationale for

exempting revenue bonds from the constitutional restriction is obviously inapplicable.  The state

no longer acts as a conduit, but rather it has directly obligated general tax revenues to sustain the

fund for bond payment." *Id.*

79.     The court went on to conclude that "viewing the transactions as a whole, the

existence of the Authority must be disregarded if we are to remain faithful to the purpose of the

constitutional debt limitation." *Id.* at 144.  This conclusion did not turn on any distinction

between revenue bonds and full faith and credit bonds or on any finding that the Authority lacked

status as a legal entity separate from the state.  Rather:

> The stripping away of the formal paraphernalia that clothe the Authority
> and the transactions leads us to believe that a debt of the state is created
> within the meaning of the constitutional provision.  Regardless of how the
> status of the Authority as a legal entity is viewed, its presence should be
> disregarded because its sole function is a mechanical one to effectuate a
> connection between the bondholders and the state in a manner which
> defeats the purpose of the debt limitation.  To view the Authority as
> independent would be a victory of form over substance.  The relationship
> in fact is one between the bondholders and the state; and the state's role in
> the arrangement goes beyond simply leasing the property from the
> Authority, for it is, in essence, retiring a debt which has been incurred on
> its behalf and which it has the sole responsibility to repay.

*Id.* at 145-46.

80.     More recently, in *Winkler v. State School Building. Authority,* 189 W.Va. 748

(1993), the Supreme Court of West Virginia held that bonds of the State School Building

Authority were debts of the state and thus subject to constitutional debt restrictions, even though

25

the state had expressly disclaimed liability for the bonds and even though the funds for payment

of the bonds were subject to legislative appropriation.  Although the source of payment was a

special "sinking fund" rather than rents paid by the state (as in the typical case), the funds came

from the state's general revenues just the same.  *See id.* at 762-63.  Having analyzed the

structure, the court found that it would be "difficult to conclude that the revenue bonds issued by

the SBA are not obligations of the State" when "the requirement of maintaining the sinking fund

in order to service the bonds and provide for their redemption indicates a financial commitment

by the Legislature."  *Id.* at 763.  With regard to the funds being subject to appropriation, the

justices of the court "could not close [their] minds to the practical consequences of this revenue

arrangement," as "accept[ing] the premise that the Legislature is not bound to fund the bonds and

would allow a default, thereby impairing the credit rating of the State, assume[d] a naivete on

[their] part that [they] simply [did] not possess."[17]  *Id.*

      81.    The reasoning of these courts is even more compelling in the bankruptcy context,

where courts have always sought to determine the true nature of a transaction by looking beyond

---

[17]   Other courts have also concluded that public building authorities are shams.  *See, e.g., Scroggs v. Kansas City,* 499 S.W.2d 500, 505 (Mo. 1973) (holding that bonds to be issued by the Kansas City Missouri Public Building Authority for the construction of a convention center on city land, which the authority would then lease back to the city, and which bonds would be paid from convention center operating revenues and certain increased taxes, were subject to the state's constitutional debt limit because "[i]f the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state"); *State ex rel. Wash. State Bldg. Fin. Auth. v. Yelle,* 47 Wash. 2d 705, 714 (1955) (holding that bonds to be issued by the State Building Financing Authority for the construction of facilities for state educational institutions were debts of the state, resulting in a violation of the constitutional debt limit, because the Authority's sole source of revenue was the rents to be charged to the state institutions, and thus "it was actually the state which is attempting to use this means of acquiring buildings for its own use"); *State v. Volusia Cty. Sch. Bldg. Auth.,* 60 So. 2d 761, 761 (Fla. 1952) ("[T]he bonds and proposed lease or rental contract are clearly in violation of [the state's constitutional debt limit].  It is a matter of common knowledge that the Board of Public Instruction is possessed of no funds except those raised by taxation or that arise from appropriations by the legislature for specified purposes designated by law.  The Act, the bonds drawn in question, and the lease or rental contract, propose to raise and appropriate these funds for a purpose or in a way condemned by [the state constitution] . . . ."); *State ex rel. Pub. Institutional Bldg. Auth. v. Neffner,* 137 Ohio St. 390, 399 (1940) ("Where substantial funds which have heretofore gone into the general funds of the state treasury are pledged to liquidate such [Public Institutional Building Authority] bonds, thereby requiring the state to seek and secure revenues otherwise in order to meet its obligations to care for and support its wards, then the obligation of those bonds does become the ultimate obligation of the state.  To hold otherwise would result in an evasion of the constitutional limitations.").

the form and the parties' labels to focus on the transaction's economic substance.  *See, e.g., In re PCH Assocs.,* 804 F.2d 193, 198 (2d Cir. 1986) ("[T]he Code mandates that a court look beyond mere form to the circumstances of each case, including the economic substance of the transaction, to determine whether a 'true lease' exists for purposes of the Code."); *In re Doctors Hosp. of Hyde Park, Inc.,* 463 B.R. 93, 112 (Bankr. N.D. 1ll. 2011) (recognizing that bankruptcy courts "must look to the substance of the transaction, rather than its form"); *In re Dena Corp.,* 312 B.R. 162, 169 (Bankr. N.D. 1ll. 2004) ("Courts look [to] the economic reality underlying a questioned agreement and not to the labels applied by the parties to determine the true nature of a transaction."); *In re Burm,* 554 B.R. 5, 17 (Bankr. D. Mass. 2016) ("[C]ommercial transactions are complicated, and the determination of whether a transfer of interest in accounts receivable is truly a 'sale' or whether the payment of the 'purchase price' is in reality a 'loan,' requires a close look at the details of the transaction."); *In re Eureka S. R.R., Inc.,* 72 B.R. 813, 815 (Bankr. N.D. Cal. 1987) ("[S]imply calling the transaction a [sale] does not make it so; labels cannot change the true nature of the underlying transaction.").

82.     As the District of Puerto Rico Bankruptcy Court has explained in the "true lease" context, "determining whether an instrument is a true lease [or a secured financing] hinges on the realities of the lease and not the labels applied by the parties."  *In re Three Star Telecast, Inc.,* 73 B.R. 270, 272 (Bankr. D.P.R. 1987); *accord In re Access Equip, Inc.,* 62 B.R. 642, 645 (Bankr. D. Mass. 1986) ("In determining whether a contract is a 'true lease' or one intended for security, courts do not consider what description the parties have given to it, but what is its essential character.") (internal quotations omitted).  Courts have also followed a "substance over form" approach in determining whether a particular interest constitutes property of the estate.  Thus, in *In re The Ground Round, Inc.,* 482 F.3d 15 (1st Cir. 2007), the First Circuit held that a liquor

license was property of the estate even though state law expressly provided it was "not property." *Id.* at 17; *see also In re Gull Air, Inc.,* 890 F.2d 1255, 1259-60 (1st Cir. 1989) (holding that the debtor airline had a property interest in airport arrival and departure slots "despite the FAA's provision that" such slots "do not represent a property right [pursuant to the Code of Federal Regulations]").

