# Exhibit 12

| NEW ISSUE - BOOK-ENTRY ONLY | RATINGS: | Moody's: | Baa1 |
| See "Book-Entry Only System" under THE BONDS | See RATINGS | Fitch: | BBB+ |
| | | S&P: | BBB |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

### $2,318,190,000
## COMMONWEALTH OF PUERTO RICO
### Public Improvement Refunding Bonds, Series 2012 A
### (General Obligation Bonds)

**Dated: Date of Delivery**                        **Due: July 1, as shown on the inside cover**

The Public Improvement Refunding Bonds, Series 2012 A (the "Bonds") are issuable as registered bonds without coupons in denominations of $5,000 or whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2013. The Bonds are subject to redemption prior to maturity as set forth herein. The Commonwealth expects to issue, on or about March 29, 2012, its $415,270,000 Public Improvement Refunding Bonds, Series 2012 B (the "Series B Bonds"). The Series B Bonds are being offered solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent on the issuance of the Series B Bonds.

The scheduled payment of principal and interest on certain of the Bonds as indicated on the inside cover (the "Insured Bonds"), when due, will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by **ASSURED GUARANTY MUNICIPAL CORP.**

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges LLC, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about April 3, 2012.

| **Barclays Capital** | | | **J.P. Morgan** |
| **Goldman, Sachs & Co.** | | | **Jefferies** |
| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citigroup** | **Morgan Stanley** |
| **Ramirez & Co. Inc.** | **Raymond James** | **RBC Capital Markets** | **UBS FS Puerto Rico** |
| | **Wells Fargo Securities** | | |

BBVAPR MSD    FirstBank PR Securities    Oriental Financial Services    Popular Securities    Santander Securities    Scotia MSD    VAB FINANCIAL

March 7, 2012

# $2,318,190,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2012 A
## (General Obligation Bonds)

| Maturity Date July 1 | Principal Amount | Interest Rate | Price or Yield (%) | CUSIP[*] |
|---|---|---|---|---|
| 2020 | $10,000,000 | 4.000% | 100.00 | 74514LA31 |
| 2020 | 35,345,000 | 5.000% | 4.00 | 74514LC47 |
| 2021 | 49,400,000 | 4.000% | 4.24 | 74514LA49 |
| 2021 | 52,895,000 | 5.000% | 4.24 | 74514LC54 |
| 2022 | 32,110,000 | 4.125% | 4.39 | 74514LA56 |
| 2022 | 21,285,000 | 5.000% | 4.39 | 74514LC62 |
| 2022[†] | 20,000,000 | 4.000% | 4.14 | 74514LD46 |
| 2023 | 7,290,000 | 4.375% | 4.51 | 74514LC70 |
| 2023 | 68,500,000 | 5.250% | 4.51[‡] | 74514LA64 |
| 2023[†] | 5,000,000 | 4.125% | 4.26 | 74514LD53 |
| 2024 | 10,000,000 | 4.000% | 4.60 | 74514LC88 |
| 2024 | 11,050,000 | 5.250% | 4.60[‡] | 74514LA72 |
| 2024[†] | 5,000,000 | 4.125% | 4.35 | 74514LD61 |
| 2025 | 22,030,000 | 4.500% | 4.65 | 74514LA80 |
| 2025[†] | 5,000,000 | 4.250% | 4.42 | 74514LD79 |
| 2026 | 60,000,000 | 5.500% | 4.50[§] | 74514LD38 |
| 2026 | 4,455,000 | 4.500% | 4.70 | 74514LC96 |
| 2026 | 69,740,000 | 5.500% | 4.67[‡] | 74514LA98 |
| 2027 | 17,945,000 | 5.500% | 4.76[‡] | 74514LB22 |
| 2027[†] | 11,520,000 | 4.250% | 4.50 | 74514LD87 |
| 2028 | 64,795,000 | 5.750% | 4.79[‡] | 74514LB30 |
| 2029 | 6,665,000 | 5.000% | 4.85[‡] | 74514LB48 |
| 2030 | 7,000,000 | 4.750% | 4.90 | 74514LB97 |
| 2031 | 7,335,000 | 4.750% | 4.95 | 74514LB55 |
| 2032 | 7,685,000 | 5.000% | 100.00 | 74514LC21 |
| 2033 | 27,400,000 | 5.000% | 5.06 | 74514LC39 |

