# **Exhibit 13**

**NEW ISSUE - BOOK-ENTRY ONLY**
See "Book-Entry Only System" under THE BONDS

| RATINGS: | Moody's: | Baa1 |
|---|---|---|
| See RATINGS | Fitch: | BBB+ |
| | S&P: | BBB |

*In the opinion of O'Neill & Borges LLC, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Bonds, and the interest thereon, are exempt from Commonwealth of Puerto Rico taxation. Under most circumstances, interest on the Bonds is exempt from United States income taxation to residents of Puerto Rico. Interest on the Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. See TAX MATTERS herein.*

**$415,270,000**
## COMMONWEALTH OF PUERTO RICO
**Public Improvement Refunding Bonds, Series 2012 B**
**(General Obligation Bonds)**

**Dated: Date of Delivery**                          **Due: July 1, as shown on the inside cover**

The Public Improvement Refunding Bonds, Series 2012 B (the "Bonds") are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable monthly on the first day of each month, commencing on May 1, 2012. The Bonds are subject to redemption prior to maturity as set forth herein. The Commonwealth expects to issue, on or about April 3, 2012, its $2,318,190,000 Public Improvement Refunding Bonds, Series 2012 A (the "Series A Bonds"). The Series A Bonds are being offered for sale in the United States tax-exempt markets pursuant to a separate Official Statement. The issuance of the Bonds is not contingent on the issuance of the Series A Bonds.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges LLC, San Juan, Puerto Rico, as Underwriters' Counsel. O'Neill & Borges LLC will also act as Special Puerto Rico Tax Counsel. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 29, 2012.

### UBS FS Puerto Rico

**BofA Merrill Lynch**          **Popular Securities**          **Santander Securities**

Barclays Capital          BBVAPR MSD          Citigroup          FirstBank PR Securities

Oriental Financial Services          Ramirez & Co. Inc          Raymond James          Scotia MSD

March 7, 2012

# $415,270,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2012 B
## (General Obligation Bonds)

| Maturity Date July 1 | Principal Amount | Interest Rate | Price | CUSIP[*] |
|---|---|---|---|---|
| 2013[†] | $55,605,000 | 2.250% | 100.00 | 74514LZS9 |
| 2014 | 69,990,000 | 2.950% | 100.00 | 74514LZT7 |
| 2015 | 67,300,000 | 3.250% | 100.00 | 74514LZU4 |
| 2016 | 56,170,000 | 3.650% | 100.00 | 74514LZV2 |
| 2017 | 27,385,000 | 3.900% | 100.00 | 74514LZW0 |
| 2018 | 51,925,000 | 4.100% | 100.00 | 74514LZX8 |
| 2019 | 20,160,000 | 4.250% | 100.00 | 74514LZY6 |
| 2020 | 17,125,000 | 4.400% | 100.00 | 74514LZZ3 |

$49,610,000[†]     5.300% Term Bonds due July 1, 2033     Yield 5.35%     CUSIP 74514LA23

---

[*] Copyright, American Bankers Association.  CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc.  This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services.  CUSIP numbers are provided for convenience of reference only.  Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy of such numbers.

[†] Not reoffered

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| | | |
|---|---|---|
| KENNETH D. MCCLINTOCK<br>*Secretary of State* | GUILLERMO SOMOZA COLOMBANI<br>*Secretary of Justice* | JESÚS F. MÉNDEZ RODRÍGUEZ<br>*Secretary of the Treasury* |
| EDWARD MORENO ALONSO<br>*Secretary of Education* | MIGUEL ROMERO LUGO<br>*Secretary of Labor and<br>Human Resources* | DR. LORENZO GONZÁLEZ<br>*Secretary of Health* |
| MIGUEL SANTIAGO CÓRDOVA<br>*Acting Secretary of Agriculture* | RUBÉN A. HERNÁNDEZ GREGORAT<br>*Secretary of Transportation<br>and Public Works* | JOSÉ R. PÉREZ-RIERA<br>*Secretary of Economic<br>Development and Commerce* |
| YANITSIA IRIZARRY MÉNDEZ<br>*Secretary of Family Affairs* | MIGUEL HERNÁNDEZ VIVONI<br>*Secretary of Housing* | DANIEL J. GALÁN KERCADÓ<br>*Secretary of Natural and<br>Environmental Resources* |
| LUIS G. RIVERA MARÍN<br>*Secretary of<br>Consumer Affairs* | HENRY NEUMANN ZAYAS<br>*Secretary of Sports and Recreation* | JESÚS GONZÁLEZ CRUZ<br>*Secretary of Corrections<br>and Rehabilitation* |

