# **Exhibit 16**

**NEW ISSUE – BOOK-ENTRY**
(See "Book-Entry Only System" under The Bonds)

In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force, (i) interest on the Bonds will be exempt from federal income tax, subject to certain conditions as described under *Tax Matters* and, in the case of the 2002 Refunding Bonds, assuming among other matters, no Change in Law as described under "Delayed Delivery of the 2002 Refunding Bonds" in *Plan of Financing*, and (ii) the Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters* for a description of alternative minimum tax consequences with respect to interest on the Bonds and other tax considerations.

## $1,249,770,000

# COMMONWEALTH OF PUERTO RICO

**$274,135,000 Public Improvement Bonds of 2001, Series A**
**$136,835,000 Public Improvement Bonds of 2001, Series B**
**$337,235,000 Public Improvement Refunding Bonds, Series 2001**
**$501,565,000 Public Improvement Refunding Bonds, Series 2002**
(General Obligation Bonds)

Dated: Date of Delivery                                                                                                   Due: July 1, as shown below

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 or any multiple thereof. Interest on the Public Improvement Bonds of 2001 and the Public Improvement Refunding Bonds, Series 2001 (collectively, the "2001 Bonds"), will be payable beginning on January 1, 2002 and each July 1 and January 1 thereafter. Interest on the Public Improvement Refunding Bonds, Series 2002 (the "2002 Bonds" and together with the 2001 Bonds, the "Bonds"), will be payable beginning on July 1, 2002 and on each January 1 and July 1 thereafter. Certain of the Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2011. See *The Bonds*.

**The Bonds are general obligations of the Commonwealth of Puerto Rico. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.**

The scheduled payment of principal of and interest on the 2001 Bonds when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the 2001 Bonds by Financial Security Assurance Inc. See *Bond Insurance*.

The principal of and interest on the 2002 Bonds maturing after July 1, 2005 and a portion of the 2002 Bonds maturing on July 1, 2005, as shown in the inside cover, will be insured by a municipal bond new issue insurance policy issued by Financial Guaranty Insurance Company. See *Bond Insurance*.

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, LLP, San Juan, Puerto Rico. It is expected that settlement for the 2001 Bonds will occur on or about June 7, 2001 and that settlement for the 2002 Bonds will occur on or about April 4, 2002.

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | | **Salomon Smith Barney** |
| | **Merrill Lynch & Co.** | |
| Bear, Stearns & Co. Inc. | JPMorgan | Lehman Brothers |
| Morgan Stanley Dean Witter | Samuel A. Ramírez & Co. Inc. | UBS PaineWebber Inc. |

May 24, 2001

[This page intentionally left blank]

$1,249,770,000

# Commonwealth of Puerto Rico

$274,135,000 Public Improvement Bonds of 2001, Series A
$136,835,000 Public Improvement Bonds of 2001, Series B
$337,235,000 Public Improvement Refunding Bonds, Series 2001
$501,565,000 Public Improvement Refunding Bonds, Series 2002
(General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") which includes the cover page, the inside cover page and the appendices hereto, provides certain information in connection with the sale of $274,135,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2001, Series A, $136,835,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2001, Series B (collectively, the "Public Improvement Bonds"), $337,235,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2001 (the "2001 Refunding Bonds") and $501,565,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2002 (the "2002 Refunding Bonds"; the 2002 Refunding Bonds and the 2001 Refunding Bonds are herein collectively called the "Refunding Bonds"; and the Public Improvement Bonds, the 2001 Refunding Bonds and the 2002 Refunding Bonds are herein collectively called the "Bonds"). The Public Improvement Bonds and the 2001 Refunding Bonds will be insured by an insurance policy (the "FSA Bond Insurance Policy") issued by Financial Security Assurance Inc. ("FSA Insurance"). The 2002 Refunding Bonds maturing after July 1, 2005 and the 2002 Refunding Bonds in the aggregate principal amount of $21,190,000 maturing on July 1, 2005 (the "2002 Insured Bonds") will be insured by an insurance policy (the "FGIC Bond Insurance Policy"; and collectively with the FSA Bond Insurance Policy, the "Policies") issued by Financial Guaranty Insurance Company ("FGIC Insurance").

