# **Exhibit 17**

NEW ISSUE - BOOK-ENTRY
See "Book-Entry Only System" under *The Bonds*

*In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force, (i) subject to continuing compliance with certain tax covenants, interest on the Bonds will not be includable in gross income for federal income tax purposes and (ii) the Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation under existing law. However, see "Tax Exemption" for a description of alternative minimum tax consequences with respect to interest on the Bonds and other tax considerations.*

**$727,115,000**
**COMMONWEALTH OF PUERTO RICO**
**$279,240,000 Public Improvement Refunding Bonds, Series 2004 A**
**$447,875,000 Public Improvement Refunding Bonds, Series 2004 B**
**(General Obligation Bonds)**

**Dated: Date of Delivery**                                                                                       **Due: July 1, as shown on the inside cover**

The Series 2004 A Bonds and Series 2004 B Bonds will be issued as registered bonds without coupons in denominations of $5,000 and $25,000, respectively, or any multiple thereof.

The Series 2004 A Bonds will bear interest at the rates shown on the inside cover until July 1, 2012 (the "Mandatory Tender Date"). The Series 2004 A Bonds are subject to mandatory tender, payable as to the principal portion solely from the remarketing of the Series 2004 A Bonds, on the Mandatory Tender Date at a price equal to the principal amount thereof plus accrued interest, if any, to such date. Holders of the Series 2004 A Bonds will have no right to retain the Series 2004 A Bonds after the Mandatory Tender Date. After the Mandatory Tender Date, the Commonwealth may from time to time change the method of determining the interest on the Series 2004 A Bonds, as provided in the Bond Resolution. See "Mandatory Tender for Purchase of Series 2004 A Bonds" under *The Bonds*.

The Series 2004 B Bonds will be issued initially as bonds that bear interest at ARS Rates (as defined herein), and may be converted at the option of the Commonwealth, subject to certain restrictions, to bonds that bear interest at different rates, including Daily Interest Rates, Weekly Interest Rates, Commercial Paper Rates, Fixed Interest Rates or Term Interest Rates. The Series 2004 B Bonds will bear interest from their date of delivery for the Initial Periods set forth on the inside front cover at the rates established by Lehman Brothers for Sub-Series 2004 B-1 through B-4 and by Goldman, Sachs & Co. for Sub-Series 2004 B-5 through B-8 and thereafter at the applicable ARS Rates determined for each of the Auction Periods set forth on the inside front cover pursuant to the Auction Procedures described herein. These Auction Periods may, at the option of the Commonwealth, be converted to daily, seven-day, twenty-eight day, thirty-five day, three month, six month or Special Auction Periods. Upon conversion from an ARS Rate Period to a Daily Rate Period, a Weekly Rate Period, a Commercial Paper Period, a Term Rate Period or a Fixed Rate Period, the Series 2004 B Bonds will be subject to mandatory tender, payable as to the principal portion solely from the remarketing of the Series 2004 B Bonds to be converted, on the conversion date at a price equal to the principal amount thereof plus accrued interest, if any, to such date. See "ARS Provisions of Series 2004 B Bonds" under *The Bonds* and "*Appendix II*-ARS Provisions."

The scheduled payment of principal of and interest on some of the Series 2004 A Bonds will be insured by Financial Guaranty Insurance Company, Financial Security Assurance Inc. and MBIA Insurance Corporation, as indicated on the inside cover of this Official Statement, and the scheduled payment of principal of and interest on all of the Series 2004 B Bonds will be insured by CDC IXIS Financial Guaranty North America, Inc., Financial Guaranty Insurance Company and Financial Security Assurance Inc., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters subject to the approval of legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain other conditions. Not all of the firms listed below will be acting as underwriters for the Series 2004 B Bonds. See *Underwriting* herein for information on the Underwriters purchasing the Series 2004 A Bonds and those purchasing the Series 2004 B Bonds. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that settlement for the Bonds will occur in New York, New York, on or about May 18, 2004.

| | | |
|---|---|---|
| GOLDMAN, SACHS & CO. | BANC OF AMERICA SECURITIES LLC | CITIGROUP |
| JP MORGAN | LEHMAN BROTHERS | MERRILL LYNCH & CO. |
| MORGAN STANLEY | | RAYMOND JAMES & ASSOCIATES, INC. |
| SAMUEL A. RAMÍREZ & CO., INC. | | UBS FINANCIAL SERVICES INC. |
| | WACHOVIA BANK, NATIONAL ASSOCIATION | |

