# **Exhibit 18**

*NEW ISSUES—FULL-BOOK-ENTRY*
*See "Book-Entry Only System" under The Bonds*

In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. However, see Tax Exemption for a description of the alternative minimum tax on corporations and certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

# $587,730,000
# COMMONWEALTH OF PUERTO RICO
### $475,000,000 Public Improvement Bonds of 1999
### $112,730,000 Public Improvement Refunding Bonds, Series 1999
### (General Obligation Bonds)

*Dated: December 1, 1998*                                                                 *Due: July 1, as shown below*

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 or any multiple thereof. Interest on the Bonds will be payable July 1, 1999 (representing seven months' interest) and each January 1 and July 1 thereafter. Certain of the Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2008. See The Bonds.

The Bonds are general obligations of the Commonwealth of Puerto Rico. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.

### $475,000,000 Public Improvement Bonds of 1999

| Amount | Maturity July 1, | Interest Rate | Price or Yield | Amount | Maturity July 1, | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| $4,050,000 | 1999 | 5.00% | 3.10% | $11,555,000 | 2009 | 5.25% | 4.40% |
| 7,715,000 | 2000 | 5.00 | 3.55 | 12,165,000 | 2010 | 5.25 | 4.47 |
| 8,100,000 | 2001 | 5.00 | 3.73 | 12,800,000 | 2011 | 5.25 | 4.53 |
| 8,505,000 | 2002 | 5.00 | 3.85 | 13,475,000 | 2012 | 5.25 | 4.59 |
| 8,930,000* | 2003 | 3.55 | 100 | 14,180,000 | 2013 | 5.25 | 4.65 |
| 9,250,000* | 2004 | 3.65 | 100 | 14,925,000 | 2014 | 5.25 | 4.71 |
| 9,585,000 | 2005 | 4.15 | 100 | 15,710,000 | 2015 | 5.25 | 4.76 |
| 9,985,000 | 2006 | 5.00 | 4.22 | 16,535,000 | 2016 | 5.25 | 4.80 |
| 10,485,000 | 2007 | 5.00 | 4.27 | 17,400,000 | 2017 | 5.25 | 4.83 |
| 11,005,000 | 2008 | 5.00 | 4.33 | 18,315,000 | 2018 | 5.25 | 4.85 |

$105,995,000 4.75% Term Bonds due July 1, 2023 — Yield 5.04%,
$134,335,000 5.00% Term Bonds due July 1, 2028 — Yield 5.11%
(plus accrued interest)

### $112,730,000 Public Improvement Refunding Bonds Series 1999

| Amount | Maturity July 1, | Interest Rate | Yield |
|---|---|---|---|
| $62,730,000 | 2005 | 5.00% | 4.15% |
| 50,000,000† | 2005 | 5.00 | 3.95 |

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters subject to the approval of legality by Brown & Wood LLP, New York, New York, Bond Counsel and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez, San Juan, Puerto Rico. It is expected that settlement for the Bonds will occur in New York, New York, on or about December 17, 1998.

| | | |
|---|---|---|
| **MORGAN STANLEY DEAN WITTER** | **BEAR, STEARNS & CO. INC.** | **GOLDMAN, SACHS & CO.** |
| **MERRILL LYNCH & CO.** | | **PAINEWEBBER INCORPORATED** |
| **RAYMOND JAMES & ASSOCIATES INC.** | **JP MORGAN & CO.** | **PRUDENTIAL SECURITIES INCORPORATED** |
| **SAMUEL A. RAMIREZ & CO., INC.** | | **SALOMON SMITH BARNEY** |

*December 3, 1998*

---

\* *Insured by Ambac Assurance Corporation.*
† *Insured by MBIA Insurance Corporation.*

