# **Exhibit 27**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

LEX CLAIMS, LLC, et al.,

            Plaintiffs,

      v.

ALEJANDRO GARCÍA PADILLA, et al.,

            Defendants.

Case No. 3:16-cv-02374 (FAB)

## COFINA SENIOR BONDHOLDERS' MOTION AND INCORPORATED MEMORANDUM OF LAW FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(c)

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................5

    A.   COFINA Is Created and Receives Ownership of the Dedicated Sales Tax 5

    B.   The Commonwealth Issues General Obligation Bonds, Which Do Not Have a Cognizable Interest in Commonwealth Property and Thus Receive Higher Yields ................................................................................8

    C.   Plaintiffs Respond to the Executive Order's Moratorium on Their Payments By Seeking to Divert Funds from COFINA Bondholders ........12

ARGUMENT ........................................................................................................13

I.    PLAINTIFFS CANNOT STATE A CLAIM UNDER PROMESA.....................14

II.   PLAINTIFFS' CLAIMS ARE BARRED BY LACHES AND ESTOPPEL ........18

    A.   The Claims of the 2014 GO Bondholders Are Barred Under New York Law ................................................................................19

    B.   The Claims of Remaining Plaintiffs Are Barred Under Puerto Rico Law 24

III.  AT A MINIMUM, THE CLAIMS BY THE 2014 GO BONDHOLDERS SHOULD BE DISMISSED UNDER NEW YORK CONTRACT LAW ............27

IV.  FULL FAITH AND CREDIT BONDS ISSUED AFTER 2011 EXCEEDED THE CONSTITUTIONAL DEBT LIMIT AND ARE THUS INVALID AND NOT ENTITLED TO ANY PRIORITY ........................................................29

V.   THE CONSTITUTIONAL CHALLENGE TO ACT 91 FAILS AS A MATTER OF PUERTO RICO LAW ..........................................................34

    A.   THE COMMONWEALTH'S LEGISLATIVE ASSEMBLY HOLDS THE POWER TO IMPOSE TAXES AND ISSUE DEBT, AND COURTS MUST NOT LIGHTLY SECOND GUESS ITS EXERCISE OF SAID POWER..............................................................................35

    B.   THE LEGISLATIVE ASSEMBLY'S POWER TO TAX AND ISSUE DEBT INCLUDES THE PREROGATIVE TO DETERMINE THAT A TAX REVENUE WILL NOT BE AN "AVAILABLE RESOURCE" .....38

    C.   COFINA IS THE RESULT OF THE LEGISLATIVE ASSEMBLY'S VALID USE OF ITS CONSTITUTIONAL POWER TO IMPOSE TAXES AND ISSUE DEBT ...................................................40

    D.   CONCLUSION................................................................43

CONCLUSION.....................................................................................................44

i

## TABLE OF AUTHORITIES

**Page**

### Cases

*1301 Properties Owner LP v. Abelson*,
 2016 WL 1367908 (Sup. Ct. N.Y. Cnty. Apr. 1, 2016)..........................23

*Antilles Cement Corp. v. Fortuno*,
 670 F.3d 310 (1st Cir. 2012).....................................16

*Aponte-Torres v. Univ. of P.R.*,
 445 F.3d 50 (1st Cir. 2006).....................................14

*Matter of Barabash*,
 31 N.Y.2d 76 (N.Y. 1972).....................................20

*Burns v. Egan*,
 117 A.D.2d 38 (3d Dep't 1986).....................................16

*Cerajewski v. McVey*,
 72 N.E.2d 650 (Ind. 1947).....................................32

*Cipollone v. Liggett Group, Inc.*,
 505 U.S. 504 (1992).....................................16

*Consejo Titulares v. Ramon Vazquez*,
 186 D.P.R. 311 (2012).....................................25

*Crossroads Dev. Corp. v. E.L.A.*,
 103 D.P.R. 789 (1975).....................................26

*Dominguez Castro v. ELA*,
 178 DPR 1 (2010).....................................7

*Eaton v. Shiawassee County*,
 218 F. 588 (6th Cir. 1914).....................................34

*E.L.A. v. Aguayo*,
 80 D.P.R. 552, 597 (1958).....................................35

*E.L.A. v. Nw. Selecta*,
 2012 TSPR 56.....................................37

*Frappier v. Countrywide Home Loans, Inc.*,
 750 F.3d 91 (1st Cir. 2014).....................................13

*Fred y Otros v. E.L.A.*,
 150 D.P.R. 599, 606-607 (2000).....................................15

*Freeman v. Town of Hudson*,
 714 F.3d 29 (1st Cir. 2013).....................................14

*Gray v. Evercore Restructuring L.L.C.*,
  544 F.3d 320 (1st Cir. 2008) ...................................................................13

*Int'l Gen. Electric v. Concrete Builders*,
  104 D.P.R. 871 (1976) ......................................................................24, 26

*Interior Developers v. Mun. de San Juan*,
  177 D.P.R. 693 (2009) ......................................................................36, 41

*Kaplan v. State*,
  202 A.D.2d 742 (3d Dep't 1994)..............................................................21

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
  424 F.3d 195 (2d Cir. 2005).....................................................................28

*Lex Claims, LLC v. Garca-Padilla*,
  2017 WL 657432 (D.P.R. Feb. 17, 2017) ................................................18

*Martinez v. Puerto Rico*,
  594 F. Supp. 2d 181 (D.P.R. 2009)..........................................................14

*Missouri v. Jenkins*,
  495 U.S. 33 (1990)....................................................................................16

*Mun. de Utuado v. Aireko Const. Corp.*,
  176 D.P.R. 897 (2009)..............................................................................41

*Najas Realty, LLC v. Seekonk Water Dist.*,
  821 F.3d 134 (1st Cir. 2016).....................................................................13

*Neitzke v. Williams*,
  490 U.S. 319 (1989)..................................................................................14

*Nieves v. United States*,
  2015 WL 8770036 (D.P.R. Dec. 14, 2005) .............................................13

*O.C.S. v. Universal*,
  187 D.P.R. 164, 171-74 (2012).................................................................26

*PEAJE Inv. LLC v. Garcia-Padilla*,
  845 F.3d 505 (1st Cir. 2017).....................................................................17

*PIP v. Commonwealth*,
  186 D.P.R. 1 (2012).............................................................................24, 25

*P.R. Tel. Co. v. Sec. of Treasury*,
  81 P.R.R. 948 (1960).................................................................................36

*R.C.A. v. Gobierno de la Capital*,
  91 D.P.R. 416 (1964).........................................................................37, 41

*Rhem v. Malcolm*,
  507 F.2d 333 (2d Cir. 1974)......................................................................16

iii

*Saratoga Cnty. Chambers of Commerce, Inc. v. Pataki,*
    100 N.Y.2d 801 (N.Y. 2003) ............................................................................22

*Schulz v. State,*
    81 N.Y.2d 336 (N.Y. 1993) .................................................................21, 22, 25

*Schulz v. State,*
    193 A.D.2d 171 (3d Dep't 1993) ......................................................................22

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army corps of Eng'rs,*
    531 U.S. 159 (2001) .........................................................................................17

*State v. Spring City,*
    260 P.2d 527 (Utah 1955) ................................................................................34

*Summer v. City of Rochester,*
    60 A.D.3d 1271 (4th Dep't 2009) ...............................................................20, 21

*Terwilliger v. Terwilliger,*
    206 F.3d 240 (2d Cir. 2000) .............................................................................28

*In re Trusteeship Created by American Home Mortg. Inv. Trust 2005-2,*
    2014 WL 3858506 (S.D.N.Y. July 24, 2014) ..................................................27

*United States v. Security Indus. Bank,*
    459 U.S. 70 (1982) ...........................................................................................17

*Veltri v. Bldg. Serv. 32B-J Pension Fund,*
    393 F.3d 318 (2d Cir. 2004) .............................................................................23

*Welsch v. Likins,*
    550 F.2d 1122 (8th Cir. 1977) .........................................................................16

## **Statutes**

10 L.P.R.A. § 998 .......................................................................................10, 20

31 L.P.R.A. § 7 ................................................................................................24

13 L.P.R.A § 11a ..............................................................................15, 40, 41, 42

13 L.P.R.A § 12 .......................................................................................6, 17, 41

13 L.P.R.A § 13 ................................................................................................41

42 U.S.C. § 1983 .............................................................................................12

Federal Rule of Civil Procedure 12(c) .............................................................1

Federal Rule of Civil Procedure Rule 12(b)(6) ...............................................13

P.R. Const. art. VI, § 2 .......................................6, 9, 29, 33, 37, 38, 40, 41

P.R. Const. art. VI, § 7 .....................................................................................34

P.R. Const. art. VI, § 8 ........................................................6, 9, 13, 28, 34, 35, 39, 40, 41

## **Miscellaneous**

P.R. Laws Ann. Const. Art. 6 § 2 .................................................................................35

J.P. Tras Monge, *Constitutional History of Puerto Rico*,
    San Juan, Ed. U.P.R. 1982, Vol. III .......................................................................37

Intervenor-Defendants, the COFINA Senior Bondholders,[1] respectfully submit this memorandum of law in support of their Motion under Federal Rule of Civil Procedure 12(c) for judgment on Count 2 of Plaintiffs' Second Amended Complaint ("SAC"), and on Count 12 to the extent the relief sought is derived from or the same as in Count 2.

## PRELIMINARY STATEMENT

Executive Order 2016-30 stopped payment on Plaintiffs' bonds because of the need for the money for essential services for the people of Puerto Rico. Rather than asserting that the money is not needed for essential services or taking the untenable position that essential services should be sacrificed to pay off their bonds, Plaintiffs instead ask the Court to stop payments on other bonds, namely the COFINA bonds, in order to pay theirs. To support that request, they rely on Section 303(3) of PROMESA, which preempts executive orders that "alter, amend, or modify" the rights of bondholders.

But the Executive Order did not modify any rights Plaintiffs had to COFINA property because there were never any to begin with. Plaintiffs are holders of debt issued by the Commonwealth, not by COFINA. Their debt is supported on an unsecured basis by the Commonwealth's full faith and credit, not by COFINA's property, which, through valid legislative action over ten years ago, is held separately from the Commonwealth's "available resources" and is pledged to COFINA's own bondholders. Since COFINA's inception, Plaintiffs have had no

---

[1] The COFINA Senior Bondholders are Jose F. Rodriguez, and the following entities, either as beneficial holders or on behalf of managed funds and accounts: Cyrus Capital Partners, L.P.; Decagon Holdings 1, L.L.C.; Decagon Holdings 2, L.L.C.; Decagon Holdings 3, L.L.C.; Decagon Holdings 4, L.L.C.; Decagon Holdings 5, L.L.C.; Decagon Holdings 6, L.L.C.; Decagon Holdings 7, L.L.C.; Decagon Holdings 8, L.L.C.; Decagon Holdings 9, L.L.C.; Decagon Holdings 10, L.L.C.; GoldenTree Asset Management LP; Merced Capital, L.P.; Old Bellows Partners LP; Scoggin Management LP; Taconic Master Fund 1.5 L.P.; Taconic Opportunity Master Fund L.P.; Tilden Park Capital Management LP; Värde Credit Partners Master, L.P.; Värde Investment Partners, L.P.; Värde Investment Partners (Offshore) Master, L.P.; The Värde Skyway Master Fund, L.P.; and Whitebox Advisors LLC.