83.     It also bears noting that, in the city of Detroit's bankruptcy, the city argued that certificates of participation ("COPs") issued as part of a structure created by the city to finance unfunded pension liabilities were null and void, and that the COP holders and insurers could recover nothing, because the structure was a sham designed to circumvent the city's debt limit.  *In re City of Detroit*, 524 B.R. 147, 192-97 (Bankr. E.D. Mich. 2014).  The structure at issue, while not a public building authority, was similar to the Commonwealth's PBA structure in that investment vehicles were issued by a separate legal entity that paid the holders with revenues derived from contracts with the entity's government creator, which, on paper, was not directly indebted to the holders.  *Id.* at 193.  In its decision confirming the city's plan of adjustment, under which the COP holders and insurers split a recovery of just thirteen cents on the dollar, the court found that the city's arguments had "substantial merit" and that "the City would have a reasonable likelihood of success on the merits."  *Id.* at 193-97.  The court thus looked beyond the form to the substance of the structure in assessing the plan's fairness with respect to the COPs.

84.     Although, outside the bankruptcy context, some courts have held that public building authority structures do not create debts of the state or municipality, their reasoning cannot withstand careful scrutiny.  *See generally* Robert C. Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 YALE L. J.

234 (1958) (analyzing public building authority structures and concluding that "[n]o satisfactory theory has been advanced which justifies exempting the building authority device from constitutional debt limits").  But even if the reasoning of these courts was sound (it is not), the cases are decisively distinguishable on the grounds that the state or municipality had not "pledged" its full faith and credit for payment of the bonds through a guaranty of both the rents and the bonds themselves.

85.     Indeed, the absence of such an obligation is often cited as a critical factor in the analysis.  For example, in *Enourato v. New Jersey Building Authority,* 90 N.J. 396 (1982), the Supreme Court of New Jersey held that "[t]he [New Jersey Public Building] Authority's bonds and notes are not a debt or liability of the State [because] [t]hey state on their face that the State does not pledge its faith and credit to their payment," and "[a]lthough the Act not only contemplates that the State will make the necessary appropriations [for rents payable to the Authority] but also seeks to ensure this result . . . the State is under no legal obligation to do so." *Id.* at 410.  Thus, contrary to the situation here, "[t]he Authority's creditors have notice that their only remedy lies against the Authority."  *Id.; see also Wisniewski v. Murphy,* 454 N.J. Super. Ct. App. Div., 508, 524 (2018) (noting that the constitutionality of New Jersey Public Building Authority bonds hinged on "the legal autonomy of the issuing authority and the specific language on the bonds that disclaimed any enforceable obligation on the part of the State"); *Book v. State Office Bldg. Comm'n.,* 238 Ind. 120, 140 (1958) ("Under [the public building authority act's] provisions[,] bondholders, in case of default, have no recourse against the State of Indiana in its corporate sovereign capacity, or against any State fund."); *Walinske v. Detroit-Wayne Joint Bldg. Auth.,* 325 Mich. 562, 581-82 (1949) ("Inasmuch as the bonds proposed to be issued by the

Authority are not faith and credit obligations of its incorporators, they need not be voted on by the electorate, nor are they subject to the debt limitations of the municipalities.").

86.      Puerto Rico's public building authority structure appears to be unique in that the Commonwealth explicitly "pledged" its full faith and credit, not only to guarantee the rents payable by Commonwealth entities, but to guarantee the PBA Bonds themselves.  Even if the Commonwealth had not explicitly guaranteed the bonds, it did so implicitly by guaranteeing the rents, which are the source of payment for the debt service.  *See Alan v. Wayne Cty.,* 388 Mich. 210, 267, *opinion adhered to on denial of reh'g,* 388 Mich. 626 (1972) ("Here the County's full faith and credit is pledged [for payment of the rent] and we hold the authority is (not) separate from the government and autonomous but is acting as an alter ego.  This means the County is pledging its full faith and credit not only to pay the rent but also to pay the bonds, neither of which Acts 31 and 94 permit.") (internal quotation marks and alterations omitted).  To the Objectors' knowledge, no court has ever exempted public building authority bonds from a constitutional debt limit where the bonds, let alone the bonds and the rents, were backed by a full faith and credit guaranty.  Accordingly, calculation of the Debt Service Limit must include PBA Bond debt service (as opposed to guaranty payments made on account of PBA Bonds) because, in economic reality, PBA debt service is a direct obligation of the Commonwealth.

### C.      Issuance Of 2014 GO Bonds Violated Debt Service Limit Even If Calculation Does Not Include PBA Bonds

87.      The 2014 GO Bonds were issued in the aggregate principal amount of $3.5 billion, but once again, things are not as they appear.  Nearly $425 million of the 2014 GO Bond proceeds were used to pay interest on the 2014 GO Bonds during the first three years they were outstanding, and those interest payments were excluded from the calculation of the Commonwealth's Debt Service Limit (as described below).  *See* 2014 A Official Statement, at 24

30

& 34, Exhibit 6.  Thus, the Commonwealth really borrowed approximately $3.1 billion for the intended purposes but, because the Commonwealth knew it would not have sufficient revenues to pay even the first few years of interest on the bonds, it borrowed money for that too. Although this is not uncommon in municipal project financing, where the project being financed might take years to begin generating revenues for the payment of debt service, the 2014 GO Bonds were not issued to finance any such revenue-generating project.  2014 A Official Statement, at 24, Exhibit 6.

88.     Under the plain language of the Commonwealth Constitution, the Debt Service Limit calculation does not depend on the source of payment for the debt service.  Rather, the Constitution refers to "the amount of principal of and interest on such bonds and notes."  P.R. LAWS ANN. CONST. art. VI, § 2.  The interest paid from the proceeds of the 2014 GO Bonds was "interest on such bonds" just the same as interest on the bonds paid from any other source.