| | | | | |
|---|---|---|---|---|
| $322,925,000[†] | 5.000% Term Bonds due July 1, 2035 | Price 100.00 | CUSIP | 74514LD20 |
| $263,540,000 | 5.125% Term Bonds due July 1, 2037 | Yield 5.250% | CUSIP | 74514LB63 |
| $459,305,000 | 5.500% Term Bonds due July 1, 2039 | Yield 5.250%[‡] | CUSIP | 74514LB71 |
| $632,975,000 | 5.000% Term Bonds due July 1, 2041 | Yield 5.320% | CUSIP | 74514LB89 |

---

[*]   Copyright, American Bankers Association.  CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc.  This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services.  CUSIP numbers are provided for convenience of reference only.  Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Insured by Assured Guaranty Municipal Corp.

[‡]   Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

[§]   Priced at the stated yield to the July 1, 2018 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

# Government of Puerto Rico

### Governor

### LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

KENNETH D. MCCLINTOCK
*Secretary of State*

EDWARD MORENO ALONSO
*Secretary of Education*

MIGUEL SANTIAGO CÓRDOVA
*Acting Secretary of Agriculture*

YANITSIA IRIZARRY MÉNDEZ
*Secretary of Family Affairs*

LUIS G. RIVERA MARÍN
*Secretary of
Consumer Affairs*

GUILLERMO SOMOZA COLOMBANI
*Secretary of Justice*

MIGUEL ROMERO LUGO
*Secretary of Labor and
Human Resources*

RUBÉN A. HERNÁNDEZ GREGORAT
*Secretary of Transportation
and Public Works*

MIGUEL HERNÁNDEZ VIVONI
*Secretary of Housing*

HENRY NEUMANN ZAYAS
*Secretary of Sports and Recreation*

JESÚS F. MÉNDEZ RODRÍGUEZ
*Secretary of the Treasury*

DR. LORENZO GONZÁLEZ
*Secretary of Health*

JOSÉ R. PÉREZ-RIERA
*Secretary of Economic
Development and Commerce*

DANIEL J. GALÁN KERCADÓ
*Secretary of Natural and
Environmental Resources*

JESÚS GONZÁLEZ CRUZ
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.  The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable.  The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof.  The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time.**

**Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and Appendix III – Specimen Municipal Bond Insurance Policy.**

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth.  In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements.  All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth.  However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information.  Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information.  Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

## TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ............................................................................................................1
OVERVIEW ...........................................................................................................................................3
RECENT DEVELOPMENTS .................................................................................................................4
    Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit ...........4
    Preliminary Revenues for the First Seven Months of Fiscal Year 2012 ..............................................5
    Preliminary Results for Fiscal Year 2011 ...........................................................................................5
    Financial Condition of Retirement Systems .......................................................................................5
    Economy ...............................................................................................................................................6
PLAN OF FINANCING ..........................................................................................................................7
    Sources and Uses of Funds .................................................................................................................7
THE BONDS ...........................................................................................................................................8
    General .................................................................................................................................................8
    Book-Entry Only System ....................................................................................................................8
    Discontinuance of the Book-Entry Only System ...............................................................................10
    Authorization .....................................................................................................................................10
    Redemption ........................................................................................................................................11
    Notice of Redemption; Effect of Redemption ..................................................................................12
    Security ..............................................................................................................................................12
    Payment Record .................................................................................................................................14
    Debt Limitation .................................................................................................................................14
    Maturity Limitation ...........................................................................................................................16
BOND INSURANCE .............................................................................................................................16
    Bond Insurance Policy .......................................................................................................................16
    Assured Guaranty Municipal Corp. ..................................................................................................17
    Bond Insurance Provisions under the Bond Resolution ....................................................................18
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ....................................................................18
    Public Sector Debt ............................................................................................................................18
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt.....................20
LITIGATION ........................................................................................................................................21
TAX MATTERS ....................................................................................................................................21
    Discount Bonds .................................................................................................................................22
    Premium Bonds .................................................................................................................................22
LEGAL MATTERS ...............................................................................................................................23
LEGAL INVESTMENT .........................................................................................................................23
VERIFICATION OF MATHEMATICAL COMPUTATIONS ..............................................................23
UNDERWRITING .................................................................................................................................23
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ........................................................25
RATINGS ..............................................................................................................................................25
CONTINUING DISCLOSURE ..............................................................................................................26
    Continuing Disclosure Undertaking .................................................................................................26
    Prior Continuing Disclosure Non-Compliance ................................................................................28
MISCELLANEOUS ..............................................................................................................................29