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.  The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof.  The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time.**

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth.  In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements.  All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth.  However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information.  Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

**TABLE OF CONTENTS**

**Page**

INTRODUCTORY STATEMENT ..........................................................................................................1
OVERVIEW ......................................................................................................................................3
RECENT DEVELOPMENTS ..................................................................................................................4
    Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit ...........4
    Preliminary Revenues for the First Seven Months of Fiscal Year 2012 ...............................................5
    Preliminary Results for Fiscal Year 2011 .............................................................................5
    Financial Condition of Retirement Systems ..........................................................................5
    Economy ...............................................................................................................6
PLAN OF FINANCING ........................................................................................................................7
    Sources and Uses of Funds ............................................................................................7
THE BONDS ......................................................................................................................................7
    General .................................................................................................................7
    Book-Entry Only System ..............................................................................................8
    Discontinuance of the Book-Entry Only System .....................................................................10
    Authorization ...........................................................................................................10
    Redemption .............................................................................................................10
    Notice of Redemption; Effect of Redemption .......................................................................11
    Security .................................................................................................................11
    Payment Record ........................................................................................................13
    Debt Limitation ........................................................................................................13
    Maturity Limitation ....................................................................................................15
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ...............................................................................15
    Public Sector Debt .....................................................................................................15
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ...........17
LITIGATION ...................................................................................................................................18
TAX MATTERS ................................................................................................................................18
LEGAL MATTERS ............................................................................................................................20
LEGAL INVESTMENT .......................................................................................................................21
VERIFICATION OF MATHEMATICAL COMPUTATIONS ...........................................................................21
UNDERWRITING .............................................................................................................................21
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ......................................................................22
RATINGS .......................................................................................................................................22
CONTINUING DISCLOSURE ...............................................................................................................22
    Continuing Disclosure Undertaking ..................................................................................22
    Prior Continuing Disclosure Non-Compliance .......................................................................25
MISCELLANEOUS ............................................................................................................................25

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated December 6, 2011 ..........................................................................................I-1

Appendix II – Proposed Form of Opinion of Bond Counsel ...........................................................II-1

Appendix III – Proposed Form of Opinion of Special Puerto Rico Tax Counsel...................................III-1

Appendix IV – Table of Refunded Bonds ................................................................................IV-1

[This Page Intentionally Left Blank]

**$415,270,000**
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2012 B
### (General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, and the appendices, provides certain information in connection with the sale of $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012B (the "Bonds"). The Commonwealth expects to issue, on or about April 3, 2012, its $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012A (the "Series A Bonds"). The Series A Bonds are being offered for sale in the United States tax-exempt markets pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series A Bonds.

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on March 7, 2012.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated December 6, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the projected fiscal year 2012 deficit, the budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on December 6, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were

1

audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report and files the Commonwealth's Annual Financial Report. Although the Commonwealth has filed all such reports, these filings were made after the May 1 deadline between 2006 and 2010 (and also in certain years before that period), and therefore did not comply with the undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertakings relating to fiscal year 2010 by filing the Commonwealth Report and the Commonwealth's Annual Financial Report before the filing deadline. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at http://www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

2

## OVERVIEW

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the budget and projected deficit for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS below.

**RECENT DEVELOPMENTS**

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

**Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit**

*Revenues.* Preliminary General Fund net revenues for the first six months of fiscal year 2012 (from July 1, 2011 to December 31, 2011) were $3.542 billion, an increase of $335.1 million, or 10.5%, from $3.207 billion of net revenues for the same period in the prior fiscal year. These revenues represent 41% of budgeted revenues of $8.650 billion for the fiscal year, and $80 million less than the budget for the period.