The Public Improvement Bonds are being issued under the provisions of Act No. 118 of the Legislature of Puerto Rico, approved July 13, 2000 ("Act No. 118"), and pursuant to a resolution authorizing the issuance of the Public Improvement Bonds (the "Public Improvement Bond Resolution") adopted by the Secretary of the Treasury and approved by the Governor of Puerto Rico on May 24, 2001. The Refunding Bonds are being issued under the provisions of Act No. 33 of the Legislature of Puerto Rico, approved December 7, 1942 ("Act No. 33", and Act No. 118 together with Act No. 33, the "Act") and pursuant to a resolution authorizing the issuance of the Refunding Bonds (the "Refunding Bond Resolution", and together with the Public Improvement Bond Resolution, the "Bond Resolution") adopted by the Secretary of the Treasury and approved by the Governor of Puerto Rico on May 24, 2001.

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.

This Official Statement also incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2000 prepared by the Department of the Treasury (the "Commonwealth's Annual Financial Report"), which report includes the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 2000, together with the independent auditor's report thereon, dated December 29, 2000, of Deloitte & Touche LLP, independent auditors, and is incorporated by reference herein in reliance upon the reports of such firm given their

1

authority as experts in accounting and auditing. The Commonwealth's Annual Financial Report has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing the Commonwealth's Annual Financial Report filed with each NRMSIR and the Municipal Securities Rulemaking Board (the "MSRB") or any other document containing the Commonwealth's Annual Financial Report filed with each NRMSIR after the date hereof and prior to the termination of the offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide, without charge to any person to whom this Official Statement is delivered, on the written request of such person, a copy of the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, NY 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, PR 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below.

## OVERVIEW

The following is a summary of certain information regarding the Commonwealth contained in the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated April 30, 2001 (the "Commonwealth Report"), attached hereto as *Appendix I*. This summary does not purport to be complete and is qualified in its entirety by reference to more detailed information appearing in the Commonwealth Report, which should be read in its entirety.

Puerto Rico is located approximately 1,600 miles southeast of New York City. The U.S. Census Bureau has determined Puerto Rico's population to be 3,808,610 for the year 2000. Puerto Rico's political status is that of a commonwealth. The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as is exercised by the state governments of each of the fifty states over their respective internal affairs, with similar separation of powers among the executive, legislative and judicial branches; however, it differs from the states in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. The official languages of Puerto Rico are Spanish and English.

**Economic Trends**

Puerto Rico has enjoyed seventeen years of uninterrupted economic expansion. Factors contributing to this expansion include government-sponsored economic development programs, periodic declines in the exchange value of the United States dollar which is the currency used in the

Commonwealth, increases in the level of federal transfers, the relatively low cost of borrowing, and until recently, low oil prices.

Gross product in fiscal 2000 was $41.4 billion ($34.8 billion in 1996 prices) and in fiscal 1996 was $30.4 billion. This represents an increase in gross product of 36.3% from fiscal 1996 to 2000 (14.7% in 1996 prices). Since fiscal 1985, personal income, both aggregate and per capita has increased consistently each fiscal year. In fiscal 2000, aggregate personal income was $38.2 billion ($34.6 billion in 1996 prices) and personal income per capita was $9,870 ($8,925 in 1996 prices). The difference in the statistics of 1996 for gross product and personal income is attributable to the different price deflators used for each.

Average employment increased from 1,092,200 in fiscal 1996, to 1,159,470 in fiscal 2000. Average unemployment decreased from 13.8% in fiscal 1996 to 11.0% in fiscal 2000. According to the Labor Department's Household Employment Survey, during fiscal 2000 total employment increased 1.1% over fiscal 1999. Total monthly employment averaged 1,159,470 in fiscal 2000, compared to 1,146,660 in fiscal 1999. The seasonally adjusted unemployment rate for March 2001 was 10.6%.

According to the Labor Department's Household Employment Survey, during the first nine months of fiscal 2001, total employment increased 1.0% over the same period in fiscal 2000. Monthly employment averaged 1,160,220 during the first nine months of fiscal 2001, compared to 1,149,700 for the same period in fiscal 2000.