April 30, 2004

# Commonwealth of Puerto Rico

## Governor

SILA M. CALDERÓN

## Members of the Cabinet

CÉSAR MIRANDA
*Chief of Staff*

| | | |
|---|---|---|
| JOSÉ M. IZQUIERDO<br>*Secretary of State* | ANABELLE RODRÍGUEZ<br>*Secretary of Justice* | JUAN A. FLORES GALARZA<br>*Secretary of the Treasury* |
| CÉSAR A. REY<br>*Secretary of Education* | FRANK ZORRILLA MALDONADO<br>*Secretary of Labor and Human Resources* | JOHNNY V. RULLÁN<br>*Secretary of Health* |
| LUIS RIVERO CUBANO<br>*Secretary of Agriculture* | FERNANDO E. FAGUNDO<br>*Secretary of Transportation and Public Works* | MILTON SEGARRA<br>*Secretary of Economic Development and Commerce* |
| YOLANDA ZAYAS SANTANA<br>*Secretary of Family Affairs* | ILEANA ECHEGOYEN<br>*Secretary of Housing* | LUIS E. RODRÍGUEZ<br>*Secretary of Natural and Environmental Resources* |
| FERNANDO TORRES RAMÍREZ<br>*Interim Secretary of Consumer Affairs* | JORGE L. ROSARIO<br>*Secretary of Sports and Recreation* | MIGUEL A. PEREIRA<br>*Secretary of Corrections and Rehabilitation* |

---

| *Legislative Officers* | *Fiscal Officers* |
|---|---|
| ANTONIO FAS ALZAMORA<br>President, Senate | MELBA ACOSTA<br>Director, Office of Management and Budget |
| CARLOS VIZCARRONDO<br>Speaker, House of Representatives | ANTONIO FARÍA<br>President, Government Development Bank for Puerto Rico |

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS AND THE COMMONWEALTH'S OUTSTANDING GENERAL OBLIGATION BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning CDC IXIS Financial Guaranty North America, Inc. ("CIFG NA"), Financial Guaranty Insurance Company ("FGIC"), Financial Security Assurance Inc. ("FSA") and MBIA Insurance Corporation ("MBIA") contained under the caption *Bond Insurance* and the insurance policy specimens appearing in *Appendices IV* through *VII* herein, none of the information in this Official Statement has been supplied or verified by CIFG NA, FGIC, FSA and MBIA, respectively, and CIFG NA, FGIC, FSA and MBIA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information, (ii) the validity of the Bonds, or (iii) the tax exempt status of the interest on the Bonds.

## TABLE OF CONTENTS

| | Page | | Page |
|---|---|---|---|
| INTRODUCTORY STATEMENT | 1 | PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 30 |
| OVERVIEW | 3 | Pro Forma Public Sector Debt | 30 |
| PLAN OF FINANCING | 4 | Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 31 |
| Sources and Uses of Funds | 5 | TAX EXEMPTION | 33 |
| Interest Rate Swap Agreements | 5 | Premium Bonds | 34 |
| THE BONDS | 6 | LEGAL MATTERS | 34 |
| Description of the Series 2004 A Bonds | 6 | LEGAL INVESTMENT | 34 |
| Description of the Series 2004 B Bonds | 6 | VERIFICATION OF MATHEMATICAL COMPUTATIONS | 34 |
| Book-Entry Only System | 7 | UNDERWRITING | 35 |
| Payments and Transfers | 9 | GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 35 |
| Discontinuance of the Book-Entry Only System | 9 | RATINGS | 36 |
| Mandatory Tender for Purchase of Series 2004 A Bonds | 9 | CONTINUING DISCLOSURE | 36 |
| ARS Provisions of Series 2004 B Bonds | 10 | MISCELLANEOUS | 39 |
| Redemption Provisions | 17 | Appendix I  Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated April 1, 2004 | I-1 |
| Notice of Redemption; Effect of Redemption | 18 | Appendix II  ARS Provisions | II-1 |
| Authorization | 19 | Appendix III  Form of Opinion of Bond Counsel | III-1 |
| Security | 19 | Appendix IV  Specimen of the CIFG NA Insurance Policy | IV-1 |
| Payment Record | 20 | Appendix V  Specimen of the FGIC Insurance Policy | V-1 |
| Debt Limitation | 20 | Appendix VI  Specimen of the FSA Insurance Policy | VI-1 |
| Maturity Limitation | 21 | Appendix VII  Specimen of the MBIA Insurance Policy | VII-1 |
| Interest Rate Swap Risk | 22 | | |
| BOND INSURANCE | 23 | | |
| The CIFG NA Bond Insurance Policy | 23 | | |
| The FGIC Bond Insurance Policy | 24 | | |
| The FSA Bond Insurance Policy | 27 | | |
| The MBIA Bond Insurance Policy | 28 | | |
| Concerning the Bond Insurers' Policies | 30 | | |