# Commonwealth of Puerto Rico

### Governor

PEDRO ROSSELLÓ

### Members of the Cabinet

ANGEL MOREY
*Chief of Staff*

| | | |
|---|---|---|
| NORMA E. BURGOS ANDÚJAR<br>*Secretary of State* | JOSÉ A. FUENTES AGOSTINI<br>*Secretary of Justice* | XENIA VÉLEZ SILVA<br>*Secretary of the Treasury* |
| VÍCTOR FAJARDO<br>*Secretary of Education* | AURA GONZÁLEZ<br>*Secretary of Labor and Human Resources* | CARMEN FELICIANO DE MELECIO<br>*Secretary of Health* |
| MIGUEL A. MUÑOZ MUÑOZ<br>*Secretary of Agriculture* | CARLOS I. PESQUERA MORALES<br>*Secretary of Transportation and Public Works* | CARLOS J. VIVONI<br>*Secretary of Economic Development and Commerce* |
| ANGIE VARELA<br>*Secretary of Family Affairs* | ANA CARMEN ALEMAÑY<br>*Secretary of Housing* | DANIEL PAGÁN ROSA<br>*Secretary of Natural and Environmental Resources* |
| JOSÉ A. ALICEA<br>*Secretary of Consumer Affairs* | ERIC R. LABRADOR ROSA<br>*Secretary of Sports and Recreation* | ZOÉ LABOY ALVARADO<br>*Secretary of Corrections and Rehabilitation* |

PEDRO TOLEDO
*Commissioner of Protection and Public Safety*

---

*Legislative Officers*

CHARLIE RODRÍGUEZ
President, Senate

EDISON MISLA ALDARONDO
Speaker, House of Representatives

*Fiscal Officers*

JORGE E. APONTE HERNÁNDEZ
Director, Office of Management and Budget

LOURDES M. ROVIRA
President, Government Development Bank for Puerto Rico

---

*Others*

JOSÉ R. CABALLERO MERCADO
*President, Planning Board*

ALCIDES ORTIZ
*Director, Federal Affairs Office*

# $587,730,000

# Commonwealth of Puerto Rico

### $475,000,000 Public Improvement Bonds of 1999

### $112,730,000 Public Improvement Refunding Bonds, Series 1999

### (General Obligation Bonds)

## INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page and the appendices, provides certain information in connection with the sale of $475,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 1999 (the "Public Improvement Bonds"), and $112,730,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 1999 (the "Refunding Bonds", and together with the Public Improvement Bonds, the "Bonds"). The Public Improvement Bonds maturing July 1 of the years 2003 and 2004 (the "Ambac Insured Bonds") will be insured by a municipal bond insurance policy (the "Ambac Bond Insurance Policy") issued by Ambac Assurance Corporation ("Ambac"). The Refunding Bonds maturing July 1, 2005 in the principal amount of $50,000,000 (the "MBIA Insured Bonds", and collectively with the Ambac Insured Bonds, the "Insured Bonds") will be insured by a financial guaranty insurance policy (the "MBIA Bond Insurance Policy") issued by MBIA Insurance Corporation ("MBIA Insurance").

The Public Improvement Bonds are being issued under the provisions of Act No. 219 of the Legislature of Puerto Rico, approved August 9, 1998 ("Act No. 219"), and pursuant to a resolution authorizing the issuance of the Public Improvement Bonds (the "Public Improvement Bond Resolution") adopted by the Secretary of the Treasury and approved by the Governor of Puerto Rico on December 3, 1998. The Refunding Bonds are being issued under the provisions of Act No. 2 of the Legislature of Puerto Rico, approved October 10, 1985, and Joint Resolution No. 57 of the Legislature of Puerto Rico, approved July 12, 1993 (collectively, "Act No. 2", and together with Act No. 219, the "Act") and pursuant to a resolution authorizing the issuance of the Refunding Bonds (the "Refunding Bond Resolution", and together with the Public Improvement Bond Resolution, the "Bond Resolution") adopted by the Secretary of the Treasury and approved by the Governor of Puerto Rico on December 3, 1998.

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim on available Commonwealth revenues.