1

relationship with it, and the Executive Order left this arrangement completely intact. Thus, in an attempt to side-step these undisputed facts, Plaintiffs claim that their right to COFINA's property comes from the Puerto Rico Constitution. Not only are Plaintiffs unable to show this, they also cannot show that the Court should consider this constitutional challenge at all. Rather, in addition to their constitutional claim being wrong, their claims fail for multiple other reasons.

**First**, as a threshold matter, Plaintiffs rely on Section 303(3) of PROMESA but that statute does not support their request for a declaration and injunction to compel COFINA to transfer funds to the Puerto Rico Treasury pending the stay. If Plaintiffs have any claim under Section 303(3), it is that the statute preempts the Executive Order. Yet, the Executive Order did not concern (or even mention) COFINA. Rather, it imposed a moratorium on the Commonwealth's payments to Plaintiffs. Thus, even if Plaintiffs are successful on preemption, their remedy is not against COFINA; their remedy is that the moratorium is declared void. Section 303(3) does not provide anything else, and certainly not a basis to issue a declaration or injunction requiring actions on the part of COFINA, a third party to the Executive Order. *See infra*, § I.

**Second**, Plaintiffs' claims to COFINA property are barred by the doctrines of laches and equitable estoppel. If there were any time to raise a constitutional challenge to the exclusion of COFINA's property from the Commonwealth's "available resources," it was no later than when Plaintiffs bought their general obligation debt years ago. From the outset, Plaintiffs' bond documents made clear to them that, pursuant to legislative action, they had no claim to COFINA's revenues and that this property was ***not*** an "available resource" to them under the Commonwealth's full faith and credit. To compensate for this lack of a dedicated revenue stream, Plaintiffs negotiated for and received higher interest rates, which at their peak reached 8% (9% when properly calculated). These parallel structures—with COFINA receiving one source of

funding and Plaintiffs receiving another, with neither having access to the other—has been relied on for years by COFINA investors, the Commonwealth, and the market. Plaintiffs' claims, which seek to upend these expectations, could have been brought sooner, are too destabilizing now, and are precluded as a matter of law. *See infra* § II.

**Third**, the provisions of the bond documents that provided ample notice to Plaintiffs that they had no claim to COFINA's property are particularly fatal to those who purchased their bonds from the 2014 issuance (the "2014 GO Bondholders"). Although Plaintiffs assert that COFINA's property is an "available resource" under the Puerto Rico Constitution, the 2014 GO Bondholders cannot avail themselves of that argument because they **contractually** disclaimed any reference to Puerto Rico law in defining their rights and entitlements. These bondholders specifically negotiated for New York law to apply to their contract. As a result, what an "available resource" is for them is not a matter of interpreting the Puerto Rico Constitution but of merely interpreting their contract, the plain reading of which is that 2014 bonds have no right to payment from COFINA's property. Any claims asserted by the 2014 GO Bondholders should be dismissed for this reason alone. *See infra* § III.

**Fourth**, the claims of many Plaintiffs should be dismissed because their bonds were issued in excess of the Puerto Rico Constitution's debt limit and thus were not valid or entitled to constitutional priority in the first place. Although Plaintiffs allege their priority, it is their burden to establish it. Under the Puerto Rico Constitution, the Commonwealth can only provide full faith and credit to bonds issued in conformity with the constitutional debt limit. When all obligations backed by the Commonwealth's full faith and credit are properly calculated and included, that limit was reached in 2011. As a result, any bonds issued after 2011 (such as those purchased by

3

the 2014 GO Bondholders) that purport to be backed by full faith and credit are not entitled to priority under the Puerto Rico Constitution and may be void as ultra vires. *See infra* § IV.

**Finally**, in light of these fatal defects in Plaintiffs' claims, the Court need not address their constitutional challenge, which presents an issue of first impression. Nonetheless, Plaintiffs' arguments on this issue are also wrong. The thrust of their argument is that the Constitution's use of the term "available resources" in Article VI means "all resources" of the Commonwealth and that, as a result, the Legislative Assembly has no authority to impose taxes and place some of the revenues in the Treasury and some elsewhere (such as in COFINA).

This reading is contrary to the plain text and intent of the Puerto Rico Constitution. Under the Constitution, the branch of the government that is empowered to impose taxes, issue debt and determine how the revenues will be used is the Legislative Assembly. So long as the Legislative Assembly's acts are directed to a "public purpose," the Puerto Rico Constitution grants it wide latitude in carrying out that authority. This principle is confirmed by the use of the term "available resources" and the legislative history of related provisions, which show that the term does not refer to all money raised by the Commonwealth but rather that which is designated for the Puerto Rico Treasury for public use. Thus, for COFINA's property rights to be questioned, the enabling legislation had to be completely untethered to a reasonable public purpose.

Yet, it is undisputed that the Legislative Assembly created COFINA to alleviate Puerto Rico's economic crisis and repay pre-existing debt rather than allow the public credit to go into default. Its intent was to improve the Commonwealth's credit rating and allow it to borrow at a lower cost, pay suppliers and replenish emergency and relief funds. Because these goals are quintessentially public in nature, the Legislative Assembly was well within its authority in passing COFINA's legislation. *See infra* § V. As a result, Plaintiffs' constitutional challenge should be

4

rejected, and judgment should be granted against them as to Count 2 (and Count 12 to the extent it seeks the same relief).

## BACKGROUND

### A. COFINA Is Created and Receives Ownership of the Dedicated Sales Tax

In 2006, Puerto Rico faced a monumental financial crisis, leading to a full shut-down of its government. In response, the Legislative Assembly created the "Puerto Rico Urgent Interest Fund Corporation" ("UIFC"), the predecessor to COFINA, to help alleviate Puerto Rico's economic crisis. *See* SAC ¶ 103. The Legislative Assembly also imposed for the first time a sales and use tax, known in Spanish as the Impuesto sobre Ventas y Uso (the "IVU"), and by statute transferred ownership of a portion of the IVU (the "Dedicated Sales Tax") to UIFC (and later, to COFINA). In 2007, the Legislative Assembly created COFINA as a replacement for the UIFC, and authorized COFINA to issue bonds backed by the Dedicated Sales Tax. *See* Act of July 5, 2007, No. 56-2007 ("Act 56-2007"); SAC ¶ 103. These legislative acts were passed by the vote of nearly every representative of both major parties in a rare show of bipartisan support.

In the enabling legislation, COFINA's funds were separated from the Commonwealth's general fund such that they "shall not be covered into the Treasury of Puerto Rico and shall neither constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." Act of Dec. 26, 2006, No. 291-2006 ("Act 291-2006"), § 2; *see* SAC ¶¶ 19, 103. In reliance on this structure, bondholders (on-island and elsewhere) purchased approximately $4.5 billion in bonds from COFINA in 2007, and another $740 million in 2008. Subsequent legislation enacted in early 2009 expanded the COFINA structure and transferred additional IVU to it. *See* Act of Jan. 14, 2009, No. 1-2009 ("Act 1-2009"); *see also* Act of Mar. 9, 2009, No. 7-2009 ("Act 7-2009"); SAC ¶ 101. Between 2009 and 2011, COFINA sold additional bonds to investors, both within Puerto Rico, and off the Island. In total, investors have purchased more than $16 billion of

COFINA bonds.[2] *See* SAC ¶ 96. The proceeds of the sale of COFINA bonds were used for

legitimate public purposes, as determined by the Legislative Assembly.

Until this lawsuit, it was always understood that the Dedicated Sales Tax was not available

to the Commonwealth's general fund or to service the Commonwealth's general obligations. The

statement of motives to COFINA's enabling legislation stated that the Dedicated Sales Tax is

"***owned*** by COFINA" and "shall not constitute available resources of the Commonwealth of Puerto

Rico for any purpose." Stmt. of Motives, Act 56-2007 (emphasis added). The Legislative

Assembly reiterated this when it expanded COFINA in 2009. *See* Act 1-2009, § 3 (stating that the

"Dedicated Sales Tax Fund … shall not be deposited in the Treasury of Puerto Rico, nor shall it

constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for

use by the Secretary."). Every amendment since continued to affirm COFINA's ownership of the

Dedicated Sales Tax. *See* 13 L.P.R.A § 12 (codifying creation of the Dedicated Sales Tax Fund).[3]

This was also reported in the Commonwealth's financial statements every year. *See, e.g.*, Ex. 1

(June 30, 2012 Year End Fin. Report)[4] ("In addition, the portion of the sales and use tax allocated

to COFINA is not included as internal revenues since the legislation that created COFINA

transferred ownership of such portion … to COFINA and provided that [it] was not available

---

[2] Certain of the COFINA bonds are capital appreciation bonds that do not pay an interest coupon, and instead accrete value over time that is paid upon maturity. The value of these bonds increases over time until repayment. While the current value of COFINA bonds is approximately $17.2 billion, the original value of all bonds at issuance was approximately $16.3 million.

[3] In addition, the Executive Branch of alternating political parties have issued legal opinions confirming COFINA's validity. *See* Ex. 2 (Opinion of Attorney General Guillermo A. Somoza-Colombani, Dec. 13, 2011) ("The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.").

[4] All exhibits are attached to the accompanying March 18, 2017 Declaration of Rafael Escalera in Support of This Motion.

resources under the Constitutional provisions relating to full faith and credit bonds.").[5]  This feature of COFINA was essential to COFINA bondholders because, while they would not be supported by the Commonwealth's full faith and credit (like general obligations), they would have the benefit of a separate bankruptcy remote legal structure and a dedicated stream of payments.

In the event any person wished to question the legislative transfer of the Dedicated Sales Tax, or the statutory liens thereby created, the Legislative Assembly created a mechanism to address that.  When COFINA was expanded in 2009, the Legislative Assembly conferred jurisdiction on the Supreme Court of Puerto Rico to "resolve any matter … when the issue is the validity or constitutionality" of the COFINA-enabling laws.  Act 7-2009 § 69.  Despite this jurisdictional grant, no challenge to COFINA's ownership of the Dedicated Sales Tax had been made before this lawsuit.[6]

In light of COFINA's ownership of the Dedicated Sales Tax and the statutory lien granted to bondholders, COFINA bonds received strong, investment-grade ratings.  In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that **separates** the revenue stream supporting the bonds **from** the Commonwealth of Puerto Rico,

---

[5]    By contrast, other governmental revenue streams pledged to bonds offerings are explicitly deemed to constitute "available resources."  For example, Hotel Occupancy Tax Revenue Bonds issued by the Puerto Rico Convention Center District Authority disclose that they are "available revenues under the Constitution" and "may be applied" to service public debt.  Mar. 15, 2006 Official Stmt. at 22.  The same is true for Transportation Revenue Bonds and Transportation Revenue Refunding Bonds and bonds issued by the Puerto Rico Infrastructure Financing Authority.  *See* June 17, 2010 Official Stmt. at 19. (taxes supporting the bonds "if needed … are subject to being applied first to the payment of debt service on the public debt ."); Dec. 16, 2011 Official Stmt. at 37 ("Special Tax Revenues are available revenues under the Constitution.") (Official Statements available at http://www.gdb-pur.com/investors_resources/exempt-securities.html).