89.     In calculating the Debt Service Limit, the Commonwealth **did not include** the nearly $425 million of interest to be paid from the proceeds of the 2014 GO Bonds themselves in fiscal years 2014, 2015, and 2016, thereby creating the appearance that the Debt Service Limit would not be violated.  As shown in Appendix II hereto, had that interest been included in the calculation, the issuance of the 2014 GO Bonds would have been shown to violate the Debt Service Limit (even without including debt service on the PBA Bonds).

90.     Although it would not change the analysis, the proceeds used to pay interest were not even held in a separate escrow account for that purpose.  Rather, the proceeds were deposited in the Commonwealth Redemption Fund (as defined in footnote 8 above) and were therefore available for the payment of debt service on all of the Commonwealth's GO bonds and notes. 2014 A Official Statement, at 31, Exhibit 6.  Upon information and belief, the Commonwealth

31

Redemption Fund, which is held by GDB, was never established as a valid trust with respect to the proceeds at issue or otherwise. Therefore, and perhaps by design, the Commonwealth had access to those funds at all times.

## II. INVALID GO BONDS WERE ALSO ISSUED IN VIOLATION OF CONSTITUTIONAL BALANCED BUDGET CLAUSE[18]

91. As a means of municipal finance, GO bonds are traditionally issued to finance capital projects such as land acquisition and infrastructure development.[19] By contrast, the Invalid GO Bonds were used (among other purposes) to finance deficit spending (directly or indirectly), which is not a purpose for which the Commonwealth had the power to borrow money.

92. More egregious still, the 2014 GO Bonds were issued when the Commonwealth was already straining under an unsustainable debt load and had already engaged bankruptcy counsel to draft debt restructuring legislation (which, as the Court is aware, was ultimately struck down by the U.S. Supreme Court).

93. As touted by GDB in a 1974 *Barron's* magazine advertisement for Commonwealth GO bonds, "[t]heir soundness as investments is underscored by a forthright and fundamental fact: that **deficit financing is specifically prohibited in the Constitution of the Commonwealth**." GDB Advertisement, *Barron's* Magazine, February 1974, Exhibit 25 (emphasis added). In simple terms, "deficit financing" is the practice of alleviating a budget deficit by borrowing money rather than reducing expenses or increasing taxes. The

---

[18] The FOMB does not take a position with respect to whether the Invalid GO Bonds violate the Balanced Budget Clause as described in Part II of this Objection. However, the FOMB reserves its right to raise this or additional objections.

[19] MRSC, Types of Municipal Debt, *available at* http://mrsc.org/Home/Explore-Topics/Finance/Debt/Types-of-Municipal-Debt.aspx; Zacks, The Difference Between General Obligation Bonds & Revenue Bonds, *available at* https://finance.zacks.com/difference-between-general-obligation-bonds-revenue-bonds-1303.html.

Commonwealth's constitutional prohibition of deficit financing should have been a good selling point, but what seemed a "forthright and fundamental fact" in 1974 was later forgotten or ignored.

94.     In the English version of the Commonwealth Constitution approved by the U.S. Congress, Article VI, Section 7 provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. LAWS ANN. CONST. art. VI, § 7 (emphasis added).

95.     The Spanish version of the Constitution adopted by the Puerto Rico legislative Assembly uses the term "recursos totales," which in English means "total **resources**," not "total **revenues**" (which would be rendered "rentas totales" in Spanish).  During Puerto Rico's constitutional convention, a delegate inquired (in Spanish) as to the meaning of the term "recursos totales."  Certified Translation of Session Diary of the Constitutional Convention of Puerto Rico, at 1090, Exhibit 26.  The question was taken up by the president of the drafting committee, who explained (in Spanish) that "recursos totales" was meant to be broader than "total revenues," which was the term used in the balanced budget clause of the Jones Act, which governed Puerto Rico until the adoption of the Commonwealth Constitution.[20]  *Id.*  He further explained that "recursos totales" was meant to include, among other things beyond tax revenues, the "issuance of bonds" (translated from Spanish).  *Id.* at 1090.[21]

---

[20]   The Jones Act provided that "[n]o appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the Government of Porto Rico during any fiscal year shall exceed the **total revenue** then provided for by law and applicable for such appropriation or expenditure, including any available surplus in the treasury, unless the legislature making such appropriation shall provide for levying a sufficient tax to pay such appropriation or expenditure within such fiscal year."  Section 34 of Jones Act, ch. 145, 39 Stat. 951, 963 (1917) (emphasis added).

[21]   In 1974, the Puerto Rico Attorney General relied on this colloquy and the relative breadth of the term "recursos" (resources) in opining that receivables for taxes owed in the prior fiscal could be counted as part of the balanced budget equation.  The opinion did not even address the fact that the official English version of the

96.     Thus, while the Spanish version of the Constitution uses a term that is broader

than "total revenues" and was meant to include some form of bond proceeds, the English version

uses "total revenues" just like the Jones Act.  Because "revenues" does not include borrowings

(which are a form of expense when repaid), the constitutionality of deficit financing depends, as

an initial matter, on which version of the Constitution controls.  The answer to that question is

found in Public Law 600 of July 3, 1950, which is the law by which the U.S. Congress

"provide[d] for the organization of a constitutional government by the people of Puerto Rico,"[22]

and Public Law 447 of July 3, 1952, which is the law by which the U.S. Congress approved the

Commonwealth Constitution conditional upon certain amendments not relevant here.

Public Law 600 provided that "[u]pon **approval by the Congress** the constitution shall

**become effective in accordance with its terms**."  Public Law 600, 64 Stat. 319, 48

U.S.C. § 731d (1950) (emphasis added).  Public Law 447 provided that:

> the constitution of the Commonwealth of Puerto Rico **hereby approved**
> shall **become effective** when the Constitutional Convention of Puerto Rico
> shall have declared in a formal resolution its acceptance in the name of the
> people of Puerto Rico of the conditions of approval herein contained, and
> when the Governor of Puerto Rico, being duly notified by the proper
> officials of Constitutional Convention of Puerto Rico that such resolution
> of acceptance has been formally adopted, shall issue a proclamation to that
> effect.

Act of July 3, 1952, Pub. L. No. 82-447, 66 Stat. 327-328 (1952) (emphasis added).

97.     There can be no doubt that it was the **English version** of the Constitution that the

U.S. Congress approved.  The official letter from the Puerto Rico Resident Commissioner

transmitting the Constitution to the U.S. Congress stated that "[t]he copy of the constitution

which I am transmitting is the official English text."  A. Fernos-Isern, Letter of Transmittal (Feb.