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
    dated December 6, 2011 .................................................................................................................. I-1

Appendix II – Proposed Form of Opinion of Bond Counsel ...................................................................II-1

Appendix III – Specimen Municipal Bond Insurance Policy ..................................................................III-1

Appendix IV – Table of Refunded Bonds ............................................................................................. IV-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

$2,318,190,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2012 A
### (General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, and the appendices, provides certain information in connection with the sale of $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012A (the "Bonds"). The Commonwealth expects to issue, on or about March 29, 2012, its $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012B (the "Series B Bonds"). The Series B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series B Bonds.

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on March 7, 2012.

The scheduled payment of principal and interest on the Bonds maturing July 1, 2022 bearing interest at a rate of 4.000%, July 1, 2023 bearing interest at a rate of 4.125%, July 1, 2024 bearing interest at a rate of 4.125%, July 1, 2025 bearing interest at a rate of 4.250%, July 1, 2027 bearing interest at a rate of 4.250%, and July 1, 2035 bearing interest at a rate of 5.000% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. ("AGM").

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated December 6, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the projected fiscal year 2012 deficit, the budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on December 6, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter

1

paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants.  Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report.  Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.  The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document.  Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement.  Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds.   Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report and files the Commonwealth's Annual Financial Report.  Although the Commonwealth has filed all such reports, these filings were made after the May 1 deadline between 2006 and 2010 (and also in certain years before that period), and therefore did not comply with the undertakings.  In 2011, the Commonwealth complied with its continuing disclosure undertakings relating to fiscal year 2010 by filing the Commonwealth Report and the Commonwealth's Annual Financial Report before the filing deadline. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at http://www.gdbpr.com.  No additional

information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the budget and projected deficit for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS below.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit

*Revenues.* Preliminary General Fund net revenues for the first six months of fiscal year 2012 (from July 1, 2011 to December 31, 2011) were $3.542 billion, an increase of $335.1 million, or 10.5%, from $3.207 billion of net revenues for the same period in the prior fiscal year. These revenues represent 41% of budgeted revenues of $8.650 billion for the fiscal year, and $80 million less than the budget for the period.

The increase in General Fund net revenues is mainly due to the collection of $965.5 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as part of Act No. 154 of October 25, 2010 ("Act No. 154") as part of the tax reform, which amount is consistent with the Government's projection of collections from the excise tax during this period. This increase was partially offset by (i) a decrease in collections of $241.4 million from income tax on individuals, $101.4 million from income tax on corporations, and $91.5 million from withholdings from non-residents, all of which were primarily a result of the tax relief provided to individual and corporate taxpayers as part of the tax reform, (ii) the elimination in fiscal year 2011 of the special property tax imposed on residential and commercial real estate in fiscal year 2009 as part of the temporary revenue raising measures included in the fiscal stabilization plan, and (iii) decreases in miscellaneous non-tax revenues, excise taxes on tobacco products and other items due to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154.

Preliminary sales and use tax collections for the first six months of fiscal year 2012 were $556.4 million, an increase of $13.8 million, or 2.5%, from the sales and use tax collections for the same period in the prior fiscal year. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund. See "Security" under THE BONDS and "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth Report.

For more information on the tax reform and Act No. 154, see "Tax Reform" in "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report.

*Expenses.* Preliminary General Fund total expenses (on a cash basis) for the first six months of fiscal year 2012 amounted to $3.776 billion. This amount excludes approximately $542.7 million in expenses related to the Department of Education Schoolwide Program that have not been included in the central government accounting system. These expenses will be included in the central government accounting system once they are allocated by school according to the matching formula approved by the United States federal government. If the expenses related to the Department of Education Schoolwide Program are included, preliminary General Fund total expenses (on a cash basis) for the first six months of fiscal year 2012 amounted to $4.319 billion, or 47% of budgeted expenditures for fiscal year 2012, which are $9.260 billion.