The increase in General Fund net revenues is mainly due to the collection of $965.5 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as part of Act No. 154 of October 25, 2010 ("Act No. 154") as part of the tax reform, which amount is consistent with the Government's projection of collections from the excise tax during this period.   This increase was partially offset by (i) a decrease in collections of $241.4 million from income tax on individuals, $101.4 million from income tax on corporations, and $91.5 million from withholdings from non-residents, all of which were primarily a result of the tax relief provided to individual and corporate taxpayers as part of the tax reform, (ii) the elimination in fiscal year 2011 of the special property tax imposed on residential and commercial real estate in fiscal year 2009 as part of the temporary revenue raising measures included in the fiscal stabilization plan, and (iii) decreases in miscellaneous non-tax revenues, excise taxes on tobacco products and other items due to current economic conditions.   The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154.

Preliminary sales and use tax collections for the first six months of fiscal year 2012 were $556.4 million, an increase of $13.8 million, or 2.5%, from the sales and use tax collections for the same period in the prior fiscal year.  A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund.  See "Security" under THE BONDS and "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth Report.

For more information on the tax reform and Act No. 154, see "Tax Reform" in "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report.

*Expenses.*  Preliminary General Fund total expenses (on a cash basis) for the first six months of fiscal year 2012 amounted to $3.776 billion.  This amount excludes approximately $542.7 million in expenses related to the Department of Education Schoolwide Program that have not been included in the central government accounting system.   These expenses will be included in the central government accounting system once they are allocated by school according to the matching formula approved by the United States federal government.  If the expenses related to the Department of Education Schoolwide Program are included, preliminary General Fund total expenses (on a cash basis) for the first six months of fiscal year 2012 amounted to $4.319 billion, or 47% of budgeted expenditures for fiscal year 2012, which are $9.260 billion.

The deficit for fiscal year 2012 was budgeted and is projected to be approximately $610 million, excluding approximately $685.2 million of principal and interest payments on Commonwealth general obligation bonds that were refinanced through GDB financings (the "GDB Lines of Credit"), which financings will be repaid from the proceeds of the Bonds and the Series A Bonds, and $154 million of interest payments on Commonwealth guaranteed Public Building Authority Bonds that were refinanced through GDB financings, and which financings are expected to be repaid from the proceeds of the issuance of Public Building Authority Bonds.  The Office of Management and Budget ("OMB") had indicated earlier in fiscal

4

year 2012 that the sectors of health and public safety carried risk of budget overruns for fiscal year 2012 as they were undergoing operational changes that were not considered during the preparation of the 2012 budget. According to OMB, budget overruns (if any) in these sectors will be offset by budget savings in other sectors, such that the projected deficit for fiscal year 2012 remains at $610 million.

**Preliminary Revenues for the First Seven Months of Fiscal Year 2012**

Preliminary General Fund net revenues for the first seven months of fiscal year 2012 (from July 1, 2011 to January 31, 2012) were $4.272 billion, an increase of $549.9 million, or 14.8%, from $3.722 billion of net revenues for the same period in the prior fiscal year. These revenues represent 49% of budgeted revenues of $8.650 billion for the fiscal year, and $68 million less than the budget for the period.

Preliminary sales and use tax collections for the first seven months of fiscal year 2012 were $676.6 million, an increase of $13.3 million, or 2.0%, from the sales and use tax collections for the same period in the prior fiscal year.

**Preliminary Results for Fiscal Year 2011**

For a discussion of the preliminary results for fiscal year 2011, see "Preliminary Results for Fiscal Year 2011" in "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report. However, please note that revised preliminary General Fund total revenues for fiscal year 2011 were $8.149 billion (including approximately $126.7 million attributable to the electronic and traditional lotteries). After preliminary expenses of $9.202 billion (excluding $638.7 million of debt service that was refinanced), this resulted in a deficit of $1.053 billion, which was covered primarily by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System, collectively referred to as the "Retirement Systems") that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability ("UAAL") (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively. Based on the current statutory employer and member funding requirements and disbursement projections (which reflect continued funding shortfalls), the UAAL of the Retirement Systems is expected to continue growing for several years instead of being amortized.