The Planning Board's gross product forecast for fiscal 2001, made in March 2001, projected an increase of 2.2% over fiscal 2000 and an increase of 2.0% for fiscal 2002. The performance of the economy during fiscal 2001 and 2002 will be affected principally by the performance of the United States economy and by the increase in oil prices and the level of interest rates. The change in the Federal Reserve monetary policy to lower interest rates embodies a positive impact for the Commonwealth's economy, primarily its construction industry. Since Puerto Rico is heavily dependent on oil imports for its energy needs, if the level of oil prices remains at its current high level for a long period of time, that could have an adverse effect on the level of economic activity in Puerto Rico during the remainder of fiscal 2001 and during fiscal 2002.

**Real GNP Growth Rate**



*DRI Forecast 4/01

**Fiscal Year**

PR  US

Puerto Rico has a diversified economy with the manufacturing and services sectors comprising the principal sectors. Manufacturing is the largest sector in terms of gross domestic product. According to the Planning Board's figures, in fiscal 2000 manufacturing generated $27.4 billion, or 43.5%, of gross domestic product and accounted for 13.7% of total employment, as compared with fiscal 1999, when it generated $26.6 billion, or 44.4%, of gross domestic product and accounted for 13.9% of total employment. See "Economic Performance by Sector" under *The Economy* in the Commonwealth Report. Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last two decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the heavy investment in the pharmaceutical, scientific instruments, computers, medical products and electrical products industries in Puerto Rico over the last decade. One of the factors assisting the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Internal Revenue Code Section 936, phased out the federal tax incentives during a ten-year period. See "Tax Incentives - Incentives Under the Code" under *The Economy* in the Commonwealth Report.

The services sector, which includes hotel and related services and currently accounts for approximately 50.7% of total employment, generated $24.0 billion, or 38.1%, of Puerto Rico's gross domestic product in fiscal 2000, as compared with $22.3 billion, or 37.2%, of gross domestic product in fiscal 1999.

Growth in construction contributed to increased economic activity in fiscal 2000. The growth in the construction industry was evidenced by a nominal increase of 7.3% in construction investment for fiscal 2000 over fiscal 1999.

Tourism continues to make a significant contribution to economic activity. More than 4.6 million visitors spent $2.4 billion in Puerto Rico in fiscal 2000. San Juan has become the largest home port for cruise ships in the Caribbean and the second largest home port for cruise ships in the world. Twenty-six U.S. and international airlines offer scheduled service to and from San Juan and American Airlines uses San Juan as a hub for its intra-Caribbean operations. This reflects the importance of Puerto Rico as a tourist destination and as a transportation hub in the Caribbean.

**Fiscal Management**

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget and the Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. The Office of Management and Budget prepares the Commonwealth budget and has the responsibility for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Section 7 on Article VI of the Constitution of Puerto Rico provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The financial statements of the Commonwealth for fiscal 2000 were audited by Deloitte & Touche LLP, whose report thereon is dated December 29, 2000. For a summary of the Commonwealth's significant accounting policies, see Note 1 to the Commonwealth's general purpose financial statements included in the Commonwealth's Annual Financial Report. Preparation of the audited financial

statements of the Commonwealth involves the collection and combination of audited financial statements from 50 separate reporting entities.

**Debt Management**

The Constitution of Puerto Rico limits the amount of general obligation debt that can be issued. The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation. See "Debt Limitation" under *The Bonds*.

Historically, the Commonwealth has maintained a fiscal policy which provides for a prudent relationship between the growth of public sector debt and the growth of the economic base required to service that debt. Since fiscal 1996, however, public sector debt increased at a rate greater than the growth of gross product due to an increase in the amount of debt incurred to finance certain key infrastructure projects which are important to the development of the economy and are expected to produce long term economic benefits. This increase in debt has been partially offset by debt incurred to refinance outstanding debt that has enabled Puerto Rico to benefit from the historically low levels of interest rates and realize debt service savings. See "Trends of Public Sector Debt" under *Debt* and "Economic Performance by Sector - Construction" under *The Economy* in the Commonwealth Report.