# $727,115,000
# Commonwealth of Puerto Rico
### $279,240,000 Public Improvement Refunding Bonds, Series 2004 A
### $447,875,000 Public Improvement Refunding Bonds, Series 2004 B
### (General Obligation Bonds)

## INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the appendices hereto and the report incorporated by reference below, provides certain information in connection with the sale of $279,240,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2004 A (the "Series 2004 A Bonds") and $447,875,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2004 B (the "Series 2004 B Bonds" and together with the Series 2004 A Bonds, the "Bonds").

The Bonds are being issued under the provisions of Act No. 2 of the Legislature of Puerto Rico, approved October 10, 1985, and Joint Resolution No. 57 of the Legislature of Puerto Rico, approved July 12, 1993 (collectively, the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted by the Secretary of the Treasury and approved by the Governor of Puerto Rico on April 30, 2004.

The Series 2004 A Bonds maturing on July 1, 2031, in the aggregate principal amount of $40,000,000 and bearing interest at a rate of 5.0% (the "MBIA Insured Bonds"), will be insured by a municipal bond insurance policy (the "MBIA Insurance Policy") issued by MBIA Insurance Corporation ("MBIA"). The Series 2004 A Bonds maturing on July 1, 2031, in the aggregate principal amount of $29,165,000 and bearing interest at a rate of 5.0% (the "FSA Series 2004 A Insured Bonds"), will be insured by a municipal bond insurance policy (the "FSA Series 2004 A Insurance Policy") issued by Financial Security Assurance Inc. ("FSA"). The Series 2004 A Bonds maturing on July 1, 2031, bearing interest at a rate of 4.0% (the "FGIC Series 2004 A Insured Bonds"), will be insured by a municipal bond insurance policy (the "FGIC Series 2004 A Insurance Policy") issued by Financial Guaranty Insurance Company ("FGIC").

The Sub-Series 2004 B-1 Bonds, the Sub-Series 2004 B-2 Bonds, the Sub-Series 2004 B-3 Bonds and the Sub-Series 2004 B-4 Bonds (the "FSA Series 2004 B Insured Bonds" and, together with the FSA Series 2004 A Insured Bonds, the "FSA Insured Bonds"), will be insured by a municipal bond insurance policy issued by FSA (the "FSA Series 2004 B Insurance Policy" and, together with the FSA Series 2004 A Insurance Policy, the "FSA Insurance Policy"). The Sub-Series 2004 B-5 Bonds and the Sub-Series 2004 B-6 Bonds (the "CIFG NA Insured Bonds"), will be insured by a municipal bond insurance policy (the "CIFG NA Insurance Policy") issued by CDC IXIS Financial Guaranty North America, Inc. ("CIFG NA"). The Sub-Series 2004 B-7 Bonds and the Sub-Series 2004 B-8 Bonds (the "FGIC Series 2004 B Insured Bonds" and, together with the FGIC Series 2004 A Insured Bonds, the "FGIC Insured Bonds" and, together with the FSA Insured Bonds, the MBIA Insured Bonds and the CIFG NA Insured Bonds, collectively, the "Insured Bonds"), will be insured by a municipal bond insurance policy issued by FGIC (the "FGIC Series 2004 B Insurance Policy" and, together with the FGIC Series 2004 A Insurance Policy, the "FGIC Insurance Policy" and, together with the CIFG NA Insurance Policy, the FSA Insurance Policy, and the MBIA Insurance Policy, collectively, the "Insurance Policies"). CIFG NA, FGIC, FSA and MBIA are each a "Bond Insurer" and, collectively, the "Bond Insurers."