This Official Statement includes the cover page, the Appendices and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 1997 prepared by the Department of the Treasury (the "Commonwealth's Annual Financial Report"), which includes the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 1997, together with the independent auditor's report thereon, dated December 15, 1997, of Deloitte & Touche LLP, certified public accountants and which is incorporated herein by reference. The Commonwealth's Annual Financial Report has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR") and with the Municipal Securities Rulemaking Board (the "MSRB") as *Appendix II* to the Official Statement of the Commonwealth, dated January 15, 1998, relating to the sale of $503,963,264.10 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 1998 (General Obligation Bonds). Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth filed with each NRMSIR and the MSRB or any other document containing the Commonwealth's Annual Financial Report filed with each NRMSIR after the date

1

hereof and prior to the termination of the offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, N.Y. 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, PR 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The Commonwealth expects that its Comprehensive Annual Financial Report for the fiscal year ended June 30, 1998, including its audited general purpose financial statements for such fiscal year, will be available to investors during December 1998. Promptly after its release, said report and financial statements will be filed with and available from each NRMSIR.

## OVERVIEW

The following is a summary of certain information regarding the Commonwealth contained in the Commonwealth of Puerto Rico Financial Information and Operating Data Report dated September 30, 1998 (the "Commonwealth Report"), attached hereto as Appendix I. This summary does not purport to be complete and is qualified in its entirety by reference to more detailed information appearing in the Commonwealth Report, which should be read in its entirety.

Puerto Rico is located approximately 1,600 miles southeast of New York City. Its population was estimated to be 3,770,000 in fiscal 1997. Puerto Rico's constitutional status is that of an unincorporated territory of the United States and the ultimate source of power over Puerto Rico, pursuant to the territorial clause of the Federal Constitution, is the United States Congress. The United States and Puerto Rico share a common defense, market, currency and citizenship. The Government of Puerto Rico exercises virtually the same control over its internal affairs as do the fifty states, with similar separation of powers among the executive, legislative and judicial branches. The official languages of Puerto Rico are Spanish and English.

**Economic Trends**

Puerto Rico has enjoyed fifteen years of uninterrupted economic expansion. Almost every sector of the economy has participated in this expansion and record levels of employment have been achieved. Factors contributing to this expansion include government-sponsored economic development programs, periodic declines in the exchange value of the United States dollar, increases in the level of federal transfers, the relatively low cost of borrowing, and low oil prices.

Gross product in fiscal 1993 was $25.1 billion ($24.5 billion in 1992 prices) and in fiscal 1997 was $32.1 billion ($27.7 billion in 1992 prices). This represents an increase in gross product of 27.7% from fiscal 1993 to 1997 (13.0% in 1992 prices). Since fiscal 1985, personal income, both aggregate and per capita, has increased consistently each fiscal year. In fiscal 1997, aggregate personal income was $32.1 billion ($30.0 billion in 1992 prices) and personal income per capita was $8,509 ($7,957 in 1992 prices). The difference in the statistics of 1992 prices for gross product and personal income is attributable to the difference in the price deflators used for each.

Average employment increased from 999,000 in fiscal 1993, to 1,137,400 in fiscal 1998. Average unemployment decreased from 16.8% in fiscal 1993, to 13.6% in fiscal 1998. According to the Labor Department's Household Employment Survey, during fiscal 1998, total employment increased 0.8% over fiscal 1997. The seasonally adjusted unemployment rate for October 1998 was 14.3%.

The Planning Board's gross product forecast for fiscal 1998, made in February 1997, projected an increase of 3.0% over fiscal 1997. Its gross product forecast for fiscal 1999 made in February 1998, projected an increase of 2.7% over fiscal 1998. The performance of the economy during fiscal 1999 will be affected by the performance of the United States economy and the impact of Hurricane Georges, as discussed below.