[6]    The constitutionality of other aspects of the 2009 legislation was challenged on a timely basis.  *See Dominguez Castro v. ELA,* 178 DPR 1 (2010) (upholding the constitutionality of Act 7 of 2009 from various challenges under both the U.S. and Puerto Rico Constitutions brought by public employees who were laid off from their employment pursuant to a fiscal stabilization plan that the Commonwealth implemented pursuant to Act 7).

along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal." Ex. 3 (Standard & Poor's, Puerto Rico Sales Tax Fin. Corp., June 28, 2007), at 2 (emphases added). It further stated that "[t]he legislative act creating COFINA … *successfully separates* and *provides a priority interest* in the Commonwealth's sales and use taxes for the [COFINA] bondholders." *Id.* (emphases added). The views of Moody's were the same: "We note that the rating on the [COFINA] Bonds is significantly higher than our current Baa3/negative rating on the Commonwealth's G.O. bonds, primarily reflecting our assessment of the strength of the *pledged sales tax security* …." Ex. 4 (Moody's Investor Service, New Issue: Moody's Assigns A1 Rating And Stable Outlook To Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, June 27, 2007), at 2 (emphasis added). The ratings reflected not only COFINA's strong legal protections but also the use of a common municipal financing structure—a tax-backed securitization.

**B.     The Commonwealth Issues General Obligation Bonds, Which Do Not Have a Cognizable Interest in Commonwealth Property and Thus Receive Higher Yields**

After the creation of COFINA, the Commonwealth continued to raise funds through the issuance of general obligation ("GO") bonds. Unlike COFINA bonds, GO Bonds are supported by an unsecured pledge of the Commonwealth's good faith, credit or taxing power and are considered public debt for purposes of the Puerto Rico Constitution. *See* SAC ¶ 15. As such, GO Bondholders do not have an interest in any property of the Commonwealth nor of any of its instrumentalities, such as COFINA. *See, e.g.*, Ex. 5 (Official Stmt. For General Obligation Bonds of 2014, Series A ("2014 Official Stmt.")) at 16 ("Holders of … general obligation debt may not attach the Commonwealth's property."). Rather, they possess a different source of repayment, namely "any funds" in the Commonwealth's Treasury. *See, e.g.*, Ex. 6 (Bond Resolution adopted March 11, 2014 (the "2014 Resolution")) § 19; SAC ¶¶ 63-65. This never included the Dedicated

8

Sales Tax, which, by legislative action, is not paid into the Treasury. Though they do not have rights to the Dedicated Sales Tax, GO Bondholders have a first (albeit unsecured) claim on the Commonwealth's "available resources." Under the Puerto Rico Constitution, if "available resources" are insufficient to fund all of the desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8.

Since the source of the GO Bondholders' repayment is the Treasury, the GO Bondholders' remedies are likewise directed to the Treasury if the Commonwealth does not make payments. The Puerto Rico Constitution allows holders of Constitutional debt to compel the Secretary of the Treasury to "apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof …." P.R. Const. art. VI, § 2. Bondholders also agreed in their bond documents that their remedy for nonpayment was an action against "the Secretary of the Treasury to apply available Commonwealth resources to the payment of the Bonds …." *See, e.g.*, Ex. 6 (2014 Resolution) § 20(a).

Because the GO Bondholders cannot turn to any specific property of the Commonwealth or its instrumentalities for repayment on their bonds, GO Bonds have consistently had lower credit ratings than the COFINA bonds. While COFINA bonds were given strong investment-grade ratings for their greater perceived safety, the 2014 GO Bonds, for example, received a rating from Moody's of only Ba2, meaning that they were "judged to be speculative and are subject to substantial credit risk."[7] Indeed, as recently as 2013, the Legislative Assembly acknowledged that GO Bonds were rated lower than COFINA Bonds because the latter were "backed by the revenues

---

[7] *See* Moody's Investors Services, "Rating Symbols and Definitions," available at https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

of the sales and use tax" while the GO Bonds were supported by a promise to pay when funds were available. Stmt. of Motives, Act of Oct. 10, 2013, No. 116-2013 ("Act 116-2013").

To compensate investors for the risk of lending on an unsecured basis against the financial health of the Commonwealth's general fund, GO Bonds consistently garnered a higher interest rate than COFINA bonds. That rate peaked with the 2014 issuance of GO Bonds, which charged 8%. This significant rate for municipal debt was on top of an "Original Issue Discount" (or "OID") of 7% of the face amount that the 2014 GO Bondholders negotiated to enrich their deal. This meant that the Commonwealth issued and promised to repay $3.5 billion but in exchange received only $3.255 billion from the bondholders. *See* Ex. 5 (2014 Official Stmt.) at 24 (identifying "Original Issue Discount" of $245 million); Ex. 6 (2014 Resolution) § 25, at 13. Moreover, $422.7 million of proceeds from the bonds were earmarked for the payment of interest on the bonds, meaning this money was unavailable to the Commonwealth. Ex. 5 (2014 Official Stmt.) at 11 & 24 (showing $422.7 million "from the issuance of the Bonds will be used to pay interest on the Bonds."). Adjusting for the effect of this amount and the OID, the interest rate on the 2014 GO Bonds was in economic substance 9.1% (which, for comparison, exceeds the limit under Puerto Rico usury law). *See* 10 L.P.R.A. § 998. Thus, whereas the weighted average cost of COFINA bonds has been about 5.75%, for the GO Bonds (accounting for these incentives) it has been about 6.37%.

The GO Bondholders understood that, in exchange for this higher interest rate, they had absolutely no claim to COFINA's revenues. Since the creation of COFINA, there have been 18 issuances or remarketings of GO Bonds. Each one was made pursuant to a bond resolution by the Commonwealth and is accompanied by one or more preliminary and final "Official Statements." In every one of these issuances, the Official Statements expressly state that the Dedicated Sales Tax has been committed to COFINA and thus is not available to repay the GO Bonds.

For instance, the 2014 Preliminary Official Statement and the 2014 Official Statement together affirm no less than **eight times** that the Dedicated Sales Tax is not available to the 2014 GO Bonds. The documents state that the Dedicated Sales Tax does "not constitute 'available resources' … and [is] not available for use by the Secretary of the Treasury." Ex. 5 (2014 Official Stmt.) at 29. In another section: "the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." *Id.* These acknowledgements were then repeated multiple times. *See id.* at 31, II-58 & II-59.[8] Identical disclosures were made in the Preliminary Official Statement as well. *See* Ex. 7 (2014 Preliminary Official Stmt.), 27-28, 30, II-58 & II-59. The same is true for the rest of the GO Bond issuances.[9]

In the more than ten years after COFINA's enabling legislation was passed and until this lawsuit was commenced, no GO Bondholder had ever questioned COFINA's exclusive right to the Dedicated Sales Tax. This was so even though the most recent GO Bond offering was used to refinance (and repay) more than $330 million of lower cost COFINA obligations. *See* Ex. 5 (2014 Official Stmt.) at 33 (showing amount of COFINA bonds "as adjusted" following 2014 GO Bond

---

[8] The notation "II" refers to Appendix II to the 2014 Official Statement.

[9] *See* March 7, 2012 Official Statement (Series 2012 A) at 13, 14, I-54; March 7, 2012 Official Statement (Series 2012 B) at 12, 13, I-54; July 11, 2011 Supplement to Official Statement (Series 2011, 2011 D, 2011 E) at 20, 21, I-48; June 16, 2011 Remarketing Statement (Sub-Series 2003 C-5-2) at 32, 34; March 10, 2011 Official Statement (Series 2011 C) at 18-19, 20, I-48; February 10, 2011 Official Statement (Series 2011 A) at 18, 19, I-48; December 3, 2009 Official Statement (Series 2009 C) at 13, 14; November 4, 2009 Official Statement (Series 2009 B) at 14, 15, I-37; September 11, 2009 Official Statement (Series 2009 A) at 10-11, 12, I-37; September 11, 2009 Remarketing Statement (Series 2007 A-4) at 10, 11, I-37; September 5, 2008 Official Statement (Series A) at 12, I-30, I-41, I-65; May 7, 2008 Supplement to Official Statement (Series 2008 C) at 5, 16, I-31, I-42; May 7, 2008 Supplement to Official Statement (Series 2008 A, 2008 B) at 5-6, 29, I-31, I-42; May 7, 2008 Supplement to Remarketing Statement (Series 2007 A-6, A-7, A-8, A-9) at 7, 30, I-31, I-42; October 16, 2007 Supplement to Official Statement (Series 2007 A) at 40, I-27; September 13, 2007 Preliminary Official Statement (Series 2007 A) at 12, I-27; September 13, 2007 Preliminary Official Statement (Series 2007 B) at 11, I-27, *available at* http://www.gdb-pur.com/investors_resources/commonwealth.html.

issuance).[10] Rather than challenge COFINA's payment structure, the GO Bondholders benefited from it. Every year, they collected higher interest rates because their bonds were unsecured and riskier. They also benefitted from the lower-cost financing that COFINA bonds provided to the Commonwealth.

### C. Plaintiffs Respond to the Executive Order's Moratorium on Their Payments By Seeking to Divert Funds from COFINA Bondholders

In June 2016, then-Governor García Padilla issued Executive Order 2016-30 (the "Executive Order"), declaring "a moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth," including the GO Bonds. *See* SAC ¶ 9. In July 2016, the GO Bondholders initiated this lawsuit, and, on November 4, 2016, they filed the Second Amended Complaint, asserting claims against the Commonwealth of Puerto Rico, certain officers of the Commonwealth, COFINA, the Executive Director of COFINA, and Bank of New York Mellon Corp., as trustee for COFINA. *See id.* at ¶¶ 24-31. The GO Bondholders allege to be beneficial owners of GO Bonds and bonds issued by certain of the Commonwealth's public corporations that are guaranteed by the Commonwealth, though they do not specify their holdings. *See id.* at ¶¶ 5, 23. They do allege they own 2014 GO Bonds. *See* SAC, Count 11 (alleging claim as to 2014 GO Bonds).

The Second Amended Complaint asserts 13 causes of action, nine of which the GO Bondholders concede are subject to the stay provided by Section 405 of PROMESA. *See id.* at ¶ 99. Of the remaining four causes of action that the Court has found are not stayed (Dkt. No. 184), two causes of action are directed to COFINA. Count 2 seeks declaratory judgment and injunctive relief, and alleges that the Executive Order violates Section 303(3) of PROMESA

---

[10] The COFINA bond anticipation notes that were refinanced by the 2014 GO Bonds had an interest rate of 1.95%.

because it "subordinate[s] the rights of holders" of the GO Bonds to COFINA bondholders by halting payment on GO Bonds without halting payment on COFINA bonds. *Id.* at ¶¶ 137-40. The second of the two causes of action, Count 12, seeks declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that the Commonwealth and COFINA have "deprived Plaintiffs of rights, privileges, and immunities secured by" the laws of the Unites States and Puerto Rico. *Id.* at ¶¶ 192-93. According to Plaintiffs, Count 12 "rests on the same violations of federal law" alleged in Count 2 and the other unstayed causes of action (which are not directed to COFINA). Dkt. No. 39 at 13.