---

Constitution uses the narrower term "revenues."  Op. Sec. Just., No. 1974-15, Trans. (May 21, 1974), Exhibit
23.

[22]   P.R. Fed. Relations Act of 1950, Pub. L. No. 81-600, 64 Stat. 319 (1950).

12, 1952), *reprinted in* Doc. 27 DOCUMENTS ON THE CONSTITUTIONAL RELATIONSHIP OF PUERTO

RICO AND THE UNITED STATES 218-19 (Marcos Ramirez Lavandero, 3rd Ed. 1988), Exhibit 1.[23]

98.    As a consequence, the "terms" in accordance with which the Constitution became

effective were the terms of the English version approved by the U.S. Congress; not the Spanish

version debated at the constitutional convention.  It is indisputable that, if the English version

controls, deficit financing is constitutionally prohibited and, because they were used to finance

deficit spending, the Invalid GO Bonds were not issued for a lawful purpose.

## III.   INVALID GO BONDS ARE NULL AND VOID AND BONDHOLDERS HAVE NO EQUITABLE REMEDY AGAINST THE COMMONWEALTH

99.    The issuance of the Invalid GO Bonds in violation of the Debt Service Limit and

the Balanced Budget Clause renders them null and void, and, as a consequence, the bondholders

have no remedy.  As mandated by Article VI, Section 9 of the Commonwealth Constitution, any

expenditure of public funds must be for a public purpose and "pursuant to law."  Accordingly,

when a government transaction violates Puerto Rico law (not least the Constitution itself) a

private counterparty has no remedy if the illegality implicates a clear public policy.  The Debt

Service Limit and the Balanced Budget Clause inarguably embody a clear public policy of the

---

[23]    *See also* H.R. Rep. No. 82-435, at 4-21 (1952), Message from the President of the United States, dated April 22, 1952, Exhibit 2 (President Truman finding that English version of the Commonwealth Constitution complied with provisions of Federal Relations Act and U.S. Constitution and forwarding English version to Congress for approval); H.R. Rep. No. 82-1832, at 8 (1952), Exhibit 3 (documenting that, on April 30, 1952, House Committee on Interior and Insular Affairs unanimously recommended approval of English version of the Commonwealth Constitution forwarded to Congress by President Truman); *id.* at 4 (documenting that, on February 6, 1952, Puerto Rico constitutional convention had "signed the enrolled text of the constitution, which was adopted both in English version and Spanish version" and that people of Puerto Rico voted on and approved Constitution on March 3, 1952 following printing and circulation of English and Spanish versions throughout the island); Resolution 34 (July 10, 1952), *reprinted in* Doc. 29 DOCUMENTS ON THE CONSTITUTIONAL RELATIONSHIP OF PUERTO RICO AND THE UNITED STATES 222-23 (Marcos Ramirez Lavandero, 3rd Ed. 1988), Exhibit 4 (accepting conditions of U.S. Congress set forth in Public Law 447 for approval of the Commonwealth Constitution as adopted by people of Puerto Rico on March 3, 1952 and sent to Congress by President Truman); N. Almiroty, Proclamation by Governor of Puerto Rico (July 25, 1952), *reprinted in* Doc. 30 DOCUMENTS ON THE CONSTITUTIONAL RELATIONSHIP OF PUERTO RICO AND THE UNITED STATES 224 (Marcos Ramirez Lavandero, 3rd Ed. 1988), Exhibit 5 (declaring effective the Commonwealth Constitution as approved by Puerto Rico Constitutional Convention through Resolution 34).

Commonwealth regarding the issuance of debt, and thus holders of the Invalid GO Bonds cannot

recover under an unjust enrichment theory.

100.    In *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta,* 91 F. Supp. 3d 267,

290 (D.P.R. 2015), the court held that a contract between a Puerto Rico municipality and a real

estate developer was "null and void" because it illegally purported to grant incentive payments

funded from municipal sales and use tax collections.  The court further held that, because the

contract violated Puerto Rico law, the developer had no right to future payments and had to

return funds already received under the contract.  *See also State v. Spring City,* 123 Utah 471,

475 (1955) ("Obligations incurred after the debt limit is reached are void, and their payment

should not be permitted to deprive legitimate claimants."); *State ex rel. Nuveen v. Greer,* 88 Fla.

249, 260 (1924) (holding that, where "a statute [authorizing the issuance of municipal bonds] is

unconstitutional and has never been adjudged to be valid, bonds issued thereunder are void, and

a purchaser acquires no lawful property rights therein as bonds that are secured by the

Constitution"); *Eaton v. Shiawassee Cty.,* 218 F. 588, 591 (6th Cir. 1914) (lenders could not

recover funds borrowed in excess of county's authority to incur debt); *McCurdy v. Shiawassee

Cty.,* 154 Mich. 550, 556 (1908) (holding that notes were void because county was prohibited

from "borrowing] money necessary to defray the current expenses and charges of the county").

101.    As the relevant case law demonstrates, equitable theories such as estoppel, unjust

enrichment, and ratification are of no avail.  The Puerto Rico Supreme Court has "unequivocally

rejected" the application of equitable estoppel as developed in the common law for use in its civil

law system.  *CMI CapitalMkt. Inv., LLC v. Municipality of Bayamon,* 410 F.Supp. 2d 61, 76

(D.P.R. 2006) (noting potential problems that could arise from the application in Puerto Rico of

common law equitable estoppel).  A similar doctrine, known as "*actos propios*" (loosely

translated, the "doctrine of one's own acts") has been incorporated into Puerto Rico's legal

system via Article 7 of the Puerto Rico Civil Code, P.R. LAWS ANN. 31 § 7, which allows a court

to apply equitable principles in the absence of any applicable law.  While the *actos propios*

doctrine is "'parallel to the doctrine of estoppel in English law,' . . . there are differences in their

development and content."  *Id. (quoting Int'l Gen. Elec. v. Concrete Builders of P.R, Inc.,* 104 D.

P.R. 871, 877 (1976)).

102.    Puerto Rico courts have held that the doctrine of *actos propios* "is generally

inapposite to the actions of government officers and agents."  *CMI Capital,* 410 F. Supp. 2d at 76

n. 21.  The doctrine **may** apply to government action **only** where the public interest would

otherwise be harmed.  *See Mendoza Aldarondo v. Asociacion de Empleados,* 94 D.P.R. 564, 579

(1967) (explaining the "general rule that 'estoppel' cannot arise from acts by government

officials or government agents").  Puerto Rico courts will not apply the *actos propios* doctrine if

doing so would entail a violation of law or public policy.  *See Morales v. Mun. De Toa Baja,* 119

D.P.R. 682, 692-93 (1987) (holding that the *actos propios* doctrine was inapplicable where the

public policy of protecting public funds and the general welfare of the municipality was

implicated).  As expressed in the Commonwealth Constitution, it is a fundamental public policy

of the Commonwealth that the power of the Legislative Assembly to incur debt should be limited

based on the Commonwealth's internal revenues, lest political expediency lead to the

accumulation of an unsustainable debt burden.