The deficit for fiscal year 2012 was budgeted and is projected to be approximately $610 million, excluding approximately $685.2 million of principal and interest payments on Commonwealth general obligation bonds that were refinanced through GDB financings (the "GDB Lines of Credit"), which financings will be repaid from the proceeds of the Bonds and the Series B Bonds, and $154 million of interest payments on Commonwealth guaranteed Public Building Authority Bonds that were refinanced through GDB financings, which financings are expected to be repaid from the proceeds of the issuance of

4

Public Building Authority Bonds. The Office of Management and Budget ("OMB") had indicated earlier in fiscal year 2012 that the sectors of health and public safety carried risk of budget overruns for fiscal year 2012 as they were undergoing operational changes that were not considered during the preparation of the 2012 budget. According to OMB, budget overruns (if any) in these sectors will be offset by budget savings in other sectors, such that the projected deficit for fiscal year 2012 remains at $610 million.

**Preliminary Revenues for the First Seven Months of Fiscal Year 2012**

Preliminary General Fund net revenues for the first seven months of fiscal year 2012 (from July 1, 2011 to January 31, 2012) were $4.272 billion, an increase of $549.9 million, or 14.8%, from $3.722 billion of net revenues for the same period in the prior fiscal year. These revenues represent 49% of budgeted revenues of $8.650 billion for the fiscal year, and $68 million less than the budget for the period.

Preliminary sales and use tax collections for the first seven months of fiscal year 2012 were $676.6 million, an increase of $13.3 million, or 2.0%, from the sales and use tax collections for the same period in the prior fiscal year.

**Preliminary Results for Fiscal Year 2011**

For a discussion of the preliminary results for fiscal year 2011, see "Preliminary Results for Fiscal Year 2011" in "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report. However, please note that revised preliminary General Fund total revenues for fiscal year 2011 were $8.149 billion (including approximately $126.7 million attributable to the electronic and traditional lotteries). After preliminary expenses of $9.202 billion (excluding $638.7 million of debt service that was refinanced), this resulted in a deficit of $1.053 billion, which was covered primarily by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System, collectively referred to as the "Retirement Systems") that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability ("UAAL") (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively. Based on the current statutory employer and member funding requirements and disbursement projections (which reflect continued funding shortfalls), the UAAL of the Retirement Systems is expected to continue growing for several years instead of being amortized.

The Retirement Systems are currently preparing the actuarial valuation as of June 30, 2011. The administration of the Retirement Systems expects that, primarily as a result of a decrease in the assumed investment return to be used in the actuarial valuation as of June 30, 2011, the UAAL (including basic and system administered benefits) of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System will increase to approximately $21.5 billion, $9.1 billion and $318.8 million, respectively. These estimates, however, are preliminary and could change as part of the Retirement Systems' review of the actuarial valuation as of June 30, 2011.

Because the statutory employer and member contributions are not adequate to fund the retirement systems' benefits, the retirement systems' assets are being rapidly depleted and, as a result, the currently

scheduled future contributions will not be adequate to accumulate sufficient assets to make future benefit payments when due. Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls, and considering the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System adopted in July 2011: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2021; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2021; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $125.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

For a detailed discussion of the funding requirements and benefit structure of the Retirement Systems, as well as their financial and actuarial situation, funding shortfalls, and efforts to address their financial solvency, including the July 2011 increase in required employer contributions to the Employees Retirement System and the Teachers Retirement System, see RETIREMENT SYSTEMS and "Overview of Economic and Fiscal Condition – Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems" under INTRODUCTION in the Commonwealth Report.

**Economy**

*Gross National Product.* The most recent available forecast prepared by the Planning Board in February 2011 stated that the annual growth of real GNP for Puerto Rico would be -1.0% in fiscal year 2011 and 0.7% in fiscal year 2012. The Planning Board is finishing the preliminary numbers for the accounts corresponding to fiscal year 2011 and it is currently working with the forecasts for fiscal years 2012 and 2013.