The Retirement Systems are currently preparing the actuarial valuation as of June 30, 2011. The administration of the Retirement Systems expects that, primarily as a result of a decrease in the assumed investment return to be used in the actuarial valuation as of June 30, 2011, the UAAL (including basic and system administered benefits) of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System will increase to approximately $21.5 billion, $9.1 billion and $318.8 million, respectively. These estimates, however, are preliminary and could change as part of the Retirement Systems' review of the actuarial valuation as of June 30, 2011.

Because the statutory employer and member contributions are not adequate to fund the retirement systems' benefits, the retirement systems' assets are being rapidly depleted and, as a result, the currently scheduled future contributions will not be adequate to accumulate sufficient assets to make future benefit payments when due. Based on the assumptions used in the latest actuarial valuations, including the

expected continued funding shortfalls, and considering the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System adopted in July 2011: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2021; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2021; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $125.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

For a detailed discussion of the funding requirements and benefit structure of the Retirement Systems, as well as their financial and actuarial situation, funding shortfalls, and efforts to address their financial solvency, including the July 2011 increase in required employer contributions to the Employees Retirement System and the Teachers Retirement System, see RETIREMENT SYSTEMS and "Overview of Economic and Fiscal Condition – Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems" under INTRODUCTION in the Commonwealth Report.

**Economy**

*Gross National Product.* The most recent available forecast prepared by the Planning Board in February 2011 stated that the annual growth of real GNP for Puerto Rico would be -1.0% in fiscal year 2011 and 0.7% in fiscal year 2012. The Planning Board is finishing the preliminary numbers for the accounts corresponding to fiscal year 2011 and it is currently working with the forecasts for fiscal years 2012 and 2013.

*Employment.* According to the Household Survey, total employment fell by 2.3% in fiscal year 2011 and by 0.5% in the first half of fiscal year 2012. The unemployment rate for fiscal year 2011 and for the first six months of fiscal year 2012 was 15.9% and 15.5%, respectively, slightly lower than the average for fiscal year 2010 (16.0%). In December 2011, the unemployment rate fell to 13.2%. According to the Establishment Survey, total payroll employment fell by 2.3% in fiscal year 2011 and was virtually unchanged during the first six months of fiscal year 2012. December 2011 year-over-year growth in total payroll employment was 0.2%, along with September and November 2011, the first three months of positive growth since 2006.

*Economic Activity Index.* The economic activity index (EAI) prepared by the GDB reflected a reduction of 2.9% in fiscal year 2011. For the first six months of fiscal year 2012 the EAI showed a year-over-year reduction of 0.9%, compared to a reduction of 3.5% for the first semester of fiscal year 2011. In December 2011, the year-over-year growth rate of the EAI was 0.5%, which represents the first positive growth rate since March 2006.

## PLAN OF FINANCING

The Bonds are being issued to provide funds to (i) repay a GDB Line of Credit, the proceeds of which refinanced deposits to the Commonwealth's Redemption Fund for the payment of principal and interest from February 1, 2012 to July 1, 2012 on certain general obligation bonds and notes of the Commonwealth, (ii) refund certain of the Commonwealth's outstanding general obligation bonds as set forth in *Appendix IV* – Table of Refunded Bonds (the "Refunded Bonds"), (iii) pay capitalized interest on a portion of the Bonds, and (iv) pay expenses related to the issuance and sale of the Bonds.

The Secretary of the Treasury will deposit the proceeds of the Bonds to be utilized to pay principal of, and premium and interest on, the Refunded Bonds into an escrow fund (the "Escrow Fund") with an escrow agent to be selected by the Commonwealth. The proceeds of the Bonds deposited in the Escrow Fund will either be held uninvested in cash or invested in non-callable direct obligations of the United States, the principal of and interest on which will be sufficient to pay, when due, the principal of, and premium and interest on, the Refunded Bonds. The sufficiency of the amount so deposited, with investment earnings thereon, to pay the principal of, and premium and interest on, the Refunded Bonds, will be verified by Causey Demgen & Moore, Inc., among other calculations. See VERIFICATION OF MATHEMATICAL COMPUTATIONS.