## PLAN OF FINANCING

**The Public Improvement Bonds**

The net proceeds of the Public Improvement Bonds will be deposited in (i) the 2001 Public Improvements Fund established under Act No. 118 to carry out the capital improvement programs authorized by the Legislature, including but not limited to highways and transportation facilities, aqueduct and sewer facilities, schools, health and social welfare facilities, agricultural and tourism facilities, park and other recreation facilities, flood control and solid waste facilities, housing, municipal projects, and other governmental projects, and (ii) the Extraordinary Maintenance Fund established under Act No. 66 of the Legislature of Puerto Rico, approved August 14, 1991, to be used, among various purposes, to cover the costs of permanent improvements related to water resources.

The Public Improvement Bonds are being issued in two series in the respective aggregate principal amounts of $274,135,000 and $136,835,000 and designated "Public Improvement Bonds of 2001 of the Commonwealth of Puerto Rico, Series A" and "Public Improvement Bonds of 2001 of the Commonwealth of Puerto Rico, Series B" (the "Public Improvement Series A Bonds" and the "Public Improvement Series B Bonds", respectively).

**The Refunding Bonds**

*2001 Refunding Bonds.* The 2001 Refunding Bonds will be issued for the purpose of: (a) refunding at par on July 31, 2001, $164,222,000 principal amount of special promissory notes issued on behalf of the Commonwealth by the Secretary of the Treasury to Government Development Bank (the "Promissory Notes") for the purpose of making a portion of the monthly deposits to the Commonwealth's Redemption Fund (hereinafter mentioned) and (b) refunding certain general obligation bonds of the Commonwealth as follows (the "2001 Refunded Bonds"):

5

| Public Improvement Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| 1993 | $ 8,495,000 | 5.60% | July 1, 2006 | July 1, 2002 | 101.50% |
| 1993 | 8,995,000 | 5.60% | July 1, 2007 | July 1, 2002 | 101.50% |
| 1993 | 9,530,000 | 5.70% | July 1, 2008 | July 1, 2002 | 101.50% |
| 1994 | 8,155,000 | 6.20% | July 1, 2007 | July 1, 2004 | 101.50% |
| 1997, Series B | 25,000,000* | 5.50% | July 1, 2002 | N/A | N/A |
| 2000 | 100,000,000 | 6.00% | July 1, 2029 | July 1, 2005 | 101.00% |

\* $37,860,000 currently outstanding.

*2002 Refunding Bonds.* The 2002 Refunding Bonds will be issued on or about April 4, 2002 for the purpose of redeeming on July 1, 2002, at a redemption price of 101.5%, $504,760,000 aggregate principal amount of the Commonwealth's Public Improvement Refunding Bonds, Series 1992A (the "2002 Refunded Bonds"; and together with the 2001 Refunded Bonds, the "Refunded Bonds"), stated to mature as set forth below:

| Principal Amount to be Refunded | Interest Rate | Maturity Date (July 1) |
|---|---|---|
| $ 11,310,000 | 5.875% | 2005 |
| 10,090,000 | 6.00% | 2006 |
| 26,700,000 | N/A | 2008 (ARNs) |
| 26,700,000 | N/A | 2008 (YCNs) |
| 28,750,000 | 5.75% | 2009 |
| 30,925,000 | 6.25% | 2010 |
| 180,485,000 | 6.00% | 2014 |
| 94,900,000 | N/A | 2020 (ARNs) |
| 94,900,000 | N/A | 2020 (YCNs) |