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.

This Official Statement includes the cover page, the inside cover page, the Commonwealth of Puerto Rico Financial Information and Operating Data Report dated April 1, 2004 (the "Commonwealth Report") attached hereto as *Appendix I*, the description of the ARS Provisions attached hereto as *Appendix II* and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2002, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein. It is expected that the financial statements of the Commonwealth for fiscal year 2003 will be available during the second calendar quarter of 2004.

The Commonwealth Report attached hereto as *Appendix I* includes important information about the Commonwealth, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of the fiscal 2003 budget, the approved budget for fiscal year 2004, the proposed budget for fiscal year 2005, and the debt of the Commonwealth's public sector, and should be read in its entirety.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth for the fiscal year ended June 30, 2002, together with the independent auditor's report thereon, dated April 30, 2003, of KPMG LLP, certified public accountants. The Commonwealth's Annual Financial Report has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG LLP did not audit the financial statements of the Public Buildings Authority's capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with each NRMSIR and the Municipal Securities Rulemaking Board, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, New York

10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report may also be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## OVERVIEW

Puerto Rico is located approximately 1,600 miles southeast of New York City. According to the United States Census Bureau, its population was 3,808,610 in 2000. Puerto Rico's political status is that of a commonwealth. The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth government exercises virtually the same control over its internal affairs as is exercised by the state governments of each of the fifty states over their respective internal affairs, with similar separation of powers among the executive, legislative and judicial branches. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives, but no vote. Most federal taxes, except those such as Social Security taxes, which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2003 (which ended on June 30, 2003), the Commonwealth's gross product (preliminary, in current dollars) was $47.4 billion and personal income per capita (preliminary, in current dollars) was $11,279.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget and Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. The Office of Management and Budget prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*.

## PLAN OF FINANCING

The Bonds are being issued for the purpose of refunding the following general obligation bonds of the Commonwealth (the "Refunded Bonds"):

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date July 1, | Redemption Date July 1, | Redemption Price (% of Par) |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 1999 | $11,035,000*[1] | 5.000% | 07/01/2005 | — | — |
| Public Improvement Refunding Bonds, Series 1999 | 35,400,000[2] | 5.000 | 07/01/2005 | — | — |
| Public Improvement Bonds of 2001, Series B | 3,890,000 | 5.050 | 07/01/2020 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2001, Series B | 8,125,000 | 5.000 | 07/01/2021 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2001, Series B | 5,625,000 | 5.050 | 07/01/2021 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2001, Series B | 8,630,000 | 5.125 | 07/01/2023 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2001, Series B | 19,575,000 | 5.000 | 07/01/2023 | 07/01/2011 | 100 |
| Public Improvement Refunding Bonds, Series 2001 | 21,635,000 | 5.000 | 07/01/2024 | 07/01/2011 | 100 |
| Public Improvement Refunding Bonds, Series 2001 | 81,130,000 | 5.250 | 07/01/2027 | 07/01/2011 | 100 |
| Public Improvement Refunding Bonds, Series 2001 | 104,455,000 | 5.125 | 07/01/2030 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2002, Series A | 17,140,000 | 5.375 | 07/01/2028 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2002, Series A | 102,045,000 | 5.125 | 07/01/2031 | 07/01/2011 | 100 |
| Public Improvement Bonds of 2003, Series A | 13,000,000 | 4.800 | 07/01/2032 | 07/01/2012 | 100 |
| Public Improvement Bonds of 2003, Series A | 130,290,000 | 5.000 | 07/01/2032 | 07/01/2012 | 100 |
| Public Improvement Bonds of 2003, Series A | 112,270,000 | 5.000 | 07/01/2027 | 07/01/2012 | 100 |
| Public Improvement Bonds of 2004, Series A | 140,000 | 2.000 | 07/01/2004 | — | — |
| Public Improvement Bonds of 2004, Series A | 690,000 | 4.000 | 07/01/2006 | — | — |
| Public Improvement Bonds of 2004, Series A | 710,000 | 4.000 | 07/01/2007 | — | — |
| Public Improvement Bonds of 2004, Series A | 740,000 | 5.000 | 07/01/2008 | — | — |
| Public Improvement Bonds of 2004, Series A | 770,000 | 5.000 | 07/01/2009 | — | — |
| Public Improvement Bonds of 2004, Series A | 815,000 | 5.000 | 07/01/2010 | — | — |
| Public Improvement Bonds of 2004, Series A | 855,000 | 5.000 | 07/01/2011 | — | — |
| Public Improvement Bonds of 2004, Series A | 895,000 | 5.000 | 07/01/2012 | — | — |