* DRI Forecast

Puerto Rico has a diversified economy with the manufacturing and services sectors comprising the principal sectors. Manufacturing is the largest sector in terms of gross domestic product. According to the Planning Board's estimates, in fiscal 1997 manufacturing generated $19.8 billion, or 41.2%, of gross domestic product and accounted for 14.4% of total employment; as compared with fiscal 1996, when it generated $19.0 billion, or 42.0%, of gross domestic product and accounted for 14.4% of total employment. See "Economic Performance by Sector" under *The Economy* in the Commonwealth Report. Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last two decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the heavy investment in the pharmaceutical, scientific instruments, computer, microprocessor, medical product and electrical product industries over the last decade. One of the factors assisting the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Internal Revenue Code Section 936, phased out the federal tax incentives during a ten-year period. See "Tax Incentives—Sections 30A and 936 of the Code" under *The Economy* in the Commonwealth Report.

The services sector, which includes hotel and related services and currently accounts for approximately 50.4% of total employment, generated $18.4 billion, or 38.2%, of Puerto Rico's gross domestic product in fiscal 1997, as compared with $17.5 billion, or 38.3%, of gross domestic product in fiscal 1996.

3

Growth in construction and tourism also contributed to increased economic activity in fiscal 1997. The growth in the construction industry was evidenced by a nominal increase of 14.7% in construction investment for fiscal 1997 over fiscal 1996. Tourism has grown in each fiscal year since fiscal 1985. More than 4.3 million visitors spent $2.0 billion in Puerto Rico in fiscal 1997. San Juan has become the largest home port for cruise ships in the Caribbean and the second largest home port for cruise ships in the world. Twenty-four U.S. and international airlines offer scheduled service to and from San Juan, and a major U.S. airline uses San Juan as a hub for its intra-Caribbean operations. This reflects the importance of Puerto Rico as a tourist destination and as a transportation hub in the Caribbean.

**Recent Developments — Hurricane Georges**

On September 21, 1998, Puerto Rico suffered the direct impact of Hurricane Georges. The hurricane caused extensive damage throughout the island, with the most serious damage occurring in the central mountain region. The island was declared an emergency zone by President Clinton, thus making it eligible for emergency assistance from the Federal Emergency Management Agency ("FEMA"). Most losses to government and private property are expected to be covered by private insurance, FEMA emergency aid and local government assistance programs.

The day after the hurricane struck, most of the island was without water, 100% of the Electric Power Authority's customers did not have electricity and some areas were without local telephone service. The Government has been able to restore these utility services at a faster pace than had been experienced during prior hurricane recovery programs. To date, water service has been restored to more than 94% of the Aqueduct and Sewer Authority customers, electrical power has been restored to more than 98% of the Electric Power Authority customers and total telephone service has been restored to more than 97% of the Puerto Rico Telephone Company customers.

Due to the loss of electrical power, almost all businesses on the island were closed for a few days immediately after the hurricane. Business establishments have reopened at a rapid pace. Currently, 90% of the wholesalers and retailers, and 95% of manufacturers are operational. Of the total hotel room inventory on the island, 83% are now available for occupancy. Some hotels suffered extensive damage and remain closed to complete repairs before the beginning of the winter tourist season.

It is expected that the hurricane will have a moderate short term negative impact on the economy. Unemployment figures may increase during the second quarter of fiscal year 1999 while the economy recovers from the effects of the hurricane. The receipt of FEMA funds and private insurance proceeds and the corresponding increase in capital investment resulting from restoration activities is expected to counteract the negative impact of the temporary slowdown in production activity. It is expected that the island will receive more than $3 billion from FEMA assistance and private insurance proceeds. This infusion is expected to generate increased economic activity similar to what the island experienced in the months after Hurricane Hugo and Hurricane Hortense in 1989 and 1996, respectively.