The equitable relief that Plaintiffs seek is not limited to an invalidation of the Executive Order. In addition to preemption, Plaintiffs also seek a declaration "that the revenues diverted to COFINA (or any substitute revenues) are 'available resources' within the meaning of Article VI, Section 8 of the Puerto Rico Constitution and that such funds cannot be transferred to COFINA or COFINA bondholders." SAC, Prayer for Relief, at 66-67.[11] They also request a mandatory injunction to seize COFINA funds and have them transferred to the Puerto Rico Treasury. *See id.*

## ARGUMENT

Under Federal Rule of Civil Procedure 12(c), judgment on the pleadings should be granted when the complaint fails to state facts sufficient to establish a claim to relief that is plausible on its face. *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 140 (1st Cir. 2016) (citing *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008)). The standard of review of a Rule 12(c) motion is the same as that for a motion to dismiss under Rule 12(b)(6). *Frappier v.*

---

[11] It is in reality the GO Bondholders who seek to "divert" someone else's property. The Dedicated Sales Tax is property of COFINA under pre-existing law, pledged for the benefit of citizens of Puerto Rico and the states. More citizens of Puerto Rico own COFINA bonds than any other bond issued by the territory or any of its instrumentalities, and by a ratio of 7:1 over holders of GO Bonds. *See* Commonwealth Fiscal Plan, Oct. 14, 2016, at 71.

*Countrywide Home Loans, Inc.*, 750 F.3d 91, 96 (1st Cir. 2014). The only "modest difference" between the two is that a Rule 12(b)(6) motion is limited to the complaint but a Rule 12(c) motion considers the pleadings as a whole, including "the defendant's answer and the affirmative defenses." *Nieves v. United States*, 2015 WL 8770036, at *1 (D.P.R. Dec. 14, 2005); *see Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54-55 (1st Cir. 2006) ("A Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole.").

The Court may also consider "documents appended to the complaint, documents incorporated by reference, and matters of which judicial notice can be taken." *Martinez v. Puerto Rico*, 594 F. Supp. 2d 181, 185 (D.P.R. 2009); *see also Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (finding that court may consider "official public records," "documents central to plaintiffs' claim" and "documents sufficiently referred to in the complaint").

If "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed," even if it is "based … on a close but ultimately unavailing" legal theory. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation and quotation marks omitted). Under these standards, the Senior COFINA Bondholders' Motion should be granted, and the GO Bondholders' claims under Count 2 (and Count 12 to the extent it seeks the same relief) should be dismissed.

## I. PLAINTIFFS CANNOT STATE A CLAIM UNDER PROMESA

In Count 2, Plaintiffs assert that the Executive Order is preempted by Section 303(3) of PROMESA on the grounds that it affected their rights as holders of debt. *See* SAC ¶ 140; PROMESA § 303(3). Yet, they do not merely seek to invalidate the order. They also seek a declaration against COFINA that its property can be used to pay their bonds and an injunction to require COFINA to transfer that property to the Puerto Rico Treasury. *See* SAC, Prayer for Relief

at 67-68.  This claim should be dismissed as a matter of law because PROMESA does not provide for any remedy other than preemption.

PROMESA preempts "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory …."  PROMESA § 303(3).  The statute does not provide a vehicle to adjudicate claims brought  by debt holders of a territory, on the one hand, against a territorial instrumentality, on the other hand.

Moreover, even if it did, the Executive Order still did not "alter, amend, or modify" any rights between Plaintiffs and COFINA.  Rather, it maintained the status quo that existed before the Executive Order was issued.  The Executive Order concerned Plaintiffs' relationship with their debtor, the Commonwealth, and imposed a moratorium on making payments to Plaintiffs, and other Commonwealth bondholders.  This proclamation did not alter any of the Plaintiffs' rights to payment from COFINA or COFINA's property because, even before the Executive Order, Plaintiffs had no entitlement to such relief.  That has been the valid law of the land for over a decade since the Legislative Assembly created COFINA, granted it ownership of the Dedicated Sales Tax for the benefit of its bondholders, and made this property unavailable to the Commonwealth and, therefore, the GO Bondholders.  As holders of GO Bonds, since issuance, Plaintiffs' rights have been exclusively against the Commonwealth and the funds in the Puerto Rico Treasury.[12]  Although Plaintiffs seek to challenge that decade-old legislation, Section 303(3)

---

[12]  Plaintiffs' rights against the Commonwealth do not *ipse dixit* mean that they or the Commonwealth have rights against COFINA.  Under PROMESA, the Commonwealth and COFINA maintain their separate identities as distinct legal entities, with different property and different bondholders.  *See, e.g.*, PROMESA § 301(b) (defining the territory's "affiliates" as any of its territorial instrumentality); § 302 (permitting both the territory and territorial instrumentalities to be debtors); § 307 (defining venue separately for each); § 407 (providing certain rights to creditors of a territorial instrumentality but not to creditors of the Commonwealth).  Puerto Rico law was not overridden by the federal statute, and Puerto Rico has always maintained the distinction between the Commonwealth and its instrumentalities.  13

does not provide a hook to do so because the statute only provides that unlawful executive orders "shall be preempted," not that equitable relief can be awarded against third parties.

Thus, assuming the moratorium on paying unsecured general obligations altered Plaintiffs' rights with the Commonwealth, then the only remedy available to them under Section 303(3) is preemption (or nullification) of the moratorium.[13]  *See* C*ipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("state law that conflicts with federal law is 'without effect'"); *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 323 (1st Cir. 2012) (holding that, for preemption purposes, Puerto Rico laws that "interfere with, or are contrary to the laws of Congress" are void).

There is no basis in PROMESA, and Plaintiffs allege none, that would then give Plaintiffs a right, or the Court the power, to issue an injunction or other relief instructing the Commonwealth how to pay Plaintiffs and from what sources, much less instructing COFINA how it is required to use its independently-held and segregated funds.  This would also be beyond the Court's equitable powers.  *See Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) ("the [lower court's] imposition of a tax increase … was an extraordinary event [which] not only intruded on local authority but circumvented it altogether."); *id.* ("one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions."); *Rhem v. Malcolm*, 507 F.2d 333, 341 (2d Cir. 1974) (remanding to lower court to "refashion" equitable relief where initial order encroached on "steps traditionally left to appropriate executive and legislative bodies"); *Welsch v. Likins*, 550 F.2d 1122, 1132-33 (8th Cir.

---

L.P.R.A. § 11a(a) (COFINA is "[a] public corporation and instrumentality of the Commonwealth of Puerto Rico, […] which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico."); *Fred y Otros v. E.L.A.*, 150 D.P.R. 599, 606-607 (2000). (noting that there is a difference between a department or agency of the Government and a public corporation or instrumentality).

[13]  Indeed, this raises the question why Plaintiffs need any relief against COFINA if they are correct, the Executive Order is invalidated, and repayment of their bonds continues from the general fund.

1977) (vacating injunction that compelled additional municipal financing, finding that "experience has shown that when governors and state legislatures see clearly what their constitutional duty is with respect to state institutions and realize that the duty must be discharged, they are willing to take necessary steps, including the appropriation of necessary funds").

Not only does PROMESA fail to provide the authority to impose this remedy; PROMESA specifically prohibits it. Section 305 of PROMESA states:

> notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the use or enjoyment by the debtor of any income-producing property.

PROMESA § 305. The relief requested by Plaintiffs—moving funds from COFINA to the Commonwealth and freezing it there—would plainly violate Section 305 on all of these grounds. And there is nothing in Section 303(3) to suggest that a remedy for a violation of preemption can be imposed in violation of Section 305.

Moreover, a contrary reading of Section 303(3)—as permitting relief in addition to preemption—would **create** constitutional and statutory violations, not remedy them.[14] This is so because Puerto Rico law assures COFINA of the Dedicated Sales Tax for the benefit of its creditors.

---

[14] Under the doctrine of constitutional avoidance, the U.S. Supreme Court has cautioned that, as a matter of statutory interpretation, courts should "first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided." *United States v. Security Indus. Bank*, 459 U.S. 70, 78 (1982) (citations omitted); *see Solid Waste Agency of N. Cook Cnty. v. U.S. Army corps of Eng'rs*, 531 U.S. 159, 173 (2001) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts should] construe the statue to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *PEAJE Inv. LLC v. Garícia-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) (adopting construction of statute to respect the "cardinal principle" of constitutional avoidance).

*See* 13 L.P.R.A. § 12(a) (the Dedicated Sales Tax revenue is "hereby transferred to, and shall be the property of COFINA.").  The relief sought by Plaintiffs would impair that right and result in a taking of COFINA bondholders' property in violation of the Fifth Amendment of the United States Constitution.[15]  Congress was careful to protect property rights by enacting Section 407 of PROMESA, which prohibits transfers from a territorial instrumentality like COFINA to the territory where it "deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors."  PROMESA § 407.  Thus, the Court should not permit Plaintiffs to seek a remedy to stop one possibly unlawful act (against them) by committing an unquestionably unlawful one (against COFINA bondholders).

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY LACHES AND ESTOPPEL

As shown above (*see infra* § I), although Plaintiffs' claims are brought pursuant to Section 303(3) of PROMESA, the declaratory and injunctive remedies they seek do not arise from PROMESA but are instead tied to their underlying constitutional challenge to COFINA's ownership of the Dedicated Sales Tax.  As the Court already noted earlier in this case, Plaintiffs' claims "certainly implicate the lawfulness of the Commonwealth's assignment of IVU revenues to COFINA …."  *Lex Claims, LLC v. García-Padilla*, 2017 WL 657432, at \*6 (D.P.R. Feb. 17, 2017).

If there was a time for Plaintiffs to challenge that "lawfulness," and seek equitable relief, it was years ago when they purchased their bonds (the last of which was issued in March 2014).

---

[15]   *See Security Indus. Bank*, 459 U.S. at 81-82 (instructing that "[n]o bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress" and thus courts should not construe a statute in a way that would require them "to resolve difficult and sensitive questions arising out of the guarantees of the takings clause."); *see PEAJE Inv.*, 845 F.3d at 511 (questioning the constitutionality of a statutory interpretation that would allow the Commonwealth to spend "every penny" of collateral and leave debt holder unsecured).

The time is not now after tens of billions of dollars in general obligations and COFINA bonds have been issued and serviced on the basis of COFINA's property rights being separate and unavailable to the Commonwealth. This inexcusable delay bars their claims to equitable relief under the doctrines of laches and estoppel under New York law (as to the 2014 GO Bondholders) and Puerto Rico law (as to all others).

## A. The Claims of the 2014 GO Bondholders Are Barred Under New York Law

New York law governs the 2014 GO Bondholders' contract and any action based on it. Ex. 6 (2014 Resolution) § 37(a) (stating that bonds are "governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or this Resolution …."). Under that law, the 2014 GO Bondholders cannot state a claim for equitable relief.