103.    Likewise, under Puerto Rico law, the doctrine of unjust enrichment cannot be

applied in contravention of a clear public policy embodied in a statute or the Constitution.  Thus,

in *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1010 (1994), the Puerto Rico Supreme Court held

that a medical equipment supplier could not recover as unjust enrichment the value of equipment

delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts.

104. The same is true for ratification. Under Puerto Rico law, if a government contract does not follow strict formation requirements and comply with all applicable laws, it is of no force or effect and cannot be ratified by later conduct. *See* Certified Translation of *Vicar Builders Dev., Inc. v. ELA,* 192 D.P.R. 256, 267-70 (2015), Exhibit 10 (rejecting the argument that the Puerto Rico Department of Justice had ratified the extension of a lease agreement by continuing to occupy property and pay rent); *see also Cecort Realty Dev., Inc. v. Llompart- Zeno,* 100 F. Supp. 3d 145, 157-158 (D.P.R. 2015) (holding that a government agency's termination of a lease agreement did not deprive a realty company of property rights where the agreement did not comply with bidding requirements and was therefore invalid).

105. In short, a private party transacting with the Commonwealth takes the risk that, if the transaction runs afoul of a clear public policy embodied in a statute or the Constitution, no remedy will be available against the Commonwealth. Although a harsh result for the counterparty to an unlawful transaction, allowing a recovery against the Commonwealth (in whatever form) would be a much harsher result for the people of Puerto Rico as a whole. Laws governing the expenditure of public funds exist for one reason—to protect the interests of Puerto Rico taxpayers. *Cf. Olds v. Alvord,* 133 Fla. 221, 227-28 (1938), *on reh'g,* 139 Fla. 745 (1939) ("[T]he equities are not all on the side of the bondholder . . . The manner in which [the Constitution was violated] is immaterial so far as the taxpayer is concerned. If it [the Constitution] can be circumvented by a species of legal circumlocution in the manner contended, it is obsolete and had as well be written off the book."); *McCurdy*, 154 Mich. at 561 ("In cases where equitable reasons are urged for the purpose of placing liability upon a municipality,

consideration of the rights and interests of those most seriously interested must not be lost sight

of.  The taxpayer is entitled to the protection of all constitutional and statutory restrictions. In the

aggregate he is the public for whose benefit the municipality exists, and which bears all the

burdens put upon it, but which is not consulted when such burdens, as in this case, are

assumed."); *Gillette-Herzog Mfg. Co. v. Canyon Cty.,* 85 F. 396, 398 (C.C.D. Idaho 1898)

("Plaintiff's counsel further say that, if the contract [with the county to construct bridges] was

not authorized [because it violated the constitutional debt limit], yet, as the defendant made it, as

the bridges were constructed in pursuance of it, as there was no fraud in the transaction, and as

defendant accepted the bridges, and has since had the benefit thereof, it must pay for them their

fair value as upon an implied contract . . . If such is the law, it follows that this constitutional

provision is utterly useless.").[24]

## IV.     BONDHOLDERS HAVE NO REMEDY UNDER UCC ARTICLE 8

106.     Article 8 of the UCC (adopted in Puerto Rico as Article 8 of the Commercial

Transactions Act) contains two provisions dealing with the issuance of invalid securities.  As set

forth more fully below, section 8-202 provides for the validation of securities under specified

conditions as a defense to an issuer's assertion of invalidity.  Section 8-210 provides a remedy to

holders of "overissued" securities *(i.e.,* securities issued in excess of the issuer's power);[25]

specifically, delivery of an identical security that does not constitute an overissue or, if no such

---

[24]   In any event, even if holders of Invalid GO Bonds had remedies against the Commonwealth as a result of the
invalidity of their bonds (they do not), any and all such claims asserted against the Commonwealth in
connection with those remedies would be automatically subordinated by operation of section 510(b) of the
Bankruptcy Code.  *See infra* at 42, n. 26.

[25]   Section 8-210 defines an "overissue" as "the issue of securities in excess of the amount the issuer has corporate
power to issue, but an overissue does not occur if appropriate action has cured the overissue." 1995 P.R. LAWS
208, art. 8-210(a), as amended, P.R. LAWS ANN. 19, § 1760(a).  Although the section speaks in terms of
"corporate power," it has been applied to the issuance of government bonds in excess of a debt limit.  *See
Farmers State Bank & Trust Co. v. City of Yates Ctr.*, 229 Kan. 330, 337-38 (1981) (applying state's version of
UCC section 8-210 in upholding purchase price remedy for holders of overissued municipal bonds).

security is available, recovery of the purchase price paid by the security holder (not the face amount of the security or any interest or dividends).  *See* 1995 P.R. LAWS 208, art. 8-210(c), as amended, P.R. LAWS ANN. 19 § 1760(c) (delivery of identical security); 1995 P.R. LAWS 208, art. 8-210(d), as amended, P.R. LAWS ANN. 19 § 1760(d) (recovery of purchase price).  Neither section gives rise to an allowable claim against the Commonwealth.

### A.   No Statute Can Nullify The Constitution

107.   To the extent section 8-202 purports to validate bonds issued in violation of the Commonwealth Constitution, the section is itself unconstitutional for the simple reason that a statute cannot override the Constitution, which is the supreme law of the land (subject to the plenary power of the U.S. Congress under the Territories Clause of the U.S. Constitution).  As the Supreme Court of Florida held in *Weinberger v. Board of Public Instruction of St. Johns County*., 93 Fla. 470, 481-82 (1927):

> The Legislature, by a curative statute, may . . . validate bonds originally issued without authority, provided the Legislature could have authorized the issuance of the bonds in the first place.  **But when bonds are issued in violation of a mandatory provision of the Constitution, as, for instance, when in excess of the debt limit fixed by the Constitution**, or when such bonds have not been authorized by a two-thirds vote of the people, as required by the Constitution), or, as in the case before us, where the maturities fixed by the issuing body are contrary to the express requirement of the Constitution, **such bonds are void ab initio, and cannot be validated by curative legislation**. (emphasis added).