*Employment.* According to the Household Survey, total employment fell by 2.3% in fiscal year 2011 and by 0.5% in the first half of fiscal year 2012. The unemployment rate for fiscal year 2011 and for the first six months of fiscal year 2012 was 15.9% and 15.5%, respectively, slightly lower than the average for fiscal year 2010 (16.0%). In December 2011, the unemployment rate fell to 13.2%. According to the Establishment Survey, total payroll employment fell by 2.3% in fiscal year 2011 and was virtually unchanged during the first six months of fiscal year 2012. December 2011 year-over-year growth in total payroll employment was 0.2%, along with September and November 2011, the first three months of positive growth since 2006.

*Economic Activity Index.* The economic activity index (EAI) prepared by the GDB reflected a reduction of 2.9% in fiscal year 2011. For the first six months of fiscal year 2012 the EAI showed a year-over-year reduction of 0.9%, compared to a reduction of 3.5% for the first semester of fiscal year 2011. In

6

December 2011, the year-over-year growth rate of the EAI was 0.5%, which represents the first positive growth rate since March 2006.

## PLAN OF FINANCING

The Bonds are being issued to provide funds to (i) repay the GDB Lines of Credit, the proceeds of which refinanced deposits to the Commonwealth's Redemption Fund for the payment of principal and interest due on January 1, 2012 and July 1, 2012 on certain general obligation bonds and notes of the Commonwealth, (ii) refund certain of the Commonwealth's outstanding general obligation bonds as set forth in *Appendix IV* – Table of Refunded Bonds (the "Refunded Bonds"), and fund associated termination payments due under an investment agreement and interest rate exchange agreements, (iii) pay capitalized interest on a portion of the Bonds to April 3, 2015, and (iv) pay expenses related to the issuance and sale of Bonds.

The Secretary of the Treasury will deposit the proceeds of the Bonds to be utilized to pay principal and interest on the Refunded Bonds into an escrow fund (the "Escrow Fund") with an escrow agent to be selected by the Commonwealth. The proceeds of the Bonds deposited in the Escrow Fund will either be held uninvested in cash or invested in non-callable direct obligations of the United States, the principal of and interest on which will be sufficient to pay the principal of and interest when due on the Refunded Bonds. The sufficiency of the amount so deposited, with investment earnings thereon, to pay the principal of and interest on the Refunded Bonds, will be verified by Causey, Demgen & Moore, Inc., among other calculations. See VERIFICATION OF MATHEMATICAL COMPUTATIONS.

The Sources and Uses of Funds are as follows (rounded to the nearest dollar):

**Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $2,318,190,000 |
| Net Original Issue Discount | (4,261,947) |
| Total sources | $2,313,928,053 |

Uses:

| | |
|---|---|
| Repayment of GDB Lines of Credit | $  654,664,367 |
| Deposit into Escrow Fund for Refunded Bonds | 1,212,951,370 |
| Capitalized Interest | 283,214,850 |
| Underwriting discount, legal, printing and other financing expenses† | 163,097,466 |
| Total uses | $2,313,928,053 |

---

†     Includes the cost to the Commonwealth of terminating interest rate exchange agreements entered into in connection with the Refunded Bonds, an investment agreement entered into in connection with the Refunded Bonds, the premium due on the Bond Insurance Policy, legal, printing and other financing expenses.

The Commonwealth intends to use a portion of the proceeds of the Bonds to pay the costs of terminating an investment agreement and certain interest rate exchange agreements. Affiliates of Morgan Stanley, RBC Capital Markets and UBS Financial Services Incorporated of Puerto Rico, underwriters for the Bonds, are the counterparties to some of the interest rate exchange agreements being terminated and, as a result, will receive a portion of the proceeds of the Bonds in connection with the termination of such interest rate exchange agreements. See UNDERWRITING.

The Commonwealth routinely explores opportunities to restructure its debt to reduce debt service. Subject to market conditions, the Commonwealth expects to issue, from time to time, general obligation refunding bonds to refund certain of its outstanding general obligation bonds and notes. In addition, subject to market conditions and, to the extent necessary, the approval of the Legislative Assembly, the

Commonwealth expects to issue general obligation bonds to finance capital improvement projects.   In December 2011, the Legislative Assembly approved the issuance of general obligation bonds and notes in the amount of $290 million to fund such capital improvement projects.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of