### Sources and Uses of Funds

The Sources and Uses of Funds are as follows (rounded to the nearest dollar):

| | |
|---|---:|
| Sources: | |
| Principal amount of the Bonds | $415,270,000 |
| Net Original Issue Discount | (315,024) |
| Total sources | $414,954,976 |
| | |
| Uses: | |
| Repayment of GDB Line of Credit | $ 40,352,037 |
| Deposit into Escrow Fund for Refunded Bonds | 362,516,055 |
| Capitalized Interest | 8,559,930 |
| Underwriting discount, legal, printing and other financing expenses | 3,526,954 |
| Total uses | $414,954,976 |

The Commonwealth routinely explores opportunities to restructure its debt to reduce debt service. Subject to market conditions, the Commonwealth expects to issue, from time to time, general obligation refunding bonds to refund certain of its outstanding general obligation bonds and notes. In addition, subject to market conditions and, to the extent necessary, the approval of the Legislative Assembly, the Commonwealth expects to issue general obligation bonds to finance capital improvement projects. In December 2011, the Legislative Assembly approved the issuance of general obligation bonds and notes in the amount of $290 million to fund such capital improvement projects.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in

"Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial

8

ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, any Underwriter or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT

PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar.  Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository).  In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteenth day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Sections 25 and 37 of the Organic Act of Puerto Rico of 1917, as amended, provided that local legislative powers were vested in a Legislature (the predecessor to the current Legislative Assembly) whose authority extended to matters of a legislative character not locally inapplicable. Pursuant to this power, the Legislature enacted the Act. Section 1 of Article IX of the Constitution of the Commonwealth provides that all laws in existence at the time of its passage continue in full force and effect unless they are inconsistent with the Constitution, are amended or repealed, or expire by their own terms. Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Act was amended by Acts 6 and 10 of July 24, 1952 to authorize the Secretary of the Treasury to issue bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor.  In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

**Redemption**

The Bonds maturing prior to July 1, 2016 are not subject to redemption prior to maturity. The Bonds maturing on or after July 1, 2016 are subject to redemption prior to maturity as described below.

There are no amortization requirements for the Bonds maturing on July 1, 2033.

*Optional Redemption.*  At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds maturing on or after July 1, 2016 (other than the Bonds maturing on July 1, 2033)

are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2015, either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds maturing on July 1, 2033 are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2022, either in whole or in part, on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

In accordance with the Act, the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable with any funds available to the Commonwealth, which funds are appropriated as continuous appropriations, without the need to make specific appropriations for such purposes.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39 of 1976"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its good faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 of 1976 provides that the obligation of the Secretary of the

Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010, 2011 and 2012 the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to refinance deposits to the Redemption Fund. The Commonwealth expects to enter into a loan agreement with Government Development Bank the proceeds of which would be used to refinance deposits to the Redemption Fund during fiscal year 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to refinance deposits to the Redemption Fund after June 30, 2013. On February 15, 2012, the Redemption Fund was fully funded.

Act No. 39 of 1976 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving

the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds. Upon the issuance of the Series A Bonds, the Series 2004A Bonds and the Series 2004B Bonds will no longer be outstanding. The interest rate exchange agreements entered into in connection with the Series 2004A Bonds and the Series 2004B Bonds will be terminated in connection with the issuance of the Series A Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the good faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into interest rate exchange agreements, the effect of which economically enables the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements (the "Series 2003C Swaps"), the effect of which economically enables the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds. Upon the issuance of the Series A Bonds, approximately $431,000,000 of the 2003C Swap Bonds will remain outstanding. A portion of the Series 2003 Swaps will be terminated in connection with the issuance of the Series A Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into interest rate exchange agreements (the "Series 2007A Swaps"), the effect of which economically enables the Commonwealth to pay a fixed rate of interest in respect thereof. Upon the issuance of the Series A Bonds, approximately $29,840,000 of the 2007 Swap Bonds will remain outstanding. A portion of the Series 2007A Swaps will be terminated in connection with the issuance of the Series A Bonds.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds") for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds (the "Series 2004B Swap").