*Making and Effect of Escrow Deposits - The 2001 Refunding Bonds.* The Secretary of the Treasury will deposit the net proceeds of the 2001 Refunding Bonds into two escrow funds with Banco Popular de Puerto Rico (the "Escrow Agent"). One of said funds will relate to the refunding of the Public Improvement Bonds of 1993 and 2000 as described above (the "1993 and 2000 Escrow Fund"), and the other will relate to the refunding of the Promissory Notes and the Public Improvement Bonds of 1994 and 1997, Series B as described above (the "1994 and 1997B Escrow Fund"). A portion of the net proceeds of the 2001 Refunding Bonds will be invested in noncallable United States Treasury obligations (in the case of the 1994 and 1997B Escrow Fund) and in legally permitted investments consisting of a guaranteed investment contract with Transamerica Occidental Life Insurance Company, which agreement is insured by AMBAC Assurance Corporation (in the case of the 1993 and 2000 Escrow Fund), the principal of and interest (or other payments) on which, with any uninvested moneys, will be sufficient to pay the principal of and premium, if any, on the 2001 Refunded Bonds on the maturity or redemption dates set forth above, which redemption dates will be irrevocably designated by the Secretary of the Treasury in the Refunding Bond Resolution, and to pay the interest thereon (after July 1, 2001) to such dates. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the Refunded Bonds referred to above in this paragraph, will be verified by Samuel Klein and Company (the "Verification Agent"). Upon the deposit of cash and the noncallable United States Treasury obligations into the 1994 and 1997B Escrow Fund with the Escrow Agent referred to above and upon the payment by the Commonwealth on July 1, 2001 of the debt service on said Refunded Bonds, the Public Improvement Bonds of 1994 and 1997, Series B being so refunded will cease to be outstanding under the terms of their respective authorizing resolutions. In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, once the actions described in the preceding sentence have occurred, the Public Improvement Bonds of 1994 and 1997, Series B being refunded will be deemed not to be outstanding for the purpose of applying the debt limitation under Section 2 of Article VI of the Constitution of Puerto Rico.

6

*Making and Effect of Escrow Deposits - The 2002 Refunding Bonds.* The Secretary of the Treasury will deposit the net proceeds of the 2002 Refunding Bonds into an escrow fund with the Escrow Agent. A portion of the net proceeds of the 2002 Refunding Bonds will be invested in legally permitted investments consisting of guaranteed investment agreements with Trinity Plus Funding Company, LLC ("Trinity") and with AIG Matched Funding Corp. the payments on which, with any uninvested moneys, will be sufficient to pay the principal of and premium on the 2002 Refunded Bonds on July 1, 2002, which redemption date will be irrevocably designated by the Secretary of the Treasury in the Refunding Bond Resolution, and to pay the interest thereon after the issuance of the 2002 Refunding Bonds to such date. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the 2002 Refunded Bonds, will be verified by the Verification Agent.

Trinity is a limited liability company one of whose common members is FGIC MRCA Corp., an affiliate of FGIC Insurance whose policy is insuring a portion of the 2002 Refunding Bonds. The FGIC Bond Insurance Policy does not in any way cover Trinity's obligations under its investment agreement with the Escrow Agent in respect of the 2002 Refunded Bonds, nor will FGIC Insurance be liable to cover any defaults by Trinity under said guaranteed investment agreement. See *Bond Insurance*, below.

**Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $1,249,770,000.00 |
| Net original issue premium | 38,413,893.90 |
| Total sources | $1,288,183,893.90 |

Uses:

| | |
|---|---|
| Deposit into the 2001 Public Improvements Fund | $ 400,500,000.00 |
| Deposit into the Extraordinary Maintenance Fund | 21,250,000.00 |
| Deposit into Escrow Fund for 2001 Refunded Bonds | 329,370,465.35 |
| Deposit into Escrow Fund for 2002 Refunded Bonds | 518,987,192.62 |
| Underwriting discount, insurance premiums and other financing expenses | 18,076,235.93 |
| Total uses | $1,288,183,893.90 |

**Delayed Delivery of the 2002 Refunding Bonds**

Only the 2001 Bonds are expected to be issued in 2001. The 2002 Refunding Bonds are expected to be issued on or about April 4, 2002. The Commonwealth is required to issue the 2002 Refunding Bonds and the Underwriters are required to purchase the 2002 Refunding Bonds unless (1) the Underwriters are not permitted to purchase the 2002 Refunding Bonds because of a Change in Law (as defined below) or (2) the Commonwealth and the Underwriters do not receive (a) the opinion of Bond Counsel described below, and certain opinions of counsel to the Commonwealth and counsel to the Underwriters, (b) a supplement to this Official Statement (the "2002 Supplement"), together with a certificate of the Commonwealth as to the accuracy of this Official Statement as so supplemented, and (c) a certificate of the Commonwealth to the effect that it is not aware of the existence of any default under the Resolution (the "No-Default Certificate").