* Expected amount. Principal amount refunded may be higher or lower depending upon the precise portfolio of Government Obligations (defined below) purchased with the proceeds of the Bonds and deposited into the Escrow Fund (also defined below). The Commonwealth expects to place a final purchase order for such Government Obligations shortly before the delivery of the Bonds. The portfolio of Government Obligations may be further adjusted upon the delivery of certain bonds to be issued by Public Buildings Authority as described in the second paragraph below this table and in *Tax Exemption* below.

[1] Originally issued in the principal amount of $62,730,000.
[2] Originally issued in the principal amount of $50,000,000.

The Secretary of the Treasury will deposit the net proceeds of the Bonds and certain other available moneys into an escrow fund (the "Escrow Fund") with Banco Popular de Puerto Rico (the "Escrow Agent"). The net proceeds of the Bonds and such other available moneys will be invested in noncallable direct obligations of the United States ("Government Obligations"), the principal of and interest on which, will be sufficient to pay the principal of and premium on the Refunded Bonds on the redemption date mentioned above, which redemption date will be irrevocably designated by the Secretary of the Treasury, and to pay the interest thereon to such redemption date.

Upon the deposit with the Escrow Agent referred to above (and in the case of the Public Improvement Refunding Bonds, Series 1999, identified in footnote * in the table above, after the delivery of certain bonds to be issued by the Public Buildings Authority on June 10, 2004, at which date, the precise principal amount of such Series 1999 Bonds to be refunded will be known), the Refunded Bonds will cease to be outstanding under the terms of their respective authorizing resolutions. Under the Act, once the above deposit of Government Obligations has been made, all the Refunded Bonds will be deemed not to be outstanding for the purpose of applying the debt limitation under Section 2 of Article VI of the Commonwealth's Constitution.

The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the Refunded Bonds referred to above, will be verified by Samuel Klein & Co., Certified Public Accountants (the "Verification Agent").

4

**Sources and Uses of Funds**

Sources:

| | |
|---|---:|
| Principal amount of the Bonds | $727,115,000.00 |
| Net original issue premium | 16,094,767.65 |
| Total sources | $743,209,767.65 |

Uses:

| | |
|---|---:|
| Deposit into the Escrow Fund for Refunded Bonds | $719,457,698.88[1] |
| Underwriting discount, bond insurance premium and legal, printing, and other financing expenses | 23,752,068.77 |
| Total uses | $743,209,767.65 |

---

[1] In addition, approximately $12.7 million currently on deposit in the Redemption Fund is expected to be deposited into the Escrow Fund upon delivery of the Bonds.

**Interest Rate Swap Agreements**

On April 13, 2004, in anticipation of the issuance of the Series 2004 B Bonds, Government Development Bank, on behalf of the Commonwealth, entered into interest rate exchange agreements (the "Interest Rate Agreements") with Goldman Sachs Mitsui Marine Derivative Products, L.P., which is an affiliate of Goldman, Sachs & Co. (an underwriter of the Bonds), rated "Aaa" and "AA+" by Moody's Investors Service ("Moody's) and Standard & Poor's, a division of The McGraw-Hill Companies ("S&P"), respectively, and with Lehman Brothers Special Financing, Inc. ("LBSF"), which is an affiliate of Lehman Brothers Inc. (an underwriter of the Bonds) (upon transfer of the Interest Rate Agreements to the Commonwealth, as described below, LBSF will be substituted as counterparty by Lehman Brothers Derivative Products, Inc., which is rated "Aaa" and "AAA" by Moody's and S&P, respectively) (collectively, the "Counterparties"). The purpose of the Interest Rate Agreements was to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith in relation to the Series 2004 B Bonds.