**Fiscal Management**

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget and Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. The Office of Management and Budget prepares the Commonwealth's budget and has the responsibility for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Section 7 of Article VI of the Constitution of Puerto Rico provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

Since fiscal 1990, the complete financial statements of the Commonwealth have been audited. The financial statements of the Commonwealth for fiscal 1997 were audited by Deloitte & Touche LLP, whose report thereon is dated December 15, 1997. For a summary of the Commonwealth's significant accounting policies, see Note 1 to the Commonwealth's general purpose financial statements included in the Commonwealth's Annual Financial Report. Preparation of the audited financial statements of the Commonwealth involves the collection and combination of audited financial statements from 48 separate reporting entities. The Commonwealth expects to release its audited financial statements for fiscal 1998 during December 1998 after the expected delivery of the Bonds. Copies of such statements together with the report thereon of Deloitte & Touche LLP will be filed with and available from each NRMSIR promptly upon their release. The address of each NRMSIR is set forth in *Continuing Disclosure* below.

**Debt Management**

The Constitution of Puerto Rico limits the amount of general obligation debt that can be issued. The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation. See "Debt Limitation" under *The Bonds*.

Historically, the Commonwealth has maintained a fiscal policy which provides for a prudent relationship between the growth of public sector debt and the growth of the economic base required to service that debt. In the last three fiscal years, however, public sector debt has increased at a rate greater than the growth of gross product due to an increase in the amount of debt incurred to finance certain key infrastructure projects, which are important to the development of the economy and are expected to produce long term economic benefits, and debt incurred to refinance outstanding debt to enable Puerto Rico to benefit from the historically low levels of interest rates and to realize debt service savings. From fiscal 1994 to 1997, public sector debt increased 26.9% while gross product increased 20.5%. This trend of higher levels of public sector debt relative to the growth in gross product is expected to continue during the next few fiscal years as the level of public sector capital investment remains high. See "Trends of Public Sector Debt" under *Debt* and "Economic Performance by Sector - Construction" under *The Economy* in the Commonwealth Report.

As of September 30, 1998, outstanding short-term debt, relative to total debt, was 6.6%.

## PLAN OF FINANCING

**The Public Improvement Bonds**

The net proceeds of the Public Improvement Bonds will be deposited in (i) the 1999 Public Improvements Fund established under Act No. 219 to carry out the capital improvement programs authorized by the Legislature, including but not limited to highways and transportation facilities, aqueduct and sewer facilities, schools, health and social welfare facilities, agricultural facilities, park and other recreation facilities, flood control and solid waste facilities, housing, and other governmental purposes, and (ii) the Extraordinary Maintenance Fund established under Act No. 66 of the Legislature of Puerto Rico, approved August 14, 1991, to carry out the dredging and maintenance of Lake Carraizo, in the amounts specified below.

**The Refunding Bonds**

The Refunding Bonds will be issued under the provisions of Act No. 2 for the purpose of refunding the following Commonwealth of Puerto Rico Public Improvement Bonds and Public Improvement Refunding Bonds (collectively, the "Refunded Bonds"), such Refunded Bonds being redeemed or paid on the dates, and at the prices, set forth below:

5

| Refunded Bonds | Amount to be Refunded | Interest Rate | Maturity Date July 1, | Redemption Date | Redemption Price (% of Par) |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 1987 | $112,730,000 | 5.00% | 2005 | January 21, 1999 | 100% |
| Public Improvement Bonds of 1993 | 2,485,000* | 5.00 | 1999 | --- | --- |
| Public Improvement Bonds of 1994 | 5,150,000 | 5.30 | 1999 | --- | --- |
| Total | $120,365,000 | | | | |

*$5,795,000 principal amount currently outstanding.

The refunding will permit the Commonwealth to realize savings on the aggregate debt service requirements on its general obligation bonds. The Secretary of the Treasury will deposit the net proceeds of the Refunding Bonds and certain other available moneys with State Street Bank and Trust Company, N.A., as Escrow Agent. A portion of the net proceeds and such other available moneys will be invested in noncallable direct obligations of the United States, the principal of and interest on which, with any remaining net proceeds not so invested, will be sufficient to pay the principal of the Refunded Bonds on the respective redemption or maturity dates set forth above, and to pay interest accrued thereon to such dates. None of such dates will be changed by the Secretary of the Treasury. The mathematical computation of the sufficiency of the amount so deposited, with the investment earnings thereon, to accomplish the refunding of the Refunded Bonds will be verified by Deloitte & Touche LLP, the verification agent. See *Verification of Mathematical Computations*. Upon the deposit with the Escrow Agent referred to above, the Refunded Bonds will cease to be outstanding under the terms of their respective authorizing resolutions. Under Act No. 2, once the above deposit of cash and noncallable direct obligations of the United States has been made, all the Refunded Bonds will be deemed not to be outstanding for the purpose of applying the debt limitation under Section 2 of Article VI of the Commonwealth's Constitution.

**Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $587,730,000.00 |
| Accrued Interest | 1,295,703.55 |
| Net original issue premium | 10,621,111.05 |
| Other available moneys | 5,695,291.60 |
| Total sources | $605,342,106.20 |

Uses:

| | |
|---|---|
| Payment into the 1999 Public Improvements Fund | $451,437,247.26 |
| Payment into the Extraordinary Maintenance Fund | 23,750,000.00 |
| Deposit to Escrow Fund | 123,229,398.29 |
| Deposit to Redemption Fund (as described below) | 1,295,703.55 |
| Underwriting discount, bond insurance premiums and legal, printing, and other financing expenses | 5,629,757.10 |
| Total uses | $605,342,106.20 |

# THE BONDS

## General

The Bonds will be dated, will bear interest at such rates, payable at such times, and will mature on the dates and in the principal amounts set forth on the cover page of this Official Statement. The Refunding Bonds are not subject to redemption prior to maturity. The Public Improvement Bonds are subject to redemption at the times and at the prices set forth below in "Redemption."

## Book-Entry Only System

The following information concerning The Depository Trust Company ("DTC"), New York, New York and DTC's book-entry system has been obtained from DTC. Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered Bonds registered in the name of Cede & Co. (DTC's partnership nominee). One fully registered Bond will be issued for each maturity of the Public Improvement Bonds, each in the aggregate principal amount of such maturity, and two fully registered Refunding Bonds (one representing the MBIA Insured Bonds and one representing the remaining Refunding Bonds), will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants (the "Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations (the "Direct Participants"). DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of a Bond (a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Bonds except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers all Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Bonds to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Commonwealth, or Banco Popular de Puerto Rico as paying agent and registrar (the "Registrar"), subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to DTC is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, definitive Bonds will also be printed and delivered.

DTC management is aware that some computer systems for processing data ("Systems") that are dependent upon calendar dates, including dates before, on, and after January 1, 2000, may encounter "Year 2000 problems". DTC has informed its Participants and other members of the financial community (the "Industry") that it has developed and is implementing a program so that its Systems, as the same relate to the timely payment of distributions (including principal and interest payments) to securityholders, book-entry deliveries, and settlement of trades within DTC ("DTC Services"), continue to function appropriately. This program includes a technical assessment and a remediation plan, each of which is complete. Additionally, DTC's program includes a testing phase, which is expected to be completed within appropriate time frames.

However, DTC's ability to perform its services properly is also dependent upon other parties, including but not limited to issuers and their agents, as well as Direct Participants, Indirect Participants and third party vendors from whom DTC licenses software and hardware, and third party vendors on whom DTC relies for information or the provision of services, including telecommunication and electrical utility service providers, among others. DTC has informed the Industry that it is contacting (and will continue to contact) third party vendors from whom DTC acquires services to: (i) impress upon them the importance of such services being Year 2000 compliant; and (ii) determine the extent of their efforts for Year 2000 remediation (and, as appropriate, testing) of their services. In addition, DTC is in the process of developing such contingency plans as it deems appropriate.

According to DTC, the foregoing information with respect to DTC has been provided to the Industry for informational purposes only and is not intended to serve as a representation, warranty, or contract modification of any kind.