From the beginning, the 2014 GO Bondholders knew that payment on their bonds could not be made from the Dedicated Sales Tax. That point was made abundantly clear in the documents for every general obligation bond issuance before theirs (and after the creation of COFINA). *See supra* at 10-11. Their own documents were the same. The 2014 Preliminary Official Statement and the 2014 Official Statement together affirm no less than **eight times** that the Dedicated Sales Tax is not available to pay the 2014 GO Bonds. These Official Statements were stapled to the 2014 Resolution, which by its terms **ratified, confirmed and approved** them. Ex. 6 (2014 Resolution), §§ 31 & 32.[16] The 2014 Official Statement, for example, expressly stated that the Dedicated Sales Tax does "not constitute 'available resources' … and [is] not available

---

[16] Under Section 31, the Preliminary Official Statement "is hereby approved and the distribution and use of said Preliminary Official Statement by the Underwriters in connection with the offering of said Bonds is hereby in all respects ratified, confirmed and approved." *Id.* at § 31. Under Section 32, the Official Statement "is hereby approved … and the Underwriters are hereby authorized to distribute said Official Statement in connection with the offering and sale of said Bonds." *Id.* at § 32.

for use by the Secretary of the Treasury." Ex. 5 (2014 Official Stmt.) at 29. It went on to state

that "the portion of the Commonwealth sales and use tax allocated to COFINA is not available for

the payment of principal of and interest on the Bonds." *Id.* The reason for this, it explained was

that the "legislation creating COFINA … ***transfers ownership*** of [the Dedicated Sales Tax] to

COFINA." *Id.* at 31 (emphasis added). Similar statements were then repeated over and over for

the avoidance of any doubt. *See id.* at 31, II-58 & II-59.[17]

Identical disclosures were made in the Preliminary Official Statement as well. *See* Ex. 7

(2014 Preliminary Official Stmt.) at 27-28, 30, II-58 & II-59. And other sections of the Official

Statement further underscored that the 2014 GO Bonds were not backed by the same funding

sources as the COFINA bonds. *See, e.g.*, Ex. 5 (2014 Official Stmt.) at 33 (distinguishing between

bonds "guaranteed by the Commonwealth's good faith and credit" and those "payable from sales

tax revenues (COFINA)").

In addition to opportunity and notice, the bondholders also had the means to challenge the

validity of the Dedicated Sales Tax. In 2009, legislation was enacted which expanded COFINA

and transferred additional IVU to it. *See* SAC ¶ 101. That legislation conferred jurisdiction to the

Supreme Court of Puerto Rico to "resolve any matter … when the issue is the validity or

constitutionality" of the COFINA-enabling laws. Act 7-2009 § 69. Despite this jurisdictional

grant, the 2014 GO Bondholders never availed themselves of it.

The 2014 GO Bondholders also benefitted from the fact that their bonds did not have a

right to COFINA's revenues. To compensate for the unsecured nature of their investment, the

---

[17]    Some of the provisions in the bond documents cautioned that the transfer of the Dedicated Sales
Tax had not been challenged in court. This, however, would not have excused Plaintiffs' delay. If anything,
the failure to raise any concerns in light of this would only demonstrate a "wait-and-see" approach that is
more unreasonable.

2014 GO Bondholders bargained for an effective interest rate (accounting for the OID and funds earmarked for interest payments back to them) of approximately 9.1%—a rate higher than that which would be considered usurious under Puerto Rico law. *See* 10 L.P.R.A. § 998 (limiting the rate on loans greater than $3,000 to 8%). And they collected this benefit—amassing over $500 million in profit—for more than two years before filing this lawsuit.

This inexcusable delay, for which no explanation is provided in the Second Amended Complaint, bars their claims under the doctrine of laches. In New York, a plaintiff's "neglect or omission to assert a right … taken in conjunction with the lapse of time … and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity." *Schulz v. State*, 81 N.Y.2d 336, 348 (N.Y. 1993) (quoting *Matter of Barabash*, 31 N.Y.2d 76, 81 (N.Y. 1972)) (omitting internal quotation marks); *see also Summer v. City of Rochester*, 60 A.D.3d 1271, 1273 (4th Dep't 2009) (granting judgment against lawsuit brought less than two years after city action); *Burns v. Egan*, 117 A.D.2d 38, 42 (3d Dep't 1986) ("Indeed, this court has upheld a laches determination where the delay was less than a year's duration.").[18] This applies whether the plaintiff seeks to prevent future action (such as, the transfer of future taxes to COFINA) or undo past conduct. *See Kaplan v. State*, 202 A.D.2d 742, 743-44 (3d Dep't 1994) ("Although petitioner does not seek to invalidate past bond sales, the requested prohibition of future disbursements … would undoubtedly have a substantial effect on the financing mechanism as a whole.").

*Schulz* is instructive and dictates how to apply New York law. There, New York citizens challenged portions of a 1990 statute authorizing the issuance of long-term debt on the basis that

---

[18] Although laches does not bar all varieties of constitutional claims, it does apply in New York to bar challenges to the constitutionality of public financing measures because of the importance of these transactions to the government's maintenance and operations. *See, e.g., Summers*, 60 A.D.3d at 1273-74 (plaintiff's constitutional challenge to municipal financing legislation was barred by laches, and "contention that the defense of laches is against public policy is without merit") (*citing Schulz*, 81 N.Y.2d at 348-50).

it violated the New York State Constitution. In response to a laches defense, the plaintiffs argued that they brought their lawsuit only one year after the legislation's enactment, only six months after the bonds were issued, and only one month after learning of the State's alleged misconduct.

The New York Court of Appeals rejected the plaintiffs' arguments. It explained that, in determining whether laches applies, courts "must examine and explore the nature and subject matter of the particular controversy, its context and *the reliance and prejudicial impact on defendants and others materially affected*." *Schulz*, 81 N.Y.2d at 347 (emphasis added). As the court reasoned, "[t]hese considerations must be examined for their impact on the State, on the operation and maintenance of orderly government, *on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general*." *Id.* at 348 (emphasis added). Of critical importance to the court was the fact that, during the plaintiffs' delay, "the challenged financing plans were transacted in reliance on the presumed constitutionality" of the financing statute. *Id.* Affirming the dismissal of the lawsuit, the court concluded that "constitutional challenges to public financing of such massive and profound dimension, possibly causing traumatic disturbance to settled matters of public finances and governance, should be undertaken reasonably promptly." *Id.*[19]

As in *Schulz*, the 2014 GO Bondholders failed to act reasonably "in light of the great prejudice certain to be inflicted" on COFINA bondholders and the Commonwealth "when financial transactions of [this] magnitude and destabilizing impact are at stake and may be upset."

---

[19] The case was later revisited with the same result. There, the same plaintiffs challenged a 1993 law that expanded the earlier financing program. *See Schulz v. State*, 193 A.D.2d 171, 177 (3d Dep't 1993), *aff'd on other grounds*, 84 N.Y.2d 231 (N.Y. 1994). The New York Appellate Division ruled that plaintiffs' claims were again barred by laches because even though the plaintiffs promptly challenged the 1993 expansion, the financing scheme itself was created in 1990 and could have been challenged then. *Id.* at 177-78 ("Quite simply, to abort these programs at this point would create severe fiscal problems and cause the same sort of disruption and prejudice which led the Court of Appeals to apply the doctrine of laches in [the first case].").

*Id.* at 349-50. COFINA bonds have traded and COFINA bondholders have planned their financial matters on the understanding that COFINA owned the Dedicated Sales Tax. Upending Puerto Rico debt would also severely prejudice the Commonwealth, which has paid over $500 million to the 2014 GO Bondholders on account of bonds that would have been priced much lower if the Dedicated Sales Tax were "available resources." It also unsettles the Commonwealth's finances, harms the public entities that invested in COFINA, and undermines the Commonwealth's ability to use securitizations in the future or obtain investment-grade credit ratings by creating uncertainty or onerous restrictions in the priority and sources of payment. *See Saratoga Cnty. Chambers of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 818-19 (N.Y. 2003) (emphasizing state's need "to maintain fiscal credibility as a borrower," and finding that laches would be appropriate if late challenge "might hinder the State's ability to raise financing in the future, to say nothing of the effects on budget projections that invalidation of a source of revenue would cause").[20]

These same facts also justify dismissal on the basis of estoppel under New York law. This doctrine is applied by courts "to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *1301 Properties Owner LP v. Abelson*, 2016 WL 1367908, at *5 (Sup. Ct. N.Y. Cnty. Apr. 1, 2016) (finding that it would be "manifestly unfair" to allow a party to raise late objections to certain financial certifications as the other parties had by then "lost the opportunity to correct any defects"). Moreover, "silence may in some cases be sufficient to

---

[20] The court in *Saratoga* did not apply laches to dismiss the claims, finding, unlike here, that it was questionable whether the party invoking laches had suffered economic prejudice from the delay or if the party in fact profited for it. *See id.* at 817 ("having no basis to conclude that [the party seeking laches] has not profited—we cannot dismiss a suit on laches grounds"). By contrast, the COFINA Senior Bondholders have not profited and are still owed billions of dollars on their obligations.

establish a misrepresentation" for purposes of equitable estoppel.  *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

The conduct of the 2014 GO Bondholders meets this standard.  Doing nothing to preclear any "available resources" concern before the 2014 GO Bonds were issued, these bondholders agreed to a multi-billion debt issuance built on documents that confirmed that COFINA property was not available to them.  The bondholders' voluntarily agreement to that structure affirmed to COFINA bondholders that there would be no constitutional challenge.  On the basis of that affirmation, COFINA Senior Bondholders in particular have allowed hundreds of millions of dollars of COFINA funds to be paid out to COFINA's subordinate bondholders.  If there had been a challenge to the Dedicated Sales Tax before, then an Event of Default would have been triggered under the COFINA Resolution, resulting in enforcement of the payment priority to place COFINA Senior Bondholders ahead of subordinate bondholders.  Having "led [COFINA bondholders] to form the reasonable belief that [a claim to COFINA's property] would not be asserted," the 2014 GO Bondholders are estopped from asserting otherwise.

### B.      The Claims of Remaining Plaintiffs Are Barred Under Puerto Rico Law

Laches and estoppel apply equally to bar claims by Plaintiffs who own bonds that were issued before 2014 and are governed by Puerto Rico law.  Like the 2014 GO Bondholders, the remaining Plaintiffs knew when they purchased that they did not have an interest in the Dedicated Sales Tax.  After the formation of COFINA, their transaction documents similarly disclosed that the Dedicated Sales Tax would not be available to service their bonds.  And pre-COFINA Plaintiffs could have challenged COFINA's enabling legislation or any of its amendments in the last 10 years.  *See supra*, at 10-11 (showing Plaintiffs' understanding from bond documents).

As the Supreme Court of Puerto Rico has recognized, Article 7 of the Puerto Rico Civil Code (31 L.P.R.A. § 7) permits the application of equitable remedies when no statute is on point.

*See Int'l Gen. Electric v. Concrete Builders*, 104 D.P.R. 871, 873-874, 4 P.R. Offic. Trans. 1221, 1225 (1976) ("When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice … shall be taken into consideration.") (quoting 31 L.P.R.A. § 7) (omitting quotation marks).

Turning first to laches, Puerto Rico law recognizes that the doctrine is borrowed from the common law tradition, rather than the civil law tradition. *See PIP v. Commonwealth*, 186 D.P.R. 1, 13-16 (2012) (applying laches to bar challenge to legislative referendum) ("Although it is an equitable remedy, and even though our judicial system is eminently of a civil law tradition, in our jurisdiction we have applied the doctrine of laches in relation to extraordinary remedies provided by our system that have been adopted from common law, such as the injunction, the mandamus and the certiorari."); *Consejo Titulares v. Ramon Vazquez*, 186 D.P.R. 311, 340-41 (2012) (noting that laches is based on American common law doctrine of equity). A Puerto Rico court would thus look to U.S. state courts for persuasive authority, such as the *Schulz* decision.