*See also Nolan Cty. v. State*, 83 Tex. 182, 200 (1891) ("Where a contract, which a municipal corporation has attempted to create, is invalid merely for want of legislative authority to create it, it can be made valid by a subsequent law.  But if, at the time of its attempted creation, the legislature could not have authorized it, it may be doubted whether the legislature could make it valid, although in the mean time [sic], by a change in the constitution, the restriction upon its own power may have been removed.").

40

108.    Likewise, section 8-210 is unconstitutional insofar as it purports to afford a remedy that would otherwise be unavailable to the holders of unconstitutional bonds.  Affording such a remedy would undermine important public policies enshrined in the Constitution, which cannot be set aside by legislative or judicial action.  *See supra* Part III.  As the Supreme Court of Iowa recognized in *McPherson v. Foster Bros.,* 43 Iowa 48, 69-70 (1876):

> Th[e] view [that purchasers of unconstitutional bonds should have a remedy] presents the suggestion of an ingenious plan for setting at naught the provision of the Constitution of the state under consideration. It is commended on the ground that, if the Constitution be enforced so as to cure the evil from which it is intended to protect the people of the state, it would operate to ensnare and defraud those who deal with political corporations.  In such a case, according to the sentiment of the above quotation, the Constitution becomes an instrument of fraud, and on that ground may be violated.  It must be confessed that it is a novel thought, to disregard the supreme law of the state because it operates to ensnare and defraud innocent persons.  The error of the quotation is based upon a partial view of the rights of those who are called innocent purchasers, and want of attention to the object and purpose of the constitutional restriction in question.

*Id.* at 69-70.

### B.    UCC Section 8-202 Is Otherwise Inapplicable

109.    Section 8-202 of the UCC provides, in relevant part, that "[t]he following rules apply if an issuer asserts that a security is not valid":

> (1)    A security other than one issued by a government or governmental subdivision, agency, or instrumentality, even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of a constitutional provision.  In that case, the security is valid in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue.

> (2)    Paragraph (1) applies to an issuer that is a government or governmental subdivision, agency, or instrumentality only if there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for the particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security.

41

1995 P.R. LAWS 208, art. 8-202(b), as amended, P.R. LAWS ANN. 19 § 1752(b).

110.    If this Court were to find that section 8-210 does afford a remedy in this case,

section 8-202 would be inapplicable on that basis alone.  *See* 1995 P.R. LAWS 208, art. 8-210(b),

as amended, P.R. LAWS ANN. 19 § 1760(b) ("Except as otherwise provided in subsections (c) and

(d) [i.e., section 8-210's remedy provisions], the provisions of this [Article] which validate a

security [i.e., section 8-202] or compel its issue or reissue do not apply to the extent that

validation, issue, or reissue would result in overissue."); *see also* UCC 8-202, cmt. (describing

section 8-210 as an "exception" to section 8-202 validation).  In other words, overissued

securities cannot be validated, but holders of overissued securities are afforded a remedy under

section 8-210.  Here, the remedy would be, at best, an unsecured (but subordinated pursuant to

Bankruptcy Code section 510(b)) claim against the Commonwealth for *the purchase price paid*

by the bondholder (which, for many of the biggest bondholders, was presumably well below

par).[26]

111.    In any event, section 8-202 is inapplicable for other reasons. As an initial matter,

section 8-202 applies only to claims of invalidity by the "issuer" of the defective securities, and

neither Objector was the "issuer" of the Invalid GO Bonds within the meaning of the statute.  In

---

[26]    Section 510(b) of the Bankruptcy Code provides that any "claim arising from rescission of a purchase or sale of
a security of the debtor . . . for damages arising from the purchase or sale of such a security . . . shall be
subordinated" to all claims of equal or greater priority. 11 U.S.C. § 510(b).  Accordingly, even if holders of
Invalid GO Bonds had remedies against the Commonwealth as a result of the invalidity of their bonds (they do
not), any and all claims asserted against the Commonwealth in connection with those remedies would be
automatically subordinated by operation of section 510(b).  *See In re Blondheim Real Estate, Inc.*, 91 B.R. 639,
640 (Bankr. D.N.H. 1988) (section 510(b) is meant to subordinate claims for "recovery other than the simple
recovery of an unpaid debt upon an instrument" such that a "security-holder alleging fraud in the purchase of
the security" should not "share on the resulting fraud claim on an equal basis with general unsecured
creditors").  Moreover, section 510(b) is a "strict liability" provision in that its mandatory subordination
provision applies to any claim, even where there is no "allegation of fraud."  *See In re Public Serv. Co. of N.H.*,
129 B.R. 3, 5 (Bankr. D.N.H. 1991) (holding that "the language of 510(b) is broad enough to include breach of
contract and  related actions as well"); *see also In re PT-1 Commc's, Inc.*, 304 B.R. 601, 610 (Bankr. E.D.N.Y.
2004) (subordinating claims alleging breach of contract, breach of fiduciary duty, unjust enrichment, and
tortious interference).

addition, deficit financing was not a purpose for which the Commonwealth had the power to

borrow money.  Moreover, any bondholder invoking UCC 8- 202 has the burden of establishing

such bondholder's eligibility for validation.  Finally, if a bondholder is an original issue

purchaser, section 8-202 is inapplicable on its face.

> i.     Neither Objector Is An "Issuer" Within Meaning Of UCC Section 8-202

112.     Section 8-201(a) of the UCC provides that "[w]ith respect to an obligation on or a

defense to a security, an 'issuer' includes a person that":

> (1)     places or authorizes the placing of its name on a security
> certificate, other than as authenticating trustee, registrar, transfer agent, or
> the like, to evidence a share, participation, or other interest in its property
> or in an enterprise, or to evidence its duty to perform an obligation
> represented by the certificate;
>
> (2)     creates a share, participation, or other interest in its property or in
> an enterprise, or undertakes an obligation, that is an uncertificated
> security;
>
> (3)     directly or indirectly creates a fractional interest in its property, if
> the fractional interest is represented by a security certificate; or
>
> (4)     becomes responsible for, or in place of, another person described
> as an issuer in this section.

1995 P.R. LAWS 208, art. 8-201(a), as amended, P.R. LAWS ANN. 19 § 1751(a).

113.     Neither the FOMB nor the Committee is an "issuer" under subsections (1), (2), or

(3), and thus the only question is whether either Objector is an "issuer" under subsection (4), *i.e.,*

whether either Objector has become "responsible for, or in the place of," the Commonwealth as

"issuer" of the 2014 GO Bonds.  Clearly, they have not.