8

the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, any Underwriter or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar.  Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository).  In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteenth day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Sections 25 and 37 of the Organic Act of Puerto Rico of 1917, as amended, provided that local legislative powers were vested in a Legislature (the predecessor to the current Legislative Assembly) whose authority extended to matters of a legislative character not locally inapplicable. Pursuant to this power, the Legislature enacted the Act. Section 1 of Article IX of the Constitution of the Commonwealth provides that all laws in existence at the time of its passage continue in full force and effect unless they are inconsistent with the Constitution, are amended or repealed, or expire by their own terms. Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Act was amended by Acts 6 and 10 of July 24, 1952 to authorize the Secretary of the Treasury to issue bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

**Redemption**

The Bonds maturing prior to July 1, 2023 are not subject to redemption prior to maturity. The Bonds maturing on or after July 1, 2023 are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds maturing on or after July 1, 2023 (other than certain Bonds maturing on July 1, 2026 as described below) are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2022, either in whole or in part (and if in part, in such order of maturity or amortization requirement within a maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds maturing on July 1, 2026 (bearing interest at 5.5%, and with an initial offering yield of 4.5% and CUSIP of 74514LD38) are subject to redemption, from any moneys that may be available for that purpose, prior to maturity, commencing on July 1, 2018, either in whole or in part, on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The Bonds maturing July 1, 2035, 2037, 2039 and 2041 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), at a redemption price of par, plus accrued interest to the dates fixed for redemption:

**Amortization Requirements for Insured Bonds Maturing July 1, 2035**

| Year (July 1) | Amortization Requirement |
|---|---|
| 2033 | $105,000,000 |
| 2034 | 107,925,000 |
| 2035* | 110,000,000 |

**Amortization Requirements for Bonds Maturing July 1, 2037**

| Year (July 1) | Amortization Requirement |
|---|---|
| 2034 | $80,620,000 |
| 2035 | 32,275,000 |
| 2036 | 71,030,000 |
| 2037* | 79,615,000 |

**Amortization Requirements for Bonds Maturing July 1, 2039**

| Year (July 1) | Amortization Requirement |
|---|---|
| 2038 | $223,505,000 |
| 2039* | 235,800,000 |

**Amortization Requirements for Bonds Maturing July 1, 2041**

| Year (July 1) | Amortization Requirement |
|---|---|
| 2040 | $308,770,000 |
| 2041* | 324,205,000 |

_____
* Maturity

11

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

In accordance with the Act, the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable with any funds available to the Commonwealth, which funds are appropriated as continuous appropriations, without the need to make specific appropriations for such purposes.

$5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2010, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

**GT** GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
    Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:   $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
      Series 2012 A (General Obligation Bonds)

Dear Mr. Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico (the "Commonwealth") in connection with the issuance of $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012 A (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended (the "Act"), and such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the Governor of the Commonwealth on March 7, 2012 (the "Bond Resolution"). We also have examined one of the Bonds of each series as executed and authenticated.

The Bonds are issued pursuant to the Act and the Bond Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Bond Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Bond Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.      The Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged.

Secretary of the Treasury
_____, 2012
Page 2

    4.    Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Bond Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

    Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

    The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

    The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

               Respectfully submitted,

               Greenberg Traurig, LLP

**APPENDIX III**



# MUNICIPAL BOND
# INSURANCE POLICY

ISSUER:                                                                          Policy No:     -N

BONDS:   $ in aggregate principal amount of                                       Effective Date:

                                                                                   Premium:  $

   ASSURED GUARANTY MUNICIPAL CORP. ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

   On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

   Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which  has  been  recovered  from  such  Owner  pursuant  to  the

Page 2 of 2
Policy No. -N

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM. The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud) whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. has caused this Policy to be executed on its behalf by its Authorized Officer.



ASSURED GUARANTY MUNICIPAL CORP.