In March 2011, the Commonwealth issued its $274,550,000 Public Improvement Refunding Bonds, Series 2011 (the "2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds. Upon the issuance of the Series A Bonds, the 2011 Swap Bonds will no longer be outstanding. The Series 2004B Swap will be terminated in connection with the issuance of the Series A Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index

published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of September 30, 2011.

After giving effect to the issuance of the Bonds and the Series A Bonds (including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series A Bonds), future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in the fiscal year ending June 30, 2016, based on the assumption that (i) the outstanding 2003C Swap Bonds, 2006 CPI Bonds, and 2007 Swap Bonds bear interest at the maximum rate of 12% per annum (rather than the lower rate that the Commonwealth is required to pay under the applicable interest rate exchange agreements as permitted by law) and (ii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates, rather than the rates set forth in the basis swap. This amount ($989,231,968) plus the amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $1,005,751,968, is equal to 13.2% of $7,600,369,500, which is the average of the adjusted preliminary internal revenues for the fiscal year ended June 30, 2010 and preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in clause (i) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, as permitted by law, the percentage referred to in the preceding sentence would be 12.7%. Any potential termination payment (which is a good faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the applicable interest rate exchange agreements is not included in the calculation of the 15% constitutional debt limitation.

As of December 31, 2011, Port of the Americas Authority had issued bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), in the amount of $250 million, of which $213.2 million is currently outstanding. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to continue to make all payments on the POA Guaranteed Bonds under the good faith and credit guarantee of the Commonwealth. During fiscal year 2011 and fiscal year 2012, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $16.5 million and $17.3 million, respectively.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

### PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The table on the following page presents a summary of the public sector debt of the Commonwealth outstanding as of December 31, 2011. The table also shows the public sector debt as adjusted for the effects of the issuance of the Bonds and the Series A Bonds, including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series A Bonds. The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report.

**Commonwealth of Puerto Rico**
**Public Sector Debt***
**(in millions)**

| | December 31, 2011 | As Adjusted by the issuance of the Bonds and the Series A Bonds |
|---|---|---|
| GENERAL FUND RELATED DEBT | | |
| Direct good faith and credit obligations | $ 9,772 | $10,793[1] |
| Puerto Rico guaranteed debt [2] | 5,466 | 5,466 |
| Debt supported by Puerto Rico appropriations or taxes [3] | 3,727 | 3,727 |
| Tax and Revenue Anticipation Notes [4] | 900 | 900 |
| Pension Obligation Bonds [5] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,813 | $23,834 |
| Sales and Use Tax (COFINA) debt | $15,224 | $15,224 |
| Public corporations and agencies [6] | 23,641 | 23,641 |
| Municipal Debt | 3,498 | 3,498 |
| Limited Obligations/non-recourse debt [7] | 2,263 | 2,263 |
| | 44,626 | 44,626 |
| TOTAL PUBLIC SECTOR DEBT | $67,439 | $68,460 |

* Totals may not add due to rounding.

(1) Includes $75 million in Commonwealth bond anticipation notes issued in January 2012. Excludes approximately $227 million of principal due July 1, 2012 that will be paid through the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series A Bonds.

(2) Consists of $666 million of bonds issued by Aqueduct and Sewer Authority, $423 million of State Revolving Fund Loans incurred under various federal water laws, $213 million of bonds issued by Port of the Americas Authority, and $4.012 billion of Public Building Authority bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

(4) Includes related short-term financings.

(5) Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

(6) Excludes $5.4 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities. Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included the table. Excludes $1,800,450,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012A (Senior Lien) and $295,245,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012B (Senior Lien) issued on February 29, 2012. Also excludes $1,000,000,000 of Puerto Rico Government Development Bank for Puerto Rico, Senior Notes, 2012 Series A issued on February 7, 2012.