ADVERSE CHANGES (FINANCIAL OR OTHER) IN THE AFFAIRS OF THE COMMONWEALTH WILL NOT EXCUSE THE UNDERWRITERS FROM PAYING FOR AND TAKING DELIVERY OF THE 2002 REFUNDING BONDS UNLESS ANY SUCH ADVERSE CHANGE HAS NOT BEEN ACCURATELY AND COMPLETELY DESCRIBED IN OR INCORPORATED BY REFERENCE IN THE 2002 SUPPLEMENT OR THE COMMONWEALTH IS UNABLE TO DELIVER THE NO-DEFAULT CERTIFICATE DESCRIBED ABOVE.

7

It is a condition of the issuance of the 2002 Refunding Bonds that Bond Counsel deliver its approving opinion on the 2002 Refunding Bonds substantially in the form set forth in *Appendix II*. Bond Counsel's ability to deliver this opinion is subject to its review and analysis at the time the 2002 Refunding Bonds are to be issued of certain matters, including, among others, (1) the application of the proceeds of the 2002 Refunding Bonds, (2) pertinent provisions of law, including, but not necessarily limited to, Puerto Rico law and federal income tax and securities laws then in effect or proposed to be in effect and (3) certifications and representations delivered or made by the Commonwealth and the Underwriters at the time of issuance of the 2002 Refunding Bonds. Bond Counsel has advised the Commonwealth and the Underwriters that, (A) if the Commonwealth and the Underwriters satisfy their respective obligations set forth in the contract of purchase for the 2002 Refunding Bonds (the "Contract of Purchase") and (B) if there is no change in any applicable law, or in any other facts or circumstances (tax or otherwise) that, in Bond Counsel's view, affect or are material to its opinion, and (C) if such certifications and representations are delivered or made to Bond Counsel's satisfaction, Bond Counsel expects to be able to deliver an approving opinion substantially in the form attached hereto as *Appendix II*. No assurances can be given that there will be no change in applicable law prior to the time the 2002 Refunding Bonds are to be issued, that the facts and circumstances that are material to such opinion will not differ at the time the 2002 Refunding Bonds are to be issued from those currently expected, or that such certifications and representations will be delivered and made. As a consequence, no assurance can be made that an approving opinion on the 2002 Refunding Bonds will be delivered by Bond Counsel.

FAILURE TO DELIVER THE 2002 SUPPLEMENT OR THE OPINIONS AND CERTIFICATES IN THE FORM AND SUBSTANCE PROVIDED FOR IN THE CONTRACT OF PURCHASE (UNLESS SUCH FAILURE IS WAIVED BY THE UNDERWRITERS) WILL MEAN THAT THE 2002 REFUNDING BONDS WILL NOT BE ISSUED AND DELIVERED. THE UNDERWRITERS HAVE THE RIGHT, BUT ARE UNDER NO OBLIGATION, TO WAIVE ANY SUCH FAILURE.

In addition, the Underwriters are not required to purchase the 2002 Refunding Bonds if at any time on or prior to the date the 2002 Refunding Bonds are to be issued, as a result of a Change in Law, the Underwriters are or would be prohibited from lawfully purchasing the 2002 Refunding Bonds or lawfully selling the 2002 Refunding Bonds to the public.

As defined in the Contract of Purchase, "Change in Law" means (i) any change in federal, Puerto Rico or state law or any changes in regulations or other pronouncements or interpretations by federal, Puerto Rico or state agencies, (ii) the enactment, introduction or proposal of any federal legislation (if it has a proposed effective date that is on or before the date the 2002 Refunding Bonds are to be issued), (iii) the enactment, introduction or proposal of any law, rule or regulation by any other governmental body, department or agency (federal, Puerto Rico or state) (if it has a proposed effective date that is on or before the date the 2002 Refunding Bonds are to be issued) or (iv) the handing down of a judgment, ruling or order issued by any court or administrative body, which in each case would prohibit (or have the retroactive effect of prohibiting, if enacted, adopted, passed or finalized) the Underwriters from purchasing or selling the 2002 Refunding Bonds to the public (or would make the Commonwealth's issuance, sale or delivery illegal, if enacted, adopted, passed or finalized); provided, however, that such change in law, rule or regulation or judgment, ruling or order shall have become effective or been enacted, introduced, proposed or issued, as the case may be, after the date of this Official Statement.