Pursuant to the terms of the Interest Rate Agreements, upon issuance of the Series 2004 B Bonds, Government Development Bank will, on the date of delivery of the Bonds, begin paying a fixed interest rate and begin receiving a variable interest rate equal to a predetermined percentage of LIBOR plus a spread (which variable interest rate is expected to correspond closely to the variable interest rate to be paid by the Commonwealth on the Series 2004 B Bonds), based on an aggregate notional amount initially equal to $447,875,000 and declining throughout the term of the Interest Rate Agreements in tandem with reductions in the outstanding principal amount of the Series 2004 B Bonds. In addition, upon enactment of proposed legislation that will expressly authorize the Commonwealth to enter into agreements of the nature of the Interest Rate Agreements and, among other things, to pledge the good faith, credit and taxing power of the Commonwealth to all payments to be made by it thereunder, Government Development Bank expects to transfer its obligations under the Interest Rate Agreements to the Commonwealth. The Interest Rate Agreements will terminate on the final maturity date of the Series 2004 B Bonds.

The obligation of Government Development Bank to make scheduled payments under the Interest Rate Agreements prior to their transfer to the Commonwealth, as well as certain payments due upon the termination of the Interest Rate Agreements prior to the stated termination date thereof and similarly prior to such transfer, will be an unsecured general obligation of Government Development Bank payable from any lawfully available funds.

5

## THE BONDS

**Description of the Series 2004 A Bonds**

This description of the Series 2004 A Bonds relates only to the terms and provisions which are applicable during the period from their date of delivery through July 1, 2012 (the "Mandatory Tender Date").

The Series 2004 A Bonds will be dated the date of their delivery and will bear interest from that date. The Series 2004 A Bonds will be initially issued in book-entry only form and will mature, subject to prior redemption, on the dates set forth on the inside cover of this Official Statement. The Series 2004 A Bonds will be issuable as fully registered bonds without coupons in denominations of $5,000 or any multiple thereof.

The Series 2004 A Bonds initially will bear interest at the rates set forth on the inside cover hereof during the period ending on the Mandatory Tender Date. During that period, interest will be payable semiannually on each January 1 and July 1, commencing July 1, 2004, and will be computed on the basis of a 360-day year of twelve 30-day months.

The Series 2004 A Bonds are subject to mandatory tender, payable solely from the remarketing of the Series 2004 A Bonds, on the Mandatory Tender Date at a price equal to 100% of the principal amount thereof plus accrued interest, if any, to such Date. Holders of the Series 2004 A Bonds will have no right to retain the Series 2004 A Bonds after such Mandatory Tender Date. Prior to the Mandatory Tender Date, the Series 2004 A Bonds may not be tendered and may not be converted to bear interest at any rate other than the rates set forth on the inside cover hereof, as provided in the Bond Resolution. See "Mandatory Tender for Purchase of Series 2004 A Bonds," below.

**Description of the Series 2004 B Bonds**

The Series 2004 B Bonds will be issued initially as bonds that bear interest at ARS Rates (as defined below in "ARS Provisions of Series 2004 B Bonds") but may be converted at the option of the Commonwealth, subject to certain restrictions, to bonds that bear interest at different rates including Daily Interest Rates, Weekly Interest Rates, Commercial Paper Rates, Term Interest Rates, or Fixed Interest Rates. The Series 2004 B Bonds will be dated the date of their delivery, and will bear interest from that date for the applicable Initial Period set forth on the inside front cover of this Official Statement at the rates established by Lehman Brothers for the Sub-Series 2004 B-1 Bonds through the Sub-Series 2004 B-4 Bonds and by Goldman, Sachs & Co. for the Sub-Series 2004 B-5 Bonds through the Sub-Series 2004 B-8 Bonds and thereafter at the ARS Rate determined pursuant to the Auction Procedures (as hereinafter defined). Following the Initial Period, the Series 2004 B Bonds will initially bear interest for the Auction Periods set forth on the inside front cover of the Official Statement but can be converted to a daily, seven-day, 28-day, 35-day, three-month, six-month or a Special Auction Periods. A Special Auction Period is any period of 182 days or less which is divisible by seven and which is not another Auction Period or any period of more than 182 days which ends not later than the final maturity of the Series 2004 B Bonds. Upon conversion from an ARS Rate Period to a Daily Rate Period, a Weekly Rate Period, a Commercial Paper Rate Period, a Term Rate Period or a Fixed Rate Period, the Series 2004 B Bonds will be subject to mandatory tender, payable as to the principal portion solely from the proceeds of the remarketing of the Series 2004 B Bonds to be converted, on the conversion date at a price equal to 100% of the principal amount thereof plus accrued interest, if any, to such date. Interest on the Series 2004 B Bonds in a daily, seven-day, 28-day, 35-day, a three-month or a Special Auction Period of 180 days or less will be computed on the basis of a 360-day year for the actual number of days elapsed. Interest on the Series