**Payments and Transfers**

No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the principal office of the Registrar in San Juan, Puerto Rico. Interest on the Bonds will be payable by check mailed to the respective addresses of the registered owners determined as of the applicable record date thereof provided in the Bond Resolution as shown on the registration books of the Commonwealth maintained by the Registrar. The Bonds will be issued only as registered Bonds without coupons in denominations of $5,000 or any multiple thereof. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust office of the Registrar in San Juan, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislature. Pursuant to this power, the Legislature enacted the Act, which authorizes the issuance of the Bonds.

**Redemption**

The Refunding Bonds are not subject to redemption.

*Optional Redemption of Public Improvement Bonds.* At the option of the Secretary of the Treasury and upon at least 30 days' notice, the Public Improvement Bonds maturing on July 1, 2023 and July 1, 2028 are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, on or after July 1, 2008, either in whole or in part, on any date, as directed by the Secretary of the Treasury, at the redemption prices (expressed as a percentage of principal amount) set forth in the table below, together with accrued interest to the date fixed for redemption:

| Period During Which Redeemed | Redemption Price |
|---|---|
| July 1, 2008 through June 30, 2009 | 101 % |
| July 1, 2009 through June 30, 2010 | 100½ |
| July 1, 2010 and thereafter | 100 |

The Public Improvement Bonds maturing prior to July 1, 2023 are not subject to redemption prior to maturity.

*Mandatory Redemption.* The term Public Improvement Bonds maturing July 1, 2023 and July 1, 2028 are also subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon at least 30 days' notice, on July 1, 2019 and on July 1, 2024, respectively, and on July 1 in each year thereafter at a redemption price of par plus accrued interest to the dates fixed for redemption:

9

| July 1 | Amortization Requirements for Term Bonds due July 1 | |
|---|---|---|
| | **2023** | **2028** |
| 2019 | $19,280,000 | |
| 2020 | 20,195,000 | |
| 2021 | 21,155,000 | |
| 2022 | 22,155,000 | |
| 2023 | 23,210,000* | |
| 2024 | | $24,310,000 |
| 2025 | | 25,525,000 |
| 2026 | | 26,805,000 |
| 2027 | | 28,145,000 |
| 2028 | | 29,550,000* |
| **Average life (years)** | 22.6 | 27.6 |

*Maturity.

If the amount of the term Public Improvement Bonds purchased or redeemed pursuant to an amortization requirement during any fiscal year exceeds the amount of the amortization requirement for such Bonds for such fiscal year, the amortization requirement for such Public Improvement Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice and Effect of Redemption of Public Improvement Bonds**

Any redemption of the Public Improvement Bonds, either in whole or in part, shall be made upon at least thirty (30) days' prior notice by mail to DTC or, if the book-entry only system as described above has been discontinued, by first class mail, postage prepaid, to all registered owners in the manner and under the terms and conditions provided in the Public Improvement Bond Resolution. On the date designated for redemption, notice having been given as provided in the Public Improvement Bond Resolution and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Public Improvement Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Public Improvement Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the Public Improvement Bond Resolution, Public Improvement Bonds and portions of Public Improvement Bonds which have been duly called for redemption under the provisions of the Public Improvement Bond Resolution, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Public Improvement Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Public Improvement Bond Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

Each notice of redemption shall contain, among other things, the CUSIP identification number of the Public Improvement Bonds (or portion thereof) being called for redemption, the redemption date and price and the address at which such Public Improvement Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Public Improvement Bond will not affect the validity of the proceedings for the redemption of any other Public Improvement Bond.

10

If less than all the Public Improvement Bonds of any maturity are called for redemption, the particular Public Improvement Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Public Improvement Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

## Security

### *Provision for Payment of Public Debt*

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose with the Department of the Treasury in the fiscal year in which such payment is due. The provisions contained in the Act regarding the payment of the principal of and interest on the Bonds are considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. Such payments are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth revenues. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highway and Transportation Authority (the "Highway Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never applied such amounts to the payment of its public debt.

Since fiscal 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never applied such amounts to the payment of its public debt.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of the Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

### *Special Fund for General Obligation Debt Service*

Act No. 83, approved August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Special Fund for the Amortization and Redemption of General Obligations Evidenced by Bonds and Promissory Notes (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.