This would be appropriate because the basic purpose of laches under Puerto Rico law is the same as it is under New York law—to prevent a plaintiff from asserting an overdue claim that would cause unfair disruption if allowed to proceed. For example, in *PIP*, the plaintiff challenged a legislative referendum to amend the Puerto Rico Constitution. Although the Supreme Court of Puerto Rico declined to dismiss the claim on the basis of laches, it did so because, unlike here, the court also concluded that the amendment was still in its initial stages and thus there was still time to resolve the constitutional controversy without causing chaos. *Id.* at 16.

The decision nonetheless provides persuasive guidance. Like the *Schulz* court, the Supreme Court of Puerto Rico explained that laches is necessary to prevent "the neglect or negligence in the exercise of a right, which together with the lapse of time and other circumstances

[ ] cause prejudice to the adverse party." *Id.* at 13. The court further reasoned that the "objective" of laches "is to avoid rewarding a party that fails to act even knowing the existence of its right and in so doing causes prejudice to the other or harms important public and private interests." *Id.* Finally, the court instructed that "it is improper for one side to sit idle until the last moment to file its constitutional claim [because] [t]his tarnishes our system [and] [o]ur constitutional document deserves more respect." *Id.* at 16. In light of *PIP*, the same undisputed facts that show laches under New York law would also justify a finding of laches under Puerto Rico law.

As to estoppel, the Supreme Court of Puerto Rico has held that the doctrine of "actos propios"—or "one's own act"—is a "general principle of law" "with universal validity." *Int'l Gen. Electric*, 4 P.R. Offic. Trans. at 1231. It bars a claim when the plaintiff has created a "situation contrary to reality" that may affect the behavior of others and another party has acted to its detriment in response to the plaintiff's conduct. *Id.* The doctrine's purpose is to maintain the relationship between the parties as it was created. *O.C.S. v. Universal*, 187 D.P.R. 164, 171-74 (2012).

Puerto Rico case law shows that the doctrine applies in this case. In *Crossroads Dev. Corp. v. E.L.A.*, 103 D.P.R. 789, 3 P.R. Offic. Trans. 1104 (1975), for example, the plaintiff applied to the Planning Board for a development permit. The Planning Board approved the plaintiff's application on the condition that the plaintiff dedicate a portion of the property for public use, namely for the extension of two major roads. The plaintiff did not challenge the Planning Board's designation of that parcel as "public" and indeed benefitted from it as it increased the value of the rest of the property. Later, when the plaintiff was denied another development permit, it sued to reclaim the property that it had dedicated, claiming that the Planning Board's designation of the property for public use was invalid.

26

The Supreme Court of Puerto Rico rejected the plaintiff's arguments. Finding that the plaintiff willingly benefited from the Planning Board's original designation and approval, the court reasoned that the plaintiff could not then "disavow[ ] that part of the approval which [was] not convenient to its interests." *Id.* at 1105. The court went on by stating that it "would be contrary to equity and to the rational, continuous and orderly process" of government planning to allow the plaintiff to "go over its own acts." *Id.* at 1108. The same result should follow here too.

## III.   IN ADDITION, THE CLAIMS BY THE 2014 GO BONDHOLDERS SHOULD BE DISMISSED UNDER NEW YORK CONTRACT LAW

As shown above (*see infra* §II.A.), the provisions of the bond documents affirming Plaintiff's inability to seek payment on COFINA's property requires dismissal of their claims on the basis of laches and estoppel. Dismissal as to the 2014 GO Bondholders is particularly appropriate because their documents show not merely their awareness that COFINA's property was excluded from "available resources" but also their having ***contractually*** disclaimed any entitlement to that property.

Unlike claims by Plaintiffs who may assert bonds governed by Puerto Rico law, the 2014 GO Bondholders negotiated for New York law to apply to their bonds.[21] *See supra* at 18. They do not dispute that New York law governs and in fact have asserted in the Second Amended Complaint that Puerto Rico law is irrelevant to their New York-governed contract.[22] *See* SAC, Count 11.

---

[21]   The laws of the Commonwealth, by contrast, apply only "with respect to the adoption and execution [of the Resolution] by the Commonwealth." Ex. 6 (2014 Resolution) § 37(a). This would include, for example, whether the 2014 GO Bonds violated Puerto Rico's debt limit when extant full faith and credit obligations are properly included under Puerto Rico law. *See Infra __*.

[22]   The 2014 GO Bondholders no doubt chose New York law in an attempt to insulate themselves from the possibility that Puerto Rico's financial challenges would lead to Puerto Rico to enact debt restructuring or moratorium laws. *See* Ex. 5 (2014 Official Stmt.) at 5-14 (discussing risk that Puerto Rico could seek to pass debt restructuring law).

That contract includes both the 2014 Resolution as well as the Preliminary and Official Statements, which were ratified, approved, and confirmed by the Resolution, and thus must be read together with it. *See* Ex. 6 (2014 Resolution), §§ 31 & 32. *See In re Trusteeship Created by American Home Mortg. Inv. Trust 2005-2*, 2014 WL 3858506, at \*20 (S.D.N.Y. July 24, 2014) ("Here, it is necessary for [the court] to consider the Offering Documents when [reading] the Indenture because the Indenture cannot be read without them, since it explicitly referenced and incorporated the Prospectus.").

A plain reading of these documents shows that the 2014 GO Bondholders consented in the contract to the exclusion of the Dedicated Sales Tax from their funding sources. Under the contract's repayment provisions, the 2014 GO Bondholders are entitled to payment only from "any funds in the Treasury of the Commonwealth." *Id.* at § 19. If the Commonwealth did not pay principal or interest on the bonds from these "funds in the Treasury," the 2014 GO Bondholders agreed that their remedy would be to "compel the Secretary of the Treasury to apply available Commonwealth resources to the payment of the Bonds …." *Id.* at § 20(a) (emphasis added). The agreement is unambiguous as to what was ***not*** included in these amounts, stating that COFINA's revenues "do not constitute 'available resources' of the Commonwealth." Ex. 5 (2014 Official Stmt.) at 29. And to leave no room for doubt, these were not "available resources" precisely "for purposes of Section and Section 8 of Article VI of the Commonwealth Constitution," the same provisions under which the 2014 GO Bondholders bring their claims now. *Id.*

As a result, deciding these Plaintiffs' claims does not turn on any constitutional issue. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases … should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its

provisions."). *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) ("Under New York

law, a written contract is to be interpreted so as to give effect to the intention of the parties as

expressed in the unequivocal language they have employed."). Rather, the 2014 GO Bondholders

cannot escape the terms of their own agreement, which expressly agreed to exclude COFINA's

property from their contractual description of "available resources." On the plain meaning of their

contract, claims asserted by Plaintiffs on the basis of the 2014 GO Bonds must be dismissed.

## IV.   FULL FAITH AND CREDIT BONDS ISSUED AFTER 2011 EXCEEDED THE CONSTITUTIONAL DEBT LIMIT AND ARE THUS INVALID AND NOT ENTITLED TO ANY PRIORITY

To proceed on their claims at this stage, Plaintiffs bear the burden to show that they hold

bonds having valid constitutional priority. Yet, they have not articulated which series of bonds

they hold other than that they hold at least 2014 GO Bonds. These bonds, and any others issued

after 2011, however, cannot provide a basis for Plaintiffs' claims because they were issued when

the Commonwealth's general obligations exceeded the constitutional debt service limit. Thus,

they are not entitled to the Commonwealth's full faith and credit and were not constitutionally

valid to begin with.

Under the Puerto Rico Constitution, only bonds that are issued within the debt limit are

backed by the Commonwealth's full faith and credit. As set forth in Article VI, Section 2, the

Commonwealth may not issue bonds backed by its "full faith credit and taxing power" if:

> the total of (i) the amount of principal of and interest on such bonds and notes,
> together with the amount of principal of and interest on all such bonds and notes
> theretofore issued by the Commonwealth and then outstanding, payable in any
> fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next
> preceding the then current fiscal year for principal or interest on account of any
> outstanding obligations evidenced by bonds or notes guaranteed by the
> Commonwealth, shall exceed 15% of the average of the total amount of the annual
> revenues raised under the provisions of Commonwealth legislation and covered
> into the Treasury of Puerto Rico in the two fiscal years next preceding the then
> current fiscal year ....

*See* P.R. Const., art. VI, § 2. This means that the Commonwealth is prohibited from issuing full faith and credit public-debt bonds if (i) the amounts due on them "payable in any fiscal year" plus (ii) the amounts paid for principal or interest "on account of" any bonds guaranteed in the last fiscal year exceeds 15% of the average revenues deposited into the Treasury over the two previous years. Moreover, the Commonwealth "shall not guarantee any obligations" if the 15% debt service limit is exceeded. *Id.*

That limit was breached in 2011. By March of that year, the average revenues for the prior two fiscal years was approximately $7.3 billion. *See* Ex. 1 (June 30, 2012 Year End Fin. Report) at 292 (showing "Internal revenue average for two years").[23] At the same time, it was calculated that, over the life of the bonds, the highest amount "payable" on GO Bonds "in any fiscal year" (which the Official Statements refer to as the "future maximum annual debt service" amount), was approximately $957.9 million. *See* Ex. 8 (Mar. 2011 Series C Official Stmt.) at 21 (showing debt service requirements on GO Bonds). Adding the amount that the Commonwealth had paid the prior year on bonds it guaranteed raises this number to approximately $968.4 million. *See id.* at 22 (showing that the Commonwealth paid approximately $10.5 million on bonds it guaranteed). The amount of debt service on the GO Bonds alone thus brought the Commonwealth to the cusp of the debt limit and was approximately 13.23% of average revenues (968.4 million divided by 7.3 billion).

But other full faith and credit obligations need to be added to complete the calculation consistent with both the text of the Puerto Rico Constitution and its obvious purpose. Namely,

---

[23] In the various Official Statements, the Commonwealth provided estimates of the average revenues for the prior two fiscal years. *See, e.g.,* Ex. 8 (Mar. 2011 Series C Official Stmt.) at 22. For the 2012-FY annual report, the Commonwealth included an updated schedule reflecting the average two-year revenues used for debt limit purposes from 2003 to 2012.

between June 1995 and June 2012, the Commonwealth indisputably pledged its full faith, credit, and taxing power to support more than $6.7 billion of bonds to fund its office buildings and other facilities. *See, e.g.*, Ex. 9 (June 8, 2012 PBA Official Stmt.), Preamble ("The Bonds are … secured by the guaranty of the Commonwealth … to draw from any funds available in the Department of Treasury"). These bonds were issued through the Puerto Rico Public Buildings Authority ("PBA") and were backed by rental payments on facilities that the PBA leased to the Commonwealth. And to ensure no wiggle room at all on the fullness and faithfulness of the obligations, pursuant to the PBA's enabling legislation, the Commonwealth's good faith and credit were also "pledged for the payment of rentals" on all of its lease agreements with the PBA. *Id.* at 14.