114.     First, PROMESA itself defines "issuer" in this context as the Government of

Puerto Rico.  *See* 48 U.S.C. §§ 2231(a)(8), (a)(15), (a)(2), (e); *accord* 48 U.S.C. § 2101(b)(2).[27]

---

[27]     To the extent there is any inconsistency between UCC 8-201(a) and PROMESA, the terms of PROMESA
govern.  48 U.S.C. § 2103.

Thus, it is the Government of Puerto Rico, not the FOMB or the Committee, that the U.S.

Congress designated as the "issuer" for purposes of resolving claims and debts under

PROMESA.

115.    Moreover, applicable case law analyzing Article 8 is consistent with the "issuer"

designation in PROMESA.  The court's decision in *Moscato v. Technologies, Inc.,* No. 04 Civ.

2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2015), is instructive.  There, the plaintiff

alleged that the defendants—including the issuers of certain stock and shares, the stock transfer

company, and the issuers' common director—had violated certain obligations of Article 8

relating to the issuance of the plaintiff's shares.  The court dismissed the claims under Article 8

as against the issuers' director because the director "very clearly [was] not the issuer."  *Id.* at *4.

The court explained that an issuer "is the person responsible for the performance of the

obligations represented by a security," which is "usually the enterprise that places its name on the

security certificate as an indication that the security represents debt of that enterprise."  *Id.*; *see*

*also Banco de La Republica de Colombia v. Bank of New York Mellon,* No. 10 Civ. 536(AKH),

2013 WL 3871419 (S.D.N.Y. July 26, 2013) (noting that the definition of "issuer" under the

UCC reflects the "economic reality" of a securities offering).

116.    Notably, Bankruptcy Code section 541 is **not** incorporated into PROMESA.  *See*

48 U.S.C. § 2161(a).  As a result, neither the FOMB nor the Committee "step into the shoes" of

the Debtors in the same capacity as if these cases were brought under chapter 11 of the

Bankruptcy Code.  *Compare In re Hawaii Corporation*, 59 B.R. 410, 412 (D. Haw. 1986)

(holding that a bankruptcy trustee qualified as an "issuer" under UCC section 8-207 because the

trustee, by operation of the Bankruptcy Act, falls within subsection [(a)(4)].").  Here, the

Government of Puerto Rico continues to possess and maintain control, albeit with oversight by

the FOMB, of the "enterprise" of Puerto Rico.  Significantly, neither Objector assumes the economic obligations of Puerto Rico.

117.    Consistent with this analysis, commentators have emphasized that section 8-201(a)(4) is concerned with parties obligated to perform on an issuance.  Hawkland on the UCC, a leading treatise, explains that section 8-201(a)(4) applies when Corporation A takes control of Corporation B and becomes (for purposes of Article 8) the issuer of securities issued by Corporation B.  7A Hawkland UCC Series § 8-201:3 [Rev].  Another leading treatise, Anderson on the UCC, similarly explains that a person is treated as an issuer under (a)(4) if such person "assumes the obligation of" an issuer, "whether by succession in interest or by novation."  8-201:11 [Rev] Substituted obligor, 8 Anderson UCC § 8-201:11 [Rev] (3rd. Ed.).

118.    In economic reality, the FOMB acts as a principal or "director" of the Government of Puerto Rico, but it is not the "enterprise" ultimately responsible for the obligations under the Invalid GO Bonds.  Nor could the Committee be considered the "enterprise" ultimately responsible for such obligations.  Accordingly, neither the FOMB nor the Committee can be deemed the "issuer" of the Invalid GO Bonds.

ii.    Commonwealth Had No Power to Issue Invalid GO Bonds for Improper Purpose

119.    Section 8-202 applies to an issuance of government securities only if one of two conditions is met: (i) "there has been substantial compliance with the legal requirements governing the issue"; or (ii) "the issuer has received a substantial consideration for the issue as a whole or for the particular security **and** a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security."  1995 P.R. LAWS 208, art. 8-202(b), as amended, P.R. LAWS ANN. 19 § 1752(b) (emphasis added).

45

120.    The "substantial compliance" condition is met if the only defects with the issuance are of a merely technical nature.  As explained in the Official Comments, "[t]he purpose of the substantial compliance requirement is to make certain that a mere technicality as, *e.g.,* in the manner of publishing election notices, shall not be a ground for depriving an innocent purchaser of rights in the security."  UCC § 8-202, cmt. 3.  To say the least, if the Invalid GO Bonds were issued in violation of the Debt Service Limit, there has not been "substantial compliance with the legal requirements governing the issue."  Thus, any possible applicability of section 8-202 turns on whether the "power" condition is met.

121.    Even assuming that a government entity has the "power" to issue bonds for an otherwise proper purpose in violation of a constitutional debt limit (it does not), financing deficit spending is an improper purpose prohibited by the Balanced Budget Clause.  Accordingly, the Invalid GO Bonds cannot be validated under section 8-202.

iii.    Bondholders Must Prove Eligibility For Validation

122.    Section 8-114 of the UCC provides that "in an action on a certificated security against the issuer: . . . [i]f it is shown that a defense or defect exists, the plaintiff has the burden of establishing that the plaintiff or some person under whom the plaintiff claims is a person against whom the defense or defect cannot be asserted."  UCC § 8-114(4).  Although the section refers to actions "against" an issuer, "section [8-114] should be read as requiring that any party claiming bona fide purchaser status has the burden of establishing such status, even where he is a defendant."  7 Hawkland UCC Series § 8-105:6 (discussing relevant portion of old section 8-105, which is now in section 8-114).

123.    In any event, a proof of claim seeking payment on bonds is effectively an "action on a certificated security against the issuer."  *See* UCC 8-114, cmt. ("An 'action on a security'

46

includes any action or proceeding brought against the issuer to enforce a right or interest that is part of the security, such as an action to collect principal or interest or a dividend . . .").

124.    Therefore, any bondholder invoking UCC 8-202 has the burden of establishing (i) that the bondholder qualifies as a "purchaser" within the meaning of the UCC, (ii) that the bondholder gave "value" for the bonds, and (iii) that the bondholder was "without notice" of any invalidating defect.

125.    If any bondholder invokes UCC 8-202, the Objectors will seek discovery on these issues from that bondholder and any other appropriate parties.