By _____
        Authorized Officer


Form 500NY (5/90)

III-2

Appendix IV

Table of Refunded Bonds

All of the Refunded Bonds are being redeemed at par.

| Series of Bonds[1] | Principal Amount Outstanding Prior to Refundings | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date | CUSIP |
|---|---|---|---|---|---|---|
| PIRB, Series 1998 | $125,590,000 | $ 58,850,000 | 4.500% | 2023 | May 3, 2012 | 745145AX0 |
| PIRB, Series 1998 | 28,240,000 | 28,240,000 | 5.000% | 2026 | May 3, 2012 | 745145AY8 |
| PIB, Series 1999 | 84,150,000 | 84,150,000 | 4.750% | 2023 | May 3, 2012 | 745145HR6 |
| PIB, Series 1999 | 26,655,000 | 15,210,000 | 5.000% | 2028 | May 3, 2012 | 7451452Q4 |
| PIB, Series 2001B | 7,345,000 | 7,345,000 | 4.700% | 2014 | May 3, 2012 | 745145UU4 |
| PIB, Series 2001B | 4,165,000 | 4,165,000 | 4.800% | 2015 | May 3, 2012 | 745145UW0 |
| PIB, Series 2001B | 1,585,000 | 1,585,000 | 4.900% | 2016 | May 3, 2012 | 745145UY6 |
| PIB, Series 2001B | 2,665,000 | 2,665,000 | 4.950% | 2017 | May 3, 2012 | 745145VA7 |
| PIB, Series 2001B | 5,810,000 | 5,810,000 | 5.000% | 2018 | May 3, 2012 | 745145VC3 |
| PIB, Series 2001B | 1,385,000 | 1,385,000 | 5.050% | 2019 | May 3, 2012 | 745145VE9 |
| PIB, Series 2001B | 2,675,000 | 2,675,000 | 5.050% | 2020 | May 3, 2012 | 74514LBB2 |
| PIB, Series 2001B | 5,580,000 | 5,580,000 | 5.050% | 2021 | May 3, 2012 | 74514LBC0 |
| PIB, Series 2001B | 3,865,000 | 3,865,000 | 5.050% | 2021 | May 3, 2012 | 74514LBD8 |
| PIB, Series 2001B | 5,415,000 | 5,415,000 | 5.125% | 2023 | May 3, 2012 | 74514LBE6 |
| PIB, Series 2001B | 12,285,000 | 12,285,000 | 5.000% | 2023 | May 3, 2012 | 74514LBF3 |
| PIRB, Series 2001 | 13,575,000 | 13,575,000 | 5.000% | 2024 | May 3, 2012 | 74514LBG1 |
| PIRB, Series 2001 | 50,905,000 | 50,905,000 | 5.250% | 2027 | May 3, 2012 | 74514LBH9 |
| PIRB, Series 2001 | 65,535,000 | 24,895,000 | 5.125% | 2030 | May 3, 2012 | 74514LBJ5 |
| PIB, Series 2002A | 33,860,000 | 33,860,000 | 5.375% | 2028 | May 3, 2012 | 74514LBK2 |
| PIRB, Series 2003C-4 | 46,385,000 | 46,385,000 | var | 2018 | May 3, 2012 | 74514LXX0 |
| PIB, Series 2004A | 8,035,000 | 8,035,000 | 5.250% | 2014 | July 1, 2013 | 7451454Q2 |
| PIB, Series 2004A | 11,580,000 | 11,580,000 | 5.250% | 2015 | July 1, 2013 | 7451454R0 |
| PIB, Series 2004A | 12,185,000 | 12,185,000 | 5.250% | 2016 | July 1, 2013 | 7451454S8 |
| PIB, Series 2004A | 13,500,000 | 13,500,000 | 5.250% | 2018 | July 1, 2013 | 7451454U3 |
| PIB, Series 2004A | 2,200,000 | 2,200,000 | 5.250% | 2019 | July 1, 2013 | 74514LPS0 |
| PIB, Series 2004A | 14,955,000 | 14,955,000 | 5.250% | 2020 | July 1, 2013 | 7451454W9 |
| PIB, Series 2004A | 15,740,000 | 15,740,000 | 5.250% | 2021 | July 1, 2013 | 7451454X7 |
| PIB, Series 2004A | 16,565,000 | 16,565,000 | 5.250% | 2022 | July 1, 2013 | 7451454Y5 |
| PIB, Series 2004A | 17,435,000 | 17,435,000 | 5.250% | 2023 | July 1, 2013 | 7451454Z2 |
| PIRB, Series 2004A | 187,760,000 | 187,760,000 | 5.000%[2] | 2030 | July 1, 2012 | 7451458M7 |
| PIRB, Series 2004A | 29,165,000 | 29,165,000 | 5.000%[2] | 2031 | July 1, 2012 | 7451458N5 |
| PIRB, Series 2004A | 40,000,000 | 40,000,000 | 5.000%[2] | 2031 | July 1, 2012 | 7451458P0 |
| PIRB, Series 2004A | 22,315,000 | 22,315,000 | 4.000%[2] | 2031 | July 1, 2012 | 7451458Q8 |
| PIRB, Series 2004B-1 | 2,625,000 | 2,625,000 | var | 2012 | April 18, 2012 | 74514LXN2 |
| PIRB, Series 2004B-1 | 2,725,000 | 2,725,000 | var | 2013 | April 18, 2012 | 74514LXP7 |
| PIRB, Series 2004B-1 | 2,825,000 | 2,825,000 | var | 2014 | April 18, 2012 | 74514LXQ5 |
| PIRB, Series 2004B-1 | 2,925,000 | 2,925,000 | var | 2015 | April 18, 2012 | 74514LXR3 |
| PIRB, Series 2004B-1 | 3,025,000 | 3,025,000 | var | 2016 | April 18, 2012 | 74514LXS1 |
| PIRB, Series 2004B-1 | 3,125,000 | 3,125,000 | var | 2017 | April 18, 2012 | 74514LXT9 |