(7) Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $343.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008, and $100 million of Housing Revenue Bonds, Series 2008, issued the Puerto Rico Housing Finance Authority; $149.1 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $74.6 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.5 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico.

16

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on December 31, 2011 (after giving effect to the issuance of $75 million of Commonwealth general obligation bond anticipation notes in January 2012, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series A Bonds); (ii) the Bonds; (iii) the Series A Bonds; and (iv) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements\***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service [1] | The Bonds | | Series A Bonds Debt Service [3] | Grand Total [3] |
| | | Principal | Interest [3] | | |
|---|---|---|---|---|---|
| 2012 [2] | $ 144,464 | $ - | $ 3,159 | - | $ 147,623 |
| 2013 | 817,647 | 55,605 | 12,361 | $ 29,809 | 915,421 |
| 2014 | 722,581 | 69,990 | 11,109 | 23,954 | 827,634 |
| 2015 | 741,401 | 67,300 | 9,045 | 47,030 | 864,776 |
| 2016 | 754,573 | 56,170 | 9,487 | 118,359 | 938,588 |
| 2017 | 711,001 | 27,385 | 7,437 | 118,359 | 864,181 |
| 2018 | 625,329 | 51,925 | 6,369 | 118,359 | 801,982 |
| 2019 | 776,849 | 20,160 | 4,240 | 118,359 | 919,608 |
| 2020 | 763,684 | 17,125 | 3,383 | 163,704 | 947,896 |
| 2021 | 569,328 | - | 2,629 | 218,486 | 790,444 |
| 2022 | 532,097 | - | 2,629 | 184,966 | 719,692 |
| 2023 | 434,361 | - | 2,629 | 189,172 | 626,162 |
| 2024 | 478,896 | - | 2,629 | 130,310 | 611,836 |
| 2025 | 484,692 | - | 2,629 | 130,104 | 617,425 |
| 2026 | 438,682 | - | 2,629 | 236,065 | 677,377 |
| 2027 | 472,550 | - | 2,629 | 123,999 | 599,178 |
| 2028 | 443,315 | - | 2,629 | 157,852 | 603,796 |
| 2029 | 462,535 | - | 2,629 | 95,997 | 561,161 |
| 2030 | 457,805 | - | 2,629 | 95,998 | 556,432 |
| 2031 | 443,439 | - | 2,629 | 96,001 | 542,069 |
| 2032 | 339,126 | - | 2,629 | 96,002 | 437,758 |
| 2033 | 266,743 | 49,610 | 2,629 | 220,333 | 539,315 |
| 2034 | 199,490 | - | - | 269,858 | 469,348 |
| 2035 | 321,993 | - | - | 214,060 | 536,053 |
| 2036 | 321,989 | - | - | 135,661 | 457,650 |
| 2037 | 317,047 | - | - | 140,606 | 457,653 |
| 2038 | 220,404 | - | - | 280,416 | 500,820 |
| 2039 | 220,403 | - | - | 280,418 | 500,821 |
| 2040 | 220,401 | - | - | 340,419 | 560,820 |
| 2041 | 220,404 | - | - | 340,415 | 560,819 |
| Total | $13,923,229 | $415,270 | $100,769 | $4,715,069 | $19,154,337 |

\*   Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1]   The amounts shown on this column i) include $75 million of Commonwealth bond anticipation notes issued in January 2012, and ii) exclude debt service on PRASA's bonds guaranteed by the Commonwealth, which have been paid by PRASA since 2006.  In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund.  The amounts shown in this column also do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds.  The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit. See THE BONDS – Debt Limitation.

[2]   Excludes approximately $685 million of principal and interest due in fiscal year 2012 paid and to be paid from the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series A Bonds.

[3]   The figures for interest on the Bonds have been reduced by the interest that was capitalized through the issuance of the Bonds in the following amounts: approximately $672 thousand in fiscal year 2012 and $2.6 million in each of fiscal years 2013, 2014 and 2015.  The figures for Series A Bonds debt service have been reduced by the interest that was capitalized through the issuance of the Series A Bonds in the following amounts: approximately $117.5 million due during fiscal year 2013, $94.4 million due during fiscal year 2014 and $71.3 million due during fiscal year 2015.