Events that may occur prior to the issuance of the 2002 Refunding Bonds may have significant consequences to persons who have agreed to purchase the 2002 Refunding Bonds. The market prices of the 2002 Refunding Bonds on the date the 2002 Refunding Bonds are issued are unlikely to be the same as the purchase prices therefor, and such differences may be substantial. Several facts may adversely affect such prices, including (but not limited to) a general increase or decrease in market interest rates, any threatened or adopted change in the federal income tax laws affecting the relative benefits of owning tax-exempt securities versus other types of investments, or any adverse development with respect to the

Commonwealth's financial condition or prospects or with respect to the ratings on the Commonwealth's indebtedness, including the ratings on the 2002 Refunding Bonds. In addition, although the delivery of the approving opinion of Bond Counsel is a condition to the issuance and delivery of the 2002 Refunding Bonds and is subject to a number of conditions to be fulfilled at the time of such delivery as described above, changes or proposed changes in federal income tax laws or regulations or interpretations thereof could affect the market value of tax-exempt securities, including the 2002 Refunding Bonds, without preventing the delivery of such opinion or the delivery of the 2002 Refunding Bonds.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. Certain Bonds are subject to redemption at the times and at the prices set forth below in "Redemption".

### Book-Entry Only System

The following information concerning The Depository Trust Company ("DTC"), New York, New York and DTC's book-entry system has been obtained from DTC. Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered Bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered Bond will be issued for each maturity of the Public Improvement Bonds and the Refunding Bonds, each in the aggregate principal amount of such maturity and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants (the "Direct Participants") deposit with DTC. DTC also facilitates the settlement among Direct Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Direct Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants" and together with the Direct Participants, the "Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of a Bond (a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of the

Beneficial Owners. Beneficial Owners will not receive definitive Bonds except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the Bonds within a maturity and issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Bonds to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to DTC or to such other nominee as may be requested by DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payment date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Commonwealth or Banco Popular de Puerto Rico as paying agent and registrar (the "Registrar"), subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to DTC is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds are required to be printed and delivered, to or for the account of the respective Beneficial Owners.

The Commonwealth may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, definitive Bonds will also be printed and delivered, to or for the account of the respective Beneficial Owners.

**Payments and Transfers**

No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial

10

Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

In the event that the book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the corporate trust office of the Registrar in San Juan, Puerto Rico. Interest on the Bonds will be payable by check mailed to the respective addresses of the registered owners determined as of the applicable record date thereof provided in the Bond Resolution as shown on the registration books of the Commonwealth maintained by the Registrar. The Bonds will be issued only as registered Bonds without coupons in denominations of $5,000 or any multiple thereof. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust office of the Registrar in San Juan, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such registration of transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of Puerto Rico provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislature. Pursuant to this power, the Legislature enacted the Act, which authorizes the issuance of the Bonds.

**Redemption**

*Optional Redemption.* The Public Improvement Series A Bonds are not subject to optional redemption.

At the option of the Secretary of the Treasury and upon at least 30 days' notice, the outstanding Public Improvement Series B Bonds and the 2001 Refunding Bonds are subject to redemption, from any moneys that may be available for that purpose (other than moneys set aside in respect of an amortization requirement), prior to maturity, on or after July 1, 2011, as a whole or in part, as directed by the Secretary of the Treasury, at any time at the principal amount together with the interest thereon to the date fixed for redemption, without premium.

The 2002 Refunding Bonds are not subject to optional redemption.

*Mandatory Redemption.* The term Public Improvement Series B Bonds maturing July 1, 2023, and the 2001 Refunding Bonds maturing July 1, 2024, July 1, 2027 and July 1, 2030 are subject to redemption on or before July 1, 2022 and on or before each July 1 thereafter in respect of each fiscal year for which there is an amortization requirement, to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such 2001 Refunding Bonds and otherwise subject to adjustment as described below), upon at least 30 days' notice at a redemption price of par plus accrued interest to the dates fixed for redemption.