6

2004 B Bonds in a six-month Auction Period or a Special Auction Period of more than 180 days will be computed on the basis of a 360-day year of twelve 30-day months. See "ARS Provisions of Series 2004 B Bonds" below and "*Appendix II*-ARS Provisions."

The Series 2004 B Bonds will be dated the date of their delivery and will bear interest from that date. The Series 2004 B Bonds will be initially issued in book-entry only form and will mature, subject to prior redemption, on the dates set forth on the inside front cover of this Official Statement. The Series 2004 B Bonds will be issuable as fully registered bonds without coupons in denominations of $25,000 or any multiple thereof. The final maturity for the Series 2004 B Bonds is 2032.

**Book-Entry Only System**

The following information concerning The Depository Trust Company ("DTC") and DTC's book entry system has been obtained from DTC and neither the Commonwealth nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered Bond will be issued for each maturity of each of the Series 2004 A Bonds and the Series 2004 B Bonds, each in the aggregate principal amount of such maturity, and will be deposited with or for the benefit of DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Bonds Clearing Corporation, Government Bonds Clearing Corporation, NBS Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, GSCC, MBSCC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: "AAA." The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of a Bond ("Beneficial Owner") will in turn be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive any confirmation from DTC of their purchases. Beneficial Owners are, however, expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the

Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee does not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bond documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on such record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, its nominee, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

    DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds will be printed and delivered.

    The Commonwealth may decide to discontinue use of the system of book-entry transfers through DTC (or a successor depository). In that event, definitive Bonds will be printed and delivered.

**Payments and Transfers**

    No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

    For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

    In the event that the book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the principal office of Banco Popular de Puerto Rico, acting as Registrar (the "Registrar"), in San Juan, Puerto Rico. Interest on the Bonds will be payable by check mailed to the respective addresses of the registered owners determined as of the record date thereof provided in the Bond Resolution as shown on the registration books of the Commonwealth maintained by the Registrar. The Series 2004 A Bonds will be issued only as registered Bonds without coupons in denominations of $5,000 or any multiple thereof. The Series 2004 B Bonds will be issued only as registered Bonds without coupons in denominations of $25,000 or any multiple thereof. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust office of the Registrar in San Juan, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Mandatory Tender for Purchase of Series 2004 A Bonds**

    The Series 2004 A Bonds are subject to mandatory tender for purchase, payable as to their principal portion solely from the remarketing thereof, at a purchase price equal to the principal amount of such bonds (the "Tender Purchase Price") on the Mandatory Tender Date, with no right of the owners of such bonds to retain them. On the Mandatory Tender Date, the Series 2004 A Bonds must be tendered for purchase by the holders thereof to the Registrar. Goldman, Sachs & Co. (the "Remarketing Agent") will act as remarketing agent of the Series 2004 A Bonds pursuant to a remarketing agreement with the Commonwealth acting through the Secretary of the Treasury.

    Prior to the Mandatory Tender Date, the Secretary of the Treasury will determine the initial interest rate mode or modes that will be applicable to such bonds from and after the Mandatory Tender Date. The interest rate or rates to be borne by such bonds immediately after the Mandatory Tender Date will be determined by the Remarketing Agent and will be equal to the lowest rate or rates that, in the opinion of the Remarketing Agent, will permit the remarketing of such bonds at par. The interest rate or rates to be determined by the Remarketing Agent may be a fixed or variable rate, and the Series 2004 A Bonds may be subject to subsequent remarketings. If the Secretary of the Treasury determines that the