The economic substance and effect of these transactions on the people of Puerto Rico is that the Commonwealth borrowed money from investors from the issuance of bonds, and agreed to pledge its full faith and credit ***twice*** to repay the bonds through "rental payments" to the PBA and then a guarantee (with the same full faith and credit) of any shortfalls between the "rent" and the principal and interest payments due on the bonds. But this "guarantee" was entirely superfluous because an entity cannot guarantee its own "rental" obligations. Although the PBA has many bondholders, the Commonwealth is the PBA's only lessee. *See id.* at 19 ("the [PBA] enters into lease agreements … with various departments [etc.] of the Commonwealth"). Moreover, the timing and amount of the Commonwealth's payments to the PBA is tied to the principal and interest requirements on the bonds. *See id.* at 19 (showing that rentals owed by the Commonwealth "are calculated taking into account … Principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings"). When "rent" is due, the Treasury sends funds to the Government Development Bank ("GDB") under an Inter-Agency Agreement designed to speed up payment; funds from this "rent" are then used to

service the PBA bonds. *See id.* at 16. Indeed, one time, when there was an impromptu reduction in PBA's debt service requirements, there was a corresponding reduction in the "rent" the Commonwealth had to pay for that period. *See id.* at 17. Given the nature of the PBA bonds' recourse, and its "double full faith protection," it is quite plain to see the "rental obligations and payments" by the Commonwealth were in fact "for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth."

The only reason the PBA bonds have yet to be included in the debt limit calculation, even though they are backed by the full faith and credit of the Commonwealth (in two ways), is that the PBA acts as a conduit thereby creating the illusion that the Commonwealth does not have a direct full faith and credit obligation to PBA bond investors, only a guarantee. Yet, the reality is to the contrary, and the Court must look to the substance of the transactions in determining that the PBA debt should be counted against the constitutional debt limit. *See Cerajewski v. McVey*, 72 N.E.2d 650, 652 (Ind. 1947) ("In appraising the validity of the statute before us …, we must consider the purpose of the debt limitation section of the Constitution and must look through the form of the statute to the substance of what it does and we should not countenance subterfuge to evade the intent of our fundamental law.").

When the PBA bonds are correctly accounted for, the Commonwealth's full faith and credit obligations were approximately 15.1% of average revenues by March 2011—an amount that exceeded the constitutional debt limit.[24] At that time, the Commonwealth issued $442 million of

---

[24] To correctly account for the PBA bonds, one would add the annual debt service requirements on the PBA bonds to the annual debt service requirements on the GO Bonds at that time. The highest combined amount over the life of the bonds, plus the amounts paid the prior year on bonds that were guaranteed, would then be the amount "payable in any fiscal year" that is used in the constitutional debt limit calculation. In addition, the conclusion that obligations were 15.1% of revenues in 2011 is conservative. While the Commonwealth, for debt limit purposes, includes debt service payments that are later refunded with the proceeds of refunding bonds invested in non-eligible investments, the calculation above excludes these amounts.

2011 Series C GO Bonds. With this issuance, the Commonwealth's maximum debt service amount (considering both GO and PBA bonds) was approximately $1.1 billion (compared to average revenues at that time of approximately $7.3 billion). *Compare* Ex. 8 (Mar. 2011 Series C Official Stmt.) at 22 & 26 (schedule showing debt service on GO Bonds of $847.4 million in 2012, and payment of $10.5 on bonds the Commonwealth guaranteed) *with* Ex. 10 (Oct. 2009 PBA Series Q Official Stmt.) at 25 (schedule showing debt service on PBA bonds of $251.2 in 2012).[25] By August 2011, the Commonwealth's obligations were approximately 15.3% of average revenues. And by the time the 2014 GO bonds were issued in March 2014 (and including that issuance), the Commonwealth was way over the line, with obligations of approximately 17.5% of average revenues:



As a result, no GO Bonds (or PBA bonds) issued after 2011 can claim an entitlement to the Commonwealth's guarantee of full faith, credit and taxing power. *See* P.R. Const., art. VI, § 2

---

[25] In other words, as of the March 2011 issuance, the maximum debt service the Commonwealth had to pay on both GO Bonds and PBA bonds in one year was approximately $1.1 billion in 2012.

("the Commonwealth shall not guarantee any obligations" if the debt limit is exceeded). Without this, holders of these bonds also cannot claim any entitlement to the Commonwealth's "available resources" and their claims should be dismissed for this reason.

The claims of these bondholders should also be dismissed because any bonds issued after 2011 that purport to be backed the Commonwealth's full faith and credit were issued in violation of the constitutional debt limit and are thus void. *See, e.g.*, *State v. Spring City*, 260 P.2d 527, 529 (Utah 1955) ("Obligations incurred after the debt limit is reached are void, and their payment should not be permitted to deprive legitimate claimants."); *Eaton v. Shiawassee County*, 218 F. 588, 591 (6th Cir. 1914) (lenders could not recover funds loaned to county where funds were borrowed in excess of the county's authority to create a debt).

## V. THE CONSTITUTIONAL CHALLENGE TO ACT 91 FAILS AS A MATTER OF PUERTO RICO LAW

The essential allegation of the Second Amended Complaint is that more than $17 billion in bonds issued by COFINA under Act 91, are the offspring of an unconstitutional legislative act enacted over a decade ago to deprive the Commonwealth and, derivatively, its creditors of an "available resource" under Article VI, Sections 2 and 8 of the Puerto Rico Constitution. COFINA bonds continue to be serviced despite the moratorium that Executive Order 2016-30 imposed upon bonds issued or guaranteed by the Commonwealth of Puerto Rico, including their GO Bonds. Plaintiffs claim that this trumps their first-payment-guarantee under Article VI, Sec. 8 of the Puerto Rico Constitution.

Plaintiffs' contention that the term "*available* resources" means "*total* resources" or "*all* resources" and their failure to recognize that the Legislative Assembly, in the exercise of its power to tax and issue debt, can give content to the term "available resources", is contrary to the letter, history, and spirit of Article VI, Secs. 2, 7 and 8, of the Puerto Rico Constitution, as amended.

34

Under the Puerto Rico doctrine of judicial restraint, the court must resolve this question only if the case cannot be decided otherwise. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 597 (1958). Intervenor-Defendants raise the issue here, should the case survive the previously briefed equitable arguments, while preserving their right to motion this Honorable Court for certification of this question to the Supreme Court or Puerto Rico ("SCOPR").

### A. THE COMMONWEALTH'S LEGISLATIVE ASSEMBLY HOLDS THE POWER TO IMPOSE TAXES AND ISSUE DEBT, AND COURTS MUST NOT LIGHTLY SECOND GUESS ITS EXERCISE OF SAID POWER

Article VI, Section 2 of the Puerto Rico Constitution, originally approved by the people of Puerto Rico and Congress in 1952, contained only two sentences. The first entrusts the power to impose taxes upon the Legislative Assembly, warning that said power shall never be suspended or surrendered. P.R. Laws Ann. Const. Art. 6 § 2. That sentence has remained unchanged and without limitations. The second sentence grants the legislature the power to issue debt. In 1961, the debt issued "directly" by the Commonwealth of Puerto Rico, for which the full faith and credit of the same was pledged, was limited.

Section 2 further requires that the Secretary of the Treasury apply "available resources"[26] to the payment of interest on, and amortization of the public debt, upon suit of any bondholder, in a situation covered by Sec. 8 of the same article.[27]

---

[26]  Though the official translation of the term is "available revenues", we are using the term "available resources" as the more accurate translation. Plaintiffs use the same term in the Second Amended Complaint. Either way the operative word is "available".

[27]  Section 2 provides, in pertinent part:

> The power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. The power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly […] The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by

35

For plaintiffs, the "available resources" of Secs. 2 and 8 are "all" resources. That is plainly wrong. The section immediately preceding the priority of payment provision uses the phrase "total resources" when dealing with appropriations, demonstrating the obvious, "available" assumes "non-available," both within "total resources."

Plaintiffs' challenge to Act. 91 squarely presents the question whether the Legislative Assembly has the power to create a sales and use tax and exclude a portion of the new sum of the total resources from the constitutionally "available resources." The answer is yes, as this is part and parcel of the power to tax and issue debt entrusted to the Legislative Assembly by the Puerto Rico Constitution.

The taxing power encompasses the prerogative to create a tax and decide how its revenue will be used, provided it is for a "public purpose". *Interior Developers v. Mun. de San Juan*, 177 D.P.R. 693, 703 (2009). The scope and deference granted to the Legislative Assembly in the exercise of this prerogative is exemplified in *P. R. Tel. Co. v. Tribunal de Contribuciones,* 81 D.P.R. 982, 996 (1960), where the SCOPR refused to second guess that branch's determination that a tax scheme had a "public purpose". The SCOPR explained:

> The objection against [the tax] arises from the fact that **the law that creates it at the same time destines it to a specific purpose instead of ordering its deposit in the general funds** of the government. […] **The only concern that we have […] is to determine if Congress can, without violating the fundamental law, make an assignment for the specified purpose. If the Congress, for reasons it deemed satisfactory, decided to adopt the quantum of revenues from the special tax as a measure of the assignment, we find no valid support to attack its power to do so.** [citations omitted]

The SCOPR cautioned against judicial interference with said prerogative except in extreme cases where there is no reasonably conceivable public purpose.

---

Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

36

… since the adoption of the XIVth Amendment, the states can only impose taxes for a public purpose and not for private purposes, but the requirements of due process allow free range for the exercise of a wide legislative discretion in determining which disbursements would serve the general wellbeing. **The ways to benefit public interest are peculiarly within the knowledge of the Legislature and it is it, and not the courts, who has the duty and responsibility of choosing among the possible methods. Therefore, to justify court intervention there must be a clear case of deviation from any reasonably conceivable public purpose or […] a display of arbitrary power, not a display of judgment. This judicial authority […] must be exercised with the most extreme caution.** [citations omitted]

In fact, when Sec. 2 says that said power "shall never be surrendered or suspended," it means that other branches of government must abstain from interfering with it. *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416, 440 (1964).[28] When that language was discussed during the Constitutional Assembly, it was explained as follows: "The language is addressed at not limiting the faculty of the Legislative Assembly to impose and collect taxes."[29] This suggests that the prohibition seeks to prevent encroachment by other branches of government, thus cementing the broad discretion of the Legislative Assembly in this field. Our Supreme Court has interpreted this language as the Constitutional Assembly discussions suggests:

> The Constitution, Art. VI, Sec. 2, provides that the power of the CWPR to impose and collect taxes […] will be exercised as provided by the Legislative Assembly and **will never surrendered or suspended. This Court cannot be inclined to surrender [the Legislative Assembly's taxing power] easily** and would only annul it when exercised in violation of the applicable provisions of the CWPR Constitution or of the personal rights guaranteed by said Constitution – that no person shall be deprived of liberty or property without due process of law, or that no person shall be denied the equal protection of the laws – or if it is exercised in violation of the legal obligations that the people accepted in its Federal Relations.

In sum, the Puerto Rico Constitution entrusts the Legislative Assembly with the power to impose taxes and determine how these will be used. The drafters' intention was to turn this into a very

---

[28] Overruled as to other aspects of its holding by *E.L.A. v. Nw. Selecta,* 185 D.P.R. 40 (2012).