126.    Any bondholder that purchased Invalid GO Bonds on or after March 8, 2017 was on notice of the Debt Service Limit violation because the possibility of such a violation was explicitly raised in a *Law 360* article.  *See* Richard J. Cooper, *et al.*, *Issues To Expect In A Title III Puerto Rico Restructuring,* Law360 (March 8, 2017, 11:07 AM), https://www.law360.com/articles/898663/issues-to-expect-in-a-title-iii-puerto-rico-restructuring (raising the possibility that the PBA Bonds could be deemed direct obligations of the Commonwealth for debt limit purposes).  Just over a week later, on March 18, 2017, the fact of the violation was explicitly raised in an unredacted motion filed by the COFINA Senior Bondholders' Coalition in the *Lex Claims* proceeding initiated by a group of GO Bondholders. *See* COFINA Senior Bondholders' Motion and Incorporated Memorandum of Law for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c), *Lex Claims, LLC v. Alejandro Garcia-Padilla,* Case No. 3:16-CV-02374 (D.P.R.), Dkt. No. 219, Exhibit 27.

iv.    UCC Section 8-202 Is Expressly Inapplicable To Original Issue Purchasers

127.    Where, as here, the defect in a bond issuance involves a constitutional violation, UCC 8-202 does not validate bonds in the hands of an original issue purchaser.  Thus, if any

bondholder purchased Invalid GO Bonds in the original offering, that bondholder's Invalid GO

Bonds cannot be validated under UCC 8-202 even if that section were otherwise applicable.

128.    If any holder of Invalid GO Bonds claims not to be an original issue purchaser

under UCC 8-202, the Objectors will seek discovery from that bondholder and any other

appropriate parties with respect to that bondholder's purchase of Invalid GO Bonds.

## V.    ALTERNATIVELY, CLAIMS BASED ON INVALID GO BONDS MUST BE DISALLOWED TO THE EXTENT THEY INCLUDE UNAMORTIZED ORIGINAL ISSUE DISCOUNT

129.    Most of the Invalid GO Bonds were issued with OID.  For example, the 2014 GO

Bonds were issued with OID of 7% (*i.e.*, the bonds were issued at 93% of par).

130.    Section 502(b)(2) of the Bankruptcy Code bars the recovery of "unmatured

interest," and courts have unanimously held that "unmatured interest" includes unamortized

OID.  *See* 2008 Ann. Surv. of Bankr. Law 6 ("[B]ankruptcy courts unanimously have held that

nonamortized OID is not allowable as a claim in bankruptcy.").

131.    As the court explained in *In re Public Service Company of New Hampshire.,* 114

B.R. 800 (Bankr D.N.H. 1990), "the word 'interest' in the statute is clearly sufficient to

encompass the OID variation in the method of providing for and collecting what in economic

fact is interest to be paid to compensate for the delay and risk involved in the ultimate repayment

of monies loaned."  *Id*. at 803.[28]  In other words, interest is interest, regardless of its form, and

the Bankruptcy Code precludes the recovery of interest on unsecured claims.  "The statutory rule

excludes original issue discount to prevent creditors from claiming disguised, unearned

---

[28]    In the tax context, the Supreme Court has recognized that "[e]arned original issue discount serves the same function as stated interest" such that "[t]he $6 earned on a one-year note for $106 issued for $100 is precisely like the $6 earned on a one-year loan of $100 at 6% stated interest."  *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57-58 (1965).  The First Circuit has also recognized in the tax context that "[o]riginal issue discount is a form of interest or compensation for the use of money."  *Real Estate Inv. Tr. of Am. v. Comm'r*, 334 F.2d 986, 989 (1st Cir. 1964).

interest—regardless of context." *In re Pengo Indus., Inc.,* 962 F.2d 543, 547 (5th Cir. 1992); *see also In re Doctors Hosp. of Hyde Park, Inc.,* 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014) ("[C]ourts look to the economic substance of the transaction to determine what counts as interest."); *In re Chateaugay Corp.,* 109 B.R. 51, 55 (Bankr. S.D.N.Y. 1990) (explaining that "semantics should not distort the rationale and purpose of the Code" and holding that "the essential factor guiding this Court in making its determination of allowability is the underlying economic substance of the transaction . . . [which dictates that] the discount represented unmatured interest [that] must be disallowed").

132.    Accordingly, to the extent that OID on Invalid GO Bonds remained unamortized as of the Petition Date, the portion of any claims constituting such OID must be disallowed.  The Objectors will establish at trial that, as of the Petition Date, more than $230 million of OID on Invalid GO Bonds remained unamortized.

## **NOTICE**

133.    Notice of this Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (iv) the Official Committee of Retirees; (v) the insurers of the bonds issued or guaranteed by the Debtors; (vi) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; (vii) holders of Commonwealth bonds who are parties to any group that has filed a statement under Bankruptcy Rule 2019; (viii) the holders and insurers of Commonwealth bonds

identified on Appendix I hereto;[29] (ix) Cede & Co., as depository for Commonwealth bonds; and

(x) all parties that have filed a notice of appearance in the above-captioned Title III cases.

*[Remainder of page intentionally left blank.]*

---

[29] According to the claims registry maintained by Prime Clerk, more than 4,000 proofs of claim have been filed asserting bond-based claims against the Commonwealth.  Many of these claims are based on bonds other than GO bonds.  However, given the sheer volume of claims, it would be cost-prohibitive to review and analyze more than 4,000 proofs of claim to determine which ones, in fact, assert claims based on holdings of Invalid GO Bonds.  The Objectors, therefore, limited their review to proofs of claim alleging more than $50 million of bond debt.

WHEREFORE, the Objectors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated: January 14, 2019                    */s/ Edward Weisfelner*

BROWN RUDNICK LLP
Edward S. Weisfelner, Esq. (*Pro Hac Vice*)
Angela M. Papalaskaris, Esq. (*Pro Hac Vice*)
Justin S. Weddle, Esq. (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
eweisfelner@brownrudnick.com
apapalaskaris@brownrudnick.com
jweddle@brownrudnick.com

Stephen A. Best, Esq. (*Pro Hac Vice*)
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
sbest@brownrudnick.com

Sunni P. Beville, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and Management
Board, acting through the Special Claims Committee*

and

*/s/ Alberto Estrella*

ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial Oversight and Management
Board, acting through the Special Claims Committee*

and

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212)318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to Official Committee of Unsecured Creditors for
all Title III Debtors (other than COFINA)*

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Aneses Negron, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787)523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to Official Committee of Unsecured
Creditors for all Title III Debtors (other than COFINA)*