(1)  PIRB – Public Improvement Refunding Bonds
     PIB -- Public Improvement Bonds

(2)  Interest Rate through July 1, 2012 mandatory tender date.

IV- 1

| Series of Bonds[1] | Principal Amount Outstanding Prior to Refundings | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date | CUSIP |
|---|---|---|---|---|---|---|
| PIRB, Series 2004B-1 | 3,250,000 | 3,250,000 | var | 2018 | April 18, 2012 | 74514LXU6 |
| PIRB, Series 2004B-1 | 3,350,000 | 3,350,000 | var | 2019 | April 18, 2012 | 74514LXV4 |
| PIRB, Series 2004B-1 | 7,375,000 | 7,375,000 | var | 2020 | April 18, 2012 | 74514LXW2 |
| PIRB, Series 2004B-1 | 10,725,000 | 10,725,000 | var | 2021 | April 18, 2012 | 74514LXJ1 |
| PIRB, Series 2004B-2 | 6,625,000 | 6,625,000 | var | 2021 | May 3, 2012 | 74514LYF8 |
| PIRB, Series 2004B-2 | 17,950,000 | 17,950,000 | var | 2022 | May 3, 2012 | 74514LYG6 |
| PIRB, Series 2004B-2 | 18,650,000 | 18,650,000 | var | 2023 | May 3, 2012 | 74514LYH4 |
| PIRB, Series 2004B-2 | 12,775,000 | 12,775,000 | var | 2024 | May 3, 2012 | 74514LXZ5 |
| PIRB, Series 2004B-3 | 6,575,000 | 6,575,000 | var | 2024 | May 3, 2012 | 74514LYJ0 |
| PIRB, Series 2004B-3 | 20,075,000 | 20,075,000 | var | 2025 | May 3, 2012 | 74514LYK7 |
| PIRB, Series 2004B-3 | 26,175,000 | 26,175,000 | var | 2026 | May 3, 2012 | 74514LYL5 |
| PIRB, Series 2004B-3 | 3,175,000 | 3,175,000 | var | 2027 | May 3, 2012 | 74514LYA9 |
| PIB, Series 2005A | 14,985,000 | 14,985,000 | 5.000% | 2018 | July 1, 2014 | 74514LCW5 |
| PIRB, Series 2007A-2 | 99,450,000 | 84,535,000 | var | 2029 | May 3, 2012 | 74514LNK9 |
| PIRB, Series 2007A-3 | 99,500,000 | 84,575,000 | var | 2029 | April 18, 2012 | 74514LXL6 |
| PIRB, Series 2011B | 67,650,000 | 67,650,000 | var | 2034 | April 18, 2012 | 74514LWU7 |

(1)   PIRB -- Public Improvement Refunding Bonds
       PIB -- Public Improvement Bonds

IV- 2

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

COMMONWEALTH OF PUERTO RICO • PUBLIC IMPROVEMENT REFUNDING BONDS, SERIES 2012 A (GENERAL OBLIGATION BONDS)



Printed by: ImageMaster
www.ImageMaster.com