Sources:  Government Development Bank and Department of the Treasury.

## LITIGATION

As of the date hereof, to the knowledge of the officers of the Department of the Treasury with responsibility over the issuance of the Bonds, there is no litigation of any nature pending or threatened against the Commonwealth to restrain or enjoin the issuance, sale, execution or delivery of the Bonds or the application of the proceeds thereof as described in this Official Statement, or in any way contesting or affecting the validity of the Bonds or any proceedings of the Commonwealth taken with respect to the issuance or sale of the Bonds.

## TAX MATTERS

The following is a summary of the opinion of O'Neill & Borges LLC, Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Bonds by Puerto Rico residents.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Puerto Rico Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service (the "IRS") or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained. Moreover, this section is not to be construed as a substitute for careful tax planning. Prospective investors are urged to consult their own tax advisors with specific reference to their own tax situations, including the application and effect of other tax laws and any possible changes in the tax laws after the date of this official statement. Entities that are classified as partnerships or other pass-through entities under the PR Code or the US Code and other entities subject to special tax regimes should consult their tax advisors regarding the Puerto Rico and United States tax consequences of investment in the Bonds.

In the opinion of O'Neill & Borges LLC, under the provisions of the Acts of Congress and the laws of Puerto Rico in force as of the date of issuance of the Bonds:

1.    Interest on the Bonds is:

    (a)    exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico, Act No. 1-2011 of the Legislature of Puerto Rico, approved January 31, 2011, as amended (the "PR Code");

    (b)    excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book income" of a corporation for purposes of computing the alternative minimum tax imposed by Section 1022.03(a) of the PR Code;

    (c)    exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

    (d)    exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

2.      The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3.      The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

5.      Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with eligible funds, as such term is defined in the Acts.

6.      Gain recognized from the sale or exchange of the Bonds will be subject to income tax under the PR Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations organized under the laws of Puerto Rico.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds, including but not limited to financial institutions, should be aware that, pursuant to Sections 1033.17(a)(5), 1033.17(a)(10) and 1033.17(f) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for regular and alternative minimum Puerto Rico income tax purposes, of interest expense and other expenses related to an investment in the Bonds.

**IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Bonds.**

The following discussion is limited to Bonds held as capital assets and does not purport to address interest or gain on the Bonds that is effectively connected with a Puerto Rico trade or business.  Based upon the provisions of the United States Internal Revenue Code of 1986, as amended (the "US Code"), now in force and the rules and regulations thereunder, in the opinion of O'Neill & Borges LLC:

1.      Interest or original issue discount on the Bonds owned by an individual is excludable from the gross income of the individual for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue discount is to be recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or

attributable to, the conduct of a trade or business within the United States by such individual under the US Code. In addition, for U.S. federal income tax purposes, no deduction or credit will be allowed that is allocable to or chargeable against amounts so excluded from the Puerto Rico individual's gross income.

2.        Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.        United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such individual, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside of Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) each of the ten years preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

4.        Puerto Rico corporations generally will not be subject to income or withholding tax under the US Code on gain recognized on the sale or exchange of the Bonds, unless the gain is effectively connected, or treated as effectively connected, with the conduct by the Puerto Rico corporation of a trade or business in the United States.

The opinion of Special Puerto Rico Tax Counsel regarding the tax consequences under Puerto Rico law and the US Code arising from the ownership of, receipt or accrual of interest on or disposition of the Bonds is limited to the above. Special Puerto Rico Tax Counsel does not express any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds or as to the tax consequences under the laws of any state or any other taxing jurisdictions. Purchaser of the Bonds should consult his, her or its tax advisor as to such tax consequences.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement. O'Neill & Borges LLC, San Juan, Puerto Rico will pass on certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel. The form of opinion of Special Puerto Rico Tax Counsel is set forth in *Appendix III* to this Official Statement.