[29] Constitutional Assembly Diaries, p. 2575. Unofficial translation.

wide power. J.P. Tras Monge, *Constitutional History of Puerto Rico*, San Juan, Ed. U.P.R. 1982, Vol. III, p. 216.  As the democratically elected branch with "peculiar" knowledge in this area, the Legislative Assembly's exercise of said power cannot be second-guessed by the judicial branch, unless there is a clear deviation from any reasonably conceivable public purpose or a display of arbitrary power. As we will see shortly, that is not the case here.

### B. THE LEGISLATIVE ASSEMBLY'S POWER TO TAX AND ISSUE DEBT INCLUDES THE PREROGATIVE TO DETERMINE THAT A TAX REVENUE WILL <u>NOT</u> BE AN "AVAILABLE RESOURCE"

The Constitution does not directly define the term "available resources" used in Sections 2 and 8 of Article VI.  However, when setting the credit margin, Section 2 bases it on the "revenues" that are also deposited into the Puerto Rico Treasury. Conversely, there must be "revenues" that are not deposited into the Treasury. These are therefore not "available".  Because the Legislative Assembly was vested with the power to impose taxes and issue debt, that power must include the designation of what revenues are deposited into the Puerto Rico Treasury and therefore made "available".

The Constitution could have limited all debt issued by the Commonwealth and its instrumentalities but did not.  In limiting the amount of **only** full faith and credit debt, the Constitution recognizes that there will be other kinds of debt, as per the power to issue debt of the second sentence of Sec. 2.  That other debt will, in a situation covered by Sec. 8, be paid with non-available resources, raised with the power to tax, but not deposited into the Treasury.

The 1961 amendment to Article VI, Sec. 2, to include a formula to set the Commonwealth's credit margin, different from what had therefore applied under the Jones Act. Under the formula adopted in 1961, the credit margin for debt issued directly by the Commonwealth and subject to

its full faith and credit guarantee, is based on a percentage of revenues <u>deposited</u>[30] into the Puerto Rico Treasury.[31] When discussing the 1961 amendment, the Special Commission that issued recommendations on the amendment explained:[32]

> Under the current system, the credit margin increases with the increase in property and the increase in its corresponding value assessment. These factors are not necessarily under the control of the Legislative Assembly. However, **under the proposed formula, the Legislative Assembly would have a more absolute control over the credit margin.**
>
> … [T]he formula proposed to set the **<u>credit margin</u>** of the State is more flexible and realistic than the one currently in use. It is based on the **<u>available resources</u>** of the Government, which is the true source to confront payment of State obligations, and not on a percentage of the assessment value of [real] property, which is not a true index of capacity to pay. **The formula is in harmony with Sec. 8 of Art. VI of our Constitution which in synthesis provides that the available resources of the State shall be used first for the payment of interest and amortization of the public debt**.
> […]

---

[30] The term used by the Constitution is "ingresados", meaning deposited, translated in the Official translation as "covered into the Treasury".

[31] Section 2 provides, in pertinent part:

…no <u>direct obligations</u> of the Commonwealth for money <u>borrowed directly by the Commonwealth</u> evidenced by bonds or notes for the payment of which the <u>full faith credit and taxing power of the Commonwealth shall be pledged</u> shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed <u>15% of the average of the total amount of the annual revenues</u> raised under the provisions of Commonwealth legislation **and** <u>covered into the Treasury</u> of Puerto Rico in the two fiscal years next preceding the then current fiscal year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

[32] Legislative Diary, Vol. XIV No. 27, 1961, pp. 221, 226, 248. Unofficial translation.

Thus, the Legislature, in deciding whether to deposit in the Treasury or not, is deciding what resources are going to be "available" for purposes of Sec. 8 and for purposes of the judicial implementation of the same in Sec. 2, through an action in the nature of a *mandamus* against the Secretary of the Treasury only. Therefore, since the purpose of the 1961 Amendment was to confer upon the Legislative Assembly the power to better control the credit margin, that power includes the determination of what revenues are deposited into the Puerto Rico Treasury. It is from these deposited funds that holders of full faith and credit debt can compel payment from the Secretary of the Treasury:

> The portion of the Constitutional amendment contained in the Resolution that we are considering contains, as well, a new provision, I think I already mentioned it, that is in the Constitution of the State of New York, and which provides that judicial action may be filed against the Secretary of the Treasury **to dedicate available resources in the Treasury** to the payment of interests over the principal of the public debt.[33]

Therefore, the Legislative Assembly, in the exercise of its constitutionally delegated taxing and debt issuing prerogatives, could validly create a tax, direct that its revenues not be deposited in the Treasury and, as such, remove them from the resources that are "available" to pay full faith and credit debt. That is exactly what the Legislative Assembly did with Act 91, by ordering the transfer of the DST to a special fund not within the Puerto Rico Treasury.

### C. COFINA IS THE RESULT OF THE LEGISLATIVE ASSEMBLY'S VALID USE OF ITS CONSTITUTIONAL POWER TO IMPOSE TAXES AND ISSUE DEBT

1. Through PR Act 91-2006, the Legislative Assembly Validly Exercised Its Taxing Power and Created a Sales and Use Tax ("SUT")

Act 91-2006, as amended, 13 L.P.R.A. § 11a, created COFINA as "[a] public corporation and instrumentality of the Commonwealth of Puerto Rico, […] which constitutes a corporate and

---

[33] Legislative Diary, Vol. XIV No. 27, 1961, Page. 221. Unofficial translation.

political entity independent and separate from the Commonwealth of Puerto Rico." Its purpose is to issue bonds and use other financing mechanisms to attain certain public purposes. To support its financing functions, the debt issued by COFINA is repaid from the designated portion of the tax deposited in the Dedicated Sales Tax Fund ("DST"), pursuant to the provisions of Act 91. *Id.* Under Section 3 of Act 91, the transfer of the portion of the Sales and Use Tax ("SUT") that goes to the DST "is made in exchange for, and in consideration of COFINA's commitment to" pay or fund the public uses outlined in Section 2 of Act 91. The DST is never deposited in the Puerto Rico Treasury and is expressly removed from "available resources". In addition, property of the DST is expressly transferred to COFINA. The flip side is that COFINA bonds are denied the Commonwealth's full faith and credit guarantee. 13 LP.R.A. §§ 11a, 12 and 13.

The validity of this quintessential exercise of taxing power must be analyzed pursuant to the Legislative Assembly's broad power to impose taxes and issue debt. This power is at least as broad as the analogous power enjoyed by the states, *see Interior Developers v. Mun. de San Juan*, 177 D.P.R. 693, 703 (2009)[34]; *Mun. de Utuado v. Aireko Const. Corp.*, 176 D.P.R. 897, 904 (2009)[35]. It is also as broad as intended by our Constitution, to include the power to determine what funds are deposited into the Treasury and available to the Secretary of the Treasury to be used by Sec. 8 when the available revenues are insufficient for the appropriations. As we have discussed, this power is not meant to be second-guessed unless it clearly deviates from <u>any reasonably conceivable public purpose</u> or constitutes a display of arbitrary power, contrary to the Constitution or federal law. *R.C.A. v. Gobierno de la Capital*, *supra*.

---

[34] A copy of the certified translation of this document has been attached as Exhibit __.

[35] A copy of the certified translation of this document has been attached as Exhibit __.

COFINA bonds were Puerto Rico's first rescue bond. The use of the securitization mechanism created by Act. 91, allowed Puerto Rico to refinance prior debt at more advantageous terms, including lower interest rates. It also enabled Puerto Rico to achieve other purposes authorized by Act 91, as amended throughout the years, including paying suppliers and nourishing certain emergency and relief funds.[36] These objectives have an unquestionably rational public purpose and have been implemented within the Legislative Assembly's constitutional tax and debt issuance authority. There is no room for Plaintiffs to invite the court to second-guess the constitutionality of Act 91.

2. Because the DST is Not Deposited in Puerto Rico's Treasury Fund, It Is Not An "Available Resource"

The above discussion demonstrates that the Legislative Assembly can validly create a tax for a public purpose and exclude its revenues from "available resources." The question remains whether the mechanism effectively removed the DST from "available resources". The answer to this question is yes.

As previously discussed, the "available resources" are those "revenues" that are also deposited into the Puerto Rico Treasury. Conversely, "revenues" not deposited there are not

---

[36] Under Act. 91, 13 L.P.R.A. sec. 11a, the purposes of COFINA include:

- To pay or refinance all or part of the extraconstitutional debt;
- to pay debt of the Secretary of the Treasury or the Commonwealth with the Government Development Bank;
- to pay financing to the Commonwealth from other financial institutions and debt with no repayment source or payable from budget appropriations;
- to pay suppliers;
- to pay or finance operating expenses;
- to nourish the Puerto Rico Economic Stimulus Fund;
- to nourish the Emergency Fund;
- to nourish the Economic Cooperation and Alternatives Fund for Public Employees;
- to nourish the Fiscal Reconstruction Fund and
- to pay, finance, or refinance certain bond anticipation notes or to cover the cost of necessary public improvements.

"available resources." Such is the case of the DST, which is not deposited in the Puerto Rico Treasury. Instead, the SUT is directly deposited in a separate account at Banco Popular de Puerto Rico, from which the DST is then transferred to the Bank of New York. Thus, the DST is never an "available resource."

### D. CONCLUSION

Act 91 created COFINA to issue bonds whose proceeds could fund certain public objectives. To ensure that the COFINA financing mechanism was attractive to investors, so that financing could be obtained at the lowest cost, the Legislative Assembly securitized these bonds by transferring to COFINA ownership of the DST and providing that the DST would never be deposited in the Treasury. This guarantee is a trade-off to offset the fact that Act 91 denies COFINA bonds the full faith and credit guarantee. Thus, just as the holders of COFINA bonds forgo the benefit of the full faith and credit guarantee in exchange for exclusive ownership of the DST, the GO Bondholders forgo the benefits of the DST, in exchange for the full faith and credit guarantee over all available (not "total") resources. This financing mechanism cannot be said to lack a reasonable public purpose. Disagreement over the wisdom, convenience or effectiveness of this mechanism, is a legally insufficient basis to challenge it.

Finally, as stated at the outset of this section, this question presents an issue of first impression of Puerto Rico Constitutional law. There are no binding precedents and any uncertainty as to any analogous precedents should be decided by the SCOPR.

## **CONCLUSION**

Judgment should be granted against the GO Bondholders as to Count 2 (and Count 12 to the extent it seeks the same relief).

DATED: March 18, 2017

Respectfully submitted,

REICHARD & ESCALERA

By : **/s/ Rafael Escalera**
   **Rafael Escalera**
   USDC No. 122609
   escalera@reichardescalera.com

   **Sylvia M. Arizmendi**
   USDC-PR 210714
   arizmendis@reichardescalera.com

   **Carlos R. Rivera-Ortiz**
   USDC-PR 303409
   riverac@reichardescalera.com

   255 Ponce de León Avenue
   MCS Plaza, 10th Floor
   San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Eric Winston** (*pro hac vice*)
ericwinston@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Brant Duncan Kuehn** (*pro hac vice*)
brantkuehn@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

Co-Counsel for the COFINA Senior Bondholders

44

## CERTIFICATE OF SERVICE

    I hereby certify that on March 18, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties of record.

                            /s/ Daniel Salinas
                            USDC